EXECUTION VERSION

**Shared Services Agreement**

**by and between**

**Ally Financial Inc.**
**and**
**Residential Capital, LLC**

**Effective as of May  ___, 2012**

*1.*   *DEFINITIONS.* ....................................................................................... *1*

   **1.1**   Definitions. ........................................................................................ 1
*2.*   *TERM AND RENEWAL* ....................................................................... *4*

   **2.1**   Initial Term. ...................................................................................... 4
   **2.2**   Renewal. ............................................................................................ 4
*3.*   *SERVICES.* ............................................................................................ *5*

   **3.1**   Services. ............................................................................................ 5
   **3.2**   Additional Services. ......................................................................... 6
   **3.3**   Changes to Services/Change Control Procedures. ............................ 6
   **3.4**   Recipients' Obligations. ................................................................... 7
   **3.5**   Required Consents. ............................................................................ 7
   **3.6**   Security Level; Additional Security Measures. ................................ 8
*4.*   *USE OF AFFILIATES AND SUBCONTRACTORS.* ................................ *8*

   **4.1**   Affiliates and Subcontractors. .......................................................... 8
   **4.2**   Compliance. ....................................................................................... 9
*5.*   *RELATIONSHIP MANAGEMENT.* ....................................................... *9*

   **5.1**   Relationship Managers. .................................................................... 9
   **5.2**   Governance Model. ........................................................................... 9
   **5.3**   Reports. ............................................................................................. 9
   **5.4**   Regulatory Review. ......................................................................... 10
   **5.5**   Books and Records; Audit. ............................................................. 10
   **5.6**   Books and Records; Audit. ............................................................. 10
   **5.7**   Informal Dispute Resolution Procedures. ...................................... 10
   **5.8**   Continued Performance. .................................................................. 10
*6.*   *FACILITIES.* ....................................................................................... *11*

   **6.1**   Use of Recipient Facilities. ............................................................ 11
   **6.2**   Supplier Facilities and Systems. .................................................... 12
   **6.3**   Physical Security for Facilities. ..................................................... 12
*7.*   *INTELLECTUAL PROPERTY AND PROPRIETARY RIGHTS* ............. *12*

   **7.1**   Ownership of Pre-Existing Intellectual Property. .......................... 12
   **7.2**   Development of Intellectual Property. ............................................ 12
   **7.3**   Limited License to Use Supplier Work Processes and Software. .... 13
   **7.4**   No Implied Licenses. ...................................................................... 13
*8.*   *RECIPIENT DATA.* ............................................................................. *13*

   **8.1**   Definition. ....................................................................................... 13
   **8.2**   Ownership. ...................................................................................... 13
   **8.3**   Data Security. ................................................................................. 14
*9.*   *CONFIDENTIALITY.* ........................................................................... *14*

   **9.1**   Obligations. .................................................................................... 14
   **9.2**   Excluded Information ...................................................................... 14
   **9.3**   Compelled Disclosure. .................................................................... 15
   **9.4**   Return of Information. ..................................................................... 15
   **9.5**   Exception. ....................................................................................... 15

| | | |
|---|---|---|
| **9.6** | Obligations. | 15 |
| **9.7** | Loss of Confidential Information. | 16 |
| **9.8** | No Implied Rights. | 16 |
| **10.** | **COMPENSATION.** | **16** |
| **10.1** | General. | 16 |
| **10.2** | Taxes. | 16 |
| **10.3** | Invoicing and Payment. | 16 |
| **11.** | **REPRESENTATIONS AND WARRANTIES.** | **17** |
| **11.1** | Services. | 17 |
| **11.2** | Maintenance. | 17 |
| **11.3** | Authorization. | 17 |
| **11.4** | Viruses. | 17 |
| **11.5** | Disclaimer. | 17 |
| **12.** | **INSURANCE.** | **17** |
| **12.1** | Insurance. | 17 |
| **12.2** | Risk of Loss. | 18 |
| **13.** | **INDEMNIFICATION AND LIMITATIONS ON LIABILITY.** | **18** |
| **13.1** | Indemnification. | 18 |
| **13.2** | Limitations on Liability. | 21 |
| **13.3** | Indemnification and Limitations on Liability Relating to Negligence and Strict Liability. | 22 |
| **13.4** | Exclusive Remedy. | 23 |
| **13.5** | Insurance. | 23 |
| **14.** | **TERMINATION.** | **23** |
| **14.1** | Termination. | 23 |
| **14.2** | Termination Following Sale. | 24 |
| **14.3** | Election of Terminating Party. | 24 |
| **14.4** | Survival. | 24 |
| **14.5** | Rights Upon Termination or Expiration; Sale. | 24 |
| **14.6** | Dedicated Assets. | 25 |
| **14.7** | Transition Services Agreement. | 25 |
| **15.** | **FULLY INTEGRATED AGREEMENT.** | **25** |
| **16.** | **GENERAL.** | **26** |
| **16.1** | Acknowledgement. | 26 |
| **16.2** | Binding Effect; No Assignment. | 26 |
| **16.3** | Counterparts. | 27 |
| **16.4** | Entire Agreement. | 27 |
| **16.5** | Force Majeure. | 27 |
| **16.6** | Further Assurances. | 28 |
| **16.7** | Governing Law; Jurisdiction and Forum; Waiver Of Jury Trial. | 28 |
| **16.8** | Headings. | 28 |
| **16.9** | Independent Contractors. | 28 |

ny-1040886

**16.10**  Notices.  ................................................................................................ 28
**16.11**  Public Announcements.  ................................................................................ 29
**16.12**  Amendments and Waivers.  .......................................................................... 29
**16.13**  Severability.  ............................................................................................... 30
**16.14**  No Third Party Beneficiaries.  ..................................................................... 30
**16.15**  Order of Precedence.................................................................................... 30

ny-1040886

12-12020-mg    Doc 3209-1    Filed 03/18/13    Entered 03/18/13 08:48:53    Exhibit A-F
Pg 5 of 66

**SCHEDULES**

Schedule A-1          Parent Services
Schedule A-2          Reverse Services
Schedule A-3          Planned IT Projects
Schedule B            Governance Model
Schedule C            Pricing Methodology
Schedule C-1          Pricing for Parent Services
Schedule C-2          Pricing for Reverse Services
Schedule D-1          List of AFI Recipients and Supported Facilities
Schedule D-2          List of ResCap Recipients and Supported Facilities
Schedule E            Form of Supplement

iv

# SHARED SERVICES AGREEMENT

This Shared Services Agreement (this "**Agreement**") is entered into on this __ day of May   , 2012 and effective as of  the date this Agreement is approved by the Bankruptcy Court (the "**Effective Date**") by and between Residential Capital, LLC, a Delaware limited liability company ("**ResCap**") and Ally Financial Inc., a Delaware Corporation ("**AFI**").

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows.

**1.**                              **DEFINITIONS.**

**1.1**   <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

"**Additional Services**" has the meaning set forth in **<u>Section 3.2</u>**.

"**Affiliate**" means, with respect to any specified Person, (a) those other Persons with respect to which such specified Person directly or indirectly owns or controls more than 50% of the voting equity securities of such other Person, (b) those other Persons that directly or indirectly own or control more than 50% of the voting equity securities of such specified Person, and (c) as to the Persons identified in the preceding clauses (a) and (b), those Persons that directly or indirectly own or control more than 50% of the voting equity securities of such identified Persons; <u>provided</u>, <u>however</u>, that, for purposes of this Agreement:  (a) ResCap and its direct and indirect Subsidiaries shall not be deemed to be Affiliates of AFI; and (b) only the direct and indirect Subsidiaries of ResCap shall be deemed to be the Affiliates of ResCap.

"**Bankruptcy Court**" means the bankruptcy court in which the chapter 11 case(s) of ResCap and/or its Subsidiaries are pending.

"**Bankruptcy Code**" means title 11 of the United States Code**.**

"**Buyer**" means one or more purchasers of all or substantially all of the assets of ResCap and certain of its Subsidiaries pursuant to the Sale.

"**Change**" means any change or modification in the Services, or the schedule for performing such Services.

"**Charges**" has the meaning set forth in **<u>Schedule C</u>**.

"**Claim**" has the meaning set forth in **<u>Section 13.1(d)(1)</u>**.

"**Claim Notice**" has the meaning set forth in **<u>Section 13.1(d)(1)</u>**.

"**Completion**" has the meaning set forth in **<u>Section 14.3(c)(3)</u>**.

"**Confidential Information**" has the meaning set forth in **<u>Section 9.1</u>**.

"**Customized Services**" has the meaning set forth in **<u>Section 3.3(a)</u>**.

"**Damages**" has the meaning set forth in **<u>Section 13.1(a)</u>**.

 "**Dedicated Assets**" means any Supplier's third party contracts, Supplier Equipment, Supplier

Personnel and Supplier Software primarily dedicated to providing Services to Recipient.

"**Equipment**" means computer and telecommunications equipment (without regard to the entity owning or leasing such equipment) including:  (a) servers, personal computers, and associated attachments, accessories, peripheral devices, printers, cabling and other equipment; and (b) private branch exchanges, multiplexors, modems, CSUs/DSUs, hubs, bridges, routers, switches and other telecommunications equipment.

"**Force Majeure Event**" has the meaning set forth in **Section 16.5(a)**.

"**Functional Service Areas**" means the categories of Parent Services or Reverse Services that are set forth under **Schedule C-1** or **Schedule C-2**, as applicable

"**Governmental Authority**" means any government or political subdivision, board, commission or other instrumentality thereof, whether federal, state, local or foreign.

"**Include**" and its derivatives means including without limitation.  This term is as defined whether or not capitalized in this Agreement.

"**Indemnified Parties**" has the meaning set forth **Section 13.1(a)**.

"**Indemnifying Party**" has the meaning set forth **Section 13.1(d)**.

"**Initial Term**" has the meaning set forth in **Section 2.1**.

"**Intellectual Property**" or "**IP**" means any of the following, whether subsisting now or in the future anywhere in the world:  (a) patents and pending patent applications; (b) trademarks, service marks, trade names and trade dress, and associated goodwill and rights of publicity and all rights associated therewith; (c) copyrights, including copyrights in works of authorship and computer Software; (d) confidential and proprietary information, including trade secrets and proprietary algorithms; (e) data base rights; (f) design rights and rights in designs; (g) rights in domain names; (h) rights in know-how; (i) all other intellectual property rights subsisting now or in the future, anywhere in the world; and (j) registrations, right to register and pending applications for registration of the foregoing, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force throughout the world (including rights in any of the foregoing); and (k) any and all causes of action arising from or related to any of the foregoing.

"**Intellectual Property Rights**" means any and all common law, statutory and other rights in Intellectual Property honored and/or enforceable under any Laws.

"**Law**" means any applicable order, writ, injunction, decree, judgment, ruling, statute, law, rule or regulation of any federal, state, municipal or local government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, court or tribunal or any arbitrator or arbitral body.

"**New Developments**" means new Systems implemented by Supplier that are substantially different from the existing Systems, including major replacements to existing Systems and any directly related major replacements to work processes, policies and procedures implemented by Supplier.

"**Parent Services**" has the meaning set forth in **Section 3.1(a)**.

"**Parties**" means AFI and ResCap.

"**Person**" means any individual, partnership, firm, corporation, association, joint venture, limited

liability company, trust or other entity, or any governmental entity.

"**Plan**" means ResCap's and certain of its Subsidiaries' chapter 11 plan(s) of reorganization or liquidation under the Bankruptcy Code.

"**Planned IT Projects**" has the meaning set forth in **Section 3.1(g)**.

"**Pre-Existing Intellectual Property**" has the meaning set forth in **Section 7.1**.

"**Recipient**" (i) in the case of Parent Services means ResCap and its Affiliates listed on **Schedule D-1**, and (ii) in the case of Reverse Services means AFI and its Affiliates listed on **Schedule D-2**.

"**Recipient Data**" has the meaning set forth in **Section 8.1**.

"**Recipient Equipment**" means all Equipment owned or leased by a Recipient and used in connection with the Services.

"**Recipient Facilities**" has the meaning set forth in **Section 6.1(a)**.

"**Recipient Software**" means all Software owned by, or provided under license to, Recipient and used in connection with the Services (and all modifications, replacements, upgrades, enhancements, documentation, materials and media relating to the foregoing).

"**Recipient System**" means an interconnected grouping of Recipient Equipment and/or Recipient Software used in connection with the Services, and all additions, modifications, substitutions, upgrades or enhancements thereto.

"**Relationship Manager**" has the meaning set forth in **Section 5.1**.

"**Required Consents**" means the consents, if any, required from third parties in connection with Supplier's provision, and Recipient's receipt, of the Services.

"**Reverse Services**" has the meaning set forth in **Section 3.1(a)**.

"**Sale**" means a sale of all or substantially all of the assets of ResCap and/or certain of its Subsidiaries pursuant to the Plan or section 363 of the Bankruptcy Code.

"**Services**" means all or any of Parent Services, Reverse Services, Customized Services, Termination Assistance Services, provided by a Supplier, as applicable given the context.

"**Software**" means programs and programming (including the supporting documentation, media, on-line help facilities and tutorials).

"**Statement(s) of Work**" means the mutually agreed internal documents that set forth the Services in respect of the Functional Service Areas that are identified in **Schedule A-1** or **Schedule A-2**, as applicable.

"**Subcontractors**" means Supplier's contractors or other agents of Supplier that perform a portion of the Services.

"**Subsidiaries**" means, with respect to any specified Person, those other Persons with respect to which such specified Person directly or indirectly owns or controls more than 50% of the voting equity securities of such other Person.

"**Supplement**" has the meaning set forth in **Section 3.2**.

"**Supplier**" means (i) in the case of Parent Services, AFI and any AFI Affiliates that provide

such Services, and (ii) in the case of Reverse Services, ResCap, and any ResCap Affiliates that provide such Services. For purposes of clarity, all references to "Supplier" refer only to the Party that is acting as the "Supplier" with respect to the Equipment, Software and other applicable responsibilities for the Services being performed by such Party in its capacity as the "Supplier".

"**Supplier Equipment**" means Equipment owned or leased by the Party that in its capacity as the "Supplier" hereunder, or an Affiliate or Subcontractor of such Party, and used in connection with the Services.

"**Supplier Facilities**" has the meaning given in **Section 6.2**.

"**Supplier Personnel**" means those employees, representatives, contractors, Subcontractors and agents of the Party that is acting in its capacity as the "Supplier" hereunder, who perform any Services under this Agreement.

"**Supplier Software**" means all software programs and programming owned by, or provided under license to, the Party that is acting in its capacity as the "Supplier" and used to provide the Services (and all modifications, replacements, upgrades, enhancements, documentation, materials and media relating to the foregoing).

"**Supplier System**" means an interconnected grouping of Supplier Equipment and/or Supplier Software used in connection with the Services, and all additions, modifications, substitutions, upgrades or enhancements thereto.

"**Systems**" means Recipient Systems and Supplier Systems or any of them.

"**Term**" has the meaning set forth in **Section 2.2**.

"**Termination Assistance Services**" has the meaning set forth in **Section 14.5(a)**.

"**Termination Service Periods**" has the meaning set forth in **Section 14.5(a)**.

"**Third Party Claim**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Third Party Claim Notice**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Transition Services Agreement**" has the meaning set forth in **Section 14.5(a)**.


## 2.                    TERM AND RENEWAL

**2.1**  Initial Term.  The initial term of this Agreement begins on the Effective Date and continues through and until midnight Eastern Time on the one (1) year anniversary of the date on which ResCap and  certain of  its Subsidiaries file voluntary petitions ("**Petitions**") for relief under Chapter 11 of the Bankruptcy Code, as amended (the "**Initial Term**"), unless earlier terminated or extended in accordance with the terms of this Agreement and except for any Service that has been terminated in accordance with the terms of this Agreement.

**2.2**  Renewal.  The Initial Term will be automatically extended for additional periods of one (1) year each unless either Party provides to the other Party written notice of nonrenewal at least three (3) month prior to the expiration of the then-current Term.  The Initial Term as extended by any such additional period(s) (if any) shall be referred to as the "**Term**".

3.                          **SERVICES.**

   3.1  Services.

         **(a)** Performance.  AFI will provide the Services within each of the Functional
Service Areas listed in **Schedule A-1** (the "**Parent Services**"), and ResCap will provide the
Services within each of the Functional Service Areas listed in **Schedule A-2** (the "**Reverse
Services**"), in each case beginning on the Effective Date.  Services provided by a Supplier
under this Agreement may be provided by that Supplier directly or through any of its
Affiliates and/or Subcontractors at Supplier's discretion.  A Supplier will not be relieved of
any of its obligations under this Agreement as a result of the provision of Services by any of
Supplier's Subsidiaries or other Supplier Personnel pursuant to this **Section 3.1(a)**.  Supplier
agrees that it will not enter into any new Subcontracting arrangement that would involve the
transfer to a Subcontractor or another third party of Recipient's personal information, without
the prior written consent of the other Party.  The Supplier Personnel providing Services will
at all times be qualified to provide the Services assigned to them.

         **(b)** Recipients and Facilities.  Supplier will provide the Services to Recipient
at the Recipient Facilities for which such Services are provided as of the Effective Date or,
with respect to any particular Services, such other locations as may be specifically identified
in **Schedule D-1** or **Schedule D-2** with respect to such Services.  Supplier will negotiate in
good faith to provide Services in support of any new Recipient or additional Recipient
Facility, but shall not be obligated to provide Services to new Recipients or additional
Recipient Facilities unless the pricing and terms for such new Recipients or facilities has
been agreed upon by the Parties.

         **(c)** Service Standards.  Supplier will perform or cause to be performed the
Services referenced in the applicable Statement(s) of Work, to Recipient (i) with reasonable
skill, care and diligence; and (ii) performed in substantially the same manner (including
historic levels of service, historical usage levels and geographic provisioning) that such
Services were generally performed by Supplier for Recipient immediately prior to the
Effective Date and thereafter in substantially the same manner (including historic levels of
service, historical usage levels and geographic provisioning) as Supplier generally performs
such Services for its own businesses in accordance with its then-current processes and
procedures (except to the extent such Services differ because of the need to follow legal
corporate formalities and to keep Recipient Data separate from Supplier data, or as may be
mutually agreed through the Parties' change control principles pursuant to **Sections 3.2** and
**3.3**).  In no event will Supplier be required to make any customization to the Services (or
Supplier's associated Systems or processes) that are unique to Recipient, except for
customizations that are expressly agreed upon in accordance with **Sections 3.2** and **3.3**.  Each
Party acting in its capacity as Recipient shall, and such Party shall cause all of its Affiliates
that are Recipients to, comply with any applicable terms and conditions of third party
contracts used by Supplier in connection with the Services.

         **(d)** Implied Services.  If any services, functions or responsibilities performed
by Supplier for Recipient as of the Effective Date are not specifically described in this
Agreement but are necessary for Supplier to perform or provide the Services described in this

ny-1040886

Agreement in accordance with **Section 3.1(c)**, such services, functions or responsibilities shall be deemed to be included within the scope of the Services to the same extent and in the same manner as if specifically described in this Agreement, except to the extent otherwise specified in this Agreement and excluding all services, functions and responsibilities of Recipient under this Agreement (including any services, functions or responsibilities not specifically described in this Agreement but are necessary for Recipient to perform or provide such services, functions and responsibilities described in this Agreement). Except as otherwise expressly provided in this Agreement, as between the Parties, Supplier shall be responsible for providing the facilities, personnel and other resources as necessary to provide the Services consistent with the requirements of **Section 3.1(c)**.

       **(e)** <u>Not a Requirements Contract</u>.  This Agreement will not be construed as a requirements contract and will not be interpreted to prevent Recipient from obtaining from third parties, or providing itself, any or all of the Services or similar services.

       **(f)** <u>Dedicated Assets</u>.  Upon the reasonable request of either Party, the Parties will work together in good faith to identify the Dedicated Assets, and with respect to Supplier Personnel that are Dedicated Assets, on a Service-by-Service basis:  (i) the number of individuals providing such Service; (ii) the title of each such individual providing such Service (e.g., senior accountant, deputy general counsel, human resources manager, etc.); and (iii) the amount of time that each such individual spends providing such Service on a full-time equivalent (FTE) basis (e.g., 0.4 FTE).

       **(g)** <u>Planned IT Projects</u>.  **Schedule A-3** to this Agreement sets forth a list of IT projects that are planned or ongoing as of the Effective Date (the "**Planned IT Projects**"). ResCap acknowledges and agrees that (i) the Services will be modified during the Term by and in accordance with each Planned IT Project, and (ii) the Planned IT Projects are necessary for the maintenance, upgrade, safety, or security of the AFI environment. ResCap will pay to AFI the portion of each Planned IT Project as applicable to Recipient, in accordance with **Schedule A-3** so long as ResCap or its Affiliates continue to receive Services that are based on or involve the use of AFI's IT environment.  ResCap will provide to AFI cooperation and assistance as necessary or reasonably requested by AFI to allow AFI to implement each Planned IT Project.

    **3.2** <u>Additional Services</u>.  A Party may, from time to time during the Term, upon at least ninety (90) days prior written notice to the other Party, request that the other Party provide additional services, functions and responsibilities not within the scope of the Services provided by the performing Party ("**Additional Services**").  Any such Additional Services will be provided under supplements to **Schedule A-1** or **Schedule A-2**, as applicable entered into by the Parties ("**Supplements**") for the charges set forth therein and mutually agreed upon. Supplements shall be in the form of **Schedule E**.  During the ninety (90) day period after the Effective Date, the Parties will work together to define a process reasonably satisfactory to the Parties that will be used to (a) submit and prioritize requests for Additional Services and (b) create and execute Supplements for Additional Services.

    **3.3** <u>Changes to Services/Change Control Procedures</u>.

ny-1040886

(a) Customized Services.  Supplier shall only provide Services customized for Recipient ("**Customized Services**") in accordance with this **Section 3.3**, and shall not otherwise be required to make customizations to the Services or Supplier Systems.

(b) Changes Requested by Recipients.  Recipient from time to time, upon at least thirty (30) days notice may require that the Supplier decrease or reasonably increase the Services provided to Recipient and the Charges shall be modified in accordance with the procedures set forth in Exhibit C. A Party may, from time to time during the Term, upon at least ninety (90) days prior written notice to the other Party, request that the other Party provide Customized Services.  If the Parties mutually agree on the provision of Customized Services, such request for Customized Services and such Customized Services will be provided under Supplements to **Schedule A-1** or **Schedule A-2**, as applicable.  Before Supplier is required to provide any Customized Services, the Parties shall jointly agree on the applicable Charges for any agreed Customized Services, including any Charges that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with any changes to the Services.

(c) Changes Required by Applicable Law.  If Customized Services are necessary in order to comply with applicable Laws or changes to Supplier's third party contracts, Supplier will provide such Customized Services unless (i) such Customized Services require a material change to a Supplier System, or the implementation of a new Supplier System, or (ii) providing such Customized Services is not practicable given the then-current characteristics of the Supplier Systems, and the use thereof for Supplier and its Affiliates, and subject to the Parties jointly agreeing on the applicable Charges for such Customized Services.  Any such Customized Services will be provided under Supplements to **Schedule A-1** or **Schedule A-2**, as applicable.  The Parties will negotiate in good faith in order to promptly agree on the applicable charges for any such necessary Customized Services.  If providing such Customized Services is not practicable given the Supplier Systems, Recipient may purchase such services from a third party, provided that the Parties must agree on (A) the activities required to transition the affected Services from Supplier to such third party, (B) the impact on the remaining Services, and (C) the Charges associated with removing such Services and (D) the Charges for the remaining Services.

**3.4** Recipients' Obligations.  Supplier's failure to perform its obligations under this Agreement will be excused (and any rights of the Recipient arising as a consequence of such failure will not be exercised by the Recipient) if and to the extent such Supplier non-performance is caused by (a) the wrongful or tortuous actions of Recipient or a third party contractor performing obligations on behalf of Recipient under this Agreement, or (b) the failure of Recipient or such a third party contractor to perform such Recipient's obligations under this Agreement.  Recipient will be responsible for any additional costs incurred by Supplier in connection with providing the Services as a result of any such failure.  Supplier will use commercially reasonable efforts to perform its obligations notwithstanding such failure, provided that Recipient works with Supplier through the Relationship Managers to remedy the failure.

**3.5** Required Consents.

(a) <u>Responsibility</u>.  Each Party will be responsible for obtaining any Required Consents required under its own third party contracts pertaining to any Software, Equipment, Systems or other materials or associated services required in connection with the Services under this Agreement.  Such responsibility shall include the administrative activities necessary to obtain the Required Consents and payment of the fees and/or expenses associated with obtaining the Required Consents.  In the event of a pending Sale or upon termination of any Service(s) or this Agreement, the Parties will cooperate in order to determine and obtain any Required Consents necessary in order to transition any Software, Equipment, Systems or other materials to the other Party and/or the Buyer(s).

(b) <u>Contingent Arrangements</u>.  If, despite using commercially reasonable efforts, either Party is unable to obtain a Required Consent for which it is responsible under **<u>Section 3.5(a)</u>**, such Party will use commercially reasonable efforts to obtain a replacement license, product or right, as applicable.  If such replacement cannot be obtained using commercially reasonable efforts, the Parties will work together in good faith to develop a mutually acceptable alternative arrangement that is sufficient to enable Supplier to provide, and Recipient to receive the Services without such Required Consent.  The Party responsible for obtaining the Required Consent will be financially responsible for the costs of such alternative arrangement.  If the Parties can not reach a resolution under **<u>Section 3.5</u>**, either Party may require that the affected Services be discontinued in which case the Charges for Services will be equitably adjusted to account for such discontinuation.

**3.6**  <u>Security Level; Additional Security Measures</u>.  Supplier may take physical or information security measures (a) that affect the manner in which the Services are provided to maintain Supplier's current level (or, if greater, an industry-standard level) of physical and electronic security (including data security and data privacy) during the Term and (b) that address any new security-related issues, including compliance with applicable law and governmental orders related to security and issues in connection with new technologies or threats.  Supplier shall provide Recipient reasonable, prior written notice of any such physical or information security measures that are material to Supplier's delivery of the Services.  Recipient shall provide all assistance reasonably requested by Supplier in connection with such security measures.  Recipient shall pay to Supplier increased Charges for the applicable Services that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with such security measures with respect to the Services provided to Recipient under this Agreement.

**4.**                          **USE OF AFFILIATES AND SUBCONTRACTORS.**

**4.1**  <u>Affiliates and Subcontractors</u>.

(a) <u>Use of Affiliates and Subcontractors</u>.  Subject to **<u>Section 3.1(a)</u>**, Supplier will have the right to use Affiliates and Subcontractors to assist Supplier in the provision of the Services.  Supplier shall adhere to Supplier's then-current "Third Party Vendor Management" policies when engaging Subcontractors to perform Services under this Agreement.  In respect of any material Services for which Supplier desires to engage a Subcontractor, Supplier shall seek and obtain Recipient's approval of such Subcontractor, which approval Recipient shall not unreasonably withhold or delay; provided, however, that

8

12-12020-mg   Doc 1820-7   Filed 10/23/12   Entered 10/23/12 01:41:43   Exhibit A-
Woehr Decl at 6 of   Pg 14 of 66
Part 6 of Pg 22 of 78

all Subcontractors engaged or otherwise performing services for Supplier as of the Effective Date are hereby deemed approved by Recipient.

      **(b)** <u>Supplier Responsibility for Affiliates and Subcontractors</u>. Supplier shall remain responsible for the Services performed by its Affiliates and Subcontractors to the same extent as if such Services were performed by such Supplier. In the event that Supplier's subcontractor(s) fails to perform their obligations for which Supplier is utilizing them under this Agreement, Supplier will not be responsible or liable for such failure. However, Supplier will exercise any rights that it may have under its contract with the Subcontractor to cause the Subcontractor to resolve or cure any such failure within a reasonable time period, taking into consideration the circumstances of such failure, the nature of the services and the impact that such failure has on the Recipient. If such failure is not resolved or cured within a reasonable time period, Supplier will exercise any rights that it may have under its contract with the Subcontractor in the same manner that Supplier responds to such failure with respect to the services such Subcontractor provides for Supplier or Supplier's Affiliates businesses, taking into consideration the circumstances of such failure, the nature of the services and the impact that such failure has on the Recipient. Supplier shall be Recipient's sole point of contact regarding the Services, including with respect to payment. In addition, each Party, in its capacity as Supplier, will monitor and manage (including any necessary audits as to data privacy and security) its Subcontractors being used to perform Services for Recipient in compliance with Supplier's third party vendor management policies and procedures throughout the Term and any renewal or extension of the Agreement.

      **4.2** <u>Compliance</u>. Supplier will cause its employees and agents as well as the employees of its Affiliates and Subcontractors while at Recipient Facilities, to comply with the personnel, operational, safety and security procedures, policies, rules and regulations applicable to Recipient employees and agents and the Recipient Facilities, of which they have been given notice in advance by Recipient.

**5.**                           **RELATIONSHIP MANAGEMENT.**

      **5.1** <u>Relationship Managers</u>. Each Party will appoint an individual (each, a "**Relationship Manager**") who, from the Effective Date until replaced by the appointing Party, will serve as that Party's representative under this Agreement. Each Relationship Manager will (a) have overall responsibility for managing and coordinating the performance of the appointing Party's obligations under this Agreement, and (b) be authorized to act for and on behalf of the appointing Party concerning all matters relating to this Agreement. Neither Party will reassign a Relationship Manager, unless it provides at least ten (10) days prior written notice to the other Party. If a Relationship Manager ceases to be employed by the Party that appointed it or is reassigned by such Party, such Party will promptly appoint a new Relationship Manager and provide written notice to the other Party of the new Relationship Manager so appointed.

      **5.2** <u>Governance Model</u>. The Parties will conduct meetings and manage interactions in accordance with the governance model described in **<u>Schedule B</u>**.

**5.3**   Reports.  Each Party will provide to the other Party the reports described in the applicable Statement of Work, in the format and at the frequencies specified therein. In addition, ResCap will provide AFI access to such information and reports in their possession and control about ResCap and its direct and indirect Affiliates as AFI requests from time to time for regulatory reporting, audit, risk management, compliance, corporate governance, bank and/or bank holding company supervision and/or examination, and or other business purposes.

**5.4**   Regulatory Review.  Each Party will notify the other promptly of any formal request or order by a governmental agency or regulator or any internal or external audit examination or request to examine records regarding Recipient that are maintained by Supplier or to audit Supplier's performance of the Services.  Supplier will cooperate with any such examination or audit.  Recipient will reimburse Supplier for the actual and reasonable out-of-pocket costs Supplier incurs in connection with that examination or audit.

**5.5**   Books and Records; Audit.  Each Party acting in its capacity as a Supplier will, and will cause its Affiliates providing Services hereunder to, keep books of account and other records, in reasonable detail and in accordance with generally accepted accounting principles, consistently applied, as to the Charges for providing the Services to Recipient pursuant to this Agreement, and shall make such books of account and other records available to Recipient (and to any Governmental Authority that desires to audit Recipient) for inspection during normal business hours in a non-disruptive manner so as not to disrupt Supplier's business operations during the Term and for twenty-four (24) months thereafter for the purpose of performing audits and inspections of Supplier, related to the Services performed under this Agreement to: verify the accuracy of Charges and invoices.

**5.6**   Each Party acting in its capacity as a Supplier shall, and will cause its Affiliates providing Services hereunder to, use commercially reasonable efforts to provide to such auditors, inspectors, regulators, and representatives, at Recipient's sole cost and expense, such assistance as they reasonably require.  Recipient's auditors and other representatives shall comply with Supplier's security and confidentiality policies, procedures and requirements. All such inspections or audits may be performed only by an independent third party auditing firm of national standing that has a written agreement with Recipient in which such third party agrees (i) to confidentiality obligations no less protective of Supplier than Recipient's confidentiality obligations under this Agreement and (ii) not to share with Recipient the Supplier information provided in connection with such inspection or audit, other than the findings and conclusions of the audit report.

**5.7**   Informal Dispute Resolution Procedures.   The informal dispute resolution procedures applicable to disputes under or in connection with this Agreement are set forth in **Schedule B**.

**5.8**   Continued Performance.  Each Party agrees that it will, unless otherwise directed by the other Party, continue performing its obligations under this Agreement while any dispute is being resolved until this Agreement expires or is terminated in accordance with its terms, provided, however, that in the case of a dispute with regards to a Party's alleged failure to pay amounts in excess of two (2) times the average monthly Charges for the Services provided

hereunder to such Party or its Affiliates, Supplier may suspend its performance of the Services until the earlier of such dispute is resolved or this Agreement is terminated; provided, further, that if Recipient pays such disputed amounts, (a) Supplier will continue to perform its obligations under this Agreement and (b) such payment will not constitute a waiver of any claims Recipient may have with respect to such disputed amounts.

**6.**                        **FACILITIES.**

    **6.1**   Use of Recipient Facilities.

    **(a)**   General.   Except as expressly set forth otherwise in any applicable Statement(s) of Work, each Party will, and will cause its Affiliates to, acting in its capacity as "Recipient", provide to Supplier, at no charge, the space, office furnishings, janitorial service, telephone service, utilities (including air conditioning) and office-related equipment, supplies, and duplicating services at Recipient's premises that Supplier may reasonably need to provide the Services (collectively, the "**Recipient Facilities**").   In addition, each Party will, and will cause its Affiliates to, acting in its capacity as "Recipient" provide necessary storage space for backup data files related to the Services and will provide additional storage space that may be required by any change in retention schedules required by Recipient.   Supplier's employees will have reasonable access to the Recipient Facilities twenty-four hours a day, seven days a week; provided, however, that in times of emergency, turnaround or significant maintenance or construction activity, access may be restricted or denied if not required in connection with such emergency, turnaround, maintenance or construction.   In such an event, Supplier will be excused from its performance of the Services to the extent Supplier is unable to provide the Services in accordance with the requirements of this Agreement as a result of such restricted access.

    **(b)**   Relocation.   If Recipient contemplates or makes a final decision to alter or relocate any of the Recipient Facilities or if a Change of Control is pending that will require Supplier to relocate any of its personnel or Equipment from any Recipient Facility and the alteration or relocation could reasonably be expected to impact the Services (including the cost to perform, timing, ability to perform or level of performance) then Recipient will provide Supplier with sufficient advance notice of that fact to allow Supplier a reasonable amount of time to prepare for and implement the alteration or relocation as it impacts Supplier.   The Parties acknowledge that in the case of a Change of Control it is likely that personnel and Equipment of each Party will be required to be relocated from the other Party's facilities.   The Parties will work together in good faith for a planned and orderly process for such relocation, timed as much as possible to coincide with the scheduled completion of migration of all Services provided by each of them for the other from such facility, and each Party will bear its own relocation costs and expenses.   Before requiring Supplier to relocate from any Recipient Facilities, the Parties will agree on any adjustments to (i) the Services that may be required as a result of the alteration or relocation, and (ii) Supplier's Charges that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with the alteration or relocation.

    **(c)**   Supplier's Obligations.   Supplier will (i) keep the Recipient Facilities in good order, and (ii) not commit waste or damage to those facilities or use those facilities for

ny-1040886

any purpose other than providing the Services (and appropriate incidental use for internal Supplier administrative tasks unrelated to other customer accounts or Supplier marketing efforts).

(d)  Access to Recipient Systems.  Supplier will limit its, and will require that all Supplier Personnel who have access to Recipient Systems will limit their, access to those portions of such Recipient Systems for which they are authorized in connection with the Services.  Supplier will limit such access to those Supplier Personnel who are needed in order to provide the Services.  Supplier will cooperate with Recipient in the investigation of any apparent unauthorized access by Supplier Personnel to the Recipient Systems.

6.2  Supplier Facilities and Systems.

(a)  Supplier Facilities.  Supplier may perform the Services in such facilities maintained by or for Supplier or its Affiliates or Subcontractors (collectively, "**Supplier Facilities**") as Supplier reasonably deems appropriate, so long as appropriate security procedures have been implemented and are being observed at the Supplier Facilities.  While at Supplier Facilities, each Party will, and will cause its and its Affiliates' personnel to, in its capacity as "Recipient", comply with Supplier's reasonable security requirements and other relevant policies of which they have been given notice.

(b)  Access to Supplier Systems.  Each Party in its capacity as Recipient will limit its, and will require that all Recipient personnel who have access to Supplier's computer or electronic data storage systems to, limit their, access to those portions of such systems for which they are authorized in connection with their receipt and use of the Services.   Each Party in its capacity as Recipient will (i) limit such access to those Recipient personnel who are authorized to use the Services, (ii) subject to Recipient's record retention policy, make available, upon Supplier's request, to Supplier a written list of the names of each individual who has been granted such access, and (iii) adhere to Supplier's security rules and procedures for use of Supplier's systems.  All user identification numbers and passwords disclosed to the Recipients to permit Recipient personnel to access the Supplier systems will be deemed to be, and will be treated as, Supplier's Confidential Information.  Recipient will cooperate with Supplier in the investigation of any apparent unauthorized access by Recipient personnel to Supplier's systems.

6.3  Physical Security for Facilities.  Supplier will be responsible for all security procedures at any Supplier Facilities.  Each Party as Recipient will provide all necessary security personnel and security equipment at the Recipient Facilities.  While at the Recipient Facilities, each Party as Supplier will cause all Supplier Personnel to comply with Recipient's physical security procedures, as made known to Supplier's Relationship Manager.

7.                                    INTELLECTUAL PROPERTY AND PROPRIETARY RIGHTS

7.1  Ownership of Pre-Existing Intellectual Property.  Except as expressly provided in **Section 7.2**, and **7.3**, nothing in this Agreement shall grant or transfer any rights, title or interests in any Intellectual Property invented or created before or after the Effective Date by

or on behalf of a Party and/or its Affiliates or otherwise controlled by or licensed to such Party and/or its Affiliates (the "**Pre-Existing Intellectual Property**").  A Party's use of the other Party's Pre-Existing Intellectual Property shall not modify the ownership rights set forth above.

**7.2**  Development of Intellectual Property.   Subject to **Section 8**, as between the Parties (and without affecting Recipient's right, title and interest in and to Recipient Data or any Confidential Information of Recipient), all Intellectual Property developed or acquired by or for Supplier or any of its Affiliates in connection with providing the Services shall be owned by Supplier.  Any services that rely on New Developments are outside the scope of the Services under this Agreement and therefore would have to be separately negotiated and agreed upon by the Parties.

**7.3**  Limited License to Use Supplier Work Processes and Software.  Supplier grants to Recipient a limited, non-exclusive, non-assignable license, with the right for Recipient to grant sublicenses to its Affiliates, to use the work processes and Software owned by Supplier and/or its Affiliates that are provided to Recipient in connection with the Services solely to the extent necessary for Recipient to receive Services, and perform its responsibilities under this Agreement during the Term.  THE SUPPLIER WORK PROCESSES AND SOFTWARE AND ALL DELIVERABLES ARE PROVIDED BY SUPPLIER ON AN AS-IS BASIS.  SUPPLIER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH WORK PROCESSES AND SOFTWARE AND DELIVERABLES.

**7.4**  No Implied Licenses.  Except as expressly specified in this Agreement, nothing in this Agreement will be deemed to grant to one Party, by implication, estoppel or otherwise, license rights, ownership rights or any other Intellectual Property Rights in any work processes, Software or other materials, data or information owned by the other Party or any Affiliate of the other Party.

**8.**                                **RECIPIENT DATA.**

**8.1**  Definition.   The term "**Recipient Data**" means (i) any data or information of Recipient or its respective vendors, customers or other business partners that is provided to or obtained by Supplier in the performance of its obligations under this Agreement, including data and information regarding Recipient's businesses, customers, operations, facilities, products, consumer markets, assets and finances in whatever form or format including in the form of any analysis or compilation of such data, and (ii) any data or information collected or processed in connection with the Services, even if such data or information is contained in reports, documentation, compilations or analyses provided to Recipient as part of the Services.  For the avoidance of doubt, Supplier retains ownership of data pertaining to its performance of Services, including data pertaining to the volume and quality of the Services.

**8.2**  Ownership.   As between Recipient and Supplier, Recipient owns and will continue to own all right, title and interest in and to all Recipient Data. To the extent that

ny-1040886

Recipient Data is embedded or incorporated into reports and other documentation, analyses, compilations and other materials (including code or software) owned or licensed by Supplier ("Supplier Materials") and provided to and for use by Recipient as part of the Services, Supplier will not be deemed to have assigned or transferred any of its right, title or interest in or to any underlying Intellectual Property Rights thereto. Supplier hereby grants to Recipient a perpetual, irrevocable, royalty free, transferable (to a Buyer of all or substantially all the core business of Recipient) license to use, reproduce, display and perform (whether publicly or otherwise) and modify (and have others exercise such rights on behalf of Recipient (or Buyer)) such Supplier Materials solely as necessary for Recipient's (or Buyer's) use in the ordinary course of its mortgage related business. Recipient's (or Buyer's) use (including, without limitation, the use by any third party on behalf of Recipient (or Buyer)) of the Supplier Materials is subject to the confidentiality obligations set forth below in **Section 9** and any third party restrictions imposed on any Supplier Materials of which Supplier makes Recipient aware. Additionally, Recipient's ownership of the Recipient Data reflected in Supplier Materials shall not serve to transfer or otherwise affect any of Supplier's right, title and/or interest in and/or to any of underlying Intellectual Property Rights in any Supplier Materials. Supplier may not use Recipient Data for any purpose except: (x) to provide the Services; (y) as required by AFI as the parent of ResCap to meet its financial and regulatory reporting requirements; or (z) as otherwise permitted under this Agreement, nor may Supplier sell, assign, lease or otherwise dispose of or commercially exploit Recipient Data. Supplier acknowledges that Recipient is not restricted from using or disseminating Recipient Data in the format in which it is provided by Supplier or any different format.

**8.3** <u>Data Security</u>. Supplier will establish and maintain safeguards against the destruction, loss or alteration of Recipient Data in its possession that are no less rigorous than those for Supplier's operations. If Recipient reasonably requests additional safeguards for Recipient Data, Supplier will provide those additional safeguards as Additional Services under a new Supplement subject to **Sections 3.2** and **3.3**. Recipient has established backup security for data and keeps backup data files in its possession. If Recipient chooses to establish additional backup security and backup data files, it may do so, except that if such activities increase Supplier's cost of providing the Services or require Additional Services or Customized Services, such activities will be subject to **Sections 3.2** and **3.3**. In all instances, Recipient will ensure that Supplier will have access to the backup data files as Supplier reasonably needs to provide the Services.

**9.** **CONFIDENTIALITY.**

**9.1** <u>Obligations</u>. Each Party will retain the other Party's non-public, proprietary and confidential information with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature ("**Confidential Information**") in confidence and not disclose the same to any third party nor use the same, except as expressly permitted in this **Section 9**. As used in this Agreement, "**Confidential Information**" shall include all non-public information, in any form, furnished or made available directly or indirectly by one Party to the other that is (a) marked confidential, restricted, proprietary and/or with a similar designation and/or (b) provided under circumstances reasonably indicating that it is confidential, restricted and/or proprietary. The terms and conditions of this Agreement shall be deemed Confidential Information. In the case

14

of either Party, Confidential Information also shall include, whether or not designated "Confidential Information", (i) Software, materials and other Intellectual Property owned by the disclosing Party, and (ii) all non-public information concerning the operations, affairs and businesses of a Party or its Affiliates, the financial affairs of a Party or its Affiliates, and the relations of a Party or its Affiliates with its customers, employees and service providers (including customer lists, customer information, account information and consumer markets).

**9.2** <u>Excluded Information</u>. Excepted from the obligations of confidence and non-use under this **Section 9** is that information which:

(**a**) the receiving Party is legally required to disclose, which disclosure shall be made in accordance with the below provisions of Section 9.3;

(**b**) is independently developed by the receiving Party without reference to Confidential Information of the disclosing Party;

(**c**) was, at the time of disclosure to it, in the public domain;

(**d**) after disclosure to it, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

(**e**) was in the possession of the receiving Party at the time of disclosure to it;

(**f**) was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure.

**9.3** <u>Compelled Disclosure</u>. Notwithstanding the provisions of this **Section 9**, if the receiving Party becomes legally compelled to disclose any of the disclosing Party's Confidential Information, the receiving Party will promptly advise the disclosing Party of such legal requirement to disclose Confidential Information in order that the disclosing Party may seek a protective order, may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information in the circumstances. The receiving Party will disclose only that portion of the disclosing Party's Confidential Information that it is legally required to disclose.

**9.4** <u>Return of Information</u>. Except for Confidential Information for which a continuing license is granted to the receiving Party under this Agreement, upon written request by the disclosing Party or upon Termination or conclusion of the Agreement, all of the disclosing Party's Confidential Information in whatever form will be returned to the disclosing Party or destroyed by the Receiving Party and certified as such to the Disclosing Party, without retaining copies thereof, except that any instances of such Confidential Information in an archived form that are commercially impractical to return may be retained so long as the receiving Party does not access or make use of such Confidential Information after receipt of the written request for return from the disclosing Party.

**9.5** <u>Exception</u>. Notwithstanding anything else in this **Section 9**, Supplier will have a

right to disclose Recipient's Confidential Information to third parties to the extent reasonably necessary for Supplier to accomplish its responsibilities contemplated hereunder or for Supplier to comply with its obligations under applicable law, including its reporting obligations under applicable law, and, in the case of AFI, to use Confidential Information of ResCap to operate AFI's business, consistent with the manner such Confidential Information was used by AFI prior to the Effective Date; provided, however, that such disclosure to third parties will be made under confidentiality terms and conditions that are no less favorable to Recipient than the provisions of this **Section 9** or, if less favorable, that are consistent with Recipient's customary practice for the nature of the third party receiving Recipient's Confidential Information.

   9.6   Obligations.

   **(a)** Each Party's Confidential Information shall remain the property of that Party except as expressly provided otherwise by the other provisions of this Agreement. Except as otherwise provided in this Agreement, each Party shall each use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent disclosing to third parties the Confidential Information of the other as it employs to avoid unauthorized disclosure, publication or dissemination of its own information of a similar nature.

   **(b)** In the event of any disclosure or loss of any Confidential Information of the disclosing Party, the receiving Party shall notify the disclosing Party promptly upon become aware thereof.

   **9.7**   Loss of Confidential Information.   In the event of any disclosure or loss of any Confidential Information of the disclosing Party due to the fault of the receiving Party, the receiving Party shall promptly, at its own expense:  (a) notify the disclosing Party in writing; and (b) cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

   **9.8**   No Implied Rights.   Nothing contained in this **Section 9** shall be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to the Confidential Information of the other Party.

## 10.   COMPENSATION.

   **10.1** General.  ResCap will pay to AFI the Charges as set forth in **Schedule C-1a** and elsewhere in **Schedule C**, and AFI will pay to ResCap the Charges as set forth in **Schedule C-2a** and elsewhere in **Schedule C**.  Supplier will provide Recipient with estimated invoices (with information linking the Services delivered to the invoice amounts) on a monthly basis on or before the last day of each calendar month for all Services performed by Supplier and all related Charges incurred by Recipient during that month.   The last business day of the calendar month is the cut-off for delivered Services and related Charges to be invoiced in the next calendar month. The estimated charges will be adjusted to actual charged by the last day of the following month. Recipient will pay the estimated and adjusted actual invoices within

45 days of the receipt of an invoice from Supplier.  Any payment by Recipient is without prejudice of its right to contest the accuracy of any Charges.

**10.2** Taxes.  In addition to the prices determined pursuant to **Schedule C**, each Party will pay, and hold the other Party harmless against, all goods and services, sales, use, excise and other taxes, and other fees or assessments imposed by law in connection with the provision of the Services by the other Party, other than taxes measured by the other Party's net income.  The Parties will cooperate with each other and use commercially reasonable efforts to assist the other in entering into such arrangements as the other may reasonably request in order to minimize, to the extent lawful and feasible, the payment or assessment of any taxes relating to the transactions contemplated by this Agreement; provided, however, that nothing in this **Section 10.2** will obligate Supplier to cooperate with, or assist, Recipient in any arrangement proposed by Recipient that would, in Supplier's sole discretion, have a detrimental effect on Supplier or any of Supplier's Affiliates.

**10.3** Invoicing and Payment.  Supplier will invoice Recipient in accordance with **Schedule C**.  Payments for amounts past due will bear interest calculated on a per annum basis from the due date to the date of actual payment at a fluctuating interest rate equal at all times to the prime rate of interest announced publicly from time to time by Citibank, N.A. plus two percent (2%), but in no case higher than the maximum rate permitted by Law.  Each Party will make payments under this Agreement by electronic funds transfer in accordance with payment instructions provided by the other Party in its capacity as Supplier from time to time.

**11.**                       **REPRESENTATIONS AND WARRANTIES.**

**11.1** Services.  Supplier represents and warrants to Recipient that it will use the level of care in providing the Services required by **Section 3.1(c)**, or with respect to Services that are dedicated to Recipient (i.e., where Supplier does not provide similar services to itself or its Affiliates), Supplier will provide such Services using commercially reasonable efforts and in a workmanlike manner, and in accordance with commercially reasonable practices.

**11.2** Maintenance.  Supplier represents and warrants to Recipient that it shall provide for the maintenance of the Supplier Systems, Supplier Equipment and Supplier Software in the same manner that such functions were generally performed by Supplier for Recipient immediately prior to the effective Date and thereafter in a manner consistent with the standard of performance required by **Section 3.1(c)**, for such items to generally operate in accordance with the manner in which they operated in the past or in the manner in which they operate in the future in support of Supplier and its Affiliates.

**11.3** Authorization.  Each Party represents and warrants to the other Party that, subject to approval of this Agreement by the Bankruptcy Court:  (a) it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by this Agreement; and (b) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite corporate action on the part of such Party.

**11.4** Viruses.  Each Party represents and warrants to the other Party that it shall use the

17

same efforts that it uses with respect to its own users and Systems, to avoid computer viruses from being introduced into the Systems of the other Party under this Agreement or the Systems that such Party is using to perform Services hereunder.

**11.5** Disclaimer.  EXCEPT AS EXPRESSLY SET FORTH IN THIS **SECTION 11**, NONE OF SUPPLIER, ITS AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES MAKE OR HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE SERVICES, INCLUDING WITH RESPECT TO (A) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, (B) THE USE OF THE SERVICE BY RECIPIENT AFTER THE RECEIPT THEREOF, OR (C) THE PROBABLE SUCCESS OR PROFITABILITY OF RECIPIENT'S OR ANY OF RECIPIENT'S BUSINESS AFTER THE RECEIPT OF THE SERVICES.

## 12.                              INSURANCE.

**12.1** Insurance.  At all times during the Term and any extension hereof, unless and until the effective date of the Plan, ResCap, its Affiliates, and all of their respective directors, officers and employees will be covered under AFI's existing policies of insurance.  Upon and following the effective date of the Plan, (i) both Parties will procure and maintain in full force and effect their own insurance policies at their own expense and for their own benefit, as determined by each party independently, but consistent with any and all applicable federal, state and local laws or regulations, and (ii) AFI will use commercially reasonable efforts to continue to renew its current blended directors and officers liability and fiduciary liability insurance program (the "Current Program"), for a period of six years following the effective date of the Plan (the "Run Off Period"), on substantially the same terms and conditions as the Current Program and including prior acts coverage with respect to claims arising from acts or omissions that occurred prior to the Effective Date; provided that if AFI is unable to continue the Current Program for the entire Run Off Period despite its commercially reasonable efforts it shall promptly notify the Debtors and use best efforts to obtain run off coverage for the balance of the Run Off Period.

**12.2** Risk of Loss.  Supplier will be responsible for the risk of loss of, or damage to, any property of Recipient at a Supplier facility, unless and to the extent that such loss or damage was caused by the acts or omissions of Recipient and/or Recipient's Affiliates, and/or its and/or their employees, agents and/or Subcontractors.  Recipient will be responsible for the risk of loss of, or damage to, any property of Supplier at a Recipient facility unless and to the extent that such loss or damage was caused by the acts or omissions of Supplier and/or Supplier's Affiliates, and/or its and/or their employees, agents and/or Subcontractors.  The risk of loss of, or damage to, property in transit will remain with the Party arranging the shipment.

## 13.              INDEMNIFICATION AND LIMITATIONS ON LIABILITY.

**13.1** Indemnification.

    **(a)** Recipient Indemnification. Recipient will indemnify, hold harmless and defend Supplier and its Affiliates and their respective directors, officers and employees

("**Indemnified Parties**"), from and against any and all liabilities, damages, penalties, judgments, assessments, losses, costs and expenses in any case, whether arising under strict liability or otherwise (including reasonable outside attorneys' fees) (collectively, "**Damages**") suffered or otherwise incurred due to a Third Party Claim arising from or out of or relating to this Agreement, including the performance (or failure to perform) by Supplier of its obligations under this Agreement; provided, however, that to the extent and in the proportion Damages also arise out of or relate to the gross negligence or willful misconduct of any Indemnified Party, then the indemnity under this **Section 13.1(a)** will not apply.

**(b)** Indemnification by Supplier. Supplier will indemnify, hold harmless and defend the Recipient Indemnified Parties from and against any and all Damages suffered or otherwise incurred due to a Third Party Claim to the extent arising from or out of or relating to the gross negligence or willful misconduct of any Supplier Parties; provided, however, that to the extent and in the proportion Damages also arise from or out of or relate to the performance (or failure to perform) by Recipient of its obligations under this Agreement, then Supplier's indemnity under this **Section 13.1(b)** will not apply.

**(c)** Infringement.

**(1)** Indemnity. Supplier will indemnify, hold harmless and defend the Recipient Indemnified Parties, and Recipient will indemnify, hold harmless and defend the Supplier Indemnified Parties, from and against any and all Damages due to a Third Party Claim to the extent that the claim alleges that any information or materials provided by the Indemnifying Party to the Indemnified Party under this Agreement infringes or misappropriates any Intellectual Property Right of such third party in any country in which Services are performed or received under this Agreement.

**(2)** Exclusions. Neither Party shall have any obligation or liability to the other Party to the extent any infringement or misappropriation is caused by:

(i)          modifications to any such information or materials made by the other Party, its Affiliates, or its third party contractors;

(ii)          any combination of the allegedly infringing information or materials with items not provided by the Indemnifying Party , unless such combination was approved or directed in writing by the Indemnifying Party;

(iii)          a breach of this Agreement by the other Party;

(iv)          the failure of the other Party to use corrections or modifications provided by the Indemnifying Party offering equivalent features and functionality to the extent the Indemnifying Party notified the other Party that the failure to do so could result in infringement liability;

(v)          the content provided by the other Party and not resulting from the Indemnifying Party's modification of that content without the other Party's approval; or

(vi)        third party Software, except to the extent that such infringement or misappropriation arises from the failure of the Indemnifying Party to obtain the necessary licenses or to abide by the limitations of the applicable third party Software licenses.

(3)    Third Party Software Indemnities.    As specified in **Section13.1(c)(2)(vi)**, the foregoing infringement indemnification does not apply to third party Software.  With respect to third party Software provided by Supplier or its Subcontractors pursuant to this Agreement, Supplier and its Subcontractors shall use commercially reasonable efforts to obtain intellectual property indemnification for Recipient (or obtain intellectual property indemnification for itself and enforce such indemnification on behalf of Recipient) from the suppliers of such Software comparable to the intellectual property indemnification generally available in the industry for the same Software products.  With respect to third party Software provided by Recipient pursuant to this Agreement, Recipient shall use commercially reasonable efforts to obtain intellectual property indemnification for Supplier and its Affiliates (or obtain intellectual property indemnification for itself and enforce such indemnification on behalf of the Supplier and its Affiliates) from the suppliers of such Software comparable to the intellectual property indemnification generally available in the industry for the same Software products.

(d) Indemnification Procedure.  The Party making a claim for indemnification under this **Section 13.1** is referred to as the "Indemnified Party" and the Party or other Persons against whom such claims are asserted under this **Section 13** are referred to as the "**Indemnifying Party**."  All claims by any Indemnified Party under this **Section 13** will be asserted and resolved as follows:

(1)    In the event that any right, demand, claim, action and cause of action, assertion, notice of claim or assertion, complaint, litigation, suit, proceeding, formal investigation, inquiry, audit or review of any nature, civil, criminal, regulatory, administrative or otherwise, or any grievance or arbitration (each, a "**Claim**") is asserted or instituted in writing by any person or entity other than the Parties or their Affiliates that could give rise to Damages for which an Indemnifying Party could be liable to an Indemnified Party under this Agreement (such Claim, a "**Third Party Claim**"), the Indemnified Party will promptly send to the Indemnifying Party a written notice specifying the nature of such Third Party Claim, together with all information reasonably available to the Indemnified Party with respect to such Third Party Claim (a "**Third Party Claim Notice**"); provided, however, that a delay in notifying the Indemnifying Party will not relieve the Indemnifying Party of its obligations under this Agreement, except to the extent that such failure will have caused actual prejudice to the Indemnifying Party.

(2)    In the event of a Third Party Claim, the Indemnifying Party will have ten (10) business days  after receipt of the Third Party Claim Notice relating to such Third Party Claim to elect to undertake, conduct and control, through counsel of its own choosing (provided that such counsel is reasonably acceptable to the Indemnified Party) and at its own expense, the settlement or defense of such Third Party Claim (in which case the Indemnifying Party will not thereafter be responsible for the fees and expenses of any separate counsel retained by any Indemnified Party except as set forth below).  Notwithstanding an Indemnifying Party's election to appoint counsel to represent an Indemnified Party in connection with a Third Party Claim, an Indemnified Party will have the right to employ separate counsel, and the Indemnifying Party will bear the reasonable fees, costs and expenses of such separate counsel if

20

(i) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Party would present such counsel with a conflict of interest, or (ii) the Indemnifying Party will not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such Third Party Claim.  If the Indemnifying Party elects to undertake such defense, it will promptly assume and hold such Indemnified Party harmless from and against the full amount of any Damages resulting from such Third Party Claim to the extent provided herein. If the Indemnifying Party elects to undertake such defense, (x) the Indemnified Party agrees to cooperate with the Indemnifying Party and its counsel in contesting such Third Party Claim, and, if appropriate and related to such Third Party Claim, the Indemnifying Party and the Indemnified Party will reasonably cooperate with each other in connection with defending such Third Party Claim, and (y) such Third Party Claim may not be settled or compromised by the Indemnifying Party without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed; provided, however, that in the event any Indemnified Party settles or compromises or consents to the entry of any judgment with respect to any Third Party Claim without the prior written consent of the Indemnifying Party, such Indemnified Party will be deemed to have waived all rights against the Indemnifying Party for indemnification under this **Section 13**.  If the Indemnifying Party does not undertake the defense of such Third Party Claim, the Indemnified Party will have the right to contest, settle, compromise or consent to the entry of any judgment with respect to such Third Party Claim, and, in doing so, will not thereby waive any right to recourse therefor pursuant to this Agreement; provided, however, that at any time during the course of the matter the Indemnifying Party may assume the defense of such Third Party Claim by written notice of the same to the Indemnified Party.

        **(3)**      In the event of a Third Party Claim, from and after the delivery of a Claim Notice under this Agreement, at the request of the Indemnifying Party, the Indemnified Party will grant the Indemnifying Party and its representatives all reasonable access to the books, records and properties of such Indemnified Party to the extent reasonably related to the matters to which the Claim Notice relates.  All such access will be granted during normal business hours and will be granted under conditions that will not unreasonably interfere with the businesses and operations of such Indemnified Party.  The Indemnifying Party will not, and will cause its representatives not to, use (except in connection with such Claim Notice or such Third Party Claim) or disclose to any third person or entity other than the Indemnifying Party's representatives (except as may be required by Law) any information obtained pursuant to this **Section 13.1(c)(3)**, which is designated by the Indemnified Party as (or provided under circumstances in reasonably indicating that it is) confidential.

       **13.2** Limitations on Liability.

        **(a)** Subject to the specific provisions and limitations of this **Section 13.2**, it is the intent of the Parties that each Party will be liable to the other Party for all Damages incurred by the non-breaching Party arising out of the breach of or failure to perform any of the breaching Party's agreements, covenants or obligations under this Agreement.  If a Party has a Claim for such Damages, it will promptly send to the breaching Party a written notice specifying the nature of such Claim, together with all information reasonably available to such non-breaching Party with respect to such Claim (a "**Claim Notice**"); provided, however, that a delay in notifying the breaching Party will not relieve the breaching Party of its obligations under this Agreement, except to the extent that such failure will have caused

actual prejudice to the breaching Party. In the event of such a Claim, the breaching Party will notify the non-breaching Party within 45 days of receipt of a Claim Notice whether or not the breaching Party disputes such Claim.

**(b)**     The total aggregate liability of Supplier under or in connection with this Agreement, regardless of the form of the action or the theory of the recovery, will be limited to:

**(1)**     With respect to Damages arising out of or relating to the failure by Supplier to meet the standards set forth in **Section 11.1**, subject to **Section 13.2(b)(2)**, at Recipient's option, which option Recipient shall exercise in its reasonable discretion after reasonably consulting with Supplier and after exhausting the escalation process set forth in Schedule B, the replacement of (if applicable) or re-performance of, or repayment of the price paid for, such Service; provided, however, that if Recipient requests the replacement of or re-performance of such Service, Supplier shall, instead have the option of refunding to Recipient the price paid for such Service in those instances where re-performance or replacement of the Services cannot, in Supplier's good faith opinion  be completed in a commercially reasonable manner. In the limited instances where Supplier determines that Supplier cannot replace or re-perform the Services in a commercially reasonable manner, Recipient shall have the option to terminate those specific Services from the Agreement without cost to Supplier other than the refund for the Services not performed in accordance with the Agreement discussed above. In any such limited instance, Recipient may elect to terminate and no longer have any obligation to pay for those specific Services under the Agreement, and Supplier's obligation will be limited to the refund discussed above and any reasonable cooperation requested by Recipient in the transition of the terminated services to Recipient or a third party.

**(2)**     With respect to indemnity Claims under **Section 13.1** or other Claims arising out of or relating to the gross negligence or willful misconduct of Supplier, the fees actually received by Supplier from Recipient for Services during the twelve (12) months preceding the last act or omission giving rise to such Claims or, in the event such last act or omission occurs during the first twelve (12) months following the date hereof, an amount equal to twelve (12) times the fees paid for Services in the month preceding such last act or omission;

**(3)**     With respect to all other Damages under or in connection with this Agreement, the fees actually received by Supplier from Recipient for Services during the twelve (12) months preceding the last act or omission giving rise to such Damages or, in the event such last act or omission occurs during the first twelve (12) months following the date hereof, an amount equal to twelve (12) times the fees paid for Services in the month preceding such last act or omission.

**(c)**     Each Party will use its commercially reasonable efforts to mitigate Damages for which it seeks recourse hereunder, including by promptly pursuing recovery under available insurance policies, provided, however, that the failure of such Party to successfully mitigate such Damages will not affect such Party's right to seek recourse with respect to such Damages so long as such Party will have used its commercially reasonable efforts to mitigate.

**(d)**     Any amounts payable under **Article 13** will be calculated after giving effect to any proceeds received from insurance policies covering the Damages.

22

ny-1040886

**(e)** IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES OR ANY OF ITS OR THEIR DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE RESPONSIBLE OR LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, OR FOR ANY LOSS OF PROFITS, LOSS OF REVENUE, LOSS RESULTING FROM INTERRUPTION OF BUSINESS OR LOSS OF USE OR DATA, EVEN IF THAT PARTY, ITS AFFILIATES OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY OF ANY KIND, UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ITS IMPLEMENTATION.

**13.3** Indemnification and Limitations on Liability Relating to Negligence and Strict Liability.  ALL INDEMNITIES AND LIMITATIONS ON LIABILITY CONTAINED IN THIS **SECTION 13** WILL APPLY WHETHER OR NOT THE INDEMNITEE OR PARTY CLAIMING DAMAGES WAS OR IS CLAIMED TO BE PASSIVELY, CONCURRENTLY OR ACTIVELY NEGLIGENT, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT IS IMPOSED OR SOUGHT TO BE IMPOSED ON SUCH INDEMNITEE OR PARTY.

**13.4** Exclusive Remedy.  Neither Party will have any remedy arising out of or relating to the breach of this Agreement other than the indemnification remedies set forth in **Section 13.1** and Claims for direct damages referred to in **Section 13.2**, in each case subject to the limitations and exclusions set forth in this **Section 13**.

**13.5** Insurance.  From and after the completion of a Sale, each Party will cause its insurers to waive their rights of subrogation against the other Party with respect to any Claim.

## 14.        TERMINATION.

**14.1** Termination.  Without limiting the rights of the Parties under any other provision of this Agreement, any Service to be provided under this Agreement may be terminated as follows:

**(a)** by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, after Recipient fails to pay the Charges for such Service when due in accordance with this Agreement, the terminating Party sends to the other Party an initial notice of such failure and the other Party fails to pay such Charges within forty-five (45) days of receipt of such initial notice; or

**(b)** by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, following a material breach by Recipient of this Agreement other than a payment default, the terminating Party sends to the other Party a notice of such material breach and the other Party fails to cure such material breach within 30 days; provided however, that if cure cannot reasonably be accomplished within such 30-day period, this Agreement may not be terminated by reason of such breach for so long as the other Party

commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within 90 days of such written notice; or

(c) by either Party acting in its capacity as "Recipient", upon written notice to the other Party if, following a material breach by Supplier of this Agreement, the terminating Party sends to the other Party an initial notice of such material breach and the other Party fails to cure such material breach within 30 days of receipt of such initial notice; provided, however, that if cure cannot reasonably be accomplished within such 30-day period, this Agreement may not be terminated by reason of such breach for so long as the other Party commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within 90 days of such written notice;

(d) by either Party acting in its capacity as "Recipient", upon at least ninety (90) days prior written notice to the other Party; or

(e) otherwise upon mutual agreement of the Parties.

14.2  Termination Following Sale.  Upon the final approval by the Bankruptcy Court of a Sale, either Party in its capacity as a Supplier may within 14 days of such final approval elect to terminate the provision of the Services that such Party is required to provide to the other Party under this Agreement, effective upon the closing of such Sale.  In the event of such termination, Recipient will provide Supplier with notice of any Termination Assistance Services required by Recipient within twenty-one (21) days after receipt of such notice.

14.3  Election of Terminating Party.  In connection with any termination pursuant to this **Section 14**, the Party exercising such termination rights may elect to continue to receive the Services (other than Services so terminated) that the other Party provides to it.

14.4  Survival.  Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement will survive any termination or expiration of this Agreement and continue in full force and effect including, but not limited to, the following:  **Sections 8.2** (Ownership), **9** (Confidentiality), **10** (Compensation), **11** (Representations and Warranties), **12** (Insurance), **13** (Indemnification and Limitations on Liability), **14.4** (Survival), **14.5** (Rights Upon Termination or Expiration; Sale), **16.3** (Counterparts), **16.5** (Force Majeure), **16.6** (Further Assurances), **16.7** (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial), **16.8** (Headings), **16.11** (Public Announcements), and **16.13** (Severability).

14.5  Rights Upon Termination or Expiration; Sale.

(a)  Termination or Expiration.  Commencing six (6) months prior to expiration of the Term or any extension thereof, or upon either Party receiving any notice of termination from the other Party pursuant to the above provisions of **Section 14**:

(1)  At Recipient's option, Supplier will provide to Recipient the termination assistance reasonably requested by Recipient to allow the Services to continue, and to facilitate the orderly transfer of responsibility for performance of the Services, including any migration of Recipient Data, to Recipient (collectively, "**Termination Assistance Services**"),

ny-1040886

for a period of up to six (6) months (or, with respect to information technology Services, eighteen (18) months) after the effective date of such termination of Services or expiration of the Term (the "**Termination Services Periods**"); provided however, that, if mutually agreed upon in writing by the Parties (including with respect to adjustments in Charges), the Termination Service Periods may be extended until the effective date of the Plan.

          (2)      The Termination Assistance Services to be provided during the Termination Services Periods may include, as and if reasonably required by Recipient, the following, among other Services:  (i) developing, together with Recipient, a plan for the orderly transition of the performance of the Services, including the migration of Recipient Data from Supplier to Recipient or to a third party designated by Recipient; (ii) providing reasonable training for personnel of Recipient in the performance of the Services then being transitioned to Recipient or the third party designated by Recipient, to the extent Services are being assumed by that third party; and (iii) providing cooperation to Recipient to facilitate the transition of the performance of the Services to Recipient or to a third party designated by Recipient, in accordance with a mutually agreed upon transition plan for the applicable Services.  If Supplier provides any access to Supplier facilities, Systems or resources in connection with the execution of such plan, Recipient will, and will cause its personnel and any third parties having such access to, comply with Supplier's security and confidentiality requirements.  Notwithstanding the foregoing, Supplier shall not be required to grant access to or share any of Supplier's proprietary information, data or technology with any third party.

          **(b)** Charges.  ResCap will pay to AFI Charges for the Services described in **Section 14.5(a)** as provided in **Schedule C**, including during the Termination Services Periods.  AFI will pay to ResCap Charges for the Services described in **Section 14.5(a)** as provided in **Schedule C**, including during the Termination Services Periods.  In the event of any termination of Services by Supplier for cause, if approved by the Bankruptcy Court, Charges for the related Termination Assistance Services will be paid by Recipient monthly in advance.

     **14.6** Dedicated Assets.  Upon the approval by the Bankruptcy Court of any Sale or as otherwise mutually agreed between the Parties to facilitate a Sale, AFI and ResCap each agree to promptly enter into good faith negotiations with the Buyer(s) in such Sale to agree on which, if any, Dedicated Assets are to be transferred to Recipient, an Affiliate of Recipient, or such Buyer(s), in connection with such Sale, and the terms and conditions of such transfer (including pricing and allocation of responsibility with respect to obtaining and paying for the associated Required Consents).  Notwithstanding the allocation of responsibility for Required Consents in **Section 3.5**, except as otherwise agreed upon by the Parties, Recipient shall reimburse Supplier for any actual costs, losses, transfer fees or termination penalties incurred by Supplier in connection with the transfer or assignment to Recipient, an Affiliate of Recipient or such Buyer(s) of any Dedicated Assets.  Supplier shall use good faith efforts to mitigate such costs including, to the extent feasible, by not entering into (or extending) during the Term such Supplier contracts that contain transfer fees or early termination penalties without the written consent of Recipient. For the avoidance of doubt, while each Party agrees to negotiate in good faith with respect to the transfer of Dedicated Assets, neither Party shall be obligated to transfer any Dedicated Assets, except as otherwise mutually agreed upon in writing by the Parties.

25

      **14.7** <u>Transition Services Agreement</u>.  Upon the approval by the Bankruptcy Court of any Sale or as otherwise mutually agreed between the Parties to facilitate a Sale, AFI and ResCap each agree to promptly enter into good faith negotiations with the Buyer(s) in such Sale for an agreement pursuant to which AFI, ResCap and/or the Buyer(s) would provide or receive, as applicable, reasonable specified transition services in connection with such Sale (the "**Transition Services Agreement**").  The services to be provided to the Buyer and the terms relating to the transition of certain Services are to be addressed in the Transition Services Agreement.  For the avoidance of doubt, while AFI agrees to negotiate in good faith with ResCap and/or a Buyer with respect to entering into a Transition Services Agreement, AFI is not obligated to provide services to a Buyer or after a Sale, other than Termination Assistance Services  as contemplated in **<u>Section 14.5(a)(2)</u>** unless otherwise agreed by  AFI.

**15.**                        **FULLY INTEGRATED AGREEMENT.**  The following provisions of this Section 15 are subject to the other provisions set forth in this Agreement relating to Recipient's right to increase the amount of, decrease the amount of and/or terminate any Service provided to Recipient by and/or on behalf of Supplier.

      15.1       Each of the Parties represents, warrants, covenants, and agrees that this Agreement including the exhibits and schedules thereto comprise a single, unitary, indivisible, and non-severable agreement governing the operational arrangements between Supplier and its Affiliates on the one hand and Recipient and its Affiliates on the other hand.  Although various schedules in this Agreement describe different services, all of the Services covered by this Agreement are highly integrated and interdependent, such that removal of any of the services would impair the delivery, value or usability of the remaining services.  Accordingly, the description of those Services and the associated terms in separate documents, including separate Charges for the Services, does not signify that each constitutes a separate agreement; instead, such treatment is intended solely to facilitate articulation of the terms and conditions of the overall single, unitary and indivisible transaction.  The use of expressions "single", "unitary", "indivisible", and "non-severable" to describe this Agreement is not merely for convenient reference.  It is the conscious choice and express intent of the Parties to enter into a single, unitary, indivisible and non-severable transaction.  Each of the Parties agrees that from an economic point of view this Agreement including all exhibits and schedules thereto reflect one indivisible and non-severable economic bargain between Supplier and Recipient, all other provisions of this Agreement and the provisions of each exhibit and schedule thereto, including such schedules and exhibits that may be executed following the Effective Date, have been negotiated and agreed to collectively as a single, composite, inseparable transaction, and that any one component of the transaction would not have been entered into other than as a part of the overall transaction.  Except as expressly provided in this Agreement or any exhibit or schedule thereto for specific isolated purposes (and in such cases only to the extent expressly so stated, it otherwise being presumed that this paragraph is applicable), (i) all provisions of this Agreement including all exhibits and schedules thereto, including definitions, commencement and expiration dates, monetary provisions, use provisions, breach, default, setoff, recoupment, enforcement and termination provisions, and assignment, are integral to the entire transaction and are not severable; (ii) the economic terms of the transaction would have been substantially different had separate transactions been acceptable

to the Parties; and (iii) the provisions of this Agreement including all exhibits and schedules thereto will at all times be construed, interpreted and applied such that the intention of all Parties to effect a unitary, indivisible transaction will be preserved and maintained.

15.2      Without limiting the foregoing **Section 15.1**, the Parties further agree that for all purposes, including any transfer, assignment, rescission, assumption, or rejection of this Agreement under Section 365 of the Bankruptcy Code or any amendment or successor section thereof, or otherwise, this Agreement including all exhibits and schedules thereto constitutes one indivisible, integrated and non-severable agreement dealing with and covering one legal and economic unit which must be transferred, assigned, rescinded, assumed, or rejected (as applicable) as a whole with respect to all (and not less than all) of the obligations covered under this Agreement including all exhibits and schedules thereto.

15.3      The terms and provisions of this Agreement govern the provision of all Services under this Agreement.

# 16.      GENERAL.

**16.1** Acknowledgement.  The Parties acknowledge that the terms and conditions of this Agreement have been the subject of active and complete negotiations, and that this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provision of this Agreement.

**16.2** Binding Effect; No Assignment.  This Agreement is binding upon and inures to the benefit of the Parties and their respective successors, permitted assigns and legal representatives.  This Agreement is not assignable by either Party without the prior written consent of the other Party, and any other purported assignment will be null and void.

**16.3** Counterparts.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which will be considered one and the same agreement, and will become effective when one or more counterparts have been signed by each of the Parties and delivered (including by facsimile) to the other Parties.

**16.4** Entire Agreement.   This Agreement, including the Schedules hereto, which are each hereby incorporated herein and made a part hereof, contains the entire agreement between the Parties with respect to the subject matter hereof.  While purchase orders, invoices or similar routine documents may be used to implement or administer provisions of this Agreement, any provisions of such documents that add to, vary, modify or are at conflict with the provisions of this Agreement will be deemed deleted and will have no force or effect on either Party's rights or obligations under this Agreement.

**16.5** Force Majeure.

(a) "**Force Majeure Event**" means any event beyond the reasonable control of the Party affected that significantly interferes with the performance by such Party of its obligations under this Agreement, including acts of God, strikes, lockouts or industrial disputes or disturbances, civil disturbances, arrests or restraint from rulers or people,

ny-1040886

interruptions by government or court orders or present and future valid orders of any regulatory body having proper jurisdiction (other than any such interruption arising from the failure by the Party claiming force majeure to comply with any applicable regulation or to obtain and comply with any required permit), acts of the public enemy, wars, riots, blockades, insurrections, inability to secure labor or secure materials upon terms deemed practicable by the Party affected (including by reason of allocations, voluntary or involuntary, promulgated by authorized governmental agencies), epidemics, landslides, lightning, earthquakes, fire, storm, floods, washouts, explosions, breakage or accident to machinery.

(b) If a Force Majeure Event is claimed by either Party, the Party making such claim will orally notify the other Party as soon as reasonably possible after the occurrence of such Force Majeure Event and, in addition, will provide the other Party with written notice of such Force Majeure Event within five (5) days after the occurrence of such Force Majeure Event.

(c) Except for a Party's obligations to make payments hereunder (including those obligations of **Section 10.3** hereof), neither Party hereto will be liable for any nonperformance or delay in performance of the terms of this Agreement when such failure is due to a Force Majeure Event and the Charges payable by Recipient shall be equitably adjusted such that Recipient is not be obligated to pay any Charges for any Services to the extent not performed due to a Force Majeure Event. If either Party relies on the occurrence of a Force Majeure Event as a basis for being excused from performance of its obligations hereunder, such Party relying on the Force Majeure Event will (i) provide an estimate of the expected duration of the Force Majeure Event and its probable impact on performance of such Party's obligations hereunder and (ii) provide prompt notice to the other Party of the cessation of the Force Majeure Event.

(d) Upon the occurrence of a Force Majeure Event, the same will, so far as possible, be remedied as expeditiously as possible using commercially reasonable efforts. It is understood and agreed that nothing in this **Section 16.5(d)** will require the settlement of strikes, lockouts or industrial disputes or disturbances by acceding to the demands of any opposing party therein when such course is inadvisable in the discretion of the Party having the difficulty.

**16.6** Further Assurances. Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

**16.7** Governing Law; Jurisdiction and Forum; Waiver Of Jury Trial.

(a) This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the choice of law principles thereof.

(b) Each Party irrevocably submits to the jurisdiction of the Bankruptcy Court in any action arising out of or relating to this Agreement, and hereby irrevocably agrees that

28

all claims in respect of such action may be heard and determined in the Bankruptcy Court. Each Party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Parties further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any proceeding contemplated above will be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which will be conclusive evidence of the fact and amount of such judgment.

(c) Each Party waives, to the fullest extent permitted by Law, any right it may have to a trial by jury in respect of any action, suit or proceeding arising out of or relating to this Agreement. Each Party certifies that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications set forth above in this **Section 16.7**.

**16.8** Headings.  The Section headings contained in this Agreement are inserted for convenience of reference only and do not affect the meaning or interpretation of this Agreement.  All references to Sections contained herein mean Sections of this Agreement unless otherwise stated and except in the Schedules hereto, wherein references to Sections mean Sections of such Schedule unless otherwise stated.

**16.9** Independent Contractors.  Supplier is an independent contractor, with all of the attendant rights and liabilities of an independent contractor, and not an agent or employee of Recipient.  Any provision in this Agreement, or any action by Recipient, that may appear to give Recipient the right to direct or control Supplier in performing under this Agreement means that Supplier will follow the desires of Recipient in results only.

**16.10**      Notices.  All notices and other communications to be given to any Party hereunder are sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service or three days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or when received in the form of a facsimile or e-mail transmission and will be directed to the physical address, facsimile number or e-mail address set forth below (or at such other address or facsimile number as such Party will designate by like notice):

**IF TO AFI:**


Ally Financial Inc.
200 Renaissance Center, MC 200-B09-B-11
Detroit, Michigan 48265
Attention:  Chief Financial Officer
E-Mail Address: james.mackey@ally.com

With a copy to:
Ally Financial Inc. Legal Staff
200 Renaissance Center, MC 200-B09-B-11

Detroit, Michigan 48265
Attention:  IT Counsel
E-mail address: Thomas.lynch@ally.com

**IF TO RESCAP:**

Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  James Whitlinger
E-Mail Address.: jim.whitlinger@gmacm.com

With a copy to:
Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  Tammy Hamzehpour
E-mail Address: tammy.hamzehpour@gmacm.com

**16.11**     Public Announcements.  Except as otherwise required by law, each of AFI and ResCap will consult with the other and obtain the prior written consent of the other before issuing, or permitting any agent or Affiliate to issue, any press releases or otherwise making, or permitting any agent or Affiliate to make, any public statements with respect to this Agreement or the transactions contemplated hereby; provided, however, that the prior written consent of the other Party is not required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of the other Party.

**16.12**     Amendments and Waivers.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by both Parties.  The Parties may, only by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of such other Party to be performed or complied with.  The waiver by either Party of a breach of any term or provision of this Agreement will not be construed as a waiver of any subsequent breach.  Except as otherwise expressly provided herein, no failure to exercise, delay in exercising or single or partial exercise of any right, power or remedy by either Party, and no course of dealing between the Parties, will constitute a waiver of any such right, power or remedy.

**16.13**     Severability.  If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions of this Agreement will not be affected thereby, and there will be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

**16.14**     No Third Party Beneficiaries.  This Agreement is entered into solely between, and, except with respect to the rights of the Supplier Parties and the Recipient Parties under **Section 13**, may be enforced only by, Recipient and Supplier.  This Agreement does not

30

12-12020-mg    Doc 3389-1    Filed 09/28/12    Entered 09/28/12 21:41:42    Exhibit A -
Pg 36 of 66 Pg 44 of 78

create any rights or causes of action in or on behalf of any third parties, including employees, suppliers, customers, Affiliates or Subcontractors of a Party, or create any obligations of a Party to any such third parties, except that either Party is entitled to include as part of its Damages under this Agreement the Damages incurred by its Affiliates or Subcontractors in connection with a breach by the other Party of this Agreement.

     **16.15**     <u>Order of Precedence</u>.   In the event of a conflict, this Agreement takes precedence over the Schedules.

*[Signature Page Follows]*

ny-1040886

12-12020-mg   Doc 3829-1   Filed 09/28/12   Entered 09/28/12 09:41:53   Exhibit P.
Pg 37 of 66

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, to be effective as of the Effective Date.

**Ally Financial Inc.**                                   **Residential Capital, LLC**

By: _____          By: _____

Name:  _Michael A. Carpenter_                  Name: _____

Title:  _Chief Executive Officer_                  Title: _____

S-1

12-12020-mg    Doc 3309-1    Filed 09/28/12    Entered 09/28/12 09:48:53    Exhibit P.
Pg 46 of 78

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, to be effective as of the Effective Date.

**Ally Financial Inc.**

By: _____

Name: _____

Title: _____

**Residential Capital, LLC**

By: _____

Name:    Thomas Marano

Title:    Chief Executive Officer

# Schedule A-1

## Parent Services

**The following Statements of Work are governed by the Agreement.**

**AFI to ResCap Statements of Work by Functional Service Area**

| | Functional Service Area | SOW Name | SOW Number (if applicable) |
|---|---|---|---|
| 1 | Audit | Internal Audit Services | 1G |
| 2 | Capital Markets | Capital Markets Services | 1C |
| 3 | Communications | Communications and Investor Relations Services | - |
| 4 | Communications | eCommerce Services | 1H |
| 5 | Compliance | Global Security Services | 1O |
| 6 | Compliance | Global Privacy Services | 1N |
| 7 | Compliance (includes Consent Order Costs) | Global Compliance Services | 1M |
| 8 | Facilities | Facilities Services | 1Ka |
| 9 | Finance Tax | Finance Shared Services | 1a04 |
| 10 | Finance Tax | Tax Services | 1a08 |
| 11 | Finance Tax | General Accounting Services | 1A5 |
| 12 | Government Relations | Government Relations | 1X |
| 13 | Human Resources | Human Resources Support Services | 1Qa |
| 14 | ITG | Global Information Security | 1R1 |
| 15 | ITG | Application Development and Support – IT Corporate Services | 1R9 |
| 16 | ITG | Cross Functional Services | - |
| 17 | ITG | End User Computing Services | - |
| 18 | ITG | IT Technology Strategy and Architecture Services | - |
| 19 | ITG | Voice Services Mobility SOW (Mid)_AFI to ResCap | - |
| 20 | ITG | Network Services – Local Area Network | - |
| 21 | ITG | Network Services – Network WAN Network Services WAN (Mid)_AFI to ResCap | - |
| 22 | ITG | Hosting Operations – Hosting, Implementation and Data Center Services | - |
| 23 | ITG | Voice Services - Telecommunications and Contact Center Telecom Call Center AFI to ResCap | - |
| 24 | Legal | Legal Services | 1S |
| 25 | Loan Review | Loan Review | 1T |
| 26 | Marketing | Global Brand & Product Marketing | 1I |
| 27 | Risk | Risk Management | 1J |
| 28 | Supply Chain | Supply Chain Management Services | 1P |
| 29 | Treasury | Treasury Services - Global Funding and Liquidity ("GF&L") | 1W1 |
| 30 | Treasury | Treasury Services Structured Funding Deal Compliance and Facility Management | 1W2 |
| 31 | Treasury | Treasury Services, Treasury Operations | 1W7 |

## Schedule A-2

## Reverse Services

**The following Statements of Work are governed by the Agreement.**

**ResCap to AFI Statements of Work by Functional Service Area**

| # | Functional Service Area | SOW Name | SOW Number (if applicable) |
|---|---|---|---|
| 1 | Accounting | Capital Markets Accounting | 14L |
| 2 | Accounting | ResCap Accounting Services | - |
| 3 | Accounting | Accounting | 14F |
| 4 | Business Risk and Controls and Business Excellence Support | Business Risk and Controls and Business Excellence Support | 14J |
| 5 | Capital Markets | Capital Markets | 14B |
| 6 | Capital Markets | Records Services | 14I |
| 7 | Compliance | Line of Business Compliance Services | 14H |
| 8 | Consumer Lending | Consumer Lending Services | 14M |
| 9 | Finance | Mortgage Financial Planning and Analysis | 14G |
| 10 | Human Resources | HR Support Services (AFI) | 1Qb |
| 11 | Human Resources | HR Support Services (Bank) | 14C |
| 12 | ITG | IT Resource Services | - |
| 13 | ITG | Application Support | 14A |
| 14 | Legal | Legal Services (AFI) | 1S |
| 15 | Legal | Legal Services (Bank) | 14E |
| 16 | Masterservicing | Master Servicing for Ally Auto - Bond Administration | - |
| 17 | Masterservicing | Master Servicing for Ally Auto - Bond Modeling | - |
| 18 | Risk | Risk Services Reporting and Special Assets | - |
| 19 | Risk | Risk Management & Data Collection | 14D |
| 20 | Risk | Client Repurchase | 14N |

**Schedule A-3**

**Planned IT Projects**

| | Selected | 2012 Total 3rd Party Expense | | 2012 People Expense | | 2012 Total Project Expense | | Mortgage Allocation | |
|---|---|---|---|---|---|---|---|---|---|
| **AFI ==> Rescap** | Driver | Monthly $ | Annual $ | Monthly $ | Annual $ | Monthly $ | Annual $ | Monthly $ | Annual $ |
| Global Functions Infrastructure | 33.1% | 128,835 | 1,546,021 | 13,760 | 165,120 | 142,595 | 1,711,141 | 47,199 | 566,388 |
| Corporate Infrastructure | 33.1% | 34,614 | 415,364 | 3,645 | 43,736 | 38,258 | 459,100 | 12,664 | 151,962 |
| Security | 33.1% | 50,000 | 600,000 | 22,054 | 264,646 | 72,054 | 864,646 | 23,850 | 286,198 |
| Finance | 33.1% | 53,333 | 640,000 | 26,100 | 313,203 | 79,434 | 953,203 | 26,293 | 315,510 |
| Treasury | 33.1% | 97,583 | 1,171,000 | 122,259 | 1,467,106 | 219,842 | 2,638,106 | 72,768 | 873,213 |
| Compliance | 33.1% | 35,333 | 424,000 | 7,378 | 88,532 | 42,711 | 512,532 | 14,137 | 169,648 |
| Legal | 33.1% | 60,083 | 721,000 | 50,439 | 605,273 | 110,523 | 1,326,273 | 36,583 | 438,996 |
| HR | 24.9% | 52,083 | 625,000 | 43,152 | 517,822 | 95,235 | 1,142,822 | 23,707 | 284,485 |
| Communications | 24.9% | 12,500 | 150,000 | 24,584 | 295,009 | 37,084 | 445,009 | 9,231 | 110,777 |
| Supply Chain | 33.1% | 39,583 | 475,000 | 75,825 | 909,896 | 115,408 | 1,384,896 | 38,200 | 458,401 |
| Capital Markets | 33.1% | 60,083 | 721,000 | 50,079 | 600,950 | 110,162 | 1,321,950 | 36,464 | 437,565 |
| Technology Operations | 16.1% | 166,327 | 1,995,928 | 192,734 | 2,312,805 | 359,061 | 4,308,733 | 57,809 | 693,706 |
| | | | | | | | | | |
| Total | | 790,359 | 9,484,314 | 632,008 | 7,584,098 | 1,422,368 | 17,068,412 | 398,904 | 4,786,850 |

| Memo: Direct Charged Project Expense | |
|---|---|
| Shared Services - RTCoE Project | 401,380 |
| Technology Ops. Project Expense | 73,185 |
| Finance - Mortgage Ledger Risk Project | 893,630 |
| Direct Charged Infrastructure Shared Services - TI $ | 221,928 |
| Mortgage Infrastructure Project Expense | 1,690,480 |
| Total Projects Direct and Shared Expense (excl ResCap DW) | $  8,067,453 |
| | |
| Rescap Data Warehouse Apr-Dec (Capital) | 3,823,528 |
| ResCap Data Warehouse Apr-Dec (Expense) | 158,235 |
| Hardware purchased to date | 2,748,351 |

## Consolidated 2012 Project List

| Project/Initiative Name | BU/GF Name | Budget Allocated To | 2012 IT Project Spend Subtotal (calculated IT Project Spend Expense + IT Project Spend Software Capital + IT Project Spend) | 2012 IT Project Spend Expense | People Expense Factor (varies by Global Function) | People Expense Dollar | Total Project Expense (3rd Party + People Factor) | Difference in Plan b/w Spend and Capital | Official Color |
|---|---|---|---|---|---|---|---|---|---|
| EU EUI Enterprise Windows 7 Test Environment | Global Functions Infrastructure | Infrastructure | | $23 | 10.7% | $2 | $26 | $36 Green | |
| EU EUI Wireless LAN | Global Functions Infrastructure | Infrastructure | 4 | $2 | 10.7% | $0 | $2 | $2 Green | |
| Global Database Upgrade | Global Functions Infrastructure | Infrastructure | 110 | $110 | 10.7% | $12 | $121 | $1 Green | |
| HT EV 2011 Evergreen-Win & UNIX Servers | Global Functions Infrastructure | Infrastructure | 2 | $1 | 10.7% | $0 | $1 | $1 Green | |
| HT EV F5 Load Balancing | Global Functions Infrastructure | Infrastructure | 11 | $11 | 10.7% | $1 | $12 | $0 Green | |
| HT TI TSS Storage and BUR Capacity Optimization | Global Functions Infrastructure | Infrastructure | 7 | $7 | 10.7% | $1 | $8 | $0 Green | |
| NW D2D - Telecom/Network - LAN - Corporate Port Admission (CPA) Transformation | Global Functions Infrastructure | Infrastructure | 122 | $122 | 10.7% | $13 | $135 | $0 Green | |
| NW EV Datacenter LAN Expansion and Upgrade  Datacenter WAN Backbone | Global Functions Infrastructure | Infrastructure | 99 | $20 | 10.7% | $2 | $23 | $79 Green | |
| Risk (TeamMate, Open Pages) | Global Functions Infrastructure | Infrastructure | 1,068 | $868 | 10.7% | $93 | $961 | $200 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (20%) | Global Functions Infrastructure | Infrastructure | 7 | $7 | 10.7% | $1 | $8 | $0 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (80%) | Global Functions Infrastructure | Infrastructure | 506 | $183 | 10.7% | $20 | $203 | $323 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Global Functions Infrastructure | Infrastructure | 127 | $46 | 10.7% | $5 | $51 | $81 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Global Functions Infrastructure | Infrastructure | 2 | $1 | 10.7% | $0 | $2 | $0 Green | |
| SM D2D - Service Mgmt Suite for Mortgage / LV | Global Functions Infrastructure | Infrastructure | 167 | $83 | 10.7% | $9 | $92 | $83 Green | |
| Transition/Transformation | Global Functions Infrastructure | Infrastructure | 52 | $52 | 10.7% | $6 | $57 | $0 Green | |
| Vulnerability Scanning - Expansion for WebInspect / AMP | Global Functions Infrastructure | Infrastructure | 54 | $9 | 10.7% | $1 | $10 | $45 Green | |
| Mortgage Data Warehouse Build (Retail and Commercial) | Basel II | Corp - Basel II | $ 4,386 | $0 | 39.7% | $0 | $0 | $4,386 Green | |
| Blackrock Interfaces Releases 2012 | Capital Markets | Corp - Capital Markets | 276 | $276 | 83.3% | $230 | $506 | $0 Green | |
| Broker Dealer Enhancement Releases 2012 | Capital Markets | Corp - Capital Markets | 400 | $200 | 83.3% | $167 | $367 | $200 Green | |
| Model Support Initiatives | Capital Markets | Corp - Capital Markets | 445 | $245 | 83.3% | $204 | $449 | $200 Green | |
| Ally Pulse release program | Communications | Corp - Communications | 150 | $150 | 196.7% | $295 | $445 | $0 Green | |
| Compliance Training | Compliance | Corp - Compliance | 200 | $200 | 20.9% | $42 | $242 | $0 Green | |
| Control Room Function for Surveillance to the Trading Tier/Pre-clearance Policies | Compliance | Corp - Compliance | 100 | $100 | 20.9% | $21 | $121 | $0 Green | |
| US Bridger Upgrade | Compliance | Corp - Compliance | 150 | $124 | 20.9% | $26 | $150 | $0 Green | |
| CMAP / Eagle Release Program | Finance | Corp - Finance | 640 | $640 | 48.9% | $313 | $953 | $0 Green | |
| Mortgage Ledger Risk Mitigation | Finance | Corp - Finance | $ 1,350 | $600 | 48.9% | $294 | $894 | $750 Green | |
| 2012 Compensation Cycle Program | HR | Corp - HR | 39 | $39 | 82.9% | $32 | $71 | $0 Green | |
| 2012 HR Talent Mgmt & TA Release Pool | HR | Corp - HR | 10 | $10 | 82.9% | $8 | $18 | $0 Green | |
| 2012 HR Total Rewards Release Pool | HR | Corp - HR | 20 | $20 | 82.9% | $17 | $37 | $0 Green | |
| 2012 Workforce Admin and ER&P Release Pool | HR | Corp - HR | 74 | $74 | 82.9% | $61 | $135 | $0 Green | |
| 2013 Compensation Cycle Program | HR | Corp - HR | 226 | $226 | 82.9% | $187 | $413 | $0 Green | |
| Annual Enrollment Benefits Program | HR | Corp - HR | 156 | $156 | 82.9% | $129 | $285 | $0 Green | |
| Equity Program Implementation | HR | Corp - HR | 100 | $100 | 82.9% | $83 | $183 | $0 Green | |
| eDiscovery Release | Legal | Corp - Legal | 115 | $115 | 83.9% | $97 | $212 | $0 Green | |
| eDocs DM Upgrade | Legal | Corp - Legal | 57 | $57 | 83.9% | $48 | $105 | $0 Green | |
| Team Room Release | Legal | Corp - Legal | 42 | $42 | 83.9% | $35 | $77 | $0 Green | |
| TeamConnect Release | Legal | Corp - Legal | 142 | $142 | 83.9% | $119 | $261 | $0 Green | |
| TeamConnect Upgrade | Legal | Corp - Legal | 365 | $365 | 83.9% | $306 | $671 | $0 Green | |
| Cogent Release Pool | Risk | Corp - Risk | 200 | $200 | 39.7% | $79 | $279 | $0 Green | |
| Open Pages - Release Pool | Risk | Corp - Risk | 892 | $359 | 39.7% | $143 | $502 | $533 Green | |
| Open Pages - Technology Upgrade | Risk | Corp - Risk | 2,335 | $186 | 39.7% | $74 | $260 | $2,149 Green | |
| Polytraunche Upgrade (Acoutape/Aploytraunche/NEV Tech Upgrade) | Risk | Corp - Risk | 54 | $54 | 39.7% | $21 | $75 | $0 Green | |
| Ariba Release Program | Supply Chain | Corp - Supply Chain | 248 | $248 | 191.6% | $475 | $723 | $0 Green | |
| Supplier Risk Management Program | Supply Chain | Corp - Supply Chain | 227 | $227 | 191.6% | $435 | $662 | $0 Green | |
| Quantum Release Program | Treasury | Corp - Treasury | 212 | $150 | 125.3% | $188 | $338 | $62 Green | |
| Quantum Upgrade | Treasury | Corp - Treasury | 345 | $195 | 125.3% | $244 | $439 | $150 Green | |
| Security Compliance and Remediation | Treasury | Corp - Treasury | 286 | $0 | 125.3% | $0 | $0 | $286 Green | |
| Sierra, Intelimatch, SSB Release Master | Treasury | Corp - Treasury | 665 | $515 | 125.3% | $645 | $1,160 | $150 Green | |
| WebSeries Release Program | Treasury | Corp - Treasury | 426 | $311 | 125.3% | $390 | $701 | $115 Green | |
| Application Vulnerability Scanning Improvements | Information Security | Information Security | 1,200 | $600 | 44.1% | $265 | $865 | $600 Green | |
| Enterprise IAM R2 | Information Security | Information Security | $ 700 | $0 | 44.1% | $0 | $0 | $700 Green | |
| EU EUI Enterprise Windows 7 Test Environment | Corp Infrastructure | Infrastructure | 33 | $13 | 10.7% | $1 | $14 | $20 Green | |
| EU EUI Wireless LAN | Corp Infrastructure | Infrastructure | 2 | $1 | 10.7% | $0 | $1 | $1 Green | |
| Global Database Upgrade | Corp Infrastructure | Infrastructure | 61 | $61 | 10.7% | $7 | $68 | $0 Green | |
| HT EV F5 Load Balancing | Corp Infrastructure | Infrastructure | 6 | $6 | 10.7% | $1 | $7 | $0 Green | |
| HT TI TSS Storage and BUR Capacity Optimization | Corp Infrastructure | Infrastructure | 4 | $4 | 10.7% | $0 | $4 | $0 Green | |
| NW D2D - Telecom/Network - LAN - Corporate Port Admission (CPA) Transformation | Corp Infrastructure | Infrastructure | 69 | $69 | 10.7% | $7 | $76 | $0 Green | |
| NW EV Datacenter LAN Expansion and Upgrade | Corp Infrastructure | Infrastructure | 56 | $11 | 10.7% | $1 | $13 | $44 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (20%) | Corp Infrastructure | Infrastructure | 4 | $4 | 10.7% | $0 | $4 | $0 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (80%) | Corp Infrastructure | Infrastructure | 283 | $102 | 10.7% | $11 | $113 | $181 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Corp Infrastructure | Infrastructure | 71 | $26 | 10.7% | $3 | $28 | $45 Green | |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Corp Infrastructure | Infrastructure | 1 | $1 | 10.7% | $0 | $1 | $0 Green | |
| SM D2D - Service Mgmt Suite for Mortgage / LV | Corp Infrastructure | Infrastructure | 167 | $83 | 10.7% | $9 | $92 | $83 Green | |
| TI Technical Support Resources | Corp Infrastructure | Infrastructure | 3,500 | $3,500 | 10.7% | $374 | $3,874 | $0 Green | |
| Transition/Transformation | Corp Infrastructure | Infrastructure | 29 | $29 | 10.7% | $3 | $32 | $0 Green | |
| Vulnerability Scanning - Expansion for WebInspect / AMP | Corp Infrastructure | Infrastructure | 30 | $5 | 10.7% | $1 | $6 | $25 Green | |
| EU EUI Enterprise Windows 7 Test Environment | Mortgage - Infrastructure | Infrastructure | $ 77 | $30 | 10.7% | $3 | $34 | $47 Green | |
| EU EUI Wireless LAN | Mortgage - Infrastructure | Infrastructure | $ 5 | $2 | 10.7% | $0 | $2 | $2 Green | |
| Global Database Upgrade | Mortgage - Infrastructure | Infrastructure | $ 143 | $143 | 10.7% | $15 | $158 | $0 Green | |
| HT EV 2011 Evergreen-Win & UNIX Servers | Mortgage - Infrastructure | Infrastructure | $ 2 | $1 | 10.7% | $0 | $1 | $1 Green | |
| HT EV F5 Load Balancing | Mortgage - Infrastructure | Infrastructure | $ 14 | $14 | 10.7% | $1 | $15 | $0 Green | |
| HT EV Ruby on Rails 2.0.x + Mongrel 1.x Upgrades and Replacement | Mortgage - Infrastructure | Infrastructure | $ 3 | $3 | 10.7% | $0 | $3 | $0 Green | |
| HT EV SunOne | Mortgage - Infrastructure | Infrastructure | $ 3 | $3 | 10.7% | $0 | $3 | $0 Green | |
| HT TI TSS Storage and BUR Capacity Optimization | Mortgage - Infrastructure | Infrastructure | $ 9 | $9 | 10.7% | $1 | $10 | $0 Green | |
| NW EV Datacenter LAN Expansion and Upgrade | Mortgage - Infrastructure | Infrastructure | $ 129 | $27 | 10.7% | $3 | $29 | $103 Green | |
| NW EV Rescap Telephony Evergreen 2015 | Mortgage - Infrastructure | Infrastructure | $ 75 | $75 | 10.7% | $8 | $83 | $0 Green | |

5

12-12020-mg    Doc 3369-1    Filed 09/28/12    Entered 09/28/12 03:41:53    Exhibit A -
Part 45 of 66

## Consolidated 2012 Project List

| Project/ Initiative Name | BU/GF Name | Budget Allocated To | 2012 IT Project Spend Subtotal (calculated IT Project Spend Expense + IT Project Spend Software Capital + IT Project Spend | 2012 IT Project Spend Expense | People Expense Factor (varies by Global Function) | People Expense Dollar | Total Project Expense (3rd Party + People Factor) | Difference in Plan b/w Spend and Capital | Official Color |
|---|---|---|---|---|---|---|---|---|---|
| Rescap WAN/LAN/Voice Transition | Mortgage - Infrastructure | Infrastructure | $ 400 | $250 | 10.7% | $27 | $277 | $150 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (20%) | Mortgage - Infrastructure | Infrastructure | $ 9 | $9 | 10.7% | $1 | $10 | $421 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (80%) | Mortgage - Infrastructure | Infrastructure | $ 659 | $238 | 10.7% | $25 | $264 | $105 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Mortgage - Infrastructure | Infrastructure | $ 165 | $60 | 10.7% | $6 | $66 | $0 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Mortgage - Infrastructure | Infrastructure | $ 2 | $2 | 10.7% | $0 | $3 | $0 | Green |
| SM D2D - Service Mgmt Suite for Mortgage / LV | Mortgage - Infrastructure | Infrastructure | $ 1,000 | $500 | 10.7% | $53 | $553 | $500 | Green |
| TI EV Infrastructure Evergreen Program | Mortgage - Infrastructure | Infrastructure | $ 82 | $82 | 10.7% | $9 | $90 | $0 | Green |
| Transition/Transformation | Mortgage - Infrastructure | Infrastructure | $ 67 | $67 | 10.7% | $7 | $75 | $0 | Green |
| Vulnerability Scanning - Expansion for WebInspect / AMP | Mortgage - Infrastructure | Infrastructure | $ 70 | $12 | 10.7% | $1 | $13 | $58 | Green |
| PMO Resource Release Pool | Tech Ops - GPMO | TO - GPMO | $ 1,800 | $1,800 | 29.7% | $534 | $2,334 | $0 | Green |
| RTCoE Managed Resources for BU NADD | Tech Ops - RTCoE | TO - RTCoE | $ 6,000 | $6,000 | 29.7% | $1,779 | $7,779 | $0 | Green |

Yellow Shading - Projects to be Direct Charged at 100%
Grey Shading - Partially Direct Charged
Orange Shading - 100% Capital Charged at 0%

12-12020-mg    Doc 3309-7    Filed 09/28/12    Entered 09/28/12 21:41:43    Exhibit A -
Pg 53 of 78

### Schedule B

### Governance Model

**1.    INTRODUCTION**

This **Schedule B** (this "**Schedule B**") is incorporated by reference and attached to the Shared Services Agreement by and between ResCap and AFI dated May__, 2012 (the "**Agreement**").

**2.    AGREEMENT COVERAGE**

This **Schedule B** sets out the service management model for Supplier and Recipient (the "**Service Management Model**"), related to the Services provided under the Agreement.

**3.    OVERVIEW**

Supplier and Recipient will each appoint responsible, knowledgeable persons to serve as their representatives to oversee the performance of the Agreement (such persons and each Party's Relationship Manager shall collectively constitute the "**Service Management Team**").

The Service Management Team members will work informally on a regular basis, but the Relationship Managers, and such additional Service Management Team members as the Relationship Managers may designate from time to time, will meet formally at least monthly.  These monthly meetings will review such topics as significant operational concerns, performance metrics as developed by the Service Management Team, future service needs, transition service progress and pricing.  In addition, the Relationship Managers may from time to time designate Service Management Team members to meet in sub-teams either on a temporary or ongoing basis, to deal with specific issues under the Agreement.  The Relationship Managers will share the responsibility for organizing the meetings and ensuring the effectiveness of the meetings.

Each Party will staff its Service Management Team as necessary to represent the areas of services offered.

**4.    SCOPE**

The Service Management Team will be responsible for overseeing the overall execution of the Agreement to ensure that each Party performs its responsibilities as expected.

The Service Management Team's responsibilities shall include the following:

(a)    Strategy and Direction.    The Service Management Team may make recommendations as to strategic direction and provide critical input for business planning decisions between Supplier and Recipient.

(b)    <u>General Service Management</u>.  The Service Management Team may review the status of projects and prioritize work.  The Service Management Team will also be a forum for discussions between Supplier and Recipient regarding service changes and opportunities for Additional Services, and will coordinate with management and service delivery teams to ensure appropriate execution of such service changes or Additional Services.

(c)    <u>Issue Resolution</u>.  The Service Management Team will be responsible for resolving problems, concerns or inefficiencies in their execution as they arise, and will escalate unresolved issues as described below.

## 5.    ESCALATION

Issues that cannot be resolved within a reasonable period of time (which period of time shall not exceed twenty (20) days) by the Parties' respective Service Management Team members responsible for the applicable subject area must be first be escalated to the Relationship Managers.  If the Relationship Managers are unable to resolve an issue within ten (10) days, then either Party's Relationship Manager may, upon prior written notice to the other Relationship Manager, escalate such issue to Recipient's and Supplier's executive management representative for resolution.  Neither Party may initiate any formal legal proceedings for resolution of such issue until ten (10) business days after such issue has been escalated to each Party's executive management representatives.

The provisions and time periods specified in this **Section 5** will not be construed to prevent a Party from instituting, and a Party is authorized to institute, formal proceedings earlier to (A) avoid the expiration of any applicable limitations period, (B) preserve a superior position with respect to other creditors, or (C) address a claim arising out of the breach of a Party's obligations under **Section 9** of the Agreement or a dispute with respect to Intellectual Property Rights.

## Schedule C

## Pricing Methodology

1.    **INTRODUCTION**

This **Schedule C** (this "**Schedule C**") is incorporated by reference and attached to the Shared Services Agreement by and between ResCap and AFI dated May__, 2012 (the "**Agreement**").

1.1    <u>Charges</u>.  This **Schedule C** describes the Charges, and the methodologies for their calculation, with respect to the Services.

1.2    <u>Order of Precedence</u>.  The Parties acknowledge that certain obligations may be set forth in both this Schedule and elsewhere in the Agreement, and in the event of a conflict, such conflict shall be resolved in accordance with **Section 16.15** of the Agreement.

1.3    <u>Section and Article References</u>.  Unless otherwise specified, Section references in this **Schedule C** refer to the Sections of this **Schedule C**.

1.4    <u>Definitions</u>.  Capitalized terms have the meanings assigned below.  Any other capitalized terms used and not otherwise defined in this **Schedule C** have the meanings given them in the Agreement.

(a)    "**Business Change Event**" means any change in the products or services offered by Recipient or the expansion or closure of any Facility of any Recipient, or a decrease or increase in Recipient's level of consumption of the Services from the historical usage levels of its business, in either case that has a material impact on the cost to Supplier of providing any impacted Services.

(b)    "**Charges**" means:

(i)    any Total Shared Services Charge;

(ii)    amounts to be paid by Recipient as Pass-Through Expenses;

(iii)    the charges for Additional Services that may be agreed upon by the Parties pursuant to a signed Supplement from time to time;

(iv)    the charges for the Customized Services that may be agreed upon by the Parties pursuant to a signed Supplement from time to time; and

(v)    the charges for Termination Assistance Services.

(c)     **"Monthly Fixed Charges"** means, for a given month and Service, the amount reflected in **Schedule C-1b** or **C-2b** for such Service.  This amount does not include amounts to be paid by Recipient as Monthly Variable Charges or Pass-Through Expenses.

(d)     **"Monthly Variable Charges"** means, for a given month and Service, the (i) total actual costs incurred by Supplier for the Service, multiplied by (ii) the Recipient cost allocation percentage for such Service that was agreed upon between the Parties, as reflected in **Schedule C-1b** or **C-2b**, as applicable.  This amount does not include amounts to be paid by Recipient as Pass-Through Expenses.

(e)     **"Pass-Through Expenses"** as referenced in **Schedule C-1b** and **C-2b** means those third-party, out-of-pocket expenses actually incurred by Supplier in connection with a given Service (e.g., external audit fees, training for consent orders, consent order direct vendor costs), which will be either (i) approved by Recipient prior to being incurred by Supplier; provided, that if Recipient does not approve any such expense Supplier will have no obligation to procure or provide the goods or services associated with such expense, (ii) approved by Recipient in advance as being within a category or for a Service already approved by the Parties as for a billed-as-incurred expense, or (iii) for a good or service reasonably necessary to allow Supplier to deliver the Services contemplated under this Agreement.

(f)     "**Price Adjustment Event**" means any of the following:

  (i)     a Business Change Event occurs; or

  (ii)    a Service has been terminated pursuant to **Section 3** or **Article 14** of the Agreement.

(g)     "**Price Adjustment Process**" means the process described in **Section 3.4** of this **Schedule C**.

(h)     "**Total Monthly Shared Services Charge**" means, in respect of any individual Service, the monthly Charge for that Service, which shall be applicable from the Effective Date until the termination date for such Service, as such Charges are listed on **Schedule C-1a** or **Schedule C-2a** and may be adjusted in accordance with any Price Adjustment Event and/or Price Adjustment Process.  The Total Shared Services Charge represents the aggregate of the Total Base Costs, Third Party Costs and IT Projects as referenced on Schedule C-1a and Schedule C-2a. The Total Base Costs are equal to an amount representing Employee Costs, IT Costs,

Platform Costs and the Indirect Support Costs for that Functional Service Area, as described below:

(i)              Employee Costs means compensation, benefits, travel and other non-compensation related personnel costs;

(ii)            IT Costs means those costs associated with IT services under Schedule A-1 and Schedule A-2;

(iii)          Platform Costs means the Charges to the Recipient for use of the IT services on Supplier's platform related to depreciation and amortization in respect of IT infrastructure; and

(iv)         Indirect Support Costs means, for AFI, an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in Schedule C-1b, and for ResCap means an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in Schedule C-2b. Such percentages in each case are those referenced in the formulas in the Pricing Methodology Spreadsheets titled "Shared Services Global Functions Exhibit v.11.pdf" (AFI to ResCap) and "ResCap to AFI Shared Services Pricing 05-13-12.pdf" (ResCap to AFI).

These amounts are set forth in **Schedule C-1a** and **Schedule C-2a** on a monthly basis as the Total Monthly Shared Services Charge. The Total Monthly Shared Services Charges do not include any (i) Charges for Additional Services or Customized Services, (ii) Termination Assistance Services or (iii) Pass-Through Expenses.

Pricing for the Services set forth on **Schedule C-1a** and **Schedule C-2a** can change on a monthly basis, depending upon whether the Service is priced on the basis of Monthly Fixed Charges or Monthly Variable Charges, as indicated on **Schedule C-1b** and **Schedule C-2b**. Any such calculations will be made by reference to and in accordance with the formulas in the Pricing Methodology Spreadsheets titled "Shared Services Global Functions Exhibit v.11.pdf" (AFI to ResCap) and "ResCap to AFI Shared Services Pricing 05-13-12.pdf" (ResCap to AFI).

1.5      <u>General</u>.

(a)      Unless specifically stated otherwise, each Party will be financially responsible for all costs and expenses associated with performing its responsibilities under this Agreement.

(b)      Unless the Parties otherwise agree, for the purpose of calculating Charges, any Services that start on a day other than the first day of a month or are

1.6    Attachments.  Attached to this **Schedule C** are the following Attachments:

**Schedule C-1a** – Pricing for Parent Services

**Schedule C-2a** – Pricing for Reverse Services

**Schedule C-1b** –Billing Method by Service – Parent Services

**Schedule C-2b** –Billing Method by Service – Reverse Services

2.      **COMMENCEMENT OF CHARGES.**

The Total Shared Services Charges will begin on the Effective Date and are set forth in **Schedule C-1a** and **Schedule C-2a**.  Charges for Additional Services, Customized Services, and Termination Assistance Services shall begin on the date such services begin to be performed by Supplier.

3.      **PRICING METHODOLOGY.**

3.1     Total Monthly Shared Services Charges.  All Total Monthly Shared Services Charges will only be adjusted in accordance with the Price Adjustment Process.

3.2     Additional Services.  Charges for Additional Services will be set forth in the applicable Supplement for such Services.  To the extent the Additional Services are ongoing, the Charge may also or in the alternative be added as a separate item in **Schedule C-1a** or **Schedule C-2a**, as applicable and, if so included as a separate item, will be subject to the Price Adjustment Process just as any other Total Shared Services Charges would be.

3.3     Customized Services.  Charges for Customized Services will be set forth in the applicable Supplement for such Services.  To the extent the Customized Services are ongoing, the Charge may also or in the alternative be added as a separate item in **Schedule C-1a** or **Schedule C-2a**, as applicable and, if so included as a separate item, will be subject to the Price Adjustment Process just as any other Total Shared Services Charges would be.

3.4     This section is intentionally left blank.

3.5     Price Adjustment Process.  The Price Adjustment Process described in this **Section 3.5** will be followed by the Parties upon either Party's written request in the event of a Price Adjustment Event.  The Price Adjustment Process for Business Change Events is subject to any approval right or termination right that Supplier may have with respect to such change in Services pursuant to **Section 3** or **14** of the Agreement.

(a)     The Price Adjustment Process will be initiated immediately following a Price Adjustment Event and the resulting change to the Charges will take

effect as soon as practical and will be retroactive to the point in time that the Price Adjustment Event occurs (or, in the case of adjustments under **Section 3.5(c)** below, retroactive to the point in time that the New Cost Allocation is determined).

(b)     Unless the Price Adjustment Process is initiated for a Business Change Event, during the Price Adjustment Process the Parties will mutually determine in good faith the cost impact of the Price Adjustment Event through the methodologies set forth in the exhibits to Schedule C including all of the sub-attachments. When a Service is being terminated by a Party, the starting assumption is that Recipient will no longer be charged for that Service; provided, however, that Supplier may be entitled to reimbursement from Recipient of all costs previously paid by Recipient for such Service that Supplier is not able to eliminate, for example, costs for physical assets which cannot be reduced (i.e. leasing expenses or rental expenses which cannot be eliminated), third party costs (i.e. minimum revenue commitments which are required under a third party agreement) or any other non-internal costs ("**Stranded Costs**") which the Parties using appropriate due diligence and commercially reasonable efforts can not eliminate.  If, after using such efforts the Parties are unable to eliminate 100% of any Stranded Costs, the Parties will meet and discuss the remaining Stranded Costs to be reimbursed by Recipient to Supplier.

(c)     The Total Shared Services Charges set forth in **Schedule C-1a** and **Schedule C-2a** were determined by allocating to Recipient a portion of Supplier's underlying costs of performing the applicable Service (such cost allocation, the "**Initial Cost Allocations**").  In the event the Price Adjustment Process is initiated solely due to a Business Change Event and does not involve a termination of the applicable Service, then during the Price Adjustment Process, Supplier will (i) use the cost allocation methodology that was used to determine the Initial Cost Allocation for such Service, to determine a new cost allocation reflecting Recipient's then-current level of consumption of such Service, taking into account material increases or decreases (if any) in Supplier's overall costs that are a direct result of the change in Recipient's level of consumption of such Service (a "**New Cost Allocation**"), and (ii) if the New Cost Allocation differs from the Initial Cost Allocation for such Service, adjust the Total Shared Services Charge for such Service accordingly.   Except as otherwise agreed by the Parties, the cost allocation determination described above shall only be performed for the area impacted by the Business Change Event and such cost allocation determination per Functional Service Area shall not be performed more than once per month. At Recipient's request, Supplier will provide Recipient with all supporting calculations of the effects of such Business Change Event on Supplier's costs of performing the Services.

3.6     <u>Charges for Extensions of Term</u>.   The pricing in this **Schedule C** as of the

Effective Date includes only the pricing for the Services during the Initial Term. Any extensions of the Term are subject to the Parties reaching agreement of the pricing during such extension period.

3.7    <u>Termination Assistance Services</u>.  If requested by Recipient, Supplier will provide Termination Assistance Services in accordance with **<u>Section 14.5</u>** of the Agreement.  The price of Termination Assistance Services shall be documented in a Supplement to **<u>Schedule A</u>**. In addition to any Charges otherwise provided for in the Agreement or **<u>Schedule C</u>**, Recipient will reimburse Supplier for all incremental additional resource and other costs and expenses required or incurred by Supplier to provide Termination Assistance Services.

Schedule C-1

Pricing for Parent Services [1]

| Parent Services Pricing | Monthly Total Shared Services Charge (US$) | | | |
|---|---|---|---|---|
| Functional Service Area | Total Base Costs [2] | Third Party Costs | IT Projects | Total Shared Services |
| Finance / Tax | $ 1,340,595 | $ - | $ 26,293 | $ 1,366,888 |
| Audit | 12,845 | 67,168 | - | 80,013 |
| Treasury | 820,790 | - | 72,768 | 893,558 |
| Risk | 799,225 | 29,000 | - | 828,225 |
| Insurance Premium | - | 1,267,250 | - | 1,267,250 |
| Compliance | 403,948 | - | 14,137 | 418,086 |
| Consent Order | 189,720 | 150,000 | - | 339,720 |
| Loan Review | 33,577 | - | - | 33,577 |
| HR | 367,188 | 468,747 | 23,707 | 859,642 |
| Legal | 127,175 | - | 36,583 | 163,758 |
| Communications / IR | 296,414 | - | 9,231 | 305,645 |
| Capital Markets | 464,577 | - | 36,464 | 501,041 |
| Marketing | 253,271 | - | - | 253,271 |
| Facilities | 115,956 | 119,436 | - | 235,392 |
| Supply Chain | 608,376 | - | 38,200 | 646,576 |
| Gov't Relations | 31,651 | 3,000 | - | 34,651 |
| ITG | 1,879,177 | - | 141,521 | 2,020,698 |
| Total Monthly Charge | $ 7,744,484 | $ 2,104,601 | $ 398,904 | $ 10,247,989 |

[1]Approximate costs of services - refer to 3 supporting Exhibits. C-1a AFI Shared Services Workstream, C-1b Monthly Billing detail and Exhibits in C-1c for Pricing calculations

[2] Includes employee costs, IT services, IT platform costs, and 13.8% of Indirect Support

**Schedule C-1a**

**AFI Shared Services Workstream**

**ResCap, LLC - Pricing Summary**

| AFI Shared Service | BASE COSTS | | | | | BILLED AS INCURRED | | | As of May 10, 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Employee (1) | IT Costs | Platform Costs | Indirect Support Costs | Total Base Costs | Third Party Costs (2) | IT Projects | Total As Incurred | Total Shared Services | Total Shared Services Monthly |
| | [A] | [B] | [C] | [D] = 13.8% of [A]+[B]+[C] | [E] = [A]+[B]+[C]+[D] | [F] | [G] | [H] = [F]+[G] | [I] = [E]+[H] | |
| Finance / Tax | $ 5.9 | $ 5.4 | $ 2.9 | $ 2.0 | $ 16.1 | - | 0.3 | 0.3 | $ 16.4 | $ 1.4 |
| Audit | 0.1 | 0.0 | - | - | 0.2 | 0.8 | - | 0.8 | 1.0 | 0.1 |
| Treasury | 3.9 | 4.3 | 0.5 | 1.2 | 9.8 | - | 0.9 | 0.9 | 10.7 | 0.9 |
| Risk | 2.8 | 4.7 | 0.9 | 1.2 | 9.6 | 0.3 | - | 0.3 | 9.9 | 0.8 |
| Insurance Premium | - | - | - | - | - | 15.2 | - | 15.2 | 15.2 | 1.3 |
| Compliance | 2.3 | 1.5 | 0.5 | 0.6 | 4.8 | - | 0.2 | 0.2 | 5.0 | 0.4 |
| Consent Order | 2.0 | - | - | 0.3 | 2.3 | 1.8 | - | 1.8 | 4.1 | 0.3 |
| Loan Review | 0.4 | - | - | 0.0 | 0.4 | - | - | - | 0.4 | 0.0 |
| HR | 2.9 | 0.9 | 0.0 | 0.5 | 4.4 | 5.6 | 0.3 | 5.9 | 10.3 | 0.9 |
| Legal | 0.3 | 0.9 | 0.1 | 0.2 | 1.5 | - | 0.4 | 0.4 | 2.0 | 0.2 |
| Communications | 1.4 | 1.6 | 0.1 | 0.4 | 3.6 | - | 0.1 | 0.1 | 3.7 | 0.3 |
| Capital Markets | 3.4 | 1.4 | 0.1 | 0.7 | 5.6 | - | 0.4 | 0.4 | 6.0 | 0.5 |
| Marketing | 2.7 | - | - | 0.4 | 3.0 | - | - | - | 3.0 | 0.3 |
| Facilities | 1.0 | 0.2 | 0.0 | 0.2 | 1.4 | 1.4 | - | 1.4 | 2.8 | 0.2 |
| Supply Chain | 5.6 | 0.7 | 0.1 | 0.9 | 7.3 | - | 0.5 | 0.5 | 7.8 | 0.6 |
| Gov't Relations | 0.3 | - | - | 0.0 | 0.4 | 0.0 | - | 0.0 | 0.4 | 0.0 |
| ITG (3) | | 17.5 | 2.4 | 2.7 | 22.6 | - | 1.7 | 1.7 | 24.2 | 2.0 |
| **Total Shared Services** | $ 34.9 | $ 39.1 | $ 7.7 | $ 11.3 | $ 92.9 | $ 25.2 | $ 4.8 | $ 30.0 | $ 123.0 | $ 10.2 |

(1) Base costs include 2012 C&B plus employee cost for T&E, Facilities, Office & Communications, Training, and other employee related expenses

(2) Direct / Third Party costs represent pass through costs based on diligence and negotiations

(3) ITG Breakdown

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Tech Infrastructure | 8.1 | 0.8 | 1.2 | 10.1 | - | 0.7 | 0.7 | 10.8 |
| Security | 5.8 | 1.4 | 1.0 | 8.2 | - | 0.3 | 0.3 | 8.4 |
| Architecture | 1.7 | 0.1 | 0.2 | 2.0 | - | - | - | 2.0 |
| Tech & Ops | 2.0 | - | 0.3 | 2.2 | - | 0.7 | 0.7 | 2.9 |
| Total ITG | $ 17.5 | $ 2.4 | $ 2.7 | $ 22.6 | $ - | $ 1.7 | $ 1.7 | $ 24.2 |

5/12/2012   10:47 AM

Schedule C-1b
Pricing for Parent Services

## Parent Services Pricing

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| 1 Finance/Tax | 1a4 | Headcount | Finance Shared Services - Payroll | $33,260 | Monthly Variable |
| | 1a4 | Purchase Orders | Finance Shared Services - P2P | $64,648 | Monthly Variable |
| | 1a4 | Reconciliations | Finance Shared Services - Accounting | $17,379 | Monthly Variable |
| | 1a4 | Expenses Accounts | Finance Shared Services - T&E | $17,895 | Monthly Variable |
| | 1a5 | Time Study | Accounting Policy Team | $48,854 | Monthly Fixed |
| | 1a5 | Time Study | Benefits Accounting | $5,949 | Monthly Fixed |
| | 1a5 | Time Study | Accounting Leadership and Oversight - Accounting and Policy | $17,753 | Monthly Fixed |
| | 1a8 | Time Study | Tax - Direct Team Costs | $212,846 | Monthly Fixed |
| | 1a8 | Time Study | Tax Indirect Services | $56,717 | Monthly Fixed |
| | 1a8 | Time Study | Tax Leadership | $48,543 | Monthly Fixed |
| | NA | pass through | External Audit Fees | $0 | Monthly Variable - Bill as Incurred |
| | 1a5 | Time Study | Financial Controls - Consolidated and Global Functions (Grennan Team) | $0 | Monthly Fixed |
| | 1a4 | Time Study | ITG Finance - FP&A Support for ResCap and Global Functions (Kubitz Team) | $32,448 | Monthly Fixed |
| | 1r9 | OPEX share less SAP exclusions | Finance - Sustain | $507,713 | Monthly Variable |
| | 1r9 | OPEX share less SAP exclusions | Finance - IT Platform | $276,591 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Finance - IT Projects | $26,293 | Monthly Variable |
| | | | **Finance Total** | **$1,366,888** | |
| 2 Audit | 1g | Time Study | Direct Team Related to ResCap | $0 | Monthly Fixed |
| | 1g | Time Study | Training for the Consent Order - signed with PwC - training for all audit staff - already expensed - design classes; customize the services | $0 | Monthly Variable - Bill as Incurred |
| | 1g | pass through | Co-Sourcing for the Consent Order - Subject Matter experts for demonstrating enhanced coverage - planning activities make sure we cover the right audits | $66,667 | Monthly Variable - Bill as Incurred |
| | 1g | pass through | Indirect costs for additional Audit work from Fisette Team - Help Mgmt reporting, audit deck etc | $9,046 | Monthly Variable - Bill as Incurred |
| | 1g | pass through | TeamMate - Audit software to hold workpapers | $502 | Monthly Variable - Bill as Incurred |
| | 1r9 | OPEX share | Audit - IT Sustain | $3,799 | Monthly Variable |
| | | | **Audit Total** | **$80,013** | |
| 3 Treasury | 1w1 | Time Study | ST Liquidity and Funding Planning | $16,933 | Monthly Fixed |
| | 1w1 | Time Study | LT Liquidity | $11,288 | Monthly Fixed |
| | 1w1 | Time Study | Risk Controls | $3,327 | Monthly Fixed |
| | 1w1 | Time Study | Liquidity Executive | $8,877 | Monthly Fixed |
| | 1w1 | Time Study | OH Allocation - Facilities and Travel | $4,209 | Monthly Fixed |
| | 1w1 | Time Study | Leadership Direct | $7,864 | Monthly Fixed |
| | 1w2 | Time Study | Global Funding Team | $97,558 | Monthly Fixed |
| | 1w2 | Time Study | OH Allocation - Facilities and Travel | $8,862 | Monthly Fixed |
| | 1w2 | Time Study | Leadership Allocation - Direct | $14,202 | Monthly Fixed |
| | 1w7 | Time Study | Direct Costing | $147,214 | Monthly Fixed |
| | 1w7 | Time Study | Facilities and Travel | $16,173 | Monthly Fixed |
| | 1w7 | Time Study | Leadership Allocation | $30,789 | Monthly Fixed |
| | 1r9 | EOP Assets | Treasury - ITG Sustain | $405,076 | Monthly Variable |
| | 1r9 | EOP Assets | Trasury - ITG Platform | $48,418 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Treasury - IT Projects | $72,768 | Monthly Variable |
| | | | **Treasury Total** | **$893,558** | |
| 4 Risk (Includes Model Governance) | 1j | Time Study | Leadership Administration | $101,341 | Monthly Fixed |
| | 1j | Time Study | Enterprise Risk (includes Analytics from Seth S. Group) | $73,041 | Monthly Fixed |
| | 1j | Time Study | Corporate Insurance/BCP | $9,969 | Monthly Fixed |
| | 1j | Time Study | Market Risk | $77,142 | Monthly Fixed |
| | 1j | Time Study | SAG | $0 | Monthly Fixed |

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| | 1j | Reserved seats at contigency site | Business Continuity Planning - Sungard Expenses  3rd party | $29,000 | Monthly Variable - Bill as Incurred |
| | 1j | Headcount | Corporate Insurance Premiums | $1,267,250 | Monthly Fixed |
| | 1r9 | Risk Time Study | Risk - IT Sustain | $448,279 | Monthly Variable |
| | 1r9 | Risk Time Study | Risk - Platform | $89,453 | Monthly Fixed |
| | | | Risk Total | $2,095,475 | |
| 5  Compliance (Includes Consent Order Costs) | 1o | Time Study | Global Security | $42,747 | Monthly Fixed |
| | 1n | Time Study | Privacy Services | $0 | Monthly Fixed |
| | 1m | Time Study | Leadership Administration | $45,046 | Monthly Fixed |
| | 1m | Time Study | AML | $47,424 | Monthly Fixed |
| | 1m | Time Study | Program Management | $56,744 | Monthly Fixed |
| | 1m | Time Study | Global Functions | $22,916 | Monthly Fixed |
| | 1m | 100% to ResCap | Consent Order Direct Costs - 3rd Party | $150,000 | Monthly Variable - Bill as Incurred |
| | 1m | 100% to ResCap | Consent Order Staffing | $189,720 | Monthly Fixed |
| | 1r9 | OPEX share | Compliance - IT Sustain | $143,865 | Monthly Variable |
| | 1r9 | OPEX share | Compliance - Platform | $45,206 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Compliance - IT Projects | $14,137 | Monthly Variable |
| | | | Compliance Total | $757,806 | |
| 6  Loan Review | 1t | % of total loans reviewed | Loan Reviews | $33,577 | Monthly Fixed |
| 7  Human Resources | 1q | Time Study | Benefits Administration | $32,410 | Monthly Fixed |
| | 1q | Time study | Compensation | $67,169 | Monthly Fixed |
| | 1q | ResCap specific BPO costs | Employee Relations | $15,005 | Monthly Fixed |
| | 1q | Time Study | HR Business Partner Support | $91,370 | Monthly Fixed |
| | 1q | Time Study | Operations - Base Costs | $39,485 | Monthly Fixed |
| | 1q | Time Study | Operations - Third party | $440,167 | Monthly Fixed |
| | 1q | Time Study | Staffing - Base Costs | $31,247 | Monthly Fixed |
| | 1q | Time Study | Staffing - Third Party | $28,580 | Monthly Fixed |
| | 1q | Higher of 11.75% of ResCap base pay or claim experience | Medical Dental, Life Insurance, Disability Charges | $0 | Monthly Variable |
| | 1q | actual contributions | 401K Employer Contributions | $0 | Monthly Variable |
| | 1r9 | headcount share | HR - IT Sustain | $87,360 | Monthly Variable |
| | 1r9 | headcount share | HR - IT Platform | $3,142 | Monthly Variable |
| | 1r9 | headcount share | HR - IT Projects | $23,707 | Monthly Variable |
| | | | HR - Total | $859,642 | |
| 8  Legal | 1s | Time Study | HR and Employment | $10,022 | Monthly Fixed |
| | 1s | Time Study | Procurement | $2,181 | Monthly Fixed |
| | 1s | Time Study | Law Department Management Support | $5,527 | Monthly Fixed |
| | 1s | Time Study | Proportion of Attorneys & Paralegals | $14,798 | Monthly Fixed |
| | 1r9 | OPEX share | Legal - IT Sustain | $82,841 | Monthly Variable |
| | 1r9 | OPEX share | Legal - IT Platform | $11,805 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Legal - IT Projects | $36,583 | Monthly Variable |
| | | | Legal Total | $163,758 | |
| 9  Communications and Investor Relations | SOW* | Time Study | Employee Communications | $2,016 | Monthly Fixed |
| | SOW* | Time Study | Community Relations | $0 | Monthly as Incurred |
| | SOW* | Time Study | Digital Communications | $10,149 | Monthly Fixed |
| | SOW* | headcount share | Investor Relations | $124,433 | NA |

5/12/2012

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| | 1r9 | headcount share | Communications - IT Sustain | $150,324 | Monthly Variable |
| | 1r9 | headcount share | Communications - IT Platform | $9,493 | Monthly Fixed |
| | 1r9 | headcount share | Communications - IT Projects | $9,231 | Monthly Variable |
| | | | Communications Total | $305,645 | |
| 10 Capital Markets and IM | SOW* | Time Study + Blackrock | Investment Management | $305,570 | Monthly Fixed |
| | SOW* | 1 analyst | MSR Analyst | $14,229 | Monthly Fixed |
| | 1r9 | OPEX share | Capital Markets - IT Sustain | $136,423 | Monthly Variable |
| | 1r9 | OPEX share | Capital Markets - IT Platform | $8,355 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Capital Markets - IT Projects | $36,464 | Monthly Variable |
| | | | Capital Markets - Total | $501,041 | |
| 11 Marketing | 1i | Time Study | Strategic Marketing Planning & Strategy Development | $53,206 | Monthly Fixed |
| | 1i | Time Study | Creative Asset Design Production & Mgmt | $46,856 | Monthly Fixed |
| | 1i | Time Study | Marketing performance evaluation & optimization activities | $13,686 | Monthly Fixed |
| | 1i | Time Study | Management of day-to-day marketing operational responsibilities | $12,839 | Monthly Fixed |
| | 1i | Time Study | Facilities, Office Communications | $8,298 | Monthly Fixed |
| | 1i | Time Study | Travel | $3,781 | Monthly Fixed |
| | 1i | Time Study | eCommerce Product Mgmt Services | $50,190 | Monthly Fixed |
| | 1i | Time Study | Customer Experience Design & Development | $49,137 | Monthly Fixed |
| | 1i | Time Study | Website Optimization | $3,676 | Monthly Fixed |
| | 1i | Time Study | Facilities, Office Communications | $7,969 | Monthly Fixed |
| | 1i | Time Study | Travel | $3,632 | Monthly Fixed |
| | | | **Marketing Total** | $253,271 | |
| 12 Facilities | 1ka | Square Footage | Facility Services | $90,479 | Monthly Fixed |
| | 1ka | Square Footage | 3rd party JLL Services | $119,436 | Monthly Fixed |
| | 1ka | Square Footage | Current rent payment process and allocation to business/function based on occupied space will stay in effect | $0 | Settled Monthly |
| | 1r9 | Square Footage | Facilities - IT Sustain | $22,293 | Monthly Variable |
| | 1r9 | Square Footage | Facilities - IT Platform | $3,184 | Monthly Fixed |
| | | | Facilities Total | $235,392 | |
| 13 Supply Chain | 1kb | Time Study | | | |
| | 1kb | NA | Sourcing, Monitoring and Off-boarding of Vendors | $535,930 | Monthly Fixed |
| | 1kb | NA | Pricing covers the Maintenance of the Risk Partner Relationships and all work associated with meeting the Consent Order requirements and other services | $0 | NA |
| | 1r9 | Vendor Spend | Supply Chain - IT Sustain | $63,513 | Monthly Variable |
| | 1r9 | Vendor Spend | Supply Chain - IT Platform | $8,933 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Supply Chain - IT Projects | $38,200 | Monthly Variable |
| | | | Supply Chain - Total | $646,576 | |
| 14 Executive Leadership | | | | $0 | NA |
| 15 Government Relations | 1x | | Government Relations | $34,651 | Monthly Fixed |
| 16 ITG | | | ITG Sustain | | |
| | All IT SOWs excl 1r1, 1r9, SOW for IT Resources, IT Tech Strat and Architecture | OPEX share less non-Mortgage NIDD exclusions | Corporate TI (includes NIDD) | $844,182 | Monthly Variable |
| | 1r1 | OPEX share less non-Mortgage Privacy and Project Sustain | Security | $679,516 | Monthly Variable |

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| | IT Tech_Strat_Architecture | OPEX share less non Mortgage application and Project Sustain | Architecture | $169,203 | Monthly Variable |
| | Cross Functional | OPEX Share | Technology Operations Group | $186,276 | Monthly Variable |
| | | | IT Projects for Mortgage | | |
| | 1r9 | OPEX share for selected projects | TI Global Functions NADD | $47,199 | Monthly Variable |
| | 1r9 | OPEX share for selected projects | TI Corporate NADD | $12,664 | Monthly Variable |
| | 1r9 | OPEX share for selected projects | Security | $23,850 | Monthly Variable |
| | 1r9 | Project spend | Technology Operations Group | $57,809 | Monthly Variable |
| | | | Projects for Mortgage | $0 | Monthly Variable |
| | | | ITG - Total | $2,020,698 | |

Total Monthly Shared Service Charge     $10,247,989

Annual Total Shared Service Charge     $122,975,884

\* SOW is not numbered

12-12020-mg    Doc 3809-1    Filed 09/20/13    Entered 09/20/13 08:48:53    Exhibit A -
Pg 59 of 66

**Schedule C-2**
**Pricing for ResCap Services** [1]

| ResCap to AFI | | Monthly Total Shared Services Charges (US $) | | | |
|---|---|---|---|---|---|
| **Functional Service Area** | **Statement of Work** | **Total Base Costs (2)** | **Third Party Costs** | **IT Projects** | **Total Shared Services** |
| Human Resources | HR Support Services (AFI) | $      74,326 | $                - | TBD | $      74,326 |
| Legal | Legal Services (AFI) | 21,481 | - | TBD | 21,481 |
| ITG | IT Resource Services | 1,015,068 | - | TBD | 1,015,068 |
| Compliance | Line of Business Compliance Services | 79,088 | - | TBD | 79,088 |
| Risk | Risk Services - Reporting and Special Assets | 23,342 | - | TBD | 23,342 |
| Accounting | ResCap Accounting Services | 163,437 | - | TBD | 163,437 |
| Master Servicing | Master Servicing for Ally Auto - Bond Modeling | 15,436 | 15,000 | TBD | 30,436 |
| Master Servicing | Master Servicing for Ally Auto - Bond Administration | 26,274 | - | TBD | 26,274 |
| **Subtotal** | | **$   1,418,453** | **$   15,000** | **$              -** | **$   1,433,453** |

| ResCap to AFI  for Bank | | Monthly Total Shared Services Charges (US $) | | | |
|---|---|---|---|---|---|
| **Functional Service Area** | **Statement of Work** | **Total Base Costs (2)** | **Third Party Costs** | **IT Projects** | **Total Shared Services** |
| ITG | Application Support | $    444,495 | $    222,122 | TBD | $    666,617 |
| Capital Markets | Capital Markets | 428,678 | - | TBD | 428,678 |
| Human Resources | HR Support Services (Bank) | 32,388 | - | TBD | 32,388 |
| Risk | Risk Management and Data Collection | 501,014 | 141,858 | TBD | 642,872 |
| Legal | Legal Services (Bank) | 20,317 | - | TBD | 20,317 |
| Accounting | Accounting | 78,159 | - | TBD | 78,159 |
| Finance | Mortgage Financial Planning and Analysis | 101,984 | - | TBD | 101,984 |
| Capital Markets | Records Services | 49,829 | - | TBD | 49,829 |
| Business Risk and Controls and Business Excellence | Business Risk and Controls and Business Excellence | 105,454 | 8,381 | TBD | 113,835 |
| Accounting | Capital Markets Accounting | 50,377 | - | TBD | 50,377 |
| Consumer Lending | Consumer Lending Services | 817,156 | - | TBD | 817,156 |
| Risk | Client Repurchase Management | 6,638 | - | TBD | 6,638 |
| **Subtotal** | | **$   2,636,488** | **$   372,361** | **$              -** | **$   3,008,850** |
| **Subtotal** | | **$   4,054,941** | **$   387,361** | **$              -** | **$   4,442,302** |

[1] Approximate costs of services  - refer to supporting exhibts C2-a and C2-b
[2] Includes Employee Costs and 2.9% indirect support

**Schedule C-2a**
**Pricing for ResCap Services** [1]

| ResCap to AFI - Functional Area | Statement of Work | Employee (1) (A) | IT Costs (B) | Platform Costs (C) | Indirect Support Costs (D) = 2.9% of (A) + (B) + (C) | Total Base Costs (E) = (A) + (B) + (C) + (D) | Third Party Costs (F) | IT Projects (G) | Total As Incurred (H) = (F) + (G) | Total Shared Services (I) = (E) + (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| **ResCap to AFI** | | | | | | | | | | |
| Human Resources | HR Support Services (AFI) | 866,926 | - | - | 24,991 | 891,918 | - | - | - | 891,918 |
| Legal | Legal Services (AFI) | 250,555 | - | - | 7,223 | 257,777 | - | - | - | 257,777 |
| ITG | IT Resource Services | 11,839,510 | - | - | 341,302 | 12,180,812 | - | - | - | 12,180,812 |
| Compliance | Line of Business Compliance Services | 922,464 | - | - | 26,592 | 949,057 | - | - | - | 949,057 |
| Risk | Risk Services - Reporting and Special Assets | 272,258 | - | - | 7,848 | 280,107 | - | - | - | 280,107 |
| Accounting | ResCap Accounting Services | 1,906,290 | - | - | 54,953 | 1,961,243 | - | - | - | 1,961,243 |
| Master Servicing | Master Servicing for Ally Auto - Bond Modeling | 174,996 | - | - | 10,234 | 185,230 | 180,000 | - | 180,000 | 365,230 |
| Master Servicing | Master Servicing for Ally Auto - Bond Administration | 306,456 | - | - | 8,834 | 315,290 | - | - | - | 315,290 |
| **Total AFI** | | 16,539,455 | - | - | 481,979 | 17,021,434 | 180,000 | - | 180,000 | 17,201,434 |
| | | | | | | | | | | |
| **ResCap to AFI for Ally Bank** | | | | | | | | | | |
| ITG | Application Support | 5,109,805 | - | - | 224,141 | 5,333,945 | 2,665,462 | - | 2,665,462 | 7,999,408 |
| Capital Markets | Capital Markets | 5,000,000 | - | - | 144,137 | 5,144,137 | - | - | - | 5,144,137 |
| Human Resources | HR Support Services (Bank) | 377,765 | - | - | 10,890 | 388,655 | - | - | - | 388,655 |
| Risk | Risk Management and Data Collection | 5,796,011 | - | - | 216,157 | 6,012,168 | 1,702,299 | - | 1,702,299 | 7,714,467 |
| Legal | Legal Services (Bank) | 236,973 | - | - | 6,831 | 243,804 | - | - | - | 243,804 |
| Accounting | Accounting | 911,628 | - | - | 26,280 | 937,908 | - | - | - | 937,908 |
| Finance | Mortgage Financial Planning and Analysis | 1,189,513 | - | - | 34,291 | 1,223,804 | - | - | - | 1,223,804 |
| Capital Markets | Records Services | 581,189 | - | - | 16,754 | 597,943 | - | - | - | 597,943 |
| Business Risk and Controls and Business Excellence | Business Risk and Controls and Business Excellence | 1,227,169 | - | - | 38,275 | 1,265,444 | 100,575 | - | 100,575 | 1,366,019 |
| Accounting | Capital Markets Accounting | 587,589 | - | - | 16,939 | 604,528 | - | - | - | 604,528 |
| Consumer Lending | Consumer Lending Services | 9,531,114 | - | - | 274,757 | 9,805,872 | - | - | - | 9,805,872 |
| Risk | Client Repurchase Management | 77,419 | - | - | 2,232 | 79,651 | - | - | - | 79,651 |
| **Total AFI for the Bank** | | 30,626,175 | - | - | 1,011,684 | 31,637,859 | 4,468,336 | - | 4,468,336 | 36,106,196 |
| | | | | | | | | | | |
| **Total Bank and AFI** | | 47,165,630 | - | - | 1,493,663 | 48,659,293 | 4,648,336 | - | 4,648,336 | 53,307,629 |

*(Occupancy is currently cash settled)*

[1] Employee Costs include Compensation and Benefits plus costs for T&E, Facilities, Office and Communications, Training and other errmployee related expenses

[2] Direct third party costs represent  pass-through costs based on diligence and negotiations

**Schedule C-2b**
**Pricing for ResCap Services**

| ResCap to AFI Pricing | | | | |
|---|---|---|---|---|
| **Function** | **Statement of Work** | **Service** | **Monthly Total Shared Service Charge (US$)** | **Monthly Billing Methodology** |
| 1. Human Resources | HR Support Services (AFI) | All Services | $74,326 | Monthly Fixed |
| 2. Legal | Legal Services (AFI) | Internal Counsel | $21,481 | Monthly Fixed |
| | | External Counsel | TBD | Monthly Variable As incurred |
| 3. ITG | IT Resource Services | IT Sustain | $1,015,068 | Monthly Variable As incurred |
| | | IT Projects | TBD | Monthly Variable As incurred |
| 4. Compliance | Line of Business Compliance Services | All Services | $79,088 | Monthly Fixed |
| 5. Risk | Risk Services - Reporting and Special Assets | All Services | $23,342 | Monthly Fixed |
| 6. Accounting | ResCap Accounting Services | All Services | $163,437 | Monthly Fixed |
| 7. Master Servicing | Master Servicing for Ally Auto - Bond Modeling | All Services | $30,436 | Monthly Fixed |
| 8. Master Servicing | Master Servicing for Ally Auto - Bond Administration | All Services | $26,274 | Monthly Variable As incurred |

| ResCap to AFI for the Bank Pricing | | | | |
|---|---|---|---|---|
| **Function** | **Statement of Work** | **Service** | **Monthly Total Shared Service Charge (US$)** | **Monthly Billing Methodology** |
| 14a ITG | Application Support | Sustain | $666,617 | Monthly Variable based on departmental expenses |
| | | Projects | TBD | Monthly Variable As incurred |
| 14b Capital Markets | Capital Markets | All Services | $428,678 | Monthly Fixed |
| | | Document Custody 3rd Party | TBD | Monthly Variable As incurred |
| 14c. Human Resouces | HR Support Services (Bank) | All Services | $32,388 | Monthly Fixed |
| 14d Risk | Risk Management and Data Collection | All Services | $642,872 | Monthly Variable based on departmental expenses |
| 14e Legal | Legal Services (Bank) | Internal Counsel | $20,317 | Monthly Fixed |
| | | External Counsel | TBD | Monthly Variable As incurred |
| 14f. Accounting | Accounting | All Services | $78,159 | Monthly Fixed |
| 14g Finance | Mortgage Financial Planning and Analysis | All Services | $101,984 | Monthly Fixed |
| 14i Capital Markets | Records Services | All Services | $49,829 | Monthly Fixed |
| | | 3rd Party Costs | TBD | Monthly Variable As incurred |
| 14j Business Risk and Controls and Business Excellence | Business Risk and Controls and Business Excellence | All Services | $113,835 | Monthly Fixed |
| 14L Accounting | Capital Markets Accounting | All Services | $50,377 | Monthly Fixed |
| 14M Consumer Lending | Consumer Lending Services | All Services | $817,156 | Monthly Variable Based on Consumer Loans funded |
| 14N Risk | Client Repurchase Management | All Services | $6,638 | Monthly Fixed Needs to be reviewd quarterly to establish a new ratio of recoveries processed |

Total Monthly Shared Service Charge  $      4,442,302
Total Annual Shared Service Charge  $    53,307,630

12-12020-mg   Doc 3209-1   Filed 03/18/12   Entered 03/18/12 09:43:53   Exhibit F-
Pg 62 of 66

## <u>Schedule D-1</u>

List of AFI and Supported Facilities

As kept by the Corporate Real Estate Office as of the Effective Date

**Schedule D-2**

List of ResCap and Supported Facilities

As kept by the Corporate Real Estate Office as of the Effective Date

## Schedule E

## Form of Supplement

_____

### Supplement [X]

This Supplement __ (this "**Supplement**") is made and entered into as of the __ day of
____, 2012 (the "**Supplement Effective Date**") by and between Ally Financial Inc., a
Delaware corporation ("**AFI**") and Residential Capital, LLC, a Delaware limited liability
company ("**ResCap**") (together with AFI, the "**Parties**").

1.     **BACKGROUND**

This Supplement is entered into pursuant to the terms of the Shared Services
Agreement between AFI and ResCap dated [•] (the "**Agreement**") and constitutes
a Supplement under the Agreement.  Capitalized terms used but not defined in
this Supplement have the meanings assigned to those terms in the Agreement.

2.     **SERVICES DESCRIPTION AND CHARGES**

Supplier will provide [*Insert brief description of the services here.*]____ services
as [Additional Services]/[Customized Services][, which shall be described in
more detail in _____, for the Charges set forth [therein]/[in **Schedule C** to the
Agreement].

3.     **CHANGES**

*[Refer to the clauses in the Agreement relating to Services and incorporate here
as appropriate and agreed as the clauses in the Agreement do not apply to the
Additional Services or Customized Services being added pursuant to this
Supplement.]*

4.     **TERM AND TERMINATION**

*[Term and notice provisions to be inserted as appropriate.]*

5.     **[OTHER TERMS**

*The Parties further agree:*

*[Insert any other terms and conditions applicable to the Additional Services or
Customized Services to be performed under this Supplement. ]*

6.     **MISCELLANEOUS**

This Supplement is incorporated by reference into the Agreement.  In the event of

any conflict between the terms of this Supplement and the Agreement, the terms
of this Supplement shall only prevail to the extent that this Supplement expressly
states that it is intended to override a term of the Agreement.

SPACE   BELOW   INTENTIONALLY   BLANK   –   SIGNATURE   PAGE
FOLLOWS

12-12020-mg    Doc 3885-1    Filed 06/03/12    Entered 06/03/12 04:48:33    Exhibit P.
Pg 67 of 67

**IN WITNESS WHEREOF**, the Parties have caused this Supplement to be executed by
their respective duly authorized representatives as of the Supplement Effective Date.

Ally Financial Inc.

By: _____
Name:
Title:

Residential Capital, LLC

By: _____
Name:
Title: