MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Joel C. Haims

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

————————————————————————

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

------------------------------------------------------------------------

**<u>SUPPLEMENTAL DECLARATION OF JOHN G. MONGELLUZZO</u>**

I, John G. Mongelluzzo, declare:

1.    I am Managing Director at Residential Capital, LLC, a Debtor in this bankruptcy case.

(The Debtors and Debtors in Possession are herein collectively referred to as "ResCap.")  In that

role, I am responsible for capital markets operations.  I have been employed at ResCap since

April 2009.

2.    I submit this declaration to supplement my declaration of August 7, 2012 (my "Initial

Declaration").  First, I address the costs and burdens of producing the Loan Files requested by

the FHFA and anticipated requests for Loan Files from other defendants in the FHFA Case.

Second, I address one Statement of Work that I was involved in negotiating and drafting that is

part of the Shared Services Agreement between ResCap and Ally Financial, Inc.

12-12020-mg    Doc 1296-2    Filed 08/28/12    Entered 08/28/12 16:48:53    Exhibit 2:
Pg 2 of 31

## Document Production Costs and Burdens

3.    As discussed in my Initial Declaration, the production of a large number of Loan Files is costly and burdensome to the Debtors.  While I do not know exactly how many Loan Files that ResCap may eventually be asked to produce in relation to the FHFA litigation, I am informed that the FHFA has requested 5,000 Loan Files. Below, I discuss the costs and burdens associated with that request.

4.    I am also informed that the defendants in the FHFA case may be seeking approximately 43,000 Loan Files from ResCap.  For the Court's convenience, I also discuss the costs and burdens associated with such a production below.

5.    Because, to my knowledge, no one has identified the specific Loan Files that my group would be tasked with finding and producing, my descriptions below are based on the average times and costs associated with finding and producing Loan Files of similar vintage.   I also do not know what the required time frame for production would be, so for the purposes of this declaration, I assume turnaround times that are normal for ResCap's business, except where otherwise noted.

## I.    FHFA'S REQUEST FOR 5,000 LOAN FILES

6.    As described in my Initial Declaration, producing Loan Files is a labor intensive task. The first step is to locate the Loan Files.  To search for 5,000 Loan Files across ResCap's 14 databases would take approximately three days and occupy time from two of ResCap's Fulfillment Group employees.  The results of this search would provide the location (or locations) for the Loan Files and their constituent parts.

7.    After running those initial searches, the Fulfillment Group would work to clear up search errors, exceptions, and other problems that arise during the initial database search.  This part of the process would take approximately two days  The Fulfillment Group would then request that

the various third party storage vendors employed by the Debtors to store hard copy Loan Files
pull the requested Loan Files.

8.   Once the Fulfillment Group informs our vendors which Loan Files are needed, the
vendors track down the documents in their storage facilities.  We have a contractual limit of
1,250 boxes per week[1] that we can request from our vendors at the set contractual rate.  Some
Loan Files may be in the same box as others and some Loan Files are likely to have components
in more than one box, so it is difficult to estimate precisely how many boxes would need to be
pulled to produce these 5,000 Loan Files.

9.   If the vendors are required to pull boxes containing Loan Files in excess of the
contractual amounts, the storage vendors charge substantially more per file, if they are able to
comply with the increased volume of requests at all.  Based on the contractual limits, it could
take five weeks or more for the vendors to locate and pull all of the Loan Files.  However, that
does not account for the fact that ResCap requests thousands of files on a regular basis as part of
its regular business operations.  In July of this year ResCap requested 5,082 Loan Files and in
August requested more than 8,000 Loan Files.  I also expect there to be increasing requests
necessary for complying with various tasks associated with the bankruptcy, and complying with
other investigations and consent orders.  This means that substantially all of the documents at
issue here would have to be requested on an extra-contractual basis (and at extra-contractual
prices, discussed below).

10. While our vendors are usually willing to exceed their contractual limitations, to do so
comes at additional cost to the Debtors and there is a limit to their capacity.

---

[1] In my Initial Declaration, I mistakenly stated that our contractual limit is 250 boxes per week.
That mistake was inadvertent, and the correct number is 1,250 boxes per week.

ny-1054715

11. As Loan Files are pulled by the vendors, they are sent to another vendor, for imaging. This process, when the imaging vendor is not overburdened, usually only takes a few days. However, with a request of 5,000 Loan Files being sent to the imaging vendor over the course of five or so weeks, the imaging process for each Loan File may take longer than a few days because giving the imaging vendor more than 1,000 Loan Files every week for five weeks in addition to the Loan Files ResCap already sends on a weekly basis per week is not an insignificant increase.  As a result, the imaging vendor will likely be required to spread out the imaging requests over a longer period of time so as not to interfere with the imaging that needs to be completed for other key functions of the Debtor.

12. In summary, and although I stress again that it is somewhat hard to estimate without knowing the actual loan numbers for the Loan Files at issue, based on the current level of requests being processed by the Fulfillment Group and assuming our vendors have adequate capacity, producing 5,000 Loan Files would take approximately five to seven weeks and would, during most if not all of that time, stress the Fulfillment Group  when they are already under significant burdens to comply with the restructuring related obligations, among others.

13. As described in my Initial Declaration, if the contractual limits with the storage vendors are not exceeded, it costs approximately $25-$28 per Loan File to locate, ship, image, and produce each file.  Therefore, the approximate cost of producing 5,000 Loan Files would be $125,000-$140,000.  Those costs are exclusive of attorney time, litigation vendor costs, and other costs that producing Loan Files might incur after the Fulfillment Group has completed its work, to which I cannot speak.

14. If the contractual limits with the storage vendors are exceeded, the costs increase.  As noted above, because of the existing volume of requests that the Fulfillment Group makes based

on our business needs, and the increasing requests that are the result of the restructuring process, the majority of—if not all—of the Loan Files at issue would have to be produced at the extra-contractual rate. Although the number varies, in the past few months, the Fulfillment Group requested more than 5,000 Loan Files in July and requested more than 8,000 Loan Files in August, and I understand that there are more requests for Loan Files forthcoming, including requests from the Creditor's Committee and Examiner. For each Loan File requested in excess of our contractual limitations, I estimate that it costs $75-100 to produce instead of $25-$28 to produce. Therefore, if all 5,000 Loan Files at issue here must be produced outside of the contractual rate, which is likely, it would cost approximately $375,000-$500,000.

## II.    REQUEST FOR 43,000 LOAN FILES

15. I have been informed that the various non-Ally defendants in the FHFA case are likely to seek the production of 43,000 Loan Files from the debtors because they want all of the Loan Files in the so-called "supporting loan groups." I summarize below the likely costs and burdens associated with such a large request.

16. Clearly, producing 43,000 Loan Files is an enormous undertaking and exponentially more difficult and costly than producing only 5,000 Loan Files. In fact, it simply may not be possible to produce 43,000 Loan Files in any reasonable amount of time without completely preventing the Fulfillment Group and its vendors from undertaking the work necessary for the Debtors to run their business and complete the restructuring.

17. Producing 43,000 Loan Files would take a lot of time and cost a lot of money. As outlined in my Initial Declaration, simply searching for 43,000 Loan Files in ResCap's 14 databases could take a full week. Because of the size of the searches, the Fulfillment Group would have to search the databases at night because conducting a batch search for that many

documents prevents the databases from being used for any other purpose, which is not acceptable during the working day.

18. After the week of searches, it would take the Fulfillment Group approximately one or two weeks to clear up search errors, exceptions, and other problems that arise during the initial database search. The process of searching and reconciling errors and exceptions would occupy two Fulfillment Group employees during that time.

19. Once the Fulfillment Group tells ResCap's storage vendors which Loan Files are needed, it will take time for the vendors to pull the Loan Files. Assuming ResCap's contractual limits of 1,250 boxes per week are not exceeded, it could take 34 weeks—or eight months—to locate, pull, and ship all of the requested Loan Files. Asking the vendors to exceed the contractual limitations for an extended period of time could seriously limit their ability to locate and pull documents necessary for running the Debtors' business and consummating the restructuring. Of course, asking the storage vendors to exceed the contractual capacity will also cause the costs of production to increase dramatically.

20. As with 5,000 files, having ResCap's imaging vendor attempt to image 43,000 Loan Files poses significant problems—but exponentially more so. Such an increased volume of imaging over such a prolonged period of time will undoubtedly have significant negative implications on their ability to timely image documents critical to run ResCap's business and consummate the restructuring. Because of the volume of imaging that 43,000 Loan Files represents, the imaging vendor will likely have to spread out the imaging over many months.

21. Because a production of 43,000 Loan Files is so large, I would estimate that if the current workload of the Fulfillment Group remains constant, it would take approximately ten months to complete full production of all of those Loan Files. That assumes, however, that the storage

vendors and imaging vendors are able to exceed their contractual limits for a prolonged period of

time and that somebody can pay for those costs.

22. Based on the $25-$28 estimate for the production of a Loan File within the contractual

limits, it would cost approximately $1,075,000 to $1,204,000.  However, as noted above, that

estimate is unlikely to be the true costs because the Debtors are already requesting thousands of

documents a month.  Therefore, the costs would almost certainly be $75-$100 per Loan File,

meaning it would cost between $3,225,000 and $4,300,000 to produce 43,000 Loan Files over

the course of ten months.

23. The only prior experience that could serve as a predictor for how the production of

43,000 Loan Files might go is the MBIA litigation.  In that case, the Fulfillment Group produced

64,000 Loan Files in a case where ResCap is a defendant.  That production of 64,000 Loan Files

was done on an expedited basis and still took approximately nine months.  That production was

very burdensome on the Fulfillment Group, and was undertaken pre-bankruptcy and at a time

when significantly fewer obligations—such as those related the restructuring and various consent

orders—were burdening the Fulfillment Group.

**Shared Services Agreement**

24. I have been asked to describe the purpose and scope of the Record Services Statement of

Work related to the Shared Services Agreement because I was involved in negotiating and

drafting it.  Attached hereto as Exhibit A is the Record Services Statement of Work.  Below, I

describe the purpose and scope of that Statement of Work as well as its relationship to large

discovery requests such as are at issue here.

25. I am aware of, and have reviewed, the "Shared Services Agreement" between ResCap and Ally Financial, Inc. ("AFI"). I understand its purpose is to allow ResCap and AFI to continue sharing the services post-bankruptcy that they had shared pre-bankruptcy.

26. Because some of the functions that the capital markets operations group I oversee at ResCap previously supported both ResCap and AFI, certain aspects of my group's work were included in the Record Services Statement of Work.

27. The Record Services Statement of Work, and in particular the clause which relates to the processing of "request for files/documents that are received from internal and external clients for loan sales, litigation requests, audits and reconciliation projects and deliver files/images to requestor in a mutually agreeable format . . . ." was intended to capture the type of document processing that group performed for AFI prior to the bankruptcy.

28. The requests that the Fulfillment Group received from AFI pre-bankruptcy were for small numbers of files (including Loan Files) that were necessary for ordinary business purposes, such as individual foreclosure cases, repurchase requests, among others. It was not the intention for the Record Services Statement of Work to include the production of thousands—and certainly not tens of thousands—of Loan Files for AFI in litigation to which the Debtors were not involved. Indeed, I do not recall any such large scale requests ever being made by AFI of the Fulfillment Group prior to the bankruptcy filing, so such a request was not contemplated by or included in that scope of work. I cannot recall any requests from AFI to the Fulfillment Group prior to the bankruptcy that involved any more than a few hundred Loan Files, and even those cases were rare. The type of Loan Files pulls performed by the Fulfillment Group for AFI were almost always for one or two Loan Files at a time.

29. In Exhibit D to the Record Services Statement of Work, it provides that all requests for
Loan Files will be made on the same day as they are received.  This is not a turnaround time
ResCap would have—or could have—agreed to if the Record Services Statement of Work
contemplated the production of thousands of Loan Files because, as described above, it can take
day or weeks to even run the database searches for such large numbers of Loan Files.  It is,
therefore, a literal impossibility to comply a one day turnaround in such cases.

30. The fee structure set out in the Shared Services Agreement—which allocates just under
$50,000 to ResCap per month for Record Services—was arrived at based on the total services
that ResCap provides to AFI, including modest and limited Loan File and other record pulls that
were the norm prior to the bankruptcy and did not include any contemplation of large Loan File
collections such as what are at issue here.  Were such large scale Loan File pulls contemplated,
the monthly fee likely would have to be substantially higher because the burden and costs of
such Loan File pulls would have raised the costs of the services ResCap provides to AFI.  It is
also worthy of note that even in the case of the individual Loan Files and other document pulls
contemplated by the Record Services Statement of Work, the third party costs are to be borne by
AFI, not the Debtors.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true
to the best of my knowledge, information, and belief.  Executed on August 28, 2012, at Fort
Washington, PA.

/s/ John G. Mongelluzzo_____

John G. Mongelluzzo

12-12020-mg    Doc 1298-9    Filed 08/28/12    Entered 08/28/12 16:48:56    Exhibit 2:
Pg 10 of 21

# Exhibit A

# STATEMENT OF WORK

### For Record Services to the
### Shared Services Agreement between Residential Capital, LLC and Ally Financial Inc.
### Dated as of May ____, 2012 (the "Agreement")

This Statement of Work ("SOW"), between Ally Financial Inc. ("AFI") and Residential Capital, LLC (together with its subsidiaries, "ResCap"), is issued this ____, May 2012 ("SOW Effective Date") to detail the deliverables and/or services to be performed in accordance with the terms and conditions of the Agreement between AFI and ResCap.  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Agreement. This SOW is subject, in its entirety, to the terms and conditions of the Agreement.

## I.  OVERVIEW

This SOW sets forth each Party's responsibilities for the Record Services Group services provided by ResCap to AFI including the following:

Records Services and what do we do:

- Receive, image, track and maintain mortgage loan file records associated with origination/purchase and servicing of mortgage assets

- Fulfill requests for Data, Documents and Folders

- Manage Final Docs including custodial exception clearing for investor certification and financing line document delivery

- Manage Retention and Destruction of asset related (paper) records

- Recover and correct documents for investors and custodians

- Manage Vendors who support outsourcing of scanning, post-closing, storage and delivery for Record Services

- Manage Projects and Reporting

## II.  SCOPE OF SERVICES

During the Term of the Statement of Work, ResCap will provide the following services to AFI:

A. **In-House Fulfillment**
1. Collateral Transfer
   a. Facilitates Treasury and Capital Markets in the determination/confirmation of custodial file locations
   b. Updates custodial locations in LoanServ & the Custodial File Database and performs research functions to reconcile custodial locations for files that are shown as not on hand
2. File Request Fulfillment

12-12020-mg    Doc 1295-2    Filed 08/28/12    Entered 08/28/12 16:46:53    Exhibit 1:
Pg 12 of 21

   a.   Process requests for files/documents that are received from internal and external clients for loans sales, litigation requests, audits and reconciliation projects
   b.   Deliver files/images to requestor in a mutually agreeable format that is suitable to their request (i.e. electronic format)
3.   Mail
   a.   Files and documents are received from various internal and external customers
   b.   Files are received for reinstatement, files and documents are logged into the Inventory Request Management (IRM) system
   c.   Requests are processed through a database, files and documents are shipped to the vendor and or custodian for reinstatement

**B.   Final Document Recovery and Curative**
1.   Assignment
   a.   Investors and custodians can request corrections to assignments, new assignments, and prior assignments
   b.   The request is fulfilled by the Certification Reconciliation Team and sent to the requestor
2.   Mortgage
   a.   Investor or custodian may request delivery of the recorded mortgage, delivery of a county certified copy, or corrections to the recorded mortgage.
   b.   Steps are taken to record and/or correct the mortgage and deliver it to the requestor when the mortgage has not been recorded or ResCap does not have possession of the recorded mortgage
3.   Title
   a.   Investor or custodian may request receipt of the final title policy
   b.   The Certification Reconciliation Team reviews the imaged Title Policy and confirms the Title Policy is required
      ▪   VA Vendee loans, Hawaii Homeland loans, Secretary of Urban and Housing Authority loan, and refinances without title charges do not require title policies
4.   Mods
   a.   The Certification Reconciliation Team receives document and exception requests through Investor Demands Database
   b.   GNMA or FHA Loan Modification requests are fulfilled by following GNMA guidelines since the loans are pooled or could potentially be pooled to GNMA regardless of the original source
      ▪   The original GNMA or FHA Loan Modification is required prior to completing the procedure

**C.   Project Management and Reporting** *(Project Office)*
1.   Systems/Database Mgt
   a.   Test and coordinate modifications to a system/database when needed
   b.   Troubleshoot problems when they occur
   c.   Make recommendations and plans for future system upgrades
   d.   Ensures the performance of the systems and databases are properly working
2.   Enterprise Initiatives:
   a.   BCP - Business Continuity Plan
   b.   CRIM – Company Records and Information Management
3.   P&P
   a.   Compose and maintain all required documentation related to Policies & Procedures and implementing changes to existing high level documents

12-12020-mg    Doc 1290-2    Filed 08/28/12    Entered 08/28/12 16:46:53    Exhibit 2:
Supplemental Mongelluzzo Declaration    Pg 14 of 22

12-12020-mg    Doc 1290-2    Filed 10/29/12    Entered 10/29/12 21:41:52    Exhibit 2:
Pg 13 of 21

    3. Reporting/Analytics
        a. Report and examine a problem or issue and recommend an action, function as proposals that identify or define problems and look for specific ways of resolving them
        b. Other analytical reports are feasibility studies that examine proposed solutions and determine their practicality
    4. Image Pends
        a. Documents are uploaded to Looking Glass by various internal and external groups and departments. If it is determined that an image is illegible or incorrectly cataloged. An Image Pend will be created through Inventory Status System (ISS). The Image Pend lists the incorrect attribute of the image and provides guidance on how to correct the image.
        b. The process to correct the **image** is the same whether Records Services found the discrepancy or the department was made aware of the discrepancy (Attachment A - Image Pend Table Guide)

D. **Vendor Management** *(Project Office)*
    1. Auditing/Performance Reports
        a. Responsible for auditing Vendors for compliance to the agreed upon Service Level Agreement (SLA)
        b. Vendor Management  pulls a representative sample of loans from various applications, and tests individual files and processes from the sample
        c. The results are logged and delivered to the Vendor, which aids in identifying and reconciling potential risks
    2. Change Orders
        a. Responsible for receiving and approving Vendor Change Orders
           ▪ Change Orders are completed to improve or create processes that are or will be handled by a Record Services Vendor
           ▪ Vendor Management is responsible for ensuring the new or changed procedure is followed
        b. Responsible for analyzing vendor processes and makes recommendations for continuous process improvement
    3. Invoices/Payables
        a. After vendor has completed work and the curative actions are taken, the vendor bills ResCap for the service provided
        b. Invoices are received, approved, logged, and the curative cost is recorded by project name and cost center
    4. SOW
        a. Collaborate with Strategic Sourcing and Business Units on Statement of Work review, revision and implementation
    5. POA Mgt
        a. Maintain the inventory of original unrecorded Power of Attorneys and distributes POA for investors referenced in the beneficiary matrix
    6. SBO Payoffs
        a. Payoff Report from Master Servicing is requested every other week. The report lists SBO loans that have paid off and is used to generate payoff requests. Vendor Management receives the Payoff Report, processes the report through an internal database, and submits a request in Inventory Status System (ISS) to have the files delivered to the SBO Servicer.
    7. Bailee Letters

    a.   Record Services, through its vendor ACS, currently pursues loan level bailee letters when loans are released from financing lines or if a new investor requests them for the portfolio they are or will be purchasing from ResCap.
- For financing line loans, there is a bailee letter template for each financing line.

    b.   For the investor requests, the collateral file has previously been released to the attorney, so Record Services/ACS is accountable for creating the bailee letter and sending via e-mail to the attorney. Follow-up will occur with the attorney until an executed letter is received. Upon receipt, it is uploaded to Filenet and an image is provided to the investor.

8.   Any references to Vendors herein refers to Exhibit C. ResCap may add or remove any Vendor and will provide AFI with an updated Exhibit C.

## III. DELIVERABLES

### A. In-House Fulfillment

1. Responsible for file, (credit & custodial) and document fulfillment, to include the tracking, auditing, reconciling, and confirming transfers, custodial requests, file locations, documents, and repurchases
2. Process requests for files/documents that are received from internal and external clients for loans sales, litigation requests, audits and reconciliation projects

### B. Final Document Recovery and Curative

1. Research, recover, audit, cure and track the receipt of key final documents from internal and external customers that are required by the Investor, Treasury, Capital Markets or Lending Channels, per contractual or structured deal requirements

### C. Project Office

1. Responsible for Internal and External Relationship Management and Vendor Management, including management of outsourcing and storage vendors
2. Financial Management and support for Budget Planning, Forecasting and Actual spend tracking; Business Analytics and reporting; Data Analytics and System Support
3. Enterprise coordination of change management and communication plans, including Policies and Procedures documentation and departmental training programs
4. Management of physical and electronic document storage, retention, and destruction
5. Process Mapping; Implementation of business solutions; and Tracking and status reporting of project issues

## IV. TERM

The Term of this SOW shall be in accordance with the term of the Agreement, unless otherwise modified or terminated in accordance with the Agreement.

## V. ASSUMPTIONS AND DEPENDENCIES

None Identified

## VI.  AFI AND RESCAP  RESPONSIBILITIES

A. AFI Responsibilities
1. Provide ResCap with necessary information related business information, key decisions, changes in strategy, etc. with sufficient lead time to allow ResCap so it can maintain and deliver services described in this SOW.

B. ResCap Responsibilities
1. During the Term of the statement of work, ResCap will provide all services under the terms and conditions of this SOW
2. ResCap will provide notice to AFI of any changes to procedures or processes
3. During the Term, should significant changes be made to ResCap Policies and Procedures that impact services provided by ResCap, AFI will receive the same communication
4. All records and data will be handled, stored and maintained according to the Ally Company Records and Information Management Policy (CRIM)

## VII.  SERVICE LEVEL AGREEMENTS

A.  Performance Standards

1. In House Fulfillment
   a. All folder and document requests, will be requested from the appropriate source by an established timeline.
      ▪ Folder and document requests received after the cutoff time of ordering, will be requested from the appropriate source on the following business day.
   b. When folders are locally available, they should be received by ResCap, by a determined timeline
   c. When image delivery is required, the folder documents will be scanned within an established timeline from when the documents are received
2. Final Document Recovery and Curative
   a. System CIT's SLA are based on the Procedures set in accordance with company policy by the Business owner at the time the CIT is created              .
   b. Deadlines are determined for presale by the closing date, and post sale deadlines are according to the PSA (Purchasing Sales Agreement) .
      ▪ Each deal is unique according to what closing dates, delivery dates, and special arrangements they have promised to the Investor.
3. Project Management and Reporting *(Project Office)*
   a. Projects and Initiatives are completed by established timeframes
4. Vendor Management *(Project Office)*
   a. Vendor Scorecards will be published by the 15th business day of the following month.
   b. Power of Attorneys will be shipped to requestors  by an established timeline
   c. Invoices are processed and submitted to Accounts Payable  subsequent of being notified the invoice was reconciled.
   d. Create and submit Change Orders to vendors within  a reasonable timeframe of identifying issue or process improvement.
   e. Bailee Letters and SBO requests  would be covered within vendor's SLA

5.   Any references to established timelines herein refers to Exhibit D.  ResCap may change such established timelines and will provide AFI with an updated Exhibit D.  To the extent there are material changes in Rescap's established timelines, ResCap and AFI shall work towards establishing mutually agreeable timelines.

Deliverables noted in this SOW will be provided to AFI within timelines required by the terms of the relevant transactions, due dates or as may be requested and agreed upon by AFI and ResCap to fulfill certain business needs.  To the extent such Deliverables have agreed upon timelines, such timelines are deemed to be Service Levels.  In addition, any Deliverables in this SOW must be consistent with historical practice and Services provided must be delivered with the same standard of care, diligence, priority and frequency with which the Services were provided immediately prior to the date hereof; provided, however, that ResCap shall be entitled to subcontract the performance of any or all of the Services to a third party to the extent permitted under the Agreement; and provided, further that ResCap may modify processes and service approach as needed so long as impacted Deliverables and Service Levels continue to be met.  ResCap remains responsible and liable for the performance of any subcontracted services (and the Services provided by ResCap's Affiliates) as if performed by ResCap.


B.      Remediation Processes

1.   If ResCap reasonably determines that there is inadequate staffing or staffing that lacks necessary training or skills to meet the service level agreements set forth in Section VII.A, AFI agrees to work reasonably with ResCap to address any such deficiencies in staff or skill sets

C.      Escalation Processes

1.   Issues and gaps in performance shall be reviewed by AFI initially with the appropriate ResCap contact.

2.   If issues or gaps are not resolved satisfactorily by ResCap in a reasonable time frame, the issues will be escalated by AFI to the appropriate ResCap department manager for resolution.

3.   If issues remain unresolved in AFI's opinion, those issues will be escalated to the appropriate ResCap executive.

Management for ResCap will meet with management for AFI periodically, consistent with the Governance Model described in **Schedule B** to the Agreement, to review performance, project status, changes to policies and procedures, escalated matters, regulatory changes and any other matters that might need to be reviewed by the parties to this Statement of Work


# VIII.  PRICING


All services provided by ResCap under the terms of this SOW will be provided at such charges as may be set forth in the pricing exhibit to the Agreement.

12-12020-mg    Doc 1296-2    Filed 08/28/12    Entered 08/28/12 16:48:53    Exhibit 2:
Pg 17 of 21

12-12020-mg    Doc 1820-9    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit 1:
Supplemental Mongelluzzo Declaration    Pg 18 of 22

IX.   **EMPLOYEE CONTACTS**

AFI and ResCap have identified some of the employees who are currently associated with the Services provided pursuant to this Statement of Work.  See <u>Exhibit A</u> for a list of AFI and ResCap employee contacts including names, telephone numbers, and e-mail addresses.

XI.   **Attachments, Exhibits or Schedules**

Exhibit A – List of Employee Contacts

Exhibit B – List of Record Services Systems

Exhibit C – List of Vendors

Exhibit D –  Service Level Agreement Timeline

Any attachments, exhibits or schedules attached to this Statement of Work shall be incorporated by references into the SOW.

## EXHIBIT A

### Key Employee Listing

**The following employees are designated by AFI as a point of contact during the term of this SOW.**

| Name: Last, First | Role | Phone # | Email |
|---|---|---|---|
| Mainardi, Marianne | SVP, Correspondent Funding | (215) 734-4510 | Marianne.Mainardi@ally.com |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**The following employees are designated by ResCap as a point of contact during the term of this SOW.**

| Name: Last, First | Role | Phone # | Email |
|---|---|---|---|
| Fisher, Jamie | Team Leader – Project Office | (319) 236-5462 | Jamie.Fisher@gmacm.com |
| Smith, Kimberly | Team Leader – Project Office | (319) 236-5211 | Kimberly.Smith@gmacm.com |
| Magnuson, Lisa | Team Leader – Vendor Mgt. | (952) 857-7245 | Lisa.Magnuson@gmacm.com |
| Backora, Dave | Team Leader – In House Fulfillment | (952) 857-7121 | David.Backora@gmacm.com |
| Osborne, Cassie | Team Leader – Final Document Recovery | (319) 236-5543 | Cassie.Osborne@gmacm.com |
| Karns, Heidi | Team Leader – Final Document Curative | (319) 236-5494 | Heidi.Karns@gmacm.com |
| DiSandro, Fred | Associate – Project Office | (215) 734-4007 | Fred.Disandro@gmacm.com |

**The following employees are designated by AFI and ResCap as persons who must be notified of escalated issues pertaining to this SOW.**

| Name: Last, First | Role | Phone # | Email |
|---|---|---|---|
| Mongelluzzo, John | Managing Director | (215) 734-7645 | John.Mongelluzzo@gmacrescap.com |
| Glemser, Patrick | Director | (215) 734-4747 | Patrick.V.Glemser@gmacm.com |
| Blanford, Todd | Manager | (319)-236-7495 | Todd.Blanford@gmacrescap.com |
|  |  |  |  |

# EXHIBIT B

# Record Services Systems


Looking Glass
New Trak – Process Management
Record Management System (RMS)
ECLIPSE
PILOT
WALT
WATS
Business Objects/Crystal Reports
FileNet Platform ResCap
REKON2000 (SQL2000)
MadCap
SODA
MS Access
Coopers DB
Investor Demands DB
Custodial File Mgmt DB
Forest and Trees
DocTrac – RMM
FiServ LSP / LoanServ
DeskTop Image Upload
DocSplitter
Citrix Application Access Services
MERS

The systems listed above may change from time to time.  ResCap will provide an update to AFI as
changes occur.

12-12020-mg   Doc 1296-2   Filed 08/28/12   Entered 08/28/12 16:48:58   Exhibit 2:
Pg 20 of 21

## EXHIBIT C

### Record Services Vendors

Iron Mountain
Kenwood
ACS
Indecomm Global
Corelogic
American Title
Courthouse Direct
NBS

12-12020-mg    Doc 1290-9    Filed 10/29/12    Entered 10/29/12 21:41:52    Exhibit 1:
Pg 22 of 22

**EXHIBIT D**

**Service Level Agreement Timeline**

1. In House Fulfillment
    - Folder and Document Request – Ordered on same business day request is made if received before the established cutoff time
    - Folders and Documents locally available – Received by ResCap within 24 to 48 hours
    - Image Delivery – Folder Documents are scanned on the same day received by Rescap's vendor(s) if received before the established cutoff time
2. Final Document Recovery and Curative
    - Purchasing Sales Agreement – Typically 90-120 days from closing date
3. Project Management and Reporting
    - No set timeline as project deadlines differ from one to another
4. Vendor Management
    - Power of Attorneys – Shipped same business day request is made if received before the established cutoff time
    - Invoices – Submitted within 24hrs of invoice being reconciled
    - Change Orders – Submitted within 48hrs of identified issue or process improvement
    - Bailee Letters/SBO requests – 96hr SLA