MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Joel C. Haims

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
)
In re:                                            )    Case No. 12-12020 (MG)
                                                  )
RESIDENTIAL CAPITAL, LLC, et al.,   )    Chapter 11
                                                  )
Debtors.                              )    Jointly Administered
                                                  )
---------------------------------------------------------------

## DECLARATION OF JOHN G. MONGELLUZZO

I, John G. Mongelluzzo, declare:

1. I am Managing Director at Residential Capital, LLC, a Debtor in this bankruptcy case. (The Debtors and Debtors in Possession are herein collectively referred to as "ResCap.") In that role, I am responsible for capital markets operations. I have been employed at ResCap since April 2009.

2. I head a group of eighty-seven employees who are responsible for capital markets operations. Thirteen of these employees staff the Fulfillment Group, which tracks, researches, and otherwise manages the files ResCap maintains to document the loans it originates, services, and securitizes.

3. ResCap's principal business is brokering, originating, purchasing, selling, securitizing, and servicing residential mortgage loans throughout the United States.  For example, ResCap is the fifth largest servicer of residential mortgage loans in the United States, servicing more than 2.4 million mortgage loans.

4. For every loan originated, serviced, or securitized by ResCap, there is an attendant "Loan File," or a file maintained in the course of originating, approving, funding, or servicing the loan that, generally speaking, documents the existence and history of that loan.  Because of the scope of ResCap's business, as indicated above, ResCap maintains millions of Loan Files.

5. The job of filing and tracking these Loan Files falls to the Fulfillment Group.  Of the Fulfillment Group's thirteen members, four are dedicated to foreclosures, only researching Loan Files and executing affidavits for use in foreclosure proceedings.  The remaining nine employees respond to other requests for Loan Files, such as the Federal Housing Finance Agency's requests for Loan Files at issue here.

6. I understand that, in the present case, the Federal Housing Finance Agency ("FHFA") is seeking various documents from ResCap, including many Loan Files.  Specifically, it is my understanding that FHFA seeks Loan Files for loans that were included in twenty-one securitizations at issue in FHFA's lawsuit against Ally Financial, Inc., Ally Securities, and GMAC Mortgage Group.  These securitizations I understand consist of approximately 105,000 loans and were sponsored by Residential Funding Company, LLC ("RFC"), one of ResCap's two primary operating subsidiaries that acquired and sold mortgage loans in "private label" securitizations.  To my knowledge, FHFA has not specifically stated how many Loan Files it is requesting at this time from ResCap.  However, for purposes of this declaration, whether FHFA

requests 105,000 Loan Files or some lesser number, the analysis regarding the burden on ResCap to produce Loan Files is the same.

## I.    COMPOSITION OF LOAN FILES

7. In its request for Loan Files, I understand that FHFA has specifically requested "files that are aggregated and maintained in the course of originating, underwriting, approving, and funding the loan," and "files that are compiled and used in the course of servicing the loan." (Doc. 859 ¶ 5.) These sets of documents are components of Loan Files, and in the industry they are known as (1) origination files and (2) servicing files.

### A.    The Origination File

8. A Loan File is first started when a loan is originated. Loan documentation created during origination and prior to closing is considered part of the origination file. These documents generally include, for example, loan applications, appraisals, credit reports, underwriter reports, legal and compliance disclosures, income documentation, and asset verifications.

9. If a ResCap entity originated the loan, then ResCap prepared the origination file. If ResCap did not originate the loan but included that loan in one of its securitizations, then that loan would have been originated by a third party and then subsequently purchased by ResCap. For any loan originated by a third party, that third party would have created the origination file, and ResCap would have acquired that file upon purchasing the loan.

### B.    The Servicing File

10. After a loan is originated or—for those loans originated by third parties—purchased by ResCap, the loan is transferred to ResCap's servicing platform. At this point, a second file, the servicing file, is created.

11. The servicing file is comprised of post-closing documents, such as servicing notes, payment histories, borrower correspondence, foreclosure documentation, bankruptcy

3

information, insurance claims, and other any post-closing information received from the borrower.

## II.   LOCATION OF LOAN FILES

12. For a variety of reasons set forth below, for loans of the vintage at issue in the FHFA litigation, it is a labor intensive and time-consuming process to locate and compile these constituent parts to make a complete Loan File.

### A.    Electronic and Hard Copy File Formats

13. First, the origination and servicing files for most Loan Files include both electronic and hard copy documents.

14. For a period of time, ResCap maintained all of its Loan Files in hard copy format. At some time prior to my arrival at ResCap, ResCap began to image and store electronically the loan documents for new and existing files as it received them. These documents are stored on ResCap's FileNet system. Certain servicing documents, such as payment history and servicing notes, are electronically stored on a separate system maintained by the servicing group called MortgageServ.

15. However, ResCap still maintains hard copies of many documents. For example, paper copies of loan-related documents are arriving in ResCap's offices all the time, and it is simply not practicable to image and store all of them electronically.

16. Also, while some older hard copy files may have been pulled from storage and imaged over the course of the past few years for different reasons—for example, for a foreclosure proceeding—ResCap has not electronically imaged all old paper documents, because that effort would be a mammoth undertaking and would be prohibitively expensive.

17. Due to the transition between hard and electronic copies, there are many Loan Files for which ResCap maintains some hard copy documents and some electronic documents. Thus, in

4

order to compile a full Loan File, we need to locate the hard copy records and the electronic records, and match the two together.

18. Most of the Loan Files sought by FHFA are likely comprised of both hard copy and electronic files because of their vintage, but we cannot know for certain until we search our databases for each Loan File.

### B.    Search Capabilities

19. Second, someone in the Fulfillment Group has to locate each Loan File and determine whether the components of such Loan File are stored electronically and/or in hard copy. That effort is not a fully automated process.

20. ResCap maintains the location information for each piece of a Loan File in a series of fourteen computer databases. This information is indexed by loan number. To find the components of any one Loan File, the Fulfillment Group must know the loan number and input that loan number into all fourteen different databases, one database at a time.

21. This process of searching each and every database for each individual loan is the only way to identify the location of the Loan File and its constituent parts. There is simply no way to glean that information from the loan number, the loan's vintage, or the securitization.

22. The Fulfillment Group can search each database for Loan Files in bulk by loan number. In other words, the Fulfillment Group can run one search per database for all of the Loan Files, once they have the corresponding loan number for each file. This process would require having all the loan numbers for the Loan Files at issue. Someone in the Fulfillment Group would have to create a spreadsheet containing all the loan numbers for the search. Simply identifying the loan numbers and creating this spreadsheet to define the search parameters for the thousands of loans at issue would take significant time.

5

23. For bulk searches, once the spreadsheet is compiled, the Fulfillment Group would then upload it to a computer system that would search for each loan number in the fourteen databases, one database at a time.

24. The time it takes to search in this manner dramatically increases as the volume of loan numbers input into the search system increases. For example, based on my experience, to search for 105,000 loans in just one database would take approximately one night of computing time. For such large searches, we have to employ batch processing overnight to avoid overloading our computer systems during the day. To search through all fourteen databases, therefore, would take approximately two weeks of nearly non-stop nightly batch processing that would, for the most part, lock out my staff from using their computer systems during that processing time.

25. This problem is compounded by the reality of scarce computing time: we simply do not have two weeks of uninterrupted computing time to dedicate to any project. Our resources are already stretched thin as a result of (1) the daily searches attendant to ResCap's ongoing business operations and (2) the other large searches that must be completed as part of ResCap's restructuring efforts, which I will describe in further detail below. Any additional large, bulk searches for Loan Files would have to be prioritized and scheduled around those processes.

26. Moreover, the search process is not complete once the computer systems have finished processing the search requests in all databases. Each database search simply returns Loan File location information for each loan number we input. But each database only contains certain loan numbers, so we must reconcile the search results from each database against every other database to ensure that we have actually found each Loan File. This means the Fulfillment Group must cross-check the results of all fourteen bulk searches. This too takes significant time.

6

27. Even then, bulk searches of this type are rarely 100% accurate: the system invariably returns false-hits when we search in bulk. For example, our search result may show that some components of Loan Files appear in our system in three different locations; some may come back as not being in the system at all. Again, the Fulfillment Group would have to spend considerable time tracking down these errant Loan Files.

### C.    Hard Copy Storage Locations

28. Third, ResCap stores its hard copy Loan Files in multiple locations across the country.

29. ResCap contracts with two primary vendors, Iron Mountain and Kenwood Records, plus a few ancillary vendors to store hard copy Loan Files. These vendors own and operate seven or eight different storage sites for origination files and servicing files. The sites are located in California, Illinois, Minnesota, Pennsylvania, and Texas, among other places around the country.

30. Loan Files are not stored by securitization, so Loan Files for loans in one securitization could therefore be in a number of different locations.

31. Each storage site is a large warehouse holding boxes of documents—anywhere from hundreds of thousands to millions of boxes—for various clients. These sites are not solely dedicated to housing ResCap documents. ResCap's millions of Loan Files are stored in boxes among the millions of other boxes according to the vendors' own filing systems.

32. ResCap must therefore rely on its storage vendors to locate, pull, and ship documents. For example, even if today the Fulfillment Group knew which vendors and which storage sites held each Loan File at issue in the FHFA lawsuit, it would still take significant time for our vendors to physically locate and pull those files. Precisely how long would largely depend on the resources the vendors have on hand to devote to the project. In addition, as I will detail further below, ResCap must pay the vendors to retrieve the loan files, and at times the vendors charge ResCap a premium for their efforts.

7

## III.   BURDENS AND COSTS OF LOAN FILE PRODUCTION

33. Due to the nature of the process described above, finding, collecting, and producing Loan Files is very labor intensive, time consuming, and expensive.

34. Again, in order to simply identify the location of a Loan File—or, more likely, because the constituent parts are generally not stored together, the various locations of a Loan File—the Fulfillment Group must enter each and every loan number into the fourteen databases, one database at a time. The computing time alone to search for 105,000 loans would take at least two weeks or potentially longer given the Fulfillment Group's other commitments to supporting ResCap.

35. Once the searches are completed, the Fulfillment Group would have to review and reconcile the search results—and that does not include considerable time spent chasing the false-hits that large bulk searches invariably return.

36. Once my team has reconciled the search results, we can then begin retrieving components of Loan Files that are identified as electronically stored on ResCap's systems. At the same time, we would also send requests to the various vendors and facilities identified as the custodians of any hard copy components of the Loan Files.

### A.   Compiling Electronic Files

37. For any piece of a Loan File that is stored electronically, my team must upload the image files from ResCap's FileNet system to a viewer program. The viewer program allows our staff to review images of pages contained in that piece of the Loan File.

38. After the Fulfillment Group has uploaded the image files and reviewed the images to confirm that we have the piece of the Loan File we searched for, team members can burn those image files to CD to be sent to, in this case, attorneys or e-discovery vendors.

8

39. This too takes a great deal of time. The Fulfillment Group has the ability to mass-import and burn image files. But they are generally limited to importing only five hundred files at a time.

40. Moreover, uploading the electronic images we have on hand is usually not the end of the story, as the vast majority of Loan Files are comprised of both electronic and hard copy files, as outlined above.

### B.     Compiling Hard Copy Files

41. If the databases tell the Fulfillment Group that all or part of a Loan File is stored in hard copy, we will contact the vendor or vendors who have custody of the relevant pieces of the Loan File and tell them what we would like them to pull from each storage facility.

42. The vendor must identify in their own filing system which box contains the relevant files. They must locate that box in the storage facility, pull the box, pull the relevant file from the box, and work with members of the Fulfillment Group to confirm that the files they obtain respond to our request.

43. Once the correct box and file are confirmed, the vendor generally ships the file to another vendor, Affiliated Computer Services ("ACS"), a subsidiary of Xerox, for imaging. On average, our storage vendors will charge $11 to $12 to search for, pull, ship, retrieve, and re-shelve a Loan File (though, as detailed below, these costs increase as volume increases).

44. Once ACS receives the file, ACS will work to image it along with the many other imaging projects it has for ResCap. These other projects are considerable. In my experience, ACS has imaged approximately 150 to 175 million pages of documents per year for ResCap alone. For that reason, ACS generally must spread large production requests across days, weeks, or even months of workflow in order to avoid delaying ResCap's daily business operations. Also, ResCap cannot simply speed up the process by contracting with more vendors. Each of

9

ResCap's vendors must be specially qualified to handle borrowers' sensitive personally identifiable information contained in Loan Files—like social security, bank account, and credit card numbers—and that qualification is itself difficult and time consuming to obtain.

45. Once ACS images a Loan File, the result is electronic image files that ACS can "push" to ResCap's FileNet via a secure internet connection. ACS then returns the hard copy file to the storage vendor for re-shelving. On average, ACS will charge $12 to $13 for imaging costs per Loan File.

46. As with the electronic files discussed above, once ACS pushes image files to FileNet, the Fulfillment Group can upload those images to the viewer program and review them. They can then burn the image files to CD to be shipped to ResCap's attorneys or e-discovery vendors.

### C.    Overall Burden and Costs

47. All of this work takes a substantial amount of time. How quickly our vendors can respond to our requests will depend largely on the size of the request and the resources the vendor has available at any one time to spend on that request. Even if ResCap is willing and able to pay a premium for a vendor's overtime and additional resources, at some point it is not logistically feasible for a vendor to dedicate more people and resources to a job. For example, only so many employees and forklifts can work at one time in a packed warehouse, and ACS only has so many scanners to image documents.

48. The costs and burdens of this process are staggering. In the *MBIA Insurance Corp. v. Residential Funding Company, LLC* lawsuit, for example, the Fulfillment Group produced roughly 64,000 Loan Files over a period of nine months. Notably, that production occurred prior to the bankruptcy filing, and even then it was not possible to produce documents any faster without impeding ResCap's daily operations.

10

49. Besides the tremendous amount of time that the collection and processing of Loan Files imposes on my team, and the attendant cost of that labor, the company incurs substantial out-of-pocket costs.

50. For Loan Files stored in hard copy, as indicated above, additional costs include searching, pulling, shipping, retrieving, and re-shelving costs incurred by our storage vendors—which run around $12 to $13 per Loan File—and shipping and imaging costs incurred by ACS—which also run around $12 to $13 per Loan File.

51. For electronically stored files—which includes hard copy files that have been electronically imaged under the process described above and files already stored electronically on FileNet—those costs include approximately twenty-five cents per Loan File to burn CDs, plus an additional $1.25 per Loan File in other internal operating costs. Those costs may seem small on a per-file basis, but producing 105,000 Loan Files will cost ResCap out-of-pocket approximately $157,500 on just this aspect of production.

52. On average, therefore, the out-of-pocket cost of collecting and preparing a single Loan File that contains any hard-copy documents—which nearly every Loan File does—is approximately $25, plus $1.50 in internal costs. Again, this estimate does not include the costs of labor associated with ResCap employees. And, as discussed below, these estimates for average costs are likely substantially lower than the actual costs of producing the Loan Files requested by the FHFA will be due to the sheer volume of what they have requested.

53. It is important to note that the estimate of more than $25 assumes our vendors are retrieving and processing a relatively low volume of Loan Files under our current service-level agreements. Under those agreements, as volume increases, price increases. For example, under current pricing structures, Kenwood and Iron Mountain will pull 250 boxes for us per week—

11

which could contain 250 distinct Loan Files or pieces of Loan Files, depending on their size. The $25 figure quoted above is based on these base contractual rates. As soon as we ask for more than 250 boxes per week, the vendors will charge for additional staffing and overtime.

54. Although the average cost per Loan File will vary when we request more than 250 boxes per week, based on Loan File size, location, and volume of Loan Files we request, historically it has cost $75 to $100 per Loan File when we exceed our contractual limit of 250 boxes. Again, these are out-of-pocket costs to ResCap. So a large scale production of even 40,000 Loan Files pulled on a short time frame could easily cost $3 million to $4 million in out-of-pocket costs.

55. It is also important to note that any costs associated with preparing and producing Loan Files for production in the context of litigation are costs incurred *after* my team has located, collected, and prepared the Loan Files and turned them over to ResCap's attorneys or e-discovery vendors, and *after* the costs described in paragraphs 50 through 54 above have been incurred.

56. I understand these additional production costs to include hosting, processing, and production fees; but those processes and costs are handled by the legal department and outside litigation counsel. Put another way, the costs I described in paragraph 52 above, *plus* the costs associated with hosting, processing, and production in the context of litigation, are the total out-of-pocket costs for producing loan files.

**IV. RESTRUCTURING AND OTHER OBLIGATIONS**

57. Unfortunately, as described below, right now and for the foreseeable future my team is already highly taxed because of restructuring-related obligations, among others. We simply do not have time to process a request for a substantial number of Loans Files, such as the 105,000 at issue in the FHFA lawsuit, and meet our existing restructuring-related obligations.

58. My group, among many others at ResCap, is under tremendous pressure to meet the demands of a variety of constituencies during the restructuring process and to meet ResCap's preexisting obligations under various settlements and consent agreements. Based on productivity tracking reports, I estimate that the Fulfillment Group receives tens of thousands of requests to process and produce documents every month.

59. Simply put, anytime anyone needs a Loan File (other than for purposes of a foreclosure) there are only nine employees in the Fulfillment Group who can process and respond to that request. These employees have knowledge of and access to ResCap's comprehensive filing systems and cannot be replaced or supplemented with temporary employees.

60. Among the most time-consuming and pressing of those matters that my team is intimately involved with are the following:

    a. Compiling and completing certain loan files as part of the due diligence and other issues regarding the proposed sales of ResCap's servicing operations and legacy loan portfolios. For example, the Fulfillment Group is in the process of pulling and reviewing approximately 54,000 Loan Files in connection with the asset purchase agreement with Berkshire Hathaway, Inc. The Fulfillment Group is also busy researching Loan Files and clearing exceptions in connection with the proposed sales of ResCap's mortgage servicing rights, an effort that ultimately affects the value of those rights and the amount paid under any asset purchase agreements.

    b. Producing documents and responding to requests for information in connection with investigations by the Creditors' Committee and the Examiner. For example, I understand the Committee is currently seeking approximately 3,000 to 5,000

13

12-12020-mg    Doc 1923-21    Filed 10/22/12    Entered 10/22/12 21:41:42    Exhibit K
Declaration of John G. Mongelluzzo    Pg 15 of 15

12-12020-mg    Doc 1023-2    Filed 08/07/12    Entered 08/07/12 15:39:56    Exhibit 2
Pg 14 of 14

       Loan Files from ResCap in connection with its review and analysis of the RMBS trust settlement.

    c. Assisting with data collection related to various United States government entities and governmental associations to continue to comply with obligations imposed on mortgage originators and servicers such as FNMA, Federal Home Loan Mortgage Corporation, Governmental National Mortgage Association, and Department of Housing and Urban Development.

    d. Assisting with document collection and gathering to ensure compliance with the April 13, 2011 Consent Order with the Board of Governors of the Federal Reserve System.

61. These tasks are in addition to the everyday tasks the Fulfillment Group performs to support ResCap's underlying business, including gathering loan files for servicing needs, like foreclosure proceedings, loan payoffs, refinancings, and modifications.

62. Burdening the Fulfillment Group with having to collect, process, and prepare Loan Files for litigation, such as the 105,000 Loan Files at issue in the FHFA lawsuit, will put a tremendous strain on our resources and our ability to meet our other obligations.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true to the best of my knowledge, information, and belief. Executed on August 7, 2012, at Fort Washington, PA.

_____
John G. Mongelluzzo

14