MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:      (212) 468-7900
Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi

*Proposed Counsel for the Debtors and
Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 12- |
|  | ) |  |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Chapter 11 |
|  | ) |  |
| Debtors. | ) | Joint Administration Pending |
|  | ) |  |

--------------------------------------------------------------

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS UNDER BANKRUPTCY
CODE SECTIONS 105(a) AND 363(b) AUTHORIZING RESIDENTIAL CAPITAL, LLC
TO ENTER INTO A SHARED SERVICES AGREEMENT WITH ALLY
FINANCIAL INC. *NUNC PRO TUNC* TO THE PETITION DATE FOR
THE CONTINUED RECEIPT AND PROVISION OF SHARED SERVICES
<u>NECESSARY FOR THE OPERATION OF THE DEBTORS' BUSINESSES</u>**

The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1] hereby move for entry of interim and final orders, under sections 105(a) and

363(b) of title 11 of the United States Code (the "Bankruptcy Code") authorizing Residential

Capital, LLC ("ResCap") to enter into a shared services agreement (the "Agreement") with its

indirect non-debtor parent, Ally Financial Inc. ("AFI") *nunc pro tunc* to the Petition Date for the

---

[1]     The names of the Debtors in these cases and their respective tax identification numbers are identified on
<u>Exhibit 1</u> to the Whitlinger Affidavit (defined below).  Additional subsidiaries and affiliates of the Debtors may
file Chapter 11 petitions on a rolling basis.  As used herein, the term "Debtors" includes any such entities.

continued receipt and provision of shared services between ResCap and AFI necessary for the continued operation of the Debtors' businesses (the "Motion").[2]  In support of the Motion, the Debtors rely upon and incorporate by reference the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings, filed with the Court concurrently herewith (the "Whitlinger Affidavit").  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a) and 363(b).

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee, examiner or statutory creditors' committee has been appointed in these Chapter 11 cases.

3.      The Debtors are a leading residential real estate finance company indirectly owned by AFI, which is not a Debtor.  The Debtors and their non-debtor affiliates operate the fifth largest servicing business and the tenth largest mortgage origination business in

---

[2]      Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

ny-1014583

the United States.  A more detailed description of the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of these

bankruptcy cases, is set forth in the Whitlinger Affidavit.

4.      The Debtors' primary and most valuable business operations consist of

servicing mortgage loans for investors, including loans originated by the Debtors, Ally Bank, and

other third parties.  As of March 31, 2012, the Debtors were servicing over 2.4 million domestic

mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion.  To

preserve and realize the value of these assets and achieve the goals of these Chapter 11 cases, the

Debtors developed and are prepared to implement a strategy that provides maximum value to the

Debtors' estates.

5.      The Debtors negotiated and entered into two separate asset purchase

agreements.  The first, with Nationstar Mortgage LLC as the proposed stalking horse bidder

("Nationstar") for the sale of their mortgage loan origination and servicing businesses (the

"Platform Sale"), and the second, with AFI as the proposed stalking horse bidder for the sale of

their legacy portfolio consisting mainly of mortgage loans and other residual financial assets (the

"Legacy Sale" and collectively with the Platform Sale, the "Asset Sales").

6.      In furtherance of their restructuring strategy, and contemporaneous with

the commencement of these Chapter 11 cases, the Debtors have filed a motion for authority to,

among other things, establish auction and sale procedures for the Asset Sales,[3] and for approval

---

[3]     See *Debtors' Motion Pursuant to 11 U.S.C.  §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 For Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up-Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief.*

ny-1014583

to consummate the Asset Sales under a plan. If, however, the Debtors do not obtain confirmation of a plan by deadlines to be determined, then the Sale Motion allows the Debtors to pursue an alternative course of action and immediately move forward with the Asset Sales under Bankruptcy Code section 363(b) and outside of a plan.

## PRELIMINARY STATEMENT

7.      The Agreement is critical to the continued operation of the Debtors' businesses during the pendency of these Chapter 11 cases, specifically in connection with the Asset Sales discussed above. The services that the Debtors seek to continue providing to and receiving from AFI during these Chapter 11 cases pursuant to the Agreement include, among other things: (i) information technology services; (ii) employee benefits administration and other human resources functions; (iii) accounting, tax and internal audit services; (iv) treasury and collateral management; (v) risk management functions; (vi) supply chain management, including procurement of goods and services from third parties; (vii) government and regulatory relations and compliance services; (viii) facilities management services; (ix) marketing services; and (x) capital markets services relating to managing the value of certain of the Debtors' loan servicing rights. Given the integrated nature of the Debtors' and AFI's businesses, the continuation of these services pursuant to the Agreement is both warranted and absolutely necessary to avoid any disruption to the Debtors' day-to-day operations.

8.      As described above, the Debtors are seeking authority to sell substantially all of their assets pursuant to a plan, or in the alternative, through a section 363 sale. As set forth in the asset purchase agreements, Nationstar and AFI require as a condition to the closing of the Asset Sales that the Debtors operate their businesses in the ordinary course and use commercially reasonable efforts to preserve the value of their business enterprise. The Debtors are optimistic

that the sale of substantially all of their assets will yield a significant return for the Debtors'

estates.  To comply with the provisions of the asset purchase agreements with Nationstar and

AFI and preserve the value of their businesses, the Debtors must avoid significant disruptions to

their operations during this critical postpetition period.  Accordingly, the Debtors seek authority

for ResCap to enter into and perform under the Agreement with AFI to ensure the continued

receipt and provision of the essential services included in the Agreement.  As explained in detail

below, the relief requested is in the best interests of the Debtors' estates and amply warranted

under the circumstances.

### RELIEF REQUESTED

9.      By this Motion, the Debtors seek entry of interim and final orders pursuant

to Bankruptcy Code sections 105(a) and 363(b) authorizing ResCap to (i) enter into the

Agreement substantially in the form attached hereto as <u>Exhibit A</u> *nunc pro tunc* to the Petition

Date; (ii) provide services to AFI in accordance with the Agreement; and (iii) pay AFI for

services received in accordance with the Agreement.   The Debtors are seeking Court approval of

the Agreement *nunc pro tunc* to the Petition Date; however, by this Motion, the Debtors are also

seeking to perform under the Agreement as of the Petition Date upon the entry of an interim

order and subject to a final hearing.  Only ResCap and AFI are parties to the Agreement;

however, each party is required to work with its respective subsidiaries to ensure that all of the

services are provided and each of the ResCap's Debtor affiliates and AFI's non-debtor affiliates

receive services as applicable.

10.     The Debtors request that, to the extent necessary, the relief sought by this

Motion apply to any future debtor (a "Future Debtor") in these jointly-administered cases

without any further order of the Court.  The Debtors propose that a debtor be deemed to be a

ny-1014583

Future Debtor upon the Court's entry of an order authorizing the joint administration of such

Future Debtor's Chapter 11 case with the Chapter 11 cases of the Debtors.

### A.    The Agreement

11.    Prior to the Petition Date, in the ordinary course of business, ResCap, AFI

and certain of their affiliates provided various financial, operational and administrative services

to each other, which the Debtors seek to continue on and after the Petition Date pursuant to the

Agreement.  Historically, the services that are now subject of the Agreement were provided on

an undocumented basis.  Although these arrangements were suitable, the Debtors determined it

was in their best interests to compile a comprehensive and integrated agreement, to become

effective postpetition, to ensure that (i) the Debtors obtain and pay for only those services that

are necessary during their Chapter 11 cases; (ii) the services that are being provided between

ResCap and AFI are specifically identified; and (iii) ResCap may reduce or terminate the receipt

of services at any time, including, without limitation, following the closing of a sale of

substantially all of the Debtors' assets.

12.    The mortgage loan origination, servicing and related securitization

operations of AFI are an integrated business involving the Debtors and Ally Bank.  The Debtors

believe the services covered by the Agreement are common among enterprises similar to those of

the Debtors and their non-debtor affiliates, especially given the integrated nature of their

businesses, because these arrangements eliminate redundant functions, reduce costs and allow

for the realization of operational synergies.  The Debtors are seeking the Court's authority to

allow ResCap to enter into the Agreement with AFI so that these services can be continued

postpetition to allow for a smooth transition to operating as a debtor in possession, facilitate the

Asset Sales, and complete a wind-down of the Debtors' businesses following a sale.

ny-1014583

13.     The following are the salient terms of the Agreement:[4]

Term          The initial term of the Agreement begins on the date the Agreement is approved
              by the Bankruptcy Court (the "Effective Date")[5] and continues through midnight
              Eastern Time on the one (1) year anniversary of the Petition Date (the "Initial
              Term"), unless earlier terminated or extended in accordance with the terms of the
              Agreement and except for any Service that has been terminated in accordance
              with the terms of the Agreement.  The Initial Term will be automatically
              extended for additional periods of one (1) year each unless either Party provides
              to the other Party written notice of nonrenewal at least three (3) months prior to
              the expiration of the then-current Term.  The Initial Term as extended by any
              such additional period(s) (if any) shall be referred to as the "Term."

Services      AFI will provide the Services within each of the Functional Service Areas listed
              in Schedule A-1 (the "Parent Services"), and ResCap will provide the Services
              within each of the Functional Service Areas listed in Schedule A-2 (the "Reverse
              Services"), in each case beginning on the Effective Date.  Services provided by a
              Supplier under the Agreement may be provided by that Supplier directly or
              through any of its Affiliates and/or Subcontractors at Supplier's discretion.  A
              Supplier will not be relieved of any of its obligations under the Agreement as a
              result of the provision of Services by any of Supplier's Subsidiaries or other
              Supplier Personnel.  Supplier agrees that it will not enter into any new
              Subcontracting arrangement that would involve the transfer to a Subcontractor or
              another third party of Recipient's personal information, without the prior written
              consent of the other Party.  The Supplier Personnel providing Services will at all
              times be qualified to provide the Services assigned to them.

Additional    A Party may, from time to time during the Term, upon at least ninety (90) days
Services      prior written notice to the other Party, request that the other Party provide
              additional services, functions and responsibilities not within the scope of the
              Services provided by the performing Party ("Additional Services").  Any such
              Additional Services will be provided under supplements to Schedule A-1 or
              Schedule A-2, as applicable, entered into by the Parties ("Supplements") for the
              charges set forth therein and mutually agreed upon.  Supplements shall be in the
              form of Schedule E to the Agreement.  During the ninety (90) day period after
              the Effective Date, the Parties will work together to define a process reasonably
              satisfactory to the Parties that will be used to (a) submit and prioritize requests
              for Additional Services and (b) create and execute Supplements for Additional

---

[4]    Capitalized terms used in the summary and not otherwise defined shall have the meaning ascribed to them in the
       Agreement.  The contents of this summary are qualified in their entirety by the terms of the Agreement.  In the
       event of a conflict between this summary and the Agreement, the Agreement shall govern.

[5]    As noted above, the Debtors are seeking Court approval of the Agreement *nunc pro tunc* to the Petition Date.
       Upon entry of a final order, as requested by the Debtors, the Petition Date will operate as the Effective Date of
       the Agreement.

Services.

**Changes to Services/ Change Control Procedures**

A Party may, from time to time during the Term, upon at least ninety (90) days prior written notice to the other Party, request that the other Party provide Customized Services.  If the Parties mutually agree on the provision of Customized Services, such request for Customized Services and such Customized Services will be provided under Supplements to Schedule A-1 or Schedule A-2, as applicable.  Before Supplier is required to provide any Customized Services, the Parties shall jointly agree on the applicable Charges for any agreed Customized Services, including any Charges that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with any changes to the Services.

**Ownership of Data**

As between Recipient and Supplier, Recipient owns and will continue to own all right, title and interest in and to all Recipient Data. To the extent that Recipient Data is embedded or incorporated into reports and other documentation, analyses, compilations and other materials (including code or software) owned or licensed by Supplier ("Supplier Materials") and provided to and for use by Recipient as part of the Services, Supplier will not be deemed to have assigned or transferred any of its right, title or interest in or to any underlying Intellectual Property Rights thereto.  Supplier grants to Recipient a perpetual, irrevocable, royalty free, transferable (to a Buyer of all or substantially all of the core business of Recipient) license to use, reproduce, display and perform (whether publicly or otherwise) and modify (and have others exercise such rights on behalf of Recipient (or Buyer)) such Supplier Materials solely as necessary for Recipient's (or Buyer's) use in the ordinary course of its mortgage related business.  Recipient's (or Buyer's) use (including without limitation, the use by any third party on behalf of Recipient (or Buyer)) of the Supplier Materials is subject to the confidentiality obligations set forth in Section 9 of the Agreement and any third party restrictions imposed on any Supplier Materials of which Supplier makes Recipient aware.  Additionally, Recipient's ownership of the Recipient Data reflected in Supplier Materials shall not serve to transfer or otherwise affect any of Supplier's right, title and/or interest in and/or to any of underlying Intellectual Property Rights in any Supplier Materials.  Supplier may not use Recipient Data for any purpose except: (x) to provide the Services; (y) as required by AFI as the parent of ResCap to meet its financial and regulatory reporting requirements; or (z) as otherwise permitted under the Agreement, nor may Supplier sell, assign, lease or otherwise dispose of or commercially exploit Recipient Data.  Supplier acknowledges that Recipient is not restricted from using or disseminating Recipient Data in the format in which it is provided by Supplier or any different format.

**Compensation**

ResCap will pay to AFI the Charges as set forth in Schedule C-1a and elsewhere in Schedule C, and AFI will pay to ResCap the Charges as set forth in Schedule C-2a and elsewhere in Schedule C.  Supplier will provide Recipient with estimated invoices (with information linking the Services delivered to the invoice

8

amounts) on a monthly basis on or before the last day of each calendar month for all Services performed by Supplier and all related Charges incurred by Recipient during that month.  The last business day of the calendar month is the cut-off for delivered Services and related Charges to be invoiced in the next calendar month. The estimated charges will be adjusted to actual charged by the last day of the following month. Recipient will pay the estimated and adjusted actual invoices within forty-five (45) days of the receipt of an invoice from Supplier.  Any payment by Recipient is without prejudice of its right to contest the accuracy of any Charges.

<u>Recipient Indemnification</u>

Recipient will indemnify, hold harmless and defend Supplier and its Affiliates and their respective directors, officers and employees ("Indemnified Parties"), from and against any and all liabilities, damages, penalties, judgments, assessments, losses, costs and expenses in any case, whether arising under strict liability or otherwise (including reasonable outside attorneys' fees) (collectively, "Damages") suffered or otherwise incurred due to a Third Party Claim arising from or out of or relating to the Agreement, including the performance (or failure to perform) by Supplier of its obligations under the Agreement; <u>provided, however</u>, that to the extent and in the proportion Damages also arise out of or relate to the gross negligence or willful misconduct of any Indemnified Party, then such indemnity will not apply.

<u>Supplier Indemnification</u>

Supplier will indemnify, hold harmless and defend the Recipient Indemnified Parties from and against any and all Damages suffered or otherwise incurred due to a Third Party Claim to the extent arising from or out of or relating to the gross negligence or willful misconduct of any Supplier Parties; <u>provided</u>, <u>however</u>, that to the extent and in the proportion Damages also arise from or out of or relate to the performance (or failure to perform) by Recipient of its obligations under the Agreement, then such Supplier indemnity will not apply.

<u>Other Indemnification Provisions</u>

The Agreement also contains indemnification provisions relating to the infringement or misappropriation of intellectual property rights and third party software, as well as procedures for seeking indemnification and certain limitations on liability, as set forth in more detail in the Agreement.

<u>Termination</u>

Without limiting the rights of the Parties under any other provision of the Agreement, any Service to be provided under the Agreement may be terminated as follows:

(a)     by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, after Recipient fails to pay the Charges for such Service when due in accordance with the Agreement, the terminating Party sends to the other Party an initial notice of such failure and the other Party fails to pay such Charges within forty-five (45) days of receipt of such initial notice; or

(b)     by either Party acting in its capacity as "Supplier", upon written

9

notice to the other Party if, following a material breach by Recipient of the Agreement other than a payment default, the terminating Party sends to the other Party a notice of such material breach and the other Party fails to cure such material breach within thirty (30) days; provided however, that if cure cannot reasonably be accomplished within such thirty (30) day period, the Agreement may not be terminated by reason of such breach for so long as the other Party commences a cure within such thirty (30) day period and pursues such cure diligently to completion and such completion occurs within ninety (90) days of such written notice; or

(c)    by either Party acting in its capacity as "Recipient", upon written notice to the other Party if, following a material breach by Supplier of the Agreement, the terminating Party sends to the other Party an initial notice of such material breach and the other Party fails to cure such material breach within thirty (30) days of receipt of such initial notice; provided, however, that if cure cannot reasonably be accomplished within such thirty (30) day period, the Agreement may not be terminated by reason of such breach for so long as the other Party commences a cure within such thirty (30) day period and pursues such cure diligently to completion and such completion occurs within ninety (90) days of such written notice; or

(d)    by either Party acting in its capacity as "Recipient", upon at least ninety (90) days prior written notice to the other Party; or

(e)    otherwise upon mutual agreement of the Parties.

Termination Following Sale

Upon the final approval by the Bankruptcy Court of a Sale, either Party in its capacity as a Supplier may within fourteen (14) days of such final approval elect to terminate the provision of the Services that such Party is required to provide to the other Party under the Agreement, effective upon the closing of such Sale.  In the event of such termination, Recipient will provide Supplier with notice of any Termination Assistance Services required by Recipient within twenty-one (21) days after receipt of such notice.

Rights upon Termination or Expiration/ Termination Assistance Services

Commencing six (6) months prior to expiration of the Term or any extension thereof, or upon either Party receiving any notice of termination from the other Party pursuant to Section 14 of the Agreement:

(a)    At Recipient's option, Supplier will provide to Recipient the termination assistance reasonably requested by Recipient to allow the Services to continue, and to facilitate the orderly transfer of responsibility for performance of the Services, including any migration of Recipient Data, to Recipient (collectively, "Termination Assistance Services"),  for a period of up to six (6) months (or, with respect to information technology Services, eighteen (18) months) after the effective date of such termination of Services or expiration of the Term (the "Termination Services Periods");

10

provided however, that, if mutually agreed upon in writing by the Parties (including with respect to adjustments in Charges), the Termination Service Periods may be extended until the effective date of a plan of reorganization of ResCap and its affiliated Debtors.

    (b)    The Termination Assistance Services to be provided during the Termination Services Periods may include, as and if reasonably required by Recipient, the following, among other Services: (i) developing, together with Recipient, a plan for the orderly transition of the performance of the Services, including the migration of Recipient Data from Supplier to Recipient or to a third party designated by Recipient; (ii) providing reasonable training for personnel of Recipient in the performance of the Services then being transitioned to Recipient or the third party designated by Recipient, to the extent Services are being assumed by that third party; and (iii) providing cooperation to Recipient to facilitate the transition of the performance of the Services to Recipient or to a third party designated by Recipient, in accordance with a mutually agreed upon transition plan for the applicable Services.

ResCap will pay to AFI Charges for the Termination Assistance Services as set forth in Schedule C to the Agreement, including during the Termination Services Periods.  AFI will pay to ResCap Charges for the Termination Assistance Services as set forth in Schedule C to the Agreement, including during the Termination Services Periods.  In the event of any termination of Services by Supplier for cause, if approved by the Bankruptcy Court, Charges for the related Termination Assistance Services will be paid by Recipient monthly in advance.

As set forth in Schedule C to the Agreement, the price of Termination Assistance Services will be documented in a Supplement to Schedule A.  In addition to any Charges otherwise provided for in the Agreement or Schedule C, Recipient will reimburse Supplier for all incremental additional resource and other costs and expenses required or incurred by Supplier to provide Termination Assistance Services.

| Transition Services Agreement | Upon the approval by the Bankruptcy Court of any Sale, or as otherwise mutually agreed between the Parties to facilitate a Sale, AFI and ResCap each agree to promptly enter into good faith negotiations with the Buyer(s) in such Sale for an agreement pursuant to which AFI, ResCap and/or the Buyer(s) would provide or receive, as applicable, reasonable specified transition services in connection with such Sale (the "Transition Services Agreement").  The services to be provided to the Buyer and the terms relating to the transition of certain Services are to be addressed in the Transition Services Agreement.  For the avoidance of doubt, while AFI agrees to negotiate in good faith with ResCap and/or a Buyer with respect to entering into a Transition Services Agreement, AFI is not obligated to provide services to a Buyer or after a Sale, other than Termination Assistance Services as contemplated in Section 14.5(a)(2) of the Agreement unless otherwise agreed by AFI. |

ny-1014583

Total Shared
Services Charge

Total Shared Services Charges (as described below) will begin on the Effective Date and are set forth in <u>Schedule C-1a</u> and <u>Schedule C-2a</u> to the Agreement. Charges for Additional Services, Customized Services, and Termination Assistance Services shall begin on the date such services begin to be performed by Supplier.

"Total Monthly Shared Services Charge" means, in respect of any individual Service, the monthly Charge for that Service, which shall be applicable from the Effective Date until the termination date for such Service, as such Charges are listed on <u>Schedule C-1a</u> or <u>Schedule C-2a</u> to the Agreement and may be adjusted in accordance with any Price Adjustment Event and/or Price Adjustment Process (each as described below). The Total Shared Services Charge represents the aggregate of the Total Base Costs, Third Party Costs and IT Projects as referenced on <u>Schedule C-1a</u> and <u>Schedule C-2a</u>. The Total Base Costs are equal to an amount representing Employee Costs, IT Costs, Platform Costs and the Indirect Support Costs for that Functional Service Area, as described below:

(i) Employee Costs means compensation, benefits, travel and other non-compensation related personnel costs;

(ii) IT Costs means those costs associated with IT services under <u>Schedule A-1</u> and <u>Schedule A-2</u> to the Agreement;

(iii) Platform Costs means the Charges to the Recipient for use of the IT services on Supplier's platform related to depreciation and amortization in respect of IT infrastructure; and

(iv) Indirect Support Costs means, for AFI, an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in <u>Schedule C-1b</u>, and for ResCap means an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in <u>Schedule C-2b</u>. Such percentages in each case are those referenced in the formulas in the Pricing Methodology Spreadsheets titled "Shared Services Global Functions Exhibit v.11.pdf" (AFI to ResCap) and "ResCap to AFI Shared Services Pricing 05-13-12.pdf " (ResCap to AFI).

These amounts are set forth in <u>Schedule C-1a</u> and <u>Schedule C-2a</u> to the Agreement on a monthly basis as the Total Monthly Shared Services Charge. The Total Monthly Shared Services Charges do not include any (i) Charges for Additional Services or Customized Services, (ii) Termination Assistance Services or (iii) Pass-Through Expenses.

Pricing for the Services set forth on <u>Schedule C-1a</u> and <u>Schedule C-2a</u> to the

12

Agreement can change on a monthly basis, depending upon whether the Service is priced on the basis of Monthly Fixed Charges or Monthly Variable Charges, as indicated on <u>Schedule C-1b</u> and <u>Schedule C-2b</u> to the Agreement.  Any such calculations will be made by reference to and in accordance with the formulas in the Pricing Methodology Spreadsheets titled "ResCap to AFI Shared Services Pricing 05-13-12.pdf" (ResCap to AFI).

<u>Price Adjustment Event</u>

As set forth on <u>Schedule C</u> to the Agreement, "Price Adjustment Event" means any of the following: (i) a Business Change Event[6] occurs; or (ii) a Service has been terminated pursuant to <u>Section 3</u> (Additional Services or Customized Services) or <u>Section 14</u> (Termination) of the Agreement.

<u>Price Adjustment Process</u>

The Price Adjustment Process described in <u>Schedule C</u> to the Agreement will be followed by the Parties upon either Party's written request in the event of a Price Adjustment Event.  The Price Adjustment Process for Business Change Events is subject to any approval right or termination right that Supplier may have with respect to such change in Services pursuant to <u>Section 3</u> (Additional Services or Customized Services) or <u>Section 14</u> (Termination) of the Agreement.

(a)    The Price Adjustment Process will be initiated immediately following a Price Adjustment Event and the resulting change to the Charges will take effect as soon as practical and will be retroactive to the point in time that the Price Adjustment Event occurs (or, in the case of adjustments under subsection (c) below, retroactive to the point in time that the New Cost Allocation (as described below) is determined).

(b)    Unless the Price Adjustment Process is initiated for a Business Change Event, during the Price Adjustment Process the Parties will mutually determine in good faith the cost impact of the Price Adjustment Event through the methodologies set forth in the exhibits to <u>Schedule C</u> including all of the sub-attachments. When a Service is being terminated by a Party, the starting assumption is that Recipient will no longer be charged for that Service; <u>provided, however</u>, that Supplier may be entitled to reimbursement from Recipient of all costs previously paid by Recipient for such Service that Supplier is not able to eliminate, for example, costs for physical assets which cannot be reduced (i.e. leasing expenses or rental expenses which cannot be eliminated), third party costs (i.e. minimum revenue commitments which are required under a third party agreement) or any other non-internal costs ("Stranded Costs") which the Parties using appropriate due diligence and commercially reasonable efforts can not eliminate.  If, after using such efforts the Parties are unable

---

[6]    "Business Change Event" means any change in the products or services offered by Recipient or the expansion or closure of any Facility of any Recipient, or a decrease or increase in Recipient's level of consumption of the Services from the historical usage levels of its business, in either case that has an impact on the cost to Supplier of providing any impacted Services.

13

to eliminate 100% of any Stranded Costs, the Parties will meet and discuss the remaining Stranded Costs to be reimbursed by Recipient to Supplier.

(c)     The Total Shared Services Charges set forth in <u>Schedule C-1a</u> and <u>Schedule C-2a</u> were determined by allocating to Recipient a portion of Supplier's underlying costs of performing the applicable Service (such cost allocation, the "Initial Cost Allocations").  In the event the Price Adjustment Process is initiated solely due to a Business Change Event and does not involve a termination of the applicable Service, then during the Price Adjustment Process, Supplier will (i) use the cost allocation methodology that was used to determine the Initial Cost Allocation for such Service, to determine a new cost allocation reflecting Recipient's then-current level of consumption of such Service, taking into account material increases or decreases (if any) in Supplier's overall costs that are a direct result of the change in Recipient's level of consumption of such Service (a "New Cost Allocation"), and (ii) if the New Cost Allocation differs from the Initial Cost Allocation for such Service, adjust the Total Shared Services Charge for such Service accordingly.  At Recipient's request, Supplier will provide Recipient with all supporting calculations of the effects of such Business Change Event on Supplier's costs of performing the Services.

14.     As noted above, the services to be provided by AFI and ResCap pursuant to the Agreement are broken down into categories of services, as set forth on Schedules A-1 and A-2 to the Agreement (each a "Functional Service Area"), the most significant of which are summarized as follows:

(a) Information Technology.  AFI and ResCap provide information technology development, maintenance and servicing functions to each other for each of the systems used in the operation of their respective businesses.  Likewise, AFI and ResCap provide information technology services at their respective facilities for employees of the other affiliates located at such facilities.  Many of the information technology services provided by AFI involve creation and maintenance of systems that are critical to Debtors' daily business operations and the integration of the Debtors' and Ally Bank's systems to ensure seamless operation of the Debtors' mortgage origination, servicing and securitization operations.

(b) Human Resources.  ResCap and AFI also provide various global human resources functions to each other.  For instance, ResCap provides various employee relations, staffing, workforce planning, and compensation design, administration and monitoring functions to AFI.  AFI, on the other hand, provides

ResCap services relating to compensation plan monitoring, benefits design and administration, talent management and performance review functions.

(c) Finance, Tax & Audit. AFI and ResCap provide various finance, tax and audit services on a global basis for the consolidated organization. More specifically, ResCap provides Ally Bank with many accounting services relating to general ledger recordation and reconciliation, mortgage loan-level payment accounting, and real estate owned accounting. The Debtors also rely upon AFI for accounts payable and payroll processing, tax services and internal audit procedures and frameworks. In addition, AFI provides ResCap with various regulatory reporting and control services. These services are critical to the Debtors' ability to continue to operate their businesses in the ordinary course and ensure compliance with the requirements of governmental regulators.

(d) Compliance. AFI provides the Debtors with global compliance services, including development of compliance and procedure frameworks, training employees regarding the compliance policies and procedures, and assessing and testing compliance programs. The Debtors also provide to AFI various compliance support services. These services enable the Debtors and AFI to comply with recent agreements and settlements with federal and state authorities and ensure that the Debtors and AFI continue to operate in compliance with the requirements of governmental units that regulate the lending industry.

(e) Risk Management. ResCap provides AFI with mortgage credit and servicing policy, risk management, and quality assurance services, as well as certain services related to the repurchase of loans from correspondent lenders and brokers on behalf of Ally Bank. AFI provides to the Debtors enterprise policies and governance, operational risk management, business continuity planning, market and counterparty risk management, and reports and analytics.

(f) Treasury. AFI provides the Debtors with various cash management and treasury services,[7] including cash and wire desk services, as well as liquidity and collateral management services. Each of these services is critical to the Debtors' ability to maintain liquidity and funding so that they can continue to operate their businesses and continue activities related to the origination, servicing and securitization of mortgage loans.

(g) Legal. ResCap provides various banking and mortgage related legal services to AFI, while AFI provides general legal services to the Debtors. The legal services that are provided are in the form of certain AFI legal employees allocating a percentage of their time to ResCap legal matters, and vice versa for ResCap's legal employees working on legal matters relating to AFI.

---

[7] By separate motion, filed concurrently herewith, the Debtors seek to continue their current cash management systems with modifications necessitated by their postpetition financing needs.

15

(h) Supply Chain.  AFI's global supply chain functional group provides ResCap with assistance in negotiating contracts with and transitioning to suppliers, as well as monitoring and off-boarding existing suppliers.

(i) Capital Markets. The Debtors provide various capital markets related functions to Ally Bank, including services related to securitization of mortgages with the GSEs, portfolio management and accounting, and management of mortgage servicing rights. AFI provides various investment management and capital markets IT services to the Debtors.

(j) Marketing.  AFI provides the Debtors with global brand and product marketing services across mass media, direct, digital, sponsorship/events, and sales support materials.  Such services include strategic marketing planning and management of day-to-day marketing operational responsibilities.

(k) Facilities. AFI provides the Debtors with various facilities related services, mostly through contracts with third parties, including, without limitation, monitoring and contracting for cost of space, mail and food services; providing space planning; and coordinating any construction or renovations.

15.    The specific services to be performed in each Functional Service Area are set forth in various Statements of Work.  The specific services detailed in the Statements of Work are documented in a summary of the Statements of Work attached hereto as Exhibit B.

16.    As discussed above, the Agreement also provides for the provision of certain Customized Services, Additional Services and Termination Assistance Services.  For the avoidance of doubt, by seeking the authority to enter into and perform under the Agreement, the Debtors are seeking the authority to provide to, receive from and/or compensate AFI for such further services, as and if necessary in the ordinary course of business, without the need for further order of this Court.

17.    The prices of the services being provided to AFI and ResCap pursuant to the Agreement, which are set forth in more detail on Schedules C-1a and C-2a to the Agreement and described above, are generally in the form of monthly service charges by Functional Service Area for services provided by ResCap to AFI and services provided by AFI to ResCap.  The

16

anticipated aggregate monthly cost to ResCap for the services received from AFI is approximately $10.2 million. The anticipated aggregated monthly cost for services provided by ResCap to AFI is approximately $4.4 million. The initial charges under the Agreement are based on projected operations at postpetition levels, which are expected to continue through one or more sales of the Debtors' assets. The Debtors are not seeking to pay any prepetition claims through or pursuant to the Agreement.

18.  The quantity and scope of services to be received by the Debtors pursuant to the Agreement has been scaled back from historical levels to reflect only those services that the Debtors believe are necessary to ensure the efficient operation of their businesses during their Chapter 11 cases. As noted above, either party in its capacity as a recipient may terminate the receipt of services, with pricing to be adjusted based on such termination, at any time pursuant to the terms of the Agreement, including in connection with the closing of a sale of substantially all of the Debtors' assets. Any such termination as a recipient does not relieve the party from its obligations as a supplier of services. The Debtors anticipate that the services they will need under the Agreement will be reduced significantly following a sale; however, the Debtors will likely require the continuation of certain limited services from AFI during a wind-down period. Pursuant to the Agreement, the Debtors will be able to secure the performance of such limited services, at reduced costs, to complete the wind-down of their businesses following a sale.

19.  The Agreement was negotiated at arm's length over an extended period of time by senior personnel from AFI and ResCap with the assistance of independent counsel to each of the Parties, which is reflected in the flexibility of the services provided and the pricing and termination rights. On May 13, 2012, ResCap's board of directors approved ResCap's entry into the Agreement.

ny-1014583

### B.    The Urgent Need for the Agreement

20.    As described above, ResCap and AFI provide services to each other that are critical to the continued operations of their affiliated businesses.  If the Debtors are not authorized to continue receiving and compensating AFI for all of the services as well as providing services to AFI pursuant to the Agreement, there will be immediate and widespread disruption of the Debtors' operations which would, in all likelihood, significantly diminish the value of the Debtors' estates and impede the Debtors' ability to consummate any going concern sale with a buyer.

21.    For example, failure to receive these services would disrupt the Debtors' use of information technology.  The Debtors rely upon AFI to maintain, develop and service many of the integrated information technology systems utilized, among other things, to seamlessly transmit loan applications and data among various AFI affiliates.  Any disturbance to the operation of these systems could cause an interruption in the Debtors' origination and servicing businesses and result in a significant decline in the value of the Debtors' businesses.

22.    Moreover, discontinuing the services would disrupt fundamental administrative aspects of the Debtors' businesses.  For example, many of the Debtors' human resources services are managed by AFI.  Without AFI's human resource services, the Debtors would not be able to offer basic health benefits to employees, continue certain other employee benefit plans and administer payroll, potentially causing an exodus of the Debtors' most valuable employees and irreparable harm to employee morale and trust.  In an industry where enterprise value is so heavily contingent on employees, such repercussions would be devastating to the Debtors' operations.

23.    Likewise, without AFI services, the Debtors cannot continue to ensure compliance with the myriad of regulatory requirements governing the mortgage origination and

18

servicing industry.  Ultimately, failing to comply with regulatory requirements could potentially

result in revocation of the licenses that each state requires the Debtors to maintain in order to

continue origination activities and mortgage loan servicing.  At a minimum, failure to satisfy

compliance requirements would cause the Debtors to incur substantial costs and administrative

burdens to address any such non-compliance.

24.     The Debtors also recognize that they must continue to provide services to

AFI to preserve the value of their bankruptcy estates.  The Debtors' and AFI's loan origination

and securitization businesses are integrated.  In connection with origination activities, across a 47

state platform, the Debtors, in their capacities as licensed mortgage brokers, broker loan

applications and supporting materials with Ally Bank.  Ally Bank in turn, then underwrites,

originates and funds loans based on the loan application packages.  The substantial majority of

these loans are pooled and securitized as part of GSE backed securities for which the Debtors

typically act as loan servicers.  Thus, it is essential to the Debtors' day-to-day operations and

their business model that AFI and its affiliates are able to continue to rely upon and have the

benefits of the services historically performed by ResCap.  Any material disruption to AFI's

operations caused by ResCap's failure to provide services would necessarily disrupt the Debtors'

operations to the detriment of the Debtors and their creditors.

## APPLICABLE AUTHORITY

### A.     The Agreement Has a Sound Business Purpose and Should Be Approved Pursuant to Sections 363(b) and 105 (a) of the Bankruptcy Code

25.     Bankruptcy Code section 363(b)(1) provides that after notice and a

hearing a debtor may use, sell or lease property of the estate outside the ordinary course of

business.  11 U.S.C. § 363(b)(1).  Additionally, under Bankruptcy Code section 105(a), this

Court "may issue any order…that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]." 11 U.S.C. § 105(a). Courts in this Circuit have consistently held that a debtor may use, sell or lease property of the estate outside the ordinary course of business where a sound business purpose justifies such actions. Contrarian Funds LLC v. Aretex LLC (In re WestPoint Stevens, Inc.), 600 F.3d 231, 248 n.8 (2d Cir. 2010); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); In re Borders Group, Inc., 453 B.R. 459, 473 (Bankr. S.D.N.Y. 2011); In re Boston Generating, LLC, 440 B.R. 302, 321 (Bankr. S.D.N.Y. 2010). Specifically, once a debtor articulates a valid business justification for a particular form of relief, the court reviews the debtor's request under the "business judgment rule." "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985), rev'd on other grounds, Gantler v. Stephens, 965 A.2d 695, 713 (Del. 2009)); In re Quigley Co., 437 B.R. 102, 156-57 (Bankr. S.D.N.Y. 2010). "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." In re Quigley Co., 437 B.R. at 157 (quoting In re Integrated Res., Inc., 147 B.R. at 656). Consequently, a debtor's business decision "should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice." In re Aerovox, Inc., 269 B.R. 74, 80 (Bankr. D. Mass. 2001) (internal quotations omitted); cf. In re Global Grossing Ltd., 295 B.R. 726, 742 (Bankr. S.D.N.Y. 2003). The burden of rebutting the presumption in favor of a debtor exercising its business judgment under section 363(b) falls on a party opposing the requested relief. See In re Integrated Res., Inc., 147 B.R. at 656 (citing

Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984), rev'd on other grounds, Brehm v. Eisner, 746

A.2d 244, 254 (Del. 2000)).

26.     The decision to document and enter into the Agreement is in the sound

business judgment of the Debtors because it ensures that the Debtors are able to continue to

receive necessary services that will permit them to operate their businesses smoothly in Chapter

11 through a sale and a subsequent wind-down.  As discussed above, the Agreement was

negotiated at arm's length and the amount of services to be received by the Debtors pursuant to

the Agreement has been scaled back from historical levels to reflect only those services that the

Debtors believe are necessary during their Chapter 11 cases.

27.     Likewise, the Debtors submit that the pricing terms in the Agreement were

heavily negotiated and reasonably calculated.  The Agreement was also drafted to provide step-

down pricing so that following the sale of the Debtors' businesses, ResCap will pay for only

those services that the Debtors require to wind-down their estates, which will permit the Debtors

to reduce costs following the closing of a sale.

28.     The cost of the services to be provided to ResCap and its affiliates under

the Agreement is eminently reasonable, particularly when juxtaposed against the additional costs

and administrative burden the Debtors would no doubt incur if they attempted to transfer these

services to new third-party suppliers or perform them in house, assuming they were able to do so

in either case.  Given the type and volume of services received and provided by the Debtors, it

would be highly impracticable for the Debtors to duplicate these services through other sources.

Even if they could do so, shifting to outside service providers would likely require significant

expenditures to customize the suppliers' services to address the Debtors' particularized needs.

Further, the Debtors' employees are already experiencing disruption in their day-to-day

operations.  Sourcing these services to new third-party providers would only amplify the disruption and add additional layers of unnecessary complexity to the ability of employees to complete their daily tasks.

29.     In light of the foregoing, the Debtors submit that they have demonstrated more than a sound business justification to continue to provide and receive the services under the Agreement.  Allowing the Debtors to enter into and provide services under the Agreement without interruption is absolutely necessary to preserve, enhance and maximize the value of the Debtors' estates and is in the best interests of the Debtors, their creditors, and all other parties in interest.  Accordingly, the Debtors submit that entry into the Agreement represents an exercise of their sound business judgment and request authorization, pursuant to Bankruptcy Code section 363(b), to enter into the Agreement and to continue to provide the services set forth in the Agreement.

### B.     Request for Immediate Relief and Waiver of Stay

30.     Bankruptcy Rule 6003 generally precludes the Court from authorizing certain relief until twenty-one days after the petition is filed, except to the extent necessary to prevent "immediate and irreparable harm." Fed. R. Bankr. P. 6003.  The Debtors submit that Bankruptcy Rule 6003 has been satisfied because the concerns raised above demonstrate that the interim relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates.  Accordingly, the Debtors request that an order granting the relief requested in this Motion be entered on an interim basis.

31.     To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

ny-1014583

## SCOPE OF MOTION

32.     This Motion is limited to the Agreement between ResCap and AFI and the associated services provided by ResCap and AFI thereunder.  The Motion does not cover all aspects of the Debtors' transactions with AFI or other affiliates.  Other ordinary course agreements and payment arrangements exist between and among the Debtors and their non-debtor affiliates, including, without limitation, those that are disclosed in publicly available filings with the Securities and Exchange Commission and other regulatory bodies.[8]  Whether or not a particular transaction with an affiliate is described in the Agreement or this Motion, and whether or not the Debtors seek an order with respect to the continuation of such transaction, the Debtors intend to continue ordinary course transactions with affiliates after the Petition Date pursuant to the authority granted to them by Bankruptcy Code section 363(c).  The Debtors do not believe that any of the relief sought herein limits their right to conduct other transactions with Debtor and non-debtor affiliates in the ordinary course of business without prior Court approval.

## NOTICE

33.     Notice of this Motion will be given to the following parties, or in lieu thereof, to their counsel:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the office of the United States Attorney General; (c) the office of the New York Attorney General; (d) the office of the United States Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; (g) each of

---

[8]     One intercompany item that is not covered by this Motion, or the pricing in the Agreement, is the charge for AFI's and Ally Bank's use of buildings or spaces that are owned or leased by the Debtors, as well as charges for the Debtors' use of space owned or leased by AFI or Ally Bank.  In 2012, the Debtors expect to pay, in the ordinary course of business, up to $3 million to AFI for the use of AFI and/or Ally Bank space.  ResCap, on the other hand, expects to charge AFI up to $12 million in 2012 for AFI's and Ally Bank's use of the Debtors' space.

ny-1014583

the Debtors' prepetition lenders, or their agents, if applicable; (h) each of the indenture trustees

for the Debtors' outstanding notes issuances; (i) Ally Financial Inc. and its counsel; (j) counsel to

the administrative agent for the Debtors' proposed providers of debtor in possession financing;

(k) Nationstar Mortgage LLC and its counsel; and (l) the parties included on the Debtors' list of

fifty (50) largest unsecured creditors (collectively, the "Initial Notice Parties").  The Debtors

submit that, in view of the facts and circumstances, such notice is sufficient and no other or

further notice need be provided.

34.     Within two (2) days after entry of an interim order, the Debtors propose to

serve a copy of the Motion and the interim order upon the Initial Notice Parties.  The Debtors

request that the Court schedule the final hearing on the Motion for a date that is as soon as

practicable, but in no event later than forty-five (45) days following the entry of the interim order,

and establish the date prior to the final hearing for parties to file objections to the Motion.

35.     Any objections to the relief requested in the Motion must be filed with the

Clerk of the Bankruptcy Court and served upon and received by: (a) proposed counsel for the

Debtors, Morrison & Foerster LLP (Attn:  Larren M. Nashelsky, Gary S. Lee and Lorenzo

Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, 21st Floor, New York, NY 10004 (Attn:  Tracy Hope Davis, Linda A. Riffkin

and Brian S. Masumoto); (c) counsel for AFI, Kirkland and Ellis, LLP, Citigroup Center, 601

Lexington Avenue, New York, NY 10022 (Attn:  Richard Cieri); (d) counsel for the

administrative agent for the Debtors' proposed providers of debtor in possession financing; and

(e) counsel for any statutory committee appointed in the Debtors' cases.  If no objections are

filed to the Motion, the Court may enter the order without further notice or hearing.

## CONCLUSION

36.     WHEREFORE, the Debtors respectfully request that the Court: (i) enter an interim order substantially in the form attached hereto as <u>Exhibit C</u>, granting certain of the relief sought herein immediately; (ii) enter a final order substantially in the form attached hereto as <u>Exhibit D</u>, granting the relief sought herein on a final basis and authorizing ResCap to enter into the Agreement *nunc pro tunc* to the Petition Date; and (iii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated:  May 14, 2012
    New York, New York

*/s/*  Larren M. Nashelsky

Larren M. Nashelsky
Gary S. Lee
Lorenzo Marinuzzi
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Proposed Counsel for the Debtors and
Debtors in Possession*

ny-1014583