**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**           **FOR PUBLICATION**

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*          Case No. 12-12020 (MG)

                              Debtors.      Jointly Administered


**MEMORANDUM OPINION AND ORDER DENYING MOTION FOR ORDER**
**APPOINTING AN OFFICIAL COMMITTEE OF BORROWERS**

*A P P E A R A N C E S:*

ROBERT E. BROWN, P.C.
*Counsel for Homeowner Claimants*
44 Wall Street, 12th Floor
New York, NY 10005
By:   Robert E. Brown, Esq.

SCHLAM STONE & DOLAN LLP
*Counsel for Homeowner Claimants*
26 Broadway, 19th Floor
New York, New York 10004
By:   Bennette D. Kramer, Esq.

MORRISON & FOERSTER LLP
*Counsel for the Debtors*
1290 Avenue of the Americas
New York, New York 10104
By:   Gary S. Lee, Esq.
      Norman S. Rosenbaum, Esq.
      Lorenzo Marinuzzi, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Counsel for the Official Committee of Unsecured*
*Creditors*
1177 Avenue of the Americas
New York, New York 10036
By:   Kenneth H. Eckstein, Esq.
      Douglas H. Mannal, Esq.
      Elise S. Frejka, Esq.

SHEARMAN & STERLING LLP
*Counsel for Citibank, N.A.*
599 Lexington Avenue
New York, New York 10022
By:    Fredric Sosnick, Esq.
       Edmund M. Emrich, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is a *Motion for an Order Appointing an Official Committee of Borrowers Pursuant to Section 1102(a)(2)*, filed by Homeowners,[1] who argue that their interests are underrepresented in the Debtor's bankruptcy. ("Motion," ECF Doc. # 1264.) Both the Debtors and the Official Committee of Unsecured Creditors ("Creditors Committee") have filed objections (ECF Doc. ## 1451 and 1449, respectively), arguing that the Borrowers Committee would be an unnecessary cost to the estate because the Homeowners are represented by the Creditors Committee and the Homeowners are protected by the DOJ/AG Settlement,[2] the Consent Order,[3] and the Supplemental Servicing Order.[4] Citibank, N.A. ("Citibank") filed a

---

[1]    The Homeowners are the following individuals: Nathaniel Arnold, Luis Fitzgerald-Fernandez, Alan Israel & Jill C. Habib, Peter Webb, Ariel Barel, Jean-Marc Bensaid, Diane Boyter, Conrad Burnett, Stephen & Francesca Grello, Francine Modderno, Florence Mason, Jimmy Morris, Phillip Weissburg, Audrey & Griggs Wimbley, Patrick Farrell, Melissa Lallo, Caley Coleff, Terry Slovak, Amelia Colvin, Yvonne Hartshorn, Roxanne Harbert, William A. Marshall, Sr., Joanna L. Belanger, David A. Belanger, Kristin Burak, Linda Clark, Shannon Mcintyre, John Lebron, Timothy Dixon, Jeffrey Ginn, and Val M. Steele. The Homeowners represent that they each entered into mortgage contracts with one or more of the Debtors, and/or had their loans sold, securitized, and held in one or more of the Debtors.

[2]    The DOJ/AG Settlement refers to a settlement between the Debtors and the four other largest servicers of mortgage loans in the United States, the federal government, 49 state attorneys general, and 48 state banking departments. The Debtors are obligated under the settlement to, among other things, provide a minimum of $200 million towards borrower relief for certain loans owned by Ally Bank and the Debtors, which includes loan modifications such as principal reductions, rate modifications and refinancing for borrowers that meet certain requirements.

[3]    The Consent Order refers to an order entered into between Debtors Residential Capital, LLC and GMAC Mortgage, LLC, non-debtors Ally Financial Inc. and Ally Bank, and the Federal Reserve Board and the Federal Deposit Insurance Company. (ECF Doc. # 1357, Ex. 5.) Pursuant to the Consent Order, the Debtors are responsible for making improvements to various aspects of their residential mortgage loan servicing business, including, among other things, compliance programs, internal audits, communications with borrowers, vendor management, management information systems, employee training, and oversight by the boards of directors of Residential Capital, LLC and GMAC Mortgage, LLC. The Consent Order also requires the parties to perform an extensive

2

limited objection, (ECF Doc. # 1447), seeking to ensure that even if a Borrowers Committee is appointed, the appointment would not interfere with timing of the sale of Debtors' assets. The moving parties filed an omnibus reply in support of the motion to appoint the Borrowers Committee (ECF Doc. # 1518), arguing that the Borrowers Committee is necessary because the Homeowners are unsophisticated creditors, have limited resources, and very little power on the Creditors Committee. A partial joinder in support of the motion was filed, arguing that the Creditors Committee's interests are adverse to many homeowners in that the Creditors Committee is seeking to enlarge the value of the estate via, *inter alia*, foreclosures—whereas many homeowners are fighting to keep those same houses. (ECF Doc. # 1494.)

For the reasons explained below, the Court denies the Motion. The Court understands, however, that the Creditors Committee intends shortly to establish a process whereby current and former borrowers and other individual parties-in-interest can communicate with special counsel about borrower-specific issues, and that the Debtors will both advise current and former borrowers and other individual parties-in-interest of this resource and direct these parties to contact special counsel to the Creditors Committee.

## I.   BACKGROUND

### A. The Debtors' Mortgage Loan Servicing Business

The Debtors are the fifth largest servicer of residential mortgages in the country, servicing over 2.4 million mortgage loans with an aggregate unpaid principal balance of

---

review of past foreclosure proceedings with respect to loans serviced by the Debtors, with the assistance of an independent consultant, and to prepare and submit a detailed report regarding the results of the review.

[4]    The Supplemental Servicing Order refers to the *Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* (ECF Doc. # 774).

approximately $374 billion as of March 2012.[5] The Debtors and their non-debtor affiliates are also the tenth largest originator of residential mortgage loans in the United States. Whitlinger Decl. ¶ 10. The collapse of the housing market in the United States that began more than five years ago has taken a heavy toll on the Debtors' business and finances. The Debtors suffered net losses of $5.6 billion and $4.5 billion in the years ended December 31, 2008 and 2009, respectively. *Id.* ¶ 82. In 2011, the Debtors had a consolidated net loss of $845.1 million. *Id.* ¶ 86.

While the issue raised by this motion is whether a separate Borrowers Committee should be appointed, the context is important. The Debtors are parties to thousands of lawsuits and investigations throughout the nation, including lawsuits brought either by (i) Debtors seeking to foreclose on mortgages they service, (ii) investors in or insurers of residential mortgage-backed securities ("RMBS") created or serviced by the Debtors or their non-debtor affiliates,[6] (iii) borrowers of loans serviced by the Debtors, and (iv) federal and state law enforcement authorities or agencies. The Debtors face the potential for enormous liability in these cases and investigations.[7] While the Debtors' most substantial dollar exposure to litigation claims may be from investors or insurers of residential mortgage-backed securities ("RMBS") originated or serviced by the Debtors, the Debtors also face substantial claims from homeowners arising

---

[5]  *See Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings*, dated May 14, 2012, ¶¶ 6, 9 ("Whitlinger Decl.") (ECF Doc. # 6).

[6]  "[S]ince 2007, the Debtors have faced substantial and continuing increases in repurchase requests due to alleged breaches of representations and warranties or early payment defaults. From January 1, 2008 through March 31, 2012, the Debtors have repurchased mortgage loans or otherwise made payments with respect to representation and warranty claims of approximately $2.8 billion. At March 31, 2012, the Debtors' aggregate reserve in respect of representation and warranty liabilities was $810.8 million." *Id.* ¶ 100.

[7]  The Debtors have estimated that "their reasonably possible losses over time related to litigation matters and potential repurchase obligations and related claims . . . could be between $0 and $4 billion in excess of existing accruals." *Id.* ¶ 104.

4

primarily from mortgage foreclosure activities. One current member of the Creditors Committee is a residential mortgage borrower.

The Debtors have entered into several significant settlement agreements with government authorities relating to the Debtors' mortgage origination and servicing conduct.[8] Since the start of this case, the Debtors have emphasized the importance of their compliance with these consent orders. While assuring compliance with consent orders and avoiding additional liability from mortgage loan servicing and foreclosure activities is important to all creditors, there is no doubt that borrowers have a particular interest in such issues. The question now is whether an additional committee, with its attendant expense and duplication, is necessary to accomplish what can be better and more efficiently accomplished with the retention of special counsel to the Creditors Committee, something the Court understands the Creditors Committee is prepared to do.

### B. Sale of the Debtors' Loan Servicing Platform and Legacy Loan Portfolio

Faced with daunting prospects, the Debtors' ultimate parent, Ally Financial Inc. ("AFI"), which also owns substantial non-residential mortgage-related businesses, developed a strategy to

---

[8] The Debtors explained in the Whitlinger Declaration:

> On February 9, 2012, AFI, ResCap, and certain other of the Debtors, along with the four largest servicers of mortgage loans in the United States, reached an agreement in principle with the federal government, 49 state attorneys general, and 48 state banking departments with respect to the DOJ/AG Investigation (the "DOJ/AG Settlement"). The DOJ/AG Settlement generally resolves potential claims of the government parties arising out of origination and servicing activities and foreclosure matters, subject to certain exceptions.
>
> On February 9, 2012, AFI and ResCap agreed with the [Federal Reserve Board] on a civil money penalty ("CMP") of $207 million related to the same activities that were the subject of the DOJ/AG Settlement. This amount will be reduced dollar-for-dollar in connection with satisfaction of the federal portion of the required monetary payment and the borrower relief obligations included within the DOJ/AG Settlement, as well as participation in other similar programs approved by the FRB. Additional future penalties related to the CMP may be imposed if the Debtors are unable to satisfy the borrower relief requirements of the DOJ/AG Settlement within two years.

*Id.*

5

file these chapter 11 cases and seek an early sale of its significant mortgage-related businesses.[9] AFI's goal was obviously to isolate its money-losing businesses and shed as much of the present and future liabilities associated with those businesses as possible.

The Court has approved two stalking horse purchase agreements: one with Nationstar Mortgage LLC as the stalking horse bidder for the sale of the Debtors' "mortgage loan origination and servicing businesses" (the "Platform Sale"); the other with Berkshire Hathaway Inc. as the stalking horse bidder for the sale of Debtors' "legacy" portfolio "consisting mainly of mortgage loans and other residual financial assets" (the "Legacy Sale" and together with the Platform Sale, the "Asset Sales"). *Id.* ¶ 7. Both the Platform Sale and the Legacy Sale are subject to higher and better offers. An auction is currently scheduled for October 23 and 24, 2012. Assuming successful auction sales, it will likely be many months before the Platform Sale closes. In order to maximize value for the estate, the Debtors have emphasized the importance of conducting "business as usual" as the sales process moves forward.

Recognizing the challenges in operating in chapter 11 and conducting a large loan servicing business subject to the additional constraints imposed by the Debtors' FRB and DOJ settlements, the Debtors filed a motion for approval of the Supplemental Servicing Order. The Order addresses important issues, such as how the automatic stay would apply in any state or federal court actions in which the Debtors seek to foreclose on mortgages they own or service. While the Court approved the Supplemental Servicing Order, approval was granted after numerous objections were resolved or overruled. Counsel for homeowners raised important issues about that motion, bringing to bear the important perspectives of consumers that were not otherwise raised by any other parties in interest.

---

[9] "The purpose of these Chapter 11 cases is to facilitate an orderly sale of the Debtors' most valuable assets, settle the Debtors' claims with their parent AFI, resolve the Debtors' legacy liabilities and complete an orderly wind-down of their remaining assets." *Id.* ¶ 105.

6

Moreover, nearly every omnibus motion calendar in this case has included a large number of lift stay motions or other requests for relief relating to litigation by or against homeowners. Many of these homeowners have appeared *pro se*, raising important issues often concerning homeowners' efforts to save their homes from foreclosure or to proceed with litigation seeking to recover damages from the Debtors for alleged misconduct in loan servicing and foreclosure activities. Of course, an official Borrowers Committee, if one were appointed, could not represent individual homeowners with specific grievances against the Debtors. But, as it has done on other issues in this case, the Creditors Committee can play an important role with respect to the interests of one of its constituencies—borrowers who are creditors because of claims they hold against the Debtors. Retention of special counsel to the Creditors Committee would be helpful in furthering this important role.

### C. Debtors' Objection to Appointment of a Borrowers Committee

Debtors object to the appointment of a Borrowers Committee for the following reasons. First, the Homeowners have failed to furnish any "valid" basis why the Creditors Committee—which currently includes one borrower member—cannot fairly and properly represent their interests as potential or actual unsecured creditors.

Second, the Homeowners do not allege inadequate representation of borrowers due to any violations of the Creditors Committee's fiduciary duties. Instead, they seek formal committee status (1) to protect individual borrower interests in pending and potential foreclosure litigation throughout the nation and (2) to protect borrowers from some theoretical risk that other members on the Creditors Committee will join together to harm the borrowers' interests.

Third, the Debtors and other parties have put significant programs in place to ensure that the borrowers' interests are adequately protected. For example:

7

- *First*, new and existing borrowers of the Debtors are protected under the DOJ/AG Settlement and the Consent Order (each as defined below and, together, the "Government Agreements"), because, among other things, they require the Debtors to adopt improved loan servicing standards. Meanwhile, defaulting and distressed borrowers of the Debtors are protected under the Government Agreements because they obligate the Debtors to commit money and efforts to address loan modifications within a specified time frame.

- *Second*, at the outset of these cases, the Debtors obtained relief to permit the Debtors to continue servicing mortgage loans in the ordinary course, with respect to both their existing contractual arrangements with Fannie Mae, Freddie Mac and Ginnie Mae (collectively, the "Government Agencies"), and private label transactions. That relief was both mandated and supported by the Government Agencies.

- *Third*, at their own initiative, under the Supplemental Servicing Order, the Debtors obtained expansive borrower and debtor relief from the automatic stay to allow borrowers to defend against foreclosures and eviction proceedings and to fully prosecute their rights where borrowers are subject to their own bankruptcy cases.

- *Fourth*, the Debtors are monitored by 49 state attorneys general, the United States Department of Justice, the Federal Reserve Board, and other agencies to ensure the Debtors' compliance with the Government Agreements. Moreover, the Supplemental Servicing Order is monitored and enforced by the Bankruptcy Court. Accordingly, there is no need for another watchdog with respect to the protections for borrowers.

*See* Debtors' Obj. ¶ 3.

Lastly, Debtors argue that appointing another committee would exact significant costs on the Debtors' estates, would be duplicative of the Creditors Committee work, and would not make administration of these cases any more efficient or alleviate any burden on this Court.

**D. Creditors Committee Objection**

The Creditors Committee argues that the appointment of another official committee to represent borrowers would be redundant and duplicative of the Creditors Committee. It would also serve an improper purpose, as the Homeowners apparently seek to gain official status in order to advise individual borrowers holding contingent unsecured claims with regard to their personal legal rights and defenses vis-à-vis the Debtors in pending and threatened foreclosure actions.

8

The Creditors Committee also takes issue with the Homeowners' argument that their interests are diametrically opposed to the interests of the other members on the Creditors Committee. The Creditors Committee notes that "the very nature of a creditors' committee is to represent varying creditor constituencies, with divergent and sometimes even opposing interests, and each member is charged with the fiduciary duty of serving the interests of creditors generally." Creditors Committee Obj. ¶ 2. Moreover, the Creditors Committee argues that a separate committee for a particular group of creditors "is warranted only in rare cases where intercreditor conflicts are both extreme and central to resolving the case." *Id*. The Creditors Committee also echoes the Debtors' concerns about the adverse impact that appointment of a Borrowers Committee might have on the estate.

E. **Citibank Limited Objection**

Citibank filed a limited objection requesting that, should a Borrowers Committee be appointed, the sale process should not be delayed as a result. See Citibank Limited Objection ¶ 17.

II.    **DISCUSSION**

Section 1102(a)(2) of the Bankruptcy Code permits the appointment of an additional committee of creditors only if necessary to assure adequate representation of creditors. Appointment of an additional Committee is an extraordinary remedy that courts are reluctant to grant. *See In re Dana Corp.*, 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) (citing *In re Enron Corp.*, 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).

In considering this extraordinary remedy, courts employ a two-step process. First, a court determines whether the appointment of an additional committee is necessary to assure the movants are adequately represented. *Mirant Americas Energy Mktg., L.P. v. Official Comm. of*

*Unsecured Creditors of Enron Corp.,* No. 02-cv-6274, 2003 WL 22327118, *3 (S.D.N.Y. Oct. 10, 2003) (stating that section 1102(a) of the Bankruptcy Code "clearly requires an initial determination of whether a party is adequately represented"). Second, if the answer to the first question is "yes," then the court must decide whether it should exercise its discretion and order such appointment. *See Enron Corp.,* 279 B.R. at 685.

The burden is on the moving party to prove that the existing committee does not provide adequate representation. *Dana Corp.*, 344 B.R. at 38. *See also Enron Corp.*, 279 B.R. at 685; *In re Winn-Dixie Stores, Inc.*, 326 B.R. 853, 857 (Bankr. M.D. Fla. 2005); *In re Dow Corning Corp.*, 194 B.R. 121, 144 (Bankr. E.D. Mich. 1996), *rev'd on other grounds*, 212 B.R. 258 (E.D. Mich. 1997).

Despite having discretion to direct the appointment of additional official committees, courts are hesitant to grant such relief, and the requirement that the moving party show that such a committee is "necessary to assure adequate representation" has been described as ranging from a "high standard" to requiring a showing that an additional committee is "'absolutely required,' 'essential,' or 'indispensable.'" *See In re Eastman Kodak*, No. 12-10202, 2012 WL 2501071, at *2 (Bankr. S.D.N.Y. June 28, 2012) (quoting *In re ShoreBank Corp.*, 467 B.R. 156, 164-65 (Bankr. N.D. Ill. 2011)); *In re Oneida Ltd.*, 351 B.R. 79, 83 (Bankr. S.D.N.Y. 2006).

Although there is no framework provided in the Bankruptcy Code for courts to determine "adequate representation," bankruptcy courts in this district generally consider seven factors in deciding whether appointment of an additional official committee is necessary to ensure adequate representation:

> (1) the ability of the existing committee to function;
> (2) the nature of the case;
> (3) the standing and desires of the various constituencies;
> (4) the ability of creditors to participate in a case without an additional committee;

> (5) the delay and additional cost that would result if the court grants the motion;
> (6) the tasks which a separate committee is to perform; and
> (7) other factors relevant to the adequate representation issue.

*See Dana Corp.*, 344 B.R. at 38.

No one factor is dispositive, and the consideration given to each depends on the circumstances of a particular chapter 11 case. *See Dana Corp.*, 344 B.R. at 38 (citing *In re Kalvar Microfilm, Inc.*, 195 B.R. 599, 600-01 (Bankr. D. Del. 1996)).

In the vast majority of chapter 11 cases, a single committee of creditors has been deemed sufficient. *See, e.g.*, *In re Sharon Steel Corp.*, 100 B.R. 767, 777-78 (Bankr. W.D. Pa. 1989) (explaining that a single Creditors Committee is the norm and appointment of additional committees is an extraordinary remedy); *see also In re Hills Stores Co.*, 137 B.R. 4 (Bankr. S.D.N.Y. 1992) (denying request for appointment of separate committee of subordinated bondholders); *Ad Hoc Bondholders Group v. Interco, Inc. (In re Interco, Inc.)*, 141 B.R. 422 (Bankr. E.D. Mo. 1992) (denying request to appoint separate committee of debenture holders); *In re Public Serv. Co. of N.H.*, 89 B.R. 1014, 1019 (Bankr. D.N.H. 1988) (declining request by individual debenture holders for appointment of separate committee). This high standard dictates that an additional committee not be appointed unless the moving parties prove that they "are unable to represent their interests . . . without an official committee." *See In re Williams Comm'ns Grp., Inc.*, 281 B.R. 216, 223 (Bankr. S.D.N.Y. 2002) (denying motion for appointment of equity committee since shareholders' interests were adequately represented).

The large size of a bankruptcy case in and of itself is not determinative of whether additional committees should be appointed. *See Dana Corp.*, 344 B.R. at 718; *see also Mirant*, 2003 WL 22327118, at *6 (refusing to appoint an additional official committee of trade creditors even though at the time of filing the Enron case was the largest bankruptcy matter in history).

11

Moreover, the mere presence of a conflict of interest does not necessitate an additional committee. *See Mirant*, 2003 WL 22327118, at *6. And, forming a Borrowers Committee solely to advance individual borrowers' claims is not appropriate, because acting as *de facto* counsel for borrowers would be an impermissible role for an official committee. *See id.* ("The principal purpose of creditors' committees is not to advocate any particular creditor class's agenda, but rather to 'strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished.'") (quoting *Hills Stores,* 137 B.R. at 7); *see also In re Garden Ridge Corp.*, No. 04-10324, 2005 Bankr. LEXIS 323, at *12 (Bankr. D. Del. Mar. 2, 2005) (declining to appoint an official committee for landlords because an "Official Committee is simply not intended to represent individual creditor interests").

### A. The Creditors Committee Has a Fiduciary Duty to the Entire Class of Creditors

It is well settled that statutory unsecured creditors committees owe a fiduciary duty to the entire class of creditors represented by such committee and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case. *See Dana Corp.*, 344 B.R. at 38; *see also Mirant*, 2003 WL 22327118, at *4 (noting that a "creditors' committee owes a fiduciary obligation to its constituency"); *In re Barney's, Inc.,* 197 B.R. 431, 442 (Bankr. S.D.N.Y. 1996) (stating that a "committee and its members have a fiduciary duty to all creditors represented by the committee"). In *Mirant*, for example, despite the presence of divergent interests of the members of the Creditors Committee, the court refused to appoint an additional committee of trade creditors and noted that the official committee of unsecured creditors in those cases was adequately representing the interests of all unsecured creditors. *See Mirant*, 2003 WL 22327118, at *10. Furthermore, this fiduciary obligation is present "whether or not a member of a particular group is included in its membership." *Id*. at *7 (citation

12

omitted).  A committee "must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors." *Shaw & Levine v. Gulf & W. Indus., Inc. (In re The Bohack Corp.),* 607 F.2d 258, 262 n.4 (2d Cir. 1979) (citing *Woods v. City Nat'l Bank & Trust Co.,* 312 U.S. 262 (1941)).

Further, adequate representation does not require proportionate representation of distinct groups of creditors on a committee of unsecured creditors.  The determinative factor is whether the official committee is serving their interests as unsecured creditors.  *See Dana Corp.,* 334 B.R. at 38-39 ("The issue is not whether the Official Committee is an exact replica of the creditor body, but whether representation of various creditor types is adequate.").

Indeed, a committee cannot advocate on behalf of individual constituents for policy as well as practical reasons—if a Borrowers Committee was appointed for such a purpose, "[n]either the committee nor its lawyers could function if each constituent was a client." *In re The Circle K Corp.*, 199 B.R. 92, 99-100 (Bankr. S.D.N.Y. 1996), *aff'd*, No. 96 CIV. 5801, 1997 WL 31197 (S.D.N.Y. Jan. 28, 1997).

### B. Cases Relied on by the Homeowners

The Homeowners rely on *In re American Home Mortgage Holdings,* No. 07-11047 (Bankr. D. Del. 2007).  There, the bankruptcy court ordered appointment of an official committee of borrowers where (i) there was no borrower representative member on the official creditors committee, (ii) borrowers apparently did not have relief from the automatic stay to assert claims and counterclaims as defenses against foreclosures, evictions and borrower bankruptcy proceedings, (iii) notice of the bar date was provided to only those borrowers who were in active litigation with the debtors, and (iv) the debtors had sold their mortgage loan

13

servicing business and were liquidating, and therefore were unable to provide relief to borrowers in distress.

Here, by contrast, (a) the borrowers have a representative on the Creditors Committee, (b) the Debtors are continuing to operate their mortgage servicing business subject to monitoring and sanctions for noncompliance with the borrower protections provided in the Government Agreements, (c) the Debtors will provide notice of the Bar Date to all borrowers whose mortgage loans are being serviced by the Debtors (not just borrowers who are in active litigation with the Debtors), (d) the Court has provided some relief from the automatic stay for borrowers pursuant to the Supplemental Servicing Order, and (e) the Debtors have provided telephonic access to the Court upon request.

Similarly, the *First Alliance* decisions cited in the Motion do not support the relief sought in the Motion. These decisions refer to a bankruptcy court order granting a motion to appoint a Borrowers Committee, but the decisions do so in the context of the borrowers' subsequent litigation alleging fraud against one of the First Alliance debtors' mortgage securitizers. *In re First Alliance Mortgage Co.,* 298 B.R. 652, 654 (C.D. Cal. 2003) (referring to an order of the bankruptcy court ordering appointment of a Borrowers Committee). The decisions do not provide legal reasoning or analysis underpinning the decision to form an additional official committee in those cases. The *First Alliance* docket shows only that the United States Trustee appointed the official committee; it is unclear whether the motion for appointment of a Borrowers Committee was opposed. Consequently, the *First Alliance* decisions do not provide any substantive guidance on the issue of whether a Borrowers Committee should be appointed in these cases.

C.  **Borrowers Are An Important Constituency Whose Interests Are Sufficiently Represented by the Creditors Committee**

The Court views the issue of whether a Borrowers Committee should be appointed as a very close question. The Creditors Committee already includes one borrower representative. The Creditors Committee is represented by excellent legal and financial professionals, and the Creditors Committee has engaged actively on a broad range of issues. This case was touted by Debtors as a "prepackaged bankruptcy" when it was filed in May 2012, but the Debtors have yet to file a plan and it has become increasingly clear that numerous contentious issues separate the parties in interest in this case.

While issues concerning homeowners facing foreclosure differ in many respects from the issues facing other creditors, the existing Creditors Committee is capable of dealing with homeowners' concerns as well. The willingness of the Creditors Committee to retain special counsel with expertise in homeowners' foreclosure issues will further help in assuring appropriate protection of the interests of such creditors as well.[10]

On the record before the Court, the moving parties have failed to carry their burden of establishing that an official Borrowers Committee should be appointed in this case. Appointing a separate committee is an "extraordinary remedy." Both the law and the facts support the objections of the Debtors and the Creditors Committee. Applying the seven-factor test set forth in *Dana Corp.*, 344 B.R. at 38, the Court concludes that this is *not* an appropriate case for the Court to exercise its discretion to order appointment of a separate committee.

---

[10]   Of course, where foreclosure proceedings are properly conducted, the borrowers are not creditors of the Debtors' estates. It is only where borrowers have a claim against the Debtors based on some alleged misconduct that the borrowers become creditors. At this point, however, it is clear that numerous borrowers have asserted claims against the Debtors in litigation pending in state and federal courts around the country, even though most of those borrowers have not yet filed proofs of claim in the Debtors' bankruptcy cases.

The role of the Creditors Committee is to "strike a proper balance between the parties such that an effective and viable reorganization of the debtor may be accomplished." *Mirant*, 2003 WL 22327118, at *6. The fact that the Creditors Committee includes a cross section of the unsecured creditors in these cases is a strength and not a weakness, and does not support appointment of a separate Borrowers Committee.

### III.    CONCLUSION

For the foregoing reasons, the Motion seeking an order requiring appointment of a separate Borrowers Committee is **DENIED**.

**IT IS SO ORDERED.**

Dated:    October 23, 2012
          New York, New York

                                        ___*Martin Glenn*_____
                                        MARTIN GLENN
                                        United States Bankruptcy Judge