Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C.  20005
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

− and −

Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC., et al. | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**NOTICE OF FILING OF ALLY FINANCIAL INC.'S**
**REPLY MEMORANDUM IN FURTHER RESPONSE TO THE**
**COURTS' OCTOBER 16 ORDER ON THE PRODUCTION OF RESCAP LOAN FILES**

PLEASE TAKE NOTICE that Ally Financial Inc. ("*AFI*") hereby files *Ally's Reply Memorandum in Further Response to the Courts' October 16 Order on the Production of ResCap Loan Files* (the "*Reply*") and *Reply Declaration of Reginald R. Goeke in Response to the Courts' October 16 Order on the Production of ResCap Loan Files*, both of which were filed concurrently in *Federal Housing Fin. Agency v. Ally Fin. Inc.*, No. 11 Civ. 7010 (DLC)

(S.D.N.Y. Oct. 6, 2011).    The Reply references three decisions that are only available on electronic databases.    AFI attaches true and correct copies of the following unpublished decisions:

- *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98 Civ. 479, 1999 U.S. Dist. LEXIS 101 (S.D.N.Y. Jan. 11, 1999), referenced on page 3 of the Reply and attached hereto as **Exhibit A**.

- *Ssangyong Corp. v. Vida Shoes, Int'l, Inc.*, No. 03 Civ. 5014, 2004 U.S. Dist. LEXIS 9101 (S.D.N.Y. May 19, 2004), referenced on page 3 of the Reply and attached hereto as **Exhibit B**.

- *U.S. Fidelity & Guar. Co. v. Am. Re-Ins. Co.*, No. 604517/02, 20120 WL 3536828 (N.Y. Sup. Aug. 17, 2010), referenced on page 4 of the Reply and attached hereto as **Exhibit C**.

New York, New York
Dated: October 25, 2012

/s/  *Judson D. Brown*
_____

Jeffrey S. Powell
Daniel T. Donovan
Judson D. Brown
KIRKLAND & ELLIS LLP
655 15th Street, N.W., Ste. 1200
Washington, D.C.  20005
Telephone:     (202) 879-5000
Facsimile:     (202) 879-5200

– and –

Richard M. Cieri
Ray C. Schrock
Stephen E. Hessler
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Counsel for Ally Financial Inc. and Ally Bank*

**<u>EXHIBIT A</u>**



HUNTER DOUGLAS, INC., Plaintiff, -against- COMFORTEX
CORPORATION, Defendant.

Civil Action No. M8-85 (WHP), [98 CV 0479 (LEK) (DNH),
N.D.N.Y.]

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

1999 U.S. Dist. LEXIS 101

January 11, 1999, Decided
January 11, 1999, Filed

**JUDGES:** [*1] WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

*MEMORANDUM AND ORDER*

WILLIAM H. PAULEY III, District Judge:

Hunter Douglas, Inc. ("Hunter") commenced this miscellaneous proceeding by order to show cause seeking to compel a nonparty to comply with a subpoena duces tecum and ad testificandum issued from this district on December 15, 1998. Blinds to Go, Inc. ("Blinds to Go"), [1] the nonparty, is represented by the same attorneys representing the defendant, Comfortex Corp. ("Comfortex"), in the underlying patent infringement action pending in the Northern District of New York. Blinds to Go is a customer of Comfortex and has purchased for resale the allegedly infringing product. The alignment of the litigants and their respective counsel in this proceeding is noteworthy because they are all involved in the underlying action pending in the Northern District.

1 According to Comfortex's counsel, Blinds to Go is a corporation of New Brunswick, Canada, with its corporate headquarters in Montreal. Its United States subsidiary, Blinds to Go (US) Inc., is a Delaware corporation with an office in Lyndhurst, New Jersey.

1999 U.S. Dist. LEXIS 101, *1

[*2]  Hunter filed its order to show cause to compel Blinds to Go to comply with a subpoena served on December 15, 1998. The December 15, 1998 subpoena that Hunter seeks to enforce on an expedited basis bears a striking resemblance to an earlier subpoena it served on Blinds to Go on October 7, 1998. In fact, all counsel acknowledged during oral argument that the only differences between the two subpoenas are that the December 15, 1998 subpoena seeks testimony from a witness and adds two additional categories of documents to the fourteen categories enumerated in the first subpoena.

The October 7 subpoena precipitated a flurry of communications with the Northern District of New York. [2] First, by letter dated October 20, 1998 Comfortex's counsel, Robert Neuner, Esq., advised District Judge Lawrence E. Kahn that the Blinds to Go subpoena and other third party subpoenas "will be an issue before Magistrate Judge Hurd." His words were prophetic. A day later, Mr. Neuner, now representing Blinds to Go, [3] Those objections raised a host of issues, including the need for authorization from the appropriate judicial authorities in Canada, and other more pedestrian

1999 U.S. Dist. LEXIS 101, *3

[*3] objections such as confidential business information, attorney client privilege, overbreadth and relevance.

2    In contrast, the October 7 subpoena, while issued from the Southern District of New York, created nary a ripple in this district. No orders to show cause or objections were filed here.

3    At oral argument on January 5, 1999, Mr. Neuner acknowledged that the objections to the October 7, 1998 subpoena duces tecum were properly captioned as "Objections of Blinds to Go, Inc. Pursuant to FED. R. CIV. P. 45 (c)(2)(B)" but inadvertently signed by Mr. Neuner, on behalf of his law firm Baker & Botts, LLP, as "Attorneys For Defendant Comfortex Corporation." *See* transcript at 5:7-17. Any confusion about the professional capacity in which Mr. Neuner was acting was dispelled during oral argument on the present application in this district.

On October 28, 1998, Magistrate Judge David N. Hurd entertained extensive argument on the October 7, 1998 subpoena and many other discovery issues. Unfortunately, no transcript

1999 U.S. Dist. LEXIS 101, *4

[*4] of the proceedings was made and the attorneys have fallen back on their recollections of what was said and done. Not surprisingly, they agree on very little.

On its face, Magistrate Judge Hurd's order is clear and categorical. That order dated December 4, 1998 states:

> Defendant's objections to document subpoenas served on Blinds to Go, Newell Furnishings, Inc. and Mohawk Fabric Company are OVERRULED."

*See* Movant's Exhibit 8. While Magistrate Judge Hurd's words could not have been plainer, the litigants' counsel interpret them differently. In a logomochical exercise, Comfortex and Blinds to Go assert that Magistrate Judge Hurd's ruling is only binding on Comfortex and not the subpoenaed party, Blinds to Go, because of the Court's reference to the "Defendant's objections." Hunter insists that the opposite is true. Neither Comfortex nor Blinds to Go appealed or sought leave to reargue. Nor did Hunter, the prevailing party in that discovery dispute, seek to compel compliance or move for contempt in the Northern District of New York. Instead, the parties embarked on round two in this district and expect this Court to sort the matter out. [4]

> [4] Any ambiguity in Magistrate Judge Hurd's order may be traced to the fact that Mr. Neuner was serving two different clients in the same proceeding and inadvertently executed a document on behalf of Comfortex when he was actually representing Blinds to Go.

1999 U.S. Dist. LEXIS 101, *4

[*5]  Having reviewed all of the motion papers and supplemental letter submissions and having heard oral argument, this Court grants that branch of Hunter's motion to compel production of documents and overrules Blinds to Go's objections to document request numbers 1 through 14 in the December 15, 1998 subpoena because they are clones of request numbers 1 through 14 in the October 7, 1998 subpoena. This Court declines to revisit matters which have already been ruled on in the Northern District of New York or to second guess the magistrate judge who has supervised discovery in the main action. [5]

5  It should be noted, however, that the fact that defendant Comfortex has waived its objection of attorney-client privilege as a result of asserting certain affirmative defenses does not mean that Blinds to Go, a nonparty, has also waived that objection. If they so chose, counsel should bring this to the attention of Magistrate Judge Hurd at their next conference scheduled for January 14, 1999.

Document request numbers 15

[*6] and 16 in the December 15, 1998 subpoena are new and were not addressed by the magistrate judge in the Northern District of New York. Request number 15 seeks:

> Each document that refers to or relates to Comfortex's business dealings with Blinds to Go concerning Serenity or "Shangri-La"-type window coverings or fabric suitable for use in Serenity or "Shangri-La"-type window coverings, including without limitation each document that constitutes, refers to, or relates to (a) any rejection by Blinds to Go of any Serenity or "Shangri-La" -type fabric supplied by Comfortex; (b) any meetings between Comfortex representatives and Blinds to Go representatives concerning Serenity or "Shangri-La"-type window coverings or fabric; (c) any development or testing of any version of Serenity or "Shangri-La" -type product incorporating a single type of translucent fabric in both the front and rear facings of the product; (d) any agreement by Comfortex to take back Serenity or "Shangri-La" product rejected by Blinds to Go; and (e) Comfortex's disposition of any fabric rejected by Blinds to Go.

Request number 16 seeks:

> Each document that refers to or relates to any change by

1999 U.S. Dist. LEXIS 101, *7

[*7] Comfortex in the fabrics incorporated in the facings of Serenity or "Shangri-La" window coverings, including without limitation each document that constitutes, refers to, or relates to (a) any survey of consumers performed in any Comfortex factory outlet store concerning any re-designed Serenity or "Shangri-La" product exhibiting an appearance of moire images; (b) any presentation by Comfortex to Comfortex dealers (including any presentation in New Jersey in July 1998) of any re-designed Serenity or "Shangri-La" product utilizing a single type of translucent fabric in the product's front and back facings; (c) any records of consumer or retailer reaction to Serenity or "Shangri-La" window coverings incorporating a single type of translucent fabric in the product's front and back facings; (d) any records of orders placed on the basis of the original Serenity or "Shangri-La" product design which were filled with modified Serenity or "Shangri-La" product incorporating a single type of translucent fabric in the product's front and back facings; (e) any distribution by Comfortex of any revised advertising or marketing materials to be used in connection with any modified Serenity or "Shangri-La"

1999 U.S. Dist. LEXIS 101, *8

[*8] product incorporating a single type of translucent fabric in the product's front and back facings; (f) any analysis of whether Comfortex should replace or recall any advertising and marketing materials for Serenity or "Shangri-La" distributed prior to Comfortex's initiation of sales of modified Serenity or "Shangri-La" product incorporating a single type of translucent fabric in the product's front and back facings.

This Court will consider these document requests de novo. Both appear relevant on their face and do not appear to be unduly burdensome.

Moreover, no valid objections were raised by Blinds to Go during oral argument.

Defendant asserts that because the requested documents and the proffered deponent are located in Canada, this Court lacks jurisdiction to compel compliance. The fact that Blinds to Go (US), Inc., Blinds to Go's corporate subsidiary, has an office located within the reach of a subpoena issued from this district suggests otherwise. *See* FED R. CIV. P. 45.

In determining whether a corporation within the United States can be compelled to produce documents held by a foreign affiliate, this Court must first consider the nature of the relationship between

[*9] the corporation and its affiliate. *See Addamax Corp. v. Open Software Found.,Inc.*, 148 F.R.D. 462, 467 (D.Mass.1993); *Alcan Int'l Ltd. v. S.A. Day Mfg. Co.*, 176 F.R.D. 75, 78 (W.D.N.Y.1996). If the nature of the relationship between the parent and its affiliate is such that the affiliate can obtain documents from its foreign parent to assist itself in litigation, it must produce them for discovery purposes. The critical inquiry is whether the affiliate can exercise custody and control over the documents.

The test to determine whether a corporation has custody and control over documents located with an overseas affiliate is not limited to whether the corporation has a legal right to those documents. *See Cooper Indus.,Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y.1984). Rather, the test focuses on whether the corporation has "access to the documents" and "ability to obtain the documents." *Addamax Corp. v. Open Software Found.,Inc.*, 148 F.R.D. 462, 467 (D.Mass.1993).

The nature of the relationship between Blinds to Go (US), Inc. and Blinds to Go is such that documents ordinarily flow freely between them. During oral argument, Blinds to Go's counsel acknowledged

1999 U.S. Dist. LEXIS 101, *10

[*10] that if Blinds to Go was the subject of a government investigation in the United States and documents were sought here, Blinds to Go (US), Inc. could cause its corporate parent in Canada to comply with a lawful subpoena and produce documents in this district. *See* transcript at 27:10-16. In addition, it appears that much of the plaintiff's underlying cause of action stem from revenues derived from Blinds to Go's business dealings in the United States. [6] Finally, the mere fact that the subpoenaed documents are in Canada does not exempt them from discovery. *See Cooper Indus.,Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 (S.D.N.Y.1984) ("The fact that the documents are situated in a foreign country does not bar their discovery."). [7] Therefore, Blinds to Go is ordered to comply with document request numbers 15 and 16 of the December 15, 1998 subpoena to the extent that Blinds to Go (US), Inc. can exercise custody and control over the relevant documents.

6    The documents that a corporation utilizes in the normal course of its business are presumed to be in its control unless proven otherwise. *See Cooper Indus.,Inc. v. British Aerospace, Inc.*, 102 F.R.D. 918, 920 n.1 (S.D.N.Y.1984)

[*11]
    7    If a defendant could evade
discovery in this manner, many
domestic corporations would have
a foreign affiliate for storing
sensitive documents.

    Finally, the December 15, 1998
subpoena differs from the October 7,
1998 subpoena in one other respect. It
seeks to depose "the person(s) having
most knowledge of the matters referred
to in [requests numbers 1 through
16]." Blinds to Go's counsel objects
and asserts that the only individual
with the requisite knowledge is a
Canadian national who resides in
Montreal. While that information may
be helpful to the parties, it is of

little utility to a court presented
with a motion to compel a "person with
knowledge" from a corporation.

    On the present record, this Court
lacks the authority to direct the
appearance of a Canadian national in
this district. *See e.g., Price
Waterhouse LLP v. First American
Corp., et. al*, 182 F.R.D. 56, 1998
U.S. Dist. LEXIS 12435, 1998 WL
474196, at *8 (S.D.N.Y. 1998). The
proper procedures for conducting such
a deposition are set forth in FED R.
CIV. P. 28(b), 28 U.S.C. § 1781 and
the Hague Convention on Taking
Evidence Abroad in Civil or Commercial

[*12] Matters. The parties acknowledge that these procedures have not been utilized and judicial economy suggests that any such application should be directed to the Northern District, where the underlying patent infringement action is pending.

Nevertheless, Blinds to Go should produce an officer or employee of Blinds to Go (US), Inc. with knowledge of the matters sought in the subpoena for deposition, who resides, is employed or regularly transacts business within 100 miles of this Court. *See* FED R. CIV. P. 45(c)(3)(A)(ii). That deposition can be excused if there is no officer or employee of the subsidiary in the United States that has knowledge of the matters about which Hunter seeks to inquire. In that event, Blinds to Go may offer an affidavit by its president or CEO that there is no person in the employ of the subsidiary in the United States with knowledge of the matters at issue here.

A final observation is warranted. This Court has devoted substantial time to oral argument and a review of this complicated and heavily litigated dispute. The parties and their counsel appear to be unreasonably multiplying the proceedings, a matter of concern under 28 U.S.C. § 1927. By the litigants'

1999 U.S. Dist. LEXIS 101, *13

[*13]    own admission, Magistrate Judge Hurd has already devoted considerable time and energy to resolving discovery disputes in the underlying action, including the October 15, 1998 subpoena. However, this Court will leave such issues to my learned colleagues in the Northern District who are thoroughly familiar with all of the nuances of the parties' litigation activities in the underlying action.

Conclusion

For these reasons, it is ORDERED that:

(1) Blinds to Go shall comply with document request numbers 1 through 14 of the December 15, 1998 subpoena because those requests are identical to requests made in a prior subpoena that was the subject of a ruling of Magistrate Judge Hurd's order dated December 4, 1998;

(2) Blinds to Go shall comply with document request numbers 15 and 16 to the extent that Blinds to Go (US), Inc. can exercise custody and control over the relevant documents because the documents requested are relevant to the claims and not unduly burdensome;

(3) Blinds to Go shall produce an officer or employee of its United States subsidiary with knowledge of the matters sought in the December 15, 1998 subpoena or, alternatively, furnish an affidavit by the

1999 U.S. Dist. LEXIS 101, *14

[*14]  president or CEO of Blinds to Go stating that there are no such persons in the employ of Blinds to Go (US), Inc.; and

(4) the parties and Blinds to Go are directed to bring any additional matters relating to the production of documents or witnesses by Blinds to Go or Blinds to Go (US), Inc. before the magistrate judge assigned to supervise discovery in the underlying patent infringement action in the Northern District of New York.

Dated: New York, New York

January 11, 1999

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

**<u>EXHIBIT B</u>**



SSANGYONG CORPORATION, Plaintiff, - against - VIDA SHOES INTERNATIONAL, INC.; MOUNTAIN TRAILS, INC.; VICTOR H. DABAH; JUNG HEE YU a/k/a ABRAHAM YU; and GENE DeCARLO, Defendants.

03 Civ. 5014(KMW)(DFE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 9101

May 19, 2004, Decided
May 20, 2004, Filed

**DISPOSITION:** Plaintiffs' motion for production of documents granted.

**COUNSEL:** [*1] For Ssangyong Corporation, Plaintiff: David Scott, David Scott, Esq., New York, NY.

For Vida Shoes International, Inc., Mountain Trails, Inc., Victor H. Dabah, Jung Hee Yu aka Abraham Yu, Gene Decarlo, Defendants: S. Reid Kahn, Kane Kessler, P.C., New York, NY.

**JUDGES:** DOUGLAS F. EATON, United States Magistrate Judge.

**OPINION BY:** DOUGLAS F. EATON

**OPINION**

MEMORANDUM AND ORDER

DOUGLAS F. EATON, United States Magistrate Judge.

On February 2, 2004, plaintiff served a document subpoena on Shanghai Commercial Bank, Ltd. ("SCB Ltd") at 125 East 56th Street, New York, New York. On April 6, 2004, I issued a Memorandum and Order.

On April 19, 2004, SCB Ltd served three documents:

(a) a two-page fax letter dated April 15 to SCB Ltd's Hong Kong headquarters from the Hong Kong law firm of Wong and Chan, solicitors for three of the companies whose bank accounts have been subpoenaed: (1) Wei-Da International Shoes Co., Ltd., (2) Jones Fair Limited and (3) Lanex Limited. The letter confirms that these three companies received a copy of my April 6 order. Paragraph 4 of that order said that the accountholders will be deemed to have waived any objections to plaintiff's subpoena unless they sent

2004 U.S. Dist. LEXIS 9101, *2

[*2] me a formal motion to quash or modify by April 19. Instead of doing so, Wong and Chan have chosen to threaten SCB Ltd with suit in the Hong Kong courts.

(b) a three-page affidavit of Chiu Nam Wu, an Assistant Vice President of SCB Ltd's New York branch.

(c) a very perfunctory six-page memorandum of law from Pitney Hardin LLP, the New York attorneys for SCB Ltd.

On April 27, plaintiff served two documents:

(d) a declaration of Robert J. Rohrberger, Esq. annexing 19 exhibits.

(e) a 33-page memorandum of law ("Pl. Mem.").

As plaintiff pointed out, SCB Ltd relied on one Hong Kong case, *F.D.C. Co. Ltd. v. Chase Manhattan Bank, N.A.,* 1984 WL 442080 (Hong Kong Court of Appeal, Oct. 17, 1984), yet failed to mention the powerful countervailing decisions by Judge Sweet and Judge Goettel in that very same controversy.

On May 10, SCB Ltd served three more documents (the first two annexed to an authenticating affidavit of Jonathan M. Borg):

(f) a May 10 fax to SCB Ltd from Wong and Chan, again threatening suit in Hong Kong.

(g) a six-page memorandum of law from W. C. Kau, Esq., a Hong Kong solicitor for SCB Ltd who also relies on the Hong Kong court's decision

2004 U.S. Dist. LEXIS 9101, *3

[*3] in *F.D.C. Co. Ltd.*

(h) a 12-page reply memorandum of law ("Reply Mem.") from Pitney Hardin LLP, which devotes one sentence to the decisions of Judge Sweet and Judge Goettel.

FACTUAL BACKGROUND

In this diversity lawsuit, plaintiff is a Korean corporation headquartered in Seoul, Korea. In or about August 2002, plaintiff discovered that some of its employees, including a faithless executive named Hwa-Sop Shim, had been involved in a variety of schemes relating to the shoe business whereby they stole more than US $ 95 million from plaintiff. Criminal proceedings were instituted in Korea against Shim and others. Several individuals who participated in Shim's schemes have been convicted in Korea. Shim escaped, apparently to Hong Kong, and his whereabouts are presently unknown to law enforcement agencies. (Complaint PP9-11.)

Plaintiff has sued two New York corporations and three of their principals. Four of the causes of action (for fraud, conversion, unjust enrichment and fraudulent transfer) allege that the defendants conspired with Shim and defrauded plaintiff of a portion of the $ 95 million, namely $ 2,515,000. (Complaint PP35-37.)

Plaintiff has meticulously explained

[*4] why it needs to review the banking documents of the defendants and of four non-party Hong Kong corporations that have close connections with the defendants -- (1) Wei-Da International Shoes Co., Ltd., (2) Jones Fair Limited, (3) Lanex Limited, and (4) eCentury Brand Management & Investment Company Limited. (See Pl. Mem. pp. 4-8, citing to many of the exhibits to the 4/27/04 Rohrberger Decl.) Plaintiff's explanation is not disputed by SCB Ltd, which merely asserts: "The facts of the underlying case are irrelevant for the purposes of this issue and are not set forth herein." (Reply Mem. p. 1.)

LEGAL ANALYSIS

SCB Ltd advances only two arguments for resisting an order to produce its Hong Kong documents:

(1) Its New York branch lacks "control" over the documents that are located in SCB Ltd's Hong Kong headquarters.

(2) The Hong Kong common law of bank secrecy prohibits SCB Ltd from producing the documents; our Court should make a comity analysis and decline to compel production.

The argument that the New York branch lacks "control"

The subpoena was issued by our Court. Pursuant to a subpoena, a non-party may be required to produce documents in its "possession, custody,

2004 U.S. Dist. LEXIS 9101, *5

[*5]    or    control."    Fed.R.Civ.P.
45(a)(1)(C). The meaning of the word
"control" is an issue of United States
law.

The affidavit of SCB Ltd's Mr. Wu
says:

> [SCB Ltd] is a banking
> corporation organized under
> the laws of the Hong Kong
> Special    Administrative
> Region    of    the    Peoples
> Republic of China. [SCB Ltd]
> has been licensed by the
> Comptroller of the Currency
> of the United States to
> conduct a commercial and
> international bank business
> from its New York Federal
> Limited branch located at
> 125 East 56th Street, New

York, New York 10022.

(4/19/04 Wu aff. P3.) SCB Ltd also has
branches in San Francisco and Los
Angeles, which serve both U.S. and
non-U.S. residents. (See SCB Ltd's
website, reproduced at Exh. 14 to the
Rohrberger Decl. and described in Pl.
Mem. pp. 11-15.)

SCB Ltd concedes that it and its
New York branch are not separately
incorporated. (Reply Mem., p. 4.)
Nevertheless, it argues that I should
treat its Hong Kong headquarters and
its New York branch as if they were
two entities; it cites no United
States law for this proposition.
Instead, it relies on a 1984 decision
by the Hong Kong Court of Appeal in a
case which also involved

2004 U.S. Dist. LEXIS 9101, *6

[*6] our Court. (This case will be discussed at length in the comity section of my legal analysis.)

The case was *F.D.C. Co. Ltd. v. Chase Manhattan Bank, N.A.,* 1984 WL 442080, [1990] 1 HKLR 277 (Hong Kong Ct. of App., Oct. 17, 1984). The three judges wrote separately, and two of them wrote on this issue. Judge Huggins wrote (with my underlining):

    . . . I adopt the view of the English Court of Appeal in *Regina v. Grossman (1981) 73 Cr App R 302* and conclude that the Hong Kong branch of the Bank should for present purposes be considered as a different entity separate from the head office in New York. Anyone opening an account in Hong Kong would anticipate that in the ordinary course of business the records containing the details of that account would be kept entirely within the office or branch at which the account was opened. Nevertheless, he would recognize that there might be circumstances (for example a special investigation into a suspected fraud) in which the ordinary course of business would be extended and require that such details be sent to another office of the same bank. If the bank were a foreign bank, that might even involve

2004 U.S. Dist. LEXIS 9101, *7

[*7] sending the details out of the Colony, but, as it seems to me, that is the only relevance of the fact that the defendant Bank here has its head office in the United States of America. Clearly the obligation of secrecy is not subject to territorial limits, thus permitting the Bank to publish the plaintiff's accounts anywhere but in Hong Kong. Had the Bank in the ordinary course of business sent details of the plaintiffs' accounts to its head office in the United States of America the Bank could not properly have volunteered information about the accounts to the United States Government, but Mr. Hoffman concedes that he would then not have been able properly to ask the courts of Hong Kong to restrain production in New York in the face of the orders for production made by the United States courts. As things are, the information is not in the United States of America and it is not suggested that the information is needed in the United States of America in the ordinary course of banking business: it is required by the head office solely for the purpose of its being disclosed to the United States Government.

1984 WL 442080 at *283-84.

I read the portions

2004 U.S. Dist. LEXIS 9101, *8

[*8] underlined by me as follows. If any Hong Kong bank (including SCB Ltd) "suspected [a] fraud" upon itself or upon one of its customers, then it would be "in the ordinary course of banking business" that "details" [documents] would "be sent to another office of the same bank" in a foreign country -- and all Hong Kong accountholders "recognize" that risk.

The opinion of Judge Yang (*id.* at *286-287) quotes the lengthy headnote from the English Court of Appeal decision in *Regina v. Grossman* (also summarized at 1981 WL 188142). *Grossman* arose from an *ex parte* inspection by the Inland Revenue,

pursuant to an *ex parte* order from an English judge, of Barclays Bank's branch on the Isle of Man, despite an injunction from a Manx judge. The English Court of Appeal ruled: "As the English bank's branch in the Isle of Man was subject to Manx law and regulations it was to be considered as a different entity from its headquarters branch in London . . . ." (quoted in 1984 WL 442080 at *287). In *F.D.C. Co. Ltd.,* the circumstances were much different -- thoroughly reasoned orders by Judge Sweet and Judge Goettel after full argument. Nevertheless, the

2004 U.S. Dist. LEXIS 9101, *9

[*9] Hong Kong Court of Appeal felt that *Grossman* should be extended to these facts, and that the Hong Kong courts should proceed on the fiction that Chase's headquarters and Chase's Hong Kong branch were separate entities. It is curious that SCB Ltd cites no more recent case from Hong Kong, but I will assume that this 1984 decision remains the law in Hong Kong today.

The law is much different in the United States, where SCB Ltd has chosen to engage in branch banking. Judge Goettel said:

> The law in the United States is that the production of documents may not be resisted merely

because the documents are located abroad.

*United States v. Chase Manhattan Bank, N.A.,* 584 F. Supp. 1080, 1085 (S.D.N.Y. Mar. 27, 1984). "The test for production of documents is control, not location." *Matter of Marc Rich & Co., A.G.,* 707 F.2d 663, 667 (2d Cir. 1983).

The test for "control" is the same whether the documents are requested from a party or a non-party. *Alcan International Ltd. v. S.A. Day Mfg. Co., Inc.,* 176 F.R.D. 75, 78 (W.D.N.Y. 1996).

Under Rule 34 and Rule 45, the word "'control' does not require that the

2004 U.S. Dist. LEXIS 9101, *10

[*10] party have legal ownership or actual physical possession of the documents at issue; rather documents are considered to be under a party's control when that party has the right, authority, or practical ability to obtain the documents from a non-party to the action." *Bank of New York v. Meridien Biao Bank Tanzania,* 171 F.R.D. 135, 146 (S.D.N.Y. 1997) (Francis, M.J.).

I agree with the following portion of plaintiff's brief:

> Obviously, the simplest case . . . occurs when the subpoenaed entity itself has possession and control of the documents. As discussed below, this is such a clear and simple case. Here, the entity served with the

Subpoena (SCB Ltd) is the same entity that has the documents. Under these circumstances, it is indisputable that the subpoenaed entity must produce the documents in its possession outside of the United States.

(Pl. Mem., p. 16.) The plaintiff then discussed *Dietrich v. Bauer,* 2000 U.S. Dist. LEXIS 11729, 2000 WL 1171132 (S.D.N.Y. Aug. 16, 2000), in which Judge Sweet ordered a non-party, Allied Irish Bank ("AIB") to produce documents from abroad. Judge Sweet wrote:

> . . . If this Court has personal jurisdiction over AIB, and if AIB has control

[*11] of the materials sought, then this Court can order AIB to comply with the subpoena.

AIB concedes that it conducts business in New York through its New York Branch; which is a branch of AIB itself rather than being operated or owned through another, subsidiary entity. This Court has jurisdiction over a foreign corporation doing business in New York. This rule applies to a bank that maintains and operates a branch here. Therefore, this Court has personal jurisdiction over AIB.

*Dietrich,* 2000 U.S. Dist. LEXIS 11729 [WL] at *4 (citations omitted).

SCB Ltd's reply memorandum has no persuasive retort. It says, at page 4:

. . . If a Court sitting in equity can determine that separate entities are essentially the same, . . . [then] this Court can determine that two entities . . . notwithstanding any failure to separately incorporate, . . . are *de facto* legally distinct entities . . . .

. . . *Ssangyong fails to cite any cases that stand for the proposition that a subsidiary corporation served with a subpoena can require its foreign parent to produce documents* . . . .

But SCB Ltd and its New York branch are not separate entities, and SCB Ltd is not the "foreign parent" of its New

2004 U.S. Dist. LEXIS 9101, *12

[*12]   York branch. Plaintiff's citation of *Dietrich* is directly on point, because Allied Irish Bank and its New York branch were not separate entities.

If SCB Ltd could cite some United States case holding that SCB Ltd and its New York branch are "*de facto* legally distinct entities," then we would have to make a second analysis, but the result would be the same. *Dietrich* had to go through this second analysis because in England (although not in New York) Allied Irish Bank did operate through a separate corporate entity, a subsidiary. Where there are two entities, judges in our District have considered additional factors, such as:

the degree of ownership and control exercised by the parent over its subsidiary,

a showing that the two entities operated as one, demonstrated access to documents in the ordinary course of business, and an agency relationship.

*Dietrich* 2000 U.S. Dist. LEXIS 11729 [WL] at *4, quoting cases. Judge Pauley has written:

. . . If the nature of the relationship between the parent and its affiliate is such that the affiliate can obtain documents from its foreign parent *to assist itself in litigation,* it must produce them for discovery purposes.

*Hunter Douglas, Inc. v. Comfortex Corp.,* 1999 U.S. Dist. LEXIS 101, 1999 WL 14007,

2004 U.S. Dist. LEXIS 9101, *13

[*13]  *3 (S.D.N.Y. Jan. 11, 1999) (emphasis added).

As I previously mentioned, the Hong Kong Court of Appeals said that a Hong Kong banking client must recognize the risk that documents may be sent out of Hong Kong and into New York if there is "a special investigation into a suspected fraud." *F.D.C. Co. Ltd.,* 1984 WL 442080 at *283. Nevertheless, SCB Ltd tries to persuade me otherwise; its officer in New York asserts:

> If SCB-NY were to ask for documents of the type sought by the Subpoena, for any reason, including to aid it in a litigation, it is my understanding that [SCB Ltd's Hong Kong office] would refuse to provide them. In response to a request from SCB-NY for customer information, [SCB Ltd's Hong Kong office] would provide no more information to SCB-NY than an ordinary credit reference it would provide to an unaffiliated entity. . . .

(4/19/04 Wu aff., P7.) With all respect, I find this assertion to be inconceivable, just as judges in similar cases have found similar assertions to be inconceivable. *Cooper Industries Inc. v. British Aerospace,* 102 F.R.D. 918, 919-20 (S.D.N.Y. 1984); *Alcan,* 176 F.R.D. at 79.

I also

2004 U.S. Dist. LEXIS 9101, *14

[*14]  note that plaintiff's April 27 brief said:

> .  .  .  It logically follows that the California branches (as they are defined on SCB Ltd's web page) serve non-citizens and presumably have access to the accounts held by those non-citizens outside the United States. Thus, it may be that SCB Ltd is actually saying that, based on its usual business practices, the New York branch does not deal with the Hong Kong accounts, but the California branches do. If this is the case, SCB Ltd could and should simply forward the Subpoena to one of the California branches for production.

(Pl. Mem. at 22.) SCB Ltd's May 10 reply papers do not address this point.

In short, I find that our Court has jurisdiction over SCB Ltd and that SCB Ltd has both possession of, and control over, the subpoenaed documents.

The Hong Kong law and the comity analysis

In 1983 the U.S. Internal Revenue Service (the "IRS") was investigating the tax liability of Dr. Aldo Gucci and Gucci Shops, Inc. The IRS wanted to see the banking documents of three corporations that held bank accounts in the Hong Kong branch of Chase Manhattan Bank, N.A. ("Chase"). Two were Hong Kong corporations -- F.D.C. Co. Ltd. ("F.D.C.")

2004 U.S. Dist. LEXIS 9101, *15

[*15] and Garpeg Ltd. ("Garpeg") -- and the third was a Panamanian corporation, Vanguard International Manufacturing, Inc. ("Vanguard"). Accordingly, the IRS served administrative summonses in New York on Chase. Each summons requested production of banking records of F.D.C., Garpeg, and Vanguard located in all branches of Chase, including its Hong Kong branch.

Unlike the four accountholders in the case at bar, Garpeg and Vanguard commenced actions in our Court to quash the document requests. F.D.C. did not.

In January and February 1984, F.D.C., Garpeg, and Vanguard obtained *ex parte* interim injunctions from Hong Kong Judge Mayo enjoining Chase from producing the documents to the IRS. Then, in our Court, the IRS moved to enforce all three summonses, and Chase moved to quash them.

In our Court, the first ruling came on March 23, 1984, from Judge Sweet, concerning the Garpeg account. *Garpeg, Ltd. and Chase Manhattan Bank, N.A. v. United States,* 583 F. Supp. 789 (S.D.N.Y. Mar. 23, 1984). The second ruling came four days later, from Judge Goettel, concerning the F.D.C. account. *United States v. Chase Manhattan Bank, N.A.,* 584 F. Supp. 1080

2004 U.S. Dist. LEXIS 9101, *16

[*16] (S.D.N.Y. Mar. 27, 1984). Judge Goettel's opinion did not mention Judge Sweet's, but their analyses were very similar, and they each ordered Chase to produce the pertinent Hong Kong records.

Their decisions are very much on point in our case. I shall now quote three pages from Judge Sweet's opinion:

> Garpeg and Chase have submitted affidavits by Hong Kong solicitors with respect to a banker's duty of secrecy under Hong Kong law. The duty is governed by common law principles and is not statutory in nature. A banker has a duty, arising out of the contract between the banker and his customer, to keep the affairs of the customer secret, including the state of the customer's account and all information obtained by the banker by virtue of the banking relationship. According to the affidavits, there are four exceptions to the duty not to disclose:

> (i) disclosure under compulsion of law;

> (ii) disclosure under a duty to the public;

> (iii) disclosure in furtherance of the interests of the banker; and

> (iv) disclosure with the express or implied consent of the customer.

> Disclosure under any other circumstances subjects the banker to liability for damages.

> As noted earlier, Garpeg sought

[*17]  and obtained an interim injunction from the Hong Kong Supreme Court enjoining Chase from producing Garpeg records. By this motion, Chase seeks to avoid the uncomfortable position of being subject to conflicting orders in two sovereign nations in which it does business. If the Hong Kong court permanently enjoins Chase's productions of Garpeg records, Chase's compliance with that order would be a failure to comply with the IRS summons and a potential contempt of this court. On the other hand, compliance with the IRS summons might be a violation of Chase's duties to its customer in Hong Kong and in contempt of the interim order of the Hong Kong court.

The Second Circuit has adopted a balancing test to determine whether subpoenaed documents maintained by the foreign branch of a United States bank must be disclosed despite local banking secrecy laws. *United States v. First National City Bank,* 396 F.2d 897, 902 (2d Cir. 1968); *cf. Trade Development Bank v. Continental Ins. Co.,* 469 F.2d 35, 41 (2d Cir. 1972). In *First National City Bank,* the Court noted that, "A state having jurisdiction to prescribe or enforce a rule of law is not precluded from exercising

[*18] its jurisdiction *solely* because such exercise requires a person to engage in conduct subjecting him to liability under the law of another state having jurisdiction with respect to that conduct." *First National City Bank, supra,* 396 F.2d at 901 (quoting, Restatement (Second) Foreign Relations Law of the United States § 39(1) (1965)) (emphasis added by Court of Appeals).

The Second Circuit has adopted the approach to enforcement advocated by the Restatement (Second) Foreign Relations Law, *supra* § 40. *Id.* 396 F.2d at 902; *In re Marc Rich & Co. A.G.,* 1982 U.S. Dist. LEXIS 10320, M-11-188, slip op. at 17-18 (S.D.N.Y. Aug. 25, 1982); *S.E.C. v. Banca della Svizzera Italiana,* 92 F.R.D. 111, 115 (S.D.N.Y. 1981); *accord, Trade Development Bank, supra,* 469 F.2d at 41. Section 40 provides:

§ 40. Limitations on Exercise of Enforcement Jurisdiction.

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction, in the light of such factors as

[*19]

(a) vital national interests of each of the states,

(b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,

(c) the extent to which the required conduct is to take place in the territory of the other state,

(d) the nationality of the person, and

(e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

The first two factors are of critical importance, the last three appear to be less important. *S.E.C. v. Banca della Svizzera Italiana, supra,* 92 F.R.D. at 119.

Recent proposed changes to the Restatement (Second) of the Foreign Relations Law suggest other factors which should be considered in determining the enforceability of foreign orders. These include the importance of the investigation in which the documents are sought, the degree of specificity of the request for documents, and the location in which the documents originated. Restatement (Second) of the Foreign Relations Law of the United States (Revised) § 420. (Tent. Draft No. 3, 1982). *See United States v. First National Bank of Chicago,* 699 F.2d 341, 346 (7th Cir. 1983);

2004 U.S. Dist. LEXIS 9101, *20

[*20]  *United States v. Toyota Motor Corp.,* 569 F. Supp. 1158, 1162 (C.D.Cal. 1983). These factors, although relevant, have not yet been adopted by the Second Circuit.

The vital interest of the United States, or any state for that matter, in enforcement of its tax laws is unquestionable. [Citations omitted.] On the other hand, the interest of Hong Kong in maintaining its banking secrecy doctrine, a commercial concern, does not directly involve an express statutory concern vital to the government itself. Of course, the Hong Kong policy of banking secrecy makes Hong Kong banks more attractive to those who desire financial secrecy, thus providing some competitive advantage to Hong Kong banks. However, as the Second Circuit noted in *First National City Bank, supra,* 396 F.2d at 903, with respect to German law, "it is surely of considerable significance that Germany considers bank secrecy simply a privilege that can be waived by the customer and is content to leave the matter of enforcement to the vagaries of private litigation. Indeed, bank secrecy is not even required by statute." The same can be said for Hong Kong bank secrecy doctrine. Accordingly, I find that the

[*21] interest of the United States in enforcing its tax laws significantly outweighs Hong Kong's interest in preserving bank secrecy. *Cf. In re Marc Rich & Co. A.G., supra,*1982 U.S. Dist. LEXIS 10320 at *25, slip op. at 18 (interest of United States in investigating violations of its tax laws outweighs Swiss interest in avoiding possible disclosure of business secrets). [In discussing this first factor, Judge Goettel's opinion four days later noted that the Government of Hong Kong has not become a party to any of these litigations.]

The second important factor to consider is the potential hardship imposed upon Chase by inconsistent enforcement actions. Chase argues that it will be placed in an "untenable legal quandary" if Garpeg obtains a permanent injunction in Hong Kong and that it would be subject to an action for contempt and an action for damages in Hong Kong if it complies with the summons. This argument has been rejected repeatedly. *See In re Grand Jury Proceedings,* 691 F.2d 1384, 1388-89 (11th Cir. 1982) (bank's assertion that it would be fundamentally unfair to require a "mere stakeholder" to incur criminal liability in the Bahamas rejected), *cert. denied,* 462 U.S. 1119, 103 S. Ct. 3086, 77 L. Ed. 2d 1348 (1983);

2004 U.S. Dist. LEXIS 9101, *22

[*22] *United States v. Vetco Inc., supra,* 691 F.2d 1281 at 1291 (possible criminal liability in Switzerland did not preclude enforcement and sanctions); *Ohio v. Arthur Andersen & Co.,* 570 F.2d 1370, 1374 (10th Cir. 1978), *cert. denied,* 439 U.S. 833, 58 L. Ed. 2d 129, 99 S. Ct. 114 (1979); *S.E.C. v. Banca della Svizzera Italiana, supra,* 92 F.R.D. at 118. These cases are said to be inapposite because they did not involve a request for records of a person who was not under investigation by the United States, and the distinction unquestionably exists. However, essentially it is simply a resurrection of Garpeg's objections to the relevance of the summons. Once it has been established that the records are relevant to the IRS investigation because of the relationship between Garpeg and the taxpayer being investigated, it is not unreasonable to order the records produce.

The remaining factors of the Restatement balancing test -- place of performance, nationality of the resisting party and the extent to which enforcement can be expected to achieve compliance with the rule -- are of little assistance. Compliance with the contested part of the summons

2004 U.S. Dist. LEXIS 9101, *23

[*23] would take place in Hong Kong, the nationalities of the resisting parties, Chase and Garpeg, are United States and Hong Kong, respectively, and the extent to which enforcement can be expected is mere speculation. The additional factors proposed by section 420 of the revised Restatement -- the importance of the investigation, the degree of specificity of the request, and the original location of the documents -- weigh in favor of enforcement, except for the final factor. The investigation of the IRS is certainly important given the paramount interest of the United States in enforcing its tax laws, and this court has narrowly tailored the document request to further that investigation.

Based on a balance of the factors discussed above, I conclude that the summons should be enforced, as modified, and Chase should be compelled to produce the records requested, whether in Hong Kong or elsewhere. While I recognize the potential predicament of Chase if the Supreme Court of Hong Kong grants a permanent injunction, it may have to confront the unpleasant choice mentioned in *First National City Bank, supra,* 396 F.2d at 905 (quoting *First National City Bank of New York v. Internal Revenue Service,* 271 F.2d 616, 620 (2d Cir. 1959),

[*24]    *cert. denied,* 361 U.S. 948, 80 S. Ct. 402, 4 L. Ed. 2d 381 (1960)), "the need to 'surrender to one sovereign or the other the privileges received therefrom' or, alternatively a willingness to accept the consequences."

*Garpeg,* 583 F. Supp. at 795-97.

Chase then argued in the Hong Kong court to vacate the interim injunctions against it. On April 3, 1984, Hong Kong Judge Clough made an order continuing those injunctions, and Chase promptly appealed to the Hong Kong Court of Appeal.

Meanwhile, Judge Sweet had not yet ruled on the request for the Vanguard account, apparently waiting for the Second Circuit to rule in an unrelated case concerning the notice due to a co-owner of a joint bank account. Continuing to press its motion to quash, Chase informed Judge Sweet of Judge Clough's ruling, argued that this changed the balancing of the factors, and therefore urged Judge Sweet to reach a result different from the March opinions issued by Judge Sweet as to Garpeg and by Judge Goettel as to F.D.C. Judge Sweet analyzed all the factors relating to Vanguard's account and reached the same result, writing: "The fact that the Hong Kong court chose to disregard

[*25] this court's earlier decision in the *Garpeg* action does not alter the court's reasoning." *Vanguard International Mfg., Inc. v. U.S.,* 588 F. Supp. 1229, 1233 (S.D.N.Y. July 6, 1984).

Four days later, Judge Sweet ruled that Chase was in contempt. *Garpeg, Ltd. and Chase Manhattan Bank v. U.S.,* 588 F. Supp. 1240 (S.D.N.Y. July 10, 1984). Judge Sweet acknowledged that inability to comply with a court's order is a defense to a civil contempt action, but he wrote:

> The court does not question Chase's good faith effort to dissolve the Hong Kong injunction. However, the court in its March 23, 1984 opinion weighed the consequences of enforcement, considered the potential conflict with Hong Kong law, and concluded that the summons, as modified, should be enforced. . . .

> * * *

> Sanctions short of contempt are not available to induce Chase's compliance with the summons. For example, adverse findings of fact would have no effect against Chase in an action such as this. [Citations omitted.] Accordingly, the court concludes that it is appropriate to adjudge Chase in civil contempt and to impose a fine of $ 10,000 per day to commence thirty (30) days after

2004 U.S. Dist. LEXIS 9101, *26

[*26] entry of this opinion and order in the event Chase does not comply with the IRS summons.

*Id.* at 1242-43.

On July 30, 1984, Chase applied in Hong Kong to Judge Clough for an order discharging the injunctions prohibiting Chase from complying with Judge Sweet's order. On August 7, Judge Clough denied Chase's application, and Chase promptly appealed to the Hong Kong Court of Appeal.

On August 16, 1984, Judge Goettel ruled that Chase was also in contempt for non-compliance with his order to produce the banking records of F.D.C. *U.S. v. Chase Manhattan Bank and*

*F.D.C. Co., Ltd.,* 590 F. Supp. 1160 (S.D.N.Y. Aug. 16, 1984). Judge Goettel ordered Chase to pay a fine of $ 5,000 per day, but he stayed his order for 30 days following the outcome of Chase's appeal to the Second Circuit.

On October 17, 1984, the Hong Kong Court of Appeal issued the decision upon which SCB Ltd now relies. The three judges concluded that the preliminary injunction prohibiting Chase from producing the Hong Kong banking records was appropriate. *F.D.C. Co. Ltd. v. Chase Manhattan Bank, N.A.,* 1984 WL 442080 (Hong Kong Ct. of App., Oct. 17, 1984).

Nevertheless,

2004 U.S. Dist. LEXIS 9101, *27

[*27] on October 29, 1984, just days before the Second Circuit was scheduled to hear Chase's appeal, F.D.C. and Garpeg ceased their resistance and agreed to produce their bank records. (See 10/29/84 news article, Exh. 19 to the Rohrberger Decl., which says that Dr. Gucci had been making the litigation decisions for F.D.C. and Garpeg.) Therefore, all of the proceedings before the various courts became moot.

The thoughtful opinions of Judge Sweet and Judge Goettel remain good law. They have been cited with approval by the Second Circuit, most notably in *Badgley v. Santacroce,* 800 F.2d 33, 38 n. 2, where Judge Newman wrote:

. . . Two related cases

have held the federal interest superior to that of a foreign sovereign in rejecting an impossibility defense that compliance with an IRS summons would violate a foreign court's injunction. *See United States v. Chase Manhattan Bank, N.A.,* 590 F. Supp. 1160 (S.D.N.Y. 1984); *Garpeg, Ltd. v. United States,* 588 F. Supp. 1240 (S.D.N.Y. 1984). The District Courts, though according great weight to the foreign sovereign's "vital interests," 590 F. Supp. at 1163 n. 3, nevertheless found the

2004 U.S. Dist. LEXIS 9101, *28

[*28] federal interest dominant and held the non-complying party in contempt.

*Badgley*, a civil lawsuit by state prisoners against county officials, involved the violation of a consent decree about overcrowding. The Second Circuit brushed aside defendants' arguments that "compliance might place them in contempt of the state courts that send them prisoners." *Id.* 800 F.2d at 37. It reversed Judge Mishler and directed him "to hold the county defendants in civil contempt in the event of any subsequent failure to implement paragraph 31 of the amended consent judgment." *Id.* 800 F.2d at 39.

As I mentioned near the start, SCB Ltd's reply memorandum devotes exactly one sentence to the decisions of Judge Sweet and Judge Goettel. It distinguishes them on the ground that the United States was a party (having issued the IRS summonses) and therefore the interest of the United States was more substantial than in the case at bar. (Reply Mem. p. 8.) I agree that this is a pertinent distinction, but it hardly carries the day for SCB Ltd.

The United States was not a party in *Minpeco, S.A. v. Conticommodity Services, Inc.,* 116 F.R.D. 517 (S.D.N.Y. 1987). Judge Lasker wrote:

. . . Although

[*29] the interest of the United States in criminal and civil enforcement suits is normally greater than its interest in private disputes, the formal posture of these cases is less significant in that the plaintiffs here are asserting private rights of action under the antitrust, commodities, and racketeering statutes . . . . In fact, it is difficult to imagine a private commercial lawsuit which could be more infused with the public interest. Finally, it should also be noted that the United States has a substantial interest in fully and fairly adjudicating matters before its courts.

*Minpeco,* 116 F.R.D. at 523-24. Accord: *Alfadda v. Fenn,* 149 F.R.D. 28, 34 (S.D.N.Y. 1993) (Katz, M. J.).

In the case at bar, plaintiff has not invoked the federal racketeering statute, but rather the common law prohibiting fraud, conversion, unjust enrichment and fraudulent transfer. On the other hand, the fraud alleged is very large, and has already resulted in criminal convictions in Korea. Plaintiff is a Korean corporation, not a United States company, but it has presented substantial evidence that the defendants (two New York corporations and three individuals living

[*30] in New York and New Jersey) have defrauded plaintiff and pocketed $ 2,515,000. I disagree with SCB Ltd's characterization that this is "an otherwise unremarkable civil action concerning unpaid accounts receivable and allegations of civil fraud in which there is no public interest." (Reply Mem. p. 8.)

In *Fundacion Museo de Arte Contemporaneo v. CBI-TDB Union Bancaire Privee,* 1996 U.S. Dist. LEXIS 1482, 1996 WL 243431 (S.D.N.Y. Feb. 9, 1996), a Venezuelan corporation sued a Swiss bank with places of business in Switzerland and New York. A wrongdoer named Reyes, apparently a Venezuelan, opened a Swiss account at the defendant bank, and apparently stole a blank check from the plaintiff's Venezuela office, forged it, and successfully presented it at the defendant's New York branch. (These details appear in a later opinion, 996 F. Supp. 277 (S.D.N.Y. 1998).) Affirming an order by Magistrate Judge Ellis, Judge Leisure directed the Swiss bank to produce its internal documents relating to Reyes, including those maintained only in Switzerland. Judge Leisure acknowledged that Switzerland has embodied its bank-secrecy interest in a statute (unlike Hong Kong), and has provided criminal sanctions

2004 U.S. Dist. LEXIS 9101, *31


[*31]  (unlike Hong Kong).*Id.*, 1996 U.S. Dist. LEXIS 1482, 1996 WL 243431 at *2. Nevertheless, he went on to say:

On the other hand, the United States has a strong interest in overseeing and protecting the integrity of the banking industry in New York, where critical actions involving Check 177 occurred. The United States also has an interest in "the full and fair adjudication of matters before its courts, which is only possible through complete discovery." *Alfadda*, 149 F.R.D. at 34. Contrary to UBP's arguments, this Court finds that these interests are implicated not only in cases involving the government as a party, *see Alfadda*, 149 F.R.D. at 34, or where a litigant acts as a private attorney general, *see Minpeco,* 116 F.R.D. at 523, but also in a civil commercial litigation. Additionally, UBP performed transactions in New York and the action at issue involves allegedly criminal activity directed against a New York banking institution [Republic]. Having availed itself of the benefits of banking in this country, UBP must necessarily bear the concomitant burdens. . . .

* * *

. . . UBP argues that it acted in good faith in "accommodating

[*32] United States concerns" by obtaining its customer's waiver of secrecy pertaining to Check 177 and attempting to obtain a further waiver from him to allow UBP to produce the additional documents sought by Republic. While these efforts are acknowledged and appreciated by this Court, a good faith failed attempt to avoid the conflict between Swiss and United States interests does not prevent the Court from ordering disclosure after weighing those conflicting interests pursuant to the Restatement balancing test. In other words, bad faith will weigh heavily in favor of disclosure, but good faith does not weigh against disclosure.

*Ibid* (emphasis added).

In yet another private commercial lawsuit, based solely on diversity of citizenship, Magistrate Judge Maas ordered the defendant, a Mexican corporation, to disclose its Mexican assets even if such disclosure would violate Mexican law (a proposition he found to be unproven). *British Intern. Ins. Co. Ltd. v. Seguros La Republica, S.A.,* 2000 U.S. Dist. LEXIS 7509, 2000 WL 713057, *8-10 (S.D.N.Y. June 2, 2000).

Both plaintiff and SCB Ltd agree that the comity analysis turns on the four factors outlined in *Minpeco,* 116 F.R.D. at 522-23.

2004 U.S. Dist. LEXIS 9101, *33

[*33]  I turn now to my own analysis of those four factors in the case at bar.

1. The competing interests of the nations whose laws are in conflict.

I find that the competing interests are very similar to those described in the 1984 opinions of Judge Sweet and Judge Goettel. The interest of the United States is somewhat reduced because the United States is not a party. It is true that plaintiff has chosen to sue under New York common law and not under federal statutes such as the civil racketeering statute. Nevertheless, the asserted causes of action (fraud, conversion, unjust enrichment, and fraudulent transfer) are long established in all of the 50 states. It would be wrong to say that the United States has no interest in having the federal courts address such grievances. Indeed, the United States has opened its courts to suits by foreign corporations under the diversity jurisdiction.

The interest of Hong Kong is the same as in the 1984 controversy surrounding Chase and its Hong Kong customers. In our case, there are four corporations that hold subpoenaed accounts in Hong Kong. SCB Ltd sent them copies of my April 6 Memorandum and Order, which warned them that they will be deemed to

2004 U.S. Dist. LEXIS 9101, *34

[*34] have waived any objections to plaintiff's subpoena unless they sent me a formal motion to quash or modify by April 19. One of them (eCentury) has not bothered to respond in any way. The other three have elected not to send me any motion, but rather to sue in the courts of Hong Kong. I also note that Hong Kong's government has not expressed any view to me, or attempted to intervene in any way. As far as I am informed, Hong Kong has not underscored its interest in bank secrecy by making it the subject of a statute, or of criminal penalties, during the many years that have passed since the 1984 decisions of Judge Sweet and Judge Goettel, and the 1987 decision of Judge Lasker which said:

The foreign nation's interest [is] weaker where bank secrecy doctrine is embodied in a non-statutory "privilege" . . . and where the consequence of disclosure is at most civil liability.

*Minpeco,* 116 F.R.D. at 524.

2. The hardship of compliance.

On this factor, I have considered the hardship on SCB Ltd and also the hardship on the four Hong Kong accountholders. On the record before me, it appears that the accountholders may very well have conspired with the defendants

[*35] to defraud the plaintiff of more than $ 2,000,000. There is no claim that SCB Ltd had any knowledge of this. Nevertheless, SCB Ltd faces the possibility of a Hong Kong injunction and a Hong Kong judgment for civil liability to the accountholders. If SCB Ltd violates a Hong Kong injunction against disclosing the documents, it is conceivable that it could be subjected to criminal sanctions for the violation, but I think that possibility is quite remote on the facts of this case.

There is a real possibility of hardship on SCB Ltd and on the accountholders. However, I believe those possibilities will be greatly lessened if I make a strict confidentiality order, and therefore I have made such an order at the end of this opinion.

3. The importance to the litigation of the information and documents requested.

As I noted near the start of this opinion, the plaintiff has made a convincing showing that the requested documents are very important to this litigation. No one has refuted that. SCB Ltd's reply memorandum, at page 11, suggests that plaintiff should try to get the defendants to produce the banking records of the four Hong Kong accountholders. I am sure that the defendants do not

2004 U.S. Dist. LEXIS 9101, *36

[*36] admit that they have control over those accounts. To get a discovery order to that effect, the plaintiff would essentially have to prove its entire case. SCB Ltd also invites plaintiff to seek an order from the courts in Hong Kong. This would require plaintiff to give up significant rights given by the Federal Rules to all litigants in the federal courts.

4. The good faith of the party resisting discovery.

The parties resisting discovery include the accountholders and the defendants, not just SCB Ltd. Plaintiff has made a strong *prima facie* showing of bad faith on the part of the accountholder and the defendants. Plaintiff has not ascribed

bad faith to SCB Ltd, but I do note that SCB Ltd seems to have delayed for three months, without excuse, before turning over the responsive documents that were sitting in its New York branch.

After balancing all of the comity factors, I find that plaintiff is entitled to enforce the subpoena, but subject to certain confidentiality provisions.

CONCLUSION

Accordingly, I direct Shanghai Commercial Bank Ltd. ("SCB Ltd") to produce to plaintiff's attorneys, by May 24, 2004 at 4:00 p.m., all of the documents described in the Subpoena served

2004 U.S. Dist. LEXIS 9101, *37

[*37] on it on February 2. If SCB Ltd fails to comply with this order, then I hereby require SCB Ltd to pay plaintiffs $ 10,000 promptly on each business day when it is not in full compliance with this paragraph. I decline to stay this order pending any application to me for reconsideration. I do stay this order provided that, prior to 12:00 noon on May 24, 2004, SCB Ltd serves and files an appeal to Judge Wood. One reason for these firm deadlines is that the parties long ago scheduled a mediation for June 4, and the mediator's efforts are likely to be wasted unless plaintiff has received the documents in time to review them.

I order that these documents may not be used for any purpose except this lawsuit, and all parties must return all copies to SCB Ltd within 30 days after the conclusion of this lawsuit. I further order that plaintiff's attorneys shall hold these documents in strict confidence, and may not show them to their client unless they obtain written permission from SCB Ltd or (upon notice to SCB Ltd) from me or from Judge Wood. If any party or any attorney fails to comply with this order, then I will impose sanctions, including a payment to each pertinent accountholder of at

2004 U.S. Dist. LEXIS 9101, *38

[*38] least $ 10,000 for any use of these documents for a purpose other than this lawsuit, and at least $ 1,000 for each business day on which a party or an attorney has failed to return all copies of the documents to SCB Ltd after 30 days from the conclusion of this lawsuit.

DOUGLAS F. EATON

United States Magistrate Judge

Dated: New York, New York

May 19, 2004

**EXHIBIT C**

2010 WL 3536828 (N.Y.Sup.)

**H**

Supreme Court of New York.

New York County

UNITED STATES FIDELITY & GUARANTY COMPANY, et. al., Plaintiffs,

v.

AMERICAN RE-INSURANCE COMPANY, et al., Defendants.

No. 604517/02.

August 17, 2010.

Decision And Order

[This opinion is uncorrected and not selected for official publication.]

Richard B. Lowe.

The following papers, numbered 1 to ___ were read on this motion to/for _

PAPERS NUMBERED

Notice of Motion/ Order to Show Cause - Affidavits  _
- Exhibits ...

Answering Affidavits - Exhibits _                    _

Replying Affidavits _                                _

Cross-Motion: [ ] Yes [ ] No

Upon the foregoing papers, It is ordered that this motion MOTION IS DECIDED IN ACCORDANCE WITH ACCOM-
PANYING MEMORANDUM ORDER

Dated: 8/17/10

<<signature>>

*J.S.C.*

Check one: X FINAL DISPOSITION [ ] NON-FINAL DISPOSITION

Check if appropriate: DO NOT POST

RICHARD B. LOWE, III, J:

Motion sequence numbers and 019 (also designated as 027), 024, 025 and 026 are consolidated for disposition.

In 2002, plaintiffs United States Fidelity & Guaranty Company (USF&G), The St. Paul Fire & Marine Insurance Com-
pany, and The St. Paul Companies, Inc. (collectively with USF&G, the USF&G Parties) settled an insurance coverage
action entitled *Western MacArthur Co., et al., v United States Fidelity & Guaranty Co., et al.,* No. 721595-7 (Cal Super
Ct Alameda County) (the Underlying Coverage Action") wherein plaintiffs agreed to pay $987.4 million in satisfaction
of all asbestos injury-related claims made against Western Asbestos, a USF&G policyholder. Having paid the settlement,

2010 WL 3356828 (N.Y.Sup.)

the USF&G Parties now seek to recover a portion of their losses under reinsurance treaties issued by the defendants.

In motion sequence number 019, defendant American Re-Insurance Company (American Re) moves, pursuant to CPLR 3212, for partial summary judgment declaring that: 1) American Re has no obligation to reimburse USF&G for payments to asbestos claimants who received $100,000 or less of USF&G's money; 2) American Re has no obligation to reimburse USF&G for payments in excess of $200,000 to any claimant; 3) USF&G has the burden to prove that each claimant for whom it seeks reimbursement was exposed to asbestos before the last insurance policy USF&G issued to Western Asbestos; 4) USF&G has the burden to prove that each claimant for whom it seeks reimbursement was exposed to the asbestos of its insured, Western Asbestos Company (Western Asbestos); and 5) The $87.3 million that USF&G paid for legal fees of adverse parties and administrative expenses are not covered by reinsurance. The USF&G Parties originally cross-moved, pursuant to CPLR 3212 (e), for partial summary judgment, but have since amended their application, and now move for summary judgment in motion sequence 024.

In motion sequence 024, the USF&G Parties move, pursuant to CPLR 3212, for summary judgment as follows: (1) On the causes of action for breach of contract and beach of implied covenant of good faith and fair dealing against defendant American Re-Insurance Company n/k/a Munich Reinsurance America, Inc. (American Re), awarding USF&G compensatory damages in the amount of $202,507,261.50 together with interest thereon, and (2) On the causes of action for breach of contract and breach of implied covenant of good faith and fair dealing against defendant Excess Casualty Reinsurance Association (ECRA) and the remaining constituent pool members, defendants ACE Property and Casualty Company (ACE), Century Indemnity Company (Century), OneBeacon American Insurance Company (OneBeacon), American Home Assurance Company (American Home) and American Re, awarding USF&G compensatory damages in the aggregate amount of $59,786,218.81, together with interest thereon.

In motion sequence 025 defendant American Home moves, pursuant to CPLR 3212, for summary judgment and/or partial summary judgment, dismissing the complaint.

In motion sequence number 026, ACE, Century, OneBeacon, ECRA and Excess & Treaty Management Corporation (ETMC) (collectively, the ECRA defendants) move, pursuant to CPLR 3212 for summary judgment, dismissing the complaint.

The Underlying Action

Between 1948 and 1960, plaintiffs USF&G issued a number of liability insurance policies to Western Asbestos Company (Western Asbestos), a company that operated in California, where it sold and distributed insulation products containing asbestos manufactured by Johns-Manville Company. Subject to the terms, conditions, exclusions, and limitations of the Western Asbestos policy, USF&G insured Western Asbestos against liability for bodily injury and/or property damage caused by an "accident." Specifically, the Western Asbestos policy provided coverage for losses arising out of hazards relating to the products and business operations of Western Asbestos.

In the mid-1960s, Western Asbestos ran into financial trouble. In 1967, the MacArthur Company, which sold and installed asbestos products in the mid-west, decided to expand its business into California and formed the Western MacArthur Company (Western MacArthur). Western MacArthur purchased most of the operating assets of Western Asbestos, and took over its business. Thereafter, Western Asbestos filed a certificate of dissolution. Individuals injured by asbestos began suing Western MacArthur in the late 1970s, both in its own right, and as successor to Western Asbestos.

Subject to the terms, conditions, exclusions, and limitations of the Western Asbestos policy, USF&G insured Western Asbestos against liability for bodily injury and/or property damage caused by an "accident." Specifically, the Western

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Asbestos policy provided coverage for losses arising out of hazards relating to the products and business operations of Western Asbestos.

In 1993, Western MacArthur initiated the Underlying Coverage Action against USF&G and two other Western Asbestos insurers in the Superior Court for Alameda County, California, seeking damages and a declaration that USF&G had a duty to defend and indemnify Western MacArthur against the asbestos-related personal injury claims.

In response, USF&G argued that the entity prosecuting the Underlying Coverage Action, Western MacArthur, lacked standing to sue USF&G for breach of insurance policies that USF&G issued to Western Asbestos. Western MacArthur argued that insurance coverage purchased by Western Asbestos transferred to Western MacArthur by operation of law, but in 1997, the California Court of Appeals ruled that Western MacArthur was not entitled to Western Asbestos's insurance coverage (*General Accident Ins. Co. v Superior Court,* 55 Cal App 4th 1444, 1445 [1st Dist 1997]). As a result of this decision, USF&G took the position that it had no obligations to Western MacArthur.

Neither Western MacArthur nor USF&G could locate the insurance policies in issue. USF&G therefore argued that it had no liability because it never provided products liability coverage to Western Asbestos, and that, even if it did, its standard policies at the time did not provide products coverage. Finally, USF&G argued that even if it had provided insurance, the policies would have limited the aggregate amount of such coverage.

The trial of the Underlying Coverage Action began on March 26, 2002. In order to defeat USF&G's objections to standing, Western MacArthur found a former officer of Western Asbestos, and persuaded him to sign an assignment of insurance rights to Western MacArthur. Western MacArthur also convinced a California court to "revive" Western Asbestos after the fact to ratify the assignment. In May 2000, Western Asbestos intervened in the Underlying Coverage Action as a plaintiff. Thereafter, the trial court ruled that USF&G lacked standing to challenge the purported assignment of insurance rights to western MacArthur. These developments represented a significant defeat for USF&G.

With respect to the issue of the lost policies, the plaintiffs in the Underlying Coverage Action presented secondary evidence that USF&G's lost policies provided products coverage without aggregate limits. At this point, USF&G determined that its downside exposure potential was enormous, and it engaged in global settlement discussions.

The Settlement Agreement

On June 3, 2002, after almost 10 years of litigation, the parties reached a settlement. Pursuant to a Settlement Agreement, entered into between MacArthur Company, Western MacArthur Company and Western Asbestos Company (the Western Plaintiffs), the "Asbestos Plaintiffs" (defined as individuals holding asbestos-related claims represented by Asbestos Plaintiffs' Counsel) and the USF&G Parties, USF&G agreed to pay $975 million plus interest, which would be disbursed as follows: 1) $160 million plus interest into a judgment escrow for those claimants who already held judgments against the Western Plaintiffs; 2) $940 million into a bankruptcy trust for current and future claims (the Trust); 3) All costs and fees from and including May 17, 2002, as incurred, in connection with the handling and defense of asbestos-personal injury claims brought against the Western Plaintiffs; and 4) $12.3 million to the Asbestos Plaintiffs' Counsel (Yessman Aff., Ex. C, Settlement Agreement).

As contemplated by the Settlement Agreement, Western Asbestos, Western MacArthur and MacArthur Company filed for bankruptcy protection and sought relief under section 524 (g) U S Bankruptcy Code, which allows companies with asbestos-related liability to obtain an injunction barring all past, present and future claims in exchange for the creation of a trust fund for the compensation of existing and future asbestos claimants (*see,* 11 U S C § 524 [g]).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

According to USF&G, settlement negotiations centered on ascertaining the amount of Western MacArthur's past, present and future asbestos liability. In negotiating the settlement, the parties treated each claimant as a separate accident under USF&G's policies. The parties also assumed that an asbestos claimant could recover from USF&G only if he or she was exposed to or suffered an asbestos injury from a Western Asbestos product or from the operations of Western Asbestos during the stipulated period of USF&G's coverage, which was from 1948 through 1960.

USF&G contends that it was able to use California law to limit its obligations under the Settlement Agreement. According to USF&G, under certain California appellate court cases, insurers are required to pay "all sums," up to the policy limit of the insured's liability, not just liability allocable to damage during the policy period. USF&G contends that it mitigated the effect of these cases by successfully arguing that the limits of successive policies triggered by a single claim or injury could not be aggregated or stacked to increase the available coverage. Rather, USF&G argued, and the parties settled, on the basis that the policyholder could seek recovery under only a single policy. The Settlement Agreement was structured so that all losses were deemed to have occurred in 1959. Prevailing on this point in the negotiations meant that USF&G's liability to any particular asbestos claimant was necessarily limited to the coverage available in a single year.

In negotiating the Settlement Agreement the parties' experts used prevailing jury verdicts and settlement values to assign each type of asbestos-related injury a dollar value:

| | |
|---|---|
| Mesothelioma: | $500,000 |
| Lung Cancer: | $200,000 |
| Other Cancer: | $20,000 |
| Asbestosis: | $50,000 |
| Pleural: | $20,000 |

Thereafter, with respect to present and future claims for various plaintiffs having the most serious injuries, including mesothelioma and lung cancer, the parties capped that liability at $200,000 per claimant as per the applicable insurance policy, and then calculated USF&G's estimated liability, by multiplying the estimated number of present and future plaintiffs by $200,000.

For asbestosis, which the experts projected to result in a recovery of $50,000 for each present and future claimant, USF&G was assigned responsibility for the full amount of such claims. Its potential liability was therefore the estimated number of present and future plaintiffs multiplied by $50,000.

In preparing the reinsurance bill, with respect to present and future claimants, USF&G alleges that it retained half for itself, to satisfy the $100,000 treaty retention, and ceded only the other half to its reinsurers. Further, USF&G alleges that in submitting its reinsurance bill it did not include asbestos claimants because these projected recoveries fell within the $100,000 retention.

As to prior judgments, USF&G's liability was capped at $200,000. In billing its reinsurers for past judgments, USF&G alleges that did not bill prior judgments under $100,000 to its reinsurers, and billed only those amounts between $100,000 and $200,000 to American Re and ECRA (Grais Aff., Ex. C [Reins. Bill], at 4 - 6).

USF&G alleges that the Asbestos Plaintiffs' counsel believed that Western MacArthur faced more than $5 billion in asbestos liability and that USF&G was responsible for over $2 billion of that liability. Thus, USF&G contends that its settlement of the Underlying Coverage Action for $975 million, plus interest, was significantly less than the amounts ini-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

tially demanded by the plaintiffs.

Finally, as to the issue of attorneys' fees, Western MacArthur and the Asbestos Plaintiffs requested that a portion of the settlement be "earmarked" for certain attorneys' fees and costs. According to USF&G, the issue of what portion of the settlement should be paid to lawyers was discussed only after the settlement amount had been arrived at as a result of negotiations over the amount of USF&G's coverage obligations.

The Reinsurance Treaties

In May 1956, USF&G entered into a reinsurance treaty with American Re, identified as Treaty No. 3995-15 (the American Re Treaty), effective January 1, 1956 to January 1, 1962. Pursuant to the American Re Treaty, American Re agreed to pay USF&G 50% of the excess over $100,000 for any one loss, up to a limit of $3 million per loss, paid by USF&G in connection with direct insurance policies in force, issued, or renewed by USF&G, on or after January 1, 1956.

USF&G also entered into an additional contract for reinsurance with the ECRA. ECRA was an unincorporated association of insurance companies. At the time the treaty was entered into, ECRA consisted of 20 member companies, each of which was assigned a specific share of the profit and loss generated by ECRA's reinsurance contracts. ECRA issued a separate treaty to USF&G (the ECRA Treaty), under which ECRA insured the other 50% of losses over $100,000 paid in connection with USF&G's policies which were in effect in 1959.

Both of the reinsurance treaties contain a "follow the fortunes" or "follow the settlements" clause, which provides as follows:
All claims in which this reinsurance is involved, when allowed by the Company [USF&G], shall be binding upon the Reinsurers, which shall be bound to pay or allow, as the case may be, their proportion of such loss .... the Company shall have the right to defend, settle, or compromise any such claims, suit or proceeding, and such action on the part of the Company shall be binding upon the Reinsurers

(Kane Aff., Ex. 1 [Complaint], Ex. A [Treaty, ¶ 6]).

Motion Sequence 019

As noted above, American Re seeks partial summary judgment declaring that USF&G's claim for reinsurance is limited to American Re's share of (i) amounts over $100,000 and up to $200,000 of USF&G's money paid to each claimant, (ii) who USF&G can prove was exposed to asbestos before July 1960, and (iii) who USF&G can prove was exposed to the asbestos products or operations of its insured.

American Re argues first, that under the terms of the treaty, USF&G must retain the first $100,000 of loss paid actually paid to each asbestos claimant, and that, therefore, American Re has no obligation to reimburse USF&G for payments to asbestos claimants who received $100,000 or less of USF&G's money. Second, American Re asserts that the underlying policies issued by USF&G only covered loss of up to $200,000 per person. American Re contends that, under the Settlement Agreement, some claimants nevertheless received more than $200,000 of USF&G's money. Payments above that amount are beyond the scope of USF&G's policies and are, therefore, as a matter of law, not covered by the reinsurance of those policies.

In addition, American Re argues that the last policy that USF&G issued to Western Asbestos expired in July 1960. Under the Settlement Agreement, USF&G's money was put into the Trust, and therefore, some of USF&G's funds were paid to claimants who could not have been exposed to asbestos by 1960, such as those who were not yet born or were born too

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2010 WL 3356828 (N.Y.Sup.)

late to be of working age by then. Because payments to such claimants are beyond the scope of USF&G's policies under any theory of coverage of asbestos liabilities, as a matter of law, those payments are not covered by American Re's reinsurance of USF&G's policies. American Re further asserts that, as the plaintiff in this action for reinsurance coverage, USF&G has the burden to prove that each claimant for whom its seeks reimbursement was exposed to asbestos before the expiration of its last policy in July 1960.

American Re also argues that USF&G money has paid claims for those who were exposed to the asbestos products of three different companies, only one of which was insured by USF&G. American Re contends that, as the plaintiff in this action, USF&G has the burden to prove that each claimant for whom it seeks reimbursement was exposed to the asbestos of its insured, not the other two companies.

Finally, American Re notes that USF&G paid $87.3 million in coverage expenses for purposes other than to compensate victims of exposure to asbestos. This included $40 million to the attorneys for the three asbestos companies, $12.3 million to the attorneys for the asbestos claimants, and $35 million toward the expected administrative expenses of the Trust with respect to the Underlying Coverage Action. American Re contends that these fees are not recoverable under the reinsurance treaties.

A "follow the settlements" clause, included in the reinsurance treaty herein, requires the reinsurer (American Re), to indemnify the reinsured (USF&G), for payments made that are reasonably within the terms of the original policy (*North River Ins. Co. v Ace Am. Reins. Co.,* 361 F3d 134 [2d Cir 2003]).
[T]he doctrine imposes a contractual obligation upon the reinsurer to indemnify the ceding company for payments it makes pursuant to a loss settlement under its own policy, provided that such settlement is not fraudulent, collusive or otherwise made in bad faith, and provided further that the settlement is not an ex gratia payment, i.e., one made by a party that recognizes no legal obligation to pay, but makes payment to avoid greater expense, as in the case of a settlement by an insurance company to avoid the cost of a suit

(*Granite State Ins. Co. v Ace Am. Reins. Co.,* 46 AD3d 436, 439 [1st Dept 2007], citing *Aetna Cas. And Sur. Co. v Home Ins. Co.,* 882 F Supp 1328 [SD NY 1995]).

"The purpose of the 'follow the fortunes' or 'follow the settlements' doctrine in reinsurance law is to prevent the reinsurer from 'second-guessing' the settlement decisions of the ceding company" (*Granite State Ins. Co. v ACE Am. Reins. Co.,* 46 AD3d at 439, quoting *Aetna Cas. and Sur. Co. v Home Ins. Co.,* 882 F Supp at 1346). It is intended to avoid re-litigating coverage issues under the insured's policies and to promote good faith settlement of the insured's claims (*Allstate Ins. Co. v American Home Assur. Co.,* 43 AD3d 113 [1st Dept 2007]).

Here, American Re does not allege that USF&G's settlement in the underlying action was made in bad faith or that it constituted an ex gratia payment. Rather, its argument is that this Court should examine the actual distribution made to particular claimants under the Trust distribution procedures, and determine whether the amount *actually received by each claimant* implicates American Re's reinsurance obligations.

As an initial matter, the treaty is a reinsurance contract between USF&G and American Re, and addresses USF&G's losses pursuant to its underlying policy, not the actual recovery by individual claimants as against USF&G's insured. Moreover, under the follow the settlements doctrine, the standard by which a settlement agreement of a ceding company is judged is whether "the cedent's good faith payment is at least arguably within the scope of the insurance coverage that was reinsured" (*Granite State Ins. Co. v ACE Am. Reins. Co.,* 46 AD3d at 439). Here, American Re does not challenge USF&G's allegations as to its computation of the settlement amount. Any further inquiry into the actual recovery of each claimant would constitute the kind of re-litigation that the follow the fortunes doctrine is designed to avoid.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

American Re's argument that some of USF&G's settlement money will be used to compensate asbestos-related injuries occurring after 1960, and is therefore outside the scope of its reinsurance, apparently stems from the fact that the settlement agreement in the underlying action includes Western Asbestos, MacArthur and Western MacArthur. However, the MacArthur parties were included in the underlying coverage dispute because Western MacArthur purchased the assets and took over the business of Western Asbestos. USF&G has alleged that it calculated its potential liability assuming only claimants who were exposed to or suffered an asbestos injury from a Western Asbestos product or from the operations of the Western Asbestos during the period of USF&G's coverage. American Re has failed to present any evidence whatsoever that USF&G calculated other non-covered potential victims in its settlement figures.

As to American Re's objection to paying any portion of the settlement involving administrative expenses and/or lawyers' fees, again, American Re is seeking to look behind the settlement amount, which it has not challenged, and thereafter deduct those amounts which it deems outside of its re-insurance obligations. According to USF&G, the settlement amount, as well as American Re's obligations thereon, were calculated with reference to USF&G's underlying policy limitations and the reinsurance treaties.

The ECRA Motions

In motion sequence number 026, the ECRA defendants move, pursuant to CPLR 3212, for summary judgment dismissing the complaint.

First, the ECRA defendants assert that USF&G's reinsurance bill improperly employed an occurrence trigger for the reinsurance allocation. An "occurrence" trigger assigns liability to all policies in effect from the time of initial exposure to asbestos until death, the "accident" trigger narrowly assigns liability, at most, only to those policies in effect when the victim was initially exposed to asbestos. According to the ECRA defendants, USF&G prevailed and avoided the application of the materially broader "occurrence" trigger in the case with its insured, but switched rules and used the occurrence trigger for its allocation to the Reinsurers to attempt to broaden the number of claims that are reinsured.

USF&G acknowledges that, during the underlying action it sought to limit its liability by asserting that the continuous trigger doctrine was inapplicable because the underlying policies were written on a "caused by accident" as opposed to "occurrence" basis. USF&G asserts that it ultimately compromised on this issue. Thus, the Settlement Agreement was based upon an occurrence basis of liability. Nonetheless, the parties also negotiated that only one of the policies issued by USF&G-the policy issued in 1959-could be called upon to respond to the underlying asbestos claims. According to USF&G, there were several reasons for doing this. First, under the California "all sums" rule, although a policy is triggered only if bodily injury or property damage takes place during the policy period, once a policy is triggered, the policy obligates the insurer to pay "all sums" up to the policy limit, which the insured shall become liable to pay as damages, and not just for damages that occur during the policy period (*Aerojet-General Corp. v Transport Indem. Co.,* 17 Cal 4th 38, 57 n10 [1997], citing *Armstrong World Indus., Inc. v Aetna Cas. & Sur. Co.,* 45 Cal App 4th 1 [1996]). USF&G states that it sought to minimize the effect of this rule by providing that any recovery would be limited to the per person limit under a single USF&G policy (i.e., no stacking of policies) with the highest available limit being the 1959 policy of $200,000. USF&G asserts that, when it prepared the reinsurance billing, it ceded claims to the reinsurers in the same manner in which its payments were allocated under the Settlement Agreement- to the last policy period.

While USF&G could have settled the underlying coverage action in a manner that would have had a lesser impact on its reinsurers-such as allocating future claimants' predicted recoveries over several policy periods, it was not required to choose the method that would have had the least impact on its reinsurers:
Whenever settlements are made in cases involving multiple policies and multiple insurers and reinsurers, numerous good

faith methods of allocation will be available and under consideration, but only one will ultimately be chosen in terms of the payments actually made. To allow reinsurers to second-guess that allocation would be to make settlement impossible and reinsurance itself problematic

(*North River Ins. Co. v ACE Am. Reins. Co.,* 2002 WL 506682, *3 [SD NY 2002], *affd in relevant part, revd in part,* 361 F2d 134 [2d Cir 2004]). Further, "a cedent choosing among several reasonable allocation possibilities is surely not required to choose the allocation that minimizes its reinsurance recovery to avoid a finding of bad faith" (*Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp. of Am.,* 419 F3d 181, 193 [2d Cir 2005]). Nor, as suggested by ECRA, was USF&G's reinsurance allocation at odds with its allocation of the loss with its insured (*cf. Allstate Ins. Co. v Am. Home Assur. Co.,* 43 AD3d 113, *supra.*).

ECRA also asserts that, under California law, when an occurrence trigger is employed, thereby implicating multiple responsible policies, under the doctrine of equitable contribution, all of the policies issued by USF&G are liable for a proportion of the loss. ECRA argues that, employing this doctrine, it has no liability to USF&G because each $200,000 claim must be pro rated over several policies.

The California courts have applied the doctrine of equitable contribution only to multiple *insurers* of the same loss:
the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss .... Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation ....

($^{st}$ Dist 1998]). The California Supreme Court has stated that "[e]quitable contribution applies *only* between insurers... and *only* in the absence of contract" (*Aerojet-General, supra.,* 17 Cal 4th at 72 [citations omitted, emphasis in original]).

ECRA also argues that the California Supreme Court has indicated that, when successive policies are triggered, it is appropriate to look to the parties' "other insurance" clause to apportion the loss between policies (*Aerojet General,* 17 Cal 4th at 57 n10). Thus, it reasons, if other insurers would be held liable under successive policies, so too should the loss be apportioned over USF&G's successive policies. However, the California Supreme Court has held that " ' [o]ther insurance' clauses become relevant only where several insurers insure the same risk at the same level of coverage" (*Dart Indus., Inc. v Commercial Union Ins. Co.,* 28 Cal 4th 1059, 1079 n 6 [2002]). Here again, although USF&G could have negotiated a settlement using all policies, the follow the settlements rule does not require it.

ECRA next argues that, in 1981, the parties retroactively amended all reinsurance treaties with USF&G to provide a retention, per loss, of $3 million, as opposed to $100,000. The retention is the amount that USF&G must pay before the reinsurers' liability is triggered. If this were the case, it would effectively end the current litigation because the $3 million retention would cover the settlement amounts on every claim. However, the parties only drafted and signed policy endorsements increasing the retention of post-1962 reinsurance treaties. The Treaty at issue herein was for the year 1959. ECRA contends that contemporaneous documents indicate that the parties intended to amend all treaties, including those in effect prior to 1962. ECRA submits evidence from several sources, including a memo and the deposition testimony of Thomas Rentko, ECRA's negotiator in 1981, the deposition testimony of James Steen, a USF&G broker in 1981, and a 1987 memo from Brady Wallace, a USF&G employee, who was not present at negotiations in 1981.

First, ECRA submits a memo authored by Thomas Rentko, dated June 22, 1981, which states, in part, that the parties had agreed that "[a]ll new losses reported to reinsurers on and after July 1, 1981 will be subject to a $3,000,000 retention regardless of the date of loss (Carlinsky Aff., Ex. 57). In addition, at his deposition, Rentko stated that "[m]y intent on that was to go back to unreported losses. I don't want to pick out any years. If the claims came out of the woodwork in '62 or '59, I could care less. I didn't want to have to get into the new calendar year loss exposures" (Carlinsky Aff., Ex 58, at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

271)

However, on June 19, 1992, Randall White, a vice president of Guy Carpenter, the brokerage firm representing USF&G, wrote in a memo to Rentko: *"All new claims against USF&G's 'old first layer' casualty cover (in force from 1/1/62 to 6/30/80) will be subject to a $3,000,000 retention.* The term 'new claims' means claims first reported to reinsurers on or after 7/1/81." On his copy of the letter, Rentko wrote: "This is correct- See notes in file." Rentko signed and dated that letter (Kane Aff. Ex. 38) (emphasis added).

In fact, several additional correspondence from Guy Carpenter, indicate that the brokerage firm believed that the retroactive increases in USF&G's retention was limited to post-1962 policies (*see e.g.* Letter from Guy Carpenter [Gerard T. Tanella], 11/15/91, Kane Aff., Ex. 75; Letter from Guy Carpenter [Gerard T. Tanella], 4/8/88, Kane Aff., Ex. 39).

Next, the ECRA defendants submit the deposition testimony of James Steen, who states in a 2008 affidavit that, in 1981 "USF&G agreed to retain more of the losses prior to July 1980 through a retroactive increase in their retention to $3 million on any newly reported claims (Carlinsky Aff. Ex. 59). However, Steen also states that: "[w]ith respect to the retroactive increase in retention, *I do not remember any discussion about limiting how far back that would go.* I understood that it was intended to go all the way back to the beginning of each reinsurer's involvement with the Program" (*id*) (emphasis added).

However, in a letter dated June 19, 1981, USF&G wrote to Steen, in part, as follows: "[c]onfirming our conversation today, we are authorizing you to negotiate a 2??% to 5??% payback rate specifically applicable to the 'old' Casualty Excess First Layer with the understanding that new reported losses to the treaty after July 1 will carry a $3,000,000 retention" (Carlinsky Aff., Ex 56).

USF&G states that the "old first layer" referred to 1962 inasmuch as that was the first year that USF&G's first and second layers of reinsurance coverage were in separate treaties (Joseph Conwell Aff., ¶3). This reference to the "old excess" is supported by Randall White's letter to Rentko, noted above.

In addition, a letter from Steen to Joseph Conwell, Assistant Secretary of USF&G, dated June 3, 198,1 indicates that the parties were changing the "old" first excess layers of insurance:
We have recently discussed with American Reinsurance Company and Excess & Casualty Reinsurance Association (ECRA) *their position in renewing this First Casualty Excess layer* of your reinsurance program as of July 1, 1981 ....
Neither American Re nor ECRA have provided us with definitive quotations for the renewal of this layer. As you know, the U.S.F.&G. retention was increased from $1,000,000 to $3,000,000 effective July 1, 1980. The three reinsurers on the "old" First Excess were moved to the "new" first Excess - which is now $4,000,000 excess of $3,000,000 ....
The developing experience under the "old" first excess is of concern to the reinsurers. They have asked that we discuss with you the impact of this development in respect of the continuing relationship that each has with the U.S.F.&G. as reinsurers of the "new" First Excess.
All of this will be the subject of our discussion with you, Karl Doerre and George Bookhout on Thursday morning, June 4, 1981

(Kane Aff. Ex. 72) (emphasis added).

Finally, the ECRA defendants present the memo of Brady Wallace, a senior officer of USF&G, who, admittedly, was not involved in the 1981 negotiations, but who, in 1987, opined the following: "It seems to me that the intent was for the retroactive endorsements to apply to contracts prior to 1962 although the earlier contracts were not endorsed" (Carlinsky Aff., Ex. 54, at 2).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

However, in July 1992, when Guy Carpenter circulated revised versions of the post-1962 endorsements, Wallace signed them on behalf of USF&G.

In opposition to ECRA's motion, USF&G submits the affidavit of Joseph Conwell, who was employed by USF&G from 1955 through 1992 and was USF&G's Superintendent of Reinsurance in the early 1980s. Conwell states that he had personal knowledge of the terms and conditions of USF&G's reinsurance coverage and that the parties never intended to change the pre-1962 treaties. Conwell states, in part, that:

The discussions concerning the $3 million retention increase concerned only reinsurance treaties issued between 1962 and 1980 (i.e., the "old First Excess"). Neither I nor anyone else at USF&G ever intended to increase the retentions of any treaties with effective dates before 1962, and USF&G never agreed to increase such retentions. The retentions in pre-1962 treaties were $50,000 from 1945 to 1951 and $100,000 from 1951 to 1962.

There are a number of reasons why our negotiations concerned only the post-1962 reinsurance treaties. First and foremost, in the 1980's the reinsurers were not suffering losses in the pre-1962 years, and thus there was no reason to seek modification of those treaties ...

(Conwell Aff.).

Further, USF&G also submits several 1981 memoranda authored by American Re, which expressly acknowledge that American Re, which held the other 50% risk on the reinsurance, did not seek to extend the retention increase to pre-1962 treaties. A July 13, 1981 memo on American Re stationery states, in part, that "[s]ince when discussing the payback concept with [Guy] Carpenter we used our experience figures back to 1962, and because what we know of the years prior to 1962 suggest we made money I suggest we endorse our $3,000,000 retroactive retention back to 1/1/62" (Kane Aff., Ex. 45). An August 5, 1981 American Re memo, states "[a]s a follow-up to my recent previous memorandum, we have decided not to go back beyond accident year 1962 for purpose of moving to the $3,000,000 retention as respects losses first reported on or after 7/1/81 (Kane Aff., Ex. 46).

"It is well established that when interpreting an insurance contract, as with any written contract, the court must afford the unambiguous provisions of the policy their plain and ordinary meaning (*Greater N. Y. Mut. Ins. Co. v United States Underwriters Ins. Co.,* 36 AD3d 441, 442 [1st Dept 2007], citing *United States Fid & Guar. Co. v Annunziata,* 67 NY2d 229 [1986]; *see also Riverside S. Planning Corp v CRP/Extell Riverside, L.P.,* 60 AD3d 61, 66 [1st Dept 2008]).

The ECRA defendants ask this Court to reform the 1959 treaty to reflect what they assert was the parties' true intention-to change the retention of the pre-1962 treaties from $100,000 to $3 million. As the proponent of reformation, the ECRA defendants have the burden to prove first, that the parties' failure to endorse the pre-1962 treaties was the result of either mutual mistake or unilateral fraud, and second, exactly what was really agreed upon between the parties (*Greater New York Mut. Ins. Co. v U.S. Underwriters Ins. Co.,* 36 AD3d at 443; *William P. Pahl Equip. Corp. v Kassis,* 182 AD2d 22 [1st Dept ], *lv. dismissed in part and denied in part, 80* NY2d 1005 [1992]). Here, the ECRA defendants have failed to present sufficient evidence to raise an issue of fact as to either mutual mistake or fraud on the part of USF&G. Further, it is clear that, USF&G, Guy Carpenter and American Re intended the new retentions to affect only post 1962 treaties.

Next, the ECRA defendants assert that some portion of USF&G's nearly $1 billion settlement is compensation that should be attributed to Western's bad-faith claim, which is not covered by reinsurance. According to ECRA, the United States Bankruptcy Court found that a substantial portion of USF&G's settlement "must be attributed" to bad-faith claims against USF&G. The ECRA defendants assert that USF&G is collaterally estopped by the Bankruptcy Court decision from asserting that no part of its settlement is attributable to Western Asbestos' bad faith claim against it.

The doctrine of collateral estoppel precludes a party from re-litigating an issue that was raised in a prior action and de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

cided against that party (*Ryan v New York Tel. Co.,* 62 NY2d 494 [1984]).

In a decision approving the creation of the Trust, United States Bankruptcy Judge Leslie Tchaikovsky noted that the Settlement Agreement required the issuance of injunctions enjoining the prosecution of asbestos claims against the debtors and the settling insurers and channeling future asbestos claims to the Trust. The Court stated that to confirm the plan and issue the required injunctions the Court must find that both the plan and its proponents satisfied the requirements of both 11 USC §§ 1129 and 524 (g).

Section 1129 (a) (3) required the Court to find that the plan had been "proposed in good faith and not by any means forbidden by law." The Court stated that the "Objecting Insurers" (i.e., those who had not reached a settlement with Western Asbestos) contended that the plan was filed in bad faith and that the debtors had acted in bad faith, which was shown by their unwillingness to contribute more to the Trust. The Objecting Insurers contended that the proceeds from the USF&G and Hartford Settlement Agreements, which were the primary contribution to the Trust, either belonged to the asbestos claimants already or were without value. In response, Judge Tchaikovsky wrote as follows:

This argument ignores the value of the Debtors' bad faith claims against Settling Insurers. As discussed below, the evidence presented at the confirmation hearing convinced the Court that the Debtors had colorable claims for bad faith against each of these two insurers. While the Court cannot allocate to these bad faith claims a specific percentage of the settlement amounts, even if the bad faith claims represents only ten percent of the settlement amount, this gives them a value of approximately $200 million *19.

n19. *The Court is not deciding here the merit or specific value of any potential bad faith claim* that was or could have been raised in a state court insurance coverage action. Rather, the Court simply determines that the Debtors' contribution to the Trust was substantial

(Pedlar Aff., Ex. D, at 25) (emphasis added).

Thus, although the Judge Tchaikovsky was required to find that Western Asbestos had acted in good faith and had contributed to the Trust, she specifically noted that she was not determining the merit or specific value of any potential bad faith claim in the bankruptcy proceeding. USF&G is not bound by the Bankruptcy Court finding on this issue because none was made. Nor have the ECRA defendants presented any further evidence that a portion of the settlement amount was attributable to Western Asbestos bad faith claim. They have, therefore, failed to raise an issue of fact as to this issue.

Finally, the ECRA defendants allege that there are issues of fact as to whether USF&G's reinsurance allocation was based upon fraudulently inflated claim values and fictitious future claim counts.

The ECRA defendants claim that, "in order to support its reinsurance billing, USF&G provided the Reinsurers with a completely fictitious list of default claimants. The list bore no relationship to the amount received by holders of default judgments or to the releases that those claimants had delivered to USF&G" (ECRA Memorandum of Law, at 40).

The ECRA defendants cite Henry Ailsworth as a specific example. Henry Ailsworth obtained a default judgment of $1.260 million against Western Asbestos and received $71,000 in partial satisfaction of his judgment out of the USF&G settlement funds, even though he was first exposed to asbestos in 1974, well after the 1959 policy-year for which the ECRA defendants provided reinsurance coverage (Carlinsky Aff., Exs. 78-79). The ECRA defendants assert that, by July 2000, before it billed the reinsurers, USF&G knew that Ailsworth, and many like him, had been paid a portion of the $160 million earmarked for the holders of default judgments. The ECRA defendants assert that, nonetheless, USF&G billed its reinsurers as if it had paid Ailsworth $200,000.

The ECRA defendants make essentially the same argument that American Re made-that once the settlement funds were

2010 WL 3556828 (N.Y.Sup.)

put into the bankruptcy trust, claimants other than those who were liable under the USF&G policy received a portion of the funds, and conversely, some claimants, for whom USF&G had contributed $200,000, did not receive the total settlement attributable to them.

Here, again, while the ECRA defendants may challenge USF&G's good faith in settling the underlying action, and whether the settlement payments made by USF&G were ex gratia, or outside the scope of the underlying policy, the follow the fortunes doctrine prevents them from challenging the actual disbursement of funds to various claimants.

Along these lines, the ECRA defendants erroneously assert that USF&G created a "fraudulent" list of default judgments and sent it to the reinsurers as support for its November 2002 bill (Carlinsky Aff., Ex. 3). The ECRA defendants assert that, instead of revealing the actual recipients of the $160 million paid with respect to default judgments, USF&G created a list showing only claimants first exposed before 1960.

The list of default judgments prepared by USF&G supports its settlement of the underlying action in that it demonstrates that the default judgments rendered against its policyholder, Western Asbestos, for exposures to asbestos occurring prior to 1960, were far in excess of $160 million. Thus, USG&G's payments made to its policyholder were not ex gratia. The ECRA defendants argument is essentially that, because of the methods of distribution used by the Trust, some claimants who were not exposed prior to 1960 may have been paid with monies coming from USF&G. As already noted, the follow the fortunes doctrine prevents an inquiry into the ultimate distribution determinations of the Trust.

The ECRA defendants next allege that to "hide" the payments made to those not triggering a USF&G policy, USF&G inflated the payments made to claimants that might be reimbursable under the Treaty. The ECRA defendants point to another claimant, George Miller, who received only $15,679 in actual dollars and released USF&G for liability in that amount. Nonetheless, according to the ECRA defendants, USF&G improperly billed the Reinsurers $100,000 as if Mr. Miller had received $200,000 and released USF&G for that larger amount.

The list of default judgments, prepared by USF&G, indicates that George Miller was first exposed to asbestos in 1948, and obtained a default judgment against Western Asbestos in the Amount of $277,800 (Carlinsky Aff., Ex. 3). Under the terms of the Settlement Agreement, Mr. Miller's claim was capped at $200,000, and USF&G paid that amount into the bankruptcy trust. USF&G then billed the reinsurers for $100,000, which was appropriate.

Finally, the ECRA defendants argue that all of the asbestos claims should be aggregated into one claim because a "loss" under the Treaty is defined as the aggregate loss arising out of each "accident." The Treaty further defines "accident" as "[an] accident or occurrence, or series of accidents or occurrences *arising out of any one event* (Kane Aff., Ex. 1, Ex. A). Aggregating all asbestos-related injuries into one event (i.e., the decision to use asbestos) would drastically limit the amount of reinsurance due from them in that the Treaty has a $3.1 million maximum limit per loss.

This manner of allocating the loss is, as already noted, contrary to the manner in which the Underlying Coverage Action was settled because each asbestos claimant therein was considered a separate accident or occurrence. Further, under both New York and California law, each asbestos-related injury is considered a separate "occurrence" or "accident" since each claimant is separately exposed to asbestos at different points in time (*see e.g. In re Prudential Lines Inc. v American S.S. Owners Mut. Protector and Indem Assn.,* 158 F 3d 65, 81 [2d Cir 1998]; *London Mkt. Insurers v Superior Ct. of Los Angeles County.,* 146 Cal App 4th 648, 661 [2d Dist 2007]).

In motion sequence 025 defendant American Home moves, pursuant to CPLR 3212, for summary judgment and/or partial summary judgment, dismissing the complaint on the basis set forth in ECRA's motion to dismiss. For the reasons stated above, the motion is denied.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

USF&G's Motion for Summary Judgment

In motion sequence 024, USF&G moves for summary judgment: (1) on its causes of action for breach of contract and breach of implied covenant of good faith and fair dealing against defendants American Re in the amount of $202,507,261.50, together with interest; and (2) on its causes of action for breach of contract and breach of implied covenant of good faith and fair dealing against defendant ECRA and the remaining constituent pool members; defendants Ace Property and Casualty Company, Century Indemnity Company, OneBeacon America Insurance Company, American Home Assurance Company and American Re, in the amount of $59,786,218.81, together with interest. The difference in the amounts claimed due from American Re and the ECRA defendants is the result of settlements by nine of the ECRA pool members.

In opposition to USF&G's motion for summary judgment, the ECRA defendants assert that there are issues of fact as to: (1) the retention amount, which ECRA asserts was amended to $3 million; (2) the amount of the settlement that is attributable to USF&G's bad faith in the underlying action; (3) USF&G's use of an "occurrence" trigger was improper; (4) USF&G's use of the "all sums" rule to allocate all liability to the 1959 policy was unreasonable; and (5) USF&G committed fraud and manipulated claims to increase its reinsurance bill. Each of these assertions has been discussed above and determined to be without merit.

American Re opposes USF&G's motion for summary judgment on the grounds that, to recover from the reinsurers, USF&G must establish both that its payments are covered by the Treaty and that it acted in good faith in its post-settlement allocation of loss to the reinsurers. American Re further contends that USF&G may not support its burden of proving good faith by relying on extrinsic evidence of what the parties to the Settlement Agreement purportedly agreed during negotiations, because the Settlement Agreement contains an integration clause. As an initial matter, the parol evidence rule cannot be invoked by a non-party to an agreement (*Robert v United States Shipping Bd. Emergency Fleet Corp.,* 240 N Y 474, 478 [1925]; *Matter of SIN, Inc. v Department of Fin. of City of N.,* 126 AD2d 339, 344 [1st Dept 1987], affd. 71 NY2d 616 [1989]). In addition, American Re fought for, and was granted discovery of documents relating to settlement negotiations (*American Re-Ins. Co. v U.S. Fid. & Guar. Co.,* 19 AD3d 103 [1st Dept 2005]). American Re cannot now assert that the parties may not rely on information regarding settlement negotiations. Finally, "[a] reinsurer who seeks to avoid application of follow-the-fortunes by claiming bad faith ... must make an 'extraordinary showing of a disingenuous or dishonest failure' " (*Travelers Cas. & Sur. Co. v Gerling Global Reins. Corp.,* 419 F3d 181, 191 [2d Cir 2005], quoting *North River Ins. Co. v CIGNA Reinsur. Co.,* 52 F3d 1194, 1216 [3d Cir 1995]). Neither American Re nor the ECRA defendants have made a sufficient showing of bad faith to require a trial.

Accordingly, based upon the foregoing it is

ORDERED that as to motion sequence 019 (also designated as 027), the motion by defendant American Re-Insurance Company for summary judgment is denied; and it is further

ORDERED that as to motion sequence 026, the motion by defendants Excess Casualty Reinsurance Association, ACE Property and Casualty Company, Century Indemnity Company, OneBeacon American Insurance Company, and Excess Treaty Management Corporation for summary judgment dismissing the complaint is denied; and it is further

ORDERED that as to motion sequence 025, the motion by defendant American Home Assurance Company for summary judgment dismissing the complaint is denied; and it is further

ORDERED that as to motion sequence 024, the motion by plaintiff United States Fidelity and Guaranty Company for summary judgment is granted to the extent that plaintiff shall have judgment against defendant American Re-Insurance

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Company in the amount of $202,507,261.50 plus interest at the statutory rate, to be calculated as follows: $40,110,865.00 with interest from November 9, 2002; $162,026,951.50 with interest from May 29, 2003; and $369,445.00 with interest from July 4, 2004; together with costs and disbursements as taxed by the Clerk upon submission of an appropriate bill of costs; and it is further

ORDERED that plaintiff shall have judgment against defendants Excess Casualty Reinsurance Association, ACE Property and Casualty Company, Century Indemnity Company, OneBeacon American Insurance Company, and Excess Treaty Management Corporation in the amount of $59,786,218.81 plus interest at the statutory rate, to be calculated as follows: $11,841,930.67 with interest from November 2, 2002; $47,835,216.89 with interest from May 29, 2003 and $109,071.24 with interest from July 4, 2004, together with costs and disbursements as taxed by the Clerk upon submission of an appropriate bill of costs; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

Dated: August 17, 2010

ENTER:

<<signature>>

U.S. Fidelity & Guar. Co. v. American Re-Ins. Co.
2010 WL 3536828 (N.Y.Sup. ) (Trial Order )

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.