**Hearing Date and Time: October 31, 2012 at 10:00 a.m. (prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ x | | |
| In re: | : | Chapter 11 |
| | : | |
| Residential Capital, LLC, <u>et</u> <u>al.</u>, | : | Case No. 12-12020 (MG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| ------------------------------------------------------------ x | | |

**OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED**
**CREDITORS TO OBJECTIONS TO ITS MOTION FOR STANDING TO**
**<u>PURSUE CERTAIN CLAIMS ON BEHALF OF THE DEBTORS' ESTATES</u>**

## <u>TABLE OF CONTENTS</u>

Page

Table of Authorities ................................................................................................................... ii

REPLY TO LIMITED OBJECTIONS ....................................................................................... 1

A.      The Debtors Should Not Have Authority to Settle Claims They Have Released................ 3

B.      The Committee Is Authorized to Bring All Claims Revealed by Its Investigation. ........... 8

CONCLUSION........................................................................................................................... 10

Exhibit A – Draft Complaint

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

CASES

*ACC Bondholder Group v. Adelphia Commc'ns Corp.(In re Adelphia Commc'ns Corp.),*
    361 B.R. 337 (S.D.N.Y. 2007)......................................................................................3, 4, 5, 7

*In re Centaur, LLC,*
    Case No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. 2010) ....................................5

*In re Exide Technologies,*
    303 B.R. 48 (Bankr. D. Del. 2003) .........................................................................................5

*In re STN Enters.,*
    779 F.2d 901 (2d Cir. 1985).....................................................................................................1

*Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia*
    *Commc'ns Corp.),*
    371 B.R. 660 (S.D.N.Y. 2007)............................................................................................4, 5

*Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia*
    *Commc'ns Corp.),*
    544 F.3d 420 (2d Cir. 2008)................................................................................................5, 6

*Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),*
    423 F.3d 166 (2d Cir. 2005)................................................................................................3, 6

OTHER AUTHORITIES

Fed. R. Bankr. Proc. 9019...........................................................................................................3, 6

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "**Committee**") of the above

debtors and debtors-in-possession (collectively, the "**Debtors**") submits this omnibus reply (the

"**Reply**") to the limited objections (collectively, the "**Limited Objections**")[1] to the *Motion of the*

*Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute*

*and Settle Certain Claims on Behalf of the Debtors' Estates* [Docket No. 1546] (the "**STN**

**Motion**").[2]  In support of the Reply, the Committee respectfully represents as follows:

## REPLY TO LIMITED OBJECTIONS

1.    The STN Motion explained in detail how the Committee satisfied each

element required to obtain authority under *In re STN Enters.*, 779 F.2d 901 (2d Cir. 1985), to

bring claims on behalf of the estates against the Junior Secured Parties.  In particular, the

Committee demonstrated that:

- In the AFI DIP Order, the Debtors stipulated to the validity, amount, extent, and priority of the Junior Secured Parties' claims and liens, and expressly agreed to release the Junior Secured Parties from all estate claims.

- These stipulations and releases barred the Debtors from pursuing claims against the Junior Secured Parties, and excused the Committee from making any demand upon the Debtors to pursue these claims.

- The Committee identified multiple, colorable claims against the Junior Secured Parties.

---

[1]  The Limited Objections consist of the following: (i) *Limited Objection of U.S. Bank National Association, as Indenture Trustee, to Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* [Docket No. 1864]; (ii) *Debtors' Limited Objection to the Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* ("*Debtors' Obj.*") [Docket No. 1865]; (iii) *Ally Financial Inc.'s Limited Objection and Reservation of Rights with Respect to the Committee's Motion for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* ("*AFI Obj.*") [Docket No. 1866]; and (iv) *Limited Objection of Ad Hoc Group of Junior Secured Noteholders to Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates* ("*Ad Hoc Group Obj.*") [Docket No. 1870].

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the STN Motion.

- The claims against the Junior Secured Parties have the potential to generate recoveries for the estates far in excess of the cost of litigating them – and their prosecution is therefore likely to benefit the estates.

2.     Four parties – the Debtors, AFI, the Ad Hoc Group of Junior Secured Noteholders, and the Indenture Trustee for the Junior Secured Notes (collectively, the "**Objectors**") – have filed limited objections to the STN Motion.  Not one of these objections challenges the Committee's entitlement to standing.  Not one of the Objectors suggests that (i) the Debtors, having affirmatively released their claims against the Junior Secured Parties, may now properly prosecute them, (ii) the Committee's claims are not colorable, or (iii) the Committee's pursuit of these claims is unlikely to benefit the estates.

3.     Instead, the Objectors offer two limited objections.  First, all four Objectors argue that, while the Committee may have exclusive standing to litigate the claims to judgment, it may not be granted the exclusive right to settle them.  Rather, the Objectors – who, not coincidentally, either negotiated the AFI DIP Order or benefit directly from the stipulations and releases it contains – argue that the Debtors must retain the plenary authority to settle the very same claims that they previously released.  Second, two Objectors – not including the Debtors – seek to limit the claims the Committee may bring to those described in the STN Motion.

4.     Neither of these positions has merit.  As all concede, the Debtors cannot pursue the claims the Committee has identified.  Neither law nor common sense requires that the Debtors be allowed to settle the same claims out from under the party that is prosecuting them on behalf of the estates.  The plain language of the AFI DIP Order, moreover, grants the Committee latitude to add to the colorable claims it has already outlined.  For those, and the reasons set forth below, the Limited Objections should be overruled and the STN Motion granted in its entirety.

A. **The Debtors Should Not Have Authority to Settle Claims They Have Released.**

5.      The Committee seeks standing to prosecute the claims at issue because, under the plain terms of the AFI DIP Order, the Debtors cannot.  Unable to contest that only the Committee can properly represent the estates in pursuing these claims, the Debtors – and the other Objectors – concede the Committee's standing is appropriate.  Debtors' Obj. at ¶ 2; AFI Obj. at ¶ 1; Ad Hoc Group Obj. at ¶ 3.

6.      Nonetheless, each Objector argues that the Debtors should retain the right to settle the same claims they have previously agreed to release.  This conclusion, they argue, is required by (i) various decisions in this Circuit, most prominently in the *Adelphia* case, that they claim reserve such authority for the Debtors, (ii) the Second Circuit's decision in *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166 (2d Cir. 2005), which the Objectors read to grant the Debtors exclusive authority to manage the estates' causes of action and seek approval of settlements under Bankruptcy Rule 9019, and (iii) the Debtors' exclusive right to propose a plan of reorganization.

7.      These arguments fail for several reasons.  First, allowing the Debtors to settle the claims without the consent of the Committee is fundamentally inconsistent with a grant of derivative standing to prosecute estate claims.  Standing to prosecute claims to judgment necessarily includes the authority to negotiate a settlement of those claims before judgment and to propose that settlement to the Court for approval.  Any other rule would compromise the Committee's ability to litigate the claims, interfere with the parties' ability to resolve the claims out of court, and guarantee collateral litigation over the validity of any settlement reached without the Committee's consent – all results that will prolong these proceedings and unnecessarily drain the resources of the estates.

8.      Indeed, contrary to the Objectors' suggestion, *Adelphia* recognizes that the

grant of derivative standing carries with it settlement authority.  In *ACC Bondholder Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337 (S.D.N.Y. 2007) ("*Adelphia I*"), *aff'd,* 2007 WL 7706743 (2d Cir. 2007), the bankruptcy court granted standing to litigate intercreditor claims to various parties, including the ACC Noteholders Committee.  The bankruptcy court directed the debtors to remain neutral in the dispute, but gave them the ability to propose a settlement, subject to other parties' rights to be heard.  After a court-ordered mediation, many parties (but not the ACC Noteholders Committee) agreed to a global settlement that compromised the claims of the ACC Noteholders Committee.  When the debtors proposed a plan embodying the global settlement, the ACC Noteholders objected.  The bankruptcy court overruled that objection and confirmed the plan.

9.      On appeal, the district court granted a stay of confirmation, finding that the ACC Noteholders Committee had established a substantial likelihood that no valid settlement had been concluded and that the confirmation order approving that "settlement" should therefore be reversed.  "The Bankruptcy Court," it held, "gave the various Creditor Committees (including the ACC Noteholders Committee) the authority . . . to litigate the Inter-Creditor Dispute.  *It is beyond cavil that this includes the authority to settle those disputes*."  *Id*. at 355 (emphasis added).  "There can be little doubt that the right to litigate a cause of action must include the right to withdraw it, settle it or try it – every case must be 'dropped, settled or tried'". *Id*. at n. 82 (citing *United States v. Glens Falls Newspapers, Inc.*, 160 F.3d 853, 856 (2d Cir.1998)).  Based on this conclusion, the court held that the debtors' agreement to settle was "immaterial." *Id*. at 357 n. 90.  "[A]uthority to litigate and settle (for the ACC Debtor) was vested in the ACC Noteholders Committee." *Id*.  Because the ACC Noteholders Committee had not approved the

settlement, there was a substantial likelihood of reversal of the confirmation order.[3] *Id.*

10.    Second, the Debtors are conflicted, which should prevent the Court from granting them even co-equal settlement authority over the Committee's claims. The Committee is seeking derivative standing to prosecute these claims precisely because the Debtors have affirmatively waived their right to do so. Having affirmatively released the very claims at issue, the Debtors cannot prosecute or credibly negotiate an appropriate resolution of those claims on behalf of the estates and unsecured creditors.

11.    No Second Circuit authority supports allowing the Debtors to settle claims they cannot prosecute. Indeed, while the *Adelphia I* and *Adelphia II* decisions allowed a debtor to hold joint settlement authority with a committee, neither case held that a debtor may retain settlement authority where its ability to pursue the claims has been substantively compromised. Rather, each decision emphasized that, in the case before it, the debtor's ability to pursue the claims had not been questioned. *See Adelphia I*, 361 B.R. at n. 90 (debtor neutral in intercreditor dispute); *Adelphia II*, 371 B.R. at 670-71 (unconflicted debtor capable of pursuing claims, but deferred to equity committee's motion for standing to do so); *Adelphia III*, 544 F.3d at 423-24 (same).[4]

12.    Nor should it be lost on the Court that the Objectors urging it to permit

---

[3] The other *Adelphia* decisions cited by the Objectors are not to the contrary. Both *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 371 B.R. 660 (S.D.N.Y. 2007) ("*Adelphia II*"), and *Official Comm. of Equity Sec. Holders v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 544 F.3d 420 (2d Cir. 2008) ("*Adelphia III*"), considered the debtors' efforts to transfer claims brought by an equity committee with derivative standing to a litigation trust under a plan. While both decisions upheld the transfer, they did so based on the conclusion that bankruptcy court had first effectively withdrawn its grant of standing to the equity committee to pursue the claims. 371 B.R. at 673; 544 F.3d at 423.

[4] The two Delaware cases cited by the Ad Hoc Group are not to the contrary. The decision in *In re Centaur, LLC*, Case No. 10-10799 (KJC), 2010 WL 4624910 (Bankr. D. Del. 2010), does not suggest that the Debtor was disabled from pursuing the claims at issue. *In re Exide Technologies*, 303 B.R. 48 (Bankr. D. Del. 2003), rejected a debtor's efforts to settle committee claims under a plan of reorganization as not concluded at arm's length and not in the best interests of unsecured creditors. Perhaps because it is not from this district, the decision failed to account for *Adelphia I's* requirement that Committee consent was required where derivative standing had been granted.

the Debtors to settle the Committee's claims are the very same parties that negotiated the AFI DIP Order in the first place.  The Court should recognize their efforts for what they are:  a transparent attempt to short circuit the prosecution of any claims against the Junior Secured Parties.

13.    Third, *Smart World* does not vest the Debtors with the exclusive right to settle all estate claims, even claims brought by non-debtor parties with derivative standing.  That case did not address the settlement authority of a creditors' committee to prosecute claims that the debtor would or could not prosecute.  Rather, it considered the efforts of creditors to settle, *over the debtor's objection,* certain estate claims the debtor had brought *and was actively seeking to prosecute*.  *Smart World*, 423 F.3d at 168.  In these circumstances, the Second Circuit correctly found no basis to disturb the general presumption that a debtor controls its litigation claims or to expand the language of Bankruptcy Rule 9019 to allow creditors, as well as the debtor, to seek approval of a settlement.  *Id*. at 175. In so ruling, however, the Second Circuit expressly distinguished cases, like this one, where the debtor would not or could not pursue a cause of action.  *Id.* at 176-77   ("We do not rule out that in certain, rare cases, unjustifiable behavior by the debtor-in-possession may warrant a settlement over the debtor's objection, but this is not such a case.").  *Adelphia III*, on which the Indenture Trustee relies, is no more relevant.  There, the court emphasized that the bankruptcy court had effectively stripped the plaintiff equity committee of derivative standing, thereby depriving it of any basis to control the litigation claims transferred under the plan of reorganization.  544 F.3d at 423-424 ("We hold that . . . a court may withdraw a committee's derivative standing and transfer the management of its claims . . .  if the court concludes that such a transfer is in the best interests of the bankruptcy estate").  Of course, far from arguing that the Committee should not have standing, the Objectors

concede its propriety.

14.     Fourth, granting the Committee exclusive authority to settle the estates'
claims against the Junior Secured Parties in no way interferes with exclusivity.  *See* Debtors'
Obj. at ¶ 12; AFI Obj. at ¶ 3.  Nothing about the STN Motion authorizes the Committee or
anyone else to file a plan or solicit creditors during the Debtors' exclusive periods.  At most, the
STN Motion would limit the Debtors' ability to confirm a plan that purported to settle the
Committee's claims without the Committee's consent.  *See Adelphia I*, 361 B.R. at 354-57
(finding, on motion for stay pending appeal, substantial likelihood that confirmation of plan that
settles committee's derivative claims without committee consent is reversible error).
Exclusivity, however, only shields the Debtors from the proposal of competing plans; it does not
grant the Debtors carte blanche to propose an otherwise unconfirmable plan or strip the
Committee of valid confirmation objections.[5]

15.     The Objectors' suggestion that, if granted sole settlement authority, the
Committee will unreasonably obstruct confirmation is not only baseless, but would not warrant
granting the Debtors a current entitlement to settle the Committee's claims in any event.  This
Court always retains control over these proceedings.  If, at some point in the future, any party
believes the Committee is acting improperly, it is free to ask the Court to reconsider the
Committee's standing.  But until such a motion is made – and, unlike the Objectors' insinuations,
fully supported – there is no basis to allow the Debtors to settle claims they have already
surrendered and cannot bring themselves.[6]

---

[5]  The Committee notes that the Debtors' rights to object to any settlement of the claims against the Junior Secured
Parties will remain unaffected in the event that the Committee is granted exclusive settlement authority.

[6]  The Debtors try to distinguish the cases cited by the Committee that approved sole settlement authority for a
committee over its derivative claims by arguing that no party objected to the entry of those orders.  *See* Debtors' Obj.
at n. 5.  But this simply demonstrates that the common sense request made by the Committee is uncontroversial and,
is in fact,  -routinely granted.

**B.  The Committee Is Authorized to Bring All Claims Revealed by Its Investigation.**

16.    The Indenture Trustee and the Ad Hoc Group also suggest that the Committee seeks "blanket" standing to assert additional claims at any time in the future.  This contention is mistaken.  In fact, as represented in the STN Motion, the Committee has prepared a draft complaint, which is attached to this Reply as **Exhibit A**.[7]  If the STN Motion is granted, the Committee will file a complaint that is substantially in the form of this draft.  There will be no "endless barrage" of claims brought against the Junior Secured Parties.

17.    The Indenture Trustee and the Ad Hoc Group also argue that the Committee's complaint should be restricted to the claims described in the body of the STN Motion.  This contention misreads the AFI DIP Order.   The AFI DIP Order only provides that the Order will be preclusive with respect to any "stipulations, admissions, and releases" not challenged in an "Objection" prior the "Challenge Deadline" (defined as 90 days after entry of the AFI DIP Order).  The term "Objection," in turn, is defined as "an objection to this Final Order challenging such stipulations, admissions, releases, **or otherwise asserting any claims or causes of action on behalf of the Debtors' estates against the Junior Secured Parties** . . . ." Importantly, the AFI DIP Order provides that a motion for standing, such as the STN Motion, tolls the deadline to file an Objection, which in this instance, is the complaint.   Specifically, paragraph 28 of the AFI DIP Order provides that "if the Creditors' Committee files a motion seeking standing to bring causes of action against the Junior Secured Parties prior to the Challenge Deadline, the Challenge Deadline shall be tolled until adjudication of such motion . . . ."  Nothing in the AFI DIP Order restricts the Committee's complaint to the letter of

---

[7]   In addition to the Claims identified in the STN Motion, the Committee is seeking authority to bring, and the Complaint includes causes of action related to (i) the recharacterization of payments made to the Junior Secured Parties for attorneys' fees and expenses under the AFI DIP Order as principal payments under the Junior Secured Notes and (ii) the disallowance of the portion of the Junior Secured Parties' claim that is attributable to unamortized original issue discount that was generated in connection with the issuance of the Junior Secured Notes.

the standing motion.[8]

18.    Aware of the extraordinary complexity of these cases, the Committee specifically negotiated for this process with respect to the filing of a complaint against the Junior Secured Parties.  The Committee insisted on, and the Junior Secured Parties agreed to, a provision that the challenge deadline would be tolled upon the filing of a standing motion. This provision did not exist in the interim AFI DIP Order.  *Compare* Interim AFI DIP Order [Docket No. 89]  ¶ 27 with AFI DIP Order ¶ 28.  The Committee never agreed that the standing motion would limit the causes of action the Committee could bring.  To read this provision any other way would be to nullify the tolling provision.

19.    As set forth in the STN Motion, the Committee requests leave to file the complaint within 45 days of the Court's approval of the STN Motion.  This time will permit the parties to engage in substantive discussions that will hopefully have the effect of limiting, rather than expanding, the scope of claims against the Junior Secured Parties.[9]

---

[8] By its terms, the AFI DIP Order's preclusive effect applies only to the extent "stipulations, admissions and releases" are not challenged in the complaint.  Once a challenge is asserted, it does not preclude other causes of action not raised in the complaint.

[9]  The Indenture Trustee takes issue with the cases cited by the Committee in which the court granted additional time for the committee to file a complaint.  *See* Ad Hoc Group Obj. at ¶¶ 14-15.  The Indenture Trustee's arguments are unavailing.  As in *Evergreen Solar*, the Committee intends to use the additional time to file the complaint to engage the Junior Secured Parties in discussions to narrow the issues.  Furthermore, as indicated *supra*, the Committee does not intend to pursue additional claims beyond those specified in the complaint.  Likewise, the Indenture Trustee's argument that *Open Range* is distinguishable because the Committee did not engage the Indenture Trustee in discussions prior to filing the STN Motion is specious.  The Committee engaged in discussions with the Ad Hoc Group, the holders of over 40% of the notes represented by Indenture Trustee, prior to filing the STN Motion and engaged in extensive document production with the Debtors, AFI and the Collateral Agent.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court overrule the

Limited Objections and enter the proposed order attached to the STN Motion as <u>Exhibit A</u>, and

grant such other and further relief as the Court deems just and proper.

Dated:    October 26, 2012
          New York, New York

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Kenneth H. Eckstein
Kenneth H. Eckstein
Douglas H. Mannal
Stephen D. Zide
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8000

*Counsel for the Official Committee*
*of Unsecured Creditors*

**Exhibit A**

**DRAFT COMPLAINT**

DRAFT
10/26/12

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------------------ x | : | |
| In re: | : | Chapter 11 |
| | : | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | : | Jointly Administered |
| | : | |
| Debtors. | : | |
| ------------------------------------------------------------------------ x | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS, on behalf of the estates of the Debtors, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adversary Proceeding |
| | : | No. 12-_____ |
| U.S. BANK, NATIONAL ASSOCIATION, as indenture | : | |
| trustee under that certain Indenture, dated as of June 6, 2008; | : | |
| and WELLS FARGO BANK, N.A., third priority collateral | : | |
| agent and collateral control agent under that certain Amended | : | |
| and Restated Third Priority Pledge and Security Agreement | : | |
| and Irrevocable Proxy, dated as of December 30, 2009, | : | |
| | : | |
| Defendant. | : | |
| ------------------------------------------------------------------------ x | | |

**ADVERSARY COMPLAINT FOR DECLARATORY JUDGMENT,**
**AVOIDANCE OF LIENS AND DISALLOWANCE OF CLAIMS**

Plaintiff Official Committee of Unsecured Creditors (the "**Committee**") of Residential

Capital, LLC, a Delaware limited liability company ("**ResCap**") and its affiliated debtors

(collectively, the "**Debtors**"), by and through its undersigned counsel, on behalf of and as the

representative of the Debtors' estates, and based upon knowledge, information, belief and the

results of its investigation to date, alleges as follows:

## NATURE OF ACTION

1.    This adversary proceeding seeks: (i) a declaratory judgment that certain property

of the Debtors is not subject to liens or security interests asserted by the Collateral Agent

(defined below) for the benefit of the Indenture Trustee (defined below) and the Junior Secured

Noteholders (defined below, collectively, the "**Secured Parties**"); (ii) a declaratory judgment

that certain liens or security interests asserted by the Secured Parties on property of the Debtors

are unperfected; (iii) an order avoiding the Secured Parties' unperfected liens on or security

interests in certain property under sections 544, 550, and 551 of the Bankruptcy Code; (iv) an

order avoiding certain liens or security interests asserted by the Secured Parties on the

Preference Assets (defined below) as preferential transfers under sections 547, 550, and 551 of

the Bankruptcy Code; (v) an order recharacterizing postpetition payments to the Secured

Parties' professionals as payments of principal; (vi) an order clarifying the priority of the

Secured Parties' liens; (vii) an order disallowing the Secured Parties' claims to the extent such

claims are purportedly secured by the property referred to in clauses (i) through (iv) above

pending final resolution of such claims; and (viii) an order disallowing the Secured Parties'

claims to the extent such claims include unmatured interest.

## JURISDICTION AND VENUE

2.    This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of

Bankruptcy Procedure.

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and (e).

4.     This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (B), (C), (E), (F), (K), (M), and (O).

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     Pursuant to Local Rule 7008-1, Plaintiff consents to entry of final orders and judgments by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

## CASE BACKGROUND

7.     On May 14, 2012 (the "**Petition Date**"), ResCap and 50 of its subsidiaries filed voluntary petitions in this Court for bankruptcy protection under chapter 11 of title 11 (the "**Chapter 11 Cases**") of the United States Code (the "**Bankruptcy Code**").

8.     The Debtors are among the largest servicers and, together with Ally Bank, originators of residential mortgage loans in the United States.

## PARTIES

9.     The Committee is an official committee of unsecured creditors appointed in these cases by the United States Trustee for the Southern District of New York on May 16, 2012, under section 1102 of the Bankruptcy Code.

10.     The Committee is vested with, among other things, the powers described in Section 1103 of the Bankruptcy Code, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

11.    The Committee brings this action on behalf of the estates of EPRE LLC, a Delaware limited liability company, ETS of Virginia, Inc., a Virginia corporation, ETS of Washington, Inc. a Washington corporation, GMAC Mortgage, LLC, a Delaware limited liability company ("**GMACM**"), GMAC Mortgage USA Corporation, a Delaware corporation, GMAC-RFC Holding Company, LLC, a Delaware limited liability company, Homecomings Financial, LLC, a Delaware limited liability company, ResCap, Residential Funding Company, LLC ("**RFC**"), Residential Consumer Services, LLC, a Delaware limited liability company, and Residential Funding Mortgage Exchange, LLC, a Delaware limited liability company.

12.    Defendant U.S. Bank, National Association ("**U.S. Bank**" or the "**Indenture Trustee**") is the indenture trustee under that certain Indenture, dated as of June 6, 2008 (the "**Junior Secured Notes Indenture**"), among ResCap, as issuer, certain other Debtors, as guarantors, and U.S. Bank, pursuant to which certain 9.625% Junior Secured Notes due 2015 were issued.

13.    Defendant Wells Fargo Bank, N.A. ("**Wells Fargo**") serves as third priority collateral agent and collateral control agent (collectively, the "**Collateral Agent**") under an Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy, dated as of December 30, 2009 (the "**Notes Security Agreement**").

## FACTUAL BACKGROUND

### The Committee's Investigation

14.    On the Petition Date, the Debtors filed a motion seeking authority to enter into a postpetition financing facility with Ally Financial, Inc. (f/k/a GMAC, LLC) ("**AFI**") and to use the cash collateral of AFI and the Secured Parties (the "**AFI DIP Motion**").

15.    On June 25, 2012, the Court entered an Order [Docket No. 491] granting final approval of the AFI DIP Motion (the "**AFI DIP Order**").

16.     In the AFI DIP Order, the Debtors agreed to a series of stipulations concerning the liens and security interests granted under the Notes Security Agreement (collectively, the "**Stipulations**"), as described in more detail below in paragraph 69.

17.     Among other things, the Stipulations provide that the Debtors have released the Secured Parties from all causes of action in connection with the Junior Secured Notes and acknowledged the Secured Parties' liens on and security interests in the Notes Collateral (as defined below).  *See* AFI DIP Order ¶ 5(k).

18.     The AFI DIP Order provides that the Stipulations became binding on the Debtors upon entry of the AFI DIP Order, and become binding on all parties-in-interest, including the Committee, unless objected to by September 24, 2012 (the "**Challenge Deadline**").  *See* AFI DIP Order ¶ 28.

19.     The AFI DIP Order tolls the Challenge Deadline pending the adjudication of a motion seeking standing to bring causes of action against the Secured Parties.  *See* AFI DIP Order ¶ 28.

20.     Following entry of the AFI DIP Order, the Committee commenced an investigation of the claims and liens of the Secured Parties, including whether the Debtors waived any valid estate claims against the Secured Parties.

21.     The Committee's investigation soon focused on a $1.1 billion discrepancy in the Debtors' prepetition and postpetition disclosures concerning the Notes Collateral.

22.     The Debtors' audited financial statements for the year ended December 31, 2011, and unaudited financial statements for the quarter ended March 31, 2012 (the most recent statements prior to the Petition Date), describe the Junior Secured Notes as secured by the same $1.3 billion in collateral that secures the AFI Revolver (as defined below).

23.     According to the Stipulations, the Notes Collateral includes $1.3 billion of assets identified under the column labeled "Ally Revolver" and an additional $1.1 billion of assets identified under the column labeled "Blanket" on Exhibit A to the AFI DIP Order.

24.     Upon information and belief, prior to the Petition Date, the Debtors' internal collateral tracking database identified only approximately $1.3 billion in collateral securing the Junior Secured Notes (defined below) and the AFI Revolver.

25.     Upon information and belief, prior to the Petition Date, the Debtors' internal database identified nearly all of the "Blanket" collateral as "Unpledged."

26.     Upon information and belief, prior to agreeing to the Stipulations, the Debtors failed to independently verify whether the Secured Parties had perfected liens, or any liens at all, on the assets that comprise "Blanket" property or whether any such assets constitute Excluded Assets under (and as defined in) the Note Security Agreement.

27.     Notwithstanding the Stipulations, there are substantial, valuable assets of the Debtors that are either not subject to liens in favor of the Secured Parties or are subject to unperfected liens that may be avoided.

28.     On September 24, 2012, the Committee filed a motion seeking standing to pursue the claims in this adversary complaint [Docket No. 1563].

29.     By order dated [_____], 2012, the Court granted the Committee standing to commence, prosecute, and settle the claims set forth in this adversary complaint [Docket No. ___] (the "**Standing Order**").

30.     The Committee's claims as against the defendants are set forth below.

**The Junior Secured Notes**

31.     Before the Petition Date, the Debtors entered into numerous financing transactions.

32.    On or about June 6, 2008, ResCap, as issuer, GMAC-RFC Holding Company, LLC, GMACM, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, and RFC, as guarantors, and the Indenture Trustee entered into the Junior Secured Notes Indenture.

33.    A true and correct copy of the Junior Secured Notes Indenture, as supplemented, is attached hereto as Exhibit __.

34.    Also on or about June 6, 2008, ResCap issued approximately $4 billion of 9.625% junior secured notes due 2015 (such notes, the "**Junior Secured Notes**", and the holders of the Junior Secured Notes, the "**Junior Secured Noteholders**") under the Junior Secured Notes Indenture.

35.    The Junior Secured Notes were issued, together with cash paid under a tender offer, in exchange for approximately $6 billion of the Debtors' then-outstanding unsecured notes (the "**Old Notes**"), as described in the Form 8-K filed by ResCap on or about June 12, 2008 ("**ResCap Exchange Offer 8-K**").

36.    A copy of the ResCap Exchange Offer 8-K is attached hereto as Exhibit __.

37.    Upon information and belief, each holder that tendered Old Notes in the exchange offer received $800 of Junior Secured Notes in exchange for $1,000 face amount of Old Notes.

38.    Holders of the Old Notes had the opportunity to elect to receive cash in lieu of Junior Secured Notes that they otherwise would have received pursuant to a "modified Dutch auction" process described in the offering memorandum for the Junior Secured Notes. *See* ResCap Exchange Offer 8-K.

39.    The clearing price in the auction was $650 per $1,000 face amount of the Junior Secured Notes.

40.      Upon information and belief, the exchange of the Junior Secured Notes resulted in original issue discount of at least [$1.548 billion], which was to accrete over the life of the Junior Secured Notes.

41.      Upon information and belief, as of the Petition Date, the face amount of Junior Secured Notes was approximately $2.12 billion.

42.      Upon information and belief, as of the Petition Date, the remaining amount of unaccreted original issue discount was at least $[377 million].

43.      On or about June 6, 2008, certain Debtors[1] entered into a Third Priority Pledge and Security Agreement and Irrevocable Proxy (the "**Original Notes Security Agreement**") with the Indenture Trustee and the Collateral Agent.

44.      On or about December 30, 2009, the Original Notes Security Agreement was amended and restated in its entirety by the Notes Security Agreement.

45.      A true and correct copy of the Notes Security Agreement, as amended, is attached hereto as Exhibit __.

46.      In the Notes Security Agreement, certain Debtors[2] granted the Collateral Agent broad liens on and security interests in certain of their assets (collectively, the "**Notes**

---

[1] Specifically, Debtors ResCap, RFC, GMACM, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential Mortgage Real Estate Holdings, LLC, Equity Investment I, LLC, and Homecomings Financial Real Estate Holdings, LLC were party to the Original Notes Security Agreement. Non-Debtors GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC, and Residential Funding Real Estate Holdings, LLC were also party to the Original Notes Security Agreement.

[2] Specifically, Debtors ResCap, RFC, GMACM, GMAC-RFC Holding Company, LLC, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, Residential Mortgage Real Estate Holdings, LLC, Homecomings Financial Real Estate Holdings, LLC, DOA Holding Properties, LLC, GMAC Model Home Finance I, LLC, RFC Construction Funding, LLC Ditech, LLC, GMAC Mortgage USA Corporation, GMACR Mortgage Products, LLC, Home Connects Lending Services, LLC, Homecomings Financial Real Estate Holdings, LLC, RCSFJV2004, LLC, Residential Consumer Services, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Real Estate Holdings, LLC, Residential Mortgage Real Estate Holdings, LLC, Equity Investment I, LLC, and RFC SFJV-2002, LLC were party to the Notes Security Agreement. Non-Debtors GMAC Model Home Finance, LLC, Developers of Hidden Springs, LLC,

**Collateral**") to secure payment of the obligations under the Junior Secured Notes Indenture and the Junior Secured Notes (the "**Notes Obligations**").

47.    In Section 2 of the Notes Security Agreement, certain Debtors (collectively, the "**Recourse Obligors**") granted the Collateral Agent liens on and security interests in certain servicer advances, mortgage  loans, trading securities, account receivable, chattel paper, computer hardware, software and related rights/licenses, deposit accounts, securities accounts, instruments, investment property, documents, general intangibles, goods, equipment, fixtures, intellectual property, equity interests, promissory notes, and all other personal assets and property of any kind or description.  *See* Notes Security Agreement § 2(a)-(u).

48.    The Recourse Obligors consist of the following Debtors: GMAC-RFC Holding Company, LLC, GMACM, GMAC Residential Holding Company, LLC, Homecomings Financial, LLC, ResCap, and RFC.

49.    In Section 4 of the Notes Security Agreement, certain other Debtors (the "**FABS Grantors**") granted the Collateral Agent liens on and security interests in certain of their financial assets, trading securities, deposit accounts, investment property, instruments, cash delivered in respect of and collateral securing any financial assets, related documents, accounts receivable, general intangibles, supporting assets, and proceeds.  *See* Notes Security Agreement § 4 (a)-(e).

50.    The FABS Grantors consist of Passive Asset Transactions, LLC and RFC Asset Holdings II, LLC.

51.    In Section 5 of the Notes Security Agreement, certain other Debtors (collectively, the "**Additional Account Parties**") granted the Collateral Agent liens on and security interests

---

Residential Funding Real Estate Holdings, LLC, Ameriland, LLC, and REG-PFH, LLC were also party to the Notes Security Agreement.

in certain deposit accounts and related proceeds. *See* Notes Security Agreement §§ 5 (a) and (b).

52.      The Additional Account Parties consist of Ditech, LLC, GMAC Mortgage USA Corporation, GMACR Mortgage Products, LLC, Home Connects Lending Services, LLC, Homecomings Financial Real Estate Holdings, LLC, RCSFJV2004, LLC, Residential Consumer Services, LLC, Residential Funding Mortgage Securities I, Inc., Residential Funding Real Estate Holdings, LLC, Residential Mortgage Real Estate Holdings, LLC, and RFC SFJV-2002, LLC.

53.      Under Sections 2 through 5 of the Notes Security Agreement ("**Granting Clauses**"), Defendant Wells Fargo, in its capacities as third priority collateral agent and collateral control agent, as applicable (to the extent any of the Notes Collateral constitutes "Controlled Collateral", as defined in the Notes Security Agreement), holds liens and security interests for the benefit of the Junior Secured Noteholders, and the Indenture Trustee.[3]

54.      Each Granting Clause provides that "notwithstanding the foregoing, the [Notes Collateral] described in [such Granting Clause] shall not include Excluded Assets." Notes Security Agreement §§ 2-5.

**Liens Senior to the Defendants' Liens**

55.      On or about June 4, 2008, certain of the Debtors[4] entered into a Loan Agreement with AFI, as agent and lender (the "**Original Loan Agreement**").

---

[3] In section 3 of the Notes Security Agreement, certain other Debtors granted liens on and security interests in certain equity interests and certain notes.

[4] Specifically, (i) RFC and GMACM as borrowers, (ii) ResCap, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, and Homecomings Financial, LLC, as guarantors, and (iii) Residential Mortgage Real Estate Holdings, LLC, Residential Funding Real Estate Holdings, LLC, Homecomings Financial Real Estate Holdings, LLC, and Equity Investment I, LLC, as other obligors.

56.    On or about December 30, 2009, the same Debtors and other parties[5] entered into an Amended and Restated Loan Agreement with AFI (the "**AFI Revolver**"), amending and restating the Original Loan Agreement.

57.    A true and correct copy of the AFI Revolver, as amended, is attached hereto as Exhibit __.

58.    AFI made certain loans to the Debtors (the "**AFI Revolver Obligations**") pursuant to and in accordance with the terms and conditions of the AFI Revolver.

59.    Upon information and belief, the outstanding principal balance due under the AFI Revolver as of the Petition Date was approximately $747 million.

60.    On or about June 4, 2008, the Debtors and the Collateral Agent entered into a First Priority Pledge and Security Agreement and Irrevocable Proxy (the "**Original Revolver Security Agreement**").

61.    On or about December 30, 2009, the Original Revolver Security Agreement was amended and restated  (the "**Revolver Security Agreement**").

62.    By its terms, the Revolver Security Agreement grants the Collateral Agent liens on and security interests in the Notes Collateral to secure the Debtors' obligations under the AFI Revolver.

**The Intercreditor Agreement**

63.    On or about June 6, 2008, Defendant Wells Fargo, as Collateral Agent, Defendant U.S. Bank, as Indenture Trustee, AFI, as lender agent, and certain Debtors[6] entered into an intercreditor agreement (as amended, the "**Intercreditor Agreement**").

---

[5] Specifically, RFC and GMACM were borrowers under the AFI Revolver.  With the exception of Debtor Executive Trustee Service, LLC, the other obligors were the same as under the Notes Security Agreement.  See footnote 2 *supra*.  Debtor Executive Trustee Services, LLC became a guarantor under the AFI Revolver, but not the Junior Secured Notes, in February 2011.

64.     Attached hereto as Exhibit __ is a true and correct copy of the Intercreditor Agreement.

65.     Section 2.1(b) of the Intercreditor Agreement provides that the liens and security interests granted under the Revolver Security Agreement are first priority liens and security interests senior to the liens and security interests granted under the Notes Security Agreement.

66.     At the time the parties entered into the Intercreditor Agreement, certain other obligations of the Debtors were secured by second priority liens on and security interests in the Notes Collateral (the "**Original Second Lien Obligations**").

67.     Upon information and belief, before the Petition Date, the Original Second Lien Obligations were repaid and retired in full.

68.     Upon information and belief, upon the repayment and retirement of the Original Second Lien Obligations, the liens on and security interests in the Notes Collateral became second priority liens and security interests.

**The Debtors' Stipulations under the AFI DIP Order Concerning the Notes Collateral**

69.     The Stipulations made by the Debtors in the AFI DIP Order, included the concessions that: (i) the aggregate principal amount outstanding under the Junior Secured Notes as of the Petition Date is at least $2,120,452,000, plus accrued and unpaid interest and reimbursable expenses and fees (AFI DIP Order ¶ 5(b)(iii); (ii) the Debtors' obligations under the Junior Secured Notes are legal, valid, and binding and are not subject to avoidance (AFI DIP Order ¶¶ 5(c) and (d)); (iii) the liens and security interests granted to the Secured Parties on the Notes Collateral are first priority, valid, binding, perfected, and enforceable (AFI DIP Order

---

[6] The Debtors party to the Intercreditor Agreement are the same as the Debtors party to the Notes Security Agreement. Certain additional affiliates, including Debtor DOA Properties IX (Lots-Other), LLC, were also party to the Intercreditor Agreement.

¶ 5(g)); (iv) the Notes Collateral includes the "Pre-Petition Ally Repo Facility" and any residual

value therefrom (AFI DIP Order ¶ 5(h)); and (v) the Notes Collateral includes the assets listed

in the columns labeled "Ally Revolver" and "Blanket" on <u>Exhibit A</u> to the AFI DIP Order (AFI

DIP Order ¶ 5(h)).

70.    The Stipulations also provide that the Debtors have released the Secured Parties

from all causes of action in connection with the Junior Secured Notes and the Secured Parties'

liens on and security interests in the Notes Collateral.  *See* AFI DIP Order ¶ 5(k).

71.    The Debtors' Stipulations if not challenged, provide for the allowance of the Notes

Obligations, and excuse the filing of a proof of claim.  See AFI DIP Order ¶¶ 5(c) and (d), 31.

72.    Under the AFI DIP Order, the Secured Parties were granted several forms of adequate

protection, including replacement liens and administrative expense claims to the extent of the

diminution in value of the Secured Parties' interest in the Notes Collateral.  *See* AFI DIP Order

¶ 16(c).

73.    In particular, the Secured Parties were granted liens as adequate protection on the

equity interests of the Barclays DIP Borrowers (as defined in the AFI DIP Order), but only to the

extent that such parties' liens on  the BMMZ Facility (defined below) or any residual value therefrom

were valid.  *See* AFI DIP Order ¶ 16(c)(iii).

74.    Finally, the Secured Parties were granted adequate protection in the form of payment

of professional fees of the Indenture Trustee and the Ad Hoc Group of Holders of Junior Secured

Notes (as defined in the AFI DIP Order).  *See* AFI DIP Order ¶ 16(c)(v).

## COUNT I
## DECLARATORY JUDGMENT CONCERNING
## "RELEASED BILATERAL FACILITIES COLLATERAL"
## (28 U.S.C. §§ 2201, 2202)

75.     The Committee restates and realleges the allegations contained in paragraphs 1 through 74 above, as if fully set forth herein.

76.     The Notes Security Agreement specifically excludes "Excluded Assets" (as defined in the Notes Security Agreement) from the Notes Collateral.  *See* Notes Security Agreement §§ 2-5.

77.     Accordingly, under the Notes Security Agreement, none of the Debtors granted the Collateral Agent any liens on or security interests in the Excluded Assets.

78.     The Notes Security Agreement defines Excluded Assets to include assets pledged by the Debtors under any "Bilateral Facility," if the Bilateral Facility prohibits the Debtors from granting the Junior Secured Parties a lien on or security interest in such assets.

79.     In particular, the Notes Security Agreement defines "Excluded Assets" to include:

> (c)     *any asset*, including any account, note contract, lease, financing, arrangement, general intangible, equity investment, interest in joint ventures or other agreement *to the extent that the grant of a security interest therein would violate applicable Requirements of Law, result in the invalidation thereof or provide any party thereto with a right of termination or default* with respect thereto or *with respect to any Bilateral Facility to which such asset is subject as of the Issue Date* (in each case, after giving effect to the applicable provisions of the UCC and other applicable Requirements of Law and principles of equity); . . .

> (e)     proceeds and products of any and all of the foregoing excluded assets described in <u>clause (a)</u> through <u>(d)</u> above only to the extent such proceeds and products would constitute property or assets of the type described in <u>clause (a)</u> through <u>(d)</u> above . . . .

Notes Security Agreement, definition of "Excluded Assets" (emphasis added).

80.     The Notes Security Agreement defines the term "Bilateral Facility" to mean approximately 53 financing arrangements to which certain Debtors or their affiliates were party to as of June 6, 2008, and were listed on Schedule 7.01(t) to the Original Loan Agreement (the "**Bilateral Facilities**").

81.     Upon information and belief, the Debtors pledged certain of their assets to other creditors under the Bilateral Facilities (the "**Bilateral Facilities Collateral**").

82.     Upon information and belief, certain of the Bilateral Facilities Collateral was subsequently released from the liens or security interests granted pursuant to one or more of the Bilateral Facilities and remained property of the estates as of the Petition Date (such collateral and the proceeds thereof, the "**Released Bilateral Facilities Collateral**").

83.     Upon information and belief, after the Released Bilateral Facilities Collateral was released from the liens or security interests granted pursuant to one or more of the Bilateral Facilities, the Debtors did not separately grant to the Secured Parties, and the Secured Parties did not separately perfect, liens on or security interests in any of the Released Bilateral Facilities Collateral.

84.     The Released Bilateral Facilities Collateral includes the assets listed on the attached Schedule __.

85.     Discovery may reveal additional Released Bilateral Facilities Collateral.

86.     In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on and security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

87.    Upon information and belief, the assets listed in the "Ally Revolver" and "Blanket" columns on <u>Exhibit A</u> to the AFI DIP Order  include the Released Bilateral Facilities Collateral.

88.    The Committee disputes the Stipulations as they relate to the Released Bilateral Facilities Collateral.

89.    The Secured Parties do not have security interests in or liens (either perfected or unperfected) on the Released Bilateral Facilities Collateral because those assets are expressly excluded from the collateral on which liens or security interests are granted in the Notes Security Agreement, and there have been no subsequent grants of liens on or security interests in such property.

90.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Released Bilateral Facilities Collateral.

91.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Released Bilateral Facilities Collateral.

**COUNT II**
**DECLARATORY JUDGMENT CONCERNING**
**"UNENCUMBERED REAL PROPERTY"**
**(28 U.S.C. §§ 2201, 2202)**

92.    The Committee restates and realleges the allegations contained in paragraphs 1 through 91 above, as if fully set forth herein.

93.    As a part of their mortgage loan business, the Debtors regularly foreclose on defaulted mortgages.

94.    On information and belief, as a result of these foreclosures, GMACM, RFC, and Homecomings Financial, LLC have acquired title to certain residential real estate (the "**REO Properties**").

95.    GMACM, RFC, Homecomings Financial, LLC, EPRE LLC, ETS of Washington, Inc., GMAC-RFC Holding Company, LLC, and/or ETS of Virginia, Inc. (collectively, the "**Property Owners**") also own approximately $9 million of real property, and additional real property leasehold interests (collectively with the REO Properties, the "**Unencumbered Real Property**").

96.    On the Petition Date, the Unencumbered Real Property included those properties listed on Schedule __ hereto.

97.    Discovery may reveal additional Unencumbered Real Property.

98.    Upon information and belief, none of the Property Owners have granted or signed any mortgage or deed of trust in respect of any of the Unencumbered Real Property.

99.    Upon information and belief, the Secured Parties have not recorded a mortgage or deed of trust in respect of any Unencumbered Real Property in the appropriate office of the recorder of deeds for the jurisdiction in which a given property is located.

100.    The Secured Parties do not have a valid lien on or security interest in the Unencumbered Real Property.

101.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

102.    Upon information and belief, the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order include the Unencumbered Real Property.

103.    The Committee disputes the Stipulations as they relate to the Unencumbered Real Property.

104.    The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on the Unencumbered Real Property because no mortgages or deeds of trust were granted to the Secured Parties by the Notes Security Agreement or any other agreement, and the Secured Parties have not recorded any such mortgages or deeds of trust.

105.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Unencumbered Real Property.

106.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Unencumbered Real Property.

## COUNT III
## DECLARATORY JUDGMENT CONCERNING
## "ASSETS OF NON-OBLIGOR DEBTORS"
### (28 U.S.C. §§ 2201, 2202)

107.    The Committee restates and realleges the allegations contained in paragraphs 1 through 106 above, as if fully set forth herein.

108.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral

and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

109.    The Debtors provided the Committee with supporting information concerning the identification of assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

110.    Upon information and belief, the rows entitled "Cash and Cash Equivalents" and "Other Assets" in the "Blanket" column on Exhibit A to the AFI DIP Order include assets owned by Debtors that have not guaranteed the Junior Secured Notes, have not granted any liens or security interests to the Secured Parties, and are not otherwise obligated under the Junior Secured Notes Indenture or the Junior Secured Notes (collectively, the "**Non-Obligor Debtors**").

111.    The Non-Obligor Debtors consist of EPRE LLC, ETS of Washington, Inc., and Residential Funding Mortgage Exchange, LLC, among other Debtors.

112.    Discovery may reveal additional assets of Non-Obligor Debtors that are included in the Notes Collateral.

113.    The Committee disputes the Stipulations as they relate to the assets of Non-Obligor Debtors.

114.    The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on any assets of Non-Obligor Debtors because none of the Non-Obligor Debtors is an obligor under the Notes Security Agreement, and such entities did not otherwise grant security interests or liens in favor of the Secured Parties.

115.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and

supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the assets of the Non-Obligor Debtors.

116.   Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any assets of the Non-Obligor Debtors.

<u>**COUNT IV**</u>
**DECLARATORY JUDGMENT CONCERNING**
**"RELEASED MORTGAGE LOANS"**
**(28 U.S.C. §§ 2201, 2202)**

117.   The Committee restates and realleges the allegations contained in paragraphs 1 through 116 above, as if fully set forth herein.

118.   ResCap, RFC, and/or GMACM own certain mortgage loans that were pledged to Citibank or Goldman Sachs under May 2010 facilities with such parties (the "**Released Mortgage Loans**").

119.   Before May 2010, the Released Mortgage Loans that were not otherwise Excluded Assets may have been subject to the liens or security interests of the Secured Parties as collateral for the Notes Obligations.

120.   On May 17, 2010, the Collateral Agent signed a Partial Release of Collateral, dated as of May 17, 2010 (the "**Pledge Release**").

121.   A true and correct copy of the Pledge Release is attached hereto as Exhibit __.

122.   The Pledge Release released the Secured Parties' liens on the Released Mortgage Loans.

123.   On or about May 17, 2010, the Collateral Agent also filed  UCC-3 termination statements (the "**Termination Statements**") causing any prior financing statements to cease to be effective for the Released Mortgage Loans.

124.    True and correct copies of the Termination Statements are attached hereto as Exhibit __.

125.    Upon information and belief, the Debtors did not subsequently grant the Secured Parties any lien on or security interest in any of the Released Mortgage Loans.

126.    In the absence of a separate lien or security interest grant and perfection, the Released Mortgage Loans are not encumbered by any liens or security interests of the Secured Parties.

127.    A list of Released Mortgage Loans is attached hereto as Exhibit __.

128.    Discovery may reveal additional Released Mortgage Loans.

129.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on Exhibit A to the AFI DIP Order.

130.    Upon information and belief, the assets listed in the "Ally Revolver" and/or "Blanket" columns on Exhibit A to the AFI DIP Order include the Released Mortgage Loans.

131.    The Committee disputes the Debtors' Stipulations as they relate to the Released Mortgage Loans.

132.    The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on the Released Mortgage Loans because any such liens or security interests were released through the Pledge Release and the filing of the Termination Statements, and no subsequent liens or security interests were ever granted or perfected.

133.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and

supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Released Mortgage Loans.

134.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Released Mortgage Loans.

**COUNT V**
**DECLARATORY JUDGMENT CONCERNING**
**CHARACTERIZATION OF THE "BMMZ FACILITY"**
**(28 U.S.C. §§ 2201, 2202)**

135.    The Committee restates and realleges the allegations contained in paragraphs 1 through 134 above, as if fully set forth herein.

136.    BMMZ Holdings LLC ("**BMMZ**"), ResCap, GMACM, and RFC are parties to a Master Repurchase Agreement dated as of December 21, 2011 (the "**BMMZ Agreement**").

137.    ResCap and BMMZ are also parties to a Master Guarantee dated as of December 21, 2011 (together with the BMMZ Agreement, as each may have been amended or supplemented, the "**BMMZ Facility**").

138.    Under the BMMZ Facility, GMACM and RFC purported to "sell" mortgage loans with a book value of $377 million as of the Petition Date (excluding the Released Mortgage Loans, the "**BMMZ Mortgage Loans**") to BMMZ for the aggregate "purchase price" of $250 million, and agreed to "repurchase" the same loans for an amount generally equal to the purchase price plus a Price Differential (as defined in the BMMZ Facility) equal to LIBOR plus 4.75%. *See* Barclays DIP Order [Docket No. 490] ¶ 7(d).

139.    A list of the BMMZ Mortgage Loans is attached hereto as Exhibit __.

140.    Discovery may reveal additional BMMZ Mortgage Loans.

141.   Although the BMMZ Facility was styled as a "sale" and "repurchase" of mortgage loans, the provisions of that facility demonstrate that it was, in substance, a secured financing, and should properly be characterized as such.

142.   Among other things, the terms of the BMMZ Facility establish that the Debtors continued to bear the risks and benefits of ownership of the BMMZ Mortgage Loans, despite their purported sale to BMMZ.

143.   Upon information and belief, under the BMMZ Facility, the "purchase price" for each subject loan was significantly discounted from the fair market value of each loan.

144.   The BMMZ Facility computes the repurchase price for the subject loans based on the original purchase price plus a LIBOR-based rate, rather than the market value of those loans.

145.   The Debtors' actions also demonstrate that they considered the BMMZ Facility a secured financing.

146.   The Debtors retained significant economic rights in the BMMZ Mortgage Loans they had purported to "sell" following the purported transfer to BMMZ, including the right to excess cash flow from the "transferred" assets.

147.   The Debtors' prepetition balance sheet in their consolidated quarterly financial statements categorized the BMMZ Facility as "debt" and the BMMZ Mortgage Loans as "collateral."

148.    Because the BMMZ Facility, properly characterized, is a secured loan facility, the BMMZ Mortgage Loans were at all times property of RFC and GMACM, as applicable.

149.   The Secured Parties released any liens or security interests they had on the BMMZ Mortgage Loans pursuant to the Pledge Release and the filing of the related Termination Statements.

150.   The Secured Parties therefore have no lien or security interests on the BMMZ Mortgage Loans.

151.   Even if such liens or security interests had not been released by the Pledge Release and the filing of the related Termination Statements, certain of the BMMZ Mortgage Loans would otherwise constitute Released Bilateral Facilities Collateral because, upon information and belief, they were previously pledged to secure the Debtors' obligations under Bilateral Facilities that were subsequently terminated.

152.   The Secured Parties also have no lien on or security interest in ResCap's, RFC's, or GMACM's purported right to "repurchase" the BMMZ Mortgage Loans under the BMMZ Facility, because the BMMZ Mortgage Loans were at all times the property of ResCap, RFC, or GMACM, as the case may be.

153.   The Secured Parties therefore could not have held a lien on or security interest in the residual value of the BMMZ Mortgage Loans through the right to repurchase such loans at a discount because such right did not exist.

154.   In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral and (ii) the Notes Collateral includes the BMMZ Facility and any residual value therefrom.

155.   The Committee disputes the Stipulations as they relate to the BMMZ Mortgage Loans, the BMMZ Facility, or the residual value therefrom.

156.   Because the BMMZ Facility should properly be characterized as a secured financing, at all relevant times, RFC and GMACM owned the BMMZ Mortgage Loans and did not have a contractual right to "repurchase" those loans or any "residual value" from the BMMZ Facility.

157.    Without any liens on or security interests in (i) the BMMZ Mortgage Loans, (ii) any right to "repurchase" those loans, or (iii) any "residual value" from the BMMZ Facility, the Secured Parties are not entitled to an Adequate Protection Lien (as defined in the AFI DIP Order) on the equity interests of the Barclays DIP Borrowers for any diminution in value in their purported prepetition interests in such property.

158.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the BMMZ Mortgage Loans or the BMMZ Facility or the residual value therefrom.

159.    Such controversy is sufficient to warrant the issuance of a declaratory judgment that, among other things, and notwithstanding the Debtors' Stipulations to the contrary: (a) the BMMZ Facility was a secured financing for purposes of determining the enforceability of any liens or security interests in favor of the Secured Parties in the BMMZ Facility, in the residual value under the BMMZ Facility or the Debtors' rights in the BMMZ Mortgage Loans; (b) the Debtors did not have any right to "residual value" under the BMMZ Facility that could have been pledged to the Secured Parties; (c) at all relevant times, the Debtors owned the BMMZ Mortgage Loans; (d) any liens or security interests held by the Secured Parties on the BMMZ Mortgage Loans were either excluded or released before the Petition Date; and (e) the Secured Parties are not entitled to Adequate Protection Liens on the equity of Barclays DIP Borrowers on account of their asserted interest in the BMMZ Facility and any residual value therefrom.

<u>**COUNT VI**</u>
**DECLARATORY JUDGMENT CONCERNING**
**THE "DEPOSIT ACCOUNTS"**
**(28 U.S.C. §§ 2201, 2202)**

160.    The Committee restates and realleges the allegations contained in paragraphs 1 through 159 above, as if fully set forth herein.

161.    The Notes Security Agreement purports to grant the Collateral Agent a lien on and security interests in "Deposit Accounts" of the Guarantors, the FABS Grantors, and the Additional Account Parties.

162.    The Notes Security Agreement defines "Deposit Accounts" to have the meaning set forth in Article 9 of the UCC.

163.    A list of deposit accounts owned by one of ResCap, RFC, GMAC Mortgage USA Corporation, GMACM, Residential Consumer Services, LLC, ETS of Washington, Inc., or Residential Funding Mortgage Exchange, LLC is attached hereto as Schedule ___ (the "**<u>Deposit Accounts</u>**").

164.    Discovery may reveal additional Deposit Accounts that are not subject to perfected liens.

165.    In the AFI DIP Order, the Debtors stipulated that (i) the Secured Parties have valid, perfected, binding, and enforceable liens on and security interests in the Notes Collateral and (ii) the Notes Collateral includes all of the assets listed in the "Ally Revolver" and "Blanket" columns on <u>Exhibit A</u> to the AFI DIP Order.

166.    Upon information and belief, the assets listed in the "Ally Revolver" or "Blanket" columns on <u>Exhibit A</u> to the AFI DIP Order include the Deposit Accounts.

167.    The Deposit Accounts are deposit accounts within the meaning of the UCC.

- 25 -

168.    Upon information and belief, the Debtors and the Secured Parties have not executed control agreements with the institutions where the Deposit Accounts are located under which the institutions agreed to follow instructions originated by the secured party without obtaining consent from the debtor-depositor.

169.    Upon information and belief, the Secured Parties have not established control over the Deposit Accounts.

170.    The Committee disputes the Debtors' Stipulations as they relate to the Deposit Accounts.

171.    The Secured Parties failed to properly perfect their purported liens on and security interests in the Deposit Accounts and do not hold a perfected lien on or security interest in the Deposit Accounts.

172.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether the Collateral Agent has valid and/or perfected liens on or security interests in the Deposit Accounts.

173.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Deposit Accounts.

<u>**COUNT VII**</u>
**DECLARATORY JUDGMENT CONCERNING**
**"PRIORITY OF LIENS OF NOTES COLLATERAL"**
**(28 U.S.C. §§ 2201, 2202)**

174.    The Committee restates and realleges the allegations contained in paragraphs 1 through 173 above, as if fully set forth herein.

- 26 -

175.    The Debtors have stipulated that the Secured Parties' liens on and security interests in the Notes Collateral are "first priority" and, at the same time, subject to and subordinate to other liens.

176.    The Committee disputes such Stipulation as it relates to the priority of any liens on or security interests in the Notes Collateral.

177.    The Intercreditor Agreement provides that any such liens on and security interests in the Notes Collateral are junior to the liens and security interests securing the AFI Revolver, among other liens.

178.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and supportable and whether any of the Secured Parties' liens on and security interests in the Notes Collateral are first priority.

179.    Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, the liens and security interests securing the Notes Obligations are not first priority.

**COUNT VIII**
**DECLARATORY JUDGMENT CONCERNING**
**"COMMERCIAL TORT CLAIMS"**
**(28 U.S.C. §§ 2201, 2202)**

180.    The Committee restates and realleges the allegations contained in paragraphs 1 through 179 above, as if fully set forth herein.

181.    The Committee is currently investigating whether any of the Debtors possess causes of action for breaches of fiduciary duty, conversion or fraudulent conveyance.

182.    Upon information and belief, certain of those causes of action constitute commercial tort claims (the "**Commercial Tort Claims**") under section 9-102(a)(13) of the Uniform Commercial Code ("**UCC**").

183.    Discovery may reveal additional Commercial Tort Claims.

184.    In the AFI DIP Order, the Debtors stipulated that the Secured Parties have valid, perfected, binding, and enforceable liens on or security interests in the Notes Collateral, and the Notes Collateral was identified by reference to the defined term "Collateral" under the Notes Security Agreement.

185.    Upon information and belief, such Stipulation covers the Commercial Tort Claims.

186.    The Committee disputes the Stipulations as they relate to the Commercial Tort Claims.

187.    Section 2(g) of the Notes Security Agreement purports to grant a lien or security interest to the Secured Parties on the commercial tort claims described on Schedule V thereto as such schedule may be supplemented.

188.    Schedule V to the Notes Security Agreement indicates that no commercial tort claims are subject to the liens or security interests granted by Section 2(g) of the Notes Security Agreement.

189.    The Secured Parties do not have a security interest in or liens (either perfected or unperfected) on the Commercial Tort Claims because no such claims were described in the Notes Security Agreement.

190.    Accordingly, an actual, substantial, and justiciable controversy exists between the Committee and the Collateral Agent concerning whether the Stipulations are correct and

supportable and whether the Collateral Agent has valid or perfected liens on or security interests in the Commercial Tort Claims.

191.   Such a controversy is sufficient to warrant the issuance of a declaratory judgment that, notwithstanding the Debtors' Stipulations to the contrary, none of the Secured Parties has a lien on or security interest in any of the Commercial Tort Claims.

**COUNT IX**
**AVOIDANCE OF UNPERFECTED LIENS**
**WITH RESPECT TO THE "DEPOSIT ACCOUNTS"**
**(11 U.S.C. §§ 544, 550, and 551)**

192.   The Committee restates and realleges the allegations contained in paragraphs 1 through 191 above, as if fully set forth herein.

193.   The Secured Parties failed to properly perfect their purported liens on and security interests in the Deposit Accounts because they did not obtain requisite control over such accounts.

194.   Pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code and/or the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) have the rights and powers of (as of the commencement of this chapter 11 case and without regard to any knowledge of the Debtors, the trustee, or any other creditors), or may avoid any transfer of property of the Debtors or any obligation incurred by the Debtors that is voidable by:

- A creditor that extends credit to a debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; or

- A creditor that extends credit to a debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against a Debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

- 29 -

195.     In this case, the Secured Parties failed to properly perfect their purported liens on and security interests in the Deposit Accounts in compliance with the UCC.  UCC §§ 9-104, 9-304 and 9-314.  Any security interests of the Secured Parties in the Deposit Accounts as of the Petition Date are avoidable pursuant to Bankruptcy Code sections 544(a)(1) and (2).

196.     Because the Secured Parties do not have properly perfected liens on or security interests in the Deposit Accounts, any and all liens on and security interests in the Deposit Accounts asserted by the Secured Parties should be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property if previously transferred should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

**COUNT X**
**AVOIDANCE OF UNPERFECTED LIENS**
**WITH RESPECT TO OTHER PROPERTY**
**(11 U.S.C. §§ 544, 550, and 551)**

197.     The Committee restates and realleges the allegations contained in paragraphs 1 through 196 above, as if fully set forth herein.

198.     To the extent that Secured Parties' purported liens on and security interests in the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, and the BMMZ Mortgage Loans attached, such liens and security interests should be avoided because they were unperfected.

199.     Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the Unencumbered Real Property because they did not file a mortgage or deed of trust in the appropriate office of the recorder of deeds for the jurisdiction in which each property is located.

200.   Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the Commercial Tort Claims because they did not file a UCC-1 financing statement that sufficiently describes such claims.

201.   Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the assets of Non-Obligor Debtors because they did not file any UCC-1 financing statements against such Debtors in the appropriate offices or otherwise take actions to perfect against such Debtors' property that may be perfected by other means.

202.   Upon information and belief, the Secured Parties failed to properly perfect their purported liens on and security interests in the Released Mortgage Loans and the BMMZ Mortgage Loans because they filed the Termination Statements, which caused any prior financing statements to cease to be effective.

203.   Pursuant to sections 544(a)(1) and (2) of the Bankruptcy Code and/or the Standing Order, the Debtors, the bankruptcy trustee, and the Committee (acting on behalf of the estates) have the rights and powers of (as of the commencement of these chapter 11 cases and without regard to any knowledge of the Debtors, the trustee, or any other creditors), or may avoid any transfer of property of the Debtors or any obligation incurred by, the Debtors that is voidable by:

- A creditor that extends credit to a debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; or

- A creditor that extends credit to a debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against a Debtor that is returned unsatisfied at such time, whether or not such a creditor exists.

- 31 -

204.    Any security interests or liens of the Secured Parties in the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, or the BMMZ Mortgage Loans as of the Petition Date are unperfected for the reasons explained above and are avoidable pursuant to Bankruptcy Code sections 544(a)(1) and (2).

205.    Because the Secured Parties do not have properly perfected liens on or security interests in the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, or the BMMZ Mortgage Loans, any and all liens on and security interests in such property asserted by the Secured Parties should be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property if previously transferred, should be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

### COUNT XI
### AVOIDANCE OF
### PREFERENTIAL TRANSFERS
### (11 U.S.C. §§ 547, 550, and 551)

206.    The Committee restates and realleges the allegations contained in paragraphs 1 through 205 above, as if fully set forth herein.

207.    Upon information and belief, at least [$350] million of assets, including mortgage loans, REO Property, and governmental insurance claims (collectively, the "**Preference Assets**") were added to the Notes Collateral during the 90 days before the Petition Date.

208.    A list of the Preference Assets is attached hereto as Exhibit __.

209.    Discovery may reveal additional Preference Assets.

- 32 -

210.    Section 547(b) of the Bankruptcy Code permits a debtor to avoid a transfer of an interest in property of the debtor's estate if the following conditions have been met:  (a) the transfer was made to or for the benefit of a creditor; (b) the transfer was for or on account of an antecedent debt; (c) the transfer was made while the debtor was insolvent; (d) the transfer was made within the 90 days prior to the petition date; and (e) the transfer enabled the creditor to receive more in a Chapter 7 liquidation than it would receive had the transfer not been made.

211.    The Preference Assets were added to the Notes Collateral for the benefit of the Secured Parties on account of the Notes Obligations.

212.    Upon information and belief, the Preference Assets were added to the Notes Collateral at a time when the Debtors were insolvent.

213.    Upon information and belief, addition of the Preference Assets to the Notes Collateral reduced the amount by which the Notes Obligations were undersecured, thereby allowing the Secured Parties to receive more than they would in a hypothetical chapter 7 liquidation had the Preference Assets not been added to the Notes Collateral.

214.    Each addition of the Preference Assets to the Notes Collateral was a transfer for the benefit of the Secured Parties ("**Preferential Transfers**").

215.    Each of the Preferential Transfers was a transfer made on or within 90 days before the Petition Date.

216.    Each of the Preferential Transfers was a transfer made for or on account of the Notes Obligations.

217.    The Debtors were insolvent when they made each of the Preferential Transfers.

218.    The Preferential Transfers should be avoided pursuant to section 547 of the Bankruptcy Code, and such property if previously transferred should be recovered by the

Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.

**COUNT XII**
**OBJECTION TO ALLOWANCE OF CLAIMS**
**DUE TO PENDING AVOIDANCE ACTIONS**
**(11 U.S.C. §§ 105, 502, 506, 544, 547 and 551 and Rules 3007,  3012 and 7001**
**of the Federal Rules of Bankruptcy Procedure)**

219.   The Committee restates and realleges the allegations contained in paragraphs 1 through 218 above, as if fully set forth herein.

220.   Under the AFI DIP Order, the Notes Obligations, if not challenged, will be allowed and deemed secured by valid or properly perfected security interests in the Released Bilateral Facilities Collateral, the Unencumbered Real Property, the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, the BMMZ Facility (including the residual value of the BMMZ Facility), the BMMZ Mortgage Loans, the Deposit Accounts, and the Preference Assets (collectively, the "**Challenged Property**").

221.   Under the AFI DIP Order, the Secured Parties have been excused from filing proofs of claim for the Notes Obligations because the Debtors' Stipulations are deemed to constitute a properly filed proof of claim.

222.   The Committee hereby objects, pursuant to Bankruptcy Code sections 105, 502, 506, 544, 547, and 551, to the allowance of the Notes Obligations.

223.   Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Rules 3007, 3012 and 7001 of the Federal Rules of Bankruptcy Procedure, each of the Secured Parties' claim should be disallowed until such time as the Committee's claims herein have been finally resolved.

**<u>COUNT XIII</u>**
**OBJECTION TO ALLOWANCE OF CLAIMS**
**DUE TO INCLUSION OF UNMATURED INTEREST**
**(11 U.S.C. §§ 105, 502, and 506 and Rules 3007,  3012 and 7001**
**of the Federal Rules of Bankruptcy Procedure)**

224.    The Committee restates and realleges the allegations contained in paragraphs 1 through 223 above, as if fully set forth herein.

225.    Under the AFI DIP Order, the Debtors have stipulated that the aggregate principal amount outstanding under the Junior Secured Notes and Notes Obligations as of the Petition Date is at least $2,120,452,000.

226.    The Committee disputes such Stipulation to the extent claims for unmatured interest are included within the principal amount of the Notes Obligations.

227.    Upon information and belief, the stipulated face amount outstanding of the Junior Secured Notes and, thus, the Notes Obligations include [$377 million] of claims for unaccreted original issue discount.

228.    Such unaccreted original issue discount constitutes "unmatured interest" under section 502(b)(2) of the Bankruptcy Code.

229.    The Secured Parties were undersecured on the Petition Date because the aggregate amount of the Notes Obligations exceeded the value of the Notes Collateral securing such claims.

230.    Under section 506(b), because the Secured Parties were undersecured, the unmatured interest ceases to accrue as of the Petition Date.

231.    Under section 502(b)(2) of the Bankruptcy Code, if an objection is made to a claim, "the court, after notice and a hearing, shall determine the amount of such claim . . .  as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that . . . (2) such claim is for unmatured interest."

- 35 -

232.   The Committee hereby objects, pursuant to Bankruptcy Code sections 105, 502, and 506, to the allowance of the Notes Obligations to the extent such claims include unmatured interest.

233.   Pursuant to the applicable provisions of the Bankruptcy Code, including without limitation section 502(d), and Rules 3007, 3012 and 7001 of the Federal Rules of Bankruptcy Procedure, each of the claims of the Secured Parties' should be disallowed to the extent such claims include unmatured interest.

**COUNT XIV**
**RECHARACTERIZATION OF**
**PAYMENT OF FEES, COSTS, AND EXPENSES**
**(11 U.S.C. § 506(b))**

234.   The Committee restates and realleges the allegations contained in paragraphs 1 through 233 above, as if fully set forth herein.

235.   Under section 506(b) of the Bankruptcy Code, "[t]o the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

236.   Only oversecured creditors, and not undersecured creditors, are entitled to receive such costs, fees and related payments.

237.   The Secured Parties were undersecured on the Petition Date because the aggregate amount of the Notes Obligations greatly exceeded the value of the Notes Collateral securing such claims.

238.   Under the AFI Final DIP Order, the right to recharacterize postpetition payments to the Secured Parties' professionals was preserved.

- 36 -

239.   All postpetition payments of fees, costs, and expenses made to date to, or incurred

for the benefit of, the Secured Parties, as undersecured creditors, on account of the Notes

Obligations, must be applied against the principal amount of the Notes Obligations, including

without limitation, the Defendants' receipt of payments of fees, costs and expenses totaling

approximately [_____] through [_____] 2012, and all such payments thereafter.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an

order:

(1)   declaring that the Released Bilateral Facilities Collateral, Unencumbered
Real Property, Commercial Tort Claims, assets of Non-Obligor Debtors
and Released Mortgage Loans are not subject to any liens (perfected or
unperfected) or security interests of the Secured Parties, and such property
does not constitute security for the Notes Obligations;

(2)   declaring that (a) the BMMZ Facility was a secured financing for purposes
of determining the enforceability of any liens or security interests in favor
of the Secured Parties in the residual value of the BMMZ Facility and/or
the Debtors' rights in the BMMZ Mortgage Loans; (b) the Debtors did not
have any right to "residual value" under the BMMZ Facility that could
have been pledged to the Secured Parties; (c) at all relevant times, the
Debtors owned the BMMZ Mortgage Loans; (d) any liens and security
interests held by the Secured Parties on the BMMZ Mortgage Loans were
released before the Petition Date; and (e) the Secured Parties are not
entitled to Adequate Protection Liens (as defined in the AFI DIP Order) on
the equity of Barclays DIP Borrowers on account of their asserted interest
in the BMMZ Facility or any residual value therefrom;

(3)   declaring that any liens or security interests asserted by the Secured
Parties on the Deposit Accounts are unperfected, and such property does
not constitute security for the Notes Obligations;

(4)   declaring that any liens or security interests asserted by the Secured
Parties, to the extent valid and perfected, are not first priority;

(5)   avoiding the Secured Parties' unperfected liens on or security interests in
the Deposit Accounts pursuant to 11 U.S.C. § 544, and transferring to the
Debtors' estates pursuant to 11 U.S.C. § 550(a) and/or automatically
preserving the avoided liens on or security interests in the Deposit

Accounts for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551;

(6)     avoiding the Secured Parties' unperfected liens on or security interests in (to they exist) the Unencumbered Real Property , the Commercial Tort Claims, the assets of Non-Obligor Debtors, the Released Mortgage Loans, and the BMMZ Mortgage Loans pursuant to 11 U.S.C. § 544, and transferring to the Debtors' estates pursuant to 11 U.S.C. § 550(a) and/or automatically preserving the avoided liens thereon or security interests therein for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551;

(7)     avoiding the Preferential Transfers pursuant to 11 U.S.C. § 547, and transferring to the Debtors' estates pursuant to 11 U.S.C. § 550(a) and/or automatically preserving the avoided Preferential Transfers for the benefit of the Debtors' estates pursuant to 11 U.S.C. § 551;

(8)     disallowing the Notes Obligations pursuant to 11 U.S.C. § 502 pending final resolution of the Committee's claims;

(9)     disallowing the Notes Obligations claims pursuant to 11 U.S.C. § 502 to the extent they include unmatured interest;

(10)    recharacterizing any postpetition payments made to the Secured Parties' professionals as payments of principal on the Notes Obligations; and

(11)    granting the Committee such other and further relief as the Court deems just, proper and equitable, including the costs and expenses of this action.


Dated: _____, 2012                    Respectfully submitted,
       New York, NY
                                            _____

                                            _____

                                            *Co-counsel to the Official Committee of*
                                            *Unsecured Creditors*

- 38 -