**Objection Deadline:  October 29, 2012 at 5:00 p.m.**
**Hearing Date:  November 19, 2012 at 10:00 a.m.**

FEATHERSTONE PETRIE DESISTO LLP
600 Seventeenth Street
Suite 2400-S
Denver, Colorado  80202-5424
Andrew J. Petrie (*pro hac vice*)
Sarah B. Wallace (*pro hac vice*)
Phone:  303-626-7100
Fax:  303-626-7101
apetrie@featherstonelaw.com

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
**In re**                                                            :
                                                                     :    **Case No. 12-12020 (MG)**
**RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,**                         :
                                                                     :    **Chapter 11**
                                                                     :
                                        **Debtors.**                 :    **Jointly Administered**
---------------------------------------------------------------------x

## <u>CITIMORTGAGE, INC.'S OBJECTION TO THE DEBTORS' PROPOSED SALE OF</u>
## <u>THE SERVICING PLATFORM</u>

Pursuant to paragraphs 3-4, 23-25 and 45 of the Court's *Order Under 11 U.S.C. §§ 105,*

*363(b) and 365 (I) Authorizing and Approving Sale Procedures, Including Payment of Break-Up*

*Fees; (II) Scheduling Bid Deadline, Auction (If Necessary) and Sale Hearing; (III) Establishing*

*Assumption and Assignment Procedures, Including Procedures for Fixing Cure Amounts, etc.*

[Dkt. no. 538] (the "**Sale Procedures Order**"), and  paragraphs 9, 14 and 23 of the *First*

*Amended and Restated Notice of (I) Debtors' Intent to Assume and Assign Certain Executory*

*Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Nonresidential Real*

*Property and (II) Cure Amounts Related Thereto* [Dkt. no. 1484] (the "**Cure Notice**")[1],

---
[1]    By which the debtors' amended and restated Exhibits 3a and 3b to their July 26, 2012 *Notice of*
*(I) Debtors' Intent to Assume and Assign Certain Executory Contracts, Unexpired Leases of Personal*

counterparty CitiMortgage, Inc. ("CMI") objects to the Debtors' *Motion Pursuant to 11 U.S.C.*
*§§ 105, 363(b), (f), and (m), 365 and 1123, and Fed R. Bankr. P. 2002, 6004, 6006, and 9014 for*
*Orders: (a)(i) Authorizing and Approving Sale Procedures, Including Break-up Fee and Expense*
*Reimbursement; (ii) Scheduling Bid Deadline and Sale Hearing; (iii) Approving Form and*
*Manner of Notice Thereof; and (iv) Granting Related Relief and (b)(i) Authorizing the Sale of*
*Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests;*
*(ii) Authorizing and Approving Asset Purchase Agreements Thereto; (iii) Approving the*
*Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related*
*Thereto; and (iv) Granting Related Relief* (the "**Sale Motion**") [Dkt. no. 61], and, specifically, to
that portion of the Sale Transactions under which the Debtors' propose to transfer CMI's
servicing agreements as part of the proposed sale of the Servicing Platform to the
Purchaser/Successful Bidder. [2]  (CMI does not believe that it has any interest in the various assets
that make up the Legacy Portfolio, and, therefore, does not object to the BH Legacy APA and
those aspects of the proposed Sale Transactions.)

## Preliminary Statement

1.      CMI is the counterparty to certain executory servicing contracts that the Debtors
propose to assume and assign as part of the Sale Transactions.  The Debtors propose to assume
and then to assign to the Purchaser/Successful Bidder some, but not all, of the servicing duties
and obligations the Debtors owe CMI under those contracts.  As result, the Debtors' do not
comply with the all-or-nothing requirement that Section 365 of the Bankruptcy Code requires
before the Court could properly authorize any assumption and assignment.

---

*Property, and Unexpired Leases of Nonresidential Property and (II) Cure Amounts Related Thereto* [Dkt. no. 924].

[2]      For the purposes of this Objection, and unless otherwise defined in this Objection, CMI is using the capitalized terms to have the meanings the Sale Motion, Sale Procedures Order and the Cure Notice ascribe to them.

2.       Further, while industry custom, practice and experience dictate that there may or may likely be various servicing defaults and unresolved obligations, currently existing but at this time unrealized and/or undiscovered, for both the prepetition period and for the period between the date on which the Debtors filed their petitions and the Closing Date on which the Debtors propose the Purchaser/Successful Bidder accept the assignment of the CMI servicing contracts, the Debtors propose both that they will not be responsible for those liabilities and that the Purchaser/Successful Bidder will not be responsible for those liabilities.  As a result, the Debtors do not offer at the time of the proposed assumption, and with respect to the resulting defaults and losses to CMI from these defaults, either:  (a) a cure of the defaults; (b) the adequate assurance of a prompt cure of the defaults; or (c) the adequate assurance of prompt compensation for CMI's losses.  Thus, the Debtors' proposed sale of the Servicing Platform violates Section 365(b)(1) of the Bankruptcy Code.

3.       While Section 363 permits a debtor to sell assets of the estate, 11 U.S.C. § 363(b)(1), CMI's executory contracts do not become assets of the estate unless and until the Debtors assume them pursuant to Section 365 of the Bankruptcy Code.  *See* 11 U.S.C. § 365(a). Until the Debtors:  (a) provide accurate information that properly identifies the CMI executory contacts they propose to assume; (b) establish correct cure amounts for all defaults under those executory contracts; (c) agree to assume the entirety of the servicing obligations for which those contracts provide; (d) fulfill the requirements of section 365(f); and (e) ensure there are no "gaps" or unaddressed obligations and defaults under those contracts, CMI objects to the proposed sale.

## Background

A.    **CMI's Business Relationship with the Debtors.**

4.    CMI is the master servicer for over 3,500 mortgage loans with an unpaid principal balance (as of the petition date) of over $547 million, for which loans the Debtors (specifically, Residential Funding Company and GMAC Mortgage, LLC) are the subservicer.[3]

5.    The Debtors' obligations to CMI that they propose to assume and assign arise under several different contracts CMI has with Residential Funding Company and seven different contracts it has with GMAC Mortgage, LLC, all of which the Debtors' list on the exhibits to the Cure Notice.  [Dkt. no. 1484, Exh. 1, page 39 of 180 (contract nos. 1985-MS-ASL-1038, 1985-MS-ASL-1039), page 62 of 180 (contract no. 2005-EMX3); Exh. 2 pages 112-13 of 160 (contract nos. 1082, 1082 [sic], 1083, 1084, 1085, 1792, 2115].[4]

6.    As master servicer, CMI is as a general matter responsible under the governing agreements for supervising, overseeing and monitoring the Debtors' performance under the relevant servicing agreements.  Among other involvements, CMI as master servicer receives cash collections and mortgage loan data from the Debtors, reviews and evaluates that data, and responds to the Debtors' requests for consent or approval of actions the Debtors contemplate (for example, a proposed transfer of servicing to another party) under the relevant servicing agreement.  If and when the Debtors default under a servicing agreement, CMI as the master

---

[3]    For the purposes of this Objection, CMI will generally refer to the servicer entities with which it has contracted (Residential Funding Company and GMAC Mortgage, LLC) as the "Debtors;" recognizing, of course, that not every one of the Debtor entities was in fact a servicer/subservicer for the mortgage loans that are the subject of CMI's executory contracts.

[4]    Although the Debtors' refer in their Exhibits only to the original contracts, and do not include the various Assumption, Assignment and Recognition Agreements, and the other contracts by which the Debtors obtained their servicing rights and assumed their servicing obligations.

servicer then would become responsible for the servicing obligations and must pursue appropriate remedies against the Debtors.[5]

7.      As subservicer, the Debtors contractually agreed with CMI to provide and/or perform the following services (which list is illustrative and not exclusive):

(a)      To follow their good faith business judgment in servicing the mortgage loans consistent with the parties' agreement, the applicable program guide, and normal and usual mortgage servicing practices (where these practices are consistent with the parties' agreement).

(b)      To collect payments, waive late payment charges or penalty interest, and extend payment due dates (provided, however, that any such extension is consistent with the applicable program guide and does not result in the loss of coverage under any related mortgage insurance policy).

(c)      To make the necessary adjustments on adjustable rate mortgages on the related Adjustment Date, and to adjust the mortgagor's monthly payments accordingly.

(d)      To establish and maintain principal and interest accounts in accord with the applicable program guide, to deposit all amounts received from mortgagors in the appropriate account, and to remit those amounts (less only the appropriate servicing fees).

(e)      To establish and maintain escrow accounts, and to deposit and retain in the appropriate account all collections for taxes, assessments, hazard insurance premiums, mortgage insurance policy premiums, if any, and any and all comparable items.

---

[5]      CMI does not intend by this general overview in any way to limit or modify the terms and conditions of the servicing agreements. Those agreements contain the complete and accurate description of the parties' rights and duties, and CMI reserves all of its rights to enforce each and every one of those obligations pertaining to servicing and all of its servicing-related remedies under the contracts.

(f)     To establish and maintain custodial accounts into which they will deposit certain payments for principal reductions, liquidation proceeds, insurance proceeds, and similar amounts received, as well as to make payments and provide statements re distributions from those accounts.

(g)     To take no actions that would result in the loss of coverage under any applicable mortgage insurance policy.

(h)     To enforce due-on-sale clauses contained in the underlying mortgages, or other debt or security instruments.

(i)     To conduct foreclosures when and as appropriate, and to use their best efforts to maximize the return of principal and interest to the owner (including structuring the timing of foreclosures to achieve that end).

(j)     To manage REO properties (or, "real estate owned" properties that the owner has acquired through foreclosure or deed-in-lieu of foreclosure) as per the applicable program guide.

(k)     To release files upon the mortgagor's payment in full (or to escrow payment in full in a manner that is customary for such purpose).

(l)     To maintain appropriate records concerning funds received and disbursed, and to provide monthly and annual reporting.

[See generally *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions and First Day Pleadings* [Dkt. no. 6] ¶¶ 26-30, 34 ("**Whitlinger Affdvt.**")].

8.     As servicer, the Debtors indemnify the owner and the master servicer against any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related costs,

judgments, and any other cost, fees and expenses the owner sustains related to the servicer's

failure to perform its duties and service the mortgage loans as the servicing agreements require.

9.     As servicer, the Debtors do not have an unfettered right to assign their contracts.[6]

In addition, it is important to note that it is <u>not</u> exclusively CMI's decision to determine whether

the Debtors can assign their servicing obligations.  The contracts under which CMI is the master

servicer provide that the owner of the mortgage loans has the right to approve any change in

subservicers, and CMI is required to obtain that owner's approval before changing subservicers

(where any such approval would presumably be subject to the owner's covenant of good faith

and fair dealing).  As a result, there are potential issues under Section 365(c)(1)(A) of the

Bankruptcy Code with the transactions the Debtors propose.

10.     Thus, CMI has several different types of claims against the Debtors under the

contracts that arise from the Debtors' actions and omissions as servicer and the servicing

contracts into which the Debtors entered.  CMI has claims relating to:  (a) the Debtors' breaches

of their mortgage loan administration obligations as servicers of various mortgage loans; (b) the

---

[6]     By way of example only, Section 8.03 of the Sale and Servicing Agreement, dated and effective as of September 1, 1995, between California Federal Bank, F.S.B., as owner, and GMAC Mortgage Corporation of PA, as seller and servicer, provides in pertinent part:

> [GMAC] shall not assign this Agreement (except to GMAC Mortgage Corporation or GMAC-Residential Funding Corporation) . . . except by mutual consent of [GMAC] and the Owner or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by [GMAC]. . . .

[Contract no. 1085 § 8.03 at 38-39, listed on Dkt. no. 1484, Exh. 2, page 113 of 160].

And, to the same general effect, Section 5.02(a) of the Participation Agreement, dated as of February 3, 1997, among California Public Employees Retirement System, as owner, First Nationwide Mortgage Corporation, as manager, and GMAC Mortgage Corporation, as seller and servicer, provides in pertinent part:

> [GMACM] may not assign any of its rights or privileges hereunder or make or enter into any delegation, subcontract, authorization or appointment with respect to any of its duties, liabilities or obligations hereunder unless (i) [GMACM] shall have received the prior written consent of [FNMC] and (ii) any agreement to assign such rights and obligations provides that the assignee must assume the servicing obligations of his Agreement with respect to the applicable Mortgage Loans. . . .

[Contract no. 1085 § 5.02(a) at 32, listed on Dkt. no. 1484, Exh. 2, page 112 of 160].

Debtors' payment of servicing transfer costs and expenses; (c) the servicer's mortgage loan administration obligations, which obligations may include repurchase claims with respect to defective mortgage loans where the Debtors' have the obligation to enforce loan sellers' repurchase obligations; and (d) the Debtors' liabilities for indemnification amounts arising from the Debtors' actions as servicers (the payment of the fees, penalties and indemnification amounts arising from losses, liabilities, costs and expenses of administering the loans, including, but not limited to, costs relating to third-party claims relating to mortgage loans the Debtors' servicing activities with respect to those loans).[7]

**B.    Proceedings in the Debtors' Chapter 11 Relevant to CMI's Executory Contracts.**

11.    On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their property as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

12.    The Debtors, together with their non-debtor subsidiaries, engaged prepetition in two lines of business:  (a) originating and servicing mortgages; and (b) what the Debtors call their "legacy portfolio operations" consisting of mortgage loans and other residual financial assets.  [Whitlinger Affdvt. [Dkt. No. 6] ¶ 16].  Only the first of those lines of business and the proposed sale of the Servicing Platform have any bearing on the proposed assignment and assumption of CMI's executory contracts.

13.    The Debtors acknowledge their primary and most valuable operations consist of servicing mortgage loans for various investors, including loans the Debtors, Ally Bank (f/k/a

---

[7]    CMI also has claims against the debtors arising out of their breaches of the representations and warranties they extended as part of the origination and sale of mortgage loans.  Because the Debtors propose to sever the provisions of the agreement that deal with origination obligations out of which those defaults arise (which severance CMI does not oppose), CMI reserves all of its rights and remedies with respect to those defaults and resulting obligations and claims.

GMAC Bank), a non-debtor affiliate of the Debtors, and third parties originated, and that these operations include the subservicing of loans for various master servicers such as CMI.  [See id. ¶¶ 6, 31].

14.    On May 14, 2012, the Debtors filed the Sale Motion.

15.    As part of their preparatory work for a proposed plan of reorganization, or, in the alternative, for a proposed sale of certain assets free and clear of all liens and encumbrances under Section 363(b) of the Bankruptcy Code, the Debtors included as "part and parcel" of the proposed sale "the assumption and assignment of the Assumed Contracts."  Sale Motion [Dkt. no. 61] ¶ 31.  The Debtors are now proceeding under that alternate course.

16.    The Debtors' Sale Procedures included specific provisions with respect to the proposed assumption and assignment of the Assumed Contracts.  In particular, the Sale Procedures provided that the Debtors would serve a Notice of Assumption and Assignment on each counterparty to one or more Assumed Contracts apprising that counterparty of:

(i)    the Debtors' estimate of the Cure Amount associated with each such contract;

(ii)    [the fact, as the Debtors propose the transaction] that Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract, whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.  Any parties holding such claims or obligations will be required to respond to the Debtors' cure notice if they disagree with the amounts set forth therein; . . . .

[Id. ¶ 60, as amended; see also Exh. F (*Proposed Notice of Assumption and Assignment*).

17.    On June 28, 2012, the Court entered its Sale Procedures Order.

18.    The Debtors now characterize or include as "cure" amounts obligations that have

not yet matured.  Specifically, the Debtors' Cure Notice reads:

> Nationstar is not assuming and parties will be enjoined from asserting against
> Nationstar any claims or obligations relating to the pre-closing period under any
> Assumed Contract (including any Servicing Agreement), whether such claims or
> obligations are known, unknown, fixed, contingent, unliquidated or liquidated at
> the time of the Closing, including, without limitation, any claims or liabilities
> relating to any act or omission of any originator, holder or servicer of mortgage
> loans prior to the Closing Date, and any indemnification claims or liabilities
> relating to any act or omission of the Sellers or any other person prior to the
> Closing Date.  Any parties holding such claims or obligations will be required to
> file a Contract Objection if they disagree with the Cure Amount set forth on the
> Schedule.

[Cure Notice ¶ 21].  Thus, there are "gaps" where neither the Debtors nor the

Purchaser/Successful Bidder take responsibility for:  (a) prepetition defaults that have not yet

manifested themselves (whether characterized as "unknown," "contingent" and/or

"unliquidated"), but for which the parties' and the industry's experience teach do exist and will

manifest themselves in the future and for which the Debtors are responsible or their assignee

would be responsible; and (b) events that take place after the Petition Date and before the

Closing Date.

19.    On September 28, 2012, CMI filed *CitiMortgage, Inc.'s Objection to the Debtors'

Proposals:  (I) to Assume and Assign Certain Executory Contracts; and (II) to Assign Cure

Amounts Related Thereto* [Dkt. no. 1646], pursuant to which CMI asserted a Contract Objection

consisting of both an Assignment Objection and a Cure Objection.  CMI incorporates by this

reference that Contract Objection in its entirety.

20.    By their October 25, 2012 *Notice of Successful Bidders at the Auctions and Sales

of (A) the Platform Assets to Ocwen Loan Servicing, LLC and (B) the Whole Loan Assets to

Berkshire Hathaway Inc.* [Dkt. no. 1960], the Debtors disclosed that Ocwen Loan Servicing,

LLC ("Ocwen") was named the successful bidder for the Platform Assets and that Nationstar

Mortgage LLC ("Nationstar") was selected as the back-up bidder for those assets.[8]

### CMI's Objection to the Proposed Sale of the Servicing Platform

21.    Preliminarily, CMI continues to object to the Debtors' proposals to assume and

assign its executory contracts as part of the sale of the Servicing Platform because the Debtors

have not, at least in some, if not all, instances, provided sufficient information for CMI to

identify the specific agreements they propose to assume and assign.  The list of agreement titles

the Debtors provide in Exhibits 1 and 2 to their Cure Notice seems to provide only summaries of

titles, not the full titles of the contracts with complete dates.  In the face of that lack of

specificity, CMI reserves its right to supplement this objection as and when the Debtors provide

complete information.

22.    CMI objects to the proposed assignment and assumption, the accompanying

proposal to pay nothing as cure amounts, and the absence of the required adequate assurances

and payment of those damages CMI has incurred, because these proposals do not account for the

defaults and gaps that exist as a necessary part of these types of transactions into which the

Debtors entered with CMI.

23.    The Debtors cannot complete the proposed sale without first complying with

Section 365 because an executory contract does not become an asset of the estate until it is

assumed pursuant to Section 365.  *See* § 365(a).  "Unless and until rights under an executory

contract are timely and affirmatively assumed by the trustee, they do not become property of the

---

[8]    As of the date of this Objection, the Debtors have submitted only the *Amended and Restated Asset Purchase Agreement Among Nationstar Mortgage LLC and Certain Debtors* [Dkt. no. 534].  If the Debtors enter into an agreement with Ocwen that contains any material variation in the terms of the proposed sale, CMI reserves its rights to address those matters at that time.

debtor's estate." In re Tleel, 876 F.2d 769, 770 (9th Cir. 1989); In re Access Beyond Techs.,

Inc., 237 B.R. 32, 38 (Bankr. D. Del. 1999).

**A.    The Debtors' Proposal Does Not Provide for the Assumption and Assignment of All of Their Servicing Duties and Obligations The Debtors Owe to CMI.**

24.    The Debtors propose to rewrite their servicing agreements with CMI by

narrowing the servicing obligations Ocwen or Nationstar propose to assume from what the

servicing agreements provide.  The Sales Order does not provide for Ocwen or Nationstar to

assume all of the Debtors' duties and obligations under the Servicing Agreements.  Rather,

Ocwen's or Nationstar's duties and obligations under the Servicing Agreements are limited to

duties, obligations and agreements related to:

> (a) collections with respect to, or the administration or servicing or subservicing or master servicing of, or reporting in respect of, Mortgage Loans, (b) servicing fees or ancillary income, (c) the disbursement of collections with respect to Mortgage Loans, (d) the making of delinquency advances and servicing advances in connection with the servicing or subservicing or master servicing of Mortgage Loans, (e) payment of expenses associated with the administration, servicing or subservicing or master servicing of Mortgage Loans, (f) the limitation on liability of, and indemnification in favor of, the servicer, subservicer or master servicer thereunder, or (g) representations, warranties and covenants running in favor of the servicer, subservicer or master servicer thereunder. . . .

25.    The Debtor's list of servicing obligations does not include all of the servicer's

duties and obligations under the CMI executory contracts the Debtors propose to assume and

assign.  In fact, the servicer's contractual duties and obligations are far broader than what the

Debtors' list.  The CMI contracts provide that the Debtors, as servicer, are responsible for all

tasks relating to the administration of the mortgage loan assets for which CMI is master servicer

(to include billing, collecting, foreclosing, maintaining and selling REO properties, the

investment of mortgage loan cash flows pending distribution to owners/securities holders, and

the compilation, computation and reporting of mortgage loan performance data).  The Debtors

and Purchaser's list of servicing obligations Ocwen or Nationstar propose to assume focuses on

the day-to-day servicing of mortgage loans, and, by way of example, does not make any mention of dealing with foreclosures or the maintenance or liquidation of foreclosed properties or properties the borrowers have surrendered via deeds-in-lieu (both of which are then REO properties).  [See generally Whitlinger Affdvt. [Dkt. no. 6] ¶ 45 ("In the ordinary course of the Debtors' loan servicing business, the Debtors institute foreclosure procedures when mortgagors fail to honor their loan commitments.")].  In fact, the APA defines Mortgage Loans as something separate from REO Property, which definition has the effect of carving REO Property out of Nationstar's responsibilities.

26.    Section 365 of the Bankruptcy Code does not permit a debtor to assume only what it considers the beneficial portions of an executory contract and to leave behind those liabilities it now considers undesirable.  See, e.g., In re MF Global Holdings Ltd., 466 B.R. 239, 241 (Bankr. S.D.N.Y. 2012) ("The trustee must either assume the entire contract, *cum onere*, or reject the entire contract, shedding obligations as well as benefits."); The Leslie Fay Cos., Inc. v. Corporate Property Assocs. 3 *(In re The Leslie Fay Cos., Inc.)*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) ("If an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens.") (citing NLRB v. Bildisco & Bildisco, 465 U.S. 413, 531, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984)).

27.    Accordingly, the Court should require the Debtors to assume each executory servicing contract in its entirety (excepting only the severed origination obligations, with which proposal CMI has no objection), and to pay all amounts necessary to cure all existing defaults arising under each contract.

28.    This assumption mechanism also means that if the purchaser/assignee later reports or discovers pre-assignment defaults, it is liable for those defaults.  (Any adjustment for Ocwen

or Nationstar taking by the proposed assignment and assuming that contractual liability is one the

Debtors (as assignors) and Ocwen or Nationstar (as assignees) need to make in accounting for

the pricing of that transfer.)  That is particularly the case where the Debtors currently propose to

insulate both themselves and Ocwen or Nationstar from any carryover liabilities that arose pre-

transfer, but manifest post-transfer – where, in the non-bankruptcy context, a purchaser would be

responsible for those post-transfer liabilities and the "risk" of them would be something for

which the purchaser/assignee would account in the price it agreed to pay the seller/assignor.

**B.     The Procedures Relating to Assumption and Payment of Cure Amounts Are Neither
         Fair Nor Workable, and Do Not Comply With the Bankruptcy Code.**

29.      The Debtors' proposed schedule to complete the assumption and assignment as

part of the Sale Transactions does not provide either enough information or enough time for the

counterparties to determine and resolve their cure claims.  There are breaches the Debtors are

required to cure in connection with the assumption and assignment of the CMI contracts, or for

which the Debtors must provide adequate assurances of a prompt cure.  The identification of the

specific contracts involved, the extent of these breaches, and calculation of the resulting claim

amounts, is highly complex, and will likely vary from agreement to agreement.

30.      The Sale Motion attempts erroneously to include in proposed "cure" amounts

obligations that have not yet matured.  Cure Notice ¶¶ 17, 25.

31.      A "cure" payment relates specifically to a debtor's prior default under an

executory contract or unexpired lease.  See 11 U.S.C. § 365(b).  Neither that provision of the

Bankruptcy Code nor any case authority would permit a debtor to use a cure payment to absolve

the assignee of the risk of future claims that might arise under the agreement the debtor proposes

to assign.  Rather, the risk of future performance obligations necessarily lies with the party

assuming the obligations (or its assignee).

- 14 -

32.    Section 365 of the Bankruptcy Code is not the same and does not provide the same relief as Section 363(f) of the Bankruptcy Code.  As a result, Section 365 does not allow the assumption of an executory contract free and clear of the obligations that contract expressly sets forth.  See Cinicola v. Sharffenberger, 248 F.3d 110, 124 (3d Cir. 2001) ("[T]he sale of an executory contract triggers the protections afforded sales of bankruptcy estate property but also requires satisfaction of the requirements for assuming and/or assigning the same executory contract."); In re Access Beyond Techs, Inc., 237 B.R. at 38 (holding an executory contract does not become part of a debtor's estate until it is assumed, and "[a] debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than assuming and assigning it.").

33.    A debtor's assumption of an executory contract makes the estate liable to perform all of the obligations under that contract.  The debtor's assignment of a contract it has assumed obligates the assignee to those same terms.  See, e.g., Am. Flint Glass Workers Union vs. Anchor Resolution Corp., 197 F.3d 76, 81 (3d Cir. 1999) ("[A]n assignment of a contract as such involves a commitment by the assignee to perform all obligations under the contract, as well as to acquire all rights created by the contract.").

34.    There is nothing in the Bankruptcy Code that would permit a debtor to assume and assign any executory contract "free and clear" of the existing and ongoing duty to perform all obligations, and honor all liabilities, arising under that contract.  If the Debtors' obligation has not yet matured at the time it assumes the contract, then there can be no corresponding default that the debtor must cure at the time of assignment.  Accordingly, a proposed purchaser of the Debtors' assets that also seeks to takeover executory contracts by assignment cannot do so

without accepting all of the liabilities arising under the contracts, including those obligations that have not yet matured.

35.    If and to the extent the CMI may in the future have claims, some based on events occurring prepetition and some not, those claims have not yet matured or been liquidated (and in some instances or neither known nor capable of being known). As a result, even if the Debtors were to have correctly characterized those claims as cure claims – which proposition CMI disputes – CMI could not assert them in connection with its cure claims, and any assignment of the CMI contracts cannot now extinguish those claims.

**C.    The Debtors Propose to Create a Catch-22 Situation in Which Neither They Nor the Purchaser Will Be Responsible for Defaults Under the Executory Contracts the Debtors Propose to Assume and Assign as Part of the Sale.**

36.    The Debtors' assumption, assignment and cure proposals:  (a) presume the absence of any existing, but undiscovered or unrealized, defaults when the Debtors posit a cure amount of -0-; and (b) absolve the Purchaser from any responsibility for those defaults when and as they may be discovered or realized in the future (for example, specifically eliminating any liability of the Debtors with respect to representations and warranties made in connection with the sale, or with respect to the noticing and enforcement of any remedies against a Debtor in respect of alleged breaches of such representations and warranties).

37.    Expanding further this proposed disclaimer of liability, the Debtors provide both that they will have no liability, and that the Purchaser will have no liability, for anything relating to the pre-closing period.  Specifically, in paragraph 12 of their Cure Notice, the Debtors state:

> The respective Assumption Notice Parties shall be forever barred from . . . (ii) asserting at any time any condition to assignment, default, claims, obligations or breach and/or any additional cure, damage or other amount with respect to the respective Assumed Contract on the basis of events of any kind or nature occurring or arising prior to the Closing Date (as defined in the Nationstar APA), whether such events constituted acts or omissions by the Debtors or other person and regardless of whether such events are known or unknown, including, without

- 16 -

limitation, claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification obligations, claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.

Cure Notice ¶ 12.

38.     Likewise, in paragraph 13 of the Cure Notice, the Debtors state:  "The Debtors will request that Cure Objections to the proposed Cure Amounts based upon unquantifiable or unknown pre-closing liability be overruled; provided, however, that no such liabilities may asserted against the Purchaser or the Purchased Assets, as further described in the Sale Approval Order."  Id. ¶13.

39.     Confirming that Ocwen or Nationstar will not be responsible, the Debtors further stated in the Cure Notice:

> Nationstar is not assuming and parties will be enjoined from asserting against Nationstar any claims or obligations relating to the pre-closing period under any Assumed Contract (including any Servicing Agreement), whether such claims or obligations are known, unknown, fixed, contingent, unliquidated or liquidated at the time of the Closing, including, without limitation, any claims or liabilities relating to any act or omission of any originator, holder or servicer of mortgage loans prior to the Closing Date, and any indemnification claims or liabilities relating to any act or omission of the Sellers or any other person prior to the Closing Date.  Any parties holding such claims or obligations will be required to file a Cure Objection if they disagree with the Cure Amount set forth on the Schedule.

Id. ¶ 25 (emphasis added); accord Sale Motion ¶ 9.

40.     As a result, then, the Debtors propose that these future breaches of the contract – based as they are in the Debtors' pre-assumption acts or omissions – are ones from which Ocwen or Nationstar will be relieved, and ones for which the Debtors will have no responsibility after the proposed assumption and assignment.  Thus, the Debtors propose that no one on the subservicer side of the equation will be responsible.  This then puts the counterparty in a

Catch-22 position where it would be left with no claim against either the servicer or its

successor.

41.    This limitation on the Ocwen's or Nationstar's performance is not consistent with

the statutory requirement that a debtor can assign an executory contract only if "adequate

assurance of future performance by the assignee . . . is provided . . . ."  11 U.S.C. § 365(f)(2)(B).

In fact, this proposed limitation on the purchaser's future performance demonstrates that the

Debtors cannot (or will not) comply with Section 365(f)(2)(B) because the Debtors' proposal

would authorize Ocwen or Nationstar to walk away from any claim arising from any servicing

"act or omission" occurring prior to the Closing and from any "claims or obligations relating to

the pre-closing period under any Assumed Contract."

42.    The entire purpose of the adequate assurance of future performance is to backstop

the relief the debtor receives from any other or further liability or obligation to perform after the

assignment.  "The statutory requirement of 'adequate assurance of future performance by the

assignee' affords 'needed protection to the non-debtor party because the assignment relieves the

trustee and the bankruptcy estate from liability for breaches arising after the assignment.'"  In re

Fleming Cos., 499 F.3d 300, 305 (3d Cir. 2007) (quoting Cinicola v. Sharffenberger, 248 F.3d

at 120) (emphasis added).

43.    These are burdens the Ocwen or Nationstar properly assumes when it accepts the

assignment *cum onere*.  As the Unsecured Creditors' Committee noted in addressing the

Debtors' proposal to continue to pay certain prepetition repurchase claims in the ordinary course

post-petition and outside of a plan of reorganization, the Committee understands the Debtors'

obligations to pay prepetition liabilities and defaults:

> [T]he "doctrine of necessity" does not apply [to justify the proposed payments of
> prepetition claims], because if, as the Committee understands, such liabilities are

to be assumed, they can be paid when the servicing agreements are assumed in connection with a sale.

*Limited Objection and Reservation of Rights of the Official Committee of Unsecured Creditors to the Debtors' (I) Origination Motion and (II) Ally Servicing Motion* [Dkt. no. 202] ¶ 23 at 16-17]. The Committee then objected to the Debtors' proposal and suggested that this Court limit the Debtors' proposal to only GA Loans and not extend it to Non-GA Loans (meaning non-government sponsored entity loans). Id. ¶ 24 at 17.

44.    The fact that the Debtors propose to pay certain prepetition repurchase claims when asserted by their non-debtor affiliate, by branding those claims as being in the ordinary course of business post-petition and handling them outside of a plan of reorganization, serves to illustrate the unfairness of the Debtors' proposals.  Proposing to preserve the protected status of the GA Loans transactions, while excluding non-GA transactions, see id., is no better.  That is because either proposal would still elevate one insider creditor's group of transactions over the other creditors and over the other similarly-situated creditors' transactions (such as the counterparties to the executory servicing contracts) where those creditors would be in the same class for plan purposes under 11 U.S.C. § 1122(a).

45.    Here, the Court's assessment of whether Ocwen or Nationstar can provide adequate assurances of future performance will require, at the very least a determination of its ability to provide all of the servicing services for which the agreements provide, and not just the pared down list the Debtors propose.  "What constitutes adequate assurance is a factual question to be determined on a case by case basis with due regard to the nature of the parties, their past dealings and present commercial realities."  In re Gen. Oil Distribs., Inc., 18 B.R. 654, 658 (Bankr. E.D.N.Y. 1982); see also Androse Assocs. of Allaire, LLC v. A&P (In re A&P), 2012 U.S. Dist. LEXIS 65193 (S.D.N.Y. May 8, 2012) ("[C]ourts have determined that whether

'adequate assurance of future performance' has been provided is determined by the facts and circumstances of each case.") (internal quotation omitted).  Factors that courts have considered in determining whether a debtor has provided (or assured the counterparty that the proposed assignee will provide) adequate assurance of future performance include "financial data submitted by the debtor or movant, . . . industry outlooks, the nature and relationship of the parties, past dealings of the parties, and the willingness of the parties to fund payments."  In re Res. Tech., Corp., 2008 U.S. Dist. LEXIS 91148 (N.D. Ill. Nov. 7, 2008).  The Debtors have not provided any information that Ocwen can viably assume the massive servicing roles they propose to transfer.

**D.    There Are Significant Issues With the Procedural Posture in Which the Debtors Now Couch Their Request to Assume and Assign the Contracts as Part of the Sale.**

46.    As certain trustees have observed in challenging the procedures for cure, see *Limited Objection  of Certain Trustees for Residential Mortgage Backed Securities Trusts to Debtors Motion Pursuant to 11 U.S.C. Sections 105, 363(b), (f) and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006 and 9014, etc.* [Dkt. no. 291] ¶¶ 29-31, at pages 21-22 of 27 ("**RMBS Objection**"), the Debtors propose to resolve cure disputes prior to the conclusion of the Sale Hearing, but have not scheduled any time to do so and offer no assurance that the Debtors will be able to satisfy all cure claims prior to the assumption of the contracts as Section 365 requires.  See also Cure Notice ¶¶ 11-12.  CMI joins in that objection to the sale of the Servicing Platform.

47.    Similarly, the Debtors have requested that the Court overrule any objections "based upon unquantifiable or unknown pre-closing liability," but have not proposed a structure that would require an escrow or that would otherwise provide for the possible later satisfaction of

these claims.  Id. ¶ 13.[9]  Moreover, even if this Court were to require an escrow of the entire

proposed purchase price, it is not clear that the proposed sales will yield sufficient proceeds to

satisfy the counterparties' claims.  Accordingly, there is a very real possibility that the Debtors

will not be able to satisfy the key condition precedent to their proposals to assume and assign the

servicing contracts; in other words, they will not be able to cure the breaches of those

agreements.  CMI joins in the trusts' objection [RMBS Objection ¶¶ 31, 33] and asks that this

Court require a process for the orderly assertion and calculation of cure claims, by which the

---

[9]        And this lack of protection stands in sharp contrast to the provisions of the *Stipulation and
Proposed Order Reserving Rights With Respect to Debtors' Motion for Interim and Final Orders Under
Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the
Ally Bank Servicing Agreement in the Ordinary Course of Business* [Dkt. no. 1275], into which the
Debtors entered in connection with their obligations to service mortgage loans their non-debtor affiliate
Ally Bank owns.  This stipulation addresses disputes over compliance with the provisions of the servicing
agreement with Ally Bank and the DOJ/AG settlement.
        In that stipulation, among other things, Ally Financial, Inc. ("AFI") agreed to escrow, where and
as the Debtors pay Ally Bank in accord with the Indemnification Obligation – defined to be GMAC
Mortgage LLC's ("GMACM") obligations to pay Ally Bank in connection with loan modifications the
Debtors' assert are part of their obligations under the DOJ/AG Settlement – amounts equal to the
reasonable estimate of future liabilities incurred after the Closing Date for the sale of the Debtors'
servicing platform and on account of unperformed loan modifications.  Id. ¶ 6 (requiring a monthly
adjustment of the escrowed amount, which adjustment could result in additional payments into that
escrow).
        These indemnification obligations include the Debtors' $19.9 million post-petition
indemnification payment to Ally Bank, which payment included a payment on account of $13 million
relating to prepetition loan modifications.  *Statement of the Official Committee of Unsecured Creditors
Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the
Ally Bank Servicing Agreement in the Ordinary Course of Business* [Dkt. no. 1290] ¶ 8.  The Committee
describes the indemnification payments as follows:
               Unlike modifications to the Debtors' own loans, which simply recognize a loss in value
               that has already occurred, indemnification payments to Ally Bank are hard costs that turn
               the Debtors into guarantors of the full amount of Ally Bank's loss of original loan value.
               Far from "compensating" Ally Bank for some benefit provided to the Debtors, these
               payments extract value from the Debtors to remedy flaws in Ally Bank's own loan
               portfolio *that may have been caused by Ally Bank's own originating activities.*
Id. ¶ 9. And, this payment creates a resolution of prepetition obligations outside any plan.
        The Stipulation and Proposed Order further provides "nothing in this paragraph 6 shall relieve
GMACM or the purchaser of the Debtors' Platform, as applicable, from remitting payment on account of
the Indemnification Obligation in the first instance . . . ."  *Stipulation and Proposed Order . . .*
[Dkt. no. 1275] ¶ 6.  Thus, the Debtors recognize in this instance that the Purchaser can and should
assume future liabilities incurred pursuant to the Debtors' prepetition obligations under the GMACM
servicing agreement and/or DOJ/AG Settlement.

Court may be able to avoid undue waste and delay attendant with a failure to cure at the point of sale.

48.     CMI also joins with the trusts and objects to the Debtors' request that the Court waive the 14-day stay in connection with the closing of the sale because it also is not appropriate. The issues in question are likely to lead to controversial decisions and the corresponding possibility of appeal.  The assets in question are not of the type that run a risk of "rotting on the vine."  The Debtors propose to avoid Federal Bankruptcy Rule 6006(d), which was specifically designed to give aggrieved parties the chance to appeal and to seek a more lengthy stay in order to avoid mootness.  The Debtors have come forward with no reason why this Court should take away that important right.  [See RMBS Objection ¶ 32].

49.     CMI further objects to the procedure by which the Debtors purport to reserve the right to remove executory contracts from the list of those contracts they propose to assume and assign, and to do so at any time up to two business days before the Closing Date.  [Dkt. no. 1484 ¶¶ 5, 18, 21].  This unilateral ability to amend the motion serves only to create undue and last-minute changes to the package of assets the Debtors propose to include as part of the sale of the Servicing Platform, and such that counterparties' servicing obligations are thrown into disarray.

## Notice

50.     CMI has provided notice of this objection within the time and in the manner that paragraphs 23-25 of the Court's *Order Under 11 U.S.C. §§ 105, 363(b) and 365 (I) Authorizing and Approving Sale Procedures, Including Payment of Break-Up Fees; (II) Scheduling Bid Deadline, Auction (If Necessary) and Sale Hearing; (III) Establishing Assumption and Assignment Procedures, Including Procedures for Fixing Cure Amounts, etc.* [Dkt. no. 538], and paragraphs 9 and 11 of the *First Amended and Restated Notice of (I) Debtors' Intent to Assume*

*and Assign Certain Executory Contracts, Unexpired Leases of Personal Property and Unexpired Leases of Nonresidential Real Property and (II) Cure Amounts Related Thereto* [Dkt. no. 1484] provides.

## Conclusion

For all of the reasons stated above, CMI requests that the Court, before approving the sale of the Servicing Platform to Ocwen, or to Nationstar as its back-up:

A.     Require the Debtors to cure defaults that all of the parties know exist, but that have not yet manifested or are contingent and/or unliquidated; or

B.     Provide adequate assurances that the Debtors will cure those defaults by either: (i) requiring the Ocwen or Nationstar to retain responsibility for those obligations; or (ii) retaining the liability for those obligations as part of the "cost" of the transaction; or

C.     Not include future or unknown defaults as part of a cure, but direct that they remain the Ocwen's or Nationstar's responsibility; and

D.     Deny the Debtors' request to assume and assign CMI's executory contracts until such time as the Debtors provide for an appropriate cure and/or adequate assurances of a prompt cure, compensate CMI or provide adequate assurances that they will promptly compensate CMI for its actual pecuniary losses, and provide adequate assurances of future performance under CMI's contracts; and

E.     Grant such other and further relief as the Court determines is just and proper.

Dated: October 29, 2012
       Denver, Colorado

                          Respectfully submitted,

                          **FEATHERSTONE PETRIE DESISTO LLP**

                          /s/ Andrew J. Petrie
                          Andrew J. Petrie (*pro hac vice*)
                          Sarah B. Wallace (*pro hac vice*)
                          600 Seventeenth Street, Suite 2400-S
                          Denver, Colorado  80202-5424
                          Telephone:  303-626-7100
                          Facsimile:  303-626-7101
                          apetrie@featherstonelaw.com
                          swallace@featherstonelaw.com
                          *Attorneys for CitiMortgage, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 29th day of October, 2012, service of the

foregoing **CITIMORTGAGE, INC.'S OBJECTION TO THE DEBTORS' PROPOSED**

**SALE OF THE SERVICING PLATFORM** was effected on the following via electronic mail:

Gary S. Lee
Alexandra Steinberg Barrage
Larren M. Nashelsky
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY  10104
glee@mofo.com
abarrage@mofo.com
lnashelsky@mofo.com

Larry Nyhan
Jessica C.K. Boelter
Sidley Austin LLP
One South Dearborn
Chicago, IL  60603
lnyhan@sidley.com
jboelter@sidley.com

Kenneth H. Eckstein
Douglas H. Mannal
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY  10036
keckstein@kramerlevin.com
dmannal@kramerlevin.com

Brian Masumoto
Office of the U.S. Trustee
for the Southern District of New York
33 Whitehall St., 21st Floor
New York, NY  10004
Brian.Masumoto@usdoj.gov

Seth Goldman
Thomas Walper
Munger, Tolles & Olson, LLP
355 South Grand Avenue
Los Angeles, CA  90071
seth.goldman@mto.com
thomas.walper@mto.com

Ray C. Schrock
Richard M. Cieri
Stephen E. Hessler
Kirkland & Ellis, LLP
601 Lexington Ave.
New York, NY  10022
ray.schrock@kirkland.com
richard.cieri@kirkland.com
stephen.hessler@kirkland.com

/s/  Robin E. Anderson
Robin E. Anderson