# Exhibit D

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: **GMAC-RFC Holding Company, LLC, Case No. 12-12029**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Rowena Drennen, Flora Gaskin, Roger Turner, Christie Turner, John Picard, and Rebecca Picard on behalf of themselves and the Putative Class (as defined in Attachment 1)

❏ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Polsinelli Shughart PC
Attn: Daniel J. Flanigan, Esq.
805 Third Avenue, Suite 2020
New York, New York 10022
(212) 644-2090
dflanigan@polsinelli.com

Walters, Bender, Strohbehn & Vaughan
Attn: David M. Skeens, Esq.
2500 City Center Square, 1100 Main
Kansas City, Missouri 64105
(816) 421-6620
dskeens@wbsvlaw.com

Carlson Lynch LTD
Attn: R. Bruce Carlson
115 Federal Street, Suite 210
Pittsburgh, Pennsylvania 15212
(412) 322-9243
bcarlson@carlsonlynch.com

Court Claim Number:_____
(*If known*)

Filed on:_____

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:    email:

1. Amount of Claim as of Date Case Filed: $ **(See Attachment 1)**

If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: **(See Attachments 1, 2 and 3)**
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: **0043** | 3a. Debtor may have scheduled account as: (See instruction #3a) | 3b. Uniform Claim Identifier (optional): (See instruction #3b) |
|---|---|---|

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ❏Real Estate  ❏Motor Vehicle  ❏Other
Describe:
Value of Property: $ **Attachment 1**   Annual Interest Rate_____% ❏Fixed ❏Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim, if any: $ **Attachment 1**   Basis for perfection: _____

Amount of Secured Claim: $ **Attachment 1**   Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ **N/A** (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. (See instruction #8, and the definition of "*redacted*".)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
❏ I am the creditor.    ✓ I am the creditor's authorized agent.    ❏ I am the trustee, or the debtor, or    ❏ I am a guarantor, surety,
        (Attach copy of power of attorney, if any.)    their authorized agent.    indorser, or other codebtor.
                                                                (See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: David M. Skeens
Title: Attorney
Company: Walters, Bender, Strohbehn & Vaughan    (Signature)    Nov. 2, 2012 (Date)
Address and telephone number (if different from notice address above):

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

❏ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

❏ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

❏ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

❏ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:

$_____

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

Telephone number:    Email:

COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

# ATTACHMENT 1

## to

## Proof of Claim
## filed by Rowena Drennen et al.

1. Rowena Drennen,[1] Flora Gaskin, Roger Turner, Christie Turner, John Picard, and Rebecca Picard (the "**Class Claimants**") are a representative group of the lead plaintiffs in the consolidated class action entitled <u>In Re: Community Bank of Northern Virginia Second Mortgage Lending Practice Litigation</u>, filed in the United States District Court for the Western District of Pennsylvania, MDL No. 1674, Case Nos. 03-0425, 02-01201, 05-0688, 05-1386 (the "**Pre-Petition Class Action**").

2. The Class Claimants file this Proof of Claim (the "**Proof of Class Claim**") against this Debtor on an alter ego and veil piercing theory as set forth in Attachment 3 on behalf of themselves and all others similarly situated and the general public including, without limitation, all persons nationwide who obtained a second or subordinate, residential, federally related, non-purchase money, HOEPA qualifying mortgage loan from Community Bank of Northern Virginia or Guaranty National Bank of Tallahassee that was secured by residential real property used as their principal dwelling and that was assigned to RFC ("**Putative Class**")

3. The Class Claimants estimate that there are 44,535 members of the Putative Class

4. The Claims that the Class Claimants seek to assert against this Debtor on an alter ego and veil piercing theory are those Claims asserted against Debtor Residential Funding Company, LLC, f/k/a GMAC-Residential Funding Corporation ("**RFC**") pursuant to a Proof of Class Claim filed against RFC in which the Class Claimants assert (for convenient summary and not in limitation) generally the following claims ("**Class Claims**" or "**Claims**"), which are described in full detail in Plaintiffs' Joint Consolidated Amended Class Action Complaint filed in the Pre-Petition Class Action (the "**Class Action Complaint**"), a copy of which is attached to this Proof of Class Claim, and incorporated herein, as Attachment 2:

---

[1] Rowena Drennan is a member of the Official Committee of Unsecured Creditors. *See* Appointment of Official Committee of Unsecured Creditors, filed May 16, 2012 (Doc. No. 102).

2

- Violations of the Real Estate Settlement Procedures Act ("**RESPA**") for kickbacks, unearned fees and impermissible business relationships;

- Violations of the Truth in Lending Act ("**TILA**") and the Home Ownership and Equity Protection Act ("**HOEPA**") for inaccurate and understated material disclosures;

- Violations of other disclosure and substantive requirements of TILA and HOEPA; and

- Violations of the Racketeer Influenced and Corrupt Organizations Act ("**RICO**") for racketeering activities used to perpetuate and further a predatory lending scheme.

5.   The Class Claimants' current estimate (which is preliminary and without prejudice to the right of the Putative Class members to claim additional amounts as the facts and law as they may be developed may warrant) that the total amount recoverable on each individual Class Claim is, on average, $42,076.00.

6.   Class Claimants file this Proof of Claim on behalf of themselves and the Putative Class and its members individually and/or as a group, with a reservation of the right to identify additional members of the Putative Class in the future.

7.   The Claims are based primarily on federal statutes although there are thousands of documents that support the Claims that are too voluminous and burdensome to attach hereto.

8.   No payments have been made on account of the Claims.

9.   The Claims are not subject to any setoff or counterclaim.

10.  No security interest is held for the Claims.

11.  The Claims are asserted in addition to all other claims that Class Claimants and individual members of the Putative Class may have against the Debtor.

12.  Class Claimants reserve the right to supplement, amend, or revise this Proof of Claim as necessary.

3

13. For the reasons set forth in the Class Claimants' Motion ("**Motion**") To Apply Bankruptcy Rule 7023 And To Certify Class Claim Against Residential Funding Company, LLC and the accompanying Memorandum in support of the Motion, and the Declaration Of R. Frederick Walters, David M. Skeens, and R. Bruce Carlson in support of the Motion, which have been filed on or about the date of filing this Class Proof of Claim with reference hereto, Class Claimants should be allowed to pursue the Class Claims on behalf of the Putative Class.

# ATTACHMENT 2
# (Joint Consolidated Amended Class Action Complaint)

# to

# Proof of Claim
# filed by Rowena Drennen et al.

# ATTACHMENT 3

## Proof of Claim

## filed by Rowena Drennen et al.

Rowena Drennen,[1] Flora Gaskin, Roger Turner, Christie Turner, John Picard, and Rebecca Picard ("**Class Claimants**") assert these claims (the "**Claims**") on behalf of the Putative Class identified in Attachment 1 to the Proof Of Claim to which this Attachment 3 is attached against this Debtor through veil piercing:

1. GMAC--RFC Holding Company, LLC ("**GMAC--RFC**") is the immediate parent of Residential Funding Company, LLC ("**RFC**"). The parent of GMAC--RFC is Residential Capital, LLC ("**ResCap**"), which is the ultimate parent of the Ally Financial entities that are Debtors in this administratively consolidated proceeding. Under Delaware law, the parent of an enterprise consisting of multiple entities may be held liable for the debts of its subsidiaries and other related entities under the alter ego theory. See In re Autobacs Strauss, Inc., 473 B.R. 525, 555 (Bankr. D. Del. 2012) ("A subsidiary is an alter ego or instrumentality of a parent entity when the separate corporate identities are a fiction and the subsidiary is, in fact, being operated as a department of the parent.") (internal quotations omitted); In re Moll Indus., Inc., 454 B.R. 574, 587 (Bankr. D. Del. 2011); Mason v. Network of Wilmington, Inc., CIV.A. 19434-NC, 2005 WL 1653954, at *2-3 (Del. Ch. July 1, 2005). "To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the companies 'operated as a single economic entity' and (2) that an 'overall element of injustice or unfairness is present.'" Moll Indus., 454 B.R. at 587; Mason, 2005 WL 1653954, at *2 ("This analysis is often described as the 'alter ego' analysis, because, in substance, the Court is examining whether there are legally distinct entities.").

2. A party asserting alter ego or veil piercing does not need "to make allegations sufficient to pierce every layer of the corporate structure," Moll Indus., 454 B.R. at 587, to hold

---

[1] Rowena Drennan is a member of the Official Committee of Unsecured Creditors. See Appointment of Official Committee of Unsecured Creditors, filed May 16, 2012 (Doc. No. 102).

2

the parent liable. See Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 29 (1st Cir. 2000) (noting that case law "speaks of piercing not just subsidiaries, but of entities in the 'same corporate family.'"); Autobacs Strauss, 473 B.R. at 555 ("Plaintiffs must demonstrate that the companies functioned as a single entity and should be treated as such."). "There is no indication in the two-part test that it may only be applied to a direct relationship . . . Rather, the test requires that the companies operate as 'a single economic entity,' tied together by 'an overall element of injustice.'" Moll Indus, 454 B.R. at 587. "Indeed, 'the separate corporateness of affiliated corporations owned by the same parent may be equally disregarded under the proper circumstances.' Courts have pierced the veil in cases involving 'sibling' corporations, and in cases involving even more intricately arranged corporate structures." Springfield Terminal, 210 F.3d at 29. Thus, a plaintiff may pierce the corporate veil of multiple entity levels or remote subsidiaries to impose liability upon the parent.

3.      Dominated by the ultimate Debtor-parent ResCap (and ResCap in turn dominated by non-Debtor Ally Financial, Inc.), which treated the 51-Debtor group as its personal cherry orchard, picking its fruits at will and disregarding entity separation whenever it suited ResCap to do so, the Debtors operated their businesses as a single entity without regard to the separate entity corporate of each Debtor.[2] For example, in the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 6] (the "**First Day Aff.**"), the Debtors state that they operate only two lines of businesses through fifty-one (51) Debtor entities. See First Day Aff. ¶ 16. Indeed, ResCap integrated the 51 Debtor enterprise to implement essentially only one business (as is clearly

---

[2] ResCap also planted trees in the orchard (in the form of occasional capital contributions) but did so with the same dominion, control, and disregard of separateness as it did when harvesting the fruit of the trees.

3

reflected in the Debtor sellers and the assets sold in the pending sale to Ocwen) regardless of the separate corporate, limited liability company, or partnership structures.

4. The Debtors' debt structure indicates the seamlessness and integration of their operations. For example, the AFI Senior Secured Credit Facility has "RFC and GMAC Mortgage, as borrowers, ResCap as guarantor, Debtors Passive Asset Transactions, LLC ("PATI"), and RFC Asset Holdings II, LLC ("RAHI"), as obligors," and granting Ally Financial Inc. ("**AFI**") a first priority lien on various Debtors' assets across the hydra-headed corporate structure. See id. ¶ 60. Similarly, the Debtors have issued secured notes, with $2.1 billion in Junior Secured Notes remaining outstanding as the Petition Date. Id. ¶¶ 65-66. "The Junior Secured Notes are guaranteed by substantially all of the Debtors and the obligations under the Junior Secured Notes are secured by second priority liens on the same assets that secure the AFI Senior Secured Credit Facility." Id. ¶ 67. These borrowings indicate that the Debtors freely took on liabilities and debt secured or guaranteed by assets or operations of all Debtors in the enterprise. Indeed, these two debt structures indicate that the Debtors took on debt and other obligations as an entire enterprise, regardless of each Debtor's legal form.

5. When seeking approval of the DIP loan facilities provided to the Debtors, the Debtors asked that the financing motions be "considered and granted together as an integrated whole for the Debtors to be able to continue operating their businesses seamlessly" although each motion relates to separate collateral. Id.¶ 194.

6. Other filings of the Debtors indicate the unity of their operations and the disregard of their entity forms. For example, the Debtors state that "The Debtors filed the [Cash Management Motion]³ . . . to also implement modifications to the system in order to segregate

---

[3] Debtors' Motion for Order Under Bankruptcy Code Sections 105(a), 345, 363, 364 and 503(b)(1) and Bankruptcy Rules 6003 and 6004 Authorizing (i) Continued Use of Cash Management Services and Practices (ii) Continued Use of Existing Bank Accounts, Checks, and Business Forms, (iii) Implementation of Modified Cash Management

4

proceeds of their lenders' respective collateral." Id. ¶ 121. The Debtors' prepetition cash management system "allow[ed] cash receipts to be preserved efficiently and, through concentration, management to ensure there remains a maximum amount of liquidity." Cash Management Motion ¶ 8. "Through the highly integrated Cash Management System, the Debtors operate disbursement accounts by which they are able to track the amounts paid to and from each affiliated participant in the system." Id. ¶ 8. And the Debtors used concentration accounts that did not separate out funds for each Debtor or assets that represented different lenders' collateral. Id. ¶ 10. In fact, the Debtors aggregated and disbursed cash from GMAC Mortgage (a non-debtor) and RFC concentration accounts. Id. ¶ 12. Thus, "[t]hrough the highly integrated cash management system, the Debtors operated centralized disbursement accounts . . . ." First Day Aff. ¶ 122.[4] Thus, ResCap and the Debtors prepetition maintained their cash in centralized accounts, disregarding the separate Debtor sources of the cash, for use by the entire Debtor enterprise to meet its operational needs.

7. However, after the bankruptcy filing, the Debtors had to actually request authority to create separate accounts for DIP lender's funds and collateral so that those funds and collateral would not be intermingled with the Debtors' prepetition accounts and other collateral. Id. ¶ 123; Cash Management Motion ¶¶ 31-35. This further shows that the Debtors' centralized their cash with no regard for specific assets, collateral, or employees of an individual Debtor. And, tellingly, the DIP lenders required the Debtors to stop this practice to ensure their collateral, i.e. each Debtor's assets, did not intermingle with each other Debtor. The DIP lender believed the Debtors' cash management practices were too intermingled and thus required a separaton that had not previously existed.

---

Procedures, (iv) Interim Wavier of the Investment and Deposit Requirements of Bankruptcy Code Section 345 (v) Debtors to Honor Specific Outstanding Prepetition Payment Obligations, (vi) Continuation of Intercompany Transactions, Including Intercompany Transactions with Future Debtors, and Granting Administrative Expense Status to Intercompany Claims, and (vii) Scheduling a Final Hearing on the Requested Relief.

[4] Note that the Debtors also want to continue intercompany transactions, ignoring the Debtors' separate corporate structures post-petition. Id. ¶ 127.

5

8.  Similar to the Cash Management Motion, the Debtors' Wage Motion,[5] requests authority to use their integrated pay system from AFI, the Debtors' ultimate parent. See First Day Aff. ¶ 128. Through this system, AFI pays the Debtors' employees and then the Debtors' reimburse AFI through intercompany transactions. See id. By the same procedure, AFI pays some of the Debtors' taxes and regulatory fees, which the Debtors then reimburse AFI. See id. ¶ 135. Accordingly the Debtors' wage system further illustrates the unity of the Debtors' operations and the disregard of separate employees working for separate Debtors and obtaining pay from those separate Debtors.

9.  In addition, the Debtors' Shared Services Agreement[6] Motion concludes that the Debtors are one integrated enterprise: "[T]he services covered by the Shared Services Agreement are common among enterprises similar to those of the Debtors and their non-debtor affiliates, especially given the integrated nature of their businesses, because the arrangements eliminate redundant functions, reduce costs and allow for the realization of operational synergies." See id. ¶ 190. Termination of the shared services would cause "immediate and widespread disruption of the Debtors' operations." See id. ¶ 193. Accordingly, by continuing the Shared Services Agreement, ResCap and the Debtors declare that their operations are integrated and they are really one functioning enterprise.

10. Moreover, in the Debtors' adversary proceeding against Allstate,[7] all Debtors brought the adversary action to extend the automatic stay to non-debtor affiliates in numerous mortgage-backed securities lawsuits based on the conduct of specific Debtors. See Case No. 12-

---

[5] Debtors' Motion for an Order under Bankruptcy Code Sections 105(a), 363, 507(a) and 1107 and Bankruptcy Rule 6003 Authorizing the Debtors to Pay Prepetition Wages, Compensation and Employee Benefits and Continue Related Programs.
[6] Debtors' Motion for Interim and Final Orders under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. and to Continue the Receipt and Provision of Shared Services Necessary for the Continued Operation of the Debtors' Business.

6

ap-01671, ¶¶ 1-5, 18. A Declaration[8] supporting the complaint states that a select few witnesses would be called to testify on behalf of the "Debtors" in these disputes, demonstrating that, in the very least, upper management of the Debtors work for an integrated enterprise. See, e.g., Janiczek Decl. ¶¶ 10-11, 13-14, 17-19. Through this adversary proceeding, the Debtors seek to not only have the automatic stay apply for all Debtors but also related non-debtor entities because their operations are so integrated that disturbing a non-debtor with a significant lawsuit could impair the Debtors' ability to consummate its plan.

11. Additionally, the Debtors did not keep accurate or appropriate corporate financial records for each Debtor. Prior to the Debtors' Petition Date, the Debtors apparently arbitrarily added approximately $1.1 billion to the collateral for the Junior Secured Note Holders. See Committee Motion to Prosecute and Settle Claims on Behalf of the Debtors' Estates ¶ 3.[9] The Debtors acknowledged to the Committee that they did little independent analysis of whether the Junior Secured Noteholders had perfected a lien on this additional collateral. Id. ¶ 5. In fact, it is likely that some of the $1.1 billion in collateral is not actually assets securing the Junior Noteholder's claims. Id. ¶¶ 7-8.[10] Thus, the Debtors manipulated their corporate funds and assigned assets to collateral bases without even investigating to ensure that the assets were lenders' collateral.

---

[7] See Compl., May 25, 2012, No. 12-01671, Dkt. No. 1.

[8] See Janiczek Decl., May 25, 2012, No. 12-01671, Dkt. No. 8.

[9] The motion also notes that AFI kept substantial documentation on the Debtors' cash management and account control systems, further indicating each Debtors' inability to properly manage its own corporate records. See Committee Motion to Prosecute and Settle Claims on Behalf of the Debtors' Estates ¶ 36.

[10] In the motion to waive the requirement to file individual lists of creditors, the Debtors request that they file a list of the top 50 creditors of all the Debtors. See Motion to Waive the Requirement that Each Debtor File a List of Creditors and Authorize a Consolidated List ¶ 10. The Debtors state that, "because[] there are common creditors among certain of the Debtors, the Debtors would have to expend significant resources and effort to reconcile which claims may be asserted against which Debtors." Id. ¶ 12.

7

12. It is highly doubtful that the Debtors were a solvent enterprise for a period of time prior to the bankruptcy. Certainly they were not solvent in a cash flow and capital adequacy sense. For example, starting in January 2007, AFI was required to contribute $10.3 billion in capital to the Debtors to maintain its operations. See First Day Aff. ¶ 77. While at the same time, total equity of the Debtors declined to $399.3 million from the end of 2006 to March 2012. Id. ¶ 78. Indeed, the Debtors were "heavily dependent on AFI for funding and capital support." Id. ¶ 80. In addition, in 2011, the Debtors "had a consolidated net loss of $845.1 million." Id. ¶ 86.[11] As the Debtors' petition date loomed, AFI withdrew its support, necessitating the Debtors bankruptcy filing. Id. Thus, the Debtors did not expect to "satisfy their obligations as they come due." Id. ¶ 81; id. ¶ 91 (stating, "[T]here is no assurance that the Debtors will be able to generate net income for the entirety of 2012."). Accordingly, ResCap and the entire Debtor enterprise was likely insolvent and unable to survive without AFI's financial support, as evidenced by a prompt bankruptcy filing once AFI declined to further fund the Debtors.

13. The postpetition Asset Purchase Agreements also show no respect for entity separateness. For example, Debtors-Sellers in the postpetition Asset Purchase Agreements make representations and warranties and indemnities with no niceties of distinction or discrimination as to which Seller should actually be responsible or any notion of liability allocation or contribution among the Sellers.

14. The ultimate mockery of any notion of true separateness is the Debtors' acknowledgment that the intercompany debt supposedly owed by various Debtors to each other is a sham, which is exposed in footnote 6 of the Unsecured Creditor's Committee's motion to

---

[11] See also First Day Aff. ¶¶ 85-89 (describing the numerous hundred million dollar settlements and penalties incurred by the Debtors in the two years prior to the bankruptcy).

8

prosecute certain claims on behalf the estate,[12] in which the Committee states: "The Committee notes that the Debtors' valuation of the collateral does not include any value on account of the Debtors' intercompany claims . . . . According to the Debtors, however, the intercompany claims are subject to recharacterization and will not be a source of recovery for the Junior Secured Noteholders."

15.     The use of the various Debtor entities by the ultimate Debtor parent ResCap and its instrumentality GMAC-RFC as mere instrumentalities is unfair to the Class Claimants for the simple reason that the Class Claimants should not be forced to resort to only one of the Debtors to recover on their claims when the Debtors operated as a single enterprise, parking assets in particular entities without concern for true entity separateness, siphoning off value from one entity when it was needed by other entities in the massive constellation of Debtor entities through sham intercompany debt and effectively abandoning other entities when they no longer served the overall centralized, integrated single enterprise that is Ally-GMAC-RFC.

16.     On June 4, 2012, Berkshire Hathaway Inc. sought the appointment of an examiner to determine the (i) viability of any claims or causes of action against the Debtors' ultimate parent, AFI, for its prepetition transactions with the Debtors, which transferred billions of dollars of assets to AFI, and (ii) soundness of the proposed settlement of those claims. See Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) [Dkt. No. 208] ¶¶ 1-5.  Berkshire's motion identifies numerous prepetition transactions, involving billions of dollars, among the Debtors and "Ally and its affiliates involving the purchase of assets and businesses from ResCap, or the extension of credit secured by ResCap's assets." Id. ¶ 11.  Berkshire's motion further highlights that ResCap used the entire Debtor

---

[12] See Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Dkt. No. 1546] at ¶ 6 n.5

9

enterprise as its personal piggy bank to engage in billion dollar transactions.  Class Claimants expect that the Examiner, the Committee, and others in the case will develop additional evidence in their investigations that will support the application of veil piercing to GMAC--RFC and to ResCap and perhaps other Debtor entities.  The Class Claimants reserve all rights to present additional evidence in support of their Claims.

10