**EXHIBIT 3**

**DLJ CONSORTIUM APA**

**ASSET PURCHASE AGREEMENT**

**Among**

**DLJ MORTGAGE CAPITAL, INC.**

**ROOSEVELT MORTGAGE ACQUISITION COMPANY**

**ROOSEVELT DEPOSITOR LLC**

**BAYVIEW ACQUISITIONS, LLC**

**and**

**SELENE FINANCE LP**

**as Purchasers**

**and**

**RESIDENTIAL CAPITAL, LLC**

**RESIDENTIAL FUNDING COMPANY, LLC**

**GMAC MORTGAGE, LLC**

**GMACM BORROWER LLC**

**and**

**RFC BORROWER LLC**

**as Sellers**

**dated as of**

**October 19, 2012**

# TABLE OF CONTENTS

Page

**ARTICLE I. DEFINITIONS AND INTERPRETATION** ................................................................. 1

Section 1.1    Definitions ................................................................. 1
Section 1.2    Interpretation ................................................................. 15

**ARTICLE II. PURCHASE AND SALE OF ASSETS** ................................................................. 16

Section 2.1    Purchase and Sale of Assets ................................................................. 16
Section 2.2    Excluded Assets ................................................................. 17
Section 2.3    Post-Closing Asset Deliveries ................................................................. 18
Section 2.4    Conveyance of Assets by Affiliate Sellers. ................................................................. 18
Section 2.5    Non-Assignable Purchased Assets; Necessary Consents ................................................................. 18
Section 2.6    Retained Liabilities ................................................................. 19
Section 2.7    Closing ................................................................. 19
Section 2.8    Ancillary Agreements ................................................................. 19
Section 2.9    Deliveries by Purchasers. ................................................................. 20
Section 2.10   Deliveries by Sellers. ................................................................. 20
Section 2.11   Consumer Privacy Matters ................................................................. 21
Section 2.12   "As Is, Where Is" Transaction ................................................................. 21
Section 2.13   Purchased Assets Schedule ................................................................. 21

**ARTICLE III. PURCHASE PRICE; ADJUSTMENT; ALLOCATION** ................................................................. 21

Section 3.1    Purchase Price; Payment of Purchase Price. ................................................................. 21
Section 3.2    Purchase Price Adjustment; Final Payment. ................................................................. 23
Section 3.3    Allocation of the Purchase Price for Tax Purposes. ................................................................. 24

**ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF SELLERS** ................................................................. 25

Section 4.1    Organization and Authority ................................................................. 25
Section 4.2    Non-Contravention. ................................................................. 25
Section 4.3    Consents and Approvals. ................................................................. 26
Section 4.4    Title to Assets ................................................................. 26
Section 4.5    Mortgage Loan Portfolio ................................................................. 26
Section 4.6    [Reserved] ................................................................. 26
Section 4.7    Litigation and Claims ................................................................. 26
Section 4.8    Brokers, Finders and Financial Advisors ................................................................. 26
Section 4.9    Whole Loans. ................................................................. 26
Section 4.10   Mortgage Securities ................................................................. 28

**ARTICLE V. REPRESENTATIONS AND WARRANTIES OF PURCHASERS** ................................................................. 29

Section 5.1    Organization and Authority ................................................................. 29
Section 5.2    Non-Contravention. ................................................................. 29
Section 5.3    Consents and Approvals. ................................................................. 29
Section 5.4    Financing ................................................................. 29
Section 5.5    Non-reliance ................................................................. 29
Section 5.6    Brokers, Finders and Financial Advisors ................................................................. 30

# TABLE OF CONTENTS
(continued)

Page

**ARTICLE VI. PRE-CLOSING MATTERS AND OTHER COVENANTS** ...................................................... 30

Section 6.1    Subsequent Actions; Further Assurances ............................................... 30
Section 6.2    Third Party Consents ................................................................................ 30
Section 6.3    Access to Information ............................................................................... 30
Section 6.4    Records; Post-Closing Access to Information. ....................................... 30
Section 6.5    Interim Operations ................................................................................... 31
Section 6.6    Mortgage Approvals and Licenses .......................................................... 32
Section 6.7    Notices of Certain Events ........................................................................ 33
Section 6.8    Tax Matters .............................................................................................. 34
Section 6.9    Insurance ................................................................................................. 34
Section 6.10   Mortgage Loan Schedules ...................................................................... 34
Section 6.11   Schedules and Disclosure Memorandum. ............................................... 34
Section 6.12   Bankruptcy Actions. ................................................................................ 35
Section 6.13   SBO Servicing Agreements ..................................................................... 35
Section 6.14   Post-Closing Amounts Received and Paid .............................................. 36
Section 6.15   Confidentiality. ........................................................................................ 36
Section 6.16   Delivery of Mortgage Files. ..................................................................... 37
Section 6.17   Servicing .................................................................................................. 37
Section 6.18   Transfer of Servicing ............................................................................... 38
Section 6.19   [Reserved]. .............................................................................................. 39
Section 6.20   Electronic Data Files ............................................................................... 39
Section 6.21   [Reserved] ............................................................................................... 39
Section 6.22   Mortgage Loan Modifications ................................................................... 39

**ARTICLE VII. BANKRUPTCY COURT MATTERS** ...................................................................... 39

Section 7.1    Competing Transaction ............................................................................ 39
Section 7.2    Bankruptcy Court Filings ......................................................................... 40

**ARTICLE VIII. CONDITIONS** ........................................................................................................ 40

Section 8.1    Conditions to Obligations of Purchasers and Sellers ............................. 40
Section 8.2    Conditions to Obligations of Sellers ........................................................ 41
Section 8.3    Conditions to Obligations of Purchasers ................................................. 41

**ARTICLE IX. TERMINATION AND SURVIVAL** ............................................................................ 42

Section 9.1    Termination .............................................................................................. 42
Section 9.2    Procedure and Effect of Termination ....................................................... 44
Section 9.3    No Survival ............................................................................................... 44

**ARTICLE X. MISCELLANEOUS** ................................................................................................... 44

Section 10.1   Expenses ................................................................................................. 44
Section 10.2   Amendment; Waiver ................................................................................ 45
Section 10.3   Notices ..................................................................................................... 45
Section 10.4   Waivers .................................................................................................... 47

10504231\V-2

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| Section 10.5 | Counterparts | 47 |
| Section 10.6 | Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction. | 47 |
| Section 10.7 | Assignment | 48 |
| Section 10.8 | No Third-Party Beneficiaries | 48 |
| Section 10.9 | Public Announcements | 48 |
| Section 10.10 | Severability | 48 |
| Section 10.11 | Specific Performance | 49 |
| Section 10.12 | Waiver of Bulk Transfer Laws | 49 |
| Section 10.13 | Personal Liability | 49 |
| Section 10.14 | Entire Agreement | 49 |
| Section 10.15 | Joint and Several | 49 |

**SCHEDULES**

| | |
|---|---|
| Schedule A | [Reserved] |
| Schedule B | Contents of Credit File |
| Schedule C | DIP Financing Agreements |
| Schedule D | Knowledge of Sellers |
| Schedule E | Mortgage Securities |
| Schedule F | Purchase Price Schedule |
| Schedule G | SBO Servicing Agreements |
| Schedule 2.13 | Purchased Asset Schedule |
| Schedule 4.3 | Seller Consents and Approvals |
| Schedule 4.5 | Mortgage Loan Data Fields |
| Schedule 4.7 | Litigation and Claims |
| Schedule 4.9 | Whole Loans |
| Schedule 5.3 | Purchaser Consents and Approvals |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Sale Approval Order |

**DISCLOSURE MEMORANDUM**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of October 19, 2012, entered into between DLJ Mortgage Capital, Inc. ("DLJ"), Roosevelt Mortgage Acquisition Company ("RMAC"), Roosevelt Depositor, LLC ("Roosevelt Depositor"), Bayview Acquisitions, LLC ("Bayview") and Selene Finance LP ("Selene", and together with DLJ, RMAC, Roosevelt Depositor and Bayview, the "Purchasers" and each, a "Purchaser"), and Residential Capital, LLC ("ResCap"), Residential Funding Company, LLC ("RFC"), and GMAC Mortgage, LLC ("GMAC Mortgage"), each of which is a Delaware limited liability company, GMACM Borrower LLC, a Delaware limited liability company ("GMACM Borrower"), and RFC Borrower LLC, a Delaware limited liability company ("RFC Borrower" and together with ResCap, RFC, GMAC Mortgage, and GMACM Borrower, the "Sellers").

**WHEREAS**, Sellers, together with other Affiliates (as hereinafter defined), filed voluntary petitions ("Petitions") for relief (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on May 14, 2012 (the "Petition Date");

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchasers, and Purchasers (or Purchasers' assignee or assignees pursuant to Section 10.7 hereof) wish to purchase from Sellers, the Purchased Assets (as hereinafter defined); and

**WHEREAS**, Sellers, as debtors and debtors-in-possession, will continue in the possession of their respective assets pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions**.  As used in this Agreement, the following terms have the meanings set forth below:

"Acceptable Servicing Procedures" means the procedures, including collection and loan administration procedures, for servicing mortgage loans using the same standard of care that Sellers customarily employ and exercise in servicing and administering similar mortgage loans for their own account, which shall be in compliance with Applicable Law.

"Accrued Interest" means, with respect to any Whole Loan which is classified as 60 or less days  delinquent as of the Cut-off Date with respect to the Mortgage Note and, in the case the Whole Loan was previously modified, after such previously modified Whole Loan has had a sustained period of repayment performance of at least six months by the borrower subsequent to such modification, interest accrued on a Whole Loan whereby interest is accrued on the interest bearing UPB at the Mortgage Note rate; provided that there shall be no Accrued Interest with respect to any Whole Loan that is 60 or more days delinquent and that Accrued Interest shall be a maximum of 89 days for any Whole Loan.

"Adjustment Amount" has the meaning specified in Section 3.2(b).

"Adjustment Report" has the meaning specified in Section 3.2(d).

"Advances" means, with respect to each Mortgage Loan, the aggregate outstanding amount that, as of any date of determination, has been advanced directly by Sellers from their own funds or from funds advanced under any loan facility in connection with servicing of such Mortgage Loans in accordance with Acceptable Servicing Procedures solely with respect to Taxes, insurance premiums and corporate advances as permitted by Applicable Requirements, including in each case the right to reimbursement for, and enforce payment of, such Advances.  For the avoidance of doubt, "Advances" shall not include (i) any HELOC draws, (ii) any advances of, or on account of, principal and interest or (iii) any servicing, corporate, principal or interest advances by an SBO Servicer.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 20% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by Contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings. Notwithstanding the foregoing, for purposes of this Agreement, unless otherwise specifically provided, Affiliates of Sellers include only direct or indirect Subsidiaries of ResCap, and other Affiliates of Purchasers are excluded from the definition of Sellers' Affiliates and references to Affiliates of Purchasers exclude Sellers and their Affiliates.

"Affiliate Purchased Assets" has the meaning specified in Section 2.4(a).

"Affiliate Seller" has the meaning specified in Section 2.4(a).

"Agency" means a government-sponsored secondary mortgage market enterprise or Government Entity acquiring, owning or guaranteeing Mortgage Loans, including for purposes of this Agreement, Fannie Mae, Ginnie Mae, Freddie Mac, FHA and HUD.

"Agreement" or "this Agreement" means this Agreement, together with the Exhibits, Schedules and Disclosure Memorandum attached hereto, as any of them may be amended from time to time.

"Allocation Schedule" has the meaning specified in Section 3.3(a).

"ALTA" means the American Land Title Association or any successor thereto.

"Alternative Restructuring" means a proposal or offer for a chapter 11 plan or other restructuring transaction which Sellers and their respective Boards of Directors have determined in good faith constitutes a proposal that is reasonably likely to be more favorable to Sellers' estates, their creditors and other parties to whom Sellers owe fiduciary duties than the Chapter 11 Plan.

"Amended Disclosure Memorandum" has the meaning specified in Section 6.11(b).

"Ancillary Agreements" has the meaning specified in Section 2.8.

"Antitrust Authority" has the meaning specified in Section 6.13(b).

2

"Applicable Law" means, as of the time of reference and as applicable, any Law that is applicable to the Purchased Assets.

"Applicable Requirements" means and includes, as of the time of reference, with respect to the origination, purchase, sale and servicing of Mortgage Loans, (in each case to the extent applicable to any particular Mortgage Loan): (i) contractual obligations of Sellers (except those rendered unenforceable by the Bankruptcy Code), including with respect to any Mortgage Loan Document or any other commitment or other contractual obligation relating to a Mortgage Loan, (ii) Applicable Laws, (iii) other applicable requirements and guidelines of any Government Entity and (iv) applicable requirements of MERS.

"April Collateral Exceptions Report" means the collateral exceptions report prepared by Sellers' custodians in April 2012 and most recently updated as of May 6, 2012, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in its possession, to the extent applicable, or have document deficiencies compared to the requirements set forth in the defined term "Mortgage Loan Documents". No Seller shall have any obligation to deliver any documents included in the April Collateral Exceptions Report or cure any document deficiencies identified in the April Collateral Exceptions Report.

"Auction" has the meaning specified in the Sale Procedures Order.

"Bankruptcy Case" has the meaning specified in the preamble.

"Bankruptcy Code" has the meaning specified in the preamble.

"Bankruptcy Court" has the meaning specified in the preamble.

"Bankruptcy Exceptions" means (i) as a result of Sellers operating as debtors in possession under the Bankruptcy Code, (a) Sellers' inability to maintain the services of their officers or other employees, including the possibility that a substantial number of Sellers' employees have left, or will leave, their positions, and (b) vendors and counterparties of Sellers failing to continue to perform their obligations to Sellers, and (ii) any limitation or obligation imposed on Sellers by Order of the Bankruptcy Court or the DIP Financing Agreements.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bill of Sale" means one or more bills of sale to be executed by Sellers and Purchasers in respect of certain Purchased Assets, in a customary form as mutually agreed between Sellers and Purchasers.

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

"Claims" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown. For the avoidance of doubt, Claims expressly includes any and all rights

10504231\V-2

of Mortgagors or other Persons' rights under or in connection with any HELOCs, Mortgage Securities or any other Purchased Asset to the satisfaction of any draw requests, which Claims shall be administered in the Bankruptcy Case.

"Closing" has the meaning specified in Section 2.7.

"Closing Collateral Exceptions Report" means the collateral exceptions report generated by Sellers' custodians upon Sellers' request and at Purchasers' expense, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in Sellers' possession, to the extent applicable, have document deficiencies compared to the requirements set forth in the defined term "Mortgage Loan Documents," or as otherwise set forth in Section 3.1(d). No Seller shall have any obligation to deliver any documents included in the Closing Collateral Exceptions Report or cure any document deficiencies identified in the Closing Collateral Exceptions Report.

"Closing Date" means the date upon which the Closing occurs.

"Closing Date Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Closing Date Purchase Price" has the meaning specified in Section 3.2(a).

"Collateral Exceptions Report" means the April Collateral Exceptions Report or the Closing Collateral Exceptions Report, as applicable.

"Competing Transaction" has the meaning specified in Section 7.1.

"Confidential Information" has the meaning specified in Section 6.15(a).

"Consent" means the Permits, authorizations, consents, waivers, approvals and licenses from third parties or Government Entities necessary to consummate this Agreement and the transactions contemplated hereby and for Purchasers to hold the Purchased Assets after the Closing.

"Consent Order" means the Consent Order entered into on April 13, 2011, by and among the FDIC, the FRB and Ally Financial Inc., Ally Bank, ResCap and GMAC Mortgage.

"Contract" means any agreement, consensual obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied), including leases, subleases, licenses, sublicenses, purchase orders, indentures, lines of credit and loan agreements (other than this Agreement and the Ancillary Agreements) (including each amendment, extension, exhibit, attachment, addendum, appendix, statement of work, change order and any other similar instrument or document relating thereto).

"Credit File" means with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains, if available, the documents described on Schedule B hereto, together with the credit documentation relating to the origination of such Mortgage Loan which may be maintained on microfilm, optical storage or any other comparable medium.

"Cut-off Date" means the last day of the month immediately preceding the month of the expected Closing Date or such other date as Purchasers and Sellers may agree.

4

"Cut-off Date Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Cut-off Date Purchase Price" has the meaning specified in Section 3.1(d).

"Determination" has the meaning specified in Section 3.3(a).

"DIP Financing Agreements" means the Debtor-in-Possession Loan and Security Agreements identified on Schedule C hereto, as such agreements may be amended from time to time.

"Disclosure Memorandum" has the meaning specified in Section 6.11(a).

"Dispute Notice" has the meaning specified in Section 3.2(c).

"DOJ/AG Settlement" means the Consent Judgment filed with the U.S. District Court for the District of Columbia on March 12, 2012 to which Ally Financial Inc., ResCap and GMAC Mortgage are parties.

"Electronic Data File" means test tape(s), sale tape(s) and/or transfer tape(s) containing Mortgage Loan information delivered or to be delivered by Sellers to Purchasers in connection with the transfer of the Whole Loans contemplated hereby.

"Enforceability Exceptions" has the meaning specified in Section 4.1.

"Escrow Payments" means the aggregate amount of the escrows for real estate taxes, insurance, private mortgage insurance, and other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to any Mortgage Loan.

"Excluded Assets" has the meaning specified in Section 2.2.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"Fed Funds Rate" means, for any date, the weighted average of the rates set forth in the weekly statistical release H.15(519) (or any successor publication) published by the Board of Governors of the Federal Reserve System opposite the caption "Federal Funds (Effective)."

"FHA" means the Federal Housing Administration of HUD, or any successor thereto.

"FHA Loans" means mortgages insured by the FHA.

"Final Order" means an Order (i) as to which the time to appeal, petition for certiorari or move for review or rehearing (including, without limitation, any motions under Rule 59 of the Federal Rules of Civil Procedure or any analogous rule under the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules) has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the Order has been affirmed by the highest court to which such Order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such Order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided, that the theoretical possibility that a motion under

Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules, may be filed with respect to such order or judgment shall not prevent such Order from being considered a Final Order.

"FRB" means the Board of Governors of the Federal Reserve System.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"Funded HELOC" means: (i) any HELOC that is a Whole Loan and which has a UPB greater than zero as of August 31, 2012; and (ii) Securitized Advances.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Ginnie Mae" means the Government National Mortgage Association, a body corporate organized and existing under the laws of the United States of America within HUD, or any successor thereto.

"GMAC Mortgage" has the meaning specified in the preamble.

"Good Faith Deposit" means the wire transfer in the amount of $25 million which was paid by Purchasers and is held in escrow as a good faith deposit in connection with this Agreement.

"Government Entity" means any United States federal, state or local, or any supranational, court, judicial or arbitral body, administrative or regulatory body or other governmental or quasi-Government Entity with competent jurisdiction (including any political or other subdivision thereof), including the Agencies, the FHA, HUD, the VA, the FRB, the FDIC, the IRS, any state agency and any Antitrust Authority.

"Guaranteed Obligations" has the meaning specified in Section 10.15.

"HAMP" means the Treasury Department's Home Affordable Modification Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HARP" means the Treasury Department's Home Affordable Refinance Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HASP" means the Treasury Department's Homeowner Affordability and Stability Plan established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HELOC" means a Mortgage Loan that is a home equity line of credit.

"Homes Act" means the Helping Families Save Their Homes Act of 2009, as amended.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HUD" means the Department of Housing and Urban Development of the United States of America.

"Indebtedness" means (i) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade Liabilities incurred in the Ordinary Course of Business and payable in accordance with customary practices), (ii) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (iii) liabilities under or in connection with letters of credit or bankers' acceptances or similar items, (iv) all obligations under financing leases, (v) all Liabilities secured by any Lien on any property, (vi) all liabilities of Sellers under the HELOCs and Mortgage Securities; and (vii) all guarantee obligations.

"Independent Accounting Firm" means a nationally recognized independent accounting firm mutually chosen by Purchasers and ResCap.

"Insurance Policy" means (i) any private mortgage insurance or commitment of any private mortgage insurer to insure, (ii) any title insurance policy, (iii) any hazard insurance policy, (iv) any flood insurance policy, (v) any fidelity bond, direct surety bond, or errors and omissions insurance policy required by private mortgage insurers, (vi) any surety bonds required by state banking authorities for licensing purposes or (vii) any surety or guaranty agreement.

"Insurer" means an issuer of an Insurance Policy.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" concerning a particular subject, the affairs of any Seller or the Purchased Assets, means the actual knowledge of any individual listed on Schedule D hereto.

"Law" means any law, statute, ordinance, rule, regulation, code, Order, Permit, or other legal requirement enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Liabilities" means any and all Indebtedness, liabilities, costs, Losses, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability, or, with respect to Sellers' obligation to fund any draw requests under the Funded HELOCs or the Mortgage Securities), and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Licenses" means the Permits required by Law or an Agency or other Government Entity in order to hold the Purchased Assets.

"Lien" means any lien, charge, pledge, deed of trust, right of first refusal, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option, proxy, hypothecation, voting trust agreement, transfer restriction, easement, servitude, encroachment, or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or "Losses" means any and all damages, losses, actions, proceedings, causes of action, Liabilities, claims, Liens, penalties, fines, demands, Taxes, assessments, awards, judgments, settlements, costs and expenses, including (i) court costs and similar costs of litigation; (ii) reasonable

10504231\V-2

attorneys' and consultants' fees, including those incurred in connection with (a) investigating or attempting to avoid the matter giving rise to the Losses or (b) successfully establishing a valid right to indemnification for Losses; and (iii) interest awarded as part of a judgment or settlement, if any, but in any event "Loss" or "Losses" shall exclude punitive damages claimed, incurred or suffered by any Person (which exclusion does not include any such damages for which such Person is liable to a third party as a direct, out-of-pocket cost of such Person).

"Master Servicing Rights" means any and all rights of a Seller to master service the Mortgage Loans (other than with respect to the Securitized Advances) and to monitor the performance of the primary servicers, including to the extent applicable any and all rights of a Seller to the following: (a) any payments or monies received as compensation for master servicing the Mortgage Loans; (b) collection of any late fees, penalties or similar payments with respect to the Mortgage Loans; (c) administration and maintenance of all agreements or documents creating, defining or evidencing any such master servicing rights of the related Seller thereunder; (d) maintenance of all accounts and other rights to payment related to any of the property described in this paragraph; and (e) administration and maintenance of any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the applicable Mortgage Loans.

"Material Adverse Effect" means any condition, circumstance, event, state of facts, change or effect that is materially adverse to the Purchased Assets or to Sellers' ability to effect the transactions contemplated herein or to perform their obligations under this Agreement and the Ancillary Agreements; provided, that, for purposes of this Agreement, a Material Adverse Effect shall not include any condition, circumstance, event, state of facts, change or effect to the Purchased Assets resulting from (i) conditions, circumstances, events or changes to the housing or mortgage market or the mortgage servicing industry; (ii) the announcement or disclosure of the transactions contemplated herein, (iii) general economic, regulatory or political conditions or changes in the United States; (iv) military action or acts of terrorism; (v) changes in Law or changes in GAAP or in the application of GAAP that become effective after the date hereof that Sellers are required to adopt in accordance therewith; (vi) actions taken or not taken, in each case, at the request of the Purchasers; (vii) conditions in or changes to any financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or market index); (viii) changes in or with respect to any of the Agencies, including in their legal organization, responsibilities, oversight obligations or roles in the mortgage loan and securities markets; or (ix) any effects on the Purchased Assets resulting from the fact that Sellers will be operating as debtors-in-possession under the Bankruptcy Code; and provided, further, that, in the case of each of clauses (i), (iii), (iv), (v) and (vii), the Purchased Assets are not, or not reasonably likely to be, materially disproportionately affected by such condition, circumstance, event, state of facts, change or effect compared to similar assets of other Persons engaged in the conduct of similar businesses.

"MERS" means the Mortgage Electronic Registration System maintained by Merscorp Holdings, Inc.

"MERS Loan" means any Mortgage Loan registered on the MERS system for which MERS is listed as the record mortgagee or beneficiary on the related mortgage or assignment thereof.

"MIN" means the mortgage identification number issued to each MERS Loan.

"MOM Loan" means any Mortgage Loan that was registered on the MERS system at the time of origination thereof and for which MERS appears as the record mortgagee or beneficiary on the related mortgage.

10504231\V-2

"Mortgage File" means, with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains each of the Mortgage Loan Documents except as specified in any applicable Collateral Exceptions Report.

"Mortgage Loan" means any U.S. individual residential (one-to-four family) mortgage loan or other extension of credit secured by a Lien on U.S. real property of a borrower originated, purchased or serviced by a Seller or any Affiliate Seller (which may be a charged-off Mortgage Loan or a receivable, payment intangible or participation interest with respect to a funded HELOC advance, including with respect to Securitized Advances).

"Mortgage Loan Documents" means, for any Mortgage Loan:

(A)    either:

(i)    the original Mortgage Note, endorsed (on the Mortgage Note or an allonge attached thereto) "Pay to the order of _____ without recourse," and signed by facsimile signature in the name of the last holder of record by an authorized officer; or

(ii)    a copy of the Mortgage Note (endorsed as provided above) together with a lost note affidavit and indemnity, bearing all intervening endorsements, to the extent of any such endorsements, from the original payee to an endorsement in blank, and if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee;

(B)    the original mortgage, with evidence of recording thereon (and, in the case of a MOM Loan, with evidence of the MIN); provided, that (A) if the original mortgage has been delivered for recording to the public recording office of the jurisdiction in which the Mortgaged Property is located but has not yet been returned to the applicable Seller by such recording office, such Seller shall (i) provide to Purchaser a copy of the mortgage, and (ii) as soon as the original mortgage becomes available, deliver to Purchaser the original of such mortgage, with evidence of recording thereon, and (B) if such original mortgage is not available, has been lost or if such public recording office retains the original recorded mortgage, such Seller shall deliver or cause to be delivered to Purchaser a photocopy of such mortgage with the recording information included on such copy, certified by such Seller to be a copy of the original recorded mortgage;

(C)    unless such Mortgage Loan is a MERS Loan, the original assignment of the mortgage, from the applicable Seller signed by original signature of an authorized officer, in the name of the applicable Purchaser (or its designee as instructed by the applicable Purchaser), which assignment shall be in form and substance acceptable for recording (except for the insertion of the recording information);

(D)    unless such Mortgage Loan is a MOM Loan, originals or copies of all recorded intervening assignments of the mortgage; provided, that (A) if any original intervening assignment of the mortgage has been delivered for recording to the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located but has not yet been returned to the applicable Seller by such recording office, such Seller shall deliver to Purchaser such original intervening assignment of the mortgage, with evidence of recording thereon, if and when such assignment of the mortgage becomes available, and (B) if such intervening assignment of the mortgage is not available or if such public recording office retains the original recorded intervening assignment of the mortgage, a Seller may deliver a photocopy of such intervening assignment of the mortgage showing evidence of recordation;

9

(E)     the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any, or if such assumption, modification, consolidation or extension agreements are not available, a copy of such assumption, modification, consolidation or extension agreements; and

(F)     the original copy of the original lender's title insurance policy in the form of an ALTA mortgage title insurance policy and insuring Purchaser and its successors and assigns as to the first priority lien of the mortgage in the original principal amount of the Mortgage Loan or, if the original lender's title insurance policy has not been issued, the commitment to issue the same; provided, that this subsection (F) shall not apply to second lien Mortgage Loans.

"Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Mortgage Note" means, with respect to a Mortgage Loan, a promissory note or notes, a loan agreement or other evidence of Indebtedness with respect to such Mortgage Loan, secured by a mortgage or mortgages or a deed or deeds of trust, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"Mortgage Securities" means the trading/financing securities to be included in the Purchased Assets, which are identified on Schedule E hereto.

"Mortgage Securities Purchase Price Percentage" means 0.8194%.

"Mortgaged Property" means the real property securing repayment of the Indebtedness evidenced by a Mortgage Note pursuant to a related Mortgage Loan.

"Mortgagor" means the obligor on a Mortgage Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

"Necessary Consent" has the meaning specified in Section 2.5.

"Non-performing" means, with respect to any Mortgage Loan as of any date of determination, that (a) such Mortgage Loan is 30 or more days past due with respect to a scheduled payment of principal and interest, or (b) there exists an event of default under the terms of the related Mortgage Note or mortgage.

"Order" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties.

"Ordinary Course of Business" means the ordinary course of business of Sellers during the six months immediately preceding the Petition Date as modified from time to time in order to comply with the Consent Order, the DOJ/AG Settlement and any other change required by any Government Entity or MERS, and, from and after the Petition Date, in accordance with the budget contemplated by the DIP Financing Agreements.

"Performing" means, with respect to any Mortgage Loan as of any date of determination, such Mortgage Loan is current or fewer than 30 days past due with respect to a scheduled payment of principal and interest.

10504231\V-2

"Permits" means permits, concessions, grants, franchises, licenses, variances, exemptions, exceptions, clearances, registrations, qualifications, filings and other authorizations and approvals required or issued by any Government Entity and related to the Purchased Assets.

"Permitted Liens" means (i) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; provided, that an appropriate reserve is established therefor against the carrying amount of the related assets; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business and the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; provided, that an appropriate reserve is established therefor against the carrying amount of the related assets; and (iii) Liens that will be and are discharged or released either prior to, or simultaneously with the Closing; provided, that, except in the case of clause (i), such exceptions (a) do not render title to the property encumbered thereby unmarketable and (b) do not, individually or in the aggregate, materially detract from the value or use of such property for its current purposes.

"Person" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"Petition Date" has the meaning specified in the preamble.

"Petitions" has the meaning specified in the preamble.

"Power of Attorney" means one or more powers of attorney to be executed by Sellers in respect of certain Purchased Assets in a customary form as mutually agreed between Sellers and Purchasers.

"Primary Servicing Rights" means any and all rights of a Seller to service the Mortgage Loans, including to the extent applicable any and all rights of a Seller to the following: (a) any payments or monies received for servicing the Mortgage Loans; (b) any late fees, penalties or similar payments with respect to the Mortgage Loans; (c) all agreements or documents creating, defining or evidencing any such servicing rights to the extent they relate to such servicing rights and all rights of the related Seller thereunder; (d) Escrow Payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto, subject to the rights of the related Mortgagor in such amounts; (e) all accounts and other rights to payment related to any of the property described in this paragraph; and (f) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

"Privileged Documents" has the meaning specified in Section 2.3.

"Purchase Price" has the meaning specified in Section 3.1(a).

"Purchase Price Adjustment Statement" has the meaning specified in Section 3.2(a).

"Purchase Price Document Deficiency Multiplier" means, for each Whole Loan Bucket, the multiplier to be applied to the Whole Loan Purchase Price Percentage for such Whole Loan Bucket

based on the percentage of Mortgage Files in such Whole Loan Bucket determined to contain deficiencies (as set forth in the Closing Collateral Exceptions Report) as follows:

| Percentage Deficient | Purchase Price Document Deficiency Multiplier |
|---|---|
| < =6% | 1.033 |
| 8% | 1.029 |
| 10% | 1.021 |
| 12% | 1.013 |
| 15% | 1.000 |
| 18% | 0.979 |
| 20% | 0.962 |
| 22% | 0.948 |
| > =24% | 0.937 |

"Purchase Price Schedule" means Schedule F hereto which sets forth an example of the calculations to be made pursuant to Section 3.1 in order to calculate the Purchase Price as if calculated as of December 31, 2011.

"Purchased Assets" has the meaning specified in Section 2.1.

"Purchased Assets Schedule" has the meaning specified in Section 2.13.

"Purchased Servicing Rights" means (i) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by an SBO Servicer, the Master Servicing Rights, (ii) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by a Seller, the Primary Servicing Rights and the Master Servicing Rights, and (iii) with respect to 41 Mortgage Loans as to which a Seller owns both the Primary Servicing Rights and the Master Servicing Rights, but which are indicated on the Mortgage Loan Schedule as being primary serviced by a third-party servicer on a subservicing basis, the Primary Servicing Rights and the Master Servicing Rights.

"Purchasers" has the meaning specified in the preamble.

"Report Request Date" has the meaning specified in Section 3.1(d).

"ResCap" has the meaning specified in the preamble.

"Retained Liabilities" means any and all Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates, including but not limited to (i) any Liabilities relating to the origination, funding, securitization or servicing of Mortgage Loans by Sellers or any Affiliate of Sellers, including repurchase obligations, and any Claims arising from the funding of HELOC draw requests, (ii) any Orders applicable to the Sellers and (iii) any financial penalties under the Consent Order or the DOJ/AG Settlement and any other payments, Claims and Liabilities under the Consent Order or the DOJ/AG Settlement.

"RFC" has the meaning specified in the preamble.

"Sale Approval Order" means a Final Order or Final Orders of the Bankruptcy Court issued pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in substantially the form set forth in Exhibit 1 hereto, authorizing and approving, among other things, (i) the sale, transfer and assignment of the Purchased Assets to Purchasers in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Liens and (ii) that Purchasers are good faith purchasers entitled to the protections of Section 363(m) of the Bankruptcy Code.

"Sale Hearing" has the meaning specified in the Sale Procedures Order.

"Sale Motion" means the motion filed by Sellers with the Bankruptcy Court for the approval of the Sale Procedures Order and the Sale Approval Order, in form and substance reasonably satisfactory to Purchasers and Sellers.

"Sale Procedures" means the Sale Procedures attached as Exhibit 1 to the Sale Procedures Order.

"Sale Procedures Order" means the Order under 11 U.S.C. §§ 105, 363(B) and 365 (I) Authorizing And Approving Sale Procedures, Including Payment of Break-Up Fees; (II) Scheduling Bid Deadline, Auction (if Necessary) and Sale Hearing; (III) Establishing Assumption and Assignment Procedures, Including Procedures for Fixing Cure Amounts; and (IV) Establishing Notice Procedures and Approving Forms of Notice entered in the Bankruptcy Court on June 28, 2012 at docket number 538.

"SBO Loan" means a Mortgage Loan serviced by an SBO Servicer under an SBO Servicing Agreement.

"SBO Servicer" means the Person responsible for performing loan servicing functions with respect to a Mortgage Loan under an SBO Servicing Agreement.

"SBO Servicing Agreements" means the servicing agreements between any Seller, on the one hand, and any third-party servicer or subservicer, on the other hand, including but not limited to, each as identified on Schedule G hereto.

"Securitized Advances" means any amounts payable to a Seller or an Affiliate Seller in its capacity, including, but not limited to, as a servicer, master servicer, issuer or depositor in connection with any securitization transaction listed on the Mortgage Loan Schedule. For the avoidance of doubt, a Securitized Advance does not include any obligation to fund any draws under any HELOC. Notwithstanding anything in this Agreement to the contrary or in the Nationstar APA (as defined in the Sale Procedures Order), or in any other agreement entered into in connection with the sale of the Servicing Platform (as defined in the Sale Procedures Order), Securitized Advances represent an amount payable to the Purchasers regardless of the ownership of any servicing rights (primary or master servicing) related to the underlying home equity lines of credit.

"Sellers" has the meaning specified in the preamble.

"Servicing File" means for each Mortgage Loan other than an SBO Loan, all loan documents and information (including any servicing tapes, images and conversion reports) received or obtained through the efforts of servicing the Mortgage Loan, which may be maintained on CD or DVD. To the extent available, each Servicing File shall contain: (a) documentation relating to any releases of collateral, (b) any correspondence between the current servicer of the mortgage and the Mortgagor, (c) payment history, (d) collection letters or form notices, and (e) foreclosure correspondence and legal

notification. For the SBO Loans, the term "Servicing File" means only such copies of the foregoing documents as shall have been provided by the primary servicer and retained by the master servicing group of the applicable Seller.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries or (ii) such Person or any other Subsidiary of such Person is a general partner (excluding any such partnership where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership).

"Tax" or "Taxes" means all (i) taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign Government Entity, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns, (ii) liability for the payment of any Taxes as a result of being or having been on or before the Closing Date a member of an affiliated, consolidated, combined or unitary group or other association, and (iii) any transferee or secondary Liability in respect of Taxes, and, in each case, any interest or penalty thereon or addition thereto, whether disputed or not.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto or amendment thereof.

"Transaction Proceeds" mean the proceeds obtained by Sellers in connection with the payment of the Purchase Price pursuant to Article III hereof.

"Transfer Taxes" means any federal, state, county, local, foreign and other excise, sales, use, value added, transfer (including real property transfer or gains), conveyance, stamp, documentary transfer, filing, recording or other similar Tax, fee or charge, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, resulting directly from the transactions contemplated by this Agreement.

"UPB" means, with respect to each Mortgage Loan as of any date of determination, the unpaid principal balance of such Mortgage Loan as of the close of business on such date of determination, after deduction and application of all payments of principal received by such date of determination.

"VA" means the Department of Veteran Affairs of the United States of America, or any successor thereto.

"VA Loans" means mortgages guaranteed by the VA.

"Whole Loan Bucket" means each of the following categories of Whole Loans included in the Purchased Assets, calculated as set forth in the Purchase Price Schedule: Performing First Lien,

Non-Performing First Lien, Performing Second Lien, Non-Performing Second Lien, Other and Securitized Advances.

"Whole Loan Purchase Price Percentage" means, for the Whole Loans in each Whole Loan Bucket included in the Purchased Assets, the following percentages, which shall be adjusted by applying the applicable Purchase Price Document Deficiency Multiplier to reflect the percentage of Mortgage Files determined to be deficient based on the Closing Collateral Exceptions Report:

| Whole Loan Bucket | Purchase Price Percentage |
|---|---|
| Performing First Lien | 40.0000% |
| Non-Performing First Lien | 33.0000% |
| Performing Second Lien | 45.0000% |
| Non-Performing Second Lien | 10.0000% |
| Other | 35.0000% |
| Securitized Advances | 56.1557% |

"Whole Loans" means the first and second lien Mortgage Loans, HELOCs and other Mortgage Loans owned by Sellers and intended to be purchased by Purchasers, and any collateral, insurance, guaranty or other credit support arrangement related thereto, as identified on the Mortgage Loan Schedule, the Cut-off Date Mortgage Loan Schedule or the Closing Date Mortgage Loan Schedule, as applicable.

"Zero Balance HELOC" means any HELOC that is a Whole Loan and which has a UPB of zero as set forth on the Electronic Data File dated as of August 31, 2012.

**Section 1.2    Interpretation.** For purposes of this Agreement:`

(a)    The headings preceding the text of Articles and Sections included in this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement.

(b)    The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement.

(c)    The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.

(d)    Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement. Reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(e)    Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

(f)    Underscored references to Articles, Sections, paragraphs, clauses or Exhibits shall refer to those portions of this Agreement. The use of the terms "hereunder," "hereby,"

10504231\V-2

"hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section, paragraph or clause of, or Schedule or Exhibit to, this Agreement.

(g)    All references to amounts denominated in dollars shall mean U.S. dollars, except where specifically noted otherwise.

(h)    Whenever any payment hereunder is to be paid in "cash," payment shall be made in U.S. dollars and the method for payment shall be by wire transfer of immediately available funds.

(i)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(j)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(k)    Each of the parties has participated in the drafting and negotiation of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

(l)    Notwithstanding anything to the contrary in this Agreement, any document or other deliverable purported to be delivered on or prior to the date of this Agreement by Sellers or their Affiliates to Purchasers or their Affiliates that has not been so delivered shall be delivered to Purchasers reasonably promptly following the receipt by Sellers of a written request of Purchasers, and the failure to have delivered any such document prior to the receipt of such written request shall not be considered a default or breach for any purpose under this Agreement.

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS

**Section 2.1    Purchase and Sale of Assets**.    On the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchasers, and Purchasers shall purchase from Sellers, all of Sellers' right, title and interest in, to and under the following assets (collectively, the "Purchased Assets"), in each case free and clear of all Liens (other than Permitted Liens), Claims, Liabilities, and all funding obligations under or in connection with any Funded HELOCs, as approved for sale, transfer and assignment pursuant to the Sale Approval Order:

(a)    the pool of Whole Loans, servicing released to the extent of the Purchased Servicing Rights (including any and all Primary Servicing Rights and Master Servicing Rights included in the Purchased Servicing Rights owned by a Seller), and the right to all payments of Accrued Interest, principal, penalties, fees, charges and other amounts received or receivable on or in respect of the Mortgage Loans after the Closing Date (except to the extent that an SBO

Servicer is entitled to such amounts under an SBO Servicing Agreement), together with the Mortgage Files and the Credit Files, and any and all proceeds of the foregoing; provided, that Funded HELOCs shall only be included in the Purchased Assets if the condition set forth in Section 8.3(d)(i) is satisfied or waived by Purchasers;

(b)    the Mortgage Securities;

(c)    the Advances as of the Closing Date;

(d)    the Purchased Servicing Rights and the related Servicing Files;

(e)    the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims, including those indicated by the presence of a "litigation flag" or indicated to be in bankruptcy or active foreclosure on the Mortgage Loan Schedule, including all preference or avoidance claims and actions of any of the Sellers, in each case that are related to the Purchased Assets, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (provided, that Sellers shall be entitled to participate in the defense of any counterclaim at the Sellers' expense);

(f)    all rights to receive mail and other communications addressed to Sellers that pertains to the Purchased Assets, including any mail and communications from any Person who holds any Whole Loan (or any interest therein), trustees, customers, suppliers, distributors and their respective representatives;

(g)    all rights under insurance policies and insurance proceeds directly relating to Whole Loans serviced pursuant to any servicing agreement, and all escrow accounts and any other accounts related to the Purchased Assets and all funds and property credited thereto;

(h)    to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent related to any Purchased Asset;

(i)    all of Sellers' rights under the SBO Servicing Agreements; and

(j)    the Securitized Advances.

Section 2.2    Excluded Assets.    Notwithstanding anything herein to the contrary, Sellers will not sell, assign, convey, transfer or deliver to Purchasers, and Purchasers will not purchase, acquire or assume or take assignment or delivery of: (i) Zero Balance HELOCs, (ii) any of Sellers' obligations to fund under any Funded HELOC or Mortgage Security, (iii) any Mortgage Loan that becomes an REO property prior to the Closing Date or (iv) any and all assets, Contracts or rights that are not expressly Purchased Assets, whether tangible, real, personal or mixed (collectively, the "Excluded Assets").  For the avoidance of doubt, the SBO Servicing Agreements are being assumed and assigned to certain Purchasers, and, effective as of such assumption and assignment, such Purchasers shall be entitled to enforce all of Sellers' rights, including all termination rights, against the applicable SBO Servicer with respect to the Purchased Assets; and nothing contained herein shall be deemed to release or transfer any causes of action, lawsuits, judgments, choses of action, rights of recovery, rights of set-off, rights of recoupment, rights of demand or any other rights or Claims that Sellers may have against Ally Financial Inc. or its Affiliates.

17

Section 2.3    **Post-Closing Asset Deliveries.**  If any Seller or any Purchaser, in its reasonable discretion, determines after the Closing that any other materials or assets constituting Purchased Assets, including any Mortgage Loan Documents and any such Mortgage Loan Documents identified on the Closing Collateral Exceptions Report, are still in the possession of such Seller or any Affiliate Seller or are returned to a Seller or any Affiliate Seller by a third party agent of such parties (including but not limited to attorneys), such Seller shall, or shall cause such Affiliate Seller to, promptly deliver them to such Purchaser at no additional cost or expense to such Purchaser.  If any Seller or any Purchaser, in its reasonable discretion, determines after the Closing that other materials or assets constituting Excluded Assets were delivered to such Purchaser in error, such Purchaser shall promptly return them to the applicable Seller at Sellers' sole cost and expense.  In furtherance and not in limitation of the foregoing (and notwithstanding any provision in this Agreement to the contrary), each of Sellers and Purchasers acknowledge and agree that it is neither Sellers' nor Purchasers' intention to sell, assign or transfer possession of any documents or communications of Sellers that are subject to Sellers' attorney-client privilege and/or the work-product immunity doctrine (the "Privileged Documents").  If it is discovered that any such Privileged Documents have been inadvertently or unintentionally turned over to any Purchaser, such Purchaser agrees, upon Sellers' request, to promptly turn over to Sellers or destroy such Privileged Documents, in each case at Sellers' sole cost and expense; provided, that (i) such Purchaser shall in no way be obligated or responsible for reviewing, identifying or making a determination that any documents or communications in its possession are Privileged Documents and (ii) such Purchaser shall not be obligated to take any actions under this Section 2.3 that may subject it to any liability or otherwise be in violation with any applicable Law.

Section 2.4    **Conveyance of Assets by Affiliate Sellers.**

(a)    Notwithstanding anything to the contrary contained in this Agreement, if it is determined by Sellers and Purchasers before, at or after the Closing that any direct or indirect Subsidiary of ResCap (an "Affiliate Seller") owns or possesses any assets or properties that would be deemed to be Purchased Assets if such Affiliate Seller were a Seller under this Agreement (such assets and properties, the "Affiliate Purchased Assets"), then Sellers shall, upon Purchasers' request, promptly cause such Affiliate Seller to transfer, assign, convey and deliver to the applicable Purchaser such Affiliate Purchased Assets in accordance with the terms and conditions of this Agreement; provided, that Purchasers shall not be obligated to pay any additional amounts to Sellers in consideration for the transfer of such Affiliate Purchased Assets to such Purchaser other than those amounts that Purchasers are obligated to pay to Sellers pursuant to Section 3.1.

(b)    To the extent that any Affiliate Purchased Assets are transferred, assigned, conveyed and delivered by an Affiliate Seller to Purchasers pursuant to this Section 2.4, then each representation and warranty set forth in Article IV and each covenant in Article VI shall be deemed to be applicable to such Affiliate Seller as if such Affiliate Seller were a Seller and to such Affiliate Purchased Assets as if such Affiliate Purchased Assets were Purchased Assets.

Section 2.5    **Non-Assignable Purchased Assets; Necessary Consents**.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"),

would constitute a breach thereof or in any way adversely affect the rights of Purchasers thereunder unless the Bankruptcy Court has entered a Final Order (which may include the Sale Approval Order) whose effectiveness has not been stayed providing that (i) such Necessary Consent is not required or (ii) the Purchased Assets shall be assigned or transferred regardless of any such Necessary Consent and there shall be no breach or adverse effect on the rights of Purchasers thereunder for the failure to obtain any such Necessary Consent. As Purchasers may reasonably request, if the Bankruptcy Court has not entered such an Order, Sellers and Purchasers will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchasers. If any such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchasers would not in fact receive all such rights, such Seller and Purchasers will cooperate in a mutually agreeable arrangement under which Purchasers would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including, to the extent that such an arrangement would be permitted by Law and the related Contract, subcontracting, sub-licensing or sub-leasing to Purchasers, or under which such Seller would enforce for the benefit of Purchasers, with Purchasers assuming such Seller's obligations in accordance with this Agreement, any and all rights of such Seller against a third party thereto.

**Section 2.6    Retained Liabilities**. Sellers shall retain and be responsible for all Retained Liabilities and Purchasers shall not have any obligation of any nature or kind with respect thereto, including, without limitation, all obligations to fund any HELOC draw requests, whether related to a Funded HELOC, the Mortgage Securities or a Zero Balance HELOC.

**Section 2.7    Closing.** Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the transactions contemplated hereby shall take place at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 on the second Business Day following the date on which the conditions set forth in Sections 8.1, 8.2 and 8.3 (other than those conditions that by their nature can be satisfied only at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived but no earlier than 18 Business Days following the Cut-off Date nor, at Purchasers' option, later than the last Business Day of the month in which such conditions are satisfied or waived, or at such other time and place as the parties hereto may mutually agree. At the Closing, Purchasers shall deliver the Purchase Price in accordance with Sections 2.9 and 3.1, the transfer of title to the Purchased Assets shall take place, and the appropriate parties shall take all actions required under Sections 2.8, 2.9 and 2.10 and all other actions not previously taken but required to be taken hereunder at or prior to the Closing Date. It is a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement be concurrent requirements, and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

**Section 2.8    Ancillary Agreements**. At the Closing, Sellers shall duly execute and deliver to Purchasers, and Purchasers shall duly execute and deliver to Sellers, as applicable, each of the following agreements (the "Ancillary Agreements"):

(a)    Bills of Sale;

(b)    Transfer Tax forms, if applicable, in the form required by Law;

(c)    Powers of Attorney for each Purchaser in such number as reasonably requested by the applicable Purchaser;

19

(d)      such other agreements as may be entered into between the parties in connection with this Agreement;

(e)      all instruments or documents necessary to change the names of the individuals who have access to or are authorized to make withdrawals from or dispositions of all escrow or other accounts related to the Purchased Assets; and

(f)      any other documents that may be required by the Sale Approval Order or pursuant to any other direction by the Bankruptcy Court to be effected on or prior to the Closing.

**Section 2.9      Deliveries by Purchasers.**

(a)      At or prior to the Closing, Purchasers shall deliver to Sellers the following:

(i)      the Cut-off Date Purchase Price less the Good Faith Deposit, in immediately available funds by wire transfer to an account or accounts designated by Sellers at least two Business Days prior to the Closing Date;

(ii)      the Purchased Asset Schedule no later than the close of business on the first Business Day following the date the Sale Approval Order shall have been entered by the Bankruptcy Court;

(iii)      the certificates to be delivered pursuant to Section 8.2(c);

(iv)      Ancillary Agreements duly executed by Purchasers; and

(v)      such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Sellers, as may be necessary to effectuate the assignment of the Purchased Assets or to give effect to this Agreement or any Ancillary Agreement.

**Section 2.10      Deliveries by Sellers.**

(a)      At the Closing, Sellers shall deliver (or will have delivered), or cause to be delivered, to Purchasers the following:

(i)      the certificates to be delivered pursuant to Section 8.3(c);

(ii)      a receipt acknowledging payment of the Cut-off Date Purchase Price payable in accordance with Section 3.1(b);

(iii)      affidavits of Sellers' non-foreign status, in form and substance reasonably satisfactory to Purchaser, that comply with Section 1445 of the Tax Code and the regulations thereunder;

(iv)      Ancillary Agreements duly executed by the applicable Sellers;

(v)      the Mortgage Files delivered pursuant to Section 6.16(a); provided, that if the Mortgage Files are in the possession of a custodian of a Seller, Purchaser shall have received a trust receipt or similar document from such custodian pursuant to a mutually agreed upon bailee letter among such custodian, Purchasers and Sellers acknowledging

that such custodian holds the Mortgage Files for the benefit of Purchasers, and such custodian shall provide a copy of such trust receipt or similar document to Sellers;

(vi)      the schedule of pending loan modifications required by Section 6.22 hereof; and

(vii)      such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Purchasers, as may be necessary to effect this Agreement, including Sellers' assignment of the Purchased Assets to Purchasers (or its assignee), or as may be required to give effect to any Ancillary Agreement.

Section 2.11    Consumer Privacy Matters.    The sale, if any, of customer lists, customer data and other consumer privacy information pursuant to this Agreement is in compliance with: (i) the Gramm-Leach-Bliley Act and is consistent with the privacy notices delivered by the Sellers to Mortgagors; and (ii)(A) any policies prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Sellers that are in effect as of the Petition Date; or (B) the recommendations of any consumer privacy ombudsperson that has been appointed pursuant to section 332 of the Bankruptcy Code (to the extent that appointment of a consumer privacy ombudsperson is determined to be necessary) in connection with the transactions contemplated in this Agreement.

Section 2.12    "As Is, Where Is" Transaction.    Purchasers hereby acknowledge and agree that, except as expressly set forth in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.  Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchasers further acknowledge that they are proceeding with their acquisition of the Purchased Assets, based solely upon their independent inspections and investigations and the representations and warranties herein and in the Ancillary Agreements.    Accordingly, except as expressly set forth in this Agreement, Purchasers will accept the Purchased Assets on the Closing Date "AS IS" and "WHERE IS."

Section 2.13    Purchased Assets Schedule.    In accordance with Section 2.9(a)(ii), Purchasers shall provide Sellers a schedule (the "Purchased Asset Schedule") identifying how the Purchased Assets will be distributed among the Purchasers at the Closing; provided that there shall be no more than five (5) Purchasers and seven (7) servicers.  The Purchased Assets Schedule will identify which Purchased Assets will be owned by which Purchaser, subject to adjustment as a result of changes in the Purchased Assets identified on the Closing Date Mortgage Loan Schedule, and shall be attached to this Agreement on the Closing Date as Schedule 2.13.    Purchasers reserve sole discretion on determining the distribution of the Purchased Assets among the Purchasers.

ARTICLE III.

PURCHASE PRICE; ADJUSTMENT; ALLOCATION

Section 3.1    Purchase Price; Payment of Purchase Price.

(a)      Subject to the terms and conditions of this Article III, as aggregate consideration for the Purchased Assets, Purchasers will pay an aggregate amount in cash (the "Purchase Price") on the Closing Date equal to:

21

(i)      the product of (a) the sum, for each Whole Loan included in a Whole Loan Bucket (other than the Whole Loan Buckets related to Securitized Advances and "Other"), of the Whole Loan Purchase Price Percentage of the aggregate UPB of such Whole Loans included in such Whole Loan Buckets as of the Cut-off Date, times (b) the applicable Purchase Price Document Deficiency Multiplier; provided, that if the condition in Section 8.3(d)(i) is not satisfied or waived by Purchasers, then the Purchase Price shall be reduced by an amount equal to the sum, for each Funded HELOC, of the Whole Loan Purchase Price Percentage applicable to such Funded HELOC of the aggregate UPB of such Funded HELOC as of the Cut-off Date;

(ii)      the sum, for each Whole Loan included in the Whole Loan Bucket related to Securitized Advances and "Other", of the Whole Loan Purchase Price Percentage of the aggregate UPB of such Whole Loans included in such Whole Loan Buckets as of the Cut-off Date; provided, that if the condition in Section 8.3(d)(i) is not satisfied or waived by Purchasers, then the Purchase Price shall be reduced by an amount equal to the sum, for each Securitized Advance, of the Whole Loan Purchase Price Percentage applicable to such Securitized Advance of the aggregate UPB of such Securitized Advance as of the Cut-off Date;

(iii)      for each Whole Loan, to the extent applicable, the aggregate amount of unpaid Accrued Interest as of the Cut-off Date;

(iv)      the Mortgage Securities Purchase Price Percentage of the aggregate UPB of the Mortgage Securities included in the Purchased Assets as of the Cut-off Date;

(v)      $825,000 to reimburse the Sellers with respect to the administrative costs associated with Sellers' release of the borrowers related to the Zero Balance HELOCs, unless the condition in Section 8.3(d)(i) is not satisfied or waived by Purchasers; and

(vi)      $65,000,000.

(b)      As soon as reasonably practical following the Cut-off Date, but in no event later than 15 Business Days following the Cut-off Date (and, in any event, at least three Business Days prior to the Closing Date), Sellers shall deliver to Purchasers the Cut-off Date Mortgage Loan Schedule, prepared in good faith consistently with the preparation of the Mortgage Loan Schedule. The Cut-off Date Mortgage Loan Schedule shall be subject to approval by Purchasers, such approval not to be unreasonably withheld, conditioned or delayed.

(c)      The April Collateral Exceptions Report has been delivered to Purchasers prior to the date hereof as document #16.8.2 in the data room established in connection with this Agreement. Sellers shall have the right, but not the obligation, to remedy any document deficiencies identified in the April Collateral Exceptions Report up to and including the Report Request Date.

(d)      On the date that is twelve Business Days prior to the Closing Date, or such earlier date as the custodians shall require (the "Report Request Date"), Sellers shall instruct the custodians who prepared the April Collateral Exceptions Report to produce the Closing Collateral Exceptions Report and deliver it to Sellers and Purchasers as soon as reasonably practicable, but in no event later than seven (7) Business Days prior to the Closing Date. Purchasers shall be

22

responsible for all costs, expenses and fees incurred in connection with the production of the Closing Collateral Exceptions Report.  In addition, no later than seven (7) Business Days prior to the Closing Date, the Sellers shall deliver to the Purchasers information in Sellers' possession and reasonably available to the Sellers with respect to Mortgage Loan Documents transmitted to third party agents (including attorneys) of Sellers.  Not less than five (5) Business Days prior to the Closing Date, Sellers will provide Purchasers with a statement of Sellers' good faith calculation of the Purchase Price as of the Cut-off Date (the "Cut-off Date Purchase Price") prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule.  Subject to Section 3.2, the Closing Collateral Exceptions Report and the calculation of the Cut-off Date Purchase Price shall be subject to approval by Purchasers, such approval not to be unreasonably withheld, conditioned or delayed.

Section 3.2    Purchase Price Adjustment; Final Payment.

(a)    Post-Closing Determination.  As soon as reasonably practical following the Closing Date, but in no event later than 30 days following the Closing Date, Purchasers shall deliver to Sellers (i) the Closing Date Mortgage Loan Schedule and (ii) a statement (the "Purchase Price Adjustment Statement") setting forth Purchasers' calculation (prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule) of the Purchase Price as of the Closing Date (the "Closing Date Purchase Price").  Sellers shall provide Purchasers and their representatives full cooperation, including full access to books, records and employees in connection with the preparation of the Purchase Price Adjustment Statement.

(b)    Purchase Price True-up.  Subject to Section 3.2(d), within 30 days of delivery of the Purchase Price Adjustment Statement (or within 15 days of the final determination of the Purchase Price in accordance with Section 3.2(d)), (i) if the Closing Date Purchase Price is less than the Cut-off Date Purchase Price, then Sellers shall pay to Purchasers an amount equal to such shortfall; and (ii) if the Closing Date Purchase Price is greater than the Cut-off Date Purchase Price, then Purchasers shall pay to Sellers an amount equal to such excess (in either event, the "Adjustment Amount").  The Adjustment Amount will (A) bear simple interest from the Closing Date to the date of payment at an interest rate equal to the Fed Funds Rate per annum as published in *The Wall Street Journal* as of the Closing Date and (B) be paid by wire transfer of immediately available funds to an account or accounts designated by the recipient thereof. Sellers' obligation to pay the Adjustment Amount, if any, to Purchasers shall constitute an allowed administrative claim and be payable without application or motion by Purchasers.

(c)    Objections.  Unless Sellers deliver written notice to Purchasers of an objection to all or a part of the Purchase Price Adjustment Statement (a "Dispute Notice") prior to the expiration of the 30-day period provided in Section 3.2(b) above, the Purchase Price Adjustment Statement shall become binding in its entirety at the end of such 30-day period.  The Dispute Notice shall set forth, in reasonable detail on a line-item by line-item basis, the basis for such dispute, the amounts involved and Sellers' determination of the Purchase Price. If Sellers deliver a Dispute Notice to Purchasers within such period and the parties are unable to agree as to all issues in the Dispute Notice within the ten Business Day period immediately following the day after the Dispute Notice is received by Purchasers, then the Dispute Notice may be submitted by either Sellers or Purchasers to an Independent Accounting Firm to resolve the disputed items set forth therein in accordance with Section 3.2(d).

10504231\V-2

(d)        Dispute Resolution.  An Independent Accounting Firm shall conduct a review of the Dispute Notice and any supporting documentation submitted by either Purchasers or Sellers. The parties shall direct the Independent Accounting Firm to, as promptly as practicable and in no event later than 30 days following its receipt of the Dispute Notice, deliver to Sellers and Purchasers a report (the "Adjustment Report") setting forth in reasonable detail the Independent Accounting Firm's determination with respect to the issues specified in the Dispute Notice, and the revisions, if any, to be made to the Purchase Price Adjustment Statement together with supporting calculations.  The Independent Accounting Firm has no authority to review or raise items not expressly identified in the Dispute Notice.  With respect to each disputed line item, such determination, if not in accordance with the position of either Sellers or Purchasers, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by either Sellers or Purchasers in the Dispute Notice or the Purchase Price Adjustment Statement, respectively, with respect to such disputed line item.  Such Adjustment Report and the revisions, if any, to be made to the Purchase Price Adjustment Statement shall be final and binding on the parties, absent arithmetical error, and shall be deemed a final arbitration award that is enforceable against each of the parties in any court of competent jurisdiction, and the Purchase Price shall be adjusted according to such Adjustment Report and paid in accordance with Section 3.2(b).  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchasers.

Section 3.3        Allocation of the Purchase Price for Tax Purposes.

(a)        The Purchase Price shall be allocated among the Purchased Assets in accordance with Section 1060 of the Tax Code and the Treasury Regulations thereunder in a manner consistent with an allocation schedule (the "Allocation Schedule"), which Allocation Schedule shall be prepared by Purchasers and provided to Sellers for their review and the parties' mutual agreement within 90 days after the Closing Date.  The parties shall cooperate reasonably in attempting to reach such a mutual agreement.  If the Allocation Schedule is not mutually agreed upon within such period, the parties shall submit such dispute to an Independent Accounting Firm for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable Tax forms.  The Independent Accounting Firm's review shall be final and binding on the parties except as otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code or similar provision of other Tax law (a "Determination").  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchasers.

(b)        Each of Sellers and Purchasers shall (i) be bound by such allocation for purposes of determining Taxes (but not for any other purpose), (ii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation, and (iii) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return, except in each case as otherwise required by a Determination.  If the allocation set forth on the Allocation Schedule is disputed by any Government Entity with taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

# ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed to Purchasers by Sellers in the Disclosure Memorandum, Sellers jointly and severally represent and warrant to Purchasers, as of the date hereof and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 4.1     Organization and Authority**.   Each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted.   Each Seller has the corporate or other organizational power, authority and right to enter into and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to complete the transactions contemplated hereby and thereby (subject to entry of the Sale Procedures Order and the Sale Approval Order).  The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and (subject to entry of the Sale Procedures Order and the Sale Approval Order) validly authorized by all appropriate corporate or other organizational authority, and no other corporate or other organizational action on the part of any Seller is necessary to authorize the execution, delivery and performance by such Seller of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby.   This Agreement constitutes the valid and legally binding obligations of each Seller, enforceable against each Seller in accordance with its terms, except (i) as such enforceability may be limited by principles of public policy and subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditor's rights or by general equity principles (the "Enforceability Exceptions"); (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry of the Sale Approval Order or any other Order by the Bankruptcy Court; and (iii) that enforceability of all other provisions hereof is subject to entry of the Sale Procedures Order and any other action by the Bankruptcy Court.   Each Ancillary Agreement, when required by this Agreement to be delivered to Purchasers, will be duly and validly executed and delivered by each Seller that will be a party thereto, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its respective terms, subject to the Enforceability Exceptions.

**Section 4.2     Non-Contravention.**   Assuming all Consents, declarations, filings or registrations set forth on Schedule 4.3 have been obtained or made, as applicable, and receipt of the Sale Approval Order, the execution, delivery and performance of this Agreement and the Ancillary Agreement by Sellers and the consummation of the transactions contemplated hereby and thereby and the compliance by Sellers with the applicable terms and conditions hereof and thereof, do not and will not (a) conflict with or violate, result in a material breach or violation of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of any Seller, (ii) any Law or Order applicable to Sellers, or (iii) any material terms, conditions or provisions of any SBO Servicing Agreement or (b) result in the creation of any Lien, other than Permitted Liens, on the Purchased Assets.

25

**Section 4.3**       **Consents and Approvals**.  Upon entry of the Sale Approval Order and the satisfaction of the conditions set forth therein, no material Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby or thereby, except for (i) Consents, declarations, filings and registrations listed on Schedule 4.3 or (ii) the failure to have which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, that Sellers are not making any representation with respect to any Consent, including Permits, or declarations, filings or registrations with, any Government Entity or any other Person that must be or may be made by Purchasers (as a result of facts and circumstances specific to each Purchaser) in order to acquire the Purchased Assets.

**Section 4.4**       **Title to Assets**.  Upon entry of the Sale Approval Order at the Closing, Sellers shall transfer to Purchasers good and valid title to the Purchased Assets free and clear of any Lien (other than Permitted Liens), Claim, Liabilities, and all funding obligations under or in connection with any Funded HELOCs.

**Section 4.5**       **Mortgage Loan Portfolio**.   Sellers have delivered to Purchasers Electronic Data Files dated as of August 31, 2012 that provide asset level information with respect to the Purchased Assets, with the data fields being those described on Schedule 4.5 and has delivered to the Purchasers asset level information with respect to Advances and shall include such information as an additional data field on Schedule 4.5 (collectively, the "Mortgage Loan Schedule," which term includes, except where the context requires otherwise, updated data tapes to be prepared as of (i) the close of business on the day immediately preceding the Cut-off Date (the "Cut-off Date Mortgage Loan Schedule"), and (ii) the close of business on the day immediately preceding the Closing Date (the "Closing Date Mortgage Loan Schedule"), each to be delivered pursuant to Section 6.10) and has delivered to the Purchasers asset level information with respect to corporate advances, principal and interest advances, and tax and insurance advances for each SBO Servicer.  The information set forth in the Mortgage Loan Schedule is true, complete and correct in all material respects as of the date thereof and the information in each of the Cut-off Date Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule to be prepared and delivered to Purchasers in accordance with Section 6.10 will be true, complete and correct in all material respects as of their applicable dates.

**Section 4.6**       **[Reserved]**.

**Section 4.7**       **Litigation and Claims**.  Except as listed on Section 4.7 of the Disclosure Memorandum or as may be ordered by the Bankruptcy Court, as of the date hereof, (i) there is no action, suit, demand, inquiry, proceeding, claim, cease and desist letter, hearing or investigation by or before any Government Entity pending, or, to the Knowledge of Sellers, threatened in respect of the Purchased Assets that could materially and adversely affect the ability of Sellers to complete the transactions contemplated by this Agreement, and (ii) no Purchased Asset is subject to any material Order.

**Section 4.8**       **Brokers, Finders and Financial Advisors**.  Except for Centerview Partners LLC, whose fees will be paid by ResCap in the Bankruptcy Case, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers or any Affiliate Seller, or will be entitled to any brokers' or finders' fee or any other commission or similar fee from Sellers or any Affiliate Seller, in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

**Section 4.9**       **Whole Loans.**

10504231\V-2

(a)    Subject to the related Collateral Exception Reports, the Mortgage Loan Documents include customer information and originals or copies of all material documents (either in physical or electronic form) that are required in order to service such Whole Loan in accordance with Applicable Requirements.

(b)    Except as set forth on the Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule, no payment of principal or interest is more than 60 days past due on any Whole Loan.

(c)    Sellers are the sole owners and holders of each Whole Loan, and Sellers have full right and authority to sell and assign each Whole Loan to Purchasers pursuant to this Agreement.  Except as set forth on Section 4.9(c) of the Disclosure Memorandum, the Whole Loans have not been assigned or pledged by any Seller (except for pledges or other grants of security interests which will be released on or prior to the Closing), and Sellers have good and marketable thereto.

(d)    Each Whole Loan is genuine and constitutes the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms in all material respects, except as such enforcement may be limited by the Enforceability Exceptions.

(e)    Except as set forth on Section 4.9(e) of the Disclosure Memorandum, for each Whole Loan that is a first lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) the Lien of current real property taxes and assessments, (ii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iii) any state of facts an accurate land survey of the Mortgaged Property might show, (iv) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (v) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(f)    Except as set forth on Section 4.9(f) of the Disclosure Memorandum, for each Whole Loan that is a second lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) any first lien, (ii) the Lien of current real property taxes and assessments, (iii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iv) any state of facts an accurate land survey of the Mortgaged Property might show, (v) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (vi) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(g)    Except as set forth on Section 4.9(g) of the Disclosure Memorandum, no provision of any Whole Loan has been impaired, waived, altered or modified in any respect, (i) except by written instrument that has been recorded, if required by Applicable Law or if necessary to maintain the lien priority of the Whole Loan, and that is included in the Mortgage Loan Documents relating to such Whole Loan or (ii) except if set forth in a written instrument that has

not been recorded and such terms are set forth on the Mortgage Loan Schedule in sufficient detail. For the avoidance of doubt, all HELOCs have been suspended by Sellers as set forth in that certain Debtors' Motion Seeking Authority to Provide Notice to Borrowers that the Debtors' Will Suspend Funding Draws Under Certain Home Equity Lines of Credit, filed in the Bankruptcy Case at docket number 40 and approved by the Bankruptcy Court by Order dated May 23, 2012 and filed in the Bankruptcy Case at docket number 143, and the Funded HELOCs are to be transferred to Purchasers free and clear of all Claims associated with such suspension and all obligations to fund any draw requests from the related Mortgagors.

(h)    Each Whole Loan that is a first lien Mortgage Loan is covered by either an ALTA mortgage title insurance policy acceptable to Sellers and issued by a title insurer duly qualified to do business in the jurisdiction where the Mortgaged Property is located, or such other generally used and acceptable form of policy and applicable endorsements acceptable to prudent mortgage lending institutions making loans in the area where the Mortgaged Property is located.

(i)    As of the date hereof and as of the Closing Date, no Whole Loan that is a first lien Mortgage Loan, has been satisfied, canceled or subordinated in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no Mortgaged Property has been released from the Lien of the related mortgage in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission.

(j)    As of the date hereof and as of the Closing Date, no Whole Loan that is a second lien Mortgage Loan has been satisfied or canceled in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no Mortgaged Property has been released from the Lien of the related mortgage in whole or in part, nor has any instrument been executed that would effect any such release, cancellation or rescission.

(k)    All improvements upon the Mortgaged Property pursuant to each Whole Loan are insured against loss by fire, flood and such other hazards as are customary in the area where such Mortgaged Property is located, pursuant to insurance policies maintained by the Mortgagor or a blanket insurance policy maintained by Sellers or the applicable SBO Servicer.

(l)    Except with respect to the Whole Loans listed in <u>Section 4.9(l)</u> of the Disclosure Memorandum, none of the Whole Loans provides for recourse to or against Sellers.

(m)    Each Mortgage Loan that is a reverse mortgage loan has been fully funded and no further payments are required to be made to the related Mortgagors.

**Section 4.10    Mortgage Securities**. In connection with the sale and purchase of the Mortgage Securities hereunder, on the Closing Date Sellers shall convey to Purchasers (or, if applicable, their designee(s)) all right, title and interest in the Mortgage Securities being delivered on the Closing Date free and clear of any and all Liens (including any counterclaim, defense or right of set off by or of the issuer of the Mortgage Securities). The transfer of the Mortgage Securities by Sellers to Purchasers shall not require or cause Purchasers to assume, and shall not subject Purchasers to, any obligation, Liability or commitment to lend additional funds, including any outstanding contingent commitment.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASERS

Except as disclosed to Sellers by Purchasers in writing on the date hereof, Purchasers, individually and jointly, represent and warrant to Sellers, as of the date hereof and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 5.1    Organization and Authority**.    Purchasers have each been duly incorporated or formed, and are validly existing and in good standing under the Laws of their jurisdiction of incorporation or formation, have all corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby, and have taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements. This Agreement has been, and the Ancillary Agreements to which they as a party will be, duly and validly executed and delivered by Purchasers and this Agreement constitutes, and each of the Ancillary Agreements to which they as a party will constitute, the legal, valid and binding obligation of Purchasers enforceable against Purchasers in accordance with their terms, except as such enforceability may be limited by the Enforceability Exceptions.

**Section 5.2    Non-Contravention**.    The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchasers and the consummation of the transactions contemplated hereby and thereby and the compliance by Purchasers with the applicable terms and conditions hereof or thereof, do not and will not conflict with or violate, result in a material breach of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of each Purchaser or (ii) assuming all Consents, declarations, filings or registrations set forth on <u>Schedule 5.3</u> have been obtained or made, as applicable, any Law or Order applicable to each Purchaser.

**Section 5.3    Consents and Approvals**.    No Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by Purchasers in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated by this Agreement or by any of the Ancillary Agreements, except for Consents, declarations, filings and registrations (i) listed on <u>Schedule 5.3</u>, or (ii) Consents, the failure to have which, individually or in the aggregate, would not reasonably be expected to materially impact the ability of Purchasers to consummate the transactions contemplated hereby and satisfy all their obligations hereunder.

**Section 5.4    Financing**.    Purchasers will have, as of the Closing Date, cash on hand available to consummate the transactions contemplated hereby.

**Section 5.5    Non-reliance**.    Purchasers have not relied and are not relying on any representations, warranties or other statements whatsoever, whether written or oral (from or by Sellers, or any Person acting on their behalf) other than those expressly set out in this Agreement (or other related documents referred to herein) and acknowledge and agree that, except for any fraud claim, they will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

10504231\V-2

**Section 5.6**    **Brokers, Finders and Financial Advisors**.    No agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any brokers' or finder's fee or any other commission or similar fee in connection with the transactions contemplated hereby as a result of any action taken by Purchasers.    Purchasers acknowledge that in connection with the transactions contemplated hereby, Ally Financial Inc. has incurred, and shall be solely responsible for the payment of, certain fees to Evercore Partners Inc.

## ARTICLE VI.

## PRE-CLOSING MATTERS AND OTHER COVENANTS

**Section 6.1**    **Subsequent Actions; Further Assurances**.    Subject to the Bankruptcy Exceptions, Sellers and Purchasers shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable, including, (i) opposing any objections to, appeals from or petitions to reconsider or reopen any such approval by Persons not a party to this Agreement, (ii) directing each SBO Servicer to cooperate with the applicable Purchasers prior to and following the Closing Date, (iii) contacting third party agents of Sellers (including attorneys) that were delivered any Mortgage Loan Documents and that have not been returned to Sellers or Sellers' custodians prior to the Closing Date, informing them of this transaction and directing such third party agents to cooperate with the Purchasers; and (iv) obtaining any Final Orders approving the transactions contemplated by this Agreement or the Ancillary Agreements, if required.    If at any time after the Closing, Purchasers shall consider or be advised that any assurances or any other actions or things are necessary or desirable (a) to vest, perfect or confirm ownership (of record or otherwise) in a Purchaser, as applicable, its title or interest in the Purchased Assets or (b) otherwise to carry out this Agreement or the Ancillary Agreements, Sellers shall use commercially reasonable efforts to execute and deliver all bills of sale, instruments of conveyance, UCC filings, Powers of Attorney, assignments, assurances and orders and take and do all such other actions and things as may be reasonably requested by Purchasers, in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Purchased Assets.

**Section 6.2**    **Third Party Consents**.    Sellers and Purchasers shall use commercially reasonable efforts to obtain, as soon as reasonably practicable, all Necessary Consents, including from Government Entities and Insurers; provided, that Purchasers shall not be required to agree to actions, conditions or restrictions that would materially impair the value to Purchasers of the Purchased Assets or have a materially adverse effect on the business of Purchasers or their Affiliates.    Each party hereto shall promptly provide the other parties with copies of any communication, including any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby received by such party from any Government Entity or any other Person regarding transactions contemplated hereby.

**Section 6.3**    **Access to Information.**    From and after the date of this Agreement until the Closing Date, Sellers shall afford to Purchasers and their accountants, counsel and other representatives reasonable access, upon reasonable notice during normal business hours, to the Mortgage Files, Servicing Files and Credit Files for the Mortgage Loans and personnel with knowledge thereof; provided, that such access shall not unreasonably disrupt the business of Sellers and that nothing herein will obligate Sellers to violate any Applicable Law.

**Section 6.4**    **Records; Post-Closing Access to Information.**

(a)      On and after the Closing Date, Sellers shall execute, deliver, file and record any specific assignment, novation or other document and take any other action that may be necessary, customary or desirable and reasonably requested by Purchasers in connection with Sellers' delivery of the Mortgage Securities.

(b)      From and after the Closing Date, each party shall, and shall cause its Affiliates to, afford the other party and its counsel, accountants and other authorized representatives, with five Business Days' prior notice, reasonable access during normal business hours to the respective premises, properties, personnel, books and records and to any other assets or information, in each case relating to the Purchased Assets, that such other party reasonably deems necessary, including in connection with the Bankruptcy Case or any report or Tax Return required to be filed under applicable Law (but so as not to unduly disrupt the normal course of operations of Purchasers).

(c)      If and for so long as any party hereto is contesting or defending against any third-party charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand, including in the Bankruptcy Case, in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Purchased Assets or the Excluded Assets and Retained Liabilities in any respect, each other party hereto shall (A) reasonably cooperate with and assist it and its counsel and other advisors in the contest or defense, (B) make available its personnel (including for purposes of fact finding, consultation, interviews, depositions and, if required, as witnesses) and (C) provide such information, testimony and access to its books and records, in each case as shall be reasonably requested in connection with the contest or defense, all at the sole cost and expense (not including employee compensation and benefits costs) of the contesting or defending party.  For the avoidance of doubt, this Section 6.4(c) shall not apply with respect to disputes between the parties hereto.

(d)      Purchasers agree, at Sellers' cost and expense, to make available, at the reasonable request of Sellers, any books and records that may be included in the Purchased Assets to the extent they may relate to Excluded Assets and, if necessary, to provide such original books and records to any purchaser of such Excluded Assets and to retain only a copy thereof, subject to the delivery by such purchaser of a non-disclosure agreement as reasonably requested by Purchasers.

(e)      Notwithstanding anything to the contrary in this Agreement, each of the parties will comply with federal and state laws and regulations regarding the confidentiality and privacy relating to information collected and used in connection with the application for and processing and servicing of Mortgage Loans.

**Section 6.5      Interim Operations**.  Sellers covenant and agree that, after the date hereof and prior to the Closing, subject to the Bankruptcy Exceptions and except as (i) set forth in Section 6.5 of the Disclosure Memorandum, (ii) expressly provided in or as a result of the consummation of this Agreement, (iii) provided in the DIP Financing Agreements, (iv) ordered by the Bankruptcy Court or (v) may be agreed in writing by Purchasers:

(a)      Sellers' business relating to the Purchased Assets shall be conducted in the Ordinary Course of Business in compliance with the Applicable Requirements and Acceptable Servicing Procedures; provided, that notwithstanding the foregoing, Sellers shall not be obligated

to fund any draws under HELOCs except in accordance with any motion approved by the Bankruptcy Court;

(b)    Sellers and Affiliate Sellers shall service, or cause to be serviced, the Mortgage Loans in the Ordinary Course of Business and in accordance with all requirements of any Applicable Requirements and Acceptable Servicing Procedures. With respect to the Mortgage Loans, Sellers and Affiliate Sellers shall take no action, and refrain from taking action, which, in either case, would reasonably be expected to (i) impair the ability of Purchasers to realize on or enforce any Mortgage Note or the lien of the mortgage or any other document related thereto or (ii) jeopardize the rights or remedies available to Purchasers with respect to any Mortgage Loan or otherwise impair the ability of Purchasers to realize on the Mortgaged Property with respect to such Mortgage Loan. For the avoidance of doubt, nothing in this Agreement shall prevent Sellers from making payments to former mortgagors pursuant to the Consent Order or from offering, and effecting refinancing of or modifications to, Mortgage Loans as contemplated by the terms of the DOJ/AG Settlement, or by HAMP, HARP, HASP or any similar program that Sellers have or may develop in the Ordinary Course of Business; provided, that Sellers shall promptly provide copies to Purchasers of any reports provided to the settlement master under the DOJ/AG Settlement with respect to such agreements, arrangements and actions;

(c)    Sellers and Affiliate Sellers shall not terminate or permit to lapse any material Permits that are necessary for the ownership or servicing of the Purchased Assets;

(d)    Sellers and Affiliate Sellers (i) shall not change its servicing or administration practices with respect to the Whole Loans or the Mortgage Securities in any material respect, except in the Ordinary Course of Business, and (ii) shall not process or permit any trial or permanent Mortgage Loan modifications except in the Ordinary Course of Business;

(e)    With respect to any Purchased Asset, Sellers shall not, and shall use their best efforts to ensure that any Affiliates shall not: (i) agree to allow any form of relief from the automatic stay in the Bankruptcy Case; or (ii) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Case;

(f)    Sellers and Affiliate Sellers shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions set forth in Article VIII, not being satisfied, or would make any representation or warranty of Sellers contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date or that would materially impair the ability of Sellers or Purchasers to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(g)    With respect to clauses (a) through (f) (inclusive), Sellers and Affiliate Sellers shall not enter into any Contract to do any of the foregoing, or authorize, recommend, propose or announce an intention to do, any of the foregoing.

Section 6.6    Mortgage Approvals and Licenses. Promptly following execution of this Agreement, in each case to the extent not already obtained by Purchasers (their respective designees or an applicable Affiliate of a Purchaser that may hold the related Purchased Assets following the Closing Date), Purchasers shall have filed or shall file all applications and use commercially reasonable efforts to (i) be approved (A) by HUD to hold FHA Loans and (B) by the VA to hold VA Loans, in each case to the extent necessary; (ii) obtain all necessary licenses in all states in which they propose to hold their respective Purchased Assets in each case to the extent necessary; and (iii) obtain all other

material Permits and Licenses that are necessary to hold their respective Purchased Assets.  All such actions shall be at Purchasers' cost and expense, and Sellers shall cooperate with, and use commercially reasonable efforts to provide assistance to, Purchasers in all such efforts.

Section 6.7    **Notices of Certain Events**.  From the date hereof until the Closing Date,

(a)    A Seller shall promptly notify Purchasers of:

(i)    any written notice or other written communication from any Person (including any notices or communications filed with the Bankruptcy Court other than notices or other written communications that provide for a copy to be provided to Purchasers) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity in connection with the transactions contemplated by this Agreement;

(iii)    any change or fact with respect to any of Sellers' representations, warranties or obligations hereunder of which Seller becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Sellers of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied; or

(iv)    any Material Adverse Effect (but without giving effect to clause (ix) of the definition of Material Adverse Effect).

(b)    Purchasers shall promptly notify Sellers of

(i)    any written notice or other written communication from any Person (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchasers) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchasers) in connection with the transactions contemplated by this Agreement; or

(iii)    any change or fact with respect to any of Purchasers' representations, warranties or obligations hereunder of which they become aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Purchasers of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied.

No disclosure by any party hereto pursuant to this Section 6.7 shall be deemed to amend or supplement the Disclosure Memorandum with respect thereto or prevent or cure any misrepresentation or breach of warranty for purposes of this Agreement.

Section 6.8    **Tax Matters**.

(a)    Purchasers shall pay and be responsible for all Transfer Taxes imposed in connection with the closings of the transactions contemplated hereby.  Sellers and Purchasers shall cooperate to timely prepare, and Purchasers shall file or cause to be filed any returns or other filings relating to such Transfer Taxes (unless Sellers are required by applicable Law to file the return), including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(b)    Sellers and Purchasers shall cooperate with each other and furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Purchased Assets as is reasonably requested for the preparation or filing of any Tax Returns and for the satisfaction of legitimate Tax or accounting requirements.

Section 6.9    **Insurance**.  Purchasers and Sellers shall not take any action that may adversely affect the rights of the other with respect to any outstanding claims made or for new claims that may be made against insurance policies relating to the Purchased Assets purchased or maintained by Purchasers for the benefit of themselves and their Subsidiaries and Affiliates that the other may or will have as of the Closing Date and shall use commercially reasonable efforts to cooperate with the other in the settlement or other resolution of such claims.

Section 6.10    **Mortgage Loan Schedules**.  Sellers shall deliver to Purchasers (i) an updated version of the Mortgage Loan Schedule within 15 Business Days after the end of each month during the period from the date hereof to the Closing Date, and (ii) the Cut-off Date Mortgage Loan Schedule as provided in Section 3.1(b).

Section 6.11    **Schedules and Disclosure Memorandum.**

(a)    Sellers have made available to Purchasers the Schedules to be provided by Sellers identified in the Table of Contents (the "Schedules") and a disclosure memorandum (the "Disclosure Memorandum") that sets forth all of the items that Sellers deem to be necessary or appropriate (i) as an exception to a provision of this Agreement, (ii) in response to an express disclosure requirement contained in a provision hereof or (iii) as an exception to one or more representations or warranties contained in Article IV, as applicable, or to one or more of the covenants of Sellers contained in this Agreement; provided, that the mere inclusion of an item in the Schedules or Disclosure Memorandum as an exception to a provision or representation or warranty shall not be deemed an admission by any Seller or any Purchaser, as applicable, that such item represents a material exception or event, state of facts, circumstance, development, change or effect or that such item would reasonably be expected to have or result in a Material Adverse Effect; and provided, further, that any disclosures or exceptions made with respect to a section or subsection of this Agreement shall be deemed to qualify not only the specific section(s) referenced but also such other sections or subsections that may be affected thereby to the extent the relevance of such disclosure or exception to such other sections or subsections is readily apparent on its face.  In the event of an inconsistency between the statements in the body of this Agreement and those in the Schedules or Disclosure Memorandum, the statements in the Schedules or Disclosure Memorandum will control.

(b)    Sellers and Purchasers agree that, with respect to Sellers' representations and warranties contained in this Agreement, Sellers shall have the obligation until the Closing to

correct, supplement or amend no later than five Business Days prior to the expected Closing Date the Disclosure Memorandum with respect to any matter arising or discovered after the date of this Agreement (whether or not existing or known at the date of this Agreement) that causes the representations and warranties of Sellers to be untrue or inaccurate in any material respect (as so amended, the "Amended Disclosure Memorandum"); provided, that in no event shall any such correction, supplement or amendment be taken into account when determining the accuracy, truth and correctness of the representations and warranties of Sellers for purposes of Article VIII, including the certificates to be delivered pursuant to Section 8.3(c), except for the updates explicitly required by the representations set forth in Section 4.5 (which required updates shall only be taken into account when determining the accuracy, truth and correctness of such representations and warranties as of the Closing Date); and provided, further, that there is no obligation to update any representation that is as of a specified date.

**Section 6.12    Bankruptcy Actions.**

(a)    **[Reserved]**

(b)    Sellers shall, and Sellers shall cause all of their Subsidiaries to, comply with all of the obligations of Sellers under the Sale Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Approval Order (after the entry of such Order by the Bankruptcy Court).

(c)    Sellers shall use reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement.  Sellers shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim or Lien against or interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable state attorneys general, and local Government Entities, (iv) all applicable state and local Government Entities with taxing authority, (v) all other Persons required by any order of the Bankruptcy Court, and (vi) using their commercially reasonable efforts to serve any other Persons that Purchasers reasonably may request, any notice of the Sale Motion, the Sale Hearing, the Sale Procedures Order, the Sale Approval Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Sale Procedures Order, and any applicable local rules of the Bankruptcy Court.

**Section 6.13    SBO Servicing Agreements**.

(a)    Sellers shall assume the SBO Servicing Agreements with respect to the Purchased Assets and assign them to one or more Purchaser as directed by the Purchasers pursuant to section 365 of the Bankruptcy Code or otherwise transferred to one or more Purchasers.  Sellers shall either comply with the Assumption and Assignment Procedures set forth in the Sale Procedures Order or file a separate motion to assume the SBO Servicing Agreements and assign such SBO Servicing Agreements to the applicable Purchasers effective as of the Closing Date or such other date after entry of an Order by the Bankruptcy Court authorizing such assumption and assignment as may be selected by the applicable Purchasers. In either case, Sellers shall take all efforts to cause the deadline to object to the proposed assumption and assignment of the SBO Servicing Agreements to be on or before the Sale Hearing.  From and after the date of such assignment, the applicable Purchaser(s) shall be entitled to enforce each term of such SBO Servicing Agreements against the SBO Servicer,

including, without limitation, all rights to terminate such SBO Servicing Agreement in accordance with the terms of such SBO Servicing Agreement with respect to the Purchased Assets.

(b)    Sellers shall promptly inform each SBO Servicer identified by Purchasers that such SBO Servicer is authorized and directed to respond to direct inquiries from Purchasers regarding the SBO Loans and/or the SBO Servicing Agreement.  Each SBO Servicer is entitled to rely on this provision of this Agreement.

**Section 6.14    Post-Closing Amounts Received and Paid**.  All amounts that are received by a Seller or any Affiliate of Seller in respect of any of the Purchased Assets with respect to a period following the Closing shall be received by such Person as agent, in trust for and on behalf of Purchasers and shall be paid pursuant to Section 6.18(i).  Any such amounts received by a Seller or any Affiliate of Seller which are not payable pursuant to Section 6.18(i) shall be paid to the applicable Purchasers promptly, and in any event no less than three (3) Business Days after receipt thereof.  All such amounts received by a Seller or any Affiliate of Seller shall not constitute property of any Debtor's estate.  All amounts that are received by Purchasers or any of their Affiliates following the Closing to the extent in respect of any Excluded Assets shall be received by such Person as agent, in trust for and on behalf of Sellers, and Purchasers shall, on a monthly basis, pay or cause to be paid all such amounts over to Sellers by wire transfer of immediately available funds and shall provide Seller with information as to the nature and source of all such payments, including any invoice relating thereto.

**Section 6.15    Confidentiality.**

(a)    After the Closing, Sellers shall, and shall cause their respective Subsidiaries and instruct their respective Affiliates to, hold in confidence and not use in any manner detrimental to Sellers' business all Confidential Information concerning the Purchased Assets, except to the extent that such information can be shown to have been (i) in the public domain prior to the Closing or (ii) in the public domain at or after the Closing through no fault of Sellers or any of their Affiliates or any of their respective representatives.  If, after the Closing, Sellers or any of their Affiliates or any of their respective representatives are legally required to disclose any Confidential Information, Sellers shall to the extent permitted by Law (A) promptly notify all Purchasers to permit one or more of them, at their expense, to seek a protective order or take other appropriate action and (B) cooperate as reasonably requested by Purchasers in Purchasers' efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only at Purchasers' sole cost and expense.  If, after the Closing and in the absence of a protective order, Sellers or any of their Affiliates or any of their respective Representatives are compelled as a matter of Law to disclose any such Confidential Information to a third party, such Person may disclose to the third party compelling disclosure only the part of such Confidential Information as is required by Law to be disclosed; provided, that to the extent permitted by Law, prior to any such disclosure, such Person consults in good faith with Purchasers and their legal counsel as to such disclosure and the nature and wording of such disclosure.  "Confidential Information" shall mean any confidential information concerning the Purchased Assets, including methods of operation, products, prices, fees, costs, markets or other specialized information or proprietary matters.

(b)    If the Closing does not occur, each party shall, upon the written request of the other party, return to the other party or destroy (such destruction to be confirmed in writing to the other party upon written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) that constitutes Confidential Information of the other party, and not use any such

36

information or knowledge for any purpose whatsoever, provided that a party may maintain such information to the extent required by Law or such party's established document retention policies (including any requirement to retain email on an automated email archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a legal dispute with the other party.

(c)    Notwithstanding the foregoing, the parties to this Agreement acknowledge that each of them (and each of their employees, representatives, or other agents) has been and is permitted to disclose to any and all persons, without limitation of any kind, the federal tax treatment and structure of this Agreement (including Confidential Information) and all materials of any kind (including opinions or other tax analyses) that are or have been provided to them relating to such federal tax treatment and structure.  This provision is intended to qualify for the presumption that this Agreement is not offered under conditions of confidentiality as set forth in Treasury Regulation Section 1.6011-4(b)(3) and shall be interpreted to authorize disclosure only to the extent necessary to so qualify.

### Section 6.16    Delivery of Mortgage Files.

(a)    Not later than five (5) Business Days prior to the Closing Date (or on such later date as Purchasers shall reasonably request), Sellers shall deliver to Purchasers or Purchasers' custodian(s) as Purchasers' designee(s) the Mortgage File for each Mortgage Loan subject to a mutually agreeable bailee agreement.

(b)    In connection with the transfer of any MERS Loan pursuant to Section 2.1 hereof, Sellers shall request that the MERS system indicate that such MERS Loan has been assigned to Purchasers.  Purchasers may, at their cost and in their discretion, direct Sellers to deliver for recording to the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located, and cause to be duly recorded, any of the original assignments of mortgage. Purchasers shall pay all recording fees relating to the recordation of the assignments of mortgage from a Seller to a Purchaser and any intervening assignments.

(c)    Purchasers shall cause the notice required by Section 404 of the Homes Act to be provided within 30 days of the Closing Date to each Mortgagor with respect to each Mortgage Loan and each such notice shall, to the extent permitted by the Helping Families Act, specify (i) Purchaser or its assignee as designated by Purchaser on the Closing Date is a "creditor" for purposes of the Homes Act; (ii) the address of Purchaser or its assignee as designated by Purchaser, as applicable; (iii) the Closing Date; and (iv) that the entity selected by Purchaser to assume obligations to service the Mortgage Loan on the Closing Date is the contact person with authority to act on behalf of Purchaser or its assignee, as applicable.  If the Mortgage Loan is a MERS Loan, such notice shall state: "Ownership of your Mortgage Loan is also recorded on Mortgage Electronic Registrations System's registry at 1818 Library Street, Suite 300 Reston, Virginia 20190."

### Section 6.17    Servicing.    From and after the Closing Date, Purchasers or their
designated servicers shall comply with the DOJ/AG Settlement with respect to the applicable Purchased Assets. The Sellers and the Purchasers shall cooperate with each other in a commercially reasonable manner with respect to such performance, including but not limited to, providing information and documents to the other parties and compliance with the applicable provisions of Exhibits A, D, E, H and I of the DOJ/AG Settlement.  In addition, Purchasers agree to use their commercially reasonable efforts to

37

cooperate with and assist Sellers and their counsel and other advisors with Sellers' foreclosure review obligations under the Consent Order and the reporting and oversight program with respect thereto.

**Section 6.18    Transfer of Servicing**.    Without limiting the generality of this Section 6.18, Sellers or their designees shall take, or cause to be taken, the following actions with respect to the Mortgage Loans (other than SBO Loans) prior to the Closing Date (or within such time as may otherwise be specified below) in order to effect the transfer of the servicing of such Mortgage Loans to each Purchaser or its designee on the Closing Date:

(a)    Notice to Mortgagors.    Sellers (or their designees) shall inform in writing all Mortgagors of the change in servicer from any Seller (or its designee) to Purchasers (or their designees) at least fifteen (15) days prior to the Closing Date in accordance with Applicable Law and the terms of such "goodbye" letter (which may be combined if required by Purchasers, to the extent permitted by Applicable Law, with any "hello" letter to be sent to Mortgagors by Purchasers) shall be reasonably acceptable to Purchasers.

(b)    Transfer of Servicing.    On the Closing Date (or such later date as Purchasers shall reasonably request), Sellers shall transfer servicing of the related Mortgage Loans to Purchasers or their designees pursuant to the terms of this Agreement and the procedures set forth in reasonable and customary servicing transfer instructions agreed to by Purchasers and Sellers.

(c)    Delivery of Files.    Within 10 Business Days after the Closing Date (or such later date as Purchasers shall reasonably request), Sellers shall forward to Purchasers or their designees the Servicing Files and the Credit Files for the Mortgage Loans they own.

(d)    Payments Received Prior to the Closing Date.    Sellers shall transfer all amounts received with respect to the related Mortgage Loans on and after the Cut-off Date and prior to the Closing Date to the applicable Purchasers by wire transfer of immediately available funds within three Business Days after the Closing Date to such account or accounts as may be designated by such Purchasers to Sellers by prior written notice.  Subject to occurrence of the Closing, such amounts shall not constitute property of the Sellers' estates.

(e)    Escrow Payments.    The related balances of Escrow Payments as of the Closing Date (without offset of any negative escrow balances) shall be remitted to the applicable Purchasers by wire transfer of immediately available funds within three Business Days after the Closing Date to such account or accounts as may be designated by such Purchasers to Sellers by prior written notice.

(f)    Reconciliation Statement.    On the Closing Date or within three Business Days thereafter, Sellers shall provide Purchasers with an electronic accounting statement in a format agreed to by Sellers and Purchasers of the amounts received with respect to the Mortgage Loans on and after the Cut-off Date, Escrow Payments and remaining negative escrow balances, if any, sufficient to enable Purchasers to reconcile the amount of such payments with the accounts of the related Mortgage Loans.

(g)    Notice to Hazard, Flood and Earthquake Insurers.    Sellers shall deliver an electronic or written notice to all hazard, flood and earthquake insurance companies or their agents of the transfer of servicing within five Business Days after the Closing Date (or such other date as Purchasers shall reasonably request).

10504231\V-2

(h)    Notice to Taxing Authorities and Tax Servicers. Sellers shall deliver an electronic or written notice to all taxing authorities and tax servicers and/or their agents of the transfer of servicing within five Business Days after the Closing Date (or such other date as Purchasers shall reasonably request).

(i)    Payments Received After the Closing Date. Any payments with respect to the Mortgage Loans received by Sellers on the Closing Date or within 90 days after the Closing Date shall be remitted to the applicable Purchasers by wire transfer of immediately available funds within three Business Days of receipt to such account or accounts as may be designated by such Purchasers to Sellers by prior written notice. Any such amounts received shall not constitute property of the Sellers' estates.

Section 6.19    [Reserved].

Section 6.20    Electronic Data Files. Sellers shall deliver to Purchasers an updated version of the Electronic Data Files, which shall provide loan level information with respect to only the Whole Loans, with the loan level fields set forth on the Mortgage Loan Schedule and loan level information with respect to corporate advances, principal and interest advances, and tax and insurance advances for each SBO Servicer, within 15 Business Days after the end of each month during the period from the date hereof to the Closing Date.

Section 6.21    [Reserved]

Section 6.22    Mortgage Loan Modifications. With respect to each HAMP Loan and each Mortgage Loan that becomes subject to a HAMP modification agreement after the Cut-off Date, Purchasers shall, or shall cause their servicers to, comply with the terms of each modification agreement applicable to such Mortgage Loan and all guidelines, procedures and directives issued by the United States Treasury, Fannie Mae or Freddie Mac applicable to the servicing of such Mortgage Loan. With respect to any Mortgage Loan that is the subject of an application for modification or is in its trial period pursuant to the terms of the related modification in the Ordinary Course of Business on the Closing Date, and is not a HAMP Loan, Purchasers shall, or shall cause their servicers to, accept and continue processing such pending loan modification requests in the Ordinary Course of Business and shall honor (a) trial and permanent loan modifications entered into by the prior servicer (to the extent in effect on the Closing Date), as set forth on a schedule to be delivered by Sellers to Purchasers within ten (10) days of the date hereof, and (b) trial and permanent loan modifications entered into by the prior servicer between the date hereof and the Closing Date (to the extent in effect on the Closing Date), each as set forth on an updated schedule of all pending trial and permanent loan modifications to be delivered by Sellers to Purchasers at the Closing. The parties hereto acknowledge and agree that the related Mortgagor on any such Mortgage Loan shall be deemed a third party beneficiary of this Section 6.22 with respect to its Mortgage Loan.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

Section 7.1    Competing Transaction. Other than pursuant to and in compliance with the terms and conditions of the Sale Procedures Order, in no event may Sellers or their respective Affiliates initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person concerning any transaction (or series of transactions) involving the direct or indirect sale,

transfer or other disposition of the Purchased Assets (each a "Competing Transaction") or accept an offer or proposal from any Person with respect to a Competing Transaction.

        **Section 7.2**        **Bankruptcy Court Filings**.  Sellers have filed the Sale Motion with the Bankruptcy Court.  Subject to Section 7.1, Sellers shall pursue diligently the entry of the Sale Approval Order.  Purchasers agree that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Approval Order and all parties hereto shall use their respective reasonable best efforts to obtain a finding demonstrating that Purchasers are "good-faith" purchasers under Section 363(m) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court.  In the event the entry of the Sale Approval Order shall be appealed, Sellers and Purchasers shall use their respective reasonable efforts to defend such appeal.

## ARTICLE VIII.

## CONDITIONS

        **Section 8.1**        **Conditions to Obligations of Purchasers and Sellers**.  The respective obligations of each party to consummate the Closing shall be subject to the satisfaction, or waiver by Purchasers and Sellers, on or prior to the Closing Date of all of the following conditions precedent:

        (a)        Sale Procedures Order.  The Sale Procedures Order (i) [reserved], (ii) shall not have been modified or amended in any manner materially adverse to Purchasers unless agreed to in writing by Purchasers in their sole discretion and (iii) shall have become a Final Order; provided, that the condition set forth in clause (iii) shall be waivable only by Purchasers on behalf of the parties.

        (b)        Sale Approval Order.  The Sale Approval Order (i) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (ii) shall not have been modified or amended in any manner adverse to Purchasers unless agreed to in writing by Purchasers in their sole discretion and (iii) shall have become a Final Order.

        (c)        No Law, Judgments, Etc.  No Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Order, which is in effect and that restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.  No proceeding or investigation by any Government Entity or other Person shall have been instituted that restricts, prevents, prohibits, makes illegal, enjoins or results in material damages in respect of the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement.

        (d)        Injunctions.  No Government Entity shall have issued an Order enjoining, restraining or prohibiting the completion of the transactions contemplated hereby and no suit, action or proceeding shall have been instituted by a Government Entity or any other Person that would reasonably be expected to have a Material Adverse Effect on the Purchased Assets or enjoin, restrain, prohibit or otherwise challenge the transactions contemplated by this Agreement, or that would be reasonably likely to prevent or make illegal the consummation of the transactions contemplated by this Agreement, and no Government Entity shall have notified Purchasers or Sellers in writing that this Agreement or the consummation of the transactions contemplated by this Agreement would in any manner constitute a violation of any Law and that it intends to commence any suit, action, or proceeding to restrain, enjoin or prohibit the transactions contemplated by this Agreement.

10504231\V-2

(e)    Agency Approvals.    Purchasers (their respective designees or an applicable Affiliate of a Purchaser that may hold the related Purchased Assets following the Closing Date) shall be approved (i) by HUD to hold FHA Loans and (ii) by the VA to hold VA Loans, in each case to the extent necessary.

Section 8.2    Conditions to Obligations of Sellers.    The obligations of Sellers to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date, of the following conditions:

(a)    Warranties of Purchasers True as of Closing Date.    The representations and warranties of each Purchaser contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of each Purchaser contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date hereof and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(b)    Compliance with Covenants.    Each Purchaser shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by it on or prior to the Closing Date.

(c)    Certificate.    Sellers shall have received a certificate, signed by a duly authorized officer of each Purchaser and dated the Closing Date, to the effect that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied.

(d)    Third Party Consents.    All Consents set forth on Schedule 5.3 shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Sellers, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

Section 8.3    Conditions to Obligations of Purchasers.    The obligations of Purchasers to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date of each of the following conditions:

(a)    Warranties of Sellers True as of Closing Date.    The representations and warranties of Sellers or any Affiliate Seller contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of Sellers or any Affiliate Seller contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date hereof and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(b)    Compliance with Covenants.    Sellers shall have performed and complied with the covenants set forth in Sections 6.12(d) in all respects, and shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by them on or prior to the Closing Date.

(c)    Certificate.    Purchasers shall have received certificates, signed by duly authorized officers of Sellers and dated the Closing Date, to the effect that the conditions set forth in Sections 8.3(a) and 8.3(b) have been satisfied.

10504231\V-2

(d)    <u>Sale Approval Order</u>.

(i)    Solely with respect to the purchase of Funded HELOCs under this Agreement, the Sale Approval Order shall have been entered and become a Final Order in form and substance satisfactory to Purchasers (including with respect to (x) the treatment of HELOC advances, and (y) the Purchasers' right to receive payments with respect to Securitized Advances free and clear of all Liens (other than Permitted Liens), Claims and Liabilities, irrespective of a party's ownership of the servicing rights (primary or master servicing) related to the underlying home equity lines of credit; and

(ii)    With respect to obligations and benefits that can be realized prior to the Closing Date, Sellers shall have complied, in all material respects, with all of their obligations under, and Purchasers shall have received the benefits of, the Sale Approval Order.

(e)    <u>Other Third Party Consents</u>.  All Consents set forth on <u>Schedule 4.3</u> shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchasers, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(f)    <u>Licenses</u>.  Each Purchaser (its designees or its Affiliate that shall hold the Purchased Assets following the Closing Date), shall have obtained all Licenses and Permits necessary to own the Purchased Assets in all material respects, including those set forth in <u>Section 6.6</u>, or, with respect to any License or Permit, shall have received a written waiver by the relevant licensing Government Entity to operate the business without such License or Permit, pending the final issuance thereof.

(g)    <u>Assignment of SBO Servicing Agreements</u>. A Final Order authorizing the assumption by the applicable Sellers and assignment to the applicable Purchasers of the SBO Servicing Agreements with respect to the Purchased Assets has been entered by the Bankruptcy Court.

## ARTICLE IX.

## TERMINATION AND SURVIVAL

**Section 9.1    Termination**.  Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Closing Date:

(a)    by the mutual written consent of Sellers and Purchasers;

(b)    by Sellers or Purchasers if any court of competent jurisdiction shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Order shall have become a Final Order unless such Final Order or action was issued or taken at the request or with the support of the party seeking to terminate this Agreement (or any of its Affiliates); it being agreed that the parties hereto shall promptly appeal any such adverse order or other determination that is appealable (and argue such appeal with reasonable diligence);

(c)    by Purchasers, upon written notice to Seller if:

(i)    any condition to the obligations of Purchasers set forth in <u>Sections 8.1</u> and <u>8.3</u> shall have become incapable of fulfillment other than as a result of a breach by Purchasers of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchasers;

(ii)    there has been a material violation or breach by any Seller of any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period;

(iii)    the Sale Procedures Order is changed in a manner that is materially adverse to Purchasers without the consent of Purchasers in their sole discretion;

(iv)    the Sale Procedures Order does not provide for the final bid deadline to occur not later than October 19, 2012;

(v)    the Auction, if any, is not concluded by November 1, 2012;

(vi)    the Sale Hearing does not occur by November 27, 2012;

(vii)    the Sale Approval Order has not been entered and become a Final Order without stay of its effectiveness by December 3, 2012;

(viii)    the Sale Approval Order once entered, is changed in a manner that is adverse to Purchasers without the consent of Purchasers in their sole discretion;

(ix)    any Seller seeks to have the Bankruptcy Court enter an order dismissing the Bankruptcy Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Bankruptcy Case of any Seller or converting the Bankruptcy Case of any Seller to a case under Chapter 7 of the Bankruptcy Code, or appoints a trustee in any Seller's Bankruptcy Case or an examiner with enlarged powers relating to the operation of Sellers' businesses, and such dismissal, conversion or appointment is not reversed or vacated within three business days after the entry thereof; or

(x)    Sellers' respective Boards of Directors approve an Alternative Restructuring or Sellers execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring;

(d)    by Sellers, upon written notice to Purchasers:

(i)    if any condition to the obligations of Sellers set forth in <u>Sections 8.1</u> and <u>8.2</u> shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers; or

10504231\V-2

(ii)    if there has been a material violation or breach by Purchasers or any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period;

(iii)    [Reserved];

(e)    automatically if the Bankruptcy Court shall enter an Order approving a Competing Transaction pursuant to the Auction, provided, that if the Auction is held pursuant to the Sale Procedures, and Purchasers are designated as the Next-Highest Bidder (as such term is defined in the Sale Procedures), then this Agreement shall not terminate pursuant to this subsection (e) until the earlier of (i) the Bankruptcy Court approval of the "Successful Bid" (as such term is defined in the Sale Procedures); and (ii) 30 calendar days following the Auction. While Purchasers remain the Next-Highest Bidder (as such term is defined in the Sale Procedures), the obligations of Purchasers and Sellers described in Sections 6.1 and 6.12(c) shall be held in abeyance until the purchase agreement with the bidder or purchase agreements with the bidders, as the case may be, who made the "Successful Bid" at the Auction (as such term is defined in the Sale Procedures) are terminated; or

(f)    by Sellers or Purchasers if the Closing shall not have occurred on or before January 31, 2013 (or such later date as mutually agreed to by Sellers and Purchasers).

Section 9.2    **Procedure and Effect of Termination**.  In the event of termination of this Agreement and abandonment of the transactions contemplated by this Agreement by either or both of the parties pursuant to Section 9.1, three Business Days' written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto; provided, that no notice shall be required with respect to termination pursuant to Section 9.1(e) and provided, further, that (a) this Section 9.2 and Article X (other than Section 10.15) shall survive the termination of this Agreement and (b) no such termination shall relieve any party from any Losses arising out of any breach of this Agreement by a party that occurs upon or prior to the termination of this Agreement.  In addition, in connection with the termination of this Agreement the Sellers shall return the Good Faith Deposit to the Purchasers in accordance with the procedures set forth in the Sale Procedures.

Section 9.3    **No Survival**.  Sellers and Purchasers agree that all of the representations, warranties and covenants of Sellers and Purchasers contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date, except that the representations, warranties and covenants that by their terms survive the Closing Date or otherwise require performance by a party or parties following the Closing Date shall survive the Closing Date.

## ARTICLE X.

### MISCELLANEOUS

Section 10.1    **Expenses**.  Except as otherwise provided in this Agreement or the Sale Procedures Order, (i) all expenses relating to the preparation of assignments, the transfer of ownership of MERS Loans, and other transfer taxes, fees and expenses shall be paid by Sellers, (ii) all expenses relating to the recording of assignments from Sellers to Purchasers shall be paid by Purchasers and (iii)

all other costs and expenses incurred in connection with this Agreement and the consummation of the transactions hereunder shall be paid by the party incurring such expenses.  Following approval of the Sale Procedures Order, any claims arising from breaches by any Sellers of their obligations pursuant to the terms of this Agreement shall constitute administrative expense claims against Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy Code.

Section 10.2    **Amendment; Waiver**.  This Agreement may be amended, modified or supplemented only in writing signed by each of the parties hereto.  Any provisions of this Agreement may be waived, but only if such waiver is in writing and signed by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 10.3    **Notices**.  Any written notice to be given hereunder shall be deemed given:  (a) when received if given in person or by nationally recognized courier; (b) on the date of transmission if sent by telecopy, e-mail or other wire transmission (receipt confirmed in each case); (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, return receipt requested; and (d) if sent by an internationally recognized overnight delivery service, the second Business Day following the date given to such overnight delivery service (specified for overnight delivery and receipt confirmed).  All notices shall be addressed as follows:

if to Sellers, to:

Residential Capital, LLC
1177 Avenue of the Americas
New York, New York 10036
Facsimile:       (646) 257-2703
Attention:       Mr. Thomas Marano
Telephone:     (646) 257-2703
email:            tom.marano@gmacrescap.com

with copies to (which copies shall not constitute notice):

Residential Capital, LLC
1100 Virginia Drive
Fort Washington, Pennsylvania 19034
Facsimile:       (866) 572-7524
Attention:       Tammy Hamzehpour, Esq., General Counsel
Telephone:     (215) 682-1307
email:            tammy.hamzehpour@gmacrescap.com

*and*

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
Facsimile:       (212) 468-7900
Attention:       Gary S. Lee, Esq.
Telephone:     (212) 468-8163
email:            glee@mofo.com

45

*and*

Attention:      Larren M. Nashelsky, Esq.
Telephone :    (212) 506-7365
email:           lnashelsky@mofo.com

if to Purchasers, to:

DLJ Mortgage Capital Inc.
11 Madison Avenue
New York, New York 10010
Facsimile:      (917) 326-8691
Attention:      Adam Loskove
Telephone:    (212) 538-0187
email:           adam.loskove@credit-suisse.com

with copies to (which copies shall not constitute notice):

DLJ Mortgage Capital, Inc.
11 Madison Avenue
New York, New York 10010
Attention:      General Counsel - RMBS


Roosevelt Mortgage Acquisition Company
c/o Roosevelt Management Company LLC
1540 Broadway, #1500
New York, New York 10036
Facsimile:      (888) 303-8477
Attention:      Karen Manson
Telephone:    (212) 938-4848
email:           kmanson@rooseveltmc.com

Roosevelt Depositor LLC
c/o Roosevelt Management Company LLC
1540 Broadway, #1500
New York, New York 10036
Facsimile:      (888) 303-8477
Attention:      Karen Manson
Telephone:    (212) 938-4848
email:           kmanson@rooseveltmc.com

Bayview Acquisitions, LLC
4425 Ponce de Leon Blvd.
Coral Gables, Florida 33146
Facsimile:      (305) 448-8130
Attention:      Stuart Waldman
Telephone:    (305) 854-8880
email:           stuartwaldman@bayviewassetmanagement.com

Selene Finance LP
c/o Ranieri Partners Management LLC
650 Madison Avenue, 19th Floor
New York, New York 10022
Facsimile:        (212) 558-2098
Attention:        Dave Reedy
Telephone:      (212) 558-2060
email:             daver@ranieripartners.com

with copies to (which copies shall not constitute notice):

Ranieri Partners Management LLC
650 Madison Avenue, 20th Floor
New York, New York 10022
Facsimile:        (212) 558-2097
Attention:        Shari Siegel, General Counsel
Telephone:      (212) 558-2073
email:             sharis@ranieripartners.com

*and*

SNR Denton US LLP
1221 Avenue of the Americas
New York, New York  10028
Facsimile:        (212) 768-6800
Attention:        Salvatore Franco
Telephone:      (212) 768-6775
email:             sal.franco@snrdenton.com

**Section 10.4    Waivers**.  The failure of a party to require performance of any provision hereof shall not affect its right at a later time to enforce the same.  No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing.  No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**Section 10.5    Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 10.6    Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction.**

(a)      This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)      EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY.

47

(c)     Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.3 hereof; provided, that if the Bankruptcy Case of Sellers has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.3.

**Section 10.7     Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided, that no assignment of either party's rights or obligations may be made without the written consent of the other party, which consent shall not be unreasonably withheld or delayed; and provided, further, that Purchasers may assign this Agreement and any or all rights or obligations hereunder (including Purchasers' rights to purchase the Purchased Assets) to one or more Affiliates of Purchasers if any such Affiliate has at the Closing all Licenses necessary to own such Purchased Assets; provided, that any such Purchaser exercising such right shall remain obligated to fulfill its obligations pursuant to this Agreement and for any damages arising from an unlawful breach hereof.  Upon any such permitted assignment, the references in this Agreement to Purchasers shall also apply to any such assignee unless the context otherwise requires.

**Section 10.8     No Third-Party Beneficiaries**.  Except as provided in Section 6.22, this Agreement is solely for the benefit of the parties hereto, and no provision of this Agreement shall be deemed to confer any remedy, claim or right upon any third party, including any employee or former employee of Sellers or any participant or beneficiary in any benefit plan, program or arrangement.

**Section 10.9     Public Announcements**.  Sellers and Purchasers each agree that they and their Affiliates shall not issue any press release or otherwise make any public statement or respond to any media inquiry with respect to this Agreement or the transactions contemplated hereby without the prior approval of the other parties, which shall not be unreasonably withheld or delayed, except as may be required by Law or by any stock exchanges having jurisdiction over Sellers, Purchasers or their Affiliates.  Sellers, Affiliate Sellers and Purchasers will consult with each other regarding the content and timing of any internal announcements regarding the transactions contemplated by this Agreement and the Ancillary Agreements to Sellers' employees.

**Section 10.10     Severability**.  Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in

any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

**Section 10.11   Specific Performance**.   The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that each of Sellers and Purchasers shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court referenced in <u>Section 10.6(c)</u>, this being in addition to any other remedy to which either party is entitled at Law or in equity.

**Section 10.12   Waiver of Bulk Transfer Laws**.  Seller and Purchasers agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby and any other bulk sale or bulk transfer or similar Law.

**Section 10.13   Personal Liability**.  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any officer, director, employee, representative or investor of any party hereto.

**Section 10.14   Entire Agreement**.   This Agreement, together with the Ancillary Agreements, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof.

**Section 10.15   Joint and Several**.  The Purchasers hereby acknowledge and agree that they are jointly and severally liable to the Sellers for all representations, warranties, covenants, obligations and liabilities of each of the Purchasers hereunder.

*[SIGNATURES ON FOLLOWING PAGES]*

49

IN WITNESS WHEREOF, Purchasers and Sellers have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**DLJ MORTGAGE CAPITAL, INC.**

By     _____
        Name:
        Title:

**ROOSEVELT MORTGAGE ACQUISITION COMPANY**

By     _____
        Name:
        Title:

**ROOSEVELT DEPOSITOR LLC**

By     _____
        Name:
        Title:

**BAYVIEW ACQUISITIONS, LLC**

By     _____
        Name:
        Title:

**SELENE FINANCE LP**

By     _____
        Name:
        Title:

**RESIDENTIAL CAPITAL, LLC**

By _____

      Name:

      Title:

**RESIDENTIAL FUNDING COMPANY, LLC**

By _____

      Name:

      Title:

**GMAC MORTGAGE, LLC**

By _____

      Name:

      Title:

**GMACM BORROWER LLC**

By _____

      Name:

      Title:

**RFC BORROWER LLC**

By _____

      Name:

      Title: