**MORRISON | FOERSTER**

755 PAGE MILL ROAD
PALO ALTO
CALIFORNIA 94304-1018

TELEPHONE: 650.813.5600
FACSIMILE: 650.494.0792

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SACRAMENTO, SAN DIEGO,
DENVER, NORTHERN VIRGINIA,
WASHINGTON, D.C.

TOKYO, LONDON, BRUSSELS,
BEIJING, SHANGHAI, HONG KONG

November 4, 2012

Writer's Direct Contact
650.813.5866
DRains@mofo.com

The Honorable Martin Glenn
United States Bankruptcy Court
One Bowling Green
New York, New York 10004

Re:   In re Residential Capital, LLC, et al. (Case No. 12-12020 MG)

Dear Judge Glenn:

The Debtors write in response to the letters sent to the Court late Friday by counsel for MBIA Insurance Corporation ("MBIA") and Financial Guaranty Insurance Company ("FGIC").

Both letters join in the arguments made by the Official Committee of Unsecured Creditors (the "Committee") for the production of 367 documents that were the subject of a claw back request initiated by Ally Financial, Inc. ("AFI"). The letters also make new arguments about the respective roles of counsel for AFI and the Debtors, and about the merits of the RMBS settlement now under consideration by the Court.

On the first issue – the claw back request – the Debtors largely incorporate by reference their response to the Committee's letter. The Debtors then separately address the second and third issues – AFI's and the Debtors' representation by counsel, and the merits of the RMBS settlement.

**I.   MBIA and FGIC Have Breached Their Obligations Under Their Confidentiality Agreements By Refusing to Honor the Claw Back Request.**

MBIA's and FGIC's letters largely repeat the arguments made by the Committee concerning the claw back request. Their arguments are misleading for the same reasons as the Committee's.

Both letters, for example, resist AFI's effort to claw back 367 documents, even though MBIA and FGIC knew, before sending their letters, that AFI had shortened its list to 109 documents. Both MBIA and FGIC, like the Committee, are parties to confidentiality agreements with the Debtors and, like the Committee, both MBIA and FGIC had immediate

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Two

and automatic obligations to return or destroy the documents identified in the claw back request regardless of their views about the merits of that request. MBIA and FGIC are both in breach of their obligations under their agreements for failure to comply with AFI's claw back request. MBIA's and FGIC's letters both improperly cite to and disclose privileged information in further breach of their confidentiality agreements. And both MBIA and FGIC, like the Committee, have failed to engage in any meet-and-confer discussion with the Debtors regarding the arguments contained in their letters. They have completely by-passed the Debtors and made their arguments, asserted for the first time, directly to the Court.

For these reasons, explained more fully in the Debtors' response to the Committee, the Debtors respectfully request that the Court compel MBIA and FGIC to:

- Immediately comply with their obligations under their confidentiality agreements by returning or destroying the documents subject to the claw back request;

- Immediately withdraw their disclosures of privileged documents and take all steps necessary to protect those documents from further disclosure;

- Withdraw their current requests for the production of privileged information until they have complied with their meet-and-confer obligations.

**II. MBIA and FGIC Misrepresent the Facts Regarding the Debtors' and AFI's Legal Representation.**

Large portions of FGIC's and MBIA's letters are devoted to setting up, and then knocking down, a straw man. The straw man is the false notion that Tim Devine – AFI's chief of litigation – acted as the legal counsel for the Debtors in negotiating the RMBS settlement.

Both MBIA and FGIC base their arguments on this fiction. According to MBIA, the Debtors' "current position" is "that Mr. Devine acted as an attorney on the Debtors' behalf in connection with the analysis and negotiation of the proposed RMBS settlement agreement." (MBIA Letter, dated November 2, 2012, at p. 2.) FGIC's letter makes the same assertion: "several members of Ally's legal department jointly represented Ally and Debtors in connection with various matters including the negotiation of the RMBS Settlement Agreement pre-petition as well as other matters post-petition." (FGIC Letter, dated November 2, 2012, at p. 1.)

The truth is very different. It has not changed, and it has been consistently explained to all parties, including MBIA, FGIC, and the Committee.

Before the ResCap entities filed petitions in bankruptcy, AFI's legal department – and, in particular, Tim Devine, AFI's chief of litigation – provided legal advice directly to the

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Three

Debtors in connection with litigation involving third parties. ResCap's own legal department worked with in-house litigation lawyers from their parent company on RMBS litigation matters.

It was, of course, entirely appropriate for the Debtors to have attorney-client relationships with AFI's in-house lawyers in connection with litigation matters as to which AFI and the Debtors shared common legal interests. In those cases, the Debtors and AFI shared interests in assessing their risks and litigation exposure, and in coordinating their common defense strategy. *See Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 491 (S.D.N.Y. 1993) ("courts have upheld the privilege for communications shared by the parent with its wholly-owned subsidiary . . . upon a showing that a common attorney was representing both corporate entities or that the two corporations shared a common legal interest"); *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 474 (S.D.N.Y. 2003) (no waiver of privilege for shared communication with affiliated corporation where "the entities were represented by a common attorney, or shared a common legal interest").

In anticipation of the filing of bankruptcy petitions, AFI's legal department formally severed all legal connections to the Debtors. Neither Mr. Devine nor any other member of AFI's in-house legal department has had an attorney-client relationship with the Debtors since then. But, in light of this separation, the Debtors and AFI have entered into a joint defense agreement with regard to ongoing litigation, and they continue to cooperate in a limited fashion regarding the defense of cases involving third parties. AFI and the Debtors share common legal interests with regard to the defense of these matters.

But AFI's in-house lawyers did *not* provide legal representation to the Debtors in connection with the RMBS settlement. In the RMBS settlement negotiations, as well as in the negotiations surrounding the related plan support agreements, AFI's in-house lawyers represented AFI's interests. The Debtors' interests were represented by the Debtors' own in-house attorneys – Tammy Hamzehpour, John Ruckdaschel, and Bill Thompson – and the Debtors' lawyers at Morrison & Foerster.

MBIA, FGIC, and the Committee know all these facts. The Debtors have consistently informed all parties that, in the Debtors' view, a line must be drawn between matters as to which AFI and the Debtors shared counsel and/or a common legal interest, on the one hand, and matters relating to the negotiation of the RMBS settlement agreement, on the other. The Debtors have consistently asserted the attorney-client privilege and common interest doctrine to protect communications regarding the Debtors' and AFI's litigation against third parties. And the Debtors have consistently acknowledged that no privilege protects communications between the Debtors and AFI regarding the negotiation of the RMBS settlement, because AFI's in-house lawyers did not represent the Debtors in those negotiations, and because AFI and the Debtors did not share common legal interests in those negotiations.

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Four

The Debtors' view on these matters is well-known to MBIA, FGIC, and the Committee, because the Debtors informed them that it disagreed with AFI's initial efforts to assert common interest protection with regard to the RMBS settlement negotiations. The Debtors even gave the Committee a chart showing that, with regard to the 367 documents on AFI's original claw back list, the Debtors believed only 109 documents were properly subject to privilege, while the remaining 258 documents – including all those concerning the RMBS settlement negotiations -- were not covered by privilege.

Only by ignoring these well-known facts can MBIA and FGIC argue that Tim Devine "simultaneously represented" both AFI and the Debtors. (FGIC Letter, dated November 2, 2012, at p. 3.) Only by ignoring these facts can FGIC argue that the Debtors' joint defense agreement with AFI is "directly contrary to the prior representations Debtors and Ally have made to the Court." (*Id.*, at p. 2.)

MBIA's and FGIC's arguments, then, do not advance their position. They argue for the production of 367 documents on the ground that, with regard to the RMBS settlement negotiations, the Debtors and AFI could not properly have had privileged communications. But the Debtors never asserted they did, and AFI came around to this view before MBIA and FGIC submitted their letters. MBIA's and FGIC's letters thus succeed only in knocking down a straw man.

### III. FGIC Misrepresents the Debtors' and AFI's Goals In Negotiating the RMBS Settlement, Plan Support Agreements, and the Debtors' Settlement With AFI.

FGIC's letter goes on to make an argument not included in either MBIA's or the Committee's submissions. FGIC contends that the Debtors' "paramount goal" in the RMBS negotiations was "obtaining a third party release, as well as an estate release, for Ally's benefit." (FGIC Letter, dated November 2, 2012, at p. 4.)

Now is not the right time for a full rebuttal of this charge. But the very documents cited in FGIC's letter refute FGIC's allegations. So a brief review of those documents, and what they say, is in order.

The RMBS settlement negotiations involved three parties with different interests. The institutional investors wanted to obtain the largest possible allowed claim against the estate. AFI wanted support for a plan that would include a release from the Debtors as well as releases in its favor as against third parties. It also wanted to minimize the size of its payment to the Debtors.

The Debtors wanted to obtain the best outcome for creditors, which involved (i) obtaining the smallest possible allowed claim against the estate, (ii) obtaining the largest possible contribution to the estate from AFI, and (iii) concluding as many pre-negotiated elements of

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Five

the bankruptcy filling as possible, so as to ensure a clean sale of the Debtors' operating businesses. The documents referenced in FGIC's letter demonstrate that the Debtors achieved these goals.

The documents show that the Debtors and AFI worked together to negotiate for the smallest possible allowed claim for the institutional investors. The Debtors, with AFI's help, argued strenuously with the institutional investors over the proper ways to assess the size and risks of their claims, including arguing for lower defect rates, lower breach rates, lower projected future losses, larger discounts for litigation risks, and the like. The Debtors succeeded in negotiating the institutional investors down from initial demands of from $11 to $13 billion to the final agreed-upon $8.7 billion allowed claim.

These facts are devastating to the creditors objecting to the proposed settlement. Their theory is that the Debtors' settlement is too high, and that the Debtors proposed it as a favor to AFI. But the documents show the Debtors and AFI worked together to achieve the lowest possible allowed claim. The documents referenced in FGIC's letter put the lie to the creditors' theory of the case.

FGIC's documents also demonstrate that the Debtors achieved the best possible contribution from AFI. AFI initially refused to offer any money in return for a release from the Debtors. By the time the negotiations had ended, AFI offered a "Hard stop at 750 + 200 + 100." (FGIC Letter, dated November 2, 2012, at p. 3.) The Debtors successfully negotiated for a $1.05 billion contribution from AFI as its contribution to the Debtors. All this money inures directly to the benefit of the creditors.

A key inducement to AFI for this contribution, of course, was the Debtors' agreement to propose a plan offering releases, including third party releases, in favor of AFI, and also the Debtors' success in obtaining plan support agreements from the institutional investors. The documents referenced in FGIC's letter show AFI's in-house attorney, Tim Devine, negotiating aggressively to obtain support for a plan including third party releases. That is not surprising. AFI had every right to seek to advance its own interests, and AFI was, at the same time, responding to the Debtors' demands for an increased contribution from AFI.

The Debtors believe that AFI's $1.05 billion support contribution is fair value for the releases to be included in the Debtors' plan. It is worth noting, moreover, that the RMBS settlement is not conditioned upon approval of the Debtors' plan. The Court may approve the proposed settlement without approving the Debtors' plan, or without approving third party releases in favor of AFI. The settlement will remain in place regardless of the outcome of the Debtors' plan.

The documents also show the Debtors were successful in concluding key pre-petition agreements so as to ensure a clean sale of the Debtors' operating businesses. Those

MORRISON | FOERSTER

The Honorable Martin Glenn
November 4, 2012
Page Six

agreements, including the RMBS settlement agreement and related plan support agreements, were critical to the success of the sale of the operating businesses, the proceeds of which inure to the direct benefit of the creditors. The results of the Debtors' strategy, and the recent auction and sale, speak for themselves.

FGIC's letter, then, does not show that the Debtors' "paramount goal" was "obtaining a third party release, as well as an estate release, for Ally's benefit." (FGIC Letter, dated November 2, 2012, at p. 4.) Quite the opposite. The documents referenced in FGIC's letter show the Debtors successfully getting the lowest possible allowed claim for the institutional investors, while getting the maximum available contribution to the estate from AFI and achieving the greatest recovery from the sales of the Debtors' operating assets.

MBIA and FGIC have not offered any valid argument for lifting the protection of the attorney-client privilege, work product doctrine, or common interest doctrine. They have not shown any conflict of interest regarding the Debtors' legal representation, and they have not succeeded in undercutting the merits of the proposed RMBS settlement. Their requests for production of documents should be denied.

Respectfully submitted,

Darryl P. Rains