# EXHIBIT A

## Exhibit A

In connection with the *Objection of Fannie Mae to the Debtor's Sale Motion* (the "Objection"),[1] Fannie Mae submits the following list of additional provisions of the Asset Purchase Agreement between Ocwen and the Debtors dated as of November 2, 2012 (the "Ocwen APA") which impermissibly alter agreements among Fannie Mae and the Debtors in violation of the Bankruptcy Code. Fannie Mae provided this list to the Debtors in connection with the Nationstar APA and, in that regard, was working with the Debtors and Nationstar to evaluate its qualifications, proposed sale terms, and anticipated post-closing business terms to resolve its issues with respect to the Sale Motion and related Notices.

On October 5, 2012, the Debtors filed the Debtors' Auction Notice pursuant to which Ocwen and the Walter Entity purportedly joined to offer the successful bid at the auction for certain of the Debtors' assets, and that the Walter Entity has proposed to acquire, among other things, the servicing rights with regard to Fannie Mae's loan portfolio. However, the Ocwen APA was first filed with the Court on Saturday evening, November 3, 2012, shortly before the deadline for submission of this Objection and no Exhibits or Schedules thereto were provided. Accordingly, Fannie Mae has not been provided with nor has had adequate time to review the relevant agreements, proposed orders and other documents or pleadings concerning the purchase of the Debtors' assets by Ocwen and/or the Walter Entity.

Fannie Mae will continue to work, with the Debtors and either Ocwen and/or Walter, to evaluate their qualifications, proposed sale terms, and anticipated post-closing business terms to resolve its issues with respect to the Sale Motion and Notices. However, Fannie Mae reserves its rights to withdraw, supplement or modify any of the objections contained herein.

## Consent

- Pursuant to Section 4.3, the Debtors and Purchaser acknowledge that certain consents may be required in connection with the transaction, as set forth on Schedule 4.3. Notwithstanding anything therein to the contrary, the consent of Fannie Mae and its Conservator to this transaction is required. Moreover, pursuant to Section 6.15, either Ocwen and/or the Walter Entity will purchase the Walter Assets which includes certain obligations related to Fannie Mae and the Fannie Mae Servicing Agreements. Similarly, Sections 2.10 and 2.11 provide that the Debtors, Ocwen and/or the Walter Entity shall execute in this regard such documents and instruments as may be reasonably necessary to effectuate the Walter Assignment.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to those terms in the Objection and/or Ocwen APA. Section and Schedule references herein refer to sections and schedules of the Ocwen APA, which have not been filed with the Court nor provided to Fannie Mae.

As of the deadline for the Objection, as set forth in Section 6.15, the Walter Assignment is in the process of being negotiated and has not been agreed to and related agreements have not been finalized. Nor have drafts of such agreements been provided to Fannie Mae. Accordingly, at this time, neither Fannie Mae nor the Conservator has consented to the assumption or assignment of any executory agreements between Debtors and Fannie Mae, and neither Fannie Mae nor its Conservator has waived any portion of the amounts owing from the Debtors to Fannie Mae under the terms of any such agreements, which amounts continue to accrue. Fannie Mae's consent is subject to, among other things, the resolution of certain issues, including without limitation, representations and warranties, the Fannie EAF Facility (as defined below), any master servicing to be transferred to Ocwen and/or the Walter Entity, whether any amendments to the servicing agreements are anticipated, servicing advances, and any proposed non-assumption of standard obligations assumed on a transfer of servicing.

- Section 4.11(a) fails to define the words "Government Authority" and appears to inaccurately represent that the Debtors have not received any notice of any non-compliance with Fannie Mae's guides which, in fact, has been provided by Fannie Mae to the Debtors.

**Purchased and Excluded Assets and Liabilities**

- The definition of "Retained Liabilities" impermissibly absolves Ocwen and/or the Walter Entity of any origination obligations.

- The definition of "Retained Liabilities" impermissibly absolves Ocwen and/or the Walter Entity from performing any obligations that could be traced to any pre-Closing action or omissions under contracts assumed and assigned by the Debtors, including without limitation, indemnification obligations under such agreements that are unliquidated or unknown at the time of Closing.

- The Ocwen APA fails to ensure that the Purchaser will continue to service the loans according to the Debtors' terms, variances and special obligations.

- The Ocwen APA improperly excludes from assumption certain contracts listed on Schedule Q thereto which could relate to Fannie Mae. Schedule Q has not been filed with the Court or provided to Fannie Mae.

- The definition of "Assumed Liabilities" fails to properly assume obligations to pay all compensatory fees for the pre-Closing period that may become due post-Closing. Similarly, the definition of "Retained Liabilities impermissibly absolves Ocwen and/or Walter of certain compensatory fees that are not Assumed Liabilities.

- It appears that the Debtors and Ocwen have attempted to address the division of liability amongst themselves for foreclosure timeline compensatory fees through a

revision to the definition of Assumed Liabilities in the Ocwen APA, which currently provides that Assumed Liabilities include "any applicable compensatory fees related to a failure to adhere to the foreclosure timelines relating to any Fannie Mae or Freddie Mac Agency Loan that is a Non-Lagging Defaulted Loan." *See* Ocwen APA at § 1.1. The definition of "Non-Lagging Defaulted Loan" refers to a Schedule 1.1, which has not been provided to Fannie Mae. Accordingly, it is unclear what foreclosure timeline compensatory fees are being assumed by Ocwen. In addition to compensatory fees, there are several other servicing-related obligations that could give rise to post-closing defaults that relate to pre-closing actions or omissions by the Debtors, including, for example, the failure to maintain hazard insurance, the failure to maintain mortgage insurance, and additional foreclosure timeline violation fees.

- Section 2.1 does not provide for the assignment to the Purchaser of all the licenses and permits required to service all of the loans.

- The Ocwen APA fails to assign all Fannie Mae loans and REO serviced or subserviced by Debtors, contrary to Fannie Mae's requirements.

- Section 2.1 defines the term "Purchased Assets" and specifies the assets that will be transferred to Ocwen and/or the Walter Entity, pursuant to the Sale Motion. The term Purchased Assets includes, *inter alia*, "Licensed Transferred IP" and "Transferred IT Assets". In addition, "Walter Assets" (i.e., those Purchased Assets to be assigned to the Walter Entity) include hardware and software and certain systems and "Intellectual Property" related to "Business Lending" which is defined to include all systems and software owned by Sellers that are used to operate and facilitate loan originations via third party mortgage bankers and mortgage brokers including, WALT, pipeline management and underwriting tools. Similarly, Section 2.2 states that "Intellectual Property Licenses" are included in the term Purchased Assets. Moreover, pursuant to Section 4.15, Schedule K lists, among other things, various network-telecommunications, storage, servers and other computer equipment, which would also be transferred to the Purchaser. Schedule K has not been filed with the Court, nor has it been provided to Fannie Mae.

Based on the definition of each of those terms and the fact that computer equipment, servers and other IT Assets are being transferred to Ocwen and/or the Walter Entity, it would appear that, although not part of the Debtors' notices to assume and assign agreements among the Debtors and Fannie Mae, various other Fannie Mae contracts, licenses and/or software could be impermissibly implicated and/or transferred.

### Servicing Advances/EAF

- Fannie Mae and the Debtors are party to an Early Advance Funding Mechanism Term Sheet, dated August 1, 2010, as amended and restated on January 18, 2011,

and August 1, 2011 (the "Fannie Mae EAF Facility"), pursuant to which Fannie Mae provides the Debtors with early partial reimbursement of certain advances made by Debtors with respect to Fannie Mae loans (the "Advances"). Fannie Mae pays the early reimbursements into a collection account (the "EAF Collection Account") in which Fannie Mae holds a first priority lien, and the Debtors are permitted to use funds from the account only to make additional Advances on Fannie Mae loans in accordance with the terms of the Fannie Mae EAF Facility. Fannie Mae recoups the early reimbursement amounts it pays under the Fannie Mae EAF Facility from future final reimbursements to, and other recoveries by, the Debtors in respect of certain Advances subject to the Fannie Mae EAF Facility. The Fannie Mae EAF Facility constitutes a financial accommodation and, pursuant to section 365(c)(2) of the Bankruptcy Code, it cannot be assumed and assigned without Fannie Mae's consent.

- The definition of "Mortgage Servicing" and Section 4.9 fail to provide a procedure for the reimbursement of servicing advances. In particular, these provisions do not ensure Fannie Mae's rights to review and/or reject any reimbursement requests that do not meet Fannie Mae's requirements, nor provide a procedure to be followed in the event Fannie Mae does not approve a servicing advance.

- Pursuant to Section 4.9(c), the Debtors represent that each servicing advance is valid and a subsisting amount owed to it, but fail to provide for Fannie Mae's right to object to any reimbursement request.

**Indemnity**

- Pursuant to Section 2.17, the Debtors will provide an Indemnity Escrow Amount equal to 1% of the Purchase Price to indemnify Purchaser for breach of any Core Representations. However, this provision is inadequate for several reasons, including without limitation: (1) it does not provide a procedure for payment of indemnity claims; (2) an escrow would improperly impose procedures on contract counterparties to recover amounts owed to them that are different and more burdensome than under the contract at issue; and (3) there is no assurance that the Indemnity Escrow Amount will be sufficient to cover all permissible indemnification claims and the escrow impermissibly shifts the risk of non-payment in full at the time of assumption and assignment from the Debtors (or Ocwen or the Walter Entity) to the contract counterparty.

**Mortgage Loan Documents and the Servicing Transfer Agreement**

- The definition of "Mortgage Servicing" and Section 4.9 fail to provide assurances of adequate protocols that would allow Purchaser to obtain all the documents needed to properly service the loans. These provisions also fail to require that Purchaser obtain and retain the origination file, as required by Fannie Mae.

Finally, these provisions do not identify which party will be responsible for incomplete servicing documents and records.

- Though Section 4.9 references a Servicing Transfer Agreement, the Ocwen APA does not attach a copy of the Servicing Transfer Agreement nor provide assurances of smooth transfer of the Servicing Agreements. In fact, pursuant to Section 9.1, the deadline for finalizing such an agreement is November 30, 2012, well after the date of the hearing on the Sale Motion.

### Commitment Letter/Financing

- Section 5.4 fails to provide adequate information regarding the financing of the purchase.

### Transition Services

- Section 6.20(c) provides that post-Closing, Ocwen (and, in certain circumstances, the Walter Entity) will provide Debtors "such transition services as may be mutually agreed upon by the parties. The Transition Services Agreement has not been finalized, nor has a draft been provided to Fannie Mae. Accordingly, it is unclear what services are being provided by which entity to whom and whether such simultaneous use of services by the Debtors on the one hand and Ocwen and/or Walter on the other hand is impermissible under certain assumed and assigned contracts.

### Consent Order and DOJ/AG settlement

- The Ocwen APA does not clearly delineate those responsibilities of the Debtors and of Ocwen and/or the Walter Entity with respect to the Consent Order and the DOJ/AG Settlement. In fact, Section 2.3(i) provides that the Consent Order and the DOJ/AG Settlement will not be excluded and not assigned to Ocwen or the Walter Entity. Moreover, while Section 6.16 provides that the Debtors and Purchaser will use their best efforts to, as promptly as is reasonably practicable, address the treatment of these same agreements in an amendment to the Ocwen APA, at this time, it does not provide for full compliance with the Consent Order by the Purchaser.

### Handling and Contesting MI Rescissions and Cancellations

- The Ocwen APA fails to adequately provide for the handling and contesting of Mortgage insurance rescissions and cancellations.

### Handling and Correcting Loans with Title Defects

- The Ocwen APA fails to adequately provide for the handling and correcting of loans with title defects.