«

## UNITED STATES BANKRUPTCY COURT FOR THE

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re.: | |
| RESIDENTIAL CAPITAL, LLC, *et al.,* | Case No. 12-12020 |
| Debtors. | Chapter 11 |
| | Jointly Administered |

| | |
|---|---|
| KEVIN J. MATTHEWS | |
| Plaintiff | Adv. Proc. No. _____ |
| V. | |
| GMAC Mortgage Co., LLC | |
| Defendant | |

### COMPLAINT & JURY DEMAND

## I. Introduction

1. The claims outlined herein exemplify the abusive fast-track foreclosure and abusive debt collection practices that have rocked our headlines and economy for the past year and half by certain so-called professionals and licensed mortgage companies who have thumbed their nose to the rule of law and in which the Plaintiff, Kevin Matthews ("Matthews" or "Plaintiff") has and continues to suffer damages and losses. Further, Defendant GMAC Mortgage LLC ("GMAC"), acting directly and indirectly through its authorized agents has levied similar unfair, deceptive, and

1

knowingly bogus or fraudulent practices against hundreds of other similar Maryland homeowners for the sake of expediency and profit by disregarding and ignoring the rule of law. Matthews and every other Maryland homeowner relied upon the representations of GMAC to be truthful and honest because that is what a reasonable person expects of witnesses and parties in Maryland state courts.

2. After returning from military service in Iraq in 2006 with a medical discharge from the Maryland Army National Guard, Matthews had a number of service-related health problems including post-traumatic stress and a herniated disk. While serving in our armed forces Matthews was recognized with the Army commendation for his meritorious service and mission miles.

3. Upon his return from Iraq, Matthews used his GI benefits and qualified for a VA mortgage from USAA in which he purchased his home and property on February 14, 2008 which is subject to this action.

4. Sometime about December 2008 Matthews was injured in a car accident which exasperated certain injuries he had sustained in Iraq and he had a significant reduction of income as a result. He later exhausted his savings keeping his mortgage current and then fell into default when those savings were used up.

5. However, acting as a responsible homeowner, Matthews anticipated his default before it occurred and attempted to seek appropriate loss mitigation options while he was even in the hospital recovering from his accident. In taking this action he relied upon the terms of his VA loan that GMAC acting on behalf of its principal, USAA Federal Savings Bank ("USAA") would work with him. GMAC, however, never offered Matthews the meaningful loss mitigation alternatives he was entitled

to receive pursuant to his VA loan. GMAC also ignored requests made on his behalf by his housing counselor. Matthews also has sought and has improved his earning capacity through increased job skills by obtaining a Bachelor of Science degree in biology from Coppin State University and is now entered into graduate school.

6.  In its debt collection efforts against Matthews, GMAC and its agents and affiliates worked together to attempt to collect upon his mortgage, by filing a bogus foreclosure action and improperly acquiring the jurisdiction of this Court with those bogus documents (i) before GMAC had properly considered Matthews for all the applicable loss mitigation programs available him and (ii) before it had the right to do so under Maryland law since had not complied with the mandatory requirements established by the Maryland General Assembly before the commencement of the foreclosure action.

7.  To add insult to injury to Matthews and the true owner of the mortgage loan, GMAC neglected to honor protections afforded to Mr. Matthews by the Veterans Administration HAMP program to which Mr. Matthews relied, and proceeded instead to an illegal foreclosure action. It also subsequently evicted Matthews without the legal right to do so while Matthews was away on a school research and training trip without even advising his counsel of record who by then had properly and timely objected to the illegal foreclosure sale. When Matthews returned to his home after the bogus foreclosure action was dismissed, Matthews found that his house was damaged by GMAC and its agents who had failed to properly winterize the property and certain damage resulted as a direct and proximate result.

8.  While fighting to undo the original foreclosure sale (which had occurred without the

right to do so), the illegal robo-signing practices of GMAC and its agents became nationally known. After first attempting to defend these practices, GMAC later received leave to dismiss its bogus foreclosure action before the Circuit Court for Baltimore City, Maryland could rule upon the bogus practices.

9.  Now, Mr. Matthews stands before the Court with a host of losses and damages as a result of the actions of the Defendant and its authorized agents and affiliates. Not only has he lost and regained his legal rights to his property, but he has also lost his belongings in the eviction, he incurred legal expenses to defend the illegal debt collection action, had to pay for temporary rental housing, and has suffered physical property damage to his home by the improper seizure and weatherization of his home at the time of the illegal eviction. Alongside these financial injuries, his health and emotional well-being has been further damaged due to the stress of the illegal foreclosure action against him.

## II. <u>THE PARTIES</u>

10. Plaintiff Kevin Matthews is a resident of Baltimore City Maryland whose address is 3216 East Northern Parkway, Baltimore, Maryland 21214 ("Matthews Property").

11. Defendant GMAC Mortgage, LLC ("GMAC") engages in originating and servicing residential mortgages and is a wholly-owned subsidiary and the mortgage arm of Ally. GMAC is a Delaware corporation with its principal place of business at 1100 Virginia Drive, Fort Washington, Pennsylvania 19034. GMAC transacts business in Maryland during all operative periods of this action. GMAC is also a Maryland licensed mortgage lender/servicer (Lic. Number 15813). GMAC is also the employer of Jeffrey Stephan. At all times described herein Stephan acted with direct and

apparent authority of GMAC. GMAC is further liable for the acts of its authorized employee.

12. Not named as a party to this action, USAA Federal Savings Bank ("USAA"), is an affiliated lender of the United States Automobile Association, a Fortune 500 financial services company offering banking, investing, and insurance to people and families that serve, or served, in the United States Military. USAA is located 9800 Fredericksburg Road in San Antonio, Texas 78288.  On September 14, 2007 the Board of Directors of USAA specifically authorized certain employees of GMAC, including Stephan, to act as authorized as officers of USAA to conduct certain affairs and actions including the debt collection practices subject to this action.   At no time has USAA ever claimed publically or disclosed to any borrower such as Matthews that GMAC or Stephan acted outside the scope of authority granted to them on September 14, 2007.  At all times relevant to this action GMAC has also acted as the authorized agent of USAA pursuant to its Purchasing and Servicing Agreement with USAA which includes the serving of the Plaintiff's loan subject to this action and all "foreclosure services" and collection practices subject to this action.  GMAC's authority to act upon USAA's express behalf is governed by a Mortgage Purchasing and Serving Agreement it established with USAA which was never disclosed to Matthews.

13. Not named as a party to this action, Ally Financial Inc. ("Ally") is a registered bank holding company business affiliate of GMAC and is a leading, multinational financial services firm with a corporate center in New York. Ally has approximately $179 billion of assets and operations in approximately 25 countries. Ally engages in the

business of servicing residential mortgage loans through GMAC.  On or about May 14, 2012, GMAC filed for bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.

### III.   JURISDICTION & VENUE

14. This Court has jurisdiction asserted herein for the following reasons:

    a. This Court has jurisdiction in this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is also a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).  Defendant has admitted this fact (see Doc. 1500 at Page 6).

    b. This adversary proceeding is one arising in the debtor's (i.e. GMAC) case under Chapter 11 of Title 11 now pending in this Court.  This adversary proceeding pursuant to the Bankruptcy Rule 7001.

### IV.   FACTS

#### A.   The Foreclosure Crisis

15. Over the last four years, Maryland and, indeed, the United States have been in a foreclosure crisis. Recent news reports have established that one in ten American homes is at risk of foreclosure.

16. The number of Maryland properties with foreclosure filings has increased substantially throughout the last four years.

17. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the homes surrounding a foreclosure and, perhaps, neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

«

18. The foreclosure crisis is far from over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith for another five years or more.

19. Since the commencement of the crisis, revelations of bogus, false, and deceptive "robo signing" have come to light involving national lenders and mortgage servicers. In Maryland the illegal "robo-signing" issue has even come to the forefront because attorneys and substitute trustees, including those acting on behalf of GMAC, have admitted that they filed bogus documents in hundreds of foreclosure cases filed in state courts.

### B.  Maryland's Response to the Foreclosure Crisis

20. In 2007 at the beginning of the crisis, Governor O'Malley convened a task force of representatives to address the crisis that was then underway. The Maryland Homeownership Preservation Task Force produced a report which aptly summarized the devastating effect of foreclosures on the community as follows:

> Foreclosures have a devastating effect on homeowners and the communities in which they live. Frequently, a homeowner who loses his or her home to foreclosure loses the accrued equity. A property sold in a foreclosure sale typically draws a lower price than it would in a regular market sale. In the first half of 2005, Maryland's "foreclosure discount" was 18.8 percent, according the St. Ambrose Housing Aid Center, Inc. This is a tragedy for a growing number of Maryland families.

> Extensive damage is felt in neighborhoods and communities across Maryland. Research shows that with every foreclosure on a single family home, the value of homes within an eighth of a mile declines by about nine-tenths of a percent. Property tax revenues decline proportionally, causing a negative impact on state and local governments. A study of foreclosures in Chicago in 2005 estimated that a single foreclosure costs city government up to $5,000 or more.

> Foreclosures also bring with them the potential for more violent crime.

Research indicates that for every single percentage point increase in the foreclosure rate in a neighborhood, violent crime in that neighborhood increases by about two percent. Foreclosures can lead to vacant or neglected properties, which create an eyesore and become targets for vandalism. This can tip a community from one dominated by homeowners to one dominated by investors.

Of course, the lending industry and investors also take a hit from rising foreclosure rates. Some major lenders have closed their doors, declared bankruptcy or shuttered their subprime lending arms as a result of the waning demand for risky mortgage products in investor markets. Lenders typically lose $50,000 or more on a single foreclosure, according to information from St. Ambrose Housing Aid Center, Inc. The banking industry cites a figure well over $60,000.

Maryland Homeownership Preservation Task Force Report at 12 (November 29, 2007) *available at*

http://www.gov.state.md.us/documents/HomePreservationReport.pdf

(footnotes omitted).

21. To reasonably address and avoid some of the negative consequences of foreclosure, the Task Force Report made nine general recommendations that are relevant to the issues before the Court. *See Id.* at 40-43.

22. In response to the expanding foreclosure crisis and the Task Force Report, the General Assembly introduced and passed several bills during the 2008 legislative session to change Maryland's foreclosure process and curb certain predatory real estate processes. These bills were passed with nearly complete bi-partisan support.

As summarized in the General Assembly's 90 Day Report for the 2008 session: Until [2008], Maryland's foreclosure process, from the first foreclosure filing to final sale, had been among the shortest in the nation. Maryland is a quasi-judicial State, meaning that the authority for a foreclosure sale is derived from the mortgage or deed of trust, but a court has oversight over the foreclosure sale process. Most mortgages or deeds of trust include a "power of sale" (a provision authorizing a foreclosure sale of the property after a default) or an "assent to decree" (a provision declaring an assent to the entry of an order for a foreclosure sale after a default). Under the Maryland Rules, it was not necessary to serve process or hold a hearing prior to a

foreclosure sale pursuant to a power of sale or an assent to a decree. Consumer advocates contended that the short timeframes and weak notice provisions in State law seriously limited a homeowner's options to avoid foreclosure by, for example, working out a payment plan with the lender or selling the house. In addition, filing a request for an injunction to stop the sale is expensive, time consuming, and not a realistic option for most homeowners.

*Senate Bill 216 (Ch. 1)/House Bill 365 (Ch. 2),* emergency legislation that took effect April 4, 2008, make a number of significant changes to the foreclosure process in Maryland for residential real property. "Residential property" is defined under the Acts to mean real property improved by four or fewer single-family dwelling units. Except under specified circumstances, the Acts prohibit the filing of an action to foreclose a mortgage or deed of trust on residential property until the later of 90 days after a default in a condition on which the mortgage or deed of trust states that a sale may be made or 45 days after the notice of intent to foreclose required under the Acts is sent.

*Senate Bill 2171 House Bill 360* define "mortgage fraud" as any action by a person made with the intent to defraud that involves:

- knowingly making, using, or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that it will be relied upon by a mortgage lender, borrower, or any other party to the lending process;
- receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from the aforementioned actions;
- conspiring to violate either of the preceding provisions; or
- filing or causing to be filed in the land records in the county where a residential real property is located any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

Under the Acts, the "mortgage lending process" includes the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan, as well as the notarizing of any document in connection with a mortgage loan.

Md. Dept, of Legislative Services, The 90 Day Report, A Review of the 2008

Legislative Session, F16-18 (April 11,          2008) *available          at*

http://mlis.state.md.us/2008rs/90-Day-report/index.htm.

9

23. In response to the material violations of Stephan GMAC and many other repeat filers involved in foreclosure matters in the state courts involving Matthews and other parties in various foreclosure actions, the Maryland Court of Appeals recently adopted in October 2010 an emergency rule to deal with the robo-signing issue based upon the recommendation of the Standing Committee on Rules of Practice and Procedure. Writing for the Committee the Honorable Alan M. Wilner explained:

> The need for these changes emanates from recent revelations regarding the filing in residential foreclosure actions of affidavits as to which the affiant either did not have sufficient knowledge of the facts stated in the affidavit to validly attest to their accuracy or did not actually read or personally sign the affidavit. Preliminary audits have shown that hundreds of such affidavits have been filed in Maryland circuit courts. Up to this point, courts, with good reason and really of necessity, have relied on the accuracy of affidavits, especially when filed by attorneys, unless there is something on the face of the document to suggest otherwise or the validity of the affidavit is challenged. Evidence that has recently come to light, largely through admissions under oath by the affiants themselves, has shaken the confidence that the courts have traditionally given to those kinds of affidavits.

> In the Committee's view, the use of bogus affidavits to support actions to foreclose liens on property, apart from prejudice to the homeowners, constitutes an assault on the integrity of the judicial process itself.

> Letter from A. Wilner to the Court of Appeals, Oct. 15, 2010.

24. In further response to the foreclosure crisis, Maryland Commissioner of Financial Regulation required for its licensees "a duty of good faith and fair dealing in communications, transactions, and course of dealings with a

borrower in connection with the...servicing...of any mortgage loan, including, but not limited to...(3) The duty when servicing mortgage loans to: (a) Promptly provide borrowers with an accurate accounting of the debt owed when borrowers request an accounting; (b) Make borrowers in default aware of loss mitigation options and services offered by the licensee; (c) Provide trained personnel and telephone facilities sufficient to promptly answer and respond to borrower inquiries regarding their mortgage loans; and (d) Pursue loss mitigation when possible." Md. Code Regs. 09.03.06.20. As a Maryland licensed mortgage servicer GMAC has contractually agreed to this duty and as discussed below has utterly failed in fulfilling its responsibilities.

**C.  Scrutiny of GMAC's and Stephan's Foreclosure Practices**

25. In depositions given under oath on December 10, 2009 and June 7, 2010, Stephan testified that he signed affidavits for GMAC which were prepared by attorneys, that he was given anywhere from 5,000 to 10,000 of these documents to sign each month to be filed in cases around the country including Maryland courts, that he did not read much of the information on the documents before signing them, and that he did not have any personal knowledge of many of the facts attested to in the affidavits. Stephan Dep. 7:9-20, 10:1-13:4, Dec. 10, 2009; Stephan Dep. 29:11-30:17, 38:7-40:21, 43:12-45:21, 46:9-48:17, 54:12-25, 57:20-63:23, June 7, 2010.

26. On April 13, 2011, in response to revelations of irregular, improper, and bogus

11

foreclosure and servicing practices of GMAC, the Board of Governors of the Federal Reserve System ("Board of Governors"), the Federal Deposit Insurance Corporation ("FDIC"), GMAC, and Alley entered into a Consent Order concerning GMAC's loss mitigation and foreclosure servicing practices (hereinafter "Consent Order") on their own behalf. The Consent Order came about as a result of a horizontal review of various major residential mortgage servicers conducted by the Board of Governors, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision, examiners from the Federal Reserve Bank of Chicago and the FDIC.

27. The Consent Order recognized the following improper practices, relevant to the facts alleged herein, allegedly performed by GMAC when:

    a. It "[f]iled or caused to be filed in state courts...numerous affidavits executed by employees of [GMAC] or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the amount of principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such knowledge or review;"

    b. It ["f]iled or caused to be filed in courts in various states...or in the local land record offices, numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;"

    c. It "[l]itigated foreclosure...proceedings...without always confirming that documentation of ownership was in order at the appropriate time, including confirming that the promissory note and mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party;"

12

    «

       d. It "[f]ailed to respond in a sufficient and timely manner to the increased level of foreclosures by increasing financial, staffing, and managerial resources to ensure that the [GMAC] adequately handled the foreclosure process;"

       e. It "[f]ailed to respond in a sufficient and timely manner to the increased level of Loss Mitigation Activities to ensure timely, effective and efficient communication with borrowers with respect to Loss Mitigation Activities and foreclosure activities;" and

       f. It "[f]ailed to have adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process, including sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services with respect to the Servicing Portfolio."

Consent Order at Pages 3-4.

28. GMAC and Ally did not admit to any facts in the Consent Order but did agree that the practices described in the preceding paragraph were "unsafe and unsound banking practices." *Id.* at Page 4.

29. In a judicial statement by its authorized counsel to Superior Court of New Jersey Chancery Division, GMAC represented *In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities,* Doc. No. F-059553-10 (Sept. 2, 2011), GMAC stated as follows:

       GMAC entered into a "mortgage and Purchasing Agreement with USAA...[which] provides that [GMAC] 'shall Service all Mortgage Loans in accordance with the Servicing Agreements, the Mortgage Loan Requirements, the Service Level Objectives as set forth in Section 12.3, and the terms and conditions of the this Agreement.' 'Service' or to engage in 'Servicing' is defined in the Agreement and specifically encompasses 'foreclosure services.' ...Moreover, [GMAC] would like to make it clear that if a default occurs pursuant to Mortgage Purchasing and Servicing Agreement between [GMAC] and USAA...that any foreclosure action would be institute with USAA...as the named party, not [GMAC].''

30. On or about March 9, 2012, GMAC and Ally entered into a final settlement agreement related to the Multistate/Federal Settlement Of Foreclosure Misconduct Claims with a coalition of state attorneys general ("National Mortgage Settlement") which further exemplified the materiality of the practices of GMAC which are subject to this action and related activities carried out by Stephan and GMAC's other agents and affiliates.

31. The National Mortgage Settlement

"follow[ed] ten months of intensive negotiations between the five banks and a coalition of state attorneys general and federal agencies, including the Departments of Justice, Treasury, and Housing and Urban Development. The investigation began in October 2010 following revelations of widespread use of "robo-signed" affidavits in foreclosure proceedings across the country. State attorneys general formed a working group to investigate the problem and to confront the banks about the allegations. The major mortgage servicing banks soon acknowledged that individuals had been signing thousands of foreclosure affidavits without reviewing the validity or accuracy of the sworn statements. Several national banks then agreed to stop their foreclosure filings and sales until corrective action could be taken.

While the robo-signing issue received the most attention, other servicer-related problems were identified, including deceptive practices in the offering of loan modifications (for example, telling consumers that a loan modification was imminent while simultaneously foreclosing). The performance failures resulted in more than just poor customer service. Unnecessary foreclosures occurred due to failure to process homeowners' requests for modified payment plans. And where foreclosures should have been concluded, shoddy documentation led to protracted delays. This misconduct threatened the integrity of the legal system and had a negative impact on communities and the overall housing market."

Executive Summary of the National Mortgage Settlement at Page 1 (http://www.ata.wa.aov/uDloadedFiles/Home/About the Office/Cases/Nationa l Mortgage Settlement/National Settlement Executive Summarv.pdf)

"

### D. Background Leading to Mr. Matthews' Foreclosure Crisis

32. Plaintiff Kevin Jerron Matthews enlisted in the U.S. Air Force on July 31, 1998 after graduating Baltimore Polytechnic Institute. After multiple deployments, Mr. Matthews was discharged in 2001 due to a family hardship.

33. In 2002, Mr. Matthews enlisted in the Maryland Army National Guard as a reserve, stationed out of Towson, Maryland.

34. In May 2005, Mr. Matthews was selected to be deployed to Iraq with the 243rd Engineering Company. Mr. Matthews was officially deployed in August 2005 Kuwait and Iraq where his duties involved transportation missions.

35. Mr. Matthews returned home from Iraq in 2006 when his tour was completed. At the time when he returned, Mr. Matthews began to experience adverse effects from his deployment. Specifically, Mr. Matthews suffered from chronic back pain, post-traumatic stress disorder, and migraine headaches.

36. Despite Mr. Matthews' ailments, he continued to work for Baltimore City, Maryland.

37. In 2006 Mr. Matthews was married and in 2007 his son Kevin was born.

38. On or about February 14, 2008, Mr. Matthews purchased his home on 3216 East Northern Parkway with the assistance of the VA Guaranty Loan Program. Mr. Matthews obtained his mortgage from USAA.

39. When Mr. Matthews purchased his home, he was employed as a contractor at Fort Meade in the field of waste water management.

40. In December 2008, Mr. Matthews was involved in a serious car accident caused by a third party that further aggravated his pre-existing injuries. Due to these new, aggravated injuries, Mr. Matthews was continually absent from work and had difficulty performing the physical work required of him. As a result, he was laid off from his job in February 2009.

41. Until October 30, 2010 Matthews believed at all times when he was applying for a loan modification and seeking loss mitigation alternatives discussed in the proceeding paragraphs that he was communicating with USAA. However, on October 30, 2010 he was learned for the first time that he actually was communicating with GMAC and not USAA representatives. This knowledge came from an admission by USAA in the Washington Post reported as follows, "Roger Wildermuth, a USAA spokesman, said his firm was no longer responsible for Matthews's loan because it had been sold to GMAC, though GMAC employees in his case would have identified themselves as USAA workers 'to create a seamless customer experience.'"

    a. Is further evidence of GMAC's concealment of the true facts concerning its interest in Mr. Matthews' loan throughout the operative time period of this complaint, on March 7, 2012 GMAC sent Matthews a letter acknowledging to him for the first time that GMAC actually retained the servicing rights of his loan at the time he closed on his loan.

«

b.  Further, based upon the public records filed in the Circuit Court for
Baltimore City, Maryland concerning the Matthews loan,
Wildermuth's statement to the Washington Post was not correct at
the time it was made since the Deed of Trust subject to this action
was not in fact transferred by USAA to GMAC until January 18,
2012.  Further, no notice of the assignment was ever provided to
Matthews as required by federal law, 15 U.S.C. § 1641(g).

42. The events surrounding Mr. Matthew's foreclosure and illegal eviction took
place while the VA HAMP program was in effect. GMAC failed to take actions
required by the Veterans Administration prior to commencing and then actually
foreclosing on Mr. Matthew's VA-guaranteed loan. As such, the foreclosure
and eviction were conducted in violation of the VA HAMP program.

43. The VA HAMP program was established on January 8, 2010 when the
Veterans Benefits Administration issued Circular 26-10-02 (hereinafter "VA
Circular"). This circular provided lenders with authority and instructions for
modifying VA-guaranteed home loans in accordance with the President's
Making Home Affordable (MHA) program. The circular stated that the new
procedures would become effective on February 1, 2010.

44. The Home Affordable Modification Program ("HAMP") is one of the main
features of the MHA program. The purpose of HAMP is to help borrowers
avoid foreclosure by modifying loans to increase affordability relative to

17

borrower income. The VA Circular laid out the framework for outline the procedures that servicers of VA-guaranteed loans are required to follow before proceeding with a foreclosure.

45. Specifically, the VA Circular required all servicers to first evaluate defaulted mortgages for traditional loss mitigation actions, including repayment plans, special forbearances, and traditional loan modifications. If none of these traditional mitigation options provided the borrower with an affordable payment, the servicer would then be required to evaluate the loan for a VA HAMP modification *before* deciding that the borrower's default is insoluble and exploring alternatives to foreclosure.

46. If, after completing the HAMP evaluation, the servicer determines that the loan meets HAMP eligibility requirements, the servicer *must* execute the modification pursuant to the HAMP guidelines.

47. GMAC never offered Mr. Matthews a traditional home retention loss mitigation option, to which we was owed and relied upon in taking out his loan, during the period in which he was in default of his mortgage. Upon information and belief, Mr. Matthews' loan was never properly evaluated by GMAC for a VA HAMP modification as required by the VA Circular.

48. Prior to missing any payments on his mortgage, Mr. Matthews contacted GMAC to inform them of his circumstances, including his hospitalization, disability, and his anticipated financial hardships and he requested GMAC's,

as the authorized agent of USAA, assistance in exploring loss mitigation options relying upon the terms of his VA loan.

49. From December 2008 through August 2009, Mr. Matthews contacted GMAC by telephone after being released from the hospital and throughout his rehabilitation in an effort to keep them apprised of his current situation sometimes multiple times in a week. The continued communications demonstrates Matthews' reliance that GMAC, d/b/a USAA, would help him explore loss mitigation options.

50. Mr. Matthews made every reasonable effort to stay current on his mortgage, including draining his savings (approximately $6,000) and 401k (approximately $5,500) as well as applying his tax return refunds (approximately $4,000) and short-term disability benefits (approximately $1,500) towards his monthly mortgage payments and reasonably relied upon GMAC's duty, acting as the authorized agent of USAA and d/b/a USAA, to meaningfully consider him for loss mitigation options. Mr. Matthews chose not to pay some of his other bills so that he could use all his available funds to pay off his mortgage first. However while he was current on the mortgage, GMAC, d/b/a USAA, never offered him any meaningful loss mitigation options given his unfortunate situation.

51. Mr. Matthews finally ran out of funds in July 2009, and became thirty days delinquent on his mortgage in August 2009.

19

52. Mr. Matthews continued to contact GMAC, d/b/a USAA, after defaulting on the mortgage, calling approximately twice a week and faxing over hardship letters. Mr. Matthews explained to GMAC, d/b/a USAA, that he had applied for disability benefits in March 2009 which he hoped would permit him to make a modified payment.

53. At no time during this period of communications with GMAC, d/b/a USAA, was Mr. Matthews ever offered a repayment plan, special forbearance, loan modification, compromise claim, deed-in-lieu, refinance, assumption, or refunding. In fact GMAC intentionally concealed these loss mitigation options from him since it had no risk related to the loan and would just pass the loss on to the American taxpayer which could have otherwise been avoided.

54. In August 2009, Mr. Matthews contacted GMAC, d/b/a USAA, again and specifically requested information about a deed-in-lieu as an alternative to foreclosure. A representative of GMAC told him to draft a letter stating his financial situation and asking that a deed-in-lieu be accepted. In reliance of that representation, Mr. Matthews faxed the letter as instructed to GMAC but never received any response.

55. The stress of the mortgage situation took a toll on Mr. Matthew's family, and he and his wife divorced which was approved by this Court in July 2010.

56. Finally after months of applications and waiting, in February 2010 Mr. Matthews was approved for Social Security disability ($1,620 per month). He

also had at the time his VA disability payment ($1,298 per month).

**E. Maryland Changed its Foreclosure Law in 2008**

57. The foreclosure laws in the State of Maryland were substantially changed by the Maryland Legislature in 2008 in emergency legislation changing 200 years of Maryland foreclosure procedure. The legislature imposed specific prerequisites before any owner of a security instrument had the right to initiate a foreclosure proceeding before a Maryland Court. Among these other prerequisites, a homeowner is entitled to a Notice of Intent to Foreclose ("NOITF"). Md. ANN. CODE, REAL PROP. § 7-105.1. The NOITF must include specific information including the name of the secured party. Md. ANN. CODE, REAL PROP. § 7-105.1 (c)(4)(ii)(1)(A).

58. The simple reason for this requirement was that the legislature intended for the homeowners to know the name of the secured party who owned their mortgage because the servicers were not responding to calls from homeowners for assistance or in many instances even answering the phones in a reasonable time period. In addition, many servicers falsely claimed, all too frequently, that the owner of the loan would not permit a sustainable modification. To verify these representations and ensure homeowners had knowledge of who owned their loan, the legislature required that a standard, uniform NOITF be sent to each homeowner which identified the secured party so that the homeowner could have some other party to contact when the

21

servicer failed to help.

59. GMAC retains various agents, including Stephan, and substitute trustees and attorneys to perform foreclosure services on its behalf in the State of Maryland. The agents, substitute trustees, and attorneys act with GMAC's express authority in the foreclosure actions filed on its behalf and at its request.

60. A Maryland foreclosure proceeding based upon an incomplete Notice of Intent to Foreclose ("NOITF") is improper because it does not provide the information required by the legislature. The information required on the NOITF is material as determined by the legislature. No reasonable person would believe that a mortgage lender, servicer, and/or substitute trustee would knowingly violate the mandatory requirement of the legislature and send a materially false NOITF to a homeowner which fails to properly identify all the secured parties in the loan.

61. Instead of providing the name and address of the true secured party, GMAC routinely and regularly relies in Maryland state courts on a NOITF that sets forth a bogus party as the secured party because it does not want its borrowers to complain to the true owners of their loans GMAC is not providing the services it is required to provide contractually or under the law.

62. Under Maryland law a servicer is "a person responsible for collection and payment of principal, interest, escrow, and other moneys under an original

mortgage." MD. ANN. CODE, COMM. LAW ART. § 13-316(a)(3). Maryland law also defines a servicer as "a person who: (1) Engages in whole or in part in the business of servicing mortgage loans for others; or (2) Collects or otherwise receives payments on mortgage loans directly from borrowers for distribution to any other person." MD. ANN. CODE, FIN. INST. § 11-501 (n).

63. The servicer in these instances is not the exclusive secured party since it does not own any interest in the property of the mortgagors and only acts on their behalf as directed by their agreement(s) with the owner loan.

64. GMAC knows that it does not hold an interest in the mortgagor's property and that its client holds an interest in the property.

65. GMAC has engaged in a materially false and deceptive artifice to avoid the requirements of the Maryland foreclosure laws to the detriment of Matthews.

66. GMAC has authorized and actually proceeded to file foreclosure proceedings in Maryland courts knowing that the NOITF it provided to Matthews and other Maryland residents does not set forth each secured party required to be disclosed under Maryland law.

67. Because GMAC sent, directly and indirectly, knowingly deficient NOITFs to Matthews and other Maryland homeowners, which improperly identified Ginny Mae as the only secured party but identified none of the other required secured parties, these homeowners have no way of knowing whether the party identified as the secured party on the NOITF is accurate or not—these

false representations by GMAC are material omissions of mandatory information required by the legislature.

68. GMAC intends to proceed to foreclosure with the intent and goal that the inaccurate NOITF will not be discovered by Matthews and other Maryland homeowners. This pattern and practice is also consistent with the many inconsistent practices identified recently by the Inspector General of the Federal Housing Finance Agency's recent audit and report entitled "FHFA's Oversight of Fannie Mae's Default-Related Legal Services" (available at httD://www.fhfaoia.aov/Content/Files/AUD-2011 -004.pdfi.

69. The filing of *a* foreclosure proceedings when GMAC knows or should have known that the Matthews has not been provided the information that the legislature mandated is unfair or deceptive.

70. The filing of a foreclosure proceeding under the above circumstances is an assertion of a legal right when the right does not exist.

**F.  The First Illegal and Improper Matthews Foreclosure Action**

71. Around the time of his divorce, Mr. Matthews received a NOITF dated February 3, 2010 which was prepared and sent by GMAC's firm. By agreeing to send the notice which required certain information to be disclosed, Ward's firm voluntarily assumed a duty to speak. When that duty was voluntarily assumed, anything spoken had to be truthful. The Notice of Intent knowingly falsely stated and misrepresented that the only Secured Party was

Government National Mortgage Association ("Ginny Mae") and that the servicer of his loan was GMAC. However, up to this time Mr. Matthews never had any knowledge of either GMAC or Ginny Mae's involvement with his loan since the statements he was sent and the representatives he had spoken to identified themselves on behalf of USAA. Even after the First Foreclosure Action commenced, when Matthews called his designated contact numbers, GMAC continued to identify itself on the telephone as USAA which effectively continued to conceal the true facts from him.

72. Without actual knowledge to Mr. Matthews on February 4, 2010, USAA assigned Mr. Matthew's Note and Deed of Trust to GMAC effective January 23, 2010 for all limited purposes related to the foreclosure only.  Stephan signed this assignment which was recorded in the land records of this Court as Vice President on behalf of USAA.

73. On February 4, 2010, GMAC as the authorized agent of USAA and acting on purported behalf of Ginny Mae based upon the authorization attested to by Stephan, appointed Carrie Ward, Howard Bierman, and Jacob Geesing as its authorized Substitute Trustees in the Matthews matter. At all times thereafter Ward was an authorized agent of GMAC and acted within the scope of apparent and actual authority by GMAC.  The Deed of Appointment was recorded in the land records of Baltimore City, Maryland.

74. On or about April 2, 2010, Mr. Matthews was served with an Order to Docket

via posting on his front door. The Order to Docket was filed in this Court on
March 29, 2010 by the law firm of Bierman, Geesing, Ward & Wood, LLC and
Ward in their capacity as Substitute Trustees on behalf of GMAC, as the
authorized agent of USAA, (Case No. 24010001394)("First Foreclosure
Action"). In support of the First Foreclosure Action, Ward and Stephan on
behalf of GMAC as the authorized agent of USAA provided the following
bogus affidavits and papers in order to acquire this Court's jurisdiction:

a. The Order to Docket contained an single indecipherable signature of
   one of three substitute trustees.

b. The Affidavit, Pursuant to Md. Rule 14-207(b)(4) Regarding Copy of
   Deed of Appointment of Substitute Trustee contained a single
   indecipherable signature but listed one of three possible affiants
   including Ward—a practice held to be improper in the matter of
   *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13- C-
   10-082594).

c. The Deed of Appointment signed by Stephan was done so without the
   authorization of Ginny Mae but represented something different.
   Further Stephan signed the document without any knowledge of the
   truth of any of the statements contained therein. It also contained a
   false notarization to make it appear to be a legitimate document.

d. The Affidavit, Pursuant to Md. Rule 14-207(b)(1) Regarding Copy of

Lien Instrument contained single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

e. The Affidavit Certifying Ownership of Debt Instrument and Truth and Accuracy of Copy Filed Herein was signed by Stephan even though he lacked an personal knowledge of the facts contained within it and certain of those facts were clearly false. It also contained a false notarization to make it appear to be a legitimate document.

f. The Affidavit of Deed of Trust Debt and Right to Foreclose contained a single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

g. The Affidavit Pursuant to Service Members Civil Relief Act contained a single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

h. The Affidavit of Default and Mailing of Notice of Intent to Foreclose signed by Stephan was done so without any knowledge of the truth of

any of the statements contained therein. It also contained a false notarization to make it appear to be a legitimate document.

i.   The Affidavit of Mailing of Notice to Occupant(s) contained a single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13- C-10-082594).

j.   The Statement Designating Secured Property "Residential Real Property" contained a single indecipherable signature but listed one of three possible affiants including Ward—a practice held to be improper in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).

k.   Because the papers and affidavits filed by Ward and her firm in the First Foreclosure Action were not legally sufficient to acquire the jurisdiction of this Court, the First Foreclosure Action was substantively incorrect and false under Maryland law as judicially determined in the matter of *Geesing v. Willson* (Circuit Court for Howard County, Case No. 13-C-10-082594).   Further, the materially false information provided by Ward and her firm in the First Foreclosure Action could not have been filed in the manner and speed it was done—in other words Ward and her firm employed a strategy to create an assembly-line

"

process which cut corners in the collection practices of GMAC and those parties turned a blind eye to actually reviewing and supervising Ward and her firm.

l.  The actual identity of the person filing a Maryland consent decree or assent to decree foreclosure action is material because only those authorized as a substitute trustee may do so; and there is no provision under Maryland law permitting a substitute trustee such as Ward to another person. The identify is also important to Mr. Matthews and any other reasonable person for the same reason it is important to this Court because our adversary system requires parties to be truthful and honest and does not permit shortcuts; if it did, the integrity of the judicial system would be harmed.

75. In April 2010, in reliance to GMAC's efforts to foreclose on his home and property, Mr. Matthews engaged the housing counseling services of Belair-Edison Neighborhoods, Inc. to assist him with his efforts to mitigate his loan situation and seek alternatives to foreclosure that were required and allowed under his VA loan. His case was assigned to Roy Miller, who was authorized by Mr. Matthews to contact GMAC and negotiate on Mr. Matthews' behalf.

76. Prior to his engagement of Mr. Miller, Mr. Matthews had contacted GMAC, d/b/a USAA, on many occasions but had not received any modification or forbearance or any other loss mitigation services or consideration from

GMAC.

77. A foreclosure sale of Mr. Matthews' home was scheduled on May 21, 2010 by Ward and her firm even though the papers and documents she presented to the Circuit Court for Baltimore City, Maryland were not legally correct and as such she had no legal right under Maryland's new foreclosure laws to conduct the sale in the manner she conducted it through her firm. Since Ward is an attorney and officer of the Court, Matthews reasonably relied upon her representations to that court and himself as being truthful and correct and had no knowledge until obtaining counsel, following the foreclosure sale, that the material representations of Ward, GMAC and Stephan before the sale were false and misleading.

78. On or about May 6, 2010, Mr. Matthews contacted GMAC, d/b/a USAA, regarding the status of his modification he had previously sought by application. GMAC falsely stated he was denied a modification because he to reduce did not have sufficient income.

79. On behalf of Mr. Matthews, Miller contacted GMAC, by telephone on May 10, 2010 and confirmed that Mr. Matthews was denied a modification due to an incorrect determination that Mr. Matthews did not have sufficient income. The GMAC loss mitigation specialist that Miller spoke with said that Matthews could apply again on Mr. Matthews' behalf.

80. Like Mr. Matthews, when Miller contacted what he thought was USAA on

behalf of Mr. Matthews it was in fact was GMAC using the name USAA and

GMAC never explained that in fact is had the express authority of USAA to

use its name to act on its behalf.

81. In response and reliance to GMAC's (d/b/a USAA) representation to Miller, he

proceeded to prepare a new loan modification/hardship application with

updated documents and materials on behalf of Mr. Matthews.

82. On May 13, 2010, Mr. Matthews and Miller met to complete his new

modification request package.

83. On May 14, 2010, Miller faxed the completed hardship package to GMAC

d/b/a USAA. Mr. Miller called GMAC, d/b/a USAA, on May 21, 2010 to confirm

receipt of the package. The representative confirmed receipt of the package,

but informed Miller the foreclosure sale had not been postponed. Miller

specifically asked for the foreclosure sale to be put on hold so the package

may be reviewed per VA HAMP guidelines. The representative from GMAC,

d/b/a USAA, said he would request a hold.

84. Following the May 21, 2010 conversation with GMAC, as the authorized agent

of GMAC and d/b/a USAA, Matthews contacted GMAC throughout the day to

see if the sale had been postponed.

85. On May 24, 2010, Miller contacted the office of Bierman, Geesing, & Ward

and confirmed that that GMAC, d/b/a USAA, GMAC had purchased the

property at the May 21, 2010 foreclosure sale.

86. Following the foreclosure sale, and in reliance of Ward's firm's representation, to which as a named member of the firm and actual participant in the First Foreclosure Action, that Ward's (and her firm) had the legal right to conduct a foreclosure sale of his home and property, Mr. Matthews retained legal counsel to determine his legal rights related to the improper foreclosure action and sale given that (i) he had not received any meaningful and correct loss mitigation related to his mortgage loan despite numerous, good faith attempts prior to the sale; and (ii) GMAC, d/b/a USAA, and Ward had not complied with a mandatory, condition precedent by sending a correct and accurate Notice of Intent to Foreclose prior to the commencement of the action. Mr. Matthews incurred legal expenses to respond to the illegal First Foreclosure Action.

87. Prior to Mr. Matthews engaging counsel in First Foreclosure Action, neither Mr. Matthews nor Miller actually knew GMAC was involved in Mr. Matthews' loan since in all communications it pretended and represented it was USAA. Had GMAC's role been properly disclosed to Mr. Matthews or even Miller, they could have forwarded Mr. Matthews's mitigation requests to escalation representatives at GMAC. However, since the true relationship and ownership interests in Mr. Matthews' loan were concealed from him by GMAC, he did not have the option of mitigating his options and was limited to dealing with GMAC d/b/a USAA.

88. When Matthews contacted Ginny Mae through counsel, Ginny Mae would not

respond because it was never the secured party or owner of his loan as represented by USAA, GMAC and Ward on the NOITF used to commence the First Matthews Foreclosure Action.

89. Mr. Matthews' counsel appeared on his behalf in the First Foreclosure Action and timely filed exceptions to the foreclosure sale on July 19, 2010 with this Court. In those exceptions, Mr. Matthews objected to the right of GMAC and Ward to have conducted the foreclosure sale and to have even brought this action.

90. However, without the right to do so and while it knew Mr. Matthews was represented by counsel in the First Foreclosure Action, GMAC, d/b/a USAA, through its authorized representative RM Property Services illegally seized control of the Matthews' Property. At the time Mr. Matthews was out-of-town on a school required internship. When Mr. Matthews returned he discovered that his home had been taken over by GMAC, d/b/a USAA, and a lockbox was now on his front door, and all personal property, including his son's possessions, had been illegally removed from the premises and disposed of.

91. In addition, upon return Mr. Matthews found an eviction notice was taped to his door, unfairly and deceptively stating that Mr. Matthews had 24 hours to contact RM PropertyServices, or the locks would be changed and the property secured. Since Mr. Matthews was out of town at the time, he had no knowledge of this notice and no opportunity to remove his property—even

though GMAC, d/b/a USAA, and RM Property Services had no legal right to seize the Matthews' Property since his timely exceptions were still pending in the Circuit Court for Baltimore City, Maryland in the First Foreclosure Action. Neither GMAC nor RM Property Services or anyone else ever contacted Mr. Matthews counsel concerning the locks or Mr. Matthews' possession at the Matthews Property.

92. Due to this illegal eviction, Mr. Matthews immediately had to find an apartment to live in, and attempt to replace the belongings confiscated by the lender's agents. These belongings included but were not limited to: family clothes, tools, furniture, expensive furniture, lawn mower, a safe, tv, etc.

93. To date, Mr. Matthews has not received any of his belongings back from the GMAC's agents. The approximate value of what was stolen by the eviction was about $4,250.

94. As a result of the illegal eviction, Mr. Matthews incurred expenses for the apartment in the sum of about $7,000 since he was illegally evicted from his home and needed a place to live.

95. In the fall of 2010, when the national and state robo-signing scandals came to light, Mr. Matthews learned for the first time that Stephan had admitted in several depositions, under oath, that he had signed tens of thousands of bogus affidavits that were used to initiate foreclosure proceedings, including the First Foreclosure Action, on behalf of GMAC d/b/a USAA.

34

96. On October 28, 2010 in the First Foreclosure Action, Mr. Matthews' sought to certify a class of defendants similar to him in then pending GMAC foreclosure cases based upon the bogus Stephan affidavits and other papers.

97. Rather than defend the use of its bogus affidavits and papers in the First Foreclosure Action, GMAC, d/b/a USAA, and Ward sought to dismiss the action without prejudice. Mr. Matthews objected since GMAC did not state (at that time) that it would dismiss all the foreclosure actions using bogus Stephan affidavits and it had not offered to rescind the report of sale which creates a cloud on the Matthews Property.

98. The Circuit Court for Baltimore City, Maryland scheduled a hearing on the pending motions to take place on January 14, 2011. At that hearing, GMAC's new counsel, William Murphy, made the following representations to this Court on behalf of GMAC as the authorized agent of USAA and d/b/a USAA:

  a. For the first time, GMAC explained that it was willing to rescind the foreclosure sale of the Matthews Property.

  b. GMAC was in the process of dismissing cases, which had not been ratified, similarly situated to First Foreclosure Action which were based upon Stephan affidavits and papers

  c. This promise to voluntary dismiss all then pending cases applied to all cases carried out by Ward and her firm as well as two other firms then representing GMAC in Maryland foreclosure actions,

d.  That the costs of the dismissed foreclosures would not be passed on to the borrowers.

99. Based upon the representations of GMAC's counsel William Murphy described in the above paragraph, this Court dismissed the First Foreclosure Action.

**E. Following the First Matthews Foreclosure Action**

100.   Following the dismissal of the foreclosure, Mr. Matthews attempted to secure the keys to the home from Ward's firm. However, no one at Ward's firm ever responded and the keys were never provided.

101.   Left with no other option, Mr. Matthews had to break into the Matthews Property on or about March 25 2011 to regain possession since GMAC, d/b/a USAA, and its agents and attorneys refused to provide him the keys. Matthews had to break the lock with a hammer. When he did a neighbor he did not know called the police. The police arrived and would not allow Matthews enter the house that he owned and required him to return to his apartment to obtain and the court's Order rescinding the foreclosure sale.

102.   Matthews was angry and embarrassed that the police did not accept his representations that he was the owner of the Matthews' Property. He was worried about this was just another roadblock toward his attempts to get a fresh start and utilize his GI benefits.

103.   Upon entering the Matthews Property after having to get, he realized that the home had not been properly winterized by GMAC's sub-agents prior to the

discontinuation of the utilities. As a result, Mr. Matthews' sewage pipe and hot water heater cracked from the water expanding in the cold weather. These known damages equaled a sum of out $2,000. Additional damages and mold have also occurred as a result.

104.    On July 27, 2011, GMAC, d/b/a USAA, sent Matthews a false and bogus Notice of Intent to Foreclose identifying USAA as both the secured party and the servicer of the Matthews loan.

105.    Even though GMAC, d/b/a USAA, had dismissed the First Foreclosure Action, Mr. Matthews continued to receive notices from GMAC d/b/a USAA demanding action on his behalf and threatening to take his property. These notices are completely unsubstantiated, have required significant time to respond to by Mr. Matthews counsel which constitute additional damages incurred by Matthews, and placed undue stress on Mr. Matthews.

106.    On July 23, 2011, GMAC, d/b/a USAA, mailed Mr. Matthews a letter indicating that it believed the Matthews Property was vacant and that it would be taking steps to secure the property if not otherwise informed. Mr. Matthews' attorneys responded on August 22, 2011, and informed GMAC as the authorized agent of USAA and d/b/a USAA that the property was not vacant and is currently occupied. Mr. Matthews incurred the expense of this communication by his attorneys.

107.    Despite the proof of his occupancy, Mr. Matthews then received another

notice by the mails on August 31, 2011 stating that GMAC, d/b/a USAA, believed the property to be vacant and would be taking steps to change the locks on the property. Mr. Matthews' attorneys again responded on September 7, 2011 to again clarify this discrepancy. GMAC, d/b/a USAA, then acknowledged that the property is owner occupied in a notice sent on October 4, 2011. Mr. Matthews incurred the expense of this communication by his attorneys.

108.    In spite of GMAC's, d/b/a USAA, acknowledgment, notices stating that the property is vacant and that USAA seeks to change the locks have persisted.

109.    On November 8, 2011, Mr. Matthews received another notice on his door from GMAC, d/b/a USAA, indicating that the Property was still considered vacant and the locks would be changed despite the fact his car was in the driveway, the lights were on in the house, and there was substantial furniture inside and outside the house. Mr. Matthews' attorneys again responded on November 9, 2011 and again notified GMAC that the property was not vacant and is owner-occupied. Mr. Matthews incurred the expense of this communication by his attorneys.

**E. Second Matthews Foreclosure Action**

110.    GMAC, through its appointed agent, commenced a second foreclosure action against Matthews and his property on February 10, 2012 by filing an Order to Docket. The Order to Docket falsely stated that the Matthews

"

Property is not owner occupied when GMAC knew this allegation to be untrue. In reliance of this false statement and other described in the next paragraph, Matthews has engaged counsel to object to the sale of his home and property in the Court.

111.    GMAC provided certain affidavits to support the Order to Docket filed by the Plaintiffs in this action to acquire the Court's jurisdiction. Included among these was an Affidavit Certifying Ownership of Debt Instrument and that the Copy of the Note is a True and Accurate Copy. In this affidavit, GMAC's Authorized Officer Kimberly Fritz falsely testified "that Ginnie Mae is the owner of the [Matthews] loan." This statement is false based upon the following facts:

a.    On Ginnie Mae's website it explains, "Borrowers are sometimes mistakenly advised that Ginnie Mae is the owner or investor in a loan because government-insured or guaranteed loans (FHA, VA, RD) serve as collateral for Ginnie Mae-guaranteed securities. Ginnie Mae guarantees the security, and it carries Ginnie Mae's name; therefore, borrowers are often mistakenly advised that Ginnie Mae owns their loan." See http://www.ainniemae.aov/media/consumer web.pdf.

b.    The Notice of Intent to Foreclose sent to Mr. Matthews on October 7, 2011 which is required as a mandatory prerequisite for every foreclosure filed in Maryland and was presented to the Court by the

Plaintiffs did not identify Ginnie Mae as the secured party.

c. Despite Ms. Fritz's testimony to the contrary, nothing on the copy of the Note presented to the Court by the Plaintiffs on behalf of GMAC indicates any ownership interest by Ginnie Mae. Rather, an examination of the Note identifies an assignment by USAA to GMAC and previously filed public records described above indicate GMAC was engaged only for limited purposes and was not a holder for all purposes.

d. USAA by Deed of Assignment recorded in the land records of Baltimore City, Maryland, through its purported nominee Mortgage Electronic Registration Systems Inc., granted, assigned, and transferred to GMAC "all beneficial interest" limited to the Matthews Deed of Trust, but not actually the note, to GMAC on January 18, 2012 (recorded at Book 14058, Page 19).

e. On February 10, 2012 the Plaintiffs, as the authorized agents of GMAC, in this action wrote to Mr. Matthews and explained that his mortgage loan was with GMAC. This correspondence never identified any interest in the loan by USAA or Ginnie Mae.

## F. Mr. Matthews' Damages

112.    Having nowhere else to turn for help, Mr. Matthews is left to seek this Court's help in preventing injustice by GMAC of the unconscionable, illegal,

"

unfair and deceptive acts of each described herein and ongoing. These acts have damaged Mr. Matthews by:

a. Incurring legal fees defending the bogus First Foreclosure Action when GMAC did not have the right to attempt to collect in the manner it pursued,

b. fees and costs assessed to his mortgage account based upon the bogus and otherwise improper foreclosure actions,

c. damage to his credit through the public reporting of foreclosure collection actions, based upon knowingly false misrepresentations by Stephan and GMAC (d/b/a as USAA), filed in a manner to which GMAC had no right to pursue—and now because not of his actions but those of GMAC's improper filing in the first action there are two public foreclosure cases against Matthews which cannot be expunged from his record;

d. lost opportunity time trying to deal with the illegal debt collection practices of the Defendant which dramatically reduced his academic GPA while he was in fear of losing his home during the First Foreclosure Action and at risk of being put on academic probation which would have jeopardized his academic assistance package, and

e. emotional damages manifested by irritability, anger, sleeping problems, stress, worry, and decreased socialization.

41

## COUNT I: VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT

113.     Plaintiff re-alleges the previous paragraphs as if fully restated herein.

114.     At all times described herein Matthews reasonably relied upon the representations of the Defendant, directly and indirectly to him and the Circuit Court for Baltimore City, Maryland, that the debt collection practices of each were bona fide and legal when as it turned out they were not.

115.     The Maryland Consumer Protection Act ("MCPA"), MD CODE Ann., COMM. LAW §§ 13-101 *et seq.,* prohibits a person from engaging in unfair or deceptive trade practices in the collection of a consumer debt. MD CODE Ann., COMM. LAW § 13-303(4).

116.     The MCPA includes in its definition of "unfair or deceptive trade practices" the following:

> i.     Any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers**.** MD CODE ANN., COMM. LAW § 13- 301(1).

> ii.     Any failure to state a material fact if the failure deceives or tends to deceive. MD Code ANN., Comm. LAW § 13-301 (3).

> iii.     Any violation of a provision of Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act. MD CODE ANN.,

"

COMM. LAW § 13-301 (14)(iii).

117.     Section 13-303 prohibits unfair or deceptive trade practices in the extension of consumer credit or collection of consumer debts.

118.     The consideration of a loan modification and threat of a foreclosure action involves both the extension of credit and the collection of debts. Section 13-316 requires servicers like GMAC to respond to inquiries from consumers within 15 days.

119.     The Maryland Consumer Protection Act defines unfair or deceptive trade practices to include, inter alia, the following: (a) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; and (b) Failure to state a material fact if the failure deceives or tends to deceive.

120.     By engaging in the acts and omissions set forth above, by making the misrepresentations set forth above, and by failing to disclose material facts where the failure to do so deceived or tended to deceive, the Defendant has committed unlawful or deceptive trade practices in violation of the Maryland Consumer Protection Act. Sec. 13-301(1) and (3), Sec. 13-303(4), Sec. 13-316, and Sec. 13-301 (14)(iii) of the MCPA.

121.   The Defendant's conduct, as set forth above, had the capacity, tendency or effect of deceiving Mr. Matthews who in fact was deceived or misled, causing

injury and loss through the unfair or deceptive prosecution, based upon incomplete and bogus responses to their requests for modifications of their loans, or threat of prosecution of a bogus foreclosure action by Defendants directly and indirectly.

122.     Under the MCPA, a "person" can be "an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity." MD Code Ann., Comm. LAW § 13-101 (d).

123.     Defendant GMAC is a person as defined by the MCPA.

124.     Matthews reasonable relied upon the representations and actions of the Defendant as stated herein.

125.     The MCPA defines a "consumer" as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." MD CODE ANN., COMM. LAW § 13-101 (c)(1). Matthews is a consumer.

126.     The MCPA defines "consumer credit" and "consumer debts" as credit and debts that are "primarily for personal, family, household, or agricultural purposes." MD Code Ann., Comm. LAW § 13-101(d).

127.     Matthews' mortgage serviced and collected by GMAC is a consumer debt.

128.     Mr. Matthews' financial obligations to GMAC are also consumer debts under the MCPA because Mr. Matthews' mortgage debt was primarily for

«

personal, family, and household purposes.

129.     GMAC (d/b/a USAA), acting through its authorized substitute trustee/attorney, Ward, and employee, Stephan, initiated the foreclosure action against Mr. Matthews using robo-signed or otherwise bogus affidavits which were improper to acquire the jurisdiction of this Circuit Court for Baltimore City, Maryland in the First Foreclosure Action. These affidavits contained false written statements that the affiant had personal knowledge of the information sworn to in the affidavit. The affidavits filed in Mr. Matthews' foreclosure case were fraudulent because they contained either false or improper signatures of Ward and Stephan or because the affiant lacked the personal knowledge necessary to swear to the accuracy of their contents or that the purported affidavit was being signed by one of three possible persons with a single indecipherable signature.

130.     But for the bogus paperwork presented by GMAC the Circuit Court for Baltimore City, Maryland would not have had jurisdiction for the First Foreclosure Action that was filed against Mr. Matthews. Matthews would not have incurred attorney's fees, losses and damages, charges, and other costs related to the foreclosure process.

131.     The use of the bogus affidavits in Mr. Matthews' foreclosure violated the MCPA's prohibition against the use of false or misleading written statements or other representations that have the capacity, tendency, or effect of misleading consumers like Mr. Matthews. As such, GMAC (d/b/a

USAA) is directly liable to Mr. Matthews under the MCPA. MD CODE ANN., COMM. LAW § 13-303(4).

132.    In addition to its direct liability pursuant to this claim, GMAC is alternatively responsible as the substitute trustees' principal in the foreclosure action brought on its behalf. Under Maryland law, "'[a] principal is *prima facie* liable for the acts of his agent done in the general course of business authorized by him.' *Carroll,* 3 A. at 29." *Winemiller v. Worldwide Asset Purchasing, LLC,* 1:09-CV-02487, 2011 WL 1465571, *3 (D. Md. Apr. 15, 2011).

133.    Additionally, during its communications with Mr. Matthews, GMAC failed to tell Mr. Matthews that he was not speaking with USAA but was speaking with GMAC. This fact was material. Had Mr. Matthews known that GMAC was the true owner, he would have escalated his situation to the appropriate contacts at GMAC or USAA,—which  was in fact the express purpose of the NOITF established by the legislature in requiring certain information to be included on the NOITF.

134.    GMAC's failure to inform Mr. Matthews that GMAC, and not USAA, was the true servicer of his loan tended to and did in fact deceive Mr. Matthews.

135.    Because GMAC failed to inform Mr. Matthews of this material fact, and because this failure had the tendency of and in fact did deceive Mr. Matthews, GMAC committed an unfair or deceptive trade practice in violation

of the MCPA. MD CODE ANN., COMM. LAW § 13-301(3).

136.    Finally, GMAC's violation of the Maryland Consumer Debt Collection Act, detailed in Count III, also constituted a violation of the MCPA. MD CODE ANN., COMM. LAW § 13-301 (14)(iii).

137.    Mr. Matthews damages and losses as alleged herein were proximately caused by GMAC's actions, directly and indirectly, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury as well as those damages described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant GMAC for:

  a.  Compensatory economic and non-economic damages in the amount of no less than $500,000.

  b.  Additional compensatory damages pursuant to Sec. 13-316.

  c.  Plaintiffs costs and attorney's fees pursuant to MD CODE Ann., COMM. LAW § 13-408(b).

  d.  Such further relief as the Court deems just and proper.

## COUNT II: VIOLATIONS OF MARYLAND MORTGAGE FRAUD PROTECTION ACT

138.   Plaintiff re-alleges the previous paragraphs as if fully restated herein.

139.   The Maryland Mortgage Fraud Protection Act, MD CODE ANN., REAL PROP. LAW § 7-401, *et seq.* ("MMFPA") governs the relationship between the

Defendant and Mr. Matthews.

140.    The MMFPA defines a "homeowner" as a record owner of residential property. MD CODE Ann., REAL PROP. LAW § 7-401 (c). Mr. Matthews is the record owner of the Matthews Property and is therefore a homeowner under the Act.

141.    The MMFPA defines "mortgage lending process" to include the solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan. MD CODE ANN., REAL PROP. LAW § 7-401 (e).

142.    Under the MMFPA, a "mortgage loan" means any loan or other extension of credit that is (1) secured, in whole or in part, by any interest in residential real property in Maryland, and (2) is primarily for personal, household, or family purposes. MD CODE ANN., FINANCIAL INSTITUTIONS LAW § 11-501 (l)**.** The loan extended to Mr. Matthews was primarily for his personal, household, and family use and was secured by an interest in the residential real property located at 3216 East Northern Parkway, and is therefore a "mortgage loan" as defined by the MMFPA.

143.    The MMFPA defines "Mortgage fraud" (MD CODE Ann., REAL PROP. LAW § 7-401 (d)) as any action by a person made with the intent to defraud that involves:

   a. Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending

«

process;

b.  Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process; and

c.  Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

144.    GMAC has committed Mortgage Fraud by engaging in acts described above.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant GMAC for:

a.  Compensatory economic and non-economic damages in the amount of no less than $500,000

b.  Treble damages in the amount of no less than $1,500,000 as authorized by MD CODE ANN., REAL PROP. § 7-406(c).

c.  Plaintiffs costs and attorney's fees pursuant to MD CODE ANN., REAL PROP. § 7-406(b).

d.  Such further relief as the Court deems just and proper.

## COUNT III: VIOLATION OF MARYLAND CONSUMER DEBT COLLECTION ACT

145.   Plaintiff re-alleges the previous paragraphs as if fully restated herein.

146.   GMAC's institution of foreclosure proceedings based upon bogus documents was an attempt to collect a consumer debt, and is governed by the Maryland Consumer Debt Collection Act, MD CODE ANN., COMM. LAW §§ 1-201 *et seq.* ("MCDCA").

147.   The MCDCA defines a "consumer transaction" as "any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes." MD CODE ANN., COMM. LAW § 14-201 (c).

148.   The servicing of the Matthews mortgage loan was a consumer transaction under the MCDCA. Counter Plaintiff used the mortgage loan for personal, family, and household purposes.

149.   The MCDCA defines a "collector" as "a person collecting or attempting to collect an alleged debt arising out of a consumer transaction." MD CODE ANN., COMM. LAW § 14-201 (b).

150.   Under the MCDCA, a "person" may be a corporation or any other legal or commercial entity. MD CODE ANN., COMM. LAW § 14-201 (d). GMAC is a person under the MCDCA.

"

151.   GMAC's institution of foreclosure proceedings against the Plaintiff and its subsequent actions taken pursuant to that foreclosure were attempts to collect the debt that Plaintiff owed on his mortgage. GMAC is therefore a "collector" as defined by the MCDCA.

152.   The MCDCA states that, in collecting or attempting to collect an alleged debt, a collector may not "claim, attempt, or threaten to enforce a right with knowledge that the right does not exist." MD Code Ann., Comm. Law § 1 4 -  202(8).

153.   By authorizing the filing of debt collection foreclosure proceedings and/or conducting foreclosure actions based upon bogus or insufficient papers and affidavits through its authorized substitute trustees/attorneys and employees, GMAC has asserted a claim with knowledge that the right does not exist, a violation of MD CODE Ann., COMM. Law § 14-202(8). Specifically, GMAC was aware that such affidavits needed to be valid in order to initiate a foreclosure action against Mr. Matthews. By initiating the foreclosure proceeding without satisfying this condition precedent, GMAC attempted to enforce a right with the knowledge that the right did not yet exist.

154.   GMAC also violated the MCDCA by authorizing its agents to enter Mr. Matthews' property and remove his belongings with the knowledge that it did have the right to do so.

155.   At the time that GMAC's agents entered Mr. Matthews' property, they were aware that the foreclosure sale of the property had never been ratified by the Circuit Court for Baltimore City, Maryland. Accordingly, GMAC and its agents

were aware that they had neither equitable nor legal title to the property, and were therefore not entitled to possession of the property since they had not requested this Court in the First Foreclosure Action for permission to seize the property and they were aware that Mr. Matthews had appeared in the case through counsel and presented his legal objections to their right to conduct the sale.

156.    GMAC must be held to be aware that, in Maryland, the sole method available allowing a foreclosure sale purchaser to be awarded actual possession following the sale but prior to the audit and conveyance of the property is prescribed in Maryland Rule 14-102(a). *Empire Properties, LLC v. Hardy,* 386 Md. 628, 632, 873 A.2d 1187,1190 (Md. 2005).

157.    Specifically, Maryland Rule 14-102(a) requires a party *entitled to possession* of a property purchased at foreclosure to file a motion for judgment awarding possession of that property.

158.    At no time was GMAC legally entitled to possession of Mr. Matthews' property, nor did GMAC ever file a motion for judgment awarding possession pursuant to Maryland Rule 14-102(a).

159.    Despite knowing that it did not have a legitimate claim to possession of the property, Defendant GMAC authorized its agents to forcibly enter Mr. Matthews' home without his permission, change the locks on the doors, and remove Mr. Matthews' property. This act constituted an attempt by GMAC to collect on the debt Mr. Matthews owed on his mortgage.

160.    GMAC's attempt to enforce a right with knowledge that it did not exist constitutes a violation of the MCDCA and has damaged Mr. Matthews. Due to GMAC's violation, Mr. Matthews was forced to find an apartment on extremely short notice. Additionally, he has lost the use and enjoyment of the personal property that was confiscated by GMAC's agents.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendant GMAC:

a.  Compensatory economic and non-economic damages in the amount of no less than $500,000.

b.  Such further relief as the Court deems just and proper.

Respectfully Submitted,

Phillip R. Robinson
Legg Law Firm LLC
5500 Buckeystown Pike
Frederick, MD  21703
(301) 620-1016

*Attorney for Plaintiff*