**MORRISON & FOERSTER LLP**

1290 Avenue of the Americas
New York, New York 10104
Telephone:    (212) 468-8000
Facsimile:    (212) 468-7900


Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren
Alexandra Steinberg Barrage
Jennifer L. Marines

*Counsel for the Debtors and*
*Debtors in Possession*

**CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP**

101 Park Avenue
New York, New York  10178-0061
Telephone:  (212) 696-6000
Facsimile:   (212) 697-1559


Steven J. Reisman
Theresa A. Foudy
Maryann Gallagher


*Conflicts Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------------------ ) | | |
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ------------------------------------------------------------ ) | | |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO
## DEBTORS' SALE MOTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 2

BACKGROUND ...................................................................................................................... 6

    A.    Pre-Petition Marketing Process ................................................................ 6

    B.    Pre-Auction Marketing Process ............................................................... 7

            1.    The Platform Assets ...................................................................... 7

            2.    The Whole Loan Assets ................................................................ 9

    C.    Key Stakeholder Communications ......................................................... 11

    D.    The Auctions ........................................................................................... 11

            1.    The Platform Auction .................................................................. 11

            2.    The Whole Loan Auction ............................................................ 13

    E.    The Asset Purchase Agreements ............................................................ 14

ARGUMENT ........................................................................................................................ 15

    A.    The Sales Are a Clearly Permissible Exercise of the Debtors' Business
         Judgment ................................................................................................. 15

    B.    The Purchasers Are Good Faith Purchasers Entitled to the Full Protection
         of Section 363(m) of the Bankruptcy Code ........................................... 18

    C.    The Sale of the Debtors' Assets Free and Clear of Liens Is Authorized by
         Section 363(f) of the Bankruptcy Code ................................................. 19

    D.    The Court Should Authorize the Debtors to Assume and Assign the
         Executory Contracts Pursuant to Section 365 of the Bankruptcy Code ............... 21

            1.    Anti-Assignment Provisions in Certain of the Assumed Contracts
                  Should Not Restrict, Limit, or Prohibit the Assumption,
                  Assignment, and Sale Under Section 365(f) ............................. 22

            2.    The Debtors Are Not Impermissibly Severing the Agreements ............... 25

            3.    The Debtors Will Provide Adequate Assurance of Future
                  Performance by the Purchasers .................................................. 36

    E.    The Debtors Expect to Resolve the Fannie Mae and Freddie Mac
         Objections Prior to the Sale Hearing ..................................................... 40

    F.    The Debtors Also Expect to Resolve the Objections Filed by the DOJ
         Prior to the Sale Hearing ....................................................................... 41

    G.    General Responses to Objections ........................................................... 42

# TABLE OF AUTHORITIES

**Page**

### CASES

*In re 1945 Route 23 Assocs., Inc.*, No. 06-17474 (NLW),
2008 WL 2386296 (Bankr. D.N.J. June 9, 2008) .................................................. 34

*In re Adelphia Commc'ns Corp.*,
359 B.R. 65 (Bankr. S.D.N.Y. 2007) .................................................................... 23

*Alert Holdings, Inc. v. Interstate Protective Servs., Inc. (In re Alert Holdings, Inc.)*,
148 B.R. 194 (Bankr. S.D.N.Y. 1992) .................................................................. 29

*Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*,
56 B.R. 186 (Bankr. N.D. Ga.), *aff'd sub nom.*, *Griffin v. Bonapfel*
*(In re All Am. Of Ashburn, Inc.)*, 805 F.2d 1515 (11th Cir. 1986) ......................... 20

*In re Borders Grp., Inc.*,
453 B.R. 477 (Bankr. S.D.N.Y. 2011) .................................................................. 20

*In re Boston Generating, LLC*,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) .................................................................. 16

*Calyon N.Y. Branch v. Am. Home Mortg. Corp. (In re Am. Home Mortg., Inc.)*,
379 B.R. 503 (Bankr. D. Del.  2008),
*reconsideration denied*, 383 B.R. 585 (Bankr. D. Del.  2008) ................................ 26

*In re Chrysler LLC*,
405 B.R. 84 (Bankr. S.D.N.Y.), *aff'd*, 576 F.3d 108 (2d Cir. 2009) ....................... 20

*Cinicola v. Scharffenberger*,
248 F.3d 110 (3d Cir. 2001) ................................................................................. 37

*Cohen v. Drexel Burnham lambert Grp., Inc. (In re The Drexel
Burnham Lambert Grp., Inc.)*,
138 B.R. 687 (Bankr. S.D.N.Y. 1992) ............................................................. 28, 29

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp.
(In re Johns-Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986) .................................................................... 16

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.)*,
722 F.2d 1063 (2d Cir. 1983) ............................................................................... 15

ii

## TABLE OF AUTHORITIES
### (continued)

Page

*DB Structured Prods., Inc. v. Am. Home Mortg. Holdings, Inc.* (*In re Am. Home Mortg. Holdings, Inc.*),
   402 B.R. 87 (Bankr. D. Del. 2009) ...................................................................................... 24, 26

*Emons Indus., Inc. v. Allen* (*In re Emons Indus., Inc.*),
   220 B.R. 182 (Bankr. S.D.N.Y. 1998) ........................................................................................ 35

*In re Enron Corp.*,
   No. 01- 16034 (AJG), 2004 WL 5361245 (Bankr. S.D.N.Y. Feb. 5, 2004) .......................... 20

*In re Fieldstone Mortg. Co.*,
   427 B.R. 364 (Bankr. D. Md. 2010) ............................................................................................ 29

*In re Fleming Cos.*,
   499 F.3d 300 (3d Cir. 2007) ........................................................................................................ 37

*In re General Motors Corp.*,
   407 B.R. 463 (Bankr. S.D.N.Y. 2009) ........................................................................................ 16

*In re Goody's Family Clothing, Inc.*,
   443 B.R. 5 (Bankr. D. Del. 2010) ................................................................................................ 31

*In re Grubb and Ellis Co.*,
   No. 12-10685 (MG), 2012 Bankr. LEXIS 1279 (Bankr. S.D.N.Y. Mar. 27, 2012) ............... 15

*Hannaford Bros. Co. v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*),
   316 B.R. 772 (Bankr. S.D.N.Y. 2004) .................................................................................. 23, 35

*Kings Terrace Nursing Home & Health Related Facility v. N.Y.S. Dep't of Social Servs.*
   (*In re Kings Terrace Nursing Home & Health Related Facility*),
   No. 91 B 11478 (FBC), Adv. No. 94/8912A, 1995 WL 65531
   (Bankr. S.D.N.Y. Jan. 27, 1995) ................................................................................................ 31

*Kopolow v. P.M. Holding Corp.* (*In re Modern Textile, Inc.*),
   900 F.2d 1184 (8th Cir. 1990) ..................................................................................................... 29

*Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*),
   126 F.3d 380 (2d Cir. 1997) ........................................................................................................ 18

*Med. Malpractice Ins. Ass'n v. Hirsch* (*In re Lavigne*),
   114 F.3d 379 (2d Cir. 1997) ........................................................................................................ 29

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*In re MF Global Inc.*,
  467 B.R. 726 (Bankr. S.D.N.Y. 2012) .................................................................. 16

*In re Millivision, Inc.*,
  328 B.R. 1 (Bankr. D. Mass. 2005) ...................................................................... 31

*Newman v. McCrory Corp., (In re McCrory Corp.)*,
  210 B.R. 934 (S.D.N.Y. 1997) ............................................................................. 35

*In re Rock Indus. Mach. Corp.*,
  572 F.2d 1195 (7th Cir. 1978) .............................................................................. 19

*Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*,
  19 B.R. 323 (Bankr. W.D. Wash. 1982) ............................................................... 20

*In re Sapolin Paints, Inc.*,
  5 B.R. 412 (Bankr. E.D.N.Y. 1980) ...................................................................... 37

*Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*,
  423 F.3d 166 (2d Cir. 2005) ................................................................................. 19

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) ................................................................................. 20

*In re U.L. Radio Corp.*,
  19 B.R. 537 (Bankr. S.D.N.Y. 1982) .................................................................... 37

*Velo Holdings Inc. v. Paymentech, LLC (In re Velo Holdings Inc.)*,
  475 B.R. 367 (Bankr. S.D.N.Y. 2012) .................................................................. 29

*In re Yasin*,
  179 B.R. 43 (Bankr. S.D.N.Y. 1995) .................................................................... 29

**STATUTES**

11 U.S.C. § 363(b)(1) ............................................................................................... 15

11 U.S.C. § 363(f) .................................................................................................... 19

11 U.S.C. § 365(f)(1) ................................................................................................ 22

11 U.S.C. § 365(f)(2) ................................................................................................ 37

**TABLE OF AUTHORITIES**
**(continued)**

Page

11 U.S.C. § 363(m)....................................................................................................................18

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors")[1] submit this omnibus reply (the "Reply")[2] to the objections (the "Objections") filed to

the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed*

*R. Bankr. P. 2002, 6004, 6006, and 9014 for Orders: (I)(A) Authorizing and Approving Sale*

*Procedures, Including Break-Up Fee and Expenses Reimbursement; (II) Scheduling Bid*

*Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and*

*(IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of*

*Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset*

*Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain*

*Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief*

[Docket No. 61] (the "Sale Motion").[3]  In support of the Reply, the Debtors rely upon and

incorporate herein by reference the *Declaration of Marc D. Puntus in Support of Debtors' Sale*

*Motion* (the "Puntus Decl."), the *Declaration of John Ruckdaschel in Support of Debtors' Sale*

*Motion* (the "Ruckdaschel Decl."), the *Declaration of Ronald M. Faris of Ocwen Loan*

*Servicing, LLC in Support of Debtors' Sale Motion* (the "Faris Decl."), the *Declaration of*

*Denmar Dixon of Walter Investment Management Corp. in Support of Debtors' Sale Motion* (the

"Dixon Decl."), and the *Anti-Collusion Declaration in Accordance with Sale Procedures Order*

*Dated June 28, 2012 [Docket No. 538]* (the "Wechsler Declaration"), each of which is being

filed contemporaneously herewith.  In further support of the Reply, the Debtors, by and through

their undersigned counsel, respectfully state as follows:

---

[1]  The names of the Debtors in these cases and their respective tax identification numbers are identified on
Exhibit 1 to the *Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of the
Debtors' "First Day" Pleadings* [Docket No. 6] (the "Whitlinger Affidavit").

[2]  Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the
relief requested in this Reply may refer to http://www.kccllc.net/rescap for additional information.

[3]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Sale Motion.

## PRELIMINARY STATEMENT

1.       At the outset of these cases, the Debtors sought to accomplish the unprecedented task of selling a sustainable servicing and origination platform, which the Debtors hoped would result in substantially more value to creditors than prior liquidation efforts by mortgage servicers. In support of this effort, the Debtors obtained stalking-horse bids for a substantial portion of their assets (which could be viewed as a success in its own right), secured debtor-in-possession financing and use of cash collateral to support their operations pending the asset sales, and embarked on a marketing process to maximize the value achievable in such sales.

2.       After competitive auctions of both the Platform Assets and the Whole Loan Assets (each as defined below), the Debtors' estates are now poised to realize approximately $4.5 billion of cash from the asset sales — an improvement in purchase price amount of over $800 million from the stalking-horse bids.  In addition, over the course of the auctions, the Debtors obtained various other improvements to the asset purchase agreements, which result in several hundred million dollars of additional value to the Debtors' estates.  In the end, the Debtors estimate that the auctions resulted in approximately **$1 billion** in incremental value to the Debtors' estates over the stalking-horse transactions.  This Court's approval of the sales would mark an extraordinary accomplishment in these cases, provide hundreds of millions of dollars in value for unsecured creditors and, ultimately, form the basis for plan implementation.

3.       **Platform Auction.**  Prior to the Platform Auction on October 23, 2012, Ocwen Loan Servicing, LLC ("Ocwen")[4] — a highly rated mortgage servicer with a track record of acquiring large servicing portfolios — submitted a Qualified Bid in accordance with the Sale Procedures Order.  After two days and 28 rounds of bidding, Ocwen submitted a winning bid of $3 billion for the Platform Assets, providing approximately $782.4 million of incremental value compared to Nationstar's stalking-horse bid of approximately $2.36 billion.  The additional value

---

[4] Although Ocwen was the bidder of record for the Platform Assets, the Ocwen APA (as defined below) provides for the assignment of the Debtors' Fannie Mae servicing assets to Walter Investment Management Corp. ("Walter"), or one of Walter's affiliates as part of the platform sale.  For the purposes herein, the bid for the Platform Assets is referred to as the "Ocwen" bid.

ny-1064263

created by the Ocwen bid includes: (i) a $179.5 million bid for master servicing advances at 95%

of book value based on August 31, 2012 loan balances; (ii) an increased purchase price of $439.3

million, net of a $24 million break-up fee payable to Nationstar; (iii) improvements to the asset

purchase agreement with an estimated value of approximately $163.6 million, which amount is

comprised of (x) removal of a provision allowing for a deduction in purchase price resulting

from the unsuccessful modification of the asset purchase agreement (resulting in an estimated

benefit of $55.3 million); and (y) assumption of incremental costs related to the shut down of the

platform — i.e., certain loan transfer costs, origination pipeline wind-down, servicing transfer,

and severance costs (resulting in an estimated benefit of $108.3 million).

4.      **Whole Loan Auction.**   Prior to the Whole Loan Auction (as defined below) on

October 25, 2012, the Debtors received a Qualified Bid from a consortium of bidders consisting

of five members: DLJ Mortgage Capital, Inc., Roosevelt Mortgage Acquisition Company,

Roosevelt Depositor, LLC, Bayview Acquisitions, LLC, and Selene Finance LP (collectively, the

"DLJ Consortium").  After eleven rounds of bidding between the DLJ Consortium and Berkshire

Hathaway, Inc. ("Berkshire"), Berkshire's $1.5 billion bid was selected as the highest and best

bid, resulting in approximately $176 million of incremental value to the Debtors' estates.

5.      The winning bids submitted by Ocwen and Berkshire represent the highest and

best bids for the Purchased Assets (as defined below), respectively, and provide substantial value

for all stakeholders in these cases.  Given the numerous layers of complexity inherent in these

transactions, it is notable that, apart from various taxing authorities, not one out of approximately

60 sale and cure Objections takes issue with the Debtors' sale process, conduct at the Auctions,

or the transfer of the Debtors' assets free and clear of all liens, claims, and encumbrances.

Rather, the Objections are generally limited to the way in which the Debtors propose to assume

and assign their servicing agreements to Ocwen, and whether Ocwen can demonstrate adequate

assurance of future performance.

6.      Specifically, the underlying theme of the Objections is that the Debtors are

impermissibly severing the servicing agreements in one of three ways: (i) the Debtors are

3

seeking to sever servicing agreements from origination-related agreements sometimes contained in the same writing; (ii) Ocwen is seeking to "cherry pick" only certain servicing obligations from the servicing agreements; and (iii) the Debtors and Ocwen are seeking to sever pre-closing obligations and liabilities from those that may arise post-closing.

7.        First, while it is true that the Debtors are, in certain cases, seeking to reject loan purchase-related indemnification obligations and assume and assign related, but severable, servicing rights and obligations to Ocwen, it is the Debtors' understanding, based on subsequent discussions with various objecting parties, that no objecting party apart from Fannie Mae and Freddie Mac currently objects to the severing of origination-related agreements from the servicing agreements.[5]  With respect to Fannie Mae and Freddie Mac, the Debtors have made it clear that they are not seeking to sever any origination-related obligations arising under those servicing agreements.

8.        Second, the Debtors and Ocwen have sought to clarify in the proposed form of sale approval order for the Platform Assets that in connection with those servicing agreements that are being assumed and assigned to Ocwen pursuant to the Ocwen APA, Ocwen is obligated to perform all post-closing servicing-related obligations under such agreements (but Ocwen shall not incur any liability arising out of the Debtors' acts or omissions under the applicable agreements occurring prior to the Closing Date or in connection with any other agreement not assumed and assigned to Ocwen pursuant to the Ocwen APA).[6]

9.        Third, various objecting parties, including the RMBS Trustees, maintain that Ocwen ought to assume all obligations to indemnify the trustees for any losses or claims regardless of when the acts giving rise to such losses or claims arise.  Based on subsequent

---

[5] As discussed herein and in the *Revised Joint Omnibus Scheduling Order and Provisions for Other Relief Regarding (I) Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of RMBS Trust Settlement Agreements [Docket No. 945], and (II) the RMBS Trustees' Limited Objection to the Sale Motion* (the "Scheduling Order"), the RMBS Trustees have reserved their rights to assert origination-related claims as part of their cure claims.

[6] As parties are continuing to provide comments to the revised proposed sale orders, the Debtors shall file marked copies of such revised sale orders on November 13, 2012.

discussions with Ocwen, the Debtors understand that Ocwen is in discussions with the RMBS

Trustees regarding proposed language to be included in a revised form of sale approval order in

connection with the proposed resolution articulated by Debtors' counsel at the hearing on the

RMBS Trustees' Pre-Auction Objection.  To the extent such agreement cannot be reached, the

Debtors maintain that the RMBS Trustees are protected, as any RMBS Trustee claims related to

the Debtors' pre-Closing  Date servicing breaches are cure claims that are governed by the

conditions and procedures described in the Scheduling Order.  Likewise, with respect to other

similar objections, in light of the clarifications made to the proposed sale order, it is clear that

Ocwen is performing all required obligations under the Servicing Agreements following the

Closing Date, and any claims accruing prior to the Closing Date amount to at most cure claims,

which can be easily satisfied with the approximately $900 million in proceeds (not including the

proceeds of the approximately $1.274 billion in assets remaining to be liquidated post-closing)

that are projected to be available for payment of administrative, priority, and unsecured claims.

10.    Lastly, the Debtors remain in frequent discussions with the United States

Department of Justice (the "DOJ") and Ocwen regarding the continued fulfillment by Ocwen of

the non-monetary obligations of the DOJ/AG Settlement, which will be set forth in the Ocwen

APA in revised Section 6.16.  The parties have made significant strides towards an agreement on

a revised Section 6.16 of the Ocwen APA and expect any remaining issues will be resolved

consensually with the Government in advance of the Sale Hearing.  In the meantime, the Debtors

will continue to keep AFI and the Committee informed of these discussions with a view towards

promptly providing such parties with an updated provision agreed to by the Debtors, Ocwen, and

the applicable governmental agencies.

11.    Separately, the Debtors remain in discussions with Ocwen regarding the

assumption and assignment of the Debtors' Home Affordable Modification Program ("HAMP")[7]

---

[7] HAMP is the federal loan modification program designed to assist qualifying homeowners who can no longer afford their monthly mortgage payments as well as those homeowners who are at imminent risk of default on their mortgage loans.  The HAMP agreements involve GMAC Mortgage and  Fannie Mae as financial agent of the United States in connection with the Debtors' participation in the Making Home Affordable Programs and HAMP under the Emergency Economic Stabilization Act of 2008, as amended by the American Recovery and Reinvestment Act of

agreements and are working on a mutually agreeable solution to address the Government's issues regarding cure costs and adequate assurance of future performance.

12.     The Debtors submit that all remaining objections should be overruled to the extent not resolved consensually, or mooted, for the reasons set forth below and in the annexed Exhibit 1.

## BACKGROUND

### A.     Pre-Petition Marketing Process

13.     The Debtors, with the assistance of Centerview Partners ("Centerview"), commenced in advance of the filing of their respective Chapter 11 petitions a thorough and targeted marketing process for the Debtors' mortgage origination and servicing platform assets (the "Platform Assets") and certain of the Debtors' financial assets and a legacy loan portfolio (the "Whole Loan Assets," and together with the Platform Assets, the "Purchased Assets").[8] That process initially resulted in two proposed stalking-horse asset transactions — one with Nationstar Mortgage LLC ("Nationstar") for the Platform Assets, and the other with Ally Financial Inc. ("AFI") for the Whole Loan Assets.  On May 14, 2012 (the "Petition Date"), the Debtors filed the Sale Motion to approve these two transactions.

---

2009.  Pursuant to HAMP, the Government provided or provides certain financial incentives to GMAC Mortgage in order for GMAC to modify borrower loans so qualifying borrowers can afford to make continued payments and avoid foreclosure, or for GMAC to provide foreclosure alternatives such as short sales and deeds in lieu of foreclosure.

[8]  The Debtors' pre-Petition Date marketing process is described in extensive detail in the (a) Sale Motion; (b) *Memorandum of Law in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f), and (m), 365 and 1123, and Fed. R. Bankr. P. 2002, 6004, 6006, 9007, 9008, and 9014 for Orders: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and Sale Hearing; (III) Approving Form and Manner of Notice Thereof; and (IV) Granting Related Relief and (B)(I) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (IV) Granting Related Relief* [Docket No. 62] (the "Sale Memorandum"); (c) *Declaration of Samuel M. Greene in Support of the Proposed Sale of Debtors' Assets* [Docket No. 63] (the "First Greene Declaration"); and (d) *Supplemental Declaration of Samuel M. Greene in Further Support of the Proposed Sale of Debtors' Assets* [Docket No. 375] (the "Supplemental Greene Declaration," and together with the First Greene Declaration, the "Greene Declarations," and together with the Sale Motion and the Sale Memorandum, the "Sale Pleadings") and the Whitlinger Affidavit, all of which are incorporated herein by reference.

ny-1064263

14.     Among the objections to the Debtors' Sale Motion was the objection filed by Berkshire, in which Berkshire expressed its interest in becoming the stalking-horse bidder for both the Platform Assets and the Whole Loan Assets.  In the days preceding the June 18, 2012 hearing on the sale procedures (the "Sale Procedures Hearing"), a "mini auction" for both the Platform Assets and the Whole Loan Assets ensued, resulting in Nationstar's submission of a revised stalking-horse bid for the Platform Assets in the amount of $2.45 billion and Berkshire's submission of a stalking-horse bid for the Whole Loan Assets in the amount of $1.44 billion. Puntus Decl. at ¶ 24.  On June 28, 2012, this Court approved Nationstar and Berkshire as stalking-horse bidders for the Platform Assets and the Whole Loan Assets, respectively, in the Sale Procedures Order.[9]  Puntus Decl. at ¶ 24.

## B.     Pre-Auction Marketing Process

### 1.     The Platform Assets

15.     The Debtors, with Court-approved sale procedures in hand, then embarked on an open, transparent, and thorough marketing effort to ensure the Debtors would receive the highest possible value for their assets.  Centerview prepared a "potential purchaser" list for the Platform Assets that included approximately 30 entities that Centerview believed would have an interest in purchasing the Platform Assets.  Puntus Decl. at ¶ 25.  Centerview solicited input on that list from the professionals for the Committee and the Ad Hoc Group of Junior Secured Noteholders (the "JSBs") and gave them the opportunity to comment on and add to the list of potential purchasers.  Puntus Decl. at ¶ 25.

16.     Centerview approached each of the potential bidders on the potential purchaser list to gauge their interest in pursuing a sale transaction for the Platform Assets.  Puntus Decl. at ¶ 26.  Sixteen of those entities signed an appropriate nondisclosure agreement, received a

---

[9]  The stalking-horse bids were based on the balances on the Debtors' books and records as of February 29, 2012.  As discussed below, the bids submitted at the Auctions were based on August 31, 2012 balances.  The ultimate value received by the Debtors from the sales will be based on the values as of the Closing Date.  Because the assets subject to the sales naturally "run off" over time, e.g., loans in both the Whole Loan Assets and the servicing portfolio included in the Portfolio Assets, it is expected that the ultimate purchase price received will be less than the values set forth herein.

"Confidential Information Memorandum" describing the assets, and were granted access to an electronic data room containing diligence materials. Puntus Decl. at ¶ 26. After an initial diligence period, five of the sixteen entities responded by stating that they had an interest in acquiring the Platform Assets and indicated that they were interested in meeting with the Debtors' management team. Puntus Decl. at ¶ 26.

17.    The Debtors' management team, along with Centerview, made formal presentations to these five entities. Puntus Decl. at ¶ 27. During these presentations, the Debtors' management team and Centerview described for each of the potential purchasers the Platform Assets being sold and answered a variety of questions from the potential purchasers. Puntus Decl. at ¶ 27.

18.    Upon the conclusion of those presentations, Centerview sent a memorandum of inquiry to the five potential bidders containing certain inquiries on several issues relating to the prospective transactions, to which Centerview requested a response by August 31, 2012. Puntus Decl. at ¶ 28. The inquiries included the bidders' proposed plans for financing a transaction, whether bidding partners were required, plans for obtaining the requisite licenses and other regulatory approvals and post-closing plans for operating the business. These inquiries were designed to provide the Debtors with information necessary to evaluate prospective bids the Debtors might receive from each potential purchaser, including assisting the Debtors in assessing value to the estate, gauging the level of interest of each prospective purchaser and evaluating whether a sale to each of these purchasers could in fact be consummated. Puntus Decl. at ¶ 28.

19.    The Debtors and Centerview received responses to their memorandum of inquiry from three potential purchasers: (i) Berkshire; (ii) an undisclosed consortium of two bidders; and (iii) a consortium comprised of Ocwen and Walter. Puntus Decl. at ¶ 29. From that point forward, the Debtors focused their marketing efforts on these potential bidders. Puntus Decl. at ¶ 29. The three interested parties continued to conduct heavy diligence over the course of the subsequent weeks, which included a variety of additional meetings between the bidders and the Debtors. Puntus Decl. at ¶ 29. As part of the diligence process, recognizing their critical

8

importance to the process, the Debtors arranged in-person meetings for each of the potential purchasers with Fannie Mae, Freddie Mac, and Ginnie Mae. Puntus Decl. at ¶ 29. The purpose of such meetings, which occurred during the week of September 17th in Washington, D.C., was to ensure that Fannie Mae, Freddie Mac, and Ginnie Mae had an opportunity to "vet" the potential bidders and assess, among other things, their financial and operational wherewithal to purchase and operate the Platform Assets. Puntus Decl. at ¶ 29.

20.     On October 19, 2012 (the "Bid Deadline"), the Debtors received two qualifying bids for the Platform: (i) the stalking-horse bid previously submitted by Nationstar at a value of $2.357 billion[10]; and (ii) a bid from Ocwen at a value of $2.397 billion.[11] Puntus Decl. at ¶ 30. After adjusting for Nationstar's $24 million break-up fee, the economic value of the Ocwen bid was $2.373 billion, $16 million higher than Nationstar's stalking-horse bid (exceeding the required minimum bid increment of $5 million). Puntus Decl. at ¶ 30. In the days leading up to the auction for the Platform Assets (the "Platform Auction"), the Debtors, in the exercise of their business judgment, determined that the Ocwen bid was a qualifying bid and was the highest and best bid for the Platform. Puntus Decl. at ¶ 30. The Committee agreed with the Debtors' conclusion. Puntus Decl. at ¶ 30.

## 2.     The Whole Loan Assets

21.     Consistent with the marketing process for the Platform Assets, Centerview prepared an extensive list of potential buyers for the Whole Loan Assets. Puntus Decl. at ¶ 31. That list was submitted to the advisors for the Committee and the JSBs, who were given the

---

[10]     As noted above, because the assets subject to the Platform sale run off over time, Nationstar's bid, which was valued at $2.45 billion based on the Debtors' February 29th balance sheet, was calculated to be worth $2.357 billion based on the Debtors' August 31th balance sheet.

[11]     Ocwen's initial bid also included an offer to purchase the Debtors' master servicing advances at 95% of book value or approximately $179.5 million. Although the Nationstar bid did not include master servicing advances, because the Debtors believed that they would be able to recover 100% on these advances over approximately 30 months if they were not sold, the Debtors did not ascribe direct value to this aspect of Ocwen's bid in comparing it to Nationstar's bid. The Committee supported this analysis. Ultimately, however, as part of its initial overbid at the auction, Nationstar agreed to match Ocwen's offer to purchase the master servicing advances. As a consequence, the final bids set forth herein incorporate the sale of the master servicing advances.

9

opportunity to add to the list of potential purchasers.  Puntus Decl. at ¶ 31.  The complete list of

potential purchasers of the Whole Loan Assets totaled 46 entities.  Puntus Decl. at ¶ 31.

22.    Centerview contacted each of the potential purchasers.  Puntus Decl. at ¶ 32.

Twenty-two potential bidders signed an appropriate nondisclosure agreement and were provided

access to data tapes and an electronic data room containing loan documents. Puntus Decl. at ¶ 32.

Subsequently, those potential bidders were provided supplemental information that included a

historical cash flow analysis, mortgage payment histories, and other information to assist their

diligence efforts.  Puntus Decl. at ¶ 32.

23.    The Debtors paid for and provided to potential bidders four third-party diligence

reports to assist potential bidders with their diligence efforts.  Puntus Decl. at ¶ 33.  The first of

these reports was a "Compliance Report," in which a third party provider examined the credit

files of a sample population of borrowers to ensure that individual loans were originated in

compliance with state and federal regulations and guidelines.  The second of these reports was a

"Data Integrity Report," in which a third party provider compared the accuracy of the

information in a loan's credit files with the information found on the data tapes.  The third was a

"Title Search," which determines the lien status of each mortgage.  The fourth was a "Tax Lien

Search," which determines whether a tax lien exists on the property related to each mortgage.

24.    Throughout the remainder of the process, the Debtors and their advisors provided

updated data tapes to the bidders on a monthly basis and also provided cash flow and yield

analyses reports on the Whole Loan Assets.  Puntus Decl. at ¶ 35.

25.    On the Bid Deadline, the Debtors received two qualifying bids:  (i) the

stalking-horse bid previously submitted by Berkshire at a value of $1.324 billion[12]; and (ii) a bid

from the DLJ Consortium at a value of $1.339 billion.  Puntus Decl. at ¶ 36.  After adjusting for

Berkshire's break-up fee of $10 million, the economic value of the DLJ Consortium bid was

---

[12]    As noted above, because the assets subject to the sale naturally run off over time, Berkshire's bid, which
was valued at $1.44 billion based on February 29, 2012 balances, was calculated to be worth $1.324 billion based on
August 31, 2012 balances.

ny-1064263

$1.329 billion, $5 million higher than Berkshire's stalking-horse bid (satisfying the required bid increment of $5 million). Puntus Decl. at ¶ 36. Notably, due to certain changes made by the DLJ Consortium to the asset purchase agreement and proposed sale order, the Debtors, in consultation with the Committee, initially determined that there were certain material issues with the DLJ Consortium bid. Puntus Decl. at ¶ 36. Thus, from the time that the bid was received through the opening of the auction for the Whole Loan Assets (the "Whole Loan Auction," and together with the Platform Auction, the "Auctions"), the Debtors, in consultation with the Committee, engaged in extensive negotiations with the DLJ Consortium with respect to their proposed asset purchase agreement and sale order. Puntus Decl. at ¶ 36. Ultimately, prior to the Whole Loan Auction, the DLJ Consortium was able to address the Debtors' concerns with revisions to the proposed sale documents. Puntus Decl. at ¶ 36. As such, the Debtors, in the exercise of their business judgment, with the support of the Committee, determined that the DLJ Consortium bid was a Qualified Bid and was the highest and best bid for the Whole Loan Assets. Puntus Decl. at ¶ 36.

### C. Key Stakeholder Communications

26. Throughout the process, the Debtors and their advisors were in regular contact with all of the Debtors' key constituents, including the Committee, AFI, Barclays (the agent for the Debtors' debtor-in-possession financing facility), and Citibank (a pre-petition lender). Puntus Decl. at ¶ 37. The Debtors also maintained an open dialogue with Fannie Mae, Freddie Mac, Ginnie Mae, the DOJ, and the Federal Housing Finance Agency and provided them with regular updates on the process and worked with the potential purchasers of the Platform Assets to attempt to address any concerns raised. Puntus Decl. at ¶ 37.

### D. The Auctions

#### 1. The Platform Auction

27. The Platform Auction, which lasted until late into the evening on October 23, 2012 and concluded on the morning of October 24, 2012, went through multiple rounds of bidding. During the course of the bidding, both bidders made several qualitative

adjustments to their bid designed to reduce the administrative expense burden to the estates,

which expenses the Debtors could have been required to pay leading up to or following the

closing of the sale absent the changes.  Those adjustments, made by both bidders, included:

- <u>Severance</u>:  Both bidders agreed to make offers conforming to the Debtors' severance policies to employees representing 70% of the Debtors' potential severance cost.  The Debtors calculated that this provided $34.7 million in value to their estates through the avoidance of severance costs.

- <u>Servicing Platform Costs</u>:  Both bidders agreed to maintain loans on the Debtors' servicing platform or otherwise assume any third-party costs for the transfer of such loans to a different platform.  This will allow the Debtors to avoid paying employee incentives, vendor incentives and the need for an interim servicing agreement, each of which would have been required if the Debtors were required to operate the Platform for a period post-closing.  These changes also saved the Debtors potential loan/documentation transfer costs.  The Debtors calculated that operating the Platform for a period post-closing would cost approximately $49.6 million and that the loan/documentation transfer costs would be approximately $14.2 million.

- <u>Loan Origination Platform</u>:  Both bidders agreed to provide transition services necessary for the Debtors to wind down their loan origination pipeline post-close.  The Debtors calculated that this agreement provided $9.9 million in value to their estates.

Puntus Decl. at ¶ 40.

28.    Nationstar and Ocwen also agreed to remove a provision in their respective asset

purchase agreements that required a purchase price adjustment to the extent the Debtors did not

succeed in obtaining amendments to certain servicing agreements to allow the associated

servicing advances to be more easily financed.  Puntus Decl. at ¶ 40.  The Debtors, in

consultation with the Committee's advisors, calculated that the removal of this provision created

an approximate $55 million improvement in bid value.  Puntus Decl. at ¶ 40.

29.    During the Platform Auction, Ocwen and Nationstar also agreed to other

qualitative changes to their bids that, while being incapable of being quantified at a particular

dollar amount, were viewed by the Debtors as favorable changes.  First, both bidders allowed the

Debtors to "carve out" from the asset purchase agreement any "unprofitable" servicing

agreements (i.e., those servicing agreements where the potential cure costs would be greater than

the purchase price attributable to the master servicing rights and servicing advances underlying

the agreement). Puntus Decl. at ¶ 41. Second, both bidders agreed to assume all Ginnie Mae

liabilities in full. Puntus Decl. at ¶ 41. As a result, Ginnie Mae may now seek satisfaction of all

liabilities relating to Ginnie Mae loans, either pre- or post-closing, related to servicing or

origination, from the purchaser of the Platform Assets. Third, both bidders agreed to move the

"drop dead" date in their respective asset purchase agreements from January 31, 2013 to March

31, 2013. Puntus Decl. at ¶ 41.

30.    At the conclusion of the Platform Auction, and factoring in the amounts

attributable to the qualitative changes described above, the final bid amounts were calculated as

follows:

> **Ocwen:**         **$3 billion**
>
> **Nationstar:**   **$2.907 billion**

Puntus Decl. at ¶ 42.

31.    Given these two outstanding bids at the conclusion of the Platform Auction, with

no material differences in the proposed asset purchase agreement between the two bidders, the

Board, in the exercise of its business judgment and in consultation with the Committee,

determined that the Ocwen bid represented the highest and best offer and declared Ocwen to be

the winner of the Platform Auction.[13]  Puntus Decl. at ¶ 42. The Ocwen bid represents an

aggregate increase in value to the Debtors' estates of approximately $800 million as compared to

the Nationstar stalking-horse bid. Puntus Decl. at ¶ 42.

### 2.    The Whole Loan Auction

32.    Prior to commencing the Whole Loan Auction, the Debtors described to Berkshire

the above-mentioned changes to the proposed asset purchase agreement made by the DLJ

Consortium, and offered Berkshire the opportunity to adopt any such modifications as part of its

bid. Puntus Decl. at ¶ 42. In addition, at the outset of the auction, the Debtors requested that

---

[13] Pursuant to section 10.1(e) of the Nationstar APA, Nationstar is obligated to remain as Back-Up Bidder on the terms reflected in its last bid upon the earlier of (a) the Bankruptcy Court's approval of the successful bid and (b) 30 calendar days following the Platform Auction (November 23, 2012).

13

Berkshire agree on the record that it was willing to adopt the new language in section 6.17 of the

DLJ Consortium asset purchase agreement, which requires continued compliance with certain

aspects of the Consent Order and AG/DOJ Settlement, and Berkshire's representative agreed.

Puntus Decl. at ¶ 42.

33.    The Debtors commenced the Whole Loan Auction on October 25, 2012.  The

Whole Loan Auction lasted approximately two hours, with final bids being submitted as follows:

> **Berkshire:**      **$1.5 billion**
>
> **DLJ Consortium:**      **$1.475 billion**

Puntus Decl. at ¶ 44.

34.    Given these final bids, and with no material qualitative differences between each

bidder's proposed asset purchase agreements, the Board, in the exercise of its business judgment

and in consultation with the Committee, determined that the Berkshire offer was the highest and

best offer and declared Berkshire to be the winner of the Whole Loan Auction.[14]  Puntus Decl. at

¶ 44.  The Berkshire bid represents an aggregate increase in value of approximately $175 million

as compared to the Berkshire stalking-horse bid.  Puntus Decl. at ¶ 44.

35.    The Debtors and their advisors view the outcome of the Auctions as an

unqualified success.  Taken together, these two successful bids will result in more than

$4.5 billion dollars in value to the estates considering not only the cash being paid to the

Debtors' estates, but also the liabilities avoided — an increase of close to $1 billion from the

original stalking-horse bids.  Puntus Decl. at ¶ 45.

### E.    The Asset Purchase Agreements

36.    After the Auctions closed, the Debtors worked with Ocwen and Berkshire to

conform the terms of their respective asset purchase agreements to modifications made during

the bidding process at the Auctions.

---

[14] The DLJ Consortium is obligated to remain as Back-Up Bidder on the terms reflected in its last bid through
January 31, 2013.

37.    On November 2, 2012, certain of the Debtors entered into an asset purchase agreement for the Platform Assets, by and among Ocwen, ResCap, Residential Funding Company, LLC, and GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower LLC, and RFC Borrower LLC [Docket No. 2050] (the "Ocwen APA").

38.    On November 2, 2012, certain of the Debtors entered into an amended and restated asset purchase agreement for the Whole Loan Assets, by and among Berkshire, ResCap, Residential Funding Company, LLC, and GMAC Mortgage, LLC [Docket No. 2050] (the "Berkshire APA").

## ARGUMENT

### A.    The Sales Are a Clearly Permissible Exercise of the Debtors' Business Judgment

39.    The sales of the Purchased Assets are in the best interests of the Debtors, their estates, and their creditors.  No party has asserted an objection arguing otherwise.  In light of the aggregate $4.5 billion purchase price acquired through the Auctions, the Debtors will receive significant value for the estates if the proposed sales are approved and close.  Moreover, the Debtors conducted a vigorous and transparent marketing process that was broadly noticed and resulted in almost $1 billion of incremental value to the estates, which will be used to maximize recoveries to the Debtors' claimholders.  For these reasons and those discussed below, the sales represent a sound exercise of the Debtors' business judgment.

40.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a trustee or debtor-in-possession "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . "  11 U.S.C. § 363(b)(1).  To sell property under section 363(b), the Debtors must demonstrate to the Court a legitimate business justification for the proposed action.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re The Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Grubb and Ellis Co.*, No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, at *10-11 (Bankr. S.D.N.Y. Mar. 27, 2012) ("In

approving a transaction conducted pursuant to **section 363(b)(1)**, courts consider whether the debtor exercised sound business judgment."). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). These sales should be approved if the Court is satisfied that (a) the Debtors exercised sound business judgment; (b) the Debtors provided adequate notice; (c) the purchasers proceeded in good faith; and (d) the purchase price is fair. *See In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012)*; In re Boston Generating, LLC*, 440 B.R. 302, 329-30 (Bankr. S.D.N.Y. 2010) (citing *In re General Motors Corp.*, 407 B.R. 463, 489-93 (Bankr. S.D.N.Y. 2009)).

41.    The Debtors have satisfied all four of these requirements. *First*, the Debtors have established a good business reason for the sale of their assets. As this Court is well aware from the prior proceedings and filings, including the Whitlinger Affidavit, the confluence of economic and liquidity constraints, together with the burden imposed by multiple litigants in regulatory actions, have left the Debtors with little choice but to sell their operating assets to satisfy their obligations.

42.    *Second*, the Debtors have provided clear and adequate notice relating to the sale transactions, and no objector has claimed otherwise. The Sale Motion was served on all suggested notice parties set forth in paragraph II.C. of General Order M-383 of the Bankruptcy Court for the Southern District of New York, as well as all trustees, certificate holders, investors, rating agencies, mortgage insurers, all parties to any servicing agreements or similar agreements, and the relevant government sponsored enterprises in this case. The notice of hearing on, and notice of entry of order approving, the sales procedures, were also mailed to the aforementioned parties and posted on the website maintained by the Debtors' claims and noticing agent. The notice of the Auctions and the Sale Hearing were mailed to these parties on June 29, 2012 and published in the global edition of the Wall Street Journal and the national edition of the New

York Times.  Following the conclusion of the Auctions, the Debtors filed and served a notice of successful bidders. [Docket No. 1960].  Moreover, the Debtors issued a detailed press release providing further detail on the winning bids for both of the sales.[15]  Finally, notice of the filing of the execution copy of each of the Ocwen APA and Berkshire APA was filed (and served) on November 3, 2012. [Docket No. 2050].

43.    *Third*, as is evident from the process, there is more than ample evidence to demonstrate that the Debtors, Ocwen, and Berkshire engaged in good faith, arm's length negotiations in arriving at their respective asset purchase agreements.  Indeed, no one has claimed otherwise.  The sale efforts and negotiations were ongoing and included input and oversight from the Debtors' and the Committee's advisors, among other interested parties.  The Committee was kept apprised of sale developments as they occurred.  Moreover, copies of the proposed asset purchase agreements received on the bid deadline were given to representatives of the counterparties to the Debtors' financing agreements and the Committee.  Prior to the commencement of the Auctions, the Debtors' advisors engaged in numerous discussions with the Committee's advisors to review the competing offers, and request clarifications from the bidders.  The Debtors and the Committee jointly concluded that such offers were Qualified Bids.  The Debtors respectfully submit that the good faith of the parties is plainly evident and fully supported by the facts.

44.    *Fourth*, the Debtors' estates will receive fair value from the proposed transactions.  Indeed, as a result of the proposed transactions, the Debtors will realize approximately $4.5 billion in sale proceeds, and expect to have cash of approximately $900 million for payment of administrative, priority, and unsecured claims from the sale. Accordingly, the Debtors submit that they have received fair value for their estates as a result of the Auctions and have maximized their ability to satisfy claims against the estate.

---

[15] *See "ResCap Board of Directors Approves Bid by Berkshire Hathaway for Whole Loan Portfolio"* BUSINESS WIRE (Oct. 25, 2012, 3:16 PM), http://www.businesswire.com/news/home/20121025006591/en.

**B.    The Purchasers Are Good Faith Purchasers Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code**

45.    Not a single objection was lodged contesting the good faith of Ocwen or Berkshire as purchasers under their respective APAs.  The Debtors are unaware of any basis to believe that either purchaser did not act in good faith in connection with their participation in the Auctions, the formulation of their bids, or the negotiation of their agreements.   Moreover, as stated above, and as supported by the Puntus Declaration, prior to the Auctions, both Ocwen and Berkshire made representations that they had not colluded directly or indirectly with other actual or prospective bidders, nor had they communicated any of the terms or conditions of their respective bids to any other bidder or prospective bidder.  Faris Decl. at ¶ 16; Wechsler Decl. For these reasons, the Debtors believe that Ocwen and Berkshire each qualify for the full protections provided under section 363(m) of the Bankruptcy Code.

46.    Section 363(m) of the Bankruptcy Code affords a good faith purchaser of a debtor's assets the assurance that a subsequent reversal of the Court's decision authorizing the sale does not void the transaction.  Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

47.    Although the Bankruptcy Code does not define "good faith purchaser," the Second Circuit, construing section 363(m) of the Bankruptcy Code, has explained that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"  *Licensing by Paolo,*

*Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (quoting *In re Rock Indus. Mach.*
*Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978).

48.     As stated above, the Debtors believe (and there is no basis to suggest otherwise)
that both Ocwen and Berkshire are good faith purchasers entitled to the protections of section
363(m) of the Bankruptcy Code.

### C.     The Sale of the Debtors' Assets Free and Clear of Liens Is Authorized by Section 363(f) of the Bankruptcy Code

49.     One of the hallmark benefits of a bankruptcy sale is the ability of a purchaser of
assets of the estate to take title to such assets free and clear of liens, claims, or encumbrances,
with any such liens, claims, or encumbrances to attach to the proceeds of the sale.  Indeed, given
the very nature of a bankruptcy process, with competing claims against largely insufficient
assets, buyers would likely avoid bankruptcy sales if they were required to defend or satisfy
competing claims against the assets that they have acquired.  The Debtors respectfully submit
that the assets being sold under the Ocwen APA and the Berkshire APA should be sold free and
clear of any liens, claims, and encumbrances, with any such liens, claims, and encumbrances
attaching to the proceeds of the asset sales.

50.     Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all
or any part of its property free and clear of any and all liens, claims, or interests in such property
if: (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such
a lien, claim, or interest consents to such sale; (c) the interest is a lien and the purchase price for
the property is greater than the aggregate amount of all liens on the property; (d) the interest is
the subject of a *bona fide* dispute; or (e) the party asserting the lien, claim, or interest could be
compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.
11 U.S.C. § 363(f).  *See also Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart*
*World Techs., LLC)*, 423 F.3d 166, 169 n.3 (2d Cir. 2005); ("Section 363 permits sales of assets
free and clear of claims and interests.  It thus allows purchasers . . . to acquire assets [from a
debtor] without any accompanying liabilities.").  Section 363(f) requires only that one of the five

requirements be satisfied with respect to each such interest.  *In re Borders Grp., Inc.*, 453 B.R. 477, 483 (Bankr. S.D.N.Y. 2011).

51.    The Second Circuit has held that the reference in section 363(f) of the Bankruptcy Code to the sale being free and clear of "any interest" permits the sale of a debtor's assets free and clear of claims, including successor liability claims.  *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *see also In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y.), *aff'd*, 576 F.3d 108 (2d Cir. 2009) (sale of assets pursuant to section 363(f) extinguished any potential state successor or transferee liability claims); *Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (sale pursuant to section 363(f) barred successor liability for product defects claims), *aff'd sub nom., Griffin v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 805 F.2d 1515 (11th Cir. 1986); *Rubinstein v. Alaska Pac. Consortium (In re New England Fish Co.)*, 19 B.R. 323, 328 (Bankr. W.D. Wash. 1982) (sale pursuant to section 363(f) was free and clear of successor liability claims for employment discrimination and civil rights violations).

52.    The Debtors have provided notice to all parties that have interests in the assets, and no objections were received to the transfer of the Debtors' assets on the basis that such transfers should remain subject to all liens, claims, and encumbrances, with the exception of certain taxing authorities seeking to confirm that tax liens will remain with the properties or be satisfied.  Where an entity has not objected to a sale, consent may be implied for purposes of section 363(f)(2).  *See, e.g., In re Enron Corp.*, No. 01- 16034 (AJG), 2004 WL 5361245, at *2 (Bankr. S.D.N.Y. Feb. 5, 2004).  Thus, any entity who has failed to object to the proposed sale should be deemed to have consented to the sale of the Debtors' assets "free and clear" pursuant to section 363(f)(2) of the Bankruptcy Code.

53.    The Debtors received timely Objections from three taxing authorities to the Debtors' sale of assets free and clear of liens, one of which has been withdrawn.  The remaining

Objections argue that the Debtors cannot sell their property free and clear of the taxing

authorities' statutory tax liens without adequate protection of their liens.  As discussed in further

detail in <u>Exhibit 1</u>, the Debtors have incorporated language into the revised sale orders to clarify

that to the extent any of the Purchased Assets include any asset on which any taxing authority

has a valid lien, such lien will attach with equal validity to the proceeds of the sale of such assets.

The Debtors believe that the inclusion of this language in the revised sale order substantially

resolves the taxing authorities' Objections.  To the extent it does not, the Debtors will continue to

work with the taxing authorities to reach resolution.

> **D.    The Court Should Authorize the Debtors to Assume and Assign the Executory Contracts Pursuant to Section 365 of the Bankruptcy Code**

54.    The Ocwen APA provides for the transfer to Ocwen of the Debtors' loan

servicing platform.  The Platform Assets consist primarily of executory contracts (servicing

agreements) among one or more of the Debtors and counterparties for whom the Debtors service

loans.  Under the Ocwen APA, these vital assets are being transferred pursuant to section 365 of

the Bankruptcy Code.  A number of parties have objected to the Debtors' attempts to assume and

assign the servicing agreements under a combination of arguments, all of which miss the mark.

- <u>*First*</u>, certain of the objecting parties, including the RMBS Trustees, insist that this Court cannot authorize a transfer of their respective servicing agreements to Ocwen under section 365 unless the Debtors satisfy certain pre-conditions to the transfer required under their respective agreements.  These provisions constitute impermissible anti-assignment provisions that are unenforceable under 365(f)(1).

- <u>*Second*</u>, a number of parties object to the Debtors' assumption and assignment of servicing agreements on the basis that section 365 does not permit "partial" assignment – e.g., that the Debtors should not be permitted to assume and assign portions of an executory contract (ignoring that obligations that are distinct from one another may be severed from one another even though found in a single document).  As described in detail below, severing origination from servicing obligations in the servicing agreements is permissible under relevant applicable case law.

- <u>*Third*</u>, several objecting parties express concern that even within the scope of "servicing" obligations provided for in the servicing agreements, Ocwen is "cherry-picking" those servicing obligations it desires to take, allowing the Debtors to thereafter reject other servicing obligations that the contract parties would expect their servicer to perform.  The revised proposed sale order makes clear that Ocwen intends to assume all of the servicing obligations under the servicing agreements.

21

- *Fourth,* several parties object to the assignment on the basis that the transfer cannot occur unless Ocwen agrees to be liable for liabilities caused by the Debtors prior to the Closing Date, which, for the most part, cannot yet be identified by the counterparties to such agreements. However, like most purchasers of assets in the section 363 context, Ocwen has assumed liability for those obligations that arise from and after the Closing Date, and the pre-closing obligations that are due and owing at the time of the sale will be satisfied by the Debtors as "cure" under section 365 of the Code.

55.    For these reasons and the reasons described below, these Objections should be overruled as either contrary to law or as having been resolved in the proposed order approving the Debtors' sale of the Platform Assets to Ocwen.

> **1.    Anti-Assignment Provisions in Certain of the Assumed Contracts Should Not Restrict, Limit, or Prohibit the Assumption, Assignment, and Sale Under Section 365(f)**

56.    The RMBS Trustees, together with certain other objecting parties, argue that this Court cannot authorize the Debtors' attempted assumption and assignment of the servicing agreements unless the Debtor can satisfy certain pre-conditions to assignment found in their respective agreements. Specifically, the RMBS Trustees would have this Court enforce provisions in the servicing agreements that require the Debtors to obtain rating agency confirmation ("RAC") that the transfer of such servicing agreements will not result in a downgrade of the rating of the underlying trust securities. These RAC provisions, while not classic anti-assignment clauses requiring the consent of the contractual counterparty, are plainly the type of provision that "conditions the assignment of such contract," and thus fall within the protections of section 365(f). Requirements for third party consents, including the insurer consent provisions raised by the RMBS Trustees, are similarly unenforceable as impermissible anti-assignment provisions under section 365(f)(1).

57.    The plain language of section 365(f) of the Bankruptcy Code permits the Debtors to assign any executory contract despite the inclusion in such contract of an anti-assignment provision. Section 365(f)(1) provides that assignment under section 365(f)(2) is permissible "notwithstanding a provision in an executory contract . . . , or in applicable law, that prohibits, restricts, or conditions the assignment of such contract . . . ." 11 U.S.C. § 365(f)(1). Section 365(f) was designed by Congress to preserve and maximize the value of the assets of a debtor's

estate.  *See*, *e.g.*, *In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 73 (Bankr. S.D.N.Y. 2007)

("[Section 365(f)] implements a general Congressional purpose to permit assignments, to

maximize recovery for creditors . . . "); *Hannaford Bros. Co. v. Ames Dep't Stores, Inc. (In re

Ames Dep't Stores, Inc.)*, 316 B.R. 772, 794 (Bankr. S.D.N.Y. 2004) ("Section 365(f) performs

an important function for maximizing the value in an estate for creditors.").  The objecting

parties' attempt to enforce the anti-assignment language in the contracts the Debtors' seek to

assume and assign is manifestly inconsistent with the Bankruptcy Code, the clear Congressional

policy behind section 365(f)(1), and relevant case law.

59.     In *In re Capmark Financial Group Inc.*, No. 09-13684 (CSS) (Bankr. D. Del. Oct.

25, 2009) ("*Capmark*"), Bankruptcy Judge Sontchi held that these very RAC provisions were

unenforceable anti-assignment provisions under the Bankruptcy Code.  Specifically, Judge

Sontchi stated, "[the rating agencies] don't and won't provide a written agreement or

commitment to [reinstate existing ratings] prior to the closing.  So I think that, in effect, this

contract is out of touch with reality and, in effect, is an anti-assignment clause that is void under

the Bankruptcy Code because it's an impossible condition to meet."  Transcript of Hearing at

62:4-7,  *In re Capmark Fin. Grp., Inc.,* No. 09-13684 (CSS) (Bankr. D. Del. Nov. 24, 2009)

[*Capmark* Docket No. 1027].[16]

59.     The RMBS Trustees attempt to distinguish *Capmark* by suggesting that RAC

provisions are only anti-assignment clauses if the Debtors adduce evidence that such consents

cannot be achieved prior to closing.  *See Response of the RMBS Trustees in Support of Their

Pre-Auction Objections to the Debtors' Sale Motion* at ¶13 [Docket No. 1807]. That was not the

court's holding.  Rather, the court ruled that the RAC provisions were invalid.  The fact that the

debtor in *Capmark* thought that it would eventually obtain the necessary consents did not change

the court's ruling that such provisions were unenforceable.  The Debtors are unaware of (and the

objecting parties fail to cite) any case that says a debtor must first attempt to obtain consents or

---

[16] A copy of the *Capmark* sale hearing transcript is attached hereto as. Exhibit 2.

approvals in order for a bankruptcy court to hold that a third-party consent or other restriction on transfer provision is an unenforceable anti-assignment provision under section 365(f). That is not what section 365(f) says or requires, and the RMBS Trustees' attempt to require that the Debtors seek such consents is contrary to the plain language of the Code and established precedent.

60.    Another instructive case is *DB Structured Prods., Inc. v. Am. Home Mortg. Holdings, Inc.* (*In re Am. Home Mortg. Holdings, Inc.)*, 402 B.R. 87 (Bankr. D. Del. 2009) ("American Home Mortgage"), where the bankruptcy court found that a sale of the debtors' mortgage servicing platform should not be precluded by a provision in the servicing agreement that required the servicer under the agreement to meet the qualifications of a Freddie Mac-approved servicer.[17] The court excused performance of the Freddie Mac qualification provision to the extent necessary to facilitate the transfer of the servicing agreement, noting that such qualification provision was contractual boilerplate that could be found in most servicing agreements as a proxy for monitoring the financial wherewithal of the servicer. *Id.* at 104. The RAC provision serves a similar purpose, as it can also be considered in many respects to be a proxy for "monitoring the financial wherewithal of the servicer." It cannot be used to block a transfer of servicing where the new servicer has demonstrated adequate assurance of future performance. Indeed, it is hard to imagine that the economic interests of the RMBS Trustees and certificateholders are not vastly improved by transferring servicing to a financially strong Ocwen instead of being maintained by the Debtors, who would be forced to reject the servicing agreements, leaving the RMBS Trustees with general unsecured claims for contract rejection damages and the burden of self-servicing hundreds of transactions or finding replacement servicers.

---

[17] The court in *American Home Mortgage* decided this matter under section 363 because the parties had stipulated that the servicing agreements at issue were not executory contracts and therefore not subject to the provisions of section 365. The decision is nonetheless informative.

### 2.    The Debtors Are Not Impermissibly Severing the Agreements

#### a.    The Servicing Agreements Are Severable from the Other Agreements and May be Assumed and Assigned Independently

61.    Fannie Mae, Freddie Mac, the California Housing Finance Agency ("CalHFA"), and the Los Angeles County Employees Retirement Association ("LACERA") have objected to the Debtors' proposed assignment of the servicing agreements to Ocwen based on the mistaken premise that this Court cannot sever servicing rights and obligations from non-servicing rights and obligations.[18]  These Objections are either moot or have been withdrawn.  *First,* the Debtors are not seeking to sever agreements relating to the purchase and servicing agreements for Fannie Mae and Freddie Mac mortgage loans, which the Debtors acknowledge are distinguishable from the servicing agreements discussed below because they expressly provide that the servicer is also liable for any origination/seller-related obligations and that those obligations will be assumed by any successor servicer.  The Debtors have made this point unequivocally clear to Fannie Mae and Freddie Mac.[19]  Therefore, their objections with respect to this issue are moot.  *Second*, it is the Debtors' understanding from conversations with CalHFA and LACERA that those parties are no longer objecting to the Debtors' request to reject origination-related rights and obligations, while assuming and assigning to Ocwen servicing-related rights and obligations.  While the Debtors believe that there are no existing objections with respect to severing origination from servicing obligations, out of an abundance of caution, the Debtors have briefly addressed the issue below and submit that the proposed severance of servicing rights and obligations from non-servicing rights and obligations is permissible.

---

[18] Pursuant to paragraph 18 the Scheduling Order, the RMBS Trustees have already consented to the severing of their servicing agreements for purposes of the sale, but they have reserved their right to assert origination-related claims as part of their cure claims based on the argument that the agreements were not properly severed in the event the *Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Settlement Agreements* [Docket No. 320] is not approved or the applicable trust opts out of the agreement.  In such instance, the RMBS Scheduling Order caps the cure claims of the RMBS Trustees as set forth therein.

[19]  To be clear, Ocwen is not assuming any origination-related liability for Fannie Mae or Freddie Mac servicing arising prior to the Closing Date.  Nonetheless, the Debtors acknowledge that to the extent such liability exists it is part of the cure that must be paid to the Fannie Mae and Freddie Mac, respectively, in connection with the assumption and assignment of their agreements.

62.     Indeed, a nearly identical approach was approved by Judge Sontchi in *American Home Mortgage.*  In that case, DB Structured Products, Inc. ("DBSP") was party to a Master Mortgage Loan Purchase and Servicing Agreement ("Master Agreement") for servicing-retained sales of mortgage loans with the debtor AHM Corp.  *American Home Mortgage*, 402 B.R. at 91. The Master Agreement allowed DBSP to purchase loans from AHM Corp., with debtor AHM SV providing the servicing function for the loan.  Following commencement of their bankruptcy cases, the debtors filed a stalking-horse asset purchase agreement that provided that the buyer would acquire certain servicing rights and assume servicing-related liabilities under the Master Agreement, but not any non-servicing liabilities.  DBSP objected, arguing, among other things, that the Master Agreement must be assumed and assigned by the debtors in its entirety, or not at all.  The Delaware court disagreed, holding that under applicable New York law, the Master Agreement was severable into two separate contracts — one for the origination and sale of mortgage loans and another for the servicing of the mortgage loans.  *Id.* at 93.

63.     In reaching that conclusion, Judge Sontchi noted that severability "[was] a question of the parties' intent, to be determined from language that they employed, viewed in light of circumstances surrounding them at the time they contracted."  *Id.* at 94 (citation omitted). Under New York law, a contract is severable "when by its terms, nature, and purpose, it is susceptible of division and apportionment."  *Id.* (citing *Calyon N.Y. Branch v. Am. Home Mortg. Corp.* (*In re Am. Home Mortg., Inc.*), 379 B.R. 503, 521 (Bankr. D. Del. 2008) (citations omitted), *reconsideration denied*, 383 B.R. 585 (Bankr. D. Del. 2008).

64.     The *American Home Mortgage* court held that the Master Agreement was severable into a distinct loan servicing agreement and loan sale agreement based on three factors: (1) the nature and purpose of the agreements were different; (2) the consideration for each agreement was separate and distinct; and (3) the obligations of each party to the instrument were not interrelated.  *American Home Mortgage,* at 95-98.  That analysis is equally applicable to the servicing agreements proposed to be assumed and assigned to Ocwen, which are substantially similar to the contract at issue in *American Home Mortgage* in terms of structure and purpose.

65.    Here, as with the *American Home Mortgage* Master Agreement, the nature and

purposes of the servicing agreements are severable from the purchase agreements — the former

concern the servicing of an existing, identified body or pool of mortgage loans, and the latter

concern the initial sale and/or packaging of such loans into a securitization pool.  The

consideration underlying the servicing of the mortgage loans (which consists of servicing fees

deducted from borrower payments of principal and interest) is separate and distinct from the

consideration underlying the initial sale and/or pooling of the loans (i.e., the cash purchase price

paid for the mortgage loans).  Even in instances where a single Debtor entity acted as seller,

servicer, or subservicer in each of the transactions, the transactions nonetheless recognized and

appropriately designated the different roles that the Debtor entity would play in these

transactions.[20]

66.    For example, where the parties intended for a Debtor to act in its capacity as

servicer, they so designated, and typically used a specific defined term.  *See*, *e.g.*, Preamble to

Servicing Agreement, annexed as <u>Exhibit 1</u> to the Ruckdaschel Decl. (designating "GMAC

Mortgage Corporation, as servicer (together with its permitted successors and assigns", as the

"Servicer".))  And where the parties intended for a Debtor to act in its capacity as a seller, again

they so designated, typically employing a different defined term.  *See id.* at ¶ 1.01 (designating

"GMACM" as "Seller" and, in turn, defining "GMACM" to mean "GMAC Mortgage

Corporation, . . . in its capacity as seller of the Mortgage Loans to the Company, and any

successor thereto").  These separate designations are a reflection of the intent of the parties at the

time they contracted that the counterparty would be engaging with the Debtor in two separate

and very different capacities:  seller and servicer.  The memorialization of the Debtors'

obligations under both those capacities within a single document was simply a matter of drafting

---

[20]  In certain cases, the same Debtor entity originated the mortgage loans at the beginning of the transaction, and also acted as servicer following securitization at the back end of the transaction.  The origination was performed under an entirely different contract, and thus, any arguments that the Debtors' obligations under the origination contract should be considered part and parcel of their obligations under the subsequent servicing agreement are unavailing.

convenience for the parties.  For these reasons, to the extent applicable, this Court should follow the ruling in *American Home Mortgage* and find that the purchase and sale-related provisions contained in the servicing agreements are severable from the servicing-related provisions in those contracts.

67.     The proposed treatment of certain of the servicing agreements (in particular, those to which the RMBS Trustees are a party) is equally permissible under a tri-partite contractual analysis.  A large portion of the servicing agreements involve three distinct parties — the securitization trustee and two Debtor parties: (a) a "depositor" entity (Residential Accredit Loans, Inc., Residential Asset Securities Corporation, etc.), which purchases the loans from the originator and sells them to the applicable securitization trust, and (b) a "servicer" entity (in most cases, GMAC Mortgage or RFC), which performs the actual servicing of the loans held in the trust.  It is the depositor that makes all of the representations and warranties with respect to the origination of the loans under such servicing agreements.  The depositor also assigns its rights to the trustees to pursue representation and warranty claims directly against the originator under the separate purchase agreement between the originator and the depositor.  Only the servicer, in contrast, has no direct origination liability under the servicing agreements.

68.     As set forth below, while executory contracts must be accepted or rejected in their entirety, those contracts need not be uniformly accepted or rejected by all debtor parties thereto where the contracts are severable.  Here, it is only the Debtors that have servicing-related rights and obligations (i.e., the servicers) that are assuming and assigning the servicing agreements.

69.     As for the remaining sale/origination obligations, they may be rejected by the applicable Debtor (i.e., the depositor).  The case law is clear that the decision by a debtor to reject an executory contract does not constitute a termination of that contract, but is instead deemed a breach of that contract by the rejecting party.  *See, e.g.*, *Cohen v. Drexel Burnham Lambert Grp., Inc. (In re The Drexel Burnham Lambert Grp., Inc.)*, 138 B.R. 687, 708 (Bankr. S.D.N.Y. 1992) ("Rejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.") (citation

omitted); *In re Yasin*, 179 B.R. 43, 49 (Bankr. S.D.N.Y. 1995) ("While rejection constitutes a

breach of the contract or lease . . . it does not terminate it."). Thus, a debtor's rejection of an

executory contract does not affect or alter the obligations of other parties to the agreement. *See,*

*e.g.*, *Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 387 (2d Cir. 1997)

(noting that "the Code does not determine parties' rights regarding the contract and subsequent

breach").[21] This principle has led courts to conclude that where a debtor rejects a tri-party

agreement, the agreement remains binding upon the other two counterparties. *See, e.g.*,

*Kopolow v. P.M. Holding Corp. (In re Modern Textile, Inc.)*, 900 F.2d 1184, 1191 (8th Cir.

1990) (holding that the rejection of a sublease by the trustee did not discharge the liability of a

guarantor of the lease obligation); *In re Fieldstone Mortg. Co.*, 427 B.R. 364, 376 (Bankr. D.

Md. 2010) (holding that a debtor's rejection of the contracts had "no effect whatsoever with

respect to any performance obligations of other parties to the agreements . . . "). There is no

reason why this basic principle should not remain applicable simply because one of the non-

rejecting parties to an executory contract is also a debtor. Thus, the servicing agreements with

multiple debtor counterparties, can be assumed and assigned by only the "servicer" parties

thereto, effectively severing any origination-related liability arising under such agreements.

### b.    Ocwen is Not "Cherry-picking" Among Servicing Obligations

70.    Several objecting parties allege that Ocwen is "cherry-picking" which servicer

related obligations it will assume. That is not the case. Where possible, the Debtors and Ocwen

have sought to provide clarity to these objecting parties regarding the type and nature of the

obligations and liabilities being assumed. The Debtors seek to provide further clarity through

---

[21] Notwithstanding the arguments of several objectors to the contrary, courts in the Southern District of New York have consistently held and treated executory contracts prior to rejection or assumption as property of a debtor's estate. *See, e.g., Velo Holdings Inc. v. Paymentech, LLC (In re Velo Holdings Inc.)*, 475 B.R. 367, 384-85 (Bankr. S.D.N.Y. 2012) (this Court held that the debtors were entitled to an injunction against a counter-party to various executory contracts prior to rejection/assumption of such contracts because, in part, such contracts were significant assets of the debtors' estates and the debtors would suffer irreparable injury otherwise); *Alert Holdings, Inc. v. Interstate Protective Servs., Inc.* (*In re Alert Holdings, Inc.*), 148 B.R. 194, 203 (Bankr. S.D.N.Y. 1992); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 700-03.

modifications to the proposed sale order to make it clear that _all_ post-closing servicing related

obligations are being assumed and assigned by the Debtors to Ocwen.

71.      Paragraph P of the proposed order has now been revised to clarify that "Other

Agreements" as defined in the order includes only origination-related agreements and not any

servicing obligations.  Further, clarifying language has been added to the order, which provides

in relevant part:

> For avoidance of doubt, notwithstanding anything to the contrary
> contained in this Order or in the Ocwen APA, upon the assignment
> of the Servicing Agreements to Purchaser, Purchaser shall perform
> all of the obligations under the Servicing Agreements (but not
> perform any obligations or have any liabilities arising under the
> Other Agreements) from and after the Closing Date; provided,
> however, that Purchaser shall not incur any liability that arises out
> of or relates to any  act or omission of the Debtors (whether as
> originator, servicer, or otherwise) that occurred before the Closing
> Date.

Thus, to the extent that a trustee or owner of a loan serviced by the Debtors is concerned that

Ocwen will fail to perform any servicing obligations owed under the servicing agreements, those

concerns should now be allayed.

### c.      Pre-Closing Versus Post-Closing Liabilities Obligations

72.      The remaining dispute raised by a number of objecting parties, including the

RMBS Trustees, concerning the Debtors' assumption and assignment of contracts under section

365 of the Bankruptcy Code relates to the distinction between pre-closing and post-closing

obligations and liabilities.  Like any acquirer of an asset in bankruptcy, Ocwen has assumed

liability for those obligations that arise from and after the Closing Date.  This is sensible when

one considers that pre-closing obligations that are due and owing at the time of the sale are to be

satisfied by the Debtors as "cure" under section 365 of the Bankruptcy Code.

73.      Yet, the objecting parties contest the notion that a contract can be assumed and

assigned under section 365 of the Bankruptcy Code in a manner that severs pre-Closing Date

obligations and liabilities from those that will arise post-closing.  Instead, they request that

ny-1064263

Ocwen assume all obligations to indemnify them for any losses or claims regardless of when the activity giving rise to such losses or claims arise. This position, however, is contrary to law and would frustrate the purpose of bankruptcy sales — to shield the purchaser from any alleged liability of the debtor and thereby maximize the value such purchaser is willing to pay for the debtor's assets.

74.    In support of their request for broad protection, the objecting parties, including the RMBS Trustees,[22] argue that they cannot assess today what claims might exist because they are simply unknown or not-yet-discovered, and they are not privy to information available to the Debtors and therefore have no basis to dispute the cure claims provided to them in the Debtors' cure notice. In the objecting parties' view, the Bankruptcy Code effectively places no burden on the nondebtor counterparty to demonstrate the amount of its alleged cure claim. Instead, the objecting parties argue that the burden falls on the Debtors, who must either prove the _absence_ of cure claims or ensure that the acquirer of their contract interests assumes the liability to pay any and all cure claims that might exist.

75.    However, it is clear under section 365 of the Bankruptcy Code, that it is the nondebtor party that "has the burden of coming forward with alleged defaults and demonstrating that those defaults have been properly noticed on the debtor." *Kings Terrace Nursing Home & Health Related Facility v. N.Y.S. Dep't of Social Servs. (In re Kings Terrace Nursing Home & Health Related Facility)*, No. 91 B 11478 (FBC), Adv. No. 94/8912A, 1995 WL 65531, at *9 (Bankr. S.D.N.Y. Jan. 27, 1995); *see also In re Goody's Family Clothing, Inc.*, 443 B.R. 5, 17 n. 90 (Bankr. D. Del. 2010). The nondebtor party also bears the burden of "proof of the amount of any monetary default . . . ." *See In re Millivision, Inc.*, 328 B.R. 1, 6 (Bankr. D. Mass. 2005).

---

[22]    As noted above, the Debtors understand that Ocwen remains in discussions with the RMBS Trustees regarding proposed language to be included in a revised form of sale approval order in connection with the proposed resolution articulated by the Debtors' counsel at the hearing on the RMBS Trustees' Pre-Auction Objection.

Several of the objecting parties have failed to carry this burden to demonstrate any existing
defaults or cure amounts.[17]

76.    Moreover, arguments as to the inability to identify certain defaults are the precise
arguments made unsuccessfully by some of the same parties in *Capmark*.  Like here, *Capmark*
involved the sale of the debtors' mortgage servicing platform.  Under the asset purchase
agreement in that case, the purchaser was not obligated to assume any pre-closing liabilities.
Several parties objected (including Wells Fargo Bank, N.A. and U.S. Bank National Association,
each in its capacity as a trustee), alleging that the purchaser needed to assume liability for alleged
then-existing breaches, violations, or defaults that had yet to be discovered or quantified, but for
which the debtors were obligated to indemnify the trustees under the applicable servicing
agreements.  Some of the objecting parties alternatively suggested that the debtors establish an
escrow to satisfy these liabilities.

77.    Judge Sontchi overruled the objections, finding that it was the responsibility of
the trustees to assert cure claims on account of these obligations and that there had to be a "stop
date" for these types of claims, which date could be after the date of the sale hearing to the extent
the parties agreed.  Specifically, the court stated:

> I'm going to overrule these objections based on the idea that there
> are claims for defaults that may arise under the servicing
> agreements that have not yet been identified for whatever
> reason. That 365(b) requires, of course, that if there has been a
> default it be cured but it actually says, 'if there has been a default
> in an executory contract, the trustee may not assume such contract

---

[17]    Certain objectors to the Sale Motion also argue that they lack sufficient information to adequately dispute
the Debtors' proposed cure amounts or to calculate cure claims due to the limited information listed on exhibits to
the Debtors' notices regarding (i) intent to assume and assign executory contracts, and (ii) cure amounts related
thereto.  Some of these objectors have simply refused to work cooperatively with the Debtors to (a) confirm which
agreements are being assumed and assigned, (b) identify defaults, if any, under such agreements, and/or (c)
determine appropriate cure amounts.  These objectors not only blatantly ignore the procedures approved by the Sale
Procedures Order, but also seek to impermissibly shift to the Debtors the burden to determine what defaults, if any,
exist under the executory agreements the Debtors seek to assume and assign.  These Objections should be overruled
because they: (a) fail to satisfy the burdens under section 365(b) of the Bankruptcy Code; and (b) are in violation of
the Sale Procedures Order, which provides that parties asserting objections based upon cure amounts under assumed
contracts "must set forth with specificity the Cure Amount being claimed by the objecting party or the nature of the
asserted default, as applicable, and must include appropriate documentation in support thereof satisfactory to the
Debtors . . ."  *Sale Procedures Order*, Ex. 3, ¶10.

or lease unless at the time of assumption of such contract or lease the trustee cures that default.' There has to be a stop date. There has to be a stop the music date on issues of cure in connection with the assumption and assignment of leases and administrative expense claims. Otherwise, you simply couldn't do it. And the code clearly provides that you can. And, indeed, I take issue with some of the tone, and I don't mean that pejoratively, but some of the underlying rationale that somehow the Debtors don't get special rights in connection with 365, of course they do. That's the whole point. The Debtor can pick executory contracts and leases where it would be advantageous for them to assume or assign them, and it can reject and cure, if you will, it's bad business judgment with contracts and leases that it doesn't make sense to go forward with. It's a fundamental piece of the Bankruptcy Code. There are other provisions that make it clear that assumption and assignment of executory contracts is to be cured, is to be encouraged, for instance, anti-assignment clauses; *ipso facto* clauses. These are unenforceable defaults. I agree with Mr. Kessler if we had, if people had the ability to assert the Debtor defaulted by failing to do 'x' prior to this motion or to the sale date but I don't know what the damages are yet that's a completely different issue from the Debtor may have defaulted under the loan at some time. I don't know what that is. I don't know if it has occurred, and I don't know what damages would even arise if it had occurred, and if I find out about it that somehow they have to cure that.

That is simply too vague, too inchoate for the Court to give it any credence in connection with the assumption and assignment of the executory contract and unexpired leases. It is certainly true that in virtually every one of these cases I deal with and dealt with previously before I took the bench, that the cure issues don't get decided at the sale hearing. There is an agreement. There's a bid. There's an ask. And the monies made sure that it's there and it's dealt with at a later date. That's what's provided here. But it also provides that if you assert a cure amount prior to assuming, assumption and assignment, that's it. No more cure amount. No more admin claim. I think that's appropriate. I think that's appropriate. So I'm going to overrule those objections on that basis.

*See* Transcript of Hearing, *Capmark*, 95;19 – 97;17.

78.    The RMBS Trustees and other objectors attempt to side-step Judge Sontchi's ruling in *Capmark* by couching these obligations as affirmative post-closing indemnity obligations of Ocwen instead of pre-closing cure claims against the Debtors.  That argument reads the concept of cure out of the Bankruptcy Code.  Nevertheless, Ocwen has agreed to perform all of the post-closing obligations related to the Debtors' servicing business under the Servicing Agreements, other than obligations stemming from the Debtors' pre-closing acts or

omissions (whether as originator, servicer, or otherwise).  Thus, the obligations Ocwen is not assuming fundamentally are alleged defaults that, to the extent can be proven, are cure claims.

79.    Another instructive case on the propriety of separating pre-closing and post-closing liabilities in contracts assumed in bankruptcy is *In re ProCare Automotive Service Solutions LLC*, No. 06-10605 (Bankr. N.D. Ohio 2006) ("ProCare").[23]  In *ProCare*, the debtors sought to assume and assign to Monro Muffler Brake ("Monro") their interest in non-residential real property leases for automobile repair facilities.  As part of that assumption, the debtors sought to assume and assign as an "Acquired Contract" an agreement with BP Products North America ("BP").  BP objected to the assignment on the basis that (a) it had not been able to quantify pre-assumption cure claims associated with environmental remediation for the affected properties, and (b) the purchaser should be obligated to assume all indemnification obligations owing under the Assumed Contracts, regardless of when they arose.  The Bankruptcy Court for the Northern District of Ohio rejected both of BP's arguments.  First, the court determined that BP failed to meet its burden to demonstrate why the debtors' listed cure claim was insufficient.  Second, and notably, the court rejected BP's demand for broad indemnity from Monro, ruling that "Section 365 sets out the extent of the obligations that [purchaser] will have following this sale and that there is nothing in that section that would require [purchaser] to make an additional representation or to take on additional responsibilities."  Transcript of Hearing at 48:15-19, *In re ProCare Automotive Serv. Solutions LLC,* No. 06-10605 (PMC) (Bankr. N.D. Ohio Apr. 28, 2006) [*ProCare* Docket No. 282].

80.    In support of their position that indemnity obligations for pre-closing liabilities must be viewed as post-closing obligations, the RMBS Trustees cite to *In re 1945 Route 23 Assocs., Inc.*, No. 06-17474 (NLW), 2008 WL 2386296 (Bankr. D.N.J. June 9, 2008).  The court there held that a purchaser of assets was responsible for tax payments under a lease of non-residential real property where such tax payments were not payable under the contractual terms

---

[23] The *ProCare* sale hearing transcript is attached hereto as Exhibit 3.

of the lease until post-closing, when the tax statement was delivered to the purchaser by the landlord.  That case, however, cited applicable Third Circuit law in support of the decision, which does not apportion liabilities between pre-bankruptcy and post-bankruptcy periods (or pre-closing and post-closing periods, in this case).  Rather, under the "billing date" approach adopted by the Third Circuit, a debtor must timely perform all obligations of the debtor under a non-residential real property lease from and after the order for relief, regardless of the period during which the obligation accrued.  Accordingly, the *1945 Route 23 Associates* court determined that because there was no pre-closing contractual obligation to pay the tax bill (as none had been delivered by the landlord prior to the assignment), there was no pre-closing breach or liability that could be subject to cure.

81.     However, Second Circuit case law is entirely to the contrary.  The Southern District of New York generally applies the proration method — i.e., tax obligations may be pro-rated between the pre- and post-petition or closing period.  *See, e.g.*, *Newman v. McCrory Corp., (In re McCrory Corp.)*, 210 B.R. 934, 936-40 (S.D.N.Y. 1997); *In re Ames Dep't Stores, Inc.*, 306 B.R. at 67-70.  Applying the proration method to the *1945 Route 23 Associates* decision, would have required a court in this jurisdiction to reach the opposite conclusion and find that the tax obligations at issue are pre-closing obligations to the extent they were attributable to the pre-closing period.

82.     The instant situation is more analogous to the cases in which a court is asked to determine whether a particular claim arose pre- or post-petition.  In those cases, courts in the Southern District of New York apply the conduct test — i.e., if the conduct giving rise to a claim arose pre-petition, the claim is a pre-petition claim even if the damages do not manifest until post-petition.  *See, e.g.*, *Emons Indus., Inc. v. Allen (In re Emons Indus., Inc.)*, 220 B.R. 182, 193 (Bankr. S.D.N.Y. 1998).  The same rationale should apply here.  If the conduct that concerns the objecting parties took place pre-closing, such conduct gives rise to a pre-closing default subject to cure, even if the payment obligation (or even knowledge of the claim) might not become due until post-closing.

83.     With respect to the RMBS Trustees, independent of the tentative proposed resolution of the Pre-Auction Objections, the Debtors have already previously agreed to a special cure process for the RMBS Trustees as part of the Scheduling Order.  The RMBS Trustees have 60 days post-closing to assert their cure claims under that order.  *Scheduling Order* at ¶21. Accordingly, the RMBS Trustees will likely have another four or more months to identify and assert any claims related to the Debtors' pre-closing breaches.  Moreover, the Debtors have agreed with the RMBS Trustees that any such valid cure claims will have administrative priority. *Id.* at ¶18.  Accordingly, the Debtors believe that the RMBS Trustees have already agreed that the cure process set forth in the Scheduling Order gives them adequate assurance of cure.

84.     With respect to other objecting parties that have raised similar concerns, the Debtors believe that the revisions to the proposed sale order make clear that any obligations not being assumed by Ocwen are properly viewed as cure claims.  In light of the approximately $900 million in proceeds expected to be available for administrative, priority and unsecured claims following the sale (plus additional amounts as the Debtors continue to liquidate the significant remaining assets in the assets), there are more than sufficient proceeds to satisfy any alleged cure claims, and no further adequate assurance of cure should be required.

### 3.     The Debtors Will Provide Adequate Assurance of Future Performance by the Purchasers

85.     Ocwen is a renowned national servicer of mortgages with an established track record in the servicing industry.  Ocwen currently services more than 800,000 loans with an unpaid principal balance of over $127 billion spread across more than 1,400 servicing agreements.  Faris Decl. at ¶ 9.  Ocwen has a current market capitalization of over $4.7 billion and has excellent access to capital markets for further financing.  Faris Decl. at ¶¶ 4, 8. Additionally, Ocwen has secured financing commitments from Barclays Capital Inc. and Barclays Bank PLC (collectively, "Barclays") totaling $2.7 billion for its consummation of the transactions contemplated under the Ocwen APA.  Faris Decl. at ¶ 6.  Clearly, Ocwen is an entity with an ability to perform in the future its obligations under the assumed agreements.

86.    Ocwen has partnered with Walter in connection with the purchase of the Platform

Assets.  Both Ocwen and Walter are parties to a Joint Bidding Agreement.  Dixon Decl. at ¶ 1.

As discussed in the Dixon Declaration, Walter has the financial wherewithal to satisfy its

financial obligations under the assumed agreements and has demonstrated the necessary

experience and expertise to service the loans for which it is assuming the servicing obligations

according to its recognized high servicing standards.  Dixon Decl. at ¶ 3.

87.    Section 365(f)(2) of the Bankruptcy Code requires that, in order to assume and

assign an executory contract, a debtor must provide adequate assurance of future performance by

the assignee.  *See* 11 U.S.C. § 365(f)(2).  It does not require that the assignee provide an absolute

guarantee of fulfilling all future obligations, or perform later-discovered pre-closing obligations

of a debtor.  The phrase "adequate assurance of future performance" is not defined in the

Bankruptcy Code.  Legislative history, however, indicates that it was intended to be given a

"practical, pragmatic construction."  *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n. 10 (3d

Cir. 2001) (quoting *In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (Bankr. E.D.N.Y. 1980)).  *See

also In re Fleming Cos.*, 499 F.3d 300 (3d Cir. 2007).

> Section 2-609 of the Uniform Commercial Code, from which the
> bankruptcy statute borrows its critical language, provides that
> "when reasonable grounds for insecurity arise with respect to the
> performance of either party, the other may in writing demand
> adequate assurance of future performance . . . ."  The
> Commentaries to the Code note that " 'adequate' assurance is to be
> 'defined by commercial rather than legal standards.' "Official
> Comment 3 to Uniform Commercial Code § 2-609 (1972 Ed.).
> What constitutes "adequate assurance" is to be determined by
> factual conditions; the seller must exercise good faith and observe
> commercial standards; his satisfaction must be based upon reason
> and must not be arbitrary and capricious.

*Cinicola v. Scharffenberger*, 248 F.3d at 120 n. 10.  Adequate assurance "focuses on the

financial condition of a contracting party and his ability to meet his financial obligations."  *In re

U.L. Radio Corp.*, 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982) (citing U.C.C. § 2-609 cmt. 4).  As

set forth below, and will be further demonstrated at the Sale Hearing, each of Ocwen, Walter,

and Berkshire possesses the necessary financial and operational qualifications to perform the

obligations being assumed and assigned.

### a.    Ocwen

88.    Applying the legal standard articulated above, Ocwen's ability to provide adequate assurance of future performance is comprised of two primary components: (a) Ocwen's financial wherewithal, and (b) Ocwen's ability to comply with applicable servicing standards.  Each of these components will be addressed in turn below.

### (i)    Financial Wherewithal

89.    Ocwen possesses adequate capitalization, ensuring that it is capable of performing the servicing obligations under the contracts it is assuming, including making any required servicer advances.  Ocwen holds approximately $270.5 million in unencumbered cash and $193.7 million in unused collateralized financing capacity.  Faris Decl. at ¶ 7.  In addition, Ocwen is receiving $540 million from its bidding partner, Walter, as consideration for certain assets that Walter has agreed to purchase.  Faris Decl. at ¶ 7.  In addition, Ocwen has secured financing commitments from Barclays totaling $2.7 billion for its consummation of the transactions contemplated by the Ocwen APA, which financings consist of a $1.5 billion senior credit facility and a $1.2 billion servicer advance facility.  Faris Decl. at ¶ 6.  These facilities provide Ocwen with the requisite capital to complete the transactions contemplated by the Ocwen APA and to fund assumed servicing obligations on a going-forward basis.  Furthermore, although Ocwen does not contemplate needing to raise additional equity to close the Ocwen APA, Ocwen is able to access a significant amount of additional capital via capital markets.  Faris Decl. at ¶ 8.  This ability is proven by, among other things, the recent sales of MSRs to Ocwen's publicly held subsidiary, Home Loan Servicing Solutions, Ltd., which generated total proceeds of $1.2 billion from May through September 2012.  Faris Decl. at ¶ 8.  Additionally, between July 2010 and November 2011, Ocwen raised $375 million in equity and $925 million in senior syndicated term loans in connection with the acquisition of various mortgage loan servicing assets.  Faris Decl. at ¶ 8.

### (ii)    Compliance With Servicing Standards

90.    Ocwen is an experienced participant in the residential mortgage loan servicing industry, and has a proven track record of providing high quality servicing.   Faris Decl. at ¶¶ 9, 12.  Ocwen holds the necessary licenses and qualifications enabling it to service the acquired mortgage loans in all 50 states and the District of Columbia.  Faris Decl. at ¶ 11.

91.    Moreover, in a recent Operation Risk Assessment issued by Morningstar Credit Ratings (the "Morningstar Report") attached hereto as Exhibit 4, Ocwen received top rankings as a residential special servicer and residential non-prime servicer, and was determined to be "fully capable of serving as a residential non-prime and special servicer for its investors and subservicing clients."  Faris Decl. at ¶ 12; Morningstar Report at 3.

92.    The Debtors have carefully reviewed Ocwen's operations and proposal, and are satisfied that Ocwen is taking steps to ensure that similar quality will be provided with respect to the loans proposed to be serviced as part of the asset sales.  Ocwen has indicated that it plans to make available at ResCap's servicing locations proprietary information technology ("IT") systems to enhance and supplement those systems currently being used by ResCap, on the basis that Ocwen's IT is better suited to the high volume, "high touch" servicing practices for which Ocwen is known.[24]  Faris Decl. at ¶ 13.  Additionally, Ocwen intends to retain the vast majority of ResCap's current personnel in order to establish continuity and best practices, particularly with respect to servicing of the Freddie Mac and Ginnie Mae loans.  Faris Decl. at ¶ 13.

93.    Ocwen's ability to smoothly transition the Debtors' enormous servicing portfolio is borne out by past experience.  Within the last few years, Ocwen has acquired and successfully integrated several other large servicing portfolios including the integration of the servicing platforms of and/or loans serviced by HomEq, Litton, Saxon, JP Morgan Chase and other transfers of large volumes of mortgage servicing rights in connection with various acquisition transactions.  Faris Decl. at ¶ 14.

---

[24] "High touch" servicing refers to a specialized model of customer service that typically involves, among other things, a proactive approach to providing consumers with information, resolving errors, and working with delinquent borrowers to find alternatives to foreclosure.

39

### b.    Walter

94.    Walter has a market capitalization of approximately $1.4 billion, and liquidity, as of September 30, 2012, of approximately $128.2 million.  Dixon Decl. at ¶ 5.  As an experienced servicer of Fannie Mae loans, Walter currently holds all the necessary licenses and qualifications to service the loans under the assigned servicing agreements.  Dixon Decl. at ¶ 8.  In addition, Walter has experience integrating large servicing portfolios onto their platform, having successfully on-boarded 53 separate portfolios totaling $60.4 billion of UPB in 2011.  Dixon Decl. at ¶ 11.  The Debtors have carefully reviewed Walter's operations and proposal, and are satisfied that Walter is taking steps to ensure that similar quality will be provided with respect to the loans proposed to be serviced as part of the asset sales.  Thus, Walter is also able to perform its future obligations under the assumed agreements.

### c.    Berkshire

95.    Berkshire, with an estimated market capitalization of $211.8 billion, is more than capable of funding its acquisition of the Whole Loan Assets.  Additionally, as the owner of whole loans, Berkshire's obligations will essentially consist of collecting loan payments, a task that requires little, if any, specialized expertise.  No party has objected that Berkshire cannot provide adequate assurance of future performance, and, in fact, the Debtors believe that the primary consideration — the "financial condition" of Berkshire, and Berkshire's corresponding ability to meet its financial obligations"— is without doubt.

### E.    The Debtors Expect to Resolve the Fannie Mae and Freddie Mac Objections Prior to the Sale Hearing

96.    The Debtors have had extensive discussions with Fannie Mae and Freddie Mac regarding the treatment of their servicing agreements and cure claims.  The parties continue to discuss the resolution of their objections.  As the Debtors have advised both Fannie Mae and Freddie Mac, and as Ocwen has already agreed, the Debtors are not seeking to sever the servicing obligations from the origination obligations with respect to their agreements with the GSEs.  While Ocwen is not assuming such origination-related obligations under the APA, to the extent such obligations exist, they will be part of the cure owed to Fannie Mae and Freddie Mac,

respectively.  Given the importance of the Debtors' current relationship with the GSE's, and the desire of Ocwen and Walter to maintain that close relationship, the Debtors have agreed to waive their right to seek to sever origination-related liabilities from the affected agreements.

97.    It should be noted, however, that the Debtors disagree with Fannie Mae's characterization of the discussions among the parties regarding the manner in which the Debtors have sought to assume and assign their agreements.  The Debtors have requested information from Fannie Mae, which Fannie Mae has provided and continues to provide.  The information is necessary to attempt to calculate an appropriate cure claim, which the Debtors are committed to accomplish, assuming the amounts sought are reasonable, documented, and fair.  The Debtors are hopeful that by the time of the Sale Hearing, the Debtors and Fannie Mae will have been able to agree on a minimum cure amount that would be paid to Fannie Mae on closing, while reserving their rights with respect to additional cure claims, if any.  The Debtors hope to arrive at a similar arrangement with Freddie Mac.

**F.    The Debtors Also Expect to Resolve the Objections Filed by the DOJ Prior to the Sale Hearing.**

98.    The Debtors remain in frequent discussions with the DOJ and Ocwen regarding the continued fulfillment by Ocwen of the non-monetary obligations of the DOJ/AG Settlement. The Debtors agree with DOJ's assertion that that the parties have made significant strides towards a final agreement on a revised Section 6.16 of the Ocwen APA and expect that any remaining issues will be resolved consensually with the DOJ in advance of the Sale Hearing.  In the meantime, the Debtors will continue keeping AFI and the Committee current on these discussions with a view towards promptly providing such parties with an updated provision agreed to by the Debtors, Ocwen, and the DOJ.

99.    Regarding the related Limited Objection of AFI to the Sale Motion, the Debtors have reiterated in revised Section 6.16 that they will continue to perform and be bound by the Consent Order and DOJ/AJ Settlement Agreement, and that Ocwen will agree to perform various obligations appurtenant thereto.  The Debtors believe that upon resolution of the issue with the

Government, any concerns alleged by AFI with Ocwen's continued compliance with the Consent Order and DOJ/AG Settlement should be resolved.

100.    Moreover, the Debtors believe that the issue of whether an escrow is necessary to ensure the Debtors' compliance with the DOJ/AG Settlement and Consent Order is not yet ripe. The Debtors' conduct in these cases should make it abundantly clear that the Debtors have every intention of continuing to honor their obligations under the DOJ/AG Settlement Agreement and Consent Order.  To the extent not clear, the revised Section 6.16 should clarify any ambiguity. And if the Debtors were to fail to comply with their obligations, the substantial available proceeds noted above are more than sufficient to satisfy any such claims.  The Debtors recognize their obligation under the Plan Support Agreement with AFI.  However, the Debtors submit that the time to determine the need or amount of any escrow is not now as part of the sale to Ocwen. Rather, it should be determined at the point of plan confirmation, when the Debtors, the DOJ, Ocwen and AFI, among others, can better assess (a) the costs of compliance with the DOJ/AG Settlement and Consent Order, (b) Ocwen's track record of continued performance in accordance with those requirements, and (c) the costs to be paid to PWC and any borrowers resulting from efforts by the Debtors and the Committee to obtain modifications to the Consent Order in order to avoid the significant costs associated with the foreclosure review required thereunder.

101.    Separately, the Debtors remain in discussions with Ocwen regarding the assumption and assignment of the Debtors' HAMP agreements and are working on a mutually agreeable solution to address the Government's concerns regarding cure costs and adequate assurance of future performance.

**G.    General Responses to Objections**

102.    Considering the number of agreements the Debtors are seeking to assume and assign and the number of parties provided notice of the sale transactions, the Debtors believe that the number of Objections is relatively small.  Moreover, many of the Objections are not objections to the proposed sales themselves, but rather are objections to the amounts proposed to cure defaults in connection with the proposed assumption and assignment of certain executory

contracts and unexpired leases or other aspects of the proposed transfer (each, a "Cure Objection").

103.    Set forth as Exhibit 1 is a chart listing the Objections filed in respect of the Sale Motion, the Debtors' replies thereto, and the status of each Objection (the "Objection Summary"). In the Objection Summary, each Objection is identified as being either:[25]

- "**Unresolved**," meaning that the Objection remains in dispute and has not been resolved;

- "**Addressed**," meaning that the Debtors believe the objecting party's Objection has been adequately addressed by changes in the revised version of the applicable proposed sale order or other clarifications or agreements, but the objecting party has not yet formally advised the Debtors that its Objection is resolved;

- "**Resolved**," meaning that the objecting party has agreed that its Objection is resolved either by receipt of additional information, changes to be made to the applicable proposed sale order, or other clarifications or agreements;

- "**Partially Resolved**," meaning that the objecting party's Objection is partially Unresolved or partially Resolved; or

- "**Deferred to Cure Hearing**," meaning that the Objection is not an Objection to the Sale Motion but rather is a Cure Objection in connection with the assumption and assignment of a particular executory contract or unexpired lease and, to the extent not resolved prior the Sale Hearing, will be heard at a separate hearing to be scheduled to address cure amount and contract assignment disputes.

104.    The Debtors will, to the extent possible, seek to resolve the outstanding objections prior to the Sale Hearing or Cure Hearing, as applicable. To the extent that the objections are not resolved and/or withdrawn prior to the Sale Hearing, the Debtors submit that the objections should be overruled for the reasons set forth herein and in Exhibit 1.

---

[25] In many cases, resolutions of these Objections continue to be discussed by the parties. The Debtors will notify the Court if resolutions are reached to address any of these currently unresolved Objections.

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court enter an order (a) overruling the Objections, (b) approving the sale transactions discussed herein, and (c) granting such further relief as this Court deems appropriate.

Dated: November 12, 2012
       New York, New York

                                        _/s/_ Gary S. Lee_____
                                        Gary S. Lee
                                        Lorenzo Marinuzzi
                                        Todd M. Goren
                                        Alexandra Steinberg Barrage
                                        Jennifer L. Marines
                                        MORRISON & FOERSTER LLP
                                        1290 Avenue of the Americas
                                        New York, New York 10104
                                        Telephone: (212) 468-8000
                                        Facsimile: (212) 468-7900

                                        *Counsel for the Debtors and
                                        Debtors in Possession*

                                        **CURTIS, MALLET-PREVOST,
                                        COLT & MOSLE LLP**
                                        101 Park Avenue
                                        New York, New York  10178-0061
                                        Telephone:  (212) 696-6000
                                        Facsimile:   (212) 697-1559

                                        Steven J. Reisman
                                        Theresa A. Foudy
                                        Maryann Gallagher

                                        *Conflicts Counsel for the Debtors and
                                        Debtors in Possession*