# Exhibit 2

## *Capmark* Hearing Transcript

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3   IN RE:                        )  Case No. 09-13684 (CSS)
                                  )  Chapter 11
4   CAPMARK FINANCIAL GROUP, INC.,)
        et al,                    )
5                                 )  Courtroom No. 6
                  Debtors.        )  824 Market Street
6                                 )  Wilmington, Delaware 19801
                                  )
7                                 )
                                  )  November 24, 2009
8                                 )  1:00 P.M.

9                      TRANSCRIPT OF HEARING
             BEFORE HONORABLE CHRISTOPHER S. SONTCHI
10                 UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:          Dewey & LeBoeuf
                              By:  MICHAEL KESSLER, ESQUIRE
13                            1301 Avenue of the Americas
                              New York, New York 10019-6092
14                            (212) 259-8675

15                            Capmark Financial Group, Inc.
                              By:  TOM MIRAGLIA, ESQUIRE
16                            116 Welsh Road
                              Horsham, Pennsylvania 19044
17                            (215) 328-3681

18                            Beekman Advisors
                              By:  SHEKAR NARASIMHAN, ESQUIRE
19                            8000 Westpark Drive, Suite 250
                              McLean, Virginia 22102
20                            (703) 752-8321

21  ECRO:                     LESLIE MURIN

22  Transcription Service:    Antonio's Word Processing Services
                              704 W. 14th Street
23                            New Castle, Delaware  19720
                              Telephone:  (302) 322-9419
24                            E-Mail:  antonioswp@verizon.net

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
```

```
 1  For the Debtors:          Richards Layton & Finger
                              By:    JASON MICHAEL MADRON, ESQUIRE
 2                            One Rodney Square
                              920 North King Street
 3                            Wilmington, Delaware 19801
                              (302) 651-7595
 4
    For Paul Weiss Rifkind    Paul Weiss Rifkind Wharton Garrison
 5  Wharton Garrison:         By:    MARGARET A. PHILLIPS, ESQUIRE
                                     STEPHEN SHIMSHAK
 6                            1285 Avenue of the Americas
                              New York, New York 10019-6064
 7                            (212) 373-3571
                              (212) 373-3133
 8
    For Sun-Times Media:      Kirkland & Ellis, LLP
 9                            By:    SARA SEEWER, ESQUIRE
                              300 North LaSalle
10                            Chicago, Illinois 60654
                              (312) 862-2398
11
    For Wells Fargo Bank      Werb & Sullivan
12      As Trustee:           By:    DUANE D. WERB, ESQUIRE
                              300 Delaware Avenue, 13th Floor
13                            Wilmington, Delaware 19899
                              (302) 652-1100
14
                              Alston & Bird LLP
15                            By:    LEIB LERNER, ESQUIRE
                              333 South Hope Street, 16th Floor
16                            Los Angeles, California 90061
                              (213) 576-1193
17
                              Alston & Bird LLP
18                            By:    JONATHAN EDWARDS, ESQUIRE
                              One Atlantic Center
19                            1201 West Peachtree Street
                              Atlanta, Georgia 30309-3424
20                            (404) 881-4985

21                            By:    BRIAN COX, ESQUIRE
                                     SUZANNE C. WILLIAMS, ESQUIRE
22                            Bank of America Plaza, Suite 4000
                              101 South Tryon Street
23                            Charlotte, North Carolina 28280-4000
                              (704) 444-1328
24

25
```

```
 1 │ For Wells Fargo Bank,    Sidley Austin LLP
   │     N.A.:                By:    ALEX ROVIRA, ESQUIRE
 2 │                          787 Seventh Avenue
   │                          New York, New York 10019
 3 │                          (212) 839-5989

 4 │ For Wells Fargo Bank,    Womble Carlyle
   │ N.A., Genworth, Bank     By:    MICHAEL BUSENKELL, ESQUIRE
 5 │ Of America:             222 Delaware Avenue
   │                          Wilmington, Delaware 19801
 6 │                          (302) 252-4320

 7 │ For Bank of America      Hunton & Williams LLP
   │ Genworth:                By:    JASON HARBOUR, ESQUIRE
 8 │                                 BENJAMIN C. ACKERLY, ESQUIRE
   │                          Riverfront Plaza, East Tower
 9 │                          951 East Byrd Street
   │                          Richmond, Virginia  23219
10 │                          (804) 788-7233

11 │ For Berkadia:            DLA Piper
   │                          By:    THOMAS CALIFANO, Esquire
12 │                          1251 Avenue of the Americas
   │                          New York, New York  10020-1104
13 │                          (212) 335-4990

14 │                          Fox Rothschild
   │                          By:    L. JASON CORNELL, ESQUIRE
15 │                          Citizens Bank Center
   │                          919 North Market Street, Suite 1300
16 │                          Wilmington, Delaware 19899-2323
   │                          (302) 427-5512
17 │
   │                          Weil Gotshal & Manges LLP
18 │                          By:    ANDREA BERNSTEIN, ESQUIRE
   │                          767 Fifth Avenue
19 │                          New York, New York 10153
   │                          (212) 310-8528
20 │
   │ For Anatoly Bushler:     Farallon Capital Management
21 │                          By:    ANATOLY BUSHLER,ESQUIRE
   │                          One Maritime Plaza, Suite 2100
22 │                          San Francisco, California 94111
   │                          (415) 421-2132
23 │
   │ For Sandringham:         Fox Rothschild
24 │                          By:    JEFFREY M. SCHLERF, ESQUIRE
   │                          Citizens Bank Center
25 │                          919 North Market Street, Suite 1300
   │                          Wilmington, Delaware 19899-2323
   │                          (302) 622-4212
```

```
 1  For Sandringham:          White & Case LLP
                              By:    ANDREW M. AMBRUOSO, ESQUIRE
 2                            1155 Avenue of the Americas
                              New York, New York 10036-2787
 3                            (212) 819-8200

 4  For East Bank, Inc.:      Wilmer Cutler Pickering Hale
                              By:    PAUL WOLFSON, ESQUIRE
 5                                   LISA EWART, ESQUIRE
                              1875 Pennsylvania Avenue, NW
 6                            Washington, D.C. 20006
                              (202) 663-6390
 7
                              Cross & Simon
 8                            By:    CHRISTOPHER SIMON, ESQUIRE
                              913 North Market Street, 11th Floor
 9                            Wilmington, Delaware 19801
                              (302) 777-4200
10
    For ACAS 2007:            Cross & Simon
11                            By:    MICHAEL JOYCE, ESQUIRE
                              913 North Market Street, 11th Floor
12                            Wilmington, Delaware 19801
                              (302) 777-4200
13
    For David Creamer         Swartz Campbell
14  Charles Dunleavy:         By:    JOHN A. WETZEL, ESQUIRE
                              1 S. Church Street, Suite 400
15                            West Chester, Pennsylvania 19382
                              (610) 692-9500
16
    For U.S. Bank Nat'l       Seward & Kissel LLP
17      Association:          By:    ARLENE ALVES, ESQUIRE
                              One Battery Park Plaza
18                            New York, New York 10004
                              (212) 574-1204
19
    For Fannie Mae:           Pillsbury Winthrop Shaw Pittman LLP
20                            By:    LEO T. CROWLEY, ESQUIRE
                              1540 Broadway
21                            New York, New York 10036-4039
                              (212) 858-1740
22
                              Potter Anderson & Corroon LLP
23                            By:    THERESA BROWN-EDWARDS, ESQ.
                              Hercules Plaza
24                            1313 North Market Street, 6th Floor
                              Wilmington, Delaware 19801
25                            (302) 984-6142
```

```
 1   For GMAC:                  Pinckney, Harris & Weidinger, LLC
                                By:    DONNA HARRIS, ESQUIRE
 2                              1220 North Market Street, Suite 950
                                Wilmington, Delaware 19801
 3                              (302) 504-1499

 4   For Inverness Prop.:       Tybout Redfearn & Pell
                                By:    LAUREN McCONNELL, ESQUIRE
 5                              750 Shipyard Drive, Suite 400
                                Wilmington, Delaware 19801
 6                              (302) 658-6901

 7   For Anglo Irish Bank:      Greenberg Traurig LLP
                                By:    VICTORIA COUNIHAN, ESQUIRE
 8                              The Nemours Building
                                1007 North Orange Street, Suite 1200
 9                              Wilmington, Delaware 19801
                                (302) 661-7000
10
     For Creditors             Kramer Levin Naftalis & Frankel LLP
11   Committee:                 By:    THOMAS MAYER, ESQUIRE
                                       AMY CATON, ESQUIRE
12                                     JOSHUA BRODY, ESQUIRE
                                1177 Avenues of the Americas
13                              New York, New York 10036
                                (212) 715-9100
14
                                Bayard, P.A.
15                              By:    NEIL GLASSMAN, ESQUIRE
                                       JAMIE EDMONSON, ESQUIRE
16                              222 Delaware Avenue, Suite 900
                                Wilmington, Delaware 19801
17                              (302) 655-5000

18   For Creditor, Ad Hoc      Kasowitz Benson Torres & Friedman
     Group of Senior            By:    JEFFERY GLEIT, ESQUIRE
19   Noteholders:              1633 Broadway
                                New York, New York 10019
20                              (212) 506-1791

21   For R.R. Donnelley:        Smith Katzenstein Furlow LLP
                                By:    KATHLEEN M. MILLER, ESQUIRE
22                              The Corporate Plaza
                                800 Delaware Avenue, Suite 1000
23                              Wilmington, Delaware 19899
                                (302) 652-8400 ext. 230
24

25
```

```
 1   For CitiBank, N.A. &      Shearman & Sterling LLP
     CitiCorp North America:   By:   FREDERIC SOSNICK, ESQUIRE
 2                             599 Lexington Avenue
                               New York, New York 10022
 3                             (212) 848-8571

 4                             Ashby & Geddes, P.A.
                               By:   DON A. BESKRONE, ESQUIRE
 5                             500 Delaware Avenue
                               Wilmington, Delaware 19899
 6                             (302) 654-1888

 7   For Freddie Mac:          Landman Corsi Ballaine & Ford P.C.
                               By:   MARK LANDMAN, ESQUIRE
 8                             120 Broadway, 27th Floor
                               New York, New York 10271
 9                             (212) 238-4800

10                             Messana Rosner & Stern LLP
                               By:   FREDERIC ROSNER, ESQUIRE
11                             1000 N. West Street, Suite 1200
                               Wilmington, Delaware 19801
12                             (302) 777-1111

13                             Associate General Counsel
                               By:   KENTON HAMBRICK, ESQUIRE
14                             8200 Jones Branch Drive
                               McLean, Virginia 22102
15
     For Deutsche Bank         Stevens & Lee
16   Trust Co. Americas:       By:   JOSEPH H. HUSTON, JR., ESQ.
                               1105 North Market Street, 7th Floor
17                             Wilmington, Delaware 19801
                               (302) 425-3310
18
     For USDOJ:                United States Dept. of Justice
19                             By:   JOSEPH McMAHON, ESQUIRE
                                     GLENN GILLETT, ESQUIRE
20                             1401 H Street, N.W., Suite 4000
                               Washington, D.C. 20530
21                             (202) 514-2000

22   Interested Party,         Bingham McCutchen, LLP
     Bingham McCutchen:        By:   JONATHAN ALTER, ESQUIRE
23                             One State Street
                               Hartford, Connecticut 06103-3178
24                             (860) 240-2969

25
```

```
 1   Interested Party,          Bingham McCutchen, LLP
     MBIA Insurance:            By:    STEPHANIE GREER, ESQUIRE
 2                              399 Park Avenue
                                New York, New York 10022-4689
 3                              (212) 705-7592

 4   Interested Party,          Perry Capital
     Perry Capital:             By:    RICHARD PAIGE, ESQUIRE
 5                              767 5th Avenue, 19th Floor
                                New York, New York 10153
 6                              (212) 583-4000

 7   Interested Party,          Knighthead Capital
     Knighthead Capital:        By:    LAURA TOLEDO, ESQUIRE
 8                              623 5th Avenue
                                New York, New York 10022
 9                              (212) 888-5435

10   Interested Party,          Talamod Asset Management LLC
     Talamod Asset Mgmt.:       By:    JAY STEEN, ESQUIRE
11                              2100 McKinney Avenue, Suite 1425
                                Dallas, Texas 75201
12                              (214) 965-9100

13   Interested Party,          Aurelius Capital
     Aurelius Capital:          By:    WEI WANG, ESQUIRE
14                              535 Madison Avenue, Floor 22
                                New York, New York 10022
15                              (646) 445-6515

16   Interested Party,          Kirkland & Ellis LLP
     Brad Welland:              By:    BRAD WELLAND, ESQUIRE
17                              300 North LaSalle
                                Chicago, Illinois 60654
18                              (312) 460-7182

19   For Creditor, GE:          Husch Blackwell Sanders LLP
                                By:    MARK BENEDICT, ESQUIRE
20                                     KURT BJORKLUND, ESQUIRE
                                4801 Main Street, Suite 1000
21                              Kansas City, Missouri 64112
                                (816)283-4677
22
     For Creditor, US Bank:     Husch Blackwell Sanders LLP
23                              By:    MARSHALL C. TURNER
                                The Plaza in Clayton Office Tower
24                              190 Carondelet Plaza, Suite 600
                                St. Louis, Missouri 63105
25                              (314) 480-1768
```

```
 1  For Creditor, ACAS          Patton Boggs, LLP
    CRE, CDO:                    By:    ROBERT W. JONES, ESQUIRE
 2                              2001 Ross Avenue, Suite 3000
                                Dallas, Texas 75201
 3                              (214) 758-3583

 4  For Creditor, Wachovia      Goldberg Kohn
    Bank & Wells Fargo Bank:    By:   DANIELLE WILDERN JUHLE, ESQ.
 5                              55 East Monroe Street, Suite 3300
                                Chicago, Illinois 60603-5792
 6                              (312) 863-7131

 7  For Creditor, Morgan        Davis Polk & Wardwell LLP
    Stanley:                    By:    STEVE C. KRAUSE, ESQUIRE
 8                              450 Lexington Avenue
                                New York, New York 10017
 9                              (212) 450-4493

10  For Creditor, Ad Hoc        Milbank Tweed Hadley & McCloy
    Group of Unsecured Bank     By:    BRIAN KINNEY, ESQUIRE
11  In Debt Holders:            One Chase Manhattan Plaza
                                New York, New York 10005-1413
12                              (212) 530-5392

13  For Creditor, GE Capital    Edwards Angell Palmer & Dodge
    Corp. & US Bankcorp         By:    SELINDA A. MELNIK, ESQUIRE
14  Community Dev. Corp.:       919 North Market Street, 15th Floor
                                Wilmington, Delaware 19801
15                              (302) 777-7770

16  For Creditor, Law           Riker Danzig Scherer Hyland Perretti
    Debenture Trust Co.         By:    CURTIS PLAZA, ESQUIRE
17  Of New York:                Headquarters Plaza
                                One Speedwell Avenue
18                              (973)538-0800

19  For Creditor, Durham        Durham Asset Management
    Asset Management:           By:    RANDY RAISMAN, ESQUIRE
20                              680 Fifth Avenue, 22nd Floor
                                New York, New York 10019
21                              (212) 404-8623 ext. 00

22  For Silver Point:           Silver Point Capital
                                By:    BRENNAN DIAZ, ESQUIRE
23                              Two Greenwich Plaza, 1st Floor
                                Greenwich, Connecticut 06830-6353
24                              (203)542-4086

25
```

```
 1   For Lazard Freres & Co.: Lazard Freres & Company LLC
                              By:    CAROL FLATON, ESQUIRE
 2                            30 Rockefeller Plaza
                              New York, New York 10020
 3                            (212_ 632-6730

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                               INDEX

2
NOTICE OF AGENDA MATTERS:                                Page
3
On behalf of the Debtors, by Mr. Kessler                  13
4   On behalf of movants, by Mr. Wetzel                      20

5   OPENING STATEMENTS:
On behalf of the Debtors, by Mr. Kessler                  24
6   On behalf of the Creditors Committee, by Ms. Caton       32

7   DISCUSSION – SUMMARY CHART OF OBJECTIONS:
On behalf of Debtor, by Mr. Kessler                      63
8   On behalf of Wells Fargo, by Mr. Lerner                  70

9
                                                         Further
10  WITNESS FOR THE        Direct Cross Redirect Recross Redirect
DEBTOR:
11  Thomas E. Mara
        By Mr. Califano     35
12      By Mr. Kessler      39              55
        By Ms. Alves             42
13      By Ms. Toledo            45
        By Ms. Counihan          46
14      By Mr. Rovira            48
        By Mr. Harbour           49
15      BY Mr. Lerner            52
        By Mr. Harbour           76
16      By Mr. Benedict          81
        By Mr. Huston            89
17      By Ms. Harris            92

18  Jay Levine             131   138

19  EXHIBITS:                                    Marked Received
    D1 – Summary Chart of Objections                      32
20

21  ARGUMENT:  By Mr. Kessler                             146
            By Mr. McMahon                                148
22

23

24

25

1         THE CLERK:  All rise.

2         THE COURT:  Please be seated. Good afternoon, Mr.

3    Kessler.

4         MR. KESSLER:  Good afternoon, Your Honor.

5         THE COURT:  If I could just jump in for just a

6    minute.  And I don't know how you want to go through the

7    agenda, but I note that a substantial number of the matters

8    are either uncontested or resolved.  I like to get to the

9    main event as soon as we can.

10        MR. KESSLER:  Yes.

11        THE COURT:  So if there are no changes in orders,

12   I'm prepared to sign those motions and if there are material

13   changes, do you want to walk me through that's fine.  The

14   only thing I saw going forward was press on a contested basis

15   was 9,15 and 16, but I may be wrong.  Nine is the private

16   sale/auction issue with the Committee.

17        MR. KESSLER:  Correct.  Well, I don't have the

18   numbers on the agenda committed to memory but there are

19   three: the sale of the mortgage servicing business, the wages

20   motion and the, and the private auction sale to Premier.

21        THE COURT:  Right, I think that, that's all I saw.

22        MR. KESSLER:  Oh and ordinary course professionals

23   may be an objection.

24        THE COURT:  Okay, very good.  Let's - -

25

1        MR. KESSLER:  Mr. McMahon also has an issue with a

2    matter, not ours but a counterparty who is asking to seal

3    agreements that are attached to their order, and he will

4    raise that separately.

5        Your Honor, before we begin I've been asked by Mr.

6    Glassman if he can take the podium for a moment and introduce

7    some members of the Creditors' Committee, some counsel for

8    the Creditors.

9        THE COURT:  All right, very good.  Good afternoon,

10    Mr. Glassman.

11        MR. GLASSMAN:  Hello, Your Honor, Neil Glassman of

12    Bayard.  We have been selected and the or the Committee has

13    filed an application for our retention as Delaware counsel to

14    the Committee; Kramer Levin has been selected.  They're here;

15    Mr. Tom Mayer, Amy Caton, Josh Brody.

16        THE COURT:  Welcome.

17        MR. GLASSMAN:  Thank you, Your Honor.

18        THE COURT:  So can we sail through the - -

19        MR. KESSLER:  Yes, I'm going to try to sail through

20    as quickly as I can.  I did take or I would like to present

21    some of them out of order just because they logically go

22    together in some instances.

23        THE COURT:  All right.

24        MR. KESSLER:  And one last comment before I get

25    going.  We do have a consent extension of the interim cash

1   collateral order; however, one of the bank's lawyers

2   apparently didn't get notice of the fact that this hearing

3   was pushed forward to 1:00.  He sent me an e-mail that I

4   received on my Blackberry that he's on the train and would

5   like to push that back until later this afternoon until he

6   gets here.

7           THE COURT:  Okay.

8           MR. KESSLER:  So the first one I'd like to address,

9   Your Honor, is the extension of time to file schedules.

10          THE COURT:  Okay.

11          MR. KESSLER:  The, of course, there are no

12  objections.  The motion seeks an extension of time to file

13  the schedules of assets and liabilities, executory contract,

14  unexpired leases, etc.

15          THE COURT:  Okay, I'll sign it.  I really don't need

16  that.  If it's uncontested, I read the motions.  We got a lot

17  to do on the sale, so.  Anybody wish to be heard?  All right,

18  I'll approve the motion.

19          MR. KESSLER:  The next one on my agenda is items 2

20  and 12 that go together: the continued operation of the

21  business in the ordinary course and; then, Your Honor, will

22  recall that we filed a supplemental motion to extend or

23  expand this motion to encompass the, the loan origination

24  business.

25          THE COURT:  Uh huh.

1           MR. KESSLER:  And there are no objections, as far as

2    I know, on this.

3           THE COURT:  Well there was a limited GE objection,

4    is that resolved?  It was on the original motion.  I thought.

5           MR. BENEDICT:  Your Honor, Mark Benedict for GE

6    Capital.  And there was a limited objection on the original,

7    and it was resolved by language in the order.  And that

8    language continues in the proposed order on these motions, so

9    our objection is continued to be resolved.

10          THE COURT:  Okay, thank you.  Please approach.  All

11   right, very good.  Just give me a moment.

12          Please keep your Blackberries below the table and

13   we'll get less interference or maybe out of your pocket.

14          All right, I've signed both orders.

15          MR. KESSLER:  Okay the next one is on your agenda as

16   item 4, Your Honor, its prepetition taxes that was approved

17   on an interim basis and we're now here seeking the entry of

18   the final order.  On an interim basis, we ask for

19   $200,000.00.  On a final basis, we're asking for authority to

20   pay prepetition taxes up to $2.3 million dollars, and there

21   are no objections.

22          THE COURT:  All right.  Again, there was a limited

23   objection of GE that I understand is resolved?

24          MR. KESSLER:  Yes.

25

1          THE COURT:  Okay.  I'll sign the order.  Please

2    approach.  I've signed the order.

3          MR. KESSLER:  The next one is item 5 on your agenda

4    it's the cash management motion that was set for final

5    hearing today.  It was originally entered as an interim

6    order.  Your Honor, the Creditors Committee has asked that we

7    continue or extend the interim order on cash management until

8    the December 10th hearing so that their financial advisors can

9    have more time to deal with the complex issues in that

10   motion.  And so if it's all right, we'd like to submit

11   another interim order to extend to December 10th.  I believe

12   there are no other objections.

13         THE COURT:  We have a hearing that day, right?

14         MR. KESSLER:  I'm sorry?

15         THE COURT:  That's the next hearing - -

16         MR. KESSLER:  That's our next omnibus hearing date.

17         THE COURT:  Yeah that's fine.  Thank you.  I've

18   signed the order.

19         MR. KESSLER:  Your Honor, the next one is item 6 on

20   your agenda.  It's docket number 11, and it's the Debtors'

21   motion to reject five unexpired office leases, *Nunc Pro Tunc*

22   to the petition date.  We filed this motion on the petition

23   date or the commencement date.  We served notice on each of

24   the landlords of these five leases.  No objections were

25   filed; however, we did get a communication from one of the

1  landlords at first refusing to acknowledge that the Debtors

2  had vacated the premises because some furniture was there.

3  We reached a resolution with the landlord to abandon the

4  furnitures of the landlord and to allow that this lease be

5  deemed vacated as of the petition date, so all five of the

6  leases were vacated prior to the petition date.  There are no

7  objections.  The, we understand the rule in Delaware that the

8  Court has the discretionary authority to allow a *Nun Pro Tunc*

9  rejection.  In this case, we believe it is warranted

10  especially since no objections were filed.

11          THE COURT:  All right.

12          MR. KESSLER:  Or submitted by the landlords.

13          THE COURT:  Very good.  Please approach.  Anyone

14  wish to be heard?  All right, I'll approve the motion.  Thank

15  you.  I've signed the order.

16          MR. KESSLER:  Okay, Your Honor, the next one is the

17  motion to approve a procedure for ordinary course

18  professionals.  There were no formal objections filed;

19  however, in consultation with the United States Trustee's

20  Office, we agreed to conform the order to an order that is

21  used in another case in this district the *Nortek* case.  Mr.

22  McMahon does have, wants to make some information comments

23  which we agreed he could make, notwithstanding he's not

24  making an objection.  What this order does is allow ordinary

25  course professionals to accrue and be paid up to $35,000.00

1  per month on a rolling basis with a small list of 13 or 14

2  professionals monthly cap being as much as $60,000.00, yet

3  provides that ordinary course professionals who are non-

4  lawyer professionals must waive any prepetition claims they

5  have.  And as 327(e) provides, which I think is illogical

6  but, nonetheless, any lawyer who did not represent the Debtor

7  prepetition will also waive any prepetition claim that such

8  lawyer may have.  I'm not exactly sure how that can happen,

9  but so be it.  Other than that, I think Mr. McMahon had asked

10 us for a precise number of the ordinary course professionals

11 who will no longer be necessary or used after the sale of the

12 mortgage servicing business.  I have not been able to get a

13 precise number for him.  Only I've been able to, can only say

14 at this time that it is a large number of them who services

15 will no longer be required after the mortgage servicing

16 business is sold.

17        THE COURT:  All right, thank you.  Mr. McMahon.

18        MR. MCMAHON:  Your Honor, with the Court's

19 permission I just like to skip over this for the moment and

20 come back to it at the end.  I'm still trying to pin down one

21 issue with my client.

22        THE COURT:  That's fine.

23        MR. MCMAHON:  Thank you.

24        MR. KESSLER:  I assume that means I should hold the

25 order?

1           THE COURT:  I would expect so.

2           MR. KESSLER:  Okay just trying, Your Honor, item 8

3    on the agenda which is docket number 14 and 59.  This is the

4    motion that we filed on the first day denominated by us as

5    the trading motion.  Your Honor will recall that on an

6    interim basis, the Court entered an order that restricted,

7    restricts trading in equity of the Debtor only and did not,

8    we did not request entry of the portion of the order that

9    requested restricting, the restrictions on the trading of

10   claims. On a final basis, we're again asking only that the

11   trading restriction on equity be extended, and we are

12   withdrawing without prejudice at this time request for any

13   restrictions on the trading of claims.  We may be back if we

14   see trading activity of the size and magnitude that gives us

15   any cause for concern about NOL's being lost in this case.

16           THE COURT:  Okay.

17           MR. KESSLER:  And, again, no objections were filed.

18           THE COURT:  All right, please approach.  Anyone wish

19   to be heard?  I'll approve the motion.  Thanks.  I've signed

20   the order.

21           MR. KESSLER:  Next is item 10 on your agenda.  And

22   this is the motion for approval of procedures for interim

23   compensation to 327(a) professionals.  And no objections were

24   filed.  The procedures that we've proposed are traditional

25   and typical procedures in this district.  I can go through

1  them if Your Honor would like, but they're set out in the

2  motion.

3        THE COURT:  That's not necessary.  Anyone wish to be

4  heard?  I'll approve the motion.  Thank you.  I've signed the

5  order.

6        MR. KESSLER:  Next, I'd like to do item 3 on your

7  agenda which is the final hearing on the utilities' motion.

8        THE COURT:  Very good.

9        MR. KESSLER:  On this motion, Your Honor, there was

10  one objection filed by PECO which I believe is Pennsylvania

11  Electric.  We have resolved their objection with an agreement

12  to make a deposit that is in excess of the two week deposit.

13  We have not heard from or received objections from any other

14  party. And so with the resolution of the PECO objection, I

15  can say that there are no outstanding rejections to that

16  motion.  We'd ask that it be entered on a final basis.

17        THE COURT:  All right, please approach.  Anyone wish

18  to be heard?  I'll approve the motion and the final order.

19  Thank you.  Oh I'm sorry, I've signed the order.

20        MR. KESSLER:  Okay next on your agenda items 17 and

21  18 and these two go together.  Item 17 is docket #159 and

22  160.  These are motions that were filed by one lawyer on

23  behalf of two individuals each seeking to compel the Debtors

24  to assume or reject their contracts that were, I'll call them

25  retiree contracts, that were, that came into place prior to

1    or at the time of the sale of this business to Capmark.

2    These are executives who were paid for covenants not to

3    compete, as well as long term severance payments.  There are

4    payments that still remain under the contracts.  The Debtors

5    have agreed to the motion to compel and would like to reject

6    the contracts immediately.  We have consent from counsel for

7    the two movants to this rejection.  This also is the motion,

8    Your Honor, where counsel for the movants is asking that the

9    order not attach, but instead seal the actual compensation

10   agreements or retirement agreements with these two

11   individuals.  And I'm not sure if he's in the Courtroom or

12   wants to address it himself - -

13           MR. WETZEL:  Yes, I'm right here.

14           MR. KESSLER:  Oh I'm sorry.

15           MR. WETZEL:  That's quite all right.  John Wetzel on

16   behalf of the movants, Your Honor.  We agree to the consent

17   order.  And what we would like to see is that the, as it

18   turns out my clients picked it up on ethic that there was an

19   attachment to the agreement.  They didn't pick it up on pay

20   and they would like to see these, the time and agreements

21   because they contain a lot of personal information to be

22   sealed.  They're retired and the contracts are rejected.  I

23   don't see any harm in doing that, Your Honor.

24           THE COURT:  Well, I'm sorry are they already on,

25   have they already been filed?

 1            MR. WETZEL:  They were filed of record that's

 2    correct, Your Honor.

 3            THE COURT:  They're on the docket.

 4            MR. WETZEL:  They're on the docket and the pace of

 5    docket, but the - -

 6            THE COURT:  Mr. McMahon.

 7            MR. WETZEL:  Pardon me?

 8            THE COURT:  I want to hear from Mr. McMahon.

 9            MR. MCMAHON:  Your Honor, Joseph McMahon for the

10    United States Trustee.  Again, the moving party filed them of

11    public record and the issue is how do we put the genie back

12    in the bottle at this point.

13            MR. KESSLER:  For the record, Your Honor, the

14    Debtors do not object to the ruling.

15            THE COURT:  Can I, they're probably here. Hang on,

16    let me look.  They're in the binder, I assume?  We're

17    talking, I'm sorry.  So it's Exhibit A, we're talking about

18    the, are we talking about the agreement or the attachment to

19    the agreement?

20            MR. KESSLER:  The agreement, Your Honor, Exhibit #1,

21    I believe referred to in the docket.

22            THE COURT:   Well I don't see any provision in the

23    contract about confidentiality.

24            MR. KESSLER:  There isn't, Your Honor and that was

25    the - -

1          THE COURT:  Well I'm going to deny the motion, the

2    oral motion I guess.

3          MR. KESSLER:  The oral motion about striking it,

4    Your Honor.

5          THE COURT:  Yeah the oral motion for seal striking

6    the plea.

7          MR. KESSLER:  So with respect then I would assume

8    then with respect to the order, would you be striking that

9    out of the order because there's a paragraph in there that

10   basically says order that the attachment number one to each

11   of the motions a compel be removed from the public docket and

12   filed under seal.

13         THE COURT:  Yeah I will strike that.

14         MR. KESSLER:  Thank you, Your Honor.

15         THE COURT:  You're welcome.  I have signed the

16   order.

17         MR. KESSLER:  Okay, Your Honor, I'm now through what

18   I will affectionately call the easy part except for cash

19   collateral which I ask that we push to the end because Mr.

20   Sosnick is still on the train.

21         THE COURT:  Right.

22         MR. KESSLER:  So what we have left, according to my

23   schedule, is the wages motion, the MSB, the 363 motion to

24   sell military housing, and the, well the 363 sale motion to

25   sell Premier asset.  And there is a companion motion that

1   goes with the military housing which is, I believe, also will

2   be a quick motion but since they go together, I'd like to

3   keep it with it.  And that's the assignment and transfer of

4   an unfunded loan commitment number 14 on the agenda.

5           THE COURT:  So 13 and 14 are in tandem?  That's the

6   military assignment thing.

7           MR. KESSLER:  Yes.

8           THE COURT:  All right.  Obviously the MSB, cash

9   collateral we're holding.  Mr. McMahon is still trying to

10  deal with the ordinary, is it the ordinary course, ordinary

11  course issue.  And we have an issue with the wages motion.

12  All right.

13          MR. KESSLER:  So if it's acceptable to Your Honor, I

14  would like to begin now with the wages and benefits motion.

15          THE COURT:  That's fine.

16          MR. KESSLER:  If I can just have a moment. I've been

17  asked if we should instead begin with the sale of the

18  servicing business because I believe that's the central issue

19  that is keeping everyone here today.  And they probably let a

20  lot of people go if we do that one first.

21          THE COURT:  How long do you think that will take;

22  awhile?

23          MR. KESSLER:  Hard for me to guess.  It could take a

24  half hour, it could take two hours.

25

1          THE COURT:  All right, I think I have, I have all

2     the way until 7:00 p.m. tonight.  So I don't want you to be

3     in, you're going to run out of time at that point.  So you

4     manage the calendar, you manage the calendar however you

5     wish.  It's your hearing.

6          MR. KESSLER:  I want to do those two as the next

7     two, sale servicing and wages and benefits.  If I have to

8     push things, I don't want to push those too.  So I'd like to

9     do - -

10          THE COURT:  Okay very good.  However you want to

11     proceed.  So we'll do the sale?

12          MR. KESSLER:  Yes.

13          THE COURT:  All right.

14          MR. KESSLER:  Item 16 on your agenda, Your Honor.

15     So, Your Honor, this is the motion for the sale of the

16     mortgage servicing business or what we refer to as the MSB

17     business.  As Your Honor will recall, we went to a bidding

18     procedures process.  And at the end of the bidding

19     procedures, we did get one additional proposal and I'll

20     discuss at length that proposal and how we get to where we

21     are today.  But I'd like to begin by saying that I'm pleased

22     to report that after much negotiation yesterday, Berkadia is

23     the proposed purchaser of the MSB business and for a price

24     superior to the price that was originally in the asset

25     purchase agreement that was attached to the put auction.

1   If I can just capture my notes here, I will.  So, Your Honor,

2   let me advise the Court of the process and how we are here

3   today.  4:00 p.m. on Friday was the bidding deadline.  The

4   Debtors received two other bids prior to the 4:00 p.m.

5   deadline.  The first one was from Fannie Mae with respect to

6   a proposed purchase of just certain IP assets.  And another

7   was from PNC-Midland with respect to the Debtors' mortgage

8   servicing business but without a proposal to buy the Fannie

9   Mae portfolio of servicing.  Capmark as Your Honor knows had

10  already negotiated a purchase agreement with Berkadia.  And

11  for a bid to qualify, it must have been no less favorable to

12  the Debtors than the transaction contemplated with Berkadia.

13  By 4:00 p.m. Saturday, which was the bid qualification

14  deadline, the Debtors determined, after consultation with the

15  Committee, that the bid from Fannie Mae was a non-conforming

16  bid and was not no less favorable than the other bids and;

17  therefore, was not a qualified bid.  In consultation, again

18  with the Unsecured Creditors Committee, we notified Fannie

19  Mae prior to the 4:00 p.m. bid deadline.  The Midland bid

20  contained certain conditions and uncertainties that made it

21  impossible for the Debtors to conclude that that bid was a

22  conforming bid that was no less favorable than the Berkadia

23  transaction.  It had certain conditions and contingencies to

24  closing that were risk factors, contained execution risks,

25  and made it very, very difficult for us to compare the apples

1   to oranges bids.  Based on discussions with Midland and its

2   counsel and the expectation that Midland would amend their

3   bid to make it possible for the Debtors and the Committee to

4   bring that bid up to a qualifying bid, the Debtors and the

5   Unsecured Creditors Committee agreed to extend the bid

6   qualification deadline for PNC until 4:00 p.m. Sunday

7   afternoon.  After that 4:00 p.m. Sunday extended deadline and

8   after further analysis of the respective offers, the Debtors

9   and the Committee were still unable to conclude that

10  Midland's bid was a qualifying bid.  The Debtor and the

11  Unsecured Creditors Committee agreed to amend the procedures

12  to again extend the deadline until 9:00 a.m. on Monday which

13  was yesterday.  The Debtors informed Midland of those

14  provisions in the Midland bid that prevented such a bid from

15  being a qualifying bid.  By the 9:00 a.m. Monday morning new

16  bid qualification deadline, the Debtors and the Unsecured

17  Creditors Committee received a letter from Midland amending

18  their prior bid.  The Debtors and the Committee again sat

19  down at length and mutually determined that the revised

20  Midland bid was still not a qualifying bid.  Based on

21  discussions with Midland and its counsel and the expectation

22  that Midland would amend their bid to make it possible for

23  the Debtors and the Committee to conclude that the Midland

24  bid is a qualifying bid, we extended the bid qualification

25  deadline again from 9:00 until 10:00, then from 10:00 to

1   11:00, from 11:00 until noon, and from noon until 2:00 p.m.

2   And all the while Berkadia was sitting in our offices ready,

3   willing, and able to go forward.  And then lastly, we

4   continued to negotiate with PNC from 2:00 p.m. until 6:00

5   p.m. last evening.  At 11:15 a.m. Midland submitted another

6   amended bid.  The Debtors in consultation with the Committee

7   determined that the revised bid was materially less favorable

8   to the Debtors than the previous bid submitted by Midland.

9   And so early in the afternoon, Midland verbally revised their

10  bid by reducing the purchase price by a material amount.  And

11  this after, we believe, certain discussions and inquiries

12  between Midland and certain third parties whose contracts

13  would have to be transferred under the Midland proposal.  The

14  Debtors also learned that the favorable conclusion of the

15  anti-trust investigation that had been initiated by the

16  Department of Justice would not occur on Monday as previously

17  expected increasing the Debtors' concern over certainty of

18  closing.  In addition, the Debtors learned that Freddie Mac

19  would not be withdrawing their objection to any sale to

20  Midland, again, further increasing execution risks for the

21  Debtors associated with the Midland bid.  The Midland team

22  finally arrived at our office at 3:30 p.m. all of what I have

23  described having taken place over the telephone and by e-

24  mails.  And prior to the last bid qualification deadline, the

25  Debtors informed the Midland team of the terms that would be

1  needed to cause their bid to be a qualifying bid.  At

2  approximately 6:15 last night, the Midland team announced

3  that they would not increase their bid and left our offices.

4        Now I will also advise the Court that during this

5  entire period, we also tried to find a way to get the two

6  parties on board so that PNC could buy that part of the

7  business that it wanted and Berkadia buy the other part of

8  the business that PNC did not want.  Those negotiations also

9  were not successful for a variety of reasons not all of which

10 were necessarily conveyed to us.  However, during the course

11 of that day, Berkadia also increased its bid in an effort, I

12 believe, we believe, to just have us cut off the bid

13 extension deadlines that we continued to extend on behalf of

14 PNC.

15       So after PNC decided they would not bid, we agreed

16 to accept the Berkadia bid as they had proposed to amend it

17 over the course of the day.  And so I will now provide for

18 the Court a summary of the revised terms.

19       The amended Berkadia asset purchase agreement

20 delivers to Capmark an additional $100 million dollars in

21 cash at closing.  Sixty million dollars increase in value,

22 and let me explain the difference.  The original proposal

23 provided that $75 million dollars of the value was to be

24 provided in the form of a note.  And Your Honor will recall

25 that that note was subject to downward adjustment for losses

1  that may be incurred by Berkadia to Fannie Mae under the

2  continuing loss sharing program of the Fannie Mae portfolio.

3  As part of their revised bid, they agreed to replace that $75

4  million dollar note with $75 million dollars of cash which

5  means that the Debtors, the sellers will not share in any of

6  the Fannie Mae portfolio losses going forward but Berkadia

7  will take a 100% of those losses, and we will get the full

8  $75 million in cash.  That note had been valued internally at

9  approximately $35 million dollars.  So that getting $75

10 million in cash for what we had valued as a $35 million

11 dollar note increased our consideration by $40 million

12 dollars.  In addition, actually I'm off by five million, $30

13 million dollars.  In addition, they gave us $25 million

14 dollars in additional cash.  The two numbers together if I

15 have them right, should add up to sixty.  And I know I didn't

16 do it right, but it adds up to $60 million dollars of

17 additional value, hundred million dollars of additional cash.

18 So that we believe that the amended APA will today after all

19 expected adjustments will realize value to the estate of $467

20 to $468 million dollars.  And the old bid would have realized

21 to the estate $407 to $408 million dollars, a difference of

22 $60 million dollars.

23          Your Honor, we're here today to ask that the Court

24 approve the sale of the mortgage servicing business to

25 Berkadia under that amended agreement as I just explained or

 1  described to the Court.  There had been numerous, well I

 2  shouldn't say numerous, 16 objections filed to this motion.

 3  It's actually not a large number when we consider the many,

 4  many hundreds of notices that were sent out to counterparties

 5  to contracts whose contracts will be assumed and assigned by

 6  this transaction.  I have for Your Honor - -

 7          THE COURT:  I'm sorry I counted 22, but let's a re-

 8  file, but some were duplicate.  Perhaps that's where - -

 9          MR. KESSLER:  You're right.  I made a mistake.

10  There was a couple of later objections and one is a

11  duplicate.

12          THE COURT:  Okay.

13          MR. KESSLER:  One was a re-file.

14          THE COURT:  I'm sorry I interrupted you.

15          MR. KESSLER:  I would like to hand up to Your Honor

16  a summary chart that we have prepared of the various

17  objections so that Your Honor can follow along with us as I

18  go through them.  Give me a moment, Your Honor.

19          THE COURT:  Of course.

20          MR. KESSLER:  Ah, we found it.  May I approach, Your

21  Honor?

22          THE COURT:  Yes.  Thank you.  Do you have a copy for

23  Ms. Werkheiser please?  Ms. Werkheiser, am I correct?

24          MR. KESSLER:  So, Your Honor, this is a - -

25

1         THE COURT:  I'm sorry before we go through that

2    what, what, how are you, what are you, back up try again.

3    What evidence are you going to put on in support of the - -

4         MR. KESSLER:  I plan to have the lawyer for Berkadia

5    put on evidence of adequate assurance of future performance

6    and, as well evidence of good faith for the 363(m) portion of

7    the order.

8         THE COURT:  All right.  What about the sale process,

9    the highest and best business judgment.  I mean I can take

10   your statements or representations I suppose as evidence but

11   if someone wants to cross that would be awkward.

12        MR. KESSLER:  Your Honor, there have been no

13   objections filed to the process nor have there been any

14   objections filed to the actual sale itself that are still

15   pending today.  All of the objections, I believe, relate to,

16   relate to cure and adequate assurance as I go through this

17   chart, but if necessary, again, I'll be glad to put on Mr.

18   Fairfield who can go through the process.

19        MS. CATON:  Your Honor, Amy Caton from Kramer Levin

20   on behalf of the Creditors Committee.  When Mr. Kessler

21   finishes, we also have some comments about the process that I

22   think Your Honor would find helpful as we were involved the

23   whole way along and are a, an economically disinterested

24   party other than trying to get the best deal for the estate.

25

1          THE COURT:  I understand.  Well is there any

2    objection.  I hate to be a stickler, you know, but I do need

3    evidence to make the findings.  Is there any objection to

4    using Mr. Kessler's representations to the Court of the

5    events that occurred as evidence in support of the sale

6    motion?  I hear none.  So the Court will so move that into

7    evidence or allow that as evidence.

8       (Debtor's Exhibit #1 received into evidence)

9          MR. KESSLER:  Thank you, Your Honor.  And it may be

10   if Ms. Caton wants to give some comments relative to the

11   Committee rather than, it may be helpful to do that now

12   before we go through all these adequate assurance objections.

13          THE COURT:  Very good; thank you.

14          MS. CATON:  Thank you, Your Honor.  As I said

15   before, we were the Committee was an objective third party

16   here.  All we wanted was the best price for this business and

17   with the lowest execution risk.  And we didn't have any

18   preference for Berkadia or PNC.  We were indifferent to who

19   won the auction.  We were concerned that there was a lot of

20   execution risks with PNC.  And we very much wanted them to

21   submit a qualified bid and commence an auction.  And we gave

22   PNC multiple opportunities to become a qualifying bid.  As

23   the Debtors, I think, I have told you through their

24   statements we worked arm and arm with the Debtors over the

25   course of the weekend and yesterday to make sure that there

1   was a fair and impartial procedure and were consulted every

2   step of the way with respect to PNC and the actions that the

3   Debtors were taking with respect to PNC.  They just simply

4   never submitted a bid that was qualified and despite every

5   communication that was made to them about what needed to be

6   done.  And we believe that Berkadia's offer and their revised

7   sale agreement constitutes the best possible result for the

8   Debtors' estates here.

9            THE COURT:  Thank you.

10           MS. CATON:  Thank you.

11           MR. KESSLER:  Your Honor, the chart that I handed up

12   is a summary of the objections and our responses to those

13   objections.  As Your Honor might imagine, this is a dynamic

14   process and so a number of matters have been addressed and

15   even resolved since we prepared this chart very late last

16   night, early this morning.  And I will update you with those

17   updates as we, as we move along if that's okay.

18           THE COURT:  Well I'm wondering whether we should put

19   on the adequate assurance evidence before we go through the

20   objections since many of them were adequate assurance

21   objections.  Why don't we complete the factual record before

22   we work our way through the objections.

23           MR. KESSLER:  Okay.

24           MR. CORNELL:  Good afternoon, Your Honor, Jason

25   Cornell, Fox Rothschild on behalf of Berkadia.  Your Honor,

1   with me today is Tom Califano.  I'd like to orally move his

2   admission *Pro Hoc* and then represent to the Court we will

3   submit papers after today's hearing.

4              THE COURT:  Okay.

5              MR. CORNELL:  Thank you.

6              THE COURT:  Yes, granted.  Welcome.

7              MR. CALIFANO:  Good afternoon, Your Honor.  Your

8   Honor, I have with me Mr. Tom Mara who is an Executive Vice

9   President of Leucadia National Corp. which is a 50%

10  shareholder of Berkadia which is a joint venture of Berkshire

11  Hathaway and Leucadia National Corp.  He's been authorized to

12  testify on behalf of Berkadia and act in connection with this

13  matter.

14             THE COURT:  All right.

15             MR. CALIFANO:  So we'll call him for adequate

16  assurance.

17             THE COURT:  All right, please take the stand.

18                THOMAS E. MARA, DEBTOR'S WITNESS, SWORN

19             THE CLERK:  Please state and spell your name for the

20  record.

21             MR. MARA:  Thomas E. Mara, M-a-r-a.

22                          DIRECT EXAMINATION

23  BY MR. CALIFANO:

24  Q.  Mr. Mara, how are you employed?

25

1  A.   I'm employed by Leucadia National Corporation, 33 years

2  Executive Vice President.

3  Q.   And what is your relationship to Berkadia the purchaser?

4  A.   I oversee the Leucadia's half interest in Berkadia.

5  Q.   Okay.  And have you been authorized to testify today?

6  A.   I have.

7  Q.   What, briefly what is Berkadia?

8  A.   Berkadia is a joint venture formed 50/50 by Berkshire

9  Hathaway Corporation and Leucadia National Corporation two

10  publically traded companies for the sole purpose of the

11  acquisition of Capmark Financial Services, mortgage servicing

12  business.

13  Q.   Okay.  And how is Berkadia capitalized?

14  A.   Berkadia will be capitalized at an amount equal to the

15  purchase price which is about $515 million dollars less than

16  the perdium adjustments plus working capital, so somewhere

17  between $475 and $500 million dollars, half by Berkshire

18  Hathaway and half by Leucadia National.

19  Q.   Are Berkshire Hathaway and Leucadia National Corp.

20  committed to support this venture going forward?

21  A.   Yes, they have.

22  Q.   Okay.  Are you familiar with the put agreement that's the

23  subject of these hearings today?

24  A.   I am.

25

Mara - Direct                              36

1  Q.  Okay are you familiar with the obligations that Berkadia

2  undertook under that agreement?

3  A.  I am.

4  Q.  Okay.  Does Berkadia have the financial ability to meet

5  these obligations?

6  A.  Yes, they do.

7  Q.  Okay.  Are you familiar with the mortgage servicing

8  business that Berkadia is purchasing?

9  A.  Yes.

10 Q.  Okay.  Does Berkadia have the financial ability to run

11 that business going forward?

12 A.  Yes, it does.

13 Q.  Okay does it, will it have the ability, excuse me, will

14 it have the ability to perform the non-financial aspects of

15 that business?

16 A.  Yes.  Berkadia intends to keep the entire company intact,

17 all of the employees, of its systems, procedures, real

18 estate, etc. etc.

19 Q.  So it will be the same company - -

20 A.  Same company, different ownership.

21 Q.  Okay.  Will Berkadia have, excuse me, Your Honor, will

22 have a good capitalization after closing such that it can, so

23 it can perform in the purchase business?

24 A.  Yes.

25

1   Q.   Okay.  Are you familiar with the contracts and agreements

2   that Berkadia will be assuming under the put?

3   A.   Generally.

4   Q.   Okay.  Will Berkadia have the ability to meet the

5   obligations under those contracts?

6   A.   To the best of my knowledge, yes.

7   Q.   Okay. Was Berkadia obligated to obtain certain approvals

8   and consents from various quasigovernmental agencies?

9   A.   Yes.

10  Q.   What is the status of those approvals now?

11  A.   As far as I know, they've all been obtained as of today.

12  Q.   Okay.

13  A.   With the exception, I'm sorry, with the exception of, I

14  think, one or two licenses in the State of California or

15  maybe one other state, but all of the federal approvals have

16  been obtained.

17  Q.   Okay.  Has Berkadia received *intersum* approval from

18  Freddie Mac?

19  A.   Yes.

20  Q.   Fannie Mae?

21  A.   Yes.

22  Q.   And HUD?

23  A.   Yes.

24  Q.   Okay.  Were you involved in the negotiation of the put

25  agreement?

1  A.   I was.

2  Q.   What was your involvement?

3  A.   Painful.  I was involved from beginning to end.

4  Q.   All right could you explain why the process was painful

5  or how it was painful?

6  A.   It's, it took a long time, many, many days, nights

7  without sleep, very difficult negotiations back and forth.

8  If you read the put agreement and you'll see there's a lot of

9  detail in there.  And it's like every deal that you do very

10 difficult.

11 Q.   And were the Debtors advised was Capmark advised in this

12 process?

13 A.   Yes.

14 Q.   Okay.  Did Berkadia negotiate with the Debtors in good

15 faith?

16 A.   Yes.

17 Q.   Okay.  In your opinion was the price, the purchase price

18 originally fair value for the assets?

19 A.   Yes.

20 Q.   That Berkadia was purchasing.  Did Berkadia at any time

21 take any steps to interfere with or influence the Debtors'

22 marketing process?

23 A.   No.

24 Q.   Okay.  Did Berkadia do anything to inhibit or discourage

25 other bidders?

Mara - Direct                              39

1  A.  No.

2  Q.  Did there come a time when Berkadia raised the proposed

3  purchase price?

4  A.  Unfortunately, yes, I understand from what I heard today.

5  Q.  Could you explain those circumstances?

6  A.  It was long negotiation yesterday; started early in the

7  morning; ended early evening last night.  And the way I look

8  at it, we raised our price $65 million not $60, $65 million.

9  But at the end of the day with $65 million a hundred million

10 dollars more in cash.

11 Q.  Has Berkadia operated in good faith throughout the

12 process of purchasing these assets?

13 A.  Yes, they have.

14       MR. CALIFANO:  Your Honor, I have no further

15 questions; subject to redirect.

16       THE COURT:  Thank you.

17       MR. KESSLER:  May I ask a couple of questions, Your

18 Honor, just to complete the record?

19       THE COURT:  In support of the motion?

20       MR. KESSLER:  Yes.

21       THE COURT:  All right.

22                    DIRECT EXAMINATION

23 BY MR. KESSLER:

24 Q.  Does Berkadia have any relationship with Capmark other

25 than the purchase agreement?

1  A.  No.

2  Q.  Did in your opinion did Berkadia act at full arm's length

3  in this entire negotiation with Capmark?

4  A.  Yes.

5  Q.  Are you familiar, Mr. Mara, with the requirements under

6  some of the servicing contracts that the servicer have

7  certain ratings from the rating agencies?

8  A.  Yes.

9  Q.  Have you been able to obtain on behalf of Berkadia the

10  indicative ratings that are necessary to meet the

11  requirements of the servicing contracts?

12  A.  What we've been told.  We met with the rating agencies

13  and we have been told that upon actual purchasing of the

14  company that the ratings will be reaffirmed.

15  Q.  Okay and by that I mean, that's why I use the term

16  indicative, that once you, the company, the ratings that

17  they've indicated they'll give you, you believe they will

18  give you?

19  A.  That's correct.

20  Q.  And it is correct, is it not as you, I believe, testified

21  for Mr. Califano that your intent is to continue the

22  operation of the Capmark mortgage servicing business with the

23  same employees, the same software, the same buildings as is

24  now operated by Capmark?

25  A.  That's correct.

1  Q.  So nothing will change but the ownership and perhaps the

2  executives on behalf of the ownership?

3  A.  That's correct.

4  Q.  And to the extent that Capmark is able to operate the

5  business today, is there any reason to believe on your part

6  that Berkadia would not be able to operate the business in

7  the same way?

8  A.  No.

9  Q.  Okay now you're familiar with the terms of the contract

10  that require that Berkadia offer employment to Capmark's

11  employees on at least as good compensation terms as currently

12  are being paid by Capmark?

13  A.  Yes.

14  Q.  And are you aware that at our request we asked and

15  Berkadia sent us a letter confirming that there were no

16  secret deals, behind the scenes deals for the compensation of

17  any of the Capmark employees including the executives?

18  A.  That's correct.

19  Q.  And is that true?

20  A.  That's true.

21       MR. KESSLER:  Thank you, Your Honor.  I have no

22  further questions.

23       THE COURT:  All right, any cross examination by any

24  party?  Please adjust the microphone if you don't mind.

25

 1                        CROSS EXAMINATION

 2  BY ARLENE ALVES:

 3  Q.  Good afternoon, Arlene Alves with Seward and Kissel on

 4  behalf of U.S. Bank National Association.  I have a few

 5  questions for you.  U.S. Bank, just so you know, we are party

 6  to over 250 servicing agreements where Capmark is the

 7  servicer.  Your testimony was, if you can confirm that, your

 8  plan is to keep the servicing business intact, is that

 9  correct?

10  A.  That's correct.

11  Q.  And you indicated that you were familiar with the

12  contracts that are to be assumed, is that correct?

13  A.  That's generally.

14  Q.  Generally, yes.  Did you perform due diligence regarding

15  the extent of the servicing contracts that were whereby

16  Capmark was performing servicing?

17  A.  Yes.

18  Q.  And do you believe that you were given access to all of

19  those servicing agreements?

20  A.  I believe so.

21  Q.  Do you believe that the APA that you've executed includes

22  in the exhibit of servicing agreements to be assigned all of

23  the servicing agreements whereby Capmark was performing

24  servicing?

25

 1  A.  As far as I know the answer is yes.  They've made us

 2  aware of the ones they were performing services on.  They

 3  gave them to us.  We're assuming that everything they're

 4  doing today, we I intend to assume tomorrow.

 5  Q.  Are you aware of whether there were any servicing

 6  contracts where Capmark is currently servicing which were

 7  excluded from the APA?

 8  A.  I'm not aware of any.

 9  Q.  Do you have an approach regarding any servicing

10  agreements that were inadvertently excluded from the APA as

11  to whether or not they would be included in your transaction

12  if, indeed, Capmark is currently servicing under those

13  agreements?

14  A.  I think if it was inadvertent, it would be a mistake and

15  we would correct the mistake.

16  Q.  That's good to hear.  You also indicated that you are in

17  the process and have obtained certain approvals from

18  quasigovernment and governmental agencies relating to

19  servicing?

20  A.  Yes.

21  Q.  And I also believe you testified that you have contacted

22  rating agencies for other rating agency letters that you may

23  be required under the agreements?

24  A.  Yes, I've personally met with the rating agencies.

25

1   Q.  Are you aware that there may be other requirements in

2   connection with the transfer of servicing under some of the

3   servicing agreements?

4   A.  I'm not sure I understand your question.

5           THE COURT:  I don't either.

6   BY MS. ALVES:

7   Q.  Let me restate that.  Are you aware that under some of

8   the servicing agreements in order to effectuate a transfer of

9   servicing there must be approval from other parties?

10  A.  Yes.  We've had an extensive amount of lawyers, as you

11  can imagine, working on this and every approval that's

12  required to obtain, we are, have either obtained or are in

13  the process of obtaining that we're aware of.

14  Q.  Is it your intention to comply with all of the conditions

15  in the servicing agreements relating to approval of the

16  transfer of servicing?

17          MR. KESSLER:  Objection, Your Honor, I think that

18  calls for a legal conclusion.  We believe that certain

19  transfer requirements in some of the contracts may be

20  [indiscernible].  And asking this witness to agree

21  [indiscernible].

22          THE COURT:  Sustained.

23  BY MR. ALVES:

24  Q.  Let me restate that.  To the extent there may be certain

25  conditions for the transferring of servicing which you have

 1  been, let me restate that.  Are you aware of any conditions

 2  relating to the transfer of servicing which will, you do not

 3  intend to perform?

 4  A.  Everything that we know about, we intend to perform on.

 5  But I'm going to have to defer to my lawyers as to whether or

 6  not we require an approval or not an approval.  Every

 7  approval that we are told that we are required to obtain is

 8  our intent to do so.

 9          MS. ALVES:  Thank you.  I have no further questions.

10          THE COURT:  All right, thank you.  Any other cross,

11  Ms. Counihan?

12          MS. TOLEDO:  Laura Toledo, I'm on behalf of U.S.

13  Bankcorp Community Development Corporation.

14          THE COURT:  Yes.

15  BY MS. TOLEDO:

16  Q.  I just have a question.  Are you familiar with asset

17  management and servicing agreements between the Debtors and

18  Community Development Entities that are related to new market

19  tax credits?

20  A.  Not - -

21  Q.  Do you have any knowledge of those?

22  A.  Not personally, no.

23  Q.  Are you, do you know, then I assume you do not know

24  whether or not they are being assumed and assigned pursuant

25  to the sale?

1  A.  I don't.  I'd have to go back and look at the details in

2  the contract.  I don't recall.

3         MS. TOLEDO:  Okay, nothing further.  Thank you, Your

4  Honor.

5         THE COURT:  You're welcome. Ms. Counihan.

6  BY MS. COUNIHAN:

7  Q.  Good afternoon, my name is Victoria Counihan and I

8  represent Anglo Irish Bank and Colligo Funding.  They have a

9  servicing agreement which was listed on the notice of cure

10  and assumption and assignment.  Do you know if the, if

11  Berkadia intends to seek assumption and assignment of that

12  agreement?

13  A.  I don't know.

14  Q.  You have indicated you had some discussions with rating

15  agencies. Was Moody's one of those rating agencies?

16  A.  Yes.  I spoke, excuse me, Moody's I think I spoke to on

17  the phone; Fitch and S&P I met with personally.

18  Q.  And what did, what did Moody's tell you with respect to

19  their indications of whether they would confirm the, the,

20  whether the notes particular to this, this servicing

21  agreement would be?

22  A.  I didn't discuss specific servicing agreements.  I

23  discussed servicing in general with them and the ratings for

24  the servicing operation.

25  Q.  Have they provided any confirmation in writing?

1   A.  And they won't until the deal, transaction actually

2   closes.

3   Q.  So they have indicated they will not provide any

4   confirmation until after the closing?

5   A.  All the rating agencies basically told me that they would

6   provide a rack letter upon closing; at least they indicated

7   that.

8   Q.  Now if matters were to change between now and closing

9   would Moody's have the ability to change their mind and not

10  provide such a letter?

11  A.  They can always change their mind.

12  Q.  Last question, I think.  A provision of the particular

13  servicing agreement that Anglo has provides that if there is

14  an event of default including if Moody's either downgrades or

15  puts the notes under that particular servicing agreement on a

16  watch list for downgrade that that would allow Anglo to

17  terminate the agreement.  Do you understand that you would be

18  taking assignment of this contract if you're taking

19  assignment of the contract subject to that provision so that

20  if Moody's did not ultimately provide that letter that Anglo

21  would have the ability to terminate the agreement?

22          MR. CALIFANO:  Objection.

23          THE COURT:  Basis?  You need to be at a mike.

24          MR. CALIFANO:  Sorry.

25          THE COURT:  That's all right.

1            MR. CALIFANO:  Your Honor, he already testified he

2      wasn't personally familiar with that contract.  There's at

3      least one if not more legal conclusions embedded in that

4      question.

5            THE COURT:  I agree.  I believe he testified that

6      any legally, legal obligation that actually is a legal

7      obligation under an agreement, they're going to assume.  And

8      I think he said he was going to assume all contracts although

9      he may not be able to identify specific ones, is that

10     correct, sir?

11     A.  Yes, it is, Your Honor.

12            MS. COUNIHAN:  Thank you, Your Honor.

13            THE COURT:  You're welcome.

14            MS. COUNIHAN:  That's the only questions.

15            MR. CALIFANO:  Your Honor, I'm just going to stand

16     here for - -

17            THE COURT:  That's fine, that's fine.  Well, never

18     mind.  Yes, sir.

19            MR. ROVIRA:  Good afternoon, Your Honor, Alex Rovira

20     from Sidley Austin on behalf of Wells Fargo Bank and Wachovia

21     Bank.

22     BY MR. ROVIRA:

23     Q.  The question I have is under the put option, does

24     Berkadia intend to assume obligations under the servicing

25     agreements that arose prior to the closing date?

1  A.  I'd have to go back and take a look at the agreement, but

2  everything that's in the agreement we intend to assume.

3  Q.  So if there's a breach of the, that becomes, that arose

4  prior to the closing date but it becomes known after the

5  closing date, is that something that Berkadia will perform

6  and honor?

7        MR. CALIFANO:  Objection, Your Honor, that also

8  calls for a legal - -

9        THE COURT:  Yeah these are all legal questions okay.

10 He's not going to know.  If it's an obligation, it's an

11 obligation.  What the agreement says, the agreement says.

12 And to ask this witness whether, I mean he said it half a

13 dozen times now if it's an obligation, they're required to

14 pay, they'll pay it.  And if not, they won't, and they'll

15 talk to counsel.

16        MR. ROVIRA:  Understand, Your Honor, I just wanted

17 clarity on one of the provisions in the contract in the put

18 option.  That's it, okay, thank you.

19        THE COURT:  Okay, you're welcome.  And I read your,

20 I read the objection with regard to prepetition defaults and

21 I understand the legal issue involved.

22 BY MR. HARBOUR:

23 Q.  Good afternoon, Jason Harbour of Hunton & Williams on

24 behalf of Bank of America as Trustee and Master Servicer.

25 Just a couple quick questions, hopefully.  You testified that

1  you met with or spoke with the rating agencies when you did

2  so, did you discuss downgrades of the servicing entity or the

3  underlying bonds and securitization?

4  A.  The conversations were focused on the servicing company

5  itself.

6  Q.  Did you discuss at all downgrades of the underlying paper

7  that was entered into with under the securitization

8  agreements?

9  A.  No.

10  Q.  You indicated that you did due diligence with respect to

11  the servicing agreements, correct?

12  A.  Yes.

13  Q.  Did you do, did you also do due diligence with respect to

14  the servicing operations and whether there were any defaults

15  under the servicing agreement?

16  A.  I'm sorry, I don't understand.

17  Q.  It was a compound question; I apologize.  Did you do due

18  diligence with respect to Capmark Servicing?

19  A.  We did a lot of due diligence with respect to Capmark

20  Servicing.

21  A.  Did you do any due diligence with respect to whether

22  there were defaults under the servicing agreements that

23  you're assuming?

24  A.  We did.

25  Q.  And how did you do that, what did you do?

1  A.  We had lawyers involved, discussions with the company,

2  reading the papers, a whole host of different things.

3  Q.  Can you be more specific?

4  A.  Probably not.

5  Q.  Fair enough.  You indicated that Berkadia would be

6  capitalized by the purchase price plus an adjustment, plus

7  the working capital, correct?

8  A.  Approximately, yes.

9  Q.  What's the amount of the additional working capital - -

10  A.  I don't know yet.  Whatever it is, we'll capitalize it.

11  Q.  You said whatever it is we'll capitalize it.  Are there

12  any agreements in place that would require Berkadia to do so?

13  A.  Yes, I mean we have to provide the company with adequate

14  working capital.

15  Q.  What are those agreements?

16  A.  You'd have to refer, you have to take a look at the

17  contract.

18  Q.  What contract?

19  A.  The put agreement.

20          MR. HABOUR:  No further questions. Thank you.

21          THE COURT:  Thank you, Mr. Harbour.  Anyone else?

22  Last call?  Mr. Kessler was blocking you.  Yes, sir.

23          MR. LERNER:  One day I'll grow up and be as tall as

24  Mr. Kessler.  Leib Lerner of Alston & Bird for Wells Fargo as

25  Trustee for various securitization trusts, and I just have a

1   couple of questions that might have been overlooked before or

2   missed.

3   BY MR. LERNER:

4   Q.  When you were performing diligence into the Capmark

5   Servicing Business did you do any diligence on the actual

6   operations and how those operations work?

7   A.  Yes.

8   Q.  And did that include operations having to do with the

9   business's relationship with the Trustees for the various

10  securitizations?

11  A.  Yes.

12  Q.  And did that also include any reporting requirements to

13  those Trustees for any defaults that might occur under the

14  servicing agreements?

15  A.  Yes.

16  Q.  Can you briefly describe what those procedures are?

17  A.  Again, it's a whole host of lawyers and people reading

18  documents, discussing with the company, discussing with the

19  company's lawyers.  When I say the company I mean the

20  servicing operations, the people who actually do the work,

21  talking to their IT people, looking at their systems, etc.

22  etc.

23  Q.  Did you get any sense of timing of how long it might take

24  from when a default might occur until the business would end

25  up reporting or making a report of a default to any of the

1   Trustees?

2          MR. CALIFANO:  Your Honor - -

3          THE COURT:  What's the relevance?  What's the

4   relevance of the question?

5          MR. LERNER:  Your Honor, the relevance is that Wells

6   Fargo as Trustee has objected to the fact that there are,

7   that there might be latent defaults that would not be

8   necessarily found out for a length of time.  And if, and if

9   actually, if Mr. Mara did perform diligence then into that

10  then he might have an idea of how long it takes from when a

11  default occurs until when, until when the business is

12  actually able to inform the Trustee.  There's a whole host,

13  it's a big business, there's a whole host of procedures.  So

14  that's why I believe that this question is relevant.

15         THE COURT:  So maybe I can rephrase it for you.  Are

16  you, based on your due diligence, are you generally aware of

17  how long it takes the servicer to inform a Trustee of any

18  defaults under a mortgage?

19  A.  I'm not, Your Honor, but however way the company operates

20  today would operate the same way in the future.  And they

21  serviced $260 billion dollars so there's a lot of people

22  involved.  And if there's a default, I guess when they found

23  out the default, they notify you immediately, but can I swear

24  that that's done in every instance; of course not.  But we

25  don't intend to change any of their procedures.

1  Q.  And when you say that you guess they notify immediately,

2  you don't know any timeframe of how the notification would

3  go, is that correct?

4  A.  I would hope that they would abide by the contract and

5  notify everything within a timely fashion, but I can't

6  guarantee that they've done that historically or they'll do

7  it into the future.  There's a thousand people that work for

8  the company.

9       MR. LERNER:  Thank you.  No further questions.

10       THE COURT:  I have a, I'm sorry, not related to your

11  questions, but I have a clarification question to make sure I

12  understand.  In connection with the securitization trust

13  you're buying or assuming the responsibility to service the

14  mortgages contained in that trust on behalf of the Trustee of

15  the securitization but you're not taking any obligations in

16  connection with the actual securitization trust itself; i.e.,

17  running it, selling it?

18       MR. MARA:  No, Your Honor.

19       THE COURT:  Okay.  How did the distributions flow

20  from the PNI into the mortgage to the securitization trust,

21  do you know did they go through the Trustee?  Does anyone

22  know?  I don't know either.  I can't remember from two years

23  ago in American Home.  Okay that's fine.  Any, any redirect?

24  I'm sorry, any other cross?  All right.

25

1          MR. KESSLER:  If I may ask just one question to, to

2     clarify one thing.

3               THE COURT:  Okay redirect.

4                          REDIRECT EXAMINATION

5     BY MR. KESSLER:

6     Q.   Mr. Mara, when you indicated that Berkadia will

7     capitalize the company with additional working capital, does

8     that include sufficient capital to meet all the servicer

9     advances that will be required to operate these contracts?

10    A.   Yes.

11              MR. KESSLER:  Thank you.  Your Honor, if - -

12              THE COURT:  Any further redirect?  All right, you

13    may step down.

14              MR. MARA:  Thank you, Your Honor.

15              MR. KESSLER:  Your Honor, if at this time, I think

16    it would be appropriate for us to ask for a ruling from the

17    Court on two issues that need to be, that we need to prove

18    today.  The first is the good faith purchaser requirement and

19    you heard Mr. Mara's testimony that this was an extensive

20    arm's length negotiation using his words painful, that there

21    is no relationship present or in the past between the

22    parties.  There were no secret dealings and in addition,

23    there are no secret agreements between Berkadia and the

24    employees that are being hired under the agreement.  In

25    addition, since Berkadia is the only party purchasing, I

1  believe that we can meet the requirements of, I think its

2  365(n), anyway the no collusion factor.  And so based on the

3  evidence and the fact that there is no evidence to the

4  contrary, we would ask Your Honor to make a finding that

5  Berkadia has acted in good faith and is entitled to the

6  benefits of Section 363(m) as a good faith purchaser.

7       THE COURT:  Any objection to the Court making that

8  finding?  I hear none.  I'll make that finding.

9       MR. KESSLER:  Thank you.

10       THE COURT:  Is there any other evidence that any

11  party wishes to submit in connection with this motion?  I

12  hear none. That will close the evidence for this.  Let's go

13  through the objections.

14       MR. KESSLER:  The second thing, Your Honor, I was

15  going to ask for a finding on is the adequate assurance of

16  future performance.  What you heard in the cross examination

17  by several people - -

18       THE COURT:  Hang on - -

19       MR. KESSLER:  Was an effort - -

20       THE COURT:  I'm sorry.  Are there any, is there any

21  party still objecting to a finding of adequate assurance and

22  future performance?  Yes, okay.  Well I'm not going to make

23  that finding yet.

24       MR. KESSLER:  Okay you want to hear argument on it

25  now or at the end?

1          THE COURT:  Let's take that first.  Yeah tell me why

2    and then I'll hear any objection to the finding.

3          MR. KESSLER:  I have two basic points to make.

4    First, when the statute says adequate assurance of future

5    performance, we need to underscore the word adequate.  It

6    doesn't say guaranteed performance of future performance.  It

7    says adequate assurance of future performance.  And I think

8    Mr. Mara's testimony more than meets the standard that this,

9    that this purchaser will adequately assure future performance

10   under the contracts.  First and foremost, Capmark has been

11   performing up to this date as one of the top servicers of

12   commercial real estate mortgages in the country as you've

13   heard in this hearing, and I'd ask the Court to take judicial

14   notice from other hearings.  There has been no objection to

15   Capmark's ability to perform these contracts.  Berkadia is

16   simply acquiring the mortgage servicing business lock, stock,

17   and barrel not just the contracts but the people, the

18   software, the buildings and, as Mr. Mara testified, is doing

19   nothing to change the continuing operation of the company.

20   So assuming we get past the, the capital requirements, the

21   liquidity requirements which I'll come to in a moment, I

22   cannot see how they could fail to meet the adequate assurance

23   of future performance test when all they're doing is picking

24   up the company lock, stock and barrel and changing the name

25   at the top and perhaps putting a few new and different

1  executives in at the top; same management over the servicing,

2  same employees doing the same business as they did before.

3          Second, you heard people trying to attack adequate

4  assurance of future performance by asking Mr. Mara if they,

5  if he is familiar with certain provisions of the contract,

6  whether or not those provisions have been met on a going

7  forward basis.  I believe that's part of the adequate

8  assurance test.  Once this, the Debtor assumes and assigns

9  those contracts as hopefully the Court will authorize us to

10  do, the contracts, as the Court is fully aware, do not change

11  in any way.  The contracts will be assumed by Berkadia as is,

12  where is.  And if there are servicing requirements going

13  forward, if there are servicing standards that are required

14  of the bonds for a particular CNBS going forward and those

15  ratings are not obtained or are downgraded, that will be

16  Berkadia's risk on a going forward basis.  It is not a test

17  of whether or not this Debtor should be able to assume and

18  assign those contracts to Berkadia.  What I think we have to

19  determine today is whether Berkadia is giving adequate

20  assurance of future performance not guaranteed assurance of

21  future performance.  If they want to spend a billion dollars

22  on this company and then default six months later on account

23  of a servicing downgrade, that's their problem going forward,

24  but we - -

25          THE COURT:  Only hedge funds do that.

1            MR. KESSLER:  Beg pardon?

2            THE COURT:  That only hedge funds do that.

3            MR. KESSLER:  Well then we should have asked Mr.

4   Mara if Berkadia is a hedge fund and we can get past that

5   hurdle.  So, Your Honor, the last point I want to make is

6   several of the parties tried to make a case on the adequate

7   assurance evidence relating to their, to their default

8   objections and the requirement that the Debtor cure the

9   defense.  These objections as we'll come to when we go

10  through the various objections relate in many instances to

11  counterparties who have said we don't know of any defaults.

12  We're not aware of any defaults.  We just can't accept the

13  fact that the Debtor says the amount is zero.  And as a

14  result, we want to hold the Debtor hostage by requiring the

15  Debtor to put up some kind of huge escrow in case we find

16  that there's a default later.  They have the burden of proof

17  if they don't believe that our cure default notice was

18  accurate.  And if they wanted to, they could have done the

19  proper investigation.  We have not heard here that the Debtor

20  has defaulted in any way forward and trying to attack

21  adequate assurance of Berkadia by asking them if they're

22  going to be liable for some cure default going forward or

23  asking them legal questions about how the contract will be

24  viewed after assumption.  I don't believe reaches the issue

25  of whether they're providing adequate assurance of future

1  performance today to take these contracts.  And so with that,

2  I will leave it and I think we should leave the issues of

3  default notices and cure amounts to a later part of the

4  hearing and not allow it to encumber the argument of whether

5  Berkadia is providing adequate assurance.

6        THE COURT:  All right, does anyone wish to be heard

7  on adequate assurance?  Ms. Counihan?

8        MS. COUNIHAN:  Your Honor, Victoria Counihan again

9  for Anglo American or Anglo Irish Bank, Corporation PLC and

10  Colligo Funding Limited.  Your Honor, we have a servicing

11  agreement with the Debtors and the servicing agreement does

12  permit the Debtor to transfer and assign the agreement.  But

13  there's a clause in there that says provided that Moody's,

14  which is our particular rating agency, has confirmed in

15  writing that the transfer of the assets or the assignment

16  will not cause a downgrade qualification or withdrawal of the

17  current ratings that are assigned by Moody's to the notes

18  that are issued by the servicing agreement.  So the issue

19  that I'm having based on the testimony is number one, the

20  witness testified that when they spoke to Moody's they didn't

21  even talk about the notes that were issued pursuant to the

22  servicing agreement.  He only talked about whether there'd be

23  a downgrading of the servicer which is a different issue.

24  And also this is a condition precedent in the agreement to

25  the assignment happening.  So we have no problem if the Court

1   would be willing to put provision in the order that says by

2   the closing date that the buyer has to have obtained

3   confirmation from Moody's in writing that that the, there

4   will not be, that the assignment of this particular agreement

5   will not cause a downgrading of the underlying notes.  The

6   problem is that there's no testimony what so ever and no

7   proof that they can, that they can meet this obligation under

8   the servicing agreement.  Moody's has said that they won't

9   provide confirmation prior to closing which is required by

10  our agreement.  The witness said that they didn't even

11  discuss with Moody the downgrading of the notes that are the

12  underlying notes.  There's no evidence that the Debtors can

13  comply with the servicing agreement requirement.  And we

14  really have no idea if Moody's is going to confirm this.  And

15  certainly they don't expect that it's going to happen by

16  closing under any circumstances.  So that's our issue with

17  adequate assurance is this particular provision and their

18  contract maybe is a little bit different than other

19  contracts.

20          THE COURT:  All right, thank you.

21          MS. COUNIHAN:  I do also have a cure issue but I

22  don't know if Your Honor wants to take that later.

23          THE COURT:  Let's save that for later.  I think the,

24  let me respond to that.  I think the evidence was clear that

25  Moody's, Fitch, and S&P there were meetings with those

1   Parties that they indicated orally that they intended to

2   reinstate the existing ratings upon closing, that they don't

3   and won't provide a written agreement or commitment to do

4   that prior to the closing.  So I think that, in effect, this

5   contract is out of touch with reality and, in effect, is

6   anti-assignment clause that is void under the Bankruptcy Code

7   because it's an impossible condition to meet.  I think the

8   evidence is sufficient to provide adequate assurance that

9   that term will be complied with to the extent it's relevant

10  to the parties which is that the ratings stay in place post

11  sale.  So I'll overrule that objection.  Anyone else on

12  adequate assurance?  All right, I find based on the record

13  before me that the buyer has provided and is providing

14  adequate assurance of future performance under any contracts,

15  leases, etc. to be assumed and assigned to them under this

16  agreement.

17          MR. KESSLER:  Thank you, Your Honor.  And with those

18  two rulings, I think that it will help us get through many of

19  the objections.  But if we can now go to my chart and start,

20  I'll go through them numerically if that's okay with the

21  Court?

22          THE COURT:  That's fine. Does everyone have a chart

23  that needs a chart?  I think you have extras available, is

24  that correct?

25

 1            MR. KESSLER:  I've given out about 15 or more copies

 2   in the Courtroom.

 3            THE COURT:  They're right there at the rail.

 4            MR. KESSLER:  No these are orders.

 5            THE COURT:  Do you have any extras?

 6            MR. KESSLER:  A lot of people have taken all the

 7   ones we have.  We had a big stack of them.

 8            THE COURT:  If possible I'd ask you to share as good

 9   friends do when they have no other choice.  All right, go

10   ahead, Mr. Kessler.

11            MR. KESSLER:  We had 15 and we gave them all out.

12   Okay, Your Honor, the first one is the objection by Fannie

13   Mae as counterparty to contracts under the desk program with

14   the, Berkadia as the winning bidder, that has been withdrawn.

15            THE COURT:  All right.

16            MR. KESSLER:  Similarly with number two Freddie Mac,

17   I understand has withdrawn its objection.

18            THE COURT:  Okay, hang on.  Okay, fine.  If Mr.

19   Kessler says something you disagree with, pipe up okay.

20            MR. KESSLER:  The third one is an objection filed by

21   Affiliated Commercial Solutions, Inc. an affiliated

22   commercial service.  And according to their objection, which

23   I'll summarize very quickly, they claim that the cure amount

24   for their prepetition invoice is $403,371.00 and not the

25   $148,100.00 that we put into our, into our notice as a cure

 1   amount.  And the, we have now in response to this received

 2   the invoices from ACS's counsel, we have no objection to the

 3   invoices except a $15,000.00 invoice that is addressed to a

 4   Philippines Entity and we question whether that $15,000.00 is

 5   an obligation of the Debtor.  But, nonetheless, under the

 6   procedures for dealing with disputes over cure amounts that

 7   is in Your Honor's prior order, a dispute over the cure

 8   amount should not stand in the way of the assumption and

 9   assignment in the contract.  We will put the amount in, the,

10   the - -

11           THE COURT:  Asserted amount.

12           MR. KESSLER:  Asserted amount in controversy and in

13   escrow and we will deal with that dispute going forward.  We

14   believe we're $15,000.00 apart approximately.

15           THE COURT:  So, in effect, cure amounts are for

16   another day, but to the extent they're asserted, and I know

17   there are some where they're asserted, if you will, in

18   unliquidated or incoit way but dollar amounts, cure amounts

19   and the asserted amount, you're going to escrow them and

20   we're going to deal with it on another day.

21           MR. KESSLER:  To the extent not already resolved.

22           THE COURT:  Okay, very good.

23           MR. KESSLER:  Number 4 is an adequate assurance

24   objection and a cure amount objection.  As far as adequate

25   assurance, I think we've already, had resolved or have a

1 | finding on that one.

2 |         THE COURT:  And that's North Carolina Housing - -

3 |         MR. KESSLER:  Oh I'm sorry, yes - -

4 |         THE COURT:  Yeah let's identify for people maybe on

5 | the phone or others who don't have it in front of them.

6 |         MR. KESSLER:  Yes sorry, my mistake, North Carolina

7 | Housing Finance Agency.  This is one of those objections I

8 | believe, Your Honor, where they're saying they don't have the

9 | necessary information to object or not object to the cure

10 | amount.  All I can say to that is that the Debtors sent out

11 | the notices with the information as contained in their own

12 | files.  That the counterparty at this point has the burden to

13 | come forward and assert what they believe the cure amount to

14 | be.  They have the burden of proof at this point.  They get

15 | updated statements on a regular basis from the Debtor of its

16 | performance under their servicing contracts.  And we object

17 | to all of these objections that simply say Debtor has the

18 | information; Debtor knows more than us; hold us up because

19 | we're not able to object to a specific amount.  I would ask

20 | that that objection be overruled on that basis.  We don't

21 | know of any better way to satisfy - -

22 |         THE COURT:  I understand that.  I'm not going to

23 | make a ruling on this until we go through the whole group of

24 | people who have this issue and I have an opportunity to hear

25 | from them if they wish.  So I'm going to hold that issue in

1  abant until I hear from everybody.  I don't want other

2  parties to be prejudiced by the strength or weakness of a

3  case that's put on by someone who just happens in front of

4  them in the order.  Having said that, does anyone wish to be

5  heard on behalf of North Carolina Housing Financing Agency?

6  All right, not being present, I will overrule the objection.

7         MR. KESSLER:  Thank you, Your Honor.

8         THE COURT:  And, again, adequate assurance has been

9  dealt with so those objections are overruled.

10        MR. KESSLER:  Correct. So number 5, R. Donnelly was

11 withdrawn and is followed by a new objection that we'll come

12 to later.

13        THE COURT:  All right.

14        MR. KESSLER:  Number 6, Colligo Funding Limited and

15 Anglo Irish Bank was an adequate assurance objection that

16 we've already heard from their counsel - -

17        THE COURT:  I think I'm going to ask if she had a

18 cure issue as well.

19        MR. KESSLER:  Well as far as my chart is concerned -

20 -

21        THE COURT:  Well let's hear from Ms. Counihan.

22        MR. KESSLER:  It's an adequate assurance and asking

23 that we pay, get confirmation from Moody's or agree to pay

24 the fees and expenses, but I don't see that there's a cure

25 amount objection.

1           THE COURT:  Well let's hear from Ms. Counihan.

2           MS. COUNIHAN:  Your Honor, I think the latter part

3    of what counsel has stated is our cure issue.  There's a

4    provision in the servicing agreement that provides that the

5    Debtors will pay all costs of assignment and we believe that

6    that should include any costs for legal fees or cost to

7    pursue this objection and that should be included as a cure

8    claim.  And we can certainly provide the Debtors with an

9    amount if they are escrowing amounts or, or if they have, you

10   know, we can provide them with the actual dollar amount that

11   we believe it's going to be.  But we think that pursuant to

12   the agreement, the Debtor is required to pay all of the costs

13   of the assignment and that they should be required to do

14   that.  I don't have a dollar number for you today but I can

15   certainly quantify that and give that to the Debtors so that

16   they know what the dollar amount is.  I presume it would go

17   through closing anyway.

18           THE COURT:  Mr. Kessler.

19           MR. KESSLER:  Well, I guess this is asking for a

20   second bite at the apple.  She's asking that her attorney's

21   fees be paid for an overruled objection.

22           THE COURT:  No she's saying you have the obligation

23   under the contract to pay the costs of assignment which she

24   says includes her attorney's fees.  So even if she hadn't

25

1   objected, I'm sure her client would have required her to

2   review the documents, etc.

3          MR. KESSLER:  So what I would propose, Your Honor,

4   since we have not received any, any objection with a cure

5   amount proposal different from what we have proposed is that

6   they provide us with that information.  We'll either agree to

7   cure it by paying it or take the alternative that's available

8   to us which is to put the amount in escrow and come back to

9   Your Honor and deal with it at a later date.

10          THE COURT:  Ms. Counihan, if you can provide them

11   with an estimate offline.

12          MS. COUNIHAN:  I will do so, Your Honor, and that's

13   acceptable.

14          THE COURT:  All right, very good.

15          MR. KESSLER:  Number 7, Your Honor, is an objection

16   by Wells Fargo Bank and this is one of those more problematic

17   objections where they are saying, they are asking that

18   because they're not able, so they say, to identify a specific

19   cure amount different from what we propose that we be

20   obligated to place a percentage of the purchase price into

21   escrow with them for a one year period from which future

22   identified breaches and defaults can be cured, that we should

23   also guarantee that we will cover any deficiency and grant

24   them an administrative expense claim for those deficiencies.

25   And that the transfer of servicing to Berkadia be permissible

1  only if the Debtors cure all breaches that they may identify

2  in the future.  They're also asking that we pre-pay to Wells

3  Fargo an amount that covers possible reasonably expected

4  breaches or defaults.  And that the APA be revised to require

5  the buyer to assume all liabilities other than those

6  currently known cure amounts that are satisfied by the

7  Debtors prior to the sale.  They go on to ask that the Debtor

8  establish that we give adequate assurance of future

9  performance which we have done.  And they say that, that our

10 lists of contracts for which we assert Wells Fargo as the

11 Trustee and are to be assumed and assigned contains errors

12 and that we need to correctly identify these agreements.  I

13 believe first that they're not entitled to any of the cure

14 amount type of relief that they request.  It would be an

15 egregious burden on these Debtors to take the amount of

16 purchase price that they are requesting, put it into escrow

17 with them for as long as a year, and give Wells Fargo the

18 opportunity for a year to try to identify pre-assignment

19 defaults under their contract, obviously on the adequate

20 assurance part that's already been ruled on by the Court.

21 And I would also hasten to bring to the Court's attention

22 here again that they have not identified any defaults under

23 the contract.  The Debtors claim there are no defaults.  And

24 they have the burden, if they believe that the Debtors have

25 defaulted and have an obligation to cure, to bring forward

1   today in some form of written document what are the defaults

2   so that we can see them and make some decision as to whether

3   we will cure those defaults or chose not to assign the

4   contracts.  But to ask us to make a decision today to assign

5   the contracts in a blind and possibly have millions and

6   millions of dollars of future default obligation is not an

7   obligation under Section 365, is not a remedy that we believe

8   any counterparty to a contract is entitled to under Section

9   365, and we would ask that the Wells Fargo objection be

10  denied in its entirety as we will similarly ask for a number

11  of the other banks who simply banded together to make this

12  same type of objection that by our calculation might require

13  hundreds of millions of dollars be placed in escrow to

14  satisfy the types of objections that they're asking for.

15          THE COURT:  All right, Mr. Lerner.

16          MR. LERNER:  Thank you, Your Honor.  The first point

17  that I want to make on behalf of Wells Fargo is we're not

18  talking about Wells Fargo alone a small amount of, of money

19  by the last calculation.  It was over a hundred billion

20  dollars in outstanding balance, but let's to take this, I

21  guess, from a broader perspective.  Counsel, Debtors' counsel

22  called this banks or the Trustees banding together actually

23  they share the same concerns.  And I'm not speaking for them.

24  I'm just speaking for Wells Fargo as Trustee, but the primary

25  issue or problem that we're dealing with is Capmark has all

1  of these documents.  The Trustees are entirely reliant upon

2  Capmark for notice of any default.  And as Mr. Mara admitted

3  before, the procedures are, are unknown. Definitely Wells

4  Fargo doesn't know them.  It would be, you know, it would be

5  nice if the Debtor or Berkadia knew how those, how those

6  would happen, but we're looking here at the biggest problem

7  which is what's going to be with defaults that exist or - -

8       THE COURT:  Are we talking about defaults under the

9  servicing agreement or are we talking about defaults under

10 the underlying mortgage which would give rise to obligations

11 of the servicer to advance the monies?

12      MR. LERNER:  The latter is, is, I guess, the one

13 that's more, more worrisome because of the latency of that.

14 The, obviously the defaults that are going to be between

15 let's say directly between Capmark that exists before,

16 between Capmark and Wells Fargo.  We don't know any of those

17 to exist.  It's, but the other defaults that would then give

18 rise to reporting requirements, that would, that would give

19 rise to requirements for Wells Fargo as Trustee, to then

20 notify and take care, notify the investors for whom its

21 trustee for under the securitization agreements and for all

22 of the other tangential duties that the trustee has.

23      THE COURT:  Let me, maybe I can cut through this.

24 Counsel for Berkadia, if you could come to the podium.  I

25

1  have a question.  Berkadia is assuming the obligations of

2  servicer under all these contracts.

3          MR. CALIFANO:  Yes, Your Honor.

4          THE COURT:  If there were defaults in the underlying

5  mortgage that arose the default itself under the underlying

6  mortgage arose prepetition and there were certain, in that

7  instance there were certain notice requirements, there are

8  also certain substantive requirements to front advance the

9  losses, etc. that don't come to light until the post sale

10 period.  So you've got defaults on the underlying mortgages

11 that may have arisen presale but don't come to light to your

12 client or to the trustee to Wells Fargo or other similarly

13 situated persons, is your client assuming the liability,

14 i.e., the obligation that would arise under the servicing

15 agreement in connection with such a default?

16         MR. CALIFANO:  So is the question is my client

17 assuming the obligation to make servicer advances for pre-

18 November 24th defaults that may not be known or may not have

19 been notified?

20         THE COURT:  Yes.

21         MR. CALIFANO:  I assume so.  Let me check.  Yes,

22 Your Honor.

23         THE COURT:  All right.  Doesn't that solve your

24 problem?  In other words, the defaults are there.  They may

25 have occurred.  They may be occurring as we speak.  I think I

1   read today that one out of four U.S., of course this is

2   commercial mortgages, but one out of four U.S. mortgages home

3   mortgages is under water, probably mine too.  And so but

4   certain obligations of the servicer arise to deal with the

5   borrower's defaults.  And if they don't do that properly, I

6   suppose that would, in effect, result also in a default under

7   the MSA or whatever agreement is in place.  But an adequately

8   capitalized company is coming in and they're going to do the

9   servicing job and if those obligations arise, they're going

10  to pay them.  I don't see what the possible issue could be

11  for Wells Fargo, and I don't see why you need money put aside

12  to pay as cure something that's going to get paid by the

13  buyer as part of the ordinary course of business post sale if

14  you know where I'm coming from.

15          MR. LERNER:  I do understand where Your Honor is

16  coming from.  And it wasn't until a few moments ago it was

17  unclear to me, and I believe to more than just me and, maybe

18  if I'm getting it wrong now, maybe somebody else wants to

19  stand up that Berkadia is assuming all of those liabilities

20  even for prepetition what we're calling latent, latent

21  defaults.  But if that is correct, then I think that - -

22          THE COURT:  I'm not trying to box them in.  The

23  contract says what the contract says.

24          MR. LERNER:  Well, well and that's, and that's just

25  it is that the way we read the contract and the way we read

1  the proposed order that's not what's happening here.  If that

2  it would be what's happening then I believe that, that the,

3  that part of the objection would, would fall away.  There

4  would be a - -

5       THE COURT:  Well let's say this.  I am sure they're

6  preserving all their defenses under the contract, the

7  underlying contracts and if they have an obligation, they

8  have an obligation.  If they don't, they don't.  If the

9  Debtor committed some wanton act of, well I don't want to

10  start hypothetical questions, but - -

11       MR. CALIFANO:  Well, Your Honor, but the question

12  was with respect to servicing defaults that aren't discovered

13  and servicer advances that are not yet discovered because of

14  an underlying borrower default, and I have confirmed that

15  those servicer advances for undiscovered borrower defaults

16  will be honored - -

17       THE COURT:  And if you discover that, you know,

18  default notice should have been given to the Trustee 60 days

19  ago but you don't discover it until 30 days post closing,

20  you're going to give the notice and maybe it's a non-monetary

21  default.  If it is, it is and they can do what they want and

22  you'll have the defenses you have.

23       MR. CALIFANO:  Yes, Your Honor.

24       THE COURT:  I just I'm not trying to coy.  It was

25  less than clear to me as well, and I understand your issues,

1  but it sounds to me like this as a practical matter takes

2  care of your client's problems.

3       MR. LERNER:  Yeah much of it and then there would be

4  also, of course, under the transaction documents the issue of

5  attorney's fees and these things.  And what I heard before

6  from the Debtor is that they would deal with those in the

7  ordinary course.  And I think that if that is what they would

8  maintain with Wells Fargo, then that would probably also

9  resolve that issue.

10      THE COURT:  All right, well if, you know, if you're

11 entitled to the fees you are.  And if you're not, you're not.

12 And if you are, it may be a cure amount.  It may be,

13 somebody's going to pay.  And either the Debtor is cure or

14 the buyer in the ordinary course.  But that's an issue, you

15 know, I can't decide today.  I don't know what your contract

16 says about attorney's fees and whether it would cover

17 everything in connection with the bankruptcy or not.

18      MR. LERNER:  And to that, we would want to preserve

19 our objection to the zero cure amount to the extent that that

20 becomes an issue or that there are - -

21      THE COURT:  Well here's what I'm going to do with

22 that.  If anyone wants to reserve that right, you need to

23 give the Debtor a good faith estimate prior to closing.

24 Otherwise, they don't know what to set aside.  You know, you

25 can't, I don't want to hear it now.  I don't want to hear

1   what the bills are now, but I think prior to closing the

2   Debtor needs to have an idea of what you're talking about

3   because it affects, since it's being escrowed, to deal with

4   at a later date it's going to affect what needs to be

5   escrowed and what can be distributed.

6            MR. LERNER:  I think with that, that that concludes

7   everything that I needed to say.

8            THE COURT:  Now I want to hear from anyone else

9   right now is the time to deal with this.  I'd like to hear

10  from anyone else on this cure claim zero defaults that may

11  have arisen that need to be paid.  And Mr. Harbour is behind

12  you, Mr. Kessler.

13           MR. HARBOUR:  He's a pretty big guy I don't know.

14  Your Honor, for the record Jason Harbour, Hunton & Williams

15  again on behalf of Bank of America as Trustee and Master

16  Servicer.  I'm not sure that the entire question was answered

17  with respect to the cure issue.  There are potentially cures

18  by or default for other bi-borrowers and it's great that if

19  those defaults by borrowers happen pre-closing that the

20  purchaser will make servicing advances.  That certainly

21  resolves that concern.  Our concern, however, primarily

22  focuses on specific defaults made by Capmark with respect to

23  their servicing obligations.

24           THE COURT:  Do you know of any?

25           MR. HARBOUR:  Yes, we do know of one.  Capmark did

1  not inform us of it.  In fact, the certificate of holder

2  informed us of it that Capmark failed to make escrow deposits

3  in the amount of a $131,000.00 per month for two and a half

4  years which has aggregated to a $3.8 million dollar

5  deficiency in an escrow account which, you know, could

6  substantially obviously impact the value of that loan.  Now

7  that's just one example in 57 hundred loans that we have but

8  that's a default.  And there are other potential defaults,

9  Your Honor.  They could have, it's very easy to conceive that

10  they might have failed to pay an insurance policy.  The

11  policy dies and there's a fire.  There's a casualty, and

12  that's just a loss.  And that would be directly Capmark's

13  responsibility and to say that we've got to come up with all

14  of the information in 20 days when we don't have the

15  information, Your Honor.  What Bank of America is Trustee and

16  Master Servicer from my understanding receives are monthly

17  statements and those monthly statements go to principal and

18  interest.  They go to, you know, whether certain payments

19  have been made.  Then at the end of the year, then there's an

20  annual audit, Your Honor.  So the last annual audit that's

21  done by an accounting firm was received March, approximately

22  March 15th, 2009 not only covered 2008; notably, Your Honor,

23  that didn't pick up the $3.8 million dollar default that we

24  now know about.  Instead, it said everything was fine but we

25  don't even have that right now, Your Honor.  We don't have

1  from the servicer information about whether they've done

2  servicing properly because we won't know that until they've

3  done their annual report. So what we're asking for, Your

4  Honor, isn't that we hold the Debtors up or tie their hands

5  behind their back.  We're asking that we receive an

6  administrative claim for any cure amounts that we

7  subsequently discover. We're asking for an appropriate time

8  period to try to investigate whether such breaches have

9  occurred.  And, Your Honor, hopefully, very much hopefully

10  the $3.8 million dollar one is the only one with respect to

11  our loans that would be fantastic, and we'd love for that to

12  be the case.  And in that instance putting an appropriate

13  size escrow account and granting us administrative claims

14  costs the Debtors nothing.  If, however, Your Honor, it turns

15  out that there are substantial defaults and, Your Honor, this

16  is somewhat different than the residential mortgage context

17  because each loan here, you know, not only is probably at

18  least a few million dollars but could be tens if not hundreds

19  of millions of dollars.  So even though there may not be a

20  lot of defaults one or two defaults, 10 defaults could

21  quickly add up to $50 million dollars if there's substantial

22  defaults that can rise to huge losses.  Now the Debtors, Your

23  Honor, are the parties that know this information or that

24  have the information if they choose to go look at it to find

25  out whether defaults occur.  We simply don't have that

1  information, Your Honor.  So as I was saying a moment ago, we

2  would request that Your Honor set up a time table that we can

3  agree on a time table with the Debtors to try to figure out

4  whether any defaults have really happened.  Maybe discovery

5  is necessary.  Maybe we can agree to an appropriate process

6  whereby we look at the annual audit.  But something so that

7  we have some real information so that Bank of America as

8  Trustee and the other trustees can say they've really done

9  their duties to protect the certificate holders and the

10  security holders and that they're not cut off

11  inappropriately.  I mean the Bankruptcy Code requires the

12  Debtors to cure defaults.  And there hasn't been enough time

13  for us to determine whether their defaults exist.

14       THE COURT:  If there has been a default, the Trustee

15  may not assume unless at the time of assumption it cures.

16  Now that to me, and I think the law would agree, that if

17  you've got an incoit unliquidated default that you haven't

18  asserted yet, it's, it can't be that that contract can't be

19  assumed or assigned or we would never be able to assume an

20  assigned contracts under the code ever.  And we do it all the

21  time.

22       MR. HARBOUR:  I'm not disagreeing with Your Honor.

23  You have me at a little bit of disadvantage.  I don't have

24  the code in front of me right now.  But it also those

25  sections of 365(b)(1)(a) and (b) I know talk about providing

1  adequate assurance of cure and that's what I'm talking about

2  here.  I'm talking about providing adequate assurance that

3  they will cure, that they can cure, not that we're going to

4  be cut off and that three months from now, six months from

5  now - -

6       THE COURT:  I'm not sure if you discovered the

7  default six months from now it would be a cure claim.  I mean

8  I don't know if that's the case.

9       MR. HARBOUR:  Okay, Your Honor. It seems to be that

10 if there's an unknown default that it needs to be cured or

11 they should be providing adequate assurance that it's cured.

12 It's my understanding that the Courts regularly escrow funds

13 and provide claimants with administrative claims for

14 situations where the contract may be such that the parties

15 can't know because of the extendency of the sale process

16 whether defaults have occurred at the time.

17      THE COURT:  Okay.

18      MR. HARBOUR:  So that's really what we're asking

19 for, Your Honor.

20      THE COURT:  All right.

21      MR. HARBOUR:  And with respect to tying the hands,

22 I'll go one step further and indicate that we've, I've

23 discussed it with I think counsel for Wells Fargo, U.S. Bank,

24 some of the other Trustees and a cure amount of, a total of

25 $60 million dollars for all of the objecting parties to our

 1  minds would be appropriate here as long as we also receive an

 2  administrative expense plan.  And that's not the end of the

 3  world for the Debtors because they haven't proposed a plan

 4  yet.  They're not looking to come out of bankruptcy yet.  At

 5  that point, okay we'll have had a process.  We'll have looked

 6  at it, and we'll have been able to do the due diligence to

 7  determine whether any defaults have existed, but this process

 8  is just too fast and not appropriate.  Thank you, Your Honor.

 9          THE COURT:  You're welcome.  Anyone else on this

10  issue?

11          MR. BENEDICT:  Your Honor, this is Mark Benedict on

12  the telephone for GE Capital.

13          THE COURT:  Yes, sir.

14          MR. BENEDICT:  I think my issue is a lot more

15  limited, Your Honor.  My client did not receive the necessary

16  documentation under the servicing agreement, the financial

17  information from which we could determine whether there was a

18  cure.  Very early in the case, we requested that information

19  from Capmark.  Right about the time this hearing commenced,

20  we were provided about a 150, 160 pages of documents which

21  was the financial information we had requested. We're going

22  to need a short period of time to review that and then let

23  the Debtor know whether we think there is or is not a cure.

24  We believe we can do that before closing.  And if there's a

25  dispute, we certainly can have that amount escrowed if

1   there's a dispute as to the amount.  But we think between now

2   and closing, we can identify if there is a cure amount issue

3   outstanding.

4           THE COURT:  Okay.  Anyone else?

5           MS. ALVES:  Your Honor, Arlene Alves again for U.S.

6   Bank as Trustee.  We share in the concerns that were raised

7   by Mr. Lerner and by Mr. Harbour.  We do believe here that

8   this information is exclusively within the control of the

9   Debtors.  And we have, I believe, we, there are situations

10  where these types of service defaults would not come to our

11  notice, would not become, we would not become aware of them

12  for a significant period of time, so we believe an

13  appropriate process to protect our interest should be

14  provided here.  To the extent the Debtors are correct, you

15  know, we're not going to be taking any of the valuable estate

16  resources.  They will end up keeping all that money.  To the

17  extent we have been harmed and we had no way of knowing the

18  harm, we will be compensated and provided our adequate

19  assurance.  I would also like to point out we have a separate

20  issue here which is with respect to the U.S. Bank

21  transactions.  We've gone into great detail in our objection.

22  We have been, we have not received cure notices for all those

23  transactions which our records indicate are being serviced by

24  Capmark.  We have undertaken tremendous efforts both with

25  Debtors' counsel and with the 19 different offices of U.S.

1  Bank that are involved here to try to reconcile that and to

2  determine that, and we are looking for assurances that to the

3  extent Capmark is servicing and we have not been able to

4  identify those transactions that they're included, and that

5  to the extent cures are appropriate that we be provided with

6  a cure.

7          THE COURT:  All right.  Thank you.  Anyone else?

8          MR. ROVIRA:  Good afternoon, Your Honor, again, Alex

9  Rovira from Sidley Austin on behalf of Wells Fargo Bank and

10  Wachovia Bank in their capacities as master servicers and

11  sub-servicers over a 100 other servicing agreements.  Your

12  Honor, we share the same concerns that were raised with

13  respect to the default and latent default breaches that may

14  have occurred.  Prior to the assumption that we are not aware

15  of which we may become aware of post to assumption and which

16  we believe that there should be an adequate process in order

17  to provide for that cure amount.  We don't think that there's

18  anything in the Bankruptcy Code under 365 or the case law

19  that would allow the Debtor to say okay on this date tell me

20  how much you're owed and if you don't tell me, you are

21  forever estopped from recovering that amount.  We don't think

22  that's what the Bankruptcy Code provides for.  We think that

23  to do so would be, to allow the Debtor to get more than the

24  substantive rights that are under the contract.  It would

25  allow the Debtor to create a clean slate and a more valuable

1  asset which we do not believe is what the Bankruptcy Code

2  provides for.  I think the fact that other cases have

3  provided a reserve or an escrow amount in order to handle

4  cures or latent or unknown objections is evidence that there

5  are these concerns specifically where - -

6       THE COURT:  Can you point me to a case where the

7  Court has required escrows to cover potential latent or

8  undiscovered claims?

9       MR. ROVIRA:  Well, Your Honor, mine has been - -

10       THE COURT:  I heard a couple times now it's been

11  done so I'm not aware of it ever being done.

12       MR. ROVIRA:  Well my understanding was and, Your

13  Honor, will be more learned than I am on this, in *American*

14  *Home* and in *Homebanc*, they were unable at the time that the

15  cure amounts, the notices were issued to be able to provide

16  an accurate accounting of what the cure amount was at that

17  time.  And I understand that the Court ordered a process of

18  30 days okay make it a good faith effort to try to estimate

19  what those latent or unknown cure amounts may be.  I, so I

20  think that's a process that kind of evidences that there's,

21  there's that possibility.  But I don't think the Bankruptcy

22  Code says you're estopped if you have a latent or unknown

23  claim.  I think the Bankruptcy Code and the case law

24  specifically provides, well it doesn't specifically provide,

25  but provides that the contract is to be assumed in full.  And

1    the non-debtor counterparty is supposed to get the full

2    benefit of its agreement.

3            THE COURT:  Doesn't it come down to who pays the

4    bill?  It's not that you don't have a claim.  It's not that

5    you won't be able to exercise your remedies if you're harmed

6    by default.  You want to enforce the default, but to me and

7    there may be limitations of course, but to me I've heard loud

8    and clear from the buyer that in everything I'm hearing that

9    people are worried about, they're going, they're assuming

10   whatever liability there is. Go ahead, sir.

11           MR. CALIFANO:  Your Honor, I just want to make it

12   clear - -

13           THE COURT:  Well and let me just say with, subject

14   to defenses I mean if you, if you, if you're buying a pig in

15   a poke, you know, there's no way for you to know.

16           MR. CALIFANO:  Right but, Your Honor, when, the

17   contract does not provide that we're taking on pre-closing

18   liabilities.

19           THE COURT:  Right.

20           MR. CALIFANO:  What we are agreeing to do, I thought

21   I made it clear, I'll make it very clear.  To the extent

22   there are servicer advances which come due as a result of an

23   underlying borrower default that has not been discovered as

24   of today and is discovered in the ordinary course - -

25           THE COURT:  You'll pay this.

 1            MR. CALIFANO:  We'll pay those servicer advances.

 2            THE COURT:  I understand.

 3            MR. CALIFANO:  We're clear?

 4            THE COURT:  No, no I think that's helpful for the

 5    record.  You know, it's really difficult for me here and I

 6    don't know what to do about this, this is, everybody's being

 7    very amorphous.  There may be something that arises under my

 8    agreement which I don't know about which might be a default,

 9    and I'll know in a year, and if that's a problem then the

10    Debtor has to pay me an admin claim.  You know at some point

11    the music has to stop in a claim, it's a default claim that's

12    so incoit that it can't be articulated.  It simply can't hold

13    up the process of getting this, these contracts assumed and

14    assigned, figuring out what the cure amounts are, and going

15    forward.  I mean you can assert, maybe you can assert admin

16    claim at a later date, but I don't see why I have to require

17    escrow - - let's put it this way.  If an admin claim arises

18    at a future date as a result of the default that wasn't cured

19    that you can come in and prove me, prove up to the Court

20    you'll have an admin claim. Why should I, why should you, why

21    should you be in a special position as any other admin

22    claimant.  There are other admin, the lawyers when they have

23    a carve out, every other admin claimant is coming in here

24    will get paid.  And it's a timing issue.  It's an escrow

25    issue, but that's for another day.  I'm not saying they don't

1  have to cure.  I'm saying that in my mind now is not the day

2  to deal with it, and I don't see any evidence or any argument

3  today that would make me think, you know, it's so likely that

4  it's going to happen.  And it's so likely this estate is

5  going to dissipate that in order to protect these potential

6  administrative expense claims, I've got to somehow escrow

7  money now.  I mean if they're claims that nobody knows about

8  that arise later and they relate back to a period prior to

9  the closing, I guess is I'm ruminating here a little bit, but

10 I guess as a matter of law you'd have an admin claim.

11         MR. ROVIRA:  Well that's where I don't know if

12 there's clarity.  If we would have an admin law we, an admin

13 claim and we could provide for that in the order, I think we

14 would be satisfied with that.  I think a Debtor and my

15 concern is that the Debtors may say you're estopped from

16 that.  You had your opportunity to say what the cure amount

17 was.  You know, that was your time and moment.  Now that

18 something arose where it's, it's a lay in defect where it's,

19 and, and to address the concern is not servicing advances

20 only - -

21         THE COURT:  I think you're right.  I think borders

22 generally provide that because there's no way for the Debtors

23 to figure out if the transaction makes any sense unless they

24 have some solid idea of what the cure claims are especially

25 where the Debtors' liable as opposed to the buyers liable,

1  although the buyer usually wants to know too.  I understand

2  the conundrum.  I understand that and you're put in a, you're

3  put in a difficult place, but I'm struggling with the

4  practical reality of how we go forward when you have claims

5  that nobody knows what they may or may not be.

6       MR. ROVIRA:  I understand the need for finality and

7  the conundrum, but there should be a middle ground of finding

8  a process of a year end, a year end audit if we're able to,

9  to come up with at that moment a good faith estimate.  The

10  Debtors can object to that or just providing that any, if the

11  agreement is assumed the latent or defaults, which may not

12  ever, I'm not asking to make something hypothetical, based on

13  a hypothetical, those would be treated as admin expense

14  claims and not estopped.  And the concern that the Debtor

15  raised, I'm sorry that counsel for Berkadia was with respect

16  to services advances, my concern is where the servicer

17  Capmark was maybe misallocated certain funds that needed to

18  go to a certain escrow account or the reserve account and now

19  that claim comes back to me because the borrower now realizes

20  on its account statement that something occurred, I'm not

21  able to, our clients not able to figure that out right now

22  and it may take certain time to figure that out.  So just a

23  reasonable way to get to the middle of a process for that, we

24  believe would be an escrow or that they are granted admin

25  expense priority without, you know, because it would be

1  treated as if the cure did occur, as if the breach occurred

2  at that moment in time.  Thank you, Your Honor.

3          THE COURT:  You're welcome.  Mr. Huston.

4          MR. ROVIRA:  I'm sorry, Your Honor, one other thing.

5          THE COURT:  Oh sure, of course.

6          MR. ROVIRA:  If there's the other concern we had was

7  with the exacts the contracts would be assumed and assigned.

8  We have requested for some of the schedules that were

9  attached if there's any amendments that were made to any of

10 the servicing - -

11         THE COURT:  Well I think the, I think the testimony

12 was if there's a mistake they'll fix it.

13         MR. ROVIRA:  Okay thank you, Your Honor.

14         THE COURT:  Mr. Huston.

15         MR. HUSTON:  Good afternoon, Your Honor, may I

16 please the Court Joseph Huston at Stevens & Lee on behalf of

17 Deutsche Bank Trust Company Americas.  I don't want to re-

18 plow ground that's been plowed before.  I think Mr. Harbour

19 pretty much got it spot on.  And I just apropos my last

20 colleague's comments, it would be very helpful if Debtors

21 would identify which agreements and which defaults they

22 thought existed.  And this is not, I don't think it's with

23 good grace that we raise the objection that said you didn't

24 tell us what the defaults were and they say not my problem

25 it's your burden.  In their notice, notice of auction and

1  sale hearing which is docket #148, this, this in paragraph 2

2  it says, the Debtors believe any and all defaults under the

3  assumed contracts and leases can be cured by the payment of

4  the cure amounts listed on Exhibit A.  So they think that

5  there is a default, otherwise, we would not have been on that

6  list.

7          THE COURT:  No, no, no, no.  That is completely

8  unfair.

9          MR. HUSTON:  Well otherwise why would they have

10  listed a cure amount.  I mean a cure amount has to be listed

11  - -

12          THE COURT:  A cure amount of zero?

13          MR. HUSTON:  It has to be, but it has to be to cure

14  default otherwise there's no default.

15          THE COURT:  So that you, come on you know, Mr.

16  Huston, you've been practicing longer than I.  You know that

17  every Debtor does that to make sure that every contract is

18  covered.  And that it's subject to in effect the statute of

19  limitations or a bar date on asserting a default at a later

20  date.

21          MR. HUSTON:  Well we have, we have a non-objecting

22  party who specifically has said that the Debtors have not

23  meaningfully identified any defaults and it'd be real easy

24  for them to say Deutsche Bank no defaults.  We don't believe

25

1   there's any default in your contract in which event we would

2   then, we would then simply - -

3        THE COURT:  Haven't they said that by putting it at

4   zero?  I mean they have an obligation under the rules to make

5   these statements in good faith.  And if they think its zero

6   haven't they said we think it's zero.  If there is a default,

7   which we're not acknowledging, it will be zero.  Isn't that

8   what the whole point of that exhibit is?

9        MR. HUSTON:  I disagree, Your Honor.

10       THE COURT:  Okay.

11       MR. HUSTON:  Respectfully.  Second, with respect to

12   this issue about the incoit defaults that you raised, I think

13   you're absolutely right.  If you have, if you have something

14   that might with the passage of time become a default then I

15   don't think it is subject to cure.  The contract can be

16   assumed and assigned.  But with 365(b)(1) says if there has

17   been a default and the concern here is if there are defaults

18   that have occurred but we don't know about them yet.

19       THE COURT:  I understand.  I understand.

20       MR. HUSTON:  Finally in, I believe you asked for an

21   example and I believe in the *DVI* financial case which was a,

22   was a real, was a mess.  It was a series.  It was two

23   different lines of business and there were, and there were

24   servicing agreements that were assigned.  And then there were

25   actual direct loans which were made by the other ARM.  We

 1 | represented an Ad Hoc group of noteholders and servicers and,

 2 | if my memory serves me correctly, there was a short process

 3 | by which if you were able to identify cure costs those were

 4 | set aside subject to having notice in the hearing to see who

 5 | could prove them up and actually be entitled to them.

 6 | THE COURT:  All right.

 7 | MR. HUSTON:  But I'm not aware of any other case.

 8 | THE COURT:  Okay, thank you.  Ms. Harris.  Good

 9 | afternoon.

10 | MS. HARRIS:  Good afternoon, Your Honor, Donna

11 | Harris on behalf of GMAC.  I thought it might be a good time

12 | since we did file an objection with respect to a zero cure in

13 | the servicing agreements to let Your Honor know that the

14 | business people did actually resolve those issues.  And just

15 | prior to the hearing, we did file a formal withdrawal of our

16 | objections so we won't be going forward on our objection to

17 | this issue.

18 | THE COURT:  Thank you, anyone else?  Mr. Kessler, a

19 | reply, to a - -

20 | MR. KESSLER:  Briefly, Your Honor.

21 | THE COURT:  - - a long list of arguments.

22 | MR. KESSLER:  Briefly.  First, let me make clear on

23 | the record that where we sent out notices of assumption and

24 | intent to assign contracts and put the default amount as

25 | zero, that means we do not believe that there is any default

1  that is in need of cure.  If we did not, if we thought there

2  was a default and didn't know the number, I believe we would

3  have put unknown not zero.

4          Second, to a large extent this is a red herring

5  because none of these parties here today have indicated that

6  they have, before they received the notice been in contact

7  with the Debtor of the Debtors' failure to remit the ordinary

8  remittance reports that come to them from the servicer on a

9  regular basis where the servicer reports on the monies that

10 were received and how the monies were dispersed and the

11 advances that were made and so forth.  They have information.

12 None of them came back to the Debtor and said, or to this

13 Court, and said we believe there is a specific default,

14 except for this relatively small amounts that we heard, a few

15 million dollars, three hundred thousand.  None of them have

16 come back and said we believe there has been a default and

17 this is it.  This is the default.  We just don't know what

18 the amount is.  They have just asked the Court to recognize

19 that they, they have, they have rights to go forward and get

20 some form of an escrow and administrative expense if it comes

21 to their attention at a later date.  Now if I understand

22 correctly what they're asking for, they're asking for two

23 forms of relief.  Put $50 million dollars of the sale

24 proceeds in escrow against which they can get cures of any

25 defaults that they may identify over the next one year

1  period.  And second, to the extent the $50 million dollars is

2  not sufficient, give us an administrative expense for the

3  excess.  Well that would be such an egregious burden on this

4  Debtor that we wouldn't, I believe, know whether to even go

5  forward and assume and assign their contract.  We might even

6  prefer to reject them under those circumstances because we

7  have no idea what it would cost us or the estate on a going

8  forward basis to, to meet that obligation and that remedy.

9  So I think that they have at least some burden to come

10 forward and identify what the default is, give us an

11 opportunity to look into it and see whether the amount is

12 reflective of something that's worthwhile assuming and giving

13 them the right to an administrative expense or even

14 rejecting.  The way they've done it we're on the horns of a

15 dilemma because there is on limit as far as they're concerned

16 to our obligation.  They may take the entire sales proceeds

17 for all we know.

18        THE COURT:  Right.

19        MR. KESSLER:  So as I said, it is a red herring.

20 None of them have said we have tried to terminate this

21 agreement because of your bad behavior.  We know that there

22 are defaults.  We just don't know what the amount is or

23 anything of that sort.  It's just an effort to protect

24 themselves because they got a one time opportunity from a

25 Chapter 11 Debtor who says we're going to assume your

 1  contract for them.  To say I have an opportunity for

 2  Deutsche, I'm going to try to freeze everything you get so

 3  that we can try to collect every penny that we may be

 4  entitled to under any legal theory going forward.  That's

 5  just not the law, Your Honor.  And I'm not aware of any case

 6  in which that has been, that type of remedy has been offered.

 7          THE COURT:  Okay.

 8          MR. BENEDICT:  Your Honor, this is Mark Benedict on

 9  behalf of GE Capital.  May I briefly respond to Mr. Kessler?

10          THE COURT:  No.

11          MR. BENEDICT:  Okay.

12          MR. MAYER:  Your Honor, Tom Mayer for Kramer Levin

13  the Creditors Committee.  I need 30 seconds to confer with

14  Debtors' counsel.  May I take 30 seconds?

15          THE COURT:  Yes.

16          MR. MAYER:  Thank you, Your Honor, the Debtors will

17  deal with my issue when they see fit.  I'm sorry to take the

18  time.

19          THE COURT:  No problem.  All right, I'm going to

20  overrule these objections based on the idea that there are

21  claims for defaults that may arise under the servicing

22  agreements that have not yet been identified for whatever

23  reason.  I find that 365(b) requires, of course, that if

24  there has been a default it be cured but it actually says,

25  "if there has been a default in an executory contract, the

1  trustee may not assume such contract or lease unless at the

2  time of assumption such contract or lease the trustee cures

3  that default."  There has to be a stop date.  There has to be

4  a stop the music date on issues of cure in connection with

5  the assumption and assignment of leases and administrative

6  expense claims.  Otherwise, you simply couldn't do it.  And

7  the code clearly provides that you can.  And, indeed, I take

8  issue with some of the tone, and I don't mean that

9  pejoratively, but some of the underlying rationale that

10  somehow the Debtors don't get special rights in connection

11  with 365, of course they do.  That's the whole point.  The

12  Debtor can pick executory contracts and leases where it would

13  be advantageous for them to assume or assign them, and it can

14  reject and cure, if you will, its bad business judgment with

15  contracts and leases that it doesn't make sense to go forward

16  with.  It's a fundamental piece of the Bankruptcy Code.

17  There are other provisions that make it clear that assumption

18  and assignment of executory contracts is to be cured, is to

19  be encouraged, for instance, anti-assignment clauses; *ip so*

20  *facto* clauses.  These are unenforceable defaults.  I agree

21  with Mr. Kessler if we had, if people had the ability to

22  assert the Debtor defaulted by failing to do "x" prior to

23  this motion or to the sale date but I don't know what the

24  damages are yet that's a completely different issue from the

25  Debtor may have defaulted under the loan at some time.  I

1  don't know what that is.  I don't know if it has occurred,

2  and I don't know what damages would even arise if it had

3  occurred, and if I find out about it that somehow they have

4  to cure that.  That is simply too vague, too inchoate for the

5  Court to give it any credence in connection with the

6  assumption and assignment of the executory contract and

7  unexpired leases.  It is certainly true that in virtually

8  everyone of these cases I deal with and dealt with previously

9  before I took the Bench, that the cure issues don't get

10  decided at the sale hearing.  There is an agreement.  There's

11  a bid.  There's an ask.  And the monies made sure that it's

12  there and it's dealt with at a later date.  That's what's

13  provided here.  But it also provides that if you assert a

14  cure amount prior to assuming, assumption and assignment,

15  that's it.  No more cure amount.  No more admin claim.  I

16  think that's appropriate.  I think that's appropriate.  So

17  I'm going to overrule those objections on that basis.

18         Mr. Kessler, anything further?  Let's take a break

19  actually.  We've been going for about two and a half hours.

20  I'll take a short recess.

21         MR. KESSLER:  Thank you.

22     (recess 3:15 to 3:32)

23         THE CLERK:  All rise.

24         THE COURT:  All right, break it up.  Please be

25  seated.  I think we've probably dealt with the bulk at this

1   point of the objections - -

2        MR. KESSLER:  Yes, Your Honor, during the break we

3   tried to go through the chart and figure out which ones have

4   now been addressed by Your Honor's rulings.  And so, Your

5   Honor, I got off script because some of the people got ahead

6   of us in terms of arguing their objections and doing the

7   testimony earlier.  And so if I can, I'd like to go back and

8   mention something that I should have mentioned earlier and be

9   fully candid with the Court as I always am.  After the

10  mailing deadline, the Debtors updated the cure schedule after

11  learning of some contracts that were inadvertently left off

12  of the original schedule.  And we had left off two leases

13  approximately 340 subservicing agreements which seems like an

14  awful lot amount, awful large number but it actually is not

15  in relation to the total number in this case.  And, three,

16  pipeline transactions: these are transactions in which the

17  Debtor did not originally have an obligation because they

18  were just loans in process.  But once they became originated

19  loans they would be actual contracts that we would like to

20  assume and assign.  We sent out through Epic on November 13th

21  a late notice to assume and assign those contracts, the

22  contracts I've mentioned.  And I'm sorry, we sent that out on

23  November 20th.  And in order to provide each of those parties

24  with the same period of time to object, we have extended the

25  notice period for those parties to December, to the December

1    10th hearing.  So we may hear at December 10th some additional

2    objections that are related just to those late notice

3    contracts.

4              THE COURT:  All right.  Okay.

5              MR. KESSLER:  And I'm hopeful that we'll clear out

6    today all of the objections for all contracts other than

7    those late notices.  So before the break and before we jumped

8    ahead of ourselves, I think we were at number 7 the Wells

9    Fargo objection which I believe by Your Honor's ruling has

10    been overruled.  I think the U.S. Bank objection number 8

11    falls in the same category.

12              THE COURT:  I agree.

13              MR. KESSLER:  I think we're now down to number 9 the

14    GMA LLC objection.  This was a limited objection where we've

15    now been informed that this objection's been, says been

16    withdrawn, excuse me.  And I believe that their counsel

17    announced that right at the end.

18              THE COURT:  Yes.

19              MR. KESSLER:  Number 10 falls within Your Honor's

20    ruling on cure amounts so that one should have been disposed

21    with.  Similarly, number 11 which is the Genworth North

22    American one.

23              THE COURT:  East, 12 East Bank that's a bit

24    different.

25

1        MR. KESSLER:  Yes.  In this one they were asking for

2    some assurance as to whether their loan was being transferred

3    or just the servicing of their loan.  And we have resolved

4    that we would make a statement on the record to confirm that

5    the transfer to Berkadia will not change ownership of the

6    loan.  It is just the servicing of the loan that will be

7    transferred and; therefore, the request to assume and assign

8    servicing related to their contract does not address the

9    issues that concern them.

10        THE COURT:  All right, Mr. Simon?

11        MR. KESSLER:  I'm sorry?

12        THE COURT:  Mr. Simon.

13        MR. KESSLER:  Oh, I'm sorry.

14        MR. SIMON:  Thank you, Your Honor, Chris Simon on

15    behalf of East Bank.  With me in the Courtroom is Paul

16    Wolfson of Wilmer Hale and the Debtors' counsel

17    representations are accurate and that does resolve our

18    objection.

19        THE COURT:  All right.

20        MR. SIMON:  And I appreciate the Court's time.

21        THE COURT:  You bet.  Thank you.

22        MR. WOLFSON:  Thank you, Your Honor.

23        THE COURT:  You're welcome.

24        MR. KESSLER:  Number 13 the Freddie Mac objection

25    has been withdrawn subject to the sale going to Berkadia.

1  Number 14 the Bank of America objection, I believe, is

2  overruled per Your Honor's rulings prior to the break.  Same

3  with number 15 Wells Fargo and Wachovia Bank.  Number 16 the

4  R.R. Donnelley global real estate servicer.  They claim that

5  there are some invoices for prepetition services totaling

6  $219,909.00 that are outstanding and; therefore, are in

7  default.  We will, we will escrow that amount.  The amount

8  claimed is under review and if we can reach agreement, we

9  will.

10         THE COURT:  Okay.

11         MR. KESSLER:  If not, we'll be back before Your

12  Honor.  Number 17 Deutsche Bank's objection, I believe, is

13  overruled.

14         THE COURT:  Sorry, Ms. Miller.

15         MR. KESSLER:  Oh I'm sorry.

16         MS. MILLER:  Sorry.

17         MR. KESSLER:  Someone has to bang me.

18         MS. MILLER:  Good afternoon, Your Honor, Kathy

19  Miller on behalf of R.R. Donnelley.  We did submit a cure

20  objection for the approximately $219,000.00 on a prepetition

21  claim.  The Debtor, I'm sorry, R.R. Donnelley has been

22  providing services to the Debtor post petition.  And they had

23  been submitting invoices and there's a process where we

24  submit invoices.  We review them and they keep in contact

25  with us about when we expect payment on that.  So there is

1  another period opine for which is not governed or covered by

2  the $219 that we want to get confirmation that they will

3  continue to be processed in the ordinary course.  It looks

4  like, if I have my numbers right, about another $80,000.00

5  for the post petition.  And as Mr. Kessler just said that

6  they believe that the, it will be a couple more weeks before

7  we close.  So there may be another little bit of a gap

8  period.  So I just want to make sure that we're covered.

9       THE COURT:  All right, Mr. Kessler, I assume that's

10  all right?

11       MR. KESSLER:  Yes, sir.

12       THE COURT:  Okay.  Thank you, Ms. Miller.

13       MR. KESSLER:  If I can go back for a moment to Bank

14  of America number 14.

15       THE COURT:  Okay.

16       MR. KESSLER:  There is an amount that, they did

17  declare one amount in dispute of $3.8 million dollars.  And

18  so - -

19       THE COURT:  That's the, that's the $130,000.00 a

20  month that wasn't paid?  Mr. Harbour's nodding yes.  Okay.

21       MR. KESSLER:  Okay.

22       MR. JONES:  Your Honor, this is Bob Jones, good

23  afternoon from Patton Boggs, and I represent the certificate

24  holders on that particular [indiscernible] and servicing

25  agreement.  And this is a, was a mistake made by Capmark with

1   regard to one of the underlying loans.  It was, it was

2   entered incorrectly and led to a failure to fund a required

3   rollover account for a period of about two and a half years.

4          THE COURT:  All right.

5          MR. KESSLER:  We will escrow that amount, Your

6   Honor.  The remainder of that objection should be overruled.

7          THE COURT:  Okay, I agree.

8          MR. KESSLER:  Number 17 Deutsche Bank I think falls

9   under the earlier rulings and should be overruled.  There is

10  number 18 ACAS,CRECDO 2007-1 limited.

11         THE COURT:  That's the same issue, isn't it?

12         MR. KESSLER:  Yes - -

13         MR. JONES:  Yes, that's our, those are my clients,

14  Your Honor.  This is Bob Jones.

15         THE COURT:  All right so only $3.8 million will get

16  escrowed not $7.6.

17         MR. KESSLER:  Correct.  It's the same objection by

18  two related parties.

19         THE COURT:  Got it.

20         MR. KESSLER:  So number 19 is a reservation of

21  rights filed by the Official Committee of Unsecured

22  Creditors.  I don't believe that that reservation of rights

23  has any applicability any longer, but I - -

24         THE COURT:  I think they're on board.  I think they

25  said that.

1            MR. KESSLER:  Yup.

2            THE COURT:  They're all on their Blackberries so

3     we'll just assume that that's correct.

4            MR. KESSLER:  Number 20 the Inverness Properties LLC

5     as landlord under two lease agreements, objection says they

6     have an $8,897.00 cure amount outstanding.  This was, this

7     represents a check that was sent to them prepetition but was

8     not cashed prior to the filing. So we will get with them and

9     resolve that amount.

10           THE COURT:  All right I see two notes here $8800 and

11    about $10,000.00.

12           MR. KESSLER:  And there's another $10,553.00 amount

13    and, there again, we will escrow those amounts and either

14    reach agreement or be back before Your Honor.

15           THE COURT:  All right.

16           MR. KESSLER:  The General Electric - -

17           THE COURT:  Mr. Harbour.

18           MR. KESSLER:  Sorry.

19           MR. HARBOUR:  For the record again, Jason Harbour,

20    Your Honor.  And just a point of clarification, our objection

21    was overruled with respect to the unknown breach issue, but

22    we also, like most of the Trustees, raised expense claim

23    concerns and cure claims.  My understanding was that that

24    part of the objection we would be providing like the other

25    Trustees estimates to the Debtors.  Those amounts would be

1   cured and they would be either agreed upon or brought before

2   Your Honor.

3            THE COURT:  All right.

4            MR. KESSLER:  I thought that we, that Your Honor's

5   ruling was that they would have to submit some kind of an

6   invoice amount.

7            THE COURT:  Absolutely, prior to closing.

8            MR. KESSLER:  Yeah okay.

9            THE COURT:  With back up.

10           MR. KESSLER:  I think we're down to number 21

11  General Electric Capital Corporation which I believe is

12  overruled by Your Honor's earlier rulings.

13           MR. BENEDICT:  If it please the Court, Your Honor,

14  Mark Benedict with GE Capital.

15           THE COURT:  Yes.

16           MR. BENEDICT:  We had raised two issues.  The first

17  issue was the cure issue which has been overruled though and

18  so I won't go into that.  The other that we identified is, I

19  think Your Honor has also made statements that largely

20  resolve that.  There's an extrinsic event that's occurred

21  under our servicing agreements that gave rise to a

22  termination event, not a default by the Debtor.  And so our

23  position is that if Berkadia takes it, it takes it subject to

24  those rights whatever they are including our right to

25

1  terminate even if Berkadia takes it, even if it wasn't a

2  default by the Debtor to cure.

3         THE COURT:  That's the default by the filing of the

4  *GM* case?

5         MR. BENEDICT:  Yes, Your Honor.

6         MR. KESSLER:  And they have a motion to lift stay

7  and we will address that issue at the lift stay hearing.  But

8  I don't believe that it stands in the way of the Berkadia

9  sale whichever way Your Honor rules.

10         THE COURT:  All right.

11         MR. KESSLER:  It may end up in an adjustment but

12  not; it won't stand in the way of the sale.

13         MR. BENEDICT:  Yeah we don't believe it stands in

14  the way of the sale nor do we believe that it stands in the

15  way of the assumption of the contract.  We're just putting

16  people on notice.  We believe that right out there exists.

17         THE COURT:  Well if you have the right to terminate,

18  you have a right to terminate.

19         MR. BENEDICT:  Thank you.

20         THE COURT:  You're welcome.

21         MR. KESSLER:  I'm advised, Your Honor, that the

22  Inverness Properties $18,000.00 amount, it's actually closer

23  to $19,000.00; that we agree to those amounts and so they

24  were beyond the point of putting it in escrow and discussing

25  it.

1          THE COURT:  So you're going to pay it?

2          MR. KESSLER:  Pay that cure amount.

3          THE COURT:  I think counsels on the phone, is that

4    all right?  No?

5          MR. KESSLER:  If he objects, I'll consent to the

6    objection.

7          THE COURT:  All right.  I'll take care of; I think

8    that's it, right?  Oh, excuse me.

9          MR. KESSLER:  Number 23 - -

10         THE COURT:  Mr. Kessler, sorry.

11         MS. MCCONNELL:  Good afternoon, Your Honor, Lauren

12   McConnell on behalf of Inverness Properties.  Mr. Kessler is

13   correct.  The exact amounts of the cure objection was

14   $19,431.54.  And an agreement was reached shortly before the

15   hearing that that amount would be agreed to by the Debtors

16   would be paid.

17         THE COURT:  Okay.

18         MS. MCCONNELL:  Thank you.

19         THE COURT:  You're welcome.  I think that's it for

20   the objections.

21         MR. KESSLER:  There's one more, Your Honor, U.S.

22   Bankcorp Community Development Corporation and U.S. Bankcorp

23   Community Investment Corporation, number 22.  And this was a

24   late filed objection but, nonetheless, these agreements that

25   are addressed in that objection were inadvertently included

1    in the, on the cure schedule but are excluded assets in the

2    contract and will not be assumed and assigned.

3              THE COURT:  Okay.

4              MR. KESSLER:  And we've agreed with counsel that we

5    would make that statement on the record.

6              THE COURT:  Okay.

7              MR. KESSLER:  And so that should deal with the cure

8    schedule.  I understand Mr. McMahon has an issue with respect

9    to the order that he wants to address.

10              THE COURT:  All right, subject to, oh I'm sorry.  Is

11    this an issue with the order language?

12              MR. MCMAHON:  Well I'd call it general sale issue if

13    you want to, Your Honor, wants to address the cure as first

14    then I'll just sit down.

15              THE COURT:  No, no because I'm going to approve the

16    sale subject to the order assuming I don't sustain your

17    objection.

18              MR. MCMAHON:  Understood, Your Honor.  Well Joseph

19    McMahon for the United States Trustee.  Your Honor, prior to

20    today we raised informally with the Debtors whom I understand

21    they raised with the purchaser the following issue.  A part

22    of the deal here involves say the upstreaming of assets from

23    Capmark Bank certain loans and advances, and they're being

24    transferred to the Debtor.  Then they're skipping through as

25    part of the sale an issue we raised into whether or not

1  they're a free and clear sale with respect to that, those

2  assets, what it means and the context of its construct.

3  Capmark Bank is a non-debtor.  We're all familiar with the

4  law with respect to free and clear sales.  I mean obviously

5  you wouldn't be able to do that with respect to non-debtor

6  assets.  But given the fact that the only sensible reason

7  that we could, I guess, come up with for doing it this way

8  would be to try to somehow use the powers of 363 to bring the

9  bear upon this aspect of the transaction.  It's an issue for

10  us since so far as what exactly is going on here on a

11  mechanical level.  Certainly, given that we're dealing with

12  non-debtor assets, I think we need some clarification from

13  the Debtors as to what the status of claims vis-a-vie those

14  non-debtor assets are post this transaction.

15          THE COURT:  Okay.

16          MR. KESSLER:  A couple of points, Your Honor, first

17  the contract for purchase is for purchase of these assets

18  from the Debtors.  Capmark Bank is not a contracting party

19  with Berkadia.  And this contract entered into prepetition

20  provides that CFI, Capmark Financing, and the other sellers

21  are obligated to sell the servicing advances and loan

22  originations that currently reside in Capmark Bank.  They

23  were conveyed there as a capital contribution sometime ago.

24  We'll come back to CFI so that they can be sold to Berkadia

25  pursuant to the contract.  I'm advised by counsel at Capmark

1    that Capmark, CFI, always retained a repurchase right against

2    the servicing advances and loan originations that they could

3    always bring them back for cash if there was a desire or need

4    to do so.

5         Lastly, these are unencumbered assets as we, as we

6    presented in the motion and have argued that there is no

7    known lien or encumbrance against any of the assets being

8    sold to Berkadia that could give rise to any significant

9    issue under 363(f).  And so we don't see why we should not be

10   able to give the full 363(f) protections to Berkadia as we

11   are contractually committed to do under the APA agreement,

12   notwithstanding that some of the assets we're selling are

13   going to come back into the Debtors for a short period of

14   time in order to close the transaction as it was documented.

15   And I believe that Mr. Califano on behalf of Berkadia would

16   like to also address the Court on this issue.

17        THE COURT:  Okay.  Mr. Califano.

18        MR. CALIFANO:  Yes, Your Honor, thank you, Your

19   Honor. Your Honor, we're purchasing the assets, excuse me,

20   we're purchasing the assets from the Debtor.  We have

21   bargained for a free and clear finding from this Court and to

22   purchase these assets free and clear.  The transactions by

23   which the Debtor may take these assets into the estate

24   between affiliated Debtors should not be our concern.  This

25   contract, this sale has been noticed to the world and the

1 structure has been noticed to the world.  And the only issue

2 we're getting is from the Office of the United States

3 Trustee.  If there is something wrong, which I'm not

4 implying, if there is something that it was created by the

5 way these assets were brought back into the estate, it should

6 not be our issue.  We're buying from a Debtor.  We should buy

7 free and clear.

8          THE COURT:  Mr. Kessler, is the bank represented by

9 independent counsel?

10          MR. KESSLER:  They are represented by independent

11 counsel.  Well they're not represented by my law firm, put it

12 that way, and I do not believe that they are here today.

13          THE COURT:  All right.  And they obviously had

14 notice of the fact that $500 grand was going out the door?

15 It's about $500,000.00, is that right?

16          MR. KESSLER:  $500 million.

17          THE COURT:  $500 million uh oh.

18          MR. KESSLER:  They're not selling for $500,000.00 -

19 -

20          THE COURT:  I'm not thinking, you know, I'm not

21 thinking big enough numbers.  Mr. McMahon, any response?

22          MR. KESSLER:  Mr. [indiscernible] makes the point

23 that all assets reside at someplace at some point in time.

24 We're always talking about timing here.

25          THE COURT:  Well, you know, there could be a concern

1  that well, that it's [indiscernible] conveyance or breach of

2  fiduciary duty or something in connection with the bank.  I'm

3  not saying there is, but, Mr. McMahon.

4       MR. MCMAHON:  One reply with respect to the re-

5  purchase right.  A point of inquiry to the Debtors is whether

6  all the funds on account of these assets are immediately

7  being down streamed to the bank.

8       THE COURT:  Well they're being upstreamed and then -

9  -

10      MR. MCMAHON:  Well I know, but the proceeds I guess

11 what's - -

12      THE COURT:  I assume the proceeds aren't going to

13 the bank?

14      MR. KESSLER:  Yes, Your Honor, the bank is getting

15 the proceeds for its assets.

16      THE COURT:  Oh I see, okay.

17      MR. MCMAHON:  And the second point, Your Honor, is

18 well I don't think that the free and clear protection this

19 Court could extend could in any way apply to claims vis-a-vie

20 the bank anyway.  So the extent that the sale order could be

21 clarified to make that clear I think I might - -

22      THE COURT:  Well I don't think that's necessary.  It

23 is what it is.  Look, I couldn't give a free and clear

24 finding or order in connection with a non-debtor.  I just

25 couldn't do it.  So if there's some sort of conversion claim

1  that would ultimately allow the bank to go against whoever

2  has their assets, well no but that would be - - never mind

3  that would be scrubbed by this order, I assume.

4          MR. KESSLER:  The issue is whether a party can go

5  against Berkadia for a matter that - -

6          THE COURT:  It's really internal.

7          MR. KESSLER:  That is internal or relates to a

8  creditor - -

9          THE COURT:  Yeah, no I'm comfortable with that.  I'm

10 not bothered by that.  I'll approve it like that.

11         MR. KESSLER:  Okay.  So, Your Honor, I think we're

12 now at the end of the motion, at least as far as dealing with

13 the evidence and the objections.  And if I can, I'll give a

14 summation argument as to why we believe that the Court should

15 approve to Berkadia including the assumptions signed by

16 contracts and the protections of the order that give, that

17 are given to Berkadia.

18         THE COURT:  Well let me, I think Committee counsel

19 looked like he wanted to be heard.

20         MR MAYER:  Your Honor, I decided the clarification I

21 wanted to make is not necessary.

22         THE COURT:  Right.  I don't need a summation.  I

23 think it's clear based on the evidence before the Court that

24 the standards under 363 and 365 in connection with the sale

25 of these assets including the assumption and assignment of

1    unexpired leases and executory contracts are clearly met;

2    that the buyer has provided adequate assurance of future

3    performance; that defaults will be cured pursuant to the

4    procedures set forth.  The Debtor is going to appropriately

5    escrow the full amount of liquidated cure claims for

6    disposition at a later date.  The buyer as I said earlier,

7    the buyers clearly acted in good faith and at arm's length.

8    So I also think this a terrific result from a, just a

9    substantive standpoint.  Employees are going to keep their

10   job.  The business is going to stay in place and the assets

11   will continue to be serviced and the mortgages will continue

12   to be serviced. So subject to actually looking at the order,

13   I will approve this sale.

14          MR. KESSLER:  Thank you, Your Honor.  And I am ready

15   to hand up the order.  There were no objections to the

16   language other than the one raised by Mr. McMahon.  I do have

17   a black line that shows changes that were made from the form

18   that was attached to the original motion.

19          THE COURT:  Okay.

20          MR. KESSLER:  And I've put a yellow tab on one page

21   that requires a date be inserted.

22          THE COURT:  All right.

23          MR. KESSLER:  Thank you, Your Honor, may I approach?

24          THE COURT:  Yes.  Thank you.  Just let me look

25   through the black line real quick.

1        MR. KESSLER:  Your Honor, it's been brought to my

2   attention that there's language in the order that says cure

3   amounts have been approved to the amounts stated on the

4   record, and I would consent and concede here on the record

5   that to the extent otherwise clarified or determined during

6   the hearing today.

7        THE COURT:  Very good.  What date do we need?

8        MR. KESSLER:  It's today's date; date of entry of

9   the order.

10        THE COURT:  It's already in there.  It's in there

11   where you tabbed it.

12        MR. KESSLER:  It is?

13        THE COURT:  Looked like it; second line?

14        MR. KESSLER:  It has the word date on the first

15   line.

16        THE COURT:  Oh, oh.

17        MR. KESSLER:  It's their - -

18        THE COURT:  I, I didn't see it.  I apologize.  All

19   right, I am signing the order.  All right, what's next?

20        MR. CALIFANO:  Your Honor, may I be excused?

21        THE COURT:  Yes, you may.

22        MR. KESSLER:  Your Honor, if I may proceed?

23        THE COURT:  Yes.

24        MR. KESSLER:  The next item on the agenda, the next

25   item I'd like to address is item 8 on your agenda and that's

1  the final hearing on the wages and benefits motion.  This is

2  a matter of paramount importance to the Debtors and the

3  continued vitality of their business operations.  On the

4  commencement date, the Debtors filed a wages motion.  And

5  following the first day hearing, the Court entered an interim

6  order authorizing the Debtors to pay up to $6.9 million

7  dollars in employee obligations subject to the statutory

8  $10,950.00 priority cap.  In the order, the interim order the

9  Court also authorized the Debtor to continue to honor their

10  existing employee obligations that existed as of the

11  commencement date.  But the now, we now seek continuation of

12  these employee obligations on a permanent and final basis and

13  ask that the Court grant such relief.  There has been no

14  objection to that part of the motion which is - -

15          THE COURT:  Issues is the commissions, right?

16          MR. KESSLER:  We're coming separately to those

17  matters.  We're also asking the Court to consider approval of

18  certain prepetition payments that were carved out of the

19  interim order and are under the Debtors various employment

20  plans.  Specifically, the Debtors reserved in the wages

21  motion the right to seek approval of continued payments under

22  their prepetition employee compensation plans.  These include

23  the prepetition commission plan, the 2008 and 2009 bonus

24  plans, and the deferred awards program and severance plan.

25  And if I can, I'd like to discuss each of these separately.

1         It's out feeling that the continuation of these

2    plans is an absolute integral and necessary part of the

3    ongoing stability of the company.  We filed a supplemental

4    brief last Friday on November 20th to explain why we believe

5    the Doctrine of Necessity should in this instance allow the

6    prepayment or, excuse me, the payment of the prepetition

7    amounts that will come due under these plans during the

8    course of these cases and is discussed at length in our

9    supplemental brief.  The Debtors believe that the approval of

10   these plans is necessary and essential to maintain the

11   stability of the company going forward.  Now I can personally

12   attest to the fact that the thread of employees leaving the

13   company and leaving the company in dire straits is real.  I

14   was contacted by an attorney representing a large number of

15   employees and I believe now larger than he represented at the

16   time.  And he stated to me that on behalf of his Ad Hoc group

17   of employees that if we don't get them relief under their

18   compensation plans - -

19         UNIDENTIFIED:  Objection.

20         MR. KESSLER:  - - that they're threatening to walk

21   out the door.

22         THE COURT:  Yeah this is hearsay.  And - -

23         MR. KESSLER:  I'll be glad to testify to it if its,

24   if necessary.  Your Honor - -

25         THE COURT:  It would still be hearsay.

 1              MR. KESSLER:  Well maybe he's here.

 2              THE COURT:  Maybe he is.  But, I understand, the

 3    Debtor has a belief that it will lose people, right?

 4              MR. KESSLER:  Your Honor - -

 5              THE COURT:  The Debtor has a belief that it will

 6    lose people, correct?

 7              MR. KESSLER:  Correct.

 8              THE COURT:  All right.

 9              MR. KESSLER:  I've also prepared to offer Mr. Jay

10    Levine as the chief executive officer of the company to

11    provide testimony on the, on this issue.  And after my

12    presentation, if I can, I'd like to put him on.

13              Your Honor, on pages 4 through 6 of our brief, we

14    discuss and argue the necessity of the payment doctrine and

15    why we believe that it applies here.  I don't want to repeat

16    everything that is in our brief.  But suffice it to say that

17    if the necessity of payment doctrine lives, and we know that

18    it lives especially in the 3rd Circuit and in this Court, to

19    pay critical vendors who are threatening to not supply a

20    debtor with supplies unless their prepetition claims have

21    been paid.  To pay prepetition insurance payments, to pay

22    other types of prepetition claims where a showing is made

23    that the actual cost to the estate of paying these

24    prepetition claims out of place will actually, of not paying

25    the claims I should say, will actually be much more severe

1   and much greater harm to the estate than would result from

2   paying the prepetition claims.  The necessity of payment

3   doctrine would allow for the payment of those claims.  And we

4   would submit that if that doctrine, that under that doctrine

5   who could be more significant and important for payment under

6   the necessity of payment doctrine then the employees who are

7   the first line of defense.  The first and foremost group that

8   needs to be protected against in a, as a necessity for

9   protecting the estate where those employees are actually and

10  in real terms threatening to leave; threatening to leave the

11  company in a way that would severely harm the company in

12  amounts much, much in excess of what it would cost to pay

13  them.  There's no reason to pay critical vendors.  There's no

14  reason to pay any other prepetition claims if the employees

15  are going to walk out.  There's no one in the store to sell

16  the goods that the critical vendors would supply.  There's no

17  asset.  The asset values would diminish dramatically where we

18  would question making payment for other claims if the

19  employees are going to walk out on you.  So it's our argument

20  that the necessity of payment doctrine must apply equally or,

21  even more so, the employee prepetition claim then it does to

22  any other group of prepetition claims that the Court's

23  frequently allow to be paid.

24          Now why is it so necessary in this case to pay these

25  employees.  First, the Court has now entered an order

1   authorizing the sale of the servicing business to Berkadia.

2   Under our contract, Berkadia is going to take the employees

3   along with the business. We can't deliver the business

4   without the employees.  The employees run this business.

5   These are not assets that have value on a stand alone basis.

6   And if the employees are not paid and threaten to walk off

7   the job, we are in a situation where it may be very difficult

8   to us to realize full value from our contract the amounts

9   many, many, many millions of dollars far in excess of what

10  we're proposing to pay these employees.  Second, I'm going

11  to, as I get into the numbers, hand up to Your Honor a chart

12  where we have put in place the amounts that we are asking to

13  pay under each of these plans to the employees and the

14  amounts that we have estimated will be assumed by Berkadia

15  when these employees go over to Berkadia.  And this is

16  because we would, assuming the sale closes with Berkadia, we

17  would only be paying these prepetition claims in the ordinary

18  course of business up through the time of the sale.  And

19  Berkadia would pick up and pay all of the claims that come

20  due under those employee compensation programs on a going

21  forward basis.  Now it is true that the contract has an

22  adjustment to the purchase price for the costs of these

23  claims that Berkadia will assume.  And so they get a purchase

24  price reduction of 57% of the cost, but they're going to pay

25  the claims from and after the closing.  So the cost to the

1  Debtor assuming the closing is far less than the actual total

2  cost to the plan if there is no closing.

3        Now prior to today's hearing, we had extensive

4  discussion with the Creditors Committee and its advisors

5  about these plans in an effort to reach agreement, in an

6  effort to reach agreement on or support, I should say, from

7  the Committee to go forward.  And I'm pleased to say that

8  with the adjustments that I will bring to the Court's

9  attention, the Committee has given its full support for these

10  plans and for the payment of the plans in the order that I

11  will, that I will describe to the Court as we go through it.

12        May I hand up a chart so it makes it easier for Your

13  Honor to follow as I go through it?

14        THE COURT:  Yes.  Mr. McMahon, you look like - -

15        MR. MCMAHON:  At the close of his presentation.

16        THE COURT:  Okay.

17        MR. KESSLER:  So, Your Honor, the demonstrative

18  exhibit that I've handed to you shows the dollar amounts that

19  we're asking the Court to approve today, assuming a sale to

20  Berkadia, and that what it would cost the estate if approved

21  and there was no sale to Berkadia.

22        The first category on the chart is the commissions.

23  With our agreement, the agreement that we reached with the

24  Committee to support these payments provides that the

25  prepetition commissions that were earned as part of the

1    normal compensation by loan originators upon can be paid upon

2    Court approval for those commissions that have, that were

3    earned prior to the commencement date provided; however, that

4    any individual in the group who would be paid a commission, a

5    past due commission, in excess of a $150,000.00 would wait

6    for the excess over the $150,000.00 until the closing of the

7    servicing sale to Berkadia.  As a result of that agreement

8    with the Committee, the cost of the prepetition commission

9    program would be $1,023,299.00 upon Court approval.  And

10   there would be an additional $391,244.00 which is the excess

11   amounts to employees who would get commissions over a

12   $150,000.00 that would be deferred until closing of a

13   servicing sale.  And those two numbers would apply whether we

14   sell to Berkadia or sell to any other party assuming that

15   Berkadia - - when we did this chart, we didn't know whether

16   the Berkadia sale would be approved today so I'll say today

17   that if the Berkadia sale doesn't close for any reason and we

18   sell to someone else.

19          The second category of claims that we're asking to

20   pay are the 2008 and 2009 bonus plan payments that remained

21   that were earned prepetition and remained unpaid as of the

22   commencement date.  And Your Honor can see that there is one

23   million, assuming a sale to Berkadia, we're asking the Court

24   to approve $1,273,000.00 that would be paid on 12/31/2009 and

25   $763,000.00 would be paid to North American Servicing and

1  Mortgage banking employees that are being, that would be

2  assumed by Berkadia, and another $1,387,000.00 that is

3  payable on March 31st of 2010.  Of that amount $1,313,000.00

4  payable to the servicing and mortgage banking employees will

5  be assumed by Berkadia and the Debtor would only have to pay

6  the difference.  Now these numbers are assuming that the sale

7  takes place on December 31st of 2009.  In the event the

8  Berkadia closing is on or after the payment date for the 2008

9  and 2009 bonus plans and the Debtors have an obligation,

10  would have an obligation to make the December 31 payments

11  before the closing.  Right now, the Berkadia sale has a

12  deadline for closing of December 31st so I don't think the

13  footnote should be relevant on a Berkadia sale.  If there is

14  no sale to Berkadia, the 2008/2009 bonus plans would cost the

15  Debtors $2,036.00 on 12/31/2009 and there'd be no assumption

16  by Berkadia and $2,700,000.00 - - I think I misstated the

17  first one; $2,036,000.00 on 12/31/09 and another

18  $2,700,000.00 on 3/31/10; again no assumption by Berkadia

19  under that example.  And lastly, we have the deferred awards

20  that are payable at some point in the future.  If we have a

21  Berkadia sale there would be no amount paid by the Debtor.

22  And upon closing of the sale to Berkadia, they would assume

23  the full $9,800,000.00 due under this program.  If there is

24  no sale to Berkadia, the Debtor would be obligated to pay the

25  $9,800,000.00.  And the agreement with the Committee would

1  alter the payment schedule on this amount to make 50% payable

2  one month after the closing of an alternative servicing sale

3  and 50% payable one year after closing of the alternative

4  servicing sale.  And the full amount would be payable upon

5  any employee being terminated without cause.  He would still

6  retain his deferred award.

7       Your Honor, we also have an agreement with the

8  Creditors Committee with respect to the severance plan;

9  however, that agreement is that the severance plan will be

10  honored and respected by the Committee, but we will continue

11  to work with the Committee to try to fold in the severance

12  plan, the prepetition earned severance with a post petition

13  performance bonus plan; retention bonus plan for the

14  applicable individuals so that we can have one type of

15  retention and bonus plan that incorporates severance,

16  prepetition severance earned with it.  So we have no numbers

17  for that today.  We just have an agreement to keep those

18  severance plans in mind as we continue to negotiate.

19       I want to emphasize again that we are not asking

20  today for the payment of any of the 2008/2009 bonus plans to

21  insiders.  This is only to non-insiders nor are we asking to

22  pay insiders on the deferred awards.  We are asking the Court

23  today to bifurcate the hearing and simply asking for approval

24  of the payment of the amounts that are on your chart and

25  leave until December 10th when we will put on additional, we

1  will put on evidence at that time on the issues of insiders

2  vs. non-insider and try to meet the standards that Your Honor

3  has set forth in detail in the *Foothills* Texas case.  The

4  amounts here are what we believe should be payable to the

5  people we believe to be non-insiders.  To the extent on

6  December 10th it's determined by the Court that certain

7  individuals on our non-insider list should really be

8  insiders, than these amounts would go down accordingly.  But

9  all we're asking for today is to approve the plans leading

10  over so that we can tell the employees that they've been

11  approved and, and get those issues out of the way and leave

12  until later the issue of who is an insider, who is not.  The

13  reason we're leaving until December 10th the issue of who is

14  and who is not an insider is to give the Committee and the

15  United States Trustee's office additional time to review the

16  tables that we will present of the names of the individuals,

17  the types of bonuses, and deferred awards they're entitled to

18  and what their positions are and what not so they can be

19  better prepared to either confer with us and/or cross examine

20  at the hearing.

21          Now I'm prepared to put Mr. Jay Levine the CEO of

22  the company on the witness stand and, and get his testimony

23  with respect to the fact situation of the company that we

24  believe would meet the necessity of payment doctrine for

25  these commissions.

1            THE COURT:  All right, let's hear from Mr. McMahon.

2            MR. MCMAHON:  Your Honor, good afternoon, Joseph

3    McMahon for United States Trustee.  We ask that the entire

4    hearing on this motion be moved to December 10th and here's

5    why.  In connection with evaluating the relief that was

6    sought by the motion, the Debtors have indicated that in

7    their brief and, I guess, to our office that they have, are

8    working on identifying this insider, non-insider split.  They

9    have indicated what factors they're taking into account in

10   making that determination.  But as late as, we made the

11   request, I believe, last Thursday.  We spoke with them again

12   on Sunday requesting the list of employees that are thought

13   to be paid pursuant to this motion.  And as Debtors' counsel

14   indicated on the record today, we still do not have a defined

15   universe from the Debtors' perspective as to what constitutes

16   an insider or not.

17           THE COURT:  I thought I heard no monies going out

18   the door until I make that determination under the bonus plan

19   category.

20           MR. KESSLER:  Yes, the commissions would go out the

21   door, the two bonus plans, deferred awards, and 2008/2009

22   bonus plans would not go out the door - -

23           THE COURT:  And any insider, this is the maximum

24   amount that will get paid.  And as people are determined if

25

1  they are to be insiders, they won't get paid.  And that the

2  aggregate number will go down?

3          MR. KESSLER:  Correct.

4          THE COURT:  I just wanted to clarify.  I'm sorry,

5  Mr. McMahon.

6          MR. MCMAHON:  From our perspective, Your Honor,

7  splitting up the hearing on who gets paid from the need for

8  payment is cumbersome; certainly, not preferable from our

9  office's perspective.  And it just, you know, some of the

10  issues dealing with necessity certainly get involved in the

11  granular facts as to who you're trying to pay or not.  And I

12  appreciate the fact that the Court has indicated or no

13  payments can be made until we get to the bottom of the

14  insider, non-insider issue.  Well we don't even have base

15  level data as to who is getting paid on the non-insider side

16  of matters such that we can take a look at it.  So in light

17  of the circumstances, while I appreciate the fact that the

18  company's want some level of resolution on this issue sooner

19  rather than later, it makes sense from our office's

20  perspective to put it over to the 10th in its entirety.  To

21  the extent that the Court wants to deal with the commission

22  issue today alone that's the, you know, little bit or

23  approximately $1.4 million dollars, we're prepared to do

24  that.  But the balance of the relief, Your Honor, that should

25  be pushed off to the 10th.

1            THE COURT:  All right, thank you.  Ms. Caton.

2            MS. CATON:  Thank you, Your Honor, Amy Caton from

3    Kramer Levin.  First of all, I'd like to apologize for my

4    inattention earlier.  I was trying to send an update to our

5    Committee and I'll find a more appropriate way to do that the

6    next time.

7            THE COURT:  No, no, that's fine.

8            MS. CATON:  First of all, Your Honor, we had

9    originally sought to postpone this motion until the 10th as

10   well.  We were uncomfortable with some of the Debtors'

11   numbers and we didn't feel like we had adequate time to

12   review the information; however, our advisors [indiscernible]

13   worked for several days with the Debtors to go through these

14   numbers on an employee by employee basis.  And we've come to

15   the conclusion that the numbers are reasonable.  They're for

16   prepetition amounts.  And as the Debtor said, we expect that

17   the numbers, particularly with respect to severance, are

18   going to be taken into account with respect to any future

19   retention plans that are proposed.  While we understand the

20   U.S. Trustee's frustration given that these amounts appear to

21   be reasonable and necessary, we really would prefer to have

22   this heard today so that we could get our maximum benefit of

23   stabilizing the estate today and keep people from leaving.

24   And I'd also just once again note that these are prepetition

25   amounts due.  They're not amounts due under 503 or seeking,

1   the Debtors are not seeking approval of a 503(c) plan.  And I

2   don't think that the, while they offer to distinguish between

3   insider and non-insiders, I'm not sure that it's necessary

4   here.

5           THE COURT:  While I, that last argument I don't

6   think holds water.

7           MS. CATON:  Fair enough.  Thank you, Your Honor.

8           MR. MAYER:  Point of inquiry, Your Honor.  The

9   Committee indicated they had employee level detail.  If they

10  did, I'm wondering why our office didn't have that in hand

11  earlier.

12          MR. KESSLER:  I believe if I'm correct that your

13  office has the full list of employees who are receiving, to

14  receive the commission payments, is that correct?

15          THE COURT:  Did you have this conversation offline?

16          MR. KESSLER:  The - -

17          THE COURT:  Just figure it out over there and then

18  you can talk to me about.  Just step aside, figure out what

19  he has, what he doesn't have, and then let me know if there's

20  still a problem.

21          MR. KESSLER:  The reason they don't have the names

22  of the people, Your Honor, is because we've been endeavoring

23  to go through a very rigid exercise with the client with

24  analyzing the job functions of each of the people against

25  Your Honor's *Foothills* Texas case.  This is a company that

 1  has many people who have officer positions which is very

 2  common in the industry.  But we will endeavor to show that

 3  many of those people, most of those people are not insiders

 4  based on the job function they have and utilizing Your

 5  Honor's decision that allows the presumption to be overcome

 6  with evidence.  And we're going through that analysis first

 7  within the company, then company to lawyers, and changing it

 8  on a regular basis.  And we're agreeable to deferring that

 9  analysis to December 10th but as you heard from me and from

10  Ms. Caton, we feel there's a huge need for laying the fears

11  of the employees to let them know that we're going to, that

12  we have the ability to pay them if they're not an insider.

13          THE COURT:  I agree.  I'm going to deny the motion

14  and continue.  And I'll hear the first phase which is in

15  connection with the bonuses which is the amount and the

16  necessity of the program.  And I'll hear the commission's

17  motion and we'll wait until December 10th to deal with who

18  actually gets money and who doesn't.

19          MR. KESSLER:  So may I - -

20          THE COURT:  And I just want to comment.  I

21  understand the Committee's position but it would be my

22  position that even though these are payments that were earned

23  prepetition under a prepetition bonus plan that, nonetheless,

24  seeking to pay them post petition and, in effect, give them

25  administrative claim status implicates 503(c).

 1          MR. KESSLER:  Okay, Your Honor.  May I call Mr.

 2   Levine to the witness stand?

 3          THE COURT:  Yes.

 4               JAY LEVINE, DEBTOR'S WITNESS, SWORN

 5          THE CLERK:  Please state your full name for the

 6   record.

 7          MR. LEVINE:  Jay Levine, J-a-y, L-e-v-i-n-e.

 8                    DIRECT EXAMINATION

 9   BY MR. KESSLER:

10   Q.  Mr. Levine, you're employed by Capmark Financial Group,

11   Inc., is that correct?

12   A.  That is correct.

13   Q.  And what is your title?

14   A.  President and CEO.

15   Q.  And how long have you held this position?

16   A.  Since the beginning of this year.

17   Q.  And as President and CEO of Capmark Financial Group, Inc.

18   or what we refer to frequently as CFGI, are you familiar with

19   the company's commission program?

20   A.  Yes, I am.

21   Q.  Are you familiar with the 2008/2009 bonus plan?

22   A.  Yes, I am.

23   Q.  And are you familiar with the deferred awards program?

24   A.  Yes, I am.

25   Q.  And are you also familiar with the severance program?

1   A.   Yes, I am.

2   Q.   And in connection with your job as CEO of the company,

3   have you had discussion with employees since the filing of

4   this bankruptcy case concerning the payment of the

5   commissions, the bonuses, and deferred awards with various

6   groups of employees?

7   A.   At length.

8   Q.   And can you briefly describe for the Court the

9   discussions that you had with the employees?

10  A.   Sure.   In a nutshell with respect to the commissioned

11  employees, they've been highly concerned as a result of the

12  postponement and the first day hearing of whether or not

13  commissions would be affirmed going forward.   We let them

14  know that it was to be dealt with today.   And they should

15  remain comfortable and continue to do business, closed

16  business on behalf of customers and the company.

17          MR. MAYER:   Objection; hearsay.

18          MR. KESSLER:   Your Honor, I don't believe it's

19  hearsay for him to testify about what he knows or I'll change

20  the question to overcome the hearsay if you like?

21          THE COURT:   Well to the extent he's telling you what

22  employees told him, yes its hearsay.   But to the extent he

23  has an opinion as a fact witness based on what people have

24  told him on what effects may or may not occur in connection

25  with having the program, I think he can testify to that.

1       MR. KESSLER:  And thank you, Your Honor, I was going

2  to correct my question.

3  BY MR. KESSLER:

4  Q.  Based on information that you have in conversations with

5  employees or otherwise, do you have an understanding or an

6  opinion of the employees' position with respect to the non-

7  payment to date of their commissions?

8  A.  Yes, I do have an opinion.

9  Q.  Explain your opinion or understanding.

10 A.  My opinion is at this point employees are quite upset and

11 uncertain as to what the program will be put in place.  My

12 knowledge is its highly unusual for a company like ours to be

13 in bankruptcy and still be able to conduct business the way

14 we have.  And employees want certainty as I think most would

15 that the business they bring in will produce the income

16 they've gotten in the past.

17 Q.  And based on the discussions that you've had with

18 employees, do you have an opinion or understanding as to

19 whether they will or would threaten to leave the employ of

20 Capmark if their commission payments are not approved for

21 payment by the Court?

22 A.  I do have the belief that many of them would be ready to

23 leave if their payments, both prospective and retrospective

24 weren't made.

25

1    Q.  And do you have any information other than the fact of

2    your discussions with the employees about the possibility of

3    that?

4    A.  We've received information from competitors who we know

5    have been speaking with many of our important producers.

6    Matter of fact, we've received a letter from someone who has

7    expressed that clients have or - -

8              THE COURT:  Sustained; that's hearsay.

9    BY MR. KESSLER:

10   Q.  Do you have a copy of that letter with you?

11   A.  Yes, I do.

12   Q.  Do you have it in front of you?

13   A.  Yes, I do.

14             THE COURT:  It's hearsay.  What are you doing?

15             MR. KESSLER:  Can I ask him some questions?

16             THE COURT:  All right; yes you may.

17   BY MR. KESSLER:

18   Q.  Who was the letter received from?

19   A.  The letter was received from Love Funding.

20   Q.  And can you briefly describe what Love Funding has said

21   in the letter?

22   A.  Love Funding is a large FHA loan originator who had, it

23   was aware that PNC was potentially acquiring part of the

24   business, didn't necessarily want all the people and

25   expressed an interest in that division of the company.  And,

1  in particular, went out of their way to say that many of the

2  employees had already contacted them in advance.

3          THE COURT:  Sustained.

4  BY MR. KESSLER:

5  Q.  Did you believe the letter when you read it?

6          MR. MAYER:  Objection.

7  A.  Yes.

8          THE COURT:  Well he can testify as to whether he

9  believed it, but the substance of it is not in, the substance

10 of it is not in evidence.

11 MR. KESSLER:

12 Q.  Based on your review of this letter, do you have an

13 opinion as to whether the employees might leave for other

14 opportunities in the origination field?

15 A.  I do believe that many of the employees have been looking

16 and would be interested in leaving.

17 Q.  Are you familiar with the asset purchase agreement for

18 sale, the servicing business to Berkadia?

19 A.  Generally.

20 Q.  Are you aware of any provisions of the contract that

21 provide for Berkadia to assume the employment of employees?

22 A.  Yes.

23 Q.  And what does the agreement provide, to the best of your

24 knowledge?

25 A.  To the best of my knowledge, the agreement provides for

1  Berkadia to pick up and assume the, all the employees of the

2  mortgage banking and servicing division.

3  Q.  And is it also your understanding that they are

4  purchasing the mortgage banking and servicing business as

5  part of the contract?

6  A.  Yes.

7  Q.  Is, in your opinion can the mortgage servicing and

8  banking business be conveyed without the employees as an

9  ongoing business?

10  A.  It's not really a business without the people.

11  Q.  Mr. Levine, have any other facts come to you that would

12  give rise to an opinion as to whether or not the failure to

13  pay the employees their commissions or other awards here

14  would give rise to their leaving the employ of the company?

15  A.  Well I'm aware of general unease in the company.  I am

16  very aware that without some certainty as to the plans that

17  were put in place to actually retain employees through this

18  difficult period that we have been experiencing that many

19  employees will look.  We have actually lost a number of key

20  employees of late.  I can't say specifically whether it was

21  due to the fact we haven't affirmed these plans, but I am

22  aware there are jobs out there.  And we are and many of the

23  key employees that we need for asset management for a

24  transition to Berkadia and to make sure we are able to

25

1    effectuate that sale are people that are affected by these

2    plans.

3    Q.  And your testimony has been primarily to this point about

4    the payment of the commissions.  Does the testimony that you

5    gave apply equally as well to the authorization to pay the

6    2008 and 2009 bonuses?

7    A.  Yes, it does.

8    Q.  And does it apply equally as well to the payment of the

9    deferred awards?

10   A.  Yes, it does.

11   Q.  And does it also apply to the company honoring the

12   severance programs?

13   A.  Yes, it does.

14   Q.  Although the severance program payments would not be

15   payable unless the company actually severed the employment of

16   employees, correct?

17   A.  Correct.

18   Q.  Those severance payments would not be payable if the

19   people continued in their employment with the company,

20   correct?  And it would not be payable if the employees

21   transferred over to Berkadia?

22   A.  Correct.

23   Q.  Okay.

24          MR. KESSLER:  I don't have any other questions, Your

25   Honor.

1           THE COURT:  Very good.  Cross.

2                      CROSS EXAMINATION

3    BY MR. MMCMAHON:

4    Q.  Sir, good afternoon.

5    A.  Afternoon.

6    Q.  A few questions with respect to what's being put forth

7    before the Bankruptcy Court.  First, the deferred awards,

8    what are the criteria for earning those bonuses?

9    A.  Those awards were a part of compensation for business

10   generated in years past that were used to retain key

11   employees and, in particular, key producers from business

12   that was generated in '06, '07, and '08.

13   Q.  And those criteria were established at the beginning of a

14   calendar fiscal year, is that correct?

15   A.  Yes.

16   Q.  Thank you.  And under the deferred award's plan, is there

17   an administrator person or a board in charge of administering

18   that program?

19   A.  Linda Pickles our head of HR administers that plan.

20   Q.  Okay.  And does that person have any discretionary

21   authority with respect to the targets that were set with

22   respect to those plans?

23   A.  I don't understand the question; I'm sorry.

24   Q.  Sure.  You testified that the deferred awards are

25   production type awards.  And if I understand your testimony

1  correctly, the criteria for earning the bonuses are set at

2  the beginning of a fiscal calendar year, correct?

3  A.  I want to make sure we're both talking about the same

4  thing.  If you're talking about the deferred award for

5  producers, those specifically were a part of their

6  commissions they generated based on the business they

7  generated in that particular year.  And that's different than

8  bonuses.  There was a portion of their commissions that were

9  held back that otherwise wouldn't have been paid.

10 Q.  All right, so I'm going by the organization you have in

11 the Debtors' brief so you're seeking payment of prepetition

12 commissions in the approximate amount of $1.4 million

13 dollars, correct?

14 A.  Okay.  I think we're talking about different numbers then

15 if we're talking about that.

16 Q.  Okay.

17 A.  If they're part of a prepetition - -

18 Q.  Now - -

19 A.  $1.0 million dollars is a different number.

20 Q.  And your bonus and award's program is something different

21 that has a discretionary aspect and there's the deferred

22 aspect, correct?

23 A.  Those are three different things.

24 Q.  Now the deferred award's program my question is the

25 criteria for earning those bonuses, are they set at the

1  beginning of a measuring period, a calendar year or fiscal

2  year?

3  A.  Let me just ask one more question, let's go through it.

4  We have the commissions.  We have the bonuses.  And we have

5  what we call the deferred commissions.  Which one are we

6  talking about?

7            THE COURT:  Its deferred awards on your table - -

8            MR. LEVINE:  I don't have the exact schedules - -

9            THE COURT:  And maybe that's, I think what Mr.

10  McMahon is asking is, is there a specific criteria that is

11  established when you start a cycle under the deferred award's

12  program for what someone is going to get or not get?  I think

13  you said it's a deferred portion of their commissions?

14            MR. LEVINE:  Let me just make sure I'm clear from

15  Mr. Kessler if I may ask.  The deferred awards are the bonus

16  period, are they bonus or they not bonus?

17            THE COURT:  Well if you don't know, you can't ask

18  Mr. Kessler for help.  So you don't know.

19            MR. LEVINE:  I just want to be clear which ones

20  we're talking about.

21            MR. MCMAHON:  Your Honor, may I approach the

22  witness?

23            THE COURT:  Yes.

24            MR. LEVINE:  We refer to them - -

25  BY MR. MCMAHON:

1  Q.  And for the record what I've handed the witness is a copy

2  of the exhibit Mr. Kessler gave to the Court during argument.

3  A.  Now I'm going to deferred awards on the bottom are the

4  portions of commissions from prior years.

5  Q.  Okay.

6  A.  And those are not bonuses.  Those are not discretionary.

7  Those were totally related to production earned and business

8  generated in those years.

9  Q.  Okay.  And

10  A.  Apologies.

11  Q.  And it's purely a production award based upon criteria

12  that is set temporarily one.  Is it set at the beginning of a

13  calendar year or a fiscal year?

14  A.  I'm not sure its criteria as much as it was as portion of

15  the revenue generated by that individual, a portion was held

16  back.

17  Q.  I understand that, but they're getting a cut, right, a

18  percentage of the generation, correct?

19  A.  Right.

20  Q.  Right.  And when is that percentage set?

21  A.  It was reviewed annually.

22  Q.  I'm sorry?

23  A.  It was reviewed annually to the best of my knowledge.

24  Q.  Okay.  And the employee knew at the beginning of the year

25  what the percentage cut would be?

1   A.   Yes.

2   Q.   And did they have to reach a particular target

3   production-wise in order to earn the bonus?

4   A.   One, I'm not sure of the exact answer, but to earn the

5   bonus they were generally paid commission based on the

6   business they did.

7   Q.   Okay.  Well was it zero on up?  Meaning if you made

8   $1.00, you got a percentage cut?

9   A.   Yes.

10  Q.   And, therefore, - -

11  A.   Once you covered a minimum level which was generally low,

12  you were paid a percentage of what you generated for the

13  firm.

14  Q.   Over and above the minimum level or just once you, once

15  you reached the minimum level you vested?

16  A.   I think there's two different questions.  In general, the

17  earnings came from, they were paid a piece of the revenue

18  generated for the firm.  So if an individual generated

19  $500,000.00 of revenue for the firm, if he was for, argument-

20  sake, paid 50% of the revenue generated, he would have been

21  entitled to $250,000.00 for that year of business generated.

22  And then a portion of that would have been held back.

23         THE COURT:  So his commission is $250,000.00 under

24  your hypothetical?

25         MR. LEVINE:  Correct.

1          THE COURT:  And he doesn't get all of that?

2          MR. LEVINE:  Correct.

3          THE COURT:  There's a deferred piece?

4          MR. LEVINE:  Yes.

5          THE COURT:  And that applies to every commission he

6   earns?

7          MR. LEVINE:  Yes.

8          THE COURT:  And do the percentages stay constant

9   throughout or do they rise or fall by level of business?  So

10  a guy who brings in a million dollars gets the same

11  percentage commission and the same percentage deferred award

12  as a guy that gets $10 million dollars?

13         MR. LEVINE:  There were various plans for different

14  offices and different individuals.

15         THE COURT:  Based on their business units, etc?

16         MR. LEVINE:  Correct.

17         THE COURT:  All right.  Now the part that's deferred

18  the piece of the whole commission that's deferred that's set

19  ahead of time?

20         MR. LEVINE:  Correct.

21  MR. MCMAHON:

22  Q.  The 2008 and 2009 bonus plans, what are the criteria for

23  those awards?  How are they paid?

24  A.  Sure.  Let's pick them one at a time.  The 2008 bonus,

25  anybody that receives a bonus it's a discretionary bonus set

 1 by their manager.  The, usually the person that ultimately

 2 that manager reports to all rolled into one program based on

 3 performance of the individual, performance of the group,

 4 performance of the overall firm and ultimately approved by

 5 the, was the former compensation committee of the Capmark

 6 Board of Directors.

 7 Q.  All right.

 8 A.  As part of an overall pool established by the board.

 9 Q.  And that is a year end review?

10 A.  Yes, it is.  It's generally done in the first quarter

11 after a year completes.

12 Q.  Okay.  And do you have a sense on average what an

13 employee who might I guess potentially earn so far as a range

14 under this, under the '08 bonus plan?  In other words, what's

15 the maximum award given any single individual under it?  Do

16 you know?

17 A.  There was a dramatic range and I'm not aware of the

18 maximum for '08.

19 Q.  Who determines those awards for insiders?

20         MR. KESSLER:  Objection; calls for legal conclusion,

21 Your Honor.

22         THE COURT:  Yeah we're going to get into what's an

23 insider, what's not an insider.

24 BY MR. MCMAHON:

25 Q.  The '09 plan any different in terms of its mechanics?

1   A.   No, it was based on recommendations for key employees and

2   to be fair, there were differences.  The '08 plan if I can

3   explain the difference for a minute. The '08 plan was one

4   that was put in place when I arrived. We made the decision,

5   the executive committee made the decision in March of '08

6   when we paid out the '08 bonuses which were down dramatically

7   from the '07 bonuses.  We made the decision to use,

8   unfortunately, any employee who had a bonus over $50,000.00,

9   which was not a large number of employees, we made the

10  decision to hold back a material amount of that amount, the

11  amount over $50,000.00 and spread it out over four quarters.

12  So where the '08 money comes from was it was a former

13  retention tool to hold the employees at the firm and that's

14  the money that we're talking about here.

15  Q.   You testified regarding your impressions of necessity and

16  whether or not the payments are necessary in order to keep

17  the business alive which is really what we're here for today.

18  Of the, I guess, what, how many employees have left the

19  Debtors' employ post petition that might be entitled to

20  awards under this program, any of the three plans you have

21  here?

22  A.   A handful.

23  Q.   I'm sorry?

24  A.   A handful.

25  Q.   What's that less than - -

1  A.  Between 5 and 10.

2  Q.  And is the fact that they left a fact they're entitlement

3  to be paid under one or more of the programs?

4  A.  Absolutely.  You have to be here to collect it.

5  Q.  And to be clear, we're talking about, that's for the

6  commissions, the '08 and '09 bonus plans and deferred awards,

7  all three?

8  A.  For any of those the firm policy is you have to be here

9  to collect any of those.

10      MR. MCMAHON:  Your Honor, I don't have any further

11  questions for the witness.

12      THE COURT:  All right, any other cross?  Redirect?

13  Any redirect?

14      MR. KESSLER:  No, Your Honor.

15      THE COURT:  Thank you.  You may step down.

16      MR. LEVINE:  Thank you.

17      MR. KESSLER:  Your Honor, that concludes our

18  testimony.  I'd like to just briefly make a little more

19  argument in connection with the bonus plan.

20      As you heard from, from Mr. Levine employees have to

21  be here to collect.  That is really the crux of the problem.

22  They're here so long as they, there's still an opportunity to

23  collect.  The fear, the logical fear is that if the Court

24  says you can't collect, there's no reason for them to remain

25  with us and the fear gets extremely greater that they will

1   leave for another opportunity.  It's, it's a necessity of

2   keeping the employees, we believe, company believes, to pay

3   them what they've been promised on the dates that they were

4   promised to be paid.  You heard from Mr. Levine that some of

5   their bonus awards were deferred so that the employees could

6   and would be encouraged to stay with the company.  And to not

7   pay them now is almost like telling them that they were

8   induced to stay under some form of false pretense.  And we

9   can logically conclude from that, that we created more and

10  more incentive for them to leave.  The amount of money we're

11  talking here is in relation to putting the Berkadia sale at

12  risk, it just doesn't make sense to us.  We, whether you

13  believe that they would leave for sure or believe that there

14  would be a risk of their leaving, I don't believe that that

15  either of those conclusions affects the necessity of payment

16  doctrine.  We frequently approve payment for example to

17  critical vendors because we believe they won't ship.  We

18  don't know for certain that they won't ship if we don't pay

19  them.  We say, we come into Court and we say they have

20  threatened to stop shipping.  They have told us they won't

21  ship unless we pay their prepetition bills.  If they don't

22  ship, we won't have inventory for the Christmas season.  But

23  the standard is rarely that if we don't pay them, they will

24  absolutely, they will absolutely refuse to do business.  I

25  think the same standards should apply here.  We have to apply

1    a standard of what is reasonable under the circumstances.

2    What are the risks that we should and should not take with

3    respect to affecting the business on an ongoing basis.  I

4    believe that's what the Committee analyzed and that's why the

5    Committee, who at first was not persuaded, came around to

6    thinking along the same lines as the company and agreed that

7    it was in the best interest of the estates that these people

8    be paid.  I can't guarantee you that someone is going to walk

9    out the door. We're just dealing with risks here.

10              THE COURT:  Understood.

11              MR. KESSLER:  Thank you.

12              THE COURT:  Ms. Caton, any comment?  Nothing

13   further?

14              MS. CATON:  No, Your Honor.

15              THE COURT:  Okay.  Mr. McMahon.

16              MR. MCMAHON:  It's the Debtors' burden to carry the

17   record today, Your Honor, with the demonstration that they

18   satisfy the doctrine of necessity.  And necessity, Your

19   Honor, I think if we're going to start injecting the word

20   risk into our arguments there's obviously a risk that a

21   meteorite could hit my house today.  I hope it doesn't, but

22   certainly it's the type of thing that this Court looks at in

23   terms of evaluating the record.  What is the real harm to the

24   Debtors if the payments aren't made.  Had the Debtors made a

25   showing, a real evidentiary showing not in statements, not

1   trying to, you know, by statements from counsel that he heard

2   from an attorney that are hearsay, not by, you know, trying

3   to introduce a hearsay letter at the hearing, but in, not by,

4   you know, the Debtors' CEO impression that, you know, things

5   are tense around the company.  What really does the record

6   bear out here.  Well, the only thing factual from the

7   standpoint of necessity that's been born out is that really

8   that five people have left since the petition date.  I don't

9   think that the record that has been made here, Your Honor,

10  certainly rises to the level to give this court sufficient

11  pause from the standpoint that the business is going to shut

12  down tomorrow if these payments aren't made.  We've, you

13  know, we can go through the myriad analyses associated with

14  the reasons why we believe that's the case, but at bottom

15  it's more than just a Committee non-objection.  We think

16  there's a risk.  I don't think the evidentiary record really

17  has born that out.  Third Circuit law requires something

18  stricter than that to, to carry the day insofar as an

19  evidentiary showing.  And, you know, with respect to Your

20  Honor's observation regarding the inner play of 503(c) and

21  the doctrine of necessity, it's, it would be high irony, at

22  least, to the extent that for insiders, and we'll get to this

23  issue later, that the, you know, we needed to make the

24  payments in order to retain them was effectively the

25  argument. In other words, that would be I think a bit

 1  counterintuitive with the principles of 503(c), but we'll

 2  carry that point on December 10th.  For today's purposes, I

 3  don't know whether the showings been made.

 4          THE COURT:  All right, thank you.  Well, you can sit

 5  down Mr. Kessler.  I'm going to overrule the objection and

 6  approve the program.  I find that the necessity of payment

 7  doctrine is satisfied to pay these prepetition claims for the

 8  purpose of retaining these employees, to get us to a closing

 9  of a sale that will provide funds to the Debtors' estate well

10  in excess of the maximum potential liability here.  I don't

11  have to check my common sense at the door when I come in

12  here.  And it's simply, it's a reality of life that people

13  who think they're owed a certain amount of money, who have

14  been promised a certain amount of money, and don't get paid

15  it get pretty ticked off and are ready to leave.  I think a

16  good example would be associates who took pay cuts.  They're

17  not happy.  If they can go somewhere else, they will.  I do

18  think that the purpose here is clearly retentive.  And I do

19  think that 503(c)(3) really applies, well 503(c) applies to

20  payment of administrative expense claims.  And you are, in

21  effect, turning a prepetition unsecured claim hearing into an

22  administrative expense claim.  So to 503(c)(3) I find is also

23  satisfied in that these payments are justified by the facts

24  and circumstances of the case.  Now those are for non-

25  insiders.  I think this is a retention plan so if there are

1   proposed payments to insiders 503(c)(1) is not satisfied,

2   we're going to leave that for another day.  And I understand

3   the Debtors' intent is to establish who is and who isn't an

4   insider.  And I don't believe I've heard, as a matter of fact

5   I definitely heard that they didn't intend to pay insiders

6   under this program.  The commissions and the deferred

7   payments are clearly set on a defined system where the

8   employee knows ahead of time what the payout will be based on

9   how he or she, how hard he or she works.  The bonus plans

10  similarly, although they are subject to discretion of

11  management and usually are, are I think, the criteria

12  established today are sufficiently clear to in effect say

13  again they're not giveaways.  And again none of them are

14  going to insiders so I'm not very concerned about that at

15  all.  Overrule the objection.  I'll prepare the motion and do

16  you have a form of order?

17       MR. KESSLER:  Thank you, Your Honor.  May I

18  approach?

19       THE COURT:  Yes.  All right, I'll have a look at it.

20       MR. KESSLER:  I might add that the order you're

21  reviewing, Your Honor, has been reviewed carefully and almost

22  co-written with the Committee's counsel.

23       THE COURT:  So who gets the bill for it?  Okay I'll

24  sign the order.

25

1       MR. KESSLER:  Thank you, Your Honor.  I have two

2   hours and five minutes and only four things left so I think

3   we're on schedule.  If I can, I'd like to turn next to item

4   number 13 on the agenda.  And this is the motion to approve

5   the sale and bidding procedures for the military housing,

6   sale of the military housing business.  This motion was filed

7   on October 30th on full notice.  On November 12th, a revised

8   asset purchase agreement was filed reflecting the inclusion

9   of all of the schedules to be added to that purchase

10  agreement.  And as of the objection deadline, no objections

11  have been filed.  As with all the other motions that Your

12  Honor has heard today, we extended the deadline for the U.S.

13  Trustee and the Committee.  All the parties whose contracts

14  are to be assumed and assigned under the transaction who

15  received notice of the hearing and have received a copy of

16  the revised asset purchase agreement listing their contracts

17  as among the contracts that are being, to be assumed and

18  assigned.  This is, this contract relates to the business of

19  Capmark Financing and Capmark Capital, Inc., two Debtors.

20  And the business, among other things, arranges and provides

21  financing for the United States Government public and private

22  venture capital, excuse me, venture military housing relating

23  projects including privatization of military housing and the

24  origination and servicing of loans relating to military

25  housing.  It's a small nitch business for Capmark.  A few

1  other parties are in the business and it's a relatively small

2  market in the servicing industry.  As a result, we believe

3  there is a very small market of potential purchasers of this

4  business.  Given that there's very limited financing

5  available for these types of projects in the current

6  environment, the military housing business revenues for

7  Capmark has declined significantly in 2008 and 2009.  The

8  business is not a part of the Debtors anticipated

9  reorganization or the Debtors sale of the mortgage servicing

10  business which the Court has now approved.  Additionally, in

11  light of these Chapter 11 cases, financing counterparties are

12  likely unwilling to enter into new military housing

13  transactions with Capmark.  And so in light of the foregoing

14  the financial burden of keeping this business going, a

15  decision was made to market the sale of the military housing

16  business.  We believe it's in the best interest of the estate

17  to do so.  So in this regard before and after the

18  commencement date, the Debtors worked diligently with the

19  financial advisors to explore a sale of military housing.

20  They found a purchaser and have entered into an asset

21  purchase agreement with Jefferies Mortgage Finance Company,

22  Inc. as a stocking horse bidder.  The APA provides for the

23  purchase of only the servicing business of the military

24  housing portion of the Debtors' business but not the loan

25  origination business that is associated with that part of the

1  business.  And that is why we'll come to another motion right

2  after this one.  The purchase price is $9 million dollars.

3  It's subject to certain closing adjustments that will not

4  exceed $500,000.00.  It provides for a breakup fee to

5  Jefferies in the event of a loss of the sale to a higher

6  bidder.  The breakup fee is $250,000.00 which is just under

7  2.8% of the purchase price.  I think well within the range of

8  breakup fees typically approved in this district.  Given the

9  substantial time effort and the funds expended by Jefferies,

10 we also think that the breakup fee is fair and appropriate in

11 the event of a sale to a higher bidder.  If no timely topping

12 bid is received from another bidder, we would request and we

13 believe that a prompt sale of the assets without an auction

14 would be appropriate; however, if we do get a topping bid

15 under the bidding procedures that we would ask the Court to

16 approve today, of course, we would conduct an auction

17 pursuant to those procedures. So the motion today is seeking

18 two separate orders.  First, the bidding procedures order

19 with respect to the military housing business which would

20 provide for the scheduling of an auction if there is another

21 qualifying bid; approval of bidding procedures; approving the

22 breakup fee to Jefferies; scheduling a sale hearing after

23 we've identified the highest bid; establishing an objection

24 deadline and approving the sale hearing form of notice that

25

1  and the notice of assumption and assignment of contracts that

2  would go out to, as part of this process.

3          And the second thing we're asking is for a sale

4  order approving the sale; however, today for obvious reasons.

5  We're not asking for the entry of the sale order.  That part

6  of the motion would be deferred until the sale hearing.

7          Since the motion was filed, we can say there have

8  been some indications of interest for the business.  And

9  following discussions with the Committee, we've agreed to

10  modify the schedule forbidding and sale that's set up in the

11  motion to ensure a little bit of extra time and additional

12  time for third parties to properly review the diligence.  We

13  like to schedule the following dates if acceptable to the

14  Court that we'd have a bidding deadline of December 7th at

15  10:00 a.m.  It was previously November 30th in the motion; a

16  deadline to determine qualified bids of December 8th, one day

17  later.  It was scheduled at December 2nd in the motion; a sale

18  objection deadline of December 4th as opposed to the December

19  1 date that's in the motion; an auction if necessary on

20  December 9; and the sale hearing at our next omnibus hearing

21  dated December 10th at 2:00 p.m.  Additionally, in the motion,

22  Your Honor, as I mentioned earlier, we're asking for approval

23  of the form of bidding procedures which are very similar to

24  the bidding procedures that we adopted in the Berkadia or in

25  the servicing business sale and consistent with generally

1   with bidding procedures used in many, many other 363 sales.

2   We're asking for approval of the breakup fee as I noted

3   earlier; the sale notice and form of notice of assumption and

4   assignment.  We made a couple of other changes to the bidding

5   procedures that have been requested by third parties that

6   relate to qualifications to bids, the form of non-disclosure

7   agreement that must be signed, and so forth.  We've not

8   received any objections and I'd like to ask the Court to

9   approve this motion, at least the portions of the motion that

10  we requested approval today and the dates that we have asked,

11  we've asked the Court for.

12          THE COURT:  Does anyone wish to be heard?  Yes, sir.

13          MR. BRODY:  Good evening, Your Honor, Josh Brody,

14  Kramer Levin on behalf of the Committee. Just to echo some of

15  Mr. Kessler's comments.  We had a number of discussions with

16  the Debtors about the form of order.  And subsequent to the

17  objection, we had been contacted by a potential purchaser who

18  had asked that we move the bidding date out a little more to

19  give them additional time especially given the Thanksgiving

20  holiday weekend coming up, and the Debtors were amendable to

21  that.  And with those changes to the order, we agree it be a

22  good idea for the Debtors to have this order entered.

23          THE COURT:  All right, thank you, anyone else?  Okay

24  I'll approve the motion.  Can I see an order?  You may

25  approach.

1       MR. KESSLER:  We have on the agenda that the United

2  States Trustee's office wanted to make some informal comments

3  on the record but he stepped outside and I see him in the

4  hallway.  Would you like me to get him?

5       THE COURT:  Yeah if you don't mind.

6       MR. KESSLER:  The U.S. Trustee's office asked that

7  some additional language be placed in the order about the

8  payment of the breakup fee, specifically that the breakup fee

9  would only be payable out of proceeds of the sale and would

10  not apply to a sale in a converted Chapter 7 if that were to

11  occur, and we adopted that language.

12       THE COURT:  Okay, thank you.  I'll sign the order as

13  modified.

14       MR. KESSLER:  Thank you.

15       THE COURT:  Moves us to agenda 14, I believe?

16       MR. KESSLER:  Yes, Your Honor.  Item 14 on the

17  agenda is what I'll call a companion motion to the motion to

18  sell military housing.  As I mentioned in my discussion of

19  the military housing sale, Jefferies is buying the servicing

20  business but not the loan origination business.  The Debtor

21  in its military housing business had, has a loan origination

22  or loan commitment, I should say, of $50 million dollars that

23  is fully unfunded which is to say the Debtors have not loaned

24  out any money with respect to that loan.  If the military

25  housing business were to be sold and this loan commitment

1   stay on the books of the Debtor, we would reject the

2   contract, not fund any portion of it, and leave the borrower

3   with a rejection damages claim.  Instead, the Debtors have

4   been able to find a purchaser who is willing, I shouldn't

5   call them a purchaser, an inquirer who is willing to take the

6   $50 million dollar loan commitment for no payment

7   consideration.  Because it has no value since no amounts have

8   been funded and it's at market rates subject to the Court

9   providing an order, I'll call it a comfort order, that gives

10  them good title to the loan commitment.  The benefit to the

11  Debtor is that we don't have to reject the contract and

12  expose ourselves to rejection damages of the borrower.  And

13  we will be freed upon the assignment of this contract of any

14  further liability under that loan commitment.  And so for

15  that reason, we think that it's a reasonable business

16  judgment on the part of the Debtor to assign or transfer this

17  asset notwithstanding the zero consideration.  We don't think

18  it has any value in the market place, but it does have the

19  benefit to us of avoiding the damages.

20          THE COURT:  All right, does anyone wish to be heard?

21          MR. MAYER:  Yes, Tom Mayer for the Creditors

22  Committee.  We support this transaction. Our practice, not

23  involving this case at this time, involves a fair amount of

24  the transfer of debts so it's not an uncommon transaction.  I

25  just wish to state a reservation the Committee does not

1   concede that there would, in fact, be damages from rejection

2   of this contract.  And I hope that does not become an issue

3   in other matters in this case.

4           THE COURT:  All right, understood.

5           MR. KESSLER:  I concur.  I've, if I didn't say it

6   before I would correct to say we would risk a claim being

7   made, whatever might happen with that claim is not being - -

8           THE COURT:  Anyone else?  All right, I'll approve

9   the motion and sign the order.  You're welcome.  So I think

10  at this point, I've signed the order, at this point we've got

11  cash collateral and the Premier Asset Management motion,

12  correct?

13          MR. KESSLER:  And we have one other item and that's

14  the order on ordinary course professionals which Mr. McMahon

15  said he wanted more time to review.  And I think that he's

16  had some conversation with one of my colleagues about a

17  slight adjustment to that. Since we're talking about it, I

18  don't know if you want to do it now or?

19          THE COURT:  Well is it, in effect, resolved, Mr.

20  McMahon, subject to some language?

21          MR. MCMAHON:  I believe it is, yes.

22          THE COURT:  All right, why don't you just submit it

23  under certification of counsel.

24          MR. KESSLER:  If I may, I move to item 15 which is

25  the sale of the Premier Asset Management Company.  This is

1    another, and by the way this is docket numbers 175, 176, 177,

2    and 186.  This is another motion for a sale under Section

3    363, 365, etc., Your Honor.  A little different from the

4    other 363 motions we filed so far in this case.  But it does

5    ask for the following: the Debtor, I believe its CFI owns a

6    Japanese subsidiary.  The Japanese called Premier Asset

7    Management Company owns a 100% of the equity in that

8    subsidiary. The Japanese subsidiary does loan servicing in

9    Japan.  The motion before Your Honor is to sell the equity of

10   that Japanese subsidiary.  And we have a stocking horse

11   bidder by the name of Sandringham Investments.  Now the

12   contract that was signed prepetition with Premier provides

13   that if the Debtor enters Chapter 11, we would seek an order

14   authorizing this sale as a private sale without additional

15   bidding.  And if this Court were to not permit the sale as a

16   private sale then we would go through the typical bidding

17   procedures using Premier as a stocking horse bidder.  The

18   Debtors marketed this, the equity of this company for

19   approximately six months to the commencement date and

20   received only two offers of interest due in part, we believe,

21   to the very complicated process of transferring Premier's

22   business under Japanese regulatory requirements and other

23   practical business considerations.  By the sale of Premier,

24   we're going to, we believe, maximum the value received for

25   this business and recapture CFI funds which are currently

1 deposited are on deposit as servicer advance reserve accounts

2 in Japan.  My understanding is that under certain regulatory

3 schemes in Japan, the servicer has advanced deposits that are

4 available in the way of cash collateral to cover servicing

5 advances if they're not paid by the servicer.  So under this

6 transaction, the purchaser would purchase the equity of the

7 company and replace the cash deposits that are currently

8 advanced by Premier in Japan.  There is approximately $47

9 million dollars of funds in these accounts.  Twenty-eight

10 million of the $47 million are funds that got to Premier to

11 make the advance as an intercompany loan.  And as a result

12 when this $28 million dollars comes back, it can be

13 repatriated to CFI to a repayment of the intercompany loan.

14 The remainder of the, of the funds are, however, funds that

15 would have to be dividend back to CFI once they come out of

16 the cash collateral account.  And our understanding is that

17 that dividend would not be payable to CFI for some period of

18 time.  And as a result, our purchaser has agreed to increase

19 the cash payment for the equity to cover that additional cash

20 and then, as the owner, take the dividend when the dividend

21 would be payable to it.  This allows CFI to realize a full

22 recovery of the cash that it has on deposit in Japan upon the

23 completion of this sale.  In evaluating the two prepetition

24 proposals or offers, the Debtors included that the purchase

25 of the sale to Sandringham was the best.  The purchase price

1 | under the sale agreement is approximately $23,200,511.00;

2 | that's a conversion from yen with a possible premium on top

3 | of that of another $2,207,140.00.  As I mentioned to you

4 | earlier, the purchase would also free up all the cash that is

5 | coming back to the Debtors.  We have had expression of

6 | interest from other parties.  They have asked to do due

7 | diligence.  They've asked to for an opportunity to make

8 | offers to purchase the company.  One of the parties who is

9 | asking to do that is the party who's been looking around and

10 | kicking the [indiscernible] of this company for a long time

11 | and they're back at it looking again.  So here we are today

12 | asking that the sale be approved on a private sale basis to

13 | Premier.  But in the alternative and if the Premier sale is

14 | not approved, then under a bidding procedures that would ask

15 | for the following date, dates, excuse me:  a bidding deadline

16 | of December 7th; a deadline to determine qualifying bids of

17 | December 10th; a sale objection deadline of December 15th; an

18 | auction if we have more than one qualifying bid of December

19 | 14th; and a sale hearing on December 18th if that's available

20 | on Your Honor's calendar.  In addition, if we have a bidding

21 | process and not a sale to Sandringham, we would seek approval

22 | of a breakup fee, as well as approval of the sale notices

23 | that are attached to the motion, and the notice of assumption

24 | and assignment of contract.  The breakup fee is 50 million

25 | yen which converted to U.S. dollars is approximately

1 | $552,000.00.  It's 2.38% of the purchase price without the

2 | premium; 2.18% of the purchase price if we earn the premium.

3 | Again, I believe, well within the range of reasonableness for

4 | breakup fees in this district.  And especially in the

5 | existing situation where we have a sale of relatively small

6 | dollars that is enormously complex because of the

7 | transnational effect of it and the necessity for the parties

8 | to consider and look at all of the different legal or laws

9 | that would apply to the sale and getting the money

10 | repatriated back to the CFI in the United States.  But if we

11 | pull off this deal and get it done successfully, it's a, it

12 | would be a terrific result for the Debtors' CFI.  I believe

13 | the Committee wanted to be heard on this.  We do not have any

14 | formal objections.

15 | THE COURT:  All right.  Your basic objection was you

16 | wanted an auction I understand if - -

17 | MR. BRODY:  Yes, Your Honor, again Josh Brody for

18 | the Committee.  From the Committee's perspective, I think

19 | it's fairly straightforward.  The bidding procedures are

20 | actually built into the purchase agreement.  Since the filing

21 | of the motion, there have been other parties.  I know that

22 | we've been contacted by who are interested in bidding.  And

23 | the Committee believes that from the estate's perspective,

24 | given this additional interest, and we're not talking about

25 | keeping up bidding procedures for months and months and

1   months.  It's a fairly limited amount of time.  In our view,

2   it just made the most sense to use that fall back position in

3   the agreement to go to a public auction.

4            THE COURT:  Very good.

5            MR. BRODY:  Thank you, Your Honor.

6            THE COURT:  You're welcome.  Anyone else?

7            MR. KESSLER:  I want to correct one thing I made on

8   the, an error I may have made on the record.  The deposits

9   are approximately $75 million dollars that will come back to

10  the Debtor in the form of repayment of the intercompany debt

11  and increase of the purchase price to cover the cash that

12  would only be subject to repatriation by dividend.

13           THE COURT:  Okay.

14           MR. KESSLER:  The total cash to the estate would be

15  in the range of $80 million dollars.

16           THE COURT:  All right, excellent.  Anyone else?  All

17  right, do you have an order?

18           MR. KESSLER:  Yes, Your Honor.  Which one, the

19  private or bidding?

20           THE COURT:  Bidding procedures, wasn't that the

21  deal?

22           MR. BRODY:  Well, Your Honor, again I think if the

23  Debtors were filing a motion seeking first a private sale on

24  the alternative of bidding procedures from our perspective

25

 1  you got the bidding procedures was [indiscernible] to make

 2  the most sense.

 3          THE COURT:  Right and that was the basis of the

 4  resolution.

 5          MR. KESSLER:  No, we haven't resolved it - -

 6          THE COURT:  Oh you haven't resolved it?

 7          MR. KESSLER:  The reason - -

 8          THE COURT:  No I'll put in here, no, no.

 9          MR. KESSLER:  The reason, I'm here asking for

10  private because - -

11          THE COURT:  No, no, no, bidding procedures, bidding

12  procedures.  I have a little note here from this morning,

13  auction if Committee wants one.  It's written right here.

14  You were DOA, Mr. Kessler.  We'll do the 18th at 9:00 a.m.  Oh

15  you wrote in here 10:00 a.m.

16          MR. KESSLER:  It's been a long day, Your Honor.

17          THE COURT:  That's all right.  I'll give you 10:00.

18  I know I'm moving it.  The case I'm moving is not generating

19  $80 million dollars in cash.  All right, I signed the order.

20          MR. KESSLER:  Your Honor, I think we're at the last

21  item on the lengthy agenda and its item number 11.  It's the

22  motion to approve the use of cash collateral scheduled for a

23  final hearing today.  But I'm here asking that it be, that

24  the interim order be extended to December the 10th.  We do

25  have, I believe, an agreement with the secured lenders for a

 1  final order dealing with the use of cash collateral subject

 2  to our continuing to tweak what is an extremely complex

 3  order.  I think we could have had it done today, but the

 4  reason why we're asking to extend the interim order to

 5  December 10th is to give the Committee more time to review and

 6  comment on the order and, frankly, also for us to help

 7  through it and explain the reasoning behind some of the

 8  revision.  So what we're asking for today in the extension of

 9  the interim order is to continue the order almost exactly as

10  it was entered earlier except that we will have the

11  consensual use of an additional $3.1 million dollars of cash

12  per an Exhibit B that is attached to the interim order.  And,

13  in addition, any portion of the cash collateral that was

14  approved in the first interim order that has not already been

15  spent would roll over into the second interim order period.

16  And I'm quite hopeful that when we come back on December 10th,

17  we will have a consensual cash collateral order to hand up.

18  No promises, but I'm hopeful.

19          THE COURT:  Anyone wish to be heard?

20          MR. BRODY:  Your Honor, just to echo Mr. Kessler's

21  comments, we have been in discussions with the Debtors about

22  the cash collateral order, and I think that Mr. Kessler

23  adequately, accurately, rather, expressed the current draft

24  of the final order that's in process is fairly complex.  The

25  Committee had really just seen it for the first time this

1  past Thursday night.  And after discussions with the Debtors

2  and the lenders, they had agreed to move that.  And we are

3  working it through and we hope to come up with a consensual

4  resolution by December 10th, although I'm hoping that maybe

5  Your Honor will use that formulation for the last order,

6  though if the Committee wants it, we'll get it.  But absent

7  that I'm hopeful we can come to a professional resolution.

8          THE COURT:  All right, so you're okay with this

9  order?  I just don't want to make - -

10          MR. BRODY:  Yes, Your Honor, this order is fine.

11          THE COURT:  All right, anyone else?  Yes.

12          MR. SOSNICK:  Good afternoon, Your Honor, I'm Fred

13  Sosnick from Shearman and Sterling on behalf of Citibank.  I

14  think what the Debtor and the Committee both said is

15  accurate.  I think we are pretty close to getting done.  I

16  think just want to be clear that I think this is the last

17  consensual deal we're going to have under the existing

18  framework.  This was a long and hard decision by the lenders

19  to extend under the existing order albeit for only a little

20  bit more money, and I think we really need to get a final

21  resolution done and hope to do it by the 10th.

22          THE COURT:  Okay.  Mr. Kessler, approach with an

23  order please.

24          MR. KESSLER:  Yes, Your Honor.  There's a black line

25  [indiscernible].

1          THE COURT:  Thank you.  Okay I'm signing the order.

2          MR. KESSLER:  Your Honor, if we could just have one

3    or two minutes to be certain that we covered under the

4    agenda.  I think we did, but since we were bouncing around I

5    just want someone to concur for me.

6          THE COURT:  Take a short recess.

7       (Court in recess)

8

9                          CERTIFICATE

10

11   I certify that the foregoing is a correct transcript from the

12   electronic sound recording of the proceedings in the above-

13   entitled matter.

14   /s/Mary Zajaczkowski                          11/30/09
15   Mary Zajaczkowski                             Date
     Transcriber
16

17

18

19

20

21

22

23

24

25