## Exhibit 3

### *ProCare* Hearing Transcript

```
                UNITED STATES BANKRUPTCY COURT
                  NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
                                  *    Case No. 06-10605
     IN RE:                       *
                                  *    Cleveland, Ohio
                                  *
     PROCARE AUTOMOTIVE SERVICE   *    April 28, 2006
     SOLUTIONS LLC                *
* * * * * * * * * * * * * * * *
```

                    TRANSCRIPT OF HEARING
       BEFORE THE HONORABLE PAT E. MORGENSTERN-CLARREN
              UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

        ALAN LEPENE, ESQ.
        JEREMY CAMPANA, ESQ.
        For the Debtor

        SCOTT OPINCAR, ESQ.
        For the Committee of Unsecured Creditors

        WILLIAM SCHONBERG, ESQ.
        STUART LAVEN, ESQ.
        For Key Mezzanine Capital, et al.

        LAWRENCE GELBER, ESQ.
        For Monro Muffler Brake

        PATRICK CAROTHERS, ESQ.
        For Stoney Hollow Tire

        IAN REDMOND, ESQ.
        For GE Capital

        SUZANNA KOCH, ESQ.
        For J.P. Morgan Chase

        TIMOTHY KERN, ESQ.
        For State of Ohio Fire Marshal

        EDWARD LEEN, ESQ.
        For BP Products North America

        ROCCO DEBITETTO, ESQ.
        For East Penn Manufacturing
        LEON FRIEDBERG, ESQ.
        For Genuine Parts Company

        MARIA GIANNIRAKIS, ESQ.
        For the U.S. Trustee

Transcribed by:

- - - - - - - - - - - - - - -

Legal Electronic Recording, Inc.

5230 St. Clair Avenue

Cleveland, Ohio  44103

(216) 881-8000  Fax 881-DEPO (3376)


Proceeding  recorded  by  electronic  sound  recording,

transcript produced by transcription service.

Job No. 06E8167

Legal Electronic Recording, Inc. 216-881-8000

1        THE CLERK:  All rise.  This United States

2   Bankruptcy Court is now in session, the Honorable

3   Pat E. Morgenstern-Clarren presiding.

4        THE COURT:  Please be seated.  Good morning.

5   This is 06-10605, Procare Automotive Service Solutions,

6   LLC.  This morning's hearing is on the Debtor's request

7   to approve a sale of its assets free and clear of liens

8   and to assume and assign certain executory contracts

9   and unexpired leases.  The Debtor filed a memorandum in

10  support of that request yesterday.

11       There were a number of objections that were filed

12  and withdrawn.  I'll just read those as a group.

13  Marketplace Express, Robert Dunbar, Wurster Family

14  Irrevocable Trust, Thomas Lurie and Westwater Company.

15  So we won't need to address any of those this morning.

16       The objections that have been filed and not

17  withdrawn are these:  Genuine Parts Company, East Penn

18  Manufacturing, The Official Committee, Pro Investments,

19  State of Ohio State Fire Marshal, BP Products North

20  America and Stoney Hollow Tire.

21       We will begin, please, with appearances, starting

22  with the Debtor.

23       MR. LEPENE:  Good morning, Your Honor.  Alan

24  Lepene with the law firm of Thompson Hine, on behalf of

25  the Debtor.  And with me is Jeremy Campana of Thompson

Page 4

1    Hine.

2              THE COURT:  Thank you.

3              MR. OPINCAR:  Good morning, Your Honor.

4    Scott Opincar of McDonald Hopkins, on behalf of the

5    Official Committee of Unsecured Creditors.

6              THE COURT:  Thank you.

7              MR. SCHONBERG:  Good morning, Your Honor.

8    William Schonberg, Benesch, Friedlander, Coplan &

9    Aronoff, on behalf of Key Mezzanine Capital and Regis

10   Capital Partners.  And with me this morning is my

11   colleague, Stuart Laven.

12             THE COURT:  Thank you.

13             MR. SCHONBERG:  Thank you.

14             MR. GELBER:  Good morning, Your Honor.

15   Lawrence Gelber of Schulte, Roth & Zabel in New York,

16   here on behalf of Monro Muffler Brake, the proposed

17   purchaser.  And with me in Court today is Mr. David

18   Aberzazzy, the Controller of Monro.

19             THE COURT:  Would you spell your last name

20   for me, please?

21             MR. GELBER:  G-E-L B as in boy, E-R.

22             THE COURT:  Thank you.  Mr. Gelber, are you

23   admitted in the Northern District of Ohio?

24             MR. GELBER:  Your Honor, I've been admitted

25   pro hac vice for this case.

Legal Electronic Recording, Inc. 216-881-8000

1          THE COURT:  Great.  Thank you.

2          MR. CAROTHERS:  Good morning, Your Honor.

3     Pat Carothers, Thorpe, Reed & Armstrong, on behalf of

4     Stoney Hollow Tire.

5          THE COURT:  Thank you.

6          MR. DEBITETTO:  Good morning, Your Honor.

7     Rocco Debitetto, Hahn, Loeser & Parks, on behalf of

8     East Penn Manufacturing.

9          THE COURT:  Thank you.

10          MR. KERN:  Good morning, Your Honor.  Timothy

11     Kern, Assistant Attorney General with the State of

12     Ohio, representing the State Fire Marshal.

13          THE COURT:  And would you spell your last

14     name for me, please?

15          MR. KERN:  K-E-R-N.

16          THE COURT:  Thank you very much.

17          MS. GIANNIRAKIS:  Good morning, Your Honor.

18     Maria Giannirakis on behalf of the United States

19     Trustee.

20          THE COURT:  Thank you.

21          MR. LEEN:  Good morning, Your Honor.  Edward

22     Leen from Kelley, Drye & Warren, on behalf of BP

23     Products North America, Inc.

24          THE COURT:  Thank you.

25          MR. LEEN:  Your Honor, I have a pending pro

Page 6

1    hac vice application.

2            THE COURT:  Granted.

3            MR. LEEN:  Thank you.

4            THE COURT:  Would you spell your last name

5    for me, please?

6            MR. LEEN:  L-E-E-N.

7            THE COURT:  Thank you.

8            MS. KOCH:  Good morning.  Suzanna Koch for JP

9    Morgan Chase.

10           THE COURT:  Thank you.

11           MR. FRIEDBERG:  Good morning, Your Honor.

12    Leon Friedberg, Carlisle, Patchen & Murphy, on behalf

13    of Genuine Parts Company.

14           THE COURT:  Thank you.  Mr. Lepene, you may

15    proceed.

16           MR. LEPENE:  Thank you, Your Honor.

17       As Your Honor has noted, we are here on the motion

18    for authority to sell substantially all of the assets

19    of Procare Automotive Service Solutions.  Your Honor,

20    pursuant to the sale procedures order that was entered

21    on March 28th, 2006, the Debtor served notice of its

22    intent to sell substantially all of its assets and to

23    assume and assign unexpired leases and executory

24    contracts to Monro Muffler Brake, Inc. or to a party

25    that made a higher and better offer than the $14

Legal Electronic Recording, Inc.  216-881-8000

d1f4fcc1-4214-4ed1-b18a-c65793cda79b

1    million stalking horse bid that Monro had previously

2    made.

3        In addition to serving the notice of its intent to

4    sell its assets and assign unexpired leases and

5    executory contracts, the Debtor also served notice on

6    April the 3rd of proposed cure amounts to the non-

7    Debtor parties to the unexpired leases and executory

8    contracts that were proposed to be assumed and

9    assigned.  And then with respect to a number of those,

10   an amended notice with respect to proposed cure costs

11   was served on April the 12th.

12       The sales procedures order established a deadline

13   for parties to file objections to the sale as well as

14   objections to the proposed cure amounts.  I believe

15   under the procedures order that the deadline was fixed

16   at April 21 for filing those objections.  And as Your

17   Honor has noted, a number of objections have been

18   filed.

19       Before turning to those objections that still

20   remain, let me address, first of all, the results of

21   the sale process so that the Court and the parties in

22   interest are aware of what ultimately we are now

23   proposing to accomplish.

24       The Debtor, in conjunction with its investment

25   banker, BB&T Capital Markets, and pursuant to the sales

1    procedures order, did conduct a thorough and we think

2    vigorous process to identify other prospective

3    purchasers besides Monro who might have an interest in

4    all or some of the Debtor's assets.  A number of

5    confidentiality agreements during this process were

6    executed.  Due diligence was undertaken.

7    Interestingly, a number of the parties expressed an

8    interest in less than all of the assets looking at

9    particular markets; the Dayton market, for example, or

10   the Toledo market.  And the investment banker did

11   attempt to bring those peoples -- people together to

12   form consortiums, if you will, so that we could account

13   for all of the stores and make a competitive bid or

14   present a competitive bid that would account for all of

15   the stores and truly be competitive to the offer that

16   Monro had made which was for all of the stores in the

17   chain.

18        So those attempts were done as were -- were

19   undertaken, as well as attempting to identify people

20   who would have an interest in the entire chain.  That

21   process continued right up to the bid deadline, which

22   under the procedures order was April the 25th.  On that

23   day two bids were received in addition to the Monro

24   stalking horse bid that had previously been presented

25   to the Court.  One of those bids was limited to stores

06-10605-pmc    Doc 282    FILED 05/22/06    ENTERED 05/22/06 16:02:13    Page 8 of 54
d1f4fcc1-4214-4ed1-b18a-c65793cda79b

Page 9

1    in Dayton and Columbus and was only for approximately

2    $1.5 million, was not tied into the other bid that was

3    presented so it really was one that essentially didn't

4    qualify under the terms of the sales procedures order.

5            The other bid was for the entire chain and was

6    made by a company called Somerset Tire Service.  And

7    that bid was in an amount that at the auction was

8    determined to be the initial highest and best bid that

9    had been received.  The gross amount of that bid was

10    $15.2 million.  However, the net value to the estate,

11    based on the conditions that were set forth in that bid

12    and taking into account if that bid were accepted, the

13    payment of the breakup fee that would have to be made

14    to Monro, resulted in our determination, that is the

15    Debtor's determination after consultation with counsel

16    for the Creditors Committee and the professionals for

17    the Creditors Committee, again as contemplated by our

18    bid procedures order, the determination was made that

19    the value of that bid was, in reality, $14,250,000.

20            We then commenced the auction on April the 26th at

21    that point and Monro increased its bid to $14,650,000.

22    At that point STS declined to go any further and Monro

23    was declared to be the winning bidder.  We did inquire

24    as to all of those who were in attendance as to whether

25    anybody at the auction was prepared to make a higher

Page 10

1    and better offer than the $14,650,000 bid that Monro

2    had made and no one responded to that inquiry.  So we

3    concluded the auction and we declared that Monro was

4    the successful bidder at the gross amount of

5    $14,650,000.

6         I should also point out that in addition to the

7    $14,650,000 cash offer, as part of the negotiation

8    there were two pieces of real estate that on -- as to

9    which the Debtor is the owner but it does not operate

10   Procare Automotive repair stores.  These are sites that

11   are actually leased to others for the purpose of

12   operating gas stations so that they are rental income

13   property and Monro has agreed that these would be

14   excluded from the sale, essentially because they're not

15   part of the operating business of Procare.  So we were

16   able to reach that agreement as well, which further

17   enhances the consideration since these are income-

18   producing properties, further enhances the value, if

19   you will, that ultimately will be realized by the

20   estate.

21         THE COURT:  What does the Debtor intend to do

22   with those two pieces of real estate?

23         MR. LEPENE:  We will come before the Court

24   with a motion.  We will seek to sell those properties.

25   We ultimately, as I think we have indicated, would plan

Legal Electronic Recording, Inc. 216-881-8000

Page 11

1    to prepare a plan of liquidation in this case.  And in

2    conjunction with that but probably prior certainly to

3    our efforts to get a plan confirmed, we will come

4    before the Court and propose a process for selling

5    those particular properties.

6        Most of the objections have been resolved.

7    Certainly most and I think all with respect to cure

8    amounts have been resolved.  Your Honor mentioned Pro

9    Investments.  I know that Mr. Campana has been in

10   discussions with the attorney for Pro Investments.  I

11   don't believe anyone entered an appearance here today,

12   but I believe the representation has been made to Mr.

13   Campana that a settlement has been reached and we can

14   address that, Your Honor, later on in the proceeding in

15   terms of what that particular settlement entails.

16           THE COURT:  Why don't we do it now as long as

17   we're there.

18           MR. LEPENE:  Fine, Your Honor.  If I could

19   ask Mr. Campana to address that?

20           THE COURT:  Certainly.

21           MR. CAMPANA:  Good morning, Your Honor.

22   Jeremy Campana on behalf of Procare.

23       A settlement has been reached, as Mr. Lepene

24   indicated, and counsel for Pro Investments represented

25   that he would be filing a notice of withdrawal of their

d1f4fcebc2f4-4ed1-b18a-c65793cda79b

Page 12

1   objection by the time of the hearing.  Apparently, no

2   withdrawal has been filed yet.

3        Pro Investments filed a cure claim objection in

4   the amount of $23,000 and, based on the merits of that

5   objection, a settlement was reached in the amount of

6   $13,000 which Procare believes is acceptable and a

7   settlement agreement was reached.

8             THE COURT:  Thank you.  I'll mark that one as

9   withdrawn then.

10            MR. CAMPANA:  Thank you.

11            MR. LEPENE:  Your Honor, the only other issue

12  with respect to cure amount that I believe remains is

13  with BP Products North America, and I think that they

14  also have filed an objection to the sale.  So what I

15  would propose to do is first address those objections

16  that I believe we have essentially resolved.  And

17  counsel for the various parties with respect to those

18  particular objections that have been filed I believe

19  are in the courtroom with the possible exception of GE.

20  I wasn't sure whether anyone entered an appearance on

21  behalf of GE.  But if I might run down the list and see

22  if we can narrow the issues in terms of what objections

23  truly remain at this point.

24       The first objection that I would address is that

25  of Genuine Parts.  And I would also include with that

Legal Electronic Recording, Inc. 216-881-8000

Page 13

1    Auto Zone because those are both reclamation claimants.

2    And I know we've heard previously in connection with

3    the DIP financing order from counsel for Genuine Parts.

4    I believe their concern primarily is that nothing in

5    this order would impair in any way their right to

6    assert their reclamation claims.  And, of course,

7    language to that effect was worked out in connection

8    with the final DIP financing order.

9        With respect to what we are proposing to do here,

10   as we indicated in the final DIP order, we will be

11   escrowing from the sale proceeds that are realized if

12   the Court does approve this sale, a portion of the sale

13   proceeds in the full amount of the reclamation demands

14   that we have received.  And so I believe by virtue of

15   our being prepared to do that and having provisions to

16   that effect included in the sale order or at least the

17   sale order will adopt the provisions in the DIP

18   financing order that, in fact, require that, that I'm

19   hopeful that those objections essentially have been

20   resolved.

21       THE COURT:  Let's pause there for a moment.

22   Mr. Friedberg, is there anything that is unresolved?

23       MR. FRIEDBERG:  No, Your Honor.  I believe

24   that the representations of Mr. Lepene adequately

25   address the Genuine Parts matters.

Legal Electronic Recording, Inc. 216-881-8000

Page 14

1          THE COURT:  Is the objection withdrawn then?

2          MR. FRIEDBERG:  I think it's resolved.

3          THE COURT:  Resolved.  Fine.  We'll mark it

4     resolved.

5          MR. LEPENE:  Your Honor, the next objections

6     that I would address are those that were filed by East

7     Penn Manufacturing and also a response that was filed

8     by Stoney Hollow.  I put those two creditors in the

9     same category because they are the holders of alleged

10    purchase money security interests in inventory sold to

11    the Debtor prepetition, and again, we addressed their

12    situation in the DIP financing order in terms of

13    providing both of them with adequate protection.

14         With respect to the objections that they have

15    raised, the principal objection is that we agree to pay

16    them from the sale proceeds the amount that -- that

17    they are owed based on their asserted secured claim.

18    While we are not prepared to include language in the

19    order to that effect and given the fact that the

20    Committee does have rights to investigate and satisfy

21    itself as to the status of their prepetition security

22    interests, what we do propose in the order is again to

23    escrow from the sale proceeds a portion of the proceeds

24    in the full face amount of their alleged secured

25    claims.  That does not mean that we acknowledge that

Legal Electronic Recording, Inc. 216-881-8000

1    they are fully collateralized in the amount of their

2    claim, but we are prepared to escrow the full amount of

3    their claim pending again further proceedings in the

4    Court relative to the distribution of funds once their

5    claims, in fact, have been determined and allowed.

6              THE COURT:  Has that offer been accepted by

7    the creditors or is that still in dispute?

8              MR. LEPENE:  Well, I think probably we ought

9    to hear from them.  Just we have proposed that in the

10   response that we made but I have not had the

11   opportunity to specifically discuss with them.  I know

12   that we did circulate yesterday a proposed sale order

13   that had these provisions that also addressed the other

14   issues that East Penn had raised.  And my understanding

15   is or my belief is that the terms of the proposed sale

16   order that we circulated at least would be acceptable

17   to East Penn.  I am confident they'll be acceptable to

18   Stoney Hollow as well but it probably would make sense

19   to get confirmation of that fact on the record at this

20   point.

21             THE COURT:  Mr. Debitetto, is there any part

22   of the objection of East Penn that is not resolved by

23   the statements just made?

24             MR. DEBITETTO:  Your Honor, may I have one

25   moment with Mr. Lepene?

Legal Electronic Recording, Inc. 216-881-8000

Page 16

1          THE COURT:  Certainly.

2          MR. DEBITETTO:  Thank you.

3      Your Honor, the proposed order, as modified and

4  just agreed to here, is acceptable to East Penn and

5  it's providing for the escrow of sufficient proceeds to

6  pay our claims subject to allowance thereof.  And Your

7  Honor, with that, I would say our objection is

8  resolved.

9          THE COURT:  Thank you.  And Mr. Carothers for

10  Stoney Hollow, is there any part of Stoney Hollow's

11  position that is not resolved by Mr. Lepene's

12  statements?

13          MR. CAROTHERS:  Your Honor, the order that

14  was sent to us last night is fine with Stoney Hollow.

15  The only issue that remains from Stoney Hollow's

16  perspective is the timing by which the objections to

17  the allowance of the validity of the claims would be

18  brought by the Unsecured Creditors Committee.  I'm

19  happy to address that now or in response to the --

20          THE COURT:  Is that a part of the proposed

21  sale order?

22          MR. CAROTHERS:  It was not a part of the

23  proposed sale order although the Unsecured Creditors

24  Committee raised that as part of their objection to

25  which we replied to.

Legal Electronic Recording, Inc. 216-881-8000

1          THE COURT:  Mm-hmm.  I'm really not inclined

2     to expand the arena to include issues that aren't

3     directly raised by the sale, so let's hold that aside.

4          MR. CAROTHERS:  That's fine, Your Honor.

5          THE COURT:  Thank you.  In the meantime, I'll

6     mark this as resolved.

7          MR. LEPENE:  Your Honor, the next objection

8     that I would address is that limited objection or

9     reservation of rights filed by the Creditors Committee.

10    And I believe that the Committee essentially wanted to

11    make certain that the rights that were provided to it

12    under the DIP order, that's the DIP financing order and

13    the provisions in that order governing the disposition

14    of sale proceeds, would be preserved.  They also wanted

15    assurance that any allocation of the purchase price as

16    between the Debtor and the buyer pursuant to the terms

17    of the asset purchase agreement would not be in any way

18    determinative of the value of the individual assets for

19    purposes of distribution under a plan of liquidation or

20    subject to further proceedings before the Court.  All

21    of that certainly is consistent with the Debtor's

22    intentions.  We have included language to that effect

23    in the proposed sale order.  And I did receive an

24    acknowledgment from Mr. Opincar on behalf of the

25    Committee that the provisions that we've included in

Page 18

1    the proposed sale order are satisfactory to the

2    Committee.

3        So I do believe that the Committee is prepared to

4    withdraw its objection or that its concerns have been

5    resolved.  Obviously, Mr. Opincar is here and can speak

6    for himself in that regard.

7            THE COURT:  Mr. Opincar, is there anything

8    that is not resolved by Mr. Lepene's statements?

9            MR. OPINCAR:  No, Your Honor, and the

10   Committee will withdraw its limited objection.

11           THE COURT:  Thank you.

12           MR. OPINCAR:  Thank you.

13           MR. LEPENE:  Your Honor, that leaves GE

14   Capital, the State of Ohio Fire Marshal and BP Products

15   North America, if I've got my count correct here.  And

16   so if I might, let me address those objections in that

17   order, if the Court will allow me?

18           THE COURT:  Certainly.

19           MR. LEPENE:  We do not believe that any of

20   those objections are meritorious.  We believe that each

21   of them should be overruled.

22       With respect to GE Capital, it holds a leasehold

23   mortgage on a ground lease on which our store in New

24   Albany, Ohio, sits.  They also have a security interest

25   in the building and in the equipment in that store.  In

Legal Electronic Recording, Inc. 216-881-8000

Page 19

1   the paper that they filed they argue that the sale

2   can't be authorized free and clear of their liens

3   because they haven't consented to the sale.

4           THE COURT:  May I ask you to pause for one

5   moment?  Is someone here representing GE?  Did I miss

6   an appearance?

7           MR. REDMOND:  Your Honor, my name is Ian

8   Redmond and I am representing GE.  We had filed

9   something some time ago which was denied and we have

10  not filed an objection subsequent to that.

11          THE COURT:  Thank you.  That was also my

12  understanding was that there was no GE objection that

13  was on in connection with the sale.  So I think we

14  can -- thank you, Mr. Redmond, for clarifying.  I think

15  we're all set on that one.

16          MR. LEPENE:  Thank you, Your Honor.  I had

17  thought that in their -- the objection that they had

18  previously filed they had not only objected to the bid

19  procedures, and that was denied, but they had also

20  objected to the sale as well.  But if there is no

21  objection, we obviously can move on.

22       That would bring us to the objection filed by the

23  State of Ohio Fire Marshal.  And Your Honor, the basis

24  for that objection, as I understand it from the papers

25  that have been filed, are various environmental claims

Legal Electronic Recording, Inc. 216-881-8000

1    arising under Ohio and federal law with respect to the

2    maintenance of certain underground storage tanks.  And

3    they, in their papers, have a schedule that identifies

4    three locations at which they said there are issues

5    with respect to these storage tanks.

6        As a threshold matter I would say that they do not

7    have their facts precisely correct.  With respect to

8    one of the sites, in Dayton, Ohio, where their claim is

9    that Procare never filed a closure report with respect

10   to the tank at that store, the fact is that Procare

11   filed such a closure report in December of 2004.

12   Procare has corresponded with the appropriate

13   regulatory authority repeatedly to advise them that

14   that report, in fact, has been filed.  I have a copy of

15   the report actually in the courtroom.

16        THE COURT:  Would you give that to Mr. Kern,

17   please.  Maybe we can get that one resolved.

18        MR. LEPENE:  With respect to one of the other

19   stores, I believe it's in the Cincinnati area, Your

20   Honor, the fact is that that store was previously sold.

21   We no longer own the store.  And in fact, in any event,

22   it's obviously not part of the sale that is before you

23   today.  So that, in fact, the issues that they're

24   raising relate to only one underground storage tank.

25   But much more importantly than that, aside from the

1  facts, Your Honor, the objection is legally deficient.

2  It is based on the State's belief that they have an

3  interest in the property that is being sold and that

4  without their consent, because they have an interest in

5  the property, we cannot sell free and clear of their

6  alleged interest under Section 363(f) of the Bankruptcy

7  Code.  The fact is the State does not have an interest

8  in the property as that term is defined under the

9  Bankruptcy Code.  And I think the cases are very clear

10 in that regard.  What 363(f) deals with are liens and

11 encumbrances in property and the ability of a

12 Bankruptcy Court to authorize a sale free and clear of

13 those liens and encumbrances.  Those are the interests

14 that the Code is referring to.  We do not need the

15 consent of the State of Ohio to sell the property in

16 question pursuant to the provisions of Section 363(f).

17 They do not have an interest in the property that would

18 permit them to require that they consent to this sale.

19 So on that point alone there is no legal basis, no

20 legal support for the objection that they have raised.

21       The other ground of their objection is based on

22 the Supreme Court's decision in the Midlantic case.

23 And they claimed that on the basis of that authority we

24 are not permitted to sell this property to Monro

25 Muffler.  As the Court I'm sure is aware, Midlantic was

1   an abandonment case.  That was a case in which the

2   Supreme Court said that where a Debtor or Trustee was

3   responsible for property, owned property and sought to

4   abandon it and where there was an imminent threat to

5   public health, safety or welfare, there was no

6   authority under Section 554 to abandon that property,

7   the rationale being that there would then be no one

8   responsible for the property in question.

9        Our motion, the motion that is before you today,

10  does not seek authority to abandon anything.  We are

11  selling property to Monro Muffler who happens to be a

12  party that is far better capitalized than we are to

13  operate the property that we are selling to them on a

14  going forward basis.  Whatever claims the State of Ohio

15  Fire Marshal may have with respect to the one tank that

16  is at question will be dealt with in our plan of

17  liquidation or will be dealt with in the claims

18  resolution process under the provisions of the

19  Bankruptcy Code.  Whatever priority their claim may

20  have will be determined by the Court.  But there

21  clearly is no legal support for the State to come in

22  and say that under Section 363 we do not have the

23  right -- or I should say the Court does not have the

24  power to authorize a sale, this particular sale, to

25  Monro Muffler.

1      So, Your Honor, on that basis we think, very

2  clearly, the objection of the State Fire Marshal should

3  be overruled.

4           THE COURT:  Thank you.  May I hear from the

5  State, please?

6           MR. KERN:  Yes, Your Honor.  Thank you.  My

7  name is Timothy Kern.  I'm Assistant Attorney General

8  with the State of Ohio and I represent the State Fire

9  Marshal in this matter.

10     What Debtor's attorney failed to mention is that

11  another provision of the Bankruptcy Code, which is 28

12  USC Section 959(b), and that section clearly says that

13  a Debtor-in-Possession has the responsibility to comply

14  with all laws, state regulations and all statutes that

15  have regulatory requirements.

16     Now, in addition to that, that Code section was

17  recognized by the U.S. Supreme Court in Ohio versus

18  Kovacs, which is 469 US 274.  And in that case the

19  Supreme Court clearly said that anybody that was in

20  possession of property was required to comply with the

21  environmental statutes of the State of Ohio, because

22  that was a case obviously brought by the State of Ohio.

23     Now, in this particular situation, and I don't

24  think there's any dispute, Procare is the owner and

25  operator of the tank systems at all three sites.  So

Page 24

1   since they are in possession of those tank systems,

2   they currently, right now have the responsibility to

3   comply with all the Bureau of Underground Storage Tank

4   Regulations at these three sites.

5        Now, all three sites have ongoing regulatory

6   requirements.  Now, the first site, in Dayton, we are

7   now looking at the closure report and we may have

8   missed the fact that that report had been submitted.

9   But that is not the end of the story with that site.

10  What happened there is the tanks were removed.  And

11  under the regulations they are required to submit a

12  closure report.  The next step is the regulators at the

13  Bureau of Underground Storage Tank Regulations need to

14  look at that report and try to determine if there's any

15  issues where there has been releases at that particular

16  site.  And after that is done they will get

17  documentation from -- it's called BUSTER.  BUSTER will

18  send them documentation of whether they have to go in

19  and do further assessment at the site.

20       Now, the other two sites, you know, we have a

21  witness here today and I don't believe there's any

22  dispute, but at the other two sites they also are

23  currently registered and they own the tanking systems

24  at those sites and they also were operating the tanking

25  systems.  Now, as to the one site, and that's the site

Legal Electronic Recording, Inc. 216-881-8000

1    that's in Mayfield Heights, they are required to submit

2    what they call the Tier 1 Assessment.  And that's

3    they've already done their closure report and there are

4    some issues at the site and they have to do further

5    assessment to try to determine the extent of

6    contamination.

7         In the Cincinnati site, which they are also

8    registered for those tanks and they have -- they

9    currently own and operate those tanks, that site's

10   further on.  It's called in the Tier 2 Assessment stage

11   where they're getting close to determining what they

12   have to do in terms of the cleanup.

13        Now, the problem with Debtor's argument is that

14   they are currently responsible right now under 28 USC

15   959(b) to make sure that all the BUSTER regulatory

16   requirements are met.  Once the sale goes through and

17   they no longer are in possession of those sites, they

18   no longer will have responsibility because they are no

19   longer in possession to meet those requirements.  And

20   they make a statement here that the new buyer is in a

21   better position to meet those requirements.  The only

22   problem with that is that under the statute, which is

23   RC 3737, which is the statute that, you know, sets

24   forth the regulatory authority for underground storage

25   tanks, is that the new buyer or the new operator that

Page 26

1   was not the owner/operator during the time of the

2   release, has no statutory requirement to deal with

3   previous releases.  So what's going to happen here is

4   that if Monro takes over at least two of the sites,

5   those releases that are at the sites, they will not

6   have the responsibility to deal with those releases and

7   clean them up.  That responsibility goes to Procare.

8   But then once Procare depossesses themselves of the

9   property through the sale, they're going to have the

10   argument that they no longer have to be responsible to

11   meet those environmental obligations.  Now, right,

12   they'll deal with our claim, which I don't even think

13   we filed a claim at this stage, at a later stage, but

14   then they're going to be in the position to argue that

15   we have nothing but a general unsecured claim and

16   they'll deal with it that way.

17        Right now they have the responsibility, under the

18   Bankruptcy Code and the U.S. Supreme Court decision in

19   Ohio versus Kovacs, to deal with whatever they need to

20   do at those sites and get those sites completely in

21   compliance with the BUSTER regulatory requirements.

22   And that's why we've made our objection and that's why

23   we think we have the right to have them do something to

24   make sure that those environmental regulations are

25   going to be met.

Page 27

1       Now, we've dealt with this issue in other

2   bankruptcies not in this Court.  But one of the big

3   bankruptcies we've dealt with this issue was the Dairy

4   Mart bankruptcy.  And what was done there is an escrow

5   account was set aside by the Debtor to deal with all

6   the environmental requirements.  And if we could get

7   some sort of agreement from the Debtor on some sort of

8   trust fund or an escrow account and that money would be

9   a set aside.  And I think in this situation if you're

10  talking about a $14.6 million, I think there is enough

11  money that could be set aside to deal with the problems

12  at these three sites and then obviously if there's

13  money left over after all the sites get back into

14  compliance, then Debtor could take that money and put

15  it back into their estate.

16      But I don't agree with what the Debtor says.

17  Obviously, whether we can or cannot prevent the sale,

18  what we can do is make the Debtor, under the Bankruptcy

19  Code, come into compliance at all three of these sites.

20  And at this stage, they've refused to do it.

21          THE COURT:  Thank you.  Anything further from

22  the Debtor?

23          MR. LEPENE:  Yes, Your Honor.

24      Your Honor, again, just so the facts are straight

25  with respect to the sale.  The only site that is being

Page 28

1   conveyed to Monro that is the subject of the objection,

2   is the store in Mayfield Heights.  The other two are

3   not being conveyed to Monro, so that the issues that

4   Mr. Kern is raising with respect to whatever

5   responsibilities we may have are simply irrelevant with

6   respect to the motion that is before you.  We're only

7   dealing with one site.

8        I think Mr. Kern clearly has indicated in terms of

9   his comments with respect to establishing an escrow

10  account or what have you, that what we're dealing with

11  here is essentially a claim that they will have against

12  the Debtor for the payment of money.  That's really

13  what this is all about.  And as I suggested, we will

14  deal with that claim in connection with the plan of

15  liquidation or in connection with further proceedings

16  that are brought before this Court.  Whether that claim

17  is unsecured, Mr. Kern has suggested that we will try

18  to make that argument.  Perhaps we will.  I suspect

19  that Mr. Kern will make the argument that that is an

20  administrative expense claim that needs to be

21  satisfied.

22       We are, in fact, planning to set aside monies, as

23  the Court knows from the provisions of the DIP

24  financing order, to cover administrative expense claims

25  in this particular case.  But the fact is that under

1    the provisions of the Bankruptcy Code, the State does

2    not have the ability to prevent the Court from

3    authorizing this sale.  They do not have an interest in

4    the property within the meaning of the Bankruptcy Code.

5    We have the authority to sell the property free and

6    clear of interests.  They do not have an interest in

7    the property.  Whatever claims they have will be and

8    can be asserted against the proceeds that will be

9    generated from the sale.  And again, if they have an

10   administrative expense priority claim, if that's how it

11   ultimately would be determined, then they will be

12   entitled to have that claim satisfied in full.  If it's

13   determined to be a general unsecured claim, then they

14   will share in whatever recovery is made for the benefit

15   of unsecured creditors.  But they do not have the

16   ability to prevent the Court from authorizing this sale

17   as long as we meet the requirements of Section 363,

18   which we think we clearly do.

19            THE COURT:  All right, thank you.  This is

20   the Court's decision on this issue.  The facts are not

21   entirely clear but this is one of those situations

22   where it isn't necessary to pin down the facts in order

23   to make a decision.  The parties are in agreement that

24   at least one site is subject to the State's concern and

25   so the Court's opinion is limited to that actual

Page 30

1    situation.  This is not intended to make any kind of

2    binding determination of either party's rights with

3    respect to the other two sites or even with respect to

4    the Mayfield site.

5         There is agreement between the parties that the

6    State has a legitimate concern over environmental

7    issues that have arisen at the real estate.  Today's

8    issue, however, is a more narrow issue.  It is whether

9    the Court should approve the sale of the property in

10   the face of the State of Ohio's objection that the

11   Debtor has not complied with its responsibilities under

12   state law as confirmed by the Bankruptcy Code Section

13   959, which does require a Debtor to comply with State

14   and regulatory requirements.

15        The two different issues that have been

16   intertwined in this presentation by the lawyers,

17   however, are these.  The first is does the State have

18   an interest in the property that would trigger the

19   sections under 363(f)?  And the second is does the

20   State have a claim against the Debtor's assets?  It's

21   only the first issue that is relevant to today's

22   proceedings.

23        Section 363(f) says that the Trustee may sell

24   property under Subsection (b) or (c) of the section

25   free and clear of any interest in such property of an

Legal Electronic Recording, Inc. 216-881-8000

1   entity other than the estate only if.  The section then

2   goes on to spell out five different situations.  So for

3   this section to apply at all, an objecting creditor has

4   to have an interest in the property.  The State of Ohio

5   has an interest in seeing that its laws are complied

6   with but it has not shown that it has an interest in

7   the property that is being sold.  The property that is

8   being sold is not subject to a lien or an encumbrance

9   held by the State of Ohio and therefore, the remainder

10  of this section does not apply.

11       The State has also cited the Midlantic case

12  decided by the Supreme Court.  This Court agrees with

13  the Debtor's interpretation that that is a Court

14  decision that applied to an effort to abandon

15  contaminated property in a situation where no one would

16  be responsible for it and the Trustee essentially was

17  throwing up his hands and saying I don't want to have

18  anything to do with this.  Under that situation the

19  Supreme Court said that the Trustee was not permitted

20  to abandon the property.  This is not though a

21  situation where the Debtor is proposing to abandon the

22  property and walk away.  Debtor is proposing to sell

23  it.  The proceeds of the sale will come into the

24  estate.  Those proceeds will be available for

25  distribution to creditors who have allowed claims.  So

06-10605-pmc   Doc 282   FILED 05/22/06   ENTERED 05/22/06 16:02:13   Page 31 of 54
d1f4fcc0c2f4-4ed7-b18a-c65793cda79b

1   this is quite a different case from the Midlantic case.

2      After the sale, the State -- or at any point

3   actually, if the State has a claim against the Debtor's

4   assets, it may feel free to file it.  What the nature

5   of that claim is in terms of priority or administrative

6   claim, this Court is certainly not determining it

7   today.  But the Court is finding that the State's

8   legitimate interest in having its environmental laws

9   complied with is not a defense under 363(f) that can

10   interrupt the proposed sale of the Debtor's property.

11   So the objection is overruled for those reasons and

12   I'll put on an order that states that.

13          MR. LEPENE:  Thank you, Your Honor.

14          THE COURT:  I would encourage the Debtor,

15   obviously, as a next step, to cooperate with the State

16   and find out what the issues are because it sounds like

17   there are some that need to be addressed.

18          MR. LEPENE:  We will certainly do that, Your

19   Honor.

20      Your Honor, that brings us to the objection that

21   was filed by BP Products North America, and they were

22   both, as I recall, objection with respect to the sale

23   as well as with respect to the proposed cure notices.

24      I believe that as far as the dollar amounts of the

25   cure notices that we had proposed, all of those have

1   been worked out.  Counsel for BP is here and obviously

2   can confirm that.  But I believe what we are left with

3   as far as the BP objection is concerned is a dispute or

4   a disagreement that relates to our proposed assumption

5   and assignment to Monro of an environmental agreement

6   dated September 30th, 1999.  Under that agreement, BP

7   agreed to indemnify Procare with respect to certain

8   environmental obligations relating to various

9   properties that were sold by BP to Procare in 1999, and

10   Procare, in that agreement, agreed to indemnify BP with

11   respect to certain environmental obligations that arose

12   after the closing date of that sale with respect to

13   certain of those properties.  We included that

14   agreement on the list of contracts to be assumed and

15   signed.  We sent out a cure notice with respect to that

16   particular agreement that indicated our belief that the

17   cure cost was zero with respect to that particular

18   agreement.  BP did not take issue with our cure cost

19   proposal as to that particular agreement.  What they

20   did do was to propose that language be included in the

21   sale order asking that Monro, as the assignee, the

22   buyer and the assignee, essentially agree that in

23   connection with its assumption of the agreement, its

24   taking on the agreement by way of assignment, that it,

25   Monro, would be liable for all obligations under that

1    agreement whether known or unknown to BP or the Debtor

2    and whether such obligations were pre or post

3    assumption.  So that was the language that BP was

4    asking that Monro agree to and have included in the

5    proposed sale order.  Monro, and I think

6    understandably, has rejected that language.

7        The Debtor's position with respect to this is that

8    that language isn't necessary, and for this reason.  We

9    believe that the extent of Monro's obligations in

10   connection with the assumption and assignment of that

11   agreement to it pursuant to the provisions of Section

12   365 are really determinable as a matter of law under

13   Section 365.  Whatever obligations Monro takes on

14   pursuant to that particular agreement again is

15   determined under the provisions as a matter of law

16   pursuant to the provisions of Section 265.

17       We believe that's what the order should provide.

18   That's the type of language that should be included in

19   the order.  And it is for that basis that we don't

20   believe the objection that BP has presented, again

21   recognizing that all of the other issues have been

22   resolved, this is the last issue with BP, we think that

23   what they are asking for in terms of the language that

24   they want included in the order goes beyond what is

25   required.  Section 365 will establish the rights and

1   responsibilities of the parties to that agreement on a

2   going forward basis.  And so it is our belief that

3   their objection should be overruled and the sale should

4   be confirmed.

5       That's our position with respect to this.  I would

6   imagine that counsel for both BP and perhaps Monro

7   would want to be heard on this, Your Honor.

8           THE COURT:  Mr. Leen, please.

9           MR. LEEN:  Good morning, Your Honor.  Edward

10  Leen, Kelley, Drye & Warren, on behalf of BP Products

11  North America, Inc.

12      Your Honor, our -- just a little bit of history

13  here.  BP --

14          THE COURT:  Just a little, please.

15          MR. LEEN:  Just a little.  BP and Procare

16  were once the same company.  Procare was spun off of

17  BP.  So BP has a lot of different interests in -- in

18  relationship with Procare.

19      When the sale was done or the spinoff, there was

20  an environmental indemnification agreement entered into

21  between BP and the predecessor to Procare, but Procare,

22  and there's obligations that run back and forth.

23      The issue for today is that while the Debtor has

24  taken the position that 365 says -- says what it says

25  and that Monro is taking on the obligations, which I

Page 36

1    think is what they're saying, there is much language in

2    the order that goes on at length of how Monro is not

3    assuming any pre-closing obligations under any

4    agreement.  So therefore, if you have any

5    indemnification issues that arose pre-closing, Monro,

6    under the order, arguably has not taken on that

7    obligation.  And that's why we had asked to have that

8    language put into the order.  And there was another

9    reason we wanted to have the language put into the

10   order as well, because it was smoother to do it that

11   way than to determine what the cure cost would be if

12   we're going to have to determine what the cure is

13   because a cure would then take Tier 2 Assessments at

14   each of the properties and that's going to take some

15   while and that's not something that can be accomplished

16   in a couple of months.  That could take some time.  So

17   we were looking for the clearer, cleaner assumption.

18   And we believe also under 365 they take whatever

19   obligations existed as of the closing as well, but the

20   order arguably cuts that off.

21           THE COURT:  Mm-hmm.  I don't have that order

22   in front of me but from what you're saying, what if you

23   just added a phrase that said Monro doesn't assume pre-

24   closing obligations except for agreements specifically

25   assumed and assigned under the sale agreement?  Would

Legal Electronic Recording, Inc. 216-881-8000

Page 37

1    that resolve your issue?  Let me hear from BP first and

2    then I'll be glad to hear from Monro.

3              MR. LEEN:  I think it would but there is --

4    there's -- as long as we -- I'd have to look at the

5    order again but there's language in many different

6    paragraphs that talk about free of the liens, claims,

7    encumbrances.  And to the extent that does not exclude

8    any pre-closing obligations, indemnification

9    obligations, then fine, that works for us.  But I just

10   want to make sure that argument's not made at a later

11   time.

12             THE COURT:  Mr. Gelber, please.

13             MR. GELBER:  Good morning, Your Honor.  Once

14   again, Lawrence Gelber of Schulte, Roth & Zabel for

15   Monro Muffler Brake.

16      I don't believe that the language that Your Honor

17   suggested works for Monro.  The asset purchase

18   agreement is very clear that Monro is only assuming

19   liabilities from the closing date going forward.  The

20   sale is free and clear of all liens, claims, interest

21   and encumbrances.  I believe what Mr. Leen is referring

22   to and what BP is trying to assert is just simply

23   another claim that arose pre-closing and that is one of

24   the claims that the -- that the sale would be -- that

25   the assets would be sold free and clear of.

Legal Electronic Recording, Inc. 216-881-8000

1          THE COURT:  So is it Monro's position that it

2     is not assuming --

3          MR. GELBER:  No.  It is Monro's position that

4     it is assuming the agreement.  If as and to the extent

5     there are pre-closing issues, those are not Monro's

6     issues.  Those are issues between BP and the Debtor.

7     Anything that arises from the closing date going

8     forward, absolutely, we are assuming those.  Just as

9     with any other executory contract, we are taking the

10    post-closing liabilities and leaving behind the pre-

11    closing liabilities.  As Mr. Leen and Mr. Lepene have

12    both said, the pre-closing liabilities are something

13    that are dealt with in cures.  Section 365 provides in

14    order to assume and assign you have to cure defaults.

15    I don't know if these are actually defaults that are

16    under the agreement.  I honestly don't know.  But there

17    is nothing in Section 365 or anywhere else in the

18    Bankruptcy Code, to my knowledge, that requires a

19    purchaser of assets who's taking assets free and clear

20    of all liens and claims to assume any post-closing

21    liabilities -- I'm sorry, pre-closing liabilities

22    unless it has expressly agreed to do so in the asset

23    purchase agreement.  And I can tell you that Monro has

24    not agreed in the asset purchase agreement to assume

25    these liabilities.

06-10605-pmc   Doc 282   FILED 05/22/06   ENTERED 05/22/06 16:02:13   Page 38 of 54
d1f4fcc7c2f4ed1-b18a-c65793cda79b

1          THE COURT:  So this is a substantive dispute.

2    This is not a wordsmithing issue?

3          MR. GELBER:  I think from Monro's perspective

4    clearly it is a substantive dispute.  I believe, and

5    maybe I'm wrong, it's really a dispute between BP and

6    the Debtor and Monro is sort of caught in the middle

7    here.  I can just tell you what Monro's position is.

8    It is not something we bargained for and it is not

9    something we are willing to take.

10          THE COURT:  Thank you.  Mr. Lepene?

11          MR. LEPENE:  Your Honor, I think the point

12    that I would stress with respect to this is that we

13    went through a process which was approved by the Court

14    in terms of the bid procedures and the sale procedures

15    that we were to follow.  We did send out in connection

16    with those agreements that we were proposing to assume

17    and assign, a designation to the various parties as to

18    what the agreement was.  We indicated what we believed

19    the cure costs are.  We don't believe we have any

20    liability with respect to this particular agreement.

21    So we designated in the proposed cure cost with respect

22    to this particular agreement that was sent to BP, we

23    indicated that we believe the cure costs were zero.  If

24    we suggested -- not suggested.  It was part of the sale

25    procedures, that if a party disagreed with that, if

Legal Electronic Recording, Inc. 216-881-8000

1    they believed that they were was a liability and that

2    there were cure costs that needed to be addressed as a

3    condition of assumption and assignment of the

4    agreement, they were obligated to come forward and

5    identify that so that we could resolve that in

6    connection with this sale hearing as to what the amount

7    that they believed required to be paid as a cure cost

8    in order to permit the assumption and assignment of the

9    agreement.  BP has not come forward.  They didn't come

10   forward in response to the deadline that was

11   established pursuant to the procedures order and

12   identify cure costs associated with this particular

13   agreement.  They did identify cure costs with respect

14   to a number of the other leases that were being assumed

15   and assigned and we have had extensive discussions with

16   them and we've resolved every one of those amounts, so

17   that with respect to the cure costs associated with all

18   of those leases that are being assumed and assigned as

19   to which they are lessor and real estate taxes that had

20   accrued and needed to be accounted for, all of that has

21   been agreed to pursuant to the process and the

22   procedure that the Court established.

23        With respect to this I would suggest that the

24   burden was on BP if they felt and disagreed with our

25   assessment and belief that there were no outstanding

Page 41

1   cure costs that needed to be paid in connection with

2   the assumption and assignment of this particular

3   agreement, the environmental agreement.  They had the

4   burden of coming forward and advising us as to what

5   they believed those cure costs were.  They did not do

6   so.  I don't believe that they are prepared to do so in

7   Court today.

8       And so it is our belief, based on the procedures

9   that were approved by the Court which we followed and

10   which indicated that we would establish the amount of

11   whatever the necessary cure costs were, and again a

12   specific procedure for doing that, we believe that

13   based on the record that has been established, the cure

14   costs properly should be determined to be zero and the

15   agreement therefore should be -- we should be

16   authorized to assume and assign the agreement as part

17   of this sale to Monro.  And that essentially is our

18   position.

19       THE COURT:  Mr. Leen, is there something in

20   BP's objection that said that there was a cure cost

21   connected to the indemnity agreement.

22       MR. LEEN:  On page 2 under A, it mentions

23   environmental obligations.  We had opened the issue

24   with the Debtor regarding cure amounts on the

25   environmental indemnification agreement.

Legal Electronic Recording, Inc. 216-881-8000

Page 42

1          THE COURT:  This paragraph goes on to state

2     cure amounts, which I assume now from what Mr. Lepene

3     is saying, relate to the lease agreements; is that

4     right?

5          MR. LEEN:  It -- yeah.  It says it was to

6     cure notice we said we agree with everything on the

7     cure notice to this extent.

8          THE COURT:  Okay.  Then the paragraph says --

9          MR. LEEN:  That's the leases.

10          THE COURT:  -- except regarding any

11    environmental obligations and a couple other issues

12    that don't seem to be relevant here, BP agrees to the

13    following cure amounts.  Is there anything in this

14    obligation that then goes back and picks that up and

15    says with respect to the environmental obligations this

16    is the cure amount that BP is requesting?

17          MR. LEEN:  No, because the cure amount is

18    impossible to tell at this time.  It requires a Tier 2

19    Assessment at each of the locations in order to

20    determine whether or not there is any leakage in any of

21    the underground tanks.

22          THE COURT:  Is it impossible or is it

23    expensive?

24          MR. LEEN:  No, it's not impossible.  It's

25    impossible to do it in the time frame provided for.

Legal Electronic Recording, Inc. 216-881-8000

1  It's something we can do and we can get done.

2         THE COURT:  Did BP file anything asking the

3  Court to extend the deadlines to accommodate that

4  issue?

5         MR. LEEN:  No.  We tried to work out with the

6  Debtor and Monro on that issue.  And we reserved our

7  rights in this objection to amend any cure amounts.

8         THE COURT:  Does BP have a witness today that

9  it wishes to put on to address the cure amounts?

10 Today's the day.

11        MR. LEEN:  I understand.  BP does not have a

12 witness because there's no cure amount to put on

13 because we just -- we don't know at this time.  We

14 just -- we don't know what the situation is at each of

15 the locations.

16        THE COURT:  Anything further then from BP?

17        MR. LEEN:  No.  That's it, Your Honor.  Thank

18 you.

19        THE COURT:  Thank you.  Mr. Lepene?

20        MR. LEPENE:  Final point, Your Honor?

21        THE COURT:  Briefly, please.

22        MR. LEPENE:  Yeah, very briefly, Your Honor.

23    I would simply point out that this agreement has

24 been in effect since 1999.  They've had seven years to

25 determine what the costs associated with these

Page 44

1    properties are, if any.  We don't believe there are any

2    and we think that they simply have waited too long and

3    there was never any request to extend the hearing with

4    respect to this particular sale.  And I would agree

5    with Your Honor.  We're here today and they don't have

6    any evidence to put on.  They -- and they're saying

7    that they -- they don't know what the -- the cure costs

8    are.  We believe the cure costs are zero.

9            THE COURT:  So from a legal analysis point of

10   view, Mr. Leen, is BP's argument that the sale can't be

11   approved with this agreement assigned because the cure

12   amount has not been determined or is the legal argument

13   something different than that?

14           MR. LEEN:  It's -- it's either/or.

15           THE COURT:  I'm sorry?

16           MR. LEEN:  It's either one of two things.

17   Either one, Monro takes the obligations.

18           THE COURT:  Under what legal theory though?

19           MR. LEEN:  Under 365, when they assumed it.

20   We don't know if there are any defaults on the

21   agreements.  They're just assuming all the obligations

22   under the agreement.

23       Or there is unresolved cure amounts and it can't

24   be assumed and assigned.

25           THE COURT:  So the objection of BP is to the

Legal Electronic Recording, Inc. 216-881-8000

1    assumption and assignment?

2              MR. LEEN:  Mm-hmm.

3              THE COURT:  And the objection is that either

4    Monro is required to make some additional affirmative

5    statement before it can accept the assignment or the

6    assignment isn't ripe to go forward because the cure

7    amount is unresolved?

8              MR. LEEN:  Yes, Your Honor.

9              THE COURT:  All right, thank you.

10         This is the Court's decision.  As part of the

11   Debtor's request to sell its assets to Monro, the

12   Debtor has included a request to assume and assign

13   certain contracts under Bankruptcy Code Section 365.

14   BP objects to that part of the sale that permits the

15   assumption and assignment of an indemnity agreement

16   that was entered into between BP and the prepetition

17   Debtor in 1999.  BP argues that the sale language is

18   inadequate because Monro should be required to

19   expressly state that it is assuming prepetition

20   obligations under this agreement.  And if that argument

21   doesn't win the day, then the alternative argument made

22   by BP is that essentially the issue is not ripe to go

23   forward because the cure amount is unresolved.  Without

24   the cure amount being resolved, then the sale can't be

25   approved because it includes an assumption and

Page 46

1    assignment of a contract that is not yet ready to be

2    assumed or assigned.

3        The parties' rights come from two sources in this

4    case.  One is from the Bankruptcy Code itself, Section

5    365.  The other is from the orders that this Court put

6    on with respect to the proposed sale of the property.

7    The Court entered an order that was agreed to by many

8    parties and not objected to by anyone that set out a

9    procedure for the Debtor to identify any agreements

10   that it wished to assume or assign and to make

11   proposals regarding the cure amounts that would be a

12   predicate to the assumption and assignment.  The order

13   also gave each affected party the right and the

14   obligation to come in and object to the cure amount and

15   to propose a different amount.  The orders then

16   anticipated that any of those disputes would be

17   resolved today, which is the day set for the

18   evidentiary hearing on the assumption and assignment of

19   the contracts, to the extent that they're included in

20   the sale agreement.

21       BP filed an objection but it does not specifically

22   reserve this particular issue.  The language that

23   counsel pointed to on page 2 of the objection simply

24   says except to the extent of any environmental

25   obligations, BP agrees to the following cure amounts

Legal Electronic Recording, Inc. 216-881-8000

Page 47

1    proposed by the Debtor.  BP then goes on to list

2    specific Procare sites and specific amounts that would

3    cure the prepetition defaults under those lease

4    agreements.  BP does not then say: "and with respect to

5    the environmental obligations that would arise under

6    the indemnity agreement BP identifies this as the cure

7    amount needed."

8        BP argues this morning that there's not enough

9    time to identify the cure amounts.  The Court, however,

10   made it clear from the beginning that it would not rush

11   this case through to the detriment of parties who did

12   not have sufficient time to preserve and protect their

13   rights and slowed the process down, to some extent, to

14   make sure that all parties were notified and had a

15   legitimate opportunity to identify their own concerns.

16   This Court did not receive any request from BP to

17   change that schedule in any fashion, and so the Court

18   finds that BP has waived any rights that it might have

19   had to extend the time frame for identifying and

20   providing evidence on the cure amount.

21       Additionally, as stated by Debtor's counsel

22   without contradiction, this agreement is from 1999, and

23   to the extent that there was some investigation that

24   needed to be done, it could surely have been done

25   between 1999 and today's date, which is April 28th,

1    2006.  To the extent that that might not have been an

2    inquiry that BP would need to have made before the

3    bankruptcy filing, it certainly could have identified

4    that as an issue and gone forward after the bankruptcy

5    filing.

6        So all of those reasons result in a finding that

7    BP has waived any right to argue that the cure amount

8    is unresolved and that additional time should be given

9    or that it should be a cause to delay or derail the

10   proceedings this morning in terms of the sale.

11       The second piece of BP's argument is that Monro

12   should be required to make an additional affirmative

13   obligation under Section 365.  The Court agrees with

14   Monro's argument and as echoed by the Debtor that

15   Section 365 sets out the extent of the obligations that

16   Monro will have following this sale and that there is

17   nothing in that section that would require Monro to

18   make an additional representation or to take on

19   additional responsibilities.  That objection -- that

20   part of the objection then is also overruled.

21       So for the reasons just stated, BP's objections

22   are overruled and the Court will put on an order that

23   reflects that as well.

24           MR. LEPENE:  Your Honor, I believe that that

25   resolves all of the objections.  I believe that to be

1    the case.

2        The -- let me just raise some additional points

3    and would suggest I can do this by proffer.  If the

4    Court wants to hear testimony on these points,

5    obviously, we can put witnesses on to testify.

6            THE COURT:  What is the issue going to be?

7            MR. LEPENE:  Just to -- for the record, the

8    good faith of Monro so that they get the benefit of

9    Section -- their status as a good faith purchaser so

10   they get the protection of Section 363(m).

11           THE COURT:  Please proffer the proposed

12   evidence and then I'll ask if there's anybody who

13   objects to the proffer, and if there's an objection,

14   then we can go to a witness.

15           MR. LEPENE:  We believe, Your Honor, that the

16   facts that would support a finding that Monro is a good

17   faith purchaser are that, first and foremost, this is a

18   totally arm's length transaction.  There is no

19   connection as between the Debtor or an insider of the

20   Debtor and Monro.  Monro is a public company.  This

21   transaction was negotiated over a period of time.  It

22   was very closely scrutinized and it was intense

23   negotiation with respect to the terms of the agreement

24   and ultimately the purchase price.  I would also say

25   that, from the Debtor's perspective, we have found

Page 50

1  Monro to be particularly accommodating in terms of the

2  way they have approached this particular transaction.

3  They have been the source of Debtor-in-Possession

4  financing on what we believe to be very reasonable

5  terms.  And they did that despite the fact that we were

6  engaged in a competitive bid process and through our

7  investment banker did our best, and in fact, did

8  identify at the inception of the auction a bid, a

9  competitive bid that we determined to be a higher and

10 better bid than the one that Monro had presented.

11 Again, all in the context of Monro having financed our

12 operations since the commencement of this case.

13      So for those reasons, Your Honor, and primarily

14 because of the arm's length nature of the transaction,

15 we think the evidence clearly establishes that they are

16 a good faith purchaser and entitled to the protection

17 of Section 363(m) of the Bankruptcy Code.

18           THE COURT:  The Debtor has proffered evidence

19 that the transaction was entered into in good faith and

20 would entitle the purchaser to certain protections.  Is

21 there anyone who objects to the proffer and asks that

22 the evidence be presented through testimony of a

23 witness?

24      Nobody's responded.  The Court accepts the proffer

25 and makes the finding.

Legal Electronic Recording, Inc. 216-881-8000

Page 51

1          MR. LEPENE:  Thank you, Your Honor.

2       The other thing that we would add for the record,

3    although I don't believe there has been any objection

4    raised in terms of assumption and assignment of leases

5    or contracts as to Monro's ability to provide adequate

6    assurance of future performance, we would note for the

7    record again, Monro is a public company.  During its

8    last fiscal year its revenues were approximately $337

9    million and during its last fiscal year had a net

10   income of approximately $19.7 million.  Again, we think

11   that the record establishes adequate assurance of

12   future performance with respect to all leases and

13   contracts that are being assumed and assigned.

14          THE COURT:  But no one raised that though as

15   an issue; is that right?

16          MR. LEPENE:  I don't believe so, Your Honor.

17          THE COURT:  Then noted.

18          MR. LEPENE:  Thank you, Your Honor.

19       The only other matter that I would raise is that

20   we will -- we have circulated an order last evening.  I

21   believe that again now with the objections having been

22   resolved, I think the order itself is acceptable

23   certainly to the non-objecting parties.  We will, if I

24   might, hand that up to the Court so you might have an

25   opportunity to review that.  It does provide for a

Page 52

1    waiver of the ten-day stay under Rule 6004(g), I

2    believe it is.  And the reason for that, Your Honor,

3    and this clearly is of significance to the Debtor and

4    to the Debtor's creditors in terms of the ultimate

5    recovery.  Monro is prepared to close this transaction

6    tomorrow and to be open for business, you know, Monday

7    morning.  And that, obviously, reduces the losses,

8    eliminates the losses that we otherwise have been

9    suffering by reason of our operation of this particular

10   business, so therefore enhances the recovery for

11   creditors.  If it is at all possible that this order

12   could be entered today, obviously it would be very much

13   appreciated so that we would be in a position to close

14   the transaction tomorrow.  The parties are geared up

15   and prepared to do that, and anything the Court could

16   do in that regard for us would be greatly appreciated.

17            THE COURT:  Is there any party who objects to

18   the request that the stay not be entered for the ten

19   days?

20       Nobody has responded.  The Debtor may include that

21   in the proposed order.  Please include the language

22   that no party objected at the hearing to that

23   provision.

24            MR. LEPENE:  We will add that, Your Honor.

25   It's not in the draft presently, but we will add that.

1          THE COURT:  And if you send that over to the

2    clerk's office by e-mail in the next hour or so, it'll

3    be entered today.

4          MR. LEPENE:  Thank you very much, Your Honor.

5          THE COURT:  Thank you.  Thank you to all the

6    counsel who participated.  Winners or losers,

7    everybody's arguments were very interesting and I

8    appreciate it.  The hearing will conclude.

9          THE CLERK:  All rise.

10         (END OF PROCEEDINGS)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 54

1    State of Ohio            )

2    Cuyahoga County          )

3

4

5

6                        CERTIFICATE

7

8

9      I, Marc Eppler, a Notary Public, within and for the

10   State of Ohio, do hereby certify that the above

11   transcript is a true and accurate record of the hearing

12   held before the HONORABLE PAT E. MORGENSTERN-CLARREN.

13   This record was prepared from an audio recording provided

14   by the Court.

15      IN WITNESS WHEREOF, I have hereunto set my hand and

16   seal of office in Cleveland, Ohio on this 19th day of

17   MAY, A.D., 2006.

18

19

20

21                          _____
                                    MARC EPPLER
                            Notary Public - State of Ohio
22                          my commission expires 9-14-2008

23

24

25


Legal Electronic Recording, Inc. 216-881-8000