MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:  (212) 468-8000
Facsimile:  (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Stefan W. Engelhardt
Todd M. Goren

*Proposed Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- )
In re:                                                           )   Case No. 12-12020 (MG)
                                                                 )
RESIDENTIAL CAPITAL, LLC, <u>et al</u>.,                         )   Chapter 11
                                                                 )
                                    Debtors.                     )   Jointly Administered
                                                                 )
---------------------------------------------------------------- )

**DECLARATION OF MARC D. PUNTUS IN SUPPORT OF
<u>DEBTORS' SALE MOTION</u>**

I, Marc D. Puntus, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

    1.    I am a Partner and co-head of the Restructuring Group at Centerview Partners LLC ("Centerview"), financial advisor to Residential Capital LLC ("ResCap") and the other above-captioned debtors and debtors in possession (collectively the "Debtors").[1] I submit this declaration in support of the Debtors' Motion (A) Authorizing the Sale of Certain Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests; (B) Authorizing and

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit filed on the first day of these Chapter 11 cases.

ny-1065289

Approving Asset Purchase Agreements Thereto; (C) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief (the "Sale Motion").

## QUALIFICATIONS

2.  I previously have conveyed to the Court Centerview's qualifications in my Declaration in support of the application for Centerview's retention, my Declaration in support of the motion for approval of the Barclays DIP Facility and the AFI DIP Facility and my Declaration in support of the motion for approval of certain amendments to the Barclays DIP Facility (Docket Nos. 20 and 1784, respectively). For the Court's convenience, I set forth these qualifications again here.

3.  I have 19 years of experience advising corporations and other constituents on restructuring transactions. I also have considerable experience with mergers, acquisitions and financing transactions. I have prepared various valuation reports and testified as a fact and expert witness on numerous occasions, including in connection with Chapter 11 sale processes. Since October 18, 2011, my partner, Samuel Greene, and I have been the primary contacts at Centerview responsible for day-to-day discussions with the Debtors relating to general restructuring advice, financing efforts and the sales (the "Asset Sales") of the Debtors' servicing and origination platform and related financial assets ("the Platform") and its whole loan/trading securities portfolio ("the Whole Loan Portfolio").

4.  Established in 2006, Centerview is a leading investment banking boutique providing financial advisory services, including M&A and restructuring advice, across a broad range of industries, including financial institutions. Centerview serves a diverse set of clients around the world from its offices in New York, Los Angeles, San Francisco and London. Centerview's Restructuring Group was founded in 2011, and its professionals have extensive

2

ny-1065289

experience advising debtors, lenders, committees and acquirors in complex financial restructurings, both out-of-court and in Chapter 11 proceedings.

5. I joined Centerview in 2011 as a Partner, co-head and co-founder of the Restructuring Group.  Prior to joining Centerview, I was a Managing Director at Miller Buckfire & Co., LLC, where I was a founding member and partner for more than ten years.  Prior to Miller Buckfire, I was a member of the financial restructuring group at Dresdner Kleinwort Wasserstein, and prior to that, a Partner in the Business, Finance and Restructuring department of Weil, Gotshal & Manges LLP, a leading global law firm.  I have extensive experience in advising troubled and leveraged companies and their stakeholders. My experience includes a wide range of advisory assignments, including mergers, acquisitions, financings and restructurings, for both public and private companies.  My company-side experience includes representing Acterna, Anchor Danly, Autocam, Best Products, BroderBros., Bruno's Supermarkets, Conversent Communications, CNL Hotels & Resorts, CTC Communications, Dura Automotive, EaglePicher, Edison Brothers, Gate Gourmet, Greatwide Logistics Services, Independence Air, International Airlines Group, Isola Group, Itronix, Keystone Automotive, Magna Entertainment Corp., Mashantucket Pequot Tribal Nation/Foxwoods, MicroWarehouse, OSI Restaurants Partners, Pegasus Satellite Communications, Pegasus Broadcast, PlayPower, Progressive Moulded Products, PSINet, Reichhold, SI Corporation, Sunbeam, Women First Healthcare and Vonage Corporation.  I have also represented acquirors, secured lenders and committees in transactions involving, among other companies, AT&T Latin America, Culligan International, DS Waters, EaglePicher, Fairpoint Communications, First Wave Marine, Global Broadcasting, Grove Crane, Heilig-Meyers, Ion Media Networks, Ionica PLC, Lehman Brothers, Mariner Post-Acute Network, The Pittsburgh Penguins, RDM Sports Group, Rockefeller Center

3

Properties, Safety Components, Shared Technologies, SLI Inc., The Wiz and XO Communications.

6. Since October 2011, Centerview's ResCap "Core Team" of professionals has been diligently working on ResCap. The team includes me, Samuel Greene, Stephen Crawford, Karn Chopra, Dan Dunay, Ryan Kielty, Ben Weingarten and Jonathan Mattern.

7. Since the beginning of Centerview's engagement by the Debtors in October 2011, the Core Team has worked closely with the Debtors' management, financial staff and other professionals as part of the Debtors' restructuring and sale efforts; analyzed the Debtors' liquidity and projected cash flows; reviewed and analyzed potential debtor-in-possession financing arrangements; fully acquainted ourselves with the Debtors' business, operations, properties and finances; and assisted the Debtors in connection with preparations for commencement of these cases.

8. Accordingly, I, along with other members of the Core Team at Centerview, have developed substantial knowledge regarding the Debtors that allowed us to conduct a process leading to the proposed Asset Sales, and qualifies us to provide an assessment of the Asset Sales as set forth in this Declaration.

9. Given Centerview's and my background and expertise, I am qualified to provide the testimony referred to herein.

## PROPOSED ASSET SALES

10. Centerview has worked closely with the Debtors in the development and management of the sale process in an effort to maximize value for the Debtors' estates and stakeholders. For the reasons set forth herein, Centerview believes that the proposed Asset

4

Sales, with a combined value to the estates of approximately $4.5 billion[2], create significant value for the Debtors and their estates, ensure the opportunity for continued employment by Ocwen Financial and Walter Investment Management of a substantial majority of the Debtors' current employees and provide for the continuation of the Debtors' core business operations for the benefit of the U.S. homeowners whose loans the Debtors service and originate.

### The Debtors' Pre-Petition Marketing and Sale Efforts

11.  The previous marketing and sales efforts of the Debtors and Centerview have been chronicled in the Declarations of Samuel M. Greene in Support and in Further Support of the Proposed Sale of Debtors' Assets (Docket Nos. 63 and 375). For the Court's convenience, I briefly summarize those efforts here.

12.  Upon Centerview's retention, Centerview assisted the Debtors in evaluating a broad range of strategic alternatives, including, without limitation, continuing to pursue the status quo, an out-of-court sale transaction involving a new money investment consummated through a "spinoff" of certain assets into a "NewCo" and multiple variations of potential in-court restructuring and sale alternatives. Centerview's evaluation of each such alternative included an analysis of (i) the market landscape, (ii) the Debtors' assets, (iii) the capital necessary to obtain and manage such assets on a go-forward basis and (iv) the relative attractiveness of each out-of-court transaction as compared to a Chapter 11 proceeding.

13.  From November 2011 through mid-January 2012, the Debtors examined various potential out-of-court recapitalization and/or spinoff alternatives, including an attempted

---

[2]  The values of the stalking horse bids referenced in this Declaration are based on the balances on the Debtors' books and records as of February 29, 2012, while the values of the bids submitted at the auction are based on August 31st balances. The ultimate value received by the Debtors from the Asset Sales will be based on the values as of the closing date. Because the assets subject to the Asset Sales naturally "run off" over time, it is expected that the ultimate purchase price received will be less than the values referenced herein.

5

ny-1065289

out-of-court transaction with a third party. The Debtors and their advisors worked with the third party to develop detailed financial projections under various business structures, and assisted the third party in conducting due diligence on the business. Among the challenges to an out-of-court transaction was the significant capital contribution the third party required to assume the Debtors' financial obligations and contingent liabilities as well as the third party's requirement that a substantial amount of Fannie Mae and Freddie Mac servicing volume be guaranteed by such entities on a "fee for service" basis. Both the capital contribution and the GA servicing volume guarantees were prerequisites for an out-of-court transaction with the third party. No formal bid was made by the third party.

14. In late December 2011, with significant impending March and April 2012 debt maturities, the Debtors and Centerview shifted their focus to evaluating in-court transaction alternatives; specifically, an in-court sale of all or a substantial portion of the Debtors' assets and operations. To that end, on or about January 23, 2012, Centerview launched a targeted marketing process for the Debtors' assets and operations. Such a targeted process was necessitated by, among other things, the condensed timeframe in which a transaction was to be consummated. Centerview assisted the Debtors in strategically targeting potential bidders that had previously expressed interest in the Debtors, firms that had been recently acquisitive and/or already participating in the mortgage servicing and origination industry, firms that had the financial wherewithal and sophistication to acquire and properly capitalize an operation with the size and scope of the Debtors, and firms that were familiar with the Debtors and their operations.

15. This targeted process ultimately resulted in the receipt of three preliminary indications of interest, including one from Nationstar Mortgage ("Nationstar"), on or about February 13, 2012. Nationstar and one other bidder indicated their interest in participating as a

ny-1065289

stalking horse bidder for a substantial portion of the Debtors' assets and operations. The third bidder expressed an interest in buying a limited group of financial assets.

16. Upon receipt of these indications of interest, the Debtors and their advisors carefully evaluated the assets contemplated to be purchased under each of the three bids, the associated bid values and the contingencies associated with each bid, and determined that proceeding with the two bidders that expressed an interest in a substantial portion of the Debtors' assets and operations was most prudent. Centerview approached each of these bidders with a detailed request for supplemental information that would assist the Debtors in evaluating each indication of interest, including: (i) which assets would be purchased and which assets would remain in the estate; (ii) how the purchase price would be allocated among the purchased assets; (iii) licensing strategy; (iv) financing contingencies; and (v) how other factors might affect purchase price and transaction structure.

17. After receipt of the requested information from the bidders, the Debtors and their advisors compared the bids and determined, in their business judgment, to negotiate exclusively with Nationstar. Nationstar's offer was the highest and best offer for the Debtors' business as a whole and represented the value maximizing proposal for the following reasons, among others:

(i) Nationstar's offer was the highest dollar bid for the largest portion of the Debtors' assets and operations;

(ii) Nationstar represented a logical bidder because it was a strategic purchaser with a recent track record of purchasing mortgage assets, with access to Fortress as a funding source;

(iii) Nationstar held substantially all the mortgage operations licenses necessary to operate the Purchased Assets;

(iv) Nationstar offered the largest "equity" amount with the smallest debt financing requirements and fewest amount of contingencies;

7

ny-1065289

    (v)    Nationstar has strong relationships with Fannie Mae, Freddie Mac and Ginnie Mae; and

    (vi)    Nationstar's working knowledge of the Debtors, its operations and management from involvement in previous sales processes assisted in an expedited diligence process.

18. The Debtors and Centerview then facilitated extensive due diligence for Nationstar and Fortress over a 12-week time period. Nationstar and Fortress were provided access to over 1.2 million pages of electronic diligence materials and additional presentation materials describing the Debtors' operations and assets. The Debtors and Centerview arranged for Nationstar, Fortress and their advisors and lenders to have daily telephone conversations to address their due diligence questions and over 80 hours of on-site, in person diligence meetings conducted in the Debtors' offices in New York, NY, Fort Washington, PA and Dallas, TX. Indeed, diligence sessions, calls and meetings were continuous in the months leading up to the Chapter 11 filing.

19. On or about March 2, 2012, at the Debtors' direction, Centerview distributed a draft asset purchase agreement to Nationstar. Between March 2, 2012 and May 13, 2012, the Debtors, together with Centerview and their other advisors, negotiated the terms of the Nationstar APA and Nationstar completed its analysis of the Debtors' business. The parties and their advisors also engaged in extensive discussions with the GAs in respect of the proposed agreement and plans for maintaining the Debtors' origination and servicing operations as a going concern throughout the Debtors' Chapter 11 cases and upon sale to the successful bidder.

20. On May 13, 2012, the Nationstar APA was executed and delivered by the parties, immediately prior to the filing of the Debtors' Chapter 11 cases.

21. The Debtors, with the assistance of Centerview, also ran a marketing process for the Debtors' Whole Loan Portfolio, as detailed in the previous Supplemental

ny-1065289

Declaration of Samuel M. Greene in Further Support of the Proposed Sale of Debtors' Assets (Docket No. 375).

22.    Nationstar, in addition to its bid on the Platform, submitted a bid of $1.4 billion for the Whole Loan Portfolio. Following the submission of this bid, the Debtors and Ally Financial, Inc. ("AFI") discussed the possibility of AFI becoming the stalking horse bidder for the Portfolio. AFI, following extensive negotiations with the Debtors and their advisors, agreed to serve as the stalking horse bidder for the Whole Loan Portfolio and submitted a bid of $1.6 billion with no breakup fee or expense reimbursement required, but with the proviso that the sale had to occur under a plan of reorganization. If the Whole Loan Portfolio was sold outside of a plan of reorganization, AFI's bid would drop to $1.4 billion.

23.    On or about May 13, 2012, the AFI APA was executed and delivered by the parties, immediately prior to the filing of the Debtors' Chapter 11 cases.

**Sale Procedures Hearing**

24.    On June 15, 2012, the Friday preceding the sale procedures hearing conducted before this Court on June 18, 2012, Berkshire Hathaway submitted competing bids to become the stalking horse bidder for the Platform and the Whole Loan Portfolio. The bids were in the form of executed asset purchase agreements virtually identical to the agreements executed by Nationstar (for the Platform) and AFI (for the Whole Loan Portfolio). Due, at least in part, to Berkshire Hathaway's bids, a "pre-auction" auction ensued in advance of and during the sale procedures hearing, with this Court ultimately directing that final proposed stalking horse bids be submitted to the Debtors during the evening of June 18th. In accordance with the Court's direction, both Nationstar and Berkshire Hathaway submitted revised stalking horse bids for the Platform and Berkshire Hathaway submitted a revised stalking horse bid for the Whole Loan

Portfolio. In its revised bid for the Platform, Nationstar increased the purchase price to $2.45 billion, reduced its breakup fee from $72 million to $24 million and removed its request for up to $10 million in expense reimbursement. In its bid for the Whole Loan Portfolio, Berkshire Hathaway bid $1.44 billion with a $10 million breakup fee and no expense reimbursement (and eliminated the requirement that the Whole Loan Portfolio be sold under a plan of reorganization). In the Debtors' business judgment, the Nationstar bid for the Platform and the Berkshire Hathaway bid for the Whole Loan Portfolio were the "highest and best" bids at that time. With the support of the Creditors' Committee, the Debtors sought and obtained Court approval of these stalking horse bids and the sales procedures motion at a hearing on June 19, 2012.

### Post-Petition Marketing of the Platform

25. Following the conclusion of the sales procedures hearing, Centerview prepared a "potential purchaser" list for the Platform populated with those institutions that Centerview believed would have an interest in, and the financial resources and expertise necessary to, purchase the Platform. Approximately 30 potential purchasers were included on that list. The list was circulated to the advisors for the Creditors' Committee and the Junior Secured Bonds, who were each given an opportunity to comment on and add to the list of potential purchasers.

26. Centerview approached each of the prospective purchasers on the list to gauge their respective interest in pursuing a sale transaction for the Platform. Sixteen of those entities signed a nondisclosure agreement, received a Confidential Information Memorandum describing the assets and were granted access to an electronic data room containing diligence materials. After evaluating the Confidential Information Memorandum, five of the sixteen

10

entities that received diligence indicated that they would like an opportunity to meet with the Debtors' management team.

27. The Debtors' management team, with the participation of Centerview, made formal presentations to these five entities. During such presentations, management described in detail the Platform being sold and answered due diligence questions from the potential purchasers. Additionally, each of the five interested purchasers were afforded an opportunity to visit the Debtors' locations and perform detailed on-site due diligence with the Debtors' business units.

28. Following the management presentations, Centerview sent a memorandum to these potential purchasers containing inquiries focused on several topics, and asked for a written response by August 31, 2012. Topics included the bidders' proposed plans for financing a transaction, whether bidding partners were required, plans for obtaining the requisite licenses and other regulatory approvals and post-closing plans for operating the business. These inquiries were designed to provide the Debtors with information necessary to evaluate prospective bids the Debtors might receive from each potential purchaser, including assisting the Debtors in assessing value to the estate, gauging the level of interest of each prospective purchaser and evaluating whether a sale to each of these purchasers could in fact be consummated.

29. The Debtors received responses to their memorandum from three potential purchasers: (i) Berkshire Hathaway; (ii) an undisclosed consortium of two bidders; and (iii) a consortium comprised of Ocwen Financial ("Ocwen") and Walter Investment Management ("Walter"), referred to herein collectively as Ocwen. At that point in time, the Debtors focused their marketing efforts on these three potential purchasers, each of which continued to perform significant diligence, including various meetings with the Debtors and their management. As

part of the diligence process, recognizing their critical importance to the process, the Debtors arranged in-person meetings for each of the potential purchasers with Fannie Mae, Freddie Mac and Ginnie Mae. The purpose of such meetings, which occurred during the week of September 17th in Washington, D.C., was to ensure that Fannie Mae, Freddie Mac and Ginnie Mae had an opportunity to "vet" the potential bidders and assess, among other things, their financial and operational wherewithal to purchase and operate the Platform. Centerview attended each of these meetings.

30. On October 19th, the bid deadline approved by the Court, the Debtors received two qualifying bids for the Platform: (i) the stalking horse bid previously submitted by Nationstar at a value of $2.357 billion[3]; and (ii) a bid from Ocwen at a value of $2.397 billion.[4] After adjusting for Nationstar's $24 million break-up fee, the economic value of the Ocwen bid was $2.373 billion, $16 million higher than Nationstar's stalking horse bid (exceeding the required minimum bid increment of $5 million). The Debtors, in the exercise of their business judgment, determined that the Ocwen bid was a qualifying bid and was the highest and best bid for the Platform. The Creditors' Committee agreed with the Debtors' conclusion.

---

[3]  As noted above, because the assets subject to the Platform sale run off over time, Nationstar's bid, which was valued at $2.45 billion based on the Debtors' February 29th balance sheet, was calculated to be worth $2.357 billion based on the Debtors' August 31st balance sheet.

[4]  Ocwen's initial bid also included an offer to purchase the Debtors' master servicing advances at 95% of book value or approximately $179.5 million. Although the Nationstar bid did not include master servicing advances, because the Debtors believed that they would be able to recover 100% on these advances over approximately 30 months if they weren't sold, the Debtors did not ascribe direct value to this aspect of Ocwen's bid in comparing it to Nationstar's bid. The Creditors' Committee supported this analysis. Ultimately, however, as part of its initial overbid at the auction, Nationstar agreed to match Ocwen's offer to purchase the master servicing advances. As a consequence, the final bids set forth herein incorporate the sale of the master servicing advances.

**Post-Petition Marketing of the Whole Loan Portfolio**

31. Consistent with the marketing process for the Platform, the Debtors and Centerview prepared an extensive list of potential purchasers for the Whole Loan Portfolio. The list was circulated to the advisors for the Creditors' Committee and the Junior Secured Bonds, who were each given an opportunity to comment on and add to the list. The final list of potential purchasers for the Whole Loan Portfolio totaled 46 entities.

32. Centerview approached each of the prospective purchasers on the list to gauge their respective interest in pursuing a sale transaction for the Whole Loan Portfolio. Twenty-two potential purchasers signed nondisclosure agreements and were provided access to data tapes containing information about each loan and trading security in the Whole Loan Portfolio. Subsequently, the Debtors distributed a historical cash flow analysis of the Whole Loan Portfolio to all potential purchasers to assist in their evaluation. After the potential purchasers were afforded several weeks to evaluate the information provided, potential purchasers were provided supplemental information, including mortgage pay histories, servicing notes and broker price opinions, to assist in their diligence efforts.

33. In a further effort to facilitate comprehensive diligence for the Whole Loan Portfolio and maximize value, the Debtors, after consulting with the Creditors' Committee, paid for and delivered to the potential purchasers, four third-party diligence reports to assist in the evaluation of the Whole Loan Portfolio:

- Compliance Report: examines the credit files of a sample population of borrowers to ensure that individual loans were originated in compliance with state and federal regulations and guidelines;

- Data Integrity Report: compares the accuracy of the information in a loan's credit files with the information found on the data tapes;

- Title Search: determines the lien status of each mortgage in the Whole Loan Portfolio; and

ny-1065289

- Tax Lien Search: determines whether a tax lien exists on the property related to each mortgage loan in the Whole Loan Portfolio.

34. The Debtors also offered to each potential purchaser on-site visits with the Debtors' two main document custodians in order to allow such parties to view a population of physical collateral files and perform an independent verification of the collateral exception report prepared by the Debtors' document custodians.

35. Lastly, during the process, the Debtors and their advisors furnished to each potential purchaser, on a monthly basis, updated data tapes, cash flow and yield analyses on the Whole Loan Portfolio, and fielded questions from many potential purchasers on a daily basis.

36. On October 19th, the bid deadline approved by the Court, the Debtors received two qualifying bids for the Whole Loan Portfolio: (i) the stalking horse bid previously submitted by Berkshire Hathaway at a value of $1.324 billion[5]; and (ii) a bid from a consortium of four financial bidders led by DLJ Mortgage Capital (the "DLJ Consortium") at a value of $1.339 billion. After adjusting for Berkshire Hathaway's break-up fee of $10 million, the economic value of the DLJ Consortium bid was $1.329 billion, $5 million higher than Berkshire Hathaway's stalking horse bid (satisfying the required bid increment of $5 million). Notably, due to certain changes made by the DLJ Consortium to the asset purchase agreement and proposed sale order, the Debtors, in consultation with the Creditors' Committee, initially determined that there were certain material issues with the DLJ Consortium bid. Thus, from the time that the bid was received through the opening of the auction, the Debtors, in consultation with the Creditors' Committee, engaged in extensive negotiations with the DLJ Consortium with

---

[5] As noted above, because the assets subject to the sale naturally run off over time, Berkshire Hathaway's bid, which was valued at $1.44 billion based on February 29th balances, was calculated to be worth $1.324 billion based on August 31st balances.

respect to their proposed asset purchase agreement and sale order. Ultimately, prior to the auction, the DLJ Consortium was able to address the Debtors' concerns with revisions to the proposed sale documents. As such, the Debtors, in the exercise of their business judgment, with the support of the Creditors' Committee, determined that the DLJ Consortium bid was a qualifying bid and was the highest and best bid for the Whole Loan Portfolio.

### Key Stakeholder Communications

37. Throughout the process, the Debtors and their advisors provided the Creditors' Committee and AFI and their respective advisors, and advisors to the Junior Secured Bonds, with weekly and sometimes daily updates on the marketing processes for both the Platform and the Whole Loan Portfolio. Notably, professionals at Centerview had discussions about the sale process with Moelis & Co., the Creditors Committee's investment banker, at least two to three times per week. Other parties in interest, including Barclays (the agent for the Debtors' debtor-in-possession financing facility), and Citibank (a pre-petition lender), received updates as requested.

38. In addition to the in-person meetings discussed above, the Debtors and their advisors were in dialogue with Fannie Mae, Freddie Mac, Ginnie Mae, the Department of Justice and FHFA. The Debtors provided regular updates on the process and worked with the potential Platform purchasers to attempt to address any concerns raised. In addition, each of the bidders had direct communications with the GAs during the process. In the week prior to the Platform auction, the Debtors reached out to each of Fannie Mae, Freddie Mac and Ginnie Mae to assess their comfort level with each of Nationstar and Ocwen. While no formal consents to the Platform sale and related transfers were obtained, based on these meetings and discussions,

the Debtors became comfortable that GA servicing transfer approval would be achievable for both Nationstar and Ocwen.

### The Platform Auction

39.     In the context of a business as complicated and multi-faceted as the Platform, purchase price does not precisely align with value to the Debtors' estates.  To that end, in the weeks leading up to the auction, the Debtors and their advisors, in consultation with the Creditors' Committee and its advisors, undertook to categorize and quantify, among other things, potential administrative costs the Debtors' estates might incur in connection with each bid should the bidder prevail at auction.  After weeks of preparation and fine-tuning, the Debtors' analysis was shared with Nationstar and Ocwen in the days prior to the auction so that each party could assess the value of incorporating potential adjustments to their bids/asset purchase agreements during the auction.  Inasmuch as each of these adjustments would avoid the incurrence of certain estimated administrative expenses, the Debtors were prepared to offer each bidder credit for making such adjustments.

40.     On October 23, 2012, the Debtors began the Platform auction with Ocwen's bid as the opening bid.  During the course of the auction, Nationstar and Ocwen, as a component of their respective bids, each elected to make the following adjustments to their bids/asset purchase agreements:

- Severance:  Both bidders agreed to make offers conforming to the Debtors' severance policies to employees representing 70% of the Debtors' potential severance cost.  The Debtors calculated that this provided $34.7 million in value to their estates through the avoidance of severance costs.

- Servicing Platform Costs:  Both bidders agreed to maintain loans on the Debtors' servicing platform or otherwise assume any third-party costs for the transfer of such loans to a different platform.  This will allow the Debtors to avoid paying employee incentives, vendor incentives and the

16

> need for an interim servicing agreement, each of which would have been required if the Debtors were required to operate the Platform for a period post-closing. These changes also saved the Debtors potential loan/documentation transfer costs. The Debtors calculated that absent these changes the cost of operating the Platform for a period post-closing would be approximately $49.6 million and that the loan/documentation transfer costs would be approximately $14.2 million.

- Loan Origination Platform: Both bidders agreed to provide transition services necessary for the Debtors to wind down their loan origination pipeline post-close. The Debtors calculated that this agreement provided $9.9 million in value to their estates.

Nationstar and Ocwen also agreed to remove a provision in their respective asset purchase agreements that required a purchase price adjustment to the extent the Debtors did not succeed in obtaining amendments to certain servicing agreements to allow the associated servicing advances to be more easily financed. Prior to the auction, the Debtors, in consultation with the Creditors' Committee, evaluated each servicing agreement and evaluated the likelihood that the required amendments would be obtained by the closing date of the Platform sale. Based on this analysis, the Debtors concluded that the risk to the purchase price associated with this provision in the asset purchase agreements was $55 million (and could be as high as $180 million if no amendments were obtained by closing). Thus, in the Debtors' judgment, the removal of this provision, by both bidders, resulted in at least $55 million in incremental value.

41. Lastly, during the auction, both Ocwen and Nationstar agreed to certain "qualitative" changes to their bids/asset purchase agreements that were viewed favorably by the Debtors. First, both bidders allowed the Debtors to "carve out" from the asset purchase agreement any "unprofitable" servicing agreements (i.e., those servicing agreements where the potential cure costs would be greater than the purchase price attributable to the MSR and servicing advances underlying the agreement). Second, both bidders agreed to remove the Ginnie Mae liability bifurcation condition in the asset purchase agreements, a requirement of

17

Ginnie Mae. As a result, Ginnie Mae may now seek satisfaction of all liabilities relating to Ginnie Mae loans, either pre- or post-closing, related to servicing or origination, from the purchaser of the Platform. Third, both bidders agreed to extend the "drop dead" date in their respective asset purchase agreements from January 31, 2013 to March 31, 2013.

42. The auction was conducted from 10 a.m. to 10 p.m. on October 23rd and concluded on the morning of October 24th. There were 28 rounds of bidding, with each bidder successively meeting the required minimum bid increment each round. At the conclusion of the auction, excluding the "qualitative" changes described above, the aggregate value of the final bids including administrative costs avoided was as follows:

- Ocwen: $3 billion (purchase price) / $163.4 million (cost/purchase price risk avoidance)
- Nationstar: $2.907 billion (purchase price) / $163.4 million (cost/purchase price risk avoidance)

Given these two outstanding bids at the conclusion of the auction, and with no material differences in the proposed asset purchase agreements of the two bidders, the Debtors, in the exercise of their business judgment, determined that the Ocwen bid represented the highest and best bid and declared Ocwen the winner of the auction. The Ocwen bid represents an aggregate increase in value to the Debtors' estates of approximately $800 million as compared to the Nationstar stalking horse bid. Nationstar is contractually obligated to remain as a "back-up bidder" on the terms reflected in its last bid through November 23, 2012, or one day after the entry of a sale order, whichever is earlier.

ny-1065289

### The Whole Loan Portfolio Auction

43.     Prior to commencing the Whole Loan Portfolio auction, the Debtors described to Berkshire Hathaway the above-mentioned changes to the proposed asset purchase agreement made by the DLJ Consortium, and offered Berkshire Hathaway the opportunity to adopt any such modifications as part of its bid.  In addition, at the outset of the auction, the Debtors requested that Berkshire Hathaway agree on the record that it was willing to adopt the new language in section 6.17 of the DLJ Consortium asset purchase agreement, which requires continued compliance with certain aspects of the Consent Order and AG/DOJ Settlement, and Berkshire Hathaway's representative did so agree.

44.     The auction was conducted from 10:30 a.m. to 1:30 p.m. on October 25th.  There were 11 rounds of bidding, with final bids as follows:

- Berkshire Hathaway:   $1.5 billion
- DLJ Consortium:      $1.475 billion

Given these two outstanding bids at the conclusion of the auction, and with no material differences in the proposed asset purchase agreements of the two bidders, the Debtors, in the exercise of their business judgment, determined that the Berkshire Hathaway bid was the highest and best bid and declared Berkshire Hathaway the winner of the auction.  The Berskshire Hathaway bid represents an aggregate increase in value of approximately $175 million as compared to the Berkshire Hathaway stalking horse bid.  The DLJ Consortium is contractually obligated to remain as a "back-up bidder" on the terms reflected in its last bid through January 31, 2013.

### CONCLUSION

45.     The Debtors and their advisors view these two auctions as an unqualified success.  The two winning bids total approximately $4.5 billion (based on the Debtors' August

31, 2012 balance sheet) and represent an increase in total value to the Debtors' estates of close to $1 billion as compared to the original stalking horse bids. After repayment of the Barclays DIP, the AFI DIP, the Citi MSR facility and the Fannie Mae EAF and assuming the segregation of proceeds associated with collateral supporting the AFI LOC and AFI Revolver/Junior Secured Bonds, the Debtors project that they will have approximately $900 million in unencumbered cash from the proceeds of the Asset Sales.[6] In addition, the Debtors have approximately $1.27 billion in assets (book value) remaining in the estate to be monetized on behalf of creditors.

46. Lastly, and importantly, through modifications to the original Platform asset purchase agreements, the Debtors have ensured the opportunity for continued employment by Ocwen of a substantial majority of the Debtors' current employees and provided for the continuation of the Debtors' core business operations for the benefit of the U.S. homeowners whose loans the Debtors service and originate.

47. For the reasons set forth herein, I believe that the Asset Sales and the Sale Motion should be approved in all respects.

48. I declare, under penalty of perjury, that the foregoing is true and correct, to the best of my knowledge.

Dated: November 12, 2012
      New York, New York

                                                      /s/   Marc D. Puntus
                                                      Marc D. Puntus

---

[6] This amount assumes the payment of approximately $200 million in potential cure claims and is subject to the negotiation and resolution of those claims.