**EXHIBIT 1**

# WALTER INVESTMENT MANAGEMENT CORP
## (WAC)

## 10-Q

Quarterly report pursuant to sections 13 or 15(d)
Filed on 11/08/2012
Filed Period 09/30/2012





# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, DC 20549**

## Form 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2012

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from          to

Commission file number: 001-13417

# Walter Investment Management Corp.
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Maryland** | **13-3950486** |
| (State or other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification No.) |
| **3000 Bayport Drive, Suite 1100** | |
| **Tampa, FL** | **33607** |
| (Address of principal executive offices) | (Zip Code) |

**(813) 421-7600**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Class | Name of Exchange on Which Registered |
|---|---|
| Common Stock, $0.01 Par Value per Share | NYSE Amex |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The registrant had 35,758,189 shares of common stock outstanding as of October 31, 2012.

**WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES**
**FORM 10-Q**
**INDEX**

|  | Page No. |
|---|---|
| **PART I. FINANCIAL INFORMATION** | |
| Item 1. Financial Statements | 3 |
| Consolidated Balance Sheets as of September 30, 2012 (unaudited) and December 31, 2011 | 3 |
| Consolidated Statements of Comprehensive Income (Loss) for the Three and Nine Months Ended September 30, 2012 and 2011 (unaudited) | 5 |
| Consolidated Statement of Stockholders' Equity for the Nine Months Ended September 30, 2012 (unaudited) | 6 |
| Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2012 and 2011 (unaudited) | 7 |
| Notes to Consolidated Financial Statements (unaudited) | 8 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 38 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 68 |
| Item 4. Controls and Procedures | 68 |
| **PART II. OTHER INFORMATION** | |
| Item 1. Legal Proceedings | 68 |
| Item 1A. Risk Factors | 68 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 96 |
| Item 3. Defaults Upon Senior Securities | 96 |
| Item 4. Mine Safety Disclosures | 96 |
| Item 5. Other Information | 96 |
| Item 6. Exhibits | 96 |
| Signatures | 97 |

**WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES**

**CONSOLIDATED BALANCE SHEETS**
**(in thousands, except share and per share data)**

| | September 30, 2012 (Unaudited) | December 31, 2011 |
|---|---|---|
| **ASSETS** | | |
| Cash and cash equivalents | $ 38,536 | $ 18,011 |
| Restricted cash and cash equivalents | 391,788 | 339,826 |
| Residential loans (includes $664,746 and $672,714 at fair value) | 2,204,065 | 2,278,402 |
| Allowance for loan losses | (16,952) | (13,824) |
| Residential loans, net | 2,187,113 | 2,264,578 |
| Receivables, net (includes $60,402 and $81,782 at fair value) | 208,284 | 228,128 |
| Servicer and protective advances, net | 129,631 | 140,497 |
| Servicing rights, net | 212,697 | 250,329 |
| Goodwill | 471,282 | 470,291 |
| Intangible assets, net | 119,334 | 137,482 |
| Premises and equipment, net | 118,810 | 130,410 |
| Other assets | 107,711 | 118,028 |
| Total assets | $3,985,186 | $4,097,580 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Payables and accrued liabilities (includes $18,583 and $21,515 at fair value) | $ 165,044 | $ 217,251 |
| Servicer payables | 334,653 | 231,916 |
| Servicing advance liabilities | 99,038 | 107,039 |
| Debt | 680,757 | 742,626 |
| Mortgage-backed debt (includes $779,894 and $811,245 at fair value) | 2,119,486 | 2,224,754 |
| Deferred tax liability, net | 30,525 | 43,360 |
| Total liabilities | 3,429,503 | 3,566,946 |
| Commitments and contingencies (Note 18) | | |
| Stockholders' equity: | | |
| Preferred stock, $0.01 par value per share: | | |
| Authorized - 10,000,000 shares | | |
| Issued and outstanding - 0 shares at September 30, 2012 and December 31, 2011 | — | — |
| Common stock, $0.01 par value per share: | | |
| Authorized - 90,000,000 shares | | |
| Issued and outstanding - 28,855,253 and 27,875,158 shares at September 30, 2012 and December 31, 2011, respectively | 289 | 279 |
| Additional paid-in capital | 191,571 | 178,598 |
| Retained earnings | 363,315 | 351,341 |
| Accumulated other comprehensive income | 508 | 416 |
| Total stockholders' equity | 555,683 | 530,634 |
| Total liabilities and stockholders' equity | $3,985,186 | $4,097,580 |

The following table presents the assets and liabilities of the Company's consolidated securitization trusts, which are included in the consolidated balance sheets above. The assets in the table below include those assets that can only be used to settle obligations of the consolidated securitization trusts. The liabilities in the table below include third-party liabilities of the consolidated securitization trusts only, and for which creditors or beneficial interest holders do not have recourse to the Company, and exclude intercompany balances that eliminate in consolidation.

| | September 30, 2012 (Unaudited) | December 31, 2011 |
|---|---|---|
| **ASSETS OF THE CONSOLIDATED SECURITIZATION TRUSTS THAT CAN ONLY BE USED TO SETTLE THE OBLIGATIONS OF THE CONSOLIDATED SECURITIZATION TRUSTS:** | | |
| Restricted cash and cash equivalents | $    57,075 | $    59,685 |
| Residential loans (includes $664,746 and $672,714 at fair value) | 2,189,593 | 2,266,965 |
| Allowance for loan losses | (16,732) | (13,604) |
| Residential loans, net | 2,172,861 | 2,253,361 |
| Receivables, net (includes $60,402 and $81,782 at fair value) | 60,402 | 81,782 |
| Other assets | 60,810 | 63,498 |
| Total assets | $2,351,148 | $2,458,326 |
| **LIABILITIES OF THE CONSOLIDATED SECURITIZATION TRUSTS FOR WHICH CREDITORS OR BENEFICIAL INTEREST HOLDERS DO NOT HAVE RECOURSE TO THE COMPANY:** | | |
| Payables and accrued liabilities | $    9,455 | $    10,163 |
| Mortgage-backed debt (includes $779,894 and $811,245 at fair value) | 2,119,486 | 2,224,754 |
| Total liabilities | $2,128,941 | $2,234,917 |

The accompanying notes are an integral part of the consolidated financial statements.

4

# WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)
### (Unaudited)
### (in thousands, except per share data)

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| **REVENUES** | | | | |
| Servicing revenue and fees | $101,027 | $ 88,012 | $305,556 | $ 94,259 |
| Interest income on loans | 37,964 | 41,239 | 117,697 | 124,623 |
| Insurance revenue | 17,335 | 17,738 | 54,100 | 21,907 |
| Other revenues | 4,430 | 4,935 | 13,259 | 5,785 |
| Total revenues | 160,756 | 151,924 | 490,612 | 246,574 |
| **EXPENSES** | | | | |
| Salaries and benefits | 52,554 | 49,404 | 165,498 | 67,128 |
| Interest expense | 43,986 | 47,336 | 134,347 | 89,389 |
| General and administrative | 27,668 | 23,649 | 90,584 | 47,983 |
| Depreciation and amortization | 23,770 | 26,042 | 73,729 | 26,402 |
| Provision for loan losses | 4,596 | 1,865 | 8,122 | 3,365 |
| Other expenses, net | 730 | 5,188 | 7,396 | 14,137 |
| Total expenses | 153,304 | 153,484 | 479,676 | 248,404 |
| **OTHER GAINS (LOSSES)** | | | | |
| Net fair value gains (losses) | 3,123 | (1,404) | 8,674 | (1,404) |
| Other | — | — | — | 433 |
| Total other gains (losses) | 3,123 | (1,404) | 8,674 | (971) |
| Income (loss) before income taxes | 10,575 | (2,964) | 19,610 | (2,801) |
| Income tax expense | 4,164 | 62,494 | 7,636 | 62,562 |
| Net income (loss) | $ 6,411 | $(65,458) | $ 11,974 | $(65,363) |
| Comprehensive income (loss) | $ 6,451 | $(65,847) | $ 12,066 | $(66,030) |
| Net income (loss) | $ 6,411 | $(65,458) | $ 11,974 | $(65,363) |
| Basic earnings (loss) per common and common equivalent share | $ 0.22 | $ (2.30) | $ 0.40 | $ (2.40) |
| Diluted earnings (loss) per common and common equivalent share | 0.21 | (2.30) | 0.40 | (2.40) |
| Total dividends declared per common and common equivalent share | — | 0.22 | — | 0.22 |
| Weighted-average common and common equivalent shares outstanding - basic | 28,990 | 28,491 | 28,902 | 27,251 |
| Weighted-average common and common equivalent shares outstanding - diluted | 29,397 | 28,491 | 29,158 | 27,251 |

The accompanying notes are an integral part of the consolidated financial statements.

5

**WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY**
**(Unaudited)**
**(in thousands, except share data)**

| | Common Stock | | Additional Paid-In Capital | Retained Earnings | Accumulated Other Comprehensive Income | Total |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at January 1, 2012 | 27,875,158 | $ 279 | $178,598 | $351,341 | $ 416 | $530,634 |
| Net income | | | | 11,974 | | 11,974 |
| Other comprehensive income | | | | | 92 | 92 |
| Share-based compensation | | | 8,935 | | | 8,935 |
| Excess tax benefit on share-based compensation | | | 1,421 | | | 1,421 |
| Issuance of shares under incentive plan net of shares repurchased and cancelled | 980,095 | 10 | 2,617 | | | 2,627 |
| Balance at September 30, 2012 | 28,855,253 | $ 289 | $191,571 | $363,315 | $ 508 | $555,683 |

The accompanying notes are an integral part of the consolidated financial statements.

6

# WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS
### (Unaudited)
### (in thousands)

|  | For the Nine Months Ended September 30, | |
|  | 2012 | 2011 |
|---|---|---|
| **Operating activities** | | |
| Net income (loss) | $ 11,974 | $ (65,363) |
| **Adjustments to reconcile net income (loss) to net cash provided by operating activities** | | |
| Amortization of servicing rights | 37,809 | 14,611 |
| Net fair value losses | 2,200 | 5,130 |
| Amortization of residential loan discounts | (11,919) | (10,461) |
| Amortization of discounts on debt and deferred debt issuance costs | 8,677 | 3,309 |
| Provision for loan losses | 8,122 | 1,599 |
| Depreciation and amortization of premises and equipment and intangibles | 35,920 | 11,791 |
| Gain on mortgage-backed debt extinguishment | — | (95) |
| Change in contingent earn-out payment liability | — | (338) |
| Losses on real estate owned, net | 1,282 | 2,009 |
| Provision (benefit) for deferred income taxes | (12,898) | 49,327 |
| Share-based compensation | 11,230 | 2,896 |
| Other | (2,867) | (349) |
| **Decrease (increase) in assets** | | |
| Receivables | 2,035 | (6,639) |
| Servicer and protective advances | 12,112 | 7,918 |
| Other | (229) | (2,562) |
| **Increase (decrease) in liabilities** | | |
| Payables and accrued liabilities | (51,260) | 59,600 |
| Servicer payables | (1,291) | 1,192 |
| Cash flows provided by operating activities | 50,897 | 73,575 |
| **Investing activities** | | |
| Purchases of residential loans | (2,624) | (45,582) |
| Principal payments received on residential loans | 120,346 | 90,232 |
| Payments on receivables related to Non-Residual Trusts | 12,726 | 4,034 |
| Cash proceeds from sales of real estate owned, net | 12,802 | 2,153 |
| Purchases of premises and equipment | (6,053) | (2,972) |
| (Increase) decrease in restricted cash and cash equivalents | 50,603 | (51,308) |
| Payment for acquisition of Green Tree, net of cash acquired | — | (999,988) |
| Other | 13 | (198) |
| Cash flows provided by (used in) investing activities | 187,813 | (1,003,629) |
| **Financing activities** | | |
| Issuance of debt | — | 748,150 |
| Debt issuance costs paid | (3,582) | (30,475) |
| Payments on debt | (64,612) | (2,618) |
| Net change in Revolver | — | 13,000 |
| Issuance of servicing advance liabilities | 204,203 | 81,059 |
| Payments on servicing advance liabilities | (212,204) | (89,434) |
| Issuance of mortgage-backed debt | — | 223,065 |
| Payments on mortgage-backed debt | (143,743) | (87,480) |
| Mortgage-backed debt extinguishment | — | (1,338) |
| Dividends and dividend equivalents paid | — | (13,431) |
| Proceeds from the issuance of common stock | 755 | 100 |
| Repurchase and cancellation of common stock | (423) | — |
| Excess tax benefits on share-based compensation | 1,421 | 321 |
| Cash flows provided by (used in) financing activities | (218,185) | 840,919 |
| Net increase (decrease) in cash and cash equivalents | 20,525 | (89,135) |
| Cash and cash equivalents at the beginning of the period | 18,011 | 114,352 |
| Cash and cash equivalents at the end of the period | $ 38,536 | $ 25,217 |

The accompanying notes are an integral part of the consolidated financial statements.

## 1. Business and Basis of Presentation

Walter Investment Management Corp., or the Company or Walter Investment, is a fee-based business services provider to the residential mortgage industry. The Company is a specialty servicer providing residential loan servicing that focuses on credit-sensitive residential mortgage assets in the United States, or the U.S. In addition, the Company is a mortgage portfolio owner of credit-challenged, non-conforming residential loans in the U.S. and operates an insurance agency serving residential loan customers. At September 30, 2012, the Company serviced approximately one million accounts.

Throughout this Quarterly Report on Form 10-Q, references to "residential loans" refer to residential mortgage loans and residential retail installment agreements, which include manufactured housing loans, and references to "borrowers" refer to borrowers under residential mortgage loans and installment obligors under residential retail installment agreements.

### Acquisition of RMS

On August 31, 2012, the Company executed a Stock Purchase Agreement to acquire 100% of the outstanding stock of Reverse Mortgage Solutions, Inc., or RMS. The acquisition was closed on November 1, 2012. See Note 2 for further information.

### Acquisition of Green Tree

On July 1, 2011, the Company acquired 100% of the outstanding membership interests of GTCS Holdings, LLC, or Green Tree. Green Tree, based in St. Paul, Minnesota, is a fee-based business services company providing high-touch, third-party servicing of credit-sensitive consumer loans, including residential mortgages, manufactured housing and consumer installment loans. A substantial portion of its servicing portfolio consists of residential mortgage loans serviced for a government-sponsored enterprise, a large commercial bank and various securitization trusts. Green Tree also acts as a nationwide agent, primarily of property and casualty homeowners' insurance products for both lender-placed and voluntary insurance coverage. Through the acquisition of Green Tree, the Company has increased its ability to provide specialty servicing and generate recurring fee-for-services revenues from a capital-light platform and has diversified its revenue streams from complementary businesses. As a wholly-owned subsidiary of the Company, the financial results for Green Tree have been included in the Company's consolidated financial statements beginning on July 1, 2011.

### Interim Financial Reporting

The accompanying unaudited consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the U.S., or GAAP, for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and related notes required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments, consisting of only normal recurring accruals, considered necessary for a fair presentation have been included. Operating results for the three and nine months ended September 30, 2012 are not necessarily indicative of the results that may be expected for the year ended December 31, 2012. These unaudited interim consolidated financial statements should be read in conjunction with the Company's audited consolidated financial statements and related notes included in the Company's Annual Report on Form 10-K for the year ended December 31, 2011.

### Use of Estimates

The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. The Company's material estimates and assumptions primarily arise from risks and uncertainties associated with interest rate volatility, prepayment volatility and credit exposure and relate, but are not limited to, the allowance for loan losses, valuation of residential loans, receivables, servicing rights, goodwill and intangibles, real estate owned, and mortgage-backed debt. Although management is not currently aware of any factors that would significantly change its estimates and assumptions in the near term, actual results may differ from these estimates.

*Reclassifications and Error Corrections*

During the fourth quarter of 2011, the Company restated the quarter ended September 30, 2011 to properly reflect additional income tax expense of $3.7 million related to the accounting for the impact of the loss of Real Estate Investment Trust, or REIT, status on July 1, 2011. The impact of this correction on the three and nine month periods ended September 30, 2011 was to increase income tax expense and increase net loss by $3.7 million and increase basic and diluted loss per share by $0.13 and $0.14, respectively. See Note 14 for further information regarding the loss of REIT status.

During the second quarter of 2012, the Company made immaterial corrections of errors in certain amounts in its consolidated balance sheets at December 31, 2011 and September 30, 2011 as well as to acquisition date fair values at July 1, 2011 of the assets acquired and liabilities assumed resulting from the acquisition of Green Tree. Amounts received by the Company and required to be legally segregated in separate bank accounts have been reclassified from cash and cash equivalents to restricted cash and cash equivalents. In addition, amounts for which the Company does not meet the right of offset criteria have been reclassified from servicer and protective advances to servicer payables. Lastly, cash balances that were overdrawn at year end have been reclassified from payables and accrued liabilities to cash and cash equivalents as the legal right of offset exists within the same banking institution. These revisions had no impact on the Company's net income or goodwill. The impact of correcting these errors resulted in a decrease of $1.6 million in cash flows from operating activities and an increase of $9.4 million in cash flows used in investing activities for the nine months ended September 30, 2011 to $73.6 million and $1.0 billion, respectively.

### *Recent Accounting Guidance*

In May 2011, the Financial Accounting Standards Board, or FASB, issued an accounting standards update on fair value measurements and disclosures that was the result of work completed by them and the International Accounting Standards Board to develop common requirements for measuring fair value and for disclosing of information about fair value measurements. The amendments in this standard are effective for interim and annual periods beginning January 1, 2012. The updates related to fair value measurements had no impact on the Company's consolidated financial statements. The additional disclosures required by the new standard include quantitative information about the significant unobservable inputs used in Level 3 recurring and non-recurring fair value measurements, a description of the valuation processes used for recurring and non-recurring fair value measurements, and qualitative information about the sensitivity of recurring fair value measurements to changes in unobservable inputs. These additional disclosures have been included in Note 4.

In June 2011, the FASB issued an accounting standards update that eliminates the option to present the components of other comprehensive income (loss) as part of the statement of changes in stockholders' equity. Under the new standard, the components of net income (loss) and other comprehensive income (loss) can be presented in either a single continuous statement of comprehensive income (loss) or in two separate but consecutive statements. The accounting standard is effective for interim and annual periods beginning January 1, 2012. The change in presentation required by this standard, which had an insignificant impact on the Company's consolidated financial statements, is reflected in the consolidated statements of comprehensive income (loss).

In September 2011, the FASB issued an accounting standards update in order to simplify how goodwill is tested for impairment. Prior to the issuance of this update, goodwill was required to be tested for impairment on at least an annual basis by comparing the fair value of a reporting unit with its carrying amount including goodwill. If the fair value of the reporting unit was less than its carrying amount, then measurement of the amount of impairment was required. Under the new standard, the Company is not required to calculate the fair value of a reporting unit unless it determines that it is more likely than not that its fair value is less than its carrying amount. The amendments in this standard are effective for interim and annual periods beginning January 1, 2012 with early adoption permitted. The Company has adopted this accounting standards update effective January 1, 2012 and will apply the guidance to its annual goodwill impairment test as of October 1, 2012. Adoption of this standard had no impact on the Company's consolidated financial statements.

In December 2011, the FASB issued an accounting standards update to require disclosure of information about the effect of rights of setoff with certain financial instruments on an entity's financial position. The amendments in this standard are effective for interim and annual reporting periods beginning January 1, 2013. The Company is currently evaluating the impact of the amendments in the accounting standards update on its financial statement disclosures.

In August 2012, the FASB issued an accounting standards update for technical amendments and changes in Securities Exchange Commission, or SEC, guidance. This update amends the FASB Codification for changes in SEC guidance and corrections related to FASB accounting. The Company has adopted this accounting standards update effective August 27, 2012. Adoption of this standard had no impact on the Company's consolidated financial statements.

On November 1, 2012, the Company acquired all of the outstanding shares of RMS, or the RMS Acquisition. RMS, based in Spring, Texas, provides a full suite of services to the reverse mortgage sector, including servicing, sub-servicing, loan origination and securitization, and technology. The acquisition of RMS will position the Company as a full service leader in the reverse mortgage servicing sector with significant growth opportunities in each of the RMS service lines. The RMS Acquisition represents an attractive extension to the Company's fee-for-service business model. The results of operations for RMS will be combined with those of the Company beginning on November 1, 2012, the date of acquisition.

The table below details the estimated fair value of the consideration transferred in connection with the RMS Acquisition (in thousands, except shares and per share data):

| | Amount |
|---|---|
| Cash to owners of RMS [1] | $ 95,000 |
| Company common stock (891,265 shares at $46.39 per share) [2] | 41,346 |
| Total consideration | $136,346 |

[1]    The cash portion of the RMS Acquisition was funded through the issuance of common stock. See Note 19 for additional information.

[2]    The fair value of $46.39 per share for the 891,265 common shares issued was based on an average of the high and low prices of the Company's shares on November 1, 2012.

Due to limited time since the closing date, the Company is unable to provide actual amounts recognized as of the closing date for the assets acquired and liabilities assumed, but has used certain estimates and assumptions to estimate the purchase price allocation of the assets acquired and the liabilities assumed. Since a detailed analysis has not been performed on the individual assets or liabilities of RMS, actual results may differ materially from these estimates. The fair value of premises and equipment, servicing rights and identified intangible assets was based on cash flow analyses and related analytical procedures. The fair value of securitized Home Equity Conversion Mortgages, or HECMs, and the liability to Ginnie Mae, or GNMA, trusts was estimated based on the net present value of projected cash flows over the estimated life of the HECM loans and liability to GNMA trusts. The valuation considers assumptions that a market participant would consider in valuing the assets or liabilities, including but not limited to, assumptions for prepayments, credit and discount rates.

The following table presents the preliminary estimated purchase price allocation of the assets acquired and liabilities assumed (in thousands):

| | Amount |
|---|---|
| Assets: | |
| Cash and cash equivalents | $    19,573 |
| Restricted cash and cash equivalents | 1,125 |
| Residential loans | 4,997,735 |
| Receivables | 7,069 |
| Servicer and protective advances | 17,235 |
| Servicing rights | 28,006 |
| Goodwill | 46,747 |
| Intangible assets | 20,000 |
| Premises and equipment | 19,919 |
| Other assets | 2,395 |
| Total assets acquired | 5,159,804 |
| Liabilities: | |
| Payables and accrued liabilities | 20,024 |
| Debt | 110,455 |
| Liability to GNMA trusts | 4,872,449 |
| Deferred tax liability | 20,530 |
| Total liabilities assumed | 5,023,458 |
| Fair value of net assets acquired | $   136,346 |

The following table presents the pro forma combined revenues and net income (loss) as if RMS had been acquired on January 1, 2011 (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
| | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| Revenues | $171,052 | $158,525 | $519,358 | $456,828 |
| Net income (loss) | 12,976 | (2,312) | 27,762 | (19,589) |
| Net earnings (loss) per share - basic | 0.35 | (0.06) | 0.76 | (0.54) |
| Net earnings (loss) per share - diluted | 0.35 | (0.06) | 0.75 | (0.54) |

The unaudited pro forma financial information is not indicative of the results of operations that would have been achieved if the RMS Acquisition had taken place on January 1, 2011. The amounts have been calculated to reflect additional fair value adjustments, depreciation and amortization that would have been incurred assuming the RMS Acquisition had occurred on January 1, 2011 together with the consequential tax effects. The unaudited pro forma financial information for the three and nine months ended September 30, 2011 also includes pro forma adjustments relating to the acquisition of Green Tree on July 1, 2011, as if it had occurred on January 1, 2010. These pro forma adjustments include additional depreciation, amortization and interest expense on debt issued to consummate the acquisition of Green Tree together with the consequential tax effects. The unaudited pro forma financial information exclude costs incurred which were directly attributable to the acquisitions of RMS and Green Tree and which do not have a continuing impact on the combined operating results.

The Company incurred expenses related to the RMS Acquisition of approximately $1.9 million during the three and nine months ended September 30, 2012 which are included in general and administrative expenses.

### Green Tree

On July 1, 2011, the Company acquired all of the outstanding membership interests in Green Tree for a total consideration of $1.1 billion. The purchase consideration was allocated to the assets acquired and liabilities assumed based on their estimated fair values as of the acquisition date. During the six months ended June 30, 2012, the Company adjusted the estimated fair value of the servicer and protective advances acquired at the acquisition date. This adjustment resulted in an increase to goodwill assigned to the Servicing segment and a decrease to servicer and protective advances, net of $1.0 million. No adjustment was made during the three months ended September 30, 2012.

### Costs Associated with Exit Activities

As a result of the acquisition of Green Tree, the Company took steps in 2011 to manage and optimize the combined operations of the consolidated company. The major costs incurred as a result of these actions are severance and other-related costs, which are recorded in salaries and benefits in the consolidated statements of comprehensive income (loss). Charges associated with these exit activities have not been allocated to business segments and are included in Other in Note 17. The Company completed these exit activities at the end of June 2012; final payments or other settlements are expected to be completed by the fourth quarter of 2013.

The following table summarizes the accrued liability, which is included in payables and accrued liabilities in the consolidated balance sheets, and the related charges and cash payments and other settlements associated with these activities (in thousands):

| | Severance and Other-Related Costs | Other | Total |
|---|---|---|---|
| Balance at January 1, 2011 | $ — | $— | $ — |
| Charges | 3,222 | 278 | 3,500 |
| Cash payments or other settlements | (1,266) | (63) | (1,329) |
| Balance at December 31, 2011 | 1,956 | 215 | 2,171 |
| Charges | 768 | — | 768 |
| Cash payments or other settlements | (164) | (5) | (169) |
| Balance at March 31, 2012 | 2,560 | 210 | 2,770 |
| Charges | 357 | — | 357 |
| Cash payments or other settlements | (817) | (23) | (840) |
| Balance at June 30, 2012 | 2,100 | 187 | 2287 |
| Charges | 493 | — | 493 |
| Cash payments or other settlements | (932) | (25) | (957) |
| Balance at September 30, 2012 | $ 1,661 | $162 | $ 1,823 |
| Total expected charges | $ 4,840 | $278 | $ 5,118 |

Securitization trusts that the Company consolidates and in which it holds residual interests are referred to as the Residual Trusts. Securitization trusts that have been consolidated and in which the Company does not hold residual interests are referred to as the Non-Residual Trusts. The Non-Residual Trusts were acquired as part of the acquisition of Green Tree.

### Residual Trusts

The Company has historically funded its residential loan portfolio through securitizations and evaluates each securitization trust to determine if it meets the definition of a Variable Interest Entity, or VIE, and whether or not the Company is required to consolidate the trust. Prior to the acquisition of Green Tree, the Company determined that it was the primary beneficiary of twelve securitization trusts and, as a result, has consolidated these VIEs. As a holder of the residual securities issued by the trusts, the Company has both the obligation to absorb losses to the extent of its investment and the right to receive benefits from the trusts, both of which could potentially be significant. In addition, as the servicer for these trusts, the Company concluded it has the power to direct the activities that most significantly impact the economic performance of the trusts through its ability to manage the delinquent assets of the trusts. Specifically, the Company has discretion, subject to applicable contractual provisions and consistent with prudent mortgage-servicing practices, to decide whether to sell or work out any loans that become troubled.

The Company is not contractually required to provide any financial support to the Residual Trusts. The Company may, from time to time at its sole discretion, purchase certain assets from the trusts to cure delinquency or loss triggers for the sole purpose of releasing excess overcollateralization to the Company. Based on current performance trends, the Company does not expect to provide financial support to the Residual Trusts.

### Non-Residual Trusts

As a result of the acquisition of Green Tree, the Company determined that it is the primary beneficiary of ten securitization trusts that were consolidated on the Company's consolidated balance sheet at July 1, 2011. The Company does not currently own any residual interests in these trusts. In addition, the Company does not receive economic benefit from the residential loans while the loans are held by the Non-Residual Trusts other than the servicing fees paid to the Company to service the loans. However, as part of a prior agreement to acquire the rights to service the loans in these securitization trusts, Green Tree assumed certain obligations to exercise mandatory clean-up calls for each of these trusts at their earliest exercisable dates, which is the date each loan pool falls to 10% of the original principal amount. As the Company will take control of the remaining collateral in the trusts when these calls are exercised, the clean-up call is deemed a variable interest, as the Company will be required under this obligation to absorb any losses of the VIEs subsequent to these calls which could potentially be significant to each VIE. Additionally, as servicer of the VIEs, the Company has concluded that it has the power to direct the activities that most significantly impact the economic performance of the VIEs.

The Company is not contractually required to provide any financial support to the Non-Residual Trusts. However, as described above, the Company is obligated to exercise the mandatory clean-up call obligations it assumed as part of the agreement to acquire the rights to service the loans in these trusts. The Company expects to call these securitizations beginning in 2017 and continuing through 2019. The total outstanding balance of the residential loans expected to be called at the various respective call dates is $418.0 million.

For seven of the ten Non-Residual Trusts and four securitization trusts that have not been consolidated, the Company, as part of an agreement to service the loans in all eleven trusts, also has an obligation to reimburse a third party for the final $165.0 million in letters of credit, or LOCs, if drawn, which were issued to the eleven trusts by a third party as credit enhancements to these trusts. As the LOCs were provided as credit enhancements to these securitizations, the trusts will draw on these LOCs if there are insufficient cash flows from the underlying collateral to pay the debt holders. The total amount available on these LOCs for all eleven securitization trusts was $288.0 million and $298.5 million at September 30, 2012 and December 31, 2011, respectively. Based on the Company's estimates of the underlying performance of the collateral in these securitizations, the Company does not expect that the final $165.0 million will be drawn, and therefore, no liability for the fair value of this obligation has been recorded on the Company's consolidated balance sheets; however, actual performance may differ from this estimate in the future. For further information on the four securitization trusts that have not been consolidated by the Company, refer to the Unconsolidated VIEs section of this Note.

Included in the table below is a summary of the carrying amounts of the assets and liabilities of the Residual Trusts and the Non-Residual Trusts (in thousands):

| | Carrying Amount of Assets and Liabilities of Consolidated VIEs | | | | | |
| | September 30, 2012 | | | December 31, 2011 | | |
| | Residual Trusts | Non-Residual Trusts | Total | Residual Trusts | Non-Residual Trusts | Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Restricted cash and cash equivalents | $ 41,518 | $ 15,557 | $ 57,075 | $ 43,452 | $ 16,233 | $ 59,685 |
| Residential loans | 1,524,847 | 664,746 | 2,189,593 | 1,594,251 | 672,714 | 2,266,965 |
| Allowance for loan losses | (16,732) | — | (16,732) | (13,604) | — | (13,604) |
| Residential loans, net | 1,508,115 | 664,746 | 2,172,861 | 1,580,647 | 672,714 | 2,253,361 |
| Receivables, net | — | 60,402 | 60,402 | — | 81,782 | 81,782 |
| Other assets | 58,560 | 2,250 | 60,810 | 61,002 | 2,496 | 63,498 |
| Total assets | $1,608,193 | $742,955 | $2,351,148 | $1,685,101 | $773,225 | $2,458,326 |
| **Liabilities** | | | | | | |
| Payables and accrued liabilities | $ 9,455 | $ — | $ 9,455 | $ 10,163 | $ — | $ 10,163 |
| Mortgage-backed debt | 1,339,592 | 779,894 | 2,119,486 | 1,413,509 | 811,245 | 2,224,754 |
| Total liabilities | $1,349,047 | $779,894 | $2,128,941 | $1,423,672 | $811,245 | $2,234,917 |

The assets of each consolidated VIE are pledged as collateral for the mortgage-backed debt and are not available to satisfy claims of general creditors of the Company. The mortgage-backed debt issued by each consolidated VIE is to be satisfied solely from the proceeds of the residential loans and other collateral held in the trusts. The trusts are not cross-collateralized and the holders of the mortgage-backed debt issued by the trusts do not have recourse to the Company. Refer to Note 12 for additional information regarding the mortgage-backed debt and related collateral.

For the Residual Trusts, interest income earned on the residential loans and interest expense incurred on the mortgage-backed debt, both of which are carried at amortized cost, are recorded in the consolidated statements of comprehensive income (loss) in interest income on loans and interest expense, respectively. Additionally, the Company records its estimate of probable incurred credit losses associated with the residential loans in provision for loan losses in the consolidated statements of comprehensive income (loss). Interest receipts on residential loans and interest payments on mortgage-backed debt are included in operating activities, while principal payments on residential loans are included in investing activities and issuances of and payments on mortgage-backed debt are included in financing activities in the consolidated statements of cash flows.

For the Non-Residual Trusts, the change in fair value of residential loans, receivables, net and mortgage-backed debt, all of which are carried at fair value, are included in net fair value gains (losses) in the consolidated statements of comprehensive income (loss). Also included in net fair value gains (losses) is the interest income that is expected to be collected on the residential loans and the interest expense that is expected to be paid on the mortgage-backed debt as well as the accretion of the fair value adjustments. Accordingly, the servicing fee that the Company earns for servicing the assets of the Non-Residual Trusts is recognized in net fair value gains (losses) as a component of the recognition of the interest income on the loans. The non-cash component of net fair value gains (losses) is recognized as an adjustment in reconciling net income (loss) to the net cash provided by or used in operating activities in the consolidated statements of cash flows. Principal payments on residential loans and draws on receivables, net are included in investing activities while payments on mortgage-backed debt are included in financing activities in the consolidated statements of cash flows.

### Unconsolidated VIEs

The Company has variable interests in VIEs that it does not consolidate as it has determined that it is not the primary beneficiary of the VIEs. As described in the Consolidated VIEs section above, as part of an agreement to service the loans in eleven securitization trusts, the Company has an obligation to reimburse a third party for the final $165.0 million in LOCs if drawn. The LOCs were issued by a third party as credit enhancements to these eleven securitizations and, accordingly, the securitization trusts will draw on these LOCs if there are insufficient cash flows from the underlying collateral to pay the debt holders.

13

As noted above, the Company has determined that for seven of these securitization trusts, the Company is the primary beneficiary due to a mandatory clean-up call obligation related to these trusts and, accordingly, the Company has consolidated the seven trusts on the consolidated balance sheets. However, for four of these securitization trusts for which the Company does not have a mandatory clean-up call obligation, the Company's involvement consists only of servicer and the LOC reimbursement obligation. As explained in the Consolidated VIEs section above, the Company does not expect that the final $165.0 million in LOCs will be drawn. As the Company's only involvement is that of servicer and the LOC reimbursement obligation, which is not expected to be drawn, the Company has concluded that it is not the primary beneficiary of the trusts as it does not have a variable interest that could potentially be significant to the VIEs. Accordingly, the four securitization trusts have not been consolidated on the Company's consolidated balance sheets. At September 30, 2012 and December 31, 2011, the Company serviced $229.6 million and $250.4 million, respectively, of loans related to the four unconsolidated securitization trusts.

The following table presents the carrying amounts of the Company's assets and liabilities that relate to its variable interests in the VIEs that are not consolidated, as well as its maximum exposure to loss and the unpaid principal balance of the total assets of the unconsolidated VIEs (in thousands):

| Type of Involvement | Carrying Value of Assets Recorded on the Consolidated Balance Sheets | | | Maximum Exposure to Loss [1] | Unpaid Principal Balance of Total Assets of Unconsolidated VIEs |
| | Servicing Rights, Net | Servicer and Protective Advances, Net | Total | | |
|---|---|---|---|---|---|
| Servicing arrangements with letter of credit reimbursement obligation | | | | | |
| September 30, 2012 | $ 2,461 | $ 2,616 | $5,077 | $170,077 | $ 229,565 |
| December 31, 2011 | 2,909 | 2,832 | 5,741 | 170,741 | 250,426 |

[1]   The Company's maximum exposure to loss related to these unconsolidated VIEs equals the carrying value of servicing rights, net and servicing and protective advances, net recognized on the Company's consolidated balance sheets plus an obligation to reimburse a third party for the final $165.0 million drawn on LOCs discussed above.

## 4. Fair Value

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants. A three-tier fair value hierarchy is used to prioritize the inputs used in measuring fair value. The hierarchy gives the highest priority to unadjusted quoted market prices in active markets for identical assets or liabilities and the lowest priority to unobservable inputs. A financial instrument's level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement. The three levels of the fair value hierarchy are as follows:

### Basis or Measurement

Level 1 Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

Level 2 Inputs other than quoted prices included in Level 1 that are observable for the asset or liability, either directly or indirectly.

Level 3 Prices or valuations that require inputs that are both significant to the fair value measurement and unobservable.

The accounting guidance concerning fair value allows the Company to elect to measure financial instruments at fair value and report the changes in fair value through net income or loss. This election can only be made at certain specified dates and is irrevocable once made. The Company does not have a policy regarding specific assets or liabilities to elect to measure at fair value, but rather makes the election on an instrument-by-instrument basis as they are acquired or incurred. Upon the acquisition of Green Tree, the Company elected to measure at fair value certain assets and liabilities of the Non-Residual Trusts including residential loans, receivables and mortgage-backed debt. In addition, with the acquisition of Green Tree, the Company recognized contingent liabilities for a mandatory repurchase obligation and for professional fees liability related to certain securitizations that it continues to measure at fair value on a recurring basis in accordance with the accounting guidance for business combinations.

The Company determines fair value based upon quoted broker prices, when available, or through the use of alternative approaches, such as the discounting of expected cash flows at market rates commensurate with an instrument's credit quality and duration.

14

*Items Measured at Fair Value on a Recurring Basis.*

The following assets and liabilities are measured at their financial amounts at fair value on a recurring basis, all of which utilize significant unobservable inputs or Level 3 assumptions in their valuation. The following table provides a reconciliation of the beginning and ending balances of these assets and liabilities (in thousands):

| | For the Three Months Ended September 30, 2012 | | | |
|---|---|---|---|---|
| | Fair Value June 30, 2012 | Total Gains (Losses) Included in Net Income | Settlements | Fair Value September 30, 2012 |
| **Assets** | | | | |
| Residential loans related to Non-Residual Trusts | $ 678,682 | $ 19,346 | $ (33,282) | $ 664,746 |
| Receivables related to Non-Residual Trusts | 68,107 | (3,550) | (4,155) | 60,402 |
| Total assets | $ 746,789 | $ 15,796 | $ (37,437) | $ 725,148 |
| **Liabilities** | | | | |
| Mandatory repurchase obligation | $ (10,900) | $ 482 | $ 320 | $ (10,098) |
| Professional fees liability related to certain securitizations | (8,860) | (247) | 622 | (8,485) |
| Mortgage-backed debt related to Non-Residual Trusts | (801,338) | (12,682) | 34,126 | (779,894) |
| Total liabilities | $ (821,098) | $(12,447) | $ 35,068 | $ (798,477) |

| | For the Nine Months Ended September 30, 2012 | | | |
|---|---|---|---|---|
| | Fair Value December 31, 2011 | Total Gains (Losses) Included in Net Income | Settlements | Fair Value September 30, 2012 |
| **Assets** | | | | |
| Residential loans related to Non-Residual Trusts | $ 672,714 | $ 93,421 | $ (101,389) | $ 664,746 |
| Receivables related to Non-Residual Trusts | 81,782 | (8,654) | (12,726) | 60,402 |
| Total assets | $ 754,496 | $ 84,767 | $ (114,115) | $ 725,148 |
| **Liabilities** | | | | |
| Mandatory repurchase obligation | $ (11,849) | $ 305 | $ 1,446 | $ (10,098) |
| Professional fees liability related to certain securitizations | (9,666) | (801) | 1,982 | (8,485) |
| Mortgage-backed debt related to Non-Residual Trusts | (811,245) | (74,464) | 105,815 | (779,894) |
| Total liabilities | $ (832,760) | $(74,960) | $ 109,243 | $ (798,477) |

| | For the Three and Nine Months Ended September 30, 2011 | | | | |
|---|---|---|---|---|---|
| | Fair Value June 30, 2011 | Green Tree Acquisition | Total Gains (Losses) Included in Net Loss | Settlements | Fair Value September 30, 2011 |
| **Assets** | | | | | |
| Residential loans related to Non-Residual Trusts | $ — | $ 726,475 | $ 4,401 | $(34,631) | $ 696,245 |
| Receivables related to Non-Residual Trusts | — | 84,921 | (322) | (4,034) | 80,565 |
| Total assets | $ — | $ 811,396 | $ 4,079 | $(38,665) | $ 776,810 |
| **Liabilities** | | | | | |
| Mandatory repurchase obligation | $ — | $ (13,638) | $ (340) | $ 340 | $ (13,638) |
| Professional fees liability related to certain securitizations | — | (10,440) | (309) | 688 | (10,061) |
| Mortgage-backed debt related to Non-Residual Trusts | — | (861,674) | (4,815) | 36,001 | (830,488) |
| Total liabilities | $ — | $(885,752) | $(5,464) | $ 37,029 | $ (854,187) |

Total gains and losses for assets and liabilities measured at fair value on a recurring basis are recognized in net fair value gains (losses) in the consolidated statements of comprehensive income (loss). Total gains and losses included in net income (loss) include interest income and expense at the stated rate for interest bearing assets and liabilities, respectively, accretion and amortization, as well as the impact of changes in valuation inputs and assumptions.

12-12020-mg    Doc 2158-1    Filed 11/12/12    Entered 11/12/12 13:24:54    Exhibit 1-
Walter Investment 10-Q    Pg 18 of 120

A valuation committee determines and approves all valuation policies and unobservable inputs used to estimate fair value. The valuation committee consists of certain members of the management team responsible for accounting, treasury, operations and credit risk. The valuation committee meets on a quarterly basis to review the financial assets and liabilities that require fair value measurement, including how each financial asset and liability has actually performed in comparison to the unobservable inputs and the projected performance provided by the Company's credit risk group. The valuation committee also reviews discount rate assumptions and related available market data.

The following is a description of the methods and assumptions used to estimate the fair values of the Company's assets and liabilities measured at fair value on a recurring basis, as well as the basis for classifying these assets and liabilities as Level 3 of the fair value hierarchy.

*Residential loans related to Non-Residual Trusts* — These loans are not traded in an active, open market with readily observable prices. Accordingly, the Company estimates fair value using Level 3 unobservable market inputs. The estimated fair value is based on the net present value of projected cash flows over the estimated life of the loans. The Company's valuation considers assumptions that a market participant would consider in valuing the loans, including but not limited to, assumptions for prepayment, default, loss severity and discount rates. The Company reassesses and periodically adjusts the underlying inputs and assumptions used in the valuation for recent historical experience, as well as for current and expected relevant market conditions. Collateral performance assumptions are primarily based on analyses of historical and projected performance trends, as well as the Company's assessment of current and future economic conditions. The discount rate assumption for these assets is primarily based on the collateral and credit risk characteristics of these loans, combined with an assessment of market interest rates. Residential loans related to Non-Residual Trusts are recorded in residential loans, net in the consolidated balance sheets.

*Receivables related to Non-Residual Trusts* — The Company estimates the fair value of these receivables using Level 3 unobservable market inputs at the net present value of expected cash flows from the LOCs to be used to pay debt holders over the remaining life of the securitization trusts. The estimate of the cash to be collected from the LOCs is based on expected shortfalls of cash flows from the loans in the securitization trusts, compared to the required debt payments of the securitization trusts. The cash flows from the loans and thus the cash to be provided by the LOCs is determined by analyzing the credit assumptions for the underlying collateral in each of the securitizations. The Company reassesses and periodically adjusts the underlying inputs and assumptions used in the valuation for recent historical experience, as well as for current and expected relevant market conditions. The discount rate assumption for these assets is based on the risk-free market rate given the credit risk characteristics of the collateral supporting the LOCs. Receivables related to Non-Residual Trusts are recorded in receivables, net in the consolidated balance sheets.

*Mandatory repurchase obligation* — This contingent liability relates to a mandatory obligation in which the Company is required to repurchase loans from an investor when the loans become 90 days delinquent. The Company estimates the fair value of this obligation based on the expected net present value of expected future cash flows using Level 3 assumptions that a market participant would consider in valuing these liabilities, including but not limited to, assumptions for prepayment, default and loss severity rates applicable to the historical and projected performance of the underlying loans. The Company reassesses and periodically adjusts the underlying inputs and assumptions used in the valuation for recent historical experience, as well as for current and expected relevant market conditions. Collateral performance assumptions are primarily based on analyses of historical and projected performance trends, as well as the Company's assessment of current and future economic conditions. The discount rate assumption for this liability is primarily based on collateral characteristics combined with an assessment of market interest rates. The mandatory repurchase obligation is included in payables and accrued liabilities in the consolidated balance sheets.

*Professional fees liability related to certain securitizations* — This contingent liability primarily relates to payments for surety and auction agent fees that the Company will be required to make over the remaining life of certain consolidated and unconsolidated securitization trusts. The Company estimates the fair value using Level 3 unobservable market inputs. The estimated fair value is based on the net present value of the expected cash flows of the professional fees required to be paid related to the securitization trusts. The Company's valuation considers assumptions that a market participant would consider in valuing these liabilities, including but not limited to, estimates of collateral repayment, default and discount rates. The Company reassesses and periodically adjusts the underlying inputs and assumptions used in the valuation for recent historical experience, as well as for current and expected relevant market conditions. Collateral performance assumptions are primarily based on analyses of historical and projected performance trends, as well as the Company's assessment of current and future economic conditions. The discount rate assumption for this liability is primarily based on collateral characteristics combined with an assessment of market interest rates. Professional fees liability related to certain securitizations are included in payables and accrued liabilities in the consolidated balance sheets.

16

*Mortgage-backed debt related to Non-Residual Trusts* — This debt is not traded in an active, open market with readily observable prices. Accordingly, the Company estimates the fair value using Level 3 unobservable market inputs. The estimated fair value of the debt is based on the net present value of the projected principal and interest payments owed for the remaining life of the securitization trusts. The Company's valuation considers assumptions and estimates for principal and interest payments on the debt. An analysis of the credit assumptions for the underlying collateral in each of the securitization trusts is performed to determine the required payments to debt holders. The assumptions that a market participant would consider in valuing debt, include but are not limited to, prepayment, default, loss severity and discount rates, as well as the balance of LOCs provided as credit enhancement. The Company reassesses and periodically adjusts the underlying inputs and assumptions used in the valuation for recent historical experience, as well as for current and expected relevant market conditions. Credit performance assumptions are primarily based on analyses of historical and projected performance trends, as well as the Company's assessment of current and future economic conditions. The discount rate assumption for this liability is primarily based on credit characteristics combined with an assessment of market interest rates. Mortgage-backed debt related to Non-Residual Trusts is recorded in mortgage-backed debt in the consolidated balance sheets.

The Company utilizes a discounted cash flow method in the fair value measurement of Level 3 assets and liabilities included in the consolidated financial statements at fair value on a recurring basis. The following table presents the significant unobservable inputs used in the fair value measurement of these assets and liabilities at September 30, 2012. Significant increases or decreases in any of these inputs in isolation would result in a significantly lower or higher fair value measurement.

| | Significant Unobservable Input | Range | Weighted Average |
|---|---|---|---|
| **Assets** | | | |
| Residential loans related to Non-Residual Trusts | Conditional prepayment rate | 4.57% - 6.31% | 5.46% |
| | Loss severity | 80.81% - 91.21% | 86.43% |
| Receivables related to Non-Residual Trusts | Conditional prepayment rate | 4.45% - 6.24% | 5.49% |
| | Loss severity | 78.45% - 89.06% | 84.09% |
| **Liabilities** | | | |
| Mandatory repurchase obligation | Conditional prepayment rate | 5.30% | 5.30% |
| | Loss severity | 71.08% | 71.08% |
| Professional fees liability related to certain securitizations | Conditional prepayment rate | 4.45% - 6.87% | 5.59% |
| Mortgage-backed debt related to Non-Residual Trusts | Conditional prepayment rate | 4.45% - 6.24% | 5.49% |
| | Loss severity | 78.45% - 89.06% | 84.09% |

### *Items Measured at Fair Value on a Non-Recurring Basis*

The following assets are measured in the consolidated financial statements at fair value on a non-recurring basis utilizing significant unobservable inputs or Level 3 assumptions in their valuation (in thousands):

| | Non -Recurring Fair Value Measurements | |
|---|---|---|
| | September 30, 2012 | December 31, 2011 |
| Real estate owned, net | $ 49,521 | $ 56,147 |

At the time a residential loan becomes real estate owned, the Company records the property at the lower of its carrying amount or estimated fair value less estimated costs to sell. Upon foreclosure and through liquidation, the Company evaluates the property's fair value as compared to its carrying amount and records a valuation adjustment when the carrying amount exceeds fair value, which is recorded in other expenses, net in the consolidated statements of comprehensive income (loss). The majority of real estate owned is reported in the Loans and Residuals operating segment. In determining the fair value, the Company's accounting department performs a review of historical severity rates of real estate owned previously sold by the Company. The properties are stratified by acquisition type and holding period. The severity rates are reviewed for reasonableness by comparison to third-party market trends. Fair value is determined by applying severity rates to the stratified population and is approved by management.

For the three and nine months ended September 30, 2012, real estate owned expenses, net, which are recorded in other expenses, net in the consolidated statements of comprehensive income (loss) were $0.3 million and $5.7 million, respectively, and $3.6 million and $9.2 million for the same periods in 2011, respectively. Included in real estate owned expenses, net are lower of cost or fair value adjustments of $(0.2) million and $2.0 million for the three and nine months ended September 30, 2012, respectively, and $1.7 million and $3.7 million for the same periods in 2011, respectively.

The following table presents the significant unobservable inputs used in the fair value measurement of Level 3 assets at September 30, 2012 measured in the consolidated financial statements at fair value on a non-recurring basis. The Company utilizes historical severity experience in the measurement of the fair value of these assets:

| | Significant Unobservable Input | Range | Weighted Average |
|---|---|---|---|
| Real estate owned, net | Loss severity | 0% - 79.80% | 12.78% |

## Fair Value of Financial Instruments

The following table presents the carrying values and estimated fair values of financial assets and liabilities, and their respective levels within the fair value hierarchy, that are required to be either recorded or disclosed at fair value at September 30, 2012 and December 31, 2011, respectively (in thousands):

| | September 30, 2012 | | Fair Value Hierarchy | December 31, 2011 | |
|---|---|---|---|---|---|
| | Carrying Amount | Estimated Fair Value | | Carrying Amount | Estimated Fair Value |
| **Financial assets** | | | | | |
| Cash and cash equivalents | $ 38,536 | $ 38,536 | Level 1 | $ 18,011 | $ 18,011 |
| Restricted cash and cash equivalents | 391,788 | 391,788 | Level 1 | 339,826 | 339,826 |
| Residential loans, net | | | | | |
| Residential loans carried at amortized cost | 1,522,367 | 1,484,902 | Level 3 | 1,591,864 | 1,587,258 |
| Residential loans carried at fair value | 664,746 | 664,746 | Level 3 | 672,714 | 672,714 |
| Receivables, net | | | | | |
| Insurance premium receivables | 108,303 | 102,274 | Level 3 | 110,980 | 107,111 |
| Receivables related to Non-Residual Trusts | 60,402 | 60,402 | Level 3 | 81,782 | 81,782 |
| Other | 39,579 | 39,579 | Level 3 | 35,366 | 35,366 |
| Servicer and protective advances, net | 129,631 | 123,373 | Level 3 | 140,497 | 131,597 |
| **Financial liabilities** | | | | | |
| Payables and accrued liabilities | | | | | |
| Mandatory repurchase obligation | 10,098 | 10,098 | Level 3 | 11,849 | 11,849 |
| Professional fees liability related to certain securitizations | 8,485 | 8,485 | Level 3 | 9,666 | 9,666 |
| Payables to insurance carriers | 49,636 | 48,956 | Level 3 | 49,246 | 48,812 |
| Other | 96,825 | 96,825 | Level 3 | 146,490 | 146,490 |
| Servicer payables | 334,653 | 334,653 | Level 3 | 231,916 | 231,916 |
| Servicing advance liabilities [1] | 98,319 | 98,785 | Level 2 | 107,039 | 107,060 |
| Debt [2] | 658,321 | 713,049 | Level 2 | 718,247 | 765,201 |
| Mortgage-backed debt | | | | | |
| Mortgage-backed debt carried at amortized cost [3] | 1,319,636 | 1,326,042 | Level 3 | 1,392,393 | 1,401,400 |
| Mortgage-backed debt carried at fair value | 779,894 | 779,894 | Level 3 | 811,245 | 811,245 |

[1] The carrying amount of servicing advance liabilities is net of deferred issuance costs of $0.7 million at September 30, 2012.

[2] The carrying amount of debt is net of deferred issuance costs of $22.4 million and $24.4 million at September 30, 2012 and December 31, 2011, respectively.

[3] The carrying amount of mortgage-backed debt carried at amortized cost is net of deferred issuance costs of $20.0 million and $21.1 million at September 30, 2012 and December 31, 2011, respectively.

The following provides a description of the methods and significant assumptions used in estimating the fair value of the Company's financial instruments that are not measured at fair value on a recurring basis. A description of the methods and significant assumptions used in estimating the fair values of financial assets and liabilities measured on a recurring basis has been provided under the *Items Measured at Fair Value on a Recurring Basis* section of this note.

*Cash and cash equivalents, restricted cash and cash equivalents, other receivables, other payables and accrued liabilities and servicer payables* — The estimated fair value of these financial instruments approximates their carrying amounts due to their highly liquid or short-term nature.

*Residential loans at amortized cost* — The methods and assumptions used to estimate the fair value of residential loans carried at amortized cost are the same as those described for residential loans related to Non-Residual Trusts.

18

*Insurance premium receivables* — The estimated fair value of those receivables is based on the net present value of the expected cash flows. The determination of fair value includes assumptions related to the underlying collateral serviced by the Company, such as delinquency and default rates, as the insurance premiums are collected as part of the customers' loan payments or from the related trusts.

*Servicer and protective advances, net* — The estimated fair value of these advances is based on the net present value of expected cash flows. The determination of expected cash flows includes consideration of recoverability clauses in the Company's servicing agreements as well as assumptions related to the underlying collateral, when proceeds may be used to recover these receivables.

*Payables to insurance carriers* — The estimated fair value of these liabilities is based on the net present value of the expected carrier payments over the life of the payables.

*Servicing advance liabilities* — The estimated fair value of these liabilities is based on the net present value of projected cash flows over the expected life of the liabilities at estimated market rates.

*Debt* — The Company's 2011 Term Loans are not traded in an active, open market with readily observable prices. The estimated fair value of this debt is based on an average of broker quotes. The estimated fair value of the Company's other debt approximates their carrying amounts due to their highly liquid or short-term nature.

*Mortgage-backed debt* — The methods and assumptions used to estimate the fair value of mortgage-backed debt carried at amortized cost are the same as those described for mortgage-backed debt related to Non-Residual Trusts.

### Fair Value Option

The Company elected the fair value option for certain assets and liabilities of the VIEs that have been consolidated as a result of the acquisition of Green Tree. These assets and liabilities related to the Non-Residual Trusts include residential loans, receivables and mortgage-backed debt. The fair value option was elected for these assets and liabilities as fair value best reflects the expected future economic performance of these assets and liabilities. The yield on the loans along with any changes in fair value are recorded in net fair value gains (losses) in the consolidated statements of comprehensive income (loss). The yield on the loans includes recognition of interest income based on the stated interest rates of the loans that is expected to be collected as well as accretion of the fair value adjustments.

Presented in the table below is the fair value and unpaid principal balance of the assets and liabilities for which the Company has elected the fair value option (in thousands):

| | September 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | Estimated Fair Value | Unpaid Principal Balance [1] | Estimated Fair Value | Unpaid Principal Balance [1] |
| Assets at fair value under the fair value option | | | | |
| Residential loans related to Non-Residual Trusts | $664,746 | $837,179 | $672,714 | $907,207 |
| Receivables related to Non-Residual Trusts | 60,402 | 61,142 | 81,782 | 87,802 |
| Total | $725,148 | $898,321 | $754,496 | $995,009 |
| Liabilities at fair value under the fair value option | | | | |
| Mortgage-backed debt related to Non-Residual Trusts | $779,894 | $848,964 | $811,245 | $920,761 |

[1]    For the receivables related to Non-Residual Trusts, the unpaid principal balance represents the notional amount of expected draws under the LOCs.

Presented in the table below are the fair value gains and losses from the instrument-specific credit risk and other factors associated with the assets and liabilities for which the Company has elected the fair value option (in thousands):

| | For the Three Months Ended September 30, 2012 | | | For the Nine Months Ended September 30, 2012 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Instrument-Specific Credit Risk [1] | Other [2] | Fair Value Gain (Loss) [3] | Instrument-Specific Credit Risk [1] | Other [2] | Fair Value Gain (Loss) [3] |
| Assets at fair value under the fair value option | | | | | | |
| Residential loans related to Non-Residual Trusts | $ 2,065 | $ 17,281 | $ 19,346 | $ 14,487 | $ 78,934 | $ 93,421 |
| Receivables related to Non-Residual Trusts | (1,853) | (1,697) | (3,550) | (8,657) | 3 | (8,654) |
| Total | $ 212 | $ 15,584 | $ 15,796 | $ 5,830 | $ 78,937 | $ 84,767 |
| Liabilities at fair value under the fair value option | | | | | | |
| Mortgage-backed debt related to Non-Residual Trusts | $ (89) | $(12,593) | $(12,682) | $ (4,849) | $(69,615) | $(74,464) |

| | For the Three and Nine Months Ended September 30, 2011 | | |
| --- | --- | --- | --- |
| | Instrument-Specific Credit Risk [1] | Other [2] | Fair Value Gain (Loss) [3] |
| Assets at fair value under the fair value option | | | |
| Residential loans related to Non-Residual Trusts | $ 1,328 | $ 3,073 | $ 4,401 |
| Receivables related to Non-Residual Trusts | (576) | 254 | (322) |
| Total | $ 752 | $ 3,327 | $ 4,079 |
| Liabilities at fair value under the fair value option | | | |
| Mortgage-backed debt related to Non-Residual Trusts | $ (1,022) | $(3,793) | $(4,815) |

[1] Consists of changes in fair value due to changes in assumptions related to prepayments, defaults and severity.
[2] Includes interest income and expense at the stated rate for interest-bearing assets and liabilities, respectively, accretion, and changes in fair value due to changes in the London Interbank Offered Rate, or LIBOR, as well as actual cash flows differing than expected.
[3] Fair value gains and losses are recognized in net fair value gains (losses) in the consolidated statements of comprehensive income (loss).

Included in residential loans accounted for under the fair value option are loans that are 90 days or more past due that have a fair value of $1.9 million and $2.2 million and an unpaid principal balance of $9.8 million and $11.9 million at September 30, 2012 and December 31, 2011, respectively.

***Fair Value Gains (Losses)***

Provided in the table below is a summary of the components of net fair value gains (losses) (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| Net fair value gains (losses) | | | | |
| Assets of Non-Residual Trusts | $ 15,796 | $ 4,079 | $ 84,767 | $ 4,079 |
| Liabilities of Non-Residual Trusts | (12,682) | (4,815) | (74,464) | (4,815) |
| Mandatory repurchase obligation | 482 | (340) | 305 | (340) |
| Professional fees liability related to certain securitizations | (247) | (309) | (801) | (309) |
| Other | (226) | (19) | (1,133) | (19) |
| Net fair value gains (losses) | $ 3,123 | $(1,404) | $ 8,674 | $(1,404) |

## 5. Residential Loans, Net

Residential loans are held for investment and are comprised of mortgage loans, manufactured housing loans, and retail installment agreements that are primarily held in securitization trusts that have been consolidated by the Company. The residential loans that are held in the Residual Trusts as well as unencumbered loans are accounted for at amortized cost while the residential loans that are held in the Non-Residual Trusts that have been consolidated in conjunction with the Company's acquisition of Green Tree are accounted for at fair value. The residential loans held in consolidated securitization trusts are pledged as collateral for the mortgage-backed debt issued by the trusts and are not available to satisfy claims of the general creditors of the Company. Refer to Note 3 for further information regarding these consolidated VIEs and to Note 12 for further information regarding the mortgage-backed debt and related collateral.

Residential loans, net are summarized in the table below (in thousands):

| | September 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Carried at Amortized Cost [1] | Carried at Fair Value | Total | Carried at Amortized Cost [1] | Carried at Fair Value | Total |
| Residential loans, principal balance | $1,694,714 | $ 837,179 | $2,531,893 | $1,776,063 | $ 907,207 | $2,683,270 |
| Unamortized premiums (discounts) and other cost basis adjustments, net | (155,395) | — | (155,395) | (170,375) | — | (170,375) |
| Fair value adjustment | — | (172,433) | (172,433) | — | (234,493) | (234,493) |
| Allowance for loan losses | (16,952) | — | (16,952) | (13,824) | — | (13,824) |
| Residential loans, net | $1,522,367 | $ 664,746 | $2,187,113 | $1,591,864 | $ 672,714 | $2,264,578 |

[1] Included in unamortized premiums (discounts) and other cost basis adjustments, net for residential loans carried at amortized cost is $13.9 million and $15.3 million in accrued interest receivable at September 30, 2012 and December 31, 2011, respectively.

### *Residential Loan Acquisitions*

At acquisition, the fair value of residential loans acquired outside of a business combination is the purchase price of the residential loans, which is determined primarily based on the outstanding principal balance, the probability of future default and the estimated amount of loss given default. The Company acquired residential loans to be held for investment in the amount of $2.6 million and $45.6 million, adding $2.6 million and $63.6 million of unpaid principal to the residential loan portfolio in the nine months ended September 30, 2012 and 2011, respectively. The acquisitions during the nine months ended September 30, 2012 and 2011, respectively, included $2.4 million and $27.1 million of unpaid principal balance associated with credit-impaired loans.

### *Purchased Credit-Impaired Residential Loans*

The following table provides acquisition date details of residential loans acquired with evidence of credit deterioration (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Contractually required cash flows for acquired loans at acquisition | $1,052 | $10,959 | $ 4,913 | $ 57,738 |
| Nonaccretable difference | (791) | (8,132) | (3,673) | (30,839) |
| Expected cash flows for acquired loans at acquisition | 261 | 2,827 | 1,240 | 26,899 |
| Accretable yield | — | (267) | — | (7,698) |
| Fair value at acquisition | $ 261 | $ 2,560 | $ 1,240 | $ 19,201 |

The table below sets forth the activity in the accretable yield for purchased credit-impaired residential loans (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Balance at beginning of the period | $14,135 | $13,839 | $15,294 | $ 4,174 |
| Additions | — | 267 | — | 7,698 |
| Accretion | (735) | (797) | (2,292) | (1,932) |
| Reclassifications from nonaccretable difference | 151 | 936 | 549 | 4,305 |
| Balance at end of the period | $13,551 | $14,245 | $13,551 | $14,245 |

The table below provides additional information about purchased credit-impaired residential loans (in thousands):

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Outstanding balance [1] | $ 42,182 | $ 45,827 |
| Carrying amount | 26,600 | 28,622 |

[1]    Consists of principal and accrued interest owed to the Company as of the reporting date.

### *Disclosures About the Credit Quality of Residential Loans at Amortized Cost and the Allowance for Loan Losses*

The allowance for loan losses represents management's estimate of probable incurred credit losses inherent in the residential loan portfolio accounted for at amortized cost as of the balance sheet date. This portfolio is made up of one segment and class that consists primarily of less-than prime, credit challenged residential loans. The risk characteristics of the portfolio segment and class relate to credit exposure. The method for monitoring and assessing credit risk is the same throughout the portfolio. The allowance for loan losses on residential loans accounted for at amortized cost includes two components: (1) specifically identified residential loans that are evaluated individually for impairment and (2) all other residential loans that are considered a homogenous pool that are collectively evaluated for impairment.

The Company reviews all residential loans accounted for at amortized cost for impairment and determines a residential loan is impaired when, based on current information and events, it is probable that the Company will be unable to collect all amounts due according to the original contractual terms of the loan agreement. Factors considered in assessing collectability include, but are not limited to, a borrower's extended delinquency and the initiation of foreclosure proceedings. Loans that experience insignificant payment delays and payment shortfalls generally are not classified as impaired. Management determines the significance of payment delays and payment shortfalls on a case-by-case basis, taking into consideration all of the circumstances surrounding the loan and the borrower, including the length of delay, the reasons for the delay, the borrower's prior payment record, and the amount of the shortfall in relation to the principal and interest owed. The Company determines a specific impairment allowance based on the difference between the carrying value of the residential loan and the estimated fair value of the collateral.

The determination of the level of the allowance for loan losses and, correspondingly, the provision for loan losses, for the residential loans evaluated collectively is based on, but not limited to, delinquency levels and trends, default frequency experience, prior loan loss severity experience, and management's judgment and assumptions regarding various matters, including the composition of the residential loan portfolio, known and inherent risks in the portfolio, the estimated value of the underlying real estate collateral, the level of the allowance in relation to total loans and to historical loss levels, current economic and market conditions within the applicable geographic areas surrounding the underlying real estate, changes in unemployment levels and the impact that changes in interest rates have on a borrower's ability to refinance their loan and to meet their repayment obligations. Management evaluates these assumptions and various other relevant factors impacting credit quality and inherent losses when quantifying the Company's exposure to credit losses and assessing the adequacy of its allowance for loan losses as of each reporting date. The level of the allowance is adjusted based on the results of management's analysis. Generally, as residential loans age, the credit exposure is reduced, resulting in decreasing provisions.

While there has been some stabilization in residential property values, there has not been significant improvement in property values particularly in more rural areas of the southeastern U.S. market. Additionally, there are continued high unemployment levels and a generally uncertain economic backdrop. As a result, the Company expects the allowance for loan losses to continue to remain elevated until such time as it experiences a sustained improvement in the credit quality of the residential loan portfolio. The future growth of the allowance is highly correlated to unemployment levels and changes in home prices within the Company's markets.

While the Company considers the allowance for loan losses to be adequate based on information currently available, future adjustments to the allowance may be necessary if circumstances differ substantially from the assumptions used by management in determining the allowance for loan losses.

*Modifications*

Occasionally, the Company modifies a loan. A description of the borrower under the Company's current modification program offered to borrowers is limited and is used to assist borrowers experiencing temporary hardships and is intended to minimize the economic loss to the Company and to avoid foreclosure. Generally, the Company's modifications are short-term interest rate reductions and/or payment deferrals with forgiveness of principal rarely granted. A modification of a loan constitutes a troubled debt restructuring when a borrower is experiencing financial difficulty and the modification constitutes a concession. Loans modified in a troubled debt restructuring are typically already on non-accrual status and have an allowance recorded. At times, loans modified in a troubled debt restructuring by the Company may have the financial effect of increasing the allowance associated with the loan. The allowance for an impaired loan that has been modified in a troubled debt restructuring is measured based on the present value of expected future cash flows discounted at the loan's effective interest rate or the estimated fair value of the collateral, less any selling costs. Troubled debt restructurings continue to be insignificant to the Company.

*Allowance for Loan Losses*

The following table summarizes the activity in the allowance for loan losses on residential loans, net (in thousands):

|  | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | **2012** | **2011** | **2012** | **2011** |
| Balance at beginning of the period | $14,330 | $13,234 | $13,824 | $15,907 |
| Provision for loan losses | 4,596 | 1,865 | 8,122 | 3,365 |
| Charge-offs, net of recoveries [1] | (1,974) | (1,803) | (4,994) | (5,976) |
| Balance at end of the period | $16,952 | $13,296 | $16,952 | $13,296 |

[1] Includes charge-offs recognized upon acquisition of real estate in satisfaction of residential loans of $1.8 million and $0.7 million for the three months ended September 30, 2012 and 2011, respectively, and $4.0 million and $2.4 million for the nine months ended September 30, 2012 and 2011, respectively.

The following table summarizes the ending balance of the allowance for loan losses and the recorded investment in residential loans carried at amortized cost by basis of impairment method (in thousands):

|  | September 30, 2012 | December 31, 2011 |
|---|---|---|
| **Allowance for loan losses** | | |
| Loans individually evaluated for impairment | $ 5,807 | $ 4,366 |
| Loans collectively evaluated for impairment | 10,336 | 9,286 |
| Loans acquired with deteriorated credit quality | 809 | 172 |
| Total | $ 16,952 | $ 13,824 |
| **Recorded investment in residential loans carried at amortized cost** | | |
| Loans individually evaluated for impairment | $ 53,921 | $ 50,516 |
| Loans collectively evaluated for impairment | 1,458,798 | 1,526,550 |
| Loans acquired with deteriorated credit quality | 26,600 | 28,622 |
| Total | $1,539,319 | $1,605,688 |

The following tables present loans carried at amortized cost individually evaluated for impairment and consist primarily of residential loans in the process of foreclosure and purchased credit-impaired residential loans (in thousands):

| | September 30, 2012 | | | December 31, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Recorded Investment | Unpaid Principal Balance | Related Allowance | Recorded Investment | Unpaid Principal Balance | Related Allowance |
| Individually evaluated for impairment | | | | | | |
| With no related allowance recorded | $ 5,283 | $ 6,271 | $ — | $ 7,636 | $ 9,129 | $ — |
| With an allowance recorded | 48,638 | 52,334 | 5,807 | 42,880 | 45,775 | 4,366 |
| Purchased credit-impaired | | | | | | |
| With no related allowance recorded | 2,976 | 4,988 | — | 2,842 | 5,243 | — |
| With an allowance recorded | 23,624 | 36,982 | 809 | 25,780 | 40,027 | 172 |

| | For the Three Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2012 | | 2011 | |
| | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| Individually evaluated for impairment | | | | |
| With no related allowance recorded | $ 6,506 | $ 3 | $ 6,819 | $ 2 |
| With an allowance recorded | 44,036 | 6 | 35,876 | 17 |
| Purchased credit-impaired | | | | |
| With no related allowance recorded | 2,991 | 65 | 28,549 | 797 |
| With an allowance recorded | 23,933 | 670 | — | — |

| | For the Nine Months Ended September 30, | | | |
| --- | --- | --- | --- | --- |
| | 2012 | | 2011 | |
| | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| Individually evaluated for impairment | | | | |
| With no related allowance recorded | $ 6,935 | $ 6 | $ 8,106 | $ 20 |
| With an allowance recorded | 41,050 | 77 | 35,733 | 56 |
| Purchased credit-impaired | | | | |
| With no related allowance recorded | 2,909 | 214 | 23,029 | 1,932 |
| With an allowance recorded | 24,702 | 2,079 | — | — |

*Aging of Past Due Residential Loans*

Residential loans carried at amortized cost are placed on non-accrual status when any portion of the principal or interest is 90 days past due. When placed on non-accrual status, the related interest receivable is reversed against interest income of the current period. Interest income on non-accrual loans, if received, is recorded using the cash basis method of accounting. Residential loans are removed from non-accrual status when there is no longer significant uncertainty regarding collection of the principal and the associated interest. If a non-accrual loan is returned to accruing status, the accrued interest, at the date the residential loan is placed on non-accrual status, and forgone interest during the non-accrual period, are recorded as interest income as of the date the loan no longer meets the non-accrual criteria. The past due or delinquency status of residential loans is generally determined based on the contractual payment terms. The calculation of delinquencies excludes from delinquent amounts those accounts that are in bankruptcy proceedings that are paying their mortgage payments in contractual compliance with the bankruptcy court approved mortgage payment obligations. Loan balances are charged off when it becomes evident that balances are not collectible.

| | 30-59 Days Past Due | 60-89 Days Past Due | 90 Days or More Past Due | Total Past Due | Current | Total Residential Loans | Non-Accrual Loans |
|---|---|---|---|---|---|---|---|
| Recorded investment in residential loans carried at amortized cost | | | | | | | |
| September 30, 2012 | $20,491 | $11,565 | $67,236 | $99,292 | $1,440,027 | $1,539,319 | $67,236 |
| December 31, 2011 | $17,544 | $10,396 | $61,107 | $89,047 | $1,516,641 | $1,605,688 | $61,107 |

*Credit Risk Profile Based on Delinquencies*

Factors that are important to managing overall credit quality and minimizing loan losses are sound loan underwriting, monitoring of existing loans, early identification of problem loans, timely resolution of problems, an appropriate allowance for loan losses, and sound nonaccrual and charge-off policies. The Company primarily utilizes delinquency status to monitor the credit quality of the portfolio. Monitoring of residential loans increases when the loan is delinquent. The Company considers all loans 30 days or more past due to be non-performing. The classification of delinquencies, and thus the non-performing calculation, excludes from delinquent amounts those accounts that are in bankruptcy proceedings that are paying their mortgage payments in contractual compliance with the bankruptcy court approved mortgage payment obligations.

The following table presents the recorded investment in residential loans accounted for at amortized cost by credit quality indicator (in thousands):

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Performing | $1,440,027 | $1,516,641 |
| Non-performing | 99,292 | 89,047 |
| Total | $1,539,319 | $1,605,688 |

## 6. Receivables, Net

Receivables, net consist of the following (in thousands):

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Insurance premium receivables | $ 108,303 | $ 110,980 |
| Receivables related to Non-Residual Trusts at fair value | 60,402 | 81,782 |
| Servicing fee receivables | 31,644 | 30,530 |
| Income tax receivables | 5,608 | — |
| Other receivables | 2,350 | 4,859 |
| Receivables | 208,307 | 228,151 |
| Less: Allowance for uncollectible servicing fee and other receivables | (23) | (23) |
| Receivables, net | $ 208,284 | $ 228,128 |

25

### 7. Servicer and Protective Advances, Net

Servicer advances consist of principal and interest advanced to securitization or consolidation trusts to meet contractual payment requirements to investors. Protective advances consist of advances to protect the collateral being serviced by the Company and primarily include payments made for property taxes and insurance. The following table presents servicer and protective advances, net (in thousands):

|  | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Servicer advances | $    46,290 | $    44,079 |
| Protective advances | 104,931 | 113,826 |
| Servicer and protective advances | 151,221 | 157,905 |
| Less: Allowance for uncollectible advances | (21,590) | (17,408) |
| Servicer and protective advances, net | $    129,631 | $    140,497 |

Servicer and protective advances at September 30, 2012 and December 31, 2011, respectively, include $74.9 million and $59.9 million pledged as collateral under the Receivables Loan Agreement. In addition, at September 30, 2012 and December 31, 2011, respectively, the Company had $36.3 million and $58.3 million of servicer and protective advances for which future collections of these advances are required to be remitted to a third party to settle the balance outstanding under the Servicer Advance Reimbursement Agreement. See Note 11 for further information.

### 8. Servicing of Residential Loans

The Company's total servicing portfolio consists of accounts serviced and sub-serviced for third parties for which servicing rights have been capitalized, accounts sub-serviced for third parties, as well as loans held for investment and real estate owned recognized on the consolidated balance sheets. As a result of the acquisition of Green Tree, the Company capitalized the servicing rights associated with Green Tree's servicing and sub-servicing agreements in existence at the date of acquisition.

Provided below is a summary of the Company's total servicing portfolio (dollars in thousands):

|  | September 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
|  | Number of Accounts | Unpaid Principal Balance | Number of Accounts | Unpaid Principal Balance |
| Third-party investors [1] |  |  |  |  |
| Capitalized servicing rights | 376,650 | $17,310,452 | 402,067 | $18,717,559 |
| Capitalized sub-servicing [2] | 281,470 | 14,059,473 | 318,363 | 16,302,306 |
| Sub-servicing | 252,771 | 44,585,975 | 259,100 | 48,264,295 |
| Total third-party servicing portfolio | 910,891 | 75,955,900 | 979,530 | 83,284,160 |
| On-balance sheet |  |  |  |  |
| Residential loans and real estate owned [3] | 59,502 | 2,595,129 | 62,027 | 2,749,894 |
| Total on-balance sheet serviced assets | 59,502 | 2,595,129 | 62,027 | 2,749,894 |
| Total servicing portfolio | 970,393 | $78,551,029 | 1,041,557 | $86,034,054 |

[1]    Includes real estate owned serviced for third parties.
[2]    Consists of sub-servicing contracts held by Green Tree at the date of the acquisition of Green Tree.
[3]    Consists of unencumbered, Residual Trusts and Non-Residual Trust residential loans and real estate owned recognized on the Company's consolidated balance sheets.

26

The Company services residential mortgage loans, manufactured housing and consumer installment loans for itself and third parties. The Company earns servicing income from its third-party servicing portfolio. The following table presents servicing revenue and fees (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Servicing fees | $ 66,034 | $57,893 | $205,637 | $59,846 |
| Incentive and performance fees [1] | 25,251 | 24,013 | 71,972 | 27,475 |
| Ancillary and other fees [2] | 9,742 | 6,106 | 27,947 | 6,938 |
| Servicing revenue and fees | $101,027 | $88,012 | $305,556 | $94,259 |

[1]  Includes revenue for both the Servicing and Asset Receivables Management segments.
[2]  Includes late fees of $4.3 million and $11.1 million for the three and nine months ended September 30, 2012, respectively, and $1.7 million and $2.4 million for the same periods during 2011, respectively.

### Servicing Rights

Residential loans represent the single class of servicing rights. The amortization of servicing rights is recorded in depreciation and amortization in the consolidated statements of comprehensive income (loss). The following table summarizes the activity in the carrying value of servicing rights for the period (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Balance at beginning of the period | $224,203 | $    — | $250,329 | $    — |
| Additions | 177 | 278,952 | 177 | 278,952 |
| Amortization | (11,683) | (14,611) | (37,809) | (14,611) |
| Impairment | — | — | — | — |
| Balance at end of the period | $212,697 | $264,341 | $212,697 | $264,341 |

Servicing rights are accounted for at amortized cost and evaluated for impairment by strata based on their estimated fair value. The risk characteristics used to stratify servicing rights for purposes of measuring impairment are the type of loan products, which consist of manufactured housing loans, first lien residential mortgages and second lien residential mortgages. The fair value of servicing rights was $226.0 million and $262.7 million at September 30, 2012 and December 31, 2011, respectively, and was estimated using the present value of projected cash flows over the estimated period of net servicing income. The estimation of fair value requires significant judgment and uses key economic assumptions which are provided in the table below (dollars in thousands):

| | September 30, 2012 |
|---|---|
| Carrying amount of servicing rights | $  212,697 |
| Assumptions | |
| Weighted-average remaining life in years | 5.6 |
| Weighted-average stated customer interest rate on underlying collateral | 7.79% |
| Weighted-average discount rate | 12.08% |
| Expected conditional prepayment rate as a percentage of principal balance of serviced loans | 11.01% |

The valuation of servicing rights is affected by the underlying assumptions including prepayments of principal and discount rate. Should the actual performance and timing differ materially from the Company's projected assumptions, the estimate of fair value of the servicing rights could be materially different.

## 9. Other Assets

Other assets consist of the following (in thousands):

|  | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Real estate owned, net | $ 49,521 | $ 56,147 |
| Deferred debt issuance costs on: |  |  |
|    Term Loans and Revolver | 22,436 | 24,379 |
|    Mortgage-backed debt | 19,956 | 21,116 |
|    Servicing advance liabilities | 719 | — |
| Prepaid expenses | 7,635 | 7,145 |
| Other | 7,444 | 9,241 |
|     Total other assets | $ 107,711 | $ 118,028 |

## 10. Payables and Accrued Liabilities

Payables and accrued liabilities consist of the following (in thousands):

|  | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Payables to insurance carriers | $ 49,636 | $ 49,246 |
| Acquisition related escrow funds payable to seller | 5,000 | 45,000 |
| Employee related liabilities | 31,654 | 35,698 |
| Uncertain tax positions | 17,533 | 16,790 |
| Mandatory repurchase obligation | 10,098 | 11,849 |
| Professional fees liability related to certain securitizations | 8,485 | 9,666 |
| Accrued interest payable | 8,897 | 9,398 |
| Insurance premium cancellation reserve | 4,757 | 3,576 |
| Income taxes payable | — | 5,592 |
| Other | 28,984 | 30,436 |
|     Total payables and accrued liabilities | $ 165,044 | $ 217,251 |

## 11. Servicing Advance Liabilities

### Servicer Advance Reimbursement Agreement

On July 1, 2012, the Company renewed its Servicer Advance Reimbursement Agreement, which provides for the reimbursement of certain principal and interest and protective advances that are the responsibility of the Company under certain servicing agreements. The renewed agreement provides for a reimbursement amount of up to $150.0 million. The cost of this agreement is LIBOR plus 2.50% on the amounts that are reimbursed. The early reimbursement period expires in June 2013 or upon 120 days after written notice.

### Receivables Loan Agreement

In May 2012, the Company renewed its three-year Receivables Loan Agreement that provides borrowings up to $75.0 million and is collateralized by certain servicer and protective advances. The interest cost under the renewed agreement is LIBOR plus 3.25%. The renewed facility matures in July 2015.

## 12. Mortgage-Backed Debt and Related Collateral

### Mortgage-Backed Debt

Mortgage-backed debt consists of debt issued by the Residual and Non-Residual Trusts that have been consolidated by the Company. The mortgage-backed debt of the Residual Trusts is carried at amortized cost while the mortgage-backed debt of the Non-Residual Trusts is carried at fair value. Refer to Note 3 for further information regarding the consolidated Residual and Non-Residual Trusts.

28

Borrower remittances received on the residential loans collateralizing this debt and draws under LOCs issued by a third party serving as credit enhancements to certain Non-Residual Trusts are used to make the principal and interest payments due on the mortgage-backed debt. The maturity of the mortgage-backed debt is directly affected by principal prepayments on the collateral. As a result, the actual maturity of the mortgage-backed debt is likely to occur earlier than the stated maturity. Certain of the Company's mortgage-backed debt issued by the Residual Trusts is subject to redemption according to specific terms of the respective indenture agreements, including the option to exercise a clean-up call. The mortgage-backed debt issued by the Non-Residual Trusts is subject to mandatory clean-up calls for which the Company is obligated to exercise at the earliest possible call dates, which is the date the principal amount of each loan pool falls to 10% of the original principal amount.

*Residual Trusts*

The Residual Trusts consist of the consolidated securitization trusts that are beneficially owned by the Company. These trusts have issued mortgage-backed and asset-backed notes, or the Trust Notes, consisting of both public debt offerings and private offerings with final maturities ranging from 2029 to 2050.

The Residual Trusts, with the exception of WIMC Capital Trust 2011-1, or Trust 2011-1, contain provisions that require the cash payments received from the underlying residential loans be applied to reduce the principal balance of the Trust Notes unless certain overcollateralization or other similar targets are satisfied. These trusts contain delinquency and loss triggers, that, if exceeded, allocate any excess cash flows to paying down the outstanding principal balance of the Trust Notes for that particular securitization at an accelerated pace. Assuming no servicer trigger events have occurred and the overcollateralization targets have been met, any excess cash is released to the Company either monthly or quarterly, in accordance with the terms of the respective underlying trust agreements. For Trust 2011-1, principal and interest payments are not paid on the subordinate note or residual interests, which are held by the Company, until all amounts due on the senior notes are fully paid.

Since January 2008, Mid-State Trust 2006-1 has exceeded certain triggers and has not provided any excess cash flow to the Company. The delinquency rate for the trigger calculations, which includes real estate owned, was 10.19% at September 30, 2012 compared to a trigger level of 8.00% and the cumulative loss rate for trigger calculations was 6.58% at September 30, 2012 compared to a trigger level of 5.25%. In addition, beginning in September 2012, Mid-State Trust 2005-1 exceeded the delinquency rate trigger of 8.00%, with a delinquency rate of 8.09% at September 30, 2012. At September 30, 2012, Mid-State Trust 2005-1 has not exceeded the cumulative loss rate trigger.

*Non-Residual Trusts*

The Company has consolidated ten trusts for which it is the servicer, but does not hold any residual interests. The Company is obligated to exercise mandatory clean-up call obligations for these trusts and expects to call these securitizations beginning in 2017 and continuing through 2019. The total outstanding balance of the residential loans expected to be called at the respective call dates is $418.0 million.

**Collateral for Mortgage-Backed Debt**

At September 30, 2012, the Residual and Non-Residual Trusts have an aggregate of $2.2 billion of principal in outstanding debt, which is collateralized by $2.7 billion of assets, including residential loans, receivables related to the Non-Residual Trusts, real estate owned, net and restricted cash and cash equivalents. For seven of the ten Non-Residual Trusts, LOCs were issued by a third party as credit enhancements to these securitizations and, accordingly, the securitization trusts will draw on these LOCs if there are not enough cash flows from the underlying collateral to pay the debt holders. The notional amount of expected draws under the LOCs at September 30, 2012 was $61.1 million. The fair value of the expected draws of $60.4 million at September 30, 2012 has been recognized as receivables related to Non-Residual Trusts on the consolidated balance sheet. All of the Company's mortgage-backed debt is non-recourse and not cross-collateralized and, therefore, must be satisfied exclusively from the proceeds of the residential loans and real estate owned held in each securitization trust and from the draws on the LOCs for certain Non-Residual Trusts.

29

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Residential loans of securitization trusts, principal balance | $2,514,259 | $2,668,487 |
| Receivables related to Non-Residual Trusts | 60,402 | 81,782 |
| Real estate owned, net | 40,853 | 42,382 |
| Restricted cash and cash equivalents | 57,075 | 59,685 |
| Total mortgage-backed debt collateral | $2,672,589 | $2,852,336 |

## 13. Share-Based Compensation

During the nine months ended September 30, 2012, the Company granted 800,820 options that vest ratably over a 3-year term based upon a service condition. The weighted-average fair value of the stock options of $8.87 was based on the estimate of fair value on the date of grant using the Black-Scholes option pricing model and related assumptions. Also during this period, the Company issued 89,262 shares of fully vested common stock to its employees in the form of a bonus under the 2011 Omnibus Incentive Plan as well as 21,521 shares of fully vested common stock to its non-employee directors. The weighted-average fair value of the common stock of $20.72 was based on the average of the high and low sales prices on the date of issuance. The Company's share-based compensation expense has been reflected in the consolidated statements of comprehensive income (loss) in salaries and benefits expense.

## 14. Income Taxes

From 2009 through June 30, 2011, the Company operated as a REIT. As a result of the acquisition of Green Tree on July 1, 2011, the Company no longer qualifies as a REIT. The Company's failure to qualify as a REIT was retroactive to January 1, 2011 and the Company is now subject to U.S. federal income and applicable state and local taxes at regular corporate rates. During the period the Company operated as a REIT, the Company was generally not subject to federal income tax at the REIT level on the net taxable income distributed to stockholders, but the Company was subject to federal corporate-level tax on the net taxable income of taxable REIT subsidiaries, and was subject to taxation in various state and local jurisdictions. In addition, the Company was required to distribute at least 90% of the Company's REIT taxable income to stockholders and to meet various other requirements imposed by the Internal Revenue Code.

For the three and nine months ended September 30, 2012, the Company recorded income tax expense of $4.2 million and $7.6 million, respectively, and $62.5 million and $62.6 million for the same periods during 2011, respectively. The decrease in income tax expense for the three and nine months ended September 30, 2012 as compared to the same periods in the prior year is primarily due to the loss of REIT status as a result of the acquisition of Green Tree offset by an increase in income before income taxes. The loss of REIT status resulted in the recognition of $63.5 million in provision for current and deferred income taxes for the three and nine months ended September 30, 2011. The income tax expense recognized during the current year reflects the Company's status as a full tax-paying corporation.

### Income Tax Exposure

The Company was part of the Walter Energy, Inc. or Walter Energy, consolidated group prior to the spin-off from Walter Energy on April 17, 2009. As such, the Company is jointly and severally liable with Walter Energy for any final taxes, interest and/or penalties owed by the Walter Energy consolidated group during the time that the Company was a part of the Walter Energy consolidated group. However, in connection with the spin-off of the Company's business from Walter Energy, the Company and Walter Energy entered into a Tax Separation Agreement dated April 17, 2009, pursuant to which Walter Energy is responsible for the payment of all federal income taxes (including any interest or penalties applicable thereto) of the consolidated group. Nonetheless, to the extent that Walter Energy is unable to pay any amounts owed, the Company could be responsible for any unpaid amounts including, according to Walter Energy's most recent public filing on Form 10-Q, those related to the following:

- The Internal Revenue Service, or IRS, has filed a proof of claim for a substantial amount of taxes, interest and penalties with respect to fiscal years ended August 31, 1983 through May 31, 1994. The public filing goes on to disclose that the issues have been litigated in bankruptcy court and that an opinion was issued by the court in June 2010 as to the remaining disputed issues. The filing further states that the amounts initially asserted by the IRS do not reflect the subsequent resolution of various issues through settlements or concessions by the parties. Walter Energy believes that those portions of the claim which remain in dispute or are subject to appeal substantially overstate the amount of taxes allegedly owed. However, because of the complexity of the issues presented and the uncertainties associated with litigation, Walter Energy is unable to predict the outcome of the adversary proceeding.

- The IRS completed an audit of Walter Energy's federal income tax returns for the years ended May 31, 2000 through December 31, 2005. The IRS issued 30-Day Letters to Walter Energy proposing changes for these tax years which Walter Energy has protested. Walter Energy's filing states that the disputed issues in this audit period are similar to the issues remaining in the above-referenced dispute and therefore Walter Energy believes that its financial exposure for these years is limited to interest and possible penalties.

- Walter Energy reports that the IRS completed its audit of Walter Energy's tax returns filed for 2006 through 2008 and has proposed adjustments to tax for these periods. The IRS issued a 30-Day Letter with proposed adjustments and Walter Energy responded to the IRS within the prescribed 30-day time limit. The proposed adjustments are similar to issues in the Proof of Claim and include an adjustment to a worthless stock deduction reported in the 2008 federal income tax return. Walter Energy has evaluated all of the proposed adjustments, including the proposed adjustment related to the worthless stock deduction, and believes the tax filing positions have substantial merit.

- Walter Energy reports that the IRS is conducting an audit of Walter Energy's tax returns for 2009 and 2010. Since the examination is ongoing, Walter Energy cannot estimate the amount of any resulting tax deficiency, if any.

Walter Energy believes that all of its current and prior tax filing positions have substantial merit and intends to defend vigorously any tax claims asserted and that they believe that they have sufficient accruals to address any claims, including interest and penalties.

The Tax Separation Agreement also provides that Walter Energy is responsible for the preparation and filing of any tax returns for the consolidated group for the periods when the Company was part of the Walter Energy consolidated group. This arrangement may result in conflicts between Walter Energy and the Company. In addition, the spin-off of the Company from Walter Energy was intended to qualify as a tax-free spin-off under Section 355 of the Code. The Tax Separation Agreement provides generally that if the spin-off is determined not to be tax-free pursuant to Section 355 of the Code, any taxes imposed on Walter Energy or a Walter Energy shareholder as a result of such determination ("Distribution Taxes") which are the result of the acts or omissions of Walter Energy or its affiliates, will be the responsibility of Walter Energy. However, should Distribution Taxes result from the acts or omissions of the Company or its affiliates, such Distribution Taxes will be the responsibility of the Company. The Tax Separation Agreement goes on to provide that Walter Energy and the Company shall be jointly liable, pursuant to a designated allocation formula, for any Distribution Taxes that are not specifically allocated to Walter Energy or the Company. To the extent that Walter Energy is unable or unwilling to pay any Distribution Taxes for which it is responsible under the Tax Separation Agreement, the Company could be liable for those taxes as a result of being a member of the Walter Energy consolidated group for the year in which the spin-off occurred. The Tax Separation Agreement also provides for payments from Walter Energy in the event that an additional taxable dividend is required to cure a REIT disqualification from the determination of a shortfall in the distribution of non-REIT earnings and profits made immediately following the spin-off. As with Distribution Taxes, the Company will be responsible for this dividend if Walter Energy is unable or unwilling to pay.

### Other Tax Exposure

On June 28, 2010, the Alabama Department of Revenue, or ADOR, preliminarily assessed financial institution excise tax of approximately $4.2 million, which includes interest and penalties, on a predecessor entity for the years 2004 through 2008. This tax is imposed on financial institutions doing business in the State of Alabama. The Company was informed that the ADOR had requested legal advice with regard to the application of certain provisions of the Alabama Constitution in response to issues the Company had previously raised in its protests to the initial assessments. In November 2012, the Company received communication from the State of Alabama that they anticipate issuing a final assessment if payment is not made. The Company has contested the assessment and believes that it did not meet the definition of a financial institution doing business in the State of Alabama as defined by the Alabama Tax Code.

31

**15. Earnings (Loss) Per Share**

The following is a reconciliation of the numerators and denominators of the basic and diluted earning (loss) per share computations shown on the face of the consolidated statements of comprehensive income (loss) (in thousands, except per share data):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Basic earnings (loss) per share | | | | |
| Net income (loss) | $ 6,411 | $(65,458) | $11,974 | $(65,363) |
| Less: net income allocated to unvested participating securities | (148) | — | (292) | — |
| Net income (loss) available to common stockholders (numerator) | 6,263 | (65,458) | 11,682 | (65,363) |
| Weighted-average common shares outstanding (denominator) | 28,990 | 28,491 | 28,902 | 27,251 |
| Basic earnings (loss) per share | $ 0.22 | $ (2.30) | $ 0.40 | $ (2.40) |
| Diluted earnings (loss) per share | | | | |
| Net income (loss) | $ 6,411 | $(65,458) | $11,974 | $(65,363) |
| Less: net income allocated to unvested participating securities | (146) | — | (290) | — |
| Net income (loss) available to common stockholders (numerator) | 6,265 | (65,458) | 11,684 | (65,363) |
| Weighted-average common shares outstanding | 28,990 | 28,491 | 28,902 | 27,251 |
| Add: dilutive effect of stock options | 407 | — | 256 | — |
| Diluted weighted-average common shares outstanding (denominator) | 29,397 | 28,491 | 29,158 | 27,251 |
| Diluted earnings (loss) per share | $ 0.21 | $ (2.30) | $ 0.40 | $ (2.40) |

The Company's unvested restricted stock and restricted stock units, or RSUs, are considered participating securities. During periods of net income, the calculation of earnings per share for common stock is adjusted to exclude the income attributable to the unvested restricted stock and RSUs from the numerator and exclude the dilutive impact of those shares from the denominator. During periods of net loss, no effect is given to the participating securities because they do not share in the losses of the Company.

The calculation of diluted earnings (loss) per share does not include 0.8 million shares for the nine months ended September 30, 2012 and 0.7 million shares for the three and nine months ended September 30, 2011 because their effect would have been antidilutive.

**16. Supplemental Disclosures of Cash Flow Information**

The Company's supplemental disclosures of cash flow information are summarized as follows (in thousands):

| | For the Nine Months Ended September 30, | |
|---|---|---|
| | 2012 | 2011 |
| Supplemental Disclosure of Non-Cash Investing and Financing Activities | | |
| Real estate owned acquired through foreclosure | 50,500 | $45,802 |
| Residential loans originated to finance the sale of real estate owned | 44,190 | 57,284 |
| Issuance of common stock for the Green Tree acquisition | — | 40,220 |
| Dividend declaration | — | 6,200 |

**17. Segment Reporting**

Management has organized the Company into four reportable segments based primarily on its services as follows:

- *Servicing* — consists of operations that perform servicing for third-party investors of residential mortgages, manufactured housing and consumer installment loans and contracts, as well as for the Loans and Residuals segment and for the Non-Residual Trusts.

- *Asset Receivables Management, or ARM* — performs collections of post charge-off deficiency balances on behalf of third party securitization trusts and other asset owners.

- *Insurance* — provides voluntary and lender-placed hazard insurance for residential loans, as well as other ancillary products, through the Company's insurance agency for a commission and a reinsurer to third parties as well as to the Loans and Residuals segment.

- *Loans and Residuals* — consists of the assets and mortgage-backed debt of the Residual Trusts and the unencumbered residential loan portfolio and real estate owned.

During the three months ended March 31, 2012, the Company revised its method of allocating costs to business segments. As a result, the Company has recast the segment measures of the prior period to reflect the new cost allocation method on a consistent basis for all periods presented. In prior segment reporting, the allocation of indirect costs was based on segment profit or loss. The new method allocates indirect costs to the Insurance segment based on the ratio of the number of policies to the number of accounts serviced and to the ARM and other non-reportable segments based on headcount. All remaining indirect costs are allocated to the Servicing segment. For the three months ended September 30, 2011, the change in method increased costs allocated to the Servicing and ARM segments by $1.4 million and $0.2 million, respectively, and decreased costs allocated to the Insurance segment by $1.6 million. For the nine months ended September 30, 2011, the change in method increased costs allocated to the Servicing and ARM segments by $1.9 million and $0.2 million, respectively, and decreased costs allocated to the Insurance segment by $0.9 million and to Other by $1.2 million.

In order to reconcile the financial results for the Company's reportable segments to the consolidated results, the Company has presented the revenue and expenses and total assets of the Non-Residual Trusts and other non-reportable operating segments, as well as certain corporate expenses which have not been allocated to the business segments, in Other. Intersegment servicing and insurance revenues and expenses have been eliminated. Intersegment revenues are recognized on the same basis of accounting as such revenue is recognized in the consolidated statements of comprehensive income (loss).

Presented in the tables below are the Company's financial results by reportable segment reconciled to the consolidated income (loss) before income taxes and total assets by reportable segment reconciled to consolidated total assets (in thousands):

| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Eliminations | Total Consolidated |
|---|---|---|---|---|---|---|---|
| | | | **For the Three Months Ended September 30, 2012** | | | | |
| **REVENUES** | | | | | | | |
| Servicing revenue and fees | $96,478 | $ 9,755 | $ — | $ — | $ — | $ (5,206) | $ 101,027 |
| Interest income on loans | — | — | — | 37,964 | — | — | 37,964 |
| Insurance revenue | — | — | 17,335 | — | — | — | 17,335 |
| Other revenues | 462 | — | 88 | — | 3,880 | — | 4,430 |
| Total revenues | 96,940 | 9,755 | 17,423 | 37,964 | 3,880 | (5,206) | 160,756 |
| **EXPENSES** | | | | | | | |
| Interest expense | 1,085 | — | — | 23,081 | 19,820 | — | 43,986 |
| Depreciation and amortization | 20,360 | 2,004 | 1,369 | — | 37 | — | 23,770 |
| Provision for loan losses | — | — | — | 4,596 | — | — | 4,596 |
| Other expenses, net | 57,095 | 5,765 | 8,000 | 6,294 | 9,004 | (5,206) | 80,952 |
| Total expenses | 78,540 | 7,769 | 9,369 | 33,971 | 28,861 | (5,206) | 153,304 |
| **OTHER GAINS (LOSSES)** | | | | | | | |
| Net fair value gains (losses) | (251) | — | — | 482 | 2,892 | — | 3,123 |
| Other | — | — | — | — | — | — | — |
| Total other gains (losses) | (251) | — | — | 482 | 2,892 | — | 3,123 |
| Income (loss) before income taxes | $18,149 | $ 1,986 | $ 8,054 | $ 4,475 | $(22,089) | $ — | $ 10,575 |
| | | | **September 30, 2012** | | | | |
| Total assets | $1,323,208 | $58,672 | $148,233 | $1,631,162 | $823,911 | $— | $3,985,186 |

33

**For the Nine Months Ended September 30, 2012**

| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Eliminations | Total Consolidated |
|---|---|---|---|---|---|---|---|
| REVENUES | | | | | | | |
| Servicing revenue and fees | $ 293,873 | $ 27,584 | $ — | $ — | $ — | $ (15,901) | $ 305,556 |
| Interest income on loans | — | — | — | 117,697 | — | — | 117,697 |
| Insurance revenue | — | — | 54,100 | — | — | — | 54,100 |
| Other revenues | 2,281 | — | 577 | — | 10,401 | — | 13,259 |
| Total revenues | 296,154 | 27,584 | 54,677 | 117,697 | 10,401 | (15,901) | 490,612 |
| EXPENSES | | | | | | | |
| Interest expense | 3,808 | — | — | 70,484 | 60,055 | — | 134,347 |
| Depreciation and amortization | 63,725 | 5,901 | 4,026 | — | 77 | — | 73,729 |
| Provision for loan losses | — | — | — | 8,122 | — | — | 8,122 |
| Other expenses, net | 194,341 | 16,473 | 26,123 | 21,082 | 21,360 | (15,901) | 263,478 |
| Total expenses | 261,874 | 22,374 | 30,149 | 99,688 | 81,492 | (15,901) | 479,676 |
| OTHER GAINS (LOSSES) | | | | | | | |
| Net fair value gains (losses) | (783) | — | — | 305 | 9,152 | — | 8,674 |
| Other | — | — | — | — | — | — | — |
| Total other gains (losses) | (783) | — | — | 305 | 9,152 | — | 8,674 |
| Income (loss) before income taxes | $ 33,497 | $ 5,210 | $ 24,528 | $ 18,314 | $ (61,939) | $ — | $ 19,610 |

**For the Three Months Ended September 30, 2011**

| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Eliminations | Total Consolidated |
|---|---|---|---|---|---|---|---|
| REVENUES | | | | | | | |
| Servicing revenue and fees | $ 88,552 | $ 7,126 | $ — | $ — | $ — | $ (7,666) | $ 88,012 |
| Interest income on loans | — | — | — | 41,239 | — | — | 41,239 |
| Insurance revenue | — | — | 18,571 | — | — | (833) | 17,738 |
| Other revenues | 1,521 | — | 751 | — | 2,663 | — | 4,935 |
| Total revenues | 90,073 | 7,126 | 19,322 | 41,239 | 2,663 | (8,499) | 151,924 |
| EXPENSES | | | | | | | |
| Interest expense | 1,437 | — | — | 24,782 | 21,117 | — | 47,336 |
| Depreciation and amortization | 23,108 | 1,855 | 1,066 | — | 13 | — | 26,042 |
| Provision for loan losses | — | — | — | 1,865 | — | — | 1,865 |
| Other expenses, net | 53,604 | 4,498 | 10,836 | 10,093 | 7,709 | (8,499) | 78,241 |
| Total expenses | 78,149 | 6,353 | 11,902 | 36,740 | 28,839 | (8,499) | 153,484 |
| OTHER GAINS (LOSSES) | | | | | | | |
| Net fair value gains (losses) | (309) | — | — | (340) | (755) | — | (1,404) |
| Other | — | — | — | — | — | — | — |
| Total other gains (losses) | (309) | — | — | (340) | (755) | — | (1,404) |
| Income (loss) before income taxes | $ 11,615 | $ 773 | $ 7,420 | $ 4,159 | $ (26,931) | $ — | $ (2,964) |

**September 30, 2011**

| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Eliminations | Total Consolidated |
|---|---|---|---|---|---|---|---|
| Total assets | $1,273,859 | $ 65,274 | $ 165,132 | $1,629,732 | $ 960,982 | $ — | $ 4,094,979 |

For the Nine Months Ended September 30, 2011

| | Servicing | Asset Management | Insurance | Non-Residual Residuals | Other | Eliminations | Total Consolidated |
|---|---|---|---|---|---|---|---|
| **REVENUES** | | | | | | | |
| Servicing revenue and fees | $104,879 | $ 7,126 | $ — | $ — | $ — | $ (17,746) | $ 94,259 |
| Interest income on loans | — | — | — | 124,623 | — | — | 124,623 |
| Insurance revenue | — | — | 23,687 | — | — | (1,780) | 21,907 |
| Other revenues | 1,882 | — | 755 | — | 3,148 | — | 5,785 |
| Total revenues | 106,761 | 7,126 | 24,442 | 124,623 | 3,148 | (19,526) | 246,574 |
| **EXPENSES** | | | | | | | |
| Interest expense | 1,437 | — | — | 66,835 | 21,117 | — | 89,389 |
| Depreciation and amortization | 23,437 | 1,855 | 1,097 | — | 13 | — | 26,402 |
| Provision for loan losses | — | — | — | 3,365 | — | — | 3,365 |
| Other expenses, net | 75,689 | 4,498 | 19,405 | 28,671 | 20,511 | (19,526) | 129,248 |
| Total expenses | 100,563 | 6,353 | 20,502 | 98,871 | 41,641 | (19,526) | 248,404 |
| **OTHER GAINS (LOSSES)** | | | | | | | |
| Net fair value gains (losses) | (309) | — | — | (340) | (755) | — | (1,404) |
| Other | — | — | — | 95 | 338 | — | 433 |
| Total other gains (losses) | (309) | — | — | (245) | (417) | — | (971) |
| Income (loss) before income taxes | $ 5,889 | $ 773 | $ 3,940 | $ 25,507 | $(38,910) | $ — | $ (2,801) |

## 18. Commitments and Contingencies

### Mandatory Repurchase Obligation

The Company has a mandatory obligation to repurchase loans at par from an investor when loans become 90 days past due. The total loans outstanding and subject to being repurchased were $88.2 million at September 30, 2012. The Company has estimated the fair value of this contingent liability at September 30, 2012 as $10.1 million, which is included in payables and accrued liabilities on the consolidated balance sheet. The Company estimates that the undiscounted losses to be incurred from the mandatory repurchase obligation over the remaining lives of the loans are $14.2 million at September 30, 2012.

### Professional Fees Liability Related to Certain Securitizations

The Company has a contingent liability related to payments for certain professional fees that it will be required to make over the remaining life of various securitizations, which are based in part on the outstanding principal balance of the debt issued by these trusts. At September 30, 2012, the Company has estimated the fair value of this contingent liability at $8.5 million, which is included in payables and accrued liabilities on the consolidated balance sheet. The Company estimates that the gross amount of payments it expects to pay over the remaining lives of the securitizations is $11.7 million at September 30, 2012.

### Letter of Credit Reimbursement Obligation

The Company has an obligation to reimburse a third party for the final $165.0 million in LOCs if drawn for an aggregate of eleven securitization trusts on the LOCs issued to these trusts by a third party. Seven of these securitization trusts were consolidated on the Company's consolidated balance sheets due to the Company's mandatory clean-up call obligation related to these trusts. The LOCs were issued by a third party as credit enhancements to these eleven securitizations and, accordingly, the securitization trusts will draw on these LOCs if there are insufficient cash flows from the underlying collateral to pay the debt holders. The total amount available on these LOCs for all eleven securitization trusts was $288.0 million at September 30, 2012. Based on the Company's estimates of the underlying performance of the collateral in these securitizations, the Company does not expect that the final $165.0 million will be drawn, and therefore, no liability for the fair value of this obligation has been recorded on the Company's consolidated balance sheets, although actual performance may differ from this estimate in the future.

### Mandatory Clean-Up Call Obligation

The Company is obligated to exercise the mandatory clean-up call obligations Green Tree assumed as part of an agreement to acquire the rights to service the loans in the Non-Residual Trusts. The Company expects to call these securitizations beginning in 2017 and continuing through 2019. The total outstanding balance of the residential loans expected to be called at the respective call dates is $418.0 million.

35

*Securities Sold with Recourse*

The Company assumed, through a prior acquisition, the commitment to repurchase the principal amount of certain mortgage securities sold with recourse. At September 30, 2012, the unpaid principal balance of the mortgage securities was $1.0 million.

### Employment Agreements

At September 30, 2012, the Company had employment agreements with its senior officers with varying terms that provide for, among other things, base salary, bonus, and change-in-control provisions that are subject to the occurrence of certain triggering events.

### Transactions with Walter Energy

Following the spin-off in 2009 from Walter Energy, the Company and Walter Energy have operated independently, and neither has any ownership interest in the other. In order to allocate responsibility for overlapping or related aspects of their businesses, the Company and Walter Energy entered into certain agreements pursuant to which the Company and Walter Energy assume responsibility for various aspects of their businesses and agree to indemnify one another against certain liabilities that may arise from their respective businesses, including liabilities relating to certain tax and litigation exposure.

### Litigation

As discussed in Note 14, Walter Energy is in dispute with the IRS on a number of federal income tax issues. Walter Energy has stated in its public filings that it believes that all of its current and prior tax filing positions have substantial merit and that Walter Energy intends to defend vigorously any tax claims asserted. Under the terms of the tax separation agreement, as discussed in Note 14, between the Company and Walter Energy dated April 17, 2009, Walter Energy is responsible for the payment of all federal income taxes (including any interest or penalties applicable thereto) of the consolidated group, which includes the aforementioned claims of the IRS. However, to the extent that Walter Energy is unable to pay any amounts owed, the Company could be responsible for any unpaid amounts.

WMC is a party to a lawsuit entitled <u>Casa Linda Homes, et al. v. Walter Mortgage Company, et al.</u>, Cause No. C-2918-08-H, 389th Judicial District Court of Hidalgo County, Texas, claiming breach of contract, fraud, negligent misrepresentation, breach of fiduciary duty and bad faith, promissory estoppel and unjust enrichment. The plaintiffs are seeking actual and exemplary damages, the amount of which have not been specified, but if proven could be material. The allegations arise from a claim that WMC breached a contract with the plaintiffs by failing to purchase a certain amount of loan pool packages from the corporate plaintiff, a Texas real estate developer. The Company believes the case to be without merit and is vigorously pursuing the defense of the claim.

The Company is a party to a number of other lawsuits arising in the ordinary course of its business. While the results of such litigation cannot be predicted with certainty, the Company believes that the final outcome of such litigation will not have a materially adverse effect on the Company's financial condition, results of operations or cash flows.

## 19. Subsequent Events

On October 19, 2012, the Company closed on a registered underwritten public offering of 6,000,000 shares of its common stock, or the 2012 Common Stock Offering. The shares were sold at a price to the public of $42.00 per share. In addition, the Company granted the underwriters of the 2012 Common Stock Offering a 30-day option to purchase up to an additional 900,000 shares of common stock. The underwriters exercised this option.

On the same date, the Company also closed on a registered underwritten public offering of $265.0 million aggregate principal amount of 4.50% convertible senior subordinated notes, or the Convertible Notes, due 2019. The Convertible Notes will pay interest semi-annually on May 1 and November 1, commencing on May 1, 2013, at a rate of 4.50% per year, and will mature on November 1, 2019. In addition, the Company granted the underwriters of the Convertible Notes a 30-day option to purchase up to an additional $25.0 million aggregate principal amount of Convertible Notes. The underwriters exercised this option.

Prior to May 1, 2019, the Convertible Notes will be convertible only upon specified events and during specified periods, and, on or after May 1, 2019, at any time. The Convertible Notes will initially be convertible at a conversion rate of 17.0068 shares of the Company's common stock per $1,000 principal amount of Convertible Notes, which is equivalent to an initial conversion price of approximately $58.80, which is a 40% premium to the public offering price of the Company's common stock in the Company's 2012 Common Stock Offering. Upon conversion, the Company may pay or deliver, at its option, cash, shares of the Company's common stock, or a combination of cash and shares of common stock.

36

The Company generated net proceeds of approximately $276.1 million and $280.4 million from the 2012 Common Stock Offering and the Convertible Notes, respectively, after deducting underwriting discounts and commissions and offering expenses. The Company used the net proceeds from the Convertible Notes, together with cash on hand, to repay and terminate $265.0 million outstanding under the Company's second lien senior secured term loan and pay certain fees, expenses and premiums in connection therewith. Subsequently, the Company used approximately $95.0 million of the net proceeds from the 2012 Common Stock Offering to partially fund its acquisition of RMS. Refer to Note 2 for additional information.

On October 24, 2012, the Company collaborated with Ocwen Loan Servicing LLC, or Ocwen, to propose to buy certain mortgage-related assets held by Residential Capital LLC, or Rescap. Subject to bankruptcy court approval, the Company will acquire ResCap's origination and capital markets platforms, Fannie Mae mortgage servicing rights related to $50.4 billion in loans and $183.0 million in related advances. The final purchase price is subject to downward adjustment to reflect an expected decline in the amount of mortgage servicing rights and related advances to be acquired between the bid date and the closing date. The final purchase price will be allocated to the acquired assets based upon their fair value at closing, which is expected to be in the first quarter of 2013.

On November 1, 2012, the Company closed on its purchase of RMS, a reverse mortgage business, for cash of $95.0 million and common stock with a fair value of $41.3 million. Refer to Note 2 for additional information.

The following discussion should be read in conjunction with the consolidated financial statements and notes thereto appearing elsewhere in this Form 10-Q and in our results for the year ended December 31, 2011 filed in our Annual Report on Form 10-K on March 9, 2012. Historical results and trends which might appear should not be taken as indicative of future operations, particularly in light of our acquisition of GTCS Holdings LLC, or Green Tree, discussed below. Our results of operations and financial condition, as reflected in the accompanying statements and related footnotes, are subject to management's evaluation and interpretation of business conditions, changing capital market conditions, and other factors.

Our website can be found at www.walterinvestment.com. We make available, free of charge through the investor relations section of our website, access to our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, other documents and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, as well as proxy statements, as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission, or the SEC. We also make available, free of charge, access to our Corporate Governance Standards, charters for our Audit Committee, Compensation and Human Resources Committee, and Nominating and Corporate Governance Committee, and our Code of Conduct and Ethics governing our directors, officers, and employees. Within the time period required by the SEC and the NYSE Amex, we will post on our website any amendment to the Code of Conduct and Ethics and any waiver applicable to any executive officer, director, or senior officer (as defined in the Code of Conduct and Ethics). In addition, our website includes information concerning purchases and sales of our equity securities by our executive officers and directors, as well as disclosure relating to certain non-GAAP and financial measures (as defined by SEC Regulation G) that we may make public orally, telephonically, by webcast, by broadcast, or by similar means from time to time. The information on our website is not part of this Quarterly Report on Form 10-Q.

Our Investor Relations Department can be contacted at 3000 Bayport Drive, Suite 1100, Tampa, Florida 33607, Attn: Investor Relations, telephone (813) 421-7694.

### Safe Harbor Statement Under the Private Securities Litigation Reform Act of 1995

Certain statements in this report, including matters discussed under Item 2, "Management's Discussion and Analysis of Financial Condition and Results of Operations," should be read in conjunction with the financial statements, related notes, and other detailed information included elsewhere in this Quarterly Report on Form 10-Q. We are including this cautionary statement to make applicable and take advantage of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. The Form 10-Q may contain certain "forward-looking statements" within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which reflect our current views with respect to certain events that may affect our future performance. Statements that are not historical fact are forward-looking statements. Certain of these forward-looking statements can be identified by the use of words such as "believes," "anticipates," "expects," "intends," "plans," "projects," "estimates," "assumes," "may," "should," "will," or other similar expressions. Such forward-looking statements involve known and unknown risks, uncertainties and other important factors, which could cause actual results, performance or achievements to differ materially from future results, performance or achievements. These forward-looking statements are based on our current beliefs, intentions and expectations. These statements are not guarantees or indicative of future performance. Important assumptions and other important factors that could cause actual results to differ materially from those forward-looking statements include, but are not limited to, those factors, risks and uncertainties described in this Quarterly Report on Form 10-Q under the caption "Risk Factors" and in our other securities filings with the Securities and Exchange Commission.

In particular (but not by way of limitation), the following important factors and assumptions could affect our future results and could cause actual results to differ materially from those expressed in the forward-looking statements:

- local, regional, national and global economic trends and developments in general, and local, regional and national real estate and residential mortgage market trends in particular;

- continued uncertainty in the U.S. home sale market, including both the volume and pricing of sales, due to adverse economic conditions or otherwise;

- fluctuations in interest rates and levels of mortgage prepayments;

- risks related to the financing incurred in connection with the acquisitions of Green Tree and RMS, including our ability to achieve cash flows sufficient to carry our debt and otherwise to meet the covenants of our debt;

- the occurrence of anticipated growth of the specialty servicing sector;

- the effects of competition on our existing and potential future business, including the impact of competitors with greater financial resources and broader scopes of operation;

- our ability to raise capital to make suitable investments to offset run-off in a number of the portfolios we service and to grow our business;

- our ability to implement strategic initiatives, particularly as they relate to our ability to develop new business, including the implementation of delinquency flow programs and the receipt of new business, which are both subject to customer demand and approval;

- our ability to earn anticipated levels of performance and incentive fees on serviced business;

- the availability of suitable investments for any capital that we are able to raise and risks associated with any such investments we may pursue;

- changes in federal, state and local policies, laws and regulations affecting our business, including mortgage financing or servicing, and changes to our licensing requirements;

- changes caused by the Dodd-Frank Wall Street Reform and Consumer Protection Act, or Dodd-Frank, including regulations required by Dodd-Frank that have yet to be finalized;

- uncertainties related to regulatory pressures on large banks related to their mortgage servicing, as well as regulatory pressure on the rest of the mortgage servicing sector, including increased performance standards and reporting obligations;

- changes in regard to the rights and obligations of property owners, mortgagors and tenants;

- our ability to remain qualified as a government-sponsored entity approved seller, servicer or component servicer, including the ability to continue to comply with the government-sponsored entities' respective servicing guides;

- uncertainty relating to the status of government-sponsored entities;

- uncertainty related to inquiries from government agencies into past servicing, foreclosure, loss mitigation, and lender-placed insurance practices;

- uncertainties related to the processes for judicial and non-judicial foreclosure proceedings, including potential additional costs, delays or moratoria in the future or claims pertaining to past practices;

- unexpected losses resulting from pending, threatened or unforeseen litigation or other third-party claims against the Company;

- the effects of any changes to the servicing compensation structure for mortgage servicers pursuant to programs of government-sponsored entities or various regulatory authorities;

- changes to our insurance agency business, including increased scrutiny by government regulators and government-sponsored entities on lender-placed insurance practices;

- the effect of Company risk management strategies, including the management and protection of the personal and private information of our customers and mortgage holders and the protection of our information systems from third-party interference (cyber security);

- changes in accounting standards;

- our continued listing on the NYSE Amex or other public exchange;

- the ability or willingness of Walter Energy, Inc. and other counterparties to satisfy material obligations under agreements with us; and

- other presently unidentified factors.

The forward-looking statements included herein are only made as of the date of this Quarterly Report on Form 10-Q. We undertake no obligation to update or revise the information contained herein, including any forward-looking statements whether as a result of new information, subsequent events or circumstances, or otherwise, unless otherwise required by law.

## The Company

We are a fee-based business services provider to the residential mortgage industry. We are a specialty servicer providing residential loan servicing that focuses on credit-sensitive residential mortgage assets located in the United States, or U.S. We are also a mortgage portfolio owner and operate an insurance agency serving residential loan customers.

**Market Opportunity and Strategy**

We are a specialty servicer with a long history of servicing and responsible for delinquent loans and improving performance through collections and loss mitigation. There is currently a significant market opportunity in credit-sensitive loans. In addition, we expect the quantity of delinquent loans in the U.S. residential mortgage market to remain elevated for the next several years. We believe that a secular shift in the market has begun as credit risk owners, regulators and rating agencies demand permanent specialized servicing strategies for higher risk loans. Traditional servicers have been unable to effectively service the increased quantity of delinquent loans, leading to elevated losses for mortgage credit owners. This has reinforced to credit risk owners the need to service troubled first and second lien mortgage assets with high-touch strategies offered by third-party specialized servicers.

We are currently actively pursuing a number of opportunities to grow our business through multiple channels including, but not limited to, adding sub-servicing contracts through one time transfers and flow agreements, acquiring additional mortgage servicing rights and servicing platforms, growing our originations business and acquiring businesses that are complementary to our current platform. The U.S. residential mortgage market has approximately $10.1 trillion in loans outstanding. The large market of mortgage assets that require specialized servicing and collection presents us with an addressable opportunity.

The following is a summary of our recent activities to expand and grow our business:

- In October 2012, we closed on a registered underwritten public offering of $290.0 million aggregate principal amount of 4.50% convertible senior subordinated notes, or the Convertible Notes, and with the funds, repaid and terminated our existing $265.0 million second lien term loan.

- In October 2012, we closed on a registered underwritten public offering of 6,900,000 shares of our common stock at a price of $42.00 per share, raising net proceeds of $276.1 million.

- In October 2012, we collaborated with Ocwen Loan Servicing LLC, or Ocwen, to buy certain mortgage-related assets held by Residential Capital LLC, or Rescap, for $540.0 million. Subject to bankruptcy court approval, we will acquire ResCap's lending and capital markets platforms, $50.4 billion in Fannie Mae mortgage servicing rights and $183.0 million in related servicing advances. The final purchase price is subject to downward adjustment to reflect an expected decline in the amount of mortgage servicing rights and related advances to be acquired between the bid date and the closing date. The final purchase price will be allocated to the acquired assets based upon their fair value at closing, which is expected to be in the first quarter of 2013.

- We expect to replace our first lien term loan facility with a senior secured first lien term loan facility in the aggregate principal amount of up to $600.0 million. We also expect our revolving credit facility will be replaced with a new senior secured revolving credit facility of up to $100.0 million.

- In November 2012, we purchased Reverse Mortgage Solutions, Inc., or RMS, a reverse mortgage business for cash of $95.0 million and common stock for total consideration of $136.3 million.

- We recently began originating Fannie Mae loans. Initially, the focus will be on "recapturing" loans that are prepaying and refinancing borrowers into lower cost loans as a loss mitigation technique. This will help reduce runoff on our existing mortgage servicing portfolio to the extent we are successful. Over time, we may grow our origination business to include other products, providing another source of servicing volume.

**Acquisitions and Other Business Combinations**

*Acquisition of Reverse Mortgage Solutions, Inc*

On August 31, 2012, the Company executed a Stock Purchase Agreement to acquire 100% of the outstanding stock of RMS, or the RMS Acquisition. The RMS Acquisition was consummated on November 1, 2012. Based in Spring, Texas, RMS, provides a full suite of services to the reverse mortgage sector, including servicing, sub-servicing, loan origination and securitization, and technology. The purchase price of $136.3 million for the RMS Acquisition includes cash of $95.0 million and common stock with a fair value of $41.3 million. The cash portion of the RMS Acquisition was partially funded by our recent common stock offering. See further discussion under Common Stock Offering in the Liquidity and Capital Resources section below.

As previously disclosed in our Current Report of Form 8-K filed with the SEC on September 6, 2012, the stock consideration for the RMS Acquisition was valued for purposes of the stock purchase agreement at approximately $25.0 million based on the average closing price of $28.05 per share for the period from August 20, 2012 through August 30, 2012. For accounting purposes, the stock consideration was valued at the fair value of the stock on the closing date of the RMS Acquisition of approximately $41.3 million, which was based on an average of the high and low prices of the shares of $46.39 per share on the closing date of November 1, 2012.

On July 1, 2011, we acquired 100% of the outstanding ownership interests of the Green Tree Acquisition. Green Tree, based in St. Paul, Minnesota, is a fee-based, business services company providing high-touch, third-party servicing of credit-sensitive loans. The purchase price of the Green Tree Acquisition consisted of cash of approximately $1.0 billion and the issuance of common stock with a fair value of $40.2 million. The cash portion of the purchase price was funded by monetizing certain existing assets and by the issuance of corporate debt totaling $765 million. The Green Tree Acquisition was accounted for under the acquisition method and accordingly, the assets acquired and liabilities assumed were recorded at their estimated fair values. Net assets with an estimated fair value of $1.1 billion were acquired by us, which included the recognition of estimates of goodwill of $471.3 million and identifiable intangible assets of $150.1 million.

Pursuant to the accounting guidance for Variable Interest Entities, or VIEs, we consolidated ten securitization trusts for which Green Tree performs the servicing. We do not currently own any residual interests in these trusts, and thus, we refer to these trusts as the Non-Residual Trusts. We have elected to account for certain of the assets acquired and liabilities assumed of the Non-Residual Trusts, which consist of residential loans, certain receivables and the mortgage-backed debt, at fair value. We own the residual interests in all of our other consolidated VIEs, which we refer to as the Residual Trusts.

## Executive Summary

For the three and nine months ended September 30, 2012, we reported net income of $6.4 million and $12.0 million, or $0.21 and $0.40 per diluted share, respectively, in comparison to a net loss of $65.5 million and $65.4 million, or $2.30 and $2.40 per diluted share, for the three and nine months ended September 30, 2011, respectively. The growth in net income during the three months ended September 30, 2012 as compared to the same period in the prior year is due primarily to the recognition of $63.5 million in current and deferred taxes in 2011 due to the loss of Real Estate Investment Trust, or REIT, status as a result of the acquisition of Green Tree, partially offset by overall growth in our third party servicing portfolio which has provided positive earnings. The increase in net income during the nine months ended September 30, 2012 as compared to the same period in the prior year is due to the recognition of current and deferred taxes in 2011 due to the loss of REIT status as discussed above, partially offset by the inclusion of Green Tree for the entire current year period, as opposed to three months in the prior year period, as well as overall growth in our third party servicing portfolio.

We recognized before tax core earnings of $35.6 million and $97.8 million for the three and nine months ended September 30, 2012, respectively. Core earnings when compared to our net income reflect the following key adjustments: (1) depreciation and amortization expense related to the increase in basis recognized on assets acquired with Green Tree, (2) share-based compensation, (3) transaction and integration-related costs and (4) the net impact of the Non-Residual Trusts, which are accounted for at fair value. For a reconciliation of our consolidated income before income taxes under accounting principles generally accepted in the U.S., or GAAP, to our core earnings, refer to the Business Segment Results section.

Pro Forma Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization, or Pro Forma Adjusted EBITDA, was $60.3 million and $177.6 million for the three and nine months ended September 30, 2012, respectively, which when compared to our consolidated income before income taxes reflects the adjustments noted above for core earnings as well as the following key adjustments: (1) total depreciation and amortization expense, which includes amortization noted as a core earnings adjustment, (2) interest expense on our corporate debt, and (3) pro forma synergies. For a reconciliation of our consolidated income before income taxes under GAAP to our Pro Forma Adjusted EBIDTA, refer to the Business Segment Results section.

We generated $50.9 million in cash flow from operating activities during the nine months ended September 30, 2012 and finished the quarter with $38.5 million in cash and cash equivalents. We also had $89.7 million in funds available under our senior secured revolving credit facility at September 30, 2012.

We manage our Company in four primary business segments: Servicing; Asset Receivables Management, or ARM; Insurance; and Loans and Residuals. Refer to the Business Segment Results section for a presentation and discussion of our financial results by business segment. A description of the business conducted by each of these segments and related key financial highlights are provided below:

*Servicing* — Our Servicing business segment consists of operations that perform servicing for third-party investors in residential mortgages, manufactured housing and consumer installment loans and contracts, as well as for the Loans and Residuals segment and for the Non-Residual Trusts, which is reported in the Other segment. Our Servicing segment recognized $71.1 million and $221.1 million in contractual servicing fees during the three and nine months ended September 30, 2012, respectively, which includes contractual fees on our November and December 2011 boards of 159,000 loans. In addition, our Servicing segment recognized $15.7 million and $44.9 million in incentive and performance fees during the three and nine months ended September 30, 2012, respectively, which includes amounts already earned from the 2011 boards, as well as ancillary and other fees of $9.7 million and $27.9 million, respectively.

*ARM* — Our ARM business segment performs collections of post charge-off deficiency balances on behalf of securitization trusts and third-party asset owners. Asset recovery revenue was $9.8 million and $27.6 million for the three and nine months ended September 30, 2012, respectively.

*Insurance* — Our Insurance business segment provides voluntary and lender-placed hazard insurance for residential loans, as well as other ancillary products, through our insurance agency for a commission. Net written premiums were $38.3 million and $126.8 million for the three and nine months ended September 30, 2012, respectively. Net written premiums included lender-placed activity of $19.2 million and $63.3 million and voluntary activity of $19.1 million and $63.5 million for the three and nine months ended September 30, 2012, respectively. Total insurance revenue was $17.3 million and $54.1 million for the three and nine months ended September 30, 2012, respectively.

*Loans and Residuals* — Our Loans and Residuals business segment consists of the assets and liabilities of the Residual Trusts, as well as our unencumbered residential loan portfolio and real estate owned. Our net interest margin was 3.84% for the three months ended September 30, 2012, down 18 basis points from the same period in 2011 due primarily to a decline in yield on the loan portfolio resulting from an increase in delinquent loans and in effect, more loans being placed in non-accrual status. Our net interest margin was 4.0% for the nine months ended September 30, 2012, down 72 basis points from the same period in 2011 due primarily to the monetization of assets completed during the second quarter in 2011 in order to fund the acquisition of Green Tree. Total delinquent loans have increased to 6.63% at September 30, 2012 from 5.73% at December 31, 2011. The number of real estate owned properties has declined to 802 units at September 30, 2012, a reduction of 65 units from December 31, 2011.

**Results of Operations—Comparison of Consolidated Results of Operations for the Three and Nine Months Ended September 30, 2012 and 2011**

12-12020-mb    Doc 2138-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 - Walter Investment 10-Q    Pg 45 of 120

The acquisition of Green Tree had a significant impact on our consolidated results of operations. Unless otherwise stated, significant variances are the result of the acquisition of Green Tree.

We recognized net income of $6.4 million and $12.0 million for the three and nine months ended September 30, 2012, respectively, as compared to a net loss of $65.5 million and $65.4 million for the same periods in the prior year, respectively. A summary of our consolidated results of operations is provided below (in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Revenues | | | | | | |
| Servicing revenue and fees | $101,027 | $ 88,012 | $ 13,015 | $305,556 | $ 94,259 | $211,297 |
| Interest income on loans | 37,964 | 41,239 | (3,275) | 117,697 | 124,623 | (6,926) |
| Insurance revenue | 17,335 | 17,738 | (403) | 54,100 | 21,907 | 32,193 |
| Other revenues | 4,430 | 4,935 | (505) | 13,259 | 5,785 | 7,474 |
| Total revenues | 160,756 | 151,924 | 8,832 | 490,612 | 246,574 | 244,038 |
| Expenses | | | | | | |
| Salaries and benefits | 52,554 | 49,404 | 3,150 | 165,498 | 67,128 | 98,370 |
| Interest expense | 43,986 | 47,336 | (3,350) | 134,347 | 89,389 | 44,958 |
| General and administrative | 27,668 | 23,649 | 4,019 | 90,584 | 47,983 | 42,601 |
| Depreciation and amortization | 23,770 | 26,042 | (2,272) | 73,729 | 26,402 | 47,327 |
| Provision for loan losses | 4,596 | 1,865 | 2,731 | 8,122 | 3,365 | 4,757 |
| Other expenses, net | 730 | 5,188 | (4,458) | 7,396 | 14,137 | (6,741) |
| Total expenses | 153,304 | 153,484 | (180) | 479,676 | 248,404 | 231,272 |
| Other gains (losses) | | | | | | |
| Net fair value gains (losses) | 3,123 | (1,404) | 4,527 | 8,674 | (1,404) | 10,078 |
| Other | — | — | — | — | 433 | (433) |
| Total other gains (losses) | 3,123 | (1,404) | 4,527 | 8,674 | (971) | 9,645 |
| Income (loss) before income taxes | 10,575 | (2,964) | 13,539 | 19,610 | (2,801) | 22,411 |
| Income tax expense | 4,164 | 62,494 | (58,330) | 7,636 | 62,562 | (54,926) |
| Net income (loss) | $ 6,411 | $(65,458) | $ 71,869 | $ 11,974 | $(65,363) | $ 77,337 |

*Servicing Revenue and Fees*

We recognize servicing revenue and fees on servicing performed for third parties. This revenue includes contractual fees earned on the serviced loans, incentive and performance fees earned based on the performance of certain loans or loan portfolios serviced by us and loan modification fees. Servicing revenue and fees also includes asset recovery income, which is included in incentive and performance fees, and ancillary fees such as late fees and prepayment fees. Servicing revenue earned on loans in the consolidated VIEs, which consists of both the Residual and Non-Residual Trusts, is eliminated in consolidation. Servicing revenue and fees increased $13.0 million for the three months ended September 30, 2012 as compared to the same period in the prior year due to growth in the third party servicing portfolio of 115,000 average accounts for the three months ended September 30, 2012 as compared to the same period in the prior year. Servicing revenue and fees increased $211.3 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree as well as third-party servicing portfolio additions, net of runoff, of 136,000 accounts since the acquisition of Green Tree on July 1, 2011.

43

A summary of servicing revenue and fees is provided below (in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | **2012** | **2011** | **Variance** | **2012** | **2011** | **Variance** |
| Servicing fees | $ 66,034 | $57,893 | $ 8,141 | $205,637 | $59,846 | $145,791 |
| Incentive and performance fees | 25,251 | 24,013 | 1,238 | 71,972 | 27,475 | 44,497 |
| Ancillary and other fees | 9,742 | 6,106 | 3,636 | 27,947 | 6,938 | 21,009 |
| Servicing revenue and fees | $101,027 | $88,012 | $13,015 | $305,556 | $94,259 | $211,297 |

Included in incentive and performance fees for the three and nine months ended September 30, 2012 are incentive fees of $6.7 million and $23.3 million, respectively, and $12.7 million for the three and nine months ended September 30, 2011, that Green Tree received for exceeding pre-defined performance hurdles in servicing various loan portfolios. These fees may not recur on a regular basis, as they are earned based on the performance of underlying loan pools as compared to comparable pools serviced by others, as well as the achievement of certain performance hurdles over time, which may not be achieved on a regular schedule.

*Third-Party Servicing Portfolio*

Provided below is a summary of the activity in our third-party servicing portfolio, which includes accounts serviced for third parties for which we earn servicing revenue and, thus, excludes residential loans and real estate owned that have been recognized on our consolidated balance sheets (dollars in thousands):

| | For the Nine Months Ended September 30, 2012 | | | | |
|---|---|---|---|---|---|
| | **Number of Accounts** | **Servicing Rights Capitalized** | **Sub-Servicing Contracts Capitalized** | **Sub-Servicing Contracts Not Capitalized** | **Total** |
| Unpaid principal balance of accounts serviced for third parties | | | | | |
| Balance at January 1, 2012 | 979,530 | $18,717,559 | $16,302,306 | $48,264,295 | $83,284,160 |
| New business added | 25,634 | 615,904 | — | 1,570,883 | 2,186,787 |
| Payoffs, sales and curtailments | (30,334) | (675,608) | (805,910) | (1,004,609) | (2,486,127) |
| Balance at March 31, 2012 | 974,830 | 18,657,855 | 15,496,396 | 48,830,569 | 82,984,820 |
| New business added | 3,300 | — | — | 656,978 | 656,978 |
| Payoffs, sales and curtailments | (37,483) | (757,107) | (730,034) | (2,995,090) | (4,482,231) |
| Balance at June 30, 2012 | 940,647 | 17,900,748 | 14,766,362 | 46,492,457 | 79,159,567 |
| New business added | 6,030 | 179,181 | — | 860,550 | 1,039,731 |
| Payoffs, sales and curtailments | (35,786) | (769,477) | (706,889) | (2,767,032) | (4,243,398) |
| Balance at September 30, 2012 | 910,891 | $17,310,452 | $14,059,473 | $44,585,975 | $75,955,900 |

| | | September 30, 2012 | | | |
|---|---|---|---|---|---|
| Ending number of accounts serviced for third parties | | 376,650 | 281,470 | 252,771 | 910,891 |

| | Number of Accounts | Sub-Servicing Contracts Capitalized | Sub-Servicing Contracts Not Capitalized | Contracts Not Capitalized [1] | Total |
|---|---|---|---|---|---|
| **Unpaid principal balance of accounts serviced for third parties** | | | | | |
| Balance at January 1, 2011 | 5,539 | $ — | $ — | $ 1,348,329 | $ 1,348,329 |
| New business added | 1,637 | — | — | 382,771 | 382,771 |
| Payoffs, sales and curtailments | (1,086) | — | — | (225,370) | (225,370) |
| Balance at March 31, 2011 | 6,090 | — | — | 1,505,730 | 1,505,730 |
| New business added | 737 | — | — | 105,849 | 105,849 |
| Payoffs, sales and curtailments | (1,315) | — | — | (263,886) | (263,886) |
| Balance at June 30, 2011 | 5,512 | — | — | 1,347,693 | 1,347,693 |
| Acquisition of Green Tree | 769,108 | 20,141,602 | 17,860,799 | — | 38,002,401 |
| New business added | 97,360 | — | — | 18,866,727 | 18,866,727 |
| Payoffs, sales and curtailments | (25,257) | (738,312) | (771,254) | (202,208) | (1,711,774) |
| Balance at September 30, 2011 | 846,723 | $19,403,290 | $17,089,545 | $20,012,212 | $56,505,047 |
| | | | **September 30, 2011** | | |
| Ending number of accounts serviced for third parties | | 413,881 | 330,651 | 102,191 | 846,723 |

[1]   The beginning balance of sub-servicing rights not capitalized of $1.3 billion consists of accounts acquired through the acquisition of Marix Servicing, LLC, or Marix, in November 2010.

### Interest Income on Loans

We earn interest income on the residential loans held in the Residual Trusts and on our unencumbered residential loans, both of which are accounted for at amortized cost. For the three and nine months ended September 30, 2012, interest income decreased $3.3 million and $6.9 million, respectively, as compared to the same periods in 2011 primarily due to a decline in the residential loan balance and a slightly lower average yield on loans due to an increase in delinquencies that are 90 days or more past due. The annualized portfolio disappearance rate, consisting of contractual payments, voluntary prepayments and defaults, was 6.53% for the nine months ended September 30, 2012. Provided below is a summary of the average balances of residential loans at amortized cost and the related interest income and average yields (dollars in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| **Residential loans at amortized cost** | | | | | | |
| Interest income | $ 37,964 | $ 41,239 | $ (3,275) | $ 117,697 | $ 124,623 | $ (6,926) |
| Average balance | 1,551,398 | 1,637,914 | (86,516) | 1,572,840 | 1,633,549 | (60,709) |
| Average yield | 9.79% | 10.07% | -0.28% | 9.98% | 10.17% | -0.19% |

### Insurance Revenue

Insurance revenue consists of commission income and fees earned on voluntary and lender-placed insurance policies and other products sold to customers, net of estimated future policy cancellations, as well as premium revenue from captive reinsurers. Commission income is based on a percentage of the price of the insurance policy sold, which varies based on the type of product. Insurance revenue for the three months ended September 30, 2012 remained flat when compared to that recognized during the three months ended September 30, 2011. Insurance revenue increased $32.2 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree.

### Other Revenues

Other revenues consist of management fee income, origination fee income and accretion of certain Green Tree acquisition-related fair value adjustments. Other revenues for the three months ended September 30, 2012 remained flat when compared to that recognized during the three months ended September 30, 2011. Other revenues increased $7.5 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree.

### Salaries and Benefits

Salaries and benefits expense increased $3.2 million for the three months ended September 30, 2012 as compared to the same period in the prior year due to the addition of employees to support the growth in our business. Salaries and benefits expense increased $98.4 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree and the increase of 2,200 full-time-equivalent employees.

45

*Interest Expense*

We incur interest expense on our corporate debt, on the mortgage-backed debt of the Residual Trusts, and on our servicing advance liabilities, all of which are accounted for at amortized cost. For the three months ended September 30, 2012, interest expense decreased $3.4 million due to lower average debt balances as compared to the prior year period. For the nine months ended September 30, 2012, interest expense increased $45.0 million as compared to the same period in the prior year due largely to the issuance in 2011 of $765.0 million in corporate debt and $223.1 million in mortgage-backed debt used to fund the acquisition of Green Tree. Provided below is a summary of the average balances of our corporate debt, the mortgage-backed debt of the Residual Trusts, and the servicing advance liabilities, as well as the related interest expense and average rates (dollars in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| **Debt** | | | | | | |
| Interest expense | $ 19,839 | $ 21,217 | $ (1,378) | $ 60,182 | $ 21,217 | $ 38,965 |
| Average balance | 699,631 | 789,769 | (90,138) | 720,206 | 263,256 | 456,950 |
| Average rate | 11.34% | 10.75% | 0.59% | 11.14% | 10.75% | 0.39% |
| **Mortgage-backed debt at amortized cost** | | | | | | |
| Interest expense | $ 23,081 | $ 24,782 | $ (1,701) | $ 70,484 | $ 66,835 | $ 3,649 |
| Average balance | 1,352,031 | 1,450,618 | (98,587) | 1,376,390 | 1,359,717 | 16,673 |
| Average rate | 6.83% | 6.83% | 0.00% | 6.83% | 6.55% | 0.28% |
| **Servicing advance liabilities** | | | | | | |
| Interest expense | $ 1,066 | $ 1,337 | $ (271) | $ 3,681 | $ 1,337 | $ 2,344 |
| Average balance | 107,834 | 112,751 | (4,917) | 106,913 | 112,751 | (5,838) |
| Average rate | 3.95% | 4.74% | -0.79% | 4.59% | 4.74% | -0.15% |

*General and Administrative*

General and administrative expenses increased $4.0 million for the three months ended September 30, 2012 as compared to the same period in the prior year due to transaction expenses of $1.9 million for the RMS Acquisition and higher expenses resulting from overall growth of our business, partially offset by lower servicing expenses due to a reduction in costs for adjustments made to certain contracts to reflect current market conditions. General and administrative expenses increased $42.6 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to $54.1 million in general and administrative expenses incurred by Green Tree during the first two quarters of the current year that were not incurred during the comparable prior year periods offset partially by transaction costs incurred in 2011 relating to the acquisition of Green Tree of $13.5 million.

*Depreciation and Amortization*

Depreciation and amortization expense consists of amortization of capitalized servicing rights and intangible assets other than goodwill, as well as depreciation and amortization recognized on premises and equipment, which includes amortization of internally-developed software acquired as part of the acquisition of Green Tree. A summary of depreciation and amortization expense is provided below (in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Depreciation and amortization of: | | | | | | |
| Servicing rights | $11,683 | $14,611 | $(2,928) | $37,809 | $14,611 | $23,198 |
| Intangible assets | 6,075 | 6,112 | (37) | 18,148 | 6,112 | 12,036 |
| Premises and equipment | 6,012 | 5,319 | 693 | 17,772 | 5,679 | 12,093 |
| Total depreciation and amortization | $23,770 | $26,042 | $(2,272) | $73,729 | $26,402 | $47,327 |

Depreciation and amortization decreased $3.3 million for the three months ended September 30, 2012 as compared to the same period in the prior year due primarily to lower servicing rights. Depreciation and amortization increased $47.3 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree.

## Provision for Loan Losses

We recognize a provision for loan losses for our residential loan portfolio accounted for at amortized cost. The provision for loan losses increased $2.7 million and $4.8 million for the three and nine months ended September 30, 2012, respectively, as compared to the same periods in the prior year, due to unfavorable trends in foreclosures and severity rates. The increased foreclosures were primarily driven both by seasonality and a continued level of high unemployment for our borrowers. Higher loss severities were impacted by the sale of aged real estate owned inventory.

## Other Expenses, Net

Other expenses, net consist primarily of real estate owned expenses, net, which includes lower of cost or fair value adjustments and holding costs, and claims expense. Other expenses, net decreased $4.5 million for the three months ended September 30, 2012 as compared to the same period in the prior year due to lower real estate owned expenses, net of $3.4 million and lower claims expense of $0.9 million. Other expenses, net decreased $6.7 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to lower real estate owned expenses, net of $3.5 million and lower claims expense of $2.8 million. The decline in real estate owned expense, net during the three and nine months ended September 30, 2012 as compared to the same periods in the prior year is due to current year gains on sales of aged real estate owned properties which as a result of disposal, did not require additional fair value adjustments during the year as they did in the prior year, as well as favorable trends in fair value adjustments required for real estate owned properties that have shorter holding periods. The decline in claims expense is due primarily to severe wind storm damage claims during the nine months ended September 30, 2011. In conjunction with the acquisition of Green Tree, we decided to wind down our property reinsurance business. Existing property reinsurance policies were terminated and no new property reinsurance policies have been entered into beginning January 1, 2012 thereby eliminating claims costs and exposure subsequent to this date.

## Other Gains (Losses)

We recognized net fair value gains on assets and liabilities accounted for at fair value of $3.1 million and $8.7 million during the three and nine months ended September 30, 2012, respectively, which included a net gain of $3.1 million and $10.3 million, respectively, on the assets and liabilities of the Non-Residual Trusts, as well as a loss of $0.2 million and $1.2 million, respectively, on derivatives associated with the 2011 Term Loans. Higher than expected cash flows and accretion contributed to the net fair value gain on the assets and liabilities of the Non-Residual Trusts during the three months ended September 30, 2012. Lower discount rates resulting from changes in market rates, higher than expected cash flows and accretion contributed to the net fair value gain on the assets and liabilities of the Non-Residual Trusts during the nine months ended September 30, 2012.

During the three and nine months ended September 30, 2011, we recognized net fair value losses on assets and liabilities accounted for at fair value of $1.4 million, which included a net fair value loss of $0.7 million on the assets and liabilities of the Non-Residual Trusts due primarily to a decline in forward London Interbank Offered Rate, or LIBOR, partially offset by accretion. We also recognized other gains of $0.4 million for the nine months ended September 30, 2011, which consisted of a $0.3 million gain from the reversal of the estimated contingent earn-out liability for Marix and a $0.1 million gain on the extinguishment of mortgage-backed debt.

## Income Tax Expense

Income tax expense decreased $58.3 million and $54.9 million for the three and nine months ended September 30, 2012, respectively, as compared to the same periods in the prior year. The decrease in income tax expense for the three and nine months ended September 30, 2012 as compared to the same periods in the prior year is primarily due to the loss of Real Estate Investment Trust, or REIT, status as a result of the acquisition of Green Tree offset by an increase in income before income taxes. The loss of REIT status resulted in the recognition of $63.5 million in provision for current and deferred income taxes for the three and nine months ended September 30, 2011.

47

We manage our Company in four primary business segments: Servicing, Originations, Insurance, and Loans and Residuals. We measure the performance of our business segments through the following measures: income before income taxes, core earnings before income taxes and Pro Forma Adjusted EBITDA. Management considers core earnings before income taxes and Pro Forma Adjusted EBITDA, both non-GAAP financial measures, to be important in the evaluation of the Company as a whole and of our business segments and for allocating capital resources to our segments. Core earnings before income taxes and Pro Forma Adjusted EBITDA are utilized to assess the underlying operational performance of the continuing operations of the business. In addition, analysts, investors, and creditors may use these measures when analyzing our operating performance.

In calculating income before income taxes, we allocate indirect expenses to our business segments and include these expenses in other expenses, net. During the first quarter of 2012, we revised the method of allocating costs to business segments and have recast the segment measures of the prior periods to reflect the new cost allocation method on a consistent basis for all periods presented. In segment reporting prior to the first quarter of 2012, the allocation of indirect expenses was based on segment profit or loss. The new method allocates indirect expenses to our Insurance segment based on the ratio of the number of policies to the number of accounts serviced and to our ARM and other non-reportable segments based on headcount. All remaining indirect expenses are allocated to our Servicing segment.

We reconcile our income before income taxes for our business segments to our GAAP consolidated income before taxes and report the financial results of our Non-Residual Trusts, other non-reportable operating segments and certain corporate expenses and amounts to eliminate intercompany transactions between segments as other activity. For a reconciliation of our income before income taxes for our business segments to our GAAP consolidated income before income taxes, refer to Note 17 in the Notes to Consolidated Financial Statements.

Core earnings before income taxes consists of income before income taxes adjusted primarily for depreciation and amortization of the increased basis in assets acquired with Green Tree, non-cash expenses including share-based compensation, certain transaction charges and/or integration expenses to acquire Green Tree and RMS and combine our businesses and overhead functions, and the net impact of the consolidated Non-Residual Trusts. For a description of Pro Forma Adjusted EBITDA, refer to the Liquidity and Capital Resources section. For a reconciliation of core earnings before income taxes and Pro Forma Adjusted EBITDA to our GAAP consolidated income before taxes, refer to the Reconciliation of GAAP Consolidated Income Before Taxes to Core Earnings and Pro Forma Adjusted EBITDA in this section.

Provided below is a discussion of our financial results for our four primary business segments.

As the size of our servicing portfolio has grown significantly in the past year, our financial results may not be comparable across periods. Provided below is a summary statement of operations for our Servicing segment, which also includes core earnings before income taxes and Pro Forma Adjusted EBITDA (in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Servicing revenue and fees | | | | | | |
| Third parties | $91,425 | $80,886 | $10,539 | $278,399 | $ 87,133 | $191,266 |
| Intercompany | 5,053 | 7,666 | (2,613) | 15,474 | 17,746 | (2,272) |
| Total servicing revenue and fees | 96,478 | 88,552 | 7,926 | 293,873 | 104,879 | 188,994 |
| Other income | 462 | 1,521 | (1,059) | 2,281 | 1,882 | 399 |
| Total revenues | 96,940 | 90,073 | 6,867 | 296,154 | 106,761 | 189,393 |
| Interest expense | 1,085 | 1,437 | (352) | 3,808 | 1,437 | 2,371 |
| Depreciation and amortization | 20,360 | 23,108 | (2,748) | 63,725 | 23,437 | 40,288 |
| Other expenses, net | 57,095 | 53,604 | 3,491 | 194,341 | 75,689 | 118,652 |
| Total expenses | 78,540 | 78,149 | 391 | 261,874 | 100,563 | 161,311 |
| Net fair value gains (losses) | (251) | (309) | 58 | (783) | (309) | (474) |
| **Income (loss) before income taxes** | **18,149** | **11,615** | **6,534** | **33,497** | **5,889** | **27,608** |
| Core Earnings | | | | | | |
| Step-up depreciation and amortization | 15,700 | 18,205 | (2,505) | 49,732 | 18,205 | 31,527 |
| Share-based compensation expense | 2,164 | 887 | 1,277 | 8,231 | 1,791 | 6,440 |
| Transaction and integration costs | 404 | — | 404 | 1,868 | — | 1,868 |
| Non-cash interest expense | 247 | 309 | (62) | 684 | 309 | 375 |
| Total adjustments | 18,515 | 19,401 | (886) | 60,515 | 20,305 | 40,210 |
| **Core earnings before income taxes** | **36,664** | **31,016** | **5,648** | **94,012** | **26,194** | **67,818** |
| Pro Forma Adjusted EBITDA | | | | | | |
| Depreciation and amortization | 4,660 | 4,903 | (243) | 13,993 | 5,232 | 8,761 |
| Pro forma synergies | — | 2,185 | (2,185) | 2,651 | 6,677 | (4,026) |
| Interest expense on debt | 19 | 97 | (78) | 126 | 97 | 29 |
| Non-cash interest income | (460) | (1,362) | 902 | (2,236) | (1,362) | (874) |
| Other | 422 | 213 | 209 | 999 | 206 | 793 |
| Total adjustments | 4,641 | 6,036 | (1,395) | 15,533 | 10,850 | 4,683 |
| **Pro Forma Adjusted EBITDA** | **$41,305** | **$37,052** | **$ 4,253** | **$109,545** | **$ 37,044** | **$ 72,501** |

Provided below is a summary of the unpaid principal balance of our servicing portfolio for third parties and for on-balance sheet residential loans and real estate owned for which the Servicing segment receives intercompany servicing fees (in thousands):

| | September 30, | | |
|---|---|---|---|
| | 2012 | 2011 | Variance |
| Servicing portfolio composition | | | |
| Third parties | | | |
| First lien mortgages | $55,273,230 | $32,554,825 | $22,718,405 |
| Second lien mortgages | 10,531,505 | 12,431,581 | (1,900,076) |
| Manufactured housing | 10,131,343 | 11,486,590 | (1,355,247) |
| Other | 19,822 | 32,051 | (12,229) |
| Total third parties | 75,955,900 | 56,505,047 | 19,450,853 |
| On-balance sheet residential loans and real estate owned | 2,595,129 | 2,801,893 | (206,764) |
| Total servicing portfolio | $78,551,029 | $59,306,940 | $19,244,089 |

Provided below is a summary of the number of accounts, unpaid principal balance, contractual servicing fee rate and past due status of our servicing portfolio for third parties and for on-balance sheet residential loans and real estate owned for which the Servicing segment receives intercompany servicing fees (in thousands).

|  | September 30, 2012 | | | |
| --- | --- | --- | --- | --- |
|  | Number of Accounts | Unpaid Principal Balance | Contractual Servicing Fee | 30 Days or More Past Due [1] |
| Portfolio composition of accounts serviced for third parties |  |  |  |  |
| First lien mortgages | 327,920 | $55,273,230 | 0.21% | 13.22% |
| Second lien mortgages | 249,065 | 10,531,505 | 0.44% | 3.77% |
| Manufactured housing | 332,321 | 10,131,343 | 1.08% | 3.94% |
| Other | 1,585 | 19,822 | 0.94% | 2.89% |
| Total accounts serviced for third parties | 910,891 | 75,955,900 | 0.36% | 10.67% |
| On-balance sheet residential loans and real estate owned | 59,502 | 2,595,129 |  | 7.87% |
| Total servicing portfolio | 970,393 | $78,551,029 |  | 10.58% |

|  | December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
|  | Number of Accounts | Unpaid Principal Balance | Contractual Servicing Fee | 30 Days or More Past Due [1] |
| Portfolio composition of accounts serviced for third parties |  |  |  |  |
| First lien mortgages | 341,514 | $60,267,669 | 0.21% | 11.63% |
| Second lien mortgages | 274,912 | 11,857,226 | 0.44% | 4.63% |
| Manufactured housing | 360,528 | 11,130,515 | 1.08% | 4.36% |
| Other | 2,576 | 28,750 | 1.00% | 2.89% |
| Total accounts serviced for third parties | 979,530 | 83,284,160 | 0.36% | 9.66% |
| On-balance sheet residential loans and real estate owned | 62,027 | 2,749,894 |  | 7.36% |
| Total servicing portfolio | 1,041,557 | $86,034,054 |  | 9.40% |

[1] Past due status is measured based on the applicable method specified in the servicing agreement, which consists of the MBA method or the OTS method. Under the MBA method, a loan is considered past due if its monthly payment is not received by the end of the day immediately preceding the loan's next due date. Under the OTS method, a loan is considered past due if its monthly payment is not received by the loan's due date in the following month.

We recognized core earnings before income taxes of $36.7 million and $31.0 million for the three months ended September 30, 2012 and 2011, respectively, and $94.0 million and $26.2 million for the nine months ended September 30, 2012 and 2011, respectively, in our Servicing segment. Provided below is a summary of the key components of earnings for this segment.

Servicing revenue and fees includes contractual servicing fees, incentive and performance fees and ancillary and other fees. Servicing revenue and fees was $96.5 million and $293.9 million for the three and nine months ended September 30, 2012, respectively, an increase of $7.9 million and $189.0 million as compared to the same periods in the prior year, respectively. The increase in servicing revenue and fees during the three months ended September 30, 2012 as compared to the same period in the prior year is due to the growth in the servicing portfolio. Since the acquisition of Green Tree, the number of accounts serviced, including those associated with on-balance sheet accounts, increased by 60,000 to 970,000 at September 30, 2012. The increase in servicing revenue and fees during the nine months ended September 30, 2012 as compared to the same period in the prior year is due primarily to the acquisition of Green Tree coupled with the addition of new business since the acquisition.

Depreciation and amortization expense includes amortization of servicing rights capitalized for Green Tree's servicing and sub-servicing agreements that existed at the date of acquisition, amortization for the intangible assets recognized at the acquisition of Green Tree for customer and institutional relationship intangibles of the Servicing business and depreciation of internally-developed software capitalized with the acquisition of Green Tree. Depreciation and amortization decreased $2.7 million for the three months ended September 30, 2012 as compared to the same period in the prior year due to lower servicing rights. Depreciation and amortization increased $40.3 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree.

Other expense, net consists primarily of costs related to salaries and benefits, technology and communications, occupancy and general and administrative expenses as well as allocated indirect expenses. Other expense, net increased $3.5 million for the three months ended September 30, 2012 as compared to the same period in the prior year due to overall growth of our business. Other expense, net increased $118.7 million for the nine months ended September 30, 2012 as compared to the same period in the prior year due primarily to the acquisition of Green Tree.

### Assets Receivables Management

Our ARM business, which was acquired as part of the Green Tree acquisition, performs collections of delinquent balances on loans serviced by us for third parties after they have been charged off.

Provided below is a summary statement of operations for our ARM segment, which also includes core earnings before income taxes and Pro Forma Adjusted EBITDA (in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Servicing revenue and fees | | | | | | |
| Third parties | $ 9,602 | $ 7,126 | $ 2,476 | $27,157 | $ 7,126 | $20,031 |
| Intercompany | 153 | — | 153 | 427 | — | 427 |
| Total servicing revenue and fees | 9,755 | 7,126 | 2,629 | 27,584 | 7,126 | 20,458 |
| Depreciation and amortization | 2,004 | 1,855 | 149 | 5,901 | 1,855 | 4,046 |
| Other expenses, net | 5,765 | 4,498 | 1,267 | 16,473 | 4,498 | 11,975 |
| Total expenses | 7,769 | 6,353 | 1,416 | 22,374 | 6,353 | 16,021 |
| **Income before income taxes** | **1,986** | **773** | **1,213** | **5,210** | **773** | **4,437** |
| Core Earnings | | | | | | |
| Step-up depreciation and amortization | 2,004 | 1,855 | 149 | 5,901 | 1,855 | 4,046 |
| Share-based compensation expense | 196 | 68 | 128 | 672 | 68 | 604 |
| Total adjustments | 2,200 | 1,923 | 277 | 6,573 | 1,923 | 4,650 |
| **Core earnings before income taxes** | **4,186** | **2,696** | **1,490** | **11,783** | **2,696** | **9,087** |
| Pro Forma Adjusted EBITDA | | | | | | |
| Other | 13 | 22 | (9) | 24 | 22 | 2 |
| Total adjustments | 13 | 22 | (9) | 24 | 22 | 2 |
| **Pro Forma Adjusted EBITDA** | **$ 4,199** | **$ 2,718** | **$1,481** | **$11,807** | **$ 2,718** | **$ 9,089** |
| | | | | | | |
| Gross collections | $34,449 | $25,443 | $ 9,006 | $97,114 | $25,443 | $71,671 |

We recognized core earnings before income taxes of $4.2 million and $11.8 million for the three and nine months ended September 30, 2012, respectively, and $2.7 million for the three and nine months ended 2011, in our ARM segment. Provided below is a summary of the key components of earnings for this segment.

Servicing revenue and fees consists of asset recovery revenue. Servicing revenue and fees was $9.8 million and $27.6 million for the three and nine months ended September 30, 2012, respectively, an increase of $2.6 million and $20.5 million as compared to the same periods in the prior year, respectively. The increase in servicing revenue and fees during the three and nine months ended September 30, 2012 as compared to the same period in the prior year is due to the growth in collections.

Our Insurance segment consists of our agency and reinsurance businesses. Our agency business recognizes commission income net of estimated future policy cancellations at the time policies are effective. The reinsurance business earns premium revenue over the life of an insurance contract and incurs actual costs of property damage claims. With the acquisition of Green Tree, we significantly increased the size of our agency business and we decided to wind down our property reinsurance business. Existing property reinsurance policies were terminated and no new property reinsurance policies have been entered into beginning January 1, 2012.

Provided below is a summary statement of operations for our Insurance segment, which also includes core earnings before income taxes and Pro Forma Adjusted EBITDA (dollars in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Insurance revenue | | | | | | |
| Third parties | $17,335 | $17,738 | $ (403) | $ 54,100 | $21,907 | $32,193 |
| Intercompany | — | 833 | (833) | — | 1,780 | (1,780) |
| Total insurance revenue | 17,335 | 18,571 | (1,236) | 54,100 | 23,687 | 30,413 |
| Other income | 88 | 751 | (663) | 577 | 755 | (178) |
| Total revenues | 17,423 | 19,322 | (1,899) | 54,677 | 24,442 | 30,235 |
| Depreciation and amortization | 1,369 | 1,066 | 303 | 4,026 | 1,097 | 2,929 |
| Other expenses, net | 8,000 | 10,836 | (2,836) | 26,123 | 19,405 | 6,718 |
| Total expenses | 9,369 | 11,902 | (2,533) | 30,149 | 20,502 | 9,647 |
| **Income before income taxes** | **8,054** | **7,420** | **634** | **24,528** | **3,940** | **20,588** |
| Core Earnings | | | | | | |
| Step-up depreciation and amortization | 1,369 | 1,066 | 303 | 4,026 | 1,066 | 2,960 |
| Share-based compensation expense | 436 | 283 | 153 | 1,736 | 777 | 959 |
| Non-cash interest expense | 38 | 334 | (296) | 186 | 334 | (148) |
| Total adjustments | 1,843 | 1,683 | 160 | 5,948 | 2,177 | 3,771 |
| **Core earnings before income taxes** | **9,897** | **9,103** | **794** | **30,476** | **6,117** | **24,359** |
| Pro Forma Adjusted EBITDA | | | | | | |
| Depreciation and amortization | — | — | — | — | 31 | (31) |
| Pro forma synergies | — | 149 | (149) | — | 447 | (447) |
| Non-cash interest income | (88) | (753) | 665 | (574) | (753) | 179 |
| Other | 19 | 106 | (87) | 33 | 208 | (175) |
| Total adjustments | (69) | (498) | 429 | (541) | (67) | (474) |
| **Pro Forma Adjusted EBITDA** | **$ 9,828** | **$ 8,605** | **$ 1,223** | **$ 29,935** | **$ 6,050** | **$23,885** |
| Net written premiums | | | | | | |
| Lender placed | $19,200 | $17,210 | $ 1,990 | $ 63,332 | $19,989 | $43,343 |
| Voluntary | 19,095 | 20,509 | (1,414) | 63,524 | 23,212 | 40,312 |
| Total net written premiums | $38,295 | $37,719 | $ 576 | $126,856 | $43,201 | $83,655 |

Provided below is a summary of outstanding insurance policies written:

| | September 30, | | |
|---|---|---|---|
| | 2012 | 2011 | Variance |
| Number of outstanding policies written | | | |
| Lender placed | 108,685 | 107,811 | 874 |
| Voluntary | 88,203 | 101,083 | (12,880) |
| Total outstanding policies written | 196,888 | 208,894 | (12,006) |

We recognized core earnings before income taxes of $0.9 million and $9.1 million for the three months ended September 30, 2012 and 2011, respectively, and $30.5 million and $6.1 million for the nine months ended September 30, 2012 and 2011, respectively, in our Insurance segment. Provided below is a summary of the key components of earnings for this segment.

Insurance revenue primarily includes commission and reinsurance income as well as ancillary and other income. Insurance revenue was $17.3 million and $54.1 million for the three and nine months ended September 30, 2012, respectively, a decrease of $1.2 million and an increase of $30.4 million as compared to the same periods in the prior year, respectively. The increase in insurance revenue during the nine months ended September 30, 2012 as compared to the same period in the prior year is due primarily to the acquisition of Green Tree. Net written premiums increased to almost three times the number written in the nine months ended September 30, 2011.

### Loans and Residuals

The Loans and Residuals segment primarily consists of the residential loans, real estate owned and mortgage-backed debt of the Residual Trusts, as well as unencumbered residential loans and real estate owned. Through this business, we seek to earn a spread from the interest income we earn on the residential loans less the credit losses we incur on these loans and the interest expense we pay on the mortgage-backed debt issued to finance the loans.

Provided below is a summary statement of operations for our Loans and Residuals segment, which also includes core earnings before income taxes and Pro Forma Adjusted EBITDA (in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
|---|---|---|---|---|---|---|
| Interest income | $ 37,964 | $ 41,239 | $(3,275) | $117,697 | $124,623 | $ (6,926) |
| Interest expense | (23,081) | (24,782) | 1,701 | (70,484) | (66,835) | (3,649) |
| Net interest income | 14,883 | 16,457 | (1,574) | 47,213 | 57,788 | (10,575) |
| Provision for loan losses | (4,596) | (1,865) | (2,731) | (8,122) | (3,365) | (4,757) |
| Net interest income after provision for loan losses | 10,287 | 14,592 | (4,305) | 39,091 | 54,423 | (15,332) |
| Other gains (losses) | 482 | (340) | 822 | 305 | (245) | 550 |
| Intercompany expense | (2,917) | (8,499) | 5,582 | (8,887) | (19,526) | 10,639 |
| Other expenses, net | (3,377) | (1,594) | (1,783) | (12,195) | (9,145) | (3,050) |
| Total other expenses, net | (5,812) | (10,433) | 4,621 | (20,777) | (28,916) | 8,139 |
| **Income (loss) before income taxes** | **4,475** | **4,159** | **316** | **18,314** | **25,507** | **(7,193)** |
| Core Earnings | | | | | | |
| Non-cash interest expense | (41) | 621 | (662) | 1,011 | 1,214 | (203) |
| Total adjustments | (41) | 621 | (662) | 1,011 | 1,214 | (203) |
| **Core earnings before income taxes** | **4,434** | **4,780** | **(346)** | **19,325** | **26,721** | **(7,396)** |
| Pro Forma Adjusted EBITDA | | | | | | |
| Non-cash interest income | (3,579) | (3,502) | (77) | (11,701) | (10,463) | (1,238) |
| Residual Trusts cash flows | 480 | (806) | 1,286 | 6,105 | 9,372 | (3,267) |
| Provision for loan losses | 4,596 | 1,865 | 2,731 | 8,122 | 3,365 | 4,757 |
| Pro forma monetized assets | — | — | — | — | (13,305) | 13,305 |
| Other | (1,371) | 871 | (2,242) | 831 | 1,410 | (579) |
| Total adjustments | 126 | (1,572) | 1,698 | 3,357 | (9,621) | 12,978 |
| **Pro Forma Adjusted EBITDA** | **$ 4,560** | **$ 3,208** | **$ 1,352** | **$ 22,682** | **$ 17,100** | **$ 5,582** |

53

Provided below is a summary of the residential loan portfolio, the mortgage-backed debt and real estate owned of the Loans and Residuals segment as well as certain ratios (dollars in thousands).

12-12020-mg    Doc 2138-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 -
Walter Investment 10-Q    Pg 56 of 120

| | September 30, 2012 | December 31, 2011 | Variance |
|---|---|---|---|
| Residential loans, net of cost basis adjustments | $1,539,319 | $1,605,688 | $(66,369) |
| Allowance for loan losses | (16,952) | (13,824) | (3,128) |
| Residential loans, net | 1,522,367 | 1,591,864 | (69,497) |
| Mortgage-backed debt, net of discounts | 1,339,592 | 1,413,509 | (73,917) |
| Real estate owned | | | |
| Carrying value | $   47,271 | $   53,651 | $  (6,380) |
| Number of units | 802 | 867 | (65) |
| Delinquencies | | | |
| 30 days or more past due | 6.63% | 5.73% | 0.90% |
| 90 days or more past due | 4.58% | 3.99% | 0.59% |
| Allowance as % of residential loans | 1.10% | 0.86% | 0.24% |

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Net charge-offs [1] | $7,896 | $7,212 | $   684 | $6,659 | $7,968 | $(1,309) |
| Charge-off ratio [1] [2] | 0.51% | 0.44% | 0.07% | 0.42% | 0.49% | -0.07% |
| Coverage ratio [1] [3] | 215% | 184% | 31% | 255% | 167% | 88% |

[1]    Annualized.
[2]    The charge-off ratio is calculated as charge-offs, net of recoveries, divided by average residential loans before the allowance for loan losses. Net charge-offs includes charge-offs recognized upon acquisition of real estate in satisfaction of residential loans.
[3]    The coverage ratio is calculated as period end allowance for loan losses divided by charge-offs, net of recoveries.

Our Loans and Residuals Segment recognized core earnings before income taxes of $4.4 million and $4.8 million for the three months ended September 30, 2012 and 2011, respectively, and $19.3 million and $26.7 million for the nine months ended September 30, 2012 and 2011, respectively. These earnings primarily reflect the positive spread we earn on the residuals we hold in the Residual Trusts. Provided below is a summary of the key components of earnings for this segment for the three and nine months ended September 30, 2012 and 2011.

*Net Interest Income*

Net interest income was $14.9 million and $47.2 million for the three and nine months ended September 30, 2012, respectively, a decrease of $1.6 million and $10.6 million as compared to the same periods in the prior year, respectively. Our net interest margin decreased 18 and 72 basis points for the three and nine months ended September 30, 2012 as compared to the same periods in the prior year, respectively, while our net interest spread declined 28 basis points and 47 basis points, respectively. The decrease during the three months ended September 30, 2012 as compared to the same period in the prior year is due primarily to the decline in the residential loan balance and a lower related yield of 28 basis points resulting from an increase in delinquencies that are 90 days or more past due. The decrease during the nine months ended September 30, 2012 as compared to the same period in the prior year is due to the decline in the residential loan balance and a lower related yield of 19 basis points resulting from an increase in delinquencies that are 90 days or more past due as well as higher cost of debt of 28 basis points resulting from our issuance of mortgage-backed debt in order to partly fund the acquisition of Green Tree. In June 2011, we securitized unencumbered residential loans which resulted in the issuance of $102.0 million in mortgage-backed debt by a consolidated securitization trust. In addition, in May and June of 2011, we also issued $85.1 million in mortgage-backed debt that had been held by us and reissued $36.0 million in mortgage-backed debt that had previously been extinguished.

Provided below is a summary of our average yields and rates and the net interest spread and margin on our portfolio (dollars in thousands):

| | For the Three Months Ended September 30, | | | For the Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| Residential loans at amortized cost | | | | | | |
| Interest income | $ 37,964 | $ 41,239 | $ (3,275) | $ 117,697 | $ 124,623 | $ (6,926) |
| Average balance | 1,551,398 | 1,637,914 | (86,516) | 1,572,840 | 1,633,549 | (60,709) |
| Average yield [1] | 9.79% | 10.07% | -0.28% | 9.98% | 10.17% | -0.19% |
| Mortgage-backed debt at amortized cost | | | | | | |
| Interest expense | $ 23,081 | $ 24,782 | $ (1,701) | $ 70,484 | $ 66,835 | $ 3,649 |
| Average balance | 1,352,031 | 1,450,618 | (98,587) | 1,376,390 | 1,359,717 | 16,673 |
| Average rate [1] | 6.83% | 6.83% | 0.00% | 6.83% | 6.55% | 0.28% |
| Net interest income | $ 14,883 | $ 16,457 | $ (1,574) | $ 47,213 | $ 57,788 | $(10,575) |
| Net interest spread [2] | 2.96% | 3.24% | -0.28% | 3.15% | 3.62% | -0.47% |
| Net interest margin [3] | 3.84% | 4.02% | -0.18% | 4.00% | 4.72% | -0.72% |

[1] Annualized
[2] Net interest spread is calculated by subtracting the average rate on mortgage-backed debt at amortized cost from the average yield on residential loans at amortized cost.
[3] Net interest margin is calculated by dividing net interest income by the average balance of the residential loans at amortized cost.

*Provision for Loan Losses*

Our provision for loan losses reflects the recognition of incurred credit losses on the residential loans held by the Residual Trusts and our unencumbered residential loan portfolio. The provision for loan losses increased $2.7 million and $4.8 million for the three and nine months ended September 30, 2012, respectively, due to unfavorable trends in foreclosures and severity rates. The increased foreclosures were primarily driven both by seasonality and a continued level of high unemployment for our borrowers. Higher loss severities were impacted by the sale of aged real estate owned inventory. For further information regarding the credit quality of our residential loan portfolio and related trends, refer to the Credit Risk Management section.

*Intercompany Expenses*

Our Loans and Residuals segment is charged a fee from the Servicing segment for performing servicing activities for the residential loans and real estate owned of the Residual Trusts as well as for our unencumbered residential loans and real estate owned. In addition, during 2011 this segment was charged a premium from the Insurance segment for insurance policies written on real estate owned held by the Loans and Residuals segment.

*Other Expenses, Net*

Other expenses, net consists primarily of real estate owned expenses, net and expenses incurred to protect the collateral underlying the residential loans held by the Loans and Residuals segment.

*Reconciliation of GAAP Consolidated Income (Loss) Before Taxes to Core Earnings and Pro Forma Adjusted EBITDA*

Provided below is a reconciliation of our consolidated income (loss) before income taxes as reported under GAAP to our core earnings and Pro Forma Adjusted EBITDA (in thousands):

| | For the Three Months Ended September 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Total Consolidated |
| **Income (loss) before income taxes** | **$ 18,149** | **$ 1,986** | **$ 8,054** | **$ 4,475** | **$(22,089)** | **$ 10,575** |
| Core Earnings | | | | | | |
| Step-up depreciation and amortization | 15,700 | 2,004 | 1,369 | — | 37 | 19,110 |
| Share-based compensation expense | 2,164 | 196 | 436 | — | 71 | 2,867 |
| Transaction and integration costs | 404 | — | — | — | 2,596 | 3,000 |
| Non-cash interest expense | 247 | — | 38 | (41) | — | 244 |
| Net impact of Non-Residual Trusts | — | — | — | — | (455) | (455) |
| Other | — | — | — | — | 224 | 224 |
| Total adjustments | 18,515 | 2,200 | 1,843 | (41) | 2,473 | 24,990 |
| Core earnings (loss) before income taxes | 36,664 | 4,186 | 9,897 | 4,434 | (19,616) | 35,565 |
| Pro Forma Adjusted EBITDA | | | | | | |
| Interest expense on debt | 19 | — | — | — | 19,820 | 19,839 |
| Non-cash interest income | (460) | — | (88) | (3,579) | — | (4,127) |
| Depreciation and amortization | 4,660 | — | — | — | — | 4,660 |
| Pro forma synergies | — | — | — | — | — | — |
| Provision for loan losses | — | — | — | 4,596 | — | 4,596 |
| Residual Trusts cash flows | — | — | — | 480 | — | 480 |
| Other | 422 | 13 | 19 | (1,371) | 221 | (696) |
| Total adjustments | 4,641 | 13 | (69) | 126 | 20,041 | 24,752 |
| **Pro Forma Adjusted EBITDA** | **$ 41,305** | **$ 4,199** | **$ 9,828** | **$ 4,560** | **$ 425** | **$ 60,317** |

| | For the Nine Months Ended September 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Total Consolidated |
| **Income (loss) before income taxes** | **$ 33,497** | **$ 5,210** | **$24,528** | **$ 18,314** | **$(61,939)** | **$ 19,610** |
| Core Earnings | | | | | | |
| Step-up depreciation and amortization | 49,732 | 5,901 | 4,026 | — | 77 | 59,736 |
| Share-based compensation expense | 8,231 | 672 | 1,736 | — | 591 | 11,230 |
| Transaction and integration costs | 1,868 | — | — | — | 4,704 | 6,572 |
| Non-cash interest expense | 684 | — | 186 | 1,011 | — | 1,881 |
| Net impact of Non-Residual Trusts | — | — | — | — | (2,389) | (2,389) |
| Other | — | — | — | — | 1,153 | 1,153 |
| Total adjustments | 60,515 | 6,573 | 5,948 | 1,011 | 4,136 | 78,183 |
| Core earnings (loss) before income taxes | 94,012 | 11,783 | 30,476 | 19,325 | (57,803) | 97,793 |
| Pro Forma Adjusted EBITDA | | | | | | |
| Interest expense on debt | 126 | — | — | — | 60,056 | 60,182 |
| Non-cash interest income | (2,236) | — | (574) | (11,701) | — | (14,511) |
| Depreciation and amortization | 13,993 | — | — | — | — | 13,993 |
| Pro forma synergies | 2,651 | — | — | — | 1,118 | 3,769 |
| Provision for loan losses | — | — | — | 8,122 | — | 8,122 |
| Residual Trusts cash flows | — | — | — | 6,105 | — | 6,105 |
| Other | 999 | 24 | 33 | 831 | 307 | 2,194 |
| Total adjustments | 15,533 | 24 | (541) | 3,357 | 61,481 | 79,854 |
| **Pro Forma Adjusted EBITDA** | **$109,545** | **$ 11,807** | **$29,935** | **$ 22,682** | **$ 3,678** | **$ 177,647** |

**For the Three Months Ended September 30, 2011**

| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Total Consolidated |
|---|---|---|---|---|---|---|
| Income (loss) before income taxes | $11,615 | $ 773 | $ 7,420 | $ 4,159 | $(26,931) | $ (2,964) |
| **Core Earnings** | | | | | | |
| Step-up depreciation and amortization | 18,205 | 1,855 | 1,066 | — | — | 21,126 |
| Share-based compensation expense | 887 | 68 | 283 | — | 15 | 1,253 |
| Transaction and integration costs | — | — | — | — | 2,583 | 2,583 |
| Non-cash interest expense | 309 | — | 334 | 621 | — | 1,264 |
| Net impact of Non-Residual Trusts | — | — | — | — | 3,685 | 3,685 |
| Other | — | — | — | — | 18 | 18 |
| Total adjustments | 19,401 | 1,923 | 1,683 | 621 | 6,301 | 29,929 |
| **Core earnings (loss) before income taxes** | **31,016** | **2,696** | **9,103** | **4,780** | **(20,630)** | **26,965** |
| **Pro Forma Adjusted EBITDA** | | | | | | |
| Interest expense on debt | 97 | — | — | — | 21,118 | 21,215 |
| Non-cash interest income | (1,362) | — | (753) | (3,502) | — | (5,617) |
| Depreciation and amortization | 4,903 | — | — | — | 13 | 4,916 |
| Pro forma synergies | 2,185 | — | 149 | — | 1,330 | 3,664 |
| Provision for loan losses | — | — | — | 1,865 | — | 1,865 |
| Residual Trusts cash flows | — | — | — | (806) | — | (806) |
| Pro forma monetized assets | — | — | — | — | — | |
| Other | 213 | 22 | 106 | 871 | 4 | 1,216 |
| Total adjustments | 6,036 | 22 | (498) | (1,572) | 22,465 | 26,453 |
| **Pro Forma Adjusted EBITDA** | **$37,052** | **$ 2,718** | **$ 8,605** | **$ 3,208** | **$ 1,835** | **$ 53,418** |

**For the Nine Months Ended September 30, 2011**

| | Servicing | Asset Receivables Management | Insurance | Loans and Residuals | Other | Total Consolidated |
|---|---|---|---|---|---|---|
| Income (loss) before income taxes | $ 5,889 | $ 773 | $ 3,940 | $ 25,507 | $(38,910) | $ (2,801) |
| **Core Earnings** | | | | | | |
| Step-up depreciation and amortization | 18,205 | 1,855 | 1,066 | — | — | 21,126 |
| Share-based compensation expense | 1,791 | 68 | 777 | — | 78 | 2,714 |
| Transaction and integration costs | — | — | — | — | 14,839 | 14,839 |
| Non-cash interest expense | 309 | — | 334 | 1,214 | — | 1,857 |
| Net impact of Non-Residual Trusts | — | — | — | — | 3,685 | 3,685 |
| Other | — | — | — | — | (320) | (320) |
| Total adjustments | 20,305 | 1,923 | 2,177 | 1,214 | 18,282 | 43,901 |
| **Core earnings (loss) before income taxes** | **26,194** | **2,696** | **6,117** | **26,721** | **(20,628)** | **41,100** |
| **Pro Forma Adjusted EBITDA** | | | | | | |
| Interest expense on debt | 97 | — | — | — | 21,118 | 21,215 |
| Non-cash interest income | (1,362) | — | (753) | (10,463) | — | (12,578) |
| Depreciation and amortization | 5,232 | — | 31 | — | 13 | 5,276 |
| Pro forma synergies | 6,677 | — | 447 | — | 6,040 | 13,164 |
| Provision for loan losses | — | — | — | 3,365 | — | 3,365 |
| Residual Trusts cash flows | — | — | — | 9,372 | — | 9,372 |
| Pro forma monetized assets | — | — | — | (13,305) | — | (13,305) |
| Other | 206 | 22 | 208 | 1,410 | (923) | 923 |
| Total adjustments | 10,850 | 22 | (67) | (9,621) | 26,248 | 27,432 |
| **Pro Forma Adjusted EBITDA** | **$37,044** | **$ 2,718** | **$ 6,050** | **$ 17,100** | **$ 5,620** | **$ 68,532** |

**Liquidity and Capital Resources**

*Overview*

Liquidity is a measure of our ability to meet potential cash requirements, including ongoing commitments to repay debt and meet the financial obligations of our operations including funding acquisitions, servicing advances and general business needs. We recognize the need to have liquid funds available to operate and grow our business and it is our policy to have adequate liquidity at all times. Our liquidity, which is measured as cash and cash equivalents plus borrowing capacity available on our Revolver, was $128.2 million at September 30, 2012.

Our principal sources of liquidity are the cash from our servicing, ARM and insurance businesses, funds obtained from our revolver and servicing advance facilities, cash releases from the Residual Trusts, the principal and interest payments received from unencumbered residential loans, as well as cash proceeds from the issuance of equity and debt, and other available financing activities.

We believe that, based on current forecasts and anticipated market conditions, our current balances of cash and cash equivalents along with the funds generated from our operating cash flows, loan portfolio, issuances of debt and equity, revolver, servicing advance facilities, and other available sources of liquidity will allow for financial flexibility to not only meet anticipated cash requirements to fund operating needs and expenses, servicing advances, planned capital expenditures, and all required debt service obligations for the next twelve months, but will also allow us to pursue growth opportunities. Our operating cash flows and liquidity are significantly influenced by numerous factors, including changes in the mortgage servicing markets, interest rates, continued availability of financing including the renewal of existing servicing advance facilities, access to equity markets, and conditions in the capital markets. We continually monitor our cash flows and liquidity in order to be responsive to these changing conditions.

We intend to use the net proceeds from our public offering of equity and our planned refinancing of our first lien term loan to fund current and future acquisitions. Approximately $95.0 million of the net proceeds were used to partially fund the acquisition of RMS on November 1, 2012. We also expect to utilize these net proceeds to fund the recently announced acquisition of certain of the ResCap assets, which is expected to total approximately $500.0 million at close. This amount will be partially funded through a combination of corporate cash on hand and existing advance financing facilities. We anticipate the mortgage servicing rights, or MSR, will be financed with debt and/or obtaining capital provided by a financing partner, similar to other MSR structures in the market today. The financing plan will be finalized as we move toward the close of this transaction. We expect future acquisition transactions to be funded in a similar manner.

*Servicing*

Our servicing agreements impose on us various rights and obligations that affect our liquidity. Among the most significant of these obligations is the requirement that we advance our own funds to meet contractual principal and interest payments for certain investors and to pay taxes, insurance and foreclosure costs and various other items that are required to preserve the assets being serviced. In the normal course of business, we borrow money to fund certain of these servicing advances. We rely upon various counterparties to provide us with financing to fund a portion of our servicing advances on a short-term basis or provide for reimbursement within an agreed-upon period. Our ability to fund servicing advances is a significant factor that affects our liquidity and we depend upon our ability to secure these types of arrangements on acceptable terms and to renew or replace existing financing facilities as they expire. The servicing advance financing agreements that support these operations are discussed below.

*Residual and Non-Residual Trusts*

Our securitization trusts are consolidated for financial reporting purposes as required under GAAP. Prior to the acquisition of Green Tree, our consolidated securitization trusts represented those trusts in which we own a residual interest, or the Residual Trusts. Upon the acquisition of Green Tree, we were required under GAAP to consolidate ten additional securitization trusts for which we do not currently own any residual interests, or the Non-Residual Trusts. For further information regarding the basis for consolidating the Residual and Non-Residual Trusts, refer to Note 3 in the Notes to Consolidated Financial Statements. Our results of operations and cash flows include the activity of both the Residual and Non-Residual Trusts.

The cash proceeds from the repayment of the collateral held in the Residual and Non-Residual Trusts are owned by the trusts and serve to only repay the obligations of the trusts unless, for the Residual Trusts, certain overcollateralization or other similar targets are satisfied, in which case, the excess cash is released to us assuming no trigger event has occurred.

58

The Residual Trusts, with the exception of Trust 2011-1, contain delinquency and loss triggers that, if exceeded, allocate any excess cash flows to paying down the outstanding mortgage-backed notes for that particular securitization at an accelerated pace. Assuming no servicer trigger events have occurred and the overcollateralization targets have been met, any excess cash from these trusts is released to us. For Trust 2011-1, principal and interest payments are not paid on the subordinate note or residual interests, which are held by us, until all amounts due on the senior notes are fully paid.

Since January 2008, Mid-State Trust 2006-1 has exceeded its delinquency and cumulative loss rate triggers and has not provided any excess cash flow to us. Beginning in September 2012, Mid-State Trust 2005-1 exceeded its delinquency rate trigger. Provided below is a table summarizing the actual delinquency and cumulative loss rates in comparison to the trigger rates for our Residual Trusts:

| | | Delinquency Rate | | | Cumulative Loss Rate | |
| --- | --- | --- | --- | --- | --- | --- |
| | Delinquency Trigger | September 30, 2012 | December 31, 2011 | Cummulative Loss Trigger | September 30, 2012 | December 31, 2011 |
| Mid-State Trust IV | (1) | — | — | 10.00% | 4.32% | 4.29% |
| Mid-State Trust VI | 8.00% | 2.85% | 2.36% | 8.00% | 5.26% | 5.14% |
| Mid-State Trust VII | 8.50% | 2.62% | 1.89% | 1.50% | 0.38% | 0.04% |
| Mid-State Trust VIII | 8.50% | 2.19% | 2.07% | 1.50% | 0.33% | -0.20% |
| Mid-State Trust X | 8.00% | 3.53% | 3.05% | 8.00% | 7.28% | 7.19% |
| Mid-State Trust XI | 8.75% | 3.65% | 3.42% | 8.75% | 5.82% | 5.41% |
| Mid-State Capital Corporation 2004-1 Trust | 8.00% | 5.24% | 5.30% | 7.00% | 3.18% | 2.85% |
| Mid-State Capital Corporation 2005-1 Trust | 8.00% | 8.09% | 7.44% | 5.50% | 3.69% | 3.00% |
| Mid-State Capital Corporation 2006-1 Trust | 8.00% | 10.19% | 10.58% | 5.25% | 6.58% | 5.31% |
| Mid-State Capital Corporation 2010-1 Trust | 10.50% | 9.52% | 8.35% | 5.50% | 0.95% | 0.31% |
| WIMC Capital Trust 2011-1 | (1) | — | — | (1) | — | — |

(1)    Relevant trigger is not applicable per the underlying trust agreements.

### Mortgage-Backed Debt

We have historically funded the residential loan portfolio through the securitization market. The mortgage-backed debt issued by the Residual Trusts is accounted for at amortized cost. The mortgage-backed debt of the Non-Residual Trusts is accounted for at fair value. At September 30, 2012 and December 31, 2011, the total unpaid principal balance of mortgage-backed debt was $2.2 billion and $2.3 billion, respectively.

At September 30, 2012, mortgage-backed debt is collateralized by $2.7 billion of assets including residential loans, receivables related to the Non-Residual Trusts, real estate owned and restricted cash and cash equivalents. All of the mortgage-backed debt is non-recourse and not cross-collateralized and, therefore, must be satisfied exclusively from the proceeds of the residential loans and real estate owned held in each securitization trust and also from draws on the letters of credit, or LOCs, of certain Non-Residual Trusts.

Borrower remittances received on the residential loans collateralizing this debt and draws under LOCs issued by a third party and serving as credit enhancements to certain of the Non-Residual Trusts are used to make payments on the mortgage-backed debt. The maturity of the mortgage-backed debt is directly affected by the rate of principal prepayments on the collateral. As a result, the actual maturity of the mortgage-backed debt is likely to occur earlier than the stated maturity. Certain of our mortgage-backed debt issued by the Residual Trusts are also subject to voluntary redemption according to specific terms of the respective indenture agreements, including an option by us to exercise a clean-up call. The mortgage-backed debt issued by the Non-Residual Trusts is subject to mandatory clean-up call provisions which we are obligated to exercise at the earliest possible call dates. We expect to exercise these mandatory call obligations beginning in 2017 and continuing through 2019. The total outstanding balance of the residential loans expected to be called at the respective call dates is $418.0 million. We would expect to finance the capital required to exercise the mandatory clean-up call primarily through asset-backed financing alone or in combination with additional issuances of equity and/or corporate indebtedness; however, there can be no assurance that we will be able to obtain financing through the capital markets when needed.

On July 1, 2011, we entered into a $500 million first lien senior secured term loan and a $265 million second lien senior secured term loan, or 2011 Term Loans, to partially fund the acquisition of Green Tree. Also on July 1, 2011, we entered into a $45 million senior secured revolving credit facility, or Revolver. Our obligations under the 2011 Term Loans and Revolver are guaranteed by the assets and equity of substantially all of our subsidiaries excluding the assets of the consolidated Residual and Non-Residual Trusts. In order to hedge the cash flow risk related to the variability in interest rate payments on the 2011 Term Loans, we entered into interest rate caps and a swaption with initial notional amounts of $391 million and $175 million, respectively.

The terms of the 2011 Term Loans and Revolver are summarized in the table below:

| Debt Agreement | Interest Rate | Amortization | Maturity/Expiration |
|---|---|---|---|
| $500 million first lien term loan [1] | LIBOR plus 6.25%, LIBOR floor of 1.50% | 3.75% per quarter beginning 4th quarter of 2011; remainder at final maturity | June 30, 2016 |
| $265 million second lien term loan [2] | LIBOR plus 11.00%, LIBOR floor of 1.50% | Bullet payment at maturity | December 31, 2016 |
| $90 million revolver [3] | LIBOR plus 6.25%, LIBOR floor of 1.50% | Bullet payment at maturity | June 30, 2016 |

[1]     We are in the process of refinancing our first lien term loan with a senior secured first lien term loan facility in the aggregate principal amount of up to $600.0 million.

[2]     In October 2012, we repaid and terminated the second lien term loan with funds obtained through the issuance of Convertible Notes. See further discussion in the Convertible Notes section below.

[3]     In July 2012, we completed an amendment to the $45.0 million Revolver which increased availability under the line to $90.0 million. We are now in the process of refinancing the $90.0 million Revolver with a senior secured revolving credit facility in the aggregate principal amount of up to $100.0 million.

In addition to the required amortization payments noted in the table above, the first lien agreement requires us to prepay outstanding principal with 75% of excess cash flows as defined by the credit agreement when our Total Leverage Ratio is greater than 3.0 or 50% of excess cash flows when our Total Leverage Ratio is less than 3.0. These excess cash flow payments are scheduled to be made during the first quarter of each fiscal year beginning in 2013. In addition, in the case of settlement of the first lien prior to scheduled maturity, excess cash flow payments based on terms similar to those of the first lien agreement would be required for the second lien. Additional mandatory payments are required from (i) all net proceeds associated with new indebtedness, subject to certain exceptions, (ii) all net proceeds relating to sales of assets or recovery events, subject to certain exceptions and (iii) a portion of proceeds for issuances of equity, subject to certain exceptions.

During the nine months ended September 30, 2012, we repaid principal of $56.3 million on the 2011 Term Loans. The capacity under the Revolver allows requests for the issuance of LOCs of up to $22.5 million or total cash borrowings of up to $90.0 million less any amounts outstanding in issued LOCs. There were no borrowings under the Revolver during the nine months ended September 30, 2012. At September 30, 2012, we had outstanding $0.3 million in an issued LOC with total availability under the Revolver of $89.7 million. The commitment fee on the unused portion of the Revolver is 0.75% per year.

The 2011 Term Loans and Revolver contain customary events of default and covenants, including among other things, financial covenants, covenants that restrict our and our subsidiaries' ability to incur certain additional indebtedness, create or permit liens on assets, pay dividends and repurchase stock, engage in mergers or consolidations, and make investments. Financial covenants that must be maintained include an Interest Coverage Ratio and Total Leverage Ratio as defined in the debt agreements. Non-compliance with the Interest Coverage Ratio or the Total Leverage Ratio could result in the requirement to immediately repay all amounts outstanding under the 2011 Term Loans and Revolver. These ratios are based on EBITDA, adjusted to conform to requirements of the 2011 Term Loans, or Pro Forma Adjusted EBITDA. Pro Forma Adjusted EBITDA is defined for purposes of the 2011 Term Loan covenants as net income (loss) plus interest, provision for income taxes and depreciation and amortization, and adjustments for certain specified items as defined in the debt agreements, including pro forma adjustments during the first twelve months of the agreements.

The Interest Expense Coverage ratio is calculated by dividing Pro Forma Adjusted EBITDA by consolidated interest expense (as defined in the debt agreements), both as measured on a trailing twelve-month basis preceding the measurement date. The Total Leverage Ratio is calculated by dividing consolidated total indebtedness as of the measurement date by Pro Forma Adjusted EBITDA as measured on a trailing twelve-month basis preceding the measurement date. The first lien requires a minimum Interest Expense Coverage Ratio of 2.25:1.00 increasing to 2.75:1.00 by the end of 2016, while the second lien requires a ratio of 2.00:1.00 increasing to 2.50:1.00. The first lien allows for a maximum Total Leverage Ratio of 4.25:1.00 being reduced over time to 3.00:1.00 by the end of 2016 while the second lien allows for a ratio of 4.50:1.00 reduced to 3.25:1.00.

Pro Forma Adjusted EBITDA is a material component of these covenants. For instance, these debt agreements contain financial ratios that are calculated by reference to Pro Forma Adjusted EBITDA. Pro Forma Adjusted EBITDA is not a presentation made in accordance with U.S. GAAP, is not a measure of financial performance or condition, liquidity or profitability, and should not be considered as an alternative to (1) net income (loss) or any other performance measures determined in accordance with U.S. GAAP or (2) operating cash flows determined in accordance with U.S. GAAP. Additionally, Pro Forma Adjusted EBITDA is not intended to be a measure of free cash flow for our discretionary use, as it does not consider certain cash payments required for interest, taxes and debt service. Our presentation of Pro Forma Adjusted EBITDA has limitations as an analytical tool, and should not be considered in isolation or as a substitute for analysis of our results as reported under U.S. GAAP. Because not all companies use identical calculations, the presentation of Pro Forma Adjusted EBITDA may not be comparable to other similarly titled measures of other companies. We believe that the presentation of Pro Forma Adjusted EBITDA is appropriate to provide additional information about the calculation of the financial covenants in the debt agreements.

Provided below is a reconciliation of our income before income taxes, which is a U.S. GAAP measure of our operating results, to Pro Forma Adjusted EBITDA, which has been calculated in accordance with the definitions in the 2011 Term Loans and Revolver agreements (in thousands):

| | For the Three Months Ended September 30, 2012 | For the Nine Months Ended September 30, 2012 |
|---|---|---|
| Income before income taxes | $ 10,575 | $ 19,610 |
| Add: | | |
| Depreciation and amortization | 23,770 | 73,729 |
| Interest expense on debt | 19,839 | 60,182 |
| EBITDA | 54,184 | 153,521 |
| Add: | | |
| Non-cash share-based compensation expense | 2,867 | 11,230 |
| Pro forma synergies [1] | — | 3,769 |
| Provision for loan losses | 4,596 | 8,122 |
| Transaction and integration-related costs | 3,000 | 6,572 |
| Non-cash interest expense | 244 | 1,881 |
| Residual Trusts cash flows [2] | 480 | 6,105 |
| Other [3] | — | 3,347 |
| Sub-total | 11,187 | 41,026 |
| Less: | | |
| Non-cash interest income | (4,127) | (14,511) |
| Net impact of Non-Residual Trusts [4] | (455) | (2,389) |
| Other [3] | (472) | — |
| Sub-total | (5,054) | (16,900) |
| Pro Forma Adjusted EBITDA | $ 60,317 | $ 177,647 |

[1] Represents the estimated transaction-related synergies that have not yet been realized as if they occurred as of January 1, 2011. This pro forma adjustment has been made in accordance with the definition in our 2011 Term Loans and Revolver agreements.
[2] Represents cash flows in excess of overcollateralization requirements that have been released to us from the Residual Trusts.
[3] Represents other cash and non-cash non-recurring adjustments included in our income before income taxes.
[4] Represents the non-cash fair value adjustments related to the Non-Residual Trusts net of the cash servicing fee earned on the underlying residential loans included in our income before income taxes.

61

*Interest Coverage and Total Leverage Ratios*

Provided below are the Interest Coverage Ratio and the Total Leverage Ratio calculated at September 30, 2012:

|  | Covenant Requirement | | Actual |
|---|---|---|---|
|  | **1st Lien** | **2nd Lien** | **Actual** |
| Interest Coverage Ratio - equal to or greater than | 2.25:1.00 | 2.00:1.00 | 3.12 |
| Total Leverage Ratio - equal to or less than | 4.25:1.00 | 4.50:1.00 | 2.98 |

*Refinancing Activities*

We expect to close on the refinancing agreements for the first lien term loan and the Revolver in the fourth quarter of 2012. The agreements will contain customary events of default and covenants. These agreements will also be subject to certain financial covenants, leverage and interest coverage ratios that must be maintained.

*Convertible Notes*

On October 19, 2012, we closed on a registered underwritten public offering of $265.0 million aggregate principal amount of 4.50% convertible senior subordinated notes, or the Convertible Notes. The Convertible Notes will pay interest semi-annually on May 1 and November 1, commencing on May 1, 2013, at a rate of 4.50% per year, and will mature on November 1, 2019. In addition, we granted the underwriters of the Convertible Notes a 30-day option to purchase up to an additional $25.0 million aggregate principal amount of Convertible Notes. The underwriters exercised this option.

Prior to May 1, 2019, the Convertible Notes will be convertible only upon specified events and during specified periods, and, on or after May 1, 2019, at any time. The Convertible Notes will initially be convertible at a conversion rate of 17.0068 shares of our common stock per $1,000 principal amount of Convertible Notes, which is equivalent to an initial conversion price of approximately $58.80. Upon conversion, we may pay or deliver, at our option, cash, shares of our common stock, or a combination of cash and shares of common stock.

We generated net proceeds of approximately $280.4 million from the Convertible Notes after deducting underwriting discounts and commissions and offering expenses. We used the net proceeds from the Convertible Notes, together with cash on hand, to repay and terminate $265.0 million outstanding under our second lien senior secured term loan and pay certain fees, expenses and premiums in connection therewith

*Mortgage Servicing Rights Credit Agreement*

In November 2009, Green Tree entered into a Mortgage Servicing Rights Credit Agreement to finance the purchase of servicing rights. The note is secured by the servicing rights purchased and requires equal monthly payments for 36 months. The interest rate on this agreement is based on LIBOR plus 2.50%. The facility expires in November 2012.

**Servicing Advance Facilities**

*Servicer Advance Reimbursement Agreement*

On July 1, 2012, we renewed our Servicer Advance Reimbursement Agreement, which provides for the reimbursement of certain principal and interest and protective advances that are our responsibility under certain servicing agreements. The renewed agreement provides for a reimbursement amount of up to $150.0 million. The cost of this agreement is LIBOR plus 2.50% on the amounts that are reimbursed. The early reimbursement period expires in June 2013 or upon 120 days after written notice

*Receivables Loan Agreement*

In May 2012, we renewed our three-year Receivables Loan Agreement that provides borrowings up to $75.0 million and is collateralized by certain servicer and protective advances. The interest cost under the renewed agreement is LIBOR plus 3.25%. The renewed facility matures in July 2015.

*Common Stock Offering*

On October 19, 2012, we closed on a registered public offering of 6,050,000 shares of our common stock, or the 2012 Common Stock Offering. The shares were sold at a price to the public of $42.00 per share. In addition, we granted the underwriters of the 2012 Common Stock Offering a 30-day option to purchase up to an additional 900,000 shares of common stock. The underwriters exercised this option. We generated net proceeds of approximately $276.1 million from the 2012 Common Stock Offering after deducting underwriting discounts and commissions and offering expenses. Subsequently, we used approximately $95.0 million of the net proceeds to partially fund our acquisition of RMS. See further discussion in Note 2 in the Notes to Consolidated Financial Statements.

*Sources and Uses of Cash*

The following table sets forth selected consolidated cash flow information for the periods indicated (in thousands):

|  | For the Nine Months Ended September 30, | |
|  | 2012 | 2011 |
| --- | --- | --- |
| Cash flows provided by operating activities | $ 50,897 | $ 73,575 |
| Cash flows provided by (used in) investing activities | 187,813 | (1,003,629) |
| Cash flows provided by (used) in financing activities | (218,185) | 840,919 |
| Net increase in cash and cash equivalents | $ 20,525 | $ (89,135) |

*Operating Activities*

Net cash provided by operating activities was $50.9 million for the nine months ended September 30, 2012 as compared to $73.6 million during the same period in 2011. For the nine months ended September 30, 2012, the primary sources of cash from operating activities were the income generated from our servicing operations, our insurance business and the net interest spread from our residential loan portfolio. Cash flows from operating activities for the nine months ended September 30, 2011 were primarily generated from our residential loan portfolio carried at amortized cost. The decrease in cash flows from operations for the nine months ended September 30, 2012 as compared to the same period in the prior year is due to the payment of $40.0 million in escrow funds to the sellers of Green Tree partially offset by the inclusion of Green Tree for the entire current year period as opposed to three months in the prior year period.

*Investing Activities*

The primary sources of cash flows from investing activities include payments received on our residential loans and the receivables related to the Non-Residual Trusts, as well as cash proceeds from the sales of real estate owned offset by changes in the required level of restricted cash. Cash flows related to purchases of premises and equipment fluctuate from period to period. Net cash provided by investing activities was $187.8 million for the nine months ended September 30, 2012 as compared to $1.0 billion net cash used during the same period in 2011. For the nine months ended September 30, 2012 and 2011, the primary source of cash was the principal payments received from borrowers on our residential loans of $120.3 million and $90.2 million, respectively, which increased due to the cash flows related to the Non-Residual Trusts acquired in the Green Tree acquisition. During the nine months ended September 30, 2012 and 2011, we also received $12.7 million and $4.0 million, respectively, in cash from the receivables related to the Non-Residual Trusts. Cash proceeds from the sale of real estate owned, net was $12.8 million and $2.2 million for the nine months ended September 30, 2012 and 2011, respectively. The increase in cash proceeds from the sale of real estate owned, net is due to the inclusion of Green Tree for the entire current year period as opposed to three months of the prior year period. Also contributing to cash flows provided by investing activities during the nine months ended September 30, 2012 were $40.0 million in escrow funds that were paid to the sellers of Green Tree with restricted cash thus increasing the change in restricted cash for the settlement of the payable. During the nine months ended September 30, 2012 and 2011, cash of $2.6 million and $45.6 million, respectively, was used to purchase residential loans. The decrease in cash outflows to purchase residential loans is due to the discontinuation of our loan acquisition program in conjunction with the Green Tree acquisition. During the nine months ended September 30, 2012 and 2011, cash of $6.1 million and $3.0 million, respectively, was used for purchases of premises and equipment.

*Financing Activities*

Our cash flows from financing activities include repurchase agreements under our corporate debt which we entered into to acquire Green Tree, as well as mortgage-backed debt and servicing advance liabilities, both of which increased significantly due to the acquisition of Green Tree. Net cash used in financing activities was $218.2 million for the nine months ended September 30, 2012 as compared to net cash provided of $840.9 million during the same period in 2011. For the nine months ended September 30, 2012, the primary uses of cash were $143.7 million for principal payments on mortgage-backed debt, $64.6 million for principal payments on corporate debt and $8.0 million in payments, net of borrowings, on our servicing advance liabilities. During the nine months ended September 30, 2011, the primary source of cash was the issuance of mortgage-backed debt, net of issuance costs, of $220.0 million as well as the issuance of debt, net of issuance costs, of $720.7 million, used to fund the acquisition of Green Tree. The primary uses of cash were for principal payments on and extinguishment of mortgage-backed debt of $88.8 million, payments, net of borrowings of $8.4 million on our servicing advance facilities and dividends and dividend equivalents paid of $13.4 million.

## Credit Risk Management

*Residential Loan Credit Risk*

We are subject to credit risk associated with the residual interests that we own in the consolidated Residual Trusts as well as with the unencumbered residential loans held in our portfolio, both of which are recognized as residential loans on our consolidated balance sheets. Credit risk is the risk that we will not fully collect the principal we have invested due to borrower defaults. We manage the credit risk associated with our residential loan portfolio through sound loan underwriting, monitoring of existing loans, early identification of problem loans, timely resolution of problems, establishment of an appropriate allowance for loan losses and sound non-accrual and charge-off policies.

We do not currently own residual interests in the Non-Residual Trusts. However, we have assumed mandatory call obligations related to the Non-Residual Trusts and will be subject to credit risk associated with the purchased residential loans when the calls are exercised. The Company expects to call these securitizations beginning in 2017 and continuing through 2019.

At September 30, 2012, the principal balance of our residential loan portfolio that exposes us to credit risk was $1.7 billion. The principal balance of residential loans and the carrying value of other collateral of the Residual Trusts total $1.8 billion and is permanently financed with $1.3 billion of mortgage-backed debt leaving us with a net credit exposure of $417.6 million, which approximates our residual interests in the consolidated Residual Trusts.

The residential loans that expose us to credit risk are predominantly credit-challenged, non-conforming loans with an average loan-to-value, or LTV, ratio at origination of approximately 90.4% and an average refreshed borrower credit score of 595. While we feel that our underwriting and due diligence of these loans will help to mitigate the risk of significant borrower default on these loans, we cannot assure you that all borrowers will continue to satisfy their payment obligations under these loans, thereby avoiding default.

The information provided below consists of data for the residential loan portfolio for which we are subject to credit risk as explained above.

*Allowance for Loan Losses*

We maintain an allowance for loan losses for the unencumbered residential loans and the residential loans held in the Residual Trusts that are recognized on our consolidated balance sheets and are accounted for at amortized cost. The following table provides information regarding our allowance for loan losses and related ratios for the periods presented (dollars in thousands):

|  | Allowance for Loan Losses | Allowance as a % of Residential Loans [1] | Net Charge-offs [2] | Charge-off Ratio [2][3] | Coverage Ratio [2][4] |
|---|---|---|---|---|---|
| September 30, 2012 | $16,952 | 1.10% | $6,659 | 0.42% | 255% |
| December 31, 2011 | 13,824 | 0.86 | 8,099 | 0.50 | 171 |

[1] The allowance for loan loss ratio is calculated as period end allowance for loan losses divided by period end residential loans before the allowance for loan losses.

[2] Annualized.

[3] The charge-off ratio is calculated as charge-offs, net of recoveries divided by average residential loans before the allowance for loan losses. Net charge-offs includes charge-offs recognized upon acquisition of real estate in satisfaction of residential loans.

[4] The coverage ratio is calculated as period end allowance for loan losses divided by charge-offs, net of recoveries.

The following table summarizes activity in the allowance for loan losses for our residential loan portfolio (in thousands):

12-12020-mg    Doc 2138-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 -
Walter Investment 10-Q    Pg 67 of 120

The following table summarizes activity in the allowance for loan losses for our residential loan portfolio (in thousands):

| | For the Three Months Ended September 30, | | For the Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Balance at beginning of the period | $14,330 | $13,234 | $13,824 | $15,907 |
| Provision for loan losses | 4,596 | 1,865 | 8,122 | 3,365 |
| Charge-offs, net of recoveries [1] | (1,974) | (1,803) | (4,994) | (5,976) |
| Balance at end of the period | $16,952 | $13,296 | $16,952 | $13,296 |

[1] Includes charge-offs recognized upon acquisition of real estate in satisfaction of residential loans of $1.8 million and $0.7 million for the three months ended September 30, 2012 and 2011, respectively, and $4.0 million and $2.4 million for the nine months ended September 30, 2012 and 2011, respectively.

*Delinquency Information*

The past due or delinquency status of residential loans is generally determined based on the contractual payment terms. The calculation of delinquencies excludes from delinquent amounts those accounts that are in bankruptcy proceedings that are paying their mortgage payments in contractual compliance with the bankruptcy court approved mortgage payment obligations. The following table presents the delinquency status of our unencumbered residential loans and the residential loans held in the Residual Trusts based on the total number of loans outstanding and on the total unpaid principal balance outstanding:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Total number of residential loans outstanding | 31,970 | 32,921 |
| Delinquencies as a percent of number of residential loans outstanding: | | |
| 30-59 days | 1.39% | 0.92% |
| 60-89 days | 0.66% | 0.50% |
| 90 days or more | 3.38% | 2.90% |
| Total | 5.43% | 4.32% |
| | | |
| Principal balance of residential loans outstanding (in thousands) | $1,694,714 | $1,776,063 |
| Delinquencies as a percent of amounts outstanding: | | |
| 30-59 days | 1.32% | 1.09% |
| 60-89 days | 0.73% | 0.65% |
| 90 days or more | 4.58% | 3.99% |
| Total | 6.63% | 5.73% |

The following table summarizes our unencumbered residential loans and the residential loans in the Residual Trusts that have been placed in non-accrual status due to payments being past due 90 days or more:

| | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Residential loans: | | |
| Number of loans | 1,082 | 954 |
| Unpaid principal balance (in millions) | $ 77.6 | $ 70.8 |

*Portfolio Characteristics*

The weighted-average original LTV of our residential loans was 90.4% at both September 30, 2012 and December 31, 2011, respectively. The LTV dispersion of our unencumbered residential loans and the residential loans in the Residual Trusts is provided in the following table:

| LTV Category: | September 30, 2012 | December 31, 2011 |
|---|---|---|
| 0.00 - 70.00 | 1.55% | 1.56% |
| 70.00 - 80.00 | 3.07% | 3.09% |
| 80.01 - 90.00 [1] | 64.43% | 65.62% |
| 90.01 - 100.00 | 30.95% | 29.73% |
| Total | 100.00% | 100.00% |

[1] For residential loans in the portfolio, prior to electronic tracking of original LTVs, the maximum LTV was 90%, or 10% equity. Thus, these residential loans have been included in the 80.01 to 90.00 LTV category.

Original LTVs do not include additional value contributed by the borrower to complete the home. This additional value typically was created by the installation and completion of wall and floor coverings, landscaping, driveways and utility connections in more recent periods. Current LTVs are not readily determinable given the rural geographic distribution of our portfolio which precludes us from obtaining reliable comparable sales information to utilize in valuing the collateral.

FICO scores are refreshed on at least an annual basis. The refreshed weighted-average FICO score of our unencumbered residential loans and the residential loans in the Residual Trusts was 595 and 588 at September 30, 2012 and December 31, 2011, respectively. The refreshed weighted-average FICO dispersion of our portfolio is provided in the following table:

| Refreshed FICO Scores: | September 30, 2012 | December 31, 2011 |
|---|---|---|
| <=600 | 53.38% | 52.85% |
| 601 - 640 | 16.46% | 15.14% |
| 641 - 680 | 9.35% | 9.70% |
| 681 - 720 | 5.81% | 4.99% |
| 721 - 760 | 3.21% | 2.67% |
| 761 - 800 | 2.07% | 2.30% |
| >=801 | 1.47% | 0.91% |
| Unknown or unavailable | 8.25% | 11.44% |
| Total | 100.00% | 100.00% |

Our unencumbered residential loans and residential loans in the Residual Trusts are concentrated in the following states:

| States: | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Texas | 34.85% | 34.71% |
| Mississippi | 14.44% | 14.36% |
| Alabama | 7.92% | 7.95% |
| Florida | 7.07% | 7.06% |
| Louisiana | 6.08% | 6.07% |
| South Carolina | 5.60% | 5.56% |
| Other [1] | 24.04% | 24.29% |
| Total | 100.00% | 100.00% |

[1] Consists of loans in 42 and 43 states at September 30, 2012 and December 31, 2011, respectively, each individually representing a concentration of less than 5%.

Our unencumbered residential loans and residential loans in the Residual Trusts were originated in the following periods:

12-12020-mg    Doc 2138-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 - 
Walter Investment 10-Q    Pg 69 of 120

| Origination Year: | September 30, 2012 | December 31, 2011 |
|---|---|---|
| Year 2012 Origination | 2.58% | — |
| Year 2011 Origination | 3.93% | 4.88% |
| Year 2010 Origination | 3.28% | 3.38% |
| Year 2009 Origination | 2.67% | 2.99% |
| Year 2008 Origination | 3.99% | 8.59% |
| Year 2007 Origination | 13.77% | 15.44% |
| Year 2006 Origination | 10.22% | 10.15% |
| Year 2005 Origination and earlier | 59.56% | 54.57% |
| Total | 100.00% | 100.00% |

### Real Estate Credit Risk

We include on our consolidated balance sheets assets secured by real property and property obtained directly as a result of foreclosures. Residential property values are subject to volatility and may be affected adversely by a number of factors, including, but not limited to, national, regional and local economic conditions (which may be adversely affected by industry slowdowns and other factors); local real estate conditions (such as an oversupply of housing); changes or continued weakness in specific industry segments; construction quality, age and design; demographic factors; and retroactive changes to building or similar codes. In addition, decreases in property values reduce the value of the collateral and the potential proceeds available to a borrower to repay our loans, which could also cause us to suffer losses.

The following table presents activity related to foreclosed property (dollars in thousands):

| | For the Nine Months Ended September 30, | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2012 | | | | 2011 | | | |
| | Loans and Residuals | | Non-Residual Trusts [1] | | Loans and Residuals | | Non-Residual Trusts [1] | |
| | Units | Amount | Units | Amount | Units | Amount | Units | Amount |
| Balance at beginning of the period | 867 | $ 53,651 | 193 | $ 2,496 | 1,041 | $ 67,629 | — | $ — |
| Foreclosures and other additions, at fair value | 799 | 43,823 | 621 | 6,918 | 831 | 47,556 | 461 | 5,722 |
| Cost basis of financed sales | (718) | (43,025) | — | — | (930) | (55,065) | — | — |
| Cost basis of cash sales to third parties and other dispositions | (146) | (5,847) | (650) | (6,487) | (102) | (4,028) | (258) | (2,601) |
| Lower of cost or fair value adjustments | — | (1,331) | — | (677) | — | (3,482) | — | (186) |
| Balance at end of the period | 802 | $ 47,271 | 164 | $ 2,250 | 840 | $ 52,610 | 203 | $ 2,935 |

[1]   Foreclosed property held by the Non-Residual Trusts is included in Other in Note 17 in the Notes to Consolidated Financial Statements.

### Off-Balance Sheet Arrangements

Our off-balance sheet arrangements are described in the Off-Balance Sheet Arrangements section of the Management's Discussion and Analysis of Financial Condition and Results of Operations for the year ended December 31, 2011 included in our Annual Report on Form 10-K filed with the SEC on March 9, 2012. There have been no material changes to our involvement in or risks related to our off-balance sheet arrangements.

### Critical Accounting Policies and Estimates

The critical accounting policies and estimates used in preparation of our consolidated financial statements are described in the Critical Accounting Policies and Estimates section of the Management's Discussion and Analysis of Financial Condition and Results of Operations for the year ended December 31, 2011 included in our Annual Report on Form 10-K filed with the SEC on March 9, 2012. There have been no material changes to our critical accounting policies or estimates and the methodologies or assumptions we apply under them.

**ITEM 3.** *QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK*

For quantitative and qualitative disclosures about market risk, see Part II, Item 7A. Quantitative and Qualitative Disclosure About Market Risk, of our Annual Report on Form 10-K for the year ended December 31, 2011 filed with the SEC on March 9, 2012. Our market risks have not changed materially since December 31, 2011.

**ITEM 4.** *CONTROLS AND PROCEDURES*

**(a) Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed in our reports under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15 (e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Based on that evaluation, our management, including our Chief Executive Officer and our Chief Financial Officer, concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

**(b) Changes in Internal Controls**

There have been no changes in our internal control over financial reporting during our third quarter ended September 30, 2012, that have materially affected, or are reasonably likely to materia1ly affect, our internal control over financial reporting.

# PART II. OTHER INFORMATION

**ITEM 1.** *LEGAL PROCEEDINGS*

For a description of legal proceedings, see Part I, Item 3. Legal Proceedings, of our Annual Report on Form 10-K for the year ended December 31, 2011 filed with the SEC on March 9, 2012. There have been no material developments involving legal proceedings since December 31, 2011.

**ITEM 1A.** *RISK FACTORS*

You should carefully review and consider the risks described below. If any of the risks described below should occur, our business, prospects, financial condition, cash flows, liquidity, results of operations, and our ability to make cash distributions to our stockholders could be materially and adversely affected. In that case, the trading price of our common stock could decline and you may lose some or all of your investment in our common stock. The risks and uncertainties described below are not the only risks that may have a material adverse effect on us. Additional risks and uncertainties of which we are currently unaware, or that we currently deem to be immaterial, also may become important factors that adversely impact us. Further, to the extent that any of the information contained in this Quarterly Report on Form 10-Q constitutes forward-looking information, the risk factors set forth below are cautionary statements identifying important factors that could cause our actual results for various financial reporting periods to differ materially from those expressed in any forward-looking statements made by or on behalf of us.

**Risks Related to Our Industry**

*The business in which we engage is complex and involves many regulations, and changes in the regulatory environment affecting our business, including the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), could have a material adverse effect on our business, financial position, results of operations or cash flows.*

Our business is subject to numerous federal, state and local laws and regulations, and may be subject to judicial and administrative decisions imposing various requirements and restrictions. See "Business — Regulations" below for further information. These laws, regulations and judicial and administrative decisions include those pertaining to: real estate settlement procedures; fair lending; fair credit reporting; truth in lending; fair debt collection; compliance with net worth and financial statement delivery requirements; compliance with federal and state disclosure and licensing requirements; the establishment of maximum interest rates, finance charges, fees and other charges; secured transactions; collection, foreclosure, repossession and claims-handling procedures; unfair and deceptive acts and practices; escrow administration; lender-placed insurance; bankruptcy; loss mitigation and loan modifications; deficiency collections; other trade practices and privacy regulations providing for the use and safeguarding of non-public personal financial information of borrowers and guidance on non-traditional mortgage loans issued by the federal financial regulatory agencies. By agreement with some of our customers, we also are subject to additional requirements that our customers may impose.

Federal or state regulation and oversight of our business activities may result in increased costs and potential litigation and could limit or prevent us from operating our business in some or all of the states in which we currently operate or may reduce the revenues that we receive on our business.

*The enactment of the Dodd-Frank Act has impacted our business and may continue to do so in ways that we cannot predict until such time as rules and regulations related thereto are enacted.*

On July 21, 2010, the Dodd-Frank Act was signed into law for the express purpose of further regulating the financial services industry, including mortgage origination, sales, servicing and securitization. Certain provisions of the Dodd-Frank Act may adversely impact the operation and practices of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). We believe that Fannie Mae and Freddie Mac hold potential for growth opportunities for our business and we are unable to determine what impact the applicable provisions of the Dodd-Frank Act may have on that potential.

The Bureau of Consumer Financial Protection (the "CFPB"), a new federal agency established pursuant to the Dodd-Frank Act, officially began operation on July 21, 2011. The CFPB is charged, in part, with enforcing laws involving consumer financial products and services, including mortgage finance and servicing and reverse mortgages, and is empowered with supervision, enforcement, examination and rulemaking authority. The CFPB has an operating history of less than 18 months, and there can be no assurance that the CFPB will not make material changes to the regulations, rules or practices applicable to our industry. The Dodd-Frank Act also establishes new standards and practices for mortgage originators, another potential growth area for our business, including determining prospective borrowers' abilities to repay their mortgages, removing incentives for higher cost mortgages, prohibiting prepayment penalties for non-qualified mortgages, prohibiting mandatory arbitration clauses, requiring additional disclosures to potential borrowers and restricting the fees that mortgage originators may collect. In addition, our ability to enter into asset-backed securities transactions in the future may be impacted by the Dodd-Frank Act and other proposed reforms related thereto, the effect of which on the asset-backed securities market is currently uncertain. While we continue to evaluate all aspects of the Dodd-Frank Act, the CFPB and regulations promulgated under the Dodd-Frank Act or by the CFPB could materially and adversely affect the manner in which we conduct our businesses, result in heightened federal regulation and oversight of our business activities, and in increased costs and potential litigation associated with our business activities.

Our failure to comply with the laws, rules or regulations to which we are subject, whether actual or alleged, would expose us to fines, penalties or potential litigation liabilities, including costs, attorneys' fees, settlements and judgments, any of which could have a material adverse effect on our business, financial position, results of operations or cash flows and the value of our common stock.

*Changes in existing U.S. government-sponsored mortgage programs or servicing eligibility standards could materially and adversely affect our business, financial position, results of operations or cash flows.*

12-12020-mg    Doc 1738-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 -
Walter Investment 10-Q    Pg 72 of 120

In January 2011, the Federal Housing Finance Agency directed Fannie Mae and Freddie Mac to develop a joint initiative to consider alternatives for future mortgage servicing structures and compensation. Under this proposal, the government sponsored entities ("GSEs") are considering potential structures in which the minimum service fee would be reduced or eliminated altogether. This would provide mortgage bankers with the ability to either sell all or a portion of the retained servicing fee for cash up front, or retain an excess servicing fee. While the proposal provides additional flexibility in managing liquidity and capital requirements, it is unclear how the various options might impact mortgage-backed security pricing and the related pricing of excess servicing fees. The GSEs are also considering different pricing options for non-performing loans to better align servicer incentives with mortgage-backed securities investors and provide the loan guarantor the ability to transfer non-performing servicing. The Federal Housing Finance Agency has indicated that any change in the servicing compensation structure would be prospective and the changes, if implemented, could have a significant impact on the entire mortgage industry and on the results of operations and cash flows of our mortgage business.

***The enforcement of consent orders by certain federal banking agencies against the largest servicers related to foreclosure practices could impose additional compliance costs on our servicing business.***

On April 13, 2011, the federal banking agencies overseeing certain aspects of the mortgage market entered into consent orders with 14 of the largest mortgage servicers in the United States regarding foreclosure practices. The enforcement actions require the servicers, among other things, to: (i) correct deficiencies in residential mortgage loan servicing and foreclosure practices; (ii) make significant modifications in practices for residential mortgage loan servicing and foreclosure processing, including communications with borrowers and limitations on dual-tracking, which occurs when servicers continue to pursue foreclosure during the loan modification process; (iii) ensure that foreclosures are not pursued once a mortgage has been approved for modification and to establish a single point of contact for borrowers throughout the loan modification and foreclosure processes; and (iv) establish robust oversight and controls pertaining to their third-party vendors, including outside legal counsel, that provide default management or foreclosure services. While these enforcement consent orders are considered as not preemptive to state actions, it remains to be seen how state actions and proceedings will be affected by the consent orders.

Although we are neither a direct party to these consent orders nor a banking organization, we have become subject to certain aspects of the consent orders to the extent (i) we subservice loans for the servicers that are parties to the consent orders; (ii) our investors require that we comply with certain aspects of the consent orders; or (iii) we otherwise find it prudent to comply with certain aspects of the consent orders. In addition, the practices set forth in such enforcement consent orders may be adopted by the industry as a whole, requiring us to comply with them in order to follow standard industry practices as required by our servicing agreements. Changes to our servicing practices could increase operational and compliance costs for our servicing business, which could materially and adversely affect our financial condition or results of operations.

***Federal Government/State Attorneys General foreclosure settlement could have unforeseen effects on our business.***

On February 9, 2012, the U.S. Department of Justice, certain federal regulatory agencies, and forty-nine state attorneys general (Oklahoma is excluded) entered into a $25 billion settlement with the five largest mortgage servicers — Bank of America Corporation, JPMorgan Chase & Co., Wells Fargo Company, Citigroup, Inc. and Ally Financial, Inc. The settlement, which was approved by the U.S. District Court for the District of Columbia by consent judgments entered on April 5, 2012, provides for, among other things, payments to certain individuals whose homes have been foreclosed upon, the reduction of principal for certain other mortgagors, and the establishment of a broad array of new requirements and restrictions related to the servicing of residential mortgage loans (the "Servicing Standards"). While we are not a party to the settlement, certain of our clients have required us to implement some or most of the Servicing Standards when we service loans for them, and we expect current and future clients may require us to do so as well. Should this occur, our cost to service mortgage loans could be increased and our servicing income could be reduced by amounts that we do not believe will be material.

*Lender-placed insurance is under increased scrutiny by regulators and, in the event changes are made to current practices, it could result in damages and/or reduced income from commissions for the Green Tree insurance business and/or material changes to the revenues derived from our historical insurance business.*

12-12020-mg    Doc 438-1    Filed 11/12/12    Entered 11/12/12 11:12:34    Exhibit 1 -
Walter Investment 10-Q    Pg 73 of 120

Under certain circumstances, when borrowers fail to provide hazard insurance on their residences, the owner or servicer of the loan may place such insurance to protect the collateral and passes the premium onto the borrower. Walter Investment's historical practice had been to place the coverage with a third-party carrier which, in turn, reinsured some of the exposure with Walter Investment Reinsurance Co., Ltd., our wholly-owned subsidiary. This practice ended effective December 31, 2011. Green Tree's insurance agency acts as an agent for this purpose by placing the insurance coverage with a third-party carrier and for which the agency earns a commission. Both practices have come under the scrutiny of regulators. As of November 5, 2012, no new regulations have been put into place which would affect these practices; however, we cannot be certain that Green Tree's practice will not be restricted or even prohibited. Should this occur, the revenues from our insurance businesses could be significantly reduced or eliminated.

On March 14, 2012, Fannie Mae, a GSE for which Green Tree services mortgage loans, issued a servicing guide announcement related to lender-placed insurance, that, if not revised before its implementation date, would exclude from reimbursement by Fannie Mae any lender-placed insurance commission earned by an entity related to the servicer, such as Green Tree's insurance agency. The original June 1, 2012 implementation date has been postponed indefinitely by Fannie Mae.

***We may be subject to liability for potential violations of predatory lending and/or servicing laws, which could adversely impact our results of operations, financial condition and business.***

Various federal, state and local laws have been enacted that are designed to discourage predatory lending and servicing practices. The Home Ownership and Equity Protection Act of 1994 ("HOEPA") prohibits inclusion of certain provisions in residential loans that have mortgage rates or origination costs in excess of prescribed levels and requires that borrowers be given certain disclosures prior to origination. Some states have enacted, or may enact, similar laws or regulations, which in some cases impose restrictions and requirements greater than those in HOEPA. In addition, under the anti-predatory lending laws of some states, the origination of certain residential loans, including loans that are not classified as "high cost" loans under applicable law, must satisfy a net tangible benefits test with respect to the related borrower. This test may be highly subjective and open to interpretation. As a result, a court may determine that a residential loan, for example, does not meet the test even if the related originator reasonably believed that the test was satisfied. Failure of residential loan originators or servicers to comply with these laws, to the extent any of their residential loans are or become part of our mortgaged-related assets, could subject us, as a servicer or as an assignee or purchaser, in the case of acquired loans, to monetary penalties and could result in the borrowers rescinding the affected residential loans. Lawsuits have been brought in various states making claims against originators, servicers, assignees and purchasers of high cost loans for violations of state law. Named defendants in these cases have included numerous participants within the secondary mortgage market. If our loans are found to have been originated in violation of predatory or abusive lending laws, we could incur losses, which could materially and adversely impact our results of operations, financial condition and business.

***The expanding body of federal, state and local regulations and/or the licensing of loan servicing, collections or other aspects of our business, may increase the cost of compliance and the risks of noncompliance, and may be difficult for us to satisfy in a timely manner.***

Our business is subject to extensive regulation by federal, state and local governmental authorities and is subject to various laws and judicial and administrative decisions imposing requirements and restrictions on a substantial portion of our operations. The volume of new or modified laws and regulations has increased in recent years. Some individual municipalities have begun to enact laws that restrict loan servicing activities, including delaying or preventing foreclosures or forcing the modification of certain mortgages. Further, federal legislation recently has been proposed which, among other things, also could hinder the ability of a servicer to foreclose promptly on defaulted residential loans or would permit limited assignee liability for certain violations in the residential loan origination process, and which could result in our being held responsible for violations in the residential loan origination process.

In addition, the U.S government through the Federal Housing Administration ("FHA"), the FDIC, and the U.S. Department of the Treasury ("Treasury"), has commenced or proposed implementation of programs designed to provide homeowners with assistance in avoiding residential mortgage foreclosures, such as the Hope for Homeowners program (permitting certain distressed borrowers to refinance their mortgages into FHA insured loans), Home Affordability Modification Program ("HAMP"), and the Secured Lien Program (involving, among other things, the modification of first-lien and second-lien mortgages to reduce the principal amount or the interest rate of loans or to extend the payment terms). Green Tree and Marix are HAMP approved servicers and would be affected by any changes to HAMP rules. Moreover, certain mortgage lenders and servicers have voluntarily, or as part of settlements with law enforcement authorities, established loan-modification programs relating to loans they hold or service. Moreover, state and federal regulators are believed to be considering new regulations relating to lender-placed insurance which could reduce the amount of insurance commission earned by the Green Tree insurance agency, or adversely impact our self insurance of our legacy insurance program. These loan-modification programs, future federal, state and local legislative or regulatory actions that result in modification of outstanding loans acquired by us, changes imposed on our insurance businesses as well as changes in the requirements to qualify for refinancing with or selling to Fannie Mae, Freddie Mac, or the Government National Mortgage Association ("Ginnie Mae"), may adversely affect the value of, and the returns on, such residential mortgage loans, insurance businesses and the potential growth of our business.

Furthermore, if regulators impose new or more restrictive requirements, as has been indicated by, amongst others, the CFPB, we may have difficulty satisfying these requirements in a timely manner and/or incur additional significant costs to comply with such requirements, which could further adversely affect our results of operations or financial condition. Our failure to comply with these laws and regulations could possibly lead to civil and criminal liability; loss of licensure; termination of our servicing and sub-servicing agreements; damage to our reputation in the industry; fines, penalties and litigation, including class action lawsuits; or administrative enforcement actions. Any of these outcomes could harm our results of operations or financial condition. We are unable to predict whether federal, state or local authorities will enact laws, rules or regulations that will require changes in our practices in the future and whether any such changes could adversely affect our cost of doing business and profitability.

***Difficult conditions in the mortgage and real estate markets, financial markets and the economy generally may cause us to incur losses on our portfolio or otherwise to be unsuccessful in our business strategies. A prolonged economic slowdown, recession, period of declining real estate values or sustained high unemployment could materially and adversely affect us.***

The implementation of our business strategies may be materially affected by the continuation of current conditions in the mortgage and housing markets, the financial markets, and the economy generally. Continuing concerns over unemployment, inflation, energy and health care costs, geopolitical issues, including political unrest in the Middle East and the possibility of credit defaults by several European countries, the availability and cost of credit, the mortgage market and the real estate market, and other factors have contributed to increased volatility and diminished expectations for the economy and markets going forward. The risks associated with our servicing business and any investments we may make will be more acute during periods of economic slowdown or recession, especially if these periods are accompanied by declining real estate values or sustained unemployment. A weakening economy, high unemployment and declining real estate values significantly increase the likelihood that borrowers will default on their debt service obligations. In this event we may incur losses on our investment portfolio because the value of any collateral we foreclose upon may be insufficient to cover the full amount of our investment or may take a significant amount of time to realize. In addition, the aforementioned circumstance may adversely affect the third-party servicing performed by Green Tree and Marix and any platforms we may acquire, including our receipt of servicing incentive fee compensation and the timing, amount and reimbursement of servicing advances made by us, and may further adversely affect or prolong our ability to successfully integrate Green Tree or to bring Marix into profitability.

***Continued weakness in the mortgage and residential real estate markets could negatively affect our results of operations and financial condition, including causing credit and market value losses related to our holdings that could cause us to take charges and/or add to our allowance for loan losses in amounts that may be material.***

The residential mortgage market in the United States has experienced significant levels of defaults, credit losses, and liquidity instability. These factors have impacted investor perception of the risks associated with the residential loans that we own. Continued or increased deterioration in the residential loan market may adversely affect the performance and market value of our current investments. Deterioration in home prices or the value of our portfolio could require us to take charges, or add to our allowance for loan losses, either or both of which may be material. The residential loan market has also been severely affected by changes in the lending landscape and there is no assurance that these conditions have stabilized or will not worsen.

A continued deterioration or a delay in any recovery in the residential mortgage market may also reduce the number of new mortgages that we originate, reduce the profitability of residential loans currently serviced by us or adversely affect our ability to sell mortgage loans originated by us or increase delinquency rates. Any of the foregoing could adversely affect our business, financial condition or results of operations. In addition, the cost of servicing an increasingly delinquent residential loan portfolio may rise without a corresponding increase in servicing compensation.

While limitations on financing initially were felt in the less-than-prime mortgage market, it appears that liquidity issues now also affect prime and Alt-A lending, with the curtailment of many product types. This has an adverse impact on new demand for homes, which continues to compress home ownership rates and has a negative impact on future home price performance. There is a strong correlation between home price growth rates and residential loan delinquencies. Market deterioration has caused us to expect increased credit losses related to our holdings and to sell some foreclosed real estate assets at a loss.

## Risks Related to Our Business and Our Acquisitions

*We may fail to realize the anticipated benefits and cost savings of our acquisitions, which could adversely affect the value of our common stock.*

On July 1, 2011 we acquired Green Tree, on November 1, 2012 we acquired Reverse Mortgage Solutions, Inc. and on October 24, 2012, we, along with Ocwen Loan Servicing LLC, were determined to have submitted the highest and best bid at an auction sponsored by the US Bankruptcy Court to acquire all of the Fannie Mae mortgage servicing rights and the mortgage originations and capital markets platforms of Residential Capital LLC, or ResCap. Subject to the approval of the bid by the Bankruptcy Court, we expect to close on the ResCap acquisition in the first quarter of 2013.

The success of our acquisitions will depend, in part, on our ability to realize the anticipated benefits and cost savings from combining the businesses of the Company and the acquired entities and assets. Our ability to realize these anticipated benefits and cost savings is subject to certain risks including:

- our ability to successfully combine the businesses of the Company and acquirees;

- whether the combined businesses will perform as expected;

- the possibility that we paid more than the value we will derive from the respective acquisitions;

- the reduction of our cash available for operations and other uses;

- the incurrence of significant indebtedness to finance the acquisitions; and

- the assumption of certain known and unknown liabilities of the acquired businesses.

If we are not able to successfully combine the businesses within the anticipated time frame, or at all, the anticipated benefits and cost savings of the acquisitions may not be realized fully, or at all, or may take longer to realize than expected, the combined businesses may not perform as expected, and the value of our common stock may be adversely affected. It is possible that the integration of the businesses could result in the loss of key Company employees and/or the employees of the acquired businesses, the disruption of each company's ongoing businesses, unexpected integration issues, higher than expected integration costs and an overall post-closing integration process that takes longer than originally anticipated. Specifically, issues that must be addressed in the integration of our operations and to realize the anticipated benefits of the acquisition so the combined business performs as expected, include, among other things:

- combining the companies' business development and operations;

- integrating the companies' technologies and services;

- harmonizing the companies' operating practices, employee development and compensation programs, technology platforms, internal controls and other policies, procedures and processes;

- consolidating the companies' corporate, administrative and information technology infrastructure;

- maintaining existing agreements with customers and avoiding delays in entering into new agreements with prospective customers and suppliers; and

- coordinating geographically dispersed organizations.

In addition, at times, the attention of certain members of the companies' management and resources may be focused on the integration of the businesses of the two companies and diverted from day-to-day business operations, which may disrupt each of the companies' ongoing business and the business of the combined company.

*The Green Tree business is significantly larger than the Company's business and therefore may subject the combined business to greater scrutiny by state and federal regulators than previously experienced by our Company.*

12-12020-mg    Doc 2188-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 -
Walter Investment 10-Q    Pg 76 of 120

As described under "Risks Related to Our Industry" above, as a result of the high residential mortgage foreclosure rate in general and reports of improper servicing practices by some mortgage servicers in particular, the mortgage servicing industry has been under increased scrutiny from state and federal regulators and other authorities. This scrutiny is more likely to target larger servicing organizations like Green Tree than smaller organizations like the Company was prior to the acquisition. See for example the risk factor related to the Federal Government/State Attorneys General of all fifty states having targeted five of the largest banks in the U.S. for review and reform of their servicing practices. Similarly, in November of 2010 the Federal Trade Commission ("FTC") issued subpoenas to an unknown number of mortgage servicers, including Green Tree, requesting information on a broad range of subjects relating to the companies' operations; in January 2012, Green Tree and a number of other banks and mortgage servicers received subpoenas from the New York State Department of Financial Services relating to their lender-placed insurance practices; and in September 2012, the CFPB issued civil investigative demands to a number of mortgage servicers, including Green Tree, requesting information on a broad range of subjects relating to the companies' operations. Previously, the Company would not likely have received such requests for information. We cannot guarantee that any such investigations will not reveal violations of law or regulation that may adversely affect Green Tree's business. Moreover, as a significantly larger company, the combined business is more likely to be investigated and we cannot assure you that such investigations would not reveal any improprieties in Green Tree's past or present operations.

***One of our strategies is to increase our originations and servicing of GSE mortgages (including through acquisitions), which could expose us to additional risks.***

One of our strategies is to grow our mortgage originations business. In furtherance of this strategy, on October 19, 2012 we were deemed to have submitted the highest and best bid at an auction sponsored by the U.S. Bankruptcy Court to acquire the mortgage origination platform of Residential Capital LLC, or ResCap. Subject to the approval of the U.S. Bankruptcy Court, it is anticipated that the Company will acquire this originator's platform in the first quarter of 2013. There are a number of risks that we could be exposed to as we effectuate this strategy:

- In February 2011, the Obama Administration issued a report to Congress, and in February 2012 the Federal Housing Finance Agency issued a report to Congress outlining various options for long-term reform of Fannie Mae and Freddie Mac. These options involve gradually reducing the role of Fannie Mae and Freddie Mac in the mortgage market and ultimately winding down both institutions such that the private sector provides the majority of mortgage credit. Any of these options are likely to result in higher mortgage rates in the future, which could have a negative impact on the mortgage origination business and on mortgage servicing.

- There are federal and state legislative and agency initiatives that could, once fully implemented, adversely affect this business. For instance, the risk retention requirement under the Dodd-Frank Act requires securitizers to generally retain a minimum beneficial interest in mortgage-backed securities they sell through a securitization. Once implemented, the risk retention requirement may result in higher costs of certain originations operations and impose additional compliance requirements to meet servicing and originations criteria for qualified residential mortgages. Lastly, certain proposed federal legislation would permit borrowers in bankruptcy to restructure mortgage loans secured by primary residences. Bankruptcy courts could, if this legislation is enacted, reduce the principal balance of a mortgage loan that is secured by a lien on mortgaged property, reduce the mortgage interest rate, extend the term to maturity or otherwise modify the terms of a bankrupt borrower's mortgage loan. Any of the foregoing could also reduce the profitability of residential loans currently serviced by us or adversely affect our ability to sell mortgage loans originated by us or increase delinquency rates and, as a result, could adversely affect our business, financial condition or results of operations. In addition, the cost of servicing an increasingly delinquent residential loan portfolio may rise without a corresponding increase in servicing compensation.

- Delinquency rates can have a significant impact on our revenues and our expenses and the value of our MSRs. For example, an increase in delinquencies may result in lower revenues because, for some GSE business, we may only collect servicing fees for performing loans. Additionally, while increased delinquencies generate higher ancillary fees, including late fees, these fees are not likely to be recoverable in the event that the related loan is liquidated. In addition, an increase in delinquencies lowers the interest income we receive on cash held in collection and other accounts. Delinquencies can also increase our liability for servicing advances, as we may be required to advance certain payments early in a delinquency, and impact our liquidity. An increase in delinquencies will result in a higher cost to service due to the increased time and effort required to collect payments from delinquent borrowers. If we acquire portfolios of MSRs, the price we pay will depend on, among other things, our projections of the cash flows from the related pool of mortgage loans. Our expectation of delinquencies is a significant assumption underlying those cash flow projections. If delinquencies were significantly greater than expected, the estimated fair value of MSRs we acquire could be diminished. If the estimated fair value of MSRs is reduced, we could suffer a loss, which has a negative impact on our financial results and the benefits we would get from acquisitions.

- Loans that are GSE backed tend to be issued to higher quality borrowers with lower loan-to-value ratios. Accordingly, these borrowers can usually prepay such loans with ease through refinancings when mortgage rates decrease. Such prepayments will reduce the size of our MSR portfolio and our future servicing revenue. We make assumptions about prepayment rates, but such assumptions could be incorrect, or could be rendered incorrect through changes in interest rates. We may seek to hedge such risk but may be unsuccessful.

- In connection with loans that we originate, we expect to generally sell or securitize such loans to finance our future operations. In connection with the sale of mortgage loans, originators must make various representations and warranties concerning such loans that, if breached, require the originator to repurchase such loans or indemnify the purchaser of such loans for actual losses incurred in respect of such loans. These representations and warranties vary based on the nature of the transaction and the purchaser's or insurer's requirements but generally pertain to the ownership of the mortgage loan, the real property securing the loan and compliance with applicable laws and applicable lender and government-sponsored entity underwriting guidelines in connection with the origination of the loan. The aggregate unpaid principal balance of loans sold or serviced by us (or the UPB of certain portfolios that we may buy in future acquisitions) represents the maximum potential exposure related to loan repurchase and indemnification claims, including claims for breach of representation and warranty provisions. Due, in part, to elevated mortgage payment delinquency rates and declining housing prices, originators have experienced, and may in the future continue to experience, an increase in loan repurchase and indemnification claims due to actual or alleged breaches of representations and warranties in connection with the sale or servicing of mortgage loans. The estimation of our loan repurchase and indemnification liability is subjective and based upon our projections of the incidence of loan repurchase and indemnification claims, as well as loss severities. Given these trends, losses incurred in connection with such actual or projected loan repurchase and indemnification claims may be in excess of our estimates (including our estimate of liabilities we will assume in an acquisition and factor into our purchase price), and we may be required to increase such reserves and may sustain additional losses associated with such loan repurchase and indemnification claims in the future. Accordingly, increases to our reserves and losses incurred by us in connection with actual loan repurchases and indemnification payments in excess of our reserves could have a material adverse effect on our business, financial position, results of operations or cash flows.

***Certain aspects of our business are subject to factors that are beyond our control and/or not predictable with any degree of certainty. This unpredictability may adversely affect our projections, business plans, cash flows and business strategies in material ways.***

We believe that there is a secular shift in mortgage servicing that is underway pursuant to which mortgage servicing currently performed by the largest banks is or will be shifted to specialized servicers like the Company. Such a shift for existing servicing business, however, is largely dependent upon the willingness and ability of the parties to transfer servicing rights. We cannot be certain that this shift will continue, nor do we have any control over the scope and/or timing of the parties' efforts to transfer servicing. As a result, while we might receive assurances from our customers that new business may be coming to us, unless and until our customers secure the corresponding servicing rights and transfer the business, we cannot be certain that the new business will be consummated or that the volumes will correspond to previous assurances. In addition, some of our contracts contain periodic performance payments that are determined by formulas and/or are tied to the performance of our competitors. Inasmuch as we have little or no insight into the performance of our competitors in order that we might predict the ultimate payout of these incentives, it is difficult, if not impossible in some instances to predict with any certainty what the payout (if any) of the incentive payments will be. This unpredictability of revenues may adversely affect our projections, business plans, cash flows and business strategies in material ways.

*Our level of indebtedness could adversely affect our ability to raise additional capital to fund our operations, limit our ability to react to changes in the economy or our industry, expose us to interest rate risk to the extent of our variable rate debt and prevent us from meeting our obligations.*

Walter Investment 10-Q    Pg 78 of 120
12-12020-mg    Doc 1385    Filed 11/12/12    Entered 11/12/12 11:12:58    Exhibit 1

We have substantial levels of indebtedness. On July 1, 2011, we entered into a $500 million first lien senior secured term loan (the "First Lien Senior Secured Term Loan") and a $265 million second lien senior secured term loan (the "Second Lien Senior Secured Term Loan") to partially fund the acquisition of Green Tree. Also on July 1, 2011, we entered into a $45 million senior secured revolving credit facility (the "Revolver" and together with the First Lien Senior Secured Term Loan, the "First Lien Facility"), which was amended on July 17, 2012 to increase the commitment amount thereunder to $90 million and to permit additional incremental revolving commitments of $10 million. Our obligations under the First Lien Facility are guaranteed by substantially all of our domestic subsidiaries and are secured by substantially all of our and the guarantors' assets. In October 2012, we repaid and terminated the Second Lien Senior Secured Term Loan with funds obtained through the issuance of Convertible Notes. As of September 30, 2012, we had approximately $792.0 million of indebtedness outstanding, all of which was secured, including total outstanding indebtedness under the First Lien Senior Secured Term Loan and Second Lien Senior Secured Term Loan of $425.0 million and $265.0 million, respectively, secured obligations under a Mortgage Servicing Rights Credit Agreement, a Servicer Advance Reimbursement Agreement and a Receivables Loan Agreement that totaled $100.8 million at September 30, 2012 and other indebtedness of $1.2 million. As of September 30, 2012, as adjusted to give effect to the Convertible Notes Offering and the use of proceeds therefrom, our total indebtedness would have been approximately $817.0 million. All of these amounts of indebtedness exclude (i) intercompany indebtedness, [(ii) guarantees under the Revolver] and (iii) mortgage-backed and asset-backed notes and a variable funding loan facility, both of which are non-recourse to us and our subsidiaries. Our high level of indebtedness could have important consequences, including:

- increasing our vulnerability to downturns or adverse changes in general economic, industry or competitive conditions and adverse changes in government regulations;

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on our indebtedness, therefore reducing our ability to use our cash flow to fund our operations, capital expenditures and future business opportunities;

- exposing us to the risk of increased interest rates as certain of our unhedged obligations are at a variable rate of interest;

- limiting our ability to make strategic acquisitions or causing us to make nonstrategic divestitures;

- limiting our ability to obtain additional financing for working capital, capital expenditures, product or service line development, debt service requirements, acquisitions and general corporate or other purposes; and

- limiting our ability to adjust to changing market conditions and placing us at a competitive disadvantage compared to our competitors with lower debt levels.

We and our subsidiaries have the ability to incur additional indebtedness in the future, subject to the restrictions contained in our credit agreements governing the First Lien Facility which restrictions may change if we repay or refinance the First Lien Facility. If new indebtedness is added to our current debt levels, the related risks that we now face could intensify.

***We may not be able to generate sufficient cash to service all of our indebtedness and may not be able to refinance our indebtedness on favorable terms. If we are unable to do so, we may be forced to take other actions to satisfy our obligations under our indebtedness, which may not be successful.***

Our ability to make scheduled payments on or to refinance our debt obligations depends on our financial condition and operating performance, which is subject to prevailing economic and competitive conditions and to certain financial, business and other factors beyond our control including the risk factors as set forth herein. We cannot assure you we will maintain a level of cash flows from operating activities sufficient to permit us to pay the principal, premium, if any, and interest on our indebtedness.

In addition, we conduct some of our operations through our subsidiaries. Accordingly, repayment of our indebtedness is also dependent on the generation of cash flow by our subsidiaries and their ability to make such cash available to us by dividend, debt repayment or otherwise. Our subsidiaries may not be able to, or may not be permitted to, make distributions to enable us to make payments in respect of our indebtedness. Each subsidiary is a distinct legal entity, and, under certain circumstances, legal and contractual restrictions may limit our ability to obtain cash from our subsidiaries.

We may find it prudent or necessary to refinance our existing indebtedness. Our ability to refinance our indebtedness on favorable terms, or at all, is directly affected by the current global economic and financial conditions. In addition optional prepayment of our existing indebtedness is subject to the payment of substantial prepayment premiums. In addition, our ability to incur secured indebtedness (which would generally enable us to achieve better pricing than the incurrence of unsecured indebtedness) depends in part on the value of our assets, which depends, in turn, on the strength of our cash flows and results of operations, and on economic and market conditions and other factors.

If our cash flows and capital resources are insufficient to fund our debt service obligations, or we are unable to refinance our indebtedness, we may be forced to reduce or delay investments and capital expenditures, or to sell assets, seek additional capital or restructure our indebtedness. These alternative measures may not be successful and may not permit us to meet our scheduled debt service obligations. If our operating results and available cash are insufficient to meet our debt service obligations, we could face substantial liquidity problems and might be required to dispose of material assets or operations to meet our debt service and other obligations. We may not be able to consummate those dispositions, or the proceeds from the dispositions may not be adequate to meet any debt service obligations then due.

### *Our debt agreements contain covenants that restrict our operations and may inhibit flexibility in operating our business and increasing revenues.*

Our Credit Agreements contain various covenants that limit our ability to engage in specified types of transactions. These covenants limit our and certain of our subsidiaries' ability to, among other things:

- incur additional indebtedness or issue certain preferred shares;
- pay dividends on, repurchase or make distributions in respect of our capital stock or make other restricted payments;
- make certain investments;
- sell or transfer assets;
- create liens;
- consolidate, merge, sell or otherwise dispose of all or substantially all of our assets; and
- enter into certain transactions with our affiliates.

Under our Credit Agreements, we are required to satisfy and maintain specified financial ratios. Our ability to meet those financial ratios can be affected by events beyond our control, and there can be no assurance we will continue to meet those ratios. A breach of any of these covenants could result in a default under our Credit Agreements. Upon the occurrence of an event of default under these agreements, the lenders thereunder could elect to declare all amounts outstanding under the Credit Agreements to be immediately due and payable and to terminate all commitments to extend further credit. If we were unable to repay those amounts, the lenders under the Credit Agreements could proceed against the collateral granted to them to secure such indebtedness. If the lenders under the Credit Agreements were to demand immediate repayment of the amounts outstanding thereunder, there can be no assurance there we will have sufficient assets to repay amounts due under the Credit Agreements and our other indebtedness.

### *We may incur additional debt in connection with pending or future potential acquisitions and other pipeline transactions which would increase the risks described above.*

We intend to refinance our First Lien Facility and our Revolver through new debt financing that we expect will reduce our interest costs and also permit us to incur additional warehouse debt and purchase additional MSRs and related assets. If we are successful in that refinancing, we may incur more additional indebtedness or assume additional indebtedness in connection with pending or future potential acquisitions and other pipeline transactions. Any such indebtedness could increase our leverage and the risks we face from indebtedness described above.

### *Changes in interest rates could lead to increased prepayment rates, which could materially and adversely affect the value of our mortgage servicing rights and could have a material adverse effect on our business, financial position, results of operations or cash flows.*

Changes in interest rates are a key driver of the performance of our servicing segment, particularly with respect to portfolios consisting primarily of MSRs related to prime loans, as the values of our mortgage servicing rights are highly sensitive to changes in interest rates. Historically, the value of MSRs have increased when interest rates rise as higher interest rates lead to decreased prepayment rates, and have decreased when interest rates decline due as lower interest rates lead to increased prepayment rates. From time to time we may use various derivative financial instruments to provide a level of protection against such interest rate risk. However, no hedging strategy can protect us completely, and hedging strategies may fail because they are improperly designed, improperly executed and documented or based on inaccurate assumptions and, as a result, could actually increase our risks and losses. See "— Failure to hedge effectively against interest rate changes may adversely affect results of operations." As a result, substantial volatility in interest rates materially affects our servicing segment, as well as our consolidated financial position, results of operations and cash flows.

*Failure to hedge effectively against interest rate changes may adversely effect results of operations.*

The Company has from time to time used various derivative financial instruments to provide a level of protection against interest rate risks. In the future we may seek to manage our exposure to interest rate volatility by using interest rate hedging arrangements, such as interest cap agreements and interest rate swap agreements. No hedging strategy can protect us completely. The derivative financial instruments that we select may not have the effect of reducing our interest rate risks. In addition, the nature and timing of hedging transactions may influence the effectiveness of these strategies. Poorly designed strategies, improperly executed and documented transactions or inaccurate assumptions could actually increase our risks and losses. In addition, hedging strategies involve transaction and other costs. Our hedging strategies and the derivatives that we use may not be able to adequately offset the risks of interest rate volatility and our hedging transactions may result in or magnify losses. Furthermore, interest rate derivatives may not be available at all, or at favorable terms, particularly during economic downturns. Any of the foregoing risks could adversely affect our business, financial condition or results of operations. Additional risks related to hedging include:

- interest rate hedging can be expensive, particularly during periods of rising and volatile interest rates;

- available interest rate hedges may not correspond directly with the interest rate risk for which protection is sought;

- the duration of the hedge may not match the duration of the related liability;

- the credit quality of the party owing money on the hedge may be downgraded to such an extent that it impairs our ability to sell or assign our side of the hedging transaction;

- the party owing money in the hedging transaction may default on its obligation to pay; and

- a court could rule that such an agreement is not legally enforceable.

We would expect to enter into contracts with major financial institutions only based on their credit rating and other factors, but our Board of Directors may choose to change this policy in the future. Failure to hedge effectively against interest rate changes may materially adversely affect our results of operations.

*While increasing our servicing portfolio is a key part of our strategy, this strategy carries certain risks and we may not be able to achieve our goals.*

A key component of our strategy is to increase our servicing business. We have grown this business rapidly over the past several years, due to additions of subservicing contracts, acquisitions of servicing portfolios and our acquisition of Green Tree and we intend to continue to grow our portfolio through similar actions. This strategy creates a number of risks for us:

- Other mortgage servicers have suffered operational deficiencies and, in rare instances company failures, due to the operational risks associated with servicing mortgages and / or rapid expansion. Deficiencies in other servicers have included deterioration in operating margins due to increased costs, deterioration in servicing metrics (e.g., delinquency rates, call center metrics, account reconciliations or investor reporting), which, if they were to occur to us, could adversely affect our results of operations, and could also lead to potential violations of governmental regulations followed by enforcement penalties and fines.

- Our existing servicing portfolio will decline over time, as mortgages are repaid, prepaid or discharged. While we will seek to replenish our servicing portfolio through the addition of subservicing contracts, MSR purchases, originations or acquisitions, we cannot assure you that we will be successful in developing this business. There is significant competition existing in the sector and the supply of servicing portfolios may decline over the next few years as the opportunity created by the financial crisis ebbs. The competition for new portfolios could increase the prices we may need to pay for such portfolios or reduce subservicing margins. If we are unable to grow our portfolios, our future growth and operating results will be adversely affected, which will adversely affect our stock price.

*We use estimates in determining the fair value of certain assets. If our estimates prove to be incorrect, we may be required to write down the value of these assets which could adversely affect our earnings.*

Following the RMS Acquisition, we expect to use fair value accounting for certain assets acquired as a result of the RMS Acquisition. We estimate the fair value of our assets and liabilities by calculating the present value of expected future cash flows utilizing assumptions that we believe are used by market participants. The methodology used to estimate these values is complex and uses asset-specific collateral data and market inputs for interest and discount rates and liquidity dates.

78

Valuations are highly dependent upon the reasonableness of our assumptions and the predictability of the relationships that drive the results of our valuation methodologies. If prepayment speeds increase more than estimated, delinquency and default levels are higher than anticipated or financial market illiquidity continues beyond our estimate, we may be required to write down the value of certain assets which could adversely affect our earnings.

***We might not be able to maintain or grow our business if we cannot identify and acquire mortgage servicing rights or enter into additional subservicing agreements on favorable terms.***

Our servicing portfolio is subject to "run-off," meaning that mortgage loans serviced by us may be repaid at maturity, prepaid prior to maturity, refinanced with a mortgage not serviced by us or liquidated through foreclosure, deed-in-lieu of foreclosure or other liquidation process or repaid through standard amortization of principal. As a result, our ability to maintain the size of our servicing portfolio depends on our ability to acquire the rights to service additional residential loans. We believe there are significant business opportunities in our business development "pipeline" of potential transactions. However, we may not be able to acquire servicing rights or enter into additional subservicing agreements on terms favorable to us nor do we control the decision to transfer servicing to us. In determining the purchase price for both servicing rights and subservicing, management makes certain assumptions, many of which are beyond our control, including, among other things:

- origination vintage and geography;
- loan to value ratio;
- stratification of FICO scores;
- the rates of prepayment and repayment within the underlying pools of mortgage loans;
- projected rates of delinquencies, defaults and liquidations;
- future interest rates;
- our cost to service the loans;
- incentive and ancillary fee income; and
- amounts of future servicing advances.

As a result, we may not be successful in completing acquisitions or may overpay or not realize anticipated benefits of acquisitions in our business development pipeline. We may not realize all of the anticipated benefits of pending or potential future acquisitions, which could adversely affect our business, financial condition and results of operations."

***Our Investment Management business may be subject to liability arising out of the performance of its duties providing investment management and other related services to an investment fund, and our reputation, business and operations could be adversely affected by regulatory compliance failures related to investment adviser activities.***

One of Green Tree's subsidiaries, Green Tree Investment Management LLC ("GTIM"), jointly manages an investment fund focused on distressed mortgage-related assets. Under the relevant sub-advisory agreement for the fund, GTIM is exempted from liability for any claim, loss or cost arising out of, or in connection with, the performance of its duties, except GTIM is not exculpated from liability arising from losses caused by its gross negligence or willful misconduct or as otherwise provided under applicable federal securities laws. In addition, GTIM may expand its activities in this area and, depending on the terms of any future advisory agreements they may enter into, this liability could be increased. GTIM became a registered investment adviser under the federal Investment Advisers Act of 1940 (the "IAA") on March 30, 2012. A failure by GTIM to comply with the obligations imposed by the IAA on investment advisers, including record-keeping, advertising and operating requirements, disclosure obligations and prohibitions on fraudulent activities, could result in investigations, sanctions and reputational damage.

***The owners of certain loans we service or subservice, may, under certain circumstances, terminate our mortgage servicing rights or subservicing contracts, respectively.***

As is standard in our industry, under the terms of our master servicing agreements with GSEs and other customers, our customers have the right to terminate us as the servicer of the loans we service on their behalf if we default pursuant to the terms and conditions of the servicing agreement; and in some agreements the servicing can be transferred without cause (although in this case the servicer typically receives the fair value of the servicing rights). Under our subservicing contracts, the primary servicers for whom we conduct subservicing activities have the right to terminate our subservicing rights with or without cause, with generally 60 to 90 days' notice. In some instances, the subservicing contracts require payment of a deboarding fee upon transfer while in other instances there is little to no compensation. We expect to continue to acquire subservicing rights under terms and conditions which could exacerbate these risks.

If we were to have our servicing or subservicing rights terminated on a material portion of our servicing portfolio, this could adversely affect our business, financial condition, results of operations and stock price.

12-12020-mg   Doc 2183-1   Filed 11/12/12   Entered 11/12/12 12:12:54   Exhibit 1 -
Walter Investment 10-Q   Pg 82 of 120

***Unlike competitors that are banks, we are subject to state licensing requirements and substantial compliance costs.***

Because we are not a depository institution, we do not benefit from a federal exemption to state mortgage banking, loan servicing or debt collection licensing and regulatory requirements. We must comply with state licensing requirements in all fifty states and the District of Columbia, and are sensitive to regulatory changes that may increase our costs through stricter licensing laws, disclosure laws or increased fees or that may impose conditions to licensing that we or our personnel are unable to meet. Future state legislation and changes in regulation may significantly increase the compliance costs on our operations or reduce the amount of ancillary fees, including late fees that we may charge to borrowers. This could make our business cost-prohibitive in the affected state or states and could materially affect our business.

***Our business would be adversely affected if we lose our licenses.***

Our operations are subject to regulation, supervision and licensing under various federal, state and local statutes, ordinances and regulations. In most states in which we operate, a regulatory agency regulates and enforces laws relating to mortgage servicing companies and mortgage origination companies such as us. These rules and regulations generally provide for licensing as a mortgage servicing company, mortgage origination company, debt collection agency or third party default specialist, as applicable, requirements as to the form and content of contracts and other documentation, licensing of our employees and employee hiring background checks, licensing of independent contractors with whom we contract, restrictions on collection practices, disclosure and record-keeping requirements and enforcement of borrowers' rights. In certain states, we are subject to periodic examination by state regulatory authorities. Some states in which we operate require special licensing or provide extensive regulation of our business.

We believe that we maintain all material licenses and permits required for our current operations and are in substantial compliance with all applicable federal, state and local regulations. We may not be able to maintain all requisite licenses and permits, and the failure to satisfy those and other regulatory requirements could result in a default under our servicing agreements and have a material adverse effect on our operations. Those states that currently do not provide extensive regulation of our business may later choose to do so, and if such states so act, we may not be able to obtain or maintain all requisite licenses and permits. The failure to satisfy those and other regulatory requirements could result in a default under our servicing agreements and have a material adverse effect on our operations. Furthermore, the adoption of additional, or the revision of existing, rules and regulations could adversely affect our business, financial condition or results of operations.

***We may incur litigation costs and related losses if the validity of a foreclosure action is challenged by a borrower or if a court overturns a foreclosure.***

We may incur costs if we are required to, or if we elect to, execute or re-file documents or take other action in our capacity as a servicer in connection with pending or completed foreclosures. We may incur litigation costs if the validity of a foreclosure action is challenged by a borrower. If a court were to overturn a foreclosure because of errors or deficiencies in the foreclosure process, we may have liability to a title insurer of the property sold in foreclosure. These costs and liabilities may not be legally or otherwise reimbursable to us, particularly to the extent they relate to securitized mortgage loans. In addition, if certain documents required for a foreclosure action are missing or defective, we could be obligated to cure the defect or repurchase the loan. A significant increase in litigation costs could adversely affect our liquidity, and our inability to be reimbursed for servicing advances could adversely affect our business, financial condition or results of operations.

***We are required to make servicing advances that can be subject to delays in recovery or may not be recoverable in certain circumstances.***

During any period in which a borrower is not making payments, we are required under some of our servicing agreements to advance our own funds to meet contractual principal and interest remittance requirements for investors, and pay property taxes, insurance premiums, legal expenses and other protective advances. We also advance funds to maintain, repair and market real estate properties on behalf of investors. Our obligation to make such advances may increase in connection with any pending or potential future acquisitions of servicing portfolios. As home values change, we may have to reconsider certain of the assumptions underlying our decisions to make advances and, in certain situations, our contractual obligations may require us to make certain advances for which we may not be reimbursed. In addition, in the event a mortgage loan serviced by us defaults or becomes delinquent, the repayment to us of the advance may be delayed until the mortgage loan is repaid or refinanced or a liquidation occurs. A delay in our ability to collect advances may adversely affect our liquidity, and our inability to be reimbursed for advances could adversely affect our business, financial condition or results of operations.

*A downgrade in our servicer ratings could have an adverse effect on our business, financial condition or results of operations.*

Standard & Poor's, Moody's and Fitch rate our residential loan servicer. Our current ratings from the rating agencies are important to the conduct of our loan servicing business. These ratings may be downgraded in the future. Any such downgrade could adversely affect our business, financial condition or results of operations.

*We depend on the accuracy and completeness of information about borrowers and counterparties and any misrepresented information could adversely affect our business, financial condition and results of operations.*

In deciding whether to extend credit or to enter into other transactions with borrowers and counterparties, we may rely on information furnished to us by or on behalf of borrowers and counterparties, including financial statements and other financial information. We also may rely on representations of borrowers and counterparties as to the accuracy and completeness of that information and, with respect to financial statements, on reports of independent auditors. While we have a practice of independently verifying the borrower information that we use in deciding whether to extend credit or to agree to a loan modification, including employment, assets, income and credit score, if any of this information is intentionally or negligently misrepresented and such misrepresentation is not detected prior to loan funding, the value of the loan may be significantly lower than expected. Whether a misrepresentation is made by the loan applicant, the mortgage broker, another third party or one of our employees, we generally bear the risk of loss associated with the misrepresentation. We have controls and processes designed to help us identify misrepresented information in our loan originations operations. We, however, may not have detected or may not detect all misrepresented information in our loan originations or from our business clients. Any such misrepresented information could adversely affect our business, financial condition and results of operations.

*Technology failures or cyber-attacks against us or our vendors could damage our business operations and reputation, increase our costs, and result in significant third party liability.*

The financial services industry as a whole is characterized by rapidly changing technologies. System disruptions and failures caused by fire, power loss, telecommunications failures, unauthorized intrusion (cyber-attack), computer viruses and disabling devices, natural disasters and other similar events, may interrupt or delay our ability to provide services to our borrowers. Security breaches, acts of vandalism and developments in computer intrusion capabilities could result in a compromise or breach of the technology that we use to protect our borrowers' personal information and transaction data. Systems failures could result in reputational damage to our business and cause us to incur significant costs and third party liability, and this could adversely affect our business, financial condition or results of operations.

*We may be unable to protect our technology or keep up with the technology of our competitors.*

We rely on proprietary and licensed software, and other technology, proprietary information and intellectual property to operate our business and to provide us with a competitive advantage. However, we may be unable to maintain and protect, or prevent others from misappropriating or otherwise violating, our rights in such software, technology, proprietary information and intellectual property. In addition, competitors may be able to develop software and technologies that are as good as or better than our software and technology without violating our rights, which could put us at a disadvantage. Our failure to maintain, protect and continue to develop our software, technology, proprietary information and intellectual property could adversely affect our business, financial condition or results of operations.

*Any failure of our internal security measures or those of our vendors, or breach of our privacy protections could cause harm to our reputation and subject us to liability.*

In the ordinary course of our business, we receive and store certain confidential nonpublic information concerning borrowers including names, addresses, social security numbers and other confidential information. Additionally, we enter into third party relationships to assist with various aspects of our business, some of which require the exchange of confidential borrower information. Although we have put in place a comprehensive information security program that we monitor and update as needed, if a third party were to compromise or breach our security measures or those of the vendors, through electronic, physical or other means, and misappropriate such information, it could cause interruptions in our operations, expose us to significant liabilities, reporting obligations, remediation costs and damage to our reputation. Significant damage to our reputation or the reputation of our clients, could negatively impact our ability to attract or retain clients. Any of the foregoing risks could adversely affect our business, financial condition or results of operations.

*While we have obtained insurance to cover us against certain cyber security risks and information theft there can be no guarantee that all losses will be covered or that the insurance limits will be sufficient to cover such losses.*

We have obtained insurance coverage that protects us against losses from unauthorized penetration of company technology systems, employee theft of customer and/or company private information, and company liability for third party vendors who mishandle company information. This insurance includes coverage for third party losses as well as costs incidental to a breach of company systems such as notification, credit monitoring and ID theft resolution services. However, there can be no guarantee that every potential loss due to cyber attack or theft of information has been insured against, nor that the limits of the insurance we have acquired will be sufficient to cover all such losses.

### Legal proceedings and related costs may increase and could adversely affect our financial results.

We are routinely involved in legal proceedings concerning matters that arise in the ordinary course of our business. The addition of the Green Tree business, which is significantly larger in scope and size than our historical business, will increase the number of suits against us. The RMS Acquisition and other pending or potential future acquisitions may also increase the risk that we will be sued. The outcome of these proceedings may adversely affect our financial results. In addition, a number of participants in our industry have been the subject of class action lawsuits and regulatory actions by states' attorneys general and federal regulators. Litigation and other proceedings may require that we pay attorneys' fees, settlement costs, damages, penalties or other charges, which could adversely affect our financial results.

Governmental and regulatory investigations, both state and federal are increasing in all areas of our business. The costs of responding to the investigations can be substantial. In addition, government-mandated changes from investigations or otherwise, to servicing practices could lead to higher costs and additional administrative burdens, in particular regarding record retention and informational obligations.

### Negative public opinion could damage our reputation and adversely affect our earnings.

Reputational risk, or the risk to our business, earnings and capital from negative public opinion, is inherent in our business. Negative public opinion can result from our actual or alleged conduct in any number of activities, including lending, loan servicing, debt collection practices, and corporate governance, and from actions taken by government regulators and community organizations in response to those activities. Negative public opinion can also result from media coverage, whether accurate or not. Negative public opinion can adversely affect our ability to attract and retain customers, counterparties and employees and can expose us to litigation and regulatory action. Although we take steps to minimize reputation risk in dealing with our customers and communities, this risk will always be present in our organization.

### The industry in which we operate is concentrated and highly competitive, and, to the extent we fail to meet these competitive challenges, it would have a material adverse effect on our business, financial position, results of operations or cash flows.

We operate in a concentrated and highly competitive industry that could become even more competitive as a result of economic, legislative, regulatory or technological changes. A majority of the loans we service are controlled by relatively few entities, in particular GSEs. Competition to service mortgage loans and for mortgage loan originations comes primarily from commercial banks and savings institutions. Many of our competitors are substantially larger and have considerably greater financial, technical and marketing resources, typically have access to greater financial resources and lower funding costs. All of these factors place us at a competitive disadvantage. In addition, some of our competitors may have higher risk tolerances or different risk assessments, which could allow them to consider a wider variety of investments and establish more favorable relationships than we can. Competition to service residential loans may result in lower margins based on our servicing model. Because of the relatively limited number of customers, our failure to meet the expectations of any customer could materially impact our business. We cannot assure you that the competitive pressures we face will not have a material adverse effect on our business, financial condition or results of operations.

*Credit facilities (including term loans and revolving facilities), warehouse facilities, structured financing arrangements, securitizations and other forms of term debt, in addition to transaction or asset-specific financing arrangements that we may use to finance our investments, may contain restrictions, covenants, and representations and warranties that restrict our operations or may require us to provide additional collateral and may restrict us from leveraging our assets as fully as desired.*

We may use credit facilities (including term loans and revolving facilities), warehouse facilities, structured financing arrangements, securitizations and other forms of term debt, in addition to transaction or asset-specific financing arrangements, to finance investment purchases. Such financing facilities may contain restrictions, covenants, and representations and warranties that, among other conditions, require us to satisfy specified financial and asset quality tests and may restrict our ability to, among other actions, incur or guarantee additional debt, make certain investments or acquisitions, make distributions on or repurchase or redeem capital stock, engage in mergers or consolidations, grant liens or such other conditions as the lenders may require. If we fail to meet or satisfy any of these covenants or representations and warranties, we would be in default under these agreements and our lenders could elect to declare any and all amounts outstanding under the agreements immediately due and payable, enforce their respective interests against collateral pledged under such agreements, and restrict our ability to make additional borrowings. These financing agreements also may contain cross-default provisions, such that if a default occurs under any one agreement, the lenders under our other agreements also could declare a default.

***Our current and possible future use of securitization financings with over-collateralization requirements may have a negative impact on our cash flow.***

The terms of our current securitizations generally provide, and those that we may sponsor in the future typically will provide, that the principal amount of assets must exceed the principal balance of the related bonds by a certain amount, commonly referred to as over-collateralization. Our securitization terms now provide, and we anticipate that future securitization terms will provide, that, if certain delinquencies or losses exceed specified levels based on the analysis by the lenders or the rating agencies (or any financial guaranty insurer) of the characteristics of the assets collateralizing the bonds, the required level of over-collateralization may be increased, or may be prevented from decreasing as would otherwise be permitted, if losses or delinquencies did not exceed those levels. Other tests (based on delinquency levels or other criteria) may restrict our ability to receive net income from assets collateralizing the obligations. We cannot assure you that the performance tests will be satisfied. Given recent volatility in the securitization market, rating agencies may depart from historic practices for securitization financings, which would make such financings more costly. Failure to obtain favorable terms with regard to these matters may materially and adversely affect our net income. If our assets fail to perform as anticipated, our over-collateralization or other credit enhancement expense associated with our securitization financings will increase.

***Our existing securitization trusts contain servicer triggers that, if exceeded, could result in a significant reduction in cash flows to us.***

Some of our existing securitization trusts contain delinquency and loss triggers that, if exceeded, allocate any excess over-collateralization to paying down the bonds for the securitization at an accelerated pace rather than releasing the excess cash to us. Two of our existing securitizations have exceeded delinquency and cumulative loss rate triggers. Mid-State Capital Corporation 2006-1 Trust ("Trust 2006-1") exceeded the delinquency and cumulative loss rate triggers and has not provided any excess cash flow to us since January 2008 while Mid-State Capital Corporation 2005-1 Trust ("Trust 2005-1"), exceeded the delinquency rate trigger beginning in September 30, 2012 . At September 30, 2012, Trust 2006-1 held mortgage loans with an outstanding principal balance of $162.8 million and a book value of $156.5 million, with collateralized bonds issued by Trust 2006-1 having an outstanding principal balance of $155.4 million. At September 30, 2012, Trust 2005-1 held mortgage loans with an outstanding principal balance of $159.6 million and a book value of $154.8 million, with collateralized bonds issued by Trust 2005-1 having an outstanding principal balance of $140.8 million.

All of our other securitization trusts have experienced some level of delinquencies and losses, and, if any of these trusts were to exceed their respective triggers or if we are unable to cure the triggers already exceeded, any excess cash flow from such trusts would not be available to us and, as a result, we may not have sufficient sources of cash to meet our operating needs.

***Residential loans are subject to risks, including borrower defaults or bankruptcies, special hazard losses, declines in real estate values, delinquencies and fraud.***

During the time that we hold residential loans we are subject to risks on the underlying loans from borrower defaults and bankruptcies and from special hazard losses, such as those occurring from earthquakes, hurricanes or floods that are not covered by standard hazard insurance. If a default occurs on any residential loan we hold, we may bear the risk of loss of principal to the extent of any deficiency between the value of the mortgaged property plus any payments from any insurer or guarantor, and the amount owing on the loan. Defaults on residential loans historically coincide with declines in real estate values, which are difficult to anticipate and may be dependent on local economic conditions. Increased exposure to losses on residential loans can reduce the value of our portfolio.

*The lack of liquidity in our portfolio may adversely affect our business.*

We have invested in residential loans that are not quoted on any exchange or impossible to obtain third party pricing on the residential loans that we purchase. Illiquid investments typically experience greater price volatility as a ready market does not exist. In addition, validating third party pricing for illiquid investments may be more subjective than ready made investments. The illiquidity of our residential loans may make it difficult for us to sell such residential loans if the need or desire arises. In addition, if we are required to quickly liquidate all or a portion of our portfolio, we may realize significantly less than the value at which we have previously recorded our portfolio. As a result, our ability to assess or vary our portfolio in response to changes in economic and other conditions may be relatively limited, which could adversely affect our results of operations or financial condition.

***National and regional economic conditions may have a material impact on our profitability because a significant portion of our loan portfolio is secured by homes located in these markets.***

We service loans throughout the United States. However, we have higher concentrations of our owned residential loans in the Texas, Louisiana, Mississippi, Alabama and Florida markets. As a result of the geographic concentration of residential loans in these markets, we are particularly exposed to downturns in these local economies or other changes in local real estate conditions. In the past, rates of loss and delinquency on residential loans have increased from time to time, driven primarily by weaker economic conditions. Furthermore, precarious economic conditions may hinder the ability of borrowers to repay their obligations in all areas where we conduct our business. In the event of negative economic changes in these markets or nationally, our business, financial condition and results of operations, and the trading price of our common stock may be materially and adversely affected.

***Natural disasters and adverse weather conditions could disrupt our business and adversely affect our results of operations, including those of our insurance business.***

The climates of many of the states in which we do business and plan to continue to operate in the future, including Texas, Louisiana, Mississippi, Alabama and Florida, where we have large concentrations of owned residential loans, present increased risks of natural disaster and adverse weather. Natural disasters or adverse weather in these areas have in the past, and may in the future, cause increases in delinquencies and defaults in our mortgage portfolio and weaken demand for homes that we may have to repossess in affected areas, which could adversely affect our results of operations. In addition, the rate of delinquencies may be higher after natural disasters or adverse weather conditions. The occurrence of large loss events due to natural disasters or adverse weather could reduce the insurance coverage available to us, increase the cost of our insurance premiums and weaken the financial condition of our insurers, thereby limiting our ability to mitigate any future losses that may occur from such events. Moreover, severe flooding, wind and water damage, forced evacuations, contamination, gas leaks, fire and environmental and other damage caused by natural disasters or adverse weather could lead to a general economic downturn, including increased prices for oil, gas and energy, loss of jobs, regional disruptions in travel, transportation and tourism and a decline in real-estate related investments, especially in the areas most directly damaged by the disaster or storm.

***If we fail to maintain an effective system of internal controls, we may not be able to accurately determine our financial results or prevent fraud. As a result, our stockholders could lose confidence in our financial results, which could harm our business and the market value of our common stock.***

Section 404 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX") requires us to evaluate and report on our internal controls over financial reporting and have our independent auditors issue their own opinion on our internal control over financial reporting. Effective internal controls are necessary for us to provide reliable financial reports and effectively prevent fraud. Green Tree, which at the time of acquisition was a private company and not subject to the requirements of Sarbanes-Oxley, must be brought into compliance with SOX reporting standards. We may in the future discover areas of internal controls at Green Tree that do not exist or that need improvement. We cannot be certain that we will be successful in establishing or maintaining adequate control over our financial reporting and financial processes. Furthermore, as we grow our business, our internal controls will become more complex, and we will require significantly more resources to ensure our internal controls remain effective. If we or our independent auditors discover a material weakness, the disclosure of that fact, even if quickly remedied, could reduce the market value of our shares of common stock. In addition, the existence of any material weakness or significant deficiency would require management to devote significant time and incur significant expense to remediate any such weaknesses or deficiencies and management may not be able to remediate the same in a timely manner.

We use, and will continue to use analytical models and data in connection with the pricing of new business and the valuation of our future investments, and any incorrect, misleading or incomplete information used in connection therewith may subject us to potential risks.

12-12020-mg    Doc 2138-1    Filed 11/12/12    Entered 11/12/12 12:54    Exhibit 1-1
Walter Investment 10-Q    Pg 87 of 120

Given the complexity of our proposed future investments and strategies, we rely, and will continue to rely, on analytical models and information and data, some of which is supplied by third parties. Should our models or such data prove to be incorrect or misleading, any decision made in reliance thereon exposes us to potential risks. Some of the analytical models that we use or will be used by us are predictive in nature. The use of predictive models has inherent risks and may incorrectly forecast future behavior, leading to potential losses. We also use and will continue to use valuation models that rely on market data inputs. If incorrect market data is input into a valuation model, even a tested and well-respected valuation model, it may provide incorrect valuations and, as a result, could provide adverse actual results as compared to the predictive results.

***Following pending or potential future acquisitions or as a result of the acquisitions already completed, we may not be successful in retaining employees of any business, or in conveying the knowledge of our long-serving personnel to newly hired personnel and retaining our internal culture.***

We regularly explore opportunities to grow our business, including through acquiring companies. Uncertainty about the effect of any such acquisition on the combined company's employees may have an adverse effect on us, and consequently the combined business. This uncertainty may impair our ability to retain management and key personnel of the acquired business. Employee retention may be particularly challenging as employees may experience uncertainty about their future roles with the combined business. If key employees of the acquired business depart because of issues relating to the uncertainty and difficulty of integration, financial incentives or a desire not to continue as employees of the combined business, we may have to incur significant costs in identifying, hiring and retaining replacements for departing employees, which could reduce our ability to realize the anticipated benefits of the acquisition.

In addition, much of our success can be attributed to the knowledge, experience, and loyalty of our key management and other personnel who have served us for many years. As we grow and expand our operations, we will need to incorporate employees from acquired businesses and hire new employees to implement our business strategies. It is important that the knowledge and experience of our senior management and our overall philosophies, business model, and operational standards, including our differentiated "high-touch" approach to servicing, are adequately conveyed to, and shared by, these new members of our team. At the same time, we must ensure that our hiring and retention practices serve to maintain our internal culture. If we are unable to achieve these integration objectives, our growth could come at a risk to our business model, which has been a major underlying component of our success.

***We may change our investment and operational policies without stockholder consent, which may adversely affect the market value of our common stock.***

Our Board of Directors determines our operational policies and may amend or revise such policies, including our policies with respect to acquisitions, dispositions, growth, operations, indebtedness, or approve transactions that deviate from these policies, without a vote of, or notice to, our stockholders. Operational policy changes could adversely affect the market value of our common stock.

***We may not realize all of the anticipated benefits of pending or potential future acquisitions, which could adversely affect our business, financial condition and results of operations.***

We periodically explore opportunities to grow our business by adding subservicing contracts to our portfolios through one time transfers and flow agreements and by acquiring additional MSR assets and platforms and growing our originations business. Our ability to realize the anticipated benefits of pending or potential future acquisitions will depend, in part, on our ability to scale-up to appropriately service any such assets, and integrate the businesses of such acquired companies with our business.

The process of acquiring assets or companies may disrupt our business and may not result in the full benefits expected. The risks associated with acquisitions include, among others:

- uncoordinated market functions;

- unanticipated issues in integrating information, communications and other systems;

- unanticipated incompatibility of purchasing, logistics, marketing and administration methods;

- unanticipated liabilities associated with the acquired business or assets;

- lack of expected synergies or failure to realize the anticipated benefits we expect to realize from the acquisition;

- not retaining key employees; and

- the diversion of management's attention from ongoing business concerns.

85

The acquisition of businesses also requires integration of systems, procedures and personnel of the acquired entity into our company to make the transaction economically successful. This integration process is complicated and time consuming and can be disruptive to the borrowers of the loans serviced by the acquired business. If the integration process is not conducted successfully and with minimal effect on the acquired business and its borrowers, we may not realize the anticipated economic benefits of particular acquisitions within our expected timeframe, and we may lose subservicing business or employees of the acquired business. We may also experience a greater than anticipated loss of business even if the integration process is successful.

If we inappropriately value the assets we acquire or the value of the assets or businesses we acquire declines after we acquire them, the resulting charges may negatively affect the carrying value of the assets on our balance sheet and our earnings. In particular, in connection with such acquisition opportunities, we may be exposed to unknown or contingent liabilities of the businesses, assets and liabilities we acquire, and if these issues or liabilities exceed our estimates, our results of operations and financial condition may be materially negatively affected.

In addition, the performance of any assets or businesses we acquire may not match the historical performance of our other assets. We cannot guarantee you that the assets we acquire will perform at levels meeting our expectations. We may find that we overpaid for the acquired assets or that the economic conditions underlying our acquisition decision have changed. It may also take several quarters for us to fully integrate the newly acquired assets into our business, during which period our results of operations and financial condition may be negatively affected. Further, certain one-time expenses associated with such acquisitions may have a negative impact on our results of operations and financial condition.

Further, prices at which acquisitions can be made fluctuate with market conditions. We have experienced times during which acquisitions could not be made in specific markets at prices we considered acceptable, and we expect that we will experience this condition in the future. In addition, in order to finance an acquisition we may borrow funds, thereby increasing our leverage and diminishing our liquidity, or raise additional capital, which could dilute the interests of our existing shareholders. Also, it is possible that we will expend considerable resources in the pursuit of an acquisition that, ultimately, either does not close or is terminated.

If we incur additional indebtedness to finance an acquisition, the acquired business may not be able to generate sufficient cash flow to service that additional indebtedness.

We cannot assure you that future acquisitions will not adversely affect our results of operations and financial condition.

**Risks Related to our RMS Acquisition and the Reverse Mortgage Industry**

***We may fail to realize the anticipated benefits of the RMS Acquisition, which could adversely affect the value of our common stock.***

The success of our acquisition of RMS will depend, in part, on our ability to realize the anticipated benefits from the Acquisition. Our ability to realize these anticipated benefits is subject to certain risks including:

- whether RMS will perform as expected;

- the possibility that we paid more than the value we will derive from the RMS Acquisition;

- the possibility that the market for reverse mortgages does not meet our expectations;

- the reduction of our cash available for operations and other uses; and

- the assumption of certain known and unknown liabilities of RMS.

If we are delayed in achieving or are unable to successfully achieve the anticipated benefits of the RMS Acquisition or if the respective and/or collective businesses do not perform as expected, the value of our common stock may be adversely affected. It is possible that the integration of the businesses could result in the loss of key Company and RMS employees, the disruption of each company's ongoing businesses, unexpected integration issues, higher than expected integration costs and an overall post-closing integration process that takes longer than originally anticipated. Specifically, issues that must be addressed in the integration of our operations and to realize the anticipated benefits of the RMS Acquisition so the respective and/or collective business performs as expected, include, among other things:

- harmonizing the companies' operating practices, employee development and compensation programs, technology platforms, internal controls and other policies, procedures and processes;

- maintaining existing agreements with customers and avoiding delays in entering into new agreements with prospective customers and suppliers; and

In addition, at times, the attention of certain members of the companies' management and resources may be focused on the integration of the businesses of the two companies and diverted from day-to-day business operations, which may disrupt each of the companies' ongoing business and the collective business.

***There may be material changes to the laws, regulations, rules or practices applicable to reverse mortgage programs operated by FHA, HUD, Fannie Mae or Ginnie Mae which could materially adversely affect the reverse mortgage industry as a whole.***

The reverse mortgage industry is largely dependent upon GSEs such as FHA, HUD, Ginnie Mae and Fannie Mae. There can be no guarantee that any or all of the GSEs will continue to participate in the reverse mortgage industry or that they will not make material changes to the laws, regulations, rules or practices applicable to reverse mortgage programs. In addition, GSEs' participation in the reverse mortgage industry may be subject to economic and political changes that cannot be predicted. Any of the aforementioned circumstances could materially and adversely affect the performance of the RMS business and the value of our common stock.

***After the completion of the RMS Acquisition, we will service reverse mortgages, which will subject us to additional risks and could have a material adverse effect on our business, liquidity, financial condition and results of operations.***

After the completion of the Acquisition, we will service reverse mortgages. The reverse mortgage business is subject to substantial risks, including market, credit, interest rate, liquidity, operational, reputational and legal risks. A reverse mortgage is a loan available to seniors aged 62 or older that allows homeowners to borrow money against the value of their home. No repayment of the mortgage is required until the borrower dies or the home is sold. A deterioration of the market for reverse mortgages may reduce the number of reverse mortgages we service, reduce the profitability of reverse mortgages currently serviced by us and adversely affect our ability to sell reverse mortgages in the market. Although foreclosures involving reverse mortgages generally occur less frequently than forward mortgages, loan defaults on reverse mortgages leading to foreclosures may occur if borrowers fail to meet maintenance obligations, such as payment of taxes or home insurance premiums. An increase in foreclosure rates may increase our cost of servicing. As a reverse mortgage servicer, we will also be responsible for funding any payments due to borrowers in a timely manner, remitting to investors interest accrued, and paying for interest shortfalls. Advances on reverse mortgages are typically greater than advances on forward residential mortgages. They are typically recovered upon weekly or monthly reimbursement or from sale in the market. In the event we receive requests for advances in excess of amounts we are able to fund, we may not be able to fund these advance requests, which could materially and adversely affect our liquidity. Finally, as a result of the Acquisition, we will become subject to negative headline risk in the event that loan defaults on reverse mortgages lead to foreclosures or even evictions of elderly homeowners. All of the above factors could have a material adverse effect on our business, liquidity, financial condition and results of operations.

## Risks Related To Our Investments

***We have historically invested in less-than-prime, non-conforming and other credit-challenged residential loans, which are subject to increased risks relative to prime loans.***

Our existing portfolio includes less-than-prime residential loans and sub-performing and non-performing residential loans, which are subject to increased risks of loss. Loans may be, or may become, sub-performing or non-performing for a variety of reasons, including because the underlying property is too highly leveraged or the borrower falls upon financial distress, in either case, resulting in the borrower being unable to meet debt service obligations to us. Such sub-performing or non-performing loans may require a substantial amount of workout negotiations and/or restructuring, which may divert the attention of our senior management team from other activities and entail, among other things, a substantial reduction in the interest rate, capitalization of interest payments and a substantial write-down of the principal of our owned loans. However, even if such restructuring were successfully accomplished, a risk exists that the borrowers will not be able or willing to maintain the restructured payments or refinance the restructured loan upon maturity.

In addition, certain sub-performing or non-performing loans that we have acquired may have been originated by financial institutions that are or may become insolvent, suffer from serious financial stress or are no longer in existence. As a result, the standards by which such loans were originated, the recourse to the selling institution, and/or the standards by which such loans are being serviced or operated may be adversely affected. Further, loans on properties operating under the close supervision of a mortgage lender are, in certain circumstances, subject to certain additional potential liabilities that may exceed the value of our investment.

In the future it is possible that we may find it necessary or desirable to foreclose on some of the residential loans that we have acquired, and the foreclosure process may be lengthy and expensive. Borrowers may resist mortgage foreclosure actions by asserting numerous claims, counterclaims and defenses against us, including numerous lender liability claims and defenses, even when such assertions may have no basis in fact, in an effort to prolong the foreclosure action and force the lender into a modification of the loan or a favorable buy-out of the borrower's position. In some states, foreclosure actions can take several years to litigate. At any time prior to or during the foreclosure proceedings, the borrower may file for bankruptcy, which would have the effect of staying the foreclosure actions and further delaying the foreclosure process. Foreclosure may create a negative public perception of the related mortgaged property, resulting in a diminution of its value. Even if we are successful in foreclosing on a loan, the liquidation proceeds upon sale of the underlying real estate may not be sufficient to recover our cost basis in the loan, resulting in a loss to us. Furthermore, costs or delays involved in the effectuation of a foreclosure or a liquidation of the underlying property further reduce the proceeds and thus increase costs and potential loss.

Whether or not we have participated in the negotiation of the terms of any such mortgages, there can be no assurance as to the adequacy of the protection of the terms of the loan, including the validity or enforceability of the loan and the maintenance of the anticipated priority and perfection of the applicable security interests. Furthermore, claims may be asserted that might interfere with enforcement of our rights. In the event of a foreclosure, we may assume direct ownership of the underlying real estate. The liquidation proceeds upon sale of such real estate may not be sufficient to recover our cost basis in the loan, resulting in a loss to us. Any costs or delays involved in the effectuation of a foreclosure of the loan or a liquidation of the underlying property will further reduce the proceeds and thus increase the loss.

Whole loan mortgages are also subject to "special hazard" risk (property damage caused by hazards, such as earthquakes or environmental hazards, not covered by standard property insurance policies), and to bankruptcy risk (reduction in a borrower's mortgage debt by a bankruptcy court). In addition, claims may be assessed against us on account of our position as mortgage holder or property owner, including responsibility for tax payments, environmental hazards and other liabilities, which could have a material adverse effect on our results of operations and financial condition.

***We may not realize expected income from our portfolio.***

Historically, we invested to generate current income. To the extent the borrowers default on interest or principal payments on the residential loans in which we have invested, we may not be able to realize income from our portfolio. Any income that we realize may not be sufficient to offset our expenses. Our inability to realize income from our portfolio would have a material adverse effect on our financial condition and results of operations and the trading price of our common stock.

***Increases in interest rates could negatively affect the value of our portfolio, which could result in reduced earnings or losses.***

We have historically invested directly in residential loans. Under a normal yield curve, an investment in these loans will decline in value if long-term interest rates increase. Declines in market value ultimately may reduce earnings or result in losses to us. A significant risk associated with our portfolio is the risk that long-term interest rates will increase significantly. If long-term rates were to increase significantly, the market value of our portfolio would decline, and the duration and weighted-average life of our portfolio would increase. While we plan to hold our portfolio to maturity, we could realize a loss if our portfolio were to be sold. Market values of our portfolio may decline without any general increase in interest rates for a number of reasons, such as increases in defaults, increases in voluntary prepayments for those residential loans that are subject to prepayment risk and widening of credit spreads.

***Accounting rules for certain of our transactions continue to evolve, are highly complex, and involve significant judgments and assumptions. Changes in accounting interpretations or assumptions could impact our financial statements.***

Accounting rules for determining the fair value measurement and disclosure of financial instruments are highly complex and involve significant judgment and assumptions. These complexities could lead to a delay in preparation of financial information and the delivery of this information to our stockholders. Changes in accounting interpretations or assumptions related to fair value could impact our financial statements and our ability to timely prepare our financial statements.

*Borrowers with adjustable rate mortgage loans are especially exposed to increases in monthly payments and they may not be able to refinance their loans, which could cause delinquency, default and foreclosure and therefore adversely affect our business.*

12-12020-mg    Doc 2138-1    Filed 11/12/12    Entered 11/12/12 11:21:34    Exhibit 1-2
Walter Investment 10-Q    Pg 91 of 120

Borrowers with adjustable rate mortgage loans are exposed to increased monthly payments when the related mortgage loan's interest rate adjusts upward from an initial fixed rate or a low introductory rate, as applicable, to the rate computed in accordance with the applicable index and margin. Borrowers with adjustable rate mortgage loans seeking to refinance their mortgage loans to avoid increased monthly payments as a result of an upwards adjustment of the mortgage loan's interest rate may no longer be able to find available replacement loans at comparably low interest rates. This increase in borrowers' monthly payments, together with any increase in prevailing market interest rates, may result in significantly increased monthly payments for borrowers with adjustable rate mortgage loans, which may cause delinquency, default and foreclosure. Increased mortgage defaults and foreclosures may adversely affect our business as they reduce the number of mortgages we service.

***Changes in prepayment rates due to changes in interest rates, government mortgage programs or other factors could result in reduced earnings or losses.***

There are seldom any restrictions on borrowers' abilities to prepay their residential loans. Homeowners tend to prepay residential loans faster when interest rates decline, in particular in the case of prime loans. Consequently, owners of the loans must reinvest prepayment proceeds at the lower prevailing interest rates. Conversely, homeowners tend not to prepay residential loans when interest rates increase. Consequently, owners of the loans are unable to reinvest prepayment proceeds at the higher prevailing interest rates.

In addition, changes to government mortgage programs could result in increased prepayment rates. For example, the Home Affordable Refinance Program ("HARP") is a federal government program designed to help eligible homeowners refinance their existing mortgage loans. The mortgage must be owned or guaranteed by a GSE, and applicants must be up-to-date on their mortgage payments but unable to obtain refinancing because the value of their homes has declined.

Any increase in prepayments could have a significant impact on our servicing fee revenues, our expenses and on the valuation of our MSRs as follows:

- Revenue. If prepayment speeds increase, our servicing fees will decline more rapidly than anticipated because of the greater than expected decrease in the number of loans or unpaid balance on which those fees are based. The reduction in servicing fees would be somewhat offset by increased float earnings because the faster repayment of loans will result in higher balances in the custodial accounts that generate the float earnings. Conversely, decreases in prepayment speeds drive increased servicing fees and lead to lower float balances and float earnings.

- Expenses. Amortization of MSRs is one of our largest operating expenses. Since we amortize servicing rights in proportion to total expected income over the life of a portfolio, an increase in prepayment speeds leads to increased amortization expense as we revise downward our estimate of total expected income. Faster prepayment speeds will also result in higher compensating interest expense. Decreases in prepayment speeds lead to decreased amortization expense as the period over which we amortize MSRs is extended. Slower prepayment speeds also lead to lower compensating interest expense.

- Valuation of MSRs. We base the price we pay for MSRs and the rate of amortization of those rights on, among other things, our projection of the cash flows from the related pool of mortgage loans. Our expectation of prepayment speeds is a significant assumption underlying those cash flow projections. If prepayment speeds were significantly greater than expected, the carrying value of our MSRs could exceed their estimated fair value. When the carrying value of MSRs exceeds their fair value, we are required to record an impairment charge which has a negative impact on our financial results.

***The residential loans we service and/or have invested in are subject to delinquency, foreclosure and loss, which could result in reduced earnings.***

Residential loans are typically secured by single-family residential property and are subject to risks of delinquency, foreclosure, and risks of loss. The ability of a borrower to repay a loan secured by a residential property is dependent upon the income or assets of the borrower. A number of factors, including a general economic downturn, acts of God, terrorism, social unrest and civil disturbances, may impair borrowers' abilities to repay their loans. In the event of the bankruptcy of a residential loan borrower, the residential loan to such borrower will be deemed to be secured only to the extent of the value of the underlying collateral at the time of bankruptcy (as determined by the bankruptcy court), and the lien securing the residential loan will be subject to the avoidance powers of the bankruptcy trustee or debtor-in-possession to the extent the lien is unenforceable under state law. Foreclosure of a residential loan can be an expensive and lengthy process which could have a substantial negative effect on our anticipated return on the foreclosed residential loan.

89

*Our real estate investments are subject to risks particular to real property.*

We own assets secured by real estate and may own real estate in the future upon a default of residential loans. Real estate investments are subject to various risks, including:

- acts of God, including earthquakes, floods and other natural disasters, which may result in uninsured losses;

- acts of war or terrorism, including the consequences of terrorist attacks, such as those that occurred on September 11, 2001;

- adverse changes in national and local economic and market conditions;

- changes in governmental laws and regulations, fiscal policies and zoning ordinances and the related costs of compliance with laws and regulations, fiscal policies and ordinances;

- costs of remediation and liabilities associated with environmental conditions such as indoor mold;

- condemnation; and

- the potential for uninsured or under-insured property losses.

If any of these or similar events occurs, it may reduce our return from an affected property or investment and adversely affect our results of operations.

***Insurance on residential loan collateral may not cover all losses.***

There are certain types of losses, generally of a catastrophic nature, such as earthquakes, floods, hurricanes, terrorism or acts of war that may be uninsurable or not economically insurable. Inflation, changes in building codes and ordinances, environmental considerations and other factors, including terrorism or acts of war, also might make the insurance proceeds insufficient to repair or replace a property if it is damaged or destroyed. Under these circumstances, the insurance proceeds received might not be adequate to restore our economic position with respect to the affected real property. Any uninsured loss could result in the loss of cash flow from, and the asset value of, the affected property.

***We may be exposed to environmental liabilities with respect to properties to which we take title, which may in turn decrease the value of the underlying properties.***

In the course of our business, we may take title to real estate, and, if we do take title, we could be subject to environmental liabilities with respect to these properties. In such a circumstance, we may be held liable to a governmental entity or to third parties for property damage, personal injury, investigation, and clean-up costs incurred by these parties in connection with environmental contamination, or we may be required to investigate or clean up hazardous or toxic substances, or chemical releases at a property. The costs associated with investigation or remediation activities could be substantial. If we ever become subject to significant environmental liabilities, our business, financial condition, liquidity or results of operations could be materially and adversely affected. In addition, an owner or operator of real property may become liable under various federal, state and local laws, for the costs of remediation of certain hazardous substances released on its property. Such laws often impose liability without regard to whether the owner or operator knew of, or was responsible for, the release of such hazardous substances. The presence of hazardous substances may adversely affect an owner's ability to sell real estate or borrow using real estate as collateral. To the extent that an owner of an underlying property becomes liable for remediation or other costs, the ability of the owner to make debt payments may be reduced, which in turn may adversely affect the value of the relevant mortgage-related assets held by us.

## Risks Related To Our Common Stock

***Market interest rates may have an effect on the trading value of our shares.***

One of the factors that investors may consider in deciding whether to buy or sell our common stock is our dividend rate as a percentage of our share price relative to market interest rates. If market interest rates increase, prospective investors may demand a higher dividend rate or seek alternative investments paying higher dividends or interest. As a result, interest rate fluctuations and capital market conditions can affect the market value of our shares. For instance, if interest rates rise, it is likely that the market price of our shares will decrease as market rates on interest-bearing securities, such as bonds, increase.

Additionally, with the consummation of the Green Tree Acquisition, the Company no longer qualifies as a REIT. Consequently, we will no longer distribute a minimum of 90% of our taxable income each year as was required to maintain our REIT status. Instead, all future distributions, if any, will be made at the discretion of our Board of Directors and will depend on, among other things, our earnings, financial condition and liquidity, and such other factors as the Board of Directors deems relevant, as well as any contractual restrictions, including the covenants in our credit agreements that limit our ability to pay dividends.

### Investing in our shares may involve a high degree of risk.

The investments we make in accordance with our investment objectives may result in a high amount of risk when compared to alternative investment options and volatility or loss of principal. Our investments may be highly speculative and aggressive, are subject to credit risk, interest rate, and market value risks, among others and therefore an investment in our shares may not be suitable for someone with lower risk tolerance.

### The market price of our common stock may be volatile and you could lose all or part of your investment.

Volatility in the market price of our common stock may prevent you from being able to sell your shares at or above the price you paid for your shares. During the period from January 1, 2012 to November 5, 2012, our common stock ranged between a high of $48.54 per share to a low of $17.87 per share. The market price of our common stock has fluctuated significantly in the recent past and could fluctuate significantly in the future for various reasons, which include:

- actual or anticipated fluctuations in our quarterly or annual earnings or those of other companies in our industry;

- strategic actions by us or our competitors, such as acquisitions, restructurings, dispositions or financings;

- changes in market valuations or operating performance of our competitors or companies similar to ours;

- additions and departures of key personnel;

- variance in our operating results and prospects from the expectations of public market analysts and investors, including changes in earnings estimates or recommendations by research analysts who track our common stock or the stocks of other companies in our industry;

- changes in accounting standards, policies, guidance, interpretations or principles applicable to our business;

- changes in federal and state laws and regulations applicable to our business;

- general global macroeconomic conditions;

- economic, financial, geopolitical, regulatory or judicial events that affect us or financial markets generally; and

- risks enumerated elsewhere in this section.

The stock market has over the past several years experienced extreme price and volume fluctuations that have affected the market price of the shares of many companies in industries similar or related to ours and that have been unrelated to these companies' operating performances. These broad market fluctuations could reduce the market price of our common stock or cause the market price for our common stock to fluctuate significantly in response to factors beyond our control and unrelated to our business. These fluctuations could materially reduce our stock price and the ability to sell shares of common stock.

### We may issue shares of preferred stock with greater rights than our common stock.

Our charter authorizes our Board of Directors to issue one or more series of preferred stock and set the terms of the preferred stock without seeking any further approval from our stockholders. Any preferred stock that is issued will rank ahead of our common stock in terms of dividends, liquidation rights, or voting rights. If we issue preferred stock, it may adversely affect the market price of our common stock, decrease the amount of earnings and assets available for distribution to holders of our common stock or adversely affect the rights and powers, including voting rights, of the holders of our common stock.

*Our common stock will rank junior to all of our and our subsidiaries' liabilities in the event of a bankruptcy, liquidation or winding up.*

12-12020-mg    Doc 2136-1    Filed 11/12/12    Entered 11/12/12 12:12:54    Exhibit 1 -
Walter Investment 10-Q    Pg 94 of 120

In the event of a bankruptcy, liquidation or winding up, our assets will be available to pay obligations on our common stock only after all of our existing liabilities have been paid. In addition, upon our voluntary or involuntary liquidation, dissolution or winding up, holders of common stock will share ratably in the assets remaining after payments to creditors senior to them in our capital structure. In the event of a bankruptcy, liquidation or winding up, there may not be sufficient assets remaining, after paying our and our subsidiaries' liabilities that rank senior to obligations owed to equity holders, to pay any amounts with respect to our common stock then outstanding.

*Additional issuances of equity securities by us would dilute the ownership of our existing stockholders and could reduce our earnings per share, and may cause our common stock price to decline, which may negatively impact your investment.*

We may issue equity in the future in connection with capital raisings, acquisitions, strategic transactions, or for other purposes. In particular, we will be issuing 891,265 shares of our common stock as the Stock Consideration for the RMS Acquisition and we will be filing a shelf registration statement to cover the resales of such shares. In addition, additional shares of our common stock may be issued upon conversion of the Convertible Notes issued in a Convertible Notes Offering. To the extent we issue substantial additional equity securities, the ownership of our existing stockholders would be diluted and our earnings per share could be reduced.

Issuance of substantial numbers of additional shares of our common stock, including in connection with future acquisitions, if any, or the perception that such issuance could occur, may cause prevailing market prices for our common stock to decline, which may negatively impact your investment.

### Risks Related to Our Organization and Structure

*Certain provisions of Maryland law could inhibit a change in our control.*

Certain provisions of the Maryland General Corporation Law (the "MGCL"), may have the effect of inhibiting a third party from making a proposal to acquire us or of impeding a change in our control under circumstances that otherwise could provide the holders of shares of our common stock with the opportunity to realize a premium over the then prevailing market price of such shares. We are subject to the "business combination" provisions of the MGCL that, subject to limitations, prohibit certain business combinations between us and an "interested stockholder" (defined generally as any person who beneficially owns 10% or more of our then outstanding voting stock or an affiliate or associate of ours who, at any time within the two-year period prior to the date in question, was the beneficial owner of 10% or more of our then outstanding voting stock) or an affiliate thereof for five years after the most recent date on which the stockholder becomes an interested stockholder and, thereafter, imposes special appraisal rights and supermajority stockholder voting requirements on these combinations. These provisions of the MGCL do not apply, however, to business combinations that are approved or exempted by the Board of Directors of a corporation prior to the time that the interested stockholder becomes an interested stockholder. Pursuant to the statute, our Board of Directors has by resolution exempted business combinations between us and any other person, provided that the business combination is first approved by our Board of Directors. This resolution, however, may be altered or repealed in whole or in part at any time. If this resolution is repealed, or our Board of Directors does not otherwise approve a business combination, this statute may discourage others from trying to acquire control of us and increase the difficulty of consummating any offer.

The "control share" provisions of the MGCL provide that "control shares" of a Maryland corporation (defined as shares which, when aggregated with all other shares controlled by the stockholder, entitle the stockholder to exercise one of three increasing ranges of voting power in the election of directors) acquired in a "control share acquisition" (defined as the acquisition of issued and outstanding "control shares," subject to certain exceptions) have no voting rights except to the extent approved by our stockholders by the affirmative vote of at least two-thirds of all the votes entitled to be cast on the matter, excluding votes entitled to be cast by the acquirer of control shares, our officers and our employees who are also our directors. Our bylaws contain a provision exempting from the control share acquisition statute any and all acquisitions by any person of our shares of stock. There can be no assurance that this provision will not be amended or eliminated at any time in the future.

The "unsolicited takeover" provisions of the MGCL permit our Board of Directors, without stockholder approval and regardless of what is currently provided in our charter or bylaws, to implement certain provisions if we have a class of equity securities registered under the Exchange Act and at least three independent directors. These provisions may have the effect of inhibiting a third party from making an acquisition proposal for us or of delaying, deferring or preventing a change in our control under circumstances that otherwise could provide the holders of shares of our common stock with the opportunity to realize a premium over the then current market price.

Our Board of Directors is divided into three classes of directors. Directors of each class are elected for three-year terms upon the expiration of their current terms, and each year one class of directors will be elected by our stockholders. The current terms of the three classes of directors expire in 2013, 2014 and 2015, respectively. The staggered terms of our directors may reduce the possibility of a tender offer or an attempt at a change in control, even though a tender offer or change in control might be in the best interests of our stockholders.

**Our authorized but unissued shares of common and preferred stock may prevent a change in our control.**

Our charter authorizes us to issue additional authorized but unissued shares of common or preferred stock. In addition, our Board of Directors may, without stockholder approval, classify or reclassify any unissued shares of common or preferred stock into other classes or series of shares and set the preferences, rights and other terms of the classified or reclassified shares. As a result, our Board of Directors may establish a class or series of shares of common or preferred stock that could delay or prevent a transaction or a change in control that might involve a premium price for our shares of common stock or otherwise be in the best interest of our stockholders.

Restrictions to ownership related to our former status as a REIT are no longer applicable leaving us susceptible to takeover. Provisions in our charter that limited beneficial or constructive ownership of our stock by any one person to 9.8% of our outstanding stock are no longer applicable as a result of our decision to no longer to qualify as a REIT. This means that individuals or entities, or groups of individuals or entities could acquire a controlling interest in our company and thereafter, adversely change our operations and/or strategies.

## Tax Risks

**Summary of U.S. federal income tax risks.**

This summary of certain tax risks is limited to the U.S. federal income tax risks addressed below. Additional risks or issues may exist that are not addressed herein and that could affect the U.S. federal tax treatment of us or our stockholders. Investors are advised to consult with tax experts to fully assess their tax risks.

**We no longer qualify for taxation as a REIT for United States federal income tax purposes, and there can be no assurance that the IRS will not challenge our previous REIT status.**

Although we elected for United States federal income tax purposes to be treated as a real estate investment trust, or REIT, through December 31, 2010, as a result of the Green Tree Acquisition, we did not qualify as a REIT for 2011, and we will not qualify as a REIT for our current taxable year or any year in the foreseeable future, and, as a result, we will be unable to claim the United States federal income tax benefits associated with REIT status. There can be no assurance that the Internal Revenue Service will not challenge our qualification as a REIT for previous years in which we elected REIT status. Although we believe we did qualify as a REIT in each such year, if the Internal Revenue Service were to successfully challenge our previous REIT status, we would suffer adverse United States federal income tax consequences.

**We may be required to report taxable income from certain investments earlier than and possibly in excess of our realization of the economic income ultimately provided from them.**

We are subject to U.S federal tax provisions that do not fully match reportable taxable income with the timing of our receipt of economic income.

Most of our installment and mortgage notes receivable have a tax basis considerably less than their principal balances as we were treated, for tax purposes only, as purchasing the assets we acquired at the spin-off at amounts less than outstanding principal. In addition, we have acquired debt instruments in the secondary market at prices less than their outstanding principal balances. This has resulted in a "market discount" under tax laws that provide for complicated and sometimes non-economic income recognition schemes.

We are required to periodically recognize as taxable interest a portion of this market discount. Our method of calculating these amounts is based on a determination of our effective yield on each applicable individual obligation as if we expect to collect the outstanding principal balance in full over its stated term. No adjustment is made to take into account expected prepayments, delinquencies or foreclosures; these events are given effect as they occur. If we ultimately collect less on the debt instrument than our purchase price plus the market discount we had previously reported as income, we may not be able to benefit from any offsetting loss deductions in a later taxable year.

93

Our loss mitigation activities have and will include negotiated modifications to debt obligations as alternatives to foreclosure. Under the tax law, "significant modifications" to debt having tax basis lower than outstanding principal can and do result in taxable income in excess of realized economic income. Many of our modifications will be "significant." We are taking steps to minimize the unfavorable effects of these tax rules; as with market discount, we may not be able to benefit from any offsetting loss deductions in a later taxable year.

## Risks Relating to Our Relationship with Walter Energy

### *We may have substantial additional liability for U.S. federal income tax allegedly owed by Walter Energy.*

The Company was part of Walter Energy, consolidated group prior to the spin-off from Walter Energy on April 17, 2009. As such, the Company is jointly and severally liable with Walter Energy for any final taxes, interest and/or penalties owed by the Walter Energy consolidated group during the time that the Company was a part of the Walter Energy consolidated group. However, in connection with the spin-off of the Company's business from Walter Energy, the Company and Walter Energy entered into a Tax Separation Agreement dated April 17, 2009, pursuant to which Walter Energy is responsible for the payment of all federal income taxes (including any interest or penalties applicable thereto) of the consolidated group. Nonetheless, to the extent that Walter Energy is unable to pay any amounts owed, the Company could be responsible for any unpaid amounts including, according to Walter Energy's most recent public filing on Form 10-Q, those related to the following:

- The Internal Revenue Service, or IRS, has filed a proof of claim for a substantial amount of taxes, interest and penalties with respect to fiscal years ended August 31, 1983 through May 31, 1994. The public filing goes on to disclose that the issues have been litigated in bankruptcy court and that an opinion was issued by the court in June 2010 as to the remaining disputed issues. The filing further states that the amounts initially asserted by the IRS do not reflect the subsequent resolution of various issues through settlements or concessions by the parties. Walter Energy believes that those portions of the claim which remain in dispute or are subject to appeal substantially overstate the amount of taxes allegedly owed. However, because of the complexity of the issues presented and the uncertainties associated with litigation, Walter Energy is unable to predict the outcome of the adversary proceeding.

- The IRS completed an audit of Walter Energy's federal income tax returns for the years ended May 31, 2000 through December 31, 2005. The IRS issued 30-Day Letters to Walter Energy proposing changes for these tax years which Walter Energy has protested. Walter Energy's filing states that the disputed issues in this audit period are similar to the issues remaining in the above-referenced dispute and therefore Walter Energy believes that its financial exposure for these years is limited to interest and possible penalties.

- Walter Energy reports that the IRS has begun an audit of Walter Energy's tax returns filed for 2006 through 2008, however, because the examination is ongoing, Walter Energy cannot estimate the amount of any resulting tax deficiency, if any. Walter Energy expects the IRS exam to conclude during 2012.

Walter Energy believes that all of its current and prior tax filing positions have substantial merit and intends to defend vigorously any tax claims asserted and that they believe that they have sufficient accruals to address any claims, including interest and penalties.

The Tax Separation Agreement also provides that Walter Energy is responsible for the preparation and filing of any tax returns for the consolidated group for the periods when the Company was part of the Walter Energy consolidated group. This arrangement may result in conflicts between Walter Energy and the Company. In addition, the spin-off of the Company from Walter Energy was intended to qualify as a tax-free spin-off under Section 355 of the Code. The Tax Separation Agreement provides generally that if the spin-off is determined not to be tax-free pursuant to Section 355 of the Code, any taxes imposed on Walter Energy or a Walter Energy shareholder as a result of such determination ("Distribution Taxes") which are the result of the acts or omissions of Walter Energy or its affiliates, will be the responsibility of Walter Energy. However, should Distribution Taxes result from the acts or omissions of the Company or its affiliates, such Distribution Taxes will be the responsibility of the Company. The Tax Separation Agreement goes on to provide that Walter Energy and the Company shall be jointly liable, pursuant to a designated allocation formula, for any Distribution Taxes that are not specifically allocated to Walter Energy or the Company. To the extent that Walter Energy is unable or unwilling to pay any Distribution Taxes for which it is responsible under the Tax Separation Agreement, the Company could be liable for those taxes as a result of being a member of the Walter Energy consolidated group for the year in which the spin-off occurred. The Tax Separation Agreement also provides for payments from Walter Energy in the event that an additional taxable dividend is required to cure a REIT disqualification from the determination of a shortfall in the distribution of non-REIT earnings and profits made immediately following the spin-off. As with Distribution Taxes, the Company will be responsible for this dividend if Walter Energy is unable or unwilling to pay.

***The tax separation agreement between us and Walter Energy allocates to us certain tax risks associated with the spin-off of the financing division and the Merger and imposes other obligations that may affect our business.***

Walter Energy effectively controlled all of our tax decisions for periods during which we were a member of the Walter Energy consolidated U.S. federal income tax group and certain combined, consolidated, or unitary state and local income tax groups. Under the terms of the tax separation agreement between Walter Energy and Walter Investment Management LLC, or WIM, dated April 17, 2009, WIM generally computes WIM's tax liability for purposes of its taxable years ended December 31, 2008 and April 16, 2009, on a stand-alone basis, but Walter Energy has sole authority to respond to and conduct all tax proceedings (including tax audits) relating to WIM's U.S. federal income and combined state returns, to file all such returns on WIM's behalf and to determine the amount of WIM's liability to (or entitlement to payment from) Walter Energy for such periods. This arrangement may result in conflicts of interests between us and Walter Energy. In addition, the tax separation agreement provides that if the spin-off is determined not to be tax-free pursuant to Section 355 of the Code, WIM (and therefore we) generally will be responsible for any taxes incurred by Walter Energy or its stockholders if such taxes result from certain of our actions or omissions or for a percentage of any such taxes that are not a direct result of either our or Walter Energy's actions or omissions based upon a designated allocation formula. Additionally, to the extent that Walter Energy was unable to pay taxes, if any, attributable to the spin-off and for which it is responsible under the tax separation agreement, we could be liable for those taxes as a result of WIM being a member of the Walter Energy consolidated group for the year in which the spin-off occurred. Moreover, the tax separation agreement obligates WIM to take certain tax positions that are consistent with those taken historically by Walter Energy. In the event we do not take such positions, we could be liable to Walter Energy to the extent our failure to do so results in an increased tax liability or the reduction of any tax asset of Walter Energy.

***We may have liability for losses resulting from Walter Energy's failure to properly construct homes on which we held and/or serviced mortgages.***

In connection with the spin-off of our business from Walter Energy, we entered into a Joint Litigation Agreement with Walter Energy pursuant to which each party agreed to be responsible for any claims or litigation arising out of our respective historical businesses; i.e., Walter Energy remained responsible for claims related to homebuilding and we agreed to be responsible for claims related to mortgage servicing and insurance. From time to time, owners of homes constructed by Walter Energy subsidiaries refuse to make payments on their mortgages based on claims that their homes were improperly constructed. To the extent this results in a loss, it is our position that, pursuant to the Joint Litigation Agreement, Walter Energy is responsible for such loss. In light of the current economic conditions in the U.S., homeowners in increasing numbers are seeking to avoid paying their mortgages and may make claims of faulty construction in order to avoid such payments. To the extent that Walter Energy is unwilling to pay these claims, we may be forced to pursue these claims against Walter Energy under the Joint Litigation Agreement. Should we be unsuccessful in our pursuit of such claims, or should Walter Energy be unable to pay the claims, the losses would be our responsibility; and should the number of such claims increase materially in number, there could be a material adverse effect on our business.

95

**ITEM 2. *UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS***

a) Not applicable.

b) Not applicable.

c) Not applicable.

## ITEM 3. *DEFAULTS UPON SENIOR SECURITIES*

None.

## ITEM 4. *MINE SAFETY DISCLOSURES*

Not applicable.

## ITEM 5. *OTHER INFORMATION*

None.

## ITEM 6. *EXHIBITS*

The exhibits listed on the Exhibit Index, which appears immediately following the signature page below, are included or incorporated by reference herein.

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

WALTER INVESTMENT MANAGEMENT CORP.

Dated: November 8, 2012          By:   /s/ Mark J. O'Brien
                                       Mark J. O'Brien
                                       *Chief Executive Officer*
                                       *(Principal Executive Officer)*

Dated: November 8, 2012          By:   /s/ Charles E. Cauthen
                                       Charles E. Cauthen
                                       *Chief Financial Officer*
                                       *(Principal Financial Officer and Principal Accounting Officer)*

97

**INDEX TO EXHIBITS**

| Exh No | Notes | Description |
|---|---|---|
| 2.1.1 | (1) | Stock Purchase Agreement, dated as of August 31, 2012, by and among Reverse Mortgage Solutions, Inc., Walter Investment Management Corp., JAM Special Opportunities Fund, L.P. and the Other Sellers listed on the Signature Pages thereto (the "Stock Purchase Agreement") including forms of the following agreements attached as Exhibits to the Purchase Agreement: Escrow Note (Exhibit A), Lockup Agreement (Exhibit B), MSR Note (Exhibit C), Escrow Agreement (Exhibit D) and Employment Agreement (Exhibit F).* |
| 2.1.2 | (5) | Letter of Understanding dated November 1, 2012 relating to the RMS Stock Purchase Agreement. |
| 2.1.3 | (5) | Waiver of Closing Conditions and Obligations dated November 1, 2012 relating to the RMS Purchase Agreement. |
| 2.1.4 | (5) | Letter Agreement between the Registrant and Robert D. Yeary and the Yeary Family Trust – D dated October 31, 2012 relating to the RMS Purchase Agreement. |
| 2.2 | (2) | Asset Purchase Agreement between Ocwen Loan Servicing, LLC and Residential Capital, LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower LLC and RFC Borrower LLC dated as of November 2, 2012.* |
| 10.1 | (3) | Amendment and Joinder Agreement dated as of July 17, 2012, to the First Lien Credit Agreement, dated as of July 1, 2011, among the Company, the lenders party thereto, Credit Suisse AG and the other parties party thereto. |
| 10.2 | (5) | Joint Bidding Agreement between the Registrant and Ocwen Loan Servicing LLC dated October 19, 2012.* |
| 10.3 | (4) | First Supplemental Indenture, dated as of October 23, 2012, to the Indenture, dated as of January 13, 2012, between the Company and Wells Fargo Bank, National Association, as trustee, and Form of 4.50% Convertible Senior Subordinated Notes due 2019. |
| 31.1 | (5) | Certification by Mark J. O'Brien pursuant to Securities Exchange Act Rule 13a-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | (5) | Certification by Charles E. Cauthen pursuant to Securities Exchange Act Rule 13a-14(a), as Adopted Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32 | (5) | Certification by Mark J. O'Brien and Charles E. Cauthen pursuant to 18 U.S.C. Section 1352, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | (5) | The following materials from Walter Investment Management Corp.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2012, formatted in XBRL (eXtensible Business Reporting Language); (i) Consolidated Balance Sheets at September 30, 2012 and December 31, 2011, (ii) Consolidated Statements of Comprehensive Income (Loss) for the three and nine months ended September 30, 2012 and 2011, (iii) Consolidated Statement of Stockholders' Equity for the nine months ended September 30, 2012, (iv) Consolidated Statements of Cash Flows for the nine months ended September 30, 2012 and 2011 and (v) Notes to Consolidated Financial Statements. |

* The Company hereby undertakes to furnish supplementally a copy of any omitted schedule, annex or exhibit to such Stock Purchase Agreement to the U.S. Securities and Exchange Commission upon request.

| Note | Notes to Exhibit Index |
|---|---|
| (1) | Incorporated herein by reference to Exhibits 2.1 through 2.6 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on September 6, 2012 (File No. 001-01347). |
| (2) | Incorporated herein by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 8, 2012 (File No. 001-01347). |
| (3) | Incorporated herein by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 8-K as filed with the Securities and Exchange Commission on July 20, 2012 (File No. 001-01347). |
| (4) | Incorporated herein by reference to Exhibit 4.7 to the Registrant's Quarterly Report on Form 8-K as filed with the Securities and Exchange Commission on October 23, 2012 (File No. 001-01347). |
| (5) | Filed herewith |



November 1, 2012

Reverse Mortgage Solutions, Inc.
2727 Spring Creek Drive
Spring, TX 77373
Attention: H. Marc Helm, CEO

JAM Special Opportunities Fund L.P.
2121 Rosecrans Avenue, Suite 2390
El Segundo, CA 90245
Attn: Michael Sekits

Dear Marc and Mike:

I am writing in connection with the Stock Purchase Agreement dated August 31, 2012 by and between Reverse Mortgage Solutions, Inc., JAM Special Opportunities Fund, L.P., and the other sellers set forth in the Agreement and Walter Investment Management Corp. (the "Agreement"). Unless otherwise set forth in this letter, capitalized terms shall have the meaning ascribed to them in the Agreement.

Section 7.7 of the Agreement provides:

> If WIMC engages in a transaction or series of related transactions that constitute a refinancing of all or substantially all of the Indebtedness outstanding under either the WIMC First Lien Credit Agreement or WIMC Second Lien Credit Agreement (a "Refinancing"), the issuer of each Note and the Escrow Note shall pay the entire unpaid principal amount of each Note and the Escrow Note then outstanding and all then accrued and unpaid interest thereon, after giving effect to any reduction in the principal of the Escrow Note in accordance with Section 10.7(c), within ten (10) Business Days of the completion of such Refinancing; provided that if a Refinancing occurs prior to the release of the Escrow Amount pursuant to the Escrow Agreement, all amounts paid hereunder in respect of principal of the Escrow Note will be deposited with the Escrow Agent in the Escrow Account and all amounts paid hereunder with respect to accrued and unpaid interest on the Escrow Note shall be paid to the Sellers.



This letter will confirm the following understanding between Buyer and Sellers regarding the effect of the refinancing of the WIMC Second Lien Credit Agreement on October 23, 2012.

1. The portion of the Purchase Price that is payable by Buyer in the form of Notes shall instead be paid by Buyer at Closing with $26,000,000 in cash (the "Additional Cash Consideration").

2. The portion of the Purchase Price that is payable by Buyer with the Escrow Note shall instead be paid by Buyer at Closing with $9,000,000 in cash (the "Escrow Cash Amount"), and at Closing the Buyer will deliver the Escrow Cash Amount to the Escrow Agent to be deposited into the Escrow Account in lieu of the Escrow Note and the related pledge agreement.

3. All references in the Agreement to, and all clauses, terms and conditions related to, "Escrow Note", "Notes" and any related "pledge agreements" will be deemed omitted from the Agreement and read to give effect to the foregoing provisions of this letter. Exhibit D hereto shall be substituted for the current Exhibit D to the Agreement.

All other terms, conditions, provisions and references of and to the Agreement not addressed herein shall remain in full force and effect and shall not be altered by any provisions herein contained.

-Page 2-

If the foregoing accurately reflects your understanding of the matters described, please acknowledge your agreement below and return the signed agreement to me.

Very truly yours,

WALTER INVESTMENT MANAGEMENT CORP.

By: _____
     Stuart D. Boyd
     V.P., General Counsel and Secretary

The foregoing is agreed to as of the date first written above.

REVERSE MORTGAGE SOLUTIONS, INC.

By: _____

     JAM SPECIAL OPPORTUNITES FUND L.P.
     As Principal and Sellers' Representative

By: _____

**Exhibit D**

[Form of Escrow Agreement]

-Page 5-

Exhibit 2.1.3

EXECUTION VERSION

## WAIVER OF CLOSING CONDITIONS
## AND OBLIGATIONS

This WAIVER OF CLOSING CONDITIONS AND OBLIGATIONS (this "**Waiver**") is being executed by Walter Investment Management Corp., a Maryland corporation ("**WIMC**") and Walter Reverse Acquisition LLC, a Delaware limited liability company ("**Buyer**"), in connection with the closing of the transactions contemplated by that certain Stock Purchase Agreement, dated August 31, 2012, (as amended or modified, the "**SPA**"), by and among WIMC, Reverse Mortgage Solutions, Inc., a Delaware corporation (the "**Corporation**"), and the stockholders of the Corporation. All capitalized terms not otherwise defined in this Waiver will have the meanings ascribed to them in the SPA.

1. Each of WIMC and Buyer hereby waive the closing conditions set forth in:

(a) Section 8.2(d) of the SPA solely as it relates to the timing of the delivery of the Year-to-Date Operating Income Schedules for the month ending September 2012 on or before ten Business Days after the last day of September 2012 as required by Section 9.1(h) of the SPA; WIMC and Buyer hereby acknowledge receipt of such Year-to-Date Operating Income Schedules; however, the schedules were not delivered within the required ten-Business Day period;

(b) Sections 8.2(c), 8.2(d) and 9.1(d) of the SPA solely as they relate to obtaining, and delivering evidence to the Buyer of, the Required Consents from (i) the following States regarding state mortgage lender/servicer licenses: Idaho, Maryland and Mississippi; and (ii) the following States regarding state collection agency licenses or regulatory approvals: Colorado, Idaho, Indiana, Maryland, New Mexico and North Carolina;

(c) Sections 8.2(c), 8.2(d), 8.2(h) and 9.1(d) of the SPA solely as they relate to obtaining, and delivering evidence to the Buyer of, the following Required Consents:

(i) Centre Garden City, LLC (Lease for 4800 Riverside Drive, Palm Beach Gardens, FL (Prior Approval);

(ii) MECA 2010 – Servicing Agreement (Prior Approval); and

(iii) MECA 2011 – REO Agreement (Prior Approval).

(d) Section 8.2(g).

2. Each of WIMC and Buyer hereby waive any obligations of the Sellers and the Corporation under Section 7.3(c) of the SPA to pay the Accrued 2012 Bonuses to the Continuing Employees prior to the Closing Date, other than the Accrued 2012 Bonuses payable to H. Marc Helm, Robert Yeary and Kevin Gherardi, which have been paid.

3. Notwithstanding the provisions of Section 10.9 of the SPA, each of WIMC and Buyer, on behalf of itself and the WIMC Indemnified Parties, hereby waive any and all right to indemnification it, or they, may have under the SPA solely as a result of Sellers' or the Corporation's failure to (a) perform the obligations described in Section 1(a), Section 1(d) or Section 2 of this Waiver or (b) obtain the Required Consents described in Section 1(b) or Section 1(c).

4. All matters arising out of or relating to this Waiver shall be construed in accordance with and governed by the laws of the State of Delaware applicable to the contracts made and to be preformed therein.

*[remainder of page intentionally left blank]*

-2-

The undersigned have executed this Waiver as of this 1st day of November, 2012.

WALTER INVESTMENT MANAGEMENT CORP.

By: _____

Name: _____

Title: _____


WALTER REVERSE ACQUISITION LLC

By: _____

Name: _____

Title: _____


-3-

**Exhibit 2.1.4**



October 31, 2012

Robert D. Yeary
5004 Ledgestone Drive
Fort Worth, TX 76132

The Yeary Family Trust D
5004 Ledgestone Drive
Fort Worth, TX 76132
Attn: Robert D. Yeary, Trustee

Dear Robert and The Yeary Family Trust D:

I am writing in connection with the Stock Purchase Agreement dated August 31, 2012 by and among Walter Investment Management Corp. ("WIMC"), Reverse Mortgage Solutions, Inc., JAM Special Opportunities Fund, L.P., and the other stockholders that are a party thereto (as amended or modified, the "Agreement"). Unless otherwise set forth in this letter, capitalized terms shall have the meanings ascribed to them in the Agreement.

This letter will confirm the following understandings between WIMC and you:

1.  Fifty percent (50%) of the Cash Consideration that will become payable to Robert D. Yeary at Closing shall instead be paid to The Yeary Family Trust D at Closing.

2.  Fifty percent (50%) of the Stock Consideration that will become payable to Robert D. Yeary at Closing shall instead be paid to The Yeary Family Trust D at Closing.

3.  For all purposes of the Agreement and any Transaction Document, The Yeary Family Trust D shall be an "Other Stockholder Seller" and a "Special Seller" and shall have all of the rights and obligations of an "Other Stockholder Seller" and a "Special Seller" under the Agreement and any Transaction Document.

All other terms, conditions, provisions and references of and to the Agreement not addressed herein shall remain in full force and effect and shall not be altered by any provisions herein contained.



www.walterinvestment.com

If the foregoing accurately reflects your understanding of the matters described, please acknowledge your agreement below and return the signed agreement to me.

Very truly yours,

WALTER INVESTMENT MANAGEMENT CORP.

By: Stuart D. Boyd
    V.P., General Counsel and Secretary

The foregoing is agreed to as of the date first written above.

-Page 2-

ROBERT D. YEARY

_____

THE YEARY FAMILY TRUST D

By: _____

**Exhibit 10.2**

**Execution Copy**

# JOINT BIDDING AGREEMENT

This JOINT BIDDING AGREEMENT (this "Agreement"), dated as of October 19, 2012, is entered into by and between Ocwen Loan Servicing, LLC ("Ocwen") and Walter Investment Management Corporation ("Walter").

WHEREAS, the parties hereto desire to jointly pursue the acquisition (the "Potential Acquisition") of certain assets (the "Subject Assets") of Residential Capital, LLC and certain of its affiliates ("ResCap") that are the subject of the Amended and Restated Asset Purchase Agreement, dated as of June 28, 2012, between Nationstar Mortgage LLC and ResCap (the "Nationstar APA") pursuant to and in accordance with In re: Residential Capital, LLC, et al., Case No. 12020 (MG) (bankr. S.D.N.Y.) (the "ResCap Bankruptcy"); and

WHEREAS, the parties hereto desire to set forth herein the basic terms and conditions of this Agreement with respect to the Potential Acquisition.

NOW, THEREFORE, in consideration of the mutual covenants and promises contained in this Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1. <u>General Obligations</u>. The parties hereto agree to cooperate with each other reasonably and in good faith in connection with the Potential Acquisition. Each party shall keep the other party reasonably informed of its expectations and intentions regarding the Potential Acquisition and will notify the other party promptly of any changes therein. Each party will adhere to the policies and procedures applicable to potential bidders for the Subject Assets established in the ResCap Bankruptcy (the "Applicable Procedures").

2. <u>Pre-Signing Matters</u>.

   a. <u>Division of Subject Assets</u>. Set forth on Annex A attached hereto is (i) the Subject Assets that Ocwen intends to purchase (the "Ocwen Assets") and (ii) the Subject Assets that Walter intends to purchase (the "Walter Assets"). At any time between the date of this Agreement and the submission of the Bid (as described below), the parties, by mutual agreement, may modify Annex A to reflect a different combination of Ocwen Assets and Walter Assets.

   b. <u>Bid</u>. On or before the Bid Deadline as determined in accordance with the Sale Procedures for the Subject Assets established in the ResCap Bankruptcy (the "Sale Procedures"), Ocwen will submit a bid for the Subject Assets ("Bid"). The Bid will (i) contemplate that Ocwen or its designees (which shall include Walter, other than in the case of an Exclusive Excess Bid (as defined below)) are the direct purchasers of all of the Subject Assets, (ii) set forth a "Purchase Price" for the Subject Assets, (iii) include a mutually agreeable Bid Asset Purchase Agreement ("Bid APA") and (iv) otherwise comply with the Sale Procedures, except with respect to any changes

that are mutually agreed to by Walter and Ocwen. The amount of such Purchase Price payable at Closing by Ocwen and Walter, respectively, shall be determined in accordance Annex B. By the date of Ocwen's submission of the Bid, Walter shall wire to Ocwen an amount equal to $15 million to be applied to the Good Faith Deposit that is required to be submitted by Ocwen in connection with the Bid. If at any time after submitting the Bid the Good Faith Deposit is returned to Ocwen, Ocwen shall within three business days thereafter return such $15 million or any pro rata portion of the Good Faith Deposit returned to Ocwen to Walter.

c.    <u>Auction</u>. Assuming that the Bid is deemed to be a Qualified Bid, representatives of Ocwen and Walter shall attend the Auction with respect to the sale of the Subject Assets (and any preparatory meetings deemed by the parties to be necessary) in order to facilitate efficient communication and decision making with respect to the Bid. At the Auction, Ocwen may unilaterally determine to increase the Purchase Price (in one or more increments) up to $2,654,638,969 (the "<u>Cap</u>"). With respect to any increase in Purchase Price up to the Cap, Ocwen and Walter, respectively, will be responsible for payment of the amounts determined in accordance with Annex B. Ocwen may, in its discretion increase the Purchase Price in excess of the Cap; provided, however, that (i) if Walter agrees to such increase Walter will be responsible for an amount determined in accordance with Annex B and the increased Purchase Price shall become the Cap, or (ii) if Walter does not agree to such increase the Cap will remain the last amount agreed to by Walter and the bid will be deemed an "Excess Bid". If Ocwen elects to make an Excess Bid that is equal to or less than 1.05 times the Cap, and such Excess Bid is the winning bid for the Subject Assets, then (x) Walter shall be entitled to purchase the Walter Assets by paying an amount determined in accordance with Annex B, using the Cap as the assumed Purchase Price and (y) Ocwen shall be entitled to purchase the Ocwen Assets by paying the remainder of the actual Purchase Price. If Ocwen elects to make an Excess Bid greater than 1.05 times the Cap (an "<u>Exclusive Excess Bid</u>") and such Excess Bid is the winning bid for the Subject Assets, then Ocwen shall be entitled to purchase all of the Subject Assets (including the Walter Assets) and shall be responsible for paying the entire Purchase Price.

d.    <u>Asset Purchase Agreement</u>. Except as specifically provided in subsection c. above, in the event that the Bid APA is modified at any time prior to Walter entering into a Definitive Purchase Agreement (as defined below) in a manner that materially affects the rights or responsibilities of Walter, as they pertain to the Walter Assets, Walter may, in its sole discretion, provide written notice of its termination of this Agreement and Walter will not enter into a Definitive Purchase Agreement; in which case Ocwen will return Walter's portion of the Good Faith Deposit within three business days.

3.    <u>Pre-Closing Matters</u>. If the Auction results in Ocwen and/or Walter entering into a definitive agreement (a "<u>Definitive Purchase Agreement</u>") with ResCap to purchase the Subject Assets (whether as a result of Ocwen being the "Successful Bidder" or the "Next-Highest Bidder", as such terms are defined in the June 28, 2012 Sale Order related to the ResCap Bankruptcy), the parties shall cooperate with each other and take all steps reasonably necessary to

consummate the transaction, including using commercially reasonable efforts to obtain any consents and approvals from governmental authorities, government sponsored enterprises and other parties ("Consents") necessary to consummate the transaction. Ocwen shall be responsible for working with ResCap and, if applicable, preparing and filing all necessary Consents, and Walter shall provide Ocwen with all information reasonably requested by Ocwen in connection therewith. Ocwen shall give Walter a reasonable opportunity to review and comment on any portion of the documents related to the Consents or otherwise prepared in connection with the consummation of the transaction that are reasonably related to Walter or the Walter Assets. If, prior to the Closing, Ocwen desires to (a) amend the Definitive Purchase Agreement or waive a right under the Definitive Purchase Agreement in a manner that could have a material adverse effect on the terms of the agreement as they relate to the purchase of the Walter Assets or (b) terminate the Definitive Purchase Agreement, Walter shall have a right to approve such amendment, waiver or termination (which approval shall not be unreasonably withheld). During the pre-closing period, the parties shall also consider in good faith whether, subsequent to the Closing and based on the division of the Subject Assets among the parties, the parties need to provide each other with transitional services to allow the parties to operate their respective Subject Assets subsequent to the Closing. If the parties determine that such transition services are necessary or desirable, prior to the Closing they shall negotiate in good faith the terms of an appropriate transition services agreement.

4. <u>Closing</u>. Except in the case of an Exclusive Excess Bid or termination of this Agreement as provided in paragraph 2.d. above, at least one business day prior to the expected closing governed by the Definitive Purchase Agreement (the "Closing"), Walter shall wire to Ocwen an amount of the Purchase Price determined in accordance with Annex B. If such Closing does not occur within three business days thereafter, Ocwen shall return such amount to Walter unless Walter agrees otherwise. Concurrently with such Closing, Walter shall purchase the Walter Assets from ResCap, pursuant to a mutually agreeable Bill of Sale and Assignment and Assumption Agreement ("<u>Bill of Sale</u>") (it being understood and agreed that the Bill of Sale and the Definitive Purchase Agreement will not contain any representations, warranties, covenants or obligations of any kind of Ocwen with respect to the Walter Assets, and Walter will only retain the benefit or burden of any representations, warranties, covenants or obligations of a purchaser of the Walter Assets in the Definitive Purchase Agreement).

5. <u>Representations and Warranties</u>. Each party represents and warrants to the other party as follow:

    a.    *Organization*. Such party is a duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and is qualified to transact business in each jurisdiction in which such qualification is necessary to perform its obligations under this Agreement.

    b.    *Binding Effect*. This Agreement has been, and the Bill of Sale will be at the Closing, duly executed and delivered by such party. This Agreement is a legal, valid and binding obligation of such party enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general

equity principles. The Bill of Sale, when executed and delivered by such party, will be legal, valid and binding obligations of such party enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles

  c.   *Non-Contravention.* The execution, delivery and performance of this Agreement and the Bill of Sale, and the consummation by such party of the transactions contemplated hereby and thereby, will not (i) violate or conflict with any provision of the organizational documents of such party, (ii) violate or conflict with any law or permit applicable to such party, or (iii) constitute a breach (or event which, with the giving of notice or the lapse of time, would constitute a breach) under, or give any third party any rights of termination, acceleration or cancellation of, or result in the creation of any encumbrance on any of the assets, properties or capital stock of such party, pursuant to any contract or government order to which such party is a party.

  d.   *Corporate Authorization.* Each Party has full corporate or other organizational power and authority to execute and deliver this Agreement and the Bill of Sale and to perform its obligations under, and consummate the transactions contemplated by, this Agreement and the Bill of Sale. The execution, delivery and performance of this Agreement by such party has been duly and validly authorized by all necessary corporate action on the part of such party. The execution, delivery and performance of each of the Bill of Sale has been, or prior to Closing will have been, duly and validly authorized by all necessary corporate or other action on the part of such party.

  e.   *Financing.* As of the Closing, such party will have available sufficient cash, available lines of credit, committed debt or equity financing, or other sources of immediately available funds to pay the amounts determined in accordance with Annex B.

  f.   *Licenses and Permits.* Such party has the necessary licenses and permits to own and operate the Ocwen Assets or the Walter Assets, as applicable.

6.   <u>Exclusivity</u>. Neither party shall directly or indirectly pursue an acquisition of any of the Subject Assets pursuant to the ResCap Bankruptcy other than in partnership with the other party pursuant to this Agreement.

7.   <u>Confidentiality</u>. This Agreement and any information shared and discussions among the parties in connection with the transactions contemplated hereby shall be subject to the Mutual Non-Disclosure Agreement, dated August 2, 2012, between the parties.

8.   <u>Cost and Expenses</u>. Except as otherwise expressly set forth herein, whether or not the transaction contemplated hereby is consummated each party hereto shall bear its own costs and expenses in connection with this Agreement and the transaction contemplated hereby. Notwithstanding the foregoing, (a) in the event that Ocwen is required to pay any filing fees, consent fees or other amount pursuant the Definitive Purchase Agreement or otherwise in connection with the consummation of the transactions contemplated thereby, Walter shall as

promptly as is reasonably practicable reimburse Ocwen for the Walter Percentage of such amounts and (b) Walter shall reimburse Ocwen for the Walter Percentage of all out-of-pocket costs (including legal fees) incurred by Ocwen in connection with negotiating the Definitive Purchase Agreement and consummating the transactions contemplated thereby.

9. <u>Intentionally Omitted.</u>

10. <u>PR Coordination</u>. Each party hereto will coordinate in good faith any and all press releases and other public relations matters with respect to this Agreement and the transactions contemplated hereby. Unless otherwise required by law or the rules of any stock exchange or regulatory authority, neither party hereto may issue any press release or otherwise make any public announcement or comment with respect to this Agreement and the transactions contemplated hereby without prior coordination with, and approval from, the other party.

11. <u>General</u>. Nothing in this Agreement shall be deemed to constitute a partnership between the parties, nor constitute either party the agent of the other party for any purpose. This Agreement is governed by and to be construed in accordance with, the laws of the State of New York, without regard to the conflict of laws principles or rules thereof which would required application of the law of another jurisdiction. **EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY IN CONNECTION WITH ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.** In no event shall any party hereto have any liability to any other party for any consequential, indirect, incidental, exemplary, punitive or special damages, internal costs or lost profits.

*    *    *

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized as of the date first written above.

OCWEN LOAN SERVICING, LLC

By: _____
Name: _____
Title: _____

WALTER INVESTMENT MANAGEMENT CORPORATION

By: _____
Name: _____
Title: _____

EXHIBIT 31.1

CERTIFICATION OF MARK J. O'BRIEN
PURSUANT TO SECURITIES EXCHANGE ACT RULE 13A-14(a),
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Mark J. O'Brien, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Walter Investment Management Corp. (the "Registrant") for the period ended September 30, 2012 (the "Report");

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared; and

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

c) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

d) disclosed in this Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

/s/ Mark J. O'Brien
_____
Mark J. O'Brien
Chief Executive Officer
Date: November 8, 2012

EXHIBIT 31.2
CERTIFICATION OF CHIEF FINANCIAL OFFICER
PURSUANT TO SECURITIES EXCHANGE ACT RULE 13A-14(a),
AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

I, Charles E. Cauthen, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Walter Investment Management Corp. (the "Registrant") for the period ended September 30, 2012 (the "Report");

2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;

3. Based on my knowledge, the financial statements, and other financial information included in this Report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this Report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e), and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this Report is being prepared; and

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

c) evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and

d) disclosed in this Report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an Annual Report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

/s/ Charles E. Cauthen
Charles E. Cauthen
Chief Financial Officer
Date: November 8, 2012

EXHIBIT 32

WALTER INVESTMENT MANAGEMENT CORP. AND SUBSIDIARIES
CERTIFICATIONS PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO SECTION 906 OF
THE SARBANES-OXLEY ACT OF 2002

Mark J. O'Brien, Chief Executive Officer, and Charles E. Cauthen, Chief Financial Officer, of Walter Investment Management Corp. (the "Company"), certify to each such officer's knowledge, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350 that:

1. The Quarterly Report on Form 10-Q of the Company for the period ended September 30, 2012 (the "Report") fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: November 8, 2012                          By: /s/ Mark J. O'Brien
                                                    Mark J. O'Brien
                                                    Chief Executive Officer


Date: November 8, 2012                          By: /s/ Charles E. Cauthen
                                                    Charles E. Cauthen
                                                    Chief Financial Officer