**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) Case No.: 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, *et al.* | ) |
| | ) Chapter 11 |
| *Debtors.* | ) |

**Declaration in Support of Objection to Cure Amount Submitted by OceanFirst Bank**
**Re: Second Notice of (I) Debtors' Intent to Assume and**
**Assign Certain SBO Servicing Agreements As Executory Contracts and (II)**
**Cure Amount Related Thereto (Doc. # 2077)**

**Kathy A. Ramos**, being duly sworn and declares, pursuant to 28 U.S.C. § 1746 (2012), under penalty of perjury:

1. I am employed as the Assistant Vice President/Loss Mitigation Manager for OceanFirst Bank and have been an employee of OceanFirst Bank and employed in that title since July 2007.

2. I am informed believe that Columbia Equities, Ltd., now known as Columbia Home Loans, LLC ("*Columbia*") is a wholly owned subsidiary of OceanFirst Bank and a New York Limited Liability Company (collectively, "*OceanFirst*").

3. My job duties include loan servicing, including the collection, accounting and application and administration of defaulted and delinquent mortgage loans.

4. OceanFirst maintains a record of the above loan servicing activities listed in paragraph 3 and such records are maintained in the ordinary course of business and it is OceanFirst's ordinary course of business to maintain those records.

5. I submit this Declaration in support of Objection to Cure Amount Submitted by OceanFirst Bank Re: Second Notice of (I) Debtors' Intent to Assume and Assign Certain SBO Servicing Agreements As Executory Contracts and (II) Cure Amount Related Thereto (Doc. # 2077).

6. The facts stated in this Declaration are based on my review of OceanFirst's business records namely the loan servicing records related to the underlying Mortgage Loan as stated below.

7. On or about March 27, 1986, Residential Funding Corporation ("*Investor*") executed a Servicing Agreement with Columbia Equities Ltd., a predecessor wholly owned subsidiary of OceanFirst Bank ("*Servicing Agreement*"). The parties had also entered into a Mortgage Purchase Agreement. Under the Servicing Agreement OceanFirst agreed to service certain Mortgage Loans that were purchased by the Investor.

8. A true and accurate copy of the Servicing Agreement is attached hereto as Exhibit 1.

9. On or about July 10, 1996, Borrower Eileen Musillo ("*Borrower*") executed a promissory note in favor of Columbia Equities, Ltd. in which Columbia extended a loan to Borrower in the principal amount of $240,000.00 (the "*Note*").

10. A true and accurate copy of the Note is attached hereto as Exhibit 2.

11. Under the Note, the Borrower agreed, *inter alia*, to pay eleven (11%) percent per annum on the unpaid principal balance.

12. The Borrower to secure her promise to pay under the Note also provided a mortgage (the "*Mortgage*") on her residential home located at 736 Holmdel Road, New Jersey 07730 (the "*Property*").

13. On February 1, 2002, Borrower defaulted under the Note and Mortgage.

14. On March 5, 2002, foreclosure proceedings were commenced and on November 7, 2002, judgment of foreclosure was entered. The foreclosure sale was initially delayed, conducted, confirmed and then vacated on a tenant's motion.

15. The Borrower then filed bankruptcy. As part of a post-petition plan, Borrower agreed to make payments of principal and interest but payments were made at the statutory judgment rate below the Note Rate.

16. The Borrower has defaulted on the above plan and the Foreclosure Sale is expected to be conducted on December 3, 2012.

17. From December 1, 2002 to May 1, 2012, the Borrower remitted payments totaling $139,867.61.

18. OceanFirst advanced and deposited into the Custodial Account the total of $250,252.16 advancing funds in accordance with its Servicing Obligations under the Servicing Agreement.

19. As a result, OceanFirst is entitled to reimbursement for the funds OceanFirst advanced in the amount of $110,384.55.

20. A true and accurate copy of the accounting of the overpayment advanced and supporting calculation is attached hereto as Exhibit 3.

[Signature follows...]

**[Left Intentionally Blank]**

Toms River, New Jersey
Dated: Friday, November 16, 2012

By:

Kathy A. Ramos

Weiss & Weiss LLC
Scott A. Weiss (SW 0431)
50 Main Street, 10th Floor
White Plains, New York 10606
    ***
2000 Post Road, LL 106
Fairfield, CT 06824
(866) 277-2707
Facsimile: (203) 254-2725
Scott@weissnweiss.com

***Attorneys for OceanFirst Bank
And Columbia Home Loans, LLC***

## SERVICING AGREEMENT

AGREEMENT dated as of March 27, 1986 between RESIDENTIAL FUNDING CORPORATION doing business as Residential Funding Corporation (Delaware), a Delaware corporation, having its principal office at 8601 West 77th Street, Minneapolis, Minnesota 55440, ("Purchaser"), and COLUMBIA EQUITIES LTD., a New York corporation, having its principal office at 1075 Central Park Avenue, Scarsdale, New York 10583, ("Seller"). All initially capitalized terms not specifically defined herein shall have the meanings ascribed to them in a certain Mortgage Purchase Agreement dated even date herewith (the "Mortgage Purchase Agreement") between Seller and Purchaser.

WHEREAS, Seller and Purchaser have simultaneously entered into the Mortgage Purchase Agreement pursuant to which Seller has agreed to sell, and Purchaser has agreed to purchase, certain "Mortgage Loans" more particularly defined and described therein; and

WHEREAS, Seller and Purchaser desire to provide for the continued servicing of the Mortgage Loans subsequent to their sale to the Purchaser; and

WHEREAS, it is contemplated that the Purchaser will ultimately transfer the Mortgage Loans to the Issuer for transfer to the Trustee in accordance with the provisions of one or more Pooling and Servicing Agreements, although the Mortgage Purchase Agreement has also been structured to contemplate the possible transfer of the Mortgage Loans to one or more Secondary Market Buyers; and

WHEREAS, the Seller and the Purchaser wish to enter into a servicing agreement which will implement the intent of the Mortgage Purchase Agreement to provide servicing for the Mortgage Loans regardless of whether they are owned by Purchaser (including any Secondary Market Buyer) or the Trustee.

NOW THEREFORE, in consideration of the premises and of the mutual covenants made herein, and of other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows.

EXHIBIT _1_

2. 

1. Definitions.

Whenever used in this Agreement, the following words and
phrases, unless otherwise expressly provided or unless the
context otherwise requires, shall have the following meanings for
all purposes of this Agreement, and the definitions of such terms
are equally applicable both to the singular and plural forms of
the terms herein defined:

"Certificate Account" means the separate trust account
or accounts created and maintained for the benefit of
Certicateholders pursuant to the Pooling and Servicing Agreement.

"Certificateholders" or "Holders" means any Person or
Persons, or any successor Person or Persons, treated as the owner
of any Certificate pursuant to the Pooling and Servicing
Agreement.

"Fractional Undivided Interest" means the Fractional
Undivided Interest in the Trust Fund evidenced by a Certificate.

"Insurance Proceeds" means amounts paid by the Special
Hazard Insurer pursuant to the Special Hazard Insurance Policy,
amounts paid by the Mortgage Pool Insurer pursuant to the
Mortgage Pool Insurance Policy, and all other amounts paid by any
insurer under any Primary Policy required to be obtained or
maintained hereunder in respect of any Mortgage Loan.

"Liquidation Expenses" means expenses which are incurred
by the Seller in connection with the liquidation of any defaulted
Mortgage Loan, including, without limitation, legal fees and
expenses, any amount advanced or otherwise expended by the Seller
pursuant to Section 12 respecting the related Mortgage Loan and
any related expenditures for real estate property taxes or for
property restoration or preservation to the extent not previously
recovered by the Seller under the Special Hazard Insurance Policy
or any Primary Policy for reasons other than the Seller's failure
to comply with Section 3 or Section 4.

"Liquidation Proceeds" means monies (other than
Insurance Proceeds) received in connection with the liquidation
of defaulted Mortgage Loans, whether through trustee's sale,
foreclosure sale or otherwise.

"Monthly Advance" means an advance made by the Seller
pursuant to Section 8(d).

"Mortgage Account" means an account created and
maintained by Purchaser or an institution designated by
Purchaser.

3.

"Mortgage Pool Insurance Policy" means the original
Mortgage Pool Insurance Policy obtained by the Purchaser or the
Issuer, or any replacement Mortgage Pool Insurance Policy
obtained by the Purchaser or the Issuer pursuant to the Pooling
and Servicing Agreement.

"Mortgage Pool Insurer" means the issuer of the Mortgage
Pool Insurance Policy, or any successor thereto.

"Pass Through Certificates" means any one or more of the
Certificates issued under a Pooling and Servicing Agreement
evidencing a Fractional Undivided Interest in the Trust Fund.

"Primary Policy" means any primary mortgage insurance
policy, Title Insurance Policy, hazard insurance policy or flood
insurance policy issued in connection with the origination and
servicing of a Mortgage Loan and designating the Seller, the
Purchaser, the Issuer and/or the Trustee as named insured or
mortgagee, or any replacement policy therefor.

"Servicing Officer" means any officer of the Seller
involved in, or responsible for, the administration and servicing
of the Mortgage Loans whose name appears on a list of servicing
officers furnished to the Purchaser, as such list may from time
to time be amended or supplemented.

"Special Hazard Insurance Policy" means the original
Special Hazard Insurance Policy obtained by the Purchaser or the
Issuer, or any replacement insurance policy obtained by the
Purchaser or the Issuer pursuant to the Pooling and Servicing
Agreement.

"Special Hazard Insurer" means the insurer named in the
Special Hazard Insurance Policy, or any successor thereto.

"Trust Fund" means the corpus of the trust created
pursuant to the Pooling and Servicing Agreement, including
without limitation all funds and accounts held by the Seller or
its Designated Depository Institution for the benefit of the
Purchaser, the Issuer, the Trustee and the Certificateholders.

2.   Mortgage Purchase Agreement; Residential Funding Corporation
Seller and Servicer Guides; Performance by Seller.

(a)   This Servicing Agreement incorporates by reference
the Mortgage Purchase Agreement and the Guides.  Any
inconsistency or conflict between this Agreement and the Guides
shall be governed and resolved by reference to this Agreement.
Seller acknowledges receipt of a copy of the Guides.  The Guides
set forth additional instructions, conditions and requirements

4.

for performance by Seller of its servicing obligations and shall
be binding upon Seller to the same extent as if set forth herein
in their entirety.

(b)   The Seller shall perform its obligations pursuant
to this Servicing  Agreement and the Guides, including
collection, conversion and foreclosure procedures, in a manner
consistent, if applicable, with recovery under the Mortgage Pool
Insurance Policy and any Primary Policy, and shall exercise the
same degree of skill and care in the exercise or use of the
rights and powers granted to it under this Servicing Agreement
and the Guides, as prudent mortgage lenders in the State of New
York would exercise in the conduct of their own affairs.   In
considering what actions are or are not prudent under the
circumstances, the Seller shall consider the matters enumerated
in Section 126(2)(a) through (e) and Sections 126(3) and (4) of
the New York Real Property Law, as in effect on the date of this
Servicing Agreement.

(c)   Except as otherwise expressly set forth in this
Servicing  Agreement or the Guides or directed by the Purchaser,
the Seller shall perform all obligations as servicer of the
Mortgage Loans and all other duties as are customarily performed
with respect to the servicing of mortgage loans by servicers in
the general locality where the properties securing the Mortgage
Loans are located, or as may otherwise be reasonably requested by
the Purchaser.

(d)   This Servicing Agreement shall be deemed to be
between the Seller and the Purchaser only, and neither the
Trustee nor any Certificateholder shall be deemed parties hereto
nor shall they have claims, rights, obligations, duties or
liabilities with respect hereto, except as may herein be
specifically provided with respect to assumption of this
Servicing Agreement (as it relates to Mortgage Loans transferred
to the Trustee) by the Trustee or its designee or termination of
this Servicing Agreement (as it relates to Mortgage Loans
transferred to the Trustee) by the Trustee pursuant to Section 7
of this Servicing Agreement.  In the event that any Mortgage Loan
shall be transferred to the Trustee, Seller shall be bound to
perform and observe all of the terms, covenants and conditions of
this Agreement for the benefit of the Purchaser named herein, as
master servicer under the related Pooling and Servicing
Agreement, notwithstanding the transfer of the Mortgage Loans to
the Issuer and the Trustee.

5.

3.   Representations and Warranties of Seller.

          The Seller hereby represents and warrants to the
Purchaser that the Seller is, and shall at all times during the
term of this Agreement remain, a Qualified Servicer.

4.   Mortgage Pool Insurance Policy and Special Hazard Insurance
     Policy.

          It is understood and agreed that, in connection with
each Pooling and Servicing Agreement, the Purchaser will be
purchasing a Mortgage Pool Insurance Policy and a Special Hazard
Insurance Policy.  Promptly after the issuance of each such
policy, Purchaser agrees to provide Seller with a copy of each
Mortgage Pool Insurance Policy and Special Hazard Insurance
Policy.  The Seller shall perform its services hereunder in
compliance with the Primary Policies in a manner which will not
jeopardize collection or enforcement of rights under any Mortgage
Pool Insurance Policy and any Special Hazard Insurance Policy.
Unless otherwise requested by the Purchaser, the Seller shall not
be required to provide notices, or to file and process claims,
under the Mortgage Pool Insurance Policy and Special Hazard
Insurance Policy.  Unless the Seller is so requested, in which
event the compensation of the Seller shall not be increased by
virtue thereof, such notifications and filing and processing of
claims shall be undertaken by the Purchaser.  However, the Seller
shall cooperate with the Purchaser and shall take such action as
may be appropriate or necessary to assist such notifications and
filing and processing of claims.

5.   Maintenance of Hazard Insurance and Primary Mortgage
     Insurance Policies.

          (a)   The Seller shall cause to be maintained for each
Mortgaged Property fire insurance with extended coverage
including lightning and windstorm and coverage for vandalism and
malicious mischief in an amount which is at least equal to the
Principal Balance of such Mortgage Loan.  The Seller shall also
cause to be maintained on property acquired upon foreclosure, or
deed in lieu of foreclosure, of any Mortgage Loan, fire insurance
with extended coverage and coverage for vandalism and malicious
mischief in an amount which is at least equal to the Principal
Balance of such Mortgage Loan at the time of such foreclosure or
deed in lieu of foreclosure plus accrued interest at the rate
per annum specified in the related Mortgage Note and related
Liquidation Expenses whichever is less.  Notwithstanding the
foregoing, the levels of all coverage provided for in this
section must be maintained in any event in an amount sufficient
to prevent loss due to application of any co-insurance clause in
the policy.  Any amounts collected by the Seller under any such

6.

policy (other than amounts to be applied to the restoration or
the repair of the property subject to the related Mortgage or
property thus acquired or released to the mortgagor in accordance
with the normal and usual servicing procedures of prudent
mortgage lenders in the State of New York) shall be deposited in
the Mortgage Account (in the case of Mortgage Loans owned by the
Purchaser) or the Certificate Account (in the case of Mortgage
Loans transferred to the Trustee) subject to withdrawal pursuant
to this Servicing Agreement. Any expense incurred by the Seller
in maintaining any such insurance shall be recoverable pursuant
to this Agreement. If insurance has not been maintained by the
Seller in accordance with this subsection and there shall have
been a loss which would have been covered by such policy had it
been maintained, the Seller shall deposit in the Mortgage Account
or in the Certificate Account, as applicable, the amount which
would have been available on account of insurance proceeds but
for the non-existence of such insurance.

    (b)  Such insurance shall be with insurers licensed to
do business in New York and rated A/V or better in Best's
Insurance Reports and no earthquake or other additional insurance
is to be required of any mortgagor, other than pursuant to such
applicable laws and regulations as shall at any time be in force
as shall require such additional insurance. Where property
affected or covered by a mortgage is located in a designated
flood area, the Seller will cause to be maintained flood
insurance for those areas where flood insurance has been made
available to the extent such insurance is available.

    (c)  Subject to the requirements of subsection (b)
hereof, the Seller shall permit the Mortgagor or any person in
possession or control of the property, or his or her successors
in interest, to be free to select the insurance broker or agent
through whom any hazard insurance of any kind is to be placed or
written on any property affected or covered by a Mortgage. The
Seller may satisfy its obligations under this Section by
obtaining a mortgage impairment or other form of blanket policy,
which policy may contain a deductible clause. However, the cost
of maintaining any such mortgage impairment or other form of
blanket policy shall not be recoverable by the Seller. Seller
shall, in the event it has not maintained any other insurance
complying with this section and there is a loss which would have
been covered by such policy had it been maintained or had it not
contained a deductible clause, deposit in the Mortgage Account or
the Certificate Account as applicable the amount not otherwise
payable under the blanket policy because of its nonexistence or
such deductible clause.

    (d)  The Seller shall also obtain, or cause to be
obtained from General Electric Mortgage Insurance Corporation,

7.

primary mortgage insurance on any Mortgage Loan where the
original Principal Balance of the Mortgage Note or, in the case
of any property having secondary financing, where the sum of the
original principal amount of the related Mortgage Note and the
amount of such secondary financing, is 80% or more of the lesser
of the sales price or the appraised value of the property subject
to the related Mortgage such primary mortgage insurance to be
provided at the highest coverage allowed under New York State law
insuring the original Principal Balance of such Mortgage Note in
excess of 72% of the lesser of the sales price or appraised value
until the unpaid principal amount of such Mortgage Loan has been
reduced to 75% of the lesser of such sales price or appraised
value at origination.  In the event that General Electric
Mortgage Insurance Corporation ceases to be a Qualified Mortgage
Insurer, Seller shall maintain, or cause to be maintained, at no
expense to Purchaser, such primary mortgage insurance with
another Qualified Mortgage Insurer.

## 6.    Authority of Seller.

       In the performance of its duties hereunder Seller shall
be an independent contractor acting on its own behalf and for its
own account.  It shall have no authority, express or implied, to
act in any manner or by any means for or on behalf of the
Purchaser in any capacity other than that of an independent
contractor and will act for the Purchaser in no respect except as
expressly set forth herein and in the Guides or as it may from
time to time be requested by the Purchaser in writing.  Seller is
not authorized or empowered to waive, release or vary the terms
of the Mortgage Loans, waive any prepayment penalty, or waive or
consent to the postponement of strict compliance on the part of
any Mortgagor with any requirement of the Purchaser except as
expressly authorized in accordance with the provisions of this
Servicing Agreement or the Guides.

## 7.    Assumption or Termination of Servicing Agreement by Trustee.

       The provisions of this Section shall apply only with
respect to those Mortgage Loans transferred to the Trustee
pursuant to a Pooling and Servicing Agreement:

       (a)    It is understood and agreed that the Purchaser's
rights and obligations under this Servicing Agreement may be
assumed by the Trustee in connection with the assumption or
termination of the responsibilities, duties or liabilities of the
Purchaser under the Pooling and Servicing Agreement without act
or deed on the part of the Trustee or its successors; provided,
however, that if termination of the Purchaser's rights under the
Pooling and Servicing Agreement is occasioned by a default of the
Purchaser thereunder and the default which resulted in the

8.

termination of the Purchaser's rights under the Pooling and
Servicing Agreement was, in the opinion of the Trustee, directly
or indirectly related to or caused by the act or omission of the
Seller, the Trustee or its successor shall not be required to so
assume the Purchaser's responsibilities, duties and obligations
under this Servicing Agreement whereupon this Servicing Agreement
shall be deemed automatically terminated except that those
provisions hereof which are to survive any termination shall
survive and shall inure to the benefit of the Trustee.

(b)   Upon any such termination of the Purchaser's rights
under the Pooling and Servicing Agreement by the Trustee and the
assumption by the Trustee of the responsibilities, duties and
obligations of the Purchaser thereunder, then unless and until
the Trustee so terminates this Agreement, the Trustee, its
designee, assignee or the successor servicer for the Trustee
shall be deemed to have assumed all of the Purchaser's interest
herein and to have replaced the Purchaser as a party to this
Agreement to the same extent as if this Agreement had been
assigned to the assuming party and the Seller shall be bound to
such assuming party under all of the terms, covenants and
conditions of this Servicing Agreement for the remainder of the
term hereof.   In the event of a termination of this Servicing
Agreement by the Trustee, such termination shall be fully
effective and the Trustee shall bear no liability therefor or by
virtue thereof.

8.   Collections from Mortgagors, Protected Accounts and
     Certificate Account.

(a)   The Seller shall take all necessary action to
establish and maintain and deposit receipts on account of
scheduled monthly payments of principal and interest due after
any related Cut-Off Date under the Mortgage Loans, on a daily
basis (but not later than the first Business Day after receipt)
to the Protected Account complying with the requirements set
forth in this section.   A Protected Account shall be established
with respect to each owner and/or transferee of Mortgage Loans
serviced by Seller pursuant to this Agreement and, with respect
to the Trustee, a Protected Account shall be established with
respect to each series of Certificates issued pursuant to a
separate Pooling and Servicing Agreement.   Each Protected Account
shall constitute an account of the Trust Fund established
pursuant to the related Pooling and Servicing Agreement,
segregated on the books of the Seller or its Designated
Depository Institution and held by or on behalf of the Seller in
trust and may, if the Seller so elects, be an interest bearing
account.   All funds in the Protected Account shall be held in
trust in the name of the Trustee for the benefit of the
Certificateholders.   The Protected Account and the funds

9.

deposited therein shall be fully insured by FDIC or by the FSLIC,
to the maximum coverage provided thereby.  If the Seller is not a
banking or savings institution, then the Protected Account shall
be maintained at its Designated Depository Institution.  Within
one (1) Business Day of receipt the Seller shall remit to the
related Mortgage Account or the related Certificate Account, as
applicable, any amount required to be credited to a Protected
Account which is not so insured.

        (b)  In the event that any Mortgage Loan shall be pre-
paid in full, the amount of any such Principal Prepayment
together with accrued interest thereon to the date of prepayment
shall be deposited by the Seller in the related Mortgage Account
or the related Certificate Account, as applicable, not later than
one (1) Business Day after receipt of such prepayment; any
Principal Prepayment in part shall be deposited in the related
Mortgage Account or the related Certificate Account, as
applicable, on the next 18th day of a month.  Within two (2)
Business Days of such deposit, Seller shall furnish a report to
Purchaser identifying such prepayment.  Such deposits shall be
effected by wire transfer.  Pending such deposit in the related
Mortgage Account or the related Certificate Account, as
applicable, the amount of such prepayment shall be deposited in
the Protected Account.  Any Insurance Proceeds or Liquidation
Proceeds received by the Seller shall likewise be deposited in
the related Mortgage Account or the related Certificate Account
as applicable not later than one (1) Business Day after receipt
thereof.

        (c)  All amounts held in the Protected Account other
than Principal Prepayments in full shall, on the eighteenth day
of each month, commencing on the 18th of the month next
succeeding the initial Closing Date be deposited by the Seller in
the related Mortgage Account or Certificate Account, as
applicable.  If the eighteenth of any month is not a Business
Day, such deposit shall be made on the Business Day next
preceding.  All scheduled monthly payments of principal and
interest due on the first day of a given month with respect to a
Mortgage Loan but received after the eighteenth day of such
month, to the extent not utilized to reimburse the Seller for a
Monthly Advance made by the Seller for such month pursuant to
subsection (d) hereof, shall be promptly deposited by the Seller
in the related Mortgage Account or the related Certificate
Account, as applicable.  If so requested by the Purchaser, such
deposits shall be effected by wire transfer.

        (d)  In order to insure an orderly flow of deposits into
the related Mortgage Account and each related Certificate
Account, Seller agrees to make an advance ("Monthly Advance") of
its own funds to the extent that it believes in good faith that

10.

such funds will ultimately be recoverable from the related
Mortgagor or from the liquidation of the property subject to the
related Mortgage or from insurance policies.  Except as provided
in the last sentence of this subsection (d), in the event that
the Seller shall make a Monthly Advance of its own funds pursuant
to this subsection and shall later determine that such advance is
not recoverable, Seller shall deliver to the Purchaser an
"Officer's Certificate" setting forth the reason why Seller has
determined such advance to be non-recoverable, and thereupon the
Seller shall be entitled to reimbursement for the amount so
advanced.   Seller shall also make a Monthly Advance as necessary
to cover the cash flow shortfall with respect to any Mortgage
Loan as to which the related Mortgagor is permitted, by virtue of
any bankruptcy or insolvency proceeding, to reduce his scheduled
monthly principal and interest payment; any Monthly Advance made
pursuant to this sentence shall be recoverable by the Seller only
out of (i) any future payments made by the related Mortgagor
after the date which would have constituted the maturity date of
the related Mortgage Note (but for its extension under any plan
of reorganization) and (ii) any excess of the amount required to
be paid by such Mortgagor under any such plan over the scheduled
monthly principal and interest due under the related Mortgage
Note prior to the institution of any such plan.  As used herein
the term "Officer's Certificate" means a certificate signed on
behalf of the Seller (i) by the Chairman of the Board, the Vice
Chairman of the Board, the President or one of the
Vice-Presidents, and (ii) by the Treasurer, the Secretary, or one
of the Assistant Treasurers or Assistant Secretaries of the
Seller.

          (e)   In the event the Seller shall pay to the Purchaser
or deposit in any Mortgage Account or in any Certificate Account
any amount not required to be credited thereto, it may at any
time make a written request to Purchaser that Purchaser withdraw
such amount from any such Mortgage Account or Certificate
Account, as the case may be, and Purchaser shall, if the
circumstances surrounding such request are such that would
entitle Seller to reimbursement withdraw such amount, any
provision herein to the contrary notwithstanding.

## 9.   Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

          In addition to the Protected Account, the Seller shall
establish and maintain one or more Servicing Accounts and shall
deposit and retain therein all collections from the Mortgagors
for the payment of taxes, assessments, premiums for any policy of
primary mortgage insurance, hazard insurance or flood insurance
(if applicable), or comparable items for the account of the
mortgagors.  Each Mortgage Loan having a Loan-To-Value Ratio in

11.

excess of 80% at origination shall require an escrow for payment
of taxes and insurance premiums.  A Servicing Account shall be
established with respect to each owner or transferee of Mortgage
Loans serviced by Seller pursuant to this Agreement and, with
respect to the Trustee, a Servicing Account shall be established
with respect to each series of Certificates issued pursuant to a
separate Pooling and Servicing Agreement.  Servicing Accounts
shall be maintained in banking or savings institutions whose
accounts are insured by the FDIC or the FSLIC, including the
Seller, if the Seller is such a banking or savings institution.
Withdrawals of amounts so collected from the Servicing Accounts
may be made only to effect timely payment of taxes, assessments,
Primary Policy premiums, (if applicable), or comparable items; to
reimburse the Seller out of related collections for any such
payments made; to refund to any mortgagors any sums as may be
determined to be overpayments; to pay interest to mortgagors on
balances in Servicing Accounts or to clear and terminate the
Servicing Accounts at the termination of this Agreement.  As part
of its servicing duties, the Seller shall pay to the mortgagors
interest on funds in Servicing Accounts, to the extent required
by the law.

10. <u>Due-On-Sale Clauses; Assumption and Substitution Agreement</u>.

        (a)  In any case in which the Seller is notified by the
Mortgagor that Mortgaged Property has been or is about to be
conveyed by the Mortgagor, the Seller shall so notify Purchaser
and shall, unless otherwise directed by Purchaser, enforce the
due-on-sale clause contained in the related Mortgage.  Subject to
the foregoing, any assumption of a Mortgage Loan, whether with or
without release of the Mortgagor or person obligated thereon, and
the terms and conditions of any such assumptions or substitutions
shall be subject to approval by the Purchaser in accordance with
the procedures set forth in the Guides.  In no event shall the
Seller approve or effect any assumption or substitution of
liability without such prior written approval of the Purchaser.
In connection with any such assumption or substitution agreement,
the interest rate on the related Mortgage Loan shall not be
changed.  With respect to Mortgage Loans owned by Purchaser named
herein or transferred to the Trustee, Seller shall be free to
decide whether to require the payment of any fees for permitting
assumption or substitution of liability with respect to a
particular Mortgage Loan.  In the event that the fee charged by
the Seller for permitting assumption or substitution of liability
exceeds 1% of the unpaid Principal Balance of the related
Mortgage Loan, any excess over 1% shall be paid to the Purchaser.
With respect to Mortgage Loans transferred to the Trustee, the
Purchaser shall retain one-half of the fee for permitting
assumption or substitution of liability in excess of 1% and
shall, if required pursuant to the provisions of the Pooling and

12.

Servicing Agreement, remit to the Certificateholders one-half of such fee.

(b)   Notwithstanding the provisions of subsection (a) of this Section 10 or any other provision of this Servicing Agreement, the Seller shall not be deemed to be in default, breach, or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or any assumption which the Seller may be restricted by law from preventing, for any reason whatsoever.

11. Servicing Activities of Sellers; Notifications and Reports.

Except as otherwise expressly set forth in this Agreement or the Guides, Seller shall perform all obligations of the Purchaser as servicer of the Mortgage Loans and all other duties as are customary to the servicing of mortgage loans by servicers in the general locality where the properties securing the Mortgage Loans are located, including collections under the Mortgage Loans; maintenance of and filing and processing claims under hazard and flood insurance; enforcement of the lien of the Mortgages securing the Mortgage Loans; inspection and maintenance of the property acquired by foreclosure or deed in lieu of foreclosure, and such other activities and functions as the Purchaser may reasonably request or as may be set forth in the Guides.   Seller shall provide the Purchaser with such reports and notifications as the Purchaser may reasonably request or as set forth in the Guides.

12. Realization Upon Defaulted Mortgage Loans.

The Seller shall foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments, subject to and in accordance with the provisions of the Guides; but in so doing, the Seller shall not disclose the identity of any Certificateholder unless such disclosure by the Seller is necessary for the exercise of legal remedies or the preservation of legal rights of the holder of the Mortgage.   In connection with such foreclosure or other conversion, the Seller shall, consistent with recovery under the Mortgage Pool Insurance Policy and any policy of primary mortgage guaranty insurance, exercise such of the rights and powers vested in it hereunder and under the Guides and use the same degree of care and skill in their exercise or use, as other prudent mortgage lenders in the State of New York would exercise or use under the circumstances in the conduct of their own affairs.   In considering what actions are or are not prudent in the circumstances, the Seller shall consider the matters enumerated

13.

In Section 126(2)(a) through (e) and Sections 126(3) and (4) of
the New York Real Property Law, as in effect on the date of this
Servicing Agreement. The foregoing is subject to the proviso
that the Seller shall not be required to expend its own funds in
connection with any foreclosure or conversion or towards the
restoration of any property unless it shall determine (i) that
such foreclosure, conversion or restoration will increase the
proceeds of liquidation of the Mortgage Loan after reimbursement
to itself for such expenses and (ii) that such expenses will be
recoverable to it either through Liquidation Proceeds (respecting
which it shall have priority for purposes of charges to the
Mortgage Account or the Certificate Account, as the case may be)
or through Insurance Proceeds (respecting which it shall have
similar priority). If the Seller can obtain the information
without unreasonable effort or expense, the Seller shall render
annually to the Purchaser, after the occurrence of a default, in
respect of a Mortgage Loan unless such default has been
previously cured, a summarized statement of income and
expenditure in connection with the property. The proceeds of any
sale or disposition of any property which is liquidated shall be
deposited in the related Mortgage Account or Certificate Account
within one Business Day after receipt by the Seller.

13. Satisfaction and Assignment of Mortgages; Release of Mortgage
Files.

        In the event that a Mortgagor advises the Seller that he
intends to pre-pay a Mortgage Loan in full, the Seller shall
issue its customary pay-off letter and shall furnish a copy
thereof to the Purchaser together with the certification of a
Servicing Officer certifying that the amount to be prepaid shall
be credited to the Protected Account and deposited in the related
Mortgage Account or Certificate Account, as the case may be,
within one Business Day after receipt, requesting that the
Mortgage File of the related Mortgage Loan be delivered to it and
indicating whether the amount to be prepaid will be delivered
directly to the Seller or will be delivered to an escrow agent
satisfactory to the Seller against receipt of an appropriate
satisfaction or assignment of the related Mortgage. Such
certification shall be delivered to the Purchaser not later than
ten (10) Business Days prior to the date by which the Seller
requests that such Mortgage File be delivered to it. Such
certification shall also be accompanied by a satisfaction of
mortgage (or assignment of mortgage without recourse, if
requested by the mortgagor) in form for execution by the Trustee
or any other appropriate Person with all requisite information
completed by the Seller. In the case of any Mortgage Loan
transferred to the Trustee, Purchaser shall, upon receipt of such
certification and such unexecuted satisfaction or assignment, as
the case may be, promptly deliver to the Trustee the

14.

certification of the Purchaser to the Trustee which the Pooling
and Servicing Agreement will require to be delivered as a
condition precedent to the release of the related Mortgage File
by the Trustee to the Seller together with such unexecuted
satisfaction or assignment and a request that the Trustee execute
such satisfaction or assignment and deliver the same together
with the related Mortgage File to the Seller.

## 14. Quarterly Statement as to Compliance.

The Seller, at its own expense, will deliver to the
Purchaser within fifteen (15) days after the end of each calendar
quarter beginning with the calendar quarter ending after the
first Settlement Date an Officer's Certificate stating that (i) a
review of the activities of the Seller during the preceding
calendar quarter and of performance under this Servicing
Agreement has been made under such officer's supervision, and
(ii) to the best of such officer's knowledge, based on such
review, the Seller has fulfilled all its obligations under this
Servicing Agreement for such quarter, or, if there has been a
default in the fulfillment of any such obligation, specifying
each such default known to such officer and the nature and status
thereof.

## 15. Annual Independent Public Accountants' Servicing Report.

On or before January 15 of each year beginning
January 15, 1987, the Seller at its expense shall cause a firm of
independent certified public accountants to furnish a statement
to the Purchaser to the effect that such firm has examined
certain documents and records relating to the servicing of the
Mortgage Loans for the immediately preceding calendar year and
that, on the basis of an examination conducted substantially in
compliance with a recognized program for the auditing of the
servicing of mortgage loans, such firm is of the opinion that
such servicing has been conducted in compliance with this
Servicing Agreement except for (i) such exceptions as such firm
shall believe to be immaterial and (ii) such exceptions as shall
be set forth in such statement.

## 16. Financial Reports; Status of Accounts; Access to Documents and Information.

(a)  On or before the 5th Business Day of each month,
commencing with the 5th Business Day of the month next succeeding
the first Closing Date, the Seller shall forward by mail to the
Purchaser separate statements with respect to Fixed Rate Mortgage
Loans and with respect to Adjustable Rate Mortgage Loans setting
forth as to each:

15.

(i) Beginning Principal Balance: the aggregate
Principal Balances of the Mortgage Loans on the
last day of the second preceding month computed by
deducting from the aggregate Principal Balances of
the Mortgage Loans at the close of business on the
Cut-Off Date (a) payments due on or prior to the
last day of the second preceding month and not paid
and (b) the aggregate of all amounts deposited in
the Certificate Account or Mortgage Account on
account of principal on the Mortgage Loans,
including regularly scheduled payments of principal
and Principal Prepayments, and also including any
amounts representing voluntary advances to cover
delinquent principal, to and including the last day
of the second preceding month;

(ii) the several amounts deposited in each Mortgage
Account and in each Certificate Account, as the
case may be, since the last day of the second
preceding month by reason of (x) regularly
scheduled payments of principal, (y) Principal
Prepayments and (z) advances made by the Seller.
On any Fixed Rate Mortgage Loan statement,
Principal Prepayments shall be further broken down
into Principal Prepayments on Discounted Mortgage
Loans and on Mortgage Loans which are not
Discounted Mortgage Loans.

(iii) the amount of any payments of interest on the
Mortgage Loans;

(iv) the aggregate of the amounts reported pursuant to
(ii) and (iii) above;

(v) the amount withheld by the Seller pursuant to
Section 20 hereof;

(vi) the amount, if any, and source of any deposit in
any Mortgage Account or any Certificate Account, as
the case may be, which is in excess of the
aggregate of the amounts reported pursuant to (ii)
and (iii) above;

(vii) Ending Principal Balance: the aggregate Principal
Balances of the Mortgage Loans on the last day of
the immediately preceding month computed by
deducting from the aggregate Principal Balances of
the Mortgage Loans at the close of business on the
Cut-Off Date (a) payments due on or prior to the
last day of the immediately preceding month and not

16.

paid and (b) the aggregate of all amounts deposited
in the Certificate Account or Mortgage Account on
account of principal on the Mortgage Loans,
including regularly scheduled payments of principal
and Principal Prepayments and also including any
amounts representing advances to cover delinquent
principal, to and including the last day of the
immediately preceding month;

(viii)    the number and aggregate Principal Balances of
          Mortgage Loans which as of the 1st day of the
          current month are delinquent (a) one month or (b)
          two or more months.  On any Fixed Rate Mortgage
          Loan statement, Discounted Mortgage Loans shall be
          further broken down into Principal Balances
          remaining due from the related Mortgagor and
          Principal Balances which would exist, if the
          Mortgage Loan in question had been originated at
          the amount for which it was purchased and all
          scheduled monthly payments theretofore received had
          been applied first to interest at a rate of
          interest equal to the Mortgage Coupon Rate and then
          in reduction of such amount;

  (ix)    the estimated value of any Mortgaged Properties
          acquired through foreclosure as of the close of
          business on the last day of the immediately
          preceding month;

   (x)    the account number of the Protected Accounts
          maintained pursuant to Section 8; and

  (xi)    such other information as Purchaser may reasonably
          request.

        (b)    The Seller shall furnish to the Purchaser at the
Seller's expense, (i) a complete statement of its financial
condition within 90 days after the end of each of the Seller's
fiscal years such statement to conform to the particular
requirements of Section 232 of the Servicer Guide and Section 233
of the Seller Guide comprising the Guides; and (ii) such other
information relating to servicing of the Mortgage Loans by the
Seller as may be reasonably requested by the Purchaser.  Each
such statement of financial condition shall be certified by an
independent certified public accountant or firm of certified
public accountants.

17.

## 17. Fidelity Bond; Errors and Omissions Insurance.

(a)   The Seller agrees to keep in force at all times, at
its own expense, a fidelity bond of an incorporated surety
company authorized to do business in the State of New York,
protecting the Seller against loss of any money or other property
entrusted to the Seller or the Seller's officers or employees or
coming into their control, caused by any dishonest, fraudulent or
criminal act, direct or indirect and wherever committed, of the
Seller or of its employees. Such bond shall provide coverage of
the type and in the amount normally required by FHLMC for its
servicers. Seller further agrees to furnish, at its expense
promptly upon request of Purchaser, a certificate from the
carrier issuing such fidelity coverage specifying the form and
amount of such coverage and indicating that there can be no
change or cancellation of coverage other than on not less than
ten (10) days written notice by certified mail to the Purchaser.

(b)   The Seller shall keep in force at all times a
policy or policies of insurance covering errors and omissions
insuring the Purchaser and each owner or transferee of the
Mortgage Loans (including the Trustee for the benefit of the
Certificateholders), as their interests may appear, in the
handling of insurance coverage and other servicing matters, which
policy or policies shall be evidenced by a certificate from the
issuer of such policy to the Purchaser specifying the form and
amount of the policy and indicating that there can be no change
or cancellation of coverage other than on not less than thirty
(30) days written notice by certified mail to the Purchaser.
Such policy shall provide coverage of the type and in the amount
normally required by FHLMC for its servicers and shall be issued
by an insurance company licensed to do business in the State of
New York and reasonably acceptable to the Purchaser. Without
limiting the scope of such policy, such policy shall insure the
Purchaser, owners and transferees against any loss arising out of
the failure of the Seller to obtain or maintain any insurance as
required by this Agreement. Any other requirements with respect
to the fidelity bond and errors and omissions coverage shall be
as set forth in the Guides.

## 18. Access to Certain Documentation and Information Regarding the Mortgage Loans.

(a)   The Seller shall provide to the Purchaser, the
Issuer, the Trustee, the Certificateholder, the Federal Home Loan
Bank Board, the FDIC, the FSLIC and the New York State Banking
Department and the supervisory agents and examiners of each such
Board, Corporation or Department, access to the documentation
regarding the Mortgage Loans required by applicable state and
federal regulations, such access being afforded without charge

18.

but only upon reasonable request and during normal business hours
at the office of the Seller designated by it.

(b)   The Seller shall supply the Purchaser with
photostatic or other copies of such documentation as the
Purchaser shall require.  Such records may not be destroyed or
otherwise disposed of except as provided in the Guides.  From
time to time, the Purchaser or the Trustee may deliver part or
all of any Mortgage File to the Seller.

(c)   The Seller shall maintain such files, and the books
and records referred to above, with the same care exercised by
prudent institutional investors with respect to their own
investments.  The Seller shall bear the entire cost of
restoration of such files, books and records in the event of
damage, loss or destruction from any cause while such files,
books and records are in the care, custody or control of the
Seller.

19. Option of Seller to Purchase Mortgage Loans upon Termination
of Pooling and Servicing Agreement.

The provisions of this Section shall apply only with
respect to those Mortgage Loans which have been transferred to
the Trustee pursuant to a Pooling and Servicing Agreement.

(a)   Each Pooling and Servicing Agreement will grant to
the Purchaser or the Issuer (i) the option to repurchase all of
the Mortgage Loans in the related Mortgage Pool and all
properties obtained in foreclosure or by deed in lieu thereof at
such time as the Principal Balances of all of the mortgage loans
remaining in the related Mortgage Pool aggregate less than 10% of
the outstanding Principal Balances of the Mortgage Loans in such
Mortgage Pool on any related Settlement Date, and (ii) will
provide that such Pooling and Servicing Agreement shall terminate
on any such repurchase.  In the event that the Purchaser or the
Issuer exercises such option and provided that this Servicing
Agreement shall then be in full force and effect, the Purchaser
shall give notice of the exercise of such option to the Seller.
Such notice shall set forth the purchase price paid or agreed to
be paid for the remaining Mortgage Loans in such Mortgage Pool
and such properties.  For a period of fifteen (15) days after the
date upon which such notice is given, the Seller shall have the
option to purchase all of the Mortgage Loans (i.e.  those of the
Mortgage Loans in such Mortgage Pool which had been serviced
pursuant to this Servicing Agreement) and such properties (i.e.
those properties previously securing Mortgage Loans in such
Mortgage Pool which had been serviced pursuant to this Servicing
Agreement).  If the Seller exercises such option, the purchase
price to be paid by the Seller shall be an amount equal to the

19.

purchase price paid by the Purchaser or the Issuer together with
accrued interest on the then outstanding Principal Balances of
each of the Mortgage Loans so purchased to the first day of the
month following the month of such purchase at the related
Mortgage Coupon Rate of each such Mortgage Loan.

(b)   Upon such purchase, the Purchaser shall transfer or
cause to be transferred to the Seller title to the repurchased
Mortgage Loans and/or properties by instruments of transfer or
assignment without recourse, subject to such exceptions to title
which were of record or in effect at the time the Purchaser or
the Issuer acquired title and any other exceptions customary in
the transfer of comparable Mortgage Loans or properties.  The
Seller may exercise the foregoing right to purchase Mortgage
Loans and properties only with respect to all of the Mortgage
Loans or properties described in the notice to the Seller and
Seller may not purchase fewer than all of the Mortgage Loans or
properties.  Upon purchase, the Purchaser shall (a) deliver or
cause to be delivered to the Seller the Mortgage Files in
connection therewith, and (b) otherwise use its best efforts to
effect or cause to be effected the orderly transfer of assets to
the Seller.

(c)   The option to repurchase contained in this section
shall not be construed to modify the mandatory repurchase
obligations set forth in Section 9 of the Mortgage Purchase
Agreement with respect to a breach by the Seller of its
warranties and representations contained in said Section 9.

## 20. Compensation of the Seller.

Compensation for the performance of Seller's duties
under this Agreement with respect to each Mortgage Loan shall
consist of an amount to be deducted by Seller from the portion of
each monthly installment applicable to interest when and as (and
only if) collected (including amounts collected upon
reinstatement of a Mortgage Loan in default), equal to the
applicable Servicing Fee.  Such Servicing Fee shall be computed
on the same principal amount for the same period as the interest
portion of said installment.  Provided that Seller shall have
made a Monthly Advance to cover the scheduled monthly payment of
principal and interest due on a particular Mortgage Loan, Seller
shall also be entitled to compensation in the form of any late
payment charges collected from the Mortgagor under such Mortgage
Loan in respect of such late payment.  The Servicing Fee shall be
due the Seller with respect to any Mortgage Loan from the related
Cut-Off Date with respect thereto until termination or expiration
of this Servicing Agreement but subject, however, to the
provisions of this Section.  Seller shall not be entitled to any
compensation in any form except as provided in this Section and

20.

certain assumption fees as set forth in Section 10.  All other
charges collected from Mortgagors including prepayment penalties,
late payment charges to which the Seller is not entitled, and
that portion of assumption or substitution fees payable to the
Purchaser or to the Certificateholder, shall be deposited in the
Certificate Account or Mortgage Account on the eighteenth day of
each month, commencing on the 18th of the month next succeeding
the first Cut-Off Date.  If the eighteenth day of any month is
not a Business Day, such deposit shall be made on the Business
Day immediately preceding.  In the event that the rights of
Purchaser shall be assigned to one or more Secondary Market
Buyers and, as a result thereof, Seller shall be required to make
separate reports and remittances to such Secondary Market Buyer
or to other Persons, who might succeed to the rights of Purchaser
pursuant to the Mortgage Purchase Agreement or this Agreement,
Seller shall not be entitled to any additional servicing
compensation by reason thereof.

## 21. Indemnification.

(a)  It is agreed that if at any time any demand, claim,
cause of action, or liability or any action or other legal
proceeding should be asserted against the Purchaser, its
successors, assigns or transferees, by reason of or in connection
with any act or failure to act on the part of the Seller, the
Seller shall indemnify and save the Purchaser (including its
successors, assigns or transferees) harmless from any and all
loss, damage, liability or expense which it may sustain or incur
by reason thereof, including, without limitation, the amount of
any judgment, plus any costs and interest thereon, which may be
entered against or incurred by the Purchaser in any such claim,
as well as any attorney's fees and other disbursements paid or
incurred in connection therewith.

(b)  The Seller shall pay the cash flow shortfall with
respect to any Mortgage Loan as to which the Mortgagor is
permitted, by virtue of any bankruptcy or insolvency proceeding,
to reduce his scheduled monthly principal and interest payment.

## 22. Assignment; Successors and Assigns.

(a)  This Servicing Agreement shall not be assigned by
the Seller or its successors without the prior written consent of
the Purchaser, which consent may be withheld by the Purchaser in
its sole discretion.  Purchaser or its successors may however,
assign this Servicing Agreement or designate any Person to
receive the benefits of this Servicing Agreement, all without the
prior written consent of Seller.  Pursuant to the Pooling and
Servicing Agreement, the Trustee may have certain rights to
assume this Servicing Agreement, as it relates to Mortgage Loans

21.

transferred to the Trustee, at its option, upon certain circumstances more particularly set forth in Section 7.

(b)   This Agreement shall be binding upon and inure to the benefit of the Purchaser and the Seller and their successors and permitted assigns, including any Person, such as any Secondary Market Buyer, which may be deemed to be a "Purchaser" within the meaning of the Mortgage Purchase Agreement.

23. Written Communications and Notices.

(a)   All written communications, reports and filings from the Seller to the Purchaser, other than notices given pursuant to this Servicing Agreement, shall be sent by regular mail to the Purchaser. All notices required to be given by the Seller pursuant to this Servicing Agreement from the Seller to the Purchaser named herein shall be sent by registered or certified mail to the address hereinabove set forth with a copy to the Purchaser at 6420 Wilshire Boulevard, Suite 600, Los Angeles, California 90048. The Purchaser may, by notice given in accordance with this Section, change the address or addresses to which written communications, reports, filings and/or notices to the Purchaser may be sent.

(b)   All written communications, reports and filings from the Purchaser to the Seller, other than notices given pursuant to this Servicing Agreement, shall be sent by regular mail to the Seller at the address hereinabove set forth. All notices required to be given by the Purchaser pursuant to this Servicing Agreement shall be sent by registered or certified mail to the Seller at the address hereinabove set forth. The Seller may, by notice given in accordance with this Section, change the address to which written communications, reports, filings and/or notices to the Seller may be sent.

24. Termination of Agreement; Accounting upon Termination.

This Servicing Agreement shall become effective on the first Closing Date and thereafter shall continue in full force and effect until the first to occur of (i) termination of this Servicing Agreement in accordance with its terms, (ii) termination of this Servicing Agreement by mutual consent of the Purchaser and the Seller, (iii) payment in full of all of the Mortgage Loans and disposition of all Mortgaged Properties acquired by foreclosure or by deed in lieu of foreclosure. This Servicing Agreement shall continue in full force and effect notwithstanding (i) any transfer of the Mortgage Loans and properties acquired by foreclosure or deed in lieu of foreclosure or (ii) a repurchase by the Purchaser of any Mortgage Loans and such properties, unless the Seller shall repurchase such Mortgage

22.

Loans and such properties from the Purchaser pursuant to Section 19 hereof.

Notwithstanding any provision of this Servicing Agreement to the contrary, this Servicing Agreement shall become and be terminated at the option of the Purchaser:

A.    In any one or more of the following events ("Events of Default"):

1.    Upon the violation by the Seller of any provision of this Servicing Agreement or any other agreement with or undertaking to the Purchaser whether in connection with the Mortgage Loans or otherwise, including without limitation the violation by the Seller of the provisions of this Agreement or the Guides, including without limitation, the failure of Seller to:

(a)    File with the Purchaser timely delinquency reports with adequate detail describing delinquency problems and actions taken to effect collections; or

(b)    Follow up in a timely manner on all delinquencies and take all necessary and appropriate action to effect collection; or

(c)    Proceed with foreclosures in a timely and orderly fashion; or

(d)    Comply with the requirements established by the Purchaser for submitting loan accounting reports; or

(e)    Deposit all receipts in the accounts designated in this Servicing Agreement for deposit of such receipts on or before the dates specified herein for the making of such deposits; or

(f)    Maintain in full force and effect all policies of insurance required to be maintained pursuant to this Servicing Agreement, including without limitation, flood insurance, if applicable, hazard insurance, primary mortgage insurance, fidelity bond and errors and omissions insurance, and to furnish evidence of the existence of such insurance to the Purchaser in a timely fashion; or

2.    Upon the appointment of a receiver, trustee or liquidator of or for the Seller or of or for any of the property

23.

of the Seller, regardless of whether such appointment is
voluntary or involuntary; or upon the making by any person, firm
or corporation of an application for any such appointment; or
upon a total or substantial suspension or discontinuation of the
business of the Seller; or upon the making of an assignment for
the benefit of creditors, or composition with creditors; or upon
the adjudication of the Seller as insolvent; or upon the filing
of any petition (voluntary or involuntary) in bankruptcy or
petition pursuant to the provisions of any chapter of the
Bankruptcy Code, or upon any part of the business or property of
the Seller being taken possession of or closed by any
governmental action or body with or without warrant of law; or
upon the Seller becoming the subject of liquidation or
dissolution proceedings or any proceedings permitting the filing
of claims by creditors; or upon the issuance of any warrant of
attachment or other process against any of the assets or property
of the Seller; or upon the entry of judgment against the Seller
(either separately or jointly with any other party) in an amount
deemed to be substantial by the Purchaser; or upon the
commencement of any creditors' proceedings under the statutes of
any state, or upon the insolvency or an act of insolvency of
Seller; or upon the appointment of a committee of creditors of
Seller; or if in the judgment of the Purchaser the Seller becomes
incapacitated by operation of law or fact from faithfully
performing its duties pursuant to the terms of this Agreement; or

        3.    In the event the Seller ceases to be a Qualified
Servicer or an eligible Seller (i) within the meaning of the
regulations promulgated by any regulatory authority having
jurisdiction over the Seller or (ii) within the meaning of the
provisions of the Pooling and Servicing Agreement or this
Servicing Agreement; or

        4.    In the event of a sale of the servicing rights of
the Seller without the prior written consent of the Purchaser; or
any attempted sale of the Mortgage Loans or any participation
interest therein by the Seller; or

        5.    In the event that the Seller shall be dissolved, or
shall dispose of all or substantially all of its assets, or shall
consolidate with or merge into another entity, or shall permit
another entity to consolidate with or merge into it; or

        6.    In the event that Seller fails to furnish its most
recent financial statements within 60 days after Purchaser's
request therefor.

        B.    Upon 60 days prior written notice given by the
Purchaser to the Seller, without cause. In event the Purchaser
terminates this Servicing Agreement in accordance with this

24.

subsection B at any time after the Closing Date, the Purchaser
shall upon such termination without cause pay Seller an amount
(the "Termination Payment") equal to 2% percent of the then
aggregate unpaid Principal Balances of the Mortgage Loans in
existence at the date of termination as compensation for such
termination.   The Seller consents and agrees that the payment of
the Termination Payment shall be the sole remedy of the Seller in
the event of a termination of this Servicing Agreement by the
Purchaser pursuant to this subsection B.

Whenever the Purchaser has agreed not to unreasonably
withhold its consent, the Purchaser shall in no event be liable
for damages to the Seller for unreasonably withholding such
consent, but the Seller's sole remedy in such an event shall be
an action for specific performance.

Notwithstanding the foregoing, this Agreement shall be
terminated immediately upon purchase of the Mortgage Loans or
properties by the Seller pursuant to Section 19 of this Servicing
Agreement without any penalty or payment by the Purchaser for
such termination.

Pursuant to each Pooling and Servicing Agreement, the
Trustee has certain rights to terminate this Servicing Agreement,
at its option, as to the Mortgage Loans transferred to it
pursuant to such Pooling and Servicing Agreement, upon certain
circumstances more particularly set forth in Section 7 hereof.
In the event of any such termination by the Trustee, the
Purchaser shall have no liability to the Seller for any
compensation, Servicing Fee, penalty or payment by reason of such
termination.

From and after the effective date of termination of this
Servicing Agreement pursuant to any provision hereof, the Seller
shall be relieved of further responsibility in connection with
servicing the Mortgage Loans affected by such termination.   The
Seller forthwith upon such termination (a) shall pay over to the
Purchaser or its designee all moneys collected and held by it
pursuant to this Servicing Agreement and/or pursuant to any
agreement, letter or arrangement relating to the Mortgage Loans,
(b) shall deliver to the Purchaser or its designee all loan
documents, insurance policies, and records in connection
therewith, (c) shall deliver to the Purchaser a full accounting,
including a statement showing the monthly payments collected by
it and a statement of monies held in trust by it for the payment
of taxes, insurance and other charges in respect of the Mortgages
Loans, and (d) otherwise use its best efforts to effect the
orderly and efficient transfer of servicing to a new servicer
selected by the Purchaser or to another designee of the
Purchaser.

25.

## 25. Conditions to Effectiveness; Closing Date .

Since this Servicing Agreement shall become effective on the first Closing Date the Purchaser and the Seller acknowledge that the first Closing Date will only be deemed to have occurred upon the satisfaction of certain conditions more particularly set forth in the Mortgage Purchase Agreement. This Servicing Agreement shall be effective only with respect to the Mortgage Loans purchased pursuant to the Mortgage Purchase Agreement.

## 26. Governing Law.

This Servicing Agreement shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties shall be determined in accordance with such laws.

## 27. Miscellaneous.

The Seller shall, at its expense, execute all other documents reasonably requested by the Purchaser in furtherance of this Servicing Agreement and shall take all other steps reasonably requested by the Purchaser from time to time in order to perform the covenants and agreements herein contained and in order to effectuate the intent hereof. In the event that the Trustee, or any Person which shall own or be the transferee of Mortgage Loans and shall be a successor or assign of Purchaser under the Mortgage Purchase Agreement shall so request, Seller shall enter into a separate servicing agreement with the Purchaser named herein or such Person substantially in the form of this Servicing Agreement, but with respect only to those Mortgage Loans owned by or transferred to the Trustee or such Person, whereupon this Agreement shall be terminated as to such Mortgage Loans. The provisions of this Servicing Agreement may not be waived or modified except by a writing signed by the party against which such modification or waiver is sought to be enforced. The provisions of the immediately preceding sentence shall not, however, be construed to prohibit or limit the further modification or amendment of the Guides by Purchaser to the extent the Guides may apply to this Agreement. All representations and warranties shall survive the termination of this Agreement. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument. Headings and titles herein are for convenience only and shall not influence the construction or interpretation of this Servicing Agreement. If any term, covenant, condition or provision of this Servicing Agreement, or the application thereof to any circumstance, shall, at any time or to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Servicing Agreement or the

application thereof to circumstances other than those as to which
it is held invalid shall not be affected thereby and each term,
covenant, condition and provision of this Servicing Agreement
shall be valid and enforceable to the fullest extent permitted by
law.

      IN WITNESS WHEREOF, the parties have executed this
Agreement as of the day and year first above written.

                    RESIDENTIAL FUNDING CORPORATION
                    doing business as RESIDENTIAL
                    FUNDING CORPORATION (DELAWARE)

                    By: _____
                       Rebecca L. Walker
                       President

                    COLUMBIA EQUITIES, LTD.

                    By: _____
                       Richard S. Pardes
                       Chairman

# NOTE

Loan #: 516724

July 10, 1996.                         MONTCLAIR ,               NEW JERSEY
                                       [City]                    [State]

735 HOLMDEL ROAD, HOLMDEL, NEW JERSEY 07733
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 240,000.00  (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is  COLUMBIA EQUITIES, LTD.
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 11.00  %.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments
I will pay principal and interest by making payments every month.
I will make my monthly payments on the 1ST  day of each month beginning  on September 1, 1996.
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on August 1, 2026 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."
I will make my monthly payments at 150 WHITE PLAINS ROAD
TARRYTOWN, NEW YORK 10591  or at a different place if required by the Note Holder.
(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $2,285.58

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.
I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment  there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of  15  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.00 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.
(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**MULTISTATE FIXED RATE NOTE**-Single Family-FNMA/FHLMC UNIFORM INSTRUMENT      Form 3200 12/8

EXHIBIT  2

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

In presence of                                                          7/10/96

_Eileen Musillo_ .....................(Seal)
Borrower-EILEEN MUSILLO

............................................................................(Seal)
Borrower-

............................................................................(Seal)
Borrower-

............................................................................(Seal)
Borrower-

*(Sign Original Only)*

STATE OF NEW JERSEY        )
                          )ss:
COUNTY OF ESSEX           )

On this 10TH day of JULY , in the year  1996  ; before me personally came

EILEEN  MUSILLO

to me personally known, and known to me to be
the individual(s) described in and who executed the foregoing instrument, and duly acknowledged that SHE
executed the same.

_Leslie J. Larson_
Notary Public
LESLIE J. LARSON
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires May 26, 1998

| When This pay is satisfied | This is spread to Prin | This is spread to Int | This is the Ending Sched Bal | This is the Interest Passed Thru |
|---|---|---|---|---|
| 10/1/2001 | 149.32 | 2,136.26 | 232,897.55 | |
| 11/1/2001 | 150.69 | 2,134.89 | 232,746.86 | |
| 12/1/2001 | 152.07 | 2,133.51 | 232,594.79 | |
| 1/1/2002 | 153.46 | 2,132.12 | 232,441.33 | 2,035.20 |
| 2/1/2002 | 154.87 | 2,130.71 | 232,286.46 | 2,033.86 |
| 3/1/2002 | 156.29 | 2,129.29 | 232,130.17 | 2,032.51 |
| 4/1/2002 | 157.72 | 2,127.86 | 231,972.45 | 2,031.14 |
| 5/1/2002 | 159.17 | 2,126.41 | 231,813.28 | 2,029.76 |
| 6/1/2002 | 160.62 | 2,124.96 | 231,652.66 | 2,028.37 |
| 7/1/2002 | 162.10 | 2,123.48 | 231,490.56 | 2,026.96 |
| 8/1/2002 | 163.58 | 2,122.00 | 231,326.98 | 2,025.54 |
| 9/1/2002 | 165.08 | 2,120.50 | 231,161.90 | 2,024.11 |
| 10/1/2002 | 166.60 | 2,118.98 | 230,995.30 | 2,022.67 |
| 11/1/2002 | 168.12 | 2,117.46 | 230,827.18 | 2,021.21 |
| 12/1/2002 | 169.66 | 2,115.92 | 230,657.52 | 2,019.74 |
| 1/1/2003 | 171.22 | 2,114.36 | 230,486.30 | 2,018.25 |
| 2/1/2003 | 172.79 | 2,112.79 | 230,313.51 | 2,016.76 |
| 3/1/2003 | 174.37 | 2,111.21 | 230,139.14 | 2,015.24 |
| 4/1/2003 | 175.97 | 2,109.61 | 229,963.17 | 2,013.72 |
| 5/1/2003 | 177.58 | 2,108.00 | 229,785.59 | 2,012.18 |
| 6/1/2003 | 179.21 | 2,106.37 | 229,606.38 | 2,010.62 |
| 7/1/2003 | 180.85 | 2,104.73 | 229,425.53 | 2,009.06 |
| 8/1/2003 | 182.51 | 2,103.07 | 229,243.02 | 2,007.47 |
| 9/1/2003 | 184.19 | 2,101.39 | 229,058.83 | 2,005.88 |
| 10/1/2003 | 185.87 | 2,099.71 | 228,872.96 | 2,004.26 |
| 11/1/2003 | 187.58 | 2,098.00 | 228,685.38 | 2,002.64 |
| 12/1/2003 | 189.30 | 2,096.28 | 228,496.08 | 2,001.00 |
| 1/1/2004 | 191.03 | 2,094.55 | 228,305.05 | 1,999.34 |
| 2/1/2004 | 192.78 | 2,092.80 | 228,112.27 | 1,997.67 |
| 3/1/2004 | 194.55 | 2,091.03 | 227,917.72 | 1,995.98 |
| 4/1/2004 | 196.33 | 2,089.25 | 227,721.90 | 1,994.28 |
| 5/1/2004 | 198.13 | 2,087.45 | 227,523.26 | 1,992.57 |

Items included in judgement
Pass thru amounts included in judgement

EXHIBIT 3

| When This pay is satisfied | This is spread to Prin | This is spread to Int | This is the Ending Sched Bal | This is the Interest Passed Thru |
|---|---|---|---|---|
| 6/1/2004 | 199.95 | 2,085.63 | 227,323.31 | 1,990.83 |
| 7/1/2004 | 201.78 | 2,083.80 | 227,121.53 | 1,989.08 |
| 8/1/2004 | 203.63 | 2,081.95 | 226,917.90 | 1,987.31 |
| 9/1/2004 | 205.50 | 2,080.08 | 226,712.40 | 1,985.53 |
| 10/1/2004 | 207.38 | 2,078.20 | 226,505.02 | 1,983.73 |
| 11/1/2004 | 209.28 | 2,076.30 | 226,295.74 | 1,981.92 |
| 12/1/2004 | 211.20 | 2,074.38 | 226,084.54 | 1,980.09 |
| 1/1/2005 | 213.14 | 2,072.44 | 225,871.40 | 1,978.24 |
| 2/1/2005 | 215.09 | 2,070.49 | 225,656.31 | 1,976.37 |
| 3/1/2005 | 217.06 | 2,068.52 | 225,439.25 | 1,974.49 |
| 4/1/2005 | 219.05 | 2,066.53 | 225,220.20 | 1,972.59 |
| 5/1/2005 | 221.06 | 2,064.52 | 224,999.14 | 1,970.68 |
| 6/1/2005 | 223.09 | 2,062.49 | 224,776.05 | 1,968.74 |
| 7/1/2005 | 225.13 | 2,060.45 | 224,550.92 | 1,966.79 |
| 8/1/2005 | 227.20 | 2,058.38 | 224,323.72 | 1,964.82 |
| 9/1/2005 | 229.28 | 2,056.30 | 224,094.44 | 1,962.83 |
| 10/1/2005 | 231.38 | 2,054.20 | 223,863.06 | 1,960.83 |
| 11/1/2005 | 233.50 | 2,052.08 | 223,629.56 | 1,958.80 |
| 12/1/2005 | 235.64 | 2,049.94 | 223,393.92 | 1,956.76 |
| 1/1/2006 | 237.80 | 2,047.78 | 223,156.12 | 1,954.70 |
| 2/1/2006 | 239.98 | 2,045.60 | 222,916.14 | 1,952.62 |
| 3/1/2006 | 242.18 | 2,043.40 | 222,673.96 | 1,950.52 |
| 4/1/2006 | 244.40 | 2,041.18 | 222,429.56 | 1,948.40 |
| 5/1/2006 | 246.64 | 2,038.94 | 222,182.92 | 1,946.26 |
| 6/1/2006 | 248.90 | 2,036.68 | 221,934.02 | 1,944.10 |
| 7/1/2006 | 251.18 | 2,034.40 | 221,682.84 | 1,941.92 |
| 8/1/2006 | 253.49 | 2,032.09 | 221,429.35 | 1,939.72 |
| 9/1/2006 | 255.81 | 2,029.77 | 221,173.54 | 1,937.51 |
| 10/1/2006 | 258.16 | 2,027.42 | 220,915.38 | 1,935.27 |
| 11/1/2006 | 260.52 | 2,025.06 | 220,654.86 | 1,933.01 |
| 12/1/2006 | 262.91 | 2,022.67 | 220,391.95 | 1,930.73 |
| 1/1/2007 | 265.32 | 2,020.26 | 220,126.63 | 1,928.43 |
| 2/1/2007 | 267.75 | 2,017.83 | 219,858.88 | 1,926.11 |

| When This pay is satisfied | This is spread to Prin | This is spread to Int | This is the Ending Sched Bal | This is the Interest Passed Thru |
|---|---|---|---|---|
| 3/1/2007 | 270.21 | 2,015.37 | 219,588.67 | 1,923.77 |
| 4/1/2007 | 272.68 | 2,012.90 | 219,315.99 | 1,921.40 |
| 5/1/2007 | 275.18 | 2,010.40 | 219,040.81 | 1,919.01 |
| 6/1/2007 | 277.71 | 2,007.87 | 218,763.10 | 1,916.61 |
| 7/1/2007 | 280.25 | 2,005.33 | 218,482.85 | 1,914.18 |
| 8/1/2007 | 282.82 | 2,002.76 | 218,200.03 | 1,911.72 |
| 9/1/2007 | 285.41 | 2,000.17 | 217,914.62 | 1,909.25 |
| 10/1/2007 | 288.03 | 1,997.55 | 217,626.59 | 1,906.75 |
| 11/1/2007 | 290.67 | 1,994.91 | 217,335.92 | 1,904.23 |
| 12/1/2007 | 293.33 | 1,992.25 | 217,042.59 | 1,901.69 |
| 1/1/2008 | 296.02 | 1,989.56 | 216,746.57 | 1,899.12 |
| 2/1/2008 | 298.74 | 1,986.84 | 216,447.83 | 1,896.53 |
| 3/1/2008 | 301.47 | 1,984.11 | 216,146.36 | 1,893.92 |
| 4/1/2008 | 304.24 | 1,981.34 | 215,842.12 | 1,891.28 |
| 5/1/2008 | 307.03 | 1,978.55 | 215,535.09 | 1,888.62 |
| 6/1/2008 | 309.84 | 1,975.74 | 215,225.25 | 1,885.93 |
| 7/1/2008 | 312.68 | 1,972.90 | 214,912.57 | 1,883.22 |
| 8/1/2008 | 315.55 | 1,970.03 | 214,597.02 | 1,880.48 |
| 9/1/2008 | 318.44 | 1,967.14 | 214,278.58 | 1,877.72 |
| 10/1/2008 | 321.36 | 1,964.22 | 213,957.22 | 1,874.94 |
| 11/1/2008 | 324.31 | 1,961.27 | 213,632.91 | 1,872.13 |
| 12/1/2008 | 327.28 | 1,958.30 | 213,305.63 | 1,869.29 |
| 1/1/2009 | 330.28 | 1,955.30 | 212,975.35 | 1,866.42 |
| 2/1/2009 | 333.31 | 1,952.27 | 212,642.04 | 1,863.53 |
| 3/1/2009 | 336.36 | 1,949.22 | 212,305.68 | 1,860.62 |
| 4/1/2009 | 339.44 | 1,946.14 | 211,966.24 | 1,857.67 |
| 5/1/2009 | 342.56 | 1,943.02 | 211,623.68 | 1,854.70 |
| 6/1/2009 | 345.70 | 1,939.88 | 211,277.98 | 1,851.71 |
| 7/1/2009 | 348.87 | 1,936.71 | 210,929.11 | 1,848.68 |
| 8/1/2009 | 352.06 | 1,933.52 | 210,577.05 | 1,845.63 |
| 9/1/2009 | 355.29 | 1,930.29 | 210,221.76 | 1,842.55 |
| 10/1/2009 | 358.55 | 1,927.03 | 209,863.21 | 1,839.44 |
| 11/1/2009 | 361.83 | 1,923.75 | 209,501.38 | 1,836.30 |

129,612.11

123,720.65

| When This pay is satisfied | This is spread to Prin | This is spread to Int | This is the Ending Sched Bal | This is the Interest Passed Thru |
|---|---|---|---|---|
| 12/1/2009 | 365.15 | 1,920.43 | 209,136.23 | 1,833.14 |
| 1/1/2010 | 368.50 | 1,917.08 | 208,767.73 | 1,829.94 |
| 2/1/2010 | 371.88 | 1,913.70 | 208,395.85 | 1,826.72 |
| 3/1/2010 | 375.28 | 1,910.30 | 208,020.57 | 1,823.46 |
| 4/1/2010 | 378.72 | 1,906.86 | 207,641.85 | 1,820.18 |
| 5/1/2010 | 382.20 | 1,903.38 | 207,259.65 | 1,816.87 |
| 6/1/2010 | 385.70 | 1,899.88 | 206,873.95 | 1,813.52 |
| 7/1/2010 | 389.24 | 1,896.34 | 206,484.71 | 1,810.15 |
| 8/1/2010 | 392.80 | 1,892.78 | 206,091.91 | 1,806.74 |
| 9/1/2010 | 396.40 | 1,889.18 | 205,695.51 | 1,803.30 |
| 10/1/2010 | 400.04 | 1,885.54 | 205,295.47 | 1,799.84 |
| 11/1/2010 | 403.70 | 1,881.88 | 204,891.77 | 1,796.34 |
| 12/1/2010 | 407.41 | 1,878.17 | 204,484.36 | 1,792.80 |
| 1/1/2011 | 411.14 | 1,874.44 | 204,073.22 | 1,789.24 |
| 2/1/2011 | 414.91 | 1,870.67 | 203,658.31 | 1,785.64 |
| 3/1/2011 | 418.71 | 1,866.87 | 203,239.60 | 1,782.01 |
| 4/1/2011 | 422.55 | 1,863.03 | 202,817.05 | 1,778.35 |
| 5/1/2011 | 426.42 | 1,859.16 | 202,390.63 | 1,774.65 |
| 6/1/2011 | 430.33 | 1,855.25 | 201,960.29 | 1,770.92 |
| 7/1/2011 | 434.28 | 1,851.30 | 201,526.02 | 1,767.15 |
| 8/1/2011 | 438.26 | 1,847.32 | 201,087.76 | 1,763.35 |
| 9/1/2011 | 442.28 | 1,843.30 | 200,645.48 | 1,759.52 |
| 10/1/2011 | 446.33 | 1,839.25 | 200,199.15 | 1,755.65 |
| 11/1/2011 | 450.42 | 1,835.16 | 199,748.73 | 1,751.74 |
| 12/1/2011 | 454.55 | 1,831.03 | 199,294.18 | 1,747.80 |
| 1/1/2012 | 458.72 | 1,826.86 | 198,835.47 | 1,743.82 |
| 2/1/2012 | 462.92 | 1,822.66 | 198,372.54 | 1,739.81 |
| 3/1/2012 | 467.17 | 1,818.41 | 197,905.38 | 1,735.76 |
| 4/1/2012 | 471.45 | 1,814.13 | 197,433.93 | 1,731.67 |
| 5/1/2012 | 475.77 | 1,809.81 | 196,958.16 | 1,727.55 |
| | 33,869.09 | 226,687.03 | | 216,383.08    Interest remitted through 5/18/12 to RFC |
| | | (116,263.12) | | (116,263.12) Interest Coll plus Accrued Int to be paid |

| When This pay is satisfied | This is spread to Prin | This is spread to Int | This is the Ending Sched Bal | This is the Interest Passed Thru |
|---|---|---|---|---|
| | 250,252.16 | | | |
| | (139,867.61) | | | |
| | 110,384.55 | 110,423.91 | | 100,119.96 |
| | | | 16,146.96 | |
| | | | 123,720.65 | |
| | | | 139,867.61 | |
| | 114,824.23 | | 33,869.09 | |
| | (545.23) | | 216,383.08 | |
| | 114,279.00 | | 250,252.16 | |
| | 2,285.58 | | (110,384.55) | |
| | 116,564.58 | | | |