# Exhibit H

1  Thomas P. Kelly Jr., SBN 37545
   Thomas P. Kelly III, SBN 230699
2  50 Old Courthouse Square, Suite 609
   Santa Rosa, California, 95404-4926
3  Telephone : 707-545-8700
   Facsimile : 707-542-3371
4  Email : tomkelly@sonic.net

5  Attorneys for Plaintiffs

6

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                         COUNTY OF SONOMA

11  HITOSHI INOUE                    Case No. SCV248256
    WAKANA ANNA INOUE
12                                   Unlimited Civil
              Plaintiffs;
13  vs.                              SECOND AMENDED VERIFIED COMPLAINT

14  GMAC MORTGAGE                    1. PROMISSORY ESTOPPEL;
    CORPORATION, a Delaware          2. SET ASIDE TRUSTEE SALE;
15  Corporation; ETS SERVICES LLC, a 3. SET ASIDE TRUSTEE DEED;
    Delaware Limited Liability Company; 4. RECOVERY OF DAMAGES FOR
16  MED&G GROUP, a California        WRONGFUL FORECLOSURE;
    Limited Partnership; and DOES 001 5. FRAUD;
17  through 025; inclusive,          6. NEGLIGENT MISREPRESENTATION;
                                     7. NEGLIGENCE;
18            Defendants.            8. QUIET TITLE;
                                     9. DECLARATORY RELIEF;
19                                   10. INTENTIONAL INFLICTION OF
                                     EMOTIONAL DISTRESS.
20
                                     DEMAND FOR JURY TRIAL
21
                                     Judge:       Honorable Patrick Broderick
22                                   Court:       Department 19
                                                  3055 Cleveland Avenue
23                                                Santa Rosa, California
                                                  95403
24
                                     Action Filed:  September 20, 2010
25                                   Trial Date:    Not yet set

26

27        Comes now Plaintiffs Hitoshi Inoue and Wanaka Anna Inoue who present this Second

28  Amended Verified Complaint (hereinafter "COMPLAINT") and allege as follows:

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT              Page 1 of 31

1   //

2

## GENERAL ALLEGATIONS

3     1.    Plaintiff Hitoshi Inoue and Wakana Anna Inoue, father and daughter, were at all
4 times herein residents of Sonoma County, California and are hereinafter collectively referred to
5 as "PLAINTIFFS."

6     2.    PLAINTIFFS are informed and believe and on that basis allege that Defendant
7 GMAC Mortgage Corporation is a corporation formed and existing under the laws of the State of
8 Delaware and qualified to and is doing business in the State of California and has its principal
9 place of business in Detroit, Michigan. Defendant GMAC Mortgage Corporation and it's
10 authorized agents DOE-001 through DOE-006, are all hereinafter referred to collectively as
11 "GMAC".

12     3.    PLAINTIFFS are informed and believe and on that basis allege that Defendant
13 ETS Services LLC (hereinafter "ETS SERVICES") is a Limited Liability Company formed and
14 existing under the laws of the State of Delaware, and is qualified to and is doing business in the
15 State of California, and has its principal place of business in Burbank, California. PLAINTIFFS
16 have named ETS SERVICES herein as an indispensable party against whom no relief is sought.

17     4.    PLAINTIFFS are informed and believe and on that basis allege that Defendant
18 MED&G Group (hereinafter "MED&G") is a Limited Partnership formed under the laws of the
19 State of California, is qualified to and is doing business in the State of California, and has its
20 principal place of business in Santa Rosa, California.

21     5.    PLAINTIFFS do not know the true names and capacities of those Defendants
22 sued herein as DOES-001 through DOES-025, and therefore sue these Defendants by such
23 fictitious names. PLAINTIFFS will amend the COMPLAINT to allege their true names and
24 capacities when ascertained. PLAINTIFFS are informed and believe and thereon allege that each
25 of the fictitiously named Defendants DOES-001 through DOES-025 either caused damages to
26 PLAINTIFFS or claim some right, title, estate, lien or interest in the real property at issue herein
27 adverse to PLAINTIFFS title and interest therein. PLAINTIFFS are informed and believe and
28 thereon allege that each of these fictitiously named Defendants DOES-001 through DOES-025

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT               Page 2 of 31

1    are responsible in some manner for the occurrences herein alleged, and that PLAINTIFFS

2    injuries were proximately caused by such Defendants DOES-001 through DOES-025.

3        6.   PLAINTIFFS are informed and believe and thereon allege that at all times herein

4    mentioned each Defendant was the agent and employee of each of the remaining Defendants and

5    was acting within the course and scope of said agency and employment and with the knowledge

6    and consent of the remaining Defendants.

7    //

8                **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

9        7.   On or about June 23, 1995 PLAINTIFFS purchased certain real property in

10   Sonoma County, California commonly known as 3735 Coffey Lane, Santa Rosa, California,

11   95403-1616 also bearing Assessor's Parcel Number 058-032-016-000 (hereinafter

12   "PROPERTY").

13       8.   In connection with the purchase of the PROPERTY on about April 19, 2003

14   PLAINTIFFS executed a purchase money promissory note payable to GMAC Mortgage

15   Corporation in the sum of $248,000.00 (hereinafter "NOTE"). The NOTE was secured by a deed

16   of trust on the PROPERTY which was recorded on May 7, 2003 with the Sonoma County

17   Recorder bearing document number 2003-092480 in the official records of Sonoma County

18   (hereinafter "DEED OF TRUST"). A true and correct copy of the NOTE and DEED OF TRUST

19   is attached hereto and marked as Exhibit "A".

20       9.   Cal. Civ. Code §2924c(e) provides in part as follows:

21       "Reinstatement of a monetary default under the terms of an obligation secured by
         a deed of trust, or mortgage may be made at any time within the period
22       commencing with the date of recordation of the notice of default until five
         business days prior to the date of sale set forth in the initial recorded notice of
23       sale."

24       10.  Paragraph 19 of the DEED OF TRUST is entitled "BORROWER'S RIGHT TO

25   REINSTATE AFTER ACCELERATION" and provides as follows:

26       "If borrower meets certain conditions, Borrower shall have the right to have
         enforcement of this security instrument discontinued at any time prior to the
27       earliest of (a) five days before sale of the Property pursuant to any power of sale
         contained in this Security Instrument ... Those conditions are that Borrower (a)
28       pays lender all sums which then would be due under this security instrument and

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 3 of 31

the note as if no acceleration had occurred... ."

11.   At all times herein, PLAINTIFFS were advised that any inquiries regarding the NOTE and DEED OF TRUST should be directed solely to GMAC, and at all times herein PLAINTIFFS have dealt solely with GMAC.

12.   On December 9, 2003 PLAINTIFFS borrowed $30,000 from Bank of America. In exchange PLAINTIFFS granted Bank of America a second deed of trust on the PROPERTY. A true and correct copy of the Bank of America note and deed of trust are attached hereto and marked as Exhibit "B".

13.   On July 23, 2004 PLAINTIFFS borrowed $50,000 from Bank of America. In exchange PLAINTIFFS granted Bank of America a third deed of trust on the PROPERTY. A true and correct copy of the Bank of America note and second deed of trust are attached hereto and marked as Exhibit "C".

14.   From June of 1995 through approximately May of 2010 PLAINTIFFS made monthly mortgage payments pursuant to the NOTE of approximately $1,447.27 to GMAC.

15.   In May, 2010 the consulting contract Plaintiff Hitoshi Inoue had with GreenVolt Inc. ended. As a result of the loss of this income, PLAINTIFFS were no longer able to make mortgage payments to GMAC.

16.   Because PLAINTIFFS had fallen behind on payments, GMAC, through their agent ETS SERVICES recorded a Notice of Default against the PROPERTY on May 20, 2010 with the Sonoma County Recorder bearing document number 2010-041850 in the official records of Sonoma County (hereinafter "NOTICE OF DEFAULT"). A true and correct copy of the NOTICE OF DEFAULT is attached hereto and marked as Exhibit "D".

17.   In response to the Notice of Default, PLAINTIFFS applied for a loan modification with GMAC in June of 2010. A true and correct copy of this loan modification application is attached hereto and marked as Exhibit "E".

18.   On July 19, 2010 GMAC sent a letter to PLAINTIFFS stating that the loan modification was not complete because Plaintiff Hitoshi Inoue was self-employed, and profit/loss statements would be required. A true and correct copy of this letter is attached hereto

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 4 of 31

1  and marked as Exhibit "F".

2      19.    On July 19, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-4622

3  and asked about the status of the loan modification. An authorized representative of GMAC told

4  PLAINTIFFS that the loan modification was under review.

5      20.    On July 20, 2010 PLAINTIFFS prepared a profit and loss statement and mailed

6  it to GMAC. A true and correct copy of this statement is attached hereto and marked as Exhibit

7  "G".

8      21.    On July 30, 2010 GMAC sent a letter to PLAINTIFFS stating that the loan

9  modification application was denied due to insufficient income. PLAINTIFFS did not receive

10  this letter for several weeks after it was sent. A true and correct copy of this letter is attached

11  hereto and marked as Exhibit "H".

12      22.    On August 4, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-

13  4622 and inquired as to the status of the loan modification. The authorized representative of

14  GMAC did not tell PLAINTIFFS that the loan modification was denied. The authorized

15  representative of GMAC told PLAINTIFFS that the loan modification was still under review.

16      23.    On August 20, 2010 GMAC, through their agent ETS SERVICES, recorded a

17  Notice of Trustee's Sale against the PROPERTY with the Sonoma County Recorder bearing

18  document number 2010-069754 in the official records of Sonoma County. This Notice of Trustee

19  Sale set a sale date of September 13, 2010. (hereinafter "TRUSTEE SALE") A true and correct

20  copy of the Notice of Trustee Sale is attached hereto and marked as Exhibit "I".

21      24.    On August 19, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-

22  4622  and for the first time the authorized representative of GMAC told PLAINTIFFS that the

23  first loan modification had been denied.

24      25.    During the August 19, 2010 telephone conversation, PLAINTIFFS told the

25  authorized representative of GMAC that Plaintiff Hitoshi Inoue was in the process of starting a

26  second job, and that this would generate sufficient income to pay the NOTE. The authorized

27  representative of GMAC told PLAINTIFFS that this would be sufficient income, and that they

28  should submit a second loan modification application based on the new salary level.

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT            Page 5 of 31

26.     On August 23, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-4622. During this telephone conversation PLAINTIFFS spoke with an authorized agent of GMAC who did not identify themself to PLAINTIFFS, and thus the name and identity of this agent is unknown to PLAINTIFFS (hereinafter "DOE-001"). DOE-001 told PLAINTIFFS that to postpone the TRUSTEE SALE the total amount of the default on the NOTE would have to be paid. DOE-001 told PLAINTIFFS that the amount for full reinstatement was $15,626.02 and that if this full amount was paid the TRUSTEE SALE would be cancelled.

27.     PLAINTIFFS borrowed $15,626.02 from members of PLAINTIFFS family living in Japan in order to pay all of the back payments owed to GMAC on the NOTE.

28.     On August 25, 2010 Plaintiff Hitoshi Inoue was hired as a consultant with Technical Link.

29.     On August 26, 2010 PLAINTIFFS submitted a second loan modification application because of the increase in income represented by the Technical Link contract. A true and correct copy of this application is attached hereto and marked as Exhibit "J".

30.     On August 31, 2010 PLAINTIFFS sent a cashier's check in the amount of $15,626.02 via certified mail to GMAC in order to reinstate the NOTE (hereinafter "REINSTATEMENT PAYMENT"). A true and correct copy of this cashiers check and certified mail receipt is attached hereto and marked as Exhibit "K".

31.     On August 31, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-4622. During this telephone conversation PLAINTIFFS spoke with an authorized agent of GMAC who did not identify themself to PLAINTIFFS, and thus the name and identity of this agent is unknown to PLAINTIFFS (hereinafter "DOE-002"). During this telephone conversation, DOE-002 confirmed the facsimile number for GMAC and the mailing address to which PLAINTIFFS should send the REINSTATEMENT PAYMENT.

32.     On August 31, 2010 PLAINTIFFS contacted GMAC a second time that day by telephone at 888-714-4622. During this telephone conversation PLAINTIFFS spoke with an authorized agent of GMAC who did not identify themself to PLAINTIFFS, and thus the name and identity of this agent is unknown to PLAINTIFFS (hereinafter "DOE-003"). During this

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 6 of 31

1  telephone conversation PLAINTIFF confirmed to DOE-003 that the REINSTATEMENT

2  PAYMENT had been mailed by PLAINTIFFS to GMAC via certified mail.

3      33.    On August 31, 2010 PLAINTIFFS sent a facsimile copy of the

4  REINSTATEMENT PAYMENT to GMAC at 866-709-4744. A true and correct copy of the

5  confirmation for this facsimile transmission is attached hereto and marked as Exhibit "L".

6      34.    On September 1, 2010 GMAC sent a letter to PLAINTIFFS stating that the

7  second loan modification was under review and that GMAC would respond within 20 days. A

8  true and correct copy of this letter is attached hereto and marked as Exhibit "M".

9      35.    On September 2, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-

10  4622. During this telephone conversation PLAINTIFFS spoke with an authorized agent of

11  GMAC who did not identify themself to PLAINTIFFS, and thus the name and identity of this

12  agent is unknown to PLAINTIFFS (hereinafter "DOE-004"). PLAINTIFFS asked DOE-004 if

13  GMAC had received the REINSTATEMENT PAYMENT. DOE-004 told PLAINTIFFS they

14  could not locate the REINSTATEMENT PAYMENT. GMAC also told PLAINTIFFS in this

15  telephone conversation that PLAINTIFFS' loan modification application was still being

16  reviewed.

17      36.    On September 8, 2010 PLAINTIFFS contacted GMAC by telephone at 888-714-

18  4622. During this telephone conversation PLAINTIFFS spoke with an authorized agent of

19  GMAC who did not identify themself to PLAINTIFFS, and thus the name and identity of this

20  agent is unknown to PLAINTIFFS (hereinafter "DOE-005"). PLAINTIFFS asked DOE-005 if

21  GMAC had received the REINSTATEMENT PAYMENT. DOE-005 told PLAINTIFFS in this

22  telephone conversation that it was unknown whether GMAC had received the

23  REINSTATEMENT PAYMENT.

24      37.    During the telephone conversation of September 8, 2010, DOE-005 also told

25  PLAINTIFFS that the TRUSTEE SALE had been postponed. PLAINTIFFS asked DOE-005 at

26  least three times to confirm that the TRUSTEE SALE was postponed. DOE-005 confirmed at

27  least three times that the TRUSTEE SALE was postponed.

28      38.    On September 13, 2010 PLAINTIFFS received a letter from GMAC dated

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

1    September 8, 2010 stating the REINSTATEMENT PAYMENT was being returned because the

2    reinstatement amount had changed. A true and correct copy of this letter is attached hereto and

3    marked as Exhibit "N".

4         39.    On September 13, 2010 GMAC and ETS SERVICES completed the TRUSTEE

5    SALE by holding a public auction for the sale of the PROPERTY. At this sale, MED&G

6    purchased the PROPERTY for $244,144.84.

7         40.    On the same day as the TRUSTEE SALE, MED&G posted a three day

8    notice to quit on the PROPERTY signed by Brian Burke of Dry Creek Real Estate. A true and

9    correct copy of this notice is attached hereto and marked as Exhibit "O".

10        41.    After receiving the three day notice to quit, PLAINTIFFS contacted GMAC by

11   telephone at 888-714-4622. During this telephone conversation PLAINTIFFS spoke with an

12   authorized agent of GMAC who did not identify themself to PLAINTIFFS, and thus the name

13   and identity of this agent is unknown to PLAINTIFFS (hereinafter "DOE-006"). PLAINTIFFS

14   asked DOE-006 why the REINSTATEMENT PAYMENT had not been applied to the amount of

15   the default on the NOTE and DEED OF TRUST. DOE-006 told PLAINTIFFS that there was no

16   record of the REINSTATEMENT PAYMENT and that PLAINTIFFS could not do anything to

17   stop or reverse the TRUSTEE SALE because it had already occurred.

18        42.    On September 13, 2010 PLAINTIFFS received a letter from MED&G'S agent,

19   Jim Cates of Dry Creek Real Estate. This letter offered to pay PLAINTIFFS an unknown cash

20   amount if PLAINTIFFS surrendered possession of the PROPERTY. A true and correct copy of

21   this letter is attached hereto and marked as Exhibit "P".

22        43.    PLAINTIFFS filed the present action on September 20, 2010. On the same day

23   PLAINTIFFS recorded a Notice of Pendency of Action with the Sonoma County Recorder

24   bearing document number 2010-079903 in the official records of Sonoma County (hereinafter

25   "LIS PENDENS"). A true and correct copy the LIS PENDENS is attached hereto and marked as

26   Exhibit "Q".

27        44.    On September 20, 2010 MED&G's agent, Joe Agost of Formost Insurance entered

28   the PROPERTY. During this visit, Mr. Agost confronted PLAINTIFFS, and banged on the front

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 8 of 31

1    door and the side of the house with his fist. PLAINTIFFS were deeply distressed by this

2    behavior. A copy of Mr. Agost's apology letter dated September 21, 2010 is attached hereto and

3    marked as Exhibit "R".

4        45.    On September 20, 2010 Counsel for PLAINTIFFS contacted both MED&G and

5    ETS SERVICES and informed them of the COMPLAINT and the LIS PENDENS. (See

6    previously filed Declaration of Thomas P. Kelly III).

7        46.    On September 21, 2010 ETS SERVICES recorded a trustee deed against the

8    PROPERTY in favor of MED&G bearing document number 2010-080387 in the official records

9    of Sonoma County (hereinafter "TRUSTEE DEED"). A true and correct copy of the TRUSTEE

10    DEED is attached hereto and marked as Exhibit "S".

11        47.    On September 28, 2010 MED&G filed an Unlawful Detainer action against

12    PLAINTIFFS. A true and correct copy MED&G's Unlawful Detainer Action is attached hereto

13    and marked as Exhibit "T".

14        48.    As a result of MED&G's Unlawful Detainer Action, PLAINTIFFS were forced to

15    leave their home on October 17, 2010 and surrender possession to MED&G on October 18,

16    2010. As a result of the surrender of possession, MED&G's Unlawful Detainer Action was

17    dismissed.

18        49.    Throughout these events, PLAINTIFFS suffered severe emotional distress.

19    This included a deep sense of shock and humiliation at the sudden foreclosure after being led to

20    believe the TRUSTEE SALE would not go forward. Further, PLAINTIFFS believed that the

21    REINSTATEMENT PAYMENT made to GMAC would resolve the issue. The conduct of

22    MED&G's agent Joe Agost was also deeply distressing for PLAINTIFFS. These events have

23    also caused loss of sleep, depression, anxiety, and a sense of humiliation that these events have

24    occurred. Further, PLAINTIFFS have suffered and continue to suffer profound stress, anxiety,

25    and despair after being treated in the manner described above by all Defendants.

26    //

27                    **FIRST CAUSE OF ACTION**
                    (Breach of Contract - Promissory Estoppel as Substitute for
28                    Consideration against Defendant GMAC)

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

50.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs 1 through 49 as though fully set forth herein.

51.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See COMPLAINT, ¶9)

52.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF TRUST. (See COMPLAINT, ¶10)

53.    PLAINTIFFS are informed and believe and on that basis allege that GMAC made a clear and unambiguous promise to PLAINTIFFS that if PLAINTIFFS submitted the REINSTATEMENT PAYMENT that GMAC would postpone the TRUSTEE SALE.

54.    PLAINTIFFS allege that GMAC first made this promise on August 23, 2010, when DOE-001 advised PLAINTIFFS that if $15,626.02 was paid to GMAC the TRUSTEE SALE would be cancelled. (See COMPLAINT, ¶26)

55.    PLAINTIFFS allege that GMAC repeated this promise on September 8, 2010, when  DOE-005 advised PLAINTIFFS that the TRUSTEE SALE had been postponed. (See COMPLAINT, ¶37)

56.    PLAINTIFFS are informed and believe and on that basis allege that GMAC should have reasonably expected that PLAINTIFFS would rely upon this promise, that GMAC should have reasonably expected that PLAINTIFFS would substantially change their position in reliance on this promise, and that GMAC should have reasonably expected that PLAINTIFFS would forbear other remedies in reliance on this promise.

57.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005, by sending the REINSTATEMENT PAYMENT to GMAC. This reliance by PLAINTIFFS was reasonable because the promise made by GMAC was from an authorized agent, and PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

58.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005 by not seeking to borrow money from other lenders, friends, or family to raise additional funds

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 10 of 31

1   to reinstate the NOTE at any time five days prior to the TRUSTEE SALE pursuant to the

2   provisions of California Civil Code §2924c(e). This reliance by PLAINTIFFS was reasonable

3   because the promise made by GMAC was from an authorized agent, and PLAINTIFFS had no

4   reason to believe that GMAC would not honor it's promise.

5        59.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005

6   by forgoing bankruptcy protection under Title 11 of the United States Code. This reliance by

7   PLAINTIFFS was reasonable because the promise made by GMAC was from an authorized

8   agent, and PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

9        60.    PLAINTIFFS are informed and believe and on that basis allege that GMAC is by

10  the conduct and representations set forth above estopped to deny that PLAINTIFF waived

11  performance of the promise of GMAC to postpone the TRUSTEE SALE.

12       61.    PLAINTIFFS are informed and believe and on that basis allege that the promise

13  of GMAC was not honored because GMAC went forward with the TRUSTEE SALE despite

14  promising not to do so, a promise upon which PLAINTIFFS relied, and which has resulted in

15  injustice and loss to PLAINTIFFS. PLAINTIFFS have suffered damages because PLAINTIFFS

16  have lost title to the PROPERTY, have lost equity in the PROPERTY, were forced to abandon

17  possessions as a result of the TRUSTEE DEED, have suffered enormous anxiety and

18  humiliation, and was despicable conduct that subjected PLAINTIFFS to cruel and unjust

19  hardship in conscious disregard of PLAINTIFFS rights, so as to justify an award of exemplary

20  and punitive damages.

21       WHEREFORE, Plaintiffs pray for judgment as follows:

22  //

23                    **SECOND CAUSE OF ACTION**
                (To Set Aside Trustee's Sale against All Defendants)
24

25       62.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

    1 through 49 as though fully set forth herein.
26

27       63.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

28  at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 11 of 31

1    COMPLAINT, ¶9)

2    64.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

3    at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

4    TRUST. (See COMPLAINT, ¶10)

5    65.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

6    made a clear and unambiguous promise to PLAINTIFFS that if PLAINTIFFS submitted the

7    REINSTATEMENT PAYMENT that GMAC would postpone the TRUSTEE SALE.

8    66.    PLAINTIFFS allege that GMAC first made this promise on August 23, 2010,

9    when DOE-001 advised PLAINTIFFS that if $15,626.02 was paid to GMAC the TRUSTEE

10    SALE would be cancelled. (See COMPLAINT, ¶26)

11    67.    PLAINTIFFS allege that GMAC repeated this promise on September 8, 2010,

12    when DOE-005 advised PLAINTIFFS that the TRUSTEE SALE had been postponed. (See

13    COMPLAINT, ¶37)

14    68.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

15    should have reasonably expected that PLAINTIFFS would rely upon this promise, that GMAC

16    should have reasonably expected that PLAINTIFFS would substantially change their position in

17    reliance on this promise, and that GMAC should have reasonably expected that PLAINTIFFS

18    would forbear other remedies in reliance on this promise.

19    69.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005,

20    by sending the REINSTATEMENT PAYMENT to GMAC. This reliance by PLAINTIFFS was

21    reasonable because the promise made by GMAC was from an authorized agent, and

22    PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

23    70.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005

24    by not seeking to borrow money from other lenders, friends, or family to raise additional funds

25    to reinstate the NOTE at any time five days prior to the TRUSTEE SALE pursuant to the

26    provisions of California Civil Code §2924c(e).  This reliance by PLAINTIFFS was reasonable

27    because the promise made by GMAC was from an authorized agent, and PLAINTIFFS had no

28    reason to believe that GMAC would not honor it's promise.

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 12 of 31

71.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005 by forgoing bankruptcy protection under Title 11 of the United States Code. This reliance by PLAINTIFFS was reasonable because the promise made by GMAC was from an authorized agent, and PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

72.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005 by forgoing bankruptcy protection under Title 11 of the United States Code. This reliance by PLAINTIFFS was reasonable because the promise made by GMAC was from an authorized agent, and PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

73.    Because GMAC misrepresented the amount necessary to cure the default on the NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the NOTE as provided for in California Civil Code §2924c(e).

74.    Because GMAC misrepresented the amount necessary to cure the default on the NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the NOTE as provided under Paragraph 19 of the DEED OF TRUST.

75.    California Civil Code Section 2924 provides that a non-judicial foreclosure sale pursuant to the power of sale clause contained in a deed of trust shall comply with all requirements of applicable law.

76.    PLAINTIFFS are further informed and believe and on that basis allege that by failing to accurately state the amount necessary to cure the default on the NOTE and DEED OF TRUST, and by failing to accept the REINSTATEMENT PAYMENT, GMAC did not comply with all requirements of applicable law.

77.    PLAINTIFFS are further informed and believe and on that basis allege that because GMAC failed to comply with all requirements of applicable law, the TRUSTEE SALE held on September 13, 2010 was invalid and should be set aside.

78.    PLAINTIFFS are further informed and believe and on that basis allege that because GMAC did not honor it's promise, the TRUSTEE SALE held on September 13, 2010 was invalid and should be set aside.

79.    PLAINTIFFS are informed and believe and on that basis allege that because

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 13 of 31

1   GMAC failed to comply with all requirements of applicable law, PLAINTIFFS have suffered

2   injustice and loss. PLAINTIFFS have suffered damages because PLAINTIFFS have lost title to

3   the PROPERTY, have lost equity in the PROPERTY, were forced to abandon possessions as a

4   result of the TRUSTEE DEED, have suffered enormous anxiety and humiliation, and was

5   despicable conduct that subjected PLAINTIFFS to cruel and unjust hardship in conscious

6   disregard of PLAINTIFFS rights, so as to justify an award of exemplary and punitive damages.

7        80.    PLAINTIFFS are informed and believe and on that basis allege that the promise

8   of GMAC was not honored because GMAC went forward with the TRUSTEE SALE despite

9   promising not to do so, a promise upon which PLAINTIFFS relied, and which has resulted in

10  injustice and loss to PLAINTIFFS. PLAINTIFFS have suffered damages because PLAINTIFFS

11  have lost title to the PROPERTY, have lost equity in the PROPERTY, were forced to abandon

12  possessions as a result of the TRUSTEE DEED, have suffered enormous anxiety and

13  humiliation, and was despicable conduct that subjected PLAINTIFFS to cruel and unjust

14  hardship in conscious disregard of PLAINTIFFS rights, so as to justify an award of exemplary

15  and punitive damages.

16        WHEREFORE, Plaintiffs pray for judgment as follows:

17  //

18                          **THIRD CAUSE OF ACTION**
                   (To Set Aside Trustee's Deed against All Defendants)
19

20        81.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

21  1 through 49 as though fully set forth herein.

22        82.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

23  at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

24  COMPLAINT, ¶9)

25        83.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

26  at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

27  TRUST. (See COMPLAINT, ¶10)

28        84.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                        Page 14 of 31

1   made a clear and unambiguous promise to PLAINTIFFS that if PLAINTIFFS submitted the

2   REINSTATEMENT PAYMENT that GMAC would postpone the TRUSTEE SALE.

3       85.    PLAINTIFFS allege that GMAC first made this promise on August 23, 2010,

4   when DOE-001 advised PLAINTIFFS that if the REINSTATEMENT PAYMENT was paid to

5   GMAC the TRUSTEE SALE would be cancelled. (See COMPLAINT, ¶26)

6       86.    PLAINTIFFS allege that GMAC repeated this promise on September 8, 2010,

7   when  DOE-005 advised PLAINTIFFS that the TRUSTEE SALE had been postponed. (See

8   COMPLAINT, ¶37)

9       87.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

10   should have reasonably expected that PLAINTIFFS would rely upon this promise, that GMAC

11   should have reasonably expected that PLAINTIFFS would substantially change their position in

12   reliance on this promise, and that GMAC should have reasonably expected that PLAINTIFFS

13   would forbear other remedies in reliance on his promise.

14       88.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005,

15   by sending the REINSTATEMENT PAYMENT to GMAC. This reliance by PLAINTIFFS was

16   reasonable because the promise made by GMAC was from an authorized agent, and

17   PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

18       89.    PLAINTIFFS in fact did rely on the promise of  GMAC, DOE-001, and DOE-005

19   by not seeking to borrow money from other lenders, friends, or family to raise additional funds

20   to reinstate the NOTE at any time five days prior to the TRUSTEE SALE pursuant to the

21   provisions of California Civil Code §2924c(e).  This reliance by PLAINTIFFS was reasonable

22   because the promise made by GMAC was from an authorized agent, and PLAINTIFFS had no

23   reason to believe that GMAC would not honor it's promise.

24       90.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005

25   by forgoing bankruptcy protection under Title 11 of the United States Code. This reliance by

26   PLAINTIFFS was reasonable because the promise made by GMAC was from an authorized

27   agent, and PLAINTIFFS had no reason to believe that GMAC would not honor it's promise.

28       91.    PLAINTIFFS in fact did rely on the promise of GMAC, DOE-001, and DOE-005

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 15 of 31

1  by forgoing bankruptcy protection under Title 11 of the United States Code. This reliance by

2  PLAINTIFFS was reasonable because the promise made by GMAC was from an authorized

3  agent, and PLAINTIFFS had no reason to believe that the GMAC would not honor it's promise.

4      92.   Because GMAC misrepresented the amount necessary to cure the default on the

5  NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the

6  NOTE as provided for in California Civil Code §2924c(e).

7      93.   Because GMAC misrepresented the amount necessary to cure the default on the

8  NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the

9  NOTE as provided under Paragraph 19 of the DEED OF TRUST.

10     94.   California Civil Code Section 2924 provides that a non-judicial foreclosure sale

11  pursuant to the power of sale clause contained in a deed of trust shall comply with all

12  requirements of applicable law.

13     95.   PLAINTIFFS are further informed and believe and on that basis allege that by

14  failing to accurately state the amount necessary to cure the default on the NOTE and DEED OF

15  TRUST, and by failing to accept the REINSTATEMENT PAYMENT, GMAC did not comply

16  with all requirements of applicable law.

17     96.   PLAINTIFFS are further informed and believe and on that basis allege that

18  because GMAC failed to comply with all requirements of applicable law, the TRUSTEE SALE

19  held on September 13, 2010 was invalid, and that because the TRUSTEE SALE was invalid, the

20  TRUSTEE DEED is likewise invalid and should be set aside.

21     97.   PLAINTIFFS are further informed and believe and on that basis allege that

22  because GMAC did not honor it's promise, the TRUSTEE SALE held on September 13, 2010

23  was invalid, and that because the TRUSTEE SALE was invalid, the TRUSTEE DEED is

24  likewise invalid and should be set aside.

25     98.   PLAINTIFFS are informed and believe and on that basis allege that because

26  GMAC failed to comply with all requirements of applicable law, PLAINTIFFS have suffered

27  injustice and loss. PLAINTIFFS have suffered damages because PLAINTIFFS have lost title to

28  the PROPERTY, have lost equity in the PROPERTY, were forced to abandon possessions as a

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                Page 16 of 31

1  result of the TRUSTEE DEED, have suffered enormous anxiety and humiliation, and was

2  despicable conduct that subjected PLAINTIFFS to cruel and unjust hardship in conscious

3  disregard of PLAINTIFFS rights, so as to justify an award of exemplary and punitive damages.

4       99.    PLAINTIFFS are informed and believe and on that basis allege that the promise

5  of GMAC was not honored because GMAC went forward with the TRUSTEE SALE despite

6  promising not to do so, a promise upon which PLAINTIFFS relied, and which has resulted in

7  injustice and loss to PLAINTIFFS. PLAINTIFFS have suffered damages because PLAINTIFFS

8  have lost title to the PROPERTY, have lost equity in the PROPERTY, were forced to abandon

9  possessions as a result of the TRUSTEE DEED, have suffered enormous anxiety and

10 humiliation, and was despicable conduct that subjected PLAINTIFFS to cruel and unjust

11 hardship in conscious disregard of PLAINTIFFS rights, so as to justify an award of exemplary

12 and punitive damages.

13      WHEREFORE, Plaintiffs pray for judgment as follows:

14 //

15                    **FOURTH CAUSE OF ACTION**
16           (For Recovery of Damages for Wrongful Foreclosure
                 against Defendant GMAC)

17

18      100.   PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

19 1 through 49 as though fully set forth herein.

20      101.   PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

21 at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

22 COMPLAINT, ¶9)

23      102.   PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

24 at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

25 TRUST. (See COMPLAINT, ¶10)

26      103.   PLAINTIFFS are informed and believe and on that basis allege that GMAC

27 made a clear and unambiguous promise to PLAINTIFFS that if PLAINTIFFS submitted the

28 REINSTATEMENT PAYMENT that GMAC would postpone the TRUSTEE SALE.

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707) 545-8700

FIRST AMENDED COMPLAINT             Page 17 of 31

1  104.   PLAINTIFFS allege that GMAC first made this promise on August 23, 2010,

2  when DOE-001 advised PLAINTIFFS that if the REINSTATEMENT PAYMENT was paid to

3  GMAC the TRUSTEE SALE would be cancelled. (See COMPLAINT, ¶26)

4  105.   PLAINTIFFS allege that GMAC repeated this promise on September 8, 2010,

5  when  DOE-005 advised PLAINTIFFS that the TRUSTEE SALE had been postponed. (See

6  COMPLAINT, ¶37)

7  106.   PLAINTIFFS submitted the amount necessary to cure the default on the NOTE

8  and DEED OF TRUST as quoted by GMAC through it's authorized agent DOE-001 by making

9  the REINSTATEMENT PAYMENT.  (See COMPLAINT, ¶26, ¶30)

10  107.   Because GMAC misrepresented the amount necessary to cure the default on the

11  NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the

12  NOTE as provided for in California Civil Code §2924c(e).

13  108.   Because GMAC misrepresented the amount necessary to cure the default on the

14  NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the

15  NOTE as provided under Paragraph 19 of the DEED OF TRUST.

16  109.   California Civil Code Section 2924 provides that a non-judicial foreclosure sale

17  pursuant to the power of sale clause contained in a deed of trust shall comply with all

18  requirements of applicable law.

19  110.   PLAINTIFFS are further informed and believe and on that basis allege that by

20  failing to accurately state the amount necessary to cure the default on the NOTE and DEED OF

21  TRUST, and by failing to accept the REINSTATEMENT PAYMENT, GMAC did not comply

22  with all requirements of applicable law.

23  111.   PLAINTIFFS are further informed and believe and on that basis allege that

24  GMAC was on notice as to all applicable law, including but not limited to Cal. Civ. Code

25  §2924c(e) and Paragraph 19 of the DEED OF TRUST, and should have known of same prior to

26  conducting the TRUSTEE SALE on the PROPERTY.

27  112.   PLAINTIFFS are further informed and believe and on that basis allege that

28  GMAC was fully aware of and ratified those actions which were in violation of California Civil

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 18 of 31

1  Code §2924 and §2924e and Paragraph 19 of the DEED OF TRUST.

2      113.    PLAINTIFFS are further informed and believe and on that basis allege that as a

3  result of the failure of GMAC to comply with all applicable law, including but not limited to Cal.

4  Civ. Code §2924c(e) and Paragraph 19 of the DEED OF TRUST,  the TRUSTEE SALE was

5  wrongful, and that as a result PLAINTIFFS were wrongfully deprived of the fee title of the

6  PROPERTY.

7      114.    PLAINTIFFS are informed and believe and on that basis allege that because

8  GMAC failed to comply with all requirements of applicable law, PLAINTIFFS have suffered

9  injustice and loss. PLAINTIFFS have suffered damages because PLAINTIFFS have lost title to

10  the PROPERTY, have lost equity in the PROPERTY, were forced to abandon possessions as a

11  result of the TRUSTEE DEED, have suffered enormous anxiety and humiliation, and was

12  despicable conduct that subjected PLAINTIFFS to cruel and unjust hardship in conscious

13  disregard of PLAINTIFFS rights, so as to justify an award of exemplary and punitive damages.

14      WHEREFORE, Plaintiffs pray for judgment as follows:

15  //

16                    **FIFTH CAUSE OF ACTION**
                     (Fraud against Defendant GMAC)
17

18      115.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

19  1 through 49 as though fully set forth herein.

20      116.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

21  at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

22  COMPLAINT, ¶9)

23      117.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

24  at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

25  TRUST. (See COMPLAINT, ¶10)

26      118.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

27  through it's authorized agent DOE-001 represented to PLAINTIFFS on August 23, 2010 that the

28  amount to cure the default on the NOTE and DEED OF TRUST was $15,626.02. (See

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 19 of 31

1    COMPLAINT, ¶26)

2      119.   PLAINTIFFS submitted the amount necessary to cure the default on the NOTE

3 and DEED OF TRUST as quoted by GMAC through it's authorized agent DOE-001 by making

4 the REINSTATEMENT PAYMENT. (See COMPLAINT, ¶26, ¶30)

5      120.   Because GMAC misrepresented the amount necessary to cure the default on the

6 NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the

7 NOTE as provided for in California Civil Code §2924c(e).

8      121.   Because GMAC misrepresented the amount necessary to cure the default on the

9 NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the

10 NOTE as provided under Paragraph 19 of the DEED OF TRUST.

11      122.   California Civil Code §2924(e) provides as follows:

12         There is a rebuttable presumption that the beneficiary actually knew of all unpaid
         loan payments on the obligation owed to the beneficiary and secured by the deed
13         of trust or mortgage subject to the notice of default.

14      123.   PLAINTIFFS are informed and believe and on that basis allege that GMAC not

15 only knew the true reinstatement amount, but was presumed to know the true reinstatement

16 amount under California Civil Code §2924(e).

17      124.   PLAINTIFFS are informed and believe and on that basis allege that GMAC

18 through it's authorized agent DOE-001 intentionally misstated the reinstatement amount to

19 PLAINTIFFS, and this constitutes a fraudulent misrepresentation.

20      125.   GMAC did not inform PLAINTIFFS that the REINSTATEMENT AMOUNT was

21 insufficient until after the five day period tolled under California Civil Code §2924c(e). (See

22 COMPLAINT, ¶38)

23      126.   GMAC did not notify PLAINTIFFS of the correct reinstatement amount until

24 GMAC sent a letter to PLAINTIFFS on September 8, 2010 which is exactly five days before the

25 TRUSTEE SALE. (See COMPLAINT, ¶38)

26      127.   PLAINTIFFS are informed and believe and on that basis allege that GMAC knew

27 that a letter sent first class mail on September 8, 2010 would not be received by PLAINTIFFS

28 until after the five day period of §2924c(e) had expired, thereby preventing PLAINTIFFS from

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT             Page 20 of 31

1  making any additional payment for full reinstatement.

2      128.    PLAINTIFFS are informed and believe and on that basis allege that when GMAC

3  through it's authorized agent DOE-001 made the aforesaid fraudulent misrepresentations to

4  PLAINTIFFS they knew them to be false and made them with the intention to deceive and

5  defraud PLAINTIFFS and to induce PLAINTIFFS to act in reliance on these fraudulent

6  misrepresentations in the manner hereafter alleged, or with the expectation that PLAINTIFFS

7  would so act, which resulted in PLAINTIFFS losing title to their interest in the PROPERTY at

8  the TRUSTEE SALE.

9      129.    PLAINTIFFS were ignorant of the falsity of the fraudulent representations made

10  by GMAC through it's authorized agent DOE-001 and believed them to be true.

11      130.    PLAINTIFFS relied upon the fraudulent representations of GMAC made by

12  GMAC's authorized agent DOE-001 by making the REINSTATEMENT PAYMENT.

13      131.    PLAINTIFFS reliance on the fraudulent misrepresentations of GMAC was

14  justified as the representations were made by an authorized agent of GMAC, and PLAINTIFFS

15  had no reason to doubt the veracity of the fraudulent misrepresentations.

16      132.    As a proximate result of this reliance on the fraudulent misrepresentations  of

17  GMAC, PLAINTIFFS were induced to take no additional steps to protect their interest in the

18  PROPERTY. Had PLAINTIFFS known the true facts, they could have pursued alternate

19  measures to avoid the TRUSTEE SALE, including but not limited to, borrowing additional funds

20  to reinstate the NOTE and filing for bankruptcy protection under Title 11 of the United States

21  Code.

22      133.    In addition, as a proximate result of the fraudulent misrepresentations of GMAC,

23  PLAINTIFFS have suffered severe emotional distress in the form of inability to sleep, panic

24  attacks, depression, and daily constant anxiety.

25      134.    The aforementioned conduct of GMAC, was an intentional fraudulent

26  misrepresentation, deceit or concealment of material facts known to GMAC, and were made

27  intentionally by GMAC in order to deprive PLAINTIFFS of the PROPERTY, legal rights or

28  otherwise causing injury, and the actions of GMAC was despicable conduct that subjected

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT              Page 21 of 31

1  PLAINTIFFS to cruel and unjust hardship in conscious disregard of PLAINTIFFS rights, so as

2  to justify an award of exemplary and punitive damages.

3       WHEREFORE, Plaintiffs pray for judgment as follows:

4  //

5                     **SIXTH CAUSE OF ACTION**

6            (Negligent Misrepresentation against Defendant GMAC)

7      135.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

8  1 through 49 as though fully set forth herein.

9      136.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

10  at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

11  COMPLAINT, ¶9)

12      137.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

13  at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

14  TRUST. (See COMPLAINT, ¶10)

15      138.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

16  through it's authorized agent DOE-001 represented to PLAINTIFFS on August 23, 2010 that the

17  amount to cure the default on the NOTE and DEED OF TRUST was $15,626.02. (See

18  COMPLAINT, ¶26)

19      139.    PLAINTIFFS submitted the amount necessary to cure the default on the NOTE

20  and DEED OF TRUST as quoted by GMAC through it's authorized agent DOE-001 by making

21  the REINSTATEMENT PAYMENT. (See COMPLAINT, ¶26, ¶30)

22      140.    Because GMAC misrepresented the amount necessary to cure the default on the

23  NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the

24  NOTE as provided for in California Civil Code §2924c(e).

25      141.    Because GMAC misrepresented the amount necessary to cure the default on the

26  NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the

27  NOTE as provided under Paragraph 19 of the DEED OF TRUST.

28      142.    When GMAC through it's authorized agent DOE-001 made the representations to

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT               Page 22 of 31

1   PLAINTIFFS set forth above they had no reasonable grounds for believing them to be true.

2       143.   When GMAC through it's authorized agent DOE-001 made the representations to

3   PLAINTIFFS set forth above they were negligent and were made with the knowledge that

4   PLAINTIFFS would rely on those representations, and with the expectation that PLAINTIFFS

5   would rely on those representations, and with the intent of preventing PLAINTIFFS from further

6   inquiry into available remedies for the TRUSTEE SALE.

7       144.   In addition, as a proximate result of the negligent conduct of GMAC,

8   PLAINTIFFS have suffered severe emotional distress in the form of inability to sleep, panic

9   attacks, depression, and daily constant anxiety.

10       145.   The aforementioned conduct of GMAC, was an negligent misrepresentation, of

11   material facts known to GMAC, and were negligently made by GMAC which resulted in

12   PLAINTIFFS loss of the PROPERTY, legal rights or otherwise causing injury, and the actions

13   of GMAC was despicable conduct that subjected PLAINTIFFS to cruel and unjust hardship in

14   conscious disregard of PLAINTIFFS rights, so as to justify an award of exemplary and punitive

15   damages.

16       WHEREFORE, Plaintiffs pray for judgment as follows.

17   //

18           **SEVENTH CAUSE OF ACTION**
            (Negligence against Defendant GMAC)
19

20       146.   PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

21   1 through 49 as though fully set forth herein.

22       147.   PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

23   at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

24   COMPLAINT, ¶9)

25       148.   PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

26   at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

27   TRUST. (See COMPLAINT, ¶10)

28       149.   PLAINTIFFS are informed and believe and on that basis allege that GMAC

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT        Page 23 of 31

1   through it's authorized agent DOE-001 represented to PLAINTIFFS on August 23, 2010 that the

2   amount to cure the default on the NOTE and DEED OF TRUST was $15,626.02. (See

3   COMPLAINT, ¶26)

4        150.    PLAINTIFFS submitted the amount necessary to cure the default on the NOTE

5   and DEED OF TRUST as quoted by GMAC through it's authorized agent DOE-001 by making

6   the REINSTATEMENT PAYMENT. (See COMPLAINT, ¶26, ¶30)

7        151.    Because GMAC misrepresented the amount necessary to cure the default on the

8   NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the

9   NOTE as provided for in California Civil Code §2924c(e).

10       152.    Because GMAC misrepresented the amount necessary to cure the default on the

11  NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the

12  NOTE as provided under Paragraph 19 of the DEED OF TRUST.

13       153.    PLAINTIFFS are informed and believe and on that basis allege that at all

14  applicable times GMAC owed a duty to PLAINTIFFS to conduct all business related to the

15  NOTE and DEED OF TRUST with the level of care of a reasonable loan servicer. Further,

16  GMAC owed a duty to PLAINTIFFS to conduct all activities related to the TRUSTEE SALE in

17  accord with all applicable law, including those duties imposed on GMAC under California Civil

18  Code §2924, et. seq. And under Paragraph 19 of the DEED OF TRUST.

19       154.    PLAINTIFFS are informed and believe and on that basis allege that on September

20  13, 2010 GMAC carelessly and negligently permitted the TRUSTEE SALE to occur on the

21  PROPERTY despite the fact that PLAINTIFFS had offered the REINSTATEMENT

22  PAYMENT, and that PLAINTIFF had been misled as to the correct amount by GMAC.

23       155.    PLAINTIFFS are informed and believe and on that basis allege that this conduct

24  breached the duty GMAC owed to PLAINTIFFS, thus causing damage to PLAINTIFFS in an

25  amount according to proof.

26       156.    The aforementioned conduct of GMAC, was negligent and has resulted in

27  PLAINTIFFS loss of the PROPERTY, legal rights or otherwise causing injury, and the actions

28  of GMAC was despicable conduct that subjected PLAINTIFFS to cruel and unjust hardship in

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                  Page 24 of 31

1    conscious disregard of PLAINTIFFS rights, so as to justify an award of exemplary and punitive

2    damages.

3        WHEREFORE, Plaintiffs pray for judgment as follows:

4    //

5        **EIGHTH CAUSE OF ACTION**
         (Quiet Title against Defendant MED&G)

6

7        157.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

8    1 through 49 as though fully set forth herein.

9        158.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

10   at any time until five days prior to the TRUSTEE SALE under Cal. Civ. Code §2924c(e). (See

11   COMPLAINT, ¶9)

12       159.    PLAINTIFFS had a right to reinstate the NOTE by tendering the default amount

13   at any time until five days prior to the TRUSTEE SALE under Paragraph 19 of the DEED OF

14   TRUST. (See COMPLAINT, ¶10)

15       160.    PLAINTIFFS are informed and believe and on that basis allege that GMAC

16   through it's authorized agent DOE-001 represented to PLAINTIFFS on August 23, 2010 that the

17   amount to cure the default on the NOTE and DEED OF TRUST was $15,626.02. (See

18   COMPLAINT, ¶26)

19       161.    PLAINTIFFS submitted the amount necessary to cure the default on the NOTE

20   and DEED OF TRUST as quoted by GMAC through it's authorized agent DOE-001 by making

21   the REINSTATEMENT PAYMENT. (See COMPLAINT, ¶26, ¶30)

22       162.    Because GMAC misrepresented the amount necessary to cure the default on the

23   NOTE and DEED OF TRUST, PLAINTIFFS were denied their statutory right to reinstate the

24   NOTE as provided for in California Civil Code §2924c(e).

25       163.    Because GMAC misrepresented the amount necessary to cure the default on the

26   NOTE and DEED OF TRUST, PLAINTIFFS were denied their contract right to reinstate the

27   NOTE as provided under Paragraph 19 of the DEED OF TRUST.

28       164.    PLAINTIFFS are informed and believe and on that basis allege that the

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 25 of 31

1  TRUSTEE SALE was conducted in violation of applicable law as set forth above, and that this

2  violation renders any claim to title on the PROPERTY arising from the TRUSTEE SALE or

3  TRUSTEE DEED is invalid.

4      165.    PLAINTIFFS are informed and believe and on that basis allege that title to the

5  PROPERTY is allegedly held by MED&G, that the title of MED&G in the PROPERTY arises

6  from the TRUSTEE SALE, and that title is wrongfully held by MED&G because the TRUSTEE

7  SALE and TRUSTEE DEED are invalid.

8      166.    PLAINTIFFS are informed and believe and on that basis allege that as a result of

9  the invalid TRUSTEE SALE and TRUSTEE DEED, MED&G has no right, title, estate, lien, or

10  interests whatever in the PROPERTY or any part thereof.

11      167.    Therefore, PLAINTIFFS seek to quiet title in the name of PLAINTIFFS as of

12  September 13, 2010.

13      WHEREFORE, Plaintiffs pray for judgment as follows:

14  //

15              **NINTH CAUSE OF ACTION**
                (Declaratory Relief against All Defendants)
16

17      168.    PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

18  1 through 49 as though fully set forth herein.

19      169.    An actual controversy arisen now exists between PLAINTIFFS and Defendants

20  GMAC, ETS SERVICES, and MED&G concerning their respective rights and duties in that

21  PLAINTIFFS maintains that the TRUSTEE SALE as alleged above was not conducted in

22  accordance with all applicable law, and as a result, the TRUSTEE SALE and TRUSTEE DEED

23  should be set aside.

24      170.    GMAC, ETS SERVICES, and MED&G dispute the foregoing conditions and

25  contend that the TRUSTEE SALE and TRUSTEE DEED were properly conducted and recorded

26  and in accordance with all applicable law.

27      171.    PLAINTIFFS desire judicial determination of their rights and duties in the

28  determination as to whether the TRUSTEE SALE and TRUSTEE DEED were properly

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 26 of 31

1   conducted and recorded and in accordance with all applicable law.

2       172.   A judicial determination is necessary and appropriate at this time under the

3   circumstances in that PLAINTIFFS may ascertain their rights and duties pursuant to the conduct

4   of the TRUSTEE SALE and as to the validity of the TRUSTEE DEED.

5       173.   PLAINTIFFS further hereby seek declaratory relief from this Court that MED&G

6   was not a bona fide purchaser for value as a result of the TRUSTEE SALE or TRUSTEE DEED.

7       WHEREFORE, Plaintiffs pray for judgment as follows:

8   //

9   **TENTH CAUSE OF ACTION**
(Intentional Infliction of Emotional Distress against Defendant MED&G)

10

11       174.   PLAINTIFFS incorporate herein each and every allegation set forth in paragraphs

12   1 through 49 as though fully set forth herein.

13       175.   PLAINTIFFS are informed and believe and on that basis allege that the MED&G

14   knew or should have known that any person whose primary residence is the subject of a non-

15   judicial foreclosure is in a vulnerable state, and likely to suffer emotional distress as a result of

16   such a proceeding.

17       176.   PLAINTIFFS are informed and believe and on that basis allege that the actions

18   of the agent of MED&G,  Joe Agost of Formost Insurance, which included entering the

19   PROPERTY without any right to do so, banging on the front door and banging on the side of the

20   house with his fist was intentional and unreasonable conduct which was done with the

21   recognition that these actions were likely to result in illness through mental distress for

22   PLAINTIFFS.

23       177.   PLAINTIFFS are informed and believe and on that basis allege that the actions

24   of the agent of MED&G in brining an Unlawful Detainer Action against PLAINTIFFS was

25   calculated to cause pain and suffering for PLAINTIFFS and was intentional and unreasonable

26   conduct which was done with the recognition that these actions were likely to result in illness

27   through mental distress for PLAINTIFFS.

28       178.   In addition, as a proximate result of this conduct of MED&G, PLAINTIFFS

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT          Page 27 of 31

1    have suffered, and continue to suffer, severe emotional distress in the form of inability to sleep,

2    panic attacks, depression, and daily constant anxiety.

3    179.    The aforementioned conduct of MED&G was intentional and despicable

4    conduct that subjected PLAINTIFFS to cruel and unjust hardship in conscious disregard of

5    PLAINTIFFS rights, so as to justify an award of exemplary and punitive damages.

6    WHEREFORE, Plaintiffs pray for judgment as follows:

7    //

8    **PRAYER FOR RELIEF**

9    A.    For a judgment estopping GMAC from denying there was a Contract and

10    damages for breach thereof to PLAINTIFFS according to proof; and

11    D.    For a judgment setting aside the TRUSTEE SALE; and

12    E.    For a judgment setting aside the TRUSTEE DEED; and

13    F.    For a judgment awarding damages to PLAINTIFFS from GMAC for Recovery of

14    Damages for Wrongful Foreclosure according to proof; and

15    G.    For a judgment awarding damages to PLAINTIFFS from GMAC for Fraud

16    according to proof; and

17    H.    For a judgment awarding damages to PLAINTIFFS from GMAC for Negligent

18    Misrepresentation according to proof; and

19    I.    For a judgment to Quiet Title to the PROPERTY in the name of PLAINTIFFS

20    against MED&G; and

21    K.    For declaration that the TRUSTEE SALE and TRUSTEE DEED failed to comply

22    with applicable law and have no force or effect; and

23    L.    For a judgment awarding damages to PLAINTIFFS against MED&G for

24    Intentional Infliction of Emotional Distress according to proof; and

25    M.    For general damages against all Defendants according to proof; and

26    N.    For exemplary damages against all Defendants according to proof; and

27    O.    For punitive damages against all Defendants according to proof; and

28    P.    For Prejudgment interest; and

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                Page 28 of 31

Q.    For costs of suit herein incurred, including attorney's fees; and

R.    For such other and further relief as the Court may deem proper.

Dated: __MARCH 20__, 2010

Thomas P. Kelly III
Attorney for Plaintiffs

Thomas P. Kelly Jr.
Thomas P. Kelly III
50 Old Courthouse Sq
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                Page 29 of 31

1
2
3
4
5
### DEMAND FOR JURY TRIAL

6       Plaintiffs Hitoshi Inoue and Wakana Inoue hereby demand a jury trial on all claims.

7   Dated: March _20_, 2011

8                                           Thomas P. Kelly III
                                            Attorney for Plaintiffs
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Thomas P. Kelly Jr
Thomas P. Kelly III
50 Old Courthouse Sq
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT              Page 30 of 31

1
2
3
4    # VERIFICATIONS TO FOLLOW
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26    C:\Documents\Client Files\Inoue, Hitoshi\Pleadings\Second Amended Complaint\3-19-11 Second Amended Complaint.wpd *sine missione*
27
28

Thomas P. Kelly Jr
Thomas P. Kelly III
50 Old Courthouse Sq.
Suite 609
Santa Rosa, California
95404-4926
(707)545-8700

FIRST AMENDED COMPLAINT                    Page 31 of 31

# EXHIBIT A

Thomas P. Kelly III, SBN 230699
50 Old Courthouse Square, Suite 609
Santa Rosa, California, 95404-4926
Telephone : 707-545-8700
Facsimile : 707-542-3371
Email : tomkelly@sonic.net

Plaintiffs Exhibits
Page 1 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 1 of 17

Recording Requested By
GMAC Mortgage Corporation
DBA ditech.com
Return To:
GMAC Mortgage Corporation
DBA ditech.com
3200 Park Center Dr. Suite
150, Costa Mesa, CA 92626



**2003092480**

OFFICIAL RECORDS OF
SONOMA COUNTY
EEVE T. LEWIS

FIRST AMERICAN TITLE CO.
05/07/2003 14:21 TRD
RECORDING FEE: 52.00

**16**

Prepared By:
Jennifer Castro - Schuler

*1594473*          248.0

------[Space Above This Line For Recording Data]------

# DEED OF TRUST

MIN 100037506544019244

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated 04/19/2003 together with all Riders to this document.
**(B) "Borrower" is** Hitoshi Inoue

Borrower's address is 3735 Coffey Lane, Santa Rosa, CA 95403
. Borrower is the trustor under this Security Instrument.

**(C) "Lender" is**
GMAC Mortgage Corporation DBA ditech.com
Lender is a Residential Mortgage Lender
organized and existing under the laws of Commonwealth of Pennsylvania

**000654401924**

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005 1/01

-6A(CA) (0207)
Page 1 of 15          Initials 24.8

VMP MORTGAGE FORMS - (800)521-7291

Lender's address is
. 3200 Park Center Dr. Suite 150, Costa Mesa, CA 92626
(D) "Trustee" is
Executive Trustee Services, Inc.
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS
(F) "Note" means the promissory note signed by Borrower and dated 04/19/2003
The Note states that Borrower owes Lender
Two Hundred Forty Eight Thousand                                          Dollars
(U.S. $248,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than May 1, 2033
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

000654401924

-6A(CA) (0207).                    Page 2 of 15          Initials: _____          Form 3005  1/01

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of Sonoma  :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

The Assessor's Parcel Number (Property Tax ID#) for the Real Property is 058-032-016-000. See Attached Exhibit "A"

Parcel ID Number: 058-032-016-000

3735 Coffey Lane

Santa Rosa ("Property Address"):

which currently has the address of

[Street]

[City], California 95403- [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

000654401924

-6A(CA) (0201)                         Page 3 of 15                         Form 3005  1/01

Plaintiffs Exhibits ·
Page 4 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 4 of 17

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows.

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

000654401924

-6A(CA) (0207)    Page 4 of 15    Form 3005  1/01

Initials

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien, in legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

000654401924

-6A(CA) (0207)

Page 6 of 15

Form 3005   1/01

Plaintiffs Exhibits
Page 6 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 6 of 17

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

000654401924

6A(CA) (0707)                     Page 6 of 15                     Initials ___                     Form 3005   1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

000654401924

-6A(CA) (0207)                    Page 7 of 15                    Form 3005  1/01

Plaintiffs Exhibits
Page 8 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 8 of 17

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

0000654401924

-6A(CA) (0107)                   Page 8 of 15                   Initials                   Form 3006   1/01

Plaintiffs Exhibits
Page 9 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 9 of 17

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

000654401924

Plaintiffs Exhibits
Page 10 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 10 of 17

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

000654401924

-6A(CA) (0207)    Page 10 of 15    Initials ___    Form 3005    1/01

Plaintiffs Exhibits
Page 11 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 11 of 17

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

000654401924

●●●●-6A(CA) (0207)    Page 11 of 15    Form 3005 1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

000654401924

-6A(CA) (0207)                    Page 12 of 15                    Form 3005   1/01

Plaintiffs' Exhibits
Page 13 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 13 of 17

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows.

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

000654401924

(logo) -6A(CA) (0201)    Page 13 of 15    Initials: _____    Form 3005   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _Hitoshi Inoue_____ (Seal)
Hitoshi Inoue                                -Borrower

_____    _____ (Seal)
                                                     -Borrower

_____ (Seal)    _____ (Seal)
                  -Borrower                           -Borrower

_____ (Seal)    _____ (Seal)
                  -Borrower                           -Borrower

_____ (Seal)    _____ (Seal)
                  -Borrower                           -Borrower

000654401924

-6A(CA) (0207)                   Page 14 of 15              Form 3005  1/01

Plaintiffs Exhibits
Page 15 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 15 of 17

State of California
County of Sonoma

}  ss.

On    04/19/03    before me, Kimberly A. Sharon, Notary Public, personally appeared

Hitoshi Inoue

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

KIMBERLY A. SHARON
Commission # 1361749
Notary Public - California
Sonoma County
My Comm. Expires Jun 21, 2005

_____ (Seal)

000654401924

-6A(CA) (0207)    Page 15 of 15    Initials ___    Form 3005    1/01

Plaintiffs Exhibits
Page 16 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 16 of 17

ALL THAT CERTAIN LAND SITUATE... IN THE STATE OF CALIFORNIA, COUN    OF SONOMA, CITY OF SANTA ROSA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF C. A. LAWSON AS RECORDED IN BOOK 1129 OF OFFICIAL RECORDS, PAGE 283, SONOMA COUNTY RECORDS AND IN THE CENTER OF COFFEY LANE; THENCE ALONG SAID CENTER SOUTH 1 DEGREE 03' 40" EAST, 393.22 FEET TO THE TRUE POINT OF BEGINNING; THENCE FROM SAID TRUE POINT OF BEGINNING SOUTH 89 DEGREES 32' 20" WEST, 20.00 FEET TO A 1/2" IRON PIPE; THENCE CONTINUING SOUTH 89 DEGREES 32' 20" WEST, 203.99 FEET TO A 1/2" IRON PIPE; THENCE SOUTH 1 DEGREE 03' 40" EAST, 117.00 FEET TO A 1" X 2" HUB; THENCE CONTINUING SOUTH 1 DEGREE 03' 40" EAST, 10.00 FEET; THENCE NORTH 89 DEGREES 32' 20" EAST, 203.99 FEET TO A POINT FROM WHICH POINT A 1/2" IRON PIPE BEARS NORTH 1 DEGREE 03' 40" WEST 10.00 FEET THENCE CONTINUING NORTH 89 DEGREES 32' 20" EAST, 20.00 FEET TO THE CENTER OF COFFEY LANE, THENCE ALONG SAID CENTER NORTH 1 DEGREE 03' 40" WEST, 127.00 FEET TO THE POINT OF BEGINNING.

SAVING AND EXCEPTING THEREFROM THAT PORTION DESCRIBED IN THE DEED TO THE CITY OF SANTA ROSA, A MUNICIPAL CORPORATION RECORDED SEPTEMBER 27, 1989 UNDER DOCUMENT NO. 89092235, SONOMA COUNTY RECORDS.

058-032-016-000

Plaintiffs Exhibits
Page 17 of 109

Inoue vs. GMAC SCV 248256
Exhibit A
Page 17 of 17

# EXHIBIT B

Thomas P. Kelly III, SBN 230699
50 Old Courthouse Square, Suite 609
Santa Rosa, California, 95404-4926
Telephone : 707-545-8700
Facsimile : 707-542-3371
Email : tomkelly@sonic.net

Plaintiffs Exhibits
Page 18 of 109

Inoue vs. GMAC SCV 248256
Exhibit B
Page 1 of 17

Unless prohibited by law, our liability, if any, for wrongful dishonor of a Credit Line Draw is limited to your actual damages.

We reserve the right not to honor any Account Access Card if any of them has been reported lost or stolen. We also reserve the right not to honor Credit Line Checks that have been reported lost or stolen.

**Daily Periodic Rate and Annual Percentage Rate – Variable Rate Credit Line Portion.**   The Annual Percentage Rate applicable to the Variable Rate Portion of your Account is a variable rate equal to the Index, as defined below, plus a margin of 3.500 percentage points. The Daily Periodic Rate is equal to the Annual Percentage Rate divided by 365 (366 for billing cycles that begin in a leap year). The Daily Periodic Rate is rounded up to the seventh decimal place. The Daily Periodic Rate as of   12/09/03   is   0.013   percent, which corresponds to an ANNUAL PERCENTAGE RATE of   4.570   %. The Annual Percentage Rate includes only periodic interest and not other costs.

**Variable Rate Credit Line Portion Index.**   The "Index" is the weekly average rate of interest on 30-day Certificates of Deposit as published by the Federal Reserve Bank of New York in Statistical Release H.15. Changes in the Annual Percentage Rate will be based on the latest release published prior to the Sunday on or before the beginning of your billing cycle and will be effective on the first day of the billing cycle. If the Index is unavailable for any billing cycle, we will use the Index for the most recent preceding billing cycle in which the Index was available. If this original Index ceases to be published during the term of this Agreement, we will select a substitute index and margin. The substitute index will thereafter be the Index. The substitute index will have a historical movement substantially similar to the original Index, and the substitute index and margin will result in an Annual Percentage Rate at the time it is substituted that is substantially similar to the rate in effect at the time the original Index becomes unavailable. The Annual Percentage Rate will increase or decrease as the Index increases or decreases. An increase in the Index will result in increases in the Finance Charge which will result in an increase in the minimum monthly payment. The reverse will happen if the Index declines.

**Finance Charge Computation – Variable Rate Credit Line Portion.**   The Finance Charge applicable to the Variable Rate Credit Line Portion of your Account is comprised of a simple interest rate identified Finance Charge and certain additional charges identified as Finance Charges in the "Account Opening Costs" and "Other Charges" sections below. We reserve the right to not include these additional charges to the calculation of Finance Charges. To compute the periodic Finance Charge on the Variable Rate Credit Line Portion of your Account for a billing cycle, we start with the outstanding principal balance of all Credit Line Draws at the beginning of the billing cycle, plus (1) any unpaid Finance Charges and (2) any past due Annual Fee. Each day during the billing cycle, we add to this amount any Credit Line Draws posted to the Variable Rate Credit Line Portion of your Account, and any Annual Fee that becomes past due. We subtract any payments or credits to Credit Line Draws, Finance Charge, or past due Annual Fees posted to your Account. This gives us the daily balance subject to Finance Charges for each day of the billing cycle. We multiply the daily balance subject to Finance Charges by the Daily Periodic Rate, which gives us the periodic Finance Charge for each day. The Finance Charge for all Credit Line Draws begins on the date posted to your Account and for the Annual Fee, on the day it becomes past due.

**Monthly Payments – Variable Rate Credit Line Portion.**

Revolving Period . During the Revolving Period, your minimum monthly payment for the Variable Rate Credit Line Portion will be equal to the amount of the Finance Charge accrued on that portion of your Account for the billing cycle, plus any Other Charges and optional credit insurance premiums, if applicable. In addition, your payment must include any amount that exceeds your Total Credit Commitment plus any amount past due. Your minimum monthly payment will not reduce your principal balance.

Repayment Period . During the Repayment Period, your minimum monthly payment for the Variable Rate Credit Line Portion for each billing cycle will be equal to (A) your outstanding principal balance plus any unpaid Annual Fee on that portion of your Account on the first day of the Repayment Period divided by 180, plus (B) the Finance Charge that accrued on that portion of your Account during the billing cycle, plus (C) optional credit insurance premiums, plus (D) any amount past due. We will continue to calculate the Finance Charge that applies to your Account in the same way that it was calculated during the Revolving Period.

At any time, you may pay us more than the minimum amount due without incurring a prepayment penalty.

These payments will be in addition to the minimum monthly payment due for the Fixed Rate Loan Portion of your Account, as described following.

00013

EXHIBIT "___C___"

PAGE _3_ OF _16_

CLS-3043-2-CA/0005   02-03
05-05-30
CAMIS   Plaintiffs Exhibits
Page 20 of 109

Page 2 of 11

California
3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 3 of 17

**Automatic Payment Service.** ☐ If this box is checked, you have agreed that the minimum monthly payments on the Variable Rate Credit Line Portion will be made on the due date by automatic transfer from your N/A _____ maintained with us. If on the due date of any payment your account does not have sufficient collected funds to make such transfer in full, no payment will be applied to the Account. This may result in additional Finance Charges and possible late charges. Either you or we may cancel this service for any reason by giving written notice to the other.

## FIXED RATE LOAN PORTION OF YOUR ACCOUNT

### How You Can Borrow – Fixed Rate Loan Portion.

You may establish Fixed Rate Loans on your Account up to the Total Credit Commitment during the Revolving Period unless you are in default or your credit privileges are suspended or terminated in accordance with this Agreement. The minimum amount of a Fixed Rate Loan is $5,000 and the maximum amount is subject to the Total Credit Commitment. You may establish Fixed Rate Loans as long as the number of Fixed Rate Loans at any one time does not exceed three during the billing cycle. You may use the proceeds of a new Fixed Rate Loan to pay off all or part of an existing Fixed Rate Loan. Each Fixed Rate Loan will have a fixed interest rate and term. At the end of the Revolving Period you will continue to pay on outstanding Fixed Rate Loans at the interest rate, term and payment agreed upon at the time you established the Fixed Rate Loan.

**Fixed Rate Loan Fees.** You pay a Fixed Rate Loan Fee FINANCE CHARGE of $75. You may pay the Fixed Rate Loan Fee at the time the Fixed Rate Loan is made, or the Fee may be financed, in which case it will be included in the principal balance of the Fixed Rate Loan and will be subject to periodic Finance Charge.

### Finance Charge Computation – Fixed Rate Loan Portion

The Annual Percentage Rate on each Fixed Rate Loan you establish with automatic payment service will be the sum of the "Fixed Rate Index" in effect at the time the Fixed Rate Loan is established, as defined below, plus a margin of either _5.250_ percentage points for Fixed Rate Loans from $5,000 to $19,999, or _3.750_ percentage points for Fixed Rate Loans of $20,000 or more. If automatic payment service is not selected, the margin used to determine the Annual Percentage Rate will be increased by 1/4 of one percentage point. The Daily Periodic Rate for each Fixed Rate Loan is equal to the Annual Percentage Rate for such Fixed Rate Loan divided by 365 (366 for billing cycles that begin in a leap year).

The "Fixed Rate Index" in effect will be the monthly average of five year Treasury Constant Maturities, as published by the Federal Reserve Bank of New York in Statistical Release (H. 15) just prior to the Sunday on or before the date documents are prepared for you to establish the Fixed Rate Loan. If the original Fixed Rate Index is unavailable for any reason, we will use the most recent figures available for the Fixed Rate Index or select a substitute Index and margin in the same manner as described for the Variable Rate Credit Line Portion.

For example, the following chart shows the Daily Periodic Rates and corresponding ANNUAL PERCENTAGE RATES for Fixed Rate Loans using the Fixed Rate Index in effect as of _____ 12/09/03 _____.

| Fixed Rate Loan Amount | With Automatic Payment Service | | Without Automatic Payment Service | |
|---|---|---|---|---|
| | Daily Periodic Rate | APR | Daily Periodic Rate | APR |
| $ 5,000 to 19,999 | 0.023% | 8.540% | 0.024% | 8.790% |
| $20,000 or more | 0.019% | 7.040% | 0.020% | 7.290% |

The Annual Percentage Rate on each Fixed Rate Loan is determined in the manner described above at the time you establish the Fixed Rate Loan. As the Fixed Rate Index increases or decreases, the Annual Percentage Rate on Fixed Rate Loans established after the date of this Agreement will also increase or decrease. A higher Annual Percentage Rate will result in higher Finance Charges and a higher minimum monthly payment. However, once a Fixed Rate Loan is established, the Annual Percentage Rate for that Fixed Rate Loan will not change. The Annual Percentage Rate includes only periodic interest and not other costs.

EXHIBIT " _C_ "
PAGE _4_ OF _16_

00014

CLS-3043-3-CA/0005   02-03
05-05-3043MER
Plaintiffs Exhibits
Page 21 of 109

Page 3 of 11

California
3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 4 of 17

To compute the periodic Finance Charge for each Fixed Rate Loan for each billing cycle, we start with the principal amount of such Fixed Rate Loan at the beginning of the billing cycle. Each day during the billing cycle, we will subtract any payments of principal. This gives us the adjusted daily balance for each day of the billing cycle. We multiply the adjusted daily balance for each day of the billing cycle by the Daily Periodic Rate which gives us the periodic Finance Charge for each day of the billing cycle. We then add together the periodic Finance Charges for all of the days of the billing cycle to get the total periodic Finance Charge for that billing cycle. We will continue to calculate the Finance Charge that applies to each Fixed Rate Loan in the same way during both the Repayment Period and the Revolving Period.

## Monthly Payments – Fixed Rate Loan Portion

The minimum monthly payment due on each Fixed Rate Loan will be an amount of principal and interest sufficient to amortize the Fixed Rate Loan over the term selected by you at the time the Fixed Rate Loan is established. If you select the optional Borrower Protection™ Plan, the monthly fee for the Plan will be added to this amount and included in your minimum monthly payment. You will be told the minimum payment and will have the option to select the payment due date at that time. This payment schedule will continue into the Repayment Period without change until the Fixed Rate Loan is paid in full. This payment will be in addition to the minimum monthly payment due for the Variable Rate Credit Line Portion of your Account, as described in this Agreement.

The Fixed Rate Loan will accrue interest on a simple interest basis which means that the amortization schedule is based on all the minimum payments being received on their exact due dates. Early payments will have the effect of reducing the final payment while late payments will cause the final payment to be higher.

If there are more than 30 days from the disbursement date to the first monthly payment, the periodic Finance Charge for the first billing cycle may be in excess of the amount due on the first payment due date.

Payments on Fixed Rate Loans may be made by (1) automatic repayment service from a checking or savings account maintained with us, or (2) by separate check. If the automatic repayment service is selected but subsequently terminated by you or us, the ANNUAL PERCENTAGE RATE and the margin for the Fixed Rate Loan will be increased by 1/4 of a percentage point resulting in a corresponding increase in your minimum monthly payment.


## RULES ABOUT THE USE OF YOUR ACCOUNT

**Legal Transactions.** You agree that you will only use your Account for transactions that are legal where you reside. For example, Internet gambling transactions may be illegal in your state. Display by an on-line merchant of either our logo or a Card Company's logo does not mean that an Internet transaction is legal where you reside. We will not be liable if you engage in an illegal transaction.

**Authorizations.** Some transactions require our prior authorization. For security purposes, we may from time to time place or change limits on the number or amounts of transactions you make in a day at automated teller machines ("ATMs") or point of sale terminals. Such limitations may not be the same at every ATM or point of sale terminal. In addition, we may deny authorization to any method of accessing your Account if the Account has been suspended or terminated or if we suspect fraudulent activity. We shall not be liable for any failure to authorize a transaction for any of these reasons. However, you are liable for any transaction we authorize even if we should not have authorized it because you are or would be in default as a result of the transaction.

**Transactions With Merchants.** (a) If a merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", "all sales final", or similar language, you will be bound by that policy when you use your Account to buy goods or services from that merchant. (b) When using your Account to make travel or lodging reservations, you must obtain the merchant's cancellation policy and follow it if you cancel. If you cancel, you must obtain the cancellation number that the merchant is required to give you. The merchant may charge you for a cancelled transaction unless you can provide us with a correct cancellation number. If you make reservations or purchases of any kind, such as a lodging reservation for several nights stay or a mail order purchase, your Account may be immediately charged for the full amount of the reservation or purchase, regardless whether you have received the goods or services requested at the time your Account is charged. (c) If you authorize a merchant to charge your Account for repeat transactions without your Account Access Card, then you must notify the merchant when you want to discontinue the repeat transactions or if your Account is closed or if a new Account or Account Access Card number is issued by us. Otherwise, you will be responsible to us for the amount of all such repeat transactions. (d) If you disagree with a transaction on your statement or have a dispute with a merchant as a result of a transaction, you will provide us with the information or assistance we reasonably request. Otherwise, you will pay us for any resulting loss we have, unless we are prohibited by applicable law from holding you liable for our loss. (e) If you make a transaction in a currency other than U.S. dollars, Card Company will convert the charge or credit into a U.S. dollar amount. The conversion rate will be determined using Card Company's currency conversion procedures that are disclosed to institutions issuing Card Company's cards. The conversion rate on the processing date may differ from the rate on the date of your

00015

CLS-3043-4-CA/0005 02-03
05-05-3043NSF
Plaintiffs Exhibits
Page 22 of 109

Page 4 of 11

EXHIBIT " C "
PAGE 5 OF 16    California 3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 5 of 17

transaction. (As of the time this document was last revised, Visa used a currency conversion rate of either: (1) a wholesale market rate or (2) a government mandated rate, increased by 1% ("Foreign Currency Margin"). In each case, Visa uses the rate in effect one day before the conversion date. The U.S. dollar amount and the "rate" shown on your statement for each foreign currency transaction include only the 1% retained by Visa.) In the event Card Company chooses to change the Foreign Currency Margin, the currency conversion rate, or the day on which the currency conversion rate is determined, then transactions on your Account made in a foreign currency and processed after the change will reflect the change.

## OTHER TERMS OF YOUR ACCOUNT

**Rate Cap.**    The ANNUAL PERCENTAGE RATE applicable to the Variable Rate Credit Line Portion and any Fixed Rate Loan Portion of your Account during the Revolving Period and Repayment Period will not exceed a maximum of __18,000__ %. Other than this maximum Annual Percentage Rate limitation, there are no limitations on any increase or any decrease in the Annual Percentage Rate.

**Account Opening Costs.**    When your Account is opened, you will pay the following charges. You may pay these charges separately or they will be added to the Outstanding Balance of your Account and treated as Finance Charges or Credit Line Draws, as the case may be.

| | | | | |
|---|---|---|---|---|
| New Account Fee, a FINANCE CHARGE | $ N/A | Recording Fee | $ N/A |
| Appraisal Fee | $ N/A | Pest Inspection, a FINANCE CHARGE | $ N/A |
| Sales Escrow Fee | $ N/A | Soil Certification, a FINANCE CHARGE | $ N/A |
| Loan Escrow Fee, a FINANCECHARGE | $ N/A | BIA Approval Fee, a FINANCE CHARGE | $ N/A |
| Title Insurance Premium | $ N/A | Other | $ N/A |
| Tax Lien Service Fee, a FINANCE CHARGE | $ N/A | Other | $ N/A |
| Notary Fee | $ N/A | | |

**Early Closure Fee.**    An Early Closure Fee is charged if you close your Account within three years of the open date: $600 within the first year, $400 within the second year and $200 within the third year. No Early Closure Fee is assessed if: a) Account has been open three years or more, or b) Property is sold after the first year.

**Other Charges.**    We may also charge you the following charges in connection with your Account which will be added to the Outstanding Balance of the Variable Rate Credit Line Portion of your Account ("Other Charges").

Annual Fee. We will charge you a $ __75.00__ Annual Fee (a FINANCE CHARGE) to maintain your Account. The first Annual Fee will be charged on your 13th billing cycle and annually thereafter during your Revolving Period. There is no Annual Fee for the first year. The Annual Fee is non-refundable, and you shall owe it once it is posted to your Account, even if your Account is subsequently changed, suspended or terminated for any reason. The Annual Fee will be waived in years when the average Outstanding Balance for your Account is $20,000 or more. This average will be calculated based upon the Outstanding Balance for your Account on the last day of each of the 12 billing cycles preceding the billing cycle in which your Annual Fee would normally be charged.

Late Charge . If we do not receive the amount of your minimum monthly payment in full within fifteen days after your payment due date you will pay us a late charge equal to six percent (6%) of the unpaid portion of your minimum monthly payment with a minimum fee of $5.00.

Rejected Item Fee . You will pay a fee of $10.00 each time a Credit Line Draw is rejected for any reason, including but not limited to the following:
(A) Your Account has been suspended or terminated in accordance with this Agreement;
(B) If paid, the Credit Line Check would have caused your Outstanding Balance to exceed your Total Credit Commitment; or
(C) Your Credit Line Check is for less than $300.00.

Returned Item Fee . You will pay a returned item fee of $10.00 each time your payment is returned or if there are insufficient funds in your account when a payment is attempted through automatic repayment service.

Overlimit Fee . You will pay an overlimit fee of $10.00 each time you exceed your Total Credit Commitment.

Stop Payment Fee . You may place a stop payment on a Credit Line Check as long as the request is made in writing and received by us prior to the time the Credit Line Draw initiated by that Check is posted to the Account. You will pay us a Stop Payment Fee of $10.00 for such a request. We may require a written confirmation from you to continue a stop payment.

Statement Copy Fee . You will pay a statement copy fee of $2.00 for each statement copy requested.

CLS-3043-5-CA/0005    02-03
05-05-3043 CLS (3 1x)bits
Page 23 of 109
Page 5 of 11

EXHIBIT "  C  " California
PAGE  GMAC 049256  3043
Exhibit B
Page 6 of 17

**Increase of Fees and Charges.**   To the extent permitted by applicable law, we may increase any or all of the Other Charges except the Annual Fee described above by five percent (5%) of the existing fee on each anniversary date of your Account. At our option, we may increase none, some, or all of the Other Charges except the Annual Fee. We will notify you of any increases to the extent required by law.

**Optional Credit Insurance and/or Borrowers Protection Plan.** You may buy optional credit insurance for the Variable Rate Credit Line Portion of your Account at the time the Account is opened. Credit insurance does not cover any Fixed Rate Loan. Credit insurance is not required for this Account to be opened, nor is it required to keep the Account open or to establish any Fixed Rate Loan. If you buy credit insurance for the Variable Rate Credit Line Portion of your Account, the amount of insurance premium will be charged to the Variable Rate Credit Line Portion of your Account. The maximum amount of insurance coverage for the Variable Rate Credit Line Portion is $50,000.

Fixed Rate Loans may be protected by the Borrowers Protection Plan. Protection options include Disability, Involuntary Unemployment, and Accidental Death; or Disability and Accidental Death; or Involuntary Unemployment and Accidental Death. Two Borrowers may purchase Protection for each Fixed Rate Option, but they must select the same coverage option, and there may be restrictions on which Borrowers may apply. To qualify, you must meet all requirements as set forth in the Addendum for the Borrowers Protection Plan. The maximum amount of coverage and term for each Fixed Rate Option is described in the Addendum to the Borrowers Protection Plan.

The Borrowers Protection Plan is optional and not required to obtain a new Fixed Rate Loan. For each Fixed Rate Loan, you must specifically request the Borrowers Protection Plan, and you must sign a separate Addendum to this Agreement, even if you obtained credit life insurance for the Variable Rate Credit Line Portion of your Account or the Borrowers Protection Plan for a prior Fixed Rate Loan.

Fees for the Borrowers Protection Plan are based on and payable with the regularly scheduled monthly payment of the Fixed Rate Loan. The maximum term of the Borrowers Protection Plan is the shorter of the Fixed Rate Loan term or 120 months.

We may allow you to exceed the Total Credit Commitment temporarily and from time to time, to accommodate these amounts.

**Your Unpaid Balance.**   If you or a person you authorize asks us for a written statement of the amounts you owe under this Agreement, we may charge the maximum permitted by law for furnishing the statement.

**Our Security Interest.**   Your obligations under this Agreement are secured by a security interest

☐ _____

_____

_____

_____

(the "Manufactured Home") and all additions to and replacements and proceeds of the property described.
Additional terms regarding this collateral are set forth on the eighth page of this Agreement.

☒ A Security Instrument on your real property located at

   3735 COFFEY LANE, SANTA ROSA, CA 95403_____.

This line of credit is not secured by any other property.

By signing this Agreement, you agree to do all things you are required to do and pay all sums you are required to pay under the Security Instrument. If we incur any expense because you do not fulfill all of your obligations under this Agreement or the Security Instrument, we may charge the expenses to your Account as a Credit Line Draw or we can demand immediate payment from you. Regardless of any other agreement you have with us, the security interest you granted to us in the Property will not secure any other obligation you have with us, and your obligations under this Agreement will not be secured by any other collateral or other security interest held by us other than the security interest described in this section. Notwithstanding anything to the contrary in this Agreement, if the Outstanding Balance exceeds your Total Credit Commitment, this excess is secured by the Security Instrument only to the extent that the excess is attributable to (a) unpaid Finance Charges, Other Charges, or any unpaid charges for credit insurance or Borrowers Protection Plan or (b) expenditures incurred by us because of your failure to fulfill your obligations under this Agreement or the Security Instrument.

CLS-3043-6-CA/0005  02-03
05-05-3043NRB
Plaintiffs Exhibits
Page 24 of 109

Page 6 of 11

EXHIBIT "   C   "
PAGE  7  OF  16
Inoue vs. GMAC SCV 248256
Exhibit B
Page 7 of 17

California
3043

**Release of Collateral.**    After your Account is terminated and paid in full, you will pay the then-applicable Recording and Reconveyance Fee. These charges may be increased to the maximums permitted under applicable state law.

**Assumptions.**    Your rights and responsibilities under this Agreement may not be assumed by another person.

**Insurance.**    You will obtain and maintain insurance for fire and extended-coverage for all improvements now or hereafter existing on the Property equal to 100% of the full insurable replacement value of such improvements. Upon our notice, you must also obtain insurance against floods, earthquakes and other hazards as we may reasonably require. This insurance is not available from or through us. You may choose your own insurance provider, but the insurance company and each policy are subject to our approval. You will furnish us with a copy of each policy, and renewal of same, and each policy will name us a loss payee. You may also be required to obtain title insurance at the inception of your Account or as a condition for our subordination to another lien.

**Owner Occupancy.**    You understand and acknowledge that as a condition of our establishing the Account and making Credit Line Draws and Fixed Rate Loans under the terms of this Agreement, the Property must be occupied by you as your primary residence. At the date of this Agreement and during the term of this Agreement you will occupy the Property as your primary residence.

**Sale or Transfer of the Property.**    If you sell or transfer the Property, you must pay the full outstanding balance on your Account immediately. The Security Instrument covering the Property contains a provision that "If Trustor sells or transfers all or part of the Property or any interest in the Property (or if Trustor's beneficial interest in the Property is altered in any way) without Lender's prior written consent, Lender may, at Lender's option, declare all sums secured by this Deed of Trust to be immediately due and payable."

**Application of Payment.**    For both the Variable Rate Credit Line Portion and the Fixed Rate Loan Portion, for the purpose of computing Finance Charges payments will be credited as of the date of receipt and applied in any manner or priority we choose, reserving the right to change the manner or priority at any time, without notice.

**Changes to Your Account by the Bank – Termination.**    We may terminate your privilege to obtain Credit Line Draws and Fixed Rate Loans under this Agreement and, at our option, declare the entire Outstanding Balance immediately due and payable, without notice or demand if:

- You engage in fraud or material misrepresentation in connection with the Account;

- You do not meet your repayment obligations in this Agreement;

- You act or fail to act in a way that adversely affects the Property or any of our rights in the Property, including, but not limited to, your transfer of title to the Property or your sale of the Property without our permission;

- You are an executive officer of lender and the aggregate amount of credit extended to you by lender or other banks exceeds the amounts permitted under federal law or regulation.

If any of these events occurs we may, in the alternative, (i) suspend your Account privileges as described below in the "Temporary Suspension" section, (ii) end your Revolving Period early and start your Repayment Period as described below in the "Changes to Your Account at Your Request" section; or (iii) enforce the terms of the Security Instrument, including those that provide for trustee's sale or judicial foreclosure.

**Changes to Your Account by the Bank - Temporary Suspension.**    We can temporarily suspend your Account privileges by refusing to make additional Credit Line Draws and Fixed Rate Loans on your Account or by reducing your Total Credit Commitment if:

- Your home's value significantly declines below the appraised value it had when we approved you for the Account.

- We reasonably believe that you will not be able to meet the Account's repayment terms because your financial situation has changed materially.

- You default on any of the material obligations under the Agreement or the Security Instrument, including, but not limited to, the following:

  - If you borrow from your Account to make payment to your Account.

  - If you do not allow us to appraise the Property at our request.

00018

EXHIBIT "    C    "
PAGE  8  OF  8  17        California
3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 8 of 17

- You do not provide information requested to re-evaluate your creditworthiness.
- You permit an intervening lien to be filed against the Property that would take priority over future advances under the Agreement
- If you cease to occupy the Property as your primary residence.

- • Government action either prevents us from imposing the Annual Percentage Rate provided in this Agreement, under the Account, or impairs your security interest under the Security Instrument by causing the value of our security interest to fall below 120% of the amount of your Total Credit Commitment.

- • A government authority notifies us that making additional Credit Line Draws and Fixed Rate Loans would constitute an unsafe and unsound business practice.
- • The sum of the Index plus the margin reaches the maximum Annual Percentage Rate set for your Account (as shown above).

Our suspension of your Account privileges as described above will be effective as of the day we mail the written notice to you. During suspension, you must continue to pay at least the minimum monthly payment due each month. When each of the reasons for suspending your Account privileges ceases to exist, and you request us to reinstate your Account privileges, we will reinstate your Account privileges. If your Account privileges are suspended, your Repayment Period will begin at the time it would have begun had no suspension occurred.

**Changes to Your Account at Your Request.**    At any time, you may request that we end the Revolving Period early by notifying us in writing. At the end of the Revolving Period, or earlier if directed by you, you will no longer be able to obtain Credit Line Draws or Fixed Rate Loans. Your Outstanding Balance will be payable in accordance with the terms stated for the Repayment Period. The Revolving Period cannot be reopened when it has been ended at your request. If more than one person signs this Agreement, we may treat a request by one of you under this section as a request by all of you.

**Return of Checks and Account Access Cards.**    At our request, you will return to us any unused Credit Line Checks and Account Access Cards if your Account is terminated, your Account privileges are suspended, or your Revolving Period ends.

**Change in Terms.**    We may make changes to the terms of this Agreement if (a) you specifically agree to the change, in writing, at the time of the change; (b) the change will unequivocally benefit you throughout the remainder of the existence of the Account; or (c) the change is insignificant.

**Check Copies.**    You will retain a record of each Credit Line Check you write. We will keep copies of canceled Credit Line Checks for eight (8) years. When you request a copy, you will write a letter giving us your Account number, the Credit Line Check number and amount, and the date that the Credit Line Check posted to your billing statement.

**Credit Information.**    We may re-evaluate your creditworthiness at any time. You will provide us with information we need for our re-evaluation, and you will allow us to appraise the Property at any time and as often as we wish (at no cost to you after the first appraisal unless the appraisal is performed at your request for a Total Credit Commitment increase or after your Account is suspended or terminated).    **From time to time we may share information about our experience with you with others including Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies. We may also share information contained in any applications and information we may obtain about you from outside sources with our affiliates, provided that you may instruct us that you prefer that we not share this application and outside information with our affiliates by sending your request to Bank of America, Attn: Data Integrity, P.O. Box 27025, Richmond, VA 23261-7025, and including your name, address, phone number, account number(s) and social security number. If you make this election, certain products or services may not be made available to you.**

**Telephone Monitoring.**    To the extent not prohibited by law, our supervisory Quality Control personnel may listen to telephone calls between you and our customer service employees for the purpose of monitoring the quality of service you receive.

**Collection Costs.**    To the extent permitted by law, you agree to reimburse us, on demand, for all court costs, expenses, and attorneys' fees (including allocated cost of our salaried attorneys) incurred by us to enforce this Agreement, whether or not a lawsuit is filed or at trial or any appeal thereafter. At our option, we may add these costs to your Outstanding Balance.

**Tax Effects.** You should consult a tax advisor regarding the deductibility of interest and charges assessed to your Account.

**Notices From You.**    You will notify us immediately in writing of (1) a change in your home or billing address, (2) a change in ownership of the property, (3) loss of your Credit Line Checks or Account Access Cards, (4) unauthorized use of your Account. Notices must be sent or delivered to the address we specify on your billing statement and will be effective upon receipt.

00019

CLS-3043-8-CA/0005   02-03
05-05-30SMSR
Plaintiffs Exhibits
Page 26 of 109

Page 8 of 11

EXHIBIT " C "
PAGE 9 OF 14 17   California
3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 9 of 17

**Notices From Us.**    To the extent required by law, we will notify you of any action we take on your Account at the address indicated for you in our records. Otherwise, we may take action under this Agreement without notice or demand.

**Joint and Individual Liability.**    If more than one person signs this Agreement, each of you (a) shall have equal right to use the Account up to the Total Credit Commitment, and (b) shall be individually and jointly liable for all amounts owed under this Agreement.

**Authorized Use.**    The Credit Line Checks and Account Access Cards issued to you will be used only by a person whose name is printed on the front of the Credit Line Checks and who has signed this Agreement. If you permit anyone else to use your Credit Line Checks and Account Access Cards without our consent, you will be obligated to pay for any Credit Line Draws obtained by that person plus any Finance Charge and Other Charges attributable to such Credit Line Draws. You are not liable for unauthorized use of your Account Access Card. Notify us promptly if you believe your Account Access Card has been lost or stolen or if you discover any unauthorized transactions. We may require you to provide a written statement regarding claims of unauthorized Account Access Card transactions. If one Account Access Card is reported lost or stolen, we reserve the right to cancel all Account Access Cards and issue new ones during the Revolving Period, if your account has not been suspended or terminated.

**Severability.**    If any provision of this Agreement is determined to be unenforceable, such determination shall not affect the validity of the remaining provisions of this Agreement.

**Governing Law.**    This Agreement will be governed by federal law and California law.

**Enforceability.**    Our failure to exercise any of our rights under this Agreement will not waive any of these rights in the future. If any term of this Agreement is found to be unenforceable, all other provisions will remain in full force. We may accept any check or draft marked "payment in full" without losing any of our rights under this Agreement or Security Instrument.

**REQUEST TO ISSUE ACCOUNT ACCESS CARD AND PIN. Unless** issuance of an account access card is prohibited by law, or unless the property securing this Agreement is located in the states of Texas or New York (in which case, all references in this Agreement to an "Account Access Card" are deleted), during the Revolving Period, any of you may request us to issue to each of you signing this Agreement or to fewer of you and to any other person who may be later added as a borrower a card as described in this section, enabling each of you individually to access the Account, and an associated Personal Identification Number ("PIN"). Any of you may change the PIN for all cards, and any of you may request us to cancel or take any other action with regard to all such cards. All requests or directions, at our option, may be made verbally or in writing. Each of you is liable for all Account Access Card transactions. You agree that the cards will be used only as described in this Agreement. You further agree that the cards may be issued by us through an arrangement we may have from time to time with a card issuer (the "Card Company"), such as Visa. (Visa is a registered trademark of Visa International.) All references in this Agreement to an "Account Access Card" shall mean the card or cards described in this paragraph.

**ADDITIONAL TERMS.**    The following additional terms apply to this line of credit only if indicated under "Our Security Interest" above.

**Security.**    You agree to: (1) keep the Manufactured Home constituting security for the loan in good condition and repair and be responsible for all loss or damage to the Manufactured Home; (2) comply with all laws and regulations pertaining to the Manufactured Home and its use; (3) pay when due all taxes, licenses and other charges on or relating to the Manufactured Home; (4) execute any writings, deliver any documents, and pay for any filings deemed necessary by us to protect our rights in the Manufactured Home as security for the Account; (5) permit us to inspect the Manufactured Home upon request, and to provide us with such information as we may request concerning it; (6) notify us promptly if your address or the address at which the Manufactured Home is kept is changed from that set forth in "Our Security Interest" above, and of any claims, confiscations, loss or theft of the Manufactured Home; (7) keep the Manufactured Home free of all claims, confiscations, liens, levies, encumbrances, and security interests (other than ours) and not sell or otherwise transfer it or any right of interest therein; and (8) not install property on a permanent foundation system or otherwise affix the Manufactured Home to land in any way which could alter its legal character as personal property, without our prior written consent.

**Insurance.**    You agree to keep the Manufactured Home insured against loss by fire, hazards included within the term "Extended Coverage" and any other hazards, including floods or flooding, for which we require insurance. You agree to maintain this insurance in the amounts and for the periods that we require. You may buy this insurance from any insurance company authorized to do business in California subject to our right to refuse any insurance company for reasonable cause. All such insurance policies and renewals shall be acceptable to us. If you fail to maintain coverage described above, we may, at our option, obtain coverage to protect our rights in the Manufactured Home. You understand that any insurance purchased by us may be for the remaining term of your Account or for any shorter term as determined by us and may ensure only our interest in the Manufactured Home, and so may not cover any equity you may have in the Manufactured Home. In addition, any insurance purchased by us may cost substantially more than similar insurance that you may be able to purchase on your own behalf. At our option, the cost of any such insurance purchased by us shall be payable on demand or shall be added to the balance of the Variable Rate Credit Line Portion of your Account, and such additional amount shall be subject to Periodic Finance Charges as described in this Agreement.

00020

Page 9 of 11

EXHIBIT " C "

PAGE 10 OF 17    California
                  3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 10 of 17

All insurance policies and renewals obtained by you relating to the Manufactured Home, including those not required by us, together with all compensation, awards, damages, right of action and proceeds derived therefrom, are hereby assigned to us, and shall include a loss payable endorsement with us as the loss payee or lien holder. We will have the right to hold the policies and renewals. If we require, you will promptly give to us all receipts of paid premiums and renewal notices. In the event of loss, you will give prompt notice to the insurance carrier and us. We may make proof of loss if not made promptly by you.

At our discretion, the amount collected under any insurance policy attributable to damage to the Manufactured Home from any insured peril, shall be received, controlled and disbursed by us. Unless you and we otherwise agree in writing, all insurance proceeds from any insurance policy obtained by you, including those not required by us, will be applied to restoration, repair, or replacement of the Manufactured Home damaged if such is economically feasible and our security is not lessened. If not economically feasible or our security would be lessened, the insurance proceeds will be applied to the balance of the Account, first to the Variable Rate Portion and then to any Fixed Rate Loan Portions, whether or not then due, with any excess paid to you. If you abandon the Manufactured Home, or do not answer a notice from us that the insurance carrier has offered to settle a claim within 30 days, then we may collect the insurance proceeds. We may use the proceeds to repair, restore, or replace the Manufactured Home or to pay the balance of the Account, whether or not then due. The 30-day period will begin when the notice is given.

Unless you and we otherwise agree in writing, any application of proceeds to the principal of the Account will not extend or postpone the due date of the monthly payments or change the amount of the payments. If the Manufactured Home is acquired by us after a default under the Account, your right to any and all insurance policies and proceeds resulting from damage to the Manufactured Home prior to the acquisition will pass to us to the extent of the balance of the Account immediately prior to the acquisition.

**Bank as Agent.**    You appoint and authorize us to act as your true and lawful agent to make all necessary transfer of ownership of the property and to make, execute, and deliver all necessary instruments, assignments and transfer of ownership.

**Other Rights of Bank.**    In addition to our rights under this Agreement, we shall have the rights and remedies of a secured party under the California Uniform Commercial Code, or other applicable law, and all rights and remedies shall, to the extent permitted by law, be cumulative.

00021

CLS-3043-10-CA/0006    02-03
05-05-3044ANSR Plaintiffs Exhibits
Page 28 of 109

Page 10 of 11

EXHIBIT "  C  "
PAGE  11  OF  17    California
3043

Inoue vs. GMAC SCV 248256
Exhibit B
Page 11 of 17

Each person signing below acknowledges receiving on the date shown a complete copy of this Agreement and, if the Property securing this Agreement is your primary residence, two copies of the Notice of Right to Cancel this Agreement. You also acknowledge that you have previously received the home equity application disclosures applicable to this Account in the "Home Secured Credit" disclosure booklet, which includes the "Important Terms" and "What You Should Know About Home Equity Lines of Credit" disclosures.

I(we) have read and hereby agree to all terms and conditions of this Agreement.

BORROWER:                                         BORROWER:

X: _____              X: _____
   HITOSHI INOUE                (Date)                                        (Date)

BORROWER:                                         BORROWER:

X: _____              X: _____
                                (Date)                                        (Date)

---

**YOUR BILLING RIGHTS**
**KEEP THIS NOTICE FOR FUTURE USE**

This notice contains important information about your rights and responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we have sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:
- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Total Credit Commitment. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we did not make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone to whom we report you that you have a question about your bill, and we must tell you the name of anyone to whom we reported you. We must tell anyone to whom we report you that the matter has been settled between us when it finally is settled.

If we do not follow these rules, we cannot collect the first $50 of the questioned amount, even if the bill was correct.

**Special Rule for Account Access Card Purchases.** If you have a problem with the quality of goods or services that you purchased with an Account Access Card, and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services. You have this protection only when the purchase price was more than $50 and the purchase was made in your home state or within 100 miles of your mailing address. (If we own or operate the merchant, or if we mailed you the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase.)

00022

CLS-3043-11-CA/0005    02-03
05-06-3043NSA
Plaintiffs Exhibits
Page 29 of 109

Page 11 of 11

EXHIBIT " C "
PAGE 12 OF 17
Inoue v. GMAC SCV 248256
Exhibit B
Page 12 of 17

California
3043

Submitted for recordation by, and when recorded, return to:

**Bank of America**

| | |
|---|---|
| Branch | Consumer Collateral Tracking |
| Address | 9000 Southside Blvd, Bldg. 700 |
| City | Jacksonville |
| State | FL |
| Zip | 32256 |
| Loan #: | 31868240106348299 |
| Reference # | 010102-033360644190 |

**COPY**

Space above this line for Recorder's Use

## SHORT FORM DEED OF TRUST
### (EQUITY MAXIMIZER® ACCOUNT)

This Deed of Trust is made on **9th December, 2003** by

HITOSHI INOUE, AN UNMARRIED PERSON

(collectively and individually "Trustor"); Equitable Deed Company ("Trustee"); and the beneficiary, Bank of America, N.A. ("Bank"). Trustee is a subsidiary of Bank. Any non-titleholder signs below as Trustor solely for the purpose of subjecting any community property interest in the property described below to this Deed of Trust. The words "I," "me," and "my" in this Deed of Trust refer to the Trustor, whether one or more.

Bank and I agree:

**1. Property Security.** For the purpose of securing the obligations described below, I irrevocably grant, convey, transfer and assign to Trustee, in trust with power of sale, the property located in

SONOMA _____ County, California described as follows:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF:

with the street address: 3735 COFFEY LANE, SANTA ROSA, CA 95403

and with Parcel No. 058-032-016-000 _____ and including all improvements and fixtures now or later erected on the property, and all easements, rights, appurtenances and fixtures now or later a part of or related to the above described property (collectively the "Property").

**2. This Deed of Trust secures :**
- All obligations of the borrowers in the Equity Maximizer Agreement and Disclosure, dated 12/09/03 _____ and naming HITOSHI INOUE

as borrowers, for a revolving line of credit account (the "Agreement"), as well as any modifications and renewals of the Agreement. The Agreement provides for a Total Credit Commitment (as defined in the Agreement) of $ 30,000.00 _____, allows for repeated credit advances drawn against the Total Credit Commitment, and provides for a variable interest rate. By mutual agreement, Bank may increase the Total Credit Commitment ("Increased Credit Commitment"); and
- Trustor's performance of each obligation in this Deed of Trust.

CLS-776-1-CA/0008  4-02                              Page 1 of 2

Page 1 of 2

EXHIBIT " _C_ "

PAGE ___13___ OF ___17___

Bank of America

00023
Plaintiffs Exhibits
Page 30 of 109

Inoue v. BAC FSB 248256

Exhibit B
Page 13 of 17

This Deed of Trust will not secure borrowers' obligations under the Agreement in excess of the Total Credit Commitment or Increased Credit Commitment, except for any amounts due to: (a) unpaid interest, or (b) expenses that Bank incurs because obligations of a borrower under the Agreement are not fulfilled (including without limitation, any advances that Bank makes to perform borrowers' duties to pay taxes, insurance, etc.).

**To Protect the Security of this Deed of Trust, I Agree:** By the execution and delivery of this Deed of Trust and the Equity Maximizer Agreement and Disclosure secured hereby, that provisions (3) to (20), inclusive of the fictitious deed of trust recorded in ___SONOMA_____ County 07/13/99 _____, as Instrument ___9989234_____ in Book/Reel and_____ at Page/Image_____ of the Official Records of the County Recorder of that county, (which provisions, identical in all counties, are printed on the following pages) hereby are adopted and incorporated herein and made a part hereof as though set forth at length; and I will observe and perform such provisions; and that the reference to Property, obligations, and parties in such provisions shall be construed to refer to the Property, obligations, and parties set forth in this Deed of Trust.

Trustor requests that a copy of ANY NOTICE OF DEFAULT AND ANY NOTICE OF SALE under this Deed of Trust be mailed to Trustor at the Trustor's address shown below, or if no address is shown, then at the address of the Property.

Signature

Mailing Address for Notices:
Street                              City and State

3735 COFFEY LANE SANTA ROSA, CA 95403

HITOSHI INOUE

## GENERAL ACKNOWLEDGMENT

State of California
County of_____
On_____    before    me,_____,    personally    appeared

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature_____(SEAL)

CLS-776-2-CA/0008    4-02                    Page 2 of 2                    Bank of America



EXHIBIT " C "
PAGE _____ OF ____
Exhibit B
Page 14 of 17

## DO NOT RECORD

**3. Insurance.** I will keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Bank requires insurance. I will maintain this insurance in the amounts and for the periods that Bank requires. I am free to buy this insurance from any insurance company authorized to do business in California subject to Bank's right to refuse any insurance company for reasonable cause. All such insurance policies and renewals must be acceptable to Bank. If I fail to maintain coverage described above, Bank may, at its option, obtain coverage to protect Bank's rights in the Property in accordance with Paragraph 7.

All insurance policies and renewals obtained by me related to the Property, including those not required by Bank, together with all compensation, awards, damages, rights of action and proceeds derived therefrom are hereby assigned to Bank and must name Bank as loss payee under a standard mortgagee loss payee clause. Bank will have the right to hold the policies and renewals. If Bank requires, I will promptly give to Bank all receipts of paid premiums and renewals notices. In the event of loss, I will give prompt notice to the insurance carrier and Bank. I authorize Bank to make proof of loss if not made promptly by me.

At the discretion of Bank, the amount collected under any insurance policy attributable to damage to the Property from any insured peril shall be received, controlled and disbursed by Bank. Unless Bank and I otherwise agree in writing, all insurance proceeds from any insurance policy obtained by me, including those not required by Bank will be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Bank's security interest is not lessened. If the restoration or repair is not economically feasible or Bank's security would be lessened, the insurance proceeds will be applied to the sums secured by this Deed of Trust, whether or not then due, with any excess paid to me. If I abandon the Property, or do not answer a notice from Bank that the insurance carrier has offered to settle a claim within 30 days, then Bank may collect the insurance proceeds. Bank may use the proceeds to repair or restore the Property or to pay sums secured by this Deed of Trust, whether or not then due. The 30-day period will begin when the notice is given.

Unless Bank and I otherwise agree in writing, any application of proceeds to principal will not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If the Property is acquired by Bank under this Deed of Trust, my right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition will pass to Bank to the extent of the sums secured by this Deed of Trust immediately prior to the acquisition.

**4. Property Maintenance.** I will keep and maintain the Property in good repair. If this Deed of Trust is on a leasehold, I will comply with the terms of any lease. If this Deed of Trust is on a unit in a condominium or planned unit development ("PUD"), I will perform all of my obligations under the Covenants, Conditions and Restrictions (the "Declaration"), Articles of Incorporation, Trust Instrument or any equivalent documents which create the homeowners' association or equivalent entity owning or managing the common areas and facilities of the condominium or PUD (the "Owners' Association") and any bylaws or other rules or regulations of the Owners' Association. I will promptly pay, when due, all dues and assessments imposed by the Owners' Association. In the event of a distribution of hazard insurance proceeds, in lieu of restoration or repair following a loss to the Property or to common areas and facilities of the condominium or PUD, any proceeds payable to me are hereby assigned and shall be paid to Bank, and Bank, at its option, may apply such proceeds to restoration or repair of the Property or to sums secured by this Deed of Trust. I will take such actions as may be reasonable to insure the Owners' Association maintains a public liability insurance policy acceptable in form, amount and extent of coverage to Bank. I will not, except after notice to Bank, and with Bank's written consent, either partition or subdivide the Property or consent to: (a) the abandonment or termination of the condominium or PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of taking by condemnation or eminent domain; (b) any amendment to any provision of the Declaration or other documents creating or governing the Owners' Association if the provision is for the express benefit of Bank; (c) termination of professional management and assumption of self-management of the Owners' Association; or (d) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners' Association unacceptable to Bank.

00025

CLS-776-3-CA/0008   4-02

Bank of America

EXHIBIT " C "

Inc.DAVBFGMAG SC0242686 7
Exhibit B
Page 15 of 17

Plaintiffs Exhibits
Page 32 of 109

## DO NOT RECORD

**5. Environmental Responsibilities.** To my knowledge, there has been no disposal, discharge, deposit, injection, dumping, leaking, spilling, placing or escape of any toxic or hazardous substance, waste, pollutant or contaminant (as those items are defined under federal and state laws) on, in, under, or from the Property, and there is, and will be, no facility in, or on the Property which is to be used for the treatment, storage or disposal of any toxic or hazardous substance, waste, pollutant or contaminant (as defined under federal and state laws). I shall indemnify and hold Bank harmless from and against all claims, liabilities, proceedings, suits, losses, damages (including without limitation punitive damages), judgments and environmental response and clean-up costs, fines, penalties and expense (including without limitation reasonable attorneys' fees, costs and expenses incurred in investigating and defending against the assertion of any such liabilities, regardless of merit), which may be asserted against, sustained, suffered or incurred by Bank because of the existence of any such toxic or hazardous substance, waste, pollutant or contaminate. This indemnity shall include, without limitation, claims asserted by any federal or state governmental agency or any private party and shall continue in effect following any foreclosure, release and reconveyance of this Deed of Trust or other realization upon the security of Bank.

**6. Prior Liens.** I will perform all of my obligations under any mortgage, deed of trust, or other security instrument which creates a lien having priority over the lien of this Deed of Trust. I will pay all taxes, assessments and charges resulting from any lien having priority over this Deed of Trust, and leasehold payments or ground rents, if any.

**7. Protection of Bank's Security Interest.** If I fail to perform my obligations under this Deed of Trust, or if any action or proceeding adversely affects Bank's interest in the Property, Bank may, at Bank's option, take any action reasonably necessary (including, without limitation, paying expenses and attorneys' fees) to perform my obligations or to protect Bank's interest. Any sums that Bank pays in accordance with this Paragraph will be an additional indebtedness secured by this Deed of Trust. These payments will be subject to finance charge in accordance with the variable rate terms of the Agreement and will be due and payable by me immediately upon Bank's demand.

**8. Inspection.** Bank may enter and inspect the Property, after giving me reasonable prior notice.

**9. Condemnation.** I assign to Bank the proceeds of any award or claim for damages arising from any condemnation or taking of all or part of the Property, (and if the Property is a unit in a condominium or PUD, the common areas and facilities, or any part thereof), or for any conveyance instead of condemnation. The proceeds will be paid to Bank.

**10. Not Released from Liability; Forbearance by Bank not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Bank to me, any borrower under the Agreement or any successor in interest shall not operate to release from liability me, or any borrower under the Agreement or any successors in interest. Bank shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed of Trust by reason of any demand made by me and my successors in interest. Any forbearance by Bank in exercising any right or remedy hereunder, or otherwise afforded by law, shall not be a waiver of, or preclude the exercise of, any such right or remedy.

**11. Successors in Interest; Joint and Individual Liability; Co-Signers.** This Deed of Trust will bind and benefit the successors in interest of Bank and me, subject to Paragraph 14 below. If more than one Trustor is signing this Deed of Trust, my obligations will be joint and individual. Any Trustor who is not a borrower under the Agreement is: (a) signing this Deed of Trust only to grant and convey that Trustor's interest in the Property to Trustee according to this Deed of Trust; (b) not personally liable for obligations under the Agreement; and (c) agreeing that Bank and a Trustor who is a borrower under the Agreement may extend, modify, forbear, or make any other agreements related to this Deed of Trust without that Trustor's consent, and without releasing that Trustor from this Deed of Trust or any extension or modification of this Deed of Trust.

**12. Beneficiary Statement; Payoff Demand Statement.** Bank may collect a fee not to exceed the maximum amount permitted by law for furnishing a beneficiary statement, payoff demand statement, or any similar statement as provided by § 2943 of the Civil Code of California.

**13. No Release.** I will not be released from liability under this Deed of Trust until Trustee, acting with Bank's authority, executes and records a deed of reconveyance that releases me from this obligation under the Deed of Trust.

**14. Property Transfer; Due-On-Sale.** If I sell or transfer all or part of the Property or any interest in the Property (or if my beneficial interest in this Property is altered in any way) without Bank's prior written consent, Bank may, at Bank's option, declare all sums secured by this Deed of Trust to be immediately due and payable.

CLS-776-4-CA/0008    4-02

Bank of America

00026
Plaintiffs Exhibits
Page 33 of 109

EXHIBIT " C "

IMAGE GMAC 001 0262(3)

Exhibit B
Page 16 of 17

DO NOT RECORD

**15. Default.** The occurrence of any of the following will be deemed to be an event of default: (a) I engage in fraud or material misrepresentation in connection with the Agreement or the account established pursuant to the Agreement; (b) I do not meet my repayment obligations in the Agreement; or (c) I act or fail to act in a way that adversely affects the Property or any of Bank's right in the Property, including, but not limited to, the sale or transfer of the Property without Bank's prior written consent, unless prohibited by law. If I commit an event of default, at Bank's option, Bank may require immediate payment in full of all sums secured by this Deed of Trust without demand and may invoke the power of sale and any other remedies permitted by law. Bank shall be entitled to collect all costs and expenses incurred in pursuing the remedies provided in this paragraph, including, but not limited to, reasonable attorneys' fees (including allocated cost of Bank's salaried attorneys, to the extent permitted by law).

If Bank invokes the power of sale, Bank shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Bank's election to have the Property sold and shall have the notice recorded in each county in which the Property or some part thereof is located. Bank or Trustee shall give notice of sale in the manner prescribed by law. Trustee shall give public notice of sale to the persons and in the manner prescribed by law. After the lapse of time required by law, Trustee, without demand on me, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Bank or Bank's designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order; (a) to all reasonable costs and expense of the sale, including but not limited to, reasonable trustee's and attorneys' fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any to the person or persons legally entitled thereto.

**16. Substitution of Trustee.** At Bank's option, Bank may from time to time appoint a substitute trustee to replace Trustee by executing an instrument and recording it with the Recorder in the county stated above. This provision will supersede any other provision for trustee substitution.

**17. Request for Notices.** Bank requests that copies of notice of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to Bank's address as set forth on page one of this Deed of Trust. Any notice to me provided for in this Deed of Trust shall be given by delivering it by first class mail unless law requires use of another method. If a mailing address appears below for any Trustor, Bank's notices to that Trustor will be mailed to the address shown. Otherwise, notices will be sent to Trustor at the Property address shown on the first page of this Deed of Trust or at such other address as I shall designate by written notice to Bank. Any notice to Bank shall be given by first class mail to Bank's address on the first page of this Deed of Trust or any other address Bank designates by notice to me. Any notice provided for in this Deed of Trust shall be deemed to have been given me or Bank when given as provided in this paragraph.

**18. Leasehold.** If this Deed of Trust is on a leasehold; I shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease creating said estate and interest, and I shall not, without the express written consent of Bank, alter or amend said ground lease. Trustor covenants and agrees that there shall not be a merger of the ground lease, or the leasehold estate created thereby, with the fee estate covered by the ground lease by reason of said leasehold estate or said fee estate, or any part of either, coming into common ownership, unless Bank shall consent in writing to such merger; if I shall acquire such fee estate, then this Deed of Trust shall simultaneously and without further action be spread so as to become a lien on such fee estate.

**19. Governing Law; Enforceability.** This Deed of Trust will be governed by federal law and California law. In the event that any provision or clause of this Deed of Trust or the Agreement conflict with law, such conflict shall not affect other provisions of the Deed of Trust or the Agreement which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust and the Agreement are declared to be severable. Bank's failure to exercise any right or remedy under this Deed of Trust will not waive Bank's rights in the future.

**20. Reconveyance.** Upon payment of all sums secured by this Deed of Trust, and Bank has no further obligations to honor requests for Credit Line Draws under the Agreement, Bank shall request Trustee to reconvey the Property and also shall return this Deed of Trust and Agreement evidencing indebtedness secured by this Deed of Trust to Trustee. Trustee shall reconvey without warranty to the person or persons legally entitled thereto. Such person or persons shall pay all costs of reconveyance and recordation, if any.

CLS-776-5-CA/0008   4-02

Bank of America

00027

*EXHIBIT " C "*

*PAGE 12 OF 17*

Plaintiffs Exhibits
Page 34 of 109

Inoue vs. GMAC SCV 248266
Exhibit B
Page 17 of 17

# EXHIBIT C

Thomas P. Kelly III, SBN 230699
50 Old Courthouse Square, Suite 609
Santa Rosa, California, 95404-4926
Telephone : 707-545-8700
Facsimile : 707-542-3371
Email : tomkelly@sonic.net

Plaintiffs Exhibits
Page 35 of 109

Inoue vs. GMAC SCV 248256
Exhibit C
Page 1 of 14

# BANK OF AMERICA EQUITY MAXIMIZER® AGREEMENT AND DISCLOSURE STATEMENT

**ACCOUNT NUMBER** 31868240115664999

**Borrower:** HITOSHI INOUE

**Lender:** Bank of America, N.A.
c/o North Carolina Main Office
101 Tryon Street
Charlotte, N.C. 28255

COPY

| CREDIT LIMIT: $ 50,000.00 | DATE OF AGREEMENT: 07 /23 / 04 |

**Introduction.** This Bank of America Equity Maximizer ® Agreement and Disclosure Statement ("Agreement") governs your line of credit (the "Equity Maximizer Account") issued through Bank of America, N.A. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Bank of America, N.A. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay Bank of America, N.A., or order, the total of all credit advances and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Security Instrument" which secures your Equity Maximizer Account (**"Security Instrument"**). You will pay your Equity Maximizer Account according to the payment terms set forth below. **If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each borrower authorizes any other borrower, on any other borrower's signature alone, to cancel the Equity Maximizer Account, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.**

**Term.** The term of your Equity Maximizer Account will begin as of the date of this Agreement ("Opening Date") and will continue until     JULY 23rd, 2029          ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Equity Maximizer Account will begin on the date after the Opening Date following the expiration of the right to cancel, the perfection of the Security Instrument securing this agreement, receipt of all required certificates of noncancellation, and the meeting of all our other conditions and will continue as follows: 120 months ("Draw Period"). You may obtain credit advances during this Draw Period. After the Draw Period ends, the Repayment Period will begin and you will no longer be able to obtain credit advances. The length of the Repayment Period is as follows: up to 180 months depending on the payment schedule set forth below. You agree that we may renew or extend the period during which you may obtain credit advances or make payments. Notwithstanding the foregoing, in no event will the time during which you may obtain credit advances on the Equity Maximizer Agreement exceed twenty-five (25) years.

## Minimum Payment

**During the Draw Period.** The "Total Minimum Payment Due" is equal to the Variable Rate Balance Minimum Payment below, the payment due, if any, for any outstanding Fixed Rate Loan Option and any past due amounts from prior billing periods. (Some Fixed Rate Loan Options may have a different due date and are not figured in the calculation of the Total Minimum Payment Due). At any time you may pay more than the Total Minimum Payment Due, make additional payments or pay in full or in part the Outstanding Balance. The "Outstanding Balance" is the new balance of the Equity Maximizer Account (which, if applicable, includes principal, accrued Interest on the outstanding principal, fees and charges, Property Expenses (defined as any expense which we incur because you do not fulfill all obligations of this Agreement or if you or another party does not fulfill all obligations of the Security Instrument for the property which secures this Agreement) and any voluntary insurance or Borrowers Protection Plan™. We reserve the right to apply payments in any manner we choose, without notice. Your "Variable Rate Balance" is all of your Outstanding Balance that is not part of a Fixed Rate Loan Option.

You may choose any of the following monthly and quarterly Draw Period payment options. Your billing statement will reflect the option you have chosen. You may also change your Draw Period payment option at a later time.

> **Variable Rate Balance Minimum Payment** – Depending on what payment schedule option you choose for the Draw Period, the Variable Rate Balance Minimum Payment may vary. The Variable Rate Balance Minimum Payment will not be less than the amount of accrued interest and any voluntary insurance, plus any unpaid fees.

00029
Plaintiffs Exhibits
Page 36 of 109

California

EXHIBIT " D "

Inoue RJN EXC cv 2055 7
Exhibit C
Page 2 of 14

**Monthly Payment Options:**

**Interest Only Option** – The Minimum Payment will be the amount of accrued interest, plus any unpaid fees.

**1.5% of Variable Rate Outstanding Balance Option** – The Minimum Payment will be one and one half percent (1.5%) of the Variable Rate Outstanding Balance plus any unpaid fees, or fifty dollars ($50), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

**Fixed Payment Option** – The Minimum Payment will be at least one and one half percent (1.5%) of the Equity Maximizer Account limit plus any unpaid fees, or fifty dollars ($50), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

**Quarterly Payment Options:**

**Interest Only Option** – The Minimum Payment will be the amount of accrued interest and unpaid fees.

**4.5% of Variable Rate Outstanding Balance Option** – The Minimum Payment will be four and one half percent (4.5%) of the Variable Rate Outstanding Balance plus any unpaid fees, or one hundred fifty dollars ($150), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

**Fixed Payment Option** – The Minimum Payment will be at least four and one half percent (4.5%) of the Equity Maximizer Account limit plus any unpaid fees, or one hundred fifty dollars ($150), whichever is greater, or the Variable Rate Outstanding Balance if less than the Minimum Payment.

**During the Repayment Period.** The payment frequency you select for the Draw Period is the same for the Repayment Period. The length of the Repayment Period will vary depending on the Outstanding Balance at the beginning of the Repayment Period if any Property Expenses are incurred during the Repayment Period and if you have any Fixed Rate Loan Options. The amount of the Total Minimum Payment Due may vary due to increases or decreases in the Index or if there are any Fixed Rate Loan Options that remain unpaid at the beginning of the Repayment Period.

You may choose either the following monthly or quarterly Repayment Period payment option. Your billing statement will reflect the option you have chosen. You may also change your Repayment Period payment option at a later time.

**Monthly Payment Option** – The Total Minimum Payment Due will be an amount equal to the greater of 1/180th of the Variable Rate Principal Balance remaining on the last day of the Draw Period, plus accrued interest, unpaid fees, unpaid Property Expenses and any voluntary insurance, or fifty dollars ($50). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Option payments previously established will continue to be billed.

**Quarterly Payment Option** – The Total Minimum Payment Due will be an amount equal to the greater of 1/60th of the Variable Rate Principal Balance remaining on the last day of the Draw Period, plus accrued interest, unpaid fees and unpaid Property Expenses, or one hundred fifty dollars ($150). If there are any Fixed Rate Loan Options that remain unpaid at the start of the Repayment Period, the Fixed Rate Loan Option payments previously established will continue to be billed.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied to FINANCE CHARGES, other charges and fees, and principal in any order we choose without notice.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to 2:00 P.M. local time at the location specified, or a payment made at one of our banking centers in the state of our address first described above, by 2:00 P.M. local time on any business day will be credited to your Equity Maximizer Account as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Equity Maximizer Account, but crediting may be delayed for up to five (5) days after receipt. Business days are Monday through Friday, exclusive of legal holidays. If the due date falls on a Saturday, Sunday or legal holiday, the due date will not be extended.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Fifty Thousand and 00/100'S                                                    Dollars ($    50,000.00    ), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Equity Maximizer Account, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make

CLS3312-2                                    Page 2 of 13

00030

Plaintiffs Exhibits
Page 37 of 109

# Bank of America

## EQUITY MAXIMIZER® AGREEMENT AND DISCLOSURE STATEMENT
### SECURED BY DEED OF TRUST

| | |
|---|---|
| BORROWER (1)<br>HITOSHI INOUE | LENDER:<br>**Bank of America, N.A.** |
| BORROWER (2) | DATE OF AGREEMENT:<br>December 9, 2003 |
| BORROWER (3) | ACCOUNT NUMBER:<br>31868240106348299 |
| BORROWER (4) | TOTAL CREDIT COMMITMENT:<br>$ 30,000.00 |

**Definitions.** In this agreement, the following terms shall have the following meanings: "Account" means your variable rate revolving credit line ("Variable Rate Credit Line Portion") and any fixed rate loans ("Fixed Rate Loan Portion") established pursuant to this Agreement; "Agreement" means this Equity Maximizer Agreement and Disclosure Statement; "Credit Line Draw(s)" means all extensions of credit and advances under the Variable Rate Credit Line Portion of your Account; "Finance Charge" means the cost of credit extended to you, expressed as a dollar amount; "Fixed Rate Loan(s)" means all extensions of credit and advances under the Fixed Rate Loan Portion of your Account; "Outstanding Balance" means the total balance owed by you to us from time to time under this Agreement, including unpaid accrued Finance Charges and any other amounts due under this Agreement or the Security Instrument; "Security Instrument" means the deed of trust, mortgage or similar instrument securing your obligations under this Agreement; "Property" means the real and personal property described in the paragraph **Our Security Interest** on page 5 of this Agreement; "Total Credit Commitment" means the maximum permitted Outstanding Balance, as set forth at the top of this Agreement; "we," "us" and "our" mean the lender named above; "you" and "your" mean each person who has signed this Agreement.

## YOUR EQUITY MAXIMIZER ACCOUNT

Your Account consists of an open-end revolving Variable Rate Credit Line Portion, and a Fixed Rate Loan Portion in which you may establish up to three Fixed Rate Loans.

**Your Total Credit Commitment.** The Total Credit Commitment shown above is the overall credit limit for the combined Variable Rate Credit Line and Fixed Rate Loan Portions. You agree that the Outstanding Balance of your Account will not exceed this amount. We have no obligation to make any Credit Line Draw or Fixed Rate Loan that would cause the Outstanding Balance of your Account to exceed your Total Credit Commitment. If we do make a Credit Line Draw or Fixed Rate Loan that causes your Outstanding Balance to exceed the Total Credit Commitment, we are not obligated to do so in the future. You agree to pay any amount over your Total Credit Commitment immediately upon our request. You may request a change in your Total Credit Commitment, but your request for an increase is subject to our approval.

Any amount paid against the principal balance of the Variable Rate Credit Line Portion or any Fixed Rate Loan will increase the available credit (after the expiration of a hold period for payments by personal checks of up to eleven days) on the Variable Rate Credit Line Portion by an equal amount.

**Term.** Your Account has a term of up to 25 years. It consists of a revolving period ("Revolving Period") of up to 10 years and a repayment period ("Repayment Period") of up to 15 years. The Revolving Period will end 10 years after the Date of Agreement. Upon your request, we may, at our option, extend the Revolving Period for one additional ten (10) year period. When the Revolving Period ends, your Account enters the Repayment Period. During the Repayment Period you will no longer be able to obtain Credit Line Draws or Fixed Rate Loans and the Outstanding Balance on your Account will be payable in accordance with the terms stated for the Repayment Period.

**Promise to Pay.** You promise to pay us, at the address shown on your billing statement, the Outstanding Balance of your Account in accordance with this Agreement. Monthly Payments are due 15 days following your statement closing date. You agree to be bound by the terms and conditions of this Agreement and the Security Instrument.

## VARIABLE RATE CREDIT LINE PORTION OF YOUR ACCOUNT

**How You Can Borrow – Variable Rate Credit Line Portion.** You may obtain Credit Line Draws on your Account up to the Total Credit Commitment during the Revolving Period unless your credit privileges are suspended or terminated in accordance with this Agreement. By repaying any amount advanced, that amount becomes available to you after the expiration of a hold period for payments by personal checks of up to eleven business days. You may obtain Credit Line Draws from your Account by writing credit line checks ("Credit Line Checks") that we furnish you, by using your Account Access Card, or by such other methods as we may make available from time to time. You may not obtain Credit Line Draws from your Account to make payments to your Account.

00012

EXHIBIT "___C___"
PAGE _2_ OF _16_
Inoue vs. GMAC SCV 248256
Exhibit B
Page 2 of 17

California
3043

your Equity Maximizer Account balance exceed your Credit Limit. You agree to repay immediately the amount by which your Equity Maximizer Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Security Instrument covering your principal dwelling.

**Charges to your Equity Maximizer Account.** We may charge your Equity Maximizer Account to pay other fees and costs that you are obligated to pay under this Agreement, the Security Instrument (such as a mortgage or deed of trust) or any other document related to your Equity Maximizer Account. In addition, we may charge your Equity Maximizer Account for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Security Instrument for this transaction. We may also, at our option, charge your Equity Maximizer Account to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Equity Maximizer Account and pay the delinquent taxes. Any amount so charged to your Equity Maximizer Account will be a credit advance and will decrease the funds available, if any, under the Equity Maximizer Account. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, as stated on the signature page of this Agreement, you may obtain credit advances under your Equity Maximizer Account where available as follows:

**Equity Maximizer Account Checks.** Writing a preprinted "Special Convenience Check" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Equity Maximizer Account to be applied to your designated account by telephone upon proper identification and in accordance with procedures established by us. Except for transactions covered by the federal Electronic Fund Transfer Act and unless otherwise agreed in your deposit account agreement, **you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.**

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

**ATM Access (Not available in ID, OR and WA).** Use your Bank of America ATM card or Bank of America Check Card or "Bank of America Equity Maximizer ® Visa ® account access card" ("Account Access Card") at any of our designated ATM locations. **(In CA, ATM Access is only available thru the Bank of America Equity Maximizer Visa account access card.)**

**Bank of America Equity Maximizer Visa Account Access Card (Not available in ID, OR and WA).** Use the Account Access Card as described in this Agreement.

**Online Banking.** Transferring funds to the deposit account that you designate.

If there is more than one person authorized to use this Equity Maximizer Account, you agree not to give us conflicting instructions, such as one of you telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Special Convenience Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Special Convenience Check.

**Post-dated Checks.** Your Special Convenience Check is post-dated. If a post-dated Special Convenience Check is paid and as a result any other check is returned or not paid, we are not responsible.

**Stolen Checks.** Your Special Convenience Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Special Convenience Check is not signed by an "Authorized Signer" as defined herein.

**Termination or Suspension.** Your Equity Maximizer Account has been terminated or suspended as provided in this Agreement or could be if we paid the Special Convenience Check.

**Other Restrictions/Other Limitations.** (1) You may not make a payment on the Account with a Special Convenience Check. (2) You notify us that you wish to stop payment of a Special Convenience Check; or however you will not hold us liable if we try to stop payment of the Special Convenience Check and we are unable to do so. You may try to stop payment on a Special Convenience Check by notifying Customer Service at the number listed on your statement. Your stop payment order will remain in effect for six (6) months unless renewed.

00031
Plaintiffs Exhibits
Page 38 of 109

EXHIBIT " _D_ "
PAGE _4_ OF _14_
Inoue vs. GMAC SCV 248256
Exhibit C
Page 4 of 14

If we pay any Special Convenience Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Special Convenience Check. The Special Convenience Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Special Convenience Checks along with your periodic billing statement; however, your use of each Special Convenience Check will be reflected on your periodic statement as a credit advance. We do not "certify" Special Convenience Checks drawn on your Equity Maximizer Account.

**Limitations on the Use of Account Access Card.** We reserve the right not to honor Account Access Cards in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by honoring the Account Access Card charge.

**Stolen Account Access Card.** Your Account Access Card has been reported lost or stolen.

**Termination or Suspension.** Your Equity Maximizer Account has been terminated or suspended as provided in this Agreement or could be if we honored the Equity Maximizer Account charge.

If we pay any advance requested by use of the Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with the Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Account Access Card will be reflected on your periodic statement as a credit advance.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Equity Maximizer Account:

**Account Access Card Limitations.** The following transaction limitations will apply to your Equity Maximizer Account and accessing by other methods.

**Other Transaction Requirements. Limitations on the Use of Account Access Card.** We reserve the right not to honor the account access card linked to this Equity Maximizer Account in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Account Access Card transaction.

**Stolen Account Access Card.** Your Account Access Card has been reported lost or stolen.

**Unauthorized Signatures.** Your Account Access Card is not used by a Borrower who has been issued one.

**Termination or Suspension.** Your Equity Maximizer Account has been terminated or suspended as provided in the Agreement or could be if we paid the Account Access Card transaction.

If we pay any advance requested by use of the Account Access Card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the Account Access Card will be reflected on your periodic statement as a credit advance.

**Liability for Unauthorized Account Access Card Transactions.** You are not liable for unauthorized use of your Account Access Card. Just notify us promptly if you believe your Account Access Card has been lost or stolen or if you discover any unauthorized transactions. We may require you to provide a written statement regarding claims of unauthorized Account Access Card transactions.

**VISA is a registered trademark of VISA International Service Association.**

Lender's liability, if any, for wrongful dishonor of an advance request is limited to Borrower's actual damages. Lender shall not be liable if any merchant, financial institution or ATM refuses to honor the Account Access Card.

**Equity Maximizer Account Special Convenience Check, Telephone Request, In Person Request and ATM Access Limitations.** There are no transaction limitations for the writing of Special Convenience Checks, requesting an advance by telephone, or requesting an advance in person.

**Authorized Signers.** The words "Authorized Signer" on Special Convenience Checks and Account Access Cards as used in this Agreement mean and include each person who (a) signs the application for this Equity Maximizer Account, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Equity Maximizer Account.

CLS3312-4                                   Page 4 of 13

00032

Plaintiffs Exhibits
Page 39 of 109

EXHIBIT " D "

PAGE 5 OF 14

Inoue vs. GMAC SCV 248256
Exhibit C
Page 5 of 14

**Lost Special Convenience checks and Account Access Cards.** If you lose your Special Convenience Checks or Account Access Cards or if someone is using them without your permission, you agree to let us know immediately. You can notify us at our address shown at the beginning of this Agreement.

**Prohibited Uses.** You agree not to use any Equity Maximizer Account credit advances to make payments on your Equity Maximizer Account.

**Future Equity Maximizer Account Services.** Your application for this Equity Maximizer Account also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Equity Maximizer Account. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the Security Instrument securing this Agreement, listed herein, all the terms and conditions of which are hereby incorporated and made a part of this Agreement, a Deed of Trust dated JULY 23rd, 2004                          , to us on real property located in SONOMA County, state of California.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the mortgage or deed of trust, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Periodic Statements.** If you have a balance owing on your Equity Maximizer Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, **FINANCE CHARGES**, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

When **FINANCE CHARGES** Begin to Accrue. Periodic **FINANCE CHARGES** for credit advances under your Equity Maximizer Account will begin to accrue on the date credit advances are posted to your Equity Maximizer Account. There is no "free ride period" which would allow you to avoid a **FINANCE CHARGE** on your Equity Maximizer Account credit advances.

If you choose to establish automatic payment to draft your designated Bank of America account, the authorization will remain in full force and effect until the Bank has received written or verbal notification from you of its termination in such time and in such manner as to afford the Bank a reasonable opportunity to act on it. If at any time you select to terminate your automatic payment, your Margin will increase by 1/4%.

**HOW THE BALANCE ON WHICH THE FINANCE CHARGE IS CALCULATED IS DETERMINED.** The cost of the credit through the Equity Maximizer Account is disclosed as a Finance Charge. Except for some closing costs (indicated in this Agreement), interest will not accrue until a credit advance is made. You will pay interest on each credit advance until it is fully paid off. We will determine the **FINANCE CHARGE** for each monthly billing period by using the following simple interest rate calculation. A **FINANCE CHARGE** is calculated daily for that portion of the principal balance that is not payable under a Fixed Rate Loan Option ("Variable Rate Principal Balance") by multiplying the daily periodic rate (as indicated in "How The Rate is Used To Calculate The Finance Charge is Determined") by the daily Variable Rate Principal Balance. To get the daily Variable Rate Principal Balance we (i) take the beginning Variable Rate Principal Balance for that day (ii) add to that amount all credit advances and sums advanced by us to fulfill any obligations under a Security Instrument (such as a mortgage, deed of trust, or security agreement), if any, for that day, then (iii) subtract all principal balance payments and credits for the Variable Rate Principal Balance for that day. All of the daily Variable Rate Principal Balance **FINANCE CHARGES** for the monthly billing cycle are added to get the total Variable Rate Principal Balance **FINANCE CHARGE** for the monthly billing cycle. Transaction charges, including but not limited to Fixed Rate Loan Option conversion fees, are added to the Variable Rate Principal Balance **FINANCE CHARGE** to get the total **FINANCE CHARGE** for the monthly billing cycle. For Fixed Rate Loan Option balances, the estimated **FINANCE CHARGE** is calculated at the establishment of the Fixed Rate Loan Option and is included in the fixed payment amount.

**HOW THE RATE USED TO CALCULATE THE FINANCE CHARGE IS DETERMINED.** The initial Variable Rate Principal Balance daily periodic rate used to compute the Variable Rate Principal Balance **FINANCE CHARGE** is 1/365 of the initial Variable Rate Principal Balance **ANNUAL PERCENTAGE RATE** (as indicated under "Periodic Rate and Corresponding Annual Percentage Rate"). The Variable Rate Principal Balance **ANNUAL PERCENTAGE RATE** is a variable rate involving both an index and a margin, both described under "Periodic Rate and Corresponding Annual Percentage Rate". Finance Charges will accrue on an actual 365 day

CLS3312-5                                Page 5 of 13

00033

Plaintiffs Exhibits
Page 40 of 109

EXHIBIT " D "
PAGE 6 OF 17
Inoue vs. GMAC SCV 246255
Exhibit C
Page 6 of 14

year basis (366 day year basis for leap year). If, however, you participate in a relationship account with a Bank of America Corporation affiliate (as offered from time to time), the Variable Rate Principal Balance Daily Periodic Rate and the Variable Rate Principal Annual Percentage Rate may be reduced below the rates stated in this Agreement. The addition of a fee may cause the actual Variable Rate Principal Balance Annual Percentage Rate for the monthly billing cycle to exceed the Variable Rate Principal Balance Annual Percentage Rate stated in this Agreement.

If the index is unavailable for any monthly billing cycle, we will use the Index for the most recently preceding monthly billing cycle in which the Index was available. If the Index ceases to be published during the term of this Agreement, we will select a substitute index and margin. The substitute index will have a historical movement substantially similar to the index, and the substitute index and margin will result in an Annual Percentage Rate at the time it is substituted that is substantially similar to the rate in effect at the time the Index became unavailable.

There is no limitation on the size of any interest rate adjustment or the number of interest rate adjustments that may be made on the Equity Maximizer Account so long as the maximum Annual Percentage Rate is not exceeded. Any increase or decrease in the Index that occurs would cause a corresponding increase or decrease in the Daily Periodic Rate, Annual Percentage Rate, Finance Charges and possibly the Total Minimum Payment Due. You understand that adjustments based on an Index change will be applied automatically to the Equity Maximizer Account and you will not receive advance notice of that adjustment.

The Finance Charge on a Fixed Rate Loan Option is determined on a simple interest basis. If you make a Fixed Rate Loan Option payment(s) before or after any date, either the amount of your originally scheduled final payment may be lower or higher than the amount initially established or additional payment(s) may be required.

Under some circumstances, your payment will not cover the Finance Charges that accrue and negative amortization will occur. Negative amortization will increase the total amount you may pay us and reduce the equity in the Property.

**Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** as follows. We start with an independent index, which is the Prime Rate as published daily in the "Money Rates" table of The Wall Street Journal. When a range of rates has been published, the higher of the rates will be used. Changes in the Annual Percentage Rate will be based on the Index published the last business day prior to the first day of the next monthly billing cycle, plus the Margin, and will be effective on the first day of the next monthly billing cycle (the "Index"). We will use the most recent index value available to us as of the date of any **ANNUAL PERCENTAGE RATE** adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Equity Maximizer Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we add a margin to the value of the Index, and then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE** for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we add a margin to the value of the Index, and then divide the value by the number of days in a year (daily). To obtain the **ANNUAL PERCENTAGE RATE** we multiply the Periodic Rate by the number of days in a year (daily). This result is the **ANNUAL PERCENTAGE RATE** for your Second Payment Stream. The **ANNUAL PERCENTAGE RATE** includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Equity Maximizer Account will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate will take the form of higher payment amounts. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect monthly. In no event will the corresponding **ANNUAL PERCENTAGE RATE** be more than the lesser of 24.000% or the maximum rate allowed by applicable law. Today the Index is ___4.250 %___ per annum, and therefore the initial Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Equity Maximizer Account are as stated below:

Current Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.250 % | 4.500 % | 0.01229508 % |

Current Rates for the Second Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.250 % | 4.500 % | 0.01229508 % |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

CLS3312-6                                    Page 6 of 13

00034

EXHIBIT " *D* "

PAGE _7_ OF _14_

Inoue vs. GMAC SCV 248256
Exhibit C
Page 7 of 14

**Forgo Rate Increases.** If we forgo an **ANNUAL PERCENTAGE RATE** increase, at the time of the later adjustment we may return to the full Index value plus margin.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Equity Maximizer Account as set forth below:

**Scheduled Fee Changes.** To the extent allowed by applicable law, we may increase any or all of the fees and charges described in this Agreement by 20% of the existing fee each calendar year.

**Other Charges.** Your Equity Maximizer Account may be charged the following other charges: Miscellaneous Charges. The amount of this other charge is: to the extent allowed by applicable law, any other amount incident to the application for and the opening, administration and termination of the Equity Maximizer Account, including, but not limited to, reinstatement of Equity Maximizer Account privileges, processing of nonconforming payments processing and additional expense if an Equity Maximizer Account advance occurs in a foreign country, express courier charges, taxes and any penalties or interest thereon, imposed on this Agreement or on any transaction effected pursuant to this Agreement. We may advance any such cost or tax and any penalty or interest.

**Annual Fee** – $0 will be charged to the Equity Maximizer Account on or after each anniversary date unless the average daily balance for the past 12 month period is either (i) $15,000 or (ii) 30% of the Line.

**Fixed Rate Loan Option Conversion Fee** • There is a $0 conversion fee charged for the establishment of each Fixed Rate Loan Option.

**Late Fee** – If we do not receive the amount of your minimum monthly payment in full within ten (10) days after your payment due date, you will pay us a late charge equal to the greater of $10.00 or five percent (5%) of the unpaid portion of your minimum monthly payment.

**Returned Special Convenience Check Charge** – There is a $20.00 Returned Special Convenience Check Charge each time an Equity Maximizer Account Draw is rejected for any reason.

**Returned Payment Charge** – There is a $20.00 Returned Payment Charge each time your payment is returned or if there are insufficient funds in your account when a payment is attempted through automatic repayment service.

**Security Interest Charges.** You agree to pay all security interest charges related to your Equity Maximizer Account as set forth below:

| | | |
|---|---|---|
| Appraisal | $ | 0.00 |
| Title Insurance | $ | 0.00 |
| Title Search | $ | 0.00 |
| Title 3rd party | $ | 0.00 |
| Survey Inspection | $ | 0.00 |
| Environmental Inspection | $ | 0.00 |
| Transfer Fee | $ | 0.00 |
| Total | $ | 0.00 |

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Equity Maximizer Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happens: (1) You commit fraud or make a material misrepresentation at any time in connection with this Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Equity Maximizer Account. This includes, for example a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

Plaintiffs Exhibits
Page 42 of 109

EXHIBIT " D "

PAGE 8 OF 14

Inoue vs. GMAC SCV 248256
Exhibit C
Page 8 of 14

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Equity Maximizer Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Equity Maximizer Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore.your right to credit advances.

(4) We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Equity Maximizer Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new index will have a historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Equity Maximizer Account is reached.

**Collection Costs.** We may hire or pay someone else to help collect any and all monies due pursuant to this Agreement if you do not pay. You will pay us those amounts. This includes, subject to any limits under applicable law, our attorneys' fees and our legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Rate Increase.** In addition to our other rights during termination and acceleration, we may increase the variable **ANNUAL PERCENTAGE RATE** under this Agreement to a maximum of 24.00% percent per annum. The **ANNUAL PERCENTAGE RATE** will not exceed the maximum rate permitted by applicable law. If we do not increase the **ANNUAL PERCENTAGE RATE** upon termination or acceleration of your Equity Maximizer Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Equity Maximizer Account.

**Access Devices.** If your Equity Maximizer Account is suspended or terminated, you must immediately return to us all Special Convenience Checks and any other access devices. Any use of Special Convenience Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Special Convenience Checks or other Equity Maximizer Account access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all Special Convenience Checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount(s) owing under the variable revolving portion of this Equity Maximizer Account at any time, without penalty. However, we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Equity Maximizer Account. You agree not to send us payments marked "paid in full", "without recourse" or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written

CLS3312-8
00036

Page 8 of 13

*EXHIBIT " D "*
*PAGE 9 OF 17*

Plaintiffs Exhibits
Page 43 of 109

Inoue vs. GMAC SCV 248256
Exhibit C
Page 9 of 14

communications concerning disputed amounts, including any checks or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to us at the address shown on your statement.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You authorize us to release information about you to third parties as described in our Privacy Policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. You agree that upon our request, you will provide us with a current financial statement, a new credit application, or both, on forms provided by us. You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition. We may require a new appraisal of the Property which secures your Equity Maximizer Account at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Equity Maximizer Account and your rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Security Instrument securing this Agreement. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Equity Maximizer Account, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Equity Maximizer Account is not deductible. You should consult your own tax advisor for guidance on this subject.

**Use of the Equity Maximizer Account.** There are some additional rules about how Borrower uses the Equity Maximizer Account:

**A. Legal Transactions.** Borrower agrees that Borrower will only use the Equity Maximizer Account for transactions that are legal where Borrower resides. For example, Internet gambling transactions may be illegal in Borrower's state. Display by an on-line merchant of either Lender's logo or a Card Company's logo does not mean that an Internet transaction is legal where Borrower resides. Lender will not be liable if Borrower engages in an illegal transaction.

**B. Authorizations.** Some transactions require Lender's prior authorization. For security purposes, Lender may from time to time place or change limits on the number or amounts of transactions Borrower makes in a day at ATMs or point of sale terminals. Such limitations may not be the same at every ATM or point of sale terminal. No such limits are placed on the number or amounts of transactions Borrower makes: at Lender's banking centers, by writing a Special Convenience Check, by conducting an Overdraft Protection transaction (subject to the ATM limits, above), or by telephone. In addition, Lender may deny authorization to any method of accessing the Equity Maximizer Account if the Equity Maximizer Account has been suspended or terminated or if Lender suspects fraudulent activity. Lender shall not be liable for any failure to authorize a transaction for any of these reasons. However, Borrower is liable for any transaction Lender authorizes even if Lender should not have authorized it because Borrower is or would be in default as a result of the transaction.

**C. No Security Interest on Purchases.** This Agreement does not grant Lender a security interest in purchases Borrower charges to the Equity Maximizer Account.

**D. Transactions With Merchants.** (a) If a merchant discloses a policy such as "no returns", "no refund", "no return or credit without receipt", "as is", "store credit only", or "all sales final", or similar language, Borrower will be bound by that policy when Borrower uses the Equity Maximizer Account to buy goods or services from that merchant. (b) When using the Equity Maximizer Account to make travel or lodging reservations, Borrower must obtain the merchant's cancellation policy and follow it if Borrower cancels. If Borrower cancels, Borrower must obtain the cancellation number that the merchant is required to give Borrower. The merchant may charge Borrower for a cancelled transaction unless Borrower can provide Lender with a correct cancellation number. If Borrower makes reservations or purchases of any kind, such as a lodging reservation for several nights stay or a mail order purchase, the Equity Maximizer Account may be immediately charged for the full amount of the reservation or purchase, regardless of whether Borrower has received the goods or services requested at the time the Equity Maximizer Account is charged. (c) If Borrower authorizes a merchant to charge the Equity Maximizer Account for repeat transactions without the Account Access Card, then Borrower must notify the merchant when Borrower wants to discontinue the repeat transactions or if the Equity Maximizer Account is closed or if a new Equity Maximizer Account or Account Access Card number is issued by Lender. Otherwise, Borrower will be responsible to Lender for the amount of all such repeat transactions. (d) If Borrower disagrees with a transaction on Borrower's statement or has a dispute with a merchant as a result of a transaction, Borrower

Plaintiffs Exhibits
Page 44 of 109

EXHIBIT " D "
PAGE _10_ OF _14_
Inoue vs. GMAC SCV 248256
Exhibit C
Page 10 of 14

will provide Lender with information or assistance Lender reasonably requests. Otherwise, Borrower will pay Lender for any resulting loss Lender has, unless Lender is prohibited by applicable law from holding Borrower liable for Lender's loss. (e) If Borrower makes a transaction in a currency other than U.S. dollars, VISA will convert the charge or credit into a U.S. dollar amount. The conversion rate will be determined using VISA currency conversion procedures that are disclosed to institutions issuing VISA cards. The conversion rate on the processing date may differ from the rate on the date of Borrower's transaction. Currently, VISA uses a currency conversion rate of either: (1) a wholesale market rate or (2) a government mandated rate, increased by 1% ("Foreign Currency Margin"). In each case, VISA uses the rate in effect one day before the conversion date. The U.S. dollar amount and the "rate" shown on the Statement for each foreign currency transaction include only the 1% retained by VISA. In the event VISA chooses to change the Foreign Currency Margin, the currency conversion rate, or the day on which the currency conversion rate is determined, then transactions on the Equity Maximizer Account made in a foreign currency and processed after the change will reflect the change.

**E. Special Rule for Account Access Card Purchases (Not available in ID, OR and WA).** If Borrower has a problem with the quality of goods or services that Borrower purchased with an Account Access Card, and Borrower has tried in good faith to correct the problem with the merchant, Borrower may not have to pay the remaining amount due on the goods or services. Borrower has this protection only when the purchase price was more than $50 and the purchase was made in Borrower's home state or within 100 miles of Borrower's mailing address. (if Lender owns or operates the merchant, or if Lender mailed Borrower the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase).

**Overdraft Protection and Linked Accounts (Not available in CA and OR).** If the Equity Maximizer Account is not blocked, suspended or terminated, you may request that the Equity Maximizer Account be set up to provide overdraft protection for an associated checking or money market savings account. If the total amount of checks or other debits for a business day exceeds the available associated account balance, then an advance will be made from the Equity Maximizer Account ("Overdraft Protection"). If the Equity Maximizer Account is used for Overdraft Protection, the minimum transfer amount will be in multiples of one hundred dollars ($100) and incremental transfer amounts will be in multiples of one hundred dollars ($100). However, if there is not $100 available, but the available Equity Maximizer Account amount can cover the overdraft transaction, then the amount of the available Equity Maximizer Account will be advanced to cover the overdraft. (Note: for ID and WA, the incremental advance is $25. If the available credit on your account will not allow a $25 increment to be advanced, no transfer will be made). If the associated account is closed or blocked, Overdraft Protection will stop. If you request that the Equity Maximizer Account be connected to or "linked" to another Bank of America product, you understand and agree that a user on the "linked" account can make a transaction that exceeds the available balance on the "linked" account and cause an advance to be made. Also, if an ATM access card is given to a user on the "linked" account, that user when using the ATM access card may access the Equity Maximizer Account and obtain an advance without making a transaction directly on the "linked" account. That user may or may not be a party obligated for this Agreement.

**Skip Payment Feature.** At our discretion, from time to time we may offer a feature that will allow you to skip one or more payments. **FINANCE CHARGES** will continue to accrue on the principal balance at the applicable interest rate. At the end of the skip payment period, the payment terms of this Agreement will be reinstated automatically without further notice.

**Automatic Payment and Reservation of Rights.** If you choose to have payments made from a designated account and have arranged with us to do so, we will automatically draft the payment. Drafts will be made on the payment due date or immediately after the payment due date (if the payment due date is on a Saturday, Sunday or legal holiday). If your account does not contain the payment amount due, you understand that it is your obligation without notice from us to make the full payment. Even if you make a manual payment an automatic payment will be drafted from your designated account, unless you make such manual payment for the full payment due at least three (3) business days prior to the due date; however, if you make less than a full manual payment at least three (3) business days prior to the due date, only the remaining amount currently due will be drafted. To stop an automatic draft, you must contact us at least three (3) business days prior to the scheduled payment draft date. We may accept late payments, partial payments or checks and money orders marked "payment in full" (or similar notations) or payments accompanied by a letter stating that our acceptance of the payment indicates our agreement to the terms set forth in the letter without giving up, waiving or losing any of our rights under law or under this Agreement.

**Additional Suspension or Reduction Information.** Notwithstanding the notice of default provision contained in section (3) in the Suspension or Reduction section above, our suspension of Equity Maximizer Account privileges will be effective immediately. Written notice will be mailed to you within three (3) business days after the suspension of privileges.

**Miscellaneous.** If this Note or Agreement represents a renewal, modification, extension, substitution or consolidation of an obligation owed to us, then you acknowledge and agree that there are no claims, setoffs, avoidances, counterclaims or defenses or rights to claims, setoffs, avoidances, counterclaims or defenses to payment or enforcement of the prior obligation. You agree that if this Note or Agreement is in default, including the failure to make the Minimum Payment by the due date, you will accept calls regarding the collection of this Note or Agreement at any residence or place of employment. The calls can be automatically dialed and a recorded message may be played. You agree such calls will not be "unsolicited" calls for purposes of any federal, state or local law. To improve customer service and security, telephone communications with you may be monitored and

Plaintiffs Exhibits
Page 45 of 109

EXHIBIT " _D_ "

PAGE _11_ OF _14_

Inoue vs. GMAC SCV 248256
Exhibit C
Page 11 of 14

recorded. You agree that monitoring or recording may be done and that no additional notice to you or additional approval from you is needed. You authorize us, our parent company, Bank of America corporation (or any successor company) and Bank of America corporation's affiliates and subsidiaries ("Affiliates") to: (a) obtain other information deemed necessary concerning the granting and maintaining of this Note or Agreement, including the obtaining of credit bureau and other reports concerning your credit experience and other information from credit reporting agencies, creditors, any department of motor vehicles or similar state agency, your employer (past, present and future) and other persons (and all such entities may release and/or verify such information to us at any time without notification to you or without your consent), and (b) share information with our Affiliates, except to the extent that you have opted out of such sharing as provided in our Privacy Policy for consumers. This Note or Agreement constitutes the entire understanding and agreement between the parties as to the matters set forth in this Note or Agreement and supercedes all prior understandings and correspondence, oral or written, with respect to the subject hereof. We reserve the right to defer or delay the date certain changes are to occur without notice and without being liable for any such deferment or delay. A court decree for divorce or separation or non-court approved mutual agreement does not affect, eliminate or reduce any person's liability for the Note or Equity Maximizer Account balance if we are not a party to the decree or agreement. Notwithstanding any other provision contained in the Note or this Agreement, we do not intend to charge, and you shall not be required to pay, any amount of finance charge or fee more than the maximum permitted by applicable law. Any payment in excess of the maximum shall be refunded to you or credited against principal, at our option. If this Note or Agreement is a renewal of a prior Note or Agreement, then it is the intent of the parties that the Note or Agreement evidencing the original extension of credit not be extinguished by the renewal. It is further the intent of the parties that no novation shall occur by the renewal of such extension of credit. Our records shall be evidence of whether this Note or Agreement is a renewal. The word "you" shall also mean Borrower. The word "we" shall also mean Lender.

**Request to Issue Account Access Card and PIN and Other Instructions (not available in ID, OR and WA).** This section shall not apply if issuance of an Account Access Card is prohibited by law, or if the property securing this Agreement is located in the states of Texas or New York (in which case, all references in this Agreement to an "Account Access Card" are deleted). During the Draw Period, any one Borrower may request Lender to issue a card as described in this section, enabling access to the Account, and an associated Personal Identification Number (PIN). Any Borrower may request that such cards be provided to as many as, but no more than, the first three Borrowers listed at the top of this Agreement or who may be later added as a Borrower, or to fewer Borrowers, and to any other person who may be later added as a Borrower (provided that no more than the first three Borrowers may have such cards). Each Borrower is liable for all transactions made with such cards.

Any Borrower may give Lender any other directions with regard to such cards, including, but not limited to, terminating all of them.

All requests or directions, at Lender's option, may be made verbally or in writing. Borrower(s) agree that the cards will be used only as described in this Agreement. Borrower(s) further agree that the cards may be issued by Lender through an arrangement Lender may have from time to time with a card company (the "Card Company"), such as VISA. All references in this Agreement to an "Account Access Card" shall mean the card or cards described in this paragraph.

**Borrowers Protection Plan ™.** (Borrowers Protection Plan is a registered trademark of Bank of America Corporation).
Fixed Rate Loan Options may be protected by the Borrowers Protection Plan. Protection options include Disability, Involuntary Unemployment, and Accidental Death; or Disability and Accidental Death; or Involuntary Unemployment and Accidental Death. Two Borrowers may purchase Protection for each Fixed Rate Loan Option, but they must select the same coverage option, and there may be restrictions on which borrowers may apply. To qualify, you must meet all requirements as set forth in the Addendum for the Borrowers Protection Plan.

The Borrowers Protection Plan is optional and not required to obtain a new Fixed Rate Loan Option. For each Fixed Rate Loan Option, you must specifically request the Borrowers Protection Plan, and you must sign a separate Addendum to this Agreement, even if you obtained the Borrowers Protection Plan for a prior Fixed Rate Loan Option.

Fees for the Borrowers Protection Plan are based on and payable with the regularly scheduled monthly payment of the Fixed Rate Loan Option. Fixed Rate Loan Options with quarterly payments are not eligible for the Borrowers Protection Plan. Interest is not charged on the fees for Borrowers Protection Plan.

The maximum term of the Borrowers Protection Plan is the shorter of the Fixed Rate Loan Option term or 120 months.

We may allow you to exceed the Credit Limit temporarily and from time to time, to accommodate the premiums for the Borrowers Protection Plan.

**Fixed Rate Loan Option Payment Information.** A Fixed Rate Loan Option has a fixed interest rate and fixed term and is payable monthly. You may convert part or all of the Variable Rate Principal Balance, along with accrued interest, fees, the Fixed Rate Loan Option conversion fee and any voluntary insurance charge to a Fixed Rate Loan Option at any time during the Draw Period or the Repayment Period. We will help you establish the amount of principal and interest sufficient to amortize the Fixed Rate Loan Option over the term you select. The maximum term of any Fixed Rate Loan Option may not exceed the Repayment

CLS3312-11                                          Page 11 of 13

00039

Plaintiffs Exhibits
Page 46 of 109

EXHIBIT " _D_ "
PAGE _12_ OF _14_
Inoue vs. GMAC SCV 248256
Exhibit C
Page 12 of 14

Period maturity date of this Agreement. The minimum amount for a Fixed Rate Loan Option is $5,000. You may have up to three (3) Fixed Rate Loan Options open at any one time, but may not have more than four (4) Fixed Rate Loan Options open during any one statement period. You may convert all or part of the Variable Rate Balance, plus the Fixed Rate Loan Option conversion fee to a Fixed Rate Loan Option unless you are in default or if your credit advance privileges are suspended or terminated. If you request a Fixed Rate Loan Option, but the Variable Rate Balance is less than the amount requested, we will hold your request at the fixed interest rate offered to you for up to five (5) business days. If by the end of the fifth day the Variable Rate Balance is still less than the amount of your request, it will not be processed. There may be a conversion fee charged for the establishment of each Fixed Rate Loan Option. Please refer to "Conditions Under Which Other Charges May Be Imposed" elsewhere in this Agreement for information about the conversion fee. The Fixed Rate Loan Option ANNUAL PERCENTAGE RATE is the Prime Rate plus the Fixed Rate Loan Option margin of 8.000%. However, we may make lower Fixed Rate Loan Option rates available from time to time. Please contact your Banking Center or Customer Service for the Fixed Rate Loan Option rate currently offered. Your payment will be a fixed dollar amount to be determined at the opening of the Fixed Rate Loan Option. You may arrange a different payment date for each Fixed Rate Loan Option. Fixed Rate Loan Option payments will be billed separately from your Regular Payment in accordance with the schedule you have arranged. **For Fixed Rate Loan Options, you may choose to receive a separate bill. However, the Variable Rate Balance statement will show all activity, including payments.**

**Governing Law.** This Agreement will be governed by and interpreted in accordance with federal law and the laws of the State of North Carolina. This Agreement has been accepted by us in the State of North Carolina.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Security Instrument, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Security Instrument or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On The Line: What You Should Know About Home Equity Lines of Credit," given with the application.

This Agreement is dated

**THIS AGREEMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS AGREEMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.**

**BORROWER:**

X_____ (Seal)     X_____ (Seal)
   HITOSHI INOUE


X_____ (Seal)     X_____ (Seal)


**Effective Disbursement Date:** 07/23/04

CLS3312-12                         Page 12 of 13

00040
Plaintiffs Exhibits
Page 47 of 109

EXHIBIT " D "
PAGE 13 OF 14

Inoue vs. GMAC SCV 248256
Exhibit C
Page 13 of 14

# BILLING ERROR RIGHTS

## YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow those rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

Plaintiffs Exhibits
Page 48 of 109

*EXHIBIT " D "*
*PAGE 14 OF 14*

Inoue vs. GMAC SCV 248256
Exhibit C
Page 14 of 14

# EXHIBIT D

Thomas P. Kelly III, SBN 230699
50 Old Courthouse Square, Suite 609
Santa Rosa, California, 95404-4926
Telephone : 707-545-8700
Facsimile : 707-542-3371
Email : tomkelly@sonic.net

Plaintiffs Exhibits
Page 49 of 109

Inoue vs. GMAC SCV 248256
Exhibit D
Page 1 of 3

RECORDING REQUESTED BY:

Old Republic Default Management Services

WHEN RECORDED MAIL TO:
ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120



**2010041850**

OFFICIAL RECORDS OF
SONOMA COUNTY
JANICE ATKINSON

TITLE COURT SERVICE
05/20/2010 11:30 NTDF
RECORDING FEE: $18.00
PAID

**2** PGS



---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No.: GM-248260-C      Loan No.: 0654401924

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE
### IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,

and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice).

This amount is **$11,080.59** as of **5/19/2010**, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact,
GMAC MORTGAGE, LLC FKA
GMAC MORTGAGE CORPORATION
C/O ETS Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
(818) 260-1600 phone

Plaintiffs Exhibits
Page 50 of 109

Inoue vs. GMAC SCV 248256
Exhibit D
Page 2 of 3

TS NO.: GM-248260-C                    LOAN NO.: 0654401924

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

**Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That **Executive Trustee Services, LLC dba ETS Services, LLC** is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated **4/19/2003**, executed by **HITOSHI INOUE**, as Trustor, to secure certain obligations in favor of **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR GMAC MORTGAGE CORPORATION DBA DITECH.COM**, as beneficiary, recorded **5/7/2003**, as Instrument No. 2003092480, in Book , Page ,  of Official Records in the Office of the Recorder of **Sonoma** County, California describing land therein as:

AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including **ONE NOTE FOR THE ORIGINAL** sum of **$248,000.00** ; that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in,  the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of Principal and Interest plus impounds and/or advances which became due on 12/1/2009 plus late charges, and all subsequent installments of principal, interest, balloon payments, plus impounds and/or advances and late charges that become payable.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The undersigned declares that the beneficiary or its authorized agent has declared that they have complied with California Civil Code Section 2923.5 by making contact with the borrower or tried with due diligence to contact the borrower as required by California Civil Code Section 2923.5.

Dated: 5/19/2010

ETS Services, LLC as Agent for Beneficiary

BY: *Sandy Ashimine*

Sandy Ashimine
TRUSTEE SALE OFFICER

Plaintiffs Exhibits
Page 51 of 109

Inoue vs. GMAC SCV 248256
Exhibit D
Page 3 of 3

# EXHIBIT E

Thomas P. Kelly III, SBN 230699
50 Old Courthouse Square, Suite 609
Santa Rosa, California, 95404-4926
Telephone : 707-545-8700
Facsimile : 707-542-3371
Email : tomkelly@sonic.net

Plaintiffs Exhibits
Page 52 of 109

Inoue vs. GMAC SCV 248256
Exhibit E
Page 1 of 5

FINANCIAL ANALYSIS FORM

Account Number 0654401924

| BORROWER | CO-BORROWER |
|---|---|

Borrower's Name  HITOSHI INOUE

Co-Borrower's Name

Social Security Number  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    Date of Birth  Feb. 4, 1951

Social Security Number    Date of Birth

Home Phone Number With Area Code  (707) 526 3905

Home Phone Number With Area Code

Cell or Work Number With Area Code  (707) 575 8821

Cell or Work Number With Area Code

Email Address  hito@licengine.com

Email Address

Mailing Address  3735 Coffey Ln. Santa Rosa, CA 95403

Property Address (If Same As Mailing Address, Write Same)  3735 Coffey Ln. Santa Rosa, CA 95403

I want to ✓ Keep the Property    Sell the Property        The property is my:  ✓ Primary Residence    Second Home    Investment

The property is: ✓ Owner Occupied    Renter occupied    Vacant    If Owner Occupied, include a recent utility bill in your name in that property address.
If Renter Occupies, submit a copy of the current lease agreement.

Is the property listed for sale?    Yes ✓ No
Is it for Sale by Owner?    Yes    No
Agent's Name
Agent's Phone Number
Have you received an offer on the property?    Yes    No
Date of offer _____ Amount of Offer $

Have you contacted a credit-counseling agency for help?    Yes  ✓ No
If yes, please complete counselor contact information below:
Counselor's Name
Counselor's Phone Number
Counselor's Email

Who pays the Real Estate Tax bill on your property?
Are the taxes current?  ✓ Yes    No
Condominium or HOA Fee    Yes  $        No
Paid to

Who pays the hazard insurance policy for your property?  myself
Is the policy current?  ✓ Yes    No

Number of People in the Household  2

Have you filed for bankruptcy?    Yes ✓ No    If yes:    Chapter 7    Chapter 13    Filing Date
Has your bankruptcy been discharged?    Yes    No    Bankruptcy Case Number

If there are Liens/other Mortgages or Judgments on this property, please name the person(s), company or firm and their telephone numbers.

| Lien Holder's Name/Servicer | Balance | Contact Number | Loan Number |
|---|---|---|---|

## INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the federal government in order to monitor compliance with federal statutes that prohibit discrimination in housing. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender or servicer may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, the lender or servicer is required to note the information on the basis of visual observation or surname if you have made this request for a loan modification in person. If you do not wish to furnish the information, please check the box below.

| BORROWER | | I do not wish to furnish this information | CO-BORROWER | | I do not wish to furnish this information |
|---|---|---|---|---|---|
| Ethnicity | ☐ | Hispanic or Latino | Ethnicity | ☐ | Hispanic or Latino |
| | ✓ | Not Hispanic or Latino | | ☐ | Not Hispanic or Latino |
| Race | ☐ | American Indian or Alaska Native | Race | ☐ | American Indian or Alaska Native |
| | ✓ | Asian | | ☐ | Asian |
| | ☐ | Black or African American | | ☐ | Black or African American |
| | ☐ | Native Hawaiian or Other Pacific Islander | | ☐ | Native Hawaiian or Other Pacific Islander |
| | ☐ | White | | ☐ | White |
| Sex | ☐ | Female | Sex | ☐ | Female |
| | ✓ | Male | | ☐ | Male |

## Exhibit A - 3 Month Self Employment Income Statement (Profit and Loss Form)

This form may be used if you are self-employed or a 1099 wage earner only.

BORROWER'S NAME  Hiroshi   Inoue        Account Number   0659401924

For each borrower who is self employed a Profit and Loss Statement is required for each business. If borrower has more than one business, we require a Profit and Loss Form for each business. The example document may be used to supply the required information.

| Month and Year must be entered. Use most recent consecutive months. | Month 1: June Year 2010 | | Month 2: July Year 2010 | | Month 3: Aug Year 2010 | |
|---|---|---|---|---|---|---|
| Sales | $ | 4,800 | $ | 5,300 | $ | 5,500 |
| Cost of Goods Sold | $ | 0 | $ | | $ | |
| Gross Profit | $ | 4,800 | $ | 5,300 | $ | 5,500 |
| **Operating Expenses** | | | | | | |
| Advertising | $ | 25 | $ | 25 | $ | 25 |
| Amortization | $ | | $ | | $ | |
| Auto Expenses | $ | 40 | $ | 50 | $ | 50 |
| Bank Charges | $ | 30 | $ | 30 | $ | 30 |
| Depreciation | $ | | $ | | $ | |
| Dues & Subscriptions | $ | | $ | | $ | |
| Employee Benefits | $ | | $ | | $ | |
| Insurance | $ | | $ | | $ | |
| Interest | $ | 240 | $ | 240 | $ | 240 |
| Office Expenses | $ | | $ | | $ | |
| Payroll Taxes | $ | | $ | | $ | |
| Rent | $ | | $ | | $ | |
| Repairs & Maintenance | $ | | $ | | $ | |
| Salaries & Wages | $ | | $ | | $ | |
| Supplies | $ | 480 | $ | 740 | $ | 970 |
| Taxes & Licenses | $ | | $ | | $ | |
| Telephone | $ | 70 | $ | 70 | $ | 60 |
| Utilities | $ | 30 | $ | 40 | $ | 40 |
| Other | $ | | $ | | $ | |
| Total Operating Expenses | $ | 915 | $ | 1,175 | $ | 1,415 |
| Net Profit Before Taxes | $ | 3,885 | $ | 4,125 | $ | 4,085 |
| Income Taxes | $ | 0 | $ | | $ | |
| **Net Profit After Taxes** | $ | | $ | | $ | |

## Exhibit B - Investment Property Schedule

BORROWER'S NAME                          Account Number

For each borrower who receives rental income from an investment property an Investment Property Schedule is required. If additional space is needed, please include an additional page.

| Property Number | Property Street Address | Property City, State, and Zip Code | Number of Units (1, 2, 3, 4, or 5+) | Status Circle All That Apply R – Rental V – Vacant PS – Pending Sale F – In Foreclosure | Gross Monthly Rental Income | Monthly Mortgage Payment (including taxes and insurance) | Monthly Insurance and Taxes | Monthly HOA/Condo Dues (if applicable) |
|---|---|---|---|---|---|---|---|---|
| Primary Residence | | | | R  V  PS  F | $ | $ | $ | $ |
| 2 | | | | R  V  PS  F | $ | $ | $ | $ |
| 3 | | | | R  V  PS  F | $ | $ | $ | $ |
| 4 | | | | R  V  PS  F | $ | $ | $ | $ |
| 5 | | | | R  V  PS  F | $ | $ | $ | $ |
| 6 | | | | R  V  PS  F | $ | $ | $ | $ |
| 7 | | | | R  V  PS  F | $ | $ | $ | $ |
| 8 | | | | R  V  PS  F | $ | $ | $ | $ |
| 9 | | | | R  V  PS  F | $ | $ | $ | $ |
| 10 | | | | R  V  PS  F | $ | $ | $ | $ |
| **Totals** | | | | | $ | $ | $ | $ |

Plaintiffs Exhibits
Page 54 of 109

Inoue vs. GMAC SCV 248256
Exhibit E
Page 3 of 5

## ACKNOWLEDGEMENT AND AGREEMENT

Account Number __0658401924__

In making this request for consideration to review my loan terms I/We certify under penalty of perjury:

1   That all of the information in this document is truthful and the event(s) identified is/are the reason that I/we need to request a modification of the terms of my/our mortgage loan, short sale or deed-in-lieu of foreclosure.

2   I/we understand that the Servicer, the U.S. Department of the Treasury, or its agents may investigate the accuracy of my our statements and or may require me/us to provide supporting documentation. I/we also understand that knowingly submitting false information may violate Federal law.

3   I/we understand the Servicer will pull a current credit report on all borrowers obligated on the Note.

4   I/we understand that if I/we have intentionally defaulted on my/our existing mortgage, engaged in fraud or misrepresented any facts in connection with this document, the Servicer may cancel any Agreement under Making Home Affordable and may pursue foreclosure on my own home.

5   I/we understand any fee to validate the value of the property will be assessed to the account.

6   I/we have not received a condemnation notice; and there has been no change in the ownership of the Property since I/we signed the documents for the mortgage that I/we want to modify.

7   I/we certify that I/we will obtain credit counseling if it is determined that my/our financial hardship is related to excessive debt. For purposes of the Making Home Affordable program, "excessive debt" means that my/our debt-to-income ratios after the modification would be greater than or equal to 55%.

8   I/we are willing to provide all requested documents and to respond to all Servicer questions in a timely manner.

9   I/we understand that the Servicer will use the information in this document to evaluate my/our eligibility for a loan modification or short sale or deed-in-lieu of foreclosure, but the Servicer is not obligated to offer me/us assistance based solely on the statements in this document.

10  I/we agree that any prior waiver as to payment of escrow items in connection with my/our loan has been revoked.

11  I/we agree to the establishment of an escrow account and the payment of escrow items if an escrow account never existed on the loan.

12  I/we understand that the Servicer will collect and record personal information, including, but not limited to, my/our name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. I/we understand and consent to the disclosure of my/our personal information and the terms of any Making Home Affordable Agreement by Servicer to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Homeowner Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees or services my/our first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services in conjunction with Making Home Affordable; and (e) any HUD certified housing counselor.

13  ☑   My/Our property is owner occupied; I/we intend to reside in this property for the next twelve months.
    ☐   My/Our property is not owner occupied.



| Borrower Signature | 6/03/10 | Co-Borrower Signature | |
|---|---|---|---|
| | Date | | Date |

If you have questions about this document or the modification process, please call us at the phone number listed on your monthly account statement. If you need further counseling, you can call the Homeowner's HOPE™ Hotline at 1-888-995-HOPE (4673). The Hotline can help with questions about the program and offers free HUD-certified counseling services in English and Spanish.

**888-995-HOPE**™
Homeowner's HOPE Hotline

## NOTICE TO BORROWERS

Be advised that you are signing the following documents under penalty of perjury. Any misstatement of material fact made in the completion of these documents including but not limited to misstatement regarding your occupancy in your home, hardship circumstances, and/or income will subject you to potential criminal investigation and prosecution for the following crimes: perjury, false statements, mail fraud, and wire fraud. The information contained in these documents is subject to examination and verification. Any potential misrepresentation will be referred to the appropriate law enforcement authority for investigation and prosecution.

By signing the enclosed documents you certify, represent and agree that:
'Under penalty of perjury, all documents and information I have provided to Lender in connection with this Agreement including the documents and information regarding my eligibility for the program, are true and correct.'

If you are aware of fraud, waste, abuse, mismanagement or misrepresentations affiliated with the Troubled Asset Relief Program, please contact the SIGTARP Hotline by calling 1-877-SIG-2009 (toll-free), 202-622-4559 (fax), or www.sigtarp.gov. Mail can be sent to Hotline Office of the Special Inspector General for Troubled Asset Relief Program, 1801 L St. NW, Washington, DC 20220.



Plaintiffs Exhibits
Page 55 of 109

Inoue vs. GMAC SCV 248256
Exhibit E
Page 4 of 5

FAX COVER SHEET  *(This page should be returned to us with your completed financial analysis form)*
**PLEASE INCLUDE THE ACCOUNT NUMBER ON EVERY PAGE OF YOUR RETURNED PACKAGE**

| To: Loss Mitigation | |
|---|---|
| From: HITOSHI INOUE | Account Number(s) 0654401924 |
| Fax to: 1-866-709-4744 | or mail to: Loss Mitigation |
| | 233 Gibraltar Road Suite 600 |
| | Horsham PA 19044 |

ALL of the following information must be completed and returned to determine eligibility:

- Financial Analysis Form/Information for Government Monitoring Purposes
- A signed and dated copy of the Acknowledgement/Agreement
- A signed and dated copy of IRS Form 4506T-EZ (Request for Transcript of Tax Return). Borrowers who filed their tax returns jointly may send in one IRS Form 4506T-EZ signed and dated by both the joint filers. This form is required even if you have not filed or are not required to file tax returns.
- Documentation confirming occupancy -- a recent utility bill in your name at the property address.
- Documentation verifying expenses for Homeowners or Condominium Association Dues for condominiums and Co-Ops (if applicable)
- Documentation to verify all of the income of each borrower. Please see the chart below for the type of documentation required for each type of income.

| TYPE OF INCOME | DOCUMENTATION REQUIRED |
|---|---|
| Paid hourly or salary or short term disability | Copy of two most recent pay stubs from your employer indicating year to date information. Pay stubs cannot be more than 90 days old. |
| Self employed or receive a 1099 form | Copy of most recent quarterly or year-to-date Profit and Loss statement. See Exhibit A for a sample of a 3 Month Self Employment Income Statement (Profit and Loss Form) |
| Child support or alimony* | Copy of divorce decree, separation agreement, or other legal written agreement filed with the court that shows the amount of the award and period of time over which it will be received AND Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of child support or alimony. Bank statements cannot be over 90 days old. |
| Social Security, disability, death benefits or pension | Copy of benefits statement or letter from the provider that states the amount and frequency of the benefit AND Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of benefit income. Bank statements cannot be over 90 days old. |
| Other earned income (i.e. bonus, commission, housing allowance or overtime) | Copy of third party documentation describing the nature of the income (i.e. an employment contract and/or printouts documenting tips) and indicating the income is not a one time payout. |
| Rental income from an investment property | Copy of the most recent federal tax return with all schedules, including Schedule E-Supplemental Income and Loss AND Current lease agreement on the subject property AND Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of income. Bank statements cannot be over 90 days old. See Exhibit B for a copy of an Investment Property Schedule. |
| Rental income from room rental of the primary residence | Copy of current lease agreement. AND Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of income. Bank statements cannot be over 90 days old. |
| Unemployment | Copy of a benefits statement or letter from the provider that states the amount, frequency, and duration of the benefit. Benefit must continue for at least 9 months to be considered. AND Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of income. Bank statements cannot be over 90 days old. |
| Other income (investment, interest, dividends, etc.) | Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of income. Bank statements cannot be over 90 days old. |
| Income not specified above | Signed letter from the person(s) that contributes the income showing the amount and frequency of the income AND Copies of two most recent bank statements verifying deposit amounts or other documentation (i.e. 2 copies of checks) showing receipt of income. Bank statements cannot be over 90 days old. |

*You are not required to disclose Child Support, Alimony, or Separation Maintenance income, unless you choose to have it considered.

If you want to sell this property, please also include:
- Copy of the listing agreement
- Copy of the sales contract, if available
- Copy of the estimated Settlement Statement (HUD1), if available
- Signed Third Party Authorization Form

 **Please be aware we will not be able to process your request until all parts of the application have been completed and all supporting documentation has been supplied.**

Plaintiffs Exhibits
Page 56 of 109

Inoue vs. GMAC SCV 248256
Exhibit E
Page 5 of 5