QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Daniel L. Brockett
Susheel Kirpalani
Jennifer Barrett
Maria Ginzburg
Scott C. Shelley
51 Madison Avenue, 22nd Floor
New York, New York 10010

Telephone: (212) 849-7000
Facsimile:  (212) 849-7100
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
Eric D. Winston (admitted *pro hac vice*)
Jeremy D. Andersen (admitted *pro hac vice*)
865 South Figueroa Street
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Counsel for*

*AIG Asset Management (U.S.), LLC. et al.,*
*Allstate Insurance Company, et al.,*
*Massachusetts Mutual Life Insurance Company, and*
*Prudential Insurance Company of America, et al.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., | Chapter 11 |
| Debtors. | Jointly Administered |

**MOTION OF AIG ASSET MANAGEMENT (U.S.), LLC, THE ALLSTATE ENTITIES, MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, AND THE PRUDENTIAL ENTITIES FOR AN ORDER UNDER BANKRUPTCY RULE 3013 (i) CLASSIFYING RMBS FRAUD CLAIMS IN THE SAME CLASS  AS THE SECURITIZATION TRUSTS' CLAIMS FOR PURPOSES  OF ANY CHAPTER 11 PLAN FOR THE DEBTORS AND (ii) DIRECTING THAT MISREPRESENTATION CLAIMS CANNOT BE PLACED IN A PLAN CLASS THAT WILL BE <u>SUBORDINATED UNDER BANKRUPTCY CODE SECTION 510(b)</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

PRELIMINARY STATEMENT ............................................................................2

STATEMENT OF FACTS .....................................................................................4

    A.    The Structure of Mortgage-Backed Securities ..........................................4

    B.    The Claims at Issue ...................................................................................7

        1.    The Investors' Misrepresentation Claims ....................................7

        2.    The R&W Claims ..........................................................................8

    C.    The Debtors Intend to Give Preferential Treatment to the R&W Claims...............9

ARGUMENT .........................................................................................................10

I.    THE DEBTORS' STATED INTENTIONS HAVE MADE RIPE THE
    CLASSIFICATION ISSUES RAISED IN THIS MOTION .............................10

II.    THE INVESTORS' CLAIMS SHOULD BE CLASSIFIED THE SAME AS THE
    TRUSTS' CLAIMS .........................................................................................11

    A.    The Investors' Claims Are Substantially Similar to the Trusts' Claims...............11

    B.    The Debtors Cannot Treat These Similar Claims Differently, Because
        There Is No Reasonable Basis for Doing So and the Bankruptcy Code
        Disfavors Attempts to Treat Substantially Similar Claims Differently ................15

III.    THE INVESTORS' MISREPRESENTATION CLAIMS CANNOT BE PLACED
    IN A CLASS THAT WILL BE SUBORDINATED .........................................16

    A.    The RMBS Certificates Are Not Securities "of" the Debtors, Because the
        RMBS Certificates Represent Contractual Obligations of Only the Non-
        Debtor Trusts .........................................................................................18

    B.    The Issuing Trusts Are Not "Affiliates" of the Debtors, Because the
        Pooling and Servicing Agreements Are Not "Operating Agreements"................21

    C.    The Purposes of Bankruptcy Code Section 510(b) Would Not Be Served
        By Subordinating the Investors' Claims.................................................23

1.      Congress Was Seeking to Prevent "Bootstrapping" Up the Capital
        Structure.....................................................................................................24

2.      The Anti-Bootstrapping Purposes of Section 510(b) Would Not Be
        Advanced By Subordinating the Investors' Claims....................................27

CONCLUSION....................................................................................................................28

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re 500 Fifth Ave. Assocs.*,
  148 B.R. 1010 (Bankr. S.D.N.Y.), *aff'd* 1993 WL 316183 (S.D.N.Y. 1993)......................10

*In re AG Consultants Grain Div., Inc.*,
  77 B.R. 665 (Bankr. N.D. Ind. 1987)...................................................................15

*Allstate Ins. Co. v. GMAC Mortgage, LLC*,
  No. 27-cv-11-3480 ...................................................................................5, 8

*In re Applegate Property, Ltd.*,
  133 B.R. 827 (Bankr. W.D. Tex. 1991).................................................................21

*In re Applied Safety, Inc.*,
  200 B.R. 576 (Bankr. E.D. Pa. 1996) ...................................................................15

*In re Barakat*,
  99 F.3d 1520 (9th Cir. 1996) .............................................................................16

*In re Betacom of Phoenix, Inc.*,
  240 F.3d 823 (9th Cir. 2001) .........................................................................25, 26

*In re Boston Post Road Ltd. Partnership*,
  21 F.3d 477 (2d Cir. 1994)...............................................................................15

*In re Calpine Corp.*,
  2007 WL 4326738 (Bankr. S.D.N.Y. Nov. 21, 2007) ................................................24

*In re Chateaugay Corp.*,
  89 F.3d 942 (2d Cir. 1996)................................................................................11

*In re Cincinnati Microwave, Inc.*,
  210 B.R. 130 (Bankr. S.D. Ohio 1997)..................................................................27

*In re CIT Group Inc.*,
  479 Fed. Appx. 393 (2d Cir. 2012)...................................................................23, 27

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) .................................................................14, 16

*In re D & W Realty*,
  165 B.R. 127 (S.D. N.Y. 1994)...........................................................................15

*District of Columbia v. Carter*,
  409 U.S. 418 (1973).......................................................................................20

*In re Dow Corning Corp.*,
  244 B.R. 634 (Bankr. E. D. Mich. 1999) ...............................................................11

*In re Enron Corp.*,
  341 B.R. 141 (Bankr. S.D.N.Y. 2006) .......................................................................24, 26

*FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. Partnership*,
  155 B.R. 93 (D. N.J. 1993) .......................................................................................12

*In re Gillette Assocs., Ltd.*,
  101 B.R. 856 (Bankr. N.D. Ohio 1989) ...................................................................11

*In re Graphic Communications, Inc.*,
  200 B.R. 143 (Bankr. E.D. Mich. 1996) ..................................................................15

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
  987 F.2d 154 (3d Cir. 1993) ....................................................................................15

*In re Johnston*,
  21 F.3d 323 (9th Cir. 1994) .....................................................................................11

*In re King*,
  460 B.R. 708 (Bankr. N.D. Tex. 2011) ...................................................................15

*In re Med Diversified, Inc.*,
  461 F.3d 251 (2nd Cir. 2006)...........................................................................23, 24, 25

*In re Missionary Baptist Foundation of Am.*,
  712 F.2d 206 (5th Cir. 1983) ...................................................................................21

*In re Piece Goods Shops Co., L.P.*,
  188 B.R. 778 (Bankr. M.D.N.C. 1995) ...................................................................14

*In re SeaQuest Diving, LP*,
  579 F.3d 411 (5th Cir. 2009) ...................................................................................26

*In re Semcrude, L.P.*,
  436 B.R. 317 (Bankr. D. Del. 2010) ..................................................................16, 20

*In re Simmons*,
  288 B.R. 737 (Bankr. N.D. Tex. 2003) ...................................................................15

*Matter of Stirling Homex Corp.*,
  579 F.2d 206 (2d Cir. 1978).] .................................................................................26

*In re Telegroup, Inc.*,
  281 F.3d 133 (3d Cir. 2002).] ..................................................................................26

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ........................................................................27

*In re Vista Eyecare, Inc.*,
  283 B.R. 613 (Bankr. N.D. Ga. 2002) .....................................................................17

*In re Washington Mutual, Inc.*,
  462 B.R. 137 (Bankr. D. Del. 2011) ................................................................16, 20, 22

*In re Worldcom, Inc.*,
    329 B.R. 10 (Bankr. S.D.N.Y. 2005) ...................................................................24

*In re Wyeth Co.*,
    134 B.R. 920 (Bankr. W.D. Mo. 1991) ............................................................26

## Statutes

11 U.S.C. § 101(2) ...................................................................................................17, 21

11 U.S.C. § 102(3) .........................................................................................................21

11 U.S.C. § 1122 ........................................................................................................1, 11

11 U.S.C. § 1222(b)(1) ..................................................................................................10

11 U.S.C. § 1322(b)(1) ..................................................................................................10

11 U.S.C. § 510(b) ...................................................................................................17, 26

## Miscellaneous

John J. Slain and Homer Kripke, The Interface Between Securities Regulation and Bankruptcy—
*Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's
Creditors,* 48 N.Y.U. L. Rev. 261 (1973) ......................................................................25

*Kathleen C. Englel & Patricia A. McCoy, Turning a Blind Eye: Wall Street Finance of Predatory
Lending,* 75 Fordham L. Rev. 2039 (2007) ..................................................................19

## <u>INTRODUCTION</u>

AIG Asset Management (U.S.), LLC and affiliated entities (collectively, "<u>AIG</u>"), Allstate

Insurance Company and affiliated entities (collectively, "<u>Allstate</u>"), Massachusetts Mutual Life

Insurance Company ("<u>Mass Mutual</u>"), and Prudential Insurance Company of America and

affiliated entities (collectively, "<u>Prudential</u>," and, with AIG, Allstate, and Mass Mutual, the

"<u>Investors</u>"), holders of general unsecured claims against Residential Capital, LLC and its

debtor-subsidiaries ("the <u>Debtors</u>"), by and through their undersigned counsel, hereby file this

motion (this "<u>Motion</u>") seeking the entry of an order pursuant to section 1122 of Title 11, United

States Code (the "<u>Bankruptcy Code</u>") and Rule 3013 of the Federal Rules of Bankruptcy

Procedure ("<u>Bankruptcy Rules</u>") determining that, for purposes of any chapter 11 plan

concerning the Debtors, (i) the Misrepresentation Claims (as defined below) and the R&W

Claims (as defined below) should be classified together, and (ii) the Misrepresentation Claims

cannot be classified in a class of claims that are subject to Bankruptcy Code section 510(b).

This Motion is supported by the "Request for Judicial Notice in Support of the Motion of

AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance

Company, and the Prudential Entities for an Order Under Bankruptcy Rule 3013 Classifying

RMBS Fraud Claims in the Same Class as the Securitization Trusts' Claims For Purposes of Any

Chapter 11 Plan for the Debtors" (the "<u>RJN</u>") and the "Declaration of Eric D. Winston in

Support of the Motion of AIG Asset Management (U.S.), LLC, the Allstate Entities,

Massachusetts Mutual Life Insurance Company, and the Prudential Entities for an Order Under

Bankruptcy Rule 3013 Classifying RMBS Fraud Claims in the Same Class as the Securitization

Trusts' Claims For Purposes of Any Chapter 11 Plan for the Debtors" (the "<u>Winston</u>

<u>Declaration</u>").

## PRELIMINARY STATEMENT

The Investors all hold residential mortgage-backed securities (the "RMBS Certificates")

that were marketed by the Debtors and issued by bankruptcy remote trusts established by, but not

affiliated with, the Debtors.  An RMBS Certificate entitles the holder to a capped share of the

cash flows coming from a pool of mortgage loans (the "Mortgage Loans").  Payments from

homeowner/borrowers in respect of the Mortgage Loans flow through bankruptcy-remote trusts

(the "Trusts") to holders of RMBS Certificates.  This Motion seeks to ensure that equal treatment

is given to all creditors that were harmed by misrepresentations made by the Debtors relating to

the RMBS Certificates.

There are two types of claims at issue.  The first type of claims (the "R&W Claims") are

contract-based claims that arise under the transactional documents entered into as part of the

securitization process between the Debtors and the Trusts.  In these transactional documents, the

Debtors made certain representations about the quality of the Mortgage Loans.  Those

representations were false.  Under the terms of the transactional documents governing the RMBS

Certificates, the Trusts have the right to rescind the sale with respect to defective mortgage loans

(i.e., to "putback" those mortgage loans to the seller), and the funds they recover through that

putback process are passed through to the Trusts' current RMBS Certificate holders pursuant to

each Trust's "waterfall" structure.  It is these contractual R&W Claims by the Trusts that are the

subject to a pending settlement request (the "RMBS Trust Settlement").[1]

The second variety of claims (the "Misrepresentation Claims") arise from the same

misrepresentations by the Debtors, but are based on violations of federal securities laws and state

---

[1]    *See Debtor's Supplemental Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of RMBS Trust Settlement Agreements* (ECF Doc. # 1176) (the "Supplemental 9019 Motion") at 2-3.

blue sky laws, common law fraud and other similar theories.  In the offering materials used to

market the resulting RMBS Certificates, the Debtors repeated to the Investors the representations

that had been made to the Trusts in the transaction documents.  Those representations, about the

same loans, being described in the same way, were false for the same reasons—i.e., the

underwriting guidelines had been systematically abandoned, and the offering materials did not

accurately describe the mortgage loans underlying the RMBS Certificates.  The Debtors'

misrepresentations gave rise to the approximately $1.785 billion in fraudulent-inducement and

similar claims by the Investors.[2]

Because both sets of claims arise out of the same conduct and are for the benefit of

similarly situated claimants, this Motion is brought to ensure that the Misrepresentation Claims

are given equal treatment with the R&W Claims.  The Investors seek two rulings:

*First*, the Court should confirm that for purposes of any chapter 11 plan for the Debtors,

pursuant to Bankruptcy Code section 1122, the Misrepresentation Claims must be classified in

the same class as the R&W Claims.  Both sets of claims arise out of the Debtors' fraud and

misrepresentations concerning the same securitization process of the same Mortgage Loans, and

there is no reason why one should be given preferential treatment over the other.  This is

particularly so in light of the fact that numerous investors, including those who no longer hold

the RMBS Certificates will recover nothing on account of the R&W Claims or the settlement

thereof.  Classifying these sets of claims differently thus threatens unfairly to disadvantage those

investors whose prospects for recover are primarily premised upon the Misrepresentation Claims.

---

[2]    A portion of these claims is fixed based on the disposition of RMBS Certificates by
certain of the Investors.  The estimate of losses is based on the liquidated losses and current mark
to market pricing.

*Second*, the Court should clarify that the Misrepresentation Claims cannot be placed in a

plan class that will be subordinated under Bankruptcy Code section 510(b), which applies only to

claims based on securities "of" the Debtors or their "affiliates."  Section 510(b) is not applicable

to the Misrepresentation Claims, because the RMBS Certificates at issue are not securities (debt,

equity, or otherwise) "of" the Debtors or their "affiliates."  The RMBS Certificates represent

only the obligations *of the non-debtor Trusts* to pass through funds received *from homeowner-*

*borrowers*.  The Trusts, moreover, do not fit into any of the delineated "affiliate" situations set

forth in the Code, as courts in similar cases have recognized.  Additionally, because the

Investors' *only* relationship with the Debtors is indisputably that of a tort victim injured by the

Debtors' conduct, this case does not present the problem Section 510(b) was created to solve—

security holders of a debtor seeking to circumvent the absolute priority rule by pleading tort

claims as a means to recover the value of their lost equity.  No creditor relied on the subordinated

nature of the Investors' position in the Debtors' capital structure, for the simple reason that the

Investors are not part of the Debtors' capital structure.

Bankruptcy Rule 3013 permits this Court to consider classification issues in advance of

plan confirmation if it is desirable or necessary to establish proper classification before a plan

can be formulated.  In this case, determining the classification of the Misrepresentation Claims as

requested herein provides numerous benefits to the Debtors' estates and their creditors, and will

provide far greater certainty and less administrative costs as the Debtors (or, if exclusivity is

terminated, any other party in interest) move forward with the plan process.

## STATEMENT OF FACTS

### A.    The Structure of Mortgage-Backed Securities

***Pooling the Loans.***  Mortgage-backed securities are created from pools of mortgage

loans.  Following the closing of mortgage loans, they are transferred to a "sponsor," and again

transferred to a "depositor."  *See generally* RJN Ex. "1" (*Allstate Ins. Co. v. GMAC Mortgage,*

*LLC*, No. 27-cv-11-3480, First Amended Complaint (Minn. D. Ct. April 15, 2011) ("<u>Allstate</u>

<u>FAC</u>") ¶ 36).  Here, many of the loans were originated by the Debtors or their affiliates, and the

RMBS Certificates at issue involved the Debtors in the roles of sponsors and depositors.  *Id.* Ex.

A.

      <u>***Transferring the Loans to a Bankruptcy-Remote Trust.***</u>  After acquiring mortgage loans,

the depositor assigns the loans "to the Trustee for the benefit of the certificateholders without

recourse all the right, title and interest . . . in and to the Mortgage Loans."  *E.g.*, Winston

Declaration at Ex. "A" (March 1, 2006 Standard Terms of Pooling and Servicing Agreement,

Mortgage Asset-Backed Pass-Through Certificates Series 2006-QO3 § 2.01).  This is done

pursuant to the "Pooling and Servicing Agreement" and related transactional documents.  Those

documents contain "representations and warranties" about the features of the mortgage loans,

which form the basis of the R&W Claims.

      <u>***The Trust Issues a Series of Certificates.***</u>  In order to finance the acquisition of the loans,

the Trust issues to investors certificates backed by the pool of loans; these certificates entitle the

holder to payments from the loan pool.  Allstate FAC ¶¶ 30, 35.  Each RMBS offering involves

multiple classes, or "tranches," of certificates.  The most senior certificates have the first right to

the cash flows from the underlying pool.  Any excess then "waterfalls" down to the next tranche,

and so on.  Because it is the flow of cash from the pool of mortgages held by the trust that

determines an investor's return, if the underlying mortgages perform, certificate holders will, at

best, get their principal returned plus a pre-determined amount of maximum interest.  If enough

of the underlying borrowers fail to repay their mortgages, certificate holders may get an effective

lower rate of return, and may even lose their principal.  *Id.* ¶ 48.

*__The RMBS Certificates Represent the Trusts' Obligations to Pass Through Amounts__*

*__Received from the Underlying Mortgage Loans.__*  As can be seen in the flow-through structure

described above, the purpose of the Trust into which the loans are transferred is to "sell the

Certificates," to "enter into and perform its obligations under [the Pooling and Servicing

Agreement]," to "engage in those activities that are necessary, suitable or convenient to

accomplish the forgoing," and to "engage in such other activities as may be required in

connection with conservation of the Trust Fund and the making of distributions to the

certificateholders."  Winston Declaration at Ex. "A" (March 1, 2006 Standard Terms of Pooling

and Servicing Agreement, Mortgage Asset-Backed Pass-Through Certificates Series 2006-QO3

§ 2.08).[3]  Accordingly, the Trust is given responsibility in the transactional documents for a

number of tasks to ensure certificate holders receive the amounts they are due to be passed

through to them from the loan pools.[4]

---

[3]    Generally the Debtors' transactional documents relating to the RMBS Certificates were similar in form, and for administrative ease the Investors are providing one representative example of such documentation.

[4]    Such responsibilities include, among others:  managing the short-term investment of the received funds between the period of receipt (from borrowers) and distribution (to certificate holders); examining all documents required to be provided by the depositor and servicer to ensure they are complete; making available reports on the loans and mailing paper reports to those who request them; modifying the distribution process where necessary; maintaining a website for investors to access SEC filings; delivering the certificates in a specified form; maintaining a registry of the holders of the certificates; responding to certificate holder demands to exchange their certificates; replacing mutilated, lost, or stolen certificates; declaring Events of Default and responding to certificate holder demands regarding Events of Default; paying all applicable taxes; and delivering to the depositor reports on litigation involving the trustee.  *See* Winston Declaration at Ex. "A" §§ 2.02, 4.01, 4.03, 5.01, 5.02, 7.01, 8.01, 12.03.  The Pooling and Servicing Agreements also appoint a "servicer," who agrees to "administer the Mortgage Loans," i.e., to collect on the underlying mortgage loans from homeowners, and make decisions such as when to foreclose on the mortgaged properties.  *Id*. §§ 3.01, 3.07.  But if the servicer failed in its duties, the trustee is required to assume the servicing obligations.  Id. § 3.06.  Thus, the trustee is ultimately responsible for ensuring the servicer performs its duties, and is also responsible for creating and issuing the certificates and interacting with certificate holders.

_**Marketing the Certificates.**_  In order to market the securities, investors are given information jointly prepared, vetted, authorized, and distributed by, among others, the sponsor, depositor, and underwriters.  This information is contained in draft and final term sheets, free-writing prospectus, prospectuses and prospectus supplements, registration statements, and other materials (the "Offering Materials").  Here, the Offering Materials were jointly prepared by the Debtors, as well as non-Debtor Ally entities like the underwriting entity, non-debtor Ally Securities.  *See* Winston Declaration at Ex. "B."

**B.    The Claims at Issue**

**1.    The Investors' Misrepresentation Claims**

Between 2005 and 2007, the Investors purchased more than $4.61 billion in RMBS Certificates issued by the Trusts.  Those purchases were made in reliance on representations regarding the key risk features of the underlying mortgage loans contained in the Offering Materials given to investors on such topics as the underwriting guidelines applied to the loans, the LTV ratios of the loans, the occupancy status of the mortgaged properties, and the creditworthiness of the underlying borrowers.  RJN Ex. "1" (Allstate FAC ¶¶ 66-103).

In February 2011, Allstate filed suit against certain Debtors and non-debtor Ally Securities, seeking to recover on theories of common-law and statutory fraud.[5]  In December 2011, the Minnesota court denied the defendants' motion to dismiss the then-amended complaint.  *See* RJN Ex. "2" (*Allstate Ins. Co. v. GMAC Mortgage, LLC*, No. 27-cv-11-3480,

---

[5]    Non-debtor Ally Securities is named as a defendant in Allstate's action (under its former title, Residential Funding Securities) for its direct role in the fraud.  It served as an underwriter in connection with most of the RMBS Certificates Allstate purchased.  FAC ¶ 19. As underwriter, it played a critical role in the securitization process; underwriters provide the information that potential investors like Allstate use to decide whether to purchase the certificates, and are responsible for ensuring the accuracy of that information.  *Id.* ¶¶ 39, 42, 64(c).

slip op. (Minn. D. Ct. Nov. 28, 2011)).  Discovery was ongoing when the Debtors filed the

Petition.  Allstate is a party to the stipulation by which the Minnesota action is stayed and

Allstate's claims against all non-debtor affiliates are tolled.

On February 9, 2011, MassMutual commenced a civil action in the United States District

Court for the District of Massachusetts against certain Debtors other parties in connection with

the sale of the RMBS Certificates to MassMutual.  On February 14, 2012, the court entered an

order granting in part a motion to dismiss claims.[6]

AIG and Prudential have not yet filed law suits against the Debtors.

Each of the Investors has filed proofs of claim in these cases.  Attached hereto as

Appendix "1" is list of the all of the proofs of claim that the Investors filed (by individual

creditor and debtor entity).

### 2.    The R&W Claims

The transactional documents between the Trusts and the depositor contain representations

and warranties about the mortgage loans.  Those representations were given "for the benefit of

the Certificateholders."  March 1, 2006 Standard Terms of Pooling and Servicing Agreement,

Mortgage Asset-Backed Pass-Through Certificates Series 2006-QO3 § 2.01(f).  Not surprisingly,

the representations in the transactional documents largely track, in substance, the false

information given to investors in the Offering Materials.  *See* Section II(A), *infra*.  Critical

features of the underlying mortgage loans—including LTV ratios, owner occupancy statistics,

and borrower-creditworthiness—were inaccurately described by the Debtors in *both* the Pooling

and Servicing Agreements and in the Offering Materials.  These misrepresentations and false

statements gave rise to R&W Claims in favor of the Trusts, for the benefit of Certificateholders.

---

[6]   The district court's interlocutory order dismissed MassMutual's claims against the
Debtors, and MassMutual reserves the right to seek reversal of the dismissal order on appeal.

Because the Trusts only exist to deal with and provide cash to *current* certificate holders, those who bought the certificates in reliance on the false Offering Materials but have since sold those certificates will recover nothing by way of the R&W Claims. Thus, despite that both the R&W Claims and the Misrepresentation Claims are based on similar false representations, made in the course of the same overall securities fraud scheme, the RMBS Trust Settlement is an ineffective vehicle for delivering compensation to the true victims of the fraud.[7]

## C.    The Debtors Intend to Give Preferential Treatment to the R&W Claims

The Debtors attached a draft plan to their plan exclusivity motion, indicating therein that (a) subject to the terms of the proposed R&W Claim settlement, the R&W Claims would be separately classified from all other general unsecured claims that receive a *pro rata* share of a Debtor's liquidation property, and (b) there would be a separate section 510(b) class that receives nothing. (Docket No. 1248, at Ex. 1 pp. 19-20.) Cleverly, no explicit mention is made in the Draft Plan of the Misrepresentation Claims. However, earlier in the case, in the original motion seeking approval of the RMBS Trust Settlement, the Debtors indicated that they would to seek subordinate the Misrepresentation Claims under section 510(b). (Docket No. 320, fn. 37.) It thus appears that the Debtors intend the give preferential treatment to the R&W Claims and seek to subordinate similar claims representing losses of investors injured by the same misrepresentations made in connection with the same securitization. The Investors believe such preferential treatment is legally impermissible, and accordingly have filed this Motion.

---

[7]    There is no risk here of investors—even those that still hold senior RMBS—receiving more than 100% of their losses, given the plan does not appear to contemplate either R&W Claims nor Misrepresentation Claims paying out anywhere near that amount.

## ARGUMENT

### I.    THE DEBTORS' STATED INTENTIONS HAVE MADE RIPE THE CLASSIFICATION ISSUES RAISED IN THIS MOTION

The Court need not wait for a formal plan to be in place to make classification determinations pursuant to Bankruptcy Rule 3013.[8] To the contrary, courts should consider the issues "before a plan can be formulated" whenever it is "desirable and necessary" to do so. *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1017 n.7 (Bankr. S.D.N.Y.), *aff'd* 1993 WL 316183 (S.D.N.Y. 1993). This is such an occasion. As detailed above, the Debtors have already indicated that they will seek to subordinate the Misrepresentation Claims, and further indicated that they intend to separately classify (and provide a recovery to) the R&W Claims. With that intent made well-clear, there is no reason to allow the Debtors to waste everyone's time advancing a plan apparently being built in large part around incorrect subordination and classification/voting schemes.

The Debtors may assert that classification of the Misrepresentation Claims should be deferred until confirmation or the determination of the adequacy of a disclosure statement. That assertion should be rejected. The Debtors have repeatedly stated that resolution of the R&W Claims is critical to advancing the case towards confirmation and have put forward a draft plan showing precisely how they intend to treat the R&W Claims and the Misrepresentation Claims relative to other general unsecured claims. Further, the Debtors have indicated that they want parties in interest to identify plan confirmation issues *before* plan confirmation, so that the

---

[8] Rule 3013 provides: "For purposes of the plan and its acceptance, the court may, on motion after hearing on notice as the court may direct, determine classes of creditors and equity security holders pursuant to §§ 1122, 1222(b)(1), and 1322(b)(1) of the Code." Fed. R. Bankr. Pro. 3013. Thus, it only requires a motion brought by someone with standing to bring the issue before the court. The Investors hold at least $1.75 billion in general unsecured claims subject to timely filed proofs of claim (*see* Appendix "1") that, for the reasons set forth herein, raise classification issues. The Investors thus clearly have standing to bring this motion.

Debtors can analyze these issues and respond to them.  The Investors are doing what the Debtors

requested.[9]

## II.    THE INVESTORS' CLAIMS SHOULD BE CLASSIFIED THE SAME AS THE TRUSTS' CLAIMS

### A.    The Investors' Claims Are Substantially Similar to the Trusts' Claims

A claim may be classified with others for bankruptcy plan purposes "only if such claim

or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. §

1122.  Although on its face section 1122 only refers to what can be classified together, "[b]y

necessary implication[, it also] deals with the placing of similar claims in different classes."  *In*

*re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996).  Classification is thus "constrained by

two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may

be classified separately only for a legitimate reason."  *Id.*

The question of whether claims are substantially similar as to make disparate treatment

impermissible turns on whether they are of the same "kind, species, or character."  *In re*

*Johnston,* 21 F.3d 323, 327 (9th Cir. 1994); *In re Dow Corning Corp.,* 244 B.R. 634, 644 (Bankr.

E. D. Mich. 1999) (asking if claims "similar in legal nature, character or effect"); *In re Gillette*

*Assocs., Ltd.*, 101 B.R. 856, 872 (Bankr. N.D. Ohio 1989) (same).  Both the R&W Claims and

the Misrepresentation Claims are, on their face, general unsecured claims that normally are

---

[9]    A party-in-interest may theoretically also challenge this Motion by referring to
Bankruptcy Rule 7001, which provides that a determination of subordination requires the
commencement of an adversary proceeding.  However, Bankruptcy Rule 7001(a) expressly
provides that an adversary proceeding is required for "a proceeding to subordinate any allowed
claim or interest, *except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides
for subordination*."  Fed. R. Bankr. Pro. 7001 (emphasis added).  Here, the Debtors have
indicated that they will propose a plan that subordinates the Misrepresentation Claims, does not
subordinate the R&W Claims and, as a result, classifies the Misrepresentation Claims and R&W
Claims separately.  For purposes of plan confirmation, Bankruptcy Rule 3013 permits this Court,
"after notice and a hearing," to make classification determinations, even if the classification at
issue implicates subordination matters.

placed in the same class.[10]  But the substantial similarity between the R&W Claims and the

Misrepresentation Claims, from a bankruptcy perspective, goes much deeper.

Both the R&W Claims and the Misrepresentation Claims are based on nearly identical

misrepresentations made about the same Mortgage Loans; the only distinction is that the

misrepresentations underlying the two varieties of claims were made in documents relating to

two different points in the same securitization process.  The factual overlap is vividly illustrated

by simply comparing what the Debtors themselves have said about the R&W Claims with the

representations in the Offering Materials that gave rise to the Misrepresentation Claims:

| Topics of Misrepresentations on Which R&W Claims Are Based | Misrepresentation Claim Representations |
|---|---|
| "[T]he standards and practices used in underwriting each mortgage loan." <br><br> Mot. at ¶ 11. | "The Offering Materials all represented that the Mortgage Loans had been vetted to ensure that they had been originated according to a reasonable, consistent underwriting program.  For example, the Offering Materials for RALI 2006-QS14 represented:  'All of the mortgage loans in the mortgage pool were originated in accordance with the underwriting criteria of Residential Funding . . . Residential Funding will review each mortgage for compliance with its underwriting standard prior to purchase.'"  (*E.g.*, Allstate FAC, ¶ 69.) |
| "[T]he creditworthiness of the borrowers on the mortgage loans." <br><br> Mot. at ¶ 11. | "The Offering Materials represented that the underwriting process was designed to ensure that borrowers could afford the loan . . ."  (*E.g.*, Allstate FAC, ¶ 84.) <br><br> "For example, the Offering Documents for RALI 2006-QA14 represented that mortgagers were generally (subject to limited exceptions) required to furnish 'information regarding its assets, liabilities, income . . . , credit history and employment history, and to furnish an authorization to apply for a credit report . . .'  Based on all of this data, 'a determination' was to be made 'that the mortgagor's monthly income' was sufficient to 'meet its monthly obligations on the mortgage loan and other expenses related to the property, including property taxes, utility costs, standard hazard insurance and other fixed obligations.'"  (*E.g.*, *id.* ¶ 85.) |
| "[T]he percentage of a mortgage pool which has certain characteristics, such as owner-occupancy and documentation type." <br><br> "[V]arious characteristics of each | "The Offering Materials contained detailed statistics regarding the Mortgage Loans in the collateral pool, including the reported owner-occupancy characteristics of the Mortgage Loans.  For example, in the Offering Materials for RALI 2007-QH6, it was claimed that among the 1,549 loans, 1,282 were purportedly owner-occupied properties."  (*E.g.*, Allstate FAC, ¶¶ 80-81.) |

---

[10]    *See, e.g.*, *FGH Realty Credit Corp. v. Newark Airport/Hotel Ltd. Partnership*, 155 B.R. 93 (D. N.J. 1993) ("Unsecured claims, whether trade, tort, unsecured notes, or deficiency claims of secured creditors, are generally included in a single class because they are 'of equal rank entitled to share pro rata in values remaining after payment of secured and priority claims.'").

| Topics of Misrepresentations on Which R&W Claims Are Based | Misrepresentation Claim Representations |
|---|---|
| specific mortgage loan such as loan-to-value ratio, debt-to-income ratio, lien position, and whether the property mortgaged is owner-occupied."<br><br>Mot. at ¶ 11. | "The Offering Materials contained detailed statistics regarding [LTV and CLTV] ratios for the Mortgage Loans in the collateral pool.  For example, the Offering Materials for RALI 2007-QH6 represented that the weighted-average loan-to-value ratio at origination was 73.89%.  Similarly, the Offering Materials for RFMSII 2005-HS2 represented that no loan had a CLTV ratio greater than 100%."  (*E.g.*, *id.* ¶¶ 83-84.)<br><br>"The Offering Materials contained detailed statistics regarding the documentation procedures purportedly used for the Mortgage Loans.  For example, the Offering Materials for RFMSII 2006-HI4 represented that 5,223 of the 5,513 loans were based on 'full documentation,' while only 16 were based on 'no documentation.'"  (*E.g.*, *id.* ¶¶ 96-97.) |
| "[T]the disclosure of information on the loan tape."<br><br>Mot. at ¶ 11. | As seen above, that information was summarized for investors in such documents as the prospectus supplement.  Even more detailed, loan-by-loan data (alleged to be false by Allstate) was sometimes provided in other offering materials.  For instance, a free writing prospectus for RFMSII 2007-HI1, filed with the SEC, provides loan-by-loan line entries.  According to that data file, loan "9479582," for a property in zip code 48843, had a CLTV ratio of 123%, a debt-to-income ratio of 41%, was a second lien, and was secured by an owner-occupied property. |
| "[T]he origination of the loans in accordance with applicable federal and state laws."<br><br>Mot. at ¶ 11. | "Residential Funding, as seller, will represent and warrant, as of the date of issuance of the notes, the following:  each home loan at the time it was originated complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable anti-predatory lending laws."  (*E.g.*, Allstate FAC, Ex. X ¶ 1(b).) |

As the misrepresentations are the same, and concern the same loans, the evidence at issue is going to be the same as well.  In both instances, the claimants would show that the Mortgage Loans did not meet the stated guidelines because those guidelines had been systematically ignored.  Both the Trusts and the Investors, then, would be seeking to show, for instance, that—oftentimes, for the very same properties:  (a) the borrower did not occupy that property; (b) the appraisal was intentionally inflated; and (c) there were not any "compensating factors" justifying the use of an underwriting "exception."

The Debtors may respond by focusing on the fact the R&W Claims are nominally held by securitization trusts (which are bankruptcy-remote entities involved in the process of securitization), whereas the Misrepresentation Claims are held by the Investors.  Trying to

differentiate between the claims based on the identity of the holders fails here on both the law and the facts.

On the law, as discussed above, courts recognize that the test must "focus on the nature or legal attributes of the claims"—which is to say, courts stress that the "[e]mphasis is not upon the holder so much as it is upon that which is held." *In re Coram Healthcare Corp.,* 315 B.R. 321, 349 (Bankr. D. Del. 2004); *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 788 (Bankr. M.D.N.C. 1995) ("The similarity of claims is not judged . . . by comparing creditor claims *inter se.* Rather, the issue is whether the claims in a class have the same or similar legal status in relation to the debtor."). Thus, that the Trusts are trusts and the Investors are investors does not advance the issue. And even if the nature of the claimant were relevant, it would only confirm the similar nature of the claims here. Though the Trusts are the nominal holders of the R&W Claims, the Trusts only exist for the benefit of certificate holders. Thus, the real beneficiaries of the RMBS Trust Settlement are the current certificate holders.[11]

In sum, both the Misrepresentation Claims and the R&W Claims are based on the fact that the Debtors and non-debtors like Ally Securities made false statements about the features of the loans put into the RMBS Trusts. They are thus similar in the eyes of the Bankruptcy Code. Indeed, the primary factor that distinguishes the Misrepresentation Claims from the R&W Claims—that they are held by individual investors who themselves detrimentally relied on the false marketing materials, rather than by the Trusts acting for the benefit of a small subset of

---

[11]    To be clear, there are differences between the claims (and the claimants). For instance, the Investors' Misrepresentation Claims are not premised on or limited by the transactional documents giving rise to the R&W Claims. Indeed, Investors that have sold their RMBS Certificates would retain their Misrepresentation Claims but would no longer have R&W Claims, which run to current holders. But the fact that the false statements were given to the Investors in a different document is no basis to deem them substantially dissimilar for purposes of bankruptcy law.

such purchasers—only confirms that they need to be treated similarly for purposes of this

bankruptcy, as to ensure similar funds are available to *all* victims of the Debtors' fraud.

> **B.    The Debtors Cannot Treat These Similar Claims Differently, Because There Is No Reasonable Basis for Doing So and the Bankruptcy Code Disfavors Attempts to Treat Substantially Similar Claims Differently**

Though a plan proponent has some degree of freedom in formulating a chapter 11 plan,

"the Code was not meant to allow a [plan proponent] complete freedom to place substantially

similar claims in separate classes." *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park

Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993).  Accordingly, courts police attempts to treat

substantially similar claims differently.[12]

The traditional situations where courts allow such departures from the norm involve

creditors getting preferential treatment where needed to increase the value of the reorganized

company as a going concern—thus growing the pie for the benefit of all creditors.  *See, e.g.*, *In

re Simmons*, 288 B.R. 737, 752 (Bankr. N.D. Tex. 2003) *holding modified by In re King*, 460

B.R. 708 (Bankr. N.D. Tex. 2011) ("[I]f discrimination serves to enhance going concern value it

may not be unfair so long as the class discriminated against receives at least as much as it would

have had there been no discrimination.").[13]  And the traditional situations where courts are

*especially* hostile to disparate treatment is where, as in *John Hancock*, it appears that disparate

---

[12]    *See generally, e.g.*, *In re D & W Realty,* 165 B.R. 127, 130 (S.D. N.Y. 1994) ("separate classification of unsecured deficiency claims and other unsecured claims . . . may be permitted only for legitimate business or Code-based reasons . . . ."); *In re Boston Post Road Ltd. Partnership,* 21 F.3d 477, 483 (2d Cir. 1994) (a debtor "must adduce credible proof of a legitimate reason for separate classification of similar claims").

[13]    *See also, e.g.*, *In re Applied Safety, Inc.*, 200 B.R. 576, 583 (Bankr. E.D. Pa. 1996) (preferred creditor *owed* money to the estate); *In re Graphic Communications, Inc.*, 200 B.R. 143, 147 (Bankr. E.D. Mich. 1996); *In re AG Consultants Grain Div., Inc.*, 77 B.R. 665, 676 (Bankr. N.D. Ind. 1987).

treatment allowances appear to be driven by a desire to "gerrymander" the appearance of support

for a "cram down" plan.  987 F.2d at 158.[14]

Here, the Debtors admittedly are seeking to use the RMBS Settlement as the cornerstone

of their chapter 11 plan, and appear willing to provide more favorable treatment to the R&W

Claims in hope of garnering support for a plan the provides no distribution in respect of

Misrepresentation Claims.  However, the Trusts' future cooperation in the Debtors' business

affairs in no way will change the value of the Debtor's operation as a going concern, because

there will not be any going concern.  And the entire point of the RMBS Trust structure was to

separate the machinations of the securitizations away from the risk of the Debtors' bankruptcy.

Also, here, the differing treatment appears to be an abusive attempt to artificially manufacture

the appearance of support for a plan that will "cram down" (and, apparently, force a third-party

release by) the Investors.  Because there is no reasonable basis for treating the substantially

similar R&W Claims and Misrepresentation Claims differently, they must be classified together.

**III.    THE INVESTORS' MISREPRESENTATION CLAIMS CANNOT BE PLACED
IN A CLASS THAT WILL BE SUBORDINATED**

The Investors' Misrepresentation Claims cannot be subordinated unless the Debtors

prove that Bankruptcy Code section 510(b) applies.  *See In re Washington Mutual, Inc.*, 462 B.R.

137, 145-46 (Bankr. D. Del. 2011) ("The Court finds that the Debtors have not adequately

proven that the Pooling and Servicing Agreements constitute an operating agreement under the

plain meaning of the statute."); *In re Semcrude, L.P.*, 436 B.R. 317, 322 (Bankr. D. Del. 2010)

---

[14]    *See, e.g.*, *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996) (upholding rejection of plan where "[t]he sole purpose of Debtor's separate classification was to obtain acceptance of the Plan"); *In re Coram Healthcare Corp.*, 315 B.R. at 349 ("Where the sole purpose and effect of creating multiple classes is to mold the outcome of the voting to effectuate a 'cram down,' each class must represent a voting interest that is sufficiently distinct and weighty to merit a separate voice in determining whether the proposed reorganization should proceed.").

("The Debtors have not carried their burden of demonstrating that Harvest's claims should be subordinated pursuant to section 510(b)."); *In re Vista Eyecare, Inc.*, 283 B.R. 613, 625 (Bankr. N.D. Ga. 2002).

Bankruptcy Code section 510(b) provides, in relevant part:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale *of a security of the debtor or of an affiliate of the debtor*, [or] for damages arising from the purchase or sale *of such a security* . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . . .

11 U.S.C. § 510(b) (emphasis added). Thus, damages claims arising from the purchase of a security "of" the debtor, or "of" the debtor's "affiliate," are subordinated.

Bankruptcy Code section 101(2) defines affiliate to mean:

> (A)    entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . .

> (B)    corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor . . . .

> (C)    person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or

> (D)    entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

11 U.S.C. § 101(2).

As discussed below, section 510(b) is inapplicable because the RMBS Certificates are not securities "of" the Debtors, or any "affiliate" of the Debtors. Nor should the Court stretch the meaning of these terms to find otherwise, as the narrow purpose of section 510(b)—to prevent "bootstrapping"—is simply not present here.

A. **The RMBS Certificates Are Not Securities "of" the Debtors, Because the RMBS Certificates Represent Contractual Obligations of Only the Non-Debtor Trusts**

By its terms, section 510(b) applies only if the securities in question are "of" the Debtors (or, as discussed below, a debtor's "affiliate"). But the RMBS Certificates are not "of" the Debtors, and do not represent any obligation of or equity interests in the Debtors. To the contrary, they were issued by the non-Debtor Trusts and represent the obligations *of the Trusts* to pay the Investors a portion of the funds received *from the underlying mortgage borrowers*. The Investors are, therefore, not equity security holders of the Debtors; they have no contractual relationship with the Debtors; they do not hold any of the Debtors' corporate debt. If the Debtors had not misrepresented the nature of the RMBS Certificates, the Investors would not be pursuing direct claims against the Debtors in this bankruptcy.

The Debtors' Offering Materials make clear that the RMBS Certificates are only "of" the Trusts. The top line of the first page of the prospectus supplements identify the Trust as the "Issuing Entity." *See, e.g.*, Winston Declaration at Ex. "B" (Cover of RALI 2006-QO3 Pro. Supp.). Confirming that certificate holders do not have any direct contractual relationship with the Debtors, the front page also states: "***The certificates represent interests only in the trust, as the issuing entity***, ***and do not represent interests in or obligations of Residential Accredit Loans, Inc., as the depositor, Residential Funding Corporation, as the sponsor, or any of their affiliates***." *Id*. (emphasis added). This statement makes explicit not only that the RMBS Certificates are not securities of the Debtors, but also that the Trusts are not affiliates of the Debtors. The Offering Materials for all of the RMBS Certificates contain nearly identical disclaimers making clear they do not represent "interests in or obligations of" any of the Debtors.

The "bankruptcy risk" disclosures in the Offering Materials also confirm that the RMBS Certificates were not "of" the Debtors. Nowhere in those disclosures (or elsewhere in the

Offering Materials) did the Debtors warn that in the event of their own bankruptcy cases, fraud claims against them would be subordinated.  To the contrary, the only "bankruptcy risk" warned of was that the underlying homeowners might fail to repay their mortgages.  *See, e.g.*, Winston Declaration at Ex. "B" (RALI 2006-QO3 Pro. Supp., at S-22).  And the only Debtor-bankruptcy related disclaimer was a warning that, even though the transfer of loans to the Trusts was "intended by the parties to be and has been documented as a sale," a bankruptcy trustee "could attempt to recharacterize the sale of the mortgage loans as a loan secured by the mortgage loans." *Id.*  That it would take a "recharacterization" of the transaction before the Loans would be treated as part of the Debtors' estate confirms the purpose of the structure was to isolate the Investors from a risk of a Debtor bankruptcy[15] by treating the sale of the loans as a true sale but disclosing the risk it could possibly be treated as a secured loan of the Debtors if a bankruptcy trustee was able to successfully recharacterize the transactions.

The Debtors may argue that the securities regulations required the depositor-Debtors to perform regulatory functions usually associated with the "issuer."  But this is irrelevant in terms of whether the Certificates were "of" the Debtors for the entirely separate question of whether the subordination provisions of the Bankruptcy Code should be applied.  As discussed in Section III(C), the purpose of Bankruptcy Code section 510(b) is to combat "bootstrapping," which has nothing to do with who is responsible for making regulatory filings.  *See generally, e.g.*, *District*

---

[15]   *See generally, e.g.*, Kathleen C. Engel & Patricia A. McCoy, *Turning a Blind Eye: Wall Street Finance of Predatory Lending*, 75 Fordham L. Rev. 2039, 2045-46 (2007) ("Securitization goes by the moniker 'structured finance,' in part because a securitizer structures the transaction to isolate the loan pool from the original lender.  This is accomplished by selling the loan pool to a special purpose vehicle or 'SPV' that is owned by, but legally distinct from, the lender.  The SPV then resells the loan pool to a second SPV, which is also independent of the lender and takes title to the bundle.  The second SPV is typically in the form of a trust.  This two-tiered structure protects investors by preventing lenders' creditors from reaching the assets backing the securities in case the lender goes bankrupt.").

*of Columbia v. Carter*, 409 U.S. 418, 420-21 (1973) (rejecting argument that even "identical

words" (which is not the case here) used in "two related statutes" (which is not the case here) had

to be given the same meaning, where purposes of the laws were different); *In re SemCrude, L.P.*,

436 B.R. at 321-22 (debtor "may indeed be an 'affiliate' as the term is used in common speech,

or for purposes of state corporate law, yet not be an affiliate for purposes of Section 510(b)").

The court in *In re Washington Mutual* had no trouble finding that mortgage-backed

securities are not "of" those who, like the Debtors here, merely helped sell a trust's securities.

The debtors there were corporate parents of depositors and sponsors of a series of mortgage-

backed securities.  462 B.R. at 146-47.  Nonetheless, the court noted that "neither the [d]ebtors

nor their affiliates are the issuers of the Certificates." *Id.* at 147.  To demonstrate the folly of

extending subordination to claims brought against those who merely assisted in the sale of a

trust's certificates, the court analogized to a hypothetical situation where Washington Mutual

sold a customer Apple stock. *Id.*  On its face, it would be nonsensical to say the Apple stock is

"of" Washington Mutual merely because it marketed and sold the stock to the claimant.  The

purchaser of the Apple stock stood to realize no benefit from Washington Mutual's corporate

fortunes, accepted none of the risks of Washington Mutual's bankruptcy, provided no capital

"cushion" upon which Washington Mutual's creditors could have reasonably relied, and had no

contractual claim against Washington Mutual that it would be trying to elevate—rather, the only

relationship the Apple-stock purchaser has with Washington Mutual is that of a tort claimant.

The same holds true here, in the mortgage-backed securities context, because the

Investors' risks and rewards were driven exclusively by the performance of the Mortgage Loans

held by the non-debtor RMBS Trusts.  As in *In re Washington Mutual*, the RMBS Certificates

are not "of" the Debtors merely because the Debtors brought the Trusts' mortgage-backed

securities to market.  Accordingly, the Investors' Misrepresentation Claims may not be placed in

a class that will be subordinated.

> **B.**    **The Issuing Trusts Are Not "Affiliates" of the Debtors, Because the Pooling and Servicing Agreements Are Not "Operating Agreements"**

Because the RMBS Certificates are securities "of" the Trusts, Bankruptcy Code section

510(b) can only apply if the Trusts are "affiliates" of the Debtors.  Section 101(2) of the Code

says that "affiliate" "means" only four enumerated things.  Importantly, "[b]y using the word

'means' rather than 'includes,' Congress enacted a precise and restricted definition" of affiliate.

*In re Missionary Baptist Foundation of Am.*, 712 F.2d 206, 210 (5th Cir. 1983); cf. 11 U.S.C. §

102(3) (specifying that "the words 'includes' and 'including' are not limiting")).[16]  Accordingly,

the Debtors can be deemed "affiliates" of the Trusts for purposes of subordination only if the

Debtors can establish that the facts of this case fit squarely into one of the four situations listed in

section 101(2).  They cannot.

For bankruptcy purposes, the Trusts are affiliates of the Debtors (i) if they hold the voting

stock of the debtor, (ii) if the Debtors hold their voting stock, (iii) if they operate "the business or

substantially all of the property of the debtor under a lease or operating agreement," or (iv) if the

Trusts are "pe[ople] whose business is operated under a lease or operating agreement by a

debtor, or [pe]ople substantially all of whose property is operated under an operating agreement

with the [D]ebtor[s]."  11 U.S.C. § 101(2).

There is no "operating agreement" pursuant to which the Trusts' business or property is

being managed by the Debtors.  The  only "agreements" at all are the Pooling and Servicing

---

[16]    *Cf. In re Applegate Property, Ltd.*, 133 B.R. 827, 832 (Bankr. W.D. Tex. 1991) (in determining who is an "insider" under the Code, finding that the use of the term "includes" "suggest[s] that the statutory definition is not limiting and must be applied on a case by case basis").

Agreements.  But as the court found in *Washington Mutual* in dealing with an identical factual situation, "the Debtors have not adequately proven that the Pooling and Servicing Agreements constitute an operating agreement under the plain meaning of the statute."  *Washington Mutual*, 462 B.R. at 145-16.  Indeed, while an "operating agreement" would facially encompass most all of the necessary operations (otherwise, any vendor or subcontractor responsible for helping with a portion of a company's business could nonsensibly be deemed an "affiliate"), the Trusts retained material responsibilities, as discussed above.  *See* footnote 4, *supra*.  That a debtor, acting as servicer, was handling interactions with borrowers on behalf of the Trusts does not transform the Pooling and Servicing Agreement into an "operating agreement" regarding the Trust's business or property, when the Trusts were still responsible for handling the pivotal relationships with investors, and overseeing the servicer itself.  This reality is underscored by the fact that the Trusts' trustees—not any of the Debtors—will determine whether the Trusts will "opt in" to the RMBS Settlement.

That the Court should not deem the Pooling and Servicing Agreement to be an "operating agreement" under the Bankruptcy Code is also confirmed by the fact that in many mortgage-backed securities, using nearly identical agreements, the servicing duties are handled by a party that played no other role in the securitization chain—such as Wells Fargo servicing loans pooled by Bear Stearns.  It would be odd to say Wells Fargo is an "affiliate" of a securitization trust, where Wells Fargo had no role in the trust's creation, the pooling of the loans, or in the marketing of the trust's certificates.  Yet, such a conclusion would be required if the standard Pooling and Servicing Agreement here constitutes an "operating agreement."[17]

---

[17]    For the reasons set forth above, the Pooling and Servicing Agreements are not "operating agreements," and thus *none* of the Debtors are "affiliates" of the Trusts.  But it should also be noted that the only entity that was servicing the Loans (i.e., in the Debtors' view,

C.      **The Purposes of Bankruptcy Code Section 510(b) Would Not Be Served By Subordinating the Investors' Claims**

The Second Circuit has recognized that, where section 510(b) is ambiguous in its application, courts should be guided by purposes of subordination as revealed by the law's legislative history.  *See In re CIT Group Inc.*, 479 Fed. Appx. 393, 394 (2d Cir. 2012); *In re Med Diversified, Inc.*, 461 F. 3d 251, 256 (2nd Cir. 2006).  Courts (including the Second Circuit) recognize that the history of section 510(b) confirms that its passage was driven by the "dissimilar risk and return expectations of shareholders and creditors" and the "reliance of creditors on the equity cushion provided by shareholder investment."  *Id.*  Thus, subordination under 510(b) is appropriate only if the creditor "took on the risks of a shareholder, or seeks to recover from an equity pool presumably relied upon by creditors in deciding whether to extend credit to the debtor."  *Id.*

Here, subordination of the Investors' claims issued by the Trusts in no way furthers the policies of Bankruptcy Code section 510(b).  None of the Investors purchased or sold stock of any of the Debtors or had any expectation of taking on the risks or returns of a shareholder of a Debtor.  Indeed, the value of the Investors' claims is completely unrelated to the value of the Debtors' equity, or its operations.  In fact, as discussed above, the entire purpose of the RMBS structure was to *isolate* the Investors' risks (and rewards) from the Debtors.  This is in stark

---

operating the Trusts' business) was the sponsor-Debtor Residential Funding Company.  Thus, even if the Court disagrees with the Investors and finds the Pooling and Servicing Agreements to constitute "operating agreements" that triggered *some* "affiliate" relationship with the Trusts, it does not follow that *all* of the Debtors had such a relationship.  The Investors' claims against every Debtor except Residential Funding Company would still remain unsubordinated, because none of the other Debtors can claim to have even close to the same level of (purportedly) "operating" responsibilities under the Pooling and Servicing agreement as Residential Funding Company.  Subordinating claims along an attenuated multiple-step chain of relationships would put this case even further outside the intended purpose of section 510(b), as it is even less likely that creditors-of-affiliates-of-affiliates-of-an-obligor relied on the Investors' capital in deciding to extend credit.

contrast to the traditional way courts analyze whether a claim is one that should be subordinated, i.e., by asking whether the measure of damages would relate to the Debtors' fortunes.[18]  For instance, the Second Circuit's *Med Diversified* decision cited with approval *In re Enron Corp.*, 341 B.R. 141 (Bankr. S.D.N.Y. 2006), held that the term "damages" used in section 510(b) should be interpreted to mean "damages flowing from the changes in the debtor's share price." *In re Med Diversified*, 461 F.3d at 257.  Further, no Investor seeks to recover a contribution to the equity pool of any Debtor—each Investor bought Certificates, issued by non-Debtors and contractually limited to the proceeds of collateral securing the Certificates, but in reliance on the accuracy of the representations of the materials prepared by the Debtors.  The Investors never contributed to the equity pool of the Debtors.

Because the purpose of section 510(b) would not be served here, there is no reason to stretch the plain meaning of the terms, as discussed above, to apply subordination on the current facts.

### 1.    Congress Was Seeking to Prevent "Bootstrapping" Up the Capital Structure.

In adopting Bankruptcy Code section 510(b), Congress was concerned with equity security holders using tort doctrines to bootstrap themselves into a position where they could have equal (or in some cases, superior) claims as general creditors.  Congress determined that this was unfair, given that general creditors never shared in the company's upside and had relied on the presence of a subordinated equity "cushion" in deciding to extend credit:

---

[18]    *See In re Worldcom, Inc.*, 329 B.R. 10, 14 (Bankr. S.D.N.Y. 2005) (claim for failure to sell stock in reliance on misrepresentations was subordinated because the damage is the loss in value of debtor's stock); *In re Calpine Corp.*, 2007 WL 4326738 *1, *13 (Bankr. S.D.N.Y. Nov. 21, 2007) (claim arising from failure to exercise options to acquire stock was subordinated because value of conversion rights vary with the value of common stock).

> Placing rescinding *share holders* on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. ***The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors***. This conclusion is consistent with the equitable doctrine of laches which they characterize as "an anti-straddle rule". Laches will apply to cut off rescission rights if the security holders have failed to assert a known claim and such failure ***has caused detrimental reliance to an adverse party***.

H. Rep. No. 595, 95th Cong., 1st Sess., at 195 (1977) (emphasis added). The House Report cites

to John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and*

*Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and the*

*Issuer's Creditors*, 48 N.Y.U. L. Rev. 261 (1973) ("*Allocating the Risk*"). That article likewise

confirms the anti-bootstrapping purpose behind section 510(b).

　　*Allocating the Risk* notes how engrained the "absolute priority rule" is in our legal and

commercial communities. *Id.* at 261. It also observes how creditors typically rely on the

subordinated nature of equity claims in deciding whether to extend credit. *Id.* at 261-68.

Nonetheless, at the time the article was published, bankruptcy courts were overly deferential to

state tort laws, such as those that deem funds obtained by fraud to be held in constructive trust on

behalf of the victim. *Id.* at 268. Such "unthinking" deference, combined with the law's general

preference for creditors that can trace claims to specific property, resulted in the "unexpected"

result that defrauded equity security holders were being given claims superior even to general

creditors. *Id.* at 268-85. This result was deemed "tunnel vision," because it "does not

acknowledge the fact that the general creditor relies on the existence of an equity cushion in case

of his debtor's bankruptcy." *Id.* at 298. It was the problem identified by this article, and its

proposed solution, that drove Congress to act. *See, e.g.*, *In re Betacom of Phoenix, Inc.*, 240 F.3d

823, 829 (9th Cir. 2001) ("Congress relied heavily on the analysis of two law professors in

crafting the statute."); *In re Med. Diversified*, 461 F. 3d at 256 ("Congress agreed and in enacting

section 510(b), adopted Slain and Kripke's policy rationales for mandatory subordination: '(1)

the dissimilar expectations of shareholders and creditors; and (2) the reliance of creditors on the

equity cushion provided by shareholder investment.'").

Given such a clear legislative history as to what equity security holders should not be

permitted to do, courts routinely refer to the "very specific problem" of bootstrapping in

determining whether to apply section 510(b).  *See In re Wyeth Co.*, 134 B.R. 920, 921-22 (Bankr.

W.D. Mo. 1991).  As summarized by the court in *Enron*:

> The Second Circuit cautioned, "When a corporation becomes bankrupt, the
> temptation to lay aside the garb of a shareholder, on one pretense or another, and
> to assume the role of a creditor, is very strong, and all attempts of that kind should
> be viewed with suspicion." [*Matter of Stirling Homex Corp.*, 579 F.2d 206, 213
> (2d Cir. 1978).]  The reason for such caution, and the policy judgment behind
> section 510(b), is clear:  "***Congress enacted § 510(b) to prevent disappointed
> shareholders from recovering their investment loss by using fraud and other
> securities claims to bootstrap their way to parity*** with general unsecured creditors
> in a bankruptcy proceeding." [*In re Telegroup, Inc.*, 281 F.3d 133, 142 (3d Cir.
> 2002).]  Equity favors general creditors rather than the allegedly defrauded
> securityholders in bankruptcy for the simple reason that, ***inasmuch as the
> securityholder enjoys the benefits of share price gains, he should also bear the
> burden of insolvency***, whether such insolvency is the result of fraud or not.

341 B.R. at 158 (emphasis added).  Numerous other courts have similarly recognized that anti-

bootstrapping concerns drive the analysis of section 510(b) in situations where the application of

its text to the facts at hand may be ambiguous.  *See, e.g.*, *In re SeaQuest Diving, LP*, 579 F.3d

411, 421 (5th Cir. 2009) ("Congress's larger concern was the effort of disaffected stockholders to

recapture their investments from the debtors, regardless of the exact nature of their claims."); *In*

*re Betacom*, 240 F.3d at 829 ("Shareholders expect to take more risk than creditors in return for

the right to participate in firm profits.  The creditor only expects repayment of a fixed debt.  It is

unfair to shift all of the risk to the creditor class since the creditors extend credit in reliance on the cushion of investment provided by the shareholders.").[19]

**2.     The Anti-Bootstrapping Purposes of Section 510(b) Would Not Be Advanced By Subordinating the Investors' Claims**

The purposes of section 510(b) would not be served by subordinating the Investors' Misrepresentation Claims.  To establish that section 510(b)'s purposes will be advanced here, the Debtors must show that the Investors are trying to bootstrap a claim up the Debtors' capital structure.  *In re CIT Group Inc.*, 479 Fed. Appx. at 393 ("the existence of a 'mere connection between the claim and the purchase or sale of a security [was] not enough to support a finding that the claim 'arises from' the purchase or sale and should be subordinated unless the purposes of the statute would be served thereby'").  They cannot do this.  The Investors hold none of the Debtors' equity, nor do they hold any debentures on which the Debtors are obligated to make principal and interest payments.  Simply put, the Investors cannot be trying to bootstrap from one position in the Debtors' capital structure to another, because the Investors *hold no position within the Debtors' capital structure.*  The Investors' *only* relationship with the Debtors is that of tort claimants harmed by the conduct of the Debtors, harm for a risk that the Investors never bargained to accept, and for which they never could have realized any upside benefit for taking. It thus cannot be said that the Investors are bootstrapping claimants in any sense of that term. There is thus no reason for the Court to permit the Debtors to cram the Misrepresentation Claims into Bankruptcy Code section 510(b), which on the plain meaning of its terms does not apply.

---

[19]    *See also, e.g.*, *In re Tribune Co.*, 464 B.R. 126, 197 (Bankr. D. Del. 2011) ("The purpose of Section 510(b) is to prevent creditors or equity holders from upgrading their claim position . . . ."); *In re Cincinnati Microwave, Inc.*, 210 B.R. 130, 133 (Bankr. S.D. Ohio 1997) ("Section 510(b) prevents a security holder from 'bootstrapping' an equity claim (subordinate to the claims of general unsecured creditors) to general unsecured creditors . . . .").

## CONCLUSION

For all the foregoing reasons, the Investors respectfully request that the Court enter an

order granting the Motion and such other relief as is just and appropriate.

Dated:  November 27, 2012
        New York, New York

                        QUINN EMANUEL URQUHART &
                        SULLIVAN, LLP

                          /s/  Susheel Kirpalani
                        Susheel Kirpalani
                        Daniel L. Brockett
                        Jennifer Barrett
                        Maria Ginzburg
                        Scott C. Shelley

                        51 Madison Avenue, 22nd Floor
                        New York, New York 10010
                        Telephone: (212) 849-7000
                        Facsimile:  (212) 849-7100

                        Eric D. Winston (admitted *pro hac vice*)
                        Jeremy D. Andersen (admitted *pro hac vice*)
                        865 South Figueroa Street
                        Los Angeles, California 90017
                        Telephone: (213) 443-3000
                        Facsimile: (213) 443-3100

                        *Counsel for AIG Asset Management (U.S.),*
                        *LLC, et al., Allstate Insurance Company, et*
                        *al., Massachusetts Mutual Life Insurance*
                        *Company, and Prudential Insurance Company*
                        *of America, et al.*