# EXHIBIT 2

**STATE OF MINNESOTA**                                         **DISTRICT COURT**

**COUNTY OF HENNEPIN**                              **FOURTH JUDICIAL DISTRICT**

FILED
2011 NOV 28  PM 3: 22
BY _____ DEPUTY
HENN CO DISTRICT
COURT ADMINISTRATOR

---

Allstate Insurance Company, Allstate Life                    **ORDER**
Insurance Company, Allstate Bank (f/k/a
Allstate Federal Savings Bank), Allstate
New Jersey Insurance Company, American
Heritage Life Insurance Company, First
Colonial Insurance Company, Allstate Life
Insurance Company of New York, Allstate
Retirement Plan, and Kennett Capital, Inc.,

                    Plaintiff,

          v.                                        Court File Number 27-CV-11-3480

GMAC Mortgage, LLC (f/k/a GMAC                      Judge Margaret A. Daly
Mortgage Corporation), Residential Funding
Company, LLC (f/k/a Residential Funding
Corporation), Residential Funding Securities,
LLC (d/b/a GMAC RFC Securities, f/k/a
Residential Funding Securities Corporation),
Residential Accredit Loans, Inc., Residential
Asset Mortgage Products, Inc., Residential
Funding Mortgage Securities I, Inc.,
Residential Funding Mortgage Securities II,
Inc., and Residential Asset Securities
Corporation,

                    Defendants.

---

The above-entitled matter came before the undersigned Judge of District Court on August 31,

2011, on Defendant's Motion to Dismiss.

The Plaintiffs were represented by Arthur Boylan, Esq. of Leonard Street and Deinard, 150

South Fifth Street, Suite 2300, Minneapolis, MN 55402; and Jeremy Andersen, Esq. and Daniel

Brockett, Esq. of Quinn Emanuel Urquehart & Sullivan, LLP 51 Madison Avenue, 22nd Floor,

New York, NY 10010-1601.

1

The Defendants were represented by James Langdon, Esq. and Andrew Brantingham, Esq. of Dorsey & Whitney, LLP, South Sixth Street, Suite 1500, Minneapolis MN 55402-1498.

## SUMMARY OF FACTS

Allstate Insurance Company, Allstate Life Insurance Company, Allstate Bank, Allstate New Jersey Insurance Company, American Heritage Life Insurance Company, First Colonial Insurance Company, Allstate Life Insurance company of New York, Allstate Retirement Plan, and Kennett Capital, Inc. (collectively "Allstate" or "Plaintiffs") brought this securities fraud action.

The Defendants are GMAC Mortgage, LLC, Residential Funding Company, LLC, Residential Funding Securities, LLC, Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., and Residential Asset Securities Corporation (collectively "Defendants").

The Seller, Sponsor, and Servicer Defendants ("Seller Defendants") are Residential Funding Company, LLC and Defendant GMAC Mortgage, LLC. Seller Defendants originated, acquired, and sponsored the securitization of the loans at issue here. (Am. Compl. ¶¶ 17–18.)

The Depositor[1] Defendants are Residential Accredit Loans, Inc., Residential Asset Mortgage Products, Inc., and Residential Funding Mortgage Securities I., Inc., Residential Funding Mortgage Securities II, Inc., and Residential Asset Securities Corporation. The Depositor Defendants were the depositors for the loan pools underlying the Certificates at issue,

---

[1] A depositor acquires an inventory of loans from a seller or sponsor. The depositor then transfers the loan pool to an issuing trust. The depositor securitizes the pool of loans in the trust. Securitization allows the depositor to sell investors certificates, which grant investors rights of the cash flows from mortgagors principal and interest payments. The issuing trust passes the certificates back to the depositor, who becomes the issuer of the securities.

Registrants for some Registration Statements filed with the SEC, and issuers of mortgage-backed

Certificates that Allstate purchased. (Am. Compl. ¶ 20–25.)

The Underwriter[2] Defendant is Residential Funding Securities, LLC. It co-underwrote

many of the loans at issue here. Am. Compl. ¶ 19.

The Defendants are all part of the same corporate family: Ally Financial Inc. is the direct

or indirect parent of Defendants. GMAC Mortgage Group, LLC, is a wholly-owned subsidiary of

Ally Financial Inc., and the direct parent of Residential Capital, LLC.

From 2005 to 2007, Defendants marketed and sold 25 residential mortgage-backed

securities ("Certificates") to Allstate for over half a billion dollars. *See* Am. Compl. Ex. A–B.

The Certificates entitled Allstate to the cash flows from over 30,000 underlying loans. Pls.'

Memo. 1. In marketing each Certificate, Defendants included a set of documents (collectively

"Offering Materials") that provided information and statistics about the underlying loans. *See*

Am. Compl. Exs. D–BB. The Offering Materials also contained disclosures explaining the nature

of the investment and the methodologies used to calculate statistics.

At the time of purchase, the Allstate's Certificates had highly rated credit, on par with

U.S. treasury bills. *Id.* ¶ 4. However, the value of the Certificates declined quickly and

drastically; now, over 75 percent of the Certificates are "junk bond status," i.e., far below

investment-grade securities. *Id.* ¶ 5.

Allstate brought an action against Defendants for common law fraud, negligent

misrepresentation, fraudulent inducement, and violations under the Minnesota Consumer Fraud

Act, 1963 Minn. Laws 842 (codified at Minn. Stat. Ann. § 325F.68 -.70 (West 2006). Allstate

alleges that the Offering Materials overstated owner-occupancy rates, understated loan pools'

---

[2] An underwriter purchases the securities from an issuing trust through a depositor and then sells the securities to investors.

loan-to-value, understated the risk that borrowers could not actually afford the monthly payments, and failed to inform Allstate about the nigh number of rejected loans that underwriters waived into the pools. Am. Compl. ¶ 56. Allstate further alleges that each of the Defendants knew the Offering Materials statements were false or misleading, or else were ignorant to the statements' truth or falsity upon making the statements.

Defendants request an order granting its Motion to Dismiss under Minn. R. Civ. Proc. Rule 12.02(e), arguing that each of Allstate's claims fail to state a claim upon which relief may be granted.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Minn. R. of Civ. P. 12.02(e), courts "must consider only the facts alleged in the complaint, accepting those facts as true and must construe all reasonable inferences in favor of the nonmoving party." *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn. 2003). Minnesota courts "are not bound by legal conclusions stated in a complaint when determining whether the complaint survives a motion to dismiss for failure to state a claim." *Herbert v. City of Fifty Lakes*, 744 N.W.2d 226, 235 (Minn. 2008).

Allstate and Defendants dispute the applicable pleading standard. The parties disagree whether Minnesota Supreme Court fully incorporated the federal pleading standard the U.S. Supreme Court most recently articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009). According to *Iqbal*, a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.

4

The authority to regulate and expound upon Minnesota pleadings, practice, and procedure vests in the Minnesota Supreme Court. Minn. Stat. Ann. § 480.051 (2006). Indeed, to promote uniformity (and hence predictability) and discourage forum shopping, Minnesota courts may look to the federal courts for interpretive guidance on court rules and statutes modeled after a federal forbearer. However, the United States Supreme Court's inflections on federal rules of civil procedure do not necessarily transmute the procedural rules of state courts.

The Minnesota Supreme Court has not expressly incorporated the plausibility standard as enunciated by the United States Supreme Court in *Twombly* and *Iqbal*. In *Bahr v. Capella*, the Minnesota Supreme Court began its review of a 12.02(e) dismissal by stating that "a pleading will be dismissed only if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded." 788 N.W.2d 76, 78 (2010) (quoting *N. States Power Co. v. Franklin,* 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963)). The language is reminiscent of the "no set of facts" language in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), which the U.S. Supreme Court "retired" in *Twombly*. Although *Bahr* court cited *Twombly* favorably in demanding more than "labels and conclusions," 788 N.W.2d 76, 80 (Minn. 2010), the extent to which the Minnesota Supreme Court adopted the language and holding of *Twombly* is unclear.

Assuming that the Minnesota Supreme Court intended to adopt the plausibility language of *Twombly* and *Iqbal*, the next step would be to determine the language's meaning. *See generally* Nicholas Tymoczo, Note, Between the Possible and the Probable: Defining the Plausibility Standard After *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal*, 94 Minn. L. Rev. 505 (2009). The court finds that the U.S. Supreme Court's requirement that an inference be "plausible" is equivalent to the traditional insistence that an inference be "reasonable." Edward

A. Hartnett, Taming *Twombly*, Even After *Iqbal*, 158 U. Pa. L. Rev. 473, 484–85 (2010).  The reasonableness of an inference depends, in part, upon the substantive legal claim. Hartnett at 496. Reasonableness also depends  upon a judge's "experience and common sense,"*Iqbal*, 129 S. Ct. at 1950.  as well as historical context. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 (2007) (explaining how the economic history of the telecommunications industry militates against an inference of unlawful collusion).

Under *Iqbal* and *Twombly*, where a complaint makes no facts suggestive of illegality, allegations of conduct "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949. However, on a motion to dismiss, a court is required to view the complaint in a light most favorable to the nonmoving party and draw all *reasonable* inferences in his or her favor. Tymoczo at 536. Thus, before making an inference to a factual or legal conclusion, a court must first find the inference reasonable.

Interpreting "plausibility" as requiring a Complaint to overcome all plausible opposing inferences  would apparently contradict recent Supreme Court holding. In *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court interpreted a provision of Private Securities Litigation Reform Act (PSLRA) that requires pleaders to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(6) (2006).  The Court held that "a strong inference" must be "more than merely plausible or reasonable—it must be cogent and *at least as compelling as any opposing inference* of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. It makes little sense to subject common pleadings to a standard equal to or above the heightened PSLRA standard. Thus, a

plausible claim should be able to overcome opposing inferences that are equally if not more compelling, so long as the inference a complaint requires is itself reasonable.

## DISCUSSION

### I.  Common Law Fraud

Under Minnesota law, the elements of fraud are (1) a false, material representation; (2) that the person making the representation knows is false or asserts it without knowledge of its truth or falsity; (3) an intention that another person act on it, or circumstances justifying the other person in so acting; (4) reasonably inducing the other person to act and rely upon the representation, who; (5) suffers damage as a result. 22 Dunnell Minn. Digest *Fraud* § 2.00 (5th ed. 2006). "[A]ny allegation of misrepresentation, whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation, is considered an allegation of fraud which must be pled with particularity." *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010); *accord* Minn. R. Civ. P. 9.02. A plaintiff must plead the time, place, and contents of the fraud, *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), but the rule does not require a plaintiff to plead evidence. *Coca-Cola Co. Foods Div. v. Olmarc Packaging Co.*, 620 F. Supp. 966, 973 (D.C. Ill. 1985).

### A.  *Responsibility for Representations*

A complaint fails to plead a fraud claim when it makes "no particular assertion of which defendant was responsible for which statement or omission, or how any defendant participated in the alleged scheme." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003). Defendants argue that Allstate "utterly fail[s] to explain what role each Defendant played in the alleged fraudulent scheme" (Pls.' Memo. 6). The court disagrees.

7

Although Allstate often refers to the defendants collectively throughout the Complaint, a fair reading of the Complaint makes clear of each of the Defendants' roles in each Offering. (Am. Compl. 64). Exhibit A ties each Certificate to a specific Depositor and Seller Defendant. Exhibit B ties each Defendant to a specific Certificate purchase, listing the purchase date and price. Exhibit D and the anteceding exhibits link numerous statements in Offering Materials to a particular purchase.

Even so, Defendants argue that "[Allstate] does not explain how any given Defendant is factually or legally responsible for any particular statement [in the Offering Materials]," especially in light of the U.S. Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ---, No. 09-525, slip op. at 5–6 (June 13, 2011). In *Janus*, the Supreme Court narrowed primary liability in Rule 10b-5 securities fraud cases to those who hold ultimate authority over a statement. 131 S. Ct. at 2302. The Court interpreted narrowly the word "make" in Rule 10b-5 to avoid giving expansive scope to an implied right of action. The Court's previous decision in *Central Bank of Denver, N.A. v. First Interstate bank of Denver, N.A.*, 511 U.S. 164 (1995) also informed the Court's analysis. In *Central Bank*, the Court held that claimants cannot sue aiders and abettors under Rule 10b-5. *Id.* at 185. Defendants also point to *Trooien v. Mansour* in support of the proposition that false statements may not be attributable to a large group. 608 F.3d 1020, 1030 (8th Cir. 2010).

The interpretive constraints present in *Janus* are inapplicable here. Minnesota courts have given broad scope of liability in fraud cases. A person may be liable for fraud when either directly making a misrepresentation, or indirectly causing a misrepresentation to be made, to another. *See, e.g., Vikse v. Flaby*, 316 N.W.2d 276, 284 (1982) ("The appellants who had full knowledge of the incomplete and misleading nature of their representations [that a third party

8

relayed to another] cannot claim to be insulated from liability."); *Penn Anthacite Mining Co. Clarkson Securities Co.*, 205 Minn. 517, 521–22 (1939) (finding defendant liable for its informational statements in a consumer's report to a mercantile agency, where the mercantile agency conveyed the information to the plaintiff).

Finally, the court agrees with Allstate that *Mansour* is inapposite. *See* Pls.' Memo. 6. *Mansour* involved fraud claims against two defendants for statements clearly tied to only one of the individual's email addresses. Because the plaintiff did not explain how one defendant knew of (or otherwise bore responsibility for) the other defendant's alleged misrepresentations to the plaintiff, the court dismissed claims against the former defendant. *See Trooien v. Mansour*, No. 06-3197(JRT/FLN), at 2008 WL 2202720 *6 (D. Minn. May 23, 2008). Unlike an email address, which is typically attributable to a single individual, the Offering Materials on their face identify multiple, purportedly responsible Defendants. Furthermore, Allstate identifies the role of each Defendant in the marketing and sale of each Certificate.

For pleading purposes, the court finds that Allstate has sufficiently identified "which defendant was responsible for which statement or omission." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir. 2003). Allstate alleges that each Defendant knowingly partook in, and benefited from, a vertically integrated scheme culminating in the fraudulent sale of mortgage securities to Allstate. *See* Defs.' Reply Mem. 5. Allstate identifies the player involved in each of the offerings, and notes that the names of the responsible Defendants responsible appear on the first page of each set of the Offering materials. *Id.* Whoever controlled, authorized, or caused the Offering Materials statements to be made, is peculiarly within in the knowledge of the opposing parties, and hence better addressed on summary judgment. *Allstate Ins. Co. v. Countrywide Financial Corp.*, --- F. Supp. 2d ----, 2011 WL 5067128, at *17 (C.D. Cal. Oct. 21, 2011).

## B. *Materiality*

A statement is material if it would likely affect the decision of a reasonable person to engage in a course of conduct. *See* 22 Dunnell Minn. Digest *Fraud* § 2.01 (5th ed. 2006). Allstate alleges that the Defendants significantly misrepresented or omitted information in the Offering Materials regarding (1) the underwriting guidelines; (2) due diligence results; (3) case-by-case underwriting exceptions; (4) owner-occupancy statistics; (5) loan-to-value ratios; (6) the sufficiency of borrower income; (7) credit enhancements; (8) credit ratings; and (9) documentary bases for loan approval.

Allstate adequately alleges the existence of material misrepresentations. Each subject above informs investors of the underlying loans' risk profiles, which affects the perceived value of the underlying loans. For instance, consider the underwriting standards used to evaluate mortgage loan applications. Allstate alleges that the stated underwriting standards departed systematically and far from the actual practice of loan originators' evaluation of applicant eligibility. Am. Compl. ¶ 68. The departure from underwriting standards increased the risk that mortgagors would default on their loans and the cash flows to Certificate holders would dry up. *See id.* The likelihood one will receive a return on her investment would affect the decision of a reasonable person in deciding to invest in the mortgage-backed securities tied to these loans.

Defendants contend that numerous disclosures throughout each Prospectus preclude a finding of materiality as a matter of law. Defs.' Memo. 8. Defendants ultimately ask the court to apply the "bespeaks caution" doctrine to common law fraud case involving present or historical facts.[3] The court declines. Whether countervailing disclosures render other Prospectus statements immaterial is a question for the jury. *See, e.g., State v. Stith*, 292 N.W2d 269, 276 (Minn. 1980)

---

[3] The "bespeaks caution" doctrine generally insulates good faith forecasts from liability. James Robert Brown, The Regulation of Corporate Disclosure § 12.07[2] (Supp. 2003).

(noting that "materiality is a question for the trier of fact"); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-cv-00302, slip op. at 32 (C.D. Cal. May 5, 2011).

### C. *Falsity*

If the requirement of particularity is to carry any meaning, a complaint for fraud must specify the misleading statement and explain why it is misleading. *See* Minn. R. Civ. P. 9.02. However, a plaintiff need not plead "precise details" where "the subject matter of the fraud is uniquely within the defendants' control." *K-tel Int'l Secs. Litig.*, 300 F.3d 881, 904 (8th Cir. 2002).

Defendants argue that Allstate's 162 pages of verbatim statements from the Offering Materials do not identify which statements are false and why. Pls. Memo. 8. The court disagrees: the Complaint plainly identifies the allegedly false and misleading statements in the Offering Materials. Exhibits D through BB of the Complaint list the allegedly misrepresentative statements in the Offering Materials accompanying each group of Certificates. Each Exhibit identifies a specific set of Offering Materials and categorizes the quoted statements according to subject matter. Allstate prefaces each category of statements by alleging each statement is false. *E.g.*, Am. Compl. Ex. D, at D-1. Furthermore, each prefatory comment refers the reader back to the main body of the Complaint that provides a general account of why the statements are false. *Id.* A fair reading of the Complaint finds that Allstate has specified which statements are misleading.

Defendants mainly take issue with Allstate's bases for concluding that the statements are false or misleading. The court address each of Allstate's justifications by subject matter.

### 1.    Underwriting and Due Diligence Standards

11

Defendants argue that each of Allstate's claims falls short of particularity, because the Complaint cites from third-party reports of mortgage industry fraud and makes general allegations of wholesale abandonment of underwriting standards. Defs.' Memo. 6–7; Defs.' Reply Memo 4–5.

Courts within the Second Circuit have repeatedly dealt with mortgage security fraud complaints with allegations similar to those Allstate makes. The courts have reached general consensus: Allegations of wholesale abandonment of underwriting standards that loan originators purported to follow, but in fact ignored, meet the particularity requirement for fraud. *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-cv-3701, 2011 WL 1796426, at *8 (S.D.N.Y. May 10, 2011) (citing *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387, 392 (S.D.N.Y. 2010) and *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 502 (S.D.N.Y. 2010)); *accord In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 971–72 (N.D. Cal. 2010) . A complaint sufficiently pleads fraud "notwithstanding the fact that Offering Documents may have disclosed that loans could be issued pursuant to low- or no-documentation programs or under exceptions to those guidelines." *J.P. Morgan Chase & Co.*, 2011 WL at *8. Although Defendants point out that one case, *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09 Civ. 4050 (PKC), 2010 WL 37901810, at *12 (S.D.N.Y. Sept. 28, 2010), the court declines to follow the *Footbridge Ltd.* opinion here, reasoning that *Footbridge Ltd.* borders on requiring plaintiffs to plead fraud with complete insight before discovery.

Although the Offering Materials state that "some" exceptions would be made to the underwriting standards, and that some low- or no-documentation loans would be issued, the Offering Materials simultaneously represent that loan originators would "generally" or "in most

cases" follow underwriting standards. Am. Compl. Ex. S, at S-1. The crux of the Complaint is

that exceptions became, rather than proved, the rule.

Defendants contend that the circumstantial evidence from third-party reports is

insufficient to plead fraud with particularity. The court agrees. However, the court suggests that

Defendants confuse the particularity requirement of Rule 9.02, which requires specificity of

facts, with the always-operative general pleading requirements, which requires plausibility of

inferences. Allstate alleges that the Defendants systematically abandoned underwriting

standards, which made statements concerning underwriting standards in the Offering Materials

false or misleading. Although an allegation of defendants' systematic abandonment of standards

is a factual allegation, a fair reading of the Complaint suggests that the allegation is an inferred

conclusion of fact, critical to the misrepresentation element of the claim, which Allstate reaches

from other factual allegations in the Complaint.

As set forth above, the principles pleading standards  indicate that a court is obliged to

accept only inferences that are reasonable. To support Allstate's inference, for instance, the

Complaint points to an MBIA Insurance Corporation report ("MBIA report"), which reviewed

12,000 loan files underlying Residential Funding and GMAC mortgage-backed securities. Am.

Compl. ¶ 145. The report investigated at least two deals that Allstate invested in: RFMSII 2007-

HSA2 and RFMSII 2007-HSA3. *Id.* The MBIA report found that 88 percent of the defaulted or

delinquent loans in those securitizations contained "material deviations from the stated

guidelines." *Id.* at ¶ 146. In light of the MBIA report and other third party reports in the

Complaint finding systemic deviations from underwriting guidelines and a positive correlation

between early loan defaults and fraud,  Am. Compl. ¶¶  112, 144 –74, Allstate's inference that its

13

terribly performing securities were systematically exempted from Offering Materials' stated
underwriting standards is reasonable.

### 2.    Owner-Occupancy Rates

Allstate alleges that the Offering Materials' prospectuses stated false percentages of
owner-occupied properties. To support the claim of falsity, Allstate offers its analysis of a
random sample of loans underlying each security reveals "statistically significant" disparities
between the *stated* percentage of owner-occupied properties and the *actual* percentage of owner-
occupied properties in each prospectus. Am. Compl. ¶¶ 114–25. Moreover, Allstate alleges with
particularity how many properties were not owner-occupied. Allstate attests, for instance, that
the Prospectus for Asset RASC 2005 KS3 overstated the percentage of owner-occupied
properties by 10.43 percent. Am. Compl. ¶ 124.

Defendants contend, and Allstate admits, that the methodology Allstate used—analyzing
mortgagors' tax, credit, property, and lien records—is not identical to the data forming the basis
of the owner-occupy rates in the Prospectuses. *E.g.*, Defs.' Memo. 10. Defendants note that the
Offering Materials state the methodology used to calculate the stated owner-occupancy rate. *Id.*
For example, the prospectus for asset RASC Series 2005-KS3 claimed that owner-occupancy
rates were based on (1) the mortgagor's statement that the mortgagor intended to use the
mortgaged property as a primary residence, (2) an originator's statement to similar effect based
solely on the mortgagor's representations, or (3) "the fact that the mailing address for the
mortgagor is the same as the address of the mortgaged property." *Id.* Furthermore, Defendants
argue that "neither the Offering Materials nor [Allstate's analysis] purport to identify the precise
owner-occupancy rate for the loans in [a] pool." *Id.* at 11. The prospectus statements literally
only represented the owner-occupancy rates based on a disclosed methodology. Thus, Allstate's

analysis has no bearing on whether Defendants falsified actual owner-occupancy rates. The court agrees to this extent.

However, "[a] misrepresentation may be made either (1) by an affirmative statement that is itself or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading. Thus, a statement may be literally true, yet imply additional facts that are not true." 20A2 Minn. Prac., Bus. L. Deskbook, § 34:15 (2011). Allstate alleges that the Offering Materials owner-occupancy statistics "obviously meant to convey that these figures had some reasonable relationship to the true nature of the underlying loans." Pls.' Memo. 13. That is, Allstate argues that the owner-occupancy deliberately mislead investors by including unreliable statistics in the first place, because the statistics "were substantively meaningless." *Id.* at 13–14. Whether the disclosure of the methodology used to calculate owner-occupancy rates sufficiently qualified the statistics to render the rates not misleading, or made Defendants' reliance on the stated owner-occupancy rates unreasonable, is essentially a question of fact for the jury. Allstate's allegation that the stated owner-occupancy rates were misleadingly high, combined with Allstate's analysis suggesting lower owner-occupancy rates, renders the claim sufficiently particular and plausible at the pleading stage.

### 3.    Appraisals and Loan-to-Value Ratios

The Offering Materials  represent that loans underlying the Certificates had specific loan-to-value (LTV), combined loan-to-value ratios (CLTV), and property appraisals. Am. Compl. ¶ iv. The LTV and CLTV indicate how much a borrower loans compared to the value of the collateral property. *Id.* The CLTV is the LTV of all a borrower's mortgage obligations, not just the first mortgage. *Id.* According to Allstate, the Offering Materials included appraisals, LTVs, and CLTVs that Defendants knew were inaccurate.

15

Defendants argue that the Offering Materials made "no claim to report absolutely
accurate valuations." Pls.' Memo. 11. For example, RASC Series 2005-KS3 Trust Prospectus
stated that the appraisals used a "statistical analysis," "a broker's price opinion," or "an
automated valuation, drive-by appraisal or other certification of value." Langdon Aff. Ex. B.
Defendants further contend that, because "appraisals are opinions of value," Allstate cannot point
to any misrepresentation of fact in the valuation disclosures. Id. at 12 (quoting Am. Crystal Sugar
Co. v. County of Polk, Nos. C1-05-574, C4-06-367, 2009 WL 2431376, at *15 (Minn. Tax Ct.
Aug. 5, 2009)).

Generally, a statement of value in a real property appraisal is not a factual representation;
appraisals are generally statements of opinion, rather than statements of fact. 26 Williston on
Contracts [WLLSTN-CN] § 69:8 (4th ed. Westlaw through 2011); accord Am. Crystal Sugar Co.
v. County of Polk, Nos. C1-05-574, C4-06-376, 2009 WL 2431376, at *15 (Minn. Tax Ct. Aug.
5, 2009). However, where stated appraisal opinions are not genuinely believed,
misrepresentation claims are actionable. See In re Wells Fargo Mortg.-Backed Certificates Litig.,
712 F. Supp. 2d  958, 972  (N.D. 2010); Am. Jur. 2d Fraud & Deceit § 69 (2011) ([A] statement
of opinion may support fraud liability where the speaker knowledge of facts not warranting the
opinion.").

The court finds that Defendants overlook Allstate's fundamental allegation that
Defendants "knew the valuations feeding into those statistics were being inflated to justify loan
approval." Pls.' Memo. 14. Even if Defendants never claimed the appraisals were accurate, a
jury may find liability if the Defendants knowingly included inaccurate property value figures on
which Allstate reasonably relied. Cf. Olney Savings & Loan Assn. v. Trinity Bank Savings Assn.,
885 F.2d 266 (5th Cir. 1989) (upholding liability for fraud where defendants knowingly fed

inaccurate appraisals to a savings association in connection with a  loan participation agreement,

even though the defendants "*never expressly stated*" that the appraisals were accurate).

### 4.     Credit Enhancements

The Offering Materials state that the Certificates had certain "credit enhancements,"

which act as a cushion to protect investors from losses resulting from loan delinquency and

default. Am. Compl. ¶¶ 87–88.  For instance, the Offering Materials stated that credit

enhancements for various Certificates consisted of "excess cash flow," "overcollateralization,"

and "subordination," and "two financial guaranty insurance policies." *Id.* at 88. Allstate states

that these representations were "untrue and misleading" on two grounds: (1) the enhancement

features "were always destined to be ineffective"; and (2) all of the loans in the pool had riskier

features than what was represented. Pls.' Memo. 16. Defendants contend, however, that Plaintiffs

fail to identify any actual misrepresentation. Defs.' Memo. 12.

The court agrees with Defendants. Allstate does not adequately explain how the

enhancement statements were false or misleading. The statements quoted in Complaint do not

appear to make even suggestive  representations as to the borrower profile forming the credit

enhancements, nor does the Complaint explain how the representations regarding the underlying

loan pool applied to the loans forming the credit enhancements. Rather, the enhancement

statements merely identify the types of enhancements that would be provided. Allstate does not

dispute that these enhancements were not provided. That the credit enhancements proved

ineffective is not a basis for alleging fraud.

### 5.     Credit Ratings

Each of the Certificates received a rating indicating rating agencies' opinion of the risk

profile of the securities. The Offering Materials "represented that ratings agencies would conduct

an analysis assessing the likelihood of delinquencies and defaults in the underlying mortgage pools." Am. Compl. ¶ 92. The Offering Materials of RALI 2006-QA14, for instance, represented that the agency ratings "address the likelihood that [Certificate] holders . . . will receive all the distributions on the underlying mortgage loans to which they are entitled." *Id.* ¶ 33. Allstate alleges that Defendants fed ratings agencies "baseless and false statistics." *Id.* ¶ 93; *see also id.* ¶ 103. Consequently, the credit ratings Defendants regurgitated in the Offering Materials rendered both the ratings and statements about the ratings process false and misleading. Defendants, on the other hand, argue that the Offering Materials accurately provided credit ratings that credit agencies awarded the Certificates.

The court agrees with Allstate that the ratings and statements about the ratings process are misleading where, as Allstate alleges, Defendants know the ratings are inaccurate. *See* Am. Jur. 2d *Fraud & Deceit* § 69 (2011) ("[A] statement of opinion may support fraud liability where the speaker has knowledge of facts not warranting the opinion."). The high rate of delinquency and drastic downgrading of the Certificates credit ratings render it plausible that independent ratings agencies' investment-grade credit ratings were premised on false information. Defendants cannot escape liability for repeating agency ratings predetermined by false data, which Defendants knew was false precisely because Defendants provided the data. *See In re Wells Fargo Mortg.-Backed Certificates Litig.*, 712 F. Supp. 2d 958, 973 (N.D. Cal 2010) (allowing misrepresentation claim where the ratings "were not the result of the Ratings Agencies' independent analysis and conclusion, but rather were predetermined by Wells Fargo").

### D. *Knowledge*

Although plaintiffs must plead fraud with particularly, Minnesota allows fraud plaintiffs to aver knowledge and other conditions of mind generally. Minn. R. Civ. P. 9.02. Pleading

knowledge under common law fraud is thus less demanding than under PSLRA fraud claims,

which requires that a complaint "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind" in defrauding investors. 15 U.S.C.

§ 78u-4 (2006). However, allegations regarding condition of mind must still satisfy the always-

operative general pleading requirements. *See Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1954 (2009).

Evidence of similar deceptive dealings with other[s]" is "directly and rationally related" to

scienter. *Stanger v. Gordon*, 244 N.W.2d 628,631 (Minn. 1976); *Alam v. Chowdhury*, 764

N.W.2d 86, 89 (Minn. Ct. App. 2009) (a "pattern of misrepresentations justifies an inference that

the misrepresentations were intentional"); *MBIA Ins. Co. v. Morgan Stanley*, No. 29951-10 slip

op. at 7 (N.Y. Sup. Ct. May 26, 2011) (holding that "material and pervasive non-compliance"

with underwriting guidelines was "sufficient non-compliance from which scienter can be

inferred").

The Complaint marshals a number of sources in pleading scienter: confidential witnesses,

*e.g.*, Am. Compl. ¶¶ 51–52, 61, 141–43, 178–93; 209–10; statistical evidence and loan

underperformance, *e.g.*, *id.* ¶¶ 205–06; circumstantial third-party reports of underwriters

"waiving in" defective loans into securitization pools and providing due diligence reports to

mortgage-backed securities sellers, *e.g.*, *id.* ¶¶ 152–74, 219; Defendants' vertically integrated

system of operations; and Offering Materials statements attesting that at least one of the

Depositor Defendants, Residential Funding Corp., evaluated the loans that it purchased. *id.* ¶

215. The Complaint alleges, on information and belief, that Seller Defendants received due

diligence reports notifying Seller Defendants of the magnitude of defective loans entering loan

pools for securitization. *Id.* ¶ 225.

Defendants argue Allstate's common law fraud claims fail, because the Complaint contains only conclusory allegations that Defendants acted with scienter. Pls.' Memo. 12. According to Defendants, alleging fraud based on the poor performance of the Certificates is "nothing more than impermissible 'fraud by hindsight.'" Dfs.' Memo. 13 (quoting *Kushner v. Beverly Enters.*, 317 F.3d 820, 827 (8th Cir. 2003). Defendants also argue that the Complaint "depends largely on vague allegations that Defendants are all part of one corporate family and thus must have known loans originated by affiliates were defective." Dfs.' Memo. 13. But Allstate does not explain how affiliated originators conveyed information regarding defective loans to Defendants. *Id.* at 13. With respect to the Complaint's use of confidential witness testimony, Defendants further argue that confidential witness testimony cannot sustain a pleading of scienter. *Id.* at 14. Defendants note that "only Confidential Witness 2 is even alleged to have worked for any Defendant." *Id.* The remaining witnesses testimony, Defendants reason, tells nothing of any Defendant's knowledge. *Id.* Finally, Defendants argue that courts generally allegations by anonymous former employees are unreliable, especially in the context of the heightened pleading requirements of fraud.

Despite Defendants' arguments, the court finds that Allstate adequately pleads scienter. Neither *Iqbal* nor *Twombly* proclaimed to turn the pleading standard into an evidentiary one. Allstate's allegation that Defendants knew the Offering Materials statements is supported by the following factual claims: Allstate's allegations that (1) the Seller Defendants' vertically integrated its system of operations in the origination and sale of many of its own securities; (2) Underwriter Defendant underwrote many of the loans at issue here, (3) Depositor Defendants were merely limited-purpose finance subsidiaries created by other defendants, *id.* ¶ 64; (4) third-party reports documented systemic abandonment of underwriting standards throughout the

20

industry and securities' sellers often received due diligence reports. Taken as a whole, the Complaint's factual allegations paint a compelling portrait of complicity in the mortgage industry, which included many of Defendants' affiliated underwriters.

A comparison between Allstate's Complaint and the complaint *Bell Atlantic Corp. v. Twombly* is helpful. In *Twombly*, the Supreme Court dismissed an antitrust action against telecommunication providers. The *Twombly* complaint alleged that telecommunications companies violated § 1 of the Sherman Antitrust Act by engaging engaged in anticompetitive parallel conduct. 550 U.S. 544, 550–51 (2007). Under the Antitrust Act, a claim arises only when companies enter into a "contract, combination, or conspiracy" to engage in parallel conduct. 15 U.S.C. § 1 (2006). The *Twombly* complaint inferred a conspiracy from conduct not only consistent with "a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," but also expected business practices given the nature of the telecommunications market. *Twombly*, 550 U.S. at 555 (2007). The market forces of telecommunications industry at work in *Twombly* rendered conspiratorial communication between competitors unnecessary.

Here, Allstate's Complaint provides non-conclusory factual content about the mortgage industry, Defendants, and Defendants' affiliates that, taken is true is "suggestive of illegal conduct." *Id.* at 563 n.8. Unseen in the *Twombly* complaint, Allstate's Complaint alleges working relationships among Seller, Depositor, and Underwriter Defendants in the creation, market, and sale of mortgage-backed securities. Furthermore, where antitrust be moral hazard pervaded the mortgage industry at the time of Allstate's purchases and perpetuated the subprime mortgage crisis. A perverse incentive structure—to accept loan applications (without regard to a borrower's ability to repay), collect processing fees, and quickly and profitably dispose of highly

21

risky loans to the investing public—inhered the mortgage industry, from origination to the sale

of mortgage-backed securities. The court finds that the complaint's allegations allow a

reasonable inference that each Defendant knew the Offering Materials statements misrepresented

the risk of the Certificates underlying loans. Thus, the court does not reach Defendants' claims

regarding the sufficiency of confidential witnesses in pleading scienter.

In any event, Allstate adequately pleads that the Offering Materials misrepresented that

underwriting standards were generally followed; as Allstate alleges, the loan pools suffered from

systematically abandoned underwriting standards. A jury may well find that one or more

Defendants purported to know underwriting standards were generally followed, when in fact a

given Defendant had no knowledge of the truth or falsity of the underwriting standards

statements. *See Davis v. Re-Track Manufacturing Corp.*, 276 Minn. 116, 117 (1967). Thus, the

common law fraud count survives.

## II. Negligent Representation

The general rule for negligent misrepresentation is as follows:

> One who, in the course of his business, profession or employment, or in a
> transaction in which he has a pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is subject to liability for
> pecuniary loss caused to them by their justifiable reliance upon the information, if
> he fails to exercise reasonable care or competence in obtaining or communicating
> the information.

Restatement (Second) of Torts § 552.

Under Minnesota law, a "defendant is liable for negligent misrepresentation only if it

owes a duty of care to the plaintiff." *Summit Recovery, LLC v. Credit Card Reseller, LLC*, No.

08-5273 DSD/JSM, 2010 WL 1427322, at *3 (D. Minn. Apr. 9, 2010). Whether a defendant

owes such a duty is a question of law. *Safeco Ins. Co. Am. v. Dain Bosworth Inc.*, 531 N.W.2d

867, 873 (Minn. Ct. App. 1995).

Allstate suggests that a duty exists where a defendant supplies information either for others' guidance in which the defendant has a "pecuniary interest, or in the course of one's business, profession, or employment." Pls.' Memo. 22 (quoting *Florenzano v. Olson*, 387 N.W.2d 168, 174 (Minn. 1986)). Allstate also states that Minnesota recognizes a duty where "one has special knowledge of material facts to which the other party does not have access." *Id.* (quoting *Hommerding v. Peterson*, 376 N.W.2d 456, 459 (Minn. Ct. App. 1985)).

In Allstate's view, Defendants provided information for investors "to use as a guide in deciding whether to purchase Defendants' securities," and that Defendants had a pecuniary interest in supplying the information. *Id.* at 23. Moreover, "Defendants had unique and specialized knowledge regarding their own underwriting processes and the true nature of the loans they securitized." *Id.* Allstate concludes that Defendants owed Allstate duty of care, which Defendants violated by providing purported misrepresentations. *Id.*

The court disagrees with Allstate's understanding of negligent misrepresentation under Minnesota law. As Defendants point out, *Hommerding* involved a claim of intentional misrepresentation in the context of disclosures. Defs.' Reply Memo. 6 (citing *Hommerding*, 376 N.W.2d at 457–58). The court suggests that *Hommerding* referred to the axiom that a defendant must disclose material facts if the defendant *knows* that the other party will rely on the absence of those facts. *See Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 812 (Minn. Ct. App. 2010). A duty of care may arise when the defendant's role is akin to a fiduciary. But the Minnesota Court of Appeals in *Safeco* apparently followed the Iowa and Oregon courts in distinguishing

> misrepresentations made by persons engaged in the business or profession of supplying guidance to others [which may trigger a duty of care] from misrepresentations made during commercial transactions where the parties are dealing at arm's length.

*Safeco Ins. Co. Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 873 (Minn. Ct. App. 1995) (quoting *Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994)). No negligent representation claim lies where parties deal at arm's length in a commercial transaction, even if one party supplies guidance to another.

Although part of Defendants' business involved supplying information to investors through Offering Materials, by Allstate's own account Defendants' "business or profession" entailed the marketing and sale of securities. Allstate and the Defendants dealt at arm's length. Allstate is not alleging that it was Defendants' client. *Cf. Safeco*, 531 N.W.2d at 872 ("Although [the defendant] is generally in the business of supplying information for the guidance of its clients, here [the plaintiff] is not alleging that it was [the defendant's] client."). Notably, the *Safeco* court concluded that the defendant owed no duty of care over the argument that the defendant had exclusive access to material information. *Id.* at 873; *cf.* Pls.' Memo. 23 (alleging that Defendants had "unique and specialized knowledge regarding their own underwriting processes and the true nature of the loans they securitized" as a basis for the negligent representation claim.) To the extent *Cornerstone Home Builders, Inc. v. Guyers Development, LLC* suggests the contrary, No. A09-1178, 2010 WL 1541344, *2 (Minn. Ct. App. Apr. 20, 2010) (unpublished), the court respectfully declines to follow the reasoning of the case. *Safeco* controls. In conclusion, the court finds that losses arising from Allstate's commercial arm's length relationships are limited to suit outside of tort. Allstate's negligent misrepresentation claim is therefore denied.

## III.    Consumer Fraud Act Claim

The Minnesota Consumer Fraud Act ("Fraud Act"), 1963 Minn. Laws 1533 (codified at Minn. Stat. Ann. § 325F.68–70 (West 2006)), prohibits fraud "in connection with any with the

sale of any merchandise." Section 325F.68 subd.2 defines "merchandise" to mean "any objects,

wares, goods, commodities, intangibles, real estate, loans, or services." The parties dispute

whether the term "merchandise" includes the mortgage-backed securities at issue here.

## A. Securities Fall Within the Definition of "Merchandise" under the Consumer Fraud Act

The term "merchandise," commonly understood, "generally excludes real estate, ships,

intangibles such as software, and the like, and does not apply to money, stocks, bonds, notes, or

other mere representatives or measures of actual commodities or values." Black's Law

Dictionary (9th ed. 2009). Thus, the term "intangibles," as a subset of "merchandise," tends to

exclude mortgage-backed securities at issue here. Mortgage-backed securities are essentially

bonds, except that instead of paying investors fixed coupons, investors receive cash flows from

mortgagors' interest and principal payments. However, binding precedent also constrains

permissible choices and informs current understanding of statutory terms.

Minnesota precedent has interpreted "intangibles" in § 325F.68 more broadly than the

common understanding of the term in the context of merchandise. In *Jenson v. Touche Ross &

Co.*, the Minnesota Supreme Court held that the Fraud Act applied to the sale of investment

contracts, since investment contracts fall within the term "intangibles" under the Fraud Act. 335

N.W. 2d 720, 728 (Minn. 1983), *superseded in part by rule on other grounds as stated in

Lennartson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 662 N.W. 125 (Minn. 2003).

Furthermore, investment contracts are often understood to be a subset of, if not indistinguishable

from, a security.[4] Because this court must construe "intangibles" (and hence "merchandise") in a

---

[4] *See, e.g., United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975) ("We perceive
no distinction, for present purposes, between an 'investment contract' and an 'instrument
commonly known as a 'security.' In either case, the basic test for distinguishing the transaction
from other commercial dealings is 'whether the scheme involves an investment of money in a

manner that is harmonious with the holding of *Jenson*, the Fraud Act's reach extends to the securities at issue here.

Defendants argue that the plain language of the Fraud Act, "its structure, and the statutory context" all support the "inescapable inference" that the legislature intended to exclude securities from the Fraud Act. Defs.' Memo. 18–19. First, the term "securities" is conspicuously absent from the list of terms that fall within the meaning of "merchandise." Second, Minn. Stat. § 325F.67, which forbids false statements in advertising, explicitly mentions both "merchandise" and "securities." Because the legislature chose to explicitly include "securities" in § 325F.67, the word's absence in § 325F.68 suggests an intentional exclusion. Third, "a robust regulatory scheme for securities" already exists under the Minnesota Securities Act, 2006 Minn. Laws 192 (codified at Minn. Stat. Ann. § 80A.40–.91 (West 2006).

To support Defendants' interpretation of the Fraud Act in light of § 325F.67, Defendants invoke the following canon of statutory interpretation: "Where [the legislature] includes particular language in one section of a statute but omits it in another section . . . , it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion." Defs.' Memo. 19 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983); *accord* Defs.' Reply Memo. 9–10 (citing *Genin v. 1996 Mercury Marquis*, 662 N.W.2d 114, 118 (Minn. 2001)).

While the interpretative principle has its merits, its utility in this instant case is dubious. Defendants' use of the ellipsis is curious. *Russello* quoted in full states, "[W]here Congress includes particular language in one section *of a statute but omits it in another section of the same Act*, it is generally presumed that Congress acts intentionally and purposely in the disparate

---

common enterprise with profits to come solely from the efforts of others.'"). *See also* Minn. Stat. Ann. 80A.41(30) (West 2006) (defining the term "security" to include "investment contracts").

inclusion or exclusion." 464 U.S. at 23. The principle by its own terms limits an interpretive

endeavor analysis to the four corners of a legislative act. In *Russello*, the United States Supreme

Court had examined two subsections of the RICO Act. Likewise, in *Genin*, the Minnesota

Supreme Court compared Minn. Stat. §§ 169.1216 and 169.1217—provisions that "derived from

the same bill." 622 N.W.2d at 118; *see* Act of Apr. 29, 1992, ch. 570, §§ 14 and 15, 1992 Minn.

Laws 1944, 1952. By contrast, the Minnesota legislature enacted § 325F.67 in 1913, fifty years

before the legislature passed the Fraud Act. *See* 1913 Minn. Laws 46.

An alternative canon of statutory construction ostensibly has greater bearing on the

present interpretative task: when two statutes are *in pari materia*, or "on the same subject," a

court should construe the statutes in light of one another. The rule "has a peculiarly appropriate

application to acts upon such kindred subjects passed at the same session of the Legislature."

G.A. Endlich, Interpretation of Statutes § 45 (1888). The legislative session enacting § 325F.67

saw fit to list both "merchandise" and "securities." Terms should not be construed to render one

superfluous or insignificant, the former should not include the latter. Because § 325F.67, a

consumer fraud statute, explicitly mentions "securities," the term's absence in the Fraud Act

statute suggests the omission is deliberate. The interpretation accords with the notion that

"merchandise" "does not apply to money, stocks, bonds, notes, or other mere representatives or

measures of actual commodities or values." Black's Law Dictionary (9th ed. 2009).

However, the interpretive relevance of § 325F.67 to the Fraud Act is more attenuated

than their current proximity in the Minnesota code would reveal, casting doubt on the

presumption that the legislature fully considered the text of the earlier statute in drafting the

Fraud Act. As mentioned above, the legislature enacted § 325F.67 fifty years before the passage

of the Fraud Act. Second, § 325F.67 was a criminal statute located under the criminal chapter

entitled "Crimes Against Property by Fraud" at the time of the civil Fraud Act's passage in 1963.

Not until 1967 did the Revisor of Statutes bring both statutes under civil chapter "Regulation of

Manufacturers and Sale." Where separate legislative sessions enact a criminal and a civil statute

a half century apart, the notion that the former informed the drafting of the latter strains

credulity—at least absent additional support.

Finally, Defendants argue that, because "a robust regulatory scheme for securities" exists

under the Minnesota Securities Act, the legislature intended to exclude "securities" from the

Fraud Act. Pls.' Memo.  However, the Securities Act explicitly states that the Act's rights and

remedies "are in addition to any other rights or remedies that may exist." Minn. Stat. Ann. §

80A.76(m) (West 2006). Thus, the legislature appears to have intended the Securities Act to

supplement, rather than replace, other statutory and common law causes of action.

In sum, Certificates fall within the meaning of "merchandise" under the Fraud Act.

Although the plain meaning of "merchandise" weighs in Defendants' favor, but the Minnesota

Supreme Court's decision in *Janus* controls and constrains the court's interpretative task.

Defendants' attempt to distinguish the investment contracts in *Janus* from the Certificates here

are unavailing: Defendants marshal an inapposite canon of statutory construction and

unpersuasive, nonbinding case law for support. Even court's *sua sponte* consideration of an

appropriate, alternative canon adds little, if anything, to Defendants' case. Finally, the court finds

that Minnesota's securities laws supplement, rather than replace, actions under the Fraud Act and

Private Attorney General Statute.

### B. Allstate's Suit Satisfies the Consumer Fraud Act's "Public Benefit" Requirement

Private attorney general actions for violations of the Fraud Act are available only to

"those claimants who can demonstrate that their cause of action benefits the public." *Ly v.*

*Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000). "Isolated one-on-one transaction[s]" are

actionable, *id.* at 310, but the misrepresentations forming the basis for the Fraud Act claim must

be made "to the public at large." *Collins v. Minnesota Sch. Bus.*, 655 N.W.2d 320, 329 (Minn.

2003). Conversely, misrepresentations made only to the plaintiff are not actionable under the

Fraud Act. *Nystrom*, 615 N.W.2d at 313; *see also Davis v. U.S. Bancorp*, 383 F.3d 761, 768 (8th

Cir. 2004) (rejecting a Fraud Act claim where the plaintiff did not present evidence that

misrepresentations were made to the public at large).

   Defendants argue that Minnesota courts have refused to find a public benefit "where the

'essence' of a plaintiff's claim is for private compensation." Defs.' Reply Memo. 12. Defendants

rely on a line of cases, beginning with *Behrens v. United Vaccines, Inc.*, 228 F. Supp. 2d 965 (D.

Minn. 2002), which reason that private damages suits offer "no real prospect of a public benefit,

other than a theoretical one." *Behrens*, 228 F. Supp. 2d at 971. Under *Behrens*, that a private

damages remedy may serve a deterrent function is merely theoretical and offers no benefit to the

public. *See also Schaaf v. Residential Funding Corp.*, No. 05-1319, 2006 WL 2506974, at *7 (D.

Minn. Aug. 29, 2006) (rejecting the deterrence argument and denying a Fraud Act claim, because

a damages remedy would "accrue to the exclusive benefit" of the plaintiffs). Similarly, in *Tuttle*

*v. Lorillard Tobacco Co.*, a plaintiff brought an Fraud Act claim for misrepresentations made in

the "mass marketing of . . . smokeless tobacco." No. 99-1550 (PAM/JGL), 2003 WL 1571584,

at *6 (D. Minn. Mar. 3, 2003).The court found no public benefit because FDA-mandated health

warnings already provided the public protection the plaintiff claimed to offer.

   The court disagrees. In *Collins*, "neither the Minnesota Court of Appeals nor the

Minnesota Supreme Court indicated that the plaintiffs had sought injunctive relief." *In re*

*Levaquin Prods. Liability Litig.*, 752 F. Supp. 2d 1071, 1078 (D. Minn. 2010). Rather, the

*Collins* complaint sought damages for violations of the CFA. *Collins v. Minnesota Sch. Bus.*, 636

N.W.2d 816, 817 (Minn. Ct. App. 2001), *aff'd* 655 N.W.2d 320 (Minn. 2003). Nonetheless, the

Supreme Court held that the plaintiffs had demonstrated a public benefit based on the following

factors:

> (1) [Minnesota School of Business (MSB)] offered its programs to the general
> public and as of 1998, MSB had a total enrollment of over 1,200 students in
> all of its programs.
> (2) [A]s required by statute, MSB was licensed . . . and it sought approval . . .
> before changing the curriculum and name of its sports medicine program.
> (3) When it launched its program, [MSB] made misrepresentations to the public
> at large by airing a television advertisement.
> (4) MSB also made numerous sales and information presentations and provided
> students with a "Career Opportunities" sheet, which students interpreted as a
> list of jobs for which they might qualify after completing the program.

*Collins*, 655 N.W.2d at 330 ("All of these factors indicate that MSB presented its program to the

public at large."). The *Collins* decision makes clear that the focus is the character of the

misrepresentation rather than the type of relief sought.

Furthermore, the *Behrens* argument that deterrence does not provide a public benefit

rests on an unduly literal interpretation of the "public benefit" requirement, which

misunderstands the animating forces behind the Fraud Act and the Minnesota Supreme Court's

creation of the public benefit requirement. First, in *Ly v. Nystrom,* the Court found that

enforcement and deterrence theories heavily informed the legislature's decision in allowing

Fraud Act suits under the private attorney general action. *See Ly v. Nystrom*, 615 N.W.2d 302,

310–11 (Minn. 2000) (examining legislators' statements on the Fraud Act). Furthermore,

legislators intended damages suits to be the principal vehicle in effectuating the purpose of the

Fraud Act. *Id.*

Properly understood, the public benefit requirement is practical judicial gloss designed to

prevent a substantial alteration to common law principles regarding attorney's fees. Without a

30

limiting principle in private attorney general suits, the Court feared that Minn. Stat. § 8.31 would "substantially alter a fundamental principle of law deeply ingrained in our common law jurisprudence—that each party bears his own attorney fees in the absence of a statutory or contractual exception." *Id.* at 314. The Minnesota Supreme Court's creation of the public benefit element struck a balance between a broad interpretation of the remedial Fraud Act and the Private Attorney General Statute. The *Nystrom* Court drew its public benefit rule from the dissent in *Church of Nativity of Our Lord v. WatPro, Inc.*, 491 N.W.2d 1 (Minn. 1992). *Nystrom*, 615 N.W.2d at 312 (quoting *Nativity*, 491 N.W.2d 10 – 11 (Simonett, J., concurring in part and dissenting in part)). The *Nativity* dissent proposed the following rule to limit the scope of attorney fee awards in fraud actions: "the fraud must have the potential to deceive and ensnare members of the consumer public other than just the plaintiff, *so that* plaintiff's lawsuit has been of benefit to the public." *Id.* at 10–11. Thus, the potential to deceive other members of the consuming public forms the touchstone of the public benefit requirement.

The court is mindful of the consequences of expanding the "public benefit" requirement beyond the facts of *Nystrom* and *Collins*. As the Minnesota Court of Appeals recently noted, the term "public benefit" is subjective: "The term can be about what you want it to be." Dickson v. Lundquist, No. A04-990, 2005 WL 147719, at *2 (Minn. Ct. App. Jan. 25, 2005). Slipshod extensions that impose new hurdles for plaintiffs concomitantly narrow the remedial scope of the Fraud Act. The court finds that a focus on the nature of the relief sought imposes a burden on plaintiffs that Minnesota' highest court had not considered in *Nystrom* or *Collins*, interpreting the term "public benefit" in isolation from the judicial context in which it developed. Because the cases that have precluded Fraud Act suits for damages are not binding, the court declines to follow them here.

31

Defendants also contend that *Collins* and subsequent decisions have recognized that a misrepresentation must be "'*mass marketed* to the public'" for a public benefit to exist. Defs.' Reply Memo. 11 (quoting *In re Levaquin Prods. Liab. Litig.*, 752 F. Supp. 2d 1071, 1078 (D. Minn. 2010). Thus, a public benefit would not exist for misrepresentations publicly available but not advertised to the general public. In support of the distinction, Defendants point to *Zuts v. Case Corp.*, No. 02-1776 (PAM/RLE), 2003 WL 22848943 (D. Minn. Nov. 21, 2003). The court held found no public benefit for a claim involving publicly available but not mass-advertised promotional materials. *Zuts*, 2003 WL 22848943, at *4 (concluding that a claim for misrepresentations in promotional materials publicly available, but not widely publicized, "[fell] between the facts of *Ly* and . . . *Collins*").

Contrary to Defendants assertions, the court finds that the public benefit element does not turn on whether representations are mass-marketed or publicly available. Consider *Zutz*, the principal case on which Defendants rely. First, that the promotional materials were "publicly available" weighed in the plaintiffs' favor, as the court viewed the facts. *See* 2003 WL 22848943, at *4 ("Plaintiffs' claim does not arise out of advertising to the general public, as did the claims in *Collins*. However, as Plaintiffs point out, some of the statements alleged to violate the CFA are found in promotional materials for the air drill, and thus are publicly available.")

Second, the distinction was nevertheless irrelevant to the court's holding. Rather, the *Zutz* court grounded its holding on the relief plaintiffs sought. *See* 2003 WL 22848943, at *4. Because the plaintiffs sought only compensatory damages, the claim provided no public benefit. *Id.* As explained above, the court believes that the nature of the relief sought is not dispositive of Fraud Act claims.

32

Third, *Collins* supports a broader reading of the public benefit element: in addition to the *Collins* defendant's mass marketing advertisements, the *Collins* court found a school's distribution of allegedly misleading "Career Opportunities" sheets to its students—a substantially smaller subset of the entire public—indicated that the school's representations were made to the public at large. *See Collins*, 655 N.W.2d at 330. Similarly, here, prospective investors received the Offering Materials prior to purchasing Certificates. Thus, that the Offering Materials were "primarily intended for the much smaller circle of institutional purchasers," Am. Compl. ¶ 271, does not preclude a well-pled Fraud Act claim. In sum, the court finds that the satisfaction of the public benefit requirement turns on whether a misrepresentation was made to a single individual in a one-on-one transaction. Allstate alleges that Defendants made public misrepresentations in documents for the solicitation of numerous investors' business, the court finds Allstate's Fraud Act claim well-pled.

The court acknowledges the concern Defendants raise:

> If Plaintiffs are correct in their interpretation of the 'public benefit' requirement, then under the thinnest pretense of pursuing the public interest, every successful plaintiff in every private securities fraud action in Minnesota will be entitled to costs and attorneys' fees on the basis of a cause of action foreign to the state and federal securities laws.

Pls.' Memo. 13. As Defendants rightly point out, such a result would likely be inconsistent with the intent of the Legislature. *Id.* (citing *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2002)). However, in allowing Allstate's Fraud Act claim to proceed, Defendants' parade of horribles does not ineluctably follow. Plaintiffs pursuing claims as a private attorneys general are entitled only to attorneys' fees that are "reasonable." Minn. Stat. Ann. 8.31, subdiv. 3a (West 2006). Minnesota courts consider several factors in determining the award of reasonable attorney's fees. *See State v. Paulson*, 188 N.W.2d 424, 426 (1971). Statutory limitations are one such factor. *Id.*

The purpose of awarding attorney's fees plaintiffs is to eliminate financial barriers in pursuing claims. *See Church of Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 8 (Minn.1992) ("If there are no attorney fees awarded in this case, [the consumer] will spend virtually all of its damage award paying its attorneys."). However, the court may well find after considering evidence that awarding attorney's fees in the instant case will not effectuate the intent of the Fraud Act or the Private Attorney General Statute.

## ORDER

1. Defendants' Motion to Dismiss with respect to Allstate's common law fraud and fraudulent inducement claims (counts I and III of the Complaint) is **DENIED**.

2. Defendants' Motion to Dismiss with respect to Allstate's negligent misrepresentation claim is **GRANTED**.

3. Defendant's Motion to Dismiss with respect to Allstate's Consumer Fraud Act claim is **DENIED**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

**BY THE COURT:**

Dated:   November 28, 2011

**Margaret A. Daly**
**Judge of District Court**

34