Hearing Date: March 18, 2013

MILLER & WRUBEL P.C.
570 Lexington Avenue
New York, New York 10022
(212) 336-3500
John G. Moon
Claire L. Huene

*Attorneys for Triaxx Prime CDO 2006-1, LLC,*
*Triaxx Prime CDO 2006-2, LLC and*
*Triaxx Prime CDO 2007-1, LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

RESIDENTIAL CAPITAL, LLC, *et al.*,

Debtors.

Case No. 12-12020 (MG)

Chapter 11

**OBJECTION TO THE DEBTORS' SECOND SUPPLEMENTAL
MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR
APPROVAL OF RMBS TRUST SETTLEMENT AGREEMENTS**

Triaxx Prime CDO 2006-1, LLC, Triaxx Prime CDO 2006-2, LLC, and Triaxx Prime CDO 2007-1, LLC (collectively "**Triaxx**") respectfully submit this objection to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements (the "**RMBS 9019 Motion**") [Docket No. 1887].

**Background**

1. Under the proposed settlement (the "**Proposed RMBS Settlement**"), the trusts ("**Trusts**") would have the option to accept a share of an allowed claim (the "**Allowed Claim**") of up to $8.7 billion in exchange for a release of representation and warranty claims ("**R&W Claims**"). The Allowed Claim would be allocated to each participating Trust *pro rata* according to its Estimated Lifetime Losses (the "**Allocation Formula**").

2. In reaching the Proposed RMBS Settlement, the Debtors claim that it would have been too difficult to consider the merits of the actual R&W Claims to be covered thereby, and that the only other option was to formulate "Alleged Breach Rates" and "Agree Rates" based on "analyses and review metrics" in the "mortgage loan industry," assume such rates should be the same for all Trusts, and eventually arrive at a "Loss Share Rate" of approximately 20%. RMBS 9019 Motion ¶¶ 39, 41. The $8.7 billion Allowed Claim represents 20% of the total actual losses and estimated future losses ("**Estimated Lifetime Losses**") across all the Trusts, approximately $45 billion.

3. Triaxx holds certificates ("**Certificates**") issued by 20 Trusts (the "**Triaxx-Held Trusts**"). With respect to each of the 20 Trusts, Triaxx holds at least 25% of at least one class of Certificate. *See* Affidavit of Thomas Priore ("**Priore Aff.**"), August 14, 2012 [Doc. No. 1143], ¶ 5.

4. Trusts hold different types of mortgage loans ("**Loans**"), and the nature of the Loans determines how likely defaults are to be due to breaches of representations and warranties, and therefore give rise to viable R&W Claims, rather than economic or market factors, which would not give rise to viable R&W Claims. *See, e.g.* Declaration of Frank Sillman [Doc. No. 320-8], dated June 11, 2012, ¶ 52.

5. For example, whether a Trust holds fixed-rate or adjustable-rate ("**ARM**") Loans is a critical distinction. If borrowers default because rising interest rates causes them to be unable to afford their payments, it does not give rise to an R&W Claims. *Id.* Interest rates rose quickly between 2004 – 2007. Declaration of Claire L. Huene ("**Huene Decl.**"), dated November 29, 2012, Ex. A.

6. Similarly, some Loans employed "teaser" rates, balloon payments and other features so that borrowers had a lower payments for some initial period. Defaults due to the expiration of teaser rates or balloon payments becoming due are likely not due to any defects that could give rise to viable R&W Claims.

7. Data showing the timing of default rates reflect that ARM Loans are more susceptible to economic factors than fixed-rate prime Loans. The rate of default in ARM Loans mirrors the financial crisis, and particularly the movement of interest rates, whereas default rates for prime Loans stayed relatively constant through the period. Huene Decl. Ex. A.

8. In addition, R&W Claims are contract claims, and depend on the contract terms: the representations and warranties. One critical difference among the Trusts is whether the governing documents of a particular Trust allocate the risk of origination fraud, and if so, whether that risk was allocated to the Debtors or the investors. During the period that the Loans were originated (approximately 2004-2007), origination fraud was a substantial risk. *See, e.g.*, Huene Decl. Ex. B (Federal Bureau of Investigations mortgage fraud report for 2006). Some Trusts holding prime and alt-A Loans received the following representation and warranty from Debtor Residential Funding Company ("**RFC**"): "No fraud or misrepresentation has taken place in connection with the origination of any Mortgage Loan" (the "**No-Fraud R&W**"). *See*, *e.g.*, RFMSI 2006-S8 Assignment and Assumption Agreement, at Section 4(xxxviii) (Huene Decl. Ex. C). By contrast, the governing documents for many Trusts holding subprime Loans expressly provide that RFC is *not* liable for a defect that would otherwise be a breach of a representation and warranty if the defect "also constitutes fraud in the origination of the

3

Mortgage Loan" (the "**Fraud Liability Exclusion**"). *See, e.g.*, Huene Decl. Ex. D (RASC 2005-EMX3 Assignment and Assumption Agreement).[1]

9. It is only common sense that these types of factors result in some Trusts having significantly stronger R&W Claims than others. However, the "Steering Committee" group of the investors who negotiated the Proposed RMBS Settlement (the "**Settling Institutional Investors**") asserts that "there is no evidence here that any of the RMBS Trusts has a 'better' or 'stronger' repurchase claim than any other Trust." Steering Committee Investors' Statement in Support and Response to Settlement Objections, dated October 5, 2012 [Doc. No. 1739], ¶ 42. While the Debtors have the burden to prove the Proposed RMBS Settlement is fair, rather than Triaxx having the burden to prove that it is unfair, there is plenty of evidence that could be discussed by the parties in negotiations to revise the settlement. For example, insurance companies that cover RMBS Trusts generally only cover losses that are *not* caused by breaches of representations and warranties (which are the Debtors' responsibility). Insurers decline coverage when they believe a breach exists, and therefore the rates at which insurers decline coverage reflect viable R&W Claims. Data is available showing the rates at which insurers declined coverage for different types of the Debtors' Loans. Huene Decl. Ex. E. The data shows that insurers declined coverage for 43.45% of prime Loans, for 23.04% of Alt-A Loans, and only

---

[1] Mr. Lipps attempts to downplay the significance of the No-Fraud R&W by claiming that the following much more common representation and warranty "is the equivalent of" a No-Origination Fraud R&W: "The information set forth in the Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is true and correct in all material respects as of the date or dates respecting which such information is initially furnished." Lipps Supp. Decl. ¶¶ 31-32 (citing the Assignment and Assumption Agreement for RASC 2005-EMX3). However, the RASC 2005-EMX3 Assignment and Assumption Agreement contains the Fraud Liability Exclusion, which makes it clear that the "correct information" representation could not be read in the way Mr. Lipps suggests. *See* Huene Decl. C.

4

6.87% for subprime Loans. This clearly shows that Trusts holding prime and Alt-A Loans have far stronger R&W Claims than subprime and other types of Loans.[2]

10. The reason the Proposed RMBS Settlement ignores relative strength of R&W Claims is that Settling Institutional Investors hold substantial amounts of Certificates issued by the high-loss subprime, ARM, and other Trusts that likely have only weak R&W Claims. Priore Aff. ¶¶ 33-34. It is therefore not surprising that they negotiated the Proposed RMBS Settlement to be based only on losses and to presume that losses equate to R&W Claims.[3]

**Objection**

11. The Proposed Settlement Agreement treats losses as a proxy for R&W Claims, and assumes that the losses in all Trusts are equally likely to correlate to viable R&W Claims. This premise is faulty. The losses in some Trusts are much more likely to give rise to R&W Claims than others. The Triaxx-Held Trusts hold only fixed-rate, first lien, prime and Alt-A Loans. Because the Loans are fixed-rate, they are not susceptible to borrower default due to rising interest rates. In addition, at least 16 of the Triaxx-Held Trusts received the No-Fraud R&W. There are far fewer things that could go wrong with the Loans held by the Triaxx-Held Trusts (and other Trusts with similar features) without giving rise to viable R&W Claims. Yet

---

[2] In addition, as Triaxx has previously demonstrated, it is entirely possible to review Loan data and determine relative strength of R&W Claims Trust-by-Trust without "Herculean" manual re-underwriting. *See* Priore Aff.

[3] The Debtors seek to justify the Proposed RMBS Settlement on the grounds that the Settling Institutional Investors have done this before: the Bank of America ("**BofA**") RMBS settlement is between some Settling Institutional Investors and The Bank of New York Mellon ("**BNYM**"), as Trustee. The Debtors imply that the BofA settlement is on the verge of judicial approval. *Id.* ¶ 3 n. 7 ("approval of which is pending"); ¶ 41. To the contrary, "approval" of the BofA settlement is certainly *not* imminent or "pending." There are more than 100 intervenors in that proceeding, including Triaxx, several Federal Home Loan Banks, and the Attorneys General of the States of Delaware and New York. The New York Attorney General asserted claims against BNYM, including breach of fiduciary duty for its role in the settlement, which, like this one, is based only on losses rather than viability of R&W Claims.

according to the Debtors, losses in a Trust holding ARM or subprime Loans, or even scratch and dent Loans, which are disclosed to be defective and may already be in default at the time of securitization, are equally likely to reflect viable R&W Claims as losses in the Triaxx-Held Trusts.

12. Triaxx objects to the Allocation Formula specifically rather than the amount of the Allowed Claim. The Allocation Formula should be revised to take into account the relative likelihood of viable R&W Claims, based on (a) the types of Loans held by the Trusts and (b) the representations and warranties applicable thereto.

13. Indeed, if the relative strength of the R&W Claims were taken into account, it is possible that the amount of the Allowed Claim is too high overall and unfair to the Debtors. The Triaxx-Held Trusts and similar Trusts should receive more of their Estimated Lifetime Loss than they would under the current Proposed RMBS Settlement, which can be done through a revised Allocation Formula, but such Trusts are also a minority. Most Trusts hold subprime, ARM, scratch and dent or second lien Loans, which are likely receiving far more than then their valid R&W Claims under the Proposed RMBS Settlement. Thus, a reasonable settlement, one based on relative strength of R&W Claims rather than merely on losses, might well result in both (a) the Triaxx-Held Trusts and similar Trusts receiving more, and (b) the Debtors overall paying less. However, if the Debtors insist on distributing the Allowed Claim according to an Allocation Formula based only on each Trust's relative Estimated Lifetime Losses, the amount of the Allowed Claim would have to be greater to provide a recovery that would be within the range of reasonableness to less risky, higher-quality Trusts with stronger R&W Claims such as the Triaxx-Held Trusts.

Dated: November 29, 2012

        MILLER & WRUBEL P.C.

By:  /s/ John G. Moon
    John G. Moon
    Claire L. Huene
    570 Lexington Avenue
    New York, New York 10022
    212-336-3500

*Attorneys for the Triaxx Entities*