# Exhibit 1 to Declaration

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| RUTH J. DAVIS, an adult individual, and PHILIP F. and JEANNIE C. KOSSLER, a lawfully married couple, individually and on behalf of others similarly situated, | CIVIL ACTION NO.: *AD-01-8643* |

CIVIL DIVISION

JURY TRIAL DEMANDED

Code 190

Plaintiffs,

**COMPLAINT IN CLASS ACTION**

v.

Filed on behalf of Plaintiffs

COMMUNITY BANK OF NORTHERN VIRGINIA; FIRSTPLUS HOME LOAN TRUST 1996-2; FIRSTPLUS HOME LOAN OWNER TRUST 1996-3; FIRSTPLUS HOME LOAN OWNER TRUST 1996-4; FIRSTPLUS HOME LOAN OWNER TRUST 1997-1; FIRSTPLUS HOME LOAN OWNER TRUST 1997-2; FIRSTPLUS HOME LOAN OWNER TRUST 1997-3; FIRSTPLUS HOME LOAN OWNER TRUST 1997-4; FIRSTPLUS HOME LOAN OWNER TRUST 1998-1; FIRSTPLUS HOME LOAN OWNER TRUST 1998-2; FIRSTPLUS HOME LOAN OWNER TRUST 1998-3; FIRSTPLUS HOME LOAN OWNER TRUST 1998-4; FIRSTPLUS HOME LOAN OWNER TRUST 1998-5; GMAC-RESIDENTIAL FUNDING CORPORATION; HOMECOMINGS FINANCIAL NETWORK, INC.,

Defendants.

Counsel of Record for this Party:

R. Bruce Carlson, Pa. I.D. #56657

**SPECTER SPECTER EVANS & MANOGUE, P.C.**
Firm #684
The 26th Floor, Koppers Building
Pittsburgh, PA 15219
(412) 642-2300

*OF COUNSEL:*

Eric G. Calhoun, Esquire
LAWSON & FIELDS, P.C.
5323 Spring Valley Road, Suite 300
Dallas, TX 75240

R. Hoyt Rowell, III
Daniel O. Myers
Kevin Oufnac
NESS, MOTLEY, LOADHOLDT,
  RICHARDSON & POOLE
P.O. Box 1792
Mt. Pleasant, SC 29465

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| RUTH J. DAVIS, an adult individual, and PHILIP F. and JEANNIE C. KOSSLER, a lawfully married couple, individually and on behalf of others similarly situated, | CIVIL ACTION NO.: _____ |
| | COMPLAINT IN CLASS ACTION |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| COMMUNITY BANK OF NORTHERN VIRGINIA; FIRSTPLUS HOME LOAN TRUST 1996-2; FIRSTPLUS HOME LOAN OWNER TRUST 1996-3; FIRSTPLUS HOME LOAN OWNER TRUST 1996-4; FIRSTPLUS HOME LOAN OWNER TRUST 1997-1; FIRSTPLUS HOME LOAN OWNER TRUST 1997-2; FIRSTPLUS HOME LOAN OWNER TRUST 1997-3; FIRSTPLUS HOME LOAN OWNER TRUST 1997-4; FIRSTPLUS HOME LOAN OWNER 1998-1; FIRSTPLUS HOME LOAN OWNER TRUST 1998-2; FIRSTPLUS HOME LOAN OWNER TRUST 1998-3; FIRSTPLUS HOME LOAN OWNER TRUST 1998-4; FIRSTPLUS HOME LOAN OWNER TRUST 1998-5; GMAC-RESIDENTIAL FUNDING CORPORATION; HOMECOMINGS FINANCIAL NETWORK, INC., | |
| Defendants. | |

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE OR KNOW A LAWYER, THEN YOU SHOULD GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP:

LAWYER REFERRAL SERVICE
THE ALLEGHENY COUNTY BAR ASSOCIATION
920 CITY/COUNTY BUILDING
PITTSBURGH, PENNSYLVANIA  15219
TELEPHONE:  412-261-0518

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| RUTH J. DAVIS, an adult individual, and PHILIP F. and JEANNIE C. KOSSLER, a lawfully married couple, individually and on behalf of others similarly situated, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| COMMUNITY BANK OF NORTHERN VIRGINIA; FIRSTPLUS HOME LOAN TRUST 1996-2; FIRSTPLUS HOME LOAN OWNER TRUST 1996-3; FIRSTPLUS HOME LOAN OWNER TRUST 1996-4; FIRSTPLUS HOME LOAN OWNER TRUST 1997-1; FIRSTPLUS HOME LOAN OWNER TRUST 1997-2; FIRSTPLUS HOME LOAN OWNER TRUST 1997-3; FIRSTPLUS HOME LOAN OWNER TRUST 1997-4; FIRSTPLUS HOME LOAN OWNER 1998-1; FIRSTPLUS HOME LOAN OWNER TRUST 1998-2; FIRSTPLUS HOME LOAN OWNER TRUST 1998-3; FIRSTPLUS HOME LOAN OWNER TRUST 1998-4; FIRSTPLUS HOME LOAN OWNER TRUST 1998-5; GMAC-RESIDENTIAL FUNDING CORPORATION; HOMECOMINGS FINANCIAL NETWORK, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

CIVIL ACTION NO.: _____

COMPLAINT IN CLASS ACTION

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

## INTRODUCTION

This class action is filed on behalf of all persons who received secondary mortgage loans

funded by Community Bank of Northern Virginia (hereinafter "Community"), secured by real

property in Pennsylvania, who were damaged by any of the predatory lending practices set forth below.

## I.     THE PREDATORY LENDING PRACTICES OF COMMUNITY AND ITS AFFILIATES

1.      The issuance of secondary mortgage loans in Pennsylvania is regulated by the Secondary Mortgage Loan Act, codified at 7 P.S. Section 6601 et seq. (hereinafter the "SMLA").

2.      The SMLA defines a secondary mortgage loan as follows:

A loan in an original principal amount in excess of $5,000 which is secured in whole or in part by a lien upon any interest in real property created by a security agreement, including a mortgage, indenture, or any other similar instrument or document, which real property is subject to a prior mortgage and which is used as a dwelling . . . .

3.      The SMLA requires that no person shall engage in the business of making secondary mortgage loans in this Commonwealth without obtaining a license from the Pennsylvania Secretary of Banking.

4.      Through and including approximately the third quarter of calendar 1999, Community had agreements with various secondary mortgage originators, specifically including EquityPlus Financial, Inc., EquityPlus Financial LLC, AmericasBank Mortgage Corporation, and, Americas Mortgages LLC. Pursuant to the agreements, these originators solicited secondary mortgage loan business in the Commonwealth through direct mailings. Community would fund the loans solicited in the first instance by the originators, and would retain a percentage of the closing costs as a fee. Community would then sell the loans. Any remaining fees generated from the closing of the loans would be paid to the person or entity which originated the loan.

5.      At or around the fourth quarter of calendar 1999, Community brought all of its mortgage origination business in house.

2

6.    All of the loans made to Plaintiffs and the Class were funded by Community and the Settlement Statements executed in connection with the loans identified Community as the Lender and itemized the loan origination fees payable to Community at closing, as well as those fees payable to various third party vendors.

7.    A person or entity engaged in the secondary mortgage loan business in this Commonwealth who/which is properly licensed can charge the maximum interest rate and fees that are specifically delineated in the SMLA. Specifically, a licensee is permitted to charge a monthly interest rate of 1.85% and to collect an application fee not in excess of 3% of the original principal balance of the loan. The licensee is also permitted to recoup legitimate charges from third-party vendors actually related to the processing of a secondary mortgage loan.

8.    The SMLA expressly states that a person who/which makes secondary mortgage loans in Pennsylvania without a proper license issued by the Secretary of Banking shall be subject to criminal and civil penalties. Specifically, the SMLA states:

> Any person who is not licensed by the secretary . . . and who shall engage in the business of negotiating or making secondary mortgage loans and charge, collect, contract for or receive interest, fees, premiums, charges or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments, shall be guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to pay a fine of not less than $500 or more than $5,000, and/or undergo imprisonment not less than six months nor more than three years . . . .

9.    Because Community and its originators were not licensed to make secondary mortgage loans in this Commonwealth, they were required to comply with Pennsylvania's maximum interest statute set forth at 41 P.S. Section 101 et seq. (hereinafter "Act 6") regarding the maximum permissible interest rate which could be charged to Pennsylvania borrowers for a residential mortgage loan.

3

10.    Act 6 defines "residential mortgage" as follows:

RESIDENTIAL MORTGAGE means an obligation to pay a sum of money in an
original bona fide principal amount of fifty thousand dollars ($50,000) or less,
evidenced by a security document and secured by a lien upon real property located
within this Commonwealth . . . .

See 41 P.S. Section 101.

11.    The maximum interest rate for a residential mortgage under the terms of Act 6 is set

forth at 41 P.S. Section 301, which states, in relevant part: "The maximum lawful rate of interest for

residential mortgages, as defined in this act, entered into or contracted for during any calendar month

shall be equal to the Monthly Index of Long Term United States Government Bond Yields for the

second preceding calendar month plus an additional two and one-half per cent per annum rounded

off to the nearest quarter of one per cent per annum." See, 41 P.S. Section 301(b).

12.    The average interest rates charged by Community and its originators for secondary

mortgage loans secured by real property located in Pennsylvania was, upon information and belief,

in excess of 13%. This rate of interest is substantially in excess of the maximum permissible interest

rate under Act 6, which during the class period has been approximately 8%.

13.    In addition to the illegal interest rates discussed above, Community and its originators

charged Pennsylvania borrowers illegal fees and costs substantially in excess of the 3% application

fee which was permissible under the SMLA and/or Act 6. These illegal fees and costs are discussed

more fully below.

14.    The purpose of this class action is to compel Community and the holder's of the

mortgage notes related to the loan transactions between Community and Plaintiffs and the Class to

disgorge all illegal interest and fees and costs, and to reform the loans in accordance with

Pennsylvania law.   Community has assigned all or most of the mortgage notes executed when it

4

closed loan transactions with Plaintiffs and the Class. Community and the assignees of these notes constitute the named Defendants in this action. Plaintiffs claims are based solely upon state law.

15.    The Court of Common Pleas of Allegheny County is a proper venue for this matter because plaintiffs reside in Allegheny County, Community and/or its affiliates solicited secondary loan business in Allegheny County, the transactions or occurrences at issue occurred in Allegheny County, and Defendants made or hold as assignees, secondary mortgage loans secured by real property located in Allegheny County.

## THE PARTIES

16.    Plaintiff Ruth J. Davis is an adult individual residing at 1206 Stratford Court, Coraopolis, Allegheny County, Pennsylvania.

17.    Plaintiffs Philip F. Kossler and Jeannie C. Kossler are lawfully married individuals residing at 127 Huron Drive, Carnegie, Allegheny County, Pennsylvania.

18.    Defendant Community Bank of Northern Virginia is a Virginia corporation with a principal place of business at 8150 Leesburg Pike, Vienna, Virginia 22182.

19.    Defendant FIRSTPLUS Home Loan Trust 1996-2 is a Delaware Business Trust. This Defendant, upon information and belief, is a holder of mortgage notes related to the mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Trust 1996-2 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

20.    Defendant FIRSTPLUS Home Loan Owner Trust 1996-3 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to the mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1996-3 can be served legal process by serving US Bank, National

Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

21.    Defendant FIRSTPLUS Home Loan Owner Trust 1996-4 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to the mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1996-4 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

22.    Defendant FIRSTPLUS Home Loan Owner Trust 1997-1 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to the mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1997-1 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

23.    Defendant FIRSTPLUS Home Loan Owner Trust 1997-2 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to the mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1997-2 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

24.    Defendant FIRSTPLUS Home Loan Owner Trust 1997-3 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home

6

Loan Owner Trust 1997-3 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

25.     Defendant FIRSTPLUS Home Loan Owner Trust 1997-4 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1997-4 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

26.     Defendant FIRSTPLUS Home Loan Owner Trust 1998-1 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1998-1 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

27.     Defendant FIRSTPLUS Home Loan Owner Trust 1998-2 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1998-2 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

28.     Defendant FIRSTPLUS Home Loan Owner Trust 1998-3 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1998-3 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

29.     Defendant FIRSTPLUS Home Loan Owner Trust 1998-4 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1998-4 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

30.     Defendant FIRSTPLUS Home Loan Owner Trust 1998-5 is a Delaware Business Trust. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class. FIRSTPLUS Home Loan Owner Trust 1998-5 can be served legal process by serving US Bank, National Association, Attn: Jerry Grundhofer, President & CEO, 601 Second Avenue South, Minneapolis, MN 55402-4302.

31.     GMAC-Residential Funding Corporation is a Minnesota corporation with its principal place of business located at 8400 Normandale Lake Boulevard, Minneapolis, MN 55437. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class.

8

32.     Homecomings Financial Network, Inc. is a Delaware corporation with its principal place of business at 8400 Normandale Lake Boulevard, Suite 600, Minneapolis, MN 55437. This Defendant is named because, upon information and belief, it is a holder of mortgage notes related to mortgage loans made by Community to Plaintiffs and the Class.

## THE LOANS MADE TO PLAINTIFFS

### Ruth Davis

33.     Plaintiff Ruth J. Davis obtained a secondary mortgage loan closed in Community's name on or about February 22, 1999. The principal amount of the loan was $24,100.00 The interest rate for this loan was 15.45%. The last scheduled payment on the loan is February 22, 2024. The loan was secured by a lien on Plaintiff's residence.

34.     At closing, Plaintiff was charged various costs and fees payable to Community:

    a) origination fee:     $1928.00

    b) discount fee:         $482.00

    SETTLEMENT COSTS TO COMMUNITY:        $2,410.00

35.     Under the SMLA, the maximum amount which Community could have properly charged Plaintiff at closing was an application fee in the amount of 3% of the original principal balance of the loan, or $723.00. Plaintiff was therefore charged illegal loan origination fees by Community in the amount of $1,687.00.

### The Kossler Plaintiffs

36.     The Kosslers obtained a secondary mortgage loan closed in Community's name on or about July 28, 1998. The principal amount of the loan was $30,000.00. The interest rate for this loan was 14.817%. The last scheduled payment on the loan is August 2, 2013. The loan was secured by a lien on Plaintiffs' residence.

37.    At closing, the Kosslers were charged various costs and fees payable to Community:

| | | |
|---|---|---|
| a) | origination fee: | $2250.00 |
| b) | document review fee: | $ 250.00 |
| c) | processing fee: | $ 150.00 |

SETTLEMENT COSTS TO COMMUNITY:        $2,650.00

23.    Under the SMLA, the maximum amount which Community could have properly charged Plaintiffs at closing was an application fee of 3% of the original principal balance of the loan, or $900.00. Plaintiffs were therefore charged illegal origination fees by Community in the amount of $1750.00.

## ASSIGNEES

24.    FIRSTPLUS Home Loan Trust 1996-2, FIRSTPLUS Home Loan Trust Owner 1996-3, FIRSTPLUS Home Loan Owner Trust 1996-4, FIRSTPLUS Home Loan Owner Trust 1997-1, FIRSTPLUS Home Loan Owner Trust 1997-2, FIRSTPLUS Home Loan Owner Trust 1997-3, FIRSTPLUS Home Loan Owner Trust 1997-4, FIRSTPLUS Home Loan Owner Trust 1998-1, FIRSTPLUS Home Loan Owner Trust 1998-2, FIRSTPLUS Home Loan Owner Trust 1998-3, FIRSTPLUS Home Loan Owner Trust 1998-4, FIRSTPLUS Home Loan Owner Trust 1998-5, GMAC-Residential Funding, and/or Homecomings Financial Network, Inc. are current holders or assignees of certain of the second mortgage notes between Community and Plaintiffs/Class members. As the purchasers and/or assignees and holders of the notes made by Community to Plaintiffs/Class Members, the Assignee Defendants are liable to the representative Plaintiffs and the Class.

## CLASS ALLEGATIONS

25.     This action is filed as a class action pursuant to Pa. R. Civ. P. 1702 on behalf of all persons who received secondary mortgage loans funded by Community, secured by real property in Pennsylvania, and who were damaged by the predatory lending practices alleged herein.

26.     The class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed , based upon publicly available information, that the Class includes thousands of members. In some instances, such persons may be unaware that claims exist on their behalf. To the extent that the Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

27.     The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs received secondary mortgage loans from Community with the same illegal interest, costs and expenses charged in the loans made to Class members.

28.     The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. They are aware that they cannot settle this action without Court approval. Their interests in this action are antagonistic to the interests of Community, and they will vigorously pursue the claims of the Class.

29.     The representative Plaintiffs have retained counsel who are competent and experienced in class action litigation, and have represented other consumers in complex class actions. Counsel have agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court. Counsel have agreed to advance the expenses of the litigation contingent upon its outcome.

30.    Common questions of law and fact affect the rights of each member of the Class and

a common remedy by way of permissible damages and declaratory relief is sought for the Class.

31.    There are numerous and substantial question of law and fact common to all members

of the Class which will control in this litigation and which will predominate over any so-called

individual issues.  These common questions of law and fact include the following:

a)    Whether Community violated the Pennsylvania Secondary Mortgage
Loan Act by making secondary mortgage loans, secured by real
property in Pennsylvania, without a license and charging an interest
rate in excess of the rate permitted by Act 6;

b)    Whether the loan agreements between Community and Class
members are void, in whole or in part, as being against public policy
in that the loans violate the express provisions of the SMLA and Act
6;

c)    Whether Community charged Class members illegal costs and fees in
violation of the Pennsylvania Secondary Mortgage Loan Act;

d)    Whether Community violated Act 6 by charging class members fees
and costs which violated the Pennsylvania Secondary Mortgage Loan
Act;

e)    Whether Community's predatory lending practices violated the
Pennsylvania Unfair Trade Practices and Consumer Protection Law;
and,

f)    Whether Community, and/or the assignee Defendants, are liable for
attorneys' fees and costs, in addition to other available civil remedies
and penalties.

32.    A class action provides a fair and efficient method, if not the only method, for

adjudicating this controversy.  The substantive claims of the representative Plaintiffs and the Class

are identical and will require evidentiary proof of the same kind and application of the same law.

33.    The representative Plaintiffs will seek to identify all Class members through discovery procedures as may be appropriate and will provide to the Class such notice of this action as the Court may direct.

## COUNT I

### Illegal Contract–Contract Unenforceable in its Entirety, Illegal Components of Contract Voidable or Illegal Components of Contract Unenforceable and Plaintiffs Entitled to Additional Penalty

34.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

35.    The SMLA is a remedial statute that is intended to protect Pennsylvania consumers from predatory lending practices by second mortgage lenders.

36.    The licensure requirement in the SMLA is an integral component of the Pennsylvania Department of Banking's attempt to protect Pennsylvania citizens against predatory lending practices by secondary mortgage lenders.

37.    The existence of express civil and criminal penalty provisions in the SMLA for violation of the licensure requirement is calculated to serve as a deterrent to persons who are tempted to make secondary mortgage loans in Pennsylvania without a license.

38.    Because Community issued secondary mortgage loans to plaintiffs and the putative class without a license from the Pennsylvania Department of Banking, and because the purpose of the licensure provision in the SMLA is regulation of the secondary mortgage industry and not merely the collection of revenue, the loan agreement between Community and Plaintiffs is either void or voidable as being an illegal contract which is against public policy.

39.    Because Community was at no time a licensee under the SMLA, the interest rate which it charged for secondary mortgage loans in Pennsylvania violated both the SMLA and Act 6. Because the loans made by Community to Plaintiffs and the Class included an interest rate which violated the express statutory provisions delineated in the SMLA and Act 6, the loan agreements related to said loans are either void or voidable as being against public policy.

40.    Because Community charged Plaintiffs and the Class origination fees over and above the 3% application fee permitted by the SMLA, the loan agreements between Plaintiffs/the Class and Community are either void or voidable as being against public policy.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment declaring that their loan agreement with Community be deemed an illegal and unenforceable contract and that the Plaintiffs and the Class are hereby relieved from any obligation to make further payments of principal and interest on the note, or, in the alternative, that all provisions of the loan agreement and note which violate Pennsylvania law be stricken and reformed to comply with applicable law prospectively and that the Assignee Defendants refund to Plaintiffs and the Class all illegal interest and fees already paid on the note, plus all permissible penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT II

### Violation of Pennsylvania's Act 6 – 41 P.S. Section 101 et seq.

41.    Plaintiffs hereby incorporate every other Paragraph in this Complaint as if set forth in its entirety.

42.    Because Community was not licensed under the SMLA, the maximum interest rate which it could charge on its loans to Plaintiffs is set forth in Act 6, which states the maximum

14

amount of interest that can be charged on a residential mortgage secured by real property in the Commonwealth.

43.    The secondary mortgage loan made to Plaintiffs by Community includes an interest rate significantly in excess of the maximum permissible rate under Act 6. Act 6 expressly states that when a lender makes a mortgage loan with an illegal interest rate, "the borrower or debtor shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be lawful for such borrower or debtor, to retain and deduct such excess from the amount of such debt . . . ." See 41 P.S. Section 501.

44.    Community charged excess fees and costs in connection with its secondary mortgage loan to Plaintiffs which are illegal under the terms of the SMLA, as is fully delineated above.

45.    Plaintiffs are entitled to recover triple the amount of illegal interest paid, in addition to triple the amount of fees which were illegal under the terms of the SMLA. The specific remedial language in Act 6 which permits this recovery states:

> A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges . . . .

See, 41 P.S. Section 502.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf declaring that the interest rate payable on Plaintiffs' loans prospectively from the date of judgment will be in compliance with the maximum rate permitted by Act 6, awarding Plaintiffs triple the amount of excess interest and fees already paid, awarding statutory counsel fees and costs under 41 P.S. Section 503, and awarding to Plaintiffs and the Class all other appropriate relief.

## COUNT III

### Violation Of The Pennsylvania Unfair Trade Practices And Consumer Protection Act

46.     Plaintiffs hereby incorporate every Paragraph in this Complaint as if fully set forth herein.

47.     The loan made to Plaintiffs by Community was primarily for personal, family or household purposes.

48.     The acts and practices by Community and its agents constitute violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-2(4)(v, vii, ix and xxi):

(v)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have . . . .;

(vii)    Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

(ix)    Advertising goods or services with intent not to sell them as advertised; and,

(xxi)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

49.     Community, acting through its duly authorized agents, engaged in unfair or deceptive acts or practices in connection with making secondary mortgage loans to Plaintiffs and the Class by engaging in the following acts and practices:

a)     Failing to disclose in marketing literature, advertisements and loan documents that it was not licensed to make secondary mortgage loans in Pennsylvania and that its lending practices were in violation of the SLMA and Act 6; and,

16

   b)  Deceptively charging an illegal rate of interest, illegal costs and illegal fees in connection with second mortgage loans made to Pennsylvania consumers during the class period.

  50.  Community's non-disclosures and omissions were likely to make a difference in the decision by Plaintiffs to enter into a loan transaction with Community.

  51.  Plaintiffs have suffered ascertainable losses of money and property as a result of Community's violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

  WHEREFORE, Plaintiffs and the Class request that the Court declare that Community's acts and omissions as above-described violate the Pennsylvania Unfair Trade Practices and Consumer Protection Law and award triple the actual damages sustained by Plaintiffs and the Class, along with statutory counsel fees, costs and other appropriate relief.

## PRAYER FOR RELIEF

  WHEREFORE, Plaintiffs and the Class request that judgment be entered on their behalf and against Defendants, as follows:

  (1)  Ordering that the following Class be certified:

    All persons who received secondary mortgage loans from Community Bank of Northern Virginia, secured by real property in Pennsylvania, who were damaged by the predatory lending practices alleged herein.

  (2)  Ordering that Plaintiffs are appointed to represent the Class and that counsel for Plaintiffs herein are designated as class counsel;

  (3)  Ordering that each class member be awarded damages equal to three times the total of all illegal interest charges, costs and fees charged by Community in connection with their loans;

  (4)  Ordering that the note on each class member's loan be reformed prospectively to reflect the maximum permissible interest rate under Act 6;

  (5)  Declaring that all interest rates charged by Community in excess of those rates permitted by Act 6 were, and are, illegal;

(6)   Declaring that Community made secondary mortgage loans to Plaintiffs and the Class in violation of the Pennsylvania Secondary Mortgage Loan Act;

(7)   Declaring that Community's Loan Agreements with Plaintiffs and the Class are void or voidable, in whole or in part, as a result of Community's illegal conduct;

(8)   Awarding Plaintiffs and the Class costs of suit;

(9)   Awarding reasonable attorneys' fees under the common fund doctrine;

(10)  Awarding pre-judgment and post-judgment interest at the highest lawful rates;

(11)  Awarding an appropriate incentive fee to Plaintiffs; and

(12)  Awarding such additional relief as the Court deems appropriate.

**<u>PLAINTIFFS DEMAND TRIAL BY JURY.</u>**

SPECTER SPECTER EVANS
& MANOGUE, P.C.

By: _R. Bruce Carlson_

R. Bruce Carlson, Pa. I.D. #56657

The 26th Floor
Koppers Building
Pittsburgh, Pennsylvania 15219
(412) 642-2300

18

*OF COUNSEL:*

Eric G. Calhoun
LAWSON & FIELDS, P.C.
5323 Spring Valley Road, Suite 300
Dallas, Texas 75240

R. Hoyt Rowell, III
Daniel Myers
Kevin Oufnac
NESS, MOTLEY, LOADHOLDT,
   RICHARDSON & POOLE
P.O. Box 1792
Mt. Pleasant, South Carolina 29465

## <u>VERIFICATION</u>

The undersigned, **RUTH J. DAVIS**, avers that the statements of fact contained in the foregoing **Complaint** are true and correct to the best of her information, knowledge and belief, and are made subject to the penalties of 18 PA. CONS. STAT. ANN. §4904 relating to unsworn falsification to authorities.

_____
**RUTH J. DAVIS**

## VERIFICATION

The undersigned, **PHILIP F. and JEANNIE C. KOSSLER,** aver that the statements of fact contained in the foregoing **Complaint** are true and correct to the best of their information, knowledge and belief, and are made subject to the penalties of 18 PA. CONS. STAT. ANN. §4904 relating to unsworn falsification to authorities.

_____
PHILIP F. KOSSLER

_____
JEANNIE C. KOSSLER

# Exhibit 2 to Declaration

## IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

RUTH J. DAVIS, an adult individual, and
PHILIP F. and JEANNIE C. KOSSLER,
a lawfully married couple, individually
and on behalf of others similarly situated,

                            Plaintiffs,

         v.

COMMUNITY BANK OF NORTHERN
VIRGINIA; GMAC-RESIDENTIAL
FUNDING CORPORATION;
SOVEREIGN BANK,

      As individual Defendants
and on behalf of all Defendants
similarly situated.

CIVIL ACTION NO.: GD 01-8643

CIVIL DIVISION

JURY TRIAL DEMANDED

Code 190

**SECOND AMENDED COMPLAINT IN
CLASS ACTION**

Filed on behalf of Plaintiffs

**Counsel of Record for this Party:**
R. Bruce Carlson, Pa. I.D. #56657

**SPECTER SPECTER EVANS
  & MANOGUE, P.C.**
Firm #684
Pittsburgh, PA 15219
(412) 642-2300

Michael E. McCarthy, Esquire
25th Floor, Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219

**OF COUNSEL:**

R. Hoyt Rowell, III, Esquire
Daniel O. Myers, Esquire
Kevin Oufnac, Esquire
NESS, MOTLEY
P.O. Box 1792
Mt. Pleasant, SC 29465


Eric G. Calhoun, Esquire
Lawson, Fields, McCue, Lee
  & Campbell
14135 Midway Road
Suite 250
Addison, TX 75001

JUN. 14. 2002   2:04PM                                                                NO. 9155   P. 3

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

RUTH J. DAVIS, an adult individual,        )        CIVIL ACTION NO.: GD 01-8643
and PHILIP F. and JEANNIE C.               )
KOSSLER, a lawfully married couple,        )
individually and on behalf of others       )
similarly situated,                        )
                                           )
                    Plaintiffs,            )        JURY TRIAL DEMANDED
                                           )
        v.                                 )
                                           )
COMMUNITY BANK OF NORTHERN                  )
VIRGINIA; GMAC-RESIDENTIAL                  )
FUNDING CORPORATION;                        )
SOVEREIGN BANK,                             )
                                           )
                    Defendants.            )

## NOTICE TO DEFEND

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE OR KNOW A LAWYER, THEN YOU SHOULD GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP:

LAWYER REFERRAL SERVICE
THE ALLEGHENY COUNTY BAR ASSOCIATION
920 CITY/COUNTY BUILDING
PITTSBURGH, PENNSYLVANIA 15219
TELEPHONE: 412-261-0518

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| RUTH J. DAVIS, an adult individual, and PHILIP F. and JEANNIE C. KOSSLER, a lawfully married couple, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COMMUNITY BANK OF NORTHERN VIRGINIA; GMAC-RESIDENTIAL FUNDING CORPORATION; SOVEREIGN BANK,<br><br>Defendants. | CIVIL ACTION NO.: GD 01-8643<br><br>SECOND AMENDED COMPLAINT IN CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## SECOND AMENDED CLASS ACTION COMPLAINT

### I.  INTRODUCTION

1.   This class action is filed on behalf of all persons who received a secondary mortgage loan where the HUD 1 Settlement Statement executed by the borrower in connection with the loan indicates that the lender for the loan was Defendant Community Bank of Northern Virginia (hereinafter "CBNV"), where:

   (a)  the loan is secured by real property in Pennsylvania (the "Pennsylvania Class"),

   (b) the loan is secured by real property anywhere in the United States (the "National Class"),

and where the loan meets the definition of high-cost mortgage set forth at 15 U.S.C. §§ 1602(aa)(1)(A)-(B). Specifically excluded from the National Class are borrowers with loans secured by real property in the states of Missouri and Tennessee.

2.      While the HUD 1's executed by Plaintiffs and the Class identified CBNV as the "lender" with respect to the loan transactions at issue, Plaintiffs believe that CBNV was not the actual originator of the loans, but was instead a front which "rented" its state charter in exchange for a percentage of the origination fees collected in connection with each loan. This subterfuge is discussed below in detail.

3.      The loans at issue are "high-cost" loans under the Homeowners Equity Protection Act, 15 U.S.C. § 1641 (hereinafter "HOEPA").

4.      The named Defendants in this action are CBNV and the entities that purchased the loans made to the named Plaintiffs (the "Assignee-Defendants"), thereby stepping into the shoes of the lender pursuant to 15 U.S.C. § 1641(d)(1).

5.      In addition to the Plaintiff Class defined in Paragraph 1 of this Second Amended Complaint, Plaintiffs seek certification of a Defendant Class in which the Assignee-Defendants will represent a class of all entities that purchased mortgage loans where the HUD 1 statement executed by the borrower indicates that the lender for the loan was CBNV, and the loan meets HOEPA's definition of high-cost loan.

## II.   JURISDICTION AND VENUE

6.      In part, Plaintiffs seek relief under the Real Estate Estate Settlement Practices Act, 12 U.S.C. § 2601, et seq., (hereinafter "RESPA")(this claim implicates the National Class) and this Court is a court of competent jurisdiction for the RESPA claim pursuant to 12 U.S.C. § 2614. The

2

Court also has jurisdiction over Plaintiffs' Pennsylvania statutory and common law claims (these claims implicate the Pennsylvania Class).

7.    Venue is proper in this Court because the transactions which give rise to Plaintiffs' claims took place in Allegheny County, Pennsylvania. Additionally, real property which secures the loans at issue is located in Allegheny County, Pennsylvania.

## II.  FACTUAL ALLEGATIONS

### A.    The Predatory Lending Practices Of The CBNV Affiliates

8.    In the mid-1990's, a substantial number of mortgage lenders began to follow aggressive underwriting practices with respect to mortgage loans secured by second liens on a given borrower's home. The original principal balance of these loans, when combined with other encumbrances on the realty, frequently exceeded the value of the property. Thus the loans were known as "High Loan-To-Value" (hereinafter "HLTV") loans, or "125% loans (reflecting a total debt for the property in the amount of 125% of the value of the home). These loans were disfavored by regulated depository institutions because the amount financed frequently exceeded the equity in the property.

9.    The explosive growth of the HLTV loan market was fueled by several factors. First, during the mid-1990's American households had a substantial amount of consumer debt and were, as a general proposition, a receptive audience for the deceptive marketing of consumer loan vehicles that promoted debt consolidation. Second, by the mid-1990's, the secondary market for securitized pools of mortgage loans had become much more viable. In other words, by the mid-1990's the originators of the loans could easily sell the loans on the secondary mortgage market. The existence of a viable secondary market permitted loan originators to write the loans aggressively and to lock in substantial profits with little risk.

3

10.    As a pattern and practice, HLTV originators, including CBNV and/or its affiliate mortgage brokers, entered into standing agreements with secondary market purchasers known as "consolidators." These consolidators would purchase loans from the originators which met pre-determined underwriting requirements. The originators, including CBNV, would typically have agreements with multiple secondary market consolidators so that they could readily "pre-sell" mortgage loans. That is, the originators would know going into a mortgage transaction that the loan at issue was going to be immediately resold to a consolidator with which the originator had a standing agreement.

11.    When a loan was sold by an originator to a consolidator, the originator would formally assign the loan and mortgage to the consolidator. This assignment would be reflected in the borrower's chain of title.

12.    Consolidators would typically package large numbers of loans together in securitized pools of loans. Though the consolidator would make the assignments of given groups of loans to different securitized pools, the assignment of a specific loan to a specific pool would not necessarily be reflected in the borrower's chain of title.

13.    In recognition of the potential for abusive, predatory lending practices in the HLTV market, and to encourage industry self-regulation, Congress passed the HOEPA amendment to the Federal Truth in Lending Act, which, as noted above, is codified at 15 U.S.C. § 1641 et seq.

14.    Congress recognized that most high-cost mortgage loans were pre-sold to consolidators on the secondary market and thus HOEPA includes an assignee provision that places secondary market purchasers (here GMAC Residential Funding Corporation and Sovereign Bank) in the same shoes as the originating lender, in part by eliminating the state law holder in due course

4

defense. This provision applies to consolidators and to subsequent assignees, including securitized mortgage pools. See 15 U.S.C. §1641(d)(1).

15.    Congress expressly sought to expose secondary market purchasers to the same potential liability as loan originators. The House Conference Report issued in conjunction with the passage of HOEPA noted this fact as follows: "consumers maintain all claims and defenses in connection with such mortgages against Assignees that can be asserted against creditors."

16.    While many of the loan originators and/or their correspondents issued loans which complied with state and federal mortgage lending laws, a small percentage of the lenders fell victim to a gold rush mentality and issued predatory loans which included illegal rates of interest and/or grossly excessive, and illegal, origination fees.  HLTV loans ostensibly funded by CBNV in Pennsylvania included both illegal rates of interest and illegal origination fees.  HLTV loans ostensibly funded by CBNV nationally included multiple, material RESPA violations.

**B.    The CBNV Paradigm**

17.    CBNV was a mere front for the origination of HLTV loans.  It did nothing meaningful to support the origination of loans by its affiliate brokers beyond "renting" the use of its state charter to the affiliates so that the affiliates could attempt to circumvent state laws regulating mortgage interest and fees.   Its technical ownership interest in the loans divested almost contemporaneously with the closing of the loans as a function of standing agreements pursuant to which the loans were pre-sold to secondary market purchasers.

18.    In fact, CBNV's affiliate brokers were also originating HLTV loans in the name of other state-chartered banks during the period implicated by Plaintiffs' claims, and would merely substitute one bank for another on the appropriate lines in the loan documents. This protocol led to occasional mix-ups, so that some of the loan documents for a borrower on a loan ostensibly made

5

by CBNV would include references to a separate state-chartered bank, from which CBNV's affiliate brokers were also "renting" a state charter in exchange for the kick-back of origination fees.

19.     In exchange for its willingness to rent its state charter to third parties over which it had no meaningful control, the affiliate brokers would, in fact, kick-back or split a percentage of the origination charges from each loan to CBNV as a "fee," and the mortgage and note for each loan would deceptively identify CBNV as the mortgagee. Borrowers were uniformly deceived, however, regarding the actual amount of origination fees being kicked-back to CBNV. This deception was rooted in fraudulent disclosures appearing in Section 800 of the HUD 1 Settlement Statements executed by the borrowers.

20.     The loans originated in this fashion had all been pre-sold pursuant to standing agreements with consolidators.

21.     CBNV, a publicly traded company, deceptively described its relationship with its broker affiliates in its 1998 Annual Report as follows:

> The Bank has established agreements with several mortgage brokers whereby the Bank will fund first and second trust loans approved by the broker which meet the Bank's specified lending criteria. The Bank then sells the loans to outside investors at agreed-upon prices. The Bank retains a mortgage origination fee of 1 to 2 percent on each transaction. Any remaining fees generated from the origination of the loan and subsequent sale in excess of costs incurred are paid to the mortgage broker. Losses incurred as a result of selling loans at a discount are charged back to the mortgage broker. The Bank des not retain servicing rights on any loans sold to outside investors.

See Note D to CBNV 1998 Annual Report appended hereto as Exhibit "1," (emphasis added).

22.     Prior to the last quarter of 1999, CBNV had affiliate relationships with two different mortgage brokers, each of which operated in the name of multiple business entities.

23.    One of the affiliate brokers did business, variously, as EquityPlus Financial, Inc., EquityPlus Financial LLC, and EquityPlus Prime Lending, LLC. The officers and directors of these entities were: David B. Shumway (President/Treasurer/Registered Agent); Randy A. Bapst (Vice President/Secretary).

24.    The other affiliate broker did business under the following names:  AmericasBank Mortgage Corporation, Americas Mortgage Corporation and Americas Mortgage, LLC.  The President and Registered Agent for these entities was James Niblock.

25.    Significantly, none of the above-identified CBNV-affiliate brokers were licensed to make or broker secondary mortgage loans by the Pennsylvania Department of Banking. Notwithstanding that the CBNV-affiliate brokers were not licensed to engage in the secondary mortgage loan business in Pennsylvania, said brokers advertised, caused to be advertised, solicited, negotiated and arranged, and offered to make secondary mortgage loans to Pennsylvania consumers.  See, e.g., Direct Mail Solicitation by AmericasBank to Plaintiff Philip F. Kossler, dated July 1, 1998, appended hereto as Exhibit "2."

26.    In the last quarter of 1999, CBNV ostensibly "acquired" its mortgage broker affiliates. This transaction was described in CBNV'a 1999 Annual Report as follows:

> Late in 1999, the Mortgage Department was restructured, which increased the interest income to the Bank for the fourth quarter of the year.  The restructuring related to the loan production offices of the Bank. Previously, the Bank had consulting arrangements with various limited liability companies (LLCs).  In late 1999, the contracts with the LLCs were canceled and the primary owner in each LLC became an employee of the Bank.  Because of the restructuring, the staff in each office also became employees of the Bank.  All revenues and expenses of the mortgage loan production offices was combined with the Bank operations, including incentive bonuses paid to each mortgage office branch manager based upon the profitability of their office.

See, CBNV 1999 Annual Report at Pg. 4, "Mortgage Lending", appended hereto as Exhibit "3."

27.    Notwithstanding intimations to the contrary in its annual reports and notwithstanding the fact that the loans were originated in CBNV's name, both before and after the "acquisition" of the mortgage operation, CBNV had no meaningful control over the origination of the loans at issue. Instead, the loans were originated unilaterally by CBNV's affiliate brokers.

28.    All or substantially all of the loans made to Plaintiffs and the Pennsylvania Class ostensibly originated by CBNV included grossly excessive and illegal interest rates and origination charges.

29.    With respect to loans ostensibly originated by CBNV nationally, the apportionment or distribution of the settlement fees among CBNV, the affiliated brokers and other mortgage service providers (primarily the title service providers) owned by the affiliate brokers and/or CBNV was uniformly misrepresented in the HUD 1's executed by Plaintiffs and the Class in Section 800 of the Settlement Statements. Additionally, these Section 800 fees included illegal kickbacks that did not reflect the value of services actually provided. These illegal charges are challenged by Plaintiffs on behalf of the National Class.

30.    In addition, the charges for "title costs" imposed upon borrowers in connection with loans ostensibly originated by CBNV significantly exceeded the cost or value of the services performed, and included an illegal fee-split and/or kickback, in violation of RESPA. The apportionment or distribution of these fees denoted in Section 1100 of the Settlement Statement among CBNV, the affiliate brokers and the title service providers was uniformly misrepresented in the HUD 1's executed by Plaintiffs and the Class. These illegal charges are challenged by Plaintiffs on behalf of the National Class.

### 1.    Fraudulent Section 800 Disclosures

31.    The Settlement Statements executed by Plaintiffs and the Class misrepresented the amount of settlement fees being retained by CBNV.

32.    While the Settlement Statements indicated that the fee being retained by CBNV approximated 10% of the original principal balance of the loan, this was a fraudulent mischaracterization of the actual amount kicked-back to CBNV.

33.    In partial illustration of the fraudulent nature of the disclosures made in the Settlement Statements, CBNV alleged in its 1998 Annual Report that it was retaining only "1 to 2%" of the original principal balance of the loan and that all remaining fees were paid to the affiliate brokers.

34.    The characterization made in the CBNV Annual Report thus differed markedly from the disclosures made in the Settlement Statements executed by individual borrowers, wherein CBNV, as a pattern and practice, represented that it was retaining at least 10% of the origination fees for each individual loan.

35.    These fraudulent disclosures were made in Section 800 of the Settlement Statement.

36.    The amount actually retained by CBNV did not reflect the value of services actually performed

37.    This conduct violated RESPA.  On behalf of the National Class, Plaintiffs are challenging the illegal Section 800 charges through RESPA.

### 2.    Title Costs

38.    All or substantially all of the HLTV loans ostensibly originated by CBNV nationally, both before and after the last quarter of 1999, have included fraudulent and illegal settlement costs ostensibly related to title services.

39.    All or substantially all of the HLTV loans originated by CBNV broker-affiliate EquityPlus Financial nationally included title-related settlement costs noted in HUD1 Settlement

Statements as being payable to Advantage Title or Title America, LLC,. Both Advantage Title and

Title America, LLC were affiliated with EquityPlus Financial and shared common ownership with

EquityPlus Financial.

40.     All or substantially all of the HLTV loans originated by CBNV broker-affiliate

Americas Mortgage nationally included title-related settlement costs noted in HUD1 Settlement

Statements as being payable to First National Title & Escrow, Inc. First National Title & Escrow,

Inc. was affiliated with Americas Mortgage and shared common ownership with Americas mortgage.

41.     The title-related settlement charges included in all HLTV loans ostensibly originated

by CBNV nationally were grossly excessive and did not reflect fees actually related to the processing

of a secondary mortgage loan application or the granting of a secondary mortgage loan. To the

contrary, the fees represented a transparent ploy by CBNV and its affiliate brokers to conjure-up

additional revenue by representing to Plaintiffs and the Class that they were paying for actual title-

related services, when in fact the affiliate brokers used the title companies to disguise additional

bogus fees being funneled to CBNV and its affiliate brokers.

42.     The affiliate brokers generated significant bogus revenue by fraudulently padding the

title charges delineated in Section 1100 of the HUD 1, and washing the charges through title

companies that they owned and controlled, so that the bogus fees would be split among the title

companies, the brokers and/or CBNV.

43.     As a pattern and practice, borrowers would not receive the disclosure of affiliate

relationship form required by 12 U.S.C. § 2607(c)(4)(A) apprising them of the joint ownership and

control of the affiliate brokers and the title companies. The named Plaintiffs on this Second Amended

Complaint did not receive the required disclosures.

44.     CBNV and/or its affiliate brokers received kick-backs in connection with the title charges imposed upon Plaintiffs and the Class which substantially exceeded a legal return on ownership interest.

45.     In addition, the disclosures made in Section 1100 of the Settlement Statements executed by the borrowers did not accurately reflect the actual fee split among CBNV, the affiliate brokers and/or the title service providers.

46.     On behalf of the National Class, Plaintiffs are challenging the illegal title charges through RESPA.

## C.     Law Applicable To The Pennsylvania Class

47.     The issuance of secondary mortgage loans in Pennsylvania is regulated by the Secondary Mortgage Loan Act, codified at 7 P.S. §6601 et seq. (hereinafter the "SMLA").

48.     The SMLA defines a secondary mortgage loan as follows:

A loan in an original principal amount in excess of $5,000 which is secured in whole or in part by a lien upon any interest in real property created by a security agreement, including a mortgage, indenture, or any other similar instrument or document, which real property is subject to a prior mortgage and which is used as a dwelling . . . .

49.     The SMLA precludes the making of secondary mortgage loans in this Commonwealth without obtaining a license from the Pennsylvania Secretary of Banking:

(1) No person shall engage in the business of making secondary mortgage loans in this Commonwealth except a business corporation organized under the laws of this Commonwealth or any other state, after first obtaining a license from the secretary in accordance with the provisions of this act.

Sec. 7 P.S. §6603(a)(1).

50.     For the purposes of the SMLA, a person is deemed to be engaged in the secondary mortgage loan business in the Commonwealth if:

11

> (i) such person advertises, causes to be advertised, solicits, negotiates or arranges in the ordinary course of business, offers to make more than two secondary mortgage loans in a calendar year in this Commonwealth, whether directly or by any person acting for his benefit, but this provision shall not prohibit advertising or solicitation by a licensee under a general corporate name, logo or trade mark.

See, 7 P.S. §6603(a)(5)(i).

51.    All or substantially all of the loans made to Plaintiffs and the Class were ostensibly originated by CBNV and the HUD1 Settlement Statements executed in connection with the loans identified CBNV as the lender and itemized the loan origination fees payable to CBNV at closing, as well as those fees payable to various third party vendors.

52.    A person or entity engaged in the secondary mortgage loan business in this Commonwealth who/which is properly licensed can charge the maximum interest rate and fees that are specifically delineated in the SMLA. Specifically, a licensee is permitted to charge a monthly interest rate of 1.85% and to collect an application fee not in excess of 3% of the original principal balance of the loan. The licensee is also permitted to recoup legitimate charges actually related to the processing of a secondary mortgage loan.

53.    The SMLA expressly states that a person who/which makes secondary mortgage loans in Pennsylvania without a proper license issued by the Secretary of Banking shall be subject to criminal and civil penalties. Specifically, the SMLA states:

> Any person who is not licensed by the secretary . . . and who shall engage in the business of negotiating or making secondary mortgage loans and charge, collect, contract for or receive interest, fees, premiums, charges or other considerations which aggregate in excess of the interest that the lender would otherwise be permitted by law to charge if not licensed under this act on the amount actually loaned or advanced, or on the unpaid principal balances when the contract is payable by stated installments, shall be guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to pay a fine of not less than $500 or more than $5,000, and/or undergo imprisonment not less than six months nor more than three years . . . .

54.    Because CBNV's affiliate brokers were not licensed to make secondary mortgage loans in this Commonwealth, the loans ostensibly originated by CBNV had to comply with Pennsylvania's maximum interest statute set forth at 41 P.S. §101 et seq. (hereinafter "Act 6") regarding the maximum permissible interest rate which could be charged to Pennsylvania borrowers for a residential mortgage loan.

55.    Act 6 defines "residential mortgage" as follows:

RESIDENTIAL MORTGAGE means an obligation to pay a sum of money in an original bona fide principal amount of fifty thousand dollars ($50,000) or less, evidenced by a security document and secured by a lien upon real property located within this Commonwealth . . . .

See 41 P.S. §101.

56.    The maximum interest rate for a residential mortgage under the terms of Act 6 is set forth at 41 P.S. §301, which states, in relevant part: "The maximum lawful rate of interest for residential mortgages, as defined in this act, entered into or contracted for during any calendar month shall be equal to the Monthly Index of Long Term United States Government Bond Yields for the second preceding calendar month plus an additional two and one-half per cent per annum rounded off to the nearest quarter of one per cent per annum." See, 41 P.S. §301(b).

57.    The average interest rates charged by CBNV and its affiliates for secondary mortgage loans secured by real property located in Pennsylvania was, upon information and belief, in excess of 13%. This rate of interest is substantially in excess of the maximum permissible interest rate under Act 6, which during the class period has been approximately 8%.

58.    In addition to the illegal interest rates discussed above, CBNV and its originators charged Pennsylvania borrowers illegal fees and costs substantially in excess of the 3% application

13

fee which was permissible under the SMLA and/or Act 6. These illegal fees and costs are discussed more fully below.

59.     The purpose of this class action is to compel CBNV and the purchasers of Plaintiffs' loans to disgorge all illegal interest and fees and costs, and to reform the loans in accordance with Pennsylvania law. CBNV has assigned all or most of the mortgage notes executed when it closed loan transactions with Plaintiffs and the Class.

**D.    Federal Law Applicable To The National Class**

60.     Section 8(b) of RESPA, 12 U.S.C. § 2607(b), and 12 C.F.R. §3500.14 and 15 prohibit the kickbacks and/or fee splits, nondisclosures and fraudulent disclosures above described.

**E.    Equitable Tolling**

61.     Any applicable statute of limitations that might otherwise bar certain of Plaintiffs' claims should be tolled because CBNV fraudulently concealed:

(a)     the identity of the actual originator and/or lender for the loans at issue;

(b)     the existence of affiliate relationships among CBNV, its affiliate brokers and the title companies;

(c)     the actual apportionment of the kickback or fee split of amounts delineated in Section 800 of the Settlement Statements (i.e. the understatement of amounts kicked-back to the affiliate brokers);

(d)     the actual cost or value of title-related services;

(e)     the actual cost or value of any origination service provided by CBNV;

(f)     the actual apportionment of the fee split/kickback of the grossly inflated fees for title services;

(g)     the fact that the affiliated entities were receiving fees in excess of a legal return on ownership interest in connection with title-related services;

14

(h)  the fact that CBNV was receiving origination fees in excess of a legal
return on ownership interest, as well as the apportionment of the fee
split with respect to these fees;

(i)  the fact that the affiliate-brokers were making loans in violation of
Pennsylvania licensure laws; and,

(j)  the fact that CBNV was not exercising any supervision and/or control
over any aspect of the lending process in connection with the loans at
issue, notwithstanding the fact that CBNV's state charter was "rented"
to the affiliate brokers in an attempt to circumvent Pennsylvania
lending laws.

### III.   THE PARTIES

62.    Plaintiff Ruth J. Davis is an adult individual residing at 1206 Stratford Court,
Coraopolis, Allegheny County, Pennsylvania.

63.    Plaintiffs Philip F. Kossler and Jeannie C. Kossler are lawfully married individuals
residing at 127 Huron Drive, Carnegie, Allegheny County, Pennsylvania.

64.    Defendant Community Bank of Northern Virginia is a Virginia corporation with a
principal place of business at 8150 Leesburg Pike, Vienna, Virginia 22182.

65.    Defendant GMAC-Residential Funding Corporation is a Minnesota corporation with
its principal place of business located at 8400 Normandale Lake Boulevard, Minneapolis, MN 55437.
This Defendant is named because it purchased the loan made to Plaintiff Davis.

66.    Defendant Sovereign is a Pennsylvania corporation and a subsidiary of Sovereign
Bancorp, Inc., with a principal place of business at 1130 Berkshire Boulevard, Wyomissing, PA
19610.  This Defendant is named because it purchased the loan made to the Kossler Plaintiffs.

## IV.    THE LOANS MADE TO PLAINTIFFS

### Ruth Davis

67.    Plaintiff Ruth J. Davis obtained a secondary mortgage loan closed in CBNV's name on or about February 22, 1999. The principal amount of the loan was $24,100.00  The interest rate for this loan was 15.45%. The last scheduled payment on the loan is February 22, 2024. The loan was secured by a lien on Plaintiff's residence.  Copies of the Good Faith Estimate of Settlement Charges, HUD/Settlement Statement, Mortgage and Mortgage Note relating to the Davis loan are appended hereto as Exhibit "4"-"7."

68.    At closing, Plaintiff was charged various costs and fees ostensibly payable to CBNV:

   a)  origination fee:    $1928.00

   b)  discount fee:       $482.00

   SETTLEMENT COSTS OSTENSIBLY PAYABLE TO CBNV:  $2,410.00

69.    Under the SMLA, the maximum amount which CBNV could have properly charged Plaintiff at closing was an application fee in the amount of 3% of the original principal balance of the loan, or $723.00.   Plaintiff was therefore charged illegal loan origination fees by CBNV in the amount of $1,687.00.

70.    The amount actually retained by CBNV in connection with Section 800 origination fees differed from the amount disclosed in the Settlement Statement.

71.    Additionally, Plaintiff Davis was charged title-related closing costs of $1,158.00. The majority of these charges were bogus in that they did not reflect payment for services actually performed in connection with processing the loan.  Instead, the charges reflect a transparent mechanism through which CBNV affiliate broker EquityPlus Financial funneled additional illegal

fees to Title America, LLC, a company which EquityPlus Financial and/or CBNV owned and controlled.

72.    Part of these fees were kicked-back or split with EquityPlus Financial and its owners, and with CBNV. The kickbacks and the specific apportionment of the fee split were not disclosed to Plaintiff Davis.

73.    The actual value of any title-related services performed in connection with the loan to Ms. Davis was $200.00 or less.

**The Kossler Plaintiffs**

74.    The Kosslers obtained a secondary mortgage loan closed in CBNV's name on or about July 28, 1998. The principal amount of the loan was $30,000.00. The interest rate for this loan was 14.817%. The last scheduled payment on the loan is August 2, 2013. The loan was secured by a lien on Plaintiffs' residence. Copies of the Good Faith Estimate of Settlement Charges, HUD/Settlement Statement, Mortgage and Mortgage Note relating to the Davis loan are appended hereto as Exhibit "8"-"11."

75.    At closing, the Kosslers were charged various costs and fees ostensibly payable to CBNV:

| | | |
|---|---|---|
| a) | origination fee: | $2250.00 |
| b) | document review fee: | $ 250.00 |
| c) | processing fee: | $ 150.00 |

SETTLEMENT COSTS OSTENSIBLY TO CBNV:        $2,650.00

76.    Under the SMLA, the maximum amount which CBNV could have properly charged Plaintiffs at closing was an application fee of 3% of the original principal balance of the loan, or

$900.00. Plaintiffs were therefore charged illegal origination fees by CBNV in the amount of $1750.00.

77.     The amount actually retained by CBNV in connection with Section 800 origination fees differed from the amount disclosed in the Settlement Statement

78.     Additionally, the Kossler Plaintiffs were charged title-related closing costs of $1,000.00. The majority of these charges were bogus in that they did not reflect payment for services actually performed in connection with processing the loan. Instead, the charges reflect a transparent mechanism through which CBNV affiliate broker AmericasBank funneled additional illegal fees to First National Title & Escrow, a company which AmericasBank owned and controlled.

79.     Part of these fees were kicked-back or split with AmericasBank and its owners, and with CBNV. The kickbacks, and the specific apportionment of the fee split, were not disclosed to the Kossler Plaintiffs.

80.     The actual value of any title-related services performed in connection with the loan to the Kosslers was $200.00 or less.

## VI.  CLASS ALLEGATIONS

81.     This class action is filed on behalf of all persons who received a secondary mortgage loan where the HUD 1 Settlement Statement executed by the borrower in connection with the loan indicates that the lender for the loan was Defendant Community Bank of Northern Virginia (hereinafter "CBNV"), where:

(a) the loan is secured by real property in Pennsylvania (the "Pennsylvania Class"),

(b) the loan is secured by real property anywhere in the United States (the "National Class"),

18

and where the loan meets the definition of high-cost mortgage set forth at 15 U.S.C. §§
1602(aa)(1)(A)-(B). Specifically excluded from the National Class are borrowers with loans secured
by real property in the states of Missouri and Tennessee.

82.     The class is so numerous as to make it impracticable to bring all members of the Class
before the Court. It is believed , based upon publicly available information, that the Class includes
thousands of members. In some instances, such persons may be unaware that claims exist on their
behalf. To the extent that the Class members have knowledge of their claims, their damages are in
such amounts that when taken individually, they may be too small to justify the expense of a separate
lawsuit.

83.     The representative Plaintiffs' claims are typical of, if not identical to, the claims of the
Class. Plaintiffs received secondary mortgage loans ostensibly originated by CBNV with the same
illegal interest, costs and expenses charged in the loans made to Class members.

84.     The representative Plaintiffs will fairly and adequately represent the members of the
Class and have no interests which are antagonistic to the claims of the Class. They are aware that
they cannot settle this action without Court approval. Their interests in this action are antagonistic
to the interests of CBNV and they will vigorously pursue the claims of the Class.

85.     The representative Plaintiffs have retained counsel who are competent and experienced
in class action litigation, and have represented other consumers in complex class actions. Counsel
have agreed to handle this case on a contingent basis, with their compensation for professional
services only as awarded by the Court. Counsel have agreed to advance the expenses of the litigation
contingent upon its outcome.

86.     Common questions of law and fact affect the rights of each member of the Class and
a common remedy by way of permissible damages and declaratory relief is sought for the Class.

87.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include the following:

a)    Whether CBNV violated the Pennsylvania Secondary Mortgage Loan Act by funding secondary mortgage loans, secured by real property in Pennsylvania, which were originated by CBNV's unlicensed affiliate brokers wherein said secondary mortgage loans included an interest rate in excess of the rate permitted by Act 6;

b)    Whether the loan agreements between CBNV and Class members are void, in whole or in part, as being against public policy in that the loans violated the express provisions of the SMLA, Act 6 and RESPA;

c)    Whether CBNV, acting through its unlicensed affiliate brokers, charged Class members illegal costs and fees in connection with Pennsylvania secondary mortgage loans in violation of the Pennsylvania Secondary Mortgage Loan Act;

d)    Whether CBNV, acting through its unlicensed affiliate brokers, violated Act 6 by charging class members fees and costs which violated the Pennsylvania Secondary Mortgage Loan Act;

e)    Whether CBNV's predatory lending practices violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

f)    Whether CBNV, and/or the assignee Defendants, are liable for attorneys' fees and costs, in addition to other available civil remedies and penalties; and,

g)    Whether CBNV violated RESPA as above-alleged.

88.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the Class are identical and will require evidentiary proof of the same kind and application of the same law.

89.     The representative Plaintiffs will seek to identify all Class members through discovery

procedures as may be appropriate and will provide to the Class such notice of this action as the Court

may direct.

## 1.     The Defendant Class

90.     As noted in Paragraph 5 of Plaintiffs' Second Amended Complaint, Plaintiffs seek

certification of a Defendant Class in which Defendants GMAC Residential Funding Corporation and

Sovereign Bank are the representative Defendants.

91.     The proposed Defendant Class will include: all entities that purchased Secondary

Mortgage Loans in which the HUD 1 statement executed by the borrowers indicates that the lender

for the loan was CBNV and the loan meets HOEPA's definition of high cost loan.

92.     Just as the contract document - rooted proposed Plaintiff's Class is an archetypically

certifiable class, so too, is the proposed Defendant Class.

93.     There is a single, dispositive question of fact that unifies the Defendant Class: the

purchase of Secondary Mortgage Loans from CBNV that are covered by HOEPA.

94.     All, or virtually all, of the Secondary Mortgage Loans ostensibly originated by CBNV

are covered by HOEPA.

95.     The proposed Defendant Class meets all of the requirements of Pa. R. Civ. P. 1701

et seq., as well as the requirements of Fed. R. Civ. P. 23.

## COUNT I

**Illegal Contract: Because The Secondary Mortgage Loan Agreements Between CBNV And Plaintiffs And The Class Included Illegal Terms Which Violated The SMLA, Act 6 And RESPA, And Because The Loans At Issue Were Originated By CBNV's Unlicensed Affiliate Brokers, The Mortgages, Mortgage Notes And Deeds Of Trust Related To Said Agreements Are Void Or Voidable In Whole Or In Part.**

96.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

97.    The SMLA is a remedial statute that is intended to protect Pennsylvania consumers from predatory lending practices by secondary mortgage lenders.

98.    The licensure requirement in the SMLA is an integral component of the Pennsylvania Department of Banking's attempt to protect Pennsylvania citizens against predatory lending practices by secondary mortgage lenders.

99.    The existence of express civil and criminal penalty provisions in the SMLA for violation of the licensure requirement is calculated to serve as a deterrent to persons who are tempted to make secondary mortgage loans in Pennsylvania without a license.

100.    Because CBNV, acting through its unlicensed affiliate brokers, issued secondary mortgage loans to Plaintiffs and the Class in violation of the licensure requirements of the SMLA, and because the purpose of the licensure provision in the SMLA is regulation of the secondary mortgage industry and not merely the collection of revenue, the loan agreements between CBNV and Plaintiffs and the Class is either void or voidable as being an illegal contract which is against public policy.

101.    Because CBNV affiliate brokers were at no time licensees under the SMLA, the interest rate which CBNV charged for secondary mortgage loans in Pennsylvania violated both the SMLA and Act 6. Because the loans made by CBNV to Plaintiffs and the Class included an interest rate which violated the express statutory provisions delineated in the SMLA and Act 6, the loan agreements related to said loans are either void or voidable as being against public policy.

102.    Because CBNV charged Plaintiffs and the Class origination fees over and above the 3% application fee permitted by the SMLA, including bogus title charges, the loan agreements between Plaintiffs/the Class and CBNV are either void or voidable as being against public policy.

103.    Because CBNV violated RESPA's kickback and disclosure provisions, as above described, the loan agreements between Plaintiffs/the Class and CBNV are void or voidable as being against public policy.

104.    This Count is not intended to assert a private right of action under the SMLA. Instead, this Count is premised on black letter contract law. See, Solomon v. Gilmore, 731 A.2d 280, (Conn. 1999).

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment declaring that their loan agreements with CBNV be deemed illegal and unenforceable contracts and that Plaintiffs and the Class are hereby relieved from any obligation to make further payments of principal and interest on the notes, or, in the alternative, that all provisions of the loan agreements and notes which violate Pennsylvania law be stricken and reformed to comply with applicable law prospectively and that the Assignee Defendants refund to Plaintiffs and the Class all illegal interest and fees already paid on the note, plus all permissible penalties, attorneys fees, costs and other relief which the Court deems proper.

## COUNT II

### Violation of Pennsylvania's Act 6 – 41 P.S. Section 101 et seq.

105.    Plaintiffs hereby incorporate every other Paragraph in this Second Amended
Complaint as if set forth in its entirety.

106.    Because CBNV affiliate brokers were not licensed under the SMLA, the maximum
interest rate which CBNV could charge on its loans to Plaintiffs is set forth in Act 6, which states the
maximum amount of interest that can be charged on a residential mortgage secured by real property
in the Commonwealth.

107.    The secondary mortgage loans made to Plaintiffs and the Class by CBNV included
interest rates significantly in excess of the maximum permissible rate under Act 6. Act 6 expressly
states that when a lender makes a mortgage loan with an illegal interest rate, "the borrower or debtor
shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be
lawful for such borrower or debtor, to retain and deduct such excess from the amount of such debt
. . . ." See 41 P.S. §501.

108.    CBNV charged excess fees and costs in connection with its secondary mortgage loans
to Plaintiffs and the Class which were illegal under the terms of the SMLA, as is fully delineated
above.

109.    Plaintiffs and the Class are entitled to recover triple the amount of illegal interest paid,
in addition to triple the amount of fees which were illegal under the terms of the SMLA. The specific
remedial language in Act 6 which permits this recovery states:

> A person who has paid a rate of interest for the loan or use of money at a rate in
> excess of that provided for by this act or otherwise by law or has paid charges
> prohibited or in excess of those allowed by this act or otherwise by law may recover
> triple the amount of such excess interest or charges in a suit at law against the person
> who has collected such excess interest or charges . . . .

24

See, 41 P.S. §502.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf declaring that the interest rate payable on their loans prospectively from the date of judgment will be in compliance with the maximum rate permitted by Act 6, awarding Plaintiffs and the Class triple the amount of excess interest and fees already paid, awarding statutory counsel fees and costs under 41 P.S. §503, and awarding to Plaintiffs and the Class all other appropriate relief.

## COUNT III

### Violation Of The Pennsylvania Unfair Trade Practices And Consumer Protection Act

110. Plaintiffs hereby incorporate every Paragraph in this Second Amended Complaint as if fully set forth herein.

111. The loans made to Plaintiffs and the Class by CBNV, through its affiliate brokers, were primarily for personal, family or household purposes.

112. The acts and practices by CBNV and its agents constitute violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-2(4)( xxi):

(xxi) Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

113. CBNV, acting through its duly authorized agents, engaged in unfair or deceptive acts or practices in connection with making secondary mortgage loans to Plaintiffs and the Class by engaging in the following acts and practices:

    a) Failing to disclose in marketing literature, advertisements and loan documents that it's affiliate brokers were not licensed to make secondary mortgage loans in Pennsylvania and that its lending practices were thus in violation of the SLMA and Act 6;

25

b) Deceptively charging an illegal rate of interest, illegal costs and illegal fees in connection with second mortgage loans made to Pennsylvania consumers during the class period;

c) Deceptively charging bogus title-related settlement costs which did not reflect fees actually related to processing secondary mortgage loans and attempting to provide the imprimatur of federal law for these charges by delineating them in the Good Faith Estimate of Settlement Charges which stated that the disclosures were being made pursuant to the "Real Estate Settlement Procedures Act of 1974;" and,

d) Deceptively charging bogus title-related settlement charges and implying in the Good Faith Estimate of Settlement Charges and HUD1 Settlement Statement that these were legitimate title-related charges when, in fact, the title companies which were the alleged recipient of these fees were straw companies controlled by the affiliate brokers and CBNV, which were using the title companies to disguise additional bogus settlement charges being funneled to the affiliate brokers and Community;

e) Making secondary mortgage loans to Plaintiffs and the Class while holding itself out to be acting lawfully, specifically by distributing to Plaintiffs and the Class written Good Faith Estimates of Settlement Charges which delineated the illegal interest rates and origination fees being charged to Plaintiffs and the Class while implying that the interest rates and origination fees were lawful and proper by suggesting that the estimates were provided "pursuant to the Real Estate Settlement Procedures Act of 1974," but failing to disclose that the maximum permissible interest rate and origination fees were governed by Pennsylvania law and that the interest rate and origination fees being charged by CBNV to Plaintiffs and the Class were illegal under Pennsylvania law;

f) Failing to provide required affiliate relationship disclosures in violation of RESPA, and otherwise violating RESPA as above-described; and,

g) Violating the kickback and disclosure provisions of RESPA as above-described.

114.    CBNV had a duty not to intentionally and/or knowingly mislead Plaintiffs and the Class with respect to the legally permissible rates of interest, origination fees and settlement costs applicable to their secondary mortgage loans under Pennsylvania and federal law.

115.    CBNV's fraudulent disclosures and non-disclosures as above-described were made with the knowledge that the material information being withheld by CBNV might have justifiably induced Plaintiffs and the Class to refrain from taking secondary mortgage loans from CBNV which included illegal interest rates, origination fees and title-related settlement costs.

116.    CBNV carried out its misconduct willfully, wantonly and with reckless disregard for the interests of Plaintiffs and the Class.

117.    CBNV's non-disclosures and omissions were likely to make a difference in the decision by Plaintiffs to enter into a loan transaction with CBNV.

118.    Plaintiffs have suffered ascertainable losses of money and property as a result of CBNV's violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

WHEREFORE, Plaintiffs and the Class request that the Court declare that CBNV's acts and omissions as above-described violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law and award triple the actual damages sustained by Plaintiffs and the Class, along with statutory counsel fees, costs and other appropriate relief.

## COUNT IV

### RESPA – 12 U.S.C. § 2607(b)

119.    Plaintiffs hereby incorporate every Paragraph in this Second Amended Complaint as if fully set forth herein.

120.    CBNV and/or its affiliate brokers defrauded Plaintiffs and the Class in violation of RESPA's fee split and disclosure provisions by misrepresenting the amount of fees being retained by CBNV in Section 800 of Plaintiffs' and the Classes' Settlement Statements.

121.    CBNV retained an undisclosed fee spit that exceeded the value of any service performed in violation of RESPA.

122.   CBNV and/or its affiliate brokers charged Plaintiffs title-related settlement costs that exceeded any amount disclosed to Plaintiffs as being a customary charge for the services being provided by the affiliated title companies.

123.   CBNV and/or its affiliate brokers received kickbacks or fee splits from the title companies that exceeded, by far, a legal return on ownership interest and this fact was not disclosed to Plaintiffs.

124.   CBNV and/or its affiliate brokers defrauded Plaintiffs and the Class in violation of RESPA's fee split and disclosure provisions by misrepresenting the actual amount of fees being retained by the affiliate brokers, the affiliated title service providers and/or CBNV in Section 1100 of Plaintiffs' and the Classes' Settlement Statements

125.   As a result of the RESPA violations above alleged, Plaintiffs have been damaged in an amount to be determined at a trial of this action where they will seek all permissible damages, fees and costs.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment declaring that CBNV's acts and omissions as above-described violated RESPA and award triple the actual damages sustained by Plaintiffs and the Class, along with statutory counsel fees, costs and other appropriate relief

## COUNT V

## Civil Conspiracy

126.   Plaintiffs hereby incorporate every Paragraph in this Second Amended Complaint as if fully set forth herein.

127.   CBNV and its affiliate brokers and/or the affiliate title companies conspired to violate Pennsylvania and federal law as set forth in Counts I-IV of this Second Amended Complaint by

combining with a common plan to engage in the unlawful conduct delineated herein for the unlawful purpose of extracting illegal fees and interest from Plaintiffs and the Class.

128.    In furtherance of this conspiracy, CBNV and the affiliate brokers and/or the affiliate title companies engaged in all of the illegal acts and omissions set forth in this Second Amended Complaint.

129.    Plaintiffs and the Class have been damaged by this conspiracy in that they have been fraudulently induced to pay illegal interest and fees in connection with secondary mortgage loans ostensibly issued to them by CBNV.

WHEREFORE Plaintiffs and the Class request all of the relief delineated in the Prayer for Relief set forth below.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

                        **SPECTER SPECTER EVANS
                        & MANOGUE, P.C.**

                        By: _____
                        R. Bruce Carlson, Pa. I.D. #56657

                        The 26th Floor
                        Koppers Building
                        Pittsburgh, Pennsylvania 15219
                        (412) 642-2300

                        Michael E. McCarthy, Esquire
                        25th Floor, Lawyers Building
                        428 Forbes Avenue
                        Pittsburgh, PA 15219

*OF COUNSEL:*

Eric G. Calhoun
LAWSON, FIELDS, MCCUE, LEE
   & CAMPBELL
14135 Midway Road
Addison, Texas 75001

R. Hoyt Rowell, III
Daniel Myers
Kevin Oufnac
NESS, MOTLEY, LOADHOLDT,
   RICHARDSON & POOLE
P.O. Box 1792
Mt. Pleasant, South Carolina 29465



**Annual Report**

The following is an analysis of the change in allowance for loan losses:

|  | 1998 | 1997 |
|---|---|---|
| Balance at beginning of period | $ 972,593 | $ 673,444 |
| Provision charged against income | 940,000 | 290,000 |
| Losses charged off | (352,566) | (22,351) |
| Recoveries of loans previously charged off | 5,160 | 31,500 |
|  | $ 1,565,187 | $ 972,593 |

The following is a summary of information pertaining to impaired loans:

|  | 1998 | 1997 |
|---|---|---|
| Impaired loans without a valuation allowance | $ - | $ - |
| Impaired loans with a valuation allowance | 763,410 | 82,046 |
| Total impaired loans | $ 763,410 | $ 82,046 |

|  | 1998 | 1997 |
|---|---|---|
| Valuation allowance related to impaired loans | $ 107,045 | $ 8,205 |
| Average investment in impaired loans | $ 576,913 | $ 80,196 |
| Interest income recognized on a cash basis on impaired loans | $ 29,534 | $ - |

No additional funds were committed to be advanced in connection with impaired loans.

## NOTE D—LOANS HELD FOR SALE

The Bank has established agreements with several mortgage brokers whereby the Bank will fund first and second trust loans approved by the broker which meet the Bank's specified lending criteria. The Bank then sells the loans to outside investors at agreed-upon prices. The Bank retains a mortgage origination fee of 1 to 2 percent on each transaction. Any remaining fees generated from the origination of the loan and subsequent sale in excess of costs incurred are paid to the mortgage broker. Losses incurred as a result of selling loans at a discount are charged back to the mortgage broker. The Bank does not retain servicing rights on any loans sold to outside investors.

## NOTE E—BANK PREMISES AND EQUIPMENT

Bank premises and equipment are as follows at December 31:

|  | 1998 | 1997 |
|---|---|---|
| Cost |  |  |
| Land | $ 677,627 | $ 677,627 |
| Buildings | 1,665,658 | 1,665,658 |
| Furniture, fixtures and equipment | 3,967,098 | 3,265,508 |
|  | 6,310,383 | 5,608,793 |
| Less accumulated depreciation |  |  |
| Building | (240,709) | (199,067) |
| Furniture, fixtures and equipment | (1,486,973) | (1,004,352) |
|  | $ 4,582,701 | $ 4,405,374 |

Depreciation expense totaled $544,517 and $410,482 in 1998 and 1997, respectiv

**EXHIBIT**

*1*

JUN. 14. 2002   2:12PM                                                        NO. 9155   P. 35

AMERICASBANK                                              168-564
1760 Reston Pkwy Suite 101                               12417        0008087314
Reston, Va 20190

**THIS IS NOT A CHECK**

July 1, 1998

DOLLAR    CTS

THE SUM OF  Fifty Thousand and 00/100 Dollars          50,000   00

NON-NEGOTIABLE
COUPON

Acct No.  W6 D3
To        Philip F. Kossler
the        127 Huron Dr
order of   Carnegie, PA  15106-1826                     E142920

NON-NEGOTIABLE THIS IS NOT A CHECK. NON TRANSFERABLE

*You're pre-approved for $50,000 or more . . .*

Dear Philip F. Kossler:

Think what you could do with $50,000 or more right now!  You could pay off high-interest debts
and even have some cash left over.  Because you're a homeowner, AmericasBank can help you keep
more of your hard-earned paycheck in your pocket and get the cash you need!

An AmericasBank Debt Consolidation Loan can dramatically reduce your total of monthly
payments, letting you save hundreds of dollars every month. This chart gives you an example of how
much you could lower your monthly payments with a Debt Consolidation Loan from AmericasBank.

|                          | Your Current Monthly Payments | Your Paysaver ™ Monthly Payment |
|--------------------------|-------------------------------|---------------------------------|
| Credit Card #1           | $175                          |                                 |
| Credit Card #2           | $150                          |                                 |
| Car Loan                 | $350                          | $268*                           |
| Furniture Loan           | $ 85                          |                                 |
| New Computer             | $120                          |                                 |
| Medical/Dental Payments  | $ 90                          |                                 |
| **TOTAL PAYMENTS**       | $970                          | $268                            |

**THAT'S A PAYMENT REDUCTION OF $702 EVERY MONTH OR $8,424 THE FIRST YEAR!**

No Equity?  No Problem!  Even if you haven't built much equity in your home, call
AmericasBank at 800-500-8667 today.  We can usually give you an answer in 15 minutes or less.

Act now--this is a limited time offer.

Sincerely,

CALL NOW TOLL FREE 1-800-500-8667

Robert C. Simpson
Senior Vice President

EXHIBIT
2

P.S.  Your Pre-Approved Voucher expires July 29, 1998, so act now!  Take advantage of your
pre-approved status to consolidate your high-interest debts and get the cash you need today.

# BUSINESS RESULTS

## Mortgage Lending

Once again, the Mortgage Lending Department had a stellar performance. The volume of closed mortgage loans rose dramatically from $220 million in 1998 to more than $514 million in 1999. With numbers like these, it's easy to see why the Mortgage Department accounted for 22% of the Bank's earnings. The success of the central mortgage loan office can be directly attributed to the efforts of the efficient, professional staff responsible for overseeing the Bank's five loan production offices (LPOs). The establishment of these LPOs in Maryland and Virginia has helped to increase mortgage loan volume by offering a diverse product mix including first and second trust mortgage loans.

Late in 1999, the Mortgage Department was restructured, which increased the interest income to the Bank for the fourth quarter of the year. The restructuring related to the loan production offices of the Bank. Previously, the Bank had consulting arrangements with various limited liability companies (LLCs). In late 1999, the contracts with the LLCs were canceled and the primary owner in each LLC became an employee of the Bank. Because of the restructuring, the staff in each office also became employees of the Bank. All revenue and expenses of the mortgage loan production offices was combined with the Bank operations, including incentive bonuses paid to each mortgage office branch manager based upon the profitability of their office. These changes have significantly

impacted several of the Income Statement categories as well as the operating ratios included in the financial highlights section of this report..

The Mortgage Department's strategic marketing efforts were a key factor in the department's overwhelming success last year. A comprehensive direct mail advertising campaign significantly increased the Bank's exposure to targeted prospects in many states. Themarketing initiatives for 2000 include the possibility of advertising through the Internet as an additional method of reaching its target markets for 2000 and beyond.



Technology continues to be a driving force behind the success of Community Bank and we are continuing our efforts to revolutionize the mortgage lending process through our award-winning paperless mortgage origination and processing system.

The outlook for 2000 is bright and Community Bank anticipates another successful year with even greater loan volume. To that end, the Mortgage Lending team will continue to enhance and diversify its loan origination with agency and home equity products to achieve maximum results for both customers and shareholders alike.

## Sales Finance

The Sales Finance Department also set a new standard for success by more than doubling its volume from the previous year. In 1999, the department's portfolio rose to million comp...

Richard S. Johnson, Sales Finance Officer; James W. Benecwenga, General Manager of Heritage Auto Plaza, Alexandria, Virginia

EXHIBIT
3

JUN. 14. 2002  2:13PM                                                        NO. 9155  P. 37

# 🜛 GOOD FAITH ESTIMATE

Lender:   COMMUNITY BANK OF NORTHERN VIRGINIA

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan.  The fees
listed are estimates — the actual charges may be more or less.  Your transaction may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement
statement which you will be receiving at settlement.  The HUD-1 or HUD-1A settlement statement will show you the actual cost for items
paid at settlement.

| HUD-1 Number | Service/Provider | | Estimated Charges |
|---|---|---|---|
| 801 | Loan Origination | | 1,928.00 |
| 802 | Loan Discount | | 482.00 |
| 804 | Credit Report | * | 45.00 |
| 807 | Flood Certification Fee | | 20.00 |
| 1101 | Settlement Fee | | 283.00 |
| 1102 | Abstract or Title Search | | 300.00 |
| 1103 | Title Examination | * | 300.00 |
| 1111 | OVERNIGHT FEE | | 25.00 |
| 1112 | PROCESSING FEE | | 250.00 |
| 1201 | Recording Fees | | 41.50 |

T O T A L ===■==>>   3,674.50

\* See Addendum to Good Faith Estimate for information on required settlement service
providers.

RUTH J. DAVIS _____   Date _____        _____   Date _____

_____   Date _____        _____   Date _____

Authorized Official _____   Date _____

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA).  Additional
information can be found in the HUD Special Information Booklet, which is to be provided to you by your lender, if your application
is to purchase residential real property and the Lender will take a first lien on the property.

Property Address
1206 STANFORD CT.
Coraopolis, PA 15108-4009
Loan No          BCIGB-60670
Preparation Date  February 22, 1995
Sales Price       N/A
Loan Amount       24,100.00

Mailing Address
1206 STANFORD CT.
Coraopolis, PA 15108-4009
Borrower(s)
RUTH J. DAVIS

```
+-----------------+
|    EXHIBIT      |
|                 |
|       4         |
|                 |
+-----------------+
```

# ADDENDUM TO GOOD FAITH ESTIMATE

Creditor:  COMMUNITY BANK OF NORTHERN VIRGINIA

The following provider(s) of settlement services are required to be used by this Creditor and the amounts listed on the "Good Faith
Estimate" for these particular item(s) are based upon the charges of the provider(s) named below:

| PROVIDER: | ITEM: | RELATIONSHIP: |
|---|---|---|
| DnB, Inc. | Credit Report | |
| 5825 Arapaho Road | | |
| Dallas, TX 75248 | | |
| 972-361-0000 | | |
| | | |
| TITLE AMERICA, LLC | Title Examination | |
| 11417 SUNSET HILLS ROAD, STE. 105 | | |
| RESTON, VA 20190 | | |
| 703-995-3444 | | |

Interest Rates And Points Are Governed By The Laws Of The State Of Virginia.

| | |
|---|---|
| RUTH J. DAVIS _____ Date | _____ Date |
| _____ Date | _____ Date |

Property Address:
  1206 STANFORD CT.
  Coraopolis, PA 15108-4009

Mailing Address:
  1206 STANFORD CT.
  Coraopolis, PA 15108-4009

Appl. Number       : BCNB-60670
Preparation Date   : February 22, 1999
Sales Price        : 0.00
Loan Amount        : 24,100.00

Borrower(s):
  RUTH J. DAVIS

Authorized Official       Date Mailed

## Settlement Statement
Transactions without Seller

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| RUTH J. DAVIS | COMMUNITY BANK OF NORTHERN VIRGINIA |
| | 11417 SUNSET HILLS RD STE0328 |
| 1206 STANFORD CT., Coraopolis, PA 15108-4009 | RESTON, VA 20190 |

| Property Location: (If different from address) | Settlement Agent: |
|---|---|
| | TITLE AMERICA |
| 1206 STANFORD CT. | Place of Settlement: |
| Coraopolis, PA 15108-4009 | 11417 SUNSET HILLS RD STE0103, Reston, VA 20190 |

| Loan Number: | Settlement Date: | Disbursement Date: |
|---|---|---|
| BCB-60670 | February 22, 1999 | February 22, 1999 |

| L. SETTLEMENT CHARGES | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|
| 800. Items Payable In Connection with Loan | | | 1501. NCB PA | 1,458.00 |
| 801. Loan origination fee to COMMUNITY BANK OF NORTHERN VIRGINIA | | 1,928.00 | | |
| 802. Loan discount to COMMUNITY BANK OF NORTHERN VIRGINIA | | 482.00 | 1502. PA STATE EMP CREDIT UN | 4,881.00 |
| 803. Appraisal fee to | | | | |
| 804. Credit report to EPF | | 45.00 | 1503. AMEX | 3,110.00 |
| 805. Inspection fee to | | | | |
| 806. Mortgage insurance application fee to | | | 1504. KAUFMANNS | 851.00 |
| 807. Flood Certification Fee to EPF | | 20.00 | | |
| 808. | | | 1505. WFNNB/VS | 250.00 |
| 809. | | | | |
| 810. | | | 1506. LAZARUS/FOSMH | 238.00 |
| 811. | | | | |
| 900. Items Required by Lender to be Paid in Advance | | | 1507. MGCA/HICKES | 197.00 |
| 901. | | | | |
| 902. Mortgage insurance premium for months to | | | 1508. TALBOTS | 387.00 |
| 903. | | | 1509. SAKS FIFTH AVENUE | 125.00 |
| 904. | | | | |
| 1000. Reserves Deposited with Lender | | | 1510. ANN TAYLOR | 49.00 |
| 1001. Hazard insurance mos. @ $ per mo. | | | | |
| 1002. Mortgage insurance mos. @ $ per mo. | | | 1511. KOHLS DEP ST | 10.00 |
| 1003. City property taxes mos. @ $ per mo. | | | | |
| 1004. Cnty. property taxes mos. @ $ per mo. | | | 1512. MBNA AMERICA | 5,225.00 |
| 1005. Annual assessments mos. @ $ per mo. | | | | |
| 1006. mos. @ $ per mo. | | | 1513. | |
| 1007. mos. @ $ per mo. | | | | |
| 1008. mos. @ $ per mo. | | | 1514. | |
| 1099. | | | | |
| 1100. Title Charges | | | 1515. | |
| 1101. Settlement or closing fee to TITLE AMERICA, LLC | | 283.00 | 1520. TOTAL DISBURSED (Enter on line 1603) | 17,109.00 |
| 1102. Abstract or title search to TITLE AMERICA, LLC | | 100.00 | | |
| 1103. Title examination to TITLE AMERICA, LLC | | 120.00 | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorneys' fees to (includes above item numbers ) | | | | |
| 1108. Title insurance to (includes above item numbers ) | | | | |
| 1109. Lender's coverage $ | | | N. NET SETTLEMENT | |
| 1110. Owners Coverage $ | | | 1600. Loan Amount | 24,100.00 |
| 1111. OVERNIGHT FEE to TITLE AMERICA, LLC | | 25.00 | | |
| 1112. PROCESSING FEE to TITLE AMERICA, LLC | | 250.00 | 1601. Plus Cash/Check from Borrower | |
| 1113. | | | 1602. Minus Total Settlement Charges (line 1400) | 3,674.50 |
| 1200. Government Recording and Transfer Charges | | | | |
| 1201. Recording fees to ALLEGHENY CO. RECORDER OF DEEDS | | 41.50 | 1603. Minus Total Disbursements to Others (line 1520) | 17,109.00 |
| 1202. | | | | |
| 1203. | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | 3,316.50 |
| 1204. | | | | |
| 1205. | | | | |
| 1400. Total Settlement Charges (enter on line 1602) | | 3,674.50 | | |

Borrower's Signature
RUTH J. DAVIS

Borrower's Signature

Borrower's Signature

Borrower's Signature

EXHIBIT
5

WHEN RECORDED MAIL TO:

Parcel Number:

: BCKB-60670

# MORTGAGE

THIS MORTGAGE is made this 22nd day of February, 1999 between the Mortgagor, RUTH J. DAVIS

(herein "Borrower"), and the Mortgagee,
COMMUNITY BANK OF NORTHERN VIRGINIA, a Virginia corporation

a corporation organized and existing under the laws of
, whose address is 11417 SUNSET HILLS RD. STE#228, RESTON, VA 20190

(herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $ 24,100.00 which indebtedness is evidenced by Borrower's note dated February 22, 1999 and extensions and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on February 22, 2024 ;

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County of Allegheny State of Pennsylvania:

See Attached Exhibit 'A'

which has the address of
1206 STANFORD CT., Cornopolis, PA 15108-4009
(herein "Property Address");

| PENNSYLVANIA — SECOND MORTGAGE — 1/80 — FNMA/FHLMC UNIFORM INSTRUMENT |

LaserDoc (TM) by Delphi Information Sciences Corp (0)(518-1 1998

Form 3839
Page 1 of 5



EXHIBIT
6

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property";

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest. Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage, and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional Lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. Prior Mortgages and Deeds of Trust; Charges; Liens. Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

5. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require. The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note, without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property

16. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. Acceleration; Remedies. Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided by applicable law specifying, among other things: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceedings. Lender shall be entitled to collect in such proceedings all expenses of foreclosure, including, but not limited to, reasonable attorney' fees, and costs of documentary evidence, abstracts and title reports.

18. Borrower's Right to Reinstate. Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to at least one hour before the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. Assignment of Rents; Appointment of Receiver; Lender in Possession. As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver, shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney' fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only for those rents actually received.

20. Release. Upon payment of all sums secured by this Mortgage, Lender shall discharge this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

21. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate stated in the Note.

: BCXB-60670

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

_____ (Seal)          _____ (Seal)
                          Borrower                                    Borrower
RUTH J. DAVIS

_____ (Seal)          _____ (Seal)
                          Borrower                                    Borrower

_____ (Seal)          _____ (Seal)
                          Borrower                                    Borrower

_____ (Seal)          _____ (Seal)
                          Borrower                                    Borrower

                                                     (Sign Original Only)

Certificate of Residence                                         , do hereby certify that the correct address of
the within-named Lender is   11417 SUNSET HILLS RD. STE#228, RESTON, VA 20190

       Witness my hand this                    day of

                                           _____
                                                          Agent of Lender


COMMONWEALTH OF PENNSYLVANIA,                                    County ss:
                                              , before me, the undersigned officer,
       On this            day of
personally appeared

                                              known to me (or satisfactorily proved) to be the
person      whose name          subscribed to the within instrument and acknowledged that
executed the same for the purposes herein contained..

       IN WITNESS WHEREOF, I hereunto set my hand and seal.
My Commission Expires:

                                           _____

                                           _____
                                                       Title of Officer

                    _____ (Space Below This Line Reserved For Lender and Recorder) _____


                                                       Form 3838
                                                       Page 5 of 5

LaserDoc (TM) by Green Wormaton Sentinel Corp  DS319-5 1096

JUN. 14. 2002 2:16PM NO. 9155 P. 45

: BCKB-60670

## NOTE

February 22, 1999
*Date*                                                              *City*          *State*

1206 STANFORD CT., Coraopolis, PA 15108-4009
*Property Address*                   *City*          *State*          *Zip Code*

**1. BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 24,100.00
(This amount will be called "principal"), plus interest, to the order of the Lender. The Lender is COMMUNITY BANK OF NORTHERN VIRGINIA, a Virginia corporation
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

**2. INTEREST**
I will pay interest at a yearly rate of 13.750 %.
Interest will be charged on unpaid principal until the full amount of principal has been paid.

**3. PAYMENTS**
I will pay principal and interest by making payments each month of U.S. $ 285.50
I will make my payments on the 22nd day of each month beginning on March 22, 1999 . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on February 22, 2024, I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at 11417 SUNSET HILLS RD. STE#228
RESTON, VA 20190                                      or at a different place if required by the Note Holder.

**4. BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of 7 calendar days after the date it is due, I will promptly pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment, but not less than U.S. $ N/A and not more than U.S. $ 14.28 . I will pay this late charge only once on any late payment.
(B) Notice From Note Holder
If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.
(C) Default
If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
(D) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**5. THIS NOTE SECURED BY A DEED OF TRUST**
In addition to the protections given to the Note Holder under this Note, a Deed of Trust, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Deed of Trust describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.
Some of these conditions are described as follows:
Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Deed of Trust.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE**
I have the right to make payments of principal at any time before they are due but may be required to pay a prepayment charge. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."
If I make a full prepayment or a partial prepayment within 36 MONTHS from the date of this Note, I will be required to pay a prepayment charge. This charge will be imposed on the amount of the prepayment that exceeds Twenty percent ( 20 %) of the original principal amount of the Note in any twelve (12) month period. The charge will not exceed the amount equal to two percent (2%) on the amount prepaid in excess of Twenty percent ( 20 %) of the original principal amount of the Note
The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS**
I waive my right to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promise under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers"

**8. GIVING OF NOTICES**
Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over the rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

NOTICE TO BORROWER: Do not sign this Note if it contains blank spaces. All spaces should be completed before you sign.

RUTH J. DAVIS
_____ -Borrower          _____ -Borrower

_____ -Borrower

(Sign Original Only)

**EXHIBIT**
**7**

## GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES
(This is neither a contract nor a commitment to lend)

App No. 2RJS-98-0009655                                                    07/15/1998

| COMMUNITY BANK OF NORTHERN VIRGINIA | Subject Property Address: |
|---|---|
| 11400 Commerce Park Drive, Ste. 110 RESTON, VA 20190 TEL:(703)904-1200 FAX:(703)715-2137 | 127 HURON DR CARNEGIE CARNEGIE, PA 16106 |
| Borrower(s) / Address PHILIP F KOSSLER JEANNIE C KOSSLER 127 HURON DR CARNEGIE, PA 15106 | Proposed Loan Information Loan Amount: $30,000.00 Interest Rate: 12.990 % Term: 15 Yrs. Mo. Pmt (P&I): $379.38 |

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates; the actual charges may be more or less.  Your transaction may not involve a fee for every item listed. *

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A Settlement Statements which you will be receiving at settlement.  The HUD-1 or HUD-1A Settlement Statements will show you the actual cost for items paid at settlement.  Items marked "POC" were or will be paid outside the closing.

| # | Item Description: | HUD-1 | Amount |
|---|---|---|---|
| 1 | LOAN ORIGINATION FEE | 801 | $2,250.00 |
| 2 | CREDIT REPORT | 804 | $13.00 |
| 3 | DOC REVIEW FEE COMMUNITY BANK NORTHERN V | 808 | $250.00 |
| 4 | PROCESSING FEE COMMUNITY BANK NORTHERN | 809 | $150.00 |
| 5 | SETTLEMENT OR CLOSING FEE TO | 1101 | $450.00 |
| 6 | ABSTRACT OR TITLE SEARCH TO | 1102 | $25.00 |
| 7 | TITLE EXAMINATION | 1103 | $325.00 |
| 8 | SIGNING AGENT-NSC | 1111 | $200.00 |
| 9 | RECORDING FEES | 1201 | $43.50 |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| | | Total: | $3,706.50 |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA).  Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your mortgage broker or lender, if your application is to purchase residential real property and the lender will take a first lien on the property.

☐ This Good Faith Estimate is being provided by the Lender referenced above, a mortgage broker, and no lender has yet been obtained. A lender will provide you with an additional Good Faith Estimate within three Business Days of the receipt of your loan application. This section applicable only when checked.

* See attached listing of required service providers, if applicable.

POC/B = Paid Outside Closing by Borrower
POC/L = Paid Outside Closing by Lender
POC/D = Paid Outside Closing by Dealer/Contractor
POC/S = Paid Outside Closing by Seller
POC/R = Paid Outside Closing by Broker

X _Philip F. Kossler_ signature   7-15-98
PHILIP F. KOSSLER

X _____

X _Jeannie C. Kossler_ signature 7-15-98
JEANNIE C. KOSSLER

X _____

Management Solutions Government, Inc   (2*)31 #54-7600        Title-One Energizer™        REV 11/14/96        Copyright (c) 1994-96



EXHIBIT
8

# Settlement Statement
### Optional Form for
### Transactions without Sellers

U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0491



| Name and Address of Borrower: | Name & Address of Lender: |
|---|---|
| PHILIP F KOSSLER | COMMUNITY BANK OF NORTHERN VIRGINIA |
| JEANNIE C KOSSLER | 11400 Commerce Park Drive, Ste. 110 |
| 127 HURON DR | RESTON, VA 20190 |
| CARNEGIE, PA 15106 | |

| Property location (if different from above): | Settlement Agent: FIRST NATIONAL TITLE & ESCROW |
|---|---|
| 127 HURON DR CARNEGIE | Place of Settlement: CARNEGIE, PA |
| CARNEGIE, PA 15106 | |

| Loan Number (App Number): 2RJS-99-0009855 | Settlement Date: July 28, 1988 |
|---|---|

| L.    SETTLEMENT CHARGES | | M.    DISBURSEMENTS TO OTHERS | |
|---|---|---|---|
| 800. Items Payable in Connection with Loan | | 1501 | |
| 801. Loan Origination fee 7.500 % to COMMUNITY BANK OF NORTHERN VA | $2,250.00 | | |
| 802. Loan Discount %  % to | | 1502. MBNA AMERICA BANK NA | $316.00 |
| 803. Appraisal fee to | | | |
| 804. Credit Report to CHECO | $13.00 | 1503. FIRST NAT'L SD VISA/MC | $5,768.00 |
| 805. Inspection fee to | | | |
| 806. Mortgage Insurance application fee to | | 1504. CITIBANK PREFERRED VIS | $5,908.00 |
| 807. Mortgage Broker Fee to | | | |
| 808. DOC REVIEW FEE COMMUNITY BANK NORTHERN V | $250.00 | 1505. ADVANTA | $11,316.40 |
| 809. PROCESSING FEE COMMUNITY BANK NORTHERN | $150.00 | | |
| 810. VIRGINIA | | 1506. | |
| 811. FLOOD CERT COMMUNITY BANK NORTHERN VA | | | |
| 900. Items Required by Lender to be Paid in Advance | | 1507. | |
| 901. Interest from    to    @  $10.68  per day. | | | |
| 902. Mortgage Insurance premium for    months to | | 1508. | |
| 903. Hazard Insurance premium for    year(s) to | | 1509. | |
| 904. | | | |
| 1000. Reserves Deposited with Lender | | 1510 | |
| 1001. Hazard Insurance    months @  per month | | 1511. | |
| 1002. Mortgage Insurance    months @  per month | | | |
| 1003. City property taxes    months @  per month | | 1512. | |
| 1004. County property taxes    months @  per month | | | |
| 1005. Annual assessments    months @  per month | | 1513. | |
| 1006.    months @  per month | | | |
| 1100. Title Charges | | 1514 | |
| 1101. Settlement or closing fee to FIRST NATIONAL TITLE & ESCROW | $450.00 | | |
| 1102. Abstract or title search to FIRST NATIONAL TITLE & ESCROW | $25.00 | 1515. | |
| 1103. Title examination to FIRST NATIONAL TITLE & ESCROW | $325.00 | | |
| 1104. Title insurance binder to | | 1520. TOTAL DISBURSED (enter on line 1603) | $23,310.40 |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
| (includes above item numbers) | | | |
| 1108. Title insurance to FIRST NATIONAL TITLE & ESCROW | | | |
| (includes above item numbers) | | | |
| 1109. Lender's coverage | | N.    NET SETTLEMENT | |
| 1110. Owner's coverage | | | |
| 1111. SIGNING AGENT-WSE | $200.00 | 1600. Loan Amount | $50,000.00 |
| 1112. | | | |
| 1200. Government Recording and Transfer Charges | | 1601a. Plus Cash/Check from Borrower | |
| 1201. Recording fees to | $45.50 | | |
| 1202. City/county tax/stamps to | | 1601b. Plus Cash/Check from Borrower | |
| 1203. State tax/stamps to | | | |
| 1204. CORP ASSIGNMENT | $6.50  POC L | 1602. Minus Total Settlement Charges (line 1400) | $3,706.50 |
| 1300. Additional Settlement Charges | | | |
| 1301. Survey to | | 1603. Minus Total Disbursements to Others (line 1520) | $23,310.40 |
| 1302. Pest Inspection to | | | |
| 1303. Architectural/engineering services to | | 1604. Equals Disbursements to Borrower | $2,983.10 |
| 1304. Building Permit to | | (after expiration of any applicable | |
| 1305. LENDERS PORTION MORTGAGE TAX | | rescission period required by law) | |
| 1400. Total Settlement Charges (enter on line 1602) Excluding POC Items | $3,706.50 | Excluding all POC Items | |

The undersigned hereby acknowledge receipt of a completed copy of this statement:

POC/E = Paid Outside Closing by Borrower.  /L = by Lender,
/D = by Dealer/Contractor,  /S = by Seller,  /B = by Broker

X _____    X _____
PHILIP F KOSSLER

X _____    X _____
JEANNIE C KOSSLER

Management Systems Development, Inc. (800)984-2060    Loan Document™    HUD1A(1/29/98cb.nm)    Form HUD-1A (2/94) - ref. RESPA
Copyright (c) 1994-97



EXHIBIT
9

THIS INSTRUMENT PREPARED BY:

## MORTGAGE
### Page 1 of 6

THIS MORTGAGE is made this day,    July 28, 1998    , between the Mortgagor,
PHILIP F KOSSLER AND JEANNIE C. KOSSLER, HUSBAND AND WIFE

(herein "Borrower"),

and the Mortgagee,    COMMUNITY BANK OF NORTHERN VIRGINIA

a corporation organized and existing under the laws of    VIRGINIA    , whose address is
11400 Commerce Park Drive, Ste. 110
RESTON, VA 20190    (herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S.    $30,000.00  , which indebtedness is evidenced by Borrower's note dated    July 28, 1998    and extensions and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on
August 02, 2013    ;

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with the interest thereon, advanced in accordance herewith to protect the security of this mortgage; and the performance of the covenants and agreements of Borrower herein contained. Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County of    ALLEGHENY    , State of Pennsylvania:

SEE ATTACHED EXHIBIT A FOR LEGAL DESCRIPTION

which has the address of:    127 HURON DR CARNEGIE
CARNEGIE, PA 15106

(herein "Property Address");

App # 2RJS-98-0009655

Initials:         Initials:         Initials:         Initials:

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3839 (Page 1 of 6)
Management Systems Development, Inc. (800) 984-6080    Title-One Energizer™  #PA_MORT    Copyright (c) 1984


EXHIBIT
10

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest. Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments , if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the funds and applicable law permits Lender to make such a charge. Borrower and lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by the Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. Prior Mortgages and Deeds of Trust; Charges; Liens. Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

App # 2RJS-98-0009655

Initials: _____    Initials: _____    Initials: _____    Initials: _____

5. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

6. **Preservation and Maintenance of Property; Leasehold; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

7. **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

8. **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

9. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has a priority over this Mortgage.

10. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

App # 2RJS-98-0009685

Initials: _____    Initials: _____    Initials: _____    Initials: _____

11. *Successors and Assigns Bound; Joint and Several Liability; Co-Signers.* The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that borrower or modifying this Mortgage as to that Borrower's interest in the Property.

12. *Notice.* Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

13. *Governing Law; Severability.* The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

14. *Borrower's Copy.* Borrower shall be furnished a conformed copy of the Note and this Mortgage at the time of execution or after recordation hereof.

15. *Rehabilitation Loan Agreement.* Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the property.

16. *Transfer of the Property or a Beneficial Interest in Borrower.* If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

App # 2RJS-98-0009655

Initials: _____    Initials: _____    Initials: _____    Initials: _____

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3839 (Page 4 of 6)
Management Systems Development, Inc. (800) 384-6060    Ride-One Energizer!™  #PA_MORT    Copyright (c) 1994

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. Acceleration; Remedies. Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender, prior to acceleration shall give notice to Borrower as provided by applicable law specifying, among other things: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees, and costs of documentary evidence, abstracts and title reports.

18. Borrower's Right to Reinstate. Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to at least one hour before the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. Assignment of Rents; Appointment of Receiver; Lender in Possession. As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.
Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only for those rents actually received.

20. Release. Upon payment of all sums secured by this Mortgage, Lender shall discharge this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

21. Interest Rate After Judgement. Borrower agrees that the interest rate payable after a judgement is entered on the Note or in an action of mortgage foreclosure shall be the rate stated in the Note.

App # 2RJS-98-0009655

Initials: _____   Initials: _____   Initials: _____   Initials: _____

July 28, 1998
RESTON, VIRGINIA

PROPERTY ADDRESS:    127 HURON DR CARNEGIE
                     CARNEGIE, PA 15106

## NOTE

App No. 2AJ5-98-0008655

**1. BORROWER'S PROMISE TO PAY:** In return for a loan that I have received, I promise to pay U.S. $30,000.00 (this amount is called the "principal"), plus interest, to the order of the Lender. The Lender is
COMMUNITY BANK OF NORTHERN VIRGINIA
I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST:** I will pay interest at a yearly rate of 12.990 %. Interest will be charged on unpaid principal until the full amount of principal has been paid.

**3. PAYMENTS:** I will pay principal and interest by making payments each month of U.S. $379.38 . I will make my payments on the 2nd day of each month beginning on     September 02, 1998 . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on     August 02, 2013 , I still owe amounts under this Note, I will pay those amounts, in full, on that date.
I will make my payments at    11400 Commerce Park Drive, Ste, 110
                               RESTON, VA 20190
or at a different place if required by the Note Holder

**4. BORROWER'S FAILURE TO PAY AS REQUIRED:**
(a) Late Charge for Overdue Payments: If the Note Holder has not received the full amount of any of my monthly payments by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   10.0  % of my overdue payment, but not less than U.S.    N/A    and not more than U.S.   $37.94  . I will pay this late charge only once on each late payment.
(b) Default: If I do not pay the full amount of each monthly payment by the date stated in Section 3 above, I will be in default. Even if, at a time when I am in default, the Note Holder does not require me to pay in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
(c) Notice From Note Holder: If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date the Note Holder may require me to pay immediately the full amount of principal which which has not been paid and all interest on that amount. That date must be at least 30 days after the date the notice is mailed to me or, if it is not mailed, 30 days after the date on which it is delivered to me. If I do not cure the default, the Note Holder will have the rights which the law allows, including the right to require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.
(d) Payment of Note Holder's Costs and Expenses: If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid for its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE IS SECURED BY A MORTGAGE:** In addition to the protections given to the Note Holder under this Note, a Mortgage, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE:** I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."
I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one or my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS:** I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"), (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of non-payment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

**8. GIVING OF NOTICES:** Any notice that must be given to me under this Note will be given by delivering it or mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of that different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE:** If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amount owed under the Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

X _____        X _____
     PHILIP F KOSSLER

X _____        X _____
     JEANNIE C KOSSLER

(Sign Original Only)

PENNSYLVANIA · Second Mortgage · 1/80 · FNMA/FHLMC UNIFORM INSTRUMENT · Form 3939
Management Systems Development, Inc (800)984-5060     True-One Energizer!™  #PA_NOTE     Copyright (c) 1994


EXHIBIT
11

## CERTIFICATE OF SERVICE

The undersigned attorney for Plaintiffs certifies that a true and correct copy of the **SECOND AMENDED COMPLAINT IN CLASS ACTION** was served upon counsel of record for the Defendants, on the 12th day of June, 2002, as follows:

### VIA HAND DELIVERY:

> Thomas Allen, Esquire
> REED SMITH
> 435 Sixth Avenue
> Pittsburgh, PA 15219

### VIA OVERNIGHT MAIL

> F. Douglas Ross, Esquire
> ODIN, FELDMAN & PITTLEMAN, P.C.
> 9302 Lee Highway
> Suite 1100
> Fairfax, VA 22031-1215

R. Bruce Carlson / DJM
R. Bruce Carlson

# <u>Exhibit 3 to Declaration</u>

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RUTH J. DAVIS, an adult individual, and      :
PHILIP F. and JEANNIE C. KOSSLER,       :
a lawfully married couple, individually       :
and on behalf of others similarly situated,    :
                                  :   Civil Action No.: **O2 - 1201**
             Plaintiffs,     :   Related to Civil Action No. 01-1406
                                  :
      v.                       :
                                  :
COMMUNITY BANK OF NORTHERN      :
VIRGINIA, GMAC-RESIDENTIAL FUNDING :
CORPORATION, SOVEREIGN BANK,    :
                                  :
            Defendants.    :
                                  :
                                  :

## NOTICE OF REMOVAL

      Defendants, GMAC-Residential Funding Corporation, Sovereign Bank and Community Bank of Northern Virginia, remove the action presently pending in the Court of Common Pleas of Allegheny County, Pennsylvania, at No. GD 01-8643. In support of this Notice of Removal, Defendants state as follows:

      1.      On or about May 1, 2001, Plaintiffs filed a three-count Complaint in Civil Action in the Court of Common Pleas of Allegheny County, Pennsylvania naming GMAC-Residential Funding Corporation and Homecomings Financial Network, Inc. (collectively, the "GMAC-RFC Defendants"); Community Bank of Northern Virginia ("Community Bank"); Firstplus Home Loan Owner Trust 1996-2; Firstplus Home Loan Owner Trust 1996-3; Firstplus Home Loan Owner Trust 1996-4; First Plus Home Loan Owner Trust 1997-1; Firstplus Home Loan Owner Trust 1997-2; Firstplus Home Loan Owner Trust 1997-3; Firstplus Home Loan Owner Trust 1997-4; Firstplus Home Loan Owner 1998-1; Firstplus Home Loan Owner Trust 1998-2; Firstplus Home Loan Owner Trust 1998-3; Firstplus Home Loan Owner Trust 1998-4; and Firstplus Home Loan Owner Trust 1998-5 (collectively, the "Trust Defendants") as

defendants. (A true and correct copy of Plaintiffs' Complaint is attached as Exhibit 1 to the separately filed Appendix).

    2.    On or about May 9, 2001, Plaintiffs' counsel filed a Praecipe for Appearance. (A true and correct copy of Plaintiffs' counsel's Praecipe for Appearance is attached as Exhibit 2 to the separately filed Appendix).

    3.    On May 21, 2001, counsel for the Trust Defendants filed Praecipes for Entry of Appearance. (A true and correct copy of the Praecipes for Entry of Appearance is attached as Exhibit 3 to the separately filed Appendix).

    4.    On or about June 4, 2001, the Trust Defendants filed a Motion to file a brief in support of preliminary objections in excess of 10 pages. (A true and correct copy of the Motion is attached as Exhibit 4 to the separately filed Appendix).

    5.    On June 8, 2001, the Trust Defendants filed Preliminary Objections to Plaintiffs' Complaint. (A true and correct copy of the Trust Defendants' Preliminary Objections, Brief in Support and Proposed Order are attached as Exhibit 5 to the separately filed Appendix).

    6.    On June 15, 2001, the GMAC-RFC Defendants filed Preliminary Objections to Plaintiffs' Complaint. (A true and correct copy of the GMAC-RFC Defendants' Preliminary Objections, Brief in Support and Proposed Order are attached as Exhibit 6 to the separately filed Appendix).

    7.    On June 28, 2001, counsel for Community Bank filed a Praecipe for Entry of Appearance. (A true and correct copy of the Praecipe for Entry of Appearance is attached as Exhibit 7 to the separately filed Appendix).

    8.    In response to the Defendants' Preliminary Objections, Plaintiffs filed an Amended Complaint on July 3, 2001 ("Plaintiffs' Amended Complaint"). (A true and correct

copy of Plaintiffs' Amended Complaint, including the exhibits appended thereto, is attached as Exhibit 8 to the separately filed Appendix). The Amended Complaint added US Bank National Association, N.D. ("US Bank") as a defendant, alleging that US Bank is an assignee of Plaintiffs' and/or alleged class members' loans.

      9.    On July 19, 2001, counsel for US Bank filed a Praecipe for Entry of Appearance. (A true and correct copy of the Praecipe for Appearance is attached as Exhibit 9 to the separately filed Appendix).

      10.    On July 27, 2001, Defendants removed this action to the United States District Court for the Western District of Pennsylvania based on Plaintiffs' allegation that the "purchasers and/or assignees and holders of the notes made by Community to Plaintiffs/Class members, the Assignee Defendants are liable to the representative Plaintiffs and the Class pursuant to 15 U.S.C. §1641(d)(1)." (Amended Complaint, Ex. 8 at ¶54). Defendants maintained that this allegation raised a federal question and, therefore, this Court had jurisdiction under 28 U.S.C. § 1332. (A true and correct copy of the Notice of Removal, and the exhibits appended thereto, is attached as Exhibit 10 to the separately filed Appendix).

      11.    On or about July 31, 2001, Community Bank of Northern Virginia filed a Substitution of Appearance of Counsel. (A true and correct copy of the Substitution of Appearance is attached as Exhibit 11 to the separately filed Appendix).

      12.    On or about August 2, 2001, the GMAC-RFC Defendants filed a Stipulation of Counsel. (A true and correct copy of the Stipulation of Counsel is attached as Exhibit 12 to the separately filed Appendix).

      13.    On or about August 3, 2001, the Firstplus Trusts and U.S. Bank filed a Stipulation of Counsel. (A true and correct copy of the Stipulation of Counsel is attached as Exhibit 13 to the separately filed Appendix).

14.    On or about August 3, 2001, an Order was entered referring this case to Magistrate Judge Kenneth J. Benson for all pretrial proceedings. (A true and correct copy of the Order is attached as Exhibit 14 to the separately filed Appendix).

15.    On or about August 3, 2001, Community Bank of Northern Virginia filed a Motion to Dismiss Plaintiffs' Amended Complaint and Brief in Support. (A true and correct copy of the Motion to Dismiss, Brief in Support and exhibits appended thereto is attached as Exhibit 15 to the separately filed Appendix).

16.    On or about August 9, 2001, Plaintiffs filed a Motion to stay their obligation to file a response to the motions to dismiss pending disposition of Plaintiffs' remand motion. (A true and correct copy of Plaintiffs' Motion to Stay is attached as Exhibit 16 to the separately filed Appendix).

17.    On or about August 9, 2001, the GMAC-RFC Defendants, the Trust Defendants and U.S. Bank filed Motions to Dismiss Plaintiffs' Amended Complaint and Briefs in Support. (A true and correct copy of the Motions to Dismiss, Briefs in Support and exhibits appended thereto, are attached as Exhibit 17 to the separately filed Appendix).

18.    On or about August 10, 2001, the GMAC-RFC Defendants filed a Disclosure Statement. (A true and correct copy of the Disclosure Statement is attached as Exhibit 18 to the separately filed Appendix).

19.    On or about August 16, 2001, Plaintiffs filed a Motion to Remand and Brief in Support. Plaintiffs' argued that 15 U.S.C. § 1641(d)(1) only eliminates the state law holder in due course defense and does not create independent federal claims. (A true and correct copy of Plaintiffs' Motion to Remand, Brief in Support and exhibits appended thereto, is attached as Exhibit 19 to the separately filed Appendix).

20.    On or about August 21, 2001, an Order was entered granting plaintiffs' motion to stay plaintiffs' obligation to respond to the motions to dismiss pending plaintiffs' motion to remand. (A true and correct copy of the Order is attached as Exhibit 20 to the separately filed Appendix).

21.    On or about August 24, 2001, Community Bank of Northern Virginia filed a Disclosure Statement. (A true and correct copy of the Disclosure Statement is attached as Exhibit 21 to the separately filed Appendix).

22.    On or about August 30, 2001, the Defendants filed a Motion for a Briefing Schedule on Plaintiffs' motion to remand. (A true and correct copy of the Motion for Briefing Schedule is attached as Exhibit 22 to the separately filed Appendix).

23.    On or about September 13-14, 2001, the GMAC-RFC Defendants (to which Community of Northern Virginia joined) and the Trust Defendants filed Briefs in opposition to Plaintiffs' motion for remand. (A true and correct copy of the Defendants' Briefs and exhibits appended thereto, are attached as Exhibit 23 to the separately filed Appendix).

24.    On or about September 19, 2001, the Plaintiffs filed a Reply Brief in support of motion to remand. (A true and correct copy of the Plaintiffs Reply Brief, and exhibits appended thereto, is attached as Exhibit 24 to the separately filed Appendix).

25.    On or about November 7, 2001, counsel for Plaintiffs and counsel for Community Bank of Northern Virginia, the Firstplus Trusts, U.S. Bank and the GMAC-RFC Defendants filed a Stipulation. (A true and correct copy of the Stipulation is attached as Exhibit 25 to the separately filed Appendix).

26.    On or about November 9, 2001, the court ordered the case proceedings stayed until February 1, 2002. (A true and correct copy of the Order of Court is attached as Exhibit 26 to the separately filed Appendix).

27.    On or about January 31, 2002, the Plaintiffs filed a Notice of Supplemental Authority in further support of remand. (A true and correct copy of the Plaintiffs' Notice of Supplemental Authority is attached as Exhibit 27 to the separately filed Appendix).

28.    On or about February 8, 2002, Plaintiffs filed a notice of supplemental authority. (A true and correct copy of the Plaintiffs' Notice is attached as Exhibit 28 to the separately filed Appendix).

29.    On or about February 13, 2002, the Trust Defendants and US Bank filed a Response to Plaintiffs' supplemental filing. (A true and correct copy of the Response is attached as Exhibit 29 to the separately filed Appendix).

30.    On or about February 19, 2002, the Plaintiffs filed a Response to the Trust Defendants and US Bank's Response. (A true and correct copy of Plaintiffs' Response is attached as Exhibit 30 to the separately filed Appendix).

31.    On or about February 20, 2002, the Trust Defendants and US Bank filed a Motion for Leave to file supplemental authority. (A true and correct copy of this Motion is attached as Exhibit 31 to the separately filed Appendix).

32.    On or about March 12, 2002, the Plaintiffs filed a Notice of Supplemental Authority. (A true and correct copy of the Notice of Supplemental Authority is attached as Exhibit 32 to the separately filed Appendix).

33.    On March 27, 2002, Magistrate Judge Kenneth J. Benson issued a Report and Recommendation recommending remand because 15 U.S.C. § 1641(d)(1) merely eliminates the state law holder in due course defense in connection with "high cost" loans subject to HOEPA. (A true and correct copy of Magistrate Judge Kenneth J. Benson's Report and Recommendation is attached as Exhibit 33 to the separately filed Appendix).

34.    On April 25, 2002, Judge Gary L. Lancaster adopted the Report and
Recommendation of Magistrate Judge Kenneth J. Benson and remanded this action to the Court
of Common Pleas of Allegheny County, Pennsylvania. (A true and correct copy of the
Memorandum and Remand Order is attached as Exhibit 34 to the separately filed Appendix).

35.    On or about May 24, 2002, the Trust Defendants and U.S. Bank filed
Preliminary Objections to Plaintiffs' Amended Complaint and Brief in Support. (A true and
correct copy of the Preliminary Objections, Brief in Support and exhibits appended thereto, is
attached as Exhibit 35 to the separately filed Appendix).

36.    On or about May 24, 2002, the Trust Defendants and U.S. Bank filed a
Motion to file a brief in support of preliminary objections in excess of 10 pages. (A true and
correct copy of the Motion is attached as Exhibit 36 to the separately filed Appendix).

37.    On or about June 12, 2002, Plaintiffs filed a Second Amended Complaint
dismissing all defendants except for Community Bank and GMAC-Residential Funding
Corporation and joining Sovereign Bank ("Sovereign") as a defendant. The Plaintiffs' Second
Amended Complaint also alleged for the first time a claim "under the Real Estate Settlement
Practices Act, 12 U.S.C. § 2601." Second Amended Complaint at ¶ 6. (A true and correct copy
of Plaintiffs' Second Amended Complaint, including the exhibits appended thereto, is attached
hereto as Exhibit 1 and as Exhibit 37 to the separately filed Appendix).

38.    By this allegation, Plaintiffs' Second Amended Complaint raises a federal
question on its face. City of Chicago v. International College of Surgeons, 522 U.S. 156, 163-64
(1997); U.S. Express Lines, Ltd v. Higgins, 281 F.3d 383, 389 (3d Cir. 2002); Sicinski v.
Reliance Funding Corp., 461 F. Supp. 649, 651-52 (S.D.N.Y. 1978).

39.    This Court has "original jurisdiction of all civil actions arising under the
Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

40.      Pursuant to 28 U.S.C. § 1441(a), "[e]xcept as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

41.      Additionally, pursuant to 28 U.S.C. § 1441(b), "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties." 28 U.S.C. § 1441(b).

42.      By their counsel, all Defendants join in this Notice of Removal.

WHEREFORE, Defendants give notice that the action pending in the Court of Common Pleas of Allegheny County is removed to this Court.

REED SMITH LLP

By: _____
Thomas L. Allen
Roy W. Arnold

435 Sixth Avenue
Pittsburgh, PA  15219
(412) 288-3131

Counsel for Defendants
GMAC-Residential Funding
Corporation and Sovereign Bank

MEYER, UNKOVIC & SCOTT LLP

By: _____  (By consent RWA)
David G. Oberdick

1300 Oliver Building
Pittsburgh, Pennsylvania 15222-2304
Counsel for Defendant
Community Bank of Northern Virginia

ODIN FELDMAN & PITTLEMAN, P.C.

By: _____  (By consent RWA)
F. Douglas Ross

9302 Lee Highway
Suite 1100
Fairfax, VA  22031

Of Counsel for Defendant
Community Bank of Northern Virginia

Date:  July 9, 2002

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| RUTH J. DAVIS, an adult individual, and PHILIP F. and JEANNIE C. KOSSLER, a lawfully married couple, individually and on behalf of others similarly situated, | CIVIL ACTION NO.: GD 01-8643 |

CIVIL DIVISION

JURY TRIAL DEMANDED

              Plaintiffs,

              Code 190

      v.

**SECOND AMENDED COMPLAINT IN CLASS ACTION**

Filed on behalf of Plaintiffs

COMMUNITY BANK OF NORTHERN VIRGINIA; GMAC-RESIDENTIAL FUNDING CORPORATION; SOVEREIGN BANK,

**Counsel of Record for this Party:**
R. Bruce Carlson, Pa. I.D. #56657

     As individual Defendants and on behalf of all Defendants similarly situated.

**SPECTER SPECTER EVANS & MANOGUE, P.C.**
Firm #684
Pittsburgh, PA 15219
(412) 642-2300

Michael E. McCarthy, Esquire
25th Floor, Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219

**OF COUNSEL:**

R. Hoyt Rowell, III, Esquire
Daniel O. Myers, Esquire
Kevin Oufnac, Esquire
NESS, MOTLEY
P.O. Box 1792
Mt. Pleasant, SC 29465

Eric G. Calhoun, Esquire
Lawson, Fields, McCue, Lee & Campbell
14135 Midway Road
Suite 250
Addison, TX 75001

Exhibit 1

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

RUTH J. DAVIS, an adult individual,            )    CIVIL ACTION NO.: GD 01-8643
and PHILIP F. and JEANNIE C.                   )
KOSSLER, a lawfully married couple,            )
 individually and on behalf of others          )
similarly situated,                            )
                                               )
                Plaintiffs,                    )    JURY TRIAL DEMANDED
                                               )
        v.                                     )
                                               )
COMMUNITY BANK OF NORTHERN                      )
VIRGINIA; GMAC-RESIDENTIAL                      )
FUNDING CORPORATION;                           )
SOVEREIGN BANK,                                )
                                               )
                Defendants.                    )

## NOTICE TO DEFEND

        You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you.


        YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE OR KNOW A LAWYER, THEN YOU SHOULD GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP:

                    LAWYER REFERRAL SERVICE
            THE ALLEGHENY COUNTY BAR ASSOCIATION
                    920 CITY/COUNTY BUILDING
                 PITTSBURGH, PENNSYLVANIA 15219
                    TELEPHONE: 412-261-0518

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| RUTH J. DAVIS, an adult individual, and PHILIP F. and JEANNIE C. KOSSLER, a lawfully married couple, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COMMUNITY BANK OF NORTHERN VIRGINIA; GMAC-RESIDENTIAL FUNDING CORPORATION; SOVEREIGN BANK,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.: GD 01-8643<br><br>SECOND AMENDED COMPLAINT IN CLASS ACTION<br><br><u>JURY TRIAL DEMANDED</u> |

<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>

## I.    <u>INTRODUCTION</u>

1.    This class action is filed on behalf of all persons who received a secondary mortgage loan where the HUD 1 Settlement Statement executed by the borrower in connection with the loan indicates that the lender for the loan was Defendant Community Bank of Northern Virginia (hereinafter "CBNV"), where:

(a) the loan is secured by real property in Pennsylvania (the "Pennsylvania Class"),

(b) the loan is secured by real property anywhere in the United States (the "National Class"),

and where the loan meets the definition of high-cost mortgage set forth at 15 U.S.C. §§ 1602(aa)(1)(A)-(B). Specifically excluded from the National Class are borrowers with loans secured by real property in the states of Missouri and Tennessee.

    2.    While the HUD 1's executed by Plaintiffs and the Class identified CBNV as the "lender" with respect to the loan transactions at issue, Plaintiffs believe that CBNV was not the actual originator of the loans, but was instead a front which "rented" its state charter in exchange for a percentage of the origination fees collected in connection with each loan. This subterfuge is discussed below in detail.

    3.    The loans at issue are "high-cost" loans under the Homeowners Equity Protection Act, 15 U.S.C. § 1641 (hereinafter "HOEPA").

    4.    The named Defendants in this action are CBNV and the entities that purchased the loans made to the named Plaintiffs (the "Assignee-Defendants"), thereby stepping into the shoes of the lender pursuant to 15 U.S.C. § 1641(d)(1).

    5.    In addition to the Plaintiff Class defined in Paragraph 1 of this Second Amended Complaint, Plaintiffs seek certification of a Defendant Class in which the Assignee-Defendants will represent a class of all entities that purchased mortgage loans where the HUD 1 statement executed by the borrower indicates that the lender for the loan was CBNV, and the loan meets HOEPA's definition of high-cost loan.

## II.   JURISDICTION AND VENUE

    6.    In part, Plaintiffs seek relief under the Real Estate Estate Settlement Practices Act, 12 U.S.C. § 2601, et seq., (hereinafter "RESPA")(this claim implicates the National Class) and this Court is a court of competent jurisdiction for the RESPA claim pursuant to 12 U.S.C. § 2614. The

Court also has jurisdiction over Plaintiffs' Pennsylvania statutory and common law claims (these

claims implicate the Pennsylvania Class).

7.    Venue is proper in this Court because the transactions which give rise to Plaintiffs'

claims took place in Allegheny County, Pennsylvania. Additionally, real property which secures

the loans at issue is located in Allegheny County, Pennsylvania.

## II.  FACTUAL ALLEGATIONS

### A.    The Predatory Lending Practices Of The CBNV Affiliates

8.    In the mid-1990's, a substantial number of mortgage lenders began to follow

aggressive underwriting practices with respect to mortgage loans secured by second liens on a given

borrower's home. The original principal balance of these loans, when combined with other

encumbrances on the realty, frequently exceeded the value of the property. Thus the loans were

known as "High Loan-To-Value" (hereinafter "HLTV") loans, or "125% loans (reflecting a total

debt for the property in the amount of 125% of the value of the home). These loans were disfavored

by regulated depository institutions because the amount financed frequently exceeded the equity in

the property.

9.    The explosive growth of the HLTV loan market was fueled by several factors. First,

during the mid-1990's American households had a substantial amount of consumer debt and were,

as a general proposition, a receptive audience for the deceptive marketing of consumer loan vehicles

that promoted debt consolidation. Second, by the mid-1990's, the secondary market for securitized

pools of mortgage loans had become much more viable. In other words, by the mid-1990's the

originators of the loans could easily sell the loans on the secondary mortgage market. The existence

of a viable secondary market permitted loan originators to write the loans aggressively and to lock

in substantial profits with little risk.

3

10.    As a pattern and practice, HLTV originators, including CBNV and/or its affiliate mortgage brokers, entered into standing agreements with secondary market purchasers known as "consolidators." These consolidators would purchase loans from the originators which met pre-determined underwriting requirements. The originators, including CBNV, would typically have agreements with multiple secondary market consolidators so that they could readily "pre-sell" mortgage loans. That is, the originators would know going into a mortgage transaction that the loan at issue was going to be immediately resold to a consolidator with which the originator had a standing agreement.

11.    When a loan was sold by an originator to a consolidator, the originator would formally assign the loan and mortgage to the consolidator. This assignment would be reflected in the borrower's chain of title.

12.    Consolidators would typically package large numbers of loans together in securitized pools of loans. Though the consolidator would make the assignments of given groups of loans to different securitized pools, the assignment of a specific loan to a specific pool would not necessarily be reflected in the borrower's chain of title.

13.    In recognition of the potential for abusive, predatory lending practices in the HLTV market, and to encourage industry self-regulation, Congress passed the HOEPA amendment to the Federal Truth in Lending Act, which, as noted above, is codified at 15 U.S.C. § 1641 et seq.

14.    Congress recognized that most high-cost mortgage loans were pre-sold to consolidators on the secondary market and thus HOEPA includes an assignee provision that places secondary market purchasers (here GMAC Residential Funding Corporation and Sovereign Bank) in the same shoes as the originating lender, in part by eliminating the state law holder in due course

4

defense. This provision applies to consolidators and to subsequent assignees, including securitized mortgage pools. See 15 U.S.C. §1641(d)(1).

15.     Congress expressly sought to expose secondary market purchasers to the same potential liability as loan originators. The House Conference Report issued in conjunction with the passage of HOEPA noted this fact as follows: "consumers maintain all claims and defenses in connection with such mortgages against Assignees that can be asserted against creditors."

16.     While many of the loan originators and/or their correspondents issued loans which complied with state and federal mortgage lending laws, a small percentage of the lenders fell victim to a gold rush mentality and issued predatory loans which included illegal rates of interest and/or grossly excessive, and illegal, origination fees. HLTV loans ostensibly funded by CBNV in Pennsylvania included both illegal rates of interest and illegal origination fees. HLTV loans ostensibly funded by CBNV nationally included multiple, material RESPA violations.

B.     **The CBNV Paradigm**

17.     CBNV was a mere front for the origination of HLTV loans. It did nothing meaningful to support the origination of loans by its affiliate brokers beyond "renting" the use of its state charter to the affiliates so that the affiliates could attempt to circumvent state laws regulating mortgage interest and fees. Its technical ownership interest in the loans divested almost contemporaneously with the closing of the loans as a function of standing agreements pursuant to which the loans were pre-sold to secondary market purchasers.

18.     In fact, CBNV's affiliate brokers were also originating HLTV loans in the name of other state-chartered banks during the period implicated by Plaintiffs' claims, and would merely substitute one bank for another on the appropriate lines in the loan documents. This protocol led to occasional mix-ups, so that some of the loan documents for a borrower on a loan ostensibly made

5

by CBNV would include references to a separate state-chartered bank, from which CBNV's affiliate brokers were also "renting" a state charter in exchange for the kick-back of origination fees.

19.    In exchange for its willingness to rent its state charter to third parties over which it had no meaningful control, the affiliate brokers would, in fact, kick-back or split a percentage of the origination charges from each loan to CBNV as a "fee," and the mortgage and note for each loan would deceptively identify CBNV as the mortgagee. Borrowers were uniformly deceived, however, regarding the actual amount of origination fees being kicked-back to CBNV. This deception was rooted in fraudulent disclosures appearing in Section 800 of the HUD 1 Settlement Statements executed by the borrowers.

20.    The loans originated in this fashion had all been pre-sold pursuant to standing agreements with consolidators.

21.    CBNV, a publicly traded company, deceptively described its relationship with its broker affiliates in its 1998 Annual Report as follows:

> The Bank has established agreements with several mortgage brokers whereby the Bank will fund first and second trust loans approved by the broker which meet the Bank's specified lending criteria. The Bank then sells the loans to outside investors at agreed-upon prices. The Bank retains a mortgage origination fee of 1 to 2 percent on each transaction. Any remaining fees generated from the origination of the loan and subsequent sale in excess of costs incurred are paid to the mortgage broker. Losses incurred as a result of selling loans at a discount are charged back to the mortgage broker. The Bank does not retain servicing rights on any loans sold to outside investors.

See Note D to CBNV 1998 Annual Report appended hereto as Exhibit "1," (emphasis added).

22.    Prior to the last quarter of 1999, CBNV had affiliate relationships with two different mortgage brokers, each of which operated in the name of multiple business entities.

23.    One of the affiliate brokers did business, variously, as EquityPlus Financial, Inc., EquityPlus Financial LLC, and EquityPlus Prime Lending, LLC. The officers and directors of these entities were: David B. Shumway (President/Treasurer/Registered Agent); Randy A. Bapst (Vice President/Secretary).

24.    The other affiliate broker did business under the following names: AmericasBank Mortgage Corporation, Americas Mortgage Corporation and Americas Mortgage, LLC. The President and Registered Agent for these entities was James Niblock.

25.    Significantly, none of the above-identified CBNV-affiliate brokers were licensed to make or broker secondary mortgage loans by the Pennsylvania Department of Banking. Notwithstanding that the CBNV-affiliate brokers were not licensed to engage in the secondary mortgage loan business in Pennsylvania, said brokers advertised, caused to be advertised, solicited, negotiated and arranged, and offered to make secondary mortgage loans to Pennsylvania consumers. See, e.g., Direct Mail Solicitation by AmericasBank to Plaintiff Philip F. Kossler, dated July 1, 1998, appended hereto as Exhibit "2."

26.    In the last quarter of 1999, CBNV ostensibly "acquired" its mortgage broker affiliates. This transaction was described in CBNV's 1999 Annual Report as follows:

> Late in 1999, the Mortgage Department was restructured, which increased the interest income to the Bank for the fourth quarter of the year. The restructuring related to the loan production offices of the Bank. Previously, the Bank had consulting arrangements with various limited liability companies (LLCs). In late 1999, the contracts with the LLCs were canceled and the primary owner in each LLC became an employee of the Bank. Because of the restructuring, the staff in each office also became employees of the Bank. All revenues and expenses of the mortgage loan production offices was combined with the Bank operations, including incentive bonuses paid to each mortgage office branch manager based upon the profitability of their office.

7

See, CBNV 1999 Annual Report at Pg. 4, "Mortgage Lending", appended hereto as Exhibit "3."

27.    Notwithstanding intimations to the contrary in its annual reports and notwithstanding the fact that the loans were originated in CBNV's name, both before and after the "acquisition" of the mortgage operation, CBNV had no meaningful control over the origination of the loans at issue. Instead, the loans were originated unilaterally by CBNV's affiliate brokers.

28.    All or substantially all of the loans made to Plaintiffs and the Pennsylvania Class ostensibly originated by CBNV included grossly excessive and illegal interest rates and origination charges.

29.    With respect to loans ostensibly originated by CBNV nationally, the apportionment or distribution of the settlement fees among CBNV, the affiliated brokers and other mortgage service providers (primarily the title service providers) owned by the affiliate brokers and/or CBNV was uniformly misrepresented in the HUD 1's executed by Plaintiffs and the Class in Section 800 of the Settlement Statements. Additionally, these Section 800 fees included illegal kickbacks that did not reflect the value of services actually provided. These illegal charges are challenged by Plaintiffs on behalf of the National Class.

30.    In addition, the charges for "title costs" imposed upon borrowers in connection with loans ostensibly originated by CBNV significantly exceeded the cost or value of the services performed, and included an illegal fee-split and/or kickback, in violation of RESPA. The apportionment or distribution of these fees denoted in Section 1100 of the Settlement Statement among CBNV, the affiliate brokers and the title service providers was uniformly misrepresented in the HUD 1's executed by Plaintiffs and the Class. These illegal charges are challenged by Plaintiffs on behalf of the National Class.

### 1.    Fraudulent Section 800 Disclosures

31.    The Settlement Statements executed by Plaintiffs and the Class misrepresented the amount of settlement fees being retained by CBNV.

32.    While the Settlement Statements indicated that the fee being retained by CBNV approximated 10% of the original principal balance of the loan, this was a fraudulent mischaracterization of the actual amount kicked-back to CBNV.

33.    In partial illustration of the fraudulent nature of the disclosures made in the Settlement Statements, CBNV alleged in its 1998 Annual Report that it was retaining only "1 to 2%" of the original principal balance of the loan and that all remaining fees were paid to the affiliate brokers.

34.    The characterization made in the CBNV Annual Report thus differed markedly from the disclosures made in the Settlement Statements executed by individual borrowers, wherein CBNV, as a pattern and practice, represented that it was retaining at least 10% of the origination fees for each individual loan.

35.    These fraudulent disclosures were made in Section 800 of the Settlement Statement.

36.    The amount actually retained by CBNV did not reflect the value of services actually performed

37.    This conduct violated RESPA. On behalf of the National Class, Plaintiffs are challenging the illegal Section 800 charges through RESPA.

### 2.    Title Costs

38.    All or substantially all of the HLTV loans ostensibly originated by CBNV nationally, both before and after the last quarter of 1999, have included fraudulent and illegal settlement costs ostensibly related to title services.

39.    All or substantially all of the HLTV loans originated by CBNV broker-affiliate EquityPlus Financial nationally included title-related settlement costs noted in HUD1 Settlement

9

Statements as being payable to Advantage Title or Title America, LLC,. Both Advantage Title and
Title America, LLC were affiliated with EquityPlus Financial and shared common ownership with
EquityPlus Financial.

40.    All or substantially all of the HLTV loans originated by CBNV broker-affiliate
Americas Mortgage nationally included title-related settlement costs noted in HUD1 Settlement
Statements as being payable to First National Title & Escrow, Inc. First National Title & Escrow,
Inc. was affiliated with Americas Mortgage and shared common ownership with Americas mortgage.

41.    The title-related settlement charges included in all HLTV loans ostensibly originated
by CBNV nationally were grossly excessive and did not reflect fees actually related to the processing
of a secondary mortgage loan application or the granting of a secondary mortgage loan. To the
contrary, the fees represented a transparent ploy by CBNV and its affiliate brokers to conjure-up
additional revenue by representing to Plaintiffs and the Class that they were paying for actual title-
related services, when in fact the affiliate brokers used the title companies to disguise additional
bogus fees being funneled to CBNV and its affiliate brokers.

42.    The affiliate brokers generated significant bogus revenue by fraudulently padding the
title charges delineated in Section 1100 of the HUD 1, and washing the charges through title
companies that they owned and controlled, so that the bogus fees would be split among the title
companies, the brokers and/or CBNV.

43.    As a pattern and practice, borrowers would not receive the disclosure of affiliate
relationship form required by 12 U.S.C. § 2607(c)(4)(A) apprising them of the joint ownership and
control of the affiliate brokers and the title companies. The named Plaintiffs on this Second Amended
Complaint did not receive the required disclosures.

10

44.    CBNV and/or its affiliate brokers received kick-backs in connection with the title charges imposed upon Plaintiffs and the Class which substantially exceeded a legal return on ownership interest.

45    In addition, the disclosures made in Section 1100 of the Settlement Statements executed by the borrowers did not accurately reflect the actual fee split among CBNV, the affiliate brokers and/or the title service providers.

46.    On behalf of the National Class, Plaintiffs are challenging the illegal title charges through RESPA.

C.    **Law Applicable To The Pennsylvania Class**

47.    The issuance of secondary mortgage loans in Pennsylvania is regulated by the Secondary Mortgage Loan Act, codified at 7 P.S. §6601 et seq. (hereinafter the "SMLA").

48.    The SMLA defines a secondary mortgage loan as follows:

> A loan in an original principal amount in excess of $5,000 which is secured in whole or in part by a lien upon any interest in real property created by a security agreement, including a mortgage, indenture, or any other similar instrument or document, which real property is subject to a prior mortgage and which is used as a dwelling . . . .

49.    The SMLA precludes the making of secondary mortgage loans in this Commonwealth without obtaining a license from the Pennsylvania Secretary of Banking:

> (1) No person shall engage in the business of making secondary mortgage loans in this Commonwealth except a business corporation organized under the laws of this Commonwealth or any other state, after first obtaining a license from the secretary in accordance with the provisions of this act.

Sec. 7 P.S. §6603(a)(1).

50.    For the purposes of the SMLA, a person is deemed to be engaged in the secondary mortgage loan business in the Commonwealth if:

11

> (i) such person advertises, causes to be advertised, solicits, negotiates
> or arranges in the ordinary course of business, offers to make more
> than two secondary mortgage loans in a calendar year in this
> Commonwealth, whether directly or by any person acting for his
> benefit, but this provision shall not prohibit advertising or solicitation
> by a licensee under a general corporate name, logo or trade mark.

See, 7 P.S. §6603(a)(5)(i).

51.    All or substantially all of the loans made to Plaintiffs and the Class were ostensibly
originated by CBNV and the HUD1 Settlement Statements executed in connection with the loans
identified CBNV as the lender and itemized the loan origination fees payable to CBNV at closing,
as well as those fees payable to various third party vendors.

52.    A person or entity engaged in the secondary mortgage loan business in this
Commonwealth who/which is properly licensed can charge the maximum interest rate and fees that
are specifically delineated in the SMLA. Specifically, a licensee is permitted to charge a monthly
interest rate of 1.85% and to collect an application fee not in excess of 3% of the original principal
balance of the loan. The licensee is also permitted to recoup legitimate charges actually related to the
processing of a secondary mortgage loan.

53.    The SMLA expressly states that a person who/which makes secondary mortgage loans
in Pennsylvania without a proper license issued by the Secretary of Banking shall be subject to
criminal and civil penalties. Specifically, the SMLA states:

> Any person who is not licensed by the secretary . . . and who shall engage in the
> business of negotiating or making secondary mortgage loans and charge, collect,
> contract for or receive interest, fees, premiums, charges or other considerations which
> aggregate in excess of the interest that the lender would otherwise be permitted by law
> to charge if not licensed under this act on the amount actually loaned or advanced, or
> on the unpaid principal balances when the contract is payable by stated installments,
> shall be guilty of a misdemeanor, and upon conviction thereof, shall be sentenced to
> pay a fine of not less than $500 or more than $5,000, and/or undergo imprisonment
> not less than six months nor more than three years . . . .

12

54.    Because CBNV's affiliate brokers were not licensed to make secondary mortgage
loans in this Commonwealth, the loans ostensibly originated by CBNV had to comply with
Pennsylvania's maximum interest statute set forth at 41 P.S. §101 et seq. (hereinafter "Act 6")
regarding the maximum permissible interest rate which could be charged to Pennsylvania borrowers
for a residential mortgage loan.

55.    Act 6 defines "residential mortgage" as follows:

RESIDENTIAL MORTGAGE means an obligation to pay a sum of money in an
original bona fide principal amount of fifty thousand dollars ($50,000) or less,
evidenced by a security document and secured by a lien upon real property located
within this Commonwealth . . . .

See 41 P.S. §101.

56.    The maximum interest rate for a residential mortgage under the terms of Act 6 is set
forth at 41 P.S. §301, which states, in relevant part: "The maximum lawful rate of interest for
residential mortgages, as defined in this act, entered into or contracted for during any calendar month
shall be equal to the Monthly Index of Long Term United States Government Bond Yields for the
second preceding calendar month plus an additional two and one-half per cent per annum rounded
off to the nearest quarter of one per cent per annum." See, 41 P.S. §301(b).

57.    The average interest rates charged by CBNV and its affiliates for secondary mortgage
loans secured by real property located in Pennsylvania was, upon information and belief, in excess
of 13%. This rate of interest is substantially in excess of the maximum permissible interest rate under
Act 6, which during the class period has been approximately 8%.

58.    In addition to the illegal interest rates discussed above, CBNV and its originators
charged Pennsylvania borrowers illegal fees and costs substantially in excess of the 3% application

13

fee which was permissible under the SMLA and/or Act 6. These illegal fees and costs are discussed more fully below.

59.    The purpose of this class action is to compel CBNV and the purchasers of Plaintiffs' loans to disgorge all illegal interest and fees and costs, and to reform the loans in accordance with Pennsylvania law.   CBNV has assigned all or most of the mortgage notes executed when it closed loan transactions with Plaintiffs and the Class.

### D.    Federal Law Applicable To The National Class

60.    Section 8(b) of RESPA, 12 U.S.C. § 2607(b), and 12 C.F.R. §3500.14 and 15 prohibit the kickbacks and/or fee splits, nondisclosures and fraudulent disclosures above described.

### E.    Equitable Tolling

61.    Any applicable statute of limitations that might otherwise bar certain of Plaintiffs' claims should be tolled because CBNV fraudulently concealed:

(a)    the identity of the actual originator and/or lender for the loans at issue;

(b)    the existence of affiliate relationships among CBNV, its affiliate brokers and the title companies;

(c)    the actual apportionment of the kickback or fee split of amounts delineated in Section 800 of the Settlement Statements (i.e. the understatement of amounts kicked-back to the affiliate brokers);

(d)    the actual cost or value of title-related services;

(e)    the actual cost or value of any origination service provided by CBNV;

(f)    the actual apportionment of the fee split/kickback of the grossly inflated fees for title services;

(g)    the fact that the affiliated entities were receiving fees in excess of a legal return on ownership interest in connection with title-related services;

14

(h)    the fact that CBNV was receiving origination fees in excess of a legal
return on ownership interest, as well as the apportionment of the fee
split with respect to these fees;

(i)    the fact that the affiliate-brokers were making loans in violation of
Pennsylvania licensure laws; and,

(j)    the fact that CBNV was not exercising any supervision and/or control
over any aspect of the lending process in connection with the loans at
issue, notwithstanding the fact that CBNV's state charter was "rented"
to the affiliate brokers in an attempt to circumvent Pennsylvania
lending laws.

## III.    THE PARTIES

62.    Plaintiff Ruth J. Davis is an adult individual residing at 1206 Stratford Court,
Coraopolis, Allegheny County, Pennsylvania.

63.    Plaintiffs Philip F. Kossler and Jeannie C. Kossler are lawfully married individuals
residing at 127 Huron Drive, Carnegie, Allegheny County, Pennsylvania.

64.    Defendant Community Bank of Northern Virginia is a Virginia corporation with a
principal place of business at 8150 Leesburg Pike, Vienna, Virginia 22182.

65.    Defendant GMAC-Residential Funding Corporation is a Minnesota corporation with
its principal place of business located at 8400 Normandale Lake Boulevard, Minneapolis, MN 55437.
This Defendant is named because it purchased the loan made to Plaintiff Davis.

66.    Defendant Sovereign is a Pennsylvania corporation and a subsidiary of Sovereign
Bancorp, Inc., with a principal place of business at 1130 Berkshire Boulevard, Wyomissing, PA
19610. This Defendant is named because it purchased the loan made to the Kossler Plaintiffs.

## IV.    THE LOANS MADE TO PLAINTIFFS

### Ruth Davis

67.    Plaintiff Ruth J. Davis obtained a secondary mortgage loan closed in CBNV's name on or about February 22, 1999. The principal amount of the loan was $24,100.00  The interest rate for this loan was 15.45%. The last scheduled payment on the loan is February 22, 2024. The loan was secured by a lien on Plaintiff's residence.  Copies of the Good Faith Estimate of Settlement Charges, HUD/Settlement Statement, Mortgage and Mortgage Note relating to the Davis loan are appended hereto as Exhibit "4"-"7."

68.    At closing, Plaintiff was charged various costs and fees ostensibly payable to CBNV:

a)  origination fee:    $1928.00

b)  discount fee:       $482.00

SETTLEMENT COSTS OSTENSIBLY PAYABLE TO CBNV:  $2,410.00

69.    Under the SMLA, the maximum amount which CBNV could have properly charged Plaintiff at closing was an application fee in the amount of 3% of the original principal balance of the loan, or $723.00.   Plaintiff was therefore charged illegal loan origination fees by CBNV in the amount of $1,687.00.

70.    The amount actually retained by CBNV in connection with Section 800 origination fees differed from the amount disclosed in the Settlement Statement.

71.    Additionally, Plaintiff Davis was charged title-related closing costs of $1,158.00. The majority of these charges were bogus in that they did not reflect payment for services actually performed in connection with processing the loan.  Instead, the charges reflect a transparent mechanism through which CBNV affiliate broker EquityPlus Financial funneled additional illegal

16

fees to Title America, LLC, a company which EquityPlus Financial and/or CBNV owned and controlled.

72.      Part of these fees were kicked-back or split with EquityPlus Financial and its owners, and with CBNV. The kickbacks and the specific apportionment of the fee split were not disclosed to Plaintiff Davis.

73.      The actual value of any title-related services performed in connection with the loan to Ms. Davis was $200.00 or less.

### The Kossler Plaintiffs

74.      The Kosslers obtained a secondary mortgage loan closed in CBNV's name on or about July 28, 1998. The principal amount of the loan was $30,000.00. The interest rate for this loan was 14.817%. The last scheduled payment on the loan is August 2, 2013. The loan was secured by a lien on Plaintiffs' residence. Copies of the Good Faith Estimate of Settlement Charges, HUD/Settlement Statement, Mortgage and Mortgage Note relating to the Davis loan are appended hereto as Exhibit "8 "-"11."

75.      At closing, the Kosslers were charged various costs and fees ostensibly payable to CBNV:

| | | |
|---|---|---|
| a) | origination fee: | $2250.00 |
| b) | document review fee: | $ 250.00 |
| c) | processing fee: | $ 150.00 |

SETTLEMENT COSTS OSTENSIBLY TO CBNV:        $2,650.00

76.      Under the SMLA, the maximum amount which CBNV could have properly charged Plaintiffs at closing was an application fee of 3% of the original principal balance of the loan, or

17

$900.00. Plaintiffs were therefore charged illegal origination fees by CBNV in the amount of $1750.00.

77.     The amount actually retained by CBNV in connection with Section 800 origination fees differed from the amount disclosed in the Settlement Statement

78.     Additionally, the Kossler Plaintiffs were charged title-related closing costs of $1,000.00. The majority of these charges were bogus in that they did not reflect payment for services actually performed in connection with processing the loan. Instead, the charges reflect a transparent mechanism through which CBNV affiliate broker AmericasBank funneled additional illegal fees to First National Title & Escrow, a company which AmericasBank owned and controlled.

79.     Part of these fees were kicked-back or split with AmericasBank and its owners, and with CBNV. The kickbacks, and the specific apportionment of the fee split, were not disclosed to the Kossler Plaintiffs.

80.     The actual value of any title-related services performed in connection with the loan to the Kosslers was $200.00 or less.

## VI.  CLASS ALLEGATIONS

81.     This class action is filed on behalf of all persons who received a secondary mortgage loan where the HUD 1 Settlement Statement executed by the borrower in connection with the loan indicates that the lender for the loan was Defendant Community Bank of Northern Virginia (hereinafter "CBNV"), where:

(a) the loan is secured by real property in Pennsylvania (the "Pennsylvania Class"),

(b) the loan is secured by real property anywhere in the United States (the "National Class"),

18

and where the loan meets the definition of high-cost mortgage set forth at 15 U.S.C. §§ 1602(aa)(1)(A)-(B). Specifically excluded from the National Class are borrowers with loans secured by real property in the states of Missouri and Tennessee.

82.    The class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed, based upon publicly available information, that the Class includes thousands of members. In some instances, such persons may be unaware that claims exist on their behalf. To the extent that the Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

83.    The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs received secondary mortgage loans ostensibly originated by CBNV with the same illegal interest, costs and expenses charged in the loans made to Class members.

84.    The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. They are aware that they cannot settle this action without Court approval. Their interests in this action are antagonistic to the interests of CBNV and they will vigorously pursue the claims of the Class.

85.    The representative Plaintiffs have retained counsel who are competent and experienced in class action litigation, and have represented other consumers in complex class actions. Counsel have agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court. Counsel have agreed to advance the expenses of the litigation contingent upon its outcome.

86.    Common questions of law and fact affect the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

19

87.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include the following:

    a)    Whether CBNV violated the Pennsylvania Secondary Mortgage Loan Act by funding secondary mortgage loans, secured by real property in Pennsylvania, which were originated by CBNV's unlicensed affiliate brokers wherein said secondary mortgage loans included an interest rate in excess of the rate permitted by Act 6;

    b)    Whether the loan agreements between CBNV and Class members are void, in whole or in part, as being against public policy in that the loans violated the express provisions of the SMLA, Act 6 and RESPA;

    c)    Whether CBNV, acting through its unlicensed affiliate brokers, charged Class members illegal costs and fees in connection with Pennsylvania secondary mortgage loans in violation of the Pennsylvania Secondary Mortgage Loan Act;

    d)    Whether CBNV, acting through its unlicensed affiliate brokers, violated Act 6 by charging class members fees and costs which violated the Pennsylvania Secondary Mortgage Loan Act;

    e)    Whether CBNV's predatory lending practices violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law;

    f)    Whether CBNV, and/or the assignee Defendants, are liable for attorneys' fees and costs, in addition to other available civil remedies and penalties; and,

    g)    Whether CBNV violated RESPA as above-alleged.

88.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the Class are identical and will require evidentiary proof of the same kind and application of the same law.

89.     The representative Plaintiffs will seek to identify all Class members through discovery procedures as may be appropriate and will provide to the Class such notice of this action as the Court may direct.

### 1,     The Defendant Class

90.     As noted in Paragraph 5 of Plaintiffs' Second Amended Complaint, Plaintiffs seek certification of a Defendant Class in which Defendants GMAC Residential Funding Corporation and Sovereign Bank are the representative Defendants.

91.     The proposed Defendant Class will include: all entities that purchased Secondary Mortgage Loans in which the HUD 1 statement executed by the borrowers indicates that the lender for the loan was CBNV and the loan meets HOEPA's definition of high cost loan.

92.     Just as the contract document - rooted proposed Plaintiff's Class is an archetypically certifiable class, so too, is the proposed Defendant Class.

93.     There is a single, dispositive question of fact that unifies the Defendant Class: the purchase of Secondary Mortgage Loans from CBNV that are covered by HOEPA.

94.     All, or virtually all, of the Secondary Mortgage Loans ostensibly originated by CBNV are covered by HOEPA.

95.     The proposed Defendant Class meets all of the requirements of Pa. R. Civ. P. 1701 et seq., as well as the requirements of Fed. R. Civ. P. 23.

JUL. 10. 2002 12:31PM09PM                                    NO. 9461  P. 35

## COUNT I

**Illegal Contract: Because The Secondary Mortgage Loan Agreements Between CBNV And Plaintiffs And The Class Included Illegal Terms Which Violated The SMLA, Act 6 And RESPA, And Because The Loans At Issue Were Originated By CBNV's Unlicensed Affiliate Brokers, The Mortgages, Mortgage Notes And Deeds Of Trust Related To Said Agreements Are Void Or Voidable In Whole Or In Part.**

96.    The other Paragraphs of this Complaint are hereby incorporated as if set forth in their entirety.

97.    The SMLA is a remedial statute that is intended to protect Pennsylvania consumers from predatory lending practices by secondary mortgage lenders.

98.    The licensure requirement in the SMLA is an integral component of the Pennsylvania Department of Banking's attempt to protect Pennsylvania citizens against predatory lending practices by secondary mortgage lenders.

99.    The existence of express civil and criminal penalty provisions in the SMLA for violation of the licensure requirement is calculated to serve as a deterrent to persons who are tempted to make secondary mortgage loans in Pennsylvania without a license.

100.    Because CBNV, acting through its unlicensed affiliate brokers, issued secondary mortgage loans to Plaintiffs and the Class in violation of the licensure requirements of the SMLA, and because the purpose of the licensure provision in the SMLA is regulation of the secondary mortgage industry and not merely the collection of revenue, the loan agreements between CBNV and Plaintiffs and the Class is either void or voidable as being an illegal contract which is against public policy.

101.    Because CBNV affiliate brokers were at no time licensees under the SMLA, the interest rate which CBNV charged for secondary mortgage loans in Pennsylvania violated both the SMLA and Act 6. Because the loans made by CBNV to Plaintiffs and the Class included an interest rate which violated the express statutory provisions delineated in the SMLA and Act 6, the loan agreements related to said loans are either void or voidable as being against public policy.

102.    Because CBNV charged Plaintiffs and the Class origination fees over and above the 3% application fee permitted by the SMLA, including bogus title charges, the loan agreements between Plaintiffs/the Class and CBNV are either void or voidable as being against public policy.

103.    Because CBNV violated RESPA's kickback and disclosure provisions, as above described, the loan agreements between Plaintiffs/the Class and CBNV are void or voidable as being against public policy.

104.    This Count is not intended to assert a private right of action under the SMLA. Instead, this Count is premised on black letter contract law. See, Solomon v. Gilmore, 731 A.2d 280, (Conn. 1999).

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment declaring that their loan agreements with CBNV be deemed illegal and unenforceable contracts and that Plaintiffs and the Class are hereby relieved from any obligation to make further payments of principal and interest on the notes, or, in the alternative, that all provisions of the loan agreements and notes which violate Pennsylvania law be stricken and reformed to comply with applicable law prospectively and that the Assignee Defendants refund to Plaintiffs and the Class all illegal interest and fees already paid on the note, plus all permissible penalties, attorneys fees, costs and other relief which the Court deems proper.

23

## COUNT II

### Violation of Pennsylvania's Act 6 – 41 P.S. Section 101 et seq.

105.    Plaintiffs hereby incorporate every other Paragraph in this Second Amended Complaint as if set forth in its entirety.

106.    Because CBNV affiliate brokers were not licensed under the SMLA, the maximum interest rate which CBNV could charge on its loans to Plaintiffs is set forth in Act 6, which states the maximum amount of interest that can be charged on a residential mortgage secured by real property in the Commonwealth.

107.    The secondary mortgage loans made to Plaintiffs and the Class by CBNV included interest rates significantly in excess of the maximum permissible rate under Act 6. Act 6 expressly states that when a lender makes a mortgage loan with an illegal interest rate, "the borrower or debtor shall not be required to pay to the creditor the excess over such maximum interest rate and it shall be lawful for such borrower or debtor, to retain and deduct such excess from the amount of such debt . . . ." See 41 P.S. §501.

108.    CBNV charged excess fees and costs in connection with its secondary mortgage loans to Plaintiffs and the Class which were illegal under the terms of the SMLA, as is fully delineated above.

109.    Plaintiffs and the Class are entitled to recover triple the amount of illegal interest paid, in addition to triple the amount of fees which were illegal under the terms of the SMLA. The specific remedial language in Act 6 which permits this recovery states:

A person who has paid a rate of interest for the loan or use of money at a rate in excess of that provided for by this act or otherwise by law or has paid charges prohibited or in excess of those allowed by this act or otherwise by law may recover triple the amount of such excess interest or charges in a suit at law against the person who has collected such excess interest or charges . . . .

24

See, 41 P.S. §502.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment on their behalf declaring that the interest rate payable on their loans prospectively from the date of judgment will be in compliance with the maximum rate permitted by Act 6, awarding Plaintiffs and the Class triple the amount of excess interest and fees already paid, awarding statutory counsel fees and costs under 41 P.S. §503, and awarding to Plaintiffs and the Class all other appropriate relief.

## COUNT III

### Violation Of The Pennsylvania Unfair Trade Practices And Consumer Protection Act

110.   Plaintiffs hereby incorporate every Paragraph in this Second Amended Complaint as if fully set forth herein.

111.   The loans made to Plaintiffs and the Class by CBNV, through its affiliate brokers, were primarily for personal, family or household purposes.

112.   The acts and practices by CBNV and its agents constitute violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. 201-2(4)( xxi):

(xxi)   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

113.   CBNV, acting through its duly authorized agents, engaged in unfair or deceptive acts or practices in connection with making secondary mortgage loans to Plaintiffs and the Class by engaging in the following acts and practices:

a)   Failing to disclose in marketing literature, advertisements and loan documents that it's affiliate brokers were not licensed to make secondary mortgage loans in Pennsylvania and that its lending practices were thus in violation of the SLMA and Act 6;

b)    Deceptively charging an illegal rate of interest, illegal costs and illegal fees in connection with second mortgage loans made to Pennsylvania consumers during the class period;

c)    Deceptively charging bogus title-related settlement costs which did not reflect fees actually related to processing secondary mortgage loans and attempting to provide the imprimatur of federal law for these charges by delineating them in the Good Faith Estimate of Settlement Charges which stated that the disclosures were being made pursuant to the "Real Estate Settlement Procedures Act of 1974;" and,

d)    Deceptively charging bogus title-related settlement charges and implying in the Good Faith Estimate of Settlement Charges and HUD1 Settlement Statement that these were legitimate title-related charges when, in fact, the title companies which were the alleged recipient of these fees were straw companies controlled by the affiliate brokers and CBNV, which were using the title companies to disguise additional bogus settlement charges being funneled to the affiliate brokers and Community;

e)    Making secondary mortgage loans to Plaintiffs and the Class while holding itself out to be acting lawfully, specifically by distributing to Plaintiffs and the Class written Good Faith Estimates of Settlement Charges which delineated the illegal interest rates and origination fees being charged to Plaintiffs and the Class while implying that the interest rates and origination fees were lawful and proper by suggesting that the estimates were provided "pursuant to the Real Estate Settlement Procedures Act of 1974," but failing to disclose that the maximum permissible interest rate and origination fees were governed by Pennsylvania law and that the interest rate and origination fees being charged by CBNV to Plaintiffs and the Class were illegal under Pennsylvania law;

f)    Failing to provide required affiliate relationship disclosures in violation of RESPA, and otherwise violating RESPA as above-described; and,

g)    Violating the kickback and disclosure provisions of RESPA as above-described.

114.    CBNV had a duty not to intentionally and/or knowingly mislead Plaintiffs and the Class with respect to the legally permissible rates of interest, origination fees and settlement costs applicable to their secondary mortgage loans under Pennsylvania and federal law.

26

115.    CBNV's fraudulent disclosures and non-disclosures as above-described were made with the knowledge that the material information being withheld by CBNV might have justifiably induced Plaintiffs and the Class to refrain from taking secondary mortgage loans from CBNV which included illegal interest rates, origination fees and title-related settlement costs.

116.    CBNV carried out its misconduct willfully, wantonly and with reckless disregard for the interests of Plaintiffs and the Class.

117.    CBNV's non-disclosures and omissions were likely to make a difference in the decision by Plaintiffs to enter into a loan transaction with CBNV.

118.    Plaintiffs have suffered ascertainable losses of money and property as a result of CBNV's violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

WHEREFORE, Plaintiffs and the Class request that the Court declare that CBNV's acts and omissions as above-described violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law and award triple the actual damages sustained by Plaintiffs and the Class, along with statutory counsel fees, costs and other appropriate relief.

## COUNT IV

### RESPA – 12 U.S.C. § 2607(b)

119.    Plaintiffs hereby incorporate every Paragraph in this Second Amended Complaint as if fully set forth herein.

120.    CBNV and/or its affiliate brokers defrauded Plaintiffs and the Class in violation of RESPA's fee split and disclosure provisions by misrepresenting the amount of fees being retained by CBNV in Section 800 of Plaintiffs' and the Classes' Settlement Statements.

121.    CBNV retained an undisclosed fee spit that exceeded the value of any service performed in violation of RESPA.

27

122.    CBNV and/or its affiliate brokers charged Plaintiffs title-related settlement costs that exceeded any amount disclosed to Plaintiffs as being a customary charge for the services being provided by the affiliated title companies.

123.    CBNV and/or its affiliate brokers received kickbacks or fee splits from the title companies that exceeded, by far, a legal return on ownership interest and this fact was not disclosed to Plaintiffs.

124.    CBNV and/or its affiliate brokers defrauded Plaintiffs and the Class in violation of RESPA's fee split and disclosure provisions by misrepresenting the actual amount of fees being retained by the affiliate brokers, the affiliated title service providers and/or CBNV in Section 1100 of Plaintiffs' and the Classes' Settlement Statements

125.    As a result of the RESPA violations above alleged, Plaintiffs have been damaged in an amount to be determined at a trial of this action where they will seek all permissible damages, fees and costs.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment declaring that CBNV's acts and omissions as above-described violated RESPA and award triple the actual damages sustained by Plaintiffs and the Class, along with statutory counsel fees, costs and other appropriate relief

## COUNT V

### Civil Conspiracy

126.    Plaintiffs hereby incorporate every Paragraph in this Second Amended Complaint as if fully set forth herein.

127.    CBNV and its affiliate brokers and/or the affiliate title companies conspired to violate Pennsylvania and federal law as set forth in Counts I-IV of this Second Amended Complaint by

28

combining with a common plan to engage in the unlawful conduct delineated herein for the unlawful purpose of extracting illegal fees and interest from Plaintiffs and the Class.

128.    In furtherance of this conspiracy, CBNV and the affiliate brokers and/or the affiliate title companies engaged in all of the illegal acts and omissions set forth in this Second Amended Complaint.

129.    Plaintiffs and the Class have been damaged by this conspiracy in that they have been fraudulently induced to pay illegal interest and fees in connection with secondary mortgage loans ostensibly issued to them by CBNV.

WHEREFORE Plaintiffs and the Class request all of the relief delineated in the Prayer for Relief set forth below.

## PLAINTIFFS DEMAND TRIAL BY JURY.


SPECTER SPECTER EVANS
& MANOGUE, P.C.

By: _____
R. Bruce Carlson, Pa. I.D. #56657

The 26th Floor
Koppers Building
Pittsburgh, Pennsylvania 15219
(412) 642-2300

Michael E. McCarthy, Esquire
25th Floor, Lawyers Building
428 Forbes Avenue
Pittsburgh, PA 15219

29

*OF COUNSEL:*

Eric G. Calhoun
LAWSON, FIELDS, MCCUE, LEE
   & CAMPBELL
14135 Midway Road
Addison, Texas 75001

R. Hoyt Rowell, III
Daniel Myers
Kevin Oufnac
NESS, MOTLEY, LOADHOLDT,
   RICHARDSON & POOLE
P.O. Box 1792
Mt. Pleasant, South Carolina 29465





Annual Report

The following is an analysis of the change in allowance for loan losses:

|  | 1998 | 1997 |
|---|---|---|
| Balance at beginning of period | $ 972,593 | $ 673,444 |
| Provision charged against income | 940,000 | 290,000 |
| Losses charged off | (352,566) | (22,351) |
| Recoveries of loans previously charged off | 5,160 | 31,500 |
|  | $ 1,565,187 | $ 972,593 |

The following is a summary of information pertaining to impaired loans:

|  | 1998 | 1997 |
|---|---|---|
| Impaired loans without a valuation allowance | $ - | $ - |
| Impaired loans with a valuation allowance | 763,410 | 82,046 |
| Total impaired loans | $ 763,410 | $ 82,046 |

|  | 1998 | 1997 |
|---|---|---|
| Valuation allowance related to impaired loans | $ 107,045 | $ 8,205 |
| Average investment in impaired loans | $ 576,913 | $ 80,196 |
| Interest income recognized on a cash basis on impaired loans | $ 29,534 | $ - |

No additional funds were committed to be advanced in connection with impaired loans.

## NOTE D—LOANS HELD FOR SALE

The Bank has established agreements with several mortgage brokers whereby the Bank will fund first and second trust loans approved by the broker which meet the Bank's specified lending criteria. The Bank then sells the loans to outside investors at agreed-upon prices. The Bank retains a mortgage origination fee of 1 to 2 percent on each transaction. Any remaining fees generated from the origination of the loan and subsequent sale in excess of costs incurred are paid to the mortgage broker. Losses incurred as a result of selling loans at a discount are charged back to the mortgage broker. The Bank does not retain servicing rights on any loans sold to outside investors.

## NOTE E—BANK PREMISES AND EQUIPMENT

Bank premises and equipment are as follows at December 31:

|  | 1998 | 1997 |
|---|---|---|
| Cost |  |  |
| Land | $ 677,627 | $ 677,627 |
| Buildings | 1,665,658 | 1,665,658 |
| Furniture, fixtures and equipment | 3,967,098 | 3,265,508 |
|  | 6,310,383 | 5,608,793 |
| Less accumulated depreciation |  |  |
| Building | (240,709) | (199,067) |
| Furniture, fixtures and equipment | (1,486,973) | (1,004,352) |
|  | $ 4,582,701 | $ 4,405,374 |

Depreciation expense totaled $344,517 and $410,482 in 1998 and 1997, respectively.

EXHIBIT

1

JUL. 10. 2002. 12:34PM: 12PM                                    NO. 9461;   P. 45

AMERICASBANK
1760 Reston Pkwy Suite 101
Reston, Va 20190-

168-564
12417          0008087314

### THIS IS NOT A CHECK

July 1, 1998

THE SUM OF   Fifty Thousand and 00/100 Dollars

| DOLLAR | CTS |
|--------|-----|
| 50,000 | 00 |

NON-NEGOTIABLE
COUPON

Acct No.  W6 D3
To       Philip F. Kossler
the      127 Huron Dr
order of Carnegie, PA  15106-1826

2142920

NON-NEGOTIABLE THIS IS NOT A CHECK. NON TRANSFERABLE

*You're pre-approved for $50,000 or more . . .*

Dear Philip F. Kossler:

Think what you could do with $50,000 or more right now!  You could pay off high-interest debts and even have some cash left over.  Because you're a homeowner, AmericasBank can help you keep more of your hard-earned paycheck in your pocket and get the cash you need!

An AmericasBank Debt Consolidation Loan can dramatically reduce your total of monthly payments, letting you save hundreds of dollars every month. This chart gives you an example of how much you could lower your monthly payments with a Debt Consolidation Loan from AmericasBank.

| | Your Current Monthly Payments | Your Paysaver ™ Monthly Payment |
|---|---|---|
| Credit Card #1 | | |
| Credit Card #2 | $175 | |
| Car Loan | $150 | |
| Furniture Loan | $350 | $268* |
| New Computer | $ 85 | |
| Medical/Dental Payments | $120 | |
| | $ 90 | |
| **TOTAL PAYMENTS** | $970 | $268 |

**THAT'S A PAYMENT REDUCTION OF $702 EVERY MONTH OR $8,424 THE FIRST YEAR!**

No Equity?  No Problem!  Even if you haven't built much equity in your home, call AmericasBank at 800-500-8667 today.  We can usually give you an answer in 15 minutes or less.

Act now--this is a limited time offer.

Sincerely,

CALL NOW TOLL FREE 1-800-500-8667

Robert C. Simpson
Senior Vice President

**EXHIBIT**
2

P.S.  Your Pre-Approved Voucher expires July 29, 1998, so act now!  Take advantage of your pre-approved status to consolidate your high-interest debts and get the cash you need today.

*1. Based on APR of 11% and term of 180 months on a $15,000 loan amount. Your rate may vary according to your credit history and other factors. This variable amount is not guaranteed subject to ...*

JUL. 10. 2002 2012:34PM PM                                        NCNO. 9461 P. P. 46



# BUSINESS RESULTS

## Mortgage Lending

nce again, the Mortgage Lending Department had a stellar performance. The volume of closed mortgage loans rose dramatically from $220 million in 1998 to more than $514 million in 1999. With numbers like these, it's easy to see why the Mortgage Department accounted for 22% of the Bank's earnings. The success of the central mortgage loan office can be directly attributed to the efforts of the efficient, professional staff responsible for overseeing the Bank's five loan production offices (LPOs). The establishment of these LPOs in Maryland and Virginia has helped to increase mortgage loan volume by offering a diverse product mix including first and second trust mortgage loans.

Late in 1999, the Mortgage Department was restructured, which increased the interest income to the Bank for the fourth quarter of the year. The restructuring related to the loan production offices of the Bank. Previously, the Bank had consulting arrangements with various limited liability companies (LLCs). In late 1999, the contracts with the LLCs were canceled and the primary owner in each LLC became an employee of the Bank. Because of the restructuring, the staff in each office also became employees of the Bank. All revenue and expenses of the mortgage loan production offices was combined with the Bank operations, including incentive bonuses paid to each mortgage office branch manager based upon the profitability of their office. These changes have significantly

impacted several of the Income Statement categories as well as the operating ratios included in the financial highlights section of this report.

The Mortgage Department's strategic marketing efforts were a key factor in the department's overwhelming success last year. A comprehensive direct mail advertising campaign significantly increased the Bank's exposure to targeted prospects in many states. The marketing initiatives for 2000 include the possibility of advertising through the



Internet as an additional method of reaching its target markets for 2000 and beyond.

Technology continues to be a driving force behind the success of Community Bank and we are continuing our efforts to revolutionize the mortgage lending process through our award-winning paperless mortgage origination and processing system.

The outlook for 2000 is bright and Community Bank anticipates another successful year with even greater loan volume. To that end, the Mortgage Lending team will continue to enhance and diversify its loan origination with agency and home equity products to achieve maximum results for both customers and shareholders alike.

## Sales Finance



he Sales Finance Department also set a new standard for success by more than doubling its volume from the previous year. In 1999, the department's portfolio rose



*Richard S. Johnson, Sales Finance Officer, James W. Bongiovanna, General Manager of Mortgage Auto Place Alexandria Virginia*

million comp

Annual R

EXHIBIT

3

JUL. 10. 2002 12:35PM 2:13PM

NO. 9461   P. 47
NO. 9155   P. 37

# 🏛 GOOD FAITH ESTIMATE

Lender: COMMUNITY BANK OF NORTHERN VIRGINIA

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates — the actual charges may be more or less. Your transaction may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A settlement statement which you will be receiving at settlement. The HUD-1 or HUD-1A settlement statement will show you the actual cost for items paid at settlement.

| HUD-1 Number | Service/Provider | | Estimated Charges |
|---|---|---|---|
| 801 | Loan Origination | | |
| 802 | Loan Discount | | 1,928.00 |
| 804 | Credit Report | | 482.00 |
| 807 | Flood Certification Fee | * | 45.00 |
| 1101 | Settlement Fee | | 20.00 |
| 1102 | Abstract or Title Search | | 283.00 |
| 1103 | Title Examination | | 300.00 |
| 1111 | OVERNIGHT FEE | * | 300.00 |
| 1112 | PROCESSING FEE | | 25.00 |
| 1201 | Recording Fees | | 250.00 |
| | | | 41.50 |
| | | T O T A L =====>> | 3,674.50 |

* See Addendum to Good Faith Estimate for information on required settlement service providers.

RUTH J. DAVIS _____ Date _____

_____ Date _____

_____ Date _____

_____ Date _____

Authorized Official _____ Date _____

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which is to be provided to you by your lender, if your application is to purchase residential real property and the Lender will take a first lien on the property.

Property Address
1206 STANFORD CT.
Coraopolis, PA 15108-4009

Mailing Address
1206 STANFORD CT.
Coraopolis, PA 15108-4009

Loan No        BCKB-60570
Preparation Date  February 22, 1995
Sales Price      N/A
Loan Amount      24,100.00

Borrower(s)
RUTH J. DAVIS



EXHIBIT
4

NCNO. 9461 P. P. 48

## ADDENDUM TO GOOD FAITH ESTIMATE

Creditor: COMMUNITY BANK OF NORTHERN VIRGINIA

The following provider(s) of settlement services are required to be used by this Creditor and the amounts listed on the "Good Faith Estimate" for these particular item(s) are based upon the charges of the provider(s) named below:

| PROVIDER: | ITEM: | RELATIONSHIP: |
|---|---|---|
| DrH, Inc. | Credit Report | |
| 4603 Arapaho Road | | |
| Dallas, TX 75248 | | |
| 972-361-6060 | | |
| | | |
| TITLE AMERICA, LLC | Title Examination | |
| 11617 Sunset Hills Road, STE. 105 | | |
| RESTON, VA 20190 | | |
| 703-955-1444 | | |

Interest Rates And Points are Governed By The Laws Of The State Of Virginia.

| | | | |
|---|---|---|---|
| RUTH J. DAVIS | Date | | Date |
| | Date | | Date |

Property Address:            Mailing Address:
1206 STANFORD CT.            1206 STANFORD CT.
Coraopolis, PA 15108-4009   Coraopolis, PA 15108-4009

Appl. Number        : BCNB-60670          Borrower(s):
Preparation Date    : February 22, 1999    RUTH J. DAVIS
Sales Price         : 0.00
Loan Amount         : 24,100.00

Authorized Official        Date Mailed

AM0150-99

JUL. 10. 2002 12:35PM 4PM                                      NO. 9461    P. 49

## Settlement Statement
Transactions without Sellea

| Name & Address of Borrower: | | | Name & Address of Lender: | | |
|---|---|---|---|---|---|
| RUTH J. DAVIS | | | COMMUNITY BANK OF NORTHERN VIRGINIA | | |
| | | | 11417 SUNSET HILLS RD STE8328 | | |
| 1206 STANFORD CT., Coraopolis, PA 15108-4007 | | | RESTON, VA 20190 | | |

| Property Location: (if different from address) | Settlement Agent: |
|---|---|
| 1206 STANFORD CT. | TITLE AMERICA |
| Coraopolis, PA 15108-4007 | Place of Settlement |
| | 11417 SUNSET HILLS RD STE8103, Reston, VA 20190 |

| Loan Number: | Settlement Date: | Disbursement Date: |
|---|---|---|
| 0002-60670 | February 12, 1999 | February 12, 1999 |

| L. SETTLEMENT CHARGES | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|
| 800. Items Payable in Connection with Loan | | | 1501. MCB PA | |
| 801. Loan origination fee to COMMUNITY BANK OF NORTHERN VIRGINIA | 1,526.00 | | | 1,480.00 |
| 802. Loan discount to COMMUNITY BANK OF NORTHERN VIRGINIA | 182.00 | | 1502. PA STATE EMP CREDIT UN | |
| 803. Appraisal fee to | | | | 4,881.00 |
| 804. Credit report to WFS | 12.00 | | 1503. AMEX | |
| 805. Inspection fee to | | | | 3,110.00 |
| 806. Mortgage insurance application fee to | | | 1504. KAUFMANNS | |
| 807. Flood Certification Fee to EWF | 20.00 | | | 693.00 |
| 808. | | | 1505. WYNN/VS | |
| 809. | | | | 259.00 |
| 810. | | | 1506. LAZARUS/YOSHO | |
| 811. | | | | 238.00 |
| 900. Items Required by Lender to be Paid in Advance | | | 1507. MBCA/MICHES | |
| 901. | | | | 177.00 |
| 902. Mortgage insurance premium for months to | | | 1508. TALBOTS | |
| | | | | 167.00 |
| 903. | | | 1509. SAKS FIFTH AVENUE | |
| 904. | | | | 125.00 |
| 1000. Reserves Deposited with Lender | | | 1510. RON TAYLOR | |
| 1001. Hazard insurance mos. @ $ per mo. | | | | 42.00 |
| 1002. Mortgage insurance mos. @ $ per mo. | | | 1511. KOHLS DEP ST | |
| 1003. City property taxes mos. @ $ per mo. | | | | 15.00 |
| 1004. County property taxes mos. @ $ per mo. | | | 1512. MBNA AMERICA | |
| 1005. Annual assessments mos. @ $ per mo. | | | | 3,538.00 |
| 1006. mos. @ $ per mo. | | | 1513. | |
| 1007. mos. @ $ per mo. | | | | |
| 1008. mos. @ $ per mo. | | | 1514. | |
| 1009. mos. @ $ per mo. | | | | |
| 1100. Title Charges | | | 1515. | |
| 1101. Settlement or closing fee to TITLE AMERICA, LLC | | | | |
| 1102. Abstract or title search to TITLE AMERICA, LLC | 255.00 | | 1520. TOTAL DISBURSED (Enter on line 1603) | 17,108.00 |
| 1103. Title examination to TITLE AMERICA, LLC | 180.00 | | | |
| 1104. Title insurance binder to | 350.00 | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorneys' fees to (includes above item numbers ) | | | | |
| 1108. Title insurance to (includes above item numbers ) | | | | |
| 1109. Lender's coverage $ | | | | |
| 1110. Owner's Coverage $ | | | N. NET SETTLEMENT | |
| 1111. OVERNIGHT FEE to TITLE AMERICA, LLC | 25.00 | | 1600. Loan Amount | 24,103.00 |
| 1112. PROCESSING FEE to TITLE AMERICA, LLC | | | 1601. Plus Cash/Check from Borrower | |
| 1113. | 250.00 | | | |
| 1200. Government Recording and Transfer Charges | | | 1602. Minus Total Settlement Charges (line 1400) | 5,674.50 |
| 1201. Recording Fees to ALLEGHENY CO, RECORDS OF DEEDS | 41.50 | | 1603. Minus Total Disbursements to Others (line 1520) | 17,104.00 |
| 1202. | | | | |
| 1203. | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | 3,316.50 |
| 1204. | | | | |
| 1205. | | | | |
| 1400. Total Settlement Charges (enter on line 1602) | 5,674.50 | | | |

Borrower's Signature
RUTH J. DAVIS

Borrower's Signature _____

Borrower's Signature _____

Borrower's Signature _____

EXHIBIT
5

JUL. 10. 2002(12:35PM)4PM                                                         NO. 9461   P. 50

WHEN RECORDED MAIL TO:

Parcel Number:

: BCNB-60670                    **MORTGAGE**

THIS MORTGAGE is made this   22nd   day of       February,   1999       between the Mortgagor,
RUTH J. DAVIS

COMMUNITY BANK OF NORTHERN VIRGINIA, a Virginia corporation      (herein "Borrower"), and the Mortgagee,

a corporation organized and existing under the laws of
whose address is   11417 SUNSET HILLS RD. STE#228, RESTON, VA 20190

(herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $       24,100.00
which indebtedness is evidenced by Borrower's note dated       February 22, 1999       and extensions and
renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of the indebtedness,
if not sooner paid, due and payable on       February 22, 2024   ;
   TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of
the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender the following
described property located in the County of       Allegheny       State of Pennsylvania:

See Attached Exhibit 'A'

which has the address of
                    1206 STANFORD CT., Cornopolis, PA 15108-4009
                    (herein "Property Address");

PENNSYLVANIA — SECOND MORTGAGE — 1/80 — FNMA/FHLMC UNIFORM INSTRUMENT              Form 3839
Laser Form by United Information Resources Corp. (800)341-7009                      Page 1 of 5


EXHIBIT
6

JUL. 10. 2002 12:35PM4PM                                                NO. 9461   P. 51



TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property";

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest. Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessment, if any) which may attain priority over this Mortgage, and ground rents on the Property, if any, plus one-twelfth of yearly premium installment for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional Lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. Prior Mortgages and Deeds of Trust; Charges; Liens. Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

5. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require. The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender, provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

Form 3038
Page 2 of 5



6. **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and component documents.

7. **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

8. **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

9. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

10. **Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

11. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note, without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

12. **Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

13. **Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

14. **Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

15. **Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property

16.  Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

17.  Acceleration; Remedies.  Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided by applicable law specifying, among other things: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure.  If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclosure this Mortgage by judicial proceedings.  Lender shall be entitled to collect in such proceedings all expenses of foreclosure, including, but not limited to, reasonable attorney' fees, and costs of documentary evidence, abstracts and title reports.

18.  Borrower's Right to Reinstate.  Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to at least one hour before the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred;  (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired.  Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19.  Assignment of Rents; Appointment of Receiver; Lender in Possession.  As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due.  All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney' fees, and then to the sums secured by this Mortgage.  Lender and the receiver shall be liable to account only for those rents actually received.

20.  Release.  Upon payment of all sums secured by this Mortgage, Lender shall discharge this Mortgage without charge to Borrower.  Borrower shall pay all costs of recordation, if any.

21.  Interest Rate After Judgment.  Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate stated in the Note.

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

: ECKB-60870

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

| | |
|---|---|
| _____ (Seal) | _____ (Seal) |
| RUTH J. DAVIS      Borrower | Borrower |
| _____ (Seal) | _____ (Seal) |
| Borrower | Borrower |
| _____ (Seal) | _____ (Seal) |
| Borrower | Borrower |
| _____ (Seal) | _____ (Seal) |
| Borrower | Borrower |

(Sign Original Only)

Certificate of Residence

I, _____, do hereby certify that the correct address of the within-named Lender is   11417 SUNSET HILLS RD. STE#228, RESTON, VA. 20190

Witness my hand this _____ day of _____

_____
Agent of Lender

COMMONWEALTH OF PENNSYLVANIA,                                          County ss:

On this _____ day of _____, before me, the undersigned officer, personally appeared

_____ whose name _____ known to me (or satisfactorily proved) to be the person subscribed to me the within instrument and acknowledged that executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and seal.
My Commission Expires:

_____

_____
Title of Officer

_____ (Space Below This Line Reserved for Lender and Recorder) _____

Form 3838
Page 5 of 5

**NOTE**

: BCKB-60670

February 22, 1999

1206 STANFORD CT., Coraopolis, PA 15108-4009

1. **BORROWER'S PROMISE TO PAY**
In return for a loan that I have received, I promise to pay U.S. $ 24,100.00
(This amount will be called "principal"), plus interest, to the order of the Lender. The Lender is   COMMUNITY BANK OF
NORTHERN VIRGINIA, a Virginia corporation
. I understand that the Lender may transfer this
Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder".

2. **INTEREST**
I will pay interest at a yearly rate of   13.750  %.
Interest will be charged on unpaid principal until the full amount of principal has been paid.

3. **PAYMENTS**
I will pay principal and interest by making payments each month of U.S. $  285.50
I will make my payments on the   22nd   day of each month beginning on   MARCH 22, 1999   . I will make these
payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on
February 22, 2024, I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at   11417 SUNSET HILLS RD. STE#228                  or at a different place if required by the Note Holder.
RESTON, VA 20190

4. **BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of   7   calendar days after the date it is due,
I will promptly pay a late charge to the Note Holder. The amount of the charge will be   5.000  % of my overdue payment, but not less than U.S.
$ N/A           and not more than U.S. $ 14.28       . I will pay this late charge only once on any late payment.
(B) Notice From Note Holder
If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the
overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not
mailed, 10 days after the date on which it is delivered to me.
(C) Default
If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default the Note Holder may
require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still
have the right to do so if I am in default at a later time.
(D) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs
and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

5. **THIS NOTE SECURED BY A DEED OF TRUST**
In addition to the protections given to the Note Holder under this Note, a Deed of Trust, dated the same day as this Note, protects the Note Holder
from possible losses which might result if I do not keep the promises which I make in this Note. That Deed of Trust describes how and under what
conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.
Some of those conditions are described as follows:
Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a
beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its
option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise
is prohibited by federal law as of the date of this Deed of Trust.
If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from
the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums
prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

6. **BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of principal at any time before they are due but may be required to pay a prepayment charge. A payment of
principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of
the unpaid principal is known as a "full prepayment". A prepayment of only part of the unpaid principal is known as a "partial prepayment".
If I make a full prepayment or a partial prepayment within   36 MONTHS   from the date of this Note, I will be required to pay a prepayment charge.
This charge will be imposed on the amount of the prepayment that exceeds   twenty   percent (  20  %) of the original principal amount of this
Note in any twelve (12) month period.   The charge will be not exceed the amount equal to two percent (2%) on the amount prepaid in excess of
twenty        percent ( 20 %) of the original principal amount of this Note
The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there
will be no delays in the due dates or changes in the amount of my monthly payments unless the Note Holder agrees in writing to those delays or changes.
If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments
is due. The Note Holder may also require that the amount of my partial prepayment be applied to the amount of principal that would have been paid at my
next one or more monthly payments.

7. **BORROWER'S WAIVERS**
I waive my right to require the Note Holder to do certain things. These things are: (A) to demand payment of amounts due (known as "presentment");
(B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as
a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my
promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties
and endorsers."

8. **GIVING OF NOTICES**
Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property
Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated
in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

9. **RESPONSIBILITY OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made
in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may
enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all
of the amounts owed under this Note. Any person who takes over the rights or obligations under this Note will have all of my rights and must keep all of
my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section
7 above) is also obligated to keep all of the promises made in this Note.

NOTICE TO BORROWER: Do not sign this Note if it contains blank spaces. All spaces should be completed before you sign.

RUTH J. DAVIS                                -Borrower                                -Borrower

                                             -Borrower

SECOND MORTGAGE   8/92   WITH PREPAYMENT PENALTY                              (Sign Original Only)

**EXHIBIT 7**

JUL. 10. 2002, 12:37PM :16PM                                           NO. 9461    P. 56

## GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES
(This is neither a contract nor a commitment to lend)

App No. 2AJ5-98-0008888                                                    07/15/1998

| COMMUNITY BANK OF NORTHERN VIRGINIA | Subject Property Address: |
|---|---|
| 11400 Commerce Park Drive, Ste. 110 RESTON, VA 20190 TEL:(703)904-1200 FAX:(703)715-2137 | 127 HURON DR CARNEGIE CARNEGIE, PA 18106 |
| Borrower(s) / Address | Proposed Loan Information: |
| PHILIP F. KOSSLER JEANNIE C. KOSSLER 127 HURON DR CARNEGIE, PA 18108 | Loan Amount: $307,000.00 Interest Rate: Term: 15 Yrs. Mo. Pmt (P&I): $378.30 |

The information provided below reflects estimates of the charges which you are likely to incur at the settlement of your loan. The fees listed are estimates; the actual charges may be more or less. Your transaction may not involve a fee for every item listed.

The numbers listed beside the estimates generally correspond to the numbered lines contained in the HUD-1 or HUD-1A Settlement Statements which you will be receiving at settlement. The HUD-1or HUD-1A Settlement Statements will show you the actual cost for items paid at settlement. Items marked "POC" were or will be paid outside the closing.

| # | Item Description: | HUD-1 | Amount |
|---|---|---|---|
| 1 | LOAN ORIGINATION FEE | 801 | $2,250.00 |
| 2 | CREDIT REPORT | 804 | $15.00 |
| 3 | DOC REVIEW FEE COMMUNITY BANK NORTHERN V | 808 | $250.00 |
| 4 | PROCESSING FEE COMMUNITY BANK NORTHERN | 808 | $250.00 |
| 5 | SETTLEMENT OR CLOSING FEE TO | 809 | $150.00 |
| 6 | ABSTRACT OR TITLE SEARCH TO | 1101 | $480.00 |
| 7 | TITLE EXAMINATION | 1102 | $25.00 |
| 8 | SIGNING AGENT NSC | 1102 | $325.00 |
| 9 | RECORDING FEES | 1113 | $200.00 |
| 10 | | 1201 | $43.50 |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| | | Total: | $3,700.50 |

These estimates are provided pursuant to the Real Estate Settlement Procedures Act of 1974, as amended (RESPA). Additional information can be found in the HUD Special Information Booklet, which it is to be provided to you by your mortgage broker or lender. If your application is to purchase residential real property and the lender will take a first lien on the property.

☐ This Good Faith Estimate is being provided by the Lender referenced above, a mortgage broker, and no lender has yet been obtained. A lender will provide you with an additional Good Faith Estimate within three business days of the receipt of your loan application. This section is applicable only when checked.

* See attached listing of required service providers, if applicable.

| | |
|---|---|
| POCB = Paid Outside Closing by Borrower | |
| POCL = Paid Outside Closing by Lender | |
| POCO = Paid Outside Closing by Other/Contractor | |
| POCS = Paid Outside Closing by Seller | |
| POCR = Paid Outside Closing by Broker | |

X _____  7-13-98                    X _____
PHILIP F. KOSSLER

X _____  7-13-98                    X _____
JEANNIE C. KOSSLER



EXHIBIT
8

JUL. 10. 2002 12:38PM16PM                                                    NO. 9461    P. 57

## Settlement Statement
Optional Form for
Transactions without Sellers

U.S. Department of Housing
and Urban Development

OMB Approval No. 2502-0491

| Name and Address of Borrower: | Name & Address of Lender: |
|---|---|
| PHILIP F KOSSLER | COMMUNITY BANK OF NORTHERN VIRGINIA |
| JEANNIE C KOSSLER | 11400 Commerce Park Drive, Ste. 110 |
| 127 HURON DR | RESTON, VA 20190 |
| CARNEGIE, PA 15106 | |

| Property location of collateral (from above): | Settlement Agent: PRST NATIONAL TITLE & ESCROW |
|---|---|
| 127 HURON DR CARNEGIE | |
| CARNEGIE, PA 15106 | Place of Settlement: CARNEGIE, PA |

| Loan Number (App Number): 2RJS-58-0009655 | Settlement Date: July 28, 1998 |
|---|---|

| L. | SETTLEMENT CHARGES | | M. | DISBURSEMENT & TO OTHERS | |
|---|---|---|---|---|---|
| 800. | Items Payable in Connection with Loan | | 1501. | | |
| 801. | Loan Origination fee % to | $2,800.00 | | | |
| 802. | Loan Discount % to | | 1502. | MBNA AMERICA BANK NA | $615.00 |
| 803. | Appraisal fee to | | | | |
| 804. | Credit Report to Source | $10.00 | 1503. | FIRST NATL SB VISA/MC | $5,768.00 |
| 805. | Inspection fee to | | | | |
| 806. | Mortgage Insurance application fee to | | 1504. | CITIBANK PREFERRED VISA | $6,908.00 |
| 807. | Mortgage Broker fee to | | | | |
| 800. | 806 REVIEW fee COMMUNITY BANK NORTHERN V | $250.00 | 1505. | ADVANTA | $11,316.40 |
| 808. | Processing fee COMMUNITY BANK NORTHERN | $150.00 | | | |
| 810. | VIRGINIA | | | | |
| 811. | FLOOD CERT COMMUNITY BANK NORTHERN VA | | 1506. | | |
| 900. | Items Required by Lender to be Paid in Advance | | 1507. | | |
| 901. | Interest from to @ $10.68 per day | | | | |
| 902. | Mortgage insurance premium for months to | | 1508. | | |
| 903. | Hazard Insurance premium for year/s to | | 1509. | | |
| 904. | | | 1509. | | |
| 1000. | Reserves Deposited with Lender | | 1510. | | |
| 1001. | Hazard Insurance months @ | | 1511. | | |
| 1002. | Mortgage Insurance months @ | | | | |
| 1003. | City property taxes months @ | | 1512. | | |
| 1004. | County property taxes months @ | | | | |
| 1005. | Annual assessments months @ | | 1513. | | |
| 1006. | months @ | | | | |
| 1100. | Title Charges | | | | |
| 1101. | Settlement or closing fee to PRST NATIONAL TITLE & ESCROW | | 1514. | | |
| 1102. | Abstract or title search to PRST NATIONAL TITLE & ESCROW | $490.00 | | | |
| 1103. | Title examination to PRST NATIONAL TITLE & ESCROW | $125.00 | 1515. | | |
| 1104. | Title insurance binder to | $526.00 | | | |
| 1105. | Document preparation to | | | | |
| 1106. | Notary fee to | | 1520. | TOTAL DISBURSED (enter on line 1603) | $23,710.40 |
| 1107. | Attorney's fees to | | | | |
| | (includes above item numbers) | | | | |
| 1108. | Title insurance to PRST NATIONAL TITLE & ESCROW | | | | |
| | (includes above item numbers) | | | | |
| 1109. | Lender's coverage | | | | |
| 1110. | Owner's coverage | | N. | NET SETTLEMENT | |
| 1111. | Signing Agent/MISC | | | | |
| 1112. | | $200.00 | 1600. | Loan Amount | $50,000.00 |
| 1200. | Government Recording and Transfer Charges | | | | |
| 1201. | Recording fees to | | 1601a. | Plus Check/Check from Borrower | |
| 1202. | City/County tax/stamps to | $49.50 | | | |
| 1203. | State tax/stamps to | | 1601a. | Plus Cash/Check from Borrower | |
| 1204. | CONF ASSIGNMENT | | | | |
| 1300. | Additional Settlement Charges | $6.50 POC L | 1602. | Minus Total Settlement Charges line 1400 | $3,706.30 |
| 1301. | Survey to | | | | |
| 1302. | Pest Inspection to | | 1603. | Minus Total Disbursements to Others line 1520 | $23,710.40 |
| 1303. | Building Permit to | | | | |
| 1304. | LENDERS PORTION MORTGAGE TAX | | 1604. | Excess Disbursement to Borrower | $2,583.30 |
| 1305. | | | | (after expiration of any applicable rescission period required by law) | |
| 1400. | Total Settlement Charges (enter on line 1602) Excluding POC Items | $3,706.30 | | Excluding all POC items | |

The undersigned hereby acknowledge receipt of a completed copy of this statement:

X _Philip F Kossler_     X _____
  PHILIP F KOSSLER

X _Jeannie C Kossler_     X _____
  JEANNIE C KOSSLER

Management Systems Development, Inc. (800)884-9060        Loan Brighton™        ProUSDA(7/28/98 9:44 AM)        form HUD-1A (2/94) - ref. RESPA  Copyright 94 1994-97

EXHIBIT
9

JUL. 10. 2002. 12:38PM17PM

NO. 9461   P. 58

THIS INSTRUMENT PREPARED BY:

## MORTGAGE
### Page 1 of 6

THIS MORTGAGE is made this day,    July 28, 1998    , between the Mortgagor,
PHILIP F KOSSLER AND JEANNIE C. KOSSLER, HUSBAND AND WIFE

(herein "Borrower"),

and the Mortgagee,

COMMUNITY BANK OF NORTHERN VIRGINIA

a corporation organized and existing under the laws of    VIRGINIA    , whose address is
11400 Commerce Park Drive, Ste. 110
RESTON, VA 20190

(herein "Lender").

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S.    $30,000.00    , which indebtedness is evidenced by Borrower's note dated    July 28, 1998    and extensions and renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on August 02, 2013    :

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all other sums, with the interest thereon, advanced in accordance herewith to protect the security of this mortgage; and the performance of the covenants and agreements of Borrower herein contained. Borrower does hereby mortgage, grant and convey to Lender the following described property located in the County of    ALLEGHENY    , State of Pennsylvania:

SEE ATTACHED EXHIBIT A FOR LEGAL DESCRIPTION

which has the address of:    127 HURON DR CARNEGIE
CARNEGIE, PA 15106

(herein "Property Address");

App # 1RJS-98-0009456

Initials: _____    Initials: _____    Initials: _____    Initials: _____

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3838 (Page 1 of 6)
Management Systems Development, Inc. (800) 984-6060    Thin-One Energizer™   #PA_MORT    Copyright (c) 1984

### EXHIBIT
### 10

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property."

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest. Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments , if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by the Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. Prior Mortgages and Deeds of Trust; Charges; Liens. Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

Initials: _PFL_        Initials: _MM_        Initials: _____        Initials: _____        | App # 1RJS-98-0009655 |

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3839 (Page 2 of 5)
Management Systems Development, Inc. (800) 984-5099            This One Energizer!™    #PA_MORT            Copyright (c) 1994

NO. 9461.   P. 60
NO. 9155   P. 50

**5. Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

Initials: _____    Initials: _____    Initials: _____    Initials: _____

App # 1RJS-98-0009655

JUL. 10. 2002. 12:39PM 10PM

NO. 9461    P. 61
NO. 9155    P. 51

11. Successors and Assigns Bound; Joint and Several Liability; Co-Signers. The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that borrower or modifying this Mortgage as to that Borrower's interest in the Property.

12. Notice. Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

13. Governing Law; Severability. The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

14. Borrower's Copy. Borrower shall be furnished a conformed copy of the Note and this Mortgage at the time of execution or after recordation hereof.

15. Rehabilitation Loan Agreement. Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the property.

16. Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

Initials: _____    Initials: _____    Initials: _____    App # 2RJS-98-0009635

Initials: _____

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3809    (Page 4 of 5)

Management Systems Development, Inc. - (800) 984-5060    ®One Sharpshell™    #PA_MCRT    Copyright (c) 1984

JUL. 10. 2002. 12:39PM 18PM

NO. 9461  P. 62

NO. 9155  P. 52

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. Acceleration; Remedies. Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender, prior to acceleration shall give notice to Borrower as provided by applicable law specifying, among other things: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees, and costs of documentary evidence, abstracts and title reports.

18. Borrower's Right to Reinstate. Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to at least one hour before the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. Assignment of Rents; Appointment of Receiver; Lender in Possession. As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage. Lender and the receiver shall be liable to account only for those rents actually received.

20. Release. Upon payment of all sums secured by this Mortgage, Lender shall discharge this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

21. Interest Rate After Judgement. Borrower agrees that the interest rate payable after a judgement is entered on the Note or in an action of mortgage foreclosure shall be the rate stated in the Note.

Initials: _____    Initials: _____    Initials: _____    Initials: _____

App # 2XJS-98-0009655

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3836 (Page 5 of 6)

Management Systems Development, Inc. (800) 984-8660    Title-One Energized™    #PA_MORT    Copyright (c) 1992

July 28, 1998
RESTON, VIRGINIA

## NOTE

PROPERTY ADDRESS:    127 HURON DR CARNEGIE
                     CARNEGIE, PA 15106

App No. 2RJS-98-0009565

**1. BORROWER'S PROMISE TO PAY:** In return for a loan that I have received, I promise to pay U.S. $20,000.00 (this amount is called the "principal"), plus interest, to the order of the Lender. The Lender is COMMUNITY BANK OF NORTHERN VIRGINIA.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST:** I will pay interest at a yearly rate of 12.990 %. Interest will be charged on unpaid principal until the full amount of principal has been paid.

**3. PAYMENTS:** I will pay principal and interest by making payments each month of U.S. $279.38. I will make my payments on the 2nd day of each month beginning on September 03, 1998. I will make these payments every month until I have paid all of the principal and interest and any other charges described below, that I may owe under this Note. If, on August 02, 2013 , I still owe amounts under this Note, I will pay those amounts, in full, on that date.

I will make my monthly payments at 11480 Commerce Park Drive, Ste. 110 RESTON, VA 20190 or at a different place if required by the Note Holder.

**4. BORROWER'S FAILURE TO PAY AS REQUIRED:**

(a) Late Charge for Overdue Payments: If the Note Holder has not received the full amount of any of my monthly payments by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 10.0 % of my overdue payment, but not less than U.S. N/A and not more than U.S. $37.94 . I will pay this late charge only once on each late payment.

(b) Default: If I do not pay the full amount of each monthly payment by the date stated in Section 3 above, I will be in default. Even if, at a time when I am in default, the Note Holder does not require me to pay in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(c) Notice from Note Holder: If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all interest on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or, if it is not mailed, 30 days after the date on which it is delivered to me. If I do not cure the default, the Note Holder will have the rights which the law allows, including the right to require me to pay immediately the full amount of principal which has not been paid and all interest that I owe on that amount.

(d) Payment of Note Holder's Costs and Expenses: If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid for its costs and expenses to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**5. THIS NOTE IS SECURED BY A MORTGAGE:** In addition to the protections given to the Note Holder under this Note, a Mortgage, dated the same day as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE:** I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates of changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS:** I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of non-payment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors," sureties and endorsers."

**8. GIVING OF NOTICES:** Any notice that must be given to me under this Note will be given by delivering it or mailing it by certified mail addressed to me at the Property address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE:** If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amount owed under this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

X _____
   PHILIP F KOSSLER

X _____
   JEANNIE C KOSSLER

X _____

X _____

PENNSYLVANIA - Second Mortgage - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT - Form 3939
Management Systems Development, Inc. (800)984-8060

[Sign Original Only]

The One Mortgage™  IPA_NOTE

Copyright (c) 1994

EXHIBIT
11

JUL. 10. 2002 12:40PM                                                    NO. 9461    P. 64

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing
Notice of Removal was served on this date by U.S. Mail, first-class, postage prepaid upon the
following counsel of record:

R. Bruce Carlson, Esquire
Specter Specter Evans & Manogue, P.C.
The 26th Floor
Koppers Building
Pittsburgh, PA 15219

Counsel for GMAC-Residential Funding
Corporation, Sovereign Bank

Dated: July 9, 2002