# Exhibit 4 to Declaration



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RUSSELL K. and KATHLEEN A. ULRICH, a lawfully married couple, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GUARANTY NATIONAL BANK OF TALLAHASSEE and GMAC-RESIDENTIAL FUNDING CORPORATION,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No:  02  1616<br><br>**COMPLAINT IN CLASS ACTION**<br><br><u>JURY TRIAL DEMANDED</u> |

<u>CLASS ACTION COMPLAINT</u>

## I.    <u>INTRODUCTION</u>

1.      This class action arises from a fraudulent shell game among Defendants and their non-party co-conspirators calculated to extract illegal and excessive fees from Plaintiffs and the Class in connection with the settlement of second mortgage loans.

2.      The fees at issue were fraudulent and violated federal anti-kickback and illegal fee split provisions set forth at 12 U.S.C. § 2607 (a) and (b).

3.      Plaintiffs file this class action seeking damages on behalf of all persons who received a secondary mortgage loan where the HUD 1 Settlement Statement executed by the borrower in connection with the loan indicates that the lender for the loan was Guaranty National Bank of Tallahassee (hereinafter "GNBT"), where the loan is secured by real property anywhere in the United States and where the loan meets the definition of high-cost mortgage set forth at 15 U.S.C. §§ 1602(aa)(1)(A)-(B). Excluded from the Class are Defendants and all directors, officers, agents

and employees of Defendants, as well as any person who timely opts out of this proceeding, and any person who signed a valid release of the claims asserted in this suit.

4.    Defendants in this action are GNBT and GMAC Residential Funding Corporation (hereinafter "GMAC-RFC").

5.    The loans at issue are "high-cost" loans under the Home Ownership and Equity Protection Act, 15 U.S.C. § 1641 (hereinafter "HOEPA").

6.    Defendant GMAC-RFC both actively participated in the origination of the loans at issue and was an assignee which purchased the loans, thereby stepping into the shoes of the "originator" or "lender" pursuant to 15 U.S.C. § 1641(d)(1).

7.    While the HUD 1's executed by Plaintiffs and the Class identified GNBT as the "lender" with respect to the loan transactions at issue, Plaintiffs believe that GNBT was not the actual lender for the loans, but was instead a front which "rented" its state charter in exchange for an undisclosed, or misleadingly and inaccurately disclosed, percentage of the origination fees collected in connection with each loan. This subterfuge is discussed below in detail.

8.    The purpose of this class action is to compel GNBT and GMAC-RFC to disgorge all illegal fees and costs collected in connection with the loans made to Plaintiffs and the Class.

## II.    JURISDICTION AND VENUE

9.    Plaintiffs seek relief under the Real Estate Estate Settlement Practices Act, 12 U.S.C. § 2601, et seq., (hereinafter "RESPA") thereby raising a federal question under 28 U.S.C. §.1331.

10.    Venue is proper in this Court because the transactions which give rise to Plaintiffs' claims took place within this judicial district. Additionally, real property which secures the loans at issue is located in Allegheny County, Pennsylvania.

2

### III.  FACTUAL ALLEGATIONS

A.      **The Predatory Lending Practices Of The GNBT Affiliates**

11.     In the mid-1990's, a substantial number of mortgage lenders began to follow aggressive underwriting practices with respect to mortgage loans secured by second liens on a given borrower's home.  The original principal balance of these loans, when combined with other encumbrances on the realty, frequently exceeded the value of the property.  Thus the loans were known as "High Loan-To-Value" (hereinafter "HLTV") loans, or "125% loans (reflecting a total debt for the property in the amount of 125% of the value of the home).  These loans were disfavored by regulated depository institutions because the amount financed frequently exceeded the equity in the property.

12.     The explosive growth of the HLTV loan market was fueled by several factors.  First, during the mid-1990's American households had a substantial amount of consumer debt and were, as a general proposition, a receptive audience for the deceptive marketing of consumer loan vehicles that promoted debt consolidation.  Second, by the mid-1990's, the secondary market for securitized pools of mortgage loans had become much more viable.  In other words, by the mid-1990's the originators of the loans could easily sell the loans on the secondary mortgage market.  The existence of a viable secondary market permitted loan originators to write the loans aggressively and to lock in substantial profits with little risk.

13.     As a pattern and practice, HLTV originators, including GNBT and/or its affiliate mortgage brokers, entered into standing agreements with entities known as "consolidators."  These consolidators would purchase loans from the originators which met pre-determined underwriting requirements.  The originators, including GNBT and its affiliate brokers, would typically have agreements with multiple consolidators so that they could readily "pre-sell" mortgage loans.  That

3

is, the originators would know going into a mortgage transaction that the loan at issue was going to be immediately resold to a consolidator with which the originator had a standing agreement. Defendant GMAC-RFC was the primary consolidator used by GNBT and/or its affiliates.

14.    When a loan was sold by an originator to a consolidator, the originator would formally assign the loan and mortgage to the consolidator. This assignment would be reflected in the borrower's chain of title.

15.    Consolidators would typically package large numbers of loans together in securitized pools of loans. Though the consolidator would make the assignments of given groups of loans to different securitized pools, the assignment of a specific loan to a specific pool would not necessarily be reflected in the borrower's chain of title.

16.    In recognition of the potential for abusive, predatory lending practices in the home equity market, and to encourage industry self-regulation, Congress passed the HOEPA amendment to the Federal Truth in Lending Act, which, as noted above, is codified at 15 U.S.C. § 1641 et seq.

17.    Congress recognized that most high-cost mortgage loans were pre-sold to consolidators and resold on the secondary market and thus HOEPA includes a calculated and exacting assignee provision that places loan purchasers (here GMAC-RFC) in the same shoes as the originating lender, in part by eliminating the state law holder in due course defense.

18.    Congress expressly sought to expose consolidators and secondary market purchasers to the same potential liability as loan originators. The House Conference Report issued in conjunction with the passage of HOEPA noted this fact as follows: "consumers maintain all claims and defenses in connection with such mortgages [HOEPA - covered mortgages] against Assignees that can be asserted against creditors."

**B.**    **The GNBT Paradigm**

19.    GNBT was a mere front for the origination of HLTV loans. It did nothing meaningful

to support the origination of loans by its affiliate brokers beyond "renting" the use of its state charter

to the brokers in exchange for an undisclosed, or misleadingly and inaccurately disclosed, percentage

of the origination fees charged to borrowers in connection with each loan.

20.    In fact, GNBT's affiliate brokers were also originating HLTV loans in the name of

other state-chartered or national banks during the period implicated by Plaintiffs' claims, and would

merely substitute one bank for another on the appropriate lines in the loan documents. This protocol

led to occasional mix-ups, so that some of the loan documents for a borrower on a loan ostensibly

made by GNBT would include references to a separate state-chartered or national bank, from which

GNBT's affiliate brokers were also "renting" a state charter in exchange for the kick-back of

origination fees.

21.    In exchange for its willingness to rent its state charter to third parties over which it

had no meaningful control, the affiliate brokers would, in fact, kick-back or split a percentage of the

origination charges from each loan to GNBT as a "fee," and the mortgage and note for each loan

would deceptively identify GNBT as the mortgagee. Borrowers were uniformly deceived, however,

regarding the actual amount of origination fees being kicked-back to GNBT. This deception was

rooted in fraudulent disclosures appearing in Section 800 of the HUD 1 Settlement Statements

executed by the borrowers.

22.    The loans originated in this fashion had all been pre-sold pursuant to standing

agreements with consolidators, including Defendant GMAC-RFC.

5

23.    GNBT had an affiliate relationship with mortgage brokers which operated in the name of multiple business entities.

24.    One of the affiliate brokers did business, variously, as Equity Guaranty, LLC, EquityPlus Financial, Inc., EquityPlus Financial LLC, and EquityPlus Prime Lending, LLC. The officers and directors of these entities were: David B. Shumway (President/Treasurer/Registered Agent); Randy A. Bapst (Vice President/Secretary).

25.    GNBT had no meaningful control over the origination of the loans at issue. Instead, the loans were originated unilaterally by GNBT's affiliate brokers.

26.    The apportionment or distribution of the settlement fees among GNBT, the affiliated brokers and other mortgage service providers (primarily the title service providers) owned by the affiliate brokers and/or GNBT was uniformly misrepresented in the HUD 1's executed by Plaintiffs and the Class in Section 800 of the Settlement Statements. Additionally, these Section 800 fees included illegal kickbacks that did not reflect the value of services actually provided.

27.    In addition, the charges for "title costs" imposed upon borrowers in connection with loans ostensibly originated by GNBT significantly exceeded the cost or value of the services performed, and included an illegal fee-split and/or kickback, in violation of RESPA. The apportionment or distribution of these fees denoted in Section 1100 of the Settlement Statement among GNBT, the affiliate brokers and the title service providers was uniformly misrepresented in the HUD 1's executed by Plaintiffs and the Class.

1.    **Fraudulent Section 800 Disclosures**

28.    The Settlement Statements executed by Plaintiffs and the Class misrepresented the amount of settlement fees being retained by GNBT.

6

29.     While the Settlement Statements indicated that the fee being retained by GNBT exceeded 10% of the original principal balance of the loan, this was a fraudulent mischaracterization of the actual amount kicked-back to GNBT.

30.     These fraudulent disclosures were made in Section 800 of the Settlement Statement.

31.     Uniformly across every transaction, the amount actually retained by GNBT did not reflect the value of services actually performed. Plaintiffs and each Class Member were defrauded in materially identical fashion and in materially identical amounts.

32.     The above misrepresentations of fact, made in the context of a federally related mortgage, violated RESPA.

### 2.    Title Costs

33.     All or substantially all of the HLTV loans ostensibly originated by GNBT nationally have included fraudulent and illegal settlement costs ostensibly related to title services.

34.     All or substantially all of the HLTV loans originated by GNBT broker-affiliate Equity Guaranty, LLC nationally included title-related settlement costs noted in HUD1 Settlement Statements as being payable to Title America, LLC. This entity was affiliated with Equity Guaranty, LLC and shared common ownership with Equity Guaranty, LLC and/or GNBT. The affiliate status of the title company was not disclosed to Plaintiffs and the Class.

35.     The title-related settlement charges included in all HLTV loans ostensibly originated by GNBT nationally were grossly excessive and did not reflect fees actually related to the processing of a secondary mortgage loan application or the granting of a secondary mortgage loan. To the contrary, the fees represented a transparent ploy by GNBT and its affiliate brokers to conjure-up additional revenue by representing to Plaintiffs and the Class that they were paying for actual title-

7

related services, when in fact the affiliate brokers used the title companies to disguise additional

bogus fees being funneled to GNBT and its affiliate brokers.

36.    The affiliate brokers generated significant bogus revenue by fraudulently padding the

title charges delineated in Section 1100 of the HUD 1, and washing the charges through title

companies that they owned and controlled, so that the bogus fees would be split among the title

companies, the brokers and/or GNBT. The HUD 1 statements provided to Plaintiffs and the Class

were calculated to conceal this fraudulent scheme as follows: 1) by supplying false information with

respect to the actual recipient of the fees (i.e. there were kick-backs and/or fee splits being paid with

these fees that were not reflected in the HUD-1); 2) by charging fees for supposed settlement

services when in fact no service was being performed, and concealing the existence of a fee split

and/or kick-back in connection with said charges; 3) by radically over-charging for settlement

services that were, in fact, performed and then splitting or kicking-back the unearned fees without

disclosing this fact to Plaintiffs and the Class in the HUD 1's or otherwise.

37.    As a pattern and practice, borrowers would not receive the disclosure of affiliate

relationship form required by 12 U.S.C. § 2607(c)(4)(A) apprising them of the joint ownership and

control of the affiliate brokers and the title companies. The named Plaintiffs did not receive the

required disclosures.

38.    GNBT and/or its affiliate brokers received kick-backs in connection with the title

charges imposed upon Plaintiffs and the Class which substantially exceeded a legal return on

ownership interest.

39.    In addition, the disclosures made in Section 1100 of the Settlement Statements

executed by the borrowers did not accurately reflect the existence of a fee split or kick-back among

GNBT, the affiliate brokers and/or the title service providers. Further, Plaintiffs and each Class

8

Member were defrauded in materially identical fashion and in materially identical amounts. While the value of any title services rendered in connection with any given loan approximated $200.00, Plaintiffs and the Class were charged amounts approximating or exceeding $1,000.00 for these services.

### C.    The Role Of Defendant GMAC-Residential Funding Corporation

40.    Defendant GMAC-Residential Funding Corporation ("GMAC- RFC") was, by far, the largest purchaser or consolidator of loans ostensibly made by GNBT.

41.    GMAC-RFC entered into a loan purchase agreement with GNBT and/or its affiliate brokers.

42.    GMAC-RFC would, as a custom or policy, make a purchase pledge or commitment relating to substantially all of the loans that it purchased from GNBT and/or its affiliate brokers prior to the actual settlement or closing of a given loan.

43.    Prior to making a purchase pledge in the context of a given loan, however, GMAC-RFC would require certain information regarding the proposed terms of the prospective loan and regarding the credit and income histories of the prospective borrower.

44.    This information, or purchase pledge data, would be transmitted to GMAC-RFC in a standardized template or format, consistent with GMAC-RFC's general purchase requirements.

45.    Additionally, because the loans at issue were high-cost HOEPA loans, GMAC-RFC required that GNBT and/or its affiliate brokers provide a "Section 32" analysis delineating the specific breakdown of settlement costs to be charged to the borrower in the context of a given loan so that GMAC-RFC could determine whether the loan at issue was a HOEPA-covered loan.

46.    GMAC-RFC purchased thousands of loans from GNBT and/or its affiliate brokers.

9

47.     In connection with each of these loans, GMAC-RFC would receive the original loan file in its entirety, including executed HUD-1 Settlement Statements.

48.     GMAC-RFC performed random quality control audits of the loans purchased from GNBT and/or its affiliate brokers.

49.     GMAC-RFC thus knew, or should have known, the precise delineation of settlement fees charged to borrowers in connection with these loans.

50.     GMAC-RFC purchased second mortgage loans from various originators throughout the country and knew, or should have known, the customary range of settlement fees charged by third-party vendors, including title service providers, in the same markets where GNBT and/or its affiliate brokers originated loans.

51.     GMAC-RFC knew or should have known that the title-related settlement fees charged by the title company affiliates of GNBT and/or its brokers were grossly inflated, did not reflect fees actually related to the processing of the loans and grossly exceeded the customary range of fees charged for the same services in the markets where GNBT and/or its affiliate brokers originated loans.

52.     GMAC-RFC knew or should have known that GNBT and/or its affiliates, as a custom or policy, failed to provide written disclosures denoting the affiliation among GNBT, its brokers and the title companies used to settle the loans at issue.

53.     GMAC-RFC knew or should have known that the settlement statements issued in connection with the loans at issue did not accurately disclose the actual fee split of Section 800 Fees between GNBT and its brokers.

54.    GMAC-RFC knew or should have known that the actual Section 800 kickback

retained by GNBT did not reflect the value of services actually performed in connection with the

loans at issue.

**D.    Federal Law Applicable To The Class**

55.    Sections 8(a) and (b) of RESPA, 12 U.S.C. § 2607(a)-(b), and 12 C.F.R. §3500.14

and 15 prohibit the kickbacks and/or fee splits, nondisclosures and fraudulent disclosures above

described.

**E.    Equitable Tolling**

56.    Any applicable statute of limitations that might otherwise bar Plaintiffs' claims

should be tolled because GNBT, its affiliate brokers, its affiliate title companies and/or GMAC-RFC

provided false settlement information to Plaintiffs and the Class and otherwise fraudulently

concealed:

(a)    the identity of the actual originator and/or lender for the loans
at issue;

(b)    the existence of affiliate relationships among GNBT, its brokers and
the title companies;

(c)    the actual apportionment of the kickback or fee split of amounts
delineated in Section 800 of the Settlement Statements (i.e. the
understatement of amounts kicked-back to the affiliate brokers);

(d)    the actual cost or value of title-related services;

(e)    the actual cost or value of any origination service provided by GNBT;

(f)    the actual existence of and/or actual apportionment of the fee
split/kickback of the grossly inflated fees for title services;

(g)    the fact that the affiliated entities were receiving fees in excess of a
legal return on ownership interest in connection with title-related
services;

11

(h)    the fact that GNBT was receiving origination fees in excess of a legal
return on ownership interest, as well as the apportionment of the fee
split with respect to these fees;

(i)    the fact that GMAC-RFC conspired with GNBT and the affiliate
brokers to facilitate the unlawful practices above-described, and,
indeed, the fact that GMAC-RFC was materially involved in the
transactions at issue.

57.    Plaintiffs have exercised all due diligence that would reasonably be expected of
consumer/borrowers in the context of a residential mortgage settlement. That is, they attentively
participated in the settlement of the loan at issue, and all aspects of the borrowing process, but had
no realistic ability to discern that they were being materially defrauded by their lender and its co-
conspirators as delineated above in detail until they learned of this fact as a function of their
counsel's investigation related to the claims asserted in this Complaint.

58.    Notwithstanding the exercise of due diligence, Plaintiffs and the Class could not
reasonably have been expected to learn or discover the fact that they were deceived by the
dissemination of false settlement information, and that material information, generally, was
concealed from them in connection with the settlement of the loans at issue. That is, the purpose
of RESPA is to accurately disclose what amount of settlement money is flowing to each settlement
vendor and to indicate what service that vendor is providing in connection with the loan. The
premise of RESPA is that the accurate dissemination of settlement information is a necessary
predicate to the operation of a free market for the provisions of settlement services and, in turn, that
a free market is necessary to maximize the likelihood that borrowers will be charged fair prices for
settlement services. The provision of false settlement information at closing constitutes a violation
of RESPA. In the context of the loans at issue, RESPA was violated in wholesale and fundamental
fashion by the dissemination of false information regarding: 1) The actual amount of the settlement

fee that was being paid to a given vendor; 2) Which vendor was actually receiving the fee;  3) What services were being performed by that vendor; and, 4) The value of the services being performed by the vendor.   Further, the existence of affiliate relationships among the settlement service providers was fraudulently concealed from Plaintiffs and the Class, again in violation of RESPA. Therefore, the claims being asserted by Plaintiff and the Class present the archetypical scenario in which equitable tolling is necessary to effectuate the purpose of the federal statutory scheme at issue.

## IV.   THE PARTIES

59.     Plaintiffs Russell and Kathleen Ulrich are lawfully married individuals residing at 515 Fieldcrest Drive, Pittsburgh, PA 15209.

60.     Defendant Guaranty National Bank of Tallahassee is a national bank and is a wholly owned subsidiary of Evergreen Bancshares, Inc. with a principal place of business at 1706 West Tallahassee Street, Tallahassee, Florida 32304.

61.     Defendant GMAC-Residential Funding Corporation is a Minnesota corporation with its principal place of business located at 8400 Normandale Lake Boulevard, Minneapolis, MN 55437.

## V.   THE LOAN MADE TO PLAINTIFFS

62.     The Ulrich's obtained a secondary mortgage loan closed in GNBT's name on or about August 8, 2000.  The principal amount of the loan was $46,850.00  The interest rate for this loan was 12.99%.  The A.P.R. for the loan was 15.469%.  The loan was a high-cost HOEPA loan.  The last scheduled payment on the loan is August 14, 2025.  The loan was secured by a lien on Plaintiffs' residence.  Copies of the HUD 1 Settlement Statement, Mortgage,  Mortgage Note and Federal Truth in Lending Disclosure Statement relating to the loan are appended hereto as Exhibits "1"-"4."

13

63.    At closing, the Ulrich's were charged various Section 800 costs and fees ostensibly payable to GNBT as follows:

| | | |
|---|---|---|
| a. | origination fee: | $4,685.00 |
| 2. | loan discount: | $937.00 |
| b. | application fee: | $150.00 |
| c. | underwriting fee: | $185.00 |

SECTION 800 SETTLEMENT COSTS OSTENSIBLY TO GNBT: $5,957.00

64.    The amount actually retained by GNBT in connection with Section 800 origination fees differed from the amount disclosed in the Settlement Statement

65.    Additionally, the Plaintiffs were charged title-related closing costs in excess of $1,000.00. The majority of these charges were bogus in that they did not reflect payment for services actually performed in connection with processing the loan. Instead, the charges reflect a transparent mechanism through which GNBT funneled additional illegal fees to Title America, a company which GNBT and the affiliate broker owned and controlled.

66.    Part of these fees were kicked-back or split with the affiliate broker and its owners, and with GNBT. The kickbacks, and the specific apportionment of the fee split, were not disclosed to the Ulrich Plaintiffs.

67.    The actual value of any title-related services performed in connection with the loan to the Ulrich's was $200.00 or less.

## VI.  CLASS ALLEGATIONS

68.    This class action is filed pursuant to Fed. R. Civ. P. 23 on behalf of all persons who received a secondary mortgage loan where the HUD 1 Settlement Statement executed by the borrower in connection with the loan indicates that the lender for the loan was Guaranty National Bank of Tallahassee (hereinafter "GNBT"), where the loan is secured by real property anywhere in

14

the United States and where the loan meets the definition of high-cost mortgage set forth at 15 U.S.C. §§ 1602(aa)(1)(A)-(B). Excluded from the Class are Defendants and all directors, officers, agents and employees of Defendants, as well as any person who timely opts out of this proceeding, and any person who signed a valid release of the claims asserted in this suit.

69.    The class is so numerous as to make it impracticable to bring all members of the Class before the Court. It is believed, based upon publicly available information, that the Class includes thousands of members. In some instances, such persons may be unaware that claims exist on their behalf. To the extent that the Class members have knowledge of their claims, their damages are in such amounts that when taken individually, they may be too small to justify the expense of a separate lawsuit.

70.    The representative Plaintiffs' claims are typical of, if not identical to, the claims of the Class. Plaintiffs received secondary mortgage loans ostensibly originated by GNBT with the same illegal interest, costs and expenses charged in the loans made to Class members.

71.    The representative Plaintiffs will fairly and adequately represent the members of the Class and have no interests which are antagonistic to the claims of the Class. They are aware that they cannot settle this action without Court approval. Their interests in this action are antagonistic to the interests of GNBT and the Assignee Defendants and they will vigorously pursue the claims of the Class.

72.    The representative Plaintiffs have retained counsel who are competent and experienced in class action litigation, and have represented other consumers in complex class actions. Counsel have agreed to handle this case on a contingent basis, with their compensation for professional services only as awarded by the Court. Counsel have agreed to advance the expenses of the litigation contingent upon its outcome.

15

73.    Common questions of law and fact affect the rights of each member of the Class and a common remedy by way of permissible damages and declaratory relief is sought for the Class.

74.    There are numerous and substantial questions of law and fact common to all members of the Class which will control in this litigation and which will predominate over any so-called individual issues. These common questions of law and fact include the following:

    a)    Whether GNBT and its co-conspirators, including Defendant GMAC-RFC, as a uniform custom or policy, imposed materially identical fraudulent settlement charges and fees upon Plaintiffs and the Class;

    b)    Whether GNBT violated RESPA as above-alleged;

    c)    Whether GMAC-RFC conspired with GNBT, its affiliate brokers and its affiliate title companies to commit the unlawful acts alleged herein; and,

    d)    Whether GNBT, and/or the assignee Defendants, are liable for attorneys' fees and costs, in addition to other available civil remedies and penalties, including treble damages.

75.    A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy. The substantive claims of the representative Plaintiffs and the Class are identical and will require evidentiary proof of the same kind and application of the same law.

76.    The representative Plaintiffs will seek to identify all Class members through discovery procedures as may be appropriate and will provide to the Class such notice of this action as the Court may direct.

## COUNT I
## RESPA – 12 U.S.C. § 2607(a)-(b)

77.    GNBT and/or its affiliate brokers defrauded Plaintiffs and the Class in violation of RESPA's fee split and disclosure provisions by misrepresenting the amount of fees being retained by GNBT in Section 800 of Plaintiffs' and the Classes' Settlement Statements.

16

78.    GNBT retained an undisclosed fee spit that exceeded the value of any service performed in violation of RESPA.

79.    GNBT and/or its affiliate brokers charged Plaintiffs title-related settlement costs that exceeded any amount disclosed to Plaintiffs as being a customary charge for the services being provided by the affiliated title companies.

80.    GNBT and/or its affiliate brokers received kickbacks or fee splits from the title companies that exceeded, by far, a legal return on ownership interest and this fact was not disclosed to Plaintiffs.

81.    GNBT and/or its affiliate brokers defrauded Plaintiffs and the Class in violation of RESPA's fee split and disclosure provisions by misrepresenting the actual amount of fees being retained by the affiliate brokers, the affiliated title service providers and/or GNBT in Section 1100 of Plaintiffs' and the Classes' Settlement Statements

82.    As a result of the RESPA violations above alleged, Plaintiffs have been damaged in an amount to be determined at a trial of this action where they will seek all permissible damages, fees and costs.

WHEREFORE, Plaintiffs and the Class request that the Court enter judgment against GNBT and GMAC-RFC, jointly and severally, and that the Court award all permissible damages sustained by Plaintiffs and the Class, including treble damages, along with statutory counsel fees, costs and other appropriate relief.

**PLAINTIFFS DEMAND TRIAL BY JURY.**

17

**SPECTER SPECTER EVANS
& MANOGUE, P.C.**

By: _R. Bruce Carlson_

R. Bruce Carlson, Pa. I.D. #56657

The 26th Floor
Koppers Building
Pittsburgh, Pennsylvania 15219
(412) 642-2300

*OF COUNSEL:*

Eric G. Calhoun
LAWSON, FIELDS, MCCUE, LEE
     & CAMPBELL
14135 Midway Road
Addison, Texas 75001

A. Hoyt Rowell, III
Daniel Myers
Kevin Oufnac
RICHARDSON, PATRICK, WESTBROOK
     & BRICKMAN, LLC
503 Wando Park Boulevard
Suite 200
Mt. Pleasant, SC 29464

EXHIBIT 1

## Settlement Statement
### Transactions without Sellers

| Name & Address of Borrower: | Name & Address of Lender: |
|---|---|
| KATHLEEN A. ULRICH and RUSSELL K. ULRICH | Guaranty National Bank of Tallahassee |
| 515 FIELDCREST DR, Pittsburgh, PA 15209 | 11417 Sunset Hills Road, Ste 105 Reston, VA 20190 |

| Property Location: (If different from address) | Settlement Agent: |
|---|---|
| 515 FIELDCREST DR | TITLE AMERICA |
| Pittsburgh, PA 15209 | Place of Settlement: |
| | 11417 SUNSET HILLS RD STE#105, Reston, VA 20190 |

| Loan Number: | Settlement Date: | Disbursement Date: |
|---|---|---|
| DMF-257441 | August 8, 2000 | August 14, 2000 |

| L. SETTLEMENT CHARGES | | | M. DISBURSEMENT TO OTHERS | |
|---|---|---|---|---|
| 800. Items Payable in Connection with Loan | | | 1501. PARKVALE | 14,702.95 |
| 801. Loan origination fee to GUARANTY NATIONAL BANK | 4,685.00 | | | |
| 802. Loan discount to GUARANTY NATIONAL BANK | 937.00 | | 1502. NATIONAL CITY | 6,318.00 |
| 803. Appraisal fee to | | | | |
| 804. Credit report to | | | 1503. ALLEGHENY VALLEY BANK | 3,285.00 |
| 805. Inspection fee to | | | | |
| 806. Mortgage insurance application fee to | | | 1504. FLEET CC | 4,036.00 |
| 807. Application Fee to GUARANTY NATIONAL BANK | 150.00 | | | |
| 808. | | | 1505. SEARS | 3,869.00 |
| 809. | | | | |
| 810. | | | 1506. KOHLS DEPARTMENT STORE | 1,669.00 |
| 811. Underwriting Fee to GUARANTY NATIONAL BANK | 185.00 | | | |
| 900. Items Required by Lender to be Paid in Advance | | | 1507. | |
| 901. | | | | |
| | | | 1508. | |
| 902. Mortgage insurance premium for        months to | | | 1509. | |
| 903. | | | | |
| 904. | | | 1510. | |
| 1000. Reserves Deposited with Lender | | | | |
| 1001. Hazard insurance        mos. @ $        per mo. | | | 1511. | |
| 1002. Mortgage insurance        mos. @ $        per mo. | | | | |
| 1003. City property taxes        mos. @ $        per mo. | | | 1512. | |
| 1004. Cnty. property taxes        mos. @ $        per mo. | | | | |
| 1005. Annual assessments        mos. @ $        per mo. | | | 1513. | |
| 1006.        mos. @ $        per mo. | | | | |
| 1007.        mos. @ $        per mo. | | | 1514. | |
| 1008.        mos. @ $        per mo. | | | | |
| 1099. | | | 1515. | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee to TITLE AMERICA, LLC | 275.00 | | 1520. TOTAL DISBURSED (Enter on line 1603) | 33,819.95 |
| 1102. Abstract or title search to TITLE AMERICA, LLC | | | | |
| 1103. Title examination to TITLE AMERICA, LLC | 83.00 | | | |
| 1104. Title insurance binder to | 300.00 | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorneys' fees to (includes above item number s        ) | | | | |
| 1108. Title insurance to (includes above item number s        ) | | | | |
| 1109. Lender's coverage $ | | | N. NET SETTLEMENT | |
| 1110. Owners Coverage $ | | | 1600. Loan Amount | 46,850.00 |
| 1111. Overnight Fee to TITLE AMERICA, LLC | 25.00 | | | |
| 1112. Document Review to TITLE AMERICA, LLC | 260.00 | | 1601. Plus Cash/Check from Borrower | |
| 1113. Processing Fee to TITLE AMERICA, LLC | 250.00 | | | |
| 1200. Government Recording and Transfer Charges | | | 1602. Minus Total Settlement Charges (line 1400) | 7,191.50 |
| 1201. Recording Fees to ALLEGHENY CO. RECORDER OF DEEDS | 41.50 | | | |
| 1202. | | | 1603. Minus Total Disbursements to Others (line 1520) | 33,819.95 |
| 1203. | | | | |
| 1204. | | | 1604. Equals Disbursements to Borrower (after expiration of any applicable rescission period required by law) | 5,838.55 |
| 1205. | | | | |
| 1400. Total Settlement Charges (enter on line 1602) | 7,191.50 | | | |

| Borrower's Signature | Borrower's Signature |
|---|---|
| KATHLEEN A. ULRICH | RUSSELL K. ULRICH |

| Borrower's Signature | Borrower's Signature |
|---|---|

# EXHIBIT 2

WHEN RECORDED MAIL TO:


Parcel Number:


: DMF-257441              ## MORTGAGE

THIS MORTGAGE is made this   8th   day of        August,    2000                    between the Mortgagor,
KATHLEEN A. ULRICH and RUSSELL K. ULRICH


                                                              (herein "Borrower"), and the Mortgagee,
    Guaranty National Bank of Tallahassee

a corporation organized and existing under the laws of
,whose address is  11417 Sunset Hills Road, Ste 105, Reston, VA 20190
                                                              (herein "Lender").


        WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $        46,850.00
which indebtedness is evidenced by Borrower's note dated      August  8, 2000                    and extensions and
renewals thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of the indebtedness,
if not sooner paid, due and payable on          August 14, 2025        ;
        TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the performance of
the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey to Lender the following
described property located in the County of                    Allegheny                    State of Pennsylvania:

    See Attached Exhibit 'A'


which has the address of
            515 FIELDCREST DR, Pittsburgh, PA 15209.
                    (herein "Property Address");

| PENNSYLVANIA — SECOND MORTGAGE — 1/80 — FNMA/FHLMC UNIFORM INSTRUMENT | Form 3839 |
|---|---|

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents, all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property";

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2.  **Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage, and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional Lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a Federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3.  **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4.  **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

5.  **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage", and such other hazards as Lender may require and in such amounts and for such periods as Lender may require. The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

*LaserDoc (TM) by Delphi Information Sciences Corp. DE319-2.1096*

Form 3839
Page 2 of 5

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance by Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note, without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of Federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs", "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

LaserDoc (TM) by Delphi Information Sciences Corp.   DE319-3.1096

Form 3839
Page 3 of 5

16.  Transfer of the Property or a Beneficial Interest in Borrower.  If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

17.  Acceleration; Remedies.  Upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided by applicable law specifying, among other things:  (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 30 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property.  The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure.  If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceedings.  Lender shall be entitled to collect in such proceedings all expenses of foreclosure, including, but not limited to, reasonable attorney' fees, and costs of documentary evidence, abstracts and title reports.

18.  Borrower's Right to Reinstate.  Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to at least one hour before the commencement of bidding at a sheriff's sale or other sale pursuant to this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred:  (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees;  and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired.  Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19.  Assignment of Rents; Appointment of Receiver; Lender in Possession.  As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver  shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due.  All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney' fees, and then to the sums secured by this Mortgage.  Lender and the receiver shall be liable to account only for those rents actually received.

20.  Release.  Upon payment of all sums secured by this Mortgage, Lender shall discharge this Mortgage without charge to Borrower.  Borrower shall pay all costs of recordation, if any.

21.  Interest Rate After Judgment.  Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate stated in the Note.

LaserDoc (TM) by Delphi Information Sciences Corp.  DE319-4,1096

Form 3839
Page 4 of 5

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

: DMF-257441

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

| | | |
|---|---|---|
| _____ (Seal) | KATHLEEN A. ULRICH | Borrower |
| RUSSELL K. ULRICH _____ (Seal) | | Borrower |

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

_____ (Seal)
Borrower

(Sign Original Only)

**Certificate of Residence**

I, _____, do hereby certify that the correct address of the within-named Lender is  11417 Sunset Hills Road, Ste 105, Reston, VA 20190

Witness my hand this _____ day of _____

_____
Agent of Lender

COMMONWEALTH OF PENNSYLVANIA,                                    **County ss:**

On this _____ day of _____, before me, the undersigned officer, personally appeared _____

_____ known to me (or satisfactorily proved) to be the person _____ whose name _____ subscribed to the within instrument and acknowledged that executed the same for the purposes herein contained..

IN WITNESS WHEREOF, I hereunto set my hand and seal.
My Commission Expires:

_____

_____
Title of Officer

_____ (Space Below This Line Reserved For Lender and Recorder) _____

LaserDoc (TM) by Delphi Information Sciences Corp. DE319-5.1095

Form 3839
Page 5 of 5

# EXHIBIT 3

## NOTE

: DMF-257441

August 8, 2000
[Date]                                                                              [City]                              [State]

515 FIELDCREST DR, Pittsburgh, PA 15209
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $  46,850.00     (this amount will be called
"principal"), plus interest, to the order of the Lender.  The Lender is  Guaranty National Bank of Tallahassee

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to
received payments under this Note will be called the "Note Holder."

### 2. INTEREST

I will pay interest at a yearly rate of     12.990  %.
Interest will be charged on unpaid principal until the full amount of principal has been paid.

### 3. PAYMENTS

I will pay principal and interest by making payments each month of U.S. $     528.04
I will make my payments on the     14th     day of each month beginning on     September 14, 2000     ,
I will make these payments every month until I have paid all of the principal and interest and any other charges, described below,
that I may owe under this Note.  If, on     August 14, 2025                          , I still owe amounts under this Note, I
will pay all those amounts, in full, on that date.
I will make my monthly payments at     Guaranty National Bank of Tallahassee, 11417 Sunset
Hills Road, Ste 105, Reston, VA 20190          or at a different place if required by the Note Holder.

### 4. BORROWER'S FAILURE TO PAY AS REQUIRED

(A) Late Charge for Overdue Payments
If the Note Holder has not received the full amount of any of my monthly payments by the end of  10      calendar days after
the date it is due, I will pay a late charge to the Note Holder.  The amount of the charge will be     5.000 % of my overdue
payment, but not less than U.S. $     N/A          and not more than U.S. $     26.40          .  I will pay this late charge only once
on any late payment.

(B) Default
If I do not pay the full amount of each monthly payment by the date stated Section 3 above, I will be in default.
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described below, the
Note Holder will still have the right to do so if I am in default at a later time.

(C) Notice From Note Holder
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain
date the Note Holder has required me to pay immediately the full amount of principal which has not been paid and all the interest that
I owe on that amount.  That date must be at least 30 days after the date on which the notice is mailed to me or, if it is not mailed, 30
days after the date on which it is delivered to me.

(D) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid
back for its costs and expenses to the extent not prohibited by applicable law.  Those expenses include, for example, reasonable
attorneys' fees.

### 5. THIS NOTE SECURED BY A MORTGAGE

In addition to the protections given to the Note Holder under this Note, a Mortgage, dated     August 8, 2000          ,
protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That
Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe
under this Note.

PENNSYLVANIA——SECOND MORTGAGE—1/80——FNMA/FHLMC UNIFORM INSTRUMENT
LaserDoc (TM) by Delphi Information Sciences Corp.  OE320-1.1096

Form 3939
Page 1 of 2

: DMF-257441

## 6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

## 7. BORROWER'S WAIVERS

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

## 8. GIVING OF NOTICES

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

## 9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

_____ (Seal)          _____ (Seal)
KATHLEEN A. ULRICH            Borrower     RUSSELL K. ULRICH            Borrower

_____ (Seal)          _____ (Seal)
                             Borrower                                   Borrower

_____ (Seal)          _____ (Seal)
                             Borrower                                   Borrower

_____ (Seal)          _____ (Seal)
                             Borrower                                   Borrower

*(Sign Original Only)*

*LaserDoc (TM) by Delphi Information Sciences Corp. DE320-2.1096*

Form 3939
Page 2 of 2

# EXHIBIT 4

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name: Guaranty National Bank of Tallahassee
11417 Sunset Hills Road, Ste 105
Reston, VA 20190

Date:  August  8, 2000

Re:  DMF-257441

Borrower(s)    KATHLEEN A. ULRICH and RUSSELL K. ULRICH

Property Address: 515 FIELDCREST DR
Pittsburgh, PA 15209

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be    15.469 %.

Your regular   Monthly    payment will be $   528.04

☐   Your interest rate may increase.  Increases in the interest rate could increase your payment.  The highest amount your payment could increase is to $   N/A

---

I/We acknowledge we have read and received, three business days prior to settlement, a copy of this disclosure statement.

_____        _____
KATHLEEN A. ULRICH              Date        RUSSELL K. ULRICH              Date

_____        _____
                                Date                                      Date

_____        _____
                                Date                                      Date

_____        _____
                                Date                                      Date

LaserDoc (TM) by Delphi Information Sciences Corp.  EP017.0500

# Exhibit 5 to Declaration

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:    COMMUNITY BANK OF    )
    NORTHERN VIRGINIA AND    )
    GUARANTY NATIONAL BANK    )    CASE NO.: 03-0425
    OF TALLAHASSEE SECOND    )    Honorable Gary L. Lancaster
    MORTGAGE LOAN LITIGATION  )

## FINDINGS AND ORDER CONDITIONALLY CERTIFYING A CLASS FOR SETTLEMENT PURPOSES, PRELIMINARILY APPROVING THE CLASS SETTLEMENT, DIRECTING THE ISSUANCE OF A CLASS NOTICE TO THE CLASS AND SCHEDULING A SETTLEMENT HEARING

WHEREAS, various Class Action Complaints have been filed with, (or removed to), this Court on behalf of the following representative plaintiffs: Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Picard, Nora Miller, Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich, Thomas Mathis, Stephen and Amy Haney, and Patrice Porco, at the following docket numbers: 03-0425; 02-1201; 02-2000; 02-1563; 02-1616; and 02-1999.

WHEREAS, the parties and their attorneys have entered into a Settlement Agreement and Release, dated as of July 11, 2003, in which the parties have agreed upon a settlement of the Action, subject to the approval and determination of the Court as to the fairness, reasonableness, and adequacy of the settlement which, if approved, will result in dismissal of the Action with prejudice;

NOW, THEREFORE, upon reviewing the Settlement Agreement and Release, including the exhibits attached thereto (together, the "Settlement Agreement"), and upon reviewing all prior proceedings herein, and the matter having come before the Court for a Status Conference on June 6, 2003, and the plaintiffs having appeared by R. Bruce Carlson and Daniel O. Myers and the defendants having appeared by Thomas L. Allen, Roy W. Arnold,

Richard Tucker, F. Douglas Ross, David G. Oberdick, and Thomas P. Oldweiler, on application of the parties and based on the record,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.     These actions are all hereby consolidated at Case No. 03-0425 (the "Action"), the lead case. All pleadings hereafter shall be filed at this number. The Clerk of Court shall close Civil Actions Nos. 02-1201, 02-1563, 02-1616, 02-1999 and 02-2000.

2.     The Action is preliminarily certified as a Class Action for settlement purposes only pursuant to Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2). Defendants retain all rights to assert that this Action may not be certified as a class action except for settlement purposes. The Class consists of all persons ("Class Members") who: (a) entered into a loan agreement with Community Bank of Northern Virginia ("CBNV") and/or Guaranty National Bank of Tallahassee ("GNB"); (b) whose loan was secured by a second mortgage or deed of trust on property located in the United States; (c) whose loan was purchased by Residential Funding Corporation ("RFC"); and, (d) who was not a member of the class certified in the action captioned Baxter v. Guaranty National Bank, et al., Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

3.     Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Picard, Nora Miller, Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich, Thomas Mathis, Stephen and Amy Haney are hereby designated as representatives of the conditionally certified class.

4.     R. Bruce Carlson, (of the law firm Specter Specter Evans and Manogue, P.C.) and A. Hoyt Rowell, III and Daniel O. Myers, (of the law firm Richardson, Patrick, Westbrook and Brickman), are hereby designated as Counsel for the conditionally certified Class.

5.     The Court has subject-matter jurisdiction over this Action pursuant to 28 U.S.C. Section 1331, 1332 and 1367, and personal jurisdiction over the parties before it.

6.    The Settlement Agreement falls "within the range of possible approval" (Manual for Complex Litigation 3d Section 30.41), and therefore is preliminarily approved as being sufficient to warrant sending notice to the Class and scheduling a formal Settlement Hearing.

7.    A Settlement Hearing shall be held on November 14, 2003, at 10:00 a.m., or at such later date as the Court may direct, at the United States District Court for the Western District of Pennsylvania, U.S. Post Office and Courthouse, 7th Avenue and Grant Street, Pittsburgh, Pennsylvania, in Courtroom 911, to consider whether the Class meets the requirements for final certification under Fed. R. Civ. P. 23(a), (b)(3), (c)(2) and the United States Constitution, to evaluate the fairness, reasonableness and adequacy of the proposed settlement and whether it should be finally approved by the Court pursuant to Fed. R. Civ. P. 23(e), and to consider whether the application of plaintiffs' counsel for an award of attorneys' fees and costs, and any incentive awards that may be sought by representative plaintiffs, should be approved.

8.    The Proposed Class Notices (Exhibits C and D of the Settlement Agreement), the notice methodology described in the Settlement Agreement and the Settlement Administrator's Notice Plan (Exhibit E to the Settlement Agreement) are hereby approved.

9.    The Settlement Agreement contemplates a notice methodology that is the best practicable notice, is reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and of their right to object or exclude themselves from the proposed settlement, is reasonable and constitutes due, adequate and sufficient notice to all persons entitled to receive notice, and meets all applicable requirements of law, including, but not limited to, Fed. R. Civ. P. 23(c) and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

10.    Subject to the terms of the Settlement Agreement, Defendant is authorized to retain one or more third-party administrators to implement the terms of the Settlement Agreement.

-3-

DOCSLA-15377078.4-BSCHILDER

11.     Defendants or their designee(s) shall cause the Class Mail Notice to be mailed to each Class Member by first-class mail, postage prepaid, to his or her last known address no later than August 1, 2003.

12.     Defendants or their designee(s) shall publish the Class Publication Notice as provided in the Settlement Agreement and the Notice Plan no later than August 15, 2003.

13.     Defendants or their designee(s) shall: (i) remail any Class Mail Notice returned by the Postal Service with a forwarding address received by the Settlement Administrator; and (ii) attempt to find an address for any returned Class Notice that does not include a forwarding address consistent with the terms of the Settlement Agreement and the Notice Plan.

14.     Defendants or their designee(s) shall file proof of the mailing of the Class Mail Notice and publication of the Class Publication Notice consistent with the terms of the Settlement Agreement.

15.     Each Class Member who wishes to exclude himself or herself from the Class shall submit a written request for exclusion to the Settlement Administrator. The request for exclusion must (a) contain a reference to "In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation, Case No. 03-0425"; (b) include the name, address and telephone number of the person seeking to be excluded; (c) include a statement that the person wishes to be excluded from the Class; (d) be signed personally by the person who seeks to be excluded from the Class; and (e) be received by the Settlement Administrator by October 1, 2003. No Class Member may opt out by having a request to opt out submitted by an actual or purported agent or attorney acting on behalf of a class member. No opt out request may be made on behalf of a group of Class Members.

16.     Any Class Member who does not submit a timely, written request for exclusion from the Class, consistent with the terms of the Settlement Agreement and paragraph 15 hereof, shall be bound by all proceedings, orders and judgments in this Action, even if such Class Member has previously initiated or subsequently initiates individual litigation against the

Defendants or other proceedings encompassed by the Settled Claims defined in the Settlement Agreement.

17.    Each Class Member who wishes to object to the fairness, reasonableness or adequacy of the Settlement Agreement or the proposed settlement, or to the award of Attorneys' Fees and Expenses or any incentive awards to representative plaintiffs, shall provide to Co-Counsel for Plaintiffs and Defendants' Counsel and file with the Court, so as to be received no later than October 1, 2003, at the address listed in the Class Mail Notice, a written statement of the objection, as well as the specific reasons, if any, for each objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence the Class Member wishes to introduce in support of his or her objections.

18.    All written objections must be signed by the Class Member and must include: (1) the Class member's name, address and telephone number; (2) a statement of the objection(s) and any supporting evidence the Class Member wishes to introduce; and (3) the case name and number of this Action.

19.    Any attorney hired by a Class Member at the Class Member's expense for the purpose of objecting to the Settlement, or to the award of Attorneys' Fees and Expenses, shall file with the Clerk of Court and provide Co-Plaintiffs' Counsel and Defendants' Counsel a written notice of appearance so as to be received no later than October 1, 2003.

20.    Any Class Member who files and serves a written objection and who intends to make an appearance at the Settlement Hearing, either in person or through personal counsel hired at the Class Member's expense, shall provide Co-Plaintiffs' counsel and Defendants' Counsel and file with the Court so as to be received no later than October 1, 2003, a written notice of intention to appear. The notice of intention to appear must include an identification of witnesses the Class Member intends to call at the Settlement Hearing and any exhibits the Class Member intends to introduce into evidence at the Settlement Hearing.

-5-

21.    Plaintiffs' Counsel and Defense Counsel shall promptly furnish each other with copies of any and all objections or written requests for exclusion that come into their possession.

22.    Any Class Member who does not make his or her objection in the manner provided in this Order shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, adequacy or reasonableness of the proposed settlement.

IT IS SO ORDERED.

_____
HONORABLE GARY L. LANCASTER,
UNITED STATES DISTRICT JUDGE

7/17/03

DOCSLA-15377078.4-BSCHILDER

# Exhibit 6 to Declaration

**MDL 1674**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**APR 2 8 2005**

## RELEASED FOR PUBLICATION

FILED
CLERK'S OFFICE

## DOCKET NO. 1674

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

## TRANSFER ORDER

This litigation presently consists of four actions: two actions in the District of Maryland and one action each in the Northern District of Alabama and the Western District of Pennsylvania. Before the Panel is a motion, pursuant to 28 U.S.C. § 1407, by defendant Irwin Union Bank & Trust Company to centralize these actions in the Western District of Pennsylvania or, alternatively, in the District of Maryland or the Western District of Missouri for coordinated or consolidated pretrial proceedings. Defendant Community Bank of Northern Virginia (CBNV) and the Pennsylvania plaintiffs support the motion. Two Alabama defendants also agree that centralization of these actions in the Pennsylvania district is appropriate. The Alabama and Maryland plaintiffs oppose 1407 centralization. If the Panel deems centralization appropriate, they suggest the Northern District of Alabama as transferee district.

On the basis of the papers filed and hearing session held, the Panel finds that the actions in this litigation involve common questions of fact, and that centralization in the Western District of Pennsylvania will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation. All actions share factual questions arising out of allegations that CBNV and other lenders conspired with mortgage broker Equity Plus LLC a/k/a Equity Plus Financial, Inc., to include certain undisclosed fees and costs in residential mortgage settlements, and that this conduct violated various federal statutes and/or was improper under state common law theories of liability. Centralization under Section 1407 is necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

The Panel is persuaded that the Western District of Pennsylvania is an appropriate transferee district for this litigation. We note that i) an action is pending in the Pennsylvania district, ii) this district has the capacity to handle this litigation, and iii) a Pennsylvania action involving similar residential mortgage loans originated by CBNV and Guaranty National Bank of Tallahassee (which were subsequently purchased by the Residential Funding Corporation) has been settled and is currently the subject of multiple appeals to the Third Circuit.

## OFFICIAL FILE COPY

IMAGED APR 2 8 2005

- 2 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions on the attached Schedule A pending outside the Western District of Pennsylvania are transferred to the Western District of Pennsylvania and, with the consent of that court, assigned to the Honorable Gary L. Lancaster for coordinated or consolidated pretrial proceedings with the action pending there.[1]

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

---

[1] The Panel is conscious of the pending Third Circuit appeals, the outcome of which could conceivably affect the judge to whom this litigation is ultimately assigned.

# SCHEDULE A

<u>MDL-1674 -- In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation</u>

### <u>Northern District of Alabama</u>

*Clell L. Hobson, et al. v. Irwin Union Bank & Trust Co., et al.*, C.A. No. 7:04-2351

### <u>District of Maryland</u>

*David M. Chatfield, et al. v. Community Bank of Northern Virginia, et al.*, C.A. No. 1:04-2235
*Willard R. Ransom, et al. v. Community Bank of Northern Virginia, et al.*, C.A. No. 1:04-2236

### <u>Western District of Pennsylvania</u>

*Ruth J. Davis, et al. v. Community Bank of Northern Virginia, et al.*, C.A. No. 2:02-1201

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**MDL 1674**

SEP - 1 2005

FILED
CLERK'S OFFICE

*DOCKET NO. 1674*

### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

### IN RE COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION

*John Drennen, et al. v. Community Bank of Northern Virginia, et al.,* W.D. Missouri,
C.A. No. 4:05-665

### CONDITIONAL TRANSFER ORDER (CTO-1)

On April 28, 2005, the Panel transferred three civil actions to the United States District Court for the Western District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. With the consent of that court, all such actions have been assigned to the Honorable Gary L. Lancaster.

It appears that the action on this conditional transfer order involves questions of fact which are common to the actions previously transferred to the Western District of Pennsylvania and assigned to Judge Lancaster.

Pursuant to Rule 7.4 of the <u>Rules of Procedure of the Judicial Panel on Multidistrict Litigation,</u> 199 F.R.D. 425, 435-36 (2001), this action is transferred under 28 U.S.C. § 1407 to the Western District of Pennsylvania for the reasons stated in the order of April 28, 2005, 368 F.Supp.2d 1354 (J.P.M.L. 2005), and, with the consent of that court, assigned to the Honorable Gary L. Lancaster.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Western District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed fifteen (15) days from the entry thereof and if any party files a notice of opposition with the Clerk of the Panel within this fifteen (15) day period, the stay will be continued until further order of the Panel.

Inasmuch as no objection is
pending at this time, the
stay is lifted.

SEP 1 9 2005

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FOR THE PANEL:

*Michael J. Beck*

Michael J. Beck
Clerk of the Panel

**IMAGED** SEP 1 9 2005

**MDL 1674**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 2 2005

FILED
CLERK'S OFFICE

*DOCKET NO. 1674*

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION

*Stephanie Spann, et al. v. Community Bank of Northern Virginia, et al.,* N.D. Illinois,
C.A. No. 1:03-7022

## BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL

### TRANSFER ORDER

Presently before the Panel is a motion, pursuant to Rule 7.4, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001), by plaintiffs in this action to vacate the Panel's order conditionally transferring the action to the Western District of Pennsylvania for inclusion in the Section 1407 proceedings occurring there in this docket. Defendant Residential Funding Corp. opposes the motion and favors inclusion of this action in the centralized pretrial proceedings.

On the basis of the papers filed and hearing session held, the Panel finds that this action involves common questions of fact with actions in this litigation previously transferred to the Western District of Pennsylvania, and that transfer of the action to that district for inclusion in the coordinated or consolidated pretrial proceedings occurring there will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The Panel further finds that transfer of this action is appropriate for reasons expressed by the Panel in its original order directing centralization in this docket. In that order, the Panel held that the Western District of Pennsylvania was a proper Section 1407 forum for actions involving allegations that Community Bank of Northern Virginia and other lenders conspired with mortgage broker Equity Plus LLC a/k/a Equity Plus Financial, Inc., to improperly include certain undisclosed fees and costs in residential mortgage settlements i) in violation of various state or federal statutes, including the Truth in Lending Act, and/or ii) based upon various common law theories of liability. *See In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation,* 368 F.Supp.2d 1354 (J.P.M.L. 2005).

## OFFICIAL FILE COPY

IMAGED DEC 2    2005

- 2 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, this action is transferred to
the Western District of Pennsylvania and, with the consent of that court, assigned to the Honorable Gary
L. Lancaster for inclusion in the coordinated or consolidated pretrial proceedings occurring there in this
docket.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

# <u>Exhibit 7 to Declaration</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED

04 JUL 30 PM 1:20

U.S. DISTRICT COURT
N.D. OF ALABAMA

CLELL L. HOBSON,

and

JOHN A. NIXON,
    Individually, and as representatives of a
    class of Plaintiffs,

           Plaintiffs,

    v.

IRWIN UNION BANK AND TRUST CO.
  an Indiana corporation,
SERVE:
12677 Alcosta Boulevard
Suite 500
San Ramon, California 94583,

and

RESIDENTIAL FUNDING
CORPORATION
a Minnesota corporation
SERVE:
The Corporation Company
2000 Interstate Park
Suite 204
Montgomery, Alabama 36109

        Defendants.

Case No. _____

CV-04-C-2351-W

## COMPLAINT FOR DAMAGES

    The above-named plaintiffs state and allege the following for their Complaint for

Damages:

## NATURE OF THE CLAIMS

1. This action is brought by a class of homeowners that were and continue to be victimized by a predatory lending scheme involving Community Bank of Northern Virginia ("CBNV"), Guaranty National Bank of Tallahassee ("GNBT") and others.

2. None of the plaintiffs or proposed Class members are members of the certified class and/or persons bound by an injunction issued as part of the Judgment entered as a part of a national class action settlement reached in the matter captioned in *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation*, Case No. 03-0425, United States District Court for the Western District of Pennsylvania.

3. Currently pending in the United States Court of Appeals for the Third Circuit are a number of appeals (Appeal Nos. 03-4220, 03-4221, 03-4725, 03-4294, 03-4316, 03-4319, 03-4504, 03-4732, 03-4837, 03-4838, 03-4862, 04-1002, and 04-1039) all of which are related to, and derived from, the class action settlement in *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation*, Case No. 03-0425, in the United States District Court for the Western District of Pennsylvania. While a number of issues have been raised for appeal, of importance to this action are the appellants' claims (1) that the United States District Court for the Western District of Pennsylvania lacked subject matter jurisdiction over the claims of the plaintiffs an action captioned as *Kessler, et al. v. GMAC-Residential Funding Corporation*, Case No. 03-0425, United States District Court for the Western District of Pennsylvania, which was the lead case in a matter consisting of separate putative class actions that were consolidated together into a matter captioned in *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation*, sharing the case number, 03-0425, with the *Kessler* action as the lead case, and in which the national class was

2

certified; and (2) appellants' objections and appeals of the national class action settlement – their
claims that the settlement was not fair, adequate or reasonable – and their request that the district
court's final approval of the settlement be reversed pursuant to their appeal.

4.    If the United States Court of Appeals for the Third Circuit finds that it and/or the
United States District Court for the Western District of Pennsylvania lacked subject matter
jurisdiction over the consolidated action or the underlying actions and/or reverses the district
court's final judgment and associated grant of final approval to the national class action
settlement, then Plaintiffs will amend, at an appropriate time, if and as necessary, the proposed
Class definition set forth below to include all persons within the definition of the national class in
*In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage
Loan Litigation* that will have been reversed on appeal. Thus, to be clear, at this time Plaintiffs
do not include persons bound by the injunction in *In re Community Bank of Northern Virginia
and Guaranty National Bank Second Mortgage Loan Litigation* within the proposed Class
definition but, after resolution of the appeals in the Third Circuit, may amend, as and if
necessary, the proposed Class definition to include such persons.

5.    The claims for which the Defendants are liable arise under the Truth In Lending Act
("TILA") as amended by HOEPA, 15 U.S.C. §§ 1601 *et seq.*, and the Real Estate Settlement
Procedures Act, 12 U.S.C. §§ 2601, et seq, at 12 U.S.C. § 2607.

6.    Each of the plaintiffs entered into agreements for second mortgage loans from either
CNBV or GNBT. Each of the loans were obtained in a consumer credit transaction and were
primarily for personal, family, or household purposes, and the mortgages were all secured by the
Plaintiffs' and the Class members' principal dwellings.

7.  Each such loan is a "high-cost" or "HOEPA" loan under the Home Ownership and Equity Protection Act ("HOEPA"), at 15 U.S.C. § 1602(aa) and Regulation Z, at 12 C.F.R. § 226.32, by virtue of having met the fee and cost trigger or the annual percentage rate ("APR") trigger, or both.

8.  CBNV and GNBT, and Defendants, upon their purchase or assignment of the loans, utilized standardized worksheets and programs to determine whether the Class members loans were high costs loans as defined by HOEPA at 15 U.S.C. § 1602(aa).

9.  Each of the Plaintiffs and the Class members executed promissory notes and mortgage agreements in connection with their second mortgage loan programs, which transactions were consumer credit transactions within the meaning of TILA and HOEPA, 15 U.S.C. § 1602 and Regulation Z § 226.2.

10. The Plaintiffs' claims arise from the use of CBNV and GNBT as straw fronts in a "rent a charter" or predatory lending scheme that, among other things, involved victimizing borrowers through charging them enormous loan origination and finders' fees, title charges, and fees that were neither reasonable nor bona fide.

11. The predatory lending scheme was the brainchild of the Shumway brothers (David, DeVan and Chris) and Randy Bapst (collectively the "Shumway Organization") done, initially, through their companies, Equity Plus LLC and Equity Plus Financial Inc. (hereinafter "Equity Plus") and later through its successor, Equity Guaranty LLC ("Equity Guaranty"). These entities and other affiliated companies, including Title America LLC, USA Title LLC, Resource Title, and/or Paramount Title, were used as part of an elaborate scheme to make predatory second mortgage loans nationwide by preying upon debt laden homeowners. The plan included using at first CBNV, and later GNBT, as "fronts" for the lending operations that were, in fact, controlled

and run by Equity Plus as to CBNV and then Equity Guaranty as to GNBT. This plan was based upon the idea that using federally insured banks or national banks would insulate the Shumway Organization from liability under state consumer protection or fair lending laws.

12. In connection with such scheme, the illegitimate loan origination fees, title charges, and various other fees that were neither reasonable nor bona fide were not at all or only nominally paid to either CBNV or GNBT as was represented, but were instead funneled to Equity Plus Financial, LLC (CBNV loans) or Equity Guaranty LLC (GNBT loans) and the affiliates thereof.

13. The "origination fees," "loan discount fees," title charges and other charges at issue are not interest but were in fact and in nature finders fees and kickbacks shared by the banks (a small percentage) and the Shumway Organization (the lion's share).

14. Plaintiffs do not state any claims for "usury" under state or federal law and expressly disclaim any such claims as part of this lawsuit.

15. The specific claims made by Plaintiffs are as follows:

a. *Violations of TILA and HOEPA for Inaccurate Finance Disclosures and Material Misstatements.* As alleged more fully below, the predatory lending scheme violated TILA and HOEPA because the banks made inaccurate disclosures of the Finance Charges and the APR on the Plaintiffs' loans and the Class members' loans contained prohibited terms, including prepayment penalties. When calculating the borrowers' Finance Charges and the APRs for the purpose of making the TILA and HOEPA-required disclosures, the banks were only allowed to exclude from their calculations certain settlement charges that were "bona fide" and "reasonable" in amount and that were paid to "true" third parties as contemplated by TILA and HOEPA. Under the predatory lending scheme, as directed by the Shumway Organization

5

and their affiliated companies, including primarily Equity Plus and Equity Guaranty, certain settlement charges were wrongfully excluded from the calculation of the Finance Charge and APR. Consequentially, the Finance Charges and the APRs disclosed to the Plaintiff borrowers were materially inaccurate and therefore in violation of TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1606(c), 1639, 1640 and HOEPA's implementing regulations, Regulation Z, at 12 C.F.R. §§ 226.22, 226.23, and which violations give rise to actions for damages and rescission of the loans under HOEPA and Regulation Z. Because the loans contained prohibited terms, those loans also violated TILA and HOEPA and also give rise to actions for damages and rescission of the loans under HOEPA and Regulation Z

b.      *Violations of TILA and HOEPA for untimely HOEPA Notices.* HOEPA, among other things, requires that lenders give certain notices to borrowers in a timely fashion so that the prospective borrower can make an informed decision while under no "sales" pressure about whether they want to go forward with a loan for which they are giving a security interest in their home. Specifically, under HOEPA, at 15 U.S.C. § 1639, a borrower is to receive the required HOEPA notice 3 business days prior to the loan closing. The banks, as directed by the Shumway Operation, failed to timely provide such notices but instead provided them to the borrower for the first time at closing in violation of 15 U.S.C. § 1639(a)(1).

c.      *RESPA Violations for Illegal Kickbacks and Fee-Splits.* The banks and the Shumway Operation violated RESPA's anti-kickback and fee-splitting provisions at 12 U.S.C. § 2607 by misrepresenting the identities of the intended recipients of the settlement charges and fees, the amounts paid to such entities, and the nature of the ownership and control of the entities receiving the unlawful kickbacks and fee-splits. The banks, along with the Shumway Organization, Equity Plus, Equity Guaranty, and their affiliated companies, with the

6

knowledge and consent of the remaining Defendants, used the HUD-1 or HUD-1A Settlement Statements (hereinafter "HUD-1s") to hide unlawful kickbacks and referral fees being paid to the Shumway Organization and Equity Plus and Equity Guaranty on the second mortgage loans. The section 800 charges listed on the HUD-1s uniformly misrepresented that origination and loan discount fees were being paid to the banks when, in fact, said fees were being paid almost entirely to the Shumway Organization and Equity Plus and Equity Guaranty and the banks were receiving only a small portion of those fees. The section 1100 charges listed on the HUD-1s, in violation of RESPA at 12 U.S.C. § 2607, and RESPA's implementing regulations, Regulation X, at 24 C.F.R. § 3500.14, were imposed for services that were not bona fide, not rendered, or for nominal or duplicative services for which no fees were earned and for which no fees should have been imposed.

        d.    Further, by virtue of the "rent-a-charter" scheme, the banks' and Equity Plus' and Equity Guaranty's "affiliated business arrangements" with their controlled title companies, USA Title, Title America, Resource Title, and Paramount Title, were nothing more than "sham arrangements" used as subterfuge for passing referral fees back to Equity Plus, Equity Guaranty and the Shumway Organization, all in violation of RESPA at 12 U.S.C. § 2607, and Regulation X, at 24 C.F.R. § 3500.15. The borrowers were required to use the title companies and then, pursuant to the predatory lending scheme, the title-related charges were passed on to Equity Plus, Equity Guaranty and the Shumway Organization.

## THE PARTIES, JURISDICTION AND VENUE

### The Plaintiffs

16. Plaintiff Clell. L. Hobson resides at 3705 Dearing Down Drive, Tuscaloosa, Alabama 35405.

17. Plaintiff John A. Nixon Jr. resides at 6701 Hibiscus Lane, Northport, Alabama 35473-1864.

### The Defendants

18. Defendant IRWIN UNION BANK AND TRUST COMPANY is an Indiana corporation with its principal place of business in California, and which does business in Alabama, and can be served with legal process by serving its President or Officer in Charge at 12677 Alcosta Boulevard, Suite 500, San Ramon, California 94583. Irwin Union Bank and Trust Company is liable to the Plaintiffs and the Class for the violations of TILA, HOEPA and RESPA just as CBNV and GNBT are liable to Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under common law rules of assignee liability, and since Plaintiffs can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of each and every similarly aggrieved Class member, Irwin Union Bank and Trust is a proper party to this lawsuit.

19. Defendant RESIDENTIAL FUNDING CORPORATION (sometimes referred to above and below as "RFC") is a Delaware corporation with its principal place of business in Minnesota and is a 100% subsidiary of GMAC-RFC Holding Corporation. RFC can be served with process by serving The Corporation Company, 2000 Interstate Park, Suite 204, Montgomery, Alabama 36109. Residential Funding Corporation is liable to the Plaintiffs and the Class for the violations of TILA, HOEPA and RESPA just as CBNV and GNBT are liable to

Plaintiffs and the members of the Class pursuant to HOEPA, 15 U.S.C. § 1641(d), and under

common law rules of assignee liability, and since Plaintiffs and the members of the proposed Class

can undeniably assert their claims against CBNV and GNBT, both individually and on behalf of

each and every other member of the proposed Class, Residential Funding Corporation is a proper

party to this lawsuit.

### Jurisdiction and Venue

20. Federal question jurisdiction is proper under 28 U.S.C. § 1331 as the federal claims

asserted arise under federal law.

21. Venue and personal jurisdiction are proper in this Court pursuant to recognized

principles of due process and in accordance with 28 U.S.C. § 1391.

22. Defendants are subject to the specific jurisdiction of this Court because they, either

directly or indirectly, have purposefully directed its activities towards Alabama residents and

because the Plaintiffs' causes of action arise out of and relate to the Defendants' activities within

this judicial district and the State of Alabama.

23. Additionally, defendants are subject to the general jurisdiction of this Court because

they have substantial, continuous, and systematic contacts with the State of Alabama. By virtue

of the "rent-a-charter" scheme and conspiracy, CBNV and GNBT made and defendants acquired

thousands of loans, including hundreds of loans in Alabama, from CBNV and GNBT.

Defendants have thus, in essence, funded and/or purchased second mortgage loans made to

Alabama borrowers, and have liens on real property in Alabama (which was used as collateral

for second mortgage loans) and the power of the Alabama courts to enforce those liens, which

they have undoubtedly done in the past. Each of these Plaintiffs and Class members, make

monthly payments on their second mortgage loans, and Defendants profit directly or indirectly

from the revenue stream generated by the thousands of second mortgage loans that they own. Simply put, Defendants are in the business of funding and purchasing second mortgage loans, and such activities are central to the conduct of their business, and their funding and purchase of Alabama second mortgage loans is substantial and continuous.

24. Defendants' contacts with Alabama are sufficient, substantial and continuous, and the Plaintiffs' causes of action arise from and relate to those contacts so that the maintenance of the suit in this Court does not offend traditional notions of fair play and substantial justice and defendants should reasonably anticipate being haled into this Court in this judicial district in Alabama to answer for the unlawful acts of the banks and their own unlawful acts, especially since Alabama has a strong interest in providing a forum for its residents aggrieved by schemes to violate its consumer protection acts and fair lending laws.

25. Venue is proper in this Court because the Plaintiffs reside in this judicial district, because Defendants "reside" in this district by virtue of it being subject to personal jurisdiction in this judicial district, because they regularly solicited and did business and transacted their affairs in this judicial district and hold or held interests in real property in this judicial district, and because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this judicial district.

## FACTUAL BACKGROUND

### The Predatory and Fraudulent Lending Scheme in Greater Detail

26. The Plaintiffs were the victims of a predatory lending scheme to charge to them bogus, excessive and illegal fees and charges on their loans, together with charging high interest rates, all as part of a scheme to make high-cost loans to borrowers across the country, including borrowers in the State of Alabama. Such bogus and illegal fees were falsely characterized as and

represented to be origination fees, loan discount fees or other charges and fees to be paid to
CBNV or GNBT and title charges and fees to be paid to third-party title companies. Instead,
these bogus fees and charges were being paid directly or indirectly, in whole or in substantial
part, to the Shumway Organization, including primarily, Equity Plus and/or Equity Guaranty or
their affiliated entities, in an effort to avoid consumer protection laws and regulation of
Defendants' lending practices.

27. In particular, Equity Plus and its controlling owners began in early 1998 a massive
mortgage operation that included their use in a false and fraudulent manner state-chartered or
national banks to make high-cost home equity mortgage loans across the United States.

28. The Shumway Organization used Equity Plus and Equity Guaranty and affiliated
entities, together with multiple business forms to aggressively solicit residential home equity
mortgages through a massive national direct mail marketing campaign. The Shumways and
Bapst served as officers and directors of Equity Plus and Equity Guaranty.

29. This business scheme, however, had a unique twist. Instead of pursuing these loans
through entities that were owned or controlled by the owners of Equity Plus or Equity Guaranty
or affiliated entities, they pursued such by what facially appeared to be state-chartered, federally
insured or national banks, all part of an illegal "rent-a charter" scheme involving the charters of
those state-chartered, federally insured or national banks.

30. This scheme was intended to give the false appearance that the otherwise illegal
charges and fees were paid to the state-chartered or national bank and that such would "wash"
those charges and fees from what would otherwise be violations of various consumer protection
laws.

11

31. CBNV was first used in early 1998 by the Shumway Organization with Equity Plus and/or its affiliated predecessors or affiliated entities, including Title America, USA Title LLC, Resource Title, and Paramount Title to make second mortgage loans, which loans include the loans to certain of the plaintiffs.

32. CBNV's relationship with the Shumway Organization and Equity Plus soured in late 1999. In early 2000, the Shumway Organization then latched onto GNBT and a short time later began using Equity Guaranty and/or its affiliated entities, including Title America, USA Title LLC, Resource Title, and Paramount Title, to continue to make second mortgage loans, which loans include the loans to certain of the plaintiffs.

33. The Shumways and Bapst served as officers and directors of and/or controlled the operations of the title companies. The title companies were "sham" entities that were inadequately capitalized, had no employees, and did not compete in the marketplace for business. As such, Defendants' representations to the Plaintiffs in the HUD-1s that certain fees and charges were paid to the title companies were in fact false and designed to mislead the Plaintiffs into believing that they were dealing with independent, or "true", third party title companies who were competing in the free marketplace for business.

34. The substantial operations for promoting and making these loans and conducting the title services were conducted in whole or substantial part not at the offices of CBNV or GNBT, but at Equity Plus and Equity Guaranty LLC's offices or the offices of affiliated entities, first at 11417 Sunset Hills, Reston, Virginia, 20190 and then at 4501 Singer Court, Chantilly, Virginia 20151, for which expanded space was necessary to accommodate the vastly expanding mortgage business that was being conducted in the nominal name of the banks, but in fact by the Shumway Organization and Equity Plus and Equity Guaranty and their affiliated entities.

35. The mortgage business expanded in large part due to the massive direct mail solicitation campaign that used lists that had been purchased from major credit reporting agencies. The solicitation campaign averaged millions of pieces of mail per month and included thousands and thousands of mailings nationwide that in turn resulted in the loans to the Plaintiffs. These solicitations falsely represented and misled the Plaintiffs to believe that Equity Plus and Equity Guaranty were "authorized agents" of the Banks and/or were divisions or lending programs of the Banks.

36. These massive direct mailing costs and payroll costs were paid not by the banks, but by the Shumway Organization through Equity Plus or Equity Guaranty or one of their affiliated entities.

37. The Plaintiffs received the mail solicitations and called the banks' toll-free telephone numbers to apply for their second mortgage loans. The toll-free numbers that Plaintiffs called and were used by the Banks were in fact registered to the separate entities Equity Plus and Equity Guaranty.

38. The Plaintiffs' HUD-1s identified either of the Banks as their lenders.

39. The Plaintiffs' HUD-1s identified the "place of settlement" as either 11417 Sunset Hills, Reston, Virginia, 20190, 4501 Singer Court, Chantilly, VA 20151, which were Equity Plus' and Equity Guaranty's business addresses, or at the address of one of their affiliated or associated title companies, such as "Paramount Title" in Washington D.C.

40. Notwithstanding the HUD-1s showing that CBNV or GNBT received the origination, loan discount fees, and other Section 800 charges and fees charged to the plaintiffs, those fees, which were paid at closing, were in fact paid directly or indirectly to Equity Plus or Equity Guaranty or the Shumway Organization.

41. Notwithstanding the HUD-1s showing that Title America, USA Title, Resource Title, or Paramount Title received the title charges set forth in Section 1100 of the Plaintiffs' HUD-1s, those fees, which were paid at closing, were in fact paid directly or indirectly to Equity Plus or Equity Guaranty or the Shumway Organization.

### The Role of the Defendants in the "Rent-a-Charter" Predatory Lending Scheme

42. Defendants, although not the exclusive purchaser, were substantial purchasers of the second mortgage loans "generated" by the banks and Equity Plus or Equity Guaranty LLC or their affiliated entities.

43. Like many purchasers of mortgage loans, Defendants profited by purchasing and holding mortgage loans in their own inventory that were obtained directly or through affiliates and correspondent lenders. Defendants obtain the mortgage loans and then consolidate the loans into securitized pools and sell, as securities, interests in the pools. "Securitization" or "securitizing" as used herein and as meant in general terms refers to the process of consolidating loans (including but not limited to residential mortgage loans) and/or packaging loans (not only mortgage loans) for sale as securities.

44. Some of the most profitable loans that Defendants could either hold or securitize through its affiliates or securitized trusts were high cost home equity mortgage loans, including those commonly referred to as "High Loan To Value" ("HLTV") loans.

45. Thus Defendants turned to a number of originators of these high cost and often HLTV loans in order to generate substantial profits from either holding such loans in inventory or by securitizing such loans in securitization pools/trusts.

46. The Shumway Organization, Equity Plus and Equity Guaranty and their affiliates, through their use of CBNV and GNBT became a substantial source for Defendants' appetite for these high cost loans.

47. Defendants purchased substantially all of the second mortgage loans originated in the name of CBNV and GNBT. Having a guaranteed buyer of the second mortgage loans ensured the ability of the Shumway Organization, Equity Plus and Equity Guaranty and their affiliates to use CBNV and GNBT, and their limited reserves, to fund thousands of second mortgage loans that otherwise could not be maintained by the Banks in their own portfolios.

48. At the time they purchased the second mortgage loans, the Defendants typically reviewed each loan file to determine whether the loan met their criteria for purchase and to determine how the loan was to be securitized.

49. The Defendants were consciously purchasing high-cost second mortgage loans, and were cognizant of the "rent-a-charter" predatory lending scheme.

50. By providing the necessary funding and commitment to purchase substantially all of the loans generated by these fraudulent lending activities, Defendants could, in turn, expand their substantial profits from acquiring and/or securitizing these high cost loans.

51. By securitizing the second mortgage loans, Defendants profited from the revenue stream generated by the borrowers' monthly payments on their second mortgage loans and the ultimate sale of mortgage-backed or asset-backed securities or notes issued by the securitized trusts that they formed for that purpose.

52. In addition, by securitizing the loans, Defendants were able to issue securities that were rated by agencies such as Moody's, Fitch's and Standard & Poors. These ratings affected and were reflected in the price of the securities. In a general sense, the securities are basically

15

classes of notes representing an interest share in the pools of loans, the purchasers of which
anticipate a certain return on the notes based upon the ratings of the notes purchased. The ratings
on the securities are based upon the fact that the trust pools hold high-cost second mortgage
loans made and take into account the likelihood of the borrowers making all payments on their
second mortgage loans.

## Termination of the Fraudulent Predatory Lending Scheme

53. On February 27 2001, the Federal Deposit Insurance Corporation ("FDIC"), CBNV's
federal regulator, prepared a "Community Reinvestment Act Performance Evaluation" of CNBV.
In that evaluation, which was based, in part, upon a concurrent compliance examination of
CBNV, the FDIC issued a "NEEDS TO IMPROVE" rating to CBNV based upon its *violations
of the fair lending and consumer protection laws and regulations.*"

54. The violations identified in the FDIC's compliance examination related to
"irregularities in the marketing and administration of the bank's home equity loan program."

55. The FDIC stated that when it opened in 1992, the bank had focused upon a "balanced
portfolio of commercial, residential, and consumer loans." The FDIC found that CBNV's focus
had changed: "since 1997, the bank has greatly increased its emphasis on the home equity
market. As of evaluation date [February 2001], the home equity program conducted in the 4 loan
production offices constituted the bank's major product line."

56. CBNV's change in focus was due to its affiliation with, and agreement to rent its
charter to, the Shumway Organization, Equity Plus, and their affiliated entities.

57. The FDIC determined that CBNV typically "charges 10 points on each loan in
addition to high underwriting, processing, and title fees. Due to the substantial amount of points
and fees, these home equity loans are considered high cost transactions as defined in the Federal

Reserve Board's Regulation Z, which is the implementing regulation for the Truth in Lending Act. The bank funds the approved loans under this program and immediately sells them to the secondary market investors within 1 to 3 days. The bank does not retain any home equity loans originated under this program in its portfolio nor the servicing rights associated with these loans."

58. This report did not become public and was not released by the FDIC until December 1, 2002 because CBNV challenged the FDIC's rating and the publication of the Report.

59. In mid-2001, GNBT was audited by the Office of the Comptroller of Currency ("OCC").

60. Because Equity Guaranty LLC and/or its affiliates had actually performed all or substantially all of the operations in promoting these loans, and in finding the borrowers and making these loans, GNBT was unable to provide the necessary information to comply with the OCC's audit requests.

61. In January 2002, GNBT entered into an agreement with the OCC that placed a number of controls on the Bank to, in part, prevent the rent-a-charter scheme outlined above.

62. By early 2002, RFC curtailed and then ceased its substantial purchases of the GNBT/Guaranty Equity LLC high cost home equity loans and RFC actually returned, at least initially, a number of high cost home equity loans that it had previously purchased from GNBT/Equity Guaranty LLC or its affiliates.

63. In a press release dated March 28, 2002, RFC announced that it was no longer willing to purchase high-cost HOEPA loans. Its August 2002 "Broker/Lender Manual" restates RFC's unwillingness to purchase HOEPA Loans. In its July 1, 2003 Client Guide, RFC elaborated on these restrictions and again stated that it will no longer no purchase "high cost" HOEPA loans.

17

64. As a result of the OCC action, and Defendants' unwillingness to purchase "high-cost"
or HOEPA loans, GNBT lacked substantial purchasers for its loan production, and did not have
adequate reserves to maintain the loans in its own portfolio and the predatory loan scheme that
was the brain child of the Shumway Organization, Equity Plus, Equity Guaranty and their
affiliates came to an end.

### Assignee Liability

65. Defendants are liable to the Plaintiffs and the Plaintiff Class for the Banks' violations
of federal law just as the Banks are liable to the Plaintiffs, pursuant to HOEPA, at 15 U.S.C. §
1641(d).

66. Additionally, while HOEPA denies Defendants any "holder in due course" defenses,
such defense is not and would not otherwise be available to Defendants because they did not take
the notes and purchase the Plaintiffs' loans in "good faith" and without notice that Plaintiffs' had
defenses to the loans since each of the loans that they received came with the statutory notice
required by 15 U.S.C. § 1641(d)(4) and the standard forms in the Plaintiffs' loan files such as the
TILA and HOEPA Disclosures and the HUD-1s should have provided actual knowledge of the
TILA/HOEPA disclosure violations and would have provided notice to Defendants that the
Plaintiffs had defenses to enforcement of the loans.

67. Further, the existence of the 1641(d)(4) notice eliminates any "holder in due course"
defenses to the plaintiffs' claims since it makes the borrowers' "promise to pay" conditional.

68. Defendant took the promissory notes and trust deeds subject to the same restrictions,
limitations, and defects as they had in the hands of the Banks and acquired no greater rights than
its assignors had at the time of the assignment or sale of the loans.

## THE PLAINTIFFS' LOANS

### The Second Mortgage Loan of Clell L. Hobson

69. In early 2001 Mr. Hobson received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

70. Mr. Hobson contacted GNBT to apply for a second mortgage loan. While he believed he was dealing with a bank, he was, in fact, dealing with the Shumway Organization and Equity Plus.

71. CBNV and/or the Shumway Organization and Equity Plus, through the mails or wires, obtained the Mr. Hobson's credit report and approved his second mortgage loan.

72. On or about May 2, 2001, CBNV closed Mr. Hobson's loan (Loan No. CHAN-01-0001886) in Alabama. On this date, Mr. Hobson first received his TILA and HOEPA disclosures.

73. In connection with the above-alleged predatory lending scheme, the Shumway Organization, using CBNV as its front, loaned Mr. Hobson a total loan of $55,500.00 to be repaid with interest (17.75%) in consecutive monthly installments over a period of 20 years. The loan was a consumer loan obtained for personal, family or household purposes.

74. To secure repayment of their note, Mr. Hobson executed a mortgage for the benefit of CBNV. The mortgage granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

75. In connection with this Second Mortgage Loan, as shown on their HUD-1 settlement statement, the following fees and costs were contracted for and paid at or before closing of the Hobson loan:

| 801 | Loan Origination Fee | CBNV | 2,497,50 |
| 802 | Loan Discount Fee | CBNV | 2,220.00 |
| 808 | Lender Document Review Fee | CBNV | 150.00 |
| 809 | Lender Underwriting Fee | CBNV | 295.00 |
| 810 | Lender Application Fee | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Resource Title | 50.00 |
| 1102 | Abstract or Title Search | Resource Title/"GAC" | 175.00 |
| 1103 | Title Examination | Resource Title | 695.00 |
| 1105 | Document Preparation | Resource Title | 175.00 |
| 1201 | Recording Fee | Not identified | 45.00 |
| 1202 | City/County/stamps | Not identified | 83.25 |

76. The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

77. The HUD-1 is fraudulent in that the line items shown as being paid to Paramount Title in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

78. In connection with this loan, Mr. Hobson was provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $152,996.30 and that their annual percentage rate was 19.904%.

79. Both the Finance Charge and Disclosed APR are materially inaccurate.

80. The terms of Mr. Hobson's loan contained an illegal prepayment penalty under 15 U.S.C. § 1639(c).

### The Second Mortgage Loan of John A. Nixon, Jr.

81. In late 2000 Mr. Nixon received a solicitation in the mail indicating that he had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

82. Mr. Nixon contacted GNBT to apply for a second mortgage loan. While he believed

he was dealing with a bank, he was, in fact, dealing with the Shumway Organization and Equity

Plus.

83. CBNV and/or the Shumway Organization and Equity Plus, through the mails or

wires, obtained the Mr. Nixon's credit report and approved his second mortgage loan.

84. On or about February 2, 2001, CBNV closed Mr. Nixon's loan (Loan No.

23KA148394) in Alabama.    On this date, Mr. Nixon first received his TILA and HOEPA

disclosures.

85. In connection with the above-alleged predatory lending scheme, the Shumway

Organization, using CBNV as its front, loaned Mr. Nixon a total loan of $49,999.00 to be repaid

with interest (18.25%) in consecutive monthly installments over a period of 25 years.  The loan

was a consumer loan obtained for personal, family or household purposes.

86. To secure repayment of their note, Mr. Nixon executed a mortgage for the benefit of

CBNV.  The mortgage granted CBNV a security lien in residential real estate subject to one or

more prior mortgage loans.

87. In connection with this Second Mortgage Loan, as shown on their HUD-1 settlement

statement, the following fees and costs were contracted for and paid at or before closing of the

Nixon loan:

| | | | |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,999.92 |
| 803 | Appraisal Fee | L. Grant Mann | 175.00 |
| 807 | Application | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | "GAC" | 260.00 |
| 1103 | Title Examination | Paramount Title | 595.00 |
| 1105 | Document Preparation | Paramount Title | 175.00 |
| 1201 | Recording Fee | Clerk of Court | 109.00 |

Case 7:04-cv-02351-UWC    Document 1    Filed 07/30/04    Page 22 of 39

| 1203 | Mortgage Tax | Clerk of Court | 74.99 |

88. The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

89. The HUD-1 is fraudulent in that the line items shown as being paid to Paramount Title in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Plus or other affiliates of the Shumway Organization.

90. In connection with this loan, Mr. Nixon was provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $185,347.31 and that their annual percentage rate was 20.261%.

91. Both the Finance Charge and Disclosed APR are materially inaccurate.

## EQUITABLE ESTOPPEL, EQUITABLE TOLLING
## AND CLASS ACTION TOLLING OF LIMITATIONS PERIOD

92. CBNV, GNBT and the Shumway Organization, and each of them, knowingly and actively misled the Plaintiffs and the Class members concerning their "rent-a-charter" predatory lending scheme and/or their involvement therein and prevented the Plaintiffs and the Class members from pursuing their claims by, among other things:

    a.    Engaging in a scheme that was by its nature and design "self-concealing;"

    b.    Knowingly and actively deceiving Plaintiffs through their "rent-a-charter" scheme, in their HUD-1s and associated loan documentation and otherwise misrepresenting or failing to disclose the true nature of their illegal lending practices;

    c.    Knowingly and actively mischaracterizing and misrepresenting that the origination fees, discount fees or other types of fees and charges listed in Section 800 of the HUD-1s were being paid to GNBT or CBNV, and title-related charges listed in Section 1100 of

22

the HUD-1s were being paid to third-party title companies when such fees and charges were instead paid, directly or indirectly to the Shumway Organization, Equity Guaranty LLC or Equity Plus Financial LLC, or affiliated entities of such companies and/or otherwise knowingly misrepresenting or failing to disclose the true nature of such fees;

     d.    Knowingly and actively misrepresenting the Finance Charges and APRs on the TILA Disclosure Notices provided to Plaintiffs by, among other things, failing to include in their calculations certain title charges that were not bona fide, reasonable, lawful and/or paid to true third parties; and

     e.    Knowingly and actively preventing the banks' federal regulators from disseminating reports of their wrongdoing to the public.

     93. Plaintiffs exercised reasonable diligence during their loan transactions and dealings with the banks and in reviewing their loan documentation, but could not have, nor been reasonably expected to, uncover the complex set of facts and the highly sophisticated scheme giving rise to their claims against Defendant due to the fraudulent, unlawful and conspiratorial conduct of CBNV, GNBT and the Shumway Organization. Indeed, because TILA, HOEPA and RESPA are technical statutes, it is highly questionable whether an attorney not well-versed in those statutes would have been able to determine violations of TILA, HOEPA and RESPA upon review of the Plaintiffs' loan documents or been able to uncover the egregiousness of the predatory lending and "rent-a-charter" scheme without filing a lawsuit and engaging in discovery.

     94. The entire "rent-a-charter" predatory lending scheme worked, and could only have worked, through the cooperation and conspiratorial efforts of each of banks with the Shumway Organization, Equity Plus and Equity Guaranty and Defendants' willful blindness to the

scheme's occurrence.  At all times, Plaintiffs were actually misled into thinking that the banks were doing legitimate business and that what was being represented to them was in fact true.

## CLASS ACTION ALLEGATIONS

95. This action is properly brought as a plaintiff class action under Fed.R.Civ.Pro. 23. Plaintiffs propose, as the definition of the Class, that the Class consists of all persons who satisfy the following criteria:

(a)    That obtained a mortgage loan from CBNV or GNBT that was secured by second or subordinate lien on residential real property used by the them as their principal dwelling; and

(b)    That are not members of the national class as certified in *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation*, Case No. 03-0425, by the United States District Court for the Western District of Pennsylvania and as may be modified, reversed or affirmed by the United States Court of Appeals for the Third Circuit in the appeals relating thereto.

101.    The particular members of the Class are capable of being described without difficult managerial or administrative problems.    The members of the Class are readily identifiable from the information and records in the possession or control of CBNV, GNBT and the defendants and/or the representatives or servicing agents of each.

102.    The Class members are so numerous that individual joinder of all members is impractical.  Upon information and belief, Plaintiffs state that there are approximately 2,000 members of the Class.

103.    There are questions of law and fact common to the Class, which questions predominate over any questions affecting only individual members of Class and, in fact, the wrongs suffered and remedies sought by plaintiffs and the other members of Class are identical,

the only difference being the exact monetary amount to which each member of Class is entitled. The principal common issues are:

(a)    The nature and extent of the predatory lending and "rent-a-charter" scheme;

(b)    Whether the loans of the Class members were "high cost" or "HOEPA" loans;

(c)    Whether the Class members' HUD-1 or HUD1-A Settlement Statements uniformly misrepresented the identity of the recipients or the amounts of the settlement fees and charges imposed on their loans;

(d)    Whether the predatory lending and "rent-a-charter" scheme violated RESPA;

(e)    Whether defendants are liable to the Class members for violations of RESPA;

(f)    Whether, as part of the predatory lending and "rent-a-charter" scheme, CBNV and GNBT utilized a practice or device whereby the mandatory disclosures under TILA were not timely made;

(g)    Whether, as part of the predatory lending and "rent-a-charter" scheme, CBNV and GNBT made inaccurate disclosures on the Class members' TILA disclosures;

(h)    Whether the Class members' loans contained illegal prepayment penalties or other prohibited terms;

(i)    Whether the predatory lending and "rent-a-charter" scheme violated HOEPA;

(j)    Whether the Class members are entitled to rescind their loans;

(k)    The nature and extent of the remedies available to the Class members under RESPA;

(l)    The nature and extent of the remedies available to the Class members under TILA and HOEPA;

(m)    The nature and extent of the declaratory and injunctive relief available to the

25

Class members; and

105.    The Plaintiffs' claims are typical of those of the members of the Class and are based on the same legal and factual theories.

106.    The representative Plaintiffs will fairly and adequately represent and protect the interests of the Class. They have suffered substantial economic injury in their own capacity from the practices complained of and understand the nature of their duty as representatives of the Class; the nature and extent of their claims against Defendants and the relief available to them and the Class members. Neither Plaintiffs nor their counsel have any conflicting interests which might cause them not to vigorously pursue this action.

107.    Plaintiffs have retained counsel with extensive knowledge of RESPA, TILA and HOEPA, that are experienced in handling class actions and actions involving predatory lending and unlawful commercial practices, including other actions involving these same defendants and this same predatory lending and "rent-a-charter" scheme. Accordingly, the undersigned Counsel will provide exceptional representation of the Class.

108.    Certification of a plaintiff class under Fed. R. Civ. P. 23(b)(3) is also appropriate as to Defendant, in that common questions predominate over any questions pertaining to individual member of the Class and a plaintiff class action is superior to other available methods for the fair and efficient adjudication of this controversy. A plaintiff class action will cause an orderly and expeditious administration of Class members' claims and economies of time, effort and expense will be fostered and uniformity of decisions will be insured. Moreover, the individual class members are likely to be unaware and ignorant of their rights and not in a position (either through experience or financially) to commence individual litigation against Defendant and expecting the Class members to bring claims individually is unrealistic and

unfeasible, which is evidenced by the fact that Congress specifically provided for class actions in TILA and HOEPA and since these problems are cured by a class action.

### CAUSES OF ACTION AGAINST DEFENDANT

### COUNT I

#### Violations of the TILA, as Amended by HOEPA, for
#### Inaccurate Disclosures and Material Misstatements

96. Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

97. The loans of the Plaintiffs are "high-cost" or "HOEPA loans" governed by the provisions of the HOEPA amendments to TILA and satisfy the definition for "high-cost" loans provided at 15 U.S.C. § 1602(aa) and at Regulation Z at 12 C.F.R. § 226.32.

98. CBNV and GNBT issued to each borrower plaintiff a HOEPA Notice (15 U.S.C. § 1639(a)&(b)) and issued to Defendants a HOEPA Notice of Assignment (15 U.S.C. §1641(d)(4)).

99. Each of the Plaintiffs' loans is subject to the right to cancel or rescission provided by 15 U.S.C. § 1635 and 12 C.F.R. § 226.23.

100.    TILA, as amended by HOEPA, at 15 U.S.C. §§ 1602(u), 1638, 1639, and its implementing regulation, Regulation Z, require creditors to make specific, timely and accurate disclosures of "material" information to borrowers to promote the "informed use of credit." The "material" information includes the "annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness," and the disclosures required by HOEPA at § 1639(a).

27

101.    Certain tolerances for accuracy are allowed at 15 U.S.C. §§ 1605(f), 1610(c) and Regulation Z, at 12 C.F.R. § 226.22 and 226.23 for the disclosure of the Finance Charge and Annual Percentage Rate.

102.    CBNV and GNBT made multiple violations of HOEPA and TILA by their failure to make accurate HOEPA/TILA Finance Charge and APR disclosures under 15 U.S.C. §§ 1638 and 1639.

103.    CBNV and GNBT made multiple violations of HOEPA and TILA by including prepayment penalties and other prohibited terms within the Class members' loans under 15 U.S.C. §§ 1638 and 1639.

104.    The Plaintiffs entered into second mortgage loan transactions with CBNV and GNBT. As an incident to or a condition of the banks' extension of credit to Class members, the banks charged the Class members certain fees and charges to be paid directly or indirectly by the Class members in order to obtain the second mortgage loans.

105.    The Banks falsely and incorrectly represented that the amounts charged to the Plaintiffs as title charges in section 1100 of the Plaintiffs' HUD-1s for such things as "abstract or title searches" (line 1102) and "title examinations" (line 1103) and in certain instances "document review" (line 1112) and/or "settlement or closing fees" (line 1101) were "bona fide" and "reasonable" and paid to "true" third parties, when, in fact, they were not, and were being used directly or indirectly to further the rent-a-charter predatory lending scheme and to provide kickbacks and unearned fees to the Shumway Organization, Equity Plus, Equity Guaranty and their associated entities, and that Defendants were directly or indirectly profiting from such fees.

106.    These title-related fees and charges set forth in Section 1100 of the Class members' HUD-1s were neither bona fide nor reasonable and were not, in fact, paid to "true" third parties.

107.    Further, in each instance, the Class members were required the use of the title companies and to pay the charges as a condition of or an incident to the extension of credit.

108.    As such, all of the section 1100 fees and charges were required to be *included* in the calculation of the Finance Charge on the Class members' loans.  The banks, as a routine and typical practice, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs, *excluded* certain of the section 1100 title charges from the Finance Charge.  For example, in each instance, the bogus, excessive and unnecessary "abstract or title search fees" (line 1102) and "title examination fees" (line 1103) charged to the Plaintiffs were *excluded* from the calculation of the Finance Charge when they should have been *included* in the Finance Charge.

109.    Because certain of the section 1100 title charges were improperly excluded from the calculation of the Finance Charge and should have been included in the calculation of the Finance Charge, in each and every instance the Disclosed Finance Charge on the Plaintiffs' and the Class members' loans was understated, and varied from the Actual Finance Charge by more than $100.  Further, the Disclosed Finance Charge varied by more than one half of one percent of the total amount of credit extended to Plaintiffs as set forth in their promissory notes.  As a result, the Disclosed Finance Charges were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. § 226.23.

110.    Further, having improperly calculated the Finance Charges, the Banks inaccurately disclosed the Annual Percentage Rate (APR) on the loans of the Plaintiffs and the

Class members. In each and every instance, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs, the Banks disclosed APRs that were understated from the properly calculated and Actual APR.

111.    In each and every instance, the Disclosed APR was understated by more than 1/8% or .125%. As a result, the Disclosed APRs were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. § 226.22.

112.    Defendants were well aware of the fraudulent conduct described above and the violations of HOEPA and TILA and knew at all material times that the majority of the fees would be dispersed to the Shumway Organization and Equity Plus and Equity Guaranty by the sham title companies used to close second mortgage loans. However, because of their insatiable appetite for the high-cost, high-interest loans, Defendants allowed the Shumway Organization and Equity Plus and Equity Guaranty and the banks to violate HOEPA and TILA. As described above, by agreeing to purchase the second mortgage loans from the banks, in essence funding the loans, the HOEPA/TILA violation cycle was perpetuated and continued.

113.    Under 15 U.S.C. § 1640(c), Plaintiffs and the Class members are entitled to assert claims for rescission against any assignee or holder of their notes and mortgages. Under 15 U.S.C. § 1641(d) is subject to all claims and defenses that the Plaintiffs and Class members have against CBNV and GNBT. Under 15 U.S.C. § 1635(g), Plaintiffs and the Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

114.    Accordingly, as a result of (1) the Disclosed Finance Charges being inaccurate and understated in every instance; (2) the Disclosed APR's being inaccurate and understated in every instance; and (3) the Class members' loans containing prohibited terms, the loans violate HOEPA and TILA and the Plaintiffs are entitled to damages under 15 U.S.C. §§ 1635, 1639,

1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (5) an amount equal to the sum of all principal, interest, finance charges and fees paid by the class members pursuant to 15 U.S.C. §§ 1635, 1639, 1640 and 1641.

## COUNT II

### Violations of the TILA as Amended by the HOEPA for Failure to make Timely Disclosures of the APR and the Finance Charges

115.    Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

116.    The loans of the Plaintiffs are "high-cost" or "HOEPA loans" governed by the provisions of the HOEPA amendments to TILA and satisfy the definition for "high-cost" loans provided 15 U.S.C. § 1602(aa).

117.    CBNV and GNBT issued to each borrower plaintiff a HOEPA Notice (15 U.S.C. § 1639(a)&(b)) and Defendants a HOEPA Notice of Assignment (15 U.S.C. §1641(d)(4)).

118.    TILA, as amended by HOEPA, at 15 U.S.C. §1639(b)(1) expressly required the Banks to provide certain HOEPA disclosures "not less than three business days prior to consummation of the transaction."

119.    Section 103(y) of TILA (15 U.S.C. § 1602(y)) incorporates by reference any requirement imposed by Regulation Z promulgated by the Federal Reserve Board. Section 103(y) specifically provides :"(y) Any reference to any requirement imposed under this [TILA] title or any provision thereof includes reference to the regulation of the [Federal Reserve] Board under this title or the provision thereof in question."

120.    Regulation Z, Section 226.2 (a)(13) defines "consummation" as follows: "(13) *Consummation* means that time the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. §226.2(a)(13).

31

121.    Plaintiffs and the Class members became "contractually obligated" when they executed their notes and security deeds on the dates of their closings.

122.    Defendants had actual knowledge that the Plaintiffs' second mortgage loans were subject to the requirements of HOEPA.

123.    GNBT or CBNV, in contravention of HOEPA at 15 U.S.C. §1639(b)(1), did not provide and, in fact, first provided the required HOEPA Notice on the day of closing.

124.    The Banks' violations of HOEPA were intentional.    Integral to the predatory lending and "rent-a-charter" scheme was the banks' regular practice of withholding timely disclosures.    Instead of making timely disclosures, and in an attempt to hide their wrongdoing, the banks either directed their notary/closing agents to give the borrowers their HOEPA Notices at the loan closing and to direct the borrowers to falsely acknowledge that they had actually received the Notices three days prior to the loan closing or the banks directed their employees to simply forge the borrowers' signatures on the requisite documents by using "tracing tables." In each and every instance, the loan documents of the borrowers and/or the testimony of the borrowers rebut any presumption that the HOEPA Notices were timely delivered.

125.    Under 15 U.S.C. § 1640(c), Plaintiffs and the Class members are entitled to assert claims for rescission against any assignee or holder of their notes and mortgages. Under 15 U.S.C. § 1641(d) is subject to all claims and defenses that the Plaintiffs and Class members have against CBNV and GNBT. Under 15 U.S.C. § 1635(g), Plaintiffs and the Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

126.    As a result of the banks' failure to make timely HOEPA disclosures, the loans violate HOEPA and Plaintiffs and the Class members are entitled to damages under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3)

rescission rights and damages; and (5) an amount equal to the sum of all principal, interest,
finance charges and fees paid by the class members pursuant to 15 U.S.C. §§ 1635, 1639, 1640
and 1641.

### COUNT III

**Violations of the Real Estate Settlement Procedures Act**

127.    Each proceeding paragraph of this Complaint is hereby incorporated as if fully set
forth herein.

128.    The banks' and the Shumway Organization's "rent-a-charter" predatory lending
scheme also violated RESPA at 12 U.S.C. § 2607.

129.    The note and mortgage that each Plaintiff and Class member entered into with
CBNV and GNBT created a "federally related mortgage loan" as defined at 12 U.S.C. § 2602(1).

130.    The banks, along with the Shumway Organization, Equity Plus, Equity Guaranty,
and their affiliated companies, with the knowledge and consent of Defendants, as part of the
predatory lending and "rent-a-charter" scheme, used the Plaintiffs' HUD-1 Settlement
Statements to hide unlawful kickbacks and referral fees being paid to the Shumway Organization
and Equity Plus and Equity Guaranty on the second mortgage loans by the banks.

131.    The section 800 charges listed on the HUD-1s uniformly misrepresented that
origination and loan discount fees were being paid to the banks when, in fact, said fees were
being paid almost entirely to the Shumway Organization and Equity Plus and Equity Guaranty
and the banks were receiving only a small portion of those fees in the form of kickbacks or
finders' fees.

132.    The section 1100 charges listed on the HUD-1s, in violation of RESPA at 12
U.S.C. § 2607, and RESPA's implementing regulations, Regulation X, at 24 C.F.R. § 3500.14,

33

were imposed for services that were not bona fide, not rendered, or for nominal or duplicative services for which no fees were earned and for which no fees should have been imposed.

133.    Further, the Shumway Organization, Equity Plus and Equity Guaranty, and the banks misrepresented in the HUD-1s that the fees being imposed in Section 1100 of the HUD-1s for title-related services purportedly done by the title companies were in fact being paid to the title companies.  However, because the title companies were owned and/or controlled by the Shumway Organization and were nothing more than sham entities, the HUD-1s were actually being used to conceal kickbacks and fees splits between the Shumway Organization, Equity Plus and Equity Guaranty on one hand and the banks on the other hand.

134.    Further, by virtue of the "rent-a-charter" scheme, the banks' and Equity Plus' and Equity Guaranty's "affiliated business arrangements" with their controlled title companies, and other affiliated or related entities, were nothing more than "sham arrangements" used as subterfuge for passing referral fees back to Equity Plus, Equity Guaranty and the Shumway Organization, all in violation of RESPA at 12 U.S.C. § 2607, and Regulation X, at 24 C.F.R. § 3500.15.

135.    In fact, the banks required the Plaintiffs to use the title companies or an affiliate thereof and then pursuant to their scheme passed along the title-related charges to Equity Plus, Equity Guaranty and the Shumway Organization.

136.    As a pattern and practice, the borrowers would not receive the disclosure of affiliate relationship form required by 12 U.S.C. § 2607(c)(4)(A) apprising them of the joint ownership or control of Equity Plus and Equity Guaranty and the title companies used to close the loans.

137.    Defendants were aware of the fraudulent conduct described above and the violations of RESPA and knew at all material times that the majority of the fees would be dispersed to the Shumway Organization and Equity Plus and Equity Guaranty by the sham title companies used to close second mortgage loans. However, because of their insatiable appetite for the high-cost, high-interest loans, Defendants allowed the banks to violate RESPA. As described above, by agreeing to purchase the second mortgage loans from the banks, in essence funding the loans, the RESPA kickback and fee-split cycle was perpetuated and continued.

138.    As a result of the RESPA violations above alleged, Plaintiffs and the Class have been damaged in an amount to be determined at a trial of this action, where they will seek all permissible damages, treble damages, costs and reasonable attorneys' fees.

### Prayer for Relief

WHEREFORE, on all asserted causes of action against Defendants, Plaintiffs pray for judgment against Defendants, and each of them, jointly and severally, as follows:

- For an Order certifying that this action may be maintained as a plaintiff class action, as defined above, under Fed. R. Civ. P. 23(b)(3);

- For an Order appointing the Plaintiffs to act as representatives of the Class Members and the Class;

- For an Order appointing the undersigned counsel as interim counsel to act on behalf of the putative class before the determination of whether to certify the Class under Fed. R. Civ. P. 23(b)(3) is made;

- For an Order appointing the undersigned counsel as Class Counsel;

- For an Order directing that reasonable notice of this Class action be given to all members of the Class;

- For violating RESPA, an Order finding that the Defendants are jointly and severally liable as a matter of law to each member of the Class for actual damages; and

- For violating RESPA, an Order awarding treble damages to the Class members;

- For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, a declaration that Plaintiffs and each member of the Class is entitled to rescind their loans and that Defendants are prohibited from foreclosing on the Plaintiffs' and Class members' mortgages;

- For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an Order finding that Defendants are jointly and severally liable as a matter of law to each class member for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual damages; (2) statutory damages; (3) rescission rights and damages; and (5) an amount equal to the sum of all principal, interest, finance charges and fees paid by the Class members; and

- For a permanent injunction enjoining defendants, together with their officers, directors, employees, agents, partners or representatives, successors and any and all persons acting in concert with them or by agreement with them from directly or indirectly engaging in the wrongful acts and practices described above, all for the benefit of the Class members; and

- For an order directing disgorgement or restitution against Defendants as to each Class member and the imposition of an equitable constructive trust over such amounts for the benefit of the Class members; and

- A judgment of monetary damages against Defendants and each of them as to each Plaintiff for not only such prohibited or excess fees, but for all interest that has been contracted for or charged or paid by each of the Class members, and the value of such interest that is due and owing in the future; and

- For a judgment of punitive damages against the Defendants in a sum that is fair and reasonable; and

- For reasonable attorneys' fees as provided by law and statute; and

- For pre-and-post judgment interest as provided by law in amount according to proof at trial; and

- For an award of costs and expenses incurred in this action; and

- For such other and further relief as the Court may deem necessary and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted,

By _____
Michael Cartee, Esq. - No. CAR022
John Lloyd, Esq. – No. LLO006
CARTEE & LLOYD
2210 Eighth Street
Tuscaloosa, AL  35401
(205) 759-1554
(205) 758-9477

and

Knox McLaney, Esq. - No. MCL005
MCLANEY & ASSOCIATES, P.C.
P. O. Box 4276
Montgomery, AL 36104
(334) 265-1282
(334) 265-2319

and

37

John W. Sharbrough, Esq. – No. SHA037
THE SHARBROUGH LAW FIRM
156 St. Anthony Street
P.O. Box 996
Mobile AL  36601-0996
(251) 432-6620
(251) 432-5297

and

Scott C. Borison, Esq.
LEGG LAW FIRM, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
(301) 620-1018

and

Franklin R. Nix, Esq.
LAW OFFICES OF FRANKLIN NIX
1020 Foxcroft Road, N.W.
Atlanta, GA 30327-2624
(404) 261-9759
(404) 261-1458

and

J. Michael Vaughan
R. Frederick Walters
David M. Skeens
Garrett M. Hodes
WALTERS BENDER STROHBEHN &
    VAUGHAN, P.C.
2500 City Center Square
12th & Baltimore
P.O. Box 26188
Kansas City, MO  64196
(816) 421-6620
(816) 421-4747 (Facsimile)

and

38

Andrew Hutton, Esq.
550 West C Street
Suite 1770
San Diego, CA 92101
(619) 274-2500
(619) 839-3489

ATTORNEYS FOR PLAINTIFFS

# Exhibit 8 to Declaration

COPY

IN THE CIRCUIT COURT OF FREDERICK COUNTY, MARYLAND

David M. Chatfield                )
Gail E. Chatfield                  )
9704 Morningview Circle        )
Perry Hall, MD 21128           )
                                  )
        Plaintiff            )
                                  )
       v.                 ) Case No._____
                                  )
Community Bank of Northern Virginia  )
c/o CT Corp                )
300 E. Lombard St.           )
Baltimore MD 21202         )
                                  )
And                          )
                                )
Irwin Union Bank and Trust Company  )
c/o CT Corp                )
300 E. Lombard St.           )
Baltimore MD 21202         )
                                )
        Defendants.        )

## COMPLAINT

David M. and Gail E. Chatfield ("Chatfield"), complains as follows against the

defendants, Community Bank Of Northern Virginia (CBNV") and Irwin Union Bank and Trust

Company ("IUB"):

### *Introduction*

1.      This is an action that includes a claim under the Truth in Lending Act ("TILA"),

15USC §1601 et seq.  TILA was enacted by Congress in 1968 as Title I of the Consumer

Protection Act. TILA is a remedial statute which must be "construed liberally in favor of

consumers". Inge v. Rock Financial Corporation 281 F.3d 613, 621 (6th Cir. 2002).

1

2.    The Federal Reserve Board adopted Regulation Z shortly after enactment of the

1968 Act. Regulation Z can be found at 12 CFR 226.1 et seq. The purpose of TILA and

Regulation Z is to promote the informed use of credit and level the playing field between

competing creditors.  The law is designed to protect consumers in credit transactions by requiring

the clear disclosure of the key terms and costs of the lending transaction.  "The Truth in Lending

Act was necessary exactly because borrowers could not force creditors to provide voluntarily a

system of credit within which consumers could function intelligently". H.R.1040, 90th Cong., 2d

Sess. (1968), reprinted in (1968) U.S.Code Cong. & Ad.News 1962, 1965-70. The goal of TILA

is to enable the consumer to understand what their actual costs of borrowing will be on a given

transaction. If the consumer can understand the true cost of the credit, then they can make an

informed decision whether to obtain the credit and they can compare terms and loans offered by

various lenders. The TILA provides "a national loan vocabulary" to allow an informed

understanding of the cost of credit by forcing lenders to make certain disclosures when a

consumer is using their home as collateral for a loan. Further, TILA provides the consumer with

the right to cancel certain loans that include liens on their homes. See 15 U.S.C. Sec. 1635.

3.    TILA seeks to accomplish this laudable goal through the use of a system of precise

disclosure requirements regarding several material terms. The material disclosure terms include

"finance charges", "amount financed", "APR" and "Total Payments. See 15 U.S.C. Sec. 1602

(u).

-    The "Finance Charge" consists of the costs involved in the loan
     that include interest and other fees that may be charged in
     connection with the loan.

2

- The "Amount Financed" is the amount that the consumer walks away with after deduction of any up front costs.

- The "APR" or "Annual Percentage Rate" is not the same as the interest rate. The APR is the actual cost of the credit to the consumer after taking into account all finance charges associated with the loan. Such charges include origination fees, administrative fees, and all other costs charged to the consumer by the lender.

4. In addition to disclosure of the credit terms listed above, TILA also provides additional protections to homeowners when a loan is secured by their principal dwelling. Under TILA, a consumer has the right to cancel a transaction that includes a lien against their principal dwelling, other than a purchase money loan, for up to three business days after the loan is consummated. This right may be extended up to three years if the consumer borrower is not provided accurate material disclosures. See 15 U.S.C. Sec. 1635 (f). The homeowner exercises this right by providing a written notice to the lender. See 12 CFR 226.23 (d). The plaintiffs provided a written notice of election to cancel to the defendants within three years of the loan closing date and before the sale of their home.

5. In 1994, Congress added to TILA by enacting the Home Ownership Equity Protection Act, 15 U.S.C. § 1639, ("HOEPA"). HOEPA was enacted by Congress to curb predatory lending. Congress found that several high-rate lenders were using non-purchase money mortgages to take advantage of unsophisticated and low income homeowners in a "predatory" fashion. See S. Rep. 103-169, 1994 U.S.C.C.A.N. 1881, 1907.

3

6.      HOEPA provides additional protections for consumers whose loan falls within the definition of a "High Cost Mortgage". A loan is considered a "high cost mortgage" and triggers the HOEPA requirements if one of two tests is met. The first test is whether the consumer was charged more than 8% of the "total loan amount" in points and fees. In setting the 8% bright line test Congress found that the 8% level for points and fees was well above the industry average. The 8% trigger was to "prevent unscrupulous creditors from using grossly inflated fees and charges to take advantage of unwitting consumers". S. Rep. 103-169, 1994 U.S.S.C.A.N. 1881, 1908

7.      The plaintiffs entered into a loan with the defendant on or about June 2, 2001. The plaintiffs paid upfront fees of at least $5,390 for a $50,000 loan at an alleged annual percentage rate ("APR") of 15.923%. The plaintiffs assert that the APR disclosed is understated by more than .125%.

8.      The loan agreement, drafted on behalf of the defendant CBNV, provided the loan would be governed by the Credit Grantor Closed End Credit Provisions ("CGCECP"), 12-1001 et seq. of the Commercial Law Article of the Annotated Code of Maryland.

*Parties*

9.      Plaintiffs are residents of Waldorf, State of Maryland.

10.     Plaintiffs are "consumer borrowers" as defined by 12-1001 (d) of the CGCECP. Plaintiffs are "consumers" as defined under TILA, 15 USC § 1602(h). The loans were taken out for primarily household, personal or family purposes.

11.     The defendant CBNV nominally acted as the lender of a loan made to the plaintiff and is a "credit grantor" as defined by 12-1001 (b) of the CGCECP.

4

12.    CBNV's assignee is IUB, and either is considered a creditor under the CGCECP.

13.    CBNV made more than 5 loans secured by real estate in the calendar year 2000.

14.    CBNV is a "creditor" as defined under TILA, 15 USC § 1602(f).

15.    IUB is an assignee of CBNV.

16.    Plaintiffs were approached by alleged agents of CBNV for a second mortgage.

17.    Plaintiff entered into a loan agreement with the defendant. The loan agreement included a written election to be covered under Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

## COUNT I

### *VIOLATION OF THE HOME OWNERSHIP AND EQUITY PROTECTION ACT*

18.    The plaintiffs incorporate by reference the foregoing allegations.

19    The loan made to the Plaintiffs' asserting this count fall within the definition of a "high cost" mortgage as that term is defined by 15 U.S.C. § 1602 (aa).

20.    The loan falls within both the points and fees trigger.

21.    As a result, the subject transaction falls within the parameters of HOEPA, 15 U.S.C. § 1639.

22.    HOEPA requires that certain disclosures be made to consumers in conspicuous type size at least three business days before loan consummation. See 15 U.S.C. Sec. 1639 (b)(1).

23.    The plaintiffs were not provided the notices in advance as required.

24.    The notices provided were not in conspicuous type size.

5

25.    The HOEPA disclosures are deemed material disclosures. See 15 U.S.C. Sec. 1602 (u).

26.    The Plaintiffs provided written notice of their election to cancel the transaction.

27.    Defendant has failed and refused to perform it statutory obligations and the time to do so has passed.

28.    The Plaintiffs asserting this count are entitled to confirmation of their election to cancel the transaction under 15 U.S.C. § 1635 and a return of their finance and other charges.

29.    The Plaintiffs asserting this count are entitled to damages for the HOEPA violations.

30.    The Plaintiffs are entitled to statutory damages in an amount equal to all "finance charges" that they have paid in connection with their loans. See 15 U.S.C. Sec. 1640 (a)(4). Finance charges include all fees, costs and interest.

31.    Defendants' practices concealed information from the plaintiffs preventing their discovery of the violations.

Wherefore, the plaintiffs pray for the following relief:

1.    For an award of relief under 15 U.S.C. § 1640 (a)(4) or other statutory laws, including confirmation of their election to cancel the transaction under 15 U.S.C. § 1635 and an award equal to all finance charges paid in connection with the loans;

2.    For an award of statutory damages for the failure to timely respond to the plaintiffs' notice of their election to cancel;

3. For an award of attorneys' fees, costs and expenses incurred in this action to the extent permitted by law; and

4. For such other and further relief as the court may deem just and proper.

COUNT II

*VIOLATION OF THE TRUTH IN LENDING ACT*

32.    Plaintiffs reallege and incorporate by reference the foregoing allegations above as though set forth in full in this cause of action.

33.    The plaintiffs were each entitled to two copies of a notice of the right to cancel the transaction that set forth the date the right to cancel period expires pursuant to 12 CFR Sec. 226.23 (b) (5). However, inadequate number of notices were given resulting in a violation of TILA.

34.    The plaintiffs were entitled to a disclosure of the material terms set forth at 15 U.S.C. Sec. 1602 (u).

35.    The plaintiffs were not provided an accurate statement of the APR, finance charge or amount financed.

36.    The plaintiffs gave written notice of their election to cancel the transaction.

37.    The defendant IUB has failed and refused to perform it statutory obligations and the time to do so has passed.

Wherefore, the plaintiffs asserting this count pray for the following relief:

1. For an award of relief under 15 U.S.C. § 1640 or other statutory laws, including confirmation of their election to cancel the transaction under 15 U.S.C. § 1635 and an award equal to all

7

finance charges paid in connection with the loans;

2.  For an award of statutory damages for the failure to timely respond to the plaintiffs' notice of their election to cancel;

3.  For an award of attorneys' fees, costs and expenses incurred in this action to the extent permitted by law; and

4.  For such other and further relief as the court may deem just and proper.

COUNT III

*BREACH OF CONTRACT*

33.     Plaintiffs reallege and incorporate by reference the foregoing allegations above as though set forth in full in this cause of action.

34.     The loan agreement was prepared by the defendant, CBNV.

35.     The loan agreement provided for a prepayment penalty.

36.     A prepayment penalty is prohibited under the CGCECP, Sec. 12-1009 (e).

37.     The Agreement was governed by CGCECP at the defendant's specific election.

38.     The defendant's collection of a prepayment penalty violates the parties' agreement.

39.     Under the provisions of the CGCECP, the term entitles the plaintiffs to certain remedies.

40.     Plaintiffs are entitled to the return of all fees, costs, interest and any prepayment penalty under Sec. 12-1018 of the CGCECP.

41.     The defendants had been put on notice of the illegality of the prepayment penalty before they charged the plaintiffs a prepayment penalty.

8

42.   The defendants acted knowingly when they collected a prepayment penalty from the plaintiffs.

WHEREFORE, plaintiff requests that the Court grant the following relief in their favor and against the Defendants:

a.   The maximum amount of damages and other relief provided under '12-1018;

b.   Attorney's fees, litigation expenses and costs; and

c.   Such other and further relief that is appropriate.

Respectfully submitted,

Scott C. Borison,
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick MD 21703
(301) 620-1016
Attorneys for Plaintiffs

DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of their claims.

Scott C. Borison

9

# Exhibit 9 to Declaration

Case 1:04-cv-02236-CCB    Document 2    Filed 07/16/04    Page COPY

IN THE CIRCUIT COURT OF FREDERICK COUNTY, MARYLAND

| | |
|---|---|
| Willard R. Ransom | ) |
| Cindy Lee Ransom. | |
| 1125 Harvard Road | ) |
| Waldorf, MD 20602 | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Case No._____ |
| | |
| Community Bank of Northern Virginia | |
| c/o CT Corp | |
| 300 E. Lombard St. | ) |
| Baltimore MD 21202 | ) |
| | ) |
| And | |
| | ) |
| Irwin Union Bank and Trust Company | ) |
| c/o CT Corp | |
| 300 E. Lombard St. | |
| Baltimore MD 21202 | |
| | |
| Defendants. | |

CCB 04 CV 2236

## COMPLAINT

Willard and Cindy Ransom ("Ransom"), complains as follows against the defendants,

Community Bank Of Northern Virginia ("CBNV") and Irwin Union Bank and Trust Company

("IUB"):

### Introduction

1.    This is an action that includes a claim under the Truth in Lending Act ("TILA"),

15USC §1601 et seq. TILA was enacted by Congress in 1968 as Title I of the Consumer

Protection Act. TILA is a remedial statute which must be "construed liberally in favor of

FILED

2004 JUN -9 A II: 38

consumers". Inge v. Rock Financial Corporation 281 F.3d 613, 621 (6th Cir. 2002).

        The Federal Reserve Board adopted Regulation Z shortly after enactment of the 1968 Act. Regulation Z can be found at 12 CFR 226.1 et seq. The purpose of TILA and Regulation Z is to promote the informed use of credit and level the playing field between competing creditors. The law is designed to protect consumers in credit transactions by requiring the clear disclosure of the key terms and costs of the lending transaction. "The Truth in Lending Act was necessary exactly because borrowers could not force creditors to provide voluntarily a system of credit within which consumers could function intelligently". H.R.1040, 90th Cong., 2d Sess. (1968), reprinted in (1968) U.S.Code Cong. & Ad.News 1962, 1965-70. The goal of TILA is to enable the consumer to understand what their actual costs of borrowing will be on a given transaction. If the consumer can understand the true cost of the credit, then they can make an informed decision whether to obtain the credit and they can compare terms and loans offered by various lenders. The TILA provides "a national loan vocabulary" to allow an informed understanding of the cost of credit by forcing lenders to make certain disclosures when a consumer is using their home as collateral for a loan. Further, TILA provides the consumer with the right to cancel certain loans that include liens on their homes. See 15 U.S.C. Sec. 1635.

    3.   TILA seeks to accomplish this laudable goal through the use of a system of precise disclosure requirements regarding several material terms. The material disclosure terms include "finance charges", "amount financed", "APR" and "Total Payments. See 15 U.S.C. Sec. 1602 (u).

        The "Finance Charge" consists of the costs involved in the loan that include interest and other fees that may be charged in

2

connection with the loan.

The "Amount Financed" is the amount that the consumer walks away with after deduction of any up front costs.

The "APR" or "Annual Percentage Rate" is not the same as the interest rate. The APR is the actual cost of the credit to the consumer after taking into account all finance charges associated with the loan. Such charges include origination fees, administrative fees, and all other costs charged to the consumer by the lender.

4.      In addition to disclosure of the credit terms listed above, TILA also provides additional protections to homeowners when a loan is secured by their principal dwelling. Under TILA, a consumer has the right to cancel a transaction that includes a lien against their principal dwelling, other than a purchase money loan, for up to three business days after the loan is consummated. This right may be extended up to three years if the consumer borrower is not provided accurate material disclosures. See 15 U.S.C. Sec. 1635 (f). The homeowner exercises this right by providing a written notice to the lender. See 12 CFR 226.23 (d). The plaintiffs provided a written notice of election to cancel to the defendants within three years of the loan closing date and before the sale of their home.

5.      In 1994, Congress added to TILA by enacting the Home Ownership Equity Protection Act, 15 U.S.C. § 1639, ("HOEPA"). HOEPA was enacted by Congress to curb predatory lending. Congress found that several high-rate lenders were using non-purchase money mortgages to take advantage of unsophisticated and low income homeowners in a "predatory'

3

fashion. See S. Rep. 103-169, 1994 U.S.C.C.A.N. 1881, 1907.

6.  HOEPA provides additional protections for consumers whose loan falls within the definition of a "High Cost Mortgage". A loan is considered a "high cost mortgage" and triggers the HOEPA requirements if one of two tests is met. The first test is whether the consumer was charged more than 8% of the "total loan amount" in points and fees. In setting the 8% bright line test Congress found that the 8% level for points and fees was well above the industry average. The 8% trigger was to "prevent unscrupulous creditors from using grossly inflated fees and charges to take advantage of unwitting consumers". S. Rep. 103-169, 1994 U.S.S.C.A.N. 1881, 1908

7.  The plaintiffs entered into a loan with the defendant on or about September 25, 2001. The plaintiffs paid upfront fees of $5,844.42 for a $49,999 loan at an alleged annual percentage rate ("APR") of 18.566%. The plaintiffs assert that the APR disclosed is understated by more than .125%.

8.  The loan agreement, drafted on behalf of the defendant CBNV, provided the loan would be governed by the Credit Grantor Closed End Credit Provisions ("CGCECP"), 12-1001 et seq. of the Commercial Law Article of the Annotated Code of Maryland.

*Parties*

9.  Plaintiffs are residents of Waldorf, State of Maryland.

10.  Plaintiffs are "consumer borrowers" as defined by 12-1001 (d) of the CGCECP. Plaintiffs are "consumers" as defined under TILA, 15 USC § 1602(h). The loans were taken out for primarily household, personal or family purposes.

11.  The defendant CBNV nominally acted as the lender of a loan made to the plaintiff

4

and is a "credit grantor" as defined by 12-1001 (b) of the CGCECP.

12.   CBNV's assignee is IUB, and is considered a creditor under the CGCECP.

CBNV made more than 5 loans secured by real estate in the calendar year 2000.

14.   CBNV is a "creditor" as defined under TILA, 15 USC § 1602(f). IUB is an assignee of CBNV.

15.   Plaintiffs were approached by alleged agents of CBNV for a second mortgage.

16.   Plaintiff entered into a loan agreement with the defendant. The loan agreement included a written election to be covered under Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

## COUNT I

### VIOLATION OF THE HOME OWNERSHIP AND EQUITY PROTECTION ACT

17.   The plaintiffs incorporate by reference the foregoing allegations.

18.   The loan made to the Plaintiffs' asserting this count fall within the definition of a "high cost" mortgage as that term is defined by 15 U.S.C. § 1602 (aa).

19.   The loan falls within both the points and fees trigger and annual percentage rate trigger.

20.   As a result, the subject transaction falls within the parameters of HOEPA, 15 U.S.C. § 1639.

21.   HOEPA requires that certain disclosures be made to consumers in conspicuous type size at least three business days before loan consummation. See 15 U.S.C. Sec. 1639 (b)(1).

22.   The plaintiffs were not provided the notices in advance as required.

5

23.    The notices provided were not in conspicuous type size.

24.    The HOEPA disclosures are deemed material disclosures. See 15 U.S.C. Sec. 1602 (u).

25.    The Plaintiffs gave written notice of their election to cancel the transaction.

26.    Defendant has failed and refused to perform it statutory obligations and the time to do so has passed.

27.    The Plaintiffs asserting this count are entitled to confirmation of their election to cancel the transaction under 15 U.S.C. § 1635 and a return of their finance and other charges.

28.    The Plaintiffs asserting this count are entitled to damages for the HOEPA violations.

29.    The Plaintiffs are entitled to statutory damages in an amount equal to all "finance charges" that they have paid in connection with their loans. See 15 U.S.C. Sec. 1640 (a)(4). Finance charges include all fees, costs and interest.

30.    Defendants' practices concealed information from the plaintiffs preventing their discovery of the violations.

Wherefore, the plaintiffs pray for the following relief:

1.    For an award of relief under 15 U.S.C. § 1640 (a)(4) or other statutory laws, including confirmation of their election to cancel the transaction under 15 U.S.C. § 1635 and an award equal to all finance charges paid in connection with the loans;

2.    For an award of statutory damages for the failure to timely respond to the plaintiffs' notice of their election to cancel;

3.    For an award of attorneys' fees, costs and expenses incurred in

6

this action to the extent permitted by law; and

4. For such other and further relief as the court may deem just and proper.

## COUNT II

### *VIOLATION OF THE TRUTH IN LENDING ACT*

31. Plaintiffs reallege and incorporate by reference the foregoing allegations above as though set forth in full in this cause of action.

32. The plaintiffs were each entitled to two copies of a notice of the right to cancel the transaction that set forth the date the right to cancel period expires pursuant to 12 CFR Sec. 226.23 (b) (5). However, inadequate number of notices were given resulting in a violation of TILA.

33. The Plaintiffs were entitled to a disclosure of the material terms set forth at 15 U.S.C. Sec. 1602 (u).

34. The plaintiffs were not provided an accurate statement of the APR, finance charge or amount financed.

35. The plaintiffs gave written notice of their election to cancel the transaction.

36. The defendant has failed and refused to perform it statutory obligations and the time to do so has passed.

Wherefore, the plaintiffs asserting this count pray for the following relief:

1. For an award of relief under 15 U.S.C. § 1640 or other statutory laws, including confirmation of their election to cancel the transaction under 15 U.S.C. § 1635 and an award equal to all finance charges paid in connection with the loans;

7

2.  For an award of statutory damages for Ditech's failure to timely respond to the plaintiffs' notice of their election to cancel;

3.  For an award of attorneys' fees, costs and expenses incurred in this action to the extent permitted by law; and

4.  For such other and further relief as the court may deem just and proper.

## COUNT III

### *BREACH OF CONTRACT*

37.    Plaintiffs reallege and incorporate by reference the foregoing allegations above as though set forth in full in this cause of action.

38.    The loan agreement was prepared by the defendant, CBNV.

35.    The loan agreement provided for a prepayment penalty.

36.    A prepayment penalty is prohibited under the CGCECP, Sec. 12-1009 (e).

37.    The Agreement was governed by CGCECP at the defendant's specific election.

38.    The defendant's collection of a prepayment penalty violates the parties' agreement.

39.    Under the provisions of the CGCECP, the term entitles the plaintiffs to certain remedies.

40.    Plaintiffs were charged a prepayment penalty of approximately $4,485.

41.    Plaintiffs paid fees and costs up front of $6,289.42.

42.    Plaintiffs paid approximately $18,601.24 in interest on the loan.

8

43.    Plaintiffs are entitled to the return of all fees, costs, interest and any prepayment penalty under Sec. 12-1018 of the CGCECP.

44.    The defendants had been put on notice of the illegality of the prepayment penalty before they charged the plaintiffs a prepayment penalty.

45.    The defendants acted knowingly when they collected a prepayment penalty from the plaintiffs.

WHEREFORE, plaintiff requests that the Court grant the following relief in their favor and against the Defendants:

a.    The maximum amount of damages and other relief provided under '12-1018;

b.    Attorney's fees, litigation expenses and costs; and

c.    Such other and further relief that is appropriate.

Respectfully submitted,

Scott C. Borison
Legg Law Firm, LLC
5500 Buckeystown Pike
Frederick MD 21703
(301) 620-1016
Attorneys for Plaintiffs

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of their claims.

Scott C. Borison

9

# Exhibit 10 to Declaration

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI

JOHN AND ROWENA DRENNEN,              )
DAVID A. AND DIANE GARNER,            )
SHAWN AND LORENE STARKEY,             )
                                      )
                    Plaintiffs,       )          Case No. _____
                                      )
vs.                                   )
                                      )
COMMUNITY BANK OF NORTHERN            )
VIRGINIA, n/k/a MERCANTILE BANKSHARES )
CORPORATION,                          )
a Maryland corporation               )
SERVE:                                )
CSC Lawyers Incorporating Service Co., )
11 East Chase Street                  )
Baltimore, Maryland 21202             )
                                      )
and                                   )
                                      )
GUARANTY NATIONAL BANK,               )
OF TALLAHASSEE                        )
a National Bank                       )
SERVE:                                )
        William A. Dyess              )
        As Receiver                   )
        Federal Deposit Insurance Corporation )
        801 17th Street, N.W. (H-11072) )
        Washington, D.C. 20434        )
                                      )
and                                   )
                                      )
GMAC-RESIDENTIAL FUNDING              )
CORPORATION                           )
a Minnesota corporation               )
SERVE:                                )
        C T Corporation System        )
        120 South Central Avenue      )
        Clayton, Missouri  63105      )
                                      )
                                      )
and                                   )
                                      )

| HOMECOMINGS FINANCIAL NETWORK, | ) |
| INC. | ) |
| a Delaware corporation | ) |
| SERVE: | ) |
|     The Corporation Company | ) |
|     120 South Central Avenue | ) |
|     Clayton, Missouri 63105 | ) |
| | ) |
|     Defendants. | ) |

## COMPLAINT FOR DAMAGES

The above-named plaintiffs state and allege the following for their Complaint for Damages:

## THE NATURE OF THE PLAINTIFFS' CLAIMS AND GROUNDS FOR RESCISSION

1. This action is brought by some six (6) Missouri homeowners victimized by the predatory lending practices of Community Bank of Northern Virginia ("CBNV") and Guaranty National Bank of Tallahassee ("GNBT") (collectively, sometimes referred to as the "Defendant Banks"), along with GMAC-Residential Funding Corporation ("GMAC-RFC") and Homecomings Financial Network, Inc. ("Homecomings").

2. Each of the Plaintiffs is a person that opted out of a national class action settlement in *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation*, Case No. 03-0425, in the United States District Court for the Western District of Pennsylvania. That settlement is the subject of thirteen separate appeals now pending in the United States Court of Appeals for the Third Circuit.

3. Each Plaintiff is a member of the putative class in the matter styled <u>Hobson v. Irwin Union Bank et al.</u>, CV-04-C-2351-W, filed in the United States District Court for the Northern District of Alabama and now part of a multidistrict proceeding, MDL No. 1674, pending in the United States District Court for the Western District of Pennsylvania. In the <u>Hobson</u> matter,

2

separate claims for violations of the Truth in Lending Act ("TILA"), the Home Ownership and Equity Protection Act ("HOEPA"), the Real Estate Settlement Procedures Act ("RESPA") and the Racketeer Influenced and Corrupt Organizations Act ("RICO") are asserted on these Plaintiffs' behalf.

4. The Plaintiffs' claims set forth herein seek to enforce rescission rights and damages for Defendants failure to honor a proper demand for rescission. These claims asserted herein arise under the Truth In Lending Act ("TILA") as amended by HOEPA, at 15 U.S.C. §§ 1601 *et seq.* and are separate and in addition to the claims asserted on the instant Plaintiffs' behalf in the Hobson matter.

5. The Plaintiffs' claims asserted herein are timely pursuant to 15 U.S.C.§§ 1635(f) and 1640(e) and as otherwise tolled by the pendency of the class action litigation in the *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation* matter. Plaintiffs were within the description and definition of the putative class asserted in putative class actions consolidated into the *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation* matter and their claims, from which their right to recession derives, were within the factual premise and scope of the litigation.

6. Defendant GMAC-RESIDENTIAL FUNDING CORPORATION (sometimes referred to below as "GMAC-RFC") purchased the second mortgage loans that are the subject of this action and charged and received monthly payments from the borrowers of the second mortgage loans that are the subject of this action.

7. Defendant HOMECOMINGS FINANCIAL NETWORK, INC. ("Homecomings") acts as the servicer and agent for GMAC-RFC as to the Plaintiffs' loans and charged and

3

received monthly payments from the borrowers of the second mortgage loans that are the subject

of this action. GMAC-RFC and Homecomings stand in the shoes of the Defendant Banks just as

if they had made the second mortgage loans under HOEPA, 15 U.S.C. § 1641(d), and under the

Missouri common law of assignee liability.

8. The Plaintiffs' claims arise from the use of CBNV and GNBT as straw fronts in a

"rent a charter" predatory lending scheme that, among other things, involved victimizing

borrowers through charging them enormous loan origination and finders' fees, title charges, and

fees that were neither reasonable nor bona fide.

9. The predatory lending scheme was the brainchild of the Shumway brothers (David,

DeVan and Chris) and Randy Bapst (collectively the "Shumway Organization") done, initially,

through their companies, Equity Plus LLC and Equity Plus Financial Inc. (hereinafter "Equity

Plus") and later through its successor, Equity Guaranty LLC ("Equity Guaranty"). These entities

and other affiliated companies, including Title America LLC, USA Title LLC and Resource

Title, LLC, were used as part of an elaborate scheme to make predatory second mortgage loans

nationwide by preying upon debt laden homeowners. The plan included using at first CBNV,

and later GNBT, as "fronts" for the lending operations that were, in fact, controlled and run by

Equity Plus as to CBNV and then Equity Guaranty as to GNBT. This plan was based upon the

idea that using federally insured banks or national banks would insulate the Shumway

Organization from liability under state consumer protection or fair lending laws.

10. The Plaintiffs were the victims of a predatory lending scheme to charge to them

bogus, excessive and illegal fees and charges on their loans, together with charging high interest

rates, all as part of a scheme to make high-cost loans to borrowers across the country, including

borrowers in the State of Missouri. Such bogus and illegal fees were falsely characterized as and

4

represented to be origination fees, loan discount fees or other charges and fees to be paid to

CBNV or GNBT and title charges and fees to be paid to third-party title companies. Instead,

these bogus fees and charges were being paid directly or indirectly, in whole or in substantial

part, to the Shumway Organization, including primarily, Equity Plus and/or Equity Guaranty or

their affiliated entities, in an effort to avoid consumer protection laws and regulation of

Defendants' lending practices.

11. Each of the plaintiffs obtained a second mortgage loan from one of the Defendant

Banks. As an incident to or a condition of the banks' extension of credit to Plaintiffs, the banks

charged the Plaintiffs certain fees and charges to be paid directly or indirectly by the Plaintiffs in

order to obtain the second mortgage loans.

12. Each such loan is a "high-cost" loan under the Home Ownership and Equity

Protection Act ("HOEPA"), at 15 U.S.C. § 1602(aa) and 12 C.F.R. § 226.32(2), by virtue of

having met the fee and cost trigger or the annual percentage rate ("APR") trigger, or both.

13. At the time that the Plaintiffs' loans were made, the Defendant Banks completed

HOEPA Disclosures and Assignment Notices which identified and admitted pursuant to 15

U.S.C. §§ 1639(a)&(b) and 1641(d)(4) that the Plaintiffs' loans were HOEPA loans..

14. Upon purchase of the loans, Defendants GMAC-RFC and Homecomings reviewed

the Defendant Banks' HOEPA calculations and made their own to confirm that the loans were

HOEPA loans.

15. TILA, as amended by HOEPA, at 15 U.S.C. §§ 1602(u), 1638, 1639, and its

implementing regulation, Regulation Z, require creditors to make timely and accurate disclosures

of "material" information to borrowers to promote the "informed use of credit." The "material"

information includes the "annual percentage rate, the method of determining the finance charge

and the balance upon which a finance charge will be imposed, the amount of the finance charge,

the amount to be financed, the total of payments, the number and amount of payments, the due

dates or periods of payments scheduled to repay the indebtedness," and the disclosures required

by HOEPA at § 1639(a).

16. In connection with this scheme the Defendant Banks made multiple violations of

TILA and HOEPA at 15 U.S.C. §§ 1638 and 1639 because they made inaccurate disclosures of

the Finance Charges and the APR on the Plaintiffs' loans.

17. Certain tolerances for accuracy are allowed at 15 U.S.C. §§ 1605(f), 1610(c) and

Regulation Z, at 12 C.F.R. § 226.22 and 226.23 for the disclosure of the Finance Charge and

Annual Percentage Rate.

18. When calculating the borrowers' Finance Charges and the APRs for the purpose of

making the TILA and HOEPA-required disclosures, the Defendant Banks were only allowed to

exclude from their calculations certain settlement charges that were "bona fide" and "reasonable"

in amount and that were paid to "true" third parties as contemplated by TILA and HOEPA.

19. The Defendant Banks falsely and incorrectly represented that the amounts charged to

the Plaintiffs as title charges in section 1100 of the Plaintiffs' HUD-1s for such things as

"abstract or title searches" (line 1102), "title examinations" (line 1103) and "document reviews"

(line 1112) were "bona fide" and "reasonable" and paid to "true" third parties, when, in fact, they

were not, and were being used directly or indirectly to further the rent-a-charter predatory

lending scheme and to provide kickbacks and unearned fees to the Shumway Organization,

Equity Plus, Equity Guaranty and their associated entities, and that the Defendants GMAC-RFC

and Homecomings were directly or indirectly profiting from such fees. Further, in each instance,

the defendant banks required the use of the title companies (USA Title or Title America or

Resource Title and their affiliated entities) as a condition of or an incident to the extension of credit, required the imposition of the charges, and retained a portion of the charges.

20. These title-related fees and charges set forth in Section 1100 of the Plaintiffs' HUD-1s were neither bona fide nor reasonable and were not, in fact, paid to "true" third parties.

21. Accordingly, all of the Section 1100 certain settlement charges that should have been *included in the calculation* were instead wrongfully excluded from the calculation of the Finance Charge and APR. The defendant banks, as a routine and typical practice, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs, including the loan documents of Plaintiffs, *excluded* the bogus, excessive and unnecessary "abstract or title search fees" (line 1102) and "title examination fees" (line 1103) charged to the Plaintiffs when they should have been *included* in the Finance Charge. Consequentially, the Finance Charges and the APRs disclosed to the Plaintiff borrowers were materially inaccurate and therefore in violation of TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1606(c), 1639, 1640 and HOEPA's implementing regulations, Regulation Z, at 12 C.F.R. §§ 226.22, 226.23, and which violations rise to actions for damages and rescission of the loans under HOEPA and Regulation Z.

22. Because certain of the section 1100 title charges were improperly excluded from the calculation of the Finance Charge and should have been included in the calculation of the Finance Charge, in each and every instance the Disclosed Finance Charge on the Plaintiffs' loans was understated, and varied from the Actual Finance Charge by more than $100. Further, the Disclosed Finance Charge varied by more than one half of one percent of the total amount of credit extended to Plaintiffs as set forth in their promissory notes. As a result, the Disclosed

Finance Charges were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. § 226.23.

23. Further, having improperly calculated the Finance Charges, the Defendant Banks inaccurately disclosed the Annual Percentage Rate (APR) on the loans of the Plaintiffs. In each and every instance, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs, the Defendant Banks disclosed APRs that were understated from the properly calculated and Actual APR.

24. In each and every instance, the Disclosed APR was understated by more than 1/8% or .125%. As a result, the Disclosed APRs were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. § 226.22.

25. In connection with this scheme the Defendant Banks also violated TILA and HOEPA because they failed to provide timely HOEPA disclosures. HOEPA, among other things, also requires that lenders give certain notices to borrowers in a timely fashion so that the prospective borrower can make an informed decision while under no "sales" pressure about whether they want to go forward with a loan for which they are giving a security interest in their home. Specifically, under HOEPA, at 15 U.S.C. §1639(b)(1) expressly required the Banks to provide certain HOEPA disclosures "not less than three *business* days ___prior___ to consummation of the transaction." The loan transactions were consummated on the date of closing.

26. The Defendant Banks, as directed by the Shumway Operation, failed to timely provide such notices but, in fact, first provided the required HOEPA Notice with the closing papers for such loans and less than 3 business days before the consummation of such loans.

27. Because the HOEPA Notices were defective as a matter of law for understatement of the true APR and finance charge, they did not comply with TILA or HOEPA regardless of when they were purportedly delivered.

28. A borrower's remedy for violations of TILA and HOEPA in the nature described above includes the ability to demand and obtain a rescission of the loan. 15 U.S.C. § 1635.

29. As to each of the 3 loans at issue in this suit the borrowers timely made a proper written request for rescission to the appropriate Defendant Bank (the originating lender), to GMAC-RFC (the current holder) and Homecomings Financial (the loan servicer). Each such request was rejected.

30. The specific written request setting forth the notice of exercise of the right of rescission and the refusal of the Defendant Bank(s) and/or GMAC-RFC and Homecomings to honor that right are attached as following and incorporated herein by reference:

*Exhibits A-1 and A-2:* Notice of exercise of right to rescind letter dated June 14, 2004 and faxed on June 19, 2004 from Rowena Drennen to GMAC-RFC, Homecomings Financial and FDIC, as receiver for Guaranty National Bank of Tallahassee and Letter from Roy Arnold, Esq., counsel for GMAC-RFC and Homecomings Financial to Rowena Drennen, dated July 28, 2004, rejecting the Ms. Drennen's demand for rescission of her loan.

*Exhibits B-1 and B-2:* Notice of exercise of right to rescind letter dated June 14, 2004 and faxed on June 19, 2004 from David and Diane Garner to GMAC-RFC, Homecomings Financial and Community Bank of Northern Virginia and Letter from Roy Arnold, Esq., counsel for GMAC-RFC and Homecomings Financial, to Mr. and Mrs. Garner, dated July 28, 2004, rejecting the Garners' demand for rescission of their loan.

*Exhibits C-1 and C-2:* Notice of exercise of right to rescind letter dated June 14, 2004 and faxed on June 19, 2004 from Shawn and Lorene Starkey to GMAC-RFC, Homecomings Financial and FDIC, as receiver for Guaranty National Bank of Tallahassee and Letter from Roy Arnold, Esq., counsel for GMAC-RFC and Homecomings Financial to Mr. and Mrs. Starkey, dated July 28, 2004, rejecting the Starkeys' demand for rescission of their loan.

### THE PARTIES, JURISDICTION AND VENUE

### THE PLAINTIFFS

31. Plaintiffs John and Rowena Drennen are lawfully married individuals who reside at 2703 N. Bellefontaine Avenue, Kansas City, Clay County, Missouri 64117.

32. Plaintiffs David A. and Diane Garner are lawfully married individuals who reside at 4930 South Westfield Avenue, Republic, Greene County, Missouri 65738.

33. Plaintiffs Shawn and Lorene Starkey are lawfully married individuals who reside at 1461 Spruce Avenue, Liberty, Clay County, Missouri 64068.

### DEFENDANTS

34. Defendant COMMUNITY BANK OF NORTHERN VIRGINIA ("CBNV") was at the time of the making of the Plaintiffs' loans, a Virginia state chartered, federally insured bank. Subsequently, CBNV was purchased by Mercantile Bankshares Corporation, a Maryland Corporation. CBNV can be served with process in accordance with the information set forth in the caption of this Complaint for Damages.

35. Defendant GUARANTY NATIONAL BANK OF TALLAHASSEE ("GNBT") was at the time of the making of the Plaintiffs' loans a national bank. On March 12, 2004, the Office of the Comptroller of the Currency, GNBT's federal regulator, shut down GNBT and appointed the Federal Deposit Insurance Corporation ("FDIC") over this failed institution. The

10

12-12020-mg   Doc 2338-2   Filed 12/03/12   Entered 12/03/12 19:42:05   Exhibits 4 -
Case 4:05-cv-00665-GAF   Document 22 of 167   Filed 07/25/05   Page 11 of 24
Case 2:05-cv-01385-GLL   Document 1   Filed 07/25/05   Page 11 of 24

OCC's news release regarding the closure of GNBT disclosed that "Problem areas included a high loan-to-value home equity lending program which the bank failed to properly oversee and which led to substantial losses [and] [t]he OCC found numerous violations of *consumer laws* in this lending program ....". (Emphasis added). Upon information and belief, the "lending program" described by the OCC is the very same lending program that is the subject of this action — a predatory lending scheme first fostered by CBNV and thereafter continued by CBNV and GNBT. The "consumer laws" violated consist principally of universal, across-the-class violations of the Truth-in-Lending Act ("TILA"), the Home Ownership and Equity Protection Act ("HOEPA") and the Real Estate Settlement Procedures Act ("RESPA"). GNBT can be served with process in accordance with the information set forth in the caption of this Complaint for Damages.

36.     Defendant GMAC-RESIDENTIAL FUNDING CORPORATION (sometimes referred to above and below as "GMAC-RFC") is a Delaware corporation with its principal place of business in Minnesota and is a 100% subsidiary of GMAC-RFC Holding Corporation. GMAC-RFC can be served with process in accordance with the information set forth in the caption of this Complaint for Damages.

37.     Defendant HOMECOMINGS FINANCIAL NETWORK, INC. ("Homecomings") is a Delaware corporation (and was known as "a GMAC Company") and can be served with process in accordance with the information set forth in the caption of this Complaint for Damages.

38.     Federal question jurisdiction is proper under 28 U.S.C. § 1331 as the federal claims asserted arise under federal law.

11

39.    Venue and personal jurisdiction are proper in this Court pursuant to recognized principles of due process and in accordance with 28 U.S.C. § 1391.

40.    Defendants are subject to the specific jurisdiction of this Court because Defendants, either directly or indirectly, and by virtue of their participation in a joint venture or conspiracy to make and fund high cost predatory loans in this judicial district and the State of Missouri and by their commission of acts in furtherance of the joint venture and conspiracy and the "rent-a-charter" predatory lending scheme have purposefully directed their activities towards Missouri residents and because the Plaintiffs' causes of action arise out of and relate to the Defendants' activities within this judicial district and the State of Missouri.

41.    Additionally, Defendants are subject to the general jurisdiction of this Court because they have substantial, continuous, and systematic contacts with the State of Missouri. By virtue of their "rent-a-charter" scheme, joint venture and conspiracy, the Defendants have made and/or acquired no less than 750 loans or about $22.5 million dollars worth of loans to Missouri residents. The Assignee Defendants have funded and/or purchased tens of thousands of second mortgage loans made to Missouri borrowers, and have liens on thousands of pieces of real property in Missouri (which was used as collateral for second mortgage loans) and the power of the Missouri courts to enforce those liens, which they have undoubtedly done in the past. Each of these tens of thousands of borrowers, including the CBNV and GNBT borrowers, make monthly payments on their second mortgage loans, and the Defendants all profit either directly or indirectly from the revenue stream generated by the thousands of Missouri second mortgage loans that they own. Simply put, the Defendants are in the business of funding and purchasing and servicing second mortgage loans, and such activities are central to the conduct of

their business, and the funding and purchase of Missouri second mortgage loans is substantial and continuous.

42.    Additionally, the Defendants GMAC-RFC and Homecomings have registered agents in Missouri.

43.    Defendants' contacts with Missouri are sufficient, substantial and continuous, and the Plaintiffs' causes of action arise from and relate to those contacts so that the maintenance of the suit in this Court does not offend traditional notions of fair play and substantial justice and Defendants should reasonably anticipate being haled into this Court in this judicial district in Missouri to answer for the above described unlawful acts.

44.    Venue is proper in this Court because certain of the Plaintiffs reside in this judicial district, because the Defendants "reside" in this district by virtue of each of them being subject to personal jurisdiction in this judicial district, because Defendants regularly solicited and did business and transacted their affairs in this judicial district and hold or held interests in real property in this judicial district, and because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this judicial district.

## THE PLAINTIFFS' LOANS

### JOHN AND ROWENA DRENNEN

45.    In the summer of 2001, John and Rowena Drennen received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

46.    The Drennens contacted GNBT to apply for a second mortgage loan. While they believed they were dealing with a bank, they were, in fact, dealing with the Shumway Organization and Equity Guaranty.

47.    GNBT and/or the Shumway Organization and Equity Guaranty, through the mails or wires, obtained the Drennens' credit report and approved their second mortgage loan.

48.    On or about July 28, 2001, GNBT closed the Drennens' loan in Missouri. On this date, the Drennens first received their TILA and HOEPA disclosures.

49.    In connection with the above-alleged predatory lending scheme, the Shumway Organization, using GNBT as its front, loaned the Drennens a total loan of $47,100.00 to be repaid with interest (15.99%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

50.    To secure repayment of their note, the Drennens executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

51.    In connection with this Second Mortgage Loan, as shown on their HUD-1 settlement statement, the following fees and costs were contracted for and payable at or before closing of the Drennens' loan:

| | | | |
|------|--------------------------|--------------|----------|
| 801  | Loan Origination Fee     | GNBT         | 4,239.00 |
| 802  | Loan Discount            | GNBT         | 942.00   |
| 804  | Credit Report            | GNBT         | 50.00    |
| 811  | Underwriting Fee         | GNBT         | 200.00   |
| 812  | Flood Certification Fee  | GNBT         | 20.00    |
| 813  | Appraisal Fee            | GNBT         | 32.00    |
| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00   |

14

| 1102 | Abstract or Title Search | USA Title LLC | 134.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fee | Clay County Recorder of Deeds | 41.00 |

52. The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Guaranty or other affiliates of the Shumway Organization.

53. The HUD-1 is fraudulent in that the line items shown as being payable to USA Title LLC in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Guaranty or other affiliates of the Shumway Organization.

54. In connection with this loan, the Drennens were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $150,605.00 and that their annual percentage rate was 18.3996%.

55. Both the Finance Charge and Disclosed APR on the Drennens' loan are materially inaccurate under 15 U.S.C. §§ 1605(f), 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.22, 226.23.

56. Because the Finance Charge and Disclosed APR are inaccurate, the Drennens are entitled to rescind their loan pursuant to 15 U.S.C. §§ 1602(u), 1635(f) and 1639(j) and 12 C.F.R. § 226.23(a)(3).

57. By a letter dated June 14, 2004, the Drennens made demand upon Defendants GMAC-RFC, Homecomings Financial, and FOIC, as receiver for GNB for rescission of their loan.

58. By a letter dated July 28, 2004, from Roy Arnold, Esq., counsel for GMAC-RFC and Homecomings, the Drennens' rescission request was refused. This wrongful refusal violated 15 U.S.C. § 1635 and gives rise to damages under 15 U.S.C. § 1640(a).

## DAVID AND DIANE GARNER

59. In the winter of 2002, David and Diane Garner received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

60. The Garners contacted CBNV to apply for a second mortgage loan. While they believed they were dealing with a bank, they were, in fact, dealing with the Shumway Organization and Equity Guaranty

61. CBNV and/or the Shumway Organization and Equity Plus, through the mails or wires, obtained the Garners' credit report and approved their second mortgage loan.

62. On or about March 23, 2002, CBNV closed the Garners' loan in Missouri. On this date, the Garners first received their TILA and HOEPA disclosures.

63. In connection with the above-alleged predatory lending scheme, the Shumway Organization, using CBNV as its front, loaned the Garners a total loan of $40,000 to be repaid with interest (13.99%) in consecutive monthly installments over a period of 20 years. The loan was a consumer loan obtained for personal, family or household purposes.

64. To secure repayment of their note, the Garners executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

65. In connection with this Second Mortgage Loan, as shown on their HUD-1 settlement statement, the following fees and costs were contracted for and payable at or before closing of the Garners' loan:

| 801 | Loan Origination Fee | CBNV | 800.00 |
|------|------|------|------|
| 802 | Loan Discount | CBNV | 3,000.00 |
| 808 | Lender Document Review Fee | CBNV | 150.00 |
| 809 | Lender Underwriting Fee | CBNV | 295.00 |
| 810 | Lender Application Fee | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Resource Title LLC | 50.00 |
| 1102 | Abstract or Title Search | Resource Title LLC | 150.00 |
| 1103 | Title Examination | Resource Title LLC | 220.00 |
| 1105 | Document Preparation Fee | Resource Title LLC | 175.00 |
| 1201 | Recording Fee | Greene County Recorder of Deeds | 45.00 |

66. The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to Equity Guaranty or other affiliates of the Shumway Organization.

67. The HUD-1 is fraudulent in that the line items shown as being payable to Resource Title LLC in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity Guaranty or other affiliates of the Shumway Organization.

68. In connection with this loan, the Garners were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $83,875.99 and that their annual percentage rate was 16.158%.

69. Both the Finance Charge and Disclosed APR on the Drennens' loan are materially inaccurate under 15 U.S.C. §§ 1605(f), 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.22, 226.23.

17

70. Because the Finance Charge and Disclosed APR are materially inaccurate, the Garners are entitled to rescind their loan pursuant to 15 U.S.C. §§ 1602(u), 1635(f) and 1639(j) and 12 C.F.R. § 226.23(a)(3).

71. By a letter dated June 14, 2004, the Garners made demand upon Defendants GMAC-RFC, Homecomings Financial, and CBNV for rescission of their loan

72. By a letter dated July 28, 2004, from Roy Arnold, Esq., counsel for Defendants GMAC-RFC and Homecomings Financial, the Garners' rescission request was rescission request was refused. This wrongful refusal violated 15 U.S.C. § 1635 and gives rise to damages under 15 U.S.C. § 1640(a).

### SHAWN AND LORENE STARKEY

73. In the fall of 2001, Shawn and Lorene Starkey received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

74. The Starkeys contacted GNBT to apply for a second mortgage loan. While they believed they were dealing with a bank, they were, in fact, dealing with the Shumway Organization and Equity Guaranty.

75. GNBT and/or the Shumway Organization and Equity Guaranty, through the mails or wires, obtained the Starkeys' credit report and approved their second mortgage loan.

76. On or about October 31, 2001, GNBT closed the Starkeys' loan in Missouri. On this date, the Starkeys first received their TILA and HOEPA disclosures.

77. In connection with the above-alleged predatory lending scheme, the Shumway Organization, using GNBT as its front, loaned the Starkeys a total loan of $30,300 to be repaid

with interest (11.99%) in consecutive monthly installments over a period of 15 years. The loan
was a consumer loan obtained for personal, family or household purposes.

78. To secure repayment of their note, the Starkeys executed a deed of trust for the
benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate
subject to one or more prior mortgage loans.

79. In connection with this Second Mortgage Loan, as shown on their HUD-1 settlement
statement, the following fees and costs were contracted for and payable at or before closing of
the Starkeys' loan:

| | | | |
|------|----------------------------|-----------------------------|----------|
| 801  | Loan Origination Fee       | GNBT                        | 3,030.00 |
| 802  | Loan Discount              | GNBT                        | 606.00   |
| 804  | Credit Report              | GNBT                        | 50.00    |
| 811  | Underwriting Fee           | GNBT                        | 200.00   |
| 812  | Flood Certification Fee    | GNBT                        | 20.00    |
| 1101 | Settlement or Closing Fee  | USA Title LLC               | 150.00   |
| 1102 | Abstract or Title Search   | USA Title LLC               | 134.00   |
| 1103 | Title Examination          | USA Title LLC               | 450.00   |
| 1111 | Overnight Fee              | USA Title LLC               | 25.00    |
| 1112 | Document Review            | USA Title LLC               | 250.00   |
| 1113 | Processing Fee             | USA Title LLC               | 260.00   |
| 1201 | Recording Fee              | Clay County Recorder of Deeds | 41.00  |

80. The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in
Section 800 were, other than perhaps a very small percentage, actually paid to Equity Guaranty
or other affiliates of the Shumway Organization.

81. The HUD-1 is fraudulent in that the line items shown as being payable to USA Title
LLC in Section 1100 were, other than perhaps a very small percentage, actually paid to Equity
Guaranty or other affiliates of the Shumway Organization.

82. In connection with this loan, the Starkeys were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $39,391.81 and that their annual percentage rate was 14.9528%.

83. Both the Finance Charge and Disclosed APR on the Drennens' loan are materially inaccurate under 15 U.S.C. §§ 1605(f), 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.22, 226.23.

84. Because the Finance Charge and Disclosed APR are materially inaccurate, the Starkeys are entitled to rescind their loan under 15 U.S.C. §§ 1602(u), 1635(f) and 1639(j) and 12 C.F.R. § 226.23(a)(3).

85. By a letter dated June 28, 2004, the Starkeys made demand upon Defendants GMAC-RFC, Homecomings Financial and GNB, for rescission of their loan.

86. By a letter dated July 28, 2004, from Roy Arnold, Esq., counsel for GMAC-RFC and Homecomings Financial, the Starkeys' rescission request was rescission request was refused. This wrongful refusal violated 15 U.S.C. § 1635 and gives rise to damages under 15 U.S.C. § 1640(a).

## COUNT I

## (FAILURE TO HONOR VALID AND TIMELY DEMAND FOR RESCISSION)

87. Each proceeding paragraph of this Complaint is hereby incorporated as if fully set forth herein.

88. TILA establishes a right of rescission for any loan transaction in which the borrowers' principal dwelling is used as security. 15 U.S.C. § 1635(a). The rescission period extends until three years after consummation of the loan if no accurate and timely disclosures are given. 15 U.S.C. § 1635(f) and 12 C.F.R. § 226.23(a)(3). The right to rescind extends to an assignee.

89. As a result of the separate violations of TILA and HOEPA set forth above, Plaintiffs are entitled, among other things, to seek rescission of their loan. This right of rescission applies as against assignees. 15 U.S.C. §§ 1641(c) and (d).

90. The Plaintiffs' second mortgage loans were consumer credit transactions under 15 U.S.C. § 1635. Defendants retained security interests in the Plaintiffs' homes, which homes were the Plaintiffs' principal dwellings.

91. Each of the Plaintiffs made a timely demand for rescission by mail and facsimile and the facsimile transmissions were reported as received by Defendants.

92. Upon the Plaintiffs' exercise of their right to rescind, Defendants' security interests on the Plaintiffs' homes, along with the promissory notes executed by Plaintiffs, became void pursuant to 15 U.S.C. § 1635(b).

93. Each such request for rescission was wrongfully refused. As a result of Defendants' failure to rescind the Plaintiffs' second mortgage loans, Defendants are liable to Plaintiffs under 15 U.S.C. §§ 1635 and 1640(a)(3).

21

94. Plaintiffs are entitled to a return of all amounts, including finance charges, interest, closing costs, title charges and broker fees paid on their loans. Defendants have not returned these amounts to Plaintiffs.

95. Defendants have not terminated their security interests in the Plaintiffs' loans.

96. Because Defendants have not returned all amounts owed to Plaintiffs under 15 U.S.C. §§ 1635 and 1640 nor have they terminated their security interests in the Plaintiffs' homes, Plaintiffs are not obligated to make any tender of principal back to Defendants and are entitled to the entire principal amount of their loans pursuant to 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d)(3).

97. In any event, and as an alternative to the express provisions of 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d)(3) if such provisions are equitably modified by the Court, because the amounts that Defendants are liable to Plaintiffs exceed the amount of the principal that would be required to be tendered back to Defendants under 15 U.S.C. § 1635 had Defendants complied with the requirements of the statute, by way of off-set Plaintiffs have nothing to tender to Defendants.

98. Pursuant to 15 U.S.C. §§ 1640(a)(2)(A)(iii) and (3), for failing to rescind the Plaintiffs loans, to return all amounts owed to Plaintiffs and to terminate their security interests in the Plaintiffs' homes, Defendants are liable to Plaintiffs for statutory damages and all damages allowed under 15 U.S.C. §§ 1635 and 1640, including the costs of the action, together with reasonable attorneys' fees.

WHEREFORE, on their cause of action against Defendants, and in addition to any and all relief Plaintiffs seek in the matter captioned as Hobson v. Irwin Union Bank et al., CV-04-C-2351-W and/or as part of a multidistrict proceeding, MDL No. 1674, pending in the United

States District Court for the Western District of Pennsylvania, Plaintiffs pray for judgments against said Defendants, and each of them, as follows:

(a)      For a declaration that Plaintiff are entitled to rescind their loans and that Defendants' security interests in the Plaintiffs' homes are automatically void;

(b)      For an Order and Judgment finding that Defendants are liable as a matter of law to each Plaintiff Class member for all damages and declaratory and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d) for Defendants' failure to honor Plaintiffs' rescission demands, including all actual damages and statutory damages (which damages are separate and in addition to any damage that Plaintiffs are entitled to for Defendants' TILA and HOEPA violations and which are sought in the matter captioned as <u>Hobson v. Irwin Union Bank et al.</u>, CV-04-C-2351-W and/or as part of a multidistrict proceeding, MDL No. 1674, pending in the United States District Court for the Western District of Pennsylvania);

(c)      For a declaration that Plaintiffs are not required to make any tender of principal to Defendants for their failure to perform its obligations under 15 U.S.C. § 1635(b) and 12 C.F.R. § 226.23(d)(3) or, alternatively, a declaration that Plaintiffs may set off any and all amounts required to be tendered to Defendants with all amounts that Defendants are obligated to return to Plaintiffs;

(d)      For reasonable attorneys' fees as provided by law and statute;

(e)      For pre-and-post judgment interest as provided by law in amount according to proof at trial;

(f)      For an award of costs and expenses incurred in this action; and

(g)      For such other and further relief as the Court may deem just and proper.

12-12020-mg    Doc 2338-2    Filed 12/03/12    Entered 12/03/12 19:42:05    Exhibits 4 -
Case 4:05-cv-00665-GAF    Doc 1:85135 of 16707/25/2005 Page 24 of 24
Case 2:05-cv-01386-GLL    Document 1    Filed 07/25/05    Page 24 of 24

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.


Dated:  July 25, 2005

                              Respectfully submitted,

                              WALTERS BENDER STROHBEHN &
                              VAUGHAN, P.C.


                              By
                                  J. Michael Vaughan - Mo. Bar 24989
                                  David M. Skeens - Mo. Bar 35728
                                  Kip D. Richards - Mo. Bar 39743
                                  Garrett M. Hodes - Mo. Bar 50221

                              2500 City Center Square
                              12th & Baltimore
                              P.O. Box 26188
                              Kansas City, MO  64196
                              (816) 421-6620
                              (816) 421-4747 (Facsimile)

                              ATTORNEYS FOR PLAINTIFFS

Rowena Drennen
2703 Bellefontaine Ave.
Kansas City, Missouri 64117

June 14, 2004

**VIA FACSIMILE**
**1-952-857-7252**
**AND U.S. MAIL**
GMAC RFC
Corporate Office
8400 Normandale Blvd
Suite 250
Minneapolis, MN 55437

**VIA FACSIMILE**
**1-214-874-2023**
**AND U.S. MAIL**
Homecomings Financial
2711 North Haskell
Suite 900
Dallas, Texas 75204

**VIA FACSIMILE**
**1-972-761-2250**
**AND U.S. MAIL**
Federal Deposit Insurance Corporation
Receiver: Guaranty National Bank of Tallahassee
Attention: Claims Department, DRR
1910 Pacific Avenue
Dallas, Texas 75201

Re:   Rowena Drennen
      Guaranty National Bank of Tallahassee Loan #: LAS-01-0000129376

Dear FDIC as Receiver for Guaranty National Bank of Tallahassee, GMAC-RFC &
Homecomings Financial:

This letter is written to Guaranty National Bank of Tallahassee ("GNBT"), the
original lender of the above referenced loan and to GMAC RFC ("RFC"), the assignee of
that loan and Homecomings Financial ("Homecomings") the servicer of the loan.  The
loan was dated July 28, 2001 in an original principal amount of $47,100.00.

Notice is hereby given that I, as the borrower, hereby exercise my right to rescind
this loan transaction pursuant to the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §
1635 and Regulation Z § 226.23 and pursuant to the Home Ownership and Equity
Protection Act ("HOEPA"), as defined at 15 U.S.C. § 1602 (aa).


EXHIBIT
A - 1

This rescission is premised, without limitation, on violations of federal law and in particular violations of both TILA and HOEPA regarding the lack of required disclosures or inaccurate disclosures as to the right of rescission, the Annual Percentage Rate, the compensation to the broker and the HOEPA notice required by 15 U.S.C. § 1639.

Pursuant to the applicable law, this rescission voids the mortgage. See 15 U.S.C. 1635 and Regulation Z § 226.23. Moreover, you have twenty (20) days from the date of this notice of rescission to return to me all monies paid all persons associated with this loan (including without limitation Guaranty National Bank of Tallahassee, GMAC RFC & Homecomings) and to cancel the mortgage on my home. If you do not cancel the mortgage and return all consideration paid within this twenty (20) day period, in additional to the damages for the existing violations of federal law, you and your agents will also be liable for any additional actual and statutory damages under 15 U.S.C. § 1640(a).

I have sent one of the letters to the Guaranty National Bank of Tallahassee. Additionally, as shown above. I have sent a copy of this letter to the GMAC-RFC and a copy to Homecomings Financial.

Very Truly Yours,

Rowena Drennen

cc:    J. Michael Vaughan
       David M. Skeens

P. 1

\* \* \*  COMMUNICATION RESULT REPORT ( JUL. 19. 2004  5:20AM ) \* \* \*

TTI  WBSv

| FILE MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|-----------|--------|-----------------|--------|------|
| 349  MEMORY TX | | 19727612250 | OK | P. 7/7 |

REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL          E-2) BUSY
  E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

# WALTERS BENDER STROHBEHN VAUGHAN, P.C.
## ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:        July 19, 2004              TIME: _____

NO. OF PAGES:    ___7___  (Including this cover page)

TO:        FDIC – Guaranty National Bank of Tallahassee

TELECOPY NO.:    1-972-761-2250

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:



# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
### ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

**DATE:**      July 19, 2004                    **TIME:** _____

**NO. OF PAGES:**  __7__  (Including this cover page)

**TO:**          FDIC – Guaranty National Bank of Tallahassee

**TELECOPY NO.:**   1-972-761-2250

**CONFIRM NO.:**

**FROM:**

**CLIENT NO.:**

**RE:**

**COMMENTS:**   Please find rescission letters for Rowena Drennen, Christopher & Angela Hoppe & Shawn & Lorene Starkey

---

THIS MATERIAL WILL ALSO BE MAILED TO YOU      YES _____   NO _____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620.

_____ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: _____   TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT USE THIS TRANSMISSION IN ANY WAY, BUT CONTACT THE SENDER BY TELEPHONE.

```
x  x  x  COMMUNICATION RESULT REPORT ( JUL.19.2004  9:15AM ) x  x  x
                                                            TTI  WBSV
FILE MODE       OPTION              ADDRESS (GROUP)         RESULT      PAGE
-------------------------------------------------------------------------------
350  MEMORY TX                      12148615323               OK        P. 9/9
```

```
REASON FOR ERROR
     E-1) HANG UP OR LINE FAIL             E-2) BUSY
     E-3) NO ANSWER                        E-4) NO FACSIMILE CONNECTION
```

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:      July 19, 2004                    TIME: _____

NO. OF PAGES:      _9_    (Including this cover page)

TO:          Homecomings Financial

TELECOPY NO.:    1-214-861-5323

CONFIRM NO.:

FROM:

CLIENT NO.:



WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:      July 19, 2004                    TIME: _____

NO. OF PAGES: ___9___ (Including this cover page)

TO:            Homecomings Financial

TELECOPY NO.:   1-214-861-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

COMMENTS:    Please find rescission letters for Christopher &
Angela Hoppe, Rowena Drennon, David & Diane
Garner & Shawn & Lorene Starkey.

---

THIS MATERIAL WILL ALSO BE MAILED TO YOU    YES _____    NO _____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620.

_____ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: _____ TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFI-
DENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO
ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT
USE THIS TRANSMISSION IN ANY WAY, BUT CONTACT THE SENDER BY TELEPHONE

```
     *    *    *   COMMUNICATION RESULT REPORT ( JUL.19.2024  9:18AM ) *   *   *

                                                              TTI    WBSV
  FILE MODE        OPTION            ADDRESS (GROUP)        RESULT     PAGE
  -------------------------------------------------------------------------------
  350  MEMORY TX                     12148615323             OK      P. 9/9
```

```
  REASON FOR ERROR
    E-1) HANG UP OR LINE FAIL            E-2) BUSY
    E-3) NO ANSWER                       E-4) NO FACSIMILE CONNECTION
```

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:    July 19, 2004                    TIME: _____

NO. OF PAGES:    ___9___  (Including this cover page)

TO:        Homecomings Financial

TELECOPY NO.:    1-214-861-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:



# WALTERS BENDER STROHBEHN VAUGHAN, P.C.
### ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:        July 19, 2004                    TIME: _____

NO. OF PAGES:    _9_   (Including this cover page)

TO:              Homecomings Financial

TELECOPY NO.:   1-214-861-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

COMMENTS:    Please find rescission letters for Christopher &
Angela Hoppe, Rowena Drennon, David & Diane
Garner & Shawn & Lorene Starkey.

THIS MATERIAL WILL ALSO BE MAILED TO YOU!    YES _____   NO _____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620.

_____ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: _____ TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFI-
DENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO
ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT
USE THIS TRANSMISSION IN ANY WAY, BUT CONTACT THE SENDER BY TELEPHONE.

* * * COMMUNICATION RESULT REPORT ( JUL.19.2004  1:53PM ) * * *

| | | | TTI  WBSV | |
|---|---|---|---|---|
| FILE MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
| 355  MEMORY TX | | 19528077792 | OK | P. 9/9 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL        E-2) BUSY
E-3) NO ANSWER                   E-4) NO FACSIMILE CONNECTION

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
### ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:        July 19, 2004                TIME: _____

NO. OF PAGES:    9    (Including this cover page)

TO:          GMAC-RFC

TELECOPY NO.:   1-952-857-7952  7730

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

# ReedSmith

Roy W. Arnold
Direct Phone: 412.288.3916
Email: rarnold@reedsmith.com

Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886
412.288.3131
Fax 412.288.3063

July 28, 2004

Ms. Rowena Drennen
2703 Bellefontaine Avenue
Kansas City, Missouri 64117

Re:    Letter Dated June 14, 2004 Referencing Guaranty
       **National Bank of Tallahassee Loan # LAS-01-0000129376;**

Dear Ms. Drennen:

We represent Residential Funding Corporation ("RFC") and Homecomings Financial Network, Inc. ("Homecomings"). RFC and Homecomings hereby acknowledge receipt of your request to rescind dated June 14, 2004 sent by facsimile on July 19, 2004 in which you purport to exercise a right to cancel the above-referenced loan (the "Letter"). Please direct all future questions or communications concerning the above-referenced loan to us.

In your Letter, you assert that you are entitled to rescind your loan and void the mortgage because of violations of federal law, "in particular violations of both TILA and HOEPA regarding the lack of required disclosures or inaccurate disclosures as to the right of rescission, the Annual Percentage Rate, the compensation to the broker and the HOEPA notice required by 15 U.S.C. §1639."

Our review of the loan file indicates that you were provided with all disclosures required by TILA and HOEPA, including the HOEPA notice required by 15 U.S.C. §1639, a TILA Disclosure that included a disclosure of the Annual Percentage Rate, and a Notice of Right to Cancel. You have not specified the grounds for your assertion that the disclosures you received were "inaccurate," and we have found no grounds to conclude that any of the disclosures you received were inaccurate. Moreover, there is nothing in the file to indicate that any compensation was paid to a broker in connection with your loan.

RFC will not cancel the above-referenced loan at this time. You are expected to honor your payment obligation to RFC and Homecomings.



LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND ♦ PRINCETON
FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, UK ♦ CENTURY CITY ♦ RICHMOND ♦ HARRISBURG ♦ LEESBURG ♦ WESTLAKE VILLAGE

reedsmith.com

Ms. Rowena Drennen
July 28, 2004
Page 2

ReedSmith

Since you already have initiated litigation, RFC and/or Homecomings will respond to any claims you wish to pursue in that forum.

Very truly yours,

REED SMITH LLP

By _[signature]_
Roy W. Arnold

RWA:plm

cc:    ✓ J. Michael Vaughn, Esc.
       David M. Skeens, Esq.
       Danie L. McClain, Esq.

David & Diane Garner
4930 S. Westfield Ave.
Republic, Missouri 65738

June 14, 2004

**VIA FACSIMILE**
**1-952-857-7252**
**AND U.S. MAIL**
GMAC-RFC
Corporate Office
8400 Normandale Blvd
Suite 250
Minneapolis, MN 55437

**VIA FACSIMILE**
**1-800-399-2690**
**AND U.S. MAIL**
Homecomings Financial
2711 North Haskell
Suite 900
Dallas, Texas 75204

**VIA FACSIMILE**
**(703) 421-7202**
**AND U.S. MAIL**
Community Bank of Northern Virginia
Legal Department
107 Free Court
Sterling, Virginia 20164

    Re:   David & Diane Garner
           Community Bank of Northern Virginia Loan #: 2014934

Dear Community Bank of Northern Virginia, GMAC-RFC & Homecomings Financial;

    This letter is written to Community Bank of Northern Virginia ("CBNV"), the original lender of the above referenced loan and to GMAC-RFC ("RFC"), the assignee of that loan and Homecomings Financial ("Homecomings") the servicer of the loan. The loan was dated March 23, 2003 in an original principal amount of $40,000.00.

    Notice is hereby given that we, as borrowers, hereby exercise our right to rescind this loan transaction pursuant to the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1635 and Regulation Z § 226.23 and pursuant to the Home Ownership and Equity Protection Act ("HOEPA"), as defined at 15 U.S.C. § 1602 (aa).

    This rescission is premised, without limitation, on violations of federal law and in particular violations of both TILA and HOEPA regarding the lack of required disclosures


EXHIBIT
B - 1

or inaccurate disclosures as to the right of rescission, the Annual Percentage Rate, the compensation to the broker and the HOEPA notice required by 15 U.S.C. § 1639.

Pursuant to the applicable law, this rescission voids the mortgage. See 15 U.S.C. 1635 and Regulation Z § 226.23. Moreover, you have twenty (20) days from the date of this notice of rescission to return to me all monies paid all persons associated with this loan (including without limitation CBNV, GMAC RFC & Homecomings) and to cancel the mortgage on my home. If you do not cancel the mortgage and return all consideration paid within this twenty (20) day period, in additional to the damages for the existing violations of federal law, you and your agents will also be liable for any additional actual and statutory damages under 15 U.S.C. § 1640(a).

We have sent one of the letters to the Community Bank of Northern Virginia. Additionally, as shown above, we have sent a copy of this letter to the GMAC-RFC and a copy to Homecomings Financial.

Very Truly Yours,

David Garner

Diane Garner

cc:    J. Michael Vaughan
       David M. Skeens

P. 1

* * * COMMUNICATION RESULT REPORT ( JUL.19.2004 12:15AM ) * * *

TTI   WBSV

| FILE | MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|------|------|--------|-----------------|--------|------|
| 633  | MEMORY TX | | 17234217202 | OK | P. 3/3 |

---

REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL          E-2) BUSY
  E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

---

WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:    July 19, 2004                TIME: _____

NO. OF PAGES: _____ (Including this cover page)

TO:    Community Bank of Northern Virginia

TELECOPY NO.: ~~1-950-337-8850~~ (763-421- 7202)

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

* * *  COMMUNICATION RESULT REPORT ( JUL.19.2004  1:53PM )  * * *

| FILE MODE | OPTION | ADDRESS (GROUP) | TTI WBSV | |
|---|---|---|---|---|
| 355 MEMORY TX | | 19528577730 | RESULT | PAGE |
| | | | OK | P. 9/9 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:  July 19, 2004          TIME: _____

NO. OF PAGES:  9  (Including this cover page)

TO:  GMAC-RFC

TELECOPY NO.:  1-952-857-7252  7730

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

P. 1

```
*  *  *  COMMUNICATION RESULT REPORT ( JUL. 19, 2004   9:16AM ) *  *  *
                                                             TTI   WBFV

FILE MODE        OPTION              ADDRESS (GROUP)          RESULT       PAGE
-------------------------------------------------------------------------------
052  MEMORY TX                       12142615323              OK           P. 9/9
```

```
REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL              E-2) BUSY
  E-3) NO ANSWER                         E-4) NO FACSIMILE CONNECTION
```

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

### FAX NO. (816) 421-4747

DATE:        July 19, 2004              TIME: _____

NO. OF PAGES:    ___9___   (Including this cover page)

TO:          Homecomings Financial

TELECOPY NO.:   1-214-861-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:



WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:      July 19, 2004            TIME: _____

NO. OF PAGES:  ___9___  (Including this cover page)

TO:            Homecomings Financial

TELECOPY NO.:   1-214-861-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

COMMENTS:  Please find rescission letters for Christopher & Angela Hoppe, Rowena Drennon, David & Diane Garner & Shawn & Lorene Starkey.

THIS MATERIAL WILL ALSO BE MAILED TO YOU      YES ____  NO ____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620.

____ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: _____  TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFI-
DENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO
ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT
USE THIS TRANSMISSION IN ANY WAY, BUT CONTACT THE SENDER BY TELEPHONE.

WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:        July 19, 2004                TIME: _____

NO. OF PAGES: _____ (Including this cover page)

TO:                Community Bank of Northern Virginia

TELECOPY NO.: ~~1-952-837-9952~~ (703·421- 7202)

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

COMMENTS:    Please find rescission letters for David & Diane
Garner

THIS MATERIAL WILL ALSO BE MAILED TO YOU    YES ____ NO ____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620.

___ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: ____ _____ TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFI-
DENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO
ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT
USE THIS TRANSMISSION IN ANY WAY, BUT CONTACT THE SENDER BY TELEPHONE.

| FILE MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|-----------|--------|-----------------|--------|------|
| 343  MEMORY TX | | 19528577252 | E-3)3)3)3)3) | P. 0/3 |

---

REASON FOR ERROR
  E-1) HANG UP OR LINE FAIL          E-2) BUSY
  E-3) NO ANSWER                      E-4) NO FACSIMILE CONNECTION

---

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
## ATTORNEYS AT LAW

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

**DATE:**    July 19, 2004                **TIME:** _____

**NO. OF PAGES:** _____ (Including this cover page)

**TO:**                Community Bank of Northern Virginia

**TELECOPY NO.:**  1-952-857-7252

**CONFIRM NO.:**

**FROM:**

**CLIENT NO.:**

# ReedSmith

**Roy W. Arnold**
Direct Phone: 412.288.3916
Email: rarnold@reedsmith.com

Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886
412.288.3131
Fax 412.288.3063

July 28, 2004

Mr. David Garner
Mrs. Diane Garner
4930 S. Westfield Avenue
Republic, Missouri 65738

Re:   **Letter Dated June 14, 2004 Referencing Community**
**Bank of Northern Virginia Loan # 2014934**

Dear Mr. and Mrs. Garner:

We represent Residential Funding Corporation ("RFC") and Homecomings Financial Network, Inc. ("Homecomings"). RFC and Homecomings hereby acknowledge receipt of your request to rescind dated June 14, 2004 sent by facsimile on July 19, 2004 in which you purport to exercise a right to cancel the above-referenced loan (the "Letter"). Please direct all future questions or communications concerning the above-referenced loan to us.

In your Letter, you assert that you are entitled to rescind your loan and void the mortgage because of violations of federal law, "in particular violations of both TILA and HOEPA regarding the lack of required disclosures or inaccurate disclosures as to the right of rescission, the Annual Percentage Rate, the compensation to the broker and the HOEPA notice required by 15 U.S.C. §1639."

Our review of the loan file indicates that you were provided with all disclosures required by TILA and HOEPA, including the HOEPA notice required by 15 U.S.C. §1639, a TILA Disclosure that included a disclosure of the Annual Percentage Rate, and a Notice of Right to Cancel. You have not specified the grounds for your assertion that the disclosures you received were "inaccurate," and we have found no grounds to conclude that any of the disclosures you received were inaccurate. Moreover, there is nothing in the file to indicate that any compensation was paid to a broker in connection with your loan.

RFC will not cancel the above-referenced loan at this time. You are expected to honor your payment obligation to RFC and Homecomings.

> **EXHIBIT**
> B - 2

LONDON ♦ NEW YORK ♦ LOS ANGELES ♦ SAN FRANCISCO ♦ WASHINGTON, D.C. ♦ PHILADELPHIA ♦ PITTSBURGH ♦ OAKLAND ♦ PRINCETON
FALLS CHURCH ♦ WILMINGTON ♦ NEWARK ♦ MIDLANDS, U.K. ♦ CENTURY CITY ♦ RICHMOND ♦ HARRISBURG ♦ LEESBURG ♦ WESTLAKE VILLAGE

reedsmith.com

Mr. David Garner
Mrs. Diane Garner
July 28, 2004
Page 2

**Reed**Smith

     Since you already have in dated litigation, RFC and/or Homecomings will respond to any claims you wish to pursue in that forum.

               Very truly yours,

               REED SMITH LLP

               By _____
                   Roy W. Arnold

RWA:plm

cc:  ✓J. Michael Vaughn, Esq.
     David V. Skeens, Esq.
     Daniel L. McClain, Esq

DEXTER C. ODIN
JAMES E. FELDMAN
LAWRENCE PITTLEMAN
JOHN S. WISIACKAS
DAVID J. REEDER
GEORGE A. HARRISON
JOHN P. NACERINE
DONALD F. KING
F. DOUGLAS ROSS
BRUCE N. BLANCHARD
DAVID A. LAWRENCE
JOHN P. HORAN
EDWARD W. CAMERON
FRANCES NIEBERG GOODROW
SALLY ANN ROSTETTER
LESLIE D. FENTON
TIMOTHY NAANCY
LARRY S. COPE III
JAMES W. REYNOLDS
KEVIN T. OLIVERA
MISTI MUSTOFSKY

ALSO ADMITTED TO DC BAR
ALSO ADMITTED TO VA BAR
ALSO ADMITTED TO NY BAR
ADMITTED TO DC BAR INCORPORATION ONLY
ALSO ADMITTED TO NY AND SC BARS
ADMITTED TO DC, NY, VA, AND NY BARS ONLY

## ODIN, FELDMAN & PITTLEMAN, P.C.

ATTORNEYS AT LAW
FAIRFAX, VIRGINIA SUITE 1100
1425 NORTH COURT HOUSE ROAD

www.ofplaw.com

AVE/FAX DIRECT DIAL LINE NUMBER ADDRESS
(703) 218-2133

lcopelaw@ofplaw.com

FACSIMILE (703) 218-2160

*Thirty-Five Years of Service*

July 27, 2004

ERIC P. ROSS, LLC
KATHLEEN A. KUGLE
ROBERT E. SNYDER
D. NYATH BRUGEL
JONATHAN D. FRIEDER
FRANCES QUINN JR.
RICHARD G. GRAY
TIFFANY C. TOLL
BEATRICE V. DISALVO
DANA A. ALLEN
ELIZABETH A. KEITH
CRAIG J. FRANCO
DAVID H. ZANGRILLI
JOSEPH SMITH
LAURIE M. CAGILLI
C. A. ANAND SURESH
SANDRA D. BREHOLZ
DAVID J. WHITE
BARBARA J. DAVIS
STEPHEN V. GRANANGO
HOLLY ELAINE RAZATEN

OF COUNSEL
STEPHEN J. ANNINO
RONALD M. FEIGELSON
THOMAS R. GRAY
SIMON M. OSNOS
PHILIP CASE
STEVEN A. TYRELL

J. Michael Vaughan, Esquire
WALTERS BENDER STROHBEHN & VAUGHAN, P.C.
2500 City Center Square, 12th & Baltimore
P.O. Box 26188
Kansas City, MO   64196

### Re:   *Garners' Rescission Letter*

Dear Mike:

Community Bank of Northern Virginia has received the Garners' letter dated June 14, 2004, a copy of which was also sent to you. Because you represent the Garners in their pending litigation, I thought it more appropriate to respond to their letter through you, rather than to them directly. Also, at the outset, I would like to note that although the Garners' letter was dated June 14, 2004, it was not postmarked until July 19, 2004, and was received by the Bank on July 22, 2004.

Although the Garners' letter does not specifically set forth the basis for their rescission request, I am presuming that it is the same as what is alleged in their Complaint, which was filed well before the Bank's receipt of the Garners' letter. The Bank disagrees with the Garners' allegations as to the purported grounds for rescission, and further disagrees that the Garners have an extended right to seek rescission. The Bank further disagrees that the Garners have timely filed a statutory claim for damages. I expect that we will address these and other issues through the pending litigation once the stay has been resolved.

Very truly yours,

F. Doug las Ross

FDR:jet
cc:  Mr. David Summers

N:\DATA\CLIENTS\1794-001\Letter to J. Michael Vaughan 7.28.04.doc

JUL 3 0 2004

Shawn & Lorene Starkey
1461 Spruce Ave.
Liberty, Missouri 64068

June 14, 2004

**VIA FACSIMILE**
1-952-857-7252
**AND U.S. MAIL**
GMAC-RFC
Corporate Office
8400 Normandale Blvd
Suite 250
Minneapolis, MN 55437

**VIA FACSIMILE**
1-800-399-2690
**AND U.S. MAIL**
Homecomings Financial
2711 North Haskell
Suite 900
Dallas, Texas 75204

**VIA FACSIMILE**
1-972-761-2250
**AND U.S.MAIL**
Federal Deposit Insurance Corporation
Receiver: Guaranty National Bank of Tallahassee
Attention: Claims Department, DRR
1910 Pacific Avenue
Dallas, Texas 75201

Re:     Shawn & Lorene Starkey
        Guaranty National Bank of Tallahassee Loan #: JGB-01-0000234474

Dear FDIC as Receiver for Guaranty National Bank of Tallahassee, GMAC-RFC &
Homecomings Financial:

    This letter is written to Guaranty National Bank of Tallahassee ("GNBT"), the
original lender of the above referenced loan and to GMAC-RFC ("RFC"), the assignee of
that loan and Homecomings Financial ("Homecomings") the servicer of the loan. The
loan was dated October 31, 2001 in an original principal amount of $30,300.00.

    Notice is hereby given that we, as borrowers, hereby exercise my right to rescind
this loan transaction pursuant to the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §
1635 and Regulation Z § 226.23 and pursuant to the Home Ownership and Equity
Protection Act ("HOEPA"), as defined at 15 U.S.C. § 1602 (aa).


EXHIBIT
C-1

This rescission is premised, without limitation, on violations of federal law and in particular violations of both TILA and HOEPA regarding the lack of required disclosures or inaccurate disclosures as to the right of rescission, the Annual Percentage Rate, the compensation to the broker and the HOEPA notice required by 15 U.S.C. § 1639.

Pursuant to the applicable law, this rescission voids the mortgage. See 15 U.S.C. 1635 and Regulation Z § 226.23. Moreover, you have twenty (20) days from the date of this notice of rescission to return to me all monies paid all persons associated with this loan (including without limitation Guaranty National Bank of Tallahassee, GMAC-RFC & Homecomings) and to cancel the mortgage on my home. If you do not cancel the mortgage and return all consideration paid within this twenty (20) day period, in additional to the damages for the existing violations of federal law, you and your agents will also be liable for any additional actual and statutory damages under 15 U.S.C. § 1640(a).

We have sent one of the letters to the Guaranty National Bank of Tallahassee. Additionally, as shown above, we have sent a copy of this letter to the GMAC-RFC and a copy to Homecomings Financial.

Very Truly Yours,

Shawn Starkey

Lorane Starkey

cc:    J. Michael Vaughan
       David M. Skeens

```
*  *  *  COMMUNICATION RESULT REPORT ( JUL. 19.2004  9:00AM ) * * *
                                                              TTI   WBEV
FILE MODE        OPTION          ADDRESS (GROUP)        RESULT       PAGE
------------------------------------------------------------------------
49  MEMORY TX                    19737612250            OK          P. 7/7
```

```
----------------------------------------------------------------------------
REASON FOR ERROR
        E-1) HANG UP OR LINE FAIL          E-3) BUSY
        E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION
```

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:        July 19, 2004            TIME: _____

NO. OF PAGES:    ___7___   (Including this cover page)

TO:            FDIC – Guaranty National Bank of Tallahassee

TELECOPY NO.:    1-972-761-2250

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:



# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:    July 19, 2004                TIME: _____

NO. OF PAGES:    _7_   (Including this cover page)

TO:             FDIC – Guaranty National Bank of Tallahassee

TELECOPY NO.:    1-972-761-2250

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

COMMENTS:    Please find rescission letters for Rowena Drennen,
Christopher & Angela Hoppe & Shawn & Lorene
Starkey

THIS MATERIAL WILL ALSO BE MAILED TO YOU      YES ____ NO ____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620

____ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: _____ TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFI-
DENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO
ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT
USE THIS TRANSMISSION IN ANY WAY, BUT CONTACT THE SENDER BY TELEPHONE.

*   *   *   COMMUNICATION RESULT REPORT ( JUL. 19. 2024  1:53PM )  *   *   *

| FILE MODE | OPTION | ADDRESS (GROUP) | RESULT | PAGE |
|---|---|---|---|---|
| 55  MEMORY TX | | 13520577730 | OK | P. 9/9 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

### FAX NO. (816) 421-4747

DATE:   July 19, 2004          TIME: _____

NO. OF PAGES:   _9_   (Including this cover page)

TO:   GMAC-RFC

TELECOPY NO.:   1-952-857-7052  7730

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:



# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:    July 19, 2004                    TIME: _____

NO. OF PAGES:    _9_    (Including this cover page)

TO:        Homecomings Financial

TELECOPY NO.:    1-214-561-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

RE:

COMMENTS:    Please find rescission letters for Christopher &
Angela Hoppe, Rowena Drennon, David & Diane
Garner & Shawn & Lorene Starkey.

THIS MATERIAL WILL ALSO BE MAILED TO YOU    YES ____ NO ____

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL (816) 421-6620.

____ YES, ALL PAGES WERE RECEIVED.

CONFIRMED BY: _____ TIME: _____

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFI-
DENTIAL INFORMATION INTENDED FOR THE USE OF THE ADDRESSEE LISTED BELOW AND NO
ONE ELSE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT
RESPONSIBLE FOR DELIVERING THIS MESSAGE TO THE INTENDED RECIPIENT, PLEASE DO NOT
USE THIS TRANSMISSION IN ANY WAY BUT CONTACT THE SENDER BY TELEPHONE.

*  *  *  COMMUNICATION RESULT REPORT ( JUL. 19.2004  9:18AM ) *  *  *

| | | | | FI  XESV | |
| TLE MODE | OPTION | ADDRESS (GROUP) | | RESULT | PAGE |
|---|---|---|---|---|---|
| 52 MEMORY TX | | 12145615323 | | OK | P. 9/9 |

REASON FOR ERROR
E-1) HANG UP OR LINE FAIL          E-2) BUSY
E-3) NO ANSWER                     E-4) NO FACSIMILE CONNECTION

# WALTERS
# BENDER
# STROHBEHN
# VAUGHAN, P.C.
**ATTORNEYS AT LAW**

# TELECOPY COVER SHEET

## FAX NO. (816) 421-4747

DATE:        July 19, 2004              TIME: _____

NO. OF PAGES:    _9_    (Including this cover page)

TO:          Homecomings Financial

TELECOPY NO.:    1-214-361-5323

CONFIRM NO.:

FROM:

CLIENT NO.:

# ReedSmith

Roy W. Arnold
Direct Phone   412.288.5016
Email  ramold@reedsmith.com

Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219-1886
412.288.3131
Fax 412.288.3063

July 28, 2004

Mr. Shawn Starkey
Mrs. Lorene Starkey
1461 Spruce Avenue
Liberty, Missouri. 64086

Re:     Letter Dated June 14, 2004 Referencing Guaranty
        National Bank of Tallahassee Loan # JGB-01-0000234474:

Dear Mr. and Mrs. Starkey:

We represent Residential Funding Corporation ("RFC") and Homecomings Financial Network, Inc. ("Homecomings"). RFC and Homecomings hereby acknowledge receipt of your request to rescind dated June 14, 2004 sent by facsimile on July 19, 2004 in which you purport to exercise a right to cancel the above-referenced loan (the "Letter"). Please direct all future questions or communications concerning the above referenced loan to us.

In your Letter, you assert that you are entitled to rescind your loan and void the mortgage because of violations of federal law, "in particular violations of both TILA and HOEPA regarding the lack of required disclosures or inaccurate disclosures as to the right of rescission, the Annual Percentage Rate, the compensation to the broker and the HOEPA notice required by 15 U.S.C. §1639."

Our review of the loan file indicates that you were provided with all disclosures required by TILA and HOEPA, including the HOEPA notice required by 15 U.S.C. § 1639, a TILA Disclosure that included a disclosure of the Annual Percentage Rate, and a Notice of Right to Cancel. You have not specified the grounds for your assertion that the disclosures you received were "inaccurate," and we have found no grounds to conclude that any of the disclosures you received were inaccurate. Moreover, there is nothing in the file to indicate that any compensation was paid to a broker in connection with your loan.

We also note that on April 5, 2003, you filed a lawsuit in the Circuit Court of Clay County, Missouri, against RFC, Homecomings, and others challenging the lawfulness of various fees on your loan made by Guaranty National Bank of Tallahassee. In your complaint, you specifically alleged that you were charged unlawful fees in connection with your loans; you sought to recover the fees and interest charged on your loans; and you sought to enjoin any further action to collect such fees and interest. You did not raise any claim that your loan was made in violation of TILA and/or HOEPA.

LONDON • NEW YORK • LOS ANGELES • SAN FRANCISCO • WASHINGTON, D.C. • PHILADELPHIA • PITTSBURGH • OAKLAND • PRIN
FALLS CHURCH • WILMINGTON • NEWARK • MIDLANDS, U.K. • CENTURY CITY • RICHMOND • HARRISBURG • LEESBURG • WESTLAKE

r e e d s m i t h . c o m



EXHIBIT
C-2

AUG 1 2004

Reed Smith

Mr. Shawn Starkey
Mrs. Lorene Starkey
July 28, 2004
Page 2

After your case was removed to the federal district court for the Western District of Missouri pursuant to 28 U.S.C. § 1441, the district court dismissed your case with prejudice for failure to state a claim upon which relief could be granted. *See Phipps v. Guaranty National Bank of Tallahassee*, No. 03-9420-CV-W-GAF, 2003 WL 22149646 (W.D. Mo. Sept. 17, 2003) *appeal docketed as* No. 03-3423 (8th Cir. Sept. 30, 2003).

The district court's dismissal of your case was a final judgment by a court of competent jurisdiction based upon the merits of your alleged cause of action. As such, the district court's judgment is binding upon all the parties to that case and their respective privies according to the doctrine of *res judicata* (also known as the doctrine of claim preclusion). *See Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1014-15 (8th Cir. 2002).

Under this doctrine, all legal theories of recovery arising from a single transaction or factual situation or the "same nucleus of operative facts" must be brought at once in a single civil action; otherwise, the claims are forfeited. *Lane v. Peterson*, 899 F.2d 737, 742-43 (8th Cir. 1990); *U.S. v. Gurley*, 43 F.3d 1188, 1195-96 (8th Cir. 1994); *County of Boyd v. US Ecology, Inc.*, 48 F.3d 359 (8th Cir. 1995).

Based upon the assertions set forth in your letter, it appears that any claim challenging the lawfulness of your loan based on TILA or HOEPA would arise out of the same nucleus of operative facts as your first lawsuit against our clients. Accordingly, under the doctrine of *res judicata*, any such claim based on TILA or HOEPA would be precluded by your failure to raise the claim in your first lawsuit against us and by the district court's final judgment in that prior case.

RFC will not cancel the above-referenced loan at this time. You are expected to honor your payment obligation to RFC and Homecomings.

Very truly yours,

REED SMITH LLP

By
Roy W. Arnold

RWA:plm

cc: J. Michael Vaughn, Esq.
David M. Skeens, Esq.
Daniel L. McClain, Esq.

JS 44 (WDMO Rev. 1/03)    **CIVIL COVER SHEET**

THE JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)    PLAINTIFFS**
John and Rowena Drennen, David A. and Diane Garner, and Shawn and Lorene Starkey

**DEFENDANTS**
(1) Community Bank of Northern Virginia, (2) Guaranty National Bank of Tallahassee, (3) GMAC-Residential Funding Corporation and (4) Homecomings Financial Network, Inc.

(b) County of Residence of First Listed Plaintiff    Clay

County of Residence of First Listed Defendant    Baltimore, MD
(IN U.S. PLAINTIFF CASES ONLY)

(c) Attorneys (Firm Name, Address, and Telephone Number)
J. Michael Vaughan, David M. Skeens, Garrett M. Hodes, WALTERS, BENDER, STROHBEHN & VAUGHAN, P.C.
2500 City Center Square, 1100 Main Street
Kansas City, Missouri 64105
(816) 421-6620 (816) 421-4747 (FAX)

Attorneys (If Known)
(1) F. Douglas Ross, Odin, Feldman & Pittleman, P.C., 9302 Lee Highway, Ste. 1100, Fairfax, VA 22031; (2) William A. Dyess, FDIC, 801 17th Street, N.W. (H-11072), Washington, D.C. 20434; (3 & 4) Roy W. Arnold, Reed Smith LLP, 435 Sixth Avenue, Pittsburgh, PA 15219-1886

(d) Does this case seek a declaration judgment that a Missouri statute, rule or regulation is unconstitutional on its face or seek to enforce the enforcement of a rule or regulation as to all persons because it is unconstitutional on its face?    NO

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity (Indicate Citizenship of Parties in Item III) |

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☒ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

| | |
|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Appeal to District Judge from Magistrate Judgment |

If this is a removal from state court list the county _____ and the case number _____

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 15 U.S.C. §§ 1635, 1640, 1641
Brief description of cause: Failure to Honor Valid and Timely Demand for Rescission under Truth in Lending Act and Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1635, 1640, 1641.

**VII. REQUESTED IN COMPLAINT:**    CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    CHECK YES only if demanded in complaint:    JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY:** Related to MDL Docket No. 1674, *In re Community Bank of Northern Virginia Mortgage Lending Practices Litigation*, pending in the United States District Court for the Western District of Pennsylvania, Hon. Gary L. Lancaster.

DATE    SIGNATURE OF ATTORNEY OF RECORD

July 25, 2005    J. Michael Vaughan