# Exhibit 13 to Declaration

**IN THE UNITED STATES DISTRICT COURT OF THE
WESTERN DISTRICT OF PENNSYLVANIA**

IN RE:   COMMUNITY BANK OF     )
           NORTHERN VIRGINIA AND   )
           GUARANTY NATIONAL BANK  )   Civil Action No.  03-0425
           OF TALLAHASSEE SECOND   )   Honorable Gary L. Lancaster
           MORTGAGE LOAN LITIGATION  )

**BRIEF IN SUPPORT OF JOINT MOTION TO INVALIDATE SOLICITED OPT-OUTS
AND FOR COURT APPROVED NOTICE TO ADDRESS FALSE, MISLEADING AND
<u>DECEPTIVE SOLICITATIONS OF OPT-OUTS</u>**

# TABLE OF CONTENTS

I.      Introduction................................................................................... 1

II.     Overview of Solicitation Activities ............................................... 4

III.    Rule 23 Authorizes This Court To Invalidate The Solicited
        Opt-Outs And Issue A Curative Notice In An Attempt To
        Address The Deceptive And Misleading Opt-Out Solicitations.................... 12

IV.     The Solicitation Letters Contain Numerous Misleading
        And Inaccurate Representations And Failed To Disclose
        Important Information........................................................................ 16

V.      The Evidence Supports A Finding That The Likely Effect Of
        The Calculated Efforts To Procure Opt-Outs Was That Class
        Members Were Deceived Into Opting-Out............................................. 21

VI.     Remedies Are Warranted To Counteract The Likely Effects
        Of The False And Misleading Communication ...................................... 22

        A.      The Court Should Void The Solicited Opt-Outs, and Order
                A Corrective Notice and New Opt-Out Period ............................ 22

        B.      The Court Should Order Temporary and Limited Restraints
                On Communications Concerning the Settlement........................... 23

VII.    Conclusion ...................................................................................... 25

### IN THE UNITED STATES DISTRICT COURT OF THE
### WESTERN DISTRICT OF PENNSYLVANIA

IN RE:    COMMUNITY BANK OF         )
                 NORTHERN VIRGINIA AND   )
                 GUARANTY NATIONAL BANK  )      Civil Action No.  03-0425
                 OF TALLAHASSEE SECOND    )      Honorable Gary L. Lancaster
                 MORTGAGE LOAN LITIGATION  )

## BRIEF IN SUPPORT OF JOINT MOTION TO INVALIDATE SOLICITED OPT-OUTS AND FOR COURT APPROVED NOTICE TO ADDRESS FALSE, MISLEADING AND DECEPTIVE SOLICITATIONS OF OPT-OUTS

### I.     INTRODUCTION

        An alliance of lawyers has engaged in a deceptive and misleading multi-state campaign to solicit opt-outs and objections to the pending nationwide class action settlement involving the loans made by Community Bank of Northern Virginia ("CBNV") or Guaranty National Bank of Tallahassee ("GNBT") and assigned to Residential Funding Corporation ("RFC") (the "Settlement").  These opt-out campaigners have misinformed members of the class in an attempt to persuade them to opt-out of the Settlement and thereby forego substantial payments to which they would be entitled under the terms of the Settlement.  The parties and their counsel jointly file the accompanying motion based upon their collective view that these opt-outs are tainted in that they were solicited with inaccurate and incomplete information that likely confused class members and likely caused some or all of them to opt-out of the Settlement without an appropriate understanding of the consequences of their actions.

        Through the date of the opt-out deadline of October 1, 2003, there were 435 total opt-out requests by class members.  Of these, 419  opt-outs were tendered as part of the orchestrated opt-out campaign, including 326 opt-outs  tendered as part of the Georgia

campaign.[1]  Therefore, only 16 opt-outs were submitted by individuals who were not bombarded

with misinformation by the opt-out campaigners.  (Ex. 18).

      The parties and their counsel have been strongly opposed adversaries in

protracted litigation spanning more than two years and forged the proposed Settlement over eight

months of heavily contested negotiations.  Despite strongly held differences of opinion on many

issues, the parties and their counsel equally respect the rights of class members to make an

informed choice with regard to the Settlement on the basis of Court-approved communications.

The false and misleading statements disseminated in the opt-out solicitation letters have

interfered with this right for a group of class members whose numbers in relation to the entire

class are less than 1% -- but whose rights should nonetheless be protected.

      The Solicitation Letters (as defined below) are highly deceptive based upon

inaccurate information, omissions of important facts, false innuendo and inferences -- all

compounded by a gratuitous air of urgency manufactured by the alliance.  For example, in one of

the most egregious misstatements, Georgia attorney Franklin R. Nix -- who has admitted in

written objections to the Settlement that he was "conducting an opt-out campaign" (Ex. 19) --

creates the illusion in his letter that he actually knows details about each Class Member's loan:

> [M]y initial investigation indicates that the Equity Lenders,
> unbeknownst to you, **withheld** from you a required **advance**
> HOEPA notice[2] warning you about the very high APR [Annual
> Percentage Rate] and total payments on your loan. . . .  Besides
> withholding your HOEPA advance notice, my recalculation of the
> true APR on a sampling of class loans indicates that the APR on
> your loan was **understated**.

(Letter dated September 17, 2003 from Franklin R. Nix to "All Community Bank and Guaranty

National Bank Second Mortgage Borrowers" (the "Nix Solicitation") Ex. 1)(bold emphasis in

---

[1]    A number of the opt-out requests solicited by the alliance were submitted on behalf of
borrowers who are not class members in that their loans were not assigned to RFC.
Because these borrowers are not members of the Class, they had no opt-out rights.

[2]    "HOEPA" is the Home Ownership Equity Protection Act of 1994, which amended the
Truth in Lending Act, 15 U.S.C. §1601 *et seq.*  The "HOEPA notice" is a notice required
pursuant to 15 U.S.C. §1639 and the regulations promulgated thereunder.

original; additional emphasis supplied). In his attached "Representation and Fee Agreement," Mr. Nix stated that "Counsel believes that Client's case is well founded upon the facts and the applicable law." (Nix Representation and Fee Agreement, Ex. 2).

These statements are highly misleading because neither the "HOEPA notice" nor an "APR" calculation is publicly available, and Mr. Nix has not been counsel in any case in which he was privy to any such information with respect to the solicited borrowers. Simply put, there is no way in which Mr. Nix could possibly provide individual assurances to CBNV or GNBT borrowers since he did not possess the requisite information. Rather than disclaiming this lack of knowledge – or at bare minimum qualifying his alleged conclusions in relation to a clear description of his sample size and methodology – Mr. Nix directly assures each addressee that "you" had notices withheld or "your" APR was understated. These statements intimate to unsuspecting Class Members that an "attorney" – Mr. Nix – is in possession of legal conclusions that he is simply unable to draw (at best) or that are completely baseless (at worst). Mr. Nix further compounded his lack of knowledge by affirmatively discouraging borrowers from calling him "before you opt out" and told these individuals who were sacrificing valuable settlement rights to "exercise a certain amount of faith and trust" in him. (Ex. 1 at 4).

Because these solicitations are so rife with materially misleading statements and half-truths, and to preserve the integrity of these proceedings, this Court should invalidate all of the solicited opt-outs from Georgia, Maryland, Florida, Missouri, Illinois, and Alabama. In addition, the Court should order that a new, curative notice be sent to the affected members of the class, and allow the affected class members another opportunity to opt-out. Further, to ensure the integrity of the new opt-out period for this group, the Court should impose limited restraints on communications with class members about the Settlement during the new opt-out period. An expeditious, court-approved, corrective notice directed to the borrowers who opted-out in response to the solicitations is necessary to cure the misleading information distributed by Franklin R. Nix, Esquire in Georgia; Scott C. Borison, Esquire and Mary T. Szeluga, Esquire of the Legg Law Firm in Maryland and Florida; David M. Skeens, Esquire and Heather Carlson,

- 3 -

Esquire of the Walters Bender Stroehbein & Vaughan law firm in Missouri and Illinois; Daniel

A. Edelman of the Edelman, Combs & Latturner, LLC law firm in Illinois; and John W.

Sharbrough, III, Esquire, of the Sharbrough law firm in Alabama.

## II.    OVERVIEW OF SOLICITATION ACTIVITIES

This litigation has been vigorously contested for more than two years and

involves multiple actions filed in the United States District Court for the Western District of

Pennsylvania as well as actions filed in the United States District Court for the Western District

of Tennessee and the United States District Court for the Northern District of Ohio.    After more

than eight months of negotiations, the parties (represented by five independent law firms)

reached a class action settlement agreement, subject to the Court's approval.

By Order dated July 17, 2003, this Court preliminarily approved the Settlement,

certified a settlement class, appointed class counsel, directed the issuance of notice by both mail

and national publication and approved the content of the notices to be mailed and published.

(Order of Court, Ex. 3).  Pursuant to the Court's Order, the settlement administrator mailed the

approved Notice to more than 40,000 borrowers on or before August 1, 2003.  The Notice

informed class members of the pending settlement, explained their rights and obligations and

provided them with a court approved method of opting-out of the class should any member of the

class elect to do so.

After this Court preliminarily approved the proposed settlement, motions to stay

were filed in related cases in North Carolina and Missouri captioned <u>Bumpers v. Community</u>

<u>Bank of Northern Virginia</u> and <u>Phipps v. Guaranty National Bank of Tallahassee</u>, respectively.

Both <u>Bumpers</u> and <u>Phipps</u> alleged state law claims similar to those raised in this case and

included borrowers encompassed in the national Settlement.  Before the district court in <u>Bumpers</u>

could rule on the motion to stay, plaintiffs' counsel in the <u>Bumpers</u> case sought to transfer the

case to the United States District Court for the Western District of Pennsylvania.  The district

- 4 -

court transferred the <u>Bumpers</u> case to this Court and dismissed the motion for stay as moot by Order dated September 4, 2003.

Plaintiffs' counsel in the <u>Phipps</u> case, the law firm of Walters Bender Stroehbein & Vaughan (the "Walters Bender Firm"), opposed the motion to stay. In a Brief submitted to the United States District Court for the Western District of Missouri opposing the motion to stay, the Walters Bender Firm took the noteworthy position that this Court's Preliminary Approval Order "means nothing." (Suggestions in Opposition to Motion to Stay filed in Phipps, Ex. 4 at 4). They contended that this Court "made no inquiry of [sic] finding in regard to the appropriateness of the settlement including whether the adequacy of representation and other requirements of Rule 23 can be met." (<u>Id.</u>). The Walters Bender Firm cited no evidence whatsoever to support this claim that the Court made "no inquiry" or "finding" to support the conclusions in the Court's Preliminary Approval Order. (<u>Id.</u>). The motion to stay was subsequently mooted when the United States District Court for the Western District of Missouri granted defendants' motions to dismiss. <u>Phipps v. Guaranty National Bank of Tallahassee</u>, 2003 WL 22149646 (W.D. Mo. 2003).

On or about September 17, 2003, without notifying Class Counsel or seeking this Court's approval, Georgia attorney Franklin R. Nix mailed a Solicitation Letter, Client Questionnaire and Representation Agreement to thousands of borrowers in the state of Georgia who obtained second mortgage loans from CBNV or GNBT (Nix Solicitation, Ex. 1) urging the borrowers to opt-out of the Settlement Class. (Nix Solicitation, Ex. 1 at 1). The Nix Solicitation apparently followed a prior inaccurate letter sent to Maryland borrowers by the Legg Law Firm, LLC (the "Legg Firm") that also solicited opt-outs and provided an erroneous opt-out deadline of October 15, 2003. (Legg Solicitation No. 1, Ex. 5). The Legg Firm then sent out a second terse solicitation letter correcting the error regarding the opt-out deadline and again urging borrowers

to opt-out. (Legg Solicitation No. 2, Ex. 6). The Legg Firm also sent a solicitation letter to Florida borrowers. (Ex. 7).[3]

The Nix Solicitation cross-referenced the misinformation regarding the opt-out deadline set forth in the first Legg Solicitation and additionally stated that Nix was "a member of a team of consumer protection lawyers around the country that stands ready to pursue your HOEPA claims if you preserve them by opting out of the class settlement." (Ex. 1 at 2).

On or about September 18, 2003, without notifying Class Counsel or seeking this Court's approval, the Walters Bender Firm likewise mailed Solicitation Letters to borrowers in the states of Missouri and Illinois (the "Walters Bender Missouri and Illinois Solicitations", Ex. 9 and 10). Interestingly, although the Walters Bender Firm's clients in the Phipps case (Mr. and Mrs. Phipps, Mr. and Mrs. Starkey, and Mr. and Mrs. St. Clair) all opted out of the Settlement, and although the Walters Bender Firm told the federal district court in Phipps that "we strongly believe that there will be a substantial number of opt-outs (hopefully every Missouri borrower)," (Ex. 4 at 7), the Walters Bender Missouri and Illinois Solicitations urged class members to remain in the settlement and object. In addition to the solicitation sent out by the Walters Bender Firm, Illinois borrowers also were targeted by Daniel A. Edelman of the Edelman Combs & Latturner law firm by means of an incomplete solicitation letter urging borrowers to opt-out immediately. (Ex. 11). All of these solicitation letters are collectively referred to as the "Solicitation Letters."

The Solicitation Letters contain a number of misleading statements calculated to deceive borrowers into instinctively opting-out without accurate information concerning (1) the viability, risks and limitations on alternative claims (2) the risks and burdens of individual litigation; (3) the benefits of the Settlement; (4) the fact that the Settlement was approved by the Court, that the addressees were represented by Class Counsel appointed by the Court and that the

---

[3] Through John W. Sharbrough, III of the Sharbrough law firm, the alliance also solicited borrowers in Alabama utilizing an opt-out form virtually identical to the form used by Georgia attorney Franklin R. Nix. (Exs. 1, 7-8). The only difference in the precisely worded forms is the change in attorney and firm name.

opt-out alliance had a financial interest in soliciting opt-outs and/or objections. First, the

Solicitation Letters deceptively overstate, by affirmative misstatement or by omitting important

facts, the potential for success (both as to liability and damages) on alleged alternative claims,

while they understate applicable defenses:

- Nix asserts that his "investigation indicates" that the lenders "withheld from you a required advance HOEPA notice." (emphasis added). (Ex. 1 at 2). Interestingly, every named plaintiff in the cases filed to date signed a certification verifying that he or she received the requisite HOEPA notice and the TILA Notice of Right to Rescind. (Ex. 12)(containing signed "HOEPA notices" for each of the named plaintiffs). Moreover, there is no reason to believe that other borrowers did not receive and sign acknowledgements that they received the timely HOEPA disclosures. The solicited opt-outs should, at a minimum, be advised that if they signed such a form, they may have difficulty prevailing on a HOEPA claim. No such cautionary statement was provided by the opt-out alliance.

- Nix incredibly asserted: "[M]y recalculation of the true APR on **a sampling** of class loans indicates that **the APR on your** loan was understated." (Ex. 1 at 2) (emphasis added). Nix's sleight of hand switching from the supposed sample and the addressee's individual loan implies that Nix acquired actual knowledge regarding the disclosures given to the individual borrower in connection with his or her loan transaction. Nix failed to explain how he, or anybody for that matter, can possibly know that the APR on a particular borrower's loan was understated when he had only examined a "sampling" of some other borrowers' loan files. Nix failed to provide any details as to how his "recalculation" was done when borrowers' APR calculations are not set forth on any publicly available document, when he was not privy to such documents, how large the alleged "sampling" was or what he considers to be the supposedly "true" APR. Notwithstanding the non-public nature of the Truth in Lending statement disclosing the APR and the lack of any prior contact between Nix and the borrowers, Mr. Nix purported to know that the particular borrower --whose loan and disclosure documents he had never reviewed or analyzed -- actually had the hypothetical claim being trumpeted. This suggestion by Mr. Nix was misleading because the existence of any potential opt-out claims depends solely on the individual borrower's circumstances and not upon what someone else might attempt to prove.

- The Nix Solicitation proclaims the "lenders who purchased your second mortgage loans became absolutely liable to you" for any violation of the Truth in Lending Act ("TILA"). (Ex. 1 at 1). In making this statement, Nix fails to disclose the limitations on assignee liability under TILA, 15 U.S.C. §1641(e), and the substantial split of judicial authority regarding the scope of potential assignee liability premised on the assignee provision of HOEPA. Compare cases adopting narrower pro-defendant view of 15 U.S.C. §1641(d): Vandenbroeck v.

Contimortgage Corp., 53 F.Supp.2d 965 (W.D. Mich. 1999); Bank of New York v. Heath, 2001 WL 1771825 (Cir. Ct. Cook Co. Ill. Oct. 26, 2001); Dowdy v. First Metropolitan Mortgage Co., 2002 WL 745851 (N.D. Ill. 2002); Dash v. FirstPlus Home Loan Trust 1996-2, 2003 WL 1038355 (M.D. N.C. 2003); Faircloth v. National Home Loan Corp., 2003 WL 1232825 (M.D.N.C. 2003); Baker v. Century Financial Group, Inc., 2001 U.S. Dist. Lexis 24320 (W.D. Mo. Nov. 19, 2001); Schwartz v. Bann-Cor, No. 01-0980-CV-W (W.D. Mo. Oct. 22, 2001) with cases adopting broader interpretation of §1641(d): Bryant v. Mortgage Capital Resource Corp., 197 F.Supp. 2d 1357 (N.D. Ga. 2002); Cooper v. First Government Mortgage and Investors Corp., 238 F. Supp. 2d 50 (D.D.C. 2002); Tomlin v. Dylan Mortgage, Inc., 99-CVS-3551 (N.C. Super. June 12, 2000); Westell v. FirstPlus Home Loan Owner Trust 1998-4, No. GD 01-6841, slip op. (Allegheny Co. C.P. Aug. 5, 2002); Bannon v. First One Lending Corp., No. GD 01-6680 (Allegheny Co. C.P. May 17, 2002).

- Nix purports to describe the potential impact of the statute of limitations defense on any purported TILA or HOEPA claims. (Ex. 1 at 3). However, Nix fails to disclose that claims relating to loans made beyond the one year statute of limitations are barred unless the plaintiff satisfies his or her individual burden to prove a factual basis for tolling the statute of limitations.

- Mr. Nix failed to disclose that he has litigated the equitable tolling arguments he now trumpets and the district court rejected his arguments. Bryant v. Mortgage Capital Resource Corp., 197 F.Supp. 2d 1357, 1367 (N.D. Ga. 2002). Additionally, Mr. Nix does not disclose the fact that plaintiffs' motion for class certification in Bryant was denied by the district court. Bryant, Opinion and Order denying class certification, Ex. 13.

- The Nix Solicitation begins with the unfounded statement "**URGENT**: To protect your right to recover potentially **all of your closing fees and loan payments** from your lender, you must **reject** and '**opt out**' of the class settlement offered to you in a recent Class Action Notice." (Ex. 1 at 1)(original emphasis).  Neither the Real Estate Settlement Procedures Act, nor the Truth in Lending Act, as amended by HOEPA, or any state statutory claims raised, permit the borrowers to recover "all" of their "closing fees" and "loan payments."

- The Nix Solicitation assures borrowers that they are entitled to recover a "TILA penalty" as well as actual damages. (Ex. 1 at 2). However, Nix fails to identify any of the facts affecting whether a borrower will be precluded from obtaining a penalty or actual damages under TILA.

- In his Representation and Fee Agreement, Nix incredibly opines that he believes the borrowers' claims are "well founded." (Ex. 2 at ¶6). However, in his Solicitation Letter, Nix discouraged the borrowers from contacting him and he does not even pretend to have reviewed actual loan documents or other disclosures with respect to the addressee's particular loan.

- The Legg Solicitation states, "Legg believes that your claim may be worth much more than the settlement offer and that you should have someone review your settlement papers to determine whether the proposed settlement makes sense or whether you should receive more." (Ex. 5 at ¶1 and Ex. 6 at ¶2). In making this statement, Mr. Borison fails to disclose the risks of pursuing any allegedly greater claim, the cost or duration of such litigation and the split of authority in such litigation.

- The Walters Bender Firm failed to disclose that three different courts have dismissed two cases brought by the Walters Bender firm against the same lenders and involving the same loans as those involved in the Settlement, raising significant issues concerning certain of the claims they now contend are highly valuable: (1) Avila v. Community Bank of Northern Virginia, 2003 WL 22002779 (Mo. Ct. App. Aug. 26, 2003)(Ex. 14); (2) Phipps v. Guaranty National Bank of Tallahassee, 2003 WL 22149646 (W.D. Mo. Sept. 17, 2003)(Ex. 15). In the first case, Avila, the Missouri Court of Appeals affirmed dismissal of the plaintiffs' claims under the Missouri Second Mortgage Loan Act. In the other, Phipps, the United States District Court for the Western District of Missouri granted the defendants' motions to dismiss, and dismissed the plaintiffs' complaint in its entirety with prejudice.[4] Surely, a prospective client should be entitled to learn that the law firm soliciting his or her business, and asking that he or she forego substantial, immediate and certain cash payments, should be advised that the firm making the solicitation had three similar cases dismissed for failure to state any claim.

- The Walters Bender Firm also failed to disclose that they did not assert the HOEPA claim trumpeted in the Solicitation Letters in any of the class action lawsuits they have filed to date against the same lenders and the same loans included in the Settlement.

- When a confused class member contacted David Skeens, Esquire to ask if Walters Bender was class counsel, Mr. Skeens replied "We believe [class counsel] are not doing a good job . . . but are primarily looking out for themselves." Ex. 16. Mr. Skeens went on to note that the likelihood of success on their objections was "quite remote" -- a material fact undisclosed in the Walters Bender Solicitations.

- The Edelman Solicitation urged borrowers to opt out but failed to provide any facts upon which the borrower could evaluate whether to opt-out, merely stating: "You actually may be entitled to much more if you 'opt out' and bring your own case." (Ex. 11 at 1). There is no discussion of the risks of such litigation, the duration of the litigation, or the likelihood of success for the individual borrower.

---

[4]    In a third case brought by Walters Bender involving the same state law claims against a different bank, the trial court likewise granted summary judgment for the defendants. Adkison v. First Plus Bank No. CV-100-3174-CC (Clay Co. Cir. Ct. Dec. 3, 2003).

- The Edelman Solicitation reveals that the Firm intends to investigate the "claims and defenses" after receiving the signed authorization and that the Firm will bring suit "if the attorney's investigation shows that such a claim would have merit and that filing suit is appropriate." (Ex. 11 at 2). In short, the Solicitation clearly advocates "opt out" now and then talk to us later after you "sign and fax the enclosed agreement to us." (Id.). While this approach might minimally pass outside of the settlement context, the Solicitation advocates sacrificing valuable rights in the Settlement when no investigation of the individual borrowers' potential claims had been performed.

Second, the Solicitation Letters minimize the burdens of individual litigation:

- Nix informed borrowers that it is "highly unlikely" they will have to go to court and told them that they can submit proof of their claims by affidavit. (Ex. 1 at 4). This statement is blatantly false and misleading. Nix knows or should know that Defendants are entitled to depose each individual asserting a claim and to obtain other discovery from them. Moreover, the Defendants have the right to cross-examine any claimants at trial.

- In addressing the length of each lawsuit, Nix tells borrowers that it could take less than one year but not more than two years to reach a recovery. (Ex. 1 at 4). Nix has no basis to make this prediction. Indeed, contrary to Nix's statement, suits of this nature tend to be long and protracted. In fact, this litigation already has been pending for more than two years.

- "The only **certain** means of protecting yourself from the class action settlement is **opting out** of the proposed settlement before October 1st." (Id. at 2). Nix's clear message is that the borrower will have certain protection by opting out when, in fact, the individual borrower will be incurring substantial risk and uncertainty while foregoing a certain, and substantial, recovery.

Third, the Solicitation Letters understate the benefits of the class action Settlement:

- None of the Solicitations explain to the borrowers that the Settlement will provide substantial, immediate and certain payments without the risks and uncertainty of additional litigation.

- The Nix Solicitation belittles the Court approved Settlement as providing "only $250 or $600" and assures class members that a "conservative estimate" of potential damages would yield an "average" return of $17,000 per loan. Ex. 1 at 2-3. The Nix Solicitation concludes by assuring the class that "[a]ll you are

risking is the $250 to $600 . . . plus a very uncertain later payment of $302 . . . ."
Id. at 4. Nix's misstatement of the benefits of the Settlement is magnified by his
incomplete disclosure regarding the alleged alternative claims and his lack of
factual investigation regarding the individual borrower's potential claims.

- The "lender" has made a "class action offer." (Ex. 1 at 1). Contrary to Nix's
  statement, the parties have entered into a class action settlement subject to court
  approval and the Court has preliminarily approved the class action settlement, the
  notice and the adequacy of plaintiffs' counsel. The payments under the Settlement
  were negotiated over eight months by counsel of record for plaintiffs and
  defendants with Court approval -- following more than two years of active
  litigation.

- Mr. Borison advises people he has never met and whose loans he has never
  reviewed that "[u]ltimately you have little if anything to lose because the
  settlement offer is so low." (Ex. 5 at ¶2 and Ex. 6 at ¶3). Contrary to his
  statement, these individuals are foregoing substantial, immediate and certain
  payments under the class action Settlement for unknown claims that have not
  been investigated, evaluated or put into context with prior and existing litigation.

- Mr. Borison asserts that the "settlement is proposing to make a one time payment
  of between $250 to $900 depending on your individual loan." (Ex. 5 at ¶1 and
  Ex. 6 at ¶2). Not only does he misstate the potential recovery available, Mr.
  Borison fails to identify the facts causing the payment to vary.

- Nix falsely asserts that the "letter" explains "all borrower's rights never
  mentioned in the class notice." (Ex. 1 at 1). Contrary to Nix's statement, the class
  Notice reasonably advised class members of their rights. This Court so found in
  its Preliminary Approval Order.

- Nix inaccurately characterizes the Settlement Notice as "class defendants'
  Notice." (Ex. 1 at 2). The Settlement Notice was distributed per this Court's
  Preliminary Approval Order, and was negotiated extensively by experienced
  Class Counsel and counsel for Defendants. Moreover, the Court reviewed and
  approved the Class Notice.

Fourth, the Solicitation Letters do not make it clear to the borrowers that the

Court already had approved the Settlement and that the borrowers were represented by Class

Counsel who the Court had appointed. Instead, the Solicitations created the misimpression that

the opt-out alliance was resisting a unilateral settlement offer by the Defendants. Further, the

- 11 -

Solicitation Letters do not disclose the financial interest of the opt-out alliance in soliciting opt-outs from and objections to the Settlement.

Finally, the Nix Representation and Fee Agreement impermissibly seeks to limit Mr. Nix's exposure for advising class members to opt-out: "In the event of no recovery against GMAC, Client and Counsel solemnly agree that Client shall never seek and Counsel shall have no liability for the class settlement sums forgone by Client." (Ex. 2).

### III.    Rule 23 Authorizes This Court to Invalidate the Solicited Opt-Outs and Issue A Curative Notice In An Attempt to Address The Deceptive And Misleading Opt-Out Solicitations.

This Court should invalidate all opt-outs likely procured by the unauthorized and misleading communications with class members for three reasons. First, the unauthorized solicitation of opt-outs disregards the Court's right to control communications with class members and violates class members' rights to receive neutral, objective information about the settlement and to decide whether to participate without outside influence. Second, the Solicitation Letters included false, misleading and improper communications with class members that likely confused and misled class members as they generated opt-outs. Third, the evidence demonstrates that the opt-out campaign did successfully generate opt-outs. Accordingly, to preserve the integrity of these proceedings, and to ensure that class members have not been duped into opting-out without understanding the consequences of their actions, swift remedial action, including a new curative notice, is warranted.

Rule 23 of the Federal Rules of Civil Procedure is designed to provide class members with information that "will enable them to make an informed, intelligent decision whether to opt out or remain a member of the class." Georgine v. Amchem Products, Inc., 160 F.R.D. 478, 502 (E.D.Pa. 1995). The choice to stay in or withdraw must be a "free and unfettered" decision. Id. Rule 23(d)(2) provides that this Court may issue any appropriate order "for the protection of the members of the class or otherwise for the fair conduct of the action."

Fed.R.Civ.P. 23(d)(2). Importantly, "Rule 23(d) does not . . . require a finding of actual harm; it

authorizes the imposition of a restricting order to guard against the *likelihood* of serious abuses."

In re School Asbestos Litig., 842 F.2d 671, 683 (3d Cir. 1988) (emphasis in original) (citation

and quotation omitted).

The United States Supreme Court has recognized that "'[unapproved]

communications to class members that misrepresent the status or effect of the pending action . . .

have an obvious potential for confusion and/or adversely affecting the administration of

justice.'" Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 n.12 (1981) (brackets in original), quoting

Waldo v. Lakeshore Enterprises, 433 F.Supp. 782, 790-91 (E.D.La. 1977). "Because of the

potential for abuse, a . . . court has both the duty and broad authority to exercise control over a

class action and to enter appropriate orders governing the conduct of counsel and the parties."

Id. at 100. This "duty and authority to protect the integrity of the class and the administration of

justice" extends "to those communications that mislead or otherwise threaten to create confusion

and to influence the threshold decision whether to remain in the class." In re School Asbestos

Litigation, 842 F.2d at 683.

"Solicitation schemes" like those here threaten to create confusion and to

influence the threshold decision whether to remain in the class, in violation of established law.

See Georgine, 160 F.R.D. at 490 ("It is essential that class members' decisions to participate or

withdraw be made on the basis of independent analysis of their own self-interest"); Philadelphia

Housing Auth. v. American Radiator & Standard Sanitary Corp., 323 F.Supp. 364, 378 (E.D. Pa.

1970) (holding that class members must be able to decide whether to exclude themselves

"independently and without influence or pressure from those competing parties who either favor

or oppose the settlement.").[5] Where financially motivated lawyers solicit class members with

---

[5]    In Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp., 323
F.Supp. 364, 378 (E.D. Pa. 1970), the Court refused to amend class notice to include objections
to a settlement proposal and held that "any amendment of the notice reflecting the opposition of
a particular attorney to the proposed settlement and the reasons why he might prefer to continue
with the litigation would in effect amount to a Court-approved solicitation of prospective class

false and misleading statements, this Court should act swiftly otherwise the unapproved

communications "relegate the essential supervision of the Court to the status of an

'afterthought.'" Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1203 (11th Cir. 1985).

Courts have responded to such unauthorized efforts to procure opt-outs by, among

other things, invalidating opt-outs, providing affected class members with a new notice and a

new period to opt-out. Kleiner, 751 F.2d at 1199;[6] In re McKesson HBOC, Inc. Sec. Litig., 126

F. Supp. 2d 1239, 1246 (N.D. Cal. 2000); Georgine, 160 F.R.D. at 498-502 (E.D.Pa. 1995);

Impervious Paint Industries, Inc., 508 F.Supp. at 723-24. Courts also have restrained future

communications with class members concerning the litigation. Kleiner, 751 F.2d at 1203-07;

Cobell v. Norton, 212 F.R.D. 14, 17-19 (D.D.C. 2002); Hampton Hardware, Inc. v. Cotter & Co.,

156 F.R.D. 630, 633-35 (N.D. Tex. 1994); Haffer v. Temple Univ., 115 F.R.D. 506, 512-13

(E.D.Pa. 1987); Impervious, 508 F.Supp. at 723.

In deciding whether such remedies are warranted, it is not the Court's duty to

determine whether the misleading communications actually procured opt-outs. In re School

Asbestos Litig., 842 F.2d at 683 (holding actual harm not required); Georgine, 160 F.R.D. at

498; Hampton Hardware, 156 F.R.D. at 633. Rather, the Court's duty is to determine the

"likely" effect of the improper communications on the class members who received them.

Georgine, 160 F.R.D. at 498, 501-502 (emphasis added).

Georgine helps to illustrate this principle and explains why remedies are required

here. In Georgine, the court conditionally certified a nationwide class action settlement of

asbestos claims that allowed class members to opt-out. The court found that an alliance of

lawyers, while purporting to protect class members from an allegedly inadequate settlement,

actually engaged in an improper "organized opt-out campaign," id. at 500, designed to thwart the

---

members on his behalf." Id. at 378. The Court stated that "notice of this sort must on its face be
scrupulously neutral." Id. at 378.

[6]     It should be noted that in Kleiner, the Eleventh Circuit vacated the order striking the opt-
outs as moot when the parties subsequently settled the case, and the terms of the settlement
enabled all persons who had opted out to void their request and participate equally in the
settlement. Kleiner, at 1199.

settlement and to preserve their financial interests. This campaign included direct and indirect communications with class members that solicited opt-outs by improperly (1) failing to reveal the lawyers' financial interest in encouraging opt-outs;[7] (2) making false or misleading statements concerning the terms or benefits of the settlement;[8] (3) failing to mention any benefits of the settlement;[9] (4) falsely attributing opposition to, or opinions concerning, the settlement to others;[10] (5) engaging in conduct that likely violated the Rules of Professional Conduct.[11]

The court concluded that the "misleading, coercive and overzealous communications with the class have frustrated this Court's purposes and likely have created fear and confusion among class members." Id. at 497. According to the court, "[i]nstead of providing class members with documents that would enable a reasonable person to make an informed, intelligent decision whether to opt out or remain a member of the class, some counsel have now exposed class members to one-sided, misleading claims that likely will prohibit a free and unfettered decision to opt out of the class." Id. at 497 (quotation and citation omitted).

The district court recognized that it could not call all class members to testify as to whether they were actually influenced by the false and misleading communications. Id. at 498, 501-02. Accordingly, it considered the scope of the campaign and the likely effects on the class members from misleading statements and omissions, and concluded that the campaign had likely procured opt-outs.[12] Id. It ordered that class members receive a corrective notice and another opportunity to opt-out. Id. at 518-20.

---

[7]  Georgine, 160 F.R.D. at 494-96.
[8]  Id. at 490-94.
[9]  Id. at 491 (effects of lawyers' "forecasts of doom" were heightened by the absence of any explanation of benefits).
[10]  Id. at 493 (communications "falsely suggested . . . that leading newspapers were against the . . . settlement").
[11]  Id. at 495 n.26.
[12]  The effectiveness of the plaintiffs' lawyers' tactics was revealed not simply by the fact that 236,323 class members opted-out, id. at 486, but also by the fact that nearly 110,000 class members chose not to opt-out after receiving corrective notice and a second opportunity to opt-out. Georgine v. Amchem Products, Inc., C.A. No. 93-0215, 1995 U.S. Dist. LEXIS 13802, at *13-14 (E.D. Pa. Sept. 19, 1995).

"Unsupervised, unilateral communications with the plaintiff class sabotage the goal of informed consent by urging exclusion on the basis of a one-sided presentation of the facts, without opportunity for rebuttal." Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1203 (11th Cir. 1985). See also In re School Asbestos Litigation, 842 F.2d 671, 680 (3d Cir. 1988) ("Misleading communication to class members concerning the litigation pose a serious threat to the fairness of the litigation process, the adequacy of representation and the administration of justice generally."); Erhardt v. Prudential Group, Inc., 629 F.2d 843, 846 (2d Cir. 1980) ("Unapproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice.").

The issue in Georgine, as it is here, was whether class members were subjected to improper influence by these opt-out solicitations. Georgine, 160 F.R.D. at 488. Beginning with the fundamental premise that "District Courts have both the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties," the court held that "[i]t is essential that class members' decisions to participate or to withdraw be made on the basis of independent analysis of their own self interest, and the vehicle for accomplishing this is the class notice." Id. at 489-90.

**IV.    The Solicitation Letters Contain Numerous Misleading And Inaccurate Representations and Failed To Disclose Important Information.**

As set forth above, the Solicitation Letters provided inaccurate and incomplete information, creating a serious risk of confusion among class members. The Solicitation Letters orchestrated by the opt-out alliance contain numerous misleading statements, including: (1) overstatements, without any factual investigation of the borrower's individual loan transaction, regarding the potential for success (both as to liability and damages) on alternative claims and any likely defenses; (2) understatements of the burden on individual borrowers created by pursuing individual litigation; and (3) understatements of the benefits of the class

action Settlement;  (4) attempts to minimize the role of the Court and Class Counsel; and (5)

inadequate disclosure of the soliciting lawyers' financial interest in procuring opt-outs.

      The effect of these statements was compounded by the air of urgency created by

the opt-out alliance whereby they sought to limit communications with Class Counsel and told

class members that they had to decide to opt-out or object immediately without consultation. In

re McKesson, 126 F.Supp.2d at 1245.  Like the solicitation letters in In re McKesson, the

Solicitation Letters "communicate a gratuitous air of urgency" through the use of phrases

designed to foster quick action and, at the same time, providing "inadequate disclosure of the

comparative costs and benefits of participating in a class action."  Id.

      For example, the Nix Solicitation opens with a bold and underlined "**URGENT**"

and continues with repeated calls for immediate action (e.g., if you "fail to opt-out" you will "be

forever barred"; "don't for a moment feel sorry"; the "only certain means of protecting yourself"

is "opting out of the class before October 1"; if "you do nothing" you will be "forever barred."

(Ex. 1 at 1-4)).  The Walters Bender Solicitations contain statements such as  "**READ THIS**

**LETTER CAREFULLY BECAUSE THIS LETTER CONCERNS SUBSTANTIAL**

**LEGAL RIGHTS RELATING TO YOUR HOME**" and "**you have little time**" to act.  (Exs. 9

and 10)(original emphasis).  The Legg Solicitation states that the addressee "must act fast" and

"**you have very little time.**"  (Exs. 5 and 6)(original emphasis).  The Edelman Solicitation tells

Illinois borrowers that "[y]ou only have a short time in which to act, so please do so

immediately." (Ex. 11).

      After creating this atmosphere of urgency, the Solicitation Letters state or imply

that the individual borrower possesses alternative claims of much greater value such that they

should opt-out or object to the Settlement.  The Solicitation Letters fail to provide accurate

descriptions of the facts necessary to prevail on the alternative claims and instead (at best)

speculate as to their availability and (at worst) state that such claims exist even though no facts

have been analyzed as to the particular borrower's circumstances. The Solicitation Letters

uniformly fail to disclose: (1) the substantial risks of litigation,  (2) an adequate description of

the likely defenses that would be asserted, or (3) the split of authority on key legal issues, including favorable decisions obtained by the Defendants, in similar litigation prosecuted by some of the members of the opt-out alliance.  Likewise, the Solicitation Letters do not include the Court approved Notice and some of the Solicitation Letters do not even inform members that such information is available.  Moreover, the Solicitation Letters not only fail to provide Class Counsel's contact information, they fail to even mention the identity of Class Counsel.

There are many significant benefits class members obtain through a class action settlement negotiated by Class Counsel and approved by the Court.  These benefits include at a minimum: not having to prove liability; eliminating the uncertainty as to future results; the guarantee that funds will be available for settling claims; court approved limits on attorney fees; avoiding time-consuming and protracted litigation; realizing a positive outcome regardless of one's individual circumstances (including prior payoffs, write offs, cancellations of debt, etc.); avoiding the cost (both in terms of time and money) of pre-trial and trial procedures; and, obtaining immediate resolution of uncertain claims.  See, e.g., Georgine, 160 F.R.D. at 491 (benefits of "settlement are the elimination of the risk of having to prove liability, a negotiated settlement for cash sums due . . . [and] security that funds will be available" to settle class members' claims).

The above list is certainly not an exhaustive list of the many benefits of the Settlement.  However, it is significant to note that the Solicitation Letters fail to mention these, or any other, benefits of the Settlement.  Nor do the Letters inform class members that courts have dismissed cases brought by some members of the opt-out alliance concerning loans made by CBNV and GNBT.

The Solicitation Letters also are misleading because "there is no disclosure that fees in a class action are subject to court approval" and they provide "no advice that individual plaintiffs may be subject to the discovery requirements of the Federal Rules of Civil Procedure." In re McKesson, 126 F.Supp.2d at 1245.  The Solicitation Letters are "even more underhanded because [they] encourage[] recipients to make decisions to opt out of the class without the

benefit of the Court-approved notice materials." <u>Georgine</u>, 160 F.R.D. at 492 n.17.    The

Solicitation Letters do not include the Court approved Notice, alert the reader that the notice

information is available, nor that a toll-free number could be used to obtain relevant information

and discuss the Settlement with Court appointed Class Counsel. <u>Id.</u>

The Solicitation Letters are directed at non-clients encouraging them to hire the

soliciting law firm. (Exs. 1, 5-11). <u>Georgine</u> and its progeny make it clear that a lawyer

soliciting non-clients must fully disclose the lawyer's significant financial interest in persuading

the potential client to hire him or her so as to alert the potential client to be wary of the lawyer's

statements. <u>Georgine</u>, 160 F.R.D. at 496 (Without a full appreciation of the soliciting attorney's

financial motives, "the recipient was not on notice to closely scrutinize the substance of the

communications.  Moreover, as apparent disinterested officers of the court, class members likely

believed the communications.").

In addition to the concerns noted above, the Solicitation Letters raise serious

ethical issues.  Rule 7.1 of the Georgia Rules of Professional Conduct (the "Rules") prohibits

lawyer advertisements that are false, fraudulent, deceptive or misleading.  Accordingly, the Rules

provide that a "communication is false, fraudulent, deceptive or misleading if it . . . contains a

material misrepresentation of fact or law or omits a fact necessary to make the statement

considered as a whole not materially misleading; [or,] is likely to create an unjustified

expectation about results the lawyer can achieve . . . ."  Ga. R.P.C. 7.1(a)(1),(2).  <u>See also</u> Mo. R.

Prof. C. 4-7.1(a)-(c); Ill. R. Prof. C. 7.1(a), (b); Md. R.Prof. C. 7.1(a), (b); Fla. R.Prof. C. 4-

7.2(b); Ala. R.Prof. C. 7.1(a), (b).

As shown above, the Solicitation Letters contain numerous misrepresentations of

critical facts, distortions regarding the state of the law and other omissions.  The Nix Solicitation

also creates an "unjustified expectation" about the "damages" Mr. Nix claims he can secure for

class members.  Mr. Nix asserts that "**minimum** damages" or a "very conservative estimate" of

damages are at least "$17,000 per average loan." (Ex. 1 at 2) (emphasis in original).  In creating

expectations of such "minimum damages," however, Mr. Nix fails to fairly describe the other

side of the story. That is, Mr. Nix fails to inform the class members that such claims are subject

to many defenses and further fails to discuss the limited liability of assignees for TILA based

claims and the split of authority regarding the scope of assignee liability arising from HOEPA.

By providing only a distorted portion of the story, Mr. Nix creates unjustified expectations in the

minds of the class members.

Even more troubling is Nix's attempt to limit his potential liability for advising

class members to forego their recoveries under the Settlement. The Nix Representation and Fee

Agreement provides: "In the event of no recovery against GMAC, Client and Counsel solemnly

agree that Client shall never seek and Counsel shall have no liability for the class settlement

sums forgone by Client." (Ex. 2).

Rule 1.8(h) explicitly and appropriately condemns this practice: "A lawyer shall

not make an agreement prospectively limiting the lawyer's liability to a client for malpractice

unless permitted by law and the client is independently represented in making the agreement . . .

." Addressing a similar attempt by attorneys to limit their malpractice liability by means of an

"acknowledgement", the Georgia Supreme Court ruled that a "lawyer should not condition the

representation of a client upon the waiver of any claim for malpractice and should not attempt to

cause the waiver of any claim for malpractice by the inclusion of language amounting to such a

waiver in correspondence with a client." Supreme Court of Georgia, Formal Advisory Opinion

No. 96-2 (Ex. 17).

As the Georgia Supreme Court noted:

By attempting to limit his or her liability for malpractice or to
cause a waiver of any malpractice, the lawyer is putting himself or
herself into an adversarial relationship with the client. While
providing advice to the client on the one hand, the lawyer is
attempting to limit or excuse his or her liability for claims of
malpractice resulting from the provision of such advice on the
other hand. Such conduct places the lawyer's personal interests
ahead of the interests of the client, and thus would amount to a
failure to exercise independent professional judgment on behalf of
the client in violation of Canon 5 of the State Bar of Georgia's
Canons of Ethics.

- 20 -

Id. The same is true here. Attorney Nix is plainly providing legal advice, soliciting clients, and, at the same time, attempting to limit his potential liability. "[S]uch conduct is improper." Id.

**V.    The Evidence Supports a Finding That the Likely Effect of the Calculated Efforts to Procure Opt-outs Was That Class Members Were Deceived Into Opting-Out.**

The calculated efforts to solicit opt-outs were actually and likely effective because false, misleading and improper communications were disseminated to a wide audience and were routinely accompanied by an opt-out form to facilitate the opt-out. Moreover, the evidence confirms a strong link between the false and misleading communications and the number of opt-outs generated.

The foregoing false, misleading and improper communications were disseminated to a wide audience. It appears that Solicitation Letters were sent to hundreds, and possibly thousands, of borrowers. Thus, the opt-out solicitation campaign was extensive and reached a wide audience.

The participants in the solicitation campaign further facilitated opt-outs by providing class members with various forms that enabled them to opt-out. This tactic was effective, as the vast majority of class members who opted out, namely, more than 400 of the 435 total opt-outs, or in excess of 90% did so using the opt-out forms supplied by the various soliciting attorneys. Ex. 18.

In addition to the overwhelming proportion of solicited opt-outs to total opt-outs, there are additional facts supporting a link between the misleading and improper communications and opt-outs include the following:

- The timing of the opt-outs coincides with the start of the misleading communications. For example, it would appear that the first known improper communications with class members are the first Legg Solicitation and the Nix Solicitation dated September 17, 2003 Letter. Exs. 5 and 1. There were only 10 opt-outs received on or before September 22, 2003. Ex. 18.

- The Objection filed by Mr. Nix (which the parties will address at the appropriate time) stated that he is "conducting an opt-out campaign" and boasts of his effectiveness in procuring opt-outs. (Ex. 19). Similarly, letters from David Skeens of the Walters Bender Firm and Scott Borison of the Legg Firm specifically list class members successfully induced to opt-out of the Settlement by their firms. (Exs. 20-21). The Edelman Firm likewise submitted letters on behalf of certain alleged opt-outs. (Ex. 22). See also Ex. 19 (opt-outs using Nix, Walter Benders and Sharbrough opt-out forms).

- Only 16 opt-outs do not appear to be part of any organized opt-out campaign. (Ex. 18).

Thus, the record contains ample evidence for this Court to conclude that effects of the solicitation campaign likely caused individuals to opt-out based on misleading or incomplete information, and thereby justify the relief requested in Section VI. below.

## VI.    Remedies Are Warranted to Counteract the Likely Effects of the False and Misleading Communications.

The likely effects of the false and misleading communications require three principal remedies, namely: (1) invalidation of the solicited opt-outs; (2) a corrective notice and second opt-out period for the solicited opt-outs; and (3) temporary restraints on solicitation of opt-outs and other communications concerning the Settlement.

### A.    The Court Should Void The Opt-Outs, and Order A Corrective Notice and New Opt-out Period.

Given the likely effects of the opt-out solicitation campaign, the Court should invalidate the opt-outs and order a second notice and opt-out period as set forth in the parties' proposed Order.

In Georgine, the court decided that the best remedy was to "restore to the members who originally filed timely exclusion requests the opportunity to make a new independent decision to opt out of the class." Georgine, 160 F.R.D. at 502. It is essential that a class member's decision to participate in, or withdraw from, a class settlement be the product of

an objectively informed decision as to the member's own best interest. "It is the responsibility of the Court as a neutral arbiter, and of the attorneys in their adversary capacity, to insure this type of free and unfettered decision." Impervious Paint Indus., Inc. v. Ashland Oil, 508 F.Supp. 720, 723 (W.D. Ky. 1981). Where, as here, the class members likely have been improperly influenced by misleading communications, this Court has the "inherent jurisdiction to supervise any person or entity seeking to act on behalf of the prospective members of the class, including a party attempting to give notice of a class member's rights." In re Domestic Air Transp. Antitrust Litig., 1992 WL 357433 * (N.D. Ga. Nov. 2, 1992).

The Court unquestionably has the power to order these remedies. Rule 23(d)(2); Kleiner, 751 F.2d at 1199; In re McKesson HBOC Sec. Lit., 126 F.Supp.2d at 1246; Georgine, 160 F.R.D. at 518-20; Impervious Paint, 508 F. Supp. at 723-24. The text of the proposed curative notice, which is attached to the proposed Order, informs class members about the improper efforts to procure opt-outs and about the Settlement Agreement in a fair and neutral way that is designed to allow class members to decide whether to participate in the settlement free of outside influence. Moreover, defendants are not asking that notice be sent to all class members but only to those persons who timely opted out pursuant to solicitation. Other courts have approved similar notices and opt-out periods. See id.

### B.    The Court Should Order Temporary and Limited Restraints on Communications Concerning the Settlement.

To make sure the new notice and opt-out period are not undermined by yet another round of misleading and confusing communications, this Court should temporarily restrain communications with class members concerning the Settlement Agreement until the new opt-out period is completed. See proposed Order. The proposed limitation on communications satisfies the requirements of Fed.R.Civ.P. 23(d), as elaborated upon in Gulf Oil, 452 U.S. at 102.

First, the restraint advances the goal of making sure that class members receive fair and impartial notice and an opportunity to decide whether to opt-out free of outside

influence. Accordingly, it furthers the policies behind the rules governing class actions, including Rule 23(d)(2). See Gulf Oil, 452 U.S. at 102 (in restricting communications, court must be sure it is furthering, rather than hindering, the policies in the class action rules); In re School Asbestos Litig., 842 F.2d at 682-83 (restraints on communications that are not "litigation-neutral" further policies behind the rules).

Second, there is a "clear record" that will support "specific findings" by this Court that the need for the limitation outweighs any potential interference with the rights of the lawyers or solicitation targets. Gulf Oil, 452 U.S. at 102; see In re School Asbestos Litig., 842 F.2d at 683 (district court's findings that booklet was misleading met standards of clarity and specificity). Here, the record clearly supports specific findings of the likelihood of harm stemming from the misleading solicitation campaign. A likelihood of harm is all that is required. In re School Asbestos Litig., 842 F.2d at 683. As no one has a right to improperly solicit opt-outs, a restraint on such communications does not unduly interfere with anyone's rights. Moreover, without restraints, it is likely that class members will be bombarded with misleading communications once again. Another opt-out campaign would render the proposed curative Notice and opt-out period a nullity, and impair the administration of justice. Thus, a restraint protects the rights of class members without interfering with the rights of others.

Finally, the order is carefully drawn to limit speech as little as possible, consistent with the rights of the parties. Gulf Oil, 452 U.S. at 102. It limits the time of its operation to the new opt-out period. Cf. Kleiner, 751 F.2d at 1207 (upholding limitation throughout the entire litigation, including up to the time of trial); Hampton Hardware, 156 F.R.D. at 634 (same). Moreover, it allows communications with class members, subject only to prior approval by the Court. Such a "preview screening" mechanism has long been held to satisfy procedural, as well as any constitutional, requirements. Kleiner, 751 F.2d at 1207; Cobell, 212 F.R.D. at 20; Hampton Hardware, 156 F.R.D. at 634; Haffer, 115 F.R.D. 506, 1987 U.S. Dist. LEXIS 1612 (E.D. Pa. Mar. 3, 1987) (text of order requiring court approval of communications appears in the LEXIS version).

- 24 -

The lawyers who disseminated the Solicitation Letters would be wrong to claim the restraint violates the First Amendment. As an initial matter, misleading communications designed to solicit opt-outs are not worthy of First Amendment protection. <u>Kleiner</u>, 751 F.2d at 1204-05; <u>Impervious Paint</u>, 508 F.Supp. at 723; <u>Hampton Hardware, Inc.</u>, 156 F.R.D. at 633. Thus, the types of communications disseminated here have no first amendment protection.[13]

Even if the Solicitation Letters concerning the Settlement warrant limited constitutional protection, which they do not, courts have routinely rejected arguments that restraints on communications of the type sought here violate the First Amendment. <u>Kleiner</u>, 751 F.2d at 1206; <u>Cobell</u>, 212 F.R.D. at 20; <u>Hampton Hardware</u>, 156 F.R.D. at 633-34; <u>Haffer</u>, 115 F.R.D. at 513, <u>and see</u> <u>Hafer</u> 1987 U.S. Dist. LEXIS 1612 (E.D. Pa. Mar. 3, 1987) (text of order imposing restraint communications appears in the LEXIS version). Thus, the Court may properly restrain any communications with class members concerning the Settlement until the second opt-out period ends.

## VII.    <u>CONCLUSION</u>

For all of these reasons, the parties respectfully request that the Court grant their Joint Motion and direct that the attached curative notice be mailed to the individuals who are members of the putative class from the states of Georgia, Maryland, Florida, Missouri, Illinois, and Alabama and who as of October 1, 2003 submitted an opt-out election.

Respectfully submitted,

**ON BEHALF OF PLAINTIFFS
AND THE CLASS:**

R. Bruce Carlson, Pa. I.D. #56657
**SPECTER SPECTER EVANS
& MANOGUE, P.C.**
Koppers Building, 26th Floor
Pittsburgh, Pennsylvania 15219
(412) 642-2300

---

[13]    Even courts that determined that restraining communications concerning opt-outs required "strict scrutiny" and a "compelling government interest" found those standards satisfied in the context of an effort to solicit opt-outs. <u>See</u>, <u>e.g.</u>, <u>Georgine</u>, 160 F.R.D. at 515-17.

A. Hoyt Rowell, III
Daniel Myers
**RICHARDSON, PATRICK, WESTBROOK
    & BRICKMAN, LLC**
503 Wando Park Boulevard
Suite 200
Mt. Pleasant, SC 29464

*ON BEHALF OF RESIDENTIAL
FUNDING CORPORATION:*

Thomas L. Allen Pa. I.D. #33243
Roy W. Arnold Pa. I.D. #70544
**REED SMITH LLP**
435 Sixth Avenue
Pittsburgh, PA 15219
(412) 288-3916

*ON BEHALF OF COMMUNITY
BANK OF NORTHERN VIRGINIA:*

David G. Oberdick *(By consent RWA)*
Meyer Unkovic & Scott LLP
1300 Oliver Building
Pittsburgh, PA  15222
(412) 456-2881

F. Douglas Ross
**ODIN FELMAN & PITTLEMAN, P.C.**
9302 Lee Highway, Suite 1100
Fairfax, VA 22031

*ON BEHALF OF GUARANTY
NATIONAL BANK OF TALLAHASSEE*

Gary P. Hunt *(By consent RWA)*
**TUCKER ARENSBERG P.C.**
1500 One PPG Place
Pittsburgh, PA 15222
(412) 594-5518

Thomas P. Oldweilder
**ARMBRECHT JACKSON LLP**
1300 Riverview Plaza
P.O. Box 290
63 South Royal Street
Mobile, AL 36602

- 26 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **Brief In Support Of Joint Motion For Court Approved Notice To Address False, Misleading And Deceptive Solicitations Of Opt-Outs** was served upon the following counsel of record on this date by the method indicated:

**VIA HAND DELIVERY:**

David J. Armstrong, Esquire
Dickie, McCamey & Chilcote, P.C.
Suite 400
Two PPG Place
Pittsburgh, PA  15222

Louis M. Tarasi, Jr., Esquire
Tarasi, Tarasi & Fishman, PC
510 3rd Avenue
Pittsburgh, PA  15219-2107

Stanley A. Kirshenbaum, Esquire
1602 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA  15219

Robert B. Smith, Esquire
Leven Surloff Smith & Cohen
Fort Pitt Commons Bldg.
445 Fort Pitt Blvd.
Suite 210
Pittsburgh, PA  15219-1308

Counsel for Plaintiffs and the Class

# IN THE UNITED STATES DISTRICT COURT OF THE
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | COMMUNITY BANK OF ) NORTHERN VIRGINIA AND ) GUARANTY NATIONAL BANK ) OF TALLAHASSEE SECOND ) MORTGAGE LOAN LITIGATION ) ) ) ) | Civil Action No. 03-0425<br><br>Honorable Gary L. Lancaster |

## JOINT MOTION TO INVALIDATE SOLICITED OPT-OUTS AND FOR COURT APPROVED NOTICE TO ADDRESS FALSE, MISLEADING AND DECEPTIVE SOLICITATIONS OF OPT-OUTS

Plaintiffs, by Class Counsel, and Defendants, by their counsel, hereby move jointly for an Order invalidating solicited opt-outs and for a court-approved, curative notice and new opt-out period to address the false, misleading and deceptive solicitations of opt-outs as more fully set forth in the accompanying Brief in Support, which is incorporated herein. In addition, the parties respectfully request a temporary and limited restriction regarding communications concerning opt-outs and the class action settlement.

WHEREFORE, the parties jointly request that the Court enter the attached, proposed Order.

***ON BEHALF OF PLAINTIFFS***
***AND THE CLASS:***

R. Bruce Carlson, Pa. I.D. #56657
**SPECTER SPECTER EVANS**
 **& MANOGUE, P.C.**
The 26th Floor
Koppers Building
Pittsburgh, Pennsylvania 15219
(412) 642-2300

A. Hoyt Rowell, III
Daniel Myers
**RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC**
503 Wando Park Boulevard
Suite 200
Mt. Pleasant, SC 29464

***ON BEHALF OF RESIDENTIAL FUNDING CORPORATION:***

Thomas L. Allen Pa. I.D. #33243
Roy W. Arnold Pa. I.D. #70544
**REED SMITH LLP**
435 Sixth Avenue
Pittsburgh, PA 15219
(412) 288-3916

***ON BEHALF OF COMMUNITY BANK OF NORTHERN VIRGINIA:***

David G. Oberdick *(By consent RWA)*
Meyer Unkovic & Scott LLP
1300 Oliver Building
Pittsburgh, PA 15222
(412) 456-2881

F. Douglas Ross
**ODIN FELMAN & PITTLEMAN, P.C.**
9302 Lee Highway, Suite 1100
Fairfax, VA 22031

***ON BEHALF OF GUARANTY NATIONAL BANK OF TALLAHASSEE***

Gary P. Hunt *(By consent RWA)*
**TUCKER ARENSBERG P.C.**
1500 One PPG Place
Pittsburgh, PA 15222
(412) 594-5518

Thomas P. Oldweilder
**ARMBRECHT JACKSON LLP**
1300 Riverview Plaza
P.O. Box 290
63 South Royal Street
Mobile, AL 36602

## IN THE UNITED STATES DISTRICT COURT OF THE
## WESTERN DISTRICT OF PENNSYLVANIA

IN RE:  COMMUNITY BANK OF )
NORTHERN VIRGINIA AND )
GUARANTY NATIONAL BANK )      Civil Action No. 03-0425
OF TALLAHASSEE SECOND )
MORTGAGE LOAN LITIGATION )      Honorable Gary L. Lancaster
)
)

### PROPOSED ORDER GRANTING
### JOINT MOTION TO INVALIDATE SOLICITED OPT-OUTS AND FOR COURT
### APPROVED NOTICE TO ADDRESS FALSE, MISLEADING AND DECEPTIVE
### SOLICITATIONS OF OPT-OUTS

AND NOW this _____ day of October, 2003, upon careful consideration of

the Joint Motion to Invalidate Solicited Opt-Outs and for Court Approved Notice, the authorities

cited therein and the exhibits attached thereto, IT IS HEREBY ORDERED that the parties' Joint

Motion is GRANTED.

IT IS HEREBY ORDERED as follows:

1.    For good cause, the Court invalidates and declares void all solicited opt-

outs by class members from Georgia, Missouri, Illinois, Maryland, Florida and Alabama (the

"Solicited Opt-Out States).

2.    The settlement administrator shall promptly mail the respective proposed

curative notices for Georgia, Missouri, Illinois, Maryland, Florida and Alabama to any class

member in the respective state who submitted a timely opt-out request on or before October 1,

2003 (e.g., Georgia curative notice shall be sent to Georgia borrowers who submitted an opt-out

request).

3.    For only those class members who submitted timely opt-outs on or before

October 1, 2003 and who are located in the Solicited Opt-Out States, a second opt-out period

shall be allowed and shall expire on **October 24, 2003** (the "Second Opt-Out Period"). Except

for the opt-out deadline, all requirements regarding opt-outs set forth in the Settlement

Agreement and this Court's Preliminary Approval Order shall govern the validity and timeliness of any opt-outs from these Solicited Opt-Out States.

      4.    Except for communications between Class Counsel and members of the Class, all communications during the Second Opt-Out Period between any lawyer or law firm identified in paragraph 5 of this Order (or any person acting in concert with or at the direction of any such lawyer or law firm) and any member of the Class shall be in writing and submitted to this Court by motion to approve the communication. Except for written communications pre-approved by this Court and communications by Class Counsel upon inquiry from any class member, no communications shall be permitted during the Second Opt-out Period between any lawyer or law firm identified in paragraph 5 of this Order (or any person acting in concert with or at the direction of any such lawyer or law firm) and any member of the Class in the Solicited Opt-Out States with respect to the benefits or limitations of the Settlement, any claims encompassed within the release in the Settlement Agreement or the propriety or advisability of opt-ing out of the Settlement. With respect to any Class member electing to opt-out during this Second Opt-Out Period, this limited and temporary restriction shall cease and be terminated immediately upon Class Counsel's and/or the settlement administrator's receipt of a timely request for exclusion from the Class or "opt-out."

      5.    Class Counsel shall promptly serve this Order by facsimile and overnight mail on the following law firms and individual lawyers: Franklin R. Nix, Esquire; Scott C. Borison, Esquire, Mary T. Szeluga, Esquire and the Legg Law Firm; David M. Skeens, Esquire, Heather Carlson, Esquire and the Walters Bender Stroehbein & Vaughan law firm; Daniel A. Edelman of the Edelman, Combs & Latturner, LLC law firm; and John W. Sharbrough, III, Esquire, of the Sharbrough law firm.

 

                                    Hon. Gary L. Lancaster, U.S. District Judge

cc: All counsel of record

# TAB 1

Advertisement [1]
FRANKLIN R. NIX
ATTORNEY AT LAW
1020 FOXCROFT ROAD, N.W.
ATLANTA, GEORGIA 30327-2624

DIRECT DIAL
(404) 261-9250

E-MAIL ADDRESS
NIXFR@MCN.COM

FACSIMILE
(404) 261-1453

September 17, 2003

TO: ALL COMMUNITY BANK ("CB") and
GUARANTY NATIONAL BANK ("GNB")
SECOND MORTGAGE BORROWERS

**URGENT:** To protect your right to recover potentially **all of your closing fees and loan payments** from your lender, you must *reject* and *"opt out"* of the class settlement offered to you in a recent Class Action Notice ("Notice").

**IF YOU HAVE ALREADY HIRED ATTORNEYS TO ADVISE YOU ABOUT YOUR LENDER'S RECENT CLASS ACTION OFFER PLEASE DISREGARD THIS LETTER.**

This letter fully explains all borrowers' rights *never mentioned* in the Class Notice. *Urgent* action on your part, *before* October 1, 2003, is required if you wish to protect your consumer right to recover *all of your closing fees and loan payments* from the class defendants. This letter explains why the class defendants are offering you very small payments to settle and release your claims against them. If you *fail* to reject and "opt out" of the proposed settlement offer by completing and sending the enclosed opt-out form, you will be bound by the settlement and your consumer rights against the class defendants will be *forever barred.*

IF YOU RECENTLY **RECEIVED A LETTER FROM THE LEGG LAW FIRM, LLC ABOUT YOUR CB OR GNB LOAN, PLEASE BE ADVISED THAT THE LETTER INADVERTENTLY *MISSTATED* THE OPT OUT DEADLINE TO BE OCTOBER 15. YOUR CLASS NOTICE SETS THE OPT OUT DEADLINE AS *OCTOBER 1, 2003.*** (See Notice, page 6, paragraph (5)). The Legg Law Firm is sending you a correction letter that you may receive before or after this letter.

I have experience successfully suing lenders like yours under federal consumer protection laws directed at what is commonly called "predatory lending." These federal laws passed in 1994 specifically regulate high closing cost/high interest Second Mortgage [2] loans that you and approximately 44,000 other borrowers obtained since 1998 from CB or GNB. *In fact, the class complaint alleges that neither bank loaned you any money at all!* According to the class complaint allegations, CB and GNB were paid small fees to allow non-bank mortgage companies to use the banks' names. The names of the undisclosed mortgage companies were EquityPlus Financial, LLC and Equity Guaranty, LLC. ("Equity Lenders")(See Notice, page 3, last line).

Shortly after you obtained your loan it was purchased by another lender. Under federal law, the lenders who purchased your **second mortgage** loan became absolutely liable to you for any proven violations of the federal Truth-in-Lending Act ("TILA") and the Home Ownership & Equity Protection Act ("HOEPA"). 15 United States Code §§ 1601 to 1641.

---

[1]  Rules of the State Bar of Georgia Bar require that this type of letter be marked "Advertisement" at the top of every page.

[2]  My representation is confined to **SECOND MORTGAGE** loans that qualify as "high closing cost/high interest" loans subject to the Home Ownership & Equity Protection Act ("HOEPA"). If your loan had closing fees exceeding 8% of your total loan OR had high Annual Percentage Rates ("APR") (*not the interest rate in your rate in your note*) exceeding certain percentages, then your loan is a HOEPA loan. Call me immediately. If you obtained a CB/GNB second mortgage but never received a Class Action Settlement Notice

Specifically, my initial investigation indicates that the Equity Lenders, unbeknownst to you, *withheld* from you a required *advance* HOEPA notice warning you about the very high APR and total payments on your loan. HOEPA requires that such notices be delivered to borrowers *three days before* they actually sign any loan documents. This advance notice is designed to warn you about the terms of your loan so you can refuse the loan and look for better terms elsewhere. Besides withholding your HOEPA advance notice, my recalculation of the true APR on a sampling of class loans indicates that the APR on your loan was *understated*.

Either one of these two violations entitle a borrower to recover HOEPA-based damages, under Title 15 of the United States Code § 1640(a)(4), consisting of *all points and other loan origination fees* (probably $4,700 per average loan) and virtually *all of the loan payments ever made* (*even if you have sold your home, refinanced or suffered foreclosure*). In addition, a borrower would be entitled to recover a general TILA penalty in the range of $200 to $2,000. For example, a loan closed in September of 2000 with closing fees of $4,000 and 36 subsequent monthly payments at $500 each would yield *minimum* damages of $22,000, *plus* an additional TILA penalty of $200 to $2,000, plus attorneys' fees. [3] Conservative damage estimates per borrower, based on a $500 monthly payment, range from a high of $40,000 for a 1998 loan to a low of $10,000 for a late 2002 loan. Each monthly payment adds to a borrower's potential damages.

A very conservative estimate of the class defendants' total HOEPA liability would be 44,000 loans times $17,000 per average loan — **SEVEN HUNDRED FORTY-EIGHT MILLION DOLLARS ($748,000.000)!** The class settlement proposes to pay a maximum of only $33 million to all borrowers *plus* $8.1 million in attorneys' fees. If successful, the class defendants save over **SEVEN HUNDRED MILLION DOLLARS** in potential HOEPA damages at your expense.

So now you can appreciate the massive damages that the class defendants are trying to avoid by offering very small payments. Unfortunately the class defendants' Notice may lull many borrowers into accepting what appears to be a windfall without their knowing the class defendants' real liability under HOEPA. But don't for a moment feel sorry for the class defendants having to pay for your lenders' alleged wrongdoing. They knew exactly the risks they were taking. They gambled for huge profits on the assumption that they would never get caught by a single borrower, much less a class action composed of all borrowers. So now the class defendants face the kind of meaningful damages that Congress created to deter predatory lending.

The only *certain means* of protecting yourself from the class settlement is *opting out* of the proposed class settlement **before** October 1st. If the judge *disapproves* of the settlement at the "fairness" hearing scheduled for November 14th, all class members will be protected. If, however, the judge *approves* the settlement, you will not be bound by it *provided* you opted out before the October 1 deadline. Unfortunately, if you *do nothing* you will be counted as a class member, bound by the settlement and forever barred from collecting your rightful HOEPA damages.

I am a member of a team of *consumer protection lawyers* around the country that stands ready to pursue your HOEPA claims if you preserve them by opting out of the class settlement. It would be my pleasure to represent you but you are, of course, free to hire other counsel. I recommend, however, that you retain only counsel with prior experience against lenders like yours, with experience handling complex cases, and with particular expertise under HOEPA. Very few plaintiffs' lawyers possess all those qualifications. [4]

---

[3] The *exact amount* of your individual claim against the class defendants can be determined by adding: (1) the closing fees on your HUD-1 Settlement Statement (bottom of left-hand column); (2) all the IRS Form 1099 "interest paid" statements received from Homecomings Financial (the amount are in you tax returns if you itemized interest deductions on a Schedule A); (3) the "interest component" (estimate 95 %) of all 2003 payments, plus at least a $200 TILA penalty.

[4] This year marks my 30th year practicing law in Georgia and federal courts including the Supreme Court of the United States. In the nation's largest and oldest lawyer directory, Martindale & Hubbell, I have always held Martindale's *highest* "AV" rating. "A" stands for legal competence that is "Very High to Preeminent"; "V" stands for "Very High" ethical integrity. On a personal note, my wife of 28 years, a former real estate paralegal and I have three fine boys in high school or college. For twenty years my wife and I have been Elders of Atlanta's Peachtree Presbyterian Church

One additional factor that bears upon your rights is the one-year statute of limitations applicable to TILA and HOEPA claims. If a class action is filed, however, the statute of limitations is tolled or stopped from running for the one-year period preceding the class action filing and indefinitely tolled during the duration of the class action. This is why you will notice in the Class Notice (pages 2 & 3) that the defendants are willing to pay $600 on loans made on or after May 1, 2000 (CB loans) and September 19, 2001 (GNB loans). The class defendants apparently believe such loans are *within* the statute of limitations.

As to loans originated *before* these dates the class defendants are offering only $250 and will argue that claims on such loans are barred by the statute of limitations. There are two principal exceptions to the statute of limitations. One is called "equitable tolling." This legal doctrine essentially means that you had no *prior actual knowledge* of the violation of your TILA and HOEPA rights and that you could not have discovered such violations in exercising a reasonable borrower's caution to protect yourself. Here we would argue that if the largest mortgage company in the world with hundreds of experts trained to discover loan violations did not discover your loan's TILA and HOEPA violations, how can anyone seriously argue that consumers like yourself not trained in the law should have discovered your claims within a year of your loan closing? That is a very compelling argument that the class defendants cannot satisfactorily answer.

A second exception to the statute of limitations is known as "equitable estoppel." The argument here is that class defendants are barred from even *asserting* the statute of limitations defense. If the class defendants do not have "clean hands" in the eyes of the law they should be equitably barred from asserting any statute of limitations defense. Additionally, principles of equity and fairness strongly disfavor enabling anyone to profit from your lenders' wrongdoing.

Both of the above-stated defenses to the statute of limitations are well established in the law and have been successfully sustained in individual TILA cases. Nevertheless, since nothing is certain in this world but "death and taxes," I cannot guarantee that we could prevail against these statute of limitations defenses as to loans predating May 1, 2000 (CB) and September 19, 2001 (GNB). If the class defendants prevailed your claims would be barred and you would recover nothing. In other words, if you opt out of the class settlement, you are risking the loss of only *$250* (or *$600* if your loan postdates May 1, 2000 for CB borrowers; September 19, 2001 for GNB borrowers).

The choice is exclusively yours. Please consider that I would not seek to represent you if I were not reasonably confident of overcoming the class defendants' statute of limitations defense. That is not a guarantee but I am not in the habit of wasting my time and resources on cases that cannot be won. If you wish to opt out of the class settlement, please follow the simple steps listed in the enclosed checklist.

If you honor me with the privilege of representing you, I must have written proof of my authority to represent you under the enclosed representation and fee agreement. Even if you return the opt-out form and questionnaire I would have no legal standing to represent you before any court without a representation agreement. The representation agreement contains a standard contingent fee agreement providing for a 25% contingency fee of your gross recovery through any *settlement* acceptable to you or one third (33 &1/3 %) of the gross recovery obtained if the case *goes to trial*.

Rules of the State Bar of Georgia require that I "conspicuously present the following disclaimers:"

"Contingent attorneys' fees refers only to those fees charged by attorneys for their legal services. Such fees are not permitted in all types of cases. Court costs and other additional expenses of legal action usually must be paid by the client."

"'No fee unless you win or collect' or any similar phrase refers only to fees charged by the attorney. Court costs and other additional expenses of legal action usually must be paid by the client. Contingent fees are not permitted in all types of cases."

Notwithstanding these required disclaimers, I am allowed to prosecute your type of case for civil damages on a contingent fee basis and to *advance* all of your litigation expenses. *If we don't win you owe me nothing.*

No advance fee retainer or expenses are required. All you are risking is the $250 to $600 (plus a very *uncertain* later payment of $302, see paragraph V.(7) on page 3 of Notice) that the class defendants have offered to pay you for giving up your very significant HOEPA claims. What I am risking is substantial time and resources worth hundreds of thousands of dollars at my normal hourly rates. *Mind you, the class defendants would not be offering you a penny unless they were very concerned about their liability.* Figure out the exact total of your potential HOEPA damages under Footnote 3 and then decide.

Other common client questions may concern you. Will you have to go to court? That is highly unlikely. The understatement of your APR is on a loan document that no one can challenge. Evidence of your failure to receive the advance HOEPA notice three days before you signed your loan documents can be offered by affidavit. Can you be counter sued? Technically yes, but most lenders don't file them (frivolous claims irritate judges), and I know of no instance where such counter suits have not ended with dismissal. My job includes obtaining dismissals of any counter suits. Can the class defendants call my loan? No, not so long as you continue to make your payments. What about other loans that I have, like a car loan? Can one of the class defendants retaliate by calling my car loan? Absolutely not, so long as you make your required payments. Can I stop paying my loan while my suit is pending? Absolutely not. You are perfectly free, however, to sell or refinance your home while your case is pending. The only effect of such a sale or refinancing is to stop the accrual of *additional* damages attributable to monthly payments. No lender can prevent you from paying off your loan through a sale or refinancing. What will happen after I opt out? We will wait until the "fairness" hearing decision on November 14th. If the judge disapproves the settlement the pending class action may go forward. If the settlement is approved we will immediately file a separate suit on behalf of all opt outs. How long will it take? It could take less than a year or as long as two years. In any event, the HOEPA damages you stand to recover are worth waiting for.

Already one of the class defendants has stopped buying HOEPA loans because of the great liability they pose. Why? Because citizens like you are willing to enforce their rights.

I have tried to provide enough information for you to make an informed decision without calling me *before* you opt out. Trying to confer with thousands of clients over less than two weeks could seriously impair my ability to complete other investigations and tasks in your case. In deciding to opt out you must exercise a certain amount of faith and trust in me. We are strangers but I am not an ambulance chaser or a TV lawyer interested in a piece of a cheap settlement. I would not hold the highest ratings for legal ability and integrity had I not earned them. After all the opt outs are in, say October 6th, and provided you hired me as your counsel, I welcome the opportunity to answer any lingering questions you may have.

I very much appreciate your time and attention to this urgent matter. My phone lines will probably be constantly busy but you may leave a voicemail, e-mail or even a fax and I will get back to you. You may even call my home at 404-261-9103 (weekends included). If you do call you *must have* your Truth-in-Lending Statement and your HUD-1 Settlement Statement in hand if I am to answer any questions about your loan. If you have no *vital* questions, I urge you to mail the opt-out notice to the settlement administrator **IMMEDIATELY** and follow the other checklist steps, *I cannot help or represent you if you mail your opt out notice too late to be received by OCTOBER 1st.* If you change your mind later you can ask the court to retract your opt-out. Believing that you will find no cause to question the wisdom of your opt-out, I look forward to representing you, if that be your choice, and making your opt-out a most profitable experience.

Sincerely,

Franklin R. Nix
Georgia Bar No 544750

<u>NOTICE OF OPT OUT LETTER</u>



BY FIRST CLASS MAIL with
<u>DELIVERY CONFIRMATION</u>

GBNV-GNB Settlement Administrator
P. O. Box 12983
Birmingham, Alabama
35202—2983

        Re: Notice of Opt Out of Class Settlement – *In re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation* – Case No. 03-0425

Dear Sir:

        Pursuant to Paragraph V.(3) of the "Notice of Class Action Settlement and Hearing" the undersigned hereby give you formal notice, effective immediately, that they choose to opt out of the proposed settlement and wish to be excluded. Please inform class counsel and counsel for defendants of this opt out and our retention of Franklin R. Nix, Esq. as our counsel.

        Please be advised that the undersigned have retained as their legal counsel in this matter the Law Firm of Franklin R. Nix, 1020 Foxcroft Road, N.W., Atlanta, Georgia 30327-2624; Telephone No. (404) 261-9759; Facsimile (404) 261-1458; E-mail NIXFR@AOL.COM. The undersigned hereby direct you, class counsel, and defendants' counsel to direct all further communications in this matter exclusively to Mr. Nix. Any violation of this direction will be reported to the Court and appropriate state and federal bar authorities.

        Thank you for your cooperation in this matter.

Dated this 22 day of September, 2003.

DONALD L. BRIANT
Name of Borrower

*Donald R. Briant*
Signature of Borrower

145 FARMINGTON DR
Address of Borrower

Woodstock GA 30188
City, State, & Zip Code

770·517·4788
Telephone Number

_____
Name of Co-Borrower

_____
Signature of Co-Borrower

_____
Address of Co-Borrower

_____
City, State, & Zip Code

_____
Telephone Number

## REPRESENTATION & FEE AGREEMENT

Dear Client:

This Representation and Fee Agreement ("Agreement") is effective as of the date of signed below. This Agreement confirms the terms and conditions of Client's engagement of Franklin R. Nix, Esq. ("Counsel") as Client's legal counsel respecting the matter of Client's CB or GNB loan. After Client's opt out of the proposed class settlement in the *Kellar v. GMAC, et al.* class action this engagement entails ongoing litigation against the class defendants in whatever form and forum Counsel deems appropriate, to recover HOEPA and TILA damages against class defendants. This Agreement has no force or effect as to prospective clients who have not timely opted out of the class settlement.

Client acknowledges that no retainer or advancement of expenses shall be required. Counsel shall advance all expenses in the prosecution of Client's damage claims, shall recover such expenses solely out of any recovery in the litigation and shall in no event seek the recovery of any expenses from Client if there is no recovery in the litigation.

If there is no recovery Client shall not owe Counsel any attorneys' fees or expenses. Client agrees to pay from any recovery for Client based on a settlement acceptable to Client a contingency fee of 25% of the gross recovery or a contingency fee of 33&1/3% of the gross recovery if the Client's case goes to trial. Client acknowledges that any co-counsel retained by Counsel shall be paid exclusively out of Counsel's contingency fees and not as a charge against Client's recovery. Client agrees that the retention of co-counsel and fee sharing, without cost to plaintiff, shall be at the sole discretion of Counsel. As to the distribution of any recovery, Client agrees that Counsel shall first be entitled to recover all out of pocket expenses. After deduction of expenses, Client and Counsel shall be paid their respective percentages based on the gross recovery less expenses.

Client acknowledges having decided to opt out of the class settlement and forgo receipt of the settlement sums offered. In the event of no recovery against GMAC, Client and Counsel solemnly agree that Client shall never seek and Counsel shall have no liability for the class settlement sums forgone by Client.

Client and Counsel agree that this Agreement shall be exclusively governed by and enforceable under the laws of the State of Georgia. Any controversies or disputes hereunder shall be submitted to binding arbitration in Atlanta, Georgia pursuant to the rules and procedures of the American Arbitration Association, all costs of arbitration to be born by Counsel. Client and Counsel further agree that this Agreement constitutes the sole and entire Agreement between Client and Counsel with respect to Client's representation. No amendment or modification of this Agreement shall be enforceable unless reduced to writing and signed by all parties hereto.

Finally, Client and Counsel agree that Counsel has not guaranteed and cannot guarantee the outcome of Client's representation. Client acknowledges that while Counsel believes that Client's case is well founded upon the facts and the applicable law, its ultimate outcome is subject to fallibilities of judges and juries over which Counsel has no control. Client acknowledges that Counsel's belief in the strength of Client's is a belief only and not a warranty or a guarantee of success.

Representation accepted as of the date entered below.

Franklin R. Nix
Ga. Bar. No. 544750

I/We acknowledge having retained Franklin R. Nix, Esq. as our legal counsel for the engagement described above upon the terms and conditions stated above as of this ___ day of September, 2003.

Client/Borrower

_____
Client/Co-Borrower

# TAB 2

# REPRESENTATION AND FEE AGREEMENT

Dear Client:

  This Representation and Fee Agreement ("Agreement") is effective as of the date of signed below. This Agreement confirms the terms and conditions of Client's engagement of Franklin R. Nix, Esq. ("Counsel") as Client's legal counsel respecting the matter of Client's CB or GNB loan. After Client's opt out of the proposed class settlement in the *Kellar v. GMAC, et al* class action this engagement entails ongoing litigation against the class defendants in whatever form and forum Counsel deems appropriate. to recover HOEPA and TILA damages against class defendants. This Agreement has no force or effect as to prospective clients who have not timely opted out of the class settlement.

  Client acknowledges that no retainer or advancement of expenses shall be required. Counsel shall advance all expenses in the prosecution of Client's damage claims, shall recover such expenses solely out of any recovery in the litigation and shall in no event seek the recovery of any expenses from Client if there is no recovery in the litigation.

  If there is no recovery Client shall not owe Counsel any attorneys' fees or expenses. Client agrees to pay from any recovery for Client based on a settlement acceptable to Client a contingency fee of 25% of the gross recovery or a contingency fee of 33&1/3% of the gross recovery if the Client's case goes to trial. Client acknowledges that any co-counsel retained by Counsel shall be paid exclusively out of Counsel's contingency fees and not as a charge against Client's recovery. Client agrees that the retention of co-counsel and fee sharing, without cost to plaintiff, shall be at the sole discretion of Counsel. As to the distribution of any recovery, Client agrees that Counsel shall first be entitled to recover all out of pocket expenses. After deduction of expenses, Client and Counsel shall be paid their respective percentages based on the gross recovery less expenses.

  Client acknowledges having decided to opt out of the class settlement and forgo receipt of the settlement sums offered. In the event of no recovery against GMAC, Client and Counsel solemnly agree that Client shall never seek and Counsel shall have no liability for the class settlement sums forgone by Client.

  Client and Counsel agree that this Agreement shall be exclusively governed by and enforceable under the laws of the State of Georgia. Any controversies or disputes hereunder shall be submitted to binding arbitration in Atlanta, Georgia pursuant to the rules and procedures of the American Arbitration Association, all costs of arbitration to be born by Counsel. Client and Counsel further agree that this Agreement constitutes the sole and entire Agreement between Client and Counsel with respect to Client's representation. No amendment or modification of this Agreement shall be enforceable unless reduced to writing and signed by all parties hereto.

  Finally, Client and Counsel agree that Counsel has not guaranteed and cannot guarantee the outcome of Client's representation. Client acknowledges that while Counsel believes that Client's case is well founded upon the facts and the applicable law, its ultimate outcome is subject to fallibilities of judges and juries over which Counsel has no control. Client acknowledges that Counsel's belief in the strength of Client's is a belief only and not a warranty or a guarantee of success.

  Representation accepted as of the date entered below.

_Franklin R. Nix_
Franklin R. Nix
Ga. Bar. No. 544750

I/We acknowledge having retained Franklin R. Nix, Esq. as our legal counsel for the engagement described above upon the terms and conditions stated above us of this _____ day of September, 2003.

_____
Client/Borrower

_____
Client/Co-Borrower

# TAB 3

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:      COMMUNITY BANK OF      )
           NORTHERN VIRGINIA AND    )
           GUARANTY NATIONAL BANK  )    CASE NO.: 03-0425
           OF TALLAHASSEE SECOND   )    Honorable Gary L. Lancaster
           MORTGAGE LOAN LITIGATION )

**FINDINGS AND ORDER CONDITIONALLY CERTIFYING A CLASS
FOR SETTLEMENT PURPOSES, PRELIMINARILY APPROVING
THE CLASS SETTLEMENT, DIRECTING THE ISSUANCE OF A CLASS
NOTICE TO THE CLASS AND SCHEDULING A SETTLEMENT HEARING**

WHEREAS, various Class Action Complaints have been filed with, (or removed to), this Court on behalf of the following representative plaintiffs: Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Picard, Nora Miller, Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich, Thomas Mathis, Stephen and Amy Haney, and Patrice Porco, at the following docket numbers: 03-0425; 02-1201; 02-2000; 02-1563; 02-1616; and 02-1999.

WHEREAS, the parties and their attorneys have entered into a Settlement Agreement and Release, dated as of July 11, 2003, in which the parties have agreed upon a settlement of the Action, subject to the approval and determination of the Court as to the fairness, reasonableness, and adequacy of the settlement which, if approved, will result in dismissal of the Action with prejudice;

NOW, THEREFORE, upon reviewing the Settlement Agreement and Release, including the exhibits attached thereto (together, the "Settlement Agreement"), and upon reviewing all prior proceedings herein, and the matter having come before the Court for a Status Conference on June 6, 2003, and the plaintiffs having appeared by R. Bruce Carlson and Daniel O. Myers and the defendants having appeared by Thomas L. Allen, Roy W. Arnold,

Richard Tucker, F. Douglas Ross, David G. Oberdick, and Thomas P. Oldweiler, on application of the parties and based on the record,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.      These actions are all hereby consolidated at Case No. 03-0425 (the "Action"), the lead All pleadings hereafter shall be filed at this number. The Clerk of Court shall Civil ActionsNos. 02-1201, 02-1563, 02-1616, 02-1999 and 02-2000..

2.      The Action is preliminarily certified as a Class Action for settlement purposes only pursuant to Fed. R. Civ. P. 23(a), 23(b)(3), and 23(c)(2).  Defendants retain all rights to assert that this Action may not be certified as a class action except for settlement purposes. The Class consists of all persons ("Class Members") who: (a) entered into a loan agreement with Community Bank of Northern Virginia ("CBNV") and/or Guaranty National Bank of Tallahassee ("GNB"); (b) whose loan was secured by a second mortgage or deed of trust on property located in the United States; (c)  whose loan was purchased by Residential Funding Corporation ("RFC"); and, (d) who was not a member of the class certified in the action captioned Baxter v. Guaranty National Bank, et al., Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

3.      Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Picard, Nora Miller, Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich, Thomas Mathis, Stephen and Amy Haney are hereby designated as representatives of the conditionally certified class.

4.      R. Bruce Carlson, (of the law firm Specter Specter Evans and Manogue, P.C.) and A. Hoyt Rowell, III and Daniel O. Myers, (of the law firm Richardson, Patrick, Westbrook and Brickman), are hereby designated as Counsel for the conditionally certified Class.

5.      The Court has subject-matter jurisdiction over this Action pursuant to 28 U.S.C. Section 1331, 1332 and 1367, and personal jurisdiction over the parties before it.

6.     The Settlement Agreement falls "within the range of possible approval" (Manual for Complex Litigation 3d Section 30.41), and therefore is preliminarily approved as being sufficient to warrant sending notice to the Class and scheduling a formal Settlement Hearing.

7.     A Settlement Hearing shall be held on November 14, 2003, at 10:00 a.m., or at such later date as the Court may direct, at the United States District Court for the Western District of Pennsylvania, U.S. Post Office and Courthouse, 7th Avenue and Grant Street, Pittsburgh, Pennsylvania, in Courtroom 911, to consider whether the Class meets the requirements for final certification under Fed. R. Civ. P. 23(a), (b)(3), (c)(2) and the United States Constitution, to evaluate the fairness, reasonableness and adequacy of the proposed settlement and whether it should be finally approved by the Court pursuant to Fed. R. Civ. P. 23(e), and to consider whether the application of plaintiffs' counsel for an award of attorneys' fees and costs, and any incentive awards that may be sought by representative plaintiffs, should be approved.

8.     The Proposed Class Notices (Exhibits C and D of the Settlement Agreement), the notice methodology described in the Settlement Agreement and the Settlement Administrator's Notice Plan (Exhibit E to the Settlement Agreement) are hereby approved.

9.     The Settlement Agreement contemplates a notice methodology that is the best practicable notice, is reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and of their right to object or exclude themselves from the proposed settlement, is reasonable and constitutes due, adequate and sufficient notice to all persons entitled to receive notice, and meets all applicable requirements of law, including, but not limited to, Fed. R. Civ. P. 23(c) and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

10.    Subject to the terms of the Settlement Agreement, Defendant is authorized to retain one or more third-party administrators to implement the terms of the Settlement Agreement.

-3-

11.    Defendants or their designee(s) shall cause the Class Mail Notice to be mailed to each Class Member by first-class mail, postage prepaid, to his or her last known address no later than August 1, 2003.

12.    Defendants or their designee(s) shall publish the Class Publication Notice as provided in the Settlement Agreement and the Notice Plan no later than August 15, 2003.

13.    Defendants or their designee(s) shall: (i) remail any Class Mail Notice returned by the Postal Service with a forwarding address received by the Settlement Administrator; and (ii) attempt to find an address for any returned Class Notice that does not include a forwarding address consistent with the terms of the Settlement Agreement and the Notice Plan.

14.    Defendants or their designee(s) shall file proof of the mailing of the Class Mail Notice and publication of the Class Publication Notice consistent with the terms of the Settlement Agreement.

15.    Each Class Member who wishes to exclude himself or herself from the Class shall submit a written request for exclusion to the Settlement Administrator. The request for exclusion must (a) contain a reference to "In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation, Case No. 03-0425"; (b) include the name, address and telephone number of the person seeking to be excluded; (c) include a statement that the person wishes to be excluded from the Class; (d) be signed personally by the person who seeks to be excluded from the Class; and (e) be received by the Settlement Administrator by October 1, 2003. No Class Member may opt out by having a request to opt out submitted by an actual or purported agent or attorney acting on behalf of a class member. No opt out request may be made on behalf of a group of Class Members.

16.    Any Class Member who does not submit a timely, written request for exclusion from the Class, consistent with the terms of the Settlement Agreement and paragraph 15 hereof, shall be bound by all proceedings, orders and judgments in this Action, even if such Class Member has previously initiated or subsequently initiates individual litigation against the

-4-

DOCSLA-15377078.4-BSCHILDER

Defendants or other proceedings encompassed by the Settled Claims defined in the Settlement
Agreement.

17.    Each Class Member who wishes to object to the fairness, reasonableness or
adequacy of the Settlement Agreement or the proposed settlement, or to the award of
Attorneys' Fees and Expenses or any incentive awards to representative plaintiffs, shall provide
to Co-Counsel for Plaintiffs and Defendants' Counsel and file with the Court, so as to be
received no later than October 1, 2003, at the address listed in the Class Mail Notice, a written
statement of the objection, as well as the specific reasons, if any, for each objection, including
any legal support the Class Member wishes to bring to the Court's attention and any evidence
the Class Member wishes to introduce in support of his or her objections.

18.    All written objections must be signed by the Class Member and must include:
(1)   the Class member's name, address and telephone number;   (2)   a statement of the
objection(s) and any supporting evidence the Class Member wishes to introduce; and (3)  the
case name and number of this Action.

19.    Any attorney hired by a Class Member at the Class Member's expense for the
purpose of objecting to the Settlement, or to the award of Attorneys' Fees and Expenses, shall
file with the Clerk of Court and provide Co-Plaintiffs' Counsel and Defendants' Counsel a
written notice of appearance so as to be received no later than October 1, 2003.

20.    Any Class Member who files and serves a written objection and who intends
to make an appearance at the Settlement Hearing, either in person or through personal counsel
hired at the Class Member's expense, shall provide Co-Plaintiffs' counsel and Defendants'
Counsel and file with the Court so as to be received no later than October 1, 2003, a written
notice of intention to appear.  The notice of intention to appear must include an identification
of witnesses the Class Member intends to call at the Settlement Hearing and any exhibits the
Class Member intends to introduce into evidence at the Settlement Hearing.

21.    Plaintiffs' Counsel and Defense Counsel shall promptly furnish each other with copies of any and all objections or written requests for exclusion that come into their possession.

22.    Any Class Member who does not make his or her objection in the manner provided in this Order shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, adequacy or reasonableness of the proposed settlement.

IT IS SO ORDERED.

HONORABLE GARY L. LANCASTER,
UNITED STATES DISTRICT JUDGE

7/17/03

# TAB 4

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

ALVIN L. AND LINDA L. PHIPPS, et al.,

　　　　　Plaintiffs,

vs.                                                            Case No. 03-0420-CV-W-GAF

GGUARANTY NATIONAL BANK OF
TALLAHASSEE, et al.,

　　　　　Defendants.

## PLAINTIFFS' SUGGESTIONS IN OPPOSITION
## TO THE RFC DEFENDANTS' MOTION TO STAY

### Introduction

Defendants GMAC-Residential Funding Corporation, Residential Funding Mortgage

Securities II, Inc., JP Morgan Chase Bank, Wilmington Trust Company and Homecomings

Financial Network, Inc. (the "RFC Defendants") ask the Court to stay this action on the basis of

a proposed nationwide settlement involving second mortgage loans made by defendant Guaranty

National Bank of Tallahassee ("GNBT") now held by the RFC Defendants.[1] Before resolving

the stay request or the also pending dispositive motions, this Court first must determine that it

has jurisdiction. Smith v. Mail Boxes Etc. USA, Inc., 191 F.Supp.2d 1155 (E.D. Cal.2002)

(resolution of jurisdictional issues comes before determination of motion to stay); Kohl v.

American Home Products Corp. 78 F.Supp.2d 885, 888 (W.D. Ark. 1999) (judicial economy is

"best served" by first determining remand issue); Aetna U.S. Healthcare, Inc. v. Hoechst

Aktiengesellschaft, 54 F. Supp.2d 1042, 1047 (D. Kan. 1999) (jurisdictional issue determined on

---

[1] Second mortgage loans originated by Community Bank of Northern Virginia also are part of
the proposed Pennsylvania settlement.

motion to remand before court considered staying the action). For the reasons set forth in
Plaintiffs' Motion to Remand and supporting suggestions, including the recent decision in
Hancock v. Bank of America, ___ F.Supp.2d ___ (2003 WL 21697885 at * 3 (W.D.Ky.))
(granting remand and holding that even if mortgage loan fees at issue are governed by the
National Bank Act there is no basis to assert federal question jurisdiction), this matter must be
remanded to the Circuit Court of Clay County.  Accordingly, this Court should not address the
stay request. In any event, however, a stay is not proper.

Whether to impose the drastic act of a stay is an equitable decision that rests with sound
discretion of the court.  Here, the Missouri action is first filed and more advanced.  More
importantly, the stay request is not part a legitimate effort to avoid duplicative litigation. Instead,
it is part of a collusive effort by class counsel and defendants in the Pennsylvania settlement to
get this Missouri case and the undersigned counsel out of the way so the settling defendants can
buy a nationwide settlement on the cheap in exchange for an $8.1 million dollar payoff to the
Pennsylvania class counsel.  It is that simple and that wrong. Therefore, even were the Court to
decide this question, we are confident it would refuse to grant the stay and thereby further such
an improper scheme.

## Argument

A stay is drastic action to be rarely imposed. Landis v. North American Co., 299 U.S.
248, 255, 57 S.Ct. 163 (1936) ("Only in a rare circumstance will a litigant in one cause be
compelled to stand aside while a litigant in another settles the rule of law that will define the
rights of both"). The cases the RFC Defendants primarily rely upon are inapplicable as they
address stay under what is know as the Colorado River doctrine.  That doctrine relates to a
federal court's stay of it's proceeding in order to allow a parallel matter pending in state court to

proceed. In this matter, of course, the two courts are federal (for the moment).[2] Nonetheless, it is not disputed and it is a long understood axiom that whether or not a stay should be entered is an equitable decision left to the sound discretion of the court for which there are no rigid mechanical rules. Kerotest Mfg. Co. v. C-O-Two Fire Equipment, 342 U.S. 180, 183, 72 S.Ct. 219 (1952); accord State Farm Mutual Automobile Insurance Company v. Bonwell, 248 F.2d 862, 865 (8th Cir. 1957).[3] In this case, the facts compel a rejection of the request.

A common although not determinative factor in looking at a stay request is the issue of which matter was first filed. See e.g. Creighton Omaha Regional Health Care Corporation v. Lomas & Nettleton Company, 486 F. Supp. 392, 399 (D. Neb. 1980). The RFC Defendants list several Pennsylvania actions that are now consolidated as part of the proposed settlement, including cases that are a year or two old. They then point to the instant case, filed on April 3, 2003 and claim we are late to the party and this action must, therefore, be stayed.[4] Of course,

_____

[2] If remanded (and it should be), any attempt by the RFC Defendants to get the Pennsylvania court to stay the Missouri state court suit will have to overcome the federal prohibition against such action. 28 U.S.C. § 2283 ("A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to perfect or execute its judgments.")

[3] While the cited cases relate to stay or dismissal requests under the Federal Declaratory Judgments Act, because jurisdiction is discretionary under that Act, the instruction from those cases is equally applicable to the standard for determining a request to stay.

[4] Specifically, the RFC Defendants contend that this matter is a recent filing intended to piggy back on a nationwide settlement and is no more than a "copy cat" of prior Pennsylvania filed suits. (SIS Motion to Stay at p. 5) They are correct in only one respect. The undersigned counsel represent the plaintiffs class or a putative plaintiffs class in some 12 suits arising under Missouri's Second Mortgage Loan Act ("SMLA") each against different originating lenders here in Missouri in cases that date back to 2001 and some that were filed just weeks ago. In each such case in which the issue of class certification has been ruled on, the court did certify the matter as a plaintiffs class action and appointed the undersigned as class counsel (Couch v. SMC Lending, et al., case no. CV100-4332; Gilmore v. Preferred Credit, case no. CV100-4263-CC, and Baker v. Century Financial et al., case no. CV100-4294 in Clay County and McLean v First Horizon Home Loan Corporation (f/k/a McGuire Mortgage Company), case no. 00CV-228530 in Jackson

3

none of the Pennsylvania actions asserted a claim under the SMLA or have a named plaintiff from this state. Between fending off a removal and a host of dispositive motions, Plaintiffs have conducted considerable written discovery and will be prepared to move for class certification soon after the remand issue is decided. The Pennsylvania settlement, on the other hand, was not filed until July 17 and there has been no effort to substantiate or advance the Missouri claims purportedly subsumed in that settlement. Without a doubt, with respect to the claims of Missouri borrowers, this case is "first filed" and much more advanced.

In this regard, the fact that the Pennsylvania matter has been "conditionally" certified by the Western District of Pennsylvania means nothing. Parties that have collusively agreed to settle presented the proposed settlement to the Pennsylvania judge. There was no opposing voice whatsoever. The court made no inquiry of finding in regard to the appropriateness of the settlement including whether the adequacy of representation and other requirements of Rule 23 can be met.

Given the unique nature of class actions there are likewise unique considerations when it comes to stay requests. As explained by the Delaware Court of Chancery, any stay of one class action verses another is likely to improperly give an advantage to one class action and class counsel before a court can determine the adequacy of representation. <u>Silverstein v. Warner Communications, Inc.</u> 1991 WL 12835 (Del. Ch.) (unpublished opinion). Such logic applies in this case. To stay this action would improperly hinder the efforts to have the Missouri action promptly certified.

---

County). Thus, we agree that it is accurate to describe this matter as a "copy-cat" but what it mirrored is our earlier filed Missouri actions. It is wholly inaccurate for the RFC Defendants to portray this case or the undersigned counsel as some "Johnny-come-lately" to this second mortgage class litigation.

Again, the decision to issue a stay is an equitable and discretionary decision and the equities all point to a denial of the request. The proposed Pennsylvania settlement is no more than a collusive effort between plaintiffs and defense counsel. The defendants buy their peace nationwide for a fraction of what the cases are worth and in exchange for selling their "clients" down the river, counsel for the plaintiffs class get an $8.1 million fee. It is a poster child case for all that is wrong with class actions. If the SMLA is violated, the victim is entitled to bring a civil action for damages, which would include any wrongfully charged fee, § 408.562 RSMo, and the lender is entitled to collect no interest on the loan. § 408.236 RSMo.

Named plaintiffs John and Elizabeth St. Clair took out a $57,000 second mortgage loan from GNBT at 11.99% on June 17, 2001. (St. Clair Loan Documents attached as Exhibit 1)  In connection with the loan they were charged $5,361.00 in illegal fees. (Id.) Over the life of this 25-year loan, the St. Clairs will pay over $130,000 in interest. (Id.) Plainly their damages under the SMLA – getting back the illegal fees, any interest paid and an order that no more interest shall be paid -- are in the thousands and thousands of dollars. And yet under the Pennsylvania settlement they get $575.00. (Proposed Settlement Agreement and Release at p. 12, attached as Exhibit 2)

The RFC Defendants suggest that the settlement is fair because the Missouri borrowers will get a recovery despite the "dubious" nature of their SMLA claims. (SIS Motion to Stay at p. 6-7)  In support of this claim, they point to the currently on appeal decision in Adkison v. FirstPlus Bank et al. and Avila v. Community Bank of Virgina et al., the ruling in which will impact the SMLA claims against GNBT.  There is no need to repeat the arguments and issues presented in those like appeals.  The bottom line, however, is that for the position of the RFC Defendants to be upheld in those cases, the Missouri Court of Appeals is going to have to find

that the Missouri legislature intended for the consumer protections of the SMLA to apply only to Missouri headquartered banks while allowing foreign lenders to come here and ignore the SMLA. We are confident that the Missouri Court of Appeals will not agree with such an absurdity.[5]

Moreover, regardless of any SMLA claims, it the proposed settlement is wholly inadequate with respect to federal claims (and therefore subject to no preemption argument) held by Missouri borrowers. Under the Home Owners Equity Protection Act, borrowers obtaining high costs mortgage loans must receive a notice (known as the HOEPA notice) in advance of the closing which informs them that they are taking out a high cost loan, that their home is at risk and also disclosing, if a fixed rate loan, the annual percentage rate. See 15 U.S.C. §§ 1639(a)(1) and (a)(2). The HOPEA notice must be provided 3 days in advance of the closing. 15 U.S.C. § 1639(b)(1). The simple purpose is to make sure the borrower knows what he or she is getting into and to give them an opportunity to back out. Our investigation as to the named Plaintiffs and other Missouri borrowers indicates that they received no documents until closing – a plain violation of the HOEPA notice requirement. Under 15 U.S.C. § 1640(a)(1)(4), the damages for a failure to properly give the § 1639 HOPEA notice are "the sum of all finance charges and fees paid by the consumer." Again using the St. Clairs as an example, their listed finance charges are $130,244.65 and the total fees they were charged are $8,247. (Exhibit 1) Under the settlement the release of this claim is only worth, again, $575.[6]

---

[5] It certainly appears that the rush to get the Pennsylvania settlement finalized is part of an effort to beat the issuance of a decision from the Missouri Court of Appeals.

[6] While the statute of limitations for such a claim is one-year, 15 U.S.C. § 1640(e), because that statute of limitations is not jurisdictional, they are subject to equitable tolling. H. Ramadan v. The Chase Manhattan Corporation, 156 F.3d 499, 502 (3rd Cir. 1998). Further, the statue of limitations does not bar use of the violation as a defense for recoupment or set off in a collection

Because the proposed settlement is so inequitable, we strongly believe that there will be a substantial number of opt outs (hopefully every Missouri borrower). And it is the issue of opt outs that underscores the fallacy of the primary argument the RFC Defendants make to legitimize their request. The true basis for the stay is to get this suit and the undersigned counsel out of their way. What they say, however, is that judicial economy will be served as there is no need to allow this Missouri action to go forward because it "could be completely resolved by the nationwide settlement." (SIS Motion to Stay at p. 7) This claim is patently mistaken.

The proposed class included only those borrowers whose GNBT second mortgage loan is now held by the settling defendants, including primarily GMAC-Residential Funding Corporation. There are, however, loans made in Missouri by GNBT that are not held by the settling defendants. Thus, by definition, the Pennsylvania settlement does not include all those in this Missouri action and this fact supports denial of the stay. See May v. Smithlkine Beecham Clinical Laboratories, Inc., 710 N.E.2d 460, 465 (Ill. App. 1999) (refusing to stay state court class action in light of parallel federal court class actions where, among other things, complete relief to the state court class could not be provided in federal actions). There also are the opt outs and, again, those numbers should be very high given the inequity of the proposed settlement. Consequently, there will be Missouri borrowers to purse this Missouri case against these same defendants regardless of whether the Missouri action remains a class of 600 borrowers (the estimated total class) or just a handful or something in between. And regardless of the number of claimants, the issues will be the same. For this reason, a stay would not result in the saving of resources but it certainly would improperly delay the advancement of suit for the many Missouri borrowers that will remain in a this action.

---

proceeding. Finally, a State attorney general may commence an action to enforce a violation of §

Furthermore, the "economy of judicial and litigant resources" argument is premised upon the incorrect assumption of an ultimate approval of the Pennsylvania settlement. In fact, it is unlikely that the Pennsylvania settlement will be approved. For this additional reason a stay is not warranted.

Beyond the fairness challenges to the Pennsylvania settlement that will be made, including challenges headed up by the undersigned, the settlement faces substantial legal challenges. As the Supreme Court made clear, the criteria for certification of a settlement class are the same as the criteria for the general certification of a class action. Amchem Products Inc. v. Windsor, 521 U.S. 591, 619-20, 117 S.Ct. 2231 (1997) (with respect settlement only class certification, issues of management if a class matter were tried are not to be considered but otherwise the requirements of Rule 23(a) and (b)(3) must be met). Indeed, "proposed settlement classes sometimes warrant more, not less, caution on the question of certification." Id. at 620, n. 16. Thus, the Rule 23(a) numerosity, commonality, typicality and adequacy of representation elements must be met to certify a settlement class, as well as the Rule 23(b)(3) elements of predominance and superiority.

The claims sought to be certified in Pennsylvania settlement are every claim under the sun arising under state or federal law and for borrowers in any state. (Exhibit 2 at p. 8-9) The SMLA differs of course from those consumer protection and common law claims that exist under the laws of other states. This fact alone means certification of a nationwide class is unlikely. See e.g. Castano v. American Tobacco Company, 84 F.3d 734, 741 (5th Cir. 1996) (decertifying class action because of failure of trial court to consider variations in state law that "may swamp common issues and defeat predominance"); Dawson v. Dovenmuehle Mortgage Inc., 214 F.R.D.

---

1639 within three years from the violation.

8

196, 201 (E.D. Pa. 2003) (denying class certification of proposed nation wide class against mortgage servicing company for charging wrongful fees due to failure of plaintiff to establish that state law variances were minimal such that they would not present material obstacles to certification).

A review of the adequacy of representation issue yields a like result – no certification. It is beyond reasonable dispute that second mortgage borrowers from Pennsylvania have no business attempting to represent the interests of a Missouri borrower. Further, the named plaintiffs in the Pennsylvania action have an incentive to work against the interest of affected all other affected borrowers as under the terms of the proposed settlement, each named plaintiff will be paid an additional $1,500 if the settlement is approved.[7] (Exhibit 2 at p. 17)

Nor is it likely that the class counsel in Pennsylvania will be found to be adequate. They have not obtained and put in their settlement any class representative from Missouri (or any other state except Pennsylvania). Indeed, it is likely they have never even spoken with a Missouri GNBT borrower. To our knowledge, they have conducted no discovery relating to the Missouri claims. For no work to advance the claims of Missourians but instead for agreeing to settle the SMLA claims of the Missouri borrowers for a few hundred dollars – claims that could be worth tens of thousands of dollars – they are to get an $8.1 million dollars.[8] Fortunately, when the lawyers are trying to push through a collusive settlement and are driven by their fee rather than their clients' interests, such settlements will not stand. Reynolds v. Beneficial National Bank, 288 F.3d 277 (7th Cir. 2002).

---

[7] The majority of the named Plaintiffs in the Pennsylvania settlement (10 or 16 persons) are part of a married couple and so their "incentive" payment is really $3000 per household.
[8] Conspicuously absent from their suggestions in support is any mention of this already agreed upon fee for class counsel.

**Conclusion**

The stay request is just another piece of an overall scheme to force a wholly inadequate class action settlement down the throats of Missouri homeowners by getting this suit and the undersigned counsel out of the way. As previously noted, because remand to the Circuit Court of Clay County is proper, the stay request need not be ruled upon. Nonetheless, should this Court chose to rule on the stay request, we trust that it will refuse to be a part of furthering the collusive scheme of the plaintiffs and defense counsel in the proposed Pennsylvania settlement and will, accordingly, deny the request for a stay.

Dated: August 22, 2003

Respectfully Submitted,

WALTERS BENDER STROHBEHN
&. VAUGHAN, P.C.

By ___/s/ David M. Skeens_____
    J. Michael Vaughan - Mo. Bar 24989
    Kip D. Richards - Mo.  Bar 39743
    David M. Skeens -Mo.  Bar 35728

2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (Facsimile)

ATTORNEYS FOR PLAINTIFFS

10

OCT. 3. 2003  9:29AM    338AM                                                No. 495



# LEGG LAW FIRM, LLC.

*A Consumers' Rights Firm*

*Guaranty National Bank of Tallahassee customer*
Larry A Downs
40385 Delabrooke Rd
Mechanicsville, MD 20659

Dear Larry A Downs:

From a review of the County land records, we have determined that you entered into a loan agreement with Guaranty National Bank of Tallahassee ("Guaranty Bank"). You probably received a notice of a class action settlement against Guaranty Bank. **You will give up all your rights against Guaranty Bank and will automatically be included in the settlement unless you affirmatively say no by October 15, 2003.** The settlement is proposing to make a one time payment of between $250 to $900 depending on your individual loan. Legg Law Firm, LLC ("Legg") has reviewed *Guaranty Bank's* lending practices and has experience in litigating actions against this type of "mortgage lender". Legg believes that your claim may be worth much more than the settlement offer and that you should have someone review your settlement papers to determine whether the proposed settlement makes sense or whether you should receive more.

We can provide a free consultation and a free review of your Guaranty Bank's mortgage papers. Call us to meet or to arrange for other ways for us to review of your papers. Ultimately you have little if anything to lose because the settlement offer is so low. **Remember, pursuant to the class action notice you have very little time to decide if the settlement is acceptable to you. If you decide it is not, your election to be excluded must be received by October 15, 2003.**

Even if you have paid off your loan with *Guaranty Bank* you may still be eligible to recover damages. Please call Legg Law Firm, LLC toll free at **1888 LEGG LAW or 1888 534-4529** to set up the free consultation and mortgage review. You will need to bring with you all of your *Guaranty Bank's* settlement papers.

We look forward to hearing from you.

Sincerely,

*Scott C. Borison*

Scott C. Borison

Francis Scott Key Mall, 5500 Buckeystown Pike, Frederick, MD 21703 (p) 301.620.1016 (f) 301.620.1018
Valley Mall, 17301 Valley Mall Road, Hagerstown, MD 21740 (p) 301.416.3300 (f) 301.416.3330
Admitted in MD, DC & FL
www.legglaw.com

# TAB 6



# LEGG LAW FIRM, LLC.

*A Consumers' Rights Firm*

*Guaranty National Bank of Tallahassee customer*
Larry A Downs
40385 Delabrooke Rd
Mechanicsville, MD 20659

Dear Larry A Downs:

We previously sent you a letter about the class action settlement with Guaranty National Bank of Tallahassee ("Guaranty Bank"). It stated that you had until **October 15, 2003 but the opt out date is October 1, 2003.** You will give up all your rights against Guaranty Bank and will automatically be included in the settlement unless you affirmatively say no by October 1, 2003. They must receive the opt out by October 1, 2003. If you want to discuss this matter, you must act fast. You can contact us at toll free at **1888 LEGG LAW or 1888 534-4529.**

The settlement is proposing to make a one time payment of between $250 to $900 depending on your individual loan. Legg Law Firm, LLC ("Legg") has investigated Guaranty Bank's lending practices and has experience in litigating actions against this type of "mortgage lender". Legg believes that your claim may be worth much more than the settlement offer and that you should have someone review your settlement papers to determine whether the proposed settlement makes sense or whether you should receive more.

We can provide a free consultation and a free review of your Guaranty Bank's mortgage papers. Call us to meet or to arrange for other ways for us to review your papers. Ultimately you have little if anything to lose because the settlement offer is so low. Remember, pursuant to the class action notice you have very little time to decide if the settlement is acceptable to you. If you decide it is not, your election to be excluded must be received by October 1, 2003.

Even if you have paid off your loan with *Guaranty Bank* you may still be eligible to recover damages. Please call Legg Law Firm, LLC toll free at **1888 LEGG LAW or 1888 534-4529** to set up the free consultation and mortgage review. You will need to bring with you all of your *Guaranty Bank's* settlement papers. We look forward to hearing from you.

Sincerely,

*Scott C. Borison*

Scott C. Borison

Case # 03-0495

Francis Scott Key Mall, 5500 Buckeystown Pike, Frederick, MD 21703 (p) 301.620.1016 (f) 301.620.1018
Valley Mall, 17301 Valley Mall Road, Hagerstown, MD 21740 (p) 301.416.3300 (f) 301.416.3330
Admitted in MD, DC & FL
www.legglaw.com

# TAB 7

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

In re:

COMMUNITY BANK OF NORTHERN VIRGINIA        Case No. 03-425
AND GUARANTY NATIONAL BANK OF
TALLAHASSEE SECOND MORTGAGE LOAN            Hon. Gary L. Lancaster
LITIGATION

## DECLARATION OF R. BRUCE CARLSON

1.      My name is R. Bruce Carlson. The following Declaration is based upon my personal

knowledge and is made with full awareness by me of the potential penalties for perjury.

2.      I, along with A. Hoyt Rowell, III and Daniel Myers, am court-approved class counsel

in connection with the above litigation.

3.      I have personal knowledge regarding the coordinated opt-out campaign that is the

subject of the accompanying Joint Motion to Invalidate Solicited Opt-Outs and for Court Approved

Notice to Address False, Misleading and Deceptive Solicitations of Opt-Outs. Specifically, various

class members have contacted me and provided me with information relating to the opt-out

campaign.

4.      Among the participants in the opt-out campaign were two (2) lawyers from the Legg

Law Firm based in Frederick, Maryland. Specifically, attorneys Scott C. Borison and Mary T.

Szeluga, from the Legg Law Firm, signed solicitation letters which were mailed to class members

in the states of Maryland and Florida, and possibly in other states. Mr. Borison signed the letters that

were mailed to borrowers in Maryland and Ms. Szeluga, who is admitted to practice in the State of

Florida, signed the letters that were disseminated to Florida borrowers.

5.      In addition, class members in the State of Alabama received letters from the

Sharbrough Law Firm. These class members received solicitation materials similar to the materials

disseminated by Attorney Franklin Nix from Georgia.

6.    I, or other class counsel, have been contacted by class members from Florida and Alabama regarding the solicitation of opt-outs.

7.    Again, I make these assertions based upon my personal knowledge this 6th day of October, 2003.

R. Bruce Carlson



# LEGG LAW FIRM, LLC.

*A Consumers' Rights Firm*

ADVERTISEMENT
FOR LEGAL SERVICES AGAINST
COMMUNITY BANK

*Community Bank Customer*
Mary E Deliduka
9 Dogwood Dr
Shalimar, FL 32579-2243

Dear Mary E Deliduka:

If you have already retained a lawyer for this matter, please disregard this letter.

From a review of the County land records, we have determined that you entered into a loan agreement with Community Bank of Northern Virgina ("Community"). We have investigated Community's lending practices in different states including Florida and have found evidence that *Community* may have violated the Federal Truth in Lending Act. If Community violated these laws, you may be entitled to money damages if you have a loan or had a loan with the bank. There is a class action pending involving Community loans that will eliminate your rights if you don't opt out before October 1, 2003. A form for you to complete to opt out is enclosed if you chose to opt out.

We will be happy to review your mortgage papers. If we find a violation, then we would agree to proceed against Community on a one third contingency fee basis. You don't pay any legal fees unless we get something for you. The only cost you would be responsible for are the actual costs if the action has to be litigated in Court. In similar types of cases, we have found these costs to be minimal and are shared by all parties.

Even if you have paid off your loan with Community you may still be eligible to recover damages if *Community* violated the law. You can call our office toll free at **1 888 LEGG LAW or 1 888 534-4529** to arrange for a free review of your mortgage paperwork. You will need to provide all of your Community settlement papers.

We look forward to hearing from you.

Sincerely

*Mary T. Szeluga*
Mary T. Szeluga
Admitted   in   Florida   and   Maryland

Francis Scott Key Mall, 5500 Buckeystown Pike, Frederick, MD 21703 (p) 301.620.1016 (f) 301.620.1018
Valley Mall, 17301 Valley Mall Road, Hagerstown, MD 21740 (p) 301.416.3300 (f) 301.416.3330
Admitted in MD, DC & FL
www.legglaw.com

# TAB 8

September 30, 2003

**VIA EXPRESS MAIL**
**NEXT DAY DELIVERY**

CBNV-GNB Settlement Administrator
Post Office Box 12983
Birmingham, Alabama  35202—2983

>       **Re:    Notice of Opt Out of Class Settlement – *In re Community Bank of***
>       ***Northern Virginia and Guaranty National Bank Second Mortgage***
>       ***Loan Litigation* – Case No. 03-0425**

Dear Sir/Madam:

        Pursuant to Paragraph V.(3) of the "Notice of Class Action Settlement and Hearing" the undersigned hereby give you formal notice, effective immediately, that they choose to opt out of the proposed settlement and wish to be excluded. Please inform class counsel and counsel for defendants of this opt out and our retention of John W. Sharbrough, III as our counsel.

        Please be advised that the undersigned have retained as their legal counsel in this matter The Sharbrough Law Firm, 156 St. Anthony Street, Mobile, Alabama, 36603; Telephone No. (251) 432-1413; Facsimile (251) 432-5297; E-mail jws@sharbroughlawfirm.com. The undersigned hereby direct you, class counsel, and defendants' counsel to direct all further communications in this matter exclusively to Mr. Sharbrough.  Any violation of this direction will be reported to the Court and appropriate state and federal bar authorities.

        Thank you for your cooperation in this matter.

CBNV-GNB Settlement Administrator
September 30, 2003
Page 2


Dated this 27th day of September, 2003.


_Melba L. Brown_
ame of Borrower

_Malba L. Brown_
gnature of Borrower

_553 Riverside Drive_
ldress of Borrower

_Mobile Al. 36605_
y, State, & Zip Code

_1. 479-2716_
ephone Number


_Purlis R. Brown_
Name of Co-Borrower

_Charles R. Brown_
Signature of Co-Borrower

_2553 Riverside Drive_
Address of Co-Borrower

_Mobile Al. 36605_
City, State, & Zip Code

_251 479-2716_
Telephone Number

# TAB 9



**WALTERS**
**BENDER**
**STROHBEHN**
**VAUGHAN, P.C.**
ATTORNEYS AT LAW

September 18, 2003

### THIS IS NOT A NOTICE FROM THE COURT

ADVERTISING MATERIAL—COMMERCIAL SOLICITATIONS
ARE PERMITTED BY THE MISSOURI RULES OF PROFESSIONAL
CONDUCT BUT ARE NEITHER SUBMITTED TO OR APPROVED
BY THE MISSOURI BAR OR THE SUPREME COURT OF
MISSOURI

### READ THIS CAREFULLY BECAUSE THIS LETTER CONCERNS SUBSTANTIAL LEGAL RIGHTS RELATING TO YOUR HOME

To:    COMMUNITY BANK OF NORTHERN VIRGINIA ("CBNV") and
       GUARANTY NATIONAL BANK ("GNB") SECOND MORTGAGE BORROWERS:

## WHO WE ARE AND WHY WE ARE WRITING YOU?

For several years, our firm has been devoted to representing Missouri families that have been the victims of illegal second mortgage loans. As part of this representation, we have investigated the second mortgage loan practices of CBNV, GNB and many others. We direct this letter to Missouri residents that obtained second mortgage loans from either CBNV or GNB.

Recently, you may have received a "NOTICE OF CLASS SETTLEMENT AND HEARING" sent to second mortgage borrowers of CBNV or GNB, whose loans were purchased by Residential Funding Corporation ("RFC"), a GMAC subsidiary. That proposed nationwide class action settlement was filed in a Pennsylvania court and so we will refer to it as the "Pennsylvania Settlement." If you received this Notice, it means that without your approval or input, substantial claims that you may have relating to CBNV or GNB second mortgage loans may be settled for a few hundred dollars. For some Missouri borrowers, we believe that the Pennsylvania Settlement is inadequate and unfair. Unfortunately, you have little time to consider and act upon the options available to you. The Pennsylvania Settlement requires that to avoid being bound under the current settlement proposal, you must object or opt out of the settlement before October 1, 2003. We know this is short notice but we had to first conduct a painstaking search of the records of many Missouri counties just to identify those affected by this settlement. In any event, certain of our existing clients are going to intervene and file an objection in the Pennsylvania Court, and we write to see if you are interested in joining in that objection.

## WHAT'S GOING ON?

If you received the above mentioned Notice and do not object to or opt out of the settlement, you will get between $575 and $925 and never any more. In addition, you will forever give up the claims and important defenses relating to foreclosure and other issues that you may have under federal or Missouri law. Specifically, you may have federal law claims that entitle you to all fees and finance charges (including interest) that you have paid. There are also separate claims under Missouri's Second Mortgage Loan Act that, while called into doubt by recent court

Page 2

rulings, may be available to you.  Under a SMLA claim, the damages include the return of all interest paid and illegal charges, a bar to prevent the lender from collecting any future interest plus attorney's fees and other monetary recoveries. These federal and Missouri claims may be worth thousands or tens of thousands of dollars, while under the Pennsylvania Settlement, you are being offered only a few hundred dollars.

There are people who will do very well, however, in the Pennsylvania Settlement. The lawyers supposedly representing your interests in the Pennsylvania Settlement are seeking $8.1 million in fees and RFC has already agreed to pay them that amount.  In our opinion, RFC will also do very well as we believe that the value of the federal claims being released for which it could be liable may be hundreds of millions of dollars and yet under this Pennsylvania Settlement RFC pays a maximum of $32 million dollars.

**WHAT ARE YOUR OPTIONS?.**

In our view, you have three primary options. First, you can do nothing except as required by the Pennsylvania Settlement and you should receive between $575 to $925.

Second, you can opt out of the settlement and, if you wish, separately pursue your potential claims.  If you do that, you will receive nothing under the Pennsylvania Settlement.  Depending on your circumstances, however, you could have a claim for substantially more than is being offered. If you choose this option, please refer to the Notice for the precise details on how to do it.  We also suggest that you immediately contact an attorney because: (1) the letter notice conveying your opt out decision must be received by the settlement administrator by October 1, 2003 (and you must send a duplicate notice to class counsel Bruce Carlson, Esq.); and (2) your potential claims are subject to statutes of limitations, including a one-year limitation for certain federal claims.  Since October 1, 2003 is rapidly approaching, waste no time in acting if you want to opt out.

Third, and this is why we are writing, you may also file an objection with the Court in Pennsylvania.  As noted, we are going to file an objection on behalf of certain existing clients (others will opt out). We intend to object on the basis, among others, that the Pennsylvania Settlement pays too little for the claims being released and that the counsel for the class is inadequate. You will not lose your right to participate in the settlement by objecting and our effort could get you more money.  In our opinion, the more objectors we have the better our chance to increase the recovery of Missouri borrowers. However, it is possible, although in our opinion unlikely, that the objectors will cause the whole settlement to fail. If you have an interest in being part of the objection we will file, then we would like to further discuss this matter with you at absolutely no cost to you. You can contact me by e-mail (dskeens@wbsvlaw.com) or by calling our toll free message center at 1-800 330-2595; because the objection will be filed with the federal court in Pittsburgh no later than October 1, 2003, you must e-mail or call before noon on Friday, September 26, 2003.

Thank you for your attention and we look forward to further discussing this matter with those of you interested in joining in the objection.

Very truly yours,

WALTERS BENDER STROHBEHN & VAUGHAN, P.C.

David M. Skeens

# TAB 10

WALTERS
BENDER
STROHBEHN
VAUGHAN, P.C.
ATTORNEYS AT LAW

September 19, 2003

THIS IS NOT A COURT NOTICE

ADVERTISING MATERIAL—COMMERCIAL SOLICITATIONS ARE PERMITTED BY THE ILLINOIS RULES OF PROFESSIONAL CONDUCT BUT ARE NEITHER SUBMITTED TO OR APPROVED BY THE ILLINOIS BAR OR THE SUPREME COURT OF ILLINOIS

URGENT—THIS LETTER CONCERNS SUBSTANTIAL LEGAL RIGHTS RELATING TO YOUR HOME

To: COMMUNITY BANK OF NORTHERN VIRGINIA ("CBNV") and
GUARANTY NATIONAL BANK ("GNB") SECOND MORTGAGE BORROWERS:

**WHO WE ARE AND WHY WE ARE WRITING YOU?** I am an Illinois licensed attorney with the Kansas City, Missouri firm of Walters Bender Strohbehn & Vaughan. For several years, our firm has been devoted to representing Missouri families that have been the victims of illegal second mortgage loans. As part of this representation, we have investigated the second mortgage loan practices of CBNV, GNB and many others, including their activities in Illinois. We direct this letter to Illinois residents that obtained second mortgage loans from either CBNV or GNB.

Recently, you may have received a "NOTICE OF CLASS SETTLEMENT AND HEARING" sent to second mortgage borrowers of CBNV or GNB, whose loans were purchased by Residential Funding Corporation ("RFC"), a GMAC subsidiary. That proposed nationwide class action settlement was filed in a Pennsylvania court and so we will refer to it as the "Pennsylvania Settlement." If you received this Notice, it means that without your approval or input, substantial claims that you may have relating to CBNV or GNB second mortgage loans may be settled for a few hundred dollars. For some Illinois borrowers, we believe that the Pennsylvania Settlement is inadequate and unfair. Unfortunately, you have little time to consider and act upon the options available to you. The Pennsylvania Settlement requires that to avoid being bound under the current settlement proposal, you must object or opt out of the settlement before October 1, 2003. We know this is short notice but we had to first conduct a painstaking search of the records of many Illinois counties just to identify those affected by this settlement. In any event, certain of our existing Missouri clients are going to intervene and file an objection in the Pennsylvania Court, and we write to see if you are interested in joining in that objection.

**WHAT'S GOING ON?** If you received the above mentioned Notice and do not object to or opt out of the settlement, you will get between **$575 and $925 and never any more.** In addition, you will <u>forever</u> give up the claims and important defenses relating to foreclosure and other issues that you may have under federal or Illinois law. Specifically, you may have federal law claims that entitle you to all fees and finance charges (including interest) that you have paid. There are also separate claims under Illinois state law that, while called into doubt by recent court rulings, may also be available to you. These federal and/or Illinois claims may be worth thousands or tens of thousands of dollars, while under the Pennsylvania Settlement, you are being offered only a few hundred dollars.

There are people who will do very well, however, in the Pennsylvania Settlement. The lawyers supposedly representing your interests in the Pennsylvania Settlement are seeking $8.1 million in fees and RFC has already agreed to pay them that amount

*residen Fund Corp*

We also believe that the Pennsylvania Settlement is also a great deal for RFC. Under a federal law known as the Home Owners Equity Protection Act ("HOEPA"), 15 U.S.C. § 1641, companies like RFC that now hold your loan are liable for violations of law made by the originating lender, including federal claims like those under the Truth-In-Lending-Act ("TILA"). If the second mortgage loans made through GNB or CBNV violated federal laws requiring advance notice to the borrower (three days before closing) of the high cost ("APR") of the loan or failed to properly state the APR, then the lender and/or whoever now holds the loan are subject to substantial liability.

Either violation would entitle a borrower to recover all of your loan origination fees (again, typically 10% or more on GNB or CBNV loans) and virtually all of the loan payments you ever paid. 15 U.S.C. § 1640(a)(4). The borrower may also be entitled to a general TILA penalty of $200 to $2000. For example, a September of 2000 loan with closing fees of $2000 plus 3 years of payments at $500 per month and a TILA penalty of just $200 would yield damages of roughly $20,000. We are informed that there are some 44,000 loans in the Pennsylvania Settlement class and know that settlement the maximum total payout to be divided among all class members cannot exceed $33 million. If just 22,000 (one-half) of the borrowers in the class have these federal claims with, conservatively, only $15,000 in damages, the liability of RFC is $330 million. And yet they are paying each borrower just $575 to $925 with a maximum payout of $32 million—certainly you can see why RFC wants this settlement.

**WHAT ARE YOUR OPTIONS?** In our view, you have three primary options. First, you can do nothing except as required by the Pennsylvania Settlement and you should receive between $575 to $925.

Second, you can opt out of the settlement and, if you wish, separately pursue your potential claims. If you do that, you will receive nothing under the Pennsylvania Settlement. Depending on your circumstances, however, you could have a claim for substantially more than is being offered. If you choose this option, please refer to the Notice for the precise details on how to do it. We also suggest that you immediately contact an attorney because: (1) the letter notice conveying your opt out decision must be received by the settlement administrator by October 1, 2003 (and you must send a duplicate notice to class counsel Bruce Carlson, Esq.); and (2) your potential claims are subject to statutes of limitations, including a one-year limitation for certain federal claims. Since October 1, 2003 is rapidly approaching, waste no time in acting if you want to opt out.

Third, and this is why we are writing, you may also file an objection with the Court in Pennsylvania. As noted, we are going to file an objection on behalf of certain existing clients (others will opt out). We intend to object on the basis, among others, that the Pennsylvania Settlement pays too little for the claims being released and that the counsel for the class is inadequate. You will not lose your right to participate in the settlement by objecting and our effort could get you more money. In our opinion, the more objectors we have the better our chance to increase the recovery of Illinois borrowers. However, it is possible, although in our opinion unlikely, that the objectors will cause the whole settlement to fail. If you have an interest in being part of the objection we will file, then we would like to further discuss this matter with you at absolutely no cost to you. You can contact me by e-mail (hcarlson@wbsvlaw.com) or by calling our toll free message center at 1-800 330-2595; because the objection will be filed with the federal court in Pittsburgh no later than October 1, 2003, you must e-mail or call before noon on Friday, September 26, 2003.

Thank you for your attention and we look forward to further discussing this matter with those of you interested in joining in the objection.

Very truly yours,

WALTERS BENDER STROHBEHN &
VAUGHAN, P.C.

*Heather A Carlson*

Heather L. Carlson

# TAB 11

## EDELMAN, COMBS & LATTURNER, LLC
120 S. LaSalle Street, 18th floor
Chicago, Illinois 60603-3403
(312) 739-4200
(800) 644-4673
(312) 419-0379 (FAX)
Email: edcombs@aol.com
www.edcombs.com

**ADVERTISEMENT**

You may have or will shortly receive a notice of a settlement involving **Guaranty National Bank of Tallahassee.** The offer is for $500-$1000 per person.

You actually may be entitled to much more if you "opt out" and bring your own case. In particular, you may be able to rescind the loan and have all of your payments applied to principal instead of mostly to interest. You may also have a claim under the Illinois Interest Act for twice the total finance charges on your loan, whether or not paid.

If you are interested, please sign and fax the enclosed agreement to us. Also get us copies of your closing papers and the names and addresses of all companies to whom you have made payments on the loan. We are prepared to take the case on a wholly contingent basis.

You are not eligible if: (1) You filed a Chapter 7 after getting the loan. (2) You filed a Chapter 11, 12 or 13 after getting the loan and it was confirmed. (3) You did not live in the mortgaged property.

You also must opt out of the settlement. Opt outs must be received at these addresses by 10/1/03. We suggest you send your opt out by overnight mail today.

CBNV-GNB Settlement Administrator       R. Bruce Carlson
PO Box 12983       Specter, Specter Evans & Manogue
Birmingham AL 35202-2983       26th floor, Koppers Building
      Pittsburgh, PA 15219 — 412-642-2300

You only have a short time in which to act, so please do so immediately.

Sincerely,

/s/ Daniel A. Edelman
Daniel A. Edelman

**ADVERTISEMENT**

# EDELMAN, COMBS & LATTURNER, LLC
## 120 S. LaSalle Street, 18th floor
## Chicago, Illinois 60603-3403
## (312) 739-4200
## (800) 644-4673
## (312) 419-0379 (FAX)
## Email: edcombs@aol.com
## www.edcombs.com

## AUTHORIZATION

**Subject of representation:** The undersigned (CLIENT) retains and authorizes **Edelman, Combs & Latturner, LLC (ATTORNEYS)** to (i) investigate potential claims and defenses against **Guaranty Nat'l Bank of Tallahassee (DEFENDANTS)** concerning mortgage loan and (ii) if the attorneys' investigation shows that such a claim would have merit and that filing suit is appropriate, bring suit against Defendant and such other parties as the attorneys conclude may have liability.

**Fees.** Client and the attorneys agree that any further payment for fees for the attorneys' services to Client or expenses will be contingent upon effecting a recovery or successful result from the parties against whom the claims are brought.

The fee will be 1/3 of the benefit obtained for the client plus any additional amount the attorneys may be entitled to recover from the defendants under statutes providing for the award of attorney's fees against a defendant.

Out of pocket disbursements and expenses including the costs of computerized legal research will be reimbursed from a recovery first, prior to the division.

**Reduction** in the amount owed on the loan below the principal balance stated on the most recent statement on the loan is treated as recovery. This means that Client may have to pay attorney's fees from savings or any refinancing. If Client is unable to do either, the attorneys may be willing to take payment in installments secured by a mortgage of the same priority and with interest no greater.

**Expenses.** The attorneys will advance costs and litigation expenses including the costs of computerized legal research, in payable only from a recovery. Client will not have to pay fees or expenses of prosecution to Client's attorneys except as stated above.

**Assignment of right to fee award:** Client assigns to the attorneys all rights conferred by statute or rule to recover attorneys' fees from Defendant.

**Client responsibilities:** Client recognizes and agrees that Client will have to cooperate with the attorneys in the prosecution of the defenses and claims, by appearing at trial or at a deposition and providing documents and information. Such testimony will frequently take 1 to 1-1/2 days, Client also recognizes that the attorneys do not guarantee a favorable result, although the attorneys will use their best efforts to achieve those results.

Client is to advise the attorneys in advance of seeking any relief under the bankruptcy laws (which may result in transfer of Client's claim to a trustee).

Client will continue to make regular payments on the debt. However, Client will not pay off the debt or make other than regular payments without consulting the attorneys.

# TAB 12

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name:  COMMUNITY BANK OF NORTHERN VIRGINIA        Date: February 16, 1999
11417 SUNSET HILLS RD STE#228
RESTON, VA 20190

Re:  BCKB-60670

Borrower(s)    RUTH J. DAVIS

Property Address:  1206 STANFORD CT.
Coraopolis, PA 15108-4009

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be    15.456 %.

Your regular  Monthly    payment will be $ 285.50

☐  Your interest rate may increase.  Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $    N/A

I/We acknowledge we have read and received a copy of this disclosure statement.

_____    02/16/99
RUTH J. DAVIS                          Date                    _____    Date

_____    Date    _____    Date

_____    Date    _____    Date

_____    Date    _____    Date

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name:   COMMUNITY BANK OF NORTHERN VIRGINIA
11417 SUNSET HILLS RD STE#228
RESTON, VA 20190

Date: April 23, 1999

Re: SLK-68509

Borrower(s)   BRIAN W. KESSLER and CARLA M. KESSLER

Property Address:  6466 RT 908
Tarentum, PA 15084

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be   17.841 %.

Your regular Monthly   payment will be $ 456.23

☐ Your interest rate may increase.  Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $   N/A

---

I/We acknowledge we have read and received, seventy-two hours prior to settlement, a copy of this disclosure statement.

_BWK_

_____   04/23/99
BRIAN W. KESSLER              Date

_____   04/23/99   CMK
CARLA M. KESSLER             Date

_____
Date

_____
Date

_____
Date

_____
Date

_____
Date

_____
Date

# DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name: Guaranty National Bank of Tallahassee     Date:  August  8, 2000
          11417 Sunset Hills Road, Ste 105
          Reston, VA 20190
                                         Re:  DMF-257441

Borrower(s)   KATHLEEN A. ULRICH and RUSSELL K. ULRICH

Property Address: 515 FIELDCREST DR
                   Pittsburgh, PA 15209

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be   15.469 %.

Your regular  Monthly  payment will be $  528.04

☐ Your interest rate may increase.  Increases in the interest rate could increase your payment.
The highest amount your payment could increase is to $   N/A

---

I/We acknowledge we have read and received, three business days prior to settlement, a copy of this disclosure statement.

_Kathleen Ulrich_  8/8/00               _Russell K. Ulrich_  8/8/00
KATHLEEN A. ULRICH          /Date          RUSSELL K. ULRICH          /Date

_____  Date          _____  Date

_____  Date          _____  Date

_____  Date          _____  Date

**DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
AND THE FEDERAL RESERVE REGULATION Z
FOR SECTION 226.32 MORTGAGES**

Lender Name: Guaranty National Bank of Tallahassee
                11417 Sunset Hills Road, Ste 105
                Reston, VA 20190

Date:  May 31, 2000

Re:  BGJH-227907

Borrower(s)   REGINA A. TERRY and PAUL C. TERRY

Property Address: 7413 TOPAZ COVE
                   Memphis, TN 38125

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be   15.971 %.

Your regular  Monthly  payment will be $  720.81

☐ Your interest rate may increase. Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $   N/A

---

I/We acknowledge we have read and received, three business days prior to settlement, a copy of this disclosure statement.

_Regina A. Terry_  5/31/00        _Paul C. Terry_  5/31/00
REGINA A. TERRY     Date         PAUL C. TERRY     Date

_____ Date        _____ Date

_____ Date        _____ Date

_____ Date        _____ Date

**DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
AND THE FEDERAL RESERVE REGULATION Z
FOR SECTION 226.32 MORTGAGES**

Lender Name: COMMUNITY BANK OF NORTHERN VIRGINIA            Date: May 28, 1999
11417 SUNSET HILLS RD STE#228
RESTON, VA 20190

                                                                    Re: BKC-76412

Borrower(s)    REGINA A. TERRY and PAUL C. TERRY

Property Address: 7413 TOPAZ COVE
Memphis, TN 38125

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be    19.859 %.

Your regular Monthly    payment will be $ 411.96

☐ Your interest rate may increase. Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $    N/A

---

I/We acknowledge we have read and received, seventy-two hours prior to settlement, a copy of this disclosure statement.

_Regina A. Terry_                05/28/99            _Paul C. Terry_                05/28/99
REGINA A. TERRY                  Date              PAUL C. TERRY                  Date

_____                              _____
Date                                                 Date

_____                              _____
Date                                                 Date

_____                              _____
Date                                                 Date

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name: COMMUNITY BANK OF NORTHERN VIRGINIA
11000 BROKEN LAND PKW.
Columbia, MD 21044

Date:    October 15, 1999

Re:   NCG223352

Borrower(s)    ELLEN M. SABO and WILLIAM L. SABO JR

Property Address: 3812 CAMBRIA STREET
HOMESTEAD, PA 15120-3114

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be  17.390 %.

Your regular    Monthly       payment will be $    483.88

☐   Your interest rate may increase.  Increases in the interest rate could increase your payment.
The highest amount your payment could increase is to $   N/A.

I/We acknowledge we have read and received a copy of this disclosure statement at least three (3) business days prior to closing.

_____    10/15/99
ELLEN M. SABO              Date

_____    10/15/99
WILLIAM L. SABO JR         Date

_____    _____
Date

_____    _____
Date

_____    _____
Date

_____    _____
Date

_____    _____
Date

_____    _____
Date

## TRUTH-IN-LENDING DISCLOSURE (FOR SECTION 32 MOnᵢGAGES)

Date 9/9/2000

| NAME(S)/ADDRESS(ES) OF BORROWER(S) ('Borrower,' 'you' or 'your') | NAME(S)/ADDRESS(ES) OF LENDER (CREDITOR) ('Lender,' 'us' or 'our') |
|---|---|
| PATRICE M PORCO<br>805 CENTER AVE<br>PITTSBURGH, PENNSYLVANIA 15202 | Guaranty National Bank of Tallahassee<br>11417 Sunset Hills Road, Suite 105<br>RESTON, VIRGINIA 20190 |
| PROPERTY ADDRESS<br>805 CENTER AVE<br>PITTSBURGH, PENNSYLVANIA 15202 | LOAN NUMBER<br>GLP-01-0000008354 |

### NOTICE

**You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the Lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan.**

The **Annual Percentage Rate** on your loan will be          16.7196 %.

Your regular          **Monthly**          payment schedule will be:
                    (frequency)

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|
| 179 | $ 376.85 | 10/14/2000 |
| 1 | $ 374.71 | 9/14/2015 |
|  | $ |  |
|  | $ |  |
|  | $ |  |
|  | $ |  |

Variable rate is ☐ applicable   or   ☒ not applicable.

If "applicable" is checked, your interest rate may increase. Increases in the interest rate could increase your payment. For example, based on your loan amount of $          with an initial interest rate of          %, the maximum amount the interest rate can rise under this program is          percentage points, to          %. The monthly payment can rise from a first-year payment of $          to a maximum of $          in the          year.

### SIGNATURES

By signing below you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures in this form relate.

I/We acknowledge we have read and received, 3 days prior to settlement, a copy of this disclosure statement.

X _Patrice M. Porco_     9/9/00     X _____
PATRICE M PORCO          DATE                          DATE

X _____     X _____
                    DATE                          DATE

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name:   COMMUNITY BANK OF NORTHERN VIRGINIA
               11417 SUNSET HILLS RD STE#228
               RESTON, VA 20190

Date: April 30, 1999

Re: BCKB-62153

Borrower(s)   NORA H. MILLER

Property Address: 1610 SAHARA STREET
                  Buena Vista, PA 15018

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be   15.590 %.

Your regular Monthly   payment will be $ 419.06

☐ Your interest rate may increase. Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $   N/A

I/We acknowledge we have read and received, seventy-two hours prior to settlement, a copy of this disclosure statement.

_____ 04/30/99      _____
NORA H. MILLER              Date                                    Date

_____              _____
                           Date                                    Date

_____              _____
                           Date                                    Date

_____              _____
                           Date                                    Date

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name: COMMUNITY BANK OF NORTHERN VIRGINIA
11417 SUNSET HILLS RD STE#228
RESTON, VA 20190

Date: November 30, 1999

Re: BCJCH-147392

Borrower(s)    REBECCA J. PICARD and JOHN J. PICARD

Property Address: 5214 BECKY DR
PITTSBURG, PA 15236

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be    18.416 %.

Your regular Monthly    payment will be $ 670.07    .

☐ Your interest rate may increase. Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $    N/A    .

---

I/We acknowledge we have read and received, seventy-two hours prior to settlement, a copy of this disclosure statement.

_____  11/30/99    _____  11-30-99
REBECCA J. PICARD          Date      JOHN J. PICARD              Date

_____            _____
                           Date                                 Date

_____            _____
                           Date                                 Date

_____            _____
                           Date                                 Date

Date: 6/7/2001

# TRUTH-IN-LENDING DISCLOSURE  (FOR SECTION 32 MORTGAGES)

| NAME(S)/ADDRESS(ES) OF BORROWER(S) ("Borrower," "you" or "your") | NAME(S)/ADDRESS(ES) OF LENDER (CREDITOR) ("Lender," "us" or "our") |
|---|---|
| THOMAS T. MATHIS<br>1435 LASALLE AVE<br>PITTSBURGH, PENNSYLVANIA 15216 | Guaranty National Bank of Tallahassee<br>4601 Singer Court, Third Floor<br>CHANTILLY, VIRGINIA 20151 |
| PROPERTY ADDRESS<br>1435 LASALLE AVE<br>PITTSBURGH, PENNSYLVANIA 15216 | LOAN NUMBER<br>RDL-01-0000092494 |

## NOTICE

**You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the Lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan.**

The Annual Percentage Rate on your loan will be     17.2411 %.

Your regular     **Monthly**     payment schedule will be:
            (frequency)

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|
| 299 | $ 320.02 | 7/13/2001 |
| 1 | $ 299.60 | 6/13/2026 |
| | $ | |
| | $ | |
| | $ | |
| | $ | |

Variable rate is ☐ applicable  or  ☒ not applicable.

If "applicable" is checked, your interest rate may increase.  Increases in the interest rate could increase your payment.  For example, based on your loan amount of $                        with an initial interest rate of                  %, the maximum amount the interest rate can rise under this program is                  percentage points, to                  %.  The monthly payment can rise from a first-year payment of $                  to a maximum of $                  in the                  year.

SIGNATURES

By signing below you acknowledge receipt of a completed copy of this disclosure.  You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures in this form relate.
I/We acknowledge we have read and received, 3 days prior to settlement, a copy of this disclosure statement.

X  _~Thomas T. Mathis~ 6-7-01__  X  _____
   THOMAS T. MATHIS              DATE                      DATE

X  _____  X  _____
                          DATE                      DATE

© GREATLAND 1995
ITEM 8328L0 (9607R)

GREATLAND ■
To Order Call: 1-800-530-9393☐ Fax 616-791-1131

Date: 5/23/2001

## TRUTH-IN-LENDING DISCLOSURE (FOR SECTION 32 MORTGAGES)

| NAME(S)/ADDRESS(ES) OF BORROWER(S) ("Borrower," "you" or "your") | NAME(S)/ADDRESS(ES) OF LENDER (CREDITOR) ("Lender," "us" or "our") |
|---|---|
| STEPHEN R. HANEY<br>AMY L. HANEY<br>868 FLEMINGTON ST<br>PITTSBURGH, PENNSYLVANIA 15217 | Guaranty National Bank of Tallahassee<br>4501 Singer Court, Third Floor<br>CHANTILLY, VIRGINIA 20151 |

| PROPERTY ADDRESS | LOAN NUMBER |
|---|---|
| 868 FLEMINGTON ST<br>PITTSBURGH, PENNSYLVANIA 15217 | BSW-01-0000084046 |

### NOTICE

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the Lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan.

The **Annual Percentage Rate** on your loan will be        15.0957 %.

Your regular        **Monthly**        payment schedule will be:
                    (frequency)

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|
| 179 | $ 293.89 | 6/30/2001 |
| 1 | $ 290.68 | 5/30/2016 |
|  | $ |  |
|  | $ |  |
|  | $ |  |
|  | $ |  |

Variable rate is  ☐ applicable  or  ☒ not applicable.

If "applicable" is checked, your interest rate may increase. Increases in the interest rate could increase your payment. For example, based on your loan amount of $                  with an initial interest rate of                  %, the maximum amount the interest rate can rise under this program is                  percentage points, to                  %. The monthly payment can rise from a first-year payment of $                  to a maximum of $                  in the                  year.

By signing below you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures in this form relate.
I/We acknowledge we have read and received, 3 days prior to settlement, a copy of this disclosure statement.

X _____  5/23/01        X _____  5/23/01
STEPHEN R. HANEY        DATE        AMY L. HANEY        DATE

X _____                X _____
                        DATE                                DATE

© GREATLAND 1995
ITEM 8328L0 (9607R)

GREATLAND ■
To Order Call: 1-800-530-9393☐ Fax 616-791-1131

# TRUTH-IN-LENDING DISCLOSURE (FOR SECTION 32 MORTGAGES)

Date  2/13/2001

| NAME(S)ADDRESS(ES) OF BORROWER(S) ("Borrower," "you" or "your") | NAME(S)ADDRESS(ES) OF LENDER (CREDITOR) ("Lender," "us" or "our") |
|---|---|
| ALVIN L. PHIPPS<br>LINDA L. PHIPPS<br>200 PORTER DRIVE<br>SMITHVILLE, MISSOURI 64089 | Guaranty National Bank of Tallahassee<br>4601 Singer Court, Third Floor<br>CHANTILLY, VIRGINIA 20151 |
| PROPERTY ADDRESS<br>200 PORTER DRIVE<br>SMITHVILLE, MISSOURI 64089 | LOAN NUMBER<br>KB-01-0000038005 |

## NOTICE

**You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the Lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan.**

The Annual Percentage Rate on your loan will be          20.7779 %.

Your regular     **Monthly**     payment schedule will be:
                 (frequency)

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|
| 179 | $ 538.41 | 3/20/2001 |
| 1 | $ 533.07 | 2/20/2016 |
|  | $ |  |
|  | $ |  |
|  | $ |  |
|  | $ |  |

Variable rate is  ☐ applicable  or  ☒ not applicable.

If 'applicable' is checked, your interest rate may increase.  Increases in the interest rate could increase your payment.  For example, based on your loan amount of $                                    with an initial interest rate of                       %, the maximum amount the interest rate can rise under this program is               percentage points, to                 %.  The monthly payment can rise from a first-year payment of $                       to a maximum of $ in the                  year.

SIGNATURES

By signing below you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures in this form relate.
We acknowledge we have read and received, 3 days prior to settlement, a copy of this disclosure statement.

X _Alvin L Phipps 2-13-01_                    X _Linda L Phipps -2-13-01_
ALVIN L. PHIPPS                    DATE          LINDA L. PHIPPS                    DATE

X _____          X _____
                                  DATE                                        DATE

© GREATLAND 1995
ITEM 6328LG  (9607F)

GREATLAND ■
To Order Call 1-800-530-9393 ☐ Fax 616-791-1131

## TRUTH-IN-LENDING DISCLOSURE (FOR SECTION 32 MORTGAGES)

Date: 6/17/2001

| NAME(S)/ADDRESS(ES) OF BORROWER(S) ("Borrower," "you" or "your") | NAME(S)/ADDRESS(ES) OF LENDER (CREDITOR) ("Lender," "us" or "our") |
|---|---|
| JOHN A. ST.CLAIR JR.<br>ELIZABETH R. ST.CLAIR<br>800 NE LINDBERG DRIVE<br>KANSAS CITY, MISSOURI 64118 | Guaranty National Bank of Tallahassee<br>4601 Singer Court, Third Floor<br>CHANTILLY, VIRGINIA  20151 |

| PROPERTY ADDRESS | LOAN NUMBER |
|---|---|
| 800 NE LINDBERG DRIVE<br>KANSAS CITY, MISSOURI  64118 | GH-01-0000098438 |

### NOTICE

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the Lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan.

The Annual Percentage Rate on your loan will be          14.0354 %.

Your regular     Monthly     payment schedule will be:
                 (frequency)

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|
| 299 | $ 599.92 | 7/21/2001 |
| 1 | $ 593.57 | 6/21/2026 |
|  | $ |  |
|  | $ |  |
|  | $ |  |
|  | $ |  |

Variable rate is  ☐ applicable  or  ☒ not applicable.

If "applicable" is checked, your interest rate may increase. Increases in the interest rate could increase your payment. For example, based on your loan amount of $                with an initial interest rate of                percentage points, to                %, the maximum amount the interest rate can rise under this program is                %. The monthly payment can rise from a first-year payment of $          to a maximum of $          in the          year.

### SIGNATURES

By signing below you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures in this form relate.

I/We acknowledge we have read and received, 3 days prior to settlement, a copy of this disclosure statement.

X _John A. St Clair_ _3-17-01_     X _Elizabeth R St Clair_ _6-17-01_
JOHN A. ST.CLAIR JR.          DATE          ELIZABETH R. ST.CLAIR          DATE

X _____          X _____
                    DATE                              DATE

## TRUTH-IN-LENDING DISCLOSURE (FOR SECTION 32 MORTGAGES)

Date: 10/31/2001

| NAME(S)/ADDRESS(ES) OF BORROWER(S)("Borrower" "us" or "your") | NAME(S)/ADDRESS(ES) OF LENDER (CREDITOR) ("Lender" "we" or "our") |
|---|---|
| LORENE A. STARKEY<br>SHAWN V. STARKEY<br>146ᵗ SPRUCE AVE<br>LIBERTY, MISSOURI 64068 | Guaranty National Bank of 7      33566<br>4501 Singer Court, Third Flo...<br>CHANTILLY, VIRGINIA 20151 |

| PROPERTY ADDRESS | LOAN NUMBER |
|---|---|
| 1481 SPRUCE AVE<br>LIBERTY, MISSOURI 64068 | JGB-01-0000234474 |

### NOTICE

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the Lender will have a mortgage on your home. You could lose your home and any money you have put into it, if you do not meet your obligations under the loan.

The Annual Percentage Rate on your loan will be          14.9528 %.

Your regular      Monthly      payment schedule will be:
                  (freq. etc.)

| NO. OF PAYMENTS | AMOUNT OF PAYMENTS | PAYMENTS ARE DUE BEGINNING |
|---|---|---|
| 179 | $ 363.46 | 12/6/2001 |
| 1 | $ 361.47 | 11/6/2016 |
|  | $ |  |
|  | $ |  |
|  | $ |  |
|  | $ |  |

Variable rate is ☐ applicable   or   ☒ not applicable.

If "applicable" is checked, your interest rate may increase. Increases in the interest rate could increase your payment. For example, based on your loan amount of $                with an initial interest rate of           %, the maximum amount the interest rate can rise under this program is           percentage points, to           %. The monthly payment can rise from a first-year payment of $           to a maximum of $           in the           year.

SIGNATURES

By signing below you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures in this form relate.
I/We acknowledge we have read and received, 3 days prior to settlement, a copy of this disclosure statement.

X _~Lorene A. Starkey~_     10-31-01     X _~Shawn V. Starkey~_     10/31/01
  LORENE A. STARKEY          DATE          SHAWN J. STARKEY            DATE

X _____     _____     X _____     _____
                              DATE                                        DATE

© GREATLAND  2008
ITEM 8326LD (9607R)

GREATLAND ■
To Order Call: 1-800-530-9393  Fax 616-791-1131

## DISCLOSURE REQUIRED BY THE FEDERAL TRUTH-IN-LENDING ACT
## AND THE FEDERAL RESERVE REGULATION Z
## FOR SECTION 226.32 MORTGAGES

Lender Name:  COMMUNITY BANK OF NORTHERN VIRGINIA                    Date: February 2, 1999
              11417 SUNSET HILLS RD STE#228
              RESTON, VA 20190                                        Re: JMD-56945

Borrower(s)   LARRY E. CATON


Property Address:  24730 STAGHORN DR.
                   BEDFORD HEIGHTS, OH 44146

---

You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage on your home. You could lose your home, and any money you have put into it, if you do not meet your obligations under the loan.

The annual percentage rate on your loan will be    14.814 %.

Your regular  Monthly    payment will be $ 231.05

[ ]  Your interest rate may increase. Increases in the interest rate could increase your payment. The highest amount your payment could increase is to $    N/A

---

I/We acknowledge we have read and received a copy of this disclosure statement.

_Larry E Caton_  2/2/99
LARRY E. CATON              Date          _____  Date

_____  Date          _____  Date

_____  Date          _____  Date

_____  Date          _____  Date

# TAB 13

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MAY 3 1 2002

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

STEPHEN L. BRYANT et al.,

    Plaintiffs,

    v.

MORTGAGE CAPITAL RESOURCE
CORPORATION et al.,

    Defendants.

CIVIL ACTION

NO. 1:00-CV-671-BBM

## ORDER

This action, arising under the Truth in Lending Act ("TILA"), is currently

before the court on plaintiffs' motion for reconsideration [Doc. No. 55-1];

defendants' request for case management conference [Doc. No. 58-1]; and plaintiffs'

motions for class certification [Doc. No. 59-1], to dismiss defendants' counterclaims

[Doc. No. 60-1], to compel discovery [Doc. No. 63-1], and to extend time to file a

reply to defendants' response to the motion for class certification [Doc. No. 68-1].

Also before this court are defendants' motion for leave to file a surreply in further

opposition to plaintiffs' motion for reconsideration [Doc. No. 72-1]; defendants'

motions to strike plaintiffs' reply brief and to stay resolution of plaintiffs' motion for

class certification [Doc. Nos. 76-1, 76-2]; and plaintiffs' motion to exceed page

limitations [Doc. No. 78-1].

## I.   Factual Background[1]

Plaintiffs are consumers seeking to represent a class of approximately 4,700

borrowers who purchased high cost, high interest home equity loans from

Defendant Mortgage Capital Resource Corporation ("MCR"). Plaintiffs assert that

MCR engaged in a predatory lending scheme by targeting consumers with good

credit histories and encouraging them to complete loan applications over the phone.

Upon completion of the loan applications, MCR is alleged to have hurried plaintiffs

through the closing process, substituting high cost, high interest loans for the more

favorable loans originally applied for by plaintiffs. Plaintiffs contend that MCR's

"bait and switch" scheme was in violation of section 1639(b)(1) of TILA (as amended

by the Home Ownership and Equity Protection Act of 1994 ("HOEPA")).[2] *See* 15

U.S.C. § 1639; 12 C.F.R. §§ 226.31, 226.32.   Defendants Residential Funding

Corporation ("RFC") and Chase Manhattan Bank (as Indenture Trustee in care of

---

[1] In considering the motions listed above, the court adopts the facts as stated in its Order of January 14, 2002 [Doc. No. 54-1].  Any additional facts contained herein have been provided by the parties.

[2] By its enactment, HOEPA created special protections for a class of closed-end home equity loans made at high annual percentage rates or with excessive costs and fees. *See* National Consumer Law Center, TRUTH IN LENDING § 10.10.1, at 597 (4th ed. 1999) (hereinafter "TRUTH IN LENDING"). These protections include "new, three-day advance Miranda-like disclosures, prohibitions on certain abusive loan terms, increased statutory damages, and an extension of potential liability for assignees." *Id.*

- 2 -

RFC) purchased or were otherwise assigned MCR-originated high cost, high interest HOEPA loans.[3]  As such, plaintiffs seek to impose liability upon RFC through operation of section 1641(d)(1) of Title 15, which provides: "Any person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa) of this title shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the [originating] creditor of the mortgage . . . ."  15 U.S.C. § 1641(d)(1).

## II.    Discussion

### A.    Plaintiffs' Motion for Reconsideration

#### 1.    Legal Standard

By filing their motion for reconsideration, plaintiffs seek to invoke this court's authority to modify or vacate its prior order. *See Brogdon ex rel. Cline v. National Healthcare Corp.*, 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000) (Murphy, J.).  However, pursuant to Local Rule 7.2(E), motions for reconsideration "shall not be filed as a matter of routine practice." "Parties therefore may not employ a motion for reconsideration as a vehicle to present new arguments or evidence that should have been raised earlier, introduce novel legal theories, or repackage familiar arguments

---

[3] Because liability against Chase Manhattan Bank is founded solely upon its status as "Indenture Trustee," the court will refer only to RFC in addressing the above-listed motions.

to test whether the Court will change its mind." *Id.* (citation omitted); *Paper Recycling v. Amoco Oil Co.*, 856 F. Supp. 671, 678 (N.D. Ga. 1993) (Hall, J.). Such a motion should be "reserved for certain limited situations, namely the discovery of new evidence, an intervening development or change in the controlling law, or the need to correct a clear error or prevent a manifest injustice." *Preserve Endangered Areas of Cobb's History, Inc. v. United States Army Corps of Engineers*, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995) (O'Kelley, J.).

2.    <u>Procedural Background</u>

In its Order of January 14, 2002, this court granted RFC's motion to dismiss [Doc. No. 38-1] as it pertained to Plaintiff Diane Davis, finding that her claims failed to satisfy TILA's one-year statute of limitations.[4] Plaintiffs are now before the court seeking reinstatement of Ms. Davis's claims. In support of their motion for reconsideration, plaintiffs assert that: (1) the triggering date for Ms. Davis's claims under section 1640(e) should be the date her request for recission was rejected by RFC, not the date on which the parties entered into the loan transaction as was applied by the court; (2) the court erroneously dismissed Ms. Davis's state law

---

[4] Relying on 15 U.S.C. § 1640(e), the court held that, with respect to the named plaintiffs, TILA claims which accrued prior to March 15, 1999 (one year prior to the filing of the original complaint on March 15, 2000), were time-barred. The court further held that plaintiffs failed to allege facts sufficient to support the equitable tolling of TILA's one year statute of limitations period.

- 4 -

claims which do not fall under the purview of section 1640(e); and (3) plaintiffs'
claims should not be subject to an absolute bar date of March 15, 1999, because that
date fails to consider the alternate triggering date under section 1640(e), as well as
the timeliness of Ms. Davis's state law claims.    For the reasons stated below,
plaintiffs' motion for reconsideration is GRANTED in part and DENIED in part.

3.    <u>Triggering Dates under Section 1640(e)</u>

There are two potential means by which a court can compute the one-year
statute of limitations period for TILA damages under 15 U.S.C. § 1640(e).    The first
triggering date, applied in actions involving violations of TILA's disclosure
requirements, is often the date on which the parties entered into the loan
transaction. However, where the loans in question are subject to recission under
section 1635 (and a timely demand for recission is made) a second triggering date
exists. For this triggering date, the date on which the recission demand was denied
should be applied in determining whether a claim is time-barred under section
1640(e).[5]

---

[5] The failure of a lender to properly act when a timely recission demand is
issued can give rise to a new violation under TILA, separate and distinct from the
disclosure violation that gave rise to the right to rescind. *See Clay v. Johnson*, 77 F.
Supp. 2d 879, 885 (N. D. Ill. 1999), *rev'd on other grounds*, 264 F.3d 744 (7th Cir. 2001);
*see also* TRUTH IN LENDING § 6.13.2, at 403. Plaintiffs assert that such a violation is
controlled by the extended three-year statute of limitations period.

- 5 -

Here, plaintiffs assert that, even if Ms. Davis's claim for damages arising out of MCR's violation of section 1639(b)(1) is time-barred,[6] Ms. Davis can still maintain an action for damages under section 1640(e) because she made a timely recission demand in April 2000, and it was wrongfully denied. Plaintiffs contend, therefore, that Ms. Davis's claims fall well within the applicable three-year statute of limitations period. For support, plaintiffs direct this court to their demand for recission in Count VII of their First Amended Complaint [Doc. No. 3-1], which plaintiffs allege was rejected by RFC in May 2000. However, the record before the court does not reflect that plaintiffs' demand was ever rejected by RFC. Rather, RFC filed a timely Answer [Doc. No. 56-1] to plaintiffs' complaint (and recission demand), as well as a counterclaim for declaratory judgment, arguing that the right to rescind was not available to plaintiffs.[7] The record further reflects that plaintiffs subsequently revoked this demand by removing it from their Second Amended Complaint [Doc. No.34-1].[8] Plaintiffs now assert that, with respect to Ms. Davis,

---

[6] Section 1639(b)(1) requires the originating lender to provide all mandatory disclosures at least three days prior to the closing of the loans in question. *See* 15 U.S.C. § 1639(b)(1).

[7] In so doing, RFC effectively tolled its obligation under 15 U.S.C. § 1635 until proper determination could be made regarding the parties' rights respecting recission.

[8] Under certain circumstances, section 1635(a) of Title 15 permits a person to whom credit is extended to rescind the transaction by providing the creditor or

- 6 -

their general prayer for damages under section 1640(e) in their Second Amended

Complaint contemplates relief for both the failure to provide timely disclosures, as

well as RFC's subsequent denial of Ms. Davis's demand for recission.  However,

plaintiffs' Second Amended Complaint includes no mention of RFC's denial of

recission, nor does it contain a claim for damages based on the alleged denial of Ms.

Davis's request for recission.  Accordingly, the court finds that plaintiffs have

provided no basis for this court to reconsider its ruling dismissing Ms. Davis's claim

for damages under section 1640(e) for alleged TILA disclosure violations.

    4.    State Law Claims

    As noted above, the court, in its Order of January 14, 2002, held that claims

arising under section 1639(b)(1) of TILA and accruing prior to March 15, 1999, were

barred by section 1640(e) of the Act, which limits claims for violations of TILA's

disclosure requirements by providing that "[a]ny action under this section may be

bought in any United States district court . . . within one year from the date of

occurrence of the violation." 15 U.S.C. § 1640(e). Upon reviewing the allegations in

plaintiffs' Second Amended Complaint, the court determined that, of the four MCR

---

assignee with written notification of his intention to do so. *See* 15 U.S.C. § 1635(a);
12 C.F.R. § 226.23(a)(2). It is generally accepted that the filing of a complaint for
recission is sufficient notice of the borrower's intent to rescind. *See* TRUTH IN
LENDING § 6.10.3, at 384 & n.547. While plaintiffs maintain that Ms. Davis's demand
for recission remains in effect, plaintiffs' Second Amended Complaint clearly reflects
plaintiffs' intent to forego their right to recission in favor of money damages.

customers party to the present action, only Ms. Davis failed to satisfy the statute of

limitations requirement. As a result, the court granted "RFC's motion to dismiss

with respect to *that claim.*" *Bryant v. Mortgage Capital Res. Corp.*, No. 00-CV-671, 2002

WL 186147, at *6 n.32 (N.D. Ga. Jan. 14, 2002).

On February 1, 2002, fearing the court had applied section 1640(e)'s

limitations period to Ms. Davis's state law claims, plaintiffs filed a motion for

reconsideration, arguing that, in granting RFC's earlier motion to dismiss, the court

erred in concluding that Ms. Davis's state law claims were barred by TILA's one-

year statute of limitations. Instead, plaintiffs assert that Ms. Davis's state law claims

are properly governed by a longer statute of limitations period than claims governed

by section 1640(e).[9] The court agrees.[10] As this court previously held, Congress,

through the enactment of section 1641(d)(1), "provided an avenue, under federal

law, by which a plaintiff can seek relief from an assignee of a HOEPA loan for all

claims (including state law claims) which the plaintiff could have brought against

---

[9] While claims for damages resulting from alleged TILA disclosure violations are governed by a one-year statute of limitations period, *see* 15 U.S.C. § 1640(e), under Georgia law, the limitations period applicable to claims for common law fraud and claims arising under Georgia's Racketeer Influenced and Corrupt Organizations Act ("RICO") are four years and five years, respectively. *See* O.C.G.A. §§ 9-3-31, 16-14-8.

[10] In so holding, the court notes that the scope of its previous Order (and of RFC's motion to dismiss) was limited to consideration of plaintiffs' claims arising under section 1639(b)(1).

- 8 -

the original creditor." *Bryant*, 2002 WL 186147, at *5; *see also* TRUTH IN LENDING §

10.7.2, at 145 n.268.1 (4th ed. Supp. 2001) ("By its plain language, the statute does not

limit assignee liability to TILA or HOEPA violations . . . . This means that a

consumer could sue a holder of a HOEPA loan for state law or other federal law

violations . . . *without* raising any TILA/HOEPA claims.").[11] While Congress went

to great lengths to restrict the amount of damages awarded for claims made

permissible solely by section 1641(d)(1), *see* 15 U.S.C. § 1641(d)(2)(B), Congress made

no attempt to alter the statute of limitations already attached to those claims by

operation of state and federal law, nor was there an attempt to incorporate the one-

year statute of limitations provided for in section 1640(e). Because the court has

been made aware of no evidence or authority to support RFC's contention that

Congress intended to alter the statute of limitations periods governing plaintiffs'

state law claims through the application of section 1640(e), the court finds that Ms.

Davis's state law claims are not time-barred, and are, therefore, properly before this

court.

---

[11] Moreover, "where assignees are found to be liable, they will be subject to
the full range of claims which could have been asserted against the maker of the
loan[, including] liability for . . . fraud, consumer credit abuses, [and] RICO
violations . . . ." TRUTH IN LENDING § 10.7.3, at 624. However, through the enactment
of section 1641(d)(2), Congress expressly limited the amount of damages a plaintiff
could obtain in an action founded solely upon section 1641(d)(1). *See* 15 U.S.C.
§ 1641(d)(2); *see also* TRUTH IN LENDING § 10.7.3, at 624.

B.    Plaintiffs' Motion to Dismiss RFC's Counterclaims

1.    Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the non-moving party's claims for relief.  Fed. R. Civ. P. 12(b)(6); *Conley v. Gibson*, 355 U.S. 41, 47 (1957); *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the non-moving party.  *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983).

2.    RFC's Misrepresentation Claims

On February 1, 2002, RFC filed its Answer to plaintiffs' Second Amended Complaint, as well as two counterclaims alleging fraudulent and negligent misrepresentation.  RFC asserts that, at or before closing, plaintiffs were specifically informed that their loans were subject to assignment to other parties and that subsequent assignees of their loans would rely on their signed acknowledgments, stating that the required disclosures had been provided in accordance with HOEPA. RFC further alleges that, by signing these false-dated loan documents, plaintiffs fraudulently or negligently misrepresented that MCR timely provided the mandatory HOEPA disclosures in accordance with 15 U.S.C. § 1639(b)(1).  RFC

- 10 -

asserts that it reasonably relied on plaintiffs' alleged misrepresentations when it acquired plaintiffs' loans from MCR.   On February 25, 2002, plaintiffs filed the instant motion to dismiss RFC's counterclaims.

To state a claim for fraudulent misrepresentation under Georgia law, RFC must establish that: (1) plaintiffs made representations; (2) plaintiffs knew the representations were false; (3) the representations were made intentionally and for the purpose of deceiving RFC; (4) RFC reasonably relied upon plaintiffs' representations; and (5) plaintiffs' representations were the proximate cause of the damages incurred by RFC.  *See Williams v. Dresser Indus., Inc.*, 120 F.3d 1163, 1167 (11th Cir. 1997) (citing *Bacote v. Wyckoff*, 251 Ga. 862, 865, 310 S.E.2d 520, 523 (1984)).[12]  Here, RFC maintains that plaintiffs knowingly signed acknowledgments representing that the HOEPA disclosures had been provided in a timely fashion and knew that assignees were likely to rely on their representations.  From this, RFC concludes that plaintiffs intended subsequent assignees to rely on their falsified acknowledgments.

---

[12] By contrast, a claim for negligent misrepresentation focuses on negligence rather than intent.  *Prince Heaton Enter., Inc. v. Buffalo's Franchise Concepts, Inc.*, 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000) (Thrash, J.).  The elements of a claim for negligent misrepresentation are: (1) the negligent supply of false information to foreseeable persons, known or unknown; (2) the reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.  *See Hardaway Co. v. Parsons, Brinckerhoff, Quade, & Douglas, Inc.*, 267 Ga. 424, 426, 479 S.E.2d 727, 729 (1997).

- 11 -

In so arguing, however, RFC ignores the fundamental policies underlying 15 U.S.C. § 1641(d). As stated in this court's Order of January 14, 2002, section 1641(d)(1) was enacted to "allocate[] to the assignee the cost associated with the misconduct of the original lender in such instances where the assignee fails to inquire into or otherwise discover the deceptive and unlawful practices engaged in by the original lender." *Bryant*, 2002 WL 186147, at *5. By providing for assignee liability in this manner, Congress "intended to encourage investors in the secondary market for HOEPA loans to more carefully scrutinize the backgrounds and qualifications of those with whom they choose to do business." *Id.* To promote these overarching policies, Congress subjected assignees of high cost, high interest HOEPA loans to "all claims defenses that the consumer could assert against the creditor of the mortgage." 15 U.S.C. § 1641(d)(1).

Through their counterclaims, RFC now attempts to side-step liability under section 1641(d)(1), arguing that it reasonably relied on plaintiffs' acknowledgments attesting to the timely receipt of all HOEPA disclosures. RFC's attempt to shift responsibility to plaintiffs in this manner is seriously misguided. Upon purchase of MCR's HOEPA loans in the secondary market, RFC effectively stepped into the shoes of the originating lender, and as a result, opened itself up to liability for MCR's alleged misconduct, including the failure to provide plaintiffs with the

- 12 -

requisite three day "cooling off" period called for in 15 U.S.C. § 1639(b)(1). Because MCR controlled the document signing process at the time of closing, and therefore, was aware that plaintiffs' signed acknowledgments were false, RFC cannot now seek to avoid liability based on its alleged reliance upon plaintiffs' signed acknowledgments.

Moreover, were the court to sustain RFC's counterclaims, plaintiffs would be subject to potential liability for the predatory lending practices perpetrated by the original lender. At the same time, RFC would effectively be freed from its obligation to ensure TILA/HOEPA compliance by policing the secondary market. Such a result would undoubtedly run counter to both the underlying policy and plain language of TILA and would penalize unsuspecting borrowers overwhelmed by the high pressure sales tactics of unscrupulous lenders attempting to bypass TILA's "cooling off" period. Having thoroughly considered all arguments, the court finds that the facts as pleaded in RFC's counterclaim fail to state a claim for which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). Accordingly, plaintiffs' motion to dismiss is hereby GRANTED.

C.    Class Certification

1.    Legal Standard

Class determinations are governed by Rule 23 of the Federal Rules of Civil

Procedure. *See* Fed. R. Civ. P. 23. "A class action may be maintained only when it

satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the

alternative requirements of Rule 23(b)." *Rutstein v. Avis Rent-A-Car Systems, Inc.,*

211 F.3d 1228, 1233 (11th Cir. 2000) (quoting *Jackson v. Motel 6 Multipurpose, Inc.,* 130

F.3d 999, 1005 (11th Cir. 1995)). The initial burden of establishing the propriety of

class certification lies with the advocate of the class. *See id.* Thus, plaintiffs bear the

burden of demonstrating to the court that class certification is proper.

The district court's function is to perform a "rigorous analysis" of the

plaintiffs' asserted satisfaction of the requirements for class certification. *See General*

*Telephone Co. v. Falcon,* 457 U.S. 147, 161 (1982). In performing this function, the

court may look beyond the pleadings to the extent necessary, however, it "may not

properly reach the merits of a claim when determining whether class certification

is warranted." *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir. 1984).

2.    Rule 23(a)

Rule 23(a) allows for the maintenance of a class action only if all four of the

following requirements are satisfied: (1) "the class is so numerous that joinder is

impracticable"; (2) " there are questions of law or fact common to the class"; (3) "the

claims or defenses of the representative parties are typical of the claims or defenses

of the class"; and (4) "the representative parties will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a). "These four requirements are known

generally as numerosity, commonality, typicality, and adequacy of representation."

*Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 666 (N.D. Ga. 2001)

(Forrester, J.).

        a.    <u>Numerosity</u>

In their motion for class certification, plaintiffs represent that there are

approximately 4,700 members in the proposed class, identified from a listing of

HOEPA loans produced by RFC.[13] To satisfy the numerosity requirement, plaintiffs

_____

[13] The proposed class is comprised of the following:

> All persons who obtained from MCR, between October 1,
> 1995, and January 30, 2001, a closed-end home mortgage
> loan (whether now existing, or paid off through
> refinancing or foreclosure) that satisfied the HOEPA loan
> criteria stated in 15 U.S.C. §§ 1602(aa)(1) & (B), whereby (I)
> mandatory HOEPA disclosures were withheld from the
> borrowers pursuant to [MCR's allegedly] fraudulent
> scheme . . ., and (ii) the loan was purchased or otherwise
> assigned to [D]efendants RFC or Chase.   The Class
> excludes MCR and its current or former officers, directors,
> employees, or affiliates.

*Pls.' Mot. for Class Certification* at 2.  Plaintiffs further represent that there are several
hundred more potential class members not yet identified.

- 15 -

must proffer "some evidence or reasonable estimate of the number of class members." *See id.* (citing *Grimes v. Pitney Bowes, Inc.*, 100 F.R.D. 265, 269 (N.D. Ga. 1983) (Forrester, J.)). However, it is well-settled in this circuit that "[t]he basic question is practicability of joinder, not number of interested persons per se." *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).[14] Because mere numbers are not dispositive, the court should also examine "the size of the class, ease of identifying its members and determining their addresses, facility of making service on them if joined and their geographic dispersion." *Id.* Despite plaintiffs' failure to address many of the factors laid out above, the court is satisfied that plaintiffs' proposed class would be large enough to render joinder impracticable. As such, the court finds that plaintiffs have satisfied the numerosity requirement.

b.   <u>Commonality</u>

In contrast to the numerosity requirement addressed immediately above, the court does not find that plaintiffs have satisfied the commonality requirement of Rule 23(a). This requirement serves as a threshold "guidepost" for gauging the interrelatedness of the named plaintiffs' claims with those of the proposed class. *Falcon*, 457 U.S. at 157 n.13. A common issue is one that may be proved through the

---

[14] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

presentation of generalized proof applicable to the class as a whole, *see Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001), and the court must review the proffered evidence to determine whether this requirement has been satisfied. *See Nelson v. United States Steel Corp.*, 709 F.2d 675, 679 (11th Cir. 1983). Plaintiffs' burden at this stage "entails more than the [bare] assertion of [commonality] but less than a prima facie showing of liability." *Id.* at 680 (quoting *Gilchrist v. Bolger*, 89 F.R.D. 402, 406 (S.D. Ga. 1981)).

Here, plaintiffs maintain that the commonality requirement is easily satisfied because the core issue for each class member is identical, i.e., Did MCR withhold mandatory disclosures thereby denying class members the "cooling off" period required by TILA before closing their home loans? Plaintiffs further assert that MCR engaged in a pattern and practice of deception aimed at defrauding unsuspecting investors and that this fact can be proved simply by establishing a routine pattern of operation on the part of MCR. However, plaintiffs' briefs fail to identify what common "method of proof" would be used to establish MCR's alleged pattern of wrongful conduct other than referencing the face of the individual loan documents themselves and citing to the allegations set out in their Second Amended Complaint. *See Reid*, 205 F.R.D. at 667 n.14 (denying certification where plaintiffs failed "to show how proving the elements of their individual claims [would] also prove the claims

of the absent class members.") By contrast, RFC has successfully come forward with evidence suggesting that all plaintiffs were in fact provided with the mandatory disclosures in accordance with 15 U.S.C. § 1639(b)(1). In so doing, RFC has established that the only effective method available of proving that timely disclosures were not provided is through the presentation of individualized evidence indicating when each plaintiff in the class was provided with the required disclosure. Such a result, as a practical matter, would undoubtedly lead to the unmanageable and inefficient adjudication of individual factual issues requiring individual factual determinations. *See Jackson,* 130 F.3d at 1006.

Moreover, it is well-settled that commonality is not to be presumed, but instead must be subjected to a "rigorous analysis." *Reid,* 205 F.R.D. at 667 n.14. Here, plaintiffs have failed to come forward with evidence to support their assertions of commonality, and thus, have failed to carry their burden of establishing that the "common issue" in this action is susceptible to class-wide proof. *See Murray,* 244 F.3d at 811. Plaintiffs' failure in this regard renders the court unable to undertake the "rigorous analysis" required under the law. As such, the court finds that plaintiffs have failed to satisfy the commonality requirement of Rule 23(a).

- 18 -

c.    Typicality

As a threshold matter, Rule 23(a)'s typicality requirement seeks to ensure that a plaintiff is in fact a member of the class he or she seeks to represent. *See Machella v. Cardenas*, 653 F.2d 923, 926 (5th Cir. 1980). Typicality, along with commonality, "represent[s] the 'nexus' necessary between representatives and class members." *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 n.8 (11th Cir. 1992). While the requirements of commonality and typicality "tend to overlap," *Appleyard v. Wallace*, 754 F.2d 955, 959 (11th Cir. 1985), *overruled on other grounds by Green v. Mansour*, 474 U.S. 64 (1985), the Eleventh Circuit has explained that "commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Reid*, 205 F.R.D. at 666 (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).

To be a member of a particular class, a plaintiff must "possess the same interest and suffer the same injury shared by all members of the class he represents." *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 216 (1974). Moreover, "[a] sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th

- 19 -

Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985). Here, the predominant allegation

common to all potential class members is that MCR failed to provide them with the

requisite HOEPA disclosures in a timely fashion, thereby denying them the "cooling

off" period set out in 15 U.S.C. § 1639(b)(1). In this regard, there would appear to

be a sufficiently close nexus between "the individual characteristics" of plaintiffs'

own claims and those they seek to assert on behalf of the potential members of the

class. *Prado*, 221 F.3d at 1279. While the similarity of the individual legal theories

shared by the plaintiffs and the class at large are sufficiently similar, it is this court's

judgment that the factual differences, when applied to the class as a whole, will

render this case unmanageable and unfit for certification. However, the court

recognizes that the law in this circuit clearly states that "[t]he typicality requirement

may be satisfied despite substantial factual differences . . . when there is a 'strong

similarity of legal theories.'" *Murray*, 244 F.3d at 811 (quoting *Appleyard*, 754 F.2d at

958). Accordingly, despite the factual differences presented by the claims of the

putative class, the court finds that plaintiffs have satisfied Rule 23(a)'s typicality

requirement.[15]

---

[15] It should be noted, however, that the court reaches this conclusion with a
high degree of reluctance. It is well-settled that the requirements of commonality
and typicality "serve as guideposts for determining whether under the particular
circumstances maintenance of a class action is economical and whether the named
plaintiff's claim and the class claims are so interrelated that the interests of the class
members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S.

### d.    Adequacy of Representation

"The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985). In addition, the court's consideration of adequacy of representation should include: (1) "whether the named plaintiffs 'possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative'"; (2) "whether the named plaintiffs have 'demonstrated [s]ufficient participation in and awareness of the litigation'"; and (3) "whether the named plaintiffs have the ability to fund the litigation." *Shelley v. AmSouth Bank*, 2000 WL 1121778, at *5 (S.D. Ala. 2000) (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726-27 (11th Cir. 1987), *cert. denied*, 485 U.S. 959 (1988)). The purpose of these requirements is to protect the legal rights of absent class members as "all members of the class are bound by the res judicata effect of the judgment." *Kirkpatrick*, 827 F.2d at 726.

Despite carrying the burden of establishing the adequate representation

---

at 157 n. 13. It is this court's belief that neither judicial economy, nor the interest of putative class members, is promoted where, as here, it has not been established that the predominate allegations can be proved through the presentation of class-wide proof due to the markedly disparate circumstances underlying the individual claims of the putative class.

- 21 -

requirement, plaintiffs largely ignore the adequacy requirements of Rule 23(a)(4)

laid out above, asserting only that Milberg, Weiss, Bershad, Hynes, & Lerach, L.L.P.,

"is highly-experienced in prosecuting complex class action litigation" and that

"Franklin R. Nix is an experienced Georgia trial lawyer in complex commercial

litigation and class action."[16] Plaintiffs' failures in this regard only serve to add to

this court's concern regarding the manner in which this case has been conducted

thus far.[17] "Adequacy, like every other fact necessary for class certification, must be

---

[16] For support, plaintiffs' counsel offers the twenty-seven page firm resume of Milberg, Weiss, Bershad, Hynes, & Lerach, L.L.P., and states that Mr. Franklin Nix has been a member of the State Bar of Georgia for twenty-nine years, eighteen of which were with the law firm Alston & Bird. In response to RFC's arguments regarding plaintiffs' failure to satisfy Rule 23(a)(4), plaintiffs have, with the affidavits accompanying their reply, demonstrated their participation in and awareness of this litigation.

[17] Specifically, with their reply (which impermissibly exceeds the limits set out in Local Rule 7.1(D) by ten pages), plaintiffs have submitted affidavits and other new evidence in an attempt to satisfy the requirements of Fed. R. Civ. P. 23 discussed herein. In so doing, plaintiffs have demonstrated what the court can only conclude is a lack of regard for the rules that govern this court and judicial proceedings in general. See Reid, 205 F.R.D. at 678 n.30 ("As a general rule, a party may not submit evidence with a reply that was available but not included with the original motion."); Local Rule 7.1(D) ("If the movant files a reply, the reply brief may not exceed fifteen (15) pages[,]" absent prior permission of the court.); Local Rule 26.2(C) ("Any party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert . . . .").

In responding to plaintiffs' new evidence, RFC has filed an "emergency motion" to strike plaintiffs' reply or, in the alternative, to respond to plaintiffs' new evidence and arguments. While the court finds it unnecessary to add to the many filings already submitted, and therefore, DENIES RFC's motion to file a surreply, the

proved by the plaintiff and proved with facts, not conclusions." *Shelley*, 2000 WL 1121778, at *5 (citing *Morrison v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985)). Nonetheless, having already concluded that this case is unfit for class certification for the reasons stated herein, the court finds it unnecessary to rely on plaintiffs' failure to satisfy Rule 23(a)(4) in denying plaintiffs' motion. *See Reid*, 205 F.R.D. at 678.

      3.    <u>Fed. R. Civ. P. 23(b)</u>

As stated above, plaintiffs must satisfy the requirements of both Rule 23(a) and Rule 23(b) to establish the propriety of class certification in a given case. As a result, the court's foregoing discussion disposes of the certification issue. Even so, assuming *arguendo* that plaintiffs could satisfy the requirements of Rule 23(a), the court finds that their motion fails the requirements for class certification laid out in Rule 23(b).

      a.    <u>Rule 23(b)(3)</u>

Plaintiffs first urge the court to certify their proposed class under Fed. R. Civ. P. 23(b)(3), which provides:

---

court will consider the arguments raised by RFC in its memorandum of law attached to the motions mentioned above. Furthermore, the court hereby DENIES RFC's motion to strike plaintiffs' reply brief, as plaintiffs have filed (albeit three weeks late) a motion to suspend Local Rule 7.1(D). However, as discussed below, the court properly disregards the testimony of plaintiffs' alleged expert witness Mr. Larry S. Murphy ("Mr. Murphy"), contained therein. *See infra* note 18.

> An action may be maintained as a class action if . . . the
> court finds that the questions of law or fact common to the
> members of the class predominate over any questions
> affecting only individual members, and that a class action
> is superior to other available methods for fair and efficient
> adjudication of the controversy.

The rule further provides the following non-exhaustive list of factors pertinent to the

finding of superiority: (1) the interest of class members in individually controlling

the prosecution of the claims; (2) the extent and nature of any other pending actions

concerning the same controversy already commenced by class members; (3) the

desirability or undesirability of the chosen forum; and (4) potential difficulties in the

management of this case as a class action. *See* Rule 23(b)(3). In addition, "[t]hat

common questions of law or fact predominate over individualized questions means

that 'the issues in the class action that are subject to generalized proof, and thus

applicable to the class as a whole, must predominate over those issues that are

subject only to individualized proof.'" *Avis*, 211 F.3d at 1233 (quoting *Kerr v. City

of West Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989)). "The Rule 23(b)(3)

predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation," *Amchem Products, Inc. v. Windsor*, 521 U.S.

591, 623 (1997), and "is 'far more demanding' than Rule 23(a)'s commonality

requirement." *Avis*, 211 F.3d at 1233 (quoting *Jackson*, 130 F.3d at 1005). The court

must evaluate the alleged cause of action and determine "what value the resolution

- 24 -

of the class-wide issue will have in each class member's underlying cause of action."

*Id.* at 1234.

Plaintiffs argue that their proposed class satisfies the requirements of Rule 23(b)(3) because the common issue, i.e., when each class member received the mandatory TILA disclosures, can be proved with evidence establishing a pattern and practice of denying potential borrowers the three day "cooling off" period required by 15 U.S.C. § 1639. Plaintiffs further assert that MCR's wrongful conduct can be proved through the presentation of "uniform sales material and loan documents" and testimony from former MCR employees, as well as through the testimony of Mr. Murphy, a Certified Public Accountant, who plaintiffs maintain has experience with loan file reviews and related document review methodologies.[18]

---

[18] As noted previously, it is inappropriate, as a general rule, to "submit evidence with a reply that was available but not included with the original motion." *Reid*, 205 F.R.D. at 678 n.30. Here, in the response to plaintiffs' motion for class certification, RFC relied heavily on plaintiffs' failure to come forward with record evidence establishing that the potential class members' claims could be proved through the presentation of generalized or class-wide proof. In addition, RFC presented affidavit testimony of former MCR employees, which, in the court's view, severely undermined plaintiffs' bald assertions that a pattern and practice of wrongful conduct by MCR could be established simply by examining the face of the loan documents submitted by plaintiffs and the other potential class members.

In their reply, plaintiffs, for the first time (and in violation of Local Rule 26.2(C)), rely on the testimony of Mr. Murphy, plaintiffs' purported expert, for help in proving pattern and practice. It is evident to this court that Mr. Murphy's testimony could have, and more importantly, should have been presented in plaintiffs' initial motion for class certification. By presenting testimony which raises new arguments relating to the predominate issue in their reply, plaintiffs effectively

- 25 -

With this evidence, plaintiffs attempt to rebut RFC's proffer which effectively calls

into question plaintiffs' ability to establish a pattern or practice with class-wide or

generalized proof. *See Avis*, 211 F.3d at 1233; *Murray*, 244 F.3d at 811. RFC counters

that plaintiffs have failed to prove that questions common to the members of the

class predominate over questions only affecting members of the class because there

has been no showing that plaintiffs can prove, on a class-wide basis, when each

individual class member received the required disclosures. The court agrees.

Because proof of plaintiffs' claims can only be resolved plaintiff-by-plaintiff,

requiring "distinctly case-specific inquiries into the facts surrounding each alleged

---

denied RFC a full and fair opportunity to depose Mr. Murphy and name its own
expert for purposes of rebuttal. *See* Local Rule 26.2(C). The court further notes that
Mr. Murphy's testimony is not limited to addressing previously unforeseen issues,
nor does it merely serve to clarify already existing arguments raised in RFC's
response brief. Instead, it is apparent to the court that plaintiffs retained Mr.
Murphy in a last-ditch effort to satisfy their burden. While plaintiffs may assert that
the purpose of Mr. Murphy's testimony is to rebut the affidavit testimony presented
in RFC's response, the court notes that Mr. Murphy's testimony is more
appropriately characterized as an attempt to remedy plaintiffs' earlier decision to
rest on the allegations of their complaint to establish class certification. Because
plaintiffs improperly raise new issues and arguments in their reply (arguments
which were readily available to plaintiffs when they initially moved for class
certification) and failed to comply with the requirements of Local Rule 26.2(C), this
court will disregard Mr. Murphy's affidavit testimony. *See Reliance Ins. Co. of Ill., Inc.
v. Richfield Hospitality Servs., Inc.*, 92 F. Supp. 2d 1329, 1331-32 (N.D. Ga. 2000)
(Carnes, J.); *United States v. Ga. Dept. of Natural Res.*, 897 F. Supp. 1464, 1471 (N.D.
Ga. 1995) (Forrester, J.) (refusing to consider arguments raised for the first time in
a reply brief).

[disclosure violation,]" *Jackson*, 130 F.3d at 1006, the court finds that individual, and not common, issues predominate.[19]

Rule 23(b)(3) further requires a court to consider whether "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). Where, as here, individual issues have been found to predominate, "an action conducted nominally as a class action [will ultimately] degenerate in practice into multiple lawsuits separately tried," diminishing the superiority and efficiency of the class action device and creating numerous manageability problems. *Reid*, 205 F.R.D. at 682 (quoting *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)). The risk that this potential class action will "degenerate" into a series of mini-trials is further magnified by the presence of plaintiffs' state law claims for common law fraud and violations of Georgia's RICO statute. Resolution of these claims on a class-wide basis would

_____

[19] In arguing that common issues predominate, plaintiffs rely heavily on the allegations contained in their Second Amended Complaint, their own affidavits, and the testimony of former MCR employees. Moreover, plaintiffs maintain that a pattern and practice of wrongful conduct can be proved through the presentation of MCR loan documents. However, the court finds that RFC has successfully rebutted plaintiffs' proffer in this regard through the presentation of plaintiffs' signed HOEPA Acknowledgment forms, confirming the receipt of all required disclosures, and the affidavit testimony of former MCR employees, detailing MCR's purported compliance with TILA's disclosure requirements. While plaintiffs have, in their reply, responded to RFC's proffer with evidence to the contrary, they have failed to carry their burden of establishing that the key issue in the instant action is susceptible to generalized proof.

- 27 -

entail addressing each claim's elements of proof plaintiff-by-plaintiff. In addition,

because both state law claims forwarded by plaintiffs require proving the elements

of materiality and reliance, they are particularly unsuited for class treatment. *See*

*Andrews v. American Telephone & Telegraph Co.*, 95 F.3d 1014, 1025 (11th Cir. 1996);

*Chilton Water Auth. v. Shell Oil Co.*, No. Civ. A. 98-T-1452-N, 1999 WL 1628000, at *7

(M.D. Ala. May 21, 1999). Moreover, despite plaintiffs' assertion that a calculation

of actual damages, with respect to these claims, should be "relatively

straightforward," the court finds "[t]he idea that individual injury could be settled

on a class-wide basis is [somewhat] preposterous." *Shelley*, 2000 WL 1121778, at *7

(quoting *Avis*, 211 F.3d at 1239). More importantly, the court notes that, other than

forwarding bald assertions, plaintiffs have failed to provide any insight or

suggestion as to how actual and punitive damages can be calculated on a class-wide

basis. "[I]t is no answer to say they will be resolved later in some unexplained or

uncertain manner." *Id.* at *8 (citing *Andrews*, 95 F.3d at 1014).

Finally, RFC asserts that this case is inherently inappropriate for class

treatment because the court will be forced to determine whether the claims of the

proposed class members are timely, tolled, or time-barred. The court agrees.

Because the proposed class includes borrowers of HOEPA loans as far back as

October 1, 1995, the court will undoubtedly be faced with examining the specific

- 28 -

factual circumstances of *all* of the proposed class members' federal and state law claims to determine whether they have been timely filed. Indeed, in its Order of January 14, 2002, this court recognized this difficulty when it refused to grant RFC's motion to dismiss the time-barred claims of absent class members, finding that potential differences in their individual factual circumstances precluded a grant of dismissal.

As this circuit has made clear, when there are no predominant common issues of law or fact, "class treatment [is] either singularly inefficient . . . or unjust." *Jackson*, 130 F.3d at 1006 n.12. "The greater the number of individual determinations that must be made, the less manageable a class action becomes." *Andrews*, 95 F.3d at 1024-25. Similarly, "[t]he greater the number of individual issues, the less likely [it is that Rule 23] superiority can be established." *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996). Here, the court is satisfied that the individual issues identified above cannot be established with generalized proof, but instead would require a substantial individualized examination of each potential class member, rendering this action unfit for certification. Accordingly, the court finds that plaintiffs have failed to satisfy their burden under Rule 23(b)(3).

b.   Rule 23(b)(2)

Plaintiffs further assert that certification is proper pursuant to Rule 23(b)(2), which allows for the maintenance of a class action where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Although the rule speaks only to injunctive and declaratory relief, the Eleventh Circuit has previously held that "[m]onetary relief may be obtained in a Rule 23(b)(2) class action so long as the predominant relief sought is injunctive and declaratory." *Murray*, 244 F.3d at 812. Unless it is merely "incidental" to the injunctive and declaratory relief sought, the monetary relief sought will be deemed to predominate, and certification under Rule 23(b)(2) will not be permitted. *See id.*  Here, the relief sought by plaintiffs is undoubtedly "damage-oriented," *In re Consolidated "Non-Filing Insurance" Fee Litigation*, 195 F.R.D. 684, 695 (M.D. Ala. 2000) (finding that the "[i]ndividual damages for the TILA and RICO violations pale into insignificance when compared with the declaratory and injunctive relief to which the class would be entitled, should it prevail."), as monetary relief remains the sole remedy sought by plaintiffs. That plaintiffs now seek to modify the nature of the relief sought, in an attempt to

- 30 -

satisfy Rule 26(b)(2), by asserting that it is in fact "restitutionary" in kind is unpersuasive. However, even if the court were to accept plaintiffs' assertion that an award of monetary damages will merely serve to restore plaintiffs to the position they would have been in but for MCR's wrongful conduct, the court cannot overlook plaintiffs' prayer for punitive damages, which is entirely "[in]consistent with the equitable orientation of Rule 23(b)(2)." *Id.* Accordingly, the court finds that plaintiffs have failed to satisfy their burden under Rule 23(b)(2). Because plaintiffs have failed to satisfy the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b), the court finds that the present action is unfit for class certification. Accordingly, plaintiffs' motion for class certification is hereby DENIED.

III.    <u>Summary</u>

For the reasons stated herein, plaintiffs' motion for reconsideration [Doc. No. 55-1] is GRANTED in part and DENIED in part. Defendants' request for a case management conference [Doc. No. 58-1] is hereby GRANTED. Plaintiffs' motion for class certification [Doc. No. 59-1] is hereby DENIED; plaintiffs' motion to dismiss defendants' counterclaim [Doc. No. 60-1] is hereby GRANTED; plaintiffs' motion to compel discovery [Doc. No. 63-1] is hereby DENIED; plaintiffs' motion to extend time to file a reply to defendants' response to the motion for class certification [Doc.

No. 68-1] is hereby GRANTED.  Additionally, defendants' motion for leave to file

a surreply in further opposition to plaintiffs' motion for reconsideration [Doc. No.

72-1] is hereby DENIED; defendants' motions to strike plaintiffs' reply brief [Doc.

No. 76-1] and to stay resolution of plaintiffs' class certification motion [Doc. No 76-2]

are hereby DENIED.  Plaintiffs' motion to exceed page limitations [Doc. No. 78-1]

is hereby GRANTED.

SO ORDERED, this 31st day of May, 2002.


BEVERLY B. MARTIN
United States District Judge

# TAB 14

2003 WL 22002779
--- S.W.3d ---
(Cite as: 2003 WL 22002779 (Mo.App. W.D.))
C

Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. IT MAY BE SUBJECT TO A MOTION FOR REHEARING OR TRANSFER. IT MAY BE MODIFIED, SUPERSEDED OR WITHDRAWN.

Missouri Court of Appeals,
Western District.

Richard A. AVILA and Dana Avila, Appellants,
v.
COMMUNITY BANK OF VIRGINIA, et al,
GMAC-Residential Funding Corporation, US
Bank Trust NA as Trustee for FirstPlus Home Loan
Trust 1996-2, FirstPlus Home
Loan Owner Trust 1996-3, 1996-4, 1997-1, and
Ace Securities Corporation Home
Loan, Trust 1999-A, EquityPlus Financial, Inc.,
U.S. Bank NA, US Bank NA ND,
FirstPlus Home Loan Owner Trusts 1997-2,
1997-3, 1997-4, 1009-1, 1998-2, 1998-
3, 1998-4, 1998-5, Respondents.

No. WD 61568.

Aug. 26, 2003.

Mortgagors appealed order of the Circuit Court, Jackson County, James D. Williamson, Jr., J., dismissing their Second Mortgage Loan Act (SMLA) action for failure to state a claim. The Court of Appeals, Hardwick, J., held that: (1) order was appealable, and (2) mortgagors failed to state claim under SMLA.

Affirmed.

West Headnotes

[1] Appeal and Error ⚖➡78(3)
30k78(3)

Dismissal of mortgagors' Second Mortgage Loan Act (SMLA) cause of action against mortgagee and its assignee without prejudice for failure to state a claim was final and appealable, where mortgagors opted not to refile or further amend petition. V.A.M.S. § 408.231 et seq.; V.A.M.R. 67.01.

[2] Appeal and Error ⚖➡78(3)
30k78(3)

Because it leaves open the prospect of a future determination, a dismissal without prejudice generally is not a final judgment and, therefore, is not appealable.

[3] Appeal and Error ⚖➡78(3)
30k78(3)

An exception to general rule that dismissal without prejudice is not final and appealable arises when a petition is dismissed without prejudice for failure to state a claim on which relief can be granted and the plaintiff elects not to refile or amend the pleadings; if a plaintiff takes no action to correct petition, effect of court's decision is to dismiss cause of action and not merely the pleading , and dismissal operates as a final determination on merits and, therefore, may be appealed.

[4] Consumer Credit ⚖➡11
92Bk11

Mortgagors failed to state claim under Second Mortgage Loan Act (SMLA) against mortgagee and assignee, where no allegation or inference was made that the interest rate charged on loan secured by a second mortgage was unlawful, and interest rate of 13.5 percent was less that 20.04 percent rate allowable. V.A.M.S. § 408.231 et seq.

[5] Pretrial Procedure ⚖➡622
307Ak622

A motion to dismiss is an attack on the petition and solely a test of the adequacy of the pleadings.

[6] Appeal and Error ⚖➡863
30k863

[6] Appeal and Error ⚖➡919
30k919

Upon review of an order granting a motion to dismiss, appellate court must determine if the facts pleaded and the reasonable inferences therefrom state any grounds for relief; court assumes the factual allegations are true and makes no attempt to weigh credibility or persuasiveness.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22002779                                                          **Page 2**
(Cite as: 2003 WL 22002779 (Mo.App. W.D.))

[7] Appeal and Error ⚖⇒863
30k863

Upon review of an order granting a motion to
dismiss, appellate court reviews the petition in an
almost academic manner to determine if the facts
alleged meet the elements of a recognized cause of
action or of a cause that might be adopted in that
case.

[8] Appeal and Error ⚖⇒893(1)
30k893(1)

Appellate review of a motion to dismiss is a de
novo examination of whether the petition invokes
principles of substantive law.
J. Michael Vaughan, Kansas City, for Appellants.

Laurence R. Tucker, Kansas City, for Community
Bank of Northern VA.

Randolph G. Willis, Kansas City, MO, for GMAC-
Residential Funding.

Daniel L. McClain, Co-Counsel for GMAC-
Residential Funding.

Mark A. Olthoff, Kansas City, MO, for US Bank
Trust NA, US Bank, NA, US Bank NA ND,
FirstPlus Home Loan Owner Trusts 1997-2,
1997-3, 1997-4.

Scott M. Brinkman, Kansas City, MO, for
EquityPlus Financial.

Leslie A. Greathouse, for Ace Securities
Corporation, U.S. Bank Trust NA as Trustee for
FirstPlus Home Loan Trust, FirstPlus Home Loan
Owner Trusts 1996-3, 1996-4, 1997-1.

Before HOWARD, P.J., LOWENSTEIN and
HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

*1 Richard and Dana Avila appeal the circuit
court's dismissal of their claims against Community
Bank of Northern Virginia ("Community Bank")
and GMAC- Residential Funding Corporation
("GMAC") for violations of the Second Mortgage
Loan Act ("SMLA"), Section 408.231 et seq. [FN1]
We affirm the circuit court's dismissal because the
Avilas failed to state a claim under the SMLA on
which relief could be granted.

FACTUAL AND PROCEDURAL HISTORY

On June 30, 1998, the Avilas obtained from
Community Bank a $30,000 loan secured by a
second mortgage on the Avilas' home. The loan was
to be repaid over fifteen years at an annual interest
rate of 13.5%. To obtain the loan, the Avilas were
required to pay a loan origination fee of $2,400 to
an affiliate company of Community Bank, a title
examination fee of $231, an overnight fee of $25,
and a processing fee of $200 to a title company.

In June 2001, the Avilas filed a class action
lawsuit, in the Circuit Court of Jackson County,
alleging that Community Bank's lending practices
violated the SMLA. The Avilas sought to represent
a statewide class of real estate owners who obtained
second mortgage loans from Community Bank. In
their Second Amended Petition, the Avilas alleged
Community Bank violated the SMLA by disguising
a finder's fee as a loan origination fee, and by
charging non-bona fide fees for title examination,
processing, and overnight handling. The lawsuit
named nineteen additional defendants allegedly
involved in the lending practices, including GMAC,
which was an assignee on some of the second
mortgage loans originated by Community Bank.
The Avilas sought recovery of any improperly
collected fees and interest paid, the forfeiture of
future interest due on the loan, punitive damages,
costs, and attorney's fees.

Community Bank and GMAC, as well as several
other defendants, filed motions to dismiss the
petition [FN2] for failure to state a claim under the
SMLA. In a summary order, the circuit court
granted the motions and dismissed without prejudice
the claims against those defendants in the Second
Amended Petition. The Avilas then voluntarily
dismissed without prejudice all remaining
defendants and claims in the Second Amended
Petition. On appeal, the Avilas challenge only the
circuit court's judgment dismissing without
prejudice all claims against Community Bank and
GMAC.

APPELLATE JURISDICTION

[1] Although no jurisdictional objection has been
raised, we must sua sponte determine our authority
to review the circuit court's judgment of dismissal
without prejudice. *Chromalloy American Corp. v.
Elyria Foundry Co.*, 955 S.W.2d 1, 3 (Mo. banc

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

1997). Appellate jurisdiction is contingent upon the existence of a final judgment. *Bush Const. Machinery, Inc. v. Kansas City Factory Outlets, L.L.C.,* 37 S.W.3d 852, 854 (Mo.App. W.D.2001). A judgment is final when it disposes of all issues and parties in a case and leaves nothing for future determination. *Gibson v. Brewer,* 952 S.W.2d 239, 244 (Mo.banc 1997).

*2 [2][3] A dismissal without prejudice permits the petitioner to bring another action for the same cause. Rule 67.01 [FN3] Because it leaves open the prospect of a future determination, a dismissal without prejudice generally is not a final judgment and, therefore, is not appealable. *Bush,* 37 S.W.3d at 854. An exception to this general rule arises when a petition is dismissed without prejudice for failure to state a claim on which relief can be granted and the plaintiff elects not to refile or amend the pleadings. *Mahoney v. Doerhoff Surgical Services,* 807 S.W.2d 503, 506 (Mo. banc 1991). If the plaintiff takes no action to correct the petition, the effect of the circuit court's decision is to dismiss the *cause of action* and not merely the pleading. *Id.* Under these circumstances, the judgment of dismissal--albeit without prejudice--operates as a final determination on the merits and, therefore, may be appealed. *Id.*

All claims and defendants named in the Avila's Second Amended Petition were dismissed without prejudice. Because the Avilas opted not to refile or further amend the petition, the dismissal amounts to a final adjudication that no causes of action exist against any of the defendants. We have jurisdiction to review the judgment of dismissal without prejudice of all claims against Community Bank and GMAC because it fully and finally disposes of all parties and claims in the Second Amended Petition.

### Issue on Appeal

[4] The Avilas contend the circuit court erred in granting the motions to dismiss because the Second Amended Petition properly stated a claim for relief under the SMLA against Community Bank and GMAC. While the circuit court did not explain the reasons for dismissal, we presume the decision was based on grounds stated in the dismissal motions and will affirm if dismissal was appropriate on any grounds stated therein. *Duvall v. Lawrence,* 86 S.W.3d 74, 78 (Mo.App. E.D.2002).

[5][6][7][8] A motion to dismiss is an attack on the petition and solely a test of the adequacy of the pleadings. *Wheeler v. Sweezer,* 65 S.W.3d 565, 568 (Mo.App. W.D.2002). Upon review of an order granting a motion to dismiss, we must determine if the facts pleaded and the reasonable inferences therefrom state any grounds for relief. *In re Estate of Clark,* 83 S.W.3d 699, 702 (Mo.App. W.D.2002). We assume the factual allegations are true and make no attempt to weigh credibility or persuasiveness. *Johnson ex rel. Wilken v. Jones,* 67 S.W.3d 702, 705 (Mo.App. W.D.2002). We review the petition in an almost academic manner to determine if the facts alleged meet the elements of a recognized cause of action or of a cause that might be adopted in that case. *Nazeri v. Mo. Valley Coll.,* 860 S.W.2d 303, 306 (Mo. banc 1993). Our review is a *de novo* examination of whether the petition invokes principles of substantive law. *In re Estate of Clark,* 83 S.W.3d at 702.

The Avilas' Second Amended Petition is a single-count complaint alleging that Community Bank, and its affiliates and assignees, engaged in lending practices which violated the SMLA. Enacted in 1979, the SMLA is a consumer-protection measure designed to regulate "the business of making high interest second mortgage loans on residential real estate." *U.S. Life Title Ins. Co. v. Brents,* 676 S.W.2d 839, 841 (Mo.App. W.D.1984). Section 408.232 of the SMLA specifies the permissible interest rates and computation requirements for second mortgage loans governed by Missouri law. For loans originated prior to August 28, 1998, the maximum interest rate is 1.67% per month, equivalent to 20.04% annually, and the statute requires the interest to be computed on unpaid balances of the principal for the time actually outstanding. [FN4] Section 408.232.1.

*3 The SMLA also limits the types and amounts of "additional fees" that can be charged in connection with a high-interest second mortgage loan. Section 408.233. However, these limitations are only applicable to second mortgage loans on which an unlawful rate of interest is charged. In this regard, Section 408.232.4 states:

Sections 408.231 to 408.241 [the SMLA] shall not apply to any loans on which the rate of interest charged is lawful without regard to the rates permitted [i.e., 1.67% per month] in subsection 1 of this section.

If the interest rate on a second mortgage loan exceeds the legal limit, the lender is prohibited from assessing additional loan fees and charges except as

specifically authorized by Section 408.233. The authorized charges include public filing fees, taxes, bona fide closing costs paid to third parties, insurance, and origination fees. Section 408.233. A lender may be subject to a civil action or criminal penalties for charging any fees other than those permitted by Section 408.233. Sections 408.562, 408.240.

To state a civil claim under these provisions of the SMLA, the Avilas had to plead facts establishing that: (1) they obtained a secondary mortgage loan; (2) an unlawful rate of interest was charged on the loan; and (3) the fees charged in connection with the loan were not authorized by Section 408.233. In the Second Amended Petition, no allegation or inference was made that the interest rate charged on the Avilas' loan was unlawful. Community Bank and GMAC moved to dismiss the petition for failure to plead any facts establishing this second element of the SMLA claim. They argued the 13.5% interest rate on the Avilas' loan was lawful under applicable state and federal laws governing interest rates and, thus, no claim for relief could be stated under Section 408.232.4 of the SMLA. We presume the circuit court granted dismissal on this basis.

On appeal, the Avilas contend the circuit court erroneously interpreted Section 408.232.4 in determining the petition failed to state a claim against Community Bank and its assignee, GMAC. Appellants acknowledge that Section 408.232.4 provides the SMLA "shall not apply to any loans on which the rate of interest charged is lawful ..." They interpret the term "lawful" to mean lawful only under Missouri's interest rate laws, as opposed to lawful under any state or federal law. Community Bank is a Virginia corporation whose interest rates are governed by Virginia law. Federal law permits Community Bank, as a state-chartered bank, to export interest rates from its home state when conducting loan transactions in a foreign state. See 12 U.S.C. § 1831d.

Since Community Bank's interest rate was governed by these other state and federal laws, the Avilas argue the rate could not satisfy the requirement of being "lawful" under Missouri's interest rate laws. The Avilas contend the legislative intent of Section 408.232.4 was to exempt from the SMLA only those lenders who were subject to and complied with Missouri's interest rate laws. The Avilas suggest they were not required to plead any facts relative to Section 408.232.4 because the exemption was not applicable to Community Bank and its assignee, GMAC, as foreign lenders.

*4 To resolve this issue on appeal, we must determine the meaning of the word "lawful" as used in Section 408.232.4. The goal of statutory interpretation is to ascertain the intent of the legislature from the language used and to give effect to that intent. *State v. Residence Located at 5708 Paseo, Kansas City, Missouri,* 896 S.W.2d 532, 537 (Mo.App. W.D.1995). "When the language of a statute is clear and unambiguous on its face, courts construe the language according to its plain and ordinary meaning." *Id.* In the absence of statutory definitions, the plain and ordinary meaning of a term may be derived from a dictionary, *American Healthcare Management, Inc. v. Director or Revenue,* 984 S.W.2d 496, 498 (Mo. banc 1999), and by considering the context of the entire statute in which it appears. *Butler v. Mitchell-Hugeback, Inc.,* 895 S.W.2d 15, 19 (Mo. banc 1995). "The issue is not whether a particular word in a statute, considered in isolation, is ambiguous, but whether the statute itself is ambiguous." *J.B. Vending Co. v. Dir. of Revenue,* 54 S.W.3d 183, 187 (Mo.banc 2001).

The term "lawful" means to be "in harmony with the law" or "constituted, authorized, or established by law." *Merriam Webster's Collegiate Dictionary,* Tenth Edition, 658 (2000). These definitions indicate the ordinary use of the term does not imply a limitation as to a particular type of law, *i.e.* federal, state, local or otherwise. Courts are not authorized to add provisions to a statute that are not plainly written or necessarily implied. *Wilkinson v. Brune,* 682 S.W.2d 107, 111 (Mo.App. E.D.1984). We must presume the legislature acted with knowledge of existing state and federal interest laws, and would have expressly stated that the interest rates must be *lawful under Missouri law* if it had so intended. *Id.*

Nor is there any contextual language in Section 408.232.4 or other provisions of the SMLA to suggest the legislature intended "lawful" to mean lawful only under Missouri law. Indeed, the statute's cross-reference to a related subsection indicates no such limitation was intended. Section 408.232.4 provides that the SMLA "shall not apply to any loans on which the rate of interest charged is lawful *without regard to the rates permitted in subsection 1 of this section."* (emphasis added) Subsection 1 of Section 408.232 sets the maximum

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 22002779
(Cite as: 2003 WL 22002779, *4 (Mo.App. W.D.))

interest rates for second mortgage loans, under Missouri law, at 1.67% monthly or 20.04% annually. Reading subsections 1 and 4 together, it is clear the legislature intended to exempt from the SMLA all loans on which the interest rate was lawful, regardless of the maximum interest rate under Missouri law.

The plain language of Section 408.232.4 indicates the Avilas could only pursue an SMLA claim if the rate of interest on their second mortgage loan exceeded the maximum interest rates allowed by any applicable state or federal law. This threshold requirement is consistent with the legislative purpose of the SMLA to protect consumers in the "high-interest" secondary mortgage loan market. *U.S. Life Title Ins.*, 676 S.W.2d at 841.

*5 In the Second Amended Petition, the Avilas alleged a 13.5% interest rate was charged on their second mortgage loan originated by Community Bank. This was the only allegation in the petition regarding the interest rate. The petition failed to make any allegation or inference that the interest rate was unlawful. At most, the petition asserted improper closing fees and processing fees were charged over the course of the loan, thereby resulting in additional interest charges which violated the SMLA. However, the Avilas were not entitled to seek relief for any improper additional charges under the SMLA unless they could first demonstrate the interest rate itself was unlawful.

Community Bank and GMAC moved to dismiss the Avilas' original petition on grounds that it did not plead facts to establish this preliminary requirement for an SMLA claim. The Avilas twice amended their petition but nonetheless failed to state any facts from which it could be inferred that the 13.5% interest rate on their loan was unlawful. The circuit court properly applied Section 408.232.4 in dismissing the Second Amended Petition because the Avilas failed to state a claim for relief under the SMLA.

The judgment of the circuit court is affirmed.

All concur.

FN1. All statutory citations are to Revised Missouri Statutes 1994, unless otherwise indicated.

FN2. The motions to dismiss were filed prior to amendment of the petition, however, the parties later stipulated the dismissal motions would be deemed filed in response to the Second Amended Petition.

FN3. All rule citations are to the Missouri Rules of Civil Procedure.

FN4. The SMLA was amended, effective August 28, 1998, to set the permissible rates of interest at any "rates agreed to by the parties," provided the interest is "computed on unpaid balances of the principal for time actually outstanding." Section 408.232.1 R.S.Mo. Supp 1998. This amendment is not applicable to the Avila's loan, which originated in June 1998.

2003 WL 22002779 (Mo.App. W.D.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# TAB 15

Only the Westlaw citation is currently available.

United States District Court,
W.D. Missouri, Western Division.

Alvin L. and Linda L. PHIPPS, et al., Plaintiffs,
v.
GUARANTY NATIONAL BANK OF
TALLAHASSEE, et al., Defendants.

No. 03-420-CV-W-GAF.

Sept. 17, 2003.

David M. Skeens, J. Michael Vaughan, Kip D.
Richards, Garrett Mark Hodes, Walters, Bender,
Strohbehn & Vaughan, P.C., Kansas City, MO, for
Plaintiffs.

Nicholas L. DiVita, Berkowitz, Stanton, Brandt,
Williams & Shaw, LLP MO, Daniel L. McClain,
Randolph G. Willis, Rasmussen, Willis, Dickey &
Moore LLC, Kansas City, MO, Roy W. Arnold,
Reed, Smith, Shaw & McClay, Thomas Allen,
Reed Smith, L.L.P., Pittsburg, PA, for Defendants.

*ORDER*

FENNER, J.

**\*1** Presently before the Court are a host of motions
filed by Defendant Guaranty National Bank of
Tallahassee ("Guaranty"), Defendants GMAC-
Residential Funding Corp. *et al.* (hereinafter known
collectively as "RFC"), Defendant Household
Finance Corp. III ("Household"), and Plaintiffs
Alvin and Linda Phipps *et al.* (collectively "the
Phipps"). The Phipps have filed a motion to remand
their cause of action back to the Circuit Court of
Clay County, Missouri, arguing that this Court does
not have original jurisdiction over the case in that it
is a dispute governed exclusively by state law.
Defendants Guaranty, RFC, and Household all
oppose the remand motion stating that the Phipps'
state law claim is completely preempted by 12
U.S.C. §§ 85 and 86. RFC has filed a motion to
stay this proceeding pending the outcome of a class
action settlement in Pennsylvania, a class in which
the Phipps' would be members. Guaranty and
Household join in the motion to stay while the
Phipps oppose it. Household has filed a motion
seeking to be dismissed from the lawsuit because
none of the current named plaintiffs has a case or
controversy against it. The Phipps contend that

Household should remain in the action because
some of the as of yet unnamed plaintiffs may have a
cause of action against Household and that such
claims are juridically linked to the Phipps' claims.
Finally, RFC and Guaranty have also filed motions
to dismiss stating that the Phipps' state law claims
are entirely preempted by federal law and that the
Phipps' claims do not state a valid cause of action.

*DISCUSSION*
I. Facts Common to All Motions

The Phipps purport to represent a group of
similarly situated individuals who took out second
mortgage loans on their residences from Guaranty.
The named plaintiffs include, in addition to the
Phipps, John and Elizibeth St. Clair, and Shawn
and Lorene Starkey. The Phipps claim that
Guaranty charged them unlawful and excessive fees
in conjunction with the second mortgage loans.
They contend that these fees violate Missouri's
Second Mortgage Loan Act ("SMLA"),
Mo.Rev.Stat. § 480.231 *et seq.*

According to the Phipps' allegations, Guaranty
extended second mortgage loans to the Phipps, and
others, and charged them unlawful fees including a
loan origination fee, a loan discount fee, an
underwriting fee, an application fee, a closing fee,
fees for title searches, abstracts and examinations,
overnight shipping fees, document review fees,
processing fees, and recording fees. The Phipps
contend that these fees, particularly the origination
fees and discount fees, were actually "finders fees"
that were paid to a third party, Equity Guaranty
LLC. A settlement statement with the Department
of Housing and Urban Development ("HUD")
indicates that the origination and discount fees were
paid to Guaranty. The Phipps allege that all of these
fees violate the SMLA which reads, in pertinent
part;

1. No charge other than permitted by section
480.232 shall be directly or indirectly charged,
contracted for or received in connection with any
second mortgage loan, except as provided in this
section:
**\*2** (1) Fees and charges prescribed by law
actually and necessarily paid to public officials for
perfecting, releasing, or satisfying a security
interest related to the second mortgage loan;
(2) Taxes;
(3) Bona fide closing costs paid to third parties,
which shall include:
(a) Fees or premiums for title examination, title

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2003 WL 22149646, *2 (W.D.Mo.))

insurance, or similar purposes including survey;
(b) Fees for preparation of a deed, settlement statement, or other documents;
(c) Fees for notarizing deeds and other documents;
(d) Appraisal fees; and
(e) Fees for credit reports;
(4) Charges for insurance as described in subsection 2 of this section;
(5) A nonrefundable origination fee not to exceed five percent of the principal which may be used by the lender to reduce the rate on a second mortgage loan[.] [FN1]

> FN1. The SMLA also states that "Sections 408.231 to 408.241 [the SMLA] shall not apply to any loans on which the rate of interest charged is lawful without regard to the rates permitted in subsection 1 of this section."

The Phipps filed their complaint against Guaranty and other entities allegedly holding the mortgages in the Circuit Court of Clay County, Missouri on April 3, 2003. The Complaint alleges that Guaranty established a scheme whereby broker entities would locate individuals wanting second mortgage loans and the that broker would direct them to Guaranty. The Phipps allege that this was done so that Guaranty could charge the individual excessive fees. Nowhere in the Complaint do the Phipps allege that Guaranty charged them an unlawful interest rate. According to the allegations in the Complaint, the Phipps were charged an interest rate of 16.99% for a fifteen year loan, the St. Clairs were charged a rate of 11.99% for a twenty-five year loan, and the Starkeys were charged a rate of 11.99% on a fifteen year loan. These rates are in excess of Missouri's usury law, which currently caps interest rates at 10%. Mo.Rev.Stat. § 408.030. [FN2] However, the Phipps make no claim of illegal interest rates. In fact the Phipps go to great lengths to assert that the claims against Guaranty are based on the charging of unlawful fees, not unlawful interest rates.

> FN2. The statute provides that if market rates exceed 10%, which they currently do not, a fluctuating "market rate" may be the standard.

Guaranty and the other defendants removed the action to this Court on May 13, 2003. The Phipps now seek to have the case remanded back to state court arguing that there is no basis for federal jurisdiction. Guaranty, RFC, and Household all stress that the Phipps' claims against Guaranty *et al.*

are really in the nature of a usury claim against a national bank, which is completely preempted by federal law. Guaranty contends that the fees charged the individuals, specifically the loan origination and loan discount fees are "interest" within the broad definition of that term as set by the Office of the Comptroller of Currency ("OCC"). Because the Phipps' claims against Guaranty are really claims of usury despite the Phipps' protestations, Guaranty avers that federal law completely "occupies the field" of usury claims against national banks, thus preempting the Phipps' state law claim with federal law.

Assuming this Court to have jurisdiction, Defendants RFC and Guaranty argue that the Phipps's case should be dismissed under Federal Rule of Civil Procedure 12(b)(6) because the Complaint does not state a valid cause of action. In response to these motions, the Phipps argue that their claims are not preempted by federal law, which would mean that remand was proper. The motions to dismiss are, in truth, a rehashing of the remand arguments for it is impossible for the Court to retain jurisdiction but not dismiss the case. If the Phipps' case is completely preempted by federal law, the claims are anomalous and must be dismissed. If the Court declines jurisdiction, the Court lacks authority to rule on the motions to dismiss and they are thus moot. [FN3]

> FN3. Interestingly, in Guaranty's and RFC's Motions to Dismiss they make much of the issue of whether the Phipps have stated a valid SMLA claim. Guaranty and RFC argue that the SMLA only applies if the interest rates are unlawful, of which the Phipps make no such allegation. However, the Court can only decide the motions to dismiss if it decides that it has jurisdiction over the case. The only way the Court has jurisdiction is if federal law completely preempts and displaces state law. Thus, there is no way for the Court to decide the issue of whether the Phipps have stated a valid SMLA claim.

*3 Defendant Household also moves to dismiss the claims against it, but on a different basis than preemption. Household contends that the named plaintiffs lack standing to sue Household because it does not hold any of the named plaintiffs' mortgages. The only basis upon which to sue Household is the claim that the plaintiffs represent the interests of unnamed individuals who may have gotten second mortgage loans from Guaranty, which loans were then later assigned to Household. As of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the date of these motions, no such individual had been identified. Household contends that purporting to represent the claims of unnamed individuals adds nothing to the issue of standing and that it is an insufficient basis upon which to assert a claim against Household. The Phipps counter that the issue of class certification should be decided prior to deciding any issues of standing against individual defendants. In the alternative, the Phipps contend that the claims against Household, as holder of a putatively unlawful mortgage, would be juridically linked to the Phipps claims against Guaranty thus making standing appropriate.

Finally, Defendant RFC asserts, as an alternative to all the motions, that the case be stayed pending the resolution of a class action settlement in Pennsylvania. Household and Guaranty also join in the motion. According to RFC, the United States District Court for the Western District of Pennsylvania has, for settlement purposes, certified a class action against Guaranty. The Western District of Pennsylvania is currently in the process of finalizing the process by which class members may be allowed to opt in or out of the settlement and by which class members may make claims against Guaranty. Because the Phipps would be members of the class currently certified in Pennsylvania, RFC urges the Court to stay this proceeding until the Pennsylvania dispute is resolved. The Phipps oppose this motion arguing that the Court should not stay the proceeding because this case is first filed and more developed. The Phipps decry the Pennsylvania settlement as an attempt to buy off aggrieved individuals "on the cheap". Barring this, the Phipps contend that the Court should decide the remand issue before deciding whether to stay the action.

II. Analysis

A. Motion to Remand

A defendant may remove an action filed in state court to a court of federal jurisdiction, but only if such claim could have originally been brought in federal court. *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). In the instances of cases that could be brought under federal law (as opposed to diversity jurisdiction cases) the federal law under which the claim arises must be a direct and essential element of the plaintiff's case and cannot be based upon the anticipation of a defense of federal law. *See*

*Louisville & Nashville R.R. v. Mottley,* 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908). In cases of concurrent jurisdiction between the federal and state courts, litigants may avoid federal court by foregoing their federal remedy and pleading an exclusively state law driven cause of action. *Caterpillar,* 482 U.S. at 392. This avenue is, however, subject to the complete preemption doctrine.

*4 Ordinarily, federal jurisdiction exists only where the federal claim is present on the face of the complaint. *Magee v. Exxon Corp.* ., 135 F.3d 599, 601 (8th Cir.1998). However, if the preemptive force of federal law is "extraordinary," an entirely state law claim may be transmuted into a claim stating a federal cause of action. *Krispin v. May Dep't Stores Co.,* 218 F.3d 919, 922 (8th Cir.2000) . "Once an area of state law has been completely pre- empted [by federal law], any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar,* 482 U.S. at 393. The onus is on the defendant to demonstrate that removal is proper. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). As such, the burden is the defendant's to show that an area of state law has been completely pre-empted by federal law in order to establish proper removal jurisdiction.

Defendants Guaranty, RFC, and Household argue that removal is proper, and that remand should be denied, based on a recent United States Supreme Court, *Beneficial National Bank v. Anderson,* --- U.S. ----, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003). In *Beneficial,* the Supreme Court found that the statutes governing the creation and operations of national banks were of such force that they created an exclusive cause of action against national banks for usury. --- U.S. ----, ----, 123 S.Ct. 2058, 2064, 156 L.Ed.2d 1. The Court found that sections 85 and 86 of the National Bank Act ("NBA") created the sole law and remedy as to claims of unlawful interest rates against national banks. *Id.* As such, the Court stated that there was "no such thing as a state-law claim of usury against a national bank[,]" and held that sections 85 and 86 "supersede[d] both the substantive and remedial provisions of state usury laws[.]" *Id.* Accordingly, a claim of usury against a national bank, even a claim purporting to be grounded on state law, is in reality a federal claim.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Slip Copy
(Cite as: 2003 WL 22149646, *4 (W.D.Mo.))

The issue of whether to remand the case (as well as many other issues) comes down to a determination of whether the Phipps are really bringing a claim of unlawful interest against Guaranty and the other defendants. Section 85 of the NBA states that a national bank may charge a rate of interest on a loan consistent with the maximum allowable rate as designated by the state in which the bank is located. The Office of the Comptroller of Currency ("OCC") has issued a regulation defining "interest" as it is used in § 85. According to the OCC, the term "interest" includes "any payment compensating a creditor or prospective creditor for an extension of credit[.]" 12 C.F.R. § 7.4001. The regulation then provides a non-exhaustive list of fees which may be included under the term "interest". The regulation also exempts certain fees as not being interest, such as appraisal fees, finders' fees, or document preparation fees. *Id.*

Guaranty argues that what the Phipps claim are unlawful fees, are really "interest" under the OCC's definition. According to Guaranty, the loan origination fees and loan discount fees are payments compensating Guaranty for making the loan. This assertion is supported by the HUD settlement statements which show that the origination and discount fees were paid to Guaranty. As such, says Guaranty, these fees are "interest," hence the Phipps are making an unlawful interest claim against it, which is preempted by § 85.

*5 The Phipps counter that the origination and discount fees are in actuality finder's fees, which were paid to Equity Guaranty LLC. The OCC's definition of "interest" specifically excludes finders fees. The Phipps also cite to an decision, from this District, ordering remand of a similar lawsuit because the state law claim was not preempted by § 85. According to the Phipps, because this case is not without dispute a usury case remand should be granted. *See* Pl. Sugg, in Support, at 13 *and* Pl. Reply at 14 (citing *Adkison v. FirstPlus Bank, et al.,* Case No. 00-622 (W.D.Mo. Jan. 22, 2001)). The Phipps' argument regarding the "without dispute" requirement is based on a misreading of Eighth Circuit precedent.

The Phipps' argument that the cause of action must be undisputedly one of usury is based on an Eighth Circuit decision, *M. Nahas & Co., Inc. v. First National Bank of Hot Springs,* 930 F.2d 608 (8th Cir.1991). In that decision, the Court found that removal of a complaint against a national bank was

proper based on the complete preemption of state law by § 85. The Phipps argue, citing the *Adkison* order, that this decision holds that a claim must be without dispute a claim of unlawful interest for § 85 to completely preempt state law. Pl. Reply at 14. Because the Phipps do not claim unlawful interest, or because there is at least a dispute as to the true nature of the challenged fees, the Phipps assert that the claim is not undisputedly one of usury and should be remanded.

Contrary to the Phipps' argument, the *Nahas* decision does not stand for the principal that only undisputed usury cases are completely preempted by § 85. Rather, the holding of *Nahas* is that usury claims against national banks are preempted by § 85 and § 86. *Id.* at 612. The *Nahas* opinion says nothing about requiring the case to be "without dispute" a usury claim. This Court sees no reason to read such a heightened requirement into these types of claims. Rather, it is more logical simply to look to the nature of the allegations in the complaint, rather than the parties' designations thereof, and determine whether the claim is of a type completely preempted by federal banking law. Any other approach would allow litigants to avoid federal jurisdiction by artful schemes and artifices designed to create disputes as to the nature of the claim. This type of behavior cannot be sanctioned using the *Nahas* decision as supporting authority, especially in light of the Eighth Circuit's expressed eschewal of such practices. *See Nahas,* 930 F.2d at 612 (stating that usury claims against national banks are federal claims regardless of a plaintiff's artful attempts to couch its complaint in state law terms).

The Court can understand, to a certain degree, the Phipps' reticence to have their claim preempted by federal law. The Phipps are attempting to navigate between the Scylla of §§ 85 and 86, which would completely preempt their state law claims, and between the Charybdis of Mo.Rev.Stat. § 408.231.4, which says that an interest rate must be unlawful in order for SMLA to apply. A difficult position to be sure; for if the Phipps allege that the interest rate charged by Guaranty was unlawful, in order to satisfy § 408.231.4, the Phipps will have clearly stated a claim of usury against a national bank. Such a claim is undeniably preempted by § 85 . On the other hand, if the Phipps protest that their claim is not for unlawful interest, which course they have apparently opted to take, their state law claim is entirely groundless, because of the requirements of § 408.231.4 stating that in order for the SMLA

to apply, the interest rate charged must be unlawful. Either tack seems to be fatal to the Phipps' case.

**\*6** Regardless of the Phipps' classification of Guaranty's fees as "finder's fees" the Court must look beyond such labels and determine if the Phipps have truly made a claim of unlawful interest. The critical inquiry is whether the fees are charged in consideration for the advancement of credit or a loan. The loan origination fees and the loan discount fees appear to fit that bill. The OCC has previously opined that fees charged for opening an account with a bank are "interest" under 12 C.F.R. § 7.4001. *See* OCC Interpretive Letter No. 803, 1998 WL 320183. According to the OCC, the account opening fees were used as an alternative to higher monthly percentage finance charges and were a way for the bank to adjust for risks and costs associated with establishing and maintaining the account. *Id.* at 1998 WL 320183, \*4. Like the account opening fees addressed by the OCC in its interpretive letter, the loan origination fees and loan discount fees help the bank in dealing with the costs and considerable risks associated with making second mortgage loans. Additionally, the loan origination fees and the loan discount fees are not like the other types of fees excluded from the definition of "interest".

The OCC specifically excludes from the definition of "interest" fees such as appraisal fees, and fees for obtaining credit reports. These are the types of costs that are incurred regardless of whether the loan is advanced or not. As such they are not necessarily connected to the extension of credit. Loan origination fees and loan discount fees are generally not collected unless a loan is actually made. They are designed to eliminate, from the lender's perspective, potential risks that might make an individual an unattractive credit risk. In this regard, the origination and discount fees are more like fees associated with the extension of credit, such as annual fees, cash advances fees, and membership fees. Because these origination and discount fees help offset risk and are only levied in the event a loan is extended, as opposed to appraisal or credit report fees, the fees fit within the OCC's definition of "interest". [FN4] It thus appears on the face of the complaint that the Phipps are claiming that Guaranty charged them unlawful "interest" as defined by the OCC.

FN4. The Phipps argue that these fees are not interest because they allege that Guaranty turned

around and paid all or a portion of the fees to Equity Guaranty as a finder's fee. Whether a portion or all of these fees were paid out to a third party is not dispositive of the issue. The test is whether the fees were connected to extending or making available credit. Fees may be paid out by the lender to a third party, but that does not mean the fees were not collected in consideration for the extension of credit.

Given the true nature of the Phipps' claim, that of unlawful interest within the OCC's definition, any state law claims are completely preempted and the Phipps are subject to federal jurisdiction. As such, removal is proper and the Phipps' motion to remand is DENIED.

B. Motion to Dismiss--Defendants RFC & Guaranty

Having concluded that the Court has jurisdiction over the Phipps' claims, it will now consider RFC and Guaranty's Motions to Dismiss. Under Federal Rule of Civil Procedure 12(b), a case may be dismissed if the complaint fails to state a valid cause of action. FRCP 12(b)(6). Dismissal under the rule is "inappropriate unless it appears beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McCormack v. Citibank, N.A.*, 979 F.2d 643, 646 (8th Cir.1992). When considering a motion to dismiss, an assumption must be made that all factual allegations are true and a dismissal may be granted "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations. *Alexander v. Peffer*, 993 F.2d 1348, 1349 (8th Cir.1993).

**\*7** Having found that the Phipps are asserting a claim of unlawful interest against Guaranty, and having further found that the United States Supreme Court has stated there is no such thing as a state law claim of usury against a national bank, it is a short step to conclude that the Phipps' complaint should be dismissed. The Phipps' complaint attempts to state what does not exist, to wit: a usurious claim against a national bank premised on Missouri law. This is not a claim for which relief may be granted. [FN5] Accordingly, Defendant RFC and Defendant Guaranty's Motions to Dismiss are GRANTED. [FN6]

FN5. The Court notes that even if the Phipps had attempted to couch their case in terms of § 85, as they should have from the beginning, their claim

would have been on unstable legal ground. National banks are allowed to export the interest rates of the state in which they are located to other foreign states. *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,* 439 U.S. 299, 318-19, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). Hence, under § 85, if a national bank located in Florida charges an interest rate to a Missouri debtor that is legal in Florida, it is legal in Missouri. The Phipps make no argument, as would have been proper, that Guaranty charged them an interest rate that was unlawful in Florida, or under any applicable federal law. Additionally, it appears that the interest rates charged to the Phipps *et al.,* were below Florida's usury level of 18%, thus negating a claim under § 85. *See* Fla. Stat. Ann. § 687.03(1) (stating that it shall be unlawful for any person to charge a rate of interest greater than the equivalent of 18 percent per annum).

FN6. The parties devoted much paper to the issue of whether the Phipps had stated a valid cause of action under the SMLA. That however was not an issue the Court could address. Because the Court concluded that the Phipps' state law claim was completely preempted by federal law, there was no way for the Court to apply state law. However, in the opinion of the Court, the following bears mentioning. If the Phipps truly believe that their claim is for unlawful fees and not for unlawful interest, they have no SMLA claim. By its express terms, the SMLA, including the portion of the SMLA that removes the cap on interest rates for second mortgages, does not apply unless the interest rate charged on the second mortgage is unlawful. Mo.Rev.Stat. § 408.232.4. For example, if an interest rate charged by a Missouri bank, on a loan taken out by a Missouri citizen, exceeds 10%, the SMLA applies and certain fee restrictions must be taken into account. If the interest rate is lawful, or below 10% in Missouri, the SMLA does not apply. As discussed above, there is every indication that the interest rate Guaranty charged the Phipps was valid under Florida law. Missouri recognizes that national banks may export the usury laws of its home state into Missouri. *Avila v. Cmty Bank of Va.,* 2003 WL 22002779 (Mo.Ct.App. Aug.26, 2003). Because the interest rate charged the Phipps was most likely lawful, the SMLA would not apply and the Phipps would have no state law SMLA claim.

**C. Motion to Dismiss--Defendant Household**

Based on the above two rulings of this Court, that remand was not proper and that the Phipps' state law claims were completely preempted, there is no need to rule on Household's separate motion to dismiss as it is rendered moot. Any claim against Household would have been derivative of a claim against Guaranty by virtue of the fact Household is an assignee of some of the mortgages in question. Having ruled that the Phipps failed to make a claim against Guaranty, it logically follows that they have no claim against Household, regardless of whether there is a juridical link between the claims against Guaranty and the claims against Household. For this reason, the Court finds that Household's Motion to Dismiss should be GRANTED, but not for the reasons stated in Household's Suggestions in Support.

**D. Motion to Stay**

Having ruled that the Phipps' case should be dismissed, Defendant RFC's Motion to Stay the proceedings is rendered moot and is therefore DENIED.

*CONCLUSION*

For the above and foregoing reasons, it is hereby ORDERED as follows:

1. Plaintiff Alvin & Linda Phipps *et al.'* s Motion to Remand is DENIED

2. Defendants Guaranty National Bank of Tallahassee, GMAC--Residential Funding Corp. *et al.'* s Motions to Dismiss are GRANTED.

3. Defendant Household Finance Corp. III's Motion to Dismiss is DENIED as moot.

4. Defendant GMAC--Residential Funding Corp. *et al.'* s Motion to Stay Proceedings is DENIED as moot.

IT IS SO ORDERED.

2003 WL 22149646 (W.D.Mo.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

# TAB 16

| Subj: | **RE: CBNV/GNB Class Action Settlement** |
|---|---|
| Date: | 9/25/2003 9:56:58 AM Central Daylight Time |
| From: | |
| To: | |
| CC: | |
| *Sent from the Internet* |

Mr. and Mrs. Lewis:

You are correct, we are not part of the firms you mention. We believe that those lawyers are not doing a good job of representing the interests of Missouri borrowers but are looking out primarily for themselves and the $8.1 million fee they are seeking in the Pennsylvania Settlement.

As a result, we are going to file an objection in Pennsylvania and tell that court that what is being offered to Missouri borrowers is not enough. Our goal is to get you more money. We will seek a fee only if we are successful in getting Missouri borrowers more in the Pennsylvania Settlement.

Some have asked whether there is a chance that the objection could cause someone to lose what is now offered. The answer is yes, because it is possible that the objections we will make, as well as objections from others around the country, will cause the court to decide not to approve a settlement. In my opinion, that possibility is quite remote.

If you would like to join with the many other Missouri objectors -- or if you have other questions, please let me know

Sincerely, David M. Skeens

> ——Original Message——
> From:    JIMSshadowBOXER@aol.com [SMTP:JIMSshadowBOXER@aol.com]
> Sent:    Wednesday, September 24, 2003 6:40 PM
> To:    dskeens@wbsvlaw.com
> Subject:    Re: CBNV/GNB Class Action Settlement
>
> This is in response to your letter received today. We are a little
> confused. The original Notice of Class Action Settlement and Hearing gave
> the plaintiffs counsel- R. Bruce Carlson, Specter Specter Evans and
> Manogue, P.C. or Daniel O. Myers, Richardson Patrick Westbrook &
> Brickman, LLC. There is no mention of your legal firm. Why are we now
> being contacted by another legal firm?
>
> We are leaning towards the third option- to file an objection with the
> Court in Pennsylvania. If we file an objection, do we have to pay any
> legal fees? Please advise asap.
>
>                              Thank You
>
>                              Carol & James Lewis
>                              613 Graystone Dr.
>                              Grain Valley, MO 64029
> 816)847-0813

                              Friday, September 26, 2003 America Online: JIMSshadowBOXER

# TAB 17



**HOME          SITE MAP          DIRECTORY          CHECK CLE          SEARCH**

State Bar of Georgia                                                          **Handbook**

**State Bar of Georgia
Issued by the Supreme Court of Georgia
On March 18, 1996
Formal Advisory Opinion No. 96-2
(Proposed Formal Advisory Opinion No. 94-R1A)**

**The ethical propriety of a lawyer stamping client correspondence with a
notice stating that the client has a particular period of time to notify the
lawyer if he/she is dissatisfied with the lawyer and that if the client did not
notify the lawyer of his/her dissatisfaction within that period of time, the
client would waive any claim for malpractice.**

**QUESTION PRESENTED:**

The question presented is whether an attorney may stamp client correspondence
with a notice stating that the client has a particular period of time to notify the
lawyer if he/she is dissatisfied with the lawyer and that if the client did not notify
the lawyer of his/her dissatisfaction within that period of time, the client would
waive any claim for malpractice.

**SUMMARY ANSWER:**

A lawyer should represent a client competently and should put the interests of a
client ahead of the lawyer's own personal interests. Therefore, the lawyer should
not condition the representation of a client upon the waiver of any claim for
malpractice and should not attempt to cause the waiver of any claim for
malpractice by the inclusion of language amounting to such a waiver in
correspondence with a client.

**OPINION:**

A member of the Investigative Panel of the State Disciplinary Board has brought
to the attention of the Formal Advisory Opinion Board a practice by lawyers of
adding the following language (by rubber stamp) to correspondence with clients.

<u>Important Message</u>

If you disagree with anything set forth in this communication or the
way I have represented you to date, please notify me by certified
mail at the address set forth herein immediately. If I do not hear
from you, it shall be an acknowledgment by you per our agreement
that you are satisfied with my representation of you to date and you
agree with my statements in this communication.

The intended effect of this "message" is to create a short period of time within which the client must decide whether he or she is satisfied with the representation, and if not satisfied, the client must notify the lawyer "immediately". If such notification is not provided "immediately", the client will have acknowledged an "agreement" that the client is satisfied with the representation.

It is apparent from reviewing this "message" that the lawyer is attempting to exonerate himself or herself from any claim of malpractice or to cause a waiver of any claim for malpractice by the client against the lawyer. The attempt to limit his or her liability for malpractice signals a failure to comply with the direction of Canon 6 of the Canons of Ethics: "A lawyer should represent a client competently." As clearly explained in Ethical Consideration 6-6:

> A lawyer should not seek, by contract or other means, to limit his individual liability to his client for his malpractice. A lawyer who handles the affairs of his client properly has no need to attempt to limit his liability for his professional activities and one who does not handle the affairs of his client properly should not [be] permitted to do so.
> ....

> The provisions of this Ethical Consideration are emphasized by Directory Rule 6-102:

> (A) A lawyer shall not attempt to exonerate himself from or limit his liability to his client for his personal malpractice.

Furthermore, Canon 5 of the Canons of Ethics provides that "A lawyer should exercise independent professional judgment on behalf of a client." As explained in Ethical Consideration 5-1:

> The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of uncompromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

By attempting to limit his or her liability for malpractice or to cause a waiver of any claim for malpractice, the lawyer is putting himself or herself into an adversarial relationship with the client. While providing advice to the client on the one hand, the lawyer is attempting to limit or excuse his or her liability for claims of malpractice resulting from the provision of such advice on the other hand. Such conduct places the lawyer's personal interests ahead of the interests of the client, and thus would amount to a failure to exercise independent professional judgment on behalf of the client in violation of Canon 5 of the State Bar of Georgia's Canons of Ethics. Furthermore, such a practice may be a violation of Standards 4 and 30 of the State Bar of Georgia's Disciplinary Standards of Conduct.

In summary, the use of a message or notice, such as described herein, is an attempt to condition a representation on the waiver of any claim for malpractice by the client against the lawyer or is an attempt to cause the client to waive such a claim as a part of the representation. Because such conduct is an attempt by the lawyer to either exonerate himself or herself from claims for malpractice or limit his or her liability to the client for acts of malpractice, such conduct is improper.

© 2002 State Bar of Georgia    Disclaimer   Directions to Our Offices   Contact the Webmaster
104 Marietta St. NW, Suite 100 Atlanta, GA 30303
(800) 334-6865   (404) 527-8700

# TAB 18

## IN THE UNITED STATES DISTRICT COURT OF THE
## WESTERN DISTRICT OF PENNSYLVANIA

IN RE:    COMMUNITY BANK OF       )
            NORTHERN VIRGINIA AND  )
            GUARANTY NATIONAL BANK  )    Civil Action No. 03-0425
            OF TALLAHASSEE SECOND  )
            MORTGAGE LOAN LITIGATION )    Honorable Gary L. Lancaster
                                    )
                                    )
                                    )

## DECLARATION OF MR. L. STEPHENS TILGHMAN

I, L. Stephens Tilghman do hereby declare and state as follows:

1.    My name is L. Stephens Tilghman and I am the principal of Tilghman & Co., P.C., the settlement administrator in *In Re Community Bank Of Northern Virginia And Guaranty National Bank Of Tallahassee Second Mortgage Loan Litigation, Civil Action No. 03-0425.* Based on my review of records, I have knowledge of the facts set forth below, and am informed and believe them to be true to the best of my knowledge.

2.    Through the opt-out deadline of October 1, 2003, there were 435 total opt-out requests submitted by class members to Tilghman & Co.

3.    Of these, 419 opt-outs were tendered as part of the opt-out campaign being conducted by various law firms, including 326 opt-outs submitted by Georgia class members on opt-out forms supplied by attorney Franklin R. Nix.

4.    The vast majority of class members who opted out (more than 400 of the 435 total opt-outs) did so using opt-out forms that appear to have been prepared by the attorneys conducting the opt-out campaign.

5.    There were only 10 opt-outs received by Tilghman & Co., P.C. on or before September 22, 2003.

6.    Only 16 of the total opt-outs do not appear to be part of any opt-out campaign.


I declare the foregoing to be true and correct under penalty of perjury pursuant to the laws of the United States.

EXECUTED THIS 6th day of October 2003 at Birmingham, Alabama.


_____
L. Stephens Tilghman

# TAB 19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:

COMMUNITY BANK OF NORTHERN VIRGINIA AND             Case No. 03-425
GUARANTY NATIONAL BANK OF TALLAHASSEE
SECOND MORTGAGE LOAN LITIGATION                     Hon. Gary L. Lancaster


### NOTICE OF OBJECTIONS TO SETTLEMENT AGREEMENT


David J. Armstrong
DICKIE, McCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222
(412) 392-5227
(412) 392-5367 (fax)

And

Franklin R. Nix
LAW OFFICES OF FRANKLIN R. NIX
1020 Foxcraft Road, N.W.
Atlanta, GA 30327-2624
(404) 261-9759
(404) 261-1458

Attorneys for Intervenor/Objectors

## NOTICE OF OBJECTIONS TO SETTLEMENT AGREEMENT

Georgia class members Daniel Johnston and Jeannie Johnston by and through their attorneys Dickia McCamey & Chilcote, P.C. and Franklin R. Nix hereby give Notice to the Court and to the parties of the following Objections to the Settlement Agreement and Release, as directed by the Court in its July 17, 2003 Findings and Order Conditionally Certifying A Class For Settlement Purposes, Preliminarily Approving The Class Settlement, Directing The Issuance Of A Class Notice to the Class And Scheduling A Settlement Hearing (the "Certification Order").

It would serve no useful purpose and burden the Court to repeat the many compelling arguments against the proposed class settlement advanced by counsel for the Missouri and Illinois intevenors/objectors. Counsel agree wholeheartedly with all such arguments

### THE BULK MAIL CLASS SETTLEMENT NOTICE FAILED TO REACH AT LEAST FIFTY PERCENT OF ALL GEORGIA CLASS MEMBERS

In the course of conducting an opt-out campaign among 2,215 Georgia Class members Franklin R. Nix recently spoke with at least 500 Georgians, all of whom wished to opt out. Incredibly, at least 80% (400 Class members) advised that they had never received any Class action settlement notice. Indeed, their first knowledge of the pendancy of any class action was through Nix's opt-out solicitation letter. Extrapolated to the entire 2,215 Georgia class membership, perhaps as many as 1,600 failed to get any notice of the class action settlement. If even half that number failed to get notice, such an occurrence demonstrates such a gross denial of due process that the entire class in Georgia and all other states should be given actual notice by first class mail, *not bulk mail*.

All class notices were sent by an as yet unknown bulk mailer using Bulk Mail Permit No 2 out of Birmingham, Alabama. Where the bulk mailer got his mailing list is as yet undisclosed. The remarkable fact is that the Homecomings Financial servicing arm of GMAC/RFC mails thousands of loan payment cards to thousands of Georgian Class members every month..Were those undoubtedly best addresses provided to the bulk mailer? Apparently not for at least two hundred Georgia Class members who are presently paying Homecomings Financial never got the class

settlement notice.

Unlike First Class Mail, which is automatically forwarded and returned to the sender if it proves undeliverable, bulk is never forwarded or returned to the the sender unless special "endorsements" such as "Address Service Requested," "Forwarding Service Requested," or "Return Service Requested." are imprinted on the bulk mail. No such endorsements were used on the class settlement notices. Indeed, the extra costs associated with "special endorsements" on bulk mail is such that the costs easily exceed the cost of First Class mail. Without these special endorsements bulk mail that proves undeliverable is never forwarded, never returned to the sender and is in fact collect as "WASTE" by the Post Office, Thus, the Settlement Administrator will never be able to confirm how many notices were delivered or not delivered. That is precisely why bulk mail is virtually never used in national class actions.

The defendants in concert with class counsel have violated the fundamental notice tenet of Rule 23. Rule 23(c)(2) requires that the Court "shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Can it be that the defendants, who have every borrowers' social security number and ready access to every credit company's current address data, cannot readily identify every borrower and that borrowers' current address? And in a class settlement involving payments of between $250 and $900, why is it that defendants and class counsel elected to use the least most reliable form of mail rather than spending 37 cents?   Can it be that the class counsel wished to assure the minimum number of opt-outs by using the most unreliable form of mail? T he burden is on the Settlement Administrator to certify to the Court who got the notice and who did not. With First Class Mail the Court could rely on the presumption that First Class Mail not returned was delivered. Conversely, the returned First Class Mail clearly proves who did not get notice. Neither determination can be made with bulk mail sent without special endorsements. That alone is enough to bar the current settlement and require new notice by First Class. Incidentally, of 2,300 opt-out solicitation letters sent First Class Mail by Mr. Nix, fewer than 100 letters were

returned for better addresses. If GMAC/RFC can afford $33,000,000 in proposed settlements, can

it not afford the mere $16,280 which a First Class Mail notice would cost. It goes without saying that

all intevenor/objector counsel should be afforded immediate and unfettered discovery as to these

matters.

Respectfully submitted this 1ˢᵗ day of October, 2003.

David J. Armstrong
DICKIA McCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, Pennsylvania 15222
412-392-5227
412-392-5367(fax)

and

Franklin R. Nix
LAW OFFICES OF FRANKLIN R. NIX
1020 Foxcroft Road, N.W.
Atlanta, Georgia 30327-2624
404-261-9759
404-261-1458(fax)


ATTORNEYS FOR THE GEORGIA
INTERVENOR/OB JECTORS

3

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the above and foregoing document was mailed this 1st day of October 2003, via first-class mail, postage prepaid, to:

R. Bruce Carlson
SPECTER SPECTER EVANS & MANOGUE, P.C.
26th Floor
Koppers Building
Pittsburgh, PA 15219

ATTORNEYS FOR THE PLAINTIFF CLASS

and

Thomas L. Allen
REED SMITH, LLP
435 Sixth Avenue
Pittsburgh, PA 15219

ATTORNEYS FOR RESIDENTIAL FUNDING CORPORATION

and

F. Douglas Ross
ODIN, FELMAN & PITTLEMAN, P.C.
9302 Lee Highway, Suite 1100
Fairfax, VA 22031

ATTORNEYS FOR COMMUNITY BANK OF NORTHERN VIRGINIA

and

Gary P. Hunt
TUCKER ARENSBERG, P.C.
One PPG Place, Suite 1500
Pittsburgh, PA 15222

ATTORNEYS FOR GUARANTY NATIONAL BANK OF TALLAHASSEE

David J. Armstrong

4

# TAB 20



## WALTERS BENDER STROHBEHN VAUGHAN, P.C.
### ATTORNEYS AT LAW

September 30, 2003

Settlement Administrator
P.O. Box 12983
Birmingham, AL 35202-2938

Bruce Carlson
Specter Specter Evans and Manogue, P.C,
26th Floor
Koppers Building
Pittsburgh, PA 14219

RE:   *In re Community Bank of Northern Virginia and Guaranty National Bank Second*
      *Mortgage Loan Litigation*
      Our File No. 1011.030138

Dear Mr./Mrs. Administrator and Mr. Carlson:

Please be advised that the following Missouri borrowers have chosen to opt out of the
proposed class action settlement in the referenced action.

Christopher and Angela Hoppe
Alvin and Linda Phipps
Scott Sondergger
John and Rowena Drennon
Kristian and Ann Anderson
Horace and Laura Noel
John and Elizabeth St. Clair
Shawn and Lorene Starkey
Sean and Nazell Daugherty
James and Regina Rudkin
Charles and Melissa Kelly
Robert and Linda Dyer
Lisa Marie Jabaar
Joseph and Barbara Calvin
Mike Kosar

Settlement Administrator
R. Bruce Carlson
September 30, 2003
Page 2

Angela Randazzo
Richard and Tabitha Belk
David and Diane Garner

This letter should be redundant of opt-out notices individually sent by or on behalf of each of these borrowers.

Additionally, by this letter we hereby give notice on behalf of Marion Smith of 725 S.E. 11th Street in Lee's Summit, Missouri that he too wishes to opt out and be excluded from the proposed settlement. Mr. Smith was unable to sign today a formal notice of opt out but he did affirmatively state that he wanted to opt-out and that he wanted our firm to represent his interests. Thus, we are authorized to provide this notice on his behalf and will subsequently provide his signed confirmation of the same. Thus, you can claim no prejudice due to the failure to receive an actual signed notice by him on or before October 1, 2003. If, however, it is your intent to claim that this notice of Mr. Smith's is improper and that he remains in the class, inform me of the same immediately so that we have no delay in presenting this matter to the Court.

Very truly yours,

WALTERS BENDER
STROHBEHN & VAUGHAN, P.C.

David M. Skeens
dskeens@wbsvlaw.com

# TAB 21

# LEGG LAW FIRM, LLC
### *A CONSUMERS' RIGHTS FIRM*
5600 Buckeystown Pike
Frederick, Maryland 21703

Telephone (301) 620-1016
Hagerstown (301) 293-6020
Fax (301) 620-1016
http://www.legglaw.com
E-Mail info@legglaw.com

**Janet Legg**
**Scott C. Borison\***

\* Admitted in MD & DC
+Admitted in MD & FL
◊Admitted in GA

**Richard C. Wills\***
**Douglas B. Bowman**
**+Mary T. Szeluga**
**Natasha V. Veytsman**
Of Counsel:
**Donald A. Dunbar**
**F. Anthony Blakey**

September 30, 2003

R. Bruse Carlson
Specter, Specter Evans And Manogue, PC
26ᵗʰ Floor, Koppers Bldg.
Pittsburg, PA 15219

Re: Election to OPT OUT, Case No.: 03-0425

Dear Mr. Carlson:

Enclosed please find an Election to OPT OUT from IN Re Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Loan Litigation, Case Number 03-0425, signed by our clients, as listed below.

| | |
|---|---|
| David H. Moaney | Nancy M. RiceDavid L. & Kimberly S. Russell |
| William & Lynette Crook | |
| Leslie S. Lyles | Charles Herrera |
| Lee Valencia Holland | Patrick M. Franklin |
| Bruce & Sue Johnson | Charles R. Keith |
| Kathy D. Yingling | Carl Harvin |
| Craig & Melissa Thomas | David D. Davidson |
| Robert W. & Judith L. Obrien | Anna Sink |
| Michael & Edna Rich | Michael L. Moore |
| Ronnie M. Whiting | Steven T. & Christine E. Kerry |
| Joe & Christina Carroll | Mary E. Deliduka |
| Anthony L. & Kathy L. Dixon | Rajan L. Keswani |
| Lamar Tyler | David J. & Patricia C. Badeaux |
| Michael W. Gamber | Robert L. & Wendy K. Moser |
| Galan Hurt | Darrell Turner |
| David E. & Laura A. Colom | Robert P. Rowley, Jr. |
| Frank Jones | Eugenie E. Stevenson |
| David M. & Gail E. Chatfield | Richard L. Johnson |
| Christopher D. Pleasant | Robert L. Murphy, Jr. |
| Tracie L. Graham | Jason M. Parrish |
| Vernisha Pope | Raymond D. McDonald, III |
| Brian and Kimberly Ann Pacheco (Bundy) | Roy A. & Bambi Lynn King |
| | Eric C. & Barbara J. Lewis |

Should you have any questions, please contact me at the above listed number. Thank you.

Sincerely,

Scott C. Borison

cc:    CBNV-GNB Settlement Administrator
       PO Box 12983
       Birmingham, AL 35202-2983

Enclosure: OPT OUT Letters

# TAB 22

CBNV-GNB Settlement Administrator
PO Box 12983
Birmingham, AL 35202-2983

R. Bruce Carlson
Specter, Specter, Evans, & Manogue, P.C.
26th Floor, Koppers Building
Pittsburgh, PA 15219

RE:    Community Bank of Northern Virginia and Guaranty National Bank
       Second Mortgage Loan Litigation, Case # 03-0425

Dear Sir,

Please be advised that we have been retained by the following class member in the above referenced action.  Please accept this request to **opt out** of the above referenced class settlement. This notice serves to **exclude** the following individual from the above referenced class settlement.

**James Beckius**
**Linda Whitehead**
**8805 Waterview Rd.**
**Machesney Park, IL 61115**

Daniel A. Edelman
EDELMAN, COMBS, & LATTURNER, LLC
120 S LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200

cc.
client

RECEIVED
SEP 3 0 2003
BY:

CBNV-GNB Settlement Administrator
PO Box 12983
Birmingham, AL 35202-2983

R. Bruce Carlson
Specter, Specter, Evans, & Manogue, P.C.
26th Floor, Koppers Building
Pittsburgh, PA 15219

**RE:**   Community Bank of Northern Virginia and Guaranty National Bank
Second Mortgage Loan Litigation, Case # 03-0425

Dear Sir,

        Please be advised that we have been retained by the following class member in the above
referenced action.  Please accept this request to **opt out** of the above referenced class settlement.
This notice serves to **exclude** the following individual from the above referenced class settlement.

**Charles Poindexter**
**Maureen Poindexter**
**3407 S Lombard Ave.**
**Cicero, IL 60804**



Daniel A. Edelman
EDELMAN, COMBS, & LATTURNER, LLC
120 S LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200

cc.
client

RECEIVED
SEP 30 2003
BY:

CBNV-GNB Settlement Administrator
PO Box 12983
Birmingham, AL 35202-2983

R. Bruce Carlson
Specter, Specter, Evans, & Manogue, P.C.
26th Floor, Koppers Building
Pittsburgh, PA 15219

          **RE:**    Community Bank of Northern Virginia and Guaranty National Bank
                   Second Mortgage Loan Litigation, Case # 03-0425

Dear Sir,

      Please be advised that we have been retained by the following class member in the above referenced action. Please accept this request to **opt out** of the above referenced class settlement. This notice serves to **exclude** the following individual from the above referenced class settlement.

**James Beckius**
**Linda Whitehead**
**8805 Waterview Rd.**
**Machesney Park, IL 61115**



Daniel A. Edelman
EDELMAN, COMBS, & LATTURNER, LLC
120 S LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200

cc.
client

RECEIVED
SEP 3 0 2003
BY:

CBNV-GNB Settlement Administrator
PO Box 12983
Birmingham, AL 35202-2983

R. Bruce Carlson
Specter, Specter, Evans, & Manogue, P.C.
26th Floor, Koppers Building
Pittsburgh, PA 15219

RE:    Community Bank of Northern Virginia and Guaranty National Bank
Second Mortgage Loan Litigation, Case # 03-0425

Dear Sir,

Please be advised that we have been retained by the following class member in the above
referenced action.  Please accept this request to **opt out** of the above referenced class settlement.
This notice serves to **exclude** the following individual from the above referenced class settlement.

**Charles Poindexter**
**Maureen Poindexter**
**3407 S Lombard Ave.**
**Cicero, IL 60804**

Daniel A. Edelman
EDELMAN, COMBS, & LATTURNER, LLC
120 S LaSalle Street, 18th Floor
Chicago, IL 60603
(312) 739-4200

cc.
client



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **Joint Motion To Invalidate Opt-Outs and For Court Approved Notice To Address False, Misleading And Deceptive Solicitations Of Opt-Outs** was served upon the following counsel of record on this date by the method indicated:

### VIA HAND DELIVERY:

David J. Armstrong, Esquire
Dickie, McCamey & Chilcote, P.C.
Suite 400
Two PPG Place
Pittsburgh, PA  15222

Louis M. Tarasi, Jr.
Tarasi, Tarasi & Fishman, pC
510 3rd Avenue
Pittsburgh, PA  15219-2107

Stanley A. Kirshenbaum.
1602 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA  15219

Robert B. Smith, Esquire
Leven Surloff
Fort Pitt Commons Bldg.
445 Fort Pitt Blvd.
Suite 210
Pittsburgh, PA  15219-1308

Counsel for Plaintiff and the Class