# Exhibit 14 to Declaration

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

IN RE:    COMMUNITY BANK OF          )
NORTHERN VIRGINIA AND                )
GUARANTY NATIONAL BANK               ) Civil Action No. 03-0425
OF TALLAHASSEE SECOND                )
MORTGAGE LOAN LITIGATION        .    )

**FINAL ORDER
APPROVING CLASS ACTION SETTLEMENT**

WHEREAS plaintiffs and defendants entered into a Settlement Agreement and Release, with Exhibits (collectively, the "Settlement Agreement"), dated July 11, 2003, to settle this class action (the "Action"); and,

WHEREAS the court entered an Order dated July 17, 2003 (the "Preliminary Approval Order"), preliminarily certifying the putative class in this action for settlement purposes under Fed. R. Civ. P. 23, ordering individual and publication notice to potential class members, scheduling a Settlement Hearing for November 14, 2003, and providing potential members of the class with an opportunity to either exclude themselves from the settlement class or object to the proposed settlement; and,

WHEREAS the court held a Settlement Hearing on November 14, 2003, to determine whether to give final approval to the proposed settlement; and

-1-

WHEREAS the court has issued Findings of Fact and Conclusions of Law Approving Class Action Settlement, dated December 4, 2003, granting final certification of the settlement class, approving the proposed settlement, and dismissing the settlement class members' claims (among other things); now, therefore,

Based on the submissions of the parties and Class Members, as that term is defined in paragraph 3 below, on the testimony adduced at the Settlement Hearing, and on this Court's Findings of Fact and Conclusions of Law dated December 4, 2003, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

1.    <u>Incorporation of Other Documents</u>.    This Order Approving Class Action Settlement incorporates (a) the Settlement Agreement and Release dated July 11, 2003, and filed with this Court on July 14, 2003; (b) The following exhibits to the Settlement Agreement: (i) Exhibit A (List of Settled Actions), (ii) Exhibit B (Claim Form), (iii) Exhibit C (Class Mail Notice), (iv) Exhibit D (Class Publication Notice), (v) Exhibit E (Notice Plan), (vi) Exhibit F (the Proposed Findings and Order Conditionally Certifying A Class For Settlement Purposes, Preliminarily Approving the Class Settlement,

AO 72A
(Rev. 8/82)

Directing The Issuance Of A Class Notice To The Class And Scheduling A Settlement Hearing), (vii) Exhibit G (Proposed Final Order Approving Class Action Settlement); and, (viii) Exhibit H (Proposed Final Judgment); and

Unless otherwise provided herein, all capitalized terms in this Order shall have the same meaning as those terms in the Settlement Agreement. The Settlement Agreement and Release and all exhibits and amendments thereto shall be referred to as the "Settlement Agreement."

2. <u>Jurisdiction</u>. Because adequate notice has been disseminated and all potential Class Members have been given the opportunity to opt out of this class action, the court has personal jurisdiction over all Class Members (as defined below). The court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, including jurisdiction to approve the proposed settlement, grant final certification of the Class, and dismiss this action on the merits with prejudice.

3. <u>Final Class Certification</u>. The Class this court preliminarily certified is finally certified for settlement purposes under Fed. R. Civ. P. 23(a), (b)(3), and (c)(2) because the court finds that the Class fully satisfies all the applicable requirements of Fed. R. Civ. P. 23 and due process.

-3-

The "Class" consists of all persons or entities ("Class Members") (i) who entered into a loan agreement with Community Bank of Northern Virginia ("CBNV") and/or Guaranty National Bank of Tallahassee ("GNBT"), (ii) whose loan was secured by a second mortgage or deed of trust on property located in the United States, (iii) whose loan was purchased by Residential Funding Corporation ("RFC"), and (iv) who were not members of the class certified in the action captioned <u>Baxter v. Guaranty National Bank, et al.</u>, Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina. A list of those persons who have excluded themselves from the Class, and who, therefore, are not Class Members, is on file with the court as Plaintiffs' and Defendants' Joint Submission of Requests for Exclusion [document #95] and is incorporated herein and made a part hereof.

4.   <u>Adequacy of Representation</u>.   R. Bruce Carlson (of Specter Specter Evans & Manogue) and Hoyt A. Rowell and Daniel O. Myers (of Richardson, Patrick, Westbrook and Brickman) ("Co-Class Counsel") and the Named Plaintiffs have fully and adequately represented the Class for purposes of entering into and implementing the settlement and have satisfied the requirements of Fed. R. Civ. P. 23(a)(4).

-4-

5.    <u>Class Notice</u>.   The court finds that the Class Mail Notice and its distribution to the Class, and the publication of the Class Publication Notice, implemented pursuant to the Settlement Agreement, The Notice Plan and this court's Preliminary Approval Order:

      a.    constituted the best practicable notice to Class members under the circumstances of this action;

      b.    constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of (i) the pendency of this action, (ii) their right to exclude themselves from the Class and the proposed settlement, (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of the Class's representation by

-5-

the Named Plaintiffs or Plaintiffs' counsel, and/or the award of attorneys' fees), (iv) their right to appear at the Settlement Hearing, either on their own or through counsel hired at their own expense, if they did not exclude themselves from the Class, and (v) the binding effect of the Orders and Judgment in this action, whether favorable or unfavorable, on all persons who do not request exclusion from the Class;

c.    constituted notice that was reasonable and constituted due, adequate and sufficient notice to all persons and entities entitled to be provided with notice; and

d.    constituted notice that fully satisfied the requirements of the Federal Rules of Civil Procedure (including Fed. R. Civ. P.

-6-

23 (c) (2) and (e)), the United
States Constitution (including
the Due Process Clause), and any
other applicable law.

6. **Final Settlement Approval**. The terms and provisions of the Settlement Agreement, including all exhibits, have been entered into in good faith and are fully and finally approved as fair, reasonable, and adequate as to, and in the best interests of, each of the parties and Class Members. The parties and Class Members who have not been timely excluded from the Class are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions.

7. **Binding Effect**. The terms of the Settlement Agreement and of this Order and the accompanying Final Judgment are binding on the Named Plaintiffs and all other Class Members who have not been timely excluded from the Class, as well as their heirs, executors and administrators, successors and assigns, and those terms shall have *res judicata* and other preclusive effect in all pending and future claims, lawsuits, or other proceedings maintained by or on behalf of any such persons, to the extent those claims, lawsuits, or other proceedings involve matters that were or could have been raised in this Action or are

-7-

otherwise encompassed by the Releases set forth in paragraph 6 of the Settlement Agreement.

8.  **Releases**. The Named Plaintiffs and all Class Members shall be bound by the Releases provided in paragraph 6 of the Settlement Agreement, which is incorporated herein in all respects, regardless of whether such persons received any compensation under the Settlement Agreement. The Releases are effective as of the date of this Final Order and the accompanying Final Judgment. The court expressly adopts all defined terms in the Releases, including, but not limited to, the following definition of the claims subject to the releases (which is set forth at paragraph 2.23 of the Settlement Agreement):

> "Settled Claims" means and includes any and all claims, demands, actions, causes of action, rights, offsets, suits, damages, lawsuits, liens, costs, losses, expenses, or liabilities of any kind whatsoever, for any relief whatsoever, including monetary, injunctive, or declaratory relief, or for reimbursement of attorneys' fees, costs, or expenses, whether known or unknown, alleged

-8-

or not alleged in the Litigation, suspected or unsuspected, contingent or vested, which the Named Plaintiffs or any member of the Plaintiff Class has had, now has, or may have in the future that were or could have been raised in the Litigation and that arise out of or are related in any way with CBNV's Second Mortgage Loan Program and/or GNB's Second Mortgage Loan Program, including, but not limited to, any claims arising out of the fees or interest rates charged in connection with CBNV's Second Mortgage Loan Program and/or GNB's Second Mortgage Loan Program, alleged representations, misrepresentations, disclosures, incorrect disclosures, failures to disclose, acts (legal or illegal), omissions, failures to act, deceptions, acts of unconscionability, acts of illegality, unfair business practices, breaches of contract, usury, unfulfilled promises, breaches of warranty or fiduciary

-9-

duty, conspiracy, or violations of any consumer protection statute, any applicable state unfair trade practice statute, or any other body of case or statutory law or regulation, federal, or state, including, but not limited to, the Truth in Lending Act, 15 U.S.C. § 1601 et seq., and its implementing regulation, 12 C.F.R. part 226; the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 et seq., and its implementing regulation, 12 C.F.R. part 226.31-32; the Real Estate Settlement Procedures Act 12 U.S.C. § 2601, and its implementing regulation, 24 C.F.R. part 3500; the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and its implementing regulation, 12 C.F.R. part 202; the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 et seq., and its implementing regulation, 12 C.F.R. part 203; the Fair Housing Act, 42 U.S.C. § 3601 et seq.; the Fair Credit Reporting Act, U.S.C. § 1681 et seq.; the

-10-

AO 72A
(Rev. 8/82)

Fair Debt Collection Practices Act, § 1692 et seq.; and the Federal Trade Commission Act, 15 U.S.C. § 45 et seq., and all claims for rescission or for general, special, and punitive damages, as well as any and all claims for treble damages, penalties, attorneys' fees, and costs of suit. Any claims arising out of future conduct, such as failure to credit a future payment, are not released.

9.   **Permanent Injunction**.  All Class Members are barred and enjoined from (i) filing, commencing, prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other claim, lawsuit, arbitration, or administrative, regulatory or other proceeding or order in any jurisdiction based on, arising out of, or relating to the claims and causes of action in this Action and/or the Settled Claims; (ii) raising as a defense to any action brought against them for repayment of a loan any of the claims or causes of action in the Action and/or the Settled Claims; and (iii) organizing or soliciting the participation of any Class Members into a

-11-

separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any claim, lawsuit, or other proceeding based on, arising out of, or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this Action and/or the Settled Claims. The court finds that issuance of this permanent injunction is necessary and appropriate in aid of the court's jurisdiction over the action and to protect and effectuate the court's Final Order and Judgment.

10. **Enforcement of Settlement**. Nothing in this Final Order or the accompanying Final Judgment shall preclude any action to enforce the terms of the Settlement Agreement.

11. **Attorneys Fees and Expenses**. Counsel of record for the Class is hereby awarded attorneys' fees and reimbursement of their disbursements and expenses in the amount of $8,100,000, to be paid by Defendants to Co-Class Counsel. Such fees and expenses are to be paid, subject to the conditions set forth in the Settlement Agreement. The court shall separately issue findings and conclusions with respect to the issue of attorneys' fees, expenses, and named plaintiff incentive awards. Within twenty (20) days of the date of this Order, Counsel for the

-12-

Bumpers/Elliott "conditional" objectors is directed to submit a fee application to Class Counsel in support of its claim that prosecution of the Bumpers case added value to the Settlement or otherwise conferred value to Class Members.   At its sole discretion, within twenty (20) days of service of the fee application, Class Counsel shall allocate fees to counsel in the Bumpers action, if any, and shall set forth the basis for said allocation in writing.   Bumpers counsel shall have twenty (20) days from the date of service of Class Counsels' allocation to file objections regarding said allocation with this court, which should be supported by all evidence offered in support of any objection.   Finally, Class Counsel shall have twenty (20) days from the date of service to respond to any objection to their allocation that is filed by Bumpers' counsel.

12.   **Incentive Awards**.   The court hereby awards $1,500.00 to be paid by Co-Class Counsel to the Named Plaintiffs as incentive awards in their capacity as representative plaintiffs in this Action.

13.   **No Other Payments**.   The preceding paragraphs of this Final Order cover all claims for attorneys' fees and expenses, costs, or disbursements incurred by Co-Class Counsel or any other counsel representing Plaintiffs or Class Members or

-13-

AO 72A
(Rev. 8/82)

incurred by Plaintiffs or the Class Members or any of them in connection with or related in any manner to this Action, the settlement of this Action, the administration of such settlement, and/or the Settled Claims except to the extent otherwise specified in this Final Order and the Settlement Agreement.

14.  **Modification of Settlement Agreement**.  The parties are hereby authorized, without needing further approval from the court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement, as are consistent with this Final Order and do not limit the rights of Class Members under the Settlement Agreement.

15.  **Retention of Jurisdiction**.  The court has jurisdiction to enter this Final Order and the accompanying Final Judgment. This court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement and of this Final Order and the accompanying Final Judgment and for any other necessary purpose, including, without limitation,

(a)  enforcing the terms and conditions of the Settlement Agreement and resolving any disputes, claims, or causes of action that, in whole or in part,

AO 72A
(Rev. 8/82)

are related to or arise out of the Settlement Agreement, this Final Order or the Final Judgment (including, without limitation, whether a person or entity is or is not a Class Member, whether claims or causes of action allegedly related to this case are or are not barred by this Final Order and the Final Judgment, etc.);

(b)   entering such additional Orders as may be necessary or appropriate to protect or effectuate the Court's Final Order and the Final Judgment approving the Settlement Agreement, to dismiss all claims on the merits and with prejudice, to permanently enjoin Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this settlement; and

(c)   entering any other necessary or appropriate Orders to protect and effectuate this court's retention of continuing jurisdiction.

16.       Class Counsel has filed a motion seeking to transfer the claims of the Kossler plaintiffs to a separate docket number. The court will grant that motion by way of separate Order. The Kossler plaintiffs' loan was not assigned

-15-

to Defendant RFC, and the Kossler plaintiffs are therefore expressly excluded from the Settlement Class and not bound by this Order and the Final Judgment. The finality of this Order and the Final Judgment shall not be impacted by Class Counsel's request that this court enter a separate Order transferring the claims of the Kossler plaintiffs to a separate docket number.

17. The finality of this Order and the Final Judgment shall not be impacted by the court's retention of jurisdiction regarding the allocation of counsel fees.

18. <u>No Admissions</u>. Neither this Final Order and the accompanying Final Judgment nor the Settlement Agreement (nor any other document referred to here, nor any action taken to carry out this Order and the Final Judgment) is, may be construed as, or may be used as an admission or concession by or against the Defendants or the Released Persons of the validity of any claim or any actual or potential fault, wrongdoing, or liability. Entering into or carrying out the Settlement Agreement, and any negotiations or proceedings related to it, shall not be construed as, or deemed evidence of, an admission or concession as to the Defendants' denials or defenses and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative

-16-

AO 72A
(Rev. 8/82)

agency, or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Final Order and Final Judgment and the Settlement Agreement; *provided, however*, that this Final Order, the accompanying Final Judgment, and the Settlement Agreement may be filed in any action against or by the Defendants or the Released Persons to support a defense of *res judicata*, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion, or similar defense or counterclaim.

19. **Dismissal of Action**. This Action, including all individual and Class claims resolved in it, is dismissed on the merits and with prejudice against Plaintiffs and all other Class members, without fees or costs to any party, except as otherwise provided in this Order and the Final Judgment.

-17-

20.  <u>Rule 58 Separate Judgment</u>.  The court will separately enter the accompanying Final Judgment in accordance with Fed. R. Civ. P. 58.

SO ORDERED this ___4th___ day of ___Dec___, 2003.

_____
Honorable Gary L. Lancaster
United States District Judge

cc: All Counsel of Record

AO 72A
(Rev. 8/82)

# Exhibit 15 to Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                              )
                                    )   MDL No. 1674
COMMUNITY BANK OF NORTHERN          )   Case No. 03-0425
VIRGINIA AND GUARANTY BANK          )
SECOND MORTGAGE LITIGATION          )
                                    )

FINAL ORDER APPROVING CLASS ACTION SETTLEMENT

WHEREAS plaintiffs and defendants entered into an
agreement captioned "Modification No. 1 to Settlement Agreement and
Release" dated July 28, 2006, [Doc. No. 225, Ex. 1], which
reaffirmed, with the stated modifications, the "Settlement
Agreement and Release," dated July 11, 2003 [Doc. No.
7](hereinafter collectively referred to as the "Settlement
Agreement"); and

WHEREAS the court entered an order dated January 25,
2008, [Doc. No. 285], preliminarily certifying the class pursuant
to Fed.R.Civ.P. 23 for settlement purposes; and

WHEREAS the court entered an order dated March 18,
2008, [Doc. No. 303], ordering individual and publication notice to
potential class members, scheduling a final settlement hearing for
June 20, 2008, and providing class members with an opportunity to
exclude themselves or object to the settlement; and

WHEREAS the court held a final settlement hearing on
June 30, 2008, to determine whether to give final approval to the

proposed settlement; and

WHEREAS the court has issued a memorandum contemporaneously herewith stating its reasons for granting final certification of the class and, <u>inter alia</u>, approving the settlement; and

Based upon the submissions of the parties and Class Members, and oral argument at the final settlement hearing, and for the reasons stated in the court's memorandum filed contemporaneously herewith it is hereby ORDERED on this 14th day of August, 2008, THAT:

1. <u>Incorporation of Other Documents</u>: This order incorporates the following documents: (a) the Settlement Agreement and Release dated July 11, 2003 and filed with this court on July 14, 2003 [Doc. No. 7]; (b) Exhibit A to the Settlement Agreement; (c) Modification No. 1 to Settlement Agreement and Release dated July 28, 2006 [Doc. No. 225, Ex. 1] and all exhibits thereto; and (d) Exhibits 1, 2, and 3 to the Revised Joint Plan of Class Action Notice [Doc. No. 297]. Unless otherwise provided herein, all capitalized terms in this order shall have the same meaning as those same terms in the Settlement Agreement.

2. <u>Jurisdiction</u>: Because adequate notice has been

sent to all Class Members and all Class Members have been given the opportunity to request exclusion from this Class, the court has personal jurisdiction over all Class Members. The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1367, including, without limitation, jurisdiction to approve the proposed settlement, grant final certification of the Class, and dismiss the action on the merits and with prejudice.

3.   <u>Final Class Certification</u>: The Class this court preliminarily certified is hereby finally certified under Fed.R.Civ.P. 23(a), (b)(3) and (c)(2). The court finds that the Class satisfies the requirements of Rule 23 and due process. The Class is all persons: (i) who entered into a loan agreement with CBNV and/or GNBT; (ii) whose loan was secured by a second mortgage deed or trust on property located in the United States; (iii) whose loan was purchased by RFC; and (iv) who were not members of the class certified in the action captioned <u>Baxter v. Guaranty National Bank</u>, et al., Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake

3

County, North Carolina. A list of those persons who have not excluded themselves from the Class and who are, therefore, Class Members, was filed by Class Counsel [Doc. No. 411].

4. <u>Adequacy of Representation</u>: The law firms of Carlson & Lynch LTD., and Richardson, Patrick, Westbrook and Brickman, LLC and named plaintiffs Brian and Carla Kessler, Ruth J. Davis, John and Rebecca Piccard, Nora Miller, William and Ellen Sabo, Robert and Rebecca Clark, Edward Kruska, Russell and Kathleen Ulrich, Thomas Mathis, Stephen and Amy Haney and Patrice Porco have fully and adequately represented the Class for purposes of entering into and implementing the Settlement in accordance with Fed.R.Civ.P. 23(a)(4).

5. <u>Class Notice</u>: The court finds that the Class Mail Notice and its distribution to the Class, and the publication of the Class Publication Notice, implemented pursuant to the Settlement Agreement, the Revised Joint Plan of Class Action Notice [Doc. No. 297], and this court's order: (a) constituted the best practicable notice to the Class members under the circumstances; (b) constituted notice that was reasonably calculated

to apprise Class Members of (i) the pendency of this action, (ii) their right to exclude themselves from the Class and the proposed settlement, (iii) their right to object to any aspect of the proposed settlement (including final certification of the settlement class, the fairness, reasonableness or adequacy of the proposed settlement, the adequacy of Class Counsel's representation of the Class, the adequacy of the Named Plaintiffs representation of the Class, and/or the fees requested by Class Counsel), (iv) their right to appear personally or through counsel at the final settlement hearing if they did not exclude themselves from the Class, and (v) the binding effect of the Orders and Judgment in this action, whether favorable or unfavorable, on all persons who did not request exclusion from the class; (c) constituted notice that was reasonable and constituted due, adequate and sufficient notice to all persons and entities entitled to notice; and (d) constituted notice that fully satisfied the requirements of the Federal Rules of Civil Procedure, the United States Constitution, and any other applicable law.

6. <u>Final Settlement Approval</u>:    The terms and
provisions of the Settlement Agreement as defined
above have been entered into in good faith and are
fully and finally approved as fair, reasonable,
and adequate as to, and in the best interests of,
each of the parties and the Class Members.  The
parties and Class Members who have not timely
excluded themselves from the Class are hereby
directed    to    implement    and    consummate    the
Settlement Agreement according to its terms and
provisions.

7. <u>Binding Effect</u>:  The  terms  of  the  Settlement
Agreement, this Order and the accompanying Final
Judgment are binding on the Named Plaintiffs and
all   other   Class   Members,   who   have   not   timely
excluded themselves from the Class, as well as
their    heirs,    executors    and    administrators,
successor and assigns, and those terms shall have
<u>res judicata</u> and other preclusive effect in all
pending  and  future  claims,  lawsuits  or  other
proceedings maintained by or on behalf of any such
persons, to the extent that those claims, lawsuits
or other proceedings involve matters that were or
could have been raised in this action or otherwise

encompassed by the Releases set forth in paragraph 6 of the Settlement Agreement.

8.  <u>Releases</u>: The Named Plaintiffs and all Class Members shall be bound by the Releases provided in paragraph 6 of the Settlement Agreement, which is incorporated herein, regardless of whether such persons received any compensation under the Settlement Agreement. The Releases are effective as of the date of this Final Order and the accompanying Final Judgment. The court expressly adopts all defined terms in the Releases, including, but not limited to, the following definition of the claims subject to the Releases (set forth in paragraph 2.23 of the Settlement Agreement):

> "Settled Claims" means any and all claims, demands, actions, causes of action, right, offsets, suits, damages, lawsuits, liens, costs, losses, expenses or liabilities of any kind whatsoever, including monetary, injunctive or declaratory relief, or for the reimbursement of attorneys' fees, costs or expenses, whether known or unknown,

alleged or not alleged in the Litigation, suspected or unsuspected, contingent or vested, which the Named Plaintiffs or any member of the Plaintiff Class has had, now has, or may have in the future which were or could have been raised in the Litigation and which arise out of or are related in any way with CBNV's Second Mortgage Loan Program and/or GNB's Second Mortgage Loan Program, including, but not limited to, any claims arising out of the fees or interest rates charged in connection with CBNV's Second Mortgage Loan Program and/or GNB's Second Mortgage Loan Program, alleged representations, misrepresentations, disclosures, incorrect disclosures, failures to disclose, acts (legal or illegal), omissions, failures to act, deceptions, acts of unconscionability, acts of illegality, unfair business practices, breaches of contract, usury, unfulfilled promises, breaches of warranty and/or fiduciary duty, conspiracy, or violations

8

of any consumer protection statute, any applicable state unfair trade practice statute, or any other body of case or statutory law or regulation, federal or state, including, but not limited to, the Truth in Lending Act 15 U.S.C. § 1601 et seq., and its implementing regulation, 12 C.F.R. part 226; the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 et seq., and its implementing regulation, 12 C.F.R. part 226.31-32; the Real Estate Settlement Procedures Act 12 U.S.C. § 2601, and its implementing regulation, 24 C.F.R. part 3500; the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., and its implementing regulation, 12 C.F.R. part 202; the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 et seq., and its implementing regulation, 12 C.F.R. part 203; the Fair Housing Act, 42 U.S.C. § 3601 et seq.; the Fair Credit Reporting Act, [15] U.S.C. § 1681, et seq.; the Fair Debt Collection Practices Act [15] U.S.C. § 1692, et seq.; and the

9

Federal Trade Commission Act, 15 U.S.C. § 45, et seq., and all claims for rescission or for general, special,, and punitive damages, as well as any and all claims for treble damages, penalties, attorneys' fees and costs of suit. Any claim arising out of future conduct, such as a failure to credit a future payment, are not released.

9.  <u>Permanent Injunction</u>: Pursuant to the All-Writs Act, 28 U.S.C. § 1651(a) and the Anti-Injunction Act, 28 U.S.C. § 2283, and based on the court's familiarity with the issues in this action and the complexity of the nationwide class action settlement, the following permanent injunction is hereby issued;

All Class Members are barred and enjoined from: (i) filing, commencing prosecuting, maintaining, intervening in, participating in (as class members or otherwise), or receiving any benefits or other relief from, any other claim, lawsuit, arbitration or administrative, regulatory or other proceeding or order

10

in any jurisdiction based on, arising out of, or relating to the claims and causes of action in this Action and/or the Settled Claims; (ii) raising as a defense to any action brought against them for repayment of a loan any of the claims or causes of action in the Action and/or the Settled Claims; and (iii) organizing or soliciting the participation of any Class Members into a separate class for purposes of pursuing as a purported class action (including by seeking to amend a pending complaint to include class allegations, or by seeking class certification in a pending action) any claim, lawsuit or other proceeding based on, arising out of, or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this Action and/or the Settled Claims.

The court finds that issuance of this permanent injunction is necessary and appropriate in aid of this court's jurisdiction over the action and to protect and effectuate the Final Order and

11

Judgment.

10. <u>Enforcement of Settlement</u>: Nothing in this Final Order and Accompanying Final Judgment shall preclude any action to enforce the terms of the Settlement Agreement.

11. <u>Attorneys' Fees and Expenses, Incentive Awards</u>: No award of attorneys' fees, expenses or incentive payments is made at this time. The court retains jurisdiction to entertain such an award in the future as set forth in paragraph 13 below. Pursuant to Rule 54, the court orders that no motion for attorneys' fees, expenses, or incentive awards shall be made prior to fourteen (14) days after the expiration of the time for any party to file a notice of appeal. If an appeal is filed, the court orders that no motion for attorneys' fees, expenses, or incentive awards shall be made prior to fourteen (14) days after complete jurisdiction is re-vested in this court following the resolution of all such appeals. The motions relating to the issue of attorneys' fees, filed at Doc. Nos. 328 and 431, are DENIED, without prejudice.

12. <u>Modification of Settlement Agreement</u>: The parties

are hereby authorized, without needing further approval of the court, to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement, as are consistent with this Final Order and do not limit the rights of Class Members under the Settlement Agreement.

13. <u>Retention of Jurisdiction</u>: The court has jurisdiction to enter this Final Order and the accompanying Final Judgment. The court expressly retains jurisdiction as to all matters relating to the administration, consummation, enforcement, and interpretation of the Settlement Agreement and of this Final Order and the accompanying Final Judgment, and for any other necessary purpose including, without limitation: (a) enforcing the terms and the conditions of the Settlement Agreement and resolving any disputes, claims or causes of action that in whole or in part, are related to or arise out of the Settlement Agreement, this Final Order or the accompanying Final Judgment (including, without limitation, whether a person is or is not a Class Member, whether claims or causes of action allegedly related to this case are or are not barred by this

13

Final Order and/or the accompanying Final Judgment); (b) entering such additional orders as may be necessary or appropriate to protect or effectuate the court's Final Order and the accompanying Final Judgment approving the Settlement Agreement, dismissing all claims on the merits and with prejudice, and permanently enjoining Class Members from initiating or pursuing related proceedings, or to ensure the fair and orderly administration of this Settlement; and (c) entering any other necessary or appropriate orders to protect and effectuate this court's continuing jurisdiction over this case.

14. <u>No Admissions</u>: Neither this Final Order and accompanying Final Judgment nor the Settlement Agreement (nor any other document referred to here, nor any action taken to carry out this Order and Final Judgment) is, may be construed as, or may be used as an admission or concession by or against the Defendants or the Released Persons of the validity of any claim or any actual or potential fault, wrongdoing or liability. Entering into or carrying out the Settlement

14

Agreement, and any negotiations or proceedings related to it, shall not be construed as, or deemed evidence of, an admission or concession as to the Defendant's denials or defenses and shall not be offered or received in evidence in any action or proceeding against any party hereto in any court, administrative agency or other tribunal for any purpose whatsoever, except as evidence of the settlement or to enforce the provisions of this Final Order and the accompanying Final Judgment and the Settlement Agreement; <u>provided however</u>, that this Final Order and the accompanying Final Judgment and the Settlement Agreement may be filed in any action by the Defendants or the Released Persons to support a defense of <u>res judicata</u>, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, or any other theory of claim preclusion, issue preclusion or similar defense or counterclaim.

15. <u>Dismissal of Action</u>: This Action, including all individual and Class claims resolved in it, is dismissed on the merits and with prejudice against Plaintiffs and all other Class Members, without

fees and costs to any party except as otherwise provided in this Order and the accompanying Final Judgment.

16. <u>Judgment</u>: Pursuant to Rule 58, the court will enter a separate Final Judgment.


IT IS FURTHER ORDERED THAT:

Doc. No. 331, Motion to Refer North Carolina Claims for Advisory Opinion, is DENIED;

Doc. Nos. 414 and 415, Motions to Strike or Exclude, are DENIED;

In accordance with paragraph 11 of this Order, Doc. Nos. 328 and 431, Motions with Respect to Attorneys Fees, are DENIED, without prejudice; and

In accordance with footnote 11 of this court's memorandum filed contemporaneously herewith, Doc. No. 419, Motion to Strike or Dismiss, is GRANTED.


BY THE COURT:

Gary L. Lancaster,
United States District Judge


cc:        All Counsel of Record

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ) | |
| ) | MDL No. 1674 |
| COMMUNITY BANK OF NORTHERN ) | Case No. 03-425 |
| VIRGINIA AND GUARANTY ) | |
| NATIONAL BANK SECOND ) | The Honorable Gary L. Lancaster |
| MORTGAGE LITIGATION ) | |

## REVISED JOINT PLAN OF CLASS ACTION SETTLEMENT NOTICE

In accord with the Court's Memorandum and Order dated February 26, 2008, the Settling

Parties hereby respectfully submit the following revised documents in support of their Joint Plan

of Class Action Settlement Notice:

      1.      Attached as Exhibit 1 is the proposed Notice Plan;

      2.      Attached as Exhibit 2 is the proposed Class Mail Notice;

      3.      Attached as Exhibit 3 is the proposed Class Publication Notice.

The attached Notice Plan, Class Mail Notice, and Publication Notice have been revised to

address in all respects the Court's February 26, 2008, Memorandum and Order.  Moreover, in an

effort to avoid further conflict, and without in any way conceding that the other objections to the

originally-submitted Notice Plan, Class Mail Notice, and Publication Notice were meritorious,

the Settling Parties also have addressed many of those objections in the documents attached

hereto.

In joining in the submission of these documents, Defendants do not waive any rights

under the Settlement Agreement, as modified.

WHEREFORE, the Settling Parties respectfully request the Court to enter an Order that:

(a) approves the proposed Notice Plan, Class Mail Notice, and Publication Notice; (b) directs the

issuance of notice; and (c) establishes deadlines for the filing of objections and opt-out requests.

Respectfully submitted,

/s/ R. Bruce Carlson
R. Bruce Carlson
Gary Lynch
CARLSON LYNCH LTD.
P.O. Box 367
231 Melville Lane
Sewickley, PA 15143
Tel: 412.749.1677

   *an*

/s/ Daniel Myers

A. Hoyt Rowell, III
Daniel Myers
RICHARDSON, PATRICK, WESTBROOK & BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC 29464
*Counsel for the Named Plaintiffs and the Class*

/s/ Donna M. Doblick
Thomas L. Allen
Roy W. Arnold
Donna M. Doblick
REED SMITH LLP
435 Sixth Avenue
Pittsburgh, PA 15219
Tel: 412.288.3066
*Counsel for Residential Funding Co., LLC*

/s/ F. Douglas Ross
F. Douglas Ross
ODIN FELDMAN & PITTLEMAN, P.C.
9302 Lee Highway, Suite 1100
Fairfax, VA 22031
Tel: 703.218.2127
*Counsel for Comm. Bank of No. Virginia*

/s/ Wendy Kloner
Wendy Kloner
Federal Deposit Insurance Company
3501 Fairfax Drive, Room VS-D-7008
Arlington, VA 22226
Tel: 703.562-2384
*Counsel for FDIC, as Receiver for Guaranty National Bank of Tallahassee*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **REVISED JOINT PLAN OF CLASS ACTION SETTLEMENT NOTICES** (including attachments) was filed electronically with the Clerk of Court using the CM/ECF system this 3d day of March, 2008, which will send notification of such filing to all counsel of record.

*s/ Donna M. Doblick*
_____

Donna M. Doblick
**REED SMITH LLP**
435 Sixth Avenue
Pittsburgh, PA  15219
Phone:  412.288.3066/3916/7274
Fax:  412.288.3063
**Counsel for Residential Funding Company, LLC**

# EXHIBIT 1

## NOTICE PLAN

**In re: Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee
Second Mortgage Loan Litigation**

Tilghman & Co., Settlement Administrator under the Settlement Agreement and Release ("the Agreement") in the above matter, submits the following plan to notify Class Members of the Agreement in compliance with Rule 23 of the Federal Rules of Civil Procedure.

### Direct Mail Notice

The principal means of notifying the Class shall be direct mail notice to the Class Member's last known address, as updated via the U.S. Postal Service's National Change of Address ("NCOA") Database.

Defendants previously supplied the Settlement Administrator with a list of names and addresses of all Class Members. The Settlement Administrator will attempt to update the addresses of all Class Members using the NCOA Database. In addition to updating mailing address through the NCOA process, the following U.S. Postal Service tools are used as standard procedure: "Address Element Correction," Delivery Point Validation," and "Delivery Sequence Files."

With respect to any Class member for whom the NCOA Database does not have a valid address, the Settlement Administrator shall submit the names and addresses to the Trans Union database for updated address information.

After this updating process is completed, the Settlement Administrator will mail the approved Class Mail Notice to all Class Members at the updated address.

If any Class Mail Notices are returned by the U.S. Postal Service as undeliverable, the Settlement Administrator shall submit the names and addresses of the addressee Class Members to the Trans Union database for updated address information. The Settlement Administrator will then re-mail the Class Mail Notice to any new address obtained from the Trans Union database (and to any new address provided by the U.S. Postal Service). The envelopes containing the direct mail notice will include the following notices:

> (1) On the front: "NOTICE TO THOSE WHO OBTAINED A SECOND MORTGAGE FROM COMMUNITY BANK OF NORTHERN VIRGINIA AND/OR GUARANTY NATIONAL BANK OF TALLASSEE"

> (2) On the back: "IF YOU OBTAINED A SECOND MORTGAGE FROM COMMUNITY BANK OF NORTHERN VIRGINIA AND/OR GUARANTY NATIONAL BANK OF TALLAHASSEE, YOU COULD GET PAYMENT FROM A CLASS ACTION SETTLEMENT."

The direct mail notice will also be posted on www.CBNV-GNBTsettlement.com.

After the settlement becomes final and effective, the Settlement Administrator will attempt to update the addresses of all Class Members again (using the NCOA Database) before mailing settlement checks and claim forms.

### Publication Notice

Within ten days after the initial mailing of the Class Mail Notices, the Settlement Administrator shall cause the Class Publication Notice to be published in two (2) weekday (Monday through Thursday) national editions of USA Today, in a posting no smaller than 3 column inches in width and 5 column inches in height.

# EXHIBIT 2

## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

**IN RE:  COMMUNITY BANK OF NORTHERN VIRGINIA AND
GUARANTY NATIONAL BANK OF TALLAHASSEE
SECOND MORTGAGE LOAN LITIGATION
CASE NO.:  03-0425**

**NOTICE OF CERTIFIED CLASS ACTION SETTLEMENT**

- All persons:  (i) who entered into a loan agreement with Community Bank of Northern Virginia and/or Guaranty National Bank of Tallahassee; (ii) whose loan was secured by a second mortgage or deed of trust on property located in the United States; (iii) whose loan was purchased by Residential Funding Corporation ("RFC"); and (iv) who was **not** a member of the class certified in the action titled Baxter v. Guaranty National Bank, Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina, may be eligible to receive payments under the class action settlement.

- A modified settlement has been proposed in the above-identified class action lawsuit related to fees and interest charged on certain second mortgage loans.  The Court has entered an order and opinion preliminarily approving the modified settlement.  This modified settlement makes available additional cash relief for eligible class members, beyond the proposed cash relief that was to be made available in a prior proposed settlement of this lawsuit.  Certain mortgage borrowers who entered into second mortgage loan agreements with Community Bank of Northern Virginia ("CBNV") and/or Guaranty National Bank of Tallahassee ("GNB") **ARE ELIGIBLE TO RECEIVE MONEY** once the settlement is approved, as described below.  If you qualify, you will receive an automatic cash payment, and you might be eligible to receive additional cash payments if you satisfy certain requirements.   You can also elect to exclude yourself from the settlement, or object to it.

- Court-appointed lawyers for the class will ask the Court for attorneys' fees, expenses and costs, not to exceed the amount of $7,500,000 to be paid separately by the Defendants.  If so ordered by the Court, the Defendants may also pay up to an additional $2,000,000 in attorneys' fees and costs to other attorneys.

- Your legal rights are affected whether you act, or don't act.  Read this notice carefully.

## YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT:

| | |
|---|---|
| DO NOTHING AT THIS TIME | If you do nothing, you are agreeing to participate in the settlement. A check (and a claim form you can fill out to claim an additional payment) will be mailed to you once the settlement is approved. By selecting this option, you are giving up your rights to sue CBNV, GNB, RFC, and certain other persons and companies. |
| EXCLUDE YOURSELF | If you ask to be excluded from the settlement, **you will not receive any cash payments from the settlement.** By selecting this option, you keep any rights to sue CBNV, GNB, RFC, and the other persons and companies about the banks' second mortgage programs. |
| OBJECT | Participate in the settlement, but write to the Court about why you do not like it. |
| GO TO A HEARING | Ask to speak in Court about the fairness of the settlement. |

- These rights and options – and the deadlines to exercise them – are explained in this notice.

- The Court still has to decide whether to grant final approval of the settlement. Payments will be made once the Court grants final approval and any appeals from that order are resolved. No payments will be made if the Court does not grant final approval to the settlement, or if the settlement is reversed or undone on appeal.

**1.      Why did I get this notice?**

Mortgage records show that CBNV and/or GNB originated or made a second mortgage loan to you.

**2.      What is this lawsuit about?**

The Named Plaintiffs, on behalf of all members of the class, have asserted that **COMMUNITY BANK OF NORTHERN VIRGINIA and GUARANTY NATIONAL BANK OF TALLAHASSEE** violated certain federal and state laws in connection with the fees and interest charged on second mortgage loans, as specifically set forth in the Consolidated Amended Class Action Complaint on file and available at the Court at 700 Grant Street, Suite 3100, Pittsburgh, PA 15219. CBNV and GNB are named as Defendants because they allegedly originated and/or made the loans at issue. RFC is named as a Defendant because it allegedly purchased the loans from CBNV and GNB. CBNV, GNB (through its receiver, Federal Deposit Insurance Corporation), and RFC all deny any liability or wrongdoing.

**3.    What is a class action and who is involved?**

In a class action, one or more people called "Class Representatives," sue on behalf of people who have similar claims. All these people are a "Class" or "Class Members." The Named Plaintiffs who sued – and all the Class Members like them – are called the Plaintiffs. The companies the Named Plaintiffs sued are called the Defendants. One court resolves the issues for all Class Members, except for those who exclude themselves from the Class. U.S. District Judge Gary L. Lancaster is in charge of this class action. The Court decided that this lawsuit can be settled on a class-wide basis.

**4.    What does the lawsuit complain about?  What are the Defendants' responses?**

In the lawsuit, the Plaintiffs allege that CBNV and GNB violated federal and state laws in connection with the fees and interest charged on second mortgage loans. Specifically, the Plaintiffs allege that CBNV and GNB violated the Real Estate Settlement Procedures Act (12 U.S.C. § 2607) ("RESPA"), the Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c), (d) ("RICO"), and the laws of various states in connection with the fees and interest rates disclosed and charged on certain second mortgage loans. The Plaintiffs allege that RFC is liable for some or all of those alleged violations of the law because it purchased the loans from CBNV and RFC.

CBNV, GNB, and RFC all deny that they violated any federal or state law in connection with the banks' second mortgage loan programs.

**5.    Why is there a settlement?**

The Court did not decide in favor of the Plaintiffs or the Defendants. The Plaintiffs think they could have prevailed at a trial. The Defendants think the Plaintiffs would not have prevailed at trial. But there was no trial. Instead, both sides agreed to a settlement. That way, they avoid the risk and expense of a trial, and the people affected will receive cash payments. The Class Representatives and the attorneys for the Class think the settlement is best for all Class Members.

**6.    How do I know if I am part of the settlement?**

Judge Lancaster decided that everyone who fits this description is a Class Member:

All persons:

(i) who entered into a loan agreement with Community Bank of Northern Virginia and/or Guaranty National Bank of Tallahassee;

(ii) whose loan was secured by a second mortgage deed or trust on property located in the United States;

(iii) whose loan was purchased by Residential Funding Corporation; and

(iv) who were **not** members of the class certified in the action captioned <u>Baxter v. Guaranty National Bank</u>, et al., Case No. 01-CVS-009168, in the General Court of Justice, Superior Court Division of Wake County, North Carolina.

**7.      I'm still not sure if I am included.**

If you are still not sure whether you are included, you can ask for free help.  You can call 1-800-xxx-xxxx.

**8.      What does the settlement provide?**

The settlement provides for payments to Class Members as follows:

The Defendants have agreed to pay money to settle the litigation.  The money they are going to pay is called the "Settlement Funds."  If you (and any co-borrowers on your loan) participate in the settlement, you will receive your share of the Settlement Funds based upon a formula developed with the Plaintiffs' attorneys.  The specific amounts to be paid are as follows:

(1)      If you (and any co-borrowers) obtained a second mortgage loan from CBNV on or after May 1, 2000, you (and any co-borrowers) are eligible to receive a single payment in the amount of $600.00.

(2)      If you (and any co-borrowers) obtained a second mortgage loan from CBNV prior to May 1, 2000, you (and any co-borrowers) are eligible to receive a single payment in the amount of $250.00.

(3)      If you (and any co-borrowers) obtained a loan from CBNV secured by a second mortgage on property located in Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Missouri, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Washington, Wisconsin or Wyoming, you (and any co-borrowers) are eligible to receive a single payment in the amount of $325.00, in addition to any amounts you may receive under (1) or (2) above.

(4)      If you (and any co-borrowers) obtained a second mortgage loan from GNB on or after September 19, 2001, you (and any co-borrowers) are eligible to receive a single payment in the amount of $600.00.

(5)      If you (and any co-borrowers) obtained a second mortgage loan from GNB prior to September 19, 2001, you (and any co-borrowers) are eligible to receive a single payment in the amount of $250.00.

(6)      If you (and any co-borrowers) obtained a loan from GNB secured by a second mortgage on property located in Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Missouri, New Jersey, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Utah, Virginia, Washington, Wisconsin

or Wyoming, you (and any co-borrowers) are eligible to receive a single payment in the amount of $325.00, in addition to any amounts you may receive under (4) or (5) above.

(7) If you (and any co-borrowers) obtained a second mortgage loan from CBNV prior to May 1, 2000, or if you (and any co-borrowers) obtained a second mortgage loan from GNB prior to September 19, 2001, you (and any co-borrowers) may be eligible to receive an additional payment in the amount of $302.00, in addition to any amounts you may receive under (1) – (6) above. If you (and any co-borrowers) decide to stay with the Class, you will receive a separate mailing describing the evidence you need to submit to qualify for this additional payment. You will receive this mailing at the time you receive payment of any amounts you may receive under (1) – (6) above.

(8) If you (and any co-borrowers) satisfy the criteria listed below, you (and any co-borrowers) may be eligible to receive an additional payment in the amount of $332.00. If you (and any co-borrowers) decide to stay with the Class, you will receive a separate mailing describing the evidence you need to submit to qualify for this additional payment. You will receive this mailing at the time you receive payment of any amounts you may receive under (1) – (7) above.

**9.     How do I participate in the settlement?**

If you want to participate in the settlement, you do not need to do anything now. If the settlement is approved, a check will be mailed to you. That mailing will also include a Proof of Claim Form that you can complete and mail back by the deadline on the Form to be eligible for one or more additional payments (those described in paragraphs (7) and (8) above). Failure to fully follow the procedures will result in a class member not receiving all relief to which he would be entitled, but nonetheless being bound by any judgments, orders and releases in this case.

**10.     When would I get my payment(s)?**

The Court will hold a hearing on **[xx days after the deadline for filing any objections]**, to decide whether to finally approve the settlement. If Judge Lancaster approves the settlement, there may be appeals. It is always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps more than a year. Please be patient. If you change addresses in the interim, please inform the Settlement Administrator or Class Counsel, at the addresses listed in paragraphs 12 and 22 below.

**11.     What am I giving up to get a payment or stay in the Class?**

Unless you exclude yourself from the Class, you are staying in the Class. That means that you cannot sue, continue to sue, or be part of any other lawsuit against CBNV, GNB, RFC, and certain other persons and companies about the banks' second mortgage programs, including, but

not limited to, the fees and interests charged on second mortgage loans. Specifically, you will be releasing all "Released Persons" from all "Settled Claims." Settled Claims are defined as:

> [A]ny and all claims, demands, actions, causes of action, rights, offsets, suits, damages, lawsuits, liens, costs, losses, expenses or liabilities of any kind whatsoever, for any relief whatsoever, including monetary, injunctive or declaratory relief, or for reimbursement of attorneys' fees, costs or expenses, whether known or unknown alleged or not alleged in the Litigation, suspected or unsuspected, contingent or vested, which the Named Plaintiffs or any member of the Plaintiff Class has had, now has, or may have in the future which were or could have been raised in the Litigation and which arise out of or are related in any way with CBNV's Second Mortgage Loan Program and/or GNB's Second Mortgage Loan Program, including, but not limited to, any claims arising out of the fees or interest rates charged in connection with CBNV's Second Mortgage Loan Program and/or GNB's Second Mortgage Loan Program, alleged representations, misrepresentations, disclosures, incorrect disclosures, failures to disclose, acts (legal or illegal), omissions, failures to act, deceptions, acts of unconscionability, acts of illegality, unfair business practices, breaches of contract, usury, unfulfilled promises, breaches of warranty or fiduciary duty, conspiracy, excessive fees collected, or violations of any consumer protection statute, any state unfair trade practice statute, or any other body of case or statutory law or regulation, federal or state, including but not limited to the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* and its implementing regulation, 12 C.F.R. part 226; the Home Ownership and Equity Protection Act, 15 U.S.C. § 1639 *et seq.*, and its implementing regulation, 12 C.F.R. part 226.31-32; the Real Estate Settlement Procedures Act 12 U.S.C. § 2601, and its implementing regulation, 24 C.F.R. part 3500; the Equal Credit Opportunity Act, 15 U.S.C. §1691 *et seq.*, and its implementing regulation, 12 C.F.R. part 202; the Home Mortgage Disclosure Act, 12 U.S.C. § 2801, et seq., and its implementing regulation, 12 C.F.R. part 203; the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*; the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.*; the Fair Debt Collection Practices Act, §§ 1691, *et seq.;* and the Federal Trade Commission Act, 15 U.S.C. §§ 45, *et seq.*, and all claims for rescission or for general, special, and punitive damages, as well as any and all claims for treble damages, penalties, attorneys' fees, and costs of suit.

Among other things, you would be releasing the Released Persons from Settled Claims, even if you later discover facts in addition to or different from the facts you now know or believe to be true with respect to the subject matter of the release. You would also be giving up any right you may have had to assert the Settled Claims as a defense in any other action, or in defense of efforts or proceedings that seek to require you to repay your loan.

Any claims arising out of future conduct, such as failure to credit a future payment are **not** released.

"Released Persons" are defined to include:

Defendants and any entities or persons in any way involved in the CBNV Second Mortgage Loan Program and/or the GNB Second Mortgage Loan Program, including but

not limited to:  Title America, LLC; Equity Plus, LLC; Equity Guaranty, LLC; Homecomings Financial Network, Inc.; J.P. Morgan Chase Bank as Indenture Trustee; any closing agents or other providers of services in connection with Class Members' CBNV or GNB loans; any servicers of Class Members' CBNV and GNB loans; any assignees of Class Members' CBNV or GNB loans and any trustees or trusts which hold or have held any loans provided to Class Members pursuant to the CBNV Second Mortgage Loan Program and/or the GNB Second Mortgage Loan Program; and each of their affiliated, subsidiary, and parent companies, doing business in their own names, and all of their respective officers, directors, partners, insurers, employees, associates, trustees, agents, accountants, attorneys, predecessors, successors and assigns.

If you want more information about the scope of the Settled Claims you would be releasing if you participate in the Settlement, you should consult the Settlement Agreement, which is available at www.CBNV-GNBTsettlement.com.

In addition, if you stay in the Class, all of the Court's orders will apply to you and legally bind you.

**12.     Can I exclude myself from the Class?**

If you do not wish to participate in this settlement, you must notify Class Counsel and Counsel for the Defendants in writing that you wish to be excluded from the Class.  Your request to be excluded from the settlement Class must contain the following information:  (1) the name of class member; (2) the current address of the class member; and (3) the date signed.  No request for exclusion can be made on behalf of a group of class members.  If you are represented by an attorney, your attorney may submit a request for exclusion on your behalf, provided that the attorney includes with the filing a power of attorney signed by you.  You must mail your exclusion request postmarked no later than **[second publication date + 60]** to the Settlement Administrator at:

CBNV-GNB Settlement Administrator
P.O. Box 12983
Birmingham, AL  35202-2983

If you ask to be excluded from the Settlement Class, you will not receive a payment, and you cannot object to the settlement.  You will not be legally bound by anything that happens in this lawsuit.  You may be able to sue (or continue to sue) Defendants in the future.  A request by one borrower to exclude himself/herself from the settlement will also exclude any other co-borrowers on the same loan.

**13.     If I don't exclude myself, can I sue the Defendants for the same thing later?**

No.  Unless you exclude yourself, you give up any right to sue the Defendants for all Settled Claims (the definition of which appears in paragraph 11 above).  If you have a pending lawsuit involving any claim that might fall within the definition of Settled Claims, speak to your lawyer in that case immediately, because you must exclude yourself from *this* Class to continue your

own lawsuit. If you have a pending lawsuit on matters that are not within the definition of Settled Claims, you may continue that lawsuit even if you do not exclude yourself from this Class.

**14.    If I exclude myself, can I get a payment from this Settlement?**

No. If you exclude yourself, you will not receive any payment from this Settlement.

**15.    Do I have a lawyer in this case?**

The Court designated R. Bruce Carlson and Gary Lynch from the law firm of Carlson Lynch Ltd., and Daniel Myers and A. Hoyt Rowell, III of Richardson, Patrick, Westbrook & Brickman, LLC, to represent you and other Class Members. These lawyers are called Class Counsel. These lawyers will be paid as set forth in the following paragraph. If you want to be represented by your own lawyer, you may hire one at your own expense. If you have your own lawyer, he or she can enter an appearance in this case.

**16.    How will these lawyers be paid?**

Class Counsel will ask the Court to approve payment of attorneys' fees and expenses not to exceed the amount of $7,500,000. The fees would pay Class Counsel for investigating the facts, litigating the case, and negotiating the settlement. In addition, Class Counsel will ask for payment of $1,500 to each of the Named Plaintiffs for their services as Class Representatives. The Defendants will separately pay these fees and expenses. Any payments that the Court awards to the Named Plaintiffs will be paid out of the attorney's fees award. The Defendants have agreed not to oppose these fees and expenses. If so ordered by the Court, the Defendants will pay up to an additional $2,000,000 in attorneys' fees and costs to other attorneys. These payments will be separate and apart from the amount of money being made available to the Class, and will not reduce the amount of money paid to the Class in any way.

**17.    How can I object to the Settlement?**

If you are a Class Member, you can object to any part of the settlement that you don't like. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must send a letter that you object to *In re: Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Litigation*, Case No. 03-425. Be sure to include your name, address, telephone number, **your signature**, and the reasons you object to the settlement. **You must mail your objection, postmarked not later than [2d publication date + 60] to each of these addresses:**

| COURT | CLASS COUNSEL | DEFENSE COUNSEL |
|---|---|---|
| Clerk of Court U.S. District Court for the Western District of Pennsylvania U.S. Courthouse, 3d Floor Pittsburgh, PA 15219 **You must ask the Clerk to file your Objection in the Court's official records of the case.** | R. Bruce Carlson Gary F. Lynch Carlson Lynch Ltd. 36 N. Jefferson Street P.O. Box 7635 New Castle, PA 16107  A. Hoyt Rowell, III Daniel O. Myers Richardson, Patrick, Westbrook & Brickman, LLC 1037 Chuck Dawley Blvd. Bldg. A P.O. Box 1007 Mount Pleasant, SC 29465 | Thomas L. Allen Roy W. Arnold Reed Smith LLP 435 Sixth Avenue Pittsburgh, PA 15219  F. Douglas Ross Odin Feldman & Pittleman P.C. 9302 Lee Highway, Suite 1100 Fairfax, VA 22031  Wendy Kloner Federal Deposit Insurance Corporation Legal Division, Commercial Litigation Unit 1717 H Street, N.W., Room H-10166 Washington D.C., 20429 |

If you do not follow these instructions, the Court may not consider your objections.

**18.     What's the difference between objecting and excluding?**

Objecting is simply telling the Court that you don't like something about the settlement. You can object only if you stay in the Class. Excluding yourself is telling the Court that you don't want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

**19.     When and where will the Court decide whether to approve the Settlement?**

The District Court will hold a hearing to decide whether to approve the settlement. This "Fairness Hearing" will be held on **[xx days after the deadline for filing objections]** at the Court, 700 Grant Street, Pittsburgh, PA 15219. At this hearing, the Court will consider whether the settlement is fair, reasonable and adequate. If there are objections or requests to be heard, the Court may consider them at the hearing. The Court may also decide the amount of attorneys' fees and costs to be paid to Class Counsel.

**20.     Do I have to come to the Hearing?**

No. Class Counsel will answer any questions Judge Lancaster may have. But, you are welcome to come at your own expense. If you file an objection with the Court, you don't have to come to Court to talk about it. As long as you mailed your written objection on time to all of the addresses listed in paragraph 18 above, the Court will consider it. You may also pay your own lawyer to attend at your own expense, but it's not necessary.

**21.     May I speak at the hearing?**

You may ask the Court for permission to speak at the Fairness Hearing. To do so, you must send a letter saying that it is your "Notice of Intention to Appear in *In re: Community Bank of Northern Virginia and Guaranty National Bank Second Mortgage Litigation.*" Be sure to include your name, address, telephone number, and your signature. Your Notice of Intention to Appear must be postmarked no later than **[2d publication date + 60]**, and be sent to the Clerk of the Court, Class Counsel, and Defense Counsel at the addresses in paragraph 18 above. You cannot speak at the hearing if you excluded yourself from the settlement.

**22.     How do I get more information?**

The foregoing is only a summary of the circumstances surrounding the litigation, the claims asserted, the class, the settlement, and related matters. You may seek the advice and guidance of your own private attorney, at your own expense, if you desire. For more detailed information, you may review the pleadings, records, and other papers on file in this litigation, which may be inspected during regular business hours at the Court, 700 Grant Street, Pittsburgh, PA, 15219. If you wish to communicate with Class Counsel, you may do so by writing to R. Bruce Carlson of Carlson Lynch Ltd., 36 N. Jefferson Street, P.O. Box 7635, New Castle, PA, 16107 or Daniel O. Myers of Richardson, Patrick, Westbrook & Brickman, LLC, 1037 Chuck Dawley Blvd., Bldg. A, P.O. Box 1007, Mount Pleasant, SC 29465.

Alternatively, you may call the offices of the firm at its toll free number 1-800-xxx-xxxx, or go to its website, www.rpwb.com. You may also consult www.CBNV-GNBTsettlement.com.

So Ordered.

/s/The Honorable Gary L. Lancaster
United States District Court Judge

# EXHIBIT 3

## [PUBLISHED NOTICE OF CLASS ACTION SETTLEMENT]
### This notice may affect your rights.
### Please read carefully.

### IN THE UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF PENNSYLVANIA

IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA and GUARANTY NATIONAL BANK OF TALLAHASSEE SECOND MORTGAGE LITIGATION
Case No.: 03-0425

**IF YOU OBTAINED A SECOND MORTGAGE FROM COMMUNITY BANK OF NORTHERN VIRGINIA AND/OR GUARANTY NATIONAL BANK OF TALLAHASSEE, YOU COULD GET PAYMENT FROM A CLASS ACTION SETTLEMENT.**

### SUMMARY NOTICE OF CERTIFIED CLASS ACTION SETTLEMENT

A modified settlement has been proposed in the above-identified class action lawsuit related to fees and interest charged on certain second mortgage loans. The Court has entered an order and opinion preliminarily approving the modified settlement. This settlement makes available additional cash relief for eligible class members, beyond the proposed cash relief that was to be made available in a prior proposed settlement of this lawsuit. Certain mortgage borrowers who entered into second mortgage loan agreements with Community Bank of Northern Virginia ("CBNV") and/or Guaranty National Bank of Tallahassee ("GNB") **ARE ELIGIBLE TO RECEIVE MONEY**, as set forth below. If you qualify, you will receive some cash relief automatically, and you might be eligible to receive additional cash relief if you satisfy certain requirements. You can also elect to exclude yourself from the settlement, or object to it.

### WHO IS INCLUDED?

You are a class member and you will qualify for cash relief if: (i) you entered into a loan agreement with CBNV and/or GNB; (ii) your loan was secured by a second mortgage or deed of trust on property located in the United States; (iii) your loan was purchased by Residential Funding Corporation ("RFC"); and (iv) you were **not** a member of the class certified in the action titled Baxter v. Guaranty National Bank, Case No. 01-CVS-009168, in the General Court of Justice, Superior Court of Wake County, North Carolina.

To see and print the Full Notice that provides more detailed information about the modified settlement, go to www.CBNV-GNBTsettlement.com.

### WHAT IS THIS ABOUT?

The Named Plaintiffs, on behalf of all members of the class, have asserted that **COMMUNITY BANK OF NORTHERN VIRGINIA and GUARANTY NATIONAL BANK OF TALLAHASSEE** violated certain federal and state laws in connection with the fees and interest charged on second

mortgage loans, as specifically set forth in the Consolidated Amended Class Action Complaint on file and available at the Court at 700 Grant Street, Suite 3100, Pittsburgh, PA 15219. CBNV and GNB are named as defendants in the lawsuit because they originated and/or made the challenged second mortgage loans. RFC is named because it allegedly purchased the loans from CBNV and GNB. CBNV, GNB (through its receiver, the Federal Deposit Insurance Corporation), and RFC all deny any liability or wrongdoing.

### WHAT DOES THE SETTLEMENT PROVIDE?

Under the terms of the original settlement, all class members will receive an automatic cash payment ranging from $250.00 to $925.00. The specific amount any class member is entitled to receive automatically will depend on: (1) whether the loan was with CBNV or GNB; (2) the date of the loan; and (3) the state in which the class member resided at the time he or she obtained the loan. Certain class members also will be eligible to receive an additional payment of $302.00 if they properly complete and timely return a claim form that will be sent to them with the automatic payment.

In addition, under the terms of the modified settlement, all class members who properly complete and timely return the claim form **also** will be eligible to receive an additional payment of $332.00.

If the settlement is approved, class members who do not exclude themselves (as described below) will release CBNV, GNB, RFC and certain other persons and companies from a broad range of claims relating to CBNV's and GNB's second mortgage loan programs.

### HOW DO YOU RECEIVE PAYMENT?

If you would like to participate in the settlement and receive payment(s) as described above, you do not need to do anything now. If the settlement is approved, a check will be mailed to you. That mailing will also contain instructions telling you what you need to do (and when) to be eligible for potential additional payments.

### WHAT ARE YOUR OTHER OPTIONS?

If you do not want to receive the benefits of this settlement and be legally bound by the settlement, you must exclude yourself by **[60 days after second publication notice]**, or you will not be able to sue, or continue to sue, CBNV, GNB, RFC, and certain others about the banks' second mortgage loan programs, including, but not limited to, any claims arising out of the fees or interest rates disclosed or charged on second mortgage loans. To exclude yourself, you must submit a personally signed request, including your name, address and telephone number stating that you do not wish to be part of the Class. No request for exclusion can be made on behalf of a group of class members. If you are represented by an attorney, your attorney may submit a request for exclusion on your behalf, provided that the attorney includes with the filing a power of attorney signed by you. If you exclude yourself, you won't receive any payment from the settlement. If you stay in the settlement, but have objections to it, you must file those objections with the Court by **[60 days after second publication notice]**.

A notice of the original proposed settlement of this lawsuit

was originally given in 2003. If you objected to the settlement at that time, you must renew your objection by the deadlines set forth above in order to preserve them. If you do not do so, the Court will conclude that you want to participate in the modified settlement, without objection.

The Full Notice contains important information regarding the rights, obligations, requirements, and deadlines for class members to participate in the settlement, to be excluded from the settlement, or to object.

The Court will hold a hearing in this case (In re: Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation, Case No. 03-0425), at the U.S. Courthouse at 700 Grant Street, Pittsburgh, PA 15219, on **[xx days after the deadline for filing any objections]**, to consider whether to approve the settlement, and to consider a request by the lawyers representing all class members for attorneys' fees, expenses and costs, not to exceed $7,500,000. If so ordered by the Court, the Defendants may also pay up to an additional $2,000,000 in attorneys' fees and costs to other attorneys. Any fee the Court approves will be separate and apart from the amount of money being made available to the class, and will not reduce the amount of money paid to the class in any way. You may ask to appear at the hearing, but you do not have to.

**YOU CAN OBTAIN MORE INFORMATION REGARDING THE MODIFIED SETTLEMENT BY CALLING THE TOLL-FREE INFORMATION LINE SET UP FOR CLASS MEMBERS BY CLASS COUNSEL AT 1-800-[NUMBER]. YOU CAN ALSO OBTAIN MORE INFORMATION AT WWW.CBNV-GNBTSETTLEMENT.COM OR WWW.RPWB.COM.**

This notice is not to be construed as an expression of any opinion by the District Court with respect to the merits of the respective claims or defenses of the parties.

So Ordered.

/s/The Honorable Gary L. Lancaster
United States District Court Judge

IF YOU HAVE ANY QUESTIONS OR CONCERNS, ADDRESS ALL INQUIRIES IN THE MANNER SET FORTH ABOVE. THE COURT AND THE CLERK WILL NOT ANSWER LEGAL QUESTIONS FROM INDIVIDUAL CLAIMANTS. BY ISSUING THIS NOTICE, THE COURT EXPRESSES NO OPINION AS TO THE MERITS OF ANY CLAIMS OR DEFENSES ASSERTED IN THIS CIVIL ACTION. **PLEASE DO NOT CONTACT THE COURT.**

# Exhibit 16 to Declaration

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: COMMUNITY BANK OF NORTHERN VIRGINIA SECOND MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1674<br><br>Case No. 03-0425<br>Case No. 02-01201<br>Case No. 05-0688<br>Case No. 05-1386<br><br>Hon. Gary L. Lancaster |

THIS DOCUMENT RELATES TO ALL MDL ACTIONS

**PLAINTIFFS' JOINT CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs jointly amend all previously filed complaints in this multidistrict proceeding by substituting the following allegations of this *Joint Consolidated Amended Class Action Complaint* (sometimes the "*MDL Complaint*").

## I.    THE NATURE OF THIS ACTION

1.    This action is brought by a Plaintiffs' Class of residential mortgage borrowers against Community Bank of Northern Virginia ("CBNV")(a Virginia state-chartered, federally insured bank), now owned by PNC Bank, N.A., the Federal Deposit Insurance Corporation as receiver for Guaranty National Bank of Tallahassee ("GNBT") (a national bank)(collectively "the Banks"), and GMAC-Residential Funding Corporation n/k/a Residential Funding Company, LLC ("RFC").[1]

2.    The conduct being challenged in this action demonstrates the types of sharp practices that fueled the collapse of the American mortgage market. The objective of the conspiracy at issue was to generate the highest possible volume of residential second mortgage

loans as a vehicle to extract exponentially excessive settlement fees from borrowers (Plaintiffs are challenging the practices that occurred in approximately 50,000 loan transactions). These loans had an average principal balance of approximately $35,000. Every borrower who was enticed to close one of these loans paid "origination" and "title" fees in excess of 12% of the original principal balance of the loan – as well as exorbitant interest rates that were largely unrelated to the credit worthiness of the borrowers.[2] The fees that were charged in connection with these loans were at least four times as high as the fees that would have been available to these borrowers in a true free market for settlement services that was not impeded by the presence of a fraudulent kick-back scheme.

3.      The kickback scheme at issue was conceived by brothers David, DeVan and Chris Shumway and Randy Bapst. The Shumway/Bapst "business plan" was to drive loan volume via a massive nationwide direct mail marketing campaign. Borrowers who were identified by the marketing campaign were referred to the Bank Defendants, who would process and originate the loans in their own names, and then kick-back the overwhelming majority of the settlement fees to companies controlled by Messrs. Shumway and Bapst (the entities controlled by Shumways and Bapst will hereafter be referred to generally as the "Shumway/Bapst Organization"), notwithstanding that the Shumway/Bapst Organization was not providing any compensable settlement services in connection with the loans.

4.      Defendant RFC (and in terms of loan volume to a lesser extent the other Investor Defendants) played a crucial role in the scheme. Specifically, RFC would purchase the loans

---

[1]  RFC purchased the vast majority of the second mortgage loans at issue. A number of other entities, however, also purchased second mortgage loans originated by the Banks, including, Irwin Union Bank and Trust Company, Household Finance, Inc., Wilshire Funding Corporation, Fairbanks Capital Corporation and Morequity, Inc..

[2]  During the period of time when GNBT was making the mortgage loans at issue -- from approximately April 2000 through August 2002 -- it originated more than 28,000 loans for a cumulative loan amount in excess of $1 billion. The vast majority of these loans, like the loans originated by CBNV, were sold to RFC on a correspondent basis.

from the Banks on a correspondent basis, shortly after the settlement of the loans. RFC profited from interest incurred while holding the loans in its own portfolio, and then again after it securitized pools of loans for sale on Wall Street. The capital provided by RFC was integral to the successful operation of the scheme, in that the Banks did not have sufficient capital to permit them to hold the loans in their own portfolios for any appreciable period of time.

5.    The profits realized by the participants in the scheme were directly tied to loan volume, and every participant in the scheme ignored the unlawful aspects of the settlement practices at issue to maximize loan volume.

6.    This action includes both a plaintiffs' and a defendants' class in connection with the second mortgage home loans made by the Banks. The class of Plaintiffs includes all persons obtaining high-cost, high-interest loans from CBNV and/or from GNBT . The loans at issue are all "high-cost" loans under the Home Ownership and Equity Protection Act, 15 U.S.C. § 1641 ("HOEPA").

7.    In two prior opinions, the Third Circuit has confirmed that this matter can likely proceed as a class action. Specifically, two District Court orders approving previous proposed national settlements of the class claims at issue have been considered, vacated and remanded with instructions by the Third Circuit. In these opinions, the Third Circuit held that the claims at issue satisfy the numerosity, typicality and commonality elements of Rule 23(a), as well as the predominance and superiority elements of Rule 23(b)(3). *In re Community Bank of Northern Virginia,* 418 F.3d 277, 309-310 (3rd Cir. 2005). The Third Circuit offered detailed guidance regarding how to address potential adequacy issues under Rule 23(a)(4). *Id.* Any potential adequacy issue is resolved through the filing of this Joint Consolidated Amended Complaint.

8.    This *MDL Complaint* relates back to the initial filings in *Davis v. Community Bank of Northern Virginia, et al.* (Case No. 02-1201)(May 1, 2000) for CBNV and the Investor Defendants and *Ulrich v. Guaranty National Bank of Tallahassee, et al.* (Case No. 02-1616)(September 18, 2001) for GNBT pursuant to Federal Rule 15 and principles of class action tolling. The claims alleged herein arise out of the conduct, transactions or occurrences set forth in the *Davis* and *Ulrich* complaints and the Defendants have long had notice of these claims such that they will not be prejudiced in maintaining a defense on the merits to these claims.

9.    Each of the Plaintiffs and the Plaintiff Class Members loan transaction is a federally related mortgage loan and is governed by and subject to the Real Estate Settlement Practices Act 12 U.S.C. § 2601 *et seq.* ("RESPA"), the Truth in Lending Act ("TILA") and HOEPA (15 U.S.C. § 1602 and Regulation Z at 12 C.F.R. § 226.2). Each loan transactions is a consumer credit transactions within the meaning of the TILA and HOEPA. The loans were federally related mortgage loans obtained primarily for personal, family, or household purposes, and the mortgages were all secured by the Class Members' respective principal dwellings. None of the Class Members' loans were for business, commercial or agricultural purposes..

10.    The Banks and RFC and others, were jointly engaged in a conspiracy and racketeering enterprise, described more fully below, from which they each profited by the origination and sale of HOEPA loans through extensive mail and wire fraud.

11.    The Investor Defendants, including specifically RFC, are liable as conspirators with the Banks under the Racketeer Influenced and Corrupt Organizations Act ("RICO") and common law, as conspirators and joint venturers, and as assignees under HOEPA.

12.    HOEPA, at 15 U.S.C. § 1641(d) states that:

Any person who purchases or is otherwise assigned a mortgage referred to in section 1602 (aa) of this title shall be subject to all claims and defenses with

4

respect to that mortgage that the consumer could assert against the creditor of the mortgage, unless the purchaser or assignee demonstrates, by a preponderance of the evidence, that a reasonable person exercising ordinary due diligence, could not determine, based on the documentation required by this subchapter, the itemization of the amount financed, and other disclosure of disbursements that the mortgage was a mortgage referred to in section 1602 (aa) of this title.

13.    Each of the Investor Defendants knew they were acquiring HOEPA loans. The Investor Defendants were, upon information and belief, often involved in the making of many of the Class members' loans, such as by giving written or electronic pre-approval to the underwriting of loans and by its commitments to purchase loans from the Banks prior to the time the loans were closed.

14.    The Class members' claims arise under RESPA, TILA, HOEPA and RICO, 18 U.S.C. §§ 1961, *et seq.* The Plaintiff Class does not state any claims for "usury" under state or federal law and expressly disclaims any such claims as part of this lawsuit.

15.    Pending completion of discovery, the Class members all state claims for (1) violations of RESPA for kickbacks, unearned fees, and impermissible affiliated business relationships; (2) violations of TILA and HOEPA for inaccurate and understated material disclosures; (3) violations of TILA and HOEPA for other disclosure and substantive violations;; and (4) violations of RICO for Defendants' racketeering activities used to perpetuate and further the predatory lending scheme. Plaintiffs also seek a declaratory judgment related to their rescission rights under 15 U.S.C. § 1635.

## II.    THE PARTIES, JURISDICTION AND VENUE

### The Plaintiffs

16.    Plaintiff Ruth J. Davis resides at 302 Trotwood Drive, Coraopolis, Allegheny County, Pennsylvania.

17.    Plaintiffs Philip F. Kossler and Jeannie C. Kossler, husband and wife, reside at 127 Huron Drive, Carnegie, Allegheny County, Pennsylvania.

18.    Plaintiffs Brian W. and Carla M. Kessler, husband and wife, residing at 6466 State Route 908, Apt. 908, Tarentum, Allegheny County, Pennsylvania.

19.    Plaintiff Patrice Porco resides at 805 Center Avenue, Avalon, Pennsylvania.

20.    Plaintiff Thomas T. Mathis resides at 1435 LaSalle Avenue, Pittsburgh, Pennsylvania.

21.    Plaintiffs Stephen R. Haney and Amy L. Haney, husband and wife, reside at 868 Flemington Street, Pittsburgh, Pennsylvania.

22.    Plaintiffs John and Rebecca Picard, husband and wife, reside at 5214 Becky Drive, Pittsburgh, Pennsylvania.

23.    Plaintiffs William and Ellen Sabo, husband and wife, reside at 3812 Cambria Street, Homestead, Pennsylvania.

24.    Plaintiffs Russell and Kathleen Ulrich, husband and wife, reside at 515 Fieldcrest Drive, Pittsburgh, Pennsylvania.

25.    Plaintiff Nora H. Miller resides at 304 Brookston Drive, Cranberry TWP, Pennsylvania.

26.    Plaintiffs Robert A, and Rebecca A, Clark, husband and wife, reside at 3020 Hebron Drive, Pittsburgh, Pennsylvania.

27.     Plaintiff Edward R. Kruszka Jr., resides at 1320 Coronado Drive, McKeesport, Pennsylvania.

28.     Plaintiff Tina Merl Boor reside at 231 Marshall St, Perkasie, Pennsylvania 19844-1440.

29.     Plaintiff Martin J. Baratz resides at resides at 1727 Graces Ter, Edmond, Oklahoma 73025.

30.     Plaintiff Clell L. Hobson resides at 5100 Old Birmingham Hwy, Apt. 1001, Tuscaloosa, Alabama.

31.     Plaintiff Rosa Kelly Parkinson, a Captain in the United States Army, resides at 3736 Patti Parkway, Decatur, Georgia.

32.     Plaintiffs John and Kathy Nixon, husband and wife, reside at 6701 Hibiscus Lane, Northport, Alabama.

33.     Plaintiff Brian Cartee resides at 125 Palmetto Bay Road, Savannah, Georgia.

34.     Plaintiffs Mack and Robin Dorman, husband and wife, reside at 318 Foxwood Circle, St. Mary's Georgia.

35.     Plaintiffs Jerome and Charretta Roberts, husband and wife, reside at 415 Suwanee East Drive, Lawrenceville, Georgia.

36.     Plaintiff Melba Brown resides at 2553 Riverside Drive, Mobile, Alabama.

37.     Plaintiff Flora A. Gaskin, resides at 3408 22nd Street, Northport, Alabama.

38.     Plaintiffs Roy Lee and Ruthie Mae Logan, husband and wife, reside at 5565 Jug Factory Road, Tuscaloosa, Alabama.

39.     Plaintiffs Shawn and Lorene Starkey, husband and wife, reside at 1461 Spruce Ave., Liberty, Missouri.

40.     Plaintiffs John and Rowena Drennen, husband and wife, reside at 2703 Bellefontaine Ave., Kansas City, Missouri.

41.     Plaintiff Richard Montgomery resides at 4904 Whitney Drive, Independence, Missouri.

42.     Plaintiffs Tammy and David Wasem reside at 710 Ballantrae Drive, Wentzville, Missouri.

43.     Each of the above identified plaintiffs is a member of the Plaintiff Class and representative of all of the Class members.

44.     Plaintiffs reserve the right to add additional proposed representative plaintiffs, if necessary and in accordance with the Order of the Court.

## Defendants

### The Bank Defendants

45.     COMMUNITY BANK OF NORTHERN VIRGINIA ("CBNV") is a Virginia corporation with its principal place of business in Virginia and which does business in Pennsylvania and which as a lender and as part of the aforementioned predatory lending scheme made at least 22,810 and more likely close to 30,000 HOEPA loans to certain of the Plaintiffs and to members of the Plaintiff Class. CBNV is now known as PNC National Bank.

46.     .GUARANTY NATIONAL BANK OF TALLAHASSEE ("GNBT") is (or was) a national bank with its principal place of business in Tallahassee, FL. As indicated above, GNBT is named as a Defendant because it was previously named as a defendant in one or more prior complaints although it was closed by the OCC in March 2004 and the FDIC appears in this matter as the receiver of GNBT. As a lender and as part of the aforementioned predatory lending

8

scheme, GNBT made at least 21,725 HOEPA loans to certain of the Plaintiffs and to members of the Plaintiff Class.

### The Investor or Non-Bank Defendants

47.     DEFENDANT GMAC-RESIDENTIAL FUNDING CORPORATION n/k/a RESIDENTIAL FUNDING COMPANY, LLC (sometimes referred to above and below as "RFC") is a Delaware corporation (it is now a limited liability company) with its principal place of business in Minnesota and is a 100% subsidiary of GMAC-RFC Holding Corporation. GMAC-RFC is licensed to and does business nationwide and purchased at least 44,535 loans of the Plaintiff Class directly or indirectly from the Banks

48.     Defendant JP MORGAN CHASE BANK, F/K/A THE CHASE MANHATTAN BANK (sometimes "JP Morgan-Chase") is a New York corporation with its principal place of business in New York and which does business nationwide. JP Morgan-Chase acts as trustee for trusts and loan pools created by RFC for the purpose of "securitizing" mortgage loans.  The specific identity of each of the trusts that have been assigned the loans of the Plaintiff Class, either directly or indirectly or through an intervening depositor of other special purpose entity or "shelf" from the Banks is unknown at this time but is known by RFC and JP Morgan-Chase.

49.     Defendant IRWIN UNION BANK AND TRUST COMPANY ("Irwin") is (or was) an Indiana corporation with its principal place of business in California.  Irwin did business nationwide and purchased loans of the Plaintiff Class directly or indirectly from the Banks. As indicated above, Irwin is named as a Defendant because it was previously named as a defendant in one or more prior complaints although it was closed by the FDIC on September 18, 2009.

50.    Pursuant to HOEPA, 15 U.S.C. § 1641(d), each Investor Defendant is liable for

the violations of TILA, HOEPA, RESPA and RICO committed by CBNV and GNBT against

Plaintiffs and the members of the Class under rules of conspiracy and assignee liability.

51.    The Investor Defendants are entities or the trustees of entities that purchased

HOEPA loans from CBNV or GNBT.  The Investor Defendants held or still hold the loans of

Plaintiffs or members of the Plaintiff Class.

### The Defendant Class

52.    The Defendants also include members of a Defendant Class as more specifically

alleged below.  The Defendant Class purchased *all* of the HOEPA loans of the Plaintiff Class

directly or indirectly from the Banks and/or the Investor  Defendants and as such stand in the

shoes of the Banks and/or the Non-Bank Defendants under 15 U.S.C. § 1641(d) and under the

rules of conspiracy and assignee liability.  As such, Pursuant to HOEPA, 15 U.S.C. § 1641(d),

the Defendant Class is liable to Plaintiffs and the Plaintiff Class for the violations of TILA,

HOEPA, RESPA and RICO committed by CBNV and GNBT and/or the Investor Defendants.

### Jurisdiction And Venue

53.    Federal question jurisdiction is proper under 28 U.S.C. § 1331, 12 U.S.C. § 2614,

18 U.S.C. § 1964, and 15 U.S.C. § 1640(e) as the federal claims asserted herein arise under

federal law.

54.    Venue and personal jurisdiction are proper in this Court pursuant to recognized

principles of due process and in accordance with 28 U.S.C. § 1407, and also 28 U.S.C. § 1391

and 18 U.S.C. § 1965. Specifically, each of the actions in which this *Joint Consolidated*

*Amended Class Action Complaint* has been filed are part of a multi-district preceding  No. 1674,

which was consolidated in this Court as part of the "*In re: Community Bank of Northern Virginia Second Mortgage Loan Litigation.*"

55.    Defendants have either directly, or indirectly, purposefully directed their activities toward Pennsylvania and nationwide residents and because the Plaintiffs' causes of action arise out of and relate to the Defendants' activities, in part, within this judicial district and nationwide.

56.    Because Defendants do business nationwide, they are subject to the general jurisdiction of all district courts in the United States. Defendants have substantial, continuous, and systematic contacts with the State of Pennsylvania and/or other states nationwide. By virtue of the scheme and conspiracy described in this Complaint, CBNV and GNBT made and the Non-Bank Defendants and the Defendant Class members acquired over 50,000 loans nationwide, including hundreds of loans in Pennsylvania, from CBNV and GNBT. The Non-Bank Defendants and the Defendant Class members have thus, in essence, funded and/or purchased HOEPA mortgage loans made to Pennsylvania and nationwide borrowers, and they have liens on real property in Pennsylvania and other states nationwide (which was used as collateral for HOEPA mortgage loans) and the power of the Pennsylvania and other courts nationwide to enforce those liens, which they have undoubtedly done in the past.

57.    The Plaintiffs and the Class members made monthly payments on their HOEPA mortgage loans and Defendants and the Defendant Class members continued to profit directly or indirectly from the revenue stream generated by the HOEPA mortgage loans.

58.    The Investor Defendants and the Defendant Class members are or were in the business of funding and purchasing HOEPA mortgage loans, and such activities were central to the conduct of their business, and their funding and servicing of Pennsylvania and/or nationwide mortgage loans has been substantial and continuous.

59.     The contacts of the Defendants with Pennsylvania and/or other states nationwide are sufficient, substantial and continuous, and the Plaintiffs and the Class members' causes of action arise from and relate to those contacts so that the maintenance of the suit in this Court and the transferee Court does not offend traditional notions of fair play and substantial justice. Defendants should reasonably anticipate being haled into this Court in this judicial district in Pennsylvania and other districts nationwide to answer for their own unlawful acts, especially since Pennsylvania and all other states have a strong interest in providing a forum for their residents aggrieved by schemes to violate consumer protection acts and fair lending laws.

60.     Indeed, Plaintiffs' and Class Members' mortgage instruments expressly provide that "[t]he state and local laws applicable to this [mortgage] shall be the laws of the jurisdiction in which the property is located. The foregoing sentence shall not limit the applicability of Federal law to this [mortgage]."  Moreover, these loans which were purchased by the Investor Defendants and the Defendant Class members were purchased with notice pursuant to 15 U.S.C. § 1641(d)(4) that these loans were HOEPA loans and that the Investor Defendants and the Defendant Class members stood in the shoes of the Banks with respect to liability for such loans.

### III.    FACTUAL BACKGROUND

#### Overview of the Shumway/Bapst Scheme

61.    Beginning in early 1998, three brothers, David, DeVan and Chris Shumway, in concert with Randy Bapst, conceived what was to become a massive mortgage fraud scheme.

62.    David and DeVan Shumway, and Randy Bapst, all had extensive previous experience in the mortgage industry.

63.    Chris Shumway is the younger brother of David and DeVan. He provided seed money from his substantial personal wealth that permitted the Shumway/Bapst Organization to mount a very large direct mail marketing campaign and thereby maximize the volume of second mortgage loans available to refer to the Bank Defendants.

64.    The Shumway brothers and Mr. Bapst created multiple business forms through which they ultimately referred the loans. The form and/or names of these entities was changed as part of the Shumway/Bapst Organization's effort to stay one step ahead of the Virginia state banking regulators (i.e. the Bureau of Financial Institutions of the Virginia State Corporation Commission), including their ultimate effort to avoid the reach of Virginia regulators altogether through a relationship with Florida-domiciled national bank GNBT.

65.    As noted, the plan conceived by the Shumway/Bapst Organization sought to maximize loan volume, and thereby maximize loan settlement fees and interest. However, a non-depository lender must comply with fee caps and interest ceilings imposed by the laws of the various states, thereby limiting potential profits. To evade this problem, the Shumway/Bapst plan envisioned an association with a regulated depository institution, which arguably would not be subject to these same fee caps and interest ceilings.[3]

---

[3] The Shumway/Bapst Organization obtained formal opinion letters from prominent law firms regarding their ability to export interest rates and avoid state fee caps. For example, it obtained a letter from the Washington, D.C. office

66.    The business plan specifically contemplated that the Shumway/Bapst Organization would target a financially distressed bank, which would be offered an opportunity to derive significant income through the loans referred to the Banks by the Shumway/Bapst Organization, so long as the Banks would agree to kick-back the lion's share of the origination fees generated through the loans to the Shumway/Bapst Organization.

67.    The plan also required that the Banks would use title companies controlled by the Shumway/Bapst Organization to extract additional excessive and unearned fees from the borrowers.

68.    The initial structure used by the Shumway/Bapst Organization and Bank Defendant CBNV (now PNC) was an LLC designated EquityPlus Financial, LLC. EquityPlus, Inc. owned 75% of the LLC and CBNV owned 25%.[4]

69.    This initial structure utilized by EquityPlus Financial, Inc. and CBNV was in place for approximately five months (May 29, 1998, through October 29, 1998). During that five month period, the LLC originated loans that violated the Affiliate Business Arrangement requirements of RESPA, thereby invalidating RESPA's ABA exemption, by:  a) failing to disclose the relationship among CBNV, EquityPlus Financial, Inc. and EquityPlus Financial,

---

of Pittsburgh-based law firm Kirkpatrick & Lockhart dated May 18, 2000, which addressed the applicability of the National Bank Act to loans made by GNBT.  David Shumway, and GNBT's president, asked that Kirkpatrick and Lockhart address the following issues:  1)  whether GNBT could rely upon the most favored lender provisions of the National Bank Act to export Florida interest rates;  2)  the fees that are included in the "interest rate" under the most favored lender provisions;  3)  how high of an "interest rate" could be contracted for under Florida's usury provisions and mortgage laws; and, 4)  the maximum prepayment fee and number of discount points that could be charged under Florida law.

[4] This particular business form was conceived in response to past regulatory problems experienced by the Shumway/Bapst Organization. Specifically, the Virginia banking regulators had previously challenged a "net branch" arrangement pursuant to which Shumway/Bapst controlled company EquityPlus Financial, Inc. was brokering loans for Virginia state bank Resource Bank without the required licensure.  The regulators terminated the arrangement by issuing a cease and desist order.  Thus, when EquityPlus, Inc. commenced business with CBNV, it created an entity which was partially owned by a state-chartered bank, so that it could that assert that the LLC was a subsidiary of the bank, and thus would not need state

LLC;  b)  requiring the use of the settlement services being provided by EquityPlus, LLC and title companies which had common ownership with EquityPlus Financial, Inc.; and,    c) providing a thing of value pursuant to the arrangement that was other than a return on ownership interest.

70.    During the pendency of the LLC structure described above, the mortgage loans at issue were funded by the Bank with all origination services other than loan funding being provided by the LLC.  Nonetheless, the HUD-1s issued to borrowers at closing indicated that all settlement services delineated in Section 800 of the HUD-1s were being performed by the Bank and that all fees for those services were being paid to the Bank.  This was untrue.  Most of the services were being performed by the LLC and the majority of the fees for the services were being paid to the LLC.  The concealment of the actual allocation of fees collected impeded the operation of a free market for settlement services and contributed to the Bank's ability to significantly overcharge borrowers for these services.[5]

71.    After the Virginia banking regulators expressed concern regarding the legality of the LLC structure being utilized by EquityPlus Financial, Inc. and CBNV, the parties to that arrangement changed the form of the operation.  David Summers, the president of CBNV, described this change in a March 11, 1999, letter to the Virginia banking regulators wherein he stated:  "[T]he mortgage affiliations have been restructured as loan production offices of Community Bank.  The loan originators and processors of the limited liability mortgage affiliates are now employees of the Bank and the principals of the limited liability companies (such as EquityPlus Financial, LLC) are now consultants to the Bank."

---

licensure to broker mortgage loans in Virginia. Therefore, EquityPlus, Inc. and CBNV combined to form EquityPlus, LLC.

72.    In other words, beginning in approximately October 1998, EquityPlus Financial,
Inc. became a "consultant" to CBNV. After that date, all settlement services related to the loans
at issue were performed by CBNV.  EquityPlus Financial, Inc. did not provide any settlement
services in connection with these loans after that date.

73.    Commencing in approximately October 1998, borrowers identified by the
EquityPlus Financial, Inc. would be referred to CBNV for second mortgage loans. Toward that
end, EquityPlus Financial, Inc. would identify potential borrowers from address lists which it
purchased from credit reporting agency Equifax.   It would then contract with direct mail
marketing company Hart Hanks of San Antonio, Texas to do mass mailings to the selected
potential borrowers.

74.    Notwithstanding that EquityPlus Financial, Inc. was not providing any settlement
services, CBNV paid kick-backs to EquityPlus Financial, Inc. in exchange for the referral of the
loan business at issue. Those kick-backs consisted of all origination fees, net of expenses, less
1% of the loan balance plus $75 (these latter amounts were retained by CBNV as "loan funding
fees").   The kick-backs paid to EquityPlus Financial, Inc. were directly derivative of loan
volume, and did not bear any relationship to settlement services provided by EquityPlus
Financial, Inc. in connection with the loans, in that, as noted, EquityPlus Financial, Inc. did not
perform any compensable settlement services in connection with the loans.

75.    CBNV actively concealed the payment of kick-backs to EquityPlus Financial, Inc.
in the loan documents issued to each borrower.  For example, the HUD-1s issued to each
borrower indicated that all origination fees were being paid to CBNV, when in reality most of
the fees were being kicked-back to EquityPlus Financial, Inc., an entity not identified anywhere

---

[5] During this time frame, borrowers were also required to use title companies owned and controlled by the
Shumway/Bapst Organization.  These companies were used to extract additional excessive and unearned fees from

on the borrowers' HUD-1s.

76.    In the spring of 2000, EquityPlus, Inc. began to wind down its relationship with CBNV. David Shumway, the president of EquityPlus Financial, Inc., asserts that around that time he was introduced to the principals of GNBT by Don Schmoltz, a former consultant to CBNV.

77.    In April 2000, using a new entity with the name Equity Guaranty, LLC, the Shumway/Bapst Organization entered into a Consulting Agreement with GNBT which was in all material respects identical to the agreement that was in place between EquityPlus Financial, Inc. and CBNV for the period between October 1998 and November 1999. This Consulting Agreement remained in place through approximately February 2002.

78.    Despite having the Shumway/Bapst Organization move on to an arrangement with GNBT, CBNV continued to originate second mortgage loans via other consultants, which loans, upon information and belief, perpetrated many of the same wrongs associated with the CBNV-Shumway/Bapst relationship and which loans were purchased by RFC and perhaps other Investor Defendants.

79.    As to the Shumway/Bapst Organization, regardless of whether through CBNV or GNBT, the fundamentals of the scheme did not change.

80.    RFC purchased substantially all of the loans made to borrowers who were referred to both CBNV and GNBT by the Shumway/Bapst Organization.

81.    Representatives of RFC knew that nothing material had changed in the operation from the Shumway/Bapst/CBNV days other than the names of the business forms generating the loans. RFC suspected that unlawful fees were being paid to the Shumway/Bapst Organization.

---

borrowers. These fees were delineated in Section 1100 of the HUD-1s issued to the borrowers.

Indeed, a memorandum of a conversation with Don Russell of RFC and Paul Schieber, one of its attorneys, on January 29, 2001 notes:

> "GMAC/RFC's continuing concerns with title fee charges. GMAC/RFC believes that the fees are excessive."

82.    On information and belief, between March and September of 2001, approximately 8948 loans were originated by GNBT, with a total original principal balance of $335,070,300, or an average per loan balance of $37, 446.00.

83.    With respect to those loans, GNBT collected in excess of $ 32,000,000 in origination fees, nearly all of which was illegally kicked-back to the Shumway/Bapst organization. Shumway/Bapst-controlled title companies were also paid in excess of $8,000,000 in fees for ostensible title-services in connection with these loans, much of which was collected in violation of applicable federal law.

84.    The kick-back scheme conceived by the Shumway/Bapst Organization and carried out by the Bank Defendants – with the facilitation of RFC—eliminated the possibility of a free market for settlement services in connection with the loans at issue to the demonstrable financial detriment of Plaintiffs and the putative Class.

### The Role of Defendant GMAC-Residential Funding Corporation

85.    In the above text, this *MDL Complaint* suggests that Defendant RFC "purchased" nearly all of the loans referred to CBNV/GNBT by the Shumway/Bapst Organization. While that is a true statement, it is an oversimplification and it is useful to review GMAC-RFC's specific role in these transactions within the historical context of RFC's business model.

86.    Residential Funding Company LLC traces its roots to 1982, when it was formed as a subsidiary of Banco Mortgage Company, an affiliate of Northwestern National Bank, the predecessor of Northwest Bank.

87.    Initially, RFC focused on buying and securitizing "jumbo" mortgages (mortgages with loan balances above the purchasing authority of Freddie Mac and Fannie Mae). Over time, it moved toward buying and securitizing other mortgage products including, in a very material way, second mortgage loans.

88.    In the most simple terms, "securitization" refers to the process of packaging loans (not only mortgage loans) for sale as securities. Based on its business model, RFC's income was generated in two fundamental ways: 1) income derived from holding performing loans in inventory; and, 2) the more substantial income derived when loans are packaged and sold as securities. GMAC-RFC also derived income from loan servicing through other affiliated companies generally known as Homecomings.

89.    Since RFC does not really originate mortgage loans directly, it is necessary for it to cultivate relationships with third-party loan "originators" to insure that RFC has access to a steady flow of loan "product" which will then generate income for RFC while it is held in inventory and subsequently packaged, and then generate even more income when the packages are sold as securities.

90.    In 1990, RFC was acquired by General Motors Acceptance Corporation. Throughout the early and mid-1990's the company that had become GMAC-RFC expanded the variety of loan "products" that it would purchase and securitize.

91.    By the late 1990's, profit margins derived from the securitizations of lower-risk loan products began to dissipate and many companies, including GMAC-RFC, began to securitize higher-risk loan products.

92.    Eventually, GMAC-RFC achieved market dominance with respect to the purchase and securitization of higher-risk mortgage loans known as "125" loans, so-called

because the amount financed represented up to 125% of the value of the collateral securing the loan. These loans were also known as High-LTV (loan-to-value) loans. This "125" loan product was the marketing focus of the Shumway/Bapst Organization and, by 1999, the Shumway/Bapst operation had become the largest referral source for banks originating the "125" loan product that was ultimately purchased by RFC.

93.    Because the Shumway/Bapst Organization was the largest source of referrals for loans in the 125% securitization market that GMAC-RFC had begun to dominate, and because the relationship was so profitable, GMAC -RFC turned a blind eye to the illegal settlement practices that pervaded the loans at issue.

94.    The settlement fees collected in connection with the loans at issue were significant sources of revenue not only for the Banks and the Shumway/Bapst companies, but also for GMAC-RFC. More specifically, these fees were typically rolled into the principal of the loans and GMAC-RFC derived substantial interest income from these illegal fees while the loans were held in portfolio and then again as a function of the fact that the illegal fees padded the income received from GMAC-RFC when the loans were ultimately securitized.

95.    Because GMAC-RFC derived substantial income from the unlawful settlement fees, GMAC-RFC actively worked with the Bank Defendants to expand the loan volume being generated by the operation.

96.    GMAC-RFC directly participated in the fraudulent lending activities in that it provided the Bank Defendants with a continuing commitment to purchase all of the high-cost loan production, notwithstanding that it knew that the loans included unlawful terms.

97.    As a function of its regular presence at the offices where the loans at issue were being solicited, referred and originated, as a function of the fact that it audited the financial

statements of CBNV and GNBT, and as a function or the fact that it received all of the original loan files, including the final Settlement Statements, when it purchased the loans at issue, and as a function of the fact that it audited the loans that it was purchasing, GMAC-RFC knew the precise extent to which every borrower was being defrauded in connection with the loans at issue.

### Other Investor Defendants

98.    After CBNV began to wind down its relationship with the Shumway/Bapst Organization and RFC, it continued to originate loans through other "consultants" and sell such loans to other investor-purchasers like Irwin Union, Household Finance and Morequity. These loans had settlement terms that were very similar to the terms in the loans that were sold to RFC.

99.    These other Investor-Defendants were also integral to CBNV's continued scheme. For example, in 2001, Irwin purchased 1610 loans from CBNV and throughout the scheme it purchased as many as 3,200 loans from CBNV.

### The Downfall of the GNBT – Shumway/Bapst Operation

100.    In mid-2001, the Office of the Comptroller of the Currency ("OCC") performed an examination of GNBT. Its findings were set forth in a Report of Examination dated July 23, 2001. The OCC noted myriad deficiencies in GNBT's mortgage lending practices.

101.    In January 2002, GNBT entered into a Letter Agreement with the OCC which placed tight controls on the Bank.

102.    By this time, however, relations had also deteriorated with GMAC-RFC. By January of 2002, GMAC-RFC had become increasingly concerned about GNBT's loan origination practices.

103.    Ultimately, GMAC-RFC determined that notwithstanding the substantial income

derived from the GNBT loans, it was unwilling to continue to shoulder the risk that came with the unlawful lending practices of GNBT.

104.    Thus, in January of 2002, GMAC-RFC stated that it was unwilling to purchase any additional GNBT loans and that it would be returning approximately $40,000,000.00 in loans that had already been delivered to GMAC-RFC for purchase.[6]

105.    GMAC-RFC's actions had adverse implications for both the Shumway/Bapst Organization and GNBT. Without any purchaser for the loan production, GNBT did not have adequate reserves to maintain the loans in its own portfolio. Therefore, the Shumway/Bapst Organization had no bank to which to refer additional loans, and the Bank had no secondary market purchaser to buy additional loans.  Thus the mortgage fraud scheme conceived by the Shumway/Bapst Organization ultimately withered away.

106.    Subsequently, the Shumway/Bapst Organization attempted to obtain a license for a new mortgage company named Calusa Investments.  Rejecting that entities license application for the second time, the Virginia banking regulators stated: "The applicant's principals have an attitude of utter disdain for compliance with laws and regulations applicable to the mortgage lending/brokering business."

107.    As to GNBT, it was closed by regulators and in the OCC news release regarding that closure it was reported that as to the high loan-to-value home equity lending program, i.e., the scheme with Shumway/Bapst, the OCC found numerous violations of consumer laws.

---

[6] On July 17, 2002, David Shumway sent a letter to Bruce Paradis, then President and C.E.O. of RFC, demanding that RFC purchase the loans that it had returned.  RFC reconsidered its decision, and ultimately did repurchase those loans but did not purchase any new loans.

## Assignee, Joint Venturer and Conspirator Liability

108.    Pursuant to HOEPA, at 15 U.S.C. § 1641(d), the Investor Defendants and the Defendant Class members are liable to the Plaintiffs and the Plaintiff Class for the Banks' violations of federal and state law just as the Banks are to the Plaintiffs.

109.    The Investor Defendants and the Defendant Class members are also liable to the Plaintiffs and the Plaintiff Class for the Banks' violations of federal or state law just as the Banks are liable, because they were engaged in a joint venture, partnership and conspiracy to make, originate and sell as many high-cost mortgage loans as possible, as described fully above. The participants in the consulting/loan production office scheme were jointly engaged in and responsible for the violations of federal law.

110.    Additionally, while HOEPA denies the Investor and the Defendant Class members of any "holder in due course" defenses, such defense is not and would not otherwise be available to the Investor Defendants and the Defendant Class members because they did not take the notes and purchase the Plaintiffs' loans in "good faith" and without notice that Plaintiffs' had defenses to the loans. The Investor Defendants and the Defendant Class members were, to some extent, involved in the making of the loans, and they pre-approved loans for purchase prior to the time they were closed.

111.    Also, each of the loans that the Investor Defendants and the Defendant Class members received contained the required Section 32 or HOEPA Assignment Notice required by 15 U.S.C. § 1641(d) (4) and the standard forms in the Class members' loan files such as the TILA and HOEPA Disclosures and the HUD-1s, provided actual knowledge of the TILA and HOEPA violations and would have provided notice to the Investor Defendants and the Defendant Class members that the Class members had defenses to enforcement of the loans.

112.    In addition, the Non-Bank Defendants and the Defendant Class members individually reviewed each loan file and performed their own HOEPA calculations to determine if the loans were high-cost loans covered by HOEPA and otherwise met their criteria for purchase.

113.    Further, the existence of the HOEPA § 1641(d)(4) notice eliminates any "holder in due course" defenses to the Class members' claims.

114.    The Non-Bank Defendants and the Defendant Class members took the promissory notes and trust deeds subject to the same restrictions, limitations, and defects as they had in the hands of the Banks and acquired no greater rights than its assignors had at the time of the assignment or sale of the loans.

### The Plaintiffs' Loans

### The Davis Loan

115.    In the winter of 1999 Ruth Davis received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

116.    Ms. Davis called the toll free phone number to apply for a second mortgage loan.

117.    On or about February 22, 1999 CBNV closed the Davis loan.  On this date, Ms. Davis first received her TILA and HOEPA disclosures.

118.    In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Davis a total sum of $24,100.00 to be repaid with interest at a rate of 13.75% (APR of 15.456%) in consecutive monthly installments over a period of 24 years.  The loan was a consumer loan obtained for personal, family or household purposes.

119.    To secure repayment of their note, Ms. Davis executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

120.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Davis loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 1,928.00 |
| 802 | Loan Discount | CBNV | 482.00 |
| 804 | Credit Report | EPF | 45.00 |
| 807 | Flood Certification Fee | EPF | 20.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 283.00 |
| 1102 | Abstract or Title Search | Title America LLC | 300.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Processing Fee | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

121.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Plus Financial, Inc.

122.    Moreover, the title charges set forth in Section 1100 of the Davis HUD-1 were neither bona fide nor reasonable.  The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of actual cost of the property report is a RESPA violation.

123.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Davis was charged a loan discount fee for which no discount in her loan rate was given.

124.   In connection with this loan, Ms. Davis was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $63,971.58 and that her annual percentage rate was 15.46%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Kossler Loan

125.   In the summer of 1998 the Kosslers received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

126.   Mr. and Mrs. Kossler called the toll free phone number to apply for a second mortgage loan.

127.   On or about July 28, 1998, CBNV closed the Kossler loan.  On this date, Mr. and Mrs. Kossler first received their TILA and HOEPA disclosures.

128.   In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Kossler a total sum of $30,000.00 to be repaid with interest at a rate of 12.99% (APR of 14.817%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

129.   To secure repayment of their note, Mr. and Mrs. Kossler executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

130.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Kossler loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,250.00 |
| 804 | Credit Report | CREDCO | 13.00 |

| 808 | Document Review | CBNV | 250.00 |
|-----|------------------|------|--------|
| 809 | Processing Fee | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | First National Title & Escrow | 450.00 |
| 1102 | Abstract or Title Search | First National Title & Escrow | 25.00 |
| 1103 | Title Examination | First National Title & Escrow | 325.00 |
| 1111 | Signing Agent | NSC | 200.00 |
| 1201 | Recording Fee | Not identified | 43.50 |

131.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc. and/or Equity Plus Financial, LLC. Plaintiffs did not receive an Affiliate Business Disclosure in connection with this loan apprising them of the relationship among CBNV, EquityPlus Financial, Inc. and Equity Plus Financial, LLC.

132.    Moreover, the title charges were neither bona fide nor reasonable. The $325.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA.

133.    In connection with this loan, Mr. and Mrs. Kossler were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $40,938.40 and that their annual percentage rate was 14.817%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Kessler Loan

134.    In the Spring of 1999 Mr. and Mrs. Kessler received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

135.    Mr. and Mrs. Kessler called the toll free phone number to apply for a second mortgage loan.

136.    On or about April 30, 1999 CBNV closed the Kessler loan. On this date, Mr. and Mrs. Kessler first received their TILA and HOEPA disclosures.

137.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Kessler a total loan of $33,000.00 to be repaid with interest at a rate of 14.75% (APR of 17.841%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

138.    To secure repayment of their note, Mr. and Mrs. Kessler executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

139.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Kessler loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,640.00 |
| 802 | Loan Discount | CBNV | 990.00 |
| 807 | Application Fee | CBNV | 95.00 |
| 811 | Underwriting Fee | CBNV | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 283.50 |
| 1102 | Abstract or Title Search | Title America LLC | 300.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

140.   The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

141.   Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. The charge for post-settlement document review was unlawful under RESPA.

142.   Also, in violation of RESPA's prohibition against unearned fees, Mr. and Mrs. Kessler were charged a loan discount fee for which no discount in her loan rate was given.

143.   In connection with this loan, Mr. and Mrs. Kessler were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $53,587.45 and that their annual percentage rate was 17.841%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Porco Loan

144.   In the summer of 2000 Patrice Porco received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

145.   Ms. Porco called the toll free phone number to apply for a second mortgage loan.

146.   On or about September 9, 2000 GNBT closed the Porco loan. On this date, Ms. Porco first received her TILA and HOEPA disclosures.

147.   In connection with the above-alleged predatory lending scheme, GNBT loaned Ms. Porco a total loan of $29,800.00 to be repaid with interest at a rate of 12.99% (APR of 16.71%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

148.    To secure repayment of her note, Ms. Porco executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

149.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Porco loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,980.00 |
| 802 | Loan Discount | GNBT | 894.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 813 | Application Fee | GNBT | 150.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 63.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 250.00 |
| 1113 | Processing Fee | Title America LLC | 260.00 |
| 1201 | Recording Fee | Title America LLC | 41.50 |

150.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

151.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. Additionally, the charge for post-settlement document review violated RESPA.

152.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Porco was charged a loan discount fee for which no discount in her loan rate was given.

153.   In connection with this loan, Ms. Porco was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $43,024.86 and that her annual percentage rate was 16.7196%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Mathis Loan

154.   In the spring of 2001 Mathis received a solicitation in the mail indicating that he had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

155.   Mr. Mathis called the toll free phone number to apply for a second mortgage loan.

156.   On or about June 7, 2001 GNBT closed the Mathis loan. On this date, Mr. Mathis first received her TILA and HOEPA disclosures.

157.   In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. Mathis a total loan of $25,000.00 to be repaid with interest at a rate of 14.99% (APR of 17.24%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

158.   To secure repayment of their note, Mr. Mathis executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

159.   In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Mathis loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,375.00 |
| 804 | Credit Report | GNBT | 60.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |

| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 63.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fee | Allegheny County | 43.50 |

160.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

161.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of cost of the property report is a violation of RESPA. Additionally, the charge for a post-settlement document review violated RESPA.

162.    In connection with this loan, Mr. Mathis was provided with a Federal Truth-In-Lending Disclosure Statement that stated that his Finance Charge was $74,020.58 and that his annual percentage rate was 17.2411%. Both the Finance Charge and Disclosed APR are materially inaccurate.

**The Haney Loan**

163.    In the spring of 2001 Mr. and Mrs. Haney received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

164.    Mr. and Mrs. Haney called the toll free phone number to apply for a second mortgage loan.

165.    On or about May 23, 2001 GNBT closed the Haney loan. On this date, Mr. and Mrs. Haney first received her TILA and HOEPA disclosures.

166.   In connection with the above-alleged predatory lending scheme, GNBT loaned

Mr. and Mrs. Haney a total loan of $24,500.00 to be repaid in consecutive monthly installments

over a period of 15 years.   The loan was a consumer loan obtained for personal, family or

household purposes.

167.   To secure repayment of their note, Mr. and Mrs. Haney executed a deed of trust

for the benefit of GNBT.   The deed of trust granted GNBT a security lien in residential real

estate subject to one or more prior mortgage loans.

168.   In connection with this HOEPA Mortgage Loan, as shown on her HUD-1

Settlement Statement, the following fees and costs were charged, contracted for and paid at or

before closing of the Haney loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,450.00 |
| 802 | Loan Discount | GNBT | 490.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 50.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fee | Allegheny County | 43.60 |

169.   The HUD-1 is fraudulent in that the line items shown as being payable to GNBT

in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity

Guaranty, LLC.

170.   Moreover, the title charges were neither bona fide nor reasonable. The $450.00

charge for title examination of a third-party's property report is illegal per se under HUD

regulations and the mark up of the actual cost of the property report is a violation of RESPA. Additionally, the charge for a post-settlement document review violated RESPA.

171.    Also, in violation of RESPA's prohibition against unearned fees, Mr. and Mrs. Haney were charged a loan discount fee for which no discount in her loan rate was given.

172.    In connection with this loan, Mr. and Mrs. Haney were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $31,996.99 and that their annual percentage rate was 15.0957%. Both the Finance Charge and Disclosed APR are materially inaccurate.

## The Picard Loan

173.    In the late Fall of 1999 Mr. and Mrs. Picard received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

174.    Mr. and Mrs. Picard called the toll free phone number to apply for a second mortgage loan.

175.    On or about November 30, 1999 CBNV closed the Picard loan. On this date, Mr. and Mrs. Picard first received her TILA and HOEPA disclosures.

176.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Picard a total loan of $47,900.00 to be repaid with interest at a rate of 14.99% (APR of 18.416%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

177.    To secure repayment of their note, Mr. and Mrs. Picard executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

178.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Picard loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,832.00 |
| 802 | Loan Discount | CBNV | 2,155.00 |
| 803 | Appraisal Fee | Not identified | 175.00 |
| 807 | Application Fee | CBNV | 95.00 |
| 811 | Underwriting Fee | CBNV | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 50.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

179.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

180.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RICO. The charge for a post-settlement document review violated RESPA.

181.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Porco was charged a loan discount fee for which no discount in her loan rate was given.

182.    In connection with this loan, Mr. and Mrs. Picard were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $79,767.89 and

that their annual percentage rate was 18.416%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Sabo Loan

183.    In the Fall of 1999 Mr. and Mrs. Sabo received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

184.    Mr. and Mrs. Sabo called the toll free phone number to apply for a second mortgage loan.

185.    On or about October 15, 1999 CBNV closed the Sabo loan. On this date, Mr. and Mrs. Sabo first received her TILA and HOEPA disclosures.

186.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Sabo a total loan of $35,000.00 to be repaid with interest at a rate of 14.75% (APR of 17.390%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

187.    To secure repayment of their note, Mr. and Mrs. Sabo executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

188.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Sabo loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,500.000 |
| 808 | Application Fee | CBNV | 95.00 |
| 809 | Underwriting Fee | CBNV | 185.00 |
| 1101 | Settlement or Closing Fee | Resource Title LLC | 250.00 |

| 1102 | Abstract or Title Search | Resource Title LLC | 275.00 |
| 1103 | Title Examination | Resource Title LLC | 370.00 |
| 1111 | Overnight Fee | Resource Title LLC | 85.00 |
| 1112 | Disbursement Fee | Resource Title LLC | 26.50 |
| 1201 | Recording Fee | Not identified | 45.50 |

189.   The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

190.   Moreover, the title charges were neither bona fide nor reasonable. The $370.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is also a violation of RESPA.

191.   In connection with this loan, Mr. and Mrs. Sabo were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $56,211.00 and that their annual percentage rate was 17.39%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Ulrich Loan

192.   In the Summer of 2000 Mr. and Mrs. Ulrich received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

193.   Mr. and Mrs. Ulrich called the toll free phone number to apply for a second mortgage loan.

194.   On or about August 8, 2000 GNBT closed the Ulrich loan.  On this date, Mr. and Mrs. Ulrich first received her TILA and HOEPA disclosures.

195.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. and Mrs. Ulrich a total loan of $46,850.00 to be repaid with interest at a rate of 12.99% (APR of 15.469%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

196.    To secure repayment of their note, Mr. and Mrs. Ulrich executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

197.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Ulrich loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 4,685.00 |
| 802 | Loan Discount | GNBT | 937.00 |
| 807 | Application Fee | GNBT | 150.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 275.00 |
| 1102 | Abstract or Title Search | Title America LLC | 83.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

198.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

199.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD

regulations and the mark up of the actual cost of the property report is a violation of RESPA. The post-settlement document review fee violated RESPA.

200.   Also, in violation of RESPA's prohibition against unearned fees, Mr. and Mrs. Ulrich were charged a loan discount fee for which no discount in her loan rate was given.

201.   In connection with this loan, Mr. and Mrs. Ulrich were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $118,324.73 and that their annual percentage rate was 15.469%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Miller Loan

202.   In the spring of 1999 Nora Miller received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

203.   Ms. Miller called the toll free phone number to apply for a second mortgage loan.

204.   On or about April 30, 1999 CBNV closed the Miller loan.  On this date, Ms. Miller first received her TILA and HOEPA disclosures.

205.   In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Miller a total loan of $34,000.00 to be repaid with interest at a rate of 12.50% (APR of 15.590%) in consecutive monthly installments over a period of 15 years.  The loan was a consumer loan obtained for personal, family or household purposes.

206.   To secure repayment of their note, Ms. Miller executed a deed of trust for the benefit of CBNV.  The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

207.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Miller loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,380.00 |
| 802 | Loan Discount | CBNV | 1,870.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 283.50 |
| 1102 | Abstract or Title Search | Title America LLC | 300.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review | Title America LLC | 250.00 |
| 1201 | Recording Fee | Allegheny County | 41.50 |

208.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to EquityPlus Financial, Inc.

209.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. The charge for post-settlement document review also violates RESPA.

210.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Miller was charged a loan discount fee for which no discount in her loan rate was given.

211.    In connection with this loan, Ms. Miller was provided with a Federal Truth-In-Lending Disclosure Statement that stated her Finance Charge was $46,332.99 and that her annual percentage rate was 15.59%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Clark Loan

212.    In the Spring of 2001 Mr. and Mrs. Clark received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

213.    Mr. and Mrs. Clark called the toll free phone number to apply for a second mortgage loan.

214.    On or about March 20, 2001 GNBT closed the Clark loan.  On this date, Mr. and Mrs. Clark first received her TILA and HOEPA disclosures.

215.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. and Mrs. Clark a total loan of $27,500.00 to be repaid with interest at a rate of 11.99% (APR of 16.0042%) in consecutive monthly installments over a period of 10 years.  The loan was a consumer loan obtained for personal, family or household purposes.

216.    To secure repayment of their note, Mr. and Mrs. Clark executed a deed of trust for the benefit of GNBT.  The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

217.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Clark loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,750.00 |
| 802 | Loan Discount | GNBT | 550.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 63.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |

| 1111 | Overnight Fee    | USA Title LLC    | 25.00  |
|------|------------------|------------------|--------|
| 1112 | Document Review  | USA Title LLC    | 250.00 |
| 1113 | Processing Fee   | USA Title LLC    | 260.00 |
| 1201 | Recording Fee    | Allegheny County | 39.50  |

218.   The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

219.   Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA. The charge for post-settlement document review also violated RESPA.

220.   Also, in violation of RESPA's prohibition against unearned fees, the Clarks were charged a loan discount fee for which no discount in her loan rate was given.

221.   In connection with this loan, Mr. and Mrs. Clark were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $23,785.92 and that their annual percentage rate was 16.0042%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Kruszka Loan

222.   In the Spring of 2001 Mr. and Mrs. Kruszka received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

223.   Mr. and Mrs. Kruska called the toll free phone number to apply for a second mortgage loan.

224.    On or about May 5, 2001 GNBT closed the Kruszka loan.  On this date, Mr. and Mrs. Kruszka first received their TILA and HOEPA disclosures.

225.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. and Mrs. Kruszka a total loan of $20,100.00 to be repaid with interest at a rate of 16.99% (APR of 19.772%) in consecutive monthly installments over a period of 20 years.  The loan was a consumer loan obtained for personal, family or household purposes.

226.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Kruszka loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 1,507.00 |
| 802 | Loan Discount | GNBT | 402.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 807 | Flood Certification Fee | GNBT | 20.00 |
| 810 | E Appraisal | GNBT | 32.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 175.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 63.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |
| 1201 | Recording Fees | Allegheny County | 43.50 |

227.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to Equity Guaranty.

228.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD

regulations and the mark up of the actual cost of the property report is likewise illegal under RESPA.

229.    Also, in violation of RESPA's prohibition against unearned fees, Ms. Porco was charged a loan discount fee for which no discount in her loan rate was given. The charge for post-settlement document review also violates RESPA.

230.    In connection with this loan, Mr. and Mrs. Kruszka were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $53,198.40 and that their annual percentage rate was 19.772%. Both the Finance Charge and Disclosed APR are materially inaccurate.

### The Merl Boor Loan

231.    In the fall of 2000, Tina Merl Boor received a solicitation in the mail indicating that she had been "pre-approved" for a debt-consolidation second mortgage loan with CBNV.

232.    Tina Merl Boor called the toll-free number to apply for a second mortgage loan.

233.    On or about December 9, 2000, CBNV closed the Merl Boor loan. On this date, Ms. Merl Boor first received her TILA and HOEPA disclosures.

234.    Upon information and belief, this loan included all of the unlawful fees and charges described in connection with the loans made to other borrowers by CBNV as set forth herein.

235.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Mr. Merl Boor's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 4,396.32 |
| 802 | Loan Discount Fee | | |

| 808 | Lender Document Review Fee | | |
|------|------------------------|------------------------|--------|
| 810 | Lender Underwriting Fee | CBNV | 295.00 |
| 811 | Document Review | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | First Title and Escrow | 50.00 |
| 1102 | Abstract or Title Search | | |
| 1103 | Title Examination | | |
| 1105 | Document Preparation | | |
| 1201 | Recording Fee | First Title and Escrow | 48.00 |
| 1202 | City/County/stamps | | |

### The Baratz Loan

236.    In late 2001, Mr. Baratz received a solicitation in the mail indicating that he had been "pre-approved" for a debt-consolidation second mortgage loan with GNBT.

237.    Mr. Baratz called the toll-free number to apply for a second mortgage loan.

238.    On or about January 16, 2002, GNBT closed the Baratz loan.  On this date, Mr. Baratz first received their TILA and HOEPA disclosures.

239.    Upon information and belief, this loan included all of the unlawful fees and charges described in connection with the loans made to other borrowers by GNBT as set forth herein.

### The Hobson Loan

240.    In early 2001 Mr. Hobson received a solicitation in the mail indicating that he had been "pre-approved" for a debt-consolidation second mortgage loan with CBNV.

241.    Mr. Hobson called the toll-free number to apply for a second mortgage loan.

242.    On or about May 2, 2001, CBNV closed Mr. Hobson's loan by Fed Ex delivery in Alabama and return the very next day via the return, pre-paid Fed Ex envelope provided. For the first time, when the papers were delivered to him for closing did Mr. Hobson receive his TILA and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

243.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. Hobson a total loan of $55,500.00 to be repaid with a note interest rate of 17.75% (APR of 19.904%) in consecutive monthly installments over a period of 20 years. The loan was a consumer loan obtained for personal, family or household purposes.

244.    To secure repayment of his note, Mr. Hobson executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

245.    In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Mr. Hobson's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,497,50 |
| 802 | Loan Discount Fee | CBNV | 2,220.00 |
| 808 | Lender Document Review Fee | CBNV | 150.00 |
| 809 | Lender Underwriting Fee | CBNV | 295.00 |
| 810 | Lender Application Fee | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Resource Title | 50.00 |
| 1102 | Abstract or Title Search | Resource Title/"GAC" | 175.00 |
| 1103 | Title Examination | Resource Title | 695.00 |
| 1105 | Document Preparation | Resource Title | 175.00 |
| 1201 | Recording Fee | Not identified | 45.00 |
| 1202 | City/County/stamps | Not identified | 83.25 |

246.    The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to a mortgage consultant for CBNV.

247.    Moreover, the fees were neither bona fide nor reasonable. Indeed, Mr. Hobson was charged a total of $870.00 for an abstract of title ($175.00) and a title examination ($695.00). Charging $695.00 for a review of another settlement provider's property report is per

46

se illegal under HUD regulations. The only evidence of title work that was done on his loan is a Real Estate Property Report in which the third party service provider charged $120.00. The Property Report was marked up $55.00 over its actual cost of $120.00.

248.    The charge for document preparation was bogus since the title company did not prepare any of the documents. Moreover, charging for preparation of TILA, HOEPA and RESPA disclosures is illegal under 12 U.S.C. § 2610.

249.    In connection with this loan, Mr. Hobson was provided with a Federal Truth-In-Lending Disclosure Statement that stated that his Finance Charge was $152,996.30 and that his annual percentage rate was 19.904%, the same APR incorrectly disclosed in the 3-day advance HOEPA Notice that was not delivered to Mr. Hobson until closing.

250.    The HOEPA Notice contained extraneous matter designed to detract from the elements required under 15 U.S.C. 1639, violated the "conspicuous type size" requirement of 15 U.S.C. § 1639(a) and contained a false acknowledgement of receipt "3 days before closing." Furthermore, even the false acknowledgement is deficient on its face for failing to state that the HOEPA Notice had been received "3 *business* days prior" to closing, 15 U.S.C. 1639(b)(1)(emphasis added). Mr. Hobson's HOEPA Notice merely states "3 days before closing."

251.    Finally, the HOEPA Notice states the "*Note*" interest rate of 17.750 % in the upper right-hand corner in a deliberate ploy designed to detract and confuse the borrower's understanding of the true APR disclosed below. 15 U.S.C. § 1639(a) defines the "Specific disclosures" required and makes no provision, expressly or implicitly, for the HOEPA Notice to contain any interest figure other than the required APR. This represents yet another separate violation of HOEPA Notice requirements for which Defendants are jointly and severally liable.

252.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

253.    The terms of Mr. Hobson's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

254.    In violation of RESPA's prohibition against unearned fees, Mr. Hobson was charged a loan discount fee for which no discount was given.

### The Kelly Loan

255.    In the late summer of 2000, Captain Kelly received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

256.    Captain Kelly called the toll-free number to apply for a second mortgage loan.

257.    On or about September 27, 2000, GNBT closed Captain Kelly's loan by delivery of her closing documents via a courier who obtained Captain Kelly's execution of her closing documents in a public library near Decatur, Georgia, thereby violating Georgia's requirement that all "face-to-face" closings be conducted by a licensed attorney. Captain Kelly first received her TILA and HOEPA disclosures upon the courier's arrival, and upon the same date as the settlement date of her loan.

258.    In connection with the above-alleged predatory lending scheme, GNBT loaned Captain Kelly a total loan of $51,000 to be repaid with interest at a rate of 13.990% (APR of 16.532 %) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

259.    To secure repayment of her note, Captain Kelly executed a security deed for the benefit of GNBT.  The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

260.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Captain Kelly's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 5,160.00 |
| 802 | Loan Discount | GNBT | 516.00 |
| 807 | Application | GNBT | 150.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 106.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1112 | Document Review | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |

261.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

262.    Moreover, the title charges were marked up and neither bona fide nor reasonable.

263.    Captain Kelly was charged and "Title America" purportedly received $406.00 for an abstract of title and a title examination, as shown in Lines 1102 and 1003 of her HUD-1.  The title examination fee of $300 for review of General American's property report is per se illegal under HUD regulations.  The only title work appearing in her loan file is a Real Property Report prepared by General American Corporation South, which charged "Title America" $81.00 for the report.  The actual cost of the property was illegally marked up from $81.00 to $106.00.

264.    The charge for post-settlement document review violated RESPA.

265.    In connection with this loan, Captain Kelly was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $109,105.81 and that her APR was 16.532 %.

266.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

267.    The same APR was incorrectly disclosed in Captain Kelly's HOEPA Notice that she never received until the papers were delivered by courier for her closing, which was the same date as her date of settlement. Her HOEPA Notice violated the "conspicuous type size" requirement of 15 U.S.C. § 1639(a) and contained a false acknowledgement of receipt.

268.    The terms of Captain Kelly's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

269.    In violation of RESPA's prohibition against unearned fees, Captain Kelly was charged a loan discount fee for which no discount was given.

### The Nixon Loan

270.    In early 2001, the Nixons received a solicitation in the mail indicating that they had been approved for a debt consolidation second mortgage loan with CBNV.

271.    The Nixons called the toll-free number to apply for a second mortgage loan.

272.    On or about February 2, 2001, CBNV closed the Nixons' loan. The closing documents were Fed Ex'd to their home in Florida and were subsequently forwarded to Mr. Nixon at a meeting he was attending in Florida.  Upon receipt, Rev. Nixon complied with the closing instructions and returned the executed closing documents the day after their receipt in Florida.

273. In connection with the above-alleged predatory lending scheme, CBNV loaned the Nixons a total loan of $49,999.00 to be repaid with interest at a rate of 18.25% (APR of 20.261%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

274. To secure repayment of their note, the Nixons executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

275. In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Nixons' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,999.92 |
| 807 | Application | CBNV | 275.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | "GAC" | 260.00 |
| 1103 | Title Examination | Paramount Title | 595.00 |
| 1105 | Document Preparation | Paramount Title | 175.00 |
| 1201 | Recording Fee | Clerk of Court | 109.00 |
| 1203 | Mortgage Tax | Clerk of Court | 74.99 |

276. The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for CBNV.

277. Moreover, such fees were neither bona fide nor reasonable. Indeed, while the Nixons were charged for an Abstract of Title and a Title Examination (which perform the same function) no evidence whatsoever exists in the Nixons' loan file to suggest that an abstract of title or a title examination was even done. The $595 charge for title examination of a third-

party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $260.00 is likewise illegal. The charge for document preparation was bogus since the title company did not prepare any of the documents. Moreover, charging for the preparation of TILA, HOEPA and RESPA disclosures is illegal under 12 U.S.C. § 2610.

278.    In connection with this loan, the Nixons were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $185,347.31 and that their APR was 20.261%.

279.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

280.    The same APR was incorrectly disclosed in the Nixons' HOEPA Notice that they did not receive until the day before they signed and returned their loan documents. The HOEPA Notice the Nixons received the day before signing and returning their closing papers violates the "conspicuous type size" requirement of 15 U.S.C. 1639(a) and contains the false acknowledgement that the Nixons received their HOEPA Notice "at least three (3) business days before closing."

### The Cartee Loan

281.    In late 2001 or early 2002 Mr. Cartee received a solicitation in the mail indicating that he had been "pre-approved" for a debt-consolidation second mortgage loan with GNBT.

282.    Mr. Cartee called the toll-free number to apply for a second mortgage loan.

283.    On or about February 25, 2002, "GNBT" closed Mr. Cartee's loan by Fed Ex delivery. For the first time, when the papers were delivered to him for closing did Mr. Cartee

receive his TILA and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

284.   In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. Cartee a total loan of $29,500.00 to be repaid with a note interest rate of 12.750% (APR of 15.5596%) in consecutive monthly installments over a period of 15 years.   The loan was a consumer loan obtained for personal, family or household purposes.

285.   To secure repayment of his note, Mr. Cartee executed a deed of trust for the benefit of GNBT.   The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

286.   In connection with this HOEPA Mortgage Loan, as shown on his HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of Mr. Cartee's loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,802.50 |
| 802 | Loan Discount Fee | GNBT | 590.00 |
| 808 | GA State Tax Fee | Not identified | 6.50 |
| 810 | Lender Application Fee | GNBT | 125.00 |
| 1101 | Settlement or Closing Fee | USA Title, LLC | 100.00 |
| 1102 | Abstract or Title Search | USA Title, LLC | 81.00 |
| 1103 | Title Examination | USA Title, LLC | 450.00 |
| 1113 | Processing Fee | USA Title, LLC | 265.00 |
| 1201 | Recording Fee | Chatham County Clerk | 22.00 |
| 1202 | City/County/stamps | Clerk of the Superior Court | 88.50 |

287.   The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to the Shumway/Bapst entity.

288.    Moreover, the fees were neither bona fide nor reasonable.  Indeed, Mr. Cartee was charged a total of $531.00 for an abstract of title ($81.00) and a title examination ($450.00). The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations. The only title work that was done on his loan is a Real Estate Property Report, which charges were marked up and for which no title examination was performed.

289.    In connection with this loan, Mr. Cartee was provided with a Federal Truth-In-Lending Disclosure Statement that stated that his Finance Charge was $40,694.64 and that his annual percentage rate was 15.5596%, the same APR incorrectly disclosed in the 3-day advance HOEPA Notice that was not delivered to Mr. Cartee until closing.

290.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

291.    Mr. Cartee's Note contains an illegal prepayment penalty.  The terms of Mr. Cartee's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

292.    In violation of RESPA's prohibition against unearned fees, Mr. Cartee was charged a loan discount fee for which no discount was given.

**The Dorman Loan**

293.    In late 2001 or early 2002 Mr. and Mrs. Mack Dorman received a solicitation in the mail indicating that they had been "pre-approved" for a debt-consolidation second mortgage loan with GNBT.

294.    The Dormans called the toll-free number to apply for a second mortgage loan.

295.    On or about February 11, 2002, GNBT closed the Dorman loan (by Fed Ex delivery.) For the first time, when the papers were delivered to them for closing did the Dormans

receive their TILA and HOEPA disclosures, which was less than 3 days prior to the closing of his loan.

296.   In connection with the above-alleged predatory lending scheme, GNBT loaned the Dormans a total loan of $29,600.00 to be repaid with at an APR of 16.4352% in consecutive monthly installments over a period of 10 years.   The loan was a consumer loan obtained for personal, family or household purposes.

297.   To secure repayment of his note, the Dormans executed a deed of trust for the benefit of GNBT.   The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

298.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Dorman's loan:

| HUD-1 Line No. | Description | Paid To | Amount in $ |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 2,812.50 |
| 802 | Loan Discount Fee | GNBT | 592.00 |
| 808 | GA State Tax Fee | Not identified | 6.50 |
| 810 | Lender Application Fee | GNBT | 125.00 |
| 1101 | Settlement or Closing Fee | USA Title, LLC | 100.00 |
| 1102 | Abstract or Title Search | USA Title, LLC | 81.00 |
| 1103 | Title Examination | USA Title, LLC | 450.00 |
| 1113 | Processing Fee | USA Title, LLC | 265.00 |
| 1201 | Recording Fee | County Clerk | 22.00 |
| 1202 | City/County/stamps | Clerk of the Superior Court | 88.50 |

299.   The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, actually kicked-back to a Shumway/Bapst entity.

300.    Moreover, the fees were neither bona fide nor reasonable. Indeed, the Dormans were charged a total of $531.00 for an abstract of title ($81.00) and a title examination ($450.00). The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations. The only title work that was done on his loan is a Real Estate Property Report, which charges were marked up and for which no title examination was performed.

301.    In connection with this loan, the Dormans were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $40,694.64 and that their annual percentage rate was 16.4352%, the same APR incorrectly disclosed in the 3-day advance HOEPA Notice that was not delivered to the Dormans until closing.

302.    Both the stated Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

303.    In violation of RESPA's prohibition against unearned fees, the Dormans were charged a loan discount fee for which no discount was given.

### The Roberts Loan

304.    In the fall of 2000, Mr. and Mrs. Jerome Roberts received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

305.    Mr. and Mrs. Roberts called the toll-free number to apply for a second mortgage loan.

306.    On or about October 9, 2000, GNBT closed the Roberts loan with a courier who conducted the closing at Mr. Robert's work location in Sandy Springs, in violation of Georgia's requirement that face-to-face closings must be conducted by a licensed attorney. Upon meeting with the courier the Roberts immediately executed their closing documents. The Roberts first

received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

307.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Roberts a total loan of $39,000 to be repaid with interest (14.99%)(APR of 17.828%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

308.    To secure repayment of their note, the Roberts executed a security deed for the benefit of GNBT. The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

309.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Roberts' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 3,900.00 |
| 802 | Loan Discount | GNBT | 780.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 813 | Application Fee | GNBT | 150.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 106.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1112 | Document Review Fee | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |

310.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

311.   Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $106.00 is likewise illegal.   The charge for post-settlement document review violates RESPA.

312.   In connection with this loan, the Roberts were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $116,570.41 and that their APR was 17.828 %.

313.   The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate. The same APR was incorrectly disclosed in the Roberts' HOEPA Notice, which they never received until the papers were delivered by courier and signed immediately.

314.   The HOEPA Notice contained the false acknowledgement that the Roberts had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

315.   The terms of the Roberts' Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

316.   In violation of RESPA's prohibition against unearned fees, the Roberts were charged a loan discount fee for which no discount was given.

### The Brown Loan

317.   In the summer of 2000, Ms. Melba Brown received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

318.   Ms. Brown called the toll-free number to apply for a second mortgage loan.

319. On or about August 12, 2000, CBNV closed the Brown loan with a courier who conducted the closing. Upon meeting with the courier Ms. Brown immediately executed her closing documents. Ms. Brown first received her TILA and HOEPA disclosures at the time the documents were delivered by courier. Since she signed immediately, her advance HOEPA Notice was not delivered three business days before her closing.

320. In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Brown a total loan of $30,000 to be repaid with interest (17.450%)(APR of 20.704%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

321. To secure repayment of her note, Ms. Brown executed a security deed for the benefit of CBNV. The security deed granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

322. In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Brown loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 2,400.00 |
| 802 | Loan Discount | CBNV | 600.00 |
| 804 | Credit Report | CBNV | 15.75 |
| 808 | Lender Underwriting Fee | CBNV | 295.00 |
| 809 | Lender Application Fee | CBNV | 95.00 |
| 810 | Lender Document Review Fee | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | Resource Title LLC | 250.00 |
| 1102 | Abstract or Title Search | Resource Title LLC/GAC | 275.00 |
| 1103 | Title Examination | Resource Title LLC | 95.00 |
| 1111 | Disbursement Fee | Resource Title LLC | 150.00 |

323.   The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, actually kicked-back to a mortgage consultant for CBNV.

324.   Moreover, the title charges were neither bona fide nor reasonable. T The $95.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $275.00 is likewise illegal.

325.   In connection with this loan, Ms. Brown was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $58,774.00 and that her APR was 20.704 %. The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

326.   The HOEPA Notice contained the false acknowledgement that Ms. Brown had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

327.   In violation of RESPA's prohibition against unearned fees, Ms. Brown was charged a loan discount fee for which no discount was given.

### The Gaskin Loan

328.   In the summer of 2001, Ms. Flora Gaskin received a solicitation in the mail indicating that she had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

329.   Ms. Gaskin called the toll-free number to apply for a second mortgage loan. On or about August 8, 2001, CBNV closed the Gaskin loan with a courier who conducted the closing.

Upon meeting with the courier, Ms. Gaskin immediately executed her closing documents. She first received her TILA and HOEPA disclosures at the time the documents were delivered by courier. Since she signed immediately, her advance HOEPA Notice was not delivered three business days before her closing.

330.    In connection with the above-alleged predatory lending scheme, CBNV loaned Ms. Gaskin a total loan of $30,000 to be repaid with interest at a rate of 15.99% (APR of 17.965%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

331.    To secure repayment of her note, Ms. Gaskin executed a security deed for the benefit of CBNV. The security deed granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

332.    In connection with this HOEPA Mortgage Loan, as shown on her HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Gaskin loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 3,129.00 |
| 805 | Application Fee | CBNV | 275.00 |
| 810 | Underwriting Fee | CBNV | 295.00 |
| 811 | Lender Document Review Fee | CBNV | 150.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | Paramount Title | 260.00 |
| 1103 | Title Examination | Paramount Title | 675.00 |
| 1105 | Document Preparation Fee | Paramount Title | 175.00 |

333.    The HUD-1 is fraudulent in that the line items shown as being paid to CBNV in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for CBNV operating a loan production office in Columbia, Maryland.

334.    Moreover, the title charges were neither bona fide nor reasonable. The $675.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $260.00 is likewise illegal. The charge for document preparation was bogus since the title company did not prepare any of the documents, and it is illegal to charge for preparation of TILA, HOEPA and RESPA disclosures under 12 U.S.C. § 1610.

335.    In connection with this loan, Ms. Gaskin was provided with a Federal Truth-In-Lending Disclosure Statement that stated that her Finance Charge was $49,435.17 and that her APR was 17.965 %.

336.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

337.    The HOEPA Notice contained the false acknowledgement that Ms. Gaskin had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

338.    The terms of Ms. Gaskin's Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

### The Turner Loan

339.    In the fall of 2000, Mr. and Mrs. Roger Turner received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

340.    Mr. and Mrs. Turner called the toll-free number to apply for a second mortgage loan.

341.   On or about October 10, 2000, "GNBT" closed the Turner loan with a courier who conducted the closing. Upon meeting with the courier, the Turners immediately executed their closing documents. The Turners first received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

342.   In connection with the above-alleged predatory lending scheme, GNBT loaned the Turners a total loan of $16,200 to be repaid with interest at a rate of 14.375% (APR of 18.033%) in consecutive monthly installments over a period of 25 years. The loan was a consumer loan obtained for personal, family or household purposes.

343.   To secure repayment of their note, the Turners executed a security deed for the benefit of GNBT. The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

344.   In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Turners' loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 1,620.00 |
| 802 | Loan Discount | GNBT | 324.00 |
| 807 | Application Fee | GNBT | 150.00 |
| 811 | Underwriting Fee | GNBT | 185.00 |
| 1101 | Settlement or Closing Fee | Title America LLC | 250.00 |
| 1102 | Abstract or Title Search | Title America LLC | 130.00 |
| 1103 | Title Examination | Title America LLC | 300.00 |
| 1111 | Overnight Fee | Title America LLC | 25.00 |
| 1112 | Document Review Fee | Title America LLC | 260.00 |
| 1113 | Processing Fee | Title America LLC | 250.00 |

345.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

346.    Moreover, the title charges were neither bona fide nor reasonable. The $300.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $130 is likewise illegal.   The charge for post-settlement document review violates RESPA.

347.    In connection with this loan, the Turners were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $46,761.38 and that their APR was 18.033 %.

348.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

349.    The HOEPA Notice contained the false acknowledgement that the Turners had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

350.    The terms of the Turners' Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

351.    In violation of RESPA's prohibition against unearned fees, the Turners were charged a loan discount fee for which no discount was given.

### The Logan Loan

352.    In the summer of 2001, Mr. and Mrs. Roy Lee Logan received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

353.    The Logans called the toll-free number to apply for a second mortgage loan.

354.    On or about July 11, 2001, GNBT closed the Logan loan with a courier who conducted the closing. Upon meeting with the courier, the Logans immediately executed their closing documents. They first received their TILA and HOEPA disclosures at the time the documents were delivered by courier. Since they signed immediately, their advance HOEPA Notice was not delivered three business days before their closing.

355.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Logans a total loan of $18,600 to be repaid with interest at a rate of 11.99% (APR of 15.692%) in consecutive monthly installments over a period of 10 years.  The loan was a consumer loan obtained for personal, family or household purposes.

356.    To secure repayment of their note, the Logans executed a security deed for the benefit of GNBT.  The security deed granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

357.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Logans' loan:

| HUD-1 Line No. | Description | Paid To | Amount in $ |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 1,860.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |

| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 130.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review Fee | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |

358.    The HUD-1 is fraudulent in that the line items shown as being paid to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

359.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $130.00 is likewise illegal.    The post-settlement document review fee violates RESPA.

360.    In connection with this loan, the Logans were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $15,904.64 and that their APR was 15.6972 %.

361.    The Finance Charge, the Amount Financed and the disclosed APR were materially inaccurate.

362.    The HOEPA Notice contained the false acknowledgement that the Logans had "read and received, three business days prior to settlement, a copy of this disclosure statement." The acknowledgement, besides being false, is deficient on its face in that it does not state the required elements in a "conspicuous type size" as required by 15 U.S.C. § 1639(a).

363.    The terms of the Logans' Note lacked a required HOEPA disclosure restricting prepayment penalties under 15 U.S.C. § 1639(c).

### The Starkey Loan

364.    In the fall of 2001, the Starkeys received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

365.    The Starkeys called the toll-free number to apply for a second mortgage loan.

366.    On or about October 31, 2001, GNBT closed the Starkeys' loan in Missouri. On this date, the Starkeys first received their TILA and HOEPA disclosures.

367.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Starkeys a total loan of $30,300 to be repaid with interest at a rate of 11.99% in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

368.    To secure repayment of their note, the Starkeys executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

369.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Starkey loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 3,030.00 |
| 802 | Loan Discount | GNBT | 606.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 134.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |

370.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

371.    Moreover, the title charges were neither bona fide nor reasonable. T The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $81.00 actual cost of the property report to $134.00 is likewise illegal.    The charge for post-settlement document review violates RESPA.

372.    In connection with this loan, the Starkeys were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $39,391.81 and that their annual percentage rate was 14.9528%.

373.    Both the Finance Charge and Disclosed APR are materially inaccurate.

374.    In violation of RESPA's prohibition against unearned fees, the Starkeys were charged a loan discount fee for which no discount was given.

**The Drennen Loan**

375.    In the summer of 2001, the Drennens received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

376.    The Drennens called the toll-free number to apply for a second mortgage loan.

377.    On or about July 28, 2001, GNBT closed the Drennens' loan in Missouri. On this date, the Drennens first received their TILA and HOEPA disclosures.

378.    In connection with the above-alleged predatory lending scheme, GNBT loaned the Drennens a total loan of $47,100.00 to be repaid with interest at a rate of 15.99% (APR of 18.6284%) in consecutive monthly installments over a period of 25 years.    The loan was a consumer loan obtained for personal, family or household purposes.

379.    To secure repayment of their note, the Drennens executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

380.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Drennen loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 4,239.00 |
| 802 | Loan Discount | GNBT | 942.00 |
| 804 | Credit Report | GNBT | 50.00 |
| 811 | Underwriting Fee | GNBT | 200.00 |
| 812 | Flood Certification Fee | GNBT | 20.00 |
| 813 | E Appraisal Fee | GNBT | 32.00 |
| 1101 | Settlement or Closing Fee | USA Title LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title LLC | 134.00 |
| 1103 | Title Examination | USA Title LLC | 450.00 |
| 1111 | Overnight Fee | USA Title LLC | 25.00 |
| 1112 | Document Review | USA Title LLC | 250.00 |
| 1113 | Processing Fee | USA Title LLC | 260.00 |

381.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, kicked-back to a consultant for GNBT, Equity Guaranty.

382.    Moreover, the title charges were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the $109 actual cost of the property report to $134.00 is likewise illegal. The charge for post-settlement document review violates RESPA.

383.    In connection with this loan, the Drennens were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $150,605.00 and that their annual percentage rate was 18.3996%.

384.    Both the Finance Charge and Disclosed APR are materially inaccurate.

385.    In violation of RESPA's prohibition against unearned fees, the Drennens were charged a loan discount fee for which no discount was given.

### The Montgomery Loan

386.    In the Fall of 2001, Mr. Montgomery received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with GNBT.

387.    Mr. Montgomery contacted GNBT to apply for a second mortgage loan. While he believed he was dealing with a bank, he was, in fact, dealing with a consultant for GNBT, Equity Guaranty.

388.    On or about November 16, 2001, GNBT closed the Montgomery loan in Missouri.

389.    In connection with the above-alleged predatory lending scheme, GNBT loaned Mr. Montgomery a total loan of $81,000.00 to be repaid with interest at a rate of 13.2483% (APR of 18.6284%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

390.    To secure repayment of their note, Mr. Montgomery executed a deed of trust for the benefit of GNBT. The deed of trust granted GNBT a security lien in residential real estate subject to one or more prior mortgage loans.

391.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Montgomery loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | GNBT | 8,100.00 |
| 802 | Loan Discount | GNBT | 1,620.00 |
| 804 | Credit Report | Chase | 50.00 |
| 812 | Flood Certification Fee | GNB | 20.00 |
| 813 | E Appraisal | GNB | 32.00 |
| 1101 | Settlement or Closing Fee | USA Title, LLC | 150.00 |
| 1102 | Abstract or Title Search | USA Title, LLC | 184.00 |
| 1103 | Title Examination | USA Title, LLC | 450.00 |
| 1111 | Overnight Fee | USA Title, LLC | 25.00 |
| 1112 | Document Review | USA Title, LLC | 250.00 |
| 1113 | Processing Fee | USA Title, LLC | 260.00 |
| 1201 | Recording Fees | Not identified | 41.00 |

392.    The HUD-1 is fraudulent in that the line items shown as being payable to GNBT in Section 800 were, other than perhaps a very small percentage, actually paid to a consultant for GNBT, Equity Guaranty.

393.    The title charges accessed against Mr. Montgomery were neither bona fide nor reasonable. The $450.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and the mark up of the actual cost of the property report is a violation of RESPA.

394.    In connection with this loan, Mr. Montgomery was provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $92,588.65 and that their annual percentage rate was13.2483%.

395.    Both the Finance Charge and Disclosed APR are materially inaccurate.

396.    The required HOEPA disclosures were not timely provided to Mr. Montgomery.

397.    In violation of RESPA's prohibition against unearned fees, Mr. Montgomery was charged a loan discount fee for which no discount was given.

### The Wasem Loan

398.    In the summer of 2001 Mr. and Mrs. Wasem received a solicitation in the mail indicating that they had been pre-approved for a debt-consolidation second mortgage loan with CBNV.

399.    The Wasems called CBNV via their toll free phone number to apply for a second mortgage loan. Upon information and belief, the Wasems were instead dealing with a consultant of CBNV.

400.    On or about August 9, 2001 CBNV closed the Wasem loan. On this date, Mrs. And Mrs. Wasem first received her TILA and HOEPA disclosures.

401.    In connection with the above-alleged predatory lending scheme, CBNV loaned Mr. and Mrs. Wasem a total loan of $47,000.00 to be repaid with interest at a rate of 14.5% (APR of 15.456%) in consecutive monthly installments over a period of 15 years. The loan was a consumer loan obtained for personal, family or household purposes.

402.    To secure repayment of their note, Mr. and Mrs. Wasem executed a deed of trust for the benefit of CBNV. The deed of trust granted CBNV a security lien in residential real estate subject to one or more prior mortgage loans.

403.    In connection with this HOEPA Mortgage Loan, as shown on their HUD-1 Settlement Statement, the following fees and costs were charged, contracted for and paid at or before closing of the Wasem loan:

| HUD-1 Line No. | Description: | Paid To: | Amount in $: |
|---|---|---|---|
| 801 | Loan Origination Fee | CBNV | 4,700.00 |
| 805 | Application Fee | CBNV | 275.00 |

| 810 | Underwriting Fee | CBNV | 295.00 |
| 1101 | Settlement or Closing Fee | Paramount Title | 50.00 |
| 1102 | Abstract or Title Search | GAC | 260.00 |
| 1103 | Title Examination | Paramount Title | 675.00 |
| 1105 | Document Preparation | Paramount Title | 175.00 |
| 1112 | Document Review | CBNV | 150.00 |
| 1201 | Recording Fees | Clerk of the Court | 53.00 |

404.    The HUD-1 is fraudulent in that the line items shown as being payable to CBNV in Section 800 were, other than perhaps a very small percentage, actually paid to a consultant of CBNV.

405.    Moreover, the title charges were neither bona fide nor reasonable. The $675.00 charge for title examination of a third-party's property report is illegal per se under HUD regulations and upon information and belief, the actual cost of the property report was illegally marked up. The charge for document preparation was bogus since the title company did not prepare any of the documents and it is illegal to charge for preparation of TILA, HOEPA and RESPA disclosures under 12 U.S.C. § 1610.

406.    In connection with this loan, Mr. and Mrs. Wasem were provided with a Federal Truth-In-Lending Disclosure Statement that stated that their Finance Charge was $60,683.67 and that their annual percentage rate was 14.527%. Both the Finance Charge and Disclosed APR are materially inaccurate.

407.    The required HOEPA disclosures were not timely provided to the Wasems.

## Equitable Tolling and Equitable Estoppel

408.    The Defendants, and each of them, knowingly and actively misled the Class

Members concerning material facts related to their individual mortgage loans and knowingly and

actively prevented the Class Members from pursuing their claims by, among other things:

(a) Engaging in a scheme that was by its nature and design "self-concealing" and not reasonably discoverable by Plaintiffs and the Class notwithstanding the exercise of due diligence;

(b) Issuing fraudulent mortgage loan settlement documents to Plaintiffs and the Class which concealed the fact that the Bank Defendants were paying the Shumway/Bapst organization a referral fee for the residential mortgage loans at issue by way of a kick-back to companies controlled by the Shumway/Bapst organization, notwithstanding that the Shumway/Bapst organization was not performing any compensable settlement services in connection with the loans at issue;

(c) Falsely representing that title examinations were performed on each borrowers' loans by way of the imposition and disclosure of a settlement charge in Line 1103 of each borrowers' HUD-1 Settlement Statement for such service;

(d) Falsely representing that a true abstract or title search was performed on each of the borrowers' loans by way of the imposition of a settlement charge in Line 1102 of each borrowers' HUD-1 Settlement Statement for such service;

(e) Falsely representing that compensable "document review" services were performed in connection with the settlement of Plaintiffs' loans by disclosing such charge at Line 1112 of the Title Fee section of Plaintiffs' HUD-1s when in fact any document review services ostensibly performed in exchange for this fee were in fact non-compensable post-settlement services;

(f) Knowingly and actively concealing the understatement of Finance Charges, the overstatement of the Amount Financed and the resulting understatement of the APRs on the TILA Disclosure Statements and HOEPA Notices provided to Plaintiffs and all Class Members by, among other things, failing to include in their calculations certain title charges that were not bona fide, reasonable, lawful and/or not paid to true third parties;

(g) Falsely representing on each HUD-1 Settlement Statement that a true, honest, and independent settlement agent was performing services on the loan, when in fact the settlement agents were part of the racketeering and overall conspiracy;

(h) Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 800 of the HUD-1s were not being paid to GNBT or CBNV;

(i) Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 1100 of the HUD-1s were being paid to third-party title companies when such fees and charges were instead being kick-backed to and shared with, directly or indirectly, the Consultants and their affiliated entities;

(j) Concealing the import of the false acknowledgement of receipt in all HOEPA Notices:

(k) Knowing of their various HOEPA violations as detailed above and falsely representing to the Class Members that they had a right to rescind within three (3) days when the Banks knew or should have known that their violations of HOEPA in fact afforded every Class Member a full *three-year* period to rescind under the provisions of 15 U.S.C. § 1635(f), thereby estopping as a matter of law Defendants' assertion of the three-year repose period under 15 U.S.C. § 1635; and

(l) Knowingly and actively preventing the Banks' federal regulators (FDIC and OCC) from disseminating reports of their wrongdoing to the public, thereby suppressing and preventing the Class Members from discovering their causes of action against the Banks and Defendants until the one-year limitations periods for TILA and RESPA had since elapsed for many Class Members.

409.    The Class members exercised reasonable diligence during their loan transactions and dealings with the Banks and in reviewing their loan documentation, but could not have, nor been reasonably expected to, uncover the complex set of facts and the highly sophisticated scheme giving rise to their claims against Defendants due to the fraudulent concealment, unlawful and conspiratorial conduct of Defendants.

410.    For example, by withholding the Property Reports from the borrowers and by their failure to disclose that no title examinations were in fact performed on the loans, the Banks actively misled the borrowers and prevented them from discovering that the settlement charges imposed in Lines 1102 and 1103 of the HUD-1 Settlement Statements were neither bona fide nor reasonable and had been improperly marked up.

411.    Defendants are estopped to challenge the Class Members' reliance upon equitable tolling and estoppel to toll TILA's and RESPA's one-year statute of limitations Because the Defendants knowingly and intentionally concocted and concealed their fraudulent scheme, the Banks and the Investor Defendants and the Defendant Class members are estopped by their unclean hands to rely upon statutes of limitations that, if sustained, would reward these Defendants' efforts to conceal their wrongdoing. Any equitable tolling or equitable estoppel that

lies against the Banks to support the claims against such Banks applies with equal force to the

Investor Defendants and the Defendant Class members who stand in the Banks' shoes under the

assignee liability provisions of HOEPA. 15 U.S.C. § 1641(d).

## Class Action Tolling

412.    In addition, the statutes of limitations for each of the Plaintiffs' and the Class

members' individual claims has been tolled by virtue of class action tolling since May 1, 2001

and continues to be tolled.

413.    Specifically, on May 1, 2001, a class action captioned as *Davis v. CBNV, et al.*

was brought against Community Bank of Northern Virginia, RFC and a number of other

assignee/purchasers of its high-cost or HOEPA loans seeking to impose liability upon those

entities based upon the same facts giving rise to claims described in this Consolidated Class

Action Complaint; namely the wrongs perpetrated by the Shumway/Bapst scheme through

CBNV. The *Davis* lawsuit adequately notified CBNV, its conspirators, and the purchasers of its

loans, not only of the substantive claims being brought against them, but also of the number and

generic identities of the potential plaintiffs who may participate in the judgment such that the

defendants had the essential information necessary to determine both the subject matter and size

of the prospective class action litigation. Since May 1, 2001, no court has *denied* certification of

a class action for which the loans of the class members are within the defined class.

Consequently, at the time of the filing of this lawsuit, the Class members' statutes of limitation

for their individual claims remained tolled, and there should be no question as to the timeliness

of their claims.

414.    The statutes of limitations for those Class members whose loans were made by

GNBT have been tolled by virtue of class action tolling since September 19, 2002 and continue

to be tolled. On September 19, 2002, a class action lawsuit captioned as *Ulrich v. GNBT* was brought against GNBT and the assignee/purchasers of GNBT's loans including RFC. This action sought relief for the class members based upon the same facts giving rise to claims described in this Consolidated Class Action Complaint. This lawsuit adequately notified Defendants, its conspirators, and the purchasers of the GNBT loans, not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment such that the defendants had the essential information necessary to determine both the subject matter and size of the prospective class action litigation. Further, those Class members whose loans were purchased by RFC have been tolled as to RFC since the *Davis* filing regardless of which bank originated their loan as the *Davis* filing put RFC on notice of the claims arising from the Shumway/Bapst scheme which they knew at the time of that *Davis* filing was ongoing and continuing in connection with the Shumway/Bapst Organization's affiliation and conspiracy with GNBT.

## IV.    CLASS ACTION ALLEGATIONS

### The Plaintiff Class

415.    The Plaintiffs properly bring their claims set forth herein as a Plaintiff class action under Fed.R.Civ.P. 23(b)(3). The Plaintiffs propose, as the definition of the Plaintiff Class, that the Plaintiff Class consists of:

> all persons nationwide who obtained a second or subordinate, residential, federally related, non-purchase money, HOEPA qualifying mortgage loan from CBNV or GNBT that was secured by residential real property used by the Class Members as their principal dwelling.

416.    Plaintiffs reserve the right to revise and amend this class definition, perhaps to include sub-classes, as proper and necessitated by the progression of discovery and other issues in this class action case.

417.    Specifically excluded from the proposed Class are officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, of any of the Defendants or entities controlled by the Defendants and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants, or any of them and all governmental entities.

418.    For the purposes of the Class definition, the term "person" shall also include the person(s) to whom the loan was made and who signed the Note or, if such person(s) have filed for bankruptcy or otherwise voluntarily or involuntarily transferred his or her rights to pursue claims in this lawsuit, then that person(s)' bankruptcy trustee or legal assign.

419.    Having previously stipulated or acquiesced to certification of a class defined similarly to that above but limited to borrowers whose loans were purchased by RFC, the Banks and RFC are estopped to contest certification of the Class defined above.

420.    The particular members of the Plaintiff Class are capable of being identified without difficult managerial or administrative problems.    For example, the members of the Plaintiff Class are readily identifiable from the information and records in the possession or control of CBNV, GNBT and the Non-Bank Defendants and the Defendant Class members and/or the representatives or servicing agents of each.

421.    The Class Members are so numerous that individual joinder of all members is impractical.    Upon information and belief, this Plaintiff Class includes as many as 50,000 borrowers.

422.    There are questions of law and fact common to the Plaintiff Class, which questions predominate over any questions affecting only individual Plaintiff Class members and, in fact, the wrongs suffered and remedies sought by the Plaintiff Class members involve

numerous common violations of TILA, HOEPA, RESPA and RICO, which involve common documentary proof, the only difference being the exact monetary amount to which each Plaintiff Class member is entitled, a matter of mere mathematical calculation.   The principal common issues include, but are not limited to, the following:

(a)   Whether the Plaintiff Class Members' HUD-1 or HUD1-A Settlement Statements concealed and/or misrepresented the identity of the recipients, nature or the amounts of the settlement fees and charges imposed on their loans;

(b)   Whether the Plaintiff Class Members' HUD-1 or HUD1-A Settlement Statements contained false statements;

(c)   Whether the applicable statutes of limitation are tolled against the Defendants under the doctrines of equitable tolling, equitable estoppel, legal tolling and other maxims of equity;

(d)   The effect of class action tolling on the claims of the Plaintiff Class Members;

(e)   The nature of the Defendants' violations of RESPA, TILA, HOEPA and RICO;

(f)   Whether, CBNV and GNBT utilized a practice or device whereby the mandatory disclosures under TILA were not timely made;

(g)   Whether CBNV and GNBT made inaccurate TILA disclosures to the Plaintiff Class Members;

(h)   Whether certain of the Plaintiff Class Members' Notes failed to disclose required HOEPA disclosures restricting prepayment penalties or other prohibited terms;

(i)   Whether the Plaintiff Class Members' HOEPA Notices were displayed in the required conspicuous type size manner; contained knowingly false acknowledgments of receipt before closing; or were nevertheless deficient in asserting receipt within no

specified period or within "3 days" or "72 hours" before closing, but *not asserting* the

number of "*business*" days before closing;

(j) The nature and extent of the remedies available to the Plaintiff Class Members under

TILA and HOEPA;

(k) Whether Plaintiffs and the Class members are entitled to additional damages and

remedies for Defendants separate violations of the substantive provisions of TILA

and HOEPA;

(l) Whether the Plaintiff Class Members who closed their loans within three years before

the *Davis* and *Ulrich* cases were filed, are entitled to rescind their loans;

(m) Whether the assignee liability of HOEPA (15 U.S.C. § 1641(d)) applies to the claims

of Plaintiffs and the Plaintiff Class and to the Defendants;

(n) Whether Defendants are liable in treble damages to the Plaintiff Class Members for

violations of RESPA;

(o) The  nature and extent of the remedies available to the Plaintiff Class members under

RESPA;

(p) Whether the Defendants were involved in or participants in RICO enterprises;

(q) Whether the aforesaid use of the U.S. Postal Service and interstate couriers in

furtherance and consummation of the Banks' lending scheme constituted mail fraud;

(r) Whether the aforesaid use of interstate wires in furtherance and consummation of the

Banks' lending scheme constituted wire fraud:

(s) The nature and extent of the remedies available to the Plaintiff Class Members under

RICO;

(t) The nature and extent of the declaratory and injunctive relief available to the Plaintiff

Class members; and

(u) Whether Defendants are liable for punitive damages

423.    The Plaintiffs' claims are typical of those of the members of the Plaintiff Class. The claims are based on the same legal and factual theories because those claims depend upon the existence of uniform scheme which uniformly impacted all Class members, including the named Plaintiffs. The named Plaintiffs claims are sufficiently aligned with the claims of the class to permit them to pursue their own litigation goals and simultaneously pursue the interests of the absentee class members in adequate fashion. Because this action challenges the same course of unlawful conduct which affects the putative class, the typicality requirement is satisfied irrespective of any slight factual variation that might underlie an individual Class member's claims.

424.    The Plaintiffs will fairly and adequately represent and protect the interests of the Plaintiff Class. The Plaintiffs have suffered substantial economic injury in their own capacity from the practices complained of and understand the nature of their duty as representatives of the Class, the nature and extent of their claims against Defendants Class and the relief available to them and the Class Members.

425.    Neither the Plaintiffs nor their counsel have any conflicting interests which might cause them not to vigorously pursue this action. Further, the class representatives include representative of the different subclasses, if any, that may arise in connection with Plaintiffs' claims.

426.    The Plaintiffs have retained counsel who are experienced in complex and class action litigation generally, and in the types of claims at issue in this lawsuit specifically, are

81

knowledgeable in the applicable law, and have done a significant amount of work in identifying and investigating potential claims in this action.

427.    Certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(3) is appropriate, in that while injunctive and declaratory relief is sought, this action seeks predominantly monetary damages.  The questions of law and fact that are common to the Plaintiff Class predominate over any questions of fact pertaining to individual Plaintiff Class Members and a Plaintiff class action is superior to other available methods for the fair and efficient adjudication of this controversy. A Plaintiff class action will cause an orderly and expeditious administration of Plaintiff Class Members' claims and economies of time, effort and expense will be fostered and uniformity of decisions will be insured.  Moreover, the individual Plaintiff Class Members are likely unaware of their rights and/or not in a position (either through experience or financially) to commence individual litigation against Defendants. Expecting the Plaintiff Class Members to bring claims individually is unrealistic and unfeasible, which is evidenced by the fact that Congress specifically provided for class actions in TILA and HOEPA. The only practical means of rectifying these problems and providing wide spread relief is through class action procedure.

428.    To the extent that the Court deems the Plaintiffs' request for declaratory or injunctive relief, including the claim set forth in Count III, as an integral part of relief for the Class, then certification of a Plaintiff Class under Fed. R. Civ. P. 23(b)(2) is also appropriate as Defendants acted or refused to act on grounds generally applicable to the class without regard to the individual facts and circumstances of each individual class member.

## The Defendant Class

429.    This action is also properly brought as a Defendant Class under Fed.R.Civ.P. 23. Plaintiffs propose, as the definition of the Defendant Class, that the Defendant Class be defined as follows:

> Those persons or entities, or their trustees, that purchased or were assigned the HOEPA loans of the Plaintiffs or the Plaintiff Class.

430.    The particular members of the Defendant Class are capable of being described without difficult managerial or administrative problems.  The members of the Defendant Class are readily identifiable from the information and records in the possession or control of CBNV, GNBT or the Shumway Organization or its affiliated entities and from the other Defendants who have since assigned these loans to other members of the Defendant Class and/or their representatives or servicing agents of such HOEPA loans.

431.    The Defendant Class members are sufficiently numerous that individual joinder of all members is impractical.  This allegation is based on the fact that CBNV and GNBT "generated" extensive HOEPA loans on a nationwide basis.

432.    There are questions of law and fact common to the Defendant Class which questions predominate over any questions affecting only individual members of the Defendant Class and, in fact, the wrongs alleged against non-Bank Defendants and the Defendant Class members and the remedies sought by Plaintiffs and the Plaintiff Class members against such Defendants are identical, the only difference being the exact monetary amount to which each Defendant and Defendant Class Member is liable to the respective members of the Plaintiff Class. The principal common issues include, but are certainly not limited to:

a)    The Defendant Class members' conduct related to the predatory lending scheme;

b)    Whether the Defendant Class members are liable for the Banks' wrongful acts under HOEPA;

c)    Whether the Defendant Class members are liable for the Banks' wrongful acts under principles of assignee, conspiracy and/or partnership liability;

d)    The Defendant Class members' involvement in the racketeering enterprises;

e)    Whether the Defendant Class is entitled to assert any defenses to the Banks' violations of TILA, HOEPA, RESPA and RICO; and

f)    Whether the Defendant Class members are liable to the Plaintiff and the Plaintiff Class members as a result of their involvement in the aforementioned predatory lending scheme.

433.    The Non-Bank Defendants' defenses and those of the Defendant Class Members (which defenses are denied) are typical of those of the individual Non-Defendants and will be based on the same legal and factual theories.

434.    The Non-Bank Defendants, in representing their own interests, will also fairly and adequately represent and protect the interests of the Defendant Class.   Those Non-Bank Defendants will, as they have in the past, retain counsel experienced in defending class actions and actions involving unlawful commercial practices.   Said defendants do not, based upon information and belief, have any interests which might cause them not to vigorously defend this action.

435.    Certification of a defendant class under Fed.R.Civ.P. 23 (b)(3) is appropriate as to the Defendant Class Members in that common questions predominate over any individual questions and a defendant class action is superior for the fair and efficient adjudication of this controversy.   A defendant class action will cause an orderly and expeditious administration of

Defendant Class members' defenses, if any, and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

## V.   CAUSES OF ACTION AGAINST DEFENDANTS

### COUNT I

### Violations of the Real Estate Settlement Procedures Act

436.   Each preceding paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

437.   The scheme described above violated the anti-kick back and unearned fee provisions of RESPA (including the Affiliate Business Arrangement requirements, when applicable).

438.   The note and mortgage that each Class Member entered into with CBNV and GNBT created a "federally related mortgage loan" as defined at 12 U.S.C. § 2602(1).

439.   The Bank Defendants used the Plaintiffs' HUD-1 Settlement Statements (and other loan disclosure documents required by federal law including the Good Faith Estimate) to conceal illegal kickbacks and unearned fees being paid to the Shumway/Bapst Organization on the HOEPA mortgage loans made by the Banks and purchased by RFC (and other Investor Defendants).

440.   The section 800 charges listed on the HUD-1s uniformly misrepresented that origination and loan discount fees were being paid to the Banks when, in fact, said fees were being kicked-back almost entirely to the Shumway/Bapst Organization in exchange for the referral of the loans to the banks, notwithstanding that the Shumway/Bapst Organization was not performing any compensable settlement services in connection with the loans.[7] The amount of

---

[7] The term "origination fees" as used in this context includes all fee delineated in Section 800 of the HUD-1s issued to borrowers in connection with the loans at issue.

the kickbacks was directly derivative of loan volume, and the Banks retained only a small "funding fee" in connection with each disbursed loan.[8]

441.    As described in the text above, the title companies used in the loans referred to the Banks by the Shumway/Bapst Organization were entities owned and controlled by Messrs. Shumway and Bapst.    The fees charged to borrowers for ostensible title services by those companies were delineated in Section 1100 of the HUD-1s issued in connection with the loans.

442.    As noted, most of the fees reflected in Section 1100 were unearned in violation of Section 8(b) of RESPA in that the fees charged were not in exchange for compensable settlement services.

443.    To the extent that any affiliated business arrangement disclosures were required, they were not provided until closing, and those disclosures falsely stated or misrepresented the nature and extent of the affiliation.    Further, the disclosures were meaningless since the borrowers were required by the Banks to use title companies owned and controlled by the Shumway/Bapst Organization, thereby impeding the operation of a free marked for title-related settlement services.

444.    The Investor Defendants and the Defendant Class members were aware that fees charged for title services were excessive and often unearned.

445.    Additionally, Plaintiffs and each class member, as evidenced at line 802 of their HUD-1 Settlement Statement, was charged a "loan discount fee."

446.    HUD describes a loan discount fee as follows: "Also called 'points' or 'discount

---

[8] As previously noted, the first business structure used by CBNV and EquityPlus Financial, Inc. to generate loans was EquityPlus Financial, LLC, which they owned jointly.  With respect to loans made during the pendency of that LLC, CBNV violated RESPA's affiliate business arrangement disclosure requirements as follows:  a) it did not disclose the relationship among CBNV, EquityPlus Financial, Inc. and EquityPlus Financial, LLC;  b)  it required the use of EquityPlus Financial, LLC, for the provision of settlement services; and, c)  The parties to the arrangement were being provided with a thing of value that was other than a return on ownership interest.

points', a loan discount is a one-time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you. Each 'point' is equal to one percent of the mortgage account...." Here, however, the interest rate on the loans to Plaintiffs and other class members' was not discounted or lowered in exchange for the payment of the loan discount fee. Rather, the fee was wholly unearned in that there was no compensable settlement service provided in exchange for the fee. As such, it was a fee collected "other than for services actually performed" in violation of Section 8(b) of RESPA. The collection of the purported "loan discount fee" therefore constitutes a separate and actionable violation of RESPA.

447. As a result of the RESPA violations above alleged, the Class has been damaged in an amount to be determined at a trial of this action, where they will seek all permissible treble damages, costs and reasonable attorneys' fees.

## COUNT II

### Violations of TILA, as Amended by HOEPA, for
### Inaccurate and Understated Material Disclosures

448. Each preceding paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

449. The loans of the Plaintiffs are "HOEPA" loans governed by the provisions of the HOEPA amendments to TILA and satisfy the definition for HOEPA loans provided at 15 U.S.C. § 1602(aa) and at Regulation Z at 12 C.F.R. § 226.32.

450. As an incident to, or a condition of, the Banks' extension of credit to the Plaintiff Class members, the Banks withheld and charged to the Class members at closing certain fees and charges to be paid directly or indirectly by the Plaintiff Class members in order to obtain the HOEPA mortgage loans.

451. CBNV and GNBT issued to each borrower a HOEPA Notice (15 U.S.C. §

1639(a) & (b)) and issued to the Non-Bank Defendants and the Defendant Class a HOEPA *Notice of Assignment* (15 U.S.C. § 1641(d)(4)). The Non-Bank Defendants and the Defendant Class members reviewed the loan files at their purchase and were aware that the mortgages were HOEPA loans.

452.    Each of the Plaintiff Class members' loans that was consummated within the three-year period preceding the filing of the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002, retains the right of cancellation or rescission provided by 15 U.S.C. § 1635 and 12 C.F.R. § 226.23. As to RFC only, each of the class members whose loans closed within three years before the *Davis* filing on May 1, 2001, approximately 33,335 loans by extrapolation, remains entitled to rescission.

453.    TILA, as amended by HOEPA, at 15 U.S.C. §§ 1602(u), 1638, 1639, and its implementing regulation, Regulation Z, requires creditors to make specific, timely and accurate disclosures of "material" information to borrowers to promote the "informed use of credit." The "material" information includes the "annual percentage rate, the method of determining the finance charge and the balance upon which a finance charge will be imposed, the amount of the finance charge, the amount to be financed, the total of payments, the number and amount of payments, the due dates or periods of payments scheduled to repay the indebtedness," and the disclosures required by HOEPA at § 1639(a).

454.    Certain tolerances for accuracy (or inaccuracies) are permitted as set forth at 15 U.S.C. §§ 1605(f), 1610(c) and Regulation Z, at 12 C.F.R. §§ 226.22 and 226.23 for the disclosure of the Finance Charge and Annual Percentage Rate. No tolerances are available, however, in connection with certain of the title fees being challenged in this action, including the impermissible title examination fees, impermissible marked up "property report" fees and

impermissible "abstract fees."

455.    CBNV and GNBT violated HOEPA and TILA on every loan by failing to provide accurate disclosures of the Finance Charge and APR as required by 15 U.S.C. §§ 1638 and 1639 and as calculated by Regulation Z with tolerance for inaccuracies at 12 C.F.R. §§ 226.22, 226.23 and 226.32.

456.    The Banks falsely and incorrectly represented that the amounts charged to the Plaintiffs and Plaintiff Class members as title charges in section 1100 of the Plaintiffs' HUD-1s for such things as "abstract or title searches" (line 1102) and "title examinations" (line 1103) and in certain instances "document review" (line 1112) and/or "settlement or closing fees" (line 1101) and document preparation fees were charges incurred by the Banks.  Instead, the charges listed on the HUD-1 Settlement Statements were standardized fees that were charged on all of the second mortgage loans. These charges were not "bona fide" and "reasonable" nor paid to "true" third parties. In fact, they were being used directly or indirectly to further the scheme and to provide unearned fees to the Shumway/Bapst Organization.

457.    By virtue of the fact that the title companies were required by the Banks and/or affiliated with and/or controlled by the Shumway/Bapst Organization, the title work done by them was required to be included within the Banks' calculations of the Finance Charges and Annual Percentage Rates that TILA and HOEPA required to be disclosed to the Class members.

458.    Moreover, and regardless of the required use of the title companies and their affiliations, because title work charges were not bona fide and reasonable, these charges should have been included within the Banks' calculations of the Finance Charges and Annual Percentage Rates.

459.    The Banks, as a routine and typical practice, as evidenced from the HUD-1s and

the Truth-in-Lending Disclosure Statements that they provided to the Plaintiffs and the Plaintiff

Class members, *excluded* the section 1100 title charges from their calculations of the Finance

Charge and the Amount Financed.

460.    For example, in each instance, the marked up, bogus, excessive and unnecessary

"abstract of title" (line 1101), "title search" (line 1102) and "title examination" (line 1103) fees

charged to the Plaintiffs and Plaintiff Class members were excluded from the calculation of the

Finance Charge when they should have been *included* in the Finance Charge. Conversely, the

same amounts were used in the calculation of the Amount Financed when they should have been

*deducted* from the Amount Financed.  Although the section 1100 title charges for title abstracts,

title searches and title examinations were required and/or paid to affiliates and controlled entities

they were always improperly excluded from the calculations of the Finance Charge and Amount

Financed and should have been included in the calculation of the Finance Charge and Amount

Financed.

461.    Even if the section 1100 title charges for title abstracts, title searches and title

examinations were not required or not paid to affiliates and controlled entities, the charges were

always marked up (Lines 1102) and were neither bona fide nor reasonable (Lines 1102 and

1103) and, as such, were always improperly excluded from the calculations of the Finance

Charge and Amount Financed and should have been included in the calculation of the Finance

Charge and Amount Financed.

462.    Thus, in each and every instance, by virtue of their mechanism or formula of

making these calculations, the *disclosed* Finance Charge on the Plaintiffs' and the Plaintiff Class

Members' loans was understated, and the Amount Financed on which the APR is calculated was

overstated. As a result, the *disclosed* Finance Charges and Amount Financed were inaccurate and

90

violated TILA and HOEPA at 15 U.S.C. §§ 1605(f), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.23 and 226.32.

463.    Further, having improperly overstated the Amount Financed, the Banks inaccurately disclosed the Annual Percentage Rate (APR) on the loans of the Plaintiffs and the Plaintiff Class Members.  In each and every instance, as evidenced from the HUD-1s and the Truth in Lending Disclosure Statements that they provided to the Plaintiffs and the Plaintiff Class Members, the Banks disclosed APRs that were understated from the properly calculated and actual APR.

464.    In each and every instance, the disclosed APR was understated by more than the $1/8^{th}$ of a basis point or the 0.125% tolerance for error provided by Congress. In the case of loan padding of the "title examinations" and the "property reports" fees, the tolerance for error is zero. As a result, the disclosed APRs were inaccurate and violated TILA and HOEPA at 15 U.S.C. §§ 1606(c), 1635, 1638 and 1639 and Regulation Z, at 12 C.F.R. §§ 226.22, 226.32.

465.    Because certain of the section 1100 title charges were improperly excluded from the calculation of the Finance Charge and should have been included in the calculation of the Finance Charge, in each and every instance the *disclosed* Finance Charge on the Plaintiffs' and the Plaintiff Class members' loans was understated, and varied from the Actual Finance Charge by more than $100 or by more than ½ of one percent of the gross loan amount for purposes of rescission (not damages).  As stated, loan padding reduces these normal tolerances to zero. Because the APR is a required element of the advance HOEPA Notice required 3 business days before closing, 15 U.S.C. § 1639(a)(2)(A), it matters not when the HOEPA pre-closing notice was delivered because the disclosed APR in the notice, being identical to the underdisclosed APR in the TILA Statement, rendered the notice defective as a matter of law and represented a

*per se* violation of HOEPA Notice requirements without regard to the timeliness of delivery. Because it is an *advance* disclosure, a HOEPA Notice's deficiencies cannot be cured after the fact without closing a new loan with proper advance disclosures.

466.    The Defendants were well aware of the fraudulent conduct described above and the violations of HOEPA and TILA and knew at all material times that the majority of the fees would be dispersed to companies owned and controlled by the Shumway/Bapst Organization by the sham title companies used to close HOEPA mortgage loans.    However, because of the Investor Defendants' and the Defendant Class members' insatiable appetite for the high-cost, high-interest loans, the Defendants allowed the loan production offices and the Banks to violate HOEPA and TILA.    As described above, by agreeing to purchase the HOEPA mortgage loans from the Banks, in essence funding the loans, the cycle of HOEPA/TILA violations was perpetuated and continued by RFC and, to a lesser degree, other purchasers of these predatory and illegal loans.

467.    Under 15 U.S.C. § 1641(d) the Non-Bank Defendants and the Defendant Class members are subject to all claims and defenses that the Plaintiff Class members have against CBNV and GNBT.    Under 15 U.S.C. § 1635(g), the Plaintiff Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

468.    Accordingly, even disregarding the zero error tolerances applicable to loan padding, as a result of (1) the *disclosed* Finance Charges being inaccurate and understated by more than $100 or ½ of one percent of the gross loan amount in every instance and (2) the *disclosed* APRs being inaccurate and understated by more than 0.125 % in every HOEPA Notice; the loans violate HOEPA and TILA and the Plaintiff Class is entitled to damages under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d), including, all (1) actual and statutory damages; (2)

rescission rights and damages; and (3) an amount equal to the sum of all finance charges and fees paid by the Class Members for each and every *separate* HOEPA violation as to each and every *separate* borrower.

### COUNT III

### Multiple Violations of the Substantive Provisions of TILA and HOEPA

469.    Each preceding   paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

470.    CBNV and GBNT committed multiple violations of the substantive provisions of TILA and HOEPA, giving rise to multiple damage awards under 15 U.S.C. § 1640(a).  These violations are in addition to, and cumulative of the violations of TILA and HOEPA for inaccurate and understated material disclosures set forth above in Count I.

471.    15 U.S.C. § 1640(a) specifies that "any creditor who fails to comply with any requirement imposed under this part ... or part D or E of this subchapter ... is liable." This broad language encompasses all violations of the relevant parts of TILA and each violation committed by the Banks results in a separate statutory recovery for Plaintiffs.

472.    The loans of the Plaintiff Class members are HOEPA loans governed by the provisions of the HOEPA amendments to TILA and satisfy the definitions for HOEPA loans provided in 15 U.S.C. § 1602(aa).

473.    CBNV and GNBT issued to each borrower a HOEPA Notice (15 U.S.C. § 1639(a) & (b)) and to the Non-Bank Defendants and the Defendant Class a HOEPA Notice of Assignment (15 U.S.C. §1641(d)(4)); 12 C.F.R. §§ 226.34(a)(2).

474.    The predatory lending scheme also violated TILA and HOEPA because the Banks made untimely material disclosures on the Plaintiffs and the Class members' loans.

475.    TILA, as amended by HOEPA, at 15 U.S.C. §1639(b)(1) expressly required the Banks to provide certain HOEPA disclosures "not less than three *business* days *prior* to consummation of the transaction."

476.    Section 103(y) of TILA (15 U.S.C. § 1602(y)) incorporates by reference any requirement imposed by Regulation Z promulgated by the Federal Reserve Board. Section 103(y) specifically provides: "Any reference to any requirement imposed under this [TILA] title or any provision thereof includes reference to the regulation of the [Federal Reserve] Board under this title or the provision thereof in question."

477.    Regulation Z, Section 226.2 (a)(13) defines "consummation" as follows: "(13) *Consummation* means that time the consumer becomes contractually obligated on a credit transaction." 12 C.F.R. §226.2(a)(13). The Class Members became "contractually obligated" when they executed their notes and security deeds on the dates of their closings.

478.    Defendants had actual knowledge that the Class members' HOEPA mortgage loans were subject to the requirements of HOEPA.

479.    GNBT and CBNV, in contravention of HOEPA at 15 U.S.C. §1639(b)(1), did not provide timely notice as required by TILA and HOEPA, but, in fact, first provided the required HOEPA Notice with the closing papers for such loans and less than 3 business days before the consummation of such loans, which can be readily ascertained by a review of the applicable Fed Ex closings or the records of the attorney or courier closings.

480.    The Banks' violations of HOEPA were intentional. Integral to the predatory lending scheme was the Banks regular practice of withholding timely disclosures.

481.    The Banks' HOEPA Notices contained an additional violation in that the warnings, APR and monthly payment disclosures were printed in a non-bold, non-capital, type

size *smaller than* the other type in the notice, thereby violating HOEPA's requirement that the required warnings, APR and monthly payment disclosures in the HOEPA Notice be printed "in conspicuous type size." (15 U.S.C. § 1639(a); 12 C.F.R. § 226.32 (c)).

482.    The Banks' notices also routinely included both the APR and the note interest rate such that the disclosures were misleading and confusing.

483.    The Banks also routinely included in their HOEPA Notices a line immediately above the borrowers' signature lines that typically and falsely required the borrower to acknowledge having received the HOEPA Notice either 3 days before closing or 72 hours before closing, when the Banks knew to a certainty that such was not the case.   To the extent that such acknowledgment was known to be false to the loan's originator, the originator's wrongful conduct estops any reliance upon such acknowledgement under the equitable doctrine that no man may profit or gain an advantage over another by his own wrongdoing.

484.    In addition, such a falsification of the HOEPA Notices' receipt acknowledgement constitutes a separate HOEPA violation in that it falsely represents compliance with the 3-business-day advance delivery requirement of 15 U.S.C. § 1639(b)(1). Addition of any false information beyond the required disclosures of 15 U.S.C. § 1639(a)(1) & (2) constitutes a separate HOEPA violation for which the Banks and their Investor assignees are jointly and severally liable.

485.    Wholly apart from their false acknowledgement of receipt, many such acknowledgements are deficient on their face in that they acknowledge receipt: (1) without stating any period at all of purported pre-closing notice, or (2) merely attest delivery "3 days" or "72 hours" before closing without acknowledging receipt "3 *business* days prior" to closing. 15 U.S.C. § 1639(b)(1). Such deficient acknowledgements raise a presumption of non-compliance

and constitute yet another separate violation of HOEPA for which the Banks and RFC are jointly and severally liable.

486.    The promissory notes of the Class Members also contained an additional and separate HOEPA violation respecting HOEPA's restriction on the collection of prepayment in refinancings by original lenders. Specifically, most of the note forms utilized by CBNV and GNBT contain provisions providing for prepayment penalties but *do not* disclose the HOEPA restriction that a prepayment penalty may be collected "if ... (B) the penalty applies only to a prepayment made with amounts obtained by the consumer by means *other than* a refinancing by the creditor under the mortgage, or an affiliate of that creditor." (15 U.S.C. § 1639(c)(2)(B)). The lack of such disclosure constitutes an additional and separate violation of HOEPA for which the Banks and the Non-Bank Defendants and the Defendant Class members are jointly and severally liable.

487.    Because the HOEPA Notices were defective as a matter of law for understatement of the true APR, failure to set forth the required disclosures in conspicuous type size, insertion of false receipt acknowledgements as to the HOEPA Notices, and deficient receipt acknowledgements failing to specify the receipt period in "business" days, the HOEPA Notices were worth nothing for compliance purposes regardless of when they were purportedly delivered.

488.    Under 15 U.S.C. § 1641(d) the Non-Bank Defendants and the Defendant Class members are subject to all claims and defenses that the Plaintiff Class members have against CBNV and GNBT.

489.    Accordingly, as a result of the additional violations of the substantive provisions of TILA and HOEPA, Plaintiffs are entitled to multiple damage awards under 15 U.S.C. §§

1635, 1639, 1640 and 1641(d), including, all (1) actual and statutory damages; (2) rescission rights and damages; and (3) an amount equal to the sum of all finance charges and fees paid by the Class Members for each and every *separate* HOEPA violation as to each and every *separate* borrower.

490.    Under 15 U.S.C. § 1635(g), the Plaintiff Class members are also entitled to additional relief under 15 U.S.C. § 1640 not related to their rescission rights.

491.    Under 15 U.S.C. § 1635(a), those certain Plaintiff Class members whose loans were consummated within three years of the filing of the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002 are entitled to assert claims for rescission against any assignee or holder of their notes and mortgages. As to RFC the legal tolling date for rescission for all class members, based on *Davis*, is May 1, 1998.

## COUNT IV

### Declaratory Judgment that the Class Members have a Right to Rescind Their Loans

492.    Each preceding paragraph of this *MDL Complaint* is hereby incorporated as if fully set forth herein.

493.    Rescission is available for three business days following the finalization of the transaction, and, if the creditor fails to make all material disclosures consumer's ability to rescind may be extended for up to three years. 15 U.S.C. § 1635(a).

494.    Defendants' actions affected the entire Class such that declaratory relief would be appropriate for the entire class. This request for declaratory relief is appropriate with respect to the entire class.

495.    The Plaintiffs and the members of the Plaintiff Class seek a declaration that the Banks violated TILA and HOEPA as set forth above in Counts II and III, and thus under 15

U.S.C. § 1635(a), those class members whose loans were consummated within three years of the date of the filing the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002 are entitled to assert claims for rescission against any assignee or holder of their notes and mortgages.

496.    As to the CBNV loans and GNBT loans that have been paid off, those Class members are not obligated to make a tender of the principal back to Defendants.

497.    In addition, because the HOEPA enhanced damages and rescission damages to the Class members will exceed any tender obligation, those Class members are not required to tender any principal back to Defendants.  Instead, the Class members are entitled to a return of finance charges and interest paid on their loans.

## COUNT V

### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and 1962(d)

498.    Each preceding paragraph of this *MDL Complaint* are hereby incorporated as if fully set forth herein.

499.    Each Plaintiff and member of the Class is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

500.    The Banks, the Shumway/Bapst Organization and related entities as well as other "consultants" to the Banks (collectively the "Consultants"), the Investor Defendants and the Defendant Class members are persons within the meaning of 18 U.S.C. §§ 1961(3).

501.    The Banks, the Shumway/Bapst Organization and related entities as well as other "consultants" to the Banks (collectively the "Consultants"), the Investor Defendants and the Defendant Class members are each "persons" as defined under 18 U.S.C. § 1961(3) and have violated the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1962(c)

and 1962(d) because they were associated with enterprises, as defined in more detail below, which enterprises engaged in and wholesale activities of which affect interstate commerce and which said Defendants conducted and participated, both directly and indirectly in the conducting of the affairs of such enterprises through a pattern of racketeering activity, and which Defendants conspired to violate the provisions of 18 U.S.C, § 1962(d).

502.    Further, even if the Investor Defendants and the Defendant Class members did not conduct or participate directly in the enterprises, they agreed with the Consultants and the Banks and became co-conspirators with them as to the goal of the enterprises and facilitated and supported the endeavor by providing the flow of capital to the Banks, making them subject to conspiracy liability under 18 U.S.C. § 1962(d).    The scheme described in detail above ended when the loan purchasers, including the Investor Defendants and the Defendant Class members stopped the flow of capital to the Banks and the Consultants.

503.    The Investor Defendants and the Defendant Class members are also liable for the RICO violations of the Banks and the Consultants by virtue of 15 U.S.C. § 1641, in that the Investor Defendants and the Defendant Class members stand in the shoes of the creditors, the Banks.

504.    The Banks, the Consultants, and the Investor Defendants and the Defendant Class members used the mails and the wires and as described in more detail below, as such are defined and prohibited in 18 U.S.C. §§ 1341 and 1343, and engaged in the laundering of monetary instruments as defined and prohibited at 18 U.S.C. § 1956, as part of a fraudulent scheme and pattern of racketeering activity that was perpetrated on a nationwide basis against the home equity mortgage borrowers of the Banks and in particular on the Plaintiffs and the Plaintiffs Class.

505.    The first enterprise, "the CBNV Consultant Enterprise," consisted of a formal or informal association in fact of individuals and legal entities which included CBNV, its Consultants (including EquityPlus Financial and any successor or affiliated entity which was controlled by the owners of EquityPlus and not otherwise delineated here, Community Home Mortgage, LLC, Community Plus Financial, Community First Financial, America's Mortgage, LLC, First Security Savings, Inc., and Interbank/Market Makers, LLC), its loan purchasers-investors (primarily, RFC, Irwin, Household Finance and Countrywide), and the title companies (including Title America LLC, Resource Title, Paramount Title, Home Title and Escrow and Papermaster Title and Escrow) which were used by CBNV and its Consultants . This enterprise functioned as a continuing unit, and the liable persons were joined in purpose and in their goals to solicit and make the illegal and false second mortgage loans to borrowers of CBNV nationwide (including Plaintiffs whose loans were made by CBNV) and to sell those loans to the Investor Defendants, including primarily RFC, and the Defendant Class members.

506.    This enterprise was an association in fact that promoted and consummated and assigned and received an assignment of such home equity mortgage loans made by CBNV. The enterprise was participated in by CBNV, who made the loans to its borrowers, who funneled the illegal and excessive charges from the loans to the Consultants, who also sold the loans to the Investor Defendants and the Defendant Class members. The Investor Defendants and the Defendant Class members participated in the enterprise through their provision of the flow of operating capital to the enterprise through the purchase of the loans that met their criteria for their securitization purposes.    The title companies were affiliated with the Consultants and CBNV and were participating in a RESPA markup and kickback scheme.

507.    The second enterprise, "the GNBT Consultant Enterprise," consisted of a formal

or informal association in fact of individuals and legal entities which included GNBT, their primary consultant Equity Guaranty LLC and any successor or affiliated entity which was controlled by the owners of Equity Guaranty LLC and not otherwise delineated here, its investor-purchasers, primarily RFC, and the title companies (primarily Title America LLC and USA Title, LLC) which were used by GNBT and its consultant. This enterprise functioned as a continuing unit, and the liable persons were joined in purpose and in their goals to solicit and make the false and illegal second mortgage loans to borrowers of GNBT nationwide (including Plaintiffs whose loans were made by GNBT) and to sell those loans to RFC.

508.    This enterprise was an association in fact that promoted and consummated and assigned the home equity mortgage loans made by GNBT. The enterprise was participated in by GNBT, who made the loans to its borrowers, who funneled the illegal and excessive charges from the loans to the consultant, who also sold the loans to the investor-purchasers, primarily RFC. RFC participated in the enterprise through its provision of the flow of operating capital to the enterprise through the purchase of the loans that met their criteria for their securitization purposes. The title companies were affiliated with and controlled by the consultant and GNBT and were participating in a RESPA markup and kickback scheme.

509.    These first two enterprises had a structure that shared a commons and shared purpose, and had a continuity of structure and personnel and which structure, as an association in fact, was ascertainable and distinct from the pattern of racketeering itself, and which pattern of racketeering activity which was continuous, spanning a period of more than four years from the period in late 1997 until late in 2002, which included some 50,000 borrower/victims and which activity was related by the making of some 50,000 home equity loans through the concealed scheme as outlined above.

510.    Alternatively, and in addition to the first two enterprises referenced above, CBNV as an enterprise and with whom the "persons" within the following association in fact enterprise conspired in violation of 18 U.S.C. § 1962(d), and an association in fact enterprise, consisting of the Shumway/Bapst Organization along with the EquityPlus Financial, LLC and EquityPlus Financial, Inc., and CBNV and RFC; and each of which enterprises formed an "enterprise" as defined by RICO, 18 U.S.C. § 1961(4), which enterprises and each of them, were continuous with respect to their structure and shared a common and shared purpose with a continuity of structure and personnel and which enterprises were ascertainable and distinct from the pattern of racketeering activity under which enterprises were conducted, and which continued in existence from a period in late 1997 until in or about 2000.

511.    When their relationship with CBNV soured, GNBT as an enterprise and with whom the "persons" within the following association in fact enterprise conspired in violation of 18 U.S.C. § 1962(d), and an association in fact enterprise consisting of the Shumway/Bapst Organization and Equity Guaranty and related entities, including Title America and Title USA, and GNBT and RFC; and each of which enterprises formed an "enterprise" as defined by RICO, 18 U.S.C. § 1961(4), which enterprises and each of them were continuous with respect to their structure and shared a common and shared purpose with a continuity of structure and personnel and which enterprises were ascertainable and distinct from the pattern of racketeering activity under which enterprises were conducted, and which continued in existence from the period in late 1999 or early 2000 until late in 2002.

512.    The pattern of racketeering activity through each above enterprises included the illegal use of the mails and the wires, as such are defined and prohibited in 18 U.S.C. §§ 1341 and 1343 related directly to the scheme, as evidenced by the HUD-1 Settlement Statements

which uniformly misrepresented the disposition or payment of proceeds to CBNV, GNBT or to the title companies, when in fact the majority of the proceeds were being paid to the Consultants. In particular, the Plaintiffs' and the Plaintiffs Class' HUD-1 Settlement Statements were standard form, RESPA required documents used by the Banks and the Consultants and the Investor Defendants and the Defendant Class in the Class Members' HOEPA mortgage loan transactions, which HUD-1 Settlement Statements uniformly concealed or misrepresented the nature, amount and disposition of the charges and proceeds paid to the Banks and the title companies, or other affiliate entities, which payments, in fact, were illegally kicked back, marked-up, concealed and, without limitation, certain of such charges were illegal disbursed and concealed as being disbursed to the Consultants including in most instances persons or entities within the Shumway/Bapst Organization.

513. Additionally, the Truth In Lending Disclosure for Real Estate Mortgage Loans and the Truth In Lending Disclosure (For Section 32 Mortgages) as provided to the Plaintiffs were false and misleading in that the Annual Percentage Rate (the "APR") was understated and in violation of TILA and HOEPA and disclosures were provided to the Class Members (albeit not necessarily timely).

514. The enterprises used the interstate mails and wires to market their second mortgage loan programs and to solicit loans from potential borrowers. The use of the wires and mails was essential to each mortgage loan transaction.

515. The enterprises also engaged in money laundering as a part of, and in furtherance of, its scheme and artifice to defraud the Class members in violation of 18 U.S.C. § 1956.

516. The enterprises knew that the property involved in the second mortgage loan

transactions that they conducted with the Class members represented the proceeds of activities which constituted felonies under federal law (*i.e.*, mail and wire fraud).

517.    The second mortgage loan transactions were "financial transactions" as defined by 18 U.S.C. § 1956(c)(4).

518.    The enterprises conducted the second mortgage loan transactions with the intent of carrying on, promoting and facilitating further acts of mail and wire fraud and/or knowing that the second mortgage loan transactions were designed in whole or in part to conceal or disguise the nature, source and control of the mail and wire fraud The Defendants and the enterprises knew that the property involved in their financial transactions represented the proceeds of unlawful activities and they conducted and/or attempted to conduct their financial transactions, which involved the proceeds of the unlawful activities, with the intent to promote the carrying on of the unlawful activities and to with intent to avoid taxation on these proceeds and regulation by state licensing entities.

519.    Further, Defendants and the enterprises knew that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activities and to avoid a transaction reporting requirement under State or Federal law (as found by the OCC in its Reports of Examination).

520.    Indeed, among other things, the predicate acts of mail and wire fraud and money laundering, which are described with particularity above, and can be referenced by reviewing the loan papers found in the Plaintiffs' loan files and which are evidenced by the closing of the borrowers' loans, consisted of and used the mails and wired as follows:

(a) the purchase of credit/customer lists from the major credit reporting agencies;

(b) the false representations used by the Consultants and the loan production offices to the credit reporting agencies to obtain the customer lists;

(c) the directed mailings to the Class members used to falsely lure borrowers to the loan production offices including as set forth with more particularity immediately below;

(d) the directed mailings to the Class members which falsely contained non-existent and misrepresented loan offers, such as the borrowers were "pre-approved" for offers of credit that were not being offered;

(e) the use of the wires and telephones to intake applications for loans;

(f) the ordering of credit reports for every borrower on every loan (as evidenced by the charges for credit reports on Line 804 of the Plaintiffs' HUD-1s);

(g) the receipt of the credit reports on the borrowers (as evidenced by the charges for credit reports on Line 804 of the Plaintiffs' HUD-1s);

(h) the use of the mails and carriers such as Federal Express to "overnight" the closing papers and HUD-1's to and from the Banks and/or the Consultants ;

(i) the wiring of settlement funds, including the funds for the bogus and unlawful fees, between the Banks, the Investor Defendants and the Defendant Class members, and the Consultants and the title companies;

(j) the wiring of funds between the Investor Defendants and the Defendant Class members and the Banks after the loans were purchased by the Investors;

(k) the Banks' and the Consultants' use of the Internet to obtain funding and purchase approvals from the Investor Defendants and the Defendant Class members;

(l) the disbursement of payments to the Class members' creditors through disguised sources;

(m) the collection and receipt the Class members' monthly loan payments;

(n) the maintenance of separate books and records for the Consultants in the Banks' records;

(o) the use of shared bank accounts to deposit and withdraw proceeds of the unlawful activities; and

(p) the dozens of letters and emails which are set forth above, that were designed to perpetuate and further the consulting/franchising scheme.

521.   In addition, the racketeering activity consisted of the representations and concealment included in the HUD-1s as referenced in specific detail above as to each Class member, which HUD-1s were false and misleading and contained fraudulent misrepresentations and concealments as set forth in particular detail above, relating to each of the Plaintiffs' loans.

522.   Additionally, the racketeering activity consisted of the representations and concealments included in the Truth In Lending Disclosure for Real Estate Mortgage Loans and the Truth In Lending Disclosure (For Section 32 Mortgages) as referenced in specific detail above as to each Class member, which Disclosures were false and misleading and contained fraudulent misrepresentations and concealments as set forth in particular detail above, relating to each of the Plaintiffs' loans.

523.   Although not a necessary element of this RICO claim, the Class members relied to their detriment by consummating the lending transactions with what was represented to be and was believed to be legitimate lenders, but were, in fact, part of a predatory scheme in which the promoter used a consulting/franchising scheme to lend an air of legitimacy to the transaction. It was, in fact a false air of legitimacy, upon which misrepresentations plaintiffs

justifiably and reasonably relied, all to the Class members' detriment in that instead of dealing with legitimate lenders, Class members unknowingly, dealt with a fraudulent and illegitimate scheme.    The Class members were damaged by reason of such fraudulent racketeering activity.

524.    The racketeering activity was "self-concealing" and the very essence of these enterprises was to conceal the racketeering activity from the Class members.

525.    The Defendants, including the Banks and the Investor Defendants and the Defendant Class members are therefore liable persons to the Plaintiffs and the Plaintiff Class for the violation of 18 U.S.C. § 1962(c) and 1862(d) for having participated and conducted the operation and management of enterprises as described with specificity above and in accordance with the definition of an enterprise as set forth in 18 U.S.C. § 1961(4), through a pattern of racketeering activity of mail and wire fraud and money laundering activity, and as a conspiracy to violate the provisions of 18 U.S.C. § 1962(c), and the Class members were injured in their property by reason of such racketeering activity, which injury by virtue of the fraudulent and concealing racketeering activity was not discovered and could not have been discovered exercising reasonable diligence until and in fact, after this lawsuit was first filed. As such, the Class members' RICO claims are timely for the four-year period preceding the filing of the filing of the *Davis* case on May 1, 2001 and the *Ulrich* case on September 19, 2002.

526.    Additionally, the Defendants, including the Banks and the Investor Defendants and the Defendant Class members and the Consultants and the related and affiliate title companies conspired with and agreed, knowingly, to participate in the racketeering acts and goals of the enterprises as set forth with particularity above and agreed with one another to

conduct the enterprises through the fraudulent consulting scheme, which agreement included in specific part, the actual lending of the money to the borrowers, including the Class members, and the falsification of the HUD-1s and the Truth In Lending Disclosures, and by funneling the fraudulent and illegitimate charges to the unregulated and illegitimate promoters of these loans with the excessive charges, all in violation of 18 U.S.C. § 1962(d).   The Defendants, including the Banks and Investor Defendants and the Defendant Class members are therefore liable by virtue of 15 U.S.C. § 1641.

527.   Additionally, the Investor Defendants and the Defendant Class members conspired with and agreed, knowingly, to participate in the racketeering acts and goals of the enterprise as set forth with particularity above. They agreed with the Consultants and the Banks to the conducting of the enterprise through the fraudulent scheme, which agreement included the their actual participation in the enterprises by pre-approving loans and financing their operations, which allowed the enterprises to not only continue, but to proliferate, making more victims on the one hand, but on the other, more profits for the Consultants, the Banks and the Investor Defendants and the Defendant Class members, The scheme was dependent upon the continuous source of money and flow of capital necessary to continue the scheme and the enterprise, all in violation of 18 U.S.C. § 1962(d).

528.   Further, the Investor Defendants and the Defendant Class members are liable to the Plaintiffs and the Plaintiff Class just as the Banks are liable for the above RICO violations by virtue of 15 U.S.C. § 1641(d) because the underlying racketeering activities involved high cost loans.

529.   The Class members were in fact injured by the actions of Defendants by the conduct constituting violations of RICO, and suffered monetary damages as a result.  That the

Class members relied upon the predicate acts of mail and wire fraud and money laundering is evidenced by their agreement to enter into the second mortgage loan transactions with the Banks, their payment of fees and charges on their loans and the continued monthly payments on their second mortgage loans. As a direct, foreseeable and proximate result of the acts as alleged herein, and the violations of 18 U.S.C. §§ 1962(c) and 1962(d) by the Defendants, the Class members suffered substantial economic injury and injury to their property and they shall recover threefold the damages sustained by them, the cost of this lawsuit, and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, on all asserted causes of action against Defendants, Plaintiffs and the Plaintiff Class members pray for judgment against said Defendants and the Defendant Class members as follows:

(a) For an Order certifying that this action may be maintained as a Plaintiff class action, as defined above, under Fed. R. Civ. P. 23(a) and 23(b)(3);

(b) For an Order appointing the Plaintiffs to act as representatives of the Plaintiff Class Members and the Plaintiff Class;

(c) For an Order appointing the undersigned counsel, Carlson Lynch, LTD and Walters, Bender, Strohbehn & Vaughan, P.C. to act as Co-Lead counsel for the Plaintiffs' Class pursuant to Fed. R. Civ. P. 23(g);

(d) For an Order directing that reasonable notice of the Plaintiff Class action be given to all members of the Plaintiff Class at the appropriate time and in the manner directed by the Court;

(e) For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, a
declaration that those certain Plaintiff Class members whose loans were closed within
the three-year period preceding the filing of the filing of the *Davis* case on May 1,
2001 and the *Ulrich* case on September 19, 2002, remain entitled to rescind their
loans and that to any pending or current loans that Defendants are prohibited from
foreclosing on the Plaintiffs' and Plaintiff Class members' mortgages;

(f) For damages related to Defendants' failure to rescind the Plaintiffs' and the Class
members' HOEPA loans;

(g) For violating the HOEPA requirements of 15 U.S.C. §§ 1635, 1638, and 1639, an
Order and Judgment finding that Defendants and the Defendant Class members are
liable as a matter of law to each Plaintiff Class member for damages and declaratory
and injunctive relief allowable under 15 U.S.C. §§ 1635, 1639, 1640 and 1641(d),
including, all (1) actual and statutory damages; (2) rescission rights and damages; and
(3) an amount equal to the sum of all finance charges and fees paid by the Plaintiff
Class members for each and every *separate* HOEPA violation as to each and every
*separate* borrower;

(h) For violations of the above laws a finding of assignee liability under the provisions of
HOEPA;

(i) For violating RESPA, an Order and Judgment finding that the Defendants and the
Defendant Class members are liable as a matter of law to each member of the
Plaintiff Class for treble damages;

(j) For violating RESPA, an Order and Judgment awarding RESPA treble damages to
the Plaintiff Class members and against the Defendants and the Defendant Class

members in accordance with the loans which were "made" or assigned to the said

Defendants and the Defendant Class members;

(k) For violating RICO 18 U.S.C. § 1962(c) and 1962(d), a finding that the Defendants

and the Defendant Class members are jointly and severally liable as a matter of law to

each member of the Class for actual damages;

(l) For a trebling of the actual damages as provided in 18 U.S.C. § 1964(c);

(m) For a permanent injunction enjoining Defendants and the Defendant Class members,

together with their officers, directors, employees, agents, partners or representatives,

successors and any and all persons acting in concert with them or by agreement with

them from directly or indirectly engaging in the wrongful acts and practices described

above, all for the benefit of the Plaintiff Class Members and other future borrowers;

(n) For reasonable attorneys' fees as provided by law and statute;

(o) For pre-and-post judgment interest as provided by law in amount according to proof

at trial;

(p) For an award of costs and expenses incurred in this action; and

(q) For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

Respectfully submitted:

By    /s/ R. Bruce Carlson
R. Bruce Carlson (PA ID #56657)
Gary Lynch (PA ID # 56887)
Stephanie K. Goldin (PA ID # 202865)
CARLSON LYNCH LTD.
– Proposed Co-Lead Counsel
P.O. Box 367
231 Melville Lane
Sewickley, PA 15143
(412) 749-1677
(412) 749-1686 (Facsimile)

-and-

Daniel O. Myers
LAW OFFFICES OF DANIEL O. MYERS
1127 Queensborough Blvd., Suite 105
Mt. Pleasant, SC 29464
(843) 654-7440
(843) 654-7441

-and-

A. Hoyt Rowell, III
RICHARDSON, PATRICK, WESTBROOK
& BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC  29464
(843) 727-6550

By    /s/ David M. Skeens
J. Michael Vaughan
R. Frederick Walters
David M. Skeens
Kip D. Richards
Garrett M. Hodes
WALTERS BENDER STROHBEHN &
VAUGHAN, P.C.
– Proposed Co-Lead Counsel
2500 City Center Square
12th & Baltimore
P.O. Box 26188
Kansas City, MO  64196
(816) 421-6620
(816) 421-4747 (Facsimile)

-and-

Scott C. Borison
LEGG LAW FIRM, LLC
5500 Buckeystown Pike
Frederick, MD 21703
(301) 620-1016
(301) 620-1018 (Facsimile)

-and-

Franklin R. Nix
LAW OFFICES OF FRANKLIN NIX
1020 Foxcroft Road, N.W.
Atlanta, GA 30327-2624
(404) 261-9759
(404) 261-1458 (Facsimile)

-and-

Knox McLaney
MCLANEY & ASSOCIATES, P.C.
P. O. Box 4276
Montgomery, AL 36104
(334) 265-1282
(334) 265-2319 (Facsimile)

## **ATTORNEYS FOR PLAINTIFFS**

# Exhibit 17 to Declaration

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| IN RE: | COMMUNITY BANK OF | ) | MDL No. 1674 |
| | NORTHERN VIRGINIA | ) | Civ. Action Nos. |
| | MORTGAGE LENDING | ) | 02-1201, 03-425, |
| | PRACTICES LITIGATION | ) | 05-688, 05-1386 |

MEMORANDUM and CASE MANAGEMENT ORDER

Gary L. Lancaster,                                    September 20, 2011
Chief Judge.

The parties are familiar with the extensive factual
and procedural background of this matter and, therefore, it will
not be set forth in detail here. Pending before the court are,
inter alia: (1) Plaintiffs' Joint Motion for Multidistrict
Case Management Order Number One [doc. No. 214 at 02-1201, doc.
No. 491 at 03-425, doc. No. 211 at 05-688 and doc. No. 63 at 05-
1386]; (2) Plaintiffs' Joint Motion for Leave to File an
Amended Consolidated Complaint [doc. No. 488 at 03-425]; and (3)
Defendants' motion for leave to file a sur-reply brief in
opposition to Plaintiffs' Joint Motion for Multidistrict Case
Management Order Number One [doc. No. 219 at 02-1201, doc. No.
504 at 03-425 and doc. No. 215 at 05-688].

Defendants Residential Funding Corp., LLC, PNC Bank,
N.A., and the Federal Deposit Insurance Corp. as receiver for
Guaranty National Bank of Tallahassee and as receiver for Irwin
Union Bank and Trust Company oppose plaintiffs' proposed case

1

management order.   Defendants argue there is no need to appoint lead counsel as this juncture.   Defendants further oppose the proposed schedule, and seek bifurcated class and merits discovery.   Defendants do not oppose plaintiffs' Motion for Leave to File an Amended Consolidated Complaint with the following qualifications:   (1) defendants do not concede that the proposed complaint states a claim for relief and specifically reserve their right to file a motion to dismiss the amended complaint;   (2) defendants reserve their right to challenge whether joinder of some or all of the plaintiffs is improper;   (3) defendants do not consent to the consolidation of this matter for trial;   (4) defendants ask that plaintiffs be required to specify whether the Turner plaintiffs are named representatives;   and (5) defendants ask the court to require plaintiffs to file a RICO case statement and seek 21 days thereafter to file their responsive pleadings [doc. No. 498 at 03-425].

Three non-parties who plaintiffs seek to add as defendants in the proposed amended complaint, Household Finance, Inc., MorEquity, Inc., and WFC, Inc., have appeared specially to object to plaintiffs' motion to amend [doc. Nos. 499, 500 and 501 at 03-425].   Plaintiffs have filed no response to their objections.

For the reasons set forth below, Plaintiffs' Joint
Motion for Multidistrict Case Management Number One will be
granted in part and denied in part. Plaintiffs' Motion for
Leave to File an Amended Consolidated Complaint will also be
granted in part and denied in part. Defendants' motion to file
a sur-reply will be denied.

I.    Plaintiffs' Joint Motion for Multidistrict Case
       Management Order Number One

Plaintiffs have filed a Joint Motion for Multidistrict
Case Management Order Number One. Plaintiffs ask the court to
issue a case management order that, _inter alia_, designates R.
Bruce Carlson and R. Frederick Walters as interim co-lead
counsel. Defendants object to this appointment. Defendants
argue that there is no need to appoint interim co-lead counsel
at this juncture. Defendants further argue that plaintiffs have
not met their burden of establishing that they satisfy the
requirements of Federal Rule of Civil Procedure 23.
Specifically, defendants argue that plaintiffs' have failed to
make even a cursory showing of their qualifications to be
appointed as lead counsel pursuant to Fed.R.Civ.P. 23(g).
Defendants also imply that counsel's conduct during the course
of this litigation renders them inadequate.

Plaintiffs respond that Federal Rule of Civil
Procedure 23(g)(3) allows this court to appoint interim class

3

counsel, prior to any decision on class certification. Plaintiffs further argue that they have extensive experience in class action litigation. Plaintiffs also note that defendants' description of their conduct in this litigation to this point is inaccurate and, more importantly, irrelevant to the question of whether they should now be appointed interim co-lead class counsel. The court agrees with plaintiffs.

As the parties are aware, R. Bruce Carlson and his firm, Carlson Lynch, Ltd., filed what is now captioned <u>Kessler v. Residential Funding Corp.</u>, in this court. Thereafter, in 2004, R. Frederick Walters and his firm, Walters Bender Strohbehn & Vaughn filed <u>Hobson v. Irwin Union Bank and Trust Co.</u>, in the United States District Court for the Northern District of Alabama. That case was transferred to this court by order of the United States Judicial Panel on Multidistrict Litigation ("MDL Panel"). Throughout the course of this litigation plaintiffs' counsel has been, to put it mildly, at odds. They have recently agreed to work together to prosecute this case on remand. They correctly note that the private ordering method of selecting interim lead counsel has long been the preferred approach. <u>See</u> <u>e.g.</u> <u>Report of the Third Circuit Task Force, Selection of Class Counsel</u> 208 F.R.D. 340, 416 (2002). The court sees no reason to deviate from this well-established approach.

4

Therefore, R. Bruce Carlson, of Carlson Lynch, Ltd. and R. Frederick Walters of Walters, Bender, Stohbehn & Vaughan, P.C. will be appointed interim co-lead class counsel pursuant to Fed.R.Civ.P. 23(d) and 23(g)(3). This appointment is, of course, without prejudice to defendants' right to oppose the appointment of Mr. Carlson and Mr. Walters at the class certification stage.

Defendants also object to the remainder of the proposed case management order. Defendants generally object to plaintiffs' submission of a proposed case management order without first conferring with defendants as required by Fed.R.Civ.P. 16 and 26 and Local Rule 16.1. Defendants specifically object to the plaintiffs request to commence class and merits based discovery immediately. Defendants correctly note that both the Federal Rules of Civil Procedure require the parties to meet, confer, and file a Rule 26(f) report. Both parties neglect, however, the requirements of Local Rule 23. Pursuant to Local Rule 23, the parties are to meet, confer and file a "Joint Report of the Parties and Proposed Scheduling and Discovery Order - Class Action" in a form substantially similar to that which appears in the Appendix to the Local Rules. The parties are excused from paragraphs 4, 6, 14, and 18 of the form report.

Accordingly, the parties will be directed to meet and confer within twenty-one (21) days of the date of this Memorandum and Case Management Order. The parties will further be required to file the "Joint Report of the Parties and Proposed Scheduling and Discovery Order – Class Action" fourteen (14) days thereafter.

In formulating the plan for discovery the parties are advised that, in light of the United States Supreme Court's decision in <u>Wal-Mart Stores, Inc. v. Dukes</u>, -- U.S. --, 131 S.Ct. 2541 (2011), this court's class certification analysis may entail a preliminary inquiry into the merits. <u>See</u> <u>id</u>. at 2551-52, n. 6 (stating that "frequently [the Rule 23] 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim …"). Accordingly, discovery will not be bifurcated. The parties are directed to meet and confer regarding all other matters set forth in Fed.R.Civ.P. 26(f).

II.  <u>Motion for Leave to File an Amended Consolidated Complaint</u>

Plaintiffs have also jointly filed a Motion for Leave to File an Amended Consolidated Complaint. As noted above, defendants Residential Funding Corp., LLC, PNC Bank, N.A., and the Federal Deposit Insurance Corp. as receiver for Guaranty National Bank of Tallahassee and as receiver for Irwin Union Bank and Trust do not object to the motion but did note several

exceptions.  Plaintiffs do not object to defendants' exceptions.

Thus, the only remaining question before the court is whether plaintiffs can, at this late date, add as defendants Household Finance, Inc., MorEquity, Inc., and WFC, Inc.  The court finds that, in light of the plaintiffs' failure to seek to add these defendants in a timely fashion, the motion to add them as defendants must be denied.  The court further finds that, since none of the named plaintiffs' loans were purchased by these entities, amendment would likely be futile.

Fed.R.Civ.P. 15 provides that where, as here, amendment as a matter of course is not available, "a party may amend its pleading only with the opposing party's written consent or the court's leave … [t]he court should freely give leave when justice so requires."  Fed.R.Civ.P. 15(a)(2).  The court of appeals has held that "such leave must be granted in the absence of undue delay, bad faith, dilatory motive, unfair prejudice, or futility of amendment."  Grayson v. Mayview State Hosp., 293 F.3d 103, 109 (3d Cir. 2004).

Here, there is no dispute that, on March 11, 2005, prior to the MDL Panel's transfer of the Hobson case to this court, the United States District Court for the Northern District of Alabama dismissed Household Finance, Inc., MorEquity, Inc., and WFC, Inc.  That court held oral argument on March 4, 2005.  During oral argument, the court held that, since

7

none of the loans of the named representatives were purchased by Household Finance, Inc., MorEquity, Inc., or WFC, Inc., plaintiffs lacked standing to sue these entities.    In order to cure the standing defect the Hobson plaintiffs were directed to file an amended complaint within sixty (60) days adding as a named representative an individual whose loan was purchased by these entities.

On May 5, 2005, the Hobson action was transferred to this court.    A status conference held before this court on November 5, 2005.    At the status conference, counsel for the Hobson plaintiffs confirmed that these entities were no longer defendants.    [03-425 doc. No. 137 at p. 23].    Accordingly, in light of the long passage of time and counsel's prior representations, this court will deny the Motion for Leave to File an Amended Consolidated Complaint to the extent that it seeks to add Household Finance, Inc., MorEquity, Inc., or WFC, Inc. as defendants.    Further, the proposed amendment does not name as representative plaintiffs individuals whose loans were purchased by these entities.    Thus, the proposed amendment as to Household Finance, Inc., MorEquity, Inc., or WFC, Inc. is likely futile.

III. Conclusion

For the reasons set forth above:    Plaintiffs' Joint Motion for Multidistrict Case Management Order Number One [doc.

8

No. 214 at 02-1201, doc. No. 491 at 03-425, doc. No. 211 at 05-688 and doc. No. 63 at 05-1386] will be granted in part and denied in part;   (2)   Plaintiffs' Joint Motion for Leave to File an Amended Consolidated Complaint [doc. No. 488 at 03-425] will be granted in part and denied in part; and (3) Defendants' motion for leave to file a sur-reply brief in opposition to Plaintiffs' Joint Motion for Multidistrict Case Management Order Number One [doc. No. 219 at 02-1201, doc. No. 504 at 03-425 and doc. No. 215 at 05-688] will be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:    COMMUNITY BANK OF    )    MDL No. 1674
          NORTHERN VIRGINIA    )    Civ. Action Nos.
          MORTGAGE LENDING     )    02-1201, 03-425,
          PRACTICES LITIGATION )    05-688, 05-1386

CASE MANAGEMENT ORDER NUMBER 1

AND NOW, this 20th day of September, 2011, IT IS HEREBY

ORDERED THAT:

(1) **Pretrial Consolidation:**   The cases listed above
are, until further order, consolidated for pretrial purposes.
This order does not constitute a determination that these
actions are consolidated for trial, nor does it have the effect
of making any entity a party to an action in which it has not
been joined and served in accordance with the Federal Rules of
Civil Procedure.

(a) **Master Docket and File.**   The clerk will
maintain a master docket and case file under the style "In re
Community Bank of Northern Virginia Mortgage Lending Practices
Litigation," MDL No. 1674, master file number 03-425.   All
orders, pleadings, motions, and other documents will, when filed
and docketed, be deemed filed and docketed in each individual
case to the extent applicable.

(b) **Captions, Separate Filing.**   Orders,
pleadings, motions and other documents will bear a caption

1

similar to that of this Order. If generally applicable to all consolidated actions they shall include in their caption a notation that they related to "ALL CASES" and be filed and docketed only in the master file. Documents intended to apply only to a particular case will indicate in their caption the case number of the cases to which they apply, and be filed in both the master file and the individual case file.

> (2)   **Pending Motions**[1]

> (a)   The Joint Motion of Plaintiffs for Multidistrict Case Management Order [doc. No. 214 at 02-1201, doc. No. 491 at 03-425, doc. No. 211 at 05-688 and doc. No. 63 at 05-1386] is GRANTED in part. Specifically, as set forth infra, R. Bruce Carlson and R. Frederick Walters are appointed interim co-lead counsel. The Motion is otherwise denied. Defendants' motion for leave to file a sur-reply [doc. No. 219 at 02-1201, doc. No. 504 at 03-425 and doc. No. 215 at 05-688] is DENIED.

> (b)   The Joint Motion for Leave to file Joint Amended Consolidated Complaint [doc. No. 488 at 03-425] is GRANTED in part. Specifically, plaintiffs shall revise the Joint Amended Consolidated Complaint in accordance with the Memorandum filed contemporaneously herewith and file it within

---

[1]   Upon the filing of the Joint Amended Consolidated Complaint, the court will deny all other pending motions, without prejudice, as they will be rendered moot.

2

fourteen (14) days.  Defendants' responsive pleading will be due twenty-one (21) days thereafter.  The motion is DENIED as to the addition of Household Finance, Inc., MorEquity, Inc., and WFC, Inc. as defendants.

      (3)    **Interim Co-Lead Counsel**

         (a)  **Appointment**.  Pursuant to Fed.R.Civ.P. 23(d) and 23(g)(3) R. Bruce Carlson of Carlson Lynch Ltd., and R. Frederick Walters of Walters, Bender, Strohbehn and Vaughan, P.C are appointed interim Co-Lead Counsel.

         (b)  **Duties**.

         i.  Interim co-lead counsel shall coordinate as required by the course of pretrial proceedings.  Co-lead counsel shall act cooperatively and ensure that communication among the parties is as open and frequent as possible.  Co-lead counsel shall consider the interests of all parties in all planning and pretrial matters.

         ii.  Interim co-lead counsel shall be responsible for coordinating the activities of all plaintiffs during pretrial proceedings and shall:

         A.  Determine, after such consultation with other members of plaintiffs' counsel as may be appropriate, and present (in briefs oral argument, or such other fashion as may be appropriate, personally or by a designee) to the court and

to opposing parties the position of the plaintiffs on all matters arising during pretrial proceedings;

B.    Coordinate the initiation and conduct of discovery, including the preparation of joint interrogatories and requests for production of documents and the examination of witnesses in deposition, on behalf of plaintiffs consistent with the requirements of Fed.R.Civ.P. 26(b)(1) and (2) and Fed.R.Civ.P. 26(g) and Section _infra_ regarding discovery.

C.    Jointly conduct settlement negotiations on behalf of plaintiffs, but shall not enter into binding agreements except to the extent expressly authorized;

D.    Delegate specific tasks to other counsel in a manner to ensure that pretrial preparation for the plaintiffs is conducted effectively, efficiently, and economically;

E.    Enter into stipulations with opposing counsel as necessary for the conduct of the litigation;

F.    Prepare and distribute periodic status reports to the parties;

G.    Maintain adequate time and disbursement records covering services as interim co-lead counsel'

H.    Monitor the activities of co-counsel to ensure that schedules are met and unnecessary expenditures of time and funds are avoided; and

4

I.    Perform such other duties as may be incidental to proper coordination of plaintiffs' pretrial activities or authorized by further order of court.

Counsel for plaintiffs who disagree with interim co-lead counsel or who have individual or divergent positions may file papers with the court, present oral and written arguments, conduct examinations of deponents, and otherwise act separately on behalf of their clients as appropriate provided that in doing so they do not repeat arguments, questions, or actions of interim co-lead counsel.

(c)    **Time Records.**    All counsel shall keep a daily record of their time spent and expenses incurred in connection with this litigation indicating with specificity the hours, location, and particular activity (such as "conduct of deposition of A.B."). The failure to maintain such records will be grounds for denying court-awarded attorneys' fees, as will insufficient description of the activity.

**4. Discovery**

A.    **Joint Report of the Parties and Proposed Scheduling and Discovery Order – Class Action.**    The parties are directed to meet and confer within twenty-one (21) days of the date of this order. The parties are further directed to file the "Joint Report of the Parties and Proposed Scheduling and Discovery Order – Class Action" in a form substantially similar

to that set forth in Appendix LCvR 23.E, except that that parties are excused from paragraphs 4, 6, 14 and 18 of the model order.

B.   **Prior Discovery**.    All prior written discovery to which responses have not yet been served are deemed withdrawn.

C.   **Confidentiality Orders**.    All previously entered confidentiality orders shall remain in effect.

D.   **Procedure Governing Discovery Disputes**.    The Federal Rules of Civil Procedure allow for liberal discovery. In the absence of a privilege relevancy is the test for determining whether material is discoverable.    This rule is construed broadly and includes "any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978).

Discovery is not limited to the issues raised only in the pleadings, but rather is designed to define and clarify the issues. Id. at 351. Nor is discovery objectionable on the grounds that the information sought would be inadmissible at trial, so long as the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Additionally, should it be determined that, given the needs of the case, compliance with a discovery request would be

burdensome or expensive, this will not necessarily be grounds for non-production, but it will impact on the court's decision as to who must bear the cost of production.

In accordance with Local Rule 7.1.C., in the event a dispute arises over a discovery request, all counsel are required to confer in good faith in an effort to resolve the issue without court intervention. It shall be the obligation of the attorney for the party seeking court intervention to initiate such conferences and to do so promptly. Refusal to confer in good faith may subject counsel to sanctions, such as the imposition of costs, including attorneys' fees, under Fed.R.Civ.P. 37(a)(4).

If the parties are unable to resolve a discovery dispute and court intervention is sought, the movant shall file a Motion to Compel Discovery or a Motion for a Protective Order, as appropriate. Attached to the motion shall be a proposed order of court. The proposed order of court must set forth, in detail, the parties' proposal for resolving the discovery dispute. Within five (5) working days of receipt of the motion, the opposing party shall file a written response. Attached to the response shall be a proposed order of court.

The court will sign, without modification, the proposed order of court which, in the judgment of the court, is the most reasonable under the circumstances.

BY THE COURT,

_____, C.J.

cc: All Counsel of Record

# **<u>Exhibit 18 to Declaration</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:  COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION<br><br>THIS MOTION RELATES TO ALL ACTIONS | MDL NO. 1674<br><br>CASE NO. 02-01201,<br>CASE NO. 03-0425,<br>CASE NO. 05-0688, and<br>CASE NO. 05-1386<br><br>HON. GARY L. LANCASTER<br><br>FILED ELECTRONICALLY |

**BRIEF OF DEFENDANTS RESIDENTIAL FUNDING COMPANY, LLC, PNC BANK, N.A., AND FEDERAL DEPOSIT INSURANCE CORP. AS RECEIVER FOR GUARANTY NATIONAL BANK OF TALLAHASSEE AND AS RECEIVER FOR IRWIN UNION BANK AND TRUST COMPANY IN SUPPORT OF THEIR MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY ......................................... 2

       A.     STATEMENT OF FACTS ................................................................. 2

       B.     PROCEDURAL HISTORY ................................................................. 4

III.   ARGUMENT ....................................................................................... 5

       A.     DISMISSAL STANDARDS UNDER FED. R. CIV. P. 12(b)(6) ......................... 5

       B.     PLAINTIFFS' CLAIMS FAIL FOR LACK OF STANDING ............................... 7

              1.     Standing Is An Essential Constitutional Requirement .................. 7

              2.     All Plaintiffs Who, As Debtors In Pending Or Prior Bankruptcies Did
                     Not Schedule Their Claims As Assets Of Their Estates, Lack
                     Standing To Assert Claims In This Case ................................... 8

                     a.     Plaintiffs Brown, Clark, Davis, Drennen, Haney, Kruszka,
                            Mathis, Merl, Miller, Sabo, Starkey And Ulrich Lack Standing
                            Because They Failed To Identify In Their Bankruptcies Their
                            Asserted Claims Herein ............................................ 8

                     b.     Plaintiff Hobson Also Lacks Standing, Notwithstanding
                            Action Taken In His Pending Bankruptcy ....................... 13

              3.     Plaintiffs Lack Standing To Sue Those Defendants Who Neither
                     Originated Nor Took Assignment Of Their Loans ...................... 14

                     a.     Plaintiffs Kossler, Nixon, And Hobson Lack Standing To Sue
                            RFC .................................................................. 16

                     b.     Plaintiffs Baratz, Boor, Brown, Cartee, Clark, Davis, Dorman,
                            Drennen, Gaskin, Haney, Kelly Parkinson, Kessler, Kossler,
                            Kruszka, Logan, Mathis, Merl (Boor), Miller, Montgomery,
                            Picard, Porco, Roberts, Sabo, Starkey, Turner, Ulrich, And
                            Wasem Lack Standing To Sue IUBT ............................. 17

                     c.     Plaintiffs Whose Loans Were Originated By CBNV Do Not
                            Have Standing To Sue GNBT, And Vice Versa .................. 18

       C.     MOST PLAINTIFFS' RESPA AND TILA/HOEPA CLAIMS ARE TIME
              BARRED ............................................................................... 19

i

1.     The Claims Of Most Plaintiffs Were Not Filed Within RESPA's Or TILA/HOEPA's One-Year Limitations Periods.........................................19

    a.     Time-Barred Claims Against CBNV And RFC.............................19

    b.     Time-Barred Claims Against GNBT And RFC.............................20

    c.     Time-Barred Claims Against IUBT.............................................21

2.     Neither Non-Pennsylvania CBNV Borrowers Nor GNBT Borrowers From Any Jurisdiction Can Claim The Initial Filing Date Of The *Davis* Case ...........................................................................................21

    a.     Non-Pennsylvania Borrowers Cannot Relate Back To *Davis I* Under Federal Rule Of Civil Procedure 15(c) Because *Davis I* Did Not Provide Any Defendant With Sufficient Notice Of Any Claims By These Borrowers ...................................................21

    b.     Likewise, No Borrower Whose Loan Was Secured By Real Property Outside Of Pennsylvania Can Invoke The Class Action Tolling Doctrine To Toll A Claim From *Davis I* Regardless Of Whether CBNV Or GNBT Originated The Loan, And No GNBT Borrower Can Invoke *Davis I* (Or *Davis II*) .........................................................................................26

3.     Plaintiffs Do Not Come Remotely Close To Adequately Pleading Equitable Tolling To Save Their RESPA And TILA/HOEPA Claims From Dismissal .........................................................................................29

    a.     Plaintiffs' Complaint Falls Woefully Short Of Pleading Equitable Tolling .........................................................................30

        (1)     Equitable Tolling Requires Extraordinary Circumstances ..................................................................30

        (2)     To Invoke Fraudulent Concealment, A Complaint Must Allege Specific Affirmative Acts Of Concealment Beyond The Conduct That Allegedly Violated RESPA Or TILA/HOEPA...................................32

        (3)     Plaintiffs Have Not Alleged Active Concealment By Defendants .......................................................................36

    b.     Additionally, Plaintiffs Also Have Not Adequately Alleged That They Exercised Reasonable Diligence ...................................42

c.    The Complaint On Its Face Establishes That The TILA/HOEPA Claims Are Not Subject To Equitable Tolling Or Equitable Estoppel ...................................................................45

d.    The TILA/HOEPA Claims Directed At RFC And IUBT Cannot Be Subject To Equitable Tolling Because The Allegations Of Tolling Do Not Allege Any Misleading Conduct By RFC Or IUBT ...........................................46

4.    The Rescission Claims Are Untimely Under The Applicable Statute Of Repose, Which Is Not Subject to Tolling .............................46

D.    PLAINTIFFS' RESCISSION CLAIMS FAIL TO STATE A CLAIM ...............47

E.    THE CLAIMS OF GNBT PLAINTIFFS EDWARD KRUSZKA AND RICHARD MONTGOMERY MUST BE DISMISSED FOR FAILURE TO JOIN THEIR SPOUSES AS NECESSARY PARTIES ........................................49

F.    PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL REASONS ........................51

1.    The RESPA Claims Are Defective ...........................................................51

a.    Plaintiffs May Not Premise Their RESPA Claims On Allegations Relating To "Loan Discount Fees" ............................52

b.    Equally Deficient Are The RESPA Allegations Based On Title Charges ........................................................................................53

(1)    Defendants May Not Be Held Liable For The Alleged RESPA Violations By The Title Companies .....................54

(2)    The Allegations Of RESPA Violations By The Title Companies Are Defective For Other Reasons As Well .....54

c.    Plaintiffs' "Kickback" Allegations Also Are Defective ...............56

(1)    These Allegations Fail To The Extent They Are Premised On "Loan Discount" Fees ...................................56

(2)    These Allegations Fail To The Extent They Are Based On Purported Disclosure Violations In The HUD-1s ........56

(3)    The Complaint, And The Agreements It Purports To Characterize, Establish That There Were No "Kickbacks" In Violation Of RESPA ................................57

d.    Plaintiffs May Not Base Their RESPA Claim On The Alleged Violation Of Affiliated Business Arrangement Requirements ......61

e.    All RESPA Claims Of Borrowers Who Received Loans From
CBNV After The "Spring Of 2000" Fail As A Matter Of Law .....62

2.    Many Of The TILA Claims Also Fail For Reasons Other Than
Timeliness ....................................................................................66

a.    Nearly All Plaintiffs Acknowledged Receiving The Required
Disclosures At Least Three Business Days Prior To The
Closing ........................................................................................67

b.    The Disclosures Met Federal Standards For
"Conspicuousness" .......................................................................68

c.    TILA Does Not Require Disclosures About Prepayment
Penalties ......................................................................................69

d.    As Assignees, RFC And IUBT Are Not Liable For Disclosure
Violations Not Apparent On The Face Of The Disclosures .........69

(1)    The Plain Language Of The Statute Does Not Provide
An Affirmative Cause Of Action Against Assignees
For Latent Disclosure Violations By Original Lenders .....69

(2)    The Legislative History Confirms That There Is No
Such Cause Of Action ......................................................73

(3)    Multiple Courts Have Held That § 1641(d) Does Not
Create A Right To Sue Assignees For Non-Apparent
Violations By The Original Lender ..................................77

G.    PLAINTIFFS' RICO CLAIMS FAIL AS A MATTER OF LAW .......................78

1.    Plaintiffs' RICO Claims Under Section 1962(c) Are Defective As
Against The Banks Because Plaintiffs Have Not Alleged That The
Banks "Conducted" The Affairs Of Any RICO Enterprise ......................79

2.    Plaintiffs' RICO Conspiracy Claim Under Section 1962(d) Fails As A
Matter Of Law Against The Banks Because The Alleged Substantive
RICO Violation Is Deficient ...................................................................83

3.    Plaintiffs' RICO Claims Against RFC And IUBT Fail For Additional
Reasons ...................................................................................................84

a.    Plaintiffs' RICO Claims Against RFC Fail ...................................84

b.    Plaintiffs' RICO Claims Against IUBT Also Fail .........................85

c.    Plaintiffs Have Failed To Plead That RFC And IUBT
Conducted A RICO Enterprise ....................................................86

d.    The CAC Fails To Adequately Plead A Claim For RICO
Conspiracy .................................................................................89

IV.    CONCLUSION.............................................................................................. 91

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Albright v. Atty's Title Ins. Fund,*
    504 F. Supp. 2d 1187 (D. Utah 2007)................................................................87

*Alfaro v. E.F. Hutton & Co.,*
    606 F. Supp. 1100 (E.D. Pa. 1985) ...................................................................89

*Allen v. Wright,*
    468 U.S. 737 (1984)..........................................................................................7, 8

*Allied Int'l v. Int'l Longshoremen's Ass'n,*
    814 F.2d 32 (1st Cir. 1987)................................................................................21

*Allston-Wilson v. Philadelphia Newspapers, Inc.,*
    No. 05-4056, 2006 U.S. Dist. LEXIS 21383 (E.D. Pa. Apr. 20, 2006) ...................11

*Am. Mortg. Network v. Shelton,*
    486 F.3d 815 (4th Cir. 2007) .......................................................................48, 49

*Am. Pipe & Construction Co. v. Utah,*
    414 U.S. 538 (1974)..................................................................................*passim*

*Amsterdam Tobacco Inc. v. Philip Morris, Inc.,*
    107 F. Supp. 2d 210 (S.D.N.Y. 2000)................................................................79

*Anderson v. Acme Markets,*
    287 B.R. 624 (E.D. Pa. 2002) ...........................................................................11

*Ardese v. DCT, Inc.,*
    280 Fed. Appx. 691 (E.D. Okla. May 29, 2008)................................................12

*Arneil v. Ramsey,*
    550 F.2d 774 (2d Cir. 1977)..............................................................................22

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S. Ct. 1937 (2009)........................................................*passim*

*Ausano v. BAC Home Loans Servicing, LP,*
    No. 10cv4, 2010 WL 3463647 (S.D. Cal. Aug. 31, 2010) ...............................64

*Avila v. Immigration & Nat. Serv,*
    731 F.2d 616 (9th Cir. 1984) .......................................................................22, 25

*Baker v. Century Fin.*,
    No. 01-0903, 2001 U.S. Dist. LEXIS 24320 (W.D. Mo. Nov. 19, 2001) ...............................77

*Baldwin County Welcome Ctr. v. Brown*,
    466 U.S. 147 (1984)..........................................................................................................30

*Bancoklahoma Mortg. Corp. v. Capital Title Co.*,
    194 F.3d 1089 (10th Cir. 1999) ......................................................................................87

*Baraka v. McGreevey*,
    481 F.3d 187 (3d Cir. 2007)............................................................................................63

*Beach v. Ocwen Fed. Bank*,
    523 U.S. 410 (1998)..........................................................................................................46

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................... *passim*

*Berry v. GMAC-Residential Funding Corp.*,
    No. 01-2713, 2002 WL 1797779 (W.D. Tenn. July 31, 2002)................................14

*Boulware v. Crossland Mortg. Corp.*,
    291 F.3d 261 (4th Cir. 2002) ..........................................................................................55

*Brooks v. Terra Funding, Inc.*,
    No. 01-2946, 2002 WL 1797785 (W.D. Tenn. July 31, 2002)................................14

*Bryant v. Mortg. Capital Resources Corp.*,
    197 F. Supp. 2d 1357 (N.D. Ga. 2002)..........................................................................45

*Burnett v. New York Central Railroad Co.*,
    380 U.S. 424 (1965)..........................................................................................................23

*Bustamante v. First Fed. Sav. & Loan Ass'n*,
    619 F.2d 360 (5th Cir. 1980) ..........................................................................................48

*Cada v. Baxter Healthcare Corp.*,
    920 F.2d 446 (7th Cir. 1990) ..........................................................................................31

*Cain v. Hyatt*,
    101 B.R. 440 (E.D. Pa. 1989) .........................................................................................11

*Cappuccio v. Prime Capital Funding LLC*,
    649 F.3d 180 (3d Cir. 2011)............................................................................................68

*Cardiello v. The Money Store, Inc.*,
    No. 00-7332, 2001 WL 604007 (S.D.N.Y. June 1, 2001) ............................................40

*Carillo v. Bank of New York,*
   No. 09-61642-CIV, 2009 WL 5708925 (S.D. Fla. Dec. 22, 2009)..........................................39

*Cedeno v. Indymac Bancorp, Inc.,*
   No. 06-6438, 2008 WL 3992304 (S.D.N.Y. Aug. 26, 2008)..................................................58

*Cervantes v. Countrywide Home Loans, Inc.,*
   No. 09-17364, 2011 U.S. App. LEXIS 18569 (9th Cir. Sept. 7, 2011)....................................41

*Christiansen v. Beneficial Nat'l Bank,*
   972 F. Supp. 681 (S.D. Ga. 1997)..........................................................................................15

*Cliff v. Payco Gen. Am. Credits, Inc.,*
   363 F.3d 1113 (11th Cir. 2004) ................................................................. *passim*

*Conley v. Gibson,*
   355 U.S. 41 (1957).................................................................................................................5

*Crete v. Resort Condos. Int'l,*
   No. 09-5665, 2011 WL 666039 (D.N.J. Feb. 14, 2011) ........................................................79

*Croxford v. Sutherland Title,*
   No. 2:10-cv-0573, 2011 WL 64306 (D. Utah Jan. 7, 2011) ..........................................43, 45

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   375 B.R. 719 (Bankr. S.D.N.Y. 2007) ..............................................................................11, 12

*Dahlgren v. First Nat'l Bank of Holdrege,*
   533 F.3d 681 (8th Cir. 2008) ..........................................................................................87, 88

*Dash v. FirstPlus Home Loan Owner Trust 1996-2,*
   248 F. Supp. 2d 489 (M.D.N.C. 2003) ..............................................................................14, 77

*Davis v. Grusemeyer,*
   996 F.2d 617 (3d Cir. 1993)..............................................................................................32, 45

*DiNicola v. DiPaolo,*
   945 F. Supp. 849 (W.D. Pa. 1996)..........................................................................................48

*Dowdy v. First Metro. Mortg. Co.,*
   No. 01-CV-7211, 2002 WL 745851 (N.D. Ill. Jan. 29, 2002)................................................77

*Duke v. H&R Block Bank,*
   No. 10-cv-01927, 2011 WL 1060656 (D. Colo. Mar. 8, 2011) ..............................................42

*Dunden v. FirstPlus Bank,*
   No. 01-408, 2002 WL 1155325 (S.D. Ill. Apr. 29, 2002)................................................14, 15

*Easter v. Am. W. Fin,*
    381 F.3d 948 (9th Cir. 2004) ................................................................14

*Evans v. Rudy-Luther Toyota, Inc.,*
    39 F. Supp. 2d 1177 (D. Minn. 1999) ....................................................39

*Faircloth v. Nat'l Home Loan Corp.,*
    313 F. Supp. 2d 544 (M.D.N.C. 2003) .......................................14, 16, 78

*Fitch v. Radnor Indus., Ltd.,*
    No. 90-2084, 1990 WL 150110 (E.D. Pa. Sept. 27, 1990) ................43, 46

*Forbes v. Eagleson,*
    228 F.3d 471 (3d Cir. 2000).................................................................31

*Fowler v. UPMC Shadyside,*
    578 F.3d 203 (3d Cir. 2009)..............................................................5, 6, 7

*Frazier v. Preferred Credit,*
    No. 01-2714, 2002 WL 31039856 (W.D. Tenn. July 31, 2002)..............15

*Freeman v. Quicken Loans, Inc.,*
    626 F.3d 799 (5th Cir. 2010) ...............................................................55

*Fulmore v. Premier Fin. Corp.,*
    Nos. JFM-09-2028 et al., 2010 WL 4286362 (D. Md. Oct. 29, 2010) ....77

*Garcia v. Wachovia Mortg. Corp.,*
    676 F. Supp. 2d 895 (C.D. Cal. 2009) ...................................................34

*Garczynski v. Countrywide Home Loans, Inc.,*
    656 F. Supp. 2d 505 (E.D. Pa. 2009) ....................................................33

*Gerasta v. Hibernia Nat'l Bank,*
    575 F.2d 580 (5th Cir. 1978) ...............................................................49

*Gianduso v. U.S. Bank Nat'l Ass'n,*
    No. 3:CV-09-1971, 2010 U.S. Dist. LEXIS 116453 (M.D. Pa. Nov. 2, 2010) ......................49

*Gomez v. World Savs. Bank FSB,*
    No. 1:10-cv-01463, 2010 WL 5280004 (E.D. Cal. Dec. 13, 2010)........65

*Goodson v. Maggi,*
    No. Civ. A. 08-44, 2011 WL 2533165 (W.D. Pa. June 23, 2011).........5, 7

*Goren v. New Vision Intern., Inc.,*
    156 F.3d 721 (7th Cir. 1998) ...............................................................79

*Gov't of the V.I. v. Knight,*
    989 F.2d 619 (3d Cir. 1993)................................................................73

*Grant v. Turner,*
    No. 09-2381, 2011 WL 1775682 (D.N.J. May 9, 2011).........................78

*Haas v. Pittsburgh Nat'l Bank,*
    526 F.2d 1083 (3d Cir. 1975)................................................................26

*Hardin v. City Title & Escrow Co.,*
    797 F.2d 1037 (D.C. Cir. 1986)............................................................30

*Haug v. Bank of Am., N.A.,*
    317 F.3d 832 (8th Cir. 2003) ................................................................55

*Hedges v. United States,*
    404 F.3d 744 (3d Cir. 2005)..................................................................30

*In re "Agent Orange" Prod. Liab. Litig.,*
    818 F.2d 210 (2d Cir. 1987)..................................................................26

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)................................................................32

*In re Community Bank of Northern Virginia,*
    418 F.3d 277 (2005) ("CBNV I").......................................................4, 77

*In re Community Bank of Northern Virginia,*
    622 F.3d 275 (2005) ("CBNV II")................................................. passim

*In re Cox,*
    162 B.R. 191 (Bankr. C.D. Ill. 1993)....................................................47

*In re Ins. Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010).............................................................78, 79

*In re Rockefeller Center Prop. Sec. Litig.,*
    311 F.3d 198 (3d Cir. 2002)..................................................................32

*In re Suprema Specialties, Inc. Secs. Litig.,*
    438 F.3d 256 (3d Cir. 2006)..................................................................32

*In re Syntex Corp. Secs. Litig.,*
    95 F.3d 922 (9th Cir. 1996) ..................................................................27

*In re: Community Bank of Northern Virginia,*
    467 F. Supp. 2d 466 (W.D. Pa. 2006)..............................................31, 33

*Insignares v. Countrywide Home Loans, Inc.,*
    No. 09-60128, 2009 WL 2444322 (S.D. Fla. July 15, 2009)....................................39

*Irwin v. Dep't of Veteran Affairs,*
    498 U.S. 89 (1990)..........................................................................................31

*Jackson v. Resolution GGF Oy,*
    136 F.3d 1130 (7th Cir. 1998) ..........................................................................14

*Jacob v. Aurora Loan Servs.,*
    No. 10-1789, 2010 WL 2673128 (N.D. Cal. July 2, 2010) .....................................35

*Jenkins v. Mercantile Mortg. Co.,*
    231 F. Supp. 2d 737 (N.D. Ill. 2002) .................................................................47

*Jobe v. Argent Mortg. Co.,*
    373 Fed. Appx. 260 (3d Cir. 2010)....................................................................49

*Johnson v. Riddle,*
    No. 2:98-cv-599, 2007 U.S. Dist. LEXIS 11101 (D. Utah Feb. 15, 2007)...............23

*Jones v. Morton,*
    195 F.3d 153 (3d Cir. 1999)..............................................................................30

*Kay v. Wells Fargo & Co. N.A.,*
    No. 07-01351, 2007 WL 2141292 (N.D. Cal. July 24, 2007) .................................34

*Kester v. Zimmer Holdings, Inc.,*
    No. 2:10-cv-00523, 2010 WL 4103553 (W.D. Pa. Oct. 18, 2010)...........................63

*Killmeyer v. Oglebay Norton Co.,*
    --- F. Supp. 2d ----, No. Civ. A. 96-1723, 2011 WL 4433541 (W.D. Pa. Sept. 20, 2011) ............................................................................................................12

*Koppers Co. v. Aetna Cas. & Sur. Co.,*
    158 F.3d 170 (3d Cir. 1998)..............................................................................50

*Kost v. Kozakiewicz,*
    1 F.3d 176 (3d Cir.1993)....................................................................................5

*Krzalic v. Republic Title Co.,*
    314 F.3d 875 (7th Cir. 2002) ............................................................................55

*Lagrone v. Johnson,*
    534 F.2d 1360 (9th Cir. 1976) ..........................................................................48

*Landmann v. Bann-Cor,*
    No. 01-cv-00417, 2004 WL 1944789 (S.D. Ill. Feb. 26, 2004)...............................14

*Lane v. Vitek Real Estate Indus. Group,*
    713 F. Supp. 2d 1092 (E.D. Cal. 2010)..................................................................65

*Lawyers Title Ins. Corp. v. Dearborn Title Corp.,*
    118 F.3d 1157 (7th Cir. 1997) ..........................................................................30

*Laychock v. Wells Fargo Home Mortg.,*
    No. 07-4478, 2008 WL 2890962 (E.D. Pa. July 23, 2008) ..................................32

*Leachman v. Beech Aircraft Corp.,*
    694 F.2d 1301 (D.C. Cir. 1982)..................................................................21, 22

*Leathers v. Peoria Toyota-Volvo,*
    824 F. Supp. 155 (C.D. Ill. 1993) ..................................................................68

*Lewis v. Casey,*
    518 U.S. 343 (1996)........................................................................................8

*Lexxus Int'l, Inc. v. Loghry,*
    512 F. Supp. 2d 647 (N.D. Tex. 2007) ..............................................................11

*Lightning Lube v. Witco Corp.,*
    4 F.3d 1153 (3d Cir. 1993).............................................................................83

*Limestone Dev. Corp. v. Vill. Of Lemont,*
    520 F.3d 797 (7th Cir. 2008) .........................................................................78

*Ljepava v. M.L.S.C. Props., Inc.,*
    511 F.2d 935 (9th Cir. 1975) .........................................................................49

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)................................................................................7, 8, 17

*Lum v. Bank of Am.,*
    361 F.3d 217 (3d Cir. 2004)..................................................................10, 41, 79

*Lundy v. Adamar of New Jersey,*
    34 F.3d 1173 (3d Cir. 1994)..................................................................23, 24

*Malally v. BAC Home Loan Servicing, LLC,*
    No. 3:10-cv-0074, 2010 WL 5140626 (N.D. Ga. Oct. 8, 2010)............................39

*Manhattan Telecomms. Corp. v. DialAmerica Mktg.,*
    156 F. Supp. 2d 376 (S.D.N.Y. 2001)................................................................78

*Mannella v. County of Allegheny,*
    66 Fed. Appx. 368 (3d Cir. 2003)....................................................................31

*Marple v. Countrywide Financial Corp.,*
    No. 07-4402, 2008 U.S. Dist. LEXIS 37705 (D.N.J. May 7, 2008) .........................................32

*Martinez v. Wells Fargo Home Mortg., Inc.,*
    598 F.3d 549 (9th Cir. 2010) ...............................................................................................56

*Mathews v. Little,*
    No. 92-cv-1114, 1992 WL 192542 (E.D. Pa. July 31, 1992) .................................................31

*Matthews v. Kidder, Peabody & Co.,*
    No. Civ.A.99-85, 2000 WL 33726916 (W.D. Pa. Aug. 18, 2000) ....................................31, 32

*Matthews v. Kidder, Peabody & Co.,*
    260 F.3d 239 (3d Cir. 2001).................................................................................................31

*Mayfield v. Vanguard Sav. & Loan Assoc.,*
    710 F. Supp. 143 (E.D. Pa. 1989) ........................................................................................48

*Mayo v. GMAC Mortg., LLC,*
    No. 08-00568, 2010 U.S. Dist. LEXIS 51517 (W.D. Mo. Mar. 1, 2010)...............................14

*McAnaney v. Astoria Fin. Corp.,*
    No. 04-cv-1101, 2007 WL 2702348 (E.D.N.Y. Sept. 12, 2007) ...........................................34

*McCullogh v. Howard Hanna Co.,*
    No. 1:09cv2808, 2010 WL 1258112 (N.D. Ohio Mar. 26, 2010) ..........................................62

*Meyer v. Ameriquest Mortg. Co.,*
    342 F.3d 899 (9th Cir. 2003) ...............................................................................................47

*Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston,*
    666 F.2d 673 (1st Cir. 1981).................................................................................................74

*Miller v. Pac. Shore Funding,*
    224 F. Supp. 2d 977 (D. Md. 2002) ......................................................................................14

*Moll v. U.S. Life Title Ins. Co. of New York,*
    700 F. Supp. 1284 (S.D.N.Y. 1988).................................................................................34, 35

*Moore v. Radian Group, Inc.,*
    233 F. Supp. 2d 819 (E.D. Tex. 2002)...................................................................................56

*Morin v. Trupin,*
    835 F. Supp. 126 (S.D.N.Y. 1993) ........................................................................................89

*Mull v. Alliance Mortg. Banking Corp.,*
    219 F. Supp. 2d 895, 908-10 (W.D. Tex. 2002) ................................................................14-16

*Nelson v. County of Allegheny,*
  60 F.3d 1010 (3d Cir. 1995)...................................................................21, 22, 25

*New Castle County v. Halliburton NUS Corp.,*
  111 F.3d 1116 (3d Cir. 1997)...............................................................................31

*O'Brien v. Nat'l Prop. Analysts Partners,*
  719 F. Supp. 222 (S.D.N.Y. 1989) ......................................................................46

*O'Shea v. Littleton,*
  414 U.S. 488 (1974)..............................................................................................17

*Odesser v. Cont'l Bank,*
  676 F. Supp. 1305 (E.D. Pa. 1987) ......................................................................89

*Oshiver v. Levin, Fishbein, Sedran & Berman,*
  38 F.3d 1380 (3d Cir. 1994)...............................................................18, 31, 41, 46

*Padilla v. One West Bank,*
  No. 10-04080, 2010 WL 5300900 (N.D. Cal. Dec. 20, 2010)...............................43

*Partners Coffee Co. v. Oceana Servs. & Prods. Co.,*
  700 F. Supp. 2d 720 (W.D. Pa. 2010) ..................................................................63

*Pattetta v. Wells Fargo Bank, N.A.,*
  No. 3:09-cv-2848, 2009 WL 2905450 (D.N.J. Sept. 10, 2009)..............................32

*Pedraza v. United Guaranty Corp.,*
  114 F. Supp. 2d 1347 (S.D. Ga. 2000) ............................................................33, 36

*Pekar v. U.S. Steel/Edgar Thomson Works,*
  No. CIV. A. 09-844, 2010 WL 419421 (W.D. Pa. Jan. 29, 2010)....................58, 60

*Pettola v. Nissan Motor Acceptance Corp.,*
  44 F. Supp. 2d 442 (D. Conn. 1999) ....................................................................34

*Phillips v. County of Allegheny,*
  515 F.3d 224 (3d Cir. 2008)...........................................................................5, 6, 64

*Pineda v. Reyes,*
  No. 09-cv-01938, 2009 WL 3388376 (S.D. Cal. Oct. 20, 2009)............................65

*Podinback v. U.S. Postal Service,*
  409 F.3d 584 (3d Cir. 2005)..................................................................................31

*Poskin v. TD Banknorth, N.A.,*
  687 F. Supp. 2d 530 (W.D. Pa. 2009) ..................................................................33

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993)...................................................................................79, 80, 82, 83

*Reynoso v. Paul Fin., LLC,*
    No. 09-3225, 2009 WL 3833298 (N.D. Cal. Nov. 16, 2009) ..................................................65

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997)...........................................................................................72

*Rodriguez v. SLM Corp.,*
    No. 07-cv-1866, 2009 WL 3769217 (D. Conn. Nov. 10, 2009)..............................................42

*Ruehl v. Viacom, Inc.,*
    500 F.3d 375 (3d Cir. 2007)..................................................................................39

*Saellam v. Norfolk Southern Corp.,*
    No. 06-123, 2007 U.S. Dist. LEXIS 41150 (W.D. Pa. June 6, 2007) ....................................11

*Salinas v. United States,*
    522 U.S. 52 (1997)............................................................................................89

*Salois v. Dime Sav. Bank, FSB,*
    128 F.3d 20 (1st Cir. 1997)....................................................................................41

*Sands v. McCormick,*
    502 F.3d 263 (3d Cir. 2007)..................................................................................10

*Santiago v. GMAC Mortg. Group, Inc.,*
    417 F.3d 384 (3d Cir. 2005)..................................................................................54

*Sawtell v. E.I. Du Pont De Nemours & Co.,*
    22 F.3d 248 (10th Cir. 1994) .................................................................................27

*Schafer v. Decision One Mortg. Corp,*
    No. Civ. A. 08-5653, 2009 WL 1532048 (E.D. Pa. May 29, 2009) ..................................10, 11

*Schillinger v. Union Pac. R.R. Co.,*
    425 F.3d 330 (7th Cir. 2005) .............................................................................24, 25

*Schorsch v. Hewlett-Packard Co.,*
    417 F.3d 748 (7th Cir. 2005) .............................................................................24, 25

*Seitzinger v. Reading Hosp. & Med. Ctr.,*
    165 F.3d 236 (3d Cir. 1999)..................................................................................30

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,*
    742 F.2d 786 (3d Cir. 1984)..................................................................................89

*Sigmon Coal Co. v. Apfel,*
226 F.3d 291 (4th Cir. 2000) ................................................................................73

*Simon v. E. Ky. Welfare Rights Org.,*
426 U.S. 26 (1976) ..............................................................................................8

*Smith v. Pennington,*
352 F.3d 884 (4th Cir. 2003) ..........................................................................26, 28

*Sosa v. Alvarez-Machain,*
542 U.S. 692 (2004) ...........................................................................................72

*Spann v. Community Bank of Northern Virginia,*
No. 03-C7022, 2004 WL 691785 (N.D. Ill. Mar. 30, 2004) ..............................28, 29

*Taggart v. Wells Fargo Home Mortg., Inc.,*
No. 10-CV-00843, 2010 U.S. Dist. LEXIS 102747 (E.D. Pa. Sept. 27, 2010) ......56

*Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,*
934 F.2d 976 (8th Cir. 1991) ..............................................................................87

*Tredennick v. Bone,*
647 F. Supp. 2d 495 (W.D. Pa. 2007) ..................................................................63

*Umland v. Plano Fin. Servs., Inc.,*
542 F.3d 59 (3d Cir. 2008) .................................................................................64

*United Overseas Bank v. Veneers, Inc.,*
375 F. Supp. 596 (D. Md. 1974) .........................................................................75

*United States v. Clive,*
No. 05-0383, 2008 WL 3889726 (W.D. Pa. Aug. 19, 2008) ...............................30

*Univ. of Md. at Baltimore v. Peat,*
996 F.2d 1534 (3d Cir. 1993) .........................................................................79, 80

*Val-Com Acquisitions Trust v. Wells Fargo Bank, N.A.,*
No. 3:10-cv-1331, 2011 WL 2517230 (N.D. Tex. June 23, 2011) ...................43, 45

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,*
454 U.S. 464 (1982) .............................................................................................8

*Vandenbroeck v. Commonpoint Mortgage Co.,*
22 F. Supp. 2d 677 (W.D. Mich. 1998) ...............................................................82

*Vandenbroeck v. ContiMortgage Corp.,*
53 F. Supp. 2d 965 (W.D. Mich. 1999) ...............................................................77

*Vickers Stock Research Corp. v. Quotron Sys.,*
 No. 96 CIV 2269, 1997 U.S. Dist. LEXIS 10837 (S.D.N.Y. July 22, 1997) ..........................89

*Warth v. Seldin,*
 422 U.S. 490 (1975).............................................................................................7, 8, 17

*Washington v. National City Mortg. Co.,*
 No. 10-5042, 2011 WL 1842836 (N.D. Cal. May 16, 2011)................................................62

*Weiner v. Bank of King of Prussia,*
 358 F. Supp. 684 (E.D. Pa. 1973) ...................................................................................15

*Williams v. Aries Fin., LLC,*
 No. 09-cv-1816, 2009 WL 3851675 (E.D.N.Y. Nov. 18, 2009) .........................................34

*Williams v. Homestake Mortg. Co.,*
 968 F.2d 1137 (11th Cir. 1992) ................................................................................48, 49

*Williams v. Saxon Mortgage Servs., Inc.,*
 No. 06-0799, 2007 WL 2828752 (S.D. Ala. Sept. 27, 2007) .............................................39

*Williams v. United States,*
 405 F.2d 234 (5th Cir. 1968) ..................................................................................21, 25

*Wit v. Firstar Corp.,*
 879 F. Supp. 947 (N.D. Iowa 1995)................................................................................82

*Wooten v. Quicken Loans, Inc.,*
 626 F.3d 1187 (11th Cir. 2010) .....................................................................................52

*Yamamoto v. Bank of New York,*
 329 F.3d 1167 (9th Cir. 2003) .................................................................................48, 49

*Zaremski v. Keystone Title Associates, Inc.,*
 884 F.2d 1391 (4th Cir. 1989) ......................................................................................29

## STATE CASES

*Alexander v. PSB Lending Corp.,*
 800 N.E.2d 984 (Ind. Ct. App. 2003)..............................................................................15

*Bank of New York v. Heath,*
 No. 98-CH-8721, 2001 WL 1771825 (Ill. Cir. Ct. Oct. 26, 2001) ......................................77

*Master Fin., Inc. v. Crowder,*
 972 A.2d 864 (Md. 2009) .............................................................................................15

*Monday v. Ace Home Improvement Servs., Inc.,*
 618 N.E.2d 563 (Ill. App. 1st Dist. 1993).........................................................................47

*Murr v. Selag Corp.,*
    747 P.2d 1302 (Idaho Ct. App. 1987) ....................................................................74

### FEDERAL STATUTES

11 U.S.C. § 522 ............................................................................................................11

11 U.S.C. § 554 ............................................................................................................11

11 U.S.C. § 726(a)(1)-(6) ............................................................................................11

12 U.S.C. § 1821(j) ......................................................................................................47

12 U.S.C. § 2603 ..........................................................................................................56

12 U.S.C. § 2607 .................................................................................................. *passim*

12 U.S.C. § 2614 ..........................................................................................................19

15 U.S.C. § 1601 ..........................................................................................................70

15 U.S.C. § 1602(aa) ......................................................................................15, 70, 71

15 U.S.C. §§ 1606(c) ....................................................................................................66

15 U.S.C. § 1635 .................................................................................................. *passim*

15 U.S.C. § 1638 ..........................................................................................................66

15 U.S.C. § 1639 .................................................................................................. *passim*

15 U.S.C. §1640(e) ......................................................................................................19

15 U.S.C. § 1641 .................................................................................................. *passim*

26 U.S.C. § 2610 ..........................................................................................................54

### UCC PROVISIONS

UCC § 3-305 ................................................................................................................74

UCC § 3-306 ........................................................................................................74, 75

UCC § 9-318(1) ............................................................................................................74

UCC § 9-318(1)(a) ......................................................................................................75

### RULES

Fed. R. Civ. P. 8(a)(2) ................................................................................................90

Fed. R. Civ. P. 9(b) ............................................................................31, 32, 41, 42

Fed. R. Civ. P. 12(b)(6) ........................................................................... *passim*

Fed. R. Civ. P. 19(a) ...................................................................................50

Fed. R. Civ. P. 15(c) .....................................................................21, 23, 24, 25

### REGULATIONS

12 C.F.R. § 226.17(a)(1) ...............................................................................69

12 C.F.R. § 226.23(a)(3) ...............................................................................48

12 C.F.R. § 226.32(c) ...................................................................................68

24 C.F.R. pt. 3500 ...................................................................................*passim*

### OTHER AUTHORITIES

*Russell K. Ulrich, et al. v. GNBT*
   (Case No. 02-01616-GLL, Doc. No. 1) .....................................20, 25, 29

H.R. Conf. Rep. No. 103-652 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1977 .............................75

S. Rep. No. 103-169 (1993), *reprinted in* 1994 U.S.C.C.A.N. 1881 ................................70, 75, 76

Defendants Residential Funding Company, LLC ("RFC"), PNC Bank, N.A.

("PNC"), and Federal Deposit Insurance Corp. ("FDIC") as Receiver for Guaranty National

Bank of Tallahassee ("GNBT") and as Receiver for Irwin Union Bank and Trust Company

("IUBT") (collectively, "Defendants"), by their undersigned counsel, respectfully submit this

brief in support of their respective Motions to Dismiss.[1]

Because of the many arguments that overlap among Defendants, Defendants are

submitting this joint brief in an effort to streamline the presentation of arguments, avoid needless

repetition, and ease the burden on the Court in deciding these motions. However, certain

arguments pertain only to one Defendant or another. Accordingly, each Defendant is filing a

separate motion which adopts for that Defendant only those sections of the joint brief pertinent to

that Defendant, and in which such Defendant joins.

## I.    **INTRODUCTION**

These consolidated putative class action cases arise out of a purported "predatory

lending" scheme that allegedly occurred over a decade ago. Counsel for the original plaintiffs

have teamed up with counsel for the until-recently objector-plaintiffs to produce a 529-

paragraph, 112-page Joint Consolidated Amended Class Action Complaint (the "CAC"). Its

length notwithstanding, the CAC fails on many grounds.

As an initial matter, many of the 43 named Plaintiffs lack standing for a variety of

reasons. Nearly half lack standing because they filed bankruptcies from which these claims were

not exempted (and, in fact, with one exception, the claims were not even disclosed to the

---

[1]    The FDIC, as Receiver for GNBT, and as Receiver for IUBT, also is filing a separate
motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1).

respective trustees). Plaintiffs also lack standing to sue Defendants that neither originated nor took assignment of such Plaintiffs' loans.

In addition, as the Third Circuit recognized in its most recent opinion in this litigation, nearly two-thirds of the principal claims of the putative class members are time-barred in the absence of some basis for "relation back" or tolling, neither of which exists here. Certain Plaintiffs' claims also fail because their spouses, as co-borrowers, are indispensable parties to the case but have not been joined.

The claims themselves suffer from numerous additional defects. Plaintiffs assert various claims under three federal statutes – the Real Estate Settlement Procedures Act ("RESPA"); the federal Truth in Lending Act ("TILA"), as amended by the Home Ownership Equity Protection Act ("HOEPA"); and the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"). Rather than provide an overview of the specific allegations and their failings here, they will be discussed in the pertinent sections of the Argument.

In sum, all claims of all Plaintiffs fail as against all Defendants, but the grounds for dismissal vary depending on the particular Plaintiff, the particular claim, and the particular Defendant. To assist the Court in following which arguments require dismissal of which Plaintiffs' claims against which Defendants, Defendants attach to this brief, as Appendix A, a chart summarizing the grounds for dismissal of each claim of each Plaintiff against each Defendant.

## II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A.    STATEMENT OF FACTS

A more detailed discussion of the particular allegations that form the basis for Plaintiffs' claims is set forth in the Argument section below as necessary. The basic allegations

in the CAC of the alleged "predatory lending" scheme that gave rise to this litigation are as follows.

Plaintiffs allege that, starting in 1998, PNC's predecessor-in-interest, Community Bank of Northern Virginia ("CBNV"), formed a relationship with a group of entities owned by Randy Bapst and certain members of the Shumway family (the "Shumway/Bapst Organization"), and together they engaged in a so-called predatory lending scheme. Plaintiffs further allege that, in the spring of 2000, the Shumway/Bapst Organization began to wind down its relationship with CBNV, and around that same time, GNBT (together with CBNV, the "Banks") began to engage in the same alleged scheme with the Shumway/Bapst Organization. (CAC ¶¶ 76-79).

As part of the alleged scheme, the Shumway/Bapst Organization would solicit borrowers and refer them to CBNV or GNBT, which would make the borrowers high-interest second residential mortgage loans. At closing on the loans, Plaintiffs allege, CBNV or GNBT would (among other alleged misconduct) charge the borrowers for alleged improper title and loan fees, some of which were then paid to the Shumway/Bapst Organization as a purported "kickback" for the loan application referral. (*Id.*). Plaintiffs further allege that RFC, as well as (to a lesser extent) various other investors,[2] participated in the alleged scheme by purchasing the loans on the secondary market, while knowing that the principal of the loans included amounts that financed the alleged improper fees paid to the Shumway/Bapst Organization. (*Id.* ¶¶ 80-97).[3]

---

[2]    IUBT is identified in the CAC as one of the "Investor Defendants" that purchased loans from CBNV.

[3]    Many of these conclusory assertions from the CAC are unsupported – indeed, even contradicted – by specific, factual allegations in the CAC, as described below.

Based on these allegations, Plaintiffs assert five separate causes of action: (1) "Violations of the Real Estate Settlement Procedures Act;" (2) "Violations of TILA, as Amended by HOEPA, for Inaccurate and Understated Material Disclosures;" (3) "Multiple Violations of the Substantive Provisions of TILA and HOEPA;" (4) "Declaratory Judgment that the Class Members have a Right to Rescind Their Loans;" and (5) "Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) and 1962(d)."

**B.    PROCEDURAL HISTORY**

The Court is doubtless aware of the Procedural History of this matter and it will be reviewed here only briefly; as necessary (such as in the statutes of limitations discussion) additional elements of the history will be discussed.

In May 2001, the first of a number of putative class actions arising out of these allegations was filed. These putative class actions eventually were consolidated in this Court. Twice in this litigation, the Court certified settlement classes and approved class-wide settlements. Each time, however, the Third Circuit vacated the Orders approving the settlement and certification of the class, and remanded the litigation to this Court. *See In re Community Bank of Northern Virginia*, 418 F.3d 277 (2005) ("*CBNV I*"); *In re Community Bank of Northern Virginia*, 622 F.3d 275 (2005) ("*CBNV II*").

Following remand from *CBNV II*, counsel for Plaintiffs who had entered into the prior settlements decided to join forces with counsel for Plaintiffs who were objectors to the settlements, and Plaintiffs moved for leave to file the CAC. On September 20, 2011, the Court granted Plaintiffs leave to file the CAC against the current Defendants, and it was filed on October 4, 2011. A RICO Case Statement was filed on October 18, 2011.

4

### III.    ARGUMENT

#### A.    DISMISSAL STANDARDS UNDER FED. R. CIV. P. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a complaint that fails "to state a claim upon which relief can be granted" should be dismissed. To survive a motion to dismiss, a claim must be "plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). In evaluating plausibility, a court need not accept as true "a legal conclusion couched as a factual allegation." *Id.* at 555 (citation and quotations omitted). Nor must the court be persuaded by "well-pleaded facts that do not permit the court to infer more than the ***mere possibility*** of misconduct. . . ." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S. Ct. 1937, 1950 (2009) (emphasis added).

Following *Twombly* and *Iqbal,* this Court recently explained:

> A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). A complaint must be dismissed for failure to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Ashcroft v. Iqbal,* [556] U.S. [662], 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (May 18, 2009) (citing *Twombly,* 550 U.S. at 555–57, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

*Goodson v. Maggi*, No. Civ. A. 08-44, 2011 WL 2533165, at *5 (W.D. Pa. June 23, 2011) (Lancaster, C.J.).

This Court in *Goodson* further explained:

> Recently, in *Fowler v. UPMC Shadyside,* 578 F.3d 203 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit discussed its decision in *Phillips v. County of Allegheny,* 515 F.3d

224, 232–33 (3d Cir. 2008) (construing *Twombly* in a civil rights context), and described how the Rule 12(b)(6) standard had changed in light of *Twombly* and *Iqbal* as follows:

> After *Iqbal*, it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S.Ct. at 1949. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1948. The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See Id.* at 1949–50; *see also Twombly,* 550 U.S. at 555, & n. 3, 127 S.Ct. 1955.

*Fowler,* 578 F.3d at 210.

Thereafter, in light of *Iqbal,* the United States Court of Appeals for the Third Circuit in [*Fowler,* 578 F.3d 203], set forth a two-prong test to be applied by the district courts in deciding motions to dismiss for failure to state a claim:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*Iqbal,* 129 S.Ct. at 1949]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. *See Phillips,* 515 F.3d at 234-35. As the Supreme Court instructed in *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'" *Iqbal,* 129 S.Ct. at 1949. This "plausibility" determination will be "a context-specific task that requires the reviewing court to

6

> draw on its judicial experience and common sense."
> *Id.*

*Goodson*, 2011 WL 2533165, at *5-6 (quoting *Fowler*, 578 F.3d at 210-11).

### B.    PLAINTIFFS' CLAIMS FAIL FOR LACK OF STANDING

As a threshold matter, numerous Plaintiffs' claims must be dismissed for lack of standing. Specifically, the 17 Plaintiffs who filed for bankruptcy but did not disclose their claims on their bankruptcy schedules and were not granted leave to file claims on their own behalf have no standing to bring suit. Moreover, multiple Plaintiffs purport to bring claims against Defendants that neither made nor purchased their loans, and all such claims fail on Article III standing grounds. The Constitution and Supreme Court caselaw compel dismissal of these claims at this time. *Warth v. Seldin*, 422 U.S. 490, 517-18 (1975) ("The rules of standing . . . are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.").

### 1.    Standing Is An Essential Constitutional Requirement

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the United States Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To fulfill the basic Constitutional requirement of standing, a named plaintiff must show: (1) the named plaintiff has suffered an actual, "concrete," and "particularized" "injury in fact;" (2) there is a causal connection between the named plaintiff's injury and the particular defendant's alleged wrongful conduct – *i.e.*, that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court;" and (3) a likelihood that the named plaintiff's injury will be "redressed by a favorable decision"

against the defendant. *Lujan*, 504 U.S. at 560-61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41-42, 43 (1976)); *Allen*, 468 U.S. at 750; *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

The individual-injury requirement is not met by alleging "that injury has been suffered by other, unidentified members of the class to which [the plaintiff] belong[s] and which [he] purport[s] to represent." *Warth*, 422 U.S. at 502. The filing of an action as a putative "'class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, *not* that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (emphasis added) (quoting *Simon*, 426 U.S. at 40 n.20) (internal quotation and citation omitted).

Each of the named Plaintiffs lacks standing to sue one or more Defendants, as detailed below.

**2.    All Plaintiffs Who, As Debtors In Pending Or Prior Bankruptcies Did Not Schedule Their Claims As Assets Of Their Estates, Lack Standing To Assert Claims In This Case**

**a.    Plaintiffs Brown, Clark, Davis, Drennen, Haney, Kruszka, Mathis, Merl, Miller, Sabo, Starkey And Ulrich Lack Standing Because They Failed To Identify In Their Bankruptcies Their Asserted Claims Herein**

The following Plaintiffs lack standing to assert claims in this case, on their own behalf or as class representatives, because they have sought (and in almost all cases obtained) bankruptcy relief under Chapter 7 or Chapter 13 of the Bankruptcy Code without disclosing in their bankruptcy schedules their respective interests in the instant lawsuit or the claims which undergird it.

| NAME OF PLAINTIFF | LOAN DATE | PETITION DATE | BANKR. COURT, & DOCKET NO. | CLAIM SCHEDULED OR EXEMPTED | EXHIBIT NUMBER |
|---|---|---|---|---|---|
| Boor, Tina M. (f/k/a Tina Merl) | 12/9/2000 | 8/20/2007 | ED of Pennsylvania Case No. 07-14796 | No | 1 |
| Brown, Melba | 8/12/2000 | 8/24/2005 | SD of Alabama Case No.: 05-14703 | No | 2 |
| Clark, Robert A. & Rebecca A. | 3/20/2001 | 4/28/2007 | WD of Pennsylvania Case No. 07-22690 | No | 3 |
| Clark, Robert A & Rebecca A. | 3/20/2001 | 7/16/2009 | WD of Pennsylvania Case No.: 09-25258 | No | 4 |
| Davis, Ruth J. | 2/22/1999 | 4/15/2005 | WD of Pennsylvania Case No.: 05-24668 | No | 5 |
| Drennen, John & Rowena | 7/28/2001 | 10/19/2004 | WD of Missouri Case No.: 04-46476 | No | 6 |
| Drennen, Rowena L. | 7/28/2001 | 8/04/2005 | WD of Missouri Case No.: 05-45391 | No | 7 |
| Haney, Stephen & Amy Haney, aka Pellegrino | 5/23/2001 | 6/02/2009 | WD of Pennsylvania Case No.: 09-24135 | No | 8 |
| Hobson, Clell | | 12/2/2002 | ND of Alabama Case No. 02-736682 | No | 9 |
| Kruszka, Edward | 5/5/2001 | 5/24/2002 | WD of Pennsylvania Case No.: 02-25732 | No | 10 |
| Mathis, Thomas | 6/7/2001 | 4/29/2004 | WD of Pennsylvania Case No.: 04-25655 | No | 11 |
| Miller, Nora H. | 4/30/1999 | 8/15/2003 | ED of Pennsylvania Case No.: 03-30321 | No | 12 |
| Miller, Nora H. | 4/30/1999 | 8/20/2009 | ED of Pennsylvania Case No.: 09-26098 | No | 13 |

| NAME OF PLAINTIFF | LOAN DATE | PETITION DATE | BANKR. COURT, & DOCKET NO. | CLAIM SCHEDULED OR EXEMPTED | EXHIBIT NUMBER |
|---|---|---|---|---|---|
| Sabo, Ellen M. | 10/15/1999 | 12/13/2007 | ED of Pennsylvania Case No. 07-27844 | No | 14 |
| Starkey, Shawn & Lorene | 10/21/2001 | 5/13/2005 | WD of Missouri Case No.: 05-43228 | No | 15 |
| Ulrich, Kathleen | 8/8/2000 | 2/26/2007 | WD of Pennsylvania Case No.: 07-21134 Chapter 7 | No | 16 |

The foregoing facts regarding these Plaintiffs' bankruptcies are taken from publicly-available court records obtained through PACER. The pertinent records for each Plaintiff are attached hereto in the Exhibit indicated on the above chart. Such public records may and should be considered on a motion to dismiss without converting it into a motion for summary judgment. *Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) ("judicial proceedings constitute public records" and are to be considered on a motion to dismiss); *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (on a motion to dismiss pursuant to Rule 12(b)(6), courts generally consider "matters of public record"), *abrogated on other grounds by Twombly*, 550 U.S. 544.

Under Section 541(a) of the Bankruptcy Code [11 U.S.C. § 541(a)], all rights in a debtor's legal or equitable property are transferred to the bankruptcy estate when a Chapter 7 or Chapter 13 debtor files for bankruptcy protection. The property that is transferred to the bankruptcy estate includes causes of action belonging to the debtor at the commencement of the bankruptcy case. *Schafer v. Decision One Mortg. Corp*, No. Civ. A. 08-5653, 2009 WL 1532048, at *4 (E.D. Pa. May 29, 2009). Once an asset is transferred to the bankruptcy estate, all rights held by a debtor in the property are extinguished, unless the property is exempted from

the estate under 11 U.S.C. § 522[4] or abandoned back to the debtor under 11 U.S.C. § 554. *Id.* at
*5.[5]

        As the Court explained in *Schafer*:

> ***If a debtor fails to exempt or schedule a claim, and the trustee
> does not abandon the claim, the claim remains the property of
> the estate.*** *Allston-Wilson v. Philadelphia Newspapers, Inc.,* No.
> 05-4056, 2006 U.S. Dist. LEXIS 21383, at [*]2-3 [(E.D. Pa. Apr.
> 20, 2006)]; *see* 11 U.S.C. § 554(d). ***This is so even after the
> bankruptcy has been closed and the trustee has been discharged.***
> *See* [*Anderson v. Acme Markets,* 287 B.R. 624, 627-29 (E.D. Pa.
> 2002]; [*Cain v. Hyatt,* 101 B.R. 440, 441-43 (E.D. Pa. 1989)].

*Id.* at *4 (emphasis added).

        Although a debtor is ordinarily entitled to any surplus recovered by the

bankruptcy estate after the payment of all debts, fees, and administrative expenses, *see* 11 U.S.C.

§ 726(a)(1)-(6), the mere possibility that he could realize some benefit from the estate's

prosecution of the action is not sufficient to confer standing. *See Dabit v. Merrill Lynch, Pierce,*

---

[4]    Not surprisingly, § 522 strictly circumscribes what can be exempted, and Defendants do
not suggest that these claims could have been exempted.

[5]    When a debtor fails to schedule a claim, whether through ignorance or design, it still
passes to the estate. "If it were otherwise, a debtor who filed for bankruptcy could
prevent all of her accrued claims from passing to the trustee, simply by failing to
investigate the potential for claims. To essentially reward a debtor who has remained
unaware of potential claims would encourage passivity and inattention just at a time
when federal law expects the opposite." *Schafer,* 2009 WL 1532048, at *6. Regardless
of whether the debtor knew of the potential claim on the petition date, he or she lacks
standing to later assert it in her own name. "On the contrary, the claims properly belong
to the Chapter 7 bankruptcy trustee, and only the trustee has the authority to pursue them.
*See* [*Lexxus Int'l, Inc. v. Loghry,* 512 F. Supp. 2d 647, 656-60 (N.D. Tex. 2007)];
*Saellam v. Norfolk Southern Corp.,* No. 06-123, 2007 U.S. Dist. LEXIS 41150, at *3-4,
8-13 (W.D. Pa. June 6, 2007)." *Schafer,* 2009 WL 1532048, at *6 (footnotes omitted).
Moreover, the Plaintiffs who filed bankruptcies could not claim ignorance of their alleged
claims at the time their bankruptcies were filed, even if such were relevant, given that
they had already filed lawsuits in this Court or in the various state courts from which their
suits were transferred or removed by the time they initiated the above-referenced
bankruptcies.

*Fenner & Smith, Inc.*, 375 B.R. 719, 725 (Bankr. S.D.N.Y. 2007) (citing *Ardese v. DCT, Inc.*,

280 Fed. Appx. 691, 694 (E.D. Okla. May 29, 2008)) (noting that "if the possibility of

recovering some portion of an award or settlement of causes of actions belonging to a

bankruptcy estate was sufficient to grant standing to assert those causes of action, then all of

Plaintiff's creditors who have a superior right [to the debtor] to distribution of any such award or

settlement would also have standing as plaintiffs in this case").

 This Court has itself very recently reiterated the foregoing principles in *Killmeyer

v. Oglebay Norton Co.*, --- F. Supp. 2d ----, No. Civ. A. 96-1723, 2011 WL 4433541 (W.D. Pa.

Sept. 20, 2011) (Lancaster, C.J.). That case involved a wrongful death claim that the widow did

not schedule on her bankruptcy petition. This Court held that, as of the date of that Petition, she

was no longer the real party in interest, and only the bankruptcy trustee could pursue the claim.

*Id.* at *6.[6]

 Each of the Plaintiffs identified in this Section failed to schedule either this

lawsuit or its underlying claims as an asset of their Chapter 7 or Chapter 13 estates. Moreover,

neither this lawsuit nor their respective claims against Defendants were *exempted* from their

bankruptcy estates, and none of their trustees *abandoned* these assets to them. All but one of

these Plaintiffs have received a discharge in bankruptcy, except in Ms. Miller's second

bankruptcy, which is still pending. As the claims asserted herein were not scheduled and

exempted or abandoned, Plaintiffs lack standing to pursue them.[7]

---

[6] The Court preferred the "real party in interest" terminology to that of standing, but noted that "[t]he use of standing terminology is common in cases analyzing this issue." *Id.* at *5 n.7.

[7] Plaintiffs and their trustees should also be deemed judicially estopped from pursuing these claims, although Defendants recognize that the application of estoppel principles to this situation is unsettled. In *Killmeyer*, this Court concluded that a trustee is not

                 (continued...)

### b.    Plaintiff Hobson Also Lacks Standing, Notwithstanding Action Taken In His Pending Bankruptcy

Plaintiff Clell Hobson is a debtor in an open bankruptcy and thus lacks standing to assert claims herein. The analysis is no different for such a debtor than for a debtor who has been discharged,[8] but Plaintiff Hobson's peculiar circumstances warrant additional mention.

Mr. Hobson filed a Chapter 7 bankruptcy in the Northern District of Alabama on December 2, 2002 and received a discharge therein on March 3, 2003, without identifying the claim that he seeks to assert herein in his bankruptcy schedules. After the defendants in the *Hobson* case moved to dismiss Mr. Hobson's claims for lack of standing, for the reasons stated above (*See* Docket Entries 171 and 186-4 in Case No. 05-0688), Plaintiffs' counsel from Cartee and Lloyd moved to reopen the bankruptcy case and for the appointment of a Trustee therein to assert such claims on behalf of the creditors of Mr. Hobson's bankruptcy estate. *See* Motion to Reopen Mr. Hobson's Bankruptcy Case, attached hereto (along with all other pertinent Hobson bankruptcy papers) as Exhibit 9. On December 1, 2004, an order was entered reopening Mr. Hobson's bankruptcy and appointing Robert Morgan as Chapter 7 Trustee therein. *See* Order to Reopen Mr. Hobson's Bankruptcy Case. The Bankruptcy Court granted the motion nearly seven years ago, making clear that the claim belonged to the Trustee for the benefit of creditors of Mr. Hobson's bankruptcy estate, and not to Mr. Hobson. *See* Order on Application for Approval

---

(...continued)
judicially estopped by the actions of the plaintiff, but left open the question whether, were the trustee to pursue a claim, the plaintiff would be judicially estopped from receiving any excess recovery over the amount owed creditors in the bankruptcy (which in almost every case here would entail reopening the bankruptcy proceedings). 2011 WL 4433541, at *9. In any event, it is not necessary to resolve this question at this time, in light of the multitude of other fatal flaws in the various claims.

[8]    Thus, as noted in the prior section, Plaintiff Miller's current bankruptcy is open, but she lacks standing like everyone else, for the same reasons.

of Employment of Professional Person and Professional Services Contract, entitling Chapter 7

Trustee, Robert Morgan to not just Hobson's share in any recovery herein as a class member, but

to a presumed $5,000 in class representative compensation (*in a class yet to be certified*).

Accordingly, Plaintiffs Melba Brown, Robert and Rebecca Clark, Ruth Davis,

John and Rowena Drennen, Stephen and Amy Haney, Clell Hobson, Edward Kruszka, Thomas

Mathis, Tina Merl (Boor), Nora Miller, Ellen Sabo, Shawn and Lorene Starkey, and Kathleen

Ulrich lack standing to bring this lawsuit for themselves or as class representatives.  Lacking

standing, the claims of all of these Plaintiffs against all Defendants must be dismissed.

### 3.    Plaintiffs Lack Standing To Sue Those Defendants Who Neither Originated Nor Took Assignment Of Their Loans

Numerous federal and state courts across the country have dismissed claims

brought in putative class actions in the second mortgage context based on a lack of standing.  A

plaintiff lacks standing to sue a defendant who neither originated nor took assignment of the

plaintiff's loan.  *See, e.g., Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 995-96 (D. Md.

2002); *Easter v. Am. W. Fin*, 381 F.3d 948, 961-62 (9th Cir. 2004); *Mayo v. GMAC Mortg., LLC*,

No. 08-00568, 2010 U.S. Dist. LEXIS 51517, at *11-12 (W.D. Mo. Mar. 1, 2010); *Landmann v.*

*Bann-Cor,* No. 01-cv-00417, 2004 WL 1944789, at *3-6 (S.D. Ill. Feb. 26, 2004); *Dash v.*

*FirstPlus Home Loan Owner Trust 1996-2*, 248 F. Supp. 2d 489, 505 (M.D.N.C. 2003);

*Faircloth v. Nat'l Home Loan Corp.*, 313 F. Supp. 2d 544, 550 (M.D.N.C. 2003), *aff'd sub nom.*

*Faircloth v. Fin. Asset Secs. Corp. Mego Mortg. Homeowner Loan Trust*, 87 Fed. Appx. 314 (4th

Cir. 2004); *Mull v. Alliance Mortg. Banking Corp.,* 219 F. Supp. 2d 895, 908-10 (W.D. Tex.

2002); *Jackson v. Resolution GGF Oy*, 136 F.3d 1130, 1132 (7th Cir. 1998).[9]

---

[9]    *See also Berry v. GMAC-Residential Funding Corp.*, No. 01-2713, 2002 WL 1797779, at
*9 (W.D. Tenn. July 31, 2002); *Brooks v. Terra Funding, Inc.*, No. 01-2946, 2002 WL
(continued...)

The CAC refers repeatedly to Title 15, United States Code Section 1641(d)(1), relating to assignees, but nothing in the language of that Section or the history of HOEPA suggests that HOEPA expands the jurisdiction of the federal courts or bars Defendants from challenging claims for lack of standing. Section 1641(d)(1) provides, with certain exceptions, and subject to limitations in other provisions, that "Any person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa) of this title shall be subject to all claims and defenses with respect to that mortgage that the consumer could assert against the creditor of the mortgage. . . ." 15 U.S.C. § 1641(d)(1). The plain language of that provision applies only to actions as between a borrower and a named defendant who purchased the borrower's HOEPA loan or received an assignment of the borrower's particular loan. Section 1641(d)(1) has never been construed to relieve plaintiffs of threshold standing requirements that concern the very existence of a justiciable case or controversy between the parties and the subject matter jurisdiction of the courts – issues that cannot be waived by any party and which must be addressed by the courts before litigation on the merits is possible.

To the contrary, numerous courts have held that HOEPA is inapplicable here and does not alter the standing analysis at all. The *Mull* court explained:

> [P]laintiffs reason that under HOEPA's assignee liability provisions, the assignee defendants do not possess any defense, including standing, distinct from the defenses that would be available to the lender. However, plaintiffs['] logic is flawed as

---

(...continued)

1797785, at *10-12 (W.D. Tenn. July 31, 2002); *Frazier v. Preferred Credit*, No. 01-2714, 2002 WL 31039856, at *8-10 (W.D. Tenn. July 31, 2002); *Dunden v. FirstPlus Bank*, No. 01-408, 2002 WL 1155325, at *3 (S.D. Ill. Apr. 29, 2002); *Alexander v. PSB Lending Corp.*, 800 N.E.2d 984, 989-90 (Ind. Ct. App. 2003); *Master Fin., Inc. v. Crowder*, 972 A.2d 864, 881 (Md. 2009); *see also Christiansen v. Beneficial Nat'l Bank*, 972 F. Supp. 681, 683 (S.D. Ga. 1997) (same in non-mortgage consumer loan context); *Weiner v. Bank of King of Prussia,* 358 F. Supp. 684, 691-92 (E.D. Pa. 1973) (same).

they mistakenly focus on the language regarding "all claims and defenses." Since standing is a threshold jurisdictional question, the proper focus of the standing inquiry deals with the following clauses: "any person who purchases or is otherwise assigned a mortgage" and "with respect to that mortgage that the consumer could assert against the creditor of the mortgage." As stated above, named plaintiffs do not have standing to sue someone who does not actually hold their loans. HOEPA does nothing to alter the requirements of Article III standing; rather, it merely eliminates holder in due course defenses for assignees of certain high cost mortgages when the assignee holds the plaintiffs' loans.

*Mull*, 219 F. Supp. 2d at 910 (citations omitted); *see also Faircloth*, 87 Fed. Appx. at 317

("Respecting HOEPA, the district court correctly rejected Faircloth's novel argument that this

statute somehow creates third-party standing in this context.").

Because the Plaintiffs have failed to sufficiently allege any injury that can be

traced to any Defendant who did not deal with a specific Plaintiff's loan, Plaintiffs lack standing

to assert claims against Defendants that neither originated nor acquired their loans. The CAC

accordingly should be dismissed with prejudice as to all such claims as described below.

> **a.    Plaintiffs Kossler, Nixon, And Hobson Lack Standing To Sue RFC**

While the CAC generally alleges that some of the Plaintiffs' loans were sold to

one or more "Investor" Defendants, the Plaintiffs fail to allege which of the Plaintiffs' loans were

assigned to which of the "Investor" Defendants. Based on the allegations in prior complaints

filed in Case No. 02-1201 (the *"Kossler"* case) and Case No. 05-0688 (the *"Hobson"* case),

IUBT was at one time the assignee of the loans of Plaintiffs John and Kathy Nixon and Clell

Hobson, and Sovereign Bank was the assignee of the loan of Plaintiffs Phillip and Jeannie

Kossler. *See* ¶ 66 of Second Amended Complaint in the *Kossler/Davis* case filed in the Court of

Common Pleas of Allegheny County, Pennsylvania (docketed in Case No. 02-0201 as an

attachment to Doc. No. 1), and ¶¶ 20 and 22 of the Second Amended Complaint in *Hobson* (Doc.

No. 109 in Case No. 05-00688). Thus, the claims of Plaintiffs Kossler, Nixon, and Hobson must be dismissed as against RFC because they do not allege a specific and direct injury traceable to RFC, which neither originated, nor acquired their loans. There is no justiciable controversy between these Plaintiffs and RFC, and, thus, the court has no jurisdiction or power to consider any such claims against RFC. *See Lujan*, 504 U.S. at 560-61; *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974); *Warth*, 422 U.S. at 498, 518.

> **b.** **Plaintiffs Baratz, Boor, Brown, Cartee, Clark, Davis, Dorman, Drennen, Gaskin, Haney, Kelly Parkinson, Kessler, Kossler, Kruszka, Logan, Mathis, Merl (Boor), Miller, Montgomery, Picard, Porco, Roberts, Sabo, Starkey, Turner, Ulrich, And Wasem Lack Standing To Sue IUBT**

While, as noted above, IUBT was identified in the *Hobson* case to have been the assignee on the Nixon and Hobson loans, IUBT is not alleged to have originated or taken assignment of the loans of Plaintiffs Baratz, Brown, Cartee, Clark, Davis, Dorman, Drennen, Gaskin, Haney, Kelly Parkinson, Kessler, Kossler, Kruszka, Logan, Mathis, Merl (Boor), Miller, Montgomery, Picard, Porco, Roberts, Sabo, Starkey, Turner, Ulrich, and Wasem. The standing principles articulated above with respect to RFC thus squarely apply to the claims of these Plaintiffs against FDIC-IUBT, and their claims against FDC-IUBT must be dismissed for lack of standing. Moreover, for the reasons set forth in the Memorandum in Support of the Motion To Dismiss Plaintiffs' Joint Consolidated Amended Class Action Complaint And To Dismiss Or Strike The Plaintiffs' Class Action Claims And Certain Prayers For Relief as to FDIC-IUBT, filed this same date, Plaintiffs Hobson and Nixon also lack standing to advance claims against IUBT herein.

    c.    **Plaintiffs Whose Loans Were Originated By CBNV Do Not Have Standing To Sue GNBT, And Vice Versa**

The CAC, in ¶¶ 115-407, references the loan of each Plaintiff and avers which bank, CBNV or GNBT, originated such loan. (*See, e.g.*, CAC ¶ 117) ("On or about February 22, 1999 CBNV closed the Davis loan"). Yet in asserting their claims Plaintiffs do not seek to restrict the claims asserted on behalf of Plaintiffs with CBNV loans to CBNV, or the claims asserted on behalf of Plaintiffs with GNBT-originated loans to FDIC-GNBT. Rather, the Banks identified in the CAC are treated as joint defendants on every loan. *See, e.g.*, *id.* ¶ 455 ("CBNV and GNBT violated HOEPA and TILA on every loan . . ."). Yet, notably, absent from the CAC is any allegation that loans originated by CBNV were assigned to GNBT, or that loans originated by GNBT were assigned to CBNV – nor could there be.

The bedrock legal principles of standing stated above with respect to RFC apply squarely here and need not be repeated. Clearly, a Plaintiff whose loan was originated by CBNV has no standing to sue FDIC-GNBT, and vice versa.

Accordingly, Plaintiffs Martin Baratz, Brian Cartee, Robert and Rebecca Clark, Mack and Robin Dorman, John and Rowena Drennen, Stephen and Amy Haney, Rosa Kelly, Edward Kruszka, Roy Lee and Ruthie Mae Logan, Thomas Mathis, Richard Montgomery, Patrice Porco, Jerome and Charretta Roberts, Shawn and Lorene Starkey, and Russell and Kathleen Ulrich have no standing to sue CBNV, and Plaintiffs Melba Brown, Ruth Davis, Flora Gaskin, Clell Hobson, Brian and Carla Kessler, Philip and Jeannie Kossler, Tina Merl (Boor), Nora Miller, John and Kathy Nixon, John and Rebecca Picard, William and Ellen Sabo, and Tammy and David Wasem have no standing to sue FDIC-GNBT.

### C.   MOST PLAINTIFFS' RESPA AND TILA/HOEPA CLAIMS ARE TIME BARRED

A defendant may move to dismiss a claim on statute of limitations grounds "where the complaint facially shows noncompliance with the limitations period and the affirmative defense clearly appears on the face of the pleading." *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994). As explained below, the CAC establishes that the RESPA and TILA/HOEPA claims of most Plaintiffs (and presumably most putative class members) are time-barred.

### 1.   The Claims Of Most Plaintiffs Were Not Filed Within RESPA's Or TILA/HOEPA's One-Year Limitations Periods

Both RESPA and TILA/HOEPA require that actions thereunder be brought within one year of the date of the loan closing, making most of the Plaintiffs' claims untimely. *See* 12 U.S.C. § 2614; 15 U.S.C. §1640(e); *CBNV II*, 622 F.3d at 281, 283.

### a.   Time-Barred Claims Against CBNV And RFC

The earliest complaint against CBNV and RFC – the first *Davis* complaint[10] ("*Davis I*") – was filed in Pennsylvania state court on May 1, 2001 as a *Pennsylvania-only* putative class action. The first nationwide putative class action complaint against CBNV was the second amended complaint in *Davis* ("*Davis II*"), which was filed on June 12, 2002.

Thus, any RESPA or TILA/HOEPA claim against CBNV (and RFC for CBNV loans) arising out of a loan to Pennsylvania borrowers that closed prior to May 1, 2000 is time-barred, and any RESPA or TILA/HOEPA claim against CBNV (and RFC for CBNV loans) arising out of a loan to non-Pennsylvania borrowers that closed prior to June 12, 2001 is time-

---

[10]   *Ruth Davis and Phillip and Jeannie Kossler v. Community Bank of Northern Virginia, et al.*, C.C.P. Allegheny County, Pennsylvania (Civil Action No. GD-01-8643).

barred. (For a discussion establishing that non-Pennsylvania borrowers cannot claim the initial

filing date of *Davis I*, *see* Section III(E)(2)(a), *infra*.) Based on the closing dates alleged in the

Amended Complaint, all of the following Plaintiffs who received loans from CBNV do not have

timely RESPA or TILA/HOEPA claims: Kossler, Davis, Kessler, Miller, Sabo, Picard, Brown,

Nixon, and Hobson. (*See* CAC ¶¶ 127, 117, 136, 204, 185, 175, 319, 276, 272, 242).

### b.  Time-Barred Claims Against GNBT And RFC

The earliest complaint against GNBT and RFC – the *Ulrich* complaint – was filed

on September 19, 2002.[11] Any RESPA or TILA/HOEPA claim against GNBT (and RFC for

GNBT loans) arising out of a loan that closed prior to September 19, 2001 is therefore time-

barred. Thus, the following Plaintiffs who received loans from GNBT do not have timely

RESPA or TILA/HOEPA claims: Ulrich, Kelly, Roberts, Turner,[12] Clark, Kruszka, Haney,

Mathis, Porco, Logan, and Drennen. (*See* CAC ¶¶ 194, 257, 306, 341, 345, 214, 224, 165, 156,

146, 354, 377).

---

[11]   *Russell K. Ulrich, et al. v. GNBT* (Case No. 02-01616-GLL, Doc. No. 1). The electronic docket of this case incorrectly identifies Mr. Ulrich as Russell K. Lnu.

[12]   The Turners are not listed as Plaintiffs in the CAC (*see* ¶¶ 16-42), but their loan is nonetheless described in the body of the CAC (*id.* ¶¶ 339-51). Defendants believe that the Turners are not Plaintiffs since they are not listed as such. Indeed, as noted in the September 20 Case Management Order Memorandum [Doc. No. 506], at 2, Defendants "ask[ed] that plaintiffs be required to specify whether the Turner plaintiffs are named representatives," and Plaintiffs did not take issue with this request, *id.* at 6-7. The CAC's treatment of the Turners, however, does not provide this clarification. Defendants have nonetheless, in an abundance of caution, included two grounds for dismissal as to the Turners (statute of limitations and standing, *see* Section III(B)(3)(b), *supra*), and of course all grounds for dismissal applicable to all Plaintiffs would apply to them as well. Defendants reserve the right to move on additional grounds against the Turners if they are indeed intended to be Plaintiffs.

      c.    **Time-Barred Claims Against IUBT**

The earliest complaint against IUBT was the initial complaint in *Clell L. Hobson,*

*et al. v. Irwin Union Bank and Trust Company, et al.* in the U.S. District Court for the Northern

District of Alabama (Case No. CV- 04-C-2351 W), filed on July 30, 2004. Any RESPA or

TILA/HOEPA claim against FDIC-IUBT arising out of a loan that closed prior to July 30, 2003

is therefore time-barred. Thus, the following Plaintiffs whose loans were purchased by IUBT –

which constitutes *all* named Plaintiffs whose loans were purchased by IUBT – do not have

timely RESPA or TILA/HOEPA claims against FDIC-IUBT: John and Kathy Nixon and Clell

Hobson. (*See* CAC ¶¶ 127, 272, 242).

      **2.**      **Neither Non-Pennsylvania CBNV Borrowers Nor GNBT Borrowers From Any Jurisdiction Can Claim The Initial Filing Date Of The *Davis* Case**

            **a.**      **Non-Pennsylvania Borrowers Cannot Relate Back To *Davis I* Under Federal Rule Of Civil Procedure 15(c) Because *Davis I* Did Not Provide Any Defendant With Sufficient Notice Of Any Claims By These Borrowers**

Federal Rule of Civil Procedure 15(c) sets out the requirements that must be met

before an amended pleading that adds parties can relate back to a prior pleading. While it

phrases this requirement with respect to the addition of ***defendants***, courts have applied its

requirements by analogy to determine whether amendments adding ***plaintiffs*** relate back to

earlier pleadings. *See, e.g., Nelson v. County of Allegheny*, 60 F.3d 1010, 1014 (3d Cir. 1995)

(applying Rule 15(c) requirements to determine whether amendment naming new plaintiffs could

relate back to earlier pleading); *Allied Int'l v. Int'l Longshoremen's Ass'n*, 814 F.2d 32, 35-36

(1st Cir. 1987); *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1308-309 (D.C. Cir. 1982);

*see also* Rule 15(c) advisory committee's note ("[T]he attitude taken in revised Rule 15(c)

toward change of defendants extends by analogy to amendments changing plaintiffs.").

Where an amendment adds a new *plaintiff* to the action, the prior pleading must have provided the defendant with *both* notice of the "conduct, transaction, or occurrence" on which the proposed plaintiff's claims rest, *and* notice that the defendant would be called upon to defend the claims asserted by the proposed party. *See Nelson*, 60 F.3d at 1014-015; *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1131-133 (11th Cir. 2004) (an amended pleading adding new plaintiffs will not relate back unless defendant had adequate notice that it would be called upon to defend the claims of the proposed plaintiffs and the relation back would not unfairly prejudice the defendant); *Williams v. United States*, 405 F.2d 234, 237-38 (5th Cir. 1968) (emphasizing that the defendant "must have had fair notice that a legal claim existed in and was in effect being asserted by, the party belatedly brought in" even if the new party's claim is based on the same operative facts alleged in the original pleading).

Even where there is no showing of specific prejudice, the Third Circuit has refused to allow relation back where the original complaint failed to provide notice of the identities and claims of proposed plaintiffs because doing so "could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations ha[s] run." *Nelson*, 60 F.3d at 1015 (quoting *Leachman*, 694 F.2d at 1309). "In deciding whether an amendment relates back to the original claim, notice to the opposing party of the existence and involvement of the new plaintiff is the critical element." *Avila v. Immigration & Nat. Serv*, 731 F.2d 616, 620 (9th Cir. 1984).

Where a plaintiff makes a "strategic decision to limit the class to individuals residing in one state, and subsequently decide[s] – after the statute of limitations had run – . . . to expand his suit to encompass individuals in all fifty states," relation back will not save the expired claims if the original complaint failed to mention the proposed new plaintiffs'

involvement. *Cliff*, 363 F.3d at 1333 n.16;[13] *see also, e.g., Arneil v. Ramsey*, 550 F.2d 774, 782-83 (2d Cir. 1977), *overruled on other grounds in In re WorldCom Sec. Litig.*, 496 F.3d 245, 254 (2d Cir. 2007); *Johnson v. Riddle,* No. 2:98-cv-599, 2007 U.S. Dist. LEXIS 11101, at *14 (D. Utah Feb. 15, 2007). To satisfy the "notice" requirement, the Eleventh Circuit has held that a defendant must have notice not only of the substantive claims being brought against it, *"but also of the number and generic identities of the potential plaintiffs who may participate in the judgment."* *Cliff*, 363 F.3d at 1132-133 (quoting *Arneil*, 550 F.2d at 782-83) (emphasis added). This is because, to relate back, a complaint must provide defendants with the information necessary to determine "both the subject matter and size of the prospective litigation." *Id.*

The language in bold and italics that *Cliff* adopted from *Arneil* came directly from the Supreme Court in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). The class action tolling doctrine created there also requires that a defendant have notice of what parties are asserting claims against it before the statute of limitations has run on those claims. *See* Section III(C)(2)(b), *infra.* The common requirement of notice to the defendant of potential plaintiffs' "numbers and generic identities" flows from the fact that both doctrines strive to satisfy the policies underlying statutes of limitations, which "are primarily designed to assure fairness to defendants." *Burnett v. New York Central Railroad Co.*, 380 U.S. 424, 428 (1965). The doctrine of "[r]elation back is intimately connected with the policy of the statute of limitations." *Lundy v. Adamar of New Jersey*, 34 F.3d 1173, 1190 (3d Cir. 1994) (quoting Fed. R. Civ. P. 15(c) advisory committee's notes (1966 amendment)). Relation back must take into

---

13    Because "[n]othing prevented [the named plaintiff] from seeking to represent consumers outside Florida from the moment he initiated this lawsuit," and the original complaint gave the defendant "notice of only its obligation to defend itself against claims of Florida consumers," the Eleventh Circuit held that the initial complaint did not relate back. *Id.* at 1132-133.

account that "even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Lundy*, 34 F.3d at 1190 (quoting *Order of Railroad Telegraphers v. Railway Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944)).  The Supreme Court made the same point in *American Pipe*:

> The theory [behind the statutory limitation period] is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.'  The policies of ensuring essential fairness to defendants and of barring a plaintiff who 'has slept on his rights,' are satisfied when, as here, a named plaintiff who is found to be representative of a class commences a suit and thereby notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment.

414 U.S. at 554-55 (quoting *Order of Railroad Telegraphers*, 321 U.S. 342).

In *CBNV II*, the Third Circuit referenced the holding in *Cliff*, but noted in dicta that there "appears to be conflicting authority regarding whether an amended pleading asserting a nationwide class can relate back to an initial pleading asserting a smaller class." 622 F.3d at 306 n.23.  The Court noted that two Seventh Circuit cases – *Schillinger v. Union Pac. R.R. Co.*, 425 F.3d 330, 334 (7th Cir. 2005), and *Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 751 (7th Cir. 2005) – held that an amended pleading expanding a class definition did not commence a new suit so as to allow defendants to remove the action under the Class Action Fairness Act ("CAFA").  However, the Third Circuit acknowledged the differing context in which these decisions arose and made no determination that *Schorsch* and *Schillinger* control the operation of the relation back doctrine to the limitations issues in this case.

There is, in fact, a critical distinction between the context of the Seventh Circuit's CAFA analysis and the relation back issue in this case with respect to the Plaintiffs' claims.  The

Seventh Circuit was enforcing its obligation to preserve the strict limits on federal jurisdiction, which could only be present if there were some extraordinary reason to disregard the facts that those cases had unquestionably been commenced before the effective date of CAFA and that the original complaints were not removable either when filed or under CAFA. That the mandate not to expand jurisdiction was at the heart of the decisions is apparent in the court's bottom line statement that "[a]mendments to class definitions do not commence new suits." *Schorsch*, 417 F.3d at 751. Moreover, the Seventh Circuit addressed relation back only in the context of Illinois state statutes; neither case addressed the application of Rule 15(c) to a case properly in federal court and raising federal claims.

Notice to defendants "that a legal claim existed in, and was in effect being asserted by, the party belatedly brought in" is a critical consideration where a plaintiff seeks to take advantage of the earlier pleading to avoid the bar of the statute of limitations. *Williams*, 405 F.2d at 237-38; *Avila*, 731 F.2d at 620. Accordingly, the *dictum* in *Schorsch* and *Schillinger* is not persuasive here. Rather, the Eleventh Circuit's treatment of relation back in *Cliff* appropriately focuses on the precise issue before this Court and considers all the requirements of Rule 15(c), and is also consistent with Supreme Court precedent governing limitations issues in class action cases (discussed in Section III(C)(2)(b) below).

Under the standards articulated by the Third Circuit in *Nelson* and the Eleventh Circuit in *Cliff* in precisely the circumstances presented here, the claims asserted in the Complaint by any Plaintiff who was not included in the class defined in the *Davis I* complaint cannot relate back to that complaint.[14] As in *Cliff*, the original *Davis* plaintiffs made the strategic

---

[14]    Moreover, those Plaintiffs who fell within the class defined as *Davis I* can only relate back as to Defendants CBNV and RFC, not to GNBT or IUBT, who were not sued in *Davis I* or *II*.

decision to limit the class so as to seek relief only on behalf of Pennsylvania property owners

who had obtained loans from CBNV. Not until June 2002, more than a year later, did they add

claims on behalf of a nationwide class. Thus, as in *Cliff*, Defendants had no notice of the number

and generic identities of the non-Pennsylvania potential plaintiffs with CBNV loans until *Davis*

*II* was filed in June 2002. Defendants likewise had no notice they were being sued by GNBT

borrowers until *Ulrich* was filed.

> **b.**    **Likewise, No Borrower Whose Loan Was Secured By Real
> Property Outside Of Pennsylvania Can Invoke The Class
> Action Tolling Doctrine To Toll A Claim From *Davis I*
> Regardless Of Whether CBNV Or GNBT Originated
> The Loan, And No GNBT Borrower Can Invoke *Davis I*
> (Or *Davis II*)**

The class action tolling doctrine provides that "the commencement of a class

action suspends the applicable statute of limitations as to all asserted members of the class who

would have been parties had the suit been permitted to continue as a class action." *Am. Pipe &*

*Constr. Co.*, 414 U.S. at 554. As discussed in the previous section, such tolling is deemed

consistent with the policy and operation of a statute of limitations because the commencement of

the action provides the defendants not only with notice of the substantive claims against which

they must defend, *but also* "of the number and generic identities of the potential plaintiffs who

may participate in the judgment." *Id.* at 555. Because the class definition so describes the

claimants in the complaint, defendants will have enough information within the statutory period

"to apprise them of the nature and scope of the prospective litigation." *Haas v. Pittsburgh Nat'l*

*Bank*, 526 F.2d 1083, 1097 & n.19 (3d Cir. 1975).

Multiple Circuits have held that class action tolling only commences once a

plaintiff is included in the complaint's proposed class definition. *See In re "Agent Orange"*

*Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987) ("The intent of the *American Pipe* rule is to

26

preserve the individual right to sue of the members of a proposed class until the issue of class

certification has been decided . . . . not to toll the statute of limitations for persons such as these

[] plaintiffs who were not members of either the proposed or certified class"); *Smith v.*

*Pennington*, 352 F.3d 884, 893-94 (4th Cir. 2003) ("appellants first must have been members of

the class [the named plaintiff] sought to have certified . . . . [F]or parties outside that asserted

class, tolling will be unavailable at least until such time as the plaintiff repudiates that definition

of the class he seeks to have certified in a manner that provides adequate notice that his class

definition has changed"); *Sawtell v. E.I. Du Pont De Nemours & Co.*, 22 F.3d 248, 253 (10th Cir.

1994) (class action limiting the class to Minnesota residents did not toll the statute of limitations

for resident of New Mexico); *In re Syntex Corp. Secs. Litig.*, 95 F.3d 922, 936 (9th Cir. 1996)

(The *American Pipe* tolling doctrine "only tolls the statute of limitations for asserted class

members" and not for "proposed plaintiffs [who] wanted to expand the class in order to become

class members").

Thus, where an amendment expands the class definition beyond the originally

proposed class, such plaintiffs are not "asserted members of the [original] class." *Am. Pipe &*

*Constr. Co.*, 414 U.S. at 554. Class members added by virtue of the expanded definition cannot

take advantage of class action tolling to bring claims that expired before the class was expanded.

For example, in *Arneil*, two plaintiffs appealed the district court's finding that

their claims were barred by the applicable three-year statute of limitations. The Second Circuit

rejected plaintiffs' argument that their claims were tolled by an original class action complaint

filed on March 8, 1973. 550 F.2d at 782. The Court noted that the original complaint limited the

class to individuals who had been employed in a particular division of one of the defendant

companies. *Id.* The court found that "Plaintiffs [non-employee purchasers of the securities at

issue] could not qualify as 'asserted members' until December 1974, at the earliest, when leave was sought to expand the class to include them." *Id.* Because plaintiffs were not "asserted member[s]" of the class in March 1973, their claims were not tolled from that date.

The Fourth Circuit has made clear that the class action tolling analysis looks at the notice requirement not from the standpoint of the subjective knowledge of the defendant, but simply from the objective notice provided by the unambiguous class definition proffered by the plaintiff, *i.e.*, evidence "that demonstrates the extent of the class the ***plaintiff represented to the district court that he desired to have certified.***" *Smith v. Pennington*, 352 F.3d at 893-94 (emphasis added). In other words, the class determination turns on plaintiffs' evidenced intent, not on whether the defendant might be able to guess about its potential liability *outside* of the plaintiffs' express class definition.

The application of these principles to this case is clear-cut. *Davis I* defined a narrow class of borrowers whose secondary mortgage loans were both (i) funded by CBNV and (ii) secured by property located in the state of Pennsylvania. This class definition did not change until the filing of *Davis II* in June 12, 2002, when it was amended to expand the class to include borrowers whose CBNV-funded secondary mortgage loans were secured by property anywhere in the United States. Thus, non-Pennsylvania borrowers could not qualify as "asserted members" of the *Davis* class action until June 12, 2002 at the very earliest. Accordingly, under *American Pipe,* the claims of all non-Pennsylvania borrowers were not tolled until that date at the earliest, and then only as to CBNV and RFC. *See Am. Pipe & Constr. Co.*, 414 U.S. at 554-55.

Class action tolling with respect to *Davis I* has in fact already been analyzed in this way for some members of the proposed class in *Spann v. Community Bank of Northern*

*Virginia*, No. 03-C-7022, 2004 WL 691785 (N.D. Ill. Mar. 30, 2004). There, plaintiffs who were

not Pennsylvania residents brought TILA claims for rescission and damages against CBNV and

argued that *Davis I* tolled the statutes of limitations on their claims. *Id.* at *4, 8. The *Spann*

Court held that the three-year bar to rescind a loan under TILA was not subject to tolling, but

found that even if the TILA rescission claims could be tolled, *Davis I* would not toll them

because plaintiffs could not qualify as *Davis* class members until after the *Davis II* complaint in

June 2002 expanded the class. *Id.* at *4-8.

Given that *Spann* dealt with nearly identical claims, parties, and issues, and

indeed is *res judicata* as to some proposed class members, this Court should follow its well-

reasoned analysis to conclude that *Davis I* cannot toll the claims of non-Pennsylvania borrowers.

Plaintiffs' claim that many GNBT borrowers can invoke class action tolling from

*Davis I* (CAC ¶ 414) has even less merit. *American Pipe* is clear that tolling only benefits

"asserted members of the class" – something the GNBT members were decidedly not in *Davis I*

or *Davis II*. Rather, as Plaintiffs admit, GNBT borrower claims were asserted for the first time

on September 19, 2002 in *Ulrich*, *see* CAC ¶ 8,[15] so that is the earliest date that any GNBT

borrowers' claims were tolled.

3. **Plaintiffs Do Not Come Remotely Close To Adequately Pleading Equitable Tolling To Save Their RESPA And TILA/HOEPA Claims From Dismissal**

Plaintiffs allege that equitable tolling saves these otherwise time-barred claims

from dismissal. Plaintiffs' resort to equitable tolling fails on multiple grounds.[16]

---

[15]    CAC ¶ 8, however, misstates the date of the filing of *Ulrich* case as September 18, 2002.

[16]    In *CBNV II*, the Third Circuit noted that it has never addressed whether RESPA claims are subject to equitable tolling, or whether the statute of limitations is jurisdictional and thus not subject to tolling. 622 F.3d at 307. The Circuits are split on this issue.

(continued...)

### a. Plaintiffs' Complaint Falls Woefully Short Of Pleading Equitable Tolling

#### (1) Equitable Tolling Requires Extraordinary Circumstances

Plaintiffs' allegations are inadequate to invoke the equitable tolling doctrine. As the Third Circuit noted in this case, it approaches the doctrine of equitable tolling "warily." *CBNV II*, 622 F.3d at 304. "Equitable tolling is an extraordinary remedy which should be extended only sparingly." *Hedges v. United States*, 404 F.3d 744, 751 (3d Cir. 2005); *see also Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999) ("Although the Supreme Court has repeatedly recognized the equitable tolling doctrine, it also has cautioned that "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.' . . . We therefore approach the doctrine warily, so as to guard against possible misuse.") (citing *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 152 (1984)). Thus, it requires "'extraordinary'" and "'rare'" circumstances for the granting of equitable tolling. *United States v. Clive*, No. 05-0383, 2008 WL 3889726, at *5 (W.D. Pa. Aug. 19, 2008) (quoting *Jones v. Morton*, 195 F.3d 153, 159 (3d Cir. 1999)).

Plaintiffs seek to invoke the species of equitable tolling known as fraudulent concealment. (CAC ¶ 408). "[T]he plaintiff has the burden of proving the three necessary

---

(...continued)

> *Compare Hardin v. City Title & Escrow Co.*, 797 F.2d 1037, 1039 (D.C. Cir. 1986), *and Zaremski v. Keystone Title Associates, Inc.*, 884 F.2d 1391 (4th Cir. 1989), *with Lawyers Title Ins. Corp. v. Dearborn Title Corp.*, 118 F.3d 1157 (7th Cir. 1997). Although this question is unsettled, the standards for applying equitable tolling are not. Under these well-settled standards it is clear that the RESPA and TILA/HOEPA claims asserted here cannot be tolled. Defendants will therefore not address the unsettled issue but instead proceed directly to demonstrate that Plaintiffs have not alleged facts sufficient to invoke equitable tolling.

elements of a fraudulent concealment claim – (1) 'active misleading' by the defendant, (2) which

prevents the plaintiff from recognizing the validity of her claim within the limitations period, (3)

where the plaintiff's ignorance is not attributable to her lack of 'reasonable diligence in

attempting to uncover the relevant facts.'" *Matthews v. Kidder, Peabody & Co.*, 260 F.3d 239,

256 (3d Cir. 2001) (quoting *Forbes v. Eagleson*, 228 F.3d 471, 486-88 (3d Cir. 2000)).[17]

Because equitable tolling applies on a claim-by-claim basis, a plaintiff seeking to

invoke the doctrine has to adequately allege that the defendant against whom equitable tolling is

sought actively misled (took affirmative steps to mislead) that plaintiff with respect to the

specific claim. *See Oshiver*, 38 F.3d at 1391 n.10 (refusing to apply equitable tolling to one

claim because no active concealment alleged as to that claim). Moreover, as explained in detail

below, the plaintiff must plead and prove "efforts by the defendant – above and beyond the

wrongdoing upon which the plaintiff's claim is founded – to prevent the plaintiff from suing in

time." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990); *accord In re:*

*Community Bank of Northern Virginia*, 467 F. Supp. 2d 466, 478 (W.D. Pa. 2006). Plaintiffs

have not pled such efforts here.

---

[17]    In this Circuit any version of equitable tolling or equitable estoppel requires active misleading. *See Oshiver*, 38 F.3d at 1387, 1389 n.7 (reconciling this Circuit's law with the widely-cited case of *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990)); *see also Mannella v. County of Allegheny*, 66 Fed. Appx. 368, 371 (3d Cir. 2003). And any version of equitable tolling requires a plaintiff to show that he or she exercised reasonable diligence in preserving rights during the time period sought to be tolled. *Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 96 (1990); *Podinback v. U.S. Postal Service*, 409 F.3d 584, 592 (3d Cir. 2005); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1126 (3d Cir. 1997); *Mathews v. Little*, No. 92-cv-1114, 1992 WL 192542, at *4 (E.D. Pa. July 31, 1992).

    (2)    **To Invoke Fraudulent Concealment, A Complaint Must Allege Specific Affirmative Acts Of Concealment Beyond The Conduct That Allegedly Violated RESPA Or TILA/HOEPA**

As Judge Ambrose has explained, general allegations of concealment are not enough to toll the statute of limitations period; instead, "fraudulent concealment must be pled with the particularity required to meet the heightened standards of Fed.R.Civ.P. 9(b)." *Matthews v. Kidder, Peabody & Co.*, No. Civ.A.99-85, 2000 WL 33726916, at *28 (W.D. Pa. Aug. 18, 2000); *see also Davis v. Grusemeyer*, 996 F.2d 617, 624 n.13 (3d Cir. 1993) (fraudulent concealment tolling subject to Rule 9(b) heightened pleading requirements), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644 (3d Cir. 1998); *accord Pattetta v. Wells Fargo Bank, N.A.*, 3:09-cv-2848, 2009 WL 2905450, at *4 n.7 (D.N.J. Sept. 10, 2009)) ("As is the case whenever a plaintiff attempts to plead fraud, Plaintiffs here [alleging fraudulent concealment] must satisfy the heightened pleading requirement under Federal Rule of Civil Procedure 9(b); *Laychock v. Wells Fargo Home Mortg.*, 2008 WL 2890962, at *7 (E.D. Pa. July 23, 2008) (equitable tolling based on allegations of fraudulent concealment "must also satisfy Federal Rule of Civil Procedure 9(b)'s requirement of specificity").[18]

---

[18]    "'Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.'" *In re Suprema Specialties, Inc. Secs. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (quoting *In re Rockefeller Center Prop. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)) (internal quotation marks and citation omitted in original). "Moreover, 'Rule 9(b) requires plaintiffs to identify the source of the allegedly fraudulent misrepresentation or omission.'" *Id.* (quoting *Rockefeller*, 311 F.3d at 216) (citation omitted in original). In sum, Rule 9(b) requires, at a minimum, that plaintiffs support their allegations with all of the essential factual background that would accompany "the first paragraph of any newspaper story" – that is, the 'who, what, when, where and how' of the events at issue." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997).

In addition, as one district court within this Circuit recently explained in denying as futile a plaintiff's motion for leave to add RESPA and TILA claims, "[f]or a RESPA claim to warrant equitable tolling, 'mere silence or nondisclosure is not enough to trigger estoppel[;] the adversary must commit some affirmative *independent act of concealment* upon which the plaintiffs justifiably rely in order to toll the statute.'" *Garczynski v. Countrywide Home Loans, Inc.*, 656 F. Supp. 2d 505 (E.D. Pa. 2009) (emphasis added) (quoting *Marple v. Countrywide Financial Corp.*, No. 07-4402, 2008 U.S. Dist. LEXIS 37705, at *8 (D.N.J. May 7, 2008)). And in the TILA context, Judge Conti has stated that "[t]he fraudulent act that forms the basis of a claim for damages under the TILA will not satisfy the factual showing required to invoke the equitable tolling doctrine of fraudulent concealment. . . ." *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 551 (W.D. Pa. 2009).[19]

Courts outside of this Circuit have similarly held that a plaintiff may not invoke the doctrine of fraudulent concealment to toll the RESPA or TILA/HOEPA statute of limitations by relying on the same acts of alleged concealment that are integral to the RESPA or TILA/HOEPA claim itself. In *Pedraza v. United Guaranty Corp.*, 114 F. Supp. 2d 1347 (S.D. Ga. 2000), for example, the plaintiff tried to invoke fraudulent concealment to toll the statute of

---

[19]    *Poskin* cites in part this Court's decision in this case addressing, as on a Rule 12(b)(6) standard, whether plaintiffs' TILA claims could be equitably tolled. *See In re Community Bank of Northern Virginia*, 467 F. Supp. 2d at 478. In that decision this Court aptly stated that "*the fraudulent act(s) that provide the factual predicate for the claim, i.e., inaccurate loan documents, cannot also satisfy the factual predicate justifying equitable tolling*. . . . Rather, the objectors must show the defendants took some active steps to mislead the borrowers with the result the borrowers were lulled into sitting on their right of redress." (emphasis added.) While the Third Circuit in *CBNV II* found fault with this Court's undertaking of a Rule 12(b)(6) analysis on a motion for class certification, 622 F.3d at 303, this Court's statement of the controlling legal principle was correct then and is correct now, and it is now the appropriate time for it to be applied to both the RESPA and TILA claims.

limitations on her RESPA kickback claim. She argued that the kickback scheme constituted "a self-concealing wrong." *Id.* at 1357. Rejecting the plaintiff's argument, the *Pedraza* court reasoned that the "[p]laintiff alleges only that Defendant engaged in a kickback scheme[,]" and thus "fails to identify any conduct of Defendant, with the exception of the substantive violation of RESPA, that would justify tolling the statute of limitations." *Id.* at 1356. The court noted that RESPA "does not create any duty on the part of Defendant to disclose the existence of such a scheme to Plaintiff[,]" and that simply pointing to the concealment of the alleged scheme itself was therefore an inadequate basis on which to predicate a claim of fraudulent concealment. *Id.* at 1357. The court dismissed the RESPA claim on a motion to dismiss.

Other courts have held to the same effect for both TILA/HOEPA and RESPA claims. *See, e.g., Pettola v. Nissan Motor Acceptance Corp.*, 44 F. Supp. 2d 442, 450 (D. Conn. 1999) (citing four cases so holding in TILA context); *Garcia v. Wachovia Mortg. Corp.*, 676 F. Supp. 2d 895, 906 (C.D. Cal. 2009) (collecting TILA cases and observing "a contrary rule would render the one-year statute of limitations meaningless, as it would be tolled whenever there were improper disclosures."); *McAnaney v. Astoria Fin. Corp.*, No. 04-cv-1101, 2007 WL 2702348, at *11 n.15 (E.D.N.Y. Sept. 12, 2007); *Moll v. U.S. Life Title Ins. Co. of New York*, 700 F. Supp. 1284, 1290-291 (S.D.N.Y. 1988) (dismissing claim on Rule 12(b)(6) motion because "concealment of payments" in RESPA kickback scheme is "integral part of that wrong," so plaintiffs "must allege ***more than*** that defendant failed to disclose the existence of the payments" to obtain equitable tolling) (emphasis added); *Kay v. Wells Fargo & Co. N.A.,* No. 07-01351, 2007 WL 2141292, at *5 (N.D. Cal. July 24, 2007) (striking equitable tolling allegations because "[i]n effect, plaintiff is . . . alleging that defendants concealed that they were violating RESPA. Plaintiff alleges that Wells Fargo 'affirmatively misrepresented' that North Star took on some of

34

the risk as well as some of the premiums putative class members paid to private mortgage

insurers. This repeats the upshot of Kay's RESPA claim. She has failed to allege anything more

than the underlying violation, not that defendants took any other steps to conceal their actions."");

*Williams v. Aries Fin., LLC*, No. 09-cv-1816, 2009 WL 3851675, at *9 (E.D.N.Y. Nov. 18,

2009) (dismissing on Rule 12(b)(6) motion RESPA claim alleging kickbacks where fraudulent

concealment allegations were that "defendants did not inform [plaintiff] of the true purpose for

the subordinate mortgage or of the other fees," because ""[c]oncealment by mere silence is not

enough. There must be some trick or contrivance intended to exclude suspicion and prevent

inquiry.'") (quoting *Moll*, 700 F. Supp. at 1291); *Jacob v. Aurora Loan Servs.*, No. 10-1789,

2010 WL 2673128, at *3 (N.D. Cal. July 2, 2010) (dismissing claims on Rule 12(b)(6) motion

because "Plaintiff cannot rely on the same factual allegations to show that Defendants violated

federal statutes and to toll the limitations periods that apply under those statutes. *Otherwise,*

*equitable tolling would apply in every case where a plaintiff alleges violations of TILA,*

*HOEPA, and RESPA, and the statutes of limitations would be meaningless."*) (emphasis

added).

    Although in *CBNV II* the Third Circuit referenced the equitable tolling pleading

issue, it expressly stated that "we do not resolve the question." 622 F.3d at 307 n.24. In what

was therefore necessarily *dictum*, the court suggested in passing that the requirement of an act

beyond a misrepresentation as to the nature of closing fees or the failure to disclose information

that would reveal the alleged fraudulent nature of those fees "would effectively render equitable

tolling" "a dead letter" in the TILA/HOEPA context. *Id.* With respect, this *dictum* has it exactly

backwards. To the extent this *dictum* implies that no one will ever know of their claims until

some time after the limitations period expires, such that there would be no timely RESPA or

TILA cases brought, the short answer is that countless RESPA and TILA/HOEPA claims are brought in a timely manner. By contrast, and as amply supported by the above-cited authorities, the idea that nothing more is needed to invoke equitable tolling than pleading the underlying claims would render the RESPA and TILA/HOEPA limitation provisions dead letters. Thus, RESPA and TILA/HOEPA will remain alive and healthy if this Court follows its own prior decision – and the vast if not unanimous weight of authority on this issue – but the statutes of limitations duly enacted by Congress would be written out of existence were the Court to reverse itself and make a contrary ruling.[20]

### (3)   Plaintiffs Have Not Alleged Active Concealment By Defendants

Plaintiffs' allegations of fraudulent concealment of both the RESPA and the TILA/HOEPA claims consist of the following:

> (a)   Engaging in a scheme that was by its nature and design "self-concealing" and not reasonably discoverable by Plaintiffs and the Class notwithstanding the exercise of due diligence;

> (b)   Issuing fraudulent mortgage loan settlement documents to Plaintiffs and the Class which concealed the fact that the Bank Defendants were paying the Shumway/Bapst organization a referral fee for the residential mortgage loans at issue by way of a kick-back to companies controlled by the Shumway/Bapst organization, notwithstanding that the Shumway/Bapst organization was not performing any compensable settlement services in connection with the loans at issue;

---

[20]   The cases cited in passing by the Third Circuit, 622 F.3d at 307 n.24, do not supply contrary authority. Only two are TILA cases, and neither of those relies in any way on HUD-1s. The two RESPA cases do not involve alleged disclosure violations arising from title charges whose amounts are disclosed by the HUD-1s. As previously discussed, *Pedraza*, the only one of these cases that has ever been cited as to the adequacy of equitable tolling allegations, actually granted a motion to dismiss on the grounds that the equitable tolling allegations were insufficient.

(c)    Falsely representing that title examinations were performed on each borrowers' loans by way of the imposition and disclosure of a settlement charge in Line 1103 of each borrowers' HUD-1 Settlement Statement for such service;

(d)    Falsely representing that a true abstract or title search was performed on each of the borrowers' loans by way of the imposition of a settlement charge in Line 1102 of each borrowers' HUD-1 Settlement Statement for such service;

(e)    Falsely representing that compensable "document review" services were performed in connection with the settlement of Plaintiffs' loans by disclosing such charge at Line 1112 of the Title Fee section of Plaintiffs' HUD-1s when in fact any document review services ostensibly performed in exchange for this fee were in fact non-compensable post-settlement services;

(f)    Knowingly and actively concealing the understatement of Finance Charges, the overstatement of the Amount Financed and the resulting understatement of the APRs on the TILA Disclosure Statements and HOEPA Notices provided to Plaintiffs and all Class Members by, among other things, failing to include in their calculations certain title charges that were not bona fide, reasonable, lawful and/or not paid to true third parties;

(g)    Falsely representing on each HUD-1 Settlement Statement that a true, honest, and independent settlement agent was performing services on the loan, when in fact the settlement agents were part of the racketeering and overall conspiracy;

(h)    Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 800 of the HUD-1s were not being paid to GNBT or CBNV;

(i)    Knowingly and actively concealing that the origination fees, discount fees or other types of fees and charges listed in Section 1100 of the HUD-1s were being paid to third-party title companies when such fees and charges were instead being kick-backed to and shared with, directly or indirectly, the Consultants and their affiliated entities . . . .

(j)    Concealing the import of the false acknowledgement of receipt in all HOEPA Notices:

(k)    Knowing of their various HOEPA violations as detailed above and falsely representing to the Class Members that they had a right to rescind within three (3) days when the Banks knew or

37

should have known that their violations of HOEPA in fact afforded every Class Member a full *three-year* period to rescind under the provisions of 15 U.S.C. § 1635(f), thereby estopping as a matter of law Defendants' assertion of the three-year repose period under 15 U.S.C. § 1635; and

(l)    Knowingly and actively preventing the Banks' federal regulators (FDIC and OCC) from disseminating reports of their wrongdoing to the public, thereby suppressing and preventing the Class Members from discovering their causes of action against the Banks and Defendants until the one-year limitations

(CAC ¶ 408).

As this Court has already concluded, *see* n.19 *supra*, and as the above-cited multitude of authorities all establish, alleging in conclusory terms that a claim is "self-concealing," as plaintiffs do here (CAC ¶ 408(a)), is inadequate to invoke the doctrine of fraudulent concealment because any other conclusion would have the effect of judicially writing RESPA's and TILA/HOEPA's express statutes of limitations out of those statutes.

Most of the various acts of fraudulent concealment that plaintiffs allege – *i.e.*, the alleged misrepresentations on the borrowers' HUD-1s that supposedly concealed the alleged kickback schemes and related allegations (CAC ¶¶ 408(b)-(i)) – amount to nothing more than the self-concealment that has repeatedly been held to be inadequate. Those are exactly the same alleged misrepresentations that are integral to the RESPA and TILA/HOEPA claims themselves. *See, e.g.*, CAC ¶ 439 (alleging in RESPA Count that "[t]he Bank Defendants used the Plaintiffs' HUD-1 Settlement Statements (and other loan disclosure documents required by federal law including the Good Faith Estimate) to conceal illegal kickbacks and unearned fees being paid to the Shumway/Bapst Organization . . ."), *id.* ¶ 440 (alleging in RESPA Count that "[t]he Section 800 charges listed on the HUD-1s uniformly misrepresented that origination and loan discount fees were being paid to the Banks when, in fact, said fees were being kicked-back almost entirely to the Shumway-Bapst Organization in exchange for the referral of the loans to the banks . . .");

38

*id.* ¶ 456 (alleging in TILA/HOEPA count that "[t]he Banks falsely and incorrectly represented

that the amounts charged to the Plaintiffs... as title charges in section 1100 of the Plaintiffs'

HUD-1s . . . were charged incurred by the Banks. . . . These charges were not 'bona fide' and

'reasonable' nor paid to 'true' third parties."); *id.* ¶ 458 (complaining that disclosed APRs

illegally excluded charges for title work that was not bona fide and reasonable, supposedly in

violation of TILA).  Because the "concealment" allegations are entirely congruent with the

substantive allegations, they cannot constitute fraudulent concealment for tolling purposes.

　　　　Courts have consistently applied this same analysis to dismiss complaints

purporting to rely on equitable tolling to save TILA claims directed at improperly disclosed APR

and finance charges.  In addition to the cases cited above at pp. 32-35 , *see, e.g., Malally v. BAC*

*Home Loan Servicing, LLC*, No. 3:10-cv-0074, 2010 WL 5140626 (N.D. Ga. Oct. 8, 2010);

*Carillo v. Bank of New York*, No. 09-61642-CIV, 2009 WL 5708925 (S.D. Fla. Dec. 22, 2009);

*Insignares v. Countrywide Home Loans, Inc.*, No. 09-60128, 2009 WL 2444322 (S.D. Fla. July

15, 2009); *see also Evans v. Rudy-Luther Toyota, Inc.*, 39 F. Supp. 2d 1177, 1184 (D. Minn.

1999) (summary judgment on TILA claims alleging improper finance charges due to concealed

kickbacks, in part because treating these allegations of failure to make proper disclosures as

permitting fraudulent concealment tolling would effectively nullify the statutory statute of

limitation).  Of particular note is *Williams v. Saxon Mortgage Servs., Inc.*, No. 06-0799, 2007

WL 2828752, at *2, 4 (S.D. Ala. Sept. 27, 2007), which dismissed the TILA claim in the face of

allegations that included the dissemination of fraudulent HUD-1 statements.

　　　　Paragraphs 408(j) and (k) of the Amended Complaint are slightly different but

they likewise fail as a matter of law to justify any equitable tolling.  Paragraph 408(j) simply

alleges that some unspecified Defendant concealed the law (or, more precisely, the law as

Plaintiffs would have it). Misrepresentations of law cannot be the basis for equitable tolling. *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 384 (3d Cir. 2007). Moreover, this allegation plainly does not involve any active misleading. The second of these paragraphs is a legally erroneous assertion that providing a three-day notice of a right to rescind without judicial action, which is required to be provided by law, 15 C.F.R. §§ 22.23(a) and (b) and Form H-8 in Appendix H to C.F.R. Part 226, somehow conceals or misrepresents the separate statutory consequences of improper disclosures. Indeed, this allegation appears to be directed only to alleged tolling of the rescission claim (addressed at Section III(C)(4) *infra*), since on its face it has nothing to do with misleading anyone as to any damage claim.

Finally, ¶ 408(k), alleging interference with regulators, fails on several grounds. *First,* this averment is utterly conclusory. There neither are (nor could there be) specific allegations of anything learned and eventually disclosed by the FDIC or OCC that relates in any way to such claims, much less of anything that was necessary for a borrower to be alerted to in order to assert his or her claims. If anything of the sort existed in reports that the FDIC or OCC ultimately made public Plaintiffs would know of it (from the published report) and could plead it. Nor, of course, is there a single allegation alleging any specific action taken by any Defendant to conceal anything from the FDIC or OCC. *Second*, the idea that Defendants could "actively prevent[]" the FDIC and OCC from taking whatever actions they deemed appropriate with respect to the release of information to the public is clearly not plausible. *Third*, Defendants are unaware of any case at any time in which a private RESPA or TILA/HOEPA claim has been equitably tolled based on alleged conduct toward regulators.

Thus, Plaintiffs have not adequately alleged *any* affirmative acts of concealment – much less with the particularity required by Rule 9(b) – independent of the same alleged acts that

are integral to the claims themselves.  Plaintiffs do not, for example, allege that they called or

wrote to any of the Defendants following their loan closings to question the Defendant about the

charges at issue, and that they were lied to in a way that caused them to delay filing their claims.

As the line of above-cited authorities instruct, the doctrine of fraudulent concealment may not be

invoked in the absence of some such independent act of alleged concealment.

Finally, the Third Circuit's discussion in *CBNV II* about the desirability of

addressing equitable tolling on a motion to dismiss, *see* 622 F.3d at 301-03, once again was

*dictum* because the only holding to arise from it was that this Court's "merits inquiries . . . were

unnecessary to evaluate the adequacy requirement under Rule 23(a)(4)." *Id.* at 303.  Although

the Court of Appeals in *dictum* remarked that equitable tolling is not generally amenable to

resolution at the 12(b)(6) stage, Defendants must again respectfully point out that this

observation was simply wrong.  In fact such resolution occurs routinely, as evidenced by the

multitude of cases cited above (including several in this Circuit) doing precisely that.  And courts

of appeal have repeatedly affirmed such dismissals. *See, e.g., Cervantes v. Countrywide Home

Loans, Inc.*, No. 09-17364, 2011 U.S. App. LEXIS 18569, at *26 (9th Cir. Sept. 7, 2011); *Salois

v. Dime Sav. Bank, FSB*, 128 F.3d 20, 24-26 (1st Cir. 1997).

That is because the fraudulent concealment pleading analysis is the same as for

any other type of fraud:  a plaintiff does not have to plead *evidence* of the fraudulent

concealment in the complaint, but certainly must plead *specific facts* that, if true, would support

tolling. *See Lum,* 361 F.3d at 223 (Third Circuit affirmed dismissal of RICO claim on Rule 12

motion to dismiss because plaintiffs' "general allegations of fraud do not comply with Rule

9(b)").  To illustrate this point, in the Third Circuit case cited by the court in *CBNV II, Oshiver v.

Levin, Fishbein, Sedran & Berman*, the plaintiff there had not only pled her underlying claim

41

(that she was fired for discriminatory reasons), but that, when she inquired as to the reason for her discharge, the defendant "actively" deceived her into delaying the pursuit of her claim by telling her she was laid off because there was no work for her, when in fact she had been replaced by a male. 38 F.3d. at 1391-392. Accordingly, she had pled adequately both the underlying claim *and* the separate fraudulent concealment that caused her to delay filing suit. By contrast, there is no allegation in this case, beyond the alleged violations that form the basis of the claims, that any of the Defendants did a single thing to deceive any plaintiff into not filing suit. Under well-established principles of both equitable tolling and the Rule 9(b) pleading requirements for fraudulent concealment, plaintiffs' invocation of fraudulent concealment must be rejected as a matter of law.

### b.    Additionally, Plaintiffs Also Have Not Adequately Alleged That They Exercised Reasonable Diligence

Plaintiffs' equitable tolling assertion also fails on the additional and independent ground that Plaintiffs have failed to allege that they were reasonably diligent in attempting to uncover the alleged facts that form the basis for their claims. *See Matthews*, 260 F.3d at 256. Plaintiffs' allegations of reasonable diligence are confined to a single paragraph of their complaint. (CAC ¶ 409). They allege that they "exercised reasonable diligence during their loan transactions and dealings with the Banks and in reviewing their loan documentation. . . ." (*Id.*). Plaintiffs, however, allege no facts whatsoever to support these conclusory allegations, and they are plainly inadequate. *See, e.g., Duke v. H&R Block Bank*, No. 10-cv-01927, 2011 WL 1060656, at *5 (D. Colo. Mar. 8, 2011) (dismissing RESPA claim as time-barred and rejecting plaintiffs' attempt to allege due diligence in support of equitable tolling claim when plaintiffs failed to "provide any specificity or factual basis for their generalized assertions"); *Padilla v. One West Bank*, No. 10-04080, 2010 WL 5300900, at *7 (N.D. Cal. Dec. 20, 2010) (rejecting

42

plaintiffs' allegations in support of equitable tolling of RESPA limitations period when plaintiffs alleged that they "'acted immediately and with due diligence to examine Defendants' [sic] behavior,'" reasoning that "these conclusory statements are insufficient to find that equitable tolling applies to Plaintiffs' claims."); *Rodriguez v. SLM Corp.*, No. 07-cv-1866, 2009 WL 3769217, at *3 (D. Conn. Nov. 10, 2009) (rejecting plaintiffs' claim that fraudulent concealment tolled the TILA limitations period when plaintiffs did not "state with particularity their efforts to discover the nature of their claimed TILA violations"); *Fitch v. Radnor Indus., Ltd.*, No. 90-2084, 1990 WL 150110 (E.D. Pa. Sept. 27, 1990) (dismissing complaint for failure to allege what led to tardy discovery).

Plaintiffs further allege that, despite the aforementioned unspecified alleged acts of diligence that they claim to have performed, they "could not have, nor been reasonably expected to, uncover the complex set of facts and the highly sophisticated scheme giving rise to their claims against Defendants due to the fraudulent concealment, unlawful and conspiratorial conduct of Defendants." (CAC ¶ 409). Here, again, courts have specifically rejected similar allegations seeking to rescue RESPA claims. *See, e.g.*, *Val-Com Acquisitions Trust v. Wells Fargo Bank, N.A.*, No. 3:10-cv-1331, 2011 WL 2517230, at *4 (N.D. Tex. June 23, 2011) (rejecting plaintiffs' allegations of reasonable diligence in support of equitable tolling claim when plaintiffs alleged that "because of Saul's position as a consumer, he should not have been expected to discover the latent violations[,]" because "Plaintiffs have failed to meet the burden required for equitable tolling. Mere ignorance of the law or lack of knowledge of filing deadlines does not justify equitable tolling or other exceptions to a law's requirements."); *Croxford v. Sutherland Title*, No. 2:10-cv-0573, 2011 WL 64306, at *1 (D. Utah Jan. 7, 2011) ("Plaintiffs contend that equitable tolling should be applied because they were 'unaware of their

rights [to disclosure documents] because of the calculated concealment and scheming behavior

of Defendants.' . . . The court rejects this bald assertion.  Nothing is provided that suggests that

Plaintiffs advantaged themselves of any sort of due diligence to discover their rights relating to

the purchase of the property.  Plaintiffs' failure to avail themselves of sufficient information to

understand their rights cannot shift the consequences resulting from their ignorance to

Defendants.") (bracketed alteration in original).

   Plaintiffs' lack of due diligence as to their alleged TILA/HOEPA violations with

respect to the title fees they were charged is apparent in the record of these cases.  In the state

court action that became W.D. Pa. Civil Action No. 02-01201, Plaintiffs Ruth Davis and Philip

and Jeannie Kossler challenged supposedly bogus or misrepresented title charges on CBNV

loans on July 3, 2001.  *See* Paragraph 10 of Amended Complaint filed in Allegheny County

Court of Common Pleas Case No. FD 01-8643 ("All or substantially all of the Pennsylvania

HLTV loans funded by Community, both before and after the last quarter of 1999, include

fraudulent and illegal settlement costs ostensibly related to title services").  Being aware of that

allegation by some means, they, and any other CBNV borrower-Plaintiffs, could at that time

have discovered through the same means what they allege to have been violations of

TILA/HOEPA as to the title fee disclosures and filed.  But they now claim concealment of the

alleged facts they averred in 2001.  On September 19, 2002, in the initial complaint in W.D. Pa.

Civil Action No. 02-1616, Plaintiffs Russell and Kathleen Ulrich made an essentially identical

allegation about GNBT loans.  *See* Paragraph 33 of that Complaint.  Again, at that time the

Ulrichs, and any other GNBT borrower, could have, but did not, assert the alleged TILA/HOEPA

claims about the disclosures concerning those fees.  Indeed, 19 of the Plaintiffs defended the

settlement of the *Kessler* action before the Third Circuit by repeatedly asserting that the

TILA/HOEPA claims were time-barred or otherwise not viable. And even those Plaintiffs who are former objectors were dilatory in asserting the title fee-based TILA/HOEPA claims. None of them filed any TILA/HOEPA claim based on title fee disclosures before July 4, 2003. *See* initial complaint in N.D. Ala. Case No. 7:04 CV-04-C-2351 (W.D. Pa. Civil Action No. 05-00688).

        c.        **The Complaint On Its Face Establishes That The TILA/HOEPA Claims Are Not Subject To Equitable Tolling Or Equitable Estoppel**

In addition to Plaintiffs' pleading deficiencies, it is clear that equitable tolling could never apply to several of the types of allegations on which Plaintiffs' TILA/HOEPA claims are based. Four of Plaintiffs' five TILA/HOEPA claims – *i.e.*, that the lending banks allegedly failed to provide borrowers the required HOEPA disclosure three business days prior to the loan closings, improperly asked plaintiffs to sign the same, used too small type for disclosures, and failed to disclose one of several circumstances when a prepayment penalty could not be assessed – are based solely on the face of the documents provided (or allegedly not provided as required) at or before the loan closings, and these defects were therefore necessarily, by definition, apparent at or before closing. There is no allegation anywhere in the CAC of any misrepresentation or concealment of information pertinent to these claims, and there could never be any such allegation. Indeed, the only possible excuse for failure to file within the statutory period would be ignorance of the law, but that provides no basis for equitable tolling. *Davis*, 996 F.2d at 625; *Croxford*, 2011 WL 64306, at *1; *Val-Com*, 2011 WL 2517230, at *4. Thus, Plaintiffs' effort to invoke equitable tolling as to these claims fails as a matter of law. *See Bryant v. Mortg. Capital Resources Corp.*, 197 F. Supp. 2d 1357, 1367 (N.D. Ga. 2002) (dismissing TILA claims despite attempt to invoke equitable tolling when alleged violations were apparent at closing).

**d.    The TILA/HOEPA Claims Directed At RFC And IUBT Cannot Be Subject To Equitable Tolling Because The Allegations Of Tolling Do Not Allege Any Misleading Conduct By RFC Or IUBT**

Particularly in light of the fact that 15 U.S.C. §1641(d)(1) only removes an assignee's ability to assert a holder in due course defense (*see* Section III(F)(2)(d)(2) *infra*), the Complaint does not contain sufficient allegations to trigger any equitable tolling defense as to RFC or IUBT because (apart from the pleading insufficiencies already noted) the allegations of tolling do not assert any misleading conduct by RFC or IUBT. Equitable tolling as to a given defendant requires active misleading by that specific defendant, because the underlying principle of equitable tolling is that "a party should not be permitted to profit from its own wrongdoing." *Oshiver*, 38 F.3d at 1388. *See Fitch*, 1990 WL 150110, at *4. The allegations show on their face that RFC and IUBT were not involved in the alleged acts at or prior to the closings that are alleged (albeit insufficiently) to create equitable tolling. There are no sufficiently specific allegations that RFC and IUBT (or any Defendant) engaged in post-closing acts of concealment or misrepresentation with respect to the facts needed to bring these claims. The generalized conspiracy allegations do not suffice. *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 232 (S.D.N.Y. 1989).

*    *    *

The bulk of Plaintiffs' claims are time-barred to the extent set forth above and as summarized in Appendix A, and there is no basis for equitable tolling of their TILA/HOEPA and RESPA claims. Accordingly, these claims must be dismissed.

**4.    The Rescission Claims Are Untimely Under The Applicable Statute Of Repose, Which Is Not Subject to Tolling**

As noted above, Plaintiffs have asserted a separate Count for rescission under TILA. TILA imposes an absolute three-year period in which rescission may be sought. 15

46

U.S.C. § 1635(f). That three-year repose period is not subject to tolling: once three years have passed from the date the loan closed, a borrower's claimed right to rescind that loan is extinguished for all purposes. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 417 (1998) (§ 1635(f) "takes us beyond any question whether it limits more than the time for bringing a suit, by governing the life of the underlying right as well"); *In re Cox*, 162 B.R. 191, 195 (Bankr. C.D. Ill. 1993); *Monday v. Ace Home Improvement Servs., Inc.*, 618 N.E.2d 563, 566 (Ill. App. 1st Dist. 1993). No Plaintiff is alleged to have exercised his or her right to rescind a loan within three years of the dates on which his or her loans closed. Accordingly, Plaintiffs' supposed right to rescind their loans under TILA/HOEPA has been forever extinguished.[21]

### D.    PLAINTIFFS' RESCISSION CLAIMS FAIL TO STATE A CLAIM

In addition to untimeliness, Plaintiffs' stand-alone claims for "rescission" fail on other grounds. First, no one who has paid off his or her loan or sold the property that secured the loan has a statutory right to rescind their loans. TILA expressly provides that a borrower's rescission right "shall expire" three years after the loan closes or upon the sale of the secured property, whichever occurs first. 15 U.S.C. § 1635(f). Thus, the right of rescission ceases to exist as a matter of law when the borrower pays off the loan or sells the property securing the loan. *See, e.g., Meyer v. Ameriquest Mortg. Co.*, 342 F.3d 899, 903 (9th Cir. 2003); *Jenkins v. Mercantile Mortg. Co.*, 231 F. Supp. 2d 737, 745-46 (N.D. Ill. 2002); 12 C.F.R. § 226.23(a)(3).

Here, the loans taken out by Martin Baratz, Tina M. Boor, Brian Cartee, Robert and Rebecca Clark, Ruth Davis, Mack and Robin Dorman, John and Rowena Drennen, Flora

---

[21]    Plaintiffs' rescission and TILA damages claims should also be dismissed in their entirety as to FDIC-GNBT and FDIC-IUBT, as the FDIC as Receiver is an involuntary assignee under TILA and rescission claims are barred against a Receiver under FIRREA. *See* 15 U.S.C. § 1641(e)(1) and 12 U.S.C. § 1821(j).

Gaskin, Stephen and Amy Haney, Brian and Carla Kessler, Phillip and Jeannie Kossler, Roy and

Ruthie Logan, Thomas Mathis, Nora Miller, Richard Montgomery, John and Kathy Nixon,

Patricia Porco, William and Ellen Sabo, and Tammy and David Wasem (*See* Releases and

Certificates of Satisfaction, attached hereto as Exhibits 17-41) have been paid off. As such, none

of these Plaintiffs has any statutory right to "rescind" their loans. The Court can take judicial

notice of these publicly recorded documents without converting this preliminary motion to a

motion for summary judgment. *DiNicola v. DiPaolo*, 945 F. Supp. 849, 855, n.2 (W.D. Pa.

1996).

Second, none of these Plaintiffs allegedly tendered their loans for rescission prior

to filing suit. It is well-established that the failure to tender is fatal to a claim for rescission.

"Upon the performance of the creditor's obligations under this section, the obligor shall tender

the property to the creditor, except that if return of the property in kind would be impracticable

or inequitable, the obligor shall tender its reasonable value." 15 U.S.C. 1635(b); *see also*

*Yamamoto v. Bank of New York*, 329 F.3d 1167, 1171 (9th Cir. 2003) ("[R]escission should be

conditioned on repayment of the amounts advanced by the lender.") (citing *Lagrone v. Johnson*,

534 F.2d 1360, 1362 (9th Cir. 1976) (emphasis omitted)). "The equitable goal of rescission

under TILA is to restore the parties to the 'status quo ante.'" *Am. Mortg. Network v. Shelton*,

486 F.3d 815, 821 (4th Cir. 2007) (citing *Yamamoto*, 329 F.3d at 1172; *Williams v. Homestake*

*Mortg. Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992)). "Although mindful that the statutory

language contemplates a tender by the debtor after the creditor has performed his duties, several

courts that have expressly addressed whether or not a tender by the consumer is required before

finding a forfeiture of the proceeds of a transaction by the creditor, have found tender to be

required to insure compliance with the congressional purpose of restoring the parties to the status

quo." *Mayfield v. Vanguard Sav. & Loan Assoc.*, 710 F. Supp. 143, 147 (E.D. Pa. 1989) (citing

*Bustamante v. First Fed. Sav. & Loan Ass'n,* 619 F.2d 360, 365 (5th Cir. 1980); *Gerasta v.*

*Hibernia Nat'l Bank,* 575 F.2d 580, 584 (5th Cir. 1978)). "Pursuant to 15 U.S.C. § 1635(b),

courts have the 'discretion to condition rescission on tender by the borrower of the property he

has received from the lender.' *Ljepava v. M.L.S.C. Props., Inc.,* 511 F.2d 935, 944 (9th Cir.

1975). Other courts have denied rescission where the borrowers were unable to tender payment

of the loan amount. *See* [*Shelton,* 486 F.3d at 819]; *Yamamoto v. Bank of New York,* 329 F.3d

1167, 1173 (9th Cir. 2003); *Williams v. Homestake Mortg. Co.,* 968 F.2d 1137, 1140 (11th Cir.

1992)." *Gianduso v. U.S. Bank Nat'l Ass'n,* No. 3:CV-09-1971, 2010 U.S. Dist. LEXIS 116453,

at *6 (M.D. Pa. Nov. 2, 2010) (quoting *Jobe v. Argent Mortg. Co.,* 373 Fed. Appx. 260 (3d Cir.

2010) (*per curiam*)). Here, instead of alleging tender, Plaintiffs allege that they are not required

to tender. (CAC ¶¶ 496-97). However, tender is a necessary step in the rescission process under

TILA to restore the parties to the statue quo ante. Without tender, Plaintiffs' rescission claims

must be dismissed.

### E.   THE CLAIMS OF GNBT PLAINTIFFS EDWARD KRUSZKA AND RICHARD MONTGOMERY MUST BE DISMISSED FOR FAILURE TO JOIN THEIR SPOUSES AS NECESSARY PARTIES

According to the CAC, Plaintiff Edward Kruszka and his wife (a non-party)

obtained a mortgage loan from GNBT on May 5, 2001 and executed a deed of trust securing this

loan (*see* CAC ¶¶ 222-26). Yet, only Mr. Kruszka has brought suit seeking, *inter alia,*

repayment of monies paid on this loan and rescission. For reasons unknown, Mrs. Kruszka has

not been joined as a Plaintiff in this case, and for this reason the claims of Mr. Kruszka must be

dismissed for failure to join his wife as a necessary party.

Fed. R. Civ. P. 19(a) addresses the issue of whether a party should be joined as a

"necessary" party, stating:

(a) ***Persons to be Joined if Feasible***. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, ***or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest***. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

Fed. R. Civ. P. 19(a) (emphasis added).

If a party is determined to be a necessary party, it must then be determined

whether the absent party is an indispensable party under Rule 19(b). *Koppers Co. v. Aetna Cas.*

*& Sur. Co.,* 158 F.3d 170 (3d Cir. 1998). Subsection b of this Rule provides:

(b) ***Determination by Court Whenever Joinder not Feasible***. If a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. ***The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties;*** second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Fed. R. Civ. P. 19(b) (emphasis added).

Here, non-party Mrs. Kruszka is a necessary and indispensible party to the claims

advanced by Edward Kruszka, as Mr. Kruszka seeks remedies in which his non-party wife has a

joint interest.  Not only would reimbursement to Mr. Kruszka of payments previously made, if ordered by the Court, impair Mrs. Kruszka's interest therein as co-borrower, but it would also leave Defendants subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.  Moreover, Mrs. Kruszka, as co-owner of the mortgaged property securing the Kruszka loan, has a joint interest in the claim for rescission advanced by Mr. Kruszka.  Thus, Mr. Kruszka's failure to join his wife as a party to the claims he seeks to advance mandates dismissal.

The same problem exists with respect to the claims of Richard Montgomery.  While Mr. Montgomery's wife was a co-mortgagor on his GNBT loan (as reflected on the publically recorded mortgage attached hereto as Exhibit 34), and thus has a joint interest in the claim for rescission advanced by Mr. Montgomery.  But she has not been joined as a Plaintiff herein.  Mr. Montgomery's failure to join his wife as a party to the claims he seeks to advance mandates dismissal.

## F.    PLAINTIFFS' CLAIMS FAIL FOR ADDITIONAL REASONS

### 1.    The RESPA Claims Are Defective

Plaintiffs' RESPA claims in Count I of the CAC consist of four general categories of allegations.

- That the loan discount fees were unearned in that no loan discounts were given, allegedly in violation of RESPA Section 8(b), 12 U.S.C. § 2607(b);

- That the title fees appearing in section 1100 of the Plaintiffs' HUD-1 statements were not bona fide and reasonable in that they were either excessive or marked up, that no services were performed or that any fees for post-settlement title document review are illegal, or that title document preparation fees were either illegal or charged for work that was not done, all allegedly in violation of RESPA Sections 8(b) and 10;

- That the origination and loan discount fees appearing in section 800 of the Plaintiffs' HUD-1 statements were kicked back to non-parties ("the

51

Shumway entities") in exchange for the referral of the loans to the banks, allegedly in violation of RESPA Section 8(a), 12 U.S.C. § 2607(a);

- That there was an undisclosed affiliated business arrangement between CBNV and Shumway entities, allegedly in violation of an unspecified provision of RESPA.

Each category suffers from fatal defects that require dismissal.

- As to the discount fees, see subsection III.E.1.a;

- As to the title fees, see subsection III.E.1.b;

- As to the alleged kickbacks, see subsection III.E.1.c;

- As to the disclosure of business arrangements, see subsection III.E.1.d.

### a.    Plaintiffs May Not Premise Their RESPA Claims On Allegations Relating To "Loan Discount Fees"

Plaintiffs allege that the Banks charged them loan discount fees but failed to discount the loan's interest rate, thereby violating RESPA's prohibition against unearned fees. (*See, e.g.*, CAC ¶¶ 123, 446). These allegations fail as a matter of law.

Section 8 of RESPA applies only to the payment of fees for real estate "settlement services." 12 U.S.C. § 2607. Just last year, the Eleventh Circuit specifically considered whether loan discount points constituted a charge for rendering a "settlement service" under RESPA. *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1192 (11th Cir. 2010). After a thorough review of the language of RESPA, the interpretive regulations, the ordinary meaning of the term "service," and RESPA's legislative history, the *Wooten* court held:

> We cannot conceive of a circumstance in which the charging of loan discount points would qualify under our definition of "service." The points paid by the Wootens and Buckhaults were ostensibly in exchange for an interest rate below market . . . . As such, the points affect the interest rate and go to the very heart of the loan itself.

52

*Id.* at 1194-195 (citations omitted). The Eleventh Circuit also rejected the plaintiffs' contention that loan discount fees constituted settlement services because they were listed within the 800 series on the HUD-1, where certain settlement services are listed. As the Eleventh Circuit explained, "[p]oints in this context are part of the loan agreement, not a service provided to borrowers; therefore, regardless of its location on the HUD-1, the line 802 charge could not be for a 'settlement service.'" *Id.* at 1195. Accordingly, the court affirmed the district court's dismissal of the plaintiffs' RESPA claim challenging loan discount points. *Id.*

Here, loan discount fees comprise part of Plaintiffs' RESPA claims. This Court should follow the Eleventh Circuit's sound reasoning and dismiss those claims to the extent they are based on loan discount fees.

> **b.    Equally Deficient Are The RESPA Allegations Based On Title Charges**

Much of the RESPA count asserts purported RESPA violations allegedly committed by the various title companies – and not by any of the Defendants. Plaintiffs make certain vague and conclusory allegations that the various fees that the title companies charged were not bona fide and reasonable, and that the title companies did not perform some of the title work that the HUD-1s said was performed. (*See, e.g.,* CAC ¶¶ 122, 277). Plaintiffs also allege that the amount that the title companies charged for examining property reports prepared by other companies is illegal *per se* under HUD regulations, and that the title companies marked up the actual cost of the property report in violation of RESPA. (*See, e.g., id.* ¶ 122). Plaintiffs further allege that the title companies violated RESPA by charging for post-settlement document review. (*See, e.g., id.* ¶ 161). Finally, Plaintiffs allege that the title companies' charges for document preparation were "bogus" because they did not actually prepare documents (*see, e.g., id.* ¶ 277), and that, in any event, charging for preparation of TILA, HOEPA and RESPA

disclosures is illegal under 26 U.S.C. § 2610. (*See, e.g., id.* ¶ 248). These allegations do not state any claim against Defendants.

> **(1)    Defendants May Not Be Held Liable For The Alleged RESPA Violations By The Title Companies**

As an initial matter, liability under RESPA requires that a party "give" or "accept" part of the charges at issue. 12 U.S.C. § 2607(a), (b). Here, there is no allegation that any of the Defendants gave or accepted any part of the title charges that form the basis for the allegations described above. And there is no support in RESPA or any of the case law or regulations interpreting it that supports the notion that a lender (or its assignee) can be held liable for the alleged RESPA violations of *other* settlement service providers, such as the title companies here.

> **(2)    The Allegations Of RESPA Violations By The Title Companies Are Defective For Other Reasons As Well**

Even were Defendants somehow responsible for the alleged RESPA violations of the title companies, a number of these allegation still would be deficient. Plaintiffs' allegations that various unspecified charges by the title companies were not bona fide and reasonable, and that the title companies did not perform various unspecified title work that the HUD-1s said they performed (*see, e.g.,* CAC ¶¶ 122, 277), are just the sort of vague and conclusory allegations that are inadequate under *Twombly* and *Iqbal.*

Moreover, these allegations essentially amount to a claim that the title companies overcharged for some of their work. The Third Circuit has specifically held that RESPA "does not provide a cause of action for overcharges." *Santiago v. GMAC Mortg. Group, Inc.*, 417 F.3d 384, 387 (3d Cir. 2005). Rather, there must be a "split" of alleged unearned fees, and there is no allegation that the title companies "split" any portion of their alleged unearned fees with anyone. Numerous appellate courts have held that liability under Section 8(b) of RESPA requires that the

charge at issue be "split" between multiple parties, and does not apply to a charge that is paid to one entity even if the charge is unearned. *See Freeman v. Quicken Loans, Inc.,* 626 F.3d 799 (5th Cir. 2010), *cert. granted,* No. 10-1042 (Oct. 11, 2011);[22] *Krzalic v. Republic Title Co.,* 314 F.3d 875 (7th Cir. 2002); *Haug v. Bank of Am., N.A.,* 317 F.3d 832 (8th Cir. 2003); *Boulware v. Crossland Mortg. Corp.,* 291 F.3d 261 (4th Cir. 2002). Here, there is no such allegation.

Also deficient is Plaintiffs' allegation that a title company may not charge for both a title report and an examination of that report. The applicable regulation defining settlement services explicitly lists "title examinations" as a distinct title service for which a borrower may be charged. *See* 24 C.F.R. § 3500.2 (settlement services include ". . . (4) Provision of title services, including title searches, *title examinations,* abstract preparation . . . .) (emphasis added); *accord* 24 C.F.R. pt. 3500 App. A (1996) (explaining that separate charges may be made for title "searching" and title "examination").

Plaintiffs' allegations that the title companies charged for "post-settlement" document reviews, and preparation of RESPA, TILA and HOEPA disclosures, are not supported by the HUD-1s on which Plaintiffs rely upon in making this allegation. They premise this allegation on line items in certain of the HUD-1s that list charges for "document review" and "document preparation." (*See, e.g.,* CAC ¶¶ 161, 245, 277). However, there is no indication that the "document review" referred to in this line was a *post-settlement* document review, or that the "document preparation" charge was for preparation of *RESPA, TILA and HOEPA disclosures.* There are obviously a whole host of documents that are prepared for loan settlement other than the RESPA, TILA and HOEPA disclosures (*e.g.,* the mortgage). Plaintiffs' allegations in this

---

[22]    The Supreme Court will apparently decide the question presented here: can an unearned fee be a RESPA violation where there is no split with a third party?

regard are completely speculative and fail to satisfy the plausibility standard under *Twombly* and *Iqbal*.

### c.    Plaintiffs' "Kickback" Allegations Also Are Defective

A third category of alleged RESPA violations is that the HUD-1s misrepresented that loan origination fees and discount fees were being paid to the Banks, when in fact they allegedly were being largely kicked back to entities controlled by the Shumway/Bapst Organization notwithstanding that these entities were allegedly not performing any compensable settlement services in connection with the loans. (CAC ¶¶ 121, 440). These allegations also fail as a matter of law for a number of reasons.

### (1)    These Allegations Fail To The Extent They Are Premised On "Loan Discount" Fees

As an initial matter, these allegations, in part, involve loan discount fees. *See* Section III(F)(1)(a) *supra*.

### (2)    These Allegations Fail To The Extent They Are Based On Purported Disclosure Violations In The HUD-1s

These allegations also fail as a matter of law to the extent they purport to premise the RESPA claims on the Banks' alleged failures to disclose on the HUD-1s what entity was receiving the loan fees. The requirements for disclosure on HUD-1s are contained in Section 4 of RESPA. 12 U.S.C. § 2603. As courts have repeatedly held, RESPA does not create a private right of action for alleged violations of this provision. *See Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 557 (9th Cir. 2010) ("No express cause of action was created by Congress under RESPA Section 4."); *Taggart v. Wells Fargo Home Mortg., Inc.*, No. 10-CV-00843, 2010 U.S. Dist. LEXIS 102747, at *13-14 (E.D. Pa. Sept. 27, 2010) ("[C]ourts have found no private right of action should be implied [for violations of the RESPA Section 4].");

*Moore v. Radian Group, Inc.*, 233 F. Supp. 2d 819, 826-27 (E.D. Tex. 2002) (finding no private

right of action for violations of any statutory RESPA disclosure requirements).

> **(3)    The Complaint, And The Agreements It Purports To
> Characterize, Establish That There Were No
> "Kickbacks" In Violation Of RESPA**

RESPA's "anti-kickback" provision prohibits a person from giving or accepting

"any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or

otherwise, that business incident to or a part of a real estate settlement service involving a

federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). The

statute also includes a "safe harbor" provision which provides: "Nothing in this section shall be

construed as prohibiting . . . the payment to any person of a bona fide salary or compensation or

other payment for goods or facilities actually furnished or for services actually performed." 12

U.S.C. § 2607(c).

Here, plaintiffs try to characterize the evolution of the relationships between (i)

CBNV (and later GNBT), (ii) EquityPlus Financial, Inc. (a Shumway/Bapst entity), (iii)

EquityPlus Financial, LLC (an entity jointly owned by CBNV and EquityPlus Financial, Inc.)

(the "LLC"), and (iv) the Shumways and Bapst. Plaintiffs further attempt to describe the various

purported kickback schemes that allegedly occurred during the relationships among these parties.

(CAC ¶¶ 68-79). In fact, the relationship involved three discrete phases, and it is clear from the

face of the CAC, and the agreements that it purports to characterize, that no RESPA kickback

violations occurred during any of these phases.

As plaintiffs themselves describe the first phase (May 29, 1998 to October 29,

1998), CBNV funded the mortgage loans during this period "with all origination services other

than loan funding being provided by the LLC." (*Id.* ¶ 70). Plaintiffs further allege that "[m]ost

of the [origination] services were being performed by the LLC and the majority of the fees for

the services were being paid to the LLC." (*Id.*). Thus, plaintiffs' own allegations make plain

that the amounts that the LLC received during this period were not kickbacks at all, but rather

were for origination "services actually performed," thus falling into RESPA's safe harbor under

Section 8(c).  Because plaintiffs themselves concede in their pleading that the LLC was

performing these origination services in exchange for the amounts it received, the safe harbor

under Section 8(c) applies, and there was no RESPA kickback violation during this first phase.

*See, e.g., Cedeno v. Indymac Bancorp, Inc.*, No. 06-6438, 2008 WL 3992304, at *3 (S.D.N.Y.

Aug. 26, 2008) (granting defendants' motion to dismiss RESPA claim alleging violation of anti-

kickback provision when plaintiff conceded that purported kickback was in fact paid for services

actually performed).[23]

During the second phase (October 29, 1998 to November 21, 1999), plaintiffs

allege that the LLC no longer was part of the structure, and that all relevant settlement services

were performed by CBNV itself.  Plaintiffs further allege that EquityPlus Financial, Inc. became

a "consultant" to CBNV during this period, and referred loans to CBNV in return for which

CBNV allegedly paid kickbacks to EquityPlus Financial, Inc. (CAC ¶¶ 71-74).[24]  As part of

these allegations, plaintiffs repeatedly allege that EquityPlus Financial, Inc. "did not perform any

compensable settlement services in connection with the loans," thus attempting to remove the

arrangement from RESPA's safe harbor under Section 8(c).  (*Id.* ¶ 74).  However, the relevant

Consulting Agreement between CBNV and EquityPlus Financial, Inc. – which plaintiffs purport

---

[23]    Only one of the named plaintiffs' loans – the Kossler loan – was originated during this
first phase.  (CAC ¶ 127).

[24]    Plaintiffs also complain that these alleged kickbacks were concealed on the HUD-1s (*id.*
¶ 75), but – as discussed multiple times now – this does not create a private cause of
action under RESPA.

to characterize throughout these allegations (*see id.* ¶ 71-75), but which they fail to attach to the

CAC[25] – establishes that EquityPlus Financial, Inc. *was* in fact performing services in exchange

for the amounts it received. The Consulting Agreement specifically outlined the following

services that EquityPlus Financial, Inc. was to render:

> 3. DUTIES OF CONSULTANT
>
> Consultant will consult with and provide assistance to Bank in the administration of the Office. In addition to duties of Consultant otherwise set forth in the Agreement, Consultant will be responsible for the following duties as they relate to the administration of the Office and the origination of Mortgage loans under the Program:
>
> A) Recommending hardware equipment and software programs, configurations, and solutions for the Office's operation and activities.
>
> B) Providing advice and recommendations regarding the hiring by Bank of Mortgage Loan Originators (the "Originators") in the Office.
>
> C) Providing advisory and consulting support and recommendations for the administration of the Office loan pipeline and managing interest rate exposures.
>
> D) Providing advice and recommendations regarding the establishing and maintaining of necessary and appropriate policies and procedures for the administration of the Office.
>
> E) Directing all advertising campaigns for the Program, including market research, marketing material design and marketing material distribution.
>
> F) Overseeing the Office's business systems including, but not limited to, the telephone system and computer network.
>
> G) Providing at no expense to Bank all hardware, software, furniture, telephone systems and other equipment and capital items

---

[25]    Again, the Court may properly consider this agreement on this motion because Plaintiffs themselves make the agreement integral to their claims. *See Pekar v. U.S. Steel/Edgar Thomson Works*, No. CIV. A. 09-844, 2010 WL 419421, at *4 (W.D. Pa. Jan. 29, 2010).

deemed necessary by Bank and Consultant for use by the Office.
Bank will not purchase capital items for use in the Office.

H) Except as otherwise provided for in this Agreement, paying for
all expenses incurred in the operation of the Office including
courier fees, express delivery fees, equipment and software leases,
late charges and recording fees, rent, maintenance, postage,
stationary, supplies, telephone, advertising, appraisal fees, credit
report fees, flood certification fees, legal fees, accounting fees,
travel, entertainment and licensing fees.

I) Such other duties as Bank may request.

(Consulting Agreement, attached hereto as Exhibit 42, ¶ 3). In view of these duties, EquityPlus

Financial, Inc.'s compensation plainly was in exchange for "goods or facilities actually furnished

or for services actually performed." 12 U.S.C. § 2607(c). Thus, again during the second phase,

RESPA's safe harbor under Section 8(c) applies, and Plaintiffs' RESPA kickback allegations fail

as a matter of law.[26]

As for the third phase (November 22, 1999 to "the Spring of 2000") (CAC ¶ 76),

Plaintiffs' allegations are oblique, but, once again, the relevant agreements make plain what

occurred. As of November 21, 1999, David Shumway entered into an employment agreement

with CBNV (attached hereto as Exhibit 43) as of November 22, 1999.[27] Under the employment

agreement, David Shumway assumed loan origination responsibilities for CBNV, and was

compensated for his services. Thus, for any loans originated by CBNV from November 22, 1999

---

[26]    During this second phase, four CBNV loans closed – Davis, Kessler, Miller and Sabo.
(CAC ¶¶ 117, 136, 204, 185). Plaintiffs also allege that the arrangement that the
Shumway/Bapst Organization eventually entered into with GNBT was in all material
respects identical to the arrangement that existed between October 1998 to November
1999 involving CBNV. (Id. ¶ 77). Thus, the kickback allegations involving all GNBT
loans fail for the same reasons discussed above.

[27]    Yet again, the Court may consider these agreements given that they are integral to
plaintiffs' claims. Pekar, 2010 WL 419421, at *4.

forward, David Shumway was an employee of CBNV and the origination fees were properly

paid to CBNV. They were not "kicked-back" to any entity outside of CBNV. In the absence of

any kickback to any entity outside of CBNV, there could not have been any RESPA kickback

violations in connection with these loans.[28]

### d.   Plaintiffs May Not Base Their RESPA Claim On The Alleged Violation Of Affiliated Business Arrangement Requirements

Finally, Plaintiffs allege that CBNV violated the affiliated business arrangement

requirements of RESPA during the alleged arrangement that initially was in place during the

period May 29, 1998 through October 29, 1998. (Plaintiffs make no such allegation in

connection with the two later phases of the alleged scheme.) As noted above, just one of the

named Plaintiffs' loans – the Kosslers' loan – closed during that initial period. (CAC ¶¶ 69, 125-

33, 440 n.8).

A violation of the affiliated business arrangement requirements, however, does

not constitute a violation of RESPA. Rather, a violation of those requirements simply renders

the safe harbor for affiliated business arrangements unavailable as a defense to a RESPA

violation. As one court very recently explained:

> Plaintiffs allege that Defendants failed to disclose
> "affiliated business arrangements as required by 24 C.F.R.
> § 3500.15 and RESPA." Compl. ¶ 89. As noted RESPA § 8
> prohibits kickbacks and referral fees. . . . However, RESPA
> creates an exception for affiliated business arrangements which
> meet the requirements set forth in RESPA § 8(c)(4). . . .
>
> Accepting the truth of Plaintiffs' allegations that
> Defendants violated 24 C.F.R. § 3500.15, the Court finds that this
> claim fails as a matter of law. Plaintiffs have cited no legal
> authority nor has the Court been able to locate any cases holding

---

[28]   Only one of the named plaintiffs' loans – the Picard loan – was originated during this
third phase. (CAC ¶ 175).

that a violation of § 3500.15 or RESPA § 8(c)(4), standing alone,
is actionable. To the contrary, these provisions merely provide a
safe harbor for properly disclosed affiliated business arrangements
from liability for violations of § 8(a) or (b) of RESPA. In other
words, an affiliated business arrangement which fails to comport
with the requisite disclosure requirements remains liable for
violations of RESPA's proscription on kickback and referral fees.
Here, Defendants' alleged failure to comply with 24 C.F.R.
§ 3500.15(b)(1) simply would mean that they could be exposed to
liability for violations of RESPA § 8(a) or (b). However, as
discussed above, any claim based on § 8(a) or (b) is time-barred.

*Washington v. National City Mortg. Co.*, No. 10-5042, 2011 WL 1842836, at *7-8 (N.D. Cal.

May 16, 2011) (citations omitted); *accord McCullogh v. Howard Hanna Co.*, No. 1:09cv2808,

2010 WL 1258112 (N.D. Ohio Mar. 26, 2010) ("since Plaintiff cannot state a cause of action

under the § 2607(a) kickback provision and has not attempted to state a cause of action under

§ 2607(c), Plaintiff has no claim under RESPA, even if Defendants did not comply with the

requirements for an [affiliated business arrangement]"); 24 C.F.R. pt. 3500 (1992) ("Section

8(c)(4) . . . only creates a safe harbor against proscriptions in Section 8(a) for certain controlled

business arrangements."). Thus, even accepting the truth of Plaintiffs' allegation that CBNV

violated the affiliated business arrangement requirements in connection with the Kosslers' loan,

that simply means that CBNV could not avail itself of the safe harbor against section 8(a) and

8(b) claims, but any such claim is time-barred and fails to state a claim. There is no independent

cause of action for the alleged violation of the affiliated business arrangement disclosure. And

no Plaintiff with a closing after October 29, 1998 can even pretend to assert any such claim.

     **e.**    **All RESPA Claims Of Borrowers Who Received Loans From
CBNV After The "Spring Of 2000" Fail As A Matter Of Law**

     Finally, a separate and independent ground requires dismissal of all RESPA

claims of borrowers who received loans from CBNV after the Spring of 2000. Plaintiffs concede

that the Shumway/Bapst Organization and CBNV began to "wind down" their relationship in

"the spring of 2000." (CAC ¶ 76). The Complaint nevertheless includes five named plaintiffs –

Brown, Nixon, Hobson, Gaskin, and Wasem – who received CBNV loans that closed well after

the Spring of 2000. (*Id.* ¶¶ 319, 272, 242, 329, 4004). Even though Plaintiffs concede that

CBNV no longer had any relationship with the Shumway/Bapst Organization by the time these

loans closed, Plaintiffs nonetheless try to expand the scope of the putative class against CBNV,

alleging as follows:

> Despite having the Shumway/Bapst Organization move on to an
> arrangement with GNBT, CBNV continued to originate second
> mortgage loans *via other consultants*, which loans, upon
> information and belief, perpetrated many of the same wrongs
> associated with the CBNV-Shumway/Bapst relationship and which
> loans were purchased by RFC and perhaps other investor
> defendants.

(*Id.* ¶ 78) (emphasis added). In the individual descriptions of these post-Shumway/Bapst era

loans, the Complaint then alleges – upon "information and belief" (*id.*) – that CBNV and other

entities engaged in the same alleged misconduct that forms the basis for the claims involving the

Shumway/Bapst era loans, even though the title companies and other entities allegedly involved

with these later loans were not owned or controlled by the Shumway/Bapst Organization. (*See,*

*e.g., id.* ¶¶ 317-27). As part of these allegations, plaintiffs also allege that certain charges were

"kicked-back" to an unidentified "mortgage consultant for CBNV." (*Id.* ¶ 323).

       It is well settled that the factual allegations of a complaint "must be enough to

raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and that a Court is

"'not compelled to accept unsupported conclusions and unwarranted inferences . . . .'" *Partners*

*Coffee Co. v. Oceana Servs. & Prods. Co.*, 700 F. Supp. 2d 720, 737-38 (W.D. Pa. 2010)

(quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). In addition, while a plaintiff

may make allegations upon "information and belief," "'supporting facts upon which this belief is

founded must be set forth in the complaint.'" *Kester v. Zimmer Holdings, Inc.*, No. 2:10-cv-

00523, 2010 WL 4103553, at *3 (W.D. Pa. Oct. 18, 2010) (quoting *Tredennick v. Bone*, 647 F.

Supp. 2d 495, 501 (W.D. Pa. 2007)). Moreover, as the Third Circuit has explained, "[i]n light of

the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955,

167 L.Ed.2d 929 (2007), we have cautioned that the factual allegations in the complaint must not

be 'so undeveloped that it does not provide a defendant the type of notice of claim which is

contemplated by Rule 8.'" *Umland v. Plano Fin. Servs., Inc.*, 542 F.3d 59 (3d Cir. 2008)

(quoting *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir. 2008)).

Here, Plaintiffs' attempt to assert claims arising out of post-Spring 2000 CBNV

loans violates all of these rules of pleading. While Plaintiffs' claims involving the alleged

Shumway/Bapst Organization scheme all fail for the many reasons set forth above, at least their

averments are directed toward the Shumway/Bapst Organization (*see id.* ¶¶ 61-76). By contrast,

for the post-Spring 2000 period Plaintiffs allege nothing but vague and conclusory allegations –

upon "information and belief" – that some of the "same wrongs" may have been perpetrated with

some new ***and unidentified*** entities. These conclusory allegations are particularly egregious in

light of Plaintiffs' allegation at the beginning of the CAC that the Shumway/Bapst Organization

"conceived" the entire alleged scheme. (CAC ¶ 3). There are simply no facts, well-pled or

otherwise, supporting claims involving any post-Shumway/Bapst entity.

Also deficient are Plaintiffs' bald allegations – devoid of any supporting factual

averments – that CBNV "kick-backed" some ill-defined set of fees to some unidentified

"mortgage consultants" in connection with these later loans (*See, e.g., id.* ¶ 323). Courts have

repeatedly dismissed virtually identical RESPA allegations as inadequate under *Twombly* and

*Iqbal. See, e.g., Ausano v. BAC Home Loans Servicing, LP*, No. 10cv4, 2010 WL 3463647, at *4

(S.D. Cal. Aug. 31, 2010) ("Plaintiffs allege National City and Countrywide violated 12 U.S.C.

§ 2607 by 'providing a person with a fee, kickback or thing of value' in exchange for a referral

of a mortgage loan. (CAC ¶ 118). Plaintiffs' allegation is conclusory and merely parrots the

language of § 2607(a). . . . There are no facts supporting the allegation."); *Gomez v. World Savs.*

*Bank FSB*, No. 1:10-cv-01463, 2010 WL 5280004, at *3 (E.D. Cal. Dec. 13, 2010) ("Plaintiff's

vague, conclusory allegation that 'Defendants individually or collectively received kickbacks,

unearned fees, or a thing of value as part of the real estate settlement' does not meet Rule 8's

notice pleading requirement."); *Reynoso v. Paul Fin., LLC*, No. 09-3225, 2009 WL 3833298, at

*7 (N.D. Cal. Nov. 16, 2009) ("The Complaint includes only two conclusory allegations that

suggest that each of the Defendants was engaged in an 'illegal scheme the purpose of which was

to execute loans secured by real property in order to make commissions, kick-backs, illegal

undisclosed yield spread premiums, and undisclosed profits by the sale of any instruments

arising of the transaction.' Compl. ¶¶ 45, 89. This assertion is completely unsupported by any

factual claims in the Complaint."); *Pineda v. Reyes*, No. 09-cv-01938, 2009 WL 3388376, at *4

(S.D. Cal. Oct. 20, 2009) ("Apart from Plaintiffs' legally conclusory allegations concerning a

purported violation of section 8(a) [of RESPA], Plaintiffs fail to allege when any prohibited fee

or kickback was given, who gave it, or who received it"); *Lane v. Vitek Real Estate Indus.*

*Group*, 713 F. Supp. 2d 1092, 1101 (E.D. Cal. 2010) ("Plaintiffs' . . . allegation relating to

kickbacks similarly fails. . . . Plaintiffs' allegations of kickbacks are completely devoid of any

factual enhancement whatsoever. Plaintiffs do not explain what these kickbacks were, when

they occurred, or which defendants received them. Instead, plaintiffs simply allege the existence

of secret kickbacks. . . . Defendants should not be forced to guess how they violated RESPA. . . .

Accordingly, Plaintiffs' kickback claim 'stops short of the line between possibility and

plausibility' and must be dismissed. *Iqbal*, 129 S. Ct. at 1949.") (citation omitted).

## 2.    Many Of The TILA Claims Also Fail For Reasons Other Than Timeliness

Counts II and III of the CAC allege five distinct theories of liability under TILA/HOEPA:

- That the disclosed annual percentage rate ("APR") and Finance Charge were understated materially in that title charges were excluded from the finance charges as bona fide and reasonable when, for the reasons stated in the RESPA claims they were not (basically, that borrowers were allegedly charged a title examination fee even though no examination was allegedly performed, or if performed, it was unreasonable because no title policy was issued), allegedly in violation of 15 U.S.C. §§ 1606(c), 1635, 1638 & 1639;

- That the Banks failed to provide borrowers the required HOEPA disclosure three business days prior to the loan closings, allegedly in violation of 15 U.S.C. § 1639(b)(1);

- That certain disclosures were not "clear and conspicuous," allegedly in violation of 15 U.S.C. § 1639(a);

- That the Banks required borrowers to falsely acknowledge timely receipt of the required HOEPA disclosure, allegedly in violation of an unspecified provision of HOEPA;

- That the promissory notes did not disclose one of several circumstances when a prepayment penalty could not be assessed, allegedly in violation of 15 U.S.C. § 1639(c)(2)(B).

Count IV purports to state a stand-alone claim for relief in the nature of rescission, including a declaration and rescissionary damages in the amount of all finance charges and fees paid.

Several of these novel theories fail to state a claim for many or all of the Plaintiffs:

- As to the timeliness of HOEPA disclosures, see subsection III.E.2.a;

- As to conspicuousness, see subsection III.E.2.b;

- As to prepayment penalties, see subsection III.E.2.c.

- As to the APR-related disclosures, the timing of HOEPA disclosures, and the HOEPA acknowledgements, RFC – which was an assignee of the

loans, rather than the original lender – is entitled to dismissal because they are based on alleged misconduct by Defendants other than RFC that was not apparent from the face of the disclosures, see subsection III.E.2.d.

• As to Count IV (for TILA rescission), see Section III.E.2.e.

**a.    Nearly All Plaintiffs Acknowledged Receiving The Required Disclosures At Least Three Business Days Prior To The Closing**

To the extent that Plaintiffs' TILA/HOEPA claims are based on the alleged failure to provide disclosures at least three business days before the closing, such claims fail as a matter of law for most of the Plaintiffs. The loan files described in the CAC for most of the Plaintiffs include a signed acknowledgment of compliance with the three-business-day notice requirement. *See* Composite of TILA/HOEPA Disclosures Provided to Plaintiffs, attached hereto as Exhibit 44. The Gaskin, Wasem, Miller, Kruszka, Kelly, Nixon, Roberts, Sabo, and Ulrich files include signed acknowledgments that the TILA disclosures were made at least "three business days" before the closing, and while the Drennen, Porco, Mathis, Brown, and Montgomery acknowledgments state that the disclosures were made at least "3 days" (rather than "3 business days") prior to the closing, these closings were held on Thursdays or Fridays, and therefore, there was no difference between "3 days" and "3 business days." *Id.*

Because RFC and IUBT are the assignees of these loans, rather than the original lenders, Section 1641(b) provides that a borrower's written acknowledgement that he received the TILA disclosure notice at least three business days before closing is "conclusive proof" that the lender complied with 15 U.S.C. § 1639(b)(1). *See* 15 U.S.C. § 1641(b). Plaintiffs' assertion that they can avoid this bar merely by asserting that the acknowledgement was not truthful is directly contrary to the text of the statute.

Plaintiffs' creative attempt to get around the conclusive nature of the bar by asserting that the original lender's request for the signing of the acknowledgment was a separate

violation, for which the assignee will be liable, is equally meritless.  Nothing in TILA or HOEPA

suggests such liability and Section 1641(b) expressly provides that an assignee is legally entitled

to rely on the truthfulness of such acknowledgements.  No court has endorsed Plaintiffs'

attempted end run around the statutory language.[29]

> **b.    The Disclosures Met Federal Standards For "Conspicuousness"**

Plaintiffs' allegation that the TILA/HOEPA notices were not clear and

conspicuous because the APR and monthly payment disclosures "were printed in a non-bold,

non-capital, type size *smaller than* the other type in the notice. . ." is also neither well pled, nor

legally supported.  Disclosures "need not be in any particular type size or typeface, nor presented

in any particular manner."  12 C.F.R. § 226.32(c), Supp I, "32(c) Disclosures."  "Compliance

with [15 U.S.C. § 1639(a) and 12 CFR 226.32(c)] is satisfied when the creditor places all the

disclosures on one side of one document (unless there is not enough room) or groups the

disclosures together within the Federal Box."  *Leathers v. Peoria Toyota-Volvo,* 824 F. Supp.

155, 158 (C.D. Ill. 1993).  "'Clear and conspicuous' means, among other things, that the

disclosures must be presented in a way that does not obscure the relationship of the terms to each

other. 'Segregation of disclosures' means that the disclosures may appear on a separate sheet of

paper or may be set off from other information on the contract or other documents: by outlining

them in a box, by bold print dividing lines, by a different color background, by a different style

type."  *Id.* at 158 n.3 (citing 12 C.F.R. § 226.17(a)(1), Supp. I (1993)).  Each of the Plaintiffs'

loan files shows disclosures that conform to the well-accepted "federal box" format (*see*

---

[29]    The Bank Defendants are confident that no evidence will be adduced to support the averments that the acknowledgements were not authentic, but in light of *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180 (3d Cir. 2011), they do not rely upon the acknowledgements as a ground for dismissal under Rule 12.

Ex. ___), thereby satisfying the requirements of the statute and regulations issued pursuant thereto. *See* Exhibit 44.

> ### c.    TILA Does Not Require Disclosures About Prepayment Penalties

Contrary to Plaintiffs' contention, neither TILA nor HOEPA mandates lenders to notify borrowers that the law prohibits application of prepayment penalties to HOEPA loans. *See* 15 U.S.C. §1639(c). While Section 1639 prohibits the imposition of any prepayment penalty on a HOEPA loan, it does not mandate any disclosures about the same.

> ### d.    As Assignees, RFC And IUBT Are Not Liable For Disclosure Violations Not Apparent On The Face Of The Disclosures

Plaintiffs' TILA and HOEPA claims against RFC and IUBT are not based on alleged misdeeds by RFC and IUBT. Rather, Plaintiffs assert that HOEPA makes assignees like RFC and IUBT strictly liable for the alleged misconduct of others, whether or not the assignee knows – or is even capable of knowing – about the misconduct. While there is a split of authority among courts (and no guidance from the Third Circuit) as to whether HOEPA imposes broad strict liability, the better reasoned line of authority holds that HOEPA does not go so far.

> ### (1)    The Plain Language Of The Statute Does Not Provide An Affirmative Cause Of Action Against Assignees For Latent Disclosure Violations By Original Lenders

By its terms, § 1641(d)(1) does not provide a borrower with an affirmative cause of action against a loan assignee but only limits the rights of the assignee in the notes and instruments that it acquires, rendering the assignee subject to the claims and defenses that could otherwise be asserted against any "ordinary" (not in due course) holder in defense against the assignee's efforts to enforce the loan.

HOEPA amends TILA, 15 U.S.C. § 1601, *et seq.* to define a class of non-purchase, non-construction, closed-end loans with high interest rates or upfront fees as "High

Cost Mortgages." *See* 15 U.S.C. § 1602(aa).  In part, HOEPA imposes additional disclosure

obligations and substantive restrictions on High Cost Mortgages.  15 U.S.C. § 1639.  HOEPA

also "eliminates 'holder-in-due course' protections for assignees of High Cost Mortgages,"

which would otherwise allow an assignee to bring an action to enforce a HOEPA loan against a

borrower without regard to defenses the borrower would have had against the original lender.

*See* S. Rep. No. 103-169, at 25 (1993), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1912.

Specifically, HOEPA provides:

> (d) Rights upon <u>assignment</u> of certain mortgages, (1) In general
> any person who purchases or is otherwise assigned a mortgage
> referred to in section 1602(aa) of this title shall be subject to all
> claims and defenses with respect to that mortgage that the
> consumer could assert against the creditor of the mortgage, unless
> the purchaser or assignee demonstrates, by a preponderance of the
> evidence, that a reasonable person exercising ordinary due
> diligence, could not determine, based on the documentation
> required by this subchapter, the itemization of the amount
> financed, and other disclosure of disbursements that the mortgage
> was a [High Cost Mortgage] referred to in section 1602(aa) of this
> title. The preceding sentence does not affect rights of a consumer
> under subsection (a), (b), or (c) of this section or any other
> provision of this subchapter. HOEPA, Pub. L. 103-325, Title 1, §
> 153(c), 108 Stat. 2195 (Sept. 23, 1994),

In contrast to Section 1641(d)(1), which says nothing about a borrower's

affirmative right to bring a cause of action against assignees, several other provisions of § 1641

explicitly confer affirmative rights on borrowers as against assignees.  These provisions,

however, limit affirmative claims against assignees for violations of § 1641 by the original

lenders to situations where the violation is apparent on the face of the disclosure document.

Specifically, § 1641(a) provides, in relevant part:

> Except as otherwise specifically provided in this subchapter, any
> civil action for a violation of this subchapter or proceeding under
> section 1607 of this title which may be brought against a creditor
> may be maintained against any assignee of such creditor only if the
> violation for which such action or proceeding is brought is

apparent on the face of the disclosure statement, except where the assignment was involuntary . . .

Section 1641(e) contains a nearly identical limitation with regard to claims against a creditor regarding a consumer credit transaction secured by real estate ("Except as otherwise specifically provided in this subchapter, any civil action against a creditor for a violation of this subchapter . . . may be maintained against any assignee of such creditor only if – (a) the violation . . . is apparent on the face of the disclosure statement . . . and (b) the assignment . . . was voluntary."). Reading Section 1641(d)(1) to create a broad cause of action would be inconsistent with these provisions.

Nothing in § 1641(d) enlarges the scope of affirmative claims that may be brought against an assignee, based on the alleged misconduct of the original lender. Subsection (d) is entirely focused on the rights of the assignee, rather than those of the borrower. Both the subsection's heading (which expressly refers to "[r]ights upon assignment of certain mortgages") and its subject ("[a]ny person who purchases or is otherwise assigned a mortgage referred to in section 1602(aa)") are focused on the assignee's rights regarding the loan, not the borrower's right to bring claims for damages. The final sentence of Section 1641(d)(1) reinforces that the section addresses the rights of the assignee, rather than the consumer borrower when it states the provision "***does not affect rights of a consumer*** under subsection (a), (b), or (c) of this section or any other provision of this subchapter" (emphasis added).

The plain language of subparts § 1641(d)(2) and (3) further belies any contention that § 1641(d)(1) creates an affirmative right of action against assignees beyond the scope of those actions otherwise authorized against an assignee under federal or state law. Section 1641(d)(2) places strict limits on damages in (1) an action against an assignee under §§ 1640 and 1641(a) "based upon" a violation of TILA and (2) "all other causes of action" that are authorized

against assignees by federal or state law and "made permissible" by the elimination of holder-in-due-course protections under § 1641(d)(1).  Section 1641(d)(3) additionally provides that damages against assignees for any TILA violations shall offset any damages for all other causes of action.  The language of both provisions thus reinforces the conclusion that § 1641(d)(1) eliminates special holder-in-due-course protections but does not create any new affirmative right of action against assignees beyond the scope of those rights of action otherwise authorized against an assignee under federal or state law.

The TILA provisions cited above, as well as another provision in §1640(a) that provides that "any creditor who fails to comply with any requirement imposed under [15 U.S.C. part B] with respect to any person is liable to such person in an amount equal to the sum of. . . ." show that when Congress intends to authorize a right of action by a borrower, it does so unequivocally, not obliquely.  Comparison of the differences between the text of these provisions and § 1641(d)(1) belies Plaintiffs' claim that Congress intended §1641(d)(1) to authorize an affirmative right of action by borrowers against HOEPA loan assignees.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (when Congress "uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended").

In sum, because the plain language of TILA, as amended by HOEPA, only delineates the rights of assignees of HOEPA loans and eliminates "holder-in-due course" protections, and does not independently provide a borrower with an affirmative right of action, TILA claims against RFC and IUBT for alleged latent disclosure violations by the original lenders must be dismissed.[30]  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our

---

[30]    Only Plaintiffs' claims relating to untimely disclosures where the date of the disclosure reflected on the document was less than three business days before the closing and the failure of certain disclosures to be sufficiently "conspicuous" fall into the category of

(continued...)

inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"); *Gov't of the V.I. v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993); *see also Sigmon Coal Co. v. Apfel*, 226 F.3d 291, 305 (4th Cir. 2000), *aff'd, Barnhart v. Sigmon Coal Co.*, 534 U.S. 438 (2002) (There exists a "strong presumption that Congress expresses its intent through the language it chooses. Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.") (citation and internal quotations marks omitted).

### (2)    The Legislative History Confirms That There Is No Such Cause Of Action

Even if the Court elects to look beyond the plain language of the statute, that contextual look confirms that § 1641(d)(1): (1) delineates the rights of HOEPA loan assignees; (2) eliminates "holder-in-due-course" protections; but (3) does not authorize an affirmative cause of action for a borrower.

When Congress enacted HOEPA in September 1994, it did so against a backdrop of nearly uniform state commercial laws. Numerous states had enacted UCC provisions that provided holders in due course with special protections from claims as well as defenses by expressly addressing (1) the rights of an assignee/holder of a negotiable instrument to enforce obligations to pay the instrument and (2) the possible "claims" that the borrower/obligor could raise in an enforcement action to reduce or avoid payment on the instrument. For example, the 1972 versions of §§ 3-305 and 3-306 addressed the enforcement of notes and other instruments and provided in pertinent part as follows:

---

(...continued)
claims based on disclosure violations that are apparent from the face of the disclosure documents. As described in Section III(C)(3)(c), *supra*, those claims are clearly time-barred, in any event.

UCC § 3-305. Rights of a Holder in Due Course. To the extent that a holder is a holder in due course *he takes the instrument free from* (1) *all claims to it* on the part of any person; *and* (2) *all defenses* of any party to the instrument with whom the holder has not dealt except . . . (emphasis added).

UCC § 3-306. Rights of One Not Holder in Due Course. Unless he has the rights of a holder in due course *any person takes the instrument subject to* (a) *all valid claims to it* on the part of any person; and (b) *all defenses* of any party which would be available in an action on a simple contract . . . (emphasis added).

UCC § 9-318(1) similarly referred to an assignee's ability to enforce obligations

to pay by reference to both defenses and *claims* arising from the obligation itself:

(1) Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in § 9-206 *the rights of an assignee are subject to* (a) all the terms of the contract between the account debtor and assignor and *any defense or claim* arising therefrom; and (b) *any other defense or claim* of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment. (emphasis added).

At the time of HOEPA's enactment, the prevailing case law interpreting the

existing UCC provisions also established that the statutory language concerning "any" and "all"

"claims": (1) referred to the possible recoupment claims that an obligor could raise in an

enforcement action to reduce or avoid payment on the instrument; and (2) did *not* create any

affirmative right of action against an assignee or alter established statutory or common law rules

requiring that an assignee's contractual assumption of a lender's liabilities had to be express.

*See, e.g., Murr v. Selag Corp.*, 747 P.2d 1302, 1309 (Idaho Ct. App. 1987) (notwithstanding

being "subject to" claims, under former UCC § 3-306 the obligor cannot make affirmative claims

for damages against the note assignee based upon some tort or breach of contract by the original

payee); *Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston*, 666 F.2d 673, 677-80 (1st

Cir. 1981) (the reference in former UCC § 9-318(1)(a) to an assignee's being subject to claims

does not create affirmative rights against an assignee); *see also Hawkland & Lawrence, UCC Series* § 3-301:1 (1999) ("[Former] Section 3-306 sets forth the claims . . . available to the obligor *to defeat recovery* by a party not having the rights of a holder in due course.") (emphasis added).

    *United Overseas Bank v. Veneers, Inc.*, 375 F. Supp. 596, 606-10 (D. Md. 1974), illustrates the prevailing view. There, in analyzing the original version of UCC § 3-306, the court noted that there existed a defensive claim of recoupment (in which the obligor resists an enforcement action of an assignee based on a claim against the assignor arising from the same transaction that gives rise to the enforcement action) and a defensive claim of setoff (which may be based on a claim extrinsic to the transaction underlying the assignee's claim against the obligor). *Id.* at 606 n.1A. *United Overseas Bank's* holding – that an obligor may assert a claim of recoupment but may not assert a claim for a setoff under Maryland's UCC, *id.* at 609-10 – shows why (1) statutory language under the UCC concerning "all claims" was understood to refer to the possible recoupment claims that the obligor could raise in an enforcement action to reduce or avoid payment on the instrument, and (2) such statutory language did not create any affirmative claim by an obligor against an assignee.

    The legislative history of Section 1641(d)(1) also confirms that it was only intended to eliminate holder-in-due-course protections. According to the Senate report on the HOEPA legislation, the amendment to 15 U.S.C. § 1641(d) "eliminates *'holder in due course' protections* for assignees of High Cost Mortgages." S. Rep. No. 103-169, at 28 (emphasis added), *reprinted in* 1994 U.S.C.C.A.N. 1881, 1912; *see also* H.R. Conf. Rep. No. 103-652, at 127 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1977, 1993 (15 U.S.C. § 1641(d) "eliminates holder-in-due-course protections for purchasers and assignees" of High Cost Mortgages).

The Senate report further shows that Congress sought to calibrate the amendment to 15 U.S.C. § 1641(d) to "ensure that the High Cost Mortgage market polices itself" without "significantly restrict[ing] the flow" of credit for HOEPA-qualifying loans.  S. Rep. No. 103-169, at 28.  Both interests are served and balanced by reading the text of § 1641(d)(1) to eliminate the special protections that a holder in due course has, but these interests would be disrupted and unbalanced by Plaintiffs' construction of the statute as creating new strict liability actions against any assignee.

Interpreting Section 1641(d)(1) to be limited to eliminating holder in due course defenses leaves that provision with a significant effect on assignees purchasing loans.  An assignee trying to enforce a HOEPA loan is now subject, in any action to enforce that note, to the defenses in § 3-305(a)(2), and the defensive claims in recoupment described in § 3-305(a)(3), regardless of its status as a holder-in-due-course, (when, without § 1641(d)(1), the holder in due course would take free from those defenses and recoupment claims in an enforcement action).  Furthermore, where some other underlying state law (a) provides a right of action against an assignee for a lender's conduct but (b) provides a holder in due course with a defense to that cause of action, § 1641(d)(1) may remove that defense for assignees of HOEPA loans.  By eliminating special holder-in-due-course protections in this way for HOEPA loans, § 1641(d)(1) creates the economic incentive for self-regulation of HOEPA mortgage lending intended by Congress, without threatening to significantly restrict the flow of credit for HOEPA loans.

(3)   **Multiple Courts Have Held That § 1641(d) Does Not Create A Right To Sue Assignees For Non-Apparent Violations By The Original Lender**

In numerous cases, courts have analyzed § 1641(d)(1) and concluded that it simply eliminates potential holder-in-due-course protections and does **not** authorize a right of action against assignee defendants for lenders' violations of other state and federal statutes.[31]

For example, an Illinois circuit court dismissed TILA, RESPA, and Illinois Consumer Fraud Act counterclaims against a mortgage assignee predicated on § 1641(d)(1). *See Bank of New York v. Heath*, No. 98-CH-8721, 2001 WL 1771825 (Ill. Cir. Ct. Oct. 26, 2001), *aff'd on other grounds sub nom. U.S. Bank Nat'l Ass'n v. Clark*, 837 N.E.2d 74 (Ill. 2005). In reaching this result, the court noted that "[t]he language of subsection (1) provides in clear and unambiguous terms that assignees are subject to all claims and defenses under any law that a borrower could have asserted against the original lender. However, this provision merely eliminates the holder-in-due-course defense." *Id.* at *2 (emphasis and internal citation omitted); *accord Dowdy v. First Metro. Mortg. Co.*, No. 01C7211, 2002 WL 745851 (N.D. Ill. Jan. 29, 2002) (dismissing a state-law claim against a mortgage assignee predicated on 15 U.S.C. § 1641(d)); *Fulmore v. Premier Fin. Corp.*, Nos. JFM-09-2028 et al., 2010 WL 4286362 (D. Md. Oct. 29, 2010); *Vandenbroeck v. ContiMortgage Corp.*, 53 F. Supp. 2d 965, 968 (W.D. Mich. 1999) (ordering a remand to state court of an action predicated against a mortgage assignee predicated on 15 U.S.C. § 1641(d)); *Baker v. Century Fin.*, No. 01-0903, 2001 U.S. Dist. LEXIS 24320, at *7 (W.D. Mo. Nov. 19, 2001) (same); *Dash*, 248 F. Supp. 2d at 506 (granting motion to dismiss on standing grounds because defendant was neither the lender nor the assignee of the

---

[31]   As the Third Circuit recognized in *CBNV I*, there is a split of authority on this issue, and neither the Third Circuit nor the Supreme Court have weighed in on the question. *See* 418 F.3d at 334.

named plaintiff's loan and explaining that §1641(d) "is not intended to bestow any rights upon the borrower nor constitute an independent basis of liability. *By its terms, section 1641(d)(1) only applies if a plaintiff can assert a claim under some other law, and even then, it only affects a state law defense, that is the 'holder in due course' defense, which a defendant assignee might raise . . . .*") (internal citations omitted) (emphasis added); *Faircloth*, 313 F. Supp. 2d at 551 n.11 (same).

### G.    PLAINTIFFS' RICO CLAIMS FAIL AS A MATTER OF LAW

As one court within this Circuit recently noted, "'[b]ecause the mere assertion of a RICO claim . . . has an almost inevitable stigmatizing effect on those named as defendants, . . . courts should strive early to flush out frivolous RICO allegations at an early stage of litigation.'" *Grant v. Turner*, No. 09-2381, 2011 WL 1775682, at *7 (D.N.J. May 9, 2011) (quoting *Manhattan Telecomms. Corp. v. DialAmerica Mktg.*, 156 F. Supp. 2d 376, 380 (S.D.N.Y. 2001)). The court in *Grant* further admonished that "'courts must always be on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.'" 2011 WL 1775682, at *7 (quoting *Manhattan Telecomms.*, 156 F. Supp. 2d at 380).

The Third Circuit similarly has noted, "[a]s other courts have recognized, the concern expressed in *Twombly* is just 'as applicable to a RICO case, which resembles an antitrust case in point of complexity and the availability of punitive damages and of attorneys' fees to the successful plaintiff. RICO cases, like antitrust cases, are 'big' cases and the defendants should not be put to the expense of big-case discovery on the basis of a threadbare claim.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) (quoting *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008)).

1.    **Plaintiffs' RICO Claims Under Section 1962(c) Are Defective As
Against The Banks Because Plaintiffs Have Not Alleged That The
Banks "Conducted" The Affairs Of Any RICO Enterprise**

"To plead a RICO claim under sec. 1962(c), 'the plaintiff must allege (1) conduct

(2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *In re Ins. Brokerage*

*Antitrust Litig.*, 618 F.3d at 363 (quoting *Lum*, 361 F.3d at 223).

Plaintiffs have failed to plead the "conduct" element of the RICO claim with

respect to the Banks.  Under *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993), the "conduct"

element of a RICO claim requires allegations that the defendant participated in the "operation

and management" of the alleged RICO enterprise itself.  As one court within this Circuit recently

explained:

> This "operation and management test" is considered "very difficult
> to satisfy." *Amsterdam Tobacco Inc. v. Philip Morris, Inc.*, 107
> F.Supp.2d 210, 216 (S.D.N.Y. 2000) (internal quotation marks and
> citations omitted).  "[A]ction involving some degree of
> decisionmaking" does not necessarily "constitute [ ] participation
> in the affairs of an enterprise." *See Univ. of Md. at Baltimore v.
> Peat*, 996 F.2d 1534, 1538-39 (3d Cir. 1993).  As a result, a
> plaintiff's RICO claim is deficient where the plaintiff pleads only
> "the existence of a business relationship" between a defendant and
> a party with whom the defendant formed an enterprise. *In re Ins.
> Brokerage Antitrust Litig.*, 2007 WL 1062980 at *13 (citations
> omitted); *see also Univ. of Md. at Baltimore*, 996 F.2d 1534 at
> 1539 ("Simply because one provides goods or services that
> ultimately benefit the enterprise does not mean that one becomes
> liable under RICO as a result.").  Even a plaintiff that provides
> business services to an enterprise "with knowledge of the
> enterprise's illicit nature" does not automatically trigger RICO
> liability. *See Goren v. New Vision Intern., Inc.*, 156 F.3d 721, 728
> (7th Cir. 1998) (citation omitted).

*Crete v. Resort Condos. Int'l*, No. 09-5665, 2011 WL 666039, at *9 (D.N.J. Feb. 14, 2011).  As

the Supreme Court further explained in *Reves* itself, liability under RICO "depends on showing

that the defendants conducted or participated in the conduct of the ***enterprise's*** affairs, not just

their ***own*** affairs." 507 U.S. at 185 (emphasis in original).

The Third Circuit has made clear that the *Reves* test applies at the Rule 12(b)(6) stage. *Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993) ("We see no reason why we should not apply the *Reves* test on a motion to dismiss.").

Here, Plaintiffs allege no facts to demonstrate that CBNV or GNBT operated or managed any alleged enterprise. Rather, a fair reading of the CAC and the RICO Case Statement makes clear that the alleged enterprises were operated and managed entirely by the Shumway brothers and Bapst. Plaintiffs allege that the Shumway brothers and Bapst "conceived what was to become a massive mortgage fraud scheme." (CAC ¶ 61). Plaintiffs' RICO Case Statement similarly states that "[t]he predatory lending scheme was substantially designed and implemented with the financial assistance of the Investors *by David Shumway, DeVan Shumway, Chris Shumway, and Randy Bapst, who are collectively referred to as the Shumway/Bapst Organization*." (Pls.' RICO Case Stmt. at 19) (emphasis added).

Plaintiffs further allege: "The Shumway brothers and Mr. Bapst created multiple business forms though which they ultimately referred the loans. The form and/or names of these entities was changed as part of the Shumway/Bapst Organization's effort to stay one step ahead of the Virginia state banking regulators. . . ., including their ultimate effort to avoid the reach of the Virginia regulators altogether through a relationship with Florida-domiciled national bank GNBT." (CAC ¶ 64). The RICO Case Statement additionally asserts that the Shumway/Bapst Organization "was integrally involved as the principal owners and operators of" the various title companies and other entities that were "formed in connection with the predatory lending scheme." (Pls.' RICO Case Stmt. at 21).[32]

---

[32]    The RICO Case Statement goes on to list the following entities: EquityPlus Financial, LLC; EquityPlus Financial, Inc.; Equity Guaranty, LL; Equity Guaranty Holdings, Inc.;

(continued...)

Far from operating or managing the alleged enterprises, the Banks were, as alleged in the CAC and RICO Case Statement, just pawns in the alleged game of the Shumway/Bapst Organization.  The CAC alleges that "[t]he business plan specifically contemplated that the Shumway/Bapst Organization would *target* a financially distressed bank" (CAC ¶ 66) (emphasis added), and the remaining allegations of the CAC clearly state that the Shumway/Bapst Organization called the shots, leaving the Banks with no operation or management responsibilities of the alleged enterprises.  For example, the CAC alleges that the Shumway/Bapst Organization "required that the Banks would use title companies controlled by the Shumway/Bapst Organization to extract additional excessive and unearned fees from the borrowers."  (*Id.* ¶¶ 66, 67).

Indeed, the fact that CBNV was seamlessly replaced by GNBT in the identical alleged scheme demonstrates that the particular bank used by the alleged Shumway/Bapst Organization was irrelevant.  As the RICO Case Statement itself states, there were "substantively identical enterprises [the first involving CBNV, and the second involving GNBT] conducting the same types of predicate acts of racketeering on the same scale, based upon the same structure, scheme and design."  (Pls.' RICO Case Stmt. at 143).  The interchangeability of the Banks in the alleged scheme further proves that the Banks had no responsibility for operating or managing the alleged enterprises.  Rather, the Shumway/Bapst Organization – which was the common denominator in *both* the alleged CBNV enterprise *and* the alleged GNBT enterprise – clearly was in charge of operating and managing the alleged enterprises' affairs.  Thus, under Plaintiffs'

---

(...continued)
   Mediapro, LLC; Title America, LLC; USA Settlements, LLC; USA Settlements Holdings
   Inc.; USA Title, LLC; Save Banc Holdings, Inc.; Calusa Investments.

own averments the Banks' role in the alleged scheme was limited to conducting their own affairs

– *i.e.*, making loans to borrowers, and then selling the loans on the secondary market.

    *Vandenbroeck v. Commonpoint Mortgage Co.*, 22 F. Supp. 2d 677 (W.D. Mich.

1998), involved facts similar to those here and is instructive. There, a lender (CommonPoint)

was alleged to have charged borrowers loan discount fees without providing discounts on the

loan's interest rate, and then profiting on the loans by "upsell[ing] them for a "back end fee" to

investors. *Id.* at 680. Plaintiffs alleged the existence of a RICO enterprise consisting of

CommonPoint "with the investors and lenders who purchased the loans made by CommonPoint.

. . ." *Id.* at 682. After discussing the *Reves'* operation and management test, the court concluded

as follows:

> Beyond this naked allegation of participation by Defendants,
> Plaintiffs have not alleged any specific fact showing that
> CommonPoint or Anderson participated in conducting the alleged
> enterprise's affairs. To the extent the second amended complaint
> alleges that Defendants participated in the conduct of any affairs,
> ***those allegations show only that Defendants were engaged in
> conducting CommonPoint's affairs in arranging loans for its
> customers rather conducting the affairs of an alleged enterprise.***

*Id.* at 684 (emphasis added). The *Vandenbroeck* court thus dismissed the RICO claim on a Rule

12(b)(6) motion. The same result is urged here.

    Also instructive is *Wit v. Firstar Corp.*, 879 F. Supp. 947 (N.D. Iowa 1995).

There, an individual named Morken allegedly engaged in a cattle investment scheme in which he

solicited investors while failing to disclose the insolvent financial condition of his operation. *Id.*

at 956. The plaintiffs asserted RICO claims against a number of banks that provided the

financing for Morken's operation, as well as financing for the investors' cattle purchases. *Id.* at

957-59. Although the plaintiffs alleged that the banks engaged in numerous types of misconduct

that permitted Morken's scheme to exist, the *Wit* court, relying on the operation and management

test from *Reves*, nevertheless held that the banks' activities merely constituted the banks' own

affairs, and not that of Morken's alleged RICO enterprise. The court reasoned as follows:

> The court concludes that plaintiffs have not alleged that defendants
> participated in the conduct of Morken's RICO enterprise itself.
> Rather, ***they have alleged only that defendants conducted that
> enterprise's banking scheme***. As alleged, the court concludes that
> defendants' conduct was one step removed from management of
> the RICO enterprise itself, and thus liability will not lie under
> § 1962(c). This is not to say that plaintiffs have necessarily failed
> to allege that defendants' conduct was wrongful, either because it
> might be contrary to acceptable banking practices, fraudulent, or
> otherwise tortious. However, that conduct, if wrongful, is not
> cognizable under RICO's § 1962(c). Defendants have not been
> alleged to have had some part in directing the affairs of Morken's
> enterprise itself; rather, they have been alleged to have had some
> part only in directing conduct of the "banking scheme."

*Id.* at 965 (emphasis added). The *Wit* court further noted that "even provision of services

essential to the operation of the RICO enterprise itself is not the same as participating in the

conduct of the affairs of the enterprise." *Id.* at 966.

In sum, in the absence of any allegations demonstrating that the Banks operated

and managed the alleged enterprises, the RICO claims against them are deficient and require

dismissal.

> **2.    Plaintiffs' RICO Conspiracy Claim Under Section 1962(d) Fails As A
> Matter Of Law Against The Banks Because The Alleged Substantive
> RICO Violation Is Deficient**

Because Plaintiffs' substantive RICO claims under Section 1962(c) fail, so too do

their RICO conspiracy claims under Section 1962(d). *See Lightning Lube v. Witco Corp.,* 4 F.3d

1153, 1188, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to

violate the other subsections of section 1962 necessarily must fail if the substantive claims are

themselves deficient").

**3.     Plaintiffs' RICO Claims Against RFC And IUBT Fail For Additional Reasons**

Plaintiffs' RICO claims against RFC and IUBT are even more tenuous, given that

RFC and IUBT were yet another step removed from the alleged wrongdoers, and Plaintiffs have

failed to identify acts by RFC or IUBT that would violate RICO.[33]   The CAC largely attempts to

disguise the lack of allegations about conduct by RFC and IUBT by referring to the

"Defendants" as an undifferentiated group, but their RICO Statement pursuant to Local Rule 7.1

makes clear that they cannot point to a single act of misconduct by RFC or IUBT.

**a.     Plaintiffs' RICO Claims Against RFC Fail**

Review of the more than 260 pages of allegations contained in Plaintiffs' CAC

and their RICO Statement reveals that Plaintiffs have identified only six things that RFC

supposedly did, none of which supports a RICO claim.   Specifically, all Plaintiffs assert is that

RFC:

> 1.     "facilitated and supported the endeavor" by purchasing the loans and,
> thereby, provided the banks with funds that supposedly allowed them to continue
> the alleged scheme (CAC ¶¶ 502, 506, 508; Pls.' RICO Case Stmt. at 7, 35, 140);
>
> 2.     gained access to the loan files (which loan files Plaintiffs argue in their
> tolling arguments concealed the alleged misconduct) as well as certain "financial
> statements" of the banks as a result of its purchase of the loans (Pls.' RICO Case
> Stmt. at 140);
>
> 3.     committed "mail fraud" by corresponding with David Shumway in July
> 2002 – after Plaintiffs' Complaint alleges that the relationship between GNBT
> and RFC had "deteriorated" because "RFC had become increasingly concerned
> about GNBT's loan origination practices"  (CAC ¶ 102) – "related to the

---

[33]     Plaintiffs' alternative claim that they need not meet the elements of a RICO claim against
RFC or IUBT because RFC and IUBT are vicariously liable for RICO violations by the
original lenders (CAC ¶ 502) is baseless for the reasons described in Section III(G)(3)
above.  To Defendants' knowledge, no court has ever imposed vicarious liability for a
RICO violation under such a theory.

repurchase of loans that RFC had returned to GNBT and loan production offices"
(Pls.' RICO Case Stmt. at 56);

4.    committed "wire fraud" by acknowledging in a call with an attorney who
Plaintiffs characterize as representing RFC[34] that certain borrowers on loans
purchased by RFC had been charged "excessive" title fees (which fees were not
imposed by RFC and had already been charged by the time that RFC purchased
the loans) (Pls.' RICO Case Stmt. at 56-57);

5.    committed "wire fraud" by sending a letter to GNBT, after concerns about
compliance had been raised about an RFC review of GNBT's operations (Pls.'
RICO Case Stmt. at 60); and

6.    committed "wire fraud" by sending a letter to GNBT, after several
lawsuits had been filed, suspending GNBT's participation in the RFC loan
program (Pls.' RICO Case Stmt. at 60).

None of these allegations supports a claim that RFC was engaged in racketeering or that it

conspired in racketeering.

### b.    Plaintiffs' RICO Claims Against IUBT Also Fail

Likewise, the very *few* allegations in the RICO Case Statement concerning IUBT

fail to support Plaintiffs' conclusory *assertion* that IUBT was engaged in racketeering or a

conspiracy to commit racketeering.  Plaintiffs' RICO Case Statement merely asserts as to IUBT

that it:

- "[P]rovided CBNV and GNBT with operating capital necessary to fund
the predatory, HOEPA loans and its commitment to purchase loans
originated by predatory lending scheme;" (Pls.' RICO Case Stmt. at 12);[35]

- [W]ire[d] funds ... after the loans were purchased"; (*Id.* at 31);

---

[34]    The attorney, in fact, represented GNBT, not RFC, in negotiations about whether RFC
would purchase additional loans from GNBT after allegations of non-compliance had
been raised.

[35]    This marks the first time that any of the Plaintiffs have alleged that IUBT provided
capital to or purchased loans from GNBT, and there is no basis to believe that it did.
Notably, the Plaintiffs allege in the very next sentence that IUBT purchased loans from
CBNV (not GNBT).

- "[S]en[t] monthly invoices to the Class members"; (*Id.*); and

- "[C]ollect[ed] … the Class members' monthly loan payments." (*Id.*).

In addition, on page 58 of the RICO Case Statement, Plaintiffs assert that two

IUBT employees *emailed* CBNV "noting issues with 'Section 32 notices' and other 'violations

of Section 32,'" and the need for "procedures to evidence proper delivery of Section 32 Notices."

Yet, rather than reflecting that IUBT was participating in alleged notice violations under Section

32, these allegations (the only specific allegations relating to IUBT's conduct) reflect that IUBT

was insisting on *compliance* with Section 32.

Notably, in the charts of alleged "predicate acts," "misrepresentations,"

"participants" and "persons" underlying each Plaintiff's RICO claim (see Pls.' RICO Case Stmt.

at 37-136), those sections relating to the Nixon and Hobson loans (the only loans assigned to

IUBT) do not identify IUBT as a "participant" in any of the "predicate acts" underlying their

RICO claims, or as a "person who made [a] misrepresentation[ ]" to them.  Nor are any of the

"predicate acts" or "misrepresentations" outlined by Plaintiffs in their RICO Case Statement

regarding the Nixon or Hobson loans attributed to IUBT. *See id.* at 46, 71-74, 107-09, 113-15).

Thus, none of the Plaintiffs' allegations supports a claim that IUBT was engaged

in racketeering or a conspiracy to commit mail or wire fraud or any illegal action.

**c.    Plaintiffs Have Failed To Plead That RFC And IUBT
Conducted A RICO Enterprise**

Plaintiffs' CAC and corresponding RICO Case Statement are devoid of *any*

factual support that RFC and IUBT had knowledge of or participated in any conduct of a RICO

enterprise.  At most, their RICO Statement can be read to assert that RFC and IUBT may have

learned of the alleged misconduct after the fact.  (Pls.' RICO Case Stmt. at 56-60).

Plaintiffs' claim that RFC and IUBT "conducted" the enterprise by engaging in lawful business activity that supposedly provided funds to a RICO enterprise has been repeatedly rejected by courts around the country. *See Univ. of Md.,* 996 F.2d at 1539; *Bancoklahoma Mortg. Corp. v. Capital Title Co.,* 194 F.3d 1089, 1101 (10th Cir. 1999); *Albright v. Atty's Title Ins. Fund,* 504 F. Supp. 2d 1187, 1205 (D. Utah 2007). In addressing such allegations, courts emphasize the important distinction between a lender conducting its own affairs as a creditor and a lender taking additional steps as an outsider to direct the operation or management of the RICO enterprise. *See Dahlgren v. First Nat'l Bank of Holdrege,* 533 F.3d 681, 690 (8th Cir. 2008) ("Bankers do not become racketeers by acting like bankers.") (quoting *Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 981 (8th Cir. 1991)). In *Dahlgren,* the plaintiffs, cattle investors, brought RICO claims against the primary lender for a feedlot operator. *Id.* at 686. The *Dahlgren* plaintiffs' allegations focused on the bank's activities of managing accounts, participating in lines of credit, and commingling and transferring funds. *Id.* at 690. The bank's alleged activities, however, fell within the category of a creditor conducting its own affairs. *Id.* at 689-90. The court emphasized that it "must carefully distinguish between the bank conducting its own affairs as creditor, and the bank taking additional steps as an outsider to direct the operation or management of its customer, the RICO enterprise." *Id.* at 690. Without more, the court found the creditor's activities to be insufficient evidence that the bank "engaged" in "a pattern of racketeering activity." *Id.* at 692. Accordingly, the plaintiffs' RICO claims in *Dahlgren* were dismissed. *Id.*

This case is no different than *Dahlgren.* Here, too, Plaintiffs have done no more than allege that RFC and IUBT engaged in the normal business activity of a party purchasing loans. In their RICO Case Statement, Plaintiffs suggest that RFC "knew the precise extent to

which every borrower was being defrauded in connection with the loans at issue." Yet, every single allegation of such "knowledge" is simply a boilerplate recitation of activities that are all consistent with *normal* lending or loan purchase practices:

- [RFC's] "regular presence" at the offices where the loans at issue were being solicited, referred and originated. (Pls.' RICO Case Stmt. at 140).

- [RFC's] audits of the financial statements of CBNV and GNBT. (*Id.*)

- [RFC's] receipts of all of the original loan files, including the final HUD-1 Settlement Statements, when it purchased the loans at issue. (*Id.*)

- [RFC's] pre-approval of the loans that it was purchasing. (*Id.*)

- [RFC's] post-purchase funding review of the loans. (*Id.*)

Plaintiffs' allegations against IUBT are equally scant as reflected in the above quoted allegations concerning IUBT in the RICO Statement.

Even if RFC and IUBT engaged in each of these alleged activities, these allegations only describe actions consistent with that of a traditional creditor or loan purchaser. RFC purchased closed mortgage loans from CBNV and GNBT, and IUBT merely purchased loans from CBNV, but neither are alleged to have participated in any of the fee setting arrangements or agreements.

Neither RFC nor IUBT are alleged to have participated in the operation or management of any enterprise. Plaintiffs merely insist that without the infusion of capital from RFC and IUBT, the enterprise would have faltered. (CAC ¶¶ 506-08). It is well-settled that a plaintiff does not meet the element of participation in the management or operation of a RICO enterprise simply by alleging that a defendant possesses substantial, persuasive power to impact the enterprise. *See Vickers Stock Research Corp. v. Quotron Sys.*, No. 96 CIV 2269, 1997 U.S. Dist. LEXIS 10837 (S.D.N.Y. July 22, 1997); *Morin v. Trupin*, 835 F. Supp. 126, 135-36 (S.D.N.Y. 1993). While RFC and IUBT purchased closed loans, there is no allegation that they

directed, controlled, or managed any operations of either of the banks or of the "Shumway/Bapst Organization." Plaintiffs do not allege any specific facts showing how RFC or IUBT was involved in any of the alleged fraudulent acts or "enterprise" racketeering activities. Thus, for all of these reasons, Plaintiffs have failed to plead conduct to sustain a RICO claim against RFC and IUBT, and it therefore must be dismissed.

**d.    The CAC Fails To Adequately Plead A Claim For RICO Conspiracy**

Plaintiffs invocation of the word "conspiracy" is not sufficient to bootstrap these weak allegations into a viable RICO claim against RFC and IUBT. In order to sustain a claim for RICO conspiracy under § 1962(d), Plaintiffs must plead: (1) knowledge of the corrupt enterprise's activities and (2) agreement to facilitate those activities. *Salinas v. United States*, 522 U.S. 52, 66 (1997). A general allegation of conspiracy is insufficient; rather, Plaintiffs must give factual support to support each element of their § 1962(d) claim. *Alfaro v. E.F. Hutton & Co.*, 606 F. Supp. 1100, 1117 (E.D. Pa. 1985); *see also Odesser v. Cont'l Bank*, 676 F. Supp. 1305, 1312 (E.D. Pa. 1987) (emphasizing that the "mere agreement to commit the predicate acts is not sufficient to support a charge of conspiracy under § 1962(d)" because the plaintiff must also allege "knowledge that those acts were part of a pattern of racketeering activity conducted in such a way to violate § 1962(a), (b), or (c)") (citing *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 792 n.8 (3d Cir. 1984)).

As the Supreme Court has clearly explained, the Federal Rules of Civil Procedure require a plaintiff to "provide the 'grounds' of his 'entitle[ment] to relief' [and set forth] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted) (first alteration in original). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face,'" the Court has explained. *Iqbal*, 129 S. Ct. at 1940 (quoting *Twombly*, 550 U.S. at 570). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (citing Fed. R. Civ. P. 8(a)(2)) (second alteration in original).

Here, as elsewhere, Plaintiffs have utterly failed to satisfy the requisite pleading standards. Disregarding the conclusory assertions against RFC and IUBT (as *Iqbal* and *Twombly* compel), the Court is left with factual allegations that are entirely consistent with the conclusion that RFC and IUBT had no knowledge of any misconduct at the time that such misconduct was supposedly occurring. The fact that they provided funds to the Banks as a result of a lawful business activity in purchasing closed loans does not show knowledge and agreement to facilitate a RICO enterprise.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court grant

their respective Motions to Dismiss.

Dated: November 8, 2011                    Respectfully submitted,

                                           */s/ K. Lee Marshall*
                                           K. Lee Marshall, Esquire
                                           Michael G. Biggers, Esquire
                                           Darci F. Madden, Esquire
                                           BRYAN CAVE LLP
                                           Two Embarcadero Center, Suite 1410
                                           San Francisco, CA 94111
                                           (415) 675-3400 (phone)
                                           (415) 675-3644 (facsimile)

                                           Thomas L. Allen, Esquire
                                           Roy W. Arnold, Esquire
                                           REED SMITH LLP
                                           225 Fifth Avenue, Suite 1200
                                           Pittsburgh, PA  15222

                                           *Attorneys For Defendant*
                                           *Residential Funding Company, LLC*

                                           */s/ Darryl J. May*
                                           Darryl J. May, Esquire
                                           Joel E. Tasca, Esquire
                                           BALLARD SPAHR LLP
                                           1735 Market Street, 51st Floor
                                           Philadelphia, PA  19103
                                           (215) 665-8500 (phone)
                                           (215) 864-8999 (facsimile)

                                           *Attorneys for Defendant*
                                           *PNC Bank, N.A.*

/s/ Virginia W. Barnhart
Virginia W. Barnhart
Federal Bar No. 03345 (MD)
TREANOR POPE & HUGHES, P.A.
29 W. Susquehanna Ave., Ste. 110
Towson, MD 21204
(410) 494-7777
Fax: (410) 494-1658
Email: vwbarnhart@tph-law.com

*Attorney for Defendant, Federal Deposit
Insurance Corporation, As Receiver for
Guaranty National Bank of Tallahassee
and Irwin Union Bank and Trust Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused a true and correct copy of the foregoing

Brief, to be served upon all counsel of record via ECF, and such document is available for

viewing and downloading from the ECF system.

Dated: November 8, 2011                    */s/ Darryl J. May*
                                      Darryl J. May

# APPENDIX A

GROUNDS FOR DISMISSAL THAT APPLY TO ALL DEFENDANTS

| Name | Failed to Schedule in Bankruptcy Court | RESPA and TILA/HOEPA Claims for Money Damages are Time-Barred | TILA/HOEPA Rescission Claim is Time-Barred | TILA/HOEPA Rescission Claim Fails Because Loan Has Been Paid Off | TILA/HOEPA Rescission Claim Fails Because Plaintiffs Failed To Tender | RESPA Kickback Allegations (re: Second Phase & QWR Phase) Fail | All Other RESPA Theories Fail | TILA/HOEPA Conspicuousness Allegation Fails | TILA/HOEPA Prepayment Penalties Allegation Fails | RICO Claim Under Section 1962(c) Fails | RICO Claim Under Section 1962(d) Fails |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Banez, Martin J. | ✓ | ✓ | ✓ | | ✓ | | | ✓ | ✓ | ✓ | ✓ |
| Brown, Melba L. | | | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Carter, Brian L. | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Clark, Robert A. & Rebecca A. | ✓ | | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Davis, Ruth J. | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Dorman, Mack & Robin | | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Drennen, John & Rowena | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Gaskin, Flora A. | | | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Haney, Stephen R. & Amy L. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Hobson, Cicil L. | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kelly (Parkinson), Rosa | | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kessler, Brian W. & Carla M. | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Kessler, Philip F. & Jeannie C. | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Krupiak, Edward R., Jr. | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Logan, Roy Lee & Ruthie Mae | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Mathis, Thomas T. | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Meek, Tina (aka Tina M. Boor) | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Miller, Nora H. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Montgomery, Richard E. | | | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Nixon, John A. Jr. & Kathy | | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Prasad, John J. & Rebecca J. | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Porco, Patrice | | | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Roberts, Jerome R. & Charretta L. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Sabo, William L. Jr. & Ellen M. | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Starkey, Shawn V. & Loreen A. | | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |
| Turner, Roger & Christie | ✓ | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Ulrich, Russell K. & Kathleen | ✓ | ✓ | ✓ | | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |
| Watson, Tammy & David | | ✓ | ✓ | ✓ | ✓ | | ✓ | ✓ | ✓ | ✓ | ✓ |

Case 2:03-cv-00425-GLL   Document 521    Filed 11/08/11    Page 116 of 121

ADDITIONAL GROUNDS FOR DISMISSAL THAT APPLY TO CBNV

| Name | Plaintiff Lacks Standing to Sue CBNV Because CBNV Did Not Make the Plaintiff's Loan | RESPA Kickback Allegations (re: First Phase) Fail | RESPA Kickback Allegations (re: Third Phase) Fail | RESPA Affiliated Business Arrangement Requirements Allegations Fail | All RESPA Claims Fail Because Received Loan From CBNV After Spring 2000 |
|---|---|---|---|---|---|
| Baratz, Martin J. | √ | | | | |
| Brown, Melba L. | | | | | √ |
| Cartee, Brian L. | √ | | | | |
| Clark, Robert A. & Rebecca A. | | | | | |
| Davis, Ruth J. | | | | | |
| Dorman, Mack & Robin | √ | | | | |
| Drennen, John & Rowena | √ | | | | √ |
| Gaskin, Flora A. | | | | | √ |
| Haney, Stephen R. & Amy L. | √ | | | | |
| Hobson, Clell L. | √ | | | | |
| Kelly (Parkinson), Rosa | √ | | | | |
| Kessler, Brian W. & Carla M. | | | | | |
| Kessler, Philip F. & Jeannie C. | | √ | | √ | |
| Kuszka, Edward R., Jr. | √ | | | | |
| Logan, Roy Lee & Ruthie Mae | √ | | | | |
| Mathis, Thomas T. | √ | | | | |
| Merl, Tina (aka Tina M. Boor) | | | | | |
| Miller, Nora H. | | | | | |
| Montgomery, Richard E. | √ | | | | |
| Nixon, John A. Jr. & Kathy | | | | | √ |
| Picard, John J. & Rebecca J. | | | √ | | |
| Porco, Patrice | √ | | | | |
| Roberts, Jerome R. & Charretta L. | √ | | | | |
| Sabo, William L. Jr. & Ellen M. | | | | | |
| Starkey, Shawn V. & Lorene A. | √ | | | | |
| Turner, Roger & Christie | | | | | |
| Ulrich, Russell K. & Kathleen | √ | | | | |
| Wasem, Tammy & David | | | | | √ |

Case 2:03-cv-00425-GLL    Document 1    Filed 11/08/11    Page 117 of 121

## Deficiencies Applicable to Claims Against FDIC-GNBT *

| Plaintiff | No Subject Matter Jurisdiction- Failure to File Claim*** | No Subject Matter Jurisdiction - Failure To Continue Claim*** | No Standing Due To Bankruptcy** | No Joinder of Necessary Party** | Claim Barred by Payment*** | Claim Barred By Prior Ruling*** | Prayers for Relief & Fees Barred By FIRREA and TILA*** | RESPA/TILA Claims Untimely As to GNBT*** | Fails to State RESPA/TILA/ HOEPA/RICO Claim vs. GNBT** |
|---|---|---|---|---|---|---|---|---|---|
| Baratz, Martin | X | | | | X | | X | | X |
| Cartee, Brian | X | | | | | | | | X |
| Clark, Robert & Rebecca | X | | X | | X | | X | X | X |
| Dorman, Mack & Robin | X | | | | X | | X | | X |
| Drennen, John & Rowena | | X | X | | X | X | X | X | X |
| Haney, Stephen & Amy | X | | X | | X | | X | X | X |
| Kruzka, Edward | X | | X | X | | | X | X | X |
| Logan, Roy & Ruthie | X | | | | X | | X | X | X |
| Mathis, Thomas | X | | X | | X | | X | X | X |
| Montgomery, Richard | | X | | X | X | | X | | X |
| Parkinson, Rosa Kelly | | X | | | | | X | X | X |
| Porco, Patricia | X | | | | X | | X | X | X |
| Roberts, Jerome & Charetta | | X | | | | | X | X | X |
| Starkey, Shawn & Lorene | X | X | X | | | X | X | X | X |
| Turner, Robert & Christie | X | | | | | | X | X | X |
| Ulrich, Russell & Kathleen | X | | X | | | | X | X | X |

*Plaintiffs listed on this chart are the only ones with GNBT originated loans.

**See arguments set forth in Defendants' Joint Memorandum in support of their Motions to Dismiss the Consolidated Complaint.

***See Arguments set forth in FDIC-IUBT Memorandum.

Case 2:03-cv-00425-GLL    Document 521    Filed 11/08/11    Page 118 of 121

## Deficiencies Applicable to Claims Against FDIC-IUBT *

| Plaintiff | No Subject Matter Jurisdiction - Failure To Continue Claim*** | No Standing Due To Bankruptcy** | Claim Barred by Payment*** | Prayers for Relief & Fees Barred By FIRREA and TILA*** | RESPA/TILA Claim Untimely As to IUBT** | Fails to State Claims under RICO/RESPA/TILA/HOEPA** |
|---|---|---|---|---|---|---|
| Hobson, Clell | X | X | | X | X | X |
| Nixon, John & Kathy | X | | X | X | X | X |

*Plaintiffs listed on this chart are the only ones with IUBT purchased loans

**See arguments set forth in Defendants' Joint Memorandum in support of their Motions to Dismiss the Consolidated Complaint.

***See Arguments set forth in FDIC-IUBT Memorandum.

ADDITIONAL GROUNDS FOR DISMISSAL THAT APPLY TO RFC

| Name | All Claims Not Based on Disclosure Violations Apparent on Face Fail | Plaintiff Lacks Standing to Sue RFC Because RFC Was Not Assigned the Plaintiff's Loan | Plaintiff's Claims Fail For Failure To Join Indispensable Parties | RESPA Kickback Allegations (re: First Phase) Fail | RESPA Kickback Allegations (re: Third Phase) Fail | RESPA Affiliated Business Arrangement Requirements Allegations Fail | All RESPA Claims Fail Because Received Loan From CBNV After Spring 2000 | Acknowledged that TILA/HOEPA Disclosures Were Timely Received |
|---|---|---|---|---|---|---|---|---|
| Baratz, Martin J. | ✓ | | | | | | | |
| Brown, Melba L. | ✓ | | | | | | | ✓ |
| Cartee, Brian L. | ✓ | | | | | | | |
| Clark, Robert A. & Rebecca A. | ✓ | | | | | | ✓ | |
| Davis, Ruth J. | ✓ | | | | | | | |
| Dorman, Mack & Robin | ✓ | | | | | | | |
| Drennen, John & Rowena | ✓ | | | | | | | ✓ |
| Gaskin, Flora A. | ✓ | | | | | | ✓ | ✓ |
| Haney, Stephen R. & Amy L. | ✓ | | | | | | | |
| Hobson, Clell L. | | ✓ | | | | | | |
| Kelly (Parkinson), Rosa | ✓ | | | | | | | ✓ |
| Kessler, Brian W. & Carla M. | ✓ | | | | | | | ✓ |
| Kessler, Philip F. & Jeannie C. | ✓ | ✓ | | | | ✓ | | |
| Kruszka, Edward R., Jr. | ✓ | | | ✓ | | | | |
| Logan, Roy Lee & Ruthie Mae | ✓ | | ✓ | | | | | ✓ |
| Mathis, Thomas T. | ✓ | | | | | | | |
| Merl, Tina (aka Tina M. Boor) | ✓ | | | | | | | ✓ |
| Miller, Nora H. | ✓ | | | | | | | ✓ |
| Montgomery, Richard E. | ✓ | | ✓ | | | | | ✓ |
| Nixon, John A. Jr. & Kathy | ✓ | ✓ | | | | | | |
| Picard, John J. & Rebecca J. | ✓ | | | | ✓ | | | |
| Ponco, Patrice | ✓ | | | | | | | ✓ |
| Roberts, Jerome R. & Charretta L. | ✓ | | | | | | | ✓ |
| Sabo, William I., Jr. & Ellen M. | ✓ | | | | | | | |
| Starkey, Shawn V. & Lorene A. | ✓ | | | | | | | |
| Turner, Roger & Christie | ✓ | | | | | | | ✓ |
| Ulrich, Russell K. & Kathleen | ✓ | | | | | | | ✓ |
| Wasem, Tammy & David | ✓ | | | | | | ✓ | |

EXHIBITS TO BRIEF OF DEFENDANTS RESIDENTIAL FUNDING COMPANY, LLC,
PNC BANK, N.A., AND FEDERAL DEPOSIT INSURANCE CORP. AS RECEIVER FOR
GUARANTY NATIONAL BANK OF TALLAHASSEE AND AS RECEIVER FOR
IRWIN UNION BANK AND TRUST COMPANY IN SUPPORT OF THEIR MOTIONS
TO DISMISS

## Table of Contents

|  | Exhibit |
|---|---|
| Boor Bankruptcy Records | 1 |
| Brown Bankruptcy Records | 2 |
| Clark 2007 Bankruptcy Records | 3 |
| Clark 2009 Bankruptcy Records | 4 |
| Davis Bankruptcy Records | 5 |
| Drennen 2004 Bankruptcy Records | 6 |
| Drennen 2005 Bankruptcy Records | 7 |
| Haney Bankruptcy Records | 8 |
| Hobson Bankruptcy Records | 9 |
| Kruszka Bankruptcy Records | 10 |
| Mathis Bankruptcy | 11 |
| Miller 2003 Bankruptcy Records | 12 |
| Miller 2009 Bankruptcy Records | 13 |
| Sabo Bankruptcy Records | 14 |
| Starkey Bankruptcy Records | 15 |
| Ulrich Bankruptcy Records | 16 |
| Baratz Mortgage and Release Records | 17 |
| Boor Mortgage and Release Records | 18 |
| Brown Mortgage and Release Records | 19 |
| Cartee Mortgage and Release Records | 20 |
| Clark Mortgage and Release Records | 21 |
| Davis Mortgage and Release Records | 22 |
| Dorman Mortgage and Release Records | 23 |
| Drennen Mortgage and Release Records | 24 |
| Gaskin Mortgage and Release Records | 25 |
| Haney Mortgage and Release Records | 26 |
| Hobson Mortgage and Release Records | 27 |
| Kessler Mortgage and Release Records | 28 |
| Kossler Mortgage and Release Records | 29 |
| Kruszka Mortgage and Release Records | 30 |
| Logan Mortgage and Release Records | 31 |
| Mathis Mortgage and Release Records | 32 |
| Miller Mortgage and Release Records | 33 |
| Montgomery Mortgage and Release Records | 34 |
| Nixon Mortgage and Release Records | 35 |
| Porco Mortgage and Release Records | 36 |
| Roberts Mortgage and Release Records | 37 |

Sabo Mortgage and Release Records ........................................................................38
Starkey Mortgage and Release Records ...................................................................39
Ulrich Mortgage and Release Records .....................................................................40
Wasem Mortgage and Release Records.....................................................................41
EquityPlus Consulting Agreement.............................................................................42
David Shumway Employment Agreement .................................................................43
Composite TILA Disclosures .....................................................................................44

# <u>Exhibit 19 to Declaration</u>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ) | |
| COMMUNITY BANK OF NORTHERN ) | |
| VIRGINIA AND GUARANTY BANK ) | |
| SECOND MORTGAGE LITIGATION ) | CIVIL ACTION NO. 03-425 |
| ) | |
| ) | |
| ) | |
| ) | |

**HEARING ON**   MOTIONS TO DISMISS/STATUS CONFERENCE

Before   CHIEF JUDGE GARY L. LANCASTER

SEE BELOW                    SEE BELOW

| Appear for Plaintiffs | Appear for Defendants |
|---|---|
| Hearing Begun   9/18/12 @ 11:10 AM-12:17 PM | Hrg Adjourned to   9/18/12 @ 12:31 PM |
| Hrg concluded C.A.V.   9/18/12 @ 12:54 PM | Stenographer   SANDY WENGER (Hearing) |

| For Plaintiffs | For Defendants |
|---|---|
| BRUCE CARLSON, ESQ. | VIRGINIA BARNHART, ESQ. |
| FREDERICK WALTERS, ESQ. | SARAH MEYER, ESQ. |
| DAVID SKEENS, ESQ. | (for deft. FDIC-GNBT) |
| GARRETT HODES, ESQ. | DARRYL MAY, ESQ. |
| CARLOS DIAZ, ESQ. | JOEL TASCA, ESQ. |
| JAMISEN ETZEL, ESQ. | (for deft. PNC Bank) |
| STEPHANIE GOLDIN, ESQ. | THOMAS ALLEN, ESQ. |
| | (for deft. RFC) |

Argument on Motions taken under advisement;

Order issued re: Bankruptcy of deft. RFC;

Proposed discovery schedule to be submitted
    within 21 days

# **Exhibit 20 to Declaration**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:   COMMUNITY BANK OF        )    MDL No. 1674
         NORTHERN VIRGINIA        )    Civ. Action Nos.
         MORTGAGE LENDING         )    02-1201, 03-425,
         PRACTICES LITIGATION     )    05-688, 05-1386

ORDER

AND NOW, this /8 day of September, 2012, the Court

having been advised that defendant Residential Funding Company,

LLC has filed for bankruptcy in the United States Bankruptcy

Court for the Southern District of New York at Case No. 12-

12020, and as no further action can be taken at this time as to

this defendant, pursuant to 11 U.S.C. § 362, IT IS HEREBY

ORDERED that the Clerk of Court mark the above captioned case

closed as to defendant Residential Funding Company, LLC only.

Nothing contained in this order shall be considered a

dismissal or disposition of this matter and, should further

proceedings in it become necessary or desirable, any party may

initiate it in the same manner as if this order had not been

entered.

BY THE COURT,

_____, C.J.
Hon. Gary L. Lancaster,
Chief United States District Judge

cc: All Counsel of Record