# Exhibit 26 to Declaration

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| STEPHANIE SPANN; LEONILA T. NINI; EUFRONIO NINI; JOHN HARDT; ROBBIN VERBECK; STEPHANIE HAFFORD; CHARLES B. POINDEXTER; MAUREEN F. POINDEXTER; DAVID B. WALKER; SHUNDRA R. WALKER; JESSIE DODD; JAMES BECKIUS; LINDA WHITEHEAD; LYNELL B. WINGFIELD; JAIRO IVAN SARRIA; BEATRIZ SARRIA; MICHELLE MORGAN; SHARON FINNERTY;  DONALD APPLETON; and JEANETTE APPLETON; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) ) |  |
| COMMUNITY BANK OF NORTHERN VIRGINIA; GUARANTY NATIONAL BANK OF TALLAHASSEE; HOMECOMINGS FINANCIAL NETWORK, INC.; HOUSEHOLD FINANCIAL SERVICES, INC., RESIDENTIAL FUNDING CORPORATION; DOES 1-25; | ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

03C 7022

DOCKETED
OCT 0 6 2003

## COMPLAINT

## MATTERS COMMON TO MULTIPLE CLAIMS

## INTRODUCTION

1.     Plaintiffs bring this action to secure redress for improper charges and disclosures in connection with 14 predatory second mortgage home loans, all originated pursuant to a common scheme.  Plaintiffs allege violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq.

("TILA"), as amended by the Home Ownership & Equity Protection Act of 1994, 15 U.S.C. §§1602(aa) and 1639 ("HOEPA") and implementing Federal Reserve Board Regulation Z, 12 C.F.R. part 226, and imposition of points prohibited by state law.

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (general federal question) and 1337 (interstate commerce), and 1367 (supplemental jurisdiction), and 15 U.S.C. §1640 (Truth in Lending Act).

3.    Venue is proper because each defendant does business in the District.

4.    Applicable limitations periods have been tolled by the inclusion of the plaintiffs in a class action, In re Community Bank of Northern Virginia and Guaranty National Bank of Tallahassee Second Mortgage Loan Litigation, 03-425 (U.S.Dist.Ct., W.D.Pa.), from which plaintiffs have opted out.

## PARTIES

### Plaintiffs

5.    Plaintiff Stephanie Spann is an individual who resides in a home which she owns at 3036 Louise Street, Rockford IL 61103.

6.    Plaintiff Leonila T. Nini is an individual who resides in a home which she owns at 7130 Exner Road, Darien IL 60561. Plaintiff Eufronio Nini is her husband, has an interest in the property, and signed the mortgage.

7.    Plaintiff John Hardt is an individual who resides in a home which he owns at 10 Pine Lake Drive, Collinsville IL 62234. Plaintiff Robbin Verbeck is joint owner of the property and signed the mortgage.

8.    Plaintiff Stephanie Hafford is an individual who resides in a home which she owns at 5045 Brighton Lane, Richton Park IL 60471.

9.    Plaintiff Charles B. Poindexter is an individual who resides in a home which he owns at 3407 South Lombard Avenue, Cicero IL 60804. Plaintiff Maureen F. Poindexter is his wife, has an interest in the property, and signed the mortgage.

10.    Plaintiffs David B. Walker and Shundra R. Walker are husband and wife and reside in a home which they own at 12508 South Honore Street, Calumet Park IL 60827.

11.    Plaintiff (Ms.) Jessie Dodd is an individual who resides in a home which she owns at 339 Hoxie Avenue, Calumet City IL 60409.

12.    Plaintiffs James Beckius and Linda Whitehead are husband and wife and live in a home which they own at 8805 Waterview Road, Machesney Park IL 61115.

13.    Plaintiff (Ms.) Lynell B. Wingfield resides in a home which she owns at 311 Wellesley Drive, O'Fallon IL 62269.

14.    Plaintiffs Jairo Ivan Sarria and Beatriz Sarria are husband and wife and reside in a home which they own at 16B Hoover Court, Streamwood IL 60107.

15.    Plaintiff Michelle Morgan is an individual who resides in a home which she owns at 9725 South Keeler, Unit 109, Oak Lawn IL 60453.

16.    Plaintiff Sharon Finnerty is an individual who resides in a home which she owns at 18623 Ashland Avenue, Homewood IL 60430.

17.    Plaintiffs Donald Appleton and Jeanette Appleton are husband and wife and reside in a home which they own at 701 North 76th Street, East Saint Louis IL 62203.

3

## Defendants

18.    Defendant Community Bank of Northern Virginia ("CBNV") is a corporation chartered under Virginia law with offices at 107 Free Court, Sterling VA 20164. It transacts business in Illinois.

19.    Defendant Guaranty National Bank of Tallahassee ("GNBT") is a corporation chartered under federal law with offices at 111 South Monroe Street, Tallahassee FL 32301; 1706 West Tennessee Street, Tallahassee FL 32304; 2437 North Monroe Street, Tallahassee FL 32303; and 2613 South Monroe Street, Tallahassee FL 32301. It also had or has offices at 4501 Singer Court, Chantilly VA 20151. It transacts business in Illinois.

20.    Defendant Homecomings Financial Network, Inc. ("HFN") is a Delaware corporation with its principal places of business in Texas and Minnesota. HFN does business in Illinois. Its registered agent and office are CT Corporation System, 208 South LaSalle Street, Chicago IL 60604.

21.    Defendant Residential Funding Corporation ("GMAC-RFC") is a Delaware corporation with its principal place of business in Minnesota. GMAC-RFC does business in Illinois. Its registered agent and office are CT Corporation System, 208 South LaSalle Street, Chicago IL 60604.

22.    GMAC-RFC and HFN are affiliated corporations.    Both are indirect subsidiaries of General Motors Corporation.

23.    Defendant Household Financial Services, Inc., doing business as Household Mortgage Services ("Household"), is a corporation with its principal place of business in Illinois. Its registered agent and office are CT Corporation System, 208 South LaSalle Street, Chicago IL

4

60604.

24.     Numerous residential second mortgage loans with high "points and fees," typically amounting to 10% of the loan balance, were nominally made by CBNV and GNBT.

25.     All of these loans were extensions of consumer credit subject to TILA and HOEPA. The "points and fees" were such that HOEPA applied.

26.     The loan program was devised and orchestrated by GMAC-RFC and HFN. On information and belief, GMAC-RFC agreed to purchase the loans prior to their nominal origination by CBNV and GNBT.

27.     On information and belief, some or all of the title companies used in connection with the loan program described above were affiliated with the nominal lenders and/or assignees. For example, USA Title, L.L.C. and Title America, L.L.C., two of the title companies used to close GNBT transactions, were under common ownership with GNBT.

28.     On information and belief, GMAC-RFC owns certain of the plaintiffs' loans.

29.     Defendant HFN has been collecting payments on certain of the plaintiffs' loans.

30.     Does 1-25 are other persons and entities, unknown to plaintiffs, who have or claim an interest in plaintiffs' loans.

## SPANN TRANSACTION

31.     On June 15, 2000, plaintiff Spann obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from CBNV.

32.     The loan was in the principal amount of $35,000. The interest rate was 13%.

33.     The loan was obtained for personal, family or household purposes.

5

34.     In connection with this loan, plaintiff was charged more than three "points."

35.     The total finance charges on the loan were disclosed as $49,184.40.

36.     The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

37.     No title-related charges incurred in connection with the transaction were treated as finance charges.

38.     Regulation Z, 12 C.F.R. § 226.4, provides that the following may be excluded from the finance charge:

> **(c) Charges excluded from the finance charge. The following charges are not finance charges: . . .**
>
> > **(7) The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:**
> >
> > > **(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes. . . .**

39.     The current market rate for title examination and insurance on a second mortgage in Illinois in the amount of $100,000 or less is not more than $200-205. The two largest companies, Chicago Title and Stewart Title, both charge in that range. The market rate was slightly less when the loans were made.

40.     Spann was charged $645 for title insurance, or three times the market rate.

41.     Such charges were neither bona fide nor reasonable.

42.     Plaintiff has elected to rescind her transaction.

43.     The Spann loan is held by GMAC-RFC. HFN is collecting payments on it.

## NINI TRANSACTION

44.    On October 6, 2000, plaintiff Leonila Nini obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from CBNV. Eufronio Nini also signed the mortgage.

45.    The loan was in the principal amount of $52,000. The interest rate was 13.45%.

46.    The loan was obtained for personal, family or household purposes.

47.    In connection with this loan, plaintiff was charged more than three "points."

48.    The total finance charges on the loan were disclosed as $73,230.55.

49.    The amount financed on the loan was disclosed as $47,980.

50.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

51.    No title-related charges incurred in connection with the transaction were treated as finance charges.

52.    Nini was charged $1,077 for title insurance, or more than four times the market rate.

53.    Such charges were neither bona fide nor reasonable.

54.    Plaintiffs have elected to rescind the transaction. Notice to that effect has been given.

55.    The Nini loan is held by Household.

## HARDT TRANSACTION

56.    On August 18, 2000, plaintiff Hardt obtained a fixed-rate, fully-amortizing

7

second mortgage loan, secured by his residence, nominally from CBNV. Plaintiff Robbin Verbeck also signed the loan documents and joins as a necessary party.

57.   The loan was in the principal amount of $50,000. The interest rate was 14.99%.

58.   The loan was obtained for personal, family or household purposes.

59.   In connection with this loan, plaintiff was charged more than three "points."

60.   The total finance charges on the loan were disclosed as $147,770.54.

61.   The amount financed on the loan was disclosed as $44,230.

62.   The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

63.   No title-related charges incurred in connection with the transaction were treated as finance charges.

64.   Hardt was charged $855 for title insurance, or more than three times the market rate.

65.   Such charges were neither bona fide nor reasonable.

66.   Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

67.   The Hardt loan is held by GMAC-RFC. HFN is collecting payments on it.

**HAFFORD TRANSACTION**

68.   On October 27, 2000, plaintiff Hafford obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from GNBT.

69.   The loan was in the principal amount of $25,000. The interest rate was

8

15.375%.

70.    The loan was obtained for personal, family or household purposes.

71.    In connection with this loan, plaintiff was charged more than three "points."

72.    The total finance charges on the loan were disclosed as $77,586.30.

73.    The amount financed on the loan was disclosed as $20,658.85.

74.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

75.    No title-related charges incurred in connection with the transaction were treated as finance charges.

76.    Hafford was charged $925 for title insurance, or more than three times the market rate. These amounts were payable to Title America, L.L.C.

77.    Such charges were neither bona fide nor reasonable.

78.    Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

79.    The Hafford loan is held by GMAC-RFC. HFN is collecting payments on it.

## POINDEXTER TRANSACTION

80.    On January 26, 2001, plaintiff Charles B. Poindexter obtained a fixed-rate, fully-amortizing second mortgage loan, secured by his residence, nominally from GNBT. Plaintiff Maureen Poindexter signed the mortgage.

81.    The loan was in the principal amount of $35,000. The interest rate was 16.99%.

82.    The loan was obtained for personal, family or household purposes.

9

83.    In connection with this loan, plaintiff was charged more than three "points."

84.    The total finance charges on the loan were disclosed as $67,334.83.

85.    The amount financed on the loan was disclosed as $29,580.

86.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

87.    No title-related charges incurred in connection with the transaction were treated as finance charges.

88.    Poindexter was charged $925 for title insurance, or more than three times the market rate. These amounts were payable to USA Title, L.L.C.

89.    Such charges were neither bona fide nor reasonable.

90.    Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

91.    The Poindexter loan is held by GMAC-RFC. HFN is collecting payments on it.

### WALKER TRANSACTION

92.    On April 19, 2001, plaintiffs David B. Walker and Shundra R. Walker obtained a fixed-rate, fully-amortizing second mortgage loan, secured by their residence, nominally from GNBT.

93.    The loan was in the principal amount of $75,000. The interest rate was 11.99%.

94.    The loan was obtained for personal, family or household purposes.

95.    In connection with this loan, plaintiffs were charged more than three "points."

10

96.    The total finance charges on the loan were disclosed as $168,984.68.

97.    The amount financed on the loan was disclosed as $67,815.

98.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

99.    No title-related charges incurred in connection with the transaction were treated as finance charges.

100.    Mr. and Mrs. Walker were charged over $1,000 for title insurance, or more than four times the market rate. These amounts were paid to USA Title, L.L.C.

101.    Such charges were neither bona fide nor reasonable.

102.    Plaintiffs have elected to rescind the transaction. Notice to that effect has been given.

103.    The Walker loan is held by GMAC-RFC. HFN is collecting payments on it.

### DODD TRANSACTION

104.    On or about December 27, 2001, plaintiff Jessie Dodd and her late husband obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from GNBT.

105.    The loan was in the principal amount of $16,500. The annual percentage rate was 11.5318%.

106.    The loan was obtained for personal, family or household purposes.

107.    In connection with this loan, plaintiffs were charged more than three "points."

108.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

11

109.    No title-related charges incurred in connection with the transaction were treated as finance charges.

110.    Ms. Dodd was charged over $800 for title insurance, or more than three times the market rate. These amounts were paid to USA Title, L.L.C.

111.    Such charges were neither bona fide nor reasonable.

112.    Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

113.    The Dodd loan is held by GMAC-RFC. HFN is collecting payments on it.

## BECKIUS—WHITEHEAD TRANSACTION

114.    On October 12, 2000, plaintiffs James Beckius and Linda Whitehead obtained a fixed-rate, fully-amortizing second mortgage loan, secured by their residence, nominally from GNBT.

115.    The loan was in the principal amount of $35,000. The interest rate was 12.99%.

116.    The loan was obtained for personal, family or household purposes.

117.    In connection with this loan, plaintiffs were charged more than three "points."

118.    The total finance charges on the loan were disclosed as $50,336.77.

119.    The amount financed on the loan was disclosed as $29,330.

120.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

121.    No title-related charges incurred in connection with the transaction were treated as finance charges.

122.    Beckius and Whitehead were charged over $900 for title insurance, or more than four times the market rate. These amounts were paid to Title America, L.L.C.

123.    Such charges were neither bona fide nor reasonable.

124.    Plaintiffs have elected to rescind the transaction. Notice to that effect has been given.

125.    The Beckius-Whitehead loan is held by GMAC-RFC. HFN is collecting payments on it.

## WINGFIELD TRANSACTION

126.    On May 28, 1999, plaintiff Lynell B. Wingfield obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from CBNV.

127.    The loan was in the principal amount of $35,000. The interest rate was 13.875%.

128.    The loan was obtained for personal, family or household purposes.

129.    In connection with this loan, plaintiff was charged more than three "points."

130.    The total finance charges on the loan were disclosed as $52,735.13.

131.    The amount financed on the loan was disclosed as $30,637.75.

132.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

133.    No title-related charges incurred in connection with the transaction were treated as finance charges.

134.    Wingfield was charged over $850 for title insurance, or more than four times the market rate. These amounts were payable to Title America, L.L.C.

13

135. Such charges were neither bona fide nor reasonable.

136. Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

137. The Wingfield loan is held by GMAC-RFC. HFN is collecting payments on it.

## SARRIA TRANSACTION

138. On May 31, 2001, plaintiffs Jairo Ivan Sarria and Beatriz Sarria obtained a fixed-rate, fully-amortizing second mortgage loan, secured by their residence, nominally from GNBT.

139. The loan was in the principal amount of $65,000.

140. The loan was obtained for personal, family or household purposes.

141. In connection with this loan, plaintiffs were charged more than three "points."

142. The finance charges were disclosed as $134,913.48.

143. The amount financed was disclosed as $58,958.75.

144. The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

145. No title-related charges incurred in connection with the transaction were treated as finance charges.

146. Mr. and Mrs. Sarria were charged over $1,000 for title insurance, or more than four times the market rate. These amounts were paid to USA Title, L.L.C.

147. Such charges were neither bona fide nor reasonable.

148. Plaintiffs have elected to rescind the transaction. Notice to that effect has

14

been given.

149.    The Sarria loan is held by GMAC-RFC. HFN is collecting payments on it.

## MORGAN TRANSACTION

150.    On December 26, 2001, plaintiff Michelle Morgan obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from GNBT.

151.    The loan was in the principal amount of $21,000.

152.    The loan was obtained for personal, family or household purposes.

153.    In connection with this loan, plaintiff was charged more than three "points."

154.    The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

155.    No title-related charges incurred in connection with the transaction were treated as finance charges.

156.    Ms. Morgan was charged exorbitant amounts for title insurance. The amounts were paid to USA Title, L.L.C.

157.    Such charges were neither bona fide nor reasonable.

158.    Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

159.    The Morgan loan is held by GMAC-RFC. HFN is collecting payments on it.

## FINNERTY TRANSACTION

160.    On December 20, 2000, plaintiff Sharon Finnerty obtained a fixed-rate, fully-amortizing second mortgage loan, secured by her residence, nominally from CBNV.

15

161.   The loan was in the principal amount of $50,000.

162.   The loan was obtained for personal, family or household purposes.

163.   In connection with this loan, plaintiff was charged more than three "points."

164.   The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

165.   No title-related charges incurred in connection with the transaction were treated as finance charges.

166.   Ms. Finnerty was charged over $900 for title insurance, over four times the market rate.

167.   Such charges were neither bona fide nor reasonable.

168.   Plaintiff has elected to rescind the transaction. Notice to that effect has been given.

169.   The Finnerty loan is held by GMAC-RFC. HFN is collecting payments on it.

## APPLETON TRANSACTION

170.   On March 26, 2001, plaintiffs Donald Appleton and Jeanette Appleton obtained a fixed-rate, fully-amortizing second mortgage loan, secured by their residence, nominally from GNBT.

171.   The loan was in the principal amount of $27,000. The annual percentage rate was 18.8509%.

172.   The loan was obtained for personal, family or household purposes.

173.   In connection with this loan, plaintiffs were charged more than three "points."

174. The finance charges were disclosed as $86,874.37.

175. The amount financed was disclosed as $23,125.

176. The finance charges on the loan were understated by an amount exceeding 0.5% of the principal or $100, whichever is greater.

177. No title-related charges incurred in connection with the transaction were treated as finance charges.

178. Mr. and Mrs. Appleton were charged over $900 for title insurance, or more than four times the market rate. These amounts were paid to USA Title, L.L.C.

179. Such charges were neither bona fide nor reasonable.

180. Plaintiffs have elected to rescind the transaction. Notice to that effect has been given.

181. The Appleton loan is held by GMAC-RFC. HFN is collecting payments on it.

## COUNT 1 – TRUTH IN LENDING

182. Plaintiffs incorporate ¶¶1-181. This claim is against CBNV for those loans nominally originated by it and GNBT for those loans nominally originated by it. The present holders of the loans are sued as assignees under 15 U.S.C. §1641(c). Others collecting payments on the loan are joined as necessary parties.

183. The understatement of the finance charge and overstatement of the amount financed on the TILA disclosures furnished to plaintiffs violated 15 U.S.C. §1637 and 12 C.F.R. §226.18.

184. Discovery may reveal other violations as well. For example, the special

17

advance disclosures required by 15 U.S.C. § 1639 may not have been furnished three days prior to closing.

185.    Because the transactions at issue were secured by plaintiffs' homes, and were not entered into for purposes of the initial acquisition or construction of those homes, they were subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

(a) **Consumer's right to rescind.**

(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47

(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) **Notice of right to rescind.** In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the

18

transaction and shall clearly and conspicuously disclose the following:

> **(1)** The retention or acquisition of a security interest in the consumer's principal dwelling.
>
> **(2)** The consumer's right to rescind the transaction.
>
> **(3)** How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.
>
> **(4)** The effects of rescission, as described in paragraph (d) of this section.
>
> **(5)** The date the rescission period expires. . . .

**(f)** **Exempt transactions.** The right to rescind does not apply to the following:

> **(1)** A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].
>
> **(2)** A credit plan in which a state agency is a creditor.

186.    Since the finance charge is understated and the amount financed overstated, plaintiffs are entitled to rescind.

187.    Plaintiffs have given notice of their election to rescind.

188.    Under 15 U.S.C. §1641(c), plaintiffs are entitled to assert the right to rescind against any assignee of the loan.

189.    15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against defendants for:

19

a.    A judgment voiding plaintiffs' mortgages, capable of recordation in the public records;

b.    Statutory damages for the underlying disclosure violations and failure to rescind, as appropriate;

c.    A judgment declaring what obligations if any plaintiffs have toward defendants;

d.    Attorney's fees, litigation expenses and costs of suit;

e.    Such other or further relief as the Court deems proper.

### COUNT II – EXCESS POINTS

190.    Plaintiffs incorporate ¶¶1-181. This claim is against CBNV for those loans nominally originated by it and GNBT for those loans nominally originated by it. The present holders of the loans are sued as assignees. Others collecting payments on the loan are joined as necessary parties.

191.    The CBNV and GNBT loan documents elected to apply Illinois law to the plaintiffs' transactions.

192.    The loans violated § 4.1a of the Illinois Interest Act, 815 ILCS 205/4.1a, in that plaintiffs were charged more than three "points."

193.    Section 4.1a provides that a "charge in addition to the stated rate of interest payable directly or indirectly by the borrower and imposed directly or indirectly by the lender as a consideration for the loan, or for or in connection with the loan of money, whether paid or payable by the borrower, the seller, or any other person on behalf of the borrower to the lender or to a third party, or for or in connection with the loan of money, . . . whether denominated 'points,' 'service

20

charge,' 'discount,' 'commission,' or otherwise," such charge "in the case of a loan with an interest rate in excess of 8% per annum secured by residential real estate . . . shall not exceed 3% of such principal amount." The exclusions are "hazard, mortgage or life insurance premiums, survey, credit report, title insurance, abstract and attorneys' fees, recording charges, escrow and appraisal fees, and similar charges."

194.    The parties involved in making the loans -- CBNV, GNBT and GMAC-RFC -- therefore incurred  liability under state or federal law.

195.    All subsequent assignees of the loan are subject to plaintiffs' rights against CBNV and GNBT.

WHEREFORE, plaintiffs request that the Court enter judgment in their favor and against defendants for the following relief:

    a.    Appropriate damages;

    b.    A determination of how much if anything plaintiffs owe under the note and mortgage.

    c.    Attorney's fees, litigation expenses, and costs;

    d.    Such other or further relief as the Court deems appropriate.

_____
Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
EDELMAN, COMBS & LATTURNER, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois  60603

21

(312) 739-4200
(312) 419-0379 (FAX)

## JURY DEMAND

Plaintiffs demand trial by jury.

Daniel A. Edelman

I:\case\comm10.574\pleading\cmplt.wpd

22



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

**Plaintiff(s):** Stephanie Spann; et al.

County of Residence: Winnebago

Plaintiff's Atty:   Edelman, Combs & Latturner, LLC
                    Edelman, Combs & Latturner, LLC
                    120 S. LaSalle St., 18th Floor,
                    Chicago IL 60603
                    312-739-4200

**Defendant(s):** Community Bank of Northern Virginia; et al.

County of Residence:

Defendant's Atty:

# 03C 7022

II. Basis of Jurisdiction:         **3. Federal Question (U.S. not a party)**

III. Citizenship of Principal Parties
(Diversity Cases Only)

            Plaintiff:- N/A
            Defendant:- N/A

**JUDGE AMY ST. EVE**

**MAGISTRATE JUDGE ASHMAN**

IV. Origin :                       **1. Original Proceeding**

V. Nature of Suit:                 **890 Other Statutory Actions**

VI. Cause of Action:               **Truth in Lending Act, 15 U.S.C. Section 1601 et seq.**

**DOCKETED**
**OCT 0 6 2003**

VII. Requested in Complaint
            Class Action: **No**
            Dollar Demand:
            Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: 10/3/03

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**        Revised: 06/28/00

FILED
03 OCT -3  PH 4: 10
CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS

In the Matter of: Stephanie Spann; et al. v. Community National Bank of Northern Virginia; et al.

# 03C 7022

Case Number:

JUDGE AMY ST. EVE

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR: **PLAINTIFFS**

MAGISTRATE JUDGE ASHMAN

| **(A)** | **(B)** |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME  Daniel A. Edelman | NAME  Cathleen M. Combs |
| FIRM  Edelman, Combs & Latturner, LLC | FIRM  Edelman, Combs & Latturner, LLC |
| STREET ADDRESS  120 S. LaSalle Street, 18th | STREET ADDRESS  120 S. LaSalle Street, 18th |
| CITY/STATE/ZIP  Chicago, Illinois 60603 | CITY/STATE/ZIP  Chicago, Illinois 60603 |
| TELEPHONE NUMBER  (312) 739-4200 | TELEPHONE NUMBER  (312) 739-4200 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 00712094 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 00472840 |
| MEMBER OF TRIAL BAR?   YES  X   NO ☐ | MEMBER OF TRIAL BAR?   YES  X   NO ☐ |
| TRIAL ATTORNEY?   YES  X   NO ☐ | TRIAL ATTORNEY?   YES  X   NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO  X |
| **(C)** | **(D)** |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES ☐   NO ☐ | MEMBER OF TRIAL BAR?   YES ☐   NO ☐ |
| TRIAL ATTORNEY?   YES ☐   NO ☐ | TRIAL ATTORNEY?   YES ☐   NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ | DESIGNATED AS LOCAL COUNSEL?   YES ☐   NO ☐ |

DOCKETED
OCT 0 6 2003

FILED
08 OCT -3 PM 4: 10
CLERK
U.S. DISTRICT COURT

1-3

# Exhibit 27 to Declaration

### AFFIDAVIT OF BENJAMIN SOTO

I, Benjamin Soto, Esquire, being duly sworn, on oath state, on personal knowledge, information, and belief:

1.    I am the President of Paramount Title and Escrow, LLC.  Paramount Title & Escrow currently has (2) offices in the District of Columbia and Greenbelt, Maryland.

2.    I frequently lecture to members of the DC Bar on Real Estate issues. I am the former Chair of the Bankruptcy Section of The National Bar Association and a former Board of Director of the National Bar Association.  In 2002, I was appointed by Mayor Anthony Williams to serve on the District of Columbia Board of Real Property Assessments and Appeals, where I serve as Vice Chair. I am a member of the DC Bar, Pennsylvania Bar, DC Land Title Association and the Maryland Land Title Association.

3.    In 2000, I started my own Law Firm and Title Company, Paramount Title & Escrow, LLC in Washington DC.   Paramount Title & Escrow, LLC has over 20 employees and conducts over 200 hundred settlements a month. Paramount Title & Escrow, LLC is also an active member of the DC Land Title Association, MD Land Title Association, Better Business Bureau and the DC and US Chamber of Commerce.

4.    During the period dating from 2000 to 2002, Paramount Title provided title and closing services for approximately 150 to 200 second mortgage loans per month that were originated by Community Bank of Northern Virginia ("CBNV").

5.    In each and every instance in which borrowers paid funds to Paramount Title for title services, those services were actually performed.

6.    With respect to those loans in which Paramount Title provided title services to CBNV borrowers, Paramount Title first made arrangements to obtain an abstract of title for the relevant property.  Following receipt of the abstract, professionally trained personnel at Paramount Title would perform a title examination.  These title examinations always included an evaluation of the title abstract and an analysis of available information regarding any recorded judgments or liens to identify all potential issues relevant to the title of the property. This was required in order to satisfy CBNV's instructions to verify ownership and assure CBNV is in it's proper lien position.

7.    Paramount Title never provided closing services on any loan for CBNV for which title services were not performed.

Benjamin Soto

Signed and sworn to before
me on March _13_ , 2006.

Notary Public

**Deanne E. Babcock**
**NOTARY PUBLIC STATE OF MARYLAND**
**MY COMMISSION EXPIRES AUGUST 21, 2006**

## AFFIDAVIT OF MILLARD RUBENSTEIN

I, Millard Rubenstein, being duly sworn, on oath state, on personal knowledge, information and belief:

1.      I am the President of Resource Real Estate Services, LLC, formerly Resource Title, LLC which is located at 300 Red Brook Boulevard, Suite 300, Owings Mills, MD 21117.

2.      I have extensive knowledge of real estate law and have been a member of the Maryland bar since 1967. I have also been a frequent lecturer to attorneys and title industry professionals on real estate and compliance issues.

3.      During the period dating from 1998 to 2002, Resource Title provided title and closing services for a significant number of second mortgage loans that were originated by Community Bank of Northern Virginia ("CBNV").

4.      In each and every instance in which borrowers paid funds to Resource Title for title services, those services were actually performed.

5.      With respect to those loans in which Resource Title provided title services to CBNV borrowers, Resource Title first made arrangements to obtain an abstract of title for the relevant property. Following receipt of the abstract, professionally trained personnel at Resource Title would perform a title examination. These title examinations always included an evaluation of the title abstract and an analysis of available information regarding any recorded judgments or liens to identify all potential issues relevant to the title of the property.

6.      If Resource Title charged a borrower more for a title abstract that it incurred in vendor charges, such charges were assessed to compensate Resource Title for legitimate services associated with obtaining the title abstract.

7.      Resource Title never closed a loan for CBNV for which title services were not performed.

Millard Rubenstein

Signed and sworn to before
me on March _14_, 2006.

Notary Public

# Exhibit 28 to Declaration

### AFFIDAVIT OF MILLARD RUBENSTEIN

I, Millard Rubenstein, being duly sworn, on oath state, on personal knowledge, information and belief:

1.    I am the President of Resource Real Estate Services, LLC, formerly Resource Title, LLC which is located at 300 Red Brook Boulevard, Suite 300, Owings Mills, MD 21117.

2.    I have extensive knowledge of real estate law and have been a member of the Maryland bar since 1967. I have also been a frequent lecturer to attorneys and title industry professionals on real estate and compliance issues.

3.    During the period dating from 1998 to 2002, Resource Title provided title and closing services for a significant number of second mortgage loans that were originated by Community Bank of Northern Virginia ("CBNV").

4.    In each and every instance in which borrowers paid funds to Resource Title for title services, those services were actually performed.

5.    With respect to those loans in which Resource Title provided title services to CBNV borrowers, Resource Title first made arrangements to obtain an abstract of title for the relevant property. Following receipt of the abstract, professionally trained personnel at Resource Title would perform a title examination. These title examinations always included an evaluation of the title abstract and an analysis of available information regarding any recorded judgments or liens to identify all potential issues relevant to the title of the property.

6.    If Resource Title charged a borrower more for a title abstract that it incurred in vendor charges, such charges were assessed to compensate Resource Title for legitimate services associated with obtaining the title abstract.

7.    Resource Title never closed a loan for CBNV for which title services were not performed.

Millard Rubenstein

Signed and sworn to before
me on March _14_, 2006.

Notary Public

# Exhibit 29 to Declaration

## AFFIDAVIT OF DENNIS HOOVER

I, Dennis J. Hoover, make the following affidavit, and do hereby affirm as follows upon my information and belief:

1.      I am President of Home Title Company, Inc. ("Home Title"), located at 2 Hopkins Plaza, Suite 1100, Baltimore, MD  21201, having served as such since January 1, 2006, succeeding the prior president, Arvin E. Rosen  who passed away on October 28, 2005 after having served as President of Home Title since 1985.

2.      I am attorney duly licensed to practice law in the State of Maryland, admitted to the Bar in 1979 and am experienced in the practice of law with an emphasis in real estate and transactional law.

3.      Based on an examination of Home Title's list of all files opened for the years 1998 through 2002, Home Title opened approximately 1,000 files originated by Community Bank of Northern Virginia ("CBNV"); however, included in that total are many files which were subsequently cancelled without closing.

4.      I have examined a sampling of Home Title's files from the years 2001 and 2002, constituting approximately 175 files originated by CBNV.  Based on that review, Home Title's services for loans originated by CBNV included, but were not necessarily limited to, the provision  of the following services:

   a.      Ordering and reviewing abstracts of title.

   b.      Reviewing and analyzing judgment lien reports and judgments.

   c.      Preparing title and judgment reports to submit to lender.

   d.      Ordering judgment lien and mortgage payoffs.

   e.      Preparing, as necessary, lien and mortgage releases for in-state (MD) files or requesting and reviewing the same for out of state files.

   f.      Obtaining and updating real property tax information from governmental jurisdictions, as needed.

   g.      Reviewing legal descriptions on loan documents prepared by lender for accuracy.

5.      If Home Title charged a borrower more for a title abstract than it incurred in vendor charges, such charges were assessed to compensate Home Title for legitimate services associated with the loans originated by CBNV including time spent providing the above services and liability incurred by Home Title in connection with the provision of such services.

6.      Home Title never charged for closing or title services on any loan for CBNV for which services were not actually provided and performed.

_____
Dennis J. Hoover

Signed and sworn to before me on March ___

_____
Notary Public

G:\wpdata\0111.001\Affidavit DJH.DOC

# Exhibit 30 to Declaration

## AFFIDAVIT OF STEPHEN J PAPERMASTER

I, Stephen J. Papermaster, being duly sworn, on oath state, on personal knowledge:

1.     I am the President of First Title and Escrow, Inc. located at 30 West Gude Drive, Rockville, MD 20850.

2.     I have extensive knowledge of residential real estate transactional matters, having been involved in the residential real estate industry for 12 years.

3.     FIRST TITLE & ESCROW, INC. is a full service organization dedicated to providing exceptional title services, real estate closing and related services to lenders, brokers and borrowers around the country.

4.     During the period dating from 1998 to 2002, First Title provided title and closing services for hundreds of second mortgage loans that were originated by Community Bank of Northern Virginia ("CBNV").

5.     In each and every instance in which borrowers paid funds to First Title, First Title actually performed services to the borrower(s).

6.     With respect to those loans in which First Title provided title services to CBNV borrowers, First Title made arrangements to obtain an abstract of title for the relevant property. Following receipt of the abstract, professionally trained personnel at First Title would perform a title examination. These title examinations typically included, an evaluation of the title abstract and an analysis or review of and for ownership, prior ownership, breaks in the chain of title, mortgages, deeds of trust, liens, tax sales, review of notices of lis pendens, releases of liens, bankruptcy and judgment searches and verifications, as well as proper record-able legal descriptions. This information was searched for and reviewed in order to identify all potential issues relevant to the title of the property.

7.     First Title did not charge the borrowers for title abstracts in an amount more than the hard cost of the title abstract and a reasonable charge to compensate First Title for necessary services performed in the administration of the title abstract work.

8.     First Title never provided closing services on any loan for CBNV for which title services were not performed.

Stephen J. Papermaster

Signed and sworn to before
me on March 1/5, 2006.

Notary Public

KIYA McNEIL
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires January 31, 2010

# Exhibit 31 to Declaration

## AFFIDAVIT OF JOSEPH B. GRINDER, II

I, JOSEPH B. GRINDER, II, being duly sworn, on oath state, on personal knowledge:

1.      I am the Director of Mortgage Operations for the Annapolis, Maryland branch of First Republic Mortgage.

2.      Between July 2000 and August 2002, I was employed by Guaranty National Bank of Tallahassee ("GNBT").

3.      My first position with GNBT was Underwriter. I held this position for roughly two weeks.

4.      When I held this position, I was located at GNBT's Virginia mortgage operation.

5.      My next position with GNBT was Quality Assurance Director.

6.      I held this position from July 2000 to October 2001.

7.      When I held this position, I reported initially to Rudy Villareal for a few months and then to Jim McCroan for the remainder of that time.

8.      When I held this position, I was located at GNBT's Virginia operation.

9.      As the Quality Assurance Director, I was responsible for the management of GNBT's quality control department including all reporting and auditing functions.

10.     I was also responsible for monitoring and evaluating all departments to insure regulatory and investor compliance.

11.     I had four individuals who reported to me and assisted me in discharging these responsibilities.

12.     Part of my audit responsibilities included auditing the performance of loan originators, *i.e.*, the GNBT employees who received phone calls from prospective borrowers, to ensure that that each complied with GNBT's policies for timely providing the necessary disclosures to each borrower after the borrower provided the requisite information for a loan application.

13.     One of these policies was that an initial packet of documents and disclosures, which included, but was not limited to, the Good Faith Estimate, the Truth in Lending disclosure, Service Transfer Disclosure and a Section 32 Disclosure (the "Initial Packet"), had to be mailed to each borrower the first business day after the borrower submitted a completed loan application:.

14.     For every completed loan application that a loan originator received each day, he or she was obligated under this policy to prepare the Initial Packet the same day that he or she received the completed application.

15.     The loan originators would leave every completed Initial Packet in his or her outbox at the end of each workday.

16.     The loan originators were required to leave each Initial Packet unsealed so that I, along with my staff, were able to audit the packets.

17.    As part of my audit responsibilities, I, along with my staff, would collect all of the Initial Packets from the loan originators' outboxes at the beginning of each business day.

18.    We would print out each day a complete list of all the loan applications received by loan originators on the prior business day.

19.    We would select ten loan originators each day whose Initial Packets we would review to monitor their compliance with the GNBT policy requiring all of the necessary disclosures, including the Section 32 Disclosure, were included in the Initial Packets.

20.    If an Initial Packet failed to include any of the required documents or disclosures, including the Section 32 Disclosure, the loan originator was notified and advised to include the missing documents or disclosures.

21.    The Initial Packet would not be sent to the borrower until it complete and included all the necessary documents and disclosures.

22.    None of the Initial Packets that we collected on any particular day until we completed this audit.

23.    When I was Quality Assurance Director, I never told the loan originators how many of them would be audited on particular business day.

24.    I instructed my staff that they were not to disclose that information to the loan originators.

25.    I did not want the loan originators to know when their Initial Packets were being audited so that they had every incentive to ensure that their Initial Packets always contained the requisite documents and disclosures.

26.    I maintained detailed information on my audits of the loan originators and their compliance with GNBT's policy that timely and complete Initial Packets were sent to prospective borrowers.

27.    I maintained this detailed information to ensure that GNBT only employed loan originators who complied with GNBT's policy and procedures.

28.    I have reviewed the document attached hereto as Exhibit C entitled "HLTV/Equity Mortgage Document," which is Bates-labeled 4664-9019-0001-62.

29.    This document was one of GNBT's operations manuals during my tenure as Quality Assurance Director.

30.    I assisted with the preparation of this document.

31.    The sentence on page 4664-9019-00010 that reads "The Section 32 Disclosure must be signed or mailed to the customer at least three business days prior to settlement." was GNBT's attempt to memorialize federal law as its policy.

32.    That sentence does not reflect how GNBT actually implemented its policy.

33.    As articulated above, GNBT's policy was to ensure that the Section 32 Disclosure was sent to the borrower the next business day after GNBT received a completed loan application.

34.     GNBT also required that a new Section 32 Disclosure be sent to a borrower if there were any changes that made the initial Section 32 Disclosure inaccurate.

35.     If an amended Section 32 Disclosure was generated, any scheduled closing was postponed if the amended Section 32 Disclosure would arrive at the borrower with than less than three days before the closing.

36.     The closing would be rescheduled so that the borrower had at least three days to review and consider any amended Section 32 Disclosure.

37.     In August 2001, I was promoted from my position as Quality Assurance Director to Assistant Vice President for GNBT's mortgage operations located in Chantilly, Virginia.

38.     I know that the policies and procedures described above including GNBT's policy that Section 32 Disclosures be sent one business day after GNBT received a completed loan application remained in effect during the duration of my GNBT employment.

39.     I trained the woman who replaced me as Quality Assurance Director to ensure that she was aware of GNBT's policies and procedures including all of the procedures articulated above and knew how to implement the audit procedures also described above.

40.     I have no reason to believe that she did not conduct the audits in the same manner that I did.

41.     I have no reason to believe that she did not enforce the policies described above in the same manner that I did.

42.     I am aware of no instance in which a borrower received an untimely Section 32 Disclosure.

43.     As the Assistant Vice President, I reported to Mary Helms.

44.     When I held this position I was located at GNBT's Virginia operation.

45.     I held this position from October 2001 until my departure from GNBT in August 2002.

46.     My responsibilities as Assistant Vice President for the Virginia mortgage operations included assisting in the daily operations for underwriting, closing and funding and post-closing delivery to investor departments.

47.     Part of my responsibilities as Assistant Vice President included ensuring that GNBT had no less than a valid second lien on any loan that it issued.

48.     The loans that GNBT originated through the Virginia Office had to be marketable in the secondary market.

49.     To be marketable, GNBT had to be able to certify to the secondary market that it had no less than a valid second mortgage position on a borrower's property.

50.     Accordingly, before GNBT made a loan to a borrower and accepted a second mortgage on the borrower's property, GNBT required that a title search and a title examination be conducted on the borrower's property to determine whether GNBT would have a valid second mortgage position.

- 3 -

51.    If GNBT could not conclude from a title search and title examination that it would have a valid second mortgage position, it would not make the loan to the prospective borrower.

52.    My responsibilities as Assistant Vice President required me to consult with representatives of USA Title, primarily its president, Mary Jo Speier, and her second-in-command, Steve Parrish, to ensure that GNBT had a valid second lien on all prospective loans.

53.    If USA Title identified a title issue, it would alert a GNBT employee or officer.

54.    If USA Title identified a title issue early on in the lending process, USA Title would contact the originator and inform him or her of the issue.

55.    USA Title would normally ask the loan originator if he or she was aware of the title issue.  USA Title did not want to contact the borrower about the title issue if the loan originator had already knew of the problem and attempted to resolve it.

56.    If the loan originator was unaware of the title issue or had not contacted the borrower about the issue, USA Title would contact the borrower directly to determine if the title issue could be resolved.

57.    If USA Title identified a problem with title when a loan was being underwritten, USA Title would contact either Mary Helms and me.

58.    Some of the significant title issues that USA Title identified were outstanding judgments against borrowers, additional liens on title or additional owners of the property.

59.    When USA Title identified these types of issues for Mary Helms or me, we would work with them to determine whether there was a way in which the title issue could be resolved in such a way that GNBT would have a valid second lien.

60.    If the information that we received from USA Title suggested that a borrower could not convey a valid second lien on the property, GNBT would not make the loan to the borrower.

61.    From what I observed of USA Title and my dealings with Mary Jo Speier and Steve Parrish, I believed that USA Title was a functioning title company performing title related services for GNBT's Virginia Office.

62.    I am not aware of any instance, nor have evidence, that any borrower whose loan originated through GNBT's Virginia Office was charged for title work that was not performed.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Joseph B. Grinder, II

Signed and sworn to before
me on March 27th, 2006.

Carol Ann Schmidt
Notary Public
Carol Ann Schmidt
My notary expires 7/21/2007 4.

# Exhibit 23

# Exhibit 32 to Declaration

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE:  COMMUNITY BANK OF NORTHERN VIRGINIA MORTGAGE LENDING PRACTICES LITIGATION<br><br><br>THIS MOTION RELATES TO ALL ACTIONS | MDL NO. 1674<br><br>CASE NO. 02-01201,<br>CASE NO. 03-0425,<br>CASE NO. 05-0688, and<br>CASE NO. 05-1386<br><br>HON. GARY L. LANCASTER<br><br>FILED ELECTRONICALLY |

---

**REPLY BRIEF OF DEFENDANTS RESIDENTIAL FUNDING COMPANY, LLC,
PNC BANK, N.A., AND FEDERAL DEPOSIT INSURANCE CORP.
AS RECEIVER FOR GUARANTY NATIONAL BANK OF TALLAHASSEE
IN FURTHER SUPPORT OF THEIR MOTIONS TO DISMISS**

---

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT .........................................................................................................2

    A.   All Plaintiffs Who Failed To Schedule Or Exempt Pre-Petition Claims In
         Their Bankruptcy Cases Lack Standing To Assert Them Here ............................2

         1.   These Plaintiffs Either Lack Standing Or, As Plaintiffs Concede, Do
              Not Qualify As Real Parties In Interest .......................................................3

         2.   Plaintiffs' Request To Defer Ruling On This Motion For Some
              Indefinite Time Is Improper And Relies Upon Pure Speculation ...............8

         3.   Plaintiffs' Request For Substitution Also Should Be Rejected Because
              Bankruptcy Trustees Are Not Likely to Appear In This Case As They
              Cannot Serve As Class Representatives ....................................................12

    B.   Plaintiffs Do Not Challenge Defendants' Argument That Plaintiffs Lack
         Standing To Sue Defendants That Neither Originated Nor Were Assigned
         Their Loans .......................................................................................................13

    C.   Plaintiffs' Arguments In Response To Defendants' Statute Of Limitations
         Defense Are Unavailing ....................................................................................13

         1.   Plaintiffs' Contention That Non-Pennsylvania Borrowers' Claims
              Relate Back To *Davis I* Is Unfounded ...................................................13

              (a)   There Is No Judicial Estoppel Against Defendants ......................13

                      **(i)**   Defendants Have Not Taken Any Inconsistent
                               Positions ...........................................................................14

                      **(ii)**   In Addition To The Lack Of Any Inconsistency In The
                               First Instance, Defendants' Position Was Not Adopted
                               By The Third Circuit, So Judicial Estoppel Would Not
                               Apply................................................................................17

              (b)   Plaintiffs May Not Rely On Federal Rule Of Civil Procedure
                     15(c) Or The *American Pipe* Rule In Support Of Their Relation
                     Back Argument ............................................................................20

         2.   Plaintiffs' Contention That Defendants Waived The Statute Of
               Limitations Defense Is Specious ...............................................................24

i

3.      Plaintiffs' Arguments On Equitable Tolling Are Defective On Many Grounds ...................................................................................................26

(a)      Certain Aspects Of Plaintiffs' TILA And RESPA Claims, By Their Very Nature, Cannot Be Subject To Equitable Tolling .......26

(b)      The Court May Properly Adjudicate Equitable Tolling On A Motion To Dismiss .......................................................................27

(c)      Rule 9(b) Applies To Plaintiffs' Fraudulent Concealment Allegations .....................................................................................29

(d)      A Plaintiff Seeking To Invoke Fraudulent Concealment Must Plead An Act Of Alleged Concealment Independent Of Those That Form The Basis Of The Causes Of Action ............................31

(e)      Plaintiffs Have Not Adequately Alleged That They Exercised Reasonable Diligence.................................................................38

4.      The Rescission Claims Are Untimely Under The Applicable Statute Of Repose, Which Is Not Subject To Any Tolling .........................................39

D.      Plaintiffs Have Failed to Join Necessary and Indispensible Parties ......................41

E.      Plaintiffs' Arguments In Support Of Their RESPA Claims Fail ...........................45

1.      RESPA Does Not Apply To Discount Fees.................................................45

2.      Plaintiffs' RESPA Claim Based On Title Fees Fails Because No Private Right Of Action Can Be Stated On The Affiliated Business Arrangement Provisions of RESPA, And Because The CAC Does Not Allege An Affiliated Business Arrangement Between The Banks And The Title Companies .....................................................................................46

(a)      No Cause Of Action May Be Stated For Alleged Violations Of The Affiliated Business Arrangement Provisions Of RESPA.......46

(b)      Even If A Cause Of Action Existed For Violation Of The Safe Harbor, No Affiliated Business Arrangement Has Been Pled Here .............................................................................................49

3.      Plaintiffs' Arguments In Support Of Their RESPA Kickback Claim Fail ...........................................................................................................52

(a)      Plaintiffs Do Not Even Attempt To Contest Defendants' Arguments That The RESPA Kickback Claim On Post-November 22, 1999 Loans Fails As A Matter Of Law .................52

(b)     Plaintiffs May Not Rely On RESPA's Affiliated Business
        Arrangement Provisions To Support Their Claim For The
        Phase Running From May 29, 1998 To October 29, 1998 ...........52

(c)     The Broad Scope Of The Safe Harbor Under Section 8(c)(2) Of
        RESPA Defeats Plaintiffs' Claims For The Phase Running
        From October 29, 1998 To November 21, 1999 ...........................53

F.   Plaintiffs' TILA Claims Fail ................................................................54

     1.   Post-Spring 2000 TILA Claims For CBNV Borrowers Fail ....................54

     2.   As To RFC, The Signed Acknowledgements Are Conclusive Proof Of
          Timely TILA Disclosure ........................................................................54

     3.   Plaintiffs' "Conspicuous" Disclosure Claims Fail .....................................58

     4.   HOEPA Does Not Create a New Cause Of Action For Damages
          Against Assignees ...................................................................................59

G.   Plaintiffs' Arguments In Support Of Their RICO Claim Should Be Rejected ......63

     1.   Plaintiffs Cannot Save Their RICO Claim Against The Banks .................63

     2.   Plaintiffs Have Not Adequately Alleged A § 1962(c) Violation By
          RFC .........................................................................................................68

     3.   Plaintiffs Have Not Adequately Alleged A § 1962(d) Violation By
          RFC .........................................................................................................71

III.   CONCLUSION .............................................................................................73

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abulkhair v. PPI/Time Zero, Inc.*,
   398 Fed. Appx. 710 (3d Cir. 2010) .................................................................28

*Adams v. CitiFin., Inc.*,
   No. 402-0054, 2005 WL 2788109 (N.D. Miss. Oct. 26, 2005) ................................7

*Allstate Ins. Co. v. Valley Physical Med. & Rehabilitation, P.C.*,
   No. 05-5934, 2009 WL 3245388 (E.D.N.Y. Sept. 30, 2009) ................................64

*Am. Pipe & Constr. Co. v. Utah*,
   414 U.S. 538 (1974) ...............................................................................20, 39, 40

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...............................................................................50, 71, 72

*Asher v. Unarco Material Handling, Inc.*,
   596 F.3d 313 (6th Cir. 2010) ....................................................................21

*Autos, Inc. v. Gowin*,
   No. 05-3415, 2007 WL 2269443 (10th Cir. Aug. 9, 2007) ....................................12

*Ball v. Nationscredit Financial Servs. Corp.*,
   207 B.R. 869 (N.D. Ill. 1997) ..................................................................3

*Balter v. United States*,
   No. 04-3687, 2006 WL 335859 (3d Cir. Feb. 15, 2006) ......................................25

*Beach v. Ocwen Fed. Bank*,
   523 U.S. 410 (1998) ...............................................................................39, 40

*Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel Ltd.*,
   No. 10-22153, 2011 WL 4434891 (S.D. Fla. Sept. 23, 2011) ................................50

*Benas v. Shea Mortg. Inc.*,
   No. 11-1461, 2011 WL 4635645 (S.D. Cal. Oct. 4, 2011) ....................................48

*Bland v. Doubletree Hotel Downtown*,
   No. 3:09-272, 2010 WL 723805 (E.D. Va. Mar. 2, 2010) ....................................12

*Bolinger v. First Multiple Listing Serv., Inc.*,
   No. 10-211, 2012 WL 137883 (N.D. Ga. Jan. 18, 2012) ....................................47, 48

*Bradford v. WR Starkey Mortg., LLP*,
   No. 06-86, 2008 WL 4501957 (N.D. Ga. Feb. 22, 2008) ................................................36, 38

*Brever v. Federated Equity Mgmt. Co. of Pa.*,
   233 F.R.D. 429 (W.D. Pa. 2005) ...............................................................................................21

*Bryant v. Mortg. Capital Resource Corp.*,
   197 F. Supp. 2d 1357 (N.D. Ga. 2002) ................................................................................26, 60

*Byrnes v. DeBolt Transfer, Inc.*,
   741 F.2d 620 (3d Cir. 1984)................................................................................................29, 30

*Cada v. Baxter Healthcare Corp.*,
   920 F.2d 446 (7th Cir. 1990) ....................................................................................................37

*Cannon-Stokes v. Potter*,
   453 F.3d 446 (7th Cir. 2006) ....................................................................................................11

*Cappuccio v. Prime Capital Funding LLC*,
   649 F.3d 180 (3d Cir. 2011)......................................................................................................57

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ....................................................................................................19

*Cetel v. Kirwan Fin. Group*,
   460 F.3d 494 (3d Cir. 2006)................................................................................................32, 37

*Chao v. Roy's Constr., Inc.*,
   517 F.3d 180 (3d Cir. 2008)................................................................................................18, 19

*Charpentier v. Godsil*,
   937 F.2d 859 (3d Cir. 1991)......................................................................................................25

*Citizens Bank & Trust Co. v. Case (In the Matter of Case)*,
   937 F.2d 1014 (5th Cir.1991) .....................................................................................................9

*Clark v. Trailiner Corp.*,
   No. 00-5020, 2000 U.S. App. LEXIS 29006 (10th Cir. Nov. 13, 2000) .................................11

*Cliff v. Payco Gen. Am. Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) .....................................................................................20, 22, 23

*Coal Resources, Inc. v. Gulf & Western Indus., Inc.*,
   865 F.2d 761 (6th Cir. 1989) ....................................................................................................18

*Commonwealth of Pennsylvania v. Lake Asphalt & Petroleum Co. of Pennsylvania*,
   610 F. Supp. 885 (M.D. Pa. 1985) ............................................................................................35

*Cooper v. First Gov't Mortg. & Investors Corp.*,
238 F. Supp. 2d 50 (D.D.C. 2002) ........................................................62

*Coquina Investments v. Rothstein*,
No. 10-60786, 2011 WL 197241 (S.D. Fla. Jan. 20, 2011) ....................65

*Cornelius v. Fidelity Nat'l Title Co.*,
No. 08-754, 2009 WL 596585 (W.D. Wash. Mar. 9, 2009) ....................48

*Crete v. Resort Condos. Int'l*,
No. 09-5665, 2011 WL 666039 (D.N.J. Feb. 14, 2011) ..........................63

*Dam Things from Denmark v. Russ Berrie & Co.*,
290 F.3d 548 (3d Cir. 2002) ..................................................................17

*Das v. WMC Mortg. Corp.*,
No. 10-00650, 2011 WL 5914038 (N.D. Cal. Nov. 28, 2011) ................48

*Dash v. FirstPlus Home Loan Owner Trust 1996-2*,
248 F. Supp. 2d 489 (M.D.N.C. 2003) ...................................................59

*Davis v. Grusemeyer*,
996 F.2d 617 (3d Cir. 1993) ........................................................ *passim*

*Dechert v. Cadle Co.*,
333 F.3d 801 (7th Cir. 2003) .................................................................12

*Delrio-Mocci v. Connolly Props. Inc.*,
No. 08-2753, 2009 WL 2989537 (D.N.J. Sept. 16, 2009) ......................50

*Dongelewicz v. PNC Bank Nat'l Ass'n*,
104 Fed. Appx. 811 (3d Cir. 2004) ........................................................70

*Duran v. Equifirst Corp.*,
No. 09-03856, 2010 WL 918444 (D.N.J. Mar. 12, 2010) .......................38

*Durham v. The Loan Store, Inc.*,
No. 04-6627, 2006 WL 3422183 (N.D. Ill. Nov. 27, 2006) ....................62

*Eddy v. VI Water & Power Auth.*,
256 F.3d 204 (3d Cir. 2001) ..................................................................25

*Equal Employment Opportunity Commission v. J.D. Streett & Co.*,
No. 05-4186, 2006 WL 3076667 (S.D. Ill. Oct. 30, 2006) ......................5

*Farina v. Nokia, Inc.*,
625 F.3d 97 (3d Cir. 2010) ....................................................................23

First Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.,
    977 F. Supp. 1051 (S.D. Cal. 1997) ........................................................................... 18

Footbridge Ltd. Trust v. Countrywide Fin. Corp.,
    770 F. Supp. 2d 618 (S.D.N.Y. 2011) ........................................................................ 40

Franco v. Connecticut Gen. Life Ins.,
    No. 07-6039, 2011 WL 4448908 (D.N.J. Sept. 23, 2011) ................................. 65, 70

Freedom Med. Inc. v. Gillespie,
    634 F. Supp. 2d 490 (E.D. Pa. 2007) ......................................................................... 66

Freeman v. Quicken Loans, Inc.,
    626 F.3d 799 (5th Cir. 2010) ................................................................................ 45, 46

Garczynski v. Countrywide Home Loans, Inc.,
    656 F. Supp. 2d 505 (E.D. Pa. 2009) ............................................................ 34, 35, 37

General Refractories Co. v. First State Ins. Co.,
    500 F.3d 306 (3d Cir. 2007) ...................................................................................... 44

Gov't Employees Ins. Co. v. Hollis Med. Care, P.C.,
    No. 10-4341, 2011 WL 5507426 (E.D.N.Y. Nov. 9, 2011) ................................ 64, 65

Griffith v. Javitch, Block & Rathbone, LLP,
    358 B.R. 338 (S.D. Ohio 2007) ................................................................................. 12

Griglak v. CTX Mortgage Co.,
    No. 09-5247, 2010 WL 1424023 (D.N.J. Apr. 8, 2010) ............................................ 38

Gutierrez v. TD Bank,
    No. 11-5533, 2012 WL 272807 (D.N.J. Jan. 27, 2012) ............................................. 35

Haas v. Pittsburgh Nat'l Bank,
    526 F.2d 1083 (3d Cir. 1975) .................................................................................... 22

Hardee-Guerra v. Shire Pharms.,
    737 F. Supp. 2d 318 (E.D. Pa. 2010) ........................................................................ 12

Henderson v. GMAC Mortg. Corp.,
    No. 05-5781, 2008 WL 1733265 (W.D. Wash. Apr. 10, 2008) ................................. 56

Herzog v. IndyMac, FSB,
    No. 11-4571, 2011 WL 5513205 (D.N.J. Nov. 9, 2011) ........................................... 29

Hocker v. CitiMortgage, Inc.,
    No. 09-00973, 2012 WL 174967 (M.D. Pa. Jan. 20, 2012) ...................................... 28

*In re Abraham*,
  No. 10-80118, 2010 WL 5437253 (Bankr. D.S.C. Sept. 20, 2010) .......................................... 12

*In re Antonious*,
  373 B.R. 400 (Bankr. E.D. Pa. 2007) ........................................................................................ 9

*In re Barber*,
  266 B.R. 309 (Bankr. E.D. Pa. 2001) ...................................................................................... 62

*In re ClassicStar Mare Lease Litig.*,
  No. 07-353, 2011 WL 4591927 (E.D. Ky. Sept. 30, 2011) ...................................................... 70

*In re Community Bank of Northern Virginia*,
  467 F. Supp. 2d 466 (W.D. Pa. 2006) ................................................................................ 35, 39

*In re Community Bank of Northern Virginia*,
  622 F.3d 275 (3d Cir. 2010) .......................................................................................... 27, 31, 57

*In re Dreyfus Mutual Funds Fee Litig.*,
  428 F. Supp. 2d 342 (W.D. Pa. 2005) ...................................................................................... 28

*In re Fine Paper Litig. State of Wash.*
  632 F.2d 1081 (3d Cir. 1980) .................................................................................................. 42

*In re Gutches*,
  430 B.R. 342 (Bankr. E.D. Pa. 2009) ........................................................................................ 9

*In re Insurance Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ........................................................................................ 67, 68, 69

*In re Jackson*,
  245 B.R. 23 (Bankr. E.D. Pa. 2000) ........................................................................................ 57

*In re James*,
  120 B.R. 802 (E.D. Pa. 1990) .................................................................................................... 8

*In re Jamuna Real Estate, LLC*,
  365 B.R. 540 (Bankr. E.D. Pa. 2007) ...................................................................................... 66

*In re Janssen*,
  396 B.R. 624 (Bankr. E.D. Pa. 2008) ........................................................................................ 9

*In re Kane*,
  628 F.3d 631 (3d Cir. 2010) ............................................................................................... 14, 16

*In re Labrum & Doak*,
  No. 99-669, 1999 WL 667280 (E.D. Pa. Aug. 26, 1999) .......................................................... 9

*In re Merrill Lynch & Co, Inc. Research Reports Secs. Litig.*,
  375 B.R. 719 (S.D.N.Y. 2007) ................................................................12

*In re Phenylpropanolamine Prods. Liab. Litig.*,
  No. 1407, 2006 WL 2136722 (W.D. Wash. July 28, 2006) ................5, 7

*In re Pitt Penn Holding Co.*,
  No. 11-51879, 2011 Bankr. LEXIS 3554 (Bankr. D. Del. Sept. 16, 2011) ............................16

*In re Polis*,
  217 F.3d 899 (7th Cir. 2000) ................................................................10

*In re Regan*,
  439 B.R. 522 (Bankr. D. Kan. 2010) ......................................................56

*James v. Bridge Capital Corp.*,
  No. 08-397, 2011 WL 309692 (D. Or. Jan. 27, 2011) ............................61

*Johnston v. Lindaur*,
  No. 07-01280, 2010 WL 147939 (E.D. Cal. Jan. 12, 2010) ....................56

*Jones v. Saxon Mortg., Inc.*,
  537 F.3d 320 (4th Cir. 1998) ................................................................40

*Jubelirer v. Mastercard Int'l, Inc.*,
  68 F. Supp. 2d 1049 (W.D. Wis. 1999) ..................................................71

*Killmeyer v. Oglebay Norton Co.*,
  No. 96-1723, 2011 WL 4433541 (W.D. Pa. Sept. 20, 2011)......................2, 5, 8, 11

*Kliesh v. Select Portfolio Servicing, Inc.*,
  419 Fed. Appx. 268 (3d Cir. 2011) ........................................................28

*Knepper v. Rite Aid Corp.*,
  No. 11-1684, 2012 WL 1003515 (3d Cir. Mar. 27, 2012) ........................42

*Knittel v. First Fin. Mortg. Corp.*,
  No. 08-44, 2009 WL 1702174 (E.D. Ky. June 17, 2009) ........................56

*Kramer v. Commissioner of Social Security*,
  No. 11-4372, 2012 WL 388392 (3d Cir. Feb. 8, 2012) ..........................28

*Laychock v. Wells Fargo Home Mortg.*,
  No. 07-4478, 2008 WL 2890962 (E.D. Pa. July 23, 2008) ......................30

*Leachman v. Beech Aircraft Corp.*,
  694 F.2d 1301 (D.C. Cir. 1982) ............................................................21

*Lifanda v. Elmhurst Dodge, Inc.,*
   237 F.3d 803 (7th Cir. 2001) ............................................................58

*Loef v. First Am. Title Ins. Co.,*
   No. 08-311, 2011 WL 1326945 (D. Me. Apr. 4, 2011) ..........................43

*Lynch v. RKS Mortg. Inc.,*
   588 F. Supp. 2d 1254 (E.D. Cal. 2008)..............................................56

*Marr v. Bank of Am., N.A.,*
   No. 11-1424, 2011 WL 6091806 (7th Cir. Dec. 6, 2011) ......................57

*Massey v. Helman,*
   196 F.3d 727 (7th Cir. 1999) ............................................................25

*Matthews v. Kidder, Peabody & Co,*
   No. 99-85, 2000 WL 33726916 (W.D. Pa. Aug. 18, 2000)....................30

*McCullough v. Howard Hanna Co.,*
   No. 09-2858, 2010 WL 1258112 (N.D. Ohio Mar. 26, 2010) ...........47, 48

*McMillan v. AMC Mortg. Servs., Inc.,*
   560 F. Supp. 2d 1210 (S.D. Ala. 2008)..............................................40

*McOmie-Gray v. Bank of Am. Home Loans,*
   667 F.3d 1325 (9th Cir. 2012) ..........................................................40

*Minter v. Wells Fargo Bank, N.A.,*
   274 F.R.D. 525 (D. Md. 2011)..........................................................47

*Moll v. U.S. Life Title Ins. Co. of New York,*
   700 F. Supp. 1284 (S.D.N.Y. 1988)..........................................33, 34, 38

*Montrose Med. Group Participating Sav. Plan v. Bulger,*
   243 F.3d 773 (3d Cir. 2001).............................................................17

*Morgan v. Gay,*
   471 F.3d 469 (3d Cir. 2006)..........................................................18, 19

*Motley v. New Jersey State Police,*
   196 F.3d 160 (3d Cir. 1999)..........................................................14, 16

*Nelson v. County of Allegheny,*
   60 F.3d 1010 (3d Cir. 1995)...................................................4, 21, 22, 23

*New Hampshire v. Maine,*
   532 U.S. 742 (2001).......................................................................18

*Ocasio v. Ollson*,
    596 F. Supp. 2d 890 (E.D. Pa. 2009) ..........................................................14

*Odesser v. Cont'l Bank*,
    676 F. Supp. 1305 (E.D. Pa. 1987) ...........................................................71

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
    38 F.3d 1380 (3d Cir. 1994).............................................................29, 30, 32

*Pappa v. Unum Life Ins. Co. of Am.*,
    No. 07-0708, 2008 WL 744820 (M.D. Pa. Mar. 18, 2008) ...................66

*Park v. M & T Bank Corp.*,
    No. 09-02921, 2010 WL 1032649 (D.N.J. Mar. 16, 2010) ....................30

*Paskuly v. Marshall Field & Co.*,
    494 F. Supp. 687 (N.D. Ill. 1980) .............................................................23

*Paskuly v. Marshall Field & Co.*,
    646 F.2d 1210 (7th Cir. 1981) ..................................................................23

*Pentland v. Dravo Corp.*,
    152 F.2d 851 (3d Cir. 1945)......................................................................42

*Petersen v. United Steel Workers, AFL-CIO-CLC*,
    No. 04-0062, 2009 U.S. Dist. LEXIS 94240 (D.V.I. Oct. 7, 2009).........21

*Pettrey v. Enter. Title Agency, Inc.*,
    241 F.R.D. 268 (N.D. Ohio 2006) .............................................................47

*Pittsburgh Logistics Sys., Inc. v. C.R. England, Inc.*,
    669 F. Supp. 2d 613 (W.D. Pa. 2009).......................................................44

*Plummer v. Farmers Group, Inc.*,
    388 F. Supp. 2d 1310 (E.D. Okla. 2005) ..................................................23

*Polis v. Am. Liberty Fin., Inc.*,
    237 F. Supp. 2d 681 (S.D.W.V. 2002).......................................................54

*Politi v. Peoples Mortg. Corp.*,
    No. 10-04194, 2011 WL 666086 (D.N.J. Feb. 14, 2011) ........................29

*Ponnaoula v. Ashcroft*,
    373 F.3d 480 (3d Cir. 2004).......................................................................27

*Poole v. Marks*,
    441 Fed. Appx. 854 (3d Cir. 2011).............................................................28

*Poskin v. TD Banknorth, N.A.,*
    687 F. Supp. 2d 530 (W.D. Pa. 2009) ................................................................. 34

*Ramadan v. Chase Manhattan Corp.,*
    156 F.3d 499 (3d Cir. 1998) ............................................................................... 31

*Reiser v. Residential Funding Corp.,*
    420 F. Supp. 2d 940 (S.D. Ill. 2004) ............................................................ 36, 38

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993) ...................................................................................... 60, 68

*Riggs v. AHP Settlement Trust,*
    421 Fed. Appx. 136 (3d Cir. 2011) ................................................................... 28

*Robinson v. First Franklin Fin. Corp.,*
    No. 05-6652, 2006 WL 2540777 (E.D. Pa. Aug. 31, 2006) ............................... 58

*Robinson v. Fountainhead Title Group Corp.,*
    252 F.R.D. 275 (D. Md. 2008) ........................................................................... 47

*Robinson v. Johnson,*
    313 F.3d 128 (3d Cir. 2002) ............................................................................... 28

*Robinson v. Tyson Foods, Inc.,*
    595 F.3d 1269 (11th Cir. 2010) ......................................................................... 12

*Rodriguez v. Mustang Manufacturing Co.,*
    No. 07-13828, 2008 WL 2605471 (E.D. Mich. June 27, 2008) ....................... 5, 6

*Rolo v. City Investing Co. Liquidating Trust,*
    155 F.3d 644 (3d Cir. 1998) ............................................................................... 70

*Rosenberg v. City of New York,*
    No. 09-4016, 2011 WL 4592803 (E.D.N.Y. Sept. 20, 2011) ............................. 25

*Rozzelle v. Rossi,*
    No. 98-1738, 2007 WL 2905728 (W.D. Pa. Sept. 30, 2007) ............................. 36

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,*
    81 F.3d 355 (3d Cir. 1996) ................................................................................. 14

*Salinas v. United States,*
    522 U.S. 52 (1997) ............................................................................................. 71

*Schafer v. Decision One Mortg. Corp.,*
    No. 08-5653, 2009 WL 1886071 (E.D. Pa. June 30, 2009) ............................ 4, 7

*Schillinger v. Union Pacific R.R. Co.*,
    425 F.3d 330 (7th Cir. 2005) ..................................................................23

*Schmidt v. Fleet Bank*,
    16 F. Supp. 2d 340 (S.D.N.Y 1998)...........................................................71

*Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,
    742 F.2d 786 (3d Cir. 1984)......................................................................71

*Shimkus v. Gersten Cos.*,
    816 F.2d 1318 (9th Cir.1987) ...................................................................42

*Siegel v. AlphaWire Corp.*,
    894 F.2d 50 (3d Cir. 1990).......................................................................30

*Sindia Expedition, Inc. v. Wrecked & Abandoned Vessel*,
    895 F.2d 116 (3d Cir. 1990).....................................................................43

*Smith v. Berg*,
    247 F.3d 532 (3d Cir. 2001).....................................................................71

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004).................................................................................53

*South Broward Hosp. Dist. v. MedQuist Inc.*,
    516 F. Supp. 2d 370 (D.N.J. 2007) ..........................................................67

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*,
    181 F.3d 410 (3d Cir. 1999).....................................................................22

*Spann v. Community Bank of Northern Virginia*,
    No. 03-7022, 2004 WL 691785 (N.D. Ill. Mar. 30, 2004) ...............36, 40

*Speaks Family Legacy Chapels, Inc. v. National Heritage Enters., Inc.*,
    No. 08-04148, 2009 WL 2391769 (W.D. Mo. 2009) ..............................42

*Strayer v. Bare*,
    No. 06-2068, 2008 WL 1924092 (M.D. Pa. Apr. 28, 2008)...............66, 70

*Taggart v. Wells Fargo Home Mortg., Inc.*,
    No. 10-00843, 2010 WL 3769091 (E.D. Pa. Sept. 27, 2010).................35

*Tate v. Snap-On Tools Corp.*,
    No. 90-4436, 1997 WL 106275 (N.D. Ill. Feb. 11, 1997).......................8

*Teaupa v. U.S. Nat'l Bank, N.A.*,
    No. 10-00727, 2011 WL 6749813 (D. Haw. Dec. 22, 2011)..................48

*Thomas v. Independence Township,*
    463 F.3d 285 (3d Cir. 2006).................................................................29, 30

*Thomas v. US Bank Nat'l Assoc. ND,*
    575 F.3d 794 (8th Cir. 2009) ....................................................................61

*Thompson v. Jiffy Lube Int'l, Inc.,*
    505 F. Supp. 2d 907 (D. Kan. 2007)........................................................43

*Three Rivers Cablevision, Inc. v. City of Pittsburgh,*
    502 F. Supp. 1118 (W.D. Pa. 1980).........................................................44

*Turner v. Pavlicek,*
    No. 10-00749, 2011 WL 4458757 (S.D. Tex. Sept. 22, 2011) ................25

*Tyler House Apartments, Ltd. v. United States,*
    38 Fed. Cl. 1 (Fed. Cl. 1997) ....................................................................3

*Tyler v. Fed. Express Corp.,*
    No. 05-6826, 2006 WL 3334953 (6th Cir. Nov. 16, 2006) ....................12

*University of Maryland at Baltimore v. Peat, Marwick, Main & Co.,*
    996 F.2d 1534 (3d Cir. 1993)............................................................63, 70

*Veal v. Crown Auto Dealerships, Inc.,*
    No. 04-323, 2006 WL 435693 (M.D. Fla. Feb. 21, 2006)......................37

*Washington v. Nat'l City Mortg. Co.,*
    No. 10-5042, 2011 WL 1842836 (N.D. Cal. May 16, 2011)..............47, 48

*Wile v. Green Tree Servicing, LLC,*
    No. 04-2866, 2004 WL 2644390 (E.D. Pa. Nov. 22, 2004) ....................61

*William A. Graham Co. v. Haughey,*
    568 F.3d 425 (3d Cir. 2009).....................................................................53

*Williams v. Wells Fargo Home Mortg., Inc.,*
    411 Fed. Appx. 495 (3d Cir. 2011)..........................................................40

*Wilson v. Tucker,*
    No. 10-0714, 2011 WL 43089 (N.D. Okla. Jan. 5, 2011)........................7

*Wise v. Mortg. Lenders Network USA, Inc.,*
    420 F. Supp. 2d 389 (E.D. Pa. 2006) ......................................................37

*Wood v. Carpenter,*
    101 U.S. 135 (1879).........................................................................33, 34

*Wooten v. Quicken Loans, Inc.*,
  626 F.3d 1187 (11th Cir. 2010) ...............................................................45, 46

*Zied v. Barnhart*,
  418 Fed. Appx. 109 (3d Cir. 2011) ................................................................28

*Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak)*,
  406 F.3d 214 (3d Cir.2005) ..............................................................................9

## FEDERAL STATUTES

11 U.S.C. § 554 ..............................................................................................3, 10

11 U.S.C. § 704(a)(1) ...........................................................................................12

12 U.S.C. § 2602(7) ..............................................................................................49

12 U.S.C. § 2607 ........................................................................................... *passim*

15 U.S.C. § 1635 ........................................................................................... *passim*

15 U.S.C. § 1640(a) ..............................................................................................60

15 U.S.C. § 1641 ........................................................................................... *passim*

## RULES

Fed. R. Civ. P. 17 .......................................................................................... *passim*

Fed. R. Civ. P. 19 .......................................................................................... *passim*

## REGULATIONS

24 C.F.R. 3500.15(c)(2) ..................................................................................49, 50

## OTHER AUTHORITIES

*Freeman v. Quicken Loans, Inc.*, Tr. of Oral Argument in the United States Supreme
  Court, Feb. 21, 2012, available at
  http://www.supremecourt.gov/oral_arguments/argument_transcripts.aspx ...........................45

I.R.S. Pub. 936 (Dec. 6, 2011) ...........................................................................45

Jon B. Nelson,
  *Fast and Loose Litigants and Courts: Carnegie v. Household International, Inc. and
  the End of Settlement Classes*, 84 Tex. L. Rev. 541 (2005) ....................................19

S. Rep. No. 96-368 (1979) ...................................................................................56

7 Wright, Miller, et al., Fed. Prac. & Proc. § 1626 (3d ed. 2009) ..................................................42

Defendants Residential Funding Company, LLC ("RFC"), PNC Bank, N.A.

("PNC"), and Federal Deposit Insurance Corp. ("FDIC") as Receiver for Guaranty National

Bank of Tallahassee ("GNBT") (collectively, "Defendants"), by their undersigned counsel,

respectfully submit this reply brief in further support of their respective Motions to Dismiss.

## I.    INTRODUCTION

Each of Plaintiffs' claims suffers from multiple fatal defects, which are addressed

at length in Defendants' opening brief. Plaintiffs' opposition memorandum provides no basis

why these claims should survive dismissal. Their arguments are either contrary to law or without

foundation in their Consolidated Amended Complaint ("CAC").

Perhaps most notable about Plaintiffs' opposition is the lengths to which it goes to

try to convince the Court not to examine the legal sufficiency of the claims. Plaintiffs repeatedly

assert that the Court lacks the power to make these decisions because of the Third Circuit's

opinion, or because Defendants are "estopped" from contesting the validity of the claims based

on supposed positions Defendants previously took in connection with the settlement. The issues

that Plaintiffs describe as having been decided by the Third Circuit are all *dicta*, and thus by

definition neither precedential nor binding. Even more preposterous is the claim that Defendants

should be estopped from raising the defects in Plaintiffs' claims. This argument mischaracterizes

both the facts of Defendants' conduct in connection with the *Kessler* settlement and the law of

judicial estoppel and failed settlements. Not only have Defendants made no inconsistent

statements, but, even if they had, the *Kessler* settling Plaintiffs would be barred from raising such

statements here, by virtue of their contractual agreement not to use against Defendants any

statements made in the settlement process in the event the settlement was not approved.

In some instances, when Plaintiffs can muster no answer at all to Defendants'

arguments, they simply ignore them. In the course of lengthy papers it is easy to lose track of

such uncontested arguments.  Defendants will point those out, and the Court should, without further consideration, grant the parts of Defendants' motions that Plaintiffs have not even attempted to challenge.

For the multiple reasons detailed below and in Defendants' opening brief, the claims should all be dismissed.

## II.    ARGUMENT

### A.    All Plaintiffs Who Failed To Schedule Or Exempt Pre-Petition Claims In Their Bankruptcy Cases Lack Standing To Assert Them Here

Defendants' opening brief establishes that Plaintiffs Tina Boor, Melba Brown, Robert & Rebecca Clark, Ruth Davis, Rowena Drennen, Stephen & Amy Haney, Clell Hobson, Edward Kruszka, Thomas Mathis, Nora Miller, Shawn & Lorene Starkey, and Kathleen Ulrich lack standing to bring this action for themselves or as class representatives.  They are all Chapter 7 bankruptcy debtors who, through bad faith or neglect, failed to schedule this lawsuit or its underlying claims.  Their causes of action now belong to their bankruptcy estates and may only be asserted by their respective trustees for the benefit of Plaintiffs' creditors, and only then if each bankruptcy case is reopened, amended schedules are filed, and the trustee decides to pursue it.  (Defs. Br. 8-14.)

Plaintiffs "readily acknowledge" in their brief that, not only is Defendants' recitation of bankruptcy law accurate, but "Defendants' motion correctly raises an issue concerning the identity of the real party in interest for the claims asserted by Plaintiffs with Chapter 7 bankruptcies."  (Pltfs. Br. 78, 81.)  In addition, Plaintiffs admit that ***none*** of the Plaintiffs who filed Chapter 7 bankruptcies is a real party in interest herein.[1]  Plaintiffs

---

[1]    As this Court wrote in *Killmeyer v. Oglebay Norton Co.*, No. 96-1723, 2011 WL 4433541, at *5 (W.D. Pa. Sept. 20, 2011), "only the chapter 7 trustee is the real party in

(continued...)

nevertheless contend that the claims of Plaintiffs who previously failed to schedule their claims

in bankruptcy should **not** be dismissed.  For the reasons set forth below, the Court should reject

Plaintiffs' position.

### 1.    These Plaintiffs Either Lack Standing Or, As Plaintiffs Concede, Do Not Qualify As Real Parties In Interest

Plaintiffs initially argue that although the Plaintiffs who filed Chapter 7

bankruptcies may lack real party in interest status, they do not lack jurisdictional standing.

While courts have disagreed about procedures that should be followed when a plaintiff has filed

bankruptcy, no precedent would authorize the instant bankrupt Plaintiffs' claims to go forward.

As one district court recently explained, one line of cases holds that such plaintiffs

incurably lack standing to pursue their claims:

> Some courts addressing this kind of claim conclude that the debtor
> lacks standing at the commencement of the case, because the
> asserted claims properly belong to the bankruptcy trustee, and this
> standing defect is fatal to the debtor's claims.  *See, e.g., Tyler
> House Apartments, Ltd. v. United States*, 38 Fed. Cl. 1, 7 (Fed.Cl.
> 1997) (granting defendant's motion for summary judgment
> because, *inter alia*, plaintiff's claims properly belonged to the
> bankruptcy trustee and "no entity with standing brought a timely
> action in this court.  Thus, as of [the date the Complaint was filed],
> the court had no jurisdiction.  The lack of standing, a jurisdictional
> defect, therefore cannot be cured nunc pro tunc back to the date
> when the original complaint was filed."); *Ball v. Nationscredit
> Financial Services Corp.*, 207 B.R. 869, 872 (N.D. Ill. 1997)
> (stating that "[s]tanding goes to the court's jurisdiction and must
> exist at the time the action was filed. . . .  If [plaintiff debtor]

_____

(...continued)

interest to pursue prepetition causes of action.  The debtor may pursue the claims if the
trustee abandons them pursuant to 11 U.S.C. § 554.  However, for abandonment to occur,
the claim must either be formally abandoned by the trustee after notice and a hearing,
§ 554(a)-(b)*, or it must have been properly scheduled under section 521(a)(1) and not
administered,* § 554 (c)."  (emphasis added) (citation omitted).  As this Court further
noted (and as explained *infra*), even following abandonment, the debtor would face other
obstacles to pursuing his or her claims, such as judicial estoppel.  *Id.* at *9.

lacked standing at the time this action was filed, the suit must be
dismissed even if she later acquired an interest sufficient to support
standing.").

*Schafer v. Decision One Mortgage Corp.*, No. 08-5653, 2009 WL 1886071, at *6 n.6 (E.D. Pa.

June 30, 2009). Under this line of cases, Plaintiffs' failure to schedule their claims in bankruptcy

warrants outright dismissal of their claims without any need for further analysis.

     While Plaintiffs are correct in noting that some courts (including this Court) in

another line of cases have permitted plaintiffs who failed to schedule their claims in a prior

bankruptcy to substitute the bankruptcy trustee as the real party in interest in a subsequent action

asserting those claims, they are wrong to assert that this line of cases saves the claims at issue

from dismissal.

     The applicable rule of procedure regarding substitution, Rule 17(a)(3), provides as

follows:

> The court may not dismiss an action for failure to prosecute in the
> name of the real party in interest until, after an objection, a
> reasonable time has been allowed for the real party in interest to
> ratify, join, or be substituted into the action. After ratification,
> joinder, or substitution, the action proceeds as if it had been
> originally commenced by the real party in interest.

This Court has explained the scope of Rule 17(a)(3) as follows:

> What constitutes reasonable time "is a matter of judicial discretion
> and will depend on the facts of each case." *Schafer v. Decision
> One Mortgage Corp.,* No. 08-5653, 2009 WL 1886071 at *6, 2009
> U.S. Dist. LEXIS 56639 at *6 (E.D. Pa. June 30, 2009) (citations
> omitted).

> The scope of Rule 17(a)(3) is not unlimited; its application is
> "intended to insure against forfeiture and injustice," Fed.R.Civ.P.
> 17, 1966 Amendment, advisory committee's note. **Substitution is
> only available where the determination of the proper party is
> "difficult" or the plaintiff's misidentification of the party was the
> result of "an understandable mistake."** *Id.*; *Nelson v. County of
> Allegheny*, 60 F.3d 1010, 1015 n. 8 (3d Cir. 1995).

*Killmeyer*, 2011 WL 4433541, at *6-7 (emphasis added).

As numerous courts have concluded, it was not an "understandable mistake" for the Plaintiffs who previously filed Chapter 7 bankruptcies without scheduling their claims therein to prosecute those claims in their own names in this action. For example, in *Equal Employment Opportunity Commission v. J.D. Streett & Co.*, No. 05-4186, 2006 WL 3076667, at *3 (S.D. Ill. Oct. 30, 2006), the court rejected just such a contention, because the plaintiff knew about the facts giving rise to her cause of action well before she filed her bankruptcy petition, the "bankruptcy law that includes such causes of action as property of the estate is clear," and plaintiff had counsel since the beginning of the action. *Accord, Rodriguez v. Mustang Manufacturing Co.*, No. 07-13828, 2008 WL 2605471, at *4 (E.D. Mich. June 27, 2008) (rejecting claim of "reasonable mistake" and refusing to afford more time to amend under Rule 17(a)(3), "which is designed to protect defendants from a 'subsequent action by the party actually entitled to recover' as much as it is meant to protect plaintiff's claim from dismissal on a procedural technicality." (citation omitted); *In re Phenylpropanolamine Prods. Liab. Litig.*, No. 1407, 2006 WL 2136722, at *3 (W.D. Wash. July 28, 2006) (rejecting plaintiff's request to substitute bankruptcy trustee pursuant to Rule 17, reasoning "failure to read a document before swearing to its veracity 'on penalty of perjury' is simply not an 'understandable' mistake").

In addition, substitution under Rule 17(a)(3) must be made within a "reasonable time." Under circumstances identical to those here, courts have rejected attempts by plaintiffs to invoke Rule 17 when the plaintiff had more than "reasonable time" since the plaintiff's bankruptcy to ascertain the real party in interest. In *Rodriguez* the court found (a) that the two years that had elapsed since the debtor filed the bankruptcy petition and obtained a discharge was already "a reasonable time" in which to do so, (b) that granting the debtor time now to reopen or

substitute the trustee as the prosecuting party would cause months of delay, and (c) that further

delay would be unfairly prejudicial to the defendant. 2008 WL 2605471, at *3.

Here, the facts are even less amenable to Rule 17(a)(3) treatment than in

*Rodriguez.* Plaintiffs' bankruptcy cases were all filed more than three years ago, and some as

long as eight or nine years ago. For example, Nora Miller first filed bankruptcy in 2003, Edward

Kruszka[2] and Thomas Mathis in 2004, Melba Brown, Ruth Davis, Rowena Drennen, and Shawn

and Lorene Starkey in 2005, and Tina Boor, and Kathleen Ulrich in 2007. Even the most recent

Chapter 7 debtors, Stephen and Amy Haney and Robert and Rebecca Clark, filed bankruptcy

over three years ago, in 2009.[3]

The first of these consolidated cases was filed over a decade ago in 2001. It is

incredible for Plaintiffs now to contend that further delay is warranted so their attorneys can

begin rustling-up the real parties in interest. Moreover, although Plaintiffs claim that they have

"contacted" the trustees assigned to the Chapter 7 bankruptcy cases at issue, and even received

---

[2]    There is a chart on pages 9 and 10 of Defendants' Brief in Support of Motion to Dismiss
that contains the wrong case number and petition date for Plaintiff Edward R. Kruszka.
The information provided there is for another debtor also named Edward R. Kruszka, but
having a different social security number. The chart should reflect that Plaintiff Kruszka
filed a Chapter 7 petition on July 15, 2004 under Case No. 04-29269. This correction
does not alter Defendants' argument that Plaintiff Kruszka lacks standing because his
schedules fail to mention the purported class action or related claims, and his Chapter 7
case was closed on November 9, 2004 without administering the claims he asserts herein
as an asset. Defendants also note two typographical errors on the chart: Nora Miller's
bankruptcies were filed in the bankruptcy court for the Western (not the Eastern) District
of Pennsylvania, and the correct docket number for Clell Hobson's bankruptcy is 02-
73682.

[3]    The chart on pages 9 and 10 of Defendants' Brief in Support of Motion to Dismiss
incorrectly reflects that Ellen Sabo's Chapter 7 case was filed in the Eastern District of
Pennsylvania. In fact, Sabo's case was filed in the Western District of Pennsylvania.
Additionally, Defendants stated in their opening brief that Ms. Sabo did not schedule her
claims. This was mistaken; Ms. Sabo is the only plaintiff who did do so. Accordingly,
Defendants' bankruptcy argument is not directed against Ms. Sabo.

orders reopening two of them, Plaintiffs have not filed any motions for substitution in this action,

and no trustee has communicated with the Court in any way regarding his or her intentions in the

nearly four-month period since Defendants filed their motions to dismiss.  These circumstances

too require rejection of Plaintiffs' position.  *See, e.g., In re Phenylpropanolamine Prods. Liab.

Litig.,* 2006 WL 2136722, at *3 (rejecting plaintiff's request for substitution pursuant to Rule

17(a)(3) when several months had passed since defendant objected on standing grounds "with no

indication whether the trustee intends to pursue or abandon Peace's claims, or even when such

decision can be expected.  Neither the trustee nor plaintiff has sought substitution."); *Adams v.

CitiFin., Inc.,* No. 402-0054, 2005 WL 2788109, at *1 (N.D. Miss. Oct. 26, 2005) (rejecting

plaintiff's argument pursuant to Rule 17(a)(3) when "the court has not received any evidence of

intent by a Bankruptcy Trustee to substitute himself for any of the subject plaintiffs in order to

proceed in this action as a real party in interest."); *Schafer*, 2009 WL 1886071, at *6 n.6 ("The

Court notes that the bankruptcy trustee has not indicated whether he (or she) intends to pursue or

abandon the TILA claims that Ms. Schafer asserted in this lawsuit, or even when such a decision

could be expected."); *Wilson v. Tucker,* No. 10-0714, 2011 WL 43089, at *3 (N.D. Okla. Jan. 5,

2011) (rejecting plaintiff's argument under Rule 17(a)(3) when, just over two months after

defendant objected based on standing, "[n]either plaintiff nor the trustee has made any effort to

substitute the trustee as the real party in interest").

        In short, while the law may not be settled as to whether a Chapter 7 plaintiff who

did not schedule his or her claim lacks jurisdictional standing or instead is not the real party in

interest, under the circumstances of this case it makes no difference.  In the latter case, the claim

is barred because the Plaintiff should have performed all requisite steps in the bankruptcy

proceedings, and in this Court under Rule 17(a)(3), *long ago*.  These proceedings are years past the stage that any substitution can occur.[4]

## 2.    Plaintiffs' Request To Defer Ruling On This Motion For Some Indefinite Time Is Improper And Relies Upon Pure Speculation

Defendants are entitled to have their Rule 12 motions adjudicated now.  Plaintiffs suggest, however, that the Court defer the bankruptcy issue until Plaintiffs have had time to reopen their bankruptcy cases and take the myriad other steps required to proceed.  Indeed, they want this entire bankruptcy issue "*to await a final judgment* in this matter. . . ."  (Pltfs. Br. 85-86 (emphasis added).)  That is, respectfully submitted, outrageous.  It would certainly be unprecedented.  Whether analyzed as standing or real party in interest, suing in the correct name and capacity is something that must be addressed as one enters the courthouse, not something that can be tidied up on the way out.  The Court should soundly reject this request.

Defendants add only that Plaintiffs ask this Court not only to turn fundamental standing principles upside down by not determining the real parties in interest until judgment is entered, but they ask it to do so on the basis of pure speculation about what will happen in the multitude of bankruptcy proceedings.  It is completely speculative that the remaining Chapter 7 bankruptcies at issue will be opened, and even in those that are opened, it is far from certain that

---

[4]     The cases cited by Plaintiffs in which courts have permitted plaintiffs to invoke Rule 17 to seek substitution by bankruptcy trustees are distinguishable.  In *Killmeyer*, 2011 WL 4433541, at *6-7, and *Tate v. Snap-On Tools Corp.*, No. 90-4436, 1997 WL 106275, at *7-9 (N.D. Ill. Feb. 11, 1997), the bankruptcy trustees themselves had filed motions to substitute.  In *In re James*, 120 B.R. 802, 807 (E.D. Pa. 1990), the trustee was joined to the action by the bankruptcy court while the bankruptcy was pending, and not years after the bankruptcy as would be the case here.  Moreover, none of the cases cited in connection with any facet of the bankruptcy argument was a putative class action, in which substitution by a bankruptcy trustee would be especially inappropriate.  (*See infra* at Section II.A.3).

the trustee will choose to pursue the claim.  As the Court explained in *In re Gutches*, 430 B.R.

342 (Bankr. E.D. Pa. 2009):

> The decision to reopen a case is within the broad discretion of the bankruptcy court. *Zinchiak v. CIT Small Bus. Lending Corp. (In re Zinchiak),* 406 F.3d 214, 223 (3d Cir.2005); *In re Janssen,* 396 B.R. 624, 634 (Bankr.E.D.Pa.2008); *In re Antonious,* 373 B.R. 400, 405 (Bankr.E.D.Pa.2007); *In re Otto,* 311 B.R. 43, 47 (Bankr.E.D.Pa.2004). "This discretion depends upon the circumstances of the individual case and accords with the equitable nature of all bankruptcy court proceedings." *Citizens Bank & Trust Co. v. Case (In the Matter of Case),* 937 F.2d 1014, 1018 (5th Cir.1991). The moving party has the burden of demonstrating circumstances sufficient to justify reopening the case. *Janssen,* 396 B.R. at 634; *Antonious,* 373 B.R. at 405; *Otto,* 311 B.R. at 47. A case may be reopened to administer estate assets and to determine whether additional assets may be available for creditors of the estate. *Zinchiak,* 406 F.3d at 224; *Antonious,* 373 B.R. at 405 n. 4.

*Id*. at 344.

Moreover, a bankruptcy proceeding will not generally be re-opened unless there is

"a clear benefit" shown to **creditors**.  *In re Antonious*, 373 B.R. 400, 406 (Bankr. E.D. Pa. 2007).

Where the asset to be administered is a claim in a class action, a bankruptcy court is unlikely to

find "a clear benefit" to the creditors.  *See In re Labrum & Doak*, No. 99-669, 1999 WL 667280,

at *2 (E.D. Pa. Aug. 26, 1999) (recognizing that where a debtor's liabilities far exceed its assets,

the recovery expected by a class action plaintiff is generally insufficient for the debtor to claim a

surplus through which he might obtain standing).[5]

---

[5]    As noted above, Ms. Sabo is the only Debtor/Plaintiff to schedule the class action as an asset of her bankruptcy estate.  She also claimed $600.00 of its value as exempt property. The other Debtor/Plaintiffs not only failed to schedule the action, but it appears from their respective Schedule C Property Claimed as Exempt that, even if they did so now, they may not have sufficient exemptions remaining to retain a personal interest in the cause of action.

The procedure that a debtor must follow to gain control of an undisclosed asset is an involved one.  The debtor or trustee must first move to re-open the case under 11 U.S.C. § 350.  If the bankruptcy court grants his or her motion, the debtor must next file amended schedules that reflect the previously undisclosed asset.[6]  In some instances, the bankruptcy court will have to appoint a new trustee with whom the debtor must discuss the asset and its value to creditors, why it was not initially scheduled, and whether or not there was bankruptcy fraud.  If the asset is "burdensome to the estate or … of inconsequential value and benefit to the estate," 11 U.S.C. § 554, the trustee, after notice and a hearing, may abandon it to the debtor.  Alternatively, the debtor may move for an order directing the trustee to abandon the asset to him or her after notice and a hearing.  11 U.S.C. § 554(c).  (But as shown below, even when the asset is abandoned to the debtor, the debtor will not retroactively acquire real party in interest status.)

None of this is automatic, and whether or not a bankruptcy case will be reopened and, if reopened, whether the trustee elects to pursue the claim himself or to abandon it to the debtor, is very uncertain. Moving to reopen the bankruptcy case is just the **very first step** in a long and potentially time-consuming process.  Thus it is not surprising that Plaintiffs want to be excused from their obligations under the Bankruptcy Code and well-settled law until judgment is entered in this matter, but that is completely contrary to law.  What is certain is that none of the Chapter 7 Plaintiffs is a real party in interest, and none can be a named plaintiff and putative class representative.

---

[6]    Of the two Chapter 7 cases recently reopened, amended schedules have still not been filed in any of them.  Accordingly, even now, there is nothing before these bankruptcy courts to administer.  *In re Polis*, 217 F.3d 899 (7th Cir. 2000), cited by Plaintiffs for the proposition that a Chapter 7 debtor retains an interest in a class action "up to the amount of any applicable exemption," is of no relevance here because in none of these bankruptcy cases has the debtor scheduled the class action as either an asset of the estate or as exempt property.

Finally, even were a trustee to abandon claims to a Plaintiff, following such
abandonment, the Plaintiff would encounter other insurmountable obstacles to pursuing those
claims.  Essentially, such a Plaintiff would need to invoke Rule 17 to ***retroactively*** give
themselves real party in interest status.  This is improper, as explained in *Clark v. Trailiner
Corp.*, No. 00-5020, 2000 U.S. App. LEXIS 29006 (10th Cir. Nov. 13, 2000).  There, the
plaintiff failed to schedule a claim in bankruptcy, commenced an action in his own name
following the bankruptcy, and then sought to reopen his bankruptcy case to attempt to have the
bankruptcy trustee abandon the claim to him.  *Id.* at *2-6.  The Tenth Circuit rejected his attempt
to invoke Rule 17(a) to retroactively cure the defect in his own real party in interest status.  "Mr.
Clark, however, was not seeking to ***substitute or join*** the real-party-in-interest as permitted under
Rule 17.  He sought to ***retroactively become*** the real-party-in-interest and, thus, establish
standing.  This is not permissible."  *Id.* at *6.  So too here, Plaintiffs cannot retroactively become
real parties in interest in this action regardless of what might happen with any attempts to re-
open their bankruptcies.[7]

---

[7]    Moreover, even if a Plaintiff managed to get the trustee to abandon his or her claims, the
Plaintiff additionally would be judicially estopped from pursuing his or her claims.
While courts have held that a bankruptcy trustee pursuing a claim may not be judicially
estopped as a result of the debtor's failure to schedule the claim in bankruptcy, *see
Killmeyer*, 2011 WL 4433541, at *8-9, judicial estoppel is clearly available to bar ***the
debtor*** him or herself from pursuing the claim in the event it is abandoned.  *See, e.g.*,
*Cannon-Stokes v. Potter*, 453 F.3d 446, 448 (7th Cir. 2006) (affirming lower court's
dismissal of former bankruptcy debtor's claims based on judicial estoppel, because once
the trustee abandons the claim the creditors no longer have an interest and judicial
estoppel "comes to the fore").

In that regard it is important to add that judicial estoppel unquestionably applies to both
Chapter 7 and Chapter 13 filings.  While Plaintiffs argue that the Plaintiffs who filed
Chapter 13 bankruptcies and who did not schedule their claims (Nora Miller and the
Clarks) do not lack standing, this question need not be reached here because those
Plaintiffs also filed Chapter 7 bankruptcies.  If at some point the bankruptcy issue does
become necessary to resolve as to any Chapter 13 filers, Defendants maintain that, at a

(continued...)

11

**3.      Plaintiffs' Request For Substitution Also Should Be Rejected Because
         Bankruptcy Trustees Are Not Likely to Appear In This Case As They
         Cannot Serve As Class Representatives**

Even were the bankruptcy trustees to agree to pursue claims for the benefit of the

Chapter 7 Plaintiffs' creditors, they will not be able to appear as plaintiffs in this case because

most bankruptcy courts will not permit a trustee to serve as a class representative.  As the Court

of Appeals for the Seventh Circuit explained in *Dechert v. Cadle Company*, 333 F.3d 801, 802-

03 (7th Cir. 2003), bankruptcy trustees are highly unlikely to insert themselves as named

plaintiffs, because "very few of the benefits of settling the class action" would be received by the

trustee and the creditors (versus class counsel and the absent class members).  As a result, a

trustee acting as a named plaintiff would suffer from an intractable conflict of interest arising

from its simultaneous fiduciary obligations to both the bankruptcy estate and the class,

particularly when the former obligation is supposed to be exclusive.  *Id.*

Moreover, the protracted nature of class litigation cannot be squared with the

trustee's statutory obligation to complete his or her work "expeditiously."  11 U.S.C. § 704(a)(1).

*See In re Merrill Lynch & Co, Inc. Research Reports Secs. Litig.*, 375 B.R. 719, 726-28

(S.D.N.Y. 2007) ("courts have held that the trustee of a bankruptcy estate may not serve as a

class representative, due to conflicts of interest between the Trustee's duties to the creditors of

the bankruptcy estate and the duties owed to members of the class."); *Griffith v. Javitch, Block &*

---

(...continued)

        minimum, they will be judicially estopped from proceeding here if they did not schedule
        the claims asserted here in their bankruptcies.  *See, e.g., Robinson v. Tyson Foods, Inc.*,
        595 F.3d 1269 (11th Cir. 2010); *Autos, Inc. v. Gowin*, No. 05-3415, 2007 WL 2269443
        (10th Cir. Aug. 9, 2007); *Tyler v. Fed. Express Corp.*, No. 05-6826, 2006 WL 3334953
        (6th Cir. Nov. 16, 2006); *Hardee-Guerra v. Shire Pharms.*, 737 F. Supp. 2d 318 (E.D. Pa.
        2010); *Bland v. Doubletree Hotel Downtown*, No. 3:09-272, 2010 WL 723805 (E.D. Va.
        Mar. 2, 2010); *In re Abraham*, No. 10-80118, 2010 WL 5437253 (Bankr. D.S.C. Sept.
        20, 2010).

*Rathbone, LLP,* 358 B.R. 338, 341-42 (S.D. Ohio 2007) ("It is also clear that, except in unusual circumstances that do not exist here, a Chapter 7 trustee is not an adequate representative for a class of non-debtors, even if the class includes the debtor").

**B.      Plaintiffs Do Not Challenge Defendants' Argument That Plaintiffs Lack Standing To Sue Defendants That Neither Originated Nor Were Assigned Their Loans**

In their opening brief, Defendants explained that Plaintiffs have no standing to sue Defendants that neither originated nor were assigned their loans.  (Defs. Br. 14-18.) Plaintiffs have not even attempted to challenge this point, leaving Defendants' position unrefuted.

**C.      Plaintiffs' Arguments In Response To Defendants' Statute Of Limitations Defense Are Unavailing**

**1.      Plaintiffs' Contention That Non-Pennsylvania Borrowers' Claims Relate Back To *Davis I* Is Unfounded**

In their opening brief, Defendants explained that the TILA and RESPA claims of most Plaintiffs are time-barred in the absence of resort to equitable tolling.  (Defs. Br. 19-21.) Plaintiffs do not contest this point generally, but they spend 10 pages of their brief seeking to establish that the operative complaint for non-Pennsylvania CBNV borrowers for purposes of the statute of limitations is the *Davis I* complaint, rather than the *Davis II* complaint, as Defendants argued in their opening brief.  (Pltfs. Br. 86-95.)  Plaintiffs' arguments are meritless.

**(a)      There Is No Judicial Estoppel Against Defendants**

Plaintiffs initially argue that Defendants are judicially estopped from claiming that the operative complaint for non-Pennsylvania CBNV borrowers is anything but *Davis I.* (Pltfs. Br. 89-92.)  They base this argument on positions that Defendants supposedly took in seeking approval of the two prior settlements in this litigation (*id.*), both of which ultimately were disapproved by the Third Circuit.

### (i)    Defendants Have Not Taken Any Inconsistent Positions

The first question a court must address when considering whether judicial estoppel may properly be invoked is whether the two positions taken by the party sought to be judicially estopped are ***clearly and irreconcilably inconsistent***.  *See Motley v. New Jersey State Police*, 196 F.3d 160, 164 (3d Cir. 1999).  "Judicial estoppel is . . . not intended to eliminate all inconsistencies no matter how slight or inadvertent they may be."  *Ocasio v. Ollson*, 596 F. Supp. 2d 890, 902 (E.D. Pa. 2009); *see also In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010).  If the party's former and current positions are not mutually exclusive, judicial estoppel does not apply. *Id.*; *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 359 (3d Cir. 1996).

Here there was ***no*** inconsistency – much less one that was "clear" and "irreconcilable."  Pleadings filed by both the then-Settling Plaintiffs[8] and Defendants (collectively referred to as the "Settling Parties") in this Court and in the Third Circuit confirm both that Defendants consistently maintained Plaintiffs could not claim the filing date of *Davis I* to save their untimely claims, and that the Settlements did not concede that *Davis I* controlled the limitations analysis.

For example, after the first Settlement was reviewed by the Third Circuit and remanded to this Court, Defendants briefed that the majority of class members could not claim the filing date of *Davis I* to save their untimely TILA/HOEPA claims and clarified any ambiguity that might have arisen regarding their position as to RESPA claims by stating:

> Class Counsel and the Defendants ***negotiated*** a settlement and release of certain claims for the Class based on the filing dates of the initial complaints in *Davis* (CBNV borrowers) and *Ulrich*

---

[8]    Ruth J. Davis, Brian W. and Carla M. Kessler, Patrice Porco, Thomas T. Mathis, Stephen R. Haney and Amy L. Haney, John and Rebecca Picard, William and Ellen Sabo, Russell and Kathleen Ulrich, Nora H. Miller, Robert and Rebecca Clark, Edward R. Kruszka Jr.

> (GBNT borrowers). ***Defendants have always maintained***,
> however, that a nationwide class of borrowers does not have any
> legal right to rely upon (or relate back to) the filing of the initial
> complaint in *Davis* with respect to ***any*** federal claims, because that
> complaint alleged only state law claims on behalf of a
> Pennsylvania class.

*See* Doc. No. 176-2, W.D. Pa. Action No. 03-425, at p. 37 & n.21 (emphasis added); *see also*

Doc. No. 144, W.D. Pa. Action No. 03-425, at pp. 7-8, 17-19.

Further, both Defendants ***and the then-Settling Plaintiffs*** continued to stand by

that position through the remanded proceedings before this Court, and during the second appeal

before the Third Circuit. This Court did not approve the second, modified Settlement based on

any purported representation that *Davis I* should control the limitations analysis. Rather, this

Court recognized that:

> Neither this Modification, nor any of its provisions, nor any of the
> negotiations between the Settling Parties and their Counsel, shall
> be construed in any way as an admission or concession by any of
> the Settling Parties or their Counsel with respect to anything
> whatsoever, including but not limited to any alleged violation or
> failure to comply with any law, any legal or factual argument,
> contention or assertion. This Modification is entered into for the
> sole purpose of resolving vigorously disputed claims and other
> issues and in the interest of avoiding the burdens and expense of
> further litigation.

*See* Doc. No. 225-1, W.D. Pa. Civil Action No. 03-0425.

In their March 2010 Joint Appellees' Brief, the Settling Parties jointly and

specifically stated that the Settlement ***"was a negotiated compromise of a vigorously disputed***

***issue. It was neither an admission that any claims within this time period were timely, or a***

***concession that any unfiled claims would somehow relate back to the filing of the Davis and***

***Ulrich complaints."*** *See* Appellees' Brief at 71, United States Court of Appeals for the Third

Circuit, filed 3/8/2010, Case No. 08-3621 (emphasis added). In addition, the Settling Parties

reiterated their position that:

> [t]he Objectors' arguments that all CBNV borrowers in the Class
> are entitled to benefit from the original *Davis* filing date in the
> event that they were now given leave to assert TILA/HOEPA
> claims fails for the additional reasons that the original *Davis*
> complaint only asserted **state law** claims on behalf of a putative
> class of **Pennsylvania** borrowers.  It did **not** assert **federal law
> claims** on behalf of a **nationwide** class of borrowers.

*Id.* at 73 (emphasis added).  The Settling Parties further pointed out that "Defendants expressly

disputed [in the *Davis* action] that the federal claims the *Davis* plaintiffs **later** filed [*i.e.*, RESPA

claims] related back to the filing date of the original complaint."  *Id.* at 73 n.18 (emphasis

added); *see also Davis, et al v. PNC Bank, National Association, et al*, W.D. Pa., Doc. No. 16, at

26.

In short, the pleadings filed by the Defendants **and then-Settling Plaintiffs**

throughout the course of this litigation show that Defendants have steadfastly maintained their

position that the majority of Plaintiffs may not claim the initial filing date of *Davis* to save their

untimely TILA/HOEPA or RESPA claims through either relation back or tolling, and that the

Settlements merely represented negotiated compromises of a hotly contested issue.  Defendants

have taken no inconsistent positions, much less any irreconcilably inconsistent one, and judicial

estoppel therefore has no bearing on Defendants' limitations defense.  *See Motley v. New Jersey

State Police*, 196 F.3d 160, 164 (3d Cir. 1999); *see also In re Kane*, 628 F.3d 631, 639 (3d Cir.

2010); *In re Pitt Penn Holding Co.*, No. 11-51879, 2011 Bankr. LEXIS 3554, at *27-28 (Bankr.

D. Del. Sept. 16, 2011).  And while Defendants do not now seek to assert judicial estoppel

against those Plaintiffs who expressly stated in the Third Circuit that their claims did not relate

back to *Davis I*, it ill-behooves those Plaintiffs to make judicial estoppel arguments based on

misstatements of fact.

In fact, Plaintiffs should be careful not to make such scurrilous accusations for

another reason:  they are violating contractual duties owed by them that survived the non-

approval of the settlements.  The Settlement Agreement that the Settling Plaintiffs entered into

provides:

> . . . *in the event that this Agreement shall terminate or the*
> *settlement embodied herein does not become effective for any*
> *reason*, the Agreement *and all negotiations, court orders and*
> *proceedings relating thereto shall be without prejudice to the*
> *rights of any and all Parties hereto, who shall be restored to their*
> *respective positions existing prior to the execution of this*
> *Agreement*, and evidence relating to the Agreement and all
> negotiations shall not be discoverable or admissible in the
> Litigation or otherwise.

> Settlement Agreement ¶ 3.b. at DE 7 in *Kessler* (emphasis added).

> The Settling Parties expressly agree that, in the event that the Court
> does not approve the Settlement Agreement as modified or any
> appellate court disapproves of the Settlement Agreement as
> modified in any way that prevents the settlement from becoming
> final and effective, *no Party will use or attempt to use any*
> *conduct or statement of any other Party in connection with this*
> *modification to affect or prejudice any other Party's rights in any*
> *ensuing litigation.*  Defendants expressly reserve all rights and
> defenses to any claims and do not waive any such rights or
> defenses in the event that the Settlement Agreement as modified is
> not approved.

Modified Settlement Agreement ¶ 1 at DE 225, Exhibit 1 (emphasis added).  The Settling Parties

are acting in bad faith in violating this contractual covenant.

<div style="margin-left:2em">

**(ii)**     **In Addition To The Lack Of Any Inconsistency In The**
**First Instance, Defendants' Position Was Not Adopted**
**By The Third Circuit, So Judicial Estoppel Would Not**
**Apply**

</div>

Further, as the Third Circuit has explained, "judicial estoppel is appropriately

applied in a narrow category of cases because it 'is an extraordinary remedy that should be

employed only when a party's inconsistent behavior would otherwise result in a miscarriage of

justice.'"  *Dam Things from Denmark v. Russ Berrie & Co.*, 290 F.3d 548, 559-60 (3d Cir. 2002)

(quoting *Montrose Med. Group Participating Sav. Plan v. Bulger*, 243 F.3d 773, 784 (3d Cir.

2001)); *see also Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008) ("[J]udicial

estoppel is an extreme remedy, to be used only when the inconsistent positions are tantamount to

a knowing misrepresentation to or even fraud on the court."). Further, "Supreme Court and

Third Circuit precedent demonstrate that some aggravating factor, and not mere inconsistency is

necessary for the application of judicial estoppel." *Id.* at 186 n.5.

        Most importantly, "[n]ot only must the court find that a party adopted inconsistent

positions, but it should also consider whether the party succeeded in convincing a tribunal to

accept its position and whether the party would derive an unfair advantage in the absence of

estoppel." *Id.* at 186 n.5 (citing *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)); *accord*

*Morgan v. Gay*, 471 F.3d 469, 478 n.9 (3d Cir. 2006) ("[C]ourts regularly inquire whether the

party has succeeded in persuading a court to accept that party's earlier position, so that judicial

acceptance of an inconsistent position in a later proceeding would create the perception that

either the first or the second court was misled. Absent success in a prior proceeding, a party's

later inconsistent position introduces no risk of inconsistent court determinations, and thus poses

little threat to judicial integrity.").

        Based on this principle, courts have specifically held that judicial estoppel may

not be invoked when – as here – a party's purportedly inconsistent position was not adopted on

appeal. In *Coal Resources, Inc. v. Gulf & Western Industries, Inc.*, 865 F.2d 761 (6th Cir. 1989),

for example, the Sixth Circuit held: "We reject G & W's judicial estoppel argument because

CRI was not successful in the prior trial. Its verdict was reversed on appeal." *Id.* at 773; *accord*

*First Nat'l Ins. Co. v. Fed. Deposit Ins. Corp.*, 977 F. Supp. 1051, 1058 (S.D. Cal. 1997) ("One

of the reasons for judicial estoppel is to prevent inconsistent adjudications. There is no danger of

this in the instant action because the earlier judgment on this issue was set aside by the Ninth

Circuit.").

Against this great weight of authority – including Third Circuit authority –

Plaintiffs urge reliance on *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656 (7th Cir. 2004).

(Pltfs. Br. 91-92.)  While it is an academic point – *Carnegie* plainly conflicts with *Morgan* and

*Chao*, the clear and controlling Third Circuit precedents cited above – it does not appear that any

other court has followed *Carnegie*, and the decision has been harshly criticized.  *See, e.g.*, Jon B.

Nelson, *Fast and Loose Litigants and Courts: Carnegie v. Household International, Inc. and the

End of Settlement Classes*, 84 Tex. L. Rev. 541, 543 (2005) (opining that *Carnegie*, "misapplied

the doctrine of judicial estoppel, failing to ground it in either circuit precedent or the law as

interpreted by a majority of courts").

There is an irony in Plaintiffs' judicial estoppel argument, and their attempt to

rely on an outlier case that conflicts with binding Third Circuit precedent that need not be

reached in the first instance because Defendants' position on *Davis I* has been consistent

throughout.  If judicial estoppel had any place here based on positions taken in the settlement

proceedings, **Plaintiffs** would be the parties estopped.  For example, any Plaintiff who entered

into the previous settlements would be judicially estopped from, for example, continuing to

pursue their TILA/HOEPA claims because they vehemently argued to this Court and to the Third

Circuit when seeking approval of the settlements that such claims were meritless.  Thus, in the

event the Court were inclined to agree with Plaintiffs' judicial estoppel argument – and there is

no basis for it doing so – Defendants reserve the right, and respectfully request the opportunity,

to identify the multitude of inconsistent positions that any Plaintiff who entered into the prior

settlements is now taking in these proceedings, so that all such Plaintiffs may be judicially

estopped from taking such positions.

> **(b)  Plaintiffs May Not Rely On Federal Rule Of Civil Procedure
> 15(c) Or The *American Pipe* Rule In Support Of Their Relation
> Back Argument**

In their opening brief, Defendants explained that non-Pennsylvania CBNV

borrowers may not relate their claims back to the filing of *Davis I* under Federal Rule of Civil

Procedure 15(c), or the rule from *American Pipe & Construction Co. v. Utah*, 414 U.S. 538

(1974).  (Defs. Br. 21-29.)  Plaintiffs do not challenge Defendants' argument that Plaintiffs may

not avail themselves of *American Pipe*, leaving this argument unrefuted.

Plaintiffs do try to argue that non-Pennsylvania CBNV borrowers may invoke

relation back under Rule 15(c).  (Pltfs. Br. 92-95.)  But Plaintiffs do not expressly challenge

Defendants' reliance on *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113 (11th Cir. 2004), in

which the court held that to satisfy Rule 15(c)'s "notice" requirement, a defendant must have

notice not only of the substantive claims being brought against it, "but also of the number and

generic identities of the potential plaintiffs who may participate in the judgment."  *Id.* at 1132-

133.  Instead, Plaintiffs erroneously argue that their claims should relate back to *Davis I*, because

Defendants supposedly (a) "conceded" that the *Davis I* filing is the operative date for a

limitations analysis, (b) were not prejudiced by the subsequent filing of a complaint on behalf of

a nationwide putative class, and (c) were on notice of such claims by a nationwide putative class.

(Pltfs. Br. 92-95.)

Plaintiffs' argument that Defendants conceded relation back to *Davis I* fails for

the reasons discussed above at length.

Plaintiffs' contention that Defendants should have surmised the extent of their

potential liability after being sued by a discrete subset of borrowers for violations of

Pennsylvania state law mischaracterizes the legal standard as well as the factual record. This position cannot be squared with binding precedent. The Third Circuit has cautioned that, "[a]lthough the relation-back rule ameliorates the effect of statutes of limitations it does not save the claims of complainants who have sat on their rights," such as the claims of those Plaintiffs who were decidedly not members of the class in *Davis I*, and thus did not assert any claims in *Davis I. See Nelson v. County of Allegheny*, 60 F.3d 1010, 1015 (3d Cir. 1995) (internal citation omitted). As explained by the Third Circuit, without some limit, relation back

> would allow the tardy plaintiffs to benefit from the diligence of the other victims and, more importantly, could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations had run. Even if, as here, there were no showing of specific prejudice in the sense of lost or destroyed evidence, defendants would still be deprived of their interest in repose.

*Id.* (quoting *Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301, 1309 (D.C. Cir. 1982)); *see also Petersen v. United Steel Workers, AFL-CIO-CLC*, No. 04-0062, 2009 U.S. Dist. LEXIS 94240, at *19-20 (D.V.I. Oct. 7, 2009); *Brever v. Federated Equity Mgmt. Co. of Pa.*, 233 F.R.D. 429, 435 (W.D. Pa. 2005); *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 320 (6th Cir. 2010) ("In arguing that [Defendants] had notice of their claims because they were aware of the original plaintiffs' timely claims, the new plaintiffs' view of notice is myopic.").

To the extent that Plaintiffs' argument rests on events that occurred **after** the filing of *Davis I*, they cite no authority for their retrospective approach, and none exists.[9]

---

[9] Plaintiffs argue that, since at least 2003, Defendants started to take the position in settlement negotiations that the filing of *Davis I* was the operative filing date for all CBNV borrowers. (Pltfs. Br. 93.) Not only does this contention constitute a repackaging of Plaintiffs' meritless judicial estoppel argument, but it also presumes that the prejudice analysis may be conducted in light of events subsequent to the filing of *Davis I*, rather than at the time of its filing on May 1, 2001. Plaintiffs similarly cite the current CAC – filed just a few months ago – as proof that Defendants had notice back on May 1, 2001 of

(continued...)

Relation back preserves fairness to Defendants only when Defendants have notice of the number and generic identity of potential plaintiffs "in existence at the time the action was originally brought." *Haas v. Pittsburgh Nat'l Bank*, 526 F.2d 1083, 1097 (3d Cir. 1975). Thus, any analysis of notice must be conducted as of the time *Davis I* was originally brought (when the putative class consisted of Pennsylvania-only CBNV borrowers), and not at any point thereafter, and must be based on the pleading in *Davis I* and not any outside source.

Plaintiffs also argue that the issues of notice and prejudice to Defendants create a fact question that renders resolution of the relation back issue inappropriate on a Rule 12(b)(6) motion. (Pltfs. Br. 93-94.) None of the cases cited by Plaintiffs in their discussion of this point even involved relation back, and thus, once again, Plaintiffs' position is entirely without support.[10]

The Third Circuit in *Nelson*, 60 F.3d at 1014-015, and the Eleventh Circuit in *Cliff*, 363 F.3d at 1131-133, have analyzed whether an amended pleading relates back to avoid the bar of a statute of limitations in the very circumstances presented here and have held that the claims of a plaintiff added by amendment and not included in the original class cannot relate back to the filing date of the original complaint. The only facts needed to resolve this issue are the contents of the *Davis I* complaint, which unquestionably involved a Pennsylvania-only

---

(...continued)
the breadth of the scheme in which they were alleged to have engaged. (*Id.*). This argument too depends on a retrospective analysis based on post-*Davis I* events, rather than what Defendants had notice of as of the filing of *Davis I*.

[10] Notably, *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999), involved whether the statute of limitations had expired at all, not relation back. Further, *Southern Cross* did not categorically rule that "if there are factual issues about the applicability of a statute of limitations, then dismissal is not proper." (Pltfs. Br. 94.) In fact, the Third Circuit there affirmed the dismissal of a complaint based on limitations.

putative class and did not give notice that claims on behalf of a putative nationwide class would later be asserted.  The Court should follow *Nelson* and *Cliff* and likewise hold that these claims do not relate back.

Plaintiffs' reliance on *dictum* and a passing sentence from the Seventh Circuit cannot trump these fully-reasoned, on-point authorities.  (*See* Pltfs. Br. 94-95.)  As Defendants explained in their initial brief, *Schillinger v. Union Pacific Railroad Co.*, 425 F.3d 330, 334 (7th Cir. 2005), involved the issue of CAFA removal jurisdiction and not the application of a limitations period.[11]  The Seventh Circuit did not analyze whether the defendants received fair notice of the claims of the new parties, but rather concluded without elaboration that the "suit is still between the Schillingers and others similarly situated."  *Id.* at 334.  Furthermore, *Schillinger* addressed relation back in the context of Illinois state statutes, and not the application of Rule 15(c) to a case properly in federal court, like this case.  *See id.* at 334-35.  And *Paskuly v. Marshall Field & Company*, 646 F.2d 1210, 1211 (7th Cir. 1981), is a one-page per curiam opinion totally devoid of explanation as to how the original complaint supposedly placed defendant on notice of the likelihood of a class action.[12]

---

[11]  And even as to CAFA the Seventh Circuit's view is widely disputed.  *See Farina v. Nokia, Inc.*, 625 F.3d 97, 110-12 (3d Cir. 2010).

[12]  The district court in *Paskuly* noted that its decision was an "exception to that general rule" and that "it is rare that an amendment will relate back which adds plaintiffs who are total strangers to the lawsuit."  *Paskuly v. Marshall Field & Co.*, 494 F. Supp. 687, 689 (N.D. Ill. 1980), *aff'd* 646 F.2d 1210, 1211 (7th Cir. 1981).  The present case is instead analogous to *Plummer v. Farmers Group, Inc.*, 388 F. Supp. 2d 1310 (E.D. Okla. 2005), which distinguished *Paskuly* on the grounds that plaintiffs, like those here, "all ha[d] separate contracts, for separate property, with differing monetary value" and were "complete strangers."  *Id.* at 1316.

## 2.    Plaintiffs' Contention That Defendants Waived The Statute Of Limitations Defense Is Specious

Plaintiffs say that Defendants did not answer any of the complaints that were filed in the early 2000's in this litigation, so they waived any affirmative defense – including the statute of limitations – that they might have been able to assert now in response to the recently-filed CAC.  (Pltfs. Br. 95-96.)  This argument is patently frivolous.

As a preliminary matter, Defendants did not answer the early complaints in this litigation for good reason – the parties had reached a settlement prior to the time that any answer would have been due.  Plaintiffs cite no authority for the proposition that, following the ultimate disapproval of a class settlement, a defendant waives affirmative defenses just because – at the time the parties reached their settlement – the case had not reached the answer stage.  The lack of authority is unsurprising, as it defies any and all logic to say that a defendant waived a defense by not pleading it in a responsive pleading when the time for the responsive pleading has yet to arrive.

Even had Defendants answered Plaintiffs' earlier complaints and omitted the statute of limitations as an affirmative defense, Defendants still would be able to assert the statute of limitations in response to the recently-filed CAC.  As the Seventh Circuit has explained:

> . . . when a plaintiff files an amended complaint, the new complaint supersedes all previous complaints and controls the case from that point forward. . . .  ***Because a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses.***
>
> ****
>
> . . . To hold to the contrary would, in essence, enable plaintiffs to change their theory of the case while simultaneously locking defendants into their original pleading. This result would clearly

> contravene Federal Rule of Civil Procedure 15(a) which authorizes
> the amendment of answers "as justice so requires."

*Massey v. Helman*, 196 F.3d 727, 735 (7th Cir. 1999) (citations omitted) (emphasis added);

*accord Rosenberg v. City of New York*, No. 09-4016, 2011 WL 4592803, at *15 (E.D.N.Y. Sept.

20, 2011) ("Federal Rule of Civil Procedure 8(c) requires that affirmative defenses be asserted in

responsive pleadings.  However, in light of Rule 15(a)'s authorization of the amendment of

answers 'as justice so requires,' even where an affirmative defense is not raised in response to

the original complaint, generally, the defense is not waived where the party timely raises the

defense in response to an amended complaint."); *Turner v. Pavlicek*, No. 10-00749, 2011 WL

4458757, at *7 (S.D. Tex. Sept. 22, 2011) ("To the extent that Turner bases his untimeliness

contention on the fact that the Ruttas did not raise a Rule 12(b)(7) defense in their motion to

dismiss Turner's original complaint, . . . that contention also fails.  This court's order that Turner

file an amended complaint reset the pleadings.").

The recently-filed CAC – which added new claims and new Plaintiffs to the case

– reset the pleadings.  Thus, the filing of the CAC would allow Defendants to assert the statute of

limitations in response thereto even had Defendants previously filed answers in response to

earlier complaints in this litigation that failed to plead the statute of limitations.

Finally, even when not pled in an answer or raised in a motion to dismiss,

"affirmative defenses (including the statute of limitations) are not waived if raised at a

'pragmatically sufficient time' with no prejudice to the plaintiff."  *Balter v. United States*, No.

04-3687, 2006 WL 335859, at *1 (3d Cir. Feb. 15, 2006) (citing *Eddy v. VI Water & Power

Auth.,* 256 F.3d 204, 209 (3d Cir. 2001); *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir.

1991)).  Given the history of this litigation, it would be absurd for Plaintiffs to argue that they are

prejudiced by Defendants' assertion of the statute of limitations in response to the CAC.  That

claims of certain Plaintiffs and putative class members are time-barred has been a central issue in

this litigation since its inception. As discussed above in connection with Plaintiffs' judicial

estoppel argument, it formed the basis of the previous settlements, and was the topic of extensive

briefing in both this Court and the Third Circuit.

The contention that Defendants have waived the statute of limitations defense is

simply nonsensical.

### 3.     Plaintiffs' Arguments On Equitable Tolling Are Defective On Many Grounds

As Defendants argued in their opening brief, Plaintiffs have not pled sufficient

facts to invoke equitable tolling. (Defs. Br. 29-47.) Plaintiffs' arguments in response are

unavailing.

### (a)     Certain Aspects Of Plaintiffs' TILA And RESPA Claims, By Their Very Nature, Cannot Be Subject To Equitable Tolling

First, as discussed in Defendants' opening brief, there are certain aspects of

Plaintiffs' claims to which equitable tolling could not conceivably apply because the alleged

wrongdoing underlying the claim was inherently apparent at the time of closing. (Defs. Br. 45.)

Four out of five of the TILA/HOEPA claims are based on documents and other alleged facts that

necessarily would have been apparent to Plaintiffs at closing.[13] Plaintiffs do not even attempt to

respond to this point, thereby conceding that there can be no equitable tolling in connection with

those aspects of the TILA/HOEPA claims.[14]

---

[13]     These claims are: (1) the lending banks allegedly failed to provide borrowers the required
HOEPA disclosure three business days prior to the loan closings; (2) improperly asked
plaintiffs to sign the same; (3) used too small type for disclosures; and (4) failed to
disclose one of several circumstances when a prepayment penalty could not be assessed.

[14]     Indeed, Plaintiffs elsewhere cite *Bryant v. Mortgage Capital Resource Corp.,* 197 F.
Supp. 2d 1357 (N.D. Ga. 2002), which recognizes that these types of allegations are not
(continued...)

In addition, Plaintiffs have clarified in their opposition brief that "the actual RESPA violation" that they are alleging regarding title fees is that "the banks required the use of Shumway/Bapst title companies as a condition of receiving the second mortgage loans at issue." (Pltfs. Br. 33.)  The alleged required use of "Shumway/Bapst title companies" also is something that Plaintiffs obviously would have known at the time of closing; if Plaintiffs did not know they were required to use them, there could be no RESPA violation.  Thus, Plaintiffs cannot claim equitable tolling for their RESPA claims based on title fees.

### (b)    The Court May Properly Adjudicate Equitable Tolling On A Motion To Dismiss

Plaintiffs' equitable tolling allegations also cannot save the other aspects of the time-barred RESPA and TILA/HOEPA claims.  Plaintiffs initially argue that "[t]he question of whether claims are equitably tolled is not properly adjudicated on a motion to dismiss" (Pltfs. Br. 96), and in support Plaintiffs rely on cases from other jurisdictions, as well as *dicta* from *CBNV II* (which itself cited non-Third Circuit decisions).  (*Id.* at 98-99.)[15]

_____

(...continued)

subject to tolling.  *Id.* at 1367 (dismissing on limitations grounds claim that disclosures were falsely dated, because plaintiffs knew or should have known at the time of closing that the documents were not properly dated, and also because plaintiffs failed to exercise diligence).

[15]    The Third Circuit's comment that "tolling is generally not amenable to resolution on a Rule 12(b)(6) motion" was clearly *dicta*.  *In re Community Bank of Northern Virginia* ("*CBNV II*"), 622 F.3d 275, 301-02 (3d Cir. 2010).  *Dicta*, of course, is discussion in an opinion that "is not necessary to that opinion's holding," and which therefore is not precedential or binding.  *Ponnaoula v. Ashcroft*, 373 F.3d 480, 488 n.5 (3d Cir. 2004).  As the Third Circuit in *CBNV II* stated immediately after the foregoing comment, this Court's Rule 12(b)(6) analysis of the adequacy of Plaintiffs' equitable tolling allegations was unnecessary to the issue before the Court – *viz.* adequacy of representation under Rule 23(a)(4).  *See* 622 F.3d at 303 ("We conclude that the merits inquiries the District Court conducted here – *i.e.*, whether a new plaintiff could file an amended pleading asserting TILA/HOEPA claims consistent with Rule 15(c), or adequately plead a basis for equitable tolling under Rule 12(b)(6) – were unnecessary to evaluate the adequacy

(continued...)

27

The Third Circuit, however, has never held that it is improper to adjudicate equitable tolling on a motion to dismiss. To the contrary, as Plaintiffs themselves recognize elsewhere in their brief (*id.* at 94), under what has become known as the "Third Circuit rule," courts within this Circuit are permitted to adjudicate a statute of limitations defense on a motion to dismiss as long as the complaint shows that the claim is time-barred. *In re Dreyfus Mutual Funds Fee Litig.*, 428 F. Supp. 2d 342, 352 (W.D. Pa. 2005) (Lancaster, J.) (citing *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002)).

In fact, in even the short period of time since the Third Circuit's *dicta* in *CBNV II*, *the Third Circuit itself* has repeatedly affirmed the rejection by district courts of equitable tolling allegations on motions to dismiss. *See, e.g.*, *Kramer v. Commissioner of Social Security*, No. 11-4372, 2012 WL 388392, at *2-3 (3d Cir. Feb. 8, 2012); *Poole v. Marks*, 441 Fed. Appx. 854, 857-58 (3d Cir. 2011); *Riggs v. AHP Settlement Trust*, 421 Fed. Appx. 136, 139 (3d Cir. 2011); *Kliesh v. Select Portfolio Servicing, Inc.*, 419 Fed. Appx. 268, 271-72 (3d Cir. 2011); *Zied v. Barnhart*, 418 Fed. Appx. 109, 114 (3d Cir. 2011); *Abulkhair v. PPI/Time Zero, Inc.*, 398 Fed. Appx. 710, 711 (3d Cir. 2010). Plainly, none of those decisions would have been affirmed if the comment made in *CBNV II* was an actual holding binding future Third Circuit panels, or district courts within the Circuit. Rather, it was a mere observation in *dicta* that was simply inaccurate.

Likewise, since the time of the Third Circuit's *dicta* in *CBNV II*, district courts within this Circuit have not hesitated to reject at the Rule 12(b)(6) stage allegations of equitable

---

(...continued)
        requirement under Rule 23(a)(4)."). The Third Circuit's holding was that this Court
        applied an incorrect legal standard in determining that the named Plaintiffs and class
        counsel were adequate representatives for the putative class. *Id.* at 315. Thus, the Third
        Circuit's comment regarding the amenability of an equitable tolling analysis on a Rule
        12(b)(6) motion was unnecessary to the Third Circuit's ruling, and as such, by definition,
        is non-binding *dicta*.

tolling of the limitations period *for RESPA and TILA/HOEPA claims*.  *See, e.g.*, *Hocker v. CitiMortgage, Inc.*, No. 09-00973, 2012 WL 174967, at *3 (M.D. Pa. Jan. 20, 2012) (RESPA claim); *Herzog v. IndyMac, FSB*, No. 11-4571, 2011 WL 5513205, at *3-4 (D.N.J. Nov. 9, 2011) (TILA claim); *Politi v. Peoples Mortg. Corp.*, No. 10-04194, 2011 WL 666086, at *3-5 (D.N.J. Feb. 14, 2011) (TILA/HOEPA claims).

Accordingly, Plaintiffs' contention that it would not be "proper[]" for the Court to adjudicate Plaintiffs' equitable tolling allegations at this stage is belied by a mountain of case authority.

### (c)    Rule 9(b) Applies To Plaintiffs' Fraudulent Concealment Allegations

Plaintiffs' contention that allegations of fraudulent concealment need not be pled with particularity pursuant to Rule 9(b) (Pltfs. Br. 108-09) also is erroneous.  When the Third Circuit has directly addressed whether Rule 9(b) applies to allegations of fraudulent concealment, it has unequivocally held that it does.  *See, e.g.*, *Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 626 (3d Cir. 1984) ("We agree, of course, that fraud, and thus fraudulent concealment, must be pleaded with particularity."); *Davis v. Grusemeyer*, 996 F.2d 617, 624 n.13 (3d Cir. 1993) ("fraudulent concealment claim . . . is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b)"), *overruled on other grounds by Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644 (3d Cir. 1998).

Plaintiffs' reliance on *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1391-392 (3d Cir. 1994), is misplaced.[16]  The Third Circuit in *Oshiver* did not even

---

[16]    Plaintiffs also cite *Thomas v. Independence Township*, 463 F.3d 285 (3d Cir. 2006), for the proposition that a plaintiff need not plead a response in anticipation of an affirmative defense.  (Pltfs. Br. 109.)  *Thomas*, however, did not involve the affirmative defense of the statute of limitations, but rather involved the affirmative defense of qualified

(continued...)

mention Rule 9(b) or the *Byrnes* and *Davis* decisions, much less disturb their holding that Rule 9(b) applies to allegations of fraudulent concealment.  Of course, the panel that decided *Oshiver* did not even have the power to overrule the holdings of *Byrne* and *Davis*.  *See Siegel v. AlphaWire Corp.,* 894 F.2d 50, 53 n.2 (3d Cir. 1990) ("a panel of this court may not overrule a decision of another panel").  Moreover, as a factual matter, the plaintiff asserting gender discrimination in *Oshiver* did plead fraudulent concealment with particularity, as she alleged all the specifics of defendant's statements that actively misled her regarding the reason for her discharge, thereby delaying the filing of her complaint.  *Id.* [17]

Plaintiffs acknowledge that Judge Ambrose, in *Matthews v. Kidder, Peabody & Co.*, No. 99-85, 2000 WL 33726916, at *28 (W.D. Pa. Aug. 18, 2000), held that Rule 9(b) applies to fraudulent concealment allegations.  (Pltfs. Br. 108.)  Meanwhile, they can cite no cases from any court within the Circuit reaching the opposite conclusion.

---

(...continued)

immunity.  *See* 463 F.3d at 294 n.2.  Unlike the statute of limitations defense, the qualified immunity defense is not governed by the "Third Circuit rule," which, as explained above, subjects complaints to dismissal at the Rule 12(b)(6) stage if the complaint fails on its face to allege a timely claim, including such specific averments as would establish grounds for equitable tolling.  *Thomas* therefore does not support Plaintiffs' position.

[17]    Indeed, district courts within this Circuit, in citing *Oshiver*, have held that allegations of fraudulent concealment must meet the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Park v. M & T Bank Corp.*, No. 09-02921, 2010 WL 1032649, at *4 (D.N.J. Mar. 16, 2010); *Laychock v. Wells Fargo Home Mortg.*, No. 07-4478, 2008 WL 2890962, at *7 (E.D. Pa. July 23, 2008).  That is because the allegations in *Oshiver* **did** meet those heightened standards.

**(d)    A Plaintiff Seeking To Invoke Fraudulent Concealment Must Plead An Act Of Alleged Concealment Independent Of Those That Form The Basis Of The Causes Of Action**

As Defendants explained in their opening brief, Plaintiffs have not alleged *any* act of concealment by Defendants – much less with the requisite particularity – beyond the acts that are integral to the RESPA and TILA/HOEPA claims themselves.  (Defs. Br. 32-42.)  Plaintiffs argue that there is no requirement in this Circuit that a plaintiff plead an act of fraudulent concealment independent of the acts integral to the cause of action itself.  They say that, "[m]ost significantly, the Third Circuit has already dismissed Defendant's contention," and in support thereof they cite a statement that the Third Circuit made in passing in *CBNV II*.  (Pltfs. Br. 110.)  But, as Defendants already explained in their opening brief (Defs. Br. 35-36), that statement is not significant because it was plainly *dicta*, and Plaintiffs do not (and cannot) dispute that it was so.

Indeed, the *dicta* on this point is actually in conflict with the *CBNV II* court's actual holdings, which was that those putative class members whose transactions occurred within one year of the filing of the first applicable suit must be placed in a separate sub-class *precisely because they do not have to overcome the threshold obstacle of the statute of limitations*.  *In re Community Bank of Northern Virginia* ("*CBNV II*"), 622 F.3d 275, 304 (3d Cir. 2010).  If equitable tolling applied simply by virtue of the alleged underlying wrong, why would the Third Circuit have held as it did?  Thus, Plaintiffs' contention that the Third Circuit has "already dismissed" Defendants' position is just wrong.

Plaintiffs also assert that "[n]owhere in any of the seminal Third Circuit equitable tolling decisions is there any mandate that to invoke equity in response to an assertion that a claim is time barred that there must be some further act of fraud beyond the wrong itself when

that wrong is by its nature a concealing action." (Pltfs. Br. 110.)  That is not accurate, as shown

by the three decisions that Plaintiffs cite.

      *Ramadan v. Chase Manhattan Corp.*, 156 F.3d 499 (3d Cir. 1998), simply stands

for the proposition that equitable tolling is available in TILA cases.  It says nothing about the

elements of equitable tolling.

      By contrast, *Cetel v. Kirwan Financial Group*, 460 F.3d 494 (3d Cir. 2006), set

out the "necessary elements" of equitable tolling:

> (1) that the defendant actively misled the plaintiff; (2) which
> prevented the plaintiff from recognizing the validity of her claim
> within the limitations period; and (3) where the plaintiff's
> ignorance is not attributable to her lack of reasonable due diligence
> in attempting to uncover the relevant facts.

*Id.* at 509.  This recitation belies Plaintiffs' assertion.  That a plaintiff be "actively misled" to

prevent her from recognizing the validity of her claim necessarily requires active conduct other

than what led to the claim.  That is made apparent not only by the word "active," but also by the

focus on "prevent[ing]" the plaintiff from "recognizing the validity" of the claim.  If a defendant

violates a statute, but does not tell the plaintiff that it has done so, the defendant has not

"actively" done anything with respect to the claim.  Moreover, the "active" conduct must have

"prevented" – again, an action word – the plaintiff from discovering, not facts, but the "validity"

of her claim.  Preventing someone from discovering the validity of the claim is an active step

over and above the underlying violation.  Indeed, such active prevention is precisely what

occurred in *Cetel*, where the plaintiffs, after receiving IRS tax deficiency notices, inquired of

those who had sold them tax shelters.  Defendants reassured them that the IRS "had no case."  *Id.*

at 504.  Thus the first two elements were satisfied in *Cetel* (wherein the plaintiffs nonetheless

lost for want of due diligence), but both the court's language and the facts establish in this

Circuit that the "self-concealing wrong" theory is not applicable to equitable tolling in this
circuit.

Finally, as noted in Defendants' opening brief at 41-42, *Oshiver* presents another
paradigmatic case of a defendant taking misleading action beyond the underlying claim.  The
plaintiff there was allegedly fired for discriminatory reasons, but did not file suit in time because,
when she inquired why she was fired, she was told that she was laid off for lack of work.  In fact,
she had been replaced by a male.  Clearly, there was inquiry from the plaintiff and a
misrepresentation that did not form the basis of her discrimination claim, but that actively
prevented her from discovering its validity.  Thus, none of the three "seminal" Third Circuit
decisions supports Plaintiffs' position, and the two that actually address whether equitable tolling
occurred fully support Defendants' position.

In fact, Defendants' view represents the view of the United States Supreme Court.
In *Wood v. Carpenter*, 101 U.S. 135, 143 (1879), the Court held that, to avail oneself of equitable
tolling, "[c]oncealment by mere silence is not enough.  There must be some trick or contrivance
intended to exclude suspicion and prevent inquiry."  *Wood* was followed in a widely-cited
district court case that thoroughly analyzed the issue in the context of a RESPA claim.  In *Moll v.
U.S. Life Title Ins. Co. of New York*, 700 F. Supp. 1284 (S.D.N.Y. 1988) (discussed in
Defendants' opening brief at 34), the court explained why entries on HUD-1 statements cannot
form the basis for fraudulent concealment of a RESPA kickback scheme.  Plaintiffs there argued
that the HUD-1 they received at closing contained an entry showing that the title insurance
premium fee was received by one entity (US Life), when in fact US Life was splitting that fee
with other individuals and entities in violation of RESPA.  But, the court explained, the HUD-1
contained no representation "regarding the ultimate disposition" of the premium proceeds.  *Id.*

Quoting its earlier opinion in the *Moll* litigation dismissing plaintiffs' original complaint, 654 F.

Supp. 1012 (S.D.N.Y 1987), the court expanded on this point as follows:

> Nowhere in their complaints do plaintiffs allege that US Life **represented** that it was "'accepting'" (*i.e.*, retaining for its own account) the premium charged." The complaints do state that US Life charged the plaintiffs a certain premium for their title insurance, however, plaintiffs fail completely to plead any facts indicating whether defendant or any agent of defendant ever discussed with plaintiffs what US Life would do with the premiums.
>
> 654 F. Supp. at 1027 (S.D.N.Y. 1987) (citations omitted) (emphasis in original). Absent such allegations, plaintiffs have not shown any "trick or contrivance intended to exclude suspicion and prevent inquiry." *Wood v. Carpenter*, 101 U.S. 135, 143 (1879). As a result, plaintiffs' allegations, as a matter of law, are inadequate to justify tolling of the statute of limitations.

*Id.* at 1292-293.

The *Moll* court then reached the heart of the matter: given the nature of a RESPA

claim, the application of equitable tolling as urged by Plaintiffs here would eviscerate the

statutory limitations period:

> Indeed, were this Court to hold that entries on HUD-1 forms, standing alone, constituted evidence of fraudulent concealment, the RESPA statute of limitations would have little meaning. Section 4 of RESPA, 12 U.S.C. § 2603, requires that HUD-1 forms be used in all transactions in the United States involving federally related mortgage loans. If fraudulent concealment were established whenever a title insurance company failed to disclose the ultimate disposition of premiums on a HUD-1 form, equitable tolling would be applicable for virtually all RESPA claims. Had Congress intended this result, it is unlikely that it would have enacted a general rule requiring that RESPA claims be brought within a year of the occurrence of the violation.

*Id.* at 1293 n.6. This compelling reasoning requires rejection of the attempt by Plaintiffs here to

premise their fraudulent concealment theory on the alleged non-disclosure of purported

kickbacks in the HUD-1's.

Plaintiffs cannot muster a response to *Moll*. Nor do Plaintiffs muster a response

to the plethora of Pennsylvania federal decisions standing for the same proposition, such as

*Garczynski v. Countrywide Home Loans, Inc.*, 656 F. Supp. 2d 505, 516-17 (E.D. Pa. 2009)

(RESPA), and *Poskin v. TD Banknorth, N.A.*, 687 F. Supp. 2d 530, 531 (W.D. Pa. 2009) (TILA).

(Defs. Br. 33.) Additional decisions include a very recent one issued after Defendants' opening

brief was filed. *See Gutierrez v. TD Bank*, No. 11-5533, 2012 WL 272807, at *9 (D.N.J. Jan. 27,

2012) (dismissing, among other claims, TILA, RESPA and HOEPA claims on statute of

limitations grounds, and rejecting plaintiffs' fraudulent concealment allegations, reasoning:

"Plaintiffs' allegations regarding Defendant's active concealment limit themselves to the alleged

fraudulent mortgage transactions rather than to any additional fraudulent act that perpetuates

concealment."); *see also Taggart v. Wells Fargo Home Mortg., Inc.*, No. 10-00843, 2010 WL

3769091, at *4 (E.D. Pa. Sept. 27, 2010) (rejecting fraudulent concealment allegations in attempt

to invoke equitable tolling of the RESPA limitations period, and noting that "'mere silence or

non-disclosure is not enough to trigger estoppel[;] the adversary must commit some affirmative

independent act of concealment upon which the plaintiffs justifiably rely in order to toll the

statute.'") (quoting *Garczynski*, 656 F. Supp. 2d at 516).[18]

---

[18]    Plaintiffs attempt to draw a distinction between **the doctrine of fraudulent concealment**
on the one hand, and ***equitable tolling as-a-result-of-the-defendant-having-actively-
misled-the-plaintiff*** on the other hand, suggesting that the doctrine of fraudulent
concealment imposes a lower burden on a plaintiff. (Pltfs. Br. 106-08.) This distinction
has not been recognized by the Third Circuit or most district courts within this Circuit. In
any event, and contrary to Plaintiffs' suggestion, it is at best a distinction without a
difference, as even the few courts applying the rule under the rubric of "fraudulent

(continued...)

It should not be overlooked that, as Defendants discussed in their opening brief at 33 n.19, this Court has already ruled on the issue by finding that affirmative acts extrinsic to the underlying claim are required.  *See In re Community Bank of Northern Virginia*, 467 F. Supp. 2d 466, 478 (W.D. Pa. 2006).  This ruling was and is entirely correct.  The only reason to reconsider it would be if the *dicta* in *CBNV II* upon which Plaintiffs rely were other than *dicta*, but it is not;[19] or if the weight of authority had shifted against this position since 2006, but it has not.  To the contrary:  the weight of authority comes down almost unanimously on Defendants' side.

If more were needed, Plaintiffs also cannot, and therefore fail to, address the substantial authority from outside of the Third Circuit that supports Defendants' position on this issue.  (*See* Defs. Br. 33-35, 39.)  One particularly instructive case to which Plaintiffs have no response is *Spann v. Community Bank of Northern Virginia*, No. 03-7022, 2004 WL 691785 (N.D. Ill. Mar. 30, 2004), in a decision rendered before the matter was transferred to this MDL:

> Plaintiffs allege that fraudulent concealment had tolled the statute of limitations here 'in that the finance charge and APR miscalculations are undetectable by the average borrower.'  (R. 50-1. SAC ¶ 4a.)  This sole allegation fails to show that Community Bank took any affirmative steps to conceal Plaintiffs' cause of action.  ***They have not alleged any wrongdoing above and beyond the wrongdoing upon which the Plaintiffs' claim is founded.***  Plaintiffs have not alleged any deliberate efforts on the part of Community Bank to prevent them from suing.  Accordingly, they

_____

(...continued)
concealment" have required affirmative acts of concealment by the defendant independent of those that comprise the plaintiff's cause of action.  *See, e.g.*, *Commonwealth of Pennsylvania v. Lake Asphalt & Petroleum Co. of Pennsylvania*, 610 F. Supp. 885, 888 (M.D. Pa. 1985).

[19]   In prior cases, this Court has not hesitated to decline to follow *dicta*.  *See, e.g., Rozzelle v. Rossi*, No. 98-1738, 2007 WL 2905728, at *4 n.5 (W.D. Pa. Sept. 30, 2007) (Lancaster, J.) (holding that because "statements made by the Court of Appeals . . . were unnecessary to its narrow holding . . ., those statements were *obiter dicta* and not binding").  Defendants respectfully submit that the Court should follow the same principle here.

cannot avoid the statute of limitations based on the doctrine of
equitable estoppel.

*Id.* at *8 (emphasis added) (citation and internal quotation marks omitted).

Although this is not a case-counting contest, Plaintiffs conspicuously can muster
but a few decisions for their side of the argument.  (*See* Pltfs Br. 111-12) (citing *Bradford v. WR
Starkey Mortg., LLP*, No. 06-86, 2008 WL 4501957 (N.D. Ga. Feb. 22, 2008), and *Reiser v.
Residential Funding Corp.*, 420 F. Supp. 2d 940 (S.D. Ill. 2004)).  Each of these contains scant
analysis of the relevant issue.  The *Reiser* court even expressly recognized the correct rule of law
– *i.e.*, that the "'active steps'" taken by a defendant to fraudulently conceal a claim "must be
'above and beyond the wrongdoing upon which the plaintiff's claim is founded,'" *id.* at 946
(quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990)) – yet that court
nonetheless proceeded not to apply the very principle it cited as controlling.[20]

To summarize, the Third Circuit's *Cetel* decision imposes requirements that
Plaintiffs cannot meet.[21]  If that does not end the inquiry, then it certainly should be ended by the

---

[20]     Additional cases cited by Plaintiffs actually reinforce Defendants' position because they
rely on conduct independent of the underlying alleged wrong.  In *Veal v. Crown Auto
Dealerships, Inc.*, No. 04-323, 2006 WL 435693 (M.D. Fla. Feb. 21, 2006), a TILA
disclosure case, part of the defendants' alleged fraudulent concealment was their failure
to disclose the premium paid for the insurance product on a **separate set** of non-TILA
disclosures specific to the product.  *Id.* at *3.  In *Wise v. Mortgage Lenders Network
USA, Inc.*, 420 F. Supp. 2d 389 (E.D. Pa. 2006), the court found active, independent
concealment, including a repeated false promise by defendants that they eventually would
refinance the plaintiffs' loan on more favorable terms.  The promise to refinance had
nothing to do with the inadequacy of the documentation of the loan about which plaintiffs
complained, and the falsity of the promise was only revealed two years after the loan
closing, when the defendants refused to refinance.  *Id.* at 394-95 n.6.  *Wise* is a
particularly telling decision because it was decided by Judge Baylson, who three years
afterwards decided *Garczynski*, which, as explained above, rejects the "self-concealing
wrong" theory.

[21]     *Cetel*'s requirement that "the defendant" have actively misled the plaintiff also confirms
the argument at page 46 in Defendants' opening brief that there can be no equitable

(continued...)

principle – enunciated in this Court's *CBNV* decision, as well as *Spann, Moll,* and many other

cases – that resort to the "self-concealing wrong" theory would eviscerate the very limitations

periods Congress inserted into RESPA and TILA.

<div align="center">

**(e)    Plaintiffs Have Not Adequately Alleged That They Exercised
Reasonable Diligence**

</div>

In their opening brief, Defendants also explained that Plaintiffs have failed to

allege – other than in a totally inadequate and conclusory way – that they exercised reasonable

diligence in discovering their claims.  (Def.'s Br. 42-45.)  Defendants cited a number of cases in

support of their position (*id.*), none of which Plaintiffs have even bothered to address.

Defendants also explained that the fact that some of Plaintiffs filed certain claims arising out of

the alleged scheme in the early 2000's belies their argument that they could not at that time also

have discovered their TILA/HOEPA claims.  (Pltfs. Br. 44-45.)  Once again, Plaintiffs simply

ignore this point – but that point, alone, is dispositive.

Instead, Plaintiffs rely once again on *Reiser* and *Bradford*.  (Def.'s Br. 113-14.)

Just as these cases are in the (very small) minority in holding that fraudulent concealment can be

based solely on entries on a HUD-1, so too are those decisions essentially alone in holding that a

plaintiff can exercise reasonable diligence by relying solely on entries in a HUD-1.  As the *Moll*

court explained, a plaintiff must ask questions to demonstrate the exercise of reasonable

diligence.  *See* 700 F. Supp. at 1293 (finding that plaintiffs failed to exercise reasonable

diligence, and noting that they "could have asked US Life or their attorneys how their title

insurance premiums were being distributed."); *see also Duran v. Equifirst Corp.*, No. 09-03856,

---

(...continued)

tolling against RFC because there is no effort to allege that RFC performed any active
misleading – or dealt with Plaintiffs at all.  Plaintiffs make no effort to respond to this
defect in their pleading.

2010 WL 918444, at \*3-4 (D.N.J. Mar. 12, 2010) (holding that, even though plaintiffs had alleged they were given inaccurate loan documents, "that alone does not excuse them from exercising the reasonable insight and diligence required to pursue their claims"); *Griglak v. CTX Mortgage Co.*, No. 09-5247, 2010 WL 1424023, at \*4 (D.N.J. Apr. 8, 2010) (same).

### 4. The Rescission Claims Are Untimely Under The Applicable Statute Of Repose, Which Is Not Subject To Any Tolling

In their opening brief, Defendants demonstrated that Plaintiffs' rescission claims are untimely. TILA imposes an absolute three-year period in which rescission may be sought, and that period is not subject to tolling. (Def.'s Br. 46-47).

Plaintiffs do not claim to have sought rescission during that period. They acknowledge that these claims are not subject to equitable tolling, but claim that they are saved by a separate "legal"/class action tolling rule pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). (Pltfs. Br. 116-19.) This is an incorrect interpretation of the TILA statute of repose as construed by this Court, the Supreme Court, and the Third Circuit, as well as of *American Pipe.*

In *In re Community Bank of Northern Virginia*, 467 F. Supp. 2d 466 (W.D. Pa. 2006), certain objectors argued that the Supreme Court's decision in *Beach v. Ocwen Federal Bank*, 523 U.S. 410, 417 (1998), did not prohibit tolling of the three-year repose period in 15 U.S.C. § 1635(f) in the context of a class action. Noting that "it is clear that, upon the expiration of three years, *the right of rescission is extinguished and cannot be revived through any procedural mechanism*," this Court held that the objectors "provide no basis for this argument and the court finds no basis in *Beach* to so hold." *Id.* at 482 (emphasis added).

This conclusion is supported, indeed compelled, by the Supreme Court's analysis in *Beach*. The Supreme Court explained that the "'ultimate question' is whether Congress

intended that 'the right shall be enforceable in any event after the prescribed time, . . . and in this instance, the answer is apparent from the plain language of § 1635(f)." 523 U.S. at 416 (citations omitted). The Court then turned to the text of § 1635(f):

> Section 1635(f), however, takes us beyond any question whether it limits more than the time for bringing a suit, by governing the life of the underlying right as well. The subsection says nothing in terms of bringing an action but instead provides that the 'right of rescission [under the Act] shall expire' at the end of the time period. It talks not of a suit's commencement but of a right's duration, which it addresses in terms so straightforward as to render any limitation on the time for seeking a remedy superfluous.

*Id.* at 417. And the Court's conclusion was not limited to equitable tolling, but categorically covered all forms of tolling or other theories to extend § 1635(f)'s three-year period: "We respect Congress's manifest intent by concluding that *the Act permits no federal right to rescind, defensively or otherwise,* after the 3-year period of § 1635(f) has run." *Id.* at 419 (emphasis added).[22]

Nothing has happened to change this Court's analysis or its conclusion that "TILA/HOEPA claims for rescission are not 'viable.'" *Id.* This Court's ruling that *American Pipe* does not toll such claims is consistent with the decisions of other district courts. *See Spann v. Community Bank of Northern Virginia*, No. 03-7022, 2004 WL 691785, at *4-7 (N.D. Ill. March 30, 2004); *McMillan v. AMC Mortg. Servs., Inc.*, 560 F. Supp. 2d 1210, 1214-215 (S.D. Ala. 2008). And the Third Circuit has recently joined other Courts of Appeals in reaffirming the absolute nature of the three-year period and ruling that not even the sending of a notice of

---

[22]     Indeed, apart from the specific Congressional intent in § 1635(f), the theory that *American Pipe* announces a special "legal tolling" principle is without merit. In that case, the Supreme Court plainly fashioned a rule based on analogy and reliance on equitable tolling. *See* 414 U.S. at 559; *see also Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 626 (S.D.N.Y. 2011), and cases cited therein.

rescission (not present here) could prevent the right from being completely extinguished where, as here, "a legal action to enforce the right" had not been filed within the period. *Williams v. Wells Fargo Home Mortg., Inc.*, 411 Fed. Appx. 495, 499 (3d Cir. 2011); *see also McOmie-Gray v. Bank of Am. Home Loans*, 667 F.3d 1325, 1328 (9th Cir. 2012); *Jones v. Saxon Mortg., Inc.*, 537 F.3d 320, 327 (4th Cir. 1998) ("the time period stated therein is typically not tolled for any reason").

In claiming that class action tolling trumps the statute's absolute language terminating all right to rescind three years after the loan closing, Plaintiffs ignore the foregoing specific analysis of § 1635(f) and do not cite a single case involving this provision. They rely entirely on cases holding that other provisions generally labeled as statutes of repose, but containing different language than § 1635(f), are subject to class action tolling. These statutes do not speak to the extinguishment of the right and are thus not statutes of repose of the nature at issue here.

Finally, Plaintiffs suggest that this Court somehow made it impossible for them to file rescission claims through its orders on previous settlements. The Court knows that it has never done any such thing.

D.   **Plaintiffs Have Failed to Join Necessary and Indispensible Parties**

In response to Defendants' assertion that Plaintiffs have failed to join necessary parties under Fed. R. Civ. Proc. 19(a), Plaintiffs do not dispute that they seek rescission of loans made to Plaintiffs Edward Kruszka and Richard Montgomery, which were secured by mortgages executed by their non-party spouses. Instead, Plaintiffs argue that Rule 19(a) is inapplicable to class actions under Rule 19(d), and assert that Defendants have not established that Mrs. Kruszka and Mrs. Montgomery spouses are necessary or indispensible parties, or that they cannot be joined herein. For the reasons stated below the Plaintiffs' assertions are unfounded.

First, the claims under the Consolidated Complaint have not been certified as class action claims under Rule 23 and may never be.  Thus, Rule 19(d) has no application to the Plaintiffs' claims at present.

Second, even if this case were later certified, subsection (d) to Rule 19 does not make the remainder of Rule 19 inapplicable to a class action.  Contrary to the construction of this phrase in Plaintiffs' opposition, "Rule 19(d) on its face does not seem to render Rule 19 entirely irrelevant in class actions, but rather – as the plain language says – Rule 19 is 'subject to' the special class action provisions of Rule 23."  *Speaks Family Legacy Chapels, Inc. v. National Heritage Enterprises, Inc.*, No. 08-04148, 2009 WL 2391769, at *8 (W.D. Mo. 2009) (rejecting the construction of Rule 19(d) in 7 Wright, Miller, et al., Fed. Prac. & Proc. § 1626 (3d ed. 2009).[23]  "That requires the Court to consider how to **harmonize** the requirements of Rule 19 and Rule 23."  *Speaks,* 2009 WL 2391769, at *8 (emphasis added).  In this case, there is no conflict between Rule 23 and the need to join all parties whose interests will be impacted by litigation of a named plaintiff's individual claim, whether or not it is ultimately certified to proceed as a class action.

Multiple courts have rejected the position articulated by Plaintiffs, including the Ninth Circuit Court of Appeals, which held in *Shimkus v. Gersten Cos.* that "Rule 19(d) simply requires us to respect the language of Rule 23, but allows joinder to the extent its use does not **conflict** with Rule 23's provisions."  816 F.2d 1318, 1321 (9th Cir. 1987) (emphasis added).

---

[23]    Notably, Plaintiffs' citation to *Speaks* neglects to mention this conclusion.  Thus, rather than supporting their interpretation of Rule 19(d), *Speaks* contradicts it.  Plaintiffs' citation to *dicta* in *Pentland v. Dravo Corp.*, 152 F.2d 851, 852 (3d Cir. 1945), also fails to support their interpretation.  Not only did this very dated case not even address Rule 19(d) – which had not been adopted at the time – the holding therein was later superseded by amendment to Rule 23.  *See Knepper v. Rite Aid Corp.*, No. 11-1684, 2012 WL 1003515, at *12 nn.9-10 (3d Cir. Mar. 27, 2012).

Finding Rule 19 to be applicable in a class action case, the *Shimkus* court reversed an order approving a class action settlement and consent decree therein for failure to join all persons affected. *Id.*; *see also In re Fine Paper Litig. State of Wash.* 632 F.2d 1081, 1091 (3d Cir. 1980) ("The fact that the litigation is in the form of a class action rather than an ordinary suit does not impair the obligor's right to insist upon joinder of all interested parties"); *Thompson v. Jiffy Lube Int'l, Inc.*, 505 F. Supp. 2d 907, 922 (D. Kan. 2007).

The relief sought by Plaintiffs compels joinder of co-borrowers and co-mortgagors on the loans at issue, as the rights of both would be affected by a determination on the merits of the Plaintiffs' claims. *See Loef v. First Am. Title Ins. Co.*, No. 08-311, 2011 WL 1326945, at *3 (D. Me. Apr. 4, 2011).

Otherwise, one obligor could be awarded reimbursement of payments made jointly by co-borrowers, and the interests of a non-party mortgagor in a property could be impacted by a determination on the merits that could impact his or her defenses in a later foreclosure or other action relating to their secured property. To suggest, as Plaintiffs do, that this would not "leave the Defendants subject to a risk of incurring double, multiple or other inconsistent obligations" and affect "absent person's interests" in jointly owned property, is to ignore the obvious. *See* Rule 19(a).

The very nature of Plaintiffs' mortgage-based claims renders Mrs. Kruszka and Mrs. Montgomery both necessary and indispensable parties herein under the plain language of Rule 19(a). This risk is unquestionably "substantial" as Plaintiffs seek to rescind mortgages and recover actual and treble damages for amounts paid in settlement charges. *See Sindia Expedition, Inc. v. Wrecked & Abandoned Vessel,* 895 F.2d 116, 122 (3d Cir. 1990) (noting that

Rule 19 "was enacted to protect parties from a 'substantial' risk of multiple or inconsistent

obligations . . .").

Such requested relief cannot be "shaped" in a manner so as to benefit or impact

only one co-borrower or co-mortgagor, or avoid prejudice to the other, thereby making the

joinder of both co-borrowers and co-mortgagors on the disputed loans herein "indispensible"

under the factors articulated in *General Refractories Co. v. First State Insurance Co.,* 500 F.3d

306, 319 (3d Cir. 2007).[24]  Thus, despite Plaintiffs' assertions to the contrary, Defendants have

met their burden under *Pittsburgh Logistics Systems, Inc. v. C.R. England, Inc.,* 669 F. Supp. 2d

613, 618 (W.D. Pa. 2009), to show that Mrs. Kruszka and Mrs. Montgomery are indispensible

and that their joinder is necessary.[25]

The only question that remains is whether it is feasible to join them.  *See Three*

*Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F. Supp. 1118, 1137 (W.D. Pa. 1980).

Mr. and Mrs. Montgomery (whose current address is not disclosed in the CAC)

were residents of Missouri at the time their loan was made.  Thus, unless Mrs. Montgomery

consents to joinder, her joinder cannot be forced by this Court and Mr. Montgomery's claims for

rescission should be dismissed.  The address of the Kruszkas is also undisclosed in the CAC.  If

---

[24]    Those factors are: "first, to what extent a judgment rendered in the person's absence
        might be prejudicial to the person or those already parties; second, the extent to which, by
        protective provisions in the judgment, by the shaping of relief, or other measures, the
        prejudice can be lessened or avoided; third, whether a judgment rendered in the person's
        absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if
        the action is dismissed for nonjoinder."  *Gen. Refractories Co. v. First State Ins. Co.*, 500
        F.3d 306, 319 (3d Cir. 2007).

[25]    "The moving party bears the burden of showing that a non-party is both necessary and
        indispensable."  *Pittsburgh Logistics Systems, Inc. v. C.R. England, Inc.*, 669 F. Supp. 2d
        613, 618 (W.D. Pa. 2009).

Mrs. Kruszka is subject to the jurisdiction of this Court and competent to be joined, she should be so joined. Otherwise, Mr. Kruszka's claim should be dismissed.

> E.     **Plaintiffs' Arguments In Support Of Their RESPA Claims Fail**
>
> 1.     **RESPA Does Not Apply To Discount Fees**

In their opening brief, Defendants explained that Plaintiffs' RESPA claims based on loan discount fees fail as a matter of law because – as the Eleventh Circuit held in *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1192 (11th Cir. 2010) – discount fees do not constitute settlement services under RESPA. (Defs. Br. 52-53.) Defendants further note that, unlike other fees paid at closing, discount fees constitute tax deductible interest, *see* I.R.S. Pub. 936 (Dec. 6, 2011), thus underscoring the *Wooten* court's conclusion that such fees are incident to the loan itself, rather than for a settlement service.

In response, Plaintiffs cite a recent decision from the North Carolina Court of Appeals in *Bumpers v. Community Bank of Northern Virginia*, in which the court held that CBNV's loan discount fee violated the North Carolina Unfair and Deceptive Practices Act (the "NCUDPA"). (Pltfs. Br. 35.) However, the *Bumpers* decision (from which CBNV has sought review by the North Carolina Supreme Court) did not involve RESPA at all. For purposes of the NCUDPA analysis it does not matter that the discount fee is not for a settlement service, as established by *Wooten*, so *Bumpers* is totally inapposite here.

Unable to cite any authority contrary to *Wooten*, Plaintiffs resort to a lengthy quotation from an *amicus curiae* brief filed by the federal government in the *Freeman v. Quicken Loans, Inc.* Supreme Court proceedings. (Pltfs. Br. 35-37.) Notably, the Fifth Circuit's decision on appeal to the Supreme Court in *Freeman* was not decided on the basis that the discount fees at issue were not settlement services. *See* 626 F.3d 799, 802 n.1 (5th Cir. 2010). The parties did

not present the issue to the Supreme Court.  *See* Tr. of Oral Argument Feb. 21, 2012,[26] at 7:4-8:

"[Counsel for Petitioner]:  There are several reasons [not to address the loan discount question].

One is the lower courts did not address this question.  Quicken doesn't ask you to decide it on the

basis on that question.  We haven't briefed it. . . ."  It is thus highly unlikely that the Supreme

Court will address that issue in *Freeman*.  In any event, no court has ever adopted the rationale or

conclusion advanced by the federal government in its *amicus* brief.  The Eleventh Circuit's

analysis in *Wooten* – the only appellate authority to have addressed the issue – is persuasive and

should be followed here.

> **2.     Plaintiffs' RESPA Claim Based On Title Fees Fails Because No
> Private Right Of Action Can Be Stated On The Affiliated Business
> Arrangement Provisions of RESPA, And Because The CAC Does Not
> Allege An Affiliated Business Arrangement Between The Banks And
> The Title Companies**

Plaintiffs make no effort to refute any of Defendants' arguments on pages 53-56

of their opening brief (that Defendants cannot be held liable for alleged RESPA violations by the

title companies).  Instead, Plaintiffs clarify in their opposition brief what is far from clear in the

CAC itself – *viz.*, that "the actual RESPA claim being alleged by Plaintiffs in connection with

title fees" is that "the banks required the use of Shumway/Bapst title companies as a condition of

receiving the second mortgage loans at issue."  (Pltfs. Br. at 33.)  This articulation of the RESPA

title fee claim fares no better than Plaintiffs' claim prior to clarification.

> **(a)     No Cause Of Action May Be Stated For Alleged Violations Of
> The Affiliated Business Arrangement Provisions Of RESPA**

If the Banks were involved in an "affiliated business arrangement" with the title

companies that performed work in connection with Plaintiffs' loans, that would trigger the

---

[26]      Available at http://www.supremecourt.gov/oral_arguments/argument_transcripts.aspx

affiliated business arrangement requirements of RESPA; those include a provision that prohibits

the use of a required settlement service provider. 12 U.S.C. § 2607(c)(4)(B). But as a threshold

matter, before showing that such a relationship has not been pled, Plaintiffs fail to state a claim

because the affiliated business arrangement provisions of RESPA do not support a cause of

action.

      As explained in Defendants' opening brief, the affiliated business arrangement

requirements under Section 2607(c) merely create a safe harbor for conduct that would otherwise

be a RESPA violation. This section does not create an independent cause of action. (Defs. Br.

61-62.) For that reason alone, Plaintiffs' "clarified" RESPA claim involving title fees fails.

      Plaintiffs do not contest that Defendants' authorities stand for the stated

proposition but argue instead that there is no binding authority and that their authority is more

persuasive. Plaintiffs rely on *Bolinger v. First Multiple Listing Serv., Inc.*, No. 10-211, 2012 WL

137883 (N.D. Ga. Jan. 18, 2012), quoting extensively from it. (Pltfs. Br. 30-32.) Defendants

submit that the reasoning of the *Bolinger* court was flawed. It engaged in a tortured construction

of various provisions of RESPA to conclude that Subsection 8(c) – which consists entirely of

enumerated *exceptions* to liability for the conduct proscribed under Subsections 8(a) and (b) –

somehow gives rise to an independent cause of action for affiliated business arrangements, even

though affiliated business arrangements are mentioned nowhere in Subsections 8(a) and (b).[27]

---

[27]    Not only are *Bolinger* and the cases cited approvingly therein wrong about the law, but
the allegations in those cases specifically claimed that the defendants made kickbacks to
the affiliated enterprises. *See Bolinger*, 2012 WL 137883, at *12; *Minter v. Wells Fargo
Bank, N.A.*, 274 F.R.D. 525, 545 (D. Md. 2011); *Robinson v. Fountainhead Title Group
Corp.*, 252 F.R.D. 275, 278 (D. Md. 2008); *Pettrey v. Enter. Title Agency, Inc.*, 241
F.R.D. 268, 274 (N.D. Ohio 2006). Thus, the discussion in those cases of the
independent cause of action was unnecessary as well as in conflict with the statutory text.
As seen *infra*, Plaintiffs here do not allege kickbacks to affiliated enterprises.

Respectfully, the Court instead should follow the reasoning of *Washington v. National City Mortgage Co.*, No. 10-5042, 2011 WL 1842836 (N.D. Cal. May 16, 2011), and *McCullough v. Howard Hanna Co.*, No. 09-2858, 2010 WL 1258112 (N.D. Ohio Mar. 26, 2010), discussed on pages 61-62 of Defendants' opening brief, because they adhere to the language and structure of Section 8 itself.  Indeed, while Plaintiffs emphasize *Bolinger*'s criticism of *McCullough*'s citation to a proposed HUD rule which was never adopted (Pltfs. Br. 31-32 (citing *Bolinger*, 2012 WL 137883, at *11)), that proposed rule was by no means the driving force behind *McCullough* and the legion of other cases supporting Defendants' position.  Rather, the straightforward basis for these decisions is that the statutory language does not prohibit anything, but rather circumscribes the prohibitions of Section 8 so as ***not*** to apply to affiliated business arrangements, ***where*** the arrangement satisfies the safe harbor conditions of the statute.  12 U.S.C. § 2607(c).  If the arrangement does not satisfy those conditions, then Section 8's prohibition against "kickbacks" and "referrals" applies, where the facts support such claims.

It is highly persuasive that this straightforward reading of the statute has carried the day with almost all courts that have addressed it.  *See, e.g.*, *Teaupa v. U.S. Nat'l Bank, N.A.*, No. 10-00727, 2011 WL 6749813, at *9 (D. Haw. Dec. 22, 2011) ("§ 3500.15 'merely provide[s] a safe harbor for properly disclosed affiliated business arrangements from liability for violations of [12 U.S.C. § 2607(a) or (b).' . . .  If affiliated business arrangements are not disclosed, it only means that the non-discloser is not protected from potential liability under 12 U.S.C. § 2607(a) or (b).") (quoting *Washington*, 2011 WL 1842836, at *8); *Das v. WMC Mortg. Corp.*, No. 10-00650, 2011 WL 5914038, at *13 (N.D. Cal. Nov. 28, 2011) ("Failure to disclose an affiliated business arrangement is not an independent cause of action in the absence of allegations of kickback and referral fees."); *Benas v. Shea Mortg. Inc.*, No. 11-1461, 2011 WL 4635645, at *5

(S.D. Cal. Oct. 4, 2011) ("[A] violation of section 2607(c)(4)(A) standing alone is not actionable

because section 2607(c)(4)(A) is merely a safe harbor provision that Defendants may use to

avoid liability for violations of sections 2607(a) and 2607(b)."); *Cornelius v. Fidelity Nat'l Title

Co.*, No. 08-754, 2009 WL 596585, at *6 (W.D. Wash. Mar. 9, 2009) ("Plaintiffs have not

adequately pled a violation of RESPA by virtue of this claim [for violation of affiliated business

arrangement requirements].  One will search the language of the statute in vain for a prohibition

against any of the activities described above *unless* the referring party has received a 'fee,

kickback or thing of value' in exchange for the referral.").

> **(b)     Even If A Cause Of Action Existed For Violation Of The Safe
> Harbor, No Affiliated Business Arrangement Has Been Pled
> Here**

Even if the affiliated business arrangement safe harbor provision could somehow

be read as creating an independent cause of action, such an arrangement has not been pled here.

RESPA defines "affiliated business arrangement" as follows:

> [T]he term "affiliated business arrangement" means an
> arrangement in which (A) a person who is in a position to refer
> business incident to or part of a real estate settlement service
> involving a federally related mortgage loan, or an associate of such
> person, has either an affiliate relationship with or a direct or
> beneficial ownership interest of more than 1 percent in a provider
> of settlement services; and (B) either of such persons directly or
> indirectly refers such business to that provider or affirmatively
> influences the selection of that provider[.]

12 U.S.C. § 2602(7).  Nowhere does the CAC allege that either of the Banks had any sort of

"beneficial ownership interest" in any of the title companies.

Nor does the CAC adequately allege that the Banks and the title companies have

an "affiliate relationship."  "Affiliate relationship" is defined under the applicable RESPA

regulation as follows:

> the relationship among business entities where one entity has
> effective control over the other by virtue of a partnership or other
> agreement or is under common control with the other by a third
> party or where an entity is a corporation related to another
> corporation as parent to subsidiary by an identity of stock
> ownership.

24 C.F.R. 3500.15(c)(2).

Plaintiffs have pled no facts to demonstrate that any of these criteria are met.  The

only allegations that purport to plead any sort of affiliation between the Banks and the title

companies are not found in the body of the CAC or in the RESPA count, but rather are buried in

the RICO count on pages 100 and 101 of the CAC.  There, the CAC baldly alleges that "[t]he

title companies were affiliated with the Consultants and CBNV," and "[t]he title companies were

affiliated with and controlled by the consultant and GNBT."  (CAC ¶ 508.)  These conclusory

allegations, however, are completely unsupported by any allegations of fact demonstrating that

the Banks and the title companies were affiliated as set forth in 24 C.F.R. 3500.15(c)(2).  Instead,

these allegations are quintessential averments of "labels and conclusions" that lack "sufficient

factual matter," and should therefore be disregarded under *Twombly* and *Iqbal*.[28]

---

[28]    Plaintiffs' RICO case statement contains a few similar conclusory statements suggesting
that the Banks were affiliated with the title companies.  (*See, e.g.*, RICO Case Statement,
pp. 4, 6).  These statements are inadequate not only because they too are conclusory and
devoid of alleged factual support, but also because a RICO Case Statement may not be
used to raise new theories for the first time, or to enhance the allegations supporting non-
RICO claims.  *See, e.g.*, *Delrio-Mocci v. Connolly Props. Inc.*, No. 08-2753, 2009 WL
2989537, at *3 (D.N.J. Sept. 16, 2009) ("The purpose of a RICO case statement is to
enhance a vague complaint with additional details, not to raise new arguments or theories
of the case for the first time."); *Begualg Inv. Mgmt. Inc. v. Four Seasons Hotel Ltd.*, No.
10-22153, 2011 WL 4434891, at *4 n.9 (S.D. Fla. Sept. 23, 2011) ("The Court also
disagrees that in considering this tort claim or any of the other state law claims that the
RICO case statement should be read in conjunction with the allegations in the amended
complaint.").

Even were the Court to conclude that Plaintiffs have properly pled an affiliated business relationship between the Banks and the title companies, the Affiliated Business Arrangement Disclosure Statements (the "ABA Disclosures") that are in the loan files of Plaintiffs who borrowed from CBNV reflect that the only title company that any Plaintiff was required to use was Title America, L.L.C ("Title America").  *See, e.g.*, Affiliated Business Arrangement Disclosure Statements, attached hereto as Exhibit 45.  Only four of the Plaintiffs who borrowed from CBNV were required to use Title America.  In addition, the only title services for which Plaintiffs who borrowed from CBNV were required to use Title America were title examinations.  For other title services, the ABA Disclosures for these Plaintiffs clearly state that the borrower could shop around for title service providers other than Title America.  Thus, to the extent the Court concludes that (i) an independent cause of action exists and that (ii) the claim is properly pled, it would be limited to just four of the Plaintiffs who borrowed from CBNV, and the claim further would be limited to fees that those Plaintiffs paid for title examinations.

Likewise, only two Plaintiffs who borrowed from GNBT were required to use a particular title company.  As reflected in the addenda to the Good Faith Estimates for these Plaintiffs, both were required to use Title America, but again, these Plaintiffs were required to use Title America only for title examinations.  *See* Good Faith Estimates, attached hereto as Exhibit 46.  Thus, while no claim should be permitted to go forward here, if one were to be, it would be limited to just the two Plaintiffs who borrowed from GNBT, and further would be limited to fees that those Plaintiffs paid for title examinations.

**3.        Plaintiffs' Arguments In Support Of Their RESPA Kickback Claim Fail**

In their opening brief, Defendants explained that Plaintiffs have alleged three

phases of the alleged RESPA kickback scheme involving the Shumway/Bapst entities, and that

the kickback claim for each phase fails on its face.  (Defs. Br. 57-61.)  Plaintiffs' arguments in

response should be rejected.

**(a)        Plaintiffs Do Not Even Attempt To Contest Defendants' Arguments That The RESPA Kickback Claim On Post-November 22, 1999 Loans Fails As A Matter Of Law**

Plaintiffs' RESPA kickback claim for the third phase (November 22, 1999 to "the

Spring of 2002") fails as a matter of law because David Shumway was employed by CBNV

during that period, and thus there can be no allegation that CBNV paid alleged "kickbacks" to

any individual or entity outside of CBNV during that time.  (Defs. Br. 60-61.)  Defendants also

demonstrated that Plaintiffs have not adequately pled any RESPA kickback scheme against

CBNV for the period following the Spring of 2002.  (*Id.* at 62-65.)  Plaintiffs do not contest

either of these points in their opposition brief.  Given that Defendants' arguments on these issues

are unrefuted, the Court should dismiss all RESPA kickback claims on loans that closed on

November 22, 1999 and thereafter.

**(b)        Plaintiffs May Not Rely On RESPA's Affiliated Business Arrangement Provisions To Support Their Claim For The Phase Running From May 29, 1998 To October 29, 1998**

In their opening brief, Defendants explained that, for the first phase (May 29,

1998 to October 29, 1998), Plaintiffs' own allegations establish that EquityPlus Financial, LLC

(the "LLC") was in fact performing origination services in connection with the loans at issue,

and that Plaintiffs therefore have not stated a RESPA kickback claim for the first phase.  (Defs.

Br. 57-58.)  Plaintiffs do not dispute this point, thus apparently conceding that they have not

stated a RESPA kickback claim for this period.  Rather, they rely solely on their affiliated

business arrangement argument.  (Pltfs. Br. 27-32.)  This argument fails on the ground stated

above.  (*See* Section II.E.2 *supra*.)

> **(c)** **The Broad Scope Of The Safe Harbor Under Section 8(c)(2) Of RESPA Defeats Plaintiffs' Claims For The Phase Running From October 29, 1998 To November 21, 1999**

Plaintiffs have not stated a RESPA kickback claim for the second phase (October

29, 1998 to November 21, 1999) because the relevant Consulting Agreement for that period

demonstrates that the LLC **did** perform services for the amounts it received.  (Defs. Br. 58-60.)

In response, Plaintiffs cite cases in which courts have interpreted the term "service" under

Section 8(b) of RESPA narrowly, and they argue that the services that the LLC provided under

the Consulting Agreement do not fall within that narrow definition.  (Pltfs. Br. 17-26.)

Plaintiffs' argument is non-responsive because they are looking to the wrong

section of the statute.  Defendants are relying on the safe harbor under Subsection 8(c), which is

broader in scope than Section 8(b) in that it is not limited to "real estate settlement services."

*Compare* 12 U.S.C. § 2607(b) (prohibiting payment of any portion of charge for "real estate

settlement service . . . other than for services actually performed"), *with* 12 U.S.C. § 2607(c)

(providing that nothing in Section 2607 should be construed as prohibiting "(2) the payment to

any person of a bona fide salary or compensation or other payment for goods or facilities actually

furnished or for services actually performed").

It is a "maxim of statutory construction that 'when the legislature uses certain

language in one part of the statute and different language in another, the court assumes different

meanings were intended . . . .'"  *William A. Graham Co. v. Haughey*, 568 F.3d 425, 435 (3d Cir.

2009), *cert. denied*, 132 S. Ct. 456 (2011) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711

n.9 (2004)).  Thus, the difference in language of Subsections 8(b) and (c) is critical to their

interpretation. Unlike Subsection (b), Subsection (c) applies not just to charges for "real estate settlement service[s]," but rather applies to payment of bona fide salaries, compensation or other payments for any type of "goods or facilities actually furnished or for services actually performed." Here, the services provided by the LLC pursuant to the Consulting Agreement are unquestionably encompassed by the plain language of Subsection 8(c)(2) and fall within its safe harbor provision.

### F.    Plaintiffs' TILA Claims Fail

#### 1.    Post-Spring 2000 TILA Claims For CBNV Borrowers Fail

As an initial matter, Plaintiffs have not disputed that any TILA claims brought by Plaintiffs who closed on loans with CBNV after the Spring of 2000 necessarily fail because Plaintiffs themselves acknowledge that the supposed scheme between CBNV and Shumway was over by then (CAC ¶¶ 76-78). Thus, Plaintiffs' opposition brief offers no reason why the claims of the Gaskins and the Wasems (which are based on loans made by CBNV in August of 2001) should not be dismissed.

#### 2.    As To RFC, The Signed Acknowledgements Are Conclusive Proof Of Timely TILA Disclosure

Plaintiffs do not dispute that many of them signed acknowledgements that they received timely TILA disclosures. Instead, they assert these signed acknowledgements cannot support dismissal of their TILA claims against RFC, the assignee lender, because they are entitled to an opportunity to rebut the truth of these acknowledgements. (Pltfs. Br. 41-43.) This is simply not true.

Plaintiffs seek to obscure the fact that a different standard of proof applies to

TILA damage claims against assignees, versus those against original lenders.[29]  While it is true

that a "rebuttable presumption" standard applies to § 1639(b)(1) claims for damages against

original lenders, a signed acknowledgment amounts to "conclusive proof" of delivery in a

damages claim against an assignee.  *See* 15 U.S.C. § 1641(b); *see also Polis v. Am. Liberty Fin.,*

*Inc.*, 237 F. Supp. 2d 681, 685 (S.D.W.V. 2002) (defendant's status determines whether the

signed receipt creates a rebuttable presumption or serves as conclusive proof).  There is no

dispute that RFC is an assignee governed by § 1641(b).

While there is an exception to this rule that gives a timely rescission claim of an

aggrieved borrower the benefit of a rebuttable presumption standard notwithstanding the

assignment of the loan, this exception is limited to claims of rescission, and is not available for

claims for damages.  Section 1641(b) (the assignee liability section) merely states that the

conclusive proof standard does not apply to assignees in situations provided for by § 1635(c).

*See* 15 U.S.C. § 1641(b) ("Except as provided in section 1635(c) of this title, in any action or

proceeding by or against any subsequent assignee of the original creditor without knowledge to

the contrary by the assignee when he acquires the obligation, written acknowledgement of

receipt by a person to whom a statement is required to be given pursuant to this subchapter shall

be conclusive proof of the delivery thereof…").  In turn, § 1635(c) states:

> Notwithstanding any rule of evidence, written acknowledgment of
> receipt of any disclosures required under this subchapter by a

---

[29]    In their opening brief, Defendants expressly stated that the original lenders, the Bank
Defendants, "do not rely upon the acknowledgements as a ground for dismissal under
Rule 12," because they understood that such acknowledgements only create a
presumption of receipt and authenticity and are not conclusive proof.  (Defs. Br. 68 n.29.)
Only RFC and Irwin, the assignees, actually moved for dismissal on this basis.  Irwin, of
course, has now been dismissed from this action.

person to whom information, forms, and a statement is required to be given **pursuant to this section** does no more than create a rebuttable presumption of delivery thereof.

15 U.S.C. § 1635(c) (emphasis added).

As indicated by the title of § 1635 ("Right of rescission as to certain transactions"), this section concerns the establishment of a particular remedy – namely, rescission. By the plain language of § 1635(c), only those plaintiffs exercising a right to rescind their loans are entitled to rebut the presumption of timely delivery based on their signed acknowledgments. Further, 15 U.S.C. § 1635(g) ("Additional relief") totally cleaves the rescission remedy from other available relief, stating that "[i]n any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind."

In other words, § 1635 exists to define the circumstances for only the single remedy of rescission. As a result, § 1635(c)'s rebuttable presumption only applies to rescission claims and not damages claims. The reference to this provision in § 1641(b) thus splits the evidentiary standard for assignees based on whether they seek damages or rescission and does not alter the conclusive proof standard for TILA damages claims against assignees. Courts applying § 1641(b)'s "conclusive proof" standard rather than § 1635(c)'s rebuttable presumption standard to damage claims against assignees based on failure to provide timely TILA notices include: *In re Regan*, 439 B.R. 522, 529-32 (Bankr. D. Kan. 2010); *Johnston v. Lindaur*, No. 07-01280, 2010 WL 147939, at *2-3 (E.D. Cal. Jan. 12, 2010); *Knittel v. First Fin. Mortg. Corp.*, No. 08-44, 2009 WL 1702174, at *2 (E.D. Ky. June 17, 2009); *Lynch v. RKS Mortg. Inc.*, 588 F. Supp. 2d 1254, 1257-258 (E.D. Cal. 2008); *Henderson v. GMAC Mortg. Corp.*, No. 05-5781, 2008 WL 1733265, at *5-6 (W.D. Wash. Apr. 10, 2008).

This accords with the legislative history of these provisions.  When § 1641(b) was amended to include the proviso concerning § 1635(c), the goal was to ensure that the assignment of a loan – something totally outside the control of a borrower – would not cut off or cut back the borrower's 3-year statutory right to rescind a loan for which proper disclosures were not made. The Senate Report explains that the proviso in § 1641(b) "eliminates ambiguity on the question of assignee liability for rescission by stating explicitly that a consumer's exercise of this right is effective against an assignee.  Without such protection for the consumer, the right of rescission would provide little or no effective remedy."  S. Rep. No. 96-368 (1979).  In other words, by adding a reference to § 1635(c), Congress sought only to assure that the right of rescission remained consistent for consumers, whether or not the loan was assigned, by maintaining the "rebuttable presumption" standard for all rescission claims.  The "conclusive proof" standard for damages claims against assignees was left undisturbed.

Plaintiffs have no viable claims for rescission here.  Although they purport to seek rescission in addition to damages, it is well established that such claims are time barred by virtue of a statute of repose (as explained in Section II.C.4 *supra*), as well as unable to be pursued in a classwide proceeding, such as this one purports to be.  *See CBNV II*, 622 F.3d at 308 n.27 (recognizing courts' unanimous conclusion that rescission cannot be pursued on a classwide basis).  Contrary to Plaintiffs' assertion, they cannot effect a change in the standard of proof for their damages claims by tacking onto them wholly frivolous pleas for rescission.  Put another way, "rescission" is not a magic word, the inclusion of which changes the burden of proof for a damages claim, without regard to whether the plaintiff actually enjoys a right to rescind.

Plaintiffs have cited no case that supports their effort to impose a rebuttable presumption standard on a damage claim against an assignee in the absence of a plausible claim

to rescind. *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180 (3d Cir. 2011) (cited at

Pltfs. Br. 41), certainly does not, as there was no assignee involved in that case. As for *In re*

*Jackson*, 245 B.R. 23 (Bankr. E.D. Pa. 2000) (cited at Pltfs. Br. 42), the primary relief sought by

the debtor there was rescission, rather than damages. The case of *Marr v. Bank of America, N.A.*,

No. 11-1424, 2011 WL 6091806 (7th Cir. Dec. 6, 2011) (cited at Pltfs. Br. 42) is particularly

inapposite, since it neither involved an assignee nor a damages claim (but rather only a rescission

claim).

### 3.    **Plaintiffs' "Conspicuous" Disclosure Claims Fail**

Plaintiffs' TILA claims based on the failure to make the disclosures sufficiently

"conspicuous" (where Plaintiffs challenge the type size and format of the disclosures) must be

dismissed. As explained in Defendants' opening brief, all Plaintiffs received disclosures that

used the accepted "federal box" format, which numerous courts have found to be sufficiently

"conspicuous" to satisfy TILA. (Defs. Br. 68-69.)

Plaintiffs assert that it is inappropriate for a court to rule on the issue of

"conspicuousness" at the Rule 12(b)(6) stage. (Pltfs. Br. 44-45.) Contrary to Plaintiffs'

assertion, courts within this Circuit find the "conspicuousness" of the disclosures (that is, issues

relating to the form or the type size) a question of law that is appropriately resolved on a motion

to dismiss. For instance, in the Eastern District of Pennsylvania, the court in *Robinson v. First*

*Franklin Fin. Corp.*, dismissed a claim very similar to the one made by the instant Plaintiffs in

¶ 482 of the CAC. There, the plaintiff asserted that the APR disclosure was not sufficiently

conspicuous because it was accompanied by the Note Rate, which made it confusing. The court

disagreed, because the APR appeared in an approved bolded box format. No. 05-6652, 2006 WL

2540777, at *3-4 (E.D. Pa. Aug. 31, 2006). To the extent that the Seventh Circuit opinion cited

by Plaintiffs, *Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803 (7th Cir. 2001), suggests that

"conspicuousness" of disclosures is inappropriate for resolution on a motion to dismiss, this

approach has not been adopted within this Circuit.[30]

### 4.   HOEPA Does Not Create a New Cause Of Action For Damages Against Assignees

Nothing in § 1641(d) provides a plaintiff with an affirmative cause of action

against an assignee based purely on the assignee's status as a purchaser of a loan.  (Defs. Br. 69-

78.)  Rather, § 1641(d), by its terms, only limits the assignee's right to enforce the note that it has

purchased.  *Compare* 15 U.S.C. § 1641(a) (explaining that a civil action for violation of the title

can be maintained only if the violation for which the action is brought is apparent on the face of

the disclosure document), *with* 15 U.S.C. § 1641(d) (entitled "Rights upon assignment of certain

mortgages" and stating that "any person who purchases or is otherwise assigned a mortgage. . .

shall be subject to all claims and defenses with respect to that mortgage that the consumer could

assert against the creditor of the mortgage. . . . ***The preceding sentence does not affect the***

***rights of a consumer under subsection (a), (b), or (c) of this section or any other provision of***

***this subchapter***.") (emphasis added).  In the absence of § 1641(d), the assignee would likely be

deemed a holder in due course, free to enforce the note without regard to claims or defenses from

borrowers relating to disclosure violations and the like.  Section 1641(d) removes these holder in

due course protections and makes clear that an assignee of a HOEPA loan does not have an

---

[30]   In addition, Plaintiff overstates the holding of *Lifanda*.  While it is true that *Lifanda* makes a sweeping statement as to the propriety of resolving claims about conspicuous disclosures on a motion to dismiss, the issue before that court was quite different from the type size or formatting of the disclosures.  There, the issue was whether language about whether insurance had been purchased could be read as an implied disclosure about the right to purchase insurance from a source elsewhere.  237 F.3d at 808.  *Lifanda* did not suggest, much less hold, that a court must allow discovery before ruling on the legal question of whether the well-accepted federal box format for APR disclosures conforms with TILA.

unfettered right to enforce the instrument if accurate disclosures were not made to the borrower.

*See Dash v. FirstPlus Home Loan Owner Trust 1996-2*, 248 F. Supp. 2d 489, 506 (M.D.N.C.

2003); 15 U.S.C. § 1641(d).

Plaintiffs' brief states that the cases cited by Defendants in favor of this

interpretation are distinguishable because "[t]hey simply recognize the rule of assignee liability

does not give rise to an independent cause of action (and is therefore, not an 'element' of a

plaintiff's claim)." (Pltfs. Br. 75.) But Plaintiffs *are*, in fact, arguing that § 1641(d) amounts to

an independent cause of action, with different elements than the underlying claims against the

Bank Defendants. One of the elements of a claim under TILA, RESPA, and RICO is that the

***defendant*** has committed an act that violates the statute, in order to be liable for a statutory

violation. *See, e.g.,* 15 U.S.C. § 1640(a) (providing that "any creditor who fails to comply with

any requirement" under TILA is liable for damages); 15 U.S.C. § 1641(d) ("any person or person

who violates" RESPA is liable for three times the amount paid in settlement services); *Reves v.*

*Ernst & Young*, 507 U.S. 170, 183 (1993) (defendant must have participated in the operation and

management of the RICO enterprise to be liable). Except for the most conclusory allegations

under RICO (which are addressed in Section II.G *infra*), Plaintiffs do not even attempt to argue

that actions by RFC caused them injury. Rather, they assert that they need not allege that this

Defendant committed an act that violated any of these statutes, because HOEPA allows them to

substitute for this element an allegation that RFC purchased the notes from ***others*** who

committed wrongful actions. Such a claim on its face does not meet the elements of claims

under TILA, RESPA, or RICO and can, therefore, be viable only if there is a separate and

independent HOEPA cause of action.

The *Bryant* case cited by Plaintiffs epitomizes Plaintiffs' confusion about this issue.  (Pltfs. Br. 55.)  *Bryant v. Mortgage Capital Resource Corp.* characterizes the imposition of strict liability on assignees via HOEPA as "preserv[ing] a consumer's independent claims and defenses against assignees of HOEPA loans."  197 F. Supp. 2d 1357, 1365 (N.D. Ga. 2002).  Of course, Plaintiffs are not here attempting to "preserve" any rights a Plaintiff would have outside of HOEPA.  In the absence of HOEPA, a borrower who does not allege any misconduct by a defendant that caused the borrower injury does not have an "independent claim" to "preserve."  Only if HOEPA can be viewed as creating an independent cause of action does the borrower have a right to bring a claim against the assignee.  But, as shown in Defendants' opening brief, HOEPA confers no such right.

Contrary to Plaintiffs' contention, no Court of Appeals has "adopted Plaintiffs' position and determined that plaintiffs can pursue affirmative causes of action against loan assignees under HOEPA."  (Pltfs. Br. 49-50.)[31]  In the Eighth Circuit case cited by Plaintiffs, *Thomas v. US Bank Nat'l Assoc. ND,* 575 F.3d 794 (8th Cir. 2009), the court was not even faced with the question.  There, the defendant banks had removed to federal court claims based on the Missouri Second Mortgage Loans Act, Mo. Rev. Stat. §§ 408.231-.241, arguing that these claims were pre-empted by federal law and were, therefore, subject to federal jurisdiction.  The opinion related entirely to the pre-emption and federal jurisdiction issues, and never addressed the scope of HOEPA liability for assignees.[32]

---

[31]    A federal appellate court is expected to weigh in on this issue soon, however.  The Fourth Circuit Court of Appeals is considering the question in the case of *McLeod v. PB Investment Corp.*, Case No. No. 11-1259(L).

[32]    Some of the assignee bank defendants had argued that the plaintiffs lacked standing to sue them because the banks neither originated nor purchased the plaintiffs' loans, but the

(continued...)

None of the district court cases cited by Plaintiffs offer a reasoned basis to adopt Plaintiffs' interpretation of HOEPA. For instance, in many of the cases cited by Plaintiffs for sweeping statements about HOEPA liability being co-extensive with that of the original lender, no party was arguing against this principle and the court did not even note the authority to the contrary. *See Wile v. Green Tree Servicing, LLC*, No. 04-2866, 2004 WL 2644390, at *2 (E.D. Pa. Nov. 22, 2004) (holding that HOEPA did not apply because defendant was the servicer, not the original lender or assignee); *James v. Bridge Capital Corp.*, No. 08-397, 2011 WL 309692, at *6 (D. Or. Jan. 27, 2011) (addressing and rejecting claim that assignee could avoid liability by showing that the original lender failed to provide notice that the loan at issue was covered by HOEPA); *Durham v. The Loan Store, Inc.*, No. 04-6627, 2006 WL 3422183, at *5-8 (N.D. Ill. Nov. 27, 2006) (analyzing whether allegations were sufficient to raise a fact issue as to whether the loan at issue was a HOEPA loan). Other cited cases simply announced that § 1641(d) imposes such liability, with little explanation as to why and, again, no acknowledgment of any contrary authority. *See Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002); *In re Barber*, 266 B.R. 309, 320 (Bankr. E.D. Pa. 2001).

The plain language of § 1641(d) and its legislative history compel the conclusion that HOEPA does not create a cause of action against assignees for violations of law by original lenders. As a result, all of Plaintiffs' claims, other than those relating to disclosure violations

---

(...continued)
court declined to address the issue, preferring it to be resolved by the state court after remand. 575 F.3d at 801.

apparent on the face of the disclosure documents, fail to state a claim upon which relief may be granted against RFC.[33]

### G.    Plaintiffs' Arguments In Support Of Their RICO Claim Should Be Rejected

In their opening brief, Defendants explained that courts are to scrutinize and flush out at the early stage of litigation RICO allegations that are deficient on their face.  (Defs. Br. 78.)  Here, none of Plaintiffs' arguments in support of their RICO claim can save it from dismissal.

#### 1.    Plaintiffs Cannot Save Their RICO Claim Against The Banks

Defendants explained in their opening brief that there are no allegations that the Banks operated or managed the affairs of any alleged enterprise.  Instead, a fair reading of the CAC and the RICO Case Statement establishes that the Shumway/Bapst Organization operated all affairs of the alleged enterprises, and Plaintiffs' RICO allegations against the Banks amount to nothing more than that the Banks operated and managed their *own* affairs.  (Defs. Br. 79-83.)

In response, Plaintiffs initially spend multiple pages of their brief making strawman arguments in support of elements of their RICO claim that Defendants do not challenge on this motion to dismiss.  (Pltfs. Br. 59-62.)  Plaintiffs then argue that a defendant need not have "primary responsibility" for operating or managing the affairs of an enterprise in order for the operation or management test to be met.  (*Id.* at 63-64.)[34]

---

[33]    As previously demonstrated, the limited subset of claims that are based on patent disclosure defects fail as to all Defendants for another reason:  they are untimely and cannot by definition be saved by equitable tolling.  These claims also fail as to FDIC-GNBT because it is an "involuntary assignee" for the reasons argued in FDIC-GNBT's November 8, 2011 Memorandum and Reply in support of its Motion to Dismiss.

[34]    Plaintiffs assert that the operation or management test presents a "low hurdle" for Plaintiffs to clear at the pleading stage (Pltfs. Br. 65), but they cite no Third Circuit case or district court case from within this Circuit to support this proposition.  As explained in

(continued...)

Plaintiffs' allegations, however, fail to allege that the Banks had **any**
responsibility for operating or managing the affairs of the alleged enterprises.  Plaintiffs spend
several pages parroting allegations from the CAC and their RICO Case Statement in an effort to
show that they have alleged that the Banks had some part in directing the affairs of the alleged
enterprises.  (*Id.* at 65-68.)  When stripped of their conclusory statements and purple prose,
however, the factual averments in these allegations boil down to the fact that the Banks made
loans, sold them, and engaged in various collateral activities that were attendant to those
functions.  The alleged fact that the Banks were "target[ed]" and infiltrated by the
Shumway/Bapst entities for alleged improper purposes does not change the fact that the Banks
are not alleged to have done anything but conduct their **own** affairs (*i.e.*, making loans, selling
them on the secondary market), and not those of the alleged enterprises.  (CAC ¶ 66.)

Tellingly, Plaintiffs do not try to reconcile their claim that the Banks had a role in
directing the affairs of the alleged enterprises with their allegation that the Shumway/Bapst
Organization seamlessly replaced CBNV with GNBT, and continued to carry on the **identical**
alleged scheme.  (Defs. Br. 81-82.)  In view of this allegation, it simply is an unreasonable and
unacceptable inference that the Banks had any role in directing the affairs of the alleged
enterprises.

_____

(...continued)
Defendants' opening brief, one district court from within this Circuit recently declared
within the context of a Rule 12(b)(6) motion that the operation or management test is
considered "very difficult to meet," and the court dismissed the RICO claim on that basis.
(Defs. Br. 79) (quoting *Crete v. Resort Condos. Int'l*, No. 09-5665, 2011 WL 666039, at
*9 (D.N.J. Feb. 14, 2011)).  As Defendants also explained, the Third Circuit has made
clear that courts may apply the operation or management test to dismiss RICO claims on
Rule 12(b)(6) motions.  (Defs. Br. 80 (citing *University of Maryland at Baltimore v. Peat,
Marwick, Main & Co.*, 996 F.2d 1534, 1539 (3d Cir. 1993)).)

Plaintiffs also do not bother to address the factually similar cases cited in Defendants' opening brief in which courts have dismissed RICO claims against banks when all the banks were alleged to have done was conduct banking activities, such as making loans. (Defs. Br. 82-83.)  For their own part, Plaintiffs cite a number of cases that either bear little, if any, factual similarity to the instant case, or simply do not address the operation or management test.  Since there is no unified theme to this hodgepodge of cases Defendants will simply address them *seriatim*:

- *Allstate Ins. Co. v. Valley Physical Med. & Rehabilitation, P.C.*, No. 05-5934, 2009 WL 3245388, at *8-9 (E.D.N.Y. Sept. 30, 2009) – The court did not address the operation or management test.

- *Government Employees Ins. Co. v. Hollis Med. Care, P.C.*, No. 10-4341, 2011 WL 5507426 (E.D.N.Y. Nov. 9, 2011) – The alleged enterprise was a healthcare facility, and the court concluded that the plaintiffs had sufficiently alleged that "the management defendants" conducted or participated in the affairs of the alleged enterprise because those defendants allegedly "exercised complete control," and "total control," over the healthcare facility and the unlawful activity in which it allegedly had engaged. *Id.* at *2, 7.

- *Franco v. Connecticut Gen. Life Ins.*, No. 07-6039, 2011 WL 4448908 (D.N.J. Sept. 23, 2011) – The alleged enterprise consisted of health insurer CIGNA and a company (Ingenix) with which it contracted to provide it with data to set the amount of out-of-network (ONET) benefits it paid. *Id.* at *1, 23-24.  The court held that the "operation or management" test as against CIGNA was met because the complaint was "replete with allegations concerning CIGNA's decision-making role with regard to the use of Ingenix to determine ONET claims, the submission of allegedly insufficient and flawed data to the

database, and the defrauding of its subscribers by paying claims based on the amount it knew to be less than the prevailing fee." *Id.* at *24.

- *Coquina Investments v. Rothstein*, No. 10-60786, 2011 WL 197241 (S.D. Fla. Jan. 20, 2011) – In this case of a Ponzi scheme that is much in the news, the alleged enterprise was comprised of Rothstein, who sold fictitious structured settlements to investors, and TD Bank. *Id.* at *1, 3.  The court held that the plaintiff sufficiently alleged that TD Bank participated in the direction of the affairs of the alleged enterprise "by preparing and issuing multiple letters that affirmatively mislead investors that their accounts were irrevocably 'locked' [in a trust account] and therefore safe, when in fact Rothstein was able to access the accounts at any time and transfer the funds without the investors' knowledge. . . .  [The plaintiff] has also alleged that TD Bank met with investors and assured them of the safety of their investments. . .." *Id.* at *3.  In short, it was alleged with specificity that the bank did not confine its role to its banking function of safeguarding assets in a trust account.

- *Strayer v. Bare*, No. 06-2068, 2008 WL 1924092 (M.D. Pa. Apr. 28, 2008) – The court did not address the operation or management test, or even articulate the composition of the alleged enterprise.

- *Pappa v. Unum Life Ins. Co. of Am.*, No. 07-0708, 2008 WL 744820 (M.D. Pa. Mar. 18, 2008) – Although the court did not expressly define the alleged enterprise, it appears to have consisted of a disability insurer and its affiliates, and certain video surveillance companies, which allegedly engaged in a scheme to take surreptitious video of disability claimants in an effort to fraudulently terminate their benefits. *Id.* at *11-13.  The court held that the plaintiff sufficiently alleged that the surveillance companies participated in the affairs of the

alleged enterprise by taking video of the plaintiff's daughter with the intent to claim the daughter was the plaintiff. *Id.* at *13.

- *In re Jamuna Real Estate, LLC*, 365 B.R. 540 (Bankr. E.D. Pa. 2007) – The complaint alleged an enterprise comprised of three individuals and entities they controlled, the purpose of which was to fraudulently obtain loans. *Id.* at 548. The court concluded that the complaint adequately alleged that the three individuals operated and managed the affairs of the alleged enterprise because, among other reasons, the complaint alleged that the individuals "'*made* [at least 20] joint *decisions concerning* the affairs of the [enterprise].'" *Id.* at 547 (quoting plaintiffs' complaint).

- *Freedom Med. Inc. v. Gillespie*, 634 F. Supp. 2d 490 (E.D. Pa. 2007) – Noting that the allegations "test the limits of what is required to allege participation in an enterprise," the court held that the standard was met when the complaint alleged that a defendant prepared false invoices as part of an alleged scheme to steal from a medical equipment company, and then sell the stolen goods back to the company. *Id.* at 508.

- *South Broward Hosp. Dist. v. MedQuist Inc.*, 516 F. Supp. 2d 370 (D.N.J. 2007) – The alleged enterprise consisted of a medical transcription company, its subsidiary, and certain officers of the two companies, and the enterprise allegedly engaged in a scheme to fraudulently overbill hospitals. *Id.* at 376-79, 388-91. Based on the parenthetical accompanying the citation of the case in their brief, Plaintiffs apparently rely on *MedQuist* for the court's holding that the complaint sufficiently alleged that the individual who was the parent company's Chief Operating Officer, and the subsidiary's Senior Vice President and Chief Financial Officer, participated in the operation or management of the alleged enterprise. *Id.* at 391. That individual was "'the highest-ranking officer directly responsible for overseeing the financial

affairs, profits and revenues generated by MedQuist' at the time MedQuist was allegedly part of the fraudulent scheme," allegedly knew about the scheme, and allegedly was among the defendants who "'delivered or caused to be delivered' the ' artificially inflated invoices for transcription services. . . .'" *Id.* (quoting plaintiffs' complaint).  (Pltfs. Br. 70.)

Again, by contrast, nothing in the CAC and RICO Case Statement claims that the Banks did anything other than perform normal banking transactions.  Their allegations do not adequately plead that the Banks had a part in directing the affairs of the alleged enterprise.

### 2.  Plaintiffs Have Not Adequately Alleged A § 1962(c) Violation By RFC

Plaintiffs' RICO allegations against RFC are even more inadequate than those against the Bank Defendants.  In *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010), after reciting the operation or management requirement discussed at pages 63-64 *supra*, the Third Circuit significantly stated that "Simply pleading that a defendant 'participated in the operation of an enterprise, however, is not enough"; "The plain language of the statute requires that the 'pattern of racketeering activity' be a means by which the defendant 'participate[s], directly or indirectly, in the conduct of [the] enterprise's affairs." *Id*.  Thus, "the nexus element requires a plaintiff to show that the defendant participated in the conduct of the enterprise's affairs (per *Reves*) through – that is, 'by means of, or by the instrumentality of"… – a pattern of racketeering activity." *Id.* at 372.  And to drive the point home, the Court of Appeals concluded its discussion of § 1962(c) by stressing that the statutory language "dictates that it is the predicate acts of racketeering that must be the 'means.'" *Id.* at 372 n.69.

Plaintiffs have not stated or alleged any facts showing that RFC's conduct met these required characteristics.  The "nexus" and "integral" role that their papers describe for RFC do not constitute allegations that RFC acted in furtherance of the alleged enterprise "by means of" acts of racketeering.  The alleged actions are just a series of steps of an investor buying loans.

The so-called predicate acts alleged with respect to RFC (Pltfs. RICO Statement at 57, 59-60) are

a handful of letters that are not the means of those alleged acts of participation; they are letters

with lawyers or letters dealing with terminating RFC's purchase of loans.  (*See* Defs. Br. 84-85.)

Plaintiffs do not identify any misrepresentation or fraud in those letters.  There is no allegation

that RFC had anything to do with HUD-1s and related mailings that are identified as the core of

the alleged pattern of racketeering activity.

There are, to be sure, also bare allegations of "knowledge" of kickbacks and that

an RFC employee was part of "leadership structure" and signed agreements (Pltfs. Br. 73), but

there are no allegations as to what that employee did as a "leader" or how those unspecified

agreements operated the enterprise; these are not allegations that rise to the level of RFC

conducting the affairs of the alleged enterprise through a pattern of racketeering activity.  The

allegations of knowledge are either conclusory allegations as to the undifferentiated collection of

defendants (*see* Pltfs. RICO Statement at 8 ("These defendants and other wrongdoers were

obviously aware. . . .")) or recitations of activities that are all consistent with *normal* lending or

loan purchase practices (*see* Defs. Br. 87-88).

Nowhere is the lack of adequate factual allegations that RFC conducted the

alleged enterprises through a pattern of racketeering activity more obvious than in Plaintiffs'

emphasis on the portion of their RICO Statement asserting that RFC voluntarily chose to stop

dealing with GNBT and that this caused the Shumway organization to wither away.  (Pltfs. Br.

73-74.)  Plaintiffs would have this Court take this allegation as showing RFC played "a

significant role in the operation of the enterprises" and had "'management' and 'control' of the

enterprises."  (*Id.* at 74, 75.)  But this is not at all what this allegation shows.  It is not an

allegation of participation in a RICO scheme through a pattern of racketeering activity by RFC,

but rather exactly the opposite: an allegation that RFC was outside the alleged scheme and

helped it shut down. The cases from other circuits that Plaintiffs cite at this point (*id.* at 75) have

nothing to do with a party who shut down an alleged enterprise; they addressed individual

policemen personally participating in illegal activities and an individual deceiving borrowers in

order to introduce them to the loan shark.

   Rather than pointing to cases suggesting that their allegations here come within

the requirements of *In re Insurance Brokerage Antitrust Litigation*, Plaintiffs rely primarily on

out of context language from cases addressing the totally different issue presented when a lower-

level individual or entity seeks to avoid the "participation" element by claiming it didn't have a

high enough of a management or directing role to fall under § 1962(c). Plaintiffs demolish the

straw man that a defendant doesn't have to be the head or top player in an enterprise, but in each

of these cases the alleged defendant challenging the "conduct" element was alleged or shown to

have personally participated in fraudulent activity in furtherance of the enterprise.[35]

   And Plaintiffs' efforts to make some of their cases sound like they are on point

strain the bounds of proper advocacy. Plaintiffs point to *Strayer v. Bare*, No. 06-2068, 2008 WL

1924092 (M.D. Pa. Apr. 28, 2008), as a supposedly telling case; but they replace with "…" the

portion of the sentence that they quote that spells out that the allegations that Wachovia "acted to

assist" the RICO scheme were that it "acted 'in conjunction with Defendants Bare, Cunningham

and Frankel to unlawfully transfer client funds from the trust account to the IRS to satisfy the

---

[35]   Other cases Plaintiffs cite are equally distinguishable in that the courts had allegations of
specific fraudulent activity by the defendant. In *In re ClassicStar Mare Lease Litigation*,
No. 07-353, 2011 WL 4591927 (E.D. Ky. Sept. 30, 2011), the putative "lender"
defendant in a horse breeding Ponzi scheme was a sham without any assets that was
merely a conduit for the other fraudsters' funds. *Id.* at *3. As to *Franco v. Connecticut
General Life Ins. Co.*, No. 07-6039, 2011 WL 4448908 (D.N.J. Sept. 23, 2011), *see*
Section II.G.1 *supra*.

firm's tax obligations.'" *Id.* at *5; *compare id.*, *with* Pltfs. Br. 77.  There are no comparable

allegations of unlawful transfers or other unlawful conduct by RFC.

Significantly, Plaintiffs make no effort to distinguish the cases cited in

Defendants' opening brief, including most notably *University of Md. at Baltimore*, 996 F.2d

1534 (3d Cir. 1993).  *Dongelewicz v. PNC Bank Nat'l Ass'n*, 104 Fed. Appx. 811 (3d Cir. 2004),

is particularly instructive as to that authority's significance.  The Court of Appeals relied on it to

affirm a summary judgment in favor of lenders who were alleged to have violated § 1962(c) by

lending to a fraudulent real estate developer for the purpose of concealing its insolvency and

perpetuating its development scheme.  *See id.* at 814, 817-18.  The court in *Dongelewicz* also

noted with approval the district court that was affirmed in *Rolo v. City Investing Co. Liquidating

Trust*, 155 F.3d 644 (3d Cir. 1998); the district court had granted a motion to dismiss a § 1962(c)

claim against parties accused of knowingly financing a fraud.  *See also Jubelirer v. Mastercard

Int'l, Inc.*, 68 F. Supp. 2d 1049, 1052-053 (W.D. Wis. 1999) (dismissing § 1962(c) claim against

Mastercard for knowingly making available card services that greatly assisted on-line gambling

enterprise); *Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 346-48 (S.D.N.Y 1998) (dismissing

§ 1962(c) claim against banks whose acts and misrepresentations were alleged to have

knowingly assisted a financial advisor's scheme).

### 3.    Plaintiffs Have Not Adequately Alleged A § 1962(d) Violation By RFC

Plaintiffs defend the conspiracy allegations against RFC only on the grounds that

their substantive RICO claim against RFC passes muster, which we have demonstrated is not

accurate.  Furthermore, Plaintiffs never take direct issue with the specific grounds on which RFC

challenged the conspiracy allegations as to it.

As demonstrated in Defendants' opening brief, even under the Third Circuit's

relaxed concept of the RICO conspiracy provision, "liability will arise only from services which

were purposefully and knowingly directed at facilitating a criminal pattern of racketeering

activity." *Smith v. Berg*, 247 F.3d 532, 538 n.11 (3d Cir. 2001); *see also Salinas v. United

States*, 522 U.S. 52, 65 (1997) (conspiracy requires agreement "'that they or one or more of them

will engage in conduct that constitutes such crime'") (quoting Model Penal Code § 5.03(1)(a)

(1962)); *Odesser v. Cont'l Bank*, 676 F. Supp. 1305, 1312 (E.D. Pa. 1987) (plaintiff must allege

"knowledge that those acts were part of a pattern of racketeering activity conducted in such a

way to violate § 1962(a), (b), or (c)") (citing *Seville Indus. Mach. Corp. v. Southmost Mach.

Corp.*, 742 F.2d 786, 792 n.8 (3d Cir. 1984)).

        Plaintiffs' RICO conspiracy claim against RFC utterly fails to satisfy these

pleading standards.  It is not enough to allege that RFC knowingly facilitated the fact that loans

were made.  Yet when conclusory assertions are disregarded (as *Iqbal* and *Twombly* compel),

that is all that Plaintiffs have identified, and the Court is left with factual allegations that are

entirely consistent with the conclusion that RFC had no knowledge of any misconduct at the time

that such misconduct was supposedly occurring.  The fact that RFC provided funds to the Banks

as a result of a lawful business activity in purchasing closed loans does not show knowledge and

agreement to facilitate a RICO enterprise.  Since "the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not

'show[n]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing

Fed. R. Civ. P. 8(a)(2)).

III.    **CONCLUSION**

        For the foregoing reasons, and the reasons discussed in Defendants' opening

brief, Defendants respectfully request that the Court grant their respective Motions to Dismiss.

Dated:  March 30, 2012                Respectfully submitted,

                                */s/ K. Lee Marshall*
                                K. Lee Marshall, Esquire
                                Michael G. Biggers, Esquire
                                Darci F. Madden, Esquire
                                BRYAN CAVE LLP
                                Two Embarcadero Center, Suite 1410
                                San Francisco, CA 94111
                                (415) 675-3400 (phone)
                                (415) 675-3644 (facsimile)

                                Thomas L. Allen, Esquire
                                REED SMITH LLP
                                225 Fifth Avenue, Suite 1200
                                Pittsburgh, PA  15222

                                *Attorneys For Defendant*
                                *Residential Funding Company, LLC*

                                */s/ Darryl J. May*
                                Darryl J. May, Esquire
                                Joel E. Tasca, Esquire
                                BALLARD SPAHR LLP
                                1735 Market Street, 51st Floor
                                Philadelphia, PA  19103
                                (215) 665-8500 (phone)
                                (215) 864-8999 (facsimile)

                                *Attorneys for Defendant*
                                *PNC Bank, N.A.*

/s/ Virginia W. Barnhart_____
Virginia W. Barnhart
Federal Bar No. 03345 (MD)
TREANOR POPE & HUGHES, P.A.
29 W. Susquehanna Ave., Ste. 110
Towson, MD 21204
(410) 494-7777 (phone)
(410) 494-1658 (facsimile)

*Attorney for Defendant, Federal Deposit
Insurance Corporation, As Receiver for
Guaranty National Bank of Tallahassee*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, I caused a true and correct copy of the foregoing

Reply Brief, to be served upon all counsel of record via ECF, and such document is available for

viewing and downloading from the ECF system.

Dated:  March 30, 2012                          *<u>/s/ Darryl J. May</u>* _____
                                                    Darryl J. May