U.S. Bankruptcy Court
for the Southern District of New York

In Re: Rescap Capital            :        Case No. 12-bk-12020

Debtors                          :        Ch. 11, Joint Admin.
                                 :
                                 :
                                 :

## PRECIPE

To the Clerk of Courts

Please file the attached "Notice of Motion and Emergency
motion in [sec.] ..., And FNMA's Obj. (Doc 2102)," Instanter.

Thank you.



Sidney Lewis, Claimant

**UNITED STATES BANKRUPTCY COURT, SOUTHERN DISTRICT OF NEW YORK;**
**(at Manhattan)**
[18 USC §§ 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1), 1001(a)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]
[Rule 36(a)]

| | |
|---|---|
| In Re: Residential Capital, LLC., et al., And, ) | Case No. <u>12-bk-12020 (MG)</u> |
| In Re: GMAC, Mortgage Co., et al, ) | Chapter____ (Ch.11, Joint Admin. ) |
| Debtors ) | (Related BR Case No.07-bk-57237, S.D., OHIO) |
| ) | (Related BR Case No. 12-bk-12032, S.D., N.Y.) |
| ) | JUDGE: GLENN, MARTIN |
| UNITED STATES of America, Ex Rel., ) | |
| Yvonne D. Lewis, et al., ) | Adversary Case No.: <u>12-01731</u> |
| Plaintiffs/ Surplus Creditors ) | (Related Case No.1:12-cv-361, USDC, DC.); |
| Vs. ) | 05-CV-7346 (03-CV-7478); 03-CV-10836; |
| ) | 05-CV-4555; 03-CV-6954);(12-AP-506, 11-AP- |
| GMAC, Mortgage Co., et al, ) | 875, 10-AP-110, COA10th Dist., OHIO |
| Defendants/ Bankrupt Debtor, ) | (Related Case No.96-cv-494, USDC, S.D.,OH.) |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**  DEC - 3 2012
**(at Manhattan)**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel, ) | |
| EDWARD O'DONNELL, et al., ) | Case No.: <u>12-cv-1422</u> |
| appearing QUI TAM, ) | (Related Case No.1:12-cv-361, USDC, D.C.; |
| Plaintiff /Relator, ) | Related Case No.96-cv-494, USDC, S.D.,OH; |
| Vs. ) | 05-CV-7346 (03-CV-7478); 03-CV-10836; |
| ) | 05-CV-4555; 03-CV-6954);(04-AP-469, 04-AP- |
| ) | 1135; 04-AP-1347; 11-AP-1132; 12-AP-506; |
| BANK OF AMERICA CORP.., et al, ) | 10-AP-110, COA10th Dist., OH.; (Related |
| Defendants. ) | Case Nos.08-cv-75, 06-cv-312,USDC, S.D.,OH) |

<u>**NOTICE OF MOTION AND EMERGENCY MOTION BY CLAIMANTS FOR ORDER**</u>
<u>**ISSUED TO DEBTOR'S CLAIMS ADMINISTRATOR TO DISTRIBUTE PAYMENT OF**</u>
<u>**STATUTORILY ALLOWED CLAIM NOS. 932, 933 UNDER 11 U.S.C.A. §§ 502(a),**</u>
<u>**(g)(1), 510(b) INSTANTER; GROUNDED ON DEBTOR'S LACK OF INCONSISTENT**</u>
<u>**POSITION FOR CONSENT JUDGMENTS UNDER DOC. 13, USDC, D.C., CASE NO. 1:**</u>
<u>**12-CV-361; FRB DOCKET NO. 11-020-B-HC; AND "UNCURED" EXECUTOR**</u>
<u>**CONTRACTS UNDER 11 U.S.C.A. § 365(b)(1)(A), (c)(2), see DEBTOR'S MOTION (DOC**</u>
<u>**61 AND 61-1), INTERIM ORDER (DOC. 81), AND FNMA'S OBJ. (DOC 2102).**</u>

**UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO;**
**(at Columbus)**

[18 USC §§ 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

| | |
|---|---|
| In Re: SIDNEY T. LEWIS, pro se, | ) Case No. 2:07-bk-57237 |
| | ) (Ch.7 ) |
| Debtor | ) (Related Bankr Case No. 2:05-bk-75111) |
| | ) (Related Case No.1:12-cv-361, USDC, D.C.) |
| Social Security No.: xxx-xx-5959 | ) JUDGE: HOFFMAN, JOHN, Jr. |
| | |
| In Re: Yvonne D. Lewis, | ) Case No. 2:05-bk-75111 |
| | ) (Ch.7 ) |
| Debtor | ) (Related Case No. 2:07-bk-57237) |
| | ) (Related BR Case No. 12-bk-12020, S.D., N.Y.) |
| Social Security No.: xxx-xx-2390 | ) JUDGE: HOFFMAN, JOHN, Jr. |

**IN THE UNITED STATES DISTRICT COURT, S. D. OF OHIO**
**EASTERN DIVISION (at Columbus)**

[18 USC §§ 2, 245(b)(2)(B), 664, 666, 1350, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1), 1001(a)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

| | |
|---|---|
| UNITED STATES of America, Ex Rel., | ) |
| Sidney T. Lewis, et al., | ) Action No. 2:08-cv-1042 |
| Plaintiffs | ) (Related Dist. Ct. Cases 2:08-cv-16; 2:96-cv-494; |
| Vs. | ) 2:09-cv-179, 2:08-cv-75; 09-cv-936; 09-cv-944;) |
| | ) 2:06-cv-312; 08-cv-1040 and 08-cv-736); |
| Larry McClatchey, et al., of the | ) |
| Kegler, Brown, Hill & Ritter Lawfirm | ) JUDGE: HOLSCHUH |
| Defendants. | ) Magistrate Judge: KING |
| | |
| The Huntington National Bank, et al., | ) Civil Action No. 2:08-cv-00073 |
| Plaintiffs | ) (Related Case No.08-cv-75, at Doc. 14-4, pg.4, |
| v. | ) P.3; No. 96-cv-494, at Doc. 70; No. 08-cv-1040, |
| | ) at Doc. 2-4, pgs.13 & 18 at P.3 [No.05-JG-6455]); |
| Yvonne D. Lewis, et al., | ) JUDGE GRAHAM |
| Defendants. | ) Magistrate Judge: ABEL |

2 of 19 pages

Sidney T. Lewis, et al.,                    )      Action No. 2:08-cv-1040
    Plaintiffs,                         )      (Related Dist. Ct. Cases 2:08-cv-73; 2:96-cv-494;
Vs.                                         )      2:09-cv-179, 2:08-cv-75; 09-cv-936; 09-cv-944;)
                                        )      2:06-cv-312; 08-cv-1042 and 08-cv-736);
James Johnston, et al., involving           )
  Countrywide Home Loans.                   )      JUDGE: HOLSCHUH
    Defendants.                         )      Magistrate Judge: TERENCE P KEMP

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

[18 USC §§ 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

FRIENDS OF THE EARTH, et al.,               )      Case: 1:12-cv-00363
    Plaintiffs,                         )      (Related Dist. Ct. Case no.1:12-cv-00361);
                                        )
Vs.                                         )      Assigned To: Jackson, Amy Berman, Judge
                                        )
UNITED STATES E.P.A. and                    )
LISA JACKSON, Administrator,                )
    Defendants.                         )
                                        )

United States of AMERICA, et al.,           )      Case: 1: 12-cv-00361
    Plaintiffs,                         )      (Related Dist. Ct. Case 1: 12-cv-00363);
                                        )
Vs.                                         )      Assigned To: Rosemary M. Collyer, Judge
                                        )
Bank of AMERICA (BOA), et al.,              )
    Defendants.                         )

# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

[18 USC §§ 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1), 1001(a)][15 USC §§ 77n, 77q; 17 CFR § 274.127d-1]

SECURITIES AND EXCHANGE COMMISSION )
Plaintiff,                                  )              Case No. 4:10-cv-87

vs.

AMERICAN EQUITY INVESTMENT LIFE
HOLDING COMPANY;
DAVID J. NOBLE; and
WENDY C. WAUGAMAN,
Defendants.

) (Related Case No.94-CR-2155; No.11-
) -cv-12667, CPC, FR. CNTY., OHIO)
) (Related Case No.12AP-88; No.12AP-49;
) No.96-AP-326; No.04-AP-469;
) No.11-AP-875, COA10th Dist., OH.)
) (Related Case No.12-bk-12020, S.D., NY.)
) (Related Case No.96-cv-494, S.D., OHIO)
) (Related Case No.05-cv-122, W.D., KY.)

## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF KENTUCKY;
## LOUISVILLE DIVISION

[18 USC §§ 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1), 1001(a)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

BEVERLY S. MALONE, Living Trust Beneficiary,)
    Plaintiff,

vs.

AMERICAN EQUITY INVESTMENT LIFE
HOLDING COMPANY ("AEL") et al., and
ADDISON INSURANCE MARKETING (AIM)
    Defendants.

)
)
)
)
)
)
)
)

Case No. 3:01-CV-259(H)
(Related Dist. Ct. Case 3:05-CV-122(H));

JUDGE: JOHN HEYBURN

## UNITED STATES SUPREME COURT

Charles STRUBE, et al., Living Trust Matters,
Beverly MALONE, Living Trust Matters,
    Appellant,

vs.

AMERICAN EQUITY ("AEL"), et al.,
    Appellee.

)
)
)
)
)
)
)
)
)

11th Cir. No. 06–35, Certiorari denied.
  No. 05-13014 / No. 05-11461
Removed USDC, M.D., FL, case # 01-cv-1236
  [26 USC §§ 401(a), 4975(e)]

  Reported below: 158 Fed. Appx. 198.

## UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT; AT FL.

[18 USC §§ 245(b)(2)(B), 664, 666, 1962][29 USC §§ 1131, 1132(h), 1140]
[26 USC §§ 101(f)(3)(A), 267(b)(1), 1001(a)][42 U.S.C. §§ 1441, 3535(d), 4651(3), 7573)]

Charles STRUBE, et al., Living Trust Matters,) No. 05-11461 Non-Argument Calendar;
Beverly MALONE, Living Trust Beneficiary,) No. 05-13014 Non-Argument Calendar
    Plaintiffs/Appellants,    ) Removed from case nos. 6:01-cv-1236 and

vs.

AMERICAN EQUITY ("AEL"), et al.,
    Defendants/Appellees.

)  3:01-CV-259(H); [26 USC §§ 401(a), 4975(e)]
)  3:05-CV-122;
)    Before ANDERSON, BLACK and PRYOR,
)  Circuit Judges.

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

WHITE, et al

vs.
EXPERIAN INFORMATION
SOLUTIONS, INC., et al.

(Related C.A. Dist. Ct. Case Nos:
Case #05-cv-1073, DOC (MLGx)
Case #05-cv-7821, DOC (MLGx)
Case #06-cv-0392, DOC (MLGx)
Case #06-cv-5060, DOC (MLGx)

:    Case No. 05-cv-1070 DOC (MLGx)

:    Judge: David Carter

:
:    $45 MILLION DOLLAR SETTLEMENT
:    OF NATIONAL CLASS ACTION

:

:

:

## COURT OF APPEALS OF OHIO, TENTH APPELLATE
## DISTRICT, FRANKLIN COUNTY (at Columbus)

State of OHIO, Pff-Aplee,
   (Cross-Aplt)

v.

Dwight I. HURD, Def-Aplt, and,
Robert D. HODGE, Def-Aplt, and
Beth A. EYERMAN, Def-Aplt.
   (Cross-Aple)

:  Case No. 96APA03-326
  conspiracy to engage in a pattern of corrupt
: activity in violation of *R.C. 2923.01;*
  engaging in a pattern of corrupt activity
  ("RICO") in violation of *R.C. 2923.32;*
: aggravated theft, grand theft, and sale of
  unregistered securities *RC 1707.44(C)(1);*
:   false representations in registering securities.
  (Related Case No. 96AP-328, No 96AP -327).
: No. 04AP-469 (consolidated); No. 04AP-1135;
  No. 11 AP-875;

## IN THE UNITED STATES DISTRICT COURT, S. D. OF OHIO
## EASTERN DIVISION (at Columbus)

[18 USC §1962][R.C. §4705.02]

John P. Byrk, Pff, et al.,              :    Case No. 96-cv-494
                                             (Related Case No. 06-cv-312; No 09-cv-179)
v.                                      :    Judge: Joseph P. Kinnary
                                             RICO Enterprise (Corrupt Organization);
Dwight I. **HURD**, Def, et al.,        :    false representations in registering securities.

## IN THE UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION

[18 USC §§ 2, 1962; 15 USC § 77q(a)]

FEDERAL TRADE COMMISSION, ( FTC)    :    Case No. 123 FTC 1092-1097
       Relator,                              (File No. 932 3019, dated Apr. 15, 1997
v.                                      :     Terminating on Apr. 14, 2017)
                                             Cease and Desist ORDER, concealments and
Michael P. McIntyre, et al.,            :    misrepresentations in sales of Living Trusts.
       Respondent.

## UNITED STATES OF AMERICA
## BEFORE THE
## SECURITIES AND EXCHANGE COMMISSION
## [18 USC § 1962; 15 USC §§ 80A–24(a), 77a et seq. ]

INVESTMENT COMPANY ACT OF 1940
Release No. 30006/ March 22, 2012

---

In the Matter of                        :
                                        : (Related Doc. 240-12, at Exhibit 10, in
American Equity Life Annuity Account    : Case No. 6:01-cv-1236, USDC, M.D., FL.)
6000 Westown Parkway                    :              And
West Des Moines, Iowa 50266             : (Related Doc. 16, at Memorandum Opinion,
                                        : in Case No. 3:05-cv-122, USDC, W.D., KY.)
(811-8663)                              :

---

## IN THE UNITED STATES OF AMERICA
## SECURITIES AND EXCHANGE COMMISSION
## [18 USC § 1962; 15 USC §§ 80A–24(a), 77q; 17 CFR §§ 270.27d-1(a)(1)(j), 274.127d-1]

IN THE MATTER OF                        :    SEC FILE NUMBER: 333-46593
The American Equity Life Annuity Account,    (FILE NO. 333-46593, REGISTRATION
    (REGISTRANT)                        : STATEMENT, SECURITIES ACT OF 1933;
American Equity Inv. Life Ins. Co. ("AEL"),    FILE NO. 811-08663, REGISTRATION

(DEPOSITOR[1]).                                           :    STMNT., INVSTMNT. CO.  ACT OF 1940);
                                                         :
SECURITIES BEING OFFERED:                                
FLEXIBLE PREMIUM DEFERRED                                :    (S.E.C. Form N-4/A, PROSPECTUS;
VARIABLE ANNUITY CONTRACTS;                                   FILM NUMBERS: 98644731 / 98644732)
    And,                                                 :    Filed as amended on JUNE 9, 1998.
FLEXIBLE PREMIUM VARIABLE                                 : (Related Case No.96cv-494, USDC, S.D.,OH.,
LIFE INSURANCE POLICIES                                       at Doc. 95, Final Order filed JUNE 9, 1998)

## UNITED STATES OF AMERICA BEFORE THE
## BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
## WASHINGTON, D.C.

## FEDERAL DEPOSIT INSURANCE CORPORATION WASHINGTON, D.C.

In the Matter of                    :        FRB Docket No. 11-020-B-HC
ALLY FINANCIAL INC.                 :                    11-020-B-DEO
 Detroit, Michigan                  :        FDIC-11-123b
                                    :
ALLY BANK                           :
 Midvale, Utah                      :
                                    :
RESIDENTIAL CAPITAL, LLC            : (Related Case No.1:12-cv-361, USDC, DC.);
 Minneapolis, Minnesota             : (Related Case No. 01-cv-1236, Id, M.D., FL.);
                                    : (Related Case No. 96-cv-494, Id., S. D., OH.);
and                                 : (Related Case No. 05-CV-122, Id., W. D., KY.);
                                    : (Related Case No. 08-cv-75, Id., S. D., OH.);
                                    : (Related Case No. 01-CV-259, Id., W. D., KY.);
GMAC MORTGAGE, LLC                  : (Related Case No. 10-cv-87, Id., S. D., IA.);
 Fort Washington, Pennsylvania      : (Related Case No. 06-cv-312, Id., S. D., OH.);

## NOTICE OF MOTION AND EMERGENCY MOTION BY CLAIMANTS FOR ORDER ISSUED TO DEBTOR'S CLAIMS ADMINISTRATOR TO DISTRIBUTE PAYMENT OF STATUTORILY ALLOWED CLAIM NOS. 932, 933 UNDER 11 U.S.C.A. §§ 502(a),

---

[1] Compare: 17 CFR § 274.127d-1 - Form N-27D-1 "accounting of segregated trust account.";
With: 15 USC § 77q(a)- "Fraudulent interstate transactions"; To: 17 CFR § 270.27d-1(a)(1)-
"Reserve requirements...for the purpose of assuring the refund of charges required by sections
27(d) and 27(f) of the Act."

,

**(g)(1), 510(b) INSTANTER; GROUNDED ON DEBTOR'S LACK OF INCONSISTENT POSITION FOR CONSENT JUDGMENTS UNDER DOC. 13, USDC, D.C., CASE NO. 1: 12-CV-361; FRB DOCKET NO. 11-020-B-HC; AND "UNCURED" EXECUTOR CONTRACTS UNDER 11 U.S.C.A. § 365(b)(1)(A), (c)(2), see DEBTOR'S MOTION (DOC 61 AND 61-1), INTERIM ORDER (DOC. 81), AND FNMA'S OBJ. (DOC 2102).**

Now appears Creditor(s)/Claimants Yvonne D. Lewis and Sidney T. Lewis, *pro se* ("Movants"), pursuant to Fed. R. Bankr. P. 9013; USBC, S.D., NY, Loc. Rule 9013-1(a), and moves the U.S. Bankruptcy Court For the Southern District of New York, at Manhattan, in Case No. 12-bk-12020 for an Emergency Order directing the Debtor GMAC/Rescap's Claims Administrator to promptly distribute (indemnification) payment of allowed claims 932 & 933, forthwith, and to obtain statutory 'subrogation' under 15 USC § 80A-17(g) from the registrant AMERICAN EQUITY LIFE ANNUITY ACCOUNT's "Blanket Fidelity Bond" held by Depositor American Equity Investment Life Insurance Company pursuant to S.E.C. form N-4/A filed **JUNE 9, 1998**, at "*participation agreement*", Exhibit 8.(A), at Article(s) II and VIII, at section(s) 2.8 REPRESENTATIONS AND WARRANTIES and 8.1(a)(i) INDEMNIFICATION[2] (See attached: **EXHIBIT D**); and,

Movants state that Yvonne D. Lewis and Sidney T. Lewis (the "Claimants" of CLAIM Nos. 932, 933) are entitled to $30M ("the **Cure**") held by the Debtor(s) Claims Administrator for claim Nos. 932, 933 in this case pursuant to 11 U.S.C.A. §§ 365(b)(1)(A), 365(c)(2), 502,

---

[2] See: 15 USC § 80A–17(a) and (g) Bonding of officers and employees having access to securities or funds reads: "*The Commission is authorized to require by rules and regulations or orders for the protection of investors that any officer or employee of a registered management investment company who may singly*, or jointly with others, *have access to securities or funds of any registered company*, either directly or through authority to draw upon such funds *or to direct generally the disposition of such securities* (unless the officer or employee has such access solely through his position as an officer or employee of a bank) be *bonded by a reputable fidelity insurance company against larceny and* embezzlement in such reasonable minimum amounts as the Commission may prescribe.*"

510(b)[3], 726(a)[4] and as set forth in the attached supporting documents related to Bankruptcy

Code section 365(b)(1) which requires the chapter 11 debtors GMAC/RESCAP to **cure**, or

provide adequate assurance that it will promptly **cure** any prior defaults in HUD/FHA *executor*

*contracts* and unexpired leases at the time of assumption on **NOV. 29, 2011** (See: EXHIBIT A)

on **APRIL 20, 2012** (See: EXHIBITS B & C) as "consistent" with available prepetition "relief[5]"

subject to consent of FNMA and *"Fannie Mae EAF Facility"* and 2011-2012 *"FRB and FDIC*

*Consent Orders and DOJ/AG Settlements[6]"* related to the Nationstar APA dated May 13, 2012

(See: Doc 61-2, pgs. 1-117) issued in connection with debtors' "subordination agreements" (i.e.,

*DOJ/AG Consent Judgment)* "enforceable under applicable non-bankruptcy law" from aforesaid

---

[3] "… it is hereby ORDERED and DECREED that the Plan Trustee's Summary Judgment Motion is GRANTED, in part, as follows: (i) the Officers' and Directors' indemnification claims arising out of the ERISA Litigation (as defined in the foregoing Memorandum) are subordinated pursuant to Bankruptcy Code §510(b); …" (**See: In re Touch Am. Holdings, Inc., 381 B.R. 95, 110 (Bankr. D. Del. 2008)**) It follows that Claimant Yvonne Lewis' "indemnification claims" arise out of **1996 RICO consent judgment** [i.e., (penny stock scam, case Id.494) and PRODUCT LIABILITY (living trust, case 123 FTC 1092; And, annuity scam, case Id.1236 (FL.) and case Id.12667 (OH.)]; And arise out of **2012 RICO consent judgment** [i.e, (living trust, case Id. 122 (KY.); And, arise out of Debtors mortgage and annuity scam, case Id.361 (DC.));

[4] "Section 726(a) does expressly recognize the validity and enforceability of subordination agreements" as provided in section 510" and that section in turn states that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law." 11 U.S.C. § 510(a). Here, we have a subordination agreement which is enforceable at law and qualifies under section 510. (See: **In re El Paso Refinery, L.P., 244 B.R. 613, 625 (Bankr. W.D. Tex. 2000)**)

[5] See and Compare: Doc 61, pg 3 of 51, at (A) Filed 05/14/12 and Entered 05/14/12 in case No.12-bk-12020, "Sale Procedures Relief" …; Compared With: Doc 61-1, pg 7 of 51, Exhibit-A, at (A) Filed 05/14/12 and Entered 05/14/12 in case no. 12-12020, "**The Sale Procedures**, attached hereto as Exhibit 1, which are incorporated herein by reference, are approved and shall govern all bids and sale procedures relating to the Purchased Assets subject of each APA.")

[6] See: Doc 61-2, pg 78 of 117, Exhibit-B, at section 6.16, Nationstar Asset Purchase Agreement (APA) between Nationstar APA (**purchaser**) and GMAC Mortgage LLC (**seller**), Filed 05/14/12 and Entered 05/14/12 in case no. 12-12020, "Consent Orders and DOJ/AG Settlements" dated May 13, 2012);

related Federal case no.1:12-cv-00361-RMC, USDC, D.C., at Doc. 13, Filed 04/04/12, Pages 1

thru 92.

(Also See: Doc. 2102-1, at pgs.5-6, "*Fannie Mae Early Advance Funding [EAF] Facility*" and

"*Consent Order and DOJ/AG Settlements*")

        The object of this emergency motion is threefold: **(1)** The motion is to enable the Debtors

Claims Administrator to promptly disburse payment for Allowed Claims 932 and 933; and **(2)**

To show the Bankruptcy Court that Debtor GMAC MORTGAGE LLC, (12-bk-12020) has not

maintained an objection to said creditor Lewis' 'proof of claims' for $30M "the Cure Amounts"

(see: **PROPOSED SALE PROCEDURES ORDER**, Doc. 61-1, at pg.2 at "the Cure Amounts")

for to do so would be an "inconsistent position" from the position asserted relative to the 1996

RICO *Consent Judgment*[7] and 2011 FRB *Consent Order and 2012 DOJ/AG Settlements* (Id.) as

available relief to claimant/creditors of debtors (*GMAC Mortgage Co. LLC [assignee/servicer]*

*and Huntington National Bank [assignor/loan originator]*) as 'incorporated by reference' to the

'Huntington notice of appearance' (see Doc.168, notice), and the Nationstar Mortgage Co.

LLC's, Asset Purchase Agreement "APA" dated MAY 13, 2012 (see Doc.61-2, at Sect.6.16) and

INTERIM ORDER for Debtor's "Securitization-Related Activities" by securitization of

mortgage loans in OHIO and NEVADA for subsequent resale to FANNIE MAE filed MAY 15,

2012. (see and compare: Interim Order, Doc.81, at pg. 3, at P.4, securitization of mortgage loans

guaranteed by Ginnie Mae in OHIO and NEVADA entered MAY 15, 2012; compared with:

EXHIBIT B, **Notice of resale to FANNIE MAE in OHIO filed MAY 31, 2012**); and,

        **(3)** To show the Bankruptcy Court that Debtor GMAC MORTGAGE LLC, is attempting

to "deny" the Claimant Lewis' (third-party beneficiaries) "relief" under their prepetition

---

[7] See: Docs. 70 & 95, case no. 96-cv-494, USDC, S.D., Ohio., E. Div., (Settlement, Final Order)

HUD/FHA executory contracts involving Debtors late Notice of assignment and securitization of

the Lewis' FHA mortgage loan filed **MAY 31, 2012;** When in fact, Debtor's *"securitization*

*trusts"* guaranteed by Ginnie Mae (see 24 CFR § 251.2) for subsequent resale to FANNIE MAE

(see: Doc.81, at pg. 3, at P.4) occurred on **APRIL 20, 2012** by and through the Debtors

*"financial accommodations"* with FNMA pursuant to 11 U.S.C.A. § 365(c)(2) under the "Fannie

Mae EAF Facility" (see and compare: Doc. 2102-1, at pg.5, Line 1, EAF; compared with:

EXHIBIT C, at pg.1, P1., **Confirmation of GMAC'S resale of Bid to FNMA on APRIL 20,**

**2012 under the EAF).** This Court's Interim Order (Doc.81) entered MAY 15, 2012 in case no.

12-bk-12020 appears to alter Debtor GMAC's preceding resale to FANNIE MAE by Sheriffs

Sale on APRIL 20, 2012 (EX.C.) by prohibiting the JUNE 4, 2012 State Confirmation Order.

(Id.) though the NOV. 21, 2012 Federal Confirmation Order (Doc. 2246 & Doc. 2247).

## BH LEGACY APA

(see and compare: **BR SALE ORDER**, Doc. 2247, pg. 32 of 34, at P.37, *"The Purchaser's
obligations to Sellers* under **section 6.17** of the BH Legacy APA shall extend to any successor
estate fiduciary and AFI, in each case solely to the extent such entity is carrying out the
obligations of the Sellers under the DOJ/AG Settlement or Consent Order."; compared with:
**AMENDED APA,** BH Legacy APA, Doc 2247-1, pg. 38 of 59, at **section 6.5(B)** *"Interim
Operations,...* nothing in this Agreement shall prevent Sellers from making payments to former
mortgagors pursuant to the **Consent Order** or from offering, and effecting refinancing of or
**MODIFICATIONS** to, Mortgage Loans as contemplated by the terms of the **DOJ/AG
Settlement,** or by HAMP, HARP, HASP or any similar program that Sellers have or may
develop in the Ordinary Course of Business;...".; compared to: **AMENDED APA,** Doc 2247-1,
pgs. 44 to 45 of 59, at **Section 6.17** *"Servicing,...* "Sellers and Purchaser shall cooperate with
each other in a commercially reasonable manner with respect to such performance, including but
not limited to, providing information and documents to the other parties and *compliance with the
applicable provisions of Exhibits A, D, E, H and I of the DOJ/AG Settlement.* In addition,
Purchaser agrees to use its commercially reasonable efforts to cooperate with and assist Sellers
and their counsel and other advisors with Sellers' **foreclosure review** obligations under the
**Consent Order** and the reporting and oversight program with respect thereto.")

<u>OCWEN APA</u>

(see and compare: **BR SALE ORDER**, Doc. 2246, pg. 30 of 54, at P.32, "**Consent Order and DOJ/AG Settlement Order.** Notwithstanding anything herein to the contrary, including, without limitation, any findings and any assertion, agreement, pleading, or other document made or filed in connection with the Sale, the Sale Motion, the Sale Procedures Order, the Sale Hearing, or this Sale Order, *this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under*, (a) the Board of Governors of the Federal Reserve System *Consent Order*, dated APRIL 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation (the "**FRB Consent Order**"), (b) the *consent judgment* entered APRIL 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012 (the "**Consent Judgment**"), (c) the *Order of Assessment of a Civil Money Penalty* Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated FEBRUARY 10, 2012 (the "**Order of Assessment**"), (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates and (e) Section 6.16."; compared with: **OCWEN LOAN SERVICING, LLC, APA**, Doc 2246-1, pg. 67 of 104, at section 6.5(c) "**Interim Operations of the Business** Sellers covenant and agree that,... For the avoidance of doubt, nothing in this Agreement shall prevent Sellers from engaging in loss mitigation activities, including hiring and terminating counsel therefor even if such Contract may be or become a Material Contract, defending and/or settling routine litigation matters, or making payments to former mortgagors pursuant to the Consent Order or from offering and effecting refinancing of or modifications to Mortgage Loans as required by the terms of the DOJ/AG Settlement, or by HAMP, HARP, HASP or any similar program that the Sellers have or may develop in the Ordinary Course of Business; provided that Sellers shall promptly provide copies to Purchaser of any reports provided under the DOJ/AG Settlement to the monitor appointed to oversee Sellers' compliance with the DOJ/AG Settlement with respect to such agreements, arrangements and actions;...".; compared to: **AMENDMENT NO. 1 to OCWEN LOAN SERVICING, LLC, APA**, Doc 2246-2, pgs. 3 to 4 of 16, at **Section 6.16B** *Consent Order... "Purchaser agrees to cooperate with and assist ResCap Sellers*, any Performing Entity and their respective counsel and other advisors with regard to ResCap Sellers' performance of their obligations under paragraphs 3, 4 and 22 of the *Consent Order* regarding the Purchased Assets, including without limitation making available the necessary personnel, systems and processes, as well as the Books, Records, and relevant Mortgage Loan Documents that ResCap Sellers transferred to Purchaser in connection with the Purchased Assets as are reasonably necessary for ResCap Sellers, any Performing Entity and their respective counsel, the independent consultant and the law firms advising the independent consultant to (i) complete the independent review of foreclosure actions and associated reporting obligations to the FRB with respect thereto, and (ii) *implement the related borrower remediation plan (including facilitating non-monetary remediation such as* REFINANCINGS *or* LOAN MODIFICATIONS *at the expense of ResCap Sellers' or any Performing Entity)*, in each case as such obligations are finally approved by the FRB (collectively, the "*Foreclosure Review Obligations*");.., Furthermore, Purchaser's obligations under this Section 6.16B shall be conditioned upon the prompt reimbursement by ResCap Sellers or any Performing Entity of any and all out-of-pocket or third party costs and expenses and

Applicable Internal Costs incurred by Purchaser or its Affiliates in connection with compliance with the *Foreclosure Review Obligations..*")

This motion is supported by the claimants 'memorandum in support' as 'incorporated by reference' herein, and supported by all exhibits, testimony(s), findings, admissions, and judicial & administrative orders (State and Federal) issued in all proceedings related to, in connection with, or averred herein, as incorporated by reference with REFINANCINGS *or* LOAN MODIFICATIONS as provided under the DOJ/AG Settlement in connection with, related to, or by reason of, the underlying Penny Stocks Scam in OHIO and NEVADA as converted to "flexible premium life insurance contract", "FLEXIBLE PREMIUM DEFERRED VARIABLE ANNUITY CONTRACTS" or otherwise "FLEXIBLE PREMIUM VARIABLE LIFE INSURANCE POLICIES" issued by agreements between "AEL ("Noble")" and "AIM ("McIntyre")" (see Document 240-3, Id. Case no. 1236) to unlawfully fund incurable Living Trusts (Id. Case no. 123 FTC 1042-1097), marketed under an illegal "AIM" business model (Id. Document 240-5, pg.12 of 50, Id. Case no. 1236), without proper reserve deposits to protect investors (see 17 CFR §§ 270.27d-1(a)(1)(j), 274.127d-1), and U.S. Savings Bond transactions by "HNB/HBAN" (Doc 168, Id. Case no. 12-12020).

Respectfully Submitted,

_Sidney Lewis_
Sidney T. Lewis, Claimant
1875 Alvason Avenue
Columbus, OH 43219

_Yvonne D. Lewis_
Yvonne D. Lewis, Claimant
1875 Alvason Avenue
Columbus, OH 43219

## MEMORANDUM IN SUPPORT

Claimants show the 1988-2012 National Ponzi Scheme in three (3) parts (i.e., **1.** Fraud of Unregistered Securities as Penny Stock under the Securities Exchange Act of 1933; And, **2.**

Fraud by false statements in Registering Securities as ANNUITY CONTRACTS with false certifications of separate accounts under the Investment Company Act of 1940 and Act of 1933; And, **3**. Mortgage Fraud of Unregistered Asset-Backed Securities in OHIO and NEVADA as guaranteed (pools) by Ginnie Mae in "Agency Securitization Trusts" and "Non-Agency Securitization Trusts" for subsequent resale to Fannie Mae) as follows:

Misleading Statements For Unregistered Securities

1.  On MARCH 26, 1998 the Nat'l Class Period from 1988 to 1992 for the Unregistered "Penny Stock Scam" was certified by the United States District Court, S.D., for Ohio at Doc 70, in case no. 96-cv-494.

## "PENNY STOCK SCAM"

**EXPLAINED BY**: State of Ohio, Plaintiff-Appellee, v. Dwight I. Hurd No. 96APA03-326, COA10th, Fr. County, Ohio, *1999 Ohio App. LEXIS 2047, pg.11, at fnt.1.*; **EXPLAINED BY**: Nat'l Class Period, DOC. 70, in case BRYK et al., vs. HURD et al., 96-cv-494, on MARCH 26, 1998; **CONVERSION BY**: DOC. 95, in case BRYK et al., vs. HURD et al., 96-cv-494, on JUNE 9, 1998; **CONVERSION BY**: S.E.C. FORM, N-4/A, filed on JUNE 9, 1998 in registration filed by issuer American Equity Life Annuity Account, for FLEXIBLE PREMIUM DEFERRED ANNUITY contracts as tax deferred annuities with a 3% guaranteed interest, and Death Benefits [see 26 usc 101(f)(3)(A)].

False Registration Statements For Federally Regulated Securities

2.  A) On JUNE 9, 1998 the Nat'l RICO Class Settlement from 1988 to 1992 for the Dewey Candy Company's (OHIO) "Penny Stock Scam" was Finalized by Order of the USDC, S.D., Ohio at Doc 95, in case no. 96-cv-494.

   B) On JUNE 9, 1998 the Nat'l Class of Investment Securities from 1997 to 2001 for the National Sorbents Inc. (NEVADA) "Living Trust and Annuities Scam" as converted to the American Equity Life Annuity Account was registered with the US Securities

Exchange Commission by American Equity Investment Life Insurance Company.

(See: EXHIBIT D, Am. Equity Life Ann. Acct., S.E.C. FORM, N-4/A)

## "LIVING TRUST AND ANNUITIES SCAM"

**EXPLAINED BY**: See Attached **EXHIBIT (1)** Document 240-12, Agreement between DAVE J NOBLE and MICHAEL P. MCINTYRE, In Case No. 6:01-cv-01236-PCF-DAB, USDC, M.D., Florida, Filed 09/10/04, Exhibit 10, at Pages 2 & 7 of 7, at P.1 *"Private Label* **Products**" for *Dave J Noble*, president, American Equity Investment Life Insurances ("AEL"), and *Michael P. McIntyre[8]*, president, Addison Insurance Marketing ("AIM"); And, **CONVERSION BY**: Attached **EXHIBIT (2)** Document 2-5, CONSENT OF DEFENDANT DAVE J NOBLE, In Case No. 4:10-cv-00087-JAJ-CFB, USDC, S.D., Iowa, Filed 03/03/10, Page 1 to 6, "Oversubscribed *Private Label* Stock for *Dave J Noble*, "AEL"; And, **EXPLAINED BY**: Attached **EXHIBIT (3)** Document 240-3, Deposition of MICHAEL P. MCINTYRE, In Case No. Id, 6:01-cv-01236-PCF-DAB; and **EXPLAINED BY**: Doc 61, at Pages 11 & 12 of 51, case no.12-12020-mg, Filed and Entered 05/14/12, at P18 to P21 *"Private Label* Securitization Pools" and "Agency Securitization Trusts and Non-Agency Securitization Trusts".

Mortgage Fraud

   3.  A) On May 31, 2012 the 'AEL and AIM Nat'l Living Trust and Annuities Scams' for

unpaid death benefits on life insurance policies embedded in annuity contracts were

converted by Huntington National Bank's 2001 assignor mortgage lien/as the 2001

mortgage loan originator/ and as a 2005 Judgment Lienholder under Huntington's

Allowed 2008 Proof of Claim (See: Fnt. 9, infra) and GMAC Mortgage LLC as the 2001-

assignee of the underlying mortgage lien/for the 2001 mortgage loan originator/before the

2012 Assignment of Bid to Fannie Mae by GMAC (See: EXHIBIT B) under either the

FNMA executor contracts for <u>Fannie Mae EAF Facility</u>, see Doc. 2102-1, pg.5, line 1, in

the USDC, S.D., for New York, in case no. 12-bk-12020, or Assigned under the

HUD/FHA executor contracts for <u>HUD Loss Mitigation/Loan Modification Programs</u> as

---

[8] (See: Federal Trade Commission's Cease and Desist Order in case no. 123 FTC 1092-97 terminating on April 14, 2017, against *Michael P. McIntyre* for <u>Living Trust Scam</u> in Case: 2:09-cv-00944-ALM, Doc 10, Filed: 06/11/10, at Page: 12 of 25)

subject to the 2011 FRB/FDIC consent orders and 2012 DOJ/AG Settlement. (See: Docs. 2246 and 2247, consent orders, Modifications )

(See: **EXHIBIT (A&B)** May 31, 2012 Notice of Assignment to FNMA by GMAC)

B) On MAY 31, 2012 the Nat'l Class RICO for the "Penny Stock Scam" involving penny securities sold in Ohio and Nevada were converted to securitization trusts (Pool) for subsequent resale to Fannie Mae From **NATIONAL SORBENTS [Nevada]** (John Bryk/Yvonne Lewis) to Brokers' MSSB (Morgan Stanley Smith Barney) as "conversion" of 1998 securities settlement for **DEWEYS CANDY COMPANY [Ohio]**, Doc 95, in case no. 96-cv-494 at $0 value/$0 commissions.

(See and Compare: Order, Doc. 81, at pg.3, P.4, Id. Case no. 12-12020, "Debtors are authorized to continue their operations related to... selling mortgage loans originated by the Debtors in Ohio and Nevada directly to securitization trusts guaranteed by Ginnie Mae for securitization or to Ally Bank for subsequent resale to Fannie Mae or Freddie Mac."; Compare To: **EXHIBIT (4)** May 31, 2012 Statement of conversion of securities from **NATIONAL SORBENTS [Nevada]** to Brokers' MSSB)

For the obvious "conflict of interest" reasons, Larry McClatchey, Ch. 7 Trustee, and Larry McClatchey, Attorney for Ch. 7 Trustee in aforesaid case no. 07-bk-57237, USBC, S.D., Ohio., E. Div., as equity partner of the *Emens, Hurd, Kegler & Ritter law firm*, n.k.a. *Kegler, Brown, Hill & Ritter law firm* is involved in the classic "Ponzi schemes", i.e., the **"LIVING TRUST AND ANNUITIES FRAUD"** and **"PENNY STOCK FRAUD"** and **"MORTGAGE FRAUD"** in State of Ohio vs. HURD, case no. 94-cr-2155, CPC, Fr. County, Ohio and BRYK et al., vs. HURD et al.,(at Cincinnati) case no. 95-cv-1095 transferred (at Columbus) case no. 96-cv-494, USDC, S.D., Ohio., E. Div..  For the Mail Fraud/"Rico"/Securities Fraud and obvious "conflict of interest" reasons, said Larry McClatchey, Ch. 7 Trustee and surplus creditor/original

payee did <u>not</u> negotiate ("the **Cure**") in the Ohio original 2007-2008 disbursements in bankruptcy case no. 07-bk-57237 for the Huntington's Allowed Proof of Claim (fnt. 9, infra):

WHEREFORE, the Movants without wavier of Ohio's first court jurisdiction in case no. 07-bk-57237 for disgorgement of fraudulent Allowed Proof of Claims by HBAN/HNB[9] related to the "RICO, i.e., **"LIVING TRUST, SECURITIES AND MORTGAGE FRAUD"** (See: Doc.168, Id. Case no. 12020) appear to be against the Lewises (as discharged debtors), while appearing herein as surplus creditors/claimants.   In the interest of justice, the LEWISES appear in these bankruptcy proceedings under the privileges, protections, and policies incorporated by reference to the "**Consent Order and DOJ/AG Settlement Order**. (see ORDER, Doc. 2246, pg. 30 of 54, at P.32)

Moreover the Movants appear involuntarily by virtue of the Nationwide Fraud and Ponzi schemes affecting the 2011 **Consent Order** and 2012 **DOJ/AG Settlement Order** while submitting to the secondary jurisdiction of this honorable New York bankruptcy court. Movants request that an order be entered directing Debtors immediate payment of the Allowed Claims 932 and 933.    As described above, Yvonne D. Lewis and Sidney T. Lewis (932 claimants/Payees); and Sidney T. Lewis (933 claimant)/Bettie Hamilton (Payee) request this Order of Court so that the Debtors' Claims Administrator can issue prompt payment in compliance with Proof of Claims to "cure" defaults under the executor contract of HUD/FHA as consistent with the aforesaid Consent Order and DOJ/AG Settlement Relief (see Id., Doc 2246-1, pg. 67 of 104, at section 6.5(c)) by hand delivery or mailed to P.O. Box 247916, Columbus, Ohio 43224-7916, as "Purchaser's obligations...shall be conditioned upon the **PROMPT**

---

[9] See: **EXHIBIT 5**, Claim 2-1, in BR case no. 07-bk-57237, HNB's Proof of Claim, filed 06-06-08, for related case no 08-cv-75.

REIMBURSEMENT by ResCap Sellers." (See: Id, Doc 2246-2, Section 6.16B)  We, Yvonne

D. Lewis and Sidney T. Lewis hereby declare under penalty of perjury that the foregoing is true

and correct and state that we are the Movants in the above-named original (OHIO) and related

(NEW YORK) bankruptcy proceedings and request payment of the Proof of Claims pursuant to

11 U.S.C.A. §§ 365(b)(1)(A), 365(c)(2), 510(a), 726(a) and consent of FNMA and *"Fannie Mae*

*EAF Facility"* and 2011-2012 *"FRB and FDIC Consent Orders and DOJ/AG Settlements"* issued

as "subordination agreements" "enforceable under applicable non-bankruptcy law" [18 U.S.C.

§§ 2, 1962; **15 USC §§ 80A–24(a), 77q; 17 CFR §§ 270.27d-1(a)(1)(j), 274.127d-1**] in

aforesaid Federal case nos.1:12-cv-00361-RMC, USDC, D.C., at Document 13; and no.4:10-cv-

87, USDC, S.D., IA., at Document 7.

| | |
|---|---|
| *Sidney T.* Lewis, Claimant | Yvonne D. Lewis, Claimant |

## NOTICE OF MOTION FOR ORDER TO DISTRIBUTE PAYMENT OF CLAIMS

To all parties and their attorneys of record:

PLEASE TAKE NOTICE that on or about Monday, December 3, 2012, Claimant(s) Sid Lewis

and Yvonne Webb-Lewis, will and do move the court for an order enjoining debtor's claims

administrator, from withholding payment (relief) of allowed claims 932 and 933, during the

pendency of this action. This motion is made under *authorities* set forth in case no.1:12-cv-

00361, at Docs.11 & 13, on the grounds that: from April 4, 2012 to May 31, 2012 Debtors have

failed to cure the defects of FHA and FNMA assignment agreements as 'subordination

agreements' and 'executory contracts' "at issue" under the *"FRB and FDIC Consent Orders and*

*DOJ/AG Settlements"* as tainted by the penny stock and living trust scams.

_Sidney T. Lewis, Claimant_          _Yvonne D. Lewis, Claimant_

## CERTIFICATE OF SERVICE

A copy of the foregoing: "**NOTICE OF MOTION AND EMERGENCY MOTION BY CLAIMANTS FOR ORDER ISSUED TO DEBTOR'S CLAIMS ADMINISTRATOR TO DISTRIBUTE PAYMENT OF STATUTORILY ALLOWED CLAIM NOS. 932, 933 UNDER 11 U.S.C.A. §§ 502(A), (G)(1), 510(B) INSTANTER; GROUNDED ON DEBTOR'S LACK OF INCONSISTENT POSITION FOR CONSENT JUDGMENTS UNDER DOC. 13, USDC, D.C., CASE NO. 1: 12-CV-361; FRB DOCKET NO. 11-020-B-HC; AND "UNCURED" EXECUTOR CONTRACTS UNDER 11 U.S.C.A. § 365(B)(1)(A), (C)(2), SEE DEBTOR'S MOTION (DOC 61 AND 61-1), INTERIM ORDER (DOC. 81), AND FNMA'S OBJ. (DOC 2102)**" was served on Debtors counsels of record, and other parties to the instant action, by hand delivery, electronic mail service, or by certified U.S. Mail Service, Postage Prepaid on December 3, 2012.

Respectfully Submitted,

Sidney T. Lewis, Claimant          Yvonne D. Lewis, Claimant
1875 Alvason Avenue               1875 Alvason Avenue
Columbus, OH 43219                 Columbus, OH 43219
(614) 940-3306                     (614) 940-3306

                    or

c/o P.O. Box 247916,
Columbus, Ohio 43224-7916

EXHIBIT A

Franklin County Ohio Clerk of Courts of the Common Pleas- 2011 Nov 30 1:29 PM-03CV006954

0A083 - B20

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| **GMAC Mortgage Company** | Case No. 03 CVE 06 6954 |
| **Plaintiff,** | |
| | Judge Patrick E. Sheeran |
| **vs.** | |
| Sidney T. Lewis, et al. | **NOTICE OF ASSIGNMENT OF BID** |
| **Defendants.** | |

Plaintiff GMAC Mortgage Company, acting through counsel, hereby gives notice that it

has assigned its bid on the sale of the property that is the subject of this foreclosure action to the

following person: **Federal National Mortgage Association**, P.O. Box 650043, Dallas, TX

75265-0043.

Respectfully submitted,

Matthew J. Richardson (0077157)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-222-4921
Fax: 614-220-5613
Email: mjr2@mdk-llc.com
Attorney for Plaintiff

Ref# 03-0741/JNT2

Franklin County Ohio Clerk of Courts of the Common Pleas- 2011 Nov 30 1:29 PM-03CV006954

0A083 - B21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Notice of Assignment of

Bid was sent to the following by ordinary U.S. Mail, postage prepaid, on the date indicated

below:

Sidney T. Lewis
1875 Alvason Ave.
Columbus, OH  43219

Mary Johnson
Assistant Prosecutor
373 S. High Street – 17th Floor
Columbus, OH 43215

Michelle Sutter
Attorney for the State of Ohio Department of Taxation
101 East Town Street
Columbus, OH  43215

_____
Matthew J. Richardson
November 29 ,2011
Dated

E1410 – E4

## REAL ESTATE JUDICIAL SALE
## PURCHASER INFORMATION FORM
As Prescribed by Buckeye State Sheriffs' Association
R.C. §2329.26 - R.C. §2329.27 - R.C. §2329.271
*Must be complete and legible or it will be returned.*
*Failure to provide the following information at the time of the sale may nullify the sale and cause the purchaser to be in contempt.*

In the Court of __Common Pleas, Franklin County, Ohio__

| | |
|---|---|
| Case # __03 CVE 06 6954__ | Sale Date __October 28, 2011__ |
| Parcel # __010-136627-00__ | Property Address __1913 Argyle Drive__ |
| City/Township __Columbus__ | County __Franklin__ |

**(A)** Is the property now RESIDENTIAL RENTAL PROPERTY? ☒ Yes ☐ No
Will the PURCHASER occupy the lands and tenements? ☐ Yes ☒ No

**(B) PURCHASER:**
(Required of ALL PURCHASERS)
*(Must be readily accessible through CONTACT PERSON if any business entity listed in Section (D))*

Name: __GMAC Mortgage Company, c/o GMAC Mortgage, LLC__
Address: __1100 Virginia Drive, Foreclosure Department__
City: __Fort Washington__
State: __Pennsylvania__    Zip __19034__
Phone 1 __319-236-4784__
Phone 2 (_____) _____

**(C) CONTACT PERSON:**
(Required if currently RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business entity listed in Section (D))

Name __Shelley Peterson/Property Preservation Conveyance__
Address: __1100 Virginia Drive, Foreclosure Department__
City: __Fort Washington__
State: __Pennsylvania__    Zip: __19034__
Phone 1 __319-236-4784__
Phone 2 (_____) _____
Email: __Shelley.Peterson@GMACM.COM__

**(D) The PURCHASER is a:** ("X" one)
(Required of ALL PURCHASERS)
- ☐ TRUST
- ☐ BUSINESS TRUST
- ☐ ESTATE
- ☐ PARTNERSHIP
- ☐ LIMITED PARTNERSHIP
- ☐ LIMITED LIABILITY COMPANY
- ☐ ASSOCIATION
- ☒ CORPORATION
- ☐ OTHER BUSINESS ENTITY
- ☐ NONE OF THE ABOVE (Non-Business)

**(E) The CONTACT PERSON is a:** ("X" one)
(Required if property is currently RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business listed in Section (D))
- ☐ TRUSTEE (for Trust of Business Trust)
- ☐ EXECUTOR OR ADMINISTRATOR (for Estate)
- ☐ GENERAL PARTNER (for Partnership or Limited Partnership)
- ☐ MEMBER, MANAGER or OFFICER (for Limited Liability Company)
- ☐ ASSOCIATE (for Association)
- ☒ MEMBER, MANAGER or OFFICER (for any other Business Entity)

**(F)** PURCHASER'S principal place of business is located in: ("X" one) ☐ this County; ☐ State of Ohio; ☒ State of Pennsylvania

**(G) LOCAL CONTACT:**
(Required if NOT RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business listed in Section (D))

Name: _____
Address: _____
City: _____
State: _____    Zip: _____
Phone 1 (_____) - _____
Email: _____

(This person must be a natural person who is employed by the purchasing entity and whom the purchasing entity has designated to receive notices or inquiries about the property and whose office is in:

1...this county, if principal place of business is in this county;
2 ..in Ohio, if principal place of business is in Ohio;
3 . the principal place of business, if principal place of business is outside of Ohio.)

**(H) PROPERTY TO BE DEEDED TO:**
(Required of ALL PURCHASERS)

Name(s): __Federal National Mortgage Association__
Address: __P.O. Box 650043__
City: __Dallas__
State: __Texas__    Zip: __75265-0043__
Phone 1 (_____) . _____
Phone 2 (_____) - _____

(**NOTE** Once this form is submitted to the court, changes to the deed may only be made with a court order).

**NOTICE**
This information must be obtained at the time of sale, shall be part of the sheriff's record of proceedings and shall be part of the record of the court of common pleas. The information is a public record and open to public inspection.

Ref# 03-0741/TM

EXHIBIT B

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 May 31 3:05 PM-05CV004555

0A460 - R10

## IN THE COURT OF COMMON PLEAS
### FRANKLIN COUNTY, OHIO

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | |
|---|---|
| GMAC Mortgage Corporation | Case No. 05CVE-04-4555 |
| **Plaintiff,** | Judge Julie M. Lynch |
| vs. | |
| Yvonne D. Lewis aka Yvonne D. Webb-Lewis, et al. | **NOTICE OF ASSIGNMENT OF BID** |
| **Defendants.** | |

Plaintiff GMAC Mortgage Corporation, acting through counsel, hereby gives notice that

it has assigned its bid on the sale of the property that is the subject of this foreclosure action to

the following person:

**Federal National Mortgage Association**
**P.O. Box 650043**
**Dallas, TX 75265-0043**

Respectfully submitted,

Matthew J. Richardson (0077157)
Holly N. Wolf (0068847)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-222-4921
Fax: 614-220-5613
Email: mjr2@mdk-llc.com
Attorney for Plaintiff

THE STATE OF OHIO
Franklin County, ss

I, MARYELLEN O'SHAUGHNESSY, Clerk OF THE COURT OF COMMON PLEAS WITHIN AND FOR SAID COUNTY,

HEREBY CERTIFY THAT THE ABOVE AND FORE-GOING IS TRULY TAKEN AND COPIED FROM THE ORIGINAL .......... NOW ON FILE IN MY OFFICE
WITNESS MY HAND AND SEAL OF SAID COUNTY THIS ..... DAY OF ....... A.D. 20...
MARYELLEN O'SHAUGHNESSY, Clerk

By .................... Deputy

Ref# 05-2846/NNW

EXHIBIT B

F14

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 May 31 3:05 PM-05CV004555
0A460 - R11

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Notice of Assignment of

Bid was sent to the following by ordinary U.S. Mail, postage prepaid, on the date indicated

below:


Yvonne D. Lewis aka Yvonne D. Webb-Lewis
1875 Alvason Avenue
Columbus, OH 43219

Sidney T. Lewis
1875 Alvason Avenue
Columbus, OH 43219


_____
Matthew J. Richardson
Holly N. Wolf

May ___, 2012
Dated


EX. B

Ref# 05-2846/NNW

EXHIBIT C

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jun 04 9:39 AM-05CV004555
0A465 – 064

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

| | |
|---|---|
| **GMAC Mortgage Corporation** | Case No. 05CVE-04-4555 |
| **Plaintiff,** | Judge Julie M. Lynch |
| vs. | |
| **Yvonne D. Lewis aka Yvonne D. Webb-Lewis, et al.** | **CONFIRMATION ENTRY OF SALE AND DISTRIBUTION OF PROCEEDS** |
| **Defendants.** | |

This action was heard on the return of the Sheriff of Franklin County of the sale of

property commonly known as 1875 Alvason Avenue, Columbus, OH 43219, parcel no. 010-

136633-00 (the "Property"). The legal description of the Property is attached to this order as

Exhibit A, which is incorporated herein by reference.

1.    The Property was sold by the Sheriff on April 20, 2012 to GMAC Mortgage Corporation

for the following amount: **$81,480.00**. Plaintiff subsequently assigned its bid to Federal

National Mortgage Association ("Plaintiff's Assignee").

2.    Having carefully examined the proceedings of the officer, the Court finds that the sale of

the Property conformed in all respects to the law and the prior orders of this Court and

hereby confirms and approves the sale of the Property and these proceedings.

3.    The Sheriff shall convey the Property to Federal National Mortgage Association by deed

Ref# 05-2846/NNW

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jun 04 9:39 AM-05CV004555
0A465 - 065

according to law free and clear of all liens and encumbrances and shall issue the deed in

the following name:  Federal National Mortgage Association.

4.    The tax mailing address of the purchaser of the Property is as follows: P.O. Box 650043,

Dallas, TX 75265-0043.

5.    The prior deed reference with respect to the Property is as follows: Deed filed May 5,

1997, recorded in Official Records Volume 35026, Page G14, Recorder's Office, Franklin

County, Ohio.filed May 23, 1990, recorded in Official Records Volume 15237, Page

D07, Recorder's Office, Franklin County, Ohio.

6.    The purchaser of the Property is hereby subrogated to the rights of the mortgagees and

lien holders in the Property to the extent necessary to protect the purchaser's title to the

Property.

7.    The Court hereby grants the purchaser of the Property a writ of possession to put the

purchaser in possession of the Property.

8.    The Court hereby orders the release of all mortgages and liens held by all parties to this

action. As a result, the Clerk of Courts shall cause certificates of satisfaction and release

to be presented for recording by the County Recorder with respect to each of the

mortgages and liens listed on Exhibit B, which is attached to this order for the

convenience of the Clerk of Courts and incorporated herein by reference. Such mortgages

and liens shall be released only to the extent that they encumber the property foreclosed

upon in this action and not to the extent that they encumber any other property.

9.    Because Federal National Mortgage Association is the assignee of the successful bid of

GMAC Mortgage Corporation, which holds a valid and subsisting mortgage on the

Property, Federal National Mortgage Association need not pay the full amount of the

Ref# 05-2846/NNW

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jun 04 9:39 AM-05CV004555
0A465 - 066

purchase price to the Sheriff. Instead, Federal National Mortgage Association need only

pay an amount necessary to pay court costs, real estate taxes and assessments, and

Sheriff's costs. The deposit amount of **$350.00** tendered at the Sheriff's sale shall be

distributed as follows:

a.    The Clerk of Courts shall be paid **$399.00** for court costs.

b.    The County Treasurer shall be paid **$1,046.69** for taxes and assessments currently
      due on the Property and payable through full year 2011 as well as an estimated
      portion of the 2012 taxes pro-rated through MAY 28, 2012. Grantee takes title
      subject to all taxes, interest, penalties, assessments, and tax lien certificates if any.

c.    The Sheriff shall be paid **$125.00** for Sheriff's costs.

d.    The Auditor shall be paid **$163.50** for conveyance fees and transfer tax.

e.    The Recorder shall be paid **$36.00** for recording the deed.

f.    Since the deposit is not sufficient to satisfy these items, the Plaintiff's Assignee
      shall pay the Sheriff the deficit of **$1,420.19** to cover all requisite disbursements.

10.    The following amount shall be applied as a credit toward the amount of the judgment

previously entered in favor of the Plaintiff: **$79,709.81.**

**IT IS SO ORDERED.**

Judge Julie M. Lynch
Common Pleas Judge

Approved:

/s/ Matthew J Richardson
Matthew J. Richardson (0077157)
Holly N. Wolf (0068847)
Manley Deas Kochalski LLC
P. O. Box 165028
Columbus, OH 43216-5028
Telephone: 614-222-4921
Fax: 614-220-5613
Email: mjr2@mdk-llc.com
Attorney for Plaintiff

Via fax 5/25/12
Mary Johnson
Assistant Prosecutor
373 South High Street
17th Floor
Columbus, OH 43215
Via Email
Attorney for Franklin County Treasurer

Ref# 05-2846/NNW

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jun 04 9:39 AM-05CV004555
0A465 – 067

## EXHIBIT A

### Legal Description of the Property

Situated in the County of Franklin, in the State of Ohio, and in the City of Columbus:

Being Lot Number Seventeen (17) of ARGYLE PARK SUBDIVISION, as the same is numbered and delineated upon the recorded plat thereof, of record in Plat Book 36, Page 6, Recorder's Office, Franklin County, Ohio.

Parcel No. 010-136633-00

Address:  1875 Alvason Avenue, Columbus, OH 43219

Property Address: 1875 Alvason Avenue, Columbus, OH 43219

Parcel No.  010-136633-00

Ref# 05-2846/NNW

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jun 04 9:39 AM-05CV004555
0A465 - O68

## EXHIBIT B

### Mortgages and Liens to be Released

Mortgage in favor of The Huntington Mortgage Company, 7575 Huntington Park Drive, Columbus, OH 43235, from Yvonne D. Lewis aka Yvonne D. Webb-Lewis and Sidney T. Lewis, Husband and Wife, in the amount of $63,400.00, dated March 9, 2001, filed March 20, 2001, recorded as Official Instrument No. 200103200055720, Recorder's Office, Franklin County, Ohio,

as assigned by The Huntington Mortgage Company to GMAC Mortgage Corporation, 3451 Hammond Avenue, Waterloo, IA 50702, by Assignment dated October 4, 2001, filed November 14, 2001, recorded in Official Instrument No. 200111140262914, Recorder's Office, Franklin County, Ohio.

Ref# 05-2846/NNW

Franklin County Ohio Clerk of Courts of the Common Pleas- 2012 Jun 04 9:39 AM-05CV004555
0A465 - 069

Franklin County Court of Common Pleas

Date:            06-04-2012

Case Title:      GMAC MORTGAGE CORPORATION -VS- YVONNE D LEWIS

Case Number:     05CV004555

Type:            CONFIRMATION OF SALE

It Is So Ordered.

*/s/ Judge Julie M. Lynch*

Electronically signed on 2012-Jun-04   page 6 of 6

E1566 - K15

## REAL ESTATE JUDICIAL SALE
## PURCHASER INFORMATION FORM
As Prescribed by Buckeye State Sheriffs' Association
R C §2329 26 - R C §2329 27 - R C §2329 271
*Must be complete and legible or it will be returned*
*Failure to provide the following information at the time of the sale may nullify the sale and cause the purchaser to be in contempt*

In the Court of ___Common Pleas, Franklin County, Ohio___

| | |
|---|---|
| Case # __05CVE-04-4555__ | Sale Date __April 20 2012__ |
| Parcel # __010-136633-00__ | Property Address __1875 Alvason Avenue__ |
| City/Township __Columbus__ | County __Franklin__ |

**(A)** Is the property now RESIDENTIAL RENTAL PROPERTY? ☐ Yes ☒ No
Will the PURCHASER occupy the lands and tenements? ☐ Yes ☒ No

**(B) PURCHASER:** (Required of ALL PURCHASERS) *(Must be readily accessible through CONTACT PERSON if any business entity listed in Section (D))*

Name __GMAC Mortgage Corporation, c/o GMAC Mortgage, LLC__
Address __1100 Virginia Drive, Foreclosure Department__
City __Fort Washington__
State __Pennsylvania__  Zip __19034__
Phone 1 __319-236-4784__
Phone 2 (___)___ ___-___

**(C) CONTACT PERSON:** (Required if currently RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business entity listed in Section (D))

Name _____
Address _____
City _____
State _____  Zip _____
Phone 1 (___)___ ___-___
Phone 2 (___)___ ___-___
Email _____

**(D) The PURCHASER is a:** ("X" one) (Required of ALL PURCHASERS)
☐ TRUST
☐ BUSINESS TRUST
☐ ESTATE
☐ PARTNERSHIP
☐ LIMITED PARTNERSHIP
☐ LIMITED LIABILITY COMPANY
☐ ASSOCIATION
☒ CORPORATION
☐ OTHER BUSINESS ENTITY
☐ NONE OF THE ABOVE (Non-Business)

**(E) The CONTACT PERSON is a:** ("X" one) (Required if currently RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business listed in Section (D))
☐ TRUSTEE (for Trust of Business Trust)
☐ EXECUTOR OR ADMINISTRATOR (for Estate)
☐ GENERAL PARTNER (for Partnership or Limited Partnership)
☐ MEMBER MANAGER or OFFICER (for Limited Liability Company)
☐ ASSOCIATE (for Association)
☒ MEMBER, MANAGER or OFFICER (for any other Business Entity)

**(F)** PURCHASER'S principal place of business is located in ("X" one) ☐ this County, ☐ State of Ohio, ☒ State of Pennsylvania

**(G) LOCAL CONTACT:** (Required if NOT RESIDENTIAL RENTAL PROPERTY and PURCHASER is any business listed in Section (D))

Name __Shelley Peterson/Property Preservation Conveyance__
Address __1100 Virginia Drive, Foreclosure Department__
City __Fort Washington__
State __Pennsylvania__  Zip __19034__
Phone 1 __319-236-4784__
Phone 2 (___)___ ___-___
Email __Shelley_Peterson@GMACM.COM__ (This person must be a natural person who is employed by the purchasing entity and whom the purchasing entity has designated to receive notices or inquiries about the property and whose office is in

1 this county, if principal place of business is in this county
2 in Ohio, if principal place of business is in Ohio,
3 the principal place of business if principal place of business is outside of Ohio )

**(H) PROPERTY TO BE DEEDED TO:** (Required of ALL PURCHASERS)

Name(s) __Federal National Mortgage Association__
Address __P.O. Box 650043__
City __Dallas__
State __Texas__  Zip __75265-0043__
Phone 1 (___)___ ___-___
Phone 2 (___)___ ___-___

(**NOTE** Once this form is submitted to the court, changes to the deed may only be made with a court order)

** NOTICE **
This information must be obtained at the time of sale, shall be part of the sheriff's record of proceedings and shall be part of the record of the court of common pleas  The information is a public record and open to public inspection

Ref# 05-2846/TM

BIDI

GA - H B 138

Eff September 2008

EXHIBIT D

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLAObmYQaionwg5sDW3P6oaN5D3tdezXNmn7zlT+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Kppew57H15XYqEkaFgUe3Y22T3ML0+xO+fg1Rzg8FnS14yDC6dXtnNOvqG9hp4Jz
 dJgy4HT+K9nD4KKGSK/t7g==

<SEC-DOCUMENT>0001047469-98-023446.txt : 19980610
<SEC-HEADER>0001047469-98-023446.hdr.sgml : 19980610
ACCESSION NUMBER:           0001047469-98-023446
CONFORMED SUBMISSION TYPE:  N-4/A
PUBLIC DOCUMENT COUNT:      12
FILED AS OF DATE:           19980609
SROS:           NONE

FILER:

     COMPANY DATA:
          COMPANY CONFORMED NAME:          AMERICAN EQUITY LIFE ANNUITY ACCOUNT
          CENTRAL INDEX KEY:               0001055368
          STANDARD INDUSTRIAL CLASSIFICATION:   []
          STATE OF INCORPORATION:          IA
          FISCAL YEAR END:            1231

     FILING VALUES:
          FORM TYPE:          N-4/A
          SEC ACT:
          SEC FILE NUMBER:333-46593
          FILM NUMBER:         98644731

     FILING VALUES:
          FORM TYPE:          N-4/A
          SEC ACT:
          SEC FILE NUMBER:811-08663
          FILM NUMBER:         98644732

     BUSINESS ADDRESS:
          STREET 1:           5400 UNIVERSITY AVE
          CITY:               WEST DES MOINES
          STATE:              IA
          ZIP:                50266
          BUSINESS PHONE:     5152255400

     MAIL ADDRESS:
          STREET 1:           5400 UNIVERSITY AVE
          CITY:               WEST DES MOINES
          STATE:              IA
          ZIP:                50266
</SEC-HEADER>
<DOCUMENT>
<TYPE>N-4/A
<SEQUENCE>1
<DESCRIPTION>N-4/A
<TEXT>

<PAGE>

AS FILED WITH THE SECURITIES AND EXCHANGE COMMISSION ON JUNE 9, 1998

                                        FILE NO. 333-46593

                                        FILE NO. 811-08663

- --------------------------------------------------------------------
- --------------------------------------------------------------------

                   SECURITIES AND EXCHANGE COMMISSION
                        WASHINGTON, D.C. 20549

                        ----------------------

                              FORM N-4

        REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933      / /

             PRE-EFFECTIVE AMENDMENT NO.   1                         /X/

             POST-EFFECTIVE AMENDMENT NO.                            / /

     REGISTRATION STATEMENT UNDER THE INVESTMENT COMPANY ACT OF 1940     / /

                  AMENDMENT NO.                                      / /
                  ---------------------

              AMERICAN EQUITY LIFE ANNUITY ACCOUNT
                     (Exact Name of Registrant)

                 AMERICAN EQUITY INVESTMENT

EXHIBIT B-001

LIFE INSURANCE COMPANY
(Name of Depositor)

5000 Westown Parkway, Suite 440
West Des Moines, Iowa 50266
(Address of Depositor's Principal Executive Offices)

------------------------------

DEBRA J. RICHARDSON
5000 Westown Parkway, Suite 440
West Des Moines, Iowa 50266
(Name and Address of Agent for Service of Process)

------------------------------

COPY TO:
STEPHEN E. ROTH, ESQUIRE
Sutherland, Asbill & Brennan LLP
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2415

------------------------------

APPROXIMATE DATE OF PROPOSED PUBLIC OFFERING: AS SOON AS PRACTICABLE AFTER
THE EFFECTIVE DATE OF THIS REGISTRATION STATEMENT.

SECURITIES BEING OFFERED: FLEXIBLE PREMIUM DEFERRED VARIABLE ANNUITY
CONTRACTS.

THE REGISTRANT HEREBY AMENDS THIS REGISTRATION STATEMENT ON SUCH DATES AS
MAY BE NECESSARY TO DELAY ITS EFFECTIVE DATE UNTIL THE REGISTRANT SHALL FILE A
FURTHER AMENDMENT WHICH SPECIFICALLY STATES THAT THIS REGISTRATION STATEMENT
SHALL THEREAFTER BECOME EFFECTIVE IN ACCORDANCE WITH SECTION 8(a) OF THE
SECURITIES ACT OF 1933 OR UNTIL THE REGISTRATION STATEMENT SHALL BECOME
EFFECTIVE ON SUCH DATE AS THE COMMISSION, ACTING PURSUANT TO SAID SECTION 8(a),
MAY DETERMINE.

------------------------------------------------------------------------
------------------------------------------------------------------------

<PAGE>
CROSS REFERENCE SHEET
PURSUANT TO RULES 481(a) AND 495(a)

Showing location in Part A (prospectus) and Part B (statement of additional
information) of registration statement of information required by Form N-4

PART A

<TABLE>
<CAPTION>
ITEM OF FORM N-4                                              PROSECTUS CAPTION

| <C> <S> | PROSPECTUS CAPTION |
|---|---|
| 1. Cover Page.................... | Cover Page |
| 2. Definitions.................... | Definitions |
| 3. Synopsis....................... | Expense Tables; Summary |
| 4. Condensed Financial Information.... | Yields and Total Returns |
| 5. General | |
| (a) Depositor.................... | American Equity Investment Life Insurance Company |
| (b) Registrant.................. | American Equity Life Annuity Account |
| (c) Portfolio Company............. | Investment Options |
| (d) Fund Prospectus.............. | Investment Options |
| (e) Voting Rights................ | Voting Rights |
| (f) Administrators............... | N/A |
| 6. Deductions and Expenses | |
| (a) General..................... | Charges and Deductions; Summary |
| (b) Sales Load t................. | Charges and Deductions; Summary |
| (c) Special Purchase Plan......... | N/A |
| (d) Commissions.................. | Distribution of the Contracts |
| (e) Expenses -- Registrant....... | Charges and Deductions; Summary |
| (f) Fund Expenses................ | Investment Options; Charges and Deductions |
| (g) Organizational Expenses....... | N/A |
| 7. Contracts | |
| (a) Persons with Rights........... | Summary; Addition, Deletion or Substitution of Investments; Description of Annuity Contract; Payment Options; Voting Rights |
| (b) (i) Allocation of Purchase Payments.................... | Summary; Premiums; Free-Look Period; Allocation of Premiums |
| (ii) Transfers.............. | Summary; Transfer Privilege |
| (iii) Exchanges............. | Transfers, Assignments or Exchanges of a Contract |
| (c) Changes..................... | Additions, Deletions or Substitutions of Investments; Description of Annuity Contract; Modification; |
| (d) Inquiries................... | Cover page; Inquiries |
| 8. Annuity Period.................... | Summary; Payment Options |
| 9. Death Benefit.................... | Death Benefit Before the Retirement Date; Death Benefit After the Retirement Date |
| 10. Purchases and Contract Value | |
| (a) Purchases.................... | Summary; Issuance of a Contract; Premiums; Free Look Period; Allocation of Premiums; Variable Cash Value; |
| (b) Valuation................... | Definitions; Variable Cash Value; |
| (c) Daily Calculation............. | Definitions; Variable Cash Value; |
| (d) Underwriter................. | Issuance of a Contract; Distribution of the Contracts |
| 11. Redemptions | |
| (a) -- By Owners................. | Summary; Transfer Privilege; Surrenders and Partial Surrenders; Proceeds on the |

EX. B-002

https://www.sec.gov/Archives/edgar/data/1055368/0001047469-98-023446.txt

11/16/2012

```
                                      Retirement Date; Payments; Payment Options; Federal Tax Matters
    -- By Annuitant...............    Summary: Transfer Privilege; Surrenders and Partial Surrenders; Proceeds on the
                                      Retirement Date; Payments; Payment Options; Federal Tax Matters
    (b)  Taxes ORP...................  N/A
    (c)  Check Delay.................  Payments
    (d)  Lapse.......................  N/A
    (e)  Free Look...................  Summary; Free Look Period
</TABLE>
<PAGE>
<TABLE>
<C>   <S>                             <C>
12.   Taxes.........................  Summary: Federal Tax Matters
13.   Legal Proceedings.............  Legal Proceedings
14.   Table of Contents for the Statement   Statement of Additional Information
      of Additional Information.......  Table of Contents
</TABLE>

PART B

<TABLE>
<CAPTION>
ITEM OF FORM N-4                                          PART B CAPTION
----------------------------------   ------------------------------------------------------------------
<C>   <S>                             <C>
15.   Cover Page....................  Cover Page
16.   Table of Contents.............  Table of Contents
17.   General Information and History..  General Information About the Company
18.   Services
      (a)  Fees and Expenses of
           Registrant...............  N/A
      (b)  Management Contracts......  N/A
      (c)  Custodian................  N/A
           Independent Public Accountant..  Experts
      (d)  Assets of Registrant.....  N/A
      (e)  Affiliated Persons.......  N/A
      (f)  Principal Underwriter....  Distribution of the Contracts (prospectus)
19.   Purchase of Securities
      Being Offered.................  Distribution of the Contracts (prospectus)
      Offering Sales Load...........  N/A
20.   Underwriters..................  Distribution of the Contracts (prospectus)
21.   Calculation of Performance Data..  Calculation of Yields and Total Returns; Yields and Total Returns (prospectus)
22.   Annuity Payments..............  Payment Options (prospectus)
23.   Financial Statements..........  Financial Statements
</TABLE>

PART C -- OTHER INFORMATION

<TABLE>
<CAPTION>
ITEM OF FORM N-4                                          PART C CAPTION
----------------------------------   ------------------------------------------------------------------
<C>   <S>                             <C>
24.   Financial Statements and
      Exhibits......................  Financial Statements and Exhibits
      (a)  Financial Statements.....  (a) Financial Statements
      (b)  Exhibits.................  (b) Exhibits
25.   Directors and Officers of the
      Depositor....................  Directors and Officers of American Equity Investment Life Insurance Company
26.   Persons Controlled By or Under
      Common Control with the Depositor
      or Registrant.................  Persons Controlled By or In Common Control with the Depositor or Registrant
27.   Number of Contractowners......  Number of owners
28.   Indemnification...............  Indemnification
29.   Principal Underwriters........  Principal Underwriter
30.   Location of Accounts and Records..  Location of Books and Records
31.   Management Services...........  Management Services
32.   Undertakings..................  Undertakings and Representations
      Signature Page................  Signatures
</TABLE>
<PAGE>
PROSPECTUS


AMERICAN EQUITY LIFE ANNUITY ACCOUNT
INDIVIDUAL FLEXIBLE PREMIUM DEFERRED
VARIABLE ANNUITY CONTRACT


------------------------------------------------------------------------------
```

This Prospectus describes the individual flexible premium deferred variable
annuity contract (the "Contract") being offered by American Equity Investment
Life Insurance Company (the "Company"). The Contract may be sold to or in
connection with retirement plans, including those that qualify for special
federal tax treatment under the Internal Revenue Code.


Premiums and accumulated values are allocated, as designated by the owner, to
one or more of the subaccounts of the American Equity Life Annuity Account (the
"Account", the Declared Interest Option, or both. The assets of each Subaccount
will be invested solely in shares of the corresponding Investment Options: Value
Growth Portfolio, High Grade Bond Portfolio, High Yield Bond Portfolio, Money
Market Portfolio and Blue Chip Portfolio of EquiTrust Variable Insurance Series
Fund; Equity Income Portfolio, Mid-Cap Growth Portfolio, New America Growth
Portfolio and Personal Strategy Balanced Portfolio of T. Rowe Price Equity
Series, Inc.; International Stock Portfolio of T. Rowe Price International

*Ex. B-003*

                                                                        11/16/2012

By its authorized officer

By: /s/ Darrell N. Braman

Title:                          Vice President

Date: June 8, 1998


<PAGE>

SCHEDULE A

Name of Separate Account and Date Established by Board of Directors:

    American Equity Life Variable Account
    1/12/98

Contracts Funded by Separate Account:

    Flexible Premium Variable Life Insurance Policy

Designated Portfolios:

    T. Rowe Price Equity Series, Inc.
      - Equity Income Portfolio
      - Mid-Cap Growth Portfolio
      - New America Growth Portfolio
      - Personal Strategy Balanced Portfolio
    T. Rowe Price International Series, Inc.
      - International Stock Portfolio

Name of Separate Account and Date Established by Board of Directors:

    American Equity Life Annuity Account
    1/12/98

Contracts Funded by Separate Account:

    Flexible Premium Deferred Variable Annuity Contract

Designated Portfolios:

    T. Rowe Price Equity Series, Inc.
      - Equity Income Portfolio
      - Mid-Cap Growth Portfolio
      - New America Growth Portfolio
      - Personal Strategy Balanced Portfolio
    T. Rowe Price International Series, Inc.
      - International Stock Portfolio

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-9
<SEQUENCE>9
<DESCRIPTION>EXHIBIT 9
<TEXT>

<PAGE>

Whitfield & Eddy, P.L.C. letterhead


                              May 21, 1998


Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C.  20549

Gentlemen,

With reference to the Registration Statement on Form N-4 filed by American
Equity Investment Life Insurance Company ("Company") and its American Equity
Life Annuity Account with the Securities and Exchange Commission covering
certain variable annuity contracts, I have examined such documents and such law
as I considered necessary and appropriate, and on the basis of such
examinations, it is my opinion that:

(1)  Company is duly organized and validly existing under the laws of the State
     of Iowa.

(2)  The variable annuity contracts, when issued as contemplated by the said
     Form N-4 Registration Statement will constitute legal, validly issued and
     binding obligations of American Equity Investment Life Insurance Company.

Ex. B-004

EXHIBIT 1

## Charles W. Strube, *et al.* v. American Equity Investment Life Insurance Company
## Case No.: 6:01-CV-1236-Orl-19DAB

# EXHIBIT 10

DEPOSITION
EXHIBIT

#16  82704
        mcIntyre

# A G R E E M E N T

THIS AGREEMENT is made and entered into this 10th day of July, 1997, by and between American Equity Investment Life Insurance Company, an Iowa corporation ("American Equity"), and its parent company, American Equity Investment Life Holding Company, a Delaware corporation ("American Equity Holding"), both with principal offices at 5000 Westown Parkway, Suite 440, West Des Moines, Iowa 50266 , and Addison Insurance Marketing, Inc., a Texas corporation, with its principal offices at 16901 North Dallas Parkway, Suite 118, Dallas, Texas 75208 ("Addison").

WHEREAS, contemporaneously with the execution of this Agreement, Addison shall be appointed by American Equity as a supervising general agent for the solicitation and sale of America Equity's products; and

WHEREAS, Addison has agreed to a production goal of $100 million in total first-year annuity premiums on annuity products sold by American Equity during the 12-month period beginning on the date of this Agreement; and

WHEREAS, the parties have reached certain agreements which are supplemental to the agency relationship;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, the parties agree, as follows:

1.   _Private Label Products._

1.1   _Product Design._   The parties hereby agree to collaborate with respect to the design and development of certain fixed annuity products, hereinafter defined as "Private Label Products," which shall be marketed exclusively by Addison on behalf of American Equity. Such collaboration will include, without limitation, consultation among the actuaries and appropriate officers and employees of American Equity and Addison, respectively, regarding all principal features of the Private Label Products.

1.2   _Exclusive Marketing._   American Equity will make the Private Label Products available for distribution and sale only through full-time agents of Addison or its Affiliates. For purposes of this Agreement, the term "Affiliates" shall include any entity which controls, is controlled by or is under common control with Addison.

1.3   _Costs and Expenses._   Cost and expenses incurred by American Equity or Addison in connection with the design and development of the Private Label Products shall be the responsibility of the party incurring such costs and expenses, and neither party shall have any right of reimbursement from the other for same.

1.4   _Confidential Information._   The parties mutually agree that all information and data utilized or developed in connection with the Private Label Products shall be treated as confidential information. Neither party shall disclose any such confidential information to any other person or entity; provided that the parties shall mutually agree upon the form and content

of solicitation and sales materials to be utilized by Addison and its Subagents, as hereinafter defined, in connection with the marketing of the Private Label Products. The parties shall jointly own any and all intellectual property rights associated with the Private Label Products, and neither party shall transfer, assign and/or convey any interest in such property rights without the prior written consent of the other party, which may be withheld for any reason.

2.  *Agents of Addison*.

    2.1    *Noncompetition*. American Equity acknowledges and agrees that Addison recruits and maintains a captive agency force of independent agents who are under contract with Addison (hereinafter referred to as "Subagents" or, individually, as a "Subagent"). American Equity agrees that, in the event of the termination for any reason, with or without cause, of the agency relationship between Addison and any Subagent, American Equity shall not recontract, license, appoint, reappoint, hire or employ in any capacity, such Subagent for a period of twenty-four (24) months from the date of such termination, unless Addison specifically consents in writing to any such action, which consent may be withheld for any reason.

    2.2    *Change of Control*. Upon the occurrence of any change of control of Addison, or any of its Affiliates, the twenty-four month period referred to in subparagraph 2.1 above shall be reduced to twelve months. A change of control of Addison or any Affiliate of Addison shall be deemed to have occurred when:

        (i)    any person, organization or association of persons or organizations acting in concert shall acquire more than fifty-one percent (51%) of the outstanding voting stock of Addison or any of its Affiliates; or

        (ii)    any person, organization or association of persons or organizations acting in concert shall succeed in electing two or more directors to the Board of Directors of Addison or any Affiliate of Addison in any one election in opposition to those proposed by management; or

        (iii)    Addison or any of its Affiliates shall transfer all or substantially all of the assets of Addison or such Affiliate, respectively, to any other person or entity, excluding transfers among Addison and/or any of its Affiliates; or

        (iv)    Addison or any of its Affiliates shall consolidate with or merge into any other entity unless Addison or an Affiliate shall be the surviving corporation.

3.  *Stock Options*.

    3.1    *Grant of Options*. Subject to the vesting schedule set forth in subparagraph 3.2 below, American Equity Holding hereby grants to Addison Options to purchase 100,000 shares of duly authorized, validly issued and fully paid and nonassessable shares of common stock, $1.00 par value, of American Equity Holding, at an exercise price of Twelve Dollars ($12.00) per share, as adjusted pursuant to subparagraph 3.3 below (hereinafter referred to as the "Option Shares").

- 2 -

RESTRICTED FROM
DISCLOSURE

AEM 0008

3.2   *Vesting Schedule*.   The Options shall vest and become exercisable in accordance with the vesting schedule set forth below.  As used in the vesting schedule, the term "production" shall mean the total amount of first-year annuity premiums on new annuity policies of American Equity, and the term "qualification period" shall mean the twelve-month period beginning on the date of this Agreement.

(i)   Up to 50,000 Options shall vest and be exercisable on execution of this Agreement;

(ii)   Up to an additional 25,000 Options shall vest and be exercisable when production by Addison during the qualification period equals at least $25 million;

(iii)   The remaining 25,000 Options shall vest and be exercisable when production by Addison during the qualification period equals at least $50 million.

3.3   *Term*.   All of the Options granted pursuant to this Section 3 will have a term of ten (10) years from the date of this Agreement.

3.4   *Adjustments*.   Whenever a stock split, stock dividend or other similar change in capitalization of American Equity Holding occurs, the number of Option Shares price per Option Share as to all Options granted but not exercised, shall be appropriately adjusted to maintain the proportionate interest in the shares which Addison may acquire hereunder at an aggregate price equivalent to that which would have been paid prior to the applicable change in capitalization.  Adjustments and determinations made for purposes of this subparagraph shall be made by the Board of Directors of American Equity Holding, whose decisions as to what adjustments or determinations shall be made, and the extent thereof, shall be final, binding and conclusive.

3.5   *Method of Exercise*.   The Options shall be exercisable by written notice given by the holder to American Equity which shall state the number of Options being exercised; set forth any representations and agreements as to the holder's investment intent with respect to such shares as may be satisfactory to American Equity's counsel; and shall bear the holder's signature.  Payment of the exercise price of the Options being exercised shall be made by certified or bank cashier's check delivered with the notice of exercise.

3.6   *Reservation of Shares*.   American Equity Holding shall reserve at all times so long as any of the Options remain outstanding, free from preemptive rights, out of its treasury common stock or its authorized but unissued shares of common stock, or both, solely for the purpose of effecting the exercise of the Options, sufficient shares of common stock to provide for the exercise hereof.

3.7   *Limited Transferability*.   The Options may be transferred by Addison only to an individual who is an officer or employee of Addison if (i) such individual is an accredited investor within the meaning of § 230.501(a) of Regulation D promulgated by the Securities and Exchange Commission ("SEC") under the Securities Act of 1933 ("Securities Act"), and (ii) such transfer is otherwise exempt from registration under federal and applicable state securities laws.

- 3 -

RESTRICTED FROM DISCLOSURE

AEM 0009

Any such transfer shall be effective upon registration of the transfer by American Equity Holding on its books and records.

3.8    *Legend.*  A legend substantially in the following form will be placed on the certificates evidencing any shares of stock issued upon exercise of an Option:

"The securities represented by this certificate have not been registered under the Securities Act of 1933 or any state securities act. The securities have been acquired for investment and may not be sold, transferred, pledged or hypothecated unless (i) they shall have been registered under the Securities Act of 1933 and any applicable state securities act, or (ii) the corporation shall have been furnished with an opinion of counsel, satisfactory to counsel for the corporation that registration is not required under any of such acts."

3.9    *Compliance with Section 144.*  In the event American Equity Holding becomes subject to the reporting requirements of Section 13 or Section 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act"), American Equity Holding shall timely file all reports required to be filed by it under such Sections. Upon the request of any holder of Option Shares in connection with any proposed sale of the Option Shares under Rule 144 promulgated by the SEC under the Securities Act, American Equity Holding will deliver to such holder a written statement regarding its compliance with such requirements.

3.10    *Listing of Common Stock.*  In the event American Equity Holding lists its Common Stock on any national securities exchange or the Nasdaq National Market, the class of Common Stock so listed shall include the Option Shares; provided, however, that each holder of Option Shares shall continue to be solely responsible for compliance with the requirements of the Securities Act with respect to any sale of any of the Option Shares.

4.    <u>Miscellaneous.</u>

4.1    *Entire Agreement.*  This Agreement contains the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior arrangements, negotiations or understanding with respect thereto.

4.2    *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of Iowa.

4.3    *Waiver and Amendment.*  Any term or provision of this Agreement may be waived at any time by the party which is entitled to the benefits thereof and any term or provision of this Agreement may be amended or supplemented at any time by agreement of the parties, except that any waiver of any term or condition, or any amendment or supplementation, of this Agreement must be in a writing signed by the parties. A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive a party's rights hereunder at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

- 4 -

RESTRICTED FROM
DISCLOSURE

AEM 0010

4.4    *Illegality*. In the event that any one or more of the provisions contained in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in any other respect and the remaining provisions of this Agreement shall not, at the election of the party for whom the benefit of the provision exists, be in any way impaired.

4.5    *Notice*. Any notice or other document required or permitted to be given or delivered by either of the parties hereto shall be delivered at, or sent by certified or registered mail to the parties as follows:

| If to American Equity: | American Equity Investment Life Insurance Company |
| | Attention:  D. J. Noble, President |
| | 5000 Westown Parkway, Suite 440 |
| | West Des Moines, IA 50266 |

| If to American Equity Holding: | American Equity Investment Life Holding Company |
| | Attention:  D. J. Noble, President |
| | 5000 Westown Parkway, Suite 440 |
| | West Des Moines, IA 50266 |

| If to Addison: | Addison Insurance Marketing, Inc. |
| | Attention:  Michael P. McIntyre, President |
| | 16901 North Dallas Parkway, Suite 118 |
| | Dallas, TX 75208 |

4.6    *Assignment; Binding Effect*.  This Agreement shall be binding upon and inure to benefit of American Equity and Addison, respectively, and their successors, and assigns. This Agreement may not be assigned by either party without the prior written consent of the other, which may be withheld for any reason.

- 5 -

RESTRICTED FROM
DISCLOSURE

AEM 0011

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto on the day and year first above written.

AMERICAN EQUITY INVESTMENT LIFE
HOLDING COMPANY

By: _____
D. J. Noble, President

AMERICAN EQUITY INVESTMENT LIFE
INSURANCE COMPANY

By: _____
D. J. Noble, President

ADDISON INSURANCE MARKETING, INC.

By: _____
Michael P. McIntyre, President

H:\TPA\X1.2\EQUITY\ADDISON_.AGR

- 6 -

RESTRICTED FROM
DISCLOSURE

AEM 0012

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. |
| | ) |
| AMERICAN EQUITY INVESTMENT LIFE | ) |
| HOLDING COMPANY; | ) |
| DAVID J. NOBLE; and | ) |
| WENDY L. CARLSON, | ) |
| | ) |
| Defendants. | ) |

## CONSENT OF DEFENDANT DAVID J. NOBLE

1.    Defendant David J. Noble ("Defendant") waives service of a summons and the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2.    Without admitting or denying the allegations of the complaint (except as to personal and subject matter jurisdiction, which Defendant admits), Defendant hereby consents to the entry of the final Judgment in the form attached hereto (the "Final Judgment") and incorporated by reference herein, which, among other things:

   (a)    permanently restrains and enjoins Defendant from violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 14a-3 and 14a-9 thereunder; and

   (c)    orders Defendant to pay a civil penalty in the amount of $900,000 under Section 21(d)(3) of the Exchange Act.

3.    Defendant agrees that he shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment

made pursuant to any insurance policy, with regard to any civil penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Defendant further agrees that he shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, or local tax for any penalty amounts that Defendant pays pursuant to the Final Judgment, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

4.    Defendant waives the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

5.    Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Final Judgment.

6.    Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

7.    Defendant agrees that this Consent shall be incorporated into the Final Judgment with the same force and effect as if fully set forth therein.

8.    Defendant will not oppose the enforcement of the Final Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

9.    Defendant waives service of the Final Judgment and agrees that entry of the Final Judgment by the Court and filing with the Clerk of the Court will constitute

2

notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Final Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Final Judgment.

10.    Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges that the Court's entry of a permanent injunction may have collateral consequences under federal or state law and the rules and regulations of self-regulatory organizations, licensing boards, and other regulatory organizations. Such collateral consequences include, but are not limited to, a statutory disqualification with respect to membership or participation in, or association with a member of, a self-regulatory organization. This statutory disqualification has consequences that are separate from any sanction imposed in an administrative proceeding. In addition, in any disciplinary proceeding before the Commission based on the entry of the injunction in this action, Defendant understands that he shall not be permitted to contest the factual allegations of the complaint in this action.

11.    Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that

3

imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees: (i) not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis; and (ii) that upon the filing of this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they deny any allegation in the complaint. If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket. Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

12.     Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action. For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

13.     Defendant agrees that the Commission may present the Final Judgment to the Court for signature and entry without further notice.

14.    Defendant agrees that this Court shall retain jurisdiction over this matter

for the purpose of enforcing the terms of the Final Judgment.


Dated: _1-4-09_                                         _David J Noble_

                                                        David J. Noble

        On _January 4_, 20__, _____, a person known to
me, personally appeared before me and acknowledged executing the foregoing Consent.


                                                        _Lori Leix_
                                                        Notary Public
                                                        Commission expires:


Approved as to form:

_Robert S. Bennett_
Robert S. Bennett
Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, DC 20004
202-637-6464
Attorney for Defendant

LORI LEIX
Commission Number 732963
My Commission Expires
2/1/2011

5

## CERTIFICATE OF SERVICE

I hereby declare, under the penalty of perjury pursuant to 28 U.S.C. § 1746, that I caused a copy of the Consent of Defendant David J. Noble, to be served on March 3, 2010 by Federal Express upon:

**Attorneys for American Equity Investment Life Holding Company**
Charles F. Smith
Gretchen M. Wolf
Marcella L. Lape
Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 407-0700
charles.smith@skadden.com
gretchen.wolf@skadden.com
marcella.lape@skadden.com

**Attorneys for David J. Noble**
Robert S. Bennett
Hogan & Hartson LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-6464
rsbennett@hhlaw.com

Andrew M. Lawrence
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005
(202) 371-7097
andrew.lawrence@skadden.com

**Attorney for Wendy C. Waugaman**
Herbert F. Janick III
Bingham McCutchen LLP
85 Exchange Street, Suite 300
Portland, ME 04101
(207) 780-8270
herb.janick@bingham.com

/s/ *Jeffrey A. Shank*
Jeffrey A. Shank

1

EXHIBIT 3

# Charles W. Strube, *et al.*  v.
# American Equity Investment Life Insurance Company
# Case No.:  6:01-CV-1236-Orl-19DAB

# EXHIBIT 1

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

1

NO. 01-CI-02109         JEFFERSON CIRCUIT COURT
DIVISION ONE

BEVERLY S. MALONE            PLAINTIFF

VS.      <u>VIDEO DEPOSITION FOR THE PLAINTIFF</u>

VICTOR E. TACKETT, JR., et al.       DEFENDANTS

\*    \*    \*

DEPONENT:      MICHAEL P. McINTYRE
(VOLUME I)

DATE:      AUGUST 27, 2004

**CONDENSED**

**COPY**

KITTY SHAY
Kentuckiana Reporters
394 Starks Building
455 South Fourth Avenue
Louisville, Kentucky 40202
502-589-2273
502-584-0119 - Fax

12-12020-mg    Doc 2348    Filed 12/03/12    Entered 12/05/12 11:14:13    Main Document
Case 6:01-cv-01236-PCF-DAB    Document Pg 59 of 90 led 09/10/04    Page 3 of 22 PageID 2500

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

40

1  today?
2      A. I do not know.
3      Q. When he -- where was he when
4  you last were aware of his residence?
5      A. Dallas.
6      Q. When did Addison Insurance
7  Marketing begin working in Kentucky,
8  doing business here?
9      A. I don't recall. Probably in
10 '94, '95, possibly.
11     Q. Is Kevin Katora and Reggie
12 Carver, are they still employed?
13     A. Yes.
14     Q. When did American Estate
15 Services get formed?
16     A. I don't know.
17     Q. Were you associated in any
18 way with American -- a company known as
19 American Estate Services?
20     A. I did marketing and
21 consultation for American Estate
22 Services.
23     Q. When you say marketing and
24 consultation with American Estate

41

1  Services, what does that mean?
2      A. Well, I consulted with them
3  about how to market their company,
4  talking about advertising, direct mail,
5  recruiting.
6      Q. Did you have any ownership
7  interest in the company?
8      A. No.
9      Q. Who owned the company?
10     A. I believe Jan Schindler did.
11     Q. What was the business of
12 American Estate Services?
13     A. I believe it was a document
14 preparation company.
15     Q. What kind of documents did
16 they prepare?
17     A. Wills, trusts, dual powers of
18 attorneys, estate planning documents, I
19 believe. They could have did some other
20 things, too, Bill, I just don't remember.
21     Q. When did you first become
22 aware of the existence of American Estate
23 Services?
24     A. I don't remember. Probably

42

1  early '90s, I reckon.
2      Q. When you first learned of the
3  existence of American Estate Services,
4  was Jan Schindler employed by you?
5      A. Yes.
6      Q. Did Jan Schindler form that
7  corporation or form that organization?
8      A. I don't think she did, but
9  I'm not sure. I think -- you know, I
10 can't remember who formed that
11 organization.
12     Q. But Jan Schindler owned it?
13     A. She did.. She did own the
14 stock of the company. To my best
15 recollection, she owned 100 percent of
16 the stock.
17     Q. Did she own that company
18 before coming to work for Addison
19 Insurance?
20     A. I don't think so. I think
21 she bought the company afterwards.
22     Q. Were you aware of her
23 acquisition of that company while an
24 employee of American -- excuse me, while

43

1  an employee of Addison Insurance
2  Marketing?
3      A. I recall -- I -- I don't
4  remember the exact, whole transaction,
5  but I do recall talking about it, yes.
6      Q. Did you encourage her to
7  acquire that organization?
8      A. No. It was more of an
9  investment opportunity for her that she
10 wanted.
11     Q. When she acquired that
12 business, were there discussions with her
13 subsequent to that acquisition about a
14 partnership or relationship -- business
15 relationship between Addison Insurance
16 Marketing and American Estate Services?
17     A. Yes.
18     Q. And can you tell me,
19 generally speaking, what those
20 discussions were?
21     A. It was on the lines that
22 Addison Insurance Marketing, we sold
23 insurance and we had a group of people
24 who were licensed by the State that could

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

**124**

       (McINTYRE DEPOSITION EXHIBIT
2 MARKED)
   Q.   And before we broke at the
end of Tape 2, we were talking about the
business model.  Let me show you what's
been marked as Exhibit 2 to this
deposition, ask you if you recognize that
multipage document?
   A.   I haven't seen this.  I don't
recall the document.  Obviously this is
stuff that -- or not obviously.  It
appears to be things that was produced
through Ernst & Young, but it's been some
time if I have seen this document.  But
reviewing it, looking over it, it seems
to appear that these are our operations
as the Addison Group.
   Q.   And the purpose of this
document is what?
   A.   I believe we are looking for
potential investors or people to invest
in our company.
   Q.   It says at Page 1 at the top
in italics, "Ernst & Young has been

**125**

engaged to assist the Addison Group in
the sale of the company."
   A.   Yes, it does.
   Q.   Is that true?
   A.   Let me find it here.
   Q.   Very top of the page, first
sentence, Page 1.
   A.   Okay.  "Financial adviser
solely for use by prospective acquirers
in considering acquiring the asset stock
of the company."
   Q.   I don't know what page you're
looking at.  I'm looking at Page No. 1.
   A.   I'm sorry.  Is that this one
here?
   Q.   That page doesn't have a
number on it.  I don't -- I guess that's
actually considered little I.
   A.   All right.
   Q.   The --
   A.   Page 1.  I'm sorry.
   Q.   Double I, then we've got
triple I, then we go to Page No. 1.
   A.   Yes, I see -- I see where it

**126**

says that, has engaged to assist Addison
Group in the sale of the company, yes.
   Q.   Is that true?
   A.   Yes.
   Q.   Was that true?
   A.   Yes.
   Q.   And did you direct that Ernst
& Young be engaged for this purpose?
   A.   Yes.
   Q.   Now, is there any reason you
can think of, Mr. McIntyre, why you would
not have made it your business to have
read this document?
   A.   No.
      MR. BUSH:  Objection.
Mischaracterizes the record.
   Q.   And as far as you can recall,
you've never questioned this document's
authenticity or accuracy in terms of
reflecting the actual business practices
of Addison Insurance Marketing and
Advanced Legal Systems; is that correct?
   A.   Yes.
   Q.   All right.  I'd like to go to

**127**

Page 7, please.  And this is under the
heading Operations.  And -- go ahead.
   A.   No, I was looking at sales
process.  I understand.
   Q.   I believe this is under the
operations section following the
executive summary; is that correct?
   A.   Yes.
   Q.   And when we get to the
subheading Sales Process, there is a
chart there that demonstrates Addison
Insurance Marketing's sales process?
   A.   Yes.
   Q.   Is that accurate?  Please
take a moment and review it.
   A.   Yes.  It appears to be
accurate.
   Q.   And is that the way that
Addison Insurance Marketing performed its
sales process in the state of Kentucky?
      MR. BUSH:  Objection.  Calls
for speculation.
   A.   I don't recall exactly if
this pertained to every individual state,

### Deposition of Michael McIntyre taken August 27, 2004, Vol I

**128**

1 but overall view it looks accurate. As
2 far as a particular state of Kentucky, I
3 don't know if there was modifications
4 made, which there could have been.
5    Q.   Well --
6    A.   I'm not trying to be flip,
7 counsel, I'm just trying --
8    Q.   Let's go through it --
9    A.   Sure.
10   Q.   -- with respect to what you
11 think might have varied, Mr. McIntyre --
12   A.   Okay.
13   Q.   -- from state to state, if
14 anything?
15   A.   That's fair. Thank you.
16   Q.   In the topic direct mailings
17 there at Page 7 --
18   A.   Yes.
19   Q.   -- any of those items that
20 you feel might have varied from state to
21 state?
22   A.   Every one of them, except for
23 ALS select mailing list, that would have
24 been probably the same, but a direct mail

**129**

1 advertisement sent on behalf of attorneys
2 was different in every state.
3    Q.   How did it differ?
4    A.   According to the American Bar
5 Association advertising, from the size of
6 mail that you used to the color ink that
7 you used to the size font.
8    Q.   Well, let me ask you this.
9 In the states in which Addison Insurance
10 Marketing did business, was there ever a
11 state that direct mail advertisement was
12 not sent on behalf of attorneys?
13   A.   What period of time?
14   Q.   From the inception of
15 Advanced Legal Services through December
16 2000.
17   A.   No.
18   Q.   From the inception of
19 Advanced Legal Systems through the year
20 end of the year 2000, the sales process
21 with respect to direct mailings was as
22 stated here at Page 7 of the Ernst &
23 Young memorandum, with the exception that
24 perhaps the color varied of direct

**130**

1 mailing or the content varied of the
2 direct mailing, but direct mailings were
3 sent on behalf of attorneys in every
4 state in which Advanced Legal Systems and
5 Addison Insurance Marketing did business;
6 is that correct?
7    A.   It did for Advanced Legal
8 Systems. I'm not sure about Addison
9 Insurance Marketing, if we did it in
10 every state that Addison Insurance
11 Marketing was in, but I assure that when
12 we did the mailings on behalf of the
13 attorneys, that was through Advanced
14 Legal Systems and, yes, that was done.
15   Q.   Advanced Legal Systems' work
16 of sending out direct mailings for
17 attorneys was always done in conjunction
18 with the efforts of Addison Insurance
19 Marketing; is that correct?
20   A.   Probably most of the time,
21 yes.
22   Q.   It was envisioned, it was the
23 -- part of the business model then
24 planned that Addison Insurance Marketing

**131**

1 worked with Advanced Legal Systems to
2 accomplish their respective business
3 purposes; is that correct?
4    A.   Yes.
5    Q.   Under Roman numeral No. II,
6 the appointment center --
7    A.   Yes.
8    Q.   -- with respect to the time
9 period we've talked about -- and I'd like
10 to limit my questions to that time
11 period.
12   A.   From 1997 to 2000?
13   Q.   From the beginning of
14 Advanced Legal Systems. Was it 1997 --
15   A.   I believe it was.
16   Q.   -- that it came about?
17   A.   I believe so.
18   Q.   So from 1997 through the end
19 of year 2000 --
20   A.   Uh-huh.
21   Q.   -- we can all agree that my
22 questions will be limited to that.
23   A.   Yes, sir.
24   Q.   With respect to the Roman

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

176

1    Q.   With respect to D. Tovar,
2  executive manager, what were his duties
3  and responsibilities?
4    A.   I believe it was a female and
5  she -- I believe she handled the call
6  center -- the call center, the
7  appointment center.
8    Q.   And which company did she
9  work for?
10   A.   Advanced Legal Systems as an
11 insurance marketing...
12   Q.   Would it be fair to say that
13 Jan Schindler; yourself, Michael
14 McIntyre; Greg Skaggs; D. Tovar and C.
15 Moody worked for both Addison Insurance
16 Marketing and Advanced Legal Systems, as
17 described here on this page, No. 617?
18   A.   Yes.
19   Q.   On the row of boxes there
20 towards the bottom, far left, executive
21 secretary, what's MIS mean, the next one
22 over?
23   A.   I think it's the computer --
24 it stands for something to do with the

177

1  computer system, information system.
2    Q.   All right. And then we go to
3  accounting, we go to attorneys. Are
4  those in-house counsel or --
5    A.   No.
6    Q.   Outside counsel?
7    A.   I believe so. I'm sorry.
8    Q.   What was funny?
9         MR. WHITE:  You were going to
10 say outhouse.
11   Q.   Outhouse counsel, outhouse
12 counsel. I didn't mean to disparage Mr.
13 Ciaccio or anything like that.
14   A.   It probably related to the
15 clients -- it probably related to the
16 attorneys that did the Advanced Legal
17 System -- that we marketed for on behalf
18 of Advanced Legal Systems.
19   Q.   In other words, Victor
20 Tackett would be in that box where it's
21 labeled attorneys there on this document?
22   A.   Possibly, yes.
23   Q.   Customer conservation, what
24 is that?

178

1    A.   I think it was probably
2  dealing with clients that would call in
3  and I have questions about their
4  policies.
5    Q.   Why is there a box Addison
6  Insurance Marketing staff directly below
7  customer conservation?
8    A.   I'm not sure why that is,
9  except for -- we have -- the Addison
10 Insurance Marketing staff would probably
11 report to the customer conservation
12 department.
13   Q.   With respect to Document 617,
14 would it be fair to say that Addison
15 Insurance Marketing and Advanced Legal
16 Systems are organizationally integrated?
17   A.   Yes.
18   Q.   How did the model -- the
19 business model change, if it did, from
20 its inception in 1997 up to today's date?
21 If you could narrate for us, please.
22   A.   Well, the model change in
23 1997 -- the model, Advanced Legal Systems
24 started in 1997 and --

179

1    Q.   From that point forward?
2    A.   Right. The best I recollect
3  is that we had -- I guess the major
4  changes were the fact that we had
5  approval by each one of the states on our
6  marketing material. The attorneys got to
7  sign off on the marketing material or
8  changed -- it was state specific about
9  the marketing material. The other major
10 change was probably when we quit doing
11 business with Advanced Legal Systems in
12 2001. I believe that was in August -- or
13 September of 2001.
14   Q.   You mean Advanced Legal
15 Systems ceased to exist in August of
16 2001?
17   A.   We quit doing business.
18   Q.   Okay.
19   A.   And under that model
20 structure.
21   Q.   And what do you mean by we
22 quit doing business under that model
23 structure?
24   A.   We quit doing advertising for

*Kentuckiana Reporters - Kitty Shay*

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

---

**184**

1 1997 Advanced Legal Systems purchased the
2 majority of the assets of American Equity
3 Services?
4    A.   I don't think so.  American
5 Equity Services?
6    Q.   Did I say American Equity?
7    A.   Yes.  I apologize.
8    Q.   It must be the afternoon.  Is
9 it true that in October of 1997 Advanced
10 Legal Systems purchased the majority of
11 the assets of the business of American
12 Estate Services?
13    A.   It could have, yes.
14    Q.   And what was the purpose of
15 that acquisition?
16    A.   I think I -- I believe I
17 wanted to control the marketing arm of
18 that company and retain their clients.
19    Q.   What did you pay Jan
20 Schindler for that business?
21    A.   I don't remember.  I'd have
22 to look back through my accounting
23 records.
24    Q.   At the time there were

**185**

1 negotiations between Addison Insurance
2 Marketing and American Equity, is it true
3 that American -- let me ask it this way.
4 At the time that Addison Insurance
5 Marketing or any of the Addison Group
6 companies, yourself included, were
7 negotiating with American Equity
8 regarding the potential sale of one of
9 those businesses, is it fair to say that
10 all of Addison Insurance Marketing's
11 customers were clients of Advanced Legal
12 System affiliated attorneys and that no
13 external annuity marketing was being
14 performed by Addison Insurance Marketing?
15    MR. BUSH:  Object to the
16 form.  Mischaracterization.
17    A.   I don't believe so.  I think
18 we -- I think we did sell -- we did sell
19 annuities without -- other than Advanced
20 Legal Systems' clients, we did sell
21 annuities to people.
22    Q.   I'm referring you to Page 10
23 of Exhibit 2, which is the Addison Group
24 confidential memorandum.  Page 10, Mr.

**186**

1 McIntyre.
2    A.   Oh, 10.  I'm sorry.  I
3 thought you said 2.  Yes.
4    Q.   At the bottom near the last
5 sentence, would you read that, please.
6    A.   Uh-huh.  "Because AIM's
7 customers are primarily the clients of
8 ALS Affiliated Attorneys, no external
9 annuity marketing is currently performed
10 by AIM."
11    Q.   Is that a true statement?
12    A.   Hunh-uh.
13    Q.   Why would Ernst & Young on
14 your behalf make a statement that was
15 untrue like that in this confidential
16 memorandum?
17    A.   I don't know, but we did sell
18 other annuities for other people, but the
19 majority of our business was through ALS.
20    Q.   At Page 2 it states that
21 approximately 93 percent of gross
22 premiums written in 1997 were sold in
23 conjunction with trust services.  Is that
24 a fair statement?

**187**

1    A.   Yes.
2    Q.   That 93 percent of gross
3 premiums written refers to gross premiums
4 written on annuities; is that correct?
5    A.   I believe so, yes.
6    Q.   What is Advanced Legal
7 Systems' current status?
8    A.   I think it's inactive.
9    Q.   Has it engaged in any
10 business enterprise, any income-producing
11 work since August of '01?
12    A.   I think it was September of
13 '01, September 4th, actually, but, no,
14 not that I remember, Bill.  I don't
15 believe so.
16    Q.   After the closure or the
17 ceasing to do business by Advanced Legal
18 Systems, how has Addison marketed
19 annuities for American Equity?
20    A.   Direct mail and telephone.
21    Q.   Of annuities sold between
22 September 4th, 2001 and today's date,
23 what percentage of annuities sold by
24 Addison are American Equity annuities?

---

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

188

1   A.   I would have to look at the
2  actual numbers.  Do you want a ballpark
3  figure?
4   Q.   Yes, please.
5   A.   I would say better than 80
6  percent.
7        (McINTYRE DEPOSITION EXHIBIT
8  10 MARKED)
9   Q.   Let me show you what's been
10 marked as Exhibit 10.  Can you describe
11 Exhibit 10 for us, please.
12  A.   Agent application -- agent
13 appointment application.
14  Q.   Dated January 27th, 1997?
15  A.   Yes.
16  Q.   What is the purpose of this
17 application?  And the second page stapled
18 to it is an agent's contract that is
19 signed by you and signed by the president
20 or executive vice-president, I believe,
21 of American Equity Investment.
22  A.   Uh-huh.  I'm sorry.  What was
23 the question, Bill?
24  Q.   What is the purpose of the

189

1  agent's contract?
2   A.   I guess it's the agent's
3  declaration and authorization and it's
4  the contract outlined by American Equity
5  Investment Life Insurance Company, the
6  authority to solicit their products and
7  your limitation of authority,
8  relationships, collection of premiums,
9  delivery of policy, authority over
10 agents, commissions, advances liability,
11 indebtedness, reimbursement and
12 indemnifications.
13  Q.   Does this represent the
14 initiation of the relationship between
15 you and your companies, Addison Group,
16 and American Equity Investment Life
17 Insurance Company?
18  A.   It appears so, yes.
19        MR. ROHNER:  Object to the
20 form.
21  Q.   Mr. McIntyre, with respect to
22 the Gentry Group --
23  A.   Uh-huh.
24  Q.   -- when did it come into

190

1  existence?
2   A.   I believe it was 2 -- I want
3  to think 2000.
4   Q.   What is its role in -- in
5  connection with Advanced Legal Systems
6  from its inception until Advanced Legal
7  Systems stopped doing business in August
8  of '01?
9   A.   It doesn't have any -- it
10 doesn't have a relationship with Advanced
11 Legal Systems.
12  Q.   Does Gentry Group have a
13 relationship with American Equity?
14  A.   Yes.
15  Q.   What is that relationship?
16  A.   We are a national marketing
17 organization for them.
18  Q.   A national marketing
19 organization?
20  A.   Yes.
21  Q.   And has that been true since
22 its inception, Gentry Group?
23  A.   Yes.
24  Q.   Has Gentry Group got any

191

1  other duties and responsibilities as a
2  national marketing organization for any
3  other companies?
4   A.   I think we have -- I think
5  we're appointed with F&G, although we
6  don't do any business with them, but I
7  think we have a contract with them and
8  then the other companies that we're --
9  AF&L, Senior American, Constitution Life,
10 American Pioneer and Kenowa.
11  Q.   Are still sold by --
12  A.   Yes.
13  Q.   -- Gentry?
14  A.   Yes, sir.
15  Q.   With respect to annuities,
16 Gentry though only sells for American
17 Equity?
18  A.   Yes.
19  Q.   At its peak, what percentage
20 of annuities sold by Addison were
21 American Equity annuity products?
22  A.   I would probably say 60 to 75
23 percent.
24        MR. ROHNER:  Can I just get a

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

124

1      (McINTYRE DEPOSITION EXHIBIT
2  2 MARKED)
3      Q.  And before we broke at the
4  end of Tape 2, we were talking about the
5  business model.  Let me show you what's
6  been marked as Exhibit 2 to this
7  deposition, ask you if you recognize that
8  multipage document?
9      A.  I haven't seen this.  I don't
10 recall the document.  Obviously this is
11 stuff that -- or not obviously.  It
12 appears to be things that was produced
13 through Ernst & Young, but it's been some
14 time if I have seen this document.  But
15 reviewing it, looking over it, it seems
16 to appear that these are our operations
17 as the Addison Group.
18     Q.  And the purpose of this
19 document is what?
20     A.  I believe we are looking for
21 potential investors or people to invest
22 in our company.
23     Q.  It says at Page 1 at the top
24 in italics, "Ernst & Young has been

126

1  says that, has engaged to assist Addison
2  Group in the sale of the company, yes.
3      Q.  Is that true?
4      A.  Yes.
5      Q.  Was that true?
6      A.  Yes.
7      Q.  And did you direct that Ernst
8  & Young be engaged for this purpose?
9      A.  Yes.
10     Q.  Now, is there any reason you
11 can think of, Mr. McIntyre, why you would
12 not have made it your business to have
13 read this document?
14     A.  No.
15         MR. BUSH:  Objection.
16 Mischaracterizes the record.
17     Q.  And as far as you can recall,
18 you've never questioned this document's
19 authenticity or accuracy in terms of
20 reflecting the actual business practices
21 of Addison Insurance Marketing and
22 Advanced Legal Systems; is that correct?
23     A.  Yes.
24     Q.  All right.  I'd like to go to

125

1  engaged to assist the Addison Group in
2  the sale of the company."
3      A.  Yes, it does.
4      Q.  Is that true?
5      A.  Let me find it here.
6      Q.  Very top of the page, first
7  sentence, Page 1.
8      A.  Okay.  "Financial adviser
9  solely for use by prospective acquirers
10 in considering acquiring the asset stock
11 of the company."
12     Q.  I don't know what page you're
13 looking at.  I'm looking at Page No. 1.
14     A.  I'm sorry.  Is that this one
15 here?
16     Q.  That page doesn't have a
17 number on it.  I don't -- I guess that's
18 actually considered little I.
19     A.  All right.
20     Q.  The --
21     A.  Page 1.  I'm sorry.
22     Q.  Double I, then we've got
23 triple I, then we go to Page No. 1.
24     A.  Yes, I see -- I see where it

127

1  Page 7, please.  And this is under the
2  heading Operations.  And -- go ahead.
3      A.  No, I was looking at sales
4  process.. I understand.
5      Q.  I believe this is under the
6  operations section following the
7  executive summary; is that correct?
8      A.  Yes.
9      Q.  And when we get to the
10 subheading Sales Process, there is a
11 chart there that demonstrates Addison
12 Insurance Marketing's sales process?
13     A.  Yes.
14     Q.  Is that accurate?  Please
15 take a moment and review it.
16     A.  Yes.  It appears to be
17 accurate.
18     Q.  And is that the way that
19 Addison Insurance Marketing performed its
20 sales process in the state of Kentucky?
21         MR. BUSH:  Objection.  Calls
22 for speculation.
23     A.  I don't recall exactly if
24 this pertained to every individual state,

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

136

1     Q.  Okay.  Was there an effort on
2 behalf of American Equity to get you to
3 become exclusive?
4     A.  Never.  In fact, they
5 encouraged have multiple carriers.
6     Q.  With respect to the business
7 model of Advanced Legal Systems and that
8 of Addison Insurance Marketing, Inc.,
9 with respect to the sales process of
10 selling annuities of American Equity,
11 would it be fair to say that Roman
12 numeral III, the in-home appointment, was
13 part of that business model in every
14 state?
15     MR. BUSH:  Objection to the
16 form of the question.  It's vague and
17 ambiguous.
18     A.  There might have been a
19 couple of variations on -- there was
20 always variations.  Each state had
21 different variations of how you can
22 approach an appointment, depending on --
23 you had different rules on -- every state
24 had different rules on notaries.  For

137

1 instance, in the state of Louisiana, had
2 to be completely different, you can't --
3 you had to call and get a separate
4 independent notary to come there to
5 notarize a document.  So I've got to tell
6 you -- and I'm not trying to be flip
7 here, but it was different in every
8 state.  They had different regulations
9 that we had to follow.  Yes, we did have
10 some commonalities of people showing up
11 on the appointments, but to that extent,
12 then we had different regulations
13 pertaining to the insurance and different
14 regulations -- or not regulations,
15 different requirements by different
16 attorneys to notarize and fund the
17 documents differently.  Every state that
18 I recall had different --
19     Q.  I'm really interested in the
20 business model that's printed under Roman
21 numeral III --
22     A.  Yes, sir.
23     Q.  -- or that subsection of it,
24 and let's go through it.

138

1     A.  Okay.
2     Q.  In the states in which this
3 model was practiced, that is, as
4 described in the operations section of
5 the Ernst & Young report, is it true that
6 client service representatives would
7 visit a potential client's home?
8     A.  Yes.
9     Q.  Is it also true that the
10 client services representative would make
11 a presentation on estate planning
12 services on behalf of the attorney?
13     A.  Yes.
14     Q.  Is it also true that the
15 client service representative would
16 obtain a retainer, that is, money for the
17 affiliated attorney, like Mr. Tackett,
18 from the interested clients?
19     A.  Yes.
20     Q.  And that was true in every
21 state in which this model applies; is
22 that correct?
23     A.  I believe so.  Yes.
24     Q.  Let's move to...  Now, going

139

1 to Roman numeral IV, the same question
2 with respect to this business model we've
3 been discussing.
4     A.  Yes.
5     Q.  Was this essentially the same
6 in every state, the attorney would
7 contact and consult with the client,
8 confirm information gathered by the
9 client service representative, prepare
10 estate-planning documents, Advanced Legal
11 Services would be paid by the attorney
12 for services rendered on behalf of the
13 attorney?
14     A.  Yes.
15     Q.  And that was true in every
16 state in which you guys did business; is
17 that correct?
18     A.  I believe so, yes.
19     Q.  With respect to Roman numeral
20 V, document delivery and annuity sale,
21 the client service representative would
22 deliver the document to the attorney's
23 client; is that correct?
24     A.  Yes.

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

140

1    Q.   A client service
2  representative would assist in funding
3  per estate planning documents.  Is that
4  true in every state?
5    A.   Yes.
6    Q.   The client service
7  representative would conduct a
8  presentation about annuities, if
9  requested, and was that true in every
10  state?
11    A.   I believe so.
12    Q.   And the client service
13  representative would sell fixed annuity
14  products.  Is that true in every state?
15    A.   Sometimes, yes.  Sometimes we
16  would make sales, sometimes we wouldn't.
17  Yes, but that was --
18    Q.   That was the idea?
19    A.   It was sometimes -- if it was
20  good for the client, absolutely.
21    Q.   But if the sale took place,
22  it took place along the lines of this
23  business model with the client service
24  representative selling the annuity

141

1  product if they bought it?
2    A.   I don't remember if it was
3  exact in every state as far as a CSR
4  being an Addison Insurance Marketing
5  representative because I believe we have
6  -- I think our lexicon might be a little
7  mixed up.  The client service
8  representative is actually the
9  representative for Advanced Legal Systems
10  and the AIM representative was the
11  insurance agent for Addison Insurance
12  Marketing.  So just to clarify that.
13    Q.   We talked to Mr. Ciotti, and
14  as far as he understood it, they were one
15  and the same, they were the same
16  individual; is that correct?
17    MR. BUSH: Objection.
18  Mischaracterizes the record.
19    A.   Not always.
20    Q.   Often?
21    A.   We had a client service
22  representative and then we had an Addison
23  Insurance Marketing delivery team, so,
24  no, not very often.

142

1    Q.   Not very often?
2    A.   No, sir.
3    Q.   So you're saying there was a
4  difference between the client service
5  representatives, different individuals
6  were client service representatives as
7  opposed to the individuals who were the
8  Addison Insurance Marketing
9  representatives --
10    A.   Yes.
11    Q.   -- that sold the annuities?
12    A.   Yes, you had to be licensed
13  to sell annuities and quite a few of the
14  CSRs were not licensed individuals.
15    Q.   But if a CSR was licensed to
16  sell annuities, he could do both, that is
17  --
18    A.   It wasn't --
19    Q.   -- make the in-home
20  appointment and get the estate planning
21  documents prepared, delivered and also
22  sell the annuity?
23    A.   That really wasn't the
24  practice.

143

1    Q.   What was the practice, have
2  different people you say?
3    A.   Yes, sir.
4    Q.   Okay.  So is your
5  understanding Terry Ciotti served in both
6  capacities or do you know?
7    A.   He might have on some
8  occasions, especially since he was at one
9  -- he could have been a client service
10  representative at -- coming up and then
11  went over to Addison Insurance Marketing.
12  I believe that's his career path.  And
13  then from Addison Insurance Marketing he
14  came in to being an employee of the
15  company.  But he could have done both in
16  his career path with us.  Absolutely.
17    Q.   All right.  Let's talk about
18  the specific business model.  As I
19  understand your testimony, it was the
20  business model in states in which Addison
21  Insurance Marketing operated and Advanced
22  Legal Systems operated that an employee
23  or representative of Addison Insurance
24  Marketing go into the home of these folks

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

148

1  service representative the attorney and,
2  yes, we do have a contract with that
3  client service representative, but they
4  did also take direction from the
5  attorney.
6      Q.  What kind of direction are
7  you referring to?
8      A.  How the attorney wanted their
9  clients handled while they're in the
10 house, if they wanted to talk to the
11 client right now on the phone while the
12 CSR is in the house, if they wanted to
13 have the -- how their funding was going
14 to take place, the particular laws of
15 that particular state because on the
16 probate issues, I believe they varied by
17 state.
18     Q.  So it would be fair to say
19 then that the client service
20 representative took direction both
21 jointly from the attorney as well as
22 Advanced Legal Systems?
23     A.  Yes.
24     Q.  With respect to Exhibit 2,

149

1  back to the Ernst & Young confidential
2  memorandum from the spring of 1998, box
3  bearing Roman numeral -- Roman numeral
4  No. 6, fixed annuity process, is it true,
5  Mr. McIntyre, that in all states in which
6  -- in all states in which Advanced Legal
7  Systems and Addison Insurance Marketing
8  were following this business model, that
9  the fixed annuity would be submitted to
10 the carrier, American Equity, if it were
11 an American Equity policy?
12     A.  If it were a policy of
13 American Equity, yes.
14     Q.  And that the carrier, if it
15 were American Equity, would issue the
16 annuity policy?
17     A.  Yes.
18     Q.  And Addison Insurance
19 Marketing would receive a commission from
20 the carrier, and that would be American
21 Equity if it were American Equity; is
22 that correct?
23     A.  Yes.
24     Q.  And Addison Insurance

150

1  Marketing would deliver the annuity to
2  the client; is that also true?
3      A.  Yes.
4      Q.  And this was the business
5  model in each state; is that correct,
6  with respect to these four items listed
7  under Box 6, fixed annuity process?
8      A.  I believe so, yes.
9      Q.  Your next one is No.  5.
10        (McINTYRE DEPOSITION EXHIBIT
11 5 MARKED)
12     Q.  Let me show you what's been
13 marked as Exhibit No. 5 to your
14 deposition.  It's called the services
15 agreement.  Will you describe this for us
16 and identify it, please.
17     A.  Okay.  This was a service
18 agreement entered in between by ALMS
19 Limited, LLP, a Texas registered limited
20 liability partnership and a licensed
21 attorney, effective date.
22     Q.  We have been discussing
23 Advanced Legal Systems throughout the
24 day.  Advanced Legal Systems is a d/b/a

151

1  for an actual corporation; correct?
2      MR. BUSH:  Objection.  You
3  mean an LLP?
4      MR. McMURRY:  An LLP or a
5  corporation.
6      A.  I would have to -- I would
7  have to refer to counsel on that.
8      Q.  In other words, there is no
9  LLP or corporation known as Advanced
10 Legal Systems, the company, that's the
11 name that you guys have utilized to do
12 this business, but in fact it's Advanced
13 Legal Marketing Systems, LLP, which is
14 the actual business entity that does
15 business as Advanced Legal Systems; is
16 that correct?
17     A.  That sounds correct.
18     Q.  All right.  With respect to
19 what you're looking at there, that's
20 Exhibit No. 5; is that correct?
21     A.  Yes, sir.
22     Q.  All right.  Look, would you
23 please, at Exhibit A to that agreement.
24 That is the agreement between the

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

160

1  A.  0623?
2  Q.  Yes.  Starting with 0616 all
3  the way to the end of that exhibit.
4  A.  Yes, sir.
5  Q.  Mr. McIntyre, were these
6  documents that were provided by Advanced
7  Legal Systems and Addison Insurance
8  Marketing to Ernst & Young to demonstrate
9  to them and to allow them to put together
10  a memorandum that describes the business
11  model?
12      MR. BUSH:  Objection to form.
13  A.  I don't recall why these were
14  attached in there, but I assume that they
15  were put in there to show them what we do
16  for our attorneys.
17  Q.  Was it your understanding
18  that in the process, as it says at Page
19  1, to assist the Addison Group in the
20  sale of the company to begin negotiating
21  with American Equity Investment Life
22  Insurance Company?
23  A.  Would you repeat that?  I
24  apologize.

161

1  Q.  Did the Addison Group, as
2  defined by the three companies identified
3  in this document, Exhibit 2 --
4  A.  Uh-huh.
5  Q.  -- engage in negotiations
6  with American Equity regarding the sale
7  of the Addison Group or any of those
8  three companies that made up the Addison
9  Group?
10  A.  No.
11  Q.  There were never any
12  discussions about American Equity
13  acquiring this company?
14  A.  We showed them the document
15  and said if they would care to make an
16  offer for the company, and they declined.
17  Q.  Well, that I think is a yes
18  to my question.
19  A.  Oh, I apologize.  There was
20  no negotiations.  They didn't -- they
21  didn't want to buy the company.
22  Q.  All right.  But you did make
23  a pass at American Equity?
24  A.  Yes.  As we did with American

162

1  Investors.
2  Q.  Okay.  Why did you make a
3  pass at American Equity?
4  A.  Because they seemed like a
5  business that could -- that we might
6  possibly sell to.
7  Q.  And in the process of
8  providing information to American Equity
9  so they could determine whether they
10  wanted to buy the Addison Group of
11  companies, you or your company supplied
12  to American Equity documentation on how
13  you were conducting business?
14  A.  We supplied that to Ernst &
15  Young and then they in turn sent out a
16  booklet to American Equity, as they did
17  with American Investors.
18  Q.  Wouldn't it be fair to say
19  that the services agreement that's
20  entered into by attorneys and Advanced
21  Legal Marketing Systems was a document
22  that was provided to American Equity when
23  you made a pass at them to see if they
24  were interested in buying your companies

163

1  and that's why it's in their document
2  file?
3  A.  It could have been.
4      MR. BUSH:  Objection.  Lacks
5  for foundation.
6  A.  I don't recall, Bill, but it
7  could have been.  I'm not sure.
8  Q.  Were you involved in the
9  negotiations that led up to the
10  development of a letter of intent between
11  the Addison Group and American Equity?
12      MR. ROHNER:  Objection.
13  Lacks foundation.
14      MR. BUSH:  Same objection.
15  A.  I don't recall the letter.  I
16  don't know.  I didn't know they had ever
17  gave me a letter of intent.
18  Q.  Was there any discussion, as
19  far as you recall, between your companies
20  and American Equity towards the
21  development of a letter of intent?
22  A.  They were not interested in
23  buying Addison Group at all.  They never
24  produced anything like that, no.

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

**164**

1  Q. Let me show you what's been
2  marked as Exhibit 6 to your deposition.
3    (McINTYRE DEPOSITION EXHIBIT
4  6 MARKED)
5  Q. Do you recognize this
6  document?
7  A. No.
8  Q. Ever seen this document
9  before today?
10  A. I don't remember it, Bill,
11  but I'm sure I have if it was sent to me.
12  Q. Does it refresh your
13  recollection with respect to any
14  negotiations leading up to the
15  development of a letter of intent?
16    MR. WHITE: You marked it as
17  an exhibit already.
18    MR. McMURRY: Yes.
19  A. I really don't recall this
20  letter.
21  Q. All right. Do you recall
22  entering into a strictly private and
23  confidential agreement with the American
24  Equity Group?

**165**

1    MR. ROHNER: Is it 7?
2    (McINTYRE DEPOSITION EXHIBIT
3  7 MARKED).
4  Q. Let me show you what's been
5  marked as --
6    MR. WHITE: Yes.
7    MR. ROHNER: Thank you.
8  Q. -- Deposition Exhibit 7 and
9  ask you if your signature is on the
10  second page of that two-page document?
11  A. Yes.
12  Q. What is that document?
13  A. It's strictly a private and
14  confidential document. I don't know what
15  it is.
16  Q. You signed it, but it's not
17  something you recollect?
18  A. It's 1998, six years ago. I
19  don't remember it. I don't remember this
20  letter, to be honest with you.
21  Q. Well, you would agree with
22  me, looking at that document, that there
23  were negotiations with American Equity
24  and the Addison Group, your companies,

**166**

1  regarding the possible sale of one or
2  more of your companies to American
3  Equity?
4  A. I think this was -- I don't.
5  I really don't. I have to tell you in
6  the testimony I really don't because --
7  Q. I'm not asking you whether
8  you remember, I'm asking you if reading
9  that document --
10  A. I don't believe so, hunh-uh,
11  not the way I read it.
12  Q. Okay.
13  A. I remember sending out --
14  Ernst & Young sent out documents to
15  everybody and I think they had to sign
16  this as confidential, the information
17  that we were sending them out, to receive
18  a book.
19  Q. Have you ever heard of Everen
20  Securities?
21  A. Yes.
22  Q. Who are they?
23  A. I believe they're a security
24  firm out of Iowa.

**167**

1  Q. Were they involved in the
2  potential transaction between the Addison
3  Group and American Equity Group?
4  A. I don't recall that, no. I
5  know that I came to them for investment.
6  Q. Let me show you what we'll
7  mark as No. 8.
8    (McINTYRE DEPOSITION EXHIBIT
9  8 MARKED)
10  Q. This is a letter dated August
11  10th, 1998. On the first page at the
12  bottom it reads -- and I'll show you this
13  letter here in just a second after I read
14  it and hand it over to you, it says,
15  "This represents all the information the
16  Addison Group has available to send you
17  at this time." And this letter is
18  addressed to William Goodwin at the
19  Everen Securities Company in Des Moines,
20  Iowa. Now, is Des Moines, Iowa, where
21  American Equity does business?
22  A. Yes, that's their
23  headquarters.
24  Q. Is it just a coincidence that

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

**172**

1    A.  Yes.
2    Q.  Why is -- why is there that
3  inconsistency in your testimony?
4    A.  Because I had no idea that
5  they were really interested in buying our
6  company.
7    Q.  Yet you're copied on this
8  letter and the first sentence makes it
9  doggone clear that they were?
10   A.  Yes.
11   Q.  Do you not read your
12 correspondence, Mr. McIntyre?
13   A.  Yes.
14   Q.  Yes, that's true you don't
15 read your correspondence; is that
16 correct?
17   A.  I apologize.  Yes, I do read
18 my correspondence, Bill.
19   Q.  Is it true that at the time
20 back in 1998 it was your objective to
21 sell, that is, Mr. McIntyre's objective
22 to sell the majority interest in the
23 Addison Group, but he would consider
24 American Equity Group's proposal to

**173**

1  acquire a minority interest; however, he
2  would prefer to sell as close to 50
3  percent of the shares as possible?  Was
4  that true in July of 1998?
5    A.  Yes.
6    Q.  And you don't remember as you
7  sit here today and testified earlier that
8  this went down in 1998?
9    A.  I do now.
10   Q.  But you're honestly telling
11 the jury that you just didn't recollect
12 it until I produced these documents and
13 showed them to you?
14   A.  Yes, sir.  I don't believe I
15 ever received a letter of intent.  I
16 mean, this document --
17   Q.  I'm not asking you about a
18 letter of intent.
19   A.  I apologize, Bill.  No, I
20 don't -- I didn't recall going this -- a
21 lot of things have passed since 1998 and
22 I apologize for my poor memory, but now
23 that I receive this, I do -- it brings me
24 back to July of 1998 now.

**174**

1    Q.  We're going to take a break
2  to change tapes.  It's probably a good
3  time to take a lunch break.
4    A.  Thank you.
5    Q.  These folks are hungry.
6        Is 30 minutes enough for you
7  folks?
8        MR. MICHAEL:  As best we can.
9        (RECESS)
10       MR. McMURRY:  All right.
11 We're now on the record.  This is Tape 4,
12 the continuation of the deposition of
13 Michael McIntyre.
14   Q.  Mr. McIntyre, we were talking
15 about before our break -- our lunch
16 break, Exhibit No. 2, which is the
17 confidential memorandum dated spring of
18 1998.
19   A.  Yes.
20   Q.  I had asked you to turn to
21 the documentations at the back, and I
22 guess the second page of those, which is
23 Document Control No. 617, is a flowchart.
24 I wanted to ask you a couple of questions

**175**

1  about that.
2    A.  Yes.
3    Q.  What were the duties and
4  responsibilities of the national
5  marketing director, Greg Skaggs?
6    A.  Deal with the sales force,
7  talk with the sales -- the individual
8  salespeople, the area directors
9  underneath him, recruit, motivate, train.
10   Q.  I notice that on the left
11 side of the chart under Mr. Moody's name
12 is Addison Insurance Marketing.
13   A.  Yes.
14   Q.  I don't see Addison Insurance
15 Marketing mentioned again except down
16 perhaps the staff at the very bottom
17 there in the center.  Is Mr. Skaggs the
18 national marketing director for Advanced
19 Legal Systems?
20   A.  Yes.
21   Q.  Is he also the national
22 marketing director of Addison Insurance
23 Marketing?
24   A.  Yes.

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

224

1  talked to Sidney Mondschein, I've had
2  lunch with Sidney.
3      Q.  What did you-all discuss at
4  that lunch meeting?
5      A.  Stock market, economy,
6  investments.
7      Q.  Was this a networking lunch
8  where you could benefit from your
9  relationship with Sidney Mondschein and
10  he benefit?
11      A.  No.
12      Q.  Why would you travel to
13  California to have lunch with Sidney?
14      A.  Because I could.
15      Q.  Because you were just in the
16  neighborhood?
17      A.  I was out there.  I have an
18  agency out there.  I had an office out
19  there and so I would stop in and see
20  Sidney.  He's out there.
21      Q.  Why would you stop in and see
22  him?  You don't seem to be the kind of
23  guy that would waste much of his day
24  spending it with people that aren't going

226

1  have you had lunch with that works with
2  your agents and representatives and
3  clients?
4      A.  Yes.
5          (McINTYRE DEPOSITION EXHIBIT
6  13 MARKED)
7      Q.  Let me show you what's been
8  marked as Exhibit 13.  This is a letter
9  dated May 13th, 1997 from Addison to Ron
10  Grensteiner of American Equity; is that
11  correct?
12      A.  Yes.
13      Q.  In the second paragraph it
14  says, "Subsequent to our meeting last
15  week" -- and this is from Michael
16  McIntyre, that is you, to Ron Grensteiner
17  -- "we understand American Equity is
18  desirous of a hundred million dollars in
19  production from Addison Insurance
20  Marketing over the next 12 months."  Is
21  that correct?
22      A.  Yes.
23      Q.  Was that goal met?
24      A.  Yes.

225

1  to make him money.
2          MR. BUSH:  Objection to the
3  form of the question.
4      A.  I like Sidney.  I think he's
5  a nice gentleman and the agents like him
6  too.
7      Q.  But you said you have nothing
8  to do with Sidney Mondschein.
9      A.  I don't.  I have nothing to
10  do with Sidney Mondschein, other than the
11  fact that my agents like to talk to him
12  and he sells stock to clients and he buys
13  stock.  That's as far as our relationship
14  goes, you know.
15      Q.  He hasn't bought or sold any
16  stock for you?
17      A.  No.  I think he has a lot of
18  the agents.  I think they've bought some
19  stock with him or he sells some stock.
20      Q.  Any other stockbrokers that
21  work with your agents and representatives
22  that you've had lunch with?
23      A.  No.
24      Q.  So only Sidney Mondschein

227

1      Q.  Do you know whose handwriting
2  is on this paper?
3      A.  I do not.
4      Q.  What does it mean 80,000
5  shares where No. 3 is circled?
6          MR. ROHNER:  Objection to
7  form.
8      A.  I don't know why it's
9  circled.  There's a line that says can't
10  do.  I don't know who wrote that.
11          MR. BUSH:  Objection to the
12  question.  It's calling for speculation.
13          MR. McMURRY:  Maybe he knows.
14          MR. BUSH:  Don't guess.
15          MR. ROHNER:  He doesn't know
16  whose handwriting it is.
17          MR. BUSH:  Trying to --
18          THE WITNESS:  I don't know.
19  I don't know.  I don't know who --
20          MR. McMURRY:  He might know
21  why it's written on there.  Just because
22  he doesn't know whose handwriting it is
23  doesn't mean he doesn't know.  You're the
24  ones that said speculation.  This man is

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

228

1 smart enough to say it's speculation if
2 it's speculation.
3    Q.   Answer yes or no or you don't
4 know.
5    A.   I don't know.
6    Q.   Okay.  Was there ever a
7 discussion about 80,000 shares in 1997
8 with -- between Addison and American
9 Equity?
10    A.   I don't recall the 80,000,
11 but I did 100,000.  I recall the 100,000
12 shares.
13    Q.   Tell me about the 100,000
14 shares.
15    A.   That's the stock options that
16 were granted to me and subsequently they
17 split.
18    Q.   Split to 200?
19    A.   To 300.
20    Q.   Okay.
21    A.   Three for one.
22    Q.   And below the 80,000 shares
23 is written $12?
24    A.   Yes.

229

1    Q.   Do you think there's a
2 reference between the 12 and the 80 as
3 far as the negotiation was concerned
4 between you and American Equity?
5    A.   I don't know.
6         MR. ROHNER:  Objection to the
7 form.  Calls for speculation.
8         (McINTYRE DEPOSITION EXHIBIT
9 14 MARKED)
10    Q.   Let me show you Exhibit 14
11 after we get a new tape in the machine.
12         (OFF THE RECORD)
13         VIDEO OPERATOR:  You're on.
14         MR. McMURRY:  Are we back on
15 the record?  This is the continuation of
16 Michael McIntyre's deposition.  We are on
17 Tape 5.
18    Q.   Mr. McIntyre, would it be
19 fair to say that you made it clear in the
20 negotiation for the sale of the Addison
21 Group companies to American Equity, that
22 you made it clear to David Noble, Ron
23 Grensteiner and others at American Equity
24 that the primary source of leads for the

230

1 sale of annuities was through Advanced
2 Legal Systems in this trust -- living
3 trust concept?
4    A.   Yes.
5    Q.   We were, I believe, getting
6 ready to talk about Exhibit 14 when we
7 broke.  Let me hand you what has been
8 marked as 14.  Spread some copies out
9 here.  This letter is dated May 20th,
10 1997, a letter from you to Dave Noble at
11 American Equity, and this relates to
12 stock options we discussed earlier today;
13 is that correct?
14    A.   Yes.
15    Q.   And sure enough it looks like
16 that 80,000 shares on Exhibit 13 got
17 bumped up to 100,000 and the $12 that was
18 written on that page -- Exhibit 13 at the
19 bottom underneath the 80,000 shares is
20 indeed what the price was going to be per
21 share; is that correct?
22    A.   Yes.
23    Q.   Does this refresh your memory
24 in that regard?  Is this the way it

231

1 actually went down?
2    A.   It did.
3    Q.   All right.
4         (McINTYRE DEPOSITION EXHIBIT
5 15 MARKED)
6    Q.   This is Exhibit 15 I'm
7 showing you dated May 22nd, 1997.  It's
8 an internal memorandum between Ron
9 Grensteiner of American Equity to the
10 American Equity staff.  Third paragraph
11 reads in part, "In order to maintain
12 control of their agents activities, they
13 want all outgoing communications to be
14 funneled through Addison Insurance
15 Marketing's main office."  Do you see
16 where it reads that?
17    A.   I haven't found it yet.
18    Q.   Second line?
19    A.   Yes.  I see it.  I'm sorry.
20 I see it.  Uh-huh.
21    Q.   That's all right.  When it
22 says they want all outgoing
23 communications to be funneled through
24 AIM's main office, that is you, Michael

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

**236**

1  Addison?
2      A.  Yes.
3      Q.  Higher commissions paid to
4  Addison's sales force?
5      A.  Yes.
6      Q.  Do you know why there are
7  greater commissions and a larger profit
8  margin on these four products?
9      A.  I know there's actuarily --
10  there's actuary reasons why, Bill, but I
11  don't know exactly -- I wouldn't know on
12  these specific products why they are
13  formulated that way, I guess, without
14  looking at the actuary notes to see
15  exactly where everything's going to go.
16  I believe we looked at the products and
17  thought those were the best ones for the
18  consumers and for what we can sell too.
19      Q.  Would it be fair to say
20  generally speaking that if there's more
21  profit for the seller of a product, that
22  that's less beneficial to the purchaser
23  of that product than would a similar
24  product that the seller made less money

**237**

1  off of?
2      A.  You would have to look at
3  individual cases.  I wouldn't -- I
4  wouldn't dare speculate on that without
5  looking at different cases and different
6  benefits for each product for each
7  client's particular needs.
8      Q.  Well, in a free economy where
9  profit rules, it just seems to me that
10  generally speaking, and maybe you agree
11  or disagree, but if there is a greater
12  profit to the seller, there is a greater
13  detriment to the buyer as opposed to a
14  similar product which has less profit for
15  the seller.  Would that not be true in
16  your experience in business?
17          MR. BUSH:  Objection.
18          MR. ROHNER:  Objection to the
19  form.
20          MR. BUSH:  Form of the
21  question.
22      A.  I would have to say no, it's
23  not my experience with that because each
24  individual case is different.  I think

**238**

1  that's a speculative thing to look at.
2  When you sell a product to a particular
3  client, you look at the personal needs,
4  the individual's needs and what they need
5  and what they don't need.  And the
6  products vary.  Each one of these
7  products carries a different commission
8  level.
9      Q.  And there's a reason for
10  that?
11      A.  Yes, there is.
12      Q.  And you can't comment or
13  share your opinion as to whether or not
14  if there's more money or more profit
15  margin on these insurance products that
16  these products are probably not as good a
17  deal for the person buying them?
18      A.  I wouldn't comment on that,
19  no.
20      Q.  Why wouldn't you comment on
21  that?  Are you saying --
22      A.  Because I don't believe
23  that's true -- I don't believe that's the
24  case.

**239**

1      Q.  Okay.  You don't think that's
2  the case.  You would disagree with that
3  concept?
4      A.  Yes, sir, I would.
5      Q.  When you said that these four
6  products on Exhibit 15 were the products
7  that Addison could afford by virtue of
8  profit margin being high enough to cover
9  the cost of your marketing, you meant the
10  marketing through ALS, correct, the
11  direct mail campaign?
12      A.  Yes.
13      Q.  Now, did you make that clear
14  to the folks at American Equity, that
15  because these products created a better
16  profit margin for you, because you needed
17  a better profit margin to pay for the
18  direct mail campaign, this is what you
19  were interested in?  Did you tell them
20  that, American Equity's people?
21      A.  I don't recall.  I remember
22  looking at their benefit package and
23  seeing what different products that they
24  offered, and I believe I sat down with

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

**240**

1  our sales department and our sales
2  managers and we discussed it and we came
3  up with these products that we wanted to
4  sell.
5      Q.  Did you tell American Equity
6  that these products were the only ones
7  you were interested in because they could
8  cover your marketing costs --
9      A.  I don't believe those words
10  were used.
11      Q.  All right.  Did you tell
12  American Equity that you needed to sell
13  only the deferred annuities because you
14  needed to support your marketing through
15  this direct mail?
16      A.  I don't believe that was -- I
17  believe we laid out the policies that we
18  wanted to sell.
19      Q.  There's no question in your
20  mind, given what we've covered so far
21  today in terms of documentation and this
22  -- and this going back and forth between
23  American Equity and your companies
24  regarding the possible purchase of your

**241**

1  companies, that American Equity was given
2  all the information necessary to
3  understand the business strategy,
4  business model of Addison and ALS?
5      A.  Yes.
6      MR. ROHNER:  Object to the
7  form.
8      (McINTYRE DEPOSITION EXHIBIT
9  16 MARKED)
10      Q.  I've handed you Exhibit 16,
11  which is an agreement entered into the
12  10th day of July, 1997; is that correct?
13      A.  Yes.
14      Q.  It says in the second
15  paragraph that Addison shall be appointed
16  by American Equity as a supervising
17  general agent for the solicitation of
18  sales to American Equity products.  What
19  is a supervising general agent?
20      A.  I don't know.
21      Q.  Did you sign this agreement?
22      A.  Yes.
23      Q.  And Mr. Noble signed it as
24  the president of both American Equity

**242**

1  Investment Life and American Equity
2  Investment Holding; correct?
3      A.  Yes.
4      Q.  What was the purpose of this
5  agreement?
6      A.  Can I review it for a moment?
7      Q.  You sure can.  Take as much
8  time as you need.
9      A.  Basically I think it was an
10  agreement between Addison Insurance
11  Marketing and American Equity going
12  forward from this date, July 19, '97, how
13  we were going to do business and stock
14  options and product design and whatnot.
15      Q.  Any provision in here for
16  covering marketing costs?
17      A.  I don't see any.
18      Q.  It says here -- the last
19  whereas paragraph on Page 1, it says,
20  "The parties have reached certain
21  agreements which are supplemental to the
22  agency relationship."
23      A.  Where are you looking at?
24  I'm sorry, Bill.

**243**

1      Q.  Right here.
2      A.  Okay.
3      Q.  The last whereas paragraph.
4      A.  "Whereas, the parties have
5  reached certain agreements which are
6  supplemental to the agency relationship."
7  Okay.
8      Q.  What would those agreements
9  be?
10      A.  I don't recall.  I don't
11  remember.  I'd have to look over -- I'd
12  have to -- I'd have to ask.  I don't
13  remember.
14      Q.  Was the purpose of this
15  agreement as you understood it for
16  Addison to be appointed an agent for
17  solicitation of sale of American Equity
18  products?
19      A.  I don't think so.  I think we
20  were already appointed to sell American
21  Equity products during the other agency
22  appointment.  I think this is put down in
23  writing our agreement --
24      Q.  With the stock option?

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

244

1    A.  -- with the stock and private
2 label design.
3    Q.  Was there any kind of lead
4 co-op program where Addison and American
5 Equity would share the cost of developing
6 leads?
7    A.  Yes.
8    Q.  And where is that?  Is that
9 in this agreement or some other written
10 agreement?
11    A.  No.  We don't have an
12 agreement.
13    Q.  In other words, there wasn't
14 a written agreement on that topic?
15    A.  Right.
16    Q.  But there was an agreement on
17 that topic?
18    A.  Yes.  An oral agreement.
19    Q.  Tell us about the oral
20 agreement.
21    A.  They would reimburse us, they
22 would give us co-op expense, which is
23 industry norm.  They give you so many
24 dollars for lead development and

245

1 marketing costs.
2    Q.  Now, the lead development,
3 marketing costs money they would give you
4 was over and above the built-in profit
5 margin of the kinds of products you sold
6 referenced in Exhibit 15; is that
7 correct?
8    A.  Yes.
9    Q.  How much money did they give
10 Addison or any of your companies for lead
11 development, marketing costs?
12    A.  At one time it was $40,000 a
13 month and then it went to -- I believe it
14 was $80,000 a month for some time while
15 we were doing it, from 1997 to 2000 -- or
16 1998 it might have started, to 2000.
17    Q.  And so --
18    A.  It varied.
19    Q.  -- did the money go to
20 Addison or Advanced Legal Marketing
21 Systems, ALS, in other words?
22    A.  I believe it went to Addison
23 Insurance Marketing.  The money that was
24    Q.  Now, the money that was

246

1 acquired under this oral agreement, as
2 much as 80,000 a month that went to
3 Addison to cover lead development and
4 marketing costs, was any of that money
5 utilized by ALS for their -- to defer and
6 defray some of the marketing costs?
7    A.  I don't know.  It was -- it
8 was all put into the general account and
9 I don't know if it was exactly for that
10 particular reason or not, but it was to
11 purchase more mailings and to do more
12 direct marketing.
13    Q.  By that you mean to pay for
14 the paper to do the direct mail --
15    A.  Yes.
16    Q.  -- marketing to folks 55 to
17 age 80?
18    A.  Yes.
19    Q.  Now let's talk about the
20 general account.  That would be a general
21 account for both of these companies.
22 They shared a general banking account?
23    A.  I'm not sure.  I don't
24 believe so.  I think we had separate

247

1 accounts.
2    Q.  Were you permitted, I guess
3 because you own these companies, to use
4 money from ALS's general account for
5 things that were directly related to
6 Addison and vice versa?
7    A.  I'm not sure how the
8 accounting staff developed that up.  I
9 don't know if they filed separate returns
10 on that.  I don't believe.  Maybe they
11 could have.  But that was probably all
12 done internally with the accounting
13 department, so I really --
14    Q.  Well, again --
15    A.  I don't know if the monies
16 were separated or not.  I'm assuming the
17 money came into Addison Insurance
18 Marketing because that's who had the
19 contract with American Equity.
20    Q.  Right.  And Addison was the
21 general partner of Advanced Legal
22 Marketing Systems doing business as ALS?
23    A.  Right.
24    Q.  And so as general partner of

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

252

1  testifying as to the purpose of American
2  Equity.  You can ask him what he believes
3  his...
4      Q.  Well, you made it clear I
5  assume in your negotiations with American
6  Equity when you negotiated a deal for 40
7  to $80,000 a month, that you needed this
8  money to defray the cost of marketing
9  materials like Exhibit 17 and Exhibit 18;
10 is that correct?
11     A.  No.
12     Q.  Excuse me?
13     A.  No.  Not -- I don't even
14 think these -- when I -- when I
15 negotiated with American Equity, I don't
16 think we even had these documents at that
17 point.  When I negotiated with American
18 Equity, I needed the money to pay for
19 direct mail campaigns and marketing, not
20 necessarily these actual exhibits, 17 and
21 18.
22     Q.  That's not the point about
23 these actual exhibits.  It's exhibits
24 like --

253

1      A.  Okay.  I just want to make
2  sure.
3      Q.  -- it's documents like
4  Exhibit 17 and 18?
5      A.  Yes.
6      Q.  And you made it clear to
7  American Equity that you needed --
8      A.  Right.
9      Q.  -- the 40 to $80,000 a month
10 to defray the cost of printing materials
11 to generate leads like that which we see
12 here, Exhibit 17 and 18; correct?
13     A.  Yes.
14     Q.  Thank you.  You have the
15 color copy.  If you could hold that up so
16 that the camera can see it.  Can you now
17 open it up?  It's a trifold.  Just sort
18 of hold it there for a second.  All
19 right.  That document has a number of
20 pictures of elderly folks.  Would it be
21 fair to say that the target audience for
22 this brochure was folks from age 55 to
23 80?
24     A.  Yes.

254

1      Q.  Thank you.  You can fold that
2  back up now.  Referring back to Exhibit 2
3  to your deposition, attached there are
4  several pages beginning 0622.  The bottom
5  right-hand corner those numbers appear.
6      A.  I don't see it.
7      Q.  Excuse me?
8      A.  I don't see 0622.  I'm sorry.
9      Q.  It's this one.
10     A.  Okay.
11     Q.  All right?
12     A.  Yes.
13     Q.  Okay.  Looking through those
14 pages, that's the same brochure, is it
15 not, that Mr. Tackett was utilizing?  The
16 only difference is this brochure which
17 was attached to the Ernst & Young
18 prospectus bears the lawyer's name,
19 Michael Burstein, of Burstein &
20 Associates; is that correct?
21     A.  That appears so, yes.
22     Q.  Now, again, this was a
23 document that was supplied to American
24 Equity because of the possibility they

255

1  might want to acquire some interest in
2  the Addison Group; correct?
3      A.  Ernst & Young provided it for
4  them, yes.
5      Q.  The lawyer's name here,
6  Michael Burstein, do you know that
7  fellow?
8      A.  Yes.
9      Q.  Do you know what state he
10 practices out of?
11     A.  California.
12     Q.  All right.  And the toll free
13 number to reach Mr. Burstein is
14 1-800-580-5850, as reflected on this
15 document attached to the Addison Group
16 prospectus from Ernst & Young; is that
17 correct?
18     A.  That's the Addison Group --
19 Addison Insurance Marketing's phone
20 number.
21     Q.  I see.  So if the client were
22 to call this 1-800 number, it would not
23 ring in Mr. Burstein's office?
24     A.  That's correct.

*Deposition of Michael McIntyre taken August 27, 2004, Vol I*

276

1   Q.  When does that take place in
2  the scenario?
3      A.  When the client's
4  representative is in the house.
5      Q.  When the client's
6  representative --
7      A.  They sign the -- they sign
8  the paperwork.  I'd have to look at the
9  paperwork, but they sign -- what the
10 paperwork said, but they would sign the
11 document stating that the -- they're
12 engaging with Victor Tackett and --
13 Victor E. Tackett, Jr., and that at time
14 of delivery of the documents that they
15 want a -- request a consultation,
16 presentation from an insurance agent.
17     Q.  Well, that might happen.  Or
18 does that always happen?
19     A.  I believe it always happens.
20     Q.  Let me just run this scenario
21 by you.  Let's assume that Mrs. Malone or
22 the prospective client doesn't sign
23 anything at all on Day One when your
24 client service representative shows up at

277

1  their home and the leave-behind document
2  left behind by Michael Burstein or Victor
3  Tackett or any other lawyer in the US of
4  A is left behind and the client is
5  sitting down in the cool and calm moment
6  and reads this language, there would be
7  no way for them to know that when the
8  documents are delivered they're being
9  delivered by an insurance salesman who is
10 there, who is there primarily hopefully
11 to sell annuities; they wouldn't know
12 that, would they?
13     MR. BUSH:  Objection to the
14 question.
15     A.  I have no idea if they would
16 know that or not.
17     MR. BUSH:  Lacks foundation,
18 improper hypothetical.
19     Q.  Well, there's nothing in this
20 document that would tell them that, is
21 there?
22     A.  No.
23     Q.  Good stopping point.  We'll
24 pick up Monday.

278

1      A.  Thank you.  Have a good
2  weekend, counselor.
3
4      (DEPOSITION CONCLUDED AT 4:25
5  P.M.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

279

1   STATE OF KENTUCKY      )(
    COUNTY OF JEFFERSON)(
2
3      I, CATHERINE M. SHAY, Notary
    Public, State of Kentucky at Large,
4  hereby certify that the foregoing
    deposition was taken at the time and
5  place stated in the caption; that the
    appearances were as set forth in the
6  caption; that prior to giving the
    testimony the witness was first duly
7  sworn by me;that said testimony was taken
    down by me in stenographic notes and
8  thereafter reduced under my supervision
    to the foregoing typewritten pages; and
9  that said typewritten transcript is a
    true, accurate and complete record of the
10 stenographic notes so taken.
       I further certify that I am not
11 related by blood or marriage to any of
    the parties hereto and that I have no
12 interest in the outcome of the captioned
    case.
13     My Commission as Notary Public
    expires March 6, 2007.
14     Given under my hand this
    the _____ day of _____, 2004, at
15 Louisville, Kentucky.
16
                CATHERINE M. SHAY
17              NOTARY PUBLIC
18
19
20
21
22
23
24

*Kentuckiana Reporters - Kitty Shay*

*Page 276 to Page 279*

EXHIBIT 4

# MorganStanley
# SmithBarney

Ref: 00015348 00047093

## Client Statement
### April 1 - May 31, 2012

Account number 713-21238-16 095

**Morgan Stanley Smith Barney LLC.  Member SIPC.**
*Your Financial Advisor*
HOUSE ACCOUNT
41 SOUTH HIGH ST
SUITE 2700
COLUMBUS    OH  43215
614-460-2600
Website: www.smithbarney.com

E120000015348 3121S2AM01 CPG2P014B
YVONNE D LEWIS
1875 ALVASON AVE
COLUMBUS OH 43219-1115

‖ɪ‖ɪ‖ɪ‖ɪ‖ɪɪ‖ɪ‖‖‖ɪ‖ɪ‖ɪɪ‖ɪ‖ɪ‖ɪ‖ɪ‖ɪɪ‖ɪ‖ɪɪɪ‖‖‖

**Account carried by Citigroup Global Markets Inc.  Member SIPC.**

## Account value

| Total value | Last period | This period | % |
|---|---|---|---|
| | $ 0.00* | $ 0.00 | 100.00 |

*Does not include unpriced securities

## Gain/loss summary

| | This period | This year |
|---|---|---|
| Unrealized gain or (loss) to date | $ 0.00 | |

## Cash, money fund, bank deposits

| | This period |
|---|---|
| Opening balance | $ 0.00 |
| Closing balance | $ 0.00 |

A free credit balance in any securities account may be paid to you on demand.
Although properly accounted for, these funds may be used for business purposes.

## Portfolio summary

| | This period | This year |
|---|---|---|
| Beginning total value (excl. accr. int.) | $ 0.00 | $ 0.00 |
| Net security deposits/withdrawals | 0.00 | 0.00 |
| Net cash deposits/withdrawals | 0.00 | 0.00 |
| Beginning value net of deposits/withdrawals | 0.00 | 0.00 |
| Total value as of   5/31/2012 (excl. accr. int.) | $ 0.00 | $ 0.00 |
| Change in value | $ 0.00 | $ 0.00 |

## TRANSACTION DETAILS

*All transactions appearing are based on trade date.*

### Other security activity

| Date | Activity | Description | Quantity | Value |
|---|---|---|---|---|
| 05/04/12 | Conversion | NATIONAL SORBENTS INC -NEW- TRANSFER TO MSSB | -50 | |

Net value of securities deposited(withdrawn) + capital contributions ............ $ 0.00



# MorganStanley SmithBarney

## CLIENT STATEMENT | For the Period May 1-31, 2012

## Account Summary

**Basic Securities Account**
362-108997-011

YVONNE D LEWIS
1875 ALVASON AVE

**Brokerage Account**
Householding Anniversary Date: 4/21/12    Risk Tolerance: Moderate
Investment Objectives †: Income, Speculation, Capital Appreciation

## CHANGE IN VALUE OF YOUR ACCOUNT

| | This Period (5/1/12-5/31/12) | This Year (1/1/12-5/31/12) |
|---|---|---|
| Total Beginning Value(includes accrued interest) | — | — |
| Total Ending Value(includes accrued interest) | — | — |

† See the Disclosures section of your statement for more information about investment objectives. Please review for accuracy and inform us if your investment objectives change.

## ALLOCATION OF HOLDINGS

| | Market Value | Percentage % |
|---|---|---|
| **TOTAL VALUE** | $0.00 | 100.0% |

There Are No Holdings For This Account

1,000
750
500
250
0

Security Mark
at Right

# MorganStanley
# SmithBarney

**CLIENT STATEMENT** | For the Period May 1-31, 2012

## Account Summary

**Basic Securities Account**
362-108997-011

YVONNE D LEWIS
1875 ALVASON AVE

## INCOME SUMMARY

| | This Period (5/1/12-5/31/12) | This Year (1/1/12-5/31/12) |
|---|---|---|
| **TOTAL INCOME** | — | — |
| **TAXABLE INCOME** | | |
| Qualified Dividends | — | — |
| Other Dividends | — | — |
| Long Term Capital Gains Distributions | — | — |
| Interest | — | — |
| Other Income | — | — |
| **TAX-EXEMPT INCOME** | | |
| Dividends | — | — |
| Interest | — | — |
| Other Income | — | — |

*Taxable and tax exempt income classifications are based on the characteristics of the underlying securities and not the taxable status of the account.*

## GAIN/(LOSS) SUMMARY

| | Short-Term | Long-Term |
|---|---|---|
| **This Period (5/1/12-5/31/12)** | | |
| NET REALIZED | | |
| Gain | — | — |
| (Loss) | — | — |
| NET UNREALIZED (5/31/12) | | |
| Gain | — | — |
| (Loss) | — | — |
| **This Year (1/1/12-5/31/12)** | **Short-Term** | **Long-Term** |
| NET REALIZED | | |
| Gain | — | — |
| (Loss) | — | — |

*Gain/(Loss) and income information are provided for informational purposes only and should not be used for tax preparation. Gain/(Loss) summary information may change due to basis adjustments.*
*Please refer to the Gain/(Loss) section of the disclosures for additional information.*

Security Mark at Right

# MorganStanley
## SmithBarney

**CLIENT STATEMENT** | For the Period May 1-31, 2012

## Activity

| Basic Securities Account | YVONNE D LEWIS |
| 362-108997-011 | 1875 ALVASON AVE |

## SECURITY ACTIVITY

### SECURITY TRANSFERS

| Date | Activity Type | Security (Symbol) | Comments | Quantity | Accrued Interest | Amount |
|------|---------------|-------------------|----------|----------|------------------|--------|
| 5/4 | Transfer into Account | NATIONAL SORBENTS INC | TRANSFERRED FROM CGMI | 50.000 | | $0.00 |

Security Mark at Right

MorganStanley
SmithBarney

CLIENT STATEMENT | For the Period May 1-31, 2012

Basic Securities Account    YVONNE D LEWIS
352-108997-011    1875 ALVASON AVE

## Messages

**Risk Tolerance Definitions**

For the next three months, your statement will include your account's Risk Tolerance, which is based on information you have provided. The definition of each of the three Risk Tolerances is as follows:

• **Aggressive:** For investors who emphasize return on investment over principal preservation. They are willing to subject a greater portion of their portfolio to risk in anticipation of a greater return on investment.

• **Moderate:** For investors willing to subject a portion of their principal to increased risk in order to generate a greater rate of return.

• **Conservative:** For investors who emphasize principal preservation over return on investment.

If you have any questions or you would like to discuss your Risk Tolerance please contact your Financial Advisor.

| PERSONAL ACCOUNTS | RETIREMENT ACCOUNTS | EDUCATION ACCOUNTS | TRUST ACCOUNTS | BUSINESS ACCOUNTS |

038117 MSGDD277 006333

# MorganStanley
# SmithBarney

## CLIENT STATEMENT | For the Period May 1-31, 2012

## Disclosure (CONTINUED)

For your reference, we have included below an explanation of the investment objective alternatives applicable to your account(s):

**Income** - for investors seeking regular income with low to moderate risk to principal

**Capital Appreciation** - for investors seeking capital appreciation with moderate to high risk to principal

**Aggressive Income** - for investors seeking higher returns either as growth or as income with greater risk to principal

**Speculation** - for investors seeking high profits or quick returns with considerable possibility of losing most or all of their investment

**Listed Options**

Information with respect to commissions and other charges related to the execution of options transactions has been included in confirmations of such transactions previously furnished to you and such information will be made available to you promptly at your request.

**Margin Interest Charges**

Morgan Stanley Smith Barney calculates interest charges on margin loans as follows:

(1) Multiply the applicable margin interest rate by the daily close of business net settled debit balance.

(2) Divide by 360 (days).

Margin interest accrues daily throughout the month and is added to your debit balance at month-end. The month-end interest charge is the sum of the daily accrued interest calculations for the month. Morgan Stanley Smith Barney adds the accrued interest to your debit balance and starts a new calculation each time the applicable interest rate changes and at the close of every statement month. For current margin loan interest rates, please go to http://www.morganstanleyclientserv.com

**Important Information if you are a Margin Customer**

If you have a margin account with us, as permitted by law we may use certain securities in your account for, among other things, settling short sales and lending the securities for short sales, and as a result may

**Margin Privileges** (not available for certain accounts such as IRAs or retirement accounts)

If you have margin privileges, you may borrow money from Morgan Stanley Smith Barney in exchange for pledging assets in your accounts as collateral for any outstanding margin loan. The amount you may borrow is based on the value of the eligible securities in your margin accounts. If a security has eligible shares the number of shares pledged as collateral will be indicated below the position.

receive compensation in connection therewith.

**Money Market Pricing**

An investment in a money market fund is neither insured nor guaranteed by the FDIC or any other government agency. Although money market funds seek to preserve the value of your investment at $1.00 per share, there can be no assurance that will occur and it is possible to lose money should the fund value per share fall. Moreover, in some circumstances money market funds may be forced to cease operations when the value of a fund drops below $1.00 per share. In that event, the fund's holdings would be liquidated and distributed to the fund's shareholders. This liquidation process could take up to one month or more. During that time, these funds would not be available to you to support purchases, withdrawals, and if applicable, check writing or ATM debits from your account.

**Notice Regarding Investment Advisor Research**

Morgan Stanley Smith Barney's Investment Advisor Research department conducts research on various mutual funds and exchange-traded funds for clients holding those funds in certain investment advisory programs. If you have instead invested in any of these funds in another type of account, such as a brokerage account, you will not receive the same research materials and status updates on the funds as we provide to investment advisory clients (including instructions on selling fund shares).

**Pricing of Securities**

The prices of securities displayed on this statement are derived from various sources, and do not necessarily represent the prices at which those securities could have been bought or sold. Although we attempt to use reliable sources of information, we can offer no assurance as to its accuracy. For exchange traded securities, or those trading continually in an active marketplace, the price reflects the closing price as of the last business day of your statement period; and generally bid prices for securities that are neither exchange traded nor trading continually in an active marketplace. The prices of securities not actively traded may not be available, and are indicated by N/A (not available). The markets for some fixed income and preferred securities may not be liquid, and prices may be approximations or estimates. For these and for securities that trade less frequently, we rely on outside pricing services and / or computerized pricing models, which cannot always give us actual market values. Prices may be based on: recent transactions or bids, if available; independent quotation services that use computerized valuation formulae to calculate prices based on

institutional quantities, or estimates. Prices for non-institutional quantities of some fixed income securities are likely to be different than institutional prices. Some annuity values provided by outside sponsors are estimates. The amounts on this statement for limited partnerships are typically obtained from a third party or from the general partners unless we have obtained other information such as an independent appraisal. Since many partnership valuations are provided only annually, they do not always represent current values. Furthermore some securities, such as limited partnerships and non-traded REITs are illiquid and have no public markets, so the amounts shown on this statement may not equal the amounts you would receive if you sold or tendered your investment. The value of mutual fund shares is determined by multiplying the net asset value (NAV) by the number of shares or units held, as reported to Morgan Stanley Smith Barney by the correspondent custodian. If we cannot obtain a price or estimate, N/A appears. Speak to your Financial Advisor to obtain current information concerning the prices on your statements.

**Important Information About Auction Rate Securities**

The following information applies only to holders of Auction Rate Securities. Depending on your current holdings, this message may/may not be applicable to you. Due to market conditions, certain Auction Rate Securities are experiencing no or limited liquidity. Therefore, the price(s) for any Auction Rate Securities shown on this statement may not reflect the price(s) you would receive upon a sale at auction or in a secondary market transaction, and are not an indication of any offer to purchase at such price. There can be no assurance that a successful auction will occur or that a secondary market exists or will develop for a particular security. The prices of any Auction Rate Securities on your statement in most cases reflect par value, but may be derived from various sources. These prices may differ from: prices provided to us or our affiliates by outside pricing services; or our affiliates' own internal bookkeeping valuations; prices of transactions executed in any secondary market that exists or may develop; and/or the prices at which issuer repurchases or redemptions may occur. Please contact your Financial Advisor with any questions.

**TLGP Debt: Temporary Liquidity Guarantee Program Debt**

Bonds issued under the FDIC's Temporary Liquidity Guarantee Program are backed by the full faith and credit of the United States through the earlier of the maturity date of the debt or June 30, 2012 for securities issued prior to April 1, 2009, and the earlier of the maturity date of the debt or December 31, 2012 for securities issued on or after April 1,

CONTINUED

038117 MSODD277 006334

EXHIBITS 5

B10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT Southern District of Ohio | PROOF OF CLAIM |
|---|---|

| Name of Debtor: Sidney T Lewis | Case Number:  2:07-57237 |
|---|---|

**NOTE:** *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
5 HUNTINGTON NATL. BANK

Name and address where notices should be sent:
5 HUNTINGTON NATL. BANK
C/O LINDSEY SESTILE
PORTER WRIGHT MORRIS AND ARTHUR LLC
41 S HIGH STREET
COLUMBUS OH 43215-6101

Telephone number:  614-227-2177

☐ Check this box to indicate that this claim amends a previously filed claim.

Court Claim Number: _____
(If known)

Filed on: _____

Name and address where payment should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

**1. Amount of Claim as of Date Case Filed:**   $ 20,638.25

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

**2. Basis for Claim:**   Judgment In the Supreme Court of Ohio
(See instruction #2 on reverse side.)

**3. Last four digits of any number by which creditor identifies debtor:** _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

**4. Secured Claim (See instruction #4 on reverse side.)**
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☐ Other
Describe:

Value of Property: $_____   Annual Interest Rate ___%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $_____   Basis for perfection: _____

Amount of Secured Claim: $_____   Amount Unsecured: $_____

**6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**7. Documents:** Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. §507 (a)(8).

☐ Other - Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:

$_____

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| Date:  6/6/08 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.

Lindsay Sestile, Attorney for Creditor | FOR COURT USE ONLY |
|---|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

EXHIBIT E-5

003483

# 101-524

## The Supreme Court of Ohio

ON COMPUTER-KMR

**FILED**

MAY 2 5 2005

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Sidney T. Lewis, Yvonne D. Webb-Lewis

v.

J.E. Wiggins & Co. et al.

Case No. 05-150

ENTRY

This cause came on for further consideration of appellee's motion for sanctions for frivolous action and motion for an order declaring appellants vexatious litigators, and appellants' motion to dismiss or, in the alternative, for order to amend commingled motions for sanctions and for an order declaring appellants vexatious litigators, motion to remand the instant case to trial court for its findings of facts and conclusions of law regarding compliance with statutes, and motion for order declaring The Huntington National Bank and its counsel vexatious litigators. Upon consideration thereof,

IT IS ORDERED by the Court that appellee's motion for sanctions for frivolous action be, and hereby is, granted. The motion for an order declaring appellants vexatious litigators is denied as moot, since appellants were deemed vexatious litigators by this Court on May 11, 2005.

IT IS FURTHER ORDERED by the Court, *sua sponte*, that appellee shall file a bill and documentation in support of an award for attorney fees, in accordance with the guidelines set forth in DR 2-106, within 20 days of the date of this entry; appellants may file objections to appellee's bill and documentation within 10 days of the filing of the bill and documentation; appellee may file a reply to appellants' objections, if any, within 5 days of the filing of the objections.

IT IS FURTHER ORDERED by the Court that all of appellants' motions be, and hereby are, denied as moot.

(Franklin County Court of Appeals; Nos. 04AP469, 04AP544 and 04AP668)

I HEREBY CERTIFY that this document is a true and accurate copy of the entry of the Supreme Court of Ohio filed 5/25/05 in Supreme Court case number 05-150

In witness whereof I have hereunto subscribed my name and affixed the seal of the Supreme Court of Ohio on this 22 day of August, 20 05.

MARCIA J. MENGEL, Clerk

by _____, Deputy

THOMAS J. MOYER
Chief Justice

EX: 5

*102-100*

FILED

# The Supreme Court of Ohio

AUG 10 2005

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

ON COMPUTER-KMR

Sidney T. Lewis, Yvonne D. Webb-Lewis

v.

J. E. Wiggins & Co. et al.

Case No. 05-150

E N T R Y

This cause came on for further consideration of the bill and documentation in support of attorney fees filed by The Huntington National Bank in response to the Court's entry of May 25, 2005. Upon consideration thereof,

IT IS ORDERED by the Court that The Huntington National Bank is awarded attorney fees in the amount of $28, 517.00.

(Franklin County Court of Appeals; Nos. 04AP469, 04AP544 and 04AP668)

THOMAS J. MOYER
Chief Justice

I HEREBY CERTIFY that this document
is a true and accurate copy of the
entry of the Supreme Court of Ohio
filed   8/10/05          in Supreme
Court case number   05-150   .

In witness whereof I have hereunto
subscribed my name and affixed the
seal of the Supreme Court of Ohio
on this   22nd   day of   August , 2005.

MARCIA J. MENGEL, Clerk

by   Robert Vinf          , Deputy

EXH 5

# The Supreme Court of Ohio

05JG-08-0645

## CERTIFICATE OF JUDGMENT

I, Marcia J. Mengel, Clerk of the Supreme Court of Ohio, hereby certify that on August 10, 2005, an entry was issued by the Supreme Court of Ohio in favor of The Huntington National Bank against Sidney T. Lewis and Yvonne D. Webb-Lewis, Judgment Debtors, in the amount of Twenty Eight Thousand Five Hundred Seventeen Dollars ($28,517.00). Stated monetary judgment was for reimbursement of attorney fees and costs incurred in an action in this Court entitled *Sidney T. Lewis, Yvonne D. Webb-Lewis v. J. E. Wiggins & Co. et al.*, Case No. 05-150, which entry is entered in this Court in Journal Book 102, page number 100.

In witness whereof, I have hereunto subscribed my name and affixed the Seal of the Supreme Court of Ohio this twenty-second day of August, 2005.

MARCIA J. MENGEL, Clerk

by _Robt Vaughn_

Robert Vaughn, Deputy Clerk

CLERK OF COURTS-CV    2005 AUG 23  PM 4:44

FILED
COMMON PLEAS COURT
FRANKLIN CO. OHIO

EX. E  5
004