**Hearing Date and Time:  December 20, 2012 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline:  December 13, 2012 at 4:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------ ) | |
| In re:                                                    ) | Case No. 12-12020 (MG) |
|                                                               ) | |
| RESIDENTIAL CAPITAL, LLC, et al.,      ) | Chapter 11 |
|                                                               ) | |
|                                        Debtors.      ) | Jointly Administered |
| ------------------------------------------------------------ ) | |

**NOTICE OF DEBTORS' MOTION FOR THE ENTRY OF AN ORDER**
**FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A**
**CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take place on **December 20, 2012 at 10:00 a.m. (prevailing Eastern time)** before the Honorable Martin Glenn, at the United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Notice, Case Management, and Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], be filed electronically by registered users of the Bankruptcy Court's electronic case filing system, and be served, so as to be received no later than **December 13, 2012 at 4:00 p.m. (Prevailing Eastern Time)**, upon (a) counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Gary S. Lee and Lorenzo Marinuzzi); (b) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin, and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: US Attorney General, Eric H. Holder, Jr.); (d)  Office of the New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attn: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (e) Office of the U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY 10007 (Attn: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attn: Richard M. Cieri); (g) counsel to Barclays Bank PLC, as administrative agent for the DIP lenders, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, NY 10036 (Attn: Ken Ziman & Jonathan H. Hofer); (h) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036 (Attn: Kenneth Eckstein & Greg Horowitz); (i) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New York, NY 10019 (Attn: Jennifer C. DeMarco and Adam Lesman); (j) counsel for Berkshire Hathaway Inc.,

Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles, CA 90071 (Attention: Thomas Walper and Seth Goldman); (k) Internal Revenue Service, P.O. Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop 5-Q30.133, Philadelphia, PA 19104-5016); and (l) Securities and Exchange Commission, New York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attn: George S. Canellos, Regional Director).

       **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written objection to the relief requested in the Motion, the Bankruptcy Court may deem any opposition waived, treat the Motion as conceded, and enter an order granting the relief requested in the Motion without further notice or hearing.

Dated: December 6, 2012               Respectfully submitted,
       New York, New York

                                    /s/ Gary S. Lee
                                    Gary S. Lee
                                    Lorenzo Marinuzzi
                                    MORRISON & FOERSTER LLP
                                    1290 Avenue of the Americas
                                    New York, New York 10104
                                    Telephone: (212) 468-8000
                                    Facsimile: (212) 468-7900

                                    *Counsel for the Debtors and*
                                    *Debtors in Possession*

**Hearing Date:  December 20, 2012 at 10:00 a.m. (ET)**
**Objection Deadline:  December 13, 2012 at 4:00 p.m. (ET)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:      (212) 468-8000
Facsimile:      (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

————————————————————— )
                                                                    )
In re:                                                          )        Case No. 12-12020 (MG)
                                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,        )        Chapter 11
                                                                    )
                                    Debtors.          )        Jointly Administered
------------------------------------------------------------------- )

**DEBTORS' MOTION FOR THE ENTRY OF AN ORDER**
**FURTHER EXTENDING THEIR EXCLUSIVE PERIODS TO FILE A**
**CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

JURISDICTION ..................................................................................................................... 6

BACKGROUND ..................................................................................................................... 6

RELIEF REQUESTED ............................................................................................................ 9

BASIS FOR THE RELIEF ....................................................................................................... 10

    A.    The Requested Extension of the Exclusive Periods is Justified by the Size
        and Complexity of the Debtors' Chapter 11 Cases ............................................. 12

    B.    The Debtors Have Made Good Faith Progress Toward Reorganization and
        in Negotiations With Creditors ......................................................................... 14

    C.    An Unresolved Contingency Exists, and the Debtors Have Not Had
        Sufficient Time to Negotiate a Plan ................................................................. 17

    D.    Terminating Exclusivity Would Adversely Affect Administration of these
        Chapter 11 Cases ........................................................................................... 19

    E.    The Other Adelphia Factors Favor an Extension of the Exclusive Periods ......... 20

CONCLUSION ..................................................................................................................... 20

NOTICE ............................................................................................................................. 21

NO PRIOR REQUEST ........................................................................................................... 21

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Adelphia Commc'ns Corp.*,
    352 B.R. 578 (Bankr. S.D.N.Y. 2006) ............................................................................. 10, 11

*In re Ames Dep't Stores, Inc.*,
    No. M-47 (PKL), 1991 WL 259036 (S.D.N.Y. Nov. 25, 1991)................................................ 10

*In re Amko Plastics, Inc.*,
    197 B.R. 74 (Bankr. S.D. Ohio 1996) ................................................................................... 14

*In re Borders Grp., Inc.*,
    460 B.R. 818 (Bankr. S.D.N.Y. 2011) .................................................................. 10, 11, 18, 19

*In re Express One Int'l, Inc.*,
    194 B.R. 98 (Bankr. E.D. Tex. 1996).................................................................................... 12

*In re Interco, Inc.*,
    137 B.R. 999 (Bankr. E.D. Mo. 1992)................................................................................... 12

*In re Lexington Precision Corp.*,
    Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Oct. 31, 2008).............................................. 11, 14

*In re Lionel L.L.C.*,
    No. 04-17324, 2007 WL 2261539 (Bankr. S.D.N.Y. Aug. 3, 2007) ...................................... 11

*In re United Press Int'l, Inc.*,
    60 B.R. 265 (Bankr. D.C. 1986)........................................................................................... 19

STATUTES

11 U.S.C. § 1121(d)(1) ........................................................................................................... 10

11 U.S.C. § 1121(d)(2) ........................................................................................................... 10

OTHER AUTHORITIES

H.R. Rep. No. 95-595 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963 .......................................... 10

H.R. Rep. No. 95-595 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6191 .......................................... 12

ny-1065981

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

   The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors")[1], hereby move (the "Motion") for the entry of an order substantially in the form

attached hereto as Exhibit 1, further (i) extending the exclusive period during which only the

Debtors may file a Chapter 11 plan through and including February 28, 2013, and (ii) extending

the period during which the Debtors have the exclusive right to solicit acceptances thereof

through and including April 29, 2013.  In support of this Motion, the Debtors respectfully state

as follows:

## PRELIMINARY STATEMENT

   1.  The Debtors have made remarkable progress on numerous fronts since the First

Exclusivity Hearing (defined below).  The Debtors have used that time to maximize the value of

their estates and successfully conduct auctions for the sales of the Debtors' loan platform and

legacy loan portfolio, which upon closing are expected to yield approximately $4.5 billion in

cash for their estates and creditors.  Additionally, during this period the Debtors have engaged in

a consistent and almost daily dialogue with their key creditor constituencies to discuss a broad

spectrum of complex issues in an effort to forge a path to a consensual plan, including, but not

limited to, the proposed settlement with Ally Financial Inc., interdebtor and intercreditor

disputes, the RMBS Settlement[2], the sales of the Debtors' assets and the Examiner's

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Motions (the "Whitlinger Affidavit") [Docket No. 6].

[2] Prior to the Petition Date, the Debtors worked diligently and in good faith with institutional investors (the "RMBS Investors") to negotiate a settlement of an allowed claim of $8.7 billion against the Debtors (the "RMBS Settlement").

investigation.    The Court should further extend the Exclusive Periods to allow the Debtors to

continue these discussions with major stakeholders.

2.        On May 14, 2012 (the "Petition Date"), the Debtors commenced these

unprecedented Chapter 11 cases.  The administration of these cases has not been a simple task,

yet the Debtors have achieved many of the goals that they set at the onset of these cases.  The

sheer magnitude of matters has required, and continues to require, considerable and continuing

efforts on the part of the Debtors and their advisors to address the many difficult issues and

problems presented by these cases.  Nonetheless, since the filing of these Chapter 11 cases, the

Debtors have made significant headway.

3.        During the course of these cases, the Debtors and their advisors have necessarily

been required to devote significant attention to consummating a sale of the Debtors' assets,

which is one of the principal goals of this bankruptcy case.  When the Debtors embarked on

these Chapter 11 cases, Nationstar Mortgage LLC ("Nationstar") was the stalking horse bidder

for the sale of the Debtors' mortgage loan origination and servicing businesses (the "Platform

Sale"), and Ally Financial Inc. ("AFI") was the proposed stalking horse bidder for the sale of

the Debtors' "legacy" portfolio consisting mainly of mortgage loans and other residual financial

assets (the "Legacy Sale," together with the Platform Sale, the "Asset Sales").

4.        Following intense negotiations, Berkshire Hathaway Inc. ("Berkshire") replaced

AFI as the stalking horse bidder for the Legacy Sale.  After competitive auctions of both the

Platform Sale assets and the Legacy Sale assets, Ocwen Loan Servicing, LLC ("Ocwen") and

Berkshire were the winning bidders, respectively. The Debtors are poised to realize

approximately $4.5 billion in cash from the Asset Sales.  The final purchase prices represent an

2

aggregate increase of approximately $1 billion over the original stalking horse bids approved by the Court.

5.       Throughout these cases, the Debtors continued servicing their mortgage platform as well as originating new business.  By doing so, the Debtors were able to sell their business as a going concern, thereby substantially increasing the value of such business and the price they were able to secure in the Platform Sale.  This substantial added value for the Debtors' estates was made possible by the support the Debtors received from AFI in connection with a proposed settlement with AFI (the "AFI Settlement").  Since the appointment of Arthur J. Gonzalez as examiner (the "Examiner") in these cases to review, among other things, the AFI Settlement, the Debtors have endeavored to cooperate with the Examiner in all aspects of his investigation.

6.       At the hearing held on September 11, 2012, on the Debtors' First Exclusivity Request (defined below), the Court directed the Debtors to "move forward with negotiations with the creditors' committee and other important creditor constituencies," prior to the issuance of the Examiner's Report.  *See* Transcript of Hearing at 62:12-14, In re Residential Capital, LLC, Case No. 12-12020 (MG) (Bankr. S.D.N.Y. Sept. 11, 2012) ("Transcript of Hearing").

7.       The Debtors did not take lightly this Court's directive that the Court "…see that you're making progress or at least making an effort to make progress."  *See* Transcript of Hearing at 61:23-24.  The Debtors and their advisors have dedicated themselves to providing all major stakeholders a seat at the table.  As described in the *Debtors' Status Report Regarding Plan of Reorganization Negotiations* [Docket No. 1545], dated September 24, 2012 (the "Status Report"), in an effort to facilitate the plan process, the Debtors arranged a meeting among the Debtors' advisors and the advisors to the Creditors' Committee (defined below) to discuss key issues and the process for resolving these issues.

8.      Since the filing of the Status Report, the Debtors and their advisors have

participated in additional meetings with advisors to the Creditors' Committee, AFI, the holders

of the Debtors' junior secured bonds (the "JSBs"), the holders of senior unsecured notes (the

"SUNs"), monoline insurers and the RMBS Investors (potentially the Debtors' largest creditor

group) all in an effort to forge consensus among parties in interest.

9.      The Debtors have provided key stakeholders an array of business and financial

information in an effort to facilitate productive discussions.[3]  The Debtors and their advisors

provided key stakeholders with "waterfall" analyses which help set forth hypothetical returns to

creditors.  These types of analyses require considerable investment of time and attention by the

Debtors and their advisors.  In order to produce a waterfall, the Debtors and their advisors are

required to review and analyze the latest balance sheet for each of the fifty-one (51) Debtors to

assess the current value of the Debtors' assets and liabilities.  Additionally, the Debtors' assets

and liabilities must to be broken down by collateral group and consideration taken of lien

positions and co-borrower and guarantee relationships.  In producing a waterfall, the Debtors'

advisors are also required to analyze and forecast the trajectory of these Chapter 11 cases

following the closing of the Asset Sales, including estimating wind-down costs and timing.  The

Debtors and their advisors have devoted the time and effort to producing these waterfalls

because they recognize their importance for meaningful plan discussions.

10.      At each of these plan meetings, the Debtors and the meeting participants

identified broad categories of issues that need to be resolved either prior to or as part of a

---

[3]  The Debtors have reached out to major constituencies and shared information with those who signed
confidentiality agreements.  Certain stakeholders have refused to enter into confidentiality agreements.  Those
parties are requesting that the Debtors disclose material non-public information so that they will not be restricted
from trading in the Debtors' debt securities during plan negotiations.  The Debtors firmly believe that public
disclosure of plan discussions and the materials provided to facilitate those discussions will chill plan
negotiations.

Chapter 11 plan. Among the topics that were discussed and that need to be resolved as part of a successful, consensual plan process, are the following:

- Intercreditor Issues – including the extent and validity of the liens securing the Debtors' secured debt facilities and the treatment of intercompany claims under a plan.

- The AFI Settlement – including the proposed third party releases that may be incorporated into the plan and the allocation of the proceeds of any settlement among the Debtor entities and their creditors.

- Sales Process – including the allocation of the proceeds among the Debtors' assets, and GSE approval.

- Treatment of Various Claims Under the Plan – including strategy of dealing with various cure claims.

- Examiner Issues – including possible plan-related scenarios leading up to and following the issuance of the Examiner's Report and the timing thereof.

- The DOJ/AG Settlement and Consent Order – including the Debtors' requirements thereunder and strategy for discussions with the Federal Reserve Board regarding the Foreclosure Review services to be performed by PriceWaterhouseCoopers, LLP.

- Post-Confirmation Issues – including the structure and cost of the wind-down and the timing to conduct the sale of the Debtors' remaining assets.

11.    Additionally, as discussed below, the Debtors intend to request the appointment of a mediator to assist the plan negotiation process and ensure that those with a seat at the table are in the best position for disciplined, good faith discussions that are focused on the appropriate issues. The Debtors are optimistic that a plan mediator will aid in the negotiation of a consensual plan despite the divergent interests of the major stakeholders.

12.    The above-mentioned plan negotiations meetings and daily discussions have been successful in prompting parties to consider and address issues important to the success of these cases. The Debtors and their advisors recognize that there is still much work to be done to file

5

and seek confirmation of a Chapter 11 plan.  The Creditors' Committee has also advised the

Debtors that it supports the proposed further extension of the Exclusive Periods.   The Debtors

believe that such time will be well spent working cooperatively with their key party constituents

negotiating a consensual Chapter 11 plan.

### JURISDICTION

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested

herein is section 1121(d) of the Bankruptcy Code.

### BACKGROUND

14.     The Debtors are a leading residential real estate finance company indirectly

owned by AFI, which is not a Debtor.  As of March 31, 2012, the Debtors were the fifth largest

servicer of residential mortgage loans in the United States, servicing over 2.4 million domestic

mortgage loans with an aggregate unpaid principal balance of approximately $374.2 billion.  In

addition, prior to the Petition Date, the Debtors and their non-debtor affiliates, including Ally

Bank, were collectively the tenth largest originator of residential mortgage loans in the United

States.  A more detailed description of the Debtors, including their business operations, their

capital and debt structure, and the events leading to the filing of these bankruptcy cases, is set

forth in the Whitlinger Affidavit.

15.     On the Petition Date, each of the Debtors filed a voluntary petition with the Court

for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are managing and operating

their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and

1108.  These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No

trustee has been appointed in these Chapter 11 cases.

16.     On May 16, 2012, the United States Trustee for the Southern District of New

York (the "U.S. Trustee") appointed a nine-member official committee of unsecured creditors

(the "Creditors' Committee").

17.     On June 20, 2012, the Court directed that an examiner be appointed [Docket No.

454], and on July 3, 2012, the Court approved Arthur J. Gonzalez as the Examiner [Docket No.

674].

18.     On July 27, 2012, the Court entered an *Order Approving Scope of Investigation of

Arthur J. Gonzalez, Examiner* [Docket No. 925] (the "Examiner Investigation Order"),

including the issuance of a report (the "Examiner's Report").  On November 26, 2012, the

Examiner filed the *Second Supplement to Work Plan of Arthur J. Gonzalez, Examiner* [Docket

No. 2263] (the "Examiner Supplement").

19.     On the Petition Date, the Debtors filed the Sale Motion[4], and on June 28, 2012,

the Court entered an order approving the sale and bid procedures for the sale of the Debtors'

assets [Docket No. 62].

20.     On August 23, 2012, the Debtors filed the *Debtors' Motion for the Entry of an

Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances

Thereof* (the "First Exclusivity Motion") [Docket No. 1248] seeking to extend their exclusive

period to file a plan by nine months and extend the period during which the Debtors have the

exclusive right to solicit acceptances thereof (the "First Exclusivity Extension Request").

---

[4] *Debtors' Motion Pursuant to 11 U.S.C. §§ 105, 363(b), (f) and (m), 365 and 1123 and Fed R. Bank. P. 2002,
6004, 6006 and 9014 for Order: (A)(I) Authorizing and Approving Sale Procedures, Including Break-Up Fee and
Expense Reimbursement; (II) Scheduling Bid Hearing and Sale Deadline; (III) Approving Form and Manner of
Notice Thereof and (IV) Granting Related Relief and (B)(I)  Authorizing the Sale of Certain Assets Free and Clear
of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Asset Purchase Agreements
Thereto; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases
Related Thereto; and (IV) Granting Related Relief* (the "Sale Motion") [Docket No. 61].

21.     On September 7, 2012, in response to objections[5] to the First Exclusivity Extension Request, the Debtors filed the *Debtors' Omnibus Reply to Limited Objections to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* (the "Exclusivity Reply") [Docket No. 1371] and sought a modified extension of their exclusive period to file a plan to the earlier of (i) forty-five (45) days following the issuance of the Examiner's Report or (ii) March 29, 2013, and sixty (60) days thereafter to solicit votes on such plan.

22.     Following a hearing held on September 11, 2012 (the "Exclusivity Hearing"), the Court entered an order granting an extension of the Debtors' exclusive period to file a plan to December 20, 2012 and granting an extension of the period to solicit votes to February 18, 2013 (the "First Exclusivity Order").

23.     On October 23, 2012 and October 24, 2012, the Debtors successfully conducted an auction for the sale of the Platform Sale assets (the "Platform Auction") to Ocwen for $3 billion.

24.     On October 25, 2012, the Debtors conducted an auction for the sale of the Legacy Sale assets (the "Legacy Auction," and together with the Platform Auction, the "Auctions") to Berkshire for $1.5 billion.

---

[5]   *Limited Objection of Aurelius Capital Management, LP* ("Aurelius") *to Debtors' Motion to Extend Exclusivity* [Docket No. 1334], *Objection of Wilmington Trust, National Association* ("Wilmington Trust") *to the Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 plan and Solicit Acceptances Thereof* [Docket No. 1336], *Limited Objection of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1338] and *Limited Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1352].

25.     At a hearing held on November 19, 2012, the Court approved the Sale Motion on

the record.  On November 21, 2012, the Court entered orders approving the sales to Ocwen and

Berkshire [Docket Nos. 2246 and 2247].

## RELIEF REQUESTED

26.     The Debtors hereby move the Court, pursuant to section 1121(d) of the

Bankruptcy Code, for an order: (a) extending the period of during which the Debtors have the

exclusive right to file a Chapter 11 plan (the "Exclusive Plan Period") through and including

February 28, 2013 and (b) extending the period during which the Debtors have the exclusive

right to solicit acceptances thereof through and including April 29, 2013 (the "Exclusive

Solicitation Period" and together with the Exclusive Plan Period, the "Exclusive Periods").

27.     Over the course of these Chapter 11 cases, the Debtors have worked diligently

with parties in interest to consider those issues that will need to be addressed in order to create a

Chapter 11 plan that maximizes value for all stakeholders.  Certain creditor constituencies

objected to the length of the First Exclusivity Extension Request because they wanted more

significant roles in plan discussions.  Those issues no longer exist for parties truly interested in

participating in meaningful plan discussions.  The Debtors and their advisors have sought to

include all major constituencies in these discussions since the First Exclusivity Hearing.  Only

those parties that have refused to sign appropriate confidentiality agreements have not been

active participants.

28.     Currently, the Exclusive Plan Period expires on December 20, 2012, and the

Exclusive Solicitation Period expires on February 18, 2013. Allowing the Exclusive Plan Period

to terminate at this time would almost certainly set back the plan process.  Thus, in order to

achieve the best result, the Debtors need additional time to negotiate, document and file a

Chapter 11 plan.

9

## BASIS FOR THE RELIEF

29.    Sections 1121(b) and (c) of the Bankruptcy Code provide, respectively, that a

debtor has the exclusive right to propose a Chapter 11 plan for the first 120 days of a Chapter 11

case and the exclusive right to solicit votes for its plan for an additional 60 days.

30.    Section 1121(d) of the Bankruptcy Code provides that the Court may, "for cause,"

extend these periods: "on request of a party in interest…and after notice and a hearing, the Court

may for cause reduce or increase the 120-day period or the 180-day period referred to in this

section." 11 U.S.C. § 1121(d)(1).  However, the 120-day period "may not be extended beyond a

date that is 18 months after the [petition] date" and the 180-day period "may not be extended

beyond a date that is 20 months after the [petition] date." 11 U.S.C. § 1121(d)(2).

31.    A decision to extend exclusivity for "cause" is a fact specific inquiry and the

Court has broad discretion in granting such requests.  *In re Borders Grp., Inc.*, 460 B.R. 818,

821-22 (Bankr. S.D.N.Y. 2011) (in granting an 120 day extension, this Court noted that "The

determination of cause under section 1121(d) is a fact-specific inquiry and the court has broad

discretion in extending or terminating exclusivity.")[6]; *In re Adelphia Commc'ns Corp*., 352 B.R.

578, 586 (Bankr. S.D.N.Y. 2006) (same).  Although the Bankruptcy Code does not define

"cause," legislative history indicates that "cause" is intended to be a flexible standard that

balances the competing interest of a debtor and its creditors.  *See* H.R. Rep. No. 95-595, at 231,

232 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6191.  This flexibility is intended to give a

debtor an adequate opportunity to stabilize its business operations at the outset of the case and to

then negotiate a plan with its creditors.  *See In re Ames Dep't Stores, Inc.*, No. M-47 (PKL),

---

[6] This Court further extended the Borders' exclusive period to file a Chapter 11 plan by an additional 90 days.

1991 WL 259036, at *3 (S.D.N.Y. Nov. 25, 1991) ("The purpose of the Bankruptcy Code's
exclusivity period is to allow the debtor flexibility to negotiate with its creditors.")[7].

32.     Furthermore, a number of courts, including this Court, consider the factors
utilized by Judge Gerber in *In re Adelphia Commc'ns Corp.* (the "Adelphia Factors") when
determining whether "cause" exists to increase a debtor's exclusivity period.  The Adelphia
Factors include:

        (a) the size and complexity of the case;

        (b) the necessity for sufficient time to permit the debtor to negotiate a plan of
            reorganization and prepare adequate information;

        (c) the existence of good faith progress toward reorganization;

        (d) the fact that the debtor is paying its bills as they become due;

        (e) whether the debtor has demonstrated reasonable prospects for filing a viable
            plan;

        (f) whether the debtor has made progress in negotiations with creditors;

        (g) the amount of time which has elapsed in the case;

        (h) whether the debtor is seeking an extension of exclusivity in order to pressure
            creditors to submit to the debtor's reorganization demands; and

        (i)  whether an unresolved contingency exists.

*In re Borders Grp., Inc.*, 460 B.R. at 822 (citing *In re Adelphia Commc'ns Corp.*, 352 B.R. at
587); *In re Lionel L.L.C.*, No. 04-17324, 2007 WL 2261539, at *6 (Bankr. S.D.N.Y. Aug. 3,
2007).[8]

33.     Not all of these factors are relevant in every case, and a finding that any one of
these factors exists may justify extending a debtor's exclusive periods.  *See In re Lexington*

---

[7] A copy of this decision is attached hereto as Exhibit 2.
[8] A copy of this decision is attached hereto as Exhibit 2.

*Precision Corp.*, Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Oct. 31, 2008) [Docket No. 457][9] (considering the three most relevant factors in granting a second extension of the debtors' exclusive period to file a plan); *In re Express One Int'l, Inc.,* 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) (relying on four factors in determining that cause existed to extend exclusive periods); *In re Interco, Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992) (the existence of four factors supported allowing the debtors to retain exclusivity).

34.    At the Exclusivity Hearing, the Court advised that if the Debtors were "satisfying those factors that Judge Gerber has identified that I've applied in many cases so far, you'll get an extension of exclusivity…." *See* Transcript of Hearing at 70:18-20.  The Debtors respectfully submit that the facts and circumstances of these Chapter 11 cases satisfy the Adelphia Factors and demonstrate that sufficient cause exists to grant the Debtors' requested extensions of the Exclusive Periods.  None of the Adelphia Factors militates against granting the Debtors an extension of the Exclusive Periods.  As discussed below, the application of the most critical of the Adelphia Factors to the circumstances of these cases demonstrates that an extension of the Debtors' Exclusive Periods is warranted.

### A.    The Requested Extension of the Exclusive Periods is Justified by the Size and Complexity of the Debtors' Chapter 11 Cases

35.    The size and complexity of a debtor's case alone may constitute cause for extension of a debtor's exclusive period to file a plan.  The legislative history is clear on this point: "[I]f an unusually large company were to seek reorganization under Chapter 11, the court would probably need extra time in order to allow the debtor to reach an agreement."  H.R. Rep. No. 95-595, at 231, 232, 406 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6191, 6362.

---

[9] A copy of this decision is attached hereto as Exhibit 2.

36.    The size and complexity of these Chapter 11 cases, which involve fifty-one (51) Debtors maintaining a large servicing business during the course of these proceedings, warrants a further extension of the Exclusive Periods.  The fact that the Debtors constitute a large and extremely complex organization and that these cases are unquestionably among the largest and most complex ever filed, easily satisfy this factor, which on its own is sufficient justification to extend the Exclusive Periods.  As noted above, the Debtors and their non-debtor affiliates operate the fifth largest mortgage servicing business and the tenth largest mortgage origination business in the United States.  The Debtors' schedules list over $14 billion in assets and over $20 billion in liabilities.

37.    The Asset Sales process has also added to the scope and complexity of the Debtors' Chapter 11 cases.  Prior to the filing of these cases, the Debtors negotiated the sale of their businesses to Nationstar and AFI.  Following intense negotiations, Berkshire replaced AFI as the stalking horse bidder for the Debtors' Legacy Sale assets.  The Debtors and their advisors worked tirelessly to market the Debtors' assets.  As a result of these efforts, Ocwen was the winning bidder at the Platform Auction, providing approximately $782.4 million of incremental value compared to Nationstar's stalking horse bid of approximately $2.36 billion.  The changing of the potential purchasers of the Debtors' assets during the course of these Chapter 11 cases required and continues to require significant additional attention from the Debtors and their advisors.  The highly regulated nature of the Debtors' businesses made negotiating with each potential buyer even more complicated.  Important governmental and licensing considerations were required to be vetted with each potential bidder.  This is just an example of the many ways in which these cases, that were unquestionably complex at their start, have only become increasingly more complex throughout.

13

38.     In addition, the Debtors have done what no other mortgage servicer in a Chapter 11 proceeding has done before – sell an active loan servicing and origination platform in bankruptcy.  In achieving this goal, the Debtors have been faced with extraordinary challenges, including (i) complying with settlements with the government, (ii) producing millions of pages of documents to creditors, regulatory agencies and the Examiner, (iii) operating their businesses as a going concern, and (iv) marketing their assets.

39.     The Asset Sales are just one component, albeit a large one, of these Chapter 11 cases.  The Debtors will need to tackle numerous complex issues in the coming months, including (i) the closing of the Asset Sales currently expected to occur at the end of January 2013, (ii) marketing and selling significant remaining assets, valued in excess of $1 billion, (iii) negotiating the remaining cure claims, (iv) reviewing and reconciling other complex claims filed in these cases, and (v) ongoing DOJ/AG Settlement and Consent Order issues.

40.     The complexity of these Chapter 11 cases alone supports the requested extension of the Exclusive Periods.

**B.      The Debtors Have Made Good Faith Progress Toward Reorganization and in Negotiations With Creditors**

41.     Another important[10] Adelphia Factor requires an assessment by the Court of a debtor's progress towards rehabilitation and development of a consensual plan.  *See, e.g. In re Lexington Precision Corp.*, at 8 (granting a second extension of the debtors' exclusivity despite only "tentative" progress because further negotiations were expected to be fruitful); *In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors have made good faith progress since the Court entered the First Exclusivity Order.

---

[10] At the First Exclusivity Hearing, the Court stated that "…whether the debtor has made progress in negotiations with its creditors…it's an important factor."  *See* Transcript of Hearing at 60:11-15.

42.    The Debtors' key parties in interest consist of very fractious constituents. Negotiating a consensual Chapter 11 plan is not an easy task. The Debtors have and will continue to dedicate time and resources to forging consensus among these parties on complex interdebtor and intercreditor issues by providing updated waterfalls and engaging in plan discussions. As noted above, the Debtors' advisors have engaged in several formal meetings with representatives and members of key creditor constituencies, including representatives of each of the Creditors' Committee, AFI, the JSBs, the RMBS Investors and the SUNs. The Debtors' advisors have also engaged in countless informal discussions with the major stakeholders.

43.    In connection with these discussions, the Debtors provided creditors with an array of business and financial information. Much of this information has concerned strategic matters that could not be disclosed publicly. Accordingly, creditors or their advisors have received the information subject to confidentiality agreements. Recently, a detailed waterfall analysis reflecting the Asset Sales results was prepared by the Debtors' advisors and circulated to major stakeholders. Since it was critical for parties to have updated projections incorporating the results of the Asset Sales as part of any meaningful plan negotiations, the Debtors are hopeful that the production of this information will prompt serious negotiations regarding, among other things, intercreditor issues and have all creditors who participate in plan negotiations on a level playing field. Unfortunately, certain objectors to the Debtors' First Exclusivity Extension Request have refused to sign confidentiality agreements. The Debtors are committed to providing all major stakeholders with relevant information, but believe that disclosure of material nonpublic information without a confidentiality commitment will have a negative and chilling impact on the plan discussions.

15

44.    Additionally, notwithstanding the unquestionable effort and progress the Debtors are making, certain parties in interest have disappointingly espoused their belief that negotiating a Chapter 11 plan prior to the issuance of the Examiner's Report is "objectively futile". Although the plan may need to be reconciled with the Examiner's findings and further negotiation with each of the Debtors' key creditor constituencies may be required, the Debtors have conducted the plan negotiations process with the intention of achieving significant good faith progress prior to the issuance of the Examiner's Report, a view articulated by the Court at the Exclusivity Hearing.[11]

45.    The Debtors believe a further extension of the Exclusive Periods will be an indication to those parties that the Examiner's pending investigation should not delay plan negotiations.  Moreover, as the Court is aware and as noted above, the Debtors have on several occasions advised that they intend to request the appointment of a mediator to assist in the resolution of certain complex issues important to the confirmation of a Chapter 11 plan. Various major stakeholders have advised the Debtors that they support a mediation process. The appointment of a mediator will allow for an independent third party to ensure that parties are making material progress.  The scope of the mediation would likely concern, but not be limited to, the amount and allocation of any proposed settlement with AFI and other interdebtor and intercreditor disputes.  The Debtors believe the presence of a mediator will facilitate disciplined negotiations in connection with those issues.

46.    The Debtors believe that the substantial progress described above warrants a further extension of the Exclusive Periods.  The Debtors fully intend to continue on this path,

---

[11] "Because whatever the examiner decides, there will be various stakeholders who disagree, believe there are transactions he didn't identify as giving rise to potential claims or claims that he did identify that the debtors or AFI disagree.  So it is not the last word.  Uncertainty is what causes negotiation.  It's another data point, an important data point, obviously, but not the determinative factor."  Transcript of Hearing at 59:11-18.

and with the Auctions and Asset Sales hearing now behind them, expect that advancement will

be made.

   **C.**  **An Unresolved Contingency Exists, and the Debtors Have Not Had Sufficient
Time to Negotiate a Plan**

  47.  The existence of an unresolved contingency and the necessity of sufficient time to

permit the Debtors to negotiate a plan and prepare adequate information also favors the Debtors'

retention of exclusivity.

  48.  Specifically, the trial on the RMBS Settlement is currently scheduled to

commence on March 18, 2013.  Accordingly, the Debtors and their advisors have been and will

be working continuously until then to attempt a resolution of outstanding issues and prepare for

the trial.  In connection with the RMBS Settlement, the Debtors have been required to comply

with extensive document demands, including the review of over 114,690 electronic documents

resulting in the production of over 93,000 pages of discovery of electronic documents alone.

The Debtors and their advisors have been the subject of depositions.   The RMBS Settlement

has allowed the Debtors to minimize potential objections to the Asset Sales and help ensure

their ability to successfully transfer the Debtors' assets to the purchasers.  Is it important that the

Debtors be able to devote their attention to this matter.

  49.  Additionally, the Examiner's preliminary statement, approved by the Examiner

Investigation Order, anticipated that the Examiner's Report would take six months to prepare.

*See* Examiner Investigation Order, Ex. A ¶ 11.  Pursuant to the Examiner Supplement, the

Examiner advised the Court that the issuance of the Examiner's Report would likely not occur

until early April, 2013.  *See* Examiner Supplement ¶ 1.  While the Examiner's pending

investigation should not decelerate plan discussions, compliance with all of the Examiner's

document requests has required substantial attention from the Debtors and their advisors.  The

17

Debtors have reviewed in excess of 515,000 emails and electronic documents resulting in the production of 280,000 non-privileged emails and electronic documents comprised of over 1.2 million pages of discovery.  Over the course of the last two months, the Examiner interviewed five ResCap personnel.  On October 12, 2012 and November 1, 2012, the Examiner requested interviews with nineteen additional ResCap employees.  Many aspects of these cases require significant attention, including responding to the Examiner's document requests, and support a finding that the Debtors have not had sufficient time to negotiate a plan, thus warranting an extension of the Exclusive Periods.

50.    Also, the deadline for creditors to file proofs of claim in these Chapter 11 cases did not pass until November 16, 2012.  *In re Borders Grp., Inc.*, 460 B.R. at 826 (Bankr. S.D.N.Y. 2011) ("The … bar date is important so that the Debtors can understand the number, nature and amount of valid claims against the estate.  The Debtors need a reasonable amount of time to review and evaluate these claims.").  Approximately 5,800 claims have been filed against the Debtors' estates. The Debtors have already begun analyzing these claims.  But the task is enormous, and the Debtors need more time to complete this analysis.

51.    Lastly, the Asset Sales have unsurprisingly and necessarily required the focus of the Debtors and their advisors.  Now that the Auctions are completed, the Debtors can devote more attention to plan discussions.  The closings of the Asset Sales will also allow the Debtors to present their creditors with more accurate waterfall analyses, which will be the basis for a Chapter 11 plan.

52.    For these reasons, it would be premature for the Debtors to propose a Chapter 11 plan at this time, and this factor also provides strong support for the Debtors' proposed extension of the Exclusive Periods.

**D.    Terminating Exclusivity Would Adversely Affect Administration of these Chapter 11 Cases**

53.    As noted by this Court in *In re Borders Grp., Inc.*, courts may also consider practical factors in determining that "cause" exists to extend the Exclusive Periods.  *See In re Borders Grp., Inc.*, 460 B.R. at 827-28 (noting that it was important for the Court to consider practical factors in refusing to terminate exclusivity).  Refusing to grant this Motion and extend the Exclusive Periods at this stage would adversely affect the Debtors' administration of these Chapter 11 cases.

54.    Terminating exclusivity at this time could result in various parties in interest proposing competing plans.  Allowing this to occur would be detrimental to interests of all creditors.  This was one of the reasons this Court refused to terminate the Debtors' exclusivity in *In re Borders Grp., Inc.*, quoting the following from *In re United Press Int'l, Inc.*, 60 B.R. 265, 271 n.12 (Bankr. D.C. 1986):

> "Opening the floodgates' to allow each and every one of [the debtor's creditors] to file a plan, no matter how poorly conceived or supported, would not serve 'to secure the expeditious and economical administration of' this case nor 'to carry out the provisions of' the Bankruptcy Code."

*In re Borders Grp., Inc.*, 460 B.R. at 828.

55.    The Debtors' key creditor constituencies hold divergent interests, and it is imperative that the Debtors remain in control of the plan process if a consensual plan is to be reached.  The Debtors have taken steps to put mechanisms in place, including providing information to all parties requesting a seat at the table, engaging in meaningful discussions with those parties and taking steps towards the appointment of a mediator, to help facilitate a consensual resolution of the issues.

56.    Denying the Motion, which would result in a termination of exclusivity on December 20, 2012, would be destabilizing and foster a chaotic environment in these complex

Chapter 11 cases at the same time that the Debtors are focused on facilitating the closings of the

Asset Sales, which is projected to occur in late January 2013.  The Debtors remain committed to

leading the negotiation of a consensual Chapter 11 plan with their key parties in interest.  Given

these monumental goals and the significant headway that has been made to date, terminating

exclusivity in these cases would undoubtedly be detrimental to all of the progress that has been

accomplished thus far.

**E.**      **The Other Adelphia Factors Favor an Extension of the Exclusive Periods**

57.      None of the other Adelphia Factors militates against granting an extension of the

Exclusive Periods.  The Debtors have been paying their bills as they come due.  Only seven

months have passed since the Petition Date.  Nor are the Debtors seeking an extension of the

Exclusive Periods to pressure creditors.  As discussed above, these are highly complex cases

and much has already been accomplished to date.  The Debtors intend to use an extension of the

Exclusive Periods to work with their creditors and attempt in good faith to successfully

negotiate a consensual Chapter 11 plan.

## CONCLUSION

58.      The Debtors' prospects of successfully achieving their goal of confirming a

Chapter 11 plan with significant creditor support will be enhanced if the Debtors are allowed to

continue working with key parties in interest toward such a plan.  A further extension of the

Exclusive Periods will accelerate progress.  Denial of this Motion would jeopardize the

significant progress made to date in these Chapter 11 cases.

59.      For the reasons set forth above, the Debtors respectfully submit that ample cause

exists under the Bankruptcy Code and the applicable case law for the requested extensions of

the Exclusive Periods.

ny-1065981

60.     The Debtors reserve the right to request further extensions of the Exclusive

Periods pursuant to section 1121(d) of the Bankruptcy Code.

## NOTICE

61.     The Debtors have provided notice of this Motion in accordance with the Case

Management Procedures Order, approved by this Court on May 23, 2012 [Docket No. 141].

## NO PRIOR REQUEST

62.     No prior request for the relief sought in this Motion has been made to this or any

other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit 1, granting the relief requested herein and

granting such other relief as is just and proper.

New York, New York                    /s/ Gary S. Lee
Dated: December 6, 2012                Gary S. Lee
                                       Lorenzo Marinuzzi
                                       MORRISON & FOERSTER LLP
                                       1290 Avenue of the Americas
                                       New York, New York 10104
                                       Telephone: (212) 468-8000
                                       Facsimile: (212) 468-7900

                                       *Counsel to the Debtors
                                        and Debtors in Possession*

## Exhibit 1

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ )
In re:                                                       )    Case No. 12-12020 (MG)
                                                             )
RESIDENTIAL CAPITAL, LLC, et al.,          )    Chapter 11
                                                             )
                                        Debtors.          )    Jointly Administered
------------------------------------------------------------ )

## ORDER FURTHER EXTENDING THE EXCLUSIVE PERIODS DURING WHICH ONLY THE DEBTORS MAY FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF

Upon the motion (the "Motion") of the above-captioned debtors and debtors in possession

in these Chapter 11 cases (collectively, the "Debtors"), for entry of an order (this "Order")

extending (a) the exclusive period of time during which only the Debtors may file a plan of

reorganization (the "Exclusive Plan Period") through and including February 28, 2013, and (b)

the period of time during which only the Debtors may solicit acceptances of a plan of

reorganization (the "Solicitation Period," and, together with the Exclusive Plan Period, the

"Exclusive Periods") through and including April 29, 2013; and it appearing that this Court has

jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that

venue of these Chapter 11 cases and the Motion in this district is proper pursuant to 28 U.S.C. §§

1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. §

157(b); and this Court having determined that the relief requested in the Motion is in the best

interests of the Debtors, their estates, their creditors and other parties in interest; and this Court

having found that proper and adequate notice of the Motion and the relief requested therein has

been provided in accordance with the Bankruptcy Rules, the Local Rules and the Case

Management Procedures for these Chapter 11 cases, and that, except as otherwise ordered herein,

no other or further notice is necessary; and any objections (if any) to the Motion having been

withdrawn or overruled on the merits; and after due deliberation thereon; and good and sufficient

cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to section 1121(d) of the Bankruptcy Code, the Exclusive Plan

Period is hereby extended through and including February 28, 2013, and the Exclusive

Solicitation Period is hereby extended through and including April 29, 2013.

3.      This Order is without prejudice to (x) the Debtors' ability to seek further

extensions of the Exclusive Periods pursuant to section 1121(d) of the Bankruptcy Code and (y)

the ability of parties in interest to seek to shorten the Exclusive Periods or object to further

extensions.

4.      The Debtors are authorized and empowered to take all actions necessary to

implement the relief granted in this Order.

5.      This Court retains jurisdiction with respect to all matters arising from or related to

the enforcement of this Order.

6.      Notwithstanding anything herein to the contrary, this Order shall not modify or

affect the terms and provisions of, nor the rights and obligations under, (a) the Board of

Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among

AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal

Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment

entered April 5, 2012 by the District Court for the District of Columbia, dated February 9, 2012,

(c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the

ny-1065981

Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related

agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

New York, New York
Date: _____, 2012

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

3

**<u>Exhibit 2</u>**

Westlaw.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)
**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re AMES DEPARTMENT STORES, INC., Eastern Retailers Service Corporation, et al., Debtors.

No. M–47(PKL).
Bankruptcy Nos. 90 B 11233(JAG) to 90 B 11285(JAG).
Nov. 25, 1991.

*MEMORANDUM ORDER*

LEISURE, District Judge:

**\*1** Citibank, N.A. ("Citibank") has moved this Court on an emergency basis for an order withdrawing in part the reference of these cases to the United States Bankruptcy Court for the Southern District of New York and terminating the exclusivity periods under 11 U.S.C. § 1121. For the reasons stated below, Citibank's motion is denied.

*Background*

On April 25, 1990, Ames Department Stores, Inc. ("Ames Department Stores") and its 52 subsidiaries (collectively, the "Ames Group") filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code in the Southern District of New York. The Ames Group continues to operate its businesses and manage its properties as debtors-in-possession under 11 U.S.C. §§ 1107 and 1108. The Ames Group's bankruptcy cases were referred to the United States Bankruptcy Court for the Southern District of New York, pursuant to 28 U.S.C. § 157(a) and a standing Order of this Court dated July 10, 1984 (Ward, Acting C.J.). The cases were initially assigned to the Honorable Howard Buschman; after he resigned from the bench in early 1991, the cases were reassigned to the Honorable James Goodman, a visiting bankruptcy judge from the District of Maine.

Under 11 U.S.C. § 1121(b), the Ames Group had the exclusive right to file a plan or plans of re-

organization for 120 days after the filing of the petitions. These exclusivity periods were to expire on August 23, 1990; the Bankruptcy Court has subsequently granted nine extensions of the exclusivity periods. The latest extension was granted on November 13, 1991, and extends the exclusivity periods until January 10, 1992.

Citibank, as agent for the secured lenders ("the banks") under a $900 million Credit Agreement dated October 28, 1988, and as amended, has moved this Court on an emergency basis for an order withdrawing the reference of these cases to the Bankruptcy Court with respect to issues concerning the exclusivity periods, and terminating those exclusivity periods so that Citibank and the banks can file their own plan of reorganization. Citibank argues that the Ames Group is moving too slowly in filing its reorganization plan, and that the banks are suffering because they cannot file their own reorganization plan during the exclusivity period. Citibank maintains that with each successive extension in the exclusivity period, the Ames Group is losing large sums of money and incurring excessive legal, investment banking, and other fees, and that by the time the Ames Group does finally file a plan of reorganization, the Ames Group's financial situation will have deteriorated so badly that the banks will not have any meaningful recovery.

The Ames Group opposes Citibank's motion, and has been joined in its opposition by the Official Committee of Unsecured Creditors of Ames Department Stores (the "Unsecured Creditors' Committee") and the Official Committee of Employees ("Employees' Committee") of Ames Department Stores. The Ames Group advances a number of arguments in opposition to Citibank's motion: the determination of a debtor's exclusivity period is a fundamental "core proceeding" and should be decided by the Bankruptcy Court; Judge Goodman has been intimately involved with these complicated cases and this Court should not interfere with his decision regarding the propriety of extending the exclusivity

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)
**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

periods until January 10, 1992; Judge Goodman's most recent order extending the exclusivity periods states that the extension until January 10, 1992 "shall be the final extension of time" in these cases and that "no further extension shall be granted without either a showing of extraordinary cause" or upon written consent of all the parties, thus demonstrating the likelihood that the exclusivity periods will not be further extended beyond January 10, 1992; and withdrawal of the reference and termination of the exclusivity period so that the banks can file their own reorganization plan will have a disruptive effect on Ames Department Stores' all-important Christmas selling season.

*Discussion*

**\*2** These bankruptcy cases involving the Ames Group were referred to the Bankruptcy Court under 28 U.S.C. § 157(a) and a standing order of this Court dated July 10, 1984 (Ward, C.J.). Under 28 U.S.C. § 157(d), "[t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." The burden is thus on Citibank to demonstrate why the Court should withdraw the reference with respect to issues concerning the exclusivity periods under 11 U.S.C. § 1121(b) and issue an order terminating the exclusivity periods.

The Court has discretion in deciding whether to withdraw a reference to the Bankruptcy Court "for cause shown" under 28 U.S.C. § 157(d). *Wedtech Corp. v. Banco Popular de Puerto Rico (In re Wedtech Corp.),* 94 B.R. 293, 295 (S.D.N.Y.1988); *Lesser v. A–Z Associates (In re Lion Capital Corp.),* 48 B.R. 329, 333 (S.D.N.Y.1985). Factors for the Court to consider include "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *Holland America Insurance Co. v. Succession of Roy,* 777 F.2d 992, 999 (5th Cir.1985).

Citibank's motion is to withdraw the reference

of these bankruptcy cases to the Bankruptcy Court with respect to issues concerning the Ames Group's exclusivity periods under 11 U.S.C. § 1121(b). Under 28 U.S.C. § 157(b)(2)(A), "core proceedings" in the bankruptcy area include "matters concerning the administration of the estate." The issue of a debtor's exclusivity period and the propriety of any extensions of the period is certainly a "core proceeding," *see, e.g., In re Texaco Inc.,* 76 B.R. 322, 328 (Bankr.S.D.N.Y.1987), and is particularly well suited for determination by the Bankruptcy Court. The Bankruptcy Court has the discretion, under 11 U.S.C. § 1121(d), to extend the debtor's exclusivity period. *See In re McLean Industries, Inc.,* 87 B.R. 830, 833 (Bankr.S.D.N.Y.1987). This Court will not lightly interfere with the Bankruptcy Judge's decision on this issue; in order to prevail on its motion, Citibank must persuade the Court that the Bankruptcy Judge's latest extension of the exclusivity periods to January 10, 1992 was an abuse of his discretion.

Judge Goodman of the Bankruptcy Court has been intimately involved with these bankruptcy cases since the beginning of this year. The decision of whether to extend the exclusivity periods under 11 U.S.C. § 1121(d) involves a careful balancing of competing factors and a consideration of the interests of the many parties involved—including the Ames Group, Citibank and the banks, the Unsecured Creditors' Committee, the Employees' Committee, the Statutory Bondholders' Committee of Ames Department Stores, and the Official Committee of Unsecured Creditors of the Subsidiaries of Ames Department Stores.

**\*3** With each extension of the exclusivity periods that Judge Goodman has granted, he has monitored the Ames Group's progress in putting together a reorganization plan. Although the speed with which the Ames Group is progressing is not satisfactory to Citibank, and the Court certainly understands Citibank's desire to have the proceedings advance more quickly, the Ames Group is nonetheless working toward filing its own reorganization plan.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)

**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

Indeed, during the period from October 11, 1991 to November 14, 1991, a total of 16 meetings took place between the financial advisors working on these cases as well as between the Ames Group and the various creditor groups. *See* Affidavit of John M. Friedman, Jr., Esq. of Dewey Ballantine, counsel for the Unsecured Creditors' Committee, sworn to on November 18, 1991, ¶ 16.

Citibank and the Ames Group have presented sharply differing views of the Ames Group's financial position. Judge Goodman is in a far better position than is this Court to evaluate the Ames Group's financial position as it relates to the appropriate length of the exclusivity periods. Judge Goodman has factored such financial considerations into his decisions to extend the exclusivity periods, and Citibank has not demonstrated that Judge Goodman has acted improperly with respect to these considerations.

The Court cannot conclude that Judge Goodman's determination to extend the exclusivity periods until January 10, 1992 was inappropriate or an abuse of his discretion. The purpose of the Bankruptcy Code's exclusivity period is to allow the debtor flexibility to negotiate with its creditors. Given the complexity of these cases and the large number of creditors and other interested parties involved, it is not surprising that negotiations have been protracted and that the circumstances have warranted extensions of the exclusivity periods. Judge Goodman has carefully considered all of these factors in deciding to grant the Ames Group's requests for extensions.

An additional factor—and perhaps the most important factor of all—that justifies Judge Goodman's most recent extension to January 10, 1992, and militates against this Court's intrusion into the proceedings to terminate the exclusivity periods, is the upcoming Christmas selling season. A termination of the exclusivity periods now would likely have a disruptive effect on the Ames Group's business operations during one of the retail industry's most crucial sales periods. Giving the Ames Group

another seven weeks in which to file its own reorganization plan will not only avoid such a disruption in the Ames Group's operations but will also allow the Ames Group to factor its Christmas season sales results into a proposed reorganization plan.

The Court also notes that Judge Goodman's most recent order extending the exclusivity periods states that "[t]his Order shall be the final extension of time under Section 1121(d) of the Code granted and no further extension shall be granted without either a showing of extraordinary cause or upon the written consent of all of the official committees appointed in these cases and Citibank, N.A., as Agent for the Ames Group's pre-petition secured creditors." *See* Order Under 11 U.S.C. § 1121(d), Granting Extension of Ames Group's Exclusive Periods in Which to File Plan(s) of Reorganization and Solicit Acceptances Thereof, ¶ 3 (Bankr.S.D.N.Y. Nov. 13, 1991) (Goodman, J.). Although there is certainly no guarantee that, on or before January 10, 1992, the Ames Group will not seek yet another extension in the exclusivity periods or that Judge Goodman will not grant such a request, Judge Goodman's order makes it clear that the Ames Group will have a very heavy burden to meet should it decide to seek another extension beyond January 10, 1992. Furthermore, during oral arguments on the instant motion held on November 19, 1991, George A. Zimmerman, Esq., counsel for the Ames Group, indicated to the Court that it was most unlikely that the Ames Group would seek another extension in the exclusivity periods. There is, therefore, no compelling reason for this Court to interfere with Judge Goodman's carefully considered determination that the exclusivity periods should be extended for a comparatively brief period, until January 10, 1992.

**\*4** Matters that have been brought to the Court's attention after oral arguments do not change this result. Counsel for Citibank has informed the Court that on November 19, 1991, the Unsecured Creditors' Committee filed a motion (in which the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)

**(Cite as: 1991 WL 259036 (S.D.N.Y.))**

Ames Group has joined) in the Bankruptcy Court for substantive consolidation of the Ames Group pursuant to 11 U.S.C. § 302. Citibank contends that the filing of the motion "effectively eliminates the possibility of a consensual plan being filed" by January 10, 1992, and that the motion "will require significant discovery and its resolution will take many months." Letter of Ronald DeKoven, Esq., counsel for Citibank, dated November 21, 1991. Counsel for the Ames Group responds that significant discovery relevant to the motion for substantive consolidation has already been completed in connection with a previous adversary proceeding commenced by the Ames Group, and notes that the Ames Group's joinder in the motion proposes that the Bankruptcy Court set a schedule in order to resolve the motion within the time frame established in Judge Goodman's most recent order extending the exclusivity period. Letter of George A. Zimmerman, Esq., counsel for the Ames Group, dated November 22, 1991. Citibank has not persuaded the Court that the motion for consolidation substantially increases the likelihood that the Ames Group will seek another extension in the exclusivity periods or that Judge Goodman would grant such a request. The Bankruptcy Court is in the best position to evaluate what impact, if any, the motion will have on the Ames Group's ability to file its reorganization plan by January 10, 1992, and Judge Goodman will undoubtedly consider that in deciding the motion.

*Conclusion*

For the reasons stated above, Citibank's motion for an order withdrawing in part the reference of these cases to the Bankruptcy Court and terminating the Ames Group's exclusivity periods is denied. The cases are remanded to the Bankruptcy Court in their entirety.

SO ORDERED.

S.D.N.Y.,1991.
In re Ames Dept. Stores, Inc.
Not Reported in F.Supp., 1991 WL 259036 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

H

United States Bankruptcy Court,
S.D. New York.
In re LIONEL L.L.C., et al., Debtors.

No. 04–17324.
Aug. 3, 2007.

Schulte Roth & Zabel LLP by Adam C. Harris, Abbey Walsh, Adam L. Hirsch, New York, NY, Attorneys for the Debtors and Debtors in Possession.

Kohn, Swift, & Graf, P.C. by Robert A. Swift, Robert J. LaRocca, Philadelphia, PA, Attorneys for Mike's Train House, Inc.

Stevens & Lee, P.C. by Alec P. Ostrow, New York, NY, Attorneys for Mike's Train House, Inc.

Halperin Battaglia Raicht, LLP, by Alan D. Halperin, Robert D. Raicht, New York, NY, Counsel to the Official Committee of Unsecured Creditors of Lionel L.L.C.

**MEMORANDUM DECISION REGARDING CLAIMS OBJECTIONS, ESTIMATION PROCEDURES, STAY MODIFICATION *AND EXTENSION OF EXCLUSIVITY***

BURTON R. LIFLAND, United States Bankruptcy Judge.

**\*1** Before the Court is the motion of Lionel L.L.C. and Liontech Company ("Lionel" or the "Debtors") to estimate (the "Estimation Motion") proof of claim number 55 (the "Trade Secrets Damages Claim"), filed by Mike's Train House, Inc ("MTH"), pursuant to sections 502(b) and (c) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the motion to expunge proof of claim numbers 54 (the "Interest Claim") and 56 (the "Legal Fees Claim") filed by MTH under section 502(b) of the Bankruptcy Code and Rule 3007 of the Bankruptcy

Rules. Lionel has filed objections relating to all of the above referenced filed proofs of claim. MTH objects to the Estimation Motion and cross-moves to modify the stay and permit the litigation of the Trade Secrets Damages Claim to go forward in the District Court in the Eastern District of Michigan. MTH has also moved for an order (the "Deposition Motion") authorizing the taking of videotaped depositions of three potential witnesses.

Lionel also moves for an order granting a fifth extension of the exclusive period during which only Lionel may file a plan of reorganization and solicit acceptances thereof through October 16, 2007, and December 17, 2007, respectively MTH objects to a further extension. An evidentiary hearing commenced on June 27 and continued on August 2, 2007.

**Background**

Lionel is a well-known marketer of model train products, including steam and diesel engines, rolling stock, operating and non-operating accessories, track, transformers and electronic control devices. One of Lionel's main competitors is MTH. In 2000, MTH sued Lionel in the United States District Court for the Eastern District of Michigan (the "Michigan Court") for violating the Michigan Uniform Trade Secrets Act (the "Trade Secrets Litigation"). The suit was based on allegations that one of Lionel's former suppliers stole confidential design drawings from MTH's supplier and then used that information to design and build trains for Lionel. A trial was held and on June 9, 2004, the jury returned a verdict of $38,608,305.00 in MTH's favor. Lionel filed a motion, which was denied, for a new trial. Financially unable to post a bond to stay enforcement of the judgment pending appeal, Lionel commenced their voluntary chapter 11 cases on November 15, 2004.

On May 3, 2005, MTH filed the three proofs of claim against Lionel arising out of the Trade Secrets Litigation: [FN1] the Trade Secrets Damages

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

Claim in the amount of $38,608,305.00; the Interest Claim, in the amount of $28,813.44 for interest accruing between the date of the MTH Judgment (November 3, 2004) and the Petition Date, and the Legal Fees Claim, in the amount of $3,499,433.57 for legal fees incurred in connection with the Trade Secrets Litigation.

> FN1. MTH also filed claim number 53 alleging patent infringement claims relating to MTH's smoke patents in the amount of $17,467,449.06. The Debtors filed an objection to that claim but proceedings relating to that objection are stayed pursuant to a stipulation dated July 11, 2006.

After obtaining a modification of the automatic stay from this Court, Lionel appealed the verdict to the United States Court of Appeals for the Sixth Circuit. On December 14, 2006, the Sixth Circuit reversed the Michigan Court's denial of Lionel's motion for a new trial and vacated the MTH judgment. MTH filed a Petition for Panel Reconsideration and Suggestion for Rehearing *En Banc,* but the Sixth Circuit denied MTH's petition on April 19, 2007. On April 26, 2007, MTH asked the Sixth Circuit to stay issuance of the mandate to allow MTH to file a petition for a writ of certiorari to the United States Supreme Court. The stay was granted on May 16, 2007. On May 30, 2007, MTH filed a Motion to Vacate Stay of Mandate and for Issuance of Mandate. On June 15, 2007, the Sixth Circuit granted the motion and issued the mandate.

**\*2** The Trade Secrets Damages Claim asserted by MTH was filed in a liquidated dollar amount based upon the amount awarded to MTH in the MTH Judgment. Due to the Sixth Circuit's reversal of the MTH Judgment, the Trade Secrets Damages Claim is now a disputed and unliquidated claim because the Sixth Circuit's decision does not finally resolve the Trade Secrets Damages Case, but instead provides for the case to be remanded back to the Michigan Court for a new trial consistent with the decision. Therefore, the Debtors object to the Trade Secrets Damages Claim and request the entry

of an order authorizing the reclassification of such claim as disputed, contingent, and unliquidated. In addition, the Debtors contend that as long as the Trade Secrets Damages Claim remains disputed and unliquidated, it will prevent the Debtors from confirming a plan of reorganization. Thus, in order to avoid the purported delay that would result if the Debtors were required to retry the Trade Secrets Litigation in the Michigan Court and await the final outcome of the litigation, the Debtors seek to have this Court estimate the Trade Secrets Damages Claim pursuant to section 502(c) of the Bankruptcy Code. Accordingly, the Debtors seek entry of an order (i) disallowing and expunging the Legal Fees Claim and the Interest Claim, (ii) reclassifying the Trade Secrets Damages Claim as disputed, contingent and unliquidated, (iii) setting procedures for, and scheduling a hearing on, estimation of the Trade Secrets Damages Claim and (iv) extending exclusivity to allow for the resolution or estimation of such claims.

**Discussion**

Section 502(c) of the Bankruptcy Code provides that:

> (c) There shall be estimated for purpose of allowance under this section—

> > (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case;

11 U.S.C. § 502(c); *see Frito Lay, Inc. v. LTV Steel Co. ( In re Chateaugay Corp.),* 10 F.3d 944, 957 (2d Cir.1993) ("A bankruptcy court must estimate 'any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case.' "); *In re G–I Holdings, Inc.,* 2006 WL 2403531, \*3 (Bankr.D.N.J. August 11, 2006) ("Section 502(c) of the Bankruptcy Code is drafted in mandatory terms. That is, any contingent or unliquidated claim 'shall' be estimated so long as the 'liquidation' of the particular claim would 'unduly delay the administra-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159

**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

tion of the case.' "); *In re Lane,* 68 B.R. 609, 611 (Bankr.D.Haw.1986) ("This duty of the bankruptcy court is mandatory, since the language of [section 502(c)] states 'shall' "). Thus, when the liquidation of a claim is premised on litigation pending in a non-bankruptcy court, and the final outcome of the matter is not forthcoming, the bankruptcy court should estimate the claim. *See Maxwell v. Seaman Furniture Company, Inc. (In re Seaman's Furniture Co. of Union Square, Inc.),* 160 B.R. 40, 42 (S.D.N.Y.1993) ( "Estimation is an expedient method for setting the amount of a claim that may receive a distributive share of the estate."); *In re Apex Oil Co.,* 107 B.R. 189, 192 (Bankr.E.D.Mo.1989) ("the key consideration in whether a bankruptcy court should estimate a claim pending in another forum is whether liquidation of that claim would unduly delay the debtor's Chapter 11 reorganization."); *In re Lane,* 68 B.R. at 611 (section 502(c) of the Bankruptcy Code requires the court to estimate any claim where failing to do so would unduly delay the administration of the case). A main goal of the Bankruptcy Code is to equitably distribute the debtor's assets among its creditors. Lengthy bankruptcy proceedings cause delayed distributions, which in turn, greatly devalue the claims of all creditors as they cannot use the assets until they receive them. *See In re Paramount Publix Corp.,* 8 F.Supp. 644, 646–47 (S.D.N.Y.1934) ("Time is of the essence in bankruptcy administration. An early distribution of the bankrupt's assets among his creditors is imperative.").

**\*3** It is more than seven years since the Trade Secrets Litigation between Lionel and MTH commenced. The MTH Judgment was the impetus for the filing of these chapter 11 proceedings that have now been pending before this court for over two and a half years awaiting the outcome of the appeal As with most chapter 11 proceedings, Lionel's status as a chapter 11 debtor has placed a strain on the company's management and employees, and their relationships with both customers and manufacturers. It has also materially affected Lionel's ability to expand its business beyond the pure

"hobby" market. Mr. Calabrese, Lionel's president and CEO since September 2004, testified that he has been working diligently to develop Lionel's "mass" business such as co-branding opportunities with retailers such as Macy's, Toys–R–Us and Target. However, given the continued uncertainty surrounding Lionel's bankruptcy and the MTH claims, the willingness of the mass merchandisers to get involved in long term commitments with Lionel is limited.[FN2] Some retailers, such as Wal-Mart have "flat out refused to deal with Lionel while in bankruptcy."

> [FN2]. For example, Lionel has been invited to participate in the Macy's parade but Macy's has expressed uncertainty about giving Lionel that slot given "what's going on in with the bankruptcy and the long term issues regarding its viability."

In addition, the prolonged chapter 11 cases have had a negative effect on the Debtors' relationships with its employees. Mr. Calabrese testified that he has lost through resignation several key employees, including several senior employees with 20 odd years of experience in the product development area as well as the head of hobby sales. Mr. Calabrese testified further that although the company has several management positions open, including the head of mass sales, head of product development and head of business affairs, it has been extremely difficult to attract talented and experienced people under the current circumstances. Mr. Calabrese himself is laboring under a contract that expires at the end of this year.

Further, in the years since the Petition Date, Lionel has spent approximately $10 million dollars in total fees and expenses of which $5 million relates purely to the administration of the chapter 11 cases, including the company's attorneys and professionals, the committee's professionals, United States Trustee's fees and other similar fees.

Not long after the reversal of the Judgment by the Sixth Circuit, on May 21, 2007, the Debtors

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

filed their Disclosure Statement and Joint Plan of Reorganization (the "Plan") under chapter 11 of the Bankruptcy Code. The Plan proposes to leave all creditors of the Debtors' estates unimpaired by paying them in full, in cash, plus post-petition interest, on the effective date. One of the conditions precedent to confirmation of the Plan is that the Trade Secrets Damages Claim be settled, otherwise resolved or estimated by the Bankruptcy Court. Considering the enormous dollar amounts of the claims asserted by MTH (claims which MTH asserts could result in damages of between $60 and $70 million) in comparison to the rest of the claims and the assets of the Debtors' estates, the Debtors clearly cannot confirm the Plan if this Court cannot find it feasible without the liquidation of MTH's claims. *See eg., Sherman v. Harbin (In re Harbin),* 2007 WL 1322389, \*4 (9th Cir. May 8, 2007) (holding that in order to meet the feasibility requirement for confirmation of a plan under section 1129(a)(11) a court must evaluate "whether a potential future judgment may affect the debtor's ability to implement its plan."); *Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.),* 761 F.2d 1374, 1382 (9th Cir.1985) (estimation necessary for a determination of plan feasibility).

**\*4** MTH contends there will not be an undue delay in the administration of these chapter 11 cases if the stay is modified to allow the case to be retried in the Michigan Court. That simply defies logic. An estimation proceeding in this Court can be conducted within a very short period of time versus a full-blown jury trial in Michigan which is not even calendared. In the first trial, the parties engaged in 18 days of trial resulting in the jury verdict in June 2004. Post-trial motions and briefing were not concluded until November 2004, when Lionel's motion for a new trial was denied and judgment was finally entered. The appeal to the Sixth Circuit, including MTH's Petition for Reconsideration, consumed an additional two years and three months. Under the procedures proposed by Lionel in connection with the Estimation Motion, estimation of the Trade Secrets Damages Claim could be

concluded by the end of August, 2007.

MTH also argues that any delay in retrying the case in Michigan should not be an issue because Lionel can go ahead and confirm a plan without dealing with MTH's claims which can proceed post-confirmation or simply dismiss the chapter 11 cases and pay all creditors other than MTH. This simplistic argument is unrealistic and does not even have cosmetic appeal. First, dismissal would result in the occurrence of events of default under the Debtors' DIP financing facilities, causing acceleration of approximately $45 million in obligations (and leaving the Debtors without working capital to run the business and all creditors at the mercy of the lenders' exercise of remedies), and second result in between $15 million and $20 million of pre- and postpetition obligations becoming immediately due and payable. Moreover, under the Plan, the Debtors intend to refinance these obligations through a new exit financing facility to replace its existing debtor in possession financing facilities, and new equity capital to pay all other allowed claims and exit costs. However, with the threat of $60–$70 million in additional claims being asserted by MTH, the Debtors will have no access to the capital necessary to permit the payment of those obligations and/or the confirmation of a plan. Mr. Turkington, Lionel's CFO, also explained that based upon his experience as CFO after the MTH jury verdict entered in June 2004, that any dismissal of the chapter 11 cases with the specter of the MTH litgation continuing to hang over the head of Lionel would result in trade creditors, particularly manufacturers, constricting trade credit and even insisting on cash on delivery or cash in advance.

Even if the Debtors could get exit financing to confirm a plan prior to resolving MTH's claims, having MTH's claims ride through the bankruptcy without being discharged would not satisfy section 1129(a)(11) of the Bankruptcy Code. That section requires that "confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor ... unless such

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

liquidation or reorganization is provided for in the plan." 11 U.S.C. § 1129(a)(11). A liquidation or further reorganization contingency cannot realistically be provided for in a plan, when neither the likelihood of an adverse judgment, nor the timing and amount of such a judgment, can be predicted with any certainty. *See In re Harbin, supra.*

**\*5** MTH also contends that its request for injunctive relief is not a "claim" capable of estimation under Section 101(5)(a) of the Bankruptcy Code. This argument presupposes a finding of liability on the part of Lionel. When, and if, MTH's Trade Secrets Damages Claim is estimated above $0, then a determination will be made if MTH's request for an injunction against future misappropriation can be projected into a monetary award.FN3 Accordingly, the Debtors' request to estimate the Trade Secrets Claim is granted and MTH's motion to modify the stay to retry the case in the Michigan court is denied.

> FN3. In fact, previously in this case, a similar injunction in favor of the Debtor was monetized.

**Procedures**

Although the Bankruptcy Code does not explicitly detail procedures for estimating claims, a Bankruptcy Court may use whichever method is best suited to the circumstances. *Bittner v. Borne Chemical Co.,* 691 F.2d 134, 135 (3d Cir.1982); *In re Seaman's Furniture Company of Union Square, Inc.,* 160 BR at 41. In *In re Baldwin–United Corp,* 55 B.R. 885, 889 (Bankr.S.D.Ohio 1985) the court utilized a procedure akin to a summary trial where there was no jury, live testimony by one witness per party, a discovery cutoff date, and only two days for the hearing. Many courts adhere to the method set forth in the *Baldwin–United* case. *See e.g., In re MacDonald,* 128 B.R. 161, 166–67 (Bankr.W.D.Tex .1991) (employing an abbreviated procedure practically the same as *Baldwin–United); In re Apex Oil Co.,* 92 B.R. 843 (Bankr.E.D.Mo.1988) (utilizing a methodology analogous to *Baldwin–United); NLRB v. Grey-*

*hound Lines (In re Eagle Bus Mfg.),* 158 B.R. 421 (D.Tex.1993) (two-day summary trial); *DeGeorge Fin. Corp. v. Novak* (*In re DeGeorge Fin. Corp.*), 2002 U.S. Dist. LEXIS 17621 (D.Conn.2002) (one-day trial). Although this is not the only method of conducting the estimation procedure (*see In re Nova Real Estate Inv. Trust,* 23 B.R. 62, 65 (Bankr.E.D.Va.1982)), a longer method, such as a full-blown trial on the merits, would "eviscerate the purpose underlying Section 502(c)." *Baldwin–United,* 55 B.R. at 899. Moreover, a more time consuming method would run counter to the "efficient administration of the bankrupt's estate ..." *Bittner,* 691 F.2d at 135. Furthermore, in estimating the value of a claim, the Court of Appeals for the Second Circuit has stated that courts should make a "speedy and rough estimation of [the] claims for purposes of determining [claimant's] voice in the Chapter 11 proceedings ..." *In re Chateaugay Corp.,* 944 F.2d 997, 1006 (2d Cir.1991).

MTH complains that the estimation procedure proposed by the Debtors fails to accord with fundamental notions of due process and deliberately tilts towards excluding evidence supportive of MTH's claims. In general, the truncated trial process that can be developed under 502(c) has been found to be consistent with the dictates of due process of law. *See In re FRG, Inc.,* 121 B.R. 451, 456 (Bankr.D.Pa.1990); *In re Apex Oil Co.,* 92 B.R. at 845–47; *In re Baldwin–United Corp.,* 55 B.R. at 899–902. In addition, when a bankruptcy creditor files a proof of claim, it submits itself to the bankruptcy court's equitable powers and thereby waives its right to a jury trial. *In re Trans Marketing* 117 F.3d 1417 (5th Cir.1997) citing *Lagenkamp v. Culp,* 498 U.S. 42, 44 (1990); *First Fidelity Bank, N.A. v. Hooker Investments, Inc. (In re Hooker Investments, Inc.,)* 937 F.2d 833, 840 (2d Cir.1991) (rejecting creditor's argument that it should not be forced to make the choice between filing a proof of claim and preserving its right to a jury trial).

**\*6** However, as requested by MTH, I find that the procedures proposed by Lionel should be modi-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

fied somewhat to provide for limited additional dis-
covery and presentation time, the parameters of
which shall be the subject of a chamber's confer-
ence to be scheduled. *See.* 11 U.S.C. § 105(d). Simi-
larly, I find that MTH's Deposition Motion is, at
best, premature and shall be addressed at the
scheduling conference to review the proposed pro-
cedures. *See* Local Rule 7007–1(b) ("No discovery-re-
lated motion ... shall be heard unless counsel for the
moving party first requests an informal conference
with the Court ...").

**Extension of Exclusivity**

Former section 1121(d) of the Bankruptcy
Code, as applicable to this case, permits the court to
extend a debtor's exclusive period upon a determin-
ation of cause:

> On request of a party in interest made within
> the respective periods specified in subsections
> (b) and (c) of this section and after notice and a
> hearing, the court may for cause reduce or in-
> crease the 120–day period or the 180–day peri-
> od referred to in this section.

*See* 11 U.S.C. § 1121(d)(2004). In determining
whether a debtor has had an adequate opportunity
to negotiate a plan of reorganization and solicit ac-
ceptances thereof, a court should consider a variety
of factors, addressed below, to assess the totality of
circumstances. *In re McLean Indus., Inc.,* 87 B.R.
830, 833 (Bankr.S.D.N.Y.1987).

First, although the Debtors cases are not ex-
tremely large, the MTH claims and litigation claims
add a unique complexity to the resolution of these
cases. Second, the Debtors have made good faith
progress towards reorganization. The Debtors have
improved their business operations and have filed a
Plan that proposes to pay all creditors in full with
interest. The Debtors are current on all post-petition
obligations and predict they will maintain this abil-
ity to pay their bills as they come due. In addition
the Debtors have reviewed and resolved many of
the claims filed against them. However, the
amounts of MTH's claims remain a significant un-

resolved contingency in the Debtor's cases requir-
ing further time to confirm their Plan while those
claims are liquidated and exit financing can be put
into place.

**The Interest Claim and the Legal Fees Claim**

The Debtors also object to, and seek the disal-
lowance and expungement of, the Interest Claim
and the Legal Fees Claim. The Interest Claim cal-
culates interest from the date of the MTH Judgment
until the Petition Date. Because the MTH judgment
has been vacated by the Sixth Circuit Decision,
there is no longer a valid judgment on which in-
terest could accrue, thereby rendering the Interest
Claim void. The Legal Fees Claim seeks reimburse-
ment of MTH's legal fees and expenses expended in
connection with the Trade Secrets Litigation. MTH
filed a Petition for Counsel Fees and Cost Reim-
bursement in the Michigan Court (the "Legal Fees
Petition") on November 5, 2004; however, it has
not been ruled upon because of the automatic stay
extant in this case. The Legal Fees Petition asserts
that under the Michigan Uniform Trade Secrets Act
("MUTSA"), attorney's fees can be awarded to the
prevailing party in a litigation if willful and mali-
cious misappropriation exists. Lionel argues that
the Sixth Circuit Decision vacating the MTH Judg-
ment leaves MTH ineligible to seek the reimburse-
ment of incurred legal fees and expenses under the
MUTSA and therefore, the Legal Fees Claim is also
void. However, as MTH contends, the Legal Fees
Claim stands on the same footing as MTH's Trade
Secrets Damages Claim and may be resolved along
with it. Accordingly, the objection to the Interest
Claim is granted and the claim is expunged; the
Legal Fees Claim is also expunged without preju-
dice to reassert should fees be subsequently awar-
ded.

**Conclusion**

**\*7** The litigation in the Sixth Circuit has
already consumed seven years and following the re-
versal by the Circuit Court, the litigation is now in
a position that in the vernacular would be deemed,
"a do over." As both sides have made clear their in-

Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159
**(Cite as: 2007 WL 2261539 (Bkrtcy.S.D.N.Y.))**

tention to appeal any adverse determination, any-where, adding years of delay to the issue determina-tion, this is clearly a situation contemplated by Congress for the implementation of section 502(c). Accordingly, the Motion to Estimate is granted with the hearing procedures suggested by the Movant to be reviewed in a conference to be sched-uled with chambers. The Motion to lift the stay is denied. The Interest Claim and the Legal Fees Claims are expunged.

IT IS SO ORDERED.

Bkrtcy.S.D.N.Y.,2007.
In re Lionel L.L.C.
Not Reported in B.R., 2007 WL 2261539 (Bkrtcy.S.D.N.Y.), 48 Bankr.Ct.Dec. 159

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re                                                   :          **NOT FOR PUBLICATION**

                                                        :          Case No. 08-11153 (MG)

LEXINGTON PRECISION CORP., et.al.,     :

                                                        :          (Chapter 11)

                                Debtors.         :

-----------------------------------------------------------------x


**MEMORANDUM AND ORDER GRANTING MOTION PURSUANT TO § 1121(d) TO
EXTEND THE DEBTORS' EXCLUSIVITY**


*A P P E A R A N C E S :*

WEIL, GOTSCHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
By:     Richard P. Krasnow
          Adam P. Strochak
*Attorneys for Debtors*

ANDREWS KURTH LLP
450 Lexington Avenue
New York, NY 10017
By:     Paul N. Silverstein
          Gerald L. Bracht
*Attorneys for Official Committee of Unsecured Creditors*


**MARTIN GLENN**
**United States Bankruptcy Judge**


        Pending before this Court is the opposed motion to extend exclusivity pursuant to 11

U.S.C. § 1121(d) filed on October 7, 2008 by Lexington Precision Corporation and Lexington

Rubber Group, Inc. (collectively "Lexington" or "Debtors").  (ECF Doc. # 428.)  The motion

seeks an extension of the period in which the Debtors alone may file a plan to January 26, 2009,

and the period within which the Debtors may solicit acceptances to that plan to February 25,

2009.  (*Id.* at ¶ 14.)  On October 8, 2008, the Court entered a Bridge Order extending exclusivity

until such time as the Court decided the Debtors' motion.  (ECF Doc. #430.)  The Official

Committee of Unsecured Creditors ("Committee") objected to the motion to extend exclusivity.

(ECF Doc. # 436.)  It argues that the extension should be denied because since July 2008, when

the Court granted an initial extension, (i) the Debtors have not shown they can propose a viable

plan, and (ii) the Debtors and the Committee have made no progress in negotiations because the

Debtors have not been negotiating in good faith.  The Debtors' replied that since July the

Debtors have made significant progress toward reorganization in that they have filed an amended

proposed plan and a proposed disclosure statement.  (ECF Doc. # 444.)  The Debtors also allege

that they have made progress towards securing exit financing, they have been acting good faith,

and the negotiations with the Committee, while taking longer than expected, have progressed.

An evidentiary hearing was held on October 28, 2008.  This opinion sets forth the Court's

findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## BACKGROUND

The Debtors filed for chapter 11 relief on April 1, 2008.  On August 8, 2008, the Debtors

filed an amended proposed plan and a proposed disclosure statement.  (ECF Doc. # 305, 306.)  A

hearing to approve the disclosure statement is scheduled for November 24, 2008.  (ECF Doc. #

446.)

The Debtors primarily manufacture large volumes of high-quality rubber and metal

components for use in automobiles and medical devices.  (ECF Doc. #3 at ¶ 5.)  The Debtors'

business can be divided into two sectors:  the original equipment manufacturers (or "OEM")

divisions and aftermarket divisions.  The OEM sector, which includes the metals division and the

connector seals division, supplies automotive parts to domestic car manufacturers and other parts

2

suppliers.  The precipitous decline in the automotive industry, particularly over the last three months, has caused significant deterioration in this sector of the Debtors' business.  Debtors' Ex. 1; Committee's Ex. O.  The aftermarket sector, which includes the medical components and insulators divisions, has not suffered nearly as much.  *Id.*

This is the Debtors' second motion to extend exclusivity.  Previously, on May 21, 2008, the Committee filed a motion seeking to terminate exclusivity pursuant to 11 U.S.C. § 1121(d).  (ECF Doc. # 133.)  The Debtors opposed the motion.  (ECF Doc. # 161, 162.)  Prepetition there were unsuccessful negotiations between the Debtors and an ad-hoc committee of creditors, which eventually ceased with no additional prepetition communications.  The Debtors then filed their chapter 11 petitions.  After the petitions were filed and the Committee was appointed, largely comprised of members of the ad-hoc committee and represented by the same counsel, neither the Debtors nor the Committee reached out to the other to begin negotiations.  (See ECF Doc. # 263 at pg. 4.)  A hearing on the motion to terminate exclusivity was held on June 11, 2008.  The Court reserved judgment to allow the parties time to meet and begin negotiating the terms of a reorganization plan.  The Debtors then filed a motion to extend exclusivity on July 9, 2008.  (ECF Doc. # 238.)  On July 16, 2008, the Committee withdrew its motion to terminate exclusivity and instead opposed the Debtors' motion to extend exclusivity.  (ECF Doc. # 262.)  After an evidentiary hearing on July 21, 2008, the Court granted Debtors' motion and extended exclusivity to October 28, 2008.  (ECF Doc. # 289.)  On October 7, 2008, Debtors filed the instant motion seeking again to extend exclusivity.  For the reasons discussed below, the Court grants the extension of both the Debtors' period to file a plan until January 26, 2009, and to solicit acceptances until February 25, 2009.

# **DISCUSSION**

## A.  Exclusivity Pursuant to §1121

The Bankruptcy Code grants a debtor the exclusive right to file a plan during the first 120 days after the order granting relief.  11 U.S.C. § 1121(b).  Once the 120-day period expires or is terminated, any party in interest may file a plan of reorganization.  11 U.S.C. § 1121(c).  Events explicitly recognized by statute that end the exclusivity period include a failure to file a plan within 120 days of the order for relief or a failure to obtain acceptance of the timely filed plan within 180 days by all impaired classes.

The Bankruptcy Code allows the exclusivity period to be terminated or extended upon a showing of cause by a party in interest.  11 U.S.C. § 1121(d).  The burden of proving cause to extend exclusivity is on the moving party, in this case the Debtors.  *See In re R.G. Pharm., Inc.*, 374 B.R. 484, 487 (Bankr. D. Conn. 2007) (stating debtor has burden in motion to extend); *In re Texaco, Inc.*, 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987) (finding that party seeking either an extension or a termination of exclusivity bears the burden of proving cause).  Some courts have held that for the moving party to meet its burden it must produce affirmative evidence to support a finding of cause.  *See In re Parker Street Florist & Garden Center, Inc.*, 31 B.R. 206, 207 (Bankr. D. Mass. 1983) (debtor's assertion that it did not want the interference of competing plans was found insufficient to make an affirmative showing of cause).

## B.  Cause Pursuant to § 1121(d)

The determination of cause under section 1121(d) is a fact-specific inquiry in which the court has broad discretion in extending or terminating exclusivity.  *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-

specific."); *see also In re Lehigh Valley Prof'l Sports Club, Inc.*, 2000 WL 290187, at *2

(Bankr. E.D. Pa. Mar. 14, 2000) (relief under §1121(d) is committed to the sound discretion of

the bankruptcy judge); *In re Sharon Steel Corp.*, 78 B.R. 762, 763 (Bankr. W.D. Pa. 1987) ("The

decision of whether or not to extend the debtor's period of exclusivity rests with the discretion

of the Court.").

        As with the first exclusivity motion, the Court will focus on the nine factors for

determining cause identified by Judge Gerber in his *Adelphia* decision: (a) the size and

complexity of the case; (b) the necessity for sufficient time to permit the debtor to negotiate a

plan of reorganization and prepare adequate information; (c) the existence of good faith progress

toward reorganization; (d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for filing a viable plan;

(f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of

time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity

in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether

an unresolved contingency exists.  *In re Adelphia*, 352 B.R. at 587.

        While not all of these factors are applicable in the current case, they do provide the

necessary framework in considering the relief requested.  The factors that the Court considers

most relevant based on the arguments presented by the Debtors and the Committee are as

follows:  (i) the existence of good faith progress toward reorganization; (ii) whether the debtor

has demonstrated reasonable prospects for filing a viable plan; and (iii) whether the debtor has

made progress in negotiations with its creditors.  *In re Adelphia*, 352 B.R. at 587.  The

Committee's objection similarly addresses these factors in alleging that the Debtors (1) have not

5

demonstrated reasonable prospects for filing a viable plan, and (2) have not engaged in good faith negotiations with the Committee.  The Court will address each argument in turn.

As to the first argument, the Committee points to three facts to support a finding that the Debtors do not have reasonable prospects of filing a viable plan:  Debtors' lack of exit financing; the alleged continued diminution in value of the Debtors' business over the past several months, including the Debtors' failure to meet forecasted earnings projections; and the dramatic deterioration of the automotive industry in general over that same time period.  The Court finds that none of these facts supports a denial of an extension of exclusivity.

With respect to exit financing, the Court finds that, based on the evidence at the hearing, the Debtors have reasonable prospects of obtaining exit financing.  CapitalOne Bank previously entered into a non-binding letter agreement with Debtors to provide exit financing.  Committee's Ex. N.  While the term of the agreement has since expired, *id.* at 9, the Court heard uncontroverted testimony from the Debtors' Chairman that the Debtors remain in negotiations with CapitalOne, CapitalOne continues to perform due diligence, and CapitalOne has indicated that it is still interested in extending exit financing.  Thus, while the Committee strenuously argued that Debtors have "zero prospects" of securing exit financing, the evidence does not support such a conclusion.

Nor is the decline of the Debtors' business enough to support denying an extension of exclusivity.  As a result of the decline in business, the Debtors have missed their projected earnings over the past several months.  Committee's Ex. O.  But the effect the decline in net sales and EBITDA may have had on the Debtors' business's value is disputed.  While the Committee points out that Debtors have missed projections by 18.5% on a consolidated EBITDA basis from June through August, the Court credits the Debtors' evidence that this

diminution is primarily in the OEM businesses, and that its aftermarket businesses—the medical components and insulators divisions—are either meeting or very close to meeting projections.[1] Committee's Ex. O; Debtors' Ex. 1.  The testimony shows that Debtors' financial advisor, W.Y. Campbell & Co., currently values the OEM businesses at wind-down or near-liquidation value. Therefore, the EBITDA declines in the OEM businesses may not materially impact the value of the entire enterprise.  In any event, as the *Adelphia* decision made clear, in evaluating cause for extensions of exclusivity, the court should consider whether a debtor *could* present a viable plan, not whether the currently proposed plan is viable.  352 B.R. at 588.  As a result, the Court finds that the diminution of Debtors' business over the past few months is not a reason to deny an extension of exclusivity.

Lastly, the Committee argues that the deterioration of the general automotive market in the past few months also compels a finding that the Debtors cannot propose a viable plan.  The Court disagrees.  The Court is, of course, aware of the difficult market conditions all companies, not just the Debtors, are facing right now.  Not only has the automotive industry declined, but the tightening credit markets have made securing exit financing very difficult.  But that is not reason enough to deny an extension of exclusivity.  If the Court were to accept the Committee's argument, few, if any, debtors could continue to maintain exclusivity in the current economic climate.

The Committee's second argument opposing an extension of exclusivity is that the Debtors are not engaging in good faith negotiations, and that the Committee and the Debtors have not made any progress in negotiations.  In its last exclusivity order in July, the Court

---

[1]    The Committee argued that the medical components division's falling short of its June-August EBITDA projections by 5.6% is a significant miss.  Committee's Ex. O at 2.  The Court disagrees.  The 5.6% miss amounts to $59,000 in EBITDA over a three-month period.  As the Committee's financial advisor testified, and the Court so finds, this amount is not material.

indicated that it expected serious negotiations to begin in September; that obviously did not

happen, as the Debtors and the Committee did not sit down to negotiate until very recently.

Since that order, however, the Debtors prepared revised forecasts in light of comments from the

Committee's financial advisor, Stout Risius & Ross, as well as from changing conditions in their

business and the market.  The testimony shows that the Committee was not prepared to begin

negotiations until it received all of the information it requested from the Debtors, including the

updated projections and backup information related to the revised forecasts.  While the

Committee's insistence on receiving all of the information before negotiations commenced

cannot be faulted, it cannot then be turned into an argument for ending exclusivity.

In addition, the Debtors' financial advisor, W.Y. Campbell & Co., took longer than

expected to complete its draft valuation report, delaying the start of the negotiations by a month.

Debtors' Ex. 3.  The Court credits the Debtors' testimony that W.Y. Campbell's delay was not

purposeful and was the result of a good faith effort to prepare an accurate report in light of

changing industry conditions.

The Debtors have also been providing the Committee with all the documentation that the

Committee's financial advisor requested.  Indeed, the Committee's financial advisor testified

that he currently has all the documentation he has requested, although he did say that he may

need more information, as his review continues.  Documentary evidence also shows that the

Debtors have provided the Committee with numerous documents and reams of data.  Debtors'

Ex. 4.  The Committee and the Debtors have also recently met twice.  While progress has been

tentative, the uncontroverted testimony, including from the Committee's financial advisor, was

that the parties "are not at an impasse" in negotiations.  The inference and expectation is that

further negotiations could be fruitful.  The Court expects the parties to continue to negotiate in

good faith with a view towards agreeing on a viable plan for reorganization.  In sum, the Court

concludes that sufficient progress has been made in negotiations—and that Debtors have been

negotiating in good faith—such that it would be inappropriate to terminate exclusivity now.

The Court concludes that the Debtors have shown the necessary cause under section

1121(d) to further extend exclusivity.  It would not benefit the Debtors or the estate to deny an

extension of exclusivity now.  It has been clear since the start of this case that the Debtors and

the Committee have substantial differences regarding the proper valuation of the Debtors.  The

Debtors claim there is substantial value for equity.  The Committee vehemently disagrees.  The

time and place to resolve this issue will be in connection with a confirmation hearing.

The motion to extend exclusivity is granted to the extent provided herein.


**IT IS ORDERED**

Dated:  October 31, 2008
          New York, New York


                                    ___/s/ Martin Glenn_____
                                    UNITED STATES BANKRUPTCY JUDGE