**Hearing Date and Time:  December 20, 2012 at 10:00 a.m. (Prevailing Eastern Time)**

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JCS – 6031)
Harrison L. Denman (HD – 1945)

    and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group
of Junior Secured Noteholders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al., | ) | Case No. 12-12020 (MG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**OMNIBUS RESPONSE OF AD HOC GROUP OF JUNIOR SECURED NOTEHOLDERS**
**TO DEBTORS' MOTION FOR THE ENTRY OF AN ORDER EXTENDING THEIR**
**EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT**
**ACCEPTANCES THEREOF AND DEBTORS' MOTION FOR THE APPOINTMENT**
**OF A MEDIATOR**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

        The Ad Hoc Group of Junior Secured Noteholders (the "Ad Hoc Group"), by and

through its undersigned counsel, hereby files this omnibus response (the "Response") to the

motions of the debtors (collectively, the "Debtors") in the above-captioned cases (the "Chapter

11 Cases")  (i) for entry of an order (A) further extending the exclusive periods during which

only the Debtors may file a chapter 11 plan by an additional seventy (70) days, and (ii) extending

the period during which the Debtors have the exclusive right to solicit acceptances thereof by

sixty (60) days following the expiration of such period [Docket No. 2355] (the "Exclusivity

Motion") and (ii) for entry of an order appointing a mediator to assist the parties in resolving

certain issues relating to the formulation and confirmation of a plan [Docket No. 2357] (the

"Mediation Motion," and, together with the Exclusivity Motion, the "Motions").[1]  As and for its

Response, the Ad Hoc Group respectfully states as follows:

## PRELIMINARY STATEMENT

The Motions, when viewed in tandem, represent an inconsistency in legal and factual

positions, with the Debtors on the one hand lauding their purported progress in moving towards a

consensual plan resolving these cases and on the other hand turning to the Court for immediate

assistance with mediation because a consensual plan seems beyond their present abilities.  As set

forth herein, that inconsistency is the direct result of the Debtors having squandered their prior

extension of exclusivity through a single-minded pursuit of the RMBS Settlement, an insistence

on imposing onerous conditions on access to information relevant to the plan process in these

cases, and an inability to set appropriate expectations for the diverse constituencies in these

cases.  That said, the situation is not so dire that the Court should appoint a plan mediator at this

time or even that the Debtors need to seek the appointment of a mediator as a facial pretext to

retain control of the plan process in these cases.  The Court can grant a short extension of

exclusivity, admonish the Debtors to make a far better use of their extension this time, and allow

principals and advisors of key stakeholders to engage in meaningful discussions without the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Exclusivity
Motion.

overhang of the prior sale processes and RMBS litigation or the delay attendant to conducting a formal mediation.

The parties do not need the imposition of a mediator to fashion economic consensus in these cases.  While the legal issues surrounding a plan confirmation may be complex, the range and nature of potential economic settlements are not.  Once the asset sales are closed, the only threshold plan issue will be whether Ally will settle and will be granted a third party release in a chapter 11 plan or whether the resolution of the myriad Ally issues will be reserved for post-confirmation litigation preserved in a plan.[2]  Whether there will be an outbreak of global peace in the near term, and if not what a contested plan or plans will look like, will be known in a matter of weeks, not months, provided that the key constituencies in these cases are given access to necessary information and a proper framework in which to have discussions.  To the extent the parties need more motivation to settle in the near term, the accrual of more than $20 million per month in post-petition interest on the Junior Secured Notes should serve as a far more effective impetus to settle than the appointment of a mediator.[3]

To be clear, the Ad Hoc Group stands ready, willing and able to engage in plan negotiations over any issue that affects the prompt confirmation and consummation of a plan for these Debtors.  To the extent that the Court determines to appoint a mediator, the Ad Hoc Group believes that such mediation should be narrowly defined, subject to well-articulated conditions,

---

[2] Were it not for the unresolved issue of whether Ally will settle in exchange for a third-party release, there might be little need to consider a chapter 11 plan in lieu of a liquidating chapter 7 process.  Chapter 7 trustees are capable of resolving claims (including intercompany claims), pursuing litigations and distributing assets without the weight and cost of the current administrative overhang, including overlap among the Debtors, Creditors' Committee's, and Examiner's professionals, and the disabling conflicts which could ensue.

[3] Based on current information available, and as a direct result of the success of the sale processes, the Ad Hoc Group believes that the $2.2225 billion in pre-petition claims in respect of the Junior Secured Notes are well oversecured at this time.  With post-petition interest accruing annually at 10.625%, interest for the first year of these Chapter 11 Cases will exceed $240 million; for the second year, it will approach $270 million.  Given that the Debtors are liquidating, and thus not increasing asset values through ongoing operation, the possibility that a two-year stay in bankruptcy could consume other creditors' entire recovery has already spawned bilateral discussions about interim distributions and global plan resolutions, without the assistance of a mediator or the Debtors.

and strictly limited to a period of not more than one month.  As noted, if the parties cannot settle

within a short time frame, additional time is not going to help and may only empower those who

perceive they have the most to lose in connection with the Debtors' exit from chapter 11.  In that

regard, because plan negotiations and exclusivity extensions have been, and should be, viewed in

tandem in these cases, the Ad Hoc Group objects to an extension of exclusivity beyond January

31, 2013.

## RESPONSE

The Ad Hoc Group doubts that, as a matter of law, "cause" exists to warrant an extension

of the Debtors' exclusivity in light of the lack of progress in chapter 11 plan negotiations.

Section 1121(d) of the Bankruptcy Code permits a court "for cause [to] reduce or increase the

120-day period" during which a chapter 11 debtor has the exclusive right to file and solicit a plan

of reorganization.  11 U.S.C. § 1121(d).  "Cause" is not defined in the Bankruptcy Code, and the

determination of whether it exists is in the bankruptcy court's discretion.  See In re Adelphia

Commc'ns Corp., 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006).   Among the factors considered by

courts in determining whether cause exists to extend exclusivity is whether a debtor has made

progress in negotiations with creditors of plan-related issues.  See Adelphia, 352 B.R. at 587

(listing factors including "(c) the existence of good faith progress toward reorganization" and

"(f) whether the debtor has made progress in negotiations with creditors").

This Court has already implicitly recognized that, given the current status of these chapter

11 cases, the Adelphia factor focusing on progress in plan negotiations is of central importance

to the analysis here.  Indeed, in approving the Debtors' first request for an extension of

exclusivity, the Court cautioned that any subsequent extension would hinge on whether "you're

making progress or at least making an effort to make progress."  See September 11, 2012 Hr'g

Tr. 62:15 – 24.  For this reason, the Court granted only an initial ninety (90) day extension of the

Exclusive Periods in the First Exclusivity Order, a shorter extension than that suggested by most

objectors to the First Exclusivity Motion.  Id. at 62:15 – 16.  In keeping the Chapter 11 Cases on

a "tight leash," the Court was explicit with respect to its expectations:  "[I]f the debtor wants to

maintain exclusivity…it needs to move forward with negotiations with the creditors' committee

and other important creditor constituencies."  Id. at 62:11 – 14.

Rather than move forward during the prior extension period, negotiations of a consensual

chapter 11 plan have regressed.  The prior extension of exclusivity was granted in the context of

having the Ad Hoc Group as well as the Institutional RMBS Investors tied to plan support

agreements which obligated two large creditor constituencies to support a chapter 11 plan with

non-consensual third party releases of claims against AFI.[4]  Rather than progress on the

momentum of these agreements, however, the Court has seen a proliferation of litigation that has

eroded, rather than enhanced, much of the creditor support for the Debtors' preferred plan

construct.  On September 23, 2012, the Creditors' Committee filed a motion seeking standing to

challenge certain aspects of the nature and extent of the liens and obligations owing to the Junior

Secured Noteholders.  Thereafter, in light of the inability of the Debtors to meet their distribution

and plan milestones, the consenting Junior Secured Noteholders terminated their plan support

agreement.  The plan support agreement of the settling RMBS investors has not been presented

to the Court for approval and in any event appears to have been breached.  See June 25, 2012

Hr'g Tr. 16:23 – 17:4 (Mr. Princi) (stating that Debtors have decided to refrain from seeking

---

[4] See Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11
Petitions and First Day Motions [Docket No. 6] at Ex. 8 (Ally Settlement Agreement) at Ex. 4 (Plan Term Sheet)
("The Plan will incorporate a settlement with Ally, as described in this Term Sheet and as set forth in the Ally
Settlement Agreement pursuant to which Ally will agree to contribute the value set forth in the Ally Settlement
Agreement to the Debtors' estates for, among other things, Debtor Releases and Third Party Releases…").  The
Debtors "continue to believe such a plan is in the best interests of the Debtors' estates" and filed a draft plan of
reorganization premised on these terms as an exhibit to their first motion to extend exclusivity.  First Exclusivity
Motion ¶ 6.

court approval of the Debtors' motion to assume the plan support agreements); Debtors' Motion

for Entry of an Order Under Bankruptcy Code Section 365 and Bankruptcy Rule 6006

Authorizing the Debtors to Assume Plan Support Agreement With Steering Committee

Consenting Claimants [Docket No. 318] at Ex. 3 (the "RMBS Plan Support Agreement") at

Exhibit C (Milestones) ¶ 3 (Debtors required to obtain Court approval of RMBS Plan Support

Agreement by the earlier of July 28, 2012 and the date on which the Court enters an order

approving a disclosure statement).

For months, the Debtors have insisted that the litigated approval of the RMBS

Settlement, and the granting of an allowed claim to the settling investor groups, constituted a

"first step" in these Chapter 11 Cases to be resolved before a plan was seriously considered.  See

June 25, 2012 Hr'g Tr. 19:4 – 9 (Mr. Princi) ("The PSA of course is linked to the terms of the

plan directly, but the settlement agreement is not.  That settlement agreement is a big, big, big

first step in this case…").  In pursuing litigation over the possibility of global peace, though, the

Debtors directly countermanded the stated preferences of its creditor constituencies to focus first

on plan issues.  See September 19, 2012 Hr'g Tr. 67:14 – 67:18 (Mr. Eckstein) (statement of

Counsel to the Creditors' Committee that "it would be preferable" if the RMBS Settlement were

dealt with in a plan).  Faced with the possibilty of proceeding with the RMBS Settlement without

the approval of any creditor constituency, the Debtors have adjourned consideration of the

RMBS Settlement until a hearing on March 18, 2013 and now seek to proceed with plan issues

including claims allowance and priority issues.  See Mediator Motion ¶ 4; Notice of

Adjournment of Hearing on Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of

the RMBS Settlement Agreements [Docket No. 2305].

While the Debtors' reversal of position is encouraging, their months-long emphasis on litigation diverted valuable time and resources away from critical (and inevitable) plan negotiations.  Far from the "remarkable" and "substantial" progress emphasized by the Debtors in their Exclusivity Motion, the Debtors' professionals have met with the Ad Hoc Group's professionals only twice since exclusivity was extended more than three months ago – and the first meeting was preliminary in nature and involved no meaningful discussion of substantive plan issues.  See Exclusivity Motion ¶¶ 1, 46.  As of this date, no additional meetings are scheduled.

More critically, the Debtors have not held a single meeting with the Ad Hoc Group's principals.  Instead, they have effectively barred principals from participating in plan negotiations by insisting that these principals first sign confidentiality agreements that restrict their institutions from trading for an indefinite period and lock them into these cases for their duration, regardless of their outcome.  See Exclusivity Motion n.3 ("Certain stakeholders have refused to sign confidentiality agreements"); ¶ 43.[5]  This approach is at odds with how plan negotiations occur in most other major bankruptcy cases.  Specifically with respect to these cases, it is unclear how any of the Debtors' information could, at this time, "concern strategic matters" sufficient to warrant an open-ended confidentiality agreement, given that most of the Debtors' assets are already contracted for sale and the remaining assets will be liquidated in the near term.  See Exclusivity Motion ¶ 43.  In any event, by refusing to address the obvious commercial concerns raised by insistence on an overly restrictive and open-ended confidentiality agreement -- which would perpetually restrict any counterparty principal from trading even after

---

[5] While the Debtors tout that many parties have signed their "form" confidentiality agreement, they refuse to disclose the identity of those parties.  One can only assume that few principals, rather than advisors, have signed such agreements.

the conclusion of any plan negotiation period -- the Debtors have knowingly excluded the very

people whose input will be most critical to reaching consensus.[6]  The Debtors are clearly in

possession of business information that would be helpful in negotiations, and presumably all of

that information will need to be disclosed in a publicly filed disclosure statement.  The Debtors

provide no insight as to how the disclosure of such information now could negatively affect

negotiations -- the opposite is, in practice, almost invariably true -- or why, if it will be disclosed

later, it cannot be disclosed now.  Instead, the Debtors continually conflate the request for

disclosure of material, disclosure-statement level information necessary for negotiations with a

request that the negotiations take place in public; no party has made such a request.  Negotiations

can, and perhaps should, be conducted confidentially, provided that if the latter occurs, an

appropriate order is entered to deem that failed negotiations do not constitute material non-public

information of the Debtors.[7]

Given these facts, and provided that information flow is improved, the Ad Hoc Group

firmly believes in the parties' ability, on their own, to achieve a consensual resolution of all

material plan issues, provided that there are direct negotiations between principals within a short

time-frame.  To that end, the Ad Hoc Group does not oppose an extension of the Exclusive Plan

Period until January 31, 2013, to the extent the Court is inclined to grant the Exclusivity Motion

at all.  The Ad Hoc Group requests, however, that any order entered by the Court approving the

Exclusivity Motion specify that the approval is with prejudice to further requests to extend the

---

[6] In that regard, to the extent that the Court appoints a mediator and orders mediation, any such order should make
clear to what extent and for what time period participants are required to maintain confidentiality and restrict
themselves, with appropriate cleansing processes at the end of such period.

[7] See, e.g., In re Vitro, S.A.B. de C.V., Case No. 11-33335-hdh-15 (Bankr. N. D. Tex.  Jan. 26, 2012), [Docket No.
311] (Order in Aid of Settlement Discussions) (ordering among other things that "Settlement Proposals shall not
constitute material non-public information").

Debtors' Exclusive Periods in the absence of a comprehensive consensual agreement in principle by all key constituencies prior to the expiry of the extension.

In sum, by January 31, 2013, more than 260 days will have passed since the Debtors commenced these Chapter 11 Cases. Establishing January 31, 2013 as a "hard stop" to the Debtors' Exclusive Plan Period will reinforce the Court's "tight leash" over the Debtors' efforts to lead plan negotiations and incentivize principals to attempt to build support around an executable Debtor-sponsored plan. Absent real consensus by January 31, 2013, however, it would be appropriate for the Debtors' preferred liquidating plan structure, which to date has always contained an Ally settlement and release, to give way to alternative plan structures that could potentially achieve a broad creditor consensus. To that end, the Debtors should be given one last clear, but curtailed, shot to dictate their own fate, without the overhang of a mediator or the prospect of an indeterminate stay in chapter 11.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Ad Hoc Group requests that the Court deny the Debtors' request for the appointment of a mediator and grant an exclusivity extension until January 31, 2013 and grant such other and further relief as the Court deems just.

Dated:  December 13, 2012
        New York, New York

Respectfully submitted,

By:  /s/ J. Christopher Shore
J. Christopher Shore

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
J. Christopher Shore (JS – 6031)
Harrison L. Denman (HD – 1945)

      and

MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Gerard Uzzi (GU – 2297)

Attorneys for the Ad Hoc Group of Junior
Secured Noteholders