**EXHIBIT 1**

**<u>Scoliard Declaration</u>**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Gary S. Lee
Norman Rosenbaum

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————
|   )
In re:                                               )     Case No. 12-12020 (MG)
                                                        )
RESIDENTIAL CAPITAL, LLC, et al.,      )     Chapter 11
                                                        )
                              Debtors.      )     Jointly Administered
                                                        )
-----------------------------------------------------------------

**DECLARATION OF JENNIFER SCOLIARD, IN-HOUSE
LITIGATION COUNSEL AT RESIDENTIAL CAPITAL, LLC, IN SUPPORT
OF DEBTORS' OBJECTION TO MOTION FOR CLARIFICATION REGARDING
RELIEF FROM STAY FILED BY GREGORY BALENSIEFER [DOCKET NO. 1244]**

I, Jennifer Scoliard, declare as follows:

**A.    Background and Qualifications**

1.        I serve as In-House Senior Bankruptcy Counsel in the legal department

(the "**Legal Department**") at Residential Capital, LLC ("**ResCap**"), a limited liability company

organized under the laws of the state of Delaware and the parent of the other debtors and debtors

in possession in the above-captioned Chapter 11 cases (collectively, the "**Debtors**").  I joined

ResCap in January 2008 and have been ResCap's In-House Bankruptcy counsel since September

2010.  In my role as In-House Senior Bankruptcy Counsel at ResCap, I am responsible for the

management of all non-routine bankruptcy litigation nationwide, including contested bankruptcy

matters.

1.       I am authorized to submit this declaration (the "**Declaration**") in support of the

*Debtors' Objection To Motion For Clarification Regarding Relief From Stay* (the "**Objection**"),

filed contemporaneously herewith in response to the *Motion For Clarification Regarding Relief*

*From Stay* filed by Gregory Balensiefer [Docket No. 1244].[1]

2.       In my capacity as In-House Senior Bankruptcy Counsel, I am generally

familiar with the Debtors' litigation matters, including the State Action involving Movant.

Except as otherwise indicated, all statements in this Declaration are based upon my personal

knowledge; information supplied or verified by personnel in departments within the Debtors'

various business units; my review of the Debtors' litigation case files, books and records as well

as other relevant documents; my discussions with other members of the Legal Department;

information supplied by the Debtors' consultants; or my opinion based upon experience,

expertise, and/or knowledge of the Debtors' litigation matters, financial condition and history.  In

making my statements based on my review of the Debtors' litigation case files, books and

records, relevant documents, and other information prepared or collected by the Debtors'

employees or consultants, I have relied upon these employees and consultants accurately

recording, preparing, collecting, or verifying any such documentation and other information.  If I

were called to testify as a witness in this matter, I would testify competently to the facts set forth

herein.

**B.**       **General Litigation Pending Against the Debtors**

3.       As of December 13, 2012, the Debtors by way of direct claims and

counter-claims are defendants, respondents, or are contractually obligated to defend third parties

in  1,900  pending  litigation  and  contested  foreclosure  and  bankruptcy  matters  filed  in

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Objection
(as defined below).

jurisdictions all around the country. Approximately fifty-eight percent (58%) of these matters concern either (i) defenses asserted in foreclosure, eviction, or borrower bankruptcy proceedings or (ii) title disputes, both of which are exempted from the automatic stay by the Supplemental Servicing Order; twelve percent (12%) of ResCap's pending litigation and contested foreclosure and bankruptcy matters are not subject to the stay, notwithstanding the Supplemental Servicing Order; twenty-seven (27%) are stayed and four percent (4%) are still under review for their status. Thus, approximately seventy percent (70%) of ResCap's pending litigation and contested foreclosure and bankruptcy matters are not stayed and continue to proceed in various jurisdictions across the country. This is in addition to the tens of thousands of foreclosure actions and borrower bankruptcies the Debtors are parties to in actions pending throughout the fifty states primarily managed by the Debtors' mortgage default group. Notwithstanding the application of the Supplemental Servicing Order, there are still a substantial number of cases – approximately 27% of 1,900 (or 513) cases – that are stayed by the automatic stay.

### C.     The State Court Action

4.     On December 2, 2005, Movant executed an adjustable rate note (the "**Note**") in the amount of $113,000 in favor of New Century Mortgage Corporation ("**New Century**"). <u>See</u> Adjustable Rate Note, annexed hereto as **<u>Exhibit A</u>**. Contemporaneously therewith, as security for the Note, Movant also executed a deed of trust (the "**Deed of Trust**") for the property known as 2808 West Rosewood Drive, Chandler, Arizona (the "**Property**") in favor of New Century. <u>See</u> Deed of Trust, annexed hereto as **<u>Exhibit B</u>**.

5.     The Note was endorsed in blank by New Century and the Deed of Trust was assigned to Mortgage Electronic Registration Systems, Inc., its successors and assigns. <u>See</u> Corporation Assignment of Deed of Trust, annexed hereto as **<u>Exhibit C</u>**. Homecomings was the

initial servicer of Movant's loan until April of 2007, when GMAC Mortgage took over the servicing of Movant's loan.

6.      The State Court Action that is the subject of the Motion stems from an action filed by Movant on June 16, 2009 (the "**Prior State Court Action**") against the Debtor Defendants and others to enjoin the non-judicial foreclosure sale of the Property and to seek specific performance of a loan modification offered by GMAC Mortgage in August of 2008 (the "**2008 Loan Modification**").  The crux of the Prior State Court Action was whether the 2008 Loan Modification ever became effective.

7.      On January 22, 2010, Movant, Homecomings and GMAC Mortgage reached a preliminary agreement to settle the Prior State Court Litigation and entered into a Settlement Agreement and Mutual Release in connection therewith (the "**Settlement Agreement**").  Under the Settlement Agreement, the parties agreed that they would update and enter into the 2008 Loan Modification.

8.      Eventually, after repeated attempts to finalize the loan modification failed, and as Movant remained in default under the Note, GMAC Mortgage, through its affiliate, Executive Trustee Services, recommenced the non-judicial foreclosure sale (the "**Foreclosure Sale**") on the Property, rescheduling the sale date of the Property for February 24, 2011.  See Notice of Trustee's Sale, annexed hereto as **Exhibit D**.

9.      Movant filed a complaint commencing the State Action on February 16, 2011, which was subsequently amended on February 29, 2012 (the "**Complaint**").  See Verified First Amended Complaint, annexed hereto as **Exhibit E**.  In the State Court Action, Movant alleges, *inter alia*, that the Debtor Defendants are in breach of the Settlement Agreement and asserts claims arising from the Debtor Defendants' (i) alleged breach of contract and (ii) alleged

breach of the covenant of good faith and fair dealing, and seeks declaratory relief, and preliminary and permanent injunctive relief barring the sale of Movant's home. Movant also seeks specific performance of the Settlement Agreement, damages, and compensation for attorneys' fees and costs.

10.     On March 1, 2011, an order was entered in the State Court Action granting a preliminary injunction enjoining the Debtor Defendants from proceeding with the Foreclosure Sale. <u>See</u> Preliminary Injunction, dated March 1, 2011, annexed hereto as **<u>Exhibit F</u>**.

11.     On November 15, 2012, Movant filed two proofs of claim, each in unliquidated amounts, against Homecomings (Number 4904) and GMAC Mortgage (Number 4918). <u>See</u> Proofs of Claim, annexed hereto as **<u>Exhibit G</u>** and **<u>H</u>**, respectively.

### D.     Lifting the Automatic Stay Will Interfere With the Chapter 11 Cases

12.     The Legal Department is tasked with managing litigation in which the Debtors are defendants or respondents in state and federal court, including bankruptcy courts, as well as managing litigation for third parties for which the Debtors have a contractual obligation to defend. The Legal Department plays a very active role in analyzing and strategizing on active litigation matters, working with various departments within the Debtors' various regional offices, collecting all documents and information necessary to analyze each case, including, but not limited to, the following: (i) reviewing documents and information related to discovery, (ii) reviewing all draft pleadings and discovery responses, (iii) witness preparation of deposition and trial witnesses, (iv) directing settlement negotiations, (v) coordinating discussion with internal business personnel, (vi) maintaining the Legal Staff database, (vii) coordinating with local litigation counsel and ResCap bankruptcy counsel, (viii) attending mediations and settlement conferences and (ix) preparing for trial. The Legal Department has been the primary

group tasked with assisting in the development and implementation of the Supplemental

Servicing Order.

13.     As a result of the Debtors' bankruptcy filings and the entry of the

Supplemental Servicing Order, the Legal Department's responsibilities have increased to include

(i) the review and analysis of individual claims as they arise in conjunction with internal business

personnel, local litigation counsel and ResCap bankruptcy counsel to determine the applicability

of the Supplemental Servicing Order; (ii) fielding inquiries daily from both its outside litigation

counsel and its mortgage default counsel regarding the application of the Supplemental Servicing

Order (and will continue to do so as new legal actions arise); (iii) assisting Chapter 11 counsel

with the preparation of various motions, responses to motions for relief from stay and other

Court filings, as well as various bankruptcy related tasks; (iv) assisting Chapter 11 counsel and

internal business personnel with Chapter 11 reporting requirements; (v) assisting with pending

discovery with respect to the 9019 settlement with RMBS litigation plaintiffs; (vi) assisting with

matters pertaining to the pending asset sales; (vii) complying with the Examiner's investigation;

and (viii) assisting with the claims reconciliation process.  As the Chapter 11 Cases proceed, the

Legal Department will take an active role in the plan and disclosure statement process.  These

responsibilities are ongoing and will continue and no doubt expand as these Chapter 11 Cases

progress.

14.     Given the multi-faceted role the Legal Department plays in (i) the

managing of the Debtors' litigation and contested foreclosure and bankruptcy matters;

(ii) addressing the oversight of said litigation; (iii) responding to daily inquiries from outside

litigation counsel and mortgage loan default counsel; and (iv) assisting ResCap's bankruptcy

counsel and financial advisors with several tasks associated with the pending sales of the

servicing platform, legacy assets, RMBS settlement and attendant litigation, not to mention the various motions and other filings in the Debtors' bankruptcy case, carrying out its ordinary course tasks while at the same time discharging its duties in the Chapter 11 Cases has been and will continue to be a monumental task. Permitting legal actions otherwise stayed by the Debtors' bankruptcy to proceed (not to mention allowing entirely new actions to be commenced), therefore, would create a significant burden on the Debtors by adding an additional workload of up to approximately 496 cases. This in turn would divert the Legal Department's and other critical employees' attention from the critical tasks of running the Debtors' businesses, the administration of the Chapter 11 cases and significantly increase the Debtors' out-of-pocket legal costs.

## E.    Other **Sonnax** Factors

15.    As far as I am aware, no specialized tribunal has been created to hear any of the claims involved in the State Court Action, including claims for attorneys' fees and costs.

16.    In the vast majority of the cases, including the State Court Action, the Debtors pay their legal defense fees and costs out-of-pocket. As a result, requiring the Debtors to defend the State Court Action will result in increased out-of-pocket defense costs for outside counsel fees and expenses alone.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  December 13, 2012

/s/ Jennifer Scoliard
Jennifer Scoliard
In-House Senior Bankruptcy Counsel for
Residential Capital, LLC

# Exhibit A



# ADJUSTABLE RATE NOTE

**(LIBOR Six Month Index (as Published in *The Wall Street Journal*) - Rate Caps)**
2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT.**

| December 2, 2005 | Chandler | Arizona |
|---|---|---|
| (Date) | (City) | (State) |

**2808 W Rosewood Dr, Chandler, AZ 85224**

(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **113,000.00** (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is **New Century Mortgage Corporation.**

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of **6.125%.** The interest rate I will pay will change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay interest by making a payment every month. Beginning on the Amortization Start Date, I will pay principal each month in addition to interest.

I will make my monthly payment on the first day of each month beginning on **February 1, 2006 .**

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If, on **01/01/2036** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **18400 Von Karman, Suite 1000, Irvine, CA 92612** or at a different place if required by the Note Holder.



### (B) Amount of My Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $576.78 . This amount may change.

### (C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

### (D) Withholding

If I am a non-resident alien, I understand that all payments due hereunder shall be paid without reduction for any taxes, deductions or withholding of any nature. If such tax, deduction or withholding is required by any law to be made from any payment to the Note Holder, I shall continue to pay this Note in accordance with the terms hereof, such that the Note Holder will receive such amount as it would have received had no such tax, deduction or withholding been required.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may change on the first day of **January, 2008**  and on the same day of every 6th month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date."

### (B) The Index

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Interest Rate Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

On each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Ninety-five Hundredth(s)** percentage points **(5.950%)** to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Interest Rate Change Date.

> **(i) Interest-Only Period.** The "Interest-Only Period" is the period from the date of this Note through **January 1, 2011**, called the "Amortization Start Date." During the Interest-Only Period, my monthly payments will only pay the interest I owe. During the Interest-Only Period, the Note Holder will calculate the amount of my monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the then applicable interest rate. The result of this calculation will be the amount of my monthly payment until changed.

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Note (Multistate)
RE-440 (051005)

Page 2 of 5

1005139593



**(ii) Amortization Period.** Beginning on the Amortization Date my monthly payments will include principal. Starting on the Amortization Start Date and continuing until the Maturity Date, on each Interest Rate Change Date the Note Holder will calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date at the new interest rate, assuming, for purposes of each calculation, that the interest rate did not change again. The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

### (D) Limit on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.625 %** or less than **6.125 %**. Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.125 %** or less than **6.125%**.

### (E) Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note and to pay the interest then accruing at the Note rate as of the date my prepayments are applied. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% or $5.00, whichever is greater of my overdue monthly payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amount owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor, and further waive all relief under any valuation and appraisement laws. "Presentment" means the right to

require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. GOVERNING LAW - SECURED NOTE

This Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

### CAUTION

### IT IS IMPORTANT THAT YOU THOROUGHLY READ THIS NOTE BEFORE YOU SIGN IT.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____    _____    _____
GREGORY W BALENSIEFER                - Borrower                          - Borrower

_____    _____
                                      - Borrower                          - Borrower

_____    _____
                                      - Borrower                          - Borrower

_____    _____
                                      - Borrower                          - Borrower

(Sign Original Only)

Pay to the order of without recourse

New Century Mortgage Corporation
By:_____
Steve Nagy
V.P. Records Management

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Note (Multistate)
RE-440 (051005)

1005139593

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month Index (As Published in *The Wall Street Journal*)-Rate Caps)
### 2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD

THIS ADJUSTABLE RATE RIDER is made this **2nd**          day of **December, 2005**          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to

**New Century Mortgage Corporation**
("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2808 W Rosewood Dr, Chandler, AZ  85224**
(Property Address)

### THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of          **6.125** %. The Note provides for
changes in the interest rate and monthly payments as follows:

## 4.   INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)  Change Dates

The interest rate I will pay may change on the first day of **January, 2008**          ,
and on the same day of every 6th month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date."

### (B)  The Index

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a
margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London
market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index
figure available as of the first business day of the month immediately preceding the month in which the
Interest Rate Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)          Page 1 of 3                    **1005139593**
RE-441   (051005)

(C)  Calculation of Changes

On each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Ninety-five Hundredth(s)** percentage points ( **5.950 %**) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Interest Rate Change Date.

(i)  **Interest-Only Period.**  The "Interest-only Period" is the period from the date of this Note through **January 1, 2011**, called the "Amortization Start Date."  During the Interest-only Period, my monthly payments will only pay the interest I owe.  During the Interest-only Period, the Note Holder will calculate the amount of my monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the then applicable interest rate.  The result of this calculation will be the amount of my monthly payment until changed.

(ii)  **Amortization Period.**  Beginning on the Amortization Date my monthly payments will include principal.  Starting on the Amortization Start Date and continuing until the Maturity Date, on each Interest Rate Change Date the Note Holder will calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date at the new interest rate, assuming, for purposes of each calculation, that the interest rate did not change again.  The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

(D)  Limit on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than **7.625 %** or less than **6.125 %**.  Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month.  My interest rate will never be greater than **13.125 %** or less than **6.125 %**.

(E)  Effective Date of Changes

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

(F)  Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 11.  GOVERNING LAW - SECURED NOTE

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located.  In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note.  Some of those conditions are described as follows:

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)
RE-441   (051005)

**1005139593**

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

   ·    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

   BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____    _____
GREGORY. W BALENSIEFER          -Borrower                                    -Borrower

_____    _____
                               -Borrower                                    -Borrower

_____    _____
                               -Borrower                                    -Borrower

_____    _____
                               -Borrower                                    -Borrower

*(Sign Original Only)*

# PREPAYMENT RIDER
## ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **2nd**        day of **December**        **2005**        , and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation**                                         (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

### 5.  BORROWERS RIGHT TO PREPAY

I have the right to make prepayments of principal any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.

If within **2** year(s) from the date of execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

GREGORY W BALENSIEFER

NCMC
Prepay Rider - ARM (Multistate)
RE-103    (020800)                        Page 1 of 1                                **1005139593**

# **Exhibit B**

**Camelback Title Agency, LLC**

Return To:

New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

Prepared By:

New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612

21781·014

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20051856133  12/07/2005  04:52
ELECTRONIC RECORDING

21781-20-2-1--
fontesm

1/2

————————[Space Above This Line For Recording Data]————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 2, 2005
together with all Riders to this document.
(B) "Borrower" is GREGORY W BALENSIEFER, Unmarried Man

Borrower is the trustor under this Security Instrument. Borrower's mailing address is 2808 W
Rosewood Dr , Chandler, AZ 85224
(C) "Lender" is New Century Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of California

1005139593

**ARIZONA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          Form 3003 1/ 01 (rev. 6/02)

-6(AZ) (0206)
Page 1 of 15          Initials:

VMP MORTGAGE FORMS - (800)521-7291

Lender's mailing address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

Lender is the beneficiary under this Security Instrument.

(D) "Trustee" is CAMELBACK TITLE

. Trustee's mailing address is

333 E OSBORN #100  Phoenix, AZ 85012

(E) "Note" means the promissory note signed by Borrower and dated December 2, 2005
The Note states that Borrower owes Lender ONE HUNDRED THIRTEEN THOUSAND AND 00/100
                                                                        Dollars
(U.S. $113,000.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than 01/01/2036                  .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | Prepayment Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

1005139593

Initials: _____

-6(AZ) (0206)                    Page 2 of 15                    Form 3003   1/01 ( rev. 6/02)

Escrow No.  00021781-014-GS  Gregory Balensiefer

# LEGAL DESCRIPTION

Lot 195, of Carriage Lane Unit VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded Book 198 of Maps, page 23.

lgldescr

time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or
not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals,
extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and
agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and
conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Maricopa | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**See Legal Description Attached Hereto and Made a Part Hereof**

Parcel ID Number: 302-87-082                          which currently has the address of
2808 W Rosewood Dr                                                              [Street]
Chandler                                             [City], Arizona 85224      [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all
easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and
additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this
Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has
the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances
of record. Borrower warrants and will defend generally the title to the Property against all claims and
demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform
covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real
property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.**
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any
prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

1005139593

Initials:

-6(AZ) (0206)                     Page 3 of 15                     Form 3003   1/01 ( rev. 6/02)

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

1005139593

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or
more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or
reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on
the Property insured against loss by fire, hazards included within the term "extended coverage," and any
other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.
This insurance shall be maintained in the amounts (including deductible levels) and for the periods that
Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of
the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's
right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may
require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone
determination, certification and tracking services; or (b) a one-time charge for flood zone determination
and certification services and subsequent charges each time remappings or similar changes occur which
reasonably might affect such determination or certification. Borrower shall also be responsible for the
payment of any fees imposed by the Federal Emergency Management Agency in connection with the
review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance
coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any
particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might
not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk,
hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower
acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of
insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall
become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest
at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from
Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's
right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as
mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal
certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and
renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender,
for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and
shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender
may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree
in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall
be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and
Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to
hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the
work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken
promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series
of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law
requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any
interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by
Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If
the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance
proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

1005139593

Initials:

-6(AZ) (0206)                    Page 6 of 15                    Form 3003    1/01 ( rev. 6/02)

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in
Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance
claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the
insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day
period will begin when the notice is given. In either event, or if Lender acquires the Property under
Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance
proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and
(b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by
Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the
coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or
to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal
residence within 60 days after the execution of this Security Instrument and shall continue to occupy the
Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender
otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating
circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not
destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the
Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in
order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is
determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall
promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or
condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower
shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such
purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of
progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient
to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of
such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has
reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give
Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application
process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's
knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender
(or failed to provide Lender with material information) in connection with the Loan. Material
representations include, but are not limited to, representations concerning Borrower's occupancy of the
Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If
(a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there
is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under
this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for
enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or
regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is
reasonable or appropriate to protect Lender's interest in the Property and rights under this Security
Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing
the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien
which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

-6(AZ) (0206)                    Page 7 of 15                 Initials: ____    1005139593

Form 3003    1/01 ( rev. 6/02)

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

1005139593

Initials:

-6(AZ) (0208)                        Page 8 of 15                        Form 3003    1/01 ( rev. 6/02)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

1005139593

Initials:

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

1005139593

-6(AZ) (0206)                Page 11 of 15                Initials: ___    Form 3003    1/01 ( rev. 6/02)

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicers and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

1005139593

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                         _____ (Seal)
                                                                        GREGORY W. BALENSIEFER    -Borrower

_____                         _____ (Seal)
                                                                                                     -Borrower

_____ (Seal)                  _____ (Seal)
                              -Borrower                                                -Borrower

_____ (Seal)                  _____ (Seal)
                              -Borrower                                                -Borrower

_____ (Seal)                  _____ (Seal)
                              -Borrower                                                -Borrower

1005139593

-6(AZ) (0206)                    Page 14 of 15                Form 3003    1/01 ( rev. 6/02)

**STATE OF ARIZONA,**    MARICOPA    **County ss:**

The foregoing instrument was acknowledged before me this 2 Dee. 2005

by  GREGORY W. Bralenstefee

My Commission Expires: 5/5/07

Notary Public

OFFICIAL SEAL
JOSEPH J. SCOTT
Notary Public-State of Arizona
MARICOPA COUNTY
My Commission Expires 05/05/07

Initials:

1005139593
Form 3003    1/01 ( rev. 6/02)

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month Index (As Published in *The Wall Street Journal*)-Rate Caps)
### 2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD

THIS ADJUSTABLE RATE RIDER is made this **2nd** day of **December, 2005** ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to

**New Century Mortgage Corporation**
("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2808 W Rosewood Dr, Chandler, AZ  85224**
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE
BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of          **6.125** %. The Note provides for
changes in the interest rate and monthly payments as follows:

**4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A)  Change Dates**
The interest rate I will pay may change on the first day of **January, 2008** ,
and on the same day of every 6th month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date."

**(B)  The Index**
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a
margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London
market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index
figure available as of the first business day of the month immediately preceding the month in which the
Interest Rate Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)          Page 1 of 3                          **1005139593**
RE-441   (051005)

**(C)  Calculation of Changes**

On each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Ninety-five Hundredth(s)** percentage points ( **5.950** %) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Interest Rate Change Date.

**(i) Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **January 1, 2011**, called the "Amortization Start Date." During the Interest-only Period, my monthly payments will only pay the interest I owe. During the Interest-only Period, the Note Holder will calculate the amount of my monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the then applicable interest rate. The result of this calculation will be the amount of my monthly payment until changed.

**(ii) Amortization Period.** Beginning on the Amortization Date my monthly payments will include principal. Starting on the Amortization Start Date and continuing until the Maturity Date, on each Interest Rate Change Date the Note Holder will calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date at the new interest rate, assuming, for purposes of each calculation, that the interest rate did not change again. The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

**(D)  Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.625** % or less than **6.125** %.  Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month.  My interest rate will never be greater than **13.125** % or less than **6.125** %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**11.  GOVERNING LAW - SECURED NOTE**

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located.  In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note.  Some of those conditions are described as follows:

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____        _____
GREGORY W BALENSIEFER                -Borrower                                        -Borrower

_____        _____
                                     -Borrower                                        -Borrower

_____        _____
                                     -Borrower                                        -Borrower

_____        _____
                                     -Borrower                                        -Borrower

*(Sign Original Only)*

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)
RE-441    (051005)                    Page 3 of 3                    **1005139593**

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **2nd**        day of **December**    **2005**      , and is incorporated
into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of
Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation**                                                     (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note
and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such
inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and
Lender further covenant and agree as follows:

**5. BORROWERS RIGHT TO PREPAY**

   **I have the right to make prepayments of principal any time before they are due. A payment of
principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in
writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of
principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the
due dates of my monthly payments unless: the Note Holder agrees in writing to those changes. My
partial prepayment may reduce the amount of my monthly payments after the first Change Date
following my partial prepayment.**

   **If within   2   year(s) from the date of execution of the Security Instrument, I make a full
prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any
12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I
will pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the
amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY
PERCENT (20%) of the original principal amount of the loan.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Prepayment Rider.

_____

**GREGORY W BALENSIEFER**

_____    _____

_____    _____

_____    _____

NCMC
Prepay Rider - ARM (Multistate)
RE-103    (020800)                    Page 1 of 1                    **1005139593**

# Exhibit C

Maricopa County Recorder
Helen Purcell
20060970406
07/21/2006 02:30
U32780185-01
Electronic Recording

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive
St. Paul, MN  55117
RFC Loan Number:  10360577
Seller Loan Number: 1005139593

32780085          CORPORATION ASSIGNMENT of DEED OF TRUST
FOR VALUE RECEIVED, New Century Mortgage Corporation

18400 Von Karman, Suite 1000, Irvine, CA 92612

the undersigned hereby grants, assigns and transfers to

Mortgage Electronic Registration Systems, Inc., its successors
and assigns, PO Box 2026  Flint, Michigan 48501-2026

all beneficial interest under that certain Deed of Trust dated 12/2/2005     LEGAL DESCIPTION ATTACHED SEE
executed by GREGORY W BALENSIEFER, UNMARRIED MAN     EXHIBIT "A"

TO/FOR:    CAMELBACK TITLE, TRUSTEE

and recorded in Book  on Page  as Instrument No.Xon  of official Records in the County Recorder's Office of
Maricopa County, Arizona.

 *2005T856133  Recon12/7/2005

Mortgage Amount:    $113,000.00

Property Address:    2808 W ROSEWOOD DR  CHANDLER, AZ  85224

TOGETHER with the note or notes therein described or referred to, the money due and to become due thereon
with interest, and all rights accrued or to accrue under said Deed of Trust.

New Century Mortgage Corporation

STATE OF                                               California)    BY:
COUNTY OF                                            Orange)       NAME: Alfred Vandermade
                                                                              TITLE: AVP Shipping Manager

On 7.12.06 , before me, the undersigned, a Notary Public in and for said State personally appeared Alfred
Vandermade, AVP Shipping Manager of New Century Mortgage Corporation  personally known to me to be the person
whose name is subscribed to the within instrument and acknowledged to me that s/he executed the same in his/her
authorized capacity, and that by his/her signature on the instrument the entity upon behalf of which the person acted,
executed the instrument.  WITNESS my hand and official seal.

Notary Public in and for said State
This instrument was drafted by Cassandra Harrow,
Assistant Secretary, Residential Funding
Corporation, One Meridian Crossings, Suite 100,
Minneapolis, MN 55423, (952) 979-4000.

MARISA G. CARRASCO
Comm. # 1405482
NOTARY PUBLIC - CALIFORNIA
Orange County
My Comm. Expires March 15, 2007

min# 1002696 101036005720

MERS Phone: 1-888-679-6377

# EXHIBIT "A"

Lot 195, of Carriage Lane Unit VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded Book 198 of Maps, page 23.

U32780185-01GM02
CORP ASST DOT
LOAN# 10360577
US Recordings

# Exhibit D

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20090338837  04/16/2009  02:35
ELECTRONIC RECORDING

140981214-2-2-2--
sarabiam

**SECURITY TITLE AGENCY**

When Recorded Return to:
**Executive Trustee Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

**(818) 260-1600**

7440913960 AZ-197818-C  14-81214

# NOTICE OF TRUSTEE'S SALE

The following legally described trust property will be sold, pursuant to the power of Sale under that certain Deed of Trust dated 12/2/2005 and recorded on 12/7/2005 as Instrument # **2005-1856133**, Book Page   in the office of the County Recorder of **Maricopa** County, Arizona, at public auction to the highest bidder at At the steps at the front entrance of the Superior Court Building, 201 West Jefferson, Phoenix, Arizona, on **7/21/2009** at **12:00 PM** of said day:

**Lot 195, of CARRIAGE LANE UNIT VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 198 of Maps, Page 23.**

ACCORDING TO THE DEED OF TRUST OR UPON INFORMATION SUPPLIED BY THE BENEFICIARY, THE FOLLOWING INFORMATION IS PROVIDED PURSUANT TO A.R.S. SECTION 33-808(C):

STREET ADDRESS OR IDENTIFIABLE LOCATION:     **2808 W ROSEWOOD DR**
**CHANDLER, AZ 85224**

TAX PARCEL NUMBER: **302-87-082**

ORIGINAL PRINCIPAL BALANCE:  **$113,000.00**

NAME AND ADDRESS OF ORIGINAL TRUSTOR:
(as shown on the Deed of Trust)

**Gregory W Balensiefer, unmarried man**
**2808 W Rosewood Dr**
**Chandler, AZ 85224**

NAME AND ADDRESS OF BENEFICIARY:
(as of recording of Notice of Sale)

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
1100 VIRGINIA DRIVE
FORT WASHINGTON,  PA 19034

(Page 2 of 2)

AZ-197818-C   7440913960      14-81214

NAME, ADDRESS & TELEPHONE NUMBER OF TRUSTEE:
(as of recording of Notice of Sale)

Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
**Sale Line: 714-730-2727**

DATED: **4/15/2009**

**EXECUTIVE TRUSTEE SERVICES, LLC**

By: _____

**Rosalie Solano, Limited Signing Officer**

"Executive Trustee Services, LLC is a licensed escrow agent and therefore qualified
to act as a Trustee pursuant ARS Section 33-803(A)(1). Trustee's Regulator:
Arizona State Banking Department."

State of California} ss.
County of Los Angeles }

On **4/15/2009** before me, **Dee C. Ortega** Notary Public, personally appeared **Rosalie Solano,** who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
**Dee C. Ortega**

DEE C. ORTEGA
Commission # 1672751
Notary Public - California
Los Angeles County
My Comm. Expires Jun 5, 2010

# **Exhibit E**

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Suzanne Lambries
Filing ID 1194835
2/29/2012 1:50:00 PM

1  Jonathan A. Dessaules, State Bar No. 019439
   Rachel W. Maron, State Bar No. 016080
2  Erica J. Shoaf, State Bar No. 028159
   **DESSAULES LAW GROUP**
3  2700 North Central Avenue, Suite 1250
   Phoenix, Arizona 85004
4  Tel. 602.274.5400
   Fax 602.274.5401
5  jdessaules@dessauleslaw.com
   rmaron@dessauleslaw.com
6  eshoaf@dessauleslaw.com

7  *Attorneys for Plaintiff*

8              IN THE SUPERIOR COURT OF ARIZONA

9                    COUNTY OF MARICOPA

10  GREGORY BALENSIEFER,

11          Plaintiff,                      No. CV2011-003908

12      vs.                                 **VERIFIED FIRST AMENDED
                                            COMPLAINT**
13  HOMECOMINGS FINANCIAL, LLC, an
    Iowa corporation; GMAC MORTGAGE,
14  L.L.C., f/k/a GMAC MORTGAGE
    CORPORATION, a foreign corporation;
15  EXECUTIVE TRUSTEE SERVICES, LLC,
    a California corporation; JOHN AND JANE
16  DOES I-X; ABC CORPORATIONS I-X;
    and BLACK and WHITE COMPANIES I-X,
17
18          Defendants.

19      Plaintiff Gregory Balensiefer, by and through undersigned counsel, makes the following

20  allegations for his Complaint against Defendants Homecomings Financial, LLC, and Executive

21  Trustee Services:

22                      **PARTIES AND JURISDICTION**

23      1.    Plaintiff Gregory Balensiefer ("Balensiefer") is a resident of Maricopa County,

24  Arizona.

25      2.    Upon information and belief, Defendants Homecomings Financial, LLC

26  ("Homecomings"), GMAC Mortgage, L.L.C. ("GMAC"), and Executive Trustee Services

("ETS"), are authorized to do business and doing business in Maricopa County, Arizona.  Upon information and belief, Defendants Homecomings and GMAC are related companies, if not alter egos, of one another.

3.      Defendants caused events to occur and committed actions in Maricopa County, Arizona, which are the subject of this Complaint.  The property that is the subject of this Complaint is located in Maricopa County, Arizona.

4.      Jurisdiction and venue are proper in this Court.

**GENERAL ALLEGATIONS**

5.      Balensiefer is the owner of real property located at 2808 West Rosewood Drive, Chandler, Arizona (the "Property") with the following legal description:

> Lot 195, Carriage Lane Unit VII, according to Book 198 of Maps, page 23, records of Maricopa County, Arizona.

6.      At all relevant times, a Deed of Trust dated December 2, 2005 encumbered the Property to secure a promissory note in the amount of $113,000.00.  Upon information and belief, Homecomings holds itself out as the current assignee or holder of said Deed of Trust.  A true and correct copy of said Deed of Trust is attached hereto as Exhibit 1.

7.      Defendants have not demonstrated that they are the legal assignee or holder of the Deed of Trust entitled to foreclose.

8.      In or about September 2008, Defendants offered Balensiefer an Interest Only Adjustable Rate Loan Modification Agreement (the "Loan Modification Agreement").  Said Loan Modification Agreement provided for interest only payments of $577.71 per month starting on November 1, 2008 (plus escrow charges), a principal balance of $113,184.92, and an initial interest rate of 6.125% beginning on October 1, 2008.  A true and correct copy of the Loan Modification Agreement is attached hereto as Exhibit 2.

9.      In or about September or October 2008, Balensiefer agreed to the terms of the Loan Modification Agreement, signed it in front of a notary hired by Defendants who traveled

2

to Balensiefer, and returned the Loan Modification Agreement to Defendants by giving it to Defendants' notary and agent. Balensiefer previously paid a down payment of $1,009.77 as part of the Loan Modification Agreement.

10.    After receiving the signed Loan Modification Agreement, Defendants informed Balensiefer that the monthly payment due under the Loan Modification Agreement, together with escrow charges, was $738.47 and told Plaintiff to make payments in this amount beginning in November 2008.

11.    Balensiefer started making payments of $738.47 in or about November 2008.

12.    Balensiefer had numerous telephone calls with Defendants after entering into the Loan Modification Agreement. Defendants on several occasions confirmed the existence of the Loan Modification Agreement as well as the amounts due under the Loan Modification Agreement.

13.    Balensiefer continued to make payments of $738.47 through April 2009 until he received a Notice of Trustee's Sale.

14.    Defendants engaged in false, deceptive and misleading loan practices by inducing Balensiefer as alleged herein by, among other things, to enter into the Loan Modification Agreement and Settlement Agreement.

15.    Defendant ETS is the successor trustee under said Deed of Trust by virtue of a Substitution of Trustee recorded on or about April 15, 2009.

16.    On or about April 15, 2009, Defendants recorded or caused to be recorded a Notice of Trustee's Sale. A true and correct copy of the Notice of Trustee's Sale is attached hereto as Exhibit 3.

17.    Balensiefer previously initiated litigation in Maricopa County Superior Court against Defendants Homecomings and ETS to enjoin said Trustee's Sale from taking place in an action styled, *Balensiefer v. Homecomings Financial, LLC*, CV2009-091967 ("the 2009 Lawsuit").

3

18. Attorneys Kara A. Ricupero and Kevin R. Heaphy, of the law firm of Ryley Carlock & Applewhite, represented Defendants Homecomings and GMAC in the 2009 Lawsuit.

19. On or about January 22, 2010, Defendant Homecomings and GMAC entered into a Settlement Agreement and Mutual Release with Balensiefer in order to resolve the 2009 Lawsuit (the "Settlement Agreement"). Attorney Kara Ricupero, acting in her capacity as counsel for GMAC Mortgage and Homecomings, signed the Settlement Agreement on behalf of Defendants Homecomings and GMAC Mortgage. A true and correct copy of the Settlement Agreement is attached hereto as Exhibit 4.

20. Defendants Homecomings and GMAC were collectively referred to in the Settlement Agreement as "GMAC."

21. Paragraph 2.A of the Settlement Agreement provided that:

**Loan Modification.** GMAC and Balensiefer agree to enter into a certain Loan Modification Agreement, originally dated October 2008 (the "Modification Agreement") each and every express term of which is incorporated herein by reference. A true and correct copy of the Modification Agreement is attached hereto as Exhibit "A." The Modification Agreement shall be updated and finalized within thirty (30) days from the date of this Agreement and payments Balensiefer [by] under the Modification Agreement shall begin thereafter, but in no event shall payments be demanded or made prior to March, 2010.

22. Paragraph 2.B of the Settlement Agreement provided that:

**Correction of Credit Reporting.** GMAC agrees to contact all credit agencies to which GMAC previously reported the alleged defaults on the Loan to correct such credit reporting by GMAC with regard to Balensiefer and to further inform the same of the satisfaction of the alleged defaults from 2008 until present, and that is the subject of the Lawsuit.

23. Paragraph 2.C of the Settlement Agreement provided that:

**Cancellation of Trustee's Sale.** GMAC agrees to record, or cause to be recorded, a Cancellation of Trustee's Sale, cancelling the Notice of Trustee's Sale of the Property, recorded as document number 2009-0338837 with the County Recorder, Maricopa County, Arizona within thirty (30) days of the date of this Agreement.

24. The Settlement Agreement was meant to be, and is, a binding and enforceable contract between the parties. The only term left to be completed after its execution was that the original Modification Agreement was to be "updated and finalized." Balensiefer's obligation to

4

1  make payments was not triggered until the Modification Agreement was "updated and
2  finalized."

3      25.    Balensiefer understood that the term, "updated and finalized," meant that the dates
4  in the Modification Agreement would be brought current but that the material terms of the
5  Modification Agreement would remain unchanged.  Balensiefer had executed a copy of the
6  original Modification Agreement and remains ready, willing and able to perform under the
7  terms of the original Modification Agreement.

8      26.    Defendants Homecomings and GMAC delayed for several months sending
9  Balensiefer a copy of the "updated and finalized" Modification Agreement.

10      27.    When Balensiefer finally received a copy of the "updated and finalized"
11  Modification Agreement on November 3, 2010, however, Defendants Homecomings and
12  GMAC had inexplicably increased the principal balance of the Note from $113,184.92 that was
13  set forth in the original Modification Agreement attached as Exhibit "A" to the Settlement
14  Agreement, to $130,854.21.  A copy of the proposed Loan Modification Agreement dated
15  October 1, 2010 is attached hereto as Exhibit 5.

16      28.    Defendants Homecomings and GMAC have refused to explain the $17,669.29
17  increase in the principal balance of the Note, despite the fact that they agreed to waive "all
18  interest, fees, and penalties accruing on the Loan for reason of non-payment during the period of
19  time from September 2008 to present."  Upon information and belief, the interest, fees and
20  penalties amounted to approximately $20,000.00.

21      29.    Defendants Homecomings and GMAC have failed to fulfill other material terms
22  of the Settlement Agreement.  For example, Defendants Homecomings and GMAC upon
23  information and belief have failed "to contact all credit agencies…and to further inform the
24  same of the satisfaction of the alleged defaults."  Defendants Homecomings and GMAC have
25  also failed to cancel the Trustee's Sale as compelled to do so under the terms of the Settlement
26  Agreement.

30.     Indeed, attorney Kara Ricupero has stated that Defendants "would not continue to forego its right to non-judicially foreclose on the Property under the applicable deed of trust." On January 18, 2011, Ricupero informed the Court in the 2009 Lawsuit that a trustee's sale "is scheduled for January 24, 2011 as a result of Balensiefer's ongoing nonpayment and refusal to execute the Modification."

31.     The contractual obligation to cancel the Trustee's Sale and the correction of credit reporting was not contingent upon the fulfillment of the other terms of the Settlement Agreement.  As such, Defendants Homecomings and GMAC are in breach of the Settlement Agreement by its failure to perform these material terms of the Settlement Agreement.

32.     Because the original Notice of Trustee's Sale was canceled by virtue of the Settlement Agreement between the parties, Defendants have not met the statutory prerequisites before conducting a Trustee's Sale of the Property.  Alternatively, in the event the Trustee's Sale was not canceled, Defendants upon information and belief failed to take the proper and necessary steps to continue the Trustee's Sale.

33.     The Trustee's Sale is presently scheduled for February 24, 2011.

## COUNT ONE
### (Breach of Contract)

34.     Balensiefer incorporates the foregoing allegations as though fully set forth herein.

35.     The aforementioned actions and inaction on the part of Defendants constitute a breach of contract.  Specifically, but without limitation, Defendants' failed to cancel the Trustee's Sale, failed to correct their reports to the credit agencies constituting a material breach of the Settlement Agreement, and failed to provide Balensiefer with an "updated and finalized" Modification Agreement for him to sign.

36.     Alternatively, in the event the Settlement Agreement is deemed to be invalid or unenforceable for any reason, Defendants breached the terms of the Loan Modification Agreement by declaring him in default on his loan and noticing a Trustee's Sale.

6

37.    Balensiefer is entitled to specific performance of the Settlement Agreement or, in the alternative, of the original Loan Modification Agreement.

38.    Balensiefer has been injured as a direct and proximate result of the above breaches in an amount to be proven at trial, including but not limited to damage to credit.

39.    Balensiefer is entitled to his attorneys' fees pursuant to A.R.S. § 12-341.01.

**COUNT TWO**
**(Breach of Covenant of Good Faith and Fair Dealing)**

40.    Balensiefer incorporates the foregoing allegations as though fully set forth herein.

41.    The covenant of good faith and fair dealing is an implied term of the Settlement Agreement or, in the alternative, the Loan Modification Agreement.

42.    The aforementioned actions and inaction on the part of Defendants constitute a breach of the covenant of good faith and fair dealing.

43.    Balensiefer has been injured as a direct and proximate result of the above breaches in an amount to be proven at trial.

**COUNT THREE**
**(Declaratory Judgment)**

44.    Balensiefer incorporates the foregoing allegations as though fully set forth herein.

45.    This count is brought pursuant to the Uniform Declaratory Judgment Act, A.R.S. § 12-1831, *et seq.* and Rule 57 of the Arizona Rules of Civil Procedure.

46.    An actual and justiciable controversy has arisen between Plaintiff and Defendants regarding the Trustee's Sale currently scheduled for February 24, 2011, whether that Trustee's Sale has been canceled, whether Defendants need to re-notice a new trustee's sale, and, if not, whether Defendants otherwise properly complied with Arizona law pertaining to the continuation of the Trustee's Sales.

47.    An actual and justiciable controversy further exists between Plaintiff and Defendants concerning Defendants' right to proceed with the Trustee's Sale.

7

48.     Plaintiff is entitled to a judicial determination of the parties' respective rights, status and obligations with respect to the foregoing controversy.  This controversy will continue until resolved by a court of competent jurisdiction.

49.     Plaintiff is entitled to a judicial declaration that:

a.  Defendants agreed to cancel the Trustee's Sale on or before February 21, 2010 (*i.e.*, thirty days from execution of the Settlement Agreement).

b.  The Trustee's Sale purportedly scheduled for February 24, 2011 has been canceled.

c.  Defendants did not comply with the statutory requirements for conducting a new Trustee's Sale (*i.e.*, notice, recording, posting, and publication).

d.  To the extent that the original Trustee's Sale is not canceled, Defendants have failed to properly comply with A.R.S. § 33-810(B).

e.  Alternatively, in the event the Settlement Agreement is deemed to be invalid or unenforceable for any reason, Plaintiff and Defendants entered into a valid and binding Loan Modification Agreement in November 2008.

50.     Plaintiff is entitled to recover his costs and attorneys' fees incurred herein pursuant to A.R.S. § 12-1840.

## COUNT FOUR
### (Preliminary and Permanent Injunctive Relief)

51.     Balensiefer incorporates the foregoing allegations as though fully set forth herein.

52.     Balensiefer will be irreparably damaged if Defendants are permitted to proceed with the Trustee's Sale.

53.     By reason of the foregoing, Balensiefer is entitled to the issuance of a preliminary and permanent injunction, enjoining Defendants from continuing with the Trustee's Sale or reporting negatively regarding Balensiefer to the credit agencies pending a trial on the merits.

8

54. Injunctive relief is further warranted in this case as Balensiefer has demonstrated a reasonable likelihood of success on the merits; Defendant's conduct is highly prejudicial to Balensiefer; the conduct is in violation of Balensiefer's rights and, if left unrestrained, would tend to render a final judgment in this action ineffectual; an injunction would maintain the status quo; and a balancing of the equities favors Balensiefer.

55. Balensiefer is entitled to a preliminary injunction prohibiting Defendants from proceeding with the Trustee's Sale presently scheduled for February 24, 2011.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands and prays for judgment as follows:

(A) Awarding judgment in Plaintiff's favor and against Defendant;

(B) Awarding specific performance of the Settlement Agreement;

(C) Awarding Plaintiff all of his compensatory damages, including consequential damages, incurred in the breach of the Settlement Agreement.

(D) Enjoining and restricting Defendants from proceeding with a trustee's sale in this matter pending final determination of this matter.

(E) Awarding Plaintiff the cost of suit and reasonable attorneys' fees;

(F) Awarding Plaintiff such further relief as this Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff hereby requests a jury trial on all questions raised by this Complaint.

DATED this 29th day of February 2012.

DESSAULES LAW GROUP

By:  /s/ Jonathan A. Dessaules (019439)
Jonathan A. Dessaules
Rachel W. Maron
Erica J. Shoaf
*Attorneys for Plaintiff*

9

COPY of the foregoing mailed t
this 29th of February, 2012 to:

John C. Lemaster
Kara A. Ricupero
Kevin R. Heaphy
RYLEY CARLOCK & APPLEWHITE
One North Central Avenue, Suite 1200
Phoenix, Arizona 85004
*Attorneys for Defendants*


  /s/ Hilary L. Peters

10

## VERIFICATION

1.    I am the Plaintiff in the foregoing action;

2.    I have read the foregoing First Amended Complaint and know the contents hereof;

3.    The same is true of my own personal knowledge except as to those statements made upon information and belief, and as to those, I believe them to be true; and

4.    I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 29ᵀᴴ day of February 2012.

_____
Gregory W. Balcusister

# **Exhibit F**

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Drayson Alcantar
Filing ID 810612
3/1/2011 4:20:56 PM

1  Jonathan A. Dessaules, State Bar No. 019439
   Douglas C. Wigley, State Bar No. 027223
2  Erica J. Shoaf, State Bar No. 028159
   **DESSAULES LAW GROUP**
3  2700 North Central Avenue, Suite 1250
   Phoenix, Arizona 85004
4  Tel. 602.274.5400
   Fax 602.274.5401
5  jdessaules@dessauleslaw.com
   dwigley@dessauleslaw.com
6  eshoaf@dessauleslaw.com

7  *Attorneys for Plaintiff*

8           IN THE SUPERIOR COURT OF ARIZONA

9                 COUNTY OF MARICOPA

10 GREGORY BALENSIEFER,

11          Plaintiff,                      No. CV2011-003908

12     vs.                                  **PRELIMINARY INJUNCTION**

13 HOMECOMINGS FINANCIAL, LLC, an
   Iowa corporation; GMAC MORTGAGE,
14 L.L.C., f/k/a GMAC MORTGAGE
   CORPORATION, a foreign corporation;
15 EXECUTIVE TRUSTEE SERVICES, LLC,
   a California corporation; JOHN AND JANE
16 DOES I-X; ABC CORPORATIONS I-X;
   and BLACK and WHITE COMPANIES I-X,
17
18          Defendants.

19         This matter having come before the Court on Plaintiff's Application for Preliminary

20 Injunction, and the Court having heard evidence in this matter at an evidentiary hearing that

21 took place on February 23, 2011 and good cause appearing,

22         IT IS ORDERED that Defendants Homecomings Financial, LLC, GMAC Mortgage,

23 L.L.C., and Executive Trustee Services, LLC, and their agents and employees, are hereby

24 enjoined from conducting or otherwise executing a Trustee's Sale for the real property located at

25 2808 West Rosewood Drive, Chandler, Arizona (the "Property") until the final disposition of

26

1  this matter.    Nothing in this Order shall be construed as requiring Defendants to permanently

2  cancel such sale or bar Defendants, by or through their duly authorized agents, from appearing

3  at the scheduled date and time for the trustee's sale to postpone the same by public declaration

4  pursuant to A.R.S. § 33-810(B);

5        IT IS FURTHER ORDERED that, in lieu of a bond, Plaintiff shall deposit with the Clerk

6  of the Court monthly payments in the amount of $850.00, beginning March 1, 2011 and on the

7  first business day of each month thereafter, no later than 5:00 p.m. until further order of Court.

8  Said payments shall be made by cashier's check, lawyer's trust check or cash only.

9        DONE IN OPEN COURT this ___ day of February 2011.

10

11

12                                    _____

13                                    Judge of the Superior Court

14

15

16

17

18

19

20

21

22

23

24

25

26

2

eSignature Page -- 20110228997232_Proposed_Prelim_Injunction
n.pdf

Granted

Signed on this day, March 1, 2011



/S/ Dean Fink
Judicial Officer of Superior Court

# Exhibit G

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: **Homecomings Financial, LLC, Case No. 12-12042**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
**Gregory Balensiefer**

Name and address where notices should be sent:

**% Dessaules Law Group**
**2700 North Central Avenue, Suite 1250**
**Phoenix, Arizona 85004**

Telephone number: **(602) 274-5400**    email: **dwigley@dessauleslaw.com**

Name and address where payment should be sent (if different from above):

Telephone number:    email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim
Number:** _____
(*If known*)

Filed on: _____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**1. Amount of Claim as of Date Case Filed:** $ _____    See rider

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:**    See rider
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** **Greg Balensiefer** | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|
| | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:

Value of Property: $ _____    Annual Interest Rate _____ % ☐ Fixed ☐ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $ _____    Basis for perfection: _____

Amount of Secured Claim: $ _____    Amount Unsecured: $ _____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$ _____    (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

**Amount entitled to priority:**

$ _____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature:** (See instruction #9) Check the appropriate box.

☐ I am the creditor.    ☑ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: **Douglas C. Wigley**
Title: **Attorney**
Company: **Dessaules Law Group**
Address and telephone number (if different from notice address above):

(Signature)    **11/14/12** (Date)

Telephone number:

**RECEIVED**

**NOV 15 2012**

**KURTZMAN CARSON CONSULTANTS**

**COURT USE ONLY**

Penalty for presenting fraudulent claim: Fine of up to $500,000



**dessaules**lawgroup

**Hilary L. Peters**
Direct Line: 602.274.5400 ext. 104
hpeters@dessauleslaw.com

November 14, 2012

**VIA FEDERAL EXPRESS**

ResCap Claims Processing Center
c/o KCC
2335 Alaska Ave.
El Segundo, CA 90245

Re:    Proofs of Claim

To Whom It May Concern:

Enclosed please find the following documents to be filed:

1.    Proof of Claim on behalf of Creditor Gregory Balensiefer, *In re Homecomings Financial, LLC*, **Case No., 12-12042** (U.S. Bankruptcy Court, S.D.N.Y.); and

2.    Proof of Claim on behalf of Creditor Gregory Balensiefer, *In re GMAC Mortgage, LLC*, **Case No., 12-12032** (U.S. Bankruptcy Court, S.D.N.Y.).

If you need anything further, please do not hesitate to contact our office. Thank you for your assistance.

Sincerely,

Hilary L. Peters
Legal Assistant to
Douglas C. Wigley, Esq.

## Rider to Gregory Balensiefer's Proof of Claim
### *In re Homecomings Financial, L.L.C.*
### Case No. 12-12042

- Gregory Balensiefer ("Balensiefer") entered into a settlement agreement with Debtors Homecomings Financial, L.L.C. and GMAC Mortgage, L.L.C. (collectively "Debtors"), dated January 22, 2010, which obligated both Debtors to, among other things, provide a loan modification under specified terms, correct credit reporting, cancel a trustee's sale, and waive interest, fees and penalties.

- Debtors have not fulfilled any of their obligations and have breached the settlement agreement.

- Balensiefer brought suit in the Superior Court of Maricopa County, Arizona (case no. CV2011-003908) seeking, among other things, specific performance of the settlement agreement, incidental and consequential damages relating to his credit score (currently estimated at approximately $5,000 to $10,000), injunctive relief restricting Debtors from proceeding with a trustee's sale, and an award of attorneys' fees and costs (currently estimated at approximately $60,000) that is mandated in the settlement agreement and pursuant to Arizona state law at A.R.S. §§ 12-341 and 12-341.01. These items make up Balensiefer's claim in this bankruptcy.

- A copy of the Verified First Amended Complaint in CV2011-003908 is attached here as Exhibit A.

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Suzanne Lambries
Filing ID 1194835
2/29/2012 1:50:00 PM

1 Jonathan A. Dessaules, State Bar No. 019439
Rachel W. Maron, State Bar No. 016080
2 Erica J. Shoaf, State Bar No. 028159
**DESSAULES LAW GROUP**
3 2700 North Central Avenue, Suite 1250
Phoenix, Arizona 85004
4 Tel. 602.274.5400
Fax 602.274.5401
5 jdessaules@dessauleslaw.com
rmaron@dessauleslaw.com
6 eshoaf@dessauleslaw.com

7 *Attorneys for Plaintiff*

IN THE SUPERIOR COURT OF ARIZONA

8

9 COUNTY OF MARICOPA

10 GREGORY BALENSIEFER,

11            Plaintiff,                      No. CV2011-003908

12       vs.                                 **VERIFIED FIRST AMENDED COMPLAINT**

13 HOMECOMINGS FINANCIAL, LLC, an
Iowa corporation; GMAC MORTGAGE,
14 L.L.C., f/k/a GMAC MORTGAGE
CORPORATION, a foreign corporation;
15 EXECUTIVE TRUSTEE SERVICES, LLC,
a California corporation; JOHN AND JANE
16 DOES I-X; ABC CORPORATIONS I-X;
and BLACK and WHITE COMPANIES I-X,
17
            Defendants.
18

19       Plaintiff Gregory Balensiefer, by and through undersigned counsel, makes the following

20 allegations for his Complaint against Defendants Homecomings Financial, LLC, and Executive

21 Trustee Services:

22                          **PARTIES AND JURISDICTION**

23       1.    Plaintiff Gregory Balensiefer ("Balensiefer") is a resident of Maricopa County,

24 Arizona.

25       2.    Upon information and belief, Defendants Homecomings Financial, LLC

26 ("Homecomings"), GMAC Mortgage, L.L.C. ("GMAC"), and Executive Trustee Services

*Left margin vertical text:* **DESSAULES LAW GROUP**
2700 N. Central Avenue, Suite 1250
Phoenix, AZ 85004
Tel. 602.274.5400  Fax. 602.274.5401

1  ("ETS"), are authorized to do business and doing business in Maricopa County, Arizona. Upon

2  information and belief, Defendants Homecomings and GMAC are related companies, if not alter

3  egos, of one another.

4        3.    Defendants caused events to occur and committed actions in Maricopa County,

5  Arizona, which are the subject of this Complaint. The property that is the subject of this

6  Complaint is located in Maricopa County, Arizona.

7        4.    Jurisdiction and venue are proper in this Court.

8                                **GENERAL ALLEGATIONS**

9        5.    Balensiefer is the owner of real property located at 2808 West Rosewood Drive,

10  Chandler, Arizona (the "Property") with the following legal description:

11            Lot 195, Carriage Lane Unit VII, according to Book 198 of Maps, page 23,
              records of Maricopa County, Arizona.

12

13        6.    At all relevant times, a Deed of Trust dated December 2, 2005 encumbered the

14  Property to secure a promissory note in the amount of $113,000.00. Upon information and

15  belief, Homecomings holds itself out as the current assignee or holder of said Deed of Trust. A

16  true and correct copy of said Deed of Trust is attached hereto as Exhibit 1.

17        7.    Defendants have not demonstrated that they are the legal assignee or holder of the

18  Deed of Trust entitled to foreclose.

19        8.    In or about September 2008, Defendants offered Balensiefer an Interest Only

20  Adjustable Rate Loan Modification Agreement (the "Loan Modification Agreement"). Said

21  Loan Modification Agreement provided for interest only payments of $577.71 per month

22  starting on November 1, 2008 (plus escrow charges), a principal balance of $113,184.92, and an

23  initial interest rate of 6.125% beginning on October 1, 2008. A true and correct copy of the

24  Loan Modification Agreement is attached hereto as Exhibit 2.

25        9.    In or about September or October 2008, Balensiefer agreed to the terms of the

26  Loan Modification Agreement, signed it in front of a notary hired by Defendants who traveled

2

1  to Balensiefer, and returned the Loan Modification Agreement to Defendants by giving it to

2  Defendants' notary and agent. Balensiefer previously paid a down payment of $1,009.77 as part

3  of the Loan Modification Agreement.

4      10.    After receiving the signed Loan Modification Agreement, Defendants informed

5  Balensiefer that the monthly payment due under the Loan Modification Agreement, together

6  with escrow charges, was $738.47 and told Plaintiff to make payments in this amount beginning

7  in November 2008.

8      11.    Balensiefer started making payments of $738.47 in or about November 2008.

9      12.    Balensiefer had numerous telephone calls with Defendants after entering into the

10  Loan Modification Agreement. Defendants on several occasions confirmed the existence of the

11  Loan Modification Agreement as well as the amounts due under the Loan Modification

12  Agreement.

13      13.    Balensiefer continued to make payments of $738.47 through April 2009 until he

14  received a Notice of Trustee's Sale.

15      14.    Defendants engaged in false, deceptive and misleading loan practices by inducing

16  Balensiefer as alleged herein by, among other things, to enter into the Loan Modification

17  Agreement and Settlement Agreement.

18      15.    Defendant ETS is the successor trustee under said Deed of Trust by virtue of a

19  Substitution of Trustee recorded on or about April 15, 2009.

20      16.    On or about April 15, 2009, Defendants recorded or caused to be recorded a

21  Notice of Trustee's Sale. A true and correct copy of the Notice of Trustee's Sale is attached

22  hereto as Exhibit 3.

23      17.    Balensiefer previously initiated litigation in Maricopa County Superior Court

24  against Defendants Homecomings and ETS to enjoin said Trustee's Sale from taking place in an

25  action styled, *Balensiefer v. Homecomings Financial, LLC*, CV2009-091967 ("the 2009

26  Lawsuit").

1      18.    Attorneys Kara A. Ricupero and Kevin R. Heaphy, of the law firm of Ryley

2 Carlock & Applewhite, represented Defendants Homecomings and GMAC in the 2009 Lawsuit.

3      19.    On or about January 22, 2010, Defendant Homecomings and GMAC entered into

4 a Settlement Agreement and Mutual Release with Balensiefer in order to resolve the 2009

5 Lawsuit (the "Settlement Agreement").    Attorney Kara Ricupero, acting in her capacity as

6 counsel for GMAC Mortgage and Homecomings, signed the Settlement Agreement on behalf of

7 Defendants Homecomings and GMAC Mortgage.    A true and correct copy of the Settlement

8 Agreement is attached hereto as Exhibit 4.

9      20.    Defendants Homecomings and GMAC were collectively referred to in the

10 Settlement Agreement as "GMAC."

11      21.    Paragraph 2.A of the Settlement Agreement provided that:

12      **Loan Modification.**  GMAC and Balensiefer agree to enter into a certain Loan
Modification Agreement, originally dated October 2008 (the "Modification

13      Agreement") each and every express term of which is incorporated herein by
reference.  A true and correct copy of the Modification Agreement is attached

14      hereto as Exhibit "A."    The Modification Agreement shall be updated and
finalized within thirty (30) days from the date of this Agreement and payments

15      Balensiefer [by] under the Modification Agreement shall begin thereafter, but in
no event shall payments be demanded or made prior to March, 2010.

16

17      22.    Paragraph 2.B of the Settlement Agreement provided that:

18      **Correction of Credit Reporting.**  GMAC agrees to contact all credit agencies to
which GMAC previously reported the alleged defaults on the Loan to correct such

19      credit reporting by GMAC with regard to Balensiefer and to further inform the
same of the satisfaction of the alleged defaults from 2008 until present, and that is

20      the subject of the Lawsuit.

21      23.    Paragraph 2.C of the Settlement Agreement provided that:

22      **Cancellation of Trustee's Sale.**  GMAC agrees to record, or cause to be recorded,
a Cancellation of Trustee's Sale, cancelling the Notice of Trustee's Sale of the

23      Property, recorded as document number 2009-0338837 with the County Recorder,
Maricopa County, Arizona within thirty (30) days of the date of this Agreement.

24      24.    The Settlement Agreement was meant to be, and is, a binding and enforceable

25 contract between the parties.  The only term left to be completed after its execution was that the

26 original Modification Agreement was to be "updated and finalized."  Balensiefer's obligation to

4

1 make payments was not triggered until the Modification Agreement was "updated and
2 finalized."

3     25.    Balensiefer understood that the term, "updated and finalized," meant that the dates
4 in the Modification Agreement would be brought current but that the material terms of the
5 Modification Agreement would remain unchanged. Balensiefer had executed a copy of the
6 original Modification Agreement and remains ready, willing and able to perform under the
7 terms of the original Modification Agreement.

8     26.    Defendants Homecomings and GMAC delayed for several months sending
9 Balensiefer a copy of the "updated and finalized" Modification Agreement.

10     27.    When Balensiefer finally received a copy of the "updated and finalized"
11 Modification Agreement on November 3, 2010, however, Defendants Homecomings and
12 GMAC had inexplicably increased the principal balance of the Note from $113,184.92 that was
13 set forth in the original Modification Agreement attached as Exhibit "A" to the Settlement
14 Agreement, to $130,854.21. A copy of the proposed Loan Modification Agreement dated
15 October 1, 2010 is attached hereto as Exhibit 5.

16     28.    Defendants Homecomings and GMAC have refused to explain the $17,669.29
17 increase in the principal balance of the Note, despite the fact that they agreed to waive "all
18 interest, fees, and penalties accruing on the Loan for reason of non-payment during the period of
19 time from September 2008 to present." Upon information and belief, the interest, fees and
20 penalties amounted to approximately $20,000.00.

21     29.    Defendants Homecomings and GMAC have failed to fulfill other material terms
22 of the Settlement Agreement. For example, Defendants Homecomings and GMAC upon
23 information and belief have failed "to contact all credit agencies…and to further inform the
24 same of the satisfaction of the alleged defaults." Defendants Homecomings and GMAC have
25 also failed to cancel the Trustee's Sale as compelled to do so under the terms of the Settlement
26 Agreement.

30.    Indeed, attorney Kara Ricupero has stated that Defendants "would not continue to forego its right to non-judicially foreclose on the Property under the applicable deed of trust." On January 18, 2011, Ricupero informed the Court in the 2009 Lawsuit that a trustee's sale "is scheduled for January 24, 2011 as a result of Balensiefer's ongoing nonpayment and refusal to execute the Modification."

31.    The contractual obligation to cancel the Trustee's Sale and the correction of credit reporting was not contingent upon the fulfillment of the other terms of the Settlement Agreement.  As such, Defendants Homecomings and GMAC are in breach of the Settlement Agreement by its failure to perform these material terms of the Settlement Agreement.

32.    Because the original Notice of Trustee's Sale was canceled by virtue of the Settlement Agreement between the parties, Defendants have not met the statutory prerequisites before conducting a Trustee's Sale of the Property.  Alternatively, in the event the Trustee's Sale was not canceled, Defendants upon information and belief failed to take the proper and necessary steps to continue the Trustee's Sale.

33.    The Trustee's Sale is presently scheduled for February 24, 2011.

### COUNT ONE
### (Breach of Contract)

34.    Balensiefer incorporates the foregoing allegations as though fully set forth herein.

35.    The aforementioned actions and inaction on the part of Defendants constitute a breach of contract.    Specifically, but without limitation, Defendants' failed to cancel the Trustee's Sale, failed to correct their reports to the credit agencies constituting a material breach of the Settlement Agreement, and failed to provide Balensiefer with an "updated and finalized" Modification Agreement for him to sign.

36.    Alternatively, in the event the Settlement Agreement is deemed to be invalid or unenforceable for any reason, Defendants breached the terms of the Loan Modification Agreement by declaring him in default on his loan and noticing a Trustee's Sale.

6

37.     Balensiefer is entitled to specific performance of the Settlement Agreement or, in the alternative, of the original Loan Modification Agreement.

38.     Balensiefer has been injured as a direct and proximate result of the above breaches in an amount to be proven at trial, including but not limited to damage to credit.

39.     Balensiefer is entitled to his attorneys' fees pursuant to A.R.S. § 12-341.01.

### COUNT TWO
### (Breach of Covenant of Good Faith and Fair Dealing)

40.     Balensiefer incorporates the foregoing allegations as though fully set forth herein.

41.     The covenant of good faith and fair dealing is an implied term of the Settlement Agreement or, in the alternative, the Loan Modification Agreement.

42.     The aforementioned actions and inaction on the part of Defendants constitute a breach of the covenant of good faith and fair dealing.

43.     Balensiefer has been injured as a direct and proximate result of the above breaches in an amount to be proven at trial.

### COUNT THREE
### (Declaratory Judgment)

44.     Balensiefer incorporates the foregoing allegations as though fully set forth herein.

45.     This count is brought pursuant to the Uniform Declaratory Judgment Act, A.R.S. § 12-1831, *et seq.* and Rule 57 of the Arizona Rules of Civil Procedure.

46.     An actual and justiciable controversy has arisen between Plaintiff and Defendants regarding the Trustee's Sale currently scheduled for February 24, 2011, whether that Trustee's Sale has been canceled, whether Defendants need to re-notice a new trustee's sale, and, if not, whether Defendants otherwise properly complied with Arizona law pertaining to the continuation of the Trustee's Sales.

47.     An actual and justiciable controversy further exists between Plaintiff and Defendants concerning Defendants' right to proceed with the Trustee's Sale.

48.     Plaintiff is entitled to a judicial determination of the parties' respective rights, status and obligations with respect to the foregoing controversy. This controversy will continue until resolved by a court of competent jurisdiction.

49.     Plaintiff is entitled to a judicial declaration that:

a.  Defendants agreed to cancel the Trustee's Sale on or before February 21, 2010 (*i.e.*, thirty days from execution of the Settlement Agreement).

b.  The Trustee's Sale purportedly scheduled for February 24, 2011 has been canceled.

c.  Defendants did not comply with the statutory requirements for conducting a new Trustee's Sale (*i.e.*, notice, recording, posting, and publication).

d.  To the extent that the original Trustee's Sale is not canceled, Defendants have failed to properly comply with A.R.S. § 33-810(B).

e.  Alternatively, in the event the Settlement Agreement is deemed to be invalid or unenforceable for any reason, Plaintiff and Defendants entered into a valid and binding Loan Modification Agreement in November 2008.

50.     Plaintiff is entitled to recover his costs and attorneys' fees incurred herein pursuant to A.R.S. § 12-1840.

## COUNT FOUR
### (Preliminary and Permanent Injunctive Relief)

51.     Balensiefer incorporates the foregoing allegations as though fully set forth herein.

52.     Balensiefer will be irreparably damaged if Defendants are permitted to proceed with the Trustee's Sale.

53.     By reason of the foregoing, Balensiefer is entitled to the issuance of a preliminary and permanent injunction, enjoining Defendants from continuing with the Trustee's Sale or reporting negatively regarding Balensiefer to the credit agencies pending a trial on the merits.

8

1    54.    Injunctive relief is further warranted in this case as Balensiefer has demonstrated a

2  reasonable likelihood of success on the merits; Defendant's conduct is highly prejudicial to

3  Balensiefer; the conduct is in violation of Balensiefer's rights and, if left unrestrained, would

4  tend to render a final judgment in this action ineffectual; an injunction would maintain the status

5  quo; and a balancing of the equities favors Balensiefer.

6    55.    Balensiefer is entitled to a preliminary injunction prohibiting Defendants from

7  proceeding with the Trustee's Sale presently scheduled for February 24, 2011.

8                                **PRAYER FOR RELIEF**

9        WHEREFORE, Plaintiff demands and prays for judgment as follows:

10        (A)    Awarding judgment in Plaintiff's favor and against Defendant;

11        (B)    Awarding specific performance of the Settlement Agreement;

12        (C)    Awarding Plaintiff all of his compensatory damages, including

13                consequential damages, incurred in the breach of the Settlement

14                Agreement.

15        (D)    Enjoining and restricting Defendants from proceeding with a trustee's sale

16                in this matter pending final determination of this matter.

17        (E)    Awarding Plaintiff the cost of suit and reasonable attorneys' fees;

18        (F)    Awarding Plaintiff such further relief as this Court deems just and proper.

19                                **JURY TRIAL DEMAND**

20        Plaintiff hereby requests a jury trial on all questions raised by this Complaint.

21        DATED this 29th day of February 2012.

22                                DESSAULES LAW GROUP

23

24                                By:    /s/ Jonathan A. Dessaules (019439)
                                        Jonathan A. Dessaules
25                                      Rachel W. Maron
                                        Erica J. Shoaf
26                                      *Attorneys for Plaintiff*

                                        9

1 | COPY of the foregoing mailed t
  | this 29th of February, 2012 to:

2 |

  | John C. Lemaster
3 | Kara A. Ricupero
  | Kevin R. Heaphy
4 | RYLEY CARLOCK & APPLEWHITE
  | One North Central Avenue, Suite 1200
5 | Phoenix, Arizona 85004
  | *Attorneys for Defendants*

6 |

7 |
  |    /s/ Hilary L. Peters
8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

10

## VERIFICATION

1.    I am the Plaintiff in the foregoing action;

2.    I have read the foregoing First Amended Complaint and know the contents hereof;

3.    The same is true of my own personal knowledge except as to those statements made upon information and belief, and as to those, I believe them to be true; and

4.    I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 29TH day of February, 2012.

_____
Stephen W. Baustiani

# EXHIBIT 1

**Camelback Title Agency, LLC**

Return To:

**New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612**

Prepared By:

**New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612**

*21781·014*   1/2

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20051856133  12/07/2005  04:52
ELECTRONIC RECORDING

21781-20-2-1--
fontesm

———[Space Above This Line For Recording Data]———

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **December 2, 2005**
together with all Riders to this document.
**(B) "Borrower"** is **GREGORY W BALENSIEFER, Unmarried Man**

Borrower is the trustor under this Security Instrument. Borrower's mailing address is **2808 W
Rosewood Dr , Chandler, AZ 85224**
**(C) "Lender"** is **New Century Mortgage Corporation**

Lender is a **Corporation**
organized and existing under the laws of **California**

1005139593

**ARIZONA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**        Form 3003  1/ 01 (rev. 6/02)

-6(AZ) (0206)
Page 1 of 15                    Initials:
VMP MORTGAGE FORMS - (800)521-7291

Lender's mailing address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CAMELBACK TITLE

                                                  . Trustee's mailing address is

333 E OSBORN #100   Phoenix, AZ 85012

(E) "Note" means the promissory note signed by Borrower and dated December 2, 2005
The Note states that Borrower owes Lender ONE HUNDRED THIRTEEN THOUSAND AND 00/100
                                                                        Dollars
(U.S. $113,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than 01/01/2036          .
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | Prepayment Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

                                                        1005139593
                                         Initials:
-6(AZ) (0208)              Page 2 of 15              Form 3003   1/01 ( rev. 6/02)

Escrow No.  **00021781-014-GS  Gregory Balensiefer**

# LEGAL DESCRIPTION

Lot 195, of Carriage Lane Unit VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded Book 198 of Maps, page 23.

lgldescr

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

|  County  |  of  |  Maricopa  |  :  |
|:---:|:---:|:---:|:---:|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**See Legal Description Attached Hereto and Made a Part Hereof**

Parcel ID Number: 302-87-082                                                   which currently has the address of
2808 W Rosewood Dr                                                                                          [Street]
Chandler                                                                [City], Arizona 85224        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

1005139593

Initials:

-6(AZ) (0206)                                              Page 3 of 15                                  Form 3003   1/01 ( rev. 6/02)

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

1005139593

Initials: _____

-6(AZ) (0208)                    Page 4 of 15                    Form 3003   1/01 ( rev. 6/02)

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

1005139593

Initials:

-6(AZ) (0208)                     Page 8 of 15                     Form 3003   1/01 ( rev. 6/02)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

1005139593

Initials:

-6(AZ) (0208)                    Page 9 of 15                    Form 3003   1/01 ( rev. 6/02)

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

1005139593

Initials:

-6(AZ) (0208)          Page 10 of 15          Form 3003 1/ 01 (rev. 6/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

1005139593

Initials:

Form 3003    1/01 ( rev. 6/02)

-6(AZ) (0206)    Page 11 of 15

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicers and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                          _____ (Seal)
                                                          GREGORY W. BALENSIEFER        -Borrower

_____                          _____ (Seal)
                                                                                       -Borrower

_____ (Seal)                         _____ (Seal)
                         -Borrower                                                     -Borrower

_____ (Seal)                         _____ (Seal)
                         -Borrower                                                     -Borrower

_____ (Seal)                         _____ (Seal)
                         -Borrower                                                     -Borrower

1005139593

-6(AZ) (0206)                    Page 14 of 15              Form 3003    1/01 ( rev. 6/02)

**STATE OF ARIZONA,**                    *MARICOPA*                **County ss:**

The foregoing instrument was acknowledged before me this *2 Dee. 2005*
by *GREGORY W. Balewslefee*


My Commission Expires: *5/5/07*

_____
Notary Public

OFFICIAL SEAL
JOSEPH J. SCOTT
Notary Public-State of Arizona
MARICOPA COUNTY
My Commission Expires 05/05/07

Initials: ___

1005139593
Form 3003    1/01 ( rev. 6/02)

-6(AZ) (0208)

# ADJUSTABLE RATE RIDER

## (LIBOR Six-Month Index (As Published in *The Wall Street Journal*)-Rate Caps)
## 2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD

THIS ADJUSTABLE RATE RIDER is made this **2nd**         day of **December, 2005**         ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to
**New Century Mortgage Corporation**
("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2808 W Rosewood Dr, Chandler, AZ  85224**
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE
BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of         **6.125** %. The Note provides for
changes in the interest rate and monthly payments as follows:

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)   Change Dates

The interest rate I will pay may change on the first day of **January, 2008**         ,
and on the same day of every 6th month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date."

### (B)   The Index

Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a
margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London
market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index
figure available as of the first business day of the month immediately preceding the month in which the
Interest Rate Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)        Page 1 of 3                    **1005139593**
RE-441   (051005)

**(C)  Calculation of Changes**

On each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding
**Five And Ninety-five Hundredth(s)**                      percentage points (              **5.950** %) to the
Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point
(0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until
the next Interest Rate Change Date.

   **(i)  Interest-only Period.** The "Interest-only Period" is the period from the date of this Note
   through **January 1, 2011,** called the "Amortization Start Date." During the Interest-only Period,
   my monthly payments will only pay the interest I owe. During the Interest-only Period, the Note
   Holder will calculate the amount of my monthly payment to be one-twelfth (1/12th) of one (1)
   year's interest at the then applicable interest rate. The result of this calculation will be the amount
   of my monthly payment until changed.

   **(ii)  Amortization Period.** Beginning on the Amortization Date my monthly payments will
   include principal. Starting on the Amortization Start Date and continuing until the Maturity Date,
   on each Interest Rate Change Date the Note Holder will calculate the amount of the monthly
   payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly
   payments by the Maturity Date at the new interest rate, assuming, for purposes of each
   calculation, that the interest rate did not change again. The result of this calculation will be the
   new amount of my monthly payment until the next Interest Rate Change Date.

**(D)  Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.625** % or less
than **6.125** %. Thereafter, my interest rate will never be increased or decreased on any single Interest Rate
Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been
paying for the preceding month. My interest rate will never be greater than **13.125** % or less than **6.125** %.

**(E)  Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of
my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date
until the amount of my monthly payment changes again.

**(F)  Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount
of my monthly payment at least 25 days before the effective date of any change. The notice will include
information required by law to be given to me and also the title and telephone number of a person who will
answer any questions I may have regarding the notice.

**11.  GOVERNING LAW - SECURED NOTE**

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the
Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder
under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date
as the Note protects the Note Holder from possible losses which might result if I do not keep the promises
which I make in the Note. That Security Instrument describes how and under what conditions I may be
required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions
are described as follows:

**B.    TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

| | |
|---|---|
| GREGORY W BALENSIEFER   -Borrower | -Borrower |
| -Borrower | -Borrower |
| -Borrower | -Borrower |
| -Borrower | -Borrower |

*(Sign Original Only)*

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)
RE-441    (051005)

Page 3 of 3

**1005139593**

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **2nd** day of **December** **2005** , and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation** (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

## 5.  BORROWERS RIGHT TO PREPAY

**I have the right to make prepayments of principal any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.**

**If within   2   year(s) from the date of execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of the loan.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____

GREGORY W BALENSIEFER

_____       _____

_____       _____

_____       _____

# EXHIBIT 2

Record & Return To:
Homecomings Financial, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702

————————————————[Space Above This Line For Recorder's Use]————————————————

# INTEREST ONLY ADJUSTABLE RATE LOAN MODIFICATION
# AGREEMENT

This Interest Only Adjustable Rate Loan Modification Agreement ("Agreement") made this
1st day of October, 2008, ("Effective Date") between Gregory W Balensiefer ("Borrower") and
Homecomings Financial, LLC **Lender\Servicer or Agent for Lender\Servicer ("Lender")**,
amends and supplements that certain promissory note ("Note") dated December 2, 2005, in the
original principal amount of One Hundred Thirteen Thousand   Dollars and No Cents
($113,000.00) executed by Borrower. The Note is secured by a Mortgage, Deed of Trust, or
Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, and recorded
in the real property records of Maricopa County, AZ. Said Security Instrument covers the real
and, if applicable, personal property described in such Security Instrument (the "Property")
located at 2808 W Rosewood Dr, Chandler, AZ 85224 which real property is more particularly
described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the Agent for, or the legal holder and the owner of
the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as
amended by this Agreement, the transferee shall be the Lender as defined in this Agreement.

Borrower has requested, and Lender/ has agreed to extend or rearrange the time and
manner of payment of the Note and to extend and carry forward the lien(s) on the Property
created by the Security Instrument.

Now, therefore, in consideration of the mutual promises and agreements contained
herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby
acknowledged, and intending to be legally bound, the parties hereto agree as follows
(notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the
Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirteen
Thousand One Hundred Eighty Four Dollars and Ninety Two Cents ($113,184.92). Borrower
hereby renews and extends such indebtedness and promises to pay jointly and severally to the
order of the "Lender" the Principal Balance which consists of the amount(s) loaned to Borrower
by "Lender" plus any accrued and unpaid amounts due under the Note or Security Instrument
capitalized by Lender. Borrower also agrees to pay any unpaid interest and taxes, insurance
premiums and other costs or expenses that Lender has paid to protect or enforce its interest in, or
otherwise due under, the Note and the Security Instrument.

BAL000292

2. Interest will be charged on the new unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 6.1250% beginning on October 1, 2008. The interest rate Borrower will pay will change in accordance with this Agreement. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Borrower promises to make a payment every month. This monthly payment will consist of interest only payments of $577.71 starting on November 1, 2008 and ending on January 1, 2011 (the 'Interest Only Payment Period'). Thereafter Borrower will begin making payments consisting of principal and interest for the remaining term of the loan. The date of the borrower's first payment consisting of both principal and interest shall be February 1, 2011. Borrower will make these payments every month until all of the principal and interest and any other charges that Borrower may owe under this Agreement have been repaid. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If on January 1, 2036 ("Maturity Date"), Borrower still owes any amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the unpaid principal of the loan and/or the interest rate Borrower must pay. Lender will determine the new interest rate and any change in the amount of the monthly payment in accordance with this Agreement. The interest rate Borrower will pay may change on October 1, 2013, and on that day every six months thereafter. Each date on which the interest rate could change is called a "Change Date".

5. Beginning with the next Change Date, any change in the borrower's interest rate, will be based on a change in an Index. The Index is the "Index" provided for in the Note. The most recent Index figure available as of the date provided for in the Note that is prior to the next Change Date is called the "Current Index." If the Index is no longer available, the Lender will choose a new Index, which is based upon comparable information, as provided for in the Note. Lender will give the Borrower notice of this choice.

6. Before each Change Date, Lender will calculate the new interest rate by adding Three And Twenty Five Thousandths percentage points (3.0250%) to the Current Index. Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine, as applicable, (i) the amount of the monthly interest only payment based on the unpaid principal balance and the new interest rate, if still within the Interest Only Payment Period, or (ii) the amount of the monthly principal and interest payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments, if after the Interest Only Payment Period. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to principal.

7. The interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1 %) from the rate of interest Borrower has been paying for the preceding six months. The interest rate will never be greater than 13.1250% or less than 6.1250%.

8. Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number of a person who will answer any questions Borrower may have. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the property address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date on which the payment is due, Borrower will pay a late charge to Lender in an amount calculated in accordance with the Borrower's original Note, or as otherwise provided by law. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

10. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

11. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without "Lender's" prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by "Lender" if such exercise is prohibited by applicable law. If Lender exercises this option, "Lender" shall give Borrower notice of acceleration and \or any other notices that may be required by law. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, "Lender" may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

12. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound

BAL000294

by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

13. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed/effective as of the day and year first above written.

_____
Gregory W Balensiefer

_____
(Borrower)

_____
(Borrower)

Homecomings Financial, LLC

By: _____

Title:   Limited Signing Officer

**BORROWER ACKNOWLEDGMENT**

State of Arizona

County of Maricopa

On this 1 day of October, 2008 before me, the undersigned, a Notary Public in and for said county and state, personally appeared Gregory W Balensiefer personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: 01/15/2011

V. HERRERA
Notary Public - ARIZONA
MARICOPA COUNTY
My Commission Expires
5, 2011

**LENDER ACKNOWLEDGMENT**

State of IOWA
County of BLACKHAWK

On this __ day of _____, 200__, before me, the undersigned, a Notary Public in and for said
county and state, personally appeared _____, personally known to me or
identified to my satisfaction to be the person who executed the within instrument as
_____ of Homecomings Financial, LLC, said instrument is the act and deed of
said entity, and that they, being authorized to do so, executed and delivered said instrument for
the purposes therein contained.

   Witness my hand and official seal.


                                        _____
                                        Notary Public
                                        My Commission Expires: _____

# EXHIBIT 3

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20090338837    04/16/2009    02:35
ELECTRONIC RECORDING

140981214-2-2-2--
sarabiam

**SECURITY TITLE AGENCY**

When Recorded Return to:
**Executive Trustee Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

**(818) 260-1600**

7440913960 AZ-197818-C   14-81214

# NOTICE OF TRUSTEE'S SALE

The following legally described trust property will be sold, pursuant to the power of Sale under that certain Deed of Trust dated 12/2/2005 and recorded on 12/7/2005 as Instrument # **2005-1856133**, Book Page    in the office of the County Recorder of **Maricopa** County, Arizona, at public auction to the highest bidder at At the steps at the front entrance of the Superior Court Building, 201 West Jefferson, Phoenix, Arizona, on **7/21/2009** at **12:00 PM** of said day:

**Lot 195, of CARRIAGE LANE UNIT VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 198 of Maps, Page 23.**

ACCORDING TO THE DEED OF TRUST OR UPON INFORMATION SUPPLIED BY THE BENEFICIARY, THE FOLLOWING INFORMATION IS PROVIDED PURSUANT TO A.R.S. SECTION 33-808(C):

STREET ADDRESS OR IDENTIFIABLE LOCATION:    **2808 W ROSEWOOD DR**
**CHANDLER, AZ 85224**

TAX PARCEL NUMBER: **302-87-082**

ORIGINAL PRINCIPAL BALANCE:   **$113,000.00**

NAME AND ADDRESS OF ORIGINAL TRUSTOR:
(as shown on the Deed of Trust)

**Gregory W Balensiefer, unmarried man**
**2808 W Rosewood Dr**
**Chandler, AZ 85224**

NAME AND ADDRESS OF BENEFICIARY:
(as of recording of Notice of Sale)

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
1100 VIRGINIA DRIVE
FORT WASHINGTON, PA 19034

(Page 2 of 2)


AZ-197818-C   7440913960      14-81214



NAME, ADDRESS & TELEPHONE NUMBER OF TRUSTEE:
(as of recording of Notice of Sale)

Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
**Sale Line: 714-730-2727**


DATED: **4/15/2009**


                                    **EXECUTIVE TRUSTEE SERVICES, LLC**

                        By:    _____
                                    **Rosalie Solano, Limited Signing Officer**

"Executive Trustee Services, LLC is a licensed escrow agent and therefore qualified
to act as a Trustee pursuant ARS Section 33-803(A)(1). Trustee's Regulator:
Arizona State Banking Department."

State of California} ss.
County of Los Angeles }

On **4/15/2009** before me, **Dee C. Ortega** Notary Public, personally appeared **Rosalie Solano,** who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
          **Dee C. Ortega**

DEE C. ORTEGA
Commission # 1672751
Notary Public - California
Los Angeles County
My Comm. Expires Jun 5, 2010

# EXHIBIT 4

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

### 1.   **Recitals.**

A. The Parties to this Agreement are as follows:   Plaintiff Greg Balensiefer ("Balensiefer"); and Defendants Homecomings Financial, L.L.C. ("Homecomings") and GMAC Mortgage, L.L.C. (f/k/a GMAC Mortgage Corporation) ("GMAC Mortgage") (hereinafter Defendants shall be collectively referred to as "GMAC"). Use of the terms the "Party" or "Parties" shall be understood to refer to GMAC and Balensiefer unless otherwise expressly provided.

B. Balensiefer has a loan secured by a note and deed of trust on certain real property located at 2808 W Rosewood Dr. Chandler, Arizona 85224 ("the Property") which is held by and being serviced by GMAC under Account No. 7440913960 ("Loan").

C. The intent of this Settlement Agreement and Mutual Release (hereinafter "Agreement"), is to mutually, amicably and finally resolve, compromise, and settle all issues, disputes and claims concerning Greg Balensiefer's action seeking injunctive relief barring the foreclosure and sale of the Property by Homecomings Mortgage Electronic Registration Systems, Inc., Executive Trustee Services, LLC, and GMAC Mortgage, including all losses, damages, demands, and causes of action raised and/or that could have been raised, including any and all claims arising out of or relating to, the lawsuit styled as *Greg Balensiefer v. Homecomings Financial, LLC, et al.,* No. CV2009-091967 pending in the Superior Court of the State of Arizona in and for Maricopa County (the "Lawsuit").

### 2.   **Consideration.**   In consideration for this Agreement and the mutual promises and undertakings described herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in full settlement of all claims and damages alleged in the Lawsuit, including attorneys' fees and costs, the Parties hereby agree as follows:

A. **Loan Modification.** GMAC and Balensiefer agree to enter into a certain Loan Modification Agreement, originally dated October 2008 (the "Modification Agreement") each and every express term of which is incorporated herein by reference. A true and correct copy of the Modification Agreement is attached hereto as Exhibit "A." The Modification Agreement shall be updated and finalized within thirty (30) days from the date of this Agreement and payments Balensiefer under the Modification Agreement shall begin thereafter, but in no event shall payments be demanded or made prior to March, 2010.

B. **Correction of Credit Reporting.** GMAC agrees to contact all credit agencies to which GMAC previously reported the alleged defaults on the Loan to correct such credit reporting by GMAC with regard to Balensiefer and to further inform the same of the satisfaction of the alleged defaults from 2008 until present, and that is the subject of the Lawsuit.

C. **Cancellation of Trustee's Sale.** GMAC agrees to record, or cause to be recorded, a Cancellation of Trustee's Sale, cancelling the Notice of Trustee's Sale of the Property, recorded as document number 2009-0338837 with the County Recorder, Maricopa County, Arizona within thirty (30) days of the date of this Agreement.

D. **Wavier of Interest, Fees and Penalties.** GMAC shall waive all interest, fees, and penalties accruing on the Loan for reason of nonpayment during the period of time from September 2008 to present, or the time period of the dispute over the Loan and the Lawsuit.

E. **Balensiefer's Release of Claims and Covenant Not to Sue.** In consideration of the mutual promises and undertakings contained in this Agreement, (and except for any obligations created by this Agreement), Balensiefer does hereby unconditionally and irrevocably forever release, relieve and discharge GMAC, and each of their past, present and future directors, officers (whether acting in such capacity or individually), shareholders, owners, partners, joint venturers, principals, trustees,

2

creditors, attorneys, representatives, employees, managers, parents, subsidiaries, divisions, subdivisions, departments, affiliates, predecessors, successors, assigns and assignees, or any agent acting or purporting to act for them or on their behalf, from any and all claims, demands, costs, expenses, damages, actions, causes of action, liabilities and obligations, of whatever kind or nature, both at law or in equity, whether known or unknown, contingent or fixed, arising out of or in any way relating to, or which could have been raised in the Lawsuit as defined above in Paragraph 1.C. Balensiefer specifically covenants not to sue or take any action against GMAC and each of their past, present and future directors, officers (whether acting in such capacity or individually), shareholders, owners, partners, joint venturers, principals, trustees, creditors, attorneys, representatives, employees, managers, parents, subsidiaries, divisions, subdivisions, departments, affiliates, predecessors, successors, assigns and assignees, or any agent acting or purporting to act for them or on their behalf with respect to any claims that have been asserted or that could have been asserted in the Lawsuit or that may exist as of the date of this Agreement and that have been released by this Agreement.

E.   **GMAC's Release of Claims and Covenant Not to Sue.** In consideration of the promises and undertakings contained in this Agreement, (and except for any obligations created by this Agreement), GMAC does hereby unconditionally and irrevocably forever release, relieve and discharge Balensiefer, and any of his heirs and assigns, from any and all claims, demands, costs, expenses, damages, actions, causes of action, liabilities and obligations, of whatever kind or nature, both at law or in equity, whether known or unknown, contingent or fixed, arising out of or in any way relating to, or which could have been raised in the Lawsuit as defined above in Paragraph 1.C. GMAC specifically covenants not to sue or take any action against Balensiefer, or any of his heirs and assigns, with respect to any claims that have been asserted or that could have been asserted in the Lawsuit or that may exist as of the date of this Agreement and that have been released by this Agreement.

**F.    Dismissal of Lawsuit with Prejudice.**  Balensiefer and GMAC covenant and hereby agree that no later than thirty (30) days after execution of this Agreement, GMAC shall, through counsel, circulate and execute a stipulation providing dismissal with prejudice of the Lawsuit with each party to bear his, her or its own attorneys' fees and costs ("Stipulation"), and that once approved by each Party, said Stipulation shall be filed as promptly as possible, but in no case more than fourteen (14) days after receiving approval of each of the Parties, with the State of Arizona Superior Court in and for the County of Maricopa.

**G. No Assignment of Released Claims.**  Balensiefer and GMAC hereby each represent and warrant that it is the sole and lawful owner of all right, title, and interest in and to each of the claims released herein and has not heretofore assigned or transferred, or purported to assign or transfer, to any individual, entity or organization any of the claims released herein.  Balensiefer and GMAC hereby agree to indemnify, defend, and hold harmless each other from and against any claim subsequently brought against the other that is specifically based upon or arising out of or in connection with any assignment or transfer, or purported assignment or transfer, of any of the claims released herein.

**4.    Confidentiality.**  Balensiefer and GMAC hereby acknowledge and agree that the terms of this Agreement are confidential and have not and shall not be disclosed, discussed or revealed to any other persons, entities or organizations.  Notwithstanding the foregoing, any of the Parties may reveal the terms of the Agreement to their lawyers, accountants or other professional advisors on condition that such person(s) agrees to be bound by this Confidentiality provision.  Nothing in this Agreement shall be construed to prohibit any of the Parties from revealing this Agreement to law enforcement officials or other legal or judicial authority as may be required by law.  If any of the Parties is asked

4

about the disposition of this lawsuit, that party may state only that the dispute was resolved and its terms are confidential and cannot be disclosed.  The Parties agree to instruct counsel, personal tax advisors, and others to whom disclosure is allowed under the terms hereof, that this Agreement and its terms are strictly confidential and shall not be disclosed to any other individual, organization or entity.  The Parties and any persons, organizations or entities identified by category above who are made aware of the terms of this Agreement are advised that if this Confidentiality provision is breached, the Parties retain the right to bring an action in law for any resulting damage alleged to have been caused by the breaching person, organization or entity irrespective of their participation or nonparticipation in the Lawsuit and/or in the execution of this Agreement.

   **5.**      **No Admission of Liability.**  By entering into this Agreement, GMAC does not admit to any liability or wrongdoing whatsoever to Balensiefer or with respect to any claims asserted by Balensiefer, and GMAC expressly deny any and all such liability and wrongdoing. By settling this lawsuit Balensiefer does not concede that any claim asserted in the Lawsuit lacked merit. The Parties agree that this Agreement may be used as evidence in any action to enforce the terms of this Agreement.

   **6.**      **Severability, Jurisdiction and Governing Law.**  If any of the provisions herein are determined to be invalid by a court, arbitrator, or government agency of competent and ultimate jurisdiction, the Parties agree that such determination shall not affect the enforceability of the other provisions herein and the remaining provisions of this Agreement nevertheless shall be construed, performed, and enforced as if the invalidated or unenforceable provision had not been included in the text of the Agreement. Arizona law shall govern the validity and interpretation of this Agreement without regard for Arizona's conflicts of law principles.  The Parties stipulate that jurisdiction and venue shall lie exclusively in the State of Arizona Superior Court in and for the County of Maricopa for any action involving the validity, interpretation or

enforcement of this Agreement, or for any claim for breach of this Agreement, for damages, and for other relief sought under this Agreement.

**8.**   **Plain Meaning.**   This Agreement shall be interpreted in accordance with the plain meaning of its terms and not for or against any of the Parties hereto. No inference shall be asserted or drawn by anyone based on the Party that may have drafted any language or part of this Agreement.

**9.**   **Scope of Agreement and Acknowledgment.**   This Agreement constitutes the entire understanding of the Parties on the subjects covered and supersedes any and all prior oral or written agreements, representations, discussions or negotiations between the Parties with respect to the subject matter. Balensiefer understands and agrees that he: has carefully read and fully understands all the provisions of this Agreement and the Modification Agreement; knowingly and voluntarily agrees to all of the terms set forth in this Agreement and the Modification Agreement of his own free will and free from any duress or coercion; knowingly and voluntarily intends to be legally bound by the same; was advised and hereby is advised in writing to consider the terms of this Agreement and the Modification Agreement and that he can and may wish to consult with a licensed attorney of his choosing prior to executing the same.

**10.**   **Warranty.**   Each person signing below represents and warrants that he/she has the full power and authority to enter into this Agreement and, if executing this Agreement in a representative capacity, warrants that he/she has been duly authorized to do so by all appropriate actions.

**11.**   **Good Faith Settlement.**   This Agreement reflects a good faith resolution of all claims reached after arm's-length negotiations and without coercion and not in reliance upon any representation or promise not contained in this Agreement.

6

12.     **Attorneys' Fees and Costs.**  Each Party agrees to bear its own attorneys'
fees, expenses, and costs incurred in connection with the negotiation and preparation of
this Agreement.  However, in the event that litigation is instituted to enforce or interpret
any provision of or right pursuant to this Agreement, the prevailing Party in that litigation
shall be entitled to an award of all taxable and non-taxable costs, actual attorneys' fees,
and others expenses (through trial and appeal) against the unsuccessful Party.

13.     **Counterpart Execution.**  This Agreement may be executed in one or
more counterparts, all of which taken together shall constitute one agreement.  Signature
pages may be detached from the counterparts and attached to a single copy of this
Agreement to physically form one legally effective document.  Signatures submitted by
facsimile or telecopy transmission shall be considered effective in all respects as original
signatures and fully binding on the Parties.

14.     **Successors and Assigns.**  The provisions of this Agreement shall be
binding upon and inure to the benefit of each of the Parties hereto, and to their respective
successors in interest and assigns.

15.     **Headings.**  The headings of this Agreement are inserted solely for
convenience of the Parties for reference and are not intended to govern, limit or define
the meaning of any provision of this Agreement.

Dated: _1 · 22 · 2010_

Greg Balensiefer, a single man.

**PLAINTIFF**

Dated: _Jan 22, 2010_

By _Kara Ricupero_

**GMAC MORTGAGE, L.L.C., (F/K/A
GMAC MORTGAGE CORPORATION;
HOMECOMINGS FINANCIAL, L.L.C.**

# EXHIBIT "A"

Record & Return To:
Homecomings Financial, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702

————————————————[Space Above This Line For Recorder's Use]————————————————

# INTEREST ONLY ADJUSTABLE RATE LOAN MODIFICATION AGREEMENT

This Interest Only Adjustable Rate Loan Modification Agreement ("Agreement") made this 1st day of October, 2008, ("Effective Date") between Gregory W Balensiefer ("Borrower") and Homecomings Financial, LLC Lender\Servicer or Agent for Lender\Servicer ("Lender"), amends and supplements that certain promissory note ("Note") dated December 2, 2005, in the original principal amount of One Hundred Thirteen Thousand  Dollars and No Cents ($113,000.00) executed by Borrower.  The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, and recorded in the real property records of Maricopa County, AZ.  Said Security Instrument covers the real and, if applicable, personal property described in such Security Instrument (the "Property") located at 2808 W Rosewood Dr, Chandler, AZ 85224 which real property is more particularly described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the Agent for, or the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the Lender as defined in this Agreement.

Borrower has requested, and Lender/ has agreed to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property created by the Security Instrument.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirteen Thousand One Hundred Eighty Four Dollars and Ninety Two Cents ($113,184.92). Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of the "Lender" the Principal Balance which consists of the amount(s) loaned to Borrower by "Lender" plus any accrued and unpaid amounts due under the Note or Security Instrument capitalized by Lender. Borrower also agrees to pay any unpaid interest and taxes, insurance premiums and other costs or expenses that Lender has paid to protect or enforce its interest in, or otherwise due under, the Note and the Security Instrument:

2. Interest will be charged on the new unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 6.1250% beginning on October 1, 2008. The interest rate Borrower will pay will change in accordance with this Agreement. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Borrower promises to make a payment every month. This monthly payment will consist of interest only payments of $577.71 starting on November 1, 2008 and ending on January 1, 2011 (the 'Interest Only Payment Period'). Thereafter Borrower will begin making payments consisting of principal and interest for the remaining term of the loan. The date of the borrower's first payment consisting of both principal and interest shall be February 1, 2011. Borrower will make these payments every month until all of the principal and interest and any other charges that Borrower may owe under this Agreement have been repaid. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If on January 1, 2036 ("Maturity Date"), Borrower still owes any amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the unpaid principal of the loan and/or the interest rate Borrower must pay. Lender will determine the new interest rate and any change in the amount of the monthly payment in accordance with this Agreement. The interest rate Borrower will pay may change on October 1, 2013, and on that day every six months thereafter. Each date on which the interest rate could change is called a "Change Date".

5. Beginning with the next Change Date, any change in the borrower's interest rate, will be based on a change in an Index. The Index is the "Index" provided for in the Note. The most recent Index figure available as of the date provided for in the Note that is prior to the next Change Date is called the "Current Index." If the Index is no longer available, the Lender will choose a new Index, which is based upon comparable information, as provided for in the Note. Lender will give the Borrower notice of this choice.

6. Before each Change Date, Lender will calculate the new interest rate by adding Three And Twenty Five Thousandths percentage points (3.0250%) to the Current Index. Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine, as applicable, (i) the amount of the monthly interest only payment based on the unpaid principal balance and the new interest rate, if still within the Interest Only Payment Period, or (ii) the amount of the monthly principal and interest payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments, if after the Interest Only Payment Period. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to principal.

7. The interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1 %) from the rate of interest Borrower has been paying for the preceding six months. The interest rate will never be greater than 13.1250% or less than 6.1250%.

8. Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number of a person who will answer any questions Borrower may have. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the property address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date on which the payment is due, Borrower will pay a late charge to Lender in an amount calculated in accordance with the Borrower's original Note, or as otherwise provided by law. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

10. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

11. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without "Lender's" prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by "Lender" if such exercise is prohibited by applicable law. If Lender exercises this option, "Lender" shall give Borrower notice of acceleration and \or any other notices that may be required by law. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, "Lender" may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

12. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound

by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

13. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed/effective as of the day and year first above written.

_____        _____
Gregory W Balonsiefer                              (Borrower)

                                                              _____
                                                              (Borrower)

Homecomings Financial, LLC

By: _____

Title:   Limited Signing Officer

**BORROWER ACKNOWLEDGMENT**

State of Arizona
County of Maricopa

On this 14 day of October 2008 before me, the undersigned, a Notary Public in and for said county and state, personally appeared Gregory W Balonsiefer personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

                                                              _____
                                                              Notary Public
                                                              My Commission Expires: 01/15/2011

V. HERRERA
Notary Public · ARIZONA
MARICOPA COUNTY
My Commission Expires
5, 2011

**LENDER ACKNOWLEDGMENT**

State of IOWA
County of BLACKHAWK

On this __ day of _____, 200__, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of Homecomings Financial, LLC, said instrument is the act and deed of said entity, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public
My Commission Expires: _____

# EXHIBIT 5

Record & Return To:
GMAC Mortgage, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702
Custodian ID: W1
Investor Number: 10360577

──────────────────── *[Space Above This Line For Recorder's Use]* ────────────────────

# INTEREST ONLY FIXED RATE
# LOAN MODIFICATION AGREEMENT

      This Interest Only Fixed Rate Loan Modification Agreement ("Agreement") made this October 1, 2010 ("Effective Date") between GREGORY W BALENSIEFER ("Borrower") and GMAC Mortgage, LLC ("Lender"), the agent for Lender/Servicer, Mortgage Electronic Registration Systems, Inc. (Mortgagee) amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated December 2, 2005 and granted or assigned to Mortgage Electronic Registration Systems, Inc. as mortgagee of record (solely as nominee for Lender and Lender's successors and assigns), P. O. Box 2026, Flint, Michigan 48501-2026, (888)-679-MERS and if applicable, recorded on  with Instrument Number  in Book  and/or Page Number  of the real property records of MARICOPA County, AZ and (2) that certain promissory note ("Note") dated December 2, 2005 in the original principal sum of  One Hundred Thirteen Thousand  Dollars and No Cents ($  113,000.00) executed by Borrower.    Said Security Instrument covers the real and personal property described in such Security Instrument (the "Property") located at 2808 W ROSEWOOD DR    CHANDLER AZ 85224, which real property is more particularly described as follows:

### (Legal Description – Attach as Exhibit if Recording Agreement)

      Borrower acknowledges that Lender is the Agent for, or the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the Lender as defined in this Agreement.

      Borrower has requested, and Lender/ has agreed to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property created by the Security Instrument.

      Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirty Thousand Eight Hundred Fifty Four Dollars and Twenty One Cents ($ 130,854.21)Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of the "Lender" the Principal Balance which consists of the amount(s) loaned to Borrower by "Lender" plus any accrued and unpaid amounts due under the Note or Security Instrument capitalized by Lender. Borrower also agrees to pay any unpaid interest and taxes, insurance premiums and other costs or expenses that Lender has paid to protect or enforce its interest in, or otherwise due under, the Note and the Security Instrument.

2. Interest will be charged on the new unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 5.87500% beginning on October 1, 2010. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Borrower promises to make a payment every month. This monthly payment will consist of interest only payments of $ 640.64 starting on November 1, 2010 and ending on January 1, 2011 (the 'Interest Only Payment Period'). Thereafter Borrower will begin making payments consisting of principal and interest for the remaining term of the loan. The date of the borrower's first payment consisting of both principal and interest shall be February 1, 2011. Borrower will make these payments every month until all of the principal and interest and any other charges that Borrower may owe under this Agreement have been repaid. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If on January 1, 2036 ("Maturity Date"), Borrower still owes any amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the amount collected into escrow for the payment of taxes and/or insurance, as applicable. Change will be determined based on a period analysis of the account. The monthly payments will be applied first to the payment of interest due and then to principal.

5. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date on which the payment is due, Borrower will pay a late charge to Lender in an amount calculated in accordance with the Borrower's original Note, or as otherwise provided by law. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

6. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by

Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

7. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without "Lender's" prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by "Lender" if such exercise is prohibited by applicable law. If Lender exercises this option, "Lender" shall give Borrower notice of acceleration and \or any other notices that may be required by law. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, "Lender" may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

8. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

9. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed effective as of the day and year first above written.


_____     _____        _____
Date            GREGORY W BALENSIEFER

                                                    _____


_____     _____        _____
Date

                                                    _____


_____     _____        _____
Date

                                                    _____


_____     _____        _____
Date

                                                    _____


GMAC Mortgage, LLC

By: _____
    Limited Signing Officer

Date: _____

**LENDER ACKNOWLEDGMENT**

# **<u>Exhibit H</u>**

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |

**Name of Debtor and Case Number:** GMAC Mortgage, LLC, Case No. 12-12032

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Claim #4918    Date Filed: 11/15/2012

**Name of Creditor** (the person or other entity to whom the debtor owes money or property):
**Gregory Balensiefer**

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:** _____
(If known)

Filed on: _____

**Name and address where notices should be sent:**
% Dessaules Law Group
2700 North Central Avenue, Suite 1250
Phoenix, Arizona 85004

Telephone number: **(602) 274-5400**    email: **dwigley@dessauleslaw.com**

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

**Name and address where payment should be sent (if different from above):**

Telephone number:    email:

**1. Amount of Claim as of Date Case Filed: $** ___ See rider
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** See rider
(See instruction #2)

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.**

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** Greg Balensiefer (See instruction #3a) | **3b. Uniform Claim Identifier (optional):** (See instruction #3b) |

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
**Nature of property or right of setoff:** ☐Real Estate ☐Motor Vehicle ☐Other
Describe:
**Value of Property: $** _____    **Annual Interest Rate** _____ % ☐Fixed ☐Variable
(when case was filed)
**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
**if any: $** _____    **Basis for perfection:** _____

**Amount of Secured Claim: $** _____    **Amount Unsecured: $** _____

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
**$** _____ (See instruction #6)

**Amount entitled to priority:**

**$** _____

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

*\* Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.    ☑ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)    ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)    ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name: Douglas C. Wigley
Title: Attorney
Company: Dessaules Law Group
Address and telephone number (if different from notice address above):

(Signature) _Doug C. Wigley_    (Date) 11/14/12

**RECEIVED**
NOV 1 5 2012
KURTZMAN CARSON CONSULTANTS

Telephone number:    Email:

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprison*

COURT USE ONLY

121203212111500000000041



**dessauleslawgroup**

**Hilary L. Peters**
Direct Line: 602.274.5400 ext. 104
hpeters@dessauleslaw.com

November 14, 2012

**VIA FEDERAL EXPRESS**

ResCap Claims Processing Center
c/o KCC
2335 Alaska Ave.
El Segundo, CA 90245

Re:    Proofs of Claim

To Whom It May Concern:

Enclosed please find the following documents to be filed:

1.    Proof of Claim on behalf of Creditor Gregory Balensiefer, *In re Homecomings Financial, LLC,* **Case No., 12-12042** (U.S. Bankruptcy Court, S.D.N.Y.); and

2.    Proof of Claim on behalf of Creditor Gregory Balensiefer, *In re GMAC Mortgage, LLC,* **Case No., 12-12032** (U.S. Bankruptcy Court, S.D.N.Y.).

If you need anything further, please do not hesitate to contact our office. Thank you for your assistance.

Sincerely,

Hilary L. Peters
Legal Assistant to
Douglas C. Wigley, Esq.

**Rider to Gregory Balensiefer's Proof of Claim**
*In re GMAC Mortgage, L.L.C.*
**Case No. 12-12032**

- Gregory Balensiefer ("Balensiefer") entered into a settlement agreement with Debtors Homecomings Financial, L.L.C. and GMAC Mortgage, L.L.C. (collectively "Debtors"), dated January 22, 2010, which obligated both Debtors to, among other things, provide a loan modification under specified terms, correct credit reporting, cancel a trustee's sale, and waive interest, fees and penalties.

- Debtors have not fulfilled any of their obligations and have breached the settlement agreement.

- Balensiefer brought suit in the Superior Court of Maricopa County, Arizona (case no. CV2011-003908) seeking, among other things, specific performance of the settlement agreement, incidental and consequential damages relating to his credit score (currently estimated at approximately $5,000 to $10,000), injunctive relief restricting Debtors from proceeding with a trustee's sale, and an award of attorneys' fees and costs (currently estimated at approximately $60,000) that is mandated in the settlement agreement and pursuant to Arizona state law at A.R.S. §§ 12-341 and 12-341.01. These items make up Balensiefer's claim in this bankruptcy.

- A copy of the Verified First Amended Complaint in CV2011-003908 is attached here as Exhibit A.

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
Suzanne Lambries
Filing ID 1194835
2/29/2012 1:50:00 PM

1  Jonathan A. Dessaules, State Bar No. 019439
Rachel W. Maron, State Bar No. 016080
2  Erica J. Shoaf, State Bar No. 028159
**DESSAULES LAW GROUP**
3  2700 North Central Avenue, Suite 1250
Phoenix, Arizona 85004
4  Tel. 602.274.5400
Fax 602.274.5401
5  jdessaules@dessauleslaw.com
rmaron@dessauleslaw.com
6  eshoaf@dessauleslaw.com

7  *Attorneys for Plaintiff*

8              IN THE SUPERIOR COURT OF ARIZONA

9                  COUNTY OF MARICOPA

10 GREGORY BALENSIEFER,

11          Plaintiff,                    No. CV2011-003908

12     vs.                               **VERIFIED FIRST AMENDED
                                         COMPLAINT**
13 HOMECOMINGS FINANCIAL, LLC, an
Iowa corporation; GMAC MORTGAGE,
14 L.L.C., f/k/a GMAC MORTGAGE
CORPORATION, a foreign corporation;
15 EXECUTIVE TRUSTEE SERVICES, LLC,
a California corporation; JOHN AND JANE
16 DOES I-X; ABC CORPORATIONS I-X;
and BLACK and WHITE COMPANIES I-X,

17

18         Defendants.

19         Plaintiff Gregory Balensiefer, by and through undersigned counsel, makes the following

20 allegations for his Complaint against Defendants Homecomings Financial, LLC, and Executive

21 Trustee Services:

22                        **PARTIES AND JURISDICTION**

23     1.      Plaintiff Gregory Balensiefer ("Balensiefer") is a resident of Maricopa County,

24 Arizona.

25     2.      Upon information and belief, Defendants Homecomings Financial, LLC

26 ("Homecomings"), GMAC Mortgage, L.L.C. ("GMAC"), and Executive Trustee Services

1  ("ETS"), are authorized to do business and doing business in Maricopa County, Arizona.  Upon

2  information and belief, Defendants Homecomings and GMAC are related companies, if not alter

3  egos, of one another.

4    3.    Defendants caused events to occur and committed actions in Maricopa County,

5  Arizona, which are the subject of this Complaint.   The property that is the subject of this

6  Complaint is located in Maricopa County, Arizona.

7    4.    Jurisdiction and venue are proper in this Court.

8                              **GENERAL ALLEGATIONS**

9    5.    Balensiefer is the owner of real property located at 2808 West Rosewood Drive,

10  Chandler, Arizona (the "Property") with the following legal description:

11        Lot 195, Carriage Lane Unit VII, according to Book 198 of Maps, page 23,
          records of Maricopa County, Arizona.
12

13    6.    At all relevant times, a Deed of Trust dated December 2, 2005 encumbered the

14  Property to secure a promissory note in the amount of $113,000.00.  Upon information and

15  belief, Homecomings holds itself out as the current assignee or holder of said Deed of Trust.  A

16  true and correct copy of said Deed of Trust is attached hereto as Exhibit 1.

17    7.    Defendants have not demonstrated that they are the legal assignee or holder of the

18  Deed of Trust entitled to foreclose.

19    8.    In or about September 2008, Defendants offered Balensiefer an Interest Only

20  Adjustable Rate Loan Modification Agreement (the "Loan Modification Agreement").   Said

21  Loan Modification Agreement provided for interest only payments of $577.71 per month

22  starting on November 1, 2008 (plus escrow charges), a principal balance of $113,184.92, and an

23  initial interest rate of 6.125% beginning on October 1, 2008.  A true and correct copy of the

24  Loan Modification Agreement is attached hereto as Exhibit 2.

25    9.    In or about September or October 2008, Balensiefer agreed to the terms of the

26  Loan Modification Agreement, signed it in front of a notary hired by Defendants who traveled

                                        2

1  to Balensiefer, and returned the Loan Modification Agreement to Defendants by giving it to

2  Defendants' notary and agent. Balensiefer previously paid a down payment of $1,009.77 as part

3  of the Loan Modification Agreement.

4    10.   After receiving the signed Loan Modification Agreement, Defendants informed

5  Balensiefer that the monthly payment due under the Loan Modification Agreement, together

6  with escrow charges, was $738.47 and told Plaintiff to make payments in this amount beginning

7  in November 2008.

8    11.   Balensiefer started making payments of $738.47 in or about November 2008.

9    12.   Balensiefer had numerous telephone calls with Defendants after entering into the

10  Loan Modification Agreement. Defendants on several occasions confirmed the existence of the

11  Loan Modification Agreement as well as the amounts due under the Loan Modification

12  Agreement.

13    13.   Balensiefer continued to make payments of $738.47 through April 2009 until he

14  received a Notice of Trustee's Sale.

15    14.   Defendants engaged in false, deceptive and misleading loan practices by inducing

16  Balensiefer as alleged herein by, among other things, to enter into the Loan Modification

17  Agreement and Settlement Agreement.

18    15.   Defendant ETS is the successor trustee under said Deed of Trust by virtue of a

19  Substitution of Trustee recorded on or about April 15, 2009.

20    16.   On or about April 15, 2009, Defendants recorded or caused to be recorded a

21  Notice of Trustee's Sale. A true and correct copy of the Notice of Trustee's Sale is attached

22  hereto as Exhibit 3.

23    17.   Balensiefer previously initiated litigation in Maricopa County Superior Court

24  against Defendants Homecomings and ETS to enjoin said Trustee's Sale from taking place in an

25  action styled, *Balensiefer v. Homecomings Financial, LLC*, CV2009-091967 ("the 2009

26  Lawsuit").

3

1    18.    Attorneys Kara A. Ricupero and Kevin R. Heaphy, of the law firm of Ryley

2    Carlock & Applewhite, represented Defendants Homecomings and GMAC in the 2009 Lawsuit.

3    19.    On or about January 22, 2010, Defendant Homecomings and GMAC entered into

4    a Settlement Agreement and Mutual Release with Balensiefer in order to resolve the 2009

5    Lawsuit (the "Settlement Agreement").    Attorney Kara Ricupero, acting in her capacity as

6    counsel for GMAC Mortgage and Homecomings, signed the Settlement Agreement on behalf of

7    Defendants Homecomings and GMAC Mortgage.    A true and correct copy of the Settlement

8    Agreement is attached hereto as Exhibit 4.

9    20.    Defendants Homecomings and GMAC were collectively referred to in the

10    Settlement Agreement as "GMAC."

11    21.    Paragraph 2.A of the Settlement Agreement provided that:

12    **Loan Modification.**  GMAC and Balensiefer agree to enter into a certain Loan
Modification Agreement, originally dated October 2008 (the "Modification
13    Agreement") each and every express term of which is incorporated herein by
reference.  A true and correct copy of the Modification Agreement is attached
14    hereto as Exhibit "A."    The Modification Agreement shall be updated and
finalized within thirty (30) days from the date of this Agreement and payments
15    Balensiefer [by] under the Modification Agreement shall begin thereafter, but in
no event shall payments be demanded or made prior to March, 2010.
16
17    22.    Paragraph 2.B of the Settlement Agreement provided that:

18    **Correction of Credit Reporting.**  GMAC agrees to contact all credit agencies to
which GMAC previously reported the alleged defaults on the Loan to correct such
19    credit reporting by GMAC with regard to Balensiefer and to further inform the
same of the satisfaction of the alleged defaults from 2008 until present, and that is
20    the subject of the Lawsuit.

21    23.    Paragraph 2.C of the Settlement Agreement provided that:

22    **Cancellation of Trustee's Sale.**  GMAC agrees to record, or cause to be recorded,
a Cancellation of Trustee's Sale, cancelling the Notice of Trustee's Sale of the
23    Property, recorded as document number 2009-0338837 with the County Recorder,
Maricopa County, Arizona within thirty (30) days of the date of this Agreement.

24    24.    The Settlement Agreement was meant to be, and is, a binding and enforceable

25    contract between the parties.  The only term left to be completed after its execution was that the

26    original Modification Agreement was to be "updated and finalized." Balensiefer's obligation to

4

1 make payments was not triggered until the Modification Agreement was "updated and
2 finalized."

3        25.    Balensiefer understood that the term, "updated and finalized," meant that the dates
4 in the Modification Agreement would be brought current but that the material terms of the
5 Modification Agreement would remain unchanged.  Balensiefer had executed a copy of the
6 original Modification Agreement and remains ready, willing and able to perform under the
7 terms of the original Modification Agreement.

8        26.    Defendants Homecomings and GMAC delayed for several months sending
9 Balensiefer a copy of the "updated and finalized" Modification Agreement.

10        27.    When Balensiefer finally received a copy of the "updated and finalized"
11 Modification Agreement on November 3, 2010, however, Defendants Homecomings and
12 GMAC had inexplicably increased the principal balance of the Note from $113,184.92 that was
13 set forth in the original Modification Agreement attached as Exhibit "A" to the Settlement
14 Agreement, to $130,854.21.  A copy of the proposed Loan Modification Agreement dated
15 October 1, 2010 is attached hereto as Exhibit 5.

16        28.    Defendants Homecomings and GMAC have refused to explain the $17,669.29
17 increase in the principal balance of the Note, despite the fact that they agreed to waive "all
18 interest, fees, and penalties accruing on the Loan for reason of non-payment during the period of
19 time from September 2008 to present."  Upon information and belief, the interest, fees and
20 penalties amounted to approximately $20,000.00.

21        29.    Defendants Homecomings and GMAC have failed to fulfill other material terms
22 of the Settlement Agreement.  For example, Defendants Homecomings and GMAC upon
23 information and belief have failed "to contact all credit agencies…and to further inform the
24 same of the satisfaction of the alleged defaults."  Defendants Homecomings and GMAC have
25 also failed to cancel the Trustee's Sale as compelled to do so under the terms of the Settlement
26 Agreement.

1    30.    Indeed, attorney Kara Ricupero has stated that Defendants "would not continue to
2  forego its right to non-judicially foreclose on the Property under the applicable deed of trust."
3  On January 18, 2011, Ricupero informed the Court in the 2009 Lawsuit that a trustee's sale "is
4  scheduled for January 24, 2011 as a result of Balensiefer's ongoing nonpayment and refusal to
5  execute the Modification."

6    31.    The contractual obligation to cancel the Trustee's Sale and the correction of credit
7  reporting was not contingent upon the fulfillment of the other terms of the Settlement
8  Agreement.  As such, Defendants Homecomings and GMAC are in breach of the Settlement
9  Agreement by its failure to perform these material terms of the Settlement Agreement.

10    32.    Because the original Notice of Trustee's Sale was canceled by virtue of the
11  Settlement Agreement between the parties, Defendants have not met the statutory prerequisites
12  before conducting a Trustee's Sale of the Property.  Alternatively, in the event the Trustee's
13  Sale was not canceled, Defendants upon information and belief failed to take the proper and
14  necessary steps to continue the Trustee's Sale.

15    33.    The Trustee's Sale is presently scheduled for February 24, 2011.

16                                         COUNT ONE
                                      (Breach of Contract)
17

18    34.    Balensiefer incorporates the foregoing allegations as though fully set forth herein.

      35.    The aforementioned actions and inaction on the part of Defendants constitute a
19
  breach of contract.    Specifically, but without limitation, Defendants' failed to cancel the
20
  Trustee's Sale, failed to correct their reports to the credit agencies constituting a material breach
21
  of the Settlement Agreement, and failed to provide Balensiefer with an "updated and finalized"
22
  Modification Agreement for him to sign.
23
      36.    Alternatively, in the event the Settlement Agreement is deemed to be invalid or
24
  unenforceable for any reason, Defendants breached the terms of the Loan Modification
25
  Agreement by declaring him in default on his loan and noticing a Trustee's Sale.
26

                                              6

37.  Balensiefer is entitled to specific performance of the Settlement Agreement or, in the alternative, of the original Loan Modification Agreement.

38.  Balensiefer has been injured as a direct and proximate result of the above breaches in an amount to be proven at trial, including but not limited to damage to credit.

39.  Balensiefer is entitled to his attorneys' fees pursuant to A.R.S. § 12-341.01.

## COUNT TWO
### (Breach of Covenant of Good Faith and Fair Dealing)

40.  Balensiefer incorporates the foregoing allegations as though fully set forth herein.

41.  The covenant of good faith and fair dealing is an implied term of the Settlement Agreement or, in the alternative, the Loan Modification Agreement.

42.  The aforementioned actions and inaction on the part of Defendants constitute a breach of the covenant of good faith and fair dealing.

43.  Balensiefer has been injured as a direct and proximate result of the above breaches in an amount to be proven at trial.

## COUNT THREE
### (Declaratory Judgment)

44.  Balensiefer incorporates the foregoing allegations as though fully set forth herein.

45.  This count is brought pursuant to the Uniform Declaratory Judgment Act, A.R.S. § 12-1831, *et seq.* and Rule 57 of the Arizona Rules of Civil Procedure.

46.  An actual and justiciable controversy has arisen between Plaintiff and Defendants regarding the Trustee's Sale currently scheduled for February 24, 2011, whether that Trustee's Sale has been canceled, whether Defendants need to re-notice a new trustee's sale, and, if not, whether Defendants otherwise properly complied with Arizona law pertaining to the continuation of the Trustee's Sales.

47.  An actual and justiciable controversy further exists between Plaintiff and Defendants concerning Defendants' right to proceed with the Trustee's Sale.

7

48. Plaintiff is entitled to a judicial determination of the parties' respective rights, status and obligations with respect to the foregoing controversy. This controversy will continue until resolved by a court of competent jurisdiction.

49. Plaintiff is entitled to a judicial declaration that:

    a. Defendants agreed to cancel the Trustee's Sale on or before February 21, 2010 (*i.e.*, thirty days from execution of the Settlement Agreement).

    b. The Trustee's Sale purportedly scheduled for February 24, 2011 has been canceled.

    c. Defendants did not comply with the statutory requirements for conducting a new Trustee's Sale (*i.e.*, notice, recording, posting, and publication).

    d. To the extent that the original Trustee's Sale is not canceled, Defendants have failed to properly comply with A.R.S. § 33-810(B).

    e. Alternatively, in the event the Settlement Agreement is deemed to be invalid or unenforceable for any reason, Plaintiff and Defendants entered into a valid and binding Loan Modification Agreement in November 2008.

50. Plaintiff is entitled to recover his costs and attorneys' fees incurred herein pursuant to A.R.S. § 12-1840.

## COUNT FOUR
### (Preliminary and Permanent Injunctive Relief)

51. Balensiefer incorporates the foregoing allegations as though fully set forth herein.

52. Balensiefer will be irreparably damaged if Defendants are permitted to proceed with the Trustee's Sale.

53. By reason of the foregoing, Balensiefer is entitled to the issuance of a preliminary and permanent injunction, enjoining Defendants from continuing with the Trustee's Sale or reporting negatively regarding Balensiefer to the credit agencies pending a trial on the merits.

8

1    54.    Injunctive relief is further warranted in this case as Balensiefer has demonstrated a
2    reasonable likelihood of success on the merits; Defendant's conduct is highly prejudicial to
3    Balensiefer; the conduct is in violation of Balensiefer's rights and, if left unrestrained, would
4    tend to render a final judgment in this action ineffectual; an injunction would maintain the status
5    quo; and a balancing of the equities favors Balensiefer.

6    55.    Balensiefer is entitled to a preliminary injunction prohibiting Defendants from
7    proceeding with the Trustee's Sale presently scheduled for February 24, 2011.

8                                    **PRAYER FOR RELIEF**

9        WHEREFORE, Plaintiff demands and prays for judgment as follows:

10            (A)    Awarding judgment in Plaintiff's favor and against Defendant;

11            (B)    Awarding specific performance of the Settlement Agreement;

12            (C)    Awarding Plaintiff all of his compensatory damages, including
13                    consequential damages, incurred in the breach of the Settlement
14                    Agreement.

15            (D)    Enjoining and restricting Defendants from proceeding with a trustee's sale
16                    in this matter pending final determination of this matter.

17            (E)    Awarding Plaintiff the cost of suit and reasonable attorneys' fees;

18            (F)    Awarding Plaintiff such further relief as this Court deems just and proper.

19                                    **JURY TRIAL DEMAND**

20        Plaintiff hereby requests a jury trial on all questions raised by this Complaint.

21        DATED this 29th day of February 2012.

22                                    DESSAULES LAW GROUP

23

24                            By:    /s/ Jonathan A. Dessaules (019439)
                                    Jonathan A. Dessaules
25                                    Rachel W. Maron
                                    Erica J. Shoaf
26                                    *Attorneys for Plaintiff*

                                          9

1  COPY of the foregoing mailed t
   this 29ᵗʰ of February, 2012 to:

2

3  John C. Lemaster
   Kara A. Ricupero
   Kevin R. Heaphy
4  RYLEY CARLOCK & APPLEWHITE
   One North Central Avenue, Suite 1200
5  Phoenix, Arizona 85004
   *Attorneys for Defendants*

6

7
    /s/ Hilary L. Peters
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

10

## VERIFICATION

1.    I am the Plaintiff in the foregoing action,

2.    I have read the foregoing First Amended Complaint and know the contents thereof,

3.    The same is true of my own personal knowledge except as to those statements made upon information and belief, and as to those I believe them to be true; and

4.    I declare under penalty of perjury that the foregoing is true and correct

EXECUTED on this 29TH day of February 2012

_____
MITCHELL W. BARGERINI

# EXHIBIT 1

**Camelback Title Agency, LLC**

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20051856133  12/07/2005  04:52
ELECTRONIC RECORDING

Return To:

**New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612**

21781-20-2-1--
fontesm

Prepared By:

**New Century Mortgage
Corporation
18400 Von Karman, Ste 1000
Irvine, CA 92612**

$21781 \cdot 014$    $1/2$

————————————[Space Above This Line For Recording Data]————————————

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated **December 2, 2005**          ,
together with all Riders to this document.
**(B) "Borrower"** is **GREGORY W BALENSIEFER, Unmarried Man**

Borrower is the trustor under this Security Instrument. Borrower's mailing address is **2808 W
Rosewood Dr , Chandler, AZ 85224**
**(C) "Lender"** is **New Century Mortgage Corporation**

Lender is a **Corporation**
organized and existing under the laws of **California**

1005139593

**ARIZONA**-Single Family-**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**          **Form 3003 1/ 01 (rev. 6/02)**

**-6(AZ)** (0206)

Page 1 of 15          Initials:

VMP MORTGAGE FORMS - (800)521-7291

Lender's mailing address is 18400 Von Karman, Suite 1000, Irvine, CA 92612

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is CAMELBACK TITLE

. Trustee's mailing address is

333 E OSBORN #100   Phoenix, AZ 85012

(E) "Note" means the promissory note signed by Borrower and dated December 2, 2005
The Note states that Borrower owes Lender ONE HUNDRED THIRTEEN THOUSAND AND 00/100

Dollars

(U.S. $113,000.00      ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than 01/01/2036

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [x] Other(s) [specify] |
| | | Prepayment Rider |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to

1005139593

Initials: _____

-6(AZ) (0208)                    Page 2 of 15                    Form 3003   1/01 ( rev. 6/02)

Escrow No. **00021781-014-GS  Gregory Balensiefer**

## LEGAL DESCRIPTION

Lot 195, of Carriage Lane Unit VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded Book 198 of Maps, page 23.

lgldescr

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| County | of | Maricopa | : |
|---|---|---|---|
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**See Legal Description Attached Hereto and Made a Part Hereof**

Parcel ID Number: 302-87-082                    which currently has the address of
2808 W Rosewood Dr                                                          [Street]
Chandler                                          [City], Arizona 85224        [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

1005139593

-6(AZ) (0208)                     Page 3 of 16        Initials: _____        Form 3003   1/01 ( rev. 6/02)

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

1005139593

Initials:

-6(AZ) (0208)                           Page 6 of 15                           Form 3003    1/01 ( rev. 6/02)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

1005139593

Initials:

-6(AZ) (0206)                    Page 10 of 15                    Form 3003  1/ 01 (rev. 6/02)

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

1005139593

Initials:

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicers and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Substitute Trustee.** Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**25. Time of Essence.** Time is of the essence in each covenant of this Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this
Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____                    _____(Seal)
                                                                                   GREGORY W. BALENSIEFER              -Borrower


_____                    _____(Seal)
                                                                                                                              -Borrower


_____(Seal)                     _____(Seal)
                                        -Borrower                                                            -Borrower


_____(Seal)                     _____(Seal)
                                        -Borrower                                                            -Borrower


_____(Seal)                     _____(Seal)
                                        -Borrower                                                            -Borrower


1005139593

VMP-6(AZ) (0208)                          Page 14 of 15                    Form 3003    1/01 ( rev. 6/02)

**STATE OF ARIZONA,**     *MARICOPA*     **County ss:**

The foregoing instrument was acknowledged before me this 2 Dee. 2005

by *GREGORY W. Bralewstefce*

My Commission Expires: 5/8/07

_____
Notary Public



OFFICIAL SEAL
JOSEPH J. SCOTT
Notary Public-State of Arizona
MARICOPA COUNTY
My Commission Expires 05/08/07

Initials: ___

1005139593
Form 3003    1/01 ( rev. 6/02)

# ADJUSTABLE RATE RIDER

### (LIBOR Six-Month Index (As Published in *The Wall Street Journal*)-Rate Caps)
### 2 YEAR RATE LOCK, 5 YEAR INTEREST ONLY PERIOD

THIS ADJUSTABLE RATE RIDER is made this **2nd**          day of **December, 2005**          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure
Borrower's Adjustable Rate Note (the "Note") to

**New Century Mortgage Corporation**
("Lender") of the same date and covering the property described in the Security Instrument and located at:

**2808 W Rosewood Dr, Chandler, AZ 85224**
(Property Address)

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST
RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE MAXIMUM RATE
BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

## A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial interest rate of          **6.125** %. The Note provides for
changes in the interest rate and monthly payments as follows:

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A)  Change Dates
The interest rate I will pay may change on the first day of **January, 2008**          ,
and on the same day of every 6th month thereafter. Each date on which my interest rate could change is
called an "Interest Rate Change Date."

### (B)  The Index
Beginning with the first Interest Rate Change Date, my interest rate will be based on an Index plus a
margin. The "Index" is the average of interbank offered rates for six-month dollar deposits in the London
market ("LIBOR"), as published in *The Wall Street Journal* "Money Rates" Table. The most recent Index
figure available as of the first business day of the month immediately preceding the month in which the
Interest Rate Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon
comparable information. The Note Holder will give me notice of this choice.

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)          **Page 1 of 3**          **1005139593**
RE-441   (051005)

**(C)   Calculation of Changes**

On each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Five And Ninety-five Hundredth(s)** percentage points ( **5.950** %) to the Current Index. The Note Holder will then round this figure to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this amount will be my new interest rate until the next Interest Rate Change Date.

> **(i)   Interest-Only Period.** The "Interest-only Period" is the period from the date of this Note through **January 1, 2011,** called the "Amortization Start Date." During the Interest-only Period, my monthly payments will only pay the interest I owe. During the Interest-only Period, the Note Holder will calculate the amount of my monthly payment to be one-twelfth (1/12th) of one (1) year's interest at the then applicable interest rate. The result of this calculation will be the amount of my monthly payment until changed.

> **(ii)   Amortization Period.** Beginning on the Amortization Date my monthly payments will include principal. Starting on the Amortization Start Date and continuing until the Maturity Date, on each Interest Rate Change Date the Note Holder will calculate the amount of the monthly payment that would be sufficient to fully repay the remaining unpaid principal in equal monthly payments by the Maturity Date at the new interest rate, assuming, for purposes of each calculation, that the interest rate did not change again. The result of this calculation will be the new amount of my monthly payment until the next Interest Rate Change Date.

**(D)   Limit on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **7.625** % or less than **6.125** %. Thereafter, my interest rate will never be increased or decreased on any single Interest Rate Change Date by more than one and one half percentage points (1.5%) from the rate of interest I have been paying for the preceding month. My interest rate will never be greater than **13.125** % or less than **6.125** %.

**(E)   Effective Date of Changes**

My new interest rate will become effective on each Interest Rate Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Interest Rate Change Date until the amount of my monthly payment changes again.

**(F)   Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment at least 25 days before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

## 11.   GOVERNING LAW - SECURED NOTE

The Note is governed by federal law and the law of the jurisdiction in which the property encumbered by the Security Instrument (as defined below) is located. In addition to the protections given to the Note Holder under the Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note protects the Note Holder from possible losses which might result if I do not keep the promises which I make in the Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under the Note. Some of those conditions are described as follows:

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)
RE-441   (051005)

Page 2 of 3

**1005139593**

**B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER.**
Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____          _____
GREGORY W BALENSIEFER          -Borrower                                              -Borrower

_____          _____
                                            -Borrower                                              -Borrower

_____          _____
                                            -Borrower                                              -Borrower

_____          _____
                                            -Borrower                                              -Borrower

*(Sign Original Only)*

NCMC
Fixed/ ARM Six Month LIBOR
Interest Only Rider (Multistate)             Page 3 of 3                          **1005139593**
RE-441   (051005)

# PREPAYMENT RIDER
# ADJUSTABLE RATE LOAN

This Prepayment Rider is made this **2nd** day of **December 2005**, and is incorporated into and shall be deemed to amend and supplement the Promissory Note (the "Note") and Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure repayment of Borrower's Note to

**New Century Mortgage Corporation** (the "Lender").

To the extent that the provisions of this Prepayment Rider are inconsistent with the provisions of the Note and/or Security Instrument, the provisions of this rider shall prevail over and shall supersede any such inconsistent provisions of the Note and/or Security Instrument.

In addition to the covenants and agreements made in the Note and Security Instrument, the Borrower and Lender further covenant and agree as follows:

**5. BORROWERS RIGHT TO PREPAY**

I have the right to make prepayments of principal any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless: the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.

If within **2** year(s) from the date of execution of the Security Instrument, I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of 6 months advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY PERCENT (20%) of the original principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

GREGORY W BALENSIEFER

NCMC
Prepay Rider - ARM (Multistate)
RE-103   (020800)                    Page 1 of 1

**1005139593**

# EXHIBIT 2

Record & Return To:
Homecomings Financial, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702


————————————————[Space Above This Line For Recorder's Use]———— — — — —

# INTEREST ONLY ADJUSTABLE RATE LOAN MODIFICATION AGREEMENT

This Interest Only Adjustable Rate Loan Modification Agreement ("Agreement") made this 1st day of October, 2008, ("Effective Date") between Gregory W Balensiefer ("Borrower") and Homecomings Financial, LLC **Lender\Servicer or Agent for Lender\Servicer ("Lender")**, amends and supplements that certain promissory note ("Note") dated December 2, 2005, in the original principal amount of One Hundred Thirteen Thousand   Dollars and No Cents ($113,000.00) executed by Borrower.  The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, and recorded in the real property records of Maricopa County, AZ. Said Security Instrument covers the real and, if applicable, personal property described in such Security Instrument (the "Property") located at 2808 W Rosewood Dr, Chandler, AZ 85224 which real property is more particularly described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the Agent for, or the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the Lender as defined in this Agreement.

Borrower has requested, and Lender/ has agreed to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property created by the Security Instrument.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirteen Thousand One Hundred Eighty Four Dollars and Ninety Two Cents ($113,184.92). Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of the "Lender" the Principal Balance which consists of the amount(s) loaned to Borrower by "Lender" plus any accrued and unpaid amounts due under the Note or Security Instrument capitalized by Lender. Borrower also agrees to pay any unpaid interest and taxes, insurance premiums and other costs or expenses that Lender has paid to protect or enforce its interest in, or otherwise due under, the Note and the Security Instrument.

BAL000292

2. Interest will be charged on the new unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 6.1250% beginning on October 1, 2008. The interest rate Borrower will pay will change in accordance with this Agreement. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Borrower promises to make a payment every month. This monthly payment will consist of interest only payments of $577.71 starting on November 1, 2008 and ending on January 1, 2011 (the 'Interest Only Payment Period'). Thereafter Borrower will begin making payments consisting of principal and interest for the remaining term of the loan. The date of the borrower's first payment consisting of both principal and interest shall be February 1, 2011. Borrower will make these payments every month until all of the principal and interest and any other charges that Borrower may owe under this Agreement have been repaid. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If on January 1, 2036 ("Maturity Date"), Borrower still owes any amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the unpaid principal of the loan and/or the interest rate Borrower must pay. Lender will determine the new interest rate and any change in the amount of the monthly payment in accordance with this Agreement. The interest rate Borrower will pay may change on October 1, 2013, and on that day every six months thereafter. Each date on which the interest rate could change is called a "Change Date".

5. Beginning with the next Change Date, any change in the borrower's interest rate, will be based on a change in an Index. The Index is the "Index" provided for in the Note. The most recent Index figure available as of the date provided for in the Note that is prior to the next Change Date is called the "Current Index." If the Index is no longer available, the Lender will choose a new Index, which is based upon comparable information, as provided for in the Note. Lender will give the Borrower notice of this choice.

6. Before each Change Date, Lender will calculate the new interest rate by adding Three And Twenty Five Thousandths percentage points (3.0250%) to the Current Index. Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine, as applicable, (i) the amount of the monthly interest only payment based on the unpaid principal balance and the new interest rate, if still within the Interest Only Payment Period, or (ii) the amount of the monthly principal and interest payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments, if after the Interest Only Payment Period. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to principal.

7. The interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1 %) from the rate of interest Borrower has been paying for the preceding six months. The interest rate will never be greater than 13.1250% or less than 6.1250%.

BAL000293

8. Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number of a person who will answer any questions Borrower may have. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the property address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date on which the payment is due, Borrower will pay a late charge to Lender in an amount calculated in accordance with the Borrower's original Note, or as otherwise provided by law. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

10. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

11. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without "Lender's" prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by "Lender" if such exercise is prohibited by applicable law. If Lender exercises this option, "Lender" shall give Borrower notice of acceleration and \or any other notices that may be required by law. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, "Lender" may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

12. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound

BAL000294

by, and comply with, all of the terms and provisions thereof, as amended by this Agreement,
including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes,
insurance premiums or escrow items, as applicable. Any default by Borrower in the performance
of its obligations herein contained shall constitute a default under the Note and Security
Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security
Instrument.

13. Lender does not, by its execution of this Agreement, waive any rights it may have
against any person not a party hereto. This Agreement may be executed in multiple counterparts,
each of which shall constitute an original instrument, but all of which shall constitute one and the
same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE
THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE
OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE
REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED
HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS
AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE
PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed/effective as of the day and year first above written.

_____        _____
Gregory W Balensiefer                                        (Borrower)

_____        _____
                                                                           (Borrower)

Homecomings Financial, LLC

By: _____

Title: __Limited Signing Officer_____

**BORROWER ACKNOWLEDGMENT**

State of _____

County of _____

On this __ day of _____, 200_ before me, the undersigned, a Notary Public in and for said
county and state, personally appeared _____ personally known to me or
identified to my satisfaction to be the person(s) who executed the within instrument, and they
duly acknowledged that said instrument is their act and deed, and that they, being authorized to
do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public
My Commission Expires: 01/15/2011

V. HERRERA
Notary Public - ARIZONA
MARICOPA COUNTY
My Commission Expires
Jan. 15, 2011

BAL000295

**LENDER ACKNOWLEDGMENT**

State of IOWA
County of BLACKHAWK

On this __ day of _____, 200__, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of Homecomings Financial, LLC, said instrument is the act and deed of said entity, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

    Witness my hand and official seal.

                                                      _____
                                                      Notary Public
                                                      My Commission Expires: __  _____

BAL000296

# EXHIBIT 3

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20090338837  04/16/2009  02:35
ELECTRONIC RECORDING

140981214-2-2-2--
sarabiam

**SECURITY TITLE AGENCY**

When Recorded Return to:
**Executive Trustee Services, LLC**
**2255 North Ontario Street, Suite 400**
**Burbank, California 91504-3120**

**(818) 260-1600**

---

**7440913960 AZ-197818-C  14-81214**

# NOTICE OF TRUSTEE'S SALE

The following legally described trust property will be sold, pursuant to the power of Sale under that certain Deed of Trust dated 12/2/2005 and recorded on 12/7/2005 as Instrument # **2005-1856133**, Book Page   in the office of the County Recorder of **Maricopa** County, Arizona, at public auction to the highest bidder at At the steps at the front entrance of the Superior Court Building, 201 West Jefferson, Phoenix, Arizona, on **7/21/2009** at **12:00 PM** of said day:

**Lot 195, of CARRIAGE LANE UNIT VII, according to the plat of record in the office of the County Recorder of Maricopa County, Arizona, recorded in Book 198 of Maps, Page 23.**

ACCORDING TO THE DEED OF TRUST OR UPON INFORMATION SUPPLIED BY THE BENEFICIARY, THE FOLLOWING INFORMATION IS PROVIDED PURSUANT TO A.R.S. SECTION 33-808(C):

STREET ADDRESS OR IDENTIFIABLE LOCATION:     **2808 W ROSEWOOD DR**
                                              **CHANDLER, AZ 85224**

TAX PARCEL NUMBER: **302-87-082**

ORIGINAL PRINCIPAL BALANCE:  **$113,000.00**

NAME AND ADDRESS OF ORIGINAL TRUSTOR:
(as shown on the Deed of Trust)

**Gregory W Balensiefer, unmarried man**
**2808 W Rosewood Dr**
**Chandler, AZ 85224**

NAME AND ADDRESS OF BENEFICIARY:
(as of recording of Notice of Sale)

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
1100 VIRGINIA DRIVE
FORT WASHINGTON,  PA 19034

(Page 2 of 2)

AZ-197818-C  7440913960    14-81214

NAME, ADDRESS & TELEPHONE NUMBER OF TRUSTEE:
(as of recording of Notice of Sale)

Executive Trustee Services, LLC
2255 North Ontario Street, Suite 400
Burbank, California 91504-3120
**Sale Line: 714-730-2727**

DATED: **4/15/2009**

**EXECUTIVE TRUSTEE SERVICES, LLC**

By: _____

**Rosalie Solano, Limited Signing Officer**

"Executive Trustee Services, LLC is a licensed escrow agent and therefore qualified
to act as a Trustee pursuant ARS Section 33-803(A)(1). Trustee's Regulator:
Arizona State Banking Department."

State of California} ss.
County of Los Angeles }

On **4/15/2009** before me, **Dee C. Ortega** Notary Public, personally appeared **Rosalie Solano,** who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under penalty of perjury under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
**Dee C. Ortega**

DEE C. ORTEGA
Commission # 1672751
Notary Public - California
Los Angeles County
My Comm. Expires Jun 5, 2010

# EXHIBIT 4

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

1.    **Recitals.**

A. The Parties to this Agreement are as follows:    Plaintiff Greg Balensiefer ("Balensiefer"); and Defendants Homecomings Financial, L.L.C. ("Homecomings") and GMAC Mortgage, L.L.C. (f/k/a GMAC Mortgage Corporation) ("GMAC Mortgage") (hereinafter Defendants shall be collectively referred to as "GMAC"). Use of the terms the "Party" or "Parties" shall be understood to refer to GMAC and Balensiefer unless otherwise expressly provided.

B. Balensiefer has a loan secured by a note and deed of trust on certain real property located at 2808 W Rosewood Dr. Chandler, Arizona 85224 ("the Property") which is held by and being serviced by GMAC under Account No. 7440913960 ("Loan").

C. The intent of this Settlement Agreement and Mutual Release (hereinafter "Agreement"), is to mutually, amicably and finally resolve, compromise, and settle all issues, disputes and claims concerning Greg Balensiefer's action seeking injunctive relief barring the foreclosure and sale of the Property by Homecomings Mortgage Electronic Registration Systems, Inc., Executive Trustee Services, LLC, and GMAC Mortgage, including all losses, damages, demands, and causes of action raised and/or that could have been raised, including any and all claims arising out of or relating to, the lawsuit styled as *Greg Balensiefer v. Homecomings Financial, LLC, et al.,* No. CV2009-091967 pending in the Superior Court of the State of Arizona in and for Maricopa County (the "Lawsuit").

2.    **Consideration.**    In consideration for this Agreement and the mutual promises and undertakings described herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in full settlement of all claims and damages alleged in the Lawsuit, including attorneys' fees and costs, the Parties hereby agree as follows:

A.  **Loan Modification.**  GMAC and Balensiefer agree to enter into a certain Loan Modification Agreement, originally dated October 2008 (the "Modification Agreement") each and every express term of which is incorporated herein by reference. A true and correct copy of the Modification Agreement is attached hereto as Exhibit "A." The Modification Agreement shall be updated and finalized within thirty (30) days from the date of this Agreement and payments Balensiefer under the Modification Agreement shall begin thereafter, but in no event shall payments be demanded or made prior to March, 2010.

B.  **Correction of Credit Reporting.**  GMAC agrees to contact all credit agencies to which GMAC previously reported the alleged defaults on the Loan to correct such credit reporting by GMAC with regard to Balensiefer and to further inform the same of the satisfaction of the alleged defaults from 2008 until present, and that is the subject of the Lawsuit.

C.  **Cancellation of Trustee's Sale.**  GMAC agrees to record, or cause to be recorded, a Cancellation of Trustee's Sale, cancelling the Notice of Trustee's Sale of the Property, recorded as document number 2009-0338837 with the County Recorder, Maricopa County, Arizona within thirty (30) days of the date of this Agreement.

D.  **Wavier of Interest, Fees and Penalties.**  GMAC shall waive all interest, fees, and penalties accruing on the Loan for reason of nonpayment during the period of time from September 2008 to present, or the time period of the dispute over the Loan and the Lawsuit.

E.  **Balensiefer's Release of Claims and Covenant Not to Sue.** In consideration of the mutual promises and undertakings contained in this Agreement, (and except for any obligations created by this Agreement), Balensiefer does hereby unconditionally and irrevocably forever release, relieve and discharge GMAC, and each of their past, present and future directors, officers (whether acting in such capacity or individually), shareholders, owners, partners, joint venturers, principals, trustees,

2

creditors, attorneys, representatives, employees, managers, parents, subsidiaries, divisions, subdivisions, departments, affiliates, predecessors, successors, assigns and assignees, or any agent acting or purporting to act for them or on their behalf, from any and all claims, demands, costs, expenses, damages, actions, causes of action, liabilities and obligations, of whatever kind or nature, both at law or in equity, whether known or unknown, contingent or fixed, arising out of or in any way relating to, or which could have been raised in the Lawsuit as defined above in Paragraph 1.C. Balensiefer specifically covenants not to sue or take any action against GMAC and each of their past, present and future directors, officers (whether acting in such capacity or individually), shareholders, owners, partners, joint venturers, principals, trustees, creditors, attorneys, representatives, employees, managers, parents, subsidiaries, divisions, subdivisions, departments, affiliates, predecessors, successors, assigns and assignees, or any agent acting or purporting to act for them or on their behalf with respect to any claims that have been asserted or that could have been asserted in the Lawsuit or that may exist as of the date of this Agreement and that have been released by this Agreement.

      **E.**    **GMAC's Release of Claims and Covenant Not to Sue.**  In consideration of the promises and undertakings contained in this Agreement, (and except for any obligations created by this Agreement), GMAC does hereby unconditionally and irrevocably forever release, relieve and discharge Balensiefer, and any of his heirs and assigns, from any and all claims, demands, costs, expenses, damages, actions, causes of action, liabilities and obligations, of whatever kind or nature, both at law or in equity, whether known or unknown, contingent or fixed, arising out of or in any way relating to, or which could have been raised in the Lawsuit as defined above in Paragraph 1.C. GMAC specifically covenants not to sue or take any action against Balensiefer, or any of his heirs and assigns, with respect to any claims that have been asserted or that could have been asserted in the Lawsuit or that may exist as of the date of this Agreement and that have been released by this Agreement.

**F.     Dismissal of Lawsuit with Prejudice.**   Balensiefer and GMAC
covenant and hereby agree that no later than thirty (30) days after execution of this
Agreement, GMAC shall, through counsel, circulate and execute a stipulation providing
dismissal with prejudice of the Lawsuit with each party to bear his, her or its own
attorneys' fees and costs ("Stipulation"), and that once approved by each Party, said
Stipulation shall be filed as promptly as possible, but in no case more than fourteen (14)
days after receiving approval of each of the Parties, with the State of Arizona Superior
Court in and for the County of Maricopa.

**G. No Assignment of Released Claims.**   Balensiefer and GMAC hereby
each represent and warrant that it is the sole and lawful owner of all right, title, and
interest in and to each of the claims released herein and has not heretofore assigned or
transferred, or purported to assign or transfer, to any individual, entity or organization
any of the claims released herein.   Balensiefer and GMAC hereby agree to indemnify,
defend, and hold harmless each other from and against any claim subsequently brought
against the other that is specifically based upon or arising out of or in connection with
any assignment or transfer, or purported assignment or transfer, of any of the claims
released herein.

**4.     Confidentiality.**   Balensiefer and GMAC hereby acknowledge and agree
that the terms of this Agreement are confidential and have not and shall not be disclosed,
discussed or revealed to any other persons, entities or organizations.   Notwithstanding the
foregoing, any of the Parties may reveal the terms of the Agreement to their lawyers,
accountants or other professional advisors on condition that such person(s) agrees to be
bound by this Confidentiality provision.   Nothing in this Agreement shall be construed to
prohibit any of the Parties from revealing this Agreement to law enforcement officials or
other legal or judicial authority as may be required by law.   If any of the Parties is asked

4

about the disposition of this lawsuit, that party may state only that the dispute was resolved and its terms are confidential and cannot be disclosed. The Parties agree to instruct counsel, personal tax advisors, and others to whom disclosure is allowed under the terms hereof, that this Agreement and its terms are strictly confidential and shall not be disclosed to any other individual, organization or entity. The Parties and any persons, organizations or entities identified by category above who are made aware of the terms of this Agreement are advised that if this Confidentiality provision is breached, the Parties retain the right to bring an action in law for any resulting damage alleged to have been caused by the breaching person, organization or entity irrespective of their participation or nonparticipation in the Lawsuit and/or in the execution of this Agreement.

      **5.**     **No Admission of Liability.** By entering into this Agreement, GMAC does not admit to any liability or wrongdoing whatsoever to Balensiefer or with respect to any claims asserted by Balensiefer, and GMAC expressly deny any and all such liability and wrongdoing. By settling this lawsuit Balensiefer does not concede that any claim asserted in the Lawsuit lacked merit. The Parties agree that this Agreement may be used as evidence in any action to enforce the terms of this Agreement.

      **6.**     **Severability, Jurisdiction and Governing Law.** If any of the provisions herein are determined to be invalid by a court, arbitrator, or government agency of competent and ultimate jurisdiction, the Parties agree that such determination shall not affect the enforceability of the other provisions herein and the remaining provisions of this Agreement nevertheless shall be construed, performed, and enforced as if the invalidated or unenforceable provision had not been included in the text of the Agreement. Arizona law shall govern the validity and interpretation of this Agreement without regard for Arizona's conflicts of law principles. The Parties stipulate that jurisdiction and venue shall lie exclusively in the State of Arizona Superior Court in and for the County of Maricopa for any action involving the validity, interpretation or

5

enforcement of this Agreement, or for any claim for breach of this Agreement, for damages, and for other relief sought under this Agreement.

**8.     Plain Meaning.** This Agreement shall be interpreted in accordance with the plain meaning of its terms and not for or against any of the Parties hereto. No inference shall be asserted or drawn by anyone based on the Party that may have drafted any language or part of this Agreement.

**9.     Scope of Agreement and Acknowledgment.** This Agreement constitutes the entire understanding of the Parties on the subjects covered and supersedes any and all prior oral or written agreements, representations, discussions or negotiations between the Parties with respect to the subject matter. Balensiefer understands and agrees that he: has carefully read and fully understands all the provisions of this Agreement and the Modification Agreement; knowingly and voluntarily agrees to all of the terms set forth in this Agreement and the Modification Agreement of his own free will and free from any duress or coercion; knowingly and voluntarily intends to be legally bound by the same; was advised and hereby is advised in writing to consider the terms of this Agreement and the Modification Agreement and that he can and may wish to consult with a licensed attorney of his choosing prior to executing the same.

**10.     Warranty.**     Each person signing below represents and warrants that he/she has the full power and authority to enter into this Agreement and, if executing this Agreement in a representative capacity, warrants that he/she has been duly authorized to do so by all appropriate actions.

**11.     Good Faith Settlement.** This Agreement reflects a good faith resolution of all claims reached after arm's-length negotiations and without coercion and not in reliance upon any representation or promise not contained in this Agreement.

**12.     Attorneys' Fees and Costs.** Each Party agrees to bear its own attorneys' fees, expenses, and costs incurred in connection with the negotiation and preparation of this Agreement. However, in the event that litigation is instituted to enforce or interpret any provision of or right pursuant to this Agreement, the prevailing Party in that litigation shall be entitled to an award of all taxable and non-taxable costs, actual attorneys' fees, and others expenses (through trial and appeal) against the unsuccessful Party.

**13.     Counterpart Execution.** This Agreement may be executed in one or more counterparts, all of which taken together shall constitute one agreement. Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one legally effective document. Signatures submitted by facsimile or telecopy transmission shall be considered effective in all respects as original signatures and fully binding on the Parties.

**14.     Successors and Assigns.** The provisions of this Agreement shall be binding upon and inure to the benefit of each of the Parties hereto, and to their respective successors in interest and assigns.

**15.     Headings.** The headings of this Agreement are inserted solely for convenience of the Parties for reference and are not intended to govern, limit or define the meaning of any provision of this Agreement.

Dated: _/ · 22 · 2010_

_____
Greg Balensiefer, a single man.

**PLAINTIFF**

Dated: _Jan 22, 2010_

_____
By   Kara Ricupero

**GMAC MORTGAGE, L.L.C., (F/K/A
GMAC MORTGAGE CORPORATION;
HOMECOMINGS FINANCIAL, L.L.C.**

# EXHIBIT "A"

Record & Return To:
Homecomings Financial, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702

————————————————————[Space Above This Line For Recorder's Use]————————————————————

# INTEREST ONLY ADJUSTABLE RATE LOAN MODIFICATION AGREEMENT

This  Interest Only Adjustable Rate Loan Modification Agreement ("Agreement") made this 1st day of October, 2008, ("Effective Date") between Gregory W Balensiefer ("Borrower") and Homecomings Financial, LLC Lender\Servicer or Agent for Lender\Servicer ("Lender"), amends and supplements that certain promissory note ("Note") dated December 2, 2005, in the original principal amount of One Hundred Thirteen  Thousand  Dollars and No Cents ($113,000.00) executed by Borrower.  The Note is secured by a Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated the same date as the Note, and recorded in the real property records of Maricopa County, AZ.  Said Security Instrument covers the real and, if applicable, personal property described in such Security Instrument (the "Property") located at 2808 W Rosewood Dr, Chandler, AZ 85224 which real property is more particularly described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the Agent for, or the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the Lender as defined in this Agreement.

Borrower has requested, and Lender/ has agreed to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property created by the Security Instrument.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note and Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirteen Thousand One Hundred Eighty Four Dollars and Ninety Two Cents ($113,184.92). Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of the "Lender" the Principal Balance which consists of the amount(s) loaned to Borrower by "Lender" plus any accrued and unpaid amounts due under the Note or Security Instrument capitalized by Lender. Borrower also agrees to pay any unpaid interest and taxes, insurance premiums and other costs or expenses that Lender has paid to protect or enforce its interest in, or otherwise due under, the Note and the Security Instrument.

2. Interest will be charged on the new unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 6.1250% beginning on October 1, 2008. The interest rate Borrower will pay will change in accordance with this Agreement. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Borrower promises to make a payment every month. This monthly payment will consist of interest only payments of $577.71 starting on November 1, 2008 and ending on January 1, 2011 (the 'Interest Only Payment Period'). Thereafter Borrower will begin making payments consisting of principal and interest for the remaining term of the loan. The date of the borrower's first payment consisting of both principal and interest shall be February 1, 2011. Borrower will make these payments every month until all of the principal and interest and any other charges that Borrower may owe under this Agreement have been repaid. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If on January 1, 2036 ("Maturity Date"), Borrower still owes any amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the unpaid principal of the loan and/or the interest rate Borrower must pay. Lender will determine the new interest rate and any change in the amount of the monthly payment in accordance with this Agreement. The interest rate Borrower will pay may change on October 1, 2013, and on that day every six months thereafter. Each date on which the interest rate could change is called a "Change Date".

5. Beginning with the next Change Date, any change in the borrower's interest rate, will be based on a change in an Index. The Index is the "Index" provided for in the Note. The most recent Index figure available as of the date provided for in the Note that is prior to the next Change Date is called the "Current Index." If the Index is no longer available, the Lender will choose a new Index, which is based upon comparable information, as provided for in the Note. Lender will give the Borrower notice of this choice.

6. Before each Change Date, Lender will calculate the new interest rate by adding Three And Twenty Five Thousandths percentage points (3.0250%) to the Current Index. Lender will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated below, this rounded amount will be the new interest rate until the next Change Date. Lender will then determine, as applicable, (i) the amount of the monthly interest only payment based on the unpaid principal balance and the new interest rate, if still within the Interest Only Payment Period, or (ii) the amount of the monthly principal and interest payment that would be sufficient to repay the unpaid principal that Borrower is expected to owe at the Change Date in full on the Maturity Date at the new interest rate in substantially equal payments, if after the Interest Only Payment Period. The result of this calculation will be the new amount of the monthly payment. Borrower will pay the amount of the new monthly payment beginning on the first monthly payment date after the Change Date until the amount of the monthly payment changes again. The monthly payments will be applied first to the payment of interest due and then to principal.

7. The interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1%) from the rate of interest Borrower has been paying for the preceding six months. The interest rate will never be greater than 13.1250% or less than 6.1250%.

8. Before the effective date of any change, Lender will deliver or mail to Borrower notice of any changes in the interest rate and the amount of the monthly payment. The notice will include information required by law to be given to Borrower and also the title and telephone number of a person who will answer any questions Borrower may have. Unless applicable law requires a different method, any notice that must be given to Borrower under this Agreement will be given by delivering it or mailing it by first class mail to Borrower at the property address stated above or at a different address if Borrower gives Lender notice of Borrower's different address. Any notice that must be given to Lender under this Agreement will be given by mailing it first class mail to the Lender at the address stated in Paragraph 3 above or at a different address if Borrower is given notice of that different address.

9. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date on which the payment is due, Borrower will pay a late charge to Lender in an amount calculated in accordance with the Borrower's original Note, or as otherwise provided by law. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

10. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

11. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without "Lender's" prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by "Lender" if such exercise is prohibited by applicable law. If Lender exercises this option, "Lender" shall give Borrower notice of acceleration and \or any other notices that may be required by law. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, "Lender" may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

12. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound

by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

13. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed/effective as of the day and year first above written.

_____          _____
Gregory W Balensiefer                                          (Borrower)

_____          _____
                                                                          (Borrower)


Homecomings Financial, LLC

By: _____

Title:   Limited Signing Officer   _____

**BORROWER ACKNOWLEDGMENT**

State of Arizona
County of Maricopa

On this 14 day of October 2008 before me, the undersigned, a Notary Public in and for said county and state, personally appeared Gregory W Powers personally known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____

Notary Public
My Commission Expires: 01/15/2011

V. HERRERA
Notary Public · ARIZONA
MARICOPA COUNTY
My Commission Expires
Jan. 15, 2011

**LENDER ACKNOWLEDGMENT**

State of IOWA
County of BLACKHAWK

On this ___ day of _____, 200__, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of Homecomings Financial, LLC, said instrument is the act and deed of said entity, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

     Witness my hand and official seal.


                                        _____
                                        Notary Public
                                        My Commission Expires: _____

# EXHIBIT 5

Record & Return To:
GMAC Mortgage, LLC
Attention: Loss Mitigation
3451 Hammond Avenue
Waterloo, IA 50702
Custodian ID: W1
Investor Number: 10360577

──────────────── *[Space Above This Line For Recorder's Use]* ────────────────

# INTEREST ONLY FIXED RATE
# LOAN MODIFICATION AGREEMENT

This Interest Only Fixed Rate Loan Modification Agreement ("Agreement") made this October 1, 2010 ("Effective Date") between GREGORY W BALENSIEFER ("Borrower") and GMAC Mortgage, LLC ("Lender"), the agent for Lender/Servicer, Mortgage Electronic Registration Systems, Inc. (Mortgagee) amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument"), dated December 2, 2005 and granted or assigned to Mortgage Electronic Registration Systems, Inc. as mortgagee of record (solely as nominee for Lender and Lender's successors and assigns), P. O. Box 2026, Flint, Michigan 48501-2026, (888)-679-MERS and if applicable, recorded on with Instrument Number in Book and/or Page Number of the real property records of MARICOPA County, AZ and (2) that certain promissory note ("Note") dated December 2, 2005 in the original principal sum of One Hundred Thirteen Thousand Dollars and No Cents ($ 113,000.00) executed by Borrower.    Said Security Instrument covers the real and personal property described in such Security Instrument (the "Property") located at 2808 W ROSEWOOD DR    CHANDLER AZ 85224, which real property is more particularly described as follows:

**(Legal Description – Attach as Exhibit if Recording Agreement)**

Borrower acknowledges that Lender is the Agent for, or the legal holder and the owner of the Note and Security Instrument and further acknowledges that if Lender transfers the Note, as amended by this Agreement, the transferee shall be the Lender as defined in this Agreement.

Borrower has requested, and Lender/ has agreed to extend or rearrange the time and manner of payment of the Note and to extend and carry forward the lien(s) on the Property created by the Security Instrument.

Now, therefore, in consideration of the mutual promises and agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):

1. Borrower acknowledges that as of the Effective Date, the amount payable under the Note and secured by the Security Instrument (the "Principal Balance") is One Hundred Thirty Thousand Eight Hundred Fifty Four Dollars and Twenty One Cents (\$ 130,854.21)Borrower hereby renews and extends such indebtedness and promises to pay jointly and severally to the order of the "Lender" the Principal Balance which consists of the amount(s) loaned to Borrower by "Lender" plus any accrued and unpaid amounts due under the Note or Security Instrument capitalized by Lender. Borrower also agrees to pay any unpaid interest and taxes, insurance premiums and other costs or expenses that Lender has paid to protect or enforce its interest in, or otherwise due under, the Note and the Security Instrument.

2. Interest will be charged on the new unpaid Principal Balance until the full amount of principal has been paid. Borrower will pay interest at a yearly rate of 5.87500% beginning on October 1, 2010. The interest rate required by this Agreement is the rate Borrower will pay both before and after any default under the terms of the Note, as amended by this Agreement.

3. Borrower promises to make a payment every month. This monthly payment will consist of interest only payments of \$ 640.64 starting on November 1, 2010 and ending on January 1, 2011 (the 'Interest Only Payment Period'). Thereafter Borrower will begin making payments consisting of principal and interest for the remaining term of the loan. The date of the borrower's first payment consisting of both principal and interest shall be February 1, 2011. Borrower will make these payments every month until all of the principal and interest and any other charges that Borrower may owe under this Agreement have been repaid. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If on January 1, 2036 ("Maturity Date"), Borrower still owes any amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower will make such payments at 3451 Hammond Avenue, Waterloo, IA 50702 or at such other place as Lender may require.

4. The monthly payment may change based on changes in the amount collected into escrow for the payment of taxes and/or insurance, as applicable. Change will be determined based on a period analysis of the account. The monthly payments will be applied first to the payment of interest due and then to principal.

5. If Lender has not received the full amount of any monthly payment by the end of 15 calendar days after the date on which the payment is due, Borrower will pay a late charge to Lender in an amount calculated in accordance with the Borrower's original Note, or as otherwise provided by law. Borrower will pay this late charge promptly but only once on each late payment. The late charge is not in lieu of any other remedy of Lender, including any default remedy.

6. It is the intention of the parties that all liens and security interests described in the Security Instrument are hereby renewed and extended (if the Maturity Date of the original Note has been changed) until the indebtedness evidenced by the Note and this Agreement has been fully paid. Lender and Borrower acknowledge and agree that such renewal, amendment, modification, rearrangement or extension (if applicable) shall in no manner affect or impair the Note or liens and security interests securing same, the purpose of this Agreement being simply to modify, amend rearrange or extend (if applicable) the time and the manner of payment of the Note and indebtedness evidenced thereby, and to carry forward all liens and security interests securing the Note, which are expressly acknowledged by

Borrower to be valid and subsisting, and in full force and effect so as to fully secure the payment of the Note.

7. If all or any part of the Property or any interest in it is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without "Lender's" prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Security Instrument. However, this option shall not be exercised by "Lender" if such exercise is prohibited by applicable law. If Lender exercises this option, "Lender" shall give Borrower notice of acceleration and \or any other notices that may be required by law. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, "Lender" may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. For purposes of this paragraph, "interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is transfer of title by Borrower at a future date to a purchaser.

8. As amended hereby, the provisions of the Note and Security Instrument shall continue in full force and effect, and the Borrower acknowledges and reaffirms Borrower's liability to Lender thereunder. In the event of any inconsistency between this Agreement and the terms of the Note and Security Instrument, this Agreement shall govern. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument. Except as otherwise specifically provided in this Agreement, the Note and Security Instrument will remain unchanged, and Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement, including but not limited to, in the case of the Borrower, the obligation to pay items such as taxes, insurance premiums or escrow items, as applicable. Any default by Borrower in the performance of its obligations herein contained shall constitute a default under the Note and Security Instrument, and shall allow Lender to exercise all of its remedies set forth in said Security Instrument.

9. Lender does not, by its execution of this Agreement, waive any rights it may have against any person not a party hereto. This Agreement may be executed in multiple counterparts, each of which shall constitute an original instrument, but all of which shall constitute one and the same Agreement. EACH OF THE BORROWER AND THE LENDER ACKNOWLEDGE THAT NO REPRESENTATIONS, AGREEMENTS OR PROMISES WERE MADE BY THE OTHER PARTY OR ANY OF ITS REPRESENTATIVES OTHER THAN THOSE REPRESENTATIONS, AGREEMENTS OR PROMISES SPECIFICALLY CONTAINED HEREIN. THIS AGREEMENT, AND THE NOTE AND SECURITY INSTRUMENT (AS AMENDED HEREBY) SETS FORTH THE ENTIRE UNDERSTANDING BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES.

Executed effective as of the day and year first above written.

_____    _____    _____

Date               GREGORY W BALENSIEFER

_____    _____    _____

Date

_____    _____    _____

Date

_____    _____    _____

Date


GMAC Mortgage, LLC

By: _____
     Limited Signing Officer

Date: _____

**LENDER ACKNOWLEDGMENT**