Hearing Date: December 20, 2012 at 10:00 a.m. (ET)
Objection Deadline: December 14, 2012 at 12:00 noon (ET)

**MORGAN, LEWIS & BOCKIUS LLP**
James L. Garrity, Jr.
John C. Goodchild, III (*pro hac vice*)
101 Park Avenue
New York, New York 10178-0600
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
*Counsel to Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, as Trustees of Certain Mortgage Backed Securities Trusts*

**DECHERT LLP**
Glenn E. Siegel
Craig P. Druehl
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
*Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustees of Certain Mortgage Backed Securities Trusts*

**ALSTON & BIRD LLP**
Martin G. Bunin
John C. Weitnauer (*pro hac vice*)
William Hao
90 Park Avenue
New York, NY 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
*Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts*

**SEWARD & KISSEL LLP**
Ronald L. Cohen
Arlene R. Alves
Laurie R. Binder
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421
*Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage Backed Securities Trusts*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, *et al.*, ) | Chapter 11 |
| ) | |
| ) | |
| ) | Jointly Administered |
| Debtors. | |

**OBJECTION OF THE RMBS TRUSTEES TO DEBTORS' MOTION FOR ORDER UNDER 11 U.S.C §§ 105(a), 365(a), AND 554(a), FED. R. BANKR. P. 6006 AND 9014, AND LOCAL BANKRUPTCY RULE 6006-1 APPROVING PROCEDURES REGARDING THE FUTURE REJECTION OF EXECUTORY CONTRACTS AND <u>UNEXPIRED LEASES (DOCKET NO. 2326)</u>**

1

The Bank of New York Mellon Trust Company, N.A., Deutsche Bank Trust Company Americas, Deutsche Bank National Trust Company, U.S. Bank National Association and Wells Fargo Bank, N.A., solely in their capacities as trustees or indenture trustees for certain mortgaged backed securities trusts (collectively, the "**RMBS Trustees**")[1], hereby submit this objection (the "**Objection**") to the Debtors' *Motion Under 11 U.S.C §§ 105(a), 365(a) and 554(a), Fed. R. Bankr. P. 6006 and 9014, and Local Bankruptcy Rule 6006-1 Approving Procedures Regarding the Future Rejection of Executory Contracts and Unexpired Leases,* filed on November 30, 2012 (Docket No. 2326) (the "**Procedures Motion**"). In support of the Objection, the RMBS Trustees respectfully state as follows:

## PRELIMINARY STATEMENT

1. Prior to the collapse of the mortgage industry in 2007, the Debtors sponsored private label securitizations which they pooled into securitization trusts and contributed loans and provided servicing to private label securitizations sponsored by third parties (collectively, the "**RMBS Trusts**").[2]

2. The RMBS Trustees are trustees for over 400 RMBS Trusts, which the RMBS Trustees believe currently contain in excess of $100 billion in aggregate principal amount in respect of over 2.4 million mortgage loans serviced by Debtor entities. The beneficial owners of the mortgage loans held by the RMBS Trusts are investors in residential mortgage-backed securities ("**RMBS**"), which typically include public and private pension funds and other institutional fixed income investors.

---

[1] The Trustees file this Objection solely in their capacity as trustees of the RMBS Trusts and not, in the case of the RMBS Trustees other than Wells Fargo, N.A., in any of their capacities as members of the Official Committee of Unsecured Creditors.

[2] Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petition and First Day Pleadings ¶23 n.15. (Docket No. 6).

3. Each RMBS Trust was formed pursuant to either a Pooling and Servicing Agreement or pursuant to a highly-integrated set of Servicing Agreements, Mortgage Loan Purchase Agreements, Indentures, and/or Trust Agreements, which, when combined, provide for administration of trust assets and the related RMBS (each integrated contract governing each RMBS Trust, a "**Servicing Agreement**").

4. Each Servicing Agreement specifies the rights and obligations of the Debtors in their capacities as servicers, the RMBS Trustees, the RMBS investors and, as applicable, other parties in interest to the specific transaction. While the terms of specific transactions vary, in general the Servicing Agreements provide that Debtors in their capacities as servicers are responsible for all tasks relating to the administration of the RMBS Trusts' mortgage loan assets (billing, collecting, foreclosing, maintaining and selling foreclosed real property, the investment of mortgage loan cash flows pending distribution to securities holders, and the compilation, computation and reporting of mortgage loan performance data). In some Servicing Agreements, the Debtors in their capacities as servicers are also required to enforce mortgage loan sellers' (including the Debtors') responsibility to repurchase defective loans. Finally, under many of the Servicing Agreements, Debtors in their capacities as servicers are required to pay all fees and expenses of the Trustees, and to indemnify, defend and hold the Trustees harmless from all loss, liability, cost or expense arising from the Trustees' administration of the RMBS Trusts.

5. In general, the Servicing Agreements provide that after the occurrence of loan servicer events of default, the RMBS Trustees have certain remedial powers and responsibilities, including, importantly, the duty to act as, or appoint or consent to the appointment of, a substitute successor servicer upon termination of a servicer as to which an event of default, event

of servicer termination or servicing default has occurred.  Under some Servicing Agreements, these duties are imposed on the master servicer and not the RMBS Trustees.

6.  Servicing Agreements also usually prescribe the procedures for the appointment of, and transition to, a successor servicer so as to make such transition as seamless as possible. A major part of such procedures is continuing the role of the terminated servicer up until the point that the successor servicer is completely prepared to take over all aspects of the servicing. During the transition period, the current servicer is paid its fees and continues to make advances under the Servicing Agreements.  The current servicer usually is obligated to cooperate in all respects with an orderly transition.

7.  In the Procedures Motion, the Debtors seek an order approving proposed procedures for the future rejection of executory contracts and unexpired leases (the "**Rejection Procedures**").  The Rejection Procedures include the following:

(a) The Debtors file and serve on counterparties to the contracts that the Debtors seek to reject (the "**Proposed Rejected Contracts**") a notice of such rejection (the "**Rejection Notice**").

(b) The Rejection Notice is to contain, among other things, the proposed effective date for the rejection of each Proposed Rejected Contract (the "**Effective Date**").

(c) If no objection to the rejection of a Proposed Rejected Contract is filed, each such Proposed Rejected Contract will be deemed rejected on the proposed Effective Date set forth in the Rejection Notice, or, if no date is indicated, the date the Rejection Notice is filed with the Court (each such date, a "**Rejection Date**").

(d)     Objections to the rejection of a Proposed Rejected Contract are to be filed and served within fourteen (14) days after the date the Rejection Notice is filed.

(e)     After an objection is filed and a hearing is held on the Debtors' proposed rejection of a Proposed Rejected Contract, if the Court approves the rejection, the Proposed Rejected Contract will be deemed rejected as of the Rejection Date, or as otherwise determined by the Court.

(f)     Claims arising out of rejected contracts must be filed the later of the deadline for filing proofs of claim established by the Court, or forty-five (45) days after the Rejection Date.

8.     The RMBS Trustees are currently working with the Debtors in the hope that the objections set forth herein can be resolved. However, mindful of the possibility that the RMBS Trustees might not be able to reach a satisfactory resolution with the Debtors, the RMBS Trustees hereby assert this Objection to the Procedures Motion.

## OBJECTIONS

### I. The Retroactive Effective Dates in the Rejection Procedures are Overly Burdensome to the RMBS Trustees and Not Justified

9.     Pursuant to the Rejection Procedures, the Rejection Date of Proposed Rejected Contracts will be the date the Rejection Notice is filed unless the Debtors specifically set forth a different Rejection Date in the Rejection Notice. In the absence of the Debtors' providing a Rejection Date, the Rejection Procedures would not give the other parties to the Proposed Rejected Contracts any advance notice of the proposed rejection. Further, the Rejection Procedures would set a Rejection Date that would be prior in time to the date that the contracts are actually rejected under the Rejection Procedures (*i.e.*, as soon as the last date to file an

5

objection to the Rejection Notice has passed, or, if an objection has been filed, at the time the Court determines to grant the rejection).

10. Such retroactive rejections, however, are not favored by courts. The overwhelming majority of courts read section 365(a) of the Bankruptcy Code and Fed. R. Bankr. P. 6006 to authorize rejection of executory contracts as of the date a court orders the rejection, and not retroactively to the date the motion to reject was filed or another earlier date. *See In re Jamesway Corporation*, 179 B.R. 33, 37 (S.D.N.Y. 1995); *In re Garfinckels Inc.*, 118 B.R. 154, 154 (Bankr. D. D.C. 1990); *In re Revco D.S., Inc.*, 109 B.R. 264, 267-270 (Bankr. N.D. Ohio 1989); *In re Manis Lumber Co.*, 430 B.R. 269, 274-5 (Bankr. N.D. Ga. 2009); *In re Thinking Machines Corp.*, 67 F.3d 1021, 1025-1027 (1st Cir. 1995).

11. Retroactive rejection is permitted only where the burden on the debtor of a non-retroactive rejection date will be too great and the balance of the equities favors a retroactive rejection. *See Garfinckels*, 118 B.R. at 154 (rejection *nunc pro tunc* to an earlier date is authorized only where there is no prejudice to the non-debtor party to the contract); *Jamesway*, 179 B.R. at 38 (where creditor caused the delay in rejection by filing an improper objection, rejection date can be a date prior to court order authorizing rejection); *In re Bethlehem Steel Corp.*, 2002 U.S. Dist. LEXIS 22052, *10-11 (S.D.N.Y. Nov. 14, 2002) (court may authorize retroactive rejection where equities favor such a solution); *Manis*, 430 B.R. at 277-8 (retroactive rejection approved to reduce unnecessary burdens on the estate where delay does not prejudice the non-debtor party); *Thinking Machines*, 67 F.3d at 1028 (retroactive rejection orders may be entered where the "balance of equities preponderates in favor of such remediation").

12.     Here, there is not only no burden on the Debtors in having the Rejection Date occur after the Court is deemed to approve the rejection or actually approves the rejection, but a retroactive Rejection Date will cause the RMBS Trusts significant harm.

13.     Without a retroactive Rejection Date, the Debtors will be required to continue to perform their servicing duties under the Servicing Agreements between the time they file a Rejection Notice and the Rejection Date.  But this will not be a burden on themselves or their estates.  The Debtors will continue to be paid fees for their services as provided under the Servicing Agreements.  Furthermore, the Debtors will not be expending any funds that are not reimbursable because generally under the Servicing Agreements, the servicer has the right to refuse to make any advances if the Servicer determines that a particular advance is "non-recoverable."

14.     Applying a retroactive Effective Date will, on the other hand, cause significant prejudice and immeasurable harm to the RMBS Trusts and their investors.  Servicing is the major feature of the Servicing Agreements and is the very reason that the parties enter into Servicing Agreement.  Without a servicer, mortgage loans will not be invoiced or collected, whatever collections do come in will not be processed, properties will not foreclosed or sold, damaged property will not be repaired, required reports will not be generated, and investors will not be paid.  Moreover, failure to properly transition servicing is likely to result in much higher rejection damage claims being asserted against the Debtors.

15.     By their very terms, Servicing Agreements themselves recognize the importance of uninterrupted servicing.  As set forth above, generally Servicing Agreements contain specific

7

provisions to ensure that the transition to a successor servicer is as orderly and seamless as possible.[3]

16. Not only is a retroactive Rejection Date inappropriate in connection with the rejection of any Servicing Agreements, but the RMBS Trustees maintain that the Debtors should be required to set an Effective Date in the Rejection Notice that is at least 90 days after the date the Rejection Notice is filed. As described above, because of the importance to investors and the RMBS Trusts that servicing not be interrupted and to avoid the chaos that will likely result if servicing is interrupted, Servicing Agreements themselves generally require that the servicer being terminated cooperate in the servicing transition and continue to function as servicer in all respects until the servicing has been completely transitioned. Servicing transitions typically take at least 90 days, and providing for a 90 day period before a Servicing Agreement is actually rejected will permit servicing to be orderly transitioned as contemplated under the Servicing Agreements. As set forth above, the RMBS Trustees maintain that the 90 days of servicing to be provided by the Debtors during the transition period will not be a burden on the estate.

17. For the same reasons, if an objection is filed to the Rejection Notice and the Court ultimately upholds the Debtors' determination to reject the Servicing Agreement, the Servicing Agreement should be deemed rejected the later of the Rejection Date or ninety (90) days after the Court upholds the Debtors' determination to reject the Servicing Agreement.

## II. Further Objections

18. The RMBS Trustees assert the following further objections to the Procedures Motion[4]:

---

[3] The Debtors are surely aware of the importance of a seamless transition of servicing and the transition process if from nothing else, as a result of the recent sale of their servicing platform to Ocwen and the steps being taken to assure investors that there will be an orderly transition.

8

(a) <u>The Rejection Notice Should be Served on the RMBS Trustees and Master Servicers who are Parties to the Servicing Agreements the Debtors Seek to Reject</u>.  Because the RMBS Trustees and master servicers are responsible for the appointment of a successor servicer, it is crucial that they are assured that they will be informed of any proposed rejection of a Servicing Agreement.

(b) <u>Separate Rejection Notices Should be Sent in Connection with the Rejection of Servicing Agreements</u>. To facilitate the notice process, the RMBS Trustees request that the Debtors do not include any Servicing Agreements that the Debtors seek to reject on the same Rejection Notice with other types of agreements to be rejected.  Rather, such Servicing Agreements should be contained on separate Rejection Notices that list only Servicing Agreements (subject to Bankruptcy Rule 6006(f)'s proscriptions for omnibus rejection motions).

(c) <u>The Time Period to File Objections to Rejection Notices for Servicing Agreements Should be 30 Days</u>.  The Rejection Procedures provide for a fourteen day period for objections to be filed to Rejection Notices. The RMBS Trustees maintain that this period is too short and that they be given a period of 30 days to file such objections.  Given the unknown number of Servicing Agreements that may be subject to rejection[5], it is not

---

[4] As set forth in paragraph 8, above, the RMBS Trustees and the Debtors have been engaged in discussions regarding the issues set forth herein.  The RMBS Trustees are cautiously optimistic that they and the Debtors will consensually resolve the further objections set forth in paragraph 18 of the Objection

[5] Under the terms of the Asset Purchase Agreement (the "**Asset Purchase Agreement**") between Ocwen Loan Servicing LLC ("**Ocwen**") and certain of the Debtors, Ocwen has the right to exclude Servicing Agreements from the sale as late as two (2) business days before the closing. *Asset Purchase Agreement* at Section 2.15(b).

9

practicable to expect the RMBS Trustees to be able to analyze the relevant Servicing Agreements included on Rejection Notices, and prepare objections to each Servicing Agreement in fourteen days.

(d) <u>RMBS Trustees Should Have 45 Days After the Withdrawal or Resolution of an Objection to File a Claim</u>.  The Rejection Procedures provide that all parties have 45 days from the Effective Date to file claims arising out of rejected contracts.  However, should a party file an objection to the Rejection Notice, the 45 day period will likely run before the objection has been determined by the Court. It is unfair to require that claims be filed before objections are resolved.  It is more equitable in those cases where an objection has been filed to require that claims be filed 45 days after an objection has been withdrawn or resolved.

## CONCLUSION

19.     The Debtors' proposed Rejection Procedures are inherently too burdensome in connection with any Servicing Agreements the Debtors seek to reject.  If approved in the form proposed by the Debtors, their implementation will cause the investors in the RMBS Trusts significant monetary and equitable harm.  In order to prevent the harm that the Proposed Rejection Procedures would cause, and make the Rejection Procedures fair in connection with the RMBS Trusts, the RMBS Trustees respectfully request that the Court approve the following modifications to the Proposed Rejection Procedures:

(a)     The Rejection Notice is to be provided to the RMBS Trustee and Master Servicer for each Servicing Agreement;

(b)     Separate Rejection Notices shall be filed for Servicing Agreements;

(c) Objections to any Proposed Rejection of a Servicing Agreement shall be filed and served within 30 days of the service of the Rejection Notice;

(d) When an objection to a Rejection Notice has been filed, and either resolved consensually or by the Court in favor of the Debtors, any claims resulting from the rejection of a Servicing Agreement must be filed by the later of 45 days after the date of the resolution of such objection or the last date for filing claims established by the Court;

(e) The Rejection Date for rejection of any Servicing Agreements must occur, at the earliest, after the time for filing an objection has run, and more equitably, at least 90 days after the date the Rejection Notice is served and, if an objection has been filed, the later of the Effective Date or at least 90 days after the date the objection has been resolved.

**WHEREFORE**, for the reasons set forth herein, the RMBS Trustees respectfully request that this Court (i) grant the Objections set forth herein and modify the Rejection Procedures consistent with the objections set forth herein, and (ii) grant such other and further relief as the Court deems appropriate.

Dated: New York, New York
       December 14, 2012

Respectfully submitted,

| **MORGAN, LEWIS & BOCKIUS LLP** | **DECHERT LLP** |
|---|---|
| By: s/James L. Garrity, Jr.<br>James L. Garrity, Jr.<br>John C. Goodchild, III (*pro hac vice*)<br>101 Park Avenue<br>New York, New York 10178-0600<br>Telephone: (212) 309-6000<br>Facsimile: (212) 309-6001 | By: s/Glenn E. Siegel<br>Glenn E. Siegel<br>Craig P. Druehl<br>1095 Avenue of the Americas<br>New York, New York 10036-6797 Telephone: (212) 698-3500<br>Facsimile: (212) 698-3599 |
| *Counsel to Deutsche Bank National Trust Company and Deutsche Bank Trust Company Americas, as Trustees of Certain Mortgage Backed Securities Trusts* | *Counsel to The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A., as Trustees of Certain Mortgage Backed Securities Trusts* |
| **ALSTON & BIRD LLP** | **SEWARD & KISSEL LLP** |
| By: s/John C. Weitnauer<br>John C. Weitnauer<br>John G. Bunin<br>William Hao<br>90 Park Avenue<br>New York, NY 10016<br>Telephone: (212) 210-9400<br>Facsimile: (212) 210-9444 | By: s/Ronald L. Cohen<br>Ronald L. Cohen<br>Arlene R. Alves<br>Laurie R. Binder<br>One Battery Park Plaza<br>New York, New York 10004<br>Telephone: (212) 574-11200 Facsimile: (212) 480-8421 |
| *Counsel to Wells Fargo Bank, N.A., as Trustee of Certain Mortgage Backed Securities Trusts* | *Counsel to U.S. Bank National Association, as Trustee of Certain Mortgage Backed Securities Trusts* |

SK 03687 0119 1342579 v2