Hearing Date and Time: December 20, 2012 at 10:00 a.m. (ET)

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone:     (212) 468-8000
Facsimile:     (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Todd M. Goren

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------- )
   In re:                                       )     Case No. 12-12020 (MG)
                                             )
   RESIDENTIAL CAPITAL, LLC, et al.,  )     Chapter 11
                                             )
                                 Debtors.  )     Jointly Administered
---------------------------------------------------------------------- )

**DEBTORS' OMNIBUS REPLY TO RESPONSES TO (I) DEBTORS' MOTION FOR
THE ENTRY OF AN ORDER FURTHER EXTENDING THEIR EXCLUSIVE PERIODS
TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF AND (II)
DEBTORS' MOTION FOR APPOINTMENT OF A MEDIATOR**

TO THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE:

      The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors") submit this reply (the "Reply") to responses[1] to the (i) *Debtors' Motion for the Entry*

---

[1] *Limited Objection of the Steering Committee Group of RMBS Holders to Debtors' Motions (i) to Further Extend Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof, and (ii) for Appointment of a Mediator* [Docket No. 2400] (the "RMBS Limited Objection"), *Response of AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities the Debtors Motion for Appointment of a Mediator* [Docket No. 2403] (the "AIG Response"), *Omnibus Response of Ad Hoc Group of Junior Secured Noteholders to Debtors' Motion for the Entry of an Order Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and Debtors Motion for the Appointment of a Mediator* [Docket No. 2406] (the "JSB Response"), *Statement of Wilmington Trust, National Association in Respect of the Debtors' Motion for Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof and for Appointment of a Mediator* [Docket No. 2408] (the "Wilmington Trust Statement"), and *Statement and Reservation of Rights of the Official Committee of Unsecured Creditors with Respect to Debtors' Motion for Appointment of a Mediator and Debtors' Motion for the Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2418]

ny-1070272

*of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 2355] (the "Second Exclusivity Motion") and (ii) *Debtors' Motion for Appointment of a Mediator* [Docket No. 2357] (the "Mediator Motion," and together with the Second Exclusivity Motion, the "Motions"). In further support, the Debtors respectively allege as follows:

**REPLY**

1.  The Debtors – working with the Creditors' Committee[2] – have made significant progress[3] in forging a path to a consensual Chapter 11 plan by creating a forum within which key stakeholders can and have already begun to discuss important plan issues. In moving for the appointment of a mediator, the Debtors are seeking to put in place a mechanism in aid of plan negotiations, supported by the Creditors' Committee and other major stakeholders, to assist in fostering discussions concerning AFI Related Issues and Intercreditor and Interdebtor Issues, as described in the Mediator Motion. While a further extension of exclusivity and the appointment of a mediator are not concomitant, the Debtors believe that granting the relief requested in the Motions will precipitate advancement in plan negotiations.

2.  Complex issues pervade these Chapter 11 cases, and key parties in interest possess acutely disparate positions on many of these issues as evidenced by the range of views espoused in the Responses. The Debtors have attempted to balance the parties' divergent

---

(the "Committee Statement"), *Joinder of National Credit Union Administration Board to the Response of AIG Asset Management (U.S.), LLC, the Allstate Entities, Massachusetts Mutual Life Insurance Company, and the Prudential Entities to Debtors' Motion for Appointment of a Mediator* [Docket No. 2439] (the "NCUAB Joinder," and collectively with the Committee Statement, RMBS Limited Objection, AIG Response, JSB Response and Wilmington Trust Statement, the "Responses").

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motions.

[3] The Responses acknowledge the Debtors' achievements in these cases. *See* Wilmington Trust Statement ¶ 1 ("…there have been significant accomplishments on the sales for which the Debtors and the Creditors Committee deserve to be commended…"); Committee Statement ¶¶ 1-3 (supporting the Debtors' request for an extension of exclusivity and appointment of a mediator and noting that "progress has been made…").

ny-1070272

interests through the Motions and believe that mediation will help forge a path toward a consensual Chapter 11 plan.

3. Notably, only one creditor constituency, the Ad Hoc Group of Junior Secured Noteholders[4] (the "JSBs"), opposes the appointment of a mediator and the extension of exclusivity requested by the Debtors. The JSBs nonetheless have indicated their willingness to participate in mediation if a mediator is appointed and do not object to an extension of exclusivity, but seek to limit its duration to January 31, 2013.

4. The JSBs make numerous unfounded allegations and use the Motions as an opportunity to articulate a revisionist view of the course of these Chapter 11 cases. The JSB Response likewise unfairly disparages the Debtors' good faith attempts to include all major creditor constituencies in plan discussions and belittles the critical need for confidentiality of those discussions. The JSB Response should be seen for exactly what it is – an attempt by a group of undersecured creditors to wrest control of these cases, bully their way into receipt of postpetition interest and/or provide them with an option to trade out of their holdings should they decide to exit the Debtors' capital structure before any plan is confirmed.

5. Finally, certain of the Responses also raise concerns regarding the timing and duration of the mediation. The Debtors believe that the process should begin quickly and in earnest with a carefully constructed and defined term (subject to mutual extension) to avoid parties using mediation as a means to delay discussion of important plan issues.

---

[4] The Debtors and their advisors believe that they understand who the members of the Ad Hoc Group of JSBs are, but the most recent statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure on behalf of this group was filed almost six months ago [Docket No. 488] and has not been amended to reflect any changes to this group.

3

ny-1070272

**A.     The JSB Response**

<u>Length of Plan Exclusivity Extension</u>

6.     The JSBs are the only party to request a shorter exclusivity extension than that requested by the Debtors[5] and even they do not suggest that an extension is unwarranted at this time. It is important to understand the JSBs' analysis of their position in these cases when considering the JSB Response. The JSBs allege that their claims are oversecured and entitled to postpetition interest. The Debtors dispute these assertions entirely and will address them at the appropriate time.[6] The interests of the JSBs are thus quite different from many of the Debtors' other creditor constituencies.

7.     The JSB Response entirely disregards the fact that the Debtors have done what no other mortgage servicer in a Chapter 11 proceeding has done before – sell an active loan servicing and origination platform in bankruptcy. As a result of the Debtors' considerable efforts, the Asset Sales yielded an incremental $1 billion in value over the stalking horse bids, benefitting their creditors, including the JSBs. Yet, rather than recognizing that the Debtors and their advisors were required to focus significant attention on the Asset Sales over the last three months, the JSBs have instead used their response as an opportunity to advance their parochial interests and unfairly criticize the Debtors' plan negotiations to date.

8.     The JSBs argue that they have not had enough involvement in plan discussions because their advisors have only participated in two formal meetings with the Debtors' advisors. *See* JSB Response at 5-7. The JSBs try to create the impression that the Debtors have sat idly on

---

[5] The RMBS Limited Objection actually requests a longer extension of the Exclusive Plan Period than that requested by the Debtors - through the end of March, 2013.

[6] As will be addressed in more detail in the plan process, the JSBs assert in their objection to the Asset Sales, that their lien on the Debtors' general intangibles entitles them to some portion of the proceeds of the Platform Sale attributable to the intangible value of the Debtors' "platform." The Debtors dispute this assertion. Pursuant to the Platform Sale asset purchase agreement, the Debtors sold financial assets. Even if some value could be attributed to the "platform," notwithstanding their lien on general intangibles, the JSBs do not have a lien on any of the Debtors' servicing rights and therefore should not have a lien on the intangible value of those rights.

4

ny-1070272

the sidelines since the hearing on their first request to extend exclusivity and sought to exclude the JSBs' representatives from participating in plan discussions. This is simply not the case.

9. Putting aside the efforts of the Debtors and their advisors in connection with the Asset Sales, the truth is that the Debtors' advisors have hosted numerous meetings with major stakeholders and engaged in countless informal discussions on plan issues. Additionally, the Debtors and their advisors spent considerable time preparing waterfall analyses to facilitate productive discussions among the parties, which were presented to the JSBs following the Asset Sales.

10. The JSBs conveniently fail to mention the numerous informal discussions that have occurred between the parties' advisors. Since the first extension of exclusivity was granted on September 11, 2012, the Debtors' and JSBs' financial advisors have engaged in several informal discussions as well as weekly calls to address numerous information requests from the JSBs' advisors, including holding detailed discussions regarding the various permutations of and variables driving the waterfall analyses. The Debtors have also provided the advisors for the JSBs with access to all of the Debtors' financial and operational materials and they have access to all of the documents posted in the database maintained in connection with the Examiner's investigation. In this context, the JSBs' assertions that the two formal meetings held with the advisors to the JSBs are a sign of a lack of progress in these cases cannot be countenanced. Moreover, even if true, that should not serve to shorten the Debtors' requested exclusivity extension. *See In re Lexington Precision Corp.*, Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Oct. 31, 2008) [Docket No. 457] (finding that sufficient and good faith progress had been made in plan negotiations, even though there had only been two meetings between the debtors and the creditors' committee).

11.     The JSBs portray themselves as "ready, willing and able to engage in plan negotiations over any issue that affects the prompt confirmation and consummation of a plan for these Debtors." *See* JSB Response at 3.  But following the First Exclusivity Hearing, the Debtors were stonewalled by the JSBs and advised that without a substantially increased AFI Settlement, any discussions would be a "waste of time."  *See* Exhibit 1.

12.     What has happened since the First Exclusivity Hearing should be obvious – the Debtors have concluded a wildly successful auction of their assets, substantially improving the value of the JSBs' collateral to the point that they now believe they are entitled to post-petition interest (which, as noted above, the Debtors dispute).  By suggesting that the Debtors be given only another 40 days to negotiate a consensual plan with the many diverse creditor interests, the JSBs attempt to set the Debtors up for failure so as to allow the JSBs to take the reigns of these cases and propose a Chapter 11 plan that pays them post-petition interest.  The parties with the most to gain or lose from the plan negotiations – the Debtors' unsecured creditors – all have supported the relief requested in the Motions.  The Court should thus overrule the JSB Response and grant the Second Exclusivity Motion because the Debtors have demonstrated that they have satisfied the Adelphia Factors (*See* Exclusivity Motion ¶¶ 35-57), including making good faith progress in negotiating with creditors.  For the same reasons, the Court should deny the JSBs request that any order approving an extension of exclusivity be with prejudice to the Debtors' right to request further extensions.[7]

---

[7] Additionally, the JSB Response provides no credible argument as to why a mediator should not be appointed or why any mediator appointed should be limited to a period of one month.  Limiting mediation to a period of one month is impractical, if not impossible.  Just getting the mediator up to speed on the relevant issues will take time.  Appointing a mediator for an initial term of 70-days, as the Debtors seek, with the ability to extend such period, will allow the mediator to get up to speed on the relevant issues and conduct the mediation at the appropriate pace.

Confidentiality of Plan Negotiations is Essential

13.   The JSBs also take issue with the fact that the Debtors have conditioned participation in plan discussions on entering into a confidentiality agreement concerning those discussions and any materials prepared and distributed in connection therewith. *See* JSB Response at 7-8. The JSBs argue that their principals should be participants in the plan discussions without being restricted from trading. *See* JSB Response at 7. The JSBs maintain that the Debtors insist on "imposing onerous conditions on access to information relevant to the plan process…" and that requiring parties to sign confidentiality agreements "is at odds with how plan negotiations occur in most other major bankruptcy cases."[8] *See* JSB Response at 2 and 7. The JSBs fail to provide any factual support for these statements. While this issue is irrelevant to the Court's consideration of exclusivity, the Debtors would like to articulate to the Court why they have required confidentiality as a condition to participation in plan discussions and why other parties in interest insist on the same.

14.   *First*, the form confidentiality agreement provided to the JSBs is not onerous. Rather, it was approved by this Court in connection with the Examiner's investigation and has been signed by numerous other parties in interest in connection with plan discussions. *Second*, the Debtors sent confidentiality agreements to the JSBs in an effort to engage them in plan discussions. No one prohibited the JSBs from negotiating the terms of a confidentiality agreement. Instead, not one of the JSBs even returned to the Debtors the proposed confidentiality agreement with any comments whatsoever.

15.   *Third*, the Debtors should not be required to engage in months of negotiations with a counterparty who at any time can trade out of the Debtors' debt securities and frustrate the

---

[8] Despite explicitly stating that confidentiality is at odds with how plan negotiations occur in other major bankruptcy cases, the JSBs failed to provide any examples of major bankruptcy cases in which confidentiality was not required.

entire Chapter 11 process. Frank discussions regarding complex legal and business issues cannot occur without confidentiality. In fact, various parties in interest have advised the Debtors that they will not participate in plan negotiations without confidentiality of those discussions. Disclosure of these materials would have a chilling effect on plan discussions. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 591 (Bankr. S.D.N.Y. 2006) (refusing to require the disclosure of nonpublic materials relating to settlement negotiations and stating that "such would be inconsistent with Rule 408 and the basic ground rules under which we encourage parties to negotiate settlements."); *see also In re Washington Mutual, Inc.*, 461 B.R. 200, 266 (Bankr. D. Del. 2011) ("There is an easy solution: creditors who want to participate in settlement discussions in which they received material nonpublic information about the debtor must either restrict their trading or establish an ethical wall between traders and participants in the bankruptcy case. The Court does not believe that a requirement to restrict trading or create an ethical wall in exchange for a seat at the negotiating table places an undue burden on creditors who wish to receive confidential information and give their input.").

16. In particular, the "waterfalls" prepared in connection with plan discussions contain material nonpublic information and are predicated on various business, value, and legal assumptions made for settlement purposes. The Debtors believe that public disclosure of such analyses will frustrate plan negotiations. Furthermore, the information contained in the waterfall is subject to continuous change, and disclosure could potentially be misleading to investors without also requiring that the Debtors publish constant updates to the waterfall to be published. What the JSBs are seeking is germane solely to their parochial interests. In response to the Debtors' offer to provide the JSBs with all relevant materials on a confidential basis, the JSBs offer the Debtors' a Hobson's Choice in order to allow them to trade the Debtors' public debt –

8

ny-1070272

condition their participation in negotiations on the Debtors' public provision of sensitive settlement information, require the Debtors to undertake a constant obligation to update and correct information publicly disclosed, ensure all their creditors do the same in settlement discussions and risk chilling negotiations entirely. That is not a choice the Debtors are or should be required to make.

### B.    The RMBS Limited Objection and the Committee Statement

17.    While certain of the responders note that significant progress has not been made in negotiating the terms of a consensual Chapter 11 plan, this has not been a result of the Debtors' lack of trying. As the Court is well aware, the Debtors filed these cases with a proposed settlement with AFI. The AFI Settlement unquestionably facilitated the Debtors' continuation and sale of their mortgage servicing and origination business as a going concern. Throughout these cases, parties in interest are seemingly prepared to take the benefits of the AFI Settlement while at the same time criticizing its terms. Obviously, AFI is not going to negotiate against itself with respect to the AFI Settlement. If creditors believe that the consideration extracted by the Debtors in the AFI Settlement is insufficient, it is incumbent upon creditors to demonstrate why and formulate a good faith counter proposal. Interested parties have more than sufficient information they need to formulate such a proposal. The Debtors understand that meetings between the Creditors' Committee and AFI to discuss the potential claims against AFI have been scheduled for early January. The Debtors are thus hopeful that meaningful progress can soon be made.

18.    While no other party, aside from the JSBs, objects to the appointment of a mediator,[9] the RMBS Limited Objection[10] requests that mediation conclude no later than

---

[9] The AIG Response, filed on behalf of AIG Asset Management (U.S.), LLC, Allstate Insurance Company, Massachusetts Mutual Life Insurance Company and Prudential Insurance Company of America (the "Investors")

March 1, 2013, except as extended by the Court for good cause. The Debtors, however, believe that it is important for parties to have the ability to extend the term of the mediation without leave of Court to the extent the Debtors, the mediator, and the relevant parties to the mediation believe that the mediation is beneficial. Imposing a full stop on the mediation will be detrimental if the parties are making progress in negotiating certain key issues.

19. While the Debtors do not believe that mediation should be limited or restricted, they proposed that a mediator be appointed for a limited initial term because parties should not be allowed to use the mediation process to drag out discussions on major issues. The Debtors do not believe that the start of the mediation should be delayed until February. In light of the adjournment of the hearing on the RMBS 9019 Motion and the extent of the work that has already been performed in connection with this matter, there is no reason why those issues and the claims arising in connection with the Debtors' mortgage securitizations and any claims by parties that provided credit enhancements to the Debtors should not begin to be addressed by the mediator without delay[11] and while the parties are at the same time negotiating with AFI.

20. If the Court determines that the appointment of a mediator is appropriate at this time, the Debtors propose to immediately meet and confer with the mediator and parties in interest and devise a structure for the mediation, including setting a schedule for submitting position statements.

---

supports the Debtors' request for the appointment of a mediator. Notwithstanding this support, the Investors note that they have yet to be involved in formal plan negotiations. During the First Exclusivity Extension Hearing, the Court directed the Debtors' to make progress in plan discussions with certain parties, specifically the Creditors' Committee, AFI and the JSBs. Thus, the Debtors engaged in formal and informal discussions with various major stakeholders, including the Creditors' Committee. Additionally, AIG is a member of the Creditors' Committee. The Creditors' Committee has a duty to represent a number of interests including those aligned with the Investors.

[10] The RMBS Limited Objection also requests that all parties have access to the information provided to the mediator. Subject to entering into confidentiality agreements, the Debtors do not oppose this request.

[11] The Steering Committee Group of RMBS Holders (whose interests are represented by the three trustees who also sit on the Creditors' Committee) indicates in its papers that it supports commencement of mediation on these issues, as soon as possible after a mediator is appointed. *See* RMBS Limited Objection ¶4. The AIG Response also calls for mediation on these issues (AIG and Allstate are both members of the Creditors' Committee). *See* AIG Response ¶ 2.

21. The Court should therefore overrule the Responses and grant the relief requested in the Mediator Motion. As set forth in the Mediator Motion, the Debtors request that a sitting bankruptcy judge be appointed as mediator who will be well suited to assist in developing disciplined negotiations among these parties and fostering discussions concerning AFI Related Issues and Intercreditor and Interdebtor Issues, which are central to the formulation of any Chapter 11 plan in these cases. The divergent positions espoused in the Responses reflect the parties' opposing interests and further support the appointment of a mediator at this time.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court overrule the Responses and grant the relief requested in the Motions, and such other and further relief as is just and proper.

New York, New York  
Dated: December 18, 2012

/s/ Gary S. Lee  
Gary S. Lee  
Lorenzo Marinuzzi  
Todd M. Goren  
MORRISON & FOERSTER LLP  
1290 Avenue of the Americas  
New York, New York 10104  
Telephone: (212) 468-8000  
Facsimile: (212) 468-7900

*Counsel to the Debtors and  
Debtors in Possession*

11

ny-1070272

**<u>Exhibit 1</u>**

| | |
|---|---|
| **From:** | Uzzi, Gerard <GUzzi@milbank.com> |
| **Sent:** | Saturday, October 13, 2012 3:10 PM |
| **To:** | 'dgolden@AkinGump.com'; Lee, Gary S.; 'Thomas.Walper@mto.com' |
| **Cc:** | 'rtweschler( ı'; 'dgropper( '; 'Seth.Goldman@mto.com'; 'mniemann@hlhz.com'; 'mbrodsky( ı'; Goren, Todd M.; Marinuzzi, Lorenzo; 'cshore@ny.whitecase.com'; 'hdenman@whitecase.com'; Papeika, Greg; 'rsnellenbarger@ ı' |
| **Subject:** | Re: Residential Capital |

So that silence is not taken as acquiescence or waiver with respect to any position, we generally support disclosure of most of what has been requested by other parties as more specifically communicated by houlihan to centerview. We do not believe, however, that the Debtors should take any public position with respect to the allocation of administrative expenses either across collateral "silos" or debtor estates. With respect to the former, we know of no basis in law to allocate administrative expenses against collateral, except by order of the court pursuant to section 506(c), which has been waived in this case and which is otherwise not supportable by the facts in any event. With respect to the latter, the debtors are in conflict. Thus, to extent resolution of the issue is necessary, we believe it best left to the creditors to resolve themselves either by way of compromise or litigation. We will not condition attendance of this week's meeting on the disclosure of further information. That said, as we have discussed with other stakeholders, we believe that further settlement discussions regarding the Debtors' current plan need to be conditioned upon an indication from Ally that it is prepared to make a substantially larger contribution for its releases than what is presently proposed. In absence of such indication, further discussion of the Debtors' plan is a waste of time as it is clear that a release of Ally for the current proposed consideration is not achievable. In such event, we see no reason for the Debtors to not move directly and quickly to a liquidating plan of reorganization. We suspect that much of the information that has been requested be publicly disclosed would be appropriate for a disclosure statement in any event, so, from a practical standpoint, we see little justification for a wholesale denial or delay of further disclosure. Of course, we reserve all rights, including the right to seek a termination of exclusivity or a conversion of the case if we determine circumstances warrant such. We are available to discuss further.


Gerard Uzzi | Milbank
1 Chase Manhattan Plaza | New York, N.Y. 10005
v: 212.530.5670 | f: 212.822.5670
guzzi@milbank.com | www.milbank.com

----- Original Message -----
From: Golden, Daniel [mailto:dgolden@AkinGump.com]
Sent: Saturday, October 13, 2012 11:45 AM
To: 'GLee@mofo.com' <GLee@mofo.com>; 'thomas.walper@mto.com' <thomas.walper@mto.com>
Cc: 'rtweschler( >; zz-exGropper, Dan <dgropper( ​ ​ ​>; Uzzi, Gerard; 'Seth.Goldman@mto.com' <Seth.Goldman@mto.com>; 'mniemann( >; Brodsky, Mark <mbrodsky( ​ ​ ​ .>; 'TGoren@mofo.com' <TGoren@mofo.com>; 'LMarinuzzi@mofo.com' <LMarinuzzi@mofo.com>
Subject: Re: Residential Capital

Gary, sorry for the earlier e mail transmission failure. What I was attempting to say was that we agree wholeheartedly to Tom Walper's position and unless the Debtors change their current position it appears that advisors for the largest JSB holders will not b e at your meeting. Maybe that is the result you intend since for weeks ypu have failed, despite

1

repeated requests, to put forth a cogent explanation as th why the requested documents supposedly contain material non public information. As recently as Thursday Dan Gropper offered to meet with any of the Debtors financial advisors to discuss this topic and of course nothing has happened. When are you planning to get serious about plan negotiations and allow the necessary holders to meaningfully participate by putting them into possession of necessary documents without unnecessary obstacles? We welcome an opportunity any time between now and Tuesday to take you up and have a honest discussion about the true nature of the documents we have requested Daniel H. Golden Akin Gump Strauss Hauer & Feld LLP One Bryant Park New York, NY 10036

Phone: (212) 872-8010

Fax: (212) 872-1002


----- Original Message -----
From: Lee, Gary S. <GLee@mofo.com>
To: Golden, Daniel; 'thomas.walper@mto.com' <thomas.walper@mto.com>
Cc: 'rtweschler                               ＿＿＿＿＿＿＿＿＿n>; zz-exGropper, Dan; 'guzzi@milbank.com' <guzzi@milbank.com>; 'Seth.Goldman@mto.com' <Seth.Goldman@mto.com>; 'mniemann'                             ; Brodsky, Mark; Lee, Gary S. <GLee@mofo.com>; Goren, Todd M. <TGoren@mofo.com>; Marinuzzi, Lorenzo <LMarinuzzi@mofo.com>
Sent: Sat Oct 13 10:05:31 2012
Subject: Re: Residential Capital

Danny-Tom. We remain happy to discuss each of the specific requests with you - broadly some of it has already been made public, some we are in the process of making public, but the bulk is either sensitive and confidential information or business information that the Debtors will not make public for the reasons we have described.

We (and others) are in the process of creating additional materials for plan discussions that are intended to promote a dialogue. Of necessity, the materials contain different parties business and legal impressions for settlement purposes and as such it would be entirely inappropriate at this stage to require public disclosure. Indeed we believe that requiring production would inherently chill candor in these discussions.

We would - again - invite you to participate in this process and offer you the same confidentiality you would expect from others.

To that end, for the purposes of a meeting on Tuesday are you prepared to have the advisors sign a confidentiality agreement in the fashion White & Case and Houlihan did?

Please let me know.

Danny, by the way nothing was attached to your email of today.

Regards,



Gary S. Lee
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
T. 212.468.8042
F. 212.468.7900
glee@mofo.com

----- Original Message -----
From: Golden, Daniel [mailto:dgolden@AkinGump.com]

2

Sent: Saturday, October 13, 2012 08:52 AM
To: Walper, Thomas <thomas.walper@mto.com>
Cc: Lee, Gary S.; RTWeschler                              >; zz-exGropper, Dan <dgropper(
         n>; Gerard Uzzi <guzzi@milbank.com>; Goldman, Seth <Seth.Goldman@mto.com>; Matthew R. Niemann
              m>; Brodsky, Mark
Subject: Re: Residential Capital


Daniel H. Golden
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.8010 | Internal: 38010
Fax: +1 212.872.1002 | Mobile: +1 917.881.5902 | dgolden@akingump.com<mailto:dgolden@akingump.com> | akingump.com<http://akingump.com>

On Oct 12, 2012, at 1:31 PM, "Walper, Thomas" <thomas.walper@mto.com<mailto:thomas.walper@mto.com>> wrote:

Thank you for your response.

We respectfully disagree that the information requested should not be publicly disclosed. We believe that such disclosure will facilitate prompt and constructive plan discussions among all the relevant parties, including junior secured bondholders.

Given your position, we will not be able to attend the proposed meeting to discuss plan concepts and issues next Tuesday. We urge you to reconsider your position as we do not believe that any interest is served by retaining this information inside of these liquidating debtors.

We will be pleased to attend a meeting if you change your position. Let us know.

Kind regards.

Thomas B. Walper
(o) 213.683.9193
(c) 626.893.4642

On Oct 11, 2012, at 10:25 AM, "Lee, Gary S." <GLee@mofo.com<mailto:GLee@mofo.com>> wrote:

Tom.

I write in reponse to your letter of October 8.

As I advised the Court on September 11 and in my update, we are and will continue to engage and negotiate with all parties in these cases with a view towards prompt plan resolution. In that regard, we have held meetings with the Unsecured Creditors Committee to continue to identify plan negotiation issues and develop a staged process going forward, have met with the UCC and AFI, and are meeting with you and other representatives of the JSBs next week. We fully intend to negotiate with Berkshire and other Junior Secured Noteholders with respect to plan issues.

With respect to your specific information requests, we would be happy to provide the information to you. However, given that the requests seek material non public information we have attached a confidentiality agreement for you to execute (it is in the form that Judge Glenn approved in connection with the Examiner protocol and which he has encouraged the parties to use for all purposes). The JSBs and many other significant creditors of the debtors (including

3

the Senior Noteholders through Wilmington, several of the monolines and the RMBS trustees to name a few) have signed our form of confidentiality agreement - which is attached - and have received such information from our client.

We have determined with our client that this is the most appropriate way to ensure the flow and use of such information, and that public disclosure of material non public information is not appropriate at this time.

We stand ready to provide you with such information once you execute the confidentiality agreement.

Regards,


Gary S. Lee
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104-0050
T. 212.468.8042
F. 212.468.7900
glee@mofo.com<mailto:glee@mofo.com>
-----Original Message-----
From: Walper, Thomas [mailto:thomas.walper@mto.com]
Sent: Monday, October 08, 2012 3:41 PM
To: Lee, Gary S.
Cc: RTWeschler
Subject: Residential Capital



Gary - please see the attached. Regards.


Thomas B. Walper | Munger, Tolles & Olson LLP
355 South Grand Avenue | Los Angeles, CA 90071
Tel: 213.683.9193 | Cell: 626.893.4642 | thomas.walper@mto.com<mailto:thomas.walper@mto.com> |
www.mto.com<http://www.mto.com>

***NOTICE***
This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from disclosure under applicable law. It is not intended for transmission to, or receipt by, any unauthorized person. If you have received this message in error, do not read it. Please delete it without copying it, and notify the sender by separate e-mail so that our address record can be corrected. Thank you.



---

To ensure compliance with requirements imposed by the IRS, Morrison & Foerster LLP informs you that, if any advice concerning one or more U.S. Federal tax issues is contained in this communication (including any attachments), such advice is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

For information about this legend, go to http://www.mofo.com/Circular230/

4