**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————X

In re:

RESIDENTIAL CAPITAL, LLC, *et al*.

                  Debtors.

———————————————————————X

)
)
)
)
)
)
)

Chapter 11

Case No. 12-12020 (MG)

(Jointly Administered)

### DECLARATION OF RICHARD G. HADDAD IN SUPPORT OF MOTION BY ALLY FINANCIAL INC. AND ALLY BANK FOR AN ORDER ENFORCING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(a)(3) BY (1) ENJOINING PROSECUTION OF ALTER EGO AND VEIL PIERCING CLAIMS IN THE CLASS ACTION ENTITLED *LANDON ROTHSTEIN , ET AL. V. GMAC MORTGAGE, LLC, ET AL.*, AND (2) DECLARING SUCH CLAIMS VOID *AB INITIO*

Richard G. Haddad, pursuant to 28 U.S.C. § 1746, declares and says as follows:

1.      I am a member of the Firm of Otterbourg, Steindler, Houston & Rosen, P.C., the attorneys for Ally Financial Inc. ("*AFI*") and Ally Bank (together with AFI, "*Ally*") in the putative class action entitled *Landon Rothstein, et al. v. GMAC Mortgage, LLC, et al.*, No. 1:12-cv-03412-AJN (S.D.N.Y.) (the "*Class Action*").

2.      I submit this declaration in support of Ally's motion (the "*Motion*") for an order pursuant to section 362(a) of title 11 of the United States Code, 11 U.S.C §§ 101-1523 (the "*Bankruptcy Code*"), enforcing the automatic stay by (a) enjoining the plaintiffs in the Class Action and their attorneys from pursuing those claims asserted in the Class Action against Ally which are based in whole or in part upon allegations of alter ego or that the corporate veil of any of the above-captioned debtors (collectively, the "*Debtors*") should be pierced, and (b) declaring the assertion of such claims in the Class Action void *ab initio*.

3.     A copy of the original Class Action Complaint filed by Landon Rothstein in the Class Action on April 30, 2012 is annexed hereto as **Exhibit A**.

4.     A copy of the First Amended Class Action Complaint in the Class Action, filed on September 28, 2012, is annexed hereto as **Exhibit B**.

5.     On November 9, 2012, the attorneys for the plaintiffs in the Class Action filed a proof of claim in the bankruptcy of Residential Capital, LLC, in the amount of $1,000,000,000, purportedly on behalf of the plaintiffs in the Class Action, Landon Rothstein, Jennifer Davidson, Robert Davidson and Ihor Kobryn, "individually and on behalf of a putative class consisting of all residential mortgage loan borrowers who have been charged for lender-placed insurance in connection with loans serviced by GMAC Mortgage, LLC at any time from March 6, 2003 to the present." A copy of that proof of claim is annexed hereto as **Exhibit C**.

6.     On November 9, 2012, the attorneys for the plaintiffs in the Class Action filed a proof of claim in the bankruptcy of GMAC Mortgage, LLC, in the amount of $1,000,000,000, purportedly on behalf of the plaintiffs in the Class Action "individually and on behalf of a putative class consisting of all residential mortgage loan borrowers who have been charged for lender-placed insurance in connection with loans serviced by GMAC Mortgage, LLC at any time from March 6, 2003 to the present." A copy of that proof of claim is annexed hereto as **Exhibit D**.

7.     A copy of a Stipulation and Order  in the Class Action, entered December 17, 2012, extending the time for Ally to respond to the Amended Complaint in the Class Action pending final determination of the Motion, is annexed hereto as **Exhibit E**.

- 2 -

8.      No discovery requests have been served and no discovery had been taken in the

Class Action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 21, 2012.

_____

Richard G. Haddad

# EXHIBIT A

JUDGE NATHAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**LANDON ROTHSTEIN**, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

**GMAC MORTGAGE, LLC f/k/a GMAC MORTGAGE CORPORATION, GMAC INSURANCE MARKETING, INC. d/b/a GMAC AGENCY MARKETING, BALBOA INSURANCE COMPANY, MERITPLAN INSURANCE COMPANY,** and **JOHN DOES 1-20.**

      Defendants.

12 CV 3412

Civil Action No.: _____

RECEIVED
APR 3 0 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## CLASS ACTION COMPLAINT

### Jury Trial Demanded

Plaintiff Landon Rothstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys.   Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.     Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO") and applicable state law on behalf of himself and a nationwide putative class (the "Class"), as more specifically defined below, consisting of all residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by defendant GMAC Mortgage, Inc. f/k/a GMAC

Mortgage Corporation (hereinafter "GM") at any time from March 6, 2003 to the present (the "Class Period").

2. To protect the lenders' interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be reimbursed by the borrower for the cost. GM, a servicer of mortgage loans, procures force-placed insurance coverage with respect to the loans in its servicing portfolio from defendant Balboa Insurance Company ("Balboa").

3. This case is brought because, at all relevant times, GM has extracted kickbacks from Balboa which have artificially inflated the force-placed insurance premiums that GM has paid. This has enabled GM to demand inflated reimbursements from borrowers.

4. Specifically, beginning in or about March 2003, GM, as a *quid pro quo* for awarding Balboa its force-placed insurance business, has required Balboa to pay GM kickbacks. These kickbacks have been in the form of bogus "commissions" paid to a GM affiliate, "GMAC Agency Marketing," an unincorporated division and/or fictitious "doing business as" name of defendant GMAC Insurance Marketing, Inc. ("GI"). Balboa agreed to label these payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as bribes or kickbacks.

5. This kickback scheme has improperly inflated the reimbursements demanded from borrowers with respect to force-placed insurance on GM-serviced loans because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. The amounts of the kickbacks have then been repaid by Balboa to GM and/or GI in round-trip

2

transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium minus the kickback – represents the true or actual price or cost of the insurance.

6.      This scheme has robbed not only borrowers, but also the owners of the loans being serviced by GM. All servicing agreements entitle servicers such as GM to recoup any advances they incur from loan proceeds "off the top" before any money is passed through to the owners of the loans. Premiums on force-placed insurance constitute reimbursable servicing advances under all such agreements.

7.      At all relevant times, GM in its capacity as loan servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs but instead on the artificially inflated, fraudulently grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances before passing money through to the owners of the loans, has not netted out the amounts of the kickbacks that it has received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of the loans have borne those fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM as a result of the scheme alleged herein have come from the pockets of the pension funds that invest in the mortgages in GM's servicing portfolio and – in the case of loans in the portfolio owned

by the Federal National Mortgage Association ("Fannie Mae") and other Government Sponsored Enterprises ("GSEs") – from the pockets of United States taxpayers.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a). This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c).

9.      Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts her affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice so require." 18 U.S.C. § 1965(b).

10.      Additionally, this Court also has personal jurisdiction over the defendants because each systematically and continually conducts business throughout the State of New York.

11.      This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff is a citizen of the State of Texas. Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

12.      This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.      Venue is proper in this district under 28 U.S.C. § 1391(b), and 18 U.S.C. §§ 1965(b) and (d). Defendants regularly conduct business in this District.

4

## PARTIES

14.    Plaintiff Landon Rothstein is a resident of Humble, Texas. Plaintiff has a mortgage loan serviced by GM on a property located at 97 County Road 3701, Splendora, Texas. Plaintiff was charged $105.00 by GM purportedly to reimburse it for the cost of force-placed hazard insurance with respect to the period October 6, 2010 to January 4, 2011. The force-placed coverage was obtained by GM from defendant Balboa through its wholly-owned subsidiary defendant Meritplan Insurance Company.

15.    Defendant GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation ("GM"), is a direct or indirect subsidiary of Residential Capital, LLC, which in turn is a direct or indirect subsidiary of bank holding company Ally Financial Inc. f/k/a GMAC, Inc. ("Ally Financial"). GM is a Delaware limited liability company headquartered in Fort Washington, Pennsylvania. GM is a financial services company that engages in the servicing of residential mortgage loans.

16.    Defendant GMAC Insurance Marketing, Inc. d/b/a GMAC Agency Marketing ("GI") is a Missouri corporation and a wholly owned indirect subsidiary of Ally Financial. GI is believed to have offices located at 59 Maiden Lane, 23rd Floor, New York, New York 10038.

17.    Defendants GM and GI are referred to collectively herein as the "GMAC Defendants."

18.    Defendants John Does 1-10 are direct or indirect subsidiaries and/or affiliates of Ally Financial which have at any time during the Class Period received payments from defendant Balboa in connection with residential force-placed insurance, regardless of how those payments have been characterized, whether as purported "commissions," reinsurance premiums or otherwise.

5

19.     Defendant Balboa Insurance Company ("Balboa") is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide directly and/or indirectly through its wholly-owned subsidiaries, including defendant Meritplan.

20.     Defendant Meritplan Insurance Company ("Meritplan") is a California corporation headquartered in Irvine, California. Meritplan is a wholly-owned subsidiary of Balboa. Meritplan is a provider of lender-placed insurance to financial institutions nationwide.

21.     Defendants John Does 11-20 are direct or indirect subsidiaries and/or affiliates of Balboa which have at any time during the Class Period provided force-placed insurance coverage in connection with residential mortgages serviced by GM.

22.     Defendants Balboa and Meritplan are referred to collectively herein as the "Balboa Defendants."

23.     GM, GI, Balboa, and Meritplan are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of himself and a nationwide Class consisting of:

> All residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by GM at any time from March 6, 2003 to the present.

25.     The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

6

26.    The Class is so numerous that joinder of all members is impracticable.

27.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

28.    Plaintiff's claims are typical of the claims of the Class.

29.    There are questions of law and fact common to the Class, including but not limited to:

    a.    Whether Defendants engaged in a kickback scheme relating to force-placed insurance;

    b.    Whether GM and/or GI extracted kickbacks from the Balboa Defendants;

    c.    Whether Defendants' kickback scheme constituted mail or wire fraud;

    d.    Whether GM violated the covenants of good faith and fair dealing implied in the mortgage agreements of Plaintiff and the Class;

    e.    Whether GM breached the terms of the mortgage loan agreements of Plaintiff and the Class;

    f.    Whether Defendants have been unjustly enriched;

    g.    Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages.

30.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

31.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

7

32.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

33.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

34.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

35.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**Background on Force-Placed Insurance,
Securitization and Servicing**

36.     To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance.  If the borrower's coverage lapses or

is not obtained, the lender is entitled to purchase coverage for the home, "force place" it, and be

reimbursed by the borrower for the cost.

37.    Force-placed insurance policies generally are substantially more costly than borrower-

purchased policies, while providing less coverage. Additionally, force-placed insurance policies are

purchased by the lender and are for the lender. The lender is the sole insured and the only loss payee.

In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The

borrower's only involvement with force-placed insurance coverage is that the borrower is obligated,

by virtue of the mortgage loan agreement, to reimburse the lender for the cost. This obligation is,

in fact, secured by the lender's lien on the property.

38.    Plaintiff's mortgage loan contract is typical. Section 5 thereof provides, in pertinent

part:

> Property Insurance.  Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by
> fire, hazards included within the term "extended coverage," and any
> other hazards including, but not limited to, earthquakes and floods,
> for which Lender requires insurance.  This insurance shall be
> maintained in the amounts (including deductible levels) and for the
> periods that Lender requires.  What Lender requires pursuant to the
> preceding sentences can change during the term of the Loan.  The
> insurance carrier providing the insurance shall be chosen by Borrower
> subject to Lender's right to disapprove Borrower's choice, which
> right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above,
> Lender may obtain insurance coverage, at Lender's option and
> Borrower's expense.*  Lender is under no obligation to purchase any
> particular type or amount of coverage. Therefore, such coverage shall
> cover Lender, but might or might not protect Borrower.  Borrower's
> equity in the Property, or the contents of the Property, against any
> risk, hazard or liability and might provide greater or lesser coverage
> than was previously in effect. . . . *Any amounts disbursed by Lender
> under this Section 5 shall become additional debt of Borrower*

*secured by this Security Instrument*. These amounts shall bear
interest at the Note rate from the date of disbursement and shall be
payable, with such interest, upon notice from Lender to Borrower
requesting payment.

(emphasis added).

39.     Of course, the traditional lending relationship, where the lender makes a loan, retains

it in its portfolio, and services it itself, has become the exception rather than the rule. Most

residential mortgages in the United States are financed through securitization.

40.     Securitization is a financing method involving the issuance of securities against a

dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or

"seller") assembles a pool of mortgage loans made or "originated" by an affiliate or purchased from

unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary

(the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive,

specially created, special-purpose vehicle ("SPV"), typically a trust in the case of residential

mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loan.

The securities are sold directly to investors by the SPV or, as is more common, they are issued

directly to the depositor as payment for the loans. The depositor then resells the securities, usually

through an underwriting affiliate that places them on the market. Because the certificated securities

are collateralized by the residential mortgage loans owned by the trust, they are called residential

mortgage-backed securities ("RMBS").

41.     A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive;

it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the

financial institution.

10

42.    Loans, however, need to be managed.  Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans.  This third party is the mortgage loan servicer.  Every loan, irrespective of whether it is securitized, has a servicer.

43.    Servicers are hired by owners of whole loans, typically trustees of securitization trusts. Billions of dollars of mortgage loans are owned by GSEs, *i.e.*, Fannie Mae, the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Government National Mortgage Association.

44.    The specific duties of servicers are set forth in PSAs, Servicing Agreements, or similar contracts between the servicer and the owners of the loans which are in all respects material to this lawsuit uniform.  Pursuant to these agreements, servicers are obligated to manage the mortgages on behalf, and in the best interests of, their owners.  In fact, servicers are held to a high standard – they are required, at minimum, to use the same skill, care and practices in servicing loans for others as they customarily employ servicing loans for their own account.

45.    For example, on June 1, 2004, GM executed a PSA to become the servicer of an SPV trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA").  Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

11

46.     Servicers are responsible for performing the day-to-day tasks relating to the

mortgages. These tasks include account maintenance activities such as sending monthly statements

to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling

escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to

national credit bureaus, and remitting funds collected from mortgagors to the trust. These tasks also

include handling defaulted loans, prosecuting foreclosures and taking appropriate steps to mitigate

losses.

47.     One of the most important responsibilities of mortgage loan servicers is to protect the

owners of the mortgages from damages caused by casualty losses. All PSAs and other servicing

agreements, including those with the GSEs, require the servicer to make sure that adequate hazard

insurance is at all times maintained on the secured properties, including through force-placement if

appropriate.

48.     Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

MAINTENANCE OF HAZARD INSURANCE

The Servicer shall cause to be maintained for each Mortgage Loan
hazard insurance with extended coverage on the Mortgaged Property
in an amount which is at least equal to the lesser of (I) the Stated
Principal Balance of such Mortgage Loan and (ii) the amount
necessary to fully compensate for any damage or loss to the
improvements that are a part of such property on a replacement cost
basis, in each case in an amount not less than such amount as is
necessary to avoid the application of any coinsurance clause
contained in the related hazard insurance policy. . . . The Servicer
will comply in the performance of this Agreement with all reasonable
rules and requirements of each insurer under any such hazard policies.

49.     Additionally, Section 3.07 thereof provides:

MAINTENANCE OF INSURANCE POLICIES

> The Servicer shall not take any action that would result in
> noncoverage under any applicable Insurance Policy of any loss which,
> but for the actions of the Servicer would have been covered
> thereunder. The Servicer shall use its best efforts to keep in force and
> effect (to the extent that the related Mortgage Loan requires the
> Mortgagor to maintain such insurance), any applicable Insurance
> Policy. The Servicer shall not cancel or refuse to renew any
> Insurance Policy that is in effect at the date of the initial issuance of
> the Mortgage Note and is required to be kept in force hereunder.

50.   The servicing requirements applicable to loans owned and/or guaranteed by the GSEs

are set forth in the Fannie Mae Servicing Guide. Part II, Chapter 6 thereof provides, in pertinent

part:

> Part of a servicer's responsibility for protecting our interest in the
> security property is to ensure that hazard insurance (including flood
> insurance), under the terms specified in our Guides, is in place at all
> times. If the servicer is unable to obtain evidence of acceptable
> hazard insurance for a property, the servicer should obtain alternative
> insurance coverage (so-called "force-placed" insurance or
> "lender-placed" insurance) to protect our interests. In this instance,
> there are several guidelines that servicers should apply, subject to the
> provisions of and in compliance with applicable law and the mortgage
> documents.

**GM's Mortgage Servicing Portfolio**

51.   GM is the fifth largest servicer of residential mortgages in the United States, servicing

a portfolio of 2.5 million mortgage loans with an aggregate unpaid principal balance of

approximately $389 billion. At all relevant times, all the loans in GM's servicing portfolio have

been subject to servicing agreements with their owners and/or holders.

52.   At all relevant times, GM's mortgage servicing portfolio has been comprised of loans

owned and/or held by (i) Ally Bank, f/k/a GMAC Bank, a Utah state-chartered commercial bank

13

which is also an indirect subsidiary of Ally Financial; (ii) Fannie Mae and other GSEs; and (iii) various investors including securitization trusts pursuant to PSAs and similar agreements.

53.     The Ally Bank loans in GM's portfolio were originated by GM, then sold by GM to Ally Bank. Ally Bank either still owns such loans or has resold them to secondary market investors while retaining their servicing rights. Under the Servicing Agreements between Ally Bank and GM, GM is required to service the loans in accordance with the servicing guidelines of Fannie Mae. The servicing guidelines of Fannie Mae also govern GM's obligations with respect to the GSE loans serviced by GM.

**GM's Outsourcing Deal with Balboa**

54.     In the first quarter of 2003, GM contracted with defendant Balboa to buy force-placed insurance from Balboa in respect of GM-serviced loans.

55.     Several months later, in or about March 2003, GM expanded its relationship with Balboa by entering into a new agreement. The new agreement between GM and Balboa provided not only for GM to purchase force-placed insurance from Balboa, but for GM to outsource all of GM's functions relating to force-placed insurance – e.g., tracking borrowers' insurance policies – to Balboa.

56.     According to a March 6, 2003 press release issued by GM relating to its deal with Balboa, Balboa provides GM with "insurance tracking services that include data maintenance, EDI processing, customer service and online claims service." The term "EDI" – electronic data interchange – referred to Balboa's ability to access and interface with GM's borrower databases in real-time without any active involvement on the part of GM.

14

57.    The GM agreement with Balboa tasks Balboa with, *inter alia*, monitoring the mortgages in GM's servicing portfolio to identify expired, cancelled or non-renewed borrower policies; issuing notices to borrowers regarding the opportunity to cure; and force-placing coverage when appropriate. Balboa is also required by the agreement to maintain and staff call centers should borrowers want to speak with someone.

58.    At all relevant times, pursuant to the agreement, Balboa has functioned in all relevant respects as GM's force-placed insurance back-office. Balboa has handled all aspects of GM's force-placed insurance activities. GM does not perform any such activities itself. Balboa even issues notices to borrowers on GM letterhead, signed "Insurance Department, GMAC Mortgage LLC." Balboa also has its call center personnel identify themselves as employees of GM. Additionally, Balboa's EDI system enables Balboa to manage billings in respect of force-placed insurance, *i.e.*, adding charges and issuing credits with respect to force-placed insurance on borrowers' monthly statements, without any active involvement by GM.

59.    The initial agreement between GM and Balboa had a term of three years. However, the arrangement between GM and Balboa has continued to the present. In fact, GM is today one of Balboa's largest accounts.

**The Kickback Scheme**

60.    There is nothing inherently wrong with GM's insurance and outsourcing arrangements with Balboa. PSAs and other servicing agreements authorize outsourcing. This case is brought, however, because since at least March 2003, the arrangement between GM and Balboa has involved a wrongful component.

15

61.      Specifically, GM and Balboa devised and at all relevant times have engaged in a kickback scheme designed to generate illicit profits for GM and its affiliates based on GM's dealings with Balboa. These profits have been made off the backs of mortgage borrowers and the owners of the loans being serviced.

62.      Pursuant to the scheme, GM has extracted kickbacks or bribes from Balboa based on a percentage of the gross force-placed insurance premiums that GM has paid. These bribes are in the form of bogus "commissions" paid by Balboa to GMAC Agency Marketing, the unincorporated division and/or fictitious "doing business as" name of defendant GI. GM and Balboa agreed to fraudulently label the payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as kickbacks. The pretense is that the "commissions" are being paid by Balboa in the ordinary course of business to the insurance agent or "producer" responsible for introducing the insurance customer – *i.e.*, GM – to Balboa.

63.      At all relevant times, however, this pretense has been false. GI is not, and has never been, a *bona fide* insurance agent of Balboa; has not provided and does not provide any *bona fide* insurance agency services to Balboa; and has never solicited or sold any insurance or insurance products on behalf of Balboa, in connection with the force-placed insurance purchased by GM or otherwise.

64.      Instead, at all relevant times, GI's sole role with respect to the force-placed insurance purchased by GM has been to collect kickbacks from Balboa fraudulently labeled as "commissions." The "commissions" have been paid pursuant to a *quid pro quo* agreement or understanding that GM will continue to do force-placed insurance business with Balboa. Furthermore, at all relevant times,

16

the kickbacks have inured directly or indirectly to the benefit of GM, through inter-affiliate transactions or otherwise.

65.     Notably, the March 2003 GM press release about the deal between GM and Balboa did not say anything about GMAC Agency Marketing, GI, or "commissions." There was no mention of any broker or agent, that purportedly introduced GM to Balboa or otherwise. Rather, the deal described in the press release was bilateral, involving GM and Balboa only.

66.     Nevertheless, at all relevant times, for every dollar in gross premiums paid by GM to Balboa, Balboa has "kicked back" an agreed percentage to GI and/or GM as so-called "commissions."   Meanwhile, the stated premiums have been "grossed up" to include these kickbacks.

**The Kickback Scheme Has Harmed
Borrowers and the Owners of the Loans**

67.     Defendants' kickback scheme has unnecessarily inflated the costs of force-placed insurance with respect to GM-serviced loans, thereby damaging borrowers who have been forced to reimburse GM for such costs.  The amount of the unnecessary inflation is, at minimum, reflected by the amount of the kickbacks. This is because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks.  Balboa then returns the amounts of the kickbacks to GI and/or GM in round-trip transactions that have no legitimate business purpose.  The net charge – *i.e.*, the stated premium paid by GM minus the kickback returned directly or indirectly to GI and/or GM – represents the true or actual price or cost of the insurance.

68.     This scheme has not only robbed borrowers, but also improperly inflated force-placed insurance costs borne by the owners of the loans being serviced by GM.

17

69.     To be sure, the costs of force-placed insurance are initially incurred by the servicer, which is responsible for advancing the money to pay the premiums. Servicers such as GM, however, are functionally the senior-most creditors with respect to the loans they manage. This is because all servicing agreements entitle the servicer to recoup any costs, expenses or advances they incur "off the top" from the proceeds of collection or liquidation, before any money is passed through to the owners of the loans. This entitlement includes force-placed insurance premiums paid by the servicer, which are counted as reimbursable servicing advances under all servicing agreements. The right of the servicer to recover its servicing advances is senior even to the AAA RMBS securities issued by the securitization trusts. Furthermore, if loan-level proceeds are insufficient to enable the servicer to recoup its advances on a particular loan, the servicer is entitled to reimburse itself from the cash collected from all of the other loans covered by the servicing agreement.

70.     At all relevant times, GM in its capacity as servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs, but instead on the artificially inflated, grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances prior to passing money through the owners of the loans, has not netted out the amounts of the kickbacks that GM and/or GI have received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of GM-serviced loans have borne these fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM and/or GI from the kickback scheme alleged herein have come from the pockets of the pension funds that invest in the loans in GM's servicing portfolio and – in the case of the GSE loans in that portfolio – from the pockets of United States taxpayers.

18

71.    A number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts between servicers and mortgage investors. Servicers have no stake in the performance of mortgage loans and do not share mortgage investors' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing the fee and expense charges they can recoup "off the top."

72.    This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was simply never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, *see generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Geo. U. L. Center), or, as in this case, force-placing insurance that is fraudulently inflated in price.

73.    Servicers' compensation structure also incentivizes them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from portfolio as quickly as they can," Professor Levitin observes.

Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses, until there is no value left.

74.    Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated force-placed insurance have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and the investors in the mortgages and RMBS. It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

75.    Borrowers are not afforded any and have no choice with respect to the arrangements alleged herein. Borrowers have no legal ability or right to select their servicer or force-placed insurer. There is no mechanism for borrowers to select servicers that do not extract, or force-placed insurers that do not pay, kickbacks. When borrowers take their loans, they have no way to select their servicer, and no say whether the servicer is replaced with a new servicer, or what arrangements any servicer might have with its providers. Borrowers have no legal right or ability to opt-out with respect to the kickbacks or affiliate transactions described herein.

76.    Plaintiff does not challenge – and nothing in this complaint should be construed as challenging – the reasonableness or fairness of any force-placed insurance rates. Plaintiff challenges kickbacks and reimbursement charges fraudulently inflated by reason thereof.

77.    The kickback scheme in this case is similar to that conducted by the defendants in *Hofstetter v. Chase Home Finance, LLC*, NO. C 10-01313 WHA (N.D.Cal.), a class action that settled last year. In that case, Chase Home Finance, LLC ("Chase") allegedly extracted kickbacks

20

from force-placed flood insurer American Security Insurance Company ("ASIC"). ASIC did not, however, pay the kickbacks to Chase directly. Instead, the parties allegedly agreed to fraudulently label the kickbacks as "commissions" and route them through Chase's affiliate, Chase Insurance Agency, Inc. ("CIA"), according to settlement papers filed in the case.

78.    Discovery in *Hofstetter* revealed a system in which CIA collected "commissions" from ASIC yet rendered no *bona fide* insurance agency services in relation to the policies. "What function does Chase Insurance Agency, Inc. perform with respect to flood insurance?" the Plaintiffs' attorney asked in a deposition. "I would say no function," the Chase employee responded. *See* "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

79.    According to papers filed with the court in the case, the defendants' misconduct in *Hofstetter* allegedly resulted in "commission damages" to the members of the class, with the amount thereof measured by the force-placed insurance premiums charged multiplied by the "commission percentage" paid thereon.

80.    The kickback scheme alleged in this case has operated in material respects like that alleged in *Hofstetter*.

**Government Response**

81.    Force-placed insurance kickback schemes are increasingly becoming a focus of attention for what they are – abusive and parasitic. Fannie Mae recently began fighting back. On March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed Insurance," regarding the "costs to taxpayers" of kickback arrangements that improperly inflate the costs. The *Lender Letter* stated, in pertinent part:

21

Fannie Mae will soon implement changes to its Lender-Placed
Insurance (LPI) requirements to significantly reduce costs to
homeowners, taxpayers, and Fannie Mae. The changes will lower
barriers for borrowers who want to cure their delinquencies, while
improving transparency and boosting competition in the LPI market.

Fannie Mae requires hazard insurance on all properties for which it
owns the mortgage. If a homeowner cannot provide evidence of
coverage, the servicer must secure that coverage through the use of
LPI. *Lender-placed policies, however, are significantly more
expensive than voluntary coverage secured by the borrower and
often include commissions and other administrative costs, further
adding to the cost of LPI policies.* Two firms currently issue most
LPI policies.

An expensive LPI policy can often become an obstacle to a
delinquent borrower seeking to avoid foreclosure. To bring their loan
current, a borrower must reimburse the servicer for the cost of the LPI
policy. *If the borrower defaults in mortgage loan payments and
does not cure, Fannie Mae must reimburse the servicer for LPI
premiums. Costs to Fannie Mae ultimately become costs to
taxpayers.*

(emphasis added).

82.     On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a

*Servicing Guide Announcement*. The *Servicing Guide Announcement* "clarif[ied]" Fannie Mae's

position that servicer requests for reimbursement of lender-placed insurance premiums must exclude

"any lender-placed insurance commission earned . . . by the servicer or any related entity." Fannie

Mae indicated that "any other costs beyond the actual cost of the lender-placed insurance policy

premium" were unacceptable.

83.     The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance
Tracking Fees**

22

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

- *any lender-placed insurance commission earned on that policy by the servicer or any related entity,*

- costs associated with insurance tracking or administration, or

- *any other costs beyond the actual cost of the lender-placed insurance policy premium.*

(emphasis added).

84.       In other words, Fannie Mae forbids servicers from engaging in precisely the type of misconduct alleged herein.

85.       Additionally, in or about January 10, 2012, Benjamin Lawsky, the Superintendent of the New York State Department of Financial Services ("NYDFS"), launched a probe into improper practices relating to force-placed insurance, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

86.       On January 27, 2012, the financial services publication *American Banker* disclosed a list of entities subpoenaed by the NYDFS as part of its investigation. The list identified Balboa as among the force-placed insurance companies targeted by the NYDFS. The list also identified GMAC Agency Marketing as among the targeted "insurance producers," *i.e.*, bogus "agents" through which purported "commissions" (a/k/a kickbacks) have been paid.

87.       On April 5, 2012, the NYDFS issued a press release announcing that it had expanded its probe into force-placed insurance and was scheduling public hearings on the matter to take place in May 2012. The NYDFS press release also disclosed that the NYDFS had issued formal document requests to a number of additional insurers, including Meritplan.

23

88.    Additionally, the NYDFS press release addressed the type of kickback arrangement alleged herein.  It stated that the NYDFS investigation had already uncovered evidence that force-placed insurance costs have been artificially inflated "due [to] relationships between and payments by insurers to banks and their affiliates. . . .  Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business." The NYDFS press release also discussed that, as alleged herein, kickback-inflated force-placed insurance costs harm not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

89.    The full text of the NYDFS release states:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and

24

from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to provide information: **Balboa Insurance Company**, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), **Meritplan Insurance Company**, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one

25

major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy

26

> forced on them when their own insurance is still in place. *At the
> hearings, we will explore whether banks are using force-placed
> insurance to increase their profits at the expense of homeowners
> and investors," Lawsky said.*
>
> *The high cost of force-placed insurance adds to struggling
> homeowners' debt burden and makes it even more difficult for them
> to avoid foreclosure.  The high cost also harms investors in
> mortgages or mortgage-backed securities, because servicers
> advance the insurance payments and then recoup those payments
> out of investment income before investors are paid.*

(emphasis added).

90.    It is thus apparent that the NYDFS probe has confirmed the allegations of this

complaint and is targeting the illicit arrangements alleged herein.

### DEFENDANTS' KICKBACK SCHEME CONSTITUTES "HONEST SERVICES" MAIL AND WIRE FRAUD

91.    The scheme alleged herein violates the mail and/or wire fraud statutes, 18 U.S.C.

§§ 1341, 1343. Specifically, Defendants conducted a fraudulent scheme to, *inter alia*, deprive the

owners of GM-serviced loans of their "intangible rights" to GM's "honest services" through bribes

and kickbacks in violation of 18 U.S.C. § 1346.

92.    The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme

to deprive another of "honest services."

93.    The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent
> pretenses, representations or promises  . . .  [uses the mails in
> furtherance of the scheme shall be punished by imprisonment or fine
> or both].

18 U.S.C. § 1341.

94.    The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

27

95.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly." *Id.* at 352.

96.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

97.    Thus, through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

98.    In *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." 130 S.Ct. at 2928, 2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 2930–31.

99.    At all relevant times, GM owed legal duties to render services to the owners of the loans in GM's servicing portfolio under the PSAs, Servicing Agreements, GSE Servicing Guidelines and similar contracts governing their relationships. In all cases, those legal duties included the duty to protect the owners of the mortgages from damages caused by casualty loss by making sure that

28

adequate hazard insurance was at all times maintained on the secured properties, including through force-placement if necessary. The value of GM's services in fact depended on GM's rendering those services in an honest manner. Nevertheless, GM misused its position as the servicer of the loans to extract bribes and kickbacks from Balboa, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services" to those loan owners. Each Defendant, by virtue of the conduct as alleged herein, devised a scheme or artifice to defraud the owners of GM servicing portfolio loans by depriving those owners of their intangible rights to GM's honest services through kickbacks.

100.    Defendants' wire and mail fraud violations constitute predicate acts under RICO. Defendants' pattern of racketeering activity has proximately harmed Plaintiff and the Class.

## TOLLING OF THE STATUTES OF LIMITATIONS

101.    The claims of Plaintiff and the Class are subject to both equitable estoppel, stemming from Defendants' concealment of the facts alleged herein, and equitable tolling, stemming from Plaintiff's inability to obtain adequate information to plead the claims alleged herein. Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged. At all relevant times Defendants maintained a shroud of secrecy around their illicit dealings. Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiff and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

102.    Furthermore, at all relevant times Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GM to fulfill its contractual duties under the mortgage loan contracts of Plaintiff and the Class in good faith, and to similarly execute

29

its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and in an honest manner.  Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiff and the Class had attempted to investigate, such investigation would have been futile because it would not, until recently, have been possible to uncover any specific information as to GM's involvement in the unlawful kickback scheme alleged herein.

103.    Due to the complex, undisclosed and self-concealing nature of the scheme alleged herein, neither Plaintiff, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise to discover the misconduct alleged.  Plaintiff was able to discover the underlying basis for his claims only through the assistance of counsel.

104.    Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis.  Nevertheless, the news coverage has generally related to "robo-signing" and other improper foreclosure practices.  It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of force-placed insurance business.

105.    The first time the *The New York Times* published a news article about such kickbacks was on January 10, 2012.  *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of NYDFS, was investigating several large banks in connection with improper practices relating to force-placed insurance, including "kickbacks."  *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

106.    Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to force-placed insurance to have put Plaintiff or the Class on inquiry notice of

30

Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

107.    Furthermore, even had Plaintiff or members of the Class been on inquiry notice of misconduct relating to force-placed insurance in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they would have had no specific factual basis to allege – or even suspect – that GM was involved in any misconduct until, at the earliest, January 27, 2012.

108.    As alleged above, it was on that day that *American Banker* published a list of the entities subpoenaed as part of the NYDFS investigation. The list identified Balboa as among the force-placed insurance companies targeted by that investigation. The list also identified GMAC Agency Marketing (*i.e.*, GI) as among the targeted "insurance producers."

109.    Prior to January 27, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GM to potential kickbacks relating to force-placed insurance. Prior to such time, Plaintiff and the Class did not have an adequate factual basis to plead the claims alleged herein.

110.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiff and the Class could not have known of Defendants' violations until, at the earliest, January 27, 2012. Furthermore, any delay by Plaintiff and the Class

31

in asserting the claims herein was excusable because they could not reasonably have discovered

Defendants' misconduct absent specialized knowledge and/or assistance of counsel.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

111.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth

herein. This count is pled against all Defendants.

112.    Plaintiff, each Class member, and each Defendant are "persons," as that term is

defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

113.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term

is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of GM, GI, and the Balboa Defendants,

including their respective officers, directors, employees, agents and direct and indirect subsidiaries

(the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the

Enterprise.

114.    The Enterprise was primarily managed by GM which organized the fraudulent scheme

and procured the involvement of GI and the Balboa Defendants. GI and the Balboa Defendants

carried out their part of the scheme under the direction of GM.

115.    The companies and individuals that constitute the Enterprise were associated for the

common purpose of fraudulently inflating the stated premiums on force-placed insurance with

respect to GM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners

32

of the loans to incur, fraudulently inflated charges in respect of such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GI and directly and/or indirectly to GM.

116.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

### Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

117.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.    Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.    GM entered into servicing agreements with owners and/or holders of whole loans which provide, *inter alia*, that GM is obligated to make sure that the secured properties are adequately insured, including through force-placement of insurance if necessary;

b.    GM procures force-placed insurance with respect to the loans in its servicing portfolio from the Balboa Defendants;

c.    GM demanded and the Balboa Defendants agreed to and do pay kickbacks to GM and/or its affiliates based on a percentage of the force-placed insurance premiums paid by GM;

d.    GM and the Balboa Defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks;

e.    GM and the Balboa Defendants agreed to and do disguise the kickbacks as "commissions" paid by the Balboa Defendants to GI or other GM affiliate(s);

33

     f.     As a *quid pro quo* for the kickbacks, GM continues to procure force-placed insurance from and outsource its force-placed insurance functions to the Balboa Defendants;

     g.     The Balboa Defendants, on GM's behalf, track the loans in GM's servicing portfolio and issue notices to borrowers relating to purported lapses in their insurance coverage and their obligation to reimburse GM for the costs of any force-placed insurance;

     h.     GM bills borrowers in relation to force-placed insurance based on the stated, fraudulently inflated premiums, *i.e.*, incorporating the kickbacks;

     i.     To the extent borrowers pay the inflated costs billed to them, GM and/or GI profit from the kickbacks at the borrower's expense;

     j.     To the extent borrowers fail to pay the inflated costs billed to them, GM reimburses itself from the proceeds of loan collections and liquidations also based on the stated, fraudulently inflated premiums, thereby profiting from the kickbacks at the expense of the owners of the loans; and,

     k.     GM provides regular remittance and other reports to loan owners reflecting and/or incorporating the fraudulently inflated premiums as reimbursable servicing advances.

118.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and the owners of GM-serviced loans and to obtain money or property from the borrowers and the owners of GM-serviced loans through false or fraudulent pretenses, representations and promises.

119.    At all relevant times, Defendants' conduct included a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their intangible right to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. At all relevant times, GM was contractually obligated to render services to the owners of the loans it serviced. GM owed a duty to render those services in an honest manner. The value of those services in fact depended on GM's rendering them

34

in an honest manner. Nevertheless, at all relevant times, GM misused its position to extract bribes and kickbacks from the Balboa Defendants, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services." GI and the Balboa Defendants intentionally and wilfully conspired and participated in said breach.

120.    Each such bribe or kickback extracted by GM constituted a predicate act of mail and/or wire fraud in that each furthered and executed the scheme to deprive the owners of the loans of their right to GM's "honest services."

121.    It was reasonably foreseeable to each defendant that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

122.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to Defendants' books and records. Nevertheless, Plaintiff can allege such transmissions generally.

123.    For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

        a.    The Balboa Defendants, on GM's behalf, transmitted notices and correspondence to borrowers via mail;

        b.    GM issued monthly statements including force-placed insurance charges to borrowers via mail and/or wire;

35

      c.    The Balboa Defendants, on GM's behalf, communicated with borrowers via telephone through call centers;

      d.    GM received funds from borrowers via mail and/or wire;

      e.    GM transmitted funds reflecting fraudulently inflated insurance premiums to the Balboa Defendants via mail and/or wire;

      f.    The Balboa Defendants transmitted funds reflecting kickbacks to GI and/or GM via mail and/or wire; and,

      g.    GM transmitted remittance and other reports to loan owners and/or holders via mail and/or wire that reflected and/or incorporated the fraudulently inflated force-placed insurance costs;

124.    As to Plaintiff, Defendants utilized the mails and/or wires in the following instances, among others, for the purpose of furthering and executing the scheme:

      a.    The Balboa Defendants and/or GM transmitted notices to Plaintiff regarding force-placed insurance by mail dated October 27, 2010, December 12, 2010, September 6, 2011, and September 28, 2011;

      b.    GM transmitted statements to Plaintiff reflecting charges in connection with force-placed insurance by mail dated February 14, 2011, March 16, 2011, April 11, 2011, May 9, 2011, June 6, 2011, July 4, 2011, August 8, 2011, September 17, 2011, and October 17, 2011; and

      c.    The Balboa Defendants' call center representatives communicated with Plaintiff by wire regarding force-placed insurance on, among other dates, January 24, 2012;

125.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

36

126.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

127.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

128.    Defendants each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring fraudulently inflated charges in connection with force-placed insurance.

129.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and the owners of the loans to pay and incur inflated charges in respect of force-placed insurance and thereby enable Defendants to reap illicit profits.

130.    Defendants were common participants in the predicate acts.   Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and the owners of the loans.

### Injury to Plaintiff and the Class

131.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  At all relevant times, Plaintiff and the Class paid charges in connection with force-placed insurance that were fraudulently inflated by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

132.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

### CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

133.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

134.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

135.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

136.    As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

137.    As set forth in Count I, above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

138.    Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently inflating the stated premiums on force-placed insurance with respect to GM-serviced loans. The purpose thereof was to induce borrowers and the owners of the loans to pay and incur fraudulently inflated charges in respect of such insurance.

38

139.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

140.    As set forth in Count I, above, Defendants associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

141.    Defendants each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

142.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I, above.

143.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges in respect of force-placed insurance, as a direct, proximate and foreseeable result, of the scheme alleged herein.

144.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III

## BREACH OF CONTRACT
### (Against GM)

145.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein. This count is pled against GM.

146.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property. All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

147.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks. Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

148.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

149.    GM breached and acted in excess of its authority under the mortgage loan contracts of Plaintiff and the Class by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges. GM's charging Plaintiff and the Class for the cost of kickbacks constituted conduct not authorized and in breach of the terms of the mortgage loan contracts of Plaintiff and the Class.

150.    GM has thus breached its contracts with Plaintiff and the Class.

151.    As a direct, proximate, and legal result of the aforementioned breaches of contract,

Plaintiff and the Class have suffered damages.

## COUNT IV

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against GM)

152.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth

herein.  This count is pled against GM.

153.    Every contract contains an implied covenant of good faith and fair dealing.

154.    The mortgage loan contracts of Plaintiff and the Class require the borrower to

maintain hazard insurance on their property.  All such contracts also authorize the lender to force-

place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance

coverage.

155.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes

or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed

by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include

kickbacks.  Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits

the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

156.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms

of the mortgage loan contracts of Plaintiff and the Class.

157.    Pursuant to the implied covenant of good faith and fair dealing, GM was obligated

to perform its duties under the mortgage loan contracts in good faith and to deal fairly with Plaintiff

and the Class.

41

158.    GM breached its duty of good faith and fair dealing by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges.  By not netting out and instead incorporating the cost of the kickbacks in the force-placed insurance charges, GM engaged in bad faith conduct toward Plaintiff and the Class, dealt with Plaintiff and the Class unfairly, and contravened the reasonable expectations of Plaintiff and the Class.

159.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

### COUNT V

### COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against all Defendants)

160.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.  This count is pled against all Defendants.

161.    Plaintiff and the Class have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums.  These benefits came at the expense of Plaintiff and the Class.

162.    The circumstances are such that in equity and good conscious restitution should be made by Defendants to Plaintiff and the Class.

163.    As a result of Defendants' unjust enrichment, Plaintiff and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

164.    Plaintiff and the Class are entitled to restitution and/or disgorgement of profits

realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants

and in favor of Plaintiff and the Class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant
to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this
case as a class action and appointing Plaintiff as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiff and the Class in
an amount to be proven at trial;

c.    For judgment for Plaintiff and the Class on their claims in an amount to be proven
at trial, for compensatory damages caused by Defendants' unfair and/or deceptive
practices; along with exemplary damages to each Class member for each violation;

d.    For judgment for Plaintiff and the Class on their RICO claims, in an amount to be
proven at trial, for three times the amount of the force-placed insurance charges paid
to Defendants by Plaintiff and the Class;

e.    For restitution of all improperly collected charges and interest, and the imposition of
an equitable constructive trust over all such amounts for the benefit of Plaintiff and
the Class;

f.    For pre-judgment and post-judgment interest as provided for by law or allowed in
equity;

g.    For an order awarding Plaintiff and the Class their attorneys' fees and costs; and

h.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the

claims alleged herein.

Dated: April 30, 2012

KIRBY McINERNEY LLP

By:_____

Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiff*

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LANDON ROTHSTEIN, JENNIFER
DAVIDSON, ROBERT DAVIDSON, and
IHOR KOBRYN, individually and on behalf
of all others similarly situated,

        Plaintiffs,

        v.

ALLY FINANCIAL, INC. f/k/a GMAC
INC., ALLY BANK f/k/a GMAC BANK,
JOHN DOE CORPORATION, BALBOA
INSURANCE COMPANY, MERITPLAN
INSURANCE COMPANY, and
NEWPORT MANAGEMENT
CORPORATION,

        Defendants.

---

Civil Action No.: 1:12-CV-3412 (AJN)

**FIRST AMENDED CLASS ACTION**
**COMPLAINT**

**Jury Trial Demanded**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.     Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.     The Ally Financial Defendants And Related Non-Party Debtors . . . . . . . . . . . . 6

        C.     The Balboa Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     CLASS ACTION ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      SUBSTANTIVE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.     GMACM's Servicing Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        C.     The Kickback Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.     The Scheme Defrauds Borrowers And Loan Owners . . . . . . . . . . . . . . . . . . . . 21

        E.     Fannie Mae Learns That It Is Being Overcharged For LPI . . . . . . . . . . . . . . . . 24

        F.     The Lawsky Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

VI.     THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD . . . . . . . . . 34

        A.     The Erroneous Notices And Bills To Borrowers . . . . . . . . . . . . . . . . . . . . . . . . 35

        B.     The Erroneous Reports To Loan Owners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        C.     The Scheme Constitutes "Honest Services" Fraud . . . . . . . . . . . . . . . . . . . . . . 37

VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK
        PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VIII.   ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES,
        INCLUDING RESCAP AND GMACM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A.    Ally Financial, ResCap, And GMACM .................................. 42

B.    Investigations And Lawsuits Relating To Securitization Activities  .......... 42

C.    Investigations And Lawsuits Relating To Servicing Activities .............. 46

D.    Ally Financial Causes ResCap And GMACM To File For Bankruptcy  ....... 51

E.    Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets ............ 53

F.    Ally Financial's Domination Of ResCap And GMACM ................... 56

G.    Ally Financial's Disregard Of Corporate Formalities ..................... 63

H.    Ally Financial's Responsibility For Controlling GMACM's
      Servicing Practices ................................................. 67

IX.   TOLLING OF THE STATUTES OF LIMITATIONS  ......................... 70

X.    CLAIMS FOR RELIEF .................................................. 72

COUNT I ..................................................................... 72

COUNT II ................................................................... 80

COUNT III .................................................................. 82

COUNT IV ................................................................... 84

COUNT V .................................................................... 86

COUNT VI ................................................................... 87

COUNT VII .................................................................. 88

PRAYER FOR RELIEF ........................................................ 90

JURY TRIAL DEMANDED ..................................................... 91

ii

Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation made by and through their attorneys, which included a review of filings and public statements made by defendants, court filings, media articles and other publicly available information. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq*. ("RESPA"), and applicable state law, on behalf of themselves and a nationwide putative class consisting of residential mortgage borrowers who have been charged for force- or lender-placed hazard insurance ("LPI") in connection with loans serviced by GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation (hereinafter "GMACM") at any time from March 6, 2003 to the present (the "Class Period").

2.    To protect the lender's interest in secured property, standard mortgage loan contracts require the borrower to maintain specified levels of hazard insurance coverage. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be "reimbursed" by the borrower for the "expense."

3.    Because most loans are sold and securitized after origination, LPI is generally purchased by a loan servicer acting on behalf of the securization trust that owns legal title to the loan.

1

Any amounts paid by the servicer to buy LPI are included as "servicing advances" under the agreement between the servicer and the trust, known as the "Pooling and Servicing Agreement" or "PSA." The servicer is entitled to recoup its advances from the proceeds of the loan, whether through borrower payments or foreclosure. The servicer has the right to reimbursement "off the top," before any money is passed through to the securitization trust or other loan owner.

4.      GMACM is the fifth largest residential mortgage loan servicer in the United States. As of March 31, 2012, GMACM serviced over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion.

5.      Since at least March 2003, GMACM has obtained LPI for the loans it services from defendants Balboa Insurance Company ("Balboa") and its affiliate Meritplan Insurance Company ("Meritplan").

6.      Also since at least March 2003, GMACM has had a relationship with an affiliate of Balboa and Meritplan, defendant Newport Management Corporation ("Newport"). GMACM hires Newport as a subcontractor to perform GMACM's insurance tracking duties under GMACM's servicing agreements. Insurance tracking is a labor-intensive servicing responsibility related to LPI that consists of monitoring the status of homeowners' voluntary insurance to confirm that it is in-force, notifying homeowners of any insurance deficiencies, and securing LPI when appropriate.

7.      Balboa, Meritplan, and Newport (the "Balboa Defendants") and GMACM devised and carried out a scheme to defraud borrowers and loan owners by overcharging them for LPI. Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged through complex transactions using affiliates and related parties. GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the

2

LPI. In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Because the amounts supposedly paid by GMACM for LPI constitute servicing advances, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities to the extent borrowers fail to pay.

8.      As devised by the Balboa Defendants and GMACM, the scheme involves the payment of rebates/kickbacks in two forms: (i) free tracking services, and (ii) bogus "commissions."

9.      The free tracking services are provided by Newport. Under the scheme, GMACM pays nothing for Newport's insurance tracking services; instead, Balboa and Meritiplan pay Newport on GMACM's behalf. The money is derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI, and is routed from Balboa and Meritplan to Newport via "intercompany expense allocations." The free tracking services constitute rebates/kickbacks in kind.

10.     The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, defendant John Doe Corporation ("John Doe"). As with the tracking services, the money for the "commissions" is derived from the LPI premiums paid by GMACM. The "commission" payments are made on the pretense that John Doe is a third-party insurance agent that introduced the insurance customer, *i.e.*, GMACM, to Balboa and Meritplan. At all relevant times, however, this pretense has been false, as John Doe is not and has never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM, and never introduced GMACM to Balboa or Meritplan.

11.     Additionally, on information and belief, John Doe transfers the "commissions" that it receives to GMACM. Defendant Ally Financial, Inc. f/k/a GMAC Inc. ("Ally Financial") – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash

3

management system." Ally Financial thereby also participated in devising, and participates in carrying out, the scheme.

12.    Not just borrowers but also the owners of the loans serviced by GMACM – which include the taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by GMACM – have been grossly overcharged for LPI as a result of the scheme.

13.    On May 14, 2012, GMACM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.  Accordingly, GMACM is not named as a defendant herein.  Nevertheless, this complaint alleges that the Balboa Defendants, as participants and conspirators in the scheme, are jointly and severally liable under RICO and RESPA.  Moreover, this complaint alleges that Ally Financial, which has not filed for bankruptcy, exercised complete dominion and control over the affairs, activities, and operations of its subsidiaries, including GMACM, such that GMACM operated as a mere instrumentality or alter-ego of Ally Financial.  Therefore, Ally Financial is vicariously liable for the misconduct of GMACM alleged herein.

14.    Additionally, this complaint names defendant Ally Bank f/k/a GMAC Bank ("Ally Bank"), a subsidiary of Ally Financial that is not in bankruptcy.  Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM, including, on information and belief, loans of Class members.  Ally Bank is liable, *inter alia*, as principal for the misconduct of its appointed agent, GMACM.

4

## II.   JURISDICTION AND VENUE

15.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), and 12 U.S.C. § 2614. This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c).

16.   Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

17.   Additionally, this Court has personal jurisdiction over the defendants because each systematically and continually conducts business throughout the State of New York.

18.   This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of Texas, New York, and New Hampshire. Defendants are citizens of different states, the amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

19.   This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

20.   Venue is proper in this district under 28 U.S.C. § 1391(b), 12 U.S.C. § 2614, and 18 U.S.C. §§ 1965(b) and (d). Defendants regularly conduct business in this District.

5

### III.    PARTIES

#### A.    Plaintiffs

21.    Landon Rothstein is a resident of Texas. Rothstein has a mortgage loan serviced by GMACM on a property located at 97 County Road 3701, Splendora, Texas. Rothstein was charged $105 by GMACM purportedly to reimburse it for the cost of LPI from October 6, 2010 to January 4, 2011. The LPI coverage was obtained by GMACM from Meritplan.

22.    Jennifer Davidson and Robert Davidson are residents of New Hampshire. The Davidsons have a mortgage loan serviced by GMACM on a property located at 32 Dunbarton Estates, Nottingham, New Hampshire. The Davidsons were charged $239 by GMACM purportedly to reimburse it for the costs of LPI from April 14, 2009 to July 4, 2009. The LPI coverage was obtained by GMACM from Balboa.

23.    Ihor Kobryn is a resident of New York. Kobryn has a mortgage loan serviced by GMACM on a property located at 29 Meredith Avenue, Staten Island, New York. Kobryn was charged $1,260.78 by GMACM purportedly to reimburse it for the costs of LPI from January 19, 2012 to May 22, 2012. The LPI coverage was obtained by GMACM from Meritplan.

#### B.    The Ally Financial Defendants And Related Non-Party Debtors

24.    Ally Financial is a leading, multi-national financial services firm with approximately $184 billion of assets and operations in 37 countries. Ally Financial is a Delaware corporation headquartered in Detroit, Michigan. Ally Financial received at least $17 billion in government bailouts during the financial crisis, and still owes the United States Treasury $11.2 billion. Since the implementation of the Troubled Asset Relief Program in late 2008, Ally Financial has been owned by the U.S. Department of the Treasury, affiliates of Cerberus Capital Management, L.P.

6

("Cerberus"), affiliates of General Motors Company, and other investors. Prior to that time, Ally

Financial was owned 51% by a consortium of investors led by Cerberus and 49% by General Motors

Company. Ally Financial, was known as General Motors Acceptance Corporation until July 20,

2006, when it became a Delaware limited liability company under the name GMAC LLC. On June

30, 2009, GMAC LLC was converted from a Delaware limited liability company to a Delaware

corporation under the name GMAC Inc. On May 7, 2010, GMAC Inc. changed its corporate name

to Ally Financial.

25.    Ally Bank is an indirect wholly-owned subsidiary of Ally Financial. Ally Bank was

at all times relevant to this complaint a loan originator. Prior to May 2009, Ally Bank was known

as GMAC Bank. Ally Bank is an online bank chartered under Utah law.

26.    John Doe is a subsidiary of Ally Financial and an affiliate of GMACM. As alleged

here, John Doe received kickbacks from Balboa and Meritplan fraudulently labeled as insurance

"commissions."

27.    Ally Financial, Ally Bank, and John Doe are collectively referred to herein as the

"Ally Financial Defendants."

28.    Non-party Residential Capital, LLC f/k/a Residential Capital Corporation ("ResCap"),

is a Delaware limited liability corporation and a wholly-owned subsidiary of Ally Financial. At all

relevant times, ResCap's business included originating and servicing mortgage loans through its

wholly-owned subsidiary GMACM. ResCap is not named as a defendant in this lawsuit because it

filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on May 14, 2012. *See In

re: Residential Capital, LLC, et al., Debtors*, No. 12-12020-MG (S.D.N.Y. 2012).

7

29.    Non-party GMACM is a Delaware limited liability corporation with its principal

place of business in Fort Washington, Pennsylvania. At all relevant times, GMACM was in the

business of originating and servicing residential mortgage loans. Since 2005, GMACM has been

a wholly-owned subsidiary of ResCap. Prior to that time, GMACM was a wholly-owned subsidiary

of Ally Financial. GMACM is not named as a defendant in this lawsuit because it filed for

bankruptcy protection under Chapter 11 of the Bankruptcy Code on May 14, 2012.

### C.    The Balboa Defendants

30.    Balboa is a California corporation headquartered in Irvine, California. Balboa is a

member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011,

at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa

is a provider of LPI and insurance tracking services, directly and through its affiliates, to mortgage

loan servicers nationwide.

31.    Meritplan is a California corporation headquartered in Irvine, California. Meritplan

is a wholly-owned subsidiary of Balboa. Meritplan is a provider of LPI to mortgage loan servicers

nationwide.

32.    Newport is a California Corporation headquartered in Irvine, California. Prior to June

1, 2011, Newport was a wholly-owned subsidiary of Balboa. Thereafter, Newport became a wholly-

owned subsidiary of QBE Insurance Group. Newport provides insurance tracking services to loan

servicers as a subcontractor.

8

## IV.    CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(1), (b)(2) and (b)(3) on behalf of themselves and a nationwide class consisting of:

> All residential mortgage loan borrowers who have been charged for
> LPI in connection with loans serviced by GMACM at any time from
> March 6, 2003 to the present (the "Class").

34.    The Class excludes Defendants and any entity in which any defendant has a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

35.    The Class is so numerous that joinder of all members is impracticable.

36.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

37.    Plaintiffs' claims are typical of the claims of the Class.

38.    There are questions of law and fact common to the Class, including but not limited

to:

> a.    Whether GMACM, the Balboa Defendants and the Ally Financial Defendants
> devised a scheme to defraud borrowers and loan owners by overcharging
> them for LPI;
>
> b.    Whether the scheme alleged herein constitutes mail or wire fraud;
>
> c.    Whether GMACM and Ally Bank breached borrowers' mortgage loan
> agreements and violated the covenants of good faith and fair dealing implied
> therein;
>
> d.    Whether GMACM operated as an alter-ego of Ally Financial;
>
> e.    Whether Defendants are liable to Plaintiffs and the Class for damages and,
> if so, the measure of such damages.

9

39.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

40.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiffs have retained counsel experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

41.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

42.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

43.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

44.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

10

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

45.    To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage on the home, "force place" it, and be reimbursed by the borrower for the "expense."

46.    LPI is purchased by the lender, for the lender. The lender is the sole insured and the only loss payee. In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The borrower's only involvement with LPI is that the borrower is obligated, by virtue of the mortgage loan agreement, to reimburse the lender for the "expense." Furthermore, the borrower has no choice, as the obligation to reimburse the lender is secured by the lender's lien on the property.

47.    All mortgage loan agreements contain substantively identical terms with respect to LPI. Plaintiff Rothstein's mortgage loan agreement, for example, provides, in pertinent part:

> Property Insurance.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.*  Lender is under no obligation to purchase any

11

> particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. . . . ***Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument***. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(Emphasis added).

48.    The traditional lending relationship, where the lender makes a loan, retains it in its portfolio, and services it itself, is today the exception rather than the rule. Most residential mortgages in the United States are financed through securitization.

49.    Securitization is a financing method involving the issuance of securities against a dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or "seller") assembles a pool of mortgages made or "originated" by an affiliate or purchased from unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive, specially created special-purpose vehicle ("SPV"), typically a trust in the case of residential mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loans. The securities are sold directly to investors by the SPV or, as is more common, they are issued directly to the depositor as payment for the loans. The depositor then resells the securities, usually through an underwriting affiliate that places them on the market. Because the certificated securities are collateralized by the residential mortgages owned by the trust, they are called residential mortgage-backed securities ("RMBS").

12

50.     A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive;

it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the

financial institution.

51.     Loans, however, need to be managed. Bills must be sent out and payments collected.

Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan

servicer. Every loan, irrespective of whether it is securitized, has a servicer. Servicers are hired by

owners of whole loans, typically trustees of mortgage securitization trusts.

52.     The specific duties of the servicer are set forth in the PSA or other agreement between

the servicer and the owner of the loan. The terms of such agreements are substantively identical in

all respects relevant to this lawsuit.

53.     Specifically, servicing agreements include a broad grant or delegation of authority to

the servicer, governed by the duty of the servicer to act in the best interests of the loan owner,

combined with more specific delegations of authority relating to particular tasks.

54.     For example, on June 1, 2004, GMACM executed a PSA to become the servicer of

a mortgage securitization trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA").

Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on
> behalf of the Trust and in the best interest of and for the benefit of the
> Certificateholders . . . in accordance with the terms of this Agreement
> and the Mortgage Loans and to the extent consistent with such terms
> and in accordance with and exercising the same care in performing
> those practices that the Servicer customarily employs and exercises
> in servicing and administering mortgage loans for its own account
> (including, compliance with all applicable federal, state and local
> laws).

13

55.    Section 3.01 of the JPMorgan PSA additionally delegates to GMACM "full power

and authority, acting alone and/or through subservicers . . . to do or cause to be done any and all

things that it may deem necessary or desirable in connection with such servicing and

administration . . . ."

56.    The tasks of the servicer include account maintenance activities such as sending

monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account

balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate

mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to

the trust.

57.    Additionally, all PSAs and other servicing agreements require the servicer to make

sure that adequate hazard insurance is continuously maintained on the secured properties.  Section

3.05 of the JPMorgan PSA, for example, provides in pertinent part:

> MAINTENANCE OF HAZARD INSURANCE
>
> The Servicer shall cause to be maintained for each Mortgage Loan
> hazard insurance with extended coverage on the Mortgaged Property
> in an amount which is at least equal to the lesser of (i) the Stated
> Principal Balance of such Mortgage Loan and (ii) the amount
> necessary to fully compensate for any damage or loss to the
> improvements that are a part of such property on a replacement cost
> basis, in each case in an amount not less than such amount as is
> necessary to avoid the application of any coinsurance clause
> contained in the related hazard insurance policy. . . .  The Servicer
> will comply in the performance of this Agreement with all reasonable
> rules and requirements of each insurer under any such hazard policies.
>
> *        *        *
>
> In the event that the Servicer shall obtain and maintain a blanket
> policy with an insurer having a General Policy Rating of B:IV or
> better in Best's Key Rating Guide (or such other rating that is

14

comparable to such rating) insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section.

58.     Fulfilling the obligation to maintain continuous hazard insurance requires the servicer to monitor the status of homeowners' voluntary insurance to confirm that it is in-force, notify homeowners of any insurance lapse, and secure LPI when appropriate. These activities constitute "insurance tracking," a labor-intensive servicing responsibility which many servicers, including GMACM, outsource to subcontractors.

59.     All PSAs and other servicing agreements allow servicers to subcontract their servicing responsibilities to outside contractors provided the fees of the subcontractor are paid by the servicers.

60.     Section 3.01 of the JPMorgan PSA provides, for example:

> The Servicer shall perform all of its servicing responsibilities hereunder or may cause a subservicer to perform any such servicing responsibilities on its behalf, but the use by the Servicer of a subservicer shall not release the Servicer from any of its obligations hereunder with respect to the related Mortgage Loans. The Servicer shall pay all fees of each of its subservicers from its own funds.

61.     Any amounts paid by the servicer to buy LPI count as "servicing advances" under the PSAs and other agreements between the servicer and the loan owner. The servicer is entitled to recoup such advances from the proceeds of the loan, whether through payments made by the borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has the right to be reimbursed before any money is passed through to the securitization trust or other loan owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally

15

the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

62.     Mortgage servicing is a highly lucrative business. Servicers receive a fee based on the unpaid principal balance of each trust's mortgage pool or, in some cases, for each loan serviced. These servicing fees are typically paid from the monthly payments made by the borrowers on the loans. Annual servicing fees generally range from 0.25-0.50% of the remaining principal balance of the mortgage and are collected monthly. In addition, servicers are entitled to keep certain borrower-contracted fees such as late charge fees, assignment transfer fees, insufficient funds bank fees, assumption fees, loss mitigation fees and other incidental fees and charges. Servicers also benefit from being able to invest and earn interest on borrowers' escrow payments as they are collected until they are paid out to taxing authorities and insurance companies. Servicers also earn "float" income with respect to borrowers' monthly payments, as the payments are generally collected on the first of the month but not passed through to the owners of the loans until the end of the month.

**B.     GMACM's Servicing Portfolio**

63.     GMACM is the fifth largest residential mortgage loan servicer in the United States. GMACM services over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion. GMACM performs servicing pursuant to PSAs and other servicing agreements with numerous loan owners, including private securitization trusts, GSEs, and defendant Ally Bank.

64.     Approximately 68% of the mortgage loans (by unpaid principal balance) serviced by GMACM are owned, insured or guaranteed by Fannie Mae or another GSE.

16

65.    Approximately 690,000 mortgage loans with an unpaid principal balance of $140.8 billion are serviced by GMACM on behalf of Ally Bank.  The Ally Bank loans were originated by GMACM, then sold to Ally Bank by GMACM.  Ally Bank either still owns such loans or has resold them to private secondary market investors while retaining the servicing rights to such loans.  GMACM services the Ally Bank loans pursuant to a servicing agreement between GMACM and Ally Bank dated as of May 11, 2012.  Prior thereto, GMACM serviced the Ally Bank loans pursuant to predecessor agreements since 2001.

### C.    The Kickback Scheme

66.    In March 2003, GMACM entered into an agreement to buy LPI from Balboa and Meritplan.  GMACM also hired Newport to perform insurance tracking on its behalf.  The initial agreements between GMACM and the Balboa Defendants had a term of three years.  Such agreements, however, were renewed and continue to the present.  Today, GMACM is one of the largest LPI accounts handled by the Balboa Defendants.

67.    The kickback scheme was devised at the inception of the parties' relationship in 2003, and has been carried out continuously to the present.  Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged by complex transactions using affiliates and related parties.  GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the LPI.  In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers.  Meanwhile, the gross insurance charges are incorporated into GMACM's servicing advances, which, as alleged above, GMACM recoups "off the top."  To the extent borrowers fail to pay, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities.

17

68.     As devised by the Balboa Defendants and GMACM, the scheme involves the payment

of rebates/kickbacks in two forms: (i) free tracking services, and (ii) bogus "commissions."

69.     The free tracking services are provided by the Balboa Defendants through Newport.

Under the scheme, GMACM pays nothing for Newport's insurance tracking services.  Instead,

Balboa and Meritiplan pay Newport on GMACM's behalf.  The money is derived from the gross

premiums that GMACM pays to Balboa and Meritplan for the LPI, and is routed from Balboa and

Meritplan to Newport via "intercompany expense allocations."

70.     The free tracking services constitute rebates/kickbacks in kind.  As alleged herein,

servicers are responsible for providing tracking services as part of their duty to make sure that

adequate hazard insurance is continuously maintained.  Servicers are compensated to perform this

responsibility through the servicing fees that they collect from loan owners.  Moreover, although

servicers are entitled to hire subcontractors to perform their responsibilities, servicing agreements

require the servicer, as alleged above, to pay any subcontractors out of the servicer's "own funds."

Under GMACM's arrangement with the Balboa Defendants, however, GMACM does not pay

Newport out of GMACM's "own funds."  Instead, GMACM pays nothing.  Borrowers and loan

owners bear the cost to pay Newport through inflated LPI charges and servicing advances.

71.     GMACM and Balboa have admitted to the essential facts concerning this aspect of

the scheme. On May 21, 2012, a representative of GMACM, Michael Squillante, admitted in sworn

testimony at a public hearing on LPI held by the New York State Department of Financial Services

("NYSDFS"), that Newport derives compensation through GMACM's LPI premiums and that

GMACM pays nothing directly to Newport. NYSDFS Deputy Director Nancy Ruskin and Executive

Deputy Superintendent Joy Feigenbaum examined Squillante:

18

DEP DIRECTOR RUSKIN: . . . Does – under the current arrangement, does GMAC pay QBE First [the parent of Balboa, Meritplan and Newport] for tracking services?

MR. SQUILLANTE: No, we do not.

DEP DIRECTOR RUSKIN: Why is that?

MR. SQUILLANTE: Our motto is we are a fully-turnkey outsource relationship. . . . [w]e have wholly outsourced that business to QBE.

EXEC DEP SUPT FEIGENBAUM: If I may, I guess I don't quite understand because there is a cost for the tracking of the service, is there not?

MR. SQUILLANTE: You have to ask QBE that much. I assume that there is. But they would – I don't have their financial information around that cost.

EXEC DEP SUPT FEIGENBAUM: Are you aware –

MR. SQUILLANTE: Again, they –

EXEC DEP SUPT FEIGENBAUM: Are you aware that other servicers provide, they pay for tracking services?

MR. SQUILLANTE: Yes. I'm aware some do and some don't; as some take commissions, and some don't.

EXEC DEP SUPT FEIGENBAUM: So . . . the consideration that might be given to GMAC is, you know, not having to pay for tracking services?

MR. SQUILLANTE: No. Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa . . . . Maybe I don't understand your question.

EXEC DEP SUPT FEIGENBAUM: . . . I think my understanding is that the servicers actually pay the – pay the insurance agent to do the tracking. So, I don't – I'm not asking whether you share. I'm asking, you know, why you don't pay.

19

> MR. SQUILLANTE: We do not pay tracking. Our motto is it's completely outsourced . . .
>
> DEP DIRECTOR RUSKIN: So, QBE is basically tracking for free?
>
> MR. SQUILLANTE: You'd have to ask QBE the economics of their business. I'm not – we are not paying for tracking our portfolio. But the economics of their business, you would have to ask them.

(669-671).

72.      In written testimony to the NYSDFS dated May 1, 2012, Balboa admitted the "intercompany expense allocations." Specifically, Balboa stated:

> Balboa does not track insurance coverage.   For Balboa's lender-placed program, these services were provided by its affiliate, Newport Management Corporation ("NMC") and expenses incurred by NMC related to NMC's insurance tracking services, and/or the servicer's implementation of or conversion to such services, *were allocated to Balboa and other affiliated insurers on an intercompany expense allocation basis*.

(Emphasis added).

73.      As for the bogus "commissions," they are paid by Balboa and Meritplan to an affiliate of GMACM, defendant John Doe. As with the tracking services, the money for the "commissions" is derived from the LPI premiums paid by GMACM. The "commission" payments are made on the pretense that John Doe is a third-party insurance agent that introduced the insurance customer, *i.e.*, GMACM, to Balboa and Meritplan.

74.      At all relevant times, however, this pretense has been false. John Doe is not and has never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM. John Doe has also never been a *bona fide* insurance agent of Balboa or Meritplan, has not provided and does not provide any *bona fide* insurance agency services to Balboa or Meritplan, and has never

20

solicited or sold any insurance products on behalf of Balboa or Meritplan, in connection with LPI purchased by GMACM or otherwise. John Doe does not perform and has never performed any insurance agency functions.

75.    A press release issued by GMACM at the inception of GMACM's relationship with the Balboa Defendants belies any suggestion that GMACM was introduced to Balboa or Meritplan through any insurance agent. The March 6, 2003 press release simply announced that GMACM had "selected" Balboa to meet its insurance needs.

76.    Additionally, on information and belief, John Doe transfers the "commissions" that it receives to GMACM. Ally Financial knowingly participates in the scheme by facilitating such transfers through the "global cash management system" that Ally Financial operates for itself and its subsidiaries. *See* Affidavit of James Whitlinger at ¶¶ 121-122, *In re: Residential Capital* (filed May 14, 2012, ECF No. 6). Ally Financial's cash management system facilitates intercompany transactions and tracks amounts paid to and from each affiliated participant in the system, including John Doe and GMACM.

## D.    The Scheme Defrauds Borrowers And Loan Owners

77.    The free tracking services and "commissions" alleged above constitute illegal kickbacks or bribes paid pursuant to a *quid pro quo* agreement or understanding that GMACM will continue to do LPI business with the Balboa Defendants. The parties compute the rebates/kickbacks due GMACM as a percentage GMACM's gross LPI premiums. Moreover, the rebates/kickbacks represent a substantial percentage of such gross premiums and are, therefore, material.

78.    The scheme defrauds borrowers and loan owners. Borrowers are fraudulently billed for LPI in excess of GMACM's true costs. To the extent borrowers default, the inflated servicing

advances reduce the loan proceeds paid to loan owners. Moreover, loan owners are in effect double-billed for tracking services – first through servicing fees and then through excess LPI charges. GMACM is improperly double-dipping, collecting compensation for insurance tracking twice.

79.     Although servicers supposedly work for the owners of the mortgages they service, a number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts. Servicers have no stake in the performance of mortgage loans and do not share mortgage owners' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing whatever fee and expense charges they can recoup "off the top."

80.     This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, or, as in this case, failing to pass LPI rebates to borrowers and loan owners. *See generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Georgetown Univ. L. Center).

81.     Servicers' compensation structures also incentivize them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the

22

charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from [the] portfolio as quickly as they can," Professor Levitin observes. Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses until there is no value left.

82.    Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated LPI charges have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and investors. It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

83.    Borrowers have no say in the selection of servicer. The standard mortgage loan agreement provides:

> The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note.

84.    Accordingly, no mechanism exists for borrowers to select servicers that do not receive kickbacks from LPI insurers. Nor is there any mechanism for borrowers to opt-out with respect to the kickbacks, bribes or affiliate transactions described herein.

23

85.    Additionally, once charged for LPI, borrowers have no choice but to pay or lose their homes through foreclosure. The payment of improperly inflated LPI charges is not voluntary. As alleged above, whatever LPI charges the servicer imposes "become additional debt of Borrower," secured by the lender's lien. Furthermore, the servicer recoups LPI charges "off the top," before applying payments to loan principal.

86.    Plaintiffs do not challenge – and nothing in this complaint should be construed as challenging – any state-approved LPI "rates" or the reasonableness of any state-approved "rates." This lawsuit challenges a secret rebate scheme only.

### E.    Fannie Mae Learns That It Is Being Overcharged For LPI

87.    Fannie Mae, a GSE, purchases mortgages originated by private lenders, and is the largest single owner of mortgages in the United States. Fannie Mae has contracted with numerous servicers across the country to service tens of millions of mortgage loans. One of those servicers is GMACM. A significant percentage of the loans serviced by GMACM are owned by Fannie Mae.

88.    On March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed Insurance," regarding the "costs to taxpayers" of kickback arrangements that result in overcharges relating to LPI. The *Lender Letter* stated, in pertinent part:

> Fannie Mae will soon implement changes to its Lender-Placed Insurance (LPI) requirements to significantly reduce costs to homeowners, taxpayers, and Fannie Mae. The changes will lower barriers for borrowers who want to cure their delinquencies, while improving transparency and boosting competition in the LPI market.
>
> Fannie Mae requires hazard insurance on all properties for which it owns the mortgage. If a homeowner cannot provide evidence of coverage, the servicer must secure that coverage through the use of LPI. *Lender-placed policies, however, are significantly more expensive than voluntary coverage secured by the borrower and*

24

> *often include commissions and other administrative costs, further*
> *adding to the cost of LPI policies.* Two firms currently issue most
> LPI policies.
>
> An expensive LPI policy can often become an obstacle to a
> delinquent borrower seeking to avoid foreclosure. To bring their loan
> current, a borrower must reimburse the servicer for the cost of the LPI
> policy. *If the borrower defaults in mortgage loan payments and*
> *does not cure, Fannie Mae must reimburse the servicer for LPI*
> *premiums. Costs to Fannie Mae ultimately become costs to*
> *taxpayers.*

(Emphasis added).

89.    On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a

*Servicing Guide Announcement.* "With this Announcement, Fannie Mae is amending and clarifying

its policies regarding the . . . allowable reimbursable expenses for lender-placed insurance," the

Servicing Guide Announcement stated.   Specifically, Fannie Mae stated that requests for LPI

reimbursement must exclude "any lender-placed insurance commission earned . . . by the servicer

or any related entity." "Any costs associated with insurance tracking" must also be excluded.

90.    The *Servicing Guide Announcement* stated, in pertinent part:

> **Acceptable Lender-Placed Insurance Costs and Insurance**
> **Tracking Fees**
>
> Fannie Mae is clarifying its requirement for reasonable reimbursable
> expenses for lender-placed insurance.   Any servicer request for
> reimbursement of lender-placed insurance premiums must exclude:
>
> ■    *any lender-placed insurance commission earned on that*
>      *policy by the servicer or any related entity*,
>
> ■    *costs associated with insurance tracking* or administration, or

25

> ■    *any other costs beyond the actual cost of the lender-placed
>      insurance policy premium.*

(Emphasis added).

91.    On March 6, 2012, Fannie Mae issued a request for proposals relating to LPI (the

"RFP").[1] "Much of the current Lender Placed Insurance cost borne by Fannie Mae results from an

incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae

and the homeowner," the RFP states. "This RFP is designed to change this situation."

92.    Specifically, the RFP requests that insurers submit independent bids for LPI and

tracking services. Approved applicants are to be put on lists of "Preferred Providers" from which

servicers hired by Fannie Mae loans will be required to choose. The stated goal of the RFP is the

elimination of the "existing system" of secret rebates paid in the form of "subsidized" tracking

services and related-party "commissions," *i.e.*, the improper kickbacks complained of herein.

93.    As the RFP states, Fannie Mae conducted a "review" from which it learned that LPI

insurers pay "commissions/fees to Servicers for placing business with them" and, further, that such

commissions/fees are "recovered in part or in whole by the Lender Placed Insurer from the

premiums, which the Servicers pass on to Fannie Mae."

94.    Additionally, Fannie Mae learned that "Fannie Mae is often paying twice for

Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again

---

[1]    Fannie Mae acknowledged the existence of the RFP in March 2012, but declined to
make the document public. Nevertheless, on July 3, 2012, Birney Birnbaum, on behalf of the Center
for Economic Justice, annexed a copy of the RFP as exhibit B to written testimony submitted in
connection with a Public Hearing before the Florida Office of Insurance Regulation Regarding a Rate
Filing for Force-Placed Insurance by Praetorian Insurance Company.    .

26

via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs

of tracking services."

95.    The RFP proposes a "new business model" eliminating such secret rebates.  The

"executive summary" of the RFP states:

> As a best practice Fannie Mae seeks to reduce expenses while
> improving service quality. After extensive internal review, Fannie
> Mae believes that current Lender Placed Insurance costs are not
> market competitive and can be improved through unit price
> reductions and fee transparency to the benefit of both the taxpayers
> and homeowners. Therefore, Fannie Mae is undertaking this
> competitive procurement process to improve the pricing and fee
> transparency for Lender Placed Insurance while maintaining coverage
> and service quality.

> **Current Situation**

> Fannie Mae's current Lender Placed Insurance situation is as follows:

> 1.    Homeowners are required to maintain voluntary hazard
>        insurance on Fannie Mae insured properties.

> 2.    Lender Placed Insurance must be acquired by mortgage
>        Servicers when a property is no longer eligible for Voluntary
>        Insurance, or when the Servicer cannot obtain proof of
>        adequate Voluntary Insurance from the homeowner,
>        irrespective of whether or not that homeowner is current or
>        delinquent on the loan.

> 3.    The cost of Lender Placed Insurance is higher than the cost of
>        voluntary hazard insurance. Homeowners are billed for the
>        Lender Placed Insurance premiums. However, if the
>        homeowner does not pay the premium (for example, if the
>        property has already been vacated), then Servicers pass on the
>        premium costs to Fannie Mae.

> 4.    Servicers are responsible for providing tracking services, per
>        Fannie Mae Guidelines. Many large Servicers have chosen to
>        outsource the Insurance Tracking and associated

27

administrative process to third parties, the largest of which are affiliated with Lender Placed Insurers.

5.  *Lender Placed insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae.*

6.  *The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae.* Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down. In addition, *Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services (to the extent that insurers are providing such services).*

In appropriate circumstances, Lender Placed Insurance is necessary and important to the preservation of Fannie Mae assets. However, much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner. This RFP is designed to change this situation.

**Expected Outcome**

The expected outcome of this procurement is for Servicers and Fannie Mae to obtain competitively-priced Lender Placed Insurance that incorporates price transparency and collaboration with Lender Placed Insurers. Fannie Mae expects to achieve the following:

1.  *Eliminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae.*

2.  *Eliminate the ability of Servicers to pass on the cost of Insurance Tracking services to Fannie Mae, since the cost for such services is reimbursed to the Servicer in the form of current servicing fees.*

3.      *Separate the commissions and fees for Insurance Tracking
        services from the fees for Lender Placed Insurance to
        ensure transparency and accountability.*

4.      Require Servicers to order Lender Placed Insurance policies
        based on competitive pricing negotiated by Fannie Mae;
        Fannie Mae will choose one or more Providers based on the
        responses received during the RFP process. The chosen
        Providers will be placed on a Preferred Provider List.

5.      Restructure the business model to align Servicer incentives
        with the best interests of Fannie Mae and homeowners.

6.      Enforce best practices that encourage the use of voluntary
        insurance and reduce the demand for lender placed insurance.

Fannie Mae recognizes that the current system developed over a
period of years. However, Fannie Mae is prepared to restructure the
current Lender Placed Insurance business model to operate as a
market driven service that efficiently meets the best interests of
Fannie Mae, its partner insurers, taxpayers, and homeowners.

Fannie Mae is confident that the business model proposed herein is
fair to all parties, allows market-based pricing, *eliminates subsidies*,
and allows Fannie Mae to best meet its federal charter to facilitate
home ownership, provide liquidity to the housing market, and protect
taxpayers. Fannie Mae also believes that this new model is
sustainable over time and robust enough to adjust to changing
conditions as the housing market recovers. The attributes of the new
business model will be as follows:

1.      The premiums to be charged for Lender Placed Insurance will
        be negotiated between Fannie Mae and the Lender Placed
        Insurer(s). These premiums will be communicated to Fannie
        Mae's Servicer community.

2.      The Lender Placed Insurer(s) will continue to invoice the
        Servicers for insurance provided. *Fannie Mae will then
        reimburse the Servicers, but will not pay more than the rate
        negotiated by Fannie Mae. The rate negotiated between
        Fannie Mae and the Lender Placed Insurer(s) will exclude
        any commissions paid by the Lender Placed Insurer(s) to
        Fannie Mae Servicers to place their insurance on Fannie
        Mae properties. In addition the rate will exclude the cost of*

29

*providing Insurance Tracking services or any other costs
beyond the cost of the policy premium to the Servicer.*

3.    Servicers may contract for Insurance Tracking and associated
administrative services from a Lender Placed Insurer on the
Preferred Provider List, perform tracking services in-house,
or outsource tracking to a Provider not on the list since the
Servicer is fully liable for tracking costs. ***However, the full
cost of such services must be billed independent of, and
never embedded in, the insurance premiums charged for
Lender Placed Insurance. Fannie Mae will not reimburse
Servicers for these tracking and administrative services.***

4.    Fannie Mae will reevaluate the Preferred Provider List from
time to time as appropriate to ensure Fannie Mae is receiving
competitive pricing.

This new business model will come into effect at the close of this
procurement process.

(Emphasis added).

96.    As to tracking services, the RFP additionally states:

The scope of the tracking and administrative services to be provided
will include at least the following activities:

- Monitor status of homeowner's Voluntary Insurance to
confirm that it is in-force and in accordance with Fannie Mae
Guidelines
- Request and confirm homeowner certificates of insurance
- Notify homeowners of any Voluntary Insurance deficiencies
and attempt to correct
- Secure the placement of Lender Placed Insurance in
accordance with Fannie Mae Guidelines
- Work with homeowners to avoid placement of Lender Placed
Insurance or to secure Voluntary Insurance even after Lender
Placed Insurance has been placed
- Provide Insurance Tracking and verification customer service
to homeowners, Servicers and Fannie Mae to include
state-of-the-art call center operations
- Perform in compliance with Performance and Reporting
requirements . . .

30

> •    Maintain books of record necessary to manage the scope of services covered in this RFP to include issuing accurate reports to Fannie Mae and its Servicers as described below
>
> *The Insurance Tracker may be an affiliate of a Lender Placed Insurance company but must bid the price of Lender Placed Insurance separately from Insurance Tracking services. Under the terms of this procurement, the prices submitted for neither line of business (i.e., Lender Placed Insurance or Insurance Tracking) may subsidize the other.*

(Emphasis added).

97.    In July 2012, Fannie Mae stated that the goal of the RFP was to "lower costs for homeowners, taxpayers, and Fannie Mae" and that Fannie Mae was still in the process of evaluating bids.

### F.    The Lawsky Investigation

98.    On or about January 10, 2012, Benjamin Lawsky, the Superintendent of the NYSDFS, launched a probe into improper practices relating to LPI, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

99.    On April 5, 2012, Lawsky issued a press release announcing that it had expanded its probe into LPI and was scheduling public hearings on the matter to take place in May 2012. The press release stated that the investigation had already uncovered evidence that borrowers had been overcharged for LPI "due [to] relationships between and payments by insurers to banks and their affiliates. . . . Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business." The press release also discussed that, as alleged herein, the LPI overcharges harmed not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

31

100.    The full text of the Lawsky release stated:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to

32

provide information: Balboa Insurance Company, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), Meritplan Insurance Company, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a

substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors,*" Lawsky said.

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure. The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(Emphasis added).

34

101.    The NYSDFS held three days of hearings on LPI in May as scheduled.  As alleged above, GMACM and Balboa admitted the essential facts regarding the rebates/kickbacks paid in the form of free tracking services at the hearings.

## VI.    THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD

102.    The kickback scheme alleged herein constitutes mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### A.    The Erroneous Notices And Bills To Borrowers

103.    As GMACM's insurance tracking subcontractor, Newport issues standardized notices to borrowers.  Prior to the placement of LPI, Newport issues notices titled "Request for Property Insurance" demanding evidence of insurance and warning that LPI will be imposed if such evidence is not forthcoming.  Once LPI is imposed, Newport issues Notices of Placement.  For example, Newport issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on December 12, 2010.  Newport issued a Notice of Placement to the Davidsons on August 2, 2009, and to Kobryn on May 13, 2012.  Borrowers also receive standardized monthly billing statements from GMACM.

104.    The notices and billing statements are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension.

105.    Specifically, the notices do not disclose the rebates/kickbacks.  The notices set forth the balances owed for LPI based on the full cost of the premiums without subtracting the rebates/kickbacks.  Additionally, the notices falsely describe those balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for the money that GMACM "advanced."

35

106.    The Requests for Property Insurance state, "Since we have not received evidence of hazard insurance, we will secure hazard insurance coverage also known as lender-placed insurance. . . . You are responsible for *reimbursing* us for *the cost of this coverage*, in the amount of $[xx,xxx.xx], ('insurance charges')." (Emphasis added).

107.    The Notices of Placement state, "We have obtained lender-placed insurance coverage . . . under the terms of your mortgage. . . .   The *cost of the insurance* in the amount of $[xx,xxx.xx] was *advanced* for the period [xx/xx/20xx] to [xx/xx/20xx]." The Notices of Placement demand that borrowers "*Reimburse us* in full for the insurance." (Emphasis added).

108.    These statements are materially false and misleading and omit facts necessary to make the statements not misleading. Because the rebates/kickbacks reduce GMACM's "costs" for the LPI coverage, the balances set forth in the notices exceed the amounts actually "advanced" by GMACM or necessary to "reimburse" GMACM because the rebates/kickbacks are not subtracted from the balances. Furthermore, the monthly statements to borrowers incorporate the same falsely inflated LPI charges.

## B.    The Erroneous Reports To Loan Owners

109.    GMACM is required to provide financial reports to loan owners at least monthly documenting GMACM's payment activities with respect to each loan. The monthly financial reports are required to include information regarding any compensation received by GMACM, any advances made by GMACM, and any expenses reimbursed to GMACM.

110.    Additionally, GMACM is required to deliver certificates of compliance to each loan owner annually attesting that GMACM's activities for the year complied with the terms of the applicable PSA or other servicing agreement.

36

111.    All servicing agreements include such monthly and annual reporting requirements. For example, the JPMorgan PSA sets forth GMACM's monthly reporting requirement in Section 4.03, and GMACM's annual certification requirements in Section 3.13.

112.    GMACM's reports and certifications to loan owners are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension.  On information and belief, the reports and certifications do not disclosure the rebates/kickbacks.  Instead, the reports and certifications set forth balances for advances and reimbursements based fraudulently on the full cost of the LPI premiums without subtracting the rebates/kickbacks.  The reports and certifications also set forth balances for GMACM's compensation that fraudulently exclude the additional, undisclosed compensation derived by GMACM from the rebates/kickbacks.

113.    Moreover, on information and belief, the reports do not disclose GMACM's "double-dipping" with respect to tracking services, *i.e.*, the fact that GMACM charges loan owners for tracking services twice, first through servicing fees and then for a second time through excess LPI charges.  As alleged above, GMACM's servicing agreements obligate GMACM to pay any subcontractors "from its own funds."  The payment of Newport via excess LPI charges characterized as servicing advances, instead of from GMACM's "own funds", breaches this obligation. GMACM's certificates of compliance to loan owners fraudulently omit disclosure of such breach.

C.    **The Scheme Constitutes "Honest Services" Fraud**

114.    The scheme alleged herein constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

115.    The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

37

116.    The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

117.    The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

118.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly." *Id*. at 352.

119.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

120.    Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

121.    In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." *Id*. at 2928, 2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and

38

kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 2930-31.

122.    At all relevant times, GMACM owed legal duties to render services to loan owners. In all cases, those duties included maintenance of continuous hazard insurance coverage on the secured properties.    The value of GMACM's services depended on GMACM's rendering those services in an honest manner.    Nevertheless, GMACM misused its position as the servicer of the loans to extract bribes and kickbacks from the Balboa Defendants.    GMACM thereby breached its obligation to render "honest services" to loan owners.    GMACM, Ally Financial, and the Balboa Defendants devised a scheme or artifice to defraud loan owners of their intangible right to GMACM's honest services through kickbacks.

123.    The wire and mail fraud violations of GMACM, Ally Financial, and the Balboa Defendants, including "honest services" fraud, constitute predicate acts under RICO.    The pattern of racketeering activity alleged herein has proximately harmed Plaintiffs and the Class.

## VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK PROVISIONS

124.    The "commissions" and free tracking services provided by the Balboa Defendants to GMACM constitute unlawful kickbacks in violation of Section 8(a) of RESPA.

125.    Congress enacted RESPA to protect homeowners "from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a).    The intent of Congress was to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2).

126.    Toward that end, RESPA prohibits referral fees and kickbacks. In particular, Section

8(a) of RESPA prohibits both the giving and acceptance of "any fee, kickback, or thing of value

pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of

a real estate settlement service . . . shall be referred to any person." 12 U.S.C. § 2607(a).

127.    RESPA confers on the Secretary of the Department of Housing and Urban

Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's

purposes. *See* 12 U.S.C. § 2617(a).  The relevant regulation adopted by HUD is known as

Regulation X and sets forth in relevant part:

> § 3500.14 Prohibition against kickbacks and unearned fees.
>
> (a) Section 8 violation. Any violation of this section is a violation of
> section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement
> as such under § 3500.19. (b) No referral fees.  No person shall give
> and no person shall accept any fee, kickback or other thing of value
> pursuant to any agreement or understanding, oral or otherwise that
> business incident to or part of a settlement service involving a
> federally related mortgage loan shall be referred to any person. Any
> referral of a settlement service is not a compensable service, except
> as set forth in § 3500.15(g)(1).  A business entity (whether or not in
> an affiliate relationship) may not pay any other business entity or the
> employees of any other business entity for the referral of settlement
> service business.

24 C.F.R. §3500.14(a).

128.    The penalty for violating Section 8(a) is joint and several liability by the violators "to

the person or persons charged for the settlement services involved in the violation in an amount

equal to three times the amount of any charge paid for such settlement service." 12 U.S.C.

§ 2607(d)(2).

40

129.    Thus, 12 U.S.C. § 2607(a) prohibits kickbacks to refer business incident to or a part

of real estate settlement services to them.  If a party violates 12 U.S.C.§ 2607(a), the borrower is

entitled to a statutory penalty equal to three times the amount paid by the borrower for the settlement

service.  *See* 12 U.S.C. § 2607(d)(2).

130.    RESPA and Regulation X define the term "settlement service" liberally.  The word

"settlement" is defined as "the process of executing legally binding documents regarding a lien on

property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b).  A "settlement

service" is defined as "any service provided in connection with a prospective or actual settlement,"

and in this definition HUD specifies that settlement services include the "provision of services

involving hazard, flood, or other casualty insurance." *See id.*

131.    The placement of LPI constitutes a "settlement service" within the meaning of

RESPA. At minimum, the placement of LPI constitutes business "incident to" if not "a part of" real

estate settlement services under 12 U.S.C. § 2607.  Transactions placing LPI "regard" a "lien" on

property subject to a federally related mortgage because, as alleged above, any amounts disbursed

for LPI "become additional debt of Borrower secured by" the lender's lien on the property.  Hence,

transactions placing LPI fall squarely within the definition of a "settlement."

132.    Regulation X defines a "fee, kickback, or thing of value" as including, without

limitation:

> monies, things, discounts, salaries, commissions, fees, duplicate
> payments of a charge, stock, dividends, distributions of partnership
> profits, franchise royalties, credits representing monies that may be
> paid at a future date, the opportunity to participate in a money-making
> program, retained or increased earnings, increased equity in a parent
> or subsidiary entity . . . .  The term payment is used throughout

41

§§3500.14 and 3500.15 as synonymous with the giving or receiving
any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

133.    The "commissions" and free tracking services provided by the Balboa Defendants to

GMACM thus violate Section 8(a) of RESPA.  The loans of Plaintiffs and the Class are "federally

related" within the meaning of RESPA.  The "commissions" and free tracking services constitute

unlawful kickbacks within the meaning of Section 8(a).

## VIII.    ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES, INCLUDING RESCAP AND GMACM

134.    At all relevant times, defendant Ally Financial exercised complete domination and

control over the affairs, activities, and operations of its subsidiaries – including, specifically, those

of ResCap and GMACM – such that those subsidiaries operated as mere instrumentalities or alter-

egos of Ally Financial.  Moreover, GMACM engaged in inequitable conduct toward Plaintiffs and

the Class such that the circumstances justify piercing the corporate veils of GMACM and ResCap

in order to hold Ally Financial vicariously and/or derivatively liable for GMACM's misconduct.

### A.    Ally Financial, ResCap, And GMACM

135.    As alleged above, Ally Financial owns ResCap, which owns GMACM.  At all times

relevant to this lawsuit, Ally Financial conducted mortgage loan securitization and servicing

activities primarily through ResCap and GMACM.  Ally Financial's business model depended on

mortgage loan securitizations to fund ongoing mortgage loan originations and acquisitions and to

earn significant fees.  GMACM earned additional fees by servicing loans.

136.    Ally Financial, ResCap, and GMACM, as well as other affiliates of Ally Financial,

face numerous investigations and lawsuits relating to their securitization and servicing operations.

42

**B.      Investigations And Lawsuits Relating To Securitization Activities**

137.    GMACM is currently being investigated by the U.S. Department of Justice (the
"DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011,
Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which
"includes a broad request for documentation and other information in connection with its
investigation of potential fraud related to the origination and/or underwriting of mortgage loans."
Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of
1933 (Form S-1/A), at 23 (June 29, 2011).

138.    Additionally, on September 2, 2011, the Federal Housing Finance Authority
("FHFA"), as conservator for Freddie Mac, filed suit in New York State Supreme Court against Ally
Financial and several of its subsidiaries for claims arising in connection with its role in the public
filing of offering documents containing false and misleading statements.  These claims arise from
Freddie Mac's purchase of over $6 billion in certificates issued through twenty-one transactions
similar to the transactions at issue here.  Among other claims, FHFA brought suit for common law
fraud against various Ally Financial subsidiaries and aiding and abetting fraud against Ally Financial
for its intentional and substantial assistance in rendering material misrepresentations to Freddie Mac
in connection with the sale of the subject certificates.

139.    The FHFA also alleges violations of state and federal securities laws by Ally
Financial and several of its subsidiaries stemming from false and misleading statements contained
in publicly filed prospectuses, prospectus supplements, registration statements, and other offering
documents.  Additionally, FHFA also alleges aiding and abetting fraud against Ally Financial and
certain of its affiliates for their intentional and substantial assistance in rendering material

misrepresentations to Freddie Mac in connection with the sale of the certificates. The FHFA action

seeks relief in the form of rescission and recovery of the $6 billion purchase price of the certificates,

including lost principal and interest, as well as punitive damages and attorneys' fees and costs. In

October 2011, Ally Financial and its co-defendants removed the FHFA action to the United States

District Court for the Southern District of New York.

140.    In addition, GMACM currently is facing a lawsuit brought by monoline insurer MBIA

Insurance Corporation ("MBIA") in New York State Supreme Court in which MBIA alleges that,

in connection with certain mortgage insurance transactions with MBIA, GMACM affirmatively

misrepresented the credit quality of tens of thousands of mortgage loans, with an original principal

balance of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that

GMACM should have borne itself. On December 15, 2010, the New York State Supreme Court

issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of

representations and warranties and fraud claims, among others, to proceed to trial.

141.    Additionally, according to Ally Financial's quarterly report for the third quarter of

2011, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending against

Ally Financial's mortgage-related business units and subsidiaries arising from numerous RMBS

offerings. The plaintiffs in those suits have alleged, among other things, that Ally Financial's

various mortgage subsidiaries made misstatements and omissions in registration statements,

prospectuses, prospectus supplements, and other documents related to RMBS offerings. The alleged

misstatements typically concern underwriting standards. *See* Ally Fin. Inc., Quarterly Report (Form

10-Q), at 159 (Nov. 4, 2011). Further, in its 2011 Annual Report, Ally Financial stated that it

44

expects additional similar claims to be brought against Ally Financial and/or its subsidiaries in the future. *See* Ally Fin. Inc., Annual Report (Form 10-K), at 20 (Feb. 25, 2011).

142.    Since the filing of its November 2011 Form 10-Q, moreover, Ally Financial and its subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which have alleged, *inter alia*, material misrepresentations and omissions about the loans backing RMBS securities issued by Ally Financial's affiliates.

143.    Ally Financial and several of its subsidiaries, including GMACM, are also currently facing several lawsuits brought by monoline insurer Financial Guaranty Insurance Company ("FGIC") in which FGIC alleges that in connection with certain mortgage insurance transactions, the defendants, acting as alter egos of each other, affirmatively misrepresented the credit quality of tens of thousands of mortgage loans, with a total original principal balance of approximately $1.87 billion, as a means of unfairly shifting to investors and FGIC risks which the defendants should have borne.

144.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits from monoline insurers like MBIA and FGIC given that Ally Financial and its subsidiaries sold $42.7 billion of loans into monoline-wrapped securitizations from 2004 to 2007. During 2011, Ally Financial and its subsidiaries have received repurchase claims from monoline insurers for $265 million worth of mortgages related to securitizations it consummated between 2004 and 2007. Ally Financial evidently clearly recognizes its exposure because, according to its CEO, Michael Carpenter, ResCap has already reserved $829 million for misrepresentation and warranties claims and, according to its SEC filings, Ally Financial confirms that "litigation with . . . monolines is likely." Ally Fin. Inc., Annual Report (Form 10-K), at 98 (Feb. 28, 2012).

145.    Indeed, according to Ally Financial's 2012 annual report, the company also believes that "[t]he total exposure . . . to mortgage representation and warranty claims is most significant for loans originated and sold from 2004 through 2008, specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 and forward." Ally Fin. Inc., Annual Report (Form 10-K), at 224 (Feb. 28, 2012).

146.    Additionally, Ally Financial disclosed that the SEC served a subpoena on Ally Financial in June 2011, requesting documentation regarding certain "bulk settlements" relating to securitized mortgage loans as well as a request for materials provided to investors and prospective investors in RMBS. *See* Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

C.    **Investigations And Lawsuits Relating To Servicing Activities**

147.    On February 9, 2012, the Federal Reserve Board announced that Ally Financial, its subsidiaries, including GMACM, and several other mortgage loan servicers would be required to pay $766.5 million in monetary sanctions for "unsafe and unsound processes and practices in residential mortgage loans servicing and foreclosure processing." Press Release, FRB, February 9, 2012. On February 12, 2012, the FRB imposed well over $200 million of this fine against Ally Financial, ResCap, and GMACM pursuant to an Assessment Order, which requires that the sanctions be paid to various borrower assistance programs and nonprofit programs established to help victims of improper servicing and foreclosure practices. *See* Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, FRB Docket No. 12-006-CMP-HC (February 12, 2012) (the "Assessment Order"). According to the FRB, the

sanction "takes into account the maximum amount prescribed for unsafe and unsound practices under the applicable statutory limits, the comparative severity of the institutions' misconduct, and the comparative sizes of the institutions' foreclosure activities." *See* Press Release, FRB, February 9, 2011.

148.    Also on February 9, 2012, the United States Attorney General announced that Ally Financial, ResCap, and GMACM would take part in the $25 billion nationwide mortgage settlement to resolve claims brought by the government in response to the abusive mortgage loan servicing practices of Ally Financial and four other banks. *See* Eric Holder, U.S. Attorney General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement releases Ally Financial, ResCap, and GMACM from certain civil claims brought by the DOJ and multiple state attorneys general, the settlement does not resolve or release any other liabilities that Ally Financial, ResCap and GMACM have incurred through their improper servicing practices. *See id.*

149.    According to the U.S. Attorney General, the $25 billion settlement and $766.5 million sanction are just "the latest step forward" in holding the settling banks, including Ally Financial, ResCap, GMACM and others, accountable for "egregious mortgage loan servicing abuses."

150.    In addition to these recent settlements and Assessment Order, the FRB and the Federal Deposit Insurance Corporation (the "FDIC") previously ordered Ally Financial, ResCap and GMACM to adopt new procedures and practices in relation to mortgage loan servicing. *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

151.    The Consent Order notes that Ally Financial and its mortgage servicing subsidiaries, including ResCap and GMACM, have been accused, *inter alia*, of (1) failing to properly increase

47

financial, staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

152.    Furthermore, under the Consent Order, Ally Financial as the parent corporation is obligated to direct ResCap and GMACM to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors . . . [to assess the performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." *Id.* at 8.

153.    The Consent Order further requires GMACM to conduct a review of certain past residential mortgage foreclosure actions in order to determine whether borrowers were financially harmed. *See* Press Release, FRB (November 1, 2011). If the foreclosure process is found to have caused financial injury to the borrower, GMACM is required to provide full compensation to the borrower. *See id.*

154.    Additionally, Ally Financial is required to adhere to new, heightened servicing standards. *See* Press Release, FRB (February 9, 2011). The FRB ordered Ally Financial to remedy its servicing practices by, *inter alia*, "strengthen[ing] the coordination of communications with borrowers by providing borrowers the name of the person at the service who is their primary point of contact, establish[ing] limits on foreclosures where loan modifications have been approved,

48

establish[ing] robust third party vendor controls, strengthen[ing] compliance programs, and

provid[ing] appropriate remediation to borrowers who suffered financial injury as a result of errors

by the servicers." *See id.*

155.    The servicing and foreclosure improprieties of Ally Financial and its subsidiaries,

including GMACM, is a matter of public record.  According to the sworn testimony of a GMACM

employee, Ally Financial's mortgage servicing subsidiaries have routinely filed false affidavits in

thousands of foreclosure actions across the country.  *See Jeffrey Stephan Dep. Federal National*

*Mortgage Association v. Bradbury*, BR1-RE-09-65 (Me. Dist. Ct., Dist. Nine, June 7, 2010).  Indeed,

according to the Financial Crisis Inquiry Commission ("FCIC") Report:

> [L]enders have relied on "robo-signers" who substituted speed for
> accuracy by signing, and sometimes backdating, hundreds of
> affidavits claiming personal knowledge of facts about mortgages that
> they did not actually know to be true. One such "robosigner," Jeffrey
> Stephan of GMAC, said that he signed 10,000 affidavits in a
> month–roughly 1 per minute, in a 40-hour workweek–making it
> highly unlikely that he verified payment histories in each individual
> case of foreclosure.

FCIC Report at 407.

156.    Stephan also testified that, when executing summary judgment affidavits to be used

in judicial foreclosure actions, he was acting in accordance with policies and procedures, and never

in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits were attached,

despite swearing that he had done so in the affidavits themselves.  Stephan Dep. Tr. at 54:12-25.

Such exhibits would generally include (or at least should have included), among other things, the

mortgage note and documents relating to the assignment of the mortgage. *See id.* at 51:15-23.

Stephan further testified that when he signed an affidavit affirming that the foreclosure was proper,

all he knew was the borrower's name and whether he had signing authority for the Ally Financial

entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan testified that the process he

followed in signing summary judgment affidavits was in accordance with the policies and procedures

required by GMACM. *Id.* at 64:8-14.

157.    Additionally, in October 2010, the Ohio Attorney General filed suit against GMACM

and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false

affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC

Mortgage LLC*, No. CI0201006984, (Ohio Ct. of Common Pleas filed Aug. 6, 2010).    Although

some of the claims brought by the Ohio Attorney General's suit have been resolved by the $25

billion nationwide mortgage settlement, many additional claims not encompassed by the settlement

have survived.

158.    Similarly, in December 2011, the Massachusetts Attorney General filed suit against

GMACM for, among other things, engaging in unfair and deceptive foreclosure practices. *See

Commonwealth of Massachusetts v. Bank of America N.A.*, No. 11-4363 (Suffolk Cnty. Superior Ct.

filed Dec. 1, 2011). Days after filing suit, the Massachusetts Attorney General sent a letter to the

United States Senate Committee on Banking, Housing and Urban Affairs and the United States

House Committee on Financial Services asking that the federal government investigate Ally

Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false

documents related to property seizures. *See* Boston Globe, Attorney General Martha Coakley Urges

Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices, Dec. 6, 2011.

Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions
> against homeowners in Massachusetts and across the country, I
> respectfully request that your committees investigate Ally
> [Financial]'s serious misconduct and consider what actions the federal
> government can take to ensure that Ally [Financial] adheres to the
> law.

*Id.*

159.    While the $25 billion nationwide mortgage settlement ultimately resolved certain

claims brought by the Massachusetts Attorney General in this action, other claims survived and will

continue to be prosecuted.

**D.    Ally Financial Causes ResCap And GMACM To File For Bankruptcy**

160.    Since at least November 2011, Ally Financial was considering seeking bankruptcy

protection for ResCap, its wholly-owned subsidiary, which has reportedly lost $555 million since

2009, according to multiple published reports.  GMACM is a wholly-owned subsidiary of ResCap.

161.    Around that time, the financial industry was "betting that Ally [Financial] will place

its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting the

business as the bank prepares for an initial public offering."  Bloomberg News, Ally May Put

ResCap in Bankruptcy to Ease IPO: Corporate Finance, November 14, 2011.  As the article notes,

Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for

bankruptcy. *See id.*

162.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a significant

risk that ResCap will not be able to meet its debt service obligations and other funding obligations

in the near term."  Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 28, 2012).

51

163.    That risk ultimately came to pass as Ally Financial disclosed earlier this year that the penalties assessed by the federal government and numerous state attorneys general regarding the servicing and foreclosure practices of Ally Financial and its subsidiaries, which include GMACM, "resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011." *Id*. at 31. As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge] was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in certain of ResCap's credit facilities." Ally Financial, Current Report (Form 8-K) (January 31, 2012). Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities . . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012). ResCap's substantial shortfall, however, was "immediately remediated by Ally through a capital contribution of $197 million, which was provided through forgiveness of intercompany debt during January 2012." *Id*.

164.    Moreover, in February, 2012, it was reported that Ally Financial had contacted buyout firms such as Fortress Investment Group LLC and Cerberus regarding a potential sale of ResCap through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faced financing and liquidity deadlines. *See* Bloomberg Businessweek, Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy, Feb. 8, 2012. According to the report, "[p]otential bidders are being told that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as [RMBS] securitizations that have been the subject of litigation." *Id*. To that end, Ally Financial's

52

CEO stated that he will not pursue the aforementioned initial public offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.*

165.    Nevertheless, a bondholder group representing holders of approximately $800 million in ResCap debt expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from ResCap because it has *stripped assets from the unit.*" Bloomberg News, Paulson, Tepper Said Among Investors Urging Ally to Back ResCap, Jan. 10, 2012 (emphasis added).

166.    Indeed, as Ally Financial has pointedly noted in its most recent annual report: "In light of ResCap's liquidity and capital needs combined with volatile conditions in the marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

167.    On May 14, 2012, ResCap and certain of its subsidiaries, including GMACM, filed petitions for bankruptcy protection under Chapter 11.

E.    **Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets**

168.    On June 1, 2012, the Official Committee of Unsecured Creditors in the ResCap/GMACM bankruptcy (the "Unsecured Creditors") moved for an order authorizing them to conduct an investigation of a "complex constellation of pre- and post-petition transactions, involving billions of dollars of transfers and financings among interested parties." Specifically, the Unsecured Creditors sought to investigate transactions through which Ally Financial stripped or apparently plans to strip the Debtors of valuable assets. *In re: Residential Capital, LLC, Debtors*, No. 12-12020 ("UCC Motion") (S.D.N.Y. filed June 1, 2012) (ECF No. 192).

169.    The proposed transactions include a "stalking horse bid" by Ally Financial of up to

$1.6 billion for a portfolio of mortgage loans and securities owned by the Debtors, a $150 million

secured loan to the Debtors under an amendment to a pre-petition secured loan agreement, and a

proposed settlement agreement between the Debtors and Ally Financial (the "Ally Settlement

Agreement").

170.    Under the Ally Settlement Agreement, Ally Financial would contribute $750 million

to the Debtors' estates in exchange for (i) releases by the estates of all legal claims that the Debtors

have against Ally Financial, and (ii) non-consensual releases by third party holders of legal claims

against Ally Financial. *See* Settlement and Plan Sponsor Agreement, *In re: Residential Capital* (filed

May 14, 2012) (ECF No. 6-8).

171.    Notably, the Debtor and third-party releases in the Ally Settlement Agreement would

release any and all "causes of action under theories of veil piercing and alter ego liability." In other

words, Ally Financial is seeking through the settlement to buy, for $750 million, peace from, *inter*

*alia*, any veil-piercing or alter-ego claims that may be alleged against Ally Financial by its own

subsidiaries, ResCap and GMACM, as well as by any third parties such as Plaintiffs herein.

172.    In 2011, ResCap appointed two new members to its board, Jonathan Bally and John

E. Mack, who purportedly investigated the legal claims that the Debtors may have against Ally

Financial. Based on the purported investigation, these supposedly independent directors negotiated

the Ally Settlement Agreement and the proposed releases.

173.    Additionally, the Debtors, which possess pertinent non-public facts regarding the

subjugation of the Debtors by Ally Financial, specifically aver in the Ally Settlement Agreement that

54

they "believe" that the Debtors possess valid "veil piercing and alter ego" claims against Ally

Financial. An introductory clause of the Ally Settlement Agreement states:

> the Debtors believe certain claims exist against Ally related to the
> corporate relationship between the Debtors and Ally, including with
> respect to certain transactions between the Debtors and Ally,
> including equitable subordination, debt recharacterization, fraudulent
> conveyance, avoidance liability under federal or state laws, *and other
> causes of action under theories of veil piercing and alter ego
> liability*.

*Id.* at 1 (emphasis added).

174.   The Unsecured Creditors also sought authorization to investigate a series of

suspicious related-party transactions that occurred prior to the bankruptcy filing. The Unsecured

Creditors allege that Ally Financial transferred billions of dollars of assets from the Debtors to Ally

Financial through such transactions. UCC Motion at ¶ 4, Ex. B at ¶ 29.

175.   On June 4, 2012, creditor Berkshire Hathaway, Inc. ("Berkshire Hathaway") moved

for appointment of a bankruptcy examiner to conduct the investigation proposed by the Unsecured

Creditors. *In re: Residential Capital* (ECF No. 208). According to Berkshire Hathaway, an

investigation was warranted in light of the "dozens of transactions with Ally and its affiliates

involving billions of dollars of asset transfers and intercompany financing – transactions whose net

effect was to transfer a substantial share of ResCap's operating assets to its parent." Berkshire

Hathway went on to state:

> The Debtors now seek to release Ally from any claims arising from
> these transactions, even while they admit that the Debtors possess
> valid claims against Ally, including for fraudulent transfer, equitable
> subordination, and alter ego. An examiner should determine whether
> this proposed release is fair to the Debtors and all their stakeholders.

An examiner should also be tasked with reviewing the propriety of the Debtors' request to release Ally from any third-party claims. As the Second Circuit and this Court have observed, such non-debtor releases are especially susceptible to abuse, as they effectively offer a non-debtor a bankruptcy discharge without affording creditors the protections that would attend a bankruptcy. If there is a basis for such an extraordinary remedy in this case, it is nowhere to be found in the pleadings the Debtors have filed to date. The Debtors' settlement agreement merely recites that Ally's third party release "is justified by truly unusual circumstances," none of which are identified, and that the release is an "essential component and important to the success of the Plan," for reasons that are neither explained nor evident.

What is evident—abundantly so—is that the Debtors' plan fits neatly into Ally's publicly-stated goal of separating itself, once and for all, from ResCap. Whether Ally's agenda also happens to be in the best interest of ResCap and its creditors is another question, one that should be a focus of a searching inquiry.

*        *        *

Ally has laid much of the blame for its financial difficulties on ResCap's mortgage operations and has publicly avowed its intention to make a clean break from ResCap and its liabilities.

That break, however, comes after years of related-party transactions and asset transfers.  For example, the Rule 2004 Motion [filed by the Unsecured Creditors] identifies at least twenty different transactions with Ally and its affiliates involving the purchase of assets and businesses from ResCap, or the extension of credit secured by ResCap's assets. (Rule 2004 Mot., Ex. B, Definition of "Specified Transactions.") These transactions involved billions of dollars and sizable on-going businesses.

. . . . Th[ese] and other transactions may give rise to various potential claims that Ally and affiliates have harvested assets from ResCap and seek a quick and easy divorce through bankruptcy.

176.    On June 20, 2012, the Bankruptcy Court granted Berkshire Hathaway's motion and appointed an examiner to conduct the investigation sought.

56

## F.   Ally Financial's Domination Of ResCap And GMACM

177.   Ally Financial has recently admitted to the FRB and FDIC that it "owns and controls" ResCap and GMACM. *See* Consent Order.

178.   Ally Financial's public statements and actions demonstrate that at all relevant times Ally Financial: (i) wholly owned ResCap and GMACM; (ii) shared resources, management and employees with ResCap; (iii) considered its mortgage origination and servicing businesses through ResCap and GMACM to be "units" of Ally Financial; and (iv) had a business relationship with ResCap and GMACM designed to benefit itself at the expense of those subsidiaries.

179.   From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap and GMACM as extensions of itself, rather than as subsidiaries whose dealings were at arm's length.

180.   Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage securitization and servicing business, which was carried out by its subsidiaries. Ally Financial substantially restructured its subsidiaries in 2005.

181.   ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp. – two of Ally Financial's wholly-owned subsidiaries – were transferred to ResCap in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

182.   Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

57

183.    Further, Ally Financial's 8-K, filed on June 9, 2005, disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005 Operating Agreement").

184.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business. This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants.

185.    On December 1, 2006, Ally Financial had its inaugural conference call with investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations, "welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global financial services company." On the same investor call, Eric Feldstein, Ally Financial's then CEO, demonstrated how Ally Financial was going to take initial steps to actively control its subsidiaries. For instance, Feldstein declared that one of Ally Financial's first acts as controlling parent was "to integrate certain of GMAC mortgage operations . . . to drive some cost efficiencies." *Id.*

186.    At all times since Ally Financial caused ResCap to be incorporated, it has owned

100% of ResCap. Since incorporation, the ownership of ResCap has not changed. Statement by

Michael Carpenter, Ally Financial's CEO, Ally Financial Earnings Call, Nov. 2011.[2]

187.    Ally Financial has continued to exert its domination and control over ResCap via

shared resources, management and employees. For example, Ally Financial and ResCap shared at

least three common board members, including two individuals who were active participants with

respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's chairman

and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director of ResCap,

Sanjiv Khattri. In fact, the 2005 Operating Agreement, between ResCap and Ally Financial, which

Ally Financial filed with the SEC, and which upon information and belief is still currently in effect,

"require[s] that [ResCap's] board of directors include at least two independent directors, to be

selected by [Ally]." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005.

188.    Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors,

and also served as Chairman of ResCap's board of directors. Furthermore, Sanjiv Khattri has served

as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO

of ResCap. Numerous other individuals served as Directors and Officers of both Ally Financial and

ResCap, with many serving in roles directly related to the mortgage operations of both companies.

---

[2]    GM had created a shell company, GMAC Mortgage Group Inc., which was the direct
parent of ResCap. However, there is no indication that this company conducted any business
independent from Ally Financial. In fact, Ally Financial's first Annual Report as an independent
entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that
evidenced Ally Financial's corporate structure. There was a direct line from Ally Financial to
ResCap. *See* Ally Fin. Form 10-K, at 2 (Mar. 3, 2007). In addition, there is no indication that Ally
Financial ever discusses ResCap as an "indirect subsidiary." To the contrary, as discussed, below,
Ally has publicly stated on numerous occasions that it is the owner of ResCap.

189.    ResCap and its own subsidiaries, including GMACM, shared numerous directors and senior management as well.

190.    David C. Walker is another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including GMACM. Walker joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group. Walker has also served as a director at ResCap and GMACM, among other ResCap subsidiaries.

191.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release of Ally Financial's 2007 first quarter financial results to investors in an email bearing the ResCap logo. That announcement stated that Ally Financial's financial results were found on both Ally Financial's and ResCap's websites.

192.    Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006. Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a ResCap e-mail address, according to the complaint filed by FGIC against Ally Financial. Further, an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally Financial subsidiaries – including GMACM – should be sent not to the relevant (and supposedly independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel, according to the FGIC complaint.

193.    As further evidence of Ally Financial's domination over ResCap, the 2005 Operating Agreement also indicates that Ally Financial has expressly "restrict [ed] ResCap's ability to declare

dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates." *See id.*

194.    Conversely, s alleged above, Ally Financial has also agreed to directly pay the losses or expenses of ResCap. In the same 2005 Operating Agreement, Ally Financial stated that it would stand behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." *Id.*

195.    Until ResCap filed for bankruptcy, Ally Financial continued to make additional public statements that further demonstrated its willingness to support and fund ResCap.  For instance, in May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally Financial's Q1 2007 Earnings Call at 24 (May 2, 2007).

196.    Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of equity when it was appropriate . . ." Ally Financial's Q2 2007 Earnings Call at 9 (July 30, 2007).  Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part of our plan and a key part of our value creation." *Id.*

197.    Thus, Ally Financial's senior management assured the market that the company was supporting ResCap for the purposes of Ally Financial's own "value creation."

198.    The financial support Ally Financial gave to ResCap began in May 2005.  Upon information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by

61

channeling capital and liquidity into ResCap even as its condition continued to deteriorate as the housing market crashed. In addition to the direct financial support Ally Financial provided ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally Financial announced to the market that it renewed a funding facility with Citibank, which provided "funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap] businesses." *Id.*

199.    Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily dependent on [Ally Financial] and its affiliates for funding and capital support." Ally. Fin. Inc., Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

200.    Additionally, Annual Reports prepared by Ally Financial further note its pursuit of strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its control over its subsidiaries to enhance its own financial health. According to Ally Financial: "On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy [Ally's] current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related assets and businesses. . . . In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should minimize the impact of any significant future losses related to ResCap's legacy mortgage business . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

201.    There is also substantial evidence that billions of dollars of TARP funds meant to stabilize Ally Financial were given to ResCap. *See* TARP Report dated March 10, 2010, at 41, 44.

62

Upon information and belief, the TARP funds were commingled among a variety of entities within Ally Financial's mortgage family, including ResCap.

202.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to account for the potentially significant liabilities stemming from repurchase demands made on its mortgage-related business units. The balance of the Mortgage Repurchase Reserve was $825 million as of the fourth quarter of 2011. *See* Ally Financial's Q4 2011 Earnings Presentation at 16. Although these repurchase demands are generally made on Ally Financial's subsidiaries – including GMACM – in discussing the reserve on an earnings call, Ally Financial CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage repurchase expense of $44 million." Ally Financial's Q4 2011 Earnings Call, at 4 (Feb. 2, 2012).

203.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally Financial's third quarter 2011 earnings call, Mackey further described losses attributable to mortgage loan repurchases as belonging to Ally Financial, when he stated: "Our mortgage repurchase reserve is [as it then stood] $829 million . . . . Our loss experience improved during the quarter due to the fact that we had fewer mortgage insurance rescission payments that we experienced last quarter and that did not repeat this quarter." Ally Financial's Q3 2011 Earnings Call at 6 (Nov. 2, 2011).

204.    On the same call, Ally Financial CEO Carpenter explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ." *Id.* at 8.

205.    Additionally, Ally Financial recorded a $230 million charge in the fourth quarter of 2011 as a result of the nationwide mortgage settlement that included ResCap and GMACM. *See* Ally Fin. Inc., Form 10-K, at 12 (Feb. 28, 2012).

63

## G.    Ally Financial's Disregard Of Corporate Formalities

206.    Ally Financial describes its subsidiaries as its own business units rather than separate and distinct entities. For example, Ally Financial declared, in a section of its website specifically intended for investors, that GMACM is a "business unit" of Ally Financial, rather than an indirect subsidiary owned by ResCap. See Ally Financial Website, Ally Home > About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited Dec. 9, 2011).

207.    The origination and securitization of mortgage loans by ResCap and GMACM have long been integral parts of Ally Financial's core business. In its 2006 Annual Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate finance company focused primarily on the residential real estate market. Our business activities include the origination, purchase, servicing, sale and securitization of residential mortgage loans." GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007). Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy." *Id.* at 5.

208.    Ally Financial continued to publicly report on its own business and that of its subsidiaries on an integrated basis: "We engage in the origination, purchase, servicing, sale, and securitization of consumer (*i.e.*, residential) mortgage loans and mortgage-related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank." Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010). More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States. We are one

of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

209.    Moreover, as alleged above, Ally Financial – at least in the view of certain of ResCap's creditors – is believed to have stripped assets from its subsidiary.

210.    In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM as part of its own business. For example, in its investor presentation from 2007, ResCap declared that GMACM is "owned and operated by GMAC Residential Capital Company, LLC [ResCap]." The presentation further stated that ResCap "is part of the [Ally Financial] family of companies."

211.    As alleged above, Ally Financial exerted its dominance and control over ResCap and GMACM. When Ally Financial was not directly controlling GMACM, it was using ResCap as an instrument to do so.

212.    Prior to ResCap's and GMACM's bankruptcy filing, Ally Financial also used those subsidiaries' resources as its own to earn favorable credit ratings. For instance, a Moody's report in November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is evident from that report that Ally Financial obtained such a rating by providing information related to its ResCap mortgage units. Ally Financial itself is not engaged in the origination business. Instead, it used its ResCap mortgage units as instruments to obtain favorable ratings.

213.    Such disregard for the corporate form has persisted over time. For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses – which include [GMACM], and HomeComings Financial Network – have been

65

integrated into" ResCap.    Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems."

214.    Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano served as an officer of Ally Financial as well as Chairman and CEO of ResCap. His responsibilities include overseeing the mortgage lending and servicing in ResCap. In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage." On December 23, 2011, Marano also signed a comment letter to the Federal Housing Financial Agency ("FHFA") on behalf of both Ally Financial and GMACM. Upon information and belief, Marano – in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap – directed and controlled the actions of GMACM.

215.    A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans. He was asked the following questions at his deposition:

> Q: Could you please state your name for the record.
>
> A: My name is Jeffrey Stephan.
>
> Q: Okay. And who do you work for?
>
> A: GMAC, LLC [Ally Financial].
>
> Q: And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?

66

A: GMAC, LLC - I'm trying to think of the word to use - the most recent name.

Q: Okay.

A: It's GMCA [sic] Mortgage Corporation.

Q: Okay.

A: I'm not sure how you would word that.

Q: Okay. So are they -- does GMAC, LLC -- now has that basically taken over these other entities --

A: Yes.

Q: -- that formerly existed?

A: Yes.

Q: So these entities no longer currently exist?

A: Right.

Q: Okay. And how long then have you been employed by GMAC, LLC?

A: Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, No. 50 2008 CA 040805, (15th Cir., Dec. 10, 2009), at 4:25-5:22.

### H.    Ally Financial's Responsibility For Controlling GMACM's Servicing Practices

216.    As alleged above, Ally Financial, ResCap, and GMACM entered into a Consent Order with the FRB and FDIC on April 13, 2011.  The Consent Order was entered because Ally Financial, ResCap, and GMACM were accused of a series of foreclosure-related abuses, including: (i) failing to properly increase financial, staffing, and managerial resources to meet an increasing

number of foreclosures; (ii) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (iii) filing false affidavits in foreclosure actions; and (iv) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

217.    The Consent ordered required Ally Financial, ResCap, and GMACM to adopt new servicing procedures and practices.  Ally Financial is obligated to make sure that ResCap and GMACM take certain remedial actions to operate in a "safe and sound manner and in compliance with the terms of mortgage loan documentation and related agreements with borrowers, all applicable state and federal laws . . . rules, regulations, and court orders, as well as . . . servicing guides with GSEs or investors, and other contractual obligations, including those with the Federal Housing Administration."

218.    Specifically, the Consent Order required Ally Financial to improve its compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight.  Ally Financial was also required to strengthen its "Enterprise Compliance Program" or "ECP" with respect to "residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations."  Additionally, Ally Financial was required to implement a "Program for Board Oversight" by the Ally Financial and ResCap boards of directors.

219.    Ally Financial, ResCap, and GMACM filed a series of reports with the FRB and FDIC from July 13, 2011 through December 14, 2011, detailing their progress in implementing the terms of the Consent Order.  Notably, despite their ostensible separateness, Ally Financial, ResCap,

68

and GMACM submitted joint reports that bore the Ally Financial letterhead. The entities explained

the joint submissions to the FRB and FDIC on the grounds that:

> the Companies believe enterprise risk management is a holistic and continuous process involving governance, policies, procedures, tools, methodologies and resources that ***transcend legal entity and organizational boundaries***.

220.    As alleged above, the Consent Order requires GMACM to pay for independent

foreclosure reviews, and to compensate borrowers for any financial injuries discovered.

221.    On April 26, 2012, in view of ResCap's impending bankruptcy, Ally Financial

entered into a supplemental agreement with the FRB regarding the Consent Order. Ally Financial

agreed to be "secondarily liable" for GMACM's obligations to compensate injured borrowers and

to pay for the reviews. Additionally, Ally Financial agreed to use "all reasonable best efforts" to

ensure ResCap's continued performance under the Consent Order, notwithstanding ResCap's

bankruptcy, by seeking to require any successor or purchaser of ResCap to honor the Consent

Order's terms.

222.    As also alleged above, Ally Financial, ResCap, and GMACM each participated in the

$25 billion nationwide mortgage settlement. The settlement resolved claims in a complaint filed by

49 state attorneys general against Ally Financial, ResCap, and GMACM jointly. Ally Financial,

ResCap, and GMACM each executed the Consent Judgment filed with the U.S. District Court for

the District of Columbia on March 12, 2012.

223.    The $25 billion settlement mandates "comprehensive reform of mortgage servicing

practices," for which Ally Financial, ResCap, and GMACM, as signatories to the Consent Judgment,

are jointly responsible.

## IX.    TOLLING OF THE STATUTES OF LIMITATIONS

224.    The claims of Plaintiffs and the Class are subject to both equitable estoppel, stemming from the concealment by GMACM and Defendants of the facts alleged herein, and equitable tolling, stemming from the Plaintiffs' inability to obtain adequate information to plead the claims alleged herein.  Defendants are estopped from relying on a statute of limitations defense because they and GMACM purposefully concealed the misconduct alleged.  At all relevant times Defendants and GMACM maintained a shroud of secrecy around their illicit dealings.  Separate and apart from the acts of concealment of GMACM and the Balboa Defendants, any applicable statutes of limitations are properly tolled because Plaintiffs and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

225.    Furthermore, at all relevant times Plaintiffs and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GMACM to fulfill its contractual duties under the mortgage loan contracts of Plaintiffs and the Class in good faith, and to similarly execute its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and in an honest manner.  Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiffs and the Class had attempted to investigate, such investigation would have been futile because it would not, until recently, have been possible to uncover any specific information as to GMACM's involvement in the unlawful kickback scheme alleged herein.

226.    Due to the complex, undisclosed and self-concealing nature of the scheme alleged herein, neither Plaintiffs, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise

to discover the misconduct alleged. Plaintiffs were able to discover the underlying basis for their claims only with the assistance of counsel.

227.    Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis. Nevertheless, the news coverage has generally related to improper foreclosure practices. It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of LPI business.

228.    The first time *The New York Times* published a news article about such kickbacks was on January 10, 2012. *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of the NYSDFS, was investigating several large banks in connection with improper practices relating to LPI, including "kickbacks." *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

229.    Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to LPI to have put Plaintiffs or the Class on inquiry notice of Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

230.    Furthermore, even had Plaintiffs or members of the Class been on inquiry notice of misconduct relating to LPI in the mortgage servicing industry prior to January 10, 2012, despite

71

diligent investigation they would have had no specific factual basis to allege – or even suspect – that GMACM was involved in any misconduct until, at the earliest, May 21, 2012, when, as alleged above, GMACM and Balboa admitted at the NYSDFS's LPI hearings to GMACM's receipt of free tracking services, paid for indirectly through GMACM's LPI premiums. Prior to May 21, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GMACM to potential kickbacks relating to LPI. Prior to such time, Plaintiffs and the Class did not have an adequate factual basis to plead the claims alleged herein.

231.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiffs and the Class could not have known of the violations alleged herein until, at the earliest, May 21, 2012. Furthermore, any delay by Plaintiffs and the Class in asserting the claims herein was excusable because they could not reasonably have discovered the misconduct alleged herein absent specialized knowledge and/or assistance of counsel.

## X.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
(Against all Defendants)

232.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

233.    Plaintiffs, each Class member, each Defendant, and GMACM, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

234.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants and GMACM,

72

including their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

235.    The Enterprise was primarily managed by GMACM, which organized the fraudulent scheme and procured the involvement of the Defendants. The Defendants carried out their parts of the scheme under the direction of GMACM.

236.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for LPI with respect to GMACM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, fraudulent overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GMACM and directly and/or indirectly to the Defendants.

237.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants and GMACM engage.

### The Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

238.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants and GMACM conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint. The RICO Defendants and GMACM have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

73

a.   GMACM enters into servicing agreements with owners and/or holders of whole loans. The servicing agreements provide, *inter alia*, that GMACM is obligated to maintain continuous hazard insurance on the secured properties.

b.   GMACM buys LPI with respect to the loans it services from Balboa and Meritplan. GMACM pays insurance premiums to Balboa and Meritplan for the LPI.

c.   GMACM hires Newport, an affiliate of Balboa and Meritplan, as a subcontractor to perform GMACM's "insurance tracking" responsibilities.

d.   GMACM and the Balba Defendants conceal the fact from the public, borrowers, and loan owners, that GMACM pays Newport nothing for its insurance tracking services.

e.   Balboa and Meritplan pay rebates/kickbacks to GMACM.

f.   The money to pay the rebates/kickbacks is derived from GMACM's LPI insurance premiums. The amount of the rebates/kickbacks is computed as a percentage of GMACM's LPI insurance premiums.

g.   The rebates/kickbacks are paid in the form of free tracking services and bogus "commissions."

h.   The free tracking services are provided through Newport. GMACM pays nothing for Newport's insurance tracking services. Instead, Balboa and Meritplan pay Newport on GMACM's behalf. The money is routed from Balboa and Meritplan to Newport via "intercompany expense allocations."

i.   The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, John Doe. The "commission" payments are made on the false pretense that John Doe is a third-party insurance agent. Balboa and Meritplan falsely label the payments to John Doe as "commissions."

j.   John Doe receives the "commissions" on GMACM's behalf and then transfers them to GMACM. Ally Financial – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash management system."

k.   As a *quid pro quo* for the rebates/kickbacks, GMACM continues to procure LPI from Balboa and Meritplan and continues to outsource insurance tracking to Meritplan.

l.      GMACM retains the rebates/kickbacks for itself, while billing borrowers based on the full purported price of the LPI. The rebates/kickbacks reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Borrowers are forced to pay the full purported price of the LPI.

m.      Because amounts paid for LPI constitute "servicing advances," GMACM's "servicing advances" are improperly inflated by the failure to pass through the rebates/kickbacks to borrowers. GMACM reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

n.      As GMACM's insurance tracking subcontractor, Newport issues notices to borrowers fraudulently setting forth the balances owed for LPI based on the full prices of the LPI premiums without subtracting the rebates/kickbacks. Additionally, the notices falsely describe the balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for moneys actually "advanced." In fact, the costs of the coverage are less than the stated balances because the rebates/kickbacks reduced those costs. Moreover, GMACM "advanced" less than the stated balances, taking into account the rebates/kickbacks. Furthermore, under borrowers' loan agreements, GMACM is only entitled to "reimbursement" for its true LPI costs.

o.      GMACM issues monthly servicing reports and annual certifications of compliance to loan owners that include information about GMACM's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for GMACM's advances and reimbursements based on the full prices of the LPI without subtracting the rebates/kickbacks. The reports and certifications also fraudulently exclude the compensation that GMACM derives from the kickbacks/rebates, which are not disclosed in the reports and certifications. Moreover, the reports and certifications fraudulently conceal that Newport is not compensated by GMACM "from [GMACM's] own funds" but, instead, through the LPI insurance premiums, despite the fact that GMACM is thereby breaching its agreements with loan owners. The reports and certifications also omit disclosure that GMACM breached borrowers' mortgage loan agreements by billing them for LPI in amounts in excess of GMACM's actual costs.

239.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Defendants and GMACM engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by GMACM

75

and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

240.    The conduct of Defendants and GMACM included, without limitation, a fraudulent scheme to deprive the loan owners of their intangible rights to GMACM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.    As alleged above, GMACM owed a contractual obligation to render residential mortgage loan servicing duties to the loan owners. GMACM owed a duty to render those services in an honest manner.    Nevertheless, GMACM misused its position to extract bribes and kickbacks from the Balboa Defendants at the expense of the loan owners. GMACM thereby breached its obligations to render "honest services." Each of the Defendants intentionally and wilfully conspired and participated in GMACM's "honest services" violations. Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

241.    The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of the Defendants and GMACM in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

242.    It was reasonably foreseeable to Defendants and GMACM that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

243.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants and GMACM.    Nevertheless, Plaintiffs can allege such transmissions generally.

76

244.     For the purpose of furthering and executing the scheme, Defendants and GMACM

regularly transmitted and caused to be transmitted by means of wire communication in interstate

commerce writings, electronic data and funds, and also regularly caused matters and things to be

placed in post offices or authorized depositories, or deposited or caused to be deposited matters or

things to be sent or delivered by a private or commercial interstate carrier.  For example:

   a.     As GMACM's insurance tracking subcontractor, Newport issued materially
          false and misleading notices relating to LPI to borrowers via mail;

   b.     Newport also communicated to borrowers with respect to LPI issues by
          telephone;

   c.     GMACM issued monthly statements incorporating the falsely overstated LPI
          charges to borrowers via mail and/or wire;

   d.     GMACM issued materially false and misleading monthly servicing reports
          and annual certifications of compliance to loan owners via the mail and/or
          electronically via wire;

   e.     Newport and/or GMACM received LPI payments from borrowers via mail
          and/or wire;

   f.     GMACM transmitted LPI premiums to Balboa and Meritplan via mail and/or
          wire;

   g.     Balboa and Meritplan transmitted money to Newport via "intercompany
          expense allocations" consummated via wire;

   h.     Balboa and Mertiplan transmitted funds to John Doe reflecting purported
          "commissions" via mail and/or wire; and.

   i.     Ally Financial transferred funds representing "commissions" from John Doe
          to GMACM through its "global cash management system" via wire.

245.     As to Plaintiffs, Defendants and GMACM utilized the mails and/or wires in the

following instances, among others, for the purpose of furthering and executing the scheme:  Newport

issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on

December 12, 2010. Newport issued a Notice of Placement to the Davidsons on August 2, 2009,

and to Kobryn on May 13, 2012. Each of the Plaintiffs also received monthly billing statements

from GMACM incorporating the LPI overcharges. Additionally, each of the Plaintiffs

communicated by telephone with Newport regarding LPI, including, among others, January 24, 2012,

when Rothstein called Newport regarding LPI charges on his monthly statements.

246.    These are only examples of certain instances of the pattern of racketeering activity

consisting of mail and/or wire fraud violations engaged in by Defendants and GMACM. Each

electronic and/or postal transmission was incident to an essential part of the scheme. As detailed

above, Defendants and GMACM engaged in similar activities with respect to each member of the

Class and with respect to the owners of the loans of each member of the Class.

247.    Each such electronic and/or postal transmission was incident to an essential part of

the scheme.

248.    Additionally, each such electronic and/or postal transmission constituted a predicate

act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud

borrowers and the owners of the loans.

249.    Defendants and GMACM each participated in the scheme to defraud knowingly,

wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying

and/or incurring falsely inflated, unauthorized charges in connection with LPI.

250.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity

as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts

aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur

the falsely inflated, unauthorized charges with respect to LIP and thereby enable Defendants and GMACM to reap illicit profits.

251.    Defendants and GMACM were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

### Injury to Plaintiffs and the Class

252.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants and GMACM, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  Plaintiffs and the Class paid falsely inflated, unauthorized LPI charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged. Moreover, the overcharging of Plaintiffs and the Class for LPI was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that GMACM was entitled to recoup "off the top" from the proceeds of the loans.

253.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

254.    Ally Financial is directly liable for its role in the scheme.  Ally Financial helped devise the scheme and participates in the scheme by transferring funds representing "commissions" from John Doe to GMACM through Ally Financial's "global cash management system."  In addition, Ally Financial is vicariously liable for GMACM's violations by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

79

255.    Ally Bank is also vicariously liable for GMACM's violations. As alleged above, Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM pursuant to a series of servicing agreements since at least 2003. Ally Bank is liable as principal for the misconduct of GMACM, Ally Bank's agent. In committing the violations alleged herein, GMACM was acting within the scope of duties delegated to it by Ally Bank.

## COUNT II

## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

256.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

257.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

258.    The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

259.    As set forth in Count I, above, at all relevant times, Plaintiffs and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

260.    As also set forth in Count I, above, at all relevant times, the Defendants and GMACM were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

261.    The Defendants and GMACM formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to LPI. The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to LPI.

262.   The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

263.   As set forth in Count I, above, Defendants and GMACM conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

264.   The Defendants and GMACM were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

265.   The Defendants and GMACM committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

266.   As a direct and proximate result of the overt acts and predicate acts of Defendants and GMACM in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

267.   Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

81

268.    Ally Financial, in addition to being directly liable for its role in conspiring in the scheme, is vicariously liable for GMACM's acts of conspiracy because, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

269.    Ally Bank is also vicariously liable as principal for GMACM's acts of conspiracy. As alleged above, in engaging in such acts, GMACM was acting within the scope of its duties as an agent of Ally Bank.

## COUNT III

### VIOLATION OF RESPA, 12 U.S.C. § 2607(a)
### (Against all Defendants)

270.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

271.    Plaintiffs' loans and those of the members of the Class are "federally related" mortgage loans within the meaning of RESPA.

272.    Throughout the Class Period, Defendants provided "settlement services" with respect to "federally-related mortgage loans," as such terms are defined by RESPA, 12 U.S.C. §§ 2602(1) and (3).

273.    Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from giving or accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, for the referral of any business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

82

274.   HUD, in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b).

275.   Also in regulations relating to RESPA, HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" – a definition that specifically includes the "provision of services involving hazard, flood, or other casualty insurance." 24 C.F.R. § 3500.2(b)(11).

276.   The provision of LPI constitutes a "settlement service" under RESPA.   At a minimum, the provision of LPI constitutes business "incident to," if not "a part of," a real estate settlement service under 12 U.S.C. § 2607.

277.   The Balboa Defendants unlawfully gave and GMACM unlawfully received "kickbacks" within the meaning of RESPA, 12 U.S.C. § 2602(2), in connection with the referral of LPI business.  As alleged above, the kickbacks were paid in the form of free tracking services and bogus "commissions."

278.   Such payments constituted fees, kickbacks or things of value pursuant to an agreement that LPI business would be referred to Balboa and Meritplan.  Such practices violated RESPA, 12 U.S.C. § 2607(a).

279.   Plaintiffs and the Class were actually harmed by the unlawful scheme of Defendants and GMACM.

280.   Defendants therefore violated Section 8(a) of RESPA. Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal

to three times the amounts they have paid or will have paid with respect to LPI as of the date of judgment.

281.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit on behalf of themselves and the Class.

282.    Ally Financial is vicariously liable for GMACM's violations of RESPA by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

283.    Ally Bank is vicariously liable as principal for GMACM's violations of RESPA. As alleged above, in engaging in such violations, GMACM was acting within the scope of its duties as an agent of Ally Bank.

## COUNT IV

### BREACH OF CONTRACT
### (Against Ally Financial and Ally Bank)

284.    Plaintiffs repeat and reallege each and every paragraph as if fully set forth herein.

285.    Pursuant to its servicing agreements with loan owners, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, pursuant to the servicing agreements, GMACM is the agent of the owners of the loans of Plaintiffs and the Class. As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

286.    At no time did GMACM acquire, or could GMACM have acquired, any rights with respect to the loans of Plaintiffs and the Class other than those set forth in the mortgage loan agreements.

287.    The mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance. The mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property. Nothing authorizes the lender to charge any amount in excess of the lender's cost. Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

288.    GMACM breaches the mortgage loan agreements of Plaintiffs and the Class by charging borrowers amounts in excess of GMACM's LPI cost with respect to the borrower's property. The rebates/kickbacks that GMACM receives reduce such costs. Nevertheless, GMACM charges borrowers based on the full purported price. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks breaches the terms of the mortgage loan agreements.

289.    As a direct, proximate, and legal result of the foregoing, Plaintiffs and the Class have suffered damages.

290.    Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

291.    Ally Bank is vicariously liable for GMACM's breaches of contract as GMACM's principal. In engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank.

292.    Additionally, Ally Bank is directly liable for the breaches of contract. As alleged above, Ally Bank owns loans serviced by GMACM. The interposition of GMACM does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

## COUNT V

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Ally Financial and Ally Bank)

293.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

294.    As alleged above, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, GMACM is the agent of the owners of the loans of Plaintiffs and the Class. As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

295.    Every contract, including the mortgage loan contracts of Plaintiffs and the Class, contains an implied covenant of good faith and fair dealing.

296.    Pursuant to the implied covenant of good faith and fair dealing, GMACM was obligated to perform its duties under the mortgage loan agreements in good faith and to deal fairly with Plaintiffs and the Class.

297.    As alleged above, the mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance. The

86

mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property. Nothing authorizes the lender to charge any amount in excess of the lender's cost. Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

298.    GMACM breached its duty of good faith and fair dealing by charging borrowers amounts in excess of GMACM's LPI costs. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks constituted bad faith conduct toward Plaintiffs and the Class. GMACM thereby dealt with Plaintiffs and the Class unfairly, and contravened the reasonable expectations of Plaintiffs and the Class.

299.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

300.    Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

301.    Ally Bank is vicariously liable for GMACM's breaches of contract as GMACM's principal. In engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank.

302.    Additionally, Ally Bank is directly liable for the breaches of contract. As alleged above, Ally Bank owns loans serviced by GMACM. The interposition of GMACM does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

87

## COUNT VI

## COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against Ally Financial and Ally Bank)

303.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

304.    Plaintiffs and the Class have conferred a substantial benefit on GMACM derived from improper and unauthorized charges with respect to LPI.  These benefits came at the expense of Plaintiffs and the Class.

305.    The circumstances are such that in equity and good conscience restitution should be made by GMACM to Plaintiffs and the Class.

306.    As a result of GMACM's unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.  Plaintiffs and the Class seek full disgorgement and restitution of GMACM's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

307.    Plaintiffs and the Class are entitled to restitution and/or disgorgement of profits realized by GMACM as a result of its unfair, unlawful and/or deceptive practices.

308.    Ally Financial is vicariously liable for GMACM's unjust enrichment by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

309.    Ally Bank is vicariously liable as principal for GMACM's unjust enrichment.  As alleged above, in engaging in such violations, GMACM was acting within the scope of its duties as an agent of Ally Bank.

## COUNT VII

### BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION
### OF FUNDS HELD IN TRUST
### (Against Ally Financial and Ally Bank)

310.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

311.    The mortgage agreements of Plaintiffs and the Class contains standard escrow provisions, which are typical of other mortgages serviced by GMACM.

312.    The mortgage agreements of Plaintiffs and the Class provide that borrowers shall make monthly payments for "premiums for any and all insurance required by Lender," including LPI.

313.    The mortgage agreements of Plaintiffs and the Class further provides that any excess escrow funds are to be returned to Plaintiffs.

314.    GMACM accepts monies from Plaintiffs and the members of the Class for insurance on a monthly basis and holds such funds in escrow.

315.    GMACM is obligated to hold escrowed funds in trust. GMACM owes Plaintiffs and the Class a fiduciary duty with respect to the handling of escrowed funds.

316.    GMACM breached its fiduciary duty to Plaintiffs and the Class by: (i) demanding excessive escrow payments for LPI; (ii) collecting and holding excessive funds in escrow, in amounts greater than necessary to pay for the true cost of LPI; (iii) failing to properly account to Plaintiffs and the Class for such excess funds; and (iv) engaging in self-dealing through the diversion of rebates/kickbacks to its own pockets as alleged above.

317.    These actions were undertaken by GMACM in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Class members.

89

318.    As a direct result of GMACM's actions and subversion of the interests of Plaintiffs

and the Class to GMACM's own interest, Plaintiffs and the Class have suffered injury in the form

of unauthorized escrow charges and a loss of funds from their escrow accounts.

319.    Plaintiffs and the Class are entitled to damages for GMACM's beach of its fiduciary

obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the Class are entitled

to punitive damages because GMACM acted in bad faith in deliberate and/or reckless disregard of

their rights and its obligation to hold their escrow funds in trust.

320.    Ally Financial is vicariously liable for GMACM's breach of fiduciary duty by virtue

of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere

instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

321.    Ally Bank is vicariously liable as principal for GMACM's breach of fiduciary duty.

As alleged above, in engaging in such breaches, GMACM was acting within the scope of its duties

as an agent of Ally Bank

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants

and in favor of Plaintiffs and the Class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant
      to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this
      case as a class action and appointing Plaintiffs as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiffs and the Class
      in an amount to be proven at trial;

c.    For judgment for Plaintiffs and the Class on their claims in an amount to be proven
      at trial, for compensatory damages caused by Defendants' practices, along with
      exemplary damages to each Class member for each violation;

d.    For judgment for Plaintiffs and the Class on their RICO claims and RESPA claims, in an amount to be proven at trial, for three times the amount of the LPI charges imposed on Plaintiffs and the Class;

e.    For restitution of an amount equal to all improperly collected LPI charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the Class;

f.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.    For an order awarding Plaintiffs and the Class their attorneys' fees and costs; and

h.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of the claims alleged herein.

Dated: September 28, 2012

KIRBY McINERNEY LLP

By: _____

Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*

91

# EXHIBIT C

Claim #3966  Date Filed: 11/9/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
| --- | --- |

Name of Debtor and Case Number:  **Residential Capital, LLC, Case No. 12-12020**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

See attached schedule A.

Name and address where notices should be sent:

Mark Strauss
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022

Telephone number: 212-371-6600          email: mstrauss@kmllp.com

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
*(If known)*

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:                email:

**1. Amount of Claim as of Date Case Filed: $  1,000,000,000**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** See attached class action complaints.
(See instruction #2)

**3. Last four digits of any number by which creditor identifies debtor:**

**3a. Debtor may have scheduled account as:**
(See instruction #3a)

**3b. Uniform Claim Identifier (optional):**
(See instruction #3b)

**4. Secured Claim (See instruction #4)**
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
**Describe:**
**Value of Property:** $_____   **Annual Interest Rate**_____% ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____        Basis for perfection: _____

**Amount of Secured Claim:** $_____   **Amount Unsecured:** $_____

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____       (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ■ I am the creditor's authorized agent.   ☐ I am the trustee, or the debtor, or   ☐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)          their authorized agent.          indorser, or other codebtor.
(See Bankruptcy Rule 3004.)    (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Mark Strauss
Title: Attorney
Company: Kirby McInerney LLP                (Signature)                  (Date)
Address and telephone number (if different from notice address above):

11/9/12

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. § 507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**RECEIVED**
NOV 09 2012
KURTZMAN CARSON CONSULTANTS

Telephone number:                Email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both.

1212020121109000000000063

# Schedule A

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn, individually and on behalf of a putative class consisting of all residential mortgage loan borrowers who have been charged for lender-placed insurance in connection with loans serviced by GMAC Mortgage, LLC at any time from March 6, 2003 to the present.

JUDGE NATHAN

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

12 CV 3412



LANDON ROTHSTEIN, individually and
on behalf of all others similarly situated,

Plaintiff,

v.

GMAC MORTGAGE, LLC f/k/a GMAC
MORTGAGE CORPORATION, GMAC
INSURANCE MARKETING, INC. d/b/a
GMAC AGENCY MARKETING,
BALBOA INSURANCE COMPANY,
MERITPLAN INSURANCE COMPANY,
and JOHN DOES 1-20.

Defendants.

Civil Action No.: _____

**CLASS ACTION COMPLAINT**

<u>Jury Trial Demanded</u>

Plaintiff Landon Rothstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys.   Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO") and applicable state law on behalf of himself and a nationwide putative class (the "Class"), as more specifically defined below, consisting of all residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by defendant GMAC Mortgage, Inc. f/k/a GMAC

Mortgage Corporation (hereinafter "GM") at any time from March 6, 2003 to the present (the "Class Period").

2.      To protect the lenders' interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be reimbursed by the borrower for the cost. GM, a servicer of mortgage loans, procures force-placed insurance coverage with respect to the loans in its servicing portfolio from defendant Balboa Insurance Company ("Balboa").

3.      This case is brought because, at all relevant times, GM has extracted kickbacks from Balboa which have artificially inflated the force-placed insurance premiums that GM has paid. This has enabled GM to demand inflated reimbursements from borrowers.

4.      Specifically, beginning in or about March 2003, GM, as a *quid pro quo* for awarding Balboa its force-placed insurance business, has required Balboa to pay GM kickbacks. These kickbacks have been in the form of bogus "commissions" paid to a GM affiliate, "GMAC Agency Marketing," an unincorporated division and/or fictitious "doing business as" name of defendant GMAC Insurance Marketing, Inc. ("GI"). Balboa agreed to label these payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as bribes or kickbacks.

5.      This kickback scheme has improperly inflated the reimbursements demanded from borrowers with respect to force-placed insurance on GM-serviced loans because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. The amounts of the kickbacks have then been repaid by Balboa to GM and/or GI in round-trip

2

transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium

minus the kickback – represents the true or actual price or cost of the insurance.

6.      This scheme has robbed not only borrowers, but also the owners of the loans being

serviced by GM. All servicing agreements entitle servicers such as GM to recoup any advances they

incur from loan proceeds "off the top" before any money is passed through to the owners of the

loans. Premiums on force-placed insurance constitute reimbursable servicing advances under all

such agreements.

7.      At all relevant times, GM in its capacity as loan servicer has reimbursed itself with

respect to force-placed insurance based not on its actual costs but instead on the artificially inflated,

fraudulently grossed-up premiums charged to borrowers. In other words, GM, in recouping its

supposed servicing advances before passing money through to the owners of the loans, has not netted

out the amounts of the kickbacks that it has received from Balboa, but has instead included the full

amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have

failed to pay, the owners of the loans have borne those fraudulently inflated costs in the form of

reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped

by GM as a result of the scheme alleged herein have come from the pockets of the pension funds that

invest in the mortgages in GM's servicing portfolio and – in the case of loans in the portfolio owned

3

by the Federal National Mortgage Association ("Fannie Mae") and other Government Sponsored

Enterprises ("GSEs") – from the pockets of United States taxpayers.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1367(a).  This Court also has jurisdiction over the subject matter of this action pursuant

to 18 U.S.C. § 1964(c).

9.      Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to

institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or

transacts her affairs."  Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is

subject to service in a particular district, additional parties residing in other districts may be brought

before the forum court, in the court's discretion, to the extent that "the ends of justice so require."

18 U.S.C. § 1965(b).

10.     Additionally, this Court also has personal jurisdiction over the defendants because

each systematically and continually conducts business throughout the State of New York.

11.     This Court also has original diversity jurisdiction pursuant to the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiff is a citizen of the State of Texas.

Defendants are citizens of different states.  The amount in controversy exceeds $5,000,000, and there

are more than 100 members in the Class.

12.     This Court also has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper in this district under 28 U.S.C. § 1391(b), and 18 U.S.C. §§ 1965(b)

and (d).  Defendants regularly conduct business in this District.

4

## PARTIES

14.     Plaintiff Landon Rothstein is a resident of Humble, Texas. Plaintiff has a mortgage loan serviced by GM on a property located at 97 County Road 3701, Splendora, Texas. Plaintiff was charged $105.00 by GM purportedly to reimburse it for the cost of force-placed hazard insurance with respect to the period October 6, 2010 to January 4, 2011. The force-placed coverage was obtained by GM from defendant Balboa through its wholly-owned subsidiary defendant Meritplan Insurance Company.

15.     Defendant GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation ("GM"), is a direct or indirect subsidiary of Residential Capital, LLC, which in turn is a direct or indirect subsidiary of bank holding company Ally Financial Inc. f/k/a GMAC, Inc. ("Ally Financial"). GM is a Delaware limited liability company headquartered in Fort Washington, Pennsylvania. GM is a financial services company that engages in the servicing of residential mortgage loans.

16.     Defendant GMAC Insurance Marketing, Inc. d/b/a GMAC Agency Marketing ("GI") is a Missouri corporation and a wholly owned indirect subsidiary of Ally Financial. GI is believed to have offices located at 59 Maiden Lane, 23rd Floor, New York, New York 10038.

17.     Defendants GM and GI are referred to collectively herein as the "GMAC Defendants."

18.     Defendants John Does 1-10 are direct or indirect subsidiaries and/or affiliates of Ally Financial which have at any time during the Class Period received payments from defendant Balboa in connection with residential force-placed insurance, regardless of how those payments have been characterized, whether as purported "commissions," reinsurance premiums or otherwise.

5

19.    Defendant Balboa Insurance Company ("Balboa") is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide directly and/or indirectly through its wholly-owned subsidiaries, including defendant Meritplan.

20.    Defendant Meritplan Insurance Company ("Meritplan") is a California corporation headquartered in Irvine, California. Meritplan is a wholly-owned subsidiary of Balboa. Meritplan is a provider of lender-placed insurance to financial institutions nationwide.

21.    Defendants John Does 11-20 are direct or indirect subsidiaries and/or affiliates of Balboa which have at any time during the Class Period provided force-placed insurance coverage in connection with residential mortgages serviced by GM.

22.    Defendants Balboa and Meritplan are referred to collectively herein as the "Balboa Defendants."

23.    GM, GI, Balboa, and Meritplan are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of himself and a nationwide Class consisting of:

> All residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by GM at any time from March 6, 2003 to the present.

25.    The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

6

26.    The Class is so numerous that joinder of all members is impracticable.

27.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

28.    Plaintiff's claims are typical of the claims of the Class.

29.    There are questions of law and fact common to the Class, including but not limited to:

a.    Whether Defendants engaged in a kickback scheme relating to force-placed insurance;

b.    Whether GM and/or GI extracted kickbacks from the Balboa Defendants;

c.    Whether Defendants' kickback scheme constituted mail or wire fraud;

d.    Whether GM violated the covenants of good faith and fair dealing implied in the mortgage agreements of Plaintiff and the Class;

e.    Whether GM breached the terms of the mortgage loan agreements of Plaintiff and the Class;

f.    Whether Defendants have been unjustly enriched;

g.    Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages.

30.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

31.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

7

32.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

33.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

34.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

35.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### Background on Force-Placed Insurance, Securitization and Servicing

36.    To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses or

8

is not obtained, the lender is entitled to purchase coverage for the home, "force place" it, and be reimbursed by the borrower for the cost.

37.    Force-placed insurance policies generally are substantially more costly than borrower-purchased policies, while providing less coverage. Additionally, force-placed insurance policies are purchased by the lender and are for the lender. The lender is the sole insured and the only loss payee. In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The borrower's only involvement with force-placed insurance coverage is that the borrower is obligated, by virtue of the mortgage loan agreement, to reimburse the lender for the cost. This obligation is, in fact, secured by the lender's lien on the property.

38.    Plaintiff's mortgage loan contract is typical. Section 5 thereof provides, in pertinent part:

> Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. . . .

> *If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.* Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower. Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. . . . *Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower*

9

> *secured by this Security Instrument.* These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(emphasis added).

39.     Of course, the traditional lending relationship, where the lender makes a loan, retains it in its portfolio, and services it itself, has become the exception rather than the rule. Most residential mortgages in the United States are financed through securitization.

40.     Securitization is a financing method involving the issuance of securities against a dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or "seller") assembles a pool of mortgage loans made or "originated" by an affiliate or purchased from unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive, specially created, special-purpose vehicle ("SPV"), typically a trust in the case of residential mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loan. The securities are sold directly to investors by the SPV or, as is more common, they are issued directly to the depositor as payment for the loans. The depositor then resells the securities, usually through an underwriting affiliate that places them on the market. Because the certificated securities are collateralized by the residential mortgage loans owned by the trust, they are called residential mortgage-backed securities ("RMBS").

41.     A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive; it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution.

10

42.    Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan servicer. Every loan, irrespective of whether it is securitized, has a servicer.

43.    Servicers are hired by owners of whole loans, typically trustees of securitization trusts. Billions of dollars of mortgage loans are owned by GSEs, *i.e.*, Fannie Mae, the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Government National Mortgage Association.

44.    The specific duties of servicers are set forth in PSAs, Servicing Agreements, or similar contracts between the servicer and the owners of the loans which are in all respects material to this lawsuit uniform.    Pursuant to these agreements, servicers are obligated to manage the mortgages on behalf, and in the best interests of, their owners.  In fact, servicers are held to a high standard – they are required, at minimum, to use the same skill, care and practices in servicing loans for others as they customarily employ servicing loans for their own account.

45.    For example, on June 1, 2004, GM executed a PSA to become the servicer of an SPV trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA").  Section 3.01 of the JPMorgan PSA provides, in pertinent part:

THE SERVICER TO ACT AS SERVICER

The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

11

46.    Servicers are responsible for performing the day-to-day tasks relating to the mortgages. These tasks include account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the trust. These tasks also include handling defaulted loans, prosecuting foreclosures and taking appropriate steps to mitigate losses.

47.    One of the most important responsibilities of mortgage loan servicers is to protect the owners of the mortgages from damages caused by casualty losses. All PSAs and other servicing agreements, including those with the GSEs, require the servicer to make sure that adequate hazard insurance is at all times maintained on the secured properties, including through force-placement if appropriate.

48.    Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

MAINTENANCE OF HAZARD INSURANCE

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance with extended coverage on the Mortgaged Property in an amount which is at least equal to the lesser of (I) the Stated Principal Balance of such Mortgage Loan and (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. . . . The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.

49.    Additionally, Section 3.07 thereof provides:

MAINTENANCE OF INSURANCE POLICIES

12

> The Servicer shall not take any action that would result in noncoverage under any applicable Insurance Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. The Servicer shall use its best efforts to keep in force and effect (to the extent that the related Mortgage Loan requires the Mortgagor to maintain such insurance), any applicable Insurance Policy. The Servicer shall not cancel or refuse to renew any Insurance Policy that is in effect at the date of the initial issuance of the Mortgage Note and is required to be kept in force hereunder.

50.    The servicing requirements applicable to loans owned and/or guaranteed by the GSEs are set forth in the Fannie Mae Servicing Guide. Part II, Chapter 6 thereof provides, in pertinent part:

> Part of a servicer's responsibility for protecting our interest in the security property is to ensure that hazard insurance (including flood insurance), under the terms specified in our Guides, is in place at all times. If the servicer is unable to obtain evidence of acceptable hazard insurance for a property, the servicer should obtain alternative insurance coverage (so-called "force-placed" insurance or "lender-placed" insurance) to protect our interests. In this instance, there are several guidelines that servicers should apply, subject to the provisions of and in compliance with applicable law and the mortgage documents.

### GM's Mortgage Servicing Portfolio

51.    GM is the fifth largest servicer of residential mortgages in the United States, servicing a portfolio of 2.5 million mortgage loans with an aggregate unpaid principal balance of approximately $389 billion. At all relevant times, all the loans in GM's servicing portfolio have been subject to servicing agreements with their owners and/or holders.

52.    At all relevant times, GM's mortgage servicing portfolio has been comprised of loans owned and/or held by (i) Ally Bank, f/k/a GMAC Bank, a Utah state-chartered commercial bank

13

which is also an indirect subsidiary of Ally Financial; (ii) Fannie Mae and other GSEs; and (iii) various investors including securitization trusts pursuant to PSAs and similar agreements.

53.    The Ally Bank loans in GM's portfolio were originated by GM, then sold by GM to Ally Bank. Ally Bank either still owns such loans or has resold them to secondary market investors while retaining their servicing rights. Under the Servicing Agreements between Ally Bank and GM, GM is required to service the loans in accordance with the servicing guidelines of Fannie Mae. The servicing guidelines of Fannie Mae also govern GM's obligations with respect to the GSE loans serviced by GM.

**GM's Outsourcing Deal with Balboa**

54.    In the first quarter of 2003, GM contracted with defendant Balboa to buy force-placed insurance from Balboa in respect of GM-serviced loans.

55.    Several months later, in or about March 2003, GM expanded its relationship with Balboa by entering into a new agreement. The new agreement between GM and Balboa provided not only for GM to purchase force-placed insurance from Balboa, but for GM to outsource all of GM's functions relating to force-placed insurance – *e.g.*, tracking borrowers' insurance policies – to Balboa.

56.    According to a March 6, 2003 press release issued by GM relating to its deal with Balboa, Balboa provides GM with "insurance tracking services that include data maintenance, EDI processing, customer service and online claims service." The term "EDI" – electronic data interchange – referred to Balboa's ability to access and interface with GM's borrower databases in real-time without any active involvement on the part of GM.

14

57.    The GM agreement with Balboa tasks Balboa with, *inter alia*, monitoring the mortgages in GM's servicing portfolio to identify expired, cancelled or non-renewed borrower policies; issuing notices to borrowers regarding the opportunity to cure; and force-placing coverage when appropriate. Balboa is also required by the agreement to maintain and staff call centers should borrowers want to speak with someone.

58.    At all relevant times, pursuant to the agreement, Balboa has functioned in all relevant respects as GM's force-placed insurance back-office. Balboa has handled all aspects of GM's force-placed insurance activities. GM does not perform any such activities itself. Balboa even issues notices to borrowers on GM letterhead, signed "Insurance Department, GMAC Mortgage LLC." Balboa also has its call center personnel identify themselves as employees of GM. Additionally, Balboa's EDI system enables Balboa to manage billings in respect of force-placed insurance, *i.e.*, adding charges and issuing credits with respect to force-placed insurance on borrowers' monthly statements, without any active involvement by GM.

59.    The initial agreement between GM and Balboa had a term of three years. However, the arrangement between GM and Balboa has continued to the present. In fact, GM is today one of Balboa's largest accounts.

**The Kickback Scheme**

60.    There is nothing inherently wrong with GM's insurance and outsourcing arrangements with Balboa. PSAs and other servicing agreements authorize outsourcing. This case is brought, however, because since at least March 2003, the arrangement between GM and Balboa has involved a wrongful component.

15

61.    Specifically, GM and Balboa devised and at all relevant times have engaged in a kickback scheme designed to generate illicit profits for GM and its affiliates based on GM's dealings with Balboa. These profits have been made off the backs of mortgage borrowers and the owners of the loans being serviced.

62.    Pursuant to the scheme, GM has extracted kickbacks or bribes from Balboa based on a percentage of the gross force-placed insurance premiums that GM has paid. These bribes are in the form of bogus "commissions" paid by Balboa to GMAC Agency Marketing, the unincorporated division and/or fictitious "doing business as" name of defendant GI. GM and Balboa agreed to fraudulently label the payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as kickbacks. The pretense is that the "commissions" are being paid by Balboa in the ordinary course of business to the insurance agent or "producer" responsible for introducing the insurance customer – *i.e.*, GM – to Balboa.

63.    At all relevant times, however, this pretense has been false. GI is not, and has never been, a *bona fide* insurance agent of Balboa; has not provided and does not provide any *bona fide* insurance agency services to Balboa; and has never solicited or sold any insurance or insurance products on behalf of Balboa, in connection with the force-placed insurance purchased by GM or otherwise.

64.    Instead, at all relevant times, GI's sole role with respect to the force-placed insurance purchased by GM has been to collect kickbacks from Balboa fraudulently labeled as "commissions." The "commissions" have been paid pursuant to a *quid pro quo* agreement or understanding that GM will continue to do force-placed insurance business with Balboa. Furthermore, at all relevant times,

16

the kickbacks have inured directly or indirectly to the benefit of GM, through inter-affiliate transactions or otherwise.

65.    Notably, the March 2003 GM press release about the deal between GM and Balboa did not say anything about GMAC Agency Marketing, GI, or "commissions." There was no mention of any broker or agent, that purportedly introduced GM to Balboa or otherwise. Rather, the deal described in the press release was bilateral, involving GM and Balboa only.

66.    Nevertheless, at all relevant times, for every dollar in gross premiums paid by GM to Balboa, Balboa has "kicked back" an agreed percentage to GI and/or GM as so-called "commissions." Meanwhile, the stated premiums have been "grossed up" to include these kickbacks.

**The Kickback Scheme Has Harmed
Borrowers and the Owners of the Loans**

67.    Defendants' kickback scheme has unnecessarily inflated the costs of force-placed insurance with respect to GM-serviced loans, thereby damaging borrowers who have been forced to reimburse GM for such costs. The amount of the unnecessary inflation is, at minimum, reflected by the amount of the kickbacks. This is because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. Balboa then returns the amounts of the kickbacks to GI and/or GM in round-trip transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium paid by GM minus the kickback returned directly or indirectly to GI and/or GM – represents the true or actual price or cost of the insurance.

68.    This scheme has not only robbed borrowers, but also improperly inflated force-placed insurance costs borne by the owners of the loans being serviced by GM.

17

69. To be sure, the costs of force-placed insurance are initially incurred by the servicer, which is responsible for advancing the money to pay the premiums. Servicers such as GM, however, are functionally the senior-most creditors with respect to the loans they manage. This is because all servicing agreements entitle the servicer to recoup any costs, expenses or advances they incur "off the top" from the proceeds of collection or liquidation, before any money is passed through to the owners of the loans. This entitlement includes force-placed insurance premiums paid by the servicer, which are counted as reimbursable servicing advances under all servicing agreements. The right of the servicer to recover its servicing advances is senior even to the AAA RMBS securities issued by the securitization trusts. Furthermore, if loan-level proceeds are insufficient to enable the servicer to recoup its advances on a particular loan, the servicer is entitled to reimburse itself from the cash collected from all of the other loans covered by the servicing agreement.

70. At all relevant times, GM in its capacity as servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs, but instead on the artificially inflated, grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances prior to passing money through the owners of the loans, has not netted out the amounts of the kickbacks that GM and/or GI have received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of GM-serviced loans have borne these fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM and/or GI from the kickback scheme alleged herein have come from the pockets of the pension funds that invest in the loans in GM's servicing portfolio and – in the case of the GSE loans in that portfolio – from the pockets of United States taxpayers.

18

71.    A number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts between servicers and mortgage investors. Servicers have no stake in the performance of mortgage loans and do not share mortgage investors' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing the fee and expense charges they can recoup "off the top."

72.    This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was simply never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, *see generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Geo. U. L. Center), or, as in this case, force-placing insurance that is fraudulently inflated in price.

73.    Servicers' compensation structure also incentivizes them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from portfolio as quickly as they can," Professor Levitin observes.

19

Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses, until there is no value left.

74.    Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated force-placed insurance have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and the investors in the mortgages and RMBS. It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

75.    Borrowers are not afforded any and have no choice with respect to the arrangements alleged herein. Borrowers have no legal ability or right to select their servicer or force-placed insurer. There is no mechanism for borrowers to select servicers that do not extract, or force-placed insurers that do not pay, kickbacks. When borrowers take their loans, they have no way to select their servicer, and no say whether the servicer is replaced with a new servicer, or what arrangements any servicer might have with its providers. Borrowers have no legal right or ability to opt-out with respect to the kickbacks or affiliate transactions described herein.

76.    Plaintiff does not challenge – and nothing in this complaint should be construed as challenging – the reasonableness or fairness of any force-placed insurance rates. Plaintiff challenges kickbacks and reimbursement charges fraudulently inflated by reason thereof.

77.    The kickback scheme in this case is similar to that conducted by the defendants in *Hofstetter v. Chase Home Finance, LLC*, NO. C 10-01313 WHA (N.D.Cal.), a class action that settled last year. In that case, Chase Home Finance, LLC ("Chase") allegedly extracted kickbacks

20

from force-placed flood insurer American Security Insurance Company ("ASIC"). ASIC did not,

however, pay the kickbacks to Chase directly. Instead, the parties allegedly agreed to fraudulently

label the kickbacks as "commissions" and route them through Chase's affiliate, Chase Insurance

Agency, Inc. ("CIA"), according to settlement papers filed in the case.

78.    Discovery in *Hofstetter* revealed a system in which CIA collected "commissions"

from ASIC yet rendered no *bona fide* insurance agency services in relation to the policies. "What

function does Chase Insurance Agency, Inc. perform with respect to flood insurance?" the Plaintiffs'

attorney asked in a deposition. "I would say no function," the Chase employee responded. *See*

"Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

79.    According to papers filed with the court in the case, the defendants' misconduct in

*Hofstetter* allegedly resulted in "commission damages" to the members of the class, with the amount

thereof measured by the force-placed insurance premiums charged multiplied by the "commission

percentage" paid thereon.

80.    The kickback scheme alleged in this case has operated in material respects like that

alleged in *Hofstetter*.

**Government Response**

81.    Force-placed insurance kickback schemes are increasingly becoming a focus of

attention for what they are – abusive and parasitic. Fannie Mae recently began fighting back. On

March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed

Insurance," regarding the "costs to taxpayers" of kickback arrangements that improperly inflate the

costs. The *Lender Letter* stated, in pertinent part:

21

Fannie Mae will soon implement changes to its Lender-Placed Insurance (LPI) requirements to significantly reduce costs to homeowners, taxpayers, and Fannie Mae. The changes will lower barriers for borrowers who want to cure their delinquencies, while improving transparency and boosting competition in the LPI market.

Fannie Mae requires hazard insurance on all properties for which it owns the mortgage. If a homeowner cannot provide evidence of coverage, the servicer must secure that coverage through the use of LPI. *Lender-placed policies, however, are significantly more expensive than voluntary coverage secured by the borrower and often include commissions and other administrative costs, further adding to the cost of LPI policies*. Two firms currently issue most LPI policies.

An expensive LPI policy can often become an obstacle to a delinquent borrower seeking to avoid foreclosure. To bring their loan current, a borrower must reimburse the servicer for the cost of the LPI policy. *If the borrower defaults in mortgage loan payments and does not cure, Fannie Mae must reimburse the servicer for LPI premiums. Costs to Fannie Mae ultimately become costs to taxpayers*.

(emphasis added).

82.    On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a *Servicing Guide Announcement*. The *Servicing Guide Announcement* "clarif[ied]" Fannie Mae's position that servicer requests for reimbursement of lender-placed insurance premiums must exclude "any lender-placed insurance commission earned . . . by the servicer or any related entity." Fannie Mae indicated that "any other costs beyond the actual cost of the lender-placed insurance policy premium" were unacceptable.

83.    The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees**

22

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

■     *any lender-placed insurance commission earned on that policy by the servicer or any related entity,*

■     costs associated with insurance tracking or administration, or

■     *any other costs beyond the actual cost of the lender-placed insurance policy premium.*

(emphasis added).

84.     In other words, Fannie Mae forbids servicers from engaging in precisely the type of misconduct alleged herein.

85.     Additionally, in or about January 10, 2012, Benjamin Lawsky, the Superintendent of the New York State Department of Financial Services ("NYDFS"), launched a probe into improper practices relating to force-placed insurance, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

86.     On January 27, 2012, the financial services publication *American Banker* disclosed a list of entities subpoenaed by the NYDFS as part of its investigation. The list identified Balboa as among the force-placed insurance companies targeted by the NYDFS. The list also identified GMAC Agency Marketing as among the targeted "insurance producers," *i.e.*, bogus "agents" through which purported "commissions" (a/k/a kickbacks) have been paid.

87.     On April 5, 2012, the NYDFS issued a press release announcing that it had expanded its probe into force-placed insurance and was scheduling public hearings on the matter to take place in May 2012. The NYDFS press release also disclosed that the NYDFS had issued formal document requests to a number of additional insurers, including Meritplan.

23

88.    Additionally, the NYDFS press release addressed the type of kickback arrangement alleged herein. It stated that the NYDFS investigation had already uncovered evidence that force-placed insurance costs have been artificially inflated "due [to] relationships between and payments by insurers to banks and their affiliates. . . . Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business." The NYDFS press release also discussed that, as alleged herein, kickback-inflated force-placed insurance costs harm not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

89.    The full text of the NYDFS release states:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and

24

from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to provide information: **Balboa Insurance Company**, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), **Meritplan Insurance Company**, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one

25

major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy

26

forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors,"* Lawsky said.

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure. The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(emphasis added).

90.     It is thus apparent that the NYDFS probe has confirmed the allegations of this complaint and is targeting the illicit arrangements alleged herein.

## DEFENDANTS' KICKBACK SCHEME CONSTITUTES "HONEST SERVICES" MAIL AND WIRE FRAUD

91.     The scheme alleged herein violates the mail and/or wire fraud statutes, 18 U.S.C. §§ 1341, 1343. Specifically, Defendants conducted a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their "intangible rights" to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.

92.     The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

93.     The mail fraud statute reads in relevant part as follows:

Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

94.     The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

27

95.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this

statutory language to apply only to deprivations of property and not to encompass "the right to have

[one's] affairs conducted honestly." *Id.* at 352.

96.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud

statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the
> term "scheme or artifice to defraud" includes a scheme or artifice to
> deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

97.    Thus, through 18 U.S.C. § 1346, Congress brought schemes to deprive another of

honest services within the scope of the mail and wire fraud statutes.

98.    In *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court addressed the

scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent

schemes to deprive another of honest services through bribes or kickbacks." 130 S.Ct. at 2928,

2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme

or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and

kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least

bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved

bribery or kickback schemes. *Id.* at 2930–31.

99.    At all relevant times, GM owed legal duties to render services to the owners of the

loans in GM's servicing portfolio under the PSAs, Servicing Agreements, GSE Servicing Guidelines

and similar contracts governing their relationships. In all cases, those legal duties included the duty

to protect the owners of the mortgages from damages caused by casualty loss by making sure that

28

adequate hazard insurance was at all times maintained on the secured properties, including through force-placement if necessary. The value of GM's services in fact depended on GM's rendering those services in an honest manner. Nevertheless, GM misused its position as the servicer of the loans to extract bribes and kickbacks from Balboa, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services" to those loan owners. Each Defendant, by virtue of the conduct as alleged herein, devised a scheme or artifice to defraud the owners of GM servicing portfolio loans by depriving those owners of their intangible rights to GM's honest services through kickbacks.

100.    Defendants' wire and mail fraud violations constitute predicate acts under RICO. Defendants' pattern of racketeering activity has proximately harmed Plaintiff and the Class.

## TOLLING OF THE STATUTES OF LIMITATIONS

101.    The claims of Plaintiff and the Class are subject to both equitable estoppel, stemming from Defendants' concealment of the facts alleged herein, and equitable tolling, stemming from Plaintiff's inability to obtain adequate information to plead the claims alleged herein. Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged. At all relevant times Defendants maintained a shroud of secrecy around their illicit dealings. Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiff and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

102.    Furthermore, at all relevant times Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GM to fulfill its contractual duties under the mortgage loan contracts of Plaintiff and the Class in good faith, and to similarly execute

29

its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and in an honest manner. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiff and the Class had attempted to investigate, such investigation would have been futile because it would not, until recently, have been possible to uncover any specific information as to GM's involvement in the unlawful kickback scheme alleged herein.

103.    Due to the complex, undisclosed and self-concealing nature of the scheme alleged herein, neither Plaintiff, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise to discover the misconduct alleged. Plaintiff was able to discover the underlying basis for his claims only through the assistance of counsel.

104.    Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis. Nevertheless, the news coverage has generally related to "robo-signing" and other improper foreclosure practices. It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of force-placed insurance business.

105.    The first time the *The New York Times* published a news article about such kickbacks was on January 10, 2012. *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of NYDFS, was investigating several large banks in connection with improper practices relating to force-placed insurance, including "kickbacks." *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

106.    Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to force-placed insurance to have put Plaintiff or the Class on inquiry notice of

Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

107.    Furthermore, even had Plaintiff or members of the Class been on inquiry notice of misconduct relating to force-placed insurance in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they would have had no specific factual basis to allege – or even suspect – that GM was involved in any misconduct until, at the earliest, January 27, 2012.

108.    As alleged above, it was on that day that *American Banker* published a list of the entities subpoenaed as part of the NYDFS investigation. The list identified Balboa as among the force-placed insurance companies targeted by that investigation. The list also identified GMAC Agency Marketing (*i.e.*, GI) as among the targeted "insurance producers."

109.    Prior to January 27, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GM to potential kickbacks relating to force-placed insurance. Prior to such time, Plaintiff and the Class did not have an adequate factual basis to plead the claims alleged herein.

110.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiff and the Class could not have known of Defendants' violations until, at the earliest, January 27, 2012. Furthermore, any delay by Plaintiff and the Class

31

in asserting the claims herein was excusable because they could not reasonably have discovered

Defendants' misconduct absent specialized knowledge and/or assistance of counsel.

## CLAIMS FOR RELIEF

## COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
### ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

111.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth

herein. This count is pled against all Defendants.

112.    Plaintiff, each Class member, and each Defendant are "persons," as that term is

defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

113.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term

is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of GM, GI, and the Balboa Defendants,

including their respective officers, directors, employees, agents and direct and indirect subsidiaries

(the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the

Enterprise.

114.    The Enterprise was primarily managed by GM which organized the fraudulent scheme

and procured the involvement of GI and the Balboa Defendants. GI and the Balboa Defendants

carried out their part of the scheme under the direction of GM.

115.    The companies and individuals that constitute the Enterprise were associated for the

common purpose of fraudulently inflating the stated premiums on force-placed insurance with

respect to GM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners

32

of the loans to incur, fraudulently inflated charges in respect of such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GI and directly and/or indirectly to GM.

116.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

## Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

117.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.   Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

     a.    GM entered into servicing agreements with owners and/or holders of whole loans which provide, *inter alia*, that GM is obligated to make sure that the secured properties are adequately insured, including through force-placement of insurance if necessary;

     b.    GM procures force-placed insurance with respect to the loans in its servicing portfolio from the Balboa Defendants;

     c.    GM demanded and the Balboa Defendants agreed to and do pay kickbacks to GM and/or its affiliates based on a percentage of the force-placed insurance premiums paid by GM;

     d.    GM and the Balboa Defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks;

     e.    GM and the Balboa Defendants agreed to and do disguise the kickbacks as "commissions" paid by the Balboa Defendants to GI or other GM affiliate(s);

33

f.  As a *quid pro quo* for the kickbacks, GM continues to procure force-placed insurance from and outsource its force-placed insurance functions to the Balboa Defendants;

g.  The Balboa Defendants, on GM's behalf, track the loans in GM's servicing portfolio and issue notices to borrowers relating to purported lapses in their insurance coverage and their obligation to reimburse GM for the costs of any force-placed insurance;

h.  GM bills borrowers in relation to force-placed insurance based on the stated, fraudulently inflated premiums, *i.e.*, incorporating the kickbacks;

i.  To the extent borrowers pay the inflated costs billed to them, GM and/or GI profit from the kickbacks at the borrower's expense;

j.  To the extent borrowers fail to pay the inflated costs billed to them, GM reimburses itself from the proceeds of loan collections and liquidations also based on the stated, fraudulently inflated premiums, thereby profiting from the kickbacks at the expense of the owners of the loans; and,

k.  GM provides regular remittance and other reports to loan owners reflecting and/or incorporating the fraudulently inflated premiums as reimbursable servicing advances.

118.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and the owners of GM-serviced loans and to obtain money or property from the borrowers and the owners of GM-serviced loans through false or fraudulent pretenses, representations and promises.

119.    At all relevant times, Defendants' conduct included a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their intangible right to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. At all relevant times, GM was contractually obligated to render services to the owners of the loans it serviced. GM owed a duty to render those services in an honest manner. The value of those services in fact depended on GM's rendering them

34

in an honest manner. Nevertheless, at all relevant times, GM misused its position to extract bribes and kickbacks from the Balboa Defendants, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services." GI and the Balboa Defendants intentionally and wilfully conspired and participated in said breach.

120.    Each such bribe or kickback extracted by GM constituted a predicate act of mail and/or wire fraud in that each furthered and executed the scheme to deprive the owners of the loans of their right to GM's "honest services."

121.    It was reasonably foreseeable to each defendant that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

122.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to Defendants' books and records. Nevertheless, Plaintiff can allege such transmissions generally.

123.    For the purpose of furthering and executing the scheme, Defendants regularly transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, electronic data and funds, and also regularly caused matters and things to be placed in post offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier. For example:

        a.      The Balboa Defendants, on GM's behalf, transmitted notices and correspondence to borrowers via mail;

        b.      GM issued monthly statements including force-placed insurance charges to borrowers via mail and/or wire;

35

     c.      The Balboa Defendants, on GM's behalf, communicated with borrowers via telephone through call centers;

     d.      GM received funds from borrowers via mail and/or wire;

     e.      GM transmitted funds reflecting fraudulently inflated insurance premiums to the Balboa Defendants via mail and/or wire;

     f.      The Balboa Defendants transmitted funds reflecting kickbacks to GI and/or GM via mail and/or wire; and,

     g.      GM transmitted remittance and other reports to loan owners and/or holders via mail and/or wire that reflected and/or incorporated the fraudulently inflated force-placed insurance costs;

124.    As to Plaintiff, Defendants utilized the mails and/or wires in the following instances, among others, for the purpose of furthering and executing the scheme:

     a.      The Balboa Defendants and/or GM transmitted notices to Plaintiff regarding force-placed insurance by mail dated October 27, 2010, December 12, 2010, September 6, 2011, and September 28, 2011;

     b.      GM transmitted statements to Plaintiff reflecting charges in connection with force-placed insurance by mail dated February 14, 2011, March 16, 2011, April 11, 2011, May 9, 2011, June 6, 2011, July 4, 2011, August 8, 2011, September 17, 2011, and October 17, 2011; and

     c.      The Balboa Defendants' call center representatives communicated with Plaintiff by wire regarding force-placed insurance on, among other dates, January 24, 2012;

125.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

36

126.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

127.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

128.    Defendants each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring fraudulently inflated charges in connection with force-placed insurance.

129.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and the owners of the loans to pay and incur inflated charges in respect of force-placed insurance and thereby enable Defendants to reap illicit profits.

130.    Defendants were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and the owners of the loans.

### Injury to Plaintiff and the Class

131.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  At all relevant times, Plaintiff and the Class paid charges in connection with force-placed insurance that were fraudulently inflated by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

37

132.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT II

## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

133.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

134.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

135.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

136.    As set forth in Count I, above, at all relevant times, Plaintiff and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

137.    As set forth in Count I, above, at all relevant times, Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

138.    Defendants formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently inflating the stated premiums on force-placed insurance with respect to GM-serviced loans. The purpose thereof was to induce borrowers and the owners of the loans to pay and incur fraudulently inflated charges in respect of such insurance.

38

139.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

140.    As set forth in Count I, above, Defendants associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

141.    Defendants each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

142.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I, above.

143.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges in respect of force-placed insurance, as a direct, proximate and foreseeable result, of the scheme alleged herein.

144.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

## COUNT III

### BREACH OF CONTRACT
### (Against GM)

145.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.  This count is pled against GM.

146.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property.  All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

147.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks.  Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

148.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

149.    GM breached and acted in excess of its authority under the mortgage loan contracts of Plaintiff and the Class by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges.  GM's charging Plaintiff and the Class for the cost of kickbacks constituted conduct not authorized and in breach of the terms of the mortgage loan contracts of Plaintiff and the Class.

150.    GM has thus breached its contracts with Plaintiff and the Class.

40

151.    As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiff and the Class have suffered damages.

## COUNT IV

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against GM)

152.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against GM.

153.    Every contract contains an implied covenant of good faith and fair dealing.

154.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property. All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

155.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks. Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

156.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

157.    Pursuant to the implied covenant of good faith and fair dealing, GM was obligated to perform its duties under the mortgage loan contracts in good faith and to deal fairly with Plaintiff and the Class.

41

158.    GM breached its duty of good faith and fair dealing by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges. By not netting out and instead incorporating the cost of the kickbacks in the force-placed insurance charges, GM engaged in bad faith conduct toward Plaintiff and the Class, dealt with Plaintiff and the Class unfairly, and contravened the reasonable expectations of Plaintiff and the Class.

159.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

## COUNT V

## COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against all Defendants)

160.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

161.    Plaintiff and the Class have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums. These benefits came at the expense of Plaintiff and the Class.

162.    The circumstances are such that in equity and good conscious restitution should be made by Defendants to Plaintiff and the Class.

163.    As a result of Defendants' unjust enrichment, Plaintiff and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

42

164.    Plaintiff and the Class are entitled to restitution and/or disgorgement of profits

realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants

and in favor of Plaintiff and the Class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiff and the Class in an amount to be proven at trial;

c.    For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair and/or deceptive practices; along with exemplary damages to each Class member for each violation;

d.    For judgment for Plaintiff and the Class on their RICO claims, in an amount to be proven at trial, for three times the amount of the force-placed insurance charges paid to Defendants by Plaintiff and the Class;

e.    For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and the Class;

f.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.    For an order awarding Plaintiff and the Class their attorneys' fees and costs; and

h.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the

claims alleged herein.

43

Dated: April 30, 2012

**KIRBY McINERNEY LLP**

By:

Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LANDON ROTHSTEIN, JENNIFER
DAVIDSON, ROBERT DAVIDSON, and
IHOR KOBRYN, individually and on behalf
of all others similarly situated,

        Plaintiffs,

        v.

ALLY FINANCIAL, INC. f/k/a GMAC
INC., ALLY BANK f/k/a GMAC BANK,
JOHN DOE CORPORATION, BALBOA
INSURANCE COMPANY, MERITPLAN
INSURANCE COMPANY, and
NEWPORT MANAGEMENT
CORPORATION,

        Defendants.

Civil Action No.: 1:12-CV-3412 (AJN)

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**Jury Trial Demanded**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................... 1

II.     JURISDICTION AND VENUE ............................................ 5

III.    PARTIES ........................................................... 6

        A.    Plaintiffs .................................................. 6

        B.    The Ally Financial Defendants And Related Non-Party Debtors ............. 6

        C.    The Balboa Defendants ....................................... 8

IV.     CLASS ACTION ALLEGATIONS ......................................... 8

V.      SUBSTANTIVE ALLEGATIONS ......................................... 10

        A.    Background ................................................. 10

        B.    GMACM's Servicing Portfolio ................................. 16

        C.    The Kickback Scheme ........................................ 17

        D.    The Scheme Defrauds Borrowers And Loan Owners ................. 21

        E.    Fannie Mae Learns That It Is Being Overcharged For LPI ............. 24

        F.    The Lawsky Investigation ..................................... 31

VI.     THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD ......... 34

        A.    The Erroneous Notices And Bills To Borrowers ..................... 35

        B.    The Erroneous Reports To Loan Owners .......................... 36

        C.    The Scheme Constitutes "Honest Services" Fraud .................. 37

VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK
        PROVISIONS ...................................................... 39

VIII.   ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES,
        INCLUDING RESCAP AND GMACM ..................................... 42

A.    Ally Financial, ResCap, And GMACM ................................ 42

B.    Investigations And Lawsuits Relating To Securitization Activities .......... 42

C.    Investigations And Lawsuits Relating To Servicing Activities .............. 46

D.    Ally Financial Causes ResCap And GMACM To File For Bankruptcy ....... 51

E.    Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets ........... 53

F.    Ally Financial's Domination Of ResCap And GMACM ................... 56

G.    Ally Financial's Disregard Of Corporate Formalities ..................... 63

H.    Ally Financial's Responsibility For Controlling GMACM's
       Servicing Practices ................................................ 67

IX.    TOLLING OF THE STATUTES OF LIMITATIONS .......................... 70

X.     CLAIMS FOR RELIEF ................................................. 72

COUNT I ...................................................................... 72

COUNT II ..................................................................... 80

COUNT III .................................................................... 82

COUNT IV .................................................................... 84

COUNT V ..................................................................... 86

COUNT VI .................................................................... 87

COUNT VII ................................................................... 88

PRAYER FOR RELIEF ......................................................... 90

JURY TRIAL DEMANDED ...................................................... 91

ii

Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation made by and through their attorneys, which included a review of filings and public statements made by defendants, court filings, media articles and other publicly available information. Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA"), and applicable state law, on behalf of themselves and a nationwide putative class consisting of residential mortgage borrowers who have been charged for force- or lender-placed hazard insurance ("LPI") in connection with loans serviced by GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation (hereinafter "GMACM") at any time from March 6, 2003 to the present (the "Class Period").

2.    To protect the lender's interest in secured property, standard mortgage loan contracts require the borrower to maintain specified levels of hazard insurance coverage. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be "reimbursed" by the borrower for the "expense."

3.    Because most loans are sold and securitized after origination, LPI is generally purchased by a loan servicer acting on behalf of the securization trust that owns legal title to the loan.

1

Any amounts paid by the servicer to buy LPI are included as "servicing advances" under the agreement between the servicer and the trust, known as the "Pooling and Servicing Agreement" or "PSA." The servicer is entitled to recoup its advances from the proceeds of the loan, whether through borrower payments or foreclosure. The servicer has the right to reimbursement "off the top," before any money is passed through to the securitization trust or other loan owner.

4.    GMACM is the fifth largest residential mortgage loan servicer in the United States. As of March 31, 2012, GMACM serviced over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion.

5.    Since at least March 2003, GMACM has obtained LPI for the loans it services from defendants Balboa Insurance Company ("Balboa") and its affiliate Meritplan Insurance Company ("Meritplan").

6.    Also since at least March 2003, GMACM has had a relationship with an affiliate of Balboa and Meritplan, defendant Newport Management Corporation ("Newport"). GMACM hires Newport as a subcontractor to perform GMACM's insurance tracking duties under GMACM's servicing agreements. Insurance tracking is a labor-intensive servicing responsibility related to LPI that consists of monitoring the status of homeowners' voluntary insurance to confirm that it is in-force, notifying homeowners of any insurance deficiencies, and securing LPI when appropriate.

7.    Balboa, Meritplan, and Newport (the "Balboa Defendants") and GMACM devised and carried out a scheme to defraud borrowers and loan owners by overcharging them for LPI. Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged through complex transactions using affiliates and related parties. GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the

LPI. In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Because the amounts supposedly paid by GMACM for LPI constitute servicing advances, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities to the extent borrowers fail to pay.

8.      As devised by the Balboa Defendants and GMACM, the scheme involves the payment of rebates/kickbacks in two forms: (i) free tracking services, and (ii) bogus "commissions."

9.      The free tracking services are provided by Newport. Under the scheme, GMACM pays nothing for Newport's insurance tracking services; instead, Balboa and Meritiplan pay Newport on GMACM's behalf. The money is derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI, and is routed from Balboa and Meritplan to Newport via "intercompany expense allocations." The free tracking services constitute rebates/kickbacks in kind.

10.      The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, defendant John Doe Corporation ("John Doe"). As with the tracking services, the money for the "commissions" is derived from the LPI premiums paid by GMACM. The "commission" payments are made on the pretense that John Doe is a third-party insurance agent that introduced the insurance customer, i.e., GMACM, to Balboa and Meritplan. At all relevant times, however, this pretense has been false, as John Doe is not and has never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM, and never introduced GMACM to Balboa or Meritplan.

11.      Additionally, on information and belief, John Doe transfers the "commissions" that it receives to GMACM. Defendant Ally Financial, Inc. f/k/a GMAC Inc. ("Ally Financial") – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash

3

management system." Ally Financial thereby also participated in devising, and participates in carrying out, the scheme.

12.      Not just borrowers but also the owners of the loans serviced by GMACM – which include the taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by GMACM – have been grossly overcharged for LPI as a result of the scheme.

13.      On May 14, 2012, GMACM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. Accordingly, GMACM is not named as a defendant herein. Nevertheless, this complaint alleges that the Balboa Defendants, as participants and conspirators in the scheme, are jointly and severally liable under RICO and RESPA. Moreover, this complaint alleges that Ally Financial, which has not filed for bankruptcy, exercised complete dominion and control over the affairs, activities, and operations of its subsidiaries, including GMACM, such that GMACM operated as a mere instrumentality or alter-ego of Ally Financial. Therefore, Ally Financial is vicariously liable for the misconduct of GMACM alleged herein.

14.      Additionally, this complaint names defendant Ally Bank f/k/a GMAC Bank ("Ally Bank"), a subsidiary of Ally Financial that is not in bankruptcy. Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM, including, on information and belief, loans of Class members. Ally Bank is liable, *inter alia*, as principal for the misconduct of its appointed agent, GMACM.

4

## II.   JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), and 12 U.S.C. § 2614. This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c).

16.     Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

17.  ··   Additionally, this Court has personal jurisdiction over the defendants because each systematically and continually conducts business throughout the State of New York.

18.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of Texas, New York, and New Hampshire. Defendants are citizens of different states, the amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

19.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

20.     Venue is proper in this district under 28 U.S.C. § 1391(b), 12 U.S.C. § 2614, and 18 U.S.C. §§ 1965(b) and (d). Defendants regularly conduct business in this District.

## III.   PARTIES

### A.   Plaintiffs

21.    Landon Rothstein is a resident of Texas. Rothstein has a mortgage loan serviced by GMACM on a property located at 97 County Road 3701, Splendora, Texas. Rothstein was charged $105 by GMACM purportedly to reimburse it for the cost of LPI from October 6, 2010 to January 4, 2011. The LPI coverage was obtained by GMACM from Meritplan.

22.    Jennifer Davidson and Robert Davidson are residents of New Hampshire. The Davidsons have a mortgage loan serviced by GMACM on a property located at 32 Dunbarton Estates, Nottingham, New Hampshire. The Davidsons were charged $239 by GMACM purportedly to reimburse it for the costs of LPI from April 14, 2009 to July 4, 2009. The LPI coverage was obtained by GMACM from Balboa.

23.    Ihor Kobryn is a resident of New York. Kobryn has a mortgage loan serviced by GMACM on a property located at 29 Meredith Avenue, Staten Island, New York. Kobryn was charged $1,260.78 by GMACM purportedly to reimburse it for the costs of LPI from January 19, 2012 to May 22, 2012. The LPI coverage was obtained by GMACM from Meritplan.

### B.   The Ally Financial Defendants And Related Non-Party Debtors

24.    Ally Financial is a leading, multi-national financial services firm with approximately $184 billion of assets and operations in 37 countries. Ally Financial is a Delaware corporation headquartered in Detroit, Michigan. Ally Financial received at least $17 billion in government bailouts during the financial crisis, and still owes the United States Treasury $11.2 billion. Since the implementation of the Troubled Asset Relief Program in late 2008, Ally Financial has been owned by the U.S. Department of the Treasury, affiliates of Cerberus Capital Management, L.P.

6

("Cerberus"), affiliates of General Motors Company, and other investors. Prior to that time, Ally Financial was owned 51% by a consortium of investors led by Cerberus and 49% by General Motors Company. Ally Financial, was known as General Motors Acceptance Corporation until July 20, 2006, when it became a Delaware limited liability company under the name GMAC LLC. On June 30, 2009, GMAC LLC was converted from a Delaware limited liability company to a Delaware corporation under the name GMAC Inc. On May 7, 2010, GMAC Inc. changed its corporate name to Ally Financial.

25.    Ally Bank is an indirect wholly-owned subsidiary of Ally Financial. Ally Bank was at all times relevant to this complaint a loan originator. Prior to May 2009, Ally Bank was known as GMAC Bank. Ally Bank is an online bank chartered under Utah law.

26.    John Doe is a subsidiary of Ally Financial and an affiliate of GMACM. As alleged here, John Doe received kickbacks from Balboa and Meritplan fraudulently labeled as insurance "commissions."

27.    Ally Financial, Ally Bank, and John Doe are collectively referred to herein as the "Ally Financial Defendants."

28.    Non-party Residential Capital, LLC f/k/a Residential Capital Corporation ("ResCap"), is a Delaware limited liability corporation and a wholly-owned subsidiary of Ally Financial. At all relevant times, ResCap's business included originating and servicing mortgage loans through its wholly-owned subsidiary GMACM. ResCap is not named as a defendant in this lawsuit because it filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on May 14, 2012. *See In re: Residential Capital, LLC, et al., Debtors*, No. 12-12020-MG (S.D.N.Y. 2012).

7

29.    Non-party GMACM is a Delaware limited liability corporation with its principal place of business in Fort Washington, Pennsylvania. At all relevant times, GMACM was in the business of originating and servicing residential mortgage loans. Since 2005, GMACM has been a wholly-owned subsidiary of ResCap. Prior to that time, GMACM was a wholly-owned subsidiary of Ally Financial. GMACM is not named as a defendant in this lawsuit because it filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on May 14, 2012.

C.    **The Balboa Defendants**

30.    Balboa is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa is a provider of LPI and insurance tracking services, directly and through its affiliates, to mortgage loan servicers nationwide.

31.    Meritplan is a California corporation headquartered in Irvine, California. Meritplan is a wholly-owned subsidiary of Balboa. Meritplan is a provider of LPI to mortgage loan servicers nationwide.

32.    Newport is a California Corporation headquartered in Irvine, California. Prior to June 1, 2011, Newport was a wholly-owned subsidiary of Balboa. Thereafter, Newport became a wholly-owned subsidiary of QBE Insurance Group. Newport provides insurance tracking services to loan servicers as a subcontractor.

8

## IV.    CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(1), (b)(2) and (b)(3) on behalf of themselves and a nationwide class consisting of:

> All residential mortgage loan borrowers who have been charged for
> LPI in connection with loans serviced by GMACM at any time from
> March 6, 2003 to the present (the "Class").

34.    The Class excludes Defendants and any entity in which any defendant has a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

35.    The Class is so numerous that joinder of all members is impracticable.

36.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

37.    Plaintiffs' claims are typical of the claims of the Class.

38.    There are questions of law and fact common to the Class, including but not limited

to:

> a.    Whether GMACM, the Balboa Defendants and the Ally Financial Defendants
>        devised a scheme to defraud borrowers and loan owners by overcharging
>        them for LPI;
>
> b.    Whether the scheme alleged herein constitutes mail or wire fraud;
>
> c.    Whether GMACM and Ally Bank breached borrowers' mortgage loan
>        agreements and violated the covenants of good faith and fair dealing implied
>        therein;
>
> d.    Whether GMACM operated as an alter-ego of Ally Financial;
>
> e.    Whether Defendants are liable to Plaintiffs and the Class for damages and,
>        if so, the measure of such damages.

9

39.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

40.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiffs have retained counsel experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

41.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

42.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

43.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

44.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

10

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

45.    To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage on the home, "force place" it, and be reimbursed by the borrower for the "expense."

46.    LPI is purchased by the lender, for the lender. The lender is the sole insured and the only loss payee. In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The borrower's only involvement with LPI is that the borrower is obligated, by virtue of the mortgage loan agreement, to reimburse the lender for the "expense." Furthermore, the borrower has no choice, as the obligation to reimburse the lender is secured by the lender's lien on the property.

47.    All mortgage loan agreements contain substantively identical terms with respect to LPI. Plaintiff Rothstein's mortgage loan agreement, for example, provides, in pertinent part:

> Property Insurance.   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.   This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.   What Lender requires pursuant to the preceding sentences can change during the term of the Loan.   The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.* Lender is under no obligation to purchase any

11

> particular type or amount of coverage. Therefore, such coverage shall
> cover Lender, but might or might not protect Borrower, Borrower's
> equity in the Property, or the contents of the Property, against any
> risk, hazard or liability and might provide greater or lesser coverage
> than was previously in effect. . . .   ***Any amounts disbursed by
> Lender under this Section 5 shall become additional debt of
> Borrower secured by this Security Instrument.*** These amounts shall
> bear interest at the Note rate from the date of disbursement and shall
> be payable, with such interest, upon notice from Lender to Borrower
> requesting payment.

(Emphasis added).

48.    The traditional lending relationship, where the lender makes a loan, retains it in its

portfolio, and services it itself, is today the exception rather than the rule. Most residential

mortgages in the United States are financed through securitization.

49.    Securitization is a financing method involving the issuance of securities against a

dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or

"seller") assembles a pool of mortgages made or "originated" by an affiliate or purchased from

unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary

(the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive,

specially created special-purpose vehicle ("SPV"), typically a trust in the case of residential

mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the

loans. The securities are sold directly to investors by the SPV or, as is more common, they are

issued directly to the depositor as payment for the loans. The depositor then resells the securities,

usually through an underwriting affiliate that places them on the market. Because the certificated

securities are collateralized by the residential mortgages owned by the trust, they are called

residential mortgage-backed securities ("RMBS").

12

50.    A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive; it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution.

51.    Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan servicer. Every loan, irrespective of whether it is securitized, has a servicer. Servicers are hired by owners of whole loans, typically trustees of mortgage securitization trusts.

52.    The specific duties of the servicer are set forth in the PSA or other agreement between the servicer and the owner of the loan. The terms of such agreements are substantively identical in all respects relevant to this lawsuit.

53.    Specifically, servicing agreements include a broad grant or delegation of authority to the servicer, governed by the duty of the servicer to act in the best interests of the loan owner, combined with more specific delegations of authority relating to particular tasks.

54.    For example, on June 1, 2004, GMACM executed a PSA to become the servicer of a mortgage securitization trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA"). Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

13

55.    Section 3.01 of the JPMorgan PSA additionally delegates to GMACM "full power and authority, acting alone and/or through subservicers . . . to do or cause to be done any and all things that it may deem necessary or desirable in connection with such servicing and administration . . . ."

56.    The tasks of the servicer include account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the trust.

57.    Additionally, all PSAs and other servicing agreements require the servicer to make sure that adequate hazard insurance is continuously maintained on the secured properties. Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

> MAINTENANCE OF HAZARD INSURANCE
>
> The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance with extended coverage on the Mortgaged Property in an amount which is at least equal to the lesser of (i) the Stated Principal Balance of such Mortgage Loan and (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. . . . The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.
>
> *    *    *
>
> In the event that the Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of B:IV or better in Best's Key Rating Guide (or such other rating that is

14

comparable to such rating) insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section.

58.     Fulfilling the obligation to maintain continuous hazard insurance requires the servicer to monitor the status of homeowners' voluntary insurance to confirm that it is in-force, notify homeowners of any insurance lapse, and secure LPI when appropriate. These activities constitute "insurance tracking," a labor-intensive servicing responsibility which many servicers, including GMACM, outsource to subcontractors.

59.     All PSAs and other servicing agreements allow servicers to subcontract their servicing responsibilities to outside contractors provided the fees of the subcontractor are paid by the servicers.

60.     Section 3.01 of the JPMorgan PSA provides, for example:

> The Servicer shall perform all of its servicing responsibilities hereunder or may cause a subservicer to perform any such servicing responsibilities on its behalf, but the use by the Servicer of a subservicer shall not release the Servicer from any of its obligations hereunder with respect to the related Mortgage Loans. The Servicer shall pay all fees of each of its subservicers from its own funds.

61.     Any amounts paid by the servicer to buy LPI count as "servicing advances" under the PSAs and other agreements between the servicer and the loan owner. The servicer is entitled to recoup such advances from the proceeds of the loan, whether through payments made by the borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has the right to be reimbursed before any money is passed through to the securitization trust or other loan owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally

15

the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

62.    Mortgage servicing is a highly lucrative business. Servicers receive a fee based on the unpaid principal balance of each trust's mortgage pool or, in some cases, for each loan serviced. These servicing fees are typically paid from the monthly payments made by the borrowers on the loans. Annual servicing fees generally range from 0.25-0.50% of the remaining principal balance of the mortgage and are collected monthly. In addition, servicers are entitled to keep certain borrower-contracted fees such as late charge fees, assignment transfer fees, insufficient funds bank fees, assumption fees, loss mitigation fees and other incidental fees and charges. Servicers also benefit from being able to invest and earn interest on borrowers' escrow payments as they are collected until they are paid out to taxing authorities and insurance companies. Servicers also earn "float" income with respect to borrowers' monthly payments, as the payments are generally collected on the first of the month but not passed through to the owners of the loans until the end of the month.

**B.    GMACM's Servicing Portfolio**

63.    GMACM is the fifth largest residential mortgage loan servicer in the United States. GMACM services over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion. GMACM performs servicing pursuant to PSAs and other servicing agreements with numerous loan owners, including private securitization trusts, GSEs, and defendant Ally Bank.

64.    Approximately 68% of the mortgage loans (by unpaid principal balance) serviced by GMACM are owned, insured or guaranteed by Fannie Mae or another GSE.

16

65.    Approximately 690,000 mortgage loans with an unpaid principal balance of $140.8 billion are serviced by GMACM on behalf of Ally Bank. The Ally Bank loans were originated by GMACM, then sold to Ally Bank by GMACM. Ally Bank either still owns such loans or has resold them to private secondary market investors while retaining the servicing rights to such loans. GMACM services the Ally Bank loans pursuant to a servicing agreement between GMACM and Ally Bank dated as of May 11, 2012. Prior thereto, GMACM serviced the Ally Bank loans pursuant to predecessor agreements since 2001.

C.    **The Kickback Scheme**

66.    In March 2003, GMACM entered into an agreement to buy LPI from Balboa and Meritplan. GMACM also hired Newport to perform insurance tracking on its behalf. The initial agreements between GMACM and the Balboa Defendants had a term of three years. Such agreements, however, were renewed and continue to the present. Today, GMACM is one of the largest LPI accounts handled by the Balboa Defendants.

67.    The kickback scheme was devised at the inception of the parties' relationship in 2003, and has been carried out continuously to the present. Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged by complex transactions using affiliates and related parties. GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the LPI. In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Meanwhile, the gross insurance charges are incorporated into GMACM's servicing advances, which, as alleged above, GMACM recoups "off the top." To the extent borrowers fail to pay, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities.

17

68.     As devised by the Balboa Defendants and GMACM, the scheme involves the payment of rebates/kickbacks in two forms: (i) free tracking services, and (ii) bogus "commissions."

69.     The free tracking services are provided by the Balboa Defendants through Newport. Under the scheme, GMACM pays nothing for Newport's insurance tracking services. Instead, Balboa and Meritiplan pay Newport on GMACM's behalf. The money is derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI, and is routed from Balboa and Meritplan to Newport via "intercompany expense allocations."

70.     The free tracking services constitute rebates/kickbacks in kind. As alleged herein, servicers are responsible for providing tracking services as part of their duty to make sure that adequate hazard insurance is continuously maintained. Servicers are compensated to perform this responsibility through the servicing fees that they collect from loan owners. Moreover, although servicers are entitled to hire subcontractors to perform their responsibilities, servicing agreements require the servicer, as alleged above, to pay any subcontractors out of the servicer's "own funds." Under GMACM's arrangement with the Balboa Defendants, however, GMACM does not pay Newport out of GMACM's "own funds." Instead, GMACM pays nothing. Borrowers and loan owners bear the cost to pay Newport through inflated LPI charges and servicing advances.

71.     GMACM and Balboa have admitted to the essential facts concerning this aspect of the scheme. On May 21, 2012, a representative of GMACM, Michael Squillante, admitted in sworn testimony at a public hearing on LPI held by the New York State Department of Financial Services ("NYSDFS"), that Newport derives compensation through GMACM's LPI premiums and that GMACM pays nothing directly to Newport. NYSDFS Deputy Director Nancy Ruskin and Executive Deputy Superintendent Joy Feigenbaum examined Squillante:

18

DEP DIRECTOR RUSKIN: . . . Does – under the current arrangement, does GMAC pay QBE First [the parent of Balboa, Meritplan and Newport] for tracking services?

MR. SQUILLANTE: No, we do not.

DEP DIRECTOR RUSKIN: Why is that?

MR. SQUILLANTE: Our motto is we are a fully-turnkey outsource relationship. . . . [w]e have wholly outsourced that business to QBE.

EXEC DEP SUPT FEIGENBAUM: If I may, I guess I don't quite understand because there is a cost for the tracking of the service, is there not?

MR. SQUILLANTE: You have to ask QBE that much. I assume that there is. But they would – I don't have their financial information around that cost.

EXEC DEP SUPT FEIGENBAUM: Are you aware –

MR. SQUILLANTE: Again, they –

EXEC DEP SUPT FEIGENBAUM: Are you aware that other servicers provide, they pay for tracking services?

MR. SQUILLANTE: Yes. I'm aware some do and some don't; as some take commissions, and some don't.

EXEC DEP SUPT FEIGENBAUM: So . . . the consideration that might be given to GMAC is, you know, not having to pay for tracking services?

MR. SQUILLANTE: No. Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa . . . . Maybe I don't understand your question.

EXEC DEP SUPT FEIGENBAUM: . . . I think my understanding is that the servicers actually pay the – pay the insurance agent to do the tracking. So, I don't – I'm not asking whether you share. I'm asking, you know, why you don't pay.

19

>MR. SQUILLANTE: We do not pay tracking. Our motto is it's
>completely outsourced . . .

>DEP DIRECTOR RUSKIN: So, QBE is basically tracking for free?

>MR. SQUILLANTE: You'd have to ask QBE the economics of their
>business. I'm not – we are not paying for tracking our portfolio. But
>the economics of their business, you would have to ask them.

(669-671).

72.    In written testimony to the NYSDFS dated May 1, 2012, Balboa admitted the

"intercompany expense allocations." Specifically, Balboa stated:

>Balboa does not track insurance coverage.    For Balboa's
>lender-placed program, these services were provided by its affiliate,
>Newport Management Corporation ("NMC") and expenses incurred
>by NMC related to NMC's insurance tracking services, and/or the
>servicer's implementation of or conversion to such services, *were
>allocated to Balboa and other affiliated insurers on an
>intercompany expense allocation basis*.

(Emphasis added).

73.    As for the bogus "commissions," they are paid by Balboa and Meritplan to an affiliate

of GMACM, defendant John Doe. As with the tracking services, the money for the "commissions"

is derived from the LPI premiums paid by GMACM. The "commission" payments are made on the

pretense that John Doe is a third-party insurance agent that introduced the insurance customer, *i.e.*,

GMACM, to Balboa and Meritplan.

74.    At all relevant times, however, this pretense has been false. John Doe is not and has

never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM. John

Doe has also never been a *bona fide* insurance agent of Balboa or Meritplan, has not provided and

does not provide any *bona fide* insurance agency services to Balboa or Meritplan, and has never

20

solicited or sold any insurance products on behalf of Balboa or Meritplan, in connection with LPI purchased by GMACM or otherwise. John Doe does not perform and has never performed any insurance agency functions.

75.    A press release issued by GMACM at the inception of GMACM's relationship with the Balboa Defendants belies any suggestion that GMACM was introduced to Balboa or Meritplan through any insurance agent. The March 6, 2003 press release simply announced that GMACM had "selected" Balboa to meet its insurance needs.

76.    Additionally, on information and belief, John Doe transfers the "commissions" that it receives to GMACM. Ally Financial knowingly participates in the scheme by facilitating such transfers through the "global cash management system" that Ally Financial operates for itself and its subsidiaries. *See* Affidavit of James Whitlinger at ¶¶ 121-122, *In re: Residential Capital* (filed May 14, 2012, ECF No. 6). Ally Financial's cash management system facilitates intercompany transactions and tracks amounts paid to and from each affiliated participant in the system, including John Doe and GMACM.

### D.    The Scheme Defrauds Borrowers And Loan Owners

77.    The free tracking services and "commissions" alleged above constitute illegal kickbacks or bribes paid pursuant to a *quid pro quo* agreement or understanding that GMACM will continue to do LPI business with the Balboa Defendants. The parties compute the rebates/kickbacks due GMACM as a percentage GMACM's gross LPI premiums. Moreover, the rebates/kickbacks represent a substantial percentage of such gross premiums and are, therefore, material.

78.    The scheme defrauds borrowers and loan owners. Borrowers are fraudulently billed for LPI in excess of GMACM's true costs. To the extent borrowers default, the inflated servicing

21

advances reduce the loan proceeds paid to loan owners. Moreover, loan owners are in effect double-billed for tracking services – first through servicing fees and then through excess LPI charges. GMACM is improperly double-dipping, collecting compensation for insurance tracking twice.

79.    Although servicers supposedly work for the owners of the mortgages they service, a number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts. Servicers have no stake in the performance of mortgage loans and do not share mortgage owners' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing whatever fee and expense charges they can recoup "off the top."

80.    This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, or, as in this case, failing to pass LPI rebates to borrowers and loan owners. *See generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Georgetown Univ. L. Center).

81.    Servicers' compensation structures also incentivize them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the

22

charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal

to the liquidation value. At that point, because there is no equity left to strip, the servicer just

"want[s] to dump the property from [the] portfolio as quickly as they can," Professor Levitin

observes. Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated

fees and expenses until there is no value left.

82.    Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated LPI

charges have enabled servicers to strip billions of dollars in equity from borrowers' homes at the

expense of homeowners and investors. It has also exacerbated the housing crisis by pushing

marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes

it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and

indirectly on communities and the housing market as a whole."

83.    Borrowers have no say in the selection of servicer. The standard mortgage loan

agreement provides:

> The Note or a partial interest in the Note (together with this Security
> Instrument) can be sold one or more times without prior notice to
> Borrower. A sale might result in a change in the entity (known as the
> "Loan Servicer") that collects Periodic Payments due under the Note
> and this Security Instrument and performs other mortgage loan
> servicing obligations under the Note, this Security Instrument, and
> Applicable Law. There also might be one or more changes of the
> Loan Servicer unrelated to a sale of the Note.

84.    Accordingly, no mechanism exists for borrowers to select servicers that do not receive

kickbacks from LPI insurers. Nor is there any mechanism for borrowers to opt-out with respect to

the kickbacks, bribes or affiliate transactions described herein.

85.     Additionally, once charged for LPI, borrowers have no choice but to pay or lose their homes through foreclosure. The payment of improperly inflated LPI charges is not voluntary. As alleged above, whatever LPI charges the servicer imposes "become additional debt of Borrower," secured by the lender's lien. Furthermore, the servicer recoups LPI charges "off the top," before applying payments to loan principal.

86.     Plaintiffs do not challenge – and nothing in this complaint should be construed as challenging – any state-approved LPI "rates" or the reasonableness of any state-approved "rates." This lawsuit challenges a secret rebate scheme only.

### E.     Fannie Mae Learns That It Is Being Overcharged For LPI

87.     Fannie Mae, a GSE, purchases mortgages originated by private lenders, and is the largest single owner of mortgages in the United States. Fannie Mae has contracted with numerous servicers across the country to service tens of millions of mortgage loans. One of those servicers is GMACM. A significant percentage of the loans serviced by GMACM are owned by Fannie Mae.

88.     On March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed Insurance," regarding the "costs to taxpayers" of kickback arrangements that result in overcharges relating to LPI. The *Lender Letter* stated, in pertinent part:

> Fannie Mae will soon implement changes to its Lender-Placed Insurance (LPI) requirements to significantly reduce costs to homeowners, taxpayers, and Fannie Mae. The changes will lower barriers for borrowers who want to cure their delinquencies, while improving transparency and boosting competition in the LPI market.
>
> Fannie Mae requires hazard insurance on all properties for which it owns the mortgage. If a homeowner cannot provide evidence of coverage, the servicer must secure that coverage through the use of LPI. *Lender-placed policies, however, are significantly more expensive than voluntary coverage secured by the borrower and*

24

*often include commissions and other administrative costs, further adding to the cost of LPI policies.* Two firms currently issue most LPI policies.

An expensive LPI policy can often become an obstacle to a delinquent borrower seeking to avoid foreclosure. To bring their loan current, a borrower must reimburse the servicer for the cost of the LPI policy. *If the borrower defaults in mortgage loan payments and does not cure, Fannie Mae must reimburse the servicer for LPI premiums.   Costs to Fannie Mae ultimately become costs to taxpayers.*

(Emphasis added).

89.    On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a *Servicing Guide Announcement.* "With this Announcement, Fannie Mae is amending and clarifying its policies regarding the . . . allowable reimbursable expenses for lender-placed insurance," the Servicing Guide Announcement stated.   Specifically, Fannie Mae stated that requests for LPI reimbursement must exclude "any lender-placed insurance commission earned . . . by the servicer or any related entity." "Any costs associated with insurance tracking" must also be excluded.

90.    The *Servicing Guide Announcement* stated, in pertinent part:

### Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance.   Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

- *any lender-placed insurance commission earned on that policy by the servicer or any related entity,*

- *costs associated with insurance tracking* or administration, or

25

■    *any other costs beyond the actual cost of the lender-placed insurance policy premium.*

(Emphasis added).

91.    On March 6, 2012, Fannie Mae issued a request for proposals relating to LPI (the "RFP").[1] "Much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner," the RFP states. "This RFP is designed to change this situation."

92.    Specifically, the RFP requests that insurers submit independent bids for LPI and tracking services. Approved applicants are to be put on lists of "Preferred Providers" from which servicers hired by Fannie Mae loans will be required to choose. The stated goal of the RFP is the elimination of the "existing system" of secret rebates paid in the form of "subsidized" tracking services and related-party "commissions," *i.e.*, the improper kickbacks complained of herein.

93.    As the RFP states, Fannie Mae conducted a "review" from which it learned that LPI insurers pay "commissions/fees to Servicers for placing business with them" and, further, that such commissions/fees are "recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae."

94.    Additionally, Fannie Mae learned that "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again

---

[1]    Fannie Mae acknowledged the existence of the RFP in March 2012, but declined to make the document public. Nevertheless, on July 3, 2012, Birney Birnbaum, on behalf of the Center for Economic Justice, annexed a copy of the RFP as exhibit B to written testimony submitted in connection with a Public Hearing before the Florida Office of Insurance Regulation Regarding a Rate Filing for Force-Placed Insurance by Praetorian Insurance Company.

26

via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs

of tracking services."

95.    The RFP proposes a "new business model" eliminating such secret rebates.  The

"executive summary" of the RFP states:

> As a best practice Fannie Mae seeks to reduce expenses while
> improving service quality. After extensive internal review, Fannie
> Mae believes that current Lender Placed Insurance costs are not
> market competitive and can be improved through unit price
> reductions and fee transparency to the benefit of both the taxpayers
> and homeowners. Therefore, Fannie Mae is undertaking this
> competitive procurement process to improve the pricing and fee
> transparency for Lender Placed Insurance while maintaining coverage
> and service quality.
>
> **Current Situation**
>
> Fannie Mae's current Lender Placed Insurance situation is as follows:
>
> 1.    Homeowners are required to maintain voluntary hazard
>        insurance on Fannie Mae insured properties.
>
> 2.    Lender Placed Insurance must be acquired by mortgage
>        Servicers when a property is no longer eligible for Voluntary
>        Insurance, or when the Servicer cannot obtain proof of
>        adequate Voluntary Insurance from the homeowner,
>        irrespective of whether or not that homeowner is current or
>        delinquent on the loan.
>
> 3.    The cost of Lender Placed Insurance is higher than the cost of
>        voluntary hazard insurance. Homeowners are billed for the
>        Lender Placed Insurance premiums. However, if the
>        homeowner does not pay the premium (for example, if the
>        property has already been vacated), then Servicers pass on the
>        premium costs to Fannie Mae.
>
> 4.    Servicers are responsible for providing tracking services, per
>        Fannie Mae Guidelines. Many large Servicers have chosen to
>        outsource the Insurance Tracking and associated

27

administrative process to third parties, the largest of which are affiliated with Lender Placed Insurers.

5. *Lender Placed insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae.*

6. *The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae.* Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down. In addition, *Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services (to the extent that insurers are providing such services).*

In appropriate circumstances, Lender Placed Insurance is necessary and important to the preservation of Fannie Mae assets. However, much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner. This RFP is designed to change this situation.

**Expected Outcome**

The expected outcome of this procurement is for Servicers and Fannie Mae to obtain competitively-priced Lender Placed Insurance that incorporates price transparency and collaboration with Lender Placed Insurers. Fannie Mae expects to achieve the following:

1. *Eliminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae.*

2. *Eliminate the ability of Servicers to pass on the cost of Insurance Tracking services to Fannie Mae, since the cost for such services is reimbursed to the Servicer in the form of current servicing fees.*

28

3.   *Separate the commissions and fees for Insurance Tracking services from the fees for Lender Placed Insurance to ensure transparency and accountability.*

4.   Require Servicers to order Lender Placed Insurance policies based on competitive pricing negotiated by Fannie Mae; Fannie Mae will choose one or more Providers based on the responses received during the RFP process. The chosen Providers will be placed on a Preferred Provider List.

5.   Restructure the business model to align Servicer incentives with the best interests of Fannie Mae and homeowners.

6.   Enforce best practices that encourage the use of voluntary insurance and reduce the demand for lender placed insurance.

Fannie Mae recognizes that the current system developed over a period of years. However, Fannie Mae is prepared to restructure the current Lender Placed Insurance business model to operate as a market driven service that efficiently meets the best interests of Fannie Mae, its partner insurers, taxpayers, and homeowners.

Fannie Mae is confident that the business model proposed herein is fair to all parties, allows market-based pricing, *eliminates subsidies*, and allows Fannie Mae to best meet its federal charter to facilitate home ownership, provide liquidity to the housing market, and protect taxpayers. Fannie Mae also believes that this new model is sustainable over time and robust enough to adjust to changing conditions as the housing market recovers. The attributes of the new business model will be as follows:

1.   The premiums to be charged for Lender Placed Insurance will be negotiated between Fannie Mae and the Lender Placed Insurer(s). These premiums will be communicated to Fannie Mae's Servicer community.

2.   The Lender Placed Insurer(s) will continue to invoice the Servicers for insurance provided. *Fannie Mae will then reimburse the Servicers, but will not pay more than the rate negotiated by Fannie Mae. The rate negotiated between Fannie Mae and the Lender Placed Insurer(s) will exclude any commissions paid by the Lender Placed Insurer(s) to Fannie Mae Servicers to place their insurance on Fannie Mae properties. In addition the rate will exclude the cost of*

29

> *providing Insurance Tracking services or any other costs
> beyond the cost of the policy premium to the Servicer.*

3.  Servicers may contract for Insurance Tracking and associated
    administrative services from a Lender Placed Insurer on the
    Preferred Provider List, perform tracking services in-house,
    or outsource tracking to a Provider not on the list since the
    Servicer is fully liable for tracking costs. *However, the full
    cost of such services must be billed independent of, and
    never embedded in, the insurance premiums charged for
    Lender Placed Insurance. Fannie Mae will not reimburse
    Servicers for these tracking and administrative services.*

4.  Fannie Mae will reevaluate the Preferred Provider List from
    time to time as appropriate to ensure Fannie Mae is receiving
    competitive pricing.

This new business model will come into effect at the close of this
procurement process.

(Emphasis added).

96.   As to tracking services, the RFP additionally states:

The scope of the tracking and administrative services to be provided
will include at least the following activities:

- Monitor status of homeowner's Voluntary Insurance to
  confirm that it is in-force and in accordance with Fannie Mae
  Guidelines
- Request and confirm homeowner certificates of insurance
- Notify homeowners of any Voluntary Insurance deficiencies
  and attempt to correct
- Secure the placement of Lender Placed Insurance in
  accordance with Fannie Mae Guidelines
- Work with homeowners to avoid placement of Lender Placed
  Insurance or to secure Voluntary Insurance even after Lender
  Placed Insurance has been placed
- Provide Insurance Tracking and verification customer service
  to homeowners, Servicers and Fannie Mae to include
  state-of-the-art call center operations
- Perform in compliance with Performance and Reporting
  requirements . . .

30

•    Maintain books of record necessary to manage the scope of services covered in this RFP to include issuing accurate reports to Fannie Mae and its Servicers as described below

*The Insurance Tracker may be an affiliate of a Lender Placed Insurance company but must bid the price of Lender Placed Insurance separately from Insurance Tracking services. Under the terms of this procurement, the prices submitted for neither line of business (i.e., Lender Placed Insurance or Insurance Tracking) may subsidize the other.*

(Emphasis added).

97.    In July 2012, Fannie Mae stated that the goal of the RFP was to "lower costs for homeowners, taxpayers, and Fannie Mae" and that Fannie Mae was still in the process of evaluating bids.

**F.    The Lawsky Investigation**

98.    On or about January 10, 2012, Benjamin Lawsky, the Superintendent of the NYSDFS, launched a probe into improper practices relating to LPI, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

99.    On April 5, 2012, Lawsky issued a press release announcing that it had expanded its probe into LPI and was scheduling public hearings on the matter to take place in May 2012. The press release stated that the investigation had already uncovered evidence that borrowers had been overcharged for LPI "due [to] relationships between and payments by insurers to banks and their affiliates. . . . Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business." The press release also discussed that, as alleged herein, the LPI overcharges harmed not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

31

100.   The full text of the Lawsky release stated:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to

32

provide information: Balboa Insurance Company, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), Meritplan Insurance Company, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a

33

substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors," Lawsky said.*

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure. The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(Emphasis added).

34

101.    The NYSDFS held three days of hearings on LPI in May as scheduled. As alleged above, GMACM and Balboa admitted the essential facts regarding the rebates/kickbacks paid in the form of free tracking services at the hearings.

## VI.    THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD

102.    The kickback scheme alleged herein constitutes mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### A.    The Erroneous Notices And Bills To Borrowers

103.    As GMACM's insurance tracking subcontractor, Newport issues standardized notices to borrowers. Prior to the placement of LPI, Newport issues notices titled "Request for Property Insurance" demanding evidence of insurance and warning that LPI will be imposed if such evidence is not forthcoming. Once LPI is imposed, Newport issues Notices of Placement. For example, Newport issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on December 12, 2010. Newport issued a Notice of Placement to the Davidsons on August 2, 2009, and to Kobryn on May 13, 2012. Borrowers also receive standardized monthly billing statements from GMACM.

104.    The notices and billing statements are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension.

105.    Specifically, the notices do not disclose the rebates/kickbacks. The notices set forth the balances owed for LPI based on the full cost of the premiums without subtracting the rebates/kickbacks. Additionally, the notices falsely describe those balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for the money that GMACM "advanced."

35

106.    The Requests for Property Insurance state, "Since we have not received evidence of hazard insurance, we will secure hazard insurance coverage also known as lender-placed insurance. . . . You are responsible for *reimbursing* us for *the cost of this coverage*, in the amount of $[xx,xxx.xx], ('insurance charges')." (Emphasis added).

107.    The Notices of Placement state, "We have obtained lender-placed insurance coverage . . . under the terms of your mortgage. . . . The *cost of the insurance* in the amount of $[xx,xxx.xx] was *advanced* for the period [xx/xx/20xx] to [xx/xx/20xx]." The Notices of Placement demand that borrowers "*Reimburse us* in full for the insurance." (Emphasis added).

108.    These statements are materially false and misleading and omit facts necessary to make the statements not misleading. Because the rebates/kickbacks reduce GMACM's "costs" for the LPI coverage, the balances set forth in the notices exceed the amounts actually "advanced" by GMACM or necessary to "reimburse" GMACM because the rebates/kickbacks are not subtracted from the balances. Furthermore, the monthly statements to borrowers incorporate the same falsely inflated LPI charges.

**B.    The Erroneous Reports To Loan Owners**

109.    GMACM is required to provide financial reports to loan owners at least monthly documenting GMACM's payment activities with respect to each loan. The monthly financial reports are required to include information regarding any compensation received by GMACM, any advances made by GMACM, and any expenses reimbursed to GMACM.

110.    Additionally, GMACM is required to deliver certificates of compliance to each loan owner annually attesting that GMACM's activities for the year complied with the terms of the applicable PSA or other servicing agreement.

36

111.    All servicing agreements include such monthly and annual reporting requirements. For example, the JPMorgan PSA sets forth GMACM's monthly reporting requirement in Section 4.03, and GMACM's annual certification requirements in Section 3.13.

112.    GMACM's reports and certifications to loan owners are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension. On information and belief, the reports and certifications do not disclosure the rebates/kickbacks. Instead, the reports and certifications set forth balances for advances and reimbursements based fraudulently on the full cost of the LPI premiums without subtracting the rebates/kickbacks. The reports and certifications also set forth balances for GMACM's compensation that fraudulently exclude the additional, undisclosed compensation derived by GMACM from the rebates/kickbacks.

113.    Moreover, on information and belief, the reports do not disclose GMACM's "double-dipping" with respect to tracking services, *i.e.*, the fact that GMACM charges loan owners for tracking services twice, first through servicing fees and then for a second time through excess LPI charges. As alleged above, GMACM's servicing agreements obligate GMACM to pay any subcontractors "from its own funds." The payment of Newport via excess LPI charges characterized as servicing advances, instead of from GMACM's "own funds", breaches this obligation. GMACM's certificates of compliance to loan owners fraudulently omit disclosure of such breach.

C.      **The Scheme Constitutes "Honest Services" Fraud**

114.    The scheme alleged herein constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

115.    The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

37

116.    The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent
> pretenses, representations or promises . . . [uses the mails in
> furtherance of the scheme shall be punished by imprisonment or fine
> or both].

18 U.S.C. § 1341.

117.    The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

118.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this statutory language to apply only to deprivations of property and not to encompass "the right to have [one's] affairs conducted honestly." *Id*. at 352.

119.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the
> term "scheme or artifice to defraud" includes a scheme or artifice to
> deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

120.    Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest services within the scope of the mail and wire fraud statutes.

121.    In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the Supreme Court addressed the scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent schemes to deprive another of honest services through bribes or kickbacks." *Id*. at 2928, 2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and

38

kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or

kickback schemes. *Id.* at 2930-31.

122.    At all relevant times, GMACM owed legal duties to render services to loan owners.

In all cases, those duties included maintenance of continuous hazard insurance coverage on the

secured properties. The value of GMACM's services depended on GMACM's rendering those

services in an honest manner. Nevertheless, GMACM misused its position as the servicer of the

loans to extract bribes and kickbacks from the Balboa Defendants. GMACM thereby breached its

obligation to render "honest services" to loan owners. GMACM, Ally Financial, and the Balboa

Defendants devised a scheme or artifice to defraud loan owners of their intangible right to

GMACM's honest services through kickbacks.

123.    The wire and mail fraud violations of GMACM, Ally Financial, and the Balboa

Defendants, including "honest services" fraud, constitute predicate acts under RICO. The pattern

of racketeering activity alleged herein has proximately harmed Plaintiffs and the Class.

## VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK PROVISIONS

124.    The "commissions" and free tracking services provided by the Balboa Defendants to

GMACM constitute unlawful kickbacks in violation of Section 8(a) of RESPA.

125.    Congress enacted RESPA to protect homeowners "from unnecessarily high settlement

charges caused by certain abusive practices." 12 U.S.C. § 2601(a). The intent of Congress was to

eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain

settlement services." 12 U.S.C. § 2601(b)(2).

39

126.    Toward that end, RESPA prohibits referral fees and kickbacks. In particular, Section

8(a) of RESPA prohibits both the giving and acceptance of "any fee, kickback, or thing of value

pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of

a real estate settlement service . . . shall be referred to any person." 12 U.S.C. § 2607(a).

127.    RESPA confers on the Secretary of the Department of Housing and Urban

Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's

purposes. *See* 12 U.S.C. § 2617(a). The relevant regulation adopted by HUD is known as

Regulation X and sets forth in relevant part:

> § 3500.14 Prohibition against kickbacks and unearned fees.
>
> (a) Section 8 violation. Any violation of this section is a violation of section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement as such under § 3500.19. (b) No referral fees. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in § 3500.15(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

24 C.F.R. §3500.14(a).

128.    The penalty for violating Section 8(a) is joint and several liability by the violators "to

the person or persons charged for the settlement services involved in the violation in an amount

equal to three times the amount of any charge paid for such settlement service." 12 U.S.C.

§ 2607(d)(2).

129.    Thus, 12 U.S.C. § 2607(a) prohibits kickbacks to refer business incident to or a part

of real estate settlement services to them.  If a party violates 12 U.S.C.§ 2607(a), the borrower is

entitled to a statutory penalty equal to three times the amount paid by the borrower for the settlement

service. *See* 12 U.S.C. § 2607(d)(2).

130.    RESPA and Regulation X define the term "settlement service" liberally.  The word

"settlement" is defined as "the process of executing legally binding documents regarding a lien on

property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b).  A "settlement

service" is defined as "any service provided in connection with a prospective or actual settlement,"

and in this definition HUD specifies that settlement services include the "provision of services

involving hazard, flood, or other casualty insurance." *See id.*

131.    The placement of LPI constitutes a "settlement service" within the meaning of

RESPA.  At minimum, the placement of LPI constitutes business "incident to" if not "a part of" real

estate settlement services under 12 U.S.C. § 2607.  Transactions placing LPI "regard" a "lien" on

property subject to a federally related mortgage because, as alleged above, any amounts disbursed

for LPI "become additional debt of Borrower secured by" the lender's lien on the property.  Hence,

transactions placing LPI fall squarely within the definition of a "settlement."

132.    Regulation X defines a "fee, kickback, or thing of value" as including, without

limitation:

> monies, things, discounts, salaries, commissions, fees, duplicate
> payments of a charge, stock, dividends, distributions of partnership
> profits, franchise royalties, credits representing monies that may be
> paid at a future date, the opportunity to participate in a money-making
> program, retained or increased earnings, increased equity in a parent
> or subsidiary entity . . . .  The term payment is used throughout

41

§§3500.14 and 3500.15 as synonymous with the giving or receiving
any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

133.    The "commissions" and free tracking services provided by the Balboa Defendants to
GMACM thus violate Section 8(a) of RESPA. The loans of Plaintiffs and the Class are "federally
related" within the meaning of RESPA. The "commissions" and free tracking services constitute
unlawful kickbacks within the meaning of Section 8(a).

## VIII.    ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES, INCLUDING RESCAP AND GMACM

134.    At all relevant times, defendant Ally Financial exercised complete domination and
control over the affairs, activities, and operations of its subsidiaries – including, specifically, those
of ResCap and GMACM – such that those subsidiaries operated as mere instrumentalities or alter-
egos of Ally Financial. Moreover, GMACM engaged in inequitable conduct toward Plaintiffs and
the Class such that the circumstances justify piercing the corporate veils of GMACM and ResCap
in order to hold Ally Financial vicariously and/or derivatively liable for GMACM's misconduct.

### A.    Ally Financial, ResCap, And GMACM

135.    As alleged above, Ally Financial owns ResCap, which owns GMACM. At all times
relevant to this lawsuit, Ally Financial conducted mortgage loan securitization and servicing
activities primarily through ResCap and GMACM. Ally Financial's business model depended on
mortgage loan securitizations to fund ongoing mortgage loan originations and acquisitions and to
earn significant fees. GMACM earned additional fees by servicing loans.

136.    Ally Financial, ResCap, and GMACM, as well as other affiliates of Ally Financial,
face numerous investigations and lawsuits relating to their securitization and servicing operations.

42

## B.   Investigations And Lawsuits Relating To Securitization Activities

137.   GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans. On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

138.   Additionally, on September 2, 2011, the Federal Housing Finance Authority ("FHFA"), as conservator for Freddie Mac, filed suit in New York State Supreme Court against Ally Financial and several of its subsidiaries for claims arising in connection with its role in the public filing of offering documents containing false and misleading statements. These claims arise from Freddie Mac's purchase of over $6 billion in certificates issued through twenty-one transactions similar to the transactions at issue here. Among other claims, FHFA brought suit for common law fraud against various Ally Financial subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the subject certificates.

139.   The FHFA also alleges violations of state and federal securities laws by Ally Financial and several of its subsidiaries stemming from false and misleading statements contained in publicly filed prospectuses, prospectus supplements, registration statements, and other offering documents. Additionally, FHFA also alleges aiding and abetting fraud against Ally Financial and certain of its affiliates for their intentional and substantial assistance in rendering material

43

misrepresentations to Freddie Mac in connection with the sale of the certificates. The FHFA action

seeks relief in the form of rescission and recovery of the $6 billion purchase price of the certificates,

including lost principal and interest, as well as punitive damages and attorneys' fees and costs. In

October 2011, Ally Financial and its co-defendants removed the FHFA action to the United States

District Court for the Southern District of New York.

140.     In addition, GMACM currently is facing a lawsuit brought by monoline insurer MBIA

Insurance Corporation ("MBIA") in New York State Supreme Court in which MBIA alleges that,

in connection with certain mortgage insurance transactions with MBIA, GMACM affirmatively

misrepresented the credit quality of tens of thousands of mortgage loans, with an original principal

balance of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that

GMACM should have borne itself. On December 15, 2010, the New York State Supreme Court

issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of

representations and warranties and fraud claims, among others, to proceed to trial.

141.     Additionally, according to Ally Financial's quarterly report for the third quarter of

2011, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending against

Ally Financial's mortgage-related business units and subsidiaries arising from numerous RMBS

offerings. The plaintiffs in those suits have alleged, among other things, that Ally Financial's

various mortgage subsidiaries made misstatements and omissions in registration statements,

prospectuses, prospectus supplements, and other documents related to RMBS offerings. The alleged

misstatements typically concern underwriting standards. See Ally Fin. Inc., Quarterly Report (Form

10-Q), at 159 (Nov. 4, 2011). Further, in its 2011 Annual Report, Ally Financial stated that it

44

expects additional similar claims to be brought against Ally Financial and/or its subsidiaries in the

future. *See* Ally Fin. Inc., Annual Report (Form 10-K), at 20 (Feb. 25, 2011).

142.    Since the filing of its November 2011 Form 10-Q, moreover, Ally Financial and its

subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which have

alleged, *inter alia*, material misrepresentations and omissions about the loans backing RMBS

securities issued by Ally Financial's affiliates.

143.    Ally Financial and several of its subsidiaries, including GMACM, are also currently

facing several lawsuits brought by monoline insurer Financial Guaranty Insurance Company

("FGIC") in which FGIC alleges that in connection with certain mortgage insurance transactions,

the defendants, acting as alter egos of each other, affirmatively misrepresented the credit quality of

tens of thousands of mortgage loans, with a total original principal balance of approximately $1.87

billion, as a means of unfairly shifting to investors and FGIC risks which the defendants should have

borne.

144.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits from

monoline insurers like MBIA and FGIC given that Ally Financial and its subsidiaries sold $42.7

billion of loans into monoline-wrapped securitizations from 2004 to 2007. During 2011, Ally

Financial and its subsidiaries have received repurchase claims from monoline insurers for $265

million worth of mortgages related to securitizations it consummated between 2004 and 2007. Ally

Financial evidently clearly recognizes its exposure because, according to its CEO, Michael

Carpenter, ResCap has already reserved $829 million for misrepresentation and warranties claims

and, according to its SEC filings, Ally Financial confirms that "litigation with . . . monolines is

likely." Ally Fin. Inc., Annual Report (Form 10-K), at 98 (Feb. 28, 2012).

45

145.    Indeed, according to Ally Financial's 2012 annual report, the company also believes

that "[t]he total exposure . . . to mortgage representation and warranty claims is most significant for

loans originated and sold from 2004 through 2008, specifically the 2006 and 2007 vintages that were

originated and sold prior to enhanced underwriting standards and risk-mitigation actions

implemented in 2008 and forward." Ally Fin. Inc., Annual Report (Form 10-K), at 224 (Feb. 28,

2012).

146.    Additionally, Ally Financial disclosed that the SEC served a subpoena on Ally

Financial in June 2011, requesting documentation regarding certain "bulk settlements" relating to

securitized mortgage loans as well as a request for materials provided to investors and prospective

investors in RMBS. *See* Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under

the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

C.    **Investigations And Lawsuits Relating To Servicing Activities**

147.    On February 9, 2012, the Federal Reserve Board announced that Ally Financial, its

subsidiaries, including GMACM, and several other mortgage loan servicers would be required to pay

$766.5 million in monetary sanctions for "unsafe and unsound processes and practices in residential

mortgage loans servicing and foreclosure processing." Press Release, FRB, February 9, 2012. On

February 12, 2012, the FRB imposed well over $200 million of this fine against Ally Financial,

ResCap, and GMACM pursuant to an Assessment Order, which requires that the sanctions be paid

to various borrower assistance programs and nonprofit programs established to help victims of

improper servicing and foreclosure practices. *See* Order of Assessment of a Civil Money Penalty

Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, FRB Docket No.

12-006-CMP-HC (February 12, 2012) (the "Assessment Order"). According to the FRB, the

46

sanction "takes into account the maximum amount prescribed for unsafe and unsound practices under the applicable statutory limits, the comparative severity of the institutions' misconduct, and the comparative sizes of the institutions' foreclosure activities." *See* Press Release, FRB, February 9, 2011.

148.    Also on February 9, 2012, the United States Attorney General announced that Ally Financial, ResCap, and GMACM would take part in the $25 billion nationwide mortgage settlement to resolve claims brought by the government in response to the abusive mortgage loan servicing practices of Ally Financial and four other banks. *See* Eric Holder, U.S. Attorney General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement releases Ally Financial, ResCap, and GMACM from certain civil claims brought by the DOJ and multiple state attorneys general, the settlement does not resolve or release any other liabilities that Ally Financial, ResCap and GMACM have incurred through their improper servicing practices. *See id.*

149.    According to the U.S. Attorney General, the $25 billion settlement and $766.5 million sanction are just "the latest step forward" in holding the settling banks, including Ally Financial, ResCap, GMACM and others, accountable for "egregious mortgage loan servicing abuses."

150.    In addition to these recent settlements and Assessment Order, the FRB and the Federal Deposit Insurance Corporation (the "FDIC") previously ordered Ally Financial, ResCap and GMACM to adopt new procedures and practices in relation to mortgage loan servicing. *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

151.    The Consent Order notes that Ally Financial and its mortgage servicing subsidiaries, including ResCap and GMACM, have been accused, *inter alia*, of (1) failing to properly increase

47

financial, staffing, and managerial resources in order to meet an increasing number of foreclosures;

(2) failing to properly put in place "adequate internal controls, policies and procedures, compliance

risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false

affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that

the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

152.    Furthermore, under the Consent Order, Ally Financial as the parent corporation is

obligated to direct ResCap and GMACM to take certain remedial action to ensure that they operate

in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things, the Consent

Order requires Ally Financial to take "steps to improve the information and reports that will be

regularly reviewed by [Ally Financial's] board of directors . . . [to assess the performance of]

residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." *Id.*

at 8.

153.    The Consent Order further requires GMACM to conduct a review of certain past

residential mortgage foreclosure actions in order to determine whether borrowers were financially

harmed. *See* Press Release, FRB (November 1, 2011). If the foreclosure process is found to have

caused financial injury to the borrower, GMACM is required to provide full compensation to the

borrower. *See id.*

154.    Additionally, Ally Financial is required to adhere to new, heightened servicing

standards. *See* Press Release, FRB (February 9, 2011). The FRB ordered Ally Financial to remedy

its servicing practices by, *inter alia*, "strengthen[ing] the coordination of communications with

borrowers by providing borrowers the name of the person at the service who is their primary point

of contact, establish[ing] limits on foreclosures where loan modifications have been approved,

establish[ing] robust third party vendor controls, strengthen[ing] compliance programs, and provid[ing] appropriate remediation to borrowers who suffered financial injury as a result of errors by the servicers." *See id.*

155.     The servicing and foreclosure improprieties of Ally Financial and its subsidiaries, including GMACM, is a matter of public record. According to the sworn testimony of a GMACM employee, Ally Financial's mortgage servicing subsidiaries have routinely filed false affidavits in thousands of foreclosure actions across the country. *See Jeffrey Stephan Dep. Federal National Mortgage Association v. Bradbury*, BR1-RE-09-65 (Me. Dist. Ct., Dist. Nine, June 7, 2010). Indeed, according to the Financial Crisis Inquiry Commission ("FCIC") Report:

> [L]enders have relied on "robo-signers" who substituted speed for accuracy by signing, and sometimes backdating, hundreds of affidavits claiming personal knowledge of facts about mortgages that they did not actually know to be true. One such "robosigner," Jeffrey Stephan of GMAC, said that he signed 10,000 affidavits in a month–roughly 1 per minute, in a 40-hour workweek–making it highly unlikely that he verified payment histories in each individual case of foreclosure.

FCIC Report at 407.

156.     Stephan also testified that, when executing summary judgment affidavits to be used in judicial foreclosure actions, he was acting in accordance with policies and procedures, and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep. Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among other things, the mortgage note and documents relating to the assignment of the mortgage. *See id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the foreclosure was proper,

all he knew was the borrower's name and whether he had signing authority for the Ally Financial

entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan testified that the process he

followed in signing summary judgment affidavits was in accordance with the policies and procedures

required by GMACM. *Id.* at 64:8-14.

157.    Additionally, in October 2010, the Ohio Attorney General filed suit against GMACM

and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false

affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC*

*Mortgage LLC*, No. CI0201006984, (Ohio Ct. of Common Pleas filed Aug. 6, 2010). Although

some of the claims brought by the Ohio Attorney General's suit have been resolved by the $25

billion nationwide mortgage settlement, many additional claims not encompassed by the settlement

have survived.

158.    Similarly, in December 2011, the Massachusetts Attorney General filed suit against

GMACM for, among other things, engaging in unfair and deceptive foreclosure practices. *See*

*Commonwealth of Massachusetts v. Bank of America N.A.*, No. 11-4363 (Suffolk Cnty. Superior Ct.

filed Dec. 1, 2011). Days after filing suit, the Massachusetts Attorney General sent a letter to the

United States Senate Committee on Banking, Housing and Urban Affairs and the United States

House Committee on Financial Services asking that the federal government investigate Ally

Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false

documents related to property seizures. *See* Boston Globe, Attorney General Martha Coakley Urges

Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices, Dec. 6, 2011.

Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

In light of Ally [Financial]'s alleged deceptive and illegal actions against homeowners in Massachusetts and across the country, I respectfully request that your committees investigate Ally [Financial]'s serious misconduct and consider what actions the federal government can take to ensure that Ally [Financial] adheres to the law.

*Id.*

159.    While the $25 billion nationwide mortgage settlement ultimately resolved certain claims brought by the Massachusetts Attorney General in this action, other claims survived and will continue to be prosecuted.

### D.    Ally Financial Causes ResCap And GMACM To File For Bankruptcy

160.    Since at least November 2011, Ally Financial was considering seeking bankruptcy protection for ResCap, its wholly-owned subsidiary, which has reportedly lost $555 million since 2009, according to multiple published reports. GMACM is a wholly-owned subsidiary of ResCap.

161.    Around that time, the financial industry was "betting that Ally [Financial] will place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an initial public offering." Bloomberg News, Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance, November 14, 2011. As the article notes, Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for bankruptcy. *See id.*

162.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 28, 2012).

51

163.     That risk ultimately came to pass as Ally Financial disclosed earlier this year that the

penalties assessed by the federal government and numerous state attorneys general regarding the

servicing and foreclosure practices of Ally Financial and its subsidiaries, which include GMACM,

"resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011."

*Id.* at 31. As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge]

was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in

certain of ResCap's credit facilities." Ally Financial, Current Report (Form 8-K) (January 31, 2012).

Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net

worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities

. . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million

at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012).

ResCap's substantial shortfall, however, was "immediately remediated by Ally through a capital

contribution of $197 million, which was provided through forgiveness of intercompany debt during

January 2012." *Id.*

164.     Moreover, in February, 2012, it was reported that Ally Financial had contacted buyout

firms such as Fortress Investment Group LLC and Cerberus regarding a potential sale of ResCap

through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faced financing

and liquidity deadlines. *See* Bloomberg Businessweek, Ally's ResCap Said to Seek Buyers for

Prearranged Bankruptcy, Feb. 8, 2012. According to the report, "[p]otential bidders are being told

that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as

[RMBS] securitizations that have been the subject of litigation." *Id.* To that end, Ally Financial's

CEO stated that he will not pursue the aforementioned initial public offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.*

165.    Nevertheless, a bondholder group representing holders of approximately $800 million in ResCap debt expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from ResCap because it has *stripped assets from the unit.*" Bloomberg News, Paulson, Tepper Said Among Investors Urging Ally to Back ResCap, Jan. 10, 2012 (emphasis added).

166.    Indeed, as Ally Financial has pointedly noted in its most recent annual report: "In light of ResCap's liquidity and capital needs combined with volatile conditions in the marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

167.    On May 14, 2012, ResCap and certain of its subsidiaries, including GMACM, filed petitions for bankruptcy protection under Chapter 11.

E.    **Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets**

168.    On June 1, 2012, the Official Committee of Unsecured Creditors in the ResCap/GMACM bankruptcy (the "Unsecured Creditors") moved for an order authorizing them to conduct an investigation of a "complex constellation of pre- and post-petition transactions, involving billions of dollars of transfers and financings among interested parties." Specifically, the Unsecured Creditors sought to investigate transactions through which Ally Financial stripped or apparently plans to strip the Debtors of valuable assets. *In re: Residential Capital, LLC, Debtors*, No. 12-12020 ("UCC Motion") (S.D.N.Y. filed June 1, 2012) (ECF No. 192).

169.   The proposed transactions include a "stalking horse bid" by Ally Financial of up to

$1.6 billion for a portfolio of mortgage loans and securities owned by the Debtors, a $150 million

secured loan to the Debtors under an amendment to a pre-petition secured loan agreement, and a

proposed settlement agreement between the Debtors and Ally Financial (the "Ally Settlement

Agreement").

170.   Under the Ally Settlement Agreement, Ally Financial would contribute $750 million

to the Debtors' estates in exchange for (i) releases by the estates of all legal claims that the Debtors

have against Ally Financial, and (ii) non-consensual releases by third party holders of legal claims

against Ally Financial. *See* Settlement and Plan Sponsor Agreement, *In re: Residential Capital* (filed

May 14, 2012) (ECF No. 6-8).

171.   Notably, the Debtor and third-party releases in the Ally Settlement Agreement would

release any and all "causes of action under theories of veil piercing and alter ego liability." In other

words, Ally Financial is seeking through the settlement to buy, for $750 million, peace from, *inter*

*alia*, any veil-piercing or alter-ego claims that may be alleged against Ally Financial by its own

subsidiaries, ResCap and GMACM, as well as by any third parties such as Plaintiffs herein.

172.   In 2011, ResCap appointed two new members to its board, Jonathan Bally and John

E. Mack, who purportedly investigated the legal claims that the Debtors may have against Ally

Financial. Based on the purported investigation, these supposedly independent directors negotiated

the Ally Settlement Agreement and the proposed releases.

173.   Additionally, the Debtors, which possess pertinent non-public facts regarding the

subjugation of the Debtors by Ally Financial, specifically aver in the Ally Settlement Agreement that

54

they "believe" that the Debtors possess valid "veil piercing and alter ego" claims against Ally

Financial. An introductory clause of the Ally Settlement Agreement states:

> the Debtors believe certain claims exist against Ally related to the
> corporate relationship between the Debtors and Ally, including with
> respect to certain transactions between the Debtors and Ally,
> including equitable subordination, debt recharacterization, fraudulent
> conveyance, avoidance liability under federal or state laws, *and other
> causes of action under theories of veil piercing and alter ego
> liability*.

*Id.* at 1 (emphasis added).

174.    The Unsecured Creditors also sought authorization to investigate a series of

suspicious related-party transactions that occurred prior to the bankruptcy filing. The Unsecured

Creditors allege that Ally Financial transferred billions of dollars of assets from the Debtors to Ally

Financial through such transactions. UCC Motion at ¶ 4, Ex. B at ¶ 29.

175.    On June 4, 2012, creditor Berkshire Hathaway, Inc. ("Berkshire Hathaway") moved

for appointment of a bankruptcy examiner to conduct the investigation proposed by the Unsecured

Creditors. *In re: Residential Capital* (ECF No. 208). According to Berkshire Hathaway, an

investigation was warranted in light of the "dozens of transactions with Ally and its affiliates

involving billions of dollars of asset transfers and intercompany financing – transactions whose net

effect was to transfer a substantial share of ResCap's operating assets to its parent." Berkshire

Hathway went on to state:

> The Debtors now seek to release Ally from any claims arising from
> these transactions, even while they admit that the Debtors possess
> valid claims against Ally, including for fraudulent transfer, equitable
> subordination, and alter ego. An examiner should determine whether
> this proposed release is fair to the Debtors and all their stakeholders.

55

An examiner should also be tasked with reviewing the propriety of the Debtors' request to release Ally from any third-party claims. As the Second Circuit and this Court have observed, such non-debtor releases are especially susceptible to abuse, as they effectively offer a non-debtor a bankruptcy discharge without affording creditors the protections that would attend a bankruptcy. If there is a basis for such an extraordinary remedy in this case, it is nowhere to be found in the pleadings the Debtors have filed to date. The Debtors' settlement agreement merely recites that Ally's third party release "is justified by truly unusual circumstances," none of which are identified, and that the release is an "essential component and important to the success of the Plan," for reasons that are neither explained nor evident.

What is evident—abundantly so—is that the Debtors' plan fits neatly into Ally's publicly-stated goal of separating itself, once and for all, from ResCap. Whether Ally's agenda also happens to be in the best interest of ResCap and its creditors is another question, one that should be a focus of a searching inquiry.

*     *     *

Ally has laid much of the blame for its financial difficulties on ResCap's mortgage operations and has publicly avowed its intention to make a clean break from ResCap and its liabilities.

That break, however, comes after years of related-party transactions and asset transfers. For example, the Rule 2004 Motion [filed by the Unsecured Creditors] identifies at least twenty different transactions with Ally and its affiliates involving the purchase of assets and businesses from ResCap, or the extension of credit secured by ResCap's assets. (Rule 2004 Mot., Ex. B, Definition of "Specified Transactions.") These transactions involved billions of dollars and sizable on-going businesses.

. . . . Th[ese] and other transactions may give rise to various potential claims that Ally and affiliates have harvested assets from ResCap and seek a quick and easy divorce through bankruptcy.

176.    On June 20, 2012, the Bankruptcy Court granted Berkshire Hathaway's motion and

appointed an examiner to conduct the investigation sought.

F.   Ally Financial's Domination Of ResCap And GMACM

177.   Ally Financial has recently admitted to the FRB and FDIC that it "owns and controls" ResCap and GMACM. *See* Consent Order.

178.   Ally Financial's public statements and actions demonstrate that at all relevant times Ally Financial: (i) wholly owned ResCap and GMACM; (ii) shared resources, management and employees with ResCap; (iii) considered its mortgage origination and servicing businesses through ResCap and GMACM to be "units" of Ally Financial; and (iv) had a business relationship with ResCap and GMACM designed to benefit itself at the expense of those subsidiaries.

179.   From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap and GMACM as extensions of itself, rather than as subsidiaries whose dealings were at arm's length.

180.   Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage securitization and servicing business, which was carried out by its subsidiaries. Ally Financial substantially restructured its subsidiaries in 2005.

181.   ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp. – two of Ally Financial's wholly-owned subsidiaries – were transferred to ResCap in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

182.   Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

57

183.    Further, Ally Financial's 8-K, filed on June 9, 2005, disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005 Operating Agreement").

184.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business. This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants.

185.    On December 1, 2006, Ally Financial had its inaugural conference call with investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations, "welcome[d] everyone] to the beginning of a new era [of Ally Financial] as an independent global financial services company." On the same investor call, Eric Feldstein, Ally Financial's then CEO, demonstrated how Ally Financial was going to take initial steps to actively control its subsidiaries. For instance, Feldstein declared that one of Ally Financial's first acts as controlling parent was "to integrate certain of GMAC mortgage operations . . . to drive some cost efficiencies." *Id.*

58

186.    At all times since Ally Financial caused ResCap to be incorporated, it has owned

100% of ResCap. Since incorporation, the ownership of ResCap has not changed. Statement by

Michael Carpenter, Ally Financial's CEO, Ally Financial Earnings Call, Nov. 2011.[2]

187.    Ally Financial has continued to exert its domination and control over ResCap via

shared resources, management and employees. For example, Ally Financial and ResCap shared at

least three common board members, including two individuals who were active participants with

respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's chairman

and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director of ResCap,

Sanjiv Khattri. In fact, the 2005 Operating Agreement, between ResCap and Ally Financial, which

Ally Financial filed with the SEC, and which upon information and belief is still currently in effect,

"require[s] that [ResCap's] board of directors include at least two independent directors, to be

selected by [Ally]." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005.

188.    Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors,

and also served as Chairman of ResCap's board of directors. Furthermore, Sanjiv Khattri has served

as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO

of ResCap. Numerous other individuals served as Directors and Officers of both Ally Financial and

ResCap, with many serving in roles directly related to the mortgage operations of both companies.

---

[2]    GM had created a shell company, GMAC Mortgage Group Inc., which was the direct
parent of ResCap. However, there is no indication that this company conducted any business
independent from Ally Financial. In fact, Ally Financial's first Annual Report as an independent
entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that
evidenced Ally Financial's corporate structure. There was a direct line from Ally Financial to
ResCap. *See* Ally Fin. Form 10-K, at 2 (Mar. 3, 2007). In addition, there is no indication that Ally
Financial ever discusses ResCap as an "indirect subsidiary." To the contrary, as discussed, below,
Ally has publicly stated on numerous occasions that it is the owner of ResCap.

189.    ResCap and its own subsidiaries, including GMACM, shared numerous directors and senior management as well.

190.    David C. Walker is another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including GMACM. Walker joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group. Walker has also served as a director at ResCap and GMACM, among other ResCap subsidiaries.

191.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release of Ally Financial's 2007 first quarter financial results to investors in an email bearing the ResCap logo. That announcement stated that Ally Financial's financial results were found on both Ally Financial's and ResCap's websites.

192.    Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006. Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a ResCap e-mail address, according to the complaint filed by FGIC against Ally Financial. Further, an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally Financial subsidiaries – including GMACM – should be sent not to the relevant (and supposedly independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel, according to the FGIC complaint.

193.    As further evidence of Ally Financial's domination over ResCap, the 2005 Operating Agreement also indicates that Ally Financial has expressly "restrict [ed] ResCap's ability to declare

dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates." *See
id.*

194.    Conversely, s alleged above, Ally Financial has also agreed to directly pay the losses
or expenses of ResCap. In the same 2005 Operating Agreement, Ally Financial stated that it would
stand behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any
losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its
subsidiaries." *Id.*

195.    Until ResCap filed for bankruptcy, Ally Financial continued to make additional public
statements that further demonstrated its willingness to support and fund ResCap. For instance, in
May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief
Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of
directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's]
earnings." Ally Financial's Q1 2007 Earnings Call at 24 (May 2, 2007).

196.    Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial]
did not hesitate to inject a billion dollars of equity when it was appropriate . . ." Ally Financial's Q2
2007 Earnings Call at 9 (July 30, 2007). Khattri unequivocally stated that "[a]ll I can assure you [is]
that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade
rating is a key part of our plan and a key part of our value creation." *Id.*

197.    Thus, Ally Financial's senior management assured the market that the company was
supporting ResCap for the purposes of Ally Financial's own "value creation."

198.    The financial support Ally Financial gave to ResCap began in May 2005. Upon
information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by

61

channeling capital and liquidity into ResCap even as its condition continued to deteriorate as the
housing market crashed. In addition to the direct financial support Ally Financial provided ResCap,
it was also instrumental in obtaining outside investments that flowed directly to its mortgage
subsidiaries. In 2008, Ally Financial announced to the market that it renewed a funding facility with
Citibank, which provided "funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008).
A portion of such funding was specifically earmarked for "mortgage assets across the [Ally
Financial] and [ResCap] businesses." *Id.*

199.    Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily
dependent on [Ally Financial] and its affiliates for funding and capital support." Ally. Fin. Inc.,
Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

200.    Additionally, Annual Reports prepared by Ally Financial further note its pursuit of
strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its
control over its subsidiaries to enhance its own financial health. According to Ally Financial: "On
December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy
[Ally's] current and future liquidity, we decided to pursue strategic alternatives with respect to
ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related
assets and businesses. . . . In order to maximize value, we will consider a variety of options
including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should
minimize the impact of any significant future losses related to ResCap's legacy mortgage
business . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

201.    There is also substantial evidence that billions of dollars of TARP funds meant to
stabilize Ally Financial were given to ResCap. *See* TARP Report dated March 10, 2010, at 41, 44.

62

Upon information and belief, the TARP funds were commingled among a variety of entities within Ally Financial's mortgage family, including ResCap.

202.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to account for the potentially significant liabilities stemming from repurchase demands made on its mortgage-related business units. The balance of the Mortgage Repurchase Reserve was $825 million as of the fourth quarter of 2011. *See* Ally Financial's Q4 2011 Earnings Presentation at 16. Although these repurchase demands are generally made on Ally Financial's subsidiaries – including GMACM – in discussing the reserve on an earnings call, Ally Financial CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage repurchase expense of $44 million." Ally Financial's Q4 2011 Earnings Call, at 4 (Feb. 2, 2012).

203.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally Financial's third quarter 2011 earnings call, Mackey further described losses attributable to mortgage loan repurchases as belonging to Ally Financial, when he stated: "Our mortgage repurchase reserve is [as it then stood] $829 million . . . . Our loss experience improved during the quarter due to the fact that we had fewer mortgage insurance rescission payments that we experienced last quarter and that did not repeat this quarter." Ally Financial's Q3 2011 Earnings Call at 6 (Nov. 2, 2011).

204.    On the same call, Ally Financial CEO Carpenter explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ." *Id.* at 8.

205.    Additionally, Ally Financial recorded a $230 million charge in the fourth quarter of 2011 as a result of the nationwide mortgage settlement that included ResCap and GMACM. *See* Ally Fin. Inc., Form 10-K, at 12 (Feb. 28, 2012).

### G.   Ally Financial's Disregard Of Corporate Formalities

206.   Ally Financial describes its subsidiaries as its own business units rather than separate and distinct entities. For example, Ally Financial declared, in a section of its website specifically intended for investors, that GMACM is a "business unit" of Ally Financial, rather than an indirect subsidiary owned by ResCap. See Ally Financial Website, Ally Home > About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited Dec. 9, 2011).

207.   The origination and securitization of mortgage loans by ResCap and GMACM have long been integral parts of Ally Financial's core business. In its 2006 Annual Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate finance company focused primarily on the residential real estate market. Our business activities include the origination, purchase, servicing, sale and securitization of residential mortgage loans." GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007). Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy." *Id.* at 5.

208.   Ally Financial continued to publicly report on its own business and that of its subsidiaries on an integrated basis: "We engage in the origination, purchase, servicing, sale, and securitization of consumer (*i.e.*, residential) mortgage loans and mortgage-related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank." Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010). More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States. We are one

of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

209.    Moreover, as alleged above, Ally Financial – at least in the view of certain of ResCap's creditors – is believed to have stripped assets from its subsidiary.

210.    In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM as part of its own business. For example, in its investor presentation from 2007, ResCap declared that GMACM is "owned and operated by GMAC Residential Capital Company, LLC [ResCap]." The presentation further stated that ResCap "is part of the [Ally Financial] family of companies."

211.    As alleged above, Ally Financial exerted its dominance and control over ResCap and GMACM. When Ally Financial was not directly controlling GMACM, it was using ResCap as an instrument to do so.

212.    Prior to ResCap's and GMACM's bankruptcy filing, Ally Financial also used those subsidiaries' resources as its own to earn favorable credit ratings. For instance, a Moody's report in November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is evident from that report that Ally Financial obtained such a rating by providing information related to its ResCap mortgage units. Ally Financial itself is not engaged in the origination business. Instead, it used its ResCap mortgage units as instruments to obtain favorable ratings.

213.    Such disregard for the corporate form has persisted over time. For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses – which include [GMACM], and HomeComings Financial Network – have been

65

integrated into" ResCap.   Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems."

214.   Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano served as an officer of Ally Financial as well as Chairman and CEO of ResCap. His responsibilities include overseeing the mortgage lending and servicing in ResCap. In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage." On December 23, 2011, Marano also signed a comment letter to the Federal Housing Financial Agency ("FHFA") on behalf of both Ally Financial and GMACM. Upon information and belief, Marano – in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap – directed and controlled the actions of GMACM.

215.   A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans. He was asked the following questions at his deposition:

> Q: Could you please state your name for the record.
>
> A: My name is Jeffrey Stephan.
>
> Q: Okay. And who do you work for?
>
> A: GMAC, LLC [Ally Financial].
>
> Q: And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?

66

A: GMAC, LLC - I'm trying to think of the word to use - the most recent name.

Q: Okay.

A: It's GMCA [sic] Mortgage Corporation.

Q: Okay.

A: I'm not sure how you would word that.

Q: Okay. So are they -- does GMAC, LLC -- now has that basically taken over these other entities --

A: Yes.

Q: -- that formerly existed?

A: Yes.

Q: So these entities no longer currently exist?

A: Right.

Q: Okay. And how long then have you been employed by GMAC, LLC?

A: Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, No. 50 2008 CA 040805, (15th Cir.,

Dec. 10, 2009), at 4:25-5:22.

**H.    Ally Financial's Responsibility For Controlling GMACM's Servicing Practices**

216.    As alleged above, Ally Financial, ResCap, and GMACM entered into a Consent

Order with the FRB and FDIC on April 13, 2011. The Consent Order was entered because Ally

Financial, ResCap, and GMACM were accused of a series of foreclosure-related abuses, including:

(i) failing to properly increase financial, staffing, and managerial resources to meet an increasing

67

number of foreclosures; (ii) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (iii) filing false affidavits in foreclosure actions; and (iv) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

217.    The Consent ordered required Ally Financial, ResCap, and GMACM to adopt new servicing procedures and practices. Ally Financial is obligated to make sure that ResCap and GMACM take certain remedial actions to operate in a "safe and sound manner and in compliance with the terms of mortgage loan documentation and related agreements with borrowers, all applicable state and federal laws . . . rules, regulations, and court orders, as well as . . . servicing guides with GSEs or investors, and other contractual obligations, including those with the Federal Housing Administration."

218.    Specifically, the Consent Order required Ally Financial to improve its compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight. Ally Financial was also required to strengthen its "Enterprise Compliance Program" or "ECP" with respect to "residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." Additionally, Ally Financial was required to implement a "Program for Board Oversight" by the Ally Financial and ResCap boards of directors.

219.    Ally Financial, ResCap, and GMACM filed a series of reports with the FRB and FDIC from July 13, 2011 through December 14, 2011, detailing their progress in implementing the terms of the Consent Order. Notably, despite their ostensible separateness, Ally Financial, ResCap,

68

and GMACM submitted joint reports that bore the Ally Financial letterhead. The entities explained the joint submissions to the FRB and FDIC on the grounds that:

> the Companies believe enterprise risk management is a holistic and continuous process involving governance, policies, procedures, tools, methodologies and resources that ***transcend legal entity and organizational boundaries.***

220.    As alleged above, the Consent Order requires GMACM to pay for independent foreclosure reviews, and to compensate borrowers for any financial injuries discovered.

221.    On April 26, 2012, in view of ResCap's impending bankruptcy, Ally Financial entered into a supplemental agreement with the FRB regarding the Consent Order. Ally Financial agreed to be "secondarily liable" for GMACM's obligations to compensate injured borrowers and to pay for the reviews. Additionally, Ally Financial agreed to use "all reasonable best efforts" to ensure ResCap's continued performance under the Consent Order, notwithstanding ResCap's bankruptcy, by seeking to require any successor or purchaser of ResCap to honor the Consent Order's terms.

222.    As also alleged above, Ally Financial, ResCap, and GMACM each participated in the $25 billion nationwide mortgage settlement. The settlement resolved claims in a complaint filed by 49 state attorneys general against Ally Financial, ResCap, and GMACM jointly. Ally Financial, ResCap, and GMACM each executed the Consent Judgment filed with the U.S. District Court for the District of Columbia on March 12, 2012.

223.    The $25 billion settlement mandates "comprehensive reform of mortgage servicing practices," for which Ally Financial, ResCap, and GMACM, as signatories to the Consent Judgment, are jointly responsible.

69

## IX.    TOLLING OF THE STATUTES OF LIMITATIONS

224.    The claims of Plaintiffs and the Class are subject to both equitable estoppel, stemming

from the concealment by GMACM and Defendants of the facts alleged herein, and equitable tolling,

stemming from the Plaintiffs' inability to obtain adequate information to plead the claims alleged

herein. Defendants are estopped from relying on a statute of limitations defense because they and

GMACM purposefully concealed the misconduct alleged. At all relevant times Defendants and

GMACM maintained a shroud of secrecy around their illicit dealings. Separate and apart from the

acts of concealment of GMACM and the Balboa Defendants, any applicable statutes of limitations

are properly tolled because Plaintiffs and the Class did not know, and could not have learned, the

facts underlying their claims until shortly before filing this complaint.

225.    Furthermore, at all relevant times Plaintiffs and the Class were relieved of any duty

to investigate because they reasonably and justifiably relied on GMACM to fulfill its contractual

duties under the mortgage loan contracts of Plaintiffs and the Class in good faith, and to similarly

execute its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good

faith and in an honest manner. Even assuming there had been some indication of wrongdoing (which

there was not), and Plaintiffs and the Class had attempted to investigate, such investigation would

have been futile because it would not, until recently, have been possible to uncover any specific

information as to GMACM's involvement in the unlawful kickback scheme alleged herein.

226.    Due to the complex, undisclosed and self-concealing nature of the scheme alleged

herein, neither Plaintiffs, nor any other member of the putative Class whose claims would otherwise

be time-barred, possessed or could have possessed sufficient information or the requisite expertise

to discover the misconduct alleged. Plaintiffs were able to discover the underlying basis for their claims only with the assistance of counsel.

227.    Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis. Nevertheless, the news coverage has generally related to improper foreclosure practices. It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of LPI business.

228.    The first time *The New York Times* published a news article about such kickbacks was on January 10, 2012. *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of the NYSDFS, was investigating several large banks in connection with improper practices relating to LPI, including "kickbacks." *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

229.    Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to LPI to have put Plaintiffs or the Class on inquiry notice of Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

230.    Furthermore, even had Plaintiffs or members of the Class been on inquiry notice of misconduct relating to LPI in the mortgage servicing industry prior to January 10, 2012, despite

71

diligent investigation they would have had no specific factual basis to allege – or even suspect – that

GMACM was involved in any misconduct until, at the earliest, May 21, 2012, when, as alleged

above, GMACM and Balboa admitted at the NYSDFS's LPI hearings to GMACM's receipt of free

tracking services, paid for indirectly through GMACM's LPI premiums. Prior to May 21, 2012,

there was simply no publicly available information that even a highly skilled investigator could have

uncovered linking GMACM to potential kickbacks relating to LPI. Prior to such time, Plaintiffs and

the Class did not have an adequate factual basis to plead the claims alleged herein.

231.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the

exercise of reasonable diligence, Plaintiffs and the Class could not have known of the violations

alleged herein until, at the earliest, May 21, 2012. Furthermore, any delay by Plaintiffs and the Class

in asserting the claims herein was excusable because they could not reasonably have discovered the

misconduct alleged herein absent specialized knowledge and/or assistance of counsel.

## X.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
#### (Against all Defendants)

232.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

233.    Plaintiffs, each Class member, each Defendant, and GMACM, are "persons," as that

term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

234.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term

is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants and GMACM,

including their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

235.    The Enterprise was primarily managed by GMACM, which organized the fraudulent scheme and procured the involvement of the Defendants. The Defendants carried out their parts of the scheme under the direction of GMACM.

236.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for LPI with respect to GMACM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, fraudulent overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GMACM and directly and/or indirectly to the Defendants.

237.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants and GMACM engage.

### The Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

238.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants and GMACM conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint. The RICO Defendants and GMACM have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.   GMACM enters into servicing agreements with owners and/or holders of whole loans. The servicing agreements provide, *inter alia*, that GMACM is obligated to maintain continuous hazard insurance on the secured properties.

b.   GMACM buys LPI with respect to the loans it services from Balboa and Meritplan. GMACM pays insurance premiums to Balboa and Meritplan for the LPI.

c.   GMACM hires Newport, an affiliate of Balboa and Meritplan, as a subcontractor to perform GMACM's "insurance tracking" responsibilities.

d.   GMACM and the Balba Defendants conceal the fact from the public, borrowers, and loan owners, that GMACM pays Newport nothing for its insurance tracking services.

e.   Balboa and Meritplan pay rebates/kickbacks to GMACM.

f.   The money to pay the rebates/kickbacks is derived from GMACM's LPI insurance premiums. The amount of the rebates/kickbacks is computed as a percentage of GMACM's LPI insurance premiums.

g.   The rebates/kickbacks are paid in the form of free tracking services and bogus "commissions."

h.   The free tracking services are provided through Newport. GMACM pays nothing for Newport's insurance tracking services. Instead, Balboa and Meritplan pay Newport on GMACM's behalf. The money is routed from Balboa and Meritplan to Newport via "intercompany expense allocations."

i.   The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, John Doe. The "commission" payments are made on the false pretense that John Doe is a third-party insurance agent. Balboa and Meritplan falsely label the payments to John Doe as "commissions."

j.   John Doe receives the "commissions" on GMACM's behalf and then transfers them to GMACM. Ally Financial – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash management system."

k.   As a *quid pro quo* for the rebates/kickbacks, GMACM continues to procure LPI from Balboa and Meritplan and continues to outsource insurance tracking to Meritplan.

74

l.      GMACM retains the rebates/kickbacks for itself, while billing borrowers based on the full purported price of the LPI. The rebates/kickbacks reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Borrowers are forced to pay the full purported price of the LPI.

m.      Because amounts paid for LPI constitute "servicing advances," GMACM's "servicing advances" are improperly inflated by the failure to pass through the rebates/kickbacks to borrowers. GMACM reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

n.      As GMACM's insurance tracking subcontractor, Newport issues notices to borrowers fraudulently setting forth the balances owed for LPI based on the full prices of the LPI premiums without subtracting the rebates/kickbacks. Additionally, the notices falsely describe the balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for moneys actually "advanced." In fact, the costs of the coverage are less than the stated balances because the rebates/kickbacks reduced those costs. Moreover, GMACM "advanced" less than the stated balances, taking into account the rebates/kickbacks.    Furthermore, under borrowers' loan agreements, GMACM is only entitled to "reimbursement" for its true LPI costs.

o.      GMACM issues monthly servicing reports and annual certifications of compliance to loan owners that include information about GMACM's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for GMACM's advances and reimbursements based on the full prices of the LPI without subtracting the rebates/kickbacks. The reports and certifications also fraudulently exclude the compensation that GMACM derives from the kickbacks/rebates, which are not disclosed in the reports and certifications.    Moreover, the reports and certifications fraudulently conceal that Newport is not compensated by GMACM "from [GMACM's] own funds" but, instead, through the LPI insurance premiums, despite the fact that GMACM is thereby breaching its agreements with loan owners. The reports and certifications also omit disclosure that GMACM breached borrowers' mortgage loan agreements by billing them for LPI in amounts in excess of GMACM's actual costs.

239.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Defendants and GMACM engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by GMACM

and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

240.    The conduct of Defendants and GMACM included, without limitation, a fraudulent scheme to deprive the loan owners of their intangible rights to GMACM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. As alleged above, GMACM owed a contractual obligation to render residential mortgage loan servicing duties to the loan owners. GMACM owed a duty to render those services in an honest manner. Nevertheless, GMACM misused its position to extract bribes and kickbacks from the Balboa Defendants at the expense of the loan owners. GMACM thereby breached its obligations to render "honest services." Each of the Defendants intentionally and wilfully conspired and participated in GMACM's "honest services" violations. Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

241.    The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of the Defendants and GMACM in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

242.    It was reasonably foreseeable to Defendants and GMACM that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

243.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants and GMACM. Nevertheless, Plaintiffs can allege such transmissions generally.

76

244.   For the purpose of furthering and executing the scheme, Defendants and GMACM

regularly transmitted and caused to be transmitted by means of wire communication in interstate

commerce writings, electronic data and funds, and also regularly caused matters and things to be

placed in post offices or authorized depositories, or deposited or caused to be deposited matters or

things to be sent or delivered by a private or commercial interstate carrier.  For example:

   a.   As GMACM's insurance tracking subcontractor, Newport issued materially
        false and misleading notices relating to LPI to borrowers via mail;

   b.   Newport also communicated to borrowers with respect to LPI issues by
        telephone;

   c.   GMACM issued monthly statements incorporating the falsely overstated LPI
        charges to borrowers via mail and/or wire;

   d.   GMACM issued materially false and misleading monthly servicing reports
        and annual certifications of compliance to loan owners via the mail and/or
        electronically via wire;

   e.   Newport and/or GMACM received LPI payments from borrowers via mail
        and/or wire;

   f.   GMACM transmitted LPI premiums to Balboa and Meritplan via mail and/or
        wire;

   g.   Balboa and Meritplan transmitted money to Newport via "intercompany
        expense allocations" consummated via wire;

   h.   Balboa and Mertiplan transmitted funds to John Doe reflecting purported
        "commissions" via mail and/or wire; and.

   i.   Ally Financial transferred funds representing "commissions" from John Doe
        to GMACM through its "global cash management system" via wire.

245.   As to Plaintiffs, Defendants and GMACM utilized the mails and/or wires in the

following instances, among others, for the purpose of furthering and executing the scheme:  Newport

issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on

77

December 12, 2010. Newport issued a Notice of Placement to the Davidsons on August 2, 2009, and to Kobryn on May 13, 2012. Each of the Plaintiffs also received monthly billing statements from GMACM incorporating the LPI overcharges. Additionally, each of the Plaintiffs communicated by telephone with Newport regarding LPI, including, among others, January 24, 2012, when Rothstein called Newport regarding LPI charges on his monthly statements.

246.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants and GMACM. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants and GMACM engaged in similar activities with respect to each member of the Class and with respect to the owners of the loans of each member of the Class.

247.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

248.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

249.    Defendants and GMACM each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with LPI.

250.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur

the falsely inflated, unauthorized charges with respect to LIP and thereby enable Defendants and GMACM to reap illicit profits.

251.    Defendants and GMACM were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

### Injury to Plaintiffs and the Class

252.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants and GMACM, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs and the Class paid falsely inflated, unauthorized LPI charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged. Moreover, the overcharging of Plaintiffs and the Class for LPI was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that GMACM was entitled to recoup "off the top" from the proceeds of the loans.

253.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

254.    Ally Financial is directly liable for its role in the scheme. Ally Financial helped devise the scheme and participates in the scheme by transferring funds representing "commissions" from John Doe to GMACM through Ally Financial's "global cash management system." In addition, Ally Financial is vicariously liable for GMACM's violations by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

79

255.    Ally Bank is also vicariously liable for GMACM's violations. As alleged above, Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM pursuant to a series of servicing agreements since at least 2003. Ally Bank is liable as principal for the misconduct of GMACM, Ally Bank's agent. In committing the violations alleged herein, GMACM was acting within the scope of duties delegated to it by Ally Bank.

### COUNT II

## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

256.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

257.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

258.    The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

259.    As set forth in Count I, above, at all relevant times, Plaintiffs and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

260.    As also set forth in Count I, above, at all relevant times, the Defendants and GMACM were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

261.    The Defendants and GMACM formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to LPI. The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to LPI.

80

262.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

263.    As set forth in Count I, above, Defendants and GMACM conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

264.    The Defendants and GMACM were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

265.    The Defendants and GMACM committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

266.    As a direct and proximate result of the overt acts and predicate acts of Defendants and GMACM in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial. Such injuries include, but are not limited to, fraudulently inflated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

267.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

81

268.    Ally Financial, in addition to being directly liable for its role in conspiring in the scheme, is vicariously liable for GMACM's acts of conspiracy because, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

269.    Ally Bank is also vicariously liable as principal for GMACM's acts of conspiracy. As alleged above, in engaging in such acts, GMACM was acting within the scope of its duties as an agent of Ally Bank.

## COUNT III

### VIOLATION OF RESPA, 12 U.S.C. § 2607(a)
### (Against all Defendants)

270.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

271.    Plaintiffs' loans and those of the members of the Class are "federally related" mortgage loans within the meaning of RESPA.

272.    Throughout the Class Period, Defendants provided "settlement services" with respect to "federally-related mortgage loans," as such terms are defined by RESPA, 12 U.S.C. §§ 2602(1) and (3).

273.    Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from giving or accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, for the referral of any business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

82

274.    HUD, in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b).

275.    Also in regulations relating to RESPA, HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" – a definition that specifically includes the "provision of services involving hazard, flood, or other casualty insurance." 24 C.F.R. § 3500.2(b)(11).

276.    The provision of LPI constitutes a "settlement service" under RESPA.  At a minimum, the provision of LPI constitutes business "incident to," if not "a part of," a real estate settlement service under 12 U.S.C. § 2607.

277.    The Balboa Defendants unlawfully gave and GMACM unlawfully received "kickbacks" within the meaning of RESPA, 12 U.S.C. § 2602(2), in connection with the referral of LPI business.  As alleged above, the kickbacks were paid in the form of free tracking services and bogus "commissions."

278.    Such payments constituted fees, kickbacks or things of value pursuant to an agreement that LPI business would be referred to Balboa and Meritplan.  Such practices violated RESPA, 12 U.S.C. § 2607(a).

279.    Plaintiffs and the Class were actually harmed by the unlawful scheme of Defendants and GMACM.

280.    Defendants therefore violated Section 8(a) of RESPA.  Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal

to three times the amounts they have paid or will have paid with respect to LPI as of the date of judgment.

281.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit on behalf of themselves and the Class.

282.    Ally Financial is vicariously liable for GMACM's violations of RESPA by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

283.    Ally Bank is vicariously liable as principal for GMACM's violations of RESPA. As alleged above, in engaging in such violations, GMACM was acting within the scope of its duties as an agent of Ally Bank.

## COUNT IV

## BREACH OF CONTRACT
### (Against Ally Financial and Ally Bank)

284.    Plaintiffs repeat and reallege each and every paragraph as if fully set forth herein.

285.    Pursuant to its servicing agreements with loan owners, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, pursuant to the servicing agreements, GMACM is the agent of the owners of the loans of Plaintiffs and the Class. As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

286.    At no time did GMACM acquire, or could GMACM have acquired, any rights with respect to the loans of Plaintiffs and the Class other than those set forth in the mortgage loan agreements.

287.    The mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance. The mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property. Nothing authorizes the lender to charge any amount in excess of the lender's cost. Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

288.    GMACM breaches the mortgage loan agreements of Plaintiffs and the Class by charging borrowers amounts in excess of GMACM's LPI cost with respect to the borrower's property. The rebates/kickbacks that GMACM receives reduce such costs. Nevertheless, GMACM charges borrowers based on the full purported price. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks breaches the terms of the mortgage loan agreements.

289.    As a direct, proximate, and legal result of the foregoing, Plaintiffs and the Class have suffered damages.

290.    Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

85

291.    Ally Bank is vicariously liable for GMACM's breaches of contract as GMACM's principal. In engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank.

292.    Additionally, Ally Bank is directly liable for the breaches of contract. As alleged above, Ally Bank owns loans serviced by GMACM. The interposition of GMACM does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

### COUNT V

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Ally Financial and Ally Bank)

293.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

294.    As alleged above, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, GMACM is the agent of the owners of the loans of Plaintiffs and the Class. As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

295.    Every contract, including the mortgage loan contracts of Plaintiffs and the Class, contains an implied covenant of good faith and fair dealing.

296.    Pursuant to the implied covenant of good faith and fair dealing, GMACM was obligated to perform its duties under the mortgage loan agreements in good faith and to deal fairly with Plaintiffs and the Class.

297.    As alleged above, the mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance. The

86

mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property. Nothing authorizes the lender to charge any amount in excess of the lender's cost. Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

298. GMACM breached its duty of good faith and fair dealing by charging borrowers amounts in excess of GMACM's LPI costs. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks constituted bad faith conduct toward Plaintiffs and the Class. GMACM thereby dealt with Plaintiffs and the Class unfairly, and contravened the reasonable expectations of Plaintiffs and the Class.

299. As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

300. Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

301. Ally Bank is vicariously liable for GMACM's breaches of contract as GMACM's principal. In engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank.

302. Additionally, Ally Bank is directly liable for the breaches of contract. As alleged above, Ally Bank owns loans serviced by GMACM. The interposition of GMACM does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

## COUNT VI

## COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against Ally Financial and Ally Bank)

303.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

304.    Plaintiffs and the Class have conferred a substantial benefit on GMACM derived from improper and unauthorized charges with respect to LPI. These benefits came at the expense of Plaintiffs and the Class.

305.    The circumstances are such that in equity and good conscience restitution should be made by GMACM to Plaintiffs and the Class.

306.    As a result of GMACM's unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial. Plaintiffs and the Class seek full disgorgement and restitution of GMACM's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

307.    Plaintiffs and the Class are entitled to restitution and/or disgorgement of profits realized by GMACM as a result of its unfair, unlawful and/or deceptive practices.

308.    Ally Financial is vicariously liable for GMACM's unjust enrichment by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

309.    Ally Bank is vicariously liable as principal for GMACM's unjust enrichment. As alleged above, in engaging in such violations, GMACM was acting within the scope of its duties as an agent of Ally Bank.

## COUNT VII

## BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION
## OF FUNDS HELD IN TRUST
### (Against Ally Financial and Ally Bank)

310.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

311.    The mortgage agreements of Plaintiffs and the Class contains standard escrow provisions, which are typical of other mortgages serviced by GMACM.

312.    The mortgage agreements of Plaintiffs and the Class provide that borrowers shall make monthly payments for "premiums for any and all insurance required by Lender," including LPI.

313.    The mortgage agreements of Plaintiffs and the Class further provides that any excess escrow funds are to be returned to Plaintiffs.

314.    GMACM accepts monies from Plaintiffs and the members of the Class for insurance on a monthly basis and holds such funds in escrow.

315.    GMACM is obligated to hold escrowed funds in trust. GMACM owes Plaintiffs and the Class a fiduciary duty with respect to the handling of escrowed funds.

316.    GMACM breached its fiduciary duty to Plaintiffs and the Class by: (i) demanding excessive escrow payments for LPI; (ii) collecting and holding excessive funds in escrow, in amounts greater than necessary to pay for the true cost of LPI; (iii) failing to properly account to Plaintiffs and the Class for such excess funds; and (iv) engaging in self-dealing through the diversion of rebates/kickbacks to its own pockets as alleged above.

317.    These actions were undertaken by GMACM in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Class members.

318.    As a direct result of GMACM's actions and subversion of the interests of Plaintiffs and the Class to GMACM's own interest, Plaintiffs and the Class have suffered injury in the form of unauthorized escrow charges and a loss of funds from their escrow accounts.

319.    Plaintiffs and the Class are entitled to damages for GMACM's beach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiffs and the Class are entitled to punitive damages because GMACM acted in bad faith in deliberate and/or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

320.    Ally Financial is vicariously liable for GMACM's breach of fiduciary duty by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

321.    Ally Bank is vicariously liable as principal for GMACM's breach of fiduciary duty. As alleged above, in engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

c.    For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' practices, along with exemplary damages to each Class member for each violation;

90

d.  For judgment for Plaintiffs and the Class on their RICO claims and RESPA claims, in an amount to be proven at trial, for three times the amount of the LPI charges imposed on Plaintiffs and the Class;

e.  For restitution of an amount equal to all improperly collected LPI charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the Class;

f.  For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.  For an order awarding Plaintiffs and the Class their attorneys' fees and costs; and

h.  Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of the claims alleged herein.

Dated: September 28, 2012

**KIRBY McINERNEY LLP**

By: _____

Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel: (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*

91

# EXHIBIT D

Claim #4074  Date Filed: 11/9/2012

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: **GMAC Mortgage, LLC, Case No. 12-12032**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):

See attached schedule A.

❏ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

Mark Strauss
Kirby McInerney LLP
825 Third Avenue, 16th Floor
New York, NY 10022

**Court Claim Number:**_____
*(If known)*

Filed on:_____

Telephone number: 212-371-6600        email: mstrauss@kmllp.com

Name and address where payment should be sent (if different from above):

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:        email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

1. Amount of Claim as of Date Case Filed: $ **1,000,000,000**

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim:  See attached class action complaints.
    (See instruction #2)

❏ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

3. Last four digits of any number by which creditor identifies debtor:
_____ ___ ___ ___

3a. Debtor may have scheduled account as:
_____ (See instruction #3a)

3b. Uniform Claim Identifier (optional):
_____ (See instruction #3b)

❏ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ❏ Real Estate ❏ Motor Vehicle ❏ Other
Describe:

Value of Property: $_____   Annual Interest Rate_____ % ❏ Fixed ❏ Variable
                                                                     (when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $_____        Basis for perfection: _____

Amount of Secured Claim: $_____       Amount Unsecured: $_____

❏ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

❏ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
    $_____ (See instruction #6)

❏ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

$_____

8. Documents: Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

9. Signature: (See instruction #9) Check the appropriate box.
❏ I am the creditor.   ■ I am the creditor's authorized agent.   ❏ I am the trustee, or the debtor, or   ❏ I am a guarantor, surety,
                          (Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
                                                                      (See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.

Print Name:  Mark Strauss
Title:  Attorney
Company:  Kirby McInerney LLP
Address and telephone number (if different from notice address above):

*(Signature)*    11/9/12 *(Date)*

**RECEIVED**

NOV 0 9 2012

KURTZMAN CARSON CONSULTANTS

COURT USE ONLY

Telephone number:        Email:

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U

121203212110900000000000025

# Schedule A

Name of Creditor (the person or other entity to whom the debtor owes money or property):

Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn, individually and on behalf of a putative class consisting of all residential mortgage loan borrowers who have been charged for lender-placed insurance in connection with loans serviced by GMAC Mortgage, LLC at any time from March 6, 2003 to the present.

JUDGE NATHAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

12 CV 3412

| | |
|---|---|
| **LANDON ROTHSTEIN**, individually and on behalf of all others similarly situated, | Civil Action No.: _____ |
| Plaintiff, | RECEIVED |
| v. | APR 30 2012 |
| **GMAC MORTGAGE, LLC f/k/a GMAC MORTGAGE CORPORATION, GMAC INSURANCE MARKETING, INC. d/b/a GMAC AGENCY MARKETING, BALBOA INSURANCE COMPANY, MERITPLAN INSURANCE COMPANY,** and **JOHN DOES 1-20.** | U.S.D.C. S.D. N.Y. CASHIERS |
| | **CLASS ACTION COMPLAINT** |
| | **Jury Trial Demanded** |
| Defendants. | |

Plaintiff Landon Rothstein ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys. Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## NATURE OF ACTION

1.      Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO") and applicable state law on behalf of himself and a nationwide putative class (the "Class"), as more specifically defined below, consisting of all residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by defendant GMAC Mortgage, Inc. f/k/a GMAC

Mortgage Corporation (hereinafter "GM") at any time from March 6, 2003 to the present (the "Class Period").

2.      To protect the lenders' interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be reimbursed by the borrower for the cost. GM, a servicer of mortgage loans, procures force-placed insurance coverage with respect to the loans in its servicing portfolio from defendant Balboa Insurance Company ("Balboa").

3.      This case is brought because, at all relevant times, GM has extracted kickbacks from Balboa which have artificially inflated the force-placed insurance premiums that GM has paid. This has enabled GM to demand inflated reimbursements from borrowers.

4.      Specifically, beginning in or about March 2003, GM, as a *quid pro quo* for awarding Balboa its force-placed insurance business, has required Balboa to pay GM kickbacks. These kickbacks have been in the form of bogus "commissions" paid to a GM affiliate, "GMAC Agency Marketing," an unincorporated division and/or fictitious "doing business as" name of defendant GMAC Insurance Marketing, Inc. ("GI"). Balboa agreed to label these payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as bribes or kickbacks.

5.      This kickback scheme has improperly inflated the reimbursements demanded from borrowers with respect to force-placed insurance on GM-serviced loans because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. The amounts of the kickbacks have then been repaid by Balboa to GM and/or GI in round-trip

2

transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium minus the kickback – represents the true or actual price or cost of the insurance.

6.      This scheme has robbed not only borrowers, but also the owners of the loans being serviced by GM. All servicing agreements entitle servicers such as GM to recoup any advances they incur from loan proceeds "off the top" before any money is passed through to the owners of the loans. Premiums on force-placed insurance constitute reimbursable servicing advances under all such agreements.

7.      At all relevant times, GM in its capacity as loan servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs but instead on the artificially inflated, fraudulently grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances before passing money through to the owners of the loans, has not netted out the amounts of the kickbacks that it has received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of the loans have borne those fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM as a result of the scheme alleged herein have come from the pockets of the pension funds that invest in the mortgages in GM's servicing portfolio and – in the case of loans in the portfolio owned

3

by the Federal National Mortgage Association ("Fannie Mae") and other Government Sponsored

Enterprises ("GSEs") – from the pockets of United States taxpayers.

## JURISDICTION AND VENUE

8.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1367(a). This Court also has jurisdiction over the subject matter of this action pursuant

to 18 U.S.C. § 1964(c).

9.       Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to

institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or

transacts her affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is

subject to service in a particular district, additional parties residing in other districts may be brought

before the forum court, in the court's discretion, to the extent that "the ends of justice so require."

18 U.S.C. § 1965(b).

10.      Additionally, this Court also has personal jurisdiction over the defendants because

each systematically and continually conducts business throughout the State of New York.

11.      This Court also has original diversity jurisdiction pursuant to the Class Action

Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiff is a citizen of the State of Texas.

Defendants are citizens of different states. The amount in controversy exceeds $5,000,000, and there

are more than 100 members in the Class.

12.      This Court also has supplemental jurisdiction over Plaintiff's state law claims

pursuant to 28 U.S.C. § 1367(a).

13.      Venue is proper in this district under 28 U.S.C. § 1391(b), and 18 U.S.C. §§ 1965(b)

and (d). Defendants regularly conduct business in this District.

4

## PARTIES

14.    Plaintiff Landon Rothstein is a resident of Humble, Texas. Plaintiff has a mortgage loan serviced by GM on a property located at 97 County Road 3701, Splendora, Texas. Plaintiff was charged $105.00 by GM purportedly to reimburse it for the cost of force-placed hazard insurance with respect to the period October 6, 2010 to January 4, 2011. The force-placed coverage was obtained by GM from defendant Balboa through its wholly-owned subsidiary defendant Meritplan Insurance Company.

15.    Defendant GMAC Mortgage, LLC f/k/a GMAC Mortgage Corporation ("GM"), is a direct or indirect subsidiary of Residential Capital, LLC, which in turn is a direct or indirect subsidiary of bank holding company Ally Financial Inc. f/k/a GMAC, Inc. ("Ally Financial"). GM is a Delaware limited liability company headquartered in Fort Washington, Pennsylvania. GM is a financial services company that engages in the servicing of residential mortgage loans.

16.    Defendant GMAC Insurance Marketing, Inc. d/b/a GMAC Agency Marketing ("GI") is a Missouri corporation and a wholly owned indirect subsidiary of Ally Financial. GI is believed to have offices located at 59 Maiden Lane, 23rd Floor, New York, New York 10038.

17.    Defendants GM and GI are referred to collectively herein as the "GMAC Defendants."

18.    Defendants John Does 1-10 are direct or indirect subsidiaries and/or affiliates of Ally Financial which have at any time during the Class Period received payments from defendant Balboa in connection with residential force-placed insurance, regardless of how those payments have been characterized, whether as purported "commissions," reinsurance premiums or otherwise.

5

19.    Defendant Balboa Insurance Company ("Balboa") is a California corporation headquartered in Irvine, California. Balboa is a member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011, at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa maintains relationships with numerous lenders and provides both insurance tracking services and force-placed insurance policies nationwide directly and/or indirectly through its wholly-owned subsidiaries, including defendant Meritplan.

20.    Defendant Meritplan Insurance Company ("Meritplan") is a California corporation headquartered in Irvine, California. Meritplan is a wholly-owned subsidiary of Balboa. Meritplan is a provider of lender-placed insurance to financial institutions nationwide.

21.    Defendants John Does 11-20 are direct or indirect subsidiaries and/or affiliates of Balboa which have at any time during the Class Period provided force-placed insurance coverage in connection with residential mortgages serviced by GM.

22.    Defendants Balboa and Meritplan are referred to collectively herein as the "Balboa Defendants."

23.    GM, GI, Balboa, and Meritplan are referred to collectively herein as "Defendants."

## CLASS ACTION ALLEGATIONS

24.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and (b)(3) on behalf of himself and a nationwide Class consisting of:

> All residential mortgage borrowers who have been charged costs associated with force-placed hazard insurance in connection with loans serviced by GM at any time from March 6, 2003 to the present.

25.    The Class excludes Defendants and any entity in which any defendant has a controlling interest, and their officers, directors, legal representatives, successors and assigns.

6

26.    The Class is so numerous that joinder of all members is impracticable.

27.    A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

28.    Plaintiff's claims are typical of the claims of the Class.

29.    There are questions of law and fact common to the Class, including but not limited to:

a.    Whether Defendants engaged in a kickback scheme relating to force-placed insurance;

b.    Whether GM and/or GI extracted kickbacks from the Balboa Defendants;

c.    Whether Defendants' kickback scheme constituted mail or wire fraud;

d.    Whether GM violated the covenants of good faith and fair dealing implied in the mortgage agreements of Plaintiff and the Class;

e.    Whether GM breached the terms of the mortgage loan agreements of Plaintiff and the Class;

f.    Whether Defendants have been unjustly enriched;

g.    Whether Defendants are liable to Plaintiff and the Class for damages and, if so, the measure of such damages.

30.    These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

31.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has no claims antagonistic to those of the Class. Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation. Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

7

32.    Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of

separate actions by or against individual members of the Class would create a risk of inconsistent

or varying adjudications with respect to individual members of the Class, which would establish

incompatible standards of conduct for Defendants.

33.    Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution

of separate actions by or against individual members of the Class would create a risk of adjudications

with respect to individual members of the Class which would, as a practical matter, be dispositive

of the interests of the other members not parties to the adjudications or substantially impair or

impede their ability to protect their interests.

34.    Class action status is also warranted under Rule 23(b)(2) because Defendants have

acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final

injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

35.    Class action status is also warranted under Rule 23(b)(3) because questions of law

or fact common to the members of the Class predominate over any questions affecting only

individual members, and a class action is superior to other available methods for the fair and efficient

adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**Background on Force-Placed Insurance,
Securitization and Servicing**

36.    To protect the lender's interest in secured property, mortgage loan contracts require

the borrower to maintain specified levels of hazard insurance.  If the borrower's coverage lapses or

8

is not obtained, the lender is entitled to purchase coverage for the home, "force place" it, and be

reimbursed by the borrower for the cost.

37.    Force-placed insurance policies generally are substantially more costly than borrower-

purchased policies, while providing less coverage. Additionally, force-placed insurance policies are

purchased by the lender and are for the lender. The lender is the sole insured and the only loss payee.

In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The

borrower's only involvement with force-placed insurance coverage is that the borrower is obligated,

by virtue of the mortgage loan agreement, to reimburse the lender for the cost. This obligation is,

in fact, secured by the lender's lien on the property.

38.    Plaintiff's mortgage loan contract is typical. Section 5 thereof provides, in pertinent

part:

> Property Insurance.  Borrower shall keep the improvements now
> existing or hereafter erected on the Property insured against loss by
> fire, hazards included within the term "extended coverage," and any
> other hazards including, but not limited to, earthquakes and floods,
> for which Lender requires insurance. This insurance shall be
> maintained in the amounts (including deductible levels) and for the
> periods that Lender requires. What Lender requires pursuant to the
> preceding sentences can change during the term of the Loan. The
> insurance carrier providing the insurance shall be chosen by Borrower
> subject to Lender's right to disapprove Borrower's choice, which
> right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above,
> Lender may obtain insurance coverage, at Lender's option and
> Borrower's expense.* Lender is under no obligation to purchase any
> particular type or amount of coverage. Therefore, such coverage shall
> cover Lender, but might or might not protect Borrower. Borrower's
> equity in the Property, or the contents of the Property, against any
> risk, hazard or liability and might provide greater or lesser coverage
> than was previously in effect. . . . *Any amounts disbursed by Lender
> under this Section 5 shall become additional debt of Borrower*

9

> ***secured by this Security Instrument.*** These amounts shall bear
> interest at the Note rate from the date of disbursement and shall be
> payable, with such interest, upon notice from Lender to Borrower
> requesting payment.

(emphasis added).

39.    Of course, the traditional lending relationship, where the lender makes a loan, retains it in its portfolio, and services it itself, has become the exception rather than the rule. Most residential mortgages in the United States are financed through securitization.

40.    Securitization is a financing method involving the issuance of securities against a dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or "seller") assembles a pool of mortgage loans made or "originated" by an affiliate or purchased from unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive, specially created, special-purpose vehicle ("SPV"), typically a trust in the case of residential mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loan. The securities are sold directly to investors by the SPV or, as is more common, they are issued directly to the depositor as payment for the loans. The depositor then resells the securities, usually through an underwriting affiliate that places them on the market. Because the certificated securities are collateralized by the residential mortgage loans owned by the trust, they are called residential mortgage-backed securities ("RMBS").

41.    A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive; it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution.

10

42.    Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan servicer. Every loan, irrespective of whether it is securitized, has a servicer.

43.    Servicers are hired by owners of whole loans, typically trustees of securitization trusts. Billions of dollars of mortgage loans are owned by GSEs, *i.e.*, Fannie Mae, the Federal Home Loan Mortgage Corporation ("Freddie Mac"), or the Government National Mortgage Association.

44.    The specific duties of servicers are set forth in PSAs, Servicing Agreements, or similar contracts between the servicer and the owners of the loans which are in all respects material to this lawsuit uniform.    Pursuant to these agreements, servicers are obligated to manage the mortgages on behalf, and in the best interests of, their owners. In fact, servicers are held to a high standard – they are required, at minimum, to use the same skill, care and practices in servicing loans for others as they customarily employ servicing loans for their own account.

45.    For example, on June 1, 2004, GM executed a PSA to become the servicer of an SPV trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA"). Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

11

46.     Servicers are responsible for performing the day-to-day tasks relating to the mortgages. These tasks include account maintenance activities such as sending monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to the trust. These tasks also include handling defaulted loans, prosecuting foreclosures and taking appropriate steps to mitigate losses.

47.     One of the most important responsibilities of mortgage loan servicers is to protect the owners of the mortgages from damages caused by casualty losses. All PSAs and other servicing agreements, including those with the GSEs, require the servicer to make sure that adequate hazard insurance is at all times maintained on the secured properties, including through force-placement if appropriate.

48.     Section 3.05 of the JPMorgan PSA, for example, provides in pertinent part:

MAINTENANCE OF HAZARD INSURANCE

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance with extended coverage on the Mortgaged Property in an amount which is at least equal to the lesser of (I) the Stated Principal Balance of such Mortgage Loan and (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. . . . The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies.

49.     Additionally, Section 3.07 thereof provides:

MAINTENANCE OF INSURANCE POLICIES

12

> The Servicer shall not take any action that would result in noncoverage under any applicable Insurance Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. The Servicer shall use its best efforts to keep in force and effect (to the extent that the related Mortgage Loan requires the Mortgagor to maintain such insurance), any applicable Insurance Policy. The Servicer shall not cancel or refuse to renew any Insurance Policy that is in effect at the date of the initial issuance of the Mortgage Note and is required to be kept in force hereunder.

50.    The servicing requirements applicable to loans owned and/or guaranteed by the GSEs are set forth in the Fannie Mae Servicing Guide. Part II, Chapter 6 thereof provides, in pertinent part:

> Part of a servicer's responsibility for protecting our interest in the security property is to ensure that hazard insurance (including flood insurance), under the terms specified in our Guides, is in place at all times. If the servicer is unable to obtain evidence of acceptable hazard insurance for a property, the servicer should obtain alternative insurance coverage (so-called "force-placed" insurance or "lender-placed" insurance) to protect our interests. In this instance, there are several guidelines that servicers should apply, subject to the provisions of and in compliance with applicable law and the mortgage documents.

**GM's Mortgage Servicing Portfolio**

51.    GM is the fifth largest servicer of residential mortgages in the United States, servicing a portfolio of 2.5 million mortgage loans with an aggregate unpaid principal balance of approximately $389 billion. At all relevant times, all the loans in GM's servicing portfolio have been subject to servicing agreements with their owners and/or holders.

52.    At all relevant times, GM's mortgage servicing portfolio has been comprised of loans owned and/or held by (i) Ally Bank, f/k/a GMAC Bank, a Utah state-chartered commercial bank

13

which is also an indirect subsidiary of Ally Financial; (ii) Fannie Mae and other GSEs; and (iii) various investors including securitization trusts pursuant to PSAs and similar agreements.

53.    The Ally Bank loans in GM's portfolio were originated by GM, then sold by GM to Ally Bank. Ally Bank either still owns such loans or has resold them to secondary market investors while retaining their servicing rights. Under the Servicing Agreements between Ally Bank and GM, GM is required to service the loans in accordance with the servicing guidelines of Fannie Mae. The servicing guidelines of Fannie Mae also govern GM's obligations with respect to the GSE loans serviced by GM.

**GM's Outsourcing Deal with Balboa**

54.    In the first quarter of 2003, GM contracted with defendant Balboa to buy force-placed insurance from Balboa in respect of GM-serviced loans.

55.    Several months later, in or about March 2003, GM expanded its relationship with Balboa by entering into a new agreement. The new agreement between GM and Balboa provided not only for GM to purchase force-placed insurance from Balboa, but for GM to outsource all of GM's functions relating to force-placed insurance – *e.g.*, tracking borrowers' insurance policies – to Balboa.

56.    According to a March 6, 2003 press release issued by GM relating to its deal with Balboa, Balboa provides GM with "insurance tracking services that include data maintenance, EDI processing, customer service and online claims service." The term "EDI" – electronic data interchange – referred to Balboa's ability to access and interface with GM's borrower databases in real-time without any active involvement on the part of GM.

14

57.    The GM agreement with Balboa tasks Balboa with, *inter alia*, monitoring the mortgages in GM's servicing portfolio to identify expired, cancelled or non-renewed borrower policies; issuing notices to borrowers regarding the opportunity to cure; and force-placing coverage when appropriate. Balboa is also required by the agreement to maintain and staff call centers should borrowers want to speak with someone.

58.    At all relevant times, pursuant to the agreement, Balboa has functioned in all relevant respects as GM's force-placed insurance back-office. Balboa has handled all aspects of GM's force-placed insurance activities. GM does not perform any such activities itself. Balboa even issues notices to borrowers on GM letterhead, signed "Insurance Department, GMAC Mortgage LLC." Balboa also has its call center personnel identify themselves as employees of GM. Additionally, Balboa's EDI system enables Balboa to manage billings in respect of force-placed insurance, *i.e.*, adding charges and issuing credits with respect to force-placed insurance on borrowers' monthly statements, without any active involvement by GM.

59.    The initial agreement between GM and Balboa had a term of three years. However, the arrangement between GM and Balboa has continued to the present. In fact, GM is today one of Balboa's largest accounts.

**The Kickback Scheme**

60.    There is nothing inherently wrong with GM's insurance and outsourcing arrangements with Balboa. PSAs and other servicing agreements authorize outsourcing. This case is brought, however, because since at least March 2003, the arrangement between GM and Balboa has involved a wrongful component.

61.    Specifically, GM and Balboa devised and at all relevant times have engaged in a kickback scheme designed to generate illicit profits for GM and its affiliates based on GM's dealings with Balboa. These profits have been made off the backs of mortgage borrowers and the owners of the loans being serviced.

62.    Pursuant to the scheme, GM has extracted kickbacks or bribes from Balboa based on a percentage of the gross force-placed insurance premiums that GM has paid. These bribes are in the form of bogus "commissions" paid by Balboa to GMAC Agency Marketing, the unincorporated division and/or fictitious "doing business as" name of defendant GI. GM and Balboa agreed to fraudulently label the payments as "commissions" – and to funnel them through GMAC Agency Marketing – to disguise their true nature as kickbacks. The pretense is that the "commissions" are being paid by Balboa in the ordinary course of business to the insurance agent or "producer" responsible for introducing the insurance customer – *i.e.*, GM – to Balboa.

63.    At all relevant times, however, this pretense has been false. GI is not, and has never been, a *bona fide* insurance agent of Balboa; has not provided and does not provide any *bona fide* insurance agency services to Balboa; and has never solicited or sold any insurance or insurance products on behalf of Balboa, in connection with the force-placed insurance purchased by GM or otherwise.

64.    Instead, at all relevant times, GI's sole role with respect to the force-placed insurance purchased by GM has been to collect kickbacks from Balboa fraudulently labeled as "commissions." The "commissions" have been paid pursuant to a *quid pro quo* agreement or understanding that GM will continue to do force-placed insurance business with Balboa. Furthermore, at all relevant times,

16

the kickbacks have inured directly or indirectly to the benefit of GM, through inter-affiliate transactions or otherwise.

65.    Notably, the March 2003 GM press release about the deal between GM and Balboa did not say anything about GMAC Agency Marketing, GI, or "commissions." There was no mention of any broker or agent, that purportedly introduced GM to Balboa or otherwise. Rather, the deal described in the press release was bilateral, involving GM and Balboa only.

66.    Nevertheless, at all relevant times, for every dollar in gross premiums paid by GM to Balboa, Balboa has "kicked back" an agreed percentage to GI and/or GM as so-called "commissions." Meanwhile, the stated premiums have been "grossed up" to include these kickbacks.

## The Kickback Scheme Has Harmed
## Borrowers and the Owners of the Loans

67.    Defendants' kickback scheme has unnecessarily inflated the costs of force-placed insurance with respect to GM-serviced loans, thereby damaging borrowers who have been forced to reimburse GM for such costs. The amount of the unnecessary inflation is, at minimum, reflected by the amount of the kickbacks. This is because, at all relevant times, the stated premiums have been fraudulently "grossed up" to include the kickbacks. Balboa then returns the amounts of the kickbacks to GI and/or GM in round-trip transactions that have no legitimate business purpose. The net charge – *i.e.*, the stated premium paid by GM minus the kickback returned directly or indirectly to GI and/or GM – represents the true or actual price or cost of the insurance.

68.    This scheme has not only robbed borrowers, but also improperly inflated force-placed insurance costs borne by the owners of the loans being serviced by GM.

17

69.    To be sure, the costs of force-placed insurance are initially incurred by the servicer, which is responsible for advancing the money to pay the premiums. Servicers such as GM, however, are functionally the senior-most creditors with respect to the loans they manage. This is because all servicing agreements entitle the servicer to recoup any costs, expenses or advances they incur "off the top" from the proceeds of collection or liquidation, before any money is passed through to the owners of the loans. This entitlement includes force-placed insurance premiums paid by the servicer, which are counted as reimbursable servicing advances under all servicing agreements. The right of the servicer to recover its servicing advances is senior even to the AAA RMBS securities issued by the securitization trusts. Furthermore, if loan-level proceeds are insufficient to enable the servicer to recoup its advances on a particular loan, the servicer is entitled to reimburse itself from the cash collected from all of the other loans covered by the servicing agreement.

70.    At all relevant times, GM in its capacity as servicer has reimbursed itself with respect to force-placed insurance based not on its actual costs, but instead on the artificially inflated, grossed-up premiums charged to borrowers. In other words, GM, in recouping its supposed servicing advances prior to passing money through the owners of the loans, has not netted out the amounts of the kickbacks that GM and/or GI have received from Balboa, but has instead included the full amounts of the stated premiums, inflated by the kickbacks. As a result, to the extent borrowers have failed to pay, the owners of GM-serviced loans have borne these fraudulently inflated costs in the form of reduced proceeds and higher loss severities at liquidation. In practice, this means that profits reaped by GM and/or GI from the kickback scheme alleged herein have come from the pockets of the pension funds that invest in the loans in GM's servicing portfolio and – in the case of the GSE loans in that portfolio – from the pockets of United States taxpayers.

18

71.    A number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts between servicers and mortgage investors. Servicers have no stake in the performance of mortgage loans and do not share mortgage investors' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing the fee and expense charges they can recoup "off the top."

72.    This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was simply never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, *see generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Geo. U. L. Center), or, as in this case, force-placing insurance that is fraudulently inflated in price.

73.    Servicers' compensation structure also incentivizes them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal to the liquidation value. At that point, because there is no equity left to strip, the servicer just "want[s] to dump the property from portfolio as quickly as they can," Professor Levitin observes.

19

Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated fees and expenses, until there is no value left.

74.     Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated force-placed insurance have enabled servicers to strip billions of dollars in equity from borrowers' homes at the expense of homeowners and the investors in the mortgages and RMBS. It has also exacerbated the housing crisis by pushing marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and indirectly on communities and the housing market as a whole."

75.     Borrowers are not afforded any and have no choice with respect to the arrangements alleged herein. Borrowers have no legal ability or right to select their servicer or force-placed insurer. There is no mechanism for borrowers to select servicers that do not extract, or force-placed insurers that do not pay, kickbacks. When borrowers take their loans, they have no way to select their servicer, and no say whether the servicer is replaced with a new servicer, or what arrangements any servicer might have with its providers. Borrowers have no legal right or ability to opt-out with respect to the kickbacks or affiliate transactions described herein.

76.     Plaintiff does not challenge – and nothing in this complaint should be construed as challenging – the reasonableness or fairness of any force-placed insurance rates. Plaintiff challenges kickbacks and reimbursement charges fraudulently inflated by reason thereof.

77.     The kickback scheme in this case is similar to that conducted by the defendants in *Hofstetter v. Chase Home Finance, LLC*, NO. C 10-01313 WHA (N.D.Cal.), a class action that settled last year. In that case, Chase Home Finance, LLC ("Chase") allegedly extracted kickbacks

20

from force-placed flood insurer American Security Insurance Company ("ASIC"). ASIC did not,

however, pay the kickbacks to Chase directly. Instead, the parties allegedly agreed to fraudulently

label the kickbacks as "commissions" and route them through Chase's affiliate, Chase Insurance

Agency, Inc. ("CIA"), according to settlement papers filed in the case.

78.    Discovery in *Hofstetter* revealed a system in which CIA collected "commissions"

from ASIC yet rendered no *bona fide* insurance agency services in relation to the policies. "What

function does Chase Insurance Agency, Inc. perform with respect to flood insurance?" the Plaintiffs'

attorney asked in a deposition. "I would say no function," the Chase employee responded. *See*

"Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

79.    According to papers filed with the court in the case, the defendants' misconduct in

*Hofstetter* allegedly resulted in "commission damages" to the members of the class, with the amount

thereof measured by the force-placed insurance premiums charged multiplied by the "commission

percentage" paid thereon.

80.    The kickback scheme alleged in this case has operated in material respects like that

alleged in *Hofstetter*.

**Government Response**

81.    Force-placed insurance kickback schemes are increasingly becoming a focus of

attention for what they are – abusive and parasitic. Fannie Mae recently began fighting back. On

March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for Lender Placed

Insurance," regarding the "costs to taxpayers" of kickback arrangements that improperly inflate the

costs. The *Lender Letter* stated, in pertinent part:

21

Fannie Mae will soon implement changes to its Lender-Placed Insurance (LPI) requirements to significantly reduce costs to homeowners, taxpayers, and Fannie Mae. The changes will lower barriers for borrowers who want to cure their delinquencies, while improving transparency and boosting competition in the LPI market.

Fannie Mae requires hazard insurance on all properties for which it owns the mortgage. If a homeowner cannot provide evidence of coverage, the servicer must secure that coverage through the use of LPI. *Lender-placed policies, however, are significantly more expensive than voluntary coverage secured by the borrower and often include commissions and other administrative costs, further adding to the cost of LPI policies.* Two firms currently issue most LPI policies.

An expensive LPI policy can often become an obstacle to a delinquent borrower seeking to avoid foreclosure. To bring their loan current, a borrower must reimburse the servicer for the cost of the LPI policy. *If the borrower defaults in mortgage loan payments and does not cure, Fannie Mae must reimburse the servicer for LPI premiums. Costs to Fannie Mae ultimately become costs to taxpayers.*

(emphasis added).

82.     On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a *Servicing Guide Announcement*. The *Servicing Guide Announcement* "clarif[ied]" Fannie Mae's position that servicer requests for reimbursement of lender-placed insurance premiums must exclude "any lender-placed insurance commission earned . . . by the servicer or any related entity." Fannie Mae indicated that "any other costs beyond the actual cost of the lender-placed insurance policy premium" were unacceptable.

83.     The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees**

22

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

■    *any lender-placed insurance commission earned on that policy by the servicer or any related entity*,

■    costs associated with insurance tracking or administration, or

■    *any other costs beyond the actual cost of the lender-placed insurance policy premium*.

(emphasis added).

84.    In other words, Fannie Mae forbids servicers from engaging in precisely the type of misconduct alleged herein.

85.    Additionally, in or about January 10, 2012, Benjamin Lawsky, the Superintendent of the New York State Department of Financial Services ("NYDFS"), launched a probe into improper practices relating to force-placed insurance, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

86.    On January 27, 2012, the financial services publication *American Banker* disclosed a list of entities subpoenaed by the NYDFS as part of its investigation. The list identified Balboa as among the force-placed insurance companies targeted by the NYDFS. The list also identified GMAC Agency Marketing as among the targeted "insurance producers," *i.e.*, bogus "agents" through which purported "commissions" (a/k/a kickbacks) have been paid.

87.    On April 5, 2012, the NYDFS issued a press release announcing that it had expanded its probe into force-placed insurance and was scheduling public hearings on the matter to take place in May 2012. The NYDFS press release also disclosed that the NYDFS had issued formal document requests to a number of additional insurers, including Meritplan.

23

88.    Additionally, the NYDFS press release addressed the type of kickback arrangement
alleged herein. It stated that the NYDFS investigation had already uncovered evidence that force-
placed insurance costs have been artificially inflated "due [to] relationships between and payments
by insurers to banks and their affiliates. . . . Insurers pay high commissions to the banks or their
affiliates presumably to guarantee the insurers will receive business." The NYDFS press release also
discussed that, as alleged herein, kickback-inflated force-placed insurance costs harm not only
borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance
the insurance payments and then recoup those payments out of investment income before investors
are paid."

89.    The full text of the NYDFS release states:

**Department Of Financial Services Expands Probe Into
Force-Placed Insurance, Demanding Explanation For High
Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and
investors' expense**

**Hearings to be held on whether rates are excessive and to probe
payments between insurers, brokers, agents and mortgage
servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today
announced that he is intensifying the Department of Financial
Services investigation into force-placed insurance by requiring the
largest licensed force-placed insurers operating in New York to
provide a detailed accounting of their expenses, claims payments and
profits.

The Superintendent will hold public hearings in May to review
whether rates for force-placed insurance are excessive and to examine
the relationships between and payments to and from insurers, banks,
mortgage servicers and insurance agents and brokers. Testimony will
be taken from homeowners harmed by force-placed insurance and

24

from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to provide information: **Balboa Insurance Company**, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), **Meritplan Insurance Company**, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one

major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy

26

> forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors," Lawsky said.*
>
> *The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure. The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(emphasis added).

90.     It is thus apparent that the NYDFS probe has confirmed the allegations of this complaint and is targeting the illicit arrangements alleged herein.

## DEFENDANTS' KICKBACK SCHEME CONSTITUTES "HONEST SERVICES" MAIL AND WIRE FRAUD

91.     The scheme alleged herein violates the mail and/or wire fraud statutes, 18 U.S.C. §§ 1341, 1343. Specifically, Defendants conducted a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their "intangible rights" to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346.

92.     The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

93.     The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises . . . [uses the mails in furtherance of the scheme shall be punished by imprisonment or fine or both].

18 U.S.C. § 1341.

94.     The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

27

95.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this

statutory language to apply only to deprivations of property and not to encompass "the right to have

[one's] affairs conducted honestly." *Id.* at 352.

96.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud

statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the
> term "scheme or artifice to defraud" includes a scheme or artifice to
> deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

97.    Thus, through 18 U.S.C. § 1346, Congress brought schemes to deprive another of

honest services within the scope of the mail and wire fraud statutes.

98.    In *Skilling v. United States*, 130 S.Ct. 2896 (2010), the Supreme Court addressed the

scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent

schemes to deprive another of honest services through bribes or kickbacks." 130 S.Ct. at 2928,

2931. In fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme

or artifice to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and

kickbacks. The Court stated that "there is no doubt that Congress intended § 1346 to reach at least

bribes and kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved

bribery or kickback schemes. *Id.* at 2930–31.

99.    At all relevant times, GM owed legal duties to render services to the owners of the

loans in GM's servicing portfolio under the PSAs, Servicing Agreements, GSE Servicing Guidelines

and similar contracts governing their relationships. In all cases, those legal duties included the duty

to protect the owners of the mortgages from damages caused by casualty loss by making sure that

28

adequate hazard insurance was at all times maintained on the secured properties, including through force-placement if necessary. The value of GM's services in fact depended on GM's rendering those services in an honest manner. Nevertheless, GM misused its position as the servicer of the loans to extract bribes and kickbacks from Balboa, thereby artificially inflating the costs of force-placed insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest services" to those loan owners. Each Defendant, by virtue of the conduct as alleged herein, devised a scheme or artifice to defraud the owners of GM servicing portfolio loans by depriving those owners of their intangible rights to GM's honest services through kickbacks.

100. Defendants' wire and mail fraud violations constitute predicate acts under RICO. Defendants' pattern of racketeering activity has proximately harmed Plaintiff and the Class.

## TOLLING OF THE STATUTES OF LIMITATIONS

101. The claims of Plaintiff and the Class are subject to both equitable estoppel, stemming from Defendants' concealment of the facts alleged herein, and equitable tolling, stemming from Plaintiff's inability to obtain adequate information to plead the claims alleged herein. Defendants are estopped from relying on a statute of limitations defense because they purposefully concealed the misconduct alleged. At all relevant times Defendants maintained a shroud of secrecy around their illicit dealings. Separate and apart from Defendants' acts of concealment, any applicable statutes of limitations are properly tolled because Plaintiff and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

102. Furthermore, at all relevant times Plaintiff and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GM to fulfill its contractual duties under the mortgage loan contracts of Plaintiff and the Class in good faith, and to similarly execute

29

Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

107.    Furthermore, even had Plaintiff or members of the Class been on inquiry notice of misconduct relating to force-placed insurance in the mortgage servicing industry prior to January 10, 2012, despite diligent investigation they would have had no specific factual basis to allege – or even suspect – that GM was involved in any misconduct until, at the earliest, January 27, 2012.

108.    As alleged above, it was on that day that *American Banker* published a list of the entities subpoenaed as part of the NYDFS investigation. The list identified Balboa as among the force-placed insurance companies targeted by that investigation. The list also identified GMAC Agency Marketing (*i.e.*, GI) as among the targeted "insurance producers."

109.    Prior to January 27, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GM to potential kickbacks relating to force-placed insurance. Prior to such time, Plaintiff and the Class did not have an adequate factual basis to plead the claims alleged herein.

110.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiff and the Class could not have known of Defendants' violations until, at the earliest, January 27, 2012. Furthermore, any delay by Plaintiff and the Class

31

in asserting the claims herein was excusable because they could not reasonably have discovered

Defendants' misconduct absent specialized knowledge and/or assistance of counsel.

## CLAIMS FOR RELIEF

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

111.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth

herein. This count is pled against all Defendants.

112.    Plaintiff, each Class member, and each Defendant are "persons," as that term is

defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

113.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term

is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of GM, GI, and the Balboa Defendants,

including their respective officers, directors, employees, agents and direct and indirect subsidiaries

(the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the

Enterprise.

114.    The Enterprise was primarily managed by GM which organized the fraudulent scheme

and procured the involvement of GI and the Balboa Defendants. GI and the Balboa Defendants

carried out their part of the scheme under the direction of GM.

115.    The companies and individuals that constitute the Enterprise were associated for the

common purpose of fraudulently inflating the stated premiums on force-placed insurance with

respect to GM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners

32

of the loans to incur, fraudulently inflated charges in respect of such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GI and directly and/or indirectly to GM.

116.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engage.

### Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

117.    At all relevant times, in violation of 18 U.S.C. § 1962(c), Defendants conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint.    Defendants have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

a.    GM entered into servicing agreements with owners and/or holders of whole loans which provide, *inter alia*, that GM is obligated to make sure that the secured properties are adequately insured, including through force-placement of insurance if necessary;

b.    GM procures force-placed insurance with respect to the loans in its servicing portfolio from the Balboa Defendants;

c.    GM demanded and the Balboa Defendants agreed to and do pay kickbacks to GM and/or its affiliates based on a percentage of the force-placed insurance premiums paid by GM;

d.    GM and the Balboa Defendants agreed to and do gross-up the stated premiums on the force-placed insurance to include the amounts of the kickbacks;

e.    GM and the Balboa Defendants agreed to and do disguise the kickbacks as "commissions" paid by the Balboa Defendants to GI or other GM affiliate(s);

33

f.      As a *quid pro quo* for the kickbacks, GM continues to procure force-placed insurance from and outsource its force-placed insurance functions to the Balboa Defendants;

g.      The Balboa Defendants, on GM's behalf, track the loans in GM's servicing portfolio and issue notices to borrowers relating to purported lapses in their insurance coverage and their obligation to reimburse GM for the costs of any force-placed insurance;

h.      GM bills borrowers in relation to force-placed insurance based on the stated, fraudulently inflated premiums, *i.e.*, incorporating the kickbacks;

i.      To the extent borrowers pay the inflated costs billed to them, GM and/or GI profit from the kickbacks at the borrower's expense;

j.      To the extent borrowers fail to pay the inflated costs billed to them, GM reimburses itself from the proceeds of loan collections and liquidations also based on the stated, fraudulently inflated premiums, thereby profiting from the kickbacks at the expense of the owners of the loans; and,

k.      GM provides regular remittance and other reports to loan owners reflecting and/or incorporating the fraudulently inflated premiums as reimbursable servicing advances.

118.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341, 1343. Specifically, Defendants engaged in an intentional scheme or artifice to defraud borrowers and the owners of GM-serviced loans and to obtain money or property from the borrowers and the owners of GM-serviced loans through false or fraudulent pretenses, representations and promises.

119.    At all relevant times, Defendants' conduct included a fraudulent scheme to, *inter alia*, deprive the owners of GM-serviced loans of their intangible right to GM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. At all relevant times, GM was contractually obligated to render services to the owners of the loans it serviced. GM owed a duty to render those services in an honest manner. The value of those services in fact depended on GM's rendering them

in an honest manner. Nevertheless, at all relevant times, GM misused its position to extract bribes

and kickbacks from the Balboa Defendants, thereby artificially inflating the costs of force-placed

insurance at the expense of the loan owners. GM thereby breached its obligations to render "honest

services." GI and the Balboa Defendants intentionally and wilfully conspired and participated in said

breach.

120.    Each such bribe or kickback extracted by GM constituted a predicate act of mail

and/or wire fraud in that each furthered and executed the scheme to deprive the owners of the loans

of their right to GM's "honest services."

121.    It was reasonably foreseeable to each defendant that the mails and/or wires would be

used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute

the scheme.

122.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire

and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access

to Defendants' books and records. Nevertheless, Plaintiff can allege such transmissions generally.

123.    For the purpose of furthering and executing the scheme, Defendants regularly

transmitted and caused to be transmitted by means of wire communication in interstate commerce

writings, electronic data and funds, and also regularly caused matters and things to be placed in post

offices or authorized depositories, or deposited or caused to be deposited matters or things to be sent

or delivered by a private or commercial interstate carrier. For example:

        a.       The Balboa Defendants, on GM's behalf, transmitted notices and
               correspondence to borrowers via mail;

        b.       GM issued monthly statements including force-placed insurance charges to
               borrowers via mail and/or wire;

35

c. The Balboa Defendants, on GM's behalf, communicated with borrowers via telephone through call centers;

d. GM received funds from borrowers via mail and/or wire;

e. GM transmitted funds reflecting fraudulently inflated insurance premiums to the Balboa Defendants via mail and/or wire;

f. The Balboa Defendants transmitted funds reflecting kickbacks to GI and/or GM via mail and/or wire; and,

g. GM transmitted remittance and other reports to loan owners and/or holders via mail and/or wire that reflected and/or incorporated the fraudulently inflated force-placed insurance costs;

124. As to Plaintiff, Defendants utilized the mails and/or wires in the following instances, among others, for the purpose of furthering and executing the scheme:

a. The Balboa Defendants and/or GM transmitted notices to Plaintiff regarding force-placed insurance by mail dated October 27, 2010, December 12, 2010, September 6, 2011, and September 28, 2011;

b. GM transmitted statements to Plaintiff reflecting charges in connection with force-placed insurance by mail dated February 14, 2011, March 16, 2011, April 11, 2011, May 9, 2011, June 6, 2011, July 4, 2011, August 8, 2011, September 17, 2011, and October 17, 2011; and

c. The Balboa Defendants' call center representatives communicated with Plaintiff by wire regarding force-placed insurance on, among other dates, January 24, 2012;

125. These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants engaged in similar activities with respect to each member of the Class.

36

126.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

127.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

128.    Defendants each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring fraudulently inflated charges in connection with force-placed insurance.

129.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).  The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and the owners of the loans to pay and incur inflated charges in respect of force-placed insurance and thereby enable Defendants to reap illicit profits.

130.    Defendants were common participants in the predicate acts.  Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and the owners of the loans.

### Injury to Plaintiff and the Class

131.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c).  At all relevant times, Plaintiff and the Class paid charges in connection with force-placed insurance that were fraudulently inflated by reason, and as a direct, proximate and foreseeable result, of the scheme alleged.

132.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally

liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this

suit, including reasonable attorneys' fees.

## COUNT II

## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

133.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth

herein. This count is pled against all Defendants.

134.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to

conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

135.    Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C.

§ 1962(c).

136.    As set forth in Count I, above, at all relevant times, Plaintiff and the Class were

"persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

137.    As set forth in Count I, above, at all relevant times, Defendants were "persons" within

the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

138.    Defendants formed the previously alleged association-in-fact Enterprise, within the

meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently inflating the stated

premiums on force-placed insurance with respect to GM-serviced loans. The purpose thereof was

to induce borrowers and the owners of the loans to pay and incur fraudulently inflated charges in

respect of such insurance.

38

139.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

140.    As set forth in Count I, above, Defendants associated with the Enterprise, conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

141.    Defendants each were associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

142.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I, above.

143.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges in respect of force-placed insurance, as a direct, proximate and foreseeable result, of the scheme alleged herein.

144.    Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

39

## COUNT III

## BREACH OF CONTRACT
### (Against GM)

145.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein. This count is pled against GM.

146.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property. All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

147.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks. Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

148.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

149.    GM breached and acted in excess of its authority under the mortgage loan contracts of Plaintiff and the Class by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges. GM's charging Plaintiff and the Class for the cost of kickbacks constituted conduct not authorized and in breach of the terms of the mortgage loan contracts of Plaintiff and the Class.

150.    GM has thus breached its contracts with Plaintiff and the Class.

151.    As a direct, proximate, and legal result of the aforementioned breaches of contract, Plaintiff and the Class have suffered damages.

## COUNT IV

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against GM)

152.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against GM.

153.    Every contract contains an implied covenant of good faith and fair dealing.

154.    The mortgage loan contracts of Plaintiff and the Class require the borrower to maintain hazard insurance on their property. All such contracts also authorize the lender to force-place insurance should the borrower fail to do so or there be any lapse in the borrower's insurance coverage.

155.    Nothing in the mortgage loan contracts of Plaintiff and the Class, however, authorizes or permits the lender to charge or bill borrowers for kickbacks, or to recoup from, or be reimbursed by, borrowers with respect to kickbacks or costs that have been grossed-up and/or inflated to include kickbacks. Nothing in the mortgage loan contracts of Plaintiff and the Class authorizes or permits the lender to charge borrowers in excess of the actual cost of the force-placed insurance.

156.    As the servicer of the loans of Plaintiff and the Class, GM was bound by the terms of the mortgage loan contracts of Plaintiff and the Class.

157.    Pursuant to the implied covenant of good faith and fair dealing, GM was obligated to perform its duties under the mortgage loan contracts in good faith and to deal fairly with Plaintiff and the Class.

41

158.    GM breached its duty of good faith and fair dealing by charging borrowers for kickbacks fraudulently incorporated into force-placed insurance charges. By not netting out and instead incorporating the cost of the kickbacks in the force-placed insurance charges, GM engaged in bad faith conduct toward Plaintiff and the Class, dealt with Plaintiff and the Class unfairly, and contravened the reasonable expectations of Plaintiff and the Class.

159.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiff and the Class have suffered damages.

**COUNT V**

**COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
(Against all Defendants)**

160.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein. This count is pled against all Defendants.

161.    Plaintiff and the Class have conferred a substantial benefit upon Defendants derived from the force-placed insurance premiums. These benefits came at the expense of Plaintiff and the Class.

162.    The circumstances are such that in equity and good conscious restitution should be made by Defendants to Plaintiff and the Class.

163.    As a result of Defendants' unjust enrichment, Plaintiff and the Class have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

164.   Plaintiff and the Class are entitled to restitution and/or disgorgement of profits realized by Defendants as a result of their unfair, unlawful and/or deceptive practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class and award the following relief:

a.   For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiff as representative of the Class;

b.   For an order awarding compensatory damages on behalf of Plaintiff and the Class in an amount to be proven at trial;

c.   For judgment for Plaintiff and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair and/or deceptive practices; along with exemplary damages to each Class member for each violation;

d.   For judgment for Plaintiff and the Class on their RICO claims, in an amount to be proven at trial, for three times the amount of the force-placed insurance charges paid to Defendants by Plaintiff and the Class;

e.   For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and the Class;

f.   For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.   For an order awarding Plaintiff and the Class their attorneys' fees and costs; and

h.   Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff demands a trial by jury of the claims alleged herein.

43

Dated: April 30, 2012

**KIRBY McINERNEY LLP**

By:                           

    Mark A. Strauss (mstrauss@kmllp.com)
    Edward M. Varga, III (evarga@kmllp.com)
    J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiff*

44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LANDON ROTHSTEIN, JENNIFER
DAVIDSON, ROBERT DAVIDSON, and
IHOR KOBRYN, individually and on behalf
of all others similarly situated,

        Plaintiffs,

    v.

ALLY FINANCIAL, INC. f/k/a GMAC
INC., ALLY BANK f/k/a GMAC BANK,
JOHN DOE CORPORATION, BALBOA
INSURANCE COMPANY, MERITPLAN
INSURANCE COMPANY, and
NEWPORT MANAGEMENT
CORPORATION,

        Defendants.

Civil Action No.: 1:12-CV-3412 (AJN)

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**Jury Trial Demanded**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................. 1

II.     JURISDICTION AND VENUE ............................................. 5

III.    PARTIES ............................................................. 6

        A.    Plaintiffs ................................................. 6

        B.    The Ally Financial Defendants And Related Non-Party Debtors ............. 6

        C.    The Balboa Defendants ...................................... 8

IV.     CLASS ACTION ALLEGATIONS ........................................ 8

V.      SUBSTANTIVE ALLEGATIONS ........................................ 10

        A.    Background ................................................ 10

        B.    GMACM's Servicing Portfolio ............................... 16

        C.    The Kickback Scheme ....................................... 17

        D.    The Scheme Defrauds Borrowers And Loan Owners ................ 21

        E.    Fannie Mae Learns That It Is Being Overcharged For LPI ............. 24

        F.    The Lawsky Investigation ................................... 31

VI.     THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD ........ 34

        A.    The Erroneous Notices And Bills To Borrowers ................... 35

        B.    The Erroneous Reports To Loan Owners .......................... 36

        C.    The Scheme Constitutes "Honest Services" Fraud ................ 37

VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK
        PROVISIONS ...................................................... 39

VIII.   ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES,
        INCLUDING RESCAP AND GMACM ................................... 42

i

A.    Ally Financial, ResCap, And GMACM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.    Investigations And Lawsuits Relating To Securitization Activities  . . . . . . . . . . 42

C.    Investigations And Lawsuits Relating To Servicing Activities . . . . . . . . . . . . . . 46

D.    Ally Financial Causes ResCap And GMACM To File For Bankruptcy  . . . . . . . 51

E.    Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets . . . . . . . . . . . 53

F.    Ally Financial's Domination Of ResCap And GMACM . . . . . . . . . . . . . . . . . . . 56

G.    Ally Financial's Disregard Of Corporate Formalities  . . . . . . . . . . . . . . . . . . . . . 63

H.    Ally Financial's Responsibility For Controlling GMACM's
      Servicing Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

IX.    TOLLING OF THE STATUTES OF LIMITATIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . 70

X.    CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

COUNT I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

COUNT II  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

COUNT III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

COUNT IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

COUNT V  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

COUNT VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

COUNT VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

ii

Plaintiffs Landon Rothstein, Jennifer Davidson, Robert Davidson, and Ihor Kobryn

("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned

attorneys, allege the following upon personal knowledge as to themselves and their own acts, and

upon information and belief as to all other matters. Plaintiffs' information and belief is based upon

the investigation made by and through their attorneys, which included a review of filings and public

statements made by defendants, court filings, media articles and other publicly available information.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth

below after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action pursuant to the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), the Real Estate Settlement Procedures Act,

12 U.S.C. § 2601, *et seq.* ("RESPA"), and applicable state law, on behalf of themselves and a

nationwide putative class consisting of residential mortgage borrowers who have been charged for

force- or lender-placed hazard insurance ("LPI") in connection with loans serviced by GMAC

Mortgage, LLC f/k/a GMAC Mortgage Corporation (hereinafter "GMACM") at any time from

March 6, 2003 to the present (the "Class Period").

2.    To protect the lender's interest in secured property, standard mortgage loan contracts

require the borrower to maintain specified levels of hazard insurance coverage.  If the borrower's

coverage lapses, the lender is entitled to purchase coverage for the home, "force place" it, and be

"reimbursed" by the borrower for the "expense."

3.    Because most loans are sold and securitized after origination, LPI is generally

purchased by a loan servicer acting on behalf of the securization trust that owns legal title to the loan.

1

Any amounts paid by the servicer to buy LPI are included as "servicing advances" under the

agreement between the servicer and the trust, known as the "Pooling and Servicing Agreement" or

"PSA." The servicer is entitled to recoup its advances from the proceeds of the loan, whether

through borrower payments or foreclosure. The servicer has the right to reimbursement "off the

top," before any money is passed through to the securitization trust or other loan owner.

4.      GMACM is the fifth largest residential mortgage loan servicer in the United States.

As of March 31, 2012, GMACM serviced over 2.4 million mortgage loans with an unpaid principal

balance of approximately $374 billion.

5.      Since at least March 2003, GMACM has obtained LPI for the loans it services from

defendants Balboa Insurance Company ("Balboa") and its affiliate Meritplan Insurance Company

("Meritplan").

6.      Also since at least March 2003, GMACM has had a relationship with an affiliate of

Balboa and Meritplan, defendant Newport Management Corporation ("Newport"). GMACM hires

Newport as a subcontractor to perform GMACM's insurance tracking duties under GMACM's

servicing agreements. Insurance tracking is a labor-intensive servicing responsibility related to LPI

that consists of monitoring the status of homeowners' voluntary insurance to confirm that it is

in-force, notifying homeowners of any insurance deficiencies, and securing LPI when appropriate.

7.      Balboa, Meritplan, and Newport (the "Balboa Defendants") and GMACM devised

and carried out a scheme to defraud borrowers and loan owners by overcharging them for LPI.

Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks,

camouflaged through complex transactions using affiliates and related parties. GMACM pockets

the rebates for itself, while fraudulently billing borrowers based on the full purported price of the

2

LPI. In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Because the amounts supposedly paid by GMACM for LPI constitute servicing advances, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities to the extent borrowers fail to pay.

8.     As devised by the Balboa Defendants and GMACM, the scheme involves the payment of rebates/kickbacks in two forms: (i) free tracking services, and (ii) bogus "commissions."

9.     The free tracking services are provided by Newport. Under the scheme, GMACM pays nothing for Newport's insurance tracking services; instead, Balboa and Meritiplan pay Newport on GMACM's behalf. The money is derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI, and is routed from Balboa and Meritplan to Newport via "intercompany expense allocations." The free tracking services constitute rebates/kickbacks in kind.

10.     The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, defendant John Doe Corporation ("John Doe"). As with the tracking services, the money for the "commissions" is derived from the LPI premiums paid by GMACM. The "commission" payments are made on the pretense that John Doe is a third-party insurance agent that introduced the insurance customer, *i.e.*, GMACM, to Balboa and Meritplan. At all relevant times, however, this pretense has been false, as John Doe is not and has never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM, and never introduced GMACM to Balboa or Meritplan.

11.     Additionally, on information and belief, John Doe transfers the "commissions" that it receives to GMACM. Defendant Ally Financial, Inc. f/k/a GMAC Inc. ("Ally Financial") – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash

3

management system." Ally Financial thereby also participated in devising, and participates in carrying out, the scheme.

12.     Not just borrowers but also the owners of the loans serviced by GMACM – which include the taxpayer-backstopped Government Sponsored Enterprises ("GSEs") Fannie Mae, Freddie Mac, and Ginnie Mae, which own and/or guarantee more than two-thirds of the loans serviced by GMACM – have been grossly overcharged for LPI as a result of the scheme.

13.     On May 14, 2012, GMACM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. Accordingly, GMACM is not named as a defendant herein. Nevertheless, this complaint alleges that the Balboa Defendants, as participants and conspirators in the scheme, are jointly and severally liable under RICO and RESPA. Moreover, this complaint alleges that Ally Financial, which has not filed for bankruptcy, exercised complete dominion and control over the affairs, activities, and operations of its subsidiaries, including GMACM, such that GMACM operated as a mere instrumentality or alter-ego of Ally Financial. Therefore, Ally Financial is vicariously liable for the misconduct of GMACM alleged herein.

14.     Additionally, this complaint names defendant Ally Bank f/k/a GMAC Bank ("Ally Bank"), a subsidiary of Ally Financial that is not in bankruptcy. Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM, including, on information and belief, loans of Class members. Ally Bank is liable, *inter alia*, as principal for the misconduct of its appointed agent, GMACM.

4

## II.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a), and 12 U.S.C. § 2614. This Court also has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1964(c).

16.    Personal jurisdiction is conferred by 18 U.S.C. § 1965(a), which allows a party to institute a civil RICO action in any district in which a defendant "resides, is found, has an agent, or transacts his affairs." Alternatively, 18 U.S.C. § 1965(b) provides that as long as one defendant is subject to service in a particular district, additional parties residing in other districts may be brought before the forum court, in the court's discretion, to the extent that "the ends of justice require."

17.    Additionally, this Court has personal jurisdiction over the defendants because each systematically and continually conducts business throughout the State of New York.

18.    This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). Plaintiffs are citizens of Texas, New York, and New Hampshire. Defendants are citizens of different states, the amount in controversy exceeds $5,000,000, and there are more than 100 members in the Class.

19.    This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

20.    Venue is proper in this district under 28 U.S.C. § 1391(b), 12 U.S.C. § 2614, and 18 U.S.C. §§ 1965(b) and (d). Defendants regularly conduct business in this District.

III.    **PARTIES**

A.    **Plaintiffs**

21.    Landon Rothstein is a resident of Texas. Rothstein has a mortgage loan serviced by GMACM on a property located at 97 County Road 3701, Splendora, Texas. Rothstein was charged $105 by GMACM purportedly to reimburse it for the cost of LPI from October 6, 2010 to January 4, 2011. The LPI coverage was obtained by GMACM from Meritplan.

22.    Jennifer Davidson and Robert Davidson are residents of New Hampshire. The Davidsons have a mortgage loan serviced by GMACM on a property located at 32 Dunbarton Estates, Nottingham, New Hampshire. The Davidsons were charged $239 by GMACM purportedly to reimburse it for the costs of LPI from April 14, 2009 to July 4, 2009. The LPI coverage was obtained by GMACM from Balboa.

23.    Ihor Kobryn is a resident of New York. Kobryn has a mortgage loan serviced by GMACM on a property located at 29 Meredith Avenue, Staten Island, New York. Kobryn was charged $1,260.78 by GMACM purportedly to reimburse it for the costs of LPI from January 19, 2012 to May 22, 2012. The LPI coverage was obtained by GMACM from Meritplan.

B.    **The Ally Financial Defendants And Related Non-Party Debtors**

24.    Ally Financial is a leading, multi-national financial services firm with approximately $184 billion of assets and operations in 37 countries. Ally Financial is a Delaware corporation headquartered in Detroit, Michigan. Ally Financial received at least $17 billion in government bailouts during the financial crisis, and still owes the United States Treasury $11.2 billion. Since the implementation of the Troubled Asset Relief Program in late 2008, Ally Financial has been owned by the U.S. Department of the Treasury, affiliates of Cerberus Capital Management, L.P.

6

("Cerberus"), affiliates of General Motors Company, and other investors. Prior to that time, Ally

Financial was owned 51% by a consortium of investors led by Cerberus and 49% by General Motors

Company. Ally Financial, was known as General Motors Acceptance Corporation until July 20,

2006, when it became a Delaware limited liability company under the name GMAC LLC. On June

30, 2009, GMAC LLC was converted from a Delaware limited liability company to a Delaware

corporation under the name GMAC Inc. On May 7, 2010, GMAC Inc. changed its corporate name

to Ally Financial.

    25.    Ally Bank is an indirect wholly-owned subsidiary of Ally Financial. Ally Bank was

at all times relevant to this complaint a loan originator. Prior to May 2009, Ally Bank was known

as GMAC Bank. Ally Bank is an online bank chartered under Utah law.

    26.    John Doe is a subsidiary of Ally Financial and an affiliate of GMACM. As alleged

here, John Doe received kickbacks from Balboa and Meritplan fraudulently labeled as insurance

"commissions."

    27.    Ally Financial, Ally Bank, and John Doe are collectively referred to herein as the

"Ally Financial Defendants."

    28.    Non-party Residential Capital, LLC f/k/a Residential Capital Corporation ("ResCap"),

is a Delaware limited liability corporation and a wholly-owned subsidiary of Ally Financial. At all

relevant times, ResCap's business included originating and servicing mortgage loans through its

wholly-owned subsidiary GMACM. ResCap is not named as a defendant in this lawsuit because it

filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on May 14, 2012. *See In

re: Residential Capital, LLC, et al., Debtors*, No. 12-12020-MG (S.D.N.Y. 2012).

7

29.   Non-party GMACM is a Delaware limited liability corporation with its principal

place of business in Fort Washington, Pennsylvania. At all relevant times, GMACM was in the

business of originating and servicing residential mortgage loans. Since 2005, GMACM has been

a wholly-owned subsidiary of ResCap. Prior to that time, GMACM was a wholly-owned subsidiary

of Ally Financial. GMACM is not named as a defendant in this lawsuit because it filed for

bankruptcy protection under Chapter 11 of the Bankruptcy Code on May 14, 2012.

### C.   The Balboa Defendants

30.   Balboa is a California corporation headquartered in Irvine, California. Balboa is a

member of the Balboa Insurance Group, which was a subsidiary of Bank of America until June 2011,

at which time it was sold to QBE Insurance Group, a publicly traded Australian corporation. Balboa

is a provider of LPI and insurance tracking services, directly and through its affiliates, to mortgage

loan servicers nationwide.

31.   Meritplan is a California corporation headquartered in Irvine, California. Meritplan

is a wholly-owned subsidiary of Balboa. Meritplan is a provider of LPI to mortgage loan servicers

nationwide.

32.   Newport is a California Corporation headquartered in Irvine, California. Prior to June

1, 2011, Newport was a wholly-owned subsidiary of Balboa. Thereafter, Newport became a wholly-

owned subsidiary of QBE Insurance Group. Newport provides insurance tracking services to loan

servicers as a subcontractor.

8

## IV.   CLASS ACTION ALLEGATIONS

33.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(1), (b)(2) and (b)(3) on behalf of themselves and a nationwide class consisting of:

> All residential mortgage loan borrowers who have been charged for
> LPI in connection with loans serviced by GMACM at any time from
> March 6, 2003 to the present (the "Class").

34.   The Class excludes Defendants and any entity in which any defendant has a

controlling interest, and their officers, directors, legal representatives, successors and assigns.

35.   The Class is so numerous that joinder of all members is impracticable.

36.   A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy.

37.   Plaintiffs' claims are typical of the claims of the Class.

38.   There are questions of law and fact common to the Class, including but not limited

to:

   a.   Whether GMACM, the Balboa Defendants and the Ally Financial Defendants
        devised a scheme to defraud borrowers and loan owners by overcharging
        them for LPI;

   b.   Whether the scheme alleged herein constitutes mail or wire fraud;

   c.   Whether GMACM and Ally Bank breached borrowers' mortgage loan
        agreements and violated the covenants of good faith and fair dealing implied
        therein;

   d.   Whether GMACM operated as an alter-ego of Ally Financial;

   e.   Whether Defendants are liable to Plaintiffs and the Class for damages and,
        if so, the measure of such damages.

9

39.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class members.

40.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiffs have retained counsel experienced in complex nationwide class actions, including all aspects of litigation. Plaintiffs' counsel will fairly, adequately and vigorously protect the interests of the Class.

41.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

42.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

43.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

44.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

10

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

45.    To protect the lender's interest in secured property, mortgage loan contracts require the borrower to maintain specified levels of hazard insurance. If the borrower's coverage lapses, the lender is entitled to purchase coverage on the home, "force place" it, and be reimbursed by the borrower for the "expense."

46.    LPI is purchased by the lender, for the lender. The lender is the sole insured and the only loss payee. In the event of a casualty loss, the borrower has no right to collect any policy proceeds. The borrower's only involvement with LPI is that the borrower is obligated, by virtue of the mortgage loan agreement, to reimburse the lender for the "expense." Furthermore, the borrower has no choice, as the obligation to reimburse the lender is secured by the lender's lien on the property.

47.    All mortgage loan agreements contain substantively identical terms with respect to LPI. Plaintiff Rothstein's mortgage loan agreement, for example, provides, in pertinent part:

> Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. . . .
>
> *If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.* Lender is under no obligation to purchase any

11

particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. . . . *Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.* These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(Emphasis added).

48.     The traditional lending relationship, where the lender makes a loan, retains it in its portfolio, and services it itself, is today the exception rather than the rule. Most residential mortgages in the United States are financed through securitization.

49.     Securitization is a financing method involving the issuance of securities against a dedicated cash flow stream such as mortgage payments. A financial institution (the "sponsor" or "seller") assembles a pool of mortgages made or "originated" by an affiliate or purchased from unaffiliated third-parties. The pool of loans is sold by the sponsor to a special-purpose subsidiary (the "depositor") that has no other assets or liabilities. The depositor sells the loans to a passive, specially created special-purpose vehicle ("SPV"), typically a trust in the case of residential mortgages. The SPV issues certificated securities to raise the funds to pay the depositor for the loans. The securities are sold directly to investors by the SPV or, as is more common, they are issued directly to the depositor as payment for the loans. The depositor then resells the securities, usually through an underwriting affiliate that places them on the market. Because the certificated securities are collateralized by the residential mortgages owned by the trust, they are called residential mortgage-backed securities ("RMBS").

12

50.    A variety of reasons, *e.g.*, pass-through tax status, mandate that the SPV be passive; it is little more than a shell to hold the loans and put them beyond the reach of the creditors of the financial institution.

51.    Loans, however, need to be managed. Bills must be sent out and payments collected. Thus, a third-party must be brought in to manage the loans. This third party is the mortgage loan servicer. Every loan, irrespective of whether it is securitized, has a servicer. Servicers are hired by owners of whole loans, typically trustees of mortgage securitization trusts.

52.    The specific duties of the servicer are set forth in the PSA or other agreement between the servicer and the owner of the loan. The terms of such agreements are substantively identical in all respects relevant to this lawsuit.

53.    Specifically, servicing agreements include a broad grant or delegation of authority to the servicer, governed by the duty of the servicer to act in the best interests of the loan owner, combined with more specific delegations of authority relating to particular tasks.

54.    For example, on June 1, 2004, GMACM executed a PSA to become the servicer of a mortgage securitization trust with JPMorgan Chase Bank as the trustee (the "JPMorgan PSA"). Section 3.01 of the JPMorgan PSA provides, in pertinent part:

> THE SERVICER TO ACT AS SERVICER
>
> The Servicer shall service and administer the Mortgage Loans on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders . . . in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that the Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws).

13

55.     Section 3.01 of the JPMorgan PSA additionally delegates to GMACM "full power

and authority, acting alone and/or through subservicers . . . to do or cause to be done any and all

things that it may deem necessary or desirable in connection with such servicing and

administration . . . ."

56.     The tasks of the servicer include account maintenance activities such as sending

monthly statements to mortgagors, collecting payments from mortgagors, keeping track of account

balances, handling escrow accounts, calculating interest-rate adjustments on adjustable rate

mortgages, reporting to national credit bureaus, and remitting funds collected from mortgagors to

the trust.

57.     Additionally, all PSAs and other servicing agreements require the servicer to make

sure that adequate hazard insurance is continuously maintained on the secured properties. Section

3.05 of the JPMorgan PSA, for example, provides in pertinent part:

> MAINTENANCE OF HAZARD INSURANCE
>
> The Servicer shall cause to be maintained for each Mortgage Loan
> hazard insurance with extended coverage on the Mortgaged Property
> in an amount which is at least equal to the lesser of (i) the Stated
> Principal Balance of such Mortgage Loan and (ii) the amount
> necessary to fully compensate for any damage or loss to the
> improvements that are a part of such property on a replacement cost
> basis, in each case in an amount not less than such amount as is
> necessary to avoid the application of any coinsurance clause
> contained in the related hazard insurance policy. . . . The Servicer
> will comply in the performance of this Agreement with all reasonable
> rules and requirements of each insurer under any such hazard policies.
>
> *       *       *
>
> In the event that the Servicer shall obtain and maintain a blanket
> policy with an insurer having a General Policy Rating of B:IV or
> better in Best's Key Rating Guide (or such other rating that is

14

comparable to such rating) insuring against hazard losses on all of
the Mortgage Loans, it shall conclusively be deemed to have satisfied
its obligations as set forth in the first two sentences of this Section.

58.    Fulfilling the obligation to maintain continuous hazard insurance requires the servicer

to monitor the status of homeowners' voluntary insurance to confirm that it is in-force, notify

homeowners of any insurance lapse, and secure LPI when appropriate. These activities constitute

"insurance tracking," a labor-intensive servicing responsibility which many servicers, including

GMACM, outsource to subcontractors.

59.    All PSAs and other servicing agreements allow servicers to subcontract their

servicing responsibilities to outside contractors provided the fees of the subcontractor are paid by

the servicers.

60.    Section 3.01 of the JPMorgan PSA provides, for example:

The Servicer shall perform all of its servicing responsibilities
hereunder or may cause a subservicer to perform any such servicing
responsibilities on its behalf, but the use by the Servicer of a
subservicer shall not release the Servicer from any of its obligations
hereunder with respect to the related Mortgage Loans. The Servicer
shall pay all fees of each of its subservicers from its own funds.

61.    Any amounts paid by the servicer to buy LPI count as "servicing advances" under the

PSAs and other agreements between the servicer and the loan owner. The servicer is entitled to

recoup such advances from the proceeds of the loan, whether through payments made by the

borrower or, if the borrower defaults, through proceeds at foreclosure. Additionally, the servicer has

the right to be reimbursed before any money is passed through to the securitization trust or other loan

owner. In other words, the servicer gets paid "off the top." In this respect, servicers are functionally

15

the senior-most creditors with respect to the loans they manage; their rights are senior even to those of the owners of the loans.

62.     Mortgage servicing is a highly lucrative business. Servicers receive a fee based on the unpaid principal balance of each trust's mortgage pool or, in some cases, for each loan serviced. These servicing fees are typically paid from the monthly payments made by the borrowers on the loans. Annual servicing fees generally range from 0.25-0.50% of the remaining principal balance of the mortgage and are collected monthly. In addition, servicers are entitled to keep certain borrower-contracted fees such as late charge fees, assignment transfer fees, insufficient funds bank fees, assumption fees, loss mitigation fees and other incidental fees and charges. Servicers also benefit from being able to invest and earn interest on borrowers' escrow payments as they are collected until they are paid out to taxing authorities and insurance companies. Servicers also earn "float" income with respect to borrowers' monthly payments, as the payments are generally collected on the first of the month but not passed through to the owners of the loans until the end of the month.

     **B.     GMACM's Servicing Portfolio**

63.     GMACM is the fifth largest residential mortgage loan servicer in the United States. GMACM services over 2.4 million mortgage loans with an unpaid principal balance of approximately $374 billion. GMACM performs servicing pursuant to PSAs and other servicing agreements with numerous loan owners, including private securitization trusts, GSEs, and defendant Ally Bank.

64.     Approximately 68% of the mortgage loans (by unpaid principal balance) serviced by GMACM are owned, insured or guaranteed by Fannie Mae or another GSE.

16

65.   Approximately 690,000 mortgage loans with an unpaid principal balance of $140.8 billion are serviced by GMACM on behalf of Ally Bank. The Ally Bank loans were originated by GMACM, then sold to Ally Bank by GMACM. Ally Bank either still owns such loans or has resold them to private secondary market investors while retaining the servicing rights to such loans. GMACM services the Ally Bank loans pursuant to a servicing agreement between GMACM and Ally Bank dated as of May 11, 2012. Prior thereto, GMACM serviced the Ally Bank loans pursuant to predecessor agreements since 2001.

**C.   The Kickback Scheme**

66.   In March 2003, GMACM entered into an agreement to buy LPI from Balboa and Meritplan. GMACM also hired Newport to perform insurance tracking on its behalf. The initial agreements between GMACM and the Balboa Defendants had a term of three years. Such agreements, however, were renewed and continue to the present. Today, GMACM is one of the largest LPI accounts handled by the Balboa Defendants.

67.   The kickback scheme was devised at the inception of the parties' relationship in 2003, and has been carried out continuously to the present. Pursuant to the scheme, Balboa and Meritplan pay GMACM secret rebates, *i.e.*, kickbacks, camouflaged by complex transactions using affiliates and related parties. GMACM pockets the rebates for itself, while fraudulently billing borrowers based on the full purported price of the LPI. In other words, the rebates reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Meanwhile, the gross insurance charges are incorporated into GMACM's servicing advances, which, as alleged above, GMACM recoups "off the top." To the extent borrowers fail to pay, loan owners bear the inflated charges through reduced loan proceeds and higher loss severities.

17

68.     As devised by the Balboa Defendants and GMACM, the scheme involves the payment of rebates/kickbacks in two forms: (i) free tracking services, and (ii) bogus "commissions."

69.     The free tracking services are provided by the Balboa Defendants through Newport. Under the scheme, GMACM pays nothing for Newport's insurance tracking services. Instead, Balboa and Meritiplan pay Newport on GMACM's behalf. The money is derived from the gross premiums that GMACM pays to Balboa and Meritplan for the LPI, and is routed from Balboa and Meritplan to Newport via "intercompany expense allocations."

70.     The free tracking services constitute rebates/kickbacks in kind. As alleged herein, servicers are responsible for providing tracking services as part of their duty to make sure that adequate hazard insurance is continuously maintained. Servicers are compensated to perform this responsibility through the servicing fees that they collect from loan owners. Moreover, although servicers are entitled to hire subcontractors to perform their responsibilities, servicing agreements require the servicer, as alleged above, to pay any subcontractors out of the servicer's "own funds." Under GMACM's arrangement with the Balboa Defendants, however, GMACM does not pay Newport out of GMACM's "own funds." Instead, GMACM pays nothing. Borrowers and loan owners bear the cost to pay Newport through inflated LPI charges and servicing advances.

71.     GMACM and Balboa have admitted to the essential facts concerning this aspect of the scheme. On May 21, 2012, a representative of GMACM, Michael Squillante, admitted in sworn testimony at a public hearing on LPI held by the New York State Department of Financial Services ("NYSDFS"), that Newport derives compensation through GMACM's LPI premiums and that GMACM pays nothing directly to Newport. NYSDFS Deputy Director Nancy Ruskin and Executive Deputy Superintendent Joy Feigenbaum examined Squillante:

18

DEP DIRECTOR RUSKIN: . . . Does – under the current arrangement, does GMAC pay QBE First [the parent of Balboa, Meritplan and Newport] for tracking services?

MR. SQUILLANTE: No, we do not.

DEP DIRECTOR RUSKIN: Why is that?

MR. SQUILLANTE: Our motto is we are a fully-turnkey outsource relationship. . . . [w]e have wholly outsourced that business to QBE.

EXEC DEP SUPT FEIGENBAUM: If I may, I guess I don't quite understand because there is a cost for the tracking of the service, is there not?

MR. SQUILLANTE: You have to ask QBE that much. I assume that there is. But they would – I don't have their financial information around that cost.

EXEC DEP SUPT FEIGENBAUM: Are you aware –

MR. SQUILLANTE: Again, they –

EXEC DEP SUPT FEIGENBAUM: Are you aware that other servicers provide, they pay for tracking services?

MR. SQUILLANTE: Yes. I'm aware some do and some don't; as some take commissions, and some don't.

EXEC DEP SUPT FEIGENBAUM: So . . . the consideration that might be given to GMAC is, you know, not having to pay for tracking services?

MR. SQUILLANTE: No. Our motto is simply to turnkey and outsource it, and have the insurance wholly done by Balboa . . . . Maybe I don't understand your question.

EXEC DEP SUPT FEIGENBAUM: . . . I think my understanding is that the servicers actually pay the – pay the insurance agent to do the tracking. So, I don't – I'm not asking whether you share. I'm asking, you know, why you don't pay.

19

> MR. SQUILLANTE: We do not pay tracking. Our motto is it's
> completely outsourced . . .
>
> DEP DIRECTOR RUSKIN: So, QBE is basically tracking for free?
>
> MR. SQUILLANTE: You'd have to ask QBE the economics of their
> business. I'm not – we are not paying for tracking our portfolio. But
> the economics of their business, you would have to ask them.

(669-671).

72.     In written testimony to the NYSDFS dated May 1, 2012, Balboa admitted the

"intercompany expense allocations." Specifically, Balboa stated:

> Balboa does not track insurance coverage.   For Balboa's
> lender-placed program, these services were provided by its affiliate,
> Newport Management Corporation ("NMC") and expenses incurred
> by NMC related to NMC's insurance tracking services, and/or the
> servicer's implementation of or conversion to such services, *were
> allocated to Balboa and other affiliated insurers on an
> intercompany expense allocation basis*.

(Emphasis added).

73.     As for the bogus "commissions," they are paid by Balboa and Meritplan to an affiliate

of GMACM, defendant John Doe. As with the tracking services, the money for the "commissions"

is derived from the LPI premiums paid by GMACM. The "commission" payments are made on the

pretense that John Doe is a third-party insurance agent that introduced the insurance customer, *i.e.*,

GMACM, to Balboa and Meritplan.

74.     At all relevant times, however, this pretense has been false. John Doe is not and has

never been a third-party insurance agent but is a commonly-controlled affiliate of GMACM. John

Doe has also never been a *bona fide* insurance agent of Balboa or Meritplan, has not provided and

does not provide any *bona fide* insurance agency services to Balboa or Meritplan, and has never

solicited or sold any insurance products on behalf of Balboa or Meritplan, in connection with LPI purchased by GMACM or otherwise. John Doe does not perform and has never performed any insurance agency functions.

75.     A press release issued by GMACM at the inception of GMACM's relationship with the Balboa Defendants belies any suggestion that GMACM was introduced to Balboa or Meritplan through any insurance agent. The March 6, 2003 press release simply announced that GMACM had "selected" Balboa to meet its insurance needs.

76.     Additionally, on information and belief, John Doe transfers the "commissions" that it receives to GMACM. Ally Financial knowingly participates in the scheme by facilitating such transfers through the "global cash management system" that Ally Financial operates for itself and its subsidiaries. *See* Affidavit of James Whitlinger at ¶¶ 121-122, *In re: Residential Capital* (filed May 14, 2012, ECF No. 6). Ally Financial's cash management system facilitates intercompany transactions and tracks amounts paid to and from each affiliated participant in the system, including John Doe and GMACM.

## D.     The Scheme Defrauds Borrowers And Loan Owners

77.     The free tracking services and "commissions" alleged above constitute illegal kickbacks or bribes paid pursuant to a *quid pro quo* agreement or understanding that GMACM will continue to do LPI business with the Balboa Defendants. The parties compute the rebates/kickbacks due GMACM as a percentage GMACM's gross LPI premiums. Moreover, the rebates/kickbacks represent a substantial percentage of such gross premiums and are, therefore, material.

78.     The scheme defrauds borrowers and loan owners. Borrowers are fraudulently billed for LPI in excess of GMACM's true costs. To the extent borrowers default, the inflated servicing

21

advances reduce the loan proceeds paid to loan owners. Moreover, loan owners are in effect double-billed for tracking services – first through servicing fees and then through excess LPI charges. GMACM is improperly double-dipping, collecting compensation for insurance tracking twice.

79.    Although servicers supposedly work for the owners of the mortgages they service, a number of commentators, including Professor Adam Levitin of Georgetown University Law Center, have observed that loan servicers' compensation structure creates serious principal-agent conflicts. Servicers have no stake in the performance of mortgage loans and do not share mortgage owners' interest in maximizing the value of the loans. Rather, the interest of servicers is in maximizing whatever fee and expense charges they can recoup "off the top."

80.    This compensation structure incentivizes servicers to artificially and improperly inflate their fees and expenses. As a consequence, servicers frequently charge so-called "junk fees" either for unnecessary work or work that was never done. Servicers also engage in a variety of abusive practices, including force-placing insurance when not required, or, as in this case, failing to pass LPI rebates to borrowers and loan owners. *See generally* Adam Levitin & Tara Twomey, *Mortgage Servicing*, 28 Yale J. on Reg. 1, 76 (2010); *Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Community Opportunity of the House Financial Services Committee*, 111th Cong., Nov. 18, 2010 (Statement of Associate Professor Adam J. Levitin, Georgetown Univ. L. Center).

81.    Servicers' compensation structures also incentivize them to delay foreclosures. Delaying foreclosures keeps homeowners in a "sweatbox" of mounting servicer fees and expenses, according to Professor Levitin. Through this strategy, servicers disregard their contractual duty to maximize the value of defaulted loans for their owners and instead simply keep ramping up the

22

charges as to each loan until they hit the "sweet spot" where the amount owed to the servicer is equal

to the liquidation value. At that point, because there is no equity left to strip, the servicer just

"want[s] to dump the property from [the] portfolio as quickly as they can," Professor Levitin

observes. Servicers thus routinely drag out defaults for the purpose of piling up bogus and inflated

fees and expenses until there is no value left.

82.     Abusive servicer activities such as delayed foreclosures, "junk" fees and inflated LPI

charges have enabled servicers to strip billions of dollars in equity from borrowers' homes at the

expense of homeowners and investors. It has also exacerbated the housing crisis by pushing

marginal borrowers prematurely or unnecessarily into foreclosure. As Professor Levitin describes

it, the costs of these kinds of servicer abuses have been "externalized directly on homeowners and

indirectly on communities and the housing market as a whole."

83.     Borrowers have no say in the selection of servicer. The standard mortgage loan

agreement provides:

> The Note or a partial interest in the Note (together with this Security
> Instrument) can be sold one or more times without prior notice to
> Borrower. A sale might result in a change in the entity (known as the
> "Loan Servicer") that collects Periodic Payments due under the Note
> and this Security Instrument and performs other mortgage loan
> servicing obligations under the Note, this Security Instrument, and
> Applicable Law. There also might be one or more changes of the
> Loan Servicer unrelated to a sale of the Note.

84.     Accordingly, no mechanism exists for borrowers to select servicers that do not receive

kickbacks from LPI insurers. Nor is there any mechanism for borrowers to opt-out with respect to

the kickbacks, bribes or affiliate transactions described herein.

23

85.     Additionally, once charged for LPI, borrowers have no choice but to pay or lose their

homes through foreclosure. The payment of improperly inflated LPI charges is not voluntary. As

alleged above, whatever LPI charges the servicer imposes "become additional debt of Borrower,"

secured by the lender's lien. Furthermore, the servicer recoups LPI charges "off the top," before

applying payments to loan principal.

86.     Plaintiffs do not challenge – and nothing in this complaint should be construed as

challenging – any state-approved LPI "rates" or the reasonableness of any state-approved "rates."

This lawsuit challenges a secret rebate scheme only.

   **E.     Fannie Mae Learns That It Is Being Overcharged For LPI**

87.     Fannie Mae, a GSE, purchases mortgages originated by private lenders, and is the

largest single owner of mortgages in the United States. Fannie Mae has contracted with numerous

servicers across the country to service tens of millions of mortgage loans. One of those servicers is

GMACM. A significant percentage of the loans serviced by GMACM are owned by Fannie Mae.

88.     On March 6, 2012, Fannie Mae issued a *Lender Letter*, titled "Changes Ahead for

Lender Placed Insurance," regarding the "costs to taxpayers" of kickback arrangements that result

in overcharges relating to LPI. The *Lender Letter* stated, in pertinent part:

> Fannie Mae will soon implement changes to its Lender-Placed
> Insurance (LPI) requirements to significantly reduce costs to
> homeowners, taxpayers, and Fannie Mae. The changes will lower
> barriers for borrowers who want to cure their delinquencies, while
> improving transparency and boosting competition in the LPI market.
>
> Fannie Mae requires hazard insurance on all properties for which it
> owns the mortgage. If a homeowner cannot provide evidence of
> coverage, the servicer must secure that coverage through the use of
> LPI. *Lender-placed policies, however, are significantly more
> expensive than voluntary coverage secured by the borrower and*

24

*often include commissions and other administrative costs, further adding to the cost of LPI policies.* Two firms currently issue most LPI policies.

An expensive LPI policy can often become an obstacle to a delinquent borrower seeking to avoid foreclosure. To bring their loan current, a borrower must reimburse the servicer for the cost of the LPI policy. *If the borrower defaults in mortgage loan payments and does not cure, Fannie Mae must reimburse the servicer for LPI premiums. Costs to Fannie Mae ultimately become costs to taxpayers.*

(Emphasis added).

89.    On March 14, 2012, Fannie Mae followed up on its *Lender Letter* by issuing a *Servicing Guide Announcement.* "With this Announcement, Fannie Mae is amending and clarifying its policies regarding the . . . allowable reimbursable expenses for lender-placed insurance," the Servicing Guide Announcement stated. Specifically, Fannie Mae stated that requests for LPI reimbursement must exclude "any lender-placed insurance commission earned . . . by the servicer or any related entity." "Any costs associated with insurance tracking" must also be excluded.

90.    The *Servicing Guide Announcement* stated, in pertinent part:

**Acceptable Lender-Placed Insurance Costs and Insurance Tracking Fees**

Fannie Mae is clarifying its requirement for reasonable reimbursable expenses for lender-placed insurance. Any servicer request for reimbursement of lender-placed insurance premiums must exclude:

■    *any lender-placed insurance commission earned on that policy by the servicer or any related entity,*

■    *costs associated with insurance tracking* or administration, or

25

      ■      *any other costs beyond the actual cost of the lender-placed*
*insurance policy premium.*

(Emphasis added).

91.    On March 6, 2012, Fannie Mae issued a request for proposals relating to LPI (the "RFP").[1] "Much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner," the RFP states. "This RFP is designed to change this situation."

92.    Specifically, the RFP requests that insurers submit independent bids for LPI and tracking services. Approved applicants are to be put on lists of "Preferred Providers" from which servicers hired by Fannie Mae loans will be required to choose. The stated goal of the RFP is the elimination of the "existing system" of secret rebates paid in the form of "subsidized" tracking services and related-party "commissions," *i.e.*, the improper kickbacks complained of herein.

93.    As the RFP states, Fannie Mae conducted a "review" from which it learned that LPI insurers pay "commissions/fees to Servicers for placing business with them" and, further, that such commissions/fees are "recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae."

94.    Additionally, Fannie Mae learned that "Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again

---

[1]    Fannie Mae acknowledged the existence of the RFP in March 2012, but declined to make the document public. Nevertheless, on July 3, 2012, Birney Birnbaum, on behalf of the Center for Economic Justice, annexed a copy of the RFP as exhibit B to written testimony submitted in connection with a Public Hearing before the Florida Office of Insurance Regulation Regarding a Rate Filing for Force-Placed Insurance by Praetorian Insurance Company.

26

via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs

of tracking services."

95.    The RFP proposes a "new business model" eliminating such secret rebates.  The

"executive summary" of the RFP states:

> As a best practice Fannie Mae seeks to reduce expenses while improving service quality. After extensive internal review, Fannie Mae believes that current Lender Placed Insurance costs are not market competitive and can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners. Therefore, Fannie Mae is undertaking this competitive procurement process to improve the pricing and fee transparency for Lender Placed Insurance while maintaining coverage and service quality.

> **Current Situation**

> Fannie Mae's current Lender Placed Insurance situation is as follows:

> 1.    Homeowners are required to maintain voluntary hazard insurance on Fannie Mae insured properties.

> 2.    Lender Placed Insurance must be acquired by mortgage Servicers when a property is no longer eligible for Voluntary Insurance, or when the Servicer cannot obtain proof of adequate Voluntary Insurance from the homeowner, irrespective of whether or not that homeowner is current or delinquent on the loan.

> 3.    The cost of Lender Placed Insurance is higher than the cost of voluntary hazard insurance. Homeowners are billed for the Lender Placed Insurance premiums. However, if the homeowner does not pay the premium (for example, if the property has already been vacated), then Servicers pass on the premium costs to Fannie Mae.

> 4.    Servicers are responsible for providing tracking services, per Fannie Mae Guidelines. Many large Servicers have chosen to outsource the Insurance Tracking and associated

27

administrative process to third parties, the largest of which are affiliated with Lender Placed Insurers.

5. *Lender Placed insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums, which the Servicers pass on to Fannie Mae.*

6. *The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms to Fannie Mae.* Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down. In addition, *Fannie Mae is often paying twice for Insurance Tracking services; once via the servicing fee that Fannie Mae pays to Servicers, and again via the Lender Placed Insurance premiums, since those premiums may include or subsidize the costs of tracking services (to the extent that insurers are providing such services).*

In appropriate circumstances, Lender Placed Insurance is necessary and important to the preservation of Fannie Mae assets. However, much of the current Lender Placed Insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner. This RFP is designed to change this situation.

**Expected Outcome**

The expected outcome of this procurement is for Servicers and Fannie Mae to obtain competitively-priced Lender Placed Insurance that incorporates price transparency and collaboration with Lender Placed Insurers. Fannie Mae expects to achieve the following:

1. *Eliminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae.*

2. *Eliminate the ability of Servicers to pass on the cost of Insurance Tracking services to Fannie Mae, since the cost for such services is reimbursed to the Servicer in the form of current servicing fees.*

28

3.    *Separate the commissions and fees for Insurance Tracking services from the fees for Lender Placed Insurance to ensure transparency and accountability.*

4.    Require Servicers to order Lender Placed Insurance policies based on competitive pricing negotiated by Fannie Mae; Fannie Mae will choose one or more Providers based on the responses received during the RFP process. The chosen Providers will be placed on a Preferred Provider List.

5.    Restructure the business model to align Servicer incentives with the best interests of Fannie Mae and homeowners.

6.    Enforce best practices that encourage the use of voluntary insurance and reduce the demand for lender placed insurance.

Fannie Mae recognizes that the current system developed over a period of years. However, Fannie Mae is prepared to restructure the current Lender Placed Insurance business model to operate as a market driven service that efficiently meets the best interests of Fannie Mae, its partner insurers, taxpayers, and homeowners.

Fannie Mae is confident that the business model proposed herein is fair to all parties, allows market-based pricing, *eliminates subsidies*, and allows Fannie Mae to best meet its federal charter to facilitate home ownership, provide liquidity to the housing market, and protect taxpayers. Fannie Mae also believes that this new model is sustainable over time and robust enough to adjust to changing conditions as the housing market recovers. The attributes of the new business model will be as follows:

1.    The premiums to be charged for Lender Placed Insurance will be negotiated between Fannie Mae and the Lender Placed Insurer(s). These premiums will be communicated to Fannie Mae's Servicer community.

2.    The Lender Placed Insurer(s) will continue to invoice the Servicers for insurance provided. *Fannie Mae will then reimburse the Servicers, but will not pay more than the rate negotiated by Fannie Mae. The rate negotiated between Fannie Mae and the Lender Placed Insurer(s) will exclude any commissions paid by the Lender Placed Insurer(s) to Fannie Mae Servicers to place their insurance on Fannie Mae properties. In addition the rate will exclude the cost of*

29

> *providing Insurance Tracking services or any other costs
> beyond the cost of the policy premium to the Servicer.*

3.    Servicers may contract for Insurance Tracking and associated
administrative services from a Lender Placed Insurer on the
Preferred Provider List, perform tracking services in-house,
or outsource tracking to a Provider not on the list since the
Servicer is fully liable for tracking costs. *However, the full
cost of such services must be billed independent of, and
never embedded in, the insurance premiums charged for
Lender Placed Insurance. Fannie Mae will not reimburse
Servicers for these tracking and administrative services.*

4.    Fannie Mae will reevaluate the Preferred Provider List from
time to time as appropriate to ensure Fannie Mae is receiving
competitive pricing.

This new business model will come into effect at the close of this
procurement process.

(Emphasis added).

96.    As to tracking services, the RFP additionally states:

The scope of the tracking and administrative services to be provided
will include at least the following activities:

•    Monitor status of homeowner's Voluntary Insurance to
confirm that it is in-force and in accordance with Fannie Mae
Guidelines
•    Request and confirm homeowner certificates of insurance
•    Notify homeowners of any Voluntary Insurance deficiencies
and attempt to correct
•    Secure the placement of Lender Placed Insurance in
accordance with Fannie Mae Guidelines
•    Work with homeowners to avoid placement of Lender Placed
Insurance or to secure Voluntary Insurance even after Lender
Placed Insurance has been placed
•    Provide Insurance Tracking and verification customer service
to homeowners, Servicers and Fannie Mae to include
state-of-the-art call center operations
•    Perform in compliance with Performance and Reporting
requirements . . .

30

> • Maintain books of record necessary to manage the scope of services covered in this RFP to include issuing accurate reports to Fannie Mae and its Servicers as described below

> *The Insurance Tracker may be an affiliate of a Lender Placed Insurance company but must bid the price of Lender Placed Insurance separately from Insurance Tracking services. Under the terms of this procurement, the prices submitted for neither line of business (i.e., Lender Placed Insurance or Insurance Tracking) may subsidize the other.*

(Emphasis added).

97.    In July 2012, Fannie Mae stated that the goal of the RFP was to "lower costs for homeowners, taxpayers, and Fannie Mae" and that Fannie Mae was still in the process of evaluating bids.

### F.    The Lawsky Investigation

98.    On or about January 10, 2012, Benjamin Lawsky, the Superintendent of the NYSDFS, launched a probe into improper practices relating to LPI, including kickbacks. *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

99.    On April 5, 2012, Lawsky issued a press release announcing that it had expanded its probe into LPI and was scheduling public hearings on the matter to take place in May 2012. The press release stated that the investigation had already uncovered evidence that borrowers had been overcharged for LPI "due [to] relationships between and payments by insurers to banks and their affiliates. . . . Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business." The press release also discussed that, as alleged herein, the LPI overcharges harmed not only borrowers but also "investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid."

31

100.    The full text of the Lawsky release stated:

**Department Of Financial Services Expands Probe Into Force-Placed Insurance, Demanding Explanation For High Rates; Will Hold Public Hearings**

**Seeks basis for consistently high profits at homeowners' and investors' expense**

**Hearings to be held on whether rates are excessive and to probe payments between insurers, brokers, agents and mortgage servicers**

Benjamin M. Lawsky, Superintendent of Financial Services, today announced that he is intensifying the Department of Financial Services investigation into force-placed insurance by requiring the largest licensed force-placed insurers operating in New York to provide a detailed accounting of their expenses, claims payments and profits.

The Superintendent will hold public hearings in May to review whether rates for force-placed insurance are excessive and to examine the relationships between and payments to and from insurers, banks, mortgage servicers and insurance agents and brokers. Testimony will be taken from homeowners harmed by force-placed insurance and from the banks, insurers, reinsurers and brokers who operate in the force-placed market. Information gained from the hearings will guide the Department in any action with respect to force-placed insurance.

In light of the concerns raised by the investigation's initial findings, the Department is requiring insurers to provide more extensive and detailed information and supporting documentation, including:
· An actuarial or statistical justification for force-placed insurance rates currently on file with the Department;
· A detailed explanation of how rates and expected loss ratios are calculated;
· A detailed explanation and itemized report of insurers' expenses relating to force-placed insurance; and
· A detailed explanation and itemized report of the payments insurers receive relating to force-placed insurance.

The Department has sent formal document requests, issued under Section 308 of the Insurance Law, requiring the following firms to

32

provide information: Balboa Insurance Company, QBE Insurance Corporation, QBE Financial Institution Risk Services, Inc., American Security Insurance Company (Assurant), American Bankers Insurance Company of Florida (Assurant), Meritplan Insurance Company, American Modern Home Insurance Company, Empire Fire and Marine Insurance Company, and Fidelity and Deposit Company of Maryland.

"It appears that force-placed insurers charge very high premiums, but pay out only a very small percentage of those premiums on claims—as little as 20 cents on the dollar. In addition, questionable payments are made to various players in the force-placed business, further increasing the profits to insurers and banks," Superintendent Lawsky said. "We have asked insurers to provide a complete breakdown of how much they collect and where every penny goes so we can determine if the premiums are appropriate and the basis for these payments."

Since October 2011, the Department has been conducting a broad industry-wide investigation of force-placed insurance. The investigation has revealed that, for force-placed insurance, the percentage of premiums paid on claims, known as the loss ratio, is extremely low—in most cases, dramatically lower than the expected loss ratios insurers filed with the Department. For example, based on the investigation, while most insurers filed a loss ratio of 55%, one major insurer's actual loss ratios for the last six years averaged 22% and another averaged less than 20%. This raises serious concerns about whether premiums for this insurance have been artificially inflated.

*The investigation thus far indicates that high rates for force-placed insurance appear to be due in part to relationships between and payments by insurers to banks and their affiliates, including mortgage servicers and insurance agents and brokers. Insurers pay high commissions to the banks or their affiliates presumably to guarantee the insurers will receive business. Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks.*

The insurers may also give banks a share of the profits by giving some of the insurance premium to a reinsurer owned by the bank. Since the claims payments are so low, the banks could be gaining a

33

substantial portion of the profit without actually taking on a great deal of risk.

In addition, the investigation to date reveals that the banks now have a significant conflict of interest. Often, it is the banks' servicers who are supposed to file insurance claims, but have a strong reason not to do so. When the mortgage is owned by investors, filing a claim will benefit the investors, but reduce the profits of the servicers' owners, the banks.

Force-placed insurance is taken out by a bank or mortgage servicer when a borrower does not maintain the homeowners' insurance required by the mortgage documents. This can occur if the homeowner misses a mortgage payment, the homeowner allows the homeowners' policy to lapse, or if the bank or mortgage servicer determines that the borrower does not have a sufficient amount of coverage. Force-placed insurance is typically far more expensive than homeowners' coverage purchased by a homeowner—anywhere from two to ten times more costly—yet often provides less protection for the homeowner while protecting the lender's or investor's interest in the property.

"There appear to be a number of very significant problems with force-placed homeowners' insurance. The price is often extremely high—as much as ten times the normal rate for homeowners' insurance. And sometimes consumers have this high priced policy forced on them when their own insurance is still in place. *At the hearings, we will explore whether banks are using force-placed insurance to increase their profits at the expense of homeowners and investors," Lawsky said.*

*The high cost of force-placed insurance adds to struggling homeowners' debt burden and makes it even more difficult for them to avoid foreclosure. The high cost also harms investors in mortgages or mortgage-backed securities, because servicers advance the insurance payments and then recoup those payments out of investment income before investors are paid.*

(Emphasis added).

34

101.    The NYSDFS held three days of hearings on LPI in May as scheduled. As alleged above, GMACM and Balboa admitted the essential facts regarding the rebates/kickbacks paid in the form of free tracking services at the hearings.

## VI.    THE KICKBACK SCHEME CONSTITUTES MAIL AND WIRE FRAUD

102.    The kickback scheme alleged herein constitutes mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

### A.    The Erroneous Notices And Bills To Borrowers

103.    As GMACM's insurance tracking subcontractor, Newport issues standardized notices to borrowers. Prior to the placement of LPI, Newport issues notices titled "Request for Property Insurance" demanding evidence of insurance and warning that LPI will be imposed if such evidence is not forthcoming. Once LPI is imposed, Newport issues Notices of Placement. For example, Newport issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on December 12, 2010. Newport issued a Notice of Placement to the Davidsons on August 2, 2009, and to Kobryn on May 13, 2012. Borrowers also receive standardized monthly billing statements from GMACM.

104.    The notices and billing statements are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension.

105.    Specifically, the notices do not disclose the rebates/kickbacks. The notices set forth the balances owed for LPI based on the full cost of the premiums without subtracting the rebates/kickbacks. Additionally, the notices falsely describe those balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for the money that GMACM "advanced."

35

106.    The Requests for Property Insurance state, "Since we have not received evidence of hazard insurance, we will secure hazard insurance coverage also known as lender-placed insurance. . . . You are responsible for *reimbursing* us for *the cost of this coverage*, in the amount of $[xx,xxx.xx], ('insurance charges')." (Emphasis added).

107.    The Notices of Placement state, "We have obtained lender-placed insurance coverage . . . under the terms of your mortgage. . . . The *cost of the insurance* in the amount of $[xx,xxx.xx] was *advanced* for the period [xx/xx/20xx] to [xx/xx/20xx]." The Notices of Placement demand that borrowers "*Reimburse us* in full for the insurance." (Emphasis added).

108.    These statements are materially false and misleading and omit facts necessary to make the statements not misleading. Because the rebates/kickbacks reduce GMACM's "costs" for the LPI coverage, the balances set forth in the notices exceed the amounts actually "advanced" by GMACM or necessary to "reimburse" GMACM because the rebates/kickbacks are not subtracted from the balances. Furthermore, the monthly statements to borrowers incorporate the same falsely inflated LPI charges.

**B.    The Erroneous Reports To Loan Owners**

109.    GMACM is required to provide financial reports to loan owners at least monthly documenting GMACM's payment activities with respect to each loan. The monthly financial reports are required to include information regarding any compensation received by GMACM, any advances made by GMACM, and any expenses reimbursed to GMACM.

110.    Additionally, GMACM is required to deliver certificates of compliance to each loan owner annually attesting that GMACM's activities for the year complied with the terms of the applicable PSA or other servicing agreement.

111.    All servicing agreements include such monthly and annual reporting requirements. For example, the JPMorgan PSA sets forth GMACM's monthly reporting requirement in Section 4.03, and GMACM's annual certification requirements in Section 3.13.

112.    GMACM's reports and certifications to loan owners are false, fraudulent, and reasonably calculated to deceive persons of ordinary prudence and comprehension. On information and belief, the reports and certifications do not disclosure the rebates/kickbacks. Instead, the reports and certifications set forth balances for advances and reimbursements based fraudulently on the full cost of the LPI premiums without subtracting the rebates/kickbacks. The reports and certifications also set forth balances for GMACM's compensation that fraudulently exclude the additional, undisclosed compensation derived by GMACM from the rebates/kickbacks.

113.    Moreover, on information and belief, the reports do not disclose GMACM's "double-dipping" with respect to tracking services, *i.e.*, the fact that GMACM charges loan owners for tracking services twice, first through servicing fees and then for a second time through excess LPI charges. As alleged above, GMACM's servicing agreements obligate GMACM to pay any subcontractors "from its own funds." The payment of Newport via excess LPI charges characterized as servicing advances, instead of from GMACM's "own funds", breaches this obligation. GMACM's certificates of compliance to loan owners fraudulently omit disclosure of such breach.

C.    **The Scheme Constitutes "Honest Services" Fraud**

114.    The scheme alleged herein constitutes "honest services" fraud in violation of 18 U.S.C. § 1346.

115.    The wire fraud and mail fraud statutes make it a crime to, *inter alia*, devise a scheme to deprive another of "honest services."

37

116.    The mail fraud statute reads in relevant part as follows:

> Whoever, having devised . . . any scheme or artifice to defraud, or for
> obtaining money or property by means of false or fraudulent
> pretenses, representations or promises . . . [uses the mails in
> furtherance of the scheme shall be punished by imprisonment or fine
> or both].

18 U.S.C. § 1341.

117.    The wire fraud statute is in relevant respects identical. *See* 18 U.S.C. § 1343.

118.    In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court interpreted this

statutory language to apply only to deprivations of property and not to encompass "the right to have

[one's] affairs conducted honestly." *Id.* at 352.

119.    In response to *McNally*, Congress broadened the scope of the mail and wire fraud

statutes by enacting 18 U.S.C. § 1346. That section provides:

> For the purposes of this chapter [including § 1341 and § 1343], the
> term "scheme or artifice to defraud" includes a scheme or artifice to
> deprive another of the intangible right to honest services.

18 U.S.C. § 1346.

120.    Through 18 U.S.C. § 1346, Congress brought schemes to deprive another of honest

services within the scope of the mail and wire fraud statutes.

121.    In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the Supreme Court addressed the

scope and constitutionality of 18 U.S.C. § 1346, concluding that the statute criminalizes "fraudulent

schemes to deprive another of honest services through bribes or kickbacks." *Id.* at 2928, 2931. In

fact, the Court held that, for purposes of the mail and wire fraud statutes, the term "scheme or artifice

to defraud" in 18 U.S.C. § 1346 (the "honest services" provision), applies to bribes and kickbacks.

The Court stated that "there is no doubt that Congress intended § 1346 to reach *at least* bribes and

38

kickbacks" because the "vast majority" of pre-*McNally* honest services cases involved bribery or kickback schemes. *Id.* at 2930-31.

122.    At all relevant times, GMACM owed legal duties to render services to loan owners. In all cases, those duties included maintenance of continuous hazard insurance coverage on the secured properties. The value of GMACM's services depended on GMACM's rendering those services in an honest manner. Nevertheless, GMACM misused its position as the servicer of the loans to extract bribes and kickbacks from the Balboa Defendants. GMACM thereby breached its obligation to render "honest services" to loan owners. GMACM, Ally Financial, and the Balboa Defendants devised a scheme or artifice to defraud loan owners of their intangible right to GMACM's honest services through kickbacks.

123.    The wire and mail fraud violations of GMACM, Ally Financial, and the Balboa Defendants, including "honest services" fraud, constitute predicate acts under RICO. The pattern of racketeering activity alleged herein has proximately harmed Plaintiffs and the Class.

## VII.    THE KICKBACK SCHEME VIOLATES RESPA'S ANTI-KICKBACK PROVISIONS

124.    The "commissions" and free tracking services provided by the Balboa Defendants to GMACM constitute unlawful kickbacks in violation of Section 8(a) of RESPA.

125.    Congress enacted RESPA to protect homeowners "from unnecessarily high settlement charges caused by certain abusive practices." 12 U.S.C. § 2601(a). The intent of Congress was to eliminate "kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2).

39

126.     Toward that end, RESPA prohibits referral fees and kickbacks. In particular, Section

8(a) of RESPA prohibits both the giving and acceptance of "any fee, kickback, or thing of value

pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of

a real estate settlement service . . . shall be referred to any person." 12 U.S.C. § 2607(a).

127.     RESPA confers on the Secretary of the Department of Housing and Urban

Development ("HUD") the authority to prescribe rules and regulations to achieve the statute's

purposes. *See* 12 U.S.C. § 2617(a). The relevant regulation adopted by HUD is known as

Regulation X and sets forth in relevant part:

> § 3500.14 Prohibition against kickbacks and unearned fees.
>
> (a) Section 8 violation. Any violation of this section is a violation of
> section 8 of RESPA (12 U.S.C. 2607) and is subject to enforcement
> as such under § 3500.19. (b) No referral fees. No person shall give
> and no person shall accept any fee, kickback or other thing of value
> pursuant to any agreement or understanding, oral or otherwise that
> business incident to or part of a settlement service involving a
> federally related mortgage loan shall be referred to any person. Any
> referral of a settlement service is not a compensable service, except
> as set forth in § 3500.15(g)(1). A business entity (whether or not in
> an affiliate relationship) may not pay any other business entity or the
> employees of any other business entity for the referral of settlement
> service business.

24 C.F.R. §3500.14(a).

128.     The penalty for violating Section 8(a) is joint and several liability by the violators "to

the person or persons charged for the settlement services involved in the violation in an amount

equal to three times the amount of any charge paid for such settlement service." 12 U.S.C.

§ 2607(d)(2).

129.     Thus, 12 U.S.C. § 2607(a) prohibits kickbacks to refer business incident to or a part of real estate settlement services to them.  If a party violates 12 U.S.C.§ 2607(a), the borrower is entitled to a statutory penalty equal to three times the amount paid by the borrower for the settlement service. *See* 12 U.S.C. § 2607(d)(2).

130.     RESPA and Regulation X define the term "settlement service" liberally. The word "settlement" is defined as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b). A "settlement service" is defined as "any service provided in connection with a prospective or actual settlement," and in this definition HUD specifies that settlement services include the "provision of services involving hazard, flood, or other casualty insurance." *See id.*

131.     The placement of LPI constitutes a "settlement service" within the meaning of RESPA. At minimum, the placement of LPI constitutes business "incident to" if not "a part of" real estate settlement services under 12 U.S.C. § 2607. Transactions placing LPI "regard" a "lien" on property subject to a federally related mortgage because, as alleged above, any amounts disbursed for LPI "become additional debt of Borrower secured by" the lender's lien on the property. Hence, transactions placing LPI fall squarely within the definition of a "settlement."

132.     Regulation X defines a "fee, kickback, or thing of value" as including, without limitation:

> monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity . . . . The term payment is used throughout

41

§§3500.14 and 3500.15 as synonymous with the giving or receiving
any "thing of value" and does not require transfer of money.

24. C.F.R. § 3500.14(d).

133.    The "commissions" and free tracking services provided by the Balboa Defendants to
GMACM thus violate Section 8(a) of RESPA. The loans of Plaintiffs and the Class are "federally
related" within the meaning of RESPA. The "commissions" and free tracking services constitute
unlawful kickbacks within the meaning of Section 8(a).

## VIII.   ALLY FINANCIAL'S DOMINATION AND CONTROL OF ITS SUBSIDIARIES, INCLUDING RESCAP AND GMACM

134.    At all relevant times, defendant Ally Financial exercised complete domination and
control over the affairs, activities, and operations of its subsidiaries – including, specifically, those
of ResCap and GMACM – such that those subsidiaries operated as mere instrumentalities or alter-
egos of Ally Financial. Moreover, GMACM engaged in inequitable conduct toward Plaintiffs and
the Class such that the circumstances justify piercing the corporate veils of GMACM and ResCap
in order to hold Ally Financial vicariously and/or derivatively liable for GMACM's misconduct.

### A.    Ally Financial, ResCap, And GMACM

135.    As alleged above, Ally Financial owns ResCap, which owns GMACM. At all times
relevant to this lawsuit, Ally Financial conducted mortgage loan securitization and servicing
activities primarily through ResCap and GMACM. Ally Financial's business model depended on
mortgage loan securitizations to fund ongoing mortgage loan originations and acquisitions and to
earn significant fees. GMACM earned additional fees by servicing loans.

136.    Ally Financial, ResCap, and GMACM, as well as other affiliates of Ally Financial,
face numerous investigations and lawsuits relating to their securitization and servicing operations.

42

### B.    Investigations And Lawsuits Relating To Securitization Activities

137.    GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans. On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

138.    Additionally, on September 2, 2011, the Federal Housing Finance Authority ("FHFA"), as conservator for Freddie Mac, filed suit in New York State Supreme Court against Ally Financial and several of its subsidiaries for claims arising in connection with its role in the public filing of offering documents containing false and misleading statements. These claims arise from Freddie Mac's purchase of over $6 billion in certificates issued through twenty-one transactions similar to the transactions at issue here. Among other claims, FHFA brought suit for common law fraud against various Ally Financial subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and substantial assistance in rendering material misrepresentations to Freddie Mac in connection with the sale of the subject certificates.

139.    The FHFA also alleges violations of state and federal securities laws by Ally Financial and several of its subsidiaries stemming from false and misleading statements contained in publicly filed prospectuses, prospectus supplements, registration statements, and other offering documents. Additionally, FHFA also alleges aiding and abetting fraud against Ally Financial and certain of its affiliates for their intentional and substantial assistance in rendering material

43

misrepresentations to Freddie Mac in connection with the sale of the certificates. The FHFA action

seeks relief in the form of rescission and recovery of the $6 billion purchase price of the certificates,

including lost principal and interest, as well as punitive damages and attorneys' fees and costs. In

October 2011, Ally Financial and its co-defendants removed the FHFA action to the United States

District Court for the Southern District of New York.

140.    In addition, GMACM currently is facing a lawsuit brought by monoline insurer MBIA

Insurance Corporation ("MBIA") in New York State Supreme Court in which MBIA alleges that,

in connection with certain mortgage insurance transactions with MBIA, GMACM affirmatively

misrepresented the credit quality of tens of thousands of mortgage loans, with an original principal

balance of more than $4 billion, as a means of unfairly shifting to investors and MBIA risks that

GMACM should have borne itself. On December 15, 2010, the New York State Supreme Court

issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of

representations and warranties and fraud claims, among others, to proceed to trial.

141.    Additionally, according to Ally Financial's quarterly report for the third quarter of

2011, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending against

Ally Financial's mortgage-related business units and subsidiaries arising from numerous RMBS

offerings. The plaintiffs in those suits have alleged, among other things, that Ally Financial's

various mortgage subsidiaries made misstatements and omissions in registration statements,

prospectuses, prospectus supplements, and other documents related to RMBS offerings. The alleged

misstatements typically concern underwriting standards. *See* Ally Fin. Inc., Quarterly Report (Form

10-Q), at 159 (Nov. 4, 2011). Further, in its 2011 Annual Report, Ally Financial stated that it

44

expects additional similar claims to be brought against Ally Financial and/or its subsidiaries in the future. *See* Ally Fin. Inc., Annual Report (Form 10-K), at 20 (Feb. 25, 2011).

142.    Since the filing of its November 2011 Form 10-Q, moreover, Ally Financial and its subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which have alleged, *inter alia*, material misrepresentations and omissions about the loans backing RMBS securities issued by Ally Financial's affiliates.

143.    Ally Financial and several of its subsidiaries, including GMACM, are also currently facing several lawsuits brought by monoline insurer Financial Guaranty Insurance Company ("FGIC") in which FGIC alleges that in connection with certain mortgage insurance transactions, the defendants, acting as alter egos of each other, affirmatively misrepresented the credit quality of tens of thousands of mortgage loans, with a total original principal balance of approximately $1.87 billion, as a means of unfairly shifting to investors and FGIC risks which the defendants should have borne.

144.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits from monoline insurers like MBIA and FGIC given that Ally Financial and its subsidiaries sold $42.7 billion of loans into monoline-wrapped securitizations from 2004 to 2007. During 2011, Ally Financial and its subsidiaries have received repurchase claims from monoline insurers for $265 million worth of mortgages related to securitizations it consummated between 2004 and 2007. Ally Financial evidently clearly recognizes its exposure because, according to its CEO, Michael Carpenter, ResCap has already reserved $829 million for misrepresentation and warranties claims and, according to its SEC filings, Ally Financial confirms that "litigation with . . . monolines is likely." Ally Fin. Inc., Annual Report (Form 10-K), at 98 (Feb. 28, 2012).

45

145.    Indeed, according to Ally Financial's 2012 annual report, the company also believes

that "[t]he total exposure . . . to mortgage representation and warranty claims is most significant for

loans originated and sold from 2004 through 2008, specifically the 2006 and 2007 vintages that were

originated and sold prior to enhanced underwriting standards and risk-mitigation actions

implemented in 2008 and forward." Ally Fin. Inc., Annual Report (Form 10-K), at 224 (Feb. 28,

2012).

146.    Additionally, Ally Financial disclosed that the SEC served a subpoena on Ally

Financial in June 2011, requesting documentation regarding certain "bulk settlements" relating to

securitized mortgage loans as well as a request for materials provided to investors and prospective

investors in RMBS. *See* Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under

the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

C.    **Investigations And Lawsuits Relating To Servicing Activities**

147.    On February 9, 2012, the Federal Reserve Board announced that Ally Financial, its

subsidiaries, including GMACM, and several other mortgage loan servicers would be required to pay

$766.5 million in monetary sanctions for "unsafe and unsound processes and practices in residential

mortgage loans servicing and foreclosure processing." Press Release, FRB, February 9, 2012. On

February 12, 2012, the FRB imposed well over $200 million of this fine against Ally Financial,

ResCap, and GMACM pursuant to an Assessment Order, which requires that the sanctions be paid

to various borrower assistance programs and nonprofit programs established to help victims of

improper servicing and foreclosure practices. *See* Order of Assessment of a Civil Money Penalty

Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, FRB Docket No.

12-006-CMP-HC (February 12, 2012) (the "Assessment Order").    According to the FRB, the

46

sanction "takes into account the maximum amount prescribed for unsafe and unsound practices under the applicable statutory limits, the comparative severity of the institutions' misconduct, and the comparative sizes of the institutions' foreclosure activities." *See* Press Release, FRB, February 9, 2011.

148.    Also on February 9, 2012, the United States Attorney General announced that Ally Financial, ResCap, and GMACM would take part in the $25 billion nationwide mortgage settlement to resolve claims brought by the government in response to the abusive mortgage loan servicing practices of Ally Financial and four other banks. *See* Eric Holder, U.S. Attorney General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement releases Ally Financial, ResCap, and GMACM from certain civil claims brought by the DOJ and multiple state attorneys general, the settlement does not resolve or release any other liabilities that Ally Financial, ResCap and GMACM have incurred through their improper servicing practices. *See id.*

149.    According to the U.S. Attorney General, the $25 billion settlement and $766.5 million sanction are just "the latest step forward" in holding the settling banks, including Ally Financial, ResCap, GMACM and others, accountable for "egregious mortgage loan servicing abuses."

150.    In addition to these recent settlements and Assessment Order, the FRB and the Federal Deposit Insurance Corporation (the "FDIC") previously ordered Ally Financial, ResCap and GMACM to adopt new procedures and practices in relation to mortgage loan servicing. *See* Consent Order, FRB Docket No. 11020-B-HC (April 13, 2011) (the "Consent Order").

151.    The Consent Order notes that Ally Financial and its mortgage servicing subsidiaries, including ResCap and GMACM, have been accused, *inter alia,* of (1) failing to properly increase

47

financial, staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

152.    Furthermore, under the Consent Order, Ally Financial as the parent corporation is obligated to direct ResCap and GMACM to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id.* at 4. Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors . . . [to assess the performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." *Id.* at 8.

153.    The Consent Order further requires GMACM to conduct a review of certain past residential mortgage foreclosure actions in order to determine whether borrowers were financially harmed. *See* Press Release, FRB (November 1, 2011). If the foreclosure process is found to have caused financial injury to the borrower, GMACM is required to provide full compensation to the borrower. *See id.*

154.    Additionally, Ally Financial is required to adhere to new, heightened servicing standards. *See* Press Release, FRB (February 9, 2011). The FRB ordered Ally Financial to remedy its servicing practices by, *inter alia*, "strengthen[ing] the coordination of communications with borrowers by providing borrowers the name of the person at the service who is their primary point of contact, establish[ing] limits on foreclosures where loan modifications have been approved,

48

establish[ing] robust third party vendor controls, strengthen[ing] compliance programs, and provid[ing] appropriate remediation to borrowers who suffered financial injury as a result of errors by the servicers." *See id.*

155.    The servicing and foreclosure improprieties of Ally Financial and its subsidiaries, including GMACM, is a matter of public record. According to the sworn testimony of a GMACM employee, Ally Financial's mortgage servicing subsidiaries have routinely filed false affidavits in thousands of foreclosure actions across the country. *See Jeffrey Stephan Dep. Federal National Mortgage Association v. Bradbury*, BR1-RE-09-65 (Me. Dist. Ct., Dist. Nine, June 7, 2010). Indeed, according to the Financial Crisis Inquiry Commission ("FCIC") Report:

> [L]enders have relied on "robo-signers" who substituted speed for accuracy by signing, and sometimes backdating, hundreds of affidavits claiming personal knowledge of facts about mortgages that they did not actually know to be true. One such "robosigner," Jeffrey Stephan of GMAC, said that he signed 10,000 affidavits in a month–roughly 1 per minute, in a 40-hour workweek–making it highly unlikely that he verified payment histories in each individual case of foreclosure.

FCIC Report at 407.

156.    Stephan also testified that, when executing summary judgment affidavits to be used in judicial foreclosure actions, he was acting in accordance with policies and procedures, and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep. Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among other things, the mortgage note and documents relating to the assignment of the mortgage. *See id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the foreclosure was proper,

all he knew was the borrower's name and whether he had signing authority for the Ally Financial entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan testified that the process he followed in signing summary judgment affidavits was in accordance with the policies and procedures required by GMACM. *Id.* at 64:8-14.

157.    Additionally, in October 2010, the Ohio Attorney General filed suit against GMACM and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed thousands of false affidavits in connection with foreclosures on properties in that state. *See State of Ohio v. GMAC Mortgage LLC*, No. CI0201006984, (Ohio Ct. of Common Pleas filed Aug. 6, 2010). Although some of the claims brought by the Ohio Attorney General's suit have been resolved by the $25 billion nationwide mortgage settlement, many additional claims not encompassed by the settlement have survived.

158.    Similarly, in December 2011, the Massachusetts Attorney General filed suit against GMACM for, among other things, engaging in unfair and deceptive foreclosure practices. *See Commonwealth of Massachusetts v. Bank of America N.A.*, No. 11-4363 (Suffolk Cnty. Superior Ct. filed Dec. 1, 2011). Days after filing suit, the Massachusetts Attorney General sent a letter to the United States Senate Committee on Banking, Housing and Urban Affairs and the United States House Committee on Financial Services asking that the federal government investigate Ally Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false documents related to property seizures. *See* Boston Globe, Attorney General Martha Coakley Urges Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices, Dec. 6, 2011. Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions
> against homeowners in Massachusetts and across the country, I
> respectfully request that your committees investigate Ally
> [Financial]'s serious misconduct and consider what actions the federal
> government can take to ensure that Ally [Financial] adheres to the
> law.

*Id.*

159.    While the $25 billion nationwide mortgage settlement ultimately resolved certain claims brought by the Massachusetts Attorney General in this action, other claims survived and will continue to be prosecuted.

### D.    Ally Financial Causes ResCap And GMACM To File For Bankruptcy

160.    Since at least November 2011, Ally Financial was considering seeking bankruptcy protection for ResCap, its wholly-owned subsidiary, which has reportedly lost $555 million since 2009, according to multiple published reports. GMACM is a wholly-owned subsidiary of ResCap.

161.    Around that time, the financial industry was "betting that Ally [Financial] will place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an initial public offering." Bloomberg News, Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance, November 14, 2011. As the article notes, Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for bankruptcy. *See id.*

162.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 28, 2012).

163.    That risk ultimately came to pass as Ally Financial disclosed earlier this year that the

penalties assessed by the federal government and numerous state attorneys general regarding the

servicing and foreclosure practices of Ally Financial and its subsidiaries, which include GMACM,

"resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011."

*Id.* at 31. As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge]

was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in

certain of ResCap's credit facilities." Ally Financial, Current Report (Form 8-K) (January 31, 2012).

Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net

worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities

. . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million

at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012).

ResCap's substantial shortfall, however, was "immediately remediated by Ally through a capital

contribution of $197 million, which was provided through forgiveness of intercompany debt during

January 2012." *Id.*

164.    Moreover, in February, 2012, it was reported that Ally Financial had contacted buyout

firms such as Fortress Investment Group LLC and Cerberus regarding a potential sale of ResCap

through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faced financing

and liquidity deadlines. *See* Bloomberg Businessweek, Ally's ResCap Said to Seek Buyers for

Prearranged Bankruptcy, Feb. 8, 2012. According to the report, "[p]otential bidders are being told

that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as

[RMBS] securitizations that have been the subject of litigation." *Id.* To that end, Ally Financial's

CEO stated that he will not pursue the aforementioned initial public offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.*

165.    Nevertheless, a bondholder group representing holders of approximately $800 million in ResCap debt expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from ResCap because it has *stripped assets from the unit.*" Bloomberg News, Paulson, Tepper Said Among Investors Urging Ally to Back ResCap, Jan. 10, 2012 (emphasis added).

166.    Indeed, as Ally Financial has pointedly noted in its most recent annual report: "In light of ResCap's liquidity and capital needs combined with volatile conditions in the marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

167.    On May 14, 2012, ResCap and certain of its subsidiaries, including GMACM, filed petitions for bankruptcy protection under Chapter 11.

E.    **Ally Financial's Pre-Petition "Harvesting" Of Subsidiary Assets**

168.    On June 1, 2012, the Official Committee of Unsecured Creditors in the ResCap/GMACM bankruptcy (the "Unsecured Creditors") moved for an order authorizing them to conduct an investigation of a "complex constellation of pre- and post-petition transactions, involving billions of dollars of transfers and financings among interested parties." Specifically, the Unsecured Creditors sought to investigate transactions through which Ally Financial stripped or apparently plans to strip the Debtors of valuable assets. *In re: Residential Capital, LLC, Debtors*, No. 12-12020 ("UCC Motion") (S.D.N.Y. filed June 1, 2012) (ECF No. 192).

53

169.    The proposed transactions include a "stalking horse bid" by Ally Financial of up to $1.6 billion for a portfolio of mortgage loans and securities owned by the Debtors, a $150 million secured loan to the Debtors under an amendment to a pre-petition secured loan agreement, and a proposed settlement agreement between the Debtors and Ally Financial (the "Ally Settlement Agreement").

170.    Under the Ally Settlement Agreement, Ally Financial would contribute $750 million to the Debtors' estates in exchange for (i) releases by the estates of all legal claims that the Debtors have against Ally Financial, and (ii) non-consensual releases by third party holders of legal claims against Ally Financial. *See* Settlement and Plan Sponsor Agreement, *In re: Residential Capital* (filed May 14, 2012) (ECF No. 6-8).

171.    Notably, the Debtor and third-party releases in the Ally Settlement Agreement would release any and all "causes of action under theories of veil piercing and alter ego liability." In other words, Ally Financial is seeking through the settlement to buy, for $750 million, peace from, *inter alia*, any veil-piercing or alter-ego claims that may be alleged against Ally Financial by its own subsidiaries, ResCap and GMACM, as well as by any third parties such as Plaintiffs herein.

172.    In 2011, ResCap appointed two new members to its board, Jonathan Bally and John E. Mack, who purportedly investigated the legal claims that the Debtors may have against Ally Financial. Based on the purported investigation, these supposedly independent directors negotiated the Ally Settlement Agreement and the proposed releases.

173.    Additionally, the Debtors, which possess pertinent non-public facts regarding the subjugation of the Debtors by Ally Financial, specifically aver in the Ally Settlement Agreement that

54

they "believe" that the Debtors possess valid "veil piercing and alter ego" claims against Ally

Financial. An introductory clause of the Ally Settlement Agreement states:

> the Debtors believe certain claims exist against Ally related to the
> corporate relationship between the Debtors and Ally, including with
> respect to certain transactions between the Debtors and Ally,
> including equitable subordination, debt recharacterization, fraudulent
> conveyance, avoidance liability under federal or state laws, *and other
> causes of action under theories of veil piercing and alter ego
> liability*.

*Id.* at 1 (emphasis added).

174.    The Unsecured Creditors also sought authorization to investigate a series of

suspicious related-party transactions that occurred prior to the bankruptcy filing. The Unsecured

Creditors allege that Ally Financial transferred billions of dollars of assets from the Debtors to Ally

Financial through such transactions. UCC Motion at ¶ 4, Ex. B at ¶ 29.

175.    On June 4, 2012, creditor Berkshire Hathaway, Inc. ("Berkshire Hathaway") moved

for appointment of a bankruptcy examiner to conduct the investigation proposed by the Unsecured

Creditors. *In re: Residential Capital* (ECF No. 208). According to Berkshire Hathaway, an

investigation was warranted in light of the "dozens of transactions with Ally and its affiliates

involving billions of dollars of asset transfers and intercompany financing – transactions whose net

effect was to transfer a substantial share of ResCap's operating assets to its parent." Berkshire

Hathway went on to state:

> The Debtors now seek to release Ally from any claims arising from
> these transactions, even while they admit that the Debtors possess
> valid claims against Ally, including for fraudulent transfer, equitable
> subordination, and alter ego. An examiner should determine whether
> this proposed release is fair to the Debtors and all their stakeholders.

55

An examiner should also be tasked with reviewing the propriety of
the Debtors' request to release Ally from any third-party claims. As
the Second Circuit and this Court have observed, such non-debtor
releases are especially susceptible to abuse, as they effectively offer
a non-debtor a bankruptcy discharge without affording creditors the
protections that would attend a bankruptcy. If there is a basis for such
an extraordinary remedy in this case, it is nowhere to be found in the
pleadings the Debtors have filed to date. The Debtors' settlement
agreement merely recites that Ally's third party release "is justified
by truly unusual circumstances," none of which are identified, and
that the release is an "essential component and important to the
success of the Plan," for reasons that are neither explained nor
evident.

What is evident—abundantly so—is that the Debtors' plan fits neatly
into Ally's publicly-stated goal of separating itself, once and for all,
from ResCap. Whether Ally's agenda also happens to be in the best
interest of ResCap and its creditors is another question, one that
should be a focus of a searching inquiry.

\*        \*        \*

Ally has laid much of the blame for its financial difficulties on
ResCap's mortgage operations and has publicly avowed its intention
to make a clean break from ResCap and its liabilities.

That break, however, comes after years of related-party transactions
and asset transfers. For example, the Rule 2004 Motion [filed by the
Unsecured Creditors] identifies at least twenty different transactions
with Ally and its affiliates involving the purchase of assets and
businesses from ResCap, or the extension of credit secured by
ResCap's assets. (Rule 2004 Mot., Ex. B, Definition of "Specified
Transactions.") These transactions involved billions of dollars and
sizable on-going businesses.

. . . . Th[ese] and other transactions may give rise to various potential
claims that Ally and affiliates have harvested assets from ResCap and
seek a quick and easy divorce through bankruptcy.

176.    On June 20, 2012, the Bankruptcy Court granted Berkshire Hathaway's motion and

appointed an examiner to conduct the investigation sought.

**F.**     **Ally Financial's Domination Of ResCap And GMACM**

177.    Ally Financial has recently admitted to the FRB and FDIC that it "owns and controls" ResCap and GMACM. *See* Consent Order.

178.    Ally Financial's public statements and actions demonstrate that at all relevant times Ally Financial: (i) wholly owned ResCap and GMACM; (ii) shared resources, management and employees with ResCap; (iii) considered its mortgage origination and servicing businesses through ResCap and GMACM to be "units" of Ally Financial; and (iv) had a business relationship with ResCap and GMACM designed to benefit itself at the expense of those subsidiaries.

179.    From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap and GMACM as extensions of itself, rather than as subsidiaries whose dealings were at arm's length.

180.    Ally Financial, at the direction of its board of directors, took a number of actions in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage securitization and servicing business, which was carried out by its subsidiaries. Ally Financial substantially restructured its subsidiaries in 2005.

181.    ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp. – two of Ally Financial's wholly-owned subsidiaries – were transferred to ResCap in March 2005. Those two subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

182.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

57

183. Further, Ally Financial's 8-K, filed on June 9, 2005, disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005 Operating Agreement").

184. On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business. This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants.

185. On December 1, 2006, Ally Financial had its inaugural conference call with investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations, "welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global financial services company." On the same investor call, Eric Feldstein, Ally Financial's then CEO, demonstrated how Ally Financial was going to take initial steps to actively control its subsidiaries. For instance, Feldstein declared that one of Ally Financial's first acts as controlling parent was "to integrate certain of GMAC mortgage operations . . . to drive some cost efficiencies." *Id.*

186.    At all times since Ally Financial caused ResCap to be incorporated, it has owned

100% of ResCap. Since incorporation, the ownership of ResCap has not changed. Statement by

Michael Carpenter, Ally Financial's CEO, Ally Financial Earnings Call, Nov. 2011.[2]

187.    Ally Financial has continued to exert its domination and control over ResCap via

shared resources, management and employees. For example, Ally Financial and ResCap shared at

least three common board members, including two individuals who were active participants with

respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's chairman

and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director of ResCap,

Sanjiv Khattri. In fact, the 2005 Operating Agreement, between ResCap and Ally Financial, which

Ally Financial filed with the SEC, and which upon information and belief is still currently in effect,

"require[s] that [ResCap's] board of directors include at least two independent directors, to be

selected by [Ally]." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005.

188.    Eric A. Feldstein was Ally Financial's CEO and Chairman of its board of directors,

and also served as Chairman of ResCap's board of directors. Furthermore, Sanjiv Khattri has served

as Executive Vice President and CFO of Ally Financial, while also serving as a director and CFO

of ResCap. Numerous other individuals served as Directors and Officers of both Ally Financial and

ResCap, with many serving in roles directly related to the mortgage operations of both companies.

---

[2]    GM had created a shell company, GMAC Mortgage Group Inc., which was the direct
parent of ResCap. However, there is no indication that this company conducted any business
independent from Ally Financial. In fact, Ally Financial's first Annual Report as an independent
entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that
evidenced Ally Financial's corporate structure. There was a direct line from Ally Financial to
ResCap. See Ally Fin. Form 10-K, at 2 (Mar. 3, 2007). In addition, there is no indication that Ally
Financial ever discusses ResCap as an "indirect subsidiary." To the contrary, as discussed, below,
Ally has publicly stated on numerous occasions that it is the owner of ResCap.

59

189.    ResCap and its own subsidiaries, including GMACM, shared numerous directors and senior management as well.

190.    David C. Walker is another example of the many employees who had overlapping responsibilities at Ally Financial and its subsidiaries, including GMACM. Walker joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group. Walker has also served as a director at ResCap and GMACM, among other ResCap subsidiaries.

191.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release of Ally Financial's 2007 first quarter financial results to investors in an email bearing the ResCap logo. That announcement stated that Ally Financial's financial results were found on both Ally Financial's and ResCap's websites.

192.    Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006. Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a ResCap e-mail address, according to the complaint filed by FGIC against Ally Financial. Further, an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally Financial subsidiaries – including GMACM – should be sent not to the relevant (and supposedly independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel, according to the FGIC complaint.

193.    As further evidence of Ally Financial's domination over ResCap, the 2005 Operating Agreement also indicates that Ally Financial has expressly "restrict [ed] ResCap's ability to declare

60

dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates." *See id.*

194.    Conversely, s alleged above, Ally Financial has also agreed to directly pay the losses or expenses of ResCap. In the same 2005 Operating Agreement, Ally Financial stated that it would stand behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." *Id.*

195.    Until ResCap filed for bankruptcy, Ally Financial continued to make additional public statements that further demonstrated its willingness to support and fund ResCap.  For instance, in May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally Financial's Q1 2007 Earnings Call at 24 (May 2, 2007).

196.    Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of equity when it was appropriate . . ." Ally Financial's Q2 2007 Earnings Call at 9 (July 30, 2007).  Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part of our plan and a key part of our value creation." *Id.*

197.    Thus, Ally Financial's senior management assured the market that the company was supporting ResCap for the purposes of Ally Financial's own "value creation."

198.    The financial support Ally Financial gave to ResCap began in May 2005.  Upon information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by

61

channeling capital and liquidity into ResCap even as its condition continued to deteriorate as the housing market crashed. In addition to the direct financial support Ally Financial provided ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally Financial announced to the market that it renewed a funding facility with Citibank, which provided "funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap] businesses." *Id.*

199.    Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily dependent on [Ally Financial] and its affiliates for funding and capital support." Ally. Fin. Inc., Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

200.    Additionally, Annual Reports prepared by Ally Financial further note its pursuit of strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its control over its subsidiaries to enhance its own financial health. According to Ally Financial: "On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy [Ally's] current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related assets and businesses. . . . In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should minimize the impact of any significant future losses related to ResCap's legacy mortgage business . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

201.    There is also substantial evidence that billions of dollars of TARP funds meant to stabilize Ally Financial were given to ResCap. *See* TARP Report dated March 10, 2010, at 41, 44.

62

Upon information and belief, the TARP funds were commingled among a variety of entities within Ally Financial's mortgage family, including ResCap.

202.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to account for the potentially significant liabilities stemming from repurchase demands made on its mortgage-related business units. The balance of the Mortgage Repurchase Reserve was $825 million as of the fourth quarter of 2011. *See* Ally Financial's Q4 2011 Earnings Presentation at 16. Although these repurchase demands are generally made on Ally Financial's subsidiaries – including GMACM – in discussing the reserve on an earnings call, Ally Financial CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage repurchase expense of $44 million." Ally Financial's Q4 2011 Earnings Call, at 4 (Feb. 2, 2012).

203.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally Financial's third quarter 2011 earnings call, Mackey further described losses attributable to mortgage loan repurchases as belonging to Ally Financial, when he stated: "Our mortgage repurchase reserve is [as it then stood] $829 million . . . . Our loss experience improved during the quarter due to the fact that we had fewer mortgage insurance rescission payments that we experienced last quarter and that did not repeat this quarter." Ally Financial's Q3 2011 Earnings Call at 6 (Nov. 2, 2011).

204.    On the same call, Ally Financial CEO Carpenter explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ." *Id.* at 8.

205.    Additionally, Ally Financial recorded a $230 million charge in the fourth quarter of 2011 as a result of the nationwide mortgage settlement that included ResCap and GMACM. *See* Ally Fin. Inc., Form 10-K, at 12 (Feb. 28, 2012).

63

G.    Ally Financial's Disregard Of Corporate Formalities

206.    Ally Financial describes its subsidiaries as its own business units rather than separate and distinct entities. For example, Ally Financial declared, in a section of its website specifically intended for investors, that GMACM is a "business unit" of Ally Financial, rather than an indirect subsidiary owned by ResCap. See Ally Financial Website, Ally Home > About Ally > Investor Relations, *available at* http://www.ally.com/about/investor/ (last visited Dec. 9, 2011).

207.    The origination and securitization of mortgage loans by ResCap and GMACM have long been integral parts of Ally Financial's core business. In its 2006 Annual Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate finance company focused primarily on the residential real estate market. Our business activities include the origination, purchase, servicing, sale and securitization of residential mortgage loans." GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007). Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy." *Id*. at 5.

208.    Ally Financial continued to publicly report on its own business and that of its subsidiaries on an integrated basis: "We engage in the origination, purchase, servicing, sale, and securitization of consumer (*i.e.*, residential) mortgage loans and mortgage-related products. Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank." Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010). More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States. We are one

64

of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators." Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

209.   Moreover, as alleged above, Ally Financial – at least in the view of certain of ResCap's creditors – is believed to have stripped assets from its subsidiary.

210.   In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM as part of its own business. For example, in its investor presentation from 2007, ResCap declared that GMACM is "owned and operated by GMAC Residential Capital Company, LLC [ResCap]." The presentation further stated that ResCap "is part of the [Ally Financial] family of companies."

211.   As alleged above, Ally Financial exerted its dominance and control over ResCap and GMACM. When Ally Financial was not directly controlling GMACM, it was using ResCap as an instrument to do so.

212.   Prior to ResCap's and GMACM's bankruptcy filing, Ally Financial also used those subsidiaries' resources as its own to earn favorable credit ratings. For instance, a Moody's report in November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is evident from that report that Ally Financial obtained such a rating by providing information related to its ResCap mortgage units. Ally Financial itself is not engaged in the origination business. Instead, it used its ResCap mortgage units as instruments to obtain favorable ratings.

213.   Such disregard for the corporate form has persisted over time. For instance, Fitch Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage servicing businesses – which include [GMACM], and HomeComings Financial Network – have been

65

integrated into" ResCap.    Moreover, Moody's reported that in 2007, "ResCap combined all servicing operations under one servicing entity . . . under common management [and] common systems."

214.    Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano served as an officer of Ally Financial as well as Chairman and CEO of ResCap. His responsibilities include overseeing the mortgage lending and servicing in ResCap. In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage." On December 23, 2011, Marano also signed a comment letter to the Federal Housing Financial Agency ("FHFA") on behalf of both Ally Financial and GMACM. Upon information and belief, Marano – in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap – directed and controlled the actions of GMACM.

215.    A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans. He was asked the following questions at his deposition:

Q: Could you please state your name for the record.

A: My name is Jeffrey Stephan.

Q: Okay. And who do you work for?

A: GMAC, LLC [Ally Financial].

Q: And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?

A: GMAC, LLC - I'm trying to think of the word to use - the most recent name.

Q: Okay.

A: It's GMCA [sic] Mortgage Corporation.

Q: Okay.

A: I'm not sure how you would word that.

Q: Okay. So are they -- does GMAC, LLC -- now has that basically taken over these other entities --

A: Yes.

Q: -- that formerly existed?

A: Yes.

Q: So these entities no longer currently exist?

A: Right.

Q: Okay. And how long then have you been employed by GMAC, LLC?

A: Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, No. 50 2008 CA 040805, (15th Cir.,

Dec. 10, 2009), at 4:25-5:22.

### H.   Ally Financial's Responsibility For Controlling GMACM's Servicing Practices

216.   As alleged above, Ally Financial, ResCap, and GMACM entered into a Consent

Order with the FRB and FDIC on April 13, 2011. The Consent Order was entered because Ally

Financial, ResCap, and GMACM were accused of a series of foreclosure-related abuses, including:

(i) failing to properly increase financial, staffing, and managerial resources to meet an increasing

number of foreclosures; (ii) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (iii) filing false affidavits in foreclosure actions; and (iv) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

217.    The Consent ordered required Ally Financial, ResCap, and GMACM to adopt new servicing procedures and practices. Ally Financial is obligated to make sure that ResCap and GMACM take certain remedial actions to operate in a "safe and sound manner and in compliance with the terms of mortgage loan documentation and related agreements with borrowers, all applicable state and federal laws . . . rules, regulations, and court orders, as well as . . . servicing guides with GSEs or investors, and other contractual obligations, including those with the Federal Housing Administration."

218.    Specifically, the Consent Order required Ally Financial to improve its compliance programs, internal audit, communications with borrowers, vendor management, management information systems, employee training, and oversight. Ally Financial was also required to strengthen its "Enterprise Compliance Program" or "ECP" with respect to "residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." Additionally, Ally Financial was required to implement a "Program for Board Oversight" by the Ally Financial and ResCap boards of directors.

219.    Ally Financial, ResCap, and GMACM filed a series of reports with the FRB and FDIC from July 13, 2011 through December 14, 2011, detailing their progress in implementing the terms of the Consent Order. Notably, despite their ostensible separateness, Ally Financial, ResCap,

68

and GMACM submitted joint reports that bore the Ally Financial letterhead. The entities explained

the joint submissions to the FRB and FDIC on the grounds that:

> the Companies believe enterprise risk management is a holistic and
> continuous process involving governance, policies, procedures, tools,
> methodologies and resources that *transcend legal entity and
> organizational boundaries*.

220.    As alleged above, the Consent Order requires GMACM to pay for independent

foreclosure reviews, and to compensate borrowers for any financial injuries discovered.

221.    On April 26, 2012, in view of ResCap's impending bankruptcy, Ally Financial

entered into a supplemental agreement with the FRB regarding the Consent Order. Ally Financial

agreed to be "secondarily liable" for GMACM's obligations to compensate injured borrowers and

to pay for the reviews. Additionally, Ally Financial agreed to use "all reasonable best efforts" to

ensure ResCap's continued performance under the Consent Order, notwithstanding ResCap's

bankruptcy, by seeking to require any successor or purchaser of ResCap to honor the Consent

Order's terms.

222.    As also alleged above, Ally Financial, ResCap, and GMACM each participated in the

$25 billion nationwide mortgage settlement. The settlement resolved claims in a complaint filed by

49 state attorneys general against Ally Financial, ResCap, and GMACM jointly. Ally Financial,

ResCap, and GMACM each executed the Consent Judgment filed with the U.S. District Court for

the District of Columbia on March 12, 2012.

223.    The $25 billion settlement mandates "comprehensive reform of mortgage servicing

practices," for which Ally Financial, ResCap, and GMACM, as signatories to the Consent Judgment,

are jointly responsible.

## IX.    TOLLING OF THE STATUTES OF LIMITATIONS

224.    The claims of Plaintiffs and the Class are subject to both equitable estoppel, stemming from the concealment by GMACM and Defendants of the facts alleged herein, and equitable tolling, stemming from the Plaintiffs' inability to obtain adequate information to plead the claims alleged herein. Defendants are estopped from relying on a statute of limitations defense because they and GMACM purposefully concealed the misconduct alleged. At all relevant times Defendants and GMACM maintained a shroud of secrecy around their illicit dealings. Separate and apart from the acts of concealment of GMACM and the Balboa Defendants, any applicable statutes of limitations are properly tolled because Plaintiffs and the Class did not know, and could not have learned, the facts underlying their claims until shortly before filing this complaint.

225.    Furthermore, at all relevant times Plaintiffs and the Class were relieved of any duty to investigate because they reasonably and justifiably relied on GMACM to fulfill its contractual duties under the mortgage loan contracts of Plaintiffs and the Class in good faith, and to similarly execute its duties under the PSAs, Servicing Agreements and GSE Servicing Guidelines in good faith and in an honest manner. Even assuming there had been some indication of wrongdoing (which there was not), and Plaintiffs and the Class had attempted to investigate, such investigation would have been futile because it would not, until recently, have been possible to uncover any specific information as to GMACM's involvement in the unlawful kickback scheme alleged herein.

226.    Due to the complex, undisclosed and self-concealing nature of the scheme alleged herein, neither Plaintiffs, nor any other member of the putative Class whose claims would otherwise be time-barred, possessed or could have possessed sufficient information or the requisite expertise

70

to discover the misconduct alleged. Plaintiffs were able to discover the underlying basis for their claims only with the assistance of counsel.

227.    Issues relating to mortgages and mortgage servicing have been in the news since the 2008 financial crisis. Nevertheless, the news coverage has generally related to improper foreclosure practices. It was not until January 2012 that any major national news outlets began publishing reports about improper kickbacks relating to the referral of LPI business.

228.    The first time *The New York Times* published a news article about such kickbacks was on January 10, 2012.  *The New York Times* broke the story that Benjamin Lawsky, the Superintendent of the NYSDFS, was investigating several large banks in connection with improper practices relating to LPI, including "kickbacks."  *See* "Big Banks Face Inquiry Over Home Insurance," *The New York Times* (Jan. 10, 2012).

229.    Prior to such time, there was insufficient coverage of allegations of potential kickbacks relating to LPI to have put Plaintiffs or the Class on inquiry notice of Defendants' misconduct. Indeed, on January 18, 2012, *American Banker* (a self-described "financial services trade journal" with a readership of only approximately 31,000 that is "read by senior banking and financial services executives as well as consultants, lawyers, accountants and other professionals who serve the financial industry" and which previously published articles on force-placed insurance) observed that Superintendent Lawsky's New York probe had finally "brought national attention to banks' alleged self-dealing in the sale of force-placed insurance." "Banks Face Thicket of Force-Placed Threats," *American Banker* (Jan. 18, 2012).

230.    Furthermore, even had Plaintiffs or members of the Class been on inquiry notice of misconduct relating to LPI in the mortgage servicing industry prior to January 10, 2012, despite

71

diligent investigation they would have had no specific factual basis to allege – or even suspect – that GMACM was involved in any misconduct until, at the earliest, May 21, 2012, when, as alleged above, GMACM and Balboa admitted at the NYSDFS's LPI hearings to GMACM's receipt of free tracking services, paid for indirectly through GMACM's LPI premiums. Prior to May 21, 2012, there was simply no publicly available information that even a highly skilled investigator could have uncovered linking GMACM to potential kickbacks relating to LPI. Prior to such time, Plaintiffs and the Class did not have an adequate factual basis to plead the claims alleged herein.

231.    Any applicable statutes of limitations should be equitably tolled inasmuch as, in the exercise of reasonable diligence, Plaintiffs and the Class could not have known of the violations alleged herein until, at the earliest, May 21, 2012. Furthermore, any delay by Plaintiffs and the Class in asserting the claims herein was excusable because they could not reasonably have discovered the misconduct alleged herein absent specialized knowledge and/or assistance of counsel.

## X.    CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§ 1961-1968
### (Against all Defendants)

232.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

233.    Plaintiffs, each Class member, each Defendant, and GMACM, are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

### The Enterprise

234.    For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of the Defendants and GMACM,

72

including their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "Enterprise"). The Enterprise was separate and distinct from the persons that constituted the Enterprise.

235.    The Enterprise was primarily managed by GMACM, which organized the fraudulent scheme and procured the involvement of the Defendants. The Defendants carried out their parts of the scheme under the direction of GMACM.

236.    The companies and individuals that constitute the Enterprise were associated for the common purpose of defrauding borrowers and loan owners by overcharging them for LPI with respect to GMACM-serviced loans. The purpose thereof was to induce borrowers to pay, and the owners of the loans to incur, fraudulent overcharges in respect to such insurance. At all relevant times, the Enterprise was engaged in and its activities affected interstate commerce. The proceeds of the Enterprise were distributed to its participants, principally to GMACM and directly and/or indirectly to the Defendants.

237.    The Enterprise operated from at least March 2003. Its operation is ongoing. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants and GMACM engage.

### The Pattern of Racketeering Activity and Predicate Acts of Mail and Wire Fraud

238.    At all relevant times, in violation of 18 U.S.C. § 1962(c), the Defendants and GMACM conducted the affairs of the Enterprise through a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5) by virtue of the conduct described in this complaint. The RICO Defendants and GMACM have conducted the affairs of the Enterprise and participated in the operation and management thereof at least through the following conduct:

73

a.    GMACM enters into servicing agreements with owners and/or holders of whole loans. The servicing agreements provide, *inter alia*, that GMACM is obligated to maintain continuous hazard insurance on the secured properties.

b.    GMACM buys LPI with respect to the loans it services from Balboa and Meritplan. GMACM pays insurance premiums to Balboa and Meritplan for the LPI.

c.    GMACM hires Newport, an affiliate of Balboa and Meritplan, as a subcontractor to perform GMACM's "insurance tracking" responsibilities.

d.    GMACM and the Balba Defendants conceal the fact from the public, borrowers, and loan owners, that GMACM pays Newport nothing for its insurance tracking services.

e.    Balboa and Meritplan pay rebates/kickbacks to GMACM.

f.    The money to pay the rebates/kickbacks is derived from GMACM's LPI insurance premiums. The amount of the rebates/kickbacks is computed as a percentage of GMACM's LPI insurance premiums.

g.    The rebates/kickbacks are paid in the form of free tracking services and bogus "commissions."

h.    The free tracking services are provided through Newport. GMACM pays nothing for Newport's insurance tracking services. Instead, Balboa and Meritplan pay Newport on GMACM's behalf. The money is routed from Balboa and Meritplan to Newport via "intercompany expense allocations."

i.    The bogus "commissions" are paid by Balboa and Meritplan to an affiliate of GMACM, John Doe. The "commission" payments are made on the false pretense that John Doe is a third-party insurance agent. Balboa and Meritplan falsely label the payments to John Doe as "commissions."

j.    John Doe receives the "commissions" on GMACM's behalf and then transfers them to GMACM. Ally Financial – the parent corporation of John Doe and GMACM – facilitates such transfers through its "global cash management system."

k.    As a *quid pro quo* for the rebates/kickbacks, GMACM continues to procure LPI from Balboa and Meritplan and continues to outsource insurance tracking to Meritplan.

l.    GMACM retains the rebates/kickbacks for itself, while billing borrowers based on the full purported price of the LPI. The rebates/kickbacks reduce GMACM's LPI costs, but those savings are not passed through to borrowers. Borrowers are forced to pay the full purported price of the LPI.

m.    Because amounts paid for LPI constitute "servicing advances," GMACM's "servicing advances" are improperly inflated by the failure to pass through the rebates/kickbacks to borrowers. GMACM reimburses itself from the proceeds of the loans based on the inflated servicing advances. To the extent borrowers fail to pay, loan owners bear the inflated charges.

n.    As GMACM's insurance tracking subcontractor, Newport issues notices to borrowers fraudulently setting forth the balances owed for LPI based on the full prices of the LPI premiums without subtracting the rebates/kickbacks. Additionally, the notices falsely describe the balances as reflecting the "cost of the coverage" and the amounts necessary to "reimburse" GMACM for moneys actually "advanced." In fact, the costs of the coverage are less than the stated balances because the rebates/kickbacks reduced those costs. Moreover, GMACM "advanced" less than the stated balances, taking into account the rebates/kickbacks.    Furthermore, under borrowers' loan agreements, GMACM is only entitled to "reimbursement" for its true LPI costs.

o.    GMACM issues monthly servicing reports and annual certifications of compliance to loan owners that include information about GMACM's compensation, advances, and reimbursements. The reports and certifications fraudulently set forth balances for GMACM's advances and reimbursements based on the full prices of the LPI without subtracting the rebates/kickbacks. The reports and certifications also fraudulently exclude the compensation that GMACM derives from the kickbacks/rebates, which are not disclosed in the reports and certifications.    Moreover, the reports and certifications fraudulently conceal that Newport is not compensated by GMACM "from [GMACM's] own funds" but, instead, through the LPI insurance premiums, despite the fact that GMACM is thereby breaching its agreements with loan owners. The reports and certifications also omit disclosure that GMACM breached borrowers' mortgage loan agreements by billing them for LPI in amounts in excess of GMACM's actual costs.

239.    The pattern of racketeering activity consisted of mail and/or wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Specifically, the Defendants and GMACM engaged in an intentional scheme or artifice to defraud borrowers and the owners of the loans serviced by GMACM

and to obtain money or property from said borrowers and loan owners through false or fraudulent pretenses, representations and promises.

240.    The conduct of Defendants and GMACM included, without limitation, a fraudulent scheme to deprive the loan owners of their intangible rights to GMACM's "honest services" through bribes and kickbacks in violation of 18 U.S.C. § 1346. As alleged above, GMACM owed a contractual obligation to render residential mortgage loan servicing duties to the loan owners. GMACM owed a duty to render those services in an honest manner. Nevertheless, GMACM misused its position to extract bribes and kickbacks from the Balboa Defendants at the expense of the loan owners. GMACM thereby breached its obligations to render "honest services." Each of the Defendants intentionally and wilfully conspired and participated in GMACM's "honest services" violations. Specifically, each of the Defendants participated in devising and carrying out the scheme through the activities alleged above.

241.    The bribes, kickbacks, false statements and omissions, and mail and/or wire communications of the Defendants and GMACM in furtherance of the scheme constituted predicate acts of mail and/or wire fraud.

242.    It was reasonably foreseeable to Defendants and GMACM that the mails and/or wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme.

243.    The nature and pervasiveness of the Enterprise necessarily entailed frequent wire and/or mail transmissions. The precise dates of such transmissions cannot be alleged without access to the books and records of Defendants and GMACM. Nevertheless, Plaintiffs can allege such transmissions generally.

244.   For the purpose of furthering and executing the scheme, Defendants and GMACM

regularly transmitted and caused to be transmitted by means of wire communication in interstate

commerce writings, electronic data and funds, and also regularly caused matters and things to be

placed in post offices or authorized depositories, or deposited or caused to be deposited matters or

things to be sent or delivered by a private or commercial interstate carrier.  For example:

a.   As GMACM's insurance tracking subcontractor, Newport issued materially false and misleading notices relating to LPI to borrowers via mail;

b.   Newport also communicated to borrowers with respect to LPI issues by telephone;

c.   GMACM issued monthly statements incorporating the falsely overstated LPI charges to borrowers via mail and/or wire;

d.   GMACM issued materially false and misleading monthly servicing reports and annual certifications of compliance to loan owners via the mail and/or electronically via wire;

e.   Newport and/or GMACM received LPI payments from borrowers via mail and/or wire;

f.   GMACM transmitted LPI premiums to Balboa and Meritplan via mail and/or wire;

g.   Balboa and Meritplan transmitted money to Newport via "intercompany expense allocations" consummated via wire;

h.   Balboa and Mertiplan transmitted funds to John Doe reflecting purported "commissions" via mail and/or wire; and.

i.   Ally Financial transferred funds representing "commissions" from John Doe to GMACM through its "global cash management system" via wire.

245.   As to Plaintiffs, Defendants and GMACM utilized the mails and/or wires in the

following instances, among others, for the purpose of furthering and executing the scheme:  Newport

issued a Request for Property Insurance to the Davidsons on June 14, 2009, and to Rothstein on

77

December 12, 2010. Newport issued a Notice of Placement to the Davidsons on August 2, 2009, and to Kobryn on May 13, 2012. Each of the Plaintiffs also received monthly billing statements from GMACM incorporating the LPI overcharges. Additionally, each of the Plaintiffs communicated by telephone with Newport regarding LPI, including, among others, January 24, 2012, when Rothstein called Newport regarding LPI charges on his monthly statements.

246.    These are only examples of certain instances of the pattern of racketeering activity consisting of mail and/or wire fraud violations engaged in by Defendants and GMACM. Each electronic and/or postal transmission was incident to an essential part of the scheme. As detailed above, Defendants and GMACM engaged in similar activities with respect to each member of the Class and with respect to the owners of the loans of each member of the Class.

247.    Each such electronic and/or postal transmission was incident to an essential part of the scheme.

248.    Additionally, each such electronic and/or postal transmission constituted a predicate act of wire and/or mail fraud in that each transmission furthered and executed the scheme to defraud borrowers and the owners of the loans.

249.    Defendants and GMACM each participated in the scheme to defraud knowingly, wilfully and with a specific intent to defraud borrowers and the owners of the loans into paying and/or incurring falsely inflated, unauthorized charges in connection with LPI.

250.    The predicate acts of mail and wire fraud constitute a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events, but related acts aimed at the common purpose and goal of defrauding borrowers and loan owners to pay and incur

the falsely inflated, unauthorized charges with respect to LIP and thereby enable Defendants and GMACM to reap illicit profits.

251.    Defendants and GMACM were common participants in the predicate acts. Their activities amounted to a common course of conduct, with similar pattern and purpose, intended to deceive borrowers and owners of the loans.

### Injury to Plaintiffs and the Class

252.    As a direct and proximate result of violations of 18 U.S.C. § 1962(c) by Defendants and GMACM, Plaintiffs and the Class have been injured in their business or property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs and the Class paid falsely inflated, unauthorized LPI charges by reason, and as a direct, proximate and foreseeable result, of the scheme alleged. Moreover, the overcharging of Plaintiffs and the Class for LPI was an integral and necessary part of the scheme, as those overcharges constituted purported "servicing advances" that GMACM was entitled to recoup "off the top" from the proceeds of the loans.

253.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

254.    Ally Financial is directly liable for its role in the scheme. Ally Financial helped devise the scheme and participates in the scheme by transferring funds representing "commissions" from John Doe to GMACM through Ally Financial's "global cash management system." In addition, Ally Financial is vicariously liable for GMACM's violations by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

255.    Ally Bank is also vicariously liable for GMACM's violations. As alleged above, Ally Bank owns loans and/or the servicing rights to loans serviced by GMACM pursuant to a series of servicing agreements since at least 2003. Ally Bank is liable as principal for the misconduct of GMACM, Ally Bank's agent. In committing the violations alleged herein, GMACM was acting within the scope of duties delegated to it by Ally Bank.

## COUNT II

## CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)
### (Against all Defendants)

256.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

257.    RICO, 18 U.S.C. § 1962(d), provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

258.    The Defendants have violated 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

259.    As set forth in Count I, above, at all relevant times, Plaintiffs and the Class were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

260.    As also set forth in Count I, above, at all relevant times, the Defendants and GMACM were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

261.    The Defendants and GMACM formed the previously alleged association-in-fact Enterprise, within the meaning of 18 U.S.C. § 1961(4), for the common purpose of fraudulently overcharging borrowers and loan owners with respect to LPI. The purpose thereof was to induce borrowers and loan owners to pay or incur fraudulently inflated, unauthorized charges with respect to LPI.

80

262.    The Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1962(c).

263.    As set forth in Count I, above, Defendants and GMACM conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

264.    The Defendants and GMACM were each associated with the Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), and agreed to conduct and participate, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

265.    The Defendants and GMACM committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth in Count I.

266.    As a direct and proximate result of the overt acts and predicate acts of Defendants and GMACM in furtherance of violating 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business and property in an amount to be determined at trial.  Such injuries include, but are not limited to, fraudulently inflated charges with respect to LPI, as a direct, proximate and foreseeable result of the scheme alleged herein.

267.    Under the provisions of 18 U.S.C. § 1964(c), the Defendants are jointly and severally liable to Plaintiff and the Class for three times the damages sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

81

268.     Ally Financial, in addition to being directly liable for its role in conspiring in the scheme, is vicariously liable for GMACM's acts of conspiracy because, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

269.     Ally Bank is also vicariously liable as principal for GMACM's acts of conspiracy. As alleged above, in engaging in such acts, GMACM was acting within the scope of its duties as an agent of Ally Bank.

### COUNT III

### VIOLATION OF RESPA, 12 U.S.C. § 2607(a)
### (Against all Defendants)

270.     Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

271.     Plaintiffs' loans and those of the members of the Class are "federally related" mortgage loans within the meaning of RESPA.

272.     Throughout the Class Period, Defendants provided "settlement services" with respect to "federally-related mortgage loans," as such terms are defined by RESPA, 12 U.S.C. §§ 2602(1) and (3).

273.     Pursuant to 12 U.S.C. § 2607(a), Defendants were prohibited from giving or accepting any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, for the referral of any business "incident to or a part of a real estate settlement service involving a federally related mortgage loan."

82

274.    HUD, in regulations relating to RESPA, has defined the term "settlement" as "the process of executing legally binding documents regarding a lien on property that is subject to a federally related mortgage loan." 24 C.F.R. § 3500.2(b).

275.    Also in regulations relating to RESPA, HUD has defined a "settlement service" as "any service provided in connection with a prospective or actual settlement" – a definition that specifically includes the "provision of services involving hazard, flood, or other casualty insurance." 24 C.F.R. § 3500.2(b)(11).

276.    The provision of LPI constitutes a "settlement service" under RESPA. At a minimum, the provision of LPI constitutes business "incident to," if not "a part of," a real estate settlement service under 12 U.S.C. § 2607.

277.    The Balboa Defendants unlawfully gave and GMACM unlawfully received "kickbacks" within the meaning of RESPA, 12 U.S.C. § 2602(2), in connection with the referral of LPI business. As alleged above, the kickbacks were paid in the form of free tracking services and bogus "commissions."

278.    Such payments constituted fees, kickbacks or things of value pursuant to an agreement that LPI business would be referred to Balboa and Meritplan. Such practices violated RESPA, 12 U.S.C. § 2607(a).

279.    Plaintiffs and the Class were actually harmed by the unlawful scheme of Defendants and GMACM.

280.    Defendants therefore violated Section 8(a) of RESPA. Pursuant to RESPA, 12 U.S.C. § 2607(d), Defendants are jointly and severally liable to Plaintiffs and the Class in an amount equal

to three times the amounts they have paid or will have paid with respect to LPI as of the date of judgment.

281.    In accordance with RESPA, 12 U.S.C. § 2607(d), Plaintiffs also seek attorneys' fees and costs of suit on behalf of themselves and the Class.

282.    Ally Financial is vicariously liable for GMACM's violations of RESPA by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

283.    Ally Bank is vicariously liable as principal for GMACM's violations of RESPA. As alleged above, in engaging in such violations, GMACM was acting within the scope of its duties as an agent of Ally Bank.

**COUNT IV**

**BREACH OF CONTRACT**
**(Against Ally Financial and Ally Bank)**

284.    Plaintiffs repeat and reallege each and every paragraph as if fully set forth herein.

285.    Pursuant to its servicing agreements with loan owners, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, pursuant to the servicing agreements, GMACM is the agent of the owners of the loans of Plaintiffs and the Class. As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

286.    At no time did GMACM acquire, or could GMACM have acquired, any rights with respect to the loans of Plaintiffs and the Class other than those set forth in the mortgage loan agreements.

287.    The mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance. The mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property. Nothing authorizes the lender to charge any amount in excess of the lender's cost. Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

288.    GMACM breaches the mortgage loan agreements of Plaintiffs and the Class by charging borrowers amounts in excess of GMACM's LPI cost with respect to the borrower's property. The rebates/kickbacks that GMACM receives reduce such costs. Nevertheless, GMACM charges borrowers based on the full purported price. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks breaches the terms of the mortgage loan agreements.

289.    As a direct, proximate, and legal result of the foregoing, Plaintiffs and the Class have suffered damages.

290.    Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

85

291.    Ally Bank is vicariously liable for GMACM's breaches of contract as GMACM's principal. In engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank.

292.    Additionally, Ally Bank is directly liable for the breaches of contract. As alleged above, Ally Bank owns loans serviced by GMACM. The interposition of GMACM does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

## COUNT V

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against Ally Financial and Ally Bank)

293.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

294.    As alleged above, GMACM is an assignee of rights and delegee of correlative duties under the mortgage loan agreements of Plaintiffs and the Class. Alternatively, GMACM is the agent of the owners of the loans of Plaintiffs and the Class. As such, GMACM stands in the shoes of the original lenders, has accepted the obligations of the original lenders, and possesses the same rights as the original lenders.

295.    Every contract, including the mortgage loan contracts of Plaintiffs and the Class, contains an implied covenant of good faith and fair dealing.

296.    Pursuant to the implied covenant of good faith and fair dealing, GMACM was obligated to perform its duties under the mortgage loan agreements in good faith and to deal fairly with Plaintiffs and the Class.

297.    As alleged above, the mortgage loan agreements of Plaintiffs and the Class authorize the lender to obtain LPI in the event of any lapse in the borrower's voluntary insurance. The

mortgage loan agreements of Plaintiffs and the Class also authorize the lender to charge borrowers the costs of the insurance on their property. Nothing authorizes the lender to charge any amount in excess of the lender's cost. Lenders owe borrowers a contractual duty to limit any LPI charges to the lender's *bona fide* cost for the coverage.

298.    GMACM breached its duty of good faith and fair dealing by charging borrowers amounts in excess of GMACM's LPI costs. GMACM's failure to pass through to borrowers the cost savings represented by the rebates/kickbacks constituted bad faith conduct toward Plaintiffs and the Class. GMACM thereby dealt with Plaintiffs and the Class unfairly, and contravened the reasonable expectations of Plaintiffs and the Class.

299.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

300.    Ally Financial is vicariously liable for GMACM's breaches of contract by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

301.    Ally Bank is vicariously liable for GMACM's breaches of contract as GMACM's principal. In engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank.

302.    Additionally, Ally Bank is directly liable for the breaches of contract. As alleged above, Ally Bank owns loans serviced by GMACM. The interposition of GMACM does not relieve Ally Bank, a party to the instruments, of direct contractual liability to borrowers.

## COUNT VI

## COMMON LAW RESTITUTION/UNJUST ENRICHMENT/DISGORGEMENT
### (Against Ally Financial and Ally Bank)

303.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

304.    Plaintiffs and the Class have conferred a substantial benefit on GMACM derived from improper and unauthorized charges with respect to LPI. These benefits came at the expense of Plaintiffs and the Class.

305.    The circumstances are such that in equity and good conscience restitution should be made by GMACM to Plaintiffs and the Class.

306.    As a result of GMACM's unjust enrichment, Plaintiffs and the Class have sustained damages in an amount to be determined at trial. Plaintiffs and the Class seek full disgorgement and restitution of GMACM's enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

307.    Plaintiffs and the Class are entitled to restitution and/or disgorgement of profits realized by GMACM as a result of its unfair, unlawful and/or deceptive practices.

308.    Ally Financial is vicariously liable for GMACM's unjust enrichment by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

309.    Ally Bank is vicariously liable as principal for GMACM's unjust enrichment. As alleged above, in engaging in such violations, GMACM was acting within the scope of its duties as an agent of Ally Bank.

88

## COUNT VII

## BREACH OF FIDUCIARY DUTY/MISAPPROPRIATION
## OF FUNDS HELD IN TRUST
### (Against Ally Financial and Ally Bank)

310.    Plaintiffs repeat and reallege each and every paragraph above as if set forth herein.

311.    The mortgage agreements of Plaintiffs and the Class contains standard escrow provisions, which are typical of other mortgages serviced by GMACM.

312.    The mortgage agreements of Plaintiffs and the Class provide that borrowers shall make monthly payments for "premiums for any and all insurance required by Lender," including LPI.

313.    The mortgage agreements of Plaintiffs and the Class further provides that any excess escrow funds are to be returned to Plaintiffs.

314.    GMACM accepts monies from Plaintiffs and the members of the Class for insurance on a monthly basis and holds such funds in escrow.

315.    GMACM is obligated to hold escrowed funds in trust. GMACM owes Plaintiffs and the Class a fiduciary duty with respect to the handling of escrowed funds.

316.    GMACM breached its fiduciary duty to Plaintiffs and the Class by: (i) demanding excessive escrow payments for LPI; (ii) collecting and holding excessive funds in escrow, in amounts greater than necessary to pay for the true cost of LPI; (iii) failing to properly account to Plaintiffs and the Class for such excess funds; and (iv) engaging in self-dealing through the diversion of rebates/kickbacks to its own pockets as alleged above.

317.    These actions were undertaken by GMACM in bad faith for its own benefit and were not intended to benefit Plaintiffs or other Class members.

89

318.    As a direct result of GMACM's actions and subversion of the interests of Plaintiffs and the Class to GMACM's own interest, Plaintiffs and the Class have suffered injury in the form of unauthorized escrow charges and a loss of funds from their escrow accounts.

319.    Plaintiffs and the Class are entitled to damages for GMACM's beach of its fiduciary obligations and misappropriation of escrow funds. In addition, Plaintiffs and the Class are entitled to punitive damages because GMACM acted in bad faith in deliberate and/or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

320.    Ally Financial is vicariously liable for GMACM's breach of fiduciary duty by virtue of the fact that, as alleged above, GMACM and its parent, ResCap, operated as mere instrumentalities or alter-egos of Ally Financial at all times relevant hereto.

321.    Ally Bank is vicariously liable as principal for GMACM's breach of fiduciary duty. As alleged above, in engaging in such breaches, GMACM was acting within the scope of its duties as an agent of Ally Bank

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

a.    For an order declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and for an order certifying this case as a class action and appointing Plaintiffs as representative of the Class;

b.    For an order awarding compensatory damages on behalf of Plaintiffs and the Class in an amount to be proven at trial;

c.    For judgment for Plaintiffs and the Class on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' practices, along with exemplary damages to each Class member for each violation;

d.  For judgment for Plaintiffs and the Class on their RICO claims and RESPA claims, in an amount to be proven at trial, for three times the amount of the LPI charges imposed on Plaintiffs and the Class;

e.  For restitution of an amount equal to all improperly collected LPI charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiffs and the Class;

f.  For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

g.  For an order awarding Plaintiffs and the Class their attorneys' fees and costs; and

h.  Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of the claims alleged herein.

Dated: September 28, 2012

KIRBY McINERNEY LLP

By: _____

Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:  (212) 371-6600
Fax: (212) 751-2540

*Attorneys for Plaintiffs*

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:    DEC 1 7 2012

---

LANDON ROTHSTEIN, JENNIFER
DAVIDSON, ROBERT DAVIDSON, and
IHOR KOBRYN, individually and on behalf of
all others similarly situated,

        Plaintiffs,

    v.

ALLY FINANCIAL, INC. f/k/a GMAC INC.,
ALLY BANK  f/k/a GMAC BANK, JOHN
DOE CORPORATION, BALBOA INSURANCE
COMPANY, MERITPLAN INSURANCE
COMPANY, and NEWPORT MANAGEMENT
CORPORATION.

        Defendants.

---

Civil Action No: 12-CV-3412-AJN

## STIPULATION AND [PROPOSED] ORDER EXTENDING TIME FOR DEFENDANTS ALLY FINANCIAL INC. AND ALLY BANK TO RESPOND TO THE AMENDED COMPLAINT UNTIL AFTER RESOLUTION OF CERTAIN PROCEEDINGS IN THE BANKRUPTCY COURT RELATING TO THE AUTOMATIC STAY

**WHEREAS**, the deadline for all Defendants to answer, move or otherwise respond to the Amended Complaint in the above-captioned action (the "District Court Action") was previously extended twice pursuant to stipulated orders and is currently December 13, 2012;

**WHEREAS**, counsel for defendants Ally Financial Inc. and Ally Bank (collectively, "Ally") has indicated that on or before December 21, 2012, Ally intends to file a motion either on its own or together with counsel for certain of the debtors and debtors in possession (collectively, the "Debtors") in the administratively consolidated bankruptcy cases entitled *In re: Residential Capital, LLC, et al.*, No. 12-12020 (MG) (Jointly Administered) (Bankr. S.D.N.Y.) (the "ResCap Bankruptcy Case") pending in the United States Bankruptcy Court for the

Southern District of New York (the "Bankruptcy Court") seeking enforcement of the automatic stay pursuant to 11 U.S.C. 362(a) on the ground that some or all of the claims asserted against Ally in the Amended Complaint in the District Court Action are being asserted and prosecuted in violation of the automatic stay and seeking related declaratory and/or injunctive relief (the "Stay Enforcement Motion");

**WHEREAS**, counsel for Ally has advised counsel for Plaintiffs that Ally understands that the Debtors may commence an adversary proceeding in the ResCap Bankruptcy Case seeking to extend the automatic stay by enjoining and/or staying prosecution of any claims asserted in the District Court Action against Ally that do not belong to the Debtors' estates and are not enjoined under the Stay Enforcement Motion (the "Adversary Proceeding") which Adversary Proceeding may include a motion seeking to extend the automatic stay so as to enjoin prosecution of all such claims asserted in the District Court Action against Ally (the "Stay Extension Motion");

**WHEREAS**, Plaintiffs and their counsel dispute that Plaintiffs or their counsel have violated the automatic stay by filing or prosecuting the District Court Action, and intend to oppose the relief sought in the Bankruptcy Court; and

**WHEREAS**, Ally has requested and Plaintiffs do not oppose that the time for Ally to respond to the Amended Complaint in the District Court Action be extended until a reasonable time after entry of final and non-appealable Orders of the Bankruptcy Court resolving any Stay Enforcement Motion and any Stay Extension Motion;

**NOW, THEREFORE, IT IS STIPULATED AND AGREED**, by and between counsel for Plaintiffs and Ally as follows:

1.    The deadline for Ally to respond to the Amended Complaint is hereby extended until twenty days after the later of (a) a final and non-appealable Order of the

Bankruptcy Court on any Stay Enforcement Motion or (b) a final and non-appealable Order of the Bankruptcy Court on any Stay Extension Motion, provided such motion(s) are filed on or before December 21, 2012.

2.    Ally agrees that as to Plaintiffs it will only seek injunctive and/or declaratory relief in the Bankruptcy Court and that Ally will not (i) seek to have Plaintiffs or their counsel held in contempt of court, (ii) request or otherwise seek an award of attorneys' fees, costs or sanctions of any kind against Plaintiffs, or (iii) argue that Plaintiffs or their counsel acted in bad faith, or willfully, in connection with any violation of the automatic stay by commencing or prosecuting the District Court Action.

3.    It is not the intention of the parties hereto that this stipulation shall impact the proceeding against defendants other than Ally.

Dated:   New York, New York
         December 13, 2012

**KIRBY McINERNEY LLP**

s/Mark A. Strauss
Mark A. Strauss (mstrauss@kmllp.com)
Edward M. Varga, III (evarga@kmllp.com)
J. Brandon Walker (bwalker@kmllp.com)
825 Third Avenue, 16th Floor
New York, New York 10022
Tel:   (212) 371-6600
Fax:   (212) 751-2540

*Attorneys for Plaintiffs*

**OTTERBOURG, STEINDLER,
HOUSTON & ROSEN, P.C.**

s/Richard G. Haddad
Richard G. Haddad (rhaddad@oshr.com)
230 Park Avenue
New York, New York 10169
Tel:   (212) 661-9100
Fax:   (212) 682-6104

*Attorneys for Defendants Ally Financial Inc.
and Ally Bank*

Dated: New York, New York
      Dec : 17, 2012

**SO ORDERED.**

Hon. Alison J. Nathan
United States District Judge

3

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

230 PARK AVENUE
NEW YORK, NY 10169-0075

RICHARD G. HADDAD
MEMBER OF THE FIRM
RHADDAD@OSHR.COM

TELEPHONE: (212) 661-9100
TELECOPIER: (212) 682-6104

December 13, 2012

VIA E-MAIL

Hon. Alison J. Nathan
United States District Judge
Daniel Patrick Moynihan
    United States Courthouse
500 Pearl Street, Courtroom 23B
New York, New York  10007-1312

      Re:    Rothstein, et al. v. GMAC Mortgage LLC, et al., 1:12-cv-03412 (AJN)

Dear Judge Nathan:

      We represent defendants Ally Financial, Inc. and Ally Bank (collectively, "Ally"). As set forth in the attached Stipulation, Ally and the plaintiffs have reached a Stipulation pursuant to which Ally's time to respond to the Amended Complaint will be extended, pending a determination by the United States Bankruptcy Court for the Southern District of New York, as to whether plaintiffs' pursuit of this action against Ally should be stayed pursuant to 11 U.S.C. § 362(a) and/or § 105.

      This putative class action was originally commenced against debtor GMAC Mortgage LLC ("GMACM") and certain other parties. Shortly after the case was filed, GMACM and certain of its affiliates filed Chapter 11 bankruptcy petitions in the Bankruptcy Court. The bankruptcy cases have been assigned to Bankruptcy Judge Martin Glenn. Thereafter, on September 28, 2012, the plaintiff filed a "First Amended Class Action Complaint" removing GMACM as a defendant and instead naming the Ally parties as defendants. Because the allegations against Ally are founded upon vicarious liability, including assertions that GMACM was the alter ego and/or agent of Ally, based upon the very same alleged conduct of GMACM, it is Ally's view that these claims are either property of the Debtors' estate and therefore subject to the automatic stay or should otherwise be enjoined, pending further bankruptcy proceedings. The plaintiffs disagree.

      We have discussed these issues with plaintiffs' counsel, including Ally's intention to move in the Bankruptcy Court by no later than December 21, 2012 for an Order applying the automatic stay to some or all of the claims against Ally in this case. We have agreed with plaintiffs' counsel upon the terms of an extension of time to respond to the Amended Complaint pending determination of the Bankruptcy Court matters. It is Ally's view that having the bankruptcy-related issues determined in the Bankruptcy Court will promote the efficient

2301522.1

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

Hon. Alison J. Nathan
December 13, 2012
Page 2

resolution of the issues presented in this case, as it may render moot some or all of the claims against Ally, thereby narrowing the scope of this action.

Under the circumstances, we have prepared and attach for Your Honor's consideration the attached Stipulation extending time for Ally to respond to the Amended Complaint executed by Ally and plaintiffs. We have also discussed this matter with counsel for the other defendants, who have no objection. The Stipulation provides that it does not impact the proceeding against defendants other than Ally. Accordingly, we respectfully request that the Court enter the attached Stipulation as an Order of the Court.

Thank you for your consideration.

Respectfully submitted,

Richard G. Haddad

Encl.

cc:    Mark A. Strauss, Esq.
       Katherine L. Halliday, Esq.