**Hearing Date and Time:  January 16, 2013 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline:  January 10, 2013 at 4:00 p.m. (Prevailing Eastern Time)**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew

*Counsel for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------
                                                    )
In re:                                              )    Case No. 12-12020 (MG)
                                                    )
RESIDENTIAL CAPITAL, LLC, et al.,                   )    Chapter 11
                                                    )
                            Debtors.                )    Jointly Administered
                                                    )
---------------------------------------------------------------

**NOTICE OF DEBTORS' MOTION FOR A SUPPLEMENTAL ORDER**
**UNDER BANKRUPTCY CODE SECTIONS 363, 1107(a) AND 1108 TO THE FINAL**
**WAGES ORDER AUTHORIZING THE DEBTORS TO MAKE PAYMENTS TO THEIR**
**EMPLOYEES UNDER THE RESIDENTIAL CAPITAL, LLC ANNUAL**
**<u>INCENTIVE PLAN</u>**

**PLEASE TAKE NOTICE** that the undersigned have filed the attached *Motion for a*

*Supplemental Order Under Bankruptcy Code Sections 363, 1107(a) and 1108 to the Final Wages*

*Order Authorizing the Debtors to Make Payments to the Employees Under the Residential*

*Capital, LLC Annual Incentive Plan* (the "<u>Motion</u>").

**PLEASE TAKE FURTHER NOTICE** that a hearing on the Motion will take place on

**January 16, 2013 at 10:00 a.m. (prevailing Eastern time)** before the Honorable Martin Glenn,

at the United States Bankruptcy Court for the Southern District of New York, Alexander

Hamilton Custom House, One Bowling Green, New York, New York 10004-1408, Room 501.

**PLEASE TAKE FURTHER NOTICE** that objections, if any, to the Motion must be

made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy

Rules for the Southern District of New York, and the Notice, Case Management, and

Administrative Procedures approved by the Bankruptcy Court [Docket No. 141], be filed

electronically by registered users of the Bankruptcy Court's electronic case filing system, and be

served, so as to be received no later than **January 10, 2013 at 4:00 p.m. (Prevailing Eastern**

**Time)**, upon (a) counsel for the Debtors, Morrison & Foerster LLP, 1290 Avenue of the

Americas, New York, NY 10104 (Attn: Gary S. Lee, Lorenzo Marinuzzi and Jordan A.

Wishnew); (b) the Office of the United States Trustee for the Southern District of New York, 33

Whitehall Street, 21st Floor, New York, NY 10004 (Attn: Tracy Hope Davis, Linda A. Riffkin,

and Brian S. Masumoto); (c) the Office of the United States Attorney General, U.S. Department

of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530-0001 (Attn: US Attorney

General, Eric H. Holder, Jr.); (d)  Office of the New York State Attorney General, The Capitol,

Albany, NY 12224-0341 (Attn: Nancy Lord, Esq. and Enid N. Stuart, Esq.); (e) Office of the

U.S. Attorney for the Southern District of New York, One St. Andrews Plaza, New York, NY

10007 (Attn: Joseph N. Cordaro, Esq.); (f) counsel for Ally Financial Inc., Kirkland & Ellis LLP,

153 East 53rd Street, New York, NY 10022 (Attn: Richard M. Cieri); (g) counsel to Barclays

Bank PLC, as administrative agent for the DIP lenders, Skadden, Arps, Slate, Meagher & Flom

LLP, Four Times Square, New York, NY 10036 (Attn: Ken Ziman & Jonathan H. Hofer);

(h) counsel for the committee of unsecured creditors, Kramer Levin Naftalis & Frankel LLP,

1177 Avenue of the Americas, New York, NY 10036 (Attn: Kenneth Eckstein & Greg

Horowitz); (i) counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd

Street, New York, NY 10019 (Attn: Jennifer C. DeMarco and Adam Lesman); (j) counsel for

Berkshire Hathaway Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles,

CA 90071 (Attention:  Thomas Walper and Seth Goldman); (k) Internal Revenue Service, P.O.

Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop

5-Q30.133, Philadelphia, PA 19104-5016); and (l) Securities and Exchange Commission, New

York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attn:

George S. Canellos, Regional Director).

        **PLEASE TAKE FURTHER NOTICE** that if you do not timely file and serve a written

objection to the relief requested in the Motion, the Bankruptcy Court may deem any opposition

waived, treat the Motion as conceded, and enter an order granting the relief requested in the

Motion without further notice or hearing.


Dated: December 26, 2012                    Respectfully submitted,
        New York, New York


                                            */s/ Gary S. Lee*
                                            Gary S. Lee
                                            Lorenzo Marinuzzi
                                            Jordan A. Wishnew
                                            MORRISON & FOERSTER LLP
                                            1290 Avenue of the Americas
                                            New York, New York 10104
                                            Telephone: (212) 468-8000
                                            Facsimile: (212) 468-7900

                                            *Counsel for the Debtors and*
                                            *Debtors in Possession*

**Hearing Date:    January 16, 2013 at 10:00 a.m. (EST)**
**Objection Deadline: January 10, 2013 at 4:00 p.m. (EST)**

MORRISON & FOERSTER LLP

1290 Avenue of the Americas

New York, New York 10104

Telephone:    (212) 468-8000

Facsimile:    (212) 468-7900

Gary S. Lee

Lorenzo Marinuzzi

Jordan A. Wishnew

*Counsel for the Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- )
                                                                   )
In re:                                                             )     Case No. 12-12020 (MG)
                                                                   )
RESIDENTIAL CAPITAL, LLC, <u>et al.</u>,                           )     Chapter 11
                                                                   )
                              Debtors.                             )     Jointly Administered
----------------------------------------------------------------- )

**DEBTORS' MOTION FOR A SUPPLEMENTAL ORDER UNDER BANKRUPTCY
CODE SECTIONS 363, 1107(a) AND 1108 TO THE FINAL WAGES ORDER
AUTHORIZING THE DEBTORS TO MAKE PAYMENTS TO THEIR EMPLOYEES
<u>UNDER THE RESIDENTIAL CAPITAL, LLC ANNUAL INCENTIVE PLAN</u>**

# TABLE OF CONTENTS

**Page**

JURISDICTION ...................................................................................................................... 1

BACKGROUND ...................................................................................................................... 1

PRELIMINARY STATEMENT ............................................................................................. 2

RELIEF REQUESTED ........................................................................................................... 5

BASIS FOR RELIEF .............................................................................................................. 5

    A.    Debtors' Compensation Structure ............................................................... 5

    B.    AIP Funding Pool ......................................................................................... 6

    C.    Individual AIP Award Determinations ................................................... 11

    D.    Timing of AIP Payments .......................................................................... 12

    E.    Distinction between AIP and Key Employee Plans ............................... 12

APPLICABLE AUTHORITY .............................................................................................. 14

    A.    The AIP Obligations Are A Continuation of the Debtors' Prepetition
        Compensation Practices In The Ordinary Course Of Their Business .................. 14

    B.    If the AIP is Considered A Non-Ordinary Course Transaction, The AIP
        Should be Approved as a Valid Exercise of the Debtors' Reasoned
        Business Judgment ..................................................................................... 17

CONCLUSION ...................................................................................................................... 22

-i-

## TABLE OF AUTHORITIES

**Page**

### Cases

Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp.
(In re Johns-Manville Corp.), 60 B.R. 612 (Bankr. S.D.N.Y. 1986) .................................... 14, 18

Gassen v. Universal Bldg. Materials, Inc. (In re Berkley Multi-Units, Inc.), 88
B.R 394 (Bankr. M.D. Fla. 1988) ............................................................................. 14

In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) ........................................... 18

In re Dana Corp., 358 B.R. 567 (Bankr. S.D.N.Y. 2006) .................................... 14, 15, 19

In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) ......................... 18

In re Global Home Products, LLC, 369 B.R. 778 (Bankr. D. Del. 2007) ....................... 15

In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) ................................... 18

In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) ..................... 18

In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) ............................................... 18

In re Nellson Neutraceutical, Inc., 369 B.R. 787 (Bankr. D. Del. 2007) ....................... 15

In re The Leslie Fay Cos.,168 B.R. 294 (Bankr. S.D.N.Y. 1994) .................................. 14

Med. Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne), 114 F.3d 379 (2d Cir. 1997) .................. 14

### Statutes

11 U.S.C. §363(b)(1) ................................................................................................. 14

11 U.S.C. §363(c) ..................................................................................................... 17

### Other Authorities

In re General Growth Properties, Inc., No. 09-11977 (ALG)  (Bankr. S.D.N.Y.
October 15, 2009) ................................................................................................. 20

In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) ........ 20

ii

The debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**")[1] hereby move for entry of an order, a proposed form of which is attached hereto as Exhibit 1 (the "**Order**"), under sections 363, 1107(a) and 1108 of title 11 of the United States Code (the "**Bankruptcy Code**") To Supplement The Final Wages Order Authorizing The Debtors To Make Payments To Their Employees Under The Residential Capital, LLC Annual Incentive Plan.[2]  In support of the Motion, the Debtors incorporate by reference the Declaration of Anne Janiczek (the "**Janiczek Decl.**"), EVP, Chief Human Resources Officer for Residential Capital, LLC and its affiliates, Declaration of John E. Mack, Member of the Compensation Committee ("**Mack Decl.**") and Declaration of John Dempsey ("**Dempsey Decl.**"), each of which is being filed contemporaneously with the Motion.  In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Bankruptcy Code sections 363(b), 363(c), 1107(a) and 1108.

## BACKGROUND

2.      On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code.  The Debtors are

---

[1]    The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Whitlinger Affidavit (defined below).

[2]    Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief requested in this Motion may refer to http://www.kccllc.net/rescap for additional information.

managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code

sections 1107(a) and 1108. These cases are being jointly administered pursuant to Bankruptcy

Rule 1015(b).

3.       On the Petition Date, the Debtors filed a motion seeking authority to pay and

honor prepetition wages, compensation, employee expense and employee benefit obligations; and

maintain and continue employee compensation and benefit programs (the "**Wages Motion**").[3]

On June 12, 2012, the Bankruptcy Court entered a final order approving the Wages Motion

[Docket No. 386] (the "**Wages Order**").

4.       On May 16, 2012, the United States Trustee for the Southern District of New York

(the "**U.S. Trustee**") appointed a nine member official committee of unsecured creditors (the

"**Creditors' Committee**").  On July 3, 2012, the court appointed Arthur J. Gonzalez as the

examiner.

## PRELIMINARY STATEMENT

5.       Throughout these reorganization proceedings, in order to maintain stability in the

Debtors' workforce and thereby preserve the value in the Debtors' operating platforms, the

Debtors have sought to maintain their employees' benefits as they existed before the bankruptcy

filing, including the Residential Capital, LLC Annual Incentive Plan ("**AIP**").  Approximately

3,000 employees are eligible to participate in the AIP, including the 185 individuals who were

---

[3]    *Debtors' Motion for Entry of Interim and Final Orders Under Bankruptcy Code Sections 105(a), 363(b), 507(a), 1107 and 1108 and Bankruptcy Rule 6003 (i) Authorizing, But Not Directing, the Debtors to (a) Pay and Honor Prepetition Wages, Compensation, Employee Expense and Employee Benefit Obligations; and (b) Maintain and Continue Employee Compensation and Benefit Programs, and (ii) Directing Banks to Honor Prepetition Checks and Transfer Requests for Payment of Prepetition Employee Obligations* [Docket No. 43]*.*

2

also identified to participate in the Debtors' KEIP and KERP[4] plans.

6.      During the June 12, 2012 hearing on the final order approving the Wages Motion, the Debtors advised the Court and parties-in-interest that the Debtors intended to continue administering the AIP during these Chapter 11 cases.  However, pursuant to their agreement with the Creditors' Committee, the Debtors agreed to come back before the Court and obtain approval of payments under the AIP.  The Debtors seek the Court's permission at this time to make such cash payments so that they can adhere to their customary practice of delivering AIP payments to their employees in mid-February as well as address this issue before the close of the asset sales.[5]

7.      Like most financial services companies, a portion of the overall take-home pay for three out of four of the Debtors' employees is delivered at year's end, and for certain of those employees, these year-end awards comprise a significant portion of their annual compensation (between 33% to 58%).  In the Debtors' case, that variable element of take home pay is derived from the AIP.  The award amount is based on a manager's evaluation of the employee's performance and their overall contribution to the business.  The Debtors have utilized this compensation model for the past twenty years in order to motivate their employees to perform at optimal levels and reward them for their efforts.

---

[4]     Earlier this year, the Debtors obtained the Court's approval of a key employee incentive plan ("**KEIP**") as well as a key employee retention plan ("**KERP**"). *See* Docket Nos. 1169 & 1854.

[5]     As discussed herein, the AIP obligations associated with the employees to be hired by Ocwen/Walter (each as defined below) will be assumed by the buyers with a subsequent price adjustment to be taken against the purchase price for such costs.

3

8.      Throughout 2012, the Debtors' employees took on added responsibilities both before and during the bankruptcy filing,[6] worked greater hours than in years past and met or exceeded plan targets, thereby allowing the Debtors to perform quite exceptionally throughout the year (as evidenced by the Court's recent approval of the platform and whole loan sales).   As the Debtors' year comes to a close, the Debtors' employees would be severely disheartened if they were not to receive what in many cases forms the largest element of their compensation.

9.      The Compensation Committee of the Debtors' Board of Directors (the "**Compensation Committee**"), in an exercise of their reasonable business judgment, authorized the Debtors' business leaders to utilize a funding pool equivalent to 93.6% of the 2011 AIP funding pool amount in order to provide awards to approximately 3,000 eligible employees – a funding level lower than in years past.  Before making its decision, the Compensation Committee considered the funding recommendation of the Debtors' Chief Executive Officer ("**CEO**") and also consulted with outside advisors as to the propriety of the funding levels for specific categories of employees.

10.     For the reasons discussed herein, the Debtors assert that the proposed AIP funding pool is reasonable and payment to the employees is in the ordinary course of the Debtors' business and an appropriate exercise of the Debtors' business judgment.  Therefore, in order to provide certainty to a substantial majority of the employee population and assure all eligible employees, regardless of whether they are to be transferred to a buyer, that they will not be

---

[6]      *See* Section II of the *Supplemental Declaration of Anne Janiczek In Further Support Of Debtors' Motion for an Order Pursuant to Sections 363(b)(1) and 503(c)(3) of the Bankruptcy Code Authorizing (i) Implementation of (a) a Key Employee Retention Plan for Certain Non-Insiders and (b) a Key Employee Incentive Plan for Certain Insiders and (ii) Payment of Obligations Arising Thereunder as Administrative Expenses*. Docket No. 1005 (describing employees' enhanced responsibilities in connection with closing the asset sales and running the business on a daily basis).

ny-1069521

deprived of an important element of their annual compensation, the Debtors urge this Court to approve the Motion at the funding levels described herein.

## RELIEF REQUESTED

11.    The Wages Order provides, in pertinent part, that the Debtors may "not make payments under AFI LTECIP and ResCap AIP without further order of this Court."

12.    Pursuant to the terms of the Wages Order, the Debtors request that the Court authorize the Debtors to distribute payments under the ResCap AIP to the eligible employees so long as (i) the KEIP Participants do not receive more than seventy percent (70%) of the awards they received for their services in 2011 and (ii) the KERP Participants and all other eligible employees do not receive more than the award amount they received for their services in 2011.

## BASIS FOR RELIEF

### A.    Debtors' Compensation Structure

13.    The aggregate compensation earned by an employee of the Debtors during a calendar year is referred to as total direction compensation ("**TDC**"), which is comprised of base salary plus discretionary variable pay.  One form of variable pay offered to a majority of the Debtors' employees is a year-end award under AIP.  As of October 31, 2012, the Debtors had 3,926 employees.[7]  Not every employee is eligible to participate in AIP.  Approximately 3,000

---

[7]    The pool of eligible employees under the AIP will be based on the Debtors' final headcount as of December 31, 2012.

5

employees (the "**AIP Participants**") participate in this annual plan.[8]  The AIP Participants include all of the individuals (17) who participated in the key employee incentive plan as well as substantially all of the participants in the key employee retention plan (168 of 182).  See Janiczek Decl. at ¶¶ 3,4.

14.    The business purpose of the AIP is to set objectives for an employee to work towards throughout the year, which will contribute to the company's overall success; ensure that the employee meets/exceeds those goals by periodically evaluating the individuals on their efforts in accomplishing those goals; and thereafter, reward their efforts by issuing an award under the AIP.  See Janiczek Decl. at ¶ 5.

15.    Each year, the Debtors accrue for the estimated annual cost of discretionary variable pay.  The accrual is predicated on the award payments made in the prior year.  See Janiczek Decl. at ¶ 6.

**B.    AIP Funding Pool**

16.    In financial services companies, annual incentive awards are an important part of an employee's TDC.  According to *Mercer's 2011 US Financial Services Suite: Consumer Finance Compensation Survey*, substantially all of the organizations in the survey, including mortgage servicing companies, offer short-term incentives to key employees. Dempsey Decl. at ¶ 7.  For the senior business leaders (i.e., the KEIP Participants), the AIP award is approximately 58% of their TDC; for the managers and other key personnel (i.e., those in the KERP), the AIP award is approximately 33% of their TDC; and for the remainder of eligible employees, the AIP

---

[8]    The Debtors' remaining full-time employees are participants in one of several different variable pay plans that were approved by the Court as part of the Wages Order.

6

ny-1069521

award is approximately 8% of their TDC.[9]  See Janiczek Decl. at ¶ 7.

17.    Consistent with its historical practices, in the fourth quarter of the calendar year, the Compensation Committee of the Debtors' Board of Directors assessed the company's overall performance throughout the year and evaluated the recommendation of the Debtors' Chief Executive Officer as to the size of the funding pool for the AIP.  This year, the CEO's recommendation to the committee was to fund the pool at levels either flat to or less than the 2011 awards.  In sum, (i) non-KERP employees (approximately 2,800) and KERP employees will be eligible for the same AIP award as 2011 and (ii) employees participating in the KEIP will be eligible for an award that is seventy (70%) percent of the amount they received in 2011.  The Compensation Committee approved the CEO's recommendation, and as a result, the aggregate AIP funding pool for 2012 will be approximately $33.4 million.  See Mack Decl. at ¶ 4.

18.    As part of its evaluation of the proper size of the AIP funding pool, the Compensation Committee considered (i) the Debtors' overall performance in 2012; (ii) how the 2012 funding pool compared to funding levels in 2011 and 2010; (iii) how the Debtors' proposed funding levels compared to the market; and (iv) how the estimated AIP payments, when added to payments certain employees are eligible to receive under "key employee" programs compares to the relevant market levels.  See Mack Decl. at ¶ 5.

                    *i.*    ***Debtors' Overall Performance***

19.    ResCap's overall performance leading up to and during the Chapter 11 proceeding has been exemplary.  The Debtors' actions throughout 2012 have focused on ensuring that the

---

[9]    The Debtors' top 3 executives (i.e., Chief Executive Officer, President and Chief Capital Markets Officer), who are a part of AFI's Top 25 most-highly compensated employees, are not eligible for AIP.

value of their assets is preserved while operating in bankruptcy.  The management team has been able to preserve the Debtors' critical talent, limit any degradation in asset values, efficiently manage their operating budget and maintain and grow the business throughout the year, while also complying with extraordinary government decrees and preserving their relationship with key governmental entities.  The management team, together with their first-class employees, have accomplished what others in Chapter 11 have been unable to do – preserve as a going-concern one of the largest servicing and origination businesses in the United States while simultaneously (and successfully) marketing the platforms to numerous interested parties, and facilitating a productive section 363 auction and sale that is anticipated to yield approximately $4.5 billion in sale proceeds to the estate.  See Mack Decl. at ¶ 6.

20.     **Servicing:** this group successfully implemented all 318 U.S. Department of Justice Settlement and Consent Order servicing standard requirements, and prevented delinquency levels from significantly spiking while operating in bankruptcy, which translated into lower servicing advance requirements (i.e., net year-to-date operating cash requirements was $172.5mm less than the original DIP budget).  See Mack Decl. at ¶ 7.

21.     **Capital Markets:** throughout 2012, this group has had significant accomplishments, including:

(a)     preserving $255mm of liquidity through negotiations with Ginnie Mae that eliminated the Debtors' buyback obligations,

(b)     generating $58mm of incremental gains from the originations pipeline and risk management,

(c)     enhancing the value of the legacy loan portfolio through effective monitoring and call campaigns, and

(d)     unwinding $55bn of pipeline and mortgage servicing rights hedges before the bankruptcy filing, thus enabling the full return of collateral held by counterparties with no corresponding negative impacts on the business.

8

See Mack Decl. at ¶ 8.

22.    **Originations**: Like the servicing team, the performance of the originations team has been equally impressive.  To date, this group has generated $15.2bn in new originations versus a plan level of $8.7bn, while at the same time lowering the associated costs by $334 per loan.  Moreover, in October, this group closed 8,061 loans – a level the Debtors have not seen in the past two years.  See Mack Decl. at ¶ 9.

23.    **Risks & Controls:** while operating in bankruptcy, Debtors have met all necessary compliance measures, including those relating to the federal Consent Order.  For example, (i) the Debtors have completed testing 215 of 306 Sarbanes-Oxley controls with no significant deficiencies identified within the ResCap control environment, (ii) as of October 24, 2012, Consent Order deliverables were 96% complete and any outstanding deliverables are not past due, and (iii) as of November 1, 2012, mandatory compliance training is 99.47% complete.  See Mack Decl. at ¶ 10.

24.    **Global Functions:** while the benefits to the company and estate provided by this business unit are not easily quantified in dollars and cents, the work of the Global Functions team has been equally outstanding.  Throughout this year, this group maintained a stable workforce and efficiently managed costs.  For example, (i) after adjusting for bankruptcy costs, expenses were $13mm less than plan, (ii) all employee engagement and retention objectives were met, (iii) since the Petition Date, the Debtors have been able to attract and hire approximately 600 employees (as of November 5, 2012), and (iv) year-to-date employee turnover has been consistent with 2011 attrition rates.  See Mack Decl. at ¶ 11.

ii.    *Quantitative Comparisons*

25.    The Debtors' AIP accrual is the lowest it has been in three years and is in line with

9

market practices in the financial services industry. *See* Dempsey Decl. at ¶ 12.  For example, the

AIP funding pool for 2012 is 6.4% lower than the pool level for 2011, and 30.4% lower than the

pool level in 2010.    In addition, Mercer (US), Inc., the Debtors' compensation consultant,

advised the Compensation Committee that bonus accrual among organizations with mortgage

servicing businesses range from being approximately 10% below to 10% above the 2011 funding

levels. See Mack Decl. at ¶ 12.

26.    In connection with assessing the reasonableness of the AIP awards for the

individuals who also will receive KEIP awards, Mercer evaluated how the sum of each

individual's base salary, "target" KEIP award and AIP award (at 70% of the 2011 funding level)

compared to the Market Target[10] compensation.  Mercer determined that the sums to be received

by individuals in the KEIP were 4% below the Market Target.  See Dempsey Decl. at ¶ 10.

27.    In addition, in Mercer's declaration in support of the KEIP and KERP programs,

see Docket No. 812, it compared the variance between (i) the sum of the base salary and target

awards for KEIP & KERP participants against (ii) the aggregate market total compensation, and

found that all of the KEIP participants as well as the senior-most managers in the KERP were

receiving approximately 30% less in compensation than the market 75th percentile.  As has been

noted in earlier court filings, the Debtors always intended that the KEIP/KERP be additive to AIP,

and Mercer's earlier data reflects that the possibility of an employee receiving AIP was factored

into the cost of the KEIP and KERP programs.  See Dempsey Decl. at ¶ 10.  Therefore, it would

be reasonable and appropriate under the circumstances to allow members of the KEIP and KERP

---

[10]    Historically, it has been the Debtors' practice to price their employees' compensation at the 75th percentile in
the market (the "**Market Target**" - i.e., 25% of comparable companies have higher average compensation amounts
than the Debtors).

10

populations to be eligible for both payments under both plans.  See Dempsey Decl. at ¶¶ 10, 11.

###     C.    Individual AIP Award Determinations

28.     Once the Board authorizes the aggregate AIP funding pool, it is the Debtors' historical practice for the Chief Executive Officer and President to then provide the business unit leaders with their respective budgets for AIP distributions.  See Janiczek Decl. at ¶ 8.

29.     Ordinarily, in the first quarter of each calendar year, business leaders meet with their employees and set individual objectives for the employee to work towards throughout the year, which are consistent with the objectives of each business unit and mortgage business organization.  An employee's goals are not static and vary from year to year based on the company's broader strategic objectives.  For example, in 2012, the goals set for the employees were focused on stabilizing the business, preserving the company's assets, complying with the different regulatory programs and ensuring that asset value was maximized for the company's stakeholders.  See Janiczek Decl. at ¶ 9.

30.     Over the course of the year, each employee meets with their manager to review the employee's interim performance.  At that time, objectives may be refined in order to, for example, address the company's changing operational and personnel needs.  At the end of the year, the employee then completes a self-evaluation of whether they have met their stated goals and objectives, and their supervisor uses that form together with the supervisor's own evaluation to grade the employee's overall performance.  See Janiczek Decl. at ¶ 10.

31.     The amount of the AIP award is entirely discretionary.  Each employee's supervisor will not only consider the individual's performance; they will also consider the size of the allocated pool, how the individual employee compared to his peers and the contributions the individual made to the organization.  Accordingly, the AIP award is not guaranteed; rather, it is a

11

reflection of one's value to the company as a whole.  <u>See</u> Janiczek Decl. at ¶ 11.

### D.    Timing of AIP Payments

32.    Ordinarily, AIP payments are made in mid-February.  To the extent an employee is not transferred to one of the asset purchasers, the estate will remit payments to individuals at the estate in mid-February.  <u>See</u> Janiczek Decl. at ¶ 12.

33.    However, if an individual is transferred to an asset purchaser on or about the anticipated closing date of January 31, 2013, then the asset purchaser, consistent with its contractual obligation under its respective asset purchase agreement, will assume the accrued AIP liability currently on the Debtors' books and records.  This amount will then be treated as an adjustment against the overall purchase price.  <u>See</u> Janiczek Decl. at ¶ 13.[11]

### E.    Distinction between AIP and Key Employee Plans

34.    Earlier this year, the Debtors obtained the Court's approval of the KEIP and KERP.  The latter plan was intended to ensure that the Debtors retained personnel critical to closing the asset sales;[12] it was not incentive-based.  Accordingly, the KERP is not duplicative of the AIP award because the KERP compensated an individual for remaining with the company through a critical time in its reorganization while the AIP rewards that same individual for their contribution to the overall success of the mortgage business.  <u>See</u> Janiczek Decl. at ¶ 14.

35.    The key employee incentive plan did contain specific performance metrics, which

---

[11]    Ocwen Loan Servicing, LLC ("**Ocwen**") and Walter Investment Management Corporation ("**Walter**") have agreed to assume certain accrued employee liabilities as part of the agreed-upon asset purchase agreement.  The Debtors currently estimate that Ocwen will assume approximately $17.8 million of the AIP liability, Walter will assume approximately $10.3 million of this specific liability (but this figure may change depending on the final employee headcount), and the estate will be responsible for the remaining liability.

[12]    <u>See</u> Janiczek Declaration [Docket No. 1005-4 at ¶34] ("…the composition of the KERP population includes individuals who possess unique institutional knowledge about the Debtors' businesses and provide distinct services to the enterprise that are not easily replaceable.")

were intended to motivate the individuals to improve the purchase prices, meet very specific financial and operational goals and close the asset sales. By contrast, the AIP goals for the individuals in the KEIP are very different from the specific milestones provided for in the KEIP.

36.    The AIP objectives are established in the first quarter of the year by an employee's manager and are focused on addressing the company's daily organizational needs, improving the Debtors' overall business performance and maintaining the processes and programs necessary to allow the business to run properly. For example, the leaders of the servicing and origination units strive for specific income targets that represent an improvement on the historical performance levels. One way to do that is to work towards enhancing the volume of loans serviced and expanding the channels for new lending opportunities. In fact, during this year, the Debtors met and exceeded their goal of achieving $100mm of revenue resulting from the ongoing origination and brokering of loans. Another way of improving the company's performance is to limit employee attrition and ensure the continuity of institutional knowledge and customer service. In addition, like any other business, the senior executives are charged with meeting budget reduction targets and maintaining operational efficiencies. See Janiczek Decl. at ¶ 15.

37.    Therefore, each senior executive's AIP objectives are customized to be consistent with their role within the organization and not easily measured or quantified in the manner of the KEIP. As a result, the KEIP (like the KERP) is not duplicative of the AIP award because the AIP award compensates an individual for fulfilling their unique performance objectives throughout the course of the year, whereas the KEIP rewarded that same individual for achieving very specific and measured goals for a limited period of time in connection with a very discrete task (i.e., completing asset sales). See Janiczek Decl. at ¶ 16.

13

**APPLICABLE AUTHORITY**

A.     **The AIP Obligations Are A Continuation of the Debtors' Prepetition
Compensation Practices In The Ordinary Course Of Their Business.**

38.     Section 363(c) of the Bankruptcy Code provides that a "trustee may enter into
transactions, including the sale or lease of property of the estate, in the ordinary course of
business, without notice or a hearing[.]" 11 U.S.C. §363(c)(1).   Comm. of Asbestos-Related
Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612,
616 (Bankr. S.D.N.Y. 1986) (holding that ordinary course uses of estate property do not require a
prior hearing).

39.     Courts broadly interpret the term ordinary course.   Gassen v. Universal Bldg.
Materials, Inc. (In re Berkley Multi-Units, Inc.), 88 B.R 394, 396 (Bankr. M.D. Fla. 1988).   In
determining whether a transaction is in the ordinary course of business under Bankruptcy Code
section 363, the courts apply a two-pronged test: (1) the objective horizontal test and (2) the
subjective vertical test.   See Med. Malpractice Ins. Ass'n. v. Hirsch (In re Lavigne), 114 F.3d 379,
384-85 (2d Cir. 1997); see also In re Dana Corp., 358 B.R. 567, 580 (Bankr. S.D.N.Y. 2006) (and
cases cited therein); In re The Leslie Fay Cos.,168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).   The
horizontal test is a factual analysis as to whether the transaction in question is of the sort
commonly undertaken by companies in that industry.   Lavigne, 114 F.3d at 385.   That is, the
horizontal test focuses on whether the transaction is usual or abnormal for the industry.   The
vertical test, which is also called the creditor's expectation test, is an analysis conducted from the
perspective of a hypothetical creditor and analyzes whether the transaction subjects the creditor
to economic risks of a nature different from those it accepted when it decided to extend credit.   Id.
(internal quotations omitted); Leslie Fay Cos., 168 B.R. at 304.   "In making this determination,
courts look to the debtor's pre-petition business practices and conduct and compare" them to the

14

debtor's postpetition conduct.  Id.

40.    Here, awarding payments under the AIP to employees satisfies both the horizontal and vertical tests.  The horizontal test is met because the AIP retains the essential characteristics of the Debtors' prepetition AIP – a plan that has been in place for at least twenty years and is comparable to plans administered by dozens of the Debtors' competitors – and the Debtors' payment of awards under the AIP is within the ordinary course of its business.

41.    The Bankruptcy Court for the District of Delaware provided a detailed account of what facts it analyzed to come to the determination that a debtor's alteration of a short term compensation plan was within the ordinary course. In In re Nellson Neutraceutical, Inc., 369 B.R. 787 (Bankr. D. Del. 2007), the debtor reviewed whether a short term compensation plan was standard in the industry by examining 20 comparable companies, "based upon revenue, EBITDA and products." Id. at 797-8. The debtor then compared its own short term compensation plans with those of the comparable companies. Id. After the debtor showed that a majority of the companies had plans substantially similar to those of the debtor, the court held that the debtor's plan satisfied the horizontal dimension. Id. In addition, because the debtor presented evidence that its proposed modifications were consistent with its prepetition practices, the court concluded that the debtor's modified compensation plan also satisfied the vertical dimension test. Id. See also Dana Corp., 358 B.R. at 579-81   (finding that, because debtors' postpetition short term incentive plan was a "refinement" of its prepetition short term incentive plan, which had been a "common component" of the debtors' compensation practices historically, that the debtor's proposed postpetition modifications were within the ordinary course); In re Global Home Products, LLC, 369 B.R. 778 (Bankr. D. Del. 2007) (same).

42.    The Debtors submit that the AIP, which has been in place for twenty years, is an

15

ordinary course transaction.    From a horizontal perspective, Mercer reviewed the Debtors'

comparable competitors and concluded that substantially all of these companies have an annual

or short-term incentive plan - "The Debtors' approach to managing incentives is generally

consistent with the approach used by others in the financial services industry. See Dempsey Decl.

at ¶ 8.  From a vertical analysis, because the AIP is a continuation of the preexisting AIP on

generally the same terms as those maintained prepetition, the AIP remains consistent with the

Debtors' practices that is being utilized in these bankruptcy proceedings.

43.    Moreover, the AIP is a sound exercise of the Debtors' business judgment.  As

noted during the first-day hearings in these Chapter 11 cases, maintaining the Debtors' workforce

has been a critical component of the Debtors' value-preservation strategy. See Hearing Tr.

Residential Capital, LLC, et al. (First Day Hearing), May 14, 2012, p. 29, 6:13 [Docket No. 154].

("It's mission critical, Your Honor, that in complying with all of the additional requirements I just

described, the debtors maintain their entire workforce. These regulations require significantly

more man and woman hours to satisfy enhanced servicing standards. The servicing business is

very competitive right now, and the debtors cannot afford to lose any of their employees if they

have any hope of continuing to fulfill these regulatory obligations").

44.    Providing employees with an annual discretionary payment that has historically

comprised a portion of their annual compensation is a normal component of conducting business

and essential to continuing the Debtors' businesses, which rely heavily on consistent leadership,

familiarity with complex financial assets, and regular interaction with sophisticated governmental

entities.  As in years past, the AIP focuses on enhancing the Debtors' financial and operational

performance, and the annual payout to the employee under the AIP provides the requisite short-

term motivation and incentive to work towards achieving the desired goals.  As previously noted,

16

all of the Debtors' business units performed exceptionally throughout the year, and that performance is due, in part, to the Debtors maintaining their prepetition compensation structure, including the ability to make payment of AIP awards.

45.    Creditors should expect that the Debtors would continue their prepetition practices in connection with running their businesses, particularly where, as here, the Debtors are preserving going concern value for the benefit of their creditors.  Thus, allowing the Debtors to make the requested payments to their employees under the AIP is appropriate, consistent with market practices and does not subject creditors to economic risks that would not have otherwise been contemplated by them.

46.    Accordingly, as the AIP is an ordinary course transaction within the Debtors' reasoned business judgment, the Debtors respectfully submit that approval of the AIP is only necessary because, at the request of the Creditors' Committee, the Debtors agreed to seek formal authorization prior to making any payments under the AIP at the time the Wages Motion was approved.

**B.    If the AIP is Considered A Non-Ordinary Course Transaction, The AIP Should be Approved as a Valid Exercise of the Debtors' Reasoned Business Judgment.**

47.    Even if this Court were to find that the AIP is outside the Debtors' ordinary course of business, making payments under the AIP represents a valid exercise of the Debtors' business judgment and is in the best interests of the Debtors' estates and the interests of all stakeholders in these chapter 11 cases.

48.    Where a debtor's proposed use or sale of estate property is outside the ordinary course, section 363(b)(1) of the Bankruptcy Code authorizes the debtor in possession to take such non-ordinary course actions after notice and a hearing. 11 U.S.C. § 363(b)(1). To approve the use

17

of estate property under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to use the property outside of the ordinary course of business was based on the debtor's business judgment. See In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a 363(b) application must find a good business reason to grant such application); see also In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (noting that the standard for determining a section 363(b) motion is "a good business reason"); In re Global Crossing Ltd., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

49.      The business judgment rule shields a debtor's management's decisions from judicial second guessing. Johns-Manville, 60 B.R. at 615-16 (a "presumption of reasonableness attaches to a [D]ebtor's management decisions" and courts will generally not entertain objections to the debtor's conduct after a reasonable basis is set forth). Once a debtor articulates a valid business justification, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations and internal quotations omitted), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Accordingly, if the debtor satisfies the business judgment rule, then the court should approve the transaction should be approved under section 363(b)(1) of the Bankruptcy Code.

50.      In considering whether the AIP meets the "sound business judgment" test, courts consider, among others, the following factors:

(a)      Whether there is a reasonable relationship between the plan proposed and the results to be obtained, i.e., in the case of a

18

ny-1069521

performance incentive plan, is the plan calculated to achieve the desired performance;

(b)    Whether the cost of the plan is reasonable in the context of the debtor's assets, liabilities and earning potential;

(c)    Whether the scope of the plan is fair and reasonable, does it apply to all employees, and does it discriminate unfairly;

(d)    Whether the plan or proposal is consistent with industry standards;

(e)    The due diligence efforts of the debtor including with respect to investigating the need for a plan, analyzing which key employees need to be incentivized, determining what is available and reviewing what is generally applicable in a particular industry; and

(f)    Whether the debtor received independent counsel in performing due diligence and in creating and authorizing the incentive compensation.

Dana Corp., 358 B.R. at 576-77 (Bankr. S.D.N.Y. 2006).

51.    An analysis of the Dana factors establishes that the AIP payments should be approved as an exercise of the Debtors' sound business judgment.

52.    First, there is a reasonable relationship between the payment proposed and the results to be obtained.  Achievement of any payouts under the AIP is tied to both the company's overall performance as well as the individual's ability to meet individual performance goals that are intended to create value for the Debtors.  Therefore, the plans seek to properly incentivize employees to perform at the highest levels throughout the year.

53.    Second, the cost of the plan is reasonable in the context of the Debtors' assets, liabilities and the value to be realized through the auctions of the Debtors' assets. See Dempsey Decl. at ¶ 13.

54.    Third, the scope of the plan is fair and reasonable. The AIP applies to nearly seventy-five percent of the employee population, and those who are not eligible participate in distinct variable pay incentive programs.  The AIP seeks to incentivize a larger group of employees who all are essential to the success of the Debtors' businesses.

19

55.    <u>Fourth</u>, the AIP is consistent with industry standards. As discussed earlier, each of the Debtors' numerous competitors within the financial services industry offer short-term incentive plans similar to the AIP for their employees.  The Debtors' overall compensation and benefit policies are tied to market practice as subject to the Debtors' financial results. <u>See</u> Dempsey Decl. at ¶ 8.

56.    <u>Fifth</u>, as set forth above and in the Wages Motion, the Debtors continually review their compensation and benefit plans to ensure their compensation policies are competitive when compared to the Debtors' peers in the mortgage origination and servicing industry.

57.    <u>Sixth</u>, when setting the maximum payment levels, the Debtors received independent advice from its outside compensation consultant to ensure that the AIP payments are fair and consistent with industry standards for a company operating under bankruptcy protection. With the AIP payments, substantially all of the employees will receive TDC slightly below or in line with last year's TDC.

58.    This and other courts have recognized that incentive programs can be a highly efficient means of maximizing value for a debtor's estate and, accordingly, have approved similar incentive programs. <u>See</u> <u>In re General Growth Properties, Inc.</u>, No. 09-11977 (ALG) (Bankr. S.D.N.Y. October 15, 2009, Docket No. 3126) (approving modified prepetition bonus program); <u>In re Musicland Holding Corp.</u>, Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006, Docket No. 342) (approving continuation of pre-existing incentive plan).

59.    Therefore, in chapter 11 proceedings, it is reasonable for a debtor-in-possession to keep its employees' compensation in line with market compensation levels in order to ensure workforce stability and preserve the business as a going concern.  <u>See</u> Dempsey Decl. at ¶ 9.  The employees' TDC is in line with Debtors' target employee compensation levels relative to market,

20

and the cost to the Debtors' estates is modest in comparison to the value provided to the Debtors'

estates over the past year by this motivated group of employees, who collectively have met or

exceeded the goals set by management.

60.    Accordingly, entry of the proposed order is appropriate and in the best interest of

these estates.

21

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter an order

substantially in the form attached hereto as <u>Exhibit 1</u> granting the relief requested in the Motion;

and (ii) grant such other and further relief to the Debtors as the Court may deem just and proper.

Dated:  December 26, 2012
        New York, New York

*/s/ Gary S. Lee*
Gary S. Lee
Lorenzo Marinuzzi
Jordan A. Wishnew
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel for the Debtors and
Debtors in Possession*

22

## EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------- )
In re:                                                                       )          Case No. 12-12020 (MG)
                                                                             )
RESIDENTIAL CAPITAL, LLC, et al.,                                            )          Chapter 11
                                                                             )
                                         Debtors.                            )          Jointly Administered
-------------------------------------------------------------------------- )

**ORDER UNDER BANKRUPTCY CODE SECTIONS 363, 1107(a) AND 1108
SUPPLEMENTING THE FINAL WAGES ORDER AND AUTHORIZING THE
DEBTORS TO MAKE PAYMENTS TO THEIR EMPLOYEES UNDER THE
RESIDENTIAL CAPITAL, LLC ANNUAL INCENTIVE PLAN**

Upon the motion (the "**Motion**")[1] of Residential Capital, LLC, and certain of its

affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") for entry of an order

under Bankruptcy Code sections 363, 1107 and 1108 authorizing the Debtors to make payments

to their employees under the Residential Capital, LLC Annual Incentive Plan [Docket No.  ]; and

upon the Janiczek, Mack and Dempsey Declarations [Docket Nos. [ ], [ ] and [ ]; and it appearing

that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334;

and it appearing that venue of these Chapter 11 cases and the Motion in this district is proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this proceeding on the Motion is a

core proceeding pursuant to 28 U.S.C. § 157(b); and sufficient notice of the Motion having been

given; and it appearing that no other or further notice need be provided; and upon the record of

---

[1]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.
Creditors and parties-in-interest with questions or concerns regarding the Debtors' Chapter 11 cases or the relief
granted herein may refer to http://www.kccllc.net/rescap for additional information.

the Hearing; and it appearing that the relief requested by the Motion is in the best interests of the

Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon;

and sufficient cause appearing therefore, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Nothing herein shall be deemed to authorize the payment of any amounts

or the incurrence of any obligation that would violate section 503(c) of the Bankruptcy Code.

3.      The Debtors are authorized, but not directed, to distribute payments under

the ResCap Annual Incentive Plan to the eligible employees so long as (i) the KEIP Participants

do not receive more than seventy percent (70%) of the awards they received for their services in

2011 and (ii) the KERP Participants and all other eligible employees do not receive more than

the award amount they received for their services in 2011.

4.      The Debtors shall not make or accrue any payments under either the AIP

to employees that qualify as employees whose total compensation ranks them among the top 25

highest paid employees at AFI and its subsidiaries, including the Debtors.

5.      The AIP shall comply will all the restrictions of TARP, and the Debtors

are directed to make such revisions as necessary to comply with TARP, including any future

determination letter issued by the United States Department of the Treasury's Office of the

Special Master (the "**OSM**").

6.      The Debtors shall defer 25% of all AIP cash payments to a single Debtor

employee that is within the Next 75 who has total cash compensation deemed earned for 2012 of

greater than $500,000 for at least one year and also defer 50% of the Next 75 employee's AIP

payment for two years, unless otherwise permitted by the OSM.

7.      Notwithstanding anything herein to the contrary, this Order shall not modify or affect the terms and provisions of, nor the rights and obligations under, (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered April 5, 2012, by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with AFI and Ally Bank and their respective subsidiaries and affiliates.

8.      The requirements set forth in Bankruptcy Rule 6004(a) are satisfied.

9.      Notwithstanding Bankruptcy Rule 6004(h), to the extent applicable, this Order shall be effective and enforceable immediately upon entry hereof.

10.      The Debtors are authorized and empowered to take all actions necessary to implement the relief granted in this Order in accordance with the Motion.

11.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

Dated: New York, New York
           January __, 2013

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE