**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Case No. 12-12020 (MG) |
| ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al</u>., ) | Chapter 11 |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**DECLARATION OF JOHN DEMPSEY IN SUPPORT OF DEBTORS' MOTION FOR A SUPPLEMENTAL ORDER UNDER BANKRUPTCY CODE SECTIONS 363, 1107(a) AND 1108 TO THE FINAL WAGES ORDER AUTHORIZING THE DEBTORS TO MAKE PAYMENTS TO THEIR EMPLOYEES UNDER THE RESIDENTIAL CAPITAL, LLC ANNUAL INCENTIVE PLAN**

I, John Dempsey, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

1. I am a Partner at Mercer (US) Inc. ("**Mercer**"). My business address is 155 North Wacker Drive, Suite 1500, Chicago, Illinois 60606. Mercer is a global professional compensation services firm that was engaged by the above-captioned debtors and debtors in possession (the "**Debtors**").

2. I respectfully submit this declaration (the "**Declaration**") in support of the *Debtors' Motion for an Order To Supplement The Final Wages Order Pursuant to Sections 363, 1107(a) and 1108 of the Bankruptcy Code Authorizing The Debtors To Make Payments To Their Employees Under The Residential Capital, LLC Annual Incentive Plan*, filed contemporaneously herewith.

**A.    Background Information and Qualifications**

3. I joined Mercer following my graduation from Yale University, and have worked in the firm's Chicago, Cleveland and London offices. I received an MBA in 1992 from the Ohio State University. I have been a Principal or Partner at Mercer for approximately 12 years.

ny-1071374

4.     I have extensive experience advising organizations undergoing major financial transitions (including bankruptcies, IPOs, LBOs, and acquisitions) regarding compensation issues, and also have extensive experience with designing annual and multi-year incentive programs, change in control arrangements, and employment agreements.  My recent bankruptcy-related engagements include Borders Group, Nortel Networks, Tribune Company, Aleris, Charter Communications, Masonite, CIT Group, Capmark, Fairpoint, Caraustar, Adelphia Communications (Creditors' Committee), R.H. Donnelley, Freedom Communications, Stallion, Dana, Owens Corning, Kaiser Aluminum, Solutia, Oglebay Norton, Citation, Intermet, Venture Holdings, Alterra, EaglePicher, Allied Holdings, Mesaba Aviation, and FLAG Telecom.  I have also worked on restructuring issues with Georgia Gulf, ABN AMRO, US Foodservice, Barrick Gold, Manulife, CareMark Rx, Archipelago, and Sky Financial.

5.     Additionally, I published an article entitled *Bankruptcy Blues: Retaining Key Employees During a Financial Crisis* with Michael Siebenhaar in the February 2002 issue of Workspan, and an update, *The New Challenge of Chapter 11*, with Elizabeth Stephens in August 2008.  I have been frequently quoted on issues relating to effective transitional compensation practices in such publications as HR Magazine, Cox News, and the Atlanta Journal Constitution.  In addition, I have been quoted in the Dallas Morning News, the Chicago Tribune, and the Milwaukee Journal Sentinel.  I have also presented at the National Meeting of the Conference Board, the National Association of Stock Plan Professionals, and the National Center for Employee Ownership.

6.     In 2010, my testimony was proffered and accepted in connection with the approval of Tribune's 2010 Management Incentive Plan.  On March 11, 2011, my testimony was proffered and accepted during Tribune's confirmation hearing.

2

ny-1071374

7. According to *Mercer's 2011 US Financial Services Suite: Consumer Finance Compensation Survey*, substantially all of the seventy-five (75) organizations in the survey, including all of the mortgage servicing companies, offer short-term incentives to key employees.

8. The Debtors' approach to managing incentives is generally consistent with the approach used by others in the financial services industry. Large financial services organizations commonly balance an assessment of their operational and financial results, the market competitiveness of their compensation levels and market intelligence regarding bonus accruals of competitors for talent. Based on information furnished by Mercer and other sources, I witnessed the Compensation Committee consider each of these factors in reviewing the CEO's recommendations for the AIP funding pool.

9. Based on my experience advising companies in chapter 11 proceedings, it is reasonable for a debtor-in-possession to keep its employees' compensation in line with market compensation levels in order to ensure workforce stability and preserve the business as a going concern. The fact that employee turnover in 2012 remained consistent with 2011 levels despite considerable uncertainty of future employment prospects and an active market for mortgage professionals demonstrates the effectiveness of the Debtors' 2012 compensation strategy.

10. As shown by the table below, when one aggregates the employee's base salary, their "target" KEIP or KERP award and their anticipated AIP award (based on amounts paid out for their services in 2011), the total potential 2012 compensation of individuals in Tier 1 (i.e., the KEIP participants) is below the market, and those individuals in Tiers 2 and 3 (i.e., the KERP participants) are slightly above the Market Target.[1] It is noteworthy to emphasize that employees in Tier 2 and 3 have been identified as critical talent of the Debtors and are generally

---

[1] Historically, it has been the Debtors' practice to price their employees' compensation at the 75th percentile in the market (the "**Market Target**" - i.e., 25% of comparable companies have higher average compensation amounts than the Debtors).

senior-level managers and individual contributors in Finance, Legal and IT roles; the loss of this talent would be potentially catastrophic for the Debtors, so the Debtors exercised sound business judgment to design these employees' compensation structures accordingly. The design of the KEIP and KERP assumed that the AIP would be paid in addition to the KEIP or KERP awards

| Tier | Variance from Market Target<br>*Salary, KEIP/KERP and Proposed AIP* | Variance from Market Target<br>*Salary + KEIP/KERP* |
|---|---|---|
| I[2] | -4% | -39% |
| II | 16% | -23% |
| III | 30% | 8% |
| IV | n/a [3] | n/a |
| **Aggregate** | **15%** | **-21%** |

11. When pricing the KERP program, the Debtors identified those individuals to be necessary and critical to preserving the value of the assets to be sold in the section 363 sales. Accordingly, the awards to these individuals were intentionally positioned higher in the market to ensure that these individuals would not be motivated to seek employment elsewhere. Based on my experience counseling companies involved in mergers and acquisitions in Chapter 11 proceedings, it is both reasonable and appropriate to provide individuals considered critical to the preservation of asset value with a retention payment (in the form of a KERP) in addition to their ordinary annual compensation.

12. Currently, the accrual for year-end incentive/bonus payments, among organizations with mortgage servicing businesses, range from being approximately 10% below

---

[2] Includes a 70% funding of AIP. All other tiers represent 100% AIP funding.
[3] Mercer did not perform nor was made available to benchmarking analyses for incumbents in Tier IV therefore cannot comment on market competitiveness.

4

ny-1071374

to 10% above the 2011 funding levels.  The ResCap AIP funding pool for 2012 is 6.4% lower than the pool level for 2011, and 30.4% lower than the pool level in 2010.

13. Therefore, I believe that the cost of the AIP is reasonable in the context of the Debtors' assets, liabilities and the value to be realized through the auctions of the Debtors' assets.  Failure to compensate the AIP participants consistently with the value earned is likely to cause substantial damage to the servicing business since transferred employees are likely to be disgruntled in the absence of AIP, which is a universal practice among financial services firms to pay short term incentives to most employees.  Similarly, the confidence in ResCap as a viable employer going forward will be severely undermined if the company cannot follow through on participant expectations of receiving AIP.  The estimated $33.4 million cost of AIP is reasonably modest in comparison to the $4.5 billion of anticipated proceeds from the sale of the servicing business and whole loan portfolio with additional proceeds expected from the sale of the estate's residual assets.  It is also modest in context of the overall scope of the Debtors' $10.7 billion of recorded liabilities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on the 26th day of December, 2012 at Moreland Hills, Ohio.

_____
John Dempsey