1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matters of:                        Lead Case No.

6

7  RESIDENTIAL CAPITAL, LLC, et al.,         12-12020-mg

8            Debtors.

9  - - - - - - - - - - - - - - - - - - - -x

10 WAGNER,

11                 Plaintiff,               Adv. Proc. No.

12            - against -                   12-01913-mg

13 RESIDENTIAL FUNDING COMPANY, LLC, et al.,

14                 Defendants.

15 - - - - - - - - - - - - - - - - - - - -x

16 WILLIAMS,

17                 Plaintiff,               Adv. Proc. No.

18            - against -                   12-01896-mg

19 GMAC MORTGAGE LLC,

20                 Defendant.

21 - - - - - - - - - - - - - - - - - - - -x

22

23

24

25

2

United States Bankruptcy Court

One Bowling Green

New York, New York


December 20, 2012

10:07 AM


B E F O R E:

HON. MARTIN GLENN

U.S. BANKRUPTCY JUDGE

1

2  Doc # 2049 Debtors' Motion for a Supplemental Order Under

3  Bankruptcy Code Sections 105(a), 363, 503(b)(1), 507(a)(2),

4  1107(a) and 1108 and Bankruptcy Rule 9019 to the Final Wages

5  Order (I) Authorizing and Directing the Debtors to Reimburse

6  Ally Financial Inc. for Payments Made to the Debtors' Employees

7  on Account of Compensation Issued on or After the Petition

8  Date; (II) Granting Ally Financial Inc. an Administrative

9  Expense Claim on Account of Such Payments; (III) Granting Ally

10 Financial Inc. a Limited Release; and (IV) Authorizing the

11 Debtors to Establish and Fund an Escrow Account for the Benefit

12 of Ally Financial Inc. on Account of Such Administrative

13 Expense Claims, including Additional Amounts to the Escrow

14 Account as Necessary.

15

16 (CC: Doc# 2355) Debtors' Motion for the Entry of an Order

17 Further Extending Their Exclusive Periods to File a Chapter 11

18 Plan and Solicit Acceptances Thereof.

19

20 (CC: Doc# 2357) Debtors' Motion for Appointment of a Mediator.

21

22 Status Conference RE: Examiner's Investigation.

23

24

25

4

 1 Doc# 2326 Debtors' Motion for Order Under 11 U.S.C. 105(a),

 2 365(a) and 554(a), Fed. R. Bankr. P. 6006 and 9014, and Local

 3 Bankruptcy Rule 6006-1 Approving Procedures Regarding the

 4 Future Rejection of Executory Contracts and Unexpired Leases.

 5

 6 (Doc no. 1244) Motion for Clarification Regarding Relief from

 7 Automatic Stay filed by Douglas C. Wigley on behalf of Gregory

 8 Balensiefer.

 9

10 (Doc no. 1615) Motion for Relief from Stay filed by Michael P.

11 Donaghy, Stephanie Donaghy.

12

13 (CC: Doc no. 1908, 1818) Motion for Relief from Stay filed by

14 M. Nawaz Raja, Neelum Nawaz Raja.

15

16 (CC: Doc# 1546) Motion of the Official Committee of Unsecured

17 Creditors for Entry of an Order Authorizing It to Prosecute and

18 Settle Certain Claims on Behalf of the Debtors' Estates.

19

20 Adversary proceeding: 12-01913-mg Wagner v. Residential Funding

21 Company, LLC, et al.:

22 (Doc no. 7,9) Motion for Dismissal of Adversary Proceeding

23 Pursuant to Bankruptcy Rule 7012(b) and FRCP 12(b)(5), and (6)

24 Or, in the Alternative, Permissive Abstention Pursuant to 28

25 U.S.C. Section 1334(c)(1).

1

2   Pre-trial Conference.

3

4   Adversary proceeding: 12-01896-mg Williams V. GMAC Mortgage LLC

5   (Successor by Merger to GMAC Mor)

6   Doc# 7 Motion for Dismissal of Adversary Proceeding Pursuant to

7   Bankruptcy Rule 7012(b)(5) and (b)(6) Or, in the Alternative,

8   Permissive Abstention Pursuant to 28 U.S.C. Section 1334(c)(1).

9

10  (CC: Doc no. 1858) First Interim Application of Towers Watson

11  Delaware Inc. as Human Resources Consultant for the Debtors for

12  Compensation and Reimbursement of Expenses Incurred for the

13  Period June 25, 2012 Through August 31, 2012 for Towers Watson

14  Delaware Inc., Consultant, period: 6/25/2012 to 8/31/2012, fee:

15  $34,355.03, expenses: $0:00. Filed by Towers Watson Delaware

16  Inc.

17

18  (CC: Doc# 1900) First Application for Interim Professional

19  Compensation First Interim Fee Application of Arthur J.

20  Gonzalez, as Chapter 11 Examiner, for Allowance of Compensation

21  and Reimbursement of Expenses for the Period July 3, 2012

22  through and Including August 31, 2012 for Arthur J. Gonzalez,

23  Examiner, Other Professional, period 7/3/2012 to 8/31/2012,

24  Fee: $86,137.50, expenses: $.00.

25

6

1

2   (CC: Doc no. 1850) Application for Interim Professional

3   Compensation for Severson & Werson, PC, Special Counsel.

4

5   (CC: Doc no. 2261) Application of the Examiner for Order

6   Authorizing the Retention and Employment of Wolf Haldenstein

7   Adler Freeman & Herz LLP as Conflicts Counsel to the Examiner

8   Nunc Pro Tunc to October 15, 2012 filed by Howard Seife on

9   behalf of Arthur J. Gonzalez, Examiner.

10

11  (CC: Doc no. 1794) First Interim Application of Rubenstein

12  Associates, Inc. as Corporate Communications Consultant for the

13  Debtors for Compensation and Reimbursement of Expenses Incurred

14  for the Period from May 14, 2012 through August 31, 2012 for

15  Rubenstein Associates, Inc., Consultant.

16

17  (CC: Doc 1859) First Interim Application of Kurtzman Carson

18  Consultants, LLC as Administrative Agent for the Debtors for

19  Compensation and Reimbursement of Expenses Incurred for the

20  Period May 14, 2012 through August 31, 2012, for Kurtzman

21  Carson Consultants LLC, Other Professional, period: 5/14/2012

22  to 8/31/2012, fee: $94,074.00, expenses: $0.00. Filed by

23  Kurtzman Carson Consultants LLC.

24

25

7

1

2  (CC: Doc# 1902) First Application for Interim Professional

3  Compensation of Deloitte & Touche LLP for Compensation for

4  Services Rendered and Reimbursement of Expenses as Independent

5  Auditor and Attest Service Provider to the Debtors for the

6  Period from May 14, 2012 through August 31, 2012 for Deloitte &

7  Touche LLP, Auditor, period: 5/14/2012 to 8/31/2012, fee:

8  $690,583.50, expenses: $0.00.

9

10  (CC: Doc# 1891) First Application for Interim Professional

11  compensation of KPMG LLP, as Tax Compliance Professionals and

12  Information Technology Advisors to the Debtors and Debtors in

13  Possession, for Interim Allowance and Compensation for

14  Professional Services Rendered and Reimbursement of Actual and

15  Necessary Expenses Incurred from May 14, 2012 through August

16  31, 2012 for KPMG LLP, Other Professional, period: 5/14/2012 to

17  8/31/2012, fee: $656,390.00, expenses: $46,449.02.

18

19  (CC: Doc# 1863) First Interim Application of Fortace LLC as

20  Consultant for the Debtors for Compensation and Reimbursement

21  of Expenses Incurred for the Period May 21, 2012 through August

22  31, 2012 for Fortace LLC, Consultant, period: 5/21/2012 to

23  8/31/2012, fee: $337,939.00, expenses: $119,073.93.

24

25

8

1

2  (CC: Doc# 1871) First Interim Application of Orrick, Herrington

3  & Sutcliffe LLP as Special Securitization Transactional and

4  Litigation Counsel for the Debtors for Compensation and

5  Reimbursement of Expenses Incurred for the Period May 14, 2012

6  through August 31, 2012 for Orrick, Herrington & Sutcliffe LLP,

7  Special Counsel, period: 5/14/2012 to 8/31/2012, fee:

8  $733,357.07, expenses: $678.12.

9

10  (CC: Doc no. 1872, 2301) First Interim Application of Dorsey &

11  Whitney LLP as Special Securitization and Investigatory Counsel

12  for the Debtors for Compensation and Reimbursement of Expenses

13  Incurred for the Period May 14, 2012 through August 31, 2012

14  for Dorsey and Whitney LLP, Special Counsel, period: 5/14/2012

15  to 8/31/2012, fee: $412,188.83, expenses: $5,105.22, filed by

16  Dorsey and Whitney, LLP.

17

18  (CC: Doc# 1882) First Interim Application of Bradley Arant

19  Boult Cummings LLP as Special Litigation and Compliance Counsel

20  for the Debtors for Compensation and Reimbursement of Expenses

21  Incurred for the Period May 14, 2012, through August 31, 2012,

22  for Bradley Arant Boult Cummings LLP, Special Counsel, period:

23  5/14/2012 to 8/31/2012, fee: $4,207,515.65, expenses:

24  $157,682.41.

25

9

1

2    (CC: Doc no. 1886) First Application for Interim Professional

3    Compensation for Locke Lord LLP, Special Counsel.

4

5    (CC: Doc# 1883) First Interim Application of Centerview

6    Partners LLC as Investment Banker for the Debtors for

7    Compensation and Reimbursement of Expenses Incurred for the

8    Period May 14, 2012 through August 31, 2012 for Centerview

9    Partners LLC, Other Professional, period: 5/14/2012 to

10   8/31/2012, fee: $900,000.00, expenses $18,761.48.

11

12   (CC: Doc# 1889) First Interim Application of Carpenter Lipps &

13   Leland LLP as Special Litigation Counsel for the Debtors for

14   Compensation and Reimbursement of Expenses Incurred for the

15   Period May 14, 2012 through August 31, 2012 for Carpenter Lipps

16   & Leland LLP, Special Counsel, period: 5/14/2012 to 8/31/2012,

17   fee: $955,735.00, expenses: $334,924.08.

18

19   (CC: Doc# 1888) Interim Application for Interim Professional

20   Compensation First Interim Application of Mercer (US) Inc. as

21   Compensation Consultants to the Debtors for the Period from May

22   14, 2012 through August 31, 2012, for Mercer (US) Inc., Other

23   Professional, period: 5/14/2012 to 8/31/2012, fee: $43,618.92,

24   expenses: $6,118.74.

25

1

2   (CC: Doc# 1890) First Interim Application of Curtis, Mallet-

3   Prevost, Colt & Mosle LLP, as Conflicts Counsel to the Debtors

4   and Debtors in Possession, for Allowance and Payment of

5   Compensation for Professional Services Rendered and for

6   Reimbursement of Actual and Necessary Expenses Incurred from

7   May 14, 2012 through and Including August 31, 2012, for Curtis,

8   Mallet-Prevost, Colt & Mosle LLP, Debtors' Attorney, period:

9   5/14/2012 to 8/31/2012, fee: $496,548.50, expenses: $3,093.40.

10

11  (CC: Doc no. 1895) Second Application for Interim Professional

12  Compensation Second Interim Application of Reed Smith, LLP for

13  an Award of Compensation and Reimbursement of Expenses for

14  Services Rendered as an Ordinary Course Professional for the

15  Debtors for the Period of August 1, 2012 through August 31,

16  2012, for Reed Smith LLP, Other Professional.

17

18  (CC: Doc no. 2272) Quarterly Application for Interim

19  Professional Compensation and Reimbursement of Expenses for

20  Services Rendered as an Ordinary Course Professional for the

21  Debtors for Dykema Gossett PLLC, Other Professional, period

22  6/1/2012 to 8/31/2012, fee: $85,772.60, expenses: $2,192.49.

23

24

25

1

2    (CC: Doc no. 1894) First Application for Interim Professional

3    Compensation and Reimbursement of Expenses for Services

4    Rendered as an Ordinary Course Professional for the Debtors for

5    the Period of May 14, 2012 through August 31, 2012 for Troutman

6    Sanders, LLP, Other Professional.

7

8    (CC: Doc# 1897) First Interim Fee Application of Chadbourne &

9    Parke LLP, Counsel to the Examiner, for Allowance of

10    Compensation and Reimbursement of Expenses for the Period July

11    11, 2012 Through and Including August 31, 2012 for Chadbourne &

12    Parke LLP, Other Professional, period: 7/11/2012 to 8/31/2012,

13    fee: $3,295,849.50, expenses: $127,003.11.

14

15    (CC: Doc# 1905) First Application for Interim Professional

16    Compensation of FTI Consulting, Inc. as Financial Advisor for

17    the Debtors for Compensation and Reimbursement of Expenses of

18    Expenses Incurred for the Period May 14, 2012 through August

19    31, 2012 for FTI Consulting, Inc., Other Professional, period:

20    5/14/2012 to 8/31/2012, fee: $7,500,000.00, expenses,

21    $385,757.98.

22

23

24

25

12

1

2  (CC: Doc# 1904) First Application for Interim Professional

3  Compensation of Morrison Cohen LLP for Allowance of Interim

4  Compensation for Professional Services Rendered and Expenses

5  Incurred During the Period May 14, 2012 through August 31,

6  2012, for Morrison Cohen LLP, Other Professional, period:

7  5/14/2012 to 8/31/2012, fee: $325,625.50, expenses: $4,248.73.

8

9  (CC: Doc# 1885) First Interim Application of Morrison &

10  Foerster LLP as Bankruptcy Counsel for the Debtors for

11  Compensation and Reimbursement of Expenses Incurred for the

12  Period May 14, 2012 through August 31, 2012 for Morrison &

13  Foerster LLP, Debtors' Attorney, period: 5/14/2012 to

14  8/31/2012, fee: $14,667,747.50, expenses: $598,549.72.

15

16  (CC: Doc no. 2025) First Application for Interim Professional

17  Compensation for Prince Lobel Tye LLP, Other Professional.

18

19  (CC: Doc no. 1892) First Interim Application of Reed Smith LLP

20  for an Award of Compensation for Services Rendered as an

21  Ordinary Course Professional for the Debtors for the Period of

22  July 1, 2012 through July 31, 2012 for Reed Smith LLP, Other

23  Professional.

24

25

13

1

2   (CC: Doc# 1884) First Interim Application of AlixPartners, LLP,

3   Financial Advisor to the Official Committee of Unsecured

4   Creditors, for Compensation and Reimbursement of Expenses for

5   the Period May 21, 2012 through August 31, 2012 for

6   AlixPartners LLP, Other Professional, period: 5/21/2012 to

7   8/31/2012, fee: $2,205,724.75, expenses: $34,011.46.

8

9   (CC: Doc# 1896) First Application of Kramer Levin Naftalis &

10  Frankel LLP, Counsel for the Official Committee of Unsecured

11  Creditors, for Interim Allowance of Compensation for

12  Professional Services Rendered and for Reimbursement of Actual

13  and Necessary Expenses Incurred from May 16, 2012 through

14  August 31, 2012 for Kramer Levin Naftalis & Frankel LLP,

15  Creditor Comm. Aty, period: 5/16/2012 to 8/31/2012, fee:

16  $10,675,061.50, expenses: $305,820.34.

17

18  (CC: Doc# 1898) First Interim Application of Moelis & Company

19  LLC for Compensation for Professional Services Rendered and

20  Reimbursement of Actual and Necessary Expenses Incurred as

21  Investment Banker to the Official Committee of Unsecured

22  Creditors for the Period from May 16, 2012 through August 31,

23  2012, for Moelis & Company LLC, Other Professional, period:

24  5/16/2012 to 8/31/2012, fee: $1,391,129.03, expenses:

25  $20,194.72.

14

1

2  (CC: Doc no. 1906) First Interim Fee Application of Mesirow

3  Financial Consulting, LLC for Compensation and Reimbursement of

4  Expenses as Financial Advisor to the Examiner for the Period

5  July 24, 2012 through August 31, 2012, for Mesirow Financial

6  Consulting, LLC, Other Professional, period: 7/24/2012 to

7  8/31/2012, fee: $3,007,275.00, expenses: $30,048.00 filed by

8  Mesirow Financial Consulting, LLC.

9

10  (CC: Doc# 2354) Debtors' Motion for Order Under 11 U.S.C.

11  105(a) and 365(a), Fed. R. Bankr. P. 6006 and 9014 and Local

12  Bankruptcy Rule 6006-1 Authorizing Assumption of Unexpired

13  Lease.

14

15

16

17

18

19

20  Transcribed by:  Penina Wolicki

21  eScribers, LLC

22  700 West 192nd Street, Suite #607

23  New York, NY 10040

24  (973)406-2250

25  operations@escribers.net

15

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4         Attorneys for Debtors

5         1290 Avenue of the Americas

6         New York, NY 10104

7

8  BY:   GARY S. LEE, ESQ.

9         LORENZO MARINUZZI, ESQ.

10        NORMAN S. ROSENBAUM, ESQ.

11        JAMES A. NEWTON, ESQ.

12        SAMANTHA MARTIN, ESQ.

13        ERICA J. RICHARDS, ESQ.

14        TODD M. GOREN, ESQ.

15

16

17  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

18         Conflicts Counsel to Debtors

19         101 Park Avenue

20         New York, NY 10178

21

22  BY:   MARYANN GALLAGHER, ESQ.

23         STEVEN J. REISMAN, ESQ.

24

25

16

1

2   CARPENTER LIPPS & LELAND LLP

3           Attorneys for Residential Capital, et al.

4           280 North High Street

5           Suite 1300

6           Columbus, OH 43215

7

8   BY:   DAVID A. BECK, ESQ.

9           JEFFERY A. LIPPS, ESQ.

10

11

12   SEVERSON & WERSON

13           Special California Litigation Counsel for Debtors

14           One Embarcadero Center

15           Suite 2600

16           San Francisco, CA 94111

17

18   BY:   DUANE M. GECK, ESQ. (TELEPHONICALLY)

19

20

21

22

23

24

25

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3       Office of the United States Trustee

4       33 Whitehall Street

5       21st Floor

6       New York, NY 10004

7

8  BY:    BRIAN S. MASUMOTO, ESQ.

9

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12       Attorneys for Official Creditors' Committee

13       1177 Avenue of the Americas

14       New York, NY 10036

15

16  BY:    KENNETH H. ECKSTEIN, ESQ.

17         RACHAEL L. RINGER, ESQ.

18         DOUGLAS MANNAL, ESQ.

19         P. BRADLEY O'NEILL, ESQ.

20         STEPHEN D. ZIDE, ESQ.

21

22

23

24

25

18

1    MORRISON COHEN LLP

2          Attorneys for Independent Members of ResCap Board

3          909 Third Avenue

4          New York, NY 10022

5

6    BY:    ROBERT K. DAKIS, ESQ.

7

8

9    QUINN EMANUEL URQUHART & SULLIVAN, LLP

10          Attorneys for AIG, Allstate, Prudential, Mass Mutual

11          51 Madison Avenue

12          22nd Floor

13          New York, NY 10010

14

15    BY:    SUSHEEL KIRPALANI, ESQ.

16          SCOTT C. SHELLEY, ESQ.

17

18

19    WHITE & CASE LLP

20          Attorneys for Ad Hoc Group of Junior Secured Noteholders

21          1155 Avenue of the Americas

22          New York, NY 10036

23

24    BY:    J. CHRISTOPHER SHORE, ESQ.

25          HARRISON L. DENMAN, ESQ.

19

1   KIRKLAND & ELLIS LLP

2          Attorneys for Ally Financial Inc. & Ally Bank

3          601 Lexington Avenue

4          New York, NY 10022

5

6   BY:    RAY C. SCHROCK, ESQ.

7          STEPHEN E. HESSLER, ESQ.

8

9

10  CHADBOURNE & PARKE LLP

11         Attorneys for the Examiner

12         30 Rockefeller Plaza

13         New York, NY 10112

14

15  BY:    HOWARD SEIFE, ESQ.

16         DAVID LEMAY, ESQ.

17

18

19  JONES DAY

20         Attorneys for FGIC

21         565 South Flower Street

22         Fiftieth Floor

23         Los Angeles, CA 90071

24

25  BY:    RICHARD L. WYNNE, ESQ.

20

1    CARTER LEDYARD & MILBURN LLP

2         Attorneys for Talcott Franklin Group

3         2 Wall Street

4         New York, NY 10005

5

6    BY:   AARON R. CAHN, ESQ.

7

8

9    CLEARY GOTTLIEB STEEN & HAMILTON LLP

10         Attorneys for Wilmington Trust, N.A.

11         One Liberty Plaza

12         New York, NY 10006

13

14    BY:   MARK A. LIGHTNER, ESQ.

15         THOMAS J. MOLONEY, ESQ.

16         SEAN A. O'NEAL, ESQ.

17

18

19    KELLEY DRYE & WARREN LLP

20         Attorneys for UMB as Trustee for JSBS

21         101 Park Avenue

22         New York, NY 10178

23

24    BY:   JASON R. ADAMS, ESQ.

25         ERIC R. WILSON, ESQ.

21

1   DRUCKMAN LAW GROUP PLLC

2         Attorneys for Seneca Trustees

3         242 Drexel Avenue

4         Westbury, NY 11590

5

6   BY:   KIYAM J. POULSON, ESQ.

7

8

9   GIBBS & BRUNS LLP

10         Attorneys for RMBS Steering Committee

11         1100 Louisiana

12         Suite 5300

13         Houston, TX 77002

14

15   BY:   KATHY PATRICK, ESQ.

16

17

18   ROPES & GRAY LLP

19         Attorneys for RMBS Investors

20         1211 Avenue of the Americas

21         New York, NY 10036

22

23   BY:   KEITH H. WOFFORD, ESQ.

24

25

22

1

2    SEWARD & KISSEL LLP

3         Attorneys for U.S. Bank, N.A., as RMBS Trustee

4         One Battery Park Plaza

5         New York, NY 10004

6

7    BY:   ARLENE R. ALVES, ESQ.

8         MARK D. KOTWICK, ESQ.

9         DALE C. CHRISTENSEN, JR., ESQ.

10         LAURIE R. BINDER, ESQ.

11

12

13    ALSTON & BIRD LLP

14         Attorneys for Wells Fargo, N.A.

15         One Atlantic Center

16         1201 West Peachtree Street

17         Atlanta, GA 30309

18

19    BY:   JOHN "KIT" WEITNAUER, ESQ.

20

21

22

23

24

25

23

1

2    CADWALADER, WICKERSHAM & TAFT LLP

3         Attorneys for MBIA

4         700 Sixth Street, N.W.

5         Washington, DC 20001

6

7    BY:    MARK C. ELLENBERG, ESQ.

8

9

10   FREEBORN & PETERS LLP

11        Attorneys for Mercer (US) Inc.

12        311 South Wacker Drive

13        Suite 3000

14        Chicago, IL 60606

15

16   BY:    THOMAS R. FAWKES, ESQ.

17

18

19   DECHERT LLP

20        Attorneys for Bank of New York Mellon

21        1095 Avenue of the Americas

22        New York, NY 10036

23

24   BY:    GLENN E. SIEGEL, ESQ.

25

24

1

2   STRONGIN ROTHMAN & ABRAMS, LLP

3        5 Hanover Square

4        4th Floor

5        New York, NY 10004

6

7   BY:   DAVID ABRAMS, ESQ.

8

9

10   DESSAULES LAW GROUP

11        Attorneys for Gregory Balensiefer

12        2700 North Central Avenue

13        Suite 1250

14        Phoenix, AR 85004

15

16   BY:   DOUGLAS C. WIGLEY, ESQ.

17

18

19   LATHAM & WATKINS LLP

20        Attorneys for Moelis & Company

21        885 Third Avenue

22        New York, NY 10022

23

24   BY:   MICHAEL RIELA, ESQ.

25

25

1

2  MUNGER, TOLLES & OLSON LLP

3       Attorneys for Berkshire Hathaway

4       355 South Grand Avenue

5       Los Angeles, CA 90071

6

7  BY:   THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

8

9

10  PRINCE LOBEL TYE, LLP

11       Attorneys for Debtors

12       100 Cambridge Street

13       Suite 2200

14       Boston, MA 02114

15

16  BY:   WILLIAM A. WORTH, ESQ. (TELEPHONICALLY)

17

18

19  TROUTMAN SANDERS LLP

20       Attorneys for Debtors

21       222 Central Park Avenue

22       Suite 2000

23       Virginia Beach, VA 23462

24

25  BY:   JASON E. MANNING, ESQ. (TELEPHONICALLY)

26

1

2   ORRICK, HERRINGTON & SUTCLIFFE LLP

3        Attorneys for Residential Capital, et al.

4        1152 15th Street, NW

5        Washington, D.C. 20005-1706

6

7   BY:   DEBRA L. FELDER, ESQ. (TELEPHONICALLY)

8

9

10  DYKEMA GOSSETT PLLC

11       Attorney for the Debtors

12       1717 Main Street

13       Suite 4000

14       Dallas, TX 75201

15

16  BY:   JEFFREY R. FINE, ESQ. (TELEPHONICALLY)

17

18

19  BRADLEY ARANT BOULT CUMMINGS LLP

20       Special Litigation and Compliance Counsel to Debtors

21       One Federal Place

22       1819 Fifth Avenue North

23       Birmingham, AL 35203

24

25  BY:   JAY R. BENDER, ESQ.

27

1

2    GOLDEN & AMOS, P.L.L.C.

3         Attorneys for Tim Amos, Individually and

4            Golden & Amos, PLLC

5         543 Fifth Street

6         Parkersburg, WV 26101

7

8    BY:   TIMOTHY J. AMOS, ESQ.

9

10

11   ALSO PRESENT:

12        ROLAND S. YOUNG, Deloitte LLP

13        JACOB THOMSON, Towers Watson (TELEPHONICALLY)

14        MOHAMMAD N. RAJA, Pro Se (TELEPHONICALLY)

15        MICHAEL AGRUSA, Towers Watson (TELEPHONICALLY)

16        JOHN J. COLLINS, AlixPartners, LLC (TELEPHONICALLY)

17        STEPHANIE L. DONAGHY, Pro Se (TELEPHONICALLY)

18        LAURA J. EISELE, AlixPartners, LLC (TELEPHONICALLY)

19        ERIK FERGUSON, Residential Capital (TELEPHONICALLY)

20        DRAKE D. FOSTER, Kurtzman Carson Consultants

21        (TELEPHONICALLY)

22        PAMELA WEST, Residential Capital (TELEPHONICALLY)

23

24

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

28

1              P R O C E E D I N G S

2              THE COURT:  Please be seated.  We're here in

3      Residential Capital, number 12-12020.  Mr. Lee?

4              MR. LEE:  Good morning, Your Honor.  Gary Lee, from

5      Morrison & Foerster, for the debtors.

6              MR. RAJA:  Good morning, Your Honor, Mohammad Nawaz

7      Raja and Mrs. Neelum Nawaz Raja, movants.

8              THE COURT:  All right.  Thank you.  We're going to

9      proceed through with the agenda, and when a matter relating to

10     you comes, up, we'll call on you and give you an opportunity to

11     speak.

12             Go ahead, Mr. Lee.

13             MR. LEE:  Your Honor, the first matter on the calendar

14     today, which is item number 1 of the scheduled matters, which

15     is docket number 2049, is the debtors' motion seeking

16     permission to reimburse AFI for a post-petition compensation

17     related to senior executives and granting them an

18     administrative expense claim for the payments, a limited

19     release for the consideration they're providing to the

20     employees, and then authorizing the debtors to fund an escrow

21     account for the payment of the admin expense claim.

22             Your Honor, during the first-day hearings, the debtors

23     received authority to reimburse AFI for compensation-related

24     payments, because they act as the debtors' payroll processor.

25     And at that time, Your Honor, what we didn't specifically

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    address were the peculiarities of the U.S. government's TARP

2    program, which caused both monetary limitations and deferrals

3    in the payment of executive compensation.  And what those

4    deferrals mean is that a mechanism needs to be put in place to

5    account for post-petition compensation for 2012 that's deferred

6    through 2014; so in other words, compensation earned this year

7    that's deferred.

8          So the first component of the motion, Your Honor,

9    seeks approval of a mechanism that's been discussed and agreed

10   to between AFI, the committee, and the debtors.  It has two

11   components.  The first is the administrative expense component,

12   and the second is the funding of the escrow.  Your Honor, no

13   party has objected to that portion of the relief, and so we

14   don't believe it's controversial.

15         The second component, Your Honor, relates to pre- as

16   opposed to post-petition compensation.  And what the motion

17   does is resolve a dispute between the debtors and AFI as to

18   which party had the obligation to pay the debtors' employees

19   for pre-petition TARP-related compensation that fell due after

20   these cases were filed.  So there are various employees who

21   have compensation due from 2008,'9, '10, '11, and through the

22   first half of 2012, before we filed the cases.

23         And under the agreement that was reached -- and I have

24   to thank the committee and AFI, because they really worked

25   through what were incredibly contentious and difficult

**RESIDENTIAL CAPITAL, LLC, ET AL.**

30

1    issues -- AFI has committed to pay the outstanding pre-petition

2    compensation amounts to the debtors' employees, without seeking

3    any contribution or reimbursement from the debtors.

4         THE COURT:  That was the change in language that was

5    added after the objections were filed to make it clear that

6    they wouldn't seek reimbursement of those amounts?

7         MR. LEE:  That's correct, Your Honor.  And the parties

8    also agreed on the form of what is a limited release as well.

9    And again, the committee and AFI were really integral in

10   resolving a motion that we filed in December, which ideally, we

11   would have filed back in May, which I think will indicate the

12   length and the quality of the argument that led to it.

13        So, Your Honor, again, no parties objected to that

14   relief.  We've revised the form of order to take into account

15   the comments received from the committee, AFI, and from New

16   Jersey Carpenters.  So as I said, Your Honor, at this point,

17   the debtors would request that the Court enter the order.

18        THE COURT:  All right.  As I understand it, all of the

19   objections -- and they were limited objections -- but the

20   objections that were filed -- I want to be sure I'm correct in

21   this -- have been resolved by revising the order to add

22   language that addresses the issues that were raised by the

23   objectors?

24        MR. LEE:  That's my understanding, Your Honor.  Yes.

25        THE COURT:  Okay.  Mr. Eckstein, do you want to be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

31

1   heard on behalf of the committee?

2           MR. ECKSTEIN:  Your Honor, good morning.  Kenneth

3   Eckstein of Kramer Levin, on behalf of the official creditors'

4   committee.  Welcome back, Your Honor.  I hope you had a --

5           THE COURT:  Thank you.

6           MR. ECKSTEIN:  -- pleasant time away.

7           Your Honor, as Mr. Lee noted, this has been a subject

8   that generated a lot of discussion over several months.  And

9   the committee tried to look at it from several perspectives.

10  As Your Honor I'm sure appreciates, one of the issues that we

11  were concerned about from the outset was that there are

12  inherent conflicts that exist, given the fact that the debtors'

13  employees were being compensated with stock of the parent

14  company.  And those conflicts exist.  They continue to exist.

15  They're not being resolved as a result of this motion.  And we

16  essentially tried to bracket that issue.

17          Ultimately, the committee did not try to overlay its

18  input into the amount of the pre-petition and base compensation

19  for the debtors' employees.  And therefore, we tried to

20  structure this in a way that was neutral and protective of the

21  estates' interests.

22          THE COURT:  May I ask you this, Mr. Eckstein?  Does --

23  because they got a letter from OSM on November 30th, 2012.

24  Does that resolve the conflict issue?

25          MR. ECKSTEIN:  Your Honor, the conflict issue is not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

32

1    resolved, because it exists and it can't be eliminated.  Going

2    forward, we've made it clear that at least on a going-forward

3    basis, payment is going to be made in cash rather than in AFI

4    stock.  But that doesn't change what essentially was the --

5          THE COURT:  I mean, your conflict argument -- and I

6    understand it's not squarely presented here -- is that the

7    debtors' senior executives were dependent on the success of AFI

8    for a portion of their compensation, because it was in deferred

9    stock units.  And now, going forward, it's no longer going to

10   be in deferred stock units, it's going to be in deferred cash

11   payments.

12         MR. ECKSTEIN:  Going forward, that's correct.

13         THE COURT:  Going forward.

14         MR. ECKSTEIN:  Yes.  Going forward, we think we've

15   dealt with that conflict going forward.

16         THE COURT:  But isn't this resolved, I thought, with

17   the settlement and AFI's payment?  How is this -- how does the

18   conflict issue still exist?

19         MR. ECKSTEIN:  Your Honor, the point is, whatever

20   conflicts existed pre-petition, existed pre-petition, however,

21   it affected the conduct pre-petition.

22         THE COURT:  Okay.  That -- all right.

23         MR. ECKSTEIN:  And that was the point we were making.

24         THE COURT:  I understand.

25         MR. ECKSTEIN:  And we're not resolving that today.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

33

1          THE COURT:  All right.

2          MR. ECKSTEIN:  And that was really tied to the fact

3   that we carved out from the release whatever --

4          THE COURT:  Yes.

5          MR. ECKSTEIN:  -- claims the estate has and how the

6   conflict implicates claims --

7          THE COURT:  Okay.

8          MR. ECKSTEIN:  -- and the relationship between the

9   executives and the --

10         THE COURT:  I understand.

11         MR. ECKSTEIN:  -- parent company are reserved.

12         THE COURT:  Okay.

13         MR. ECKSTEIN:  So I think that that issue, as I said,

14  is being set aside.  The release, we think we have clarified

15  the release so that this is not inadvertently affecting

16  whatever claims are being reviewed by the examiner, by the

17  committee, or by others.  And those are not being released

18  either.

19         THE COURT:  And no third-party direct claims are being

20  affected by this?

21         MR. ECKSTEIN:  And no third-party direct claims are

22  being affected.  And also, as Mr. Lee indicated, AFI has

23  agreed, number one, to fund the amounts and not to seek

24  indemnification.

25         THE COURT:  Approximately how much is involved in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

34

1   their funding?

2   MR. ECKSTEIN:  I believe it's forty-five million or

3   fifty million.

4   THE COURT:  All right.

5   MR. ECKSTEIN:  Fifty-eight million, I'm sorry.

6   THE COURT:  Fifty-eight million?  Okay.

7   MR. ECKSTEIN:  Fifty-three million pre, and I'm told,

8   nine post.

9   THE COURT:  Okay, thank you.

10   MR. ECKSTEIN:  So on that basis, Your Honor, the

11   committee is satisfied --

12   THE COURT:  All right.

13   MR. ECKSTEIN:  -- with the order to be entered.  Thank

14   you.

15   THE COURT:  All right.  Thank you, Mr. Eckstein.

16   Anybody else wish to be heard?

17   Mr. Lee?

18   MR. LEE:  Your Honor, I just wanted to address one

19   thing which relates to the dialog with the Office of the

20   Special Master.  I mean, just to be absolutely clear, the

21   debtors began that process --

22   THE COURT:  I know it's been ongoing.

23   MR. LEE:  -- at the outset.

24   THE COURT:  I know that.

25   MR. LEE:  It is beyond anybody's expectation that we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

35

1  ultimately ended up with the letter that we ended up with.

2           THE COURT:  Yes.

3           MR. LEE:  Treasury rules are Treasury rules, Your

4  Honor.  So --

5           THE COURT:  Okay.  Thank you.

6           MR. LEE:  Thank you.

7           THE COURT:  Well, this motion, which is the debtors'

8  motion for a supplemental order authorizing it to reimburse

9  Ally Financial, Inc. for payments made to the debtors'

10  employees, it's ECF number 2049, raises issues both under

11  Section 363(b)(1) and then also because it does incorporate a

12  settlement, it raises issues under 9019.

13           The Court has considered the motion under both.  I'm

14  glad to see that the objections that had been filed have all

15  been resolved with changes to the language.  The Court

16  concludes that the debtors have satisfied the business judgment

17  standard under Section 363(b)(1), and that the settlement that

18  is included within the agreement is in the best interests of

19  the debtor and the estate, and consequently, the motion is

20  granted.

21           MR. LEE:  Thank you very much, Your Honor.

22           THE COURT:  Thank you, Mr. Lee.

23           MR. LEE:  The debtors' employees thank you too.

24           THE COURT:  Okay.

25           MR. LEE:  Your Honor, the next item on the agenda,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

36

1    sort of two items -- we filed two motions related to the plan

2    process.  The first was a motion to extend the debtors'

3    exclusive period to file a Chapter 11 plan for seventy days.

4    And that's docket number 2355.  The second was the motion to

5    appoint a mediator, which is docket number 2357.  While the

6    motions are related, Your Honor, and parties filed joint

7    responses, and we filed a joint reply, they are not mutually

8    exclusive.  And so, Your Honor, if I may, I'd like to address

9    them one-by-one, starting with exclusivity, which terminates

10   today.

11           Your Honor, I think we were fairly mindful of what you

12   said at the hearing when we were last here on the motion for

13   exclusivity.  And what we've requested is what we think is a

14   fairly modest extension of seventy days.  Indeed --

15           THE COURT:  So it's February 28th that you've asked

16   for?

17           MR. LEE:  That's correct, Your Honor.

18           THE COURT:  For proposing a plan?

19           MR. LEE:  That's correct, Your Honor.  And then sixty

20   days to solicit votes, which takes us through to April the 29th

21   of next year.

22           Your Honor, since the first request for an extension

23   of exclusivity, I think we've done everything that we can to

24   make progress in the plan discussions.  And I think both the

25   effort that we've made to make information available to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

37

1   people -- and we have made an enormous amount of information

2   available to people -- and the effort to actually move the

3   process forward, are really reflected in the responses that we

4   got to the motion to extend the exclusivity.  We received five

5   responses in total:  one from the creditors' committee, one

6   from the group represented by Ms. Patrick, one from Wilmington

7   Trust, one from AFI, and one from JSBs.  And all of the

8   responses but one support the debtors' request for an

9   extension.  Everybody agrees there should be an extension.  I

10   think that the JSBs -- junior secured bondholders object only

11   to the length proposed by the debtors, as opposed to the action

12   of exclusivity being extended by a month.

13          Your Honor, I think we squarely satisfy the Adelphia

14   factors.  We've shown both tremendous effort and progress.  I

15   think that's acknowledged in the papers that were filed.  And

16   we believe, Your Honor, that progress warrants the granting of

17   our request to extend the exclusivity.  And during that time

18   period, Your Honor, we intend to keep up the pace.  We intend

19   to engage in meaningful negotiations with the key parties.

20   And, Your Honor, we have set up a mediation process which I

21   think we'll discuss after we get through this motion.

22          Your Honor, I'd be happy to address the objection --

23   the one objection that we received to the length of our

24   requested exclusivity extension.

25          THE COURT:  Well, let me hear from the objectors.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

38

1              MR. LEE:  Okay.

2              THE COURT:  And then I'll give you a chance --

3              MR. LEE:  Thank you.

4              THE COURT:  -- to reply if necessary.

5              Mr. Eckstein, do you want to be heard first?  You

6    support the motion, but let me hear from you first.

7              MR. ECKSTEIN:  Your Honor, with respect to

8    exclusivity, the committee does support the relief requested.

9    And while I'll reserve my remarks on some of the process when

10   we get to the mediation discussion, I think that consistent

11   with the recent developments in the case, including the

12   agreement to adjourn the RMBS trial until March and the

13   discussions that have been taking place and will be taking

14   place over the next several weeks, we in fact think that an

15   extension of exclusivity is constructive.  And the committee

16   does support it.

17             We had made the point in our pleading that our

18   understanding is that there is no intention to file a plan

19   during this time period, but rather to use the period for

20   negotiations.  And obviously, at the end of the period, the

21   debtor will reserve the right to further extend for cause,

22   which we think is the appropriate way to proceed.  And on that

23   basis, we would support the extension requested by the debtor.

24             THE COURT:  All right, thank you.

25             All right, anybody else wish to be heard on the issue

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   of extension of exclusivity?

2        MR. WOFFORD:  Your Honor, for the record, Keith

3   Wofford from Ropes & Gray on behalf of the RMBS steering group.

4   As you note from our objection, it is not per se an objection

5   to exclusivity, but it is expressed out of concern for making

6   sure that the mediation and exclusivity extension interact

7   properly, and that we would prefer not to have to be back here

8   in February arguing about a further extension, when if

9   mediation is granted, we'd be in the middle of a mediation.

10       Further, we don't want the extension framework to

11  preordain a further adjournment of the RMBS settlement hearing.

12  That is, we'd like to have a mediation with a defined term,

13  which we'll talk about next, particularly a defined ending, so

14  that if, in fact, mediation is successful, there can be a plan

15  proposed with an existing exclusivity; and if it's

16  unsuccessful, parties can assess their options and we can go

17  forward with the RMBS trial.

18       THE COURT:  Thank you, Mr. Wofford.  Anybody else wish

19  to be heard?

20       MR. SHORE:  Good morning, Your Honor.  Chris Shore

21  from White & Case on behalf of the junior secured bonds.

22       We also don't object to an extension of exclusivity.

23  The question is really one of how long the extension should be.

24  And we are objecting to one beyond January 31st, which is the

25  contemplated close of the MSR and HFS --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

40

1          THE COURT:  Seems like almost tomorrow, though, I

2     mean, it's --

3          MR. SHORE:  It does.  But let me focus on one thing

4     and why we're asking for a shorter extension.  We're at an

5     inflection point in the case with the sales closing.  And we're

6     rapidly approaching estates that are essentially going to be

7     estates that hold bank accounts and hold causes of action.  And

8     the issues that have to be addressed in the context of that are

9     going to be how to allocate those assets between the various

10    debtor boxes.  Again, we've got the contemplate -- or the

11    complex capital structure here.  And how and where to place

12    those is a key issue.  In fact, the junior secured bonds and

13    Ally are the only creditors in many of those boxes.  So today,

14    the debtors, in those boxes, are proposing an extension of

15    exclusivity over the objection of their main creditor

16    constituency.

17          The next is, once you put the assets in the boxes, the

18    question is, how does that get reallocated with either inter-

19    debtor claims or inter-debtor causes of action; which is going

20    to raise some potentially difficult problems in the context of

21    settlement negotiations and plan proposals.  Then, within each

22    individual box, you have to just address the issue of the

23    priority of the claims; the challenges to the extent of our

24    liens; the allowance of claims of particular boxes with the

25    RMBS trusts and others; the potential subordination of claims

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    within those boxes.  And then finally, the issue of do we

2    monetize the litigation claims now.  Ally said it's happy to

3    settle, happy to litigate.  And we'll have to figure out how to

4    do that.

5            In the context of where we are now, we know the --

6    we've been talking to people -- the professionals know what the

7    issues are.  The professionals know what the toggles are in

8    that four-step process.

9            The only issue up right now -- and it's both in

10   connection with exclusivity and with the mediator -- is do we

11   litigate now or do we try to get a plan done?  I think

12   everybody is saying let's have a good and maybe first shot at

13   trying to resolve these issues globally in a plan.  But the

14   question today is, how should that be done and who should do

15   it?

16           And our view is that's unclear right now as to how it

17   should be done and who should be doing it.  So what we want to

18   do at this point is maintain maximum flexibility and not use

19   the process of either appointing a mediator, dealing with

20   exclusivity, or -- you're going to see we've reached a

21   resolution -- but in the context of the committee getting

22   standing, to have any of that impact the ability to maintain

23   flexibility as to paths.

24           It may be that if Ally doesn't want a third-party

25   release, and we'll know -- this is not a difficult negotiation;

**RESIDENTIAL CAPITAL, LLC, ET AL.**

42

1    it's occurred once before that led to our pre-petition

2    settlement.  And there's either going to be some movement there

3    or there isn't.  It may be that Chapter 7 is best path.  If we

4    don't need third-party releases, we're just liquidating cash

5    and causes of action.  So we don't want the process, right now,

6    of appointing the mediator, dealing with committee standing,

7    dealing with an extension of exclusivity, to impact that.

8            And fundamentally, when we get to that question of

9    which path do we take, it's our view in the context of trying

10   to resolve plans globally, that keeping people on a shorter

11   time frame is better than this concept of well, we want it out

12   to the 28th, but we're not going to file a plan in that period,

13   so we're just going to keep coming back for more.

14           THE COURT:  You know, I think the one thing that

15   clearly, I think, got across, when the issue of extending

16   exclusivity came up for the first time, was that I was not

17   particularly satisfied with the direction the case was going,

18   and consequently I set a shorter time than anybody wanted,

19   namely today.  I think that message got across.  And while

20   there's an enormous amount that needs to be done, if there's

21   going to be a consensual plan achieved, I do think that there's

22   been progress in the sense of dialog, sharing of information.

23           I have your point, Mr. Shore, about -- I'm not sure I

24   quite agree that you're right, at this moment, what you refer

25   to as the inflection point.  But everyone is really going to

**RESIDENTIAL CAPITAL, LLC, ET AL.**

43

1    have to decide over the next several months, whether you're

2    going to embark on the litigation wars or whether people are

3    going to come together and try and reach a consensual agreement

4    on a lot of very complicated issues.  So I have your point.

5         MR. SHORE:  We're -- and let me just conclude with

6    this, then.  We have a concern that we're losing sight of

7    exactly what settlement needs to occur.  What we need now is

8    informed principals and principal-to-principal discussions

9    going on.  The committee isn't going to vote on a plan.  The

10   debtors may vote.  They may not have their votes counted.  The

11   mediator isn't going to vote on a plan.

12        We have to, if we're going to get to a plan

13   settlement, get the principals educated.  This does not -- I

14   mean, we can deal with it in the context of the terms of a

15   mediation -- the notion that there's not been public disclosure

16   right now of the trial balances as of the petition date -- how

17   can you have a meaningful discussion about a secured claim

18   without having trial balances as of the petition date, to set

19   at least the basis for a discussion on what is the amount of

20   collateral as of the petition date?

21        But that's got to take place.  What's happening today,

22   and our concern, and the reason we want to keep it short to

23   make sure this isn't happening, is that the people who aren't

24   voting are looking for ongoing relevance in the cases.  There's

25   certainly a role for the debtors to facilitate the discussions

1   and for the committee to facilitate the discussions.  They

2   can't get involved in the inter-company disputes, the inter-

3   debtor disputes.

4           THE COURT:  Okay.  I --

5           MR. SHORE:  They can facilitate.  So as long as what's

6   we're doing is -- the extension of exclusivity is premised upon

7   real discussions taking place between the economic

8   stakeholders, the people who are going to be voting on the

9   plan, it really doesn't make sense to continue down this path

10  of seeing who can insert themselves in the process, who

11  ultimately isn't going to have a vote tabulated.

12          THE COURT:  All right.  Thank you, Mr. Shore.  Anybody

13  else wish to be heard?  Is there anybody else who wants to be

14  heard?  No?

15          Okay.  All right.  With respect to the debtors' motion

16  to extend exclusivity to propose a plan by February 28th and

17  solicit votes by April 29th, the motion is granted.  In the

18  Court's view, the debtor has satisfied all of the prongs of the

19  Adelphia test which I've typically followed in this case,

20  earlier, and in other cases as well.

21          There is a lot to be done.  I certainly remember when

22  this case was first filed and I read in the press that this was

23  a pre-pack.  Well, it's about as far as one can get from that.

24  It is extremely complicated, because of the number of debtors,

25  the capital structure, the different creditor constituencies.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

45

1   If there's going to be a consensual plan, there's going to need

2   to be hard negotiations, compromise, and agreement.

3          The alternative is close to nuclear war.  A lot of

4   deep pockets and high stakes.  So everyone's going to have to

5   come to the recognition of how can they achieve the best result

6   for everybody in the shortest amount of time.  I think that's

7   likely to be through negotiation.  Certainly the debtor

8   reserves its right to seek a further extension to exclusivity.

9          When the first motion for extension of exclusivity

10  came on, I made clear that there had to be a dialog, there had

11  to be negotiations, there had to be sharing of necessary

12  information.  And I think in that regard, there's certainly

13  been substantial progress.  We'll deal with the mediator motion

14  next.  But I mean, I anticipate that a process will be -- if

15  it's not already in place, it'll be put in place very quickly

16  and move forward very quickly.  There's going to have to be a

17  lot of hard negotiation and sharing of information.

18         So with respect to the extension of exclusivity, the

19  motion is granted.

20         MR. LEE:  Thank you, Your Honor.  Your Honor, the next

21  item on the agenda is docket number 2357, which is our motion

22  for the appointment of a mediator.  Your Honor, I believe there

23  is, in fact, universal consensus that a mediator is necessary

24  to help move the plan process forward.  And there's also

25  consensus from the responses that were filed that the mediator

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  would ideally be a sitting bankruptcy judge from the Southern

2  District of New York.

3        Where the parties appear to diverge, maybe more as

4  matter of nuance in process, are the scope of the mediation and

5  the timing and duration of mediation.  And perhaps, if I could

6  address both of those two at a time?

7        THE COURT:  Go ahead.

8        MR. LEE:  Okay.  So with respect to the scope, I don't

9  believe that any party who responded to our motion opposes

10  mediation with respect to what I'll call the AFI issues, which

11  is complex as they are.  I think Your Honor, knows that an

12  extraordinary number of man hours have gone into understanding

13  the AFI issues, investigating the AFI issues, taking discovery

14  on those issues.  And because of all of that work, Your Honor,

15  we believe that the issue is quite clearly ripe for mediation.

16        The committee, in its response, made clear to the

17  debtors and has made clear to us on a number of occasions, that

18  it would like a small window of opportunity to have informal

19  negotiations with AFI, and I'll allow the committee and AFI to

20  discuss what they think of that.  It is the debtors'

21  understanding from the papers filed by the committee that

22  they've scheduled two meetings in the first part of January to

23  discuss these issues.  And we're supportive of that effort.

24        But I'm mindful of what Mr. Shore said and mindful of

25  what other people have said, which is that we want to, and we

**RESIDENTIAL CAPITAL, LLC, ET AL.**

47

1    really need to, use the next two months of exclusivity as

2    productively as possible.  What I don't want to have happen,

3    and I'm sure that Your Honor doesn't, is for a number of

4    informal discussions to take place where people stare at the

5    walls and effectively just create a recipe for further delay;

6    and then I come back here in March, Your Honor, and I say,

7    well, people have met.  They've had negotiations.

8            And so rather than lose what I think could be the

9    entire month of January, we think it's important, if Your Honor

10    is inclined to grant our motion, to have the mediator educated

11    on the AFI related issues now, so that if and when -- or if or

12    when these discussions don't go anyway, the mediator can jump

13    in and effectively force some discipline on the process.

14            THE COURT:  Yes, I've made this point before, really

15    at the time of the first exclusivity motion.  It seemed like

16    everybody wanted to sit and wait for the examiner report, and I

17    made clear that this case was not going to be stopped while we

18    wait for the examiner to do the report.  And we know that the

19    time for the examiner's report has been extended out.

20            I would just reiterate again, there is no reason -- I

21    mean, I think from some of the things I've read, the parties

22    seem to have clearly identified the issues that are going to

23    have to be resolved.  That's certainly a first step, to know

24    what the issues will be.  And you need to move forward with it.

25    I'm not necessarily saying that there'll be -- maybe there will

**RESIDENTIAL CAPITAL, LLC, ET AL.**

48

1   be a resolution before we have the examiner's report.  But

2   let's assume not.  This has to move forward.  I don't think

3   you're saying anything differently than that, Mr. Lee.

4           MR. LEE:  No, Your Honor.  And in fact, what I wanted

5   to make certain of is that if informal discussions between

6   principals and parties don't make material progress in the

7   first part of January, that the parties really don't have a

8   choice at that point in time.  Mediation will start.  Mediation

9   will continue. And the mediator will ensure that the parties

10  narrow their differences.  And so that when we come back to you

11  in January, everybody has given it the time and attention that

12  it requires.  And either the mediation will be unsuccessful but

13  the effort will have been made in a disciplined way, which is

14  what a sitting bankruptcy judge in this district will

15  absolutely require.

16          THE COURT:  Okay.  Let me hear from others, all right?

17          MR. LEE:  Okay.  All right.  Your Honor --

18          THE COURT:  Go ahead.

19          MR. LEE:  -- sorry.  Just one additional point that I

20  wanted to make in relation to the mediation and the scope.

21  Really, Your Honor, I think as Your Honor has been -- is more

22  than well aware, the RMBS trial has used up a lot of this

23  Court's time and the parties' time as well.  And we did adjourn

24  that specifically to March the 18th to facilitate these

25  negotiations.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**49**

1          But to be clear, the parties have done an enormous

2     amount of work on that issue.  We all know everything there is

3     to know about each others' positions.  And that's not just in

4     relation to the RMBS aspect, but the entire waterfront of the

5     PLS claims.  And Your Honor will have seen that the

6     securities -- a class of securities claimants in the PLS have

7     filed a motion for plan treatment.  The monolines, obviously,

8     have been very actively involved in this process.  There's a

9     question as to whether their claims are or aren't subsumed

10    within the RMBS.  And it seems to us, Your Honor, and this

11    point, I think is made in lots of the papers, but it was one of

12    the bases for moving the trial to March.  If there's an issue

13    that's crying out to get resolved so that we don't have to have

14    a hearing in March, that's got to be it.

15          THE COURT:  All right, thank you.  Mr. Eckstein, do

16    you want to be heard?

17          MR. ECKSTEIN:  Your Honor, thank you.  Kenneth

18    Eckstein on behalf of the creditors' committee.  While I'm

19    pleased to see that -- I don't think, at this point, we have

20    major disagreements.  I think, if Your Honor would permit me

21    just a few comments on where we see the case right now and how

22    we think it makes best sense to proceed.

23          Your Honor, I'm not sure I would say that the case is

24    at an inflection point, but I think the case is at a very

25    advanced stage right now, where I believe it's fair to say that

1   for a variety of reasons, there is a great deal of recognition

2   on the part of all parties in the case, as far as we can

3   observe, that people need to act dynamically and quickly.  And

4   we think that's positive.  And as Your Honor knows, in

5   connection with the overall agreement by the debtor to adjourn

6   the RMBS trial by sixty days, the committee concluded that it

7   was in the best interests of the case to put a mediator in

8   place, because the feeling was that the presence of a mediator

9   would provide further motivation for the parties to exercise

10  self-help, and would also give the parties a recognition that

11  there's a structure in place to help resolve issues, if it

12  become clear that there are issues that aren't resolvable on

13  their own or that need outside encouragement.

14          Mr. Lee correctly points out that at least from the

15  committee's perspective, there is, I think, a strong incentive

16  right now to make as much effort as possible during the first

17  several weeks of 2013, to see whether or not real structure can

18  be put into this case that can provide the basis for a global

19  resolution.  And there are two things that are basically going

20  to take place.

21          Number one, the unsecured creditor constituencies, who

22  ultimately reside within the committee, but are all individual

23  creditors who hold their own claims and assert third-party

24  claims as well, have been in extensive dialog, and have

25  committed to continue extensive dialog during the early part of

 1   January.  And there are meetings that have been scheduled, and

 2   there is a formal agenda of work that parties have committed

 3   to.  And to note a point that Mr. Shore made, I think the

 4   committee agrees with the fact that it is imperative for

 5   principals to be actively involved.  And to the extent

 6   principals may not be within the committee, we're trying to put

 7   a structure in place through appropriate confidentiality

 8   agreements to make sure that principals are going to be able to

 9   have an appropriate exchange over the substance that needs to

10   be discussed surrounding a plan.

11        Number two, the committee has made extensive efforts

12   to grapple as quickly as possible with its review of potential

13   claims against AFI.  And as we said from the outset of the

14   case, we felt that this was an important investigation that

15   needs to be done.  The committee has been working closely with

16   the examiner, but on its own, has done a great deal of work.

17   And toward that end, as Mr. Lee indicated, while I don't want

18   to get ahead of ourselves by any means, the fact of the matter

19   is that we have been able to open up, I think, a constructive

20   dialog with the representatives of AFI about a process that

21   would allow us, in the near term, I think, to get real clarity

22   as to whether or not this case can or can't be the subject of a

23   negotiated plan.

24        And toward that end, in fact, two meetings have been

25   set up with the committee and its members and AFI, during the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

52

1    early part of January, to begin to substantively discuss the

2    potential claims against AFI and the defenses to those claims,

3    which both the committee and AFI, I think, have acknowledged,

4    is an appropriate predicate for substantive business

5    negotiations.  And we have that scheduled.

6         I don't want to minimize the difficulty of even

7    scheduling meetings.  But they have been scheduled.  And that's

8    constructive.  And we do not think that January is going to be

9    a waste.  I can't assure that there's going to be an agreement,

10   but it's not going to be a waste.

11        And ideally, there is going to be significant progress

12   made by the creditor constituencies about potential ways for

13   resolving significant disputes in the context of a plan, and

14   ideally, there'll be progress made with AFI.  That either leads

15   to an agreement or starts to narrow the issues.

16        And in the view of the committee, Your Honor, I think

17   that by the end of January I think we'll have a great deal of

18   clarity about whether or not progress is being made and what

19   issues, in fact, would benefit from mediation.  And at that

20   point in time, I think we can make an intelligent, informed

21   judgment about whether or not we should begin the mediation and

22   what issues should be presented to the mediator for initial

23   focus.

24        THE COURT:  Here's where I think I disagree with you,

25   Mr. Eckstein.  Mediation can accomplish at least two things.

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
Pg 53 of 188
**RESIDENTIAL CAPITAL, LLC, ET AL.**

53

1    One, once the respective parties have sort of set out their

2    bargaining positions, a mediator can be effective in helping to

3    close a gap and see if an agreement can be reached.  But I also

4    think that in a case like this, with really great complexity

5    and a lot of moving pieces, a mediator can be very important in

6    making sure that the steps in the process are clearly set out

7    in how they're going to move forward.

8            That would certainly -- I would certainly encourage

9    the committee to meet with AFI as soon as possible in January

10   to try and make progress, see whether you can make progress

11   with respect to your issues.  But I think an effective

12   mediator -- you're representing one constituency.  There are

13   many other constituencies.  I think we don't have to await the

14   outcome of your efforts with AFI to try and put together all

15   the pieces of this process.

16           So I mean I won't hide the ball on anybody.  What

17   I'm -- I want to hear anyone else who wants to be heard on the

18   mediator issue.  But I would certainly contemplate appointing a

19   mediator promptly, requiring all parties, not necessarily

20   together, but in early January, right after New Year, to meet

21   with the mediator to make sure that there's some common

22   understanding about how the process -- and maybe multiple

23   processes in the beginning are going to move forward.  And it

24   may be that the step 2 of the mediation, which is once the bid

25   and ask of respective positions are there, the mediator can be

**RESIDENTIAL CAPITAL, LLC, ET AL.**

54

1    very helpful in trying to close that gap.

2            When the first exclusivity motion came on and I gave

3    the debtors until today, one of the things I directed was that

4    the debtors meet with you to try and begin to put a process

5    together.  And I think that's happened.  Dialog did start.  No

6    agreements, but at least it got everything moving.  And I want

7    to be sure that beginning in early January that there is a

8    common understanding about how all of these steps are going to

9    move forward, over what time period.  The mediator will direct

10   what information ought to be shared, to the extent it's not

11   being voluntarily shared.  The mediator can direct time frames

12   in which things should be done.

13           So that may be where I part with you.  In reading the

14   papers, I see some of the people -- some of the responses were,

15   well, the mediation shouldn't start until the end of January.

16   That's where I think I disagree.  I guess it depends on what

17   you mean by mediation.  I think that putting together how this

18   is going to move forward is important.  I'll stop there.

19           MR. ECKSTEIN:  Your Honor, I'm not sure that there's a

20   significant difference in what Your Honor is saying from the

21   way we are looking at it.  And to the extent the mediator can

22   be helpful in making sure that the process is going to move

23   forward, I think that may be instructive.  And exactly when we

24   drill down into particular issues, may be a second step.  So --

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

55

1           MR. ECKSTEIN:  -- guess with that, Your Honor, I think

2    we're prepared to proceed, and hopefully, in fact, make as much

3    progress as we possibly can over the near term.

4           THE COURT:  Thank you, Mr. Eckstein.  Let me hear from

5    anyone else who wants to be heard.  Mr. Moloney?

6           MR. MOLONEY:  Tom Moloney on behalf of Wilmington

7    Trust.  Just very briefly, we very strongly endorse the

8    approach that Your Honor has outlined.  Thank you.

9           THE COURT:  Thank you.  Anyone else wish to be heard?

10   Mr. Wofford?

11          MR. WOFFORD:  Your Honor, we agree that the mediation

12   should have a prompt start, but also we would like if it would

13   be clear that there is, at least initially, a firm intended

14   ending date for that mediation.  Because without a deadline,

15   with this large and diverse group, we think attorneys and

16   clients may be reluctant to move forward, and we don't want to

17   get in the way of rolling stated deadlines if we can avoid it.

18          THE COURT:  Mr. Wofford, I'm more inclined -- assuming

19   that it's a sitting bankruptcy judge who's appointed as the

20   mediator, I have pretty complete confidence that the process

21   will move forward or it will end, and will not have a very

22   uncertain future.  Let's put it that way.

23          MR. WOFFORD:  Well --

24          THE COURT:  I mean, I think it is important that it

25   move forward.  I'm not so sure about setting an artificial

1   deadline now.  I would have confidence, if it's one of my

2   colleagues, for example, that they will make sure it's kept to

3   a tight schedule.

4           MR. WOFFORD:  Well, you know, for the record, Your

5   Honor, we're aware that the Court is mindful of this, but we

6   are sensitive that delay is very, very costly.  And given that

7   we have a limited pool of assets --

8           THE COURT:  Well, we're going to get to fee apps, and

9   I have clearly in mind what the expense of this case is.  And

10  so the sooner there can be a resolution, the sooner that can be

11  put to an end.

12          MR. WOFFORD:  Right.  So, again, for the record, we

13  would like it to be clear that there is an incentive for people

14  to, if there's going to be a settlement, to get on board; that

15  people understand that the train on a consensual resolution, if

16  there's going to be one, is going to be leaving the station.

17  And frankly, we think that will help the estates realize on

18  the -- to the extent the Ally potential litigations are an

19  asset, that we, as a group of creditors, have some consensus

20  that may help us effectively realize upon that asset and

21  resolve those issues as well.

22          THE COURT:  Thank you, Mr. Wofford.  Anyone else?

23          Mr. Siegel?

24          MR. SIEGEL:  Your Honor, we're very comfortable --

25          THE COURT:  Just make your appearance.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

57

1          MR. SIEGEL:  I'm sorry.  Glenn Siegel, Dechert LLP, on

2     behalf of Bank of New York Mellon.  We're one of the RMBS

3     trustees.  As I've said before, unless one of my colleagues

4     gets up and disagrees, you should assume that we are speaking

5     generally for all the RMBS trustees, and we've been

6     collaborating on this.

7          We think that this is a very useful approach.  Just to

8     reiterate -- and I think that having the mediator in place will

9     be helpful in this process.  It's been our intention to

10    commence discussions beginning early next month.  Having the

11    mediator there and laying out our plan to the mediator, I

12    think, will help us stay on schedule.  I think this is group of

13    cats that needs to be herded, and I hope the mediator can do

14    that.

15         And one of the benefits here is to kind of let

16    everybody else catch up in figuring out their own issues.  Now

17    that we, I think, have fully vetted the RMBS issues, we need to

18    fully vet the AFI issues and we need to fully vet all the other

19    issues between creditors.  We think this is useful in getting

20    there.

21         THE COURT:  Thank you, Mr. Siegel.

22         MR. KIRPALANI:  Good morning, Your Honor.  Susheel

23    Kirpalani of Quinn Emanuel.

24         THE COURT:  Good morning.

25         MR. KIRPALANI:  I'm here on behalf of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

58

1    institutional investors that I believe the debtors' counsel

2    referred to.  It's AIG, Allstate, Prudential, and Mass Mutual.

3    And collectively, our clients hold, we believe, in excess of

4    1.75 billion dollars of claims -- fraud claims against the

5    debtors and the debtors' parent.

6         And we did file a response that supported the

7    mediation.  The only thing I wanted to point out.  I know Your

8    Honor does not rubber stamp, typically, proposed orders.  And

9    you often take the pen and put down exactly what you mean and

10   what you order.  And that the actual proposed order has a

11   phrase, a defined term, "the mediation parties".  But what it

12   says is, the definition is "the relevant parties involved in

13   the mediation", and it seems a bit circular to me.

14        We have talked to the committee and we've talked to

15   the debtors.  And in fact, I learned of the mediation prospect

16   from counsel to Ally.  And I think all of those parties do

17   believe and encourage the institutional investors in

18   participating, because it would be helpful.

19        We did file -- first in the beginning of the case, we

20   were stayed or we agreed through tolling agreements not to sue

21   Ally Financial, to let the case get to a proper start and not

22   be haphazard about it.  And those stays or tollings are still

23   in place.  And we did file a motion for classification.  And at

24   various parties' requests, we agreed to adjourn that to March,

25   because we're not here to really get in the way of progress.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**59**

1   But we do think it's important that we be included in the

2   mediation, because it can facilitate progress, and we've been

3   interested to talk to folks, and we've been trying through --

4   two of these clients are sitting in the creditors' committee --

5   we've been trying through those means, and we've met with the

6   examiner.

7          But I just want to make sure that the order providing

8   for mediation is clear as to --

9          THE COURT:  Well --

10          MR. KIRPALANI:  -- who's participating.

11          THE COURT:  -- Mr. Kirpalani, I'll tell you right now,

12   what I'm inclined to do is -- assuming I grant the motion -- is

13   grant a motion without narrowly defining the scope of the

14   mediation, but to require either submissions to the mediator or

15   meeting -- face-to-face meeting with the mediator in early

16   January, and have the terms of the mediation more clearly

17   defined then, with the guidance of the mediator, if it's one of

18   my colleagues.

19          This is not -- I'm not sending this off -- we have

20   some very fine mediators on the register of mediators in the

21   court.  But if it goes to one of my colleagues, I think I'm

22   more inclined not to have a detailed order now, and then have

23   people argue whether it should be broader or narrower, but have

24   those parties who want to be heard about the scope of the

25   mediation talking to the mediator about that; one of my

**RESIDENTIAL CAPITAL, LLC, ET AL.**

60

1    colleagues, in defining the order.  So that's what I'm more

2    inclined to do, Mr. Kirpalani.

3            MR. KIRPALANI:  Thank you, Your Honor.

4            THE COURT:  Okay.

5            MR. KIRPALANI:  I mean, obviously you're the one

6    that's going to enter the order.  And as long as the debtors

7    and the committee and Ally continue to encourage our

8    participation --

9            THE COURT:  They may object to you --

10           MR. KIRPALANI:  -- I'm sure --

11           THE COURT:  -- Mr. Kirpalani, but you know, we'll just

12   see.

13           MR. KIRPALANI:  That would be bizarre twist.

14           THE COURT:  It won't be personal, but, you know.

15           MR. KIRPALANI:  It will be a turn.  I don't care about

16   the personal part.  But it would be kind of a twist to ask us

17   to defer, to defer, to defer, and then say, but you know, you

18   really shouldn't participate now.  Because then we will not be

19   continuing to defer on those matters.  That's all I'd just

20   point out, Your Honor.

21           THE COURT:  Okay.  Thank you very much.

22           MR. KIRPALANI:  Thank you.

23           THE COURT:  Anybody else wish to be heard?  Mr. Shore?

24           MR. SHORE:  Thank you, Your Honor.  Let me make one

25   clarification, and then one request.  The clarification, I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    think it was said, that everybody agrees that a mediator makes

2    sense.  We don't agree that a mediator makes sense for the

3    following reason.  There's an asset that exists right now,

4    which is the willingness of the principals to do a deal that

5    makes no sense to a mediator.

6        The problem with putting a mediator in place before

7    everybody's gotten in the room, is that it sets people's

8    expectations, and people start deferring to the mediator as to

9    the appropriate way in which to settle, or what kind of deals

10    make sense.  That can be fixed by an artful mediator, so that

11    expectations aren't set, and there is a period of time for

12    people to try to do that.

13        Our concern is, by putting a mediator in place,

14    everyone's going to sit back and start waiting to -- for input

15    from the mediator as to the strengths and weaknesses of their

16    position.  And it makes a deal harder.  That was our view.

17    This is pretty quick for a debtor to pull the trigger on we

18    need a plan mediator.  In the context of where plan mediators

19    get appointed, it's after a substantial period of time has gone

20    on where the principals -- educated principals have met, and

21    they've been unable to reach resolution, because they've just

22    hardened their position around a legal or factual issue.

23    That's just our view.

24        With respect to -- and it sounds like the boat is

25    sailing on a mediator -- to the extent there is a mediator,

1    there's going to be a lot of detail that needs to be filled in

2    at the -- by the mediator, with the assistance of the court,

3    around two principles that are very important to us.  One is

4    that principals get educated.  There has to be, in order for a

5    successful mediation to occur, information flow.

6          And this is not -- I think there were some

7    misstatements made in the reply -- we don't object to a

8    confidential mediation.  People's articulation of their legal

9    positions in a mediation should not be used in the context of

10   litigation.  But the underlying facts aren't privileged in a

11   mediation.  So to the extent that the debtors have information

12   which is relevant to the resolution of the dispute, they need

13   to get that information out there.

14         THE COURT:  Mr. Shore, let me say this.  I don't

15   disagree with anything you've said so far.  With respect to

16   information sharing, if any party is resisting sharing

17   information, particularly one of my colleagues, they just have

18   the ability to order it.  Okay.

19         Meaningful settlement negotiations require a level

20   playing field, that people have the information they need to be

21   able to formulate their positions and move forward and

22   hopefully compromise.  And so, that's one of the reasons, Mr.

23   Shore, that I think it's important to get a mediator in place

24   and started sooner rather than later, so that -- call it

25   preliminary issues about information -- if you're saying you're

**RESIDENTIAL CAPITAL, LLC, ET AL.**

63

1  not getting the information you need, you'll, in the first

2  instance -- and I don't want to get into a debate, Mr. Lee,

3  because I know you're going to say you're giving him what he

4  wants and all that -- we don't have to get into -- I'm not

5  taking a position about it at all.

6          But if your position is you're not getting what you

7  need, if a mediator is in place, you'll tell him or her -- him

8  or her.  And you'll tell him, and if it's appropriate, you'll

9  get the information and move forward.  So that's one of the

10  reasons I think it's important to get the process started

11  sooner rather than later.  I don't want to wait till the end of

12  January and then have you or someone else raise the issue,

13  well, we're not in a position to even formulate our position,

14  because we'd never gotten this information we need.

15          MR. SHORE:  The other concept that needs to be built

16  into a subsequent order is going to be around encouraging

17  principals to participate.  And that deals with, to some

18  extent, confidentiality issues.  Every piece of paper that is

19  going to be negotiated in the context here is going to be held

20  by people who are sensitive to having MNPI of the debtors or

21  whatnot.

22          In addition, the very process of participating in a

23  plan negotiation leads to, in some cases, extremely adverse

24  consequences.  The debtors, I think, cited WaMu, but then

25  didn't really discuss the fact that what ended up happening in

**RESIDENTIAL CAPITAL, LLC, ET AL.**

64

1   that case was that people who elected to participate in the

2   mediation had some very unintended consequences about their

3   participation.

4          So when we get to the stage about the ground rules for

5   participation, it's our view that they should be written in a

6   manner to get as many people as possible into the room and

7   address as many legitimate concerns of people with respect to

8   inadvertently restricting themselves or otherwise putting

9   themselves in a position where they can't assess what to do,

10  because they've been tainted with information.

11         So clearly there's going to need to be some kind of,

12  in the first instance, hard look at what really is confidential

13  versus what the debtors don't want to publish; and two, to the

14  extent that information is confidential, how we go about

15  setting up procedures for making sure that there is public

16  disclosure at an appropriate time.

17         THE COURT:  Thank you.

18         MR. SHORE:  You're welcome.

19         THE COURT:  Anybody else?  Anybody on the phone wish

20  to be heard?

21         All right, Mr. Lee?

22         MR. LEE:  Your Honor, I've very much acutely alive to

23  the confidentiality issue.  I take almost complete exception to

24  the level playing field and the quality of information, as you

25  can imagine.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

65

1          THE COURT:  I suspected you would, but --

2          MR. LEE:  I actually even managed to have a

3    spreadsheet put together of every point of contact with the

4    junior secured bondholders' advisors.  So if the day comes, I

5    have it in hand.

6          I just want to make one point clear.  Your Honor, the

7    parties are going to discuss confidentiality.  So I accept that

8    the form of the order as it currently stands clearly doesn't

9    address the confidentiality concerns.  But I would like to make

10   one --

11         THE COURT:  Do you have a copy of -- in this mound of

12   paper I have here -- let me see your form of order.

13         MR. LEE:  May I approach?

14         THE COURT:  Yes.

15      (Pause)

16         THE COURT:  All right.  Go ahead, Mr. Lee.

17         MR. LEE:  Your Honor, what underpins a lot of these

18   discussions are the trial balances and the waterfall that

19   effectively is created out of looking at fifty-seven separate

20   debtors.  And the difficulty we have is that the waterfall is

21   based on assumptions.  And they're like actuarial projections.

22   They're absolutely bound to be wrong, and they're entirely

23   subjective.  And what the debtor does not want to be exposed to

24   is a situation in which it's required to publish information

25   publicly, upon which investors rely upon -- material non-public

**RESIDENTIAL CAPITAL, LLC, ET AL.**

66

1   information that's inherently inaccurate.  It's also unfair to

2   ask the creditors, who are themselves publicly traded

3   companies, to expose their information and their analyses to

4   public scrutiny.

5        And I think that Judge Walrath really summed up the

6   issue in Washington Mutual.  And what she said is, there's an

7   easy solution.  If creditors want to participate in settlement

8   discussions in which they receive material non-public

9   information about the debtor -- or in our case, both about the

10  debtor and the creditors -- they either have to restrict their

11  trading or establish an ethical wall between the traders and

12  participants in the bankruptcy case.  We've at least one party

13  who holds debt who has effectively agreed to become restricted

14  so that they can participate as a principal in the case.

15       What Judge Walrath then went on to say is that the

16  court does not believe that a requirement to restrict trading

17  or create an ethical wall in exchange for a seat at the

18  negotiating table places an undue burden on creditors who wish

19  to receive confidential information and give their input.  And,

20  Your Honor, Judge Gerber, in Adelphia, reached precisely the

21  same conclusion.

22       So our concern, Your Honor, is that we have public

23  debt.  If we are required to publish at the end of the

24  mediation if it's unsuccessful, in order for principals to be

25  cleansed, we will, in effect, have put out into the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

67

1   marketplace, information which the debtors are saying is one

2   hundred percent likely to be incorrect.  And that, Your Honor,

3   is just a completely unfair burden.

4          So we're happy, Your Honor, to have a discussion about

5   confidentiality.  As I represented, we're prepared to take that

6   provision out of the order for the purposes of trying to

7   negotiate something.  And Your Honor, perhaps there's a

8   cleansing mechanism, perhaps there isn't.  But I think the

9   default, Your Honor, is if you want a seat at the table, become

10  restricted or set up a wall.

11         THE COURT:  Well, look.  In the context of this

12  motion, I don't plan to resolve this issue today.  It clearly

13  is something that needs to be, in the first instance, an effort

14  to negotiate it out with the mediator.

15         Before I came on the bench, for about a year before I

16  came on the bench, I was doing mediation.  And one of the

17  things that's very common -- I think mediation is most useful

18  when information is freely shared among the principal parties

19  to the mediation.  When that can't always be done, you can

20  certainly provide information for the mediator's-eyes-only.

21  It's preferable when it's shared more broadly.  But there are

22  ways to deal with this.

23         I mean, what I'm -- let me see before.  Anybody else

24  want to be heard on this mediation issue?  Mr. Eckstein?  Let's

25  not revisit everything, Mr. Shore that --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. ECKSTEIN:  Your Honor, just on this point, this is

2   really just for --

3          THE COURT:  Okay.

4          MR. ECKSTEIN:  -- maybe to facilitate a resolution of

5   this issue.  I think just from the experiences that many of us

6   have had in the WaMu case, for example, there are going to be

7   two issues.  And I think the mediator can actually help resolve

8   this.  One is what to do with the debtors' non-public

9   information.  And I think that's pretty straightforward.  The

10  other issue is really settlement negotiations themselves.  And

11  the question was whether settlement negotiations are somehow

12  material non-public information.

13         And I think what parties generally look for is as much

14  clarity as possible, that if they're going to participate in a

15  mediation, that settlement negotiations, if ultimately the

16  settlement doesn't lead to a resolution, is not in and of

17  itself, material non-public information.  Because it's not

18  practical to disclose settlement positions.

19         So that is the issue, I think, that parties may want

20  to resolve.  And my sense is, it can be resolved through some

21  discussion; and maybe the mediator can help --

22         THE COURT:  Okay.

23         MR. ECKSTEIN:  -- resolve that.  And if there's need

24  for further input from the Court they can come back.

25

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**69**

1          THE COURT:  That's fine.

2          And Mr. Shore, I didn't mean -- if there's something

3    else you want to add, go ahead.

4          MR. SHORE:  I would say exactly what Mr. Eckstein

5    said; we need to have a frank conversation about it.

6          THE COURT:  Yes.

7          MR. O'NEAL:  Your Honor, Sean O'Neal on behalf of

8    Wilmington Trust.

9          I think to that end, I think, Mr. Lee's suggestion was

10   simply that we take out paragraph 4 in the proposed order, and

11   then the parties can have this discussion about which is

12   obviously a complex and important issue.

13         THE COURT:  Okay, thank you.

14         Mr. Wofford?

15         MR. WOFFORD:  Yes, Your Honor, a similar point with

16   respect to the order.  Similarly, paragraph 5 provides that

17   parties like us with signed copies can provide information to

18   the mediator but not to other parties.  Of course we don't know

19   what the debtors have provided and who signed copies in

20   mediation.  So perhaps we should take that one out as well so

21   that we can resolve this.

22         THE COURT:  Look, what I view this as is -- obviously

23   it's pretty clear what I'm going to do; I'm going to grant a

24   motion to appoint a plan mediator.  I want the parties, in the

25   first instance, to see whether they can come to agreement on

**RESIDENTIAL CAPITAL, LLC, ET AL.**

70

1    the form of the order.  I think they need to do it with the

2    mediator who I'm going to appoint to make sure that what's

3    being proposed works for the mediator.  I'm then certainly

4    prepared to enter it as an order in the case with respect to

5    confidentiality and other things.  But it's one of the reasons

6    I want to see this process move forward, because I don't expect

7    on day one of meeting with the mediator you're going to get

8    this all resol -- hopefully you'll all agree on what ought to

9    go into the order.  If not, the mediator will resolve it.  And

10   if not, I will.  Okay?  That's what I basically contemplate.  I

11   don't want to put in cement now things that I think are

12   fairly -- can be complicated and are important and sensitive.

13   Okay?

14           Does anybody else need to be heard on this?

15           All right.  Mr. Lee, is there something else you

16   wanted to add?

17           MR. LEE:  No,  Your Honor --

18           THE COURT:  All right.

19           MR. LEE:  -- just standing up.

20           THE COURT:  I'm granting the motion to appoint a plan

21   mediator.  Indeed, the plan mediator is Judge James Peck; he

22   has agreed to serve.  Some of you probably know Judge Peck

23   handled the first day motions in my absence in the case so he

24   has some familiarity with the issues.  I have talked to him

25   briefly and he has expressed his willingness to do this.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

71

1          What I would like to happen is that Mr. Lee, Mr.

2    Eckstein, you should contact Judge Peck -- I'll call him after

3    I get off the bench -- and try and get some dates from him in

4    early January for initial discussions.  I'm going to direct

5    that any party who wishes -- first off, you all ought to try

6    and see whether you can make some progress in negotiating the

7    form of the order.  If you can't, I'm going to direct that by

8    January 7th -- 5 o'clock January 7th, the parties submit to

9    Judge Peck, not to me -- submit to Judge Peck -- not file, but

10   submit to Judge Peck proposals with respect to confidentiality

11   or anything else you want.  But hopefully, in the first

12   instance, try and see if you -- this you ought to be able to

13   negotiate out.  Okay?  You shouldn't need a mediator to work

14   out the ground rules.  All right?  But if you don't, Judge Peck

15   will do it.  All right?  And if it's appropriate for the order

16   to be entered by me in the case, I will do that.  Okay?  But I

17   want, as the first step, everybody -- Mr. Eckstein and Mr. Lee,

18   you contact Judge Peck and see if you can at least do some

19   preliminary ground work with him and get some dates how he

20   wants to proceed.  You can tell him I've set this Jan -- I'll

21   try and tell him I set this January 7th date.  See if you can

22   at least get the ball rolling.  Okay?

23          With respect to the form of the order, I think, for

24   present purposes, I don't see anything wrong with paragraphs 4

25   and 5 in this proposed order.  It really doesn't impact; it

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    gives some initial protection to everybody.  It can be adjusted

2    in a further order and guidelines.  So with respect to those

3    people who raised the issue about paragraphs 4 and 5, I think

4    the form of the order is satisfactory.  It isn't going to lock

5    in cement anything that you're going to do going forward.

6    Okay?

7              Thank you, Mr. Lee.

8              MR. LEE:  Thank you very much, Your Honor.  I'm going

9    to turn the podium over to the examiner or the examiner's

10   counsel.  Thank you.

11             MR. SEIFE:  Good morning, Your Honor.  Howard Seife

12   from Chadbourne & Parke, counsel for Arthur Gonzalez, the

13   examiner in the case.

14             As Your Honor may have noticed, the examiner is

15   present in the courtroom and is available, certainly, if you

16   have any questions after I finish the status report this

17   morning.

18             We wanted to take the opportunity this morning to

19   update the Court on the progress of the investigation.  Many

20   parties have alluded to the role of the examiner in this case,

21   and I think it's a good opportunity so everyone knows exactly

22   where we are in the process.

23             The investigation, the scope of the investigation is

24   extremely broad, as set out in the various work plans and

25   orders.  In particular, we're examining a course of conduct

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  between ResCap and the other parties, AFI, Ally Bank, over a

2  period of, really, six years.  And needless to say, over the

3  course of that time, there have been numerous transactions and

4  involvements, probably over nine major asset sales between

5  ResCap and Ally or Cerberus.  There was -- one of the more

6  significant transactions was the series of steps involved in

7  the sale of Ally Bank, and that has been raised and alluded to

8  by parties, particularly the committee, as something very

9  significant that needs to be examined.

10         Throughout this process, we're working very closely

11  with the examiner's financial advisor, Mesirow, and they are

12  testing for value, consideration, exchange, at every step of

13  the way, as well as working with us on solvency and capital

14  adequacy issues for the relevant time periods and testing

15  periods for all of these transactions.

16         We are also working closely with Mesirow on the

17  variety and numerous agreements, financial agreements between

18  ResCap and Ally and Ally Bank, including derivatives, swaps,

19  hedges, subservicing agreement, also the allocation of the

20  government settlements.  All of these are being looked at.

21         One of the -- what is becoming clear, a very

22  significant issue in determining the value of the releases

23  which are proposed under the plan and the consideration being

24  given, are the third-party claims against Ally and AFI, and we

25  are spending a considerable amount of time looking into the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    validity and scope of those claims.  As part of that process,

2    we have contacted all of the parties that have alleged,

3    publicly or privately, that they have those claims separately

4    against Ally that would be covered by the proposed release, and

5    we have invited and received submissions from those parties,

6    and we have received over ten of them which we are in the

7    process of reviewing and considering.

8           To get the other side of the story, we have shared

9    those submissions, as agreed by all the parties, with both the

10   debtors and Ally, to get their reaction and counter-arguments

11   to those alleged claims.  And in fact, we have received those

12   responses just yesterday, or I should say early this morning,

13   from those parties, and they are quite lengthy responses which

14   will be digested and taken into account in the preparation of

15   our report.

16          Enormous effort has been expended by the examiner's

17   professionals in the review of documents being produced by a

18   variety of parties.  And we've been very active in soliciting

19   documents, primarily from Ally, the debtors and Cerberus, but

20   also probably a dozen other parties, and there are more parties

21   to come.  To date, we've had produced to the examiner over

22   three million pages of documents which are being reviewed, and

23   we have taken those documents and productions and used them

24   during the course of interviews of former and current officers

25   and directors or Ally and ResCap.  We've conducted, to date,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    thirty-seven interviews; two are going forward today.  We

2    probably have an additional ten or so scheduled, and we

3    anticipate there may be fifteen or twenty additional ones to be

4    scheduled in the upcoming days.  We have also met --

5          THE COURT:  Hang on.  Whoever's on the phone, you need

6    to put your phone on mute, because we're picking up a

7    background noise.

8          Go ahead, Mr. Seife.

9          MR. SEIFE:  Thank you.  We also have met with all the

10   major constituencies in the case on more than one occasion, in

11   many cases, and we have not excluded anybody that wanted to

12   talk to us, so we haven't had the issue which may arise on the

13   mediation.

14         In terms of timing, which I know everyone is very

15   keenly interested in, as we set forth in the second

16   supplemental work plan which we filed on November 26th, it is

17   the examiner's current intention to complete and file the

18   report in early April.

19         As we set forth in that supplemental work plan, our

20   timing is very much contingent and dependent upon parties

21   cooperating in an expeditious fashion with us, particularly in

22   terms of producing documents in a timely manner and making

23   witnesses available for interviews.

24         I must say, generally, parties have been very

25   cooperative in using their best efforts to work with the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

76

1   examiner, and we've had extensive discussions with the debtors

2   in terms of production.  Needless to say, the debtors have the

3   biggest burden in terms of going through e-mails and

4   productions and making former and current officers and

5   directors available.

6         So the completion of the report, as I said, is

7   dependent upon that cooperation and compliance continuing.

8   We've had extensive discussions on the debtors going forward,

9   and we have their commitment to substantially finish document

10   production by the end of January.

11         We also have their agreement that the production,

12   primarily of e-mails, will be on a rolling basis, so we are not

13   faced with a massive dump on January 31st, which would

14   obviously put us considerably under the gun.  And so far that

15   production has been on a rolling basis and we're getting the

16   cooperation that we had sought.

17         The second part of the timing will be to complete the

18   interviews, and we hope those to be substantially complete by

19   the end of February.

20         One of the things we've had to cope with, because of

21   the time constraints and the timing of production of e-mails

22   and the like, is we're really conducting these interviews on

23   the run, in the sense we don't have the luxury of having full

24   document production which could be very relevant for the

25   interview process.  So we are reserving our right to call back

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   witnesses, if necessary, if new information comes to light or

2   e-mails are disclosed which are relevant to those witnesses.

3           So assuming all of that continues as promised, we feel

4   we will be able to produce the report, as we've said, at the

5   beginning of April.

6           One of the issues which has come up, which is on the

7   docket for later today, is we will need to seek and are seeking

8   document discovery from at least four financial institutions

9   that our firm has a conflict with:  Citibank, Morgan Stanley,

10  JPMorgan, and Goldman Sachs, and hence, we have applied to the

11  Court to hire a conflict counsel for the examiner.  That will

12  the firm of Wolf Haldenstein; Eric Levine from that firm is in

13  the courtroom.  And that application is somewhere buried in the

14  docket.  There's no objection to it, Your Honor.

15          THE COURT:  Why don't we deal with that right now?

16          MR. SEIFE:  Oh, thank you.

17          THE COURT:  Okay?

18          MR. SEIFE:  We have an application on file with your

19  court.  We filed a certificate of no objection.  It's for the

20  retention by the examiner of conflicts counsel, and that is the

21  firm of Wolf Haldenstein.  We know the application has been

22  reviewed by the U.S. Trustee's Office, and they asked for some

23  additional information which has been provided.  As I said, a

24  certificate of no objection has been filed.  The application

25  will be nunc pro tunc to October 15th, which is when we first

**RESIDENTIAL CAPITAL, LLC, ET AL.**

78

1    engaged the services of Mr. Levine.  This application, the

2    process was a bit slowed down because of Sandy and difficulty

3    of the U.S. Trustee to focus on this during the dislocations

4    because of the storm.  So based on that, we would ask the Court

5    to enter the order seeking their retention.

6              THE COURT:  All right.  Mr. Masumoto?

7              MR. MASUMOTO:  No objection,  Your Honor.

8              THE COURT:  All right.  The Court has reviewed the

9    application.  I think the application itself reveals that Mr.

10   Levine and I have known each other for many years.  We belong

11   to the same synagogue.  I think we have served on some

12   committees together.  Mr. Levine and his wife and myself and my

13   wife, on occasion, are at the same social events.  Mr. Levine

14   has appeared before me in at least one other matter.  I've made

15   similar disclosures when that's occurred.  It certainly -- I've

16   evaluated the appropriate standards of judicial conduct, and I

17   have no problem approving the retention of Wolf Haldenstein and

18   Mr. Levine.  So that motion is granted.

19             MR. SEIFE:  Thank you, Your Honor.

20             THE COURT:  Thank you, Mr. Seife.

21             MR. SEIFE:  Unless you have any questions for me or

22   the examiner --

23             THE COURT:  I do not.

24             MR. SEIFE:  Thank you, Your Honor.

25             THE COURT:  Thank you very much, Mr. Seife.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

79

1            Thank you, Mr. Gonzalez.

2            MS. MARTIN:  Good morning, Your Honor.  Samantha

3    Martin from Morrison & Foerster on behalf of the debtors.

4            THE COURT:  You need to speak up.  Pull the microphone

5    a little closer to you.

6            MS. MARTIN:  No problem.  Is that better?

7            THE COURT:  Yes, that's better.

8            MS. MARTIN:  Okay.  Next on the agenda is the debtors'

9    motion to approve procedures regarding the future rejection of

10   executory contracts and unexpired leases, docket number 2326.

11           THE COURT:  Yes.

12           MS. MARTIN:  As you know, the debtors expect to

13   consummate the platform sale and the legacy portfolio sale in

14   early 2013.  The debtors currently are evaluating which of

15   their contracts and leases should be assumed and assigned to

16   the purchasers, which ones should be assumed to facilitate the

17   debtors' wind-down activities, and which ones no longer provide

18   any benefit to the debtors' estates and should be rejected.

19           THE COURT:  Could you or Mr. Lee just update the Court

20   on what the status of the efforts to close those sales are?

21           MR. LEE:  Good morning, Your Honor.  Gary Lee from

22   Morrison & Foerster.

23           The efforts are enormous.  The engagement is constant.

24           THE COURT:  Nice to hear that, but --

25           MR. LEE:  -- and it is, Your Honor, an ongoing

**RESIDENTIAL CAPITAL, LLC, ET AL.**

80

1    process.  We're dealing with licensing issues, we're still

2    dealing with the GSEs, and there is a generally spectacular

3    level of engagement.  I think, Your Honor, we will know quite

4    soon whether or not January the 31st is the closing date or if

5    we're going to slip into February.

6          THE COURT:  On which sale are we talking about now?

7          MR. LEE:  The platform sale.

8          THE COURT:  Okay.

9          MR. LEE:  I've heard nothing in relation to the sale

10    to Berkshire.  And in relation to the platform, there are a

11    number of licensing issues.  There are still, as Your Honor

12    noted, sale hearings and cure issues; they're complex, and

13    people are taking their time and being deliberate in the way in

14    which they resolve them.

15          But Your Honor, I'm not sure when our next status

16    conference is, but I'll certainly know before that status

17    conference if there's going to be any slippage into February.

18    And January the 31st is tight, it's still everybody's goal,

19    but --

20          THE COURT:  Thank you.

21          MR. LEE:  -- not inconceivable, Your Honor.

22          THE COURT:  Thank you.

23          MS. MARTIN:  Your Honor, by the rejection procedures

24    motion, the debtors are seeking to implement procedures for the

25    rejection of executory contracts and unexpired leases in order

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    to streamline the cost and delay associated with seeking court

2    approval for each of the individual rejections.

3            Would you like me to walk Your Honor through the

4    procedures?

5            THE COURT:  No, I think the only -- the objection, I

6    guess, was what the effective date of the rejection is.  Have

7    you been able to resolve that?

8            MS. MARTIN:  We have resolved that, Your Honor.  We

9    actually, after several discussions, decided to carve out the

10   RMBS trustees' servicing agreements and custodial agreements

11   from the rejection procedures order, and I have a revised form

12   of order, if I can bring up a copy.

13           THE COURT:  Could you hand that up?

14           MS. MARTIN:  Sure.

15           THE COURT:  Okay.  Thank you.

16           MS. MARTIN:  Your Honor, there are only a few changes

17   from the original order.  First, we've agreed to consult with

18   the creditors' committee prior to filing the rejection notice,

19   to the extent practicable.  We've also carved out the RMBS

20   trustees' servicing agreements and custodial agreements, as I

21   just noted, so they will not be subject to these rejection

22   procedures, and the debtors have reserved their rights to

23   request similar relief in that respect with subsequent motions.

24   And third, we've noted that nothing in the order will alter the

25   stipulation in the order authorizing the debtors to continue

**RESIDENTIAL CAPITAL, LLC, ET AL.**

82

1   performing under the Ally Bank servicing agreement, which is

2   docket number 1420.

3           THE COURT:  So what do you contemplate as the

4   procedure with respect to the RMBS trustees -- you've carved it

5   out of here; you'll have to make a separate motion to -- these

6   procedures won't apply to them.

7           MS. MARTIN:  We either would file another motion for

8   procedures that would apply specifically to those contracts, or

9   we would just do it by separate motion.  And also, Your Honor,

10  I should note that we expect the universe of those agreements

11  to be very small, actually; it would only be any servicing

12  agreement not taken by Ocwen.

13          THE COURT:  All right.  Okay.  Does anybody else wish

14  to be heard with respect to the procedures on rejection of

15  executory contracts and unexpired leases?

16          All right.  The Court has considered the motion, the

17  issues.  The carve-out of the RMBS trustees, I think, is

18  appropriate.  The law in this district is actually not crystal

19  clear on what the effective date of a rejection can be.  These

20  procedures themselves are similar to ones that I've approved in

21  other cases, so the motion is granted.

22          MS. MARTIN:  Thank you.

23          THE COURT:  And I looked at the revised form of order

24  in that.  Did the RMBS trustees see it?

25          MS. MARTIN:  I've received feedback from several.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

83

1            THE COURT:  Somebody's shaking their head in the back

2    of the room that they have, so --

3            UNIDENTIFIED SPEAKER:  We have, Your Honor.

4            THE COURT:  Okay.  Thank you.  All right.  So that

5    motion's granted.

6            MS. MARTIN:  Thank you.

7            THE COURT:  Thank you.

8            MR. ROSENBAUM:  Your Honor, Norm Rosenbaum for the

9    debtors.

10           I didn't know if Your Honor wanted to use this time to

11   take a quick break.  We're moving on to stay relief motions,

12   adversary proceedings, and fee applications, and if there's

13   parties --

14           THE COURT:  Can we take a break till January or do you

15   want to -- I bet everybody wants their money before year end.

16           MR. ROSENBAUM:  That's true, Your Honor.

17           THE COURT:  All right.  Let's take a ten-minute

18   recess, okay?  Thank you.

19       (Recess from 11:30 a.m. until 11:46 a.m.)

20           THE COURT:  Please be seated.  Just so everybody

21   understands, we're going to resume now until about 12:20, and

22   then we have to take a lunch break.  It was a monthly judges'

23   lunch today which I need to go to.  So let's see where we can

24   get to and then we'll resume after lunch.  The plan is we'll

25   resume at 1:30 if we need to.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

84

1        Go ahead, Mr. Rosenbaum.

2        MR. ROSENBAUM:  Your Honor, the next matter on the

3   agenda is the motion of Gregory Balensiefer for clarification

4   regarding relief from the automatic stay.  Counsel for Mr.

5   Balensiefer is here to argue the motion.

6        THE COURT:  Okay.  Let me find my notes.  Just bear

7   with me just a second.

8        Go ahead.

9        MR. WIGLEY:  Good morning, Your Honor.  Douglas Wigley

10  on behalf of creditor Gregory Balensiefer, the movant here.

11       We're seeking clarification as to the extent of the

12  Court's supplemental servicing order that had entered on July

13  13th, docket number 774.  The parties are in agreement that the

14  supplemental servicing order lifts the stay as to Mr.

15  Balensiefer's -- what we're calling his equitable claim.  It's

16  a claim that he brought seeking specific performance of a

17  settlement agreement between Mr. Balensiefer and two of the

18  debtors, GMAC Mortgage and Homecomings Financial, the terms of

19  which were to modify his mortgage loan, waive interest, and a

20  variety of other terms, including cancel a trustee's sale.

21  It's because that equitable claim is his defense to the

22  debtors' efforts to foreclose on this home, that the stay is

23  lifted.

24       THE COURT:  The foreclosure has been enjoined for now?

25       MR. WIGLEY:  Yes, it has.  It was enjoined, actually,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

85

1    pre-petition, but then the case was stayed upon the debtors'

2    filing of his bankruptcy petition.

3            THE COURT:  And you want to be able to recover legal

4    fees if you prevail?

5            MR. WIGLEY:  Yes, we do.  And that's where we diverge

6    from --

7            THE COURT:  So let me ask this.  I want to make it

8    clear where I'm coming from.  Whether I consider this motion as

9    a motion for clarification or I could treat it as a motion, in

10   effect, to lift the stay to permit the matter to go forward to

11   determine legal fees, I mean, one way or the other, the issue

12   to me is should you be able to go forward and get legal fees,

13   either as a matter of clarification or because I modified the

14   stay to allow you to do it?  So I'm more interested in hearing

15   why should you be able to seek to recover your legal fees,

16   whether it's because I further lift the stay to allow it or the

17   existing order should be interpreted to permit it?

18           MR. WIGLEY:  Yes, Your Honor, and the reason it was

19   put as a motion for clarification is because we believe that

20   the supplemental servicing order contains language that does

21   lift the stay to allow this portion, this attorney's fee

22   request, to go forward.  The attorney's fee request is not

23   necessarily just one by statute, but the settlement agreement

24   that Mr. Balensiefer is seeking specific performance of, it

25   itself has a mandatory attorney fee provision.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      THE COURT:  Well, it has a prevailing party attorney

2  fee provision.

3      MR. WIGLEY:  Yes.  And because we're allowed to pursue

4  specific performance of that claim, we also have to ask for the

5  attorney's fees that are part of that settlement agreement.

6  Section 14(b) of the supplemental servicing order states the

7  following:  "that the automatic stay shall remain in full force

8  and effect with respect to all pending and future interested

9  party direct claims and counterclaims (i) for monetary relief

10  of any kind and of any nature against debtors except where a

11  monetary claim must be pled in order for an interested party to

12  assert a claim to defend against or otherwise enjoin or

13  preclude a foreclosure".

14      THE COURT:  What was the basis on which the court

15  enjoined the sale?  What was the basis on which the court

16  enjoined the foreclosure?

17      MR. WIGLEY:  The state court?

18      THE COURT:  Yes.  Yes.

19      MR. WIGLEY:  It believed that we had a likelihood of

20  prevailing in enforcing the settlement agreement.

21      THE COURT:  Okay.

22      MR. WIGLEY:  It did require a bond, and Mr.

23  Balensiefer posted it; it's a monthly payment plan, but --

24      THE COURT:  Okay.  Let me hear from Mr. Rosenbaum.

25  Why shouldn't -- whether it's clarification or otherwise, why

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    shouldn't I lift the stay, if necessary, to permit the court

2    to, if it's going to do that, fix the amount of attorney's

3    fees?  Collecting may be a different issue, but -- because as I

4    understand, you're not seeking now to be able to collect it;

5    you say you have to plead it in order to get the relief you're

6    seeking.  Am I right on that?

7            MR. WIGLEY:  And just to add, yes, Your Honor, we're

8    only seeking to liquidate --

9            THE COURT:  Yes.

10            MR. WIGLEY:  -- the amount of attorney's -- not

11    collect.  That has to be done through this proceeding; I

12    acknowledge that.

13            THE COURT:  Okay.  Mr. Rosenbaum, why shouldn't

14    that --

15            MR. ROSENBAUM:  Your Honor, I understand they made a

16    choice to plead it, and we don't take issue with that.  What

17    they're requesting the Court to do now --

18            THE COURT:  Forget the clarification issue; why

19    shouldn't I lift the stay to permit the Arizona court, if Mr.

20    Balensiefer is the prevailing party, to fix the amount of

21    attorney's -- I'm not going to fix the amount of attorney's

22    fees in a case that's in Arizona.

23            MR. ROSENBAUM:  Well, two reasons, Your Honor.  One,

24    there's no timing it; there's no idea of when that might take

25    place.  This litigation is a year old.  They're not at trial

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    yet.  They're at dispositive motions.  So essentially, what

2    they're asking the Court to do is agree in advance that two --

3    one or two or three years down the road, maybe less, that the

4    court in Arizona will have the right to determine the value of

5    their claim.  They had filed proofs of claim --

6         THE COURT:  Attorney's fee claim, if they're the

7    prevailing party on a -- they've succeeded in getting a

8    preliminary injunction.  They're seeking equitable relief in

9    the case.  If they're the prevailing party, there's a

10   contractual provision that entitles them to attorney's fees.

11   Okay?  I don't want to have to determine the amount -- I don't

12   want to have a proceeding on a proof of claim to fix the amount

13   of attorney's fees for a case that was litigated in Arizona.

14        MR. ROSENBAUM:  Well, Your Honor, I don't see that as

15   any much different than thousands of other cases where parties

16   are seeking affirmative, monetary claims against the debtors

17   that are stayed, that have filed proofs of claim, that will be

18   part of the claims resolution process.  I don't see any

19   distinction here.  There is a separate basis for the award of

20   the fees.  It was outlined in their response.  It's a separate

21   proceeding based on the laws of Arizona in the contract.

22   That's not going to be any different than many, many other

23   claims disputes we're going to ask Your Honor to resolve.

24        THE COURT:  I think it's different.  Okay?  I've

25   considered this matter.  Prepare an order that modifies the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    automatic stay, because I don't think this is clarification;

2    I'm not sure.  No one contemplated this exact thing with

3    respect to the supplemental servicing order.  So that it's

4    clear, I want an order that modifies the automatic stay to

5    permit Mr. Balensiefer to proceed with his assertion of a right

6    to recover attorney's fees if he's the prevailing party in the

7    Arizona action.  To be clear, if he's the prevailing party, the

8    amount of the attorney's fees will be liquidated but cannot be

9    collected.

10           MR. ROSENBAUM:  Thank you, Your Honor.

11           THE COURT:  Okay?  All right.

12           MR. WIGLEY:  Thank you, Your Honor.

13           THE COURT:  Thank you.  And submit -- you ought to be

14    able to agree on a form of order that does this.  Okay?

15           All right, next?

16           MR. NEWTON:  Your Honor, James Newton from Morrison &

17    Foerster on behalf of the debtors.

18           The next matter on the agenda is the motion of

19    Stephanie L. and Michael P. Donaghy for relief from the

20    automatic stay; it's docket number 1615.

21           THE COURT:  Right.

22           MR. NEWTON:  I believe I heard them on the phone.

23           THE COURT:  All right.  Are the Donaghy on the phone?

24           MS. DONAGHY:  Yes, we are.

25           THE COURT:  Okay.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

90

1          MR. DONAGHY:  Yes, Your Honor.  How are you doing?

2          THE COURT:  Okay.  Mr. and Mrs. Donaghy, why don't you

3     tell me what relief you're seeking.

4          MS. DONAGHY:  We're seeking relief from the automatic

5     stay to pursue sanctions against GMAC for their continual bad

6     faith conduct during the length of our own bankruptcy.

7          THE COURT:  Well, if I understand the papers, your

8     bankruptcy proceeding is pending before Judge Wizmur in New

9     Jersey; am I correct in that?

10          MS. DONAGHY:  Yes, you are.

11          THE COURT:  And she has entered orders in the

12     bankruptcy case, and you're -- in fact, those orders, I think,

13     were entered after this bankruptcy started, and you're alleging

14     that GMAC violated that order; am I right?

15          MS. DONAGHY:  Yes, I am.

16          THE COURT:  All right.  And as I understand it, Judge

17     Wizmur imposed sanctions against GMAC's lawyer; is that --

18          MS. DONAGHY:  Yes, Milstead & Associates, but they

19     were actually sanctioned for their part in the bad faith

20     conduct which was separate from GMAC.  I know Morrison &

21     Foerster are claiming that it's a together issue, but it's

22     actually not.  She sanctioned them for continually filing MFRs

23     against us when they weren't receiving correct information from

24     GMAC, and they were going off this incorrect information they

25     had received.  That is why she sanctioned Milstead & Associates

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   for never actually questioning GMAC to the validity of the

2   claims that they were giving them.

3            THE COURT:  All right.  And she declined to proceed

4   against GMAC because of the automatic stay in this case.

5            MS. DONAGHY:  She did, Your Honor.  And I asked, when

6   we were there at the last time before her, what we should do if

7   we were still concerned about pursuing sanctions, and she very

8   simply said you need to go to New York --

9            THE COURT:  Okay.

10           MS. DONAGHY:  -- which is why we are now on the phone.

11           THE COURT:  All right.  Let me hear from GMAC's

12   counsel.  So why shouldn't I -- I mean, is this post -- this is

13   alleged post-petition misconduct by GMAC, correct?

14           MR. NEWTON:  That's what I'm hearing now.  Previously,

15   when I had spoke with the Donaghys, my understanding was that

16   they were not seeking sanctions for violations or noncompliance

17   with that order.  I have indicated to the Donaghys, via phone

18   and also in our objection in a footnote to our objection, that

19   the debtors would not oppose the ability of the Donaghys,

20   obviously, to go back to Judge Wizmur and seek any relief that

21   they believe is necessary for the enforcement of a post-

22   petition order that was entered in their Chapter 13

23   proceeding --

24           THE COURT:  I mean, the reason --

25           MR. NEWTON:  -- as a result of the motion for

1    sanctions.

2            THE COURT:  The reason that Judge Wizmur sanctioned

3    GMAC's lawyer was because of misconduct in the Donaghy's

4    bankruptcy case done by the lawyer on behalf of GMAC, correct?

5            MR. NEWTON:  Correct, post-petition in the Donaghy's

6    bankruptcy.

7            THE COURT:  Okay.

8            MR. DONAGHY:  Your Honor, this is Michael Donaghy, if

9    I may?

10            THE COURT:  Go ahead.

11            MR. DONAGHY:  I actually wanted to bring to your

12    attention -- I don't know if it's possible, but the objection

13    that they filed against us, I was wondering if there was any

14    way that we could have that taken off of record based on the

15    sole fact that the new current objection that they filed

16    against us has all kinds of incorrect information about it.

17            THE COURT:  Okay.

18            MR. DONAGHY:  But --

19            THE COURT:  I don't do anything -- you're going to

20    have to take it up with -- you're talking about the objection

21    they filed in New Jersey?

22            MR. DONAGHY:  No, here with you, sir.

23            THE COURT:  No, they can -- they're entitled to file a

24    pleading.  I understand you may take issue with what's in it.

25    The issue for me is what should Judge Wizmur be free to do now.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

93

1              MR. DONAGHY:  Okay.

2              THE COURT:  I had understood -- tell me if I'm wrong.

3    Is the issue -- when I say post-petition, post-ResCap-petition

4    conduct in the Chapter 13 case.  That Chapter 13 case goes

5    forward, the supplemental servicing order permits you to

6    proceed to try and foreclose on the Donaghy's home, and Judge

7    Wizmur found misconduct.  Am I right about that?

8              MS. DONAGHY:  Yes, you are, Your Honor.

9              THE COURT:  Let GMAC's counsel address this.

10             MS. DONAGHY:  All right.

11             MR. NEWTON:  Judge Wizmur did sanction Milstead &

12   Associates.

13             THE COURT:  Well, she didn't sanction GMAC because she

14   felt the automatic stay kept her from doing that.

15             MR. NEWTON:  She did, but she addressed the motion for

16   sanctions, everything else other than the request for monetary

17   sanctions.

18             THE COURT:  All right.

19             MR. NEWTON:  GMAC --

20             THE COURT:  Tell me this; does the automatic stay

21   apply to post-petition conduct by the debtor?

22             MR. NEWTON:  Not as to post-petition conduct; we don't

23   believe it would apply as to the post-petition conduct of the

24   debtors.  However, the motion for sanctions was filed back in

25   March, and my understanding from speaking with the Donaghys is

1    that they would like to go back to the court in New Jersey and

2    request sanctions for the same issues that they raised in that

3    sanction motion back in March.

4             Now, I've expressed to them, as I've mentioned, that

5    to the extent they believe that Judge Wizmur's order that was

6    entered post-petition, the debtors have not complied with it or

7    otherwise didn't comply with it to their satisfaction, that's

8    something that the debtors would not oppose.  And to the extent

9    that it was even necessary, the debtors would agree to relief

10   from the automatic stay to let them do that.

11            MS. DONAGHY:  Your Honor --

12            THE COURT:  No, just --

13            MS. DONAGHY:  -- if I may --

14            THE COURT:  No --

15            MS. DONAGHY:  -- Stephanie Donaghy again.  Not only,

16   though, are we concerned with GMAC's or ResCap's post-petition

17   behavior regarding that court order that was dated in August

18   2012, but we're still also concerned with their bad faith

19   conduct.  Yes, there were things that arrived pre-petition;

20   that's why we initially went before Judge Wizmur.  However,

21   even since ResCap has been filed with their own bankruptcy,

22   we've still run into roadblocks where there's a refusal on

23   GMAC's behalf to speak with us, which is obviously they're

24   improperly servicing our accounts.  They're still imposing

25   unnecessary fees.  It's not just the issue of the order not

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    being followed, it's their continual conduct.

2              THE COURT:  All right, Ms. Donaghy, thanks.  Okay.

3              GMAC's counsel should prepare an order lifting the

4    automatic stay, to the extent it is necessary, to permit Judge

5    Wizmur to consider any applications for sanctions for any

6    conduct by or on behalf of GMAC after the filing of the ResCap

7    bankruptcy.  Put the appropriate date in.

8              As I understand it, on August 20, 2012, Judge Wizmur

9    entered an order requiring GMAC to file an amended proof of

10   claim deeming the Donaghy's account current, remove certain

11   litigation codes from their account, and she did not consider

12   the sanctions portion of the motion based upon the automatic

13   stay in this case.  The debtors subsequently filed an amended

14   proof of claim in the Jersey case.

15             The Donaghys allege that on September 21, 2012, they

16   received a statement in violation of the New Jersey order,

17   showing that payment for July 1, 2012 was due, along with fees,

18   the total unpaid amount being in excess of 8,469 dollars.  The

19   debtors allege that the Chapter 13 Trustee had improperly

20   adjusted Donaghy's monthly payments.

21             In the New Jersey court, Judge Wizmur held a

22   telephonic hearing on October 18th, 2012 to address the issue,

23   and requested that GMAC file a second amended proof of claim in

24   the New Jersey bankruptcy case to reduce the Donaghy's monthly

25   payment to the correct level.  And GMAC filed the second

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   amended proof of claim on October 23, 2012.  All that's post-

2   petition -- post-petition here.

3         If Judge Wizmur believes it's appropriate to sanction

4   GMAC for what occurred in her case, I'm lifting -- I don't even

5   know that the stay applied, but to the extent that the stay

6   would otherwise prevent her from doing so, the stay is lifted.

7         Draft an appropriate order.  Please share it with the

8   Donaghys.  If you can't agree on the form of the order, we'll

9   have a telephone hearing to resolve the issue.  Okay?

10         MR. NEWTON:  Thank you, Your Honor.

11         THE COURT:  Thank you, Mr. and Mrs. Donaghy.

12         MR. DONAGHY:  Thank you.

13         MS. DONAGHY:  Thank you, Your Honor.

14         THE COURT:  Next?

15         MR. NEWTON:  I'll turn the podium over to my colleague

16   Erica Richards.

17         MS. RICHARDS:  Good morning, Your Honor.

18         THE COURT:  Before we go on, it's been a month or so

19   since I've had lift-stay motions and things like that.  I want

20   to be clear that GMAC ResCap, if it's going to go ahead and

21   proceed with foreclosure actions in state courts or bankruptcy

22   courts or whatever around the country, it better comply with

23   all applicable law.  And to the extent that another bankruptcy

24   judge or another state court judge finds that GMAC or any of

25   the other debtors violated the rights of borrowers, if they

1    come here they're likely to get the stay lifted.  I mean, I

2    just -- I can't make it any clearer.  GMAC has to fully comply

3    with all applicable law in the way it services all loans.

4    Judge Wizmur, who is a very respected colleague and a very

5    level-headed judge, on a number of occasions has found that

6    GMAC screwed up with respect to the Donaghy's loan.  It's not

7    the only time.  There have been a series of events.  And if she

8    wants to impose sanctions, let her do it.

9            Okay, let's go on to the next matter.

10           MS. RICHARDS:  Good morning, Your Honor.  Erica

11   Richards of Morrison & Foerster, appearing on behalf of the

12   debtors.

13           Your Honor, the next item on the agenda is our third

14   and final motion for stay relief on for a hearing today.  It

15   was filed by pro se movants M. Nawaz Raja and Neelum Nawaz

16   Raja.

17           THE COURT:  Yes.

18           MS. RICHARDS:  I believe they're on the telephone

19   today.

20           THE COURT:  Okay.  Mr. and Mrs. Raja, are you on the

21   phone?  Are either of the Rajas, or anyone on their behalf, on

22   the telephone?

23           Let me just check the telephone list to see whether --

24   were they on?

25           Yes.  Okay.  All right.  The Rajas are not on the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

98

1    phone; I don't need to hear argument.  The Court has reviewed

2    the papers with respect to -- this is the Raja's motion seeking

3    relief from the automatic stay.  The debtors filed an

4    objection.  The Raja's motion is ECF number 1818.  The debtors'

5    objection is at ECF 1988.  It's supported by the declaration of

6    Warren Graham Delahey.  It's Exhibit 1 to ECF docket number

7    1988.

8           The Rajas filed their complaint commencing an action

9    pending in Loudoun County circuit court in Virginia on October

10   18, 2010.  The movants, the Rajas, did not serve the complaint

11   on the debtors, and no further action was taken by the Virginia

12   court with respect to the debtors following the filing of the

13   complaint.  As of the petition date, the state action remained

14   pending in the Virginia court.

15          The Rajas are seeking money damage claims against the

16   named defendants, which include each of the debtors, for

17   alleged violations of the Virginia Business and Professions

18   Code and Truth in Lending Act as well as injunctive and other

19   relief.

           The state action is now stayed by virtue of the

20   automatic stay.  The Rajas filed this motion on October 12,

21   2012.

22          This is similar to many other actions pending in state

23   or federal courts around the country where borrowers or former

24   borrowers of the debtors seek damages relief against one or

25   more of the debtors.  The automatic stay affords one of the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    fundamental debtor protections provided by the bankruptcy law.

2    See Midlantic National Bank 474 U.S. 494 (1986).

3          As in all of these cases, the court considers the

4    Sonnax factors set forth by the Second Circuit in Sonnax case

5    907 F.2d 1280, 1286 (2d Cir. 1990).  The court in that case set

6    out twelve nonexclusive factors for courts to consider.  This

7    is very similar to many of the cases in which I've already

8    ruled, and I won't go through all of that reasoning.  A simple

9    order should be presented denying the motion.  The Rajas have

10    failed to establish cause for lifting the stay applying the

11    Sonnax factors.  The motion is denied.

12          MS. RICHARDS:  Thank you, Your Honor.

13          The next category of items on the agenda are the

14    adversary proceedings.

15          THE COURT:  Yes.

16          MS. RICHARDS:  And before we get to those --

17          UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor, it's

18    not --

19          MS. RICHARDS:  Incorrect; sorry.  We have a motion of

20    the official committee of creditors if they'd like to, I guess,

21    go first.

22          THE COURT:  All right.  I'm sorry, I didn't hear a

23    word you said, but that's okay.

24          MS. RICHARDS:  The committee's motion is the next item

25    on the agenda.  "Other Matters" --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1           THE COURT:  Okay.

2           MS. RICHARDS:  -- (IV) on the agenda.

3           THE COURT:  All right.

4           MR. O'NEILL:  Good afternoon, Your Honor.  Brad

5     O'Neill of Kramer Levin on behalf of the committee.

6           This motion is the committee's motion for standing to

7     pursue avoidance claims in respect of the claims of the junior

8     secured noteholders.  I think this can be relatively brief.  I

9     know Your Honor's pressed for time.

10          Four limited objections were filed to the motion.  The

11    limited objections did not object to the substance or

12    colorability of the claims outlined in the complaint drafted by

13    the committee or by to the advisability of pursuing those, but

14    instead raised to principal collateral objections.

15          We have, over the last several days, negotiated with

16    each of the limited objectors, and we are pleased to announce,

17    Your Honor, that we have reached agreement with all on the form

18    of a consensual order.

19          THE COURT:  During the short break, I was handed a

20    nearly indecipherable markup of the order, which I think I was

21    able to follow.

22          MR. O'NEILL:  I am prepared to --

23          THE COURT:  Look, here's what I would suggest.  I did

24    work my way through this.  Those who filed objections, are

25    you -- does any -- assuming that this is retyped in a form that

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    can be read, are the objectors satisfied with the changes, Mr.

2    Shore, or are you --

3             MR. SHORE:  Yes, Your Honor.  I have one comment,

4    but --

5             THE COURT:  Okay.

6             MR. SHORE:  -- I need to draw Your Honor's attention

7    to it, and I think you can read it, which is paragraph 5.  Just

8    so we're clear what's going on in this order.

9             The committee is getting standing to pursue claims,

10   among other things, to come after us.

11            THE COURT:  They want to see your clients.

12            MR. SHORE:  Okay, bring it on.  I mean, I'm not going

13   to respond to the merits of it at all.  But what's ending up

14   happening here is we're going out to mediation, right?  Maybe

15   we get to a plan during the debtors' exclusive periods.  Under

16   this order, what's ending up happening is if the debtors

17   propose a plan which settles our claims, and the committee does

18   not consent, we're going to have to get into litigation over

19   whether or not the committee's consent was reasonable enough.

20   It's just we've got a weird thing in this STN order, which is

21   affecting the exclusivity that Your Honor just granted.

22            Now, what we've done to try to fix that is any other

23   party, though, can -- to the extent exclusivity is lifted, can

24   propose such a plan.  So we may get into a situation, if the

25   committee doesn't like where the settlement is but the votes

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   exist within the capital structure to push it through, we're

2   creating a little bit of a tension here that we're just going

3   to have to address at some later date.  The debtors have said

4   we're willing to give the committee, essentially, a reasonable

5   veto right over any plan we'd like to file during this period.

6            THE COURT:  All right.  Mr. O'Neill?

7            MR. O'NEILL:  Your Honor, a good portion of the

8   handwriting you were complaining about is Mr. Shore's.  And

9   he's --

10           MR. SHORE:  My handwriting is very good, Your Honor.

11           MR. O'NEILL:  He has had his crack --

12           THE COURT:  Mr. Shore, my doctor writes better than

13  this.

14           MR. O'NEILL:  He's had his crack at this order and

15  he's drafted a good portion of it, and everyone's agreed on the

16  language.  I know he showed up here and just tried to give you

17  his gloss on what the language means.

18           THE COURT:  I don't want to get into that now.

19           MR. O'NEILL:  Okay.

20           THE COURT:  The language is the language.

21           MR. O'NEILL:  I don't consent to what he said; I

22  consent to what's in the order.

23           THE COURT:  Okay.  Anybody else want to be heard

24  quickly?

25           MR. ADAMS:  Thank you, Your Honor.  Jason Adams,

**RESIDENTIAL CAPITAL, LLC, ET AL.**

103

1    Kelley Drye & Warren, on behalf of the UMB Bank.

2            Two very quick points.  I know time is short.  One, to

3    kind of clarify the record in this case, there's been a lot of

4    pleadings in the last two months referring to U.S. Bank.

5            THE COURT:  Really?

6            MR. ADAMS:  A few, Your Honor.

7            THE COURT:  This is just --

8            MR. ADAMS:  But there's been several pleadings

9    referring to U.S. Bank as the trustee here.  We wanted to

10   clarify for the record, and we have filed appropriate notices,

11   the UMB Bank is the successor trustee, pursuant to a tripartite

12   agreement with the U.S. Bank and the debtors on October 22nd,

13   and appropriate notices were filed on October 24th.  So I just

14   wanted to clarify the record on that.

15           Secondly, Your Honor, we concur with the statements

16   made by Mr. Shore with regards to the veto rights and the

17   curiosity of kind of how this is structured.  But we have

18   reviewed the order and we do consent to it, Your Honor.

19           Thank you.

20           THE COURT:  Okay.

21           MR. O'NEILL:  Your Honor, there is one additional

22   clarification which was raised, I think, by the debtors and by

23   AFI, which we agreed to make on the record, and that is you'll

24   notice at the top of the third page, the language "and

25   privileges" is struck out.  The reason for that is that AFI and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

104

1  the debtors were concerned that there not be an implication

2  that the committee was seeking or claiming an entitlement to

3  invade the debtors' privilege -- meaning attorney-client

4  privilege, as a result of the grant of the STN standing or this

5  order.  And that certainly was not our intent, and so that is

6  the reason why that language was struck out.

7          THE COURT:  Okay.  Anybody else wish to be heard?

8          MR. GOREN:  Just very briefly, Your Honor.  Todd

9  Goren, Morrison & Foerster on behalf of the debtors.  Just --

10          THE COURT:  Is any of this handwriting yours?

11          MR. GOREN:  None of it's my handwriting, Your Honor,

12  thankfully.

13          Just to address Mr. Shore's point, I mean, we

14  understand the dynamic he's talking about; we evaluated it very

15  closely.  At the end of the day, we think it's unlikely we

16  would propose a plan with a settlement of the committee's

17  litigation without them on board with that settlement.  But if

18  there is broad support among the capital structure for a

19  settlement that the committee doesn't support, we believe we

20  have sufficient flexibility under this language to propose that

21  plan, and the committee has another potential objection to that

22  plan, and we can deal with that at that point.

23          THE COURT:  Well, look, to the extent I could read it,

24  my view was at the end of the day I'm still going to have the

25  discretion of deciding what to do; if one constituency, over

**RESIDENTIAL CAPITAL, LLC, ET AL.**

105

1    the objection of the committee, wants to go ahead and propose a

2    plan that settles the claims, ultimately it's going to land

3    back on my desk.  I mean, am I wrong about that?

4            MR. GOREN:  That was exactly the way we looked at it,

5    Your Honor.

6            THE COURT:  And Mr. Eckstein, do you agree with that?

7            MR. ECKSTEIN:  That's how we viewed it as well.

8            THE COURT:  Okay.  And the one area in STN motions

9    that I think even Smart World is left perhaps more unsettled,

10   is what happens about settlement.  We'll save it for another

11   day.  That's basically it.

12           So I think I'm going to grant the motion.  I think the

13   objections have been resolved, for today, at least, and

14   hopefully we'll never have to reach the issue later on.

15           I guess the only other observation I would make is

16   that with respect to the time limit, it requires the consent of

17   Mr. Shore, at some point, if you want to move the date beyond

18   what's in here?

19           MR. O'NEILL:  Trustee is a defined term; it

20   incorporates both, I think -- yes, yes, that's correct.

21           THE COURT:  Okay.  Why --

22           MR. O'NEILL:  I mean, technically, it's U.S. Bank,

23   but --

24           THE COURT:  Okay.  All right.  I'm going to grant the

25   motion, and I'll -- I think I was able to read everything.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

106

1          MR. O'NEILL:  We can have it typed and circulated.

2          THE COURT:  Yes, and obviously we'll -- and make sure

3     it gets circulated.  And assuming I've read it correctly, it'll

4     be entered.  Okay?

5          MR. O'NEILL:  Thank you.

6          THE COURT:  Thank you very much.  We may -- well,

7     what's next, Mr. Rosen -- Mr. Rosenbaum?

8          MR. ROSENBAUM:  The next items on the agenda, Your

9     Honor, are two pre-trial conferences and adversary proceedings,

10    and the debtors' motion to dismiss both of those adversary

11    complaints.

12         THE COURT:  Do you really want them dismissed for

13    ineffective service of process?  I mean --

14         MR. ROSENBAUM:  Your Honor, that is not the main basis

15    for our request.

16         THE COURT:  I mean, you moved on that basis.

17         MR. ROSENBAUM:  We moved on that basis.  It's becoming

18    a bit of a problem for us, Your Honor, in terms of actually

19    tracking a number of adversary proceedings.  If I may, Your

20    Honor, we're probably up to a good half a dozen.  I think for

21    the most part we feel these are misplaced and don't belong in

22    this court.

23         THE COURT:  Where do they belong?  I mean, your

24    automatic stay prevents them from filing somewhere else.

25         MR. ROSENBAUM:  Your Honor --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

107

1          THE COURT:  Because you've asked the alternative for

2     abstention; abstention to what?  There's no other cases

3     pending.

4          MR. ROSENBAUM:  They have the opportunity -- at least

5     the two -- well, Your Honor, one of my colleagues is going to

6     be arguing the motions, but just globally, looking at all these

7     that have been filed, there are several of them that fall into

8     two categories.  One, they are actually in either judicial or

9     nonjudicial foreclosure states where the borrowers have not

10    taken the appropriate -- have not commenced the appropriate

11    action which they're entitled to commence under the

12    supplemental servicing order.

13         THE COURT:  We're talking about -- the two we're

14    talking about now are Williams v. GMAC Mortgage, et al.,

15    adversary proceeding number 12-01896, and Wagner v. Residential

16    Funding Company, adversary proceeding 12-01913; am I correct in

17    that?

18         MR. ROSENBAUM:  That's correct, Your Honor.

19         THE COURT:  And in both of those you -- among other

20    grounds, you move to dismiss for failure to properly serve the

21    complaints.

22         MR. ROSENBAUM:  Yes, Your Honor.

23         THE COURT:  Now, with respect to the Wagner case,

24    there are nondebtor defendants, and they've filed motions to

25    dismiss, and they're on the calendar for January 29th.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      MR. ROSENBAUM:  I understand that, Your Honor.

2      THE COURT:  Why shouldn't I just adjourn this one

3  until --

4      MR. ROSENBAUM:  Well --

5      THE COURT:  -- January 29th?

6      MR. ROSENBAUM:  -- Your Honor, and that's acceptable

7  to us, but just may I address the abstention --

8      THE COURT:  Go ahead.

9      MR. ROSENBAUM:  -- a little more?  In Wagner and in

10  Williams, there are pending nonjudicial foreclosures that have

11  not been completed, and so they're parallel cases, in a way.

12  And the plaintiffs in those actions have not commenced the --

13  have not taken -- availed themselves of the opportunities to

14  commence -- to oppose the nonjudicial foreclosure by commencing

15  the appropriate action there.

16      THE COURT:  Well, are you saying that they can't bring

17  an adversary proceeding here without first commencing an action

18  in state court and wherever?

19      MR. ROSENBAUM:  No, I'm saying -- what we're saying is

20  that we believe there's a basis for this Court to abstain under

21  1334(c)(1) in favor of an action that they can commence, that

22  they're entitled to commence under the supplemental servicing

23  order.  I mean, Your Honor, we're just trying to --

24      THE COURT:  First off, before you do that --

25      MR. ROSENBAUM:  -- introduce some rationality here.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

109

1          THE COURT:  -- the Wagner case, they served the

2    complaint but they used the wrong -- instead of -- they served

3    it on suite 250 rather than suite 350, and that's --

4          MR. ROSENBAUM:  Well, Your Honor, I mean -- we're

5    happy to withdraw that, but the point of raising those issues,

6    we're not hearing about these, we're finding them on the

7    docket; some were getting misfiled in the nonmain case.  We've

8    now put in place processes, we're treating these as if we have

9    to timely file --

10          THE COURT:  So you think my ruling on these two is

11    going to change the fact that complaints aren't showing up in

12    the right place?  I mean, I just --

13          MR. ROSENBAUM:  No, Your Honor, we think that your

14    ruling abstain -- if you were to abstain, we could use that as

15    a basis to have rational discussions with --

16          THE COURT:  Is anybody here in Wagner or Williams?

17          MR. AMOS:  Yes, Your Honor.  Timothy Amos for myself

18    and Golden & Amos, Parkersburg, West Virginia.

19          THE COURT:  For which case is that now?

20          MR. AMOS:  Van Wagner, Your Honor.

21          THE COURT:  All right.

22          MR. POULSON:  Your Honor, Kiyam Poulson, Druckman Law

23    Firm, PLLC for defendant Seneca Trustees, Inc.

24          THE COURT:  I couldn't hear that, so you're going to

25    have to make your appearance again.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

110

1          MR. POULSON:  Sorry, Your Honor.  Kiyam Poulson,

2    Druckman Law Firm, PLLC for defendant Seneca Trustees, Inc.

3          THE COURT:  In which of the cases is it?

4          MR. POULSON:  In Wagner.

5          THE COURT:  Wagner, okay.

6          MR. ABRAMS:  Good morning, Your Honor.  David Abrams,

7    Strongin Rothman & Abrams, here for defendants Peter T.

8    DeMasters; the law firm Flaherty, Sesabaugh,Bonasso PLLC; and

9    Susan Romain, in the Wagner case.

10         THE COURT:  Okay.  And you've got motions to dismiss

11   on for January 29th?

12         MR. ABRAMS:  Actually, Your Honor, we filed an answer,

13   but we do intend on making a motion --

14         THE COURT:  Okay.

15         MR. ABRAMS:  -- to dismiss as well, returnable on that

16   date.

17         MR. POULSON:  Yes, Your Honor, our motion is

18   returnable for the 29th.

19         THE COURT:  All right.  I'm going to take both of

20   these matters under submission without argument.

21         MR. ROSENBAUM:  Thank you.  Your Honor, may I make one

22   preview?

23         THE COURT:  I'm going to take both of them under

24   submission --

25         MR. ROSENBAUM:  No, no --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  -- because if I allow you to argue, I've

2     got to allow other counsel to argue.  I'm going to take both

3     matters under submission.

4          MR. ROSENBAUM:  It has nothing to do with those

5     matters, Your Honor.

6          THE COURT:  Go ahead, Mr. Rosenbaum.

7          MR. ROSENBAUM:  Just briefly; I know we're trying to

8     conclude here quickly.

9          What we'd like to propose to Your Honor, and we'll do

10    by formal motion early next year, is we believe this process

11    would benefit if we could put some procedures in place, at

12    least allow a time period for some informal mediation with

13    these parties before any of the defendants have to answer.

14    We'd like to involve the committee and the special committee

15    counsel for borrower issues, at least have a --

16         THE COURT:  Well, I wish the special committee -- the

17    committee's special counsel for borrower issues was here.  I

18    don't know whether anybody is here from --

19         MR. ROSENBAUM:  I've addressed it --

20         THE COURT:  -- because this really is something you

21    ought to be on top of.  I mean, these are exactly the -- this

22    is part of the reason that I wanted special counsel to the

23    creditors' committee for borrowers issues to see if we could

24    deal with cases like these.

25         MR. ECKSTEIN:  Your Honor, I believe that he is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    closely involved in this.  We'll make sure that he's in court.

2              THE COURT:  Why don't you identify yourself for the

3    record?

4              MR. ECKSTEIN:  Kenneth Eckstein --

5              THE COURT:  No, no, you I know.

6              MR. KRELL:  Your Honor, Justin Krell, Silverman

7    Acampora, special counsel for the borrowers committee, Your

8    Honor.

9              THE COURT:  Okay.  What I'm going to do with both

10   Williams and Wagner cases, I'm going to adjourn the hearing in

11   both cases until January 29th.  I'm going to direct the

12   committee's special counsel to confer with the plaintiffs'

13   counsel in both of these cases and with defendants' counsel,

14   and see whether before January 29th there can be some agreement

15   about how this ought to proceed or not.  Okay?

16             I mean, both of these had motions to dismiss for

17   failure to serve or improper service.  The one the suite number

18   was off by one digit.  The other one appears not to have been

19   served; there was an e-mail about it but it was not served.

20   But if I dismiss the cases on improper service, they'll just

21   try it again; that's not going to solve the problem.  So I'm

22   adjourning both matters to January 29th.  I direct special

23   counsel to the committee to confer and see whether there's a

24   way you can -- you're not going to resolve the underlying

25   issues, I don't think, but let's see if there's some resolution

**RESIDENTIAL CAPITAL, LLC, ET AL.**

113

1    possible.  Okay?

2           MR. KRELL:  Yes, Your Honor.

3           THE COURT:  All right.  Mr. Rosenbaum, anything else?

4           All right.  And those of you who are on the phone,

5    hopefully you heard what my direction was, so your matters are

6    still alive.  I do expect you to cooperate with the committee's

7    special counsel.

8           Okay, Mr. Rosenbaum?

9           MR. ROSENBAUM:  Your Honor, I know you have to go, and

10   I'd like to take this point up after lunch, the other pending

11   adversaries, and I think special borrower counsel could be

12   helpful.

13          THE COURT:  Well, we have to come back for fee

14   applications anyway, so we'll be in recess until 1:45.

15          MR. ROSENBAUM:  Thank you, Your Honor.

16          THE COURT:  And anybody who doesn't need to be here

17   this afternoon is certainly excused.

18      (Recess from 12:25 p.m. until 1:47 p.m.)

19          THE COURT:  Please be seated.  We're back on the

20   record in Residential Capital, number 12-12020.

21          Mr. Rosenbaum?

22          MR. ROSENBAUM:  Your Honor, Norm Rosenbaum, Morrison &

23   Foerster for the debtors.

24          Your Honor, before we proceed, we just want to let you

25   know that Mr. Raja, who apparently wasn't on the call when you

1    heard his motion, I think has renewed his appearance.

2              THE COURT:  All right.  The result when I wasn't able

3    to hear Mr. Raja -- and I just understand in chambers that he

4    was on the line but "listen only" -- was that I took the matter

5    on the papers and didn't permit argument by either side.  I

6    ruled from the bench and therefore my ruling stands.  Let's

7    proceed.

8              MR. ROSENBAUM:  Your Honor, would you indulge me for a

9    couple more minutes on adversary proceedings?

10             THE COURT:  Go ahead.

11             MR. ROSENBAUM:  The suggestion that Your Honor made

12   was a very good one and one we had thought about and was

13   considering to consult and utilize Mr. Freedman's office for

14   that purpose and consult with the plaintiffs.  There's about

15   fourteen pending adversaries, I think twelve of which have been

16   filed by pro se's.  In the next week or so, based on the filing

17   date, we would have to answer three of them.  With the Court's

18   approval, I'd like to suggest that the Court enter an order

19   extending the time for all the defendants to answer for at

20   least thirty days, and we can try to put that process in place

21   and speak to these parties and see if there's a resolution.  If

22   not, everyone's rights are reserved.

23             THE COURT:  I agree.  I would ordinarily be prepared

24   to extend time under other circumstances, but here it's

25   definitely appropriate.  So submit orders and I will extend the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

115

1  debtors' time to respond to the complaints.

2          Now, in some of them, there are nondebtor defendants

3  as well.  So what -- I don't know whether in the cases that are

4  pending whether that's true; certainly there were several today

5  where there were nondebtor defendants.

6          MR. ROSENBAUM:  There are, Your Honor.

7          THE COURT:  So I do believe it is important for the

8  borrower -- the committee's special counsel to confer -- the

9  debtors' counsel to confer, as well, with the plaintiffs in the

10  cases.  So I will enter an order that extends the time of all

11  defendants to respond to the complaint for thirty days.

12          MR. ROSENBAUM:  Thank you, Your Honor.  And as I said

13  before, I think we'd like to formalize that process and we'll

14  file a motion --

15          THE COURT:  Fine.

16          MR. ROSENBAUM:  -- putting that in place.  Thank you,

17  Your Honor.

18          THE COURT:  Thank you very much, Mr. Rosenbaum.

19          MR. ROSENBAUM:  With that, I'll turn the podium over

20  to Mr. Marinuzzi.

21          THE COURT:  Thank you very much.

22          MR. RAJA:  Yes, I'm Mohammad Raja.  I'm on the line.

23          THE COURT:  I'm sorry; who is that?

24          MR. RAJA:  This is Mohammad Raja.

25          THE COURT:  Yes.  If you were able to hear this

**RESIDENTIAL CAPITAL, LLC, ET AL.**

116

1    morning, and I understand that the CourtCall operator had

2    placed you on "listen only" and so you weren't able to be heard

3    by the Court.  I took the matter based on the papers and I

4    didn't permit the debtors' counsel to argue either, and I ruled

5    from the bench based on the papers before me.  So that matter

6    is concluded for now.  You can either --

7              MR. RAJA:  So Your Honor made a ruling on the --

8              THE COURT:  I already --

9              MR. RAJA:  -- motion filed -- documents filed?

10             THE COURT:  Yes, I ruled based on the documents filed.

11             MR. RAJA:  Okay.  Your Honor, I have a question and a

12   suggestion, because my hearing in this case is going on here in

13   circuit court, so then that will be stated in the outcome of

14   this or will it continue, because the prime hearing is on -- in

15   one case it's on January 3rd and in second case, just the

16   matter was on and court said that, you know, I had a private

17   practice to proceed.

18             THE COURT:  I'm not going to answer questions; I'm

19   going to enter an order, and that will resolve the matter as

20   far as this Court is concerned.  Counsel for the debtors is

21   going to submit an order.

22             MR. RAJA:  Uh --

23             THE COURT:  All right.  Sir, we're moving on, on the

24   calendar.

25             MR. RAJA:  No problem.  I'm sorry for that.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

117

1        THE COURT:  That's all right.  Thank you.

2        MR. RAJA:  Thank you, sir.

3        THE COURT:  You can either remain on the line or you

4    can excuse yourself.  Okay?

5        MR. RAJA:  If I'm done, then I can excuse myself.

6        THE COURT:  Yes, you are done.  Thank you very much.

7        MR. RAJA:  Thank you, sir.

8        THE COURT:  Okay.

9        MR. RAJA:  Bye-bye.

10        THE COURT:  Go ahead, Mr. Marinuzzi.

11        MR. MARINUZZI:  Good afternoon, Your Honor.  For the

12    record, Lorenzo Marinuzzi.

13        We turn now, Your Honor, to the interim fee

14    applications that have been filed in these cases, and there are

15    twenty-eight, if I counted correctly, in total.

16        They, between the time of the U.S. Trustee's

17    objection, which was filed almost two weeks ago, and this

18    morning, have all been resolved to the satisfaction of the U.S.

19    Trustee's Office.  We submitted to chambers a chart, which

20    hopefully the Court found helpful in identifying the resolution

21    of the various objections.  It was reviewed and approved by the

22    U.S. Trustee's Office.  And before the hearing started, since

23    the chart was circulated before we were able to resolve with

24    the U.S. Trustee's Office Morrison & Foerster's fee application

25    objection, I hand-wrote the resolution into the chart and gave

**RESIDENTIAL CAPITAL, LLC, ET AL.**

118

1   it to your clerk.

2           THE COURT:  And I have that in front of me, Mr.

3   Marinuzzi.

4           MR. MARINUZZI:  Thank you.  I don't know how Your

5   Honor wishes to proceed.  I don't think we're going to hear

6   from the U.S. Trustee on any of these applications.  I do want

7   to note, however, as part of the resolution of two of the

8   debtors' professionals' applications, specifically Morrison &

9   Foerster and FTI, that each of these two professionals has

10  agreed to carry, probably to the next interim hearing, the U.S.

11  Trustee's objection on the fees incurred in connection with the

12  KEIP KERP program.

13          THE COURT:  Just say that again.  I want to hear that

14  again, because that's the one that I have the greatest -- I

15  have something to say about.

16          MR. MARINUZZI:  Your Honor, what we've agreed with the

17  U.S. Trustee's Office is that rather than litigate that issue

18  today, we've decided to carry it.  So with respect to 308,000

19  dollars of Morrison & Foerster's fees, and I believe 58,000

20  dollars of FTI's fees, those are going to be subject to the

21  U.S. Trustee's ability to argue that objection at the next

22  interim hearing, if we're unable to resolve it among ourselves.

23  At least their objection.  Your Honor -- obviously, to the

24  extent Your Honor has issues, then Your Honor will share with

25  us and we'll be guided accordingly.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

119

1           THE COURT:  Well, I'll hold my fire.

2           MR. MARINUZZI:  Okay, Your Honor.

3           THE COURT:  Let me say this.  The reason -- this

4    should be no secret to anybody, because chambers was asked

5    whether anyone from Mercer had to appear on behalf of -- Mercer

6    had to appear in court today or whether they could be on the

7    phone, and with respect to some other applicants who were out

8    of town I said they could appear by phone.  With respect to

9    Mercer I wanted a representative here in person.  I saw the

10   objections of the U.S. Trustee with respect to fees for both

11   Mercer, Morrison & Foerster, and FTI with respect to the

12   KEIP -- the first KEIP, and KERP.  I made some comments in my

13   written opinion with respect to the KEIP.  I think there's a

14   footnote that specifically addresses Mercer, words to the

15   effect of they should have known better.  They should have

16   known better, because they were counsel in Borders when I wrote

17   an opinion on it, and my comments, I think, would apply equally

18   even though Morrison & Foerster wasn't counsel in that case.

19           I frankly thought it was largely a waste of money and

20   considerable amount of the Court's time required to deny a

21   motion that I thought was fairly clear.  I'll leave it to Mr.

22   Masumoto and the U.S. Trustee in the first instance to see if

23   they can resolve, to their satisfaction, issues regarding the

24   KEIP and KERP.  The KERP was approved.  That wasn't objected

25   to, and the Court approved it.  It was appropriate, and the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

120

1    Court approved it.

2          The law in this district is that the Court's role in

3    reviewing fees is to determine as of the time the services are

4    performed whether there's a benefit to the estate, and the

5    Court's question is what was the benefit to the estate of a

6    KEIP motion that was substantially deficient?  Let me leave it

7    at that.

8          Now, it may well be that some amount of the services

9    that were performed in connection with the unsuccessful KEIP

10   motion wound up being a benefit in reducing the work once it

11   was fixed, but I'll leave it -- how that should be dealt with

12   I'm going to leave, in the first instance, to the U.S. Trustee,

13   and I know the U.S. Trustee did object to fees of Morrison &

14   Foerster, FTI, Mercer with respect to the time spent on the

15   KEIP.  I think the issue is well taken.  How it should be dealt

16   with, I will leave it to Mr. Masumoto and his colleagues in the

17   first instance, but let me make my position clear about it.

18   Okay?

19          MR. MARINUZZI:  Understood, Your Honor.  Thank you.

20          THE COURT:  All right.  I think, Mr. Marinuzzi, what

21   might be best since -- and I appreciate the fact that everyone,

22   all of the professionals, worked with Mr. Masumoto in resolving

23   the issues that the U.S. Trustee raised with respect to the fee

24   applications.  There are obviously voluminous fee applications,

25   all of which were reviewed very carefully by my chambers, and

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    obviously were reviewed very carefully by the U.S. Trustee's

2    Office.

3          Some of you, I think, may have been here yesterday

4    when I had MF Global fee applications.  I know you weren't

5    here, Mr. Marinuzzi, but your colleagues --

6          MR. MARINUZZI:  We heard all about it, Your Honor.

7          THE COURT:  -- were here.

8          MR. MARINUZZI:  Yes.

9          THE COURT:  And I'm going to repeat some of what I

10   said yesterday for the benefit of the professionals in this

11   case.  And, really, I think on some of these things there

12   probably is not uniformity among the judges on this court, but

13   I try to be consistent from case to case in the guidelines that

14   I apply and my chambers apply in reviewing fee applications.

15   And so let me just set those out, because hopefully it will

16   guide everyone in the future.

17         I won't approve reimbursement for travel within the

18   City of New York, travel time for within the City of New York.

19   I consider that part of overhead.  So if you're coming to your

20   office -- if you're working that's one thing, but if you're

21   coming from your office to court, I don't like to see -- I

22   don't want to see -- and I don't want it hidden, okay, so it's

23   when I see travel to and from court that doesn't get approved.

24   And the issue arose yesterday because the debtor had counsel

25   from Philadelphia as one of its counsel, and I made clear I

**RESIDENTIAL CAPITAL, LLC, ET AL.**

122

1    wouldn't approve their time traveling to court because they

2    happen to be in Philadelphia.  They're hired for a case in New

3    York.

4         I will not approve reimbursement for car services,

5    taxis, or parking for travel within New York City unless it's

6    supported with details that show it was travel either before 8

7    a.m. or travel after 8 p.m. or to or from court.  I'll only

8    approve car service, taxis if voluminous documents were brought

9    to court.  Otherwise I expect people to take public transit,

10   the same way I do, and the same way I did when I was in

11   practice, okay?  So, you know when I see -- it's a red flag

12   when we see parking fees or numerous car service expenses,

13   sometimes for multiple lawyers in the same firm traveling to

14   and from court.

15        No reimbursement for airfare, other than coach class

16   on domestic or international flights.  And I didn't say this

17   yesterday, but I am going to require -- the more I've thought

18   about it -- I want certification from any lawyers who are

19   putting in fee applications that include expenses for air

20   travel that any airfare is for coach class.  If your firms want

21   to send you business class or first class that's fine, but the

22   estate is not going to be paying for anything other than coach

23   class.

24        Reimbursement for meals -- the U.S. Trustee guidelines

25   have a twenty-dollar cap for overtime meals.  That twenty-

**RESIDENTIAL CAPITAL, LLC, ET AL.**

123

1    dollar cap applies to all business meals, overtime or not, and

2    any request for reimbursement needs to indicate the persons

3    attending.  So we'll sometimes see 300 dollars, but you don't

4    know how many people.  It needs to identify the people.  If

5    it's over twenty dollars it needs to identify the number of

6    people and who they are.

7            In MF Global this was a big issue yesterday.  I don't

8    think it's an issue here.  There were barristers.  You don't

9    have any foreign counsel in this case, do you?

10           MR. MARINUZZI:  Not to my knowledge, Your Honor.

11           THE COURT:  Okay.  All right.  I'll leave that out

12   then.

13           So all expense reimbursement requests must provide

14   detailed support for the expense; date, time, amount, persons

15   using the service, et cetera.  Photocopying must include the

16   number of pages and the per-page charge.  The U.S. Trustee

17   guidelines are twenty cents, the lower of twenty cents or cost,

18   and I guess, Mr. Masumoto, what, the usual these days is ten

19   cents?

20           MR. MASUMOTO:  Right.  Without proving actual cost it

21   pays at ten cents.

22           THE COURT:  Right.  So those, and with respect to the

23   fee apps before me there were numerous applications that appear

24   to include travel time within the City of New York.  For out-

25   of-town travel the case law and the guidelines generally are

**RESIDENTIAL CAPITAL, LLC, ET AL.**

124

1　fifty percent for nonworking.  You can bill for working time,

2　but fifty percent for nonworking time.  I know the U.S. Trustee

3　looks at these carefully.  You're going to simplify the lives

4　of the U.S. Trustee's Office and of the Court, because we

5　really do go through these and review them.

6　　　　　I'm going to want to hear Mr. Masumoto with respect

7　to -- and I'm glad to see that all of these issues appear to be

8　resolved, and I think, in all likelihood, that's going to be

9　satisfactory to the Court.  What I don't do is -- I mean, I

10　have a thick memo with numerous items on many of the fee

11　applications.  As is customary, the U.S. Trustee winds up

12　agreeing on a fixed dollar amount reduction.  It may be

13　separate for fees and expenses, but they're usually lump sum

14　amount reductions, and it wouldn't be appropriate for me to go

15　through and then start hitting people for things that have

16　already, sort of, been wrapped into what the U.S. Trustee has

17　done.  So I typically will put great weight in a resolution

18　that the U.S. Trustee reaches.

19　　　　　So that's, really, all of the -- what I've had to say

20　is really aimed at the future.  Let me hear Mr. Masumoto,

21　because your office, obviously, looked at these.  There were

22　numerous applications.  You had objections, some of which were

23　very substantial.  So what can you tell me?

24　　　　　MR. MASUMOTO:  Your Honor, we did negotiate with each

25　of the parties and generally as to the specific objections that

1    were raised.  As a general rule, with respect to vagueness

2    entries the objection with vague entries were if they corrected

3    their time entries we allowed -- we asked for a ten-percent

4    reduction in order to impose a deterrent.  Otherwise there's no

5    incentive to do it right the next time.

6            THE COURT:  Vagueness and lumping are something that

7    we look at carefully, and I know Mr. Masumoto and his

8    colleagues do, and your dealing with that, I think, is

9    completely appropriate.

10           MR. MASUMOTO:  Thank you, Your Honor.  And so -- but

11   we gave a choice.  If the professionals decided that it was not

12   worth their time to make the adjustment we asked for a thirty-

13   percent reduction.

14           We did attempt to negotiate with each of the parties

15   with respect to each individual issue and not necessarily as a

16   global.  In some cases we presented a global figure because

17   it's much more convenient than to go through every entry, and

18   in some cases --

19           THE COURT:  These binders are mostly filled with fee

20   applications.

21           MR. MASUMOTO:  Yes, Your Honor.  You're certainly

22   familiar with that.  And in some cases we couldn't necessarily

23   agree in terms of how to allocate the amounts reduced, but we

24   did agree on an overall amount, so in certain cases it was,

25   sort of, an overall approach, but in most instances we did

**RESIDENTIAL CAPITAL, LLC, ET AL.**

126

1   attempt to negotiate specifically on the nature of the

2   objections, but we did negotiate separately with fees as well

3   as with the expenses and made appropriate adjustments and

4   accommodations where we thought it was effective or proper.

5          THE COURT:  Thank you.  Just coming back to where

6   people -- no, you can sit down, Mr. Masumoto.  With respect to

7   expense reimbursement items, I expect to see the details

8   provided to Court.  In some cases recently we've been getting

9   just summary schedules, and then it turns out that Mr.

10  Masumoto, quite correctly, has asked for the detail.  We

11  haven't seen it.

12         If you expect to get your expenses approved, your

13  application for fees and expenses needs to include the detailed

14  breakdown of expenses.

15         Okay.  Go ahead, Mr. Marinuzzi.

16         MR. MARINUZZI:  Your Honor, just a couple of points.

17  We're always, as a firm, mindful of the U.S. Trustee's

18  concerns.  We work with them on many cases, and we often try to

19  think of those things that are hot buttons for them and how to

20  accommodate them even without them raising objections.  And in

21  this case what we did is, as opposed to the U.S. Trustee's

22  rules about transitory timekeepers, where it's five hours per

23  person per quarter, anything less than that gets written off,

24  we actually did it on a monthly basis.

25         Ultimately it was not something we needed to do, but

1    we felt that this was a strong issue for the U.S. Trustee.  We

2    wanted to get ahead of it.  And we think it provided value to

3    the estate, saving an extra 80,000 dollars, roughly, depending

4    upon how Your Honor views Judge Chapman's decision in Ambac,

5    and we're not going to ask you to preview that.

6          Lumping -- we've agreed to write off that time.

7    Vagueness -- I think there's a little bit of a disagreement as

8    to what's vague versus what isn't.  It's kind of hard to

9    resolve it when you're talking about dollars that are measured,

10   and it's just the effort to recreate time sheets.  Honestly, if

11   we don't remember who from Kramer Levin we spoke with four

12   months ago we're not going to just make up a name.  It's just

13   not the right way to do things.  But going forward we're guided

14   accordingly.

15         I don't know if Your Honor has any specific questions

16   of the debtors' professionals.  We have people either sitting

17   behind me in court today or on the phone.  To the extent I

18   can't answer those questions, hopefully they can.  I don't know

19   if Your Honor has any questions of the committee's

20   professionals or the professionals for the examiner, but

21   they're here in court as well.

22         THE COURT:  Well, what I would like to have you do --

23   and I'm going to make one other comment, because you raise the

24   issue, and I know that the U.S. Trustee does raise the issue

25   about transitory timekeepers less than five hours.  I don't

**RESIDENTIAL CAPITAL, LLC, ET AL.**

128

1    have a blanket view about it.  Let me just say that.

2            And I think the appropriate thing is to provide the

3    U.S. Trustee, in the first instance, or the Court, with enough

4    information if there are the so-called transitory timekeepers,

5    because two hours of a partner or a senior associate's time

6    who's an expert on a particular issue that arises may be more

7    cost effective than sending off somebody who's working on the

8    case full-time to the library to spend twenty hours figuring

9    out what two hours of somebody's time may do.  I think there

10    obviously -- I think Mr. Masumoto and his colleagues wouldn't

11    be raising the issue about transitory timekeepers if there

12    wasn't some real -- an overall problem that occurs.

13            So I don't have a blanket view about it.  I think

14    it's appropriate for the U.S. Trustee to ask for more

15    information, but I think it's a case-by-case basis.

16            MR. MARINUZZI:  Understood.

17            THE COURT:  Okay.

18            MR. MARINUZZI:  Your Honor --

19            THE COURT:  I think what you ought to do is, and I

20    don't know if you want to defer to -- I mean, I'd like you to

21    just go through with each of the applications, either you or --

22    I don't know that it has to be a whole group of people coming

23    up.  If they do, fine.  I'd just like to understand clearly

24    what the agreed adjustment is.  I've read the objections.  I

25    know what the objections were.  Many of them had been agreed

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1   reductions before today.  I gather the remaining ones that

2   hadn't been resolved now have been resolved.  I'd just like to

3   get on the record what the initial request was, what the agreed

4   reduction with the U.S. Trustee has been.

5          MR. MARINUZZI:  Your Honor, I could do that based on

6   the information in this chart before me.

7          THE COURT:  That's fine.

8          MR. MARINUZZI:  And we'll do it in alphabetical order,

9   starting with the debtors' professionals.  The first firm that

10  was the subject of an objection from the U.S. Trustee was

11  Bradley Arant Boult Cummings LLP, and their total requested

12  fees were $4,207,515.65.  They've agreed to reduce those fees

13  by 70,032 dollars.  Their expenses were requested in the amount

14  of $157,682.41, and the U.S. Trustee has agreed that that

15  amount is appropriate.

16         And Your Honor, if Your Honor doesn't have a copy of

17  the chart I can hand one up.

18         THE COURT:  I have the chart right here.

19         MR. MARINUZZI:  Okay.  Great.  The next --

20         THE COURT:  I will.  I'm going to approve  the Bradley

21  Arant fee application.  Their fee application was 5,827 pages

22  long.

23         MR. MARINUZZI:  Your Honor wants detail; there's

24  detail.

25         THE COURT:  But the problem with it was -- and I don't

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    know whether Mr. Masumoto has raised this or not.  I think this

2    is an issue for the future.  Not as to the amount.  I'm

3    approving the amount.  It's organized by client matter number,

4    with only five or six entries, maximum, on any given page.  The

5    format of the application doesn't comport with the U.S. Trustee

6    guidelines, which require that time entries be organized by

7    project category, case administration, asset disposition, et

8    cetera.  And within those categories, time and service entries

9    are to be reported in chronological order and under appropriate

10   project category.  So reviewing the 5,800-page Bradley Arant

11   fee application -- it was difficult.

12           MR. BENDER:  Your Honor, Jay --

13           THE COURT:  Can you adjust how you're presenting

14   information?

15           MR. BENDER:  First of all, my name is Jay Bender, and

16   I'm with Bradley Arant.  I've got Wendell Allen, a partner of

17   mine, on the line.

18           THE COURT:  Okay.

19           MR. BENDER:  I reviewed it as well, and I couldn't

20   agree more with you, but I think that that's the way that we've

21   got to do it, certainly with the litigation matters, and Mr.

22   Allen might be able to explain this.

23           THE COURT:  May I ask you this?  Can you at least

24   prepare some summary chart that -- I'm not trying to make a lot

25   of extra work for you, but reviewing 5,800 pages that isn't

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    organized in the way we generally require -- the U.S. Trustee

2    guidelines require, you need to see if you can figure out a way

3    of putting together -- and talk to Mr. Masumoto about it,

4    extracting data from all of -- and I know there's a lot of

5    cases.

6              MR. BENDER:  We'll be happy to --

7              THE COURT:  I don't know whether you've had any

8    suggestions about it, Mr. Masumoto, but it wasn't easy.

9              MR. MASUMOTO:  Not at this time, Your Honor, but we'd

10   be happy to discuss it with them.

11             THE COURT:  Why don't you see what you can --

12             MR. BENDER:  We will, Your Honor.

13             MR. MASUMOTO:  As you indicated, it was quite

14   voluminous.

15             THE COURT:  Okay.  All right?

16             MR. BENDER:  We'll do it.

17             THE COURT:  All right.  But with the adjustment agreed

18   upon, they're approved.

19             MR. BENDER:  All right.  Thank you, Your Honor.

20             THE COURT:  Thank you.

21             MR. MARINUZZI:  Your Honor, next on the list is

22   Carpenter Lipps & Leland.  They had requested total fees of

23   955,735 dollars and total expenses of $334,924.08.  The U.S.

24   Trustee's objection was resolved.  Carpenter Lipps is reducing

25   their fees by 6,675 dollars and reducing their expenses by 890

**RESIDENTIAL CAPITAL, LLC, ET AL.**

132

1   dollars.

2           MR. MASUMOTO:  Your Honor, if I may?

3           THE COURT:  Go ahead, Mr. Masumoto.

4           MR. MASUMOTO:  I just wanted to indicate, just for

5   purposes that -- in this case the U.S. Trustee objected to

6   8,499 dollars in fees and reimbursement of $221,262.29.

7           THE COURT:  $221,260.29.

8           MR. MASUMOTO:  Right.  And the reason for the minor

9   reduction is that, at best, the bulk of that expense had to do

10  with a company that, essentially, reviewed documents, and we

11  requested, actually, the invoices and documentation, which --

12          THE COURT:  This was the litigation support vendor

13  that they were using.

14          MR. MASUMOTO:  Yes.  Lumen, I believe it was called.

15          THE COURT:  Right.

16          MR. MASUMOTO:  And each of the time entries were

17  pretty uninformative; essentially reviewing documents.

18  However, upon discussing it with counsel, and I did want to

19  mention, because I thought it was helpful, they had a very -- I

20  thought, a very effective check system.  I guess they had a

21  system in place where they could monitor the amount of time

22  spent by each timekeeper and the number of documents reviewed

23  and, in fact, use that statistics to monitor, I guess, the

24  performance and effectiveness of the various individuals, which

25  seemed to me consistent with providing the kind of information

**RESIDENTIAL CAPITAL, LLC, ET AL.**

133

1    that one would seek in a detailed timekeeping.

2           So, as Your Honor knows, sometime we have difficulty,

3    especially where there's a lot of discovery where a large

4    number of entries essentially duplicates itself by saying

5    "reviewing documents".  But I thought -- I'm not sure that

6    everyone has a similar system in place, but I thought it was

7    particularly useful and effective, and, accordingly, that's why

8    we accepted their expense.

9           THE COURT:  Okay.  I'm going to approve  the fees and

10   expenses as adjusted.  One of the reasons I'm asking for

11   certification that airfare is all at coach is there were some

12   airplane tickets included in this that seemed at pretty high

13   dollar figures.  There's someone from Carpenter Lipps who's

14   here.  Can you confirm to me that all air, that all charges --

15   I don't care if you fly business class or first class just as

16   long as the estate isn't being asked to pay for anything more

17   than coach.

18          MR. BECK:  All charges we have charged the debtors in

19   this case have been for coach airfare.  We would apologize for

20   the fact that Delta is mugging us wildly for traveling in from

21   out of town these days, but we have no control over what Delta

22   is charging us.

23          THE COURT:  Thank you for your representation.  All

24   right.  So that's approved.

25          MR. MARINUZZI:  Your Honor, next on the list is

**RESIDENTIAL CAPITAL, LLC, ET AL.**

134

1  Centerview Partners.  They've requested total fees of 900,000

2  dollars, total expenses of 18,761.48.  They've agreed to a

3  reduction in expenses of $722.29 to resolve the U.S. Trustee's

4  objection.

5          THE COURT:  Let me just find my notes, okay?

6          Mr. Masumoto, your objection to the expenses was

7  substantial, and part of it was that you didn't get sufficient

8  supporting documents.  Are you satisfied you've received it

9  now?

10          MR. MASUMOTO:  We did receive the supporting

11  documentation, Your Honor, and we're satisfied.

12          THE COURT:  All right.  I just want to make clear to

13  everybody, the Court expects to receive supporting

14  documentation for all expenses.  I'm going to go ahead and

15  approve  the Centerview application for fees with the agreed

16  reduction.

17          MR. MARINUZZI:  Your Honor, so I'm clear when Your

18  Honor asks for supporting documentations, we detail by expense

19  the type, the amount, the date.  You're not looking for

20  invoices from vendors.

21          THE COURT:  No.

22          MR. MARINUZZI:  Okay.

23          THE COURT:  No.  But --

24          MR. MARINUZZI:  I just want to be clear.

25          THE COURT:  For some of these applications we just see

**RESIDENTIAL CAPITAL, LLC, ET AL.**

135

1  travel --

2           MR. MARINUZZI:  Right.  Understood.

3           THE COURT:  -- and a number.

4           MR. MARINUZZI:  Understood.

5           THE COURT:  Okay.

6           MR. MARINUZZI:  Next on the list, Your Honor, is

7  Curtis, Mallet-Prevost, Colt & Mosle.

8           THE COURT:  Yes.

9           MR. MARINUZZI:  They've requested total fees of

10 $496,548.50 and expenses of $3,093.40, and the U.S. Trustee's

11 objection has been resolved with a voluntary reduction in fees

12 of $9,859.25.

13          THE COURT:  Approved.

14          MR. MARINUZZI:  Thank you.  Next, Your Honor, is

15 Deloitte & Touche, and they've requested fees of $690,583.50.

16 No expenses requested.  No reductions.  The U.S. Trustee has

17 agreed.

18          THE COURT:  It's approved.

19          MR. MARINUZZI:  Thank you.  Dorsey & Whitney, total

20 fees of $412,188.83, expenses of $5,105.22.  U.S. Trustee's

21 objection was resolved with a reduction in fees of $1,173.50

22 and a reduction in expenses of $1,656.54.

23          THE COURT:  I'm going to go ahead and approve it , but

24 I want to make clear, whoever B. Smith (ph.) is, if they

25 continue to put seven hours per day with the same exact

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1  description, "Manage litigation and government investigations

2  and advise client on various regulatory compliance issues", day

3  after day, with hundreds of hours by that one timekeeper, next

4  time it happens, a different result.

5          MR. MARINUZZI:  Thank you, Your Honor.  Next firm is

6  Dykema Gossett.  They've requested total fees of $85,772.60;,

7  total expenses of $2,192.49.

8          THE COURT:  Just give me a second.

9          MR. MARINUZZI:  Sure.  That's docket number 2272, Your

10  Honor.

11          THE COURT:  Well, I've got notes on all of this, so --

12          MR. MARINUZZI:  Okay.

13          THE COURT:  Go ahead.

14          MR. MARINUZZI:  Your Honor, Dykema Gossett's agreed to

15  resolve the U.S. Trustee's objection by reducing its fee

16  request by 3,000 dollars and reducing its expenses by $102.09.

17          THE COURT:  Approved.

18          MR. MARINUZZI:  Thank you.  Next, Your Honor, is

19  Fortace LLC, requesting total fees of, original request

20  $337,939, expenses of $119,073.93.  They've agreed to a

21  reduction of $18,280 in fees to resolve the U.S. Trustee's

22  objection; no reduction in expenses.

23      (Pause)

24          THE COURT:  Mr. Masumoto, were you able to satisfy

25  yourself that the airline tickets were coach?

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1      MR. MASUMOTO:  Yes, Your Honor.  We did raise it, and

2  they provided us with documentation.

3      THE COURT:  Okay.  I'm going to approve  the

4  application.  This goes to everybody, but this was true of

5  Fortace.  The descriptions of the services need to be more

6  specific, rather than "attend meeting", "conference call with

7  MoFo".

8      MR. MARINUZZI:  We'll convey that, Your Honor.

9      THE COURT:  Okay.

10      MR. MASUMOTO:  And, yes, Your Honor, just to be clear,

11  in our discussions, as a result of our discussions they did

12  provide us with revised time entries.

13      THE COURT:  Thank you.  Go ahead, Mr. Marinuzzi.

14      MR. MARINUZZI:  Your Honor, next is FTI Consulting,

15  requesting total fees of 7.5 million dollars and total expenses

16  of $385,757.98.

17      THE COURT:  Let me find that before -- okay.  Go

18  ahead.

19      MR. MARINUZZI:  They've resolved the U.S. Trustee's

20  objection by reducing their total fees by 52,000 dollars, and

21  that is going to be a reduction against the carryover amount

22  and a reduction in expenses of 7,526 dollars.  And with respect

23  to the KEIP/KERP issues, they are not today seeking approval of

24  59,225 dollars in fees.

25      THE COURT:  Let me ask this.  I thought that with

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    respect to -- FTI had 315.4 hours on the KEIP/KERP motion for a

2    total of fees of 236,903 dollars.  Mr. Masumoto?

3         MR. MASUMOTO:  Your Honor, both in respect to Morrison

4    & Foerster and FTI, the amount of reduction we asked for the

5    KEIP and the KERP was based upon a rough approximation.  It was

6    not the total amount, because Your Honor indicated the KERP was

7    approved.  And based on the time entries, there was really no

8    way of determining how to allocate each and every time entry to

9    either the KEIP or the KERP, so the amount that we've requested

10   was, we thought, was an appropriate re -- I mean, it may not

11   have been the best, but it was an attempt to get a rough

12   approximation of the amount attributable to the KEIP.

13        So the amount we asked as a reduction was certainly

14   not the total amount spent on both the KEIP and the KERP, which

15   essentially were recorded, I guess, as sort of unitary time

16   entries by all the timekeepers.  I believe in both cases we

17   applied a twenty-five percent reduction from the total

18   KEIP/KERP category of expenses as a measure of the --

19        THE COURT:  That may have satisfied the U.S. Trustee,

20   but it didn't necessarily satisfy the Court.  All right.

21        MR. MASUMOTO:  I understand, Your Honor.

22        THE COURT:  What I'm going to do is I'm going to

23   approve the FTI Consulting fees with the agreed adjustment, but

24   I want to make clear, I'm reserving the issue of fees and

25   expenses in connection with the KEIP/KERP for the subsequent

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    hearing.  And -- so, I may well raise -- there may be a further

2    adjustment that's made when the KEIP/KERP is taken up by the

3    Court at the next interim fee hearing.

4            The fact that I'm approving the fees today, the fact

5    that they include amounts of time attributable to the

6    KEIP/KERP -- we need to have a fuller discussion about it.  So

7    just so it's clear to everybody, I may take back credit against

8    future fees for some additional amount.

9            MR. MARINUZZI:  We understand, Your Honor.  And part

10   of the reason why we're pushing it is we're trying to figure

11   out what the right amount is, because in connection with

12   Morrison & Foerster, it was the entirety of the project code

13   times twenty-five percent.  The project code involves the OSM

14   discussions, TARP -- not just KEIP/KERP.  So we actually want

15   to drill down with the U.S. Trustee to figure out what's really

16   at stake.

17           THE COURT:  And I appreciate that.  And that should

18   happen, because I just --

19           MR. MARINUZZI:  And it will.

20           THE COURT:  Okay.

21           MR. MARINUZZI:  It will.

22           THE COURT:  All right.  Let's go on.

23           MR. MARINUZZI:  FTI -- Your Honor, I don't remember if

24   Your Honor ruled on it.

25           THE COURT:  I did.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          MR. MARINUZZI:  Okay.

2          THE COURT:  I approved it as presented, but I'm

3     reserving the right to --

4          MR. MARINUZZI:  Understood, but just --

5          THE COURT:  -- take some of it back.

6          MR. MARINUZZI:  Just so we're clear on the total

7     amount of the fees, 59,225 dollars, which is the value that the

8     U.S. Trustee attributed roughly to KEIP/KERP, it's not -- we're

9     not asking for approval, or FTI is not asking for approval of

10    that today.

11         THE COURT:  Right.

12         MR. MARINUZZI:  Okay.  KPMG, total fees requested of

13    656,390 dollars; total expenses of $46,449.02.  The U.S.

14    Trustee has agreed to waive its objection to KPMG's interim

15    request.

16         THE COURT:  Let me just -- I have to find it in my

17    notes.  I didn't have these in alphabetical order.  Approved.

18         MR. MARINUZZI:  Next, Your Honor, is Kurtzman Carson

19    Consultants LLC seeking total fees of 94,074 dollars; zero

20    expenses.  And the U.S. Trustee has agreed to withdraw its

21    objection.

22         THE COURT:  Approved.

23         MR. MARINUZZI:  Locke Lord, seeking fees of

24    $261,177.78 and expenses of $2,628.99.  They have resolved the

25    U.S. Trustee's rejection by reducing their fee request by 2,054

**RESIDENTIAL CAPITAL, LLC, ET AL.**

141

1    dollars.

2            THE COURT:  Give me a second.

3        (Pause)

4            THE COURT:  Approved.

5            MR. MARINUZZI:  Thank you, Your Honor.  The next

6    application is from Mercer (U.S.) Inc., seeking total fees of

7    $43,618.92, expenses of $6,118.74.  They've resolved the U.S.

8    Trustee's objection by reducing their fees by $295.80.

9            THE COURT:  Not approved.  Mercer's going to have to

10   be carried to the next hearing.

11           MR. MARINUZZI:  Understood, Your Honor.

12           THE COURT:  This is on the KEIP and the KERP.

13           MR. MARINUZZI:  Okay.  Next, Your Honor, is Morrison &

14   Cohen seeking total fees of $325,625.50, and total expenses of

15   $4,248.73.  And they've agreed to resolve the U.S. Trustee's

16   objection by reducing their fees in the amount of 6,586 dollars

17   and their expenses by $1,149.50.

18           THE COURT:  Approved.

19           MR. MARINUZZI:  Thank you, Your Honor.  Next is

20   Morrison & Foerster, seeking total fees of $14,667,747.50 and

21   total expenses of $598,549.72.  And we've agreed to carry, till

22   the next interim hearing, fees in the amount of 308,539

23   dollars, which is the amount that the U.S. Trustee had

24   quantified in its objection, understanding Your Honor's full

25   reservation that it might actually be a bigger number.  And

**RESIDENTIAL CAPITAL, LLC, ET AL.**

142

1    we've agreed to reduce the total fee request by 85,685 dollars

2    and the total expense request by 11,180 dollars in resolution

3    of the U.S. Trustee's objection.

4         (Pause)

5         THE COURT:  I'm going to approve the Morrison &

6    Foerster fees with the agreed reduction, with the same caveat

7    as FTI.  It was -- it's hard to breakdown KEIP/KERP, first

8    time, second time.  Our review showed the category of

9    "employment matters", which could be much broader than just the

10   KEIP and KERP, I recognize that, was 1,234,156 dollars.  So I'm

11   reserving -- I'm approving the fees subject to the compromise

12   with the U.S. Trustee, but reserving this issue with respect to

13   the KEIP.  We'll take up another time.

14        MR. MARINUZZI:  Understood, Your Honor.  Thank you,

15   Your Honor.  Next is Orrick, Herrington & Sutcliffe requesting

16   total fees of $733,357.07 and total expenses of $678.12.

17   They've resolved the U.S. Trustee's objection by reducing their

18   fees in the amount of $59,530.50; no reduction in expenses.

19        MS. FELDER:  Actually -- this is Debra Felder on

20   behalf of Orrick.  Our agreed reduction with the U.S. Trustee

21   is actually 54,169.

22        THE COURT:  Is that correct, Mr. Masumoto?

23        MR. MASUMOTO:  Yes, I believe that's correct, Your

24   Honor.

25        THE COURT:  All right.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

143

1          MR. MARINUZZI:  54,169.

2          THE COURT:  Okay.  We'll make sure the order is

3    correct.

4          MR. MARINUZZI:  Correct.

5          THE COURT:  It's approved.

6          MR. MARINUZZI:  Thank you, Your Honor.

7          MS. FELDER:  Thank you, Your Honor.

8          MR. MARINUZZI:  Next is Prince Lobel Tye, requesting

9    total fees of $152,107.20 and expenses of $12,661.62.  They've

10   resolved the U.S. Trustee's objection by reducing their fees by

11   5,007 dollars and expenses by 761 dollars.

12         THE COURT:  Approved.

13         MR. MARINUZZI:  Reed Smith, they've requested total

14   fees $67,224.50; expenses of $581.22.  They've resolved the

15   U.S. Trustee's objection by reducing their fees by $2,095.05.

16   No reduction in expenses.

17         THE COURT:  Approved.

18         MR. MARINUZZI:  Thank you, Your Honor.  Next is

19   Rubenstein Associates; total fee request of $25,709.75, total

20   expenses of $5,055.83.  They've agreed to resolve the U.S.

21   Trustee's objection by reducing their fees by the amount of 562

22   dollars and expenses by $1,423.15.

23         THE COURT:  I'm going to approve that.  With respect

24   to Rubenstein, I want to make clear comments I made earlier.

25   Travel -- there are some entries that appear to be travel time

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**144**

1    to court.  And travel within New York City -- travel time in

2    New York City is not compensable.  All right.  So --

3              MR. MARINUZZI:  We will make sure they understand

4    that, Your Honor.

5              THE COURT:  Okay.

6              MR. MARINUZZI:  Next is Severson & Werson seeking

7    total fees of $1,242,804.45 and expenses of $124,486.44.  After

8    discussions with the U.S. Trustee, the U.S. Trustee has agreed

9    to withdraw their objection to the Severson application.

10             THE COURT:  Mr. Masumoto, there -- with respect to the

11   Severson & Werson application, there was a $22,487.50 charge

12   for services rendered by a CPA without further explanation.

13   Were you able to get an explanation of that?

14             MR. MASUMOTO:  No, Your Honor.  It's an issue we did

15   not raise.  We may have overlooked it.

16             THE COURT:  Is someone from Severson present in court

17   or on the phone?

18             MR. GECK:  Yes, Your Honor.  This is Duane Geck for

19   Severson & Werson.

20             THE COURT:  Okay, this is at Exhibit E-1, page 89.

21   Can you explain what the CPA services for $22,487.50 were?

22             MR. GECK:  Your Honor, off the top, I cannot, because

23   of the vast volume of cases here.  I do not know which of the

24   240 or so cases that is associated with.

25             THE COURT:  All right.  With respect to Severson &

**RESIDENTIAL CAPITAL, LLC, ET AL.**

145

1  Werson, I'm going to approve the total fees requested, defer

2  the issue of expenses.  I'm not approving any expenses.  I need

3  more detail.  I'll give you the list:  May 24th, 2012, the

4  $22,487.50 charge for services rendered by CPA without an

5  explanation; June 29th, 2012, duplicate charges for outside

6  copies, $474.19.  They're at pages 268 and 274.  Duplicate

7  charges on June 29th for eScribers LLC and for court services,

8  $157.20.

9       Charges for transportation to hearings or depositions

10  merely provide the cost and description where the attorney

11  went; it does not break down the form of transportation.  For

12  instance, on May 24th, 2012, there's a charge of $97.73 for

13  "transportation:  attend hearing on client's motion for summary

14  judgment", without any detail as to what the charges cover;

15  it's at page 217.  On June 13th, 2012, two charges each for

16  $51.44 for transportation to a deposition.  June 11th, 2012,

17  duplicate charge of $209.97 for transportation to attend

18  mediation.  And this charge seems to include $70.22 for lunch

19  for one person.

20       There's a duplicate Westlaw charge of 875 dollars on

21  June 29th, 2012.  See Exhibit E-2, at pages 225 and 230.

22  There's a 1,500 dollar charge on May 24th, 2012, for

23  cancellation of an arbitration session.  So, I want more -- I'm

24  not approving any of the expenses.  I need more detail provided

25  and an explanation.  You can bring it on at the next -- the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    expenses can be brought on at the next fee hearing.

2            MR. MARINUZZI:  Okay, Your Honor.

3            MR. GECK:  This is Duane Geck; we understand, Your

4    Honor.

5            THE COURT:  Okay.

6            MR. MARINUZZI:  Your Honor, next is Towers Watson

7    Delaware, Inc. seeking fees of $34,355.03, no expenses.  This

8    was unopposed by the U.S. Trustee.

9            THE COURT:  Approved.

10           MR. MARINUZZI:  Next is Troutman Sanders, Your Honor,

11   seeking total fees of $218,509.74 and expenses of $3,714.82.

12   And they've resolved the U.S. Trustee's objection by reducing

13   their fees by $762.78 and expenses by 653 dollars.

14           THE COURT:  There was an expense item $1,562.50 for

15   associate counsel fees and expenses.  Can -- is someone from

16   Troutman Sanders here?  I mean, the issue -- I don't know

17   whether these were ordinary-course professionals or whether --

18           MR. MARINUZZI:  Your Honor, I don't know.  I --

19           THE COURT:  -- whether it required a 327 retention.

20   Mr. Masumoto, can you shed any light on this?

21           MR. MASUMOTO:  Your Honor, it's not an issue that we

22   raised with them.

23           THE COURT:  It's for Finkel Law Firm, LLC.

24           MR. MANNING:  Judge, this is Jason Manning from

25   Troutman Sanders.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1          THE COURT:  Yes.

2          MR. MANNING:  That was a local counsel that needed to

3   be retained in a different state.

4          THE COURT:  Mr. Masumoto, do you consider that under

5   ordinary-course professionals or what?

6          MR. MASUMOTO:  It seems that the practice varies, Your

7   Honor.  Had we noticed it we would have required at least the

8   time records as we did in other cases.  I don't --

9          THE COURT:  All right.  I'm going to approve --

10  Troutman Sanders continue to do work, right?

11         MR. MARINUZZI:  Correct; that's correct, Your Honor.

12         THE COURT:  I would direct that they provide Mr.

13  Masumoto with details of that expense.  I'm approving it.  If

14  there's an issue, Mr. Masumoto, you'll raise it again in the

15  future, okay?

16         MR. MASUMOTO:  Very well, Your Honor.

17         THE COURT:  All right.

18         MR. MARINUZZI:  Your Honor, I'm advised by Mr. Bender

19  of Bradley Arant that there's an additional reduction he wants

20  to advise the Court of.

21         THE COURT:  Okay.

22         MR. BENDER:  Yes, first for the record, I believe that

23  the amount of reduction we agreed to with the U.S. Trustee was

24  $77,032.30, and -- which is 7,000 more than --

25         THE COURT:  More, yeah.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

148

1          MR. BENDER:  -- what was in the chart.  And I'm sorry;

2     I didn't see the chart before coming up here.

3          THE COURT:  Okay.  I appreciate your raising it.

4          MR. BENDER:  We also want to note that in the response

5     that we filed to the objection we noted that through the

6     reconciliation process with the debtor, that there were some

7     additional reductions that we made.  And so, the final numbers

8     after taking into account the adjustments and the objection

9     would be that our allowed fee amount would be $4,060,788.24.

10    That's just for fees.  And expenses would be $148,999.34.

11         THE COURT:  All right.  I just -- reconcile it with

12    Mr. Masumoto at the end and the order ought to properly reflect

13    that --

14         MR. BENDER:  All right, thank you.

15         THE COURT:  -- and I appreciate your calling it to the

16    Court's attention.

17         MR. MARINUZZI:  Your Honor, before I turn it over to

18    Mr. Mannal or Ms. Ringer on the committee's professional

19    applications, I just wanted to raise with the Court the issue

20    of the holdback --

21         THE COURT:  Yeah.

22         MR. MARINUZZI:  -- which is something obviously at the

23    end of the year, professionals would like to be released.  I'm

24    advised that as of November 30th, the company was sitting on

25    almost 1.5 billion dollars in cash, over 300 million of which

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    was unencumbered cash with sales that we hope are going to

2    close next month.  And typically, and it varies --

3            THE COURT:  What is -- what's the holdback right now?

4    It's --

5            MR. MARINUZZI:  It's twenty percent.

6            THE COURT:  Twenty percent.

7            MR. MARINUZZI:  It's twenty percent,

8            THE COURT:  Mr. Masumoto?

9            MR. MASUMOTO:  Your Honor, we normally defer to the

10   Court as to what portion of that to release.  As Mr. Marinuzzi

11   indicated, there doesn't appear to be an issue of

12   administrative insolvency.

13           THE COURT:  Right.

14           MR. MASUMOTO:  So, we'll defer to the Court on the

15   amount.

16           THE COURT:  I saw some of the applications asked that

17   it be -- there be no holdback, but we'll do it in stages -- ten

18   percent.

19           MR. MARINUZZI:  Thank you, Your Honor.  Okay, with

20   that, I will --

21           THE COURT:  And I think, you know -- let me put a

22   little more flesh on that.  You're obviously at a critical

23   stage in the case.  We talked about that earlier this morning.

24   The plan process really needs to move forward.  One of the real

25   touchstones for me in terms of reducing the holdback, not only

**RESIDENTIAL CAPITAL, LLC, ET AL.**

1    what the cash position of the company is and its ability to

2    pay, is the progress in the case as a whole.  So, I'll reduce

3    it to ten percent now, okay?

4            MR. MARINUZZI:  Thank you, Your Honor.  All right.

5    I'll turn it over to Mr. Mannal --

6            THE COURT:  Thank you.

7            MR. MARINUZZI:  -- for the comm -- oh, Ms. Ringer, for

8    the committee's professionals.

9            THE COURT:  All right.

10           MS. RINGER:  Good afternoon, Your Honor.  Rachael

11   Ringer from Kramer Levin, counsel to the committee.  I'll

12   follow Mr. Marinuzzi's lead and just run through each of the

13   committee professionals and they -- each of them have reached a

14   resolution with the United States Trustee.

15           THE COURT:  Okay.

16           MS. RINGER:  First is AlixPartners.  They initial --

17           THE COURT:  Let me find my notes.

18           MS. RINGER:  Oh, sure.

19           THE COURT:  Just give me a second.  I have it.  Go

20   ahead.

21           MS. RINGER:  First is AlixPartners.  They initially

22   requested $2,205,724.75 in fees and $34,011.46 in expenses.

23   They have agreed to a further reduction in fees of 60,360

24   dollars and $317.99 in expenses.

25           THE COURT:  Approved.

**RESIDENTIAL CAPITAL, LLC, ET AL.**

151

1          MS. RINGER:  Next is Kramer, Levin, Naftalis &
2  Frankel.  The initial fee request was $10,675,061.50 in fees
3  and 305,000 dollars -- $305,828.34 in expenses.
4          THE COURT:  I think it was 8 -- the chart says
5  305,820.34.
6          MS. RINGER:  Oh, yes, Your Honor.  I apologize if I
7  misspoke.
8          THE COURT:  No, it's okay.
9          MS. RINGER:  In an effort to reach a resolution with
10 the United States Trustee, Kramer Levin agreed to a further
11 reduction of its fees in the amount of $163,825.25 and a
12 further reduction in expenses of $2,654.86.
13         THE COURT:  You can go back to the office and tell Mr.
14 Eckstein that you carried the ball.  They're approved.
15         MS. RINGER:  Thank you, Your Honor.  And finally,
16 Moelis & Company.  They're initial request was $1,391,129.03 in
17 fees and 20,000 dollars -- or, $20,194.72 in expenses.  They
18 have agreed to a further reduction in expenses of $1,875.73.
19         THE COURT:  Approved.
20         MS. RINGER:  Thank you.  And we would also request
21 that the same release of the holdback of ten percent apply to
22 the committee's professionals.
23         THE COURT:  Yes, it's across the board.
24         MS. RINGER:  Thank you, Your Honor.
25         MR. LEMAY:  I think it's my turn.  Your Honor, David

**RESIDENTIAL CAPITAL, LLC, ET AL.**

152

1  LeMay from Chadbourne & Parke.  I'm counsel for Arthur

2  Gonzalez, the examiner that you've appointed in this case.  We

3  have three fee applications for the examiner and the examiner's

4  professionals.  Examiner Gonzalez applied for $86,137.50 in

5  fees and no expenses.  He is obviously a very accurate

6  timekeeper.  The United States Trustee did not object to Mr.

7  Gonzalez's fees.  And therefore, I believe those are in not in

8  any way an issue.

9        THE COURT:  Mr. Masumoto?

10        MR. MASUMOTO:  Yes, Your Honor, my colleague examined

11  the examiner's fees very closely and found no fault with them.

12        THE COURT:  Approved.

13        MR. LEMAY:  Thank you, Your Honor.  Chadbourne &

14  Parke, my firm, is Examiner Gonzalez's counsel.  We submitted

15  an application for $3,295,849.50 of fees and $127,003.11 in

16  expenses.  And we had engaged in the same process that was, you

17  know, previously discussed with Mr. Masumoto's office and his

18  colleagues.  And as a result of that process, we agreed to

19  reduce our fees by a total of $19,414.59 and to reduce our

20  expenses by a total of $13,577.70 for a combined total fee and

21  expense reduction of $32,992.29.

22        THE COURT:  Mr. Masumoto?

23        MR. MASUMOTO:  Yes, that's correct, Your Honor.

24        THE COURT:  All right.  Approved.

25        MR. LEMAY:  Thank you, Your Honor.  Mesirow is the

**RESIDENTIAL CAPITAL, LLC, ET AL.**

153

1    examiner's financial advisors.  They resolved their issues with

2    the United States Trustee yesterday, too late to be included in

3    the amended agenda, but I do believe that it is reflected in

4    the chart that was given to Your Honor, apparently, by the

5    debtors' counsel.  I'll run through those numbers for you.

6            Mesirow's fee application was for 3,007,275 dollars

7    and they sought for expenses, 30,048 dollars.  Pursuant to the

8    discussions with the United States Trustee's office, Mesirow

9    agreed to reduce their fees by 27,358 dollars and their

10   expenses by 1,491 dollars.  And I haven't done the math to

11   combine those two, but perhaps it's on the -- I don't know --

12   is it on the chart what those two add up to?  I just --

13           UNIDENTIFIED SPEAKER:  28,849.

14           MR. LEMAY:  28,849 total reduction.

15           THE COURT:  Right.  It's approved as well.

16           MR. LEMAY:  Thank you, Your Honor.  And I assume the

17   examiner's professionals are subject to the same holdback

18   release scheme as the other professionals.

19           THE COURT:  Yes.

20           MR. LEMAY:  Thank you, Your Honor.

21           MR. MARINUZZI:  Your Honor, thank you.  That concludes

22   the agenda for today.  We want to thank the Court and the court

23   staff for all of its hard work on today's hearing.  We can see

24   the binders from here.  Thank you very much.

25           THE COURT:  You --

**RESIDENTIAL CAPITAL, LLC, ET AL.**

**154**

1          MR. MARINUZZI:  Happy and healthy New Year.

2          THE COURT:  I'm sure you like to end the year with fee

3    applications approved, so --

4          MR. MARINUZZI:  It's better than not approved, Your

5    Honor, for sure.  Thank you.

6          THE COURT:  Okay, we're adjourned.

7          MR. MARINUZZI:  Thank you.

8          THE COURT:  Everybody have a very happy holiday.

9          MR. MARINUZZI:  Same to you.

10          MR. MASUMOTO:  Thank you, Your Honor.

11       (Whereupon these proceedings were concluded at 2:51 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

155

1

2                              I N D E X

3

4                              RULINGS

5                                                    Page        Line

6   Debtors' motion for a supplemental order          35          19

7   authorizing it to reimburse Ally Financial,

8   Inc. for payments made to the debtors'

9   employees, granted.

10  Debtors' motion to extend exclusivity to          44          15

11  propose a plan by February 28th and solicit

12  votes by April 29th, granted

13  Debtors' motion to appoint a plan mediator        70          20

14  granted

15  If form of order isn't resolved through           71          7

16  negotiations, parties to submit proposals

17  to mediator Judge Peck by January 7th

18  Examiner's application to retain Wolf             78          18

19  Haldenstein Adler Freeman & Herz LLP as

20  conflicts counsel to the examiner nunc pro

21  tunc to October 15, 2012 is approved

22  Debtors' motion to approve procedures             82          21

23  regarding the future rejection of executory

24  contracts and unexpired leases granted

25

156

| 1 | RULINGS | | |
|---|---|---|---|
| 2 | | Page | Line |
| 3 | Automatic stay to be modified so Mr. | 88 | 25 |
| 4 | Balensiefer can assert right to recover | | |
| 5 | attorney's fees if he prevails in the | | |
| 6 | Arizona action.  Attorney's fees can be | | |
| 7 | liquidated but not be collected. | | |
| 8 | Order lifting automatic stay to permit | 95 | 3 |
| 9 | Judge Wizmur to consider Stephanie and | | |
| 10 | Michael Donaghy's applications for sanctions | | |
| 11 | against GMAC. | | |
| 12 | Mohammad Raja's motion seeking relief | 99 | 11 |
| 13 | from automatic stay denied | | |
| 14 | Motion authorizing committee to prosecute | 105 | 24 |
| 15 | and settle certain claims on behalf | | |
| 16 | of debtors' estates granted | | |
| 17 | Debtors' motion to dismiss adversary | 112 | 9 |
| 18 | proceedings 12-01913 and 12-01896 adjourned | | |
| 19 | to January 29th | | |
| 20 | Order extending the time for thirty days | 114 | 25 |
| 21 | for all defendants to answer complaints | | |
| 22 | in all pending adversary proceedings | | |
| 23 | Bradley Arant fee application | 129 | 20 |
| 24 | approved | | |
| 25 | | | |

| | | Page | Line |
|---|---|---|---|
| 1 | RULINGS | | |
| 2 | | Page | Line |
| 3 | Carpenter Lipps & Leland LLP fees and | 133 | 9 |
| 4 | expenses approved | | |
| 5 | Centerview Partners LLC fee application | 134 | 15 |
| 6 | approved | | |
| 7 | Curtis, Mallet-Prevost, Colt & Mosle fees | 135 | 13 |
| 8 | and expenses approved | | |
| 9 | Deloitte & Touche LLP fee application approved | 135 | 18 |
| 10 | Dorsey & Whitney LLP fees and expenses | 135 | 23 |
| 11 | approved | | |
| 12 | Dykema Gossett PLLC fees and expenses | 136 | 17 |
| 13 | approved | | |
| 14 | Fortace LLC fees and expenses approved | 137 | 3 |
| 15 | FTI Consulting fees and expenses approved | 138 | 23 |
| 16 | with Court reserving rights for adjustments | | |
| 17 | in future hearings | | |
| 18 | KPMG's fees and expenses approved | 140 | 17 |
| 19 | Kurtzman Carson's fees approved | 140 | 22 |
| 20 | Locke Lord's fees and expenses approved | 141 | 4 |
| 21 | Mercer (U.S.) Inc.'s fees not approved; | 141 | 9 |
| 22 | carried to the next hearing | | |
| 23 | Morrison & Cohen's fees and expenses approved | 141 | 18 |
| 24 | | | |
| 25 | | | |

1                              RULINGS

2                                              Page        Line

3  Morrison & Foerster's fees and expenses      142         5

4  approved with Court reserving rights for

5  adjustments in future hearings

6  Orrick, Herrington & Sutcliffe's fees        143         5

7  and expenses approved

8  Prince Lobel Tye's fees and expenses approved  143        12

9  Reed Smith's fees and expenses approved      143        17

10 Rubenstein Associate's fees and expenses     143        23

11 approved with comments about future travel

12 expenses

13 Severson & Werson's fees approved, but not   144        25

14 expenses until further explanations given to

15 Court

16 Towers Watson Delaware, Inc.'s fees approved  146        9

17 Troutman Sanders's fees approved with        147        9

18 Court's direction to send details of expenses

19 to UST

20 AlixPartners's fees and expenses approved    150        25

21 Kramer, Levin, Naftalis & Frankel's fees     151        14

22 and expenses approved

23 Moelis & Company's fees and expenses approved  151       19

24 Examiner Gonzalez's fees approved            152        12

25

159

1                              RULINGS

2                                                  Page        Line

3    Chadbourne & Parke's fees and expenses        152         24

4    approved

5    Mesirow's fees and expenses approved          153         15

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

160

C E R T I F I C A T I O N

I, Penina Wolicki, certify that the foregoing transcript is a
true and accurate record of the proceedings.

_____

PENINA WOLICKI

AAERT Certified Electronic Transcriber CET**D-569

eScribers

700 West 192nd Street, Suite #607

New York, NY 10040

Date:  December 23, 2012

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 161 of 188
12-12020-mg

December 20, 2012

# #

**#607 (1)**
14:22

# $

**$0.00 (2)**
6:22;7:8
**$0:00 (1)**
5:15
**$00 (1)**
5:24
**$1,149.50 (1)**
141:17
**$1,173.50 (1)**
135:21
**$1,242,804.45 (1)**
144:7
**$1,391,129.03 (2)**
13:24;151:16
**$1,423.15 (1)**
143:22
**$1,562.50 (1)**
146:14
**$1,656.54 (1)**
135:22
**$1,875.73 (1)**
151:18
**$10,675,061.50 (2)**
13:16;151:2
**$102.09 (1)**
136:16
**$119,073.93 (2)**
7:23;136:20
**$12,661.62 (1)**
143:9
**$124,486.44 (1)**
144:7
**$127,003.11 (2)**
11:13;152:15
**$13,577.70 (1)**
152:20
**$14,667,747.50 (2)**
12:14;141:20
**$148,999.34 (1)**
148:10
**$152,107.20 (1)**
143:9
**$157,682.41 (2)**
8:24;129:14
**$157.20 (1)**
145:8
**$163,825.25 (1)**
151:11
**$18,280 (1)**
136:21
**$18,761.48 (1)**
9:10
**$19,414.59 (1)**
152:19
**$2,095.05 (1)**

**143:15**
**$2,192.49 (2)**
10:22;136:7
**$2,205,724.75 (2)**
13:7;150:22
**$2,628.99 (1)**
140:24
**$2,654.86 (1)**
151:12
**$20,194.72 (2)**
13:25;151:17
**$209.97 (1)**
145:17
**$218,509.74 (1)**
146:11
**$22,487.50 (3)**
144:11,21;145:4
**$221,260.29 (1)**
132:7
**$221,262.29 (1)**
132:6
**$25,709.75 (1)**
143:19
**$261,177.78 (1)**
140:24
**$295.80 (1)**
141:8
**$3,007,275.00 (1)**
14:7
**$3,093.40 (2)**
10:9;135:10
**$3,295,849.50 (2)**
11:13;152:15
**$3,714.82 (1)**
146:11
**$30,048.00 (1)**
14:7
**$305,820.34 (1)**
13:16
**$305,828.34 (1)**
151:3
**$317.99 (1)**
150:24
**$32,992.29 (1)**
152:21
**$325,625.50 (2)**
12:7;141:14
**$334,924.08 (2)**
9:17;131:23
**$337,939 (1)**
136:20
**$337,939.00 (1)**
7:23
**$34,011.46 (2)**
13:7;150:22
**$34,355.03 (2)**
5:15;146:7
**$385,757.98 (2)**
11:21;137:16
**$4,060,788.24 (1)**
148:9
**$4,207,515.65 (2)**
8:23;129:12

**$4,248.73 (2)**
12:7;141:15
**$412,188.83 (2)**
8:15;135:20
**$43,618.92 (2)**
9:23;141:7
**$46,449.02 (2)**
7:17;140:13
**$474.19 (1)**
145:6
**$496,548.50 (2)**
10:9;135:10
**$5,055.83 (1)**
143:20
**$5,105.22 (2)**
8:15;135:20
**$51.44 (1)**
145:16
**$581.22 (1)**
143:14
**$59,530.50 (1)**
142:18
**$598,549.72 (2)**
12:14;141:21
**$6,118.74 (2)**
9:24;141:7
**$656,390.00 (1)**
7:17
**$67,224.50 (1)**
143:14
**$678.12 (2)**
8:8;142:16
**$690,583.50 (2)**
7:8;135:15
**$7,500,000.00 (1)**
11:20
**$70.22 (1)**
145:18
**$722.29 (1)**
134:3
**$733,357.07 (2)**
8:8;142:16
**$762.78 (1)**
146:13
**$77,032.30 (1)**
147:24
**$85,772.60 (2)**
10:22;136:6
**$86,137.50 (2)**
5:24;152:4
**$9,859.25 (1)**
135:12
**$900,000.00 (1)**
9:10
**$94,074.00 (1)**
6:22
**$955,735.00 (1)**
9:17
**$97.73 (1)**
145:12

# A

**AARON (1)**
20:6
**ability (5)**
41:22;62:18;91:19;
118:21;150:1
**able (20)**
51:8,19;62:21;
71:12;77:4;81:7;
85:3,12,15;87:4;
89:14;100:21;
105:25;114:2;
115:25;116:2;
117:23;130:22;
136:24;144:13
**ABRAMS (7)**
24:2,7;110:6,6,7,
12,15
**absence (1)**
70:23
**absolutely (3)**
34:20;48:15;65:22
**abstain (3)**
108:20;109:14,14
**Abstention (5)**
4:24;5:8;107:2,2;
108:7
**Acampora (1)**
112:7
**accept (1)**
65:7
**acceptable (1)**
108:6
**Acceptances (1)**
3:18
**accepted (1)**
133:8
**accommodate (1)**
126:20
**accommodations (1)**
126:4
**accomplish (1)**
52:25
**accordingly (3)**
118:25;127:14;
133:7
**Account (9)**
3:7,9,11,12,14;
28:21;29:5;30:14;
74:14;95:10,11;
148:8
**accounts (2)**
40:7;94:24
**accurate (1)**
152:5
**achieve (1)**
45:5
**achieved (1)**
42:21
**acknowledge (1)**
87:12
**acknowledged (2)**
37:15;52:3
**across (3)**

**42:15,19;151:23**
**act (3)**
28:24;50:3;98:18
**action (12)**
37:11;40:7,19;
42:5;89:7;98:8,11,
13;107:11;108:15,17,
21
**actions (3)**
96:21;98:22;
108:12
**active (1)**
74:18
**actively (2)**
49:8;51:5
**activities (1)**
79:17
**Actual (6)**
7:14;10:6;13:12,
20;58:10;123:20
**actually (20)**
37:2;65:2;68:7;
81:9;82:11,18;84:25;
90:19,22;91:1;92:11;
106:18;107:8;
110:12;126:24;
132:11;139:14;
141:25;142:19,21
**actuarial (1)**
65:21
**acutely (1)**
64:22
**Ad (1)**
18:20
**ADAMS (5)**
20:24;102:25,25;
103:6,8
**add (5)**
30:21;69:3;70:16;
87:7;153:12
**added (1)**
30:5
**addition (1)**
63:22
**Additional (9)**
3:13;48:19;75:2,3;
77:23;103:21;139:8;
147:19;148:7
**address (13)**
29:1;34:18;36:8;
37:22;40:22;46:6;
64:7;65:9;93:9;
95:22;102:3;104:13;
108:7
**addressed (3)**
40:8;93:15;111:19
**addresses (2)**
30:22;119:14
**Adelphia (1)**
37:13;44:19;66:20
**adequacy (1)**
73:14
**adjourn (6)**

38:12;48:23;50:5;
58:24;108:2;112:10
**adjourned (1)**
154:6
**adjourning (1)**
112:22
**adjournment (1)**
39:11
**adjust (1)**
130:13
**adjusted (3)**
72:1;95:20;133:10
**adjustment (5)**
125:12;128:24;
131:17;138:23;139:2
**adjustments (2)**
126:3;148:8
**Adler (1)**
6:7
**admin (1)**
28:21
**administration (1)**
130:7
**Administrative (6)**
3:8,12;6:18;28:18;
29:11;149:12
**advance (1)**
88:2
**advanced (1)**
49:25
**adversaries (2)**
113:11;114:15
**Adversary (13)**
4:20,22;5:4,6;
83:12;99:14;106:9,
10,19;107:15,16;
108:17;114:9
**adverse (1)**
63:23
**advisability (1)**
100:13
**advise (2)**
136:2;147:20
**advised (2)**
147:18;148:24
**Advisor (4)**
11:16;13:3;14:4;
73:11
**Advisors (3)**
7:12;65:4;153:1
**affected (3)**
32:21;33:20,22
**affecting (2)**
33:15;101:21
**affirmative (1)**
88:16
**affords (1)**
98:25
**AFI (31)**
28:16,23;29:10,17,
24;30:1,9,15;32:3,7;
33:22;37:7;46:10,13,
13,19,19;47:11;

51:13,20,25;52:2,3,
14;53:9,14;57:18;
73:1,24;103:23,25
**AFI's (1)**
32:17
**afternoon (4)**
100:4;113:17;
117:11;150:10
**again (11)**
30:9,13;40:10;
47:20;56:12;94:15;
109:25;112:21;
118:13,14;147:14
**against (18)**
51:13;52:2;58:4;
73:24;74:4;86:10,12;
88:16;90:5,17,23;
91:4;92:13,16;98:15,
24;137:21;139:7
**agenda (14)**
28:9;35:25;45:21;
51:2;79:8;84:3;
89:18;97:13;99:13,
25;100:2;106:8;
153:3,22
**Agent (1)**
6:18
**ago (2)**
117:17;127:12
**agree (13)**
42:24;55:11;61:2;
70:8;88:2;89:14;
94:9;96:8;105:6;
114:23;125:23,24;
130:20
**agreed (41)**
29:9;30:8;33:23;
58:20,24;66:13;
70:22;74:9;81:17;
102:15;103:23;
118:10,16;127:6;
128:24,25;129:3,12,
14;131:17;134:2,15;
135:17;136:14,20;
138:23;140:14,20;
141:15,21;142:1,6,
20;143:20;144:8;
147:23;150:23;
151:10,18;152:18;
153:9
**agreeing (1)**
124:12
**agreement (22)**
29:23;35:18;38:12;
43:3;45:2;50:5;52:9,
15;53:3;69:25;73:19;
76:11;82:1,12;84:13,
17;85:23;86:5,20;
100:17;103:12;
112:14
**agreements (10)**
51:8;54:6;58:20;
73:17,17;81:10,10,

20,20;82:10
**agrees (3)**
37:9;51:4;61:1
**AGRUSA (1)**
27:15
**ahead (25)**
28:12;46:7;48:18;
51:18;65:16;69:3;
75:8;84:1,8;92:10;
96:20;105:1;108:8;
111:6;114:10;
117:10;126:15;
127:2;132:3;134:14;
135:23;136:13;
137:13,18;150:20
**AIG (2)**
18:10;58:2
**aimed (1)**
124:20
**air (2)**
122:19;133:14
**airfare (4)**
122:15,20;133:11,
19
**airline (1)**
136:25
**airplane (1)**
133:12
**al (5)**
4:21;16:3;26:3,23;
107:14
**alive (2)**
64:22;113:6
**AlixPartners (6)**
13:2,6;27:16,18;
150:16,21
**allege (2)**
95:15,19
**alleged (4)**
74:2,11;91:13;
98:17
**alleging (1)**
90:13
**Allen (2)**
130:16,22
**allocate (3)**
40:9;125:23;138:8
**allocation (1)**
73:19
**allow (8)**
46:19;51:21;85:14,
16,21;111:1,2,12
**Allowance (7)**
5:20;7:13;10:4;
11:9;12:3;13:11;
40:24
**allowed (3)**
86:3;125:3;148:9
**Allstate (2)**
18:10;58:2
**alluded (2)**
72:20;73:7
**Ally (25)**

20,20;82:10
**agrees (3)**
3:6,8,9,12;19:2,2;
35:9;40:13;41:2,24;
56:18;58:16,21;60:7;
73:1,5,7,18,18,24;
74:4,10,19,25;82:1
**almost (4)**
40:1;64:23;117:17;
148:25
**along (1)**
95:17
**alphabetical (2)**
129:8;140:17
**ALSTON (1)**
22:13
**alter (1)**
81:24
**Alternative (4)**
4:24;5:7;45:3;
107:1
**ALVES (1)**
22:7
**always (2)**
67:19;126:17
**Ambac (1)**
127:4
**amended (5)**
95:9,13,23;96:1;
153:3
**Americas (4)**
17:13;18:21;21:20;
23:21
**among (6)**
67:18;101:10;
104:18;107:19;
118:22;121:12
**AMOS (8)**
27:2,3,4,8;109:17,
17,18,20
**amount (46)**
31:18;37:1;42:20;
43:19;45:6;49:2;
73:25;87:2,10,20,21;
88:11,12;89:8;95:18;
119:20;120:8;
123:14;124:12,14;
125:24;129:13,15;
130:2,3;132:21;
134:19;137:21;
138:4,6,9,12,13,14;
139:8,11;140:7;
141:16,22,23;142:18;
143:21;147:23;
148:9;149:15;151:11
**Amounts (2)**
3:13;30:2,6;33:23;
125:23;139:5
**analyses (1)**
66:3
**Angeles (2)**
19:23;25:5
**announce (1)**
100:16
**anticipate (2)**

45:14;75:3
**apologize (2)**
133:19;151:6
**apparently (2)**
113:25;153:4
**appear (8)**
46:3;119:5,6,8;
123:23;124:7;
143:25;149:11
**appearance (3)**
56:25;109:25;
114:1
**appeared (1)**
78:14
**appearing (1)**
97:11
**appears (1)**
112:18
**applicable (2)**
96:23;97:3
**applicants (1)**
119:7
**Application (53)**
5:10,18,19;6:2,5,
11,17;7:2,10,19;8:2,
10,18;9:2,5,12,19,20;
10:2,11,12,18;11:2,8,
15;12:2,9,16,19;13:2,
9,18;14:2;77:13,18,
21,24;78:1,9,9;
117:24;126:13;
129:21,21;130:5,11;
134:15;137:4;141:6;
144:9,11;152:15;
153:6
**applications (21)**
83:12;95:5;113:14;
117:14;118:6,8;
120:24,24;121:4,14;
122:19;123:23;
124:11,22;125:20;
128:21;134:25;
148:19;149:16;
152:3;154:3
**applied (4)**
77:10;96:5;138:17;
152:4
**applies (1)**
123:1
**apply (8)**
82:6,8;93:21,23;
119:17;121:14,14;
151:21
**applying (4)**
99:10
**appoint (4)**
36:5;69:24;70:2,20
**appointed (3)**
55:19;61:19;152:2
**appointing (3)**
41:19;42:6;53:18
**Appointment (2)**
3:20;45:22

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
12-12020-mg                                            Pg 163 of 188                                            December 20, 2012

**appreciate (4)**
120:21;139:17;
148:3,15
**appreciates (1)**
31:10
**approach (4)**
55:8;57:7;65:13;
125:25
**approaching (1)**
40:6
**appropriate (28)**
38:22;51:7,9;52:4;
61:9;63:8;64:16;
71:15;78:16;82:18;
95:7;96:3,7;103:10,
13;107:10,10;
108:15;114:25;
119:25;124:14;
125:9;126:3;128:2,
14;129:15;130:9;
138:10
**approval (6)**
29:9;81:2;114:18;
137:23;140:9,9
**approve (15)**
79:9;121:17;122:1,
4,8;129:20;133:9;
134:15;135:23;
137:3;138:23;142:5;
143:23;145:1;147:9
**approved (31)**
82:20;117:21;
119:24,25;120:1;
121:23;126:12;
131:18;133:24;
135:13,18;136:17;
138:7;140:2,17,22;
141:4,9,18;143:5,12,
17;146:9;150:25;
151:14,19;152:12,24;
153:15;154:3,4
**Approving (8)**
4:3;78:17;130:3;
139:4;142:11;145:2,
24;147:13
**Approximately (1)**
33:25
**approximation (2)**
138:5,12
**apps (2)**
56:8;123:23
**April (4)**
36:20;44:17;75:18;
77:5
**AR (1)**
24:14
**Arant (8)**
8:18,22;26:19;
129:11,21;130:10,16;
147:19
**arbitration (1)**
145:23
**area (1)**
105:8
**argue (6)**
59:23;84:5;111:1,
2;116:4;118:21
**arguing (2)**
39:8;107:6
**argument (5)**
30:12;32:5;98:1;
110:20;114:5
**arise (1)**
75:12
**arises (1)**
128:6
**Arizona (6)**
87:19,22;88:4,13,
21;89:7
**ARLENE (1)**
22:7
**arose (1)**
121:24
**around (5)**
61:22;62:3;63:16;
96:22;98:23
**arrived (1)**
94:19
**artful (1)**
61:10
**Arthur (5)**
5:19,22;6:9;72:12;
152:1
**articulation (1)**
62:8
**artificial (1)**
55:25
**aside (1)**
33:14
**aspect (1)**
49:4
**assert (2)**
50:23;86:12
**assertion (1)**
89:5
**assess (2)**
39:16;64:9
**asset (5)**
56:19,20;61:3;
73:4;130:7
**assets (3)**
40:9,17;56:7
**assigned (1)**
79:15
**assistance (1)**
62:2
**associate (1)**
146:15
**associated (2)**
81:1;144:24
**Associates (6)**
6:12,15;90:18,25;
93:12;143:19
**associate's (1)**
128:5
**assume (3)**
48:2;57:4;153:16
**assumed (2)**
79:15,16
**assuming (5)**
55:18;59:12;77:3;
100:25;106:3
**Assumption (1)**
14:12
**assumptions (1)**
65:21
**assure (1)**
52:9
**Atlanta (1)**
22:17
**Atlantic (1)**
22:15
**attempt (3)**
125:14;126:1;
138:11
**attend (3)**
137:6;145:13,17
**attending (1)**
123:3
**attention (4)**
48:11;92:12;101:6;
148:16
**Attest (1)**
7:5
**Attorney (6)**
10:8;12:13;26:11;
85:25;86:1;145:10
**attorney-client (1)**
104:3
**Attorneys (27)**
16:3;17:12;18:2,
10,20;19:2,11,20;
20:2,10,20;21:2,10,
19;22:3,14;23:3,11,
20;24:11,20;25:3,11,
20;26:3;27:3;55:15
**attorney's (12)**
85:21,22;86:5;
87:2,10,21,21;88:6,
10,13;89:6,8
**attributable (2)**
138:12;139:5
**attributed (1)**
140:8
**Aty (1)**
13:15
**Auditor (2)**
7:5,7
**August (27)**
5:13,22;6:14,20;
7:6,15,21;8:6,13,21;
9:8,15,22;10:7,15,15;
11:5,11,18;12:5,12;
13:5,14,22;14:5;
94:17;95:8
**authority (1)**
28:23
**Authorizing (8)**
3:5,10;4:17;6:6;
14:12;28:20;35:8;
81:25
**Automatic (17)**
4:7;84:4;86:7;89:1,
4,20;90:4;91:4;
93:14,20;94:10;95:4,
12;98:3,20,25;106:24
**available (5)**
36:25;37:2;72:15;
75:23;76:5
**availed (1)**
108:13
**Avenue (14)**
17:13;18:3,11,21;
19:3;20:21;21:3,20;
23:21;24:12,21;25:4,
21;26:22
**avoid (1)**
55:17
**avoidance (1)**
100:7
**await (1)**
53:13
**Award (3)**
10:13;12:20;88:19
**aware (2)**
48:22;56:5
**away (1)**
31:6

**B**

**b6 (1)**
5:7
**back (21)**
30:11;31:4;39:7;
42:13;47:6;48:10;
61:14;68:24;76:25;
83:1;91:20;93:24;
94:1,3;105:3;113:13,
19;126:5;139:7;
140:5;151:13
**background (1)**
75:7
**bad (3)**
90:5,19;94:18
**balances (3)**
43:16,18;65:18
**Balensiefer (10)**
4:8;24:11;84:3,5,
10,17;85:24;86:23;
87:20;89:5
**Balensiefer's (1)**
84:15
**ball (3)**
53:16;71:22;
151:14
**Bank (16)**
19:22;23:3;23:20;
40:7;57:2;73:1,7,18;
82:1;99:2;103:1,4,9,
11,12;105:22
**Banker (2)**
9:6;13:21
**Bankr (2)**
4:2;14:11
**Bankruptcy (26)**
2:15,24;3:3,4;4:3,
23;5:7;12:10;14:12;
46:1;48:14;55:19;
66:12;85:2;90:6,8,12,
13;92:4,6;94:21;
95:7,24;96:21,23;
99:1
**bargaining (1)**
53:2
**barristers (1)**
123:8
**base (1)**
31:18
**based (12)**
65:21;78:4;88:21;
92:14;95:12;114:16;
116:3,5,10;129:5;
138:5,7
**bases (1)**
49:12
**basically (3)**
50:19;70:10;
105:11
**basis (17)**
32:3;34:10;38:23;
43:19;50:18;76:12,
15;86:14,15;88:19;
106:14,16,17;108:20;
109:15;126:24;
128:15
**Battery (1)**
22:4
**Beach (1)**
25:23
**bear (1)**
84:6
**BECK (2)**
16:8;133:18
**become (3)**
50:12;66:13;67:9
**becoming (2)**
73:21;106:17
**began (1)**
34:21
**begin (3)**
52:1,21;54:4
**beginning (5)**
53:23;54:7;57:10;
58:19;77:5
**behalf (25)**
4:7;18:6;9:31:1,3;
39:3,21;49:18;55:6;
57:2,25;69:7;79:3;
84:10;89:17;92:4;
94:23;95:6;97:11,21;
100:5;103:1;104:9;
119:5;142:20
**behavior (1)**
94:17

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**behind (1)**
127:17
**believes (1)**
96:3
**belong (3)**
78:10;106:21,23
**bench (5)**
67:15,16;71:3;
114:6;116:5
**BENDER (14)**
26:25;130:12,15,
15,19;131:6,12,16,
19;147:18,22;148:1,
4,14
**Benefit (8)**
3:11;52:19;79:18;
111:11;120:4,5,10;
121:10
**benefits (1)**
57:15
**Berkshire (2)**
25:3;80:10
**best (9)**
35:18;42:3;45:5;
49:22;50:7;75:25;
120:21;132:9;138:11
**bet (1)**
83:15
**better (8)**
42:11;79:6,7;
96:22;102:12;
119:15,16;154:4
**beyond (3)**
34:25;39:24;
105:17
**bid (1)**
53:24
**big (1)**
123:7
**bigger (1)**
141:25
**biggest (1)**
76:3
**bill (1)**
124:1
**billion (2)**
58:4;148:25
**BINDER (1)**
22:10
**binders (2)**
125:19;153:24
**BIRD (1)**
22:13
**Birmingham (1)**
26:23
**bit (5)**
58:13;78:2;102:2;
106:18;127:7
**bizarre (1)**
60:13
**blanket (2)**
128:1,13
**Board (4)**

18:2;56:14;104:17;
151:23
**boat (1)**
61:24
**bond (1)**
86:22
**bondholders (1)**
37:10
**bondholders' (1)**
65:4
**bonds (2)**
39:21;40:12
**Borders (1)**
119:16
**borrower (4)**
111:15,17;113:11;
115:8
**borrowers (6)**
96:25;98:23,24;
107:9;111:23;112:7
**Boston (1)**
25:14
**both (25)**
29:2;35:10,13;
36:24;37:14;41:9;
46:6;52:3;66:9;74:9;
105:20;106:10;
107:19;110:19,23;
111:2;112:9,11,13,
16,22;119:10;138:3,
14,16
**Boult (4)**
8:19,22;26:19;
129:11
**bound (1)**
65:22
**Bowling (1)**
2:16
**box (1)**
40:22
**boxes (6)**
40:10,13,14,17,24;
41:1
**bracket (1)**
31:16
**Brad (1)**
100:4
**Bradley (9)**
8:18,22;17:19;
26:19;129:11,20;
130:10,16;147:19
**break (5)**
83:11,14,22;
100:19;145:11
**breakdown (2)**
126:14;142:7
**BRIAN (1)**
17:8
**brief (1)**
100:8
**briefly (6)**
55:7;70:25;104:8;
111:7

**bring (5)**
81:12;92:11;
101:12;108:16;
145:25
**broad (2)**
72:24;104:18
**broader (2)**
59:23;142:9
**broadly (1)**
67:21
**brought (3)**
84:16;122:8;146:1
**BRUNS (1)**
21:9
**built (1)**
63:15
**bulk (1)**
132:9
**burden (3)**
66:18;67:3;76:3
**buried (1)**
77:13
**business (6)**
35:16;52:4;98:17;
122:21;123:1;133:15
**buttons (1)**
126:19
**Bye-bye (1)**
117:9

# C

**CA (3)**
16:16;19:23;25:5
**CADWALADER (1)**
23:2
**CAHN (1)**
20:6
**calendar (3)**
28:13;107:25;
116:24
**California (1)**
16:13
**call (7)**
28:10;46:10;62:24;
71:2;76:25;113:25;
137:6
**called (1)**
132:14
**calling (2)**
84:15;148:15
**Cambridge (1)**
25:12
**came (5)**
42:16;45:10;54:2;
67:15,16
**can (86)**
36:23;39:14,16,16;
43:14,17;44:5,10,23;
45:5;47:12;50:2,17,
18;51:22;52:20,25;
53:2,3,5,10,25;54:11,
21;55:3,17;56:10,10;

57:13;59:2;61:10;
64:25;66:14;67:19;
68:7,20,21,24;69:11,
17,21,25;70:12;71:6,
18,20,21;72:1;81:12;
82:19;83:14,23;
92:23;100:8;101:1,7,
23,23;104:22;106:1;
108:21;112:14,24;
114:20;116:6;117:3,
4,5;119:23;124:1,23;
126:6;127:18;
129:17;130:13,23;
131:2,11;133:14;
144:21;145:25;
146:1,15,20;151:13;
153:23
**cancel (1)**
84:20
**cancellation (1)**
145:23
**cap (2)**
122:25;123:1
**Capital (11)**
16:3;26:3;27:19,
22;28:3;40:11;44:25;
73:13;102:1;104:18;
113:20
**car (3)**
122:4,8,12
**care (3)**
60:15;133:15
**carefully (4)**
120:25;121:1;
124:3;125:7
**Carpenter (6)**
9:12,15,16:2;
131:22,24;133:13
**Carpenters (1)**
30:16
**carried (2)**
141:10;151:14
**carry (3)**
118:10,18;141:21
**carryover (1)**
137:21
**Carson (5)**
6:17,21,23;27:20;
140:18
**CARTER (1)**
20:1
**carve (1)**
81:9
**carved (3)**
33:3;81:19;82:4
**carve-out (1)**
82:17
**CASE (70)**
18:19;38:11;39:21;
40:5;42:17;44:19,22;
47:17;49:21,23,24;
50:2,7,18;51:14,22;
53:4;56:9;58:19,21;

64:1;66:9,12,14;
68:6;70:4,23;71:16;
72:13,20;75:10;85:1;
87:22;88:9,13;90:12;
91:4;92:4;93:4,4;
95:13,14,24;96:4;
99:4,5;103:3;107:23;
109:1,7,19;110:9;
116:12,15,15;119:18;
121:11,13,13;122:2;
123:9,25;126:21;
128:8;130:7;132:5;
133:19;149:23;
150:2;152:2
**case-by-case (1)**
128:15
**cases (32)**
29:20,22;43:24;
44:20;63:23;75:11;
82:21;88:15;99:3,7;
107:2;108:11;110:3;
111:24;112:10,11,13,
20;115:3,10;117:14;
125:16,18,22,24;
126:8,18;131:5;
138:16;144:23,24;
147:8
**cash (6)**
32:3,10;42:4;
148:25;149:1;150:1
**catch (1)**
57:16
**categories (2)**
107:8;130:8
**category (5)**
99:13;130:7,10;
138:18;142:8
**cats (1)**
57:13
**cause (2)**
38:21;99:10
**caused (1)**
29:2
**causes (3)**
40:7,19;42:5
**caveat (1)**
142:6
**CC (35)**
3:16,20;4:13,16;
5:10,18;6:2,5,11,17;
7:2,10,19;8:2,10,18;
9:2,5,12,19;10:2,11,
18;11:2,8,15;12:2,9,
16,19;13:2,9,18;14:2,
10
**cement (2)**
70:11;72:5
**Center (2)**
16:14;22:15
**Centerview (4)**
9:5,8;134:1,15
**Central (2)**
24:12;25:21

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 165 of 188
12-12020-mg

December 20, 2012

**cents (4)**
123:17,17,19,21
**Cerberus (2)**
73:5;74:19
**Certain (4)**
4:18;48:5;95:10;
125:24
**certainly (19)**
43:25;44:21;45:7,
12;47:23;53:8,8,18;
67:20;70:3;72:15;
78:15;80:16;104:5;
113:17;115:4;
125:21;130:21;
138:13
**certificate (2)**
77:19,24
**certification (2)**
122:18;133:11
**cetera (2)**
123:15;130:8
**Chadbourne (6)**
11:8,11;19:10;
72:12;152:1,13
**challenges (1)**
40:23
**chambers (5)**
114:3;117:19;
119:4;120:25;121:14
**chance (1)**
38:2
**change (3)**
30:4;32:4;109:11
**changes (3)**
35:15;81:16;101:1
**Chapman's (1)**
127:4
**Chapter (8)**
3:17;5:20;36:3;
42:3;91:22;93:4,4;
95:19
**charge (8)**
123:16;144:11;
145:4,12,17,18,20,22
**charged (1)**
133:18
**charges (7)**
133:14,18;145:5,7,
9,14,15
**charging (1)**
133:22
**chart (12)**
117:19,23,25;
129:6,17,18;130:24;
148:1,2;151:4;153:4,
12
**check (2)**
97:23;132:20
**Chicago (1)**
23:14
**choice (3)**
48:8;87:16;125:11
**Chris (1)**

39:20
**CHRISTENSEN (1)**
22:9
**CHRISTOPHER (1)**
18:24
**chronological (1)**
130:9
**Cir (1)**
99:5
**circuit (3)**
98:9;99:4;116:13
**circular (1)**
58:13
**circulated (3)**
106:1,3;117:23
**circumstances (1)**
114:24
**cited (1)**
63:24
**Citibank (1)**
77:9
**City (6)**
121:18,18;122:5;
123:24;144:1,2
**Claim (19)**
3:9;28:18,21;
43:17;84:15,16,21;
86:4,11,12;88:5,5,6,
12,17;95:10,14,23;
96:1
**claimants (1)**
49:6
**claiming (2)**
90:21;104:2
**Claims (37)**
3:13;4:18;33:5,6,
16,19,21;40:19,23,
24,25;41:2;49:5,9;
50:23,24;51:13;52:2,
2;58:4,4;73:24;74:1,
3,11;86:9;88:16,18,
23;91:2;98:15;100:7,
7,12;101:9,17;105:2
**Clarification (12)**
4:6;60:25,25;84:3,
11;85:9,13,19;86:25;
87:18;89:1;103:22
**clarified (1)**
33:14
**clarify (3)**
103:3,10,14
**clarity (3)**
51:21;52:18;68:14
**class (8)**
49:6;122:15,20,21,
21,23;133:15,15
**classification (1)**
58:23
**cleansed (1)**
66:25
**cleansing (1)**
67:8
**clear (33)**

30:5;32:2;34:20;
45:10;46:16,17;
47:17;49:1;50:12;
55:13;56:13;59:8;
65:6;69:23;73:21;
82:19;85:8;89:4,7;
96:20;101:8;119:21;
120:17;121:25;
134:12,17,24;135:24;
137:10;138:24;
139:7;140:6;143:24
**clearer (1)**
97:2
**clearly (10)**
42:15;46:15;47:22;
53:6;56:9;59:16;
64:11;65:8;67:12;
128:23
**CLEARY (1)**
20:9
**clerk (1)**
118:1
**client (2)**
130:3;136:2
**clients (4)**
55:16;58:3;59:4;
101:11
**client's (1)**
145:13
**close (6)**
39:25;45:3;53:3;
54:1;79:20;149:2
**closely (6)**
51:15;73:10,16;
104:15;112:1;152:11
**closer (1)**
79:5
**closing (2)**
40:5;80:4
**coach (7)**
122:15,20,22;
133:11,17,19;136:25
**Code (4)**
3:3;98:18;139:12,
13
**codes (1)**
95:11
**Cohen (4)**
12:3,6;18:1;141:14
**collaborating (1)**
57:6
**collateral (2)**
43:20;100:14
**colleague (3)**
96:15;97:4;152:10
**colleagues (12)**
56:2;57:3;59:18,
21;60:1;62:17;107:5;
120:16;121:5;125:8;
128:10;152:18
**collect (2)**
87:4,11
**collected (1)**

89:9
**Collecting (1)**
87:3
**collectively (1)**
58:3
**COLLINS (1)**
27:16
**colorability (1)**
100:12
**Colt (3)**
10:3,8;135:7
**Columbus (1)**
16:6
**combine (1)**
153:11
**combined (1)**
152:20
**comfortable (1)**
56:24
**coming (7)**
42:13;85:8;121:19,
21;126:5;128:22;
148:2
**Comm (2)**
13:15;150:7
**commence (5)**
57:10;107:11;
108:14,21,22
**commenced (2)**
107:10;108:12
**commencing (3)**
98:8;108:14,17
**comment (2)**
101:3;127:23
**comments (5)**
30:15;49:21;
119:12,17;143:24
**commitment (1)**
76:9
**committed (3)**
30:1;50:25;51:2
**Committee (61)**
4:16;13:3,10,21;
17:12;21:10;29:10,
24;30:9,15;31:1,4,9,
17;33:17;34:11;37:5;
38:8,15;41:21;42:6;
43:9;44:1;46:16,19,
21;49:18;50:6,22;
51:4,6,11,15,25;52:3,
16;53:9;58:14;59:4;
60:7;73:8;81:18;
99:20;100:5,13;
101:9,17,25;102:4;
104:2,19,21;105:1;
111:14,14,16,23;
112:7,23;150:11,13
**committees (1)**
78:12
**committee's (13)**
50:15;99:24;100:6;
101:19;104:16;
111:17;112:12;

113:6;115:8;127:19;
148:18;150:8;151:22
**common (3)**
53:21;54:8;67:17
**Communications (1)**
6:12
**companies (1)**
66:3
**Company (11)**
4:21;13:18,23;
24:20;31:14;33:11;
107:16;132:10;
148:24;150:1;151:16
**compensable (1)**
144:2
**compensated (1)**
31:13
**Compensation (47)**
3:7;5:12,19,20;6:3,
13,19;7:3,3,11,13,20;
8:4,12,20;9:3,7,14,
20,21;10:5,12,13,19;
11:3,10,16,17;12:3,4,
11,17,20;13:4,11,19;
14:3;28:16;29:3,5,6,
16,19,21;30:2;31:18;
32:8
**compensation-related (1)**
28:23
**complaining (1)**
102:8
**complaint (6)**
98:8,10,13;100:12;
109:2;115:11
**complaints (4)**
106:11;107:21;
109:11;115:1
**complete (5)**
55:20;64:23;75:17;
76:17,18
**completed (1)**
108:11
**completely (2)**
67:3;125:9
**completion (1)**
76:6
**complex (4)**
40:11;46:11;69:12;
80:12
**complexity (1)**
53:4
**Compliance (5)**
7:11;8:19;26:20;
76:7;136:2
**complicated (3)**
43:4;44:24;70:12
**complied (1)**
94:6
**comply (3)**
94:7;96:22;97:2
**component (3)**
29:8,11,15
**components (1)**

29:11
**comport (1)**
130:5
**compromise (3)**
45:2;62:22;142:11
**concept (2)**
42:11;63:15
**concern (5)**
39:5;43:6,22;
61:13;66:22
**concerned (5)**
31:11;91:7;94:16,
18;104:1;116:20
**concerns (3)**
64:7;65:9;126:18
**conclude (2)**
43:5;111:8
**concluded (3)**
50:6;116:6;154:11
**concludes (2)**
35:16;153:21
**conclusion (1)**
66:21
**concur (1)**
103:15
**conduct (12)**
32:21;72:25;78:16;
90:6,20;93:4,21,22,
23;94:19;95:1,6
**conducted (1)**
74:25
**conducting (1)**
76:22
**confer (4)**
112:12,23;115:8,9
**Conference (5)**
3:22;5:2;80:16,17;
137:6
**conferences (1)**
106:9
**confidence (2)**
55:20;56:1
**confidential (4)**
62:8;64:12,14;
66:19
**confidentiality (8)**
51:7;63:18;64:23;
65:7,9;67:5;70:5;
71:10
**confirm (1)**
133:14
**conflict (8)**
31:24,25;32:5,15,
18;33:6;77:9,11
**Conflicts (6)**
6:7;10:3;31:12,14;
32:20;77:20
**connection (6)**
41:10;50:5;118:11;
120:9;138:25;139:11
**consensual (5)**
42:21;43:3;45:1;
56:15;100:18

**consensus (3)**
45:23,25;56:19
**consent (6)**
101:18,19;102:21,
22;103:18;105:16
**consequences (2)**
63:24;64:2
**consequently (2)**
35:19;42:18
**consider (6)**
85:8;95:5,11;99:6;
121:19;147:4
**considerable (2)**
73:25;119:20
**considerably (1)**
76:14
**consideration (3)**
28:19;73:12,23
**considered (3)**
35:13;82:16;88:25
**considering (2)**
74:7;114:13
**considers (1)**
99:3
**consistent (3)**
38:10;121:13;
132:25
**constant (1)**
79:23
**constituencies (5)**
44:25;50:21;52:12;
53:13;75:10
**constituency (3)**
40:16;53:12;
104:25
**constraints (1)**
76:21
**constructive (3)**
38:15;51:19;52:8
**consult (3)**
81:17;114:13,14
**Consultant (6)**
5:11,14;6:12,15;
7:20,22
**Consultants (6)**
6:18,21,23;9:21;
27:20;140:19
**Consulting (7)**
11:16,19;14:3,6,8;
137:14;138:23
**consummate (1)**
79:13
**contact (3)**
65:3;71:2,18
**contacted (1)**
74:2
**contains (1)**
85:20
**contemplate (4)**
40:10;53:18;70:10;
82:3
**contemplated (2)**
39:25;89:2

**contentious (1)**
29:25
**context (11)**
40:8,20;41:5,21;
42:9;43:14;52:13;
61:18;62:9;63:19;
67:11
**contingent (1)**
75:20
**continual (2)**
90:5;95:1
**continually (1)**
90:22
**continue (9)**
31:14;44:9;48:9;
50:25;60:7;81:25;
116:14;135:25;
147:10
**continues (1)**
77:3
**continuing (2)**
60:19;76:7
**contract (1)**
88:21
**Contracts (6)**
4:4;79:10,15;
80:25;82:8,15
**contractual (1)**
88:10
**contribution (1)**
30:3
**control (1)**
133:21
**controversial (1)**
29:14
**convenient (1)**
125:17
**conversation (1)**
69:5
**convey (1)**
137:8
**cooperate (1)**
113:6
**cooperating (1)**
75:21
**cooperation (2)**
76:7,16
**cooperative (1)**
75:25
**cope (1)**
76:20
**copies (3)**
69:17,19;145:6
**copy (3)**
65:11;81:12;
129:16
**Corporate (1)**
6:12
**corrected (1)**
125:2
**correctly (4)**
50:14;106:3;
117:15;126:10

**cost (5)**
81:1;123:17,20;
128:7;145:10
**costly (1)**
56:6
**Counsel (54)**
6:3,7;8:4,7,11,14,
19,22;9:3,13,16;10:3;
11:9;12:10;13:10;
16:13;26:20;58:1,16;
72:10,12;77:11,20;
84:4;91:12;93:9;
95:3;111:2,15,17,22;
112:7,12,13,13,23;
113:7,11;115:8,9;
116:4,20;119:16,18;
121:24,25;123:9;
132:18;146:15;
147:2;150:11;152:1,
14;153:5
**counted (2)**
43:10;117:15
**counter-arguments (1)**
74:10
**counterclaims (1)**
86:9
**country (2)**
96:22;98:23
**County (1)**
98:9
**couple (2)**
114:9;126:16
**Course (8)**
10:14,20;11:4;
12:21;69:18;72:25;
73:3;74:24
**Court (434)**
2:15;28:2,8;30:4,
17,18,25;31:5,22;
32:5,13,16,22,24;
33:1,4,7,10,12,19,25;
34:4,6,9,12,15,22,24;
35:2,5,7,13,15,22,24;
36:15,18;37:25;38:2,
4,24;39:18;40:1;
42:14;44:4,12;46:7;
47:14;48:16,18;
49:15;52:24;54:25;
55:4,9,18,24;56:5,8,
22,25;57:21,24;59:9,
11,21;60:4,9,11,14,
21,23;62:2,14;64:17,
19;65:1,11,14,16;
66:16;67:11;68:3,22,
24;69:1,6,13,22;
70:18,20;72:19;75:5;
77:11,15,17,19;78:4,
6,8,8,20,23,25;79:4,7,
11,19,19,24;80:6,8,
20,22;81:1,5,13,15;
82:3,13,16,23;83:1,4,
7,14,17,20;84:6,24;
85:3,7;86:1,14,14,15,

17,18,21,24;87:1,9,
13,17,18,19;88:2,4,6,
24;89:11,13,21,23,
25;90:2,7,11,16;91:3,
9,11,24;92:2,7,10,17,
19,23;93:2,9,13,18,
20;94:1,12,14,17;
95:2,21;96:11,14,18,
24;97:17,20;98:1,9,
12,14;99:3,5,15,22;
100:1,3,19,23;101:5,
11;102:6,12,18,20,
23;103:5,7,20;104:7,
10,23;105:6,8,21,24;
106:2,6,12,16,22,23;
107:1,13,19,23;
108:2,5,8,16,18,20,
24;109:1,10,16,19,
21,24;110:3,5,10,14,
19,23;111:1,6,16,20;
112:1,2,5,9;113:3,13,
16,19;114:2,10,18,
23;115:7,15,18,21,
23,25;116:3,8,10,13,
16,18,20,23;117:1,3,
6,8,10,20;118:2,13;
119:1,3,6,25;120:1,
20;121:7,9,12,21,23;
122:1,7,9,14;123:11,
22;124:4,9;125:6,19;
126:5,8;127:17,21,
22;128:3,17,19;
129:7,18,20,25;
130:13,18,23;131:7,
11,15,17,20;132:3,7,
12,15;133:9,23;
134:5,12,13,21,23,
25;135:3,5,8,13,18,
23;136:8,11,13,17,
24;137:3,9,13,17,25;
138:19,20,22;139:3,
17,20,22,25;140:2,5,
11,16,22,25;141:2,4,9,
12,18;142:5,22,25;
143:2,5,12,17,23;
144:1,5,10,16,16,20,
25;145:7;146:5,9,14,
19,23;147:1,4,9,12,
17,20,21,25;148:3,
11,15,19,21;149:3,6,
8,10,13,14,16,21;
150:6,9,15,17,19,25;
151:4,8,13,19,23;
152:9,12,22,24;
153:15,19,22,22,25;
154:2,6,8
**CourtCall (1)**
116:1
**courtroom (2)**
72:15;77:13
**courts (4)**
96:21,22;98:23;
99:6

**Court's (8)**
44:18;48:23;84:12;
114:17;119:20;
120:2,5;148:16
**cover (1)**
145:14
**covered (1)**
74:4
**CPA (3)**
144:12,21;145:4
**crack (2)**
102:11,14
**create (2)**
47:5;66:17
**created (1)**
65:19
**creating (1)**
102:2
**credit (1)**
139:7
**Creditor (6)**
13:15;40:15;44:25;
50:21;52:12;84:10
**Creditors (13)**
4:17;13:4,11,22;
40:13;50:23;56:19;
57:19;66:2,7,10,18;
99:20
**Creditors' (7)**
17:12;31:3;37:5;
49:18;59:4;81:18;
111:23
**critical (1)**
149:22
**crying (1)**
49:13
**crystal (1)**
82:18
**Cummings (4)**
8:19,22;26:19;
129:11
**cure (1)**
80:12
**curiosity (1)**
103:17
**current (5)**
74:24;75:17;76:4;
92:15;95:10
**currently (2)**
65:8;79:14
**Curtis (3)**
10:2,7;135:7
**custodial (2)**
81:10,20
**customary (1)**
124:11

**D**

**DAKIS (1)**
18:6
**DALE (1)**
22:9

**Dallas (1)**
26:14
**damage (1)**
98:15
**damages (1)**
98:24
**data (1)**
131:4
**Date (19)**
3:8;43:16,18,20;
55:14;71:21;74:21,
25;80:4;81:6;82:19;
95:7;98:13;102:3;
105:17;110:16;
114:17;123:14;
134:19
**dated (1)**
94:17
**dates (2)**
71:3,19
**DAVID (5)**
16:8;19:16;24:7;
110:6;151:25
**DAY (10)**
19:19;65:4;70:7,
23;104:15,24;
105:11;135:25;
136:2,3
**days (10)**
36:3,14,20;50:6;
75:4;100:15;114:20;
115:11;123:18;
133:21
**DC (2)**
23:5;26:5
**deadline (2)**
55:14;56:1
**deadlines (1)**
55:17
**deal (11)**
43:14;45:13;50:1;
51:16;52:17;61:4,16;
67:22;77:15;104:22;
111:24
**dealing (6)**
41:19;42:6,7;80:1,
2;125:8
**deals (2)**
61:9;63:17
**dealt (3)**
32:15;120:11,15
**debate (1)**
63:2
**DEBRA (2)**
26:7;142:19
**debt (2)**
66:13,23
**debtor (17)**
35:19;38:21,23;
40:10,19;44:3,18;
45:7;50:5;61:17;
65:23;66:9,10;93:21;
99:1;121:24;148:6

**Debtors (95)**
3:5,11;5:11;6:13,
18;7:5,12,12,20;8:4,
12,20;9:6,13,21;10:3,
4,15,21;11:4,17;
12:10,21;16:13;
25:11,20;26:11,20;
28:5,20,22;29:10,17;
30:3,17;34:21;35:16;
37:11;40:14;43:10,
25;44:24;46:17;54:3,
4;58:5,15;60:6;
62:11;63:20,24;
64:13;65:20;67:1;
69:19;74:10,19;76:1,
2,8;79:3,12,14;80:24;
81:22,25;83:9;84:18;
86:10;88:16;89:17;
91:19;93:24;94:6,8,
9;95:13,19;96:25;
97:12;98:3,11,12,16,
24,25;101:16;102:3;
103:12,22;104:1,9;
113:23;116:20;
133:18
**Debtors' (42)**
3:2,6,16,20;4:1,18;
10:8;12:13;14:10;
28:15,24;29:18;30:2;
31:12,19;32:7;35:7,9,
23;36:2;37:8;44:15;
46:20;58:1,5;68:8;
79:8,17,18;84:22;
85:1;98:4;101:15;
104:3;106:10;115:1,
9;116:4;118:8;
127:16;129:9;153:5
**December (2)**
2:19;30:10
**DECHERT (2)**
23:19;57:1
**decide (1)**
43:1
**decided (3)**
81:9;118:18;
125:11
**deciding (1)**
104:25
**decision (1)**
127:4
**declaration (1)**
98:5
**declined (1)**
91:3
**deeming (1)**
95:10
**deep (1)**
45:4
**default (1)**
67:9
**defend (1)**
86:12
**defendant (2)**

109:23;110:2
**defendants (8)**
98:16;107:24;
110:7;111:13;
114:19;115:2,5,11
**defendants' (1)**
112:13
**defense (1)**
84:21
**defenses (1)**
52:2
**defer (8)**
60:17,17,17,19;
128:20;145:1;149:9,
14
**deferrals (2)**
29:2,4
**deferred (5)**
29:5,7;32:8,10,10
**deferring (1)**
61:8
**deficient (1)**
120:6
**defined (5)**
39:12,13;58:11;
59:17;105:19
**defining (2)**
59:13;60:1
**definitely (1)**
114:25
**definition (1)**
58:12
**Delahey (1)**
98:6
**Delaware (4)**
5:11,14,15;146:7
**delay (3)**
47:5;56:6;81:1
**deliberate (1)**
80:13
**Deloitte (4)**
7:3,6;27:12;135:15
**Delta (2)**
133:20,21
**DeMasters (1)**
110:8
**denied (1)**
99:11
**DENMAN (1)**
18:25
**deny (1)**
119:20
**denying (1)**
99:9
**DEPARTMENT (1)**
17:2
**dependent (3)**
32:7;75:20;76:7
**depending (1)**
127:3
**depends (1)**
54:16
**deposition (1)**

145:16
**depositions (1)**
145:9
**derivatives (1)**
73:18
**description (2)**
136:1;145:10
**descriptions (1)**
137:5
**desk (1)**
105:3
**DESSAULES (1)**
24:10
**detail (8)**
62:1;126:10;
129:23,24;134:18;
145:3,14,24
**detailed (4)**
59:22;123:14;
126:13;133:1
**details (3)**
122:6;126:7;
147:13
**determine (4)**
85:11;88:4,11;
120:3
**determining (2)**
73:22;138:8
**deterrent (1)**
125:4
**developments (1)**
38:11
**dialog (7)**
34:19;42:22;45:10;
50:24,25;51:20;54:5
**difference (1)**
54:20
**differences (1)**
48:10
**different (7)**
44:25;87:3;88:15,
22,24;136:4;147:3
**differently (1)**
48:3
**difficult (4)**
29:25;40:20;41:25;
130:11
**difficulty (4)**
52:6;65:20;78:2;
133:2
**digested (1)**
74:14
**digit (1)**
112:18
**direct (10)**
33:19,21;54:9,11;
71:4,7;86:9;112:11,
22;147:12
**directed (1)**
54:3
**Directing (1)**
3:5
**direction (2)**

12-12020-mg   Doc 2523   Filed 12/23/12   Entered 12/27/12 12:39:34   Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 168 of 188
12-12020-mg

December 20, 2012

42:17;113:5
**directors (2)**
74:25;76:5
**disagree (3)**
52:24;54:16;62:15
**disagreement (1)**
127:7
**disagreements (1)**
49:20
**disagrees (1)**
57:4
**discipline (1)**
47:13
**disciplined (1)**
48:13
**disclose (1)**
68:18
**disclosed (1)**
77:2
**disclosure (2)**
43:15;64:16
**disclosures (1)**
78:15
**discovery (3)**
46:13;77:8;133:3
**discretion (1)**
104:25
**discuss (7)**
37:21;46:20,23;
52:1;63:25;65:7;
131:10
**discussed (3)**
29:9;51:10;152:17
**discussing (1)**
132:18
**discussion (8)**
31:8;38:10;43:17,
19;67:4;68:21;69:11;
139:6
**discussions (22)**
36:24;38:13;43:8,
25;44:1,7;47:4,12;
48:5;57:10;65:18;
66:8;71:4;76:1,8;
81:9;109:15;137:11,
11;139:14;144:8;
153:8
**dislocations (1)**
78:3
**dismiss (7)**
106:10;107:20,25;
110:10,15;112:16,20
**Dismissal (2)**
4:22;5:6
**dismissed (1)**
106:12
**disposition (1)**
130:7
**dispositive (1)**
88:1
**dispute (2)**
29:17;62:12
**disputes (4)**

44:2,3;52:13;88:23
**distinction (1)**
88:19
**District (4)**
46:2;48:14;82:18;
120:2
**diverge (2)**
46:3;85:5
**diverse (1)**
55:15
**Doc (18)**
3:2;4:6,10,13,22;
5:10;6:2,5,11,17;
8:10;9:2;10:11,18;
11:2;12:16,19;14:2
**Doc# (23)**
3:16,20;4:1,16;5:6,
18;7:2,10,19;8:2,18;
9:5,12,19;10:2;11:8,
15;12:2,9;13:2,9,18;
14:10
**docket (13)**
28:15;36:4,5;
45:21;77:7,14;79:10;
82:2;84:13;89:20;
98:6;109:7;136:9
**doctor (1)**
102:12
**document (3)**
76:9,24;77:8
**documentation (4)**
132:11;134:11,14;
137:2
**documentations (1)**
134:18
**documents (13)**
74:17,19,22,23;
75:22;116:9,10;
122:8;132:10,17,22;
133:5;134:8
**dollar (4)**
123:1;124:12;
133:13;145:22
**dollars (42)**
58:4;95:18;118:19,
20;123:3,5;127:3,9;
129:13;131:23,25;
132:1,6;134:2;
136:16;137:15,20,22,
24;138:2;140:7,13,
19;141:1,16,23;
142:1,2,10;143:11,
11,22;145:20;
146:13;148:25;
150:24;151:3,17;
153:6,7,9,10
**domestic (1)**
122:16
**Donaghy (30)**
4:11,11;27:17;
89:19,23,24;90:1,2,4,
10,15,18;91:5,10;
92:8,8,11,18,22;93:1,

8,10;94:11,13,15,15;
95:2;96:11,12,13
**Donaghys (6)**
91:15,17,19;93:25;
95:15;96:8
**Donaghy's (7)**
92:3,5;93:6;95:10,
20,24;97:6
**done (18)**
36:23;41:11,14,17;
42:20;44:21;49:1;
51:15,16;54:12;
67:19;87:11;92:4;
101:22;117:5,6;
124:17;153:10
**Dorsey (4)**
8:10,14,16;135:19
**Douglas (4)**
4:7;17:18;24:16;
84:9
**down (8)**
44:9;54:24;58:9;
78:2;88:3;126:6;
139:15;145:11
**dozen (1)**
74:20;106:20
**Draft (1)**
96:7
**drafted (2)**
100:12;102:15
**DRAKE (1)**
27:20
**draw (1)**
101:6
**Drexel (1)**
21:3
**drill (2)**
54:24;139:15
**Drive (1)**
23:12
**DRUCKMAN (3)**
21:1;109:22;110:2
**DRYE (2)**
20:19;103:1
**DUANE (3)**
16:18;144:18;
146:3
**due (3)**
29:19,21;95:17
**dump (1)**
76:13
**duplicate (4)**
145:5,6,17,20
**duplicates (1)**
133:4
**duration (1)**
46:5
**During (13)**
12:5;28:22;37:17;
38:19;50:16,25;
51:25;74:24;78:3;
90:6;100:19;101:15;
102:5

8,10;94:11,13,15,15;
95:2;96:11,12,13
**Dykema (4)**
10:21;26:10;136:6,
14
**dynamic (1)**
104:14
**dynamically (1)**
50:3

# E

**E-1 (1)**
144:20
**E-2 (1)**
145:21
**earlier (3)**
44:20;143:24;
149:23
**early (11)**
50:25;52:1;53:20;
54:7;57:10;59:15;
71:4;74:12;75:18;
79:14;111:10
**earned (1)**
29:6
**easy (2)**
66:7;131:8
**ECF (4)**
35:10;98:4,5,6
**ECKSTEIN (46)**
17:16;30:25;31:2,
3,6,22,25;32:12,14,
19,23,25;33:2,5,8,11,
13,21;34:2,5,7,10,13,
15;38:5,7;49:15,17,
18;52:25;54:19;55:1,
4;67:24;68:1,4,23;
69:4;71:2,17;105:6,
7;111:25;112:4,4;
151:14
**economic (1)**
44:7
**educated (4)**
43:13;47:10;61:20;
62:4
**effect (4)**
66:25;85:10;86:8;
119:15
**effective (8)**
53:2,11;81:6;
82:19;126:4;128:7;
132:20;133:7
**effectively (5)**
47:5,13;56:20;
65:19;66:13
**effectiveness (1)**
132:24
**effort (10)**
36:25;37:2,14;
46:23;48:13;50:16;
67:13;74:16;127:10;
151:9
**efforts (6)**
51:11;53:14;75:25;

79:20,23;84:22
**EISELE (1)**
27:18
**either (20)**
33:18;40:18;41:19;
42:2;48:12;52:14;
59:14;66:10;82:7;
85:13;97:21;107:8;
114:5;116:4,6;117:3;
122:6;127:16;
128:21;138:9
**elected (1)**
64:1
**eliminated (1)**
32:1
**ELLENBERG (1)**
23:7
**ELLIS (1)**
19:1
**else (24)**
34:16;38:25;39:18;
44:13,13;53:17;55:5,
9;56:22;57:16;60:23;
63:12;64:19;67:23;
69:3;70:14,15;71:11;
82:13;93:16;102:23;
104:7;106:24;113:3
**e-mail (1)**
112:19
**e-mails (4)**
76:3,12,21;77:2
**EMANUEL (2)**
18:9;57:23
**Embarcadero (1)**
16:14
**embark (1)**
43:2
**Employees (9)**
3:6;28:20;29:18,
20;30:2;31:13,19;
35:10,23
**Employment (2)**
6:6;142:9
**encourage (1)**
53:8;58:17;60:7
**encouragement (1)**
50:13
**encouraging (1)**
63:16
**end (18)**
38:20;51:17,24;
52:17;54:15;55:21;
56:11;63:11;66:23;
69:9;76:10,19;83:15;
104:15,24;148:12,23;
154:2
**ended (3)**
35:1,1;63:25
**ending (4)**
39:13;55:14;
101:13,16
**endorse (1)**
55:7

12-12020-mg   Doc 2523   Filed 12/23/12   Entered 12/27/12 12:39:34   Main Document
RESIDENTIAL CAPITAL, LLC, et al.
Pg 169 of 188
12-12020-mg

December 20, 2012

**enforcement (1)**
91:21
**enforcing (1)**
86:20
**engage (1)**
37:19
**engaged (2)**
78:1;152:16
**engagement (2)**
79:23;80:3
**enjoin (1)**
86:12
**enjoined (4)**
84:24,25;86:15,16
**enormous (5)**
37:1;42:20;49:1;
74:16;79:23
**enough (2)**
101:19;128:3
**ensure (1)**
48:9
**enter (7)**
30:17;60:6;70:4;
78:5;114:18;115:10;
116:19
**entered (9)**
34:13;71:16;84:12;
90:11,13;91:22;94:6;
95:9;106:4
**entire (2)**
47:9;49:4
**entirely (1)**
65:22
**entirety (1)**
139:12
**entitled (3)**
92:23;107:11;
108:22
**entitlement (1)**
104:2
**entitles (1)**
88:10
**entries (12)**
125:2,2,3;130:4,6,
8;132:16;133:4;
137:12;138:7,16;
143:25
**Entry (4)**
3:16;4:17;125:17;
138:8
**equally (1)**
119:17
**equitable (3)**
84:15,21;88:8
**ERIC (2)**
20:25;77:12
**Erica (2)**
96:16;97:10
**ERIK (1)**
27:19
**eScribers (2)**
14:21;145:7
**Escrow (4)**

3:11,13;28:20;
29:12
**especially (1)**
133:3
**ESQ (46)**
16:8,9,18;17:8,16,
17,18,19,20;18:6,15,
16,24,25;19:6,7,15,
16,25;20:6,14,15,16,
24,25;21:6,15,23;
22:7,8,9,10,19;23:7,
16,24;24:7,16,24;
25:7,16,25;26:7,16,
25;27:8
**essentially (9)**
31:16;32:4;40:6;
88:1;102:4;132:10,
17;133:4;138:15
**Establish (3)**
3:11;66:11;99:10
**estate (7)**
33:5;35:19;120:4,
5;122:22;127:3;
133:16
**Estates (5)**
4:18;40:6,7;56:17;
79:18
**estates' (1)**
31:21
**et (6)**
4:21;16:3;26:3;
107:14;123:15;130:7
**ethical (2)**
66:11,17
**evaluated (2)**
78:16;104:14
**evaluating (1)**
79:14
**even (9)**
52:6;63:13;65:2;
94:9,21;96:4;105:9;
119:18;126:20
**events (2)**
78:13;97:7
**Everybody (15)**
37:9;41:12;45:6;
47:16;48:11;57:16;
61:1;71:17;72:1;
83:15,20;134:13;
137:4;139:7;154:8
**everybody's (2)**
61:7;80:18
**everyone (6)**
42:25;72:21;75:14;
120:21;121:16;133:6
**everyone's (1)**
45:4;61:14;102:15;
114:22
**exact (2)**
89:2;135:25
**exactly (7)**
43:7;54:23;58:9;
69:4;72:21;105:4;

111:21
**examined (2)**
73:9;152:10
**Examiner (27)**
5:20,23;6:5,7,9;
11:9;14:4;19:11;
33:16;47:16,18;
51:16;59:6;72:9,13,
14,20;74:21;76:1;
77:11,20;78:22;
127:20;152:2,3,4,14
**Examiner's (11)**
3:22;47:19;48:1;
72:9;73:11;74:16;
75:17;152:3,11;
153:1,17
**examining (1)**
72:25
**example (2)**
56:2;68:6
**except (1)**
86:10
**exception (1)**
64:23
**excess (2)**
58:3;95:18
**exchange (3)**
51:9;66:17;73:12
**excluded (1)**
75:11
**Exclusive (4)**
3:17;36:3,8;101:15
**exclusivity (29)**
36:9,13,23;37:4,12,
17,24;38:8,15;39:1,5,
6,15,22;40:15;41:10,
20;42:7,16;44:6,16;
45:8,9,18;47:1,15;
54:2;101:21,23
**excuse (2)**
117:4,5
**excused (1)**
113:17
**executive (1)**
29:3
**executives (3)**
28:17;32:7;33:9
**Executory (4)**
4:4;79:10;80:25;
82:15
**exercise (1)**
50:9
**Exhibit (3)**
98:6;144:20;
145:21
**exist (5)**
31:12,14,14;32:18;
102:1
**existed (2)**
32:20,20
**existing (2)**
39:15;85:17
**exists (2)**

32:1;61:3
**expect (7)**
70:6;79:12;82:10;
113:6;122:9;126:7,
12
**expectation (1)**
34:25
**expectations (2)**
61:8,11
**expects (1)**
134:13
**expeditious (1)**
75:21
**expended (1)**
74:16
**Expense (16)**
3:9,13;28:18,21;
29:11;56:9;123:13,
14;126:7;132:9;
133:8;134:18;142:2;
146:14;147:13;
152:21
**Expenses (110)**
5:12,15,21,24;6:13,
19,22;7:4,8,15,17,21,
23;8:5,8,12,15,20,23;
9:7,10,14,17,24;10:6,
9,13,19,22;11:3,10,
13,17,18,20;12:4,7,
11,14;13:4,7,13,16,
20,24;14:4,7;122:12,
19;124:13;126:3,12,
13,14;129:13;131:23,
25;133:10;134:2,3,6,
14;135:10,16,20,22;
136:7,16,20,22;
137:15,22;138:18,25;
140:13,20,24;141:7,
14,17,21;142:16,18;
143:9,11,14,16,20,
22;144:7;145:2,2,24;
146:1,7,11,13,15;
148:10;150:22,24;
151:3,12,17,18;
152:5,16,20;153:7,10
**experiences (1)**
68:5
**expert (1)**
128:6
**explain (2)**
130:22;144:21
**explanation (4)**
144:12,13;145:5,
25
**expose (1)**
66:3
**exposed (1)**
65:23
**expressed (3)**
39:5;70:25;94:4
**extend (7)**
36:2;37:4,17;
38:21;44:16;114:24,

25
**extended (2)**
37:12;47:19
**Extending (3)**
3:17;42:15;114:19
**extends (1)**
115:10
**extension (20)**
36:14,22;37:9,9,
24;38:15,23;39:1,6,8,
10,22,23;40:4,14;
42:7;44:6;45:8,9,18
**extensive (5)**
50:24,25;51:11;
76:1,8
**extent (20)**
40:23;51:5;54:10,
21;56:18;61:25;
62:11;63:18;64:14;
81:19;84:11;94:5,8;
95:4;96:5,23;101:23;
104:23;118:24;
127:17
**extra (2)**
127:3;130:25
**extracting (1)**
131:4
**extraordinary (1)**
46:12
**extremely (3)**
44:24;63:23;72:24

**F**

**F2d (1)**
99:5
**faced (1)**
76:13
**face-to-face (1)**
59:15
**facilitate (7)**
43:25;44:1,5;
48:24;59:2;68:4;
79:16
**fact (23)**
31:12;33:2;38:14;
39:14;40:12;45:23;
48:4;51:4,18,24;
52:19;55:2;58:15;
63:25;74:11;90:12;
92:15;109:11;
120:21;132:23;
133:20;139:4,4
**factors (4)**
37:14;99:4,6,11
**facts (1)**
62:10
**factual (1)**
61:22
**failed (1)**
99:10
**failure (2)**
107:20;112:17

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 170 of 188
12-12020-mg

December 20, 2012

**fair (1)**
49:25
**fairly (4)**
36:11,14;70:12;
119:21
**faith (3)**
90:6,19;94:18
**fall (1)**
107:7
**familiar (1)**
125:22
**familiarity (1)**
70:24
**far (5)**
44:23;50:2;62:15;
76:14;116:20
**Fargo (1)**
22:14
**fashion (1)**
75:21
**fault (1)**
152:11
**favor (1)**
108:21
**FAWKES (1)**
23:16
**February (6)**
36:15;39:8;44:16;
76:19;80:5,17
**Fed (2)**
4:2;14:11
**Federal (2)**
26:21;98:23
**fee (58)**
5:14,19,24;6:22;
7:7,17,23;8:7,15,23;
9:10,17,23;10:9,22;
11:8,13,20;12:7,14;
13:7,15,24;14:2,7;
56:8;83:12;85:21,22,
25;86:2;88:6;113:13;
117:13,24;120:23,24;
121:4,14;122:19;
123:23;124:10;
125:19;129:21,21;
130:11;136:15;
139:3;140:25;142:1;
143:19;146:1;148:9;
151:2;152:3,20;
153:6;154:2
**feedback (1)**
82:25
**feel (2)**
77:3;106:21
**feeling (1)**
50:8
**fees (85)**
85:4,11,12,15;
86:5;87:3,22;88:10,
13,20;89:6,8;94:25;
95:17;118:11,19,20;
119:10;120:3,13;
122:12;124:13;

126:2,13;129:12,12;
131:22,25;132:6;
133:9;134:1,15;
135:9,11,15,20,21;
136:6,19,21;137:15,
20,24;138:2,23,24;
139:4,8;140:7,12,19,
23;141:6,8,14,16,20,
22;142:6,11,16,18;
143:9,10,14,15,21;
144:7;145:1;146:7,
11,13,15;148:10;
150:22,23;151:2,11,
17;152:5,7,11,15,19;
153:9
**FELDER (4)**
26:7;142:19,19;
143:7
**fell (1)**
29:19
**felt (3)**
51:14;93:14;127:1
**FERGUSON (1)**
27:19
**few (3)**
49:21;81:16;103:6
**FGIC (1)**
19:20
**field (2)**
62:20;64:24
**fifteen (1)**
75:3
**Fifth (2)**
26:22;27:5
**Fiftieth (1)**
19:22
**fifty (3)**
34:3;124:1,2
**Fifty-eight (1)**
34:5,6
**fifty-seven (1)**
65:19
**Fifty-three (1)**
34:7
**figure (5)**
41:3;125:16;131:2;
139:10,15
**figures (1)**
133:13
**figuring (2)**
57:16;128:8
**File (17)**
3:17;36:3;38:18;
42:12;58:6,19,23;
71:9;75:17;77:18;
82:7;92:23;95:9,23;
102:5;109:9;115:14
**filed (53)**
4:7,10,13;5:15;6:8,
22;8:15;14:7;29:20,
22;30:5,10,11,20;
35:14;36:1,6,7;
37:15;44:22;45:25;

46:21;49:7;75:16;
77:19,24;88:5,17;
92:13,15,21;93:24;
94:21;95:13,25;
97:15;98:3,8,20;
100:10,24;103:10,13;
107:7,24;110:12;
114:16;116:9,9,10;
117:14,17;148:5
**filing (7)**
81:18;85:2;90:22;
95:6;98:12;106:24;
114:16
**filled (2)**
62:1;125:19
**Final (3)**
3:4;97:14;148:7
**finally (2)**
41:1;151:15
**Financial (18)**
3:6,8,10,12;11:16;
13:3;14:3,4,5,8;19:2;
35:9;58:21;73:11,17;
77:8;84:18;153:1
**find (5)**
84:6;134:5;137:17;
140:16;150:17
**finding (1)**
109:6
**finds (1)**
96:24
**FINE (7)**
26:16;59:20;69:1;
115:15;122:21;
128:23;129:7
**finish (2)**
72:16;76:9
**Finkel (1)**
146:23
**fire (1)**
119:1
**firm (14)**
55:13;77:9,12,12,
21;109:23;110:2,8;
122:13;126:17;
129:9;136:5;146:23;
152:14
**firms (1)**
122:20
**First (72)**
5:10,18,19;6:11,
17;7:2,10,19;8:2,10,
18;9:2,5,12,20;10:2;
11:2,8,15;12:2,9,16,
19;13:2,9,18;14:2;
28:13;29:8,11,22;
36:2,22;38:5,6;
41:12;42:16;44:22;
45:9;46:22;47:15,23;
48:7;50:16;54:2;
58:19;63:1;64:12;
67:13;69:25;70:23;
71:5,11,17;77:25;

81:17;99:21;108:17,
24;119:12,22;120:12,
17;122:21;128:3;
129:9;130:15;
133:15;142:7;
147:22;150:16,21
**first-day (1)**
28:22
**five (4)**
37:4;126:22;
127:25;130:4
**fix (5)**
87:2,20,21;88:12;
101:22
**fixed (3)**
61:10;120:11;
124:12
**flag (1)**
122:11
**Flaherty (1)**
110:8
**flesh (1)**
149:22
**flexibility (3)**
41:18,23;104:20
**flights (1)**
122:16
**Floor (4)**
17:5;18:12;19:22;
24:4
**flow (1)**
62:5
**Flower (1)**
19:21
**fly (1)**
133:15
**focus (3)**
40:3;52:23;78:3
**Foerster (18)**
12:10,13;28:5;
79:3,2;89:17;90:21;
97:11;104:9;113:23;
118:9;119:11,18;
120:14;138:4;
139:12;141:20;142:6
**Foerster's (2)**
117:24;118:19
**folks (1)**
59:3
**follow (2)**
100:21;150:12
**followed (2)**
44:19;95:1
**following (3)**
61:3;86:7;98:12
**footnote (2)**
91:18;119:14
**force (2)**
47:13;86:7
**foreclose (2)**
84:22;93:6
**foreclosure (6)**
84:24;86:13,16;

96:21;107:9;108:14
**foreclosures (1)**
108:10
**foreign (1)**
123:9
**Forget (1)**
87:18
**form (15)**
30:8,14;65:8,12;
70:1;71:7,23;72:4;
81:11;82:23;89:14;
96:8;100:17,25;
145:11
**formal (2)**
51:2;111:10
**formalize (1)**
115:13
**format (1)**
130:5
**former (3)**
74:24;76:4;98:23
**formulate (2)**
62:21;63:13
**Fortace (4)**
7:19,22;136:19;
137:5
**forth (3)**
75:15,19;99:4
**forty-five (1)**
34:2
**forward (32)**
32:2,9,12,13,14,15;
37:3;39:17;45:16,24;
47:24;48:2;53:7,23;
54:9,18,23;55:16,21,
25;62:21;63:9;70:6;
72:5;75:1;76:8;
85:10,12,22;93:5;
127:13;149:24
**FOSTER (1)**
27:20
**found (4)**
93:7;97:5;117:20;
152:11
**four (3)**
77:8;100:10;
127:11
**four-step (1)**
41:8
**fourteen (1)**
114:15
**frame (1)**
42:11
**frames (1)**
54:11
**framework (1)**
39:10
**Francisco (1)**
16:16
**frank (1)**
69:5
**Frankel (4)**
13:10,14;17:11;

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
12-12020-mg                          Pg 171 of 188
December 20, 2012

151:2
**Franklin (1)**
20:2
**frankly (2)**
56:17;119:19
**fraud (1)**
58:4
**FRCP (1)**
4:23
**free (1)**
92:25
**FREEBORN (1)**
23:10
**Freedman's (1)**
114:13
**freely (1)**
67:18
**Freeman (1)**
6:7
**front (1)**
118:2
**FTI (12)**
11:16,19;118:9;
119:11;120:14;
137:14;138:1,4,23;
139:23;140:9;142:7
**FTI's (1)**
118:20
**full (3)**
76:23;86:7;141:24
**fuller (1)**
139:6
**full-time (1)**
128:8
**fully (4)**
57:17,18,18;97:2
**Fund (3)**
3:11;28:20;33:23
**fundamental (1)**
99:1
**fundamentally (1)**
42:8
**Funding (4)**
4:20;29:12;34:1;
107:16
**Further (18)**
3:17;38:21;39:8,
10,11;45:8;47:5;
50:9;68:24;72:2;
85:16;98:11;139:1;
144:12;150:23;
151:10,12,18
**Future (9)**
4:4;55:22;79:9;
86:8;121:16;124:20;
130:2;139:8;147:15

## G

**GA (1)**
22:17
**gap (2)**
53:3;54:1

**Gary (2)**
28:4;79:21
**gather (1)**
129:1
**gave (3)**
54:2;117:25;
125:11
**GECK (6)**
16:18;144:18,18,
22;146:3,3
**general (1)**
125:1
**generally (7)**
57:5;68:13;75:24;
80:2;123:25;124:25;
131:1
**generated (1)**
31:8
**Gerber (1)**
66:20
**gets (3)**
57:4;106:3;126:23
**GIBBS (1)**
21:9
**given (6)**
31:12;48:11;56:6;
73:24;130:4;153:4
**gives (1)**
72:1
**giving (2)**
63:3;91:2
**glad (2)**
35:14;124:7
**GLENN (3)**
2:23;23:24;57:1
**global (5)**
50:18;121:4;123:7;
125:16,16
**globally (3)**
41:13;42:10;107:6
**gloss (1)**
102:17
**GMAC (23)**
5:4,5;84:18;90:5,
14,20,24;91:1,4,13;
92:4;93:13,19;95:6,9,
23,25;96:4,20,24;
97:2,6;107:14
**GMAC's (7)**
90:17;91:11;92:3;
93:9;94:16,23;95:3
**goal (1)**
80:18
**goes (3)**
59:21;93:4;137:4
**going-forward (1)**
32:2
**GOLDEN (3)**
27:2,4;109:18
**Goldman (1)**
77:10
**Gonzalez (7)**
5:20,22;6:9;72:12;

79:1;152:2,4
**Gonzalez's (2)**
152:7,14
**Good (23)**
28:4,6;31:2;39:20;
41:12;57:22,24;
72:11,21;79:2,21;
84:9;96:17;97:10;
100:4;102:7,10,15;
106:20;110:6;
114:12;117:11;
150:10
**GOREN (4)**
104:8,9,11;105:4
**Gossett (3)**
10:21;26:10;136:6
**Gossett's (1)**
136:14
**GOTTLIEB (1)**
20:9
**government (2)**
73:20;136:1
**government's (1)**
29:1
**Graham (1)**
98:6
**Grand (1)**
25:4
**grant (7)**
47:10;59:12,13;
69:23;104:4;105:12,
24
**granted (8)**
35:20;39:9;44:17;
45:19;78:18;82:21;
83:5;101:21
**Granting (5)**
3:8,9;28:17;37:16;
70:20
**grapple (1)**
51:12
**GRAY (2)**
21:18;39:3
**great (6)**
50:1;51:16;52:17;
53:4;124:17;129:19
**greatest (1)**
118:14
**Green (1)**
2:16
**Gregory (5)**
4:7;24:11;84:3,10
**ground (3)**
64:4;71:14,19
**grounds (1)**
107:20
**Group (10)**
18:20;20:2;21:1;
24:10;37:6;39:3;
55:15;56:19;57:12;
128:22
**GSEs (1)**
80:2

**guess (9)**
54:16;55:1;81:6;
99:20;105:15;
123:18;132:20,23;
138:15
**guidance (1)**
59:17
**guide (1)**
121:16
**guided (2)**
118:25;127:13
**guidelines (7)**
72:2;121:13;
122:24;123:17,25;
130:6;131:2
**gun (1)**
76:14

## H

**Haldenstein (4)**
6:6;77:12,21;78:17
**half (2)**
29:22;106:20
**HAMILTON (1)**
20:9
**hand (3)**
65:5;81:13;129:17
**handed (1)**
100:19
**handled (1)**
70:23
**handwriting (4)**
102:8,10;104:10,
11
**hand-wrote (1)**
117:25
**Hang (1)**
75:5
**Hanover (1)**
24:3
**haphazard (1)**
58:22
**happen (4)**
47:2;71:1;122:2;
139:18
**happened (1)**
54:5
**happening (5)**
43:21,23;63:25;
101:14,16
**happens (2)**
105:10;136:4
**happy (9)**
37:22;41:2,3;67:4;
109:5;131:6,10;
154:1,8
**hard (6)**
45:2,17;64:12;
127:8;142:7;153:23
**hardened (1)**
61:22
**harder (1)**

61:16
**HARRISON (1)**
18:25
**Hathaway (1)**
25:3
**head (1)**
83:1
**healthy (1)**
154:1
**hear (17)**
37:25;38:6;48:16;
53:17;55:4;79:24;
86:24;91:11;98:1;
99:22;109:24;114:3;
115:25;118:5,13;
124:6,20
**heard (25)**
31:1;34:16;38:5,
25;39:19;44:13,14;
49:16;53:17;55:5,9;
59:24;60:23;64:20;
67:24;70:14;80:9;
82:14;89:22;102:23;
104:7;113:5;114:1;
116:2;121:6
**hearing (22)**
36:12;39:11;49:14;
85:14;91:14;95:22;
96:9;97:14;109:6;
112:10;116:12,14;
117:22;118:10,22;
139:1,3;141:10,22;
145:13;146:1;153:23
**hearings (3)**
28:22;80:12;145:9
**hedges (1)**
73:19
**held (2)**
63:19;95:21
**help (7)**
45:24;50:11;56:17,
20;57:12;68:7,21
**helpful (5)**
54:1,22;57:9;
58:18;113:12;
117:20;132:19
**helping (1)**
53:2
**hence (1)**
77:10
**herded (1)**
57:13
**Here's (2)**
52:24;100:23
**Herrington (4)**
8:2,6;26:2;142:15
**Herz (1)**
6:7
**HESSLER (1)**
19:7
**HFS (1)**
39:25
**hidden (1)**

121:22
**hide (1)**
53:16
**High (3)**
16:4;45:4;133:12
**hire (1)**
77:11
**hired (1)**
122:2
**hitting (1)**
124:15
**Hoc (1)**
18:20
**hold (5)**
40:7,7;50:23;58:3;
119:1
**holdback (6)**
148:20;149:3,17,
25;151:21;153:17
**holds (1)**
66:13
**holiday (1)**
154:8
**home (2)**
84:22;93:6
**Homecomings (1)**
84:18
**HON (1)**
2:23
**Honestly (1)**
127:10
**Honor (273)**
28:4,6,13,22,25;
29:8,12,15;30:7,13,
16,24;31:2,4,7,10,25;
32:19;34:10,18;35:4,
21,25;36:6,8,11,17,
19,22;37:13,16,18,
20,22;38:7;39:2,20;
45:20,20,22;46:11,
14;47:3,6,9;48:4,17,
21,21;49:5,10,17,20,
23;50:4;52:16;54:19,
20;55:1,8,11;56:5,24;
57:22;58:8;60:3,20,
24;64:22;65:6,17;
66:20,22;67:2,4,7,9;
68:1;69:7,15;70:17;
72:8,11,14;77:14;
78:7,19,24;79:2,21,
25;80:3,11,15,21,23;
81:3,8,16;82:9;83:3,
8,10,16;84:2,9;85:18;
87:7,15,23;88:14,23;
89:10,12,16;90:1;
91:5;92:8;93:8;
94:11;96:10,13,17;
97:10,13;99:12,17;
100:4,17;101:3,21;
102:7,10,25;103:6,
15,18,21;104:8,11;
105:5;106:9,14,18,
20,25;107:5,18,22;

108:1,6,23;109:4,13,
17,20,22;110:1,6,12,
17,21;111:5,9,25;
112:6,8;113:2,9,15,
22,24;114:8,11;
115:6,12,17;116:7,
11;117:11,13;118:5,
16,23,24,24;119:2;
120:19;121:6;
123:10;124:24;
125:10,21;126:16;
127:4,15,19;128:18;
129:5,16,16,23;
130:12;131:9,12,19,
21;132:2;133:2,25;
134:11,17,18;135:6,
14;136:5,10,14,18;
137:1,8,10,14;138:3,
6,21;139:9,23,24;
140:18;141:5,11,13,
19;142:14,15,24;
143:6,7,18;144:4,14,
18,22;146:2,4,6,10,
18,21;147:7,11,16,
18;148:17;149:9,19;
150:4,10;151:6,15,
24,25;152:10,13,23,
25;153:4,16,20,21;
154:5,10
**Honor's (3)**
100:9;101:6;
141:24
**hope (4)**
31:4;57:13;76:18;
149:1
**hopefully (9)**
55:2;62:22;70:8;
71:11;105:14;113:5;
117:20;121:15;
127:18
**hot (1)**
126:19
**hours (9)**
46:12;126:22;
127:25;128:5,8,9;
135:25;136:3;138:1
**Houston (1)**
21:13
**Howard (3)**
6:8;19:15;72:11
**Human (1)**
5:11
**hundred (1)**
67:2
**hundreds (1)**
136:3

**I**

**idea (1)**
87:24
**ideally (4)**
30:10;46:1;52:11,

14
**identified (1)**
47:22
**identify (3)**
112:2;123:4,5
**identifying (1)**
117:20
**II (1)**
3:8
**III (1)**
3:9
**IL (1)**
23:14
**imagine (1)**
64:25
**impact (3)**
41:22;42:7;71:25
**imperative (1)**
51:4
**implement (1)**
80:24
**implicates (1)**
33:6
**implication (1)**
104:1
**important (12)**
47:9;51:14;53:5;
54:18;55:24;59:1;
62:3,23;63:10;69:12;
70:12;115:7
**impose (2)**
97:8;125:4
**imposed (1)**
90:17
**imposing (1)**
94:24
**improper (2)**
112:17,20
**improperly (2)**
94:24;95:19
**inaccurate (1)**
66:1
**inadvertently (2)**
33:15;64:8
**Inc (20)**
3:6,8,10,12;5:11,
14,16;6:12,15;9:20,
22;11:16,19;19:2;
23:11;35:9;109:23;
110:2;141:6;146:7
**incentive (3)**
50:15;56:13;125:5
**inclined (5)**
47:10;55:18;59:12,
22;60:2
**include (7)**
98:16;122:19;
123:15,24;126:13;
139:5;145:18
**included (4)**
35:18;59:1;133:12;
153:2
**including (7)**

3:13;5:22;10:7;
11:11;38:11;73:18;
84:20
**inconceivable (1)**
80:21
**incorporate (1)**
35:11
**incorporates (1)**
105:20
**incorrect (4)**
67:2;90:24;92:16;
99:19
**incredibly (1)**
29:25
**Incurred (17)**
5:12;6:13,19;7:15,
21;8:5,13,21;9:7,14;
10:6;11:18;12:5,11;
13:13,20;118:11
**indecipherable (1)**
100:20
**Indeed (2)**
36:14;70:21
**indemnification (1)**
33:24
**Independent (2)**
7:4;18:2
**indicate (3)**
30:11;123:2;132:4
**indicated (6)**
33:22;51:17;91:17;
131:13;138:6;149:11
**individual (4)**
40:22;50:22;81:2;
125:15
**Individually (1)**
27:3
**individuals (1)**
132:24
**indulge (1)**
114:8
**ineffective (1)**
106:13
**inflection (3)**
40:5;42:25;49:24
**informal (4)**
46:18;47:4;48:5;
111:12
**Information (42)**
7:12;36:25;37:1;
42:22;45:12,17;
54:10;62:5,11,13,16,
17,20,25;63:1,9,14;
64:10,14,24;65:24;
66:1,3,9,19;67:1,18,
20;68:9,12,17;69:17;
77:1,23;90:23,24;
92:16;128:4,15;
129:6;130:14;132:25
**informed (2)**
43:8;52:20
**inherent (1)**
31:12

**inherently (1)**
66:1
**initial (7)**
52:22;71:4;72:1;
129:3;150:16;151:2,
16
**initially (3)**
55:13;94:20;
150:21
**injunction (1)**
88:8
**injunctive (1)**
98:18
**input (4)**
31:18;61:14;66:19;
68:24
**insert (1)**
44:10
**insolvency (1)**
149:12
**instance (10)**
63:2;64:12;67:13;
69:25;71:12;119:22;
120:12,17;128:3;
145:12
**instances (1)**
125:25
**instead (2)**
100:14;109:2
**institutional (2)**
58:1,17
**institutions (1)**
77:8
**instructive (1)**
54:23
**integral (1)**
30:9
**intelligent (1)**
52:20
**intend (3)**
37:18,18;110:13
**intended (1)**
55:13
**intent (1)**
104:5
**intention (3)**
38:18;57:9;75:17
**inter- (2)**
40:18;44:2
**interact (1)**
39:6
**inter-company (1)**
44:2
**inter-debtor (1)**
40:19
**interest (1)**
84:19
**interested (5)**
59:3;75:15;85:14;
86:8,11
**interests (3)**
31:21;35:18;50:7
**Interim (41)**

5:10,18,19;6:2,11,
17;7:2,10,13,19;8:2,
10,18;9:2,5,12,19,19,
20;10:2,11,12,18;
11:2,8,15;12:2,3,9,
16,19;13:2,11,18;
14:2;117:13;118:10,
22;139:3;140:14;
141:22
**international (1)**
122:16
**interpreted (1)**
85:17
**interview (1)**
76:25
**interviews (5)**
74:24;75:1,23;
76:18,22
**into (23)**
30:14;31:18;46:12;
50:18;54:24;63:2,4,
16;64:6;66:25;70:9;
73:25;74:14;80:5,17;
94:22;101:18,24;
102:18;107:7;
117:25;124:16;148:8
**introduce (1)**
108:25
**invade (1)**
104:3
**investigating (1)**
46:13
**Investigation (5)**
3:22;51:14;72:19,
23,23
**investigations (1)**
136:1
**Investigatory (1)**
8:11
**Investment (2)**
9:6;13:21
**Investors (4)**
21:19;58:1,17;
65:25
**invited (1)**
74:5
**invoices (2)**
132:11;134:20
**involve (1)**
111:14
**involved (7)**
33:25;44:2;49:8;
51:5;58:12;73:6;
112:1
**involvements (1)**
73:4
**involves (1)**
139:13
**issue (62)**
31:16,24,25;32:18;
33:13;38:25;40:12,
22;41:1,9;42:15;
46:15;49:2,12;53:18;

61:22;63:12;64:23;
66:6;67:12,24;68:5,
10,19;69:12;72:3;
73:22;75:12;85:11;
87:3,16,18;90:21;
92:24,25;93:3;94:25;
95:22;96:9;105:14;
118:17;120:15;
121:24;123:7,8;
128:6,11;130:2;
138:24;142:12;
144:14;145:2;
146:16,21;147:14;
148:19;149:11;152:8
**Issued (1)**
3:7
**issues (52)**
30:1,22;31:10;
35:10,12;40:8;41:7,
13;43:4;46:10,13,13,
14,23;47:11,22,24;
50:11,12;52:15,19,
22;53:11;54:24;
56:21;57:16,17,18,
19;62:25;63:18;68:7;
70:24;73:14;77:6;
80:1,11,12;82:17;
94:2;109:5;111:15,
17,23;112:25;
118:24;119:23;
120:23;124:7;136:2;
137:23;153:1
**item (6)**
28:14;35:25;45:21;
97:13;99:24;146:14
**items (5)**
36:1;99:13;106:8;
124:10;126:7
**IV (2)**
3:10;100:2

## J

**JACOB (1)**
27:13
**James (2)**
70:21;89:16
**Jan (1)**
71:20
**January (31)**
39:24;46:22;47:9;
48:7,11;51:1;52:1,8,
17;53:9;20;54:7,15;
59:16;63:12;71:4,8,8,
21;76:10,13;80:4,18;
83:14;107:25;108:5;
110:11;112:11,14,22;
116:15
**JASON (4)**
20:24;25:25;
102:25;146:24
**JAY (3)**

26:25;130:12,15
**JEFFERY (1)**
16:9
**JEFFREY (1)**
26:16
**Jersey (8)**
30:16;90:9;92:21;
94:1;95:14,16,21,24
**JOHN (2)**
22:19;27:16
**joint (2)**
36:6,7
**JONES (1)**
19:19
**JPMorgan (1)**
77:10
**JR (1)**
22:9
**JSBS (3)**
20:20;37:7,10
**JUDGE (34)**
2:24;46:1;48:14;
55:19;66:5,15,20;
70:21,22;71:2,9,9,10,
14,18;90:8,16;91:20;
92:2,25;93:6,11;94:5,
20;95:4,8,21;96:3,24,
24;97:4,5;127:4;
146:24
**judges (1)**
121:12
**judges' (1)**
83:22
**judgment (3)**
35:16;52:21;
145:14
**judicial (2)**
78:16;107:8
**July (7)**
5:21;11:10;12:22,
22;14:5;84:12;95:17
**jump (1)**
47:12
**June (6)**
5:13;145:5,7,15,16,
21
**Junior (6)**
18:20;37:10;39:21;
40:12;65:4;100:7
**JUSTICE (1)**
17:2
**Justin (1)**
112:6

## K

**KATHY (1)**
21:15
**keenly (1)**
75:15
**keep (3)**
37:18;42:13;43:22
**keeping (1)**

42:10
**KEIP (15)**
118:12;119:12,12,
13,24;120:6,9,15;
138:5,9,12,14;
141:12;142:10,13
**KEIP/KERP (9)**
137:23;138:1,18,
25;139:2,6,14;140:8;
142:7
**KEITH (2)**
21:23;39:2
**KELLEY (2)**
20:19;103:1
**KENNETH (4)**
17:16;31:2;49:17;
112:4
**kept (2)**
56:2;93:14
**KERP (10)**
118:12;119:12,24,
24;138:5,6,9,14;
141:12;142:10
**key (2)**
37:19;40:12
**kind (9)**
57:15;60:16;61:9;
64:11;86:10;103:3,
17;127:8;132:25
**kinds (1)**
92:16
**KIRKLAND (1)**
19:1
**KIRPALANI (14)**
18:15;57:22,23,25;
59:10,11;60:2,3,5,10,
11,13,15,22
**KISSEL (1)**
22:2
**KIT (1)**
22:19
**KIYAM (3)**
21:6;109:22;110:1
**knowledge (1)**
123:10
**known (3)**
78:10;119:15,16
**knows (4)**
46:11;50:4;72:21;
133:2
**KOTWICK (1)**
22:8
**KPMG (3)**
7:11,16;140:12
**KPMG's (1)**
140:14
**Kramer (9)**
13:9,14;17:11;
31:3;100:5;127:11;
150:11;151:1,10
**KRELL (3)**
112:6,6;113:2
**Kurtzman (5)**

6:17,20,23;27:20;
140:18

## L

**land (1)**
105:2
**language (11)**
30:4,22;35:15;
85:20;102:16,17,20,
20;103:24;104:6,20
**large (2)**
55:15;133:3
**largely (1)**
119:19
**last (3)**
36:12;91:6;100:15;
103:4
**late (1)**
153:2
**later (5)**
62:24;63:11;77:7;
102:3;105:14
**LATHAM (1)**
24:19
**LAURA (1)**
27:18
**LAURIE (1)**
22:10
**LAW (12)**
21:1;24:10;82:18;
96:23;97:3;99:1;
109:22;110:2,8;
120:2;123:25;146:23
**laws (1)**
88:21
**lawyer (3)**
90:17;92:3,4
**lawyers (2)**
122:13,18
**laying (1)**
57:11
**lead (2)**
68:16;150:12
**leads (2)**
52:14;63:23
**learned (1)**
58:15
**Lease (1)**
14:13
**Leases (5)**
4:4;79:10,15;
80:25;82:15
**least (19)**
32:2;43:19;50:14;
52:25;54:6;55:13;
66:12;71:18,22;77:8;
78:14;105:13;107:4;
111:12,15;114:20;
118:23;130:23;147:7
**leave (9)**
119:21;120:6,11,
12,16;123:11

**leaving (1)**
56:16
**led (2)**
30:12;42:1
**LEDYARD (1)**
20:1
**Lee (52)**
28:3,4,4,12,13;
30:7,24;31:7;33:22;
34:17,18,23,25;35:3,
6,21,22,23,25;36:17,
19;38:1,3;45:20;
46:8;48:3,4,17,19;
50:14;51:17;63:2;
64:21,22;65:2,13,16,
17;70:15,17,19;71:1,
17;72:7,8;79:19,21,
21,25;80:7,9,21
**Lee's (1)**
69:9
**left (1)**
105:9
**legacy (1)**
79:13
**legal (6)**
61:22;62:8;85:3,
11,12,15
**legitimate (1)**
64:7
**Leland (4)**
9:13,16;16:2;
131:22
**LEMAY (8)**
19:16;151:25;
152:1,13,25;153:14,
16,20
**Lending (1)**
98:18
**length (4)**
30:12;37:11,23;
90:6
**lengthy (1)**
74:13
**less (3)**
88:3;126:23;
127:25
**letter (2)**
31:23;35:1
**level (4)**
62:19;64:24;80:3;
95:25
**level-headed (1)**
97:5
**Levin (9)**
13:9,14;17:11;
31:3;100:5;127:11;
150:11;151:1,10
**Levine (6)**
77:12;78:1,10,12,
13,18
**Lexington (1)**
19:3
**Liberty (1)**

**20:11**
**library (1)**
128:8
**licensing (2)**
80:1,11
**liens (1)**
40:24
**lift (5)**
85:10,16,21;87:1,
19
**lifted (4)**
84:23;96:6;97:1;
101:23
**lifting (3)**
95:3;96:4;99:10
**lifts (1)**
84:14
**lift-stay (1)**
96:19
**light (2)**
77:1;146:20
**LIGHTNER (1)**
20:14
**likelihood (2)**
86:19;124:8
**likely (3)**
45:7;67:2;97:1
**limit (1)**
105:16
**limitations (1)**
29:2
**Limited (8)**
3:10;28:18;30:8,
19;56:7;100:10,11,16
**line (4)**
114:4;115:22;
117:3;130:17
**Lipps (7)**
9:12,15;16:2,9;
131:22,24;133:13
**liquidate (1)**
87:8
**liquidated (1)**
89:8
**liquidating (1)**
42:4
**list (5)**
97:23;131:21;
133:25;135:6;145:3
**listen (2)**
114:4;116:2
**litigate (3)**
41:3,11;118:17
**litigated (1)**
88:13
**Litigation (15)**
8:4,19;9:13;16:13;
26:20;41:2;43:2;
62:10;87:25;95:11;
101:18;104:17;
130:21;132:12;136:1
**litigations (1)**
56:18

**little (5)**
79:5;102:2;108:9;
127:7;149:22
**lives (1)**
124:3
**LLC (21)**
4:21;5:4;6:18,21,
23;7:19,22;9:6,9;
13:19,23;14:3,6,8,21;
27:16,18;136:19;
140:19;145:7;146:23
**LLP (60)**
6:7;7:3,7,11,16;
8:3,6,11,14,16,19,22;
9:3,13,16;10:3,8,12,
16;11:6,9,12;12:3,6,
10,13,17,19,22;13:2,
6,10,14;16:2;17:11;
18:1,9,19;19:1,10;
20:1,9,19;21:9,18;
22:2,13,23;23:6,19;
24:2,19;25:2,10,19;
26:2,19;27:12;57:1;
129:11
**loan (2)**
84:19;97:6
**loans (1)**
97:3
**Lobel (3)**
12:17;25:10;143:8
**Local (3)**
4:2;14:11;147:2
**lock (1)**
72:4
**Locke (2)**
9:3;140:23
**long (5)**
39:23;44:5;60:6;
129:22;133:16
**longer (2)**
32:9;79:17
**look (8)**
31:9;64:12;67:11;
68:13;69:22;100:23;
104:23;125:7
**looked (4)**
73:20;82:23;105:4;
124:21
**looking (6)**
43:24;54:21;65:19;
73:25;107:6;134:19
**looks (1)**
124:3
**Lord (2)**
9:3;140:23
**Lorenzo (1)**
117:12
**Los (2)**
19:23;25:5
**lose (1)**
47:8
**losing (1)**
43:6

**lot (13)**
31:8;43:4;44:21;
45:3,17;48:22;53:5;
62:1;65:17;103:3;
130:24;131:4;133:3
**lots (1)**
49:11
**Loudoun (1)**
98:9
**Louisiana (1)**
21:11
**lower (1)**
123:17
**Lumen (1)**
132:14
**lump (1)**
124:13
**lumping (2)**
125:6;127:6
**lunch (5)**
83:22,23,24;
113:10;145:18
**luxury (1)**
76:23

**M**

**MA (1)**
25:14
**Madison (1)**
18:11
**Main (3)**
26:12;40:15;
106:14
**maintain (2)**
41:18,22
**major (3)**
49:20;73:4;75:10
**makes (5)**
49:22;61:1,2,5,16
**making (8)**
32:23;39:5;53:6;
54:22;64:15;75:22;
76:4;110:13
**Mallet- (1)**
10:2
**Mallet-Prevost (2)**
10:8;135:7
**man (1)**
46:12
**Manage (1)**
136:1
**managed (1)**
65:2
**mandatory (1)**
85:25
**MANNAL (3)**
17:18;148:18;
150:5
**manner (2)**
64:6;75:22
**MANNING (4)**
25:25;146:24,24;

**147:2**
**many (16)**
40:13;53:13;64:6,
7;68:5;72:19;75:11;
78:10;88:22,22;
98:22;99:7;123:4;
124:10;126:18;
128:25
**March (8)**
38:12;47:6;48:24;
49:12,14;58:24;
93:25;94:3
**Marinuzzi (84)**
115:20;117:10,11,
12;118:3,4,16;119:2;
120:19,20;121:5,6,8;
123:10;126:15,16;
128:16,18;129:5,8,
19,23;131:21;
133:25;134:17,22,24;
135:2,4,6,9,14,19;
136:5,9,12,14,18;
137:8,13,14,19;
139:9,19,21,23;
140:1,4,6,12,18,23;
141:5,11,13,19;
142:14;143:1,4,6,8,
13,18;144:3,6;146:2,
6,10,18;147:11,18;
148:17,22;149:5,7,
10,19;150:4,7;
153:21;154:1,4,7,9
**Marinuzzi's (1)**
150:12
**MARK (3)**
20:14;22:8;23:7
**marketplace (1)**
67:1
**markup (1)**
100:20
**MARTIN (14)**
2:23;79:2,3,6,8,12;
80:23;81:8,14,16;
82:7,22,25;83:6
**Mass (2)**
18:10;58:2
**massive (1)**
76:13
**Master (1)**
34:20
**MASUMOTO (56)**
17:8;78:6,7;
119:22;120:16,22;
123:18,20;124:6,20,
24;125:7,10,21;
126:6,10;128:10;
130:1;131:3,8,9,13;
132:2,3,4,8,14,16;
134:6,10;136:24;
137:1,10;138:2,3,21;
142:22,23;144:10,14;
146:20,21;147:4,6,
13,14,16;148:12;

149:8,9,14;152:9,10,
22,23;154:10
**Masumoto's (1)**
152:17
**material (5)**
48:6;65:25;66:8;
68:12,17
**math (1)**
153:10
**matter (17)**
28:9,13;46:4;
51:18;78:14;84:2;
85:10,13;88:25;
89:18;97:9;114:4;
116:3,5,16,19;130:3
**matters (10)**
28:14;60:19;99:25;
110:20;111:3,5;
112:22;113:5;
130:21;142:9
**maximum (2)**
41:18;130:4
**May (64)**
6:14,20;7:6,15,21;
8:5,13,21;9:8,15,21;
10:7;11:5,18;12:5,
12;13:5,13,22;30:11;
31:22;36:8;41:24;
42:3;43:10,10;51:6;
53:24;54:13,23,24;
55:16;56:20;60:9;
65:13;68:19;72:14;
75:3,12;87:3;92:9,
24;94:13;101:24;
106:6,19;108:7;
110:21;120:8;121:3;
124:12;128:6,9;
130:23;132:2;
138:10,19;139:1,1,7;
144:15;145:3,12,22
**maybe (8)**
41:12;46:3;47:25;
53:22;68:4,21;88:3;
101:14
**MBIA (1)**
23:3
**meals (3)**
122:24,25;123:1
**mean (34)**
29:4;32:5;34:20;
40:2;43:14;45:14;
47:21;53:16;54:17;
55:24;58:9;60:5;
67:23;69:2;85:11;
91:12,24;97:1;
101:12;104:13;
105:3,22;106:13,16,
23;108:23;109:4,12;
111:21;112:16;
124:9;128:20;
138:10;146:16
**meaning (1)**
104:3

**meaningful (3)**
37:19;43:17;62:19
**means (3)**
51:18;59:5;102:17
**measure (1)**
138:18
**measured (1)**
127:9
**mechanism (3)**
29:4,9;67:8
**mediation (49)**
37:20;38:10;39:6,
9,9,12,14;43:15;46:4,
5,10,15;48:8,8,12,20;
52:19,21,25;53:24;
54:15,17;55:11,14;
58:7,11,13,15;59:2,8,
14,16,25;62:5,8,9,11;
64:2;66:24;67:16,17,
19,24;68:15;69:20;
75:13;101:14;
111:12;145:18
**Mediator (61)**
3:20;36:5;41:10,
19;42:6;43:11;45:13,
22,23,25;47:10,12;
48:9;50:7,8;52:22;
53:2,5,12,18,19,21,
25;54:9,11,21;55:20;
57:8,11,11,13;59:14,
15,17,25;61:1,2,5,6,8,
10,13,15,18,25,25;
62:2,23;63:7;67:14;
68:7,21;69:18,24;
70:2,3,7,9,21,21;
71:13
**mediators (3)**
59:20,20;61:18
**mediator's-eyes-only (1)**
67:20
**meet (3)**
53:9,20;54:4
**meeting (4)**
59:15,15;70:7;
137:6
**meetings (4)**
46:22;51:1,24;52:7
**Mellon (2)**
23:20;57:2
**Members (2)**
18:2;51:25
**memo (1)**
124:10
**mention (1)**
132:19
**mentioned (1)**
94:4
**Mercer (10)**
9:20,22;23:11;
119:5,5,9,11,14;
120:14;141:6
**Mercer's (1)**
141:9

**merely (1)**
145:10
**Merger (1)**
5:5
**merits (1)**
101:13
**Mesirow (7)**
14:2,5,8;73:11,16;
152:25;153:8
**Mesirow's (1)**
153:6
**message (1)**
42:19
**met (5)**
47:7;59:5;61:20;
75:4,9
**MF (2)**
121:4;123:7
**MFRs (1)**
90:22
**Michael (5)**
4:10;24:24;27:15;
89:19;92:8
**microphone (1)**
79:4
**middle (1)**
39:9
**Midlantic (1)**
99:2
**might (4)**
87:24;120:21;
130:22;141:25
**MILBURN (1)**
20:1
**million (8)**
34:2,3,5,6,7;74:22;
137:15;148:25
**Milstead (3)**
90:18,25;93:11
**mind (1)**
56:9
**mindful (5)**
36:11;46:24,24;
56:5;126:17
**mine (1)**
130:17
**minimize (1)**
52:6
**minor (1)**
132:8
**minutes (1)**
114:9
**misconduct (3)**
91:13;92:3;93:7
**misfiled (1)**
109:7
**misplaced (1)**
106:21
**misspoke (1)**
151:7
**misstatements (1)**
62:7
**MNPI (1)**

63:20
**modest (1)**
36:14
**modified (1)**
85:13
**modifies (2)**
88:25;89:4
**modify (1)**
84:19
**Moelis (4)**
13:18,23;24:20;
151:16
**MoFo (1)**
137:7
**MOHAMMAD (4)**
27:14;28:6;115:22,
24
**MOLONEY (4)**
20:15;55:5,6,6
**moment (1)**
42:24
**monetary (5)**
29:2;86:9,11;
88:16;93:16
**monetize (1)**
41:2
**money (3)**
83:15;98:15;
119:19
**monitor (2)**
132:21,23
**monolines (1)**
49:7
**month (5)**
37:12;47:9;57:10;
96:18;149:2
**monthly (5)**
83:22;86:23;95:20,
24;126:24
**months (5)**
31:8;43:1;47:1;
103:4;127:12
**Mor (1)**
5:5
**more (29)**
42:13;46:3;48:21;
55:18;59:16,22;60:1;
67:21;73:5;74:20;
75:10;85:14;98:25;
105:9;108:9;114:9;
122:17;125:17;
128:6,14;130:20;
133:16;137:5;145:3,
23,24;147:24,25;
149:22
**Morgan (1)**
77:9
**morning (19)**
28:4,6;31:2;39:20;
57:22,24;72:11,17,
18;74:12;79:2,21;
84:9;96:17;97:10;
110:6;116:1;117:18;

149:23
**Morrison (24)**
12:3,6,9,12;18:1;
28:5;79:3,22;89:16;
90:20;97:11;104:9;
113:22;117:24;
118:8,19;119:11,18;
120:13;138:3;
139:12;141:13,20;
142:5
**Mortgage (4)**
5:4;84:18,19;
107:14
**Mosle (3)**
10:3,8;135:7
**most (3)**
67:17;106:21;
125:25
**mostly (1)**
125:19
**Motion (88)**
3:2,16,20;4:1,6,10,
13,16,22;5:6;14:10;
28:15;29:8,16;30:10;
31:15;35:7,8,13,19;
36:2,4,12;37:4,21;
38:6;44:15,17;45:9,
13,19,21;46:9;47:10,
15;49:7;54:2;58:23;
59:12,13;67:12;
69:24;70:20;78:18;
79:9;80:24;82:5,7,9,
16,21;84:3,5;85:8,9,
9,19;89:18;91:25;
93:15,24;94:3;95:12;
97:14;98:2,4,20;99:9,
11,19,24;100:6,6,10;
105:12,25;106:10;
110:13,17;111:10;
114:1;115:14;116:9;
119:21;120:6,10;
138:1;145:13
**motions (12)**
36:1,6;70:23;
81:23;83:11;88:1;
96:19;105:8;107:6,
24;110:10;112:16
**motion's (1)**
83:5
**motivation (1)**
50:9
**mound (1)**
65:11
**movant (1)**
84:10
**movants (3)**
28:7;97:15;98:10
**move (19)**
37:2;45:16,24;
47:24;48:2;53:7,23;
54:9,18,22;55:16,21,
25;62:21;63:9;70:6;
105:17;107:20;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(15) Masumoto's - move

149:24
**moved (2)**
106:16,17
**movement (1)**
42:2
**moving (5)**
49:12;53:5;54:6;
83:11;116:23
**Mrs (4)**
28:7;90:2;96:11;
97:20
**MSR (1)**
39:25
**much (18)**
33:25;35:21;50:16;
55:2;60:21;64:22;
68:13;72:8;75:20;
78:25;88:15;106:6;
115:18,21;117:6;
125:17;142:9;153:24
**mugging (1)**
133:20
**multiple (2)**
53:22;122:13
**MUNGER (1)**
25:2
**must (4)**
75:24;86:11;
123:13,15
**mute (1)**
75:6
**Mutual (3)**
18:10;58:2;66:6
**mutually (1)**
36:7
**myself (3)**
78:12;109:17;
117:5

**N**

**NA (3)**
20:10;22:3,14
**Naftalis (4)**
13:9,14;17:11;
151:1
**name (2)**
127:12;130:15
**named (1)**
98:16
**namely (1)**
42:19
**narrow (2)**
48:10;52:15
**narrower (1)**
59:23
**narrowly (1)**
59:13
**National (1)**
99:2
**nature (2)**
86:10;126:1
**Nawaz (6)**

4:14,14;28:6,7;
97:15,15
**near (2)**
51:21;55:3
**nearly (1)**
100:20
**necessarily (6)**
47:25;53:19;85:23;
125:15,22;138:20
**Necessary (13)**
3:14;7:15;10:6;
13:13,20;38:4;45:11,
23;77:1;87:1;91:21;
94:9;95:4
**need (35)**
42:4;43:7;45:1;
47:1,24;50:3,13;
57:17,18;61:18;
62:12,20;63:1,7,14;
64:11;68:23;69:5;
70:1,14;71:13;75:5;
77:7;79:4;83:23,25;
91:8;98:1;101:6;
113:16;131:2;137:5;
139:6;145:2,24
**needed (2)**
126:25;147:2
**needless (2)**
73:2;76:2
**needs (15)**
29:4;42:20;43:7;
51:9,15;57:13;62:1;
63:15;67:13;73:9;
123:2,4,5;126:13;
149:24
**Neelum (3)**
4:14;28:7;97:15
**negotiate (7)**
67:7,14;71:13;
124:24;125:14;
126:1,2
**negotiated (3)**
51:23;63:19;
100:15
**negotiating (2)**
66:18;71:6
**negotiation (4)**
41:25;45:7,17;
63:23
**negotiations (13)**
37:19;38:20;40:21;
45:2,11;46:19;47:7;
48:25;52:5;62:19;
68:10,11,15
**neutral (1)**
31:20
**New (40)**
2:17,17;14:23;
17:6,14;18:4,13,22;
19:4,13;20:4,12,22;
21:21;22:5;23:20,22;
24:5,22;30:15;46:2;
53:20;57:2;77:1;

90:8;91:8;92:15,21;
94:1;95:16,21,24;
121:18,18;122:2,5;
123:24;144:1,2;
154:1
**NEWTON (12)**
89:16,16,22;91:14,
25;92:5;93:11,15,19,
22;96:10,15
**next (53)**
35:25;36:21;38:14;
39:13;40:17;43:1;
45:14,20;47:1;57:10;
79:8;80:15;84:2;
89:15,18;96:14;97:9,
13;99:13,24;106:7,8;
111:10;114:16;
118:10,21;125:5;
129:19;131:21;
133:25;135:6,14;
136:3,5,18;137:14;
139:3;140:18;141:5,
10,13,19,22;142:15;
143:8,18;144:6;
145:25;146:1,6,10;
149:2;151:1
**Nice (1)**
79:24
**nine (2)**
34:8;73:4
**noise (1)**
75:7
**noncompliance (1)**
91:16
**nondebtor (3)**
107:24;115:2,5
**None (1)**
104:11
**nonexclusive (1)**
99:6
**nonjudicial (3)**
107:9;108:10,14
**nonmain (1)**
109:7
**non-public (5)**
65:25;66:8;68:8,
12,17
**nonworking (2)**
124:1,2
**Norm (2)**
83:8;113:22
**normally (1)**
149:9
**North (3)**
16:4;24:12;26:22
**note (5)**
39:4;51:3;82:10;
118:7;148:4
**noted (5)**
31:7;80:12;81:21,
24;148:5
**Noteholders (2)**
18:20;100:8

**notes (5)**
84:6;134:5;136:11;
140:17;150:17
**notice (1)**
81:18;103:24
**noticed (2)**
72:14;147:7
**notices (2)**
103:10,13
**notion (1)**
43:15
**November (3)**
31:23;75:16;
148:24
**nuance (1)**
46:4
**nuclear (1)**
45:3
**number (34)**
28:3,14,15;33:23;
35:10;36:4,5;44:24;
45:21;46:12,17;47:3;
50:21;51:11;79:10;
80:11;82:2;84:13;
89:20;97:5;98:4,6;
106:19;107:15;
112:17;113:20;
123:5,16;130:3;
132:22;133:4;135:3;
136:9;141:25
**numbers (2)**
148:7;153:5
**numerous (6)**
73:3,17;122:12;
123:23;124:10,22
**Nunc (2)**
6:8;77:25
**NW (2)**
23:4;26:4
**NY (17)**
14:23;17:6,14;
18:4,13,22;19:4,13;
20:4,12,22;21:4,21;
22:5;23:22;24:5,22

**O**

**object (7)**
37:10;39:22;60:9;
62:7;100:11;120:13;
152:6
**objected (4)**
29:13;30:13;
119:24;132:5
**objecting (1)**
39:24
**objection (48)**
37:22,23;39:4,4;
40:15;77:14,19,24;
78:7;81:5;91:18,18;
92:12,15,20;98:4,5;
104:21;105:1;
117:17,25;118:11,21,

23;125:2;129:10;
131:24;134:4,6;
135:11,21;136:15,22;
137:20;140:14,21;
141:8,16,24;142:3,
17;143:10,15,21;
144:9;146:12;148:5,
8
**objections (18)**
30:5,19,19,20;
35:14;100:10,11,14,
24;105:13;117:21;
119:10;124:22,25;
126:2,20;128:24,25
**objectors (4)**
30:23;37:25;
100:16;101:1
**obligation (1)**
29:18
**observation (1)**
105:15
**observe (1)**
50:3
**obviously (17)**
38:20;49:7;60:5;
69:12,22;76:14;
91:20;94:23;106:2;
118:23;120:24;
121:1;124:21;
128:10;148:22;
149:22;152:5
**occasion (2)**
75:10;78:13
**occasions (2)**
46:17;97:5
**occur (2)**
43:7;62:5
**occurred (3)**
42:1;78:15;96:4
**occurs (1)**
128:12
**o'clock (1)**
71:8
**October (8)**
6:8;77:25;95:22;
96:1;98:9,20;103:12,
13
**Ocwen (1)**
82:12
**off (11)**
59:19;71:3,5;
90:24;92:14;108:24;
112:18;126:23;
127:6;128:7;144:22
**Office (16)**
17:3;34:19;77:22;
114:13;117:19,22,24;
118:17;121:2,20,21;
124:4,21;151:13;
152:17;153:8
**officers (2)**
74:24;76:4
**Official (7)**

4:16;13:3,10,21;
17:12;31:3;99:20
**often (2)**
58:9;126:18
**of-town (1)**
123:25
**old (1)**
87:25
**OLSON (1)**
25:2
**once (5)**
40:17;42:1;53:1,
24;120:10
**One (89)**
2:16;16:14;20:11;
22:4,15;26:21;31:10;
33:23;34:18;37:5,5,6,
7,7,8,23;39:23,24;
40:3;42:14;44:23;
48:19;49:11;50:21;
53:1,12;54:3;56:1,
16;57:2,3,15;59:17,
21,25;60:5,24,25;
62:3,17,22;63:9;65:6,
10;66:12;67:1,16;
68:8;69:20;70:5,7;
73:5,21;75:10;76:20;
77:6;78:14;85:11,23;
87:23;88:3;89:2;
98:24,25;101:3;
103:2,21;104:25;
105:8;107:5,8;108:2;
110:21;112:17,18,18;
114:12,12;116:15;
118:14;121:20,25;
127:23;129:17;
133:1,10;136:3;
145:19;149:24
**O'NEAL (3)**
20:16;69:7,7
**one-by-one (1)**
36:9
**O'NEILL (15)**
17:19;100:4,5,22;
102:6,7,11,14,19,21;
103:21;105:19,22;
106:1,5
**ones (5)**
75:3;79:16,17;
82:20;129:1
**ongoing (3)**
34:22;43:24;79:25
**only (16)**
37:10;40:13;41:9;
58:7;81:5,16;82:11;
87:8;94:15;97:7;
105:15;114:4;116:2;
122:7;130:4;149:25
**open (1)**
51:19
operations@escribersnet (1)
14:25
**operator (1)**

116:1
**opinion (2)**
119:13,17
**opportunities (1)**
108:13
**opportunity (5)**
28:10;46:18;72:18,
21;107:4
**oppose (3)**
91:19;94:8;108:14
**opposed (3)**
29:16;37:11;
126:21
**opposes (1)**
46:9
**options (1)**
39:16
**Order (89)**
3:2,5,16;4:1,17;
6:5;14:10;30:14,17,
21;34:13;35:8;58:10,
10;59:7,22;60:1,6;
62:4,18;63:16;65:8,
12;66:24;67:6;69:10,
16;70:1,4,9;71:7,15,
23,25;72:2,4;78:5;
80:25;81:11,12,17,
24,25;82:23;84:12,
14;85:17,20;86:6,11;
87:5;88:25;89:3,4,
14;90:14;91:17,22;
93:5;94:5,17,25;95:3,
9,16;96:7,8;99:9;
100:18,20;101:8,16,
20;102:14,22;
103:18;104:5;
107:12;108:23;
114:18;115:10;
116:19,21;125:4;
129:8;130:9;140:17;
143:2;148:12
**orders (5)**
58:8;72:25;90:11,
12;114:25
**ordinarily (1)**
114:23
**Ordinary (4)**
10:14,20;11:4;
12:21
**ordinary-course (2)**
146:17;147:5
**organized (3)**
130:3,6;131:1
**original (2)**
81:17;136:19
**Orrick (5)**
8:2,6;26:2;142:15,
20
**OSM (2)**
31:23;139:13
**others (3)**
33:17;40:25;48:16
**others' (1)**

49:3
**otherwise (7)**
64:8;86:12,25;
94:7;96:6;122:9;
125:4
**ought (9)**
54:10;70:8;71:5,
12;89:13;111:21;
112:15;128:19;
148:12
**ourselves (2)**
51:18;118:22
**out (39)**
33:3;39:5;41:3;
42:11;47:19;49:13;
50:14;53:1,6;57:11,
16;58:7;60:20;62:13;
65:19;66:25;67:6,14;
69:10,20;71:13,14;
72:24;81:9,19;82:5;
99:6;101:14;103:25;
104:6;119:7;121:15;
123:11;126:9;128:9;
131:2;133:21;
139:11,15
**out- (1)**
123:24
**outcome (2)**
53:14;116:13
**outlined (3)**
55:8;88:20;100:12
**outset (3)**
31:11;34:23;51:13
**outside (2)**
50:13;145:5
**outstanding (1)**
30:1
**over (24)**
31:8;38:14;40:15;
43:1;51:9;54:9;55:3;
72:9;73:1,2,4;74:6,
21;96:15;100:15;
101:18;102:5;
104:25;115:19;
123:5;133:21;
148:17,25;150:5
**overall (4)**
50:5;125:24,25;
128:12
**overhead (1)**
121:19
**overlay (1)**
31:17
**overlooked (1)**
144:15
**overtime (2)**
122:25;123:1
**own (6)**
50:13,23;51:16;
57:16;90:6;94:21

**P**

**pace (1)**
37:18
**page (4)**
103:24;130:4;
144:20;145:15
**pages (6)**
74:22;123:16;
129:21;130:25;
145:6,21
**PAMELA (1)**
27:22
**paper (2)**
63:18;65:12
**papers (9)**
37:15;46:21;49:11;
54:14;90:7;98:2;
114:5;116:3,5
**paragraph (3)**
69:10,16;101:7
**paragraphs (2)**
71:24;72:3
**parallel (1)**
108:11
**parent (3)**
31:13;33:11;58:5
**Park (3)**
20:21;22:4;25:21
**Parke (6)**
11:9,12;19:10;
72:12;152:1,14
**Parkersburg (2)**
27:6;109:18
**parking (2)**
122:5,12
**part (18)**
46:22;48:7;50:2,
25;52:1;54:13;60:16;
74:1;76:17;86:5;
88:18;90:19;106:21;
111:22;118:7;
121:19;134:7;139:9
**participants (1)**
66:12
**participate (6)**
60:18;63:17;64:1;
66:7,14;68:14
**participating (3)**
58:18;59:10;63:22
**participation (3)**
60:8;64:3,5
**particular (4)**
40:24;54:24;72:25;
128:6
**particularly (6)**
39:13;42:17;62:17;
73:8;75:21;133:7
**parties (49)**
30:7,13;36:6;
37:19;39:16;46:3;
47:21;48:6,7,9;49:1;
50:2,9,10;51:2;53:1,
19;58:11,12,16;
59:24;65:7;67:18;

68:13,19;69:11,17,
18,24;71:8;72:20;
73:1,8;74:2,5,9,13,
18,20,20;75:20,24;
83:13;84:13;88:15;
111:13;114:21;
124:25;125:14
**parties' (2)**
48:23;58:24
**partner (2)**
128:5;130:16
**Partners (3)**
9:6,9;134:1
**party (15)**
29:13,18;46:9;
62:16;66:12;71:5;
86:1,9,11;87:20;88:7,
9;89:6,7;101:23
**path (3)**
42:3,9;44:9
**paths (1)**
41:23
**PATRICK (2)**
21:15;37:6
**Pause (4)**
65:15;136:23;
141:3;142:4
**pay (4)**
29:18;30:1;133:16;
150:2
**paying (1)**
122:22
**Payment (8)**
10:4;28:21;29:3;
32:3,17;86:23;95:17,
25
**Payments (7)**
3:6,9;28:18,24;
32:11;35:9;95:20
**payroll (1)**
28:24
**pays (1)**
123:21
**PC (1)**
6:3
**Peachtree (1)**
22:16
**Peck (8)**
70:21,22;71:2,9,9,
10,14,18
**peculiarities (1)**
29:1
**pen (1)**
58:9
**pending (10)**
86:8;90:8;98:9,14,
22;107:3;108:10;
113:10;114:15;115:4
**Penina (1)**
14:20
**people (32)**
37:1,2;41:6;42:10;
43:2,23;44:8;46:25;

**47:4,7;50:3;54:14;
56:13,15;59:23;61:8,
12;62:20;63:20;64:1,
6,7;72:3;80:13;
122:9;123:4,4,6;
124:15;126:6;
127:16;128:22**

**people's (2)**
61:7;62:8

**per (4)**
39:4;126:22,23;
135:25

**percent (12)**
67:2;124:1,2;
125:13;138:17;
139:13;149:5,6,7,18;
150:3;151:21

**performance (4)**
84:16;85:24;86:4;
132:24

**performed (2)**
120:4,9

**performing (1)**
82:1

**perhaps (6)**
46:5;67:7,8;69:20;
105:9;153:11

**Period (56)**
5:13,14,21,23;6:14,
20,21;7:6,7,16,21,22;
8:5,7,13,14,21,22;
9:8,9,15,16,21,23;
10:8,15,21;11:5,10,
12,18,19;12:5,6,12,
13,21;13:5,6,15,22,
23;14:4,6;36:3;
37:18;38:19,19,20;
42:12;54:9;61:11,19;
73:2;102:5;111:12

**Periods (4)**
3:17;73:14,15;
101:15

**permission (1)**
28:16

**Permissive (2)**
4:24;5:8

**permit (9)**
49:20;85:10,17;
87:1,19;89:5;95:4;
114:5;116:4

**permits (1)**
93:5

**per-page (1)**
123:16

**person (3)**
119:9;126:23;
145:19

**personal (2)**
60:14,16

**persons (2)**
123:2,14

**perspective (1)**
50:15

**perspectives (1)**
31:9

**Peter (1)**
110:7

**PETERS (1)**
23:10

**Petition (8)**
3:7;43:16,18,20;
85:2;91:22;96:2;
98:13

**ph (1)**
135:24

**Philadelphia (2)**
121:25;122:2

**Phoenix (1)**
24:14

**phone (14)**
64:19;75:5,6;
89:22,23;91:10,17;
97:21;98:1;113:4;
119:7,8;127:17;
144:17

**Photocopying (1)**
123:15

**phrase (1)**
58:11

**picking (1)**
75:6

**piece (1)**
63:18

**pieces (2)**
53:5,15

**Place (28)**
26:21;29:4;38:13,
14;40:11;43:21;44:7;
45:15,15;47:4;50:8,
11,20;51:7;57:8;
58:23;61:6,13;62:23;
63:7;87:25;109:8,12;
111:11;114:20;
115:16;132:21;133:6

**placed (1)**
116:2

**places (1)**
66:18

**plaintiffs (3)**
108:12;114:14;
115:9

**plaintiffs' (1)**
112:12

**Plan (45)**
3:18;36:1,3,18,24;
38:18;39:14;40:21;
41:11,13;42:12,21;
43:9,11,12;44:9,16;
45:1,24;49:7;51:10,
23;52:13;57:11;
61:18,18;63:23;
67:12;69:24;70:20,
21;73:23;75:16,19;
83:24;86:23;101:15,
17,24;102:5;104:16,
21,22;105:2;149:24

**plans (2)**
42:10;72:24

**platform (3)**
79:13;80:7,10

**playing (2)**
62:20;64:24

**Plaza (3)**
19:12;20:11;22:4

**plead (2)**
87:5,16

**pleading (2)**
38:17;92:24

**pleadings (2)**
103:4,8

**pleasant (1)**
31:6

**Please (4)**
28:2;83:20;96:7;
113:19

**pleased (2)**
49:19;100:16

**pled (1)**
86:11

**PLLC (8)**
10:21;21:1;26:10;
27:2,4;109:23;110:2,
8

**PLS (2)**
49:5,6

**pm (4)**
113:18,18;122:7;
154:11

**pockets (1)**
45:4

**podium (3)**
72:9;96:15;115:19

**point (28)**
30:16;32:19,23;
38:17;40:5;41:18;
42:23,25;43:4;47:14;
48:8,19;49:11,19,24;
51:3;52:20;58:7;
60:20;65:3,6;68:1;
69:15;104:13,22;
105:17;109:5;113:10

**points (3)**
50:14;103:2;
126:16

**pool (1)**
56:7

**portfolio (1)**
79:13

**portion (7)**
29:13;32:8;85:21;
95:12;102:7,15;
149:10

**position (9)**
61:16,22;63:5,6,13,
13;64:9;120:17;
150:1

**positions (6)**
49:3;53:2,25;62:9,
21;68:18

**positive (1)**
50:4

**Possession (2)**
7:13;10:4

**possible (8)**
47:2;50:16;51:12;
53:9;64:6;68:14;
92:12;113:1

**possibly (1)**
55:3

**post (2)**
34:8;91:12

**post- (2)**
91:21;96:1

**posted (1)**
86:23

**post-petition (12)**
28:16;29:5,16;
91:13;92:5;93:3,21,
22,23;94:6,16;96:2

**post-ResCap-petition (1)**
93:3

**potential (6)**
40:25;51:12;52:2,
12;56:18;104:21

**potentially (1)**
40:20

**POULSON (7)**
21:6;109:22,22;
110:1,1,4,17

**practicable (1)**
81:19

**practical (1)**
68:18

**practice (3)**
116:17;122:11;
147:6

**pre (1)**
34:7

**pre- (1)**
29:15

**precisely (1)**
66:20

**preclude (1)**
86:13

**predicate (1)**
52:4

**prefer (1)**
39:7

**preferable (1)**
67:21

**preliminary (3)**
62:25;71:19;88:8

**premised (1)**
44:6

**preordain (1)**
39:11

**pre-pack (1)**
44:23

**preparation (1)**
74:14

**Prepare (3)**
88:25;95:3;130:24

**prepared (5)**
55:2;67:5;70:4;
100:22;114:23

**pre-petition (9)**
29:19;30:1;31:18;
32:20,20,21;42:1;
85:1;94:19

**presence (1)**
50:8

**PRESENT (4)**
27:11;71:24;72:15;
144:16

**presented (5)**
32:6;52:22;99:9;
125:16;140:2

**presenting (1)**
130:13

**press (1)**
44:22

**pressed (1)**
100:9

**Pre-trial (2)**
5:2;106:9

**pretty (5)**
55:20;61:17;68:9;
69:23;132:17;133:12

**prevail (1)**
85:4

**prevailing (7)**
86:1,20;87:20;
88:7,9;89:6,7

**prevent (1)**
96:6

**prevents (1)**
106:24

**preview (2)**
110:22;127:5

**Previously (2)**
91:14;152:17

**Prevost (1)**
10:3

**primarily (2)**
74:19;76:12

**prime (1)**
116:14

**Prince (3)**
12:17;25:10;143:8

**principal (3)**
66:14;67:18;
100:14

**principals (12)**
43:8,13;48:6;51:5,
6,8;61:4,20,20;62:4;
63:17;66:24

**principal-to-principal (1)**
43:8

**principles (1)**
62:3

**prior (1)**
81:18

**priority (1)**
40:23

**private (1)**

116:16
**privately (1)**
74:3
**privilege (2)**
104:3,4
**privileged (1)**
62:10
**privileges (1)**
103:25
**Pro (6)**
6:8;27:14,17;
77:25;97:15;114:16
**probably (7)**
70:22;73:4;74:20;
75:2;106:20;118:10;
121:12
**problem (8)**
61:6;78:17;79:6;
106:18;112:21;
116:25;128:12;
129:25
**problems (1)**
40:20
**procedure (1)**
82:4
**Procedures (13)**
4:3;64:15;79:9;
80:23,24;81:4,11,22;
82:6,8,14,20;111:11
**proceed (14)**
28:9;38:22;49:22;
55:2;71:20;89:5;
91:3;93:6;96:21;
112:15;113:24;
114:7;116:17;118:5
**proceeding (12)**
4:20,22;5:4,6;
87:11;88:12,21;90:8;
91:23;107:15,16;
108:17
**proceedings (6)**
83:12;99:14;106:9,
19;114:9;154:11
**process (41)**
34:21;36:2;37:3,
20;38:9;41:8,19;
42:5;44:10;45:14,24;
46:4;47:13;49:8;
51:20;53:6,15,22;
54:4,22;55:20;57:9;
63:10,22;70:6;72:22;
73:10;74:1,7;76:25;
78:2;80:1;88:18;
106:13;111:10;
114:20;115:13;
148:6;149:24;
152:16,18
**processes (2)**
53:23;109:8
**processor (1)**
28:24
**produce (1)**
77:4

**produced (2)**
74:17,21
**producing (1)**
75:22
**production (6)**
76:2,10,11,15,21,
24
**productions (2)**
74:23;76:4
**productively (1)**
47:2
**Professional (38)**
5:18,23;6:2,21;7:2,
10,14,16;9:2,9,19,23;
10:5,11,14,16,19,20,
21;11:2,4,6,12,15,19;
12:2,4,6,16,17,21,23;
13:6,12,19,23;14:6;
148:18
**Professionals (21)**
7:11;41:6,7;74:17;
118:9;120:22;
121:10;125:11;
127:16,20,20;129:9;
146:17;147:5;
148:23;150:8,13;
151:22;152:4;
153:17,18
**professionals' (1)**
118:8
**Professions (1)**
98:17
**program (2)**
29:2;118:12
**progress (17)**
36:24;37:14,16;
42:22;45:13;48:6;
52:11,14,18;53:10,
10;55:3;58:25;59:2;
71:6;72:19;150:2
**project (4)**
130:7,10;139:12,
13
**projections (1)**
65:21
**promised (1)**
77:3
**prompt (1)**
55:12
**promptly (1)**
53:19
**prongs (1)**
44:18
**proof (5)**
88:12;95:9,14,23;
96:1
**proofs (2)**
88:5,17
**proper (2)**
58:21;126:4
**properly (3)**
39:7;107:20;
148:12

**proposals (2)**
40:21;71:10
**propose (7)**
44:16;101:17,24;
104:16,20;105:1;
111:9
**proposed (9)**
37:11;39:15;58:8,
10;69:10;70:3;71:25;
73:23;74:4
**proposing (2)**
36:18;40:14
**Prosecute (1)**
4:17
**prospect (1)**
58:15
**protection (1)**
72:1
**protections (1)**
99:1
**protective (1)**
31:20
**provide (10)**
50:9,18;67:20;
69:17;79:17;123:13;
128:2;137:12;
145:10;147:12
**provided (7)**
69:19;77:23;99:1;
126:8;127:2;137:2;
145:24
**Provider (1)**
7:5
**provides (1)**
69:16
**providing (3)**
28:19;59:7;132:25
**proving (1)**
123:20
**provision (4)**
67:6;85:25;86:2;
88:10
**Prudential (2)**
18:10;58:2
**public (5)**
43:15;64:15;66:4,
22;122:9
**publicly (2)**
65:25;66:2;74:3
**publish (3)**
64:13;65:24;66:23
**pull (2)**
61:17;79:4
**purchasers (1)**
79:16
**purpose (1)**
114:14
**purposes (3)**
67:6;71:24;132:5
**Pursuant (6)**
4:23,24;5:6,8;
103:11;153:7
**pursue (4)**

86:3;90:5;100:7;
101:9
**pursuing (2)**
91:7;100:13
**push (1)**
102:1
**pushing (1)**
139:10
**put (24)**
29:4;40:17;45:15;
50:7,18;51:6;53:14;
54:4;55:22;56:11;
58:9;65:3;66:25;
70:11;75:6;76:14;
85:19;95:7;109:8;
111:11;114:20;
124:17;135:25;
149:21
**putting (7)**
54:17;61:6,13;
64:8;115:16;122:19;
131:3

## Q

**quality (2)**
30:12;64:24
**quantified (1)**
141:24
**quarter (1)**
126:23
**Quarterly (1)**
10:18
**quick (3)**
61:17;83:11;103:2
**quickly (6)**
45:15,16;50:3;
51:12;102:24;111:8
**QUINN (2)**
18:9;57:23
**quite (6)**
42:24;46:15;74:13;
80:3;126:10;131:13

## R

**RACHAEL (2)**
17:17;150:10
**raise (9)**
40:20;63:12;
127:23,24;137:1;
139:1;144:15;
147:14;148:19
**raised (10)**
30:22;72:3;73:7;
94:2;100:14;103:22;
120:23;125:1;130:1;
146:22
**raises (2)**
35:10,12
**raising (4)**
109:5;126:20;
128:11;148:3

**Raja (24)**
4:14,14;27:14;
28:6,7,7;97:15,16,20;
113:25;114:3;
115:22,22,24,24;
116:7,9,11,22,25;
117:2,5,7,9
**Rajas (7)**
97:21,25;98:8,10,
15,20;99:9
**Raja's (2)**
98:2,4
**rapidly (1)**
40:6
**rather (8)**
32:3;38:19;47:8;
62:24;63:11;109:3;
118:17;137:6
**rational (1)**
109:15
**rationality (1)**
108:25
**RAY (1)**
19:6
**RE (2)**
3:22;138:10
**reach (4)**
43:3;61:21;105:14;
151:9
**reached (6)**
29:23;41:20;53:3;
66:20;100:17;150:13
**reaches (1)**
124:18
**reaction (1)**
74:10
**read (8)**
44:22;47:21;101:1,
7;104:23;105:25;
106:3;128:24
**reading (1)**
54:13
**real (5)**
44:7;50:17;51:21;
128:12;149:24
**realize (2)**
56:17,20
**reallocated (1)**
40:18
**really (32)**
29:24;30:9;33:2;
37:3;39:23;42:25;
44:9;47:1,14;48:7,
21;53:4;58:25;60:18;
63:25;64:12;66:5;
68:2,10;71:25;73:2;
76:22;103:5;106:12;
111:20;121:11;
124:5,19,20;138:7;
139:15;149:24
**reason (12)**
43:22;47:20;61:3;
85:18;91:24;92:2;

103:25;104:6;
111:22;119:3;132:8;
139:10
**reasonable (2)**
101:19;102:4
**reasoning (1)**
99:8
**reasons (6)**
50:1;62:22;63:10;
70:5;87:23;133:10
**receive (4)**
66:8,19;134:10,13
**received (11)**
28:23;30:15;37:4,
23;74:5,6,11;82:25;
90:25;95:16;134:8
**receiving (1)**
90:23
**recent (1)**
38:11
**recently (1)**
126:8
**recess (4)**
83:18,19;113:14,
18
**recipe (1)**
47:5
**recognition (3)**
45:5;50:1,10
**recognize (1)**
142:10
**reconcile (1)**
148:11
**reconciliation (1)**
148:6
**record (13)**
39:2;56:4,12;
92:14;103:3,10,14,
23;112:3;113:20;
117:12;129:3;147:22
**recorded (1)**
138:15
**records (1)**
147:8
**recover (3)**
85:3,15;89:6
**recreate (1)**
127:10
**red (1)**
122:11
**reduce (7)**
95:24;129:12;
142:1;150:2;152:19,
19;153:9
**reduced (1)**
125:23
**reducing (15)**
120:10;131:24,25;
136:15,16;137:20;
140:25;141:8,16;
142:17;143:10,15,21;
146:12;149:25
**reduction (29)**

124:12;125:4,13;
129:4;132:9;134:3,
16;135:11,21,22;
136:21,22;137:21,22;
138:4,13,17;142:6,
18,20;143:16;147:19,
23;150:23;151:11,12,
18;152:21;153:14
**reductions (4)**
124:14;129:1;
131:6;148:7
**Reed (5)**
10:12,16;12:19,22;
143:13
**refer (1)**
42:24
**referred (1)**
58:2
**referring (2)**
103:4,9
**reflect (1)**
148:12
**reflected (2)**
37:3;153:3
**refusal (1)**
94:22
**regard (1)**
45:12
**Regarding (6)**
4:3,6;79:9;84:4;
94:17;119:23
**regards (1)**
103:16
**register (1)**
59:20
**regulatory (1)**
136:2
**Reimburse (4)**
3:5;28:16,23;35:8
**Reimbursement (33)**
5:12,21;6:13,19;
7:4,14,20;8:5,12,20;
9:7,14;10:6,13,19;
11:3,10,17;12:11;
13:4,12,20;14:3;30:3,
6;121:17;122:4,15,
24;123:2,13;126:7;
132:6
**reiterate (2)**
47:20;57:8
**rejected (1)**
79:18
**Rejection (11)**
4:4;79:9;80:23,25;
81:6,11,18,21;82:14,
19;140:25
**rejections (1)**
81:2
**related (4)**
28:17;36:1,6;47:11
**relates (2)**
29:15;34:19
**relating (1)**

28:9
**relation (4)**
48:20;49:4;80:9,10
**relationship (1)**
33:8
**relatively (1)**
100:8
**Release (11)**
3:10;28:19;30:8;
33:3,14,15;41:25;
74:4;149:10;151:21;
153:18
**released (2)**
33:17;148:23
**releases (2)**
42:4;73:22
**relevance (1)**
43:24
**relevant (5)**
58:12;62:12;73:14;
76:24;77:2
**Relief (21)**
4:6,10,13;29:13;
30:14;38:8;81:23;
83:11;84:4;86:9;
87:5;88:8;89:19;
90:3,4;91:20;94:9;
97:14;98:3,19,24
**reluctant (1)**
55:16
**rely (1)**
65:25
**remain (2)**
86:7;117:3
**remained (1)**
98:13
**remaining (1)**
129:1
**remarks (1)**
38:9
**remember (3)**
44:21;127:11;
139:23
**remove (1)**
95:10
**Rendered (12)**
7:4,14;10:5,14,20;
11:4;12:4,20;13:12,
19;144:12;145:4
**renewed (1)**
114:1
**repeat (1)**
121:9
**reply (3)**
36:7;38:4;62:7
**report (9)**
47:16,18,19;48:1;
72:16;74:15;75:18;
76:6;77:4
**reported (1)**
130:9
**representation (1)**
133:23

**representative (1)**
119:9
**representatives (1)**
51:20
**represented (2)**
37:6;67:5
**representing (1)**
53:12
**request (23)**
30:17;36:22;37:8,
17;60:25;81:23;
85:22,22;93:16;94:2;
106:15;123:2;129:3;
136:16,19;140:15,25;
142:1,2;143:19;
151:2,16,20
**requested (19)**
36:13;37:24;38:8,
23;95:23;129:11,13;
131:22;132:11;
134:1;135:9,15,16;
136:6;138:9;140:12;
143:13;145:1;150:22
**requesting (5)**
87:17;136:19;
137:15;142:15;143:8
**requests (2)**
58:24;123:13
**require (8)**
48:15;59:14;62:19;
86:22;122:17;130:6;
131:1,2
**required (5)**
65:24;66:23;
119:20;146:19;147:7
**requirement (1)**
66:16
**requires (2)**
48:12;105:16
**requiring (2)**
53:19;95:9
**ResCap (8)**
18:2;73:1,5,18;
74:25;94:21;95:6;
96:20
**ResCap's (1)**
94:16
**reservation (1)**
141:25
**reserve (2)**
38:9,21
**reserved (3)**
33:11;81:22;
114:22
**reserves (1)**
45:8
**reserving (5)**
76:25;138:24;
140:3;142:11,12
**reside (1)**
50:22
**Residential (8)**
4:20;16:3;26:3;

27:19,22;28:3;
107:15;113:20
**resisting (1)**
62:16
**resol (1)**
70:8
**resolution (19)**
41:21;48:1;50:19;
56:10,15;61:21;
62:12;68:4,16;88:18;
112:25;114:21;
117:20,25;118:7;
124:17;142:2;
150:14;151:9
**resolvable (1)**
50:12
**resolve (27)**
29:17;31:24;41:13;
42:10;50:11;56:21;
67:12;68:7,20,23;
69:21;70:9;80:14;
81:7;88:23;96:9;
112:24;116:19;
117:23;118:22;
119:23;127:9;134:3;
136:15,21;141:15;
143:20
**resolved (25)**
30:21;31:15;32:1,
16;35:15;47:23;
49:13;68:20;81:8;
105:13;117:18;
124:8;129:2,2;
131:24;135:11,21;
137:19;140:24;
141:7;142:17;
143:10,14;146:12;
153:1
**resolving (4)**
30:10;32:25;52:13;
120:22
**Resources (1)**
5:11
**respect (45)**
38:7;44:15;45:18;
46:8,10;53:11;61:24;
62:15;64:7;69:16;
70:4;71:10,23;72:2;
81:23;82:4,14;86:8;
89:3;97:6;98:2,12;
100:7;105:16;
107:23;118:18;
119:7,8,10,11,13;
120:14,23;123:22;
124:6;125:1,15;
126:6;137:22;138:1,
3;142:12;143:23;
144:10,25
**respected (1)**
97:4
**respective (2)**
53:1,25
**respond (3)**

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.    Pg 181 of 188
12-12020-mg

December 20, 2012

101:13;115:1,11
**responded (1)**
   46:9
**response (4)**
   46:16;58:6;88:20;
   148:4
**responses (8)**
   36:7;37:3,5,8;
   45:25;54:14;74:12,
   13
**restrict (2)**
   66:10,16
**restricted (2)**
   66:13;67:10
**restricting (1)**
   64:8
**result (8)**
   31:15;45:5;91:25;
   104:4;114:2;136:4;
   137:11;152:18
**resume (3)**
   83:21,24,25
**retained (1)**
   147:3
**Retention (5)**
   6:6;77:20;78:5,17;
   146:19
**returnable (2)**
   110:15,18
**retyped (1)**
   100:25
**reveals (1)**
   78:9
**review (4)**
   51:12;74:17;124:5;
   142:8
**reviewed (12)**
   33:16;74:22;77:22;
   78:8;98:1;103:18;
   117:21;120:25;
   121:1;130:19;
   132:10,22
**reviewing (7)**
   74:7;120:3;121:14;
   130:10,25;132:17;
   133:5
**revised (4)**
   30:14;81:11;82:23;
   137:12
**revising (1)**
   30:21
**revisit (1)**
   67:25
**RICHARD (1)**
   19:25
**Richards (10)**
   96:16,17;97:10,11,
   18;99:12,16,19,24;
   100:2
**RIELA (1)**
   24:24
**right (106)**
   28:8;30:18;32:22;

33:1;34:4,12,15;
38:21,24,25;41:9,16;
42:5,24;43:16;44:12,
15;45:8;48:16,17;
49:15,21,25;50:16;
53:20;56:12;59:11;
61:3;64:21;65:16;
70:15,18;71:14,15;
76:25;77:15;78:6,8;
82:13,16;83:4,17;
87:6;88:4;89:5,11,15,
21,23;90:14,16;91:3,
11;93:7,10,18;95:2;
97:25;99:22;100:3;
101:14;102:5,6;
105:24;109:12,21;
110:19;113:3,4;
114:2;116:23;117:1;
120:20;123:11,20,22;
125:5;127:13;
129:18;131:15,17,19;
132:8,15;133:24;
134:12;135:2;
138:20;139:11,22;
140:3,11;142:25;
144:2,25;147:9,10,
17;148:11,14;149:3,
13;150:4,9;152:24;
153:15
**rights (4)**
   81:22;96:25;
   103:16;114:22
**RINGER (14)**
   17:17;148:18;
   150:7,10,11,16,18,
   21;151:1,6,9,15,20,
   24
**ripe (1)**
   46:15
**RMBS (20)**
   21:10,19;22:3;
   38:12;39:3,11,17;
   40:25;48:22;49:4,10;
   50:6;57:2,5,17;81:10,
   19;82:4,17,24
**road (1)**
   88:3
**roadblocks (1)**
   94:22
**ROBERT (1)**
   18:6
**Rockefeller (1)**
   19:12
**ROLAND (1)**
   27:12
**role (3)**
   43:25;72:20;120:2
**rolling (4)**
   55:17;71:22;76:12,
   15
**Romain (1)**
   110:9
**room (3)**

61:7;64:6;83:2
**ROPES (2)**
   21:18;39:3
**Rosen (1)**
   106:7
**ROSENBAUM (47)**
   83:8,8,16;84:1,2;
   86:24;87:13,15,23;
   88:14;89:10;106:7,8,
   14,17,25;107:4,18,
   22;108:1,4,6,9,19,25;
   109:4,13;110:21,25;
   111:4,6,7,19;113:3,8,
   9,15,21,22,22;114:8,
   11;115:6,12,16,18,19
**ROTHMAN (2)**
   24:2;110:7
**rough (2)**
   138:5,11
**roughly (2)**
   127:3;140:8
**rubber (1)**
   58:8
**Rubenstein (4)**
   6:11,15;143:19,24
**Rule (6)**
   3:4;4:3,23;5:7;
   14:12;125:1
**ruled (5)**
   99:8;114:6;116:4,
   10;139:24
**rules (5)**
   35:3,3;64:4;71:14;
   126:22
**ruling (4)**
   109:10,14;114:6;
   116:7
**run (4)**
   76:23;94:22;
   150:12;153:5

**S**

**Sachs (1)**
   77:10
**sailing (1)**
   61:25
**sale (9)**
   73:7;79:13,13;
   80:6,7,9,12;84:20;
   86:15
**sales (4)**
   40:5;73:4;79:20;
   149:1
**Samantha (1)**
   79:2
**same (13)**
   66:21;78:11,13;
   94:2;122:10,10,13;
   135:25;142:6;
   151:21;152:16;
   153:17;154:9
**San (1)**

16:16
**sanction (4)**
   93:11,13;94:3;96:3
**sanctioned (4)**
   90:19,22,25;92:2
**sanctions (12)**
   90:5,17;91:7,16;
   92:1;93:16,17,24;
   94:2;95:5,12;97:8
**Sanders (6)**
   11:6;25:19;146:10,
   16,25;147:10
**Sandy (1)**
   78:2
**satisfaction (3)**
   94:7;117:18;
   119:23
**satisfactory (2)**
   72:4;124:9
**satisfied (8)**
   34:11;35:16;42:17;
   44:18;101:1;134:8,
   11;138:19
**satisfy (3)**
   37:13;136:24;
   138:20
**save (1)**
   105:10
**saving (1)**
   127:3
**saw (2)**
   119:9;149:16
**saying (10)**
   41:12;47:25;48:3;
   54:20;62:25;67:1;
   108:16,19,19;133:4
**schedule (2)**
   56:3;57:12
**scheduled (7)**
   28:14;46:22;51:1;
   52:5,7;75:2,4
**schedules (1)**
   126:9
**scheduling (1)**
   52:7
**scheme (1)**
   153:18
**SCHROCK (1)**
   19:6
**scope (7)**
   46:4,8;48:20;
   59:13,24;72:23;74:1
**SCOTT (1)**
   18:16
**screwed (1)**
   97:6
**scrutiny (1)**
   66:4
**Se (4)**
   27:14,17;39:4;
   97:15
**SEAN (2)**
   20:16;69:7

seat (2)
   66:17;67:9
**seated (3)**
   28:2;83:20;113:19
**Second (17)**
   10:11,12;29:12,15;
   36:4;54:24;75:15;
   76:17;84:7;95:23,25;
   99:4;116:15;136:8;
   141:2;142:8;150:19
**Secondly (1)**
   103:15
**secret (1)**
   119:4
**Section (5)**
   4:25;5:8;35:11,17;
   86:6
**Sections (1)**
   3:3
**Secured (7)**
   18:20;37:10;39:21;
   40:12;43:17;65:4;
   100:8
**securities (2)**
   49:6,6
**Securitization (2)**
   8:3,11
**seeing (1)**
   44:10
**seek (8)**
   30:6;33:23;45:8;
   77:7;85:15;91:20;
   98:24;133:1
**seeking (29)**
   28:15;30:2;77:7;
   78:5;80:24;81:1;
   84:11,16;85:24;87:4,
   6,8;88:8,16;90:3,4;
   91:16;98:2,15;104:2;
   137:23;140:19,23;
   141:6,14,20;144:6;
   146:7,11
**seeks (1)**
   29:9
**seem (1)**
   47:22
**seemed (3)**
   47:15;132:25;
   133:12
**Seems (5)**
   40:1;49:10;58:13;
   145:18;147:6
**Seife (13)**
   6:8;19:15;72:11,
   11;75:8,9;77:16,18;
   78:19,20,21,24,25
**self-help (1)**
   50:10
**send (1)**
   122:21
**sending (2)**
   59:19;128:7
**Seneca (3)**

21:2;109:23;110:2
**senior (3)**
28:17;32:7;128:5
**sense (9)**
42:22;44:9;49:22;
61:2,2,5,10;68:20;
76:23
**sensitive (3)**
56:6;63:20;70:12
**separate (7)**
65:19;82:5,9;
88:19,20;90:20;
124:13
**separately (2)**
74:3;126:2
**September (1)**
95:15
**series (2)**
73:6;97:7
**serve (4)**
70:22;98:10;
107:20;112:17
**served (5)**
78:11;109:1,2;
112:19,19
**Service (8)**
7:5;106:13;112:17,
20;122:8,12;123:15;
130:8
**Services (20)**
7:4,14;10:5,14,20;
11:3;12:4,20;13:12,
19;78:1;97:3;120:3,
8;122:4;137:5;
144:12,21;145:4,7
**servicing (13)**
81:10,20;82:1,11;
84:12,14;85:20;86:6;
89:3;93:5;94:24;
107:12;108:22
**se's (1)**
114:16
**SesabaughBonasso (1)**
110:8
**session (1)**
145:23
**set (17)**
33:14;37:20;42:18;
43:18;51:25;53:1,6;
61:11;67:10;71:20,
21;72:24;75:15,19;
99:4,5;121:15
**sets (1)**
61:7
**setting (2)**
55:25;64:15
**Settle (3)**
4:18;41:3;61:9
**settlement (25)**
32:17;35:12,17;
39:11;40:21;42:2;
43:7,13;56:14;62:19;
66:7;68:10,11,15,16,

18;84:17;85:23;86:5,
20;101:25;104:16,17,
19;105:10
**settlements (1)**
73:20
**settles (2)**
101:17;105:2
**seven (1)**
135:25
**seventy (2)**
36:3,14
**several (11)**
31:8,9;38:14;43:1;
50:17;81:9;82:25;
100:15;103:8;107:7;
115:4
**Severson (8)**
6:3;16:12;144:6,9,
11,16,19,25
**SEWARD (1)**
22:2
**shaking (1)**
83:1
**shall (1)**
86:7
**share (2)**
96:7;118:24
**shared (5)**
54:10,11;67:18,21;
74:8
**sharing (5)**
42:22;45:11,17;
62:16,16
**shed (1)**
146:20
**sheets (1)**
127:10
**SHELLEY (1)**
18:16
**SHORE (27)**
18:24;39:20,20;
40:3;42:23;43:5;
44:5,12;46:24;51:3;
60:23,24;62:14,23;
63:15;64:18;67:25;
69:2,4;101:2,3,6,12;
102:10,12;103:16;
105:17
**Shore's (2)**
102:8;104:13
**short (3)**
43:22;100:19;
103:2
**shorter (3)**
40:4;42:10,18
**shortest (1)**
45:6
**shot (1)**
41:12
**show (1)**
122:6
**showed (2)**
102:16;142:8

**showing (2)**
95:17;109:11
**shown (1)**
37:14
**side (2)**
74:8;114:5
**SIEGEL (6)**
23:24;56:23,24;
57:1,1,21
**sight (1)**
43:6
**signed (2)**
69:17,19
**significant (6)**
52:11,13;54:20;
73:6,9,22
**Silverman (1)**
112:6
**similar (7)**
69:15;78:15;81:23;
82:20;98:22;99:7;
133:6
**Similarly (1)**
69:16
**simple (1)**
99:8
**simplify (1)**
124:3
**simply (2)**
69:10;91:8
**sit (3)**
47:16;61:14;126:6
**sitting (6)**
46:1;48:14;55:19;
59:4;127:16;148:24
**situation (2)**
65:24;101:24
**six (2)**
73:2;130:4
**Sixth (1)**
23:4
**sixty (2)**
36:19;50:6
**slip (1)**
80:5
**slippage (1)**
80:17
**slowed (1)**
78:2
**small (2)**
46:18;82:11
**Smart (1)**
105:9
**Smith (6)**
10:12,16;12:19,22;
135:24;143:13
**so-called (1)**
128:4
**social (1)**
78:13
**sole (1)**
92:15
**Solicit (3)**

3:18;36:20;44:17
**soliciting (1)**
74:18
**solution (1)**
66:7
**solve (1)**
112:21
**solvency (1)**
73:13
**somebody (1)**
128:7
**Somebody's (2)**
83:1;128:9
**somehow (1)**
68:11
**someone (4)**
63:12;133:13;
144:16;146:15
**sometime (1)**
133:2
**sometimes (2)**
122:13;123:3
**somewhere (2)**
77:13;106:24
**Sonnax (3)**
99:4,4,11
**soon (2)**
53:9;80:4
**sooner (4)**
56:10,10;62:24;
63:11
**sorry (10)**
34:5;48:19;57:1;
99:17,19,22;110:1;
115:23;116:25;148:1
**sort (5)**
36:1;53:1;124:16;
125:25;138:15
**sought (2)**
76:16;153:7
**sounds (1)**
61:24
**South (1)**
19:21;23:12;25:4
**Southern (1)**
46:1
**speak (4)**
28:11;79:4;94:23;
114:21
**SPEAKER (3)**
83:3;99:17;153:13
**speaking (2)**
57:4;93:25
**Special (23)**
6:3;8:3,7,11,14,19,
22;9:3,13,16;16:13;
26:20;34:20;111:14,
16,17,22;112:7,12,
22;113:7,11;115:8
**specific (6)**
84:16;85:24;86:4;
124:25;127:15;137:6
**specifically (6)**

28:25;48:24;82:8;
118:8;119:14;126:1
**spectacular (1)**
80:2
**spend (1)**
128:8
**spending (1)**
73:25
**spent (3)**
120:14;132:22;
138:14
**spoke (2)**
91:15;127:11
**spreadsheet (1)**
65:3
**Square (1)**
24:3
**squarely (2)**
32:6;37:13
**staff (1)**
153:23
**stage (3)**
49:25;64:4;149:23
**stages (1)**
149:17
**stake (1)**
139:16
**stakeholders (1)**
44:8
**stakes (1)**
45:4
**stamp (1)**
58:8
**standard (1)**
35:17
**standards (1)**
78:16
**standing (6)**
41:22;42:6;70:19;
100:6;101:9;104:4
**stands (2)**
65:8;114:6
**Stanley (1)**
77:9
**stare (1)**
47:4
**start (8)**
48:8;54:5,15;
55:12;58:21;61:8,14;
124:15
**started (4)**
62:24;63:10;90:13;
117:22
**starting (2)**
36:9;129:9
**starts (1)**
52:15
**state (7)**
86:17;96:21,24;
98:13,22;108:18;
147:3
**stated (2)**
55:17;116:13

12-12020-mg    Doc 2523    Filed 12/23/12    Entered 12/27/12 12:39:34    Main Document
RESIDENTIAL CAPITAL, LLC, et al.
12-12020-mg
Pg 183 of 188

December 20, 2012

**statement (1)**
95:16
**statements (1)**
103:15
**States (10)**
2:15;17:2,3;86:6;
107:9;150:14;
151:10;152:6;153:2,
8
**station (1)**
56:16
**statistics (1)**
132:23
**Status (5)**
3:22;72:16;79:20;
80:15,16
**statute (1)**
85:23
**Stay (35)**
4:7,10,13;57:12;
83:11;84:4,14,22;
85:10,14,16,21;86:7;
87:1,19;89:1,4,20;
90:5;91:4;93:14,20;
94:10;95:4,13;96:5,5,
6;97:1,14;98:3,20,25;
99:10;106:24
**stayed (3)**
58:20;85:1;88:17
**stays (1)**
58:22
**STEEN (1)**
20:9
**Steering (2)**
21:10;39:3
**step (5)**
47:23;53:24;54:24;
71:17;73:12
**Stephanie (4)**
4:11;27:17;89:19;
94:15
**STEPHEN (2)**
17:20;19:7
**steps (3)**
53:6;54:8;73:6
**still (11)**
32:18;58:22;80:1,
11,18;91:7;94:18,22,
24;104:24;113:6
**stipulation (1)**
81:25
**STN (3)**
101:20;104:4;
105:8
**stock (4)**
31:13;32:4,9,10
**stop (1)**
54:18
**stopped (1)**
47:17
**storm (1)**
78:4
**story (1)**

74:8
**straightforward (1)**
68:9
**streamline (1)**
81:1
**Street (11)**
14:22;16:4;17:4;
19:21;20:3;22:16;
23:4;25:12;26:4,12;
27:5
**strengths (1)**
61:15
**strong (2)**
50:15;127:1
**STRONGIN (2)**
24:2;110:7
**strongly (1)**
55:7
**struck (2)**
103:25;104:6
**structure (8)**
31:20;40:11;44:25;
50:11,17;51:7;102:1;
104:18
**structured (1)**
103:17
**subject (7)**
31:7;51:22;81:21;
118:20;129:10;
142:11;153:17
**subjective (1)**
65:23
**submission (3)**
110:20,24;111:3
**submissions (3)**
59:14;74:5,9
**submit (6)**
71:8,9,10;89:13;
114:25;116:21
**submitted (2)**
117:19;152:14
**subordination (1)**
40:25
**subsequent (3)**
63:16;81:23;
138:25
**subsequently (1)**
95:13
**subservicing (1)**
73:19
**substance (2)**
51:9;100:11
**substantial (4)**
45:13;61:19;
124:23;134:7
**substantially (3)**
76:9,18;120:6
**substantive (1)**
52:4
**substantively (1)**
52:1
**subsumed (1)**
49:9

**succeeded (1)**
88:7
**success (1)**
32:7
**successful (2)**
39:14;62:5
**Successor (2)**
5:5;103:11
**sue (1)**
58:20
**sufficient (2)**
104:20;134:7
**suggest (2)**
100:23;114:18
**suggestion (3)**
69:9;114:11;
116:12
**suggestions (1)**
131:8
**Suite (12)**
14:22;16:5,15;
21:12;23:13;24:13;
25:13,22;26:13;
109:3,3;112:17
**SULLIVAN (1)**
18:9
**sum (1)**
124:13
**summary (3)**
126:9;130:24;
145:13
**summed (1)**
66:5
**Supplemental (12)**
3:2;35:8;75:16,19;
84:12,14;85:20;86:6;
89:3;93:5;107:12;
108:22
**support (9)**
37:8;38:6,8,16,23;
104:18,19;123:14;
132:12
**supported (3)**
58:6;98:5;122:6
**supporting (4)**
134:8,10,13,18
**supportive (1)**
46:23
**sure (31)**
30:20;31:10;39:6;
42:23;43:23;47:3;
49:23;51:8;53:6,21;
54:7,19,22;55:25;
56:2;59:7;60:10;
64:15;70:2;80:15;
81:14;89:2;106:2;
112:1;133:5;136:9;
143:2;144:3;150:18;
154:2,5
**surrounding (1)**
51:10
**Susan (1)**
110:9

**SUSHEEL (2)**
18:15;57:22
**suspected (1)**
65:1
**Sutcliffe (4)**
8:3,6;26:2;142:15
**swaps (1)**
73:18
**synagogue (1)**
78:11
**system (3)**
132:20,21;133:6

**T**

**table (2)**
66:18;67:9
**tabulated (1)**
44:11
**TAFT (1)**
23:2
**tainted (1)**
64:10
**Talcott (1)**
20:2
**talk (4)**
39:13;59:3;75:12;
131:3
**talked (4)**
58:14,14;70:24;
149:23
**talking (8)**
41:6;59:25;80:6;
92:20;104:14;
107:13,14;127:9
**TARP (2)**
29:1;139:14
**TARP-related (1)**
29:19
**Tax (1)**
7:11
**taxis (2)**
122:5,8
**technically (1)**
105:22
**Technology (1)**
7:12
**telephone (4)**
96:9;97:18,22,23
**telephonic (1)**
95:22
**TELEPHONICALLY (15)**
16:18;25:7,16,25;
26:7,16;27:13,14,15,
16,17,18,19,21,22
**ten (7)**
74:6;75:2;123:18,
21;149:17;150:3;
151:21
**ten-minute (1)**
83:17
**ten-percent (1)**
125:3

**tension (1)**
102:2
**term (5)**
39:12;51:21;55:3;
58:11;105:19
**terminates (1)**
36:9
**terms (11)**
43:14;59:16;75:14,
22;76:2,3;84:18,20;
106:18;125:23;
149:25
**test (1)**
44:19
**testing (2)**
73:12,14
**thankfully (1)**
104:12
**thanks (1)**
95:2
**therefore (3)**
31:19;114:6;152:7
**there'll (2)**
47:25;52:14
**Thereof (1)**
3:18
**thick (1)**
124:10
**Third (5)**
18:3;24:21;81:24;
97:13;103:24
**third-party (6)**
33:19,21;41:24;
42:4;50:23;73:24
**thirty (2)**
114:20;115:11
**thirty- (1)**
125:12
**thirty-seven (1)**
75:1
**THOMAS (3)**
20:15;23:16;25:7
**THOMSON (1)**
27:13
**though (4)**
40:1;94:16;101:23;
119:18
**thought (12)**
32:16;114:12;
119:19,21;122:17;
126:4;132:19,20;
133:5,6;137:25;
138:10
**thousands (1)**
88:15
**three (4)**
74:22;88:3;114:17;
152:3
**Throughout (1)**
73:10
**tickets (2)**
133:12;136:25
**tied (1)**

33:2
**tight (2)**
    56:3;80:18
**till (3)**
    63:11;83:14;
    141:21
**Tim (1)**
    27:3
**timekeeper (3)**
    132:22;136:3;
    152:6
**timekeepers (5)**
    126:22;127:25;
    128:4,11;138:16
**timekeeping (1)**
    133:1
**timely (2)**
    75:22;109:9
**times (1)**
    139:13
**timing (6)**
    46:5;75:14,20;
    76:17,21;87:24
**TIMOTHY (2)**
    27:8;109:17
**today (24)**
    28:14;32:25;36:10;
    40:13;41:14;42:19;
    43:21;54:3;67:12;
    75:1;77:7;83:23;
    97:14,19;105:13;
    115:4;118:18;119:6;
    127:17;129:1;
    137:23;139:4;
    140:10;153:22
**today's (1)**
    153:23
**Todd (1)**
    104:8
**together (9)**
    43:3;53:14,20;
    54:5,17;65:3;78:12;
    90:21;131:3
**toggles (1)**
    41:7
**told (1)**
    34:7
**TOLLES (1)**
    25:2
**tolling (1)**
    58:20
**tollings (1)**
    58:22
**Tom (1)**
    55:6
**tomorrow (1)**
    40:1
**took (2)**
    114:4;116:3
**top (3)**
    103:24;111:21;
    144:22
**total (44)**

37:5;95:18;117:15;
    129:11;131:22,23;
    134:1,2;135:9,19;
    136:6,7,19;137:15,
    15,20;138:2,6,14,17;
    140:6,12,13,19;
    141:6,14,14,20,21;
    142:1,2,16,16;143:9,
    13,19,19;144:7;
    145:1;146:11;
    152:19,20,20;153:14
**Touche (3)**
    7:3,7;135:15
**touchstones (1)**
    149:25
**toward (2)**
    51:17,24
**Towers (6)**
    5:10,13,15;27:13,
    15;146:6
**town (2)**
    119:8;133:21
**tracking (1)**
    106:19
**traded (1)**
    66:2
**traders (1)**
    66:11
**trading (2)**
    66:11,16
**train (1)**
    56:15
**Transactional (1)**
    8:3
**transactions (3)**
    73:3,6,15
**Transcribed (1)**
    14:20
**transit (1)**
    122:9
**transitory (4)**
    126:22;127:25;
    128:4,11
**transportation (5)**
    145:9,11,13,16,17
**travel (14)**
    121:17,18,23;
    122:5,6,7,20;123:24,
    25;135:1;143:25,25;
    144:1,1
**traveling (3)**
    122:1,13;133:20
**Treasury (2)**
    35:3,3
**treat (1)**
    85:9
**treating (1)**
    109:8
**treatment (1)**
    49:7
**tremendous (1)**
    37:14
**trial (9)**

38:12;39:17;43:16,
    18;48:22;49:12;50:6;
    65:18;87:25
**tried (4)**
    31:9,16,19;102:16
**trigger (1)**
    61:17
**tripartite (1)**
    103:11
**Troutman (6)**
    11:5;25:19;146:10,
    16,25;147:10
**true (3)**
    83:16;115:4;137:4
**Trust (4)**
    20:10;37:7;55:7;
    69:8
**Trustee (47)**
    17:3;20:20;22:3;
    78:3;95:19;103:9,11;
    105:19;118:6;
    119:10,22;120:12,13,
    23;122:24;123:16;
    124:2,11,16,18;
    127:1,24;128:3,14;
    129:4,10,14;130:5;
    131:1;132:5;135:16;
    138:19;139:15;
    140:8,14,20;141:23;
    142:12,20;144:8,8;
    146:8;147:23;
    150:14;151:10;
    152:6;153:2
**Trustees (8)**
    21:2;57:3,5;82:4,
    17,24;109:23;110:2
**trustees' (2)**
    81:10,20
**Trustee's (30)**
    77:22;84:20;
    117:16,19,22,24;
    118:11,17,21;121:1;
    124:4;126:17,21;
    131:24;134:3;
    135:10,20;136:15,21;
    137:19;140:25;
    141:8,15;142:3,17;
    143:10,15,21;146:12;
    153:8
**trusts (1)**
    40:25
**Truth (1)**
    98:18
**try (17)**
    31:17;41:11;43:3;
    53:10,14;54:4;61:12;
    71:3,5,12,21;93:6;
    101:22;112:21;
    114:20;121:13;
    126:18
**trying (11)**
    41:13;42:9;51:6;
    54:1;59:3,5;67:6;

108:23;111:7;
    130:24;139:10
**Tunc (2)**
    6:8;77:25
**turn (8)**
    60:15;72:9;96:15;
    115:19;117:13;
    148:17;150:5;151:25
**turns (1)**
    126:9
**twelve (1)**
    99:6;114:15
**twenty (8)**
    75:3;123:5,17,17;
    128:8;149:5,6,7
**twenty- (1)**
    122:25
**twenty-dollar (1)**
    122:25
**twenty-eight (1)**
    117:15
**twenty-five (2)**
    138:17;139:13
**twist (2)**
    60:13,16
**two (34)**
    29:10;36:1,1;46:6,
    22;47:1;50:19;51:11,
    24;52:25;59:4;62:3;
    64:13;68:7;75:1;
    84:17;87:23;88:2,3;
    103:2,4;106:9;107:5,
    8,13;109:10;117:17;
    118:7,9;128:5,9;
    145:15;153:11,12
**TX (2)**
    21:13;26:14
**Tye (3)**
    12:17;25:10;143:8
**type (1)**
    134:19
**typed (1)**
    106:1
**typically (4)**
    44:19;58:8;124:17;
    149:2

## U

**Uh (1)**
    116:22
**Ultimately (7)**
    31:17;35:1;44:11;
    50:22;68:15;105:2;
    126:25
**UMB (3)**
    20:20;103:1,11
**unable (2)**
    61:21;118:22
**uncertain (1)**
    55:22
**unclear (1)**
    41:16

**Under (22)**
    3:2;4:1;14:10;
    29:23;35:10,12,13,
    17;73:23;76:14;82:1;
    101:15;104:20;
    107:11;108:20,22;
    110:20,23;111:3;
    114:24;130:9;147:4
**underlying (2)**
    62:10;112:24
**underpins (1)**
    65:17
**understands (1)**
    83:21
**understood (8)**
    93:2;120:19;
    128:16;135:2,4;
    140:4;141:11;142:14
**undue (1)**
    66:18
**unencumbered (1)**
    149:1
**Unexpired (5)**
    4:4;14:12;79:10;
    80:25;82:15
**unfair (2)**
    66:1;67:3
**UNIDENTIFIED (3)**
    83:3;99:17;153:13
**uniformity (1)**
    121:12
**uninformative (1)**
    132:17
**unintended (1)**
    64:2
**unitary (1)**
    138:15
**United (8)**
    2:15;17:2,3;
    150:14;151:10;
    152:6;153:2,8
**units (2)**
    32:9,10
**universal (1)**
    45:23
**universe (1)**
    82:10
**unless (3)**
    57:3;78:21;122:5
**unlikely (1)**
    104:15
**unnecessary (1)**
    94:25
**unopposed (1)**
    146:8
**unpaid (1)**
    95:18
**Unsecured (5)**
    4:16;13:3,10,21;
    50:21
**unsettled (1)**
    105:9
**unsuccessful (4)**

39:16;48:12;66:24;
120:9
**up (39)**
28:10;35:1,1;
37:18,20;41:9;42:16;
48:22;51:19,25;57:4,
16;63:25;64:15;66:5;
67:10;70:19;75:6;
77:6;79:4;81:12,13;
92:20;97:6;101:13,
16;102:16;106:20;
109:11;113:10;
120:10;124:11;
127:12;128:23;
129:17;139:2;
142:13;148:2;153:12
**upcoming (1)**
75:4
**update (2)**
72:19;79:19
**upon (12)**
44:6;56:20;65:25,
25;75:20;76:7;85:1;
95:12;127:4;131:18;
132:18;138:5
**URQUHART (1)**
18:9
**USC (4)**
4:1,25;5:8;14:10
**use (6)**
38:19;41:18;47:1;
83:10;109:14;132:23
**used (4)**
48:22;62:9;74:23;
109:2
**useful (4)**
57:7,19;67:17;
133:7
**using (3)**
75:25;123:15;
132:13
**usual (1)**
123:18
**usually (1)**
124:13
**utilize (1)**
114:13

**V**

**VA (1)**
25:23
**vague (2)**
125:2;127:8
**vagueness (3)**
125:1,6;127:7
**validity (2)**
74:1;91:1
**value (5)**
73:12,22;88:4;
127:2;140:7
**Van (1)**
109:20

**varies (2)**
147:6;149:2
**variety (4)**
50:1;73:17;74:18;
84:20
**various (7)**
29:20;40:9;58:24;
72:24;117:21;
132:24;136:2
**vast (1)**
144:23
**vendor (1)**
132:12
**vendors (1)**
134:20
**versus (2)**
64:13;127:8
**vet (2)**
57:18,18
**veto (2)**
102:5;103:16
**vetted (1)**
57:17
**via (1)**
91:17
**view (11)**
41:16;42:9;44:18;
52:16;61:16,23;64:5;
69:22;104:24;128:1,
13
**viewed (1)**
105:7
**views (1)**
127:4
**violated (2)**
90:14;96:25
**violation (1)**
95:16
**violations (2)**
91:16;98:17
**Virginia (3)**
25:23;98:9,11,14,
17;109:18
**volume (1)**
144:23
**voluminous (3)**
120:24;122:8;
131:14
**voluntarily (1)**
54:11
**voluntary (1)**
135:11
**vote (4)**
43:9,10,11;44:11
**votes (4)**
36:20;43:10;44:17;
101:25
**voting (2)**
43:24;44:8

**W**

**Wacker (1)**

23:12
**Wages (1)**
3:4
**Wagner (11)**
4:20;107:15,23;
108:9;109:1,16,20;
110:4,5,9;112:10
**wait (3)**
47:16,18;63:11
**waiting (1)**
61:14
**waive (2)**
84:19;140:14
**walk (1)**
81:3
**Wall (4)**
20:3;66:11,17;
67:10
**walls (1)**
47:5
**WALPER (1)**
25:7
**Walrath (2)**
66:5,15
**WaMu (2)**
63:24;68:6
**wants (10)**
44:13;53:17;55:5;
63:4;71:20;83:15;
97:8;105:1;129:23;
147:19
**war (1)**
45:3
**warrants (1)**
37:16
**WARREN (3)**
20:19;98:6;103:1
**wars (1)**
43:2
**Washington (3)**
23:5;26:5;66:6
**waste (3)**
52:9,10;119:19
**waterfall (2)**
65:18,20
**waterfront (1)**
49:4
**WATKINS (1)**
24:19
**Watson (6)**
5:10,13,15;27:13,
15;146:6
**way (25)**
31:20;38:22;48:13;
54:21;55:17,22;
58:25;61:9;73:13;
80:13;85:11;92:14;
97:3;100:24;105:4;
108:11;112:24;
122:10,10;127:13;
130:20;131:1,2;
138:8;152:8
**ways (2)**

52:12;67:22
**weaknesses (1)**
61:15
**week (1)**
114:16
**weeks (3)**
38:14;50:17;
117:17
**weight (1)**
124:17
**weird (1)**
101:20
**WEITNAUER (1)**
22:19
**Welcome (2)**
31:4;64:18
**Wells (1)**
22:14
**Wendell (1)**
130:16
**weren't (3)**
90:23;116:2;121:4
**Werson (6)**
6:3;16:12;144:6,
11,19;145:1
**West (4)**
14:22;22:16;27:22;
109:18
**Westbury (1)**
21:4
**Westlaw (1)**
145:20
**whatnot (1)**
63:21
**What's (13)**
43:21;44:5;70:2;
92:24;101:8,13,16;
102:22;105:18;
106:7;127:8;139:15;
149:3
**Whereupon (1)**
154:11
**wherever (1)**
108:18
**WHITE (2)**
18:19;39:21
**Whitehall (1)**
17:4
**Whitney (4)**
8:11,14,16;135:19
**Whoever's (1)**
75:5
**whole (2)**
128:22;150:2
**who's (5)**
55:19;59:10;128:6,
7;133:13
**WICKERSHAM (1)**
23:2
**wife (2)**
78:12,13
**Wigley (14)**
4:7;24:16;84:9,9,

25;85:5,18;86:3,17,
19,22;87:7,10;89:12
**wildly (1)**
133:20
**WILLIAM (1)**
25:16
**Williams (5)**
5:4;107:14;108:10;
109:16;112:10
**willing (1)**
102:4
**willingness (2)**
61:4;70:25
**Wilmington (4)**
20:10;37:6;55:6;
69:8
**WILSON (1)**
20:25
**wind-down (1)**
79:17
**window (1)**
46:18
**winds (1)**
124:11
**wish (11)**
34:16;38:25;39:18;
44:13;55:9;60:23;
64:19;66:18;82:13;
104:7;111:16
**wishes (2)**
71:5;118:5
**withdraw (3)**
109:5;140:20;
144:9
**within (13)**
35:18;40:21;41:1;
44:10;50:22;51:6;
102:1;121:17,18;
122:5;123:24;130:8;
144:1
**without (12)**
30:2;43:18;55:14;
59:13;104:17;
108:17;110:20;
123:20;126:20;
144:12;145:4,14
**witnesses (3)**
75:23;77:1,2
**Wizmur (13)**
90:8,17;91:20;
92:2,25;93:7,11;
94:20;95:5,8,21;
96:3;97:4
**Wizmur's (1)**
94:5
**WOFFORD (13)**
21:23;39:2,3,18;
55:10,11,18,23;56:4,
12,22;69:14,15
**Wolf (4)**
6:6;77:12,21;78:17
**Wolicki (1)**
14:20

**wondering (1)**
92:13
**word (1)**
99:23
**words (2)**
29:6;119:14
**work (16)**
46:14;49:2;51:2,
16;71:13,19;72:24;
75:16,19,25;100:24;
120:10;126:18;
130:25;147:10;
153:23
**worked (2)**
29:24;120:22
**working (7)**
51:15;73:10,13,16;
121:20;124:1;128:7
**works (1)**
70:3
**World (1)**
105:9
**WORTH (2)**
25:16;125:12
**wound (1)**
120:10
**wrapped (1)**
124:16
**write (1)**
127:6
**writes (1)**
102:12
**written (3)**
64:5;119:13;
126:23
**wrong (5)**
65:22;71:24;93:2;
105:3;109:2
**wrote (1)**
119:16
**WV (1)**
27:6
**WYNNE (1)**
19:25

**Y**

**year (10)**
29:6;36:21;53:20;
67:15;83:15;87:25;
111:10;148:23;
154:1,2
**years (3)**
73:2;78:10;88:3
**yesterday (7)**
74:12;121:3,10,24;
122:17;123:7;153:2
**York (29)**
2:17,17;14:23;
17:6,14;18:4,13,22;
19:4,13;20:4,12,22;
21:21;22:5;23:20,22;
24:5,22;46:2;57:2;

91:8;121:18,18;
122:3,5;123:24;
144:1,2
**You're (1)**
149:22
**YOUNG (1)**
27:12

**Z**

**zero (1)**
140:19
**ZIDE (1)**
17:20

**0**

**02114 (1)**
25:14

**1**

**1 (5)**
10:15;12:22;28:14;
95:17;98:6
**1,234,156 (1)**
142:10
**1,491 (1)**
153:10
**1,500 (1)**
145:22
**1.5 (1)**
148:25
**1.75 (1)**
58:4
**1:30 (1)**
83:25
**1:45 (1)**
113:14
**1:47 (1)**
113:18
**10 (1)**
29:21
**10:07 (1)**
2:20
**100 (1)**
25:12
**10004 (3)**
17:6;22:5;24:5
**10005 (1)**
20:4
**10006 (1)**
20:12
**10010 (1)**
18:13
**10022 (3)**
18:4;19:4;24:22
**10036 (4)**
17:14;18:22;21:21;
23:22
**10040 (1)**
14:23
**101 (1)**

20:21
**10112 (1)**
19:13
**10178 (1)**
20:22
**105a (3)**
3:3;4:1;14:11
**1095 (1)**
23:21
**11 (7)**
3:17;4:1;5:20;
11:11;14:10;29:21;
36:3
**11,180 (1)**
142:2
**11:30 (1)**
83:19
**11:46 (1)**
83:19
**1100 (1)**
21:11
**1107a (1)**
3:4
**1108 (1)**
3:4
**1152 (1)**
26:4
**1155 (1)**
18:21
**11590 (1)**
21:4
**1177 (1)**
17:13
**11th (1)**
145:16
**12 (1)**
98:20
**12:20 (1)**
83:21
**12:25 (1)**
113:18
**1201 (1)**
22:16
**12-01896 (1)**
107:15
**12-01896-mg (1)**
5:4
**12-01913 (1)**
107:16
**12-01913-mg (1)**
4:20
**1211 (1)**
21:20
**12-12020 (2)**
28:3;113:20
**1244 (1)**
4:6
**1250 (1)**
24:13
**1280 (1)**
99:5
**1286 (1)**
99:5

**12b5 (1)**
4:23
**13 (4)**
91:22;93:4,4;95:19
**1300 (1)**
16:5
**1334c1 (3)**
4:25;5:8;108:21
**13th (2)**
84:13;145:15
**14 (15)**
6:14,20;7:6,15;8:5,
13,21;9:8,15,22;10:7;
11:5,18;12:5,12
**1420 (1)**
82:2
**14b (1)**
86:6
**15 (1)**
6:8
**1546 (1)**
4:16
**15th (2)**
26:4;77:25
**16 (2)**
13:13,22
**1615 (2)**
4:10;89:20
**1717 (1)**
26:12
**1794 (1)**
6:11
**18 (1)**
98:10
**18,761.48 (1)**
134:2
**1818 (2)**
4:13;98:4
**1819 (1)**
26:22
**1850 (1)**
6:2
**1858 (1)**
5:10
**1859 (1)**
6:17
**1863 (1)**
7:19
**1871 (1)**
8:2
**1872 (1)**
8:10
**1882 (1)**
8:18
**1883 (1)**
9:5
**1884 (1)**
13:2
**1885 (1)**
12:9
**1886 (1)**
9:2
**1888 (1)**

9:19
**1889 (1)**
9:12
**1890 (1)**
10:2
**1891 (1)**
7:10
**1892 (1)**
12:19
**1894 (1)**
11:2
**1895 (1)**
10:11
**1896 (1)**
13:9
**1897 (1)**
11:8
**1898 (1)**
13:18
**18th (2)**
48:24;95:22
**1900 (1)**
5:18
**1902 (1)**
7:2
**1904 (1)**
12:2
**1905 (1)**
11:15
**1906 (1)**
14:2
**1908 (1)**
4:13
**192nd (1)**
14:22
**1986 (1)**
99:2
**1988 (2)**
98:5,7
**1990 (1)**
99:5

**2**

**2 (2)**
20:3;53:24
**2,054 (1)**
140:25
**2:51 (1)**
154:11
**20 (2)**
2:19;95:8
**20,000 (1)**
151:17
**2000 (1)**
25:22
**20001 (1)**
23:5
**20005-1706 (1)**
26:5
**2008'9 (1)**
29:21
**2010 (1)**

RESIDENTIAL CAPITAL, LLC, et al.
12-12020-mg

December 20, 2012

98:10
**2012 (69)**
2:19;5:13,13,21,
22;6:8,14,14,20,20;
7:6,6,15,16,21,22;
8:5,6,13,13,21,21;
9:8,8,15,15,22,22;
10:7,7,15,16;11:5,5,
11,11,18,19;12:5,6,
12,12,22,22;13:5,5,
13,14,22,23;14:5,5;
29:5,22;31:23;94:18;
95:8,15,17,22;96:1;
98:21;145:3,5,12,15,
16,21,22
**2013 (2)**
50:17;79:14
**2014 (1)**
29:6
**2025 (1)**
12:16
**2049 (3)**
3:2;28:15;35:10
**21 (3)**
7:21;13:5;95:15
**217 (1)**
145:15
**21st (1)**
17:5
**2200 (1)**
25:13
**222 (1)**
25:21
**225 (1)**
145:21
**2261 (1)**
6:5
**2272 (2)**
10:18;136:9
**22nd (2)**
18:12;103:12
**23 (1)**
96:1
**230 (1)**
145:21
**2301 (1)**
8:10
**2326 (2)**
4:1;79:10
**23462 (1)**
25:23
**2354 (1)**
14:10
**2355 (2)**
3:16;36:4
**2357 (3)**
3:20;36:5;45:21
**236,903 (1)**
138:2
**24 (1)**
14:5
**240 (1)**
144:24

**242 (1)**
21:3
**24th (4)**
103:13;145:3,12,
22
**25 (1)**
5:13
**250 (1)**
109:3
**2600 (1)**
16:15
**26101 (1)**
27:6
**268 (1)**
145:6
**26th (1)**
75:16
**27,358 (1)**
153:9
**2700 (1)**
24:12
**274 (1)**
145:6
**28 (2)**
4:24;5:8
**28,849 (2)**
153:13,14
**280 (1)**
16:4
**28th (3)**
36:15;42:12;44:16
**29th (12)**
36:20;44:17;
107:25;108:5;
110:11,18;112:11,14,
22;145:5,7,21
**2d (1)**
99:5

**3**

**3 (1)**
5:21
**3,000 (1)**
136:16
**3,007,275 (1)**
153:6
**30 (1)**
19:12
**30,048 (1)**
153:7
**300 (2)**
123:3;148:25
**3000 (1)**
23:13
**30309 (1)**
22:17
**305,000 (1)**
151:3
**305,820.34 (1)**
151:5
**308,000 (1)**
118:18

**308,539 (1)**
141:22
**30th (2)**
31:23;148:24
**31 (25)**
5:13,22;6:14,20;
7:6,16,22;8:6,13,21;
9:8,15,22;10:7,15;
11:5,11,19;12:5,12,
22;13:5,14,22;14:5
**311 (1)**
23:12
**315.4 (1)**
138:1
**31st (4)**
39:24;76:13;80:4,
18
**327 (1)**
146:19
**33 (1)**
17:4
**350 (1)**
109:3
**35203 (1)**
26:23
**355 (1)**
25:4
**363 (1)**
3:3
**363b1 (2)**
35:11,17
**365a (2)**
4:2;14:11
**3rd (1)**
116:15

**4**

**4 (3)**
69:10;71:24;72:3
**4000 (1)**
26:13
**43215 (1)**
16:6
**474 (1)**
99:2
**494 (1)**
99:2
**4th (1)**
24:4

**5**

**5 (6)**
24:3;69:16;71:8,
25;72:3;101:7
**5,007 (1)**
143:11
**5,800 (1)**
130:25
**5,800-page (1)**
130:10
**5,827 (1)**

129:21
**5/14/2012 (13)**
6:21;7:7,16;8:7,14,
23;9:9,16,23;10:9;
11:20;12:7,13
**5/16/2012 (2)**
13:15,24
**5/21/2012 (2)**
7:22;13:6
**503b1 (1)**
3:3
**507a2 (1)**
3:3
**51 (1)**
18:11
**52,000 (1)**
137:20
**5300 (1)**
21:12
**54,169 (2)**
142:21;143:1
**543 (1)**
27:5
**554a (1)**
4:2
**562 (1)**
143:21
**565 (1)**
19:21
**58,000 (1)**
118:19
**59,225 (2)**
137:24;140:7

**6**

**6 (1)**
4:23
**6,586 (1)**
141:16
**6,675 (1)**
131:25
**6/1/2012 (1)**
10:22
**6/25/2012 (1)**
5:14
**60,360 (1)**
150:23
**6006 (2)**
4:2;14:11
**6006-1 (2)**
4:3;14:12
**601 (1)**
19:3
**60606 (1)**
23:14
**653 (1)**
146:13
**656,390 (1)**
140:13

**7**

**7 (2)**
5:6;42:3
**7,000 (1)**
147:24
**7,526 (1)**
137:22
**7,9 (1)**
4:22
**7.5 (1)**
137:15
**7/11/2012 (1)**
11:12
**7/24/2012 (1)**
14:6
**7/3/2012 (1)**
5:23
**70,032 (1)**
129:13
**700 (2)**
14:22;23:4
**7012b (1)**
4:23
**7012b5 (1)**
5:7
**75201 (1)**
26:14
**761 (1)**
143:11
**77002 (1)**
21:13
**774 (1)**
84:13
**7th (3)**
71:8,8,21

**8**

**8 (3)**
122:6,7;151:4
**8,469 (1)**
95:18
**8,499 (1)**
132:6
**8/31/2012 (22)**
5:14,23;6:22;7:7,
17,23;8:7,15,23;9:10,
16,23;10:9,22;11:12,
20;12:7,14;13:7,15,
24;14:7
**80,000 (1)**
127:3
**85,685 (1)**
142:1
**85004 (1)**
24:14
**875 (1)**
145:20
**885 (1)**
24:21
**89 (1)**
144:20
**890 (1)**
131:25

RESIDENTIAL CAPITAL, LLC, et al.

December 20, 2012

### 9

**900,000 (1)**
134:1
**90071 (2)**
19:23;25:5
**9014 (2)**
4:2;14:11
**9019 (2)**
3:4;35:12
**907 (1)**
99:5
**909 (1)**
18:3
**94,074 (1)**
140:19
**94111 (1)**
16:16
**955,735 (1)**
131:23
**973406-2250 (1)**
14:24