**Presentment Date and Time: January 15, 2013 at 12:00 p.m. (ET)**
**Objection Deadline: January 14, 2013 at 4:00 p.m. (ET)**

Kevin H. Marino (KM 4941)
John A. Boyle (JB 1058)
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Morgan Stanley & Co. Incorporated,*
*n/k/a Morgan Stanley & Co. LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                    :
In re:                                              :          Chapter 11
                                                    :
Residential Capital, LLC, <u>et al.</u>,           :          Case No. 12-12020 (MG)
                                                    :
                        Debtors.                    :          Jointly Administered
                                                    :
------------------------------------------------------X

### NOTICE OF PRESENTMENT OF PROPOSED STIPULATION AND ORDER PERMITTING MORGAN STANLEY & CO. INCORPORATED, N/K/A MORGAN STANLEY & CO. LLC TO FILE PROOF OF CLAIMS AFTER THE BAR DATE

**PLEASE TAKE NOTICE** that the undersigned will present the attached proposed Stipulation and Order Permitting Morgan Stanley & Co. Incorporated, n/k/a Morgan Stanley & Co. LLC ("Morgan Stanley") to File Proofs of Claim After the Bar Date (the "Stipulation and Order"), to the Honorable Martin Glenn, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, Room 501, for signature on **January 15, 2013 at 12:00 p.m. (Prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Stipulation and Order must be made in writing, conform to the Federal Rules of Bankruptcy Procedure, the Local

1

Bankruptcy Rules for the Southern District of New York, and the Notice, Case Management, and

Administrative Procedures approved by the Bankruptcy Court in the Order Under Bankruptcy

Code Sections 102(1), 105(a) and 105(d), and Bankruptcy Rules 1015(c), 2002(m) and 9007 and

Local Bankruptcy Rules 2002-2 Establishing Certain Notice, Case Management and

Administrative Procedures [Docket No. 141] (the "Case Management Order"), be filed with the

Bankruptcy Court electronically by registered users of the Bankruptcy Court's electronic case

filing system (with a copy to Chambers), and be served, so as to be received no later than

**January 14, 2013 at 4:00 p.m. (Prevailing Eastern Time)**, upon, (a) counsel for the Debtors,

Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Gary S.

Lee, Norman S. Rosenbaum, and Lorenzo Marinuzzi); (b) the Office of the United States Trustee

for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, NY 10004

(Attn: Tracy Hope Davis, Linda A. Riffkin and Brian S. Masumoto); (c) the Office of the United

States Attorney General, U.S. Department of Justice, 950 Pennsylvania Avenue NW,

Washington, DC 20530-0001 (Attn: U.S. Attorney General, Eric H. Holder, Jr.); (d) Office of the

New York State Attorney General, The Capitol, Albany, NY 12224-0341 (Attn: Nancy Lord,

Esq. and Enid N. Stuart, Esq.); (e) Office of the U.S. Attorney for the Southern District of New

York, One St. Andrews Plaza, New York, NY 10007 (Attn: Joseph N. Cordaro, Esq.); (f) counsel

for Ally Financial Inc., Kirkland & Ellis LLP, 153 East 53rd Street, New York, NY 10022 (Attn:

Richard M. Cieri); (g) counsel to Barclays Bank PLC, as administrative agent for the DIP

lenders, Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York

10036 (Attn: Ken Ziman & Jonathan H. Hofer); (h) counsel for the committee of unsecured

creditors, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY

10036 (Attn: Kenneth Eckstein & Greg Horowitz); (i) counsel for Nationstar Mortgage LLC,

Sidley Austin LLP, One South Dearborn, Chicago, Illinois 60603 (Attn: Jessica C.K. Boelter); (j)

counsel for Ocwen Loan Servicing, LLC, Clifford Chance US LLP, 31 West 52nd Street, New

York, New York 10019 (Attn: Jennifer C. DeMarco & Adam Lesman); (k) counsel for Berkshire

Hathaway, Inc., Munger, Tolles & Olson LLP, 355 South Grand Avenue, Los Angeles,

California, 90071 (Attn: Seth Goldman & Thomas B. Walper); (l) Internal Revenue Service, P.O.

Box 7346, Philadelphia, PA 19101-7346 (if by overnight mail, to 2970 Market Street, Mail Stop

5-Q30.133, Philadelphia, PA 19104-5016); (m) Securities and Exchange Commission, New

York Regional Office, 3 World Financial Center, Suite 400, New York, NY 10281-1022 (Attn:

George S. Canellos, Regional Director); (n) counsel for Morgan Stanley, Marino, Tortorella &

Boyle, P.C. (Attn: Kevin H. Marino and John A. Boyle), 437 Southern Boulevard, Chatham, NJ

07928; and (o) all other parties and/or counsel listed on the Special Service List, as that term is

defined in the Case Management Order (a copy of which can be viewed and obtain on the

Bankruptcy Court's website at www.ecf.nysb.uscourts.gov or, without charge, at the Debtors'

restructuring website at www.kccllc.net/rescap).

PLEASE TAKE FURTHER NOTICE that, if no objections to the Stipulation and Order

are timely filed, served and received in accordance with this Notice, the Court may enter the

Order without further notice or hearing.

Dated:  January 4, 2013
       Chatham, New Jersey

**MARINO, TORTORELLA & BOYLE, P.C.**

*/s/ John A. Boyle*
Kevin H. Marino
John A. Boyle
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Telephone: (973) 824-9300
Facsimile:  (973) 824-8425
*Attorneys for Morgan Stanley & Co. Incorporated,*
*n/k/a Morgan Stanley & Co. LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Case No. 12-12020 (MG) |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | ) |
| | ) Chapter 11 |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

<div align="center">

**STIPULATION AND ORDER PERMITTING**
**MORGAN STANLEY & CO. INCORPORATED,**
**N/K/A MORGAN STANLEY & CO. LLC**
**TO FILE PROOFS OF CLAIM AFTER THE BAR DATE**

</div>

This stipulation and order (the "**Stipulation**") is made and entered into by, between and among the debtors and debtors in possession in the above-captioned bankruptcy case (collectively, the "**Debtors**")[1] and Morgan Stanley & Co. Incorporated, n/k/a Morgan Stanley & Co. LLC ("**Morgan Stanley,**" and collectively with the Debtors, the "**Parties**"). The Parties, by and through their respective counsels, respectfully submit this Stipulation permitting Morgan Stanley to file four proofs of claim (each a "**Proof of Claim**"), copies of which are attached hereto as Exhibits 1 through 4, no later than January 16, 2013.

**RECITALS:**

A.  On May 14, 2012 (the "**Petition Date**"), each of the Debtors filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors are managing and operating their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. These cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). No trustee has been appointed in these Chapter 11 cases.

---

[1] The names of the Debtors in these cases and their respective tax identification numbers are identified on Exhibit 1 to the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6].

B.   On August 29, 2012 the Bankruptcy Court set November 9, 2012 at 5:00 p.m. (Prevailing Eastern Time) as the deadline for filing proofs of claim against the Debtors (the "**General Bar Date**") pursuant to the *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (the "**General Bar Date Order**") [Docket No. 1309].

C.   On November 7, 2012 the Bankruptcy Court ordered that the General Bar Date was extended to and including Friday, November 16, 2012 at 5:00 p.m. (Prevailing Eastern Time) (the "**Extended General Bar Date**") pursuant to the *Order Extending Deadline for Filing Proofs of Claim* [Docket No. 2093] (the "**Extended Bar Date Order**").

D.   Counsel to Morgan Stanley, the firm of Marino, Tortorella & Boyle, P.C. ("**MTB**"), has submitted the Certification of Kevin H. Marino (the "Marino Certification") annexed hereto as Exhibit "A" by which counsel has certified that MTB experienced significant disruption of its practice as a result of Superstorm Sandy, including the loss of all power to its offices for one week and a diminution in its capacity to operate effectively for several weeks thereafter; and as a result of that disruption, MTB sought the consent of Debtors to file the four Proofs of Claim (Exhibits 1 through 4 hereto) notwithstanding the passage of the Extended Bar date, with such claims to be deemed timely filed.

E. Based on the Marino Certification and MTB's timely request, the Debtors are prepared to consent to Morgan Stanley's request subject to the terms hereof.

NOW, THEREFORE, it is hereby stipulated and agreed, and upon approval by the Bankruptcy Court it shall be SO ORDERED:

1. Morgan Stanley's Proofs of Claim shall be deemed timely filed notwithstanding the occurrence of the General Bar Date or the Extended Bar Date; *provided* that Morgan Stanley

2

shall cause such Proofs of Claim to be actually filed no later than January 16, 2013.  Absent further order of the Bankruptcy Court, if Morgan Stanley fails to comply with this Stipulation by timely filing the Proofs of Claim Morgan Stanley shall be barred from: (i) asserting any claims against the Debtors or their Chapter 11 estates; and (ii) participating in any distribution in these Chapter 11 cases on account of any and all claims Morgan Stanley may have against any of the Debtors or their Chapter 11 estates.

2. In all other respects, Morgan Stanley is subject to all of the terms and conditions of the General Bar Date Order or the Extended General Bar Date Order.

5. The Parties shall retain any and all rights and defenses with respect to the Proofs of Claim, including with respect to the validity, priority, and amount of any claim asserted pursuant to the Proofs of Claim.  Nothing herein shall constitute or be deemed to constitute an admission of liability by the Debtors with respect to any claim.

6. This Stipulation shall not become effective unless and until it is approved and entered by the Bankruptcy Court.

7. This Stipulation is entered into by the Debtors and Morgan Stanley for administrative convenience only and is without prejudice to, and expressly reserves, the rights of all parties-in-interest to contest the allowance of any such claims.

8. Neither the Stipulation nor any negotiations and writings in connection with this Stipulation shall in any way be construed as or deemed to constitute an admission of liability by the Debtors with respect to any claim asserted by the Proofs of Claim.

9. Each of the Parties hereto represents and warrants it is duly authorized to enter into and be bound by this Stipulation.

3

10. This Stipulation may be executed in multiple counterparts, any of which may be transmitted by facsimile or electronic mail, and each of which shall be deemed an original, but all of which together shall constitute one instrument.

11. The Bankruptcy Court shall retain jurisdiction to hear any disputes relating to or arising from this Stipulation.

12. The terms and conditions of this Stipulation shall be immediately effective and enforceable upon its entry by the Bankruptcy Court.

**SO STIPULATED.**

Dated: December 21, 2012

/s/

**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-800
Facsimile: (212) 468-7900
*Counsel to the Debtors and Debtors in*
*Possession*

/s/

**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, NJ 079281-1488
Telephone: (973) 824-9300
Facsimile: (973) 824-8425
*Attorneys for Morgan Stanley & Co. Incorporated,*
*n/k/a Morgan Stanley & Co. LLC*

4

**SO ORDERED, THIS**
__ day of _____, 2012

_____

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

5

# EXHIBIT A

Kevin H. Marino (KM 4941)
John A. Boyle (JB 1058)
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Morgan Stanley & Co. Incorporated,*
*n/k/a Morgan Stanley & Co. LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                            :
In re:                                      :    Chapter 11
                                            :
Residential Capital, LLC, <u>et al.</u>,    :    Case No. 12-12020 (MG)
                                            :
                        Debtors.            :    Jointly Administered
                                            :
-------------------------------------------------------X

**CERTIFICATION OF COUNSEL IN SUPPORT OF REQUEST
FOR ORDER PERMITTING MORGAN STANLEY & CO.
INCORPORATED, N/K/A MORGAN STANLEY & CO. LLC TO
FILE PROOFS OF CLAIM AFTER THE BAR DATE**

KEVIN H. MARINO, of full age, hereby certifies and states:

1.      I am an attorney at law of the State of New Jersey, a member of the bar of the

United States District Court for the Southern District of New York, and a member of the law

firm Marino, Tortorella & Boyle, P.C. ("MTB"), attorneys for Morgan Stanley & Co.

Incorporated, n/k/a Morgan Stanley & Co. LLC ("Morgan Stanley") in this matter. I am fully

familiar with the facts of this case and make this Certification to induce the Debtors and Debtors

in possession, Residential Capital, LLC, et al. ("Debtors"), to enter into the attached Stipulation

permitting Morgan Stanley to file proofs of claim after the November 16, 2012 extended bar date

*nunc pro tunc*, so that the proofs of claim shall be considered timely filed.

2.      MTB experienced significant disruption of its practice as a result of Superstorm Sandy, including the loss of all power to its offices for one week and a diminution in its capacity to operate effectively for several weeks thereafter.

3.      MTB's calendaring system went down as a result of the power outage, and we experienced significant difficulty in getting the firm's computer system restored to normal operations until after the November 16th extended bar date had passed. Morgan Stanley engaged us in this matter in September 2012. If our systems had been properly operational, we would have timely filed these proofs of claim.

4.      I contacted Debtor's counsel on November 20, 2012, explained that we had failed to file proofs of claim and requested the Debtor's consent to a *nunc pro tunc* filing, which was forthcoming the following day subject to the submission of this Certification.

5.      Since securing the Debtors' consent, we have worked diligently towards a resolution of this issue.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  December 21, 2012
        Chatham, New Jersey

_____
KEVIN H. MARINO

2

# EXHIBIT 1

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: GMAC Mortgage, LLC, Case No. 12-12032

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC)

☐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

c/o Kevin H. Marino
Marino, Tortorella & Boyle, P.C.
437 Southern Boulvard
Chatham, New Jersey 07928

**Court Claim Number:**_____
(*If known*)

Filed on:_____

Telephone number: 973-824-9300                      email: kmarino@khmarino.com

Name and address where payment should be sent (if different from above):

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:                          email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

**1. Amount of Claim as of Date Case Filed: $** unliquidated/contingent/subject to amendment
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

**2. Basis for Claim:** Obligation in Underwriting Agreement to indemnify and hold harmless from certain claims
(See instruction #2)

| **3. Last four digits of any number by which creditor identifies debtor:** | **3a. Debtor may have scheduled account as:** | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|
| __ __ __ __ | (See instruction #3a) | (See instruction #3b) |

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ☐ Real Estate ☐ Motor Vehicle ☐ Other
Describe:
Value of Property: $_____ Annual Interest Rate_____% ☐ Fixed ☐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $_____                    Basis for perfection: _____

Amount of Secured Claim: $_____          Amount Unsecured: $_____

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11U.S.C. §507 (a)(8).

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

$_____

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ■ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Kevin H. Marino
Title: Outside Counsel
Company: Marino, Tortorella & Boyle, P.C.          (Signature)          12/27/12 (Date)
Address and telephone number (if different from notice address above):

Telephone number: 973-824-9300          Email: kmarino@khmarino.com

**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 Modified (Official Form 10) (12/11) cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor,
exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Claim Pursuant to 11 U.S.C. §503(b)(9):**
Check this box if you have a claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim. (See DEFINITIONS, below.)

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

## _____DEFINITIONS_____

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

## _____INFORMATION_____

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://www.kccllc.net/ResCap.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## SUMMARY OF CLAIM

On or about June 23, 2005, Morgan Stanley & Co. Incorporated, n/k/a Morgan Stanley & Co. LLC ("Morgan Stanley"), entered into an Underwriting Agreement (the "Underwriting Agreement") relating to the sale of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 issued by Residential Asset Mortgage Products, Inc. ("Residential Asset Mortgage"), the debtor in Case No. 12-12053. (Exhibit A.) Pursuant to sections 7.1 and 7.3 of the Underwriting Agreement, Residential Asset Mortgage and GMAC Mortgage Corporation, a/k/a GMAC Mortgage, LLC ("GMAC Mortgage"), the debtor in Case No. 12-12032, agreed to indemnify Morgan Stanley and hold it harmless for certain claims and actions. (Id.)

On or about July 15, 2010, The Charles Schwab Corporation filed in the Superior Court of the State of California, County of San Francisco, a complaint entitled Charles Schwab Corp. v. BNP Paribas Securities Corp., et al. (the "Schwab" Action"), against Morgan Stanley and others. (Exhibit B.) The Schwab Action constitutes an action for which Residential Asset Mortgage and GMAC Mortgage agreed in the Underwriting Agreement to indemnify and hold Morgan Stanley harmless. By letters dated September 1, 2011, Morgan Stanley notified Residential Assert Mortgage and GMAC Mortgage of the Schwab Action and their indemnification obligations with respect to that action. (Exhibit C.)

# EXHIBIT A

**Residential Asset Mortgage Products, Inc.**

GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

| Certificate Principal Balance | Pass-Through Rate | Class |
|---|---|---|
| $ 18,893,000 | Variable | Class 1-A Certificates |
| $ 56,050,000 | Variable | Class 2-A-1 Certificates |
| $ 2,739,000 | Variable | Class 2-A-2 Certificates |
| $ 144,100,000 | Variable | Class 3-A-1 Certificates |
| $ 7,061,000 | Variable | Class 3-A-2 Certificates |
| $ 52,750,000 | Variable | Class 4-A-1 Certificates |
| $ 2,592,000 | Variable | Class 4-A-2 Certificates |
| $ 80,000,000 | Variable | Class 5-A-1 Certificates |
| $ 3,933,000 | Variable | Class 5-A-2 Certificates |
| $ 6,370,000 | Variable | Class M-1 Certificates |
| $ 4,440,000 | Variable | Class M-2 Certificates |
| $ 2,702,000 | Variable | Class M-3 Certificates |
| $ 100 | Variable | Class R Certificates |

## UNDERWRITING AGREEMENT

June 23, 2005

Morgan Stanley and Co. Incorporated
1585 Broadway
New York, New York 10036

Ladies and Gentlemen:

Residential Asset Mortgage Products, Inc. (the "Company") proposes to sell to you (the "Underwriter"), the GMACM Mortgage Pass-Through Certificates, Series 2005-AR4, Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, Class 5-A-2, Class M-1, Class M-2, Class M-3, and Class R Certificates, other than a de minimis portion of the Class R Certificates, (collectively, the "Certificates"), having the aggregate principal amounts or notional amounts, as applicable, and Pass-Through Rates set forth above. The Certificates, together with the Class B-1, Class B-2 and Class B-3 Certificates of the same series, will evidence the entire beneficial interest in the Trust Fund (as defined in the Pooling and Servicing Agreement referred to below) consisting primarily of a pool (the "Pool") of hybrid, adjustable-rate, one- to four-family residential mortgage loans (the "Mortgage Loans") as described in the Prospectus Supplement (as hereinafter defined) to be sold by the Company. A de minimis portion of the Class R Certificate will not be sold hereunder and will be held by GMAC Mortgage Corporation ("GMACM").

The Mortgage Loans will be purchased by the Company from GMACM pursuant to the Mortgage Loan Purchase Agreement (the "Mortgage Loan Purchase Agreement"), dated as of June 28, 2005 among the Company, as purchaser, and GMACM, as the seller.

The Certificates will be issued pursuant to a Pooling and Servicing Agreement, dated as of June 28, 2005 (the "Pooling and Servicing Agreement"), among the Company, GMACM, as servicer, and the Deutsche Bank National Trust Company (the "Trustee"). The Certificates are described more fully in the Prospectus (as hereinafter defined) which the Company has furnished to you. Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Pooling and Servicing Agreement.

1.  Representations, Warranties and Covenants.

    1.1     The Company represents and warrants to, and agrees with you that:

            (a)     The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (No. 333-117232) on Form S-3 for the registration under the Securities Act of 1933, as amended (the "Act"), of Mortgage Asset-Backed Certificates and Asset-Backed Notes (issuable in series), including the Certificates, which registration statement has become effective, and a copy of which, as amended to the date hereof, has heretofore been delivered to you. The Company proposes to file with the Commission pursuant to Rule 424(b)5 under the rules and regulations of the Commission under the Act (the "1933 Act Regulations") a supplement dated June 23, 2005, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (the "Prospectus Supplement"), to the prospectus dated December 22, 2004 (the "Base Prospectus"), relating to the Certificates and the method of distribution thereof. Such registration statement including exhibits thereto and any information incorporated therein by reference, as amended at the date hereof, is hereinafter called the "Registration Statement"; and the Base Prospectus and the Prospectus Supplement and any information incorporated therein by reference, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (as defined below) for use in connection with the offering of the Certificates, are hereinafter called the "Prospectus."

            (b)     The Registration Statement has become effective, and the Registration Statement as of its effective date (the "Effective Date"), and the Prospectus, as of the date of the Prospectus Supplement, complied in all material respects with the applicable requirements of the Act and the 1933 Act Regulations; and the Registration Statement, as of the Effective Date, did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and the Prospectus, as of the date of the Prospectus Supplement, did not, and as of the Closing Date will not, contain an untrue statement of a material fact and did not and will not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that neither the Company nor GMACM makes any representations or warranties as to the information contained in or omitted from the Registration Statement or the Prospectus or any amendment thereof or supplement thereto relating to the information identified by underlining or other highlighting as shown in Exhibit D (the "Excluded Information"); and provided, further, that neither the Company nor GMACM makes any representations or warranties as to either (i) any information in any Computational Materials or ABS Term Sheets (each as hereinafter defined) required to be provided by the Underwriter to the Company pursuant to Section 4.2 hereof, except to the extent of any information set forth therein that constitutes Pool Information (as defined below), or

(ii) any information contained in or omitted from the portions of the Prospectus identified by underlining or other highlighting as shown in Exhibit E (the "Underwriter Information"). As used herein, "Pool Information" means information with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or GMACM to the Underwriter in final form and set forth in the Prospectus Supplement. The Company acknowledges that, except for any Computational Materials and ABS Term Sheets, the Underwriter Information constitutes the only information furnished in writing by you or on your behalf for use in connection with the preparation of the Registration Statement, any preliminary prospectus or the Prospectus, and you confirm that the Underwriter Information is correct.

(c)    The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the requisite corporate power to own its properties and to conduct its business as presently conducted by it.

(d)    This Agreement has been duly authorized, executed and delivered by the Company.

(e)    As of the Closing Date the Certificates will conform in all material respects to the description thereof contained in the Prospectus and the representations and warranties of the Company in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.2    GMACM represents and warrants to, and agrees with you that as of the Closing Date the representations and warranties of GMACM in the Mortgage Loan Purchase Agreement and the Pooling and Servicing Agreement will be true and correct in all material respects.

1.3    The Underwriter represents and warrants to and agrees with the Company and GMACM that:

(a)    The Underwriter has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.

(b)    The Underwriter has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Certificates remain outstanding.

(c)    No purpose of the Underwriter relating to any sale of any of the Class R Certificates by it will be to enable it to impede the assessment or collection of tax. In this regard, the Underwriter hereby represents to and for the benefit of the Company and GMACM that it intends to pay taxes associated with holding the Class R Certificates, as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificates (other than with respect to the de minimis portion of each class of the Class R Certificates retained by GMACM).

(d)    The Underwriter will, in connection with any transfer it makes of any of the Class R Certificates, obtain from its transferee the affidavit required by Section 5.02(f)(i)(B)(I) of the Pooling and Servicing Agreement, will not consummate any such transfer if it knows or believes that any representation contained in such affidavit is false and will provide the Trustee with the certificate required by Section 5.02(f)(i)(B)(II) of the Pooling and Servicing Agreement.

(e)    The Underwriter hereby certifies that (i) with respect to any classes of Certificates issued in authorized minimum denominations of $25,000, the fair market value of such Certificates sold to any person on the date of initial sale thereof by it will not be less than $100,000 and (ii) with respect to each class of Certificates to be maintained on the book-entry records of The Depository Trust Company ("DTC"), the interest in each such class of Certificates sold to any person on the date of initial sale thereof by it will not be less than the minimum denomination indicated for such class of Certificates in the Prospectus Supplement.

(f)    The Underwriter represents that it has in place, and covenants that it shall maintain, internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the No-Action Letters (as defined below) with respect to the generation and use of Computational Materials and ABS Term Sheets in connection with the offering of the Certificates.

(g)    As of the date hereof and as of the Closing Date, the Underwriter has complied with all of its obligations hereunder including Section 4.2 hereof, and, with respect to all Computational Materials and ABS Term Sheets prepared by the Underwriter and provided by it to the Company (directly or indirectly through GMACM) and GMACM pursuant to Section 4.2 hereof if any, such Computational Materials and ABS Term Sheets are accurate in all material respects (taking into account the assumptions explicitly set forth in the Computational Materials or ABS Term Sheets, except to the extent of any errors therein that are caused by errors in the Pool Information). The Computational Materials and ABS Term Sheets provided by you to the Company constitute a complete set of all Computational Materials and ABS Term Sheets prepared by the Underwriter that are required to be filed with the Commission.

1.4    The Underwriter covenants and agrees to pay directly, or reimburse the Company or GMACM upon demand for (i) any and all taxes (including penalties and interest) owed or asserted to be owed by the Company or GMACM as a result of a claim by the Internal Revenue Service that the transfer of any of the Class R Certificates to you hereunder or any transfer thereof by you may be disregarded for federal tax purposes and (ii) any and all losses, claims, damages and liabilities, including attorney's fees and expenses, arising out of any failure of the Underwriter to make payment or reimbursement in connection with any such assertion as required in clause (i) above. In addition, the Underwriter acknowledges that on the Closing Date (as hereinafter defined) immediately after the transactions described herein it will be the owner of the Class R Certificates for federal tax purposes, and it covenants that it will not assert in any proceeding that the transfer of the Class R Certificates from the Company to it should be disregarded for any purpose.

2.    Purchase and Sale.    Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to you, and you agree

to purchase from the Company, the Certificates, at a price equal to 101.16% of the aggregate principal balance of the Certificates as of the Closing Date. There will be added to the purchase price of the Certificates an amount equal to interest accrued thereon from June 1, 2005 (the "Cut-off Date") to but not including the Closing Date. The purchase price for the Certificates was agreed to by the Company in reliance upon the transfer from the Company to you of the tax liabilities associated with the ownership of the Class R Certificates.

3. <u>Delivery and Payment</u>. Delivery of and payment for the Certificates shall be made at the office of Orrick, Herrington & Sutcliffe LLP at 10:00 a.m., New York City time, on June 28, 2005 or such later date as you shall designate, which date and time may be postponed by agreement between you, the Company and GMACM (such date and time of delivery and payment for the Certificates being herein called the "Closing Date"). Delivery of the Certificates (other than the Class R Certificates) shall be made to you through DTC, and delivery of the Class R Certificates shall be made in registered, certificated form, in each case against payment by you of the purchase price thereof to or upon the order of the Company by wire transfer in immediately available funds. The Class R Certificates shall be registered in such names and in such denominations as you may request not less than two business days in advance of the Closing Date. The Company agrees to have the Class R Certificates available for inspection, checking and packaging by you in New York, New York not later than 1:00 p.m. on the business day prior to the Closing Date.

4. <u>Offering by the Underwriter</u>.

4.1    It is understood that you propose to offer the Certificates for sale to the public as set forth in the Prospectus and you agree that all such offers and sales by them shall be made in compliance with all applicable laws and regulations.

4.2    It is understood that you may prepare and provide to prospective investors certain Computational Materials and ABS Term Sheets (each as defined below) in connection with their offering of the Certificates, subject to the following conditions:

(a)    The Underwriter shall comply with all applicable laws and regulations in connection with the use of Computational Materials, including the No-Action Letter of May 20, 1994 issued by the Commission to Kidder, Peabody Acceptance Corporation I, Kidder, Peabody & Co. Incorporated and Kidder Structured Asset Corporation, as made applicable to other issuers and the Underwriter by the Commission in response to the request of the Public Securities Association dated May 24, 1994 (collectively, the "Kidder/PSA Letter"), as well as the PSA Letter referred to below. The Underwriter shall comply with all applicable laws and regulations in connection with the use of ABS Term Sheets, including the No-Action Letter of February 17, 1995 issued by the Commission to the Public Securities Association (the "PSA Letter" and, together with the Kidder/PSA Letter, the "No-Action Letters").

(b)    For purposes hereof, "Computational Materials" as used herein shall have the meaning given such term in the No-Action Letters, but shall include only those Computational Materials that have been prepared or delivered to prospective investors by or at the direction of you. For purposes hereof, "ABS Term Sheets" and "Collateral Term Sheets" as used herein shall have the meanings given such terms in the PSA Letter but shall include only

those ABS Term Sheets or Collateral Term Sheets that have been prepared or delivered to prospective investors by or at the direction of the Underwriter.

(c)    (i) All Computational Materials and ABS Term Sheets provided to prospective investors that are required to be filed with the Commission pursuant to the No-Action Letters shall bear a legend on each page including the following statement:

> "THE INFORMATION HEREIN HAS BEEN PROVIDED SOLELY BY [NAME OF UNDERWRITER]. NEITHER THE ISSUER OF THE CERTIFICATES NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION HEREIN. THE INFORMATION HEREIN IS PRELIMINARY, AND WILL BE SUPERSEDED BY THE APPLICABLE PROSPECTUS SUPPLEMENT AND BY ANY OTHER INFORMATION SUBSEQUENTLY FILED WITH THE SECURITIES AND EXCHANGE COMMISSION."

(ii)    In the case of Collateral Term Sheets, such legend shall also include the following statement:

> "THE INFORMATION CONTAINED HEREIN WILL BE SUPERSEDED BY THE DESCRIPTION OF THE MORTGAGE POOL CONTAINED IN THE PROSPECTUS SUPPLEMENT RELATING TO THE CERTIFICATES AND [EXCEPT WITH RESPECT TO THE INITIAL COLLATERAL TERM SHEET PREPARED BY THE UNDERWRITER] SUPERSEDES ALL INFORMATION CONTAINED IN ANY COLLATERAL TERM SHEETS RELATING TO THE MORTGAGE POOL PREVIOUSLY PROVIDED BY [NAME OF UNDERWRITER]"

The Company shall have the right to require additional specific legends or notations to appear on any Computational Materials or ABS Term Sheets, the right to require changes regarding the use of terminology and the right to determine the types of information appearing therein. Notwithstanding the foregoing, this subsection (c) will be satisfied if all Computational Materials and ABS Term Sheets referred to therein bear a legend in a form previously approved in writing by the Company.

(d)    The Underwriter shall provide the Company and GMACM with representative forms of all Computational Materials and ABS Term Sheets prior to their first use, to the extent such forms have not previously been approved by the Company for use by the Underwriter. The Underwriter shall provide to the Company, for filing on Form 8-K as provided in Section 5.9 hereof, copies (in such format as required by the Company) of all Computational Materials and ABS Term Sheets, including without limitation Computational Materials or ABS Term Sheets that are prepared or made available by or are generated pursuant to any internet Web site or electronic media established by the Underwriter or any third party to which the Underwriter provided information regarding the Certificates, that are required to be filed with the

Commission pursuant to the No-Action Letters. The Underwriter may provide copies of the foregoing in a consolidated or aggregated form including all information required to be filed. All Computational Materials and ABS Term Sheets described in this subsection (d) must be provided to the Company not later than 10:00 a.m. New York time one business day before filing thereof is required pursuant to the terms of this Agreement. The Underwriter agrees that they will not provide to any investor or prospective investor in the Certificates any Computational Materials or ABS Term Sheets on or after the day on which Computational Materials and ABS Term Sheets are required to be provided to the Company pursuant to this Section 4.2(d) (other than copies of Computational Materials or ABS Term Sheets previously submitted to the Company in accordance with this Section 4.2(d) for filing pursuant to Section 5.9 hereof), unless such Computational Materials or ABS Term Sheets are preceded or accompanied by the delivery of a Prospectus to such investor or prospective investor.

(e)    All information included in the Computational Materials and ABS Term Sheets shall be generated based on substantially the same methodology and assumptions that are used to generate the information in the Prospectus Supplement as set forth therein; provided, however, that the Computational Materials and ABS Term Sheets may include information based on alternative methodologies or assumptions if specified therein. If any Computational Materials or ABS Term Sheets that are required to be filed were based on assumptions with respect to the Pool that differ from the final Pool Information in any material respect or on Certificate structuring terms that were revised in any material respect prior to the printing of the Prospectus, you shall prepare revised Computational Materials or ABS Term Sheets, as the case may be, based on the final Pool Information and structuring assumptions, the Underwriter shall circulate such revised Computational Materials and ABS Term Sheets to all recipients of the preliminary versions thereof that indicated or subsequently indicate orally to the Underwriter that they will purchase all or any portion of the Certificates, and you shall include such revised Computational Materials and ABS Term Sheets (marked, "as revised") in the materials delivered to the Company pursuant to subsection (d) above.

(f)    The Company shall not be obligated to file any Computational Materials or ABS Term Sheets that have been determined to contain any material error or omission; provided, however, that, at the request of the Underwriter, the Company will file Computational Materials or ABS Term Sheets that contain a material error or omission if clearly marked "superseded by materials dated _____" and accompanied by corrected Computational Materials or ABS Term Sheets that are marked, "material previously dated _____, as corrected." In the event that, within the period during which the Prospectus relating to the Certificates is required to be delivered under the Act, any Computational Materials or ABS Term Sheets are determined, in the reasonable judgment of the Company, GMACM or the Underwriter, to contain a material error or omission, you shall prepare a corrected version of such Computational Materials or ABS Term Sheets, you shall circulate such corrected Computational Materials and ABS Term Sheets to all recipients of the prior versions thereof that either indicated orally to the Underwriter they would purchase all or any portion of the Certificates, or actually purchased all or any portion thereof, and you shall deliver copies of such corrected Computational Materials and ABS Term Sheets (marked, "as corrected") to the Company for filing with the Commission in a subsequent Form 8-K submission (subject to the Company's and GMACM's obtaining an accountant's comfort letter in respect of such corrected

7

Computational Materials and ABS Term Sheets, which shall be at the expense of the Underwriter).

(g)     If the Underwriter does not provide any Computational Materials or ABS Term Sheets to the Company and GMACM pursuant to subsection (d) above, the Underwriter shall be deemed to have represented, as of the Closing Date, that it did not provide any prospective investors with any information in written or electronic form in connection with the offering of the Certificates that is required to be filed with the Commission in accordance with the No-Action Letters, and the Underwriter shall provide the Company and GMACM with a certification to that effect on the Closing Date.

(h)     In the event of any delay in the delivery by the Underwriter to the Company and GMACM of all Computational Materials and ABS Term Sheets required to be delivered in accordance with subsection (d) above, or in the delivery of the accountant's comfort letter in respect thereof pursuant to Section 5.9 hereof, the Company or GMACM shall have the right to delay the release of the Prospectus to investors or to the Underwriter, to delay the Closing Date and to take other appropriate actions in each case as necessary in order to allow the Company to comply with its agreement set forth in Section 5.9 hereof to file the Computational Materials and ABS Term Sheets by the time specified therein.

(i)     The Underwriter represents that it has in place, and covenants that it shall maintain internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the No-Action Letters with respect to the generation and use of Computational Materials and ABS Term Sheets in connection with the offering of the Certificates.

4.3     The Underwriter agrees that on or prior to the sixth day after the Closing Date, it shall provide to the Company and GMACM with a certificate, substantially in the form of Exhibit F attached hereto, setting forth (i) in the case of each class of Certificates, (a) if less than 10% of the aggregate principal balance of such class of Certificates has been sold to the public as of such date, then the value calculated pursuant to clause (b)(iii) of Exhibit F hereto, or, (b) if 10% or more of such class of Certificates has been sold to the public as of such date but no single price is paid for at least 10% of the aggregate principal balance of such class of Certificates, then the weighted average price at which the Certificates of such class were sold expressed as a percentage of the principal balance of such class of Certificates sold, or (c) the first single price at which at least 10% of the aggregate principal balance of such class of Certificates was sold to the public, (ii) the prepayment assumption used in pricing each class of Certificates sold by it, and (iii) such other information as to matters of fact as the Company may reasonably request to enable it to comply with its reporting requirements with respect to each class of Certificates to the extent such information can in the good faith judgment of the Underwriter be determined by them.

4.4     The Underwriter agrees that (i) a printed copy of the Prospectus will be delivered to each person who receives a confirmation of prior to or at the same time with such confirmation of sale and, with respect to any amendment or supplement to the Prospectus, a printed copy of the Prospectus, as amended or supplemented, will be delivered to each person who receives a confirmation of sale (a) at the same time such confirmation of sale is delivered or

(b), if such confirmation has already been delivered, on or prior to the Closing Date or, in any case where delivery of the Prospectus (as amended or supplemented) is required by the Act after the Closing Date, on or prior to the 90th day following the filing of the Prospectus (as amended or supplemented) with the Commission; (ii) if an electronic copy of the Prospectus is delivered by you for any purpose, such copy shall be the same electronic file containing the Prospectus in the identical form transmitted electronically to you by or on behalf of the Company specifically for use by you pursuant to this Section 4.4; for example, if the Prospectus is delivered to you by or on behalf of the Company in a single electronic file in pdf format, then you will deliver the electronic copy of the Prospectus in the same single electronic file in pdf format; and (iii) it has not used, and during the period for which it has an obligation to deliver a "prospectus" (as defined in Section 2(a)(10) of the Act) relating to the Certificates (including any period during which you have such delivery obligation in its capacity as a "dealer" (as defined in Section 2(a)(12) of the Act)) it will not use, any internet Web site or electronic media containing information for prospective investors, including any internet Web site or electronic media maintained by third parties, in connection with the offering of the Certificates, except in compliance with applicable laws and regulations.

5. Agreements. The Company agrees with you that:

5.1    Before amending or supplementing the Registration Statement or the Prospectus with respect to the Certificates, the Company will furnish you with a copy of each such proposed amendment or supplement.

5.2    The Company will cause the Prospectus Supplement to be transmitted to the Commission for filing pursuant to Rule 424(b) under the Act by means reasonably calculated to result in filing with the Commission pursuant to said rule.

5.3    If, during the period after the first date of the public offering of the Certificates in which a prospectus relating to the Certificates is required to be delivered under the Act, any event occurs as a result of which it is necessary to amend or supplement the Prospectus, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Prospectus is delivered to a purchaser, not misleading, or if it shall be necessary to amend or supplement the Prospectus to comply with the Act or the 1933 Act Regulations, the Company promptly will prepare and furnish, at its own expense, to you, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law.

5.4    The Company will furnish to you, without charge, a copy of the Registration Statement (including exhibits thereto) and, so long as delivery of a prospectus by an underwriter or dealer may be required by the Act, as many copies of the Prospectus, any documents incorporated by reference therein and any amendments and supplements thereto as you may reasonably request.

5.5    The Company agrees, so long as the Certificates shall be outstanding, or until such time as you shall cease to maintain a secondary market in the Certificates, whichever first occurs, to deliver to you the annual statement as to compliance delivered to the Trustee

pursuant to Section 3.18 of the Pooling and Servicing Agreement and the annual statement of a firm of independent public accountants furnished to the Trustee pursuant to Section 3.19 of the Pooling and Servicing Agreement, as soon as such statements are furnished to the Company.

5.6    The Company will endeavor to arrange for the qualification of the Certificates for sale under the laws of such jurisdictions as you may reasonably designate and will maintain such qualification in effect so long as required for the initial distribution of the Certificates; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

5.7    If the transactions contemplated by this Agreement are consummated, the Company or GMACM will pay or cause to be paid all expenses incident to the performance of the obligations of the Company and GMACM under this Agreement, and will reimburse you for any reasonable expenses (including reasonable fees and disbursements of counsel) reasonably incurred by you in connection with qualification of the Certificates for sale and determination of their eligibility for investment under the laws of such jurisdictions as you have reasonably requested pursuant to Section 5.6 above and the printing of memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Certificates, and for expenses incurred in distributing the Prospectus (including any amendments and supplements thereto) to you. Except as herein provided, you shall be responsible for paying all costs and expenses incurred by you, including the fees and disbursements of your counsel, in connection with the purchase and sale of the Certificates.

5.8    If, during the period after the Closing Date in which a prospectus relating to the Certificates is required to be delivered under the Act, the Company receives notice that a stop order suspending the effectiveness of the Registration Statement or preventing the offer and sale of the Certificates is in effect, the Company will advise you of the issuance of such stop order.

5.9    The Company shall file the Computational Materials and ABS Term Sheets (if any) provided to it by you under Section 4.2(d) hereof with the Commission pursuant to a Current Report on Form 8-K by 10:00 a.m. on the morning of the first Business Day after the Prospectus is delivered to you or, in the case of any Collateral Term Sheet required to be filed prior to such date, by 10:00 a.m. on the second business day following the first day on which such Collateral Term Sheet has been sent to a prospective investor; provided, however, that prior to such filing of the Computational Materials and ABS Term Sheets (other than any Collateral Term Sheets that are not based on the Pool Information) by the Company, the Underwriter must comply with its obligations pursuant to Section 4.2 hereof and the Company must receive a letter from Deloitte & Touche, certified public accountants, satisfactory in form and substance to the Company, GMACM and their respective counsels, to the effect that such accountants have performed certain specified procedures, all of which have been agreed to by the Company and GMACM, as a result of which they determined that all information that is included in the Computational Materials and ABS Term Sheets (if any) provided by you to the Company for filing on Form 8-K, as provided in Section 4.2 hereof and this Section 5.9, is accurate except as to such matters that are not deemed by the Company to be material. The foregoing letter shall be at the expense of the Underwriter. The Company shall file any corrected

Computational Materials described in <u>Section 4.2(f)</u> hereof as soon as practicable following receipt thereof. The Company also will file with the Commission within fifteen days of the issuance of the Certificates a Current Report on Form 8-K (for purposes of filing the Pooling and Servicing Agreement).

6. <u>Conditions to the Obligations of the Underwriter</u>. The Underwriter's obligation to purchase the Certificates shall be subject to the following conditions:

6.1    No stop order suspending the effectiveness of the Registration Statement shall be in effect, and no proceedings for that purpose shall be pending or, to the knowledge of the Company, threatened by the Commission; and the Prospectus Supplement shall have been filed or transmitted for filing by means reasonably calculated to result in a filing with the Commission pursuant to Rule 424(b) under the Act.

6.2    Since June 1, 2005 there shall have been no material adverse change (not in the ordinary course of business) in the condition of the Company or GMACM.

6.3    The Company shall have delivered to you a certificate, dated the Closing Date, of the President, a Senior Vice President, a Vice President or an Assistant Secretary of the Company to the effect that the signer of such certificate has examined this Agreement, the Prospectus, the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement and various other closing documents, and that, to the best of his or her knowledge after reasonable investigation:

(a)    the representations and warranties of the Company in this Agreement and in the Pooling and Servicing Agreement are true and correct in all material respects; and

(b)    the Company has, in all material respects, complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

6.4    GMACM shall have delivered to you a certificate, dated the Closing Date, of the President, the Chief Operating Officer, a Senior Vice President or a Vice President of GMACM to the effect that the signer of such certificate has examined the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement and this Agreement and that, to the best of his or her knowledge after reasonable investigation, the representations and warranties of GMACM contained in the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement and in this Agreement are true and correct in all material respects.

6.5    You shall have received the opinion of Orrick, Herrington & Sutcliffe LLP, special counsel for the Company and GMACM, dated the Closing Date and substantially to the effect set forth in <u>Exhibit A</u>, and the opinion of Bruce P. Bowen, associate general counsel for GMACM, dated the Closing Date and substantially to the effect set forth in <u>Exhibit B</u>.

6.6    You shall have received from Stroock & Stroock & Lavan LLP, counsel for the Underwriter, an opinion dated the Closing Date in form and substance satisfactory to the Underwriter.

6.7     You shall have received from Deloitte & Touche LLP, certified public accountants, a letter satisfactory in form and substance to you and your counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by you, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "Description of the Certificates" and "Certain Yield and Prepayment Considerations" agrees with the records of GMACM excluding any questions of legal interpretation.

6.8     The Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, and Class 5-A-2 Certificates shall have been rated "AAA" by Standard & Poor's, a division of the McGraw-Hill Companies, Inc. ("S&P"). The Class 1-A, Class 2-A-1, Class 3-A-1, Class 4-A-1, and Class 5-A-1 shall have been rated "Aaa" by Moody's Investor Services ("Moody's"). The Class 2-A-2, Class 3-A-2, Class 4-A-2, and Class 5-A-2 shall have been rated "Aa1" by Moody's. The Class M-1 shall have been rated "AA," and "Aa2" respectively, by S&P and Moody's. The Class M-2 shall have been rated "A," and "A2" respectively, by S&P and Moody's. The Class M-3 shall have been rated "BBB," and "Baa2" respectively, by S&P and Moody's.

6.9     You shall have received the opinion of counsel to the Trustee, dated the Closing Date, substantially to the effect set forth in Exhibit C.

6.10    You shall have received from PricewaterhouseCoopers LLP, certified public accountants, (a) a letter satisfactory in form and substance to you and your counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by you, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "The Sellers and the Servicer" and "Description of the Mortgage Pools" agrees with the records of GMACM excluding any questions of legal interpretation and (b) the letter prepared pursuant to Section 5.9 hereof.

6.11    You shall have received from Orrick, Herrington & Sutcliffe LLP, special counsel to the Company, a reliance letter with respect to any opinions delivered to S&P or Moody's or you shall have otherwise been included as an addressee thereof.

The Company will furnish you with conformed copies of the above opinions, certificates, letters and documents as you reasonably request.

7.  Indemnification and Contribution.

7.1     The Company and GMACM, jointly and severally, agree to indemnify and hold harmless the Underwriter and each person, if any, who controls the Underwriter within the meaning of either Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement for the registration of the Certificates as originally filed or in any amendment thereof or other filing incorporated by reference therein, or in the Prospectus or incorporated by reference therein (if used within the period set forth in Section 5.3 hereof and as amended or

supplemented if the Company shall have furnished any amendments or supplements thereto), or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, except insofar as such losses, claims, damages, or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon any information with respect to which the Underwriter has agreed to indemnify the Company pursuant to Section 7.2 hereof; provided, however, that such indemnity with respect to the Prospectus shall not inure to the benefit of the Underwriter (or any person controlling any the Underwriter) to the extent that such loss, claim, damage or liability of the Underwriter results from the fact that the Underwriter sold Certificates to a person to whom there was not sent or given at or prior to the settlement date of the sale of such Certificates a copy of the Prospectus (as amended or supplemented through such date) in any case where such delivery is required by the Act if the Company or GMACM has previously furnished the Underwriter with copies thereof prior to the close of business on the Business Day preceding such settlement date, in any case where the untrue statement or omission of a material fact which caused such loss, claim, damage or liability was contained in such Prospectus and was corrected in the Prospectus (as amended or supplemented), and provided, further that none of the Company, GMACM or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information or any information included in Computational Materials or ABS Term Sheets that is incorrect solely because the Pool Information deviates in any material respect from the parameters set forth in the bid sheet attached hereto as Exhibit G provided that the Underwriter complied with its obligations to circulate and deliver to the Company revised Computational Materials and ABS Term Sheets in accordance with Section 4.2(e) hereof (any such deviation, the "Excluded Pool Information").

7.2     You agree to indemnify and hold harmless the Company, GMACM, their respective directors or officers and any person controlling the Company or GMACM to the same extent as the indemnity set forth in Section 7.1 above from the Company and GMACM to you, but only with respect to (i) the Underwriter Information and (ii) the Computational Materials and ABS Term Sheets prepared by or at the direction of the Underwriter, except to the extent of any errors in the Computational Materials or ABS Term Sheets that are caused by errors in the Pool Information; provided, however, that the indemnification set forth in this Section 7.2 shall not apply to the extent of any errors in the Computational Materials or ABS Term Sheets that are caused by Excluded Pool Information. In addition, you agree to indemnify and hold harmless the Company, GMACM, their respective directors or officers and any person controlling the Company or GMACM against any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) caused by, resulting from, relating to, or based upon any legend regarding original issue discount on any Certificate resulting from incorrect information provided by you for inclusion in the certificates described in Section 4.3 hereof.

7.3     In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 7.1 or Section 7.2 above, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel

reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them.  It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties.  Such firm shall be designated in writing by you, in the case of parties indemnified pursuant to Section 7.1 above and by the Company or GMACM, in the case of parties indemnified pursuant to Section 7.2 above.  The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel reasonably satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation.  Unless it shall assume the defense of any proceeding the indemnifying party shall not be liable for any settlement of any proceeding, effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment.  If the indemnifying party assumes the defense of any proceeding, it shall be entitled to settle such proceeding with the consent of the indemnified party or, if such settlement provides for release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the consent of the indemnified party.

7.4    If the indemnification provided for in this Section 7 is unavailable to an indemnified party under Section 7.1 or Section 7.2 hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and GMACM on the one hand and you on the other from the offering of the Certificates but also the relative fault of the Company or GMACM on the one hand and of you, on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations.  The relative fault of the Company and GMACM on the one hand and of you on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by you, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

7.5    The Company, GMACM and you agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in

Section 7.4, above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 7 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim except where the indemnified party is required to bear such expenses pursuant to Section 7.4; which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party believes that it will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

      7.6    The indemnity and contribution agreements contained in this Section 7 and the representations and warranties of the Company and GMACM in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by you or on behalf of you or any person controlling you or by or on behalf of the Company or GMACM and their respective directors or officers or any person controlling the Company or GMACM and (iii) acceptance of and payment for any of the Certificates.

      8.    Termination.  This Agreement shall be subject to termination by notice given to the Company and GMACM, if the sale of the Certificates provided for herein is not consummated because of any failure or refusal on the part of the Company or GMACM to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company or GMACM shall be unable to perform their respective obligations under this Agreement. If you terminate this Agreement in accordance with this Section 9, GMACM will reimburse you for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been reasonably incurred by you in connection with the proposed purchase and sale of the Certificates.

      9.    Certain Representations and Indemnities to Survive.  The respective agreements, representations, warranties, indemnities and other statements of the Company, GMACM or the officers of any of the Company, GMACM, and you set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by you or on your behalf or made by or on behalf of the Company or GMACM or any of their respective officers, directors or controlling persons, and will survive delivery of and payment for the Certificates.

      10. Notices.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Underwriter will be mailed, delivered or telegraphed and confirmed to Morgan Stanley and Co. Incorporated, 1585 Broadway, New York, New York 10036, or if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Residential Asset Mortgage Products, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President; or, if sent to GMACM will be mailed, delivered or telegraphed and

confirmed to it at GMAC Mortgage Corporation, 100 Witmer, Horsham, Pennsylvania 19044, Attention: President.

11. Successors. This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 7 hereof, and their successors and assigns, and no other person will have any right or obligation hereunder.

12. Applicable Law. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

13. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, GMACM and you.

Very truly yours,

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

By:  _____

Name:
Title:    Patricia C. Taylor
          Vice President

GMAC MORTGAGE CORPORATION

By:  _____

Name:
Title:    Sandy Blitzer
          Vice President

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

MORGAN STANLEY AND CO. INCORPORATED

By:  _____

Name:
Title:

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, GMACM and you.

Very truly yours,

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

By: _____

Name:
Title:

GMAC MORTGAGE CORPORATION

By: _____

Name:
Title:

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

MORGAN STANLEY AND CO. INCORPORATED

By: _____

Name:   Valerie Kay
Title:   Managing Director

## EXHIBIT A

### FORM OF OPINION OF ORRICK, HERRINGTON & SUTCLIFFE LLP

DOCSLA1:499790.2



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CA 90017-5855
tel 213-629-2020
fax 213-612-2499
WWW.ORRICK.COM

June 28, 2005

Residential Asset Mortgage Products, Inc.          GMAC Mortgage Corporation
8400 Normandale Lake Boulevard                      100 Witmer Road
Minneapolis, Minnesota 55437                        Horsham, Pennsylvania 19044

Deutsche Bank National Trust Company               Morgan Stanley and Co. Incorporated
1761 East St. Andrew Place                         1585 Broadway
Santa Ana, California 92705                        New York, New York 10036

Re:     Residential Asset Mortgage Products, Inc.
        <u>GMACM Mortgage Pass-Through Certificates, Series 2005-AR4</u>

Ladies and Gentlemen:

We have acted as special counsel to Residential Asset Mortgage Products, Inc. (the "Company") and GMAC Mortgage Corporation ("GMACM") in connection with the issuance and sale by the Company of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 (the "Certificates") pursuant to the Pooling and Servicing Agreement, dated as of June 28, 2005 (the "Pooling and Servicing Agreement"), among the Company, GMACM, as servicer (in such capacity, the "Servicer") and Deutsche Bank National Trust Company, as trustee (the "Trustee"). The Certificates consist of ten classes designated as Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, Class 5-A-2, and Class R Certificates (collectively, the "Senior Certificates"); and six classes designated as Class M-1, Class M-2 and Class M-3 (collectively, the "Class M Certificates") and Class B-1, Class B-2 and Class B-3 (collectively, the "Class B Certificates"). Only the Senior Certificates and the Class M Certificates (the "Offered Certificates") are offered pursuant to the Prospectus.

The Certificates will evidence the entire undivided interest in a trust fund (the "Trust Fund") consisting primarily of a pool of conventional, adjustable rate, one- to four-family first mortgage loans (the "Mortgage Loans") held by GMAC Bank, as custodian (the "Custodian"), pursuant to a Custodial Agreement, dated as of June 28, 2005, among the Servicer, the Custodian and the Trustee (the "Custodial Agreement"). The Offered Certificates are included in a Registration Statement on Form S-3 (File No. 333-117232) filed by the Company with the Securities and Exchange Commission (the "Commission") on July 8, 2004 and declared effective on August 9, 2004 (as amended as of the date hereof, the "Registration Statement"), and were offered by the prospectus dated December 22, 2004, as supplemented by the prospectus supplement dated June 23, 2005 (collectively, the "Prospectus"), filed with the Commission pursuant to Rule 424(b) of the rules and regulations of the Commission under the Securities Act of 1933, as amended (the



ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 2

"Act"). The Class B Certificates are described in the Private Placement Memorandum, dated June 28, 2005 (excluding the exhibits attached thereto, the "Private Placement Memorandum") prepared by the Company in connection with the sale of the Class B Certificates.

The Company acquired the Mortgage Loans from GMACM pursuant to a Mortgage Loan Purchase Agreement, dated as of June 28, 2005 (the "Mortgage Loan Purchase Agreement"), in exchange for immediately available funds and a *de minimis* portion of the Class R Certificates. The Company will sell to Morgan Stanley and Co. Incorporated ("Morgan Stanley") the Offered Certificates (other than *de minimis* portions of the Class R Certificates, the "Underwritten Certificates") pursuant to an Underwriting Agreement, dated June 23, 2005, among the Company, GMACM and Morgan Stanley (the "Underwriting Agreement"). The Company will sell the Class B Certificates to Morgan Stanley pursuant to the Purchase Agreement, dated June 28, 2005, among the Company, GMACM and Morgan Stanley (the "Purchase Agreement"). The Pooling and Servicing Agreement, Custodial Agreement, Mortgage Loan Purchase Agreement, Underwriting Agreement and the Purchase Agreement are referred to herein collectively as the "Agreements." Capitalized terms used but not defined herein shall have the meanings set forth in the Agreements. This opinion letter is rendered pursuant to Section 6.5 of the Underwriting Agreement and Section 6(e) of the Purchase Agreement.

In arriving at the opinions expressed below, we have examined and relied on the following documents:

(a)    executed copies of the Agreements;

(b)    the articles of incorporation and bylaws of the Company and GMACM;

(c)    a good standing certificate from the Secretary of State of the State of Delaware concerning the Company and a good standing certificate of the Secretary of State of the Commonwealth of Pennsylvania concerning GMACM;

(d)    resolutions adopted by the Board of Directors of the Company as of May 12, 2004, authorizing, among other things, the issuance of series of certificates registered under the Registration Statement;

(e)    a Certificate of Secretary executed by the Secretary of the Company, certifying, among other things, as to the resolutions described in clause (d);


ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 3

        (f)     the Registration Statement;

        (g)     the Prospectus;

        (h)     the Private Placement Memorandum;

        (i)     the forms of the Certificates; and

        (j)     the documents delivered by the Company and GMACM on the Closing Date pursuant to the Underwriting Agreement, the Purchase Agreement, the Mortgage Loan Purchase Agreement and the Pooling and Servicing Agreement.

In addition, we have examined and relied, as to factual matters, on the representations of the Company, GMACM and Morgan Stanley in the Underwriting Agreement, the Purchase Agreement, the Mortgage Loan Purchase Agreement and the Pooling and Servicing Agreement and on originals or copies certified or otherwise identified to our satisfaction of all such corporate records of the Company and GMACM and such other instruments and other certificates of public officials, officers and representatives of the Company, GMACM, Morgan Stanley and the Trustee, and we have made such investigations of law, as we have deemed appropriate as a basis for the opinions expressed below.

Based upon such examination and having regard for legal considerations which we deem relevant, we are of the following opinions:

1.     The Registration Statement has become effective under the Act, and, to our knowledge, no stop order suspending the effectiveness of the Registration Statement has been issued and not withdrawn, and no proceedings for that purpose have been instituted or threatened under Section 8(d) of the Act.

2.     The Registration Statement, as of the date it became effective, and the Prospectus, as of the date of the Prospectus Supplement, other than any financial or statistical information or Computational Materials or ABS Term Sheets contained therein as to which we express no opinion, complied as to form in all material respects with the requirements of the Act and the applicable rules and regulations thereunder.



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 4

3.    To our knowledge, there are no material contracts, indentures, or other documents (not including Computational Materials and ABS Term Sheets) of a character required to be described or referred to in either the Registration Statement or the Prospectus or to be filed as exhibits to the Registration Statement other than those described or referred to therein or filed as exhibits thereto.

4.    The Certificates, when duly and validly executed and authenticated in accordance with the Pooling and Servicing Agreement and paid for and delivered in accordance with the Underwriting Agreement, the Purchase Agreement or the Mortgage Loan Purchase Agreement, as the case may be, will be entitled to the benefits of the Pooling and Servicing Agreement.

5.    The statements set forth in the Prospectus under the heading "Description of the Certificates," insofar as such statements purport to summarize certain provisions of the Certificates and the Pooling and Servicing Agreement, are correct in all material respects. The statements set forth in the Basic Prospectus under the headings "Material Federal Income Tax Consequences" and "ERISA Considerations" and in the Prospectus Supplement under the headings "Material Federal Income Tax Consequences" and "ERISA Considerations," to the extent that they constitute matters of federal law or legal conclusions with respect thereto, are correct in all material respects.

6.    The Senior Certificates and Class M-1 Certificates will be "mortgage related securities," as defined in Section 3(a)(41) of the Securities Exchange Act of 1934, as amended, so long as such Certificates are rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization.

7.    The Pooling and Servicing Agreement is not required to be qualified under the Trust Indenture Act of 1939, as amended, and the Trust Fund created by the Pooling and Servicing Agreement is not required to be registered under the Investment Company Act of 1940, as amended.

8.    No consent, approval, authorization or order of any federal or State of New York court or governmental agency or body is required for the consummation by the Company of the transactions contemplated by the terms of the Agreements, except (a) such as have been obtained under the Act and (b) such as may be required under



ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 5

the blue sky laws of any jurisdiction in connection with the offer and sale of the Certificates, as to which we express no opinion.

9.    The Company has been duly incorporated, is validly existing as a corporation in good standing under the laws of the State of Delaware, and has the requisite power and authority, corporate or other, to own its own properties and conduct its own business, as presently conducted by it, and to enter into and perform its obligations under the Agreements.

10.    Each of the Agreements to which the Company is a party has been duly and validly authorized, executed and delivered by the Company.

11.    The consummation of the transactions contemplated by, and the performance by the Company of any other of the terms of, any of the Agreements to which it is a party will not result in a breach of any term or provision of the articles of incorporation or bylaws of the Company or any State of New York or federal statute or regulation, to our knowledge, result in a breach, violation or acceleration of, or constitute a default under, the terms of any indenture or other material agreement or instrument to which the Company is a party or by which it is bound or any order or regulation of the State of New York or federal court, regulatory body, administrative agency or governmental body having jurisdiction over the Company.

12.    Each of the Agreements to which the Company is a party constitutes a valid, legal and binding agreement of the Company, enforceable against the Company in accordance with its terms.

13.    Each of the Agreements to which GMACM is a party constitutes a valid, legal and binding agreement of GMACM, enforceable against GMACM in accordance with its terms.

14.    Assuming compliance with all provisions of the Pooling and Servicing Agreement, under existing law, (a) REMIC I and REMIC II will each be treated as a "real estate mortgage investment conduit" as provided for by Section 860D of the Internal Revenue Code of 1986 (the "Code"), (b) the Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, Class 5-A-2 , Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates will be treated as evidencing ownership of "regular interests" as the term "regular


**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 6

interest" is defined in the Code, in REMIC II for federal income tax purposes, (c) Component I of the Class R Certificates will be treated as the sole class of "residual interests" in REMIC I, as the term "residual interest" is defined in the Code, and (d) Component II of the Class R Certificates will be treated as the sole class of "residual interests" in REMIC II, as the term "residual interest" is defined in the Code. However, continuation of the status of REMIC I and REMIC II as REMICs may entail compliance with statutory changes in the future and with regulations not yet issued.

15. The statements made in the Private Placement Memorandum under the heading "Description of the Class B Certificates" (including any related statements in the Prospectus to which cross-reference is made), insofar as such statements purport to summarize certain provisions of the Class B Certificates, are correct in all material respects. The statements made in the Private Placement Memorandum (including any related statements in the Prospectus to which cross-reference is made) under the headings "Certain Federal Income Tax Consequences," "Legal Investment Considerations" and "ERISA Considerations," to the extent that they constitute matters of federal law or legal conclusions with respect thereto, are correct in all material respects.

16. The issuance of the Class B Certificates and the offer and sale of the Class B Certificates to Morgan Stanley, in the manner and under the circumstances contemplated in the Private Placement Memorandum and the Agreements, are transactions that do not require registration of the Class B Certificates under the Act.

In addition, we have participated in conferences with representatives of Morgan Stanley, the Company and GMACM concerning the Registration Statement and the Prospectus and have considered the matters required to be stated therein and the statements contained therein, although we have not independently verified the accuracy, completeness or fairness of such statements (except as described in paragraph 5 above). Based upon and subject to the foregoing, nothing has come to our attention to cause us to believe that the Registration Statement (excluding any exhibits filed therewith), as of the date it became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that the Prospectus, as of the date of the Prospectus Supplement or as of the Closing Date, contained or contains an untrue statement of a material fact or omitted or omits to state a material fact required to be stated therein or necessary to make the



ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 7

statements therein, in light of the circumstances under which they were made, not misleading (it being understood that we have not been requested to and we do not make any comment in this paragraph with respect to the financial statements, schedules and other financial and statistical information contained in or incorporated by reference into the Registration Statement or the Prospectus or any Computational Materials or ABS Term Sheets).

In addition, we have participated in conferences with representatives of Morgan Stanley, the Company and GMACM concerning the Private Placement Memorandum and have considered the matters required to be stated therein and the statements contained therein, although we have not independently verified the accuracy, completeness or fairness of such statements (except as described in paragraph 15 above). Based upon and subject to the foregoing, nothing has come to our attention to cause us to believe that the Private Placement Memorandum, together with the Prospectus attached thereto, as of the date hereof, contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (it being understood that we have not been requested to and we do not make any comment in this paragraph with respect to the financial statements, schedules and other financial and statistical information contained in or incorporated by reference into the Prospectus or the Private Placement Memorandum.

With your permission we have assumed the following: (a) the authenticity of original documents and the genuineness of all signatures; (b) the conformity to the originals of all documents submitted to us as copies; (c) the truth, accuracy and completeness of the information, factual matters, representations and warranties contained in the records, documents, instruments and certificates we have reviewed; and (d) except as specifically covered in the opinions set forth above, the due authorization, execution and delivery on behalf of the respective parties thereto of documents referred to herein and the legal, valid and binding effect thereof on such parties.

Whenever a statement herein is qualified by the phrase "to our knowledge" or "to our attention," it is intended to indicate that, during the course of our representation of the Company and GMACM, no information that would give us current actual knowledge of the inaccuracy of such statement has come to the attention of those attorneys currently in this firm who have rendered legal services in connection with the Certificates. However, we have not undertaken any independent investigation to determine the accuracy of any such statement, and any limited inquiry undertaken by us during the preparation of this opinion letter should not be regarded as such an investigation; no inference as to our knowledge of any matters bearing on the accuracy of any such statement should be drawn from the fact of our representation of the Company and GMACM.



ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 8

Our opinion that any document is valid, legal and binding or enforceable in accordance with its terms is subject to:  (1) limitations imposed by bankruptcy, insolvency, fraudulent conveyance, reorganization, arrangement, moratorium or other laws relating to or affecting the enforcement of creditors' rights generally; (2) general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law; and (3) rights to indemnification which may be limited by applicable law or equitable principles or otherwise unenforceable as against public policy.

With respect to our opinion set forth in paragraph 2, in passing on the form of Registration Statement and the Prospectus, we have necessarily assumed the correctness and completeness of the statements made therein.

We express no opinion as to matters of law other than the law of the State of New York and the United States of America, except to the extent necessary to render the opinions in paragraphs 9 and 10 above with respect to Delaware corporate law.  As you know, we are not licensed to practice law in the State of Delaware, and our opinions with respect to Delaware corporate law are based solely on a review of a standard compilation of the Delaware General Corporation Law.  For the purposes of the opinions rendered in paragraphs 12 and 13 above, insofar as such opinions cover the enforceability of the Custodial Agreement, we have assumed the Custodial Agreement is governed by New York law and express no opinion as to the enforceability of the choice-of-law provision contained therein.

The opinions relating to tax considerations and ERISA considerations contained herein were written to support the promotion and marketing of the securities to which they relate, and were not intended or written to be used, and cannot be used, by a taxpayer for the purpose of avoiding United States Federal income tax penalties that may be imposed.  Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 9

This opinion letter is solely for your benefit and may not be relied upon or used by, circulated, quoted or referred to, nor may copies hereof be delivered to, any other person without our prior written approval. We disclaim any obligation to update this opinion letter for events occurring or coming to our attention after the date hereof.

Very truly yours,

Orrick, Herrington & Sutcliffe LLP

ORRICK, HERRINGTON & SUTCLIFFE LLP

# **EXHIBIT B**

## FORM OF OPINION OF GMACM COUNSEL

Exhibit B-1

# GMAC Mortgage

**Bruce P. Bowen**
*Associate General Counsel*

June 28, 2005

To the Addresses identified on Schedule A attached hereto

Re:    GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

Ladies and Gentlemen:

I am associate general counsel of GMAC Mortgage Corporation, a Pennsylvania corporation (the "Company"), and have represented the Company in connection with the preparation, execution and delivery of the following documents:

  (i)    Mortgage Loan Purchase Agreement, dated as of June 28, 2005 (the "Mortgage Loan Purchase Agreement"), by and between the Company, as seller, and Residential Asset Mortgage Products, Inc. (the "Depositor");

  (ii)   Pooling and Servicing Agreement, dated as of June 28, 2005 (the "Pooling and Servicing Agreement"), among the Company, as servicer, the Depositor and Deutsche Bank National Trust Company (the "Trustee");

  (iii)  Custodial Agreement, dated as of June 28, 2005 (the "Custodial Agreement"), among the Company, the Trustee, and GMAC Bank (the "Custodian");

  (iv)   Underwriting Agreement, dated June 23, 2005 (the "Underwriting Agreement"), among the Depositor, the Company and Morgan Stanley and Co. Incorporated.

In this connection, I have examined, or caused to be examined, originals, or copies certified to my satisfaction, of the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement, the Custodial Agreement and the Underwriting Agreement (collectively, the "Agreements"), and such other documents, certificates and instruments which I have deemed necessary or appropriate in connection with this opinion. As to matters of fact, I have examined and relied upon representations, warranties and covenants of parties to the above documents contained therein and, where I have deemed appropriate, representations or certifications of officers of parties to the Agreements or public officials. In rendering this opinion letter, I have assumed (i) the authenticity of all documents submitted to me as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents submitted to me as copies, (ii) with respect to parties other than the Company, the due authorization, execution and delivery of such documents, and

GMAC Mortgage Corporation
Legal Staff
100 Witmer Road
Mail Code 190-555-200
Horsham, PA 19044

Phone: (215) 682-1263
Fax: (866) 241-8870
E-mail: Bruce_Bowen@gmacm.com

To the Addresses identified on
Schedule A attached hereto
June 28, 2005
Page 2

the necessary entity power with respect thereto, and the enforceability of such documents, (iii) the conformity of the Mortgage Loans and the documents set forth in Section 2.01(b) of the Pooling and Servicing Agreement to the requirements of the Agreements and (iv) that there is not and will not be any other agreement that modifies or supplements the agreements expressed in the Agreements.

In rendering this opinion letter, I do not express any opinion concerning any law other than the law of the Commonwealth of Pennsylvania and the federal law of the United States, and I do not express any opinion concerning the application of the "doing business" laws. To the extent that any of the matters upon which I am opining herein are governed by laws ("Other Laws") other than the laws identified in the preceding sentence, I have assumed with your permission and without independent verification or investigation as to the reasonableness of such assumption, that such Other Laws and judicial interpretation thereof do not vary in any respect material to this opinion from the corresponding laws of the Commonwealth of Pennsylvania and judicial interpretations thereof. I do not express any opinion on any issue not expressly addressed below.

My opinions set forth below are subject to the qualification that enforceability of each of the respective obligations of the parties under the Agreements is subject to (i) general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, (ii) the availability of equitable remedies, (iii) bankruptcy, insolvency, liquidation, receivership, moratorium, reorganization or other similar laws affecting the rights of creditors, (iv) implied or express covenants of good faith, and (v) limitations of public policy under applicable securities laws as to rights of indemnity and contribution thereunder. My opinions are subject to the further qualification that enforceability of each of the parties' respective obligations under the Agreements is subject to the effect of certain laws, regulations and judicial or other decisions upon the availability and enforceability of the remedies of specific performance and self help. However, the non-enforceability of any such provisions will not, taken as a whole, materially interfere with the practical realization of the benefits of the rights and remedies included in any such agreement that is the subject of any opinion expressed below, except for the considerations referred to in foregoing clause (v) and the consequences of any judicial, administrative, procedural or other delay that may be imposed by, relate to, or arise from applicable laws, equitable principles and interpretations thereof.

Capitalized terms used herein, but not defined herein, shall have the meanings assigned to them in the Agreements.

Based upon the foregoing, but subject to the assumptions, exceptions, qualifications and limitations herein expressed, I am of the opinion that:

1.      The Company is duly incorporated and validly existing as a corporation in good standing under the laws of the Commonwealth of Pennsylvania and has the requisite power to own its properties, to conduct its business as presently conducted by it and to enter into and perform its obligations under the respective Agreements to which it is a party.

2.      Each of the Agreements to which it is a party has been duly authorized, executed and delivered by the Company, and, assuming the authorization, execution and delivery by the

To the Addresses identified on
Schedule A attached hereto
June 28, 2005
Page 3

other parties thereto (other than the Company), is the legal, valid and binding agreement of the Company, enforceable against it in accordance with its terms.

3.      No consent, approval, authorization or order of any federal or Commonwealth of Pennsylvania court or any other court or agency or other governmental body is required for the consummation by the Company of the transactions contemplated by, or for the performance of the obligations of the Company under, the Agreements to which the Company is a party, except for those consents, approvals, authorizations or orders which previously have been obtained, and except such as may be required under the federal and state securities laws in connection with the purchase, offer and sale of the Certificates by the Underwriter, as to which I express no opinion.

4.      The consummation of the transactions contemplated by the Agreements by the Company will not result in a material violation of any federal or Commonwealth of Pennsylvania or any other statute or regulation or will conflict with, result in a breach, violation or acceleration of or constitute a default under any order of any federal or Commonwealth of Pennsylvania or any other court or agency or other governmental body having jurisdiction over the Company or result in the imposition of any lien or encumbrance on any of the properties of the Company, except for those liens or encumbrances provided for in the Agreements.

5.      The execution, delivery and performance by the Company of the Agreements do not conflict with or constitute a breach of any of the terms or provisions of or a default under any of the certificates of incorporation or by-laws of the Company, or any material agreement to which the Company is a party or by which the Company is bound or to which the properties of the Company are subject.

The opinions set forth herein are intended solely for the benefit of the addressees hereof in connection with the transactions contemplated herein and shall not be relied upon by any other person or for any other purpose without my prior written consent. Except for reproductions for inclusion in transcripts of the documentation relating to the transactions contemplated herein, this opinion may not be copied or otherwise reproduced or quoted from, in whole or in part, without my prior written consent.

Very truly yours,

By: _____
Name: Bruce P. Bowen
Title:   Associate General Counsel,
         GMAC Mortgage Corporation

## Schedule A

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 600
Minneapolis, Minnesota 55437

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, California 92705

Morgan Stanley and Co. Incorporated
1585 Broadway
New York, New York 10036

Standard & Poor's Ratings Services,
a division of The McGraw-Hill Companies, Inc.
55 Water Street
New York, New York 10041

Moody's Investors Service, Inc.
99 Church Street, 4th Floor
New York, New York 10007

**EXHIBIT C**

FORM OF OPINION OF TRUSTEE COUNSEL

Exhibit C-1

DOCSLA1:499790.2



**SONNENSCHEIN NATH & ROSENTHAL LLP**

601 South Figueroa Street
Suite 1500
Los Angeles, CA 90017
213.623.9300
213.623.9924 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

June 28, 2005

To those entities identified on Attachment "A" hereto

Ladies and Gentlemen:

We have acted as special counsel to Deutsche Bank National Trust Company, a national banking association (the "Trustee"), as trustee under the Pooling and Servicing Agreement dated as of June 28, 2005 (the "Pooling and Servicing Agreement") among Residential Asset Mortgage Products, Inc., as company (the "Company"), GMAC Mortgage Corporation, as servicer, and the Trustee relating to the issuance by the GMACM Mortgage Loan Trust 2005-AR4 of Residential Asset Mortgage Products, Inc. GMACM Mortgage Pass-Through Certificates, Series 2005-AR4. All capitalized terms used herein and not expressly defined herein have the definitions specified in the Pooling and Servicing Agreement.

In connection with rendering this opinion, we have examined originals, certified copies or copies otherwise identified as being true copies of the following:

    (a)    The Pooling and Servicing Agreement;

    (b)    Specimens of the Certificates;

    (c)    Articles of Association, as amended, of the Trustee; and

    (d)    By-laws, as amended, of the Trustee.

In addition, we have examined originals or copies authenticated to our satisfaction of such corporate records, certificates of officers of the Trustee and public officials, and other documents as we have deemed relevant or necessary in connection with our opinions set forth herein. As to questions of fact material to such opinions we have relied upon the representations of the Trustee set forth in the Pooling and Servicing Agreement, certificates of officers and other representatives of the Trustee and factual information we have obtained from such other sources as we have deemed reasonable. We have assumed without investigation that there has been no relevant change or development between the dates as of which the information cited in the preceding sentence was given and the date of this letter. We have not independently verified the accuracy of the matters set forth in the statements or certificates upon which we have relied. For purposes of the opinion in paragraph 1, we have relied with respect to the good standing and the extent of the power and authority of the Trustee exclusively upon a certificate

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

issued by a governmental authority in the relevant jurisdiction, and such opinion is not intended to provide any conclusion or assurance with respect to good standing beyond that conveyed by that certificate.

We have assumed (i) the genuineness and authenticity of all documents examined by us and all signatures thereon, and the conformity to originals of all copies of all documents examined by us; (ii) that the execution, delivery and/or acceptance of the Pooling and Servicing Agreement and the Certificates have been duly authorized by all action, corporate or otherwise, necessary by all of the parties thereto other than the Trustee (those parties other than the Trustee are hereinafter collectively referred to as the ("Other Parties"); (iii) the legal capacity of all natural persons executing the Pooling and Servicing Agreement; (iv) that each of the Other Parties has satisfied those legal requirements that are applicable to it to the extent necessary to make the Pooling and Servicing Agreement enforceable against it; (v) the Pooling and Servicing Agreement constitutes a valid and binding obligation of the Other Parties and is enforceable against the Other Parties in accordance with its terms; (vi) that each of the Other Parties has complied with all legal requirements pertaining to its status as such status relates to its rights to enforce the Pooling and Servicing Agreement; (vii) that the Pooling and Servicing Agreement accurately describes and contains the mutual understandings of the parties, and that there are no oral or written statements or agreements or usages of trade or courses of prior dealings among the parties that would modify, amend or vary any of the terms of the Pooling and Servicing Agreement; (viii) that the Other Parties will act in accordance with, and will refrain from taking any action that is forbidden by, the terms and conditions of the Pooling and Servicing Agreement; (ix) the constitutionality or validity of a relevant statute, rule, regulation or agency action is not in issue; (x) that the Trustee holds requisite title and rights to property involved in the transactions as contemplated by the Pooling and Servicing Agreement; (xi) all agreements other than the Pooling and Servicing Agreement with respect to which we have provided advice in our letter or reviewed in connection with our letter would be enforced as written; (xii) that there has not been any mutual mistake of fact or misunderstanding, fraud, duress or undue influence; and (xiii) that each of the Other Parties and any agent acting for it in connection with the Pooling and Servicing Agreement have acted without notice of any defense against the enforcement of any rights created by, or adverse claim to any property transferred pursuant to, the Pooling and Servicing Agreement. For purposes of the opinion in paragraph 5, we have also assumed, with your permission, that the REMIC I and REMIC II will each perform in California only the functions specified to be performed expressly through the Trustee in the Pooling and Servicing Agreement.

We confirm that we do not have any actual knowledge which has caused us to conclude that our reliance and assumptions cited in the two preceding paragraphs are unwarranted or that any information supplied in this letter is wrong. We also bring to your attention the fact that we were not present at and did not witness the execution or delivery of the Pooling and Servicing Agreement or the Certificates and, as to our opinions below regarding the execution and delivery of the Pooling and Servicing Agreement and the execution, authentication and delivery of the Certificates, we have relied solely on certifications and oral advice of the officers of the Trustee with respect thereto.

As used in this opinion with respect to any matter, the qualifying phrase "actual knowledge" or such similar phrase means the conscious awareness of facts or other information

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

by: (i) the lawyer signing this opinion; and (ii) any lawyer in this firm who has had active involvement in negotiating or preparing the Pooling and Servicing Agreement or preparing this opinion.

Based on the foregoing, and in reliance thereon, and subject to the qualifications, limitations and exceptions stated herein, we are of the opinion, having due regard for such legal considerations as we deem relevant, that:

1.    The Trustee is validly existing as a national banking association in good standing under the laws of the United States and has the requisite power and authority under the National Bank Act to enter into, and take all action required of it under, the Pooling and Servicing Agreement.

2.    The Trustee has executed and delivered the Pooling and Servicing Agreement and it is a valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms.

3.    The execution, delivery and performance by the Trustee of the Pooling and Servicing Agreement do not (i) violate or conflict with any provision of the Articles of Association, as amended, of the Trustee or its By-laws, as amended, (ii) violate or conflict with any law, rule or regulation of any governmental agency applicable to the Trustee, (iii) to our actual knowledge, violate or conflict with any judicial or governmental judgment, decree, injunction or order binding on the Trustee or its properties that would materially and adversely affect its ability to perform its obligations under the Pooling and Servicing Agreement, (iv) to our actual knowledge, violate or conflict with the terms of any material agreement or instrument, known to us, to which the Trustee is a party or by which it is bound, and (v) require the Trustee to obtain any approval, consent or waiver of any governmental agency or body (other than approvals, consents or waivers already obtained).

4.    The Trustee, in its capacity as trustee, has executed and caused to be authenticated and delivered the Certificates as required in the Pooling and Servicing Agreement.

5.    Assuming that the REMIC I and REMIC II each qualifies as a REMIC for federal income tax purposes, they will not be subject to any tax imposed by the State of California or any political subdivision thereof on their assets or income, except to the extent they are subject to the minimum franchise tax.

Our opinions as herein expressed are subject to the following qualifications and limitations:

1.    Our opinions are subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws. This exception includes:

       a.    the Federal Bankruptcy Code and thus comprehends, among others, matters of turn-over, automatic stay, avoiding powers, fraudulent transfer, preference, discharge, conversion of a non-recourse obligation into a recourse claim, limitations on ipso facto and anti-assignment clauses and

-3-

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

the coverage of pre-petition security agreements applicable to property acquired after a petition is filed;

b.    all other Federal and state bankruptcy, insolvency (including without limitation, Sections 8, 11 and 13(e) of the Federal Deposit Insurance Act), reorganization, receivership, rehabilitation, liquidation, conservation, dissolution, moratorium, arrangement and assignment for the benefit of creditors laws that affect the rights of creditors generally or that have reference to or affect only creditors of specific types of debtors;

c.    state fraudulent transfer and conveyance laws; and

d.    judicially developed doctrines in this area, such as substantive consolidation of entities and equitable subordination.

2.    Our opinions are subject to the effect of general principles of equity, whether applied by a court of law or equity. This limitation includes principles:

a.    governing the availability of specific performance, injunctive relief or other equitable remedies, which generally place the award of such remedies, subject to certain guidelines, in the discretion of the court to which application for such relief is made;

b.    affording equitable defense (e.g., waiver, laches and estoppel) against a party seeking enforcement;

c.    requiring good faith and fair dealing in the performance and enforcement of a contract by the party seeking its enforcement;

d.    requiring reasonableness in the performance and enforcement of an agreement by the party seeking enforcement of the contract;

e.    requiring consideration of the materiality of (i) a breach and (ii) the consequences of the breach to the party seeking enforcement;

f.    requiring consideration of the impracticability or impossibility of performance at the time of attempted enforcement; and

g.    affording defenses based upon the unconscionability of the enforcing party's conduct after the parties have entered into the contract.

3.    Certain other rights, remedies and waivers contained in the Pooling and Servicing Agreement and the Certificates may be rendered ineffective, or limited by, applicable laws or judicial decisions governing such provisions, but such laws and judicial decisions do not, in our opinion, make the Pooling and Servicing Agreement inadequate for the practical realization of the benefits provided by the Pooling and Servicing Agreement.

-4-

# Sonnenschein
SONNENSCHEIN NASH & ROSENTHAL LLP

4.    Our opinions are subject to the effect of the rules of law that:

a.    limit or affect the enforcement of provisions of a contract that purport to waive, or to require waiver of, (i) the obligations of good faith, fair dealing, diligence and reasonableness, (ii) broadly or vaguely stated rights, (iii) statutory, regulatory or constitutional rights, except to the extent that the statute, regulation or constitution explicitly allows waivers, (iv) unknown future defenses, and (v) rights to damages;

b.    provide that choice of law, forum selection, consent to jurisdiction, and jury waiver clauses in contracts are not necessarily binding and, with respect to California law, jury waiver clauses may be unenforceable;

c.    limit the availability of a remedy under certain circumstances where another remedy has been elected;

d.    provide a time limitation after which a remedy may not be enforced;

e.    govern and afford judicial discretion regarding the determination of damages and entitlement to attorneys' fees and other costs;

f.    may permit a party that has materially failed to render or offer performance required by the contract to cure that failure unless (i) permitting a cure would unreasonably hinder the aggrieved party from making substitute arrangements for performance, or (ii) it was important in the circumstances to the aggrieved party that performance occur by the date stated in the contract; and

g.    limit enforcement of time is of-the-essence clauses.

5.    We express no opinion as to the laws of any jurisdiction other than the laws of the States of California and New York (excluding local laws) and the federal laws of the United States of America.

6.    We express no opinion as to any legal issues identified in Section 19 of the Legal Opinion Accord of the American Bar Association except to the extent that such issues are specifically addressed herein.

This opinion is rendered on the date hereof and we have no continuing obligation hereunder to inform you of changes of law or fact subsequent to the date hereof or facts of which we have become aware after the date hereof.

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

This opinion is solely for your benefit and may not be furnished to, or relied upon by, any other person or entity without the express prior written consent of the undersigned. This opinion is limited to the matters set forth herein; no opinion may be inferred or implied beyond the matters expressly stated in this letter.

Very truly yours,

SONNENSCHEIN NATH & ROSENTHAL LLP



Attachment "A"

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

GMAC Mortgage Corporation
100 Witmer Road
Horsham, Pennsylvania 19044

## **EXHIBIT D**

## EXCLUDED INFORMATION

DOCSLA1:499790.2

## Summary

The following summary is a very general overview of the offered certificates and does not contain all of the information that you should consider in making your investment decision. To understand the terms of the offered certificates, you should read carefully this entire document and the prospectus.

| | |
|---|---|
| Title of securities........................................ | GMACM Mortgage Pass-Through Certificates, Series 2005-AR4. |
| Issuer............................................................. | GMACM Mortgage Loan Trust 2005-AR4. |
| Seller and Servicer ..................................... | GMAC Mortgage Corporation, or GMACM, a Pennsylvania corporation, will be the seller and servicer of the mortgage loans. The servicer will be obligated to service the mortgage loans pursuant to the pooling and servicing agreement, dated as of the closing date, among the depositor, the servicer and the trustee. |
| | *We refer you to "Pooling and Servicing Agreement" and "The Seller and Servicer" in this prospectus supplement for further information on the seller and servicer.* |
| Depositor...................................................... | Residential Asset Mortgage Products, Inc., an affiliate of GMAC Mortgage Corporation. |
| Trustee......................................................... | Deutsche Bank National Trust Company. |
| Mortgage pool ............................................ | 951 hybrid adjustable rate mortgage loans with an aggregate principal balance of approximately $386,070,613.57 as of the cut-off date, secured by first liens on one- to four-family residential properties. |
| Cut-off date ................................................ | June 1, 2005. |
| Closing date................................................. | On or about June 28, 2005. |
| Distribution dates ....................................... | The 19th of each month or, if the 19th is not a business day, the next business day, beginning in July 2005. |
| Scheduled final distribution date............ | With respect to each class of certificates, the distribution date in July 2035. The actual final distribution date for any class of certificates could be substantially earlier. |
| Form of certificates .................................. | Book-entry: Class A Certificates and Class M Certificates. |
| | Physical: Class R Certificates. |
| | *See "Description of the Certificates—Book-Entry Registration" in this prospectus supplement.* |
| Minimum denominations ........................ | Class A and Class M-1 Certificates: $25,000. |
| | Class M-2 and Class M-3 Certificates: $250,000. |
| | Class R Certificates: 20% percentage interests. |

risk of losses than holders of classes having earlier priority for distribution of principal. After the Certificate Principal Balances of the Class M Certificates have been reduced to zero, (i) the yield to maturity on the Class 2-A-2 Certificates will be extremely sensitive to losses on the group 2 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 2-A-1 Certificates and Class 2-A-2 Certificates, will be allocated to the Class 2-A-2 Certificates, (ii) the yield to maturity on the Class 3-A-2 Certificates will be extremely sensitive to losses on the group 3 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 3-A-1 Certificates and Class 3-A-2 Certificates, will be allocated to the Class 3-A-2 Certificates, (iii) the yield to maturity on the Class 4-A-2 Certificates will be extremely sensitive to losses on the group 4 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 4-A-1 Certificates and Class 4-A-2 Certificates, will be allocated to the Class 4-A-2 Certificates, and (v) the yield to maturity on the Class 5-A-2 Certificates will be extremely sensitive to losses on the group 5 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 5-A-1 Certificates and Class 5-A-2 Certificates, will be allocated to the Class 5-A-2 Certificates.

*Assumed Final Distribution Date:* The assumed final distribution date with respect to each class of the offered certificates is the distribution date in July 2035, which is the distribution date in the month immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its assumed final distribution date.

*Weighted Average Life:* Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security assuming no losses. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans in the related loan group is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement is the constant prepayment rate, or CPR. CPR does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans included in the trust.

The tables that begin on page S-105 have been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described under "Description of the Mortgage Pool" in this prospectus supplement and their performance. The tables assume, among other things, that:

(1)    as of the date of issuance of the offered certificates, the group 1 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $2,459,499.23 | 4.95931% | 360 | 358 | 2.75000% | 10.78940% |
| 2 | $17,355,096.03 | 5.23400% | 360 | 359 | 2.75000% | 11.23400% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.75000% | 34 | 12 | 2.50970% | 2.00000% | N/A |
| 2 | 2.75000% | 35 | 12 | 2.00000% | 2.00000% | 35 |

(2)    as of the date of issuance of the offered certificates, the group 2 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $1,609,535.66 | 5.60176% | 360 | 357 | 2.75000% | 10.60176% |
| 2 | $60,046,554.73 | 5.62853% | 360 | 359 | 2.74432% | 10.62853% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.75000% | 57 | 12 | 5.00000% | 2.00000% | N/A |
| 2 | 2.74432% | 59 | 12 | 5.00000% | 2.00000% | 59 |

(3)    as of the date of issuance of the offered certificates, the group 3 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $26,818,968.83 | 5.22473% | 360 | 360 | 2.75000% | 10.22473% |
| 2 | $131,713,240.77 | 5.39299% | 360 | 359 | 2.72958% | 10.39299% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.75000% | 60 | 12 | 5.00000% | 2.00000% | N/A |
| 2 | 2.72958% | 59 | 12 | 5.00000% | 2.00000% | 59 |

(4)     as of the date of issuance of the offered certificates, the group 4 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $11,135,189.10 | 5.43038% | 360 | 360 | 2.72084% | 10.43038% |
| 2 | $46,905,957.40 | 5.40920% | 360 | 359 | 2.74684% | 10.40920% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.72084% | 84 | 12 | 5.00000% | 2.00000% | N/A |
| 2 | 2.74684% | 83 | 12 | 5.00000% | 2.00000% | 83 |

(5)     as of the date of issuance of the offered certificates, the group 5 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $88,026,571.82 | 5.62833% | 360 | 359 | 2.74276% | 10.62833% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.74276% | 119 | 12 | 5.00000% | 2.00000% | 119 |

(6)     the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity (after taking into account the interest-only period), so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity (after taking into account the interest-only period);

(7)     the Seller will not repurchase any mortgage loan, as described under "Description of the Securities—Representations with Respect to Loans," "—Repurchases of Loans" and "Description of the Securities—Assignment of Loans" in the prospectus, and the servicer does not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust unless otherwise indicated with respect to the weighted average lives;

(8)     there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of CPR set forth in the tables;

(9)     there is no Prepayment Interest Shortfall or any other interest shortfall in any month;

(10)    payments on the certificates will be received on the 19th day of each month, commencing in July 2005;

(11)    there are no additional ongoing trust expenses payable out of the trust other than the servicing fee;

(12)    one-year LIBOR remains constant at 3.862% per annum; and

(13)    the certificates will be purchased on June 28, 2005.

Clauses (1) through (13) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the tables below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans in any group will prepay at a constant level of CPR until maturity or that all of the mortgage loans will prepay at the same level of CPR. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the various constant percentages of CPR specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans in the related loan group, or actual prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following tables indicate the weighted average life of each class of offered certificates, other than the Class R Certificates, and set forth the percentages of the initial Certificate Principal Balance of each class of offered certificates that would be outstanding after each of the distribution dates at the various percentages of CPR shown.

## Percentage of Initial Class 1-A Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ............................................. | 100 | 100 | 100 | 100 | 100 |
| June 2006.......................................... | 100 | 84 | 74 | 63 | 53 |
| June 2007.......................................... | 100 | 71 | 54 | 40 | 28 |
| June 2008.......................................... | 99 | 59 | 39 | 25 | 15 |
| June 2009.......................................... | 98 | 49 | 29 | 16 | 8 |
| June 2010.......................................... | 96 | 41 | 22 | 10 | 4 |
| June 2011.......................................... | 95 | 34 | 16 | 7 | 2 |
| June 2012.......................................... | 93 | 28 | 12 | 4 | 1 |
| June 2013.......................................... | 91 | 24 | 9 | 3 | 1 |
| June 2014.......................................... | 89 | 20 | 6 | 2 | * |
| June 2015.......................................... | 87 | 16 | 5 | 1 | * |
| June 2016.......................................... | 85 | 14 | 3 | 1 | * |
| June 2017.......................................... | 83 | 11 | 2 | * | * |
| June 2018.......................................... | 80 | 9 | 2 | * | * |
| June 2019.......................................... | 78 | 8 | 1 | * | * |
| June 2020.......................................... | 75 | 6 | 1 | * | * |
| June 2021.......................................... | 72 | 5 | 1 | * | * |
| June 2022.......................................... | 69 | 4 | * | * | * |
| June 2023.......................................... | 65 | 3 | * | * | * |
| June 2024.......................................... | 61 | 3 | * | * | * |
| June 2025.......................................... | 57 | 2 | * | * | * |
| June 2026.......................................... | 53 | 2 | * | * | * |
| June 2027.......................................... | 49 | 1 | * | * | * |
| June 2028.......................................... | 44 | 1 | * | * | * |
| June 2029.......................................... | 39 | 1 | * | * | * |
| June 2030.......................................... | 33 | 1 | * | * | * |
| June 2031.......................................... | 27 | * | * | * | * |
| June 2032.......................................... | 21 | * | * | * | * |
| June 2033.......................................... | 14 | * | * | * | * |
| June 2034.......................................... | 7 | * | * | * | * |
| June 2035.......................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.13 | 5.47 | 3.26 | 2.20 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.07 | 5.06 | 2.98 | 2.00 | 1.45 |

o   All percentages listed in the table above are rounded to the nearest 1%.

*   Indicates a number greater than 0% but less than 0.5%.

(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

### Percentage of Initial Class 2-A-1 and Class 2-A-2 Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ................................................. | 100 | 100 | 100 | 100 | 100 |
| June 2006................................................. | 100 | 84 | 74 | 63 | 53 |
| June 2007................................................. | 100 | 71 | 54 | 40 | 28 |
| June 2008................................................. | 100 | 59 | 40 | 25 | 15 |
| June 2009................................................. | 100 | 50 | 30 | 16 | 8 |
| June 2010................................................. | 100 | 42 | 22 | 11 | 4 |
| June 2011................................................. | 98 | 35 | 16 | 7 | 2 |
| June 2012................................................. | 96 | 29 | 12 | 4 | 1 |
| June 2013................................................. | 94 | 24 | 9 | 3 | 1 |
| June 2014................................................. | 92 | 20 | 7 | 2 | * |
| June 2015................................................. | 90 | 17 | 5 | 1 | * |
| June 2016................................................. | 88 | 14 | 4 | 1 | * |
| June 2017................................................. | 86 | 12 | 3 | * | * |
| June 2018................................................. | 83 | 10 | 2 | * | * |
| June 2019................................................. | 80 | 8 | 1 | * | * |
| June 2020................................................. | 77 | 6 | 1 | * | * |
| June 2021................................................. | 74 | 5 | 1 | * | * |
| June 2022................................................. | 71 | 4 | 1 | * | * |
| June 2023................................................. | 67 | 3 | * | * | * |
| June 2024................................................. | 63 | 3 | * | * | * |
| June 2025................................................. | 59 | 2 | * | * | * |
| June 2026................................................. | 55 | 2 | * | * | * |
| June 2027................................................. | 50 | 1 | * | * | * |
| June 2028................................................. | 45 | 1 | * | * | * |
| June 2029................................................. | 40 | 1 | * | * | * |
| June 2030................................................. | 34 | 1 | * | * | * |
| June 2031................................................. | 28 | * | * | * | * |
| June 2032................................................. | 22 | * | * | * | * |
| June 2033................................................. | 15 | * | * | * | * |
| June 2034................................................. | 7 | * | * | * | * |
| June 2035................................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.68 | 5.56 | 3.30 | 2.22 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.62 | 5.14 | 3.01 | 2.01 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.
(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.
(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should he read in conjunction therewith.

### Percentage of Initial Class 3-A-1 and Class 3-A-2 Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ............................................. | 100 | 100 | 100 | 100 | 100 |
| June 2006........................................... | 100 | 84 | 74 | 63 | 53 |
| June 2007........................................... | 100 | 71 | 54 | 40 | 28 |
| June 2008........................................... | 99 | 59 | 39 | 25 | 14 |
| June 2009........................................... | 99 | 49 | 30 | 16 | 8 |
| June 2010........................................... | 99 | 42 | 22 | 10 | 4 |
| June 2011........................................... | 97 | 35 | 16 | 7 | 2 |
| June 2012........................................... | 95 | 29 | 12 | 4 | 1 |
| June 2013........................................... | 93 | 24 | 9 | 3 | 1 |
| June 2014........................................... | 91 | 20 | 6 | 2 | * |
| June 2015........................................... | 89 | 17 | 5 | 1 | * |
| June 2016........................................... | 87 | 14 | 3 | 1 | * |
| June 2017........................................... | 85 | 11 | 3 | * | * |
| June 2018........................................... | 82 | 9 | 2 | * | * |
| June 2019........................................... | 79 | 8 | 1 | * | * |
| June 2020........................................... | 76 | 6 | 1 | * | * |
| June 2021........................................... | 73 | 5 | 1 | * | * |
| June 2022........................................... | 70 | 4 | * | * | * |
| June 2023........................................... | 66 | 3 | * | * | * |
| June 2024........................................... | 63 | 3 | * | * | * |
| June 2025........................................... | 59 | 2 | * | * | * |
| June 2026........................................... | 54 | 2 | * | * | * |
| June 2027........................................... | 50 | 1 | * | * | * |
| June 2028........................................... | 45 | 1 | * | * | * |
| June 2029........................................... | 39 | 1 | * | * | * |
| June 2030........................................... | 34 | 1 | * | * | * |
| June 2031........................................... | 28 | * | * | * | * |
| June 2032........................................... | 21 | * | * | * | * |
| June 2033........................................... | 15 | * | * | * | * |
| June 2034........................................... | 7 | * | * | * | * |
| June 2035........................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.49 | 5.52 | 3.28 | 2.21 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.43 | 5.11 | 2.99 | 2.00 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.
(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.
(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

## Percentage of Initial Class 4-A-1 and Class 4-A-2 Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ................................................. | 100 | 100 | 100 | 100 | 100 |
| June 2006............................................ | 100 | 84 | 74 | 63 | 53 |
| June 2007............................................ | 99 | 71 | 54 | 40 | 28 |
| June 2008............................................ | 99 | 59 | 39 | 25 | 14 |
| June 2009............................................ | 99 | 49 | 29 | 16 | 8 |
| June 2010............................................ | 99 | 42 | 22 | 10 | 4 |
| June 2011............................................ | 98 | 35 | 16 | 7 | 2 |
| June 2012............................................ | 98 | 30 | 12 | 4 | 1 |
| June 2013............................................ | 96 | 25 | 9 | 3 | 1 |
| June 2014............................................ | 94 | 21 | 7 | 2 | * |
| June 2015............................................ | 92 | 17 | 5 | 1 | * |
| June 2016............................................ | 89 | 14 | 4 | 1 | * |
| June 2017............................................ | 87 | 12 | 3 | * | * |
| June 2018............................................ | 84 | 10 | 2 | * | * |
| June 2019............................................ | 81 | 8 | 1 | * | * |
| June 2020............................................ | 78 | 7 | 1 | * | * |
| June 2021............................................ | 75 | 5 | 1 | * | * |
| June 2022............................................ | 72 | 4 | 1 | * | * |
| June 2023............................................ | 68 | 3 | * | * | * |
| June 2024............................................ | 64 | 3 | * | * | * |
| June 2025............................................ | 60 | 2 | * | * | * |
| June 2026............................................ | 56 | 2 | * | * | * |
| June 2027............................................ | 51 | 1 | * | * | * |
| June 2028............................................ | 46 | 1 | * | * | * |
| June 2029............................................ | 41 | 1 | * | * | * |
| June 2030............................................ | 35 | 1 | * | * | * |
| June 2031............................................ | 29 | * | * | * | * |
| June 2032............................................ | 22 | * | * | * | * |
| June 2033............................................ | 15 | * | * | * | * |
| June 2034............................................ | 7 | * | * | * | * |
| June 2035............................................ | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.87 | 5.57 | 3.30 | 2.21 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.81 | 5.14 | 3.00 | 2.00 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.

\* Indicates a number greater than 0% but less than 0.5%.

(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

**Percentage of Initial Class 5-A-1 and Class 5-A-2 Certificate Principal Balance**

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial | 100 | 100 | 100 | 100 | 100 |
| June 2006 | 100 | 84 | 74 | 63 | 53 |
| June 2007 | 100 | 71 | 54 | 40 | 28 |
| June 2008 | 100 | 60 | 40 | 25 | 15 |
| June 2009 | 100 | 50 | 30 | 16 | 8 |
| June 2010 | 100 | 42 | 22 | 11 | 4 |
| June 2011 | 100 | 36 | 17 | 7 | 2 |
| June 2012 | 100 | 30 | 13 | 4 | 1 |
| June 2013 | 100 | 26 | 9 | 3 | 1 |
| June 2014 | 100 | 22 | 7 | 2 | * |
| June 2015 | 100 | 19 | 5 | 1 | * |
| June 2016 | 97 | 15 | 4 | 1 | * |
| June 2017 | 95 | 13 | 3 | * | * |
| June 2018 | 92 | 11 | 2 | * | * |
| June 2019 | 89 | 9 | 1 | * | * |
| June 2020 | 85 | 7 | 1 | * | * |
| June 2021 | 82 | 6 | 1 | * | * |
| June 2022 | 78 | 5 | 1 | * | * |
| June 2023 | 74 | 4 | * | * | * |
| June 2024 | 70 | 3 | * | * | * |
| June 2025 | 66 | 2 | * | * | * |
| June 2026 | 61 | 2 | * | * | * |
| June 2027 | 55 | 1 | * | * | * |
| June 2028 | 50 | 1 | * | * | * |
| June 2029 | 44 | 1 | * | * | * |
| June 2030 | 38 | 1 | * | * | * |
| June 2031 | 31 | * | * | * | * |
| June 2032 | 24 | * | * | * | * |
| June 2033 | 16 | * | * | * | * |
| June 2034 | 8 | * | * | * | * |
| June 2035 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 22.07 | 5.71 | 3.34 | 2.23 | 1.60 |
| Weighted Average Life to Call (years)(1)(2) | 22.00 | 5.25 | 3.02 | 2.01 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.
- * Indicates a number greater than 0% but less than 0.5%.
- (1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.
- (2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

**Percentage of Initial Class M-1, Class M-2 and Class M-3 Certificate Principal Balance**

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ................................................ | 100 | 100 | 100 | 100 | 100 |
| June 2006................................................ | 100 | 100 | 100 | 100 | 100 |
| June 2007................................................ | 100 | 100 | 100 | 93 | 78 |
| June 2008................................................ | 100 | 100 | 92 | 75 | 58 |
| June 2009................................................ | 99 | 99 | 68 | 49 | 32 |
| June 2010................................................ | 99 | 89 | 51 | 31 | 17 |
| June 2011................................................ | 98 | 75 | 38 | 20 | 9 |
| June 2012................................................ | 97 | 63 | 28 | 13 | 5 |
| June 2013................................................ | 95 | 53 | 21 | 8 | 3 |
| June 2014................................................ | 94 | 44 | 15 | 5 | 2 |
| June 2015................................................ | 92 | 37 | 11 | 3 | 1 |
| June 2016................................................ | 90 | 30 | 8 | 2 | * |
| June 2017................................................ | 87 | 25 | 6 | 1 | * |
| June 2018................................................ | 85 | 21 | 4 | 1 | * |
| June 2019................................................ | 82 | 17 | 3 | 1 | * |
| June 2020................................................ | 79 | 14 | 2 | * | * |
| June 2021................................................ | 76 | 11 | 2 | * | * |
| June 2022................................................ | 72 | 9 | 1 | * | * |
| June 2023................................................ | 69 | 7 | 1 | * | * |
| June 2024................................................ | 65 | 6 | 1 | * | * |
| June 2025................................................ | 60 | 5 | * | * | * |
| June 2026................................................ | 56 | 4 | * | * | * |
| June 2027................................................ | 51 | 3 | * | * | * |
| June 2028................................................ | 46 | 2 | * | * | * |
| June 2029................................................ | 41 | 2 | * | * | * |
| June 2030................................................ | 35 | 1 | * | * | * |
| June 2031................................................ | 29 | 1 | * | * | * |
| June 2032................................................ | 22 | 1 | * | * | * |
| June 2033................................................ | 15 | * | * | * | * |
| June 2034................................................ | 7 | * | * | * | * |
| June 2035................................................ | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.92 | 9.69 | 6.05 | 4.55 | 3.55 |
| Weighted Average Life to Call (years)(1)(2) | 20.86 | 8.78 | 5.36 | 3.93 | 2.99 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.

(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

## EXHIBIT E

### UNDERWRITER INFORMATION

Exhibit E-1

DOCSLA1:499790.2

Prospectus supplement dated June 23, 2005
(To prospectus dated December 22, 2004)

# $381,630,100

## GMAC MORTGAGE CORPORATION
### Seller and Servicer

## GMACM MORTGAGE LOAN TRUST 2005-AR4
### Issuer

### Residential Asset Mortgage Products, Inc.
#### Depositor

### GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

The trust will hold a pool of one- to four-family residential first mortgage loans, segregated into five loan groups.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 10 classes of senior certificates

- 3 classes of mezzanine certificates

Credit enhancement for all of these certificates will be provided by subordination.

> **You should consider carefully the risk factors beginning on page S-11 in this prospectus supplement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

Morgan Stanley and Co. Incorporated will offer the offered certificates to the public from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of the offered certificates will be approximately 101.16% of their initial aggregate principal balance plus accrued interest, before deducting expenses of issuance payable by the depositor.

## Morgan Stanley

Any payments received by a holder of a Class R Certificate in connection with the acquisition of such Certificate will be taken into account in determining the income of such holder for federal income tax purposes. The IRS has issued regulations that require such payment to be included in income over time according to an amortization schedule that reasonably reflects the costs and benefits of holding the Class R Certificate over its expected life. The regulations also provide two more specific methods that will be accepted as meeting the general test set forth above for determining the timing and amount of income inclusion. One generally follows the method of inclusion used by the taxpayer for GAAP purposes, but not over a period shorter than the period over which the REMIC is expected to generate income. The other calls for ratable inclusion over the remaining anticipated weighted average life of the REMIC as of the time the Class R Certificate is transferred to the taxpayer. Holders of Class R Certificates should consult their tax advisors concerning the treatment of such payments for income tax purposes.

Purchasers of the Class R Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Class R Certificates.

For further information regarding the federal income tax consequences of investing in the Class R Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Class R Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Class R Certificates" in the prospectus.

## Penalty Protection

If penalties were asserted against purchasers of the offered certificates in respect of their treatment of the offered certificates for tax purposes, the summary of tax considerations contained, and the opinions stated, herein and in the prospectus may not meet the conditions necessary for purchasers' reliance on that summary and those opinions to exculpate them from the asserted penalties.

## Method of Distribution

In accordance with the terms and conditions of the underwriting agreement dated the date of this prospectus supplement, Morgan Stanley and Co. Incorporated will serve as the underwriter of the offered certificates — other than a de minimis portion of the Class R Certificates — and has agreed to purchase, and the depositor has agreed to sell, the offered certificates — other than a de minimis portion of the Class R Certificates. A de minimis portion of the Class R Certificates will be retained by GMACM and that portion is not offered hereby. The offered certificates being sold to the underwriter are referred to as the underwritten certificates. It is expected that delivery of the underwritten certificates, other than the Class R Certificates, will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Class R Certificates will be made at the offices of Morgan Stanley and Co. Incorporated, New York, New York, in each case, on or about June 28, 2005.

In connection with the underwritten certificates, the underwriter has agreed, in accordance with the terms and conditions of the underwriting agreement, to purchase all of the underwritten certificates if any of the underwritten certificates are purchased thereby.

The underwriting agreement provides that the obligations of the underwriter to pay for and accept delivery of the underwritten certificates are subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the underwriter may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the underwritten certificates, before deducting expenses payable by the depositor, will be approximately 101.16% of the aggregate Certificate Principal Balance of the underwritten certificates plus accrued interest thereon from the cut-off date, if applicable.

The underwriter may effect these transactions by selling the underwritten certificates to or through dealers, and those dealers, as agents, may receive compensation in the form of underwriting discounts, concessions or commissions from the underwriter. In connection with the sale of the underwritten certificates, the underwriter may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriter and any other dealers that participate with the underwriter in the distribution of the underwritten certificates, may be deemed to be underwriters and any profit on the resale of the underwritten certificates positioned by them may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended.

The underwriting agreement provides that the depositor will indemnify the underwriter, and that under limited circumstances the underwriter will indemnify the depositor against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

There is currently no secondary market for the offered certificates. The underwriter intends to make a secondary market in the offered certificates to be purchased by it, but is not obligated to do so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the prospectus under "Description of the Securities—Reports to Securityholders," which will include information as to the outstanding principal balance of the offered certificates. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of this information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

## Legal Matters

Certain legal matters relating to the certificates will be passed upon for the depositor by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California and for the underwriter by Stroock & Stroock & Lavan LLP, New York, New York.

## Ratings

It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement by Moody's Investors Service, Inc., or Moody's, and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or Standard & Poor's.

A security rating addresses the likelihood of the receipt by the holders of the offered certificates of distributions on the mortgage loans. The rating takes into consideration the structural and legal aspects associated with the offered certificates. The ratings on the offered certificates do not constitute statements regarding the possibility that the holders of the offered certificates might realize a lower than anticipated yield. A security rating does not address the likelihood of the receipt of amounts in respect of Prepayment Interest Shortfalls or Relief Act Shortfalls. A security rating is not a recommendation to buy,

**EXHIBIT F**

FORM OF UNDERWRITER'S
CERTIFICATE

June 23, 2005

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437

Re:    GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

Pursuant to Section 4 of the Underwriting Agreement, dated June 23, 2005, among Residential Asset Mortgage Products, Inc., GMAC Mortgage Corporation and Morgan Stanley and Co. Incorporated (the "Underwriter") relating to the Certificates referenced above, the undersigned does hereby certify that:

(a)    The prepayment assumption used in pricing the above-referenced Certificates was 25% of the prepayment assumption as set forth in the Prospectus Supplement.

(b)    Set forth below is (i), the first price, as a percentage of the principal balance of the Certificates, at which 10% of the aggregate principal balance of the Certificates was sold to the public at a single price, if applicable, or (ii) if more than 10% of the Certificates have been sold to the public but no single price is paid for at least 10% of the aggregate principal balance of the Certificates, then the weighted average price at which the Certificates were sold expressed as a percentage of the principal balance of the Certificates, or (iii) if less than 10% of the aggregate principal balance of the Certificates has been sold to the public, the purchase price for the Certificates paid by the Underwriter expressed as a percentage of the principal balance of the Certificates calculated by: (1) estimating the fair market value of the Certificates as of June 23, 2005; (2) adding such estimated fair market value to the aggregate purchase price of the Certificates described in clause (i) or (ii) above; (3) dividing each of the fair market values determined in clause (1) by the sum obtained in clause (2); (4) multiplying the quotient obtained for the Certificates in clause (3) by the purchase price paid by the Underwriter for the Certificates; and (5) dividing the product obtained in clause (4) by the original principal balance of the Certificates:

| Class 1-A: | 100.812500 % | Class M-1: | 101.484375 % |
|---|---|---|---|
| Class 2-A-1: | 101.765625 % | Class M-2: | 100.500000 % |
| Class 2-A-2: | 101.359375 % | Class M-3: | 97.828125 % |
| Class 3-A-1: | 101.109375 % | | |
| Class 3-A-2: | 100.765625 % | | |
| Class 4-A-1: | 101.000000 % | | |
| Class 4-A-2: | 100.625000 % | | |
| Class 5-A-1: | 101.218750 % | | |
| Class 5-A-2: | 100.890625 % | | |

Exhibit F-1

The prices set forth above do not include accrued interest with respect to periods before closing.

MORGAN STANLEY AND CO. INCORPORATED

By: _____

   Name:
   Title:

DOCSLA1:499790.2

**EXHIBIT G**

BID SHEET

(ON FILE WITH THE COMPANY AND UNDERWRITER)

DOCSLA1:499790.2

# EXHIBIT B

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   ROBERT A. GOODIN, State Bar No. 061302
2        rgoodin@goodinmacbride.com
   FRANCINE T. RADFORD, State Bar No. 168269
3        fradford@goodinmacbride.com
   ANNE H. HARTMAN, State Bar No. 184556
4        ahartman@goodinmacbride.com
   505 Sansome Street, Suite 900
5  San Francisco, California 94111
   Telephone:   (415) 392-7900
6  Facsimile:   (415) 398-4321

7
   THE CHARLES SCHWAB CORPORATION
8  LOWELL HAKY, State Bar No. 178526
   211 Main Street
9  San Francisco, California 94105
   Telephone:   (415) 667-0622
10 Facsimile:   (415) 667-1638

11
   GRAIS & ELLSWORTH LLP
12 DAVID J. GRAIS (*pro hac application to be submitted*)
   KATHRYN C. ELLSWORTH (*pro hac app. to be submitted*)
13 OWEN L. CYRULNIK (*pro hac application to be submitted*)
   LEANNE M. WILSON (*pro hac application to be submitted*)
14 70 East 55th Street
   New York, New York 10022
15 Telephone:   (212) 755-0100
   Facsimile:   (212) 755-0052
16

17
   Attorneys for Plaintiff
18 The Charles Schwab Corporation

19
                 IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
20
                 IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
21

22
   THE CHARLES SCHWAB CORPORATION,        No.
23
                        Plaintiff,        COMPLAINT FOR RESCISSION AND
24                                         DAMAGES FOR:
   v.
25
                                          **(1) VIOLATIONS OF §§ 25401 AND
26 BNP PARIBAS SECURITIES CORP.;              25501 OF THE CALIFORNIA
   CWMBS, INC.;                               CORPORATE SECURITIES ACT;**
27 BANC OF AMERICA SECURITIES LLC;
   BANC OF AMERICA MORTGAGE            **(2) VIOLATIONS OF §§ 11 AND 15 OF**
28 SECURITIES, INC;

                              **COMPLAINT**

*Sidebar (left margin):* GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP — ATTORNEYS AT LAW — SAN FRANCISCO

*Stamps (right side):*
SUMMONS ISSUED
FILED
San Francisco County Superior Court
JUL 15 2010
CLERK OF THE COURT
BY: _____ Deputy Clerk
P. NATT

CASE MANAGEMENT CONFERENCE SET
DEC 17 2010   9:00 AM
DEPARTMENT 212

CGC-10-501610

ORIGINAL

| | | |
|---|---|---|
| 1 | BANC OF AMERICA FUNDING CORPORATION; | **THE SECURITIES ACT OF 1933;** |
| 2 | CWALT, INC.; | |
| 3 | COUNTRYWIDE FINANCIAL CORPORATION; | **(3) VIOLATIONS OF §§ 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933;** |
| 4 | CITIGROUP GLOBAL MARKETS, INC.; CITIGROUP MORTGAGE LOAN TRUST, INC.; | **(4) VIOLATIONS OF §§ 1572 AND 1710 OF THE CALIFORNIA CIVIL CODE (NEGLIGENT MISREPRESENTATION); and** |
| 5 | RESIDENTIAL ACCREDIT LOANS, INC.; | |
| 6 | FIRST HORIZON ASSET SECURITIES INC.; | |
| 7 | CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE FIRST BOSTON | **(5) RESCISSION OF CONTRACTS UNDER § 1689 ET SEQ. OF THE CALIFORNIA CIVIL CODE** |
| 8 | MORTGAGE SECURITIES CORP.; | |
| 9 | RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.; | |
| 10 | DEUTSCHE BANK SECURITIES INC.; FIRST TENNESSEE BANK N.A.; | |
| 11 | GOLDMAN, SACHS & CO.; | |
| 12 | GS MORTGAGE SECURITIES CORP.; RBS SECURITIES, INC. F/K/A | |
| 13 | GREENWICH CAPITAL MARKETS, INC.; HSBC SECURITIES (USA) INC.; | |
| 14 | WELLS FARGO ASSET SECURITIES CORPORATION; | |
| 15 | WELLS FARGO BANK N.A.; | |
| 16 | MORGAN STANLEY & CO. INC.; MORGAN STANLEY CAPITAL I INC.; | |
| 17 | SEQUOIA RESIDENTIAL FUNDING, INC.; UBS SECURITIES, LLC; | |
| 18 | MORTGAGE ASSET SECURITIZATION TRANSACTIONS, INC.; | |
| 19 | AND, DOES 1-50, | |
| 20 | | |
| 21 | Defendants. | |

*Left margin (vertical):* GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP · ATTORNEYS AT LAW · SAN FRANCISCO

22   Plaintiff, THE CHARLES SCHWAB CORPORATION complains of Defendants

23 and for causes of action alleges as follows:

24   <u>**NATURE OF THIS ACTION**</u>

25   1.   This is an action for rescission and damages as a result of the violation by the

26 Defendants of the California Corporate Securities Act, the California Civil Code, the federal

27 Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or

28

-2-
**COMPLAINT**

issued to Charles Schwab Bank, N.A. (referred to in this Complaint as **Schwab**) 37 certificates in 36 securitization trusts backed by residential mortgage loans. Schwab paid $1.38 billion for those certificates. When they offered and then sold these certificates to Schwab, the Defendants made numerous statements to Schwab about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue as to material facts. Moreover, the Defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the Defendants made untrue statements, or omitted important information, about such material facts as the loan-to-value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans departed from their own standards in doing so.

2.     Defendants made such untrue or misleading statements about at least the following numbers of the loans in each of the 36 securitizations.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 846 | 1,597 | 53.0% |
| 2 | 1,079 | 2,274 | 47.4% |
| 3 | 356 | 779 | ·45.7% |
| 4 | 828 | 3,313 | 25.0% |
| 5 | 326 | 545 | 59.8% |
| 6 | 436 | 765 | 57.0% |
| 7 | 1,161 | 2,190 | 53.1% |
| 8 | 444 | 979 | 45.4% |
| 9 | 405 | 861 | 47.0% |
| 10 | 691 | 1,428 | 48.4% |
| 11 | 702 | 1,365 | 51.4% |
| 12 | 1,680 | 3,441 | 48.8% |
| 13 | 923 | 2,492 | 37.0% |
| 14 | 262 | 377 | 69.5% |
| 15 | 983 | 2,385 | 41.2% |
| 16 | 1,496 | 3,625 | 41.3% |
| 17[1] | 20 | 1,411 | 1.4% |

_____

[1] Plaintiff was not able to perform a complete analysis of the loans in Securitizations 17 and 33 because the necessary data was not available. Plaintiff is informed and believes, and based thereon alleges,

-3-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 18 | 1,455 | 3,976 | 36.6% |
| 19 | 2,012 | 4,785 | 42.0% |
| 20 | 437 | 611 | 71.5% |
| 21 | 243 | 367 | 66.2% |
| 22 | 537 | 1,141 | 47.1% |
| 23 | 1,451 | 3,072 | 47.2% |
| 24 | 969 | 2,803 | 34.6% |
| 25 | 2,718 | 8,138 | 33.3% |
| 26 | 2,558 | 4,741 | 54.0% |
| 27 | 1,096 | 2,517 | 43.5% |
| 28 | 586 | 1,175 | 49.9% |
| 29 | 914 | 1,948 | 46.9% |
| 30 | 671 | 1,801 | 37.3% |
| 31 | 1550 | 3,250 | 47.7% |
| 32 | 281 | 541 | 51.9% |
| 33[1] | 17 | 951 | 1.8% |
| 34 | 795 | 1,662 | 47.8% |
| 35 | 422 | 724 | 58.3% |
| 36 | 591 | 1,114 | 53.1% |

Plaintiff is informed and believes, and based thereon alleges, that even more mortgage loans than those listed in the table above were the subject of untrue or misleading statements by the Defendants.[2]

3.      The certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and the common law, Plaintiff is entitled to rescind the purchase of the certificates or to be paid damages for losses on the certificates.

4.      Twelve securities dealers sold these certificates to Schwab. The dealers are Defendants BNP Paribas (which sold to Schwab a certificate in one securitization trust, which is referred to in this Complaint as Securitization No. 1); Banc of America Securities LLC (six

that discovery will demonstrate that Defendants made untrue or misleading statements about a similar percentage of the loans in Securitizations 17 and 33 as Defendants made in the Securitizations for which complete data was available.

    [2] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-4-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    securitizations, Securitizations Nos. 2 through 7); Citigroup Global Markets, Inc. (six

2    securitizations, Securitizations Nos. 10 through 15); Credit Suisse Securities (USA) LLC (one

3    securitization, Securitization No. 16); Credit Suisse First Boston Mortgage Securities Corp. (two

4    securitizations, Securitizations Nos. 17 and 18); Deutsche Bank Securities (one securitization,

5    Securitization No. 19); First Tennessee Bank, N.A. (two securitizations, Securitizations Nos. 20

6    and 21); Goldman, Sachs & Co. (two securitizations, Securitizations Nos. 22 and 23); Greenwich

7    Capital Markets, Inc. (two securitizations, Securitizations Nos. 24 and 25); HSBC Securities

8    (USA) Inc. (two securitizations, Securitizations Nos. 26 and 27); Morgan Stanley & Co Inc. (six

9    securitizations, Securitizations Nos. 28 through 33); and UBS Securities, LLC (three

10   securitizations, Securitizations Nos. 34 through 36). Bear, Stearns & Co. Inc. sold to Schwab two

11   certificates in two securitizations (Securitization Nos. 9 and 10). The other Defendants named in

12   this Complaint are liable to Plaintiff because they were the issuers of some of those certificates or

13   because they controlled some of those issuers.

14                                          **PARTIES**

15       5.       Plaintiff is a corporation organized under the laws of Delaware with its principal

16   place of business in San Francisco, California.

17       6.       Defendant BNP Paribas Securities Corp. (referred to as **BNP**) is a corporation

18   organized under the laws of Delaware. BNP sold Schwab one of the certificates.

19       7.       Defendant Banc of America Securities LLC (referred to as **Banc of America**) is a

20   limited liability company organized under the laws of Delaware. Banc of America sold Schwab

21   seven of the certificates.

22       8.       Defendant Banc of America Mortgage Securities, Inc. (referred to as **Banc of**

23   **America Mortgage Securities**) is a corporation organized under the laws of Delaware. Banc of

24   America Mortgage Securities was the issuer of four of the certificates that Banc of America sold

25   to Schwab.

26       9.       Defendant Banc of America Funding Corporation (referred to as **Banc of America**

27   **Funding**) is a corporation organized under the laws of Delaware. Banc of America Funding was

28   the issuer of two of the certificates that Banc of America sold to Schwab.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-5-
**COMPLAINT**

1    10.    Defendant Citigroup Global Markets, Inc. (referred to as **Citigroup Global**) is a
2    corporation organized under the laws of New York. Citigroup Global sold Schwab six of the
3    certificates.

4    11.    Defendant Citigroup Mortgage Loan Trust, Inc. (referred to as **Citigroup**
5    **Mortgage**) is a corporation organized under the laws of Delaware. Citigroup Mortgage was the
6    issuer of four of the certificates that Citigroup Global sold to Schwab.

7    12.    Defendant Residential Accredit Loans, Inc. (referred to as **Residential Accredit**)
8    is a corporation organized under the laws of Delaware. Residential Accredit Loans, Inc. was the
9    issuer of one of the certificates that Citigroup Global sold to Schwab.

10    13.    Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse
11    First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under
12    the laws of Delaware. Credit Suisse sold Schwab three certificates.

13    14.    Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as
14    **CSFB Mortgage Securities**) is a corporation organized under the laws of Delaware. CSFB
15    Mortgage Securities was the issuer of one of the certificates that Credit Suisse sold to Schwab.

16    15.    Defendant Deutsche Bank Securities, Inc. (referred to as **Deutsche**) is a
17    corporation organized under the laws of Delaware. Deutsche sold Schwab one of the certificates.

18    16.    Defendant First Tennessee Bank N.A. (referred to as **First Tennessee**) is a
19    national banking association organized under the laws of the United States. First Tennessee sold
20    Schwab two of the certificates.

21    17.    Defendant First Horizon Asset Securities Inc. (referred to as **First Horizon**) is a
22    corporation organized under the laws of Delaware. First Horizon was the issuer of one of the
23    certificates that Citigroup Global sold to Schwab and the two certificates that First Tennessee sold
24    to Schwab.

25    18.    Defendant Goldman, Sachs & Co. (referred to as **Goldman Sachs**) is a limited
26    partnership organized under the laws of New York. Goldman Sachs sold Schwab two of the
27    certificates.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-6-
**COMPLAINT**

19.    Defendant GS Mortgage Securities Corp. (referred to as **GS Mortgage**) is a corporation organized under the laws of Delaware. GS Mortgage was the issuer of one of the certificates that Goldman Sachs sold to Schwab.

20.    Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets, Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of Delaware. Greenwich Capital sold Schwab two of the certificates.

21.    Defendant CWALT, Inc. (referred to as **CWALT**) is a corporation organized under the laws of Delaware. CWALT was the issuer of one of the certificates that Credit Suisse sold to Schwab, one of the certificates that Deutsche sold to Schwab, one of the certificates that Bear, Stearns & Co. Inc. sold to Schwab, two of the certificates that Greenwich Capital Markets sold to Schwab, and one of the certificates that Banc of America sold to Schwab.

22.    Defendant Countrywide Financial Corporation is a corporation organized under the laws of Delaware. Schwab is informed and believes, and based thereon alleges, that CWALT existed for no purpose other than to receive and deposit loans into the trusts. Countrywide Financial Corporation controls or controlled CWALT. Under Section 15 of the Securities Act Countrywide Financial Corporation therefore is liable to Schwab jointly and severally with, and to the same extent as, CWALT.

23.    Defendant HSBC Securities (USA) Inc. (referred to as **HSBC**) is a corporation organized under the laws of Delaware. HSBC sold Schwab two of the certificates.

24.    Defendant Morgan Stanley & Co. Inc. (referred to as **Morgan Stanley**) is a corporation organized under the laws of Delaware. Morgan Stanley sold Schwab six of the certificates.

25.    Defendant Morgan Stanley Capital I Inc. (referred to as **Morgan Stanley Capital**) is a corporation organized under the laws of Delaware. Morgan Stanley Capital was the issuer of three of the certificates that Morgan Stanley sold to Schwab.

26.    Defendant Wells Fargo Asset Securities Corporation (referred to as **Wells Fargo Asset**) is a corporation organized under the laws of Delaware. Wells Fargo Asset was the issuer

-7-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    of the two certificates that HSBC sold to Schwab and one of the certificates that Morgan Stanley

2    sok      Schwab.

3         27.    Defendant Wells Fargo Bank, N.A. (referred to as **Wells Fargo Bank**) is a

4    national banking association organized under the laws of the United States. Plaintiff is informed

5    and believes, and based thereon alleges, that Wells Fargo Asset exists for no purpose other than to

6    receive and deposit loans into the trusts. During the relevant time period, Wells Fargo Bank

7    controlled Wells Fargo Asset. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, Wells

8    Fargo Bank therefore is liable to Plaintiff jointly and severally with, and to the same extent as,

9    Wells Fargo Asset.

10        28.    Defendant Sequoia Residential Funding, Inc. (referred to as **Sequoia**) is a

11   corporation organized under the laws of Delaware. Sequoia was the issuer of one of the

12   certificates that Morgan Stanley sold to Schwab.

13        29.    Defendant Residential Asset Mortgage Products, Inc. (referred to as **Residential**

14   **Asset Mortgage**) is a corporation organized under the laws of Delaware. Residential Asset

15   Mortgage was the issuer of one of the certificates that Credit Suisse sold to Schwab, one of the

16   certificates that Goldman Sachs sold to Schwab, and one of the certificates that Morgan Stanley

17   sold to Schwab.

18        30.    Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company

19   organized under the laws of Delaware. UBS sold Schwab three of the certificates.

20        31.    Defendant CWMBS, Inc. (referred to as **CWMBS**) is a corporation organized

21   under the laws of Delaware. CWMBS was the issuer of the certificate that BNP sold to Schwab,

22   one of the certificates that Bear, Stearns & Co. Inc. sold to Schwab, and two of the certificates

23   that UBS sold to Schwab.

24        32.    Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**)

25   is a corporation organized under the laws of Delaware. MAST was the issuer of one of the

26   certificates that UBS sold to Schwab.

27        33.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

28   Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will

-8-

**COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  amend this Complaint to allege the true names and capacities of these Defendants when

2  ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants is

3  responsible in some manner for the occurrences alleged herein and proximately caused Plaintiff's

4  damages.

5  ## ASSIGNMENT OF CLAIMS

6      34.    Schwab is a national banking association organized under the laws of the United

7  States and a wholly-owned subsidiary of Plaintiff. Its investments are managed by Charles

8  Schwab Treasury, a division of Charles Schwab & Co., which is a wholly-owned subsidiary of

9  Plaintiff. Charles Schwab Treasury is the entity to which the Defendants directed their

10  solicitations to purchase all securities referred to in this Complaint. Charles Schwab Treasury

11  received those solicitations and executed the purchase of all securities referred to in this

12  Complaint.

13      35.    On June 29, 2010, Schwab assigned all of its right, title, and interest in the claims

14  made in this Complaint to Plaintiff. A copy of the assignment is attached as Exhibit A.

15  ## JURISDICTION AND VENUE

16      36.    This action is an unlimited civil case within the meaning of California Code of

17  Civil Procedure Section 88, in that, *inter alia*, the amount in controversy (as defined in California

18  Code of Civil Procedure Section 85(a)) exceeds twenty-five thousand dollars ($25,000). This

19  Court has subject-matter jurisdiction of Plaintiff's causes of action for rescission under Sections

20  25401 and 25501 of the California Corporate Securities Act, damages for negligent

21  misrepresentation, and rescission of its contracts to purchase the certificates. Under Section 22(a)

22  of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over Plaintiff's

23  causes of action for violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k,

24  77l(a)(2), and 77o.

25      37.    Under Section 22(a) of the Securities Act, "no case arising under this title and

26  brought in any State court of competent jurisdiction shall be removed to any court of the United

27  States." Because there is not complete diversity between the Plaintiff and the Defendants, the

28

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Federal courts have no jurisdiction of this action under 28 U.S.C. § 1332(a). This action is not

2    removable to Federal court.

3    　　　38.　　Defendants Banc of America, Citigroup Global, Credit Suisse, CWALT, CWMBS,

4    Deutsche, First Tennessee, Goldman Sachs, HSBC, Morgan Stanley, Greenwich Capital, Sequoia,

5    UBS, and Wells Fargo Bank are subject to personal jurisdiction in California because each of

6    them is registered to do business, and does business, in California. All of the Defendants are

7    subject to personal jurisdiction in California because they offered and sold, or controlled persons

8    that offered and sold, the certificates to Schwab "in California" within the meaning of Section

9    25008 of the California Corporate Securities Act.

10   　　　39.　　Venue is proper in this County because, among other reasons, the Defendants

11   offered and sold the certificates to Schwab in this County and because the violations of law

12   alleged in this Complaint, including the making of material untrue or misleading statements,

13   occurred in this County.

14   　　　　　　　　　　**SECURITIZATION OF MORTGAGE LOANS**

15   　　　40.　　The securities that the Defendants sold Schwab are so-called **residential**

16   **mortgage-backed securities**, or **RMBS**, created in a process known as **securitization.**

17   Securitization begins with loans on which the borrowers are to make payments, usually monthly.

18   The entity that makes the loans is known as the **originator** of the loans. The process by which the

19   originator decides whether to make particular loans is known as the **underwriting** of loans. The

20   purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit

21   standing to repay them and only against sufficient collateral. In the loan underwriting process, the

22   originator applies its **underwriting standards**.

23   　　　41.　　In general, residential mortgage lenders may hold some of the mortgage loans they

24   originate in their own portfolio and may sell other mortgage loans they originate into

25   securitizations.

26   　　　42.　　In a securitization, a large number of loans, usually of a similar type, are grouped

27   into a **collateral pool**. The originator of those loans sells them (and, with them, the right to

28   receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The

-10-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors such as Schwab. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

43.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

44.    In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

45.    One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

46.    The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the senior classes of certificates may bear so little of that risk that they may be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully 10 times the historical average.

-11-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47.    All of the certificates referred to in this Complaint were senior certificates that were rated triple-A when Schwab purchased them.

*

48.    Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

49.    The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

*

50.    **Securities dealers**, like 12 of the Defendants, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

51.    Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-12-
**COMPLAINT**

1    also includes notes from the person who underwrote the loan about whether and how the loan

2    complied with the originator's underwriting standards, including documentation of any

3    "compensating factors" that justified any departure from those standards.

4    52.    Potential investors in certificates are not given access to loan files. Instead, the

5    securities dealers that underwrite the sale of the certificates in a securitization are responsible for

6    gathering, verifying, and presenting to potential investors the information about the credit quality

7    of the loans that will be deposited into the trust. They do so by using information about the loans,

8    which has been compiled into a database known as a **loan tape**. The securities dealers use the

9    loan tape to compile numerous statistics about the loans, which are presented to potential

10   investors in a **prospectus supplement**, a disclosure document that the dealers are required to file

11   with the Securities and Exchange Commission.

12   53.    As alleged in detail below, the information that the Defendants presented to

13   Schwab about the credit quality of the loans in the collateral pools of the trusts contained many

14   statements that were material to the credit quality of those loans, but were untrue or misleading.

## TOLLING OF THE STATUTE OF LIMITATIONS

54.    Plaintiff is a putative member of the proposed classes in *Luther v. Countrywide

Financial Corporation*, Superior Court for the State of California County of Los Angeles No. BC

380698, filed on November 11, 2007; and *In re Wells Fargo Mortgage-Backed Certificates

Litigation*, United States District Court for the Northern District of California, No. 09-cv-01376-

SI, filed on March 27, 2009; the pendency of which has tolled the running of the statute of

limitations on the causes of action alleged in this Complaint.

## THE SALES OF THE CERTIFICATES

55.    The Defendants sold to Schwab 37 certificates in Securitizations Nos. 1 through

36. Details of each trust and each certificate are stated in Item 55 of Schedules 1 through 36 of

this Complaint. The Schedules correspond to Securitizations Nos. 1 through 36. Plaintiff

incorporates into this paragraph 55, and alleges as though fully set forth in this paragraph, the

contents of Item 55 of the schedules.

-13-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

56.    Defendants knew that Charles Schwab Treasury was responsible for locating, analyzing, and making investments for Schwab.

57.    Representatives of Defendants sent communications and solicitations to Charles Schwab Treasury in San Francisco for the purpose of inducing Charles Schwab Treasury to purchase the bonds for Schwab.

58.    The sale of these certificates occurred in California because representatives of the Defendants directed communications about the certificates and solicitations to purchase the bonds to Charles Schwab Treasury there, and because Charles Schwab Treasury received those communications and solicitations there.

## DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

59.    In connection with their offers and sales of the certificates to Schwab, each of the dealer Defendants sent numerous documents to Charles Schwab Treasury at its office in San Francisco. For each certificate, these documents included a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In each of these documents, each dealer made statements of material fact about the certificate that it offered and sold to Schwab. A true copy of the prospectus supplement for each securitization is available from the Securities and Exchange Commission's website.[3]

60.    Many of the statements of material fact that each dealer made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**I.    Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**A.    LTVs**

**1.    The materiality of LTVs**

61.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

---

[3] A URL for each prospectus supplement is included in Item 55 of each schedule.

-14-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV is also a primary determinant of the severity of losses for those loans that do default. The lower the LTV, the lower the severity of losses on those loans that do default. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

62.    Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans and the associated certificates. Prepayment patterns affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

63.    In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Schwab purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

64.    An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the

-15-

**COMPLAINT**

1    LTV based on the incorrect appraised value understates the risk of the loan. It is also important to

2    note that, the higher the correct LTV, the more the risk is understated by an error in value of any

3    given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater

4    than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large

5    equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%.

6    In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former,

7    only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10%

8    produces an overstatement of more than 80% in the homeowner's equity.

9        65.    For these reasons, a reasonable investor considers LTV critical to the decision

10    whether to purchase a certificate in a securitization of mortgage loans. Even small differences in

11    the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a

12    significant effect on both the risk and the rating of each certificate sold in that securitization and,

13    thus, are essential to the decision of a reasonable investor whether to purchase any such

14    certificate.

15        **2.    Untrue or misleading statements about the LTVs of the mortgage
loans in the collateral pools of these securitizations**

16

17        66.    In the prospectus supplements and other documents they sent to Charles Schwab

18    Treasury, the Defendants made material untrue or misleading statements about the LTVs of the

19    mortgage loans in the collateral pools of these securitizations. Each such statement is identified in

20    Item 66 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 66, and

21    alleges as though fully set forth in this paragraph, the contents of Item 66 of the schedules.

22        67.    The mortgage loans in the collateral pools of these securitizations were divided

23    into groups. Payments on the certificates that Schwab purchased were to be made primarily from

24    the cash flows from the loans in the particular groups that were designated to support Schwab's

25    certificates. Because of the structure of the securitizations, however, in most cases the credit

26    quality of the loans in the other groups in the securitizations also was material to the risk of the

27    certificates that Schwab purchased.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-16-

**COMPLAINT**

1    68.    The Defendants made these statements as statements of fact. Plaintiff is informed

2    and believes, and based thereon alleges, that the Defendants intended that these statements be

3    understood as statements of fact. Charles Schwab Treasury did understand the statements about

4    the LTVs as statements of fact. Plaintiff, Charles Schwab Treasury, and Schwab had no access to

5    appraisal reports or other documents or information from which it could verify the LTVs of the

6    mortgage loans other than the statements that the Defendants made about those LTVs.

7    **3.    These statements were untrue because the stated LTVs of many of
         those mortgage loans were lower than their actual LTVs.**

8

9    69.    The stated LTVs of many of the mortgage loans in each securitization were

10   significantly lower than the true LTVs because the denominators (that is, the value of the

11   properties that secured those loans) that were used to determine the disclosed LTVs were

12   overstated to a material extent.[4] The weighted-average LTVs presented in the prospectus

13   supplements were also, therefore, untrue and misleading.

14   **a.    Use of an automated valuation model demonstrates that the
         Defendants' statements about LTVs were based on overstated
         valuations of the properties in the collateral pools.**

15

16   70.    Using a comprehensive, industry-standard automated valuation model (AVM), it is

17   possible to determine the true market value of a certain property as of a selected date. An AVM is

18   based on objective criteria like the condition of the property and the actual sale prices of

19   comparable properties in the same locale shortly before the specified date and is more consistent,

20   independent, and objective than other methods of appraisal. AVMs have been in widespread use

21   for many years. The AVM on which these allegations are based incorporates a database of 500

22   million sales covering ZIP codes that represent more than 97% of the homes, occupied by more

23   than 99% of the population, in the United States. Independent testing services have determined

24   that this AVM is the most accurate of all such models.

25

26

27   [4] References in this Complaint and the schedules to the denominator in the LTVs are to the
appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage

28   loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

-17-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

71.    On many of the properties that secured the mortgage loans, the model reported that LTVs were understated. In particular, the model reported that the denominator (that is, the appraised value of the property as stated in the loan tape) that was used to determine the disclosed LTV was 105% or more of the true market value as determined by the model as of the time the loan was originated. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

72.    To take an example, in Securitization No. 1, there were 1,597 mortgage loans in the collateral pool. There was sufficient information for the model to determine the value of the properties that secured 930 of those loans. On 626 of those 930 properties, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $106,814,153. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of true market value on only 69 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominator was $11,194,470. Thus, the number of properties on which the value was overstated exceeded by more than nine times the number on which the value was understated, and the aggregate amount overstated was more than nine times the aggregate amount understated.

73.    On one of the loans in Securitization No. 1, the amount of the loan was $585,000 and the stated value of the property was $1,220,000, resulting in a stated LTV of 48%. The model, however, determined that the true value of the property was $794,000, resulting in a true LTV of 73.6%. Thus, the stated value was higher than the true value by 53.7%, and the stated LTV was lower than the true LTV by 34.7%. Both of these were huge discrepancies that were material to the credit quality of the loan.

-18-

**COMPLAINT**

74.    The overstated values of 626 properties made virtually every statement by the Defendants about the LTVs of the mortgage loans untrue or misleading. For example, the Defendants stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 196 of the 930 properties valued by the model had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans was 73.84%. In fact, among the loans that the AVM was able to value, the weighted average LTV was 90.5%. These differences were material for the reasons stated above.

75.    The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans | 1,597 |
| Number of properties on which there was enough information for the model to determine a true market value | 930 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 626 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $106,814,153 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 69 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,194,470 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 196 |
| Weighted-average LTV, as stated by Defendants (group 4) | 73.84% |
| Weighted-average LTV, as determined by the model (group 4) | 90.5% |

76.    The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 76 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 76, and alleges as though fully set forth in this paragraph, the contents of Item 76 of the schedules.

     b. **Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

77.    Of the mortgage loans in the collateral pools of these securitizations, many were taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the

-19-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    only basis for determining the value of the property because there is no sale price in a refinancing.

2    A substantial number of those properties have since been sold. In nearly all the pools, those

3    properties were sold for much less than the value ascribed to them in the LTV data reported in the

4    prospectus supplements and other documents that the Defendants sent to Charles Schwab

5    Treasury. The differences cannot be explained by the declines in house prices in the areas in

6    which those properties were located. Analysis of indices that track home prices in various

7    geographic areas shows that the differences between the values ascribed to these properties and

8    the prices at which the properties were sold are significantly greater than the declines in house

9    prices in the same geographical areas over the same periods (that is, between the making of each

10   mortgage loan and the corresponding sale). Thus, the large differences show that the values

11   ascribed to those properties, and to all properties in the collateral pools, in the LTV data reported

12   in the prospectus supplements and other documents that the Defendants sent to Charles Schwab

13   Treasury were too high, that the resulting LTVs were too low, and thus that the statements in the

14   prospectus supplements and other documents sent to Charles Schwab Treasury about the LTVs

15   were untrue or misleading.

16       78.    To take an example of Securitization No. 1, of the 1,597 mortgage loans in the

17   collateral pool, 812 were taken out to refinance, rather than to purchase, properties. For those 812

18   loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of

19   those 812 properties, 59 were subsequently sold for a total of approximately $30,927,350. The

20   total value ascribed to those same properties in the LTV data reported in the prospectus

21   supplements and other documents sent to Charles Schwab Treasury was $48,435,000. Thus, those

22   properties were sold for 63.9% of the value ascribed to them, a difference of 36.1%. This

23   difference is significantly greater than would have been predicted by the declines in house prices

24   in the areas in which those properties were located.

25       79.    The results of this analysis for the securitizations are stated in Item 79 of the

26   schedules of this Complaint. Plaintiff incorporates into this paragraph 79, and alleges as though

27   fully set forth in this paragraph, the contents of Item 79 of the schedules.

28

-20-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

2

**4.    These statements were misleading because the Defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

3    80.    As mentioned above, the LTV of a mortgage loan is a key determinant of the

4    likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

5    less likely that a decline in the value of the property will wipe out the owner's equity and thereby

6    give the owner an incentive to stop making mortgage payments and abandon the property.

7    Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to

8    predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the

9    severity of loss on those loans that do default. The power of LTV to predict defaults,

10    prepayments, and severities is a major reason why reasonable investors consider the LTVs of

11    mortgage loans important to the decision whether to purchase a certificate in the securitization of

12    those loans.

13    81.    The predictive power of the LTV of a mortgage loan is much reduced if there are

14    additional liens on the same property. Additional liens reduce the owner's equity in the property

15    and thereby increase the owner's incentive to stop making mortgage payments and abandon the

16    property if the value of the property falls below the combined amount of all of the liens on the

17    property (a strategic default). Additional liens also exacerbate delinquencies and defaults because

18    they complicate the servicing of mortgage loans and the management of delinquencies and

19    defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also

20    with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may

21    want to grant a borrower forbearance while the borrower is unemployed and allow him or her to

22    add missed payments to the principal of the loan and to resume payments when he or she is

23    employed again. But the servicer of the second-lien mortgage may refuse such forbearance and

24    initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

25    82.    According to land records, many of the properties that secured mortgage loans in

26    the collateral pool of each securitization were subject to liens in addition to the lien of the

27

28

-21-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    mortgage in the pool at the time of the closing of these securitizations.[5] In twenty-four of the

2    securitizations, the Defendants failed to disclose any of these additional liens in the prospectus

3    supplements and other documents they sent to Charles Schwab Treasury. These additional liens

4    reduced the equity of the owners of the properties subject to them, and thereby increased the risk

5    that those owners would default in payment of the mortgage loan in the pool.

6        83.    To take an example, of the 2,274 properties that secured the mortgage loans in

7    Securitization No. 2, at least 669 were subject to undisclosed liens in addition to the lien of the

8    mortgage in the pool. The undisclosed additional liens on these properties reduced the owners'

9    equity in those properties by a weighted average of 91.5% and by an aggregate amount of

10   $32,261,150.

11       84.    On one of the loans, the original balance of the mortgage loan was $532,000, the

12   represented value of the property was $760,000, the owner's ostensible equity was $228,000, and

13   the reported LTV was 70%. On the date of the closing of this securitization, however, there were

14   undisclosed additional liens on this property of $200,000. Thus, the owner's true equity was only

15   $28,000, 87.7% less than the equity implied by the disclosed loan amount and value of the

16   property. In many cases, the amounts of the undisclosed additional liens were precisely equal to

17   the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases,

18   the amount of the undisclosed additional liens was much greater than the owner's ostensible

19   equity, putting the owner "under water" on the day on which this securitization closed.

20       85.    Similar numbers of additional undisclosed liens were found in each securitization

21   in which the Defendants did not disclose the existence of additional liens. Details of the

22   undisclosed additional liens in each securitization are stated in Item 85 of the schedules of this

23   Complaint. Plaintiff incorporates into this paragraph 85, and alleges as though fully set forth in

24   this paragraph, the contents of Item 85 of the schedules. Plaintiff is informed and believes, and

25   based thereon alleges, that discovery will demonstrate that the number of loans with additional

26   liens is substantially higher than those disclosed in the schedules.

27       ―――――――――――

[5] Additional liens referred to in this Complaint and the schedules exclude liens on the loan tapes
28   that were originated on or before the date on which the mortgage loans in the pools were originated.

-22-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

86. Because the Defendants did not disclose the existence or the amounts of these additional liens, all statements that they made about the LTVs of the mortgage loans were misleading.

**B.   Appraisals**

87. As discussed above in paragraph 64, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

88. In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to pressure appraisers to appraise properties at values high enough to enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

89. This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the Defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

-23-
COMPLAINT

1.    **These statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

90.    The Defendants omitted to state that brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many forms, including the following:

- the withholding of business if the appraisers refused to inflate values,

- the withholding of business if the appraisers refused to guarantee a predetermined value,

- the withholding of business if the appraisers refused to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give the brokers and loans officers the property values that they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

91.    The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 77 through 79 above, the appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as alleged in paragraphs 70 through 76, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 9.1 | 9.5 |
| 2 | 2.0 | 2.8 |
| 3 | 6.2 | 5.8 |
| 4 | 2.1 | 2.2 |
| 5 | 2.9 | 4.2 |

-24-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 6 | 2.5 | 2.7 |
| 7 | 2.8 | 3.4 |
| 8 | 4.3 | 6.0 |
| 9 | 5.8 | 6.8 |
| 10 | 3.8 | 5.5 |
| 11 | 3.3 | 2.3 |
| 12 | 3.0 | 3.5 |
| 13 | 1.9 | 2.1 |
| 14 | 4.1 | 5.3 |
| 15 | 2.1 | 2.9 |
| 16 | 3.1 | 3.9 |
| 17 | N/A | N/A |
| 18 | 1.7 | 1.4 |
| 19 | 3.6 | 3.6 |
| 20 | 9.0 | 15.3 |
| 21 | 4.6 | 4.5 |
| 22 | 4.8 | 5.1 |
| 23 | 2.6 | 3.1 |
| 24 | 1.7 | 1.4 |
| 25 | 1.8 | 1.5 |
| 26 | 6.0 | 7.7 |
| 27 | 3.3 | 4.2 |
| 28 | 3.4 | 3.8 |
| 29 | 4.1 | 5.3 |
| 30 | 2.9 | 4.1 |
| 31 | 3.1 | 3.0 |
| 32 | 1.7 | 3.5 |
| 33 | N/A | N/A |
| 34 | 3.8 | 4.4 |
| 35 | 3.0 | 4.0 |
| 36 | 3.1 | 6.7 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

92.    Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

-25-

**COMPLAINT**

2.    **The statements by the Defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

93.    Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddic Mac require that appraisals comply with USPAP.

94.    USPAP includes the following provisions:

(a)    Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

(b)    Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

(c)    Second USPAP Ethics Management Rule:

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.    the reporting of a predetermined result (*e.g.*, opinion of value);

2.    a direction in assignment results that favors the cause of the client;

3.    the amount of a value opinion;

4.    the attainment of a stipulated result; or

5.    the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

95.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

-26-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   ____"; "If this property will not appraise for at least _____, stop and call us immediately"; etc.

2   About such conditions, Advisory Opinion 19 states:

> Certain types of conditions are unacceptable in any assignment
> because performing an assignment under such conditions violates
> USPAP. Specifically, an assignment condition is unacceptable
> when it:
>
> • precludes an appraiser's impartiality. Because such a
>   condition destroys the objectivity and independence
>   required for the development and communication of
>   credible results;
>
> • limits the scope of work to such a degree that the
>   assignment results are not credible, given the intended use
>   of the assignment; or
>
> • limits the content of a report in a way that results in the
>   report being misleading.

12   96.    In the prospectus supplements and other documents they sent to Charles Schwab

13  Treasury, the Defendants made statements that the appraisals of properties that secured the

14  mortgage loans in the collateral pools were made in compliance with USPAP or with the

15  appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP.

16  Details of each such statement are stated in Item 96 of the schedules of this Complaint. Plaintiff

17  incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph, the

18  contents of Item 96 of the schedules.

19   97.    Plaintiff is informed and believes, and based thereon alleges, that a material

20  number of mortgage loans in the collateral pools had appraisals conducted that deviated from

21  USPAP.

22   98.    Each of these statements referred to in paragraph 96 was untrue because the

23  appraisals of a material number of the properties referred to in each such statement did not

24  conform to USPAP.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-27-
**COMPLAINT**

*

99.    By each of the untrue and misleading statements referred to in paragraphs 66 and 96 above, the Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

**II.    Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**A.    The materiality of occupancy status**

100.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

101.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

**B.    Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

102.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements about the number of properties in the collateral pool of each securitization that were the primary homes of their owners. To return to the example of Securitization No. 1, the Defendants stated that, of the 1,597 mortgage loans in the collateral pool, 1,498 were secured by primary residences and 99 were not. Details of each such statement in each securitization are stated in Item 102 of the schedules of this Complaint. Plaintiff

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-28-
COMPLAINT

1  incorporates into this paragraph 102, and alleges as though fully set forth in this paragraph, the

2  contents of Item 102 of the schedules.

3      103.    These statements were untrue or misleading because (i) the stated number of

4  mortgage loans secured by primary residences was higher than the actual number of loans in that

5  category; (ii) the stated number of mortgage loans not secured by primary residences was lower

6  than the actual number of loans in that category; or (iii) the Defendants omitted to state that the

7  occupancy status of a significant number of the properties that secured the mortgage loans in the

8  collateral pools was misstated because of fraud.

9      **C.**    **Basis of the allegations above that these statements about the occupancy**

10          **status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

11      104.    Because they are less risky than other mortgage loans, mortgage loans on primary

12  residences usually have more favorable terms, including lower interest rates and more lenient

13  underwriting standards, than mortgage loans on second homes and investment properties.

14  Applicants for loans on second homes and investment properties therefore have an incentive to

15  state that the property will be their primary residence even when it will not. Plaintiff is informed

16  and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans

17  did so.

18      105.    A significant number of the properties in the collateral pool of each securitization

19  that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and

20  believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the

21  loan files of many more of the mortgage loans in the collateral pool.

22      106.    With respect to some of the properties that were stated to be primary residences,

23  the borrower instructed local tax authorities to send the bills for the taxes on the property to the

24  borrower at an address other than the property itself. This is strong evidence that the mortgaged

25  property was not the borrower's primary residence.

26      107.    In some states and counties, owners of a property are able to designate whether

27  that property is his or her "homestead," which may reduce the taxes on that property or exempt

28  the property from assets available to satisfy the owner's creditors, or both. An owner may

-29-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

108.    With respect to some of the properties that were stated to be primary residences, the borrower owned three or more properties. Thus it was reasonably likely that the borrower did not live in the property that was stated to be owner-occupied.

109.    When a borrower who lives in a mortgaged property falls behind in his or her payments, it is normally many months before foreclosure ensues, during which time the borrower tries to become current in his or her payments or to modify the mortgage so as not to lose his or her home. During this time, the borrower becomes progressively more delinquent (30 days past due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight from being current to either foreclosure or ownership by the lender, it is usually because the borrower did not live in the property and so made no effort to remain in it, but instead abandoned the property to the lender soon after he or she became unable to make the payments. In many of the securitizations, there were mortgage loans in the collateral pools that were secured by properties that were stated to be primary residences and that went straight from current to foreclosure or ownership by the lender. It is more likely than not that the properties that secured these mortgage loans were actually not primary residences.

110.    In Securitization No. 1, 112 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on that property to them at a different address; 283 owners of properties that were stated to be primary residences could have, but did not, designate that property as their homestead; and 27 owners of properties that were stated to be primary residences owned three or more properties. Eliminating duplicates, 372 properties that were stated to be primary residences actually were not, for one or more of these reasons. Thus, of the 1,498 properties that were stated to be primary residences, 372 actually were

-30-

**COMPLAINT**

1   not, and the number of properties that were not primary residences was not 99, as Defendants

2   stated, but actually 471, a material difference. The numbers of such loans in the collateral pool of

3   each securitization are stated in Item 110 of the schedules of this Complaint. Plaintiff incorporates

4   into this paragraph 110, and alleges as though fully set forth in this paragraph, the contents of

5   Item 110 of the schedules.

6                                               ∗

7       111.   By each of the untrue and misleading statements referred to in paragraph 102, the

8   Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

9   **III.   Untrue or Misleading Statements About the Underwriting Standards of the
         Originators of the Mortgage Loans in the Collateral Pools**

10      **A.   The materiality of underwriting standards and the extent of an originator's
              departures from them**

12      112.   Originators of mortgage loans have written standards by which they underwrite

13  applications for loans. An important purpose of underwriting is to ensure that the originator

14  makes mortgage loans only in compliance with those standards and that its underwriting decisions

15  are properly documented. An even more fundamental purpose of underwriting mortgage loans is

16  to ensure that loans are made only to borrowers with credit standing and financial resources to

17  repay the loans and only against collateral with value, condition, and marketability sufficient to

18  secure the loans. An originator's underwriting standards, and the extent to which the originator

19  departs from its standards, are important indicators of the risk of mortgage loans made by that

20  originator and of certificates sold in a securitization in which mortgage loans made by that

21  originator are part of the collateral pool. A reasonable investor considers the underwriting

22  standards of originators of mortgage loans in the collateral pool of a securitization, and the extent

23  to which each originator departs from its standards, important to the decision whether to purchase

24  a certificate in that securitization.

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-31-
**COMPLAINT**

**B.    Untrue or misleading statements about the underwriting standards of originators of the mortgage loans in the collateral pools and about the extent to which those originators departed from their standards**

**1.    The untrue or misleading statements**

113.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pool. Details of each such statement are stated in Item 113 of the schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 113, and alleges as though fully set forth in this paragraph, the contents of Item 113 of the schedules.

114.    Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the Defendants omitted to state that: (a) the originators were departing extensively from those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

**2.    Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools, and about the extent of their departures from those standards, were untrue or misleading**

**a.    The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

115.    Plaintiff is informed and believes, and based thereon alleges, before and during the time of these securitizations, many originators of mortgage loans relaxed their actual lending practices for loans they sold into securitizations, even though their stated underwriting standards may have remained unchanged. As a result of this relaxation, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

-32-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

116.    Based on an extensive empirical study of mortgage loans made and sold into securitizations during this period, economists at the University of Michigan and elsewhere found that the high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

117.    What these economists found about recent securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator Countrywide Home Loans Inc. as an example, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Countrywide Home Loans Inc. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator departed from its underwriting standards in making the loan, often by failing to detect fraud in the application. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Countrywide Home Loans Inc. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by departures from its underwriting standards.

-33-
**COMPLAINT**



Figure 1: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

118.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, confirming the finding of the economists at the University of Michigan that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



Figure 2: Percent of Loans Originated by Countrywide Home Loans Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

-34-
COMPLAINT

119.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint:

| Exhibit | Originator |
|---------|------------|
| B | Bank of America N.A. |
| C | Countrywide Home Loans Inc. |
| D | EMC Mortgage Corporation |
| E | GMAC Mortgage Corporation |
| F | Morgan Stanley |
| G | PHH Mortgage Corporation |
| H | SunTrust Mortgage Inc. |
| I | Wells Fargo Bank N.A. |

Plaintiff incorporates into this paragraph 119, and alleges as though fully set forth in this paragraph, the contents of Figures 1 and 2 in each Exhibit.

**b.    The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

120.    As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced very high rates of EPDs. This much higher-than-normal rate of EPDs is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 120 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 120, and alleges as though fully set forth in this paragraph, the contents of Item 120 of the schedules.

121.    A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have departed from their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which

-35-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the

2   collateral pools have experienced very high rates of delinquencies by this measure. This high rate

3   of delinquencies is strong evidence that the originators of those loans may have departed

4   extensively from their underwriting standards when making those loans. The number and percent

5   of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 121 of the

6   schedules of this Complaint. Plaintiff incorporates into this paragraph 121, and alleges as though

7   fully set forth in this paragraph, the contents of Item 121 of the schedules.

8       122.  A second common measure of delinquency is the number of loans on which the

9   borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have

10   experienced very high rates of delinquencies by this measure, some as high as 57% of the loans as

11   of March 31, 2010. This much high rate of delinquencies is strong evidence that the originators of

12   those loans may have departed extensively from their underwriting standards when making those

13   loans. The number and percent of the loans in each pool that were 30 or more days delinquent on

14   March 31, 2010, are stated in Item 122 of the schedules of this Complaint. Plaintiff incorporates

15   into this paragraph 122, and alleges as though fully set forth in this paragraph, the contents of

16   Item 122 of the schedules.

17                                   \*

18       123.  By each of the untrue and misleading statements referred to in paragraph 113

19   above, the Defendants materially understated the risk of the certificates that they offered and sold

20   to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that

21   discovery will yield additional evidence that the originators departed extensively from their

22   underwriting guidelines when making the mortgage loans in the collateral pools of these

23   securitizations.

24   **IV.**  **The Large Number of Mortgage Loans in the Collateral Pools About Which the**

25        **Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Schwab's Certificates Untrue and Misleading.**

26       124.  In the prospectus supplements and other documents they sent to Charles Schwab

27   Treasury, the Defendants made statements about the rating of each certificate by Moody's

28   Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. They stated that one or

-36-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    more of those agencies rated each such certificate triple-A or above. Details of each such

2    statement are stated in Item 124 of the schedules of this Complaint. Plaintiff incorporates into this

3    paragraph 124, and alleges as though fully set forth in this paragraph, the contents of Item 124 of

4    the schedules.

5        125.    The ratings were important to the decision of any reasonable investor whether to

6    purchase the certificates. Many investors, including Schwab, have investment policies that require

7    a certain minimum rating for all investments. The policy of Schwab was to purchase only

8    certificates that were rated triple-A.

9        126.    These statements by the Defendants about the ratings of the certificates they sold

10   to Schwab were misleading because the Defendants omitted to state that the ratings did not take

11   into account all the material untrue or misleading statements about specific mortgage loans in the

12   collateral pool. These include:

13       (a)    loans in which the LTVs were materially understated;

14       (b)    loans in which the owner's equity in the property was reduced by 5% or more by

15   undisclosed additional liens;

16       (c)    loans that suffered EPDs, strong evidence that the originators may have made

17   undisclosed departures from the underwriting standards in making those loans; and

18       (d)    loans in which the properties were stated to be owner-occupied, but were not.

19       127.    In Securitization No. 1, there were 626 loans whose LTVs were materially

20   understated and 372 loans in which the properties were stated to be owner-occupied but were not.

21   Eliminating duplicates, there were 846 loans (or 53% of the loans in the collateral pool) about

22   which Defendants made untrue or misleading statements. The numbers of such loans in the

23   collateral pool of each securitization are stated in Item 127 of the schedules of this Complaint.

24   Plaintiff incorporates into this paragraph 127, and alleges as though fully set forth in this

25   paragraph, the contents of Item 127 of the schedules.

26       128.    Plaintiff is informed and believes, and based thereon alleges, that loan files and

27   other documents available only through discovery will prove that those statements were untrue or

28   misleading with respect to many more loans as well.

-37-

**COMPLAINT**

129.    By these untrue and misleading statements, the Defendants materially understated the risk of the certificates that they offered and sold to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that the Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

## FIRST CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
### (California Corporations Code §§ 25401, 25501)

130.    This cause of action is alleged against the following Defendants:

| Against Defendants: | In connection with Securitization: |
| --- | --- |
| BNP | Securitization No. 1 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| Deutsche Bank | Securitizations Nos. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| UBS | Securitizations Nos. 34, 35, 36 |

131.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 129.

132.    In doing the acts alleged in the sale to Schwab of the certificates in the securitizations referred to above, the Defendants named above violated Sections 25401 and 25501 of the California Corporations Code by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133.    This action is brought within two years after the discovery of the untrue and misleading statements in the prospectus supplements and other documents that the Defendants sent to Charles Schwab Treasury, and within five years of Schwab's purchase of these

-38-

**COMPLAINT**

1    certificates, or within any applicable period as tolled by the pendency of the class actions referred

2    to above or others. Despite having exercised reasonable diligence, neither Plaintiff, Charles

3    Schwab Treasury, nor Schwab could reasonably have discovered earlier the untrue and

4    misleading statements in the prospectus supplements and other documents.

5        134.    Under California Corporations Code §§ 25401 and 25501, Plaintiff is entitled to

6    recover the consideration paid for each of these certificates, plus interest at the legal rate from the

7    date of purchase to the date on which it recovers the purchase price, minus the amount of income

8    received on the certificate. Pursuant to § 25501, and in anticipation of the remedies thereunder,

9    Plaintiff hereby offers to tender each certificate.

### SECOND CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS
### IN REGISTRATION STATEMENTS
#### (Section 11 of the Securities Act of 1933)

14        135.    This cause of action is alleged against the following Defendants:

| *Against Defendant:* | *In connection with Securitization:* |
|---|---|
| **Banc of America** | **Securitization No. 3** |
| **CWALT** | **Securitizations Nos. 3, 9, 18, 19, 24, 25** |
| **Credit Suisse** | **Securitization No. 18** |
| **Deutsche** | **Securitization No. 19** |
| **Greenwich Capital** | **Securitizations Nos. 24, 25** |
| **HSBC** | **Securitizations Nos. 26, 27** |
| **Morgan Stanley** | **Securitization No. 28** |
| **Wells Fargo Asset** | **Securitizations Nos. 26, 27, 28** |

22        136.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1

23    through 134.

24        137.    In doing the acts alleged, the Defendants named above violated Section 11 of the

25    Securities Act of 1933 in connection with the sale to Schwab of the certificates in the

26    securitizations referred to above.

27

28

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

138.    The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 55 of the schedules.

139.    Wells Fargo Asset is the depositor of the securitization listed above and therefore is the issuer of the certificates in those securitizations. UBS acted as underwriter of the certificate listed above.

140.    This action is brought within one year after the discovery of the untrue and misleading statements in the registration statements, as amended by the prospectus supplements, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements.

141.    The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 59 through 129.

142.    Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the Securities Act of 1933.

143.    Schwab did not know when it purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

144.    Schwab has suffered a loss on each of these certificates.

145.    Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

-40-
**COMPLAINT**

## THIRD CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
(Section 12(a)(2) of the Securities Act of 1933)

146.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitization: |
| --- | --- |
| Banc of America | Securitization No. 3 |
| CWALT | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Credit Suisse | Securitization No. 18 |
| Deutsche | Securitization No. 19 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitization No. 28 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |

147.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 145.

148.    In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred to above.

149.    This action is brought within one year after the discovery of the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury.

150.    Wells Fargo Asset is the depositor of the securitization listed above and therefore is the issuer of the certificates in that securitization. In connection with the offer and sale of these

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-41-
**COMPLAINT**

1  certificates to Schwab, the issuer also made all of the statements of material fact about these

2  certificates that were in the prospectus supplements and other written offering materials and oral

3  communications that that the dealers sent to Charles Schwab Treasury.

4      151.    Plaintiff expressly excludes from this cause of action any allegation that could be

5  construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

6  on claims of strict liability or negligence under the Securities Act of 1933.

7      152.    The Defendants named above solicited Schwab to purchase these certificates, and

8  sold the certificates to Schwab, by means of the prospectus supplements and other written

9  offering materials and oral communications.

10     153.    The prospectus supplements and other written offering materials and oral

11 communications that the dealers sent to Charles Schwab Treasury contained untrue statements of

12 material fact and omitted to state material facts necessary in order to make the statements, in the

13 light of the circumstances under which they were made, not misleading.

14     154.    Schwab did not know when it purchased these certificates that the statements in

15 the prospectus supplements and other written offering materials and oral communications that the

16 dealers sent to Charles Schwab Treasury were untrue or misleading.

17     155.    Schwab has suffered a loss on each of these certificates.

18     156.    Plaintiff is entitled to recover the consideration paid for each of these certificates,

19 plus interest at the legal rate from the date of purchase to the date on which it recovers the

20 purchase price, minus the amount of income received on each certificate. Pursuant to Section

21 12(a)(2), and in anticipation of the remedies thereunder, Plaintiff hereby offers to tender each

22 certificate.

23

24

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-42-
**COMPLAINT**

## FOURTH CAUSE OF ACTION

### LIABILITY OF CONTROLLING PERSON
**(Section 15 of the Securities Act of 1933)**

157.   This cause of action is alleged against the following Defendant:

| *Against Defendants:* | *In connection with Securitizations:* |
|---|---|
| **Countrywide Financial Corporation** | **Securitizations Nos. 3, 9, 18, 19, 24, 25** |
| **Wells Fargo Bank** | **Securitizations Nos. 26, 27, 28** |

158.   Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 156.

159.   The Defendants named above is liable because, in doing the acts alleged, persons they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred to above.

160.   Countrywide Financial Corporation by or through stock ownership, agency, or otherwise, controlled CWALT within the meaning of Section 15 of the Securities Act of 1933.

161.   Wells Fargo Bank by or through stock ownership, agency, or otherwise, controlled Wells Fargo Asset within the meaning of Section 15 of the Securities Act of 1933.

162.   In doing the acts alleged, each controlled person named in paragraphs 161 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 156.

163.   The Defendants named above are therefore jointly and severally liable with and to the same extent as the person they controlled.

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
(California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

164.    This cause of action is alleged against the following Defendants:

| Against Defendants: | In connection with Securitization: |
|---|---|
| BNP | Securitization No. 1 |
| CWMBS | Securitizations Nos. 1, 8, 35, 36 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Banc of America Mortgage Securities | Securitizations Nos. 2, 5, 6 |
| CWALT | Securitizations Nos. 3, 9,18, 19, 24, 25 |
| Banc of America Funding | Securitizations Nos. 4, 7 |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Citigroup Mortgage | Securitizations Nos. 10, 12, 13, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| CSFB Mortgage Securities | Securitization No. 16 |
| Residential Asset Mortgage | Securitizations Nos. 17, 22, 33 |
| Residential Accredit | Securitization No. 11 |
| Deutsche Bank | Securitization No. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| First Horizon | Securitizations Nos. 14, 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| GS Mortgage | Securitizations Nos. 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| Morgan Stanley Capital | Securitizations Nos. 29, 30, 31 |
| Sequoia | Securitization No. 32 |
| MAST | Securitization No. 34 |
| UBS | Securitizations Nos. 34, 35, 36 |

165.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 163.

166.    As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

-44-
COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    167.    In making the representations referred to above, the Defendants intended to induce

2    Schwab to rely on those representations in making its decision to purchase these certificates in

3    these securitizations.

4    168.    When the Defendants made these representations, they had no reasonable ground

5    for believing them to be true. Plaintiff is informed and believes, and based thereon alleges, that

6    Defendants had access to the files on the mortgage loans in the collateral pools for these

7    securitizations, and, had the Defendants inspected those files, they would have learned that the

8    information they gave Charles Schwab Treasury contained untrue or misleading statements. In

9    addition, Plaintiff is informed and believes, and based thereon alleges, that Defendants hired one

10    or more "due-diligence contractors" to ascertain whether the mortgage loans in the collateral

11    pools complied with the representations and warranties made about those loans, and these

12    contractors reported to the Defendants that a material number of the loans in the collateral pools

13    were different from the descriptions of those loans in the prospectus supplements. Thus, Plaintiff

14    is informed and believes, and based thereon alleges, that the Defendants had access to

15    information that either did make the Defendants aware, or should have made them aware had they

16    heeded that information, that the representations they made to Charles Schwab Treasury

17    contained material untrue or misleading statements about the mortgage loans in the collateral

18    pools.

19    169.    When it purchased these certificates, Schwab did not know about the untrue and

20    misleading statements alleged herein.

21    170.    Schwab reasonably and justifiably relied on the representations described above in

22    analyzing and deciding to purchase these certificates. Had the Defendants not made these false

23    and misleading representations, Schwab would not have purchased these certificates.

24    171.    As a direct and proximate result of the negligent misrepresentations by the

25    Defendants, Schwab was damaged in an amount to be proved at trial.

26

27

28

-45-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## SIXTH CAUSE OF ACTION

### RESCISSION OF CONTRACT
#### (California Civil Code §§ 1689 and 1710, and Common Law)

172.    This cause of action is alleged against the following Defendants:

| Against Defendants: | | In connection with Securitization: |
|---|---|---|
| BNP | | Securitization No. 1 |
| Banc of America | | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Citigroup Global | | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Credit Suisse | | Securitizations Nos. 16, 17, 18 |
| Deutsche Bank | | Securitizations Nos. 19 |
| First Tennessee | | Securitizations Nos. 20, 21 |
| Goldman Sachs | | Securitizations Nos. 22, 23 |
| Greenwich Capital | | Securitizations Nos. 24, 25 |
| HSBC | | Securitizations Nos. 26, 27 |
| Morgan Stanley | | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| UBS | | Securitizations Nos. 34, 35, 36 |

173.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 171.

174.    Schwab purchased each certificate pursuant to a contract in writing between Schwab and the dealer from which it purchased that certificate. Each contract stated the consideration that Schwab paid each dealer for each certificate.

175.    In making each contract to purchase the certificates, Schwab relied on the truth of the statements that the Defendants named above made in the prospectus supplements and other offering materials. Because those statements were untrue or misleading, Schwab was mistaken about its basic assumptions underlying its purchase of each certificate, and this mistake had a material adverse effect on the agreed-upon exchange represented by Schwab's purchase of each certificate. Because the Defendants named above were responsible to provide accurate information in the prospectus supplements, Schwab did not assume, nor does it bear, the risk of the fundamental mistake underlying its decision to purchase these certificates.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-46-
COMPLAINT

176.    The Defendants named above obtained the consent of Schwab to the contracts to purchase the certificates by means of their assertion, as facts, of that which was not true, when those Defendants had no reasonable ground for believing those assertions to be true.

177.    Pursuant to California Civil Code. § 1689 *et seq.*, Plaintiff is entitled to rescind, and does hereby demand the rescission of, each contract for the sale and purchase of these certificates. Plaintiff offers to restore all benefits that Schwab has received under those contracts and is entitled to recover all consideration paid under them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment as follows:

A.    On the first cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

B.    On the second cause of action, damages in an amount to be determined at trial;

C.    On the third cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

D.    On the fourth cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

E.    On the fifth cause of action, damages in an amount to be determined at trial;

F.    On the sixth cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

G.    All together with the costs of this action, the reasonable fees of Plaintiff's attorneys in this action, and such other and further relief as the Court may deem just.

COMPLAINT

1

2    Dated: July 15, 2010

GOODIN, MACBRIDE, SQUERI,
3                                      DAY & LAMPREY, LLP

4                                      By _____
                                            Robert A. Goodin
5
LOWELL HAKY
6
GRAIS & ELLSWORTH LLP
7
Attorneys for Plaintiff
8                                      The Charles Schwab Corporation

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-48-
**COMPLAINT**

# EXHIBIT C

1221 Avenue of the Americas
New York, NY 10020

## Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:    (212) 762-7291
Facsimile No:   (914) 729-2950
Email: David.Restaino@morganstanley.com

September 1, 2011

VIA OVERNIGHT MAIL

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attention: President

Dear Sir:

 Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated June 23, 2005 (the "Agreement"), relating to the sale of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 issued by Residential Asset Mortgage Products, Inc. (the "Company"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated ("Morgan Stanley") in respect of which the Company has agreed to indemnify and hold harmless Morgan Stanley and each person controlling Morgan Stanley.

 The action is a complaint filed by The Charles Schwab Corporation, captioned <u>Charles Schwab Corp. v. BNP Paribas Securities Corp. et al.</u>, Case No. CGC-10-501610, in the Superior Court of the State of California, County of San Francisco.

 The Complaint constitutes an action in respect of which the indemnification and contribution provisions of Sections 7.1 and 7.4 of the Agreement apply. The Complaint also names the Company as a defendant.

 Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

**David P. Restaino, Executive Director**
**Legal and Compliance Division**
**Direct Dial:** (212) 762-7291
**Facsimile No:** (914) 729-2950
**Email:** David.Restaino@morganstanley.com

September 1, 2011

VIA OVERNIGHT MAIL

GMAC Mortgage Corporation
100 Witmer
Horsham, Pennsylvania 19044
Attention: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated June 23, 2005, relating to the sale of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 issued by Residential Asset Mortgage Products, Inc. (the "Agreement"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated ("Morgan Stanley") in respect of which GMAC Mortgage Corporation has agreed to indemnify and hold harmless Morgan Stanley and each person controlling Morgan Stanley.

The action is a complaint filed by The Charles Schwab Corporation, captioned <u>Charles Schwab Corp. v. BNP Paribas Securities Corp. et al.</u>, Case No. CGC-10-501610, in the Superior Court of the State of California, County of San Francisco.

The Complaint constitutes an action in respect of which the indemnification and contribution provisions of Sections 7.1 and 7.4 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

# EXHIBIT 2

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number:
**Residential Asset Mortgage Products, Inc., Case No. 12-12053**

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC)

Name and address where notices should be sent:

c/o Kevin H. Marino
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928

Telephone number: 973-824-9300          email: kmarino@khmarino.com

Name and address where payment should be sent (if different from above):

Telephone number:          email:

☐ Check this box if this claim amends a previously filed claim.

**Court Claim Number:**_____
(*If known*)

Filed on:_____

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

1. **Amount of Claim as of Date Case Filed:** $ unliquidated/contingent/subject to amendment
If all or part of the claim is secured, complete item 4.
If all or part of the claim is entitled to priority, complete item 5.
☐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. **Basis for Claim:** Obligation in Underwriting Agreement to indemnify and hold harmless from certain claims
(See instruction #2)

3. **Last four digits of any number by which creditor identifies debtor:**
__ __ __ __

| 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): |
|---|---|
| (See instruction #3a) | (See instruction #3b) |

4. **Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.
**Nature of property or right of setoff:** ☐Real Estate ☐Motor Vehicle ☐Other
**Describe:**
**Value of Property:** $_____ **Annual Interest Rate**_____% ☐Fixed ☐Variable
(when case was filed)
**Amount of arrearage and other charges, as of the time case was filed, included in secured claim,**
if any: $_____          **Basis for perfection:** _____

**Amount of Secured Claim:** $_____          **Amount Unsecured:** $_____

6. **Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

7. **Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. **Documents:** Attached are *redacted* copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and *redacted* copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.
If the documents are not available, please explain:

9. **Signature:** (See instruction #9) Check the appropriate box.
☐ I am the creditor.  ■ I am the creditor's authorized agent. (Attach copy of power of attorney, if any.)  ☐ I am the trustee, or the debtor, or their authorized agent. (See Bankruptcy Rule 3004.)  ☐ I am a guarantor, surety, indorser, or other codebtor. (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Kevin H. Marino
Title: Outside Counsel
Company: Marino, Tortorella & Boyle, P.C.
Address and telephone number (if different from notice address above):

_Signature_ (Signature)     12·27·12 (Date)

Telephone number: 973-824-9300          Email: kmarino@khmarino.com

5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

☐Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

COURT USE ONLY

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

B 10 Modified (Official Form 10) (12/11) cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Claim Pursuant to 11 U.S.C. §503(b)(9):**
Check this box if you have a claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim. (See DEFINITIONS, below.)

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://www.kccllc.net/ResCap.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## SUMMARY OF CLAIM

On or about June 23, 2005, Morgan Stanley & Co. Incorporated, n/k/a Morgan Stanley & Co. LLC ("Morgan Stanley"), entered into an Underwriting Agreement (the "Underwriting Agreement") relating to the sale of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 issued by Residential Asset Mortgage Products, Inc. ("Residential Asset Mortgage"), the debtor in Case No. 12-12053. (Exhibit A.) Pursuant to sections 7.1 and 7.3 of the Underwriting Agreement, Residential Asset Mortgage and GMAC Mortgage Corporation, a/k/a GMAC Mortgage, LLC ("GMAC Mortgage"), the debtor in Case No. 12-12032, agreed to indemnify Morgan Stanley and hold it harmless for certain claims and actions. (Id.)

On or about July 15, 2010, The Charles Schwab Corporation filed in the Superior Court of the State of California, County of San Francisco, a complaint entitled Charles Schwab Corp. v. BNP Paribas Securities Corp., et al. (the "Schwab" Action"), against Morgan Stanley and others. (Exhibit B.) The Schwab Action constitutes an action for which Residential Asset Mortgage and GMAC Mortgage agreed in the Underwriting Agreement to indemnify and hold Morgan Stanley harmless. By letters dated September 1, 2011, Morgan Stanley notified Residential Assert Mortgage and GMAC Mortgage of the Schwab Action and their indemnification obligations with respect to that action. (Exhibit C.)

# EXHIBIT A

**Residential Asset Mortgage Products, Inc.**

GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

| Certificate Principal Balance | Pass-Through Rate | Class |
|---|---|---|
| $  18,893,000 | Variable | Class 1-A Certificates |
| $  56,050,000 | Variable | Class 2-A-1 Certificates |
| $    2,739,000 | Variable | Class 2-A-2 Certificates |
| $  144,100,000 | Variable | Class 3-A-1 Certificates |
| $    7,061,000 | Variable | Class 3-A-2 Certificates |
| $  52,750,000 | Variable | Class 4-A-1 Certificates |
| $    2,592,000 | Variable | Class 4-A-2 Certificates |
| $  80,000,000 | Variable | Class 5-A-1 Certificates |
| $    3,933,000 | Variable | Class 5-A-2 Certificates |
| $    6,370,000 | Variable | Class M-1 Certificates |
| $    4,440,000 | Variable | Class M-2 Certificates |
| $    2,702,000 | Variable | Class M-3 Certificates |
| $           100 | Variable | Class R Certificates |

## UNDERWRITING AGREEMENT

June 23, 2005

Morgan Stanley and Co. Incorporated
1585 Broadway
New York, New York  10036

Ladies and Gentlemen:

Residential Asset Mortgage Products, Inc. (the "Company") proposes to sell to you (the "Underwriter"), the GMACM Mortgage Pass-Through Certificates, Series 2005-AR4, Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, Class 5-A-2, Class M-1, Class M-2, Class M-3, and Class R Certificates, other than a de minimis portion of the Class R Certificates, (collectively, the "Certificates") having the aggregate principal amounts or notional amounts, as applicable, and Pass-Through Rates set forth above. The Certificates, together with the Class B-1, Class B-2 and Class B-3 Certificates of the same series, will evidence the entire beneficial interest in the Trust Fund (as defined in the Pooling and Servicing Agreement referred to below) consisting primarily of a pool (the "Pool") of hybrid, adjustable-rate, one- to four-family residential mortgage loans (the "Mortgage Loans") as described in the Prospectus Supplement (as hereinafter defined) to be sold by the Company. A de minimis portion of the Class R Certificate will not be sold hereunder and will be held by GMAC Mortgage Corporation ("GMACM").

The Mortgage Loans will be purchased by the Company from GMACM pursuant to the Mortgage Loan Purchase Agreement (the "Mortgage Loan Purchase Agreement"), dated as of June 28, 2005 among the Company, as purchaser, and GMACM, as the seller.

The Certificates will be issued pursuant to a Pooling and Servicing Agreement, dated as of June 28, 2005 (the "Pooling and Servicing Agreement"), among the Company, GMACM, as servicer, and the Deutsche Bank National Trust Company (the "Trustee"). The Certificates are described more fully in the Prospectus (as hereinafter defined) which the Company has furnished to you. Capitalized terms used herein and not otherwise defined herein shall have the meanings given such terms in the Pooling and Servicing Agreement.

1. Representations, Warranties and Covenants.

1.1    The Company represents and warrants to, and agrees with you that:

(a)    The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (No. 333-117232) on Form S-3 for the registration under the Securities Act of 1933, as amended (the "Act"), of Mortgage Asset-Backed Certificates and Asset-Backed Notes (issuable in series), including the Certificates, which registration statement has become effective, and a copy of which, as amended to the date hereof, has heretofore been delivered to you. The Company proposes to file with the Commission pursuant to Rule 424(b)5 under the rules and regulations of the Commission under the Act (the "1933 Act Regulations") a supplement dated June 23, 2005, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (the "Prospectus Supplement"), to the prospectus dated December 22, 2004 (the "Base Prospectus"), relating to the Certificates and the method of distribution thereof. Such registration statement including exhibits thereto and any information incorporated therein by reference, as amended at the date hereof, is hereinafter called the "Registration Statement"; and the Base Prospectus and the Prospectus Supplement and any information incorporated therein by reference, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (as defined below) for use in connection with the offering of the Certificates, are hereinafter called the "Prospectus."

(b)    The Registration Statement has become effective, and the Registration Statement as of its effective date (the "Effective Date"), and the Prospectus, as of the date of the Prospectus Supplement, complied in all material respects with the applicable requirements of the Act and the 1933 Act Regulations; and the Registration Statement, as of the Effective Date, did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading and the Prospectus, as of the date of the Prospectus Supplement, did not, and as of the Closing Date will not, contain an untrue statement of a material fact and did not and will not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however, that neither the Company nor GMACM makes any representations or warranties as to the information contained in or omitted from the Registration Statement or the Prospectus or any amendment thereof or supplement thereto relating to the information identified by underlining or other highlighting as shown in Exhibit D (the "Excluded Information"); and provided, further, that neither the Company nor GMACM makes any representations or warranties as to either (i) any information in any Computational Materials or ABS Term Sheets (each as hereinafter defined) required to be provided by the Underwriter to the Company pursuant to Section 4.2 hereof, except to the extent of any information set forth therein that constitutes Pool Information (as defined below), or

(ii) any information contained in or omitted from the portions of the Prospectus identified by underlining or other highlighting as shown in Exhibit E (the "Underwriter Information"). As used herein, "Pool Information" means information with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or GMACM to the Underwriter in final form and set forth in the Prospectus Supplement. The Company acknowledges that, except for any Computational Materials and ABS Term Sheets, the Underwriter Information constitutes the only information furnished in writing by you or on your behalf for use in connection with the preparation of the Registration Statement, any preliminary prospectus or the Prospectus, and you confirm that the Underwriter Information is correct.

(c)    The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the requisite corporate power to own its properties and to conduct its business as presently conducted by it.

(d)    This Agreement has been duly authorized, executed and delivered by the Company.

(e)    As of the Closing Date the Certificates will conform in all material respects to the description thereof contained in the Prospectus and the representations and warranties of the Company in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.2    GMACM represents and warrants to, and agrees with you that as of the Closing Date the representations and warranties of GMACM in the Mortgage Loan Purchase Agreement and the Pooling and Servicing Agreement will be true and correct in all material respects.

1.3    The Underwriter represents and warrants to and agrees with the Company and GMACM that:

(a)    The Underwriter has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.

(b)    The Underwriter has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Certificates remain outstanding.

(c)    No purpose of the Underwriter relating to any sale of any of the Class R Certificates by it will be to enable it to impede the assessment or collection of tax. In this regard, the Underwriter hereby represents to and for the benefit of the Company and GMACM that it intends to pay taxes associated with holding the Class R Certificates, as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificates (other than with respect to the de minimis portion of each class of the Class R Certificates retained by GMACM).

(d)    The Underwriter will, in connection with any transfer it makes of any of the Class R Certificates, obtain from its transferee the affidavit required by Section 5.02(f)(i)(B)(I) of the Pooling and Servicing Agreement, will not consummate any such transfer if it knows or believes that any representation contained in such affidavit is false and will provide the Trustee with the certificate required by Section 5.02(f)(i)(B)(II) of the Pooling and Servicing Agreement.

(e)    The Underwriter hereby certifies that (i) with respect to any classes of Certificates issued in authorized minimum denominations of $25,000, the fair market value of such Certificates sold to any person on the date of initial sale thereof by it will not be less than $100,000 and (ii) with respect to each class of Certificates to be maintained on the book-entry records of The Depository Trust Company ("DTC"), the interest in each such class of Certificates sold to any person on the date of initial sale thereof by it will not be less than the minimum denomination indicated for such class of Certificates in the Prospectus Supplement.

(f)    The Underwriter represents that it has in place, and covenants that it shall maintain, internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the No-Action Letters (as defined below) with respect to the generation and use of Computational Materials and ABS Term Sheets in connection with the offering of the Certificates.

(g)    As of the date hereof and as of the Closing Date, the Underwriter has complied with all of its obligations hereunder including Section 4.2 hereof, and, with respect to all Computational Materials and ABS Term Sheets prepared by the Underwriter and provided by it to the Company (directly or indirectly through GMACM) and GMACM pursuant to Section 4.2 hereof if any, such Computational Materials and ABS Term Sheets are accurate in all material respects (taking into account the assumptions explicitly set forth in the Computational Materials or ABS Term Sheets, except to the extent of any errors therein that are caused by errors in the Pool Information). The Computational Materials and ABS Term Sheets provided by you to the Company constitute a complete set of all Computational Materials and ABS Term Sheets prepared by the Underwriter that are required to be filed with the Commission.

1.4    The Underwriter covenants and agrees to pay directly, or reimburse the Company or GMACM upon demand for (i) any and all taxes (including penalties and interest) owed or asserted to be owed by the Company or GMACM as a result of a claim by the Internal Revenue Service that the transfer of any of the Class R Certificates to you hereunder or any transfer thereof by you may be disregarded for federal tax purposes and (ii) any and all losses, claims, damages and liabilities, including attorney's fees and expenses, arising out of any failure of the Underwriter to make payment or reimbursement in connection with any such assertion as required in clause (i) above. In addition, the Underwriter acknowledges that on the Closing Date (as hereinafter defined) immediately after the transactions described herein it will be the owner of the Class R Certificates for federal tax purposes, and it covenants that it will not assert in any proceeding that the transfer of the Class R Certificates from the Company to it should be disregarded for any purpose.

2.    Purchase and Sale.    Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to you, and you agree

to purchase from the Company, the Certificates, at a price equal to 101.16% of the aggregate principal balance of the Certificates as of the Closing Date. There will be added to the purchase price of the Certificates an amount equal to interest accrued thereon from June 1, 2005 (the "Cut-off Date") to but not including the Closing Date. The purchase price for the Certificates was agreed to by the Company in reliance upon the transfer from the Company to you of the tax liabilities associated with the ownership of the Class R Certificates.

3. Delivery and Payment. Delivery of and payment for the Certificates shall be made at the office of Orrick, Herrington & Sutcliffe LLP at 10:00 a.m., New York City time, on June 28, 2005 or such later date as you shall designate, which date and time may be postponed by agreement between you, the Company and GMACM (such date and time of delivery and payment for the Certificates being herein called the "Closing Date"). Delivery of the Certificates (other than the Class R Certificates) shall be made to you through DTC, and delivery of the Class R Certificates shall be made in registered, certificated form, in each case against payment by you of the purchase price thereof to or upon the order of the Company by wire transfer in immediately available funds. The Class R Certificates shall be registered in such names and in such denominations as you may request not less than two business days in advance of the Closing Date. The Company agrees to have the Class R Certificates available for inspection, checking and packaging by you in New York, New York not later than 1:00 p.m. on the business day prior to the Closing Date.

4. Offering by the Underwriter.

4.1    It is understood that you propose to offer the Certificates for sale to the public as set forth in the Prospectus and you agree that all such offers and sales by them shall be made in compliance with all applicable laws and regulations.

4.2    It is understood that you may prepare and provide to prospective investors certain Computational Materials and ABS Term Sheets (each as defined below) in connection with their offering of the Certificates, subject to the following conditions:

(a)    The Underwriter shall comply with all applicable laws and regulations in connection with the use of Computational Materials, including the No-Action Letter of May 20, 1994 issued by the Commission to Kidder, Peabody Acceptance Corporation I, Kidder, Peabody & Co. Incorporated and Kidder Structured Asset Corporation, as made applicable to other issuers and the Underwriter by the Commission in response to the request of the Public Securities Association dated May 24, 1994 (collectively, the "Kidder/PSA Letter"), as well as the PSA Letter referred to below. The Underwriter shall comply with all applicable laws and regulations in connection with the use of ABS Term Sheets, including the No-Action Letter of February 17, 1995 issued by the Commission to the Public Securities Association (the "PSA Letter" and, together with the Kidder/PSA Letter, the "No-Action Letters").

(b)    For purposes hereof, "Computational Materials" as used herein shall have the meaning given such term in the No-Action Letters, but shall include only those Computational Materials that have been prepared or delivered to prospective investors by or at the direction of you. For purposes hereof, "ABS Term Sheets" and "Collateral Term Sheets" as used herein shall have the meanings given such terms in the PSA Letter but shall include only

those ABS Term Sheets or Collateral Term Sheets that have been prepared or delivered to prospective investors by or at the direction of the Underwriter.

(c)   (i) All Computational Materials and ABS Term Sheets provided to prospective investors that are required to be filed with the Commission pursuant to the No-Action Letters shall bear a legend on each page including the following statement:

> "THE INFORMATION HEREIN HAS BEEN PROVIDED SOLELY BY [NAME OF UNDERWRITER]. NEITHER THE ISSUER OF THE CERTIFICATES NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION HEREIN. THE INFORMATION HEREIN IS PRELIMINARY, AND WILL BE SUPERSEDED BY THE APPLICABLE PROSPECTUS SUPPLEMENT AND BY ANY OTHER INFORMATION SUBSEQUENTLY FILED WITH THE SECURITIES AND EXCHANGE COMMISSION."

(ii)   In the case of Collateral Term Sheets, such legend shall also include the following statement:

> "THE INFORMATION CONTAINED HEREIN WILL BE SUPERSEDED BY THE DESCRIPTION OF THE MORTGAGE POOL CONTAINED IN THE PROSPECTUS SUPPLEMENT RELATING TO THE CERTIFICATES AND [EXCEPT WITH RESPECT TO THE INITIAL COLLATERAL TERM SHEET PREPARED BY THE UNDERWRITER] SUPERSEDES ALL INFORMATION CONTAINED IN ANY COLLATERAL TERM SHEETS RELATING TO THE MORTGAGE POOL PREVIOUSLY PROVIDED BY [NAME OF UNDERWRITER]"

The Company shall have the right to require additional specific legends or notations to appear on any Computational Materials or ABS Term Sheets, the right to require changes regarding the use of terminology and the right to determine the types of information appearing therein. Notwithstanding the foregoing, this subsection (c) will be satisfied if all Computational Materials and ABS Term Sheets referred to therein bear a legend in a form previously approved in writing by the Company.

(d)   The Underwriter shall provide the Company and GMACM with representative forms of all Computational Materials and ABS Term Sheets prior to their first use, to the extent such forms have not previously been approved by the Company for use by the Underwriter. The Underwriter shall provide to the Company, for filing on Form 8-K as provided in Section 5.9 hereof, copies (in such format as required by the Company) of all Computational Materials and ABS Term Sheets, including without limitation Computational Materials or ABS Term Sheets that are prepared or made available by or are generated pursuant to any internet Web site or electronic media established by the Underwriter or any third party to which the Underwriter provided information regarding the Certificates, that are required to be filed with the

Commission pursuant to the No-Action Letters. The Underwriter may provide copies of the foregoing in a consolidated or aggregated form including all information required to be filed. All Computational Materials and ABS Term Sheets described in this subsection (d) must be provided to the Company not later than 10:00 a.m. New York time one business day before filing thereof is required pursuant to the terms of this Agreement. The Underwriter agrees that they will not provide to any investor or prospective investor in the Certificates any Computational Materials or ABS Term Sheets on or after the day on which Computational Materials and ABS Term Sheets are required to be provided to the Company pursuant to this Section 4.2(d) (other than copies of Computational Materials or ABS Term Sheets previously submitted to the Company in accordance with this Section 4.2(d) for filing pursuant to Section 5.9 hereof), unless such Computational Materials or ABS Term Sheets are preceded or accompanied by the delivery of a Prospectus to such investor or prospective investor.

(e)    All information included in the Computational Materials and ABS Term Sheets shall be generated based on substantially the same methodology and assumptions that are used to generate the information in the Prospectus Supplement as set forth therein; provided, however, that the Computational Materials and ABS Term Sheets may include information based on alternative methodologies or assumptions if specified therein. If any Computational Materials or ABS Term Sheets that are required to be filed were based on assumptions with respect to the Pool that differ from the final Pool Information in any material respect or on Certificate structuring terms that were revised in any material respect prior to the printing of the Prospectus, you shall prepare revised Computational Materials or ABS Term Sheets, as the case may be, based on the final Pool Information and structuring assumptions, the Underwriter shall circulate such revised Computational Materials and ABS Term Sheets to all recipients of the preliminary versions thereof that indicated or subsequently indicate orally to the Underwriter that they will purchase all or any portion of the Certificates, and you shall include such revised Computational Materials and ABS Term Sheets (marked, "as revised") in the materials delivered to the Company pursuant to subsection (d) above.

(f)    The Company shall not be obligated to file any Computational Materials or ABS Term Sheets that have been determined to contain any material error or omission; provided, however, that, at the request of the Underwriter, the Company will file Computational Materials or ABS Term Sheets that contain a material error or omission if clearly marked "superseded by materials dated _____" and accompanied by corrected Computational Materials or ABS Term Sheets that are marked, "material previously dated _____, as corrected." In the event that, within the period during which the Prospectus relating to the Certificates is required to be delivered under the Act, any Computational Materials or ABS Term Sheets are determined, in the reasonable judgment of the Company, GMACM or the Underwriter, to contain a material error or omission, you shall prepare a corrected version of such Computational Materials or ABS Term Sheets, you shall circulate such corrected Computational Materials and ABS Term Sheets to all recipients of the prior versions thereof that either indicated orally to the Underwriter they would purchase all or any portion of the Certificates, or actually purchased all or any portion thereof, and you shall deliver copies of such corrected Computational Materials and ABS Term Sheets (marked, "as corrected") to the Company for filing with the Commission in a subsequent Form 8-K submission (subject to the Company's and GMACM's obtaining an accountant's comfort letter in respect of such corrected

Computational Materials and ABS Term Sheets, which shall be at the expense of the Underwriter).

(g)    If the Underwriter does not provide any Computational Materials or ABS Term Sheets to the Company and GMACM pursuant to subsection (d) above, the Underwriter shall be deemed to have represented, as of the Closing Date, that it did not provide any prospective investors with any information in written or electronic form in connection with the offering of the Certificates that is required to be filed with the Commission in accordance with the No-Action Letters, and the Underwriter shall provide the Company and GMACM with a certification to that effect on the Closing Date.

(h)    In the event of any delay in the delivery by the Underwriter to the Company and GMACM of all Computational Materials and ABS Term Sheets required to be delivered in accordance with subsection (d) above, or in the delivery of the accountant's comfort letter in respect thereof pursuant to Section 5.9 hereof, the Company or GMACM shall have the right to delay the release of the Prospectus to investors or to the Underwriter, to delay the Closing Date and to take other appropriate actions in each case as necessary in order to allow the Company to comply with its agreement set forth in Section 5.9 hereof to file the Computational Materials and ABS Term Sheets by the time specified therein.

(i)    The Underwriter represents that it has in place, and covenants that it shall maintain internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the No-Action Letters with respect to the generation and use of Computational Materials and ABS Term Sheets in connection with the offering of the Certificates.

4.3    The Underwriter agrees that on or prior to the sixth day after the Closing Date, it shall provide to the Company and GMACM with a certificate, substantially in the form of Exhibit F attached hereto, setting forth (i) in the case of each class of Certificates, (a) if less than 10% of the aggregate principal balance of such class of Certificates has been sold to the public as of such date, then the value calculated pursuant to clause (b)(iii) of Exhibit F hereto, or, (b) if 10% or more of such class of Certificates has been sold to the public as of such date but no single price is paid for at least 10% of the aggregate principal balance of such class of Certificates, then the weighted average price at which the Certificates of such class were sold expressed as a percentage of the principal balance of such class of Certificates sold, or (c) the first single price at which at least 10% of the aggregate principal balance of such class of Certificates was sold to the public, (ii) the prepayment assumption used in pricing each class of Certificates sold by it, and (iii) such other information as to matters of fact as the Company may reasonably request to enable it to comply with its reporting requirements with respect to each class of Certificates to the extent such information can in the good faith judgment of the Underwriter be determined by them.

4.4    The Underwriter agrees that (i) a printed copy of the Prospectus will be delivered to each person who receives a confirmation of prior to or at the same time with such confirmation of sale and, with respect to any amendment or supplement to the Prospectus, a printed copy of the Prospectus, as amended or supplemented, will be delivered to each person who receives a confirmation of sale (a) at the same time such confirmation of sale is delivered or

(b), if such confirmation has already been delivered, on or prior to the Closing Date or, in any case where delivery of the Prospectus (as amended or supplemented) is required by the Act after the Closing Date, on or prior to the 90th day following the filing of the Prospectus (as amended or supplemented) with the Commission; (ii) if an electronic copy of the Prospectus is delivered by you for any purpose, such copy shall be the same electronic file containing the Prospectus in the identical form transmitted electronically to you by or on behalf of the Company specifically for use by you pursuant to this <u>Section 4.4</u>; for example, if the Prospectus is delivered to you by or on behalf of the Company in a single electronic file in pdf format, then you will deliver the electronic copy of the Prospectus in the same single electronic file in pdf format; and (iii) it has not used, and during the period for which it has an obligation to deliver a "prospectus" (as defined in Section 2(a)(10) of the Act) relating to the Certificates (including any period during which you have such delivery obligation in its capacity as a "dealer" (as defined in Section 2(a)(12) of the Act)) it will not use, any internet Web site or electronic media containing information for prospective investors, including any internet Web site or electronic media maintained by third parties, in connection with the offering of the Certificates, except in compliance with applicable laws and regulations.

5. <u>Agreements</u>. The Company agrees with you that:

5.1    Before amending or supplementing the Registration Statement or the Prospectus with respect to the Certificates, the Company will furnish you with a copy of each such proposed amendment or supplement.

5.2    The Company will cause the Prospectus Supplement to be transmitted to the Commission for filing pursuant to Rule 424(b) under the Act by means reasonably calculated to result in filing with the Commission pursuant to said rule.

5.3    If, during the period after the first date of the public offering of the Certificates in which a prospectus relating to the Certificates is required to be delivered under the Act, any event occurs as a result of which it is necessary to amend or supplement the Prospectus, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Prospectus is delivered to a purchaser, not misleading, or if it shall be necessary to amend or supplement the Prospectus to comply with the Act or the 1933 Act Regulations, the Company promptly will prepare and furnish, at its own expense, to you, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law.

5.4    The Company will furnish to you, without charge, a copy of the Registration Statement (including exhibits thereto) and, so long as delivery of a prospectus by an underwriter or dealer may be required by the Act, as many copies of the Prospectus, any documents incorporated by reference therein and any amendments and supplements thereto as you may reasonably request.

5.5    The Company agrees, so long as the Certificates shall be outstanding, or until such time as you shall cease to maintain a secondary market in the Certificates, whichever first occurs, to deliver to you the annual statement as to compliance delivered to the Trustee

pursuant to Section 3.18 of the Pooling and Servicing Agreement and the annual statement of a firm of independent public accountants furnished to the Trustee pursuant to Section 3.19 of the Pooling and Servicing Agreement, as soon as such statements are furnished to the Company.

5.6    The Company will endeavor to arrange for the qualification of the Certificates for sale under the laws of such jurisdictions as you may reasonably designate and will maintain such qualification in effect so long as required for the initial distribution of the Certificates; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

5.7    If the transactions contemplated by this Agreement are consummated, the Company or GMACM will pay or cause to be paid all expenses incident to the performance of the obligations of the Company and GMACM under this Agreement, and will reimburse you for any reasonable expenses (including reasonable fees and disbursements of counsel) reasonably incurred by you in connection with qualification of the Certificates for sale and determination of their eligibility for investment under the laws of such jurisdictions as you have reasonably requested pursuant to Section 5.6 above and the printing of memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Certificates, and for expenses incurred in distributing the Prospectus (including any amendments and supplements thereto) to you. Except as herein provided, you shall be responsible for paying all costs and expenses incurred by you, including the fees and disbursements of your counsel, in connection with the purchase and sale of the Certificates.

5.8    If, during the period after the Closing Date in which a prospectus relating to the Certificates is required to be delivered under the Act, the Company receives notice that a stop order suspending the effectiveness of the Registration Statement or preventing the offer and sale of the Certificates is in effect, the Company will advise you of the issuance of such stop order.

5.9    The Company shall file the Computational Materials and ABS Term Sheets (if any) provided to it by you under Section 4.2(d) hereof with the Commission pursuant to a Current Report on Form 8-K by 10:00 a.m. on the morning of the first Business Day after the Prospectus is delivered to you or, in the case of any Collateral Term Sheet required to be filed prior to such date, by 10:00 a.m. on the second business day following the first day on which such Collateral Term Sheet has been sent to a prospective investor; provided, however, that prior to such filing of the Computational Materials and ABS Term Sheets (other than any Collateral Term Sheets that are not based on the Pool Information) by the Company, the Underwriter must comply with its obligations pursuant to Section 4.2 hereof and the Company must receive a letter from Deloitte & Touche, certified public accountants, satisfactory in form and substance to the Company, GMACM and their respective counsels, to the effect that such accountants have performed certain specified procedures, all of which have been agreed to by the Company and GMACM, as a result of which they determined that all information that is included in the Computational Materials and ABS Term Sheets (if any) provided by you to the Company for filing on Form 8-K, as provided in Section 4.2 hereof and this Section 5.9, is accurate except as to such matters that are not deemed by the Company to be material. The foregoing letter shall be at the expense of the Underwriter. The Company shall file any corrected

Computational Materials described in <u>Section 4.2(f)</u> hereof as soon as practicable following receipt thereof. The Company also will file with the Commission within fifteen days of the issuance of the Certificates a Current Report on Form 8-K (for purposes of filing the Pooling and Servicing Agreement).

6. <u>Conditions to the Obligations of the Underwriter</u>. The Underwriter's obligation to purchase the Certificates shall be subject to the following conditions:

6.1     No stop order suspending the effectiveness of the Registration Statement shall be in effect, and no proceedings for that purpose shall be pending or, to the knowledge of the Company, threatened by the Commission; and the Prospectus Supplement shall have been filed or transmitted for filing by means reasonably calculated to result in a filing with the Commission pursuant to Rule 424(b) under the Act.

6.2     Since June 1, 2005 there shall have been no material adverse change (not in the ordinary course of business) in the condition of the Company or GMACM.

6.3     The Company shall have delivered to you a certificate, dated the Closing Date, of the President, a Senior Vice President, a Vice President or an Assistant Secretary of the Company to the effect that the signer of such certificate has examined this Agreement, the Prospectus, the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement and various other closing documents, and that, to the best of his or her knowledge after reasonable investigation:

(a)     the representations and warranties of the Company in this Agreement and in the Pooling and Servicing Agreement are true and correct in all material respects; and

(b)     the Company has, in all material respects, complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

6.4     GMACM shall have delivered to you a certificate, dated the Closing Date, of the President, the Chief Operating Officer, a Senior Vice President or a Vice President of GMACM to the effect that the signer of such certificate has examined the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement and this Agreement and that, to the best of his or her knowledge after reasonable investigation, the representations and warranties of GMACM contained in the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement and in this Agreement are true and correct in all material respects.

6.5     You shall have received the opinion of Orrick, Herrington & Sutcliffe LLP, special counsel for the Company and GMACM, dated the Closing Date and substantially to the effect set forth in <u>Exhibit A</u>, and the opinion of Bruce P. Bowen, associate general counsel for GMACM, dated the Closing Date and substantially to the effect set forth in <u>Exhibit B</u>.

6.6     You shall have received from Stroock & Stroock & Lavan LLP, counsel for the Underwriter, an opinion dated the Closing Date in form and substance satisfactory to the Underwriter.

6.7     You shall have received from Deloitte & Touche LLP, certified public accountants, a letter satisfactory in form and substance to you and your counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by you, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "Description of the Certificates" and "Certain Yield and Prepayment Considerations" agrees with the records of GMACM excluding any questions of legal interpretation.

6.8     The Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, and Class 5-A-2 Certificates shall have been rated "AAA" by Standard & Poor's, a division of the McGraw-Hill Companies, Inc. ("S&P"). The Class 1-A, Class 2-A-1, Class 3-A-1, Class 4-A-1, and Class 5-A-1 shall have been rated "Aaa" by Moody's Investor Services ("Moody's"). The Class 2-A-2, Class 3-A-2, Class 4-A-2, and Class 5-A-2 shall have been rated "Aa1" by Moody's. The Class M-1 shall have been rated "AA," and "Aa2" respectively, by S&P and Moody's. The Class M-2 shall have been rated "A," and "A2" respectively, by S&P and Moody's. The Class M-3 shall have been rated "BBB," and "Baa2" respectively, by S&P and Moody's.

6.9     You shall have received the opinion of counsel to the Trustee, dated the Closing Date, substantially to the effect set forth in Exhibit C.

6.10    You shall have received from PricewaterhouseCoopers LLP, certified public accountants, (a) a letter satisfactory in form and substance to you and your counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by you, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "The Sellers and the Servicer" and "Description of the Mortgage Pools" agrees with the records of GMACM excluding any questions of legal interpretation and (b) the letter prepared pursuant to Section 5.9 hereof.

6.11    You shall have received from Orrick, Herrington & Sutcliffe LLP, special counsel to the Company, a reliance letter with respect to any opinions delivered to S&P or Moody's or you shall have otherwise been included as an addressee thereof.

The Company will furnish you with conformed copies of the above opinions, certificates, letters and documents as you reasonably request.

7.   Indemnification and Contribution.

7.1     The Company and GMACM, jointly and severally, agree to indemnify and hold harmless the Underwriter and each person, if any, who controls the Underwriter within the meaning of either Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended, from and against any and all losses, claims, damages and liabilities caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement for the registration of the Certificates as originally filed or in any amendment thereof or other filing incorporated by reference therein, or in the Prospectus or incorporated by reference therein (if used within the period set forth in Section 5.3 hereof and as amended or

supplemented if the Company shall have furnished any amendments or supplements thereto), or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, except insofar as such losses, claims, damages, or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon any information with respect to which the Underwriter has agreed to indemnify the Company pursuant to Section 7.2 hereof; provided, however, that such indemnity with respect to the Prospectus shall not inure to the benefit of the Underwriter (or any person controlling any the Underwriter) to the extent that such loss, claim, damage or liability of the Underwriter results from the fact that the Underwriter sold Certificates to a person to whom there was not sent or given at or prior to the settlement date of the sale of such Certificates a copy of the Prospectus (as amended or supplemented through such date) in any case where such delivery is required by the Act if the Company or GMACM has previously furnished the Underwriter with copies thereof prior to the close of business on the Business Day preceding such settlement date, in any case where the untrue statement or omission of a material fact which caused such loss, claim, damage or liability was contained in such Prospectus and was corrected in the Prospectus (as amended or supplemented), and provided, further that none of the Company, GMACM or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information or any information included in Computational Materials or ABS Term Sheets that is incorrect solely because the Pool Information deviates in any material respect from the parameters set forth in the bid sheet attached hereto as Exhibit G provided that the Underwriter complied with its obligations to circulate and deliver to the Company revised Computational Materials and ABS Term Sheets in accordance with Section 4.2(e) hereof (any such deviation, the "Excluded Pool Information").

7.2    You agree to indemnify and hold harmless the Company, GMACM, their respective directors or officers and any person controlling the Company or GMACM to the same extent as the indemnity set forth in Section 7.1 above from the Company and GMACM to you, but only with respect to (i) the Underwriter Information and (ii) the Computational Materials and ABS Term Sheets prepared by or at the direction of the Underwriter, except to the extent of any errors in the Computational Materials or ABS Term Sheets that are caused by errors in the Pool Information; provided, however, that the indemnification set forth in this Section 7.2 shall not apply to the extent of any errors in the Computational Materials or ABS Term Sheets that are caused by Excluded Pool Information. In addition, you agree to indemnify and hold harmless the Company, GMACM, their respective directors or officers and any person controlling the Company or GMACM against any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) caused by, resulting from, relating to, or based upon any legend regarding original issue discount on any Certificate resulting from incorrect information provided by you for inclusion in the certificates described in Section 4.3 hereof.

7.3    In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 7.1 or Section 7.2 above, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel

13

reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties. Such firm shall be designated in writing by you, in the case of parties indemnified pursuant to Section 7.1 above and by the Company or GMACM, in the case of parties indemnified pursuant to Section 7.2 above. The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel reasonably satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation. Unless it shall assume the defense of any proceeding the indemnifying party shall not be liable for any settlement of any proceeding, effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. If the indemnifying party assumes the defense of any proceeding, it shall be entitled to settle such proceeding with the consent of the indemnified party or, if such settlement provides for release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the consent of the indemnified party.

7.4    If the indemnification provided for in this Section 7 is unavailable to an indemnified party under Section 7.1 or Section 7.2 hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and GMACM on the one hand and you on the other from the offering of the Certificates but also the relative fault of the Company or GMACM on the one hand and of you, on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of the Company and GMACM on the one hand and of you on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by you, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

7.5    The Company, GMACM and you agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in

Section 7.4, above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 7 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim except where the indemnified party is required to bear such expenses pursuant to Section 7.4; which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party believes that it will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

7.6    The indemnity and contribution agreements contained in this Section 7 and the representations and warranties of the Company and GMACM in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by you or on behalf of you or any person controlling you or by or on behalf of the Company or GMACM and their respective directors or officers or any person controlling the Company or GMACM and (iii) acceptance of and payment for any of the Certificates.

8.    Termination. This Agreement shall be subject to termination by notice given to the Company and GMACM, if the sale of the Certificates provided for herein is not consummated because of any failure or refusal on the part of the Company or GMACM to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company or GMACM shall be unable to perform their respective obligations under this Agreement. If you terminate this Agreement in accordance with this Section 9, GMACM will reimburse you for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been reasonably incurred by you in connection with the proposed purchase and sale of the Certificates.

9.    Certain Representations and Indemnities to Survive. The respective agreements, representations, warranties, indemnities and other statements of the Company, GMACM or the officers of any of the Company, GMACM, and you set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by you or on your behalf or made by or on behalf of the Company or GMACM or any of their respective officers, directors or controlling persons, and will survive delivery of and payment for the Certificates.

10. Notices. All communications hereunder will be in writing and effective only on receipt, and, if sent to the Underwriter will be mailed, delivered or telegraphed and confirmed to Morgan Stanley and Co. Incorporated, 1585 Broadway, New York, New York 10036, or if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Residential Asset Mortgage Products, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President; or, if sent to GMACM will be mailed, delivered or telegraphed and

confirmed to it at GMAC Mortgage Corporation, 100 Witmer, Horsham, Pennsylvania 19044, Attention: President.

11. Successors.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 7 hereof, and their successors and assigns, and no other person will have any right or obligation hereunder.

12. Applicable Law.  THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

13. Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, GMACM and you.

Very truly yours,

RESIDENTIAL ASSET MORTGAGE PRODUCTS, INC.

By: _____

Name:
Title:          Patricia C. Taylor
                Vice President

GMAC MORTGAGE CORPORATION

By: _____

Name:
Title:          Sandy Blitzer
                Vice President

The foregoing Underwriting Agreement is hereby confirmed and accepted as of the date first above written.

MORGAN STANLEY AND CO. INCORPORATED

By: _____

Name:
Title:

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, GMACM and you.

Very truly yours,

RESIDENTIAL ASSET MORTGAGE
PRODUCTS, INC.


By: _____
     Name:
     Title:



GMAC MORTGAGE CORPORATION


By: _____
     Name:
     Title:


The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

MORGAN STANLEY AND CO. INCORPORATED


By: _____
     Name:    Valerie Kay
     Title:    Managing Director

## EXHIBIT A

### FORM OF OPINION OF ORRICK, HERRINGTON & SUTCLIFFE LLP

DOCSLA1:499790.2



ORRICK, HERRINGTON & SUTCLIFFE LLP
777 SOUTH FIGUEROA STREET
SUITE 3200
LOS ANGELES, CA 90017-5855
tel 213-629-2020
fax 213-612-2499
WWW.ORRICK.COM

June 28, 2005

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard
Minneapolis, Minnesota 55437

GMAC Mortgage Corporation
100 Witmer Road
Horsham, Pennsylvania 19044

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, California 92705

Morgan Stanley and Co. Incorporated
1585 Broadway
New York, New York 10036

Re:    Residential Asset Mortgage Products, Inc.
       GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

Ladies and Gentlemen:

We have acted as special counsel to Residential Asset Mortgage Products, Inc. (the "Company") and GMAC Mortgage Corporation ("GMACM") in connection with the issuance and sale by the Company of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 (the "Certificates") pursuant to the Pooling and Servicing Agreement, dated as of June 28, 2005 (the "Pooling and Servicing Agreement"), among the Company, GMACM, as servicer (in such capacity, the "Servicer") and Deutsche Bank National Trust Company, as trustee (the "Trustee"). The Certificates consist of ten classes designated as Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, Class 5-A-2, and Class R Certificates (collectively, the "Senior Certificates"); six classes designated as Class M-1, Class M-2 and Class M-3 (collectively, the "Class M Certificates") and Class B-1, Class B-2 and Class B-3 (collectively, the "Class B Certificates"). Only the Senior Certificates and the Class M Certificates (the "Offered Certificates") are offered pursuant to the Prospectus.

The Certificates will evidence the entire undivided interest in a trust fund (the "Trust Fund") consisting primarily of a pool of conventional, adjustable rate, one- to four-family first mortgage loans (the "Mortgage Loans") held by GMAC Bank, as custodian (the "Custodian"), pursuant to a Custodial Agreement, dated as of June 28, 2005, among the Servicer, the Custodian and the Trustee (the "Custodial Agreement"). The Offered Certificates are included in a Registration Statement on Form S-3 (File No. 333-117232) filed by the Company with the Securities and Exchange Commission (the "Commission") on July 8, 2004 and declared effective on August 9, 2004 (as amended as of the date hereof, the "Registration Statement"), and were offered by the prospectus dated December 22, 2004, as supplemented by the prospectus supplement dated June 23, 2005 (collectively, the "Prospectus"), filed with the Commission pursuant to Rule 424(b) of the rules and regulations of the Commission under the Securities Act of 1933, as amended (the



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 2

"Act"). The Class B Certificates are described in the Private Placement Memorandum, dated June 28, 2005 (excluding the exhibits attached thereto, the "Private Placement Memorandum") prepared by the Company in connection with the sale of the Class B Certificates.

The Company acquired the Mortgage Loans from GMACM pursuant to a Mortgage Loan Purchase Agreement, dated as of June 28, 2005 (the "Mortgage Loan Purchase Agreement"), in exchange for immediately available funds and a *de minimis* portion of the Class R Certificates. The Company will sell to Morgan Stanley and Co. Incorporated ("Morgan Stanley") the Offered Certificates (other than *de minimis* portions of the Class R Certificates, the "Underwritten Certificates") pursuant to an Underwriting Agreement, dated June 23, 2005, among the Company, GMACM and Morgan Stanley (the "Underwriting Agreement"). The Company will sell the Class B Certificates to Morgan Stanley pursuant to the Purchase Agreement, dated June 28, 2005, among the Company, GMACM and Morgan Stanley (the "Purchase Agreement"). The Pooling and Servicing Agreement, Custodial Agreement, Mortgage Loan Purchase Agreement, Underwriting Agreement and the Purchase Agreement are referred to herein collectively as the "Agreements." Capitalized terms used but not defined herein shall have the meanings set forth in the Agreements. This opinion letter is rendered pursuant to Section 6.5 of the Underwriting Agreement and Section 6(e) of the Purchase Agreement.

In arriving at the opinions expressed below, we have examined and relied on the following documents:

(a)    executed copies of the Agreements;

(b)    the articles of incorporation and bylaws of the Company and GMACM;

(c)    a good standing certificate from the Secretary of State of the State of Delaware concerning the Company and a good standing certificate of the Secretary of State of the Commonwealth of Pennsylvania concerning GMACM;

(d)    resolutions adopted by the Board of Directors of the Company as of May 12, 2004, authorizing, among other things, the issuance of series of certificates registered under the Registration Statement;

(e)    a Certificate of Secretary executed by the Secretary of the Company, certifying, among other things, as to the resolutions described in clause (d);


ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 3

        (f)    the Registration Statement;

        (g)    the Prospectus;

        (h)    the Private Placement Memorandum;

        (i)    the forms of the Certificates; and

        (j)    the documents delivered by the Company and GMACM on the Closing Date pursuant to the Underwriting Agreement, the Purchase Agreement, the Mortgage Loan Purchase Agreement and the Pooling and Servicing Agreement.

In addition, we have examined and relied, as to factual matters, on the representations of the Company, GMACM and Morgan Stanley in the Underwriting Agreement, the Purchase Agreement, the Mortgage Loan Purchase Agreement and the Pooling and Servicing Agreement and on originals or copies certified or otherwise identified to our satisfaction of all such corporate records of the Company and GMACM and such other instruments and other certificates of public officials, officers and representatives of the Company, GMACM, Morgan Stanley and the Trustee, and we have made such investigations of law, as we have deemed appropriate as a basis for the opinions expressed below.

Based upon such examination and having regard for legal considerations which we deem relevant, we are of the following opinions:

1.    The Registration Statement has become effective under the Act, and, to our knowledge, no stop order suspending the effectiveness of the Registration Statement has been issued and not withdrawn, and no proceedings for that purpose have been instituted or threatened under Section 8(d) of the Act.

2.    The Registration Statement, as of the date it became effective, and the Prospectus, as of the date of the Prospectus Supplement, other than any financial or statistical information or Computational Materials or ABS Term Sheets contained therein as to which we express no opinion, complied as to form in all material respects with the requirements of the Act and the applicable rules and regulations thereunder.



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 4

3.  To our knowledge, there are no material contracts, indentures, or other documents (not including Computational Materials and ABS Term Sheets) of a character required to be described or referred to in either the Registration Statement or the Prospectus or to be filed as exhibits to the Registration Statement other than those described or referred to therein or filed as exhibits thereto.

4.  The Certificates, when duly and validly executed and authenticated in accordance with the Pooling and Servicing Agreement and paid for and delivered in accordance with the Underwriting Agreement, the Purchase Agreement or the Mortgage Loan Purchase Agreement, as the case may be, will be entitled to the benefits of the Pooling and Servicing Agreement.

5.  The statements set forth in the Prospectus under the heading "Description of the Certificates," insofar as such statements purport to summarize certain provisions of the Certificates and the Pooling and Servicing Agreement, are correct in all material respects. The statements set forth in the Basic Prospectus under the headings "Material Federal Income Tax Consequences" and "ERISA Considerations" and in the Prospectus Supplement under the headings "Material Federal Income Tax Consequences" and "ERISA Considerations," to the extent that they constitute matters of federal law or legal conclusions with respect thereto, are correct in all material respects.

6.  The Senior Certificates and Class M-1 Certificates will be "mortgage related securities," as defined in Section 3(a)(41) of the Securities Exchange Act of 1934, as amended, so long as such Certificates are rated in one of the two highest rating categories by at least one nationally recognized statistical rating organization.

7.  The Pooling and Servicing Agreement is not required to be qualified under the Trust Indenture Act of 1939, as amended, and the Trust Fund created by the Pooling and Servicing Agreement is not required to be registered under the Investment Company Act of 1940, as amended.

8.  No consent, approval, authorization or order of any federal or State of New York court or governmental agency or body is required for the consummation by the Company of the transactions contemplated by the terms of the Agreements, except (a) such as have been obtained under the Act and (b) such as may be required under



ORRICK

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 5

the blue sky laws of any jurisdiction in connection with the offer and sale of the Certificates, as to which we express no opinion.

9.    The Company has been duly incorporated, is validly existing as a corporation in good standing under the laws of the State of Delaware, and has the requisite power and authority, corporate or other, to own its own properties and conduct its own business, as presently conducted by it, and to enter into and perform its obligations under the Agreements.

10.   Each of the Agreements to which the Company is a party has been duly and validly authorized, executed and delivered by the Company.

11.   The consummation of the transactions contemplated by, and the performance by the Company of any other of the terms of, any of the Agreements to which it is a party will not result in a breach of any term or provision of the articles of incorporation or bylaws of the Company or any State of New York or federal statute or regulation, to our knowledge, result in a breach, violation or acceleration of, or constitute a default under, the terms of any indenture or other material agreement or instrument to which the Company is a party or by which it is bound or any order or regulation of the State of New York or federal court, regulatory body, administrative agency or governmental body having jurisdiction over the Company.

12.   Each of the Agreements to which the Company is a party constitutes a valid, legal and binding agreement of the Company, enforceable against the Company in accordance with its terms.

13.   Each of the Agreements to which GMACM is a party constitutes a valid, legal and binding agreement of GMACM, enforceable against GMACM in accordance with its terms.

14.   Assuming compliance with all provisions of the Pooling and Servicing Agreement, under existing law, (a) REMIC I and REMIC II will each be treated as a "real estate mortgage investment conduit" as provided for by Section 860D of the Internal Revenue Code of 1986 (the "Code"), (b) the Class 1-A, Class 2-A-1, Class 2-A-2, Class 3-A-1, Class 3-A-2, Class 4-A-1, Class 4-A-2, Class 5-A-1, Class 5-A-2 , Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates will be treated as evidencing ownership of "regular interests" as the term "regular


**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 6

interest" is defined in the Code, in REMIC II for federal income tax purposes, (c) Component I of the Class R Certificates will be treated as the sole class of "residual interests" in REMIC I, as the term "residual interest" is defined in the Code, and (d) Component II of the Class R Certificates will be treated as the sole class of "residual interests" in REMIC II, as the term "residual interest" is defined in the Code. However, continuation of the status of REMIC I and REMIC II as REMICs may entail compliance with statutory changes in the future and with regulations not yet issued.

15.  The statements made in the Private Placement Memorandum under the heading "Description of the Class B Certificates" (including any related statements in the Prospectus to which cross-reference is made), insofar as such statements purport to summarize certain provisions of the Class B Certificates, are correct in all material respects. The statements made in the Private Placement Memorandum (including any related statements in the Prospectus to which cross-reference is made) under the headings "Certain Federal Income Tax Consequences," "Legal Investment Considerations" and "ERISA Considerations," to the extent that they constitute matters of federal law or legal conclusions with respect thereto, are correct in all material respects.

16.  The issuance of the Class B Certificates and the offer and sale of the Class B Certificates to Morgan Stanley, in the manner and under the circumstances contemplated in the Private Placement Memorandum and the Agreements, are transactions that do not require registration of the Class B Certificates under the Act.

In addition, we have participated in conferences with representatives of Morgan Stanley, the Company and GMACM concerning the Registration Statement and the Prospectus and have considered the matters required to be stated therein and the statements contained therein, although we have not independently verified the accuracy, completeness or fairness of such statements (except as described in paragraph 5 above). Based upon and subject to the foregoing, nothing has come to our attention to cause us to believe that the Registration Statement (excluding any exhibits filed therewith), as of the date it became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that the Prospectus, as of the date of the Prospectus Supplement or as of the Closing Date, contained or contains an untrue statement of a material fact or omitted or omits to state a material fact required to be stated therein or necessary to make the



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 7

statements therein, in light of the circumstances under which they were made, not misleading (it being understood that we have not been requested to and we do not make any comment in this paragraph with respect to the financial statements, schedules and other financial and statistical information contained in or incorporated by reference into the Registration Statement or the Prospectus or any Computational Materials or ABS Term Sheets).

In addition, we have participated in conferences with representatives of Morgan Stanley, the Company and GMACM concerning the Private Placement Memorandum and have considered the matters required to be stated therein and the statements contained therein, although we have not independently verified the accuracy, completeness or fairness of such statements (except as described in paragraph 15 above). Based upon and subject to the foregoing, nothing has come to our attention to cause us to believe that the Private Placement Memorandum, together with the Prospectus attached thereto, as of the date hereof, contains an untrue statement of a material fact or omits to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (it being understood that we have not been requested to and we do not make any comment in this paragraph with respect to the financial statements, schedules and other financial and statistical information contained in or incorporated by reference into the Prospectus or the Private Placement Memorandum.

With your permission we have assumed the following: (a) the authenticity of original documents and the genuineness of all signatures; (b) the conformity to the originals of all documents submitted to us as copies; (c) the truth, accuracy and completeness of the information, factual matters, representations and warranties contained in the records, documents, instruments and certificates we have reviewed; and (d) except as specifically covered in the opinions set forth above, the due authorization, execution and delivery on behalf of the respective parties thereto of documents referred to herein and the legal, valid and binding effect thereof on such parties.

Whenever a statement herein is qualified by the phrase "to our knowledge" or "to our attention," it is intended to indicate that, during the course of our representation of the Company and GMACM, no information that would give us current actual knowledge of the inaccuracy of such statement has come to the attention of those attorneys currently in this firm who have rendered legal services in connection with the Certificates. However, we have not undertaken any independent investigation to determine the accuracy of any such statement, and any limited inquiry undertaken by us during the preparation of this opinion letter should not be regarded as such an investigation; no inference as to our knowledge of any matters bearing on the accuracy of any such statement should be drawn from the fact of our representation of the Company and GMACM.



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 8

Our opinion that any document is valid, legal and binding or enforceable in accordance with its terms is subject to: (1) limitations imposed by bankruptcy, insolvency, fraudulent conveyance, reorganization, arrangement, moratorium or other laws relating to or affecting the enforcement of creditors' rights generally; (2) general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law; and (3) rights to indemnification which may be limited by applicable law or equitable principles or otherwise unenforceable as against public policy.

With respect to our opinion set forth in paragraph 2, in passing on the form of Registration Statement and the Prospectus, we have necessarily assumed the correctness and completeness of the statements made therein.

We express no opinion as to matters of law other than the law of the State of New York and the United States of America, except to the extent necessary to render the opinions in paragraphs 9 and 10 above with respect to Delaware corporate law. As you know, we are not licensed to practice law in the State of Delaware, and our opinions with respect to Delaware corporate law are based solely on a review of a standard compilation of the Delaware General Corporation Law. For the purposes of the opinions rendered in paragraphs 12 and 13 above, insofar as such opinions cover the enforceability of the Custodial Agreement, we have assumed the Custodial Agreement is governed by New York law and express no opinion as to the enforceability of the choice-of-law provision contained therein.

The opinions relating to tax considerations and ERISA considerations contained herein were written to support the promotion and marketing of the securities to which they relate, and were not intended or written to be used, and cannot be used, by a taxpayer for the purpose of avoiding United States Federal income tax penalties that may be imposed. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.



**ORRICK**

Residential Asset Mortgage Products, Inc.
Deutsche Bank National Trust Company
GMAC Mortgage Corporation
Morgan Stanley and Co. Incorporated
June 28, 2005
Page 9

This opinion letter is solely for your benefit and may not be relied upon or used by, circulated, quoted or referred to, nor may copies hereof be delivered to, any other person without our prior written approval. We disclaim any obligation to update this opinion letter for events occurring or coming to our attention after the date hereof.

Very truly yours,

ORRICK, HERRINGTON & SUTCLIFFE LLP

**EXHIBIT B**

FORM OF OPINION OF GMACM COUNSEL

Exhibit B-1

# **GMAC** Mortgage

**Bruce P. Bowen**
*Associate General Counsel*

June 28, 2005

To the Addresses identified on Schedule A attached hereto

Re:    GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

Ladies and Gentlemen:

I am associate general counsel of GMAC Mortgage Corporation, a Pennsylvania corporation (the "Company"), and have represented the Company in connection with the preparation, execution and delivery of the following documents:

(i)    Mortgage Loan Purchase Agreement, dated as of June 28, 2005 (the "Mortgage Loan Purchase Agreement"), by and between the Company, as seller, and Residential Asset Mortgage Products, Inc. (the "Depositor");

(ii)    Pooling and Servicing Agreement, dated as of June 28, 2005 (the "Pooling and Servicing Agreement"), among the Company, as servicer, the Depositor and Deutsche Bank National Trust Company (the "Trustee");

(iii)    Custodial Agreement, dated as of June 28, 2005 (the "Custodial Agreement"), among the Company, the Trustee, and GMAC Bank (the "Custodian");

(iv)    Underwriting Agreement, dated June 23, 2005 (the "Underwriting Agreement"), among the Depositor, the Company and Morgan Stanley and Co. Incorporated.

In this connection, I have examined, or caused to be examined, originals, or copies certified to my satisfaction, of the Mortgage Loan Purchase Agreement, the Pooling and Servicing Agreement, the Custodial Agreement and the Underwriting Agreement (collectively, the "Agreements"), and such other documents, certificates and instruments which I have deemed necessary or appropriate in connection with this opinion. As to matters of fact, I have examined and relied upon representations, warranties and covenants of parties to the above documents contained therein and, where I have deemed appropriate, representations or certifications of officers of parties to the Agreements or public officials. In rendering this opinion letter, I have assumed (i) the authenticity of all documents submitted to me as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents submitted to me as copies, (ii) with respect to parties other than the Company, the due authorization, execution and delivery of such documents, and

GMAC Mortgage Corporation
Legal Staff
100 Witmer Road
Mail Code 190-555-200
Horsham, PA 19044

Phone: (215) 682-1263
Fax: (866) 241-8870
E-mail: Bruce_Bowen@gmacm.com

To the Addresses identified on
Schedule A attached hereto
June 28, 2005
Page 2

the necessary entity power with respect thereto, and the enforceability of such documents, (iii) the
conformity of the Mortgage Loans and the documents set forth in Section 2.01(b) of the Pooling and
Servicing Agreement to the requirements of the Agreements and (iv) that there is not and will not be
any other agreement that modifies or supplements the agreements expressed in the Agreements.

In rendering this opinion letter, I do not express any opinion concerning any law other than the law of
the Commonwealth of Pennsylvania and the federal law of the United States, and I do not express
any opinion concerning the application of the "doing business" laws. To the extent that any of the
matters upon which I am opining herein are governed by laws ("Other Laws") other than the laws
identified in the preceding sentence, I have assumed with your permission and without independent
verification or investigation as to the reasonableness of such assumption, that such Other Laws and
judicial interpretation thereof do not vary in any respect material to this opinion from the
corresponding laws of the Commonwealth of Pennsylvania and judicial interpretations thereof. I do
not express any opinion on any issue not expressly addressed below.

My opinions set forth below are subject to the qualification that enforceability of each of the
respective obligations of the parties under the Agreements is subject to (i) general principles of
equity, regardless of whether such enforceability is considered in a proceeding in equity or at law,
(ii) the availability of equitable remedies, (iii) bankruptcy, insolvency, liquidation, receivership,
moratorium, reorganization or other similar laws affecting the rights of creditors, (iv) implied or
express covenants of good faith, and (v) limitations of public policy under applicable securities laws
as to rights of indemnity and contribution thereunder. My opinions are subject to the further
qualification that enforceability of each of the parties' respective obligations under the Agreements is
subject to the effect of certain laws, regulations and judicial or other decisions upon the availability
and enforceability of the remedies of specific performance and self help. However, the non-
enforceability of any such provisions will not, taken as a whole, materially interfere with the practical
realization of the benefits of the rights and remedies included in any such agreement that is the
subject of any opinion expressed below, except for the considerations referred to in foregoing
clause (v) and the consequences of any judicial, administrative, procedural or other delay that may be
imposed by, relate to, or arise from applicable laws, equitable principles and interpretations thereof.

Capitalized terms used herein, but not defined herein, shall have the meanings assigned to them in the
Agreements.

Based upon the foregoing, but subject to the assumptions, exceptions, qualifications and limitations
herein expressed, I am of the opinion that:

1.      The Company is duly incorporated and validly existing as a corporation in good standing
        under the laws of the Commonwealth of Pennsylvania and has the requisite power to own its
        properties, to conduct its business as presently conducted by it and to enter into and perform
        its obligations under the respective Agreements to which it is a party.

2.      Each of the Agreements to which it is a party has been duly authorized, executed and
        delivered by the Company, and, assuming the authorization, execution and delivery by the

To the Addresses identified on
Schedule A attached hereto
June 28, 2005
Page 3

other parties thereto (other than the Company), is the legal, valid and binding agreement of the Company, enforceable against it in accordance with its terms.

3.     No consent, approval, authorization or order of any federal or Commonwealth of Pennsylvania court or any other court or agency or other governmental body is required for the consummation by the Company of the transactions contemplated by, or for the performance of the obligations of the Company under, the Agreements to which the Company is a party, except for those consents, approvals, authorizations or orders which previously have been obtained, and except such as may be required under the federal and state securities laws in connection with the purchase, offer and sale of the Certificates by the Underwriter, as to which I express no opinion.

4.     The consummation of the transactions contemplated by the Agreements by the Company will not result in a material violation of any federal or Commonwealth of Pennsylvania or any other statute or regulation or will conflict with, result in a breach, violation or acceleration of or constitute a default under any order of any federal or Commonwealth of Pennsylvania or any other court or agency or other governmental body having jurisdiction over the Company or result in the imposition of any lien or encumbrance on any of the properties of the Company, except for those liens or encumbrances provided for in the Agreements.

5.     The execution, delivery and performance by the Company of the Agreements do not conflict with or constitute a breach of any of the terms or provisions of or a default under any of the certificates of incorporation or by-laws of the Company, or any material agreement to which the Company is a party or by which the Company is bound or to which the properties of the Company are subject.

The opinions set forth herein are intended solely for the benefit of the addressees hereof in connection with the transactions contemplated herein and shall not be relied upon by any other person or for any other purpose without my prior written consent.  Except for reproductions for inclusion in transcripts of the documentation relating to the transactions contemplated herein, this opinion may not be copied or otherwise reproduced or quoted from, in whole or in part, without my prior written consent.

Very truly yours,

By: _____
Name: Bruce P. Bowen
Title:   Associate General Counsel,
        GMAC Mortgage Corporation

## Schedule A

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 600
Minneapolis, Minnesota 55437

Deutsche Bank National Trust Company
1761 East St. Andrew Place
Santa Ana, California 92705

Morgan Stanley and Co. Incorporated
1585 Broadway
New York, New York  10036

Standard & Poor's Ratings Services,
a division of The McGraw-Hill Companies, Inc.
55 Water Street
New York, New York 10041

Moody's Investors Service, Inc.
99 Church Street, 4th Floor
New York, New York 10007

# EXHIBIT C

## FORM OF OPINION OF TRUSTEE COUNSEL

Exhibit C-1

DOCSLA1:499790.2



**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

601 South Figueroa Street
Suite 1600
Los Angeles, CA 90017
213.623.9300
213.623.9924 fax
www.sonnenschein.com

*Chicago*
*Kansas City*
*Los Angeles*
*New York*
*San Francisco*
*Short Hills, N.J.*
*St. Louis*
*Washington, D.C.*
*West Palm Beach*

June 28, 2005

To those entities identified on Attachment "A" hereto

Ladies and Gentlemen:

We have acted as special counsel to Deutsche Bank National Trust Company, a national banking association (the "Trustee"), as trustee under the Pooling and Servicing Agreement dated as of June 28, 2005 (the "Pooling and Servicing Agreement") among Residential Asset Mortgage Products, Inc., as company (the "Company"), GMAC Mortgage Corporation, as servicer, and the Trustee relating to the issuance by the GMACM Mortgage Loan Trust 2005-AR4 of Residential Asset Mortgage Products, Inc. GMACM Mortgage Pass-Through Certificates, Series 2005-AR4. All capitalized terms used herein and not expressly defined herein have the definitions specified in the Pooling and Servicing Agreement.

In connection with rendering this opinion, we have examined originals, certified copies or copies otherwise identified as being true copies of the following:

(a)    The Pooling and Servicing Agreement;

(b)    Specimens of the Certificates;

(c)    Articles of Association, as amended, of the Trustee; and

(d)    By-laws, as amended, of the Trustee.

In addition, we have examined originals or copies authenticated to our satisfaction of such corporate records, certificates of officers of the Trustee and public officials, and other documents as we have deemed relevant or necessary in connection with our opinions set forth herein. As to questions of fact material to such opinions we have relied upon the representations of the Trustee set forth in the Pooling and Servicing Agreement, certificates of officers and other representatives of the Trustee and factual matters we have obtained from such other sources as we have deemed reasonable. We have assumed without investigation that there has been no relevant change or development between the dates as of which the information cited in the preceding sentence was given and the date of this letter. We have not independently verified the accuracy of the matters set forth in the statements or certificates upon which we have relied. For purposes of the opinion in paragraph 1, we have relied with respect to the good standing and the extent of the power and authority of the Trustee exclusively upon a certificate

# Sonnenschein
SONNENSCHEIN NATH & ROSENTHAL LLP

issued by a governmental authority in the relevant jurisdiction, and such opinion is not intended to provide any conclusion or assurance with respect to good standing beyond that conveyed by that certificate.

We have assumed (i) the genuineness and authenticity of all documents examined by us and all signatures thereon, and the conformity to originals of all copies of all documents examined by us; (ii) that the execution, delivery and/or acceptance of the Pooling and Servicing Agreement and the Certificates have been duly authorized by all action, corporate or otherwise, necessary by all of the parties thereto other than the Trustee (those parties other than the Trustee are hereinafter collectively referred to as the ("Other Parties"); (iii) the legal capacity of all natural persons executing the Pooling and Servicing Agreement; (iv) that each of the Other Parties has satisfied those legal requirements that are applicable to it to the extent necessary to make the Pooling and Servicing Agreement enforceable against it; (v) the Pooling and Servicing Agreement constitutes a valid and binding obligation of the Other Parties and is enforceable against the Other Parties in accordance with its terms; (vi) that each of the Other Parties has complied with all legal requirements pertaining to its status as such status relates to its rights to enforce the Pooling and Servicing Agreement; (vii) that the Pooling and Servicing Agreement accurately describes and contains the mutual understandings of the parties, and that there are no oral or written statements or agreements or usages of trade or courses of prior dealings among the parties that would modify, amend or vary any of the terms of the Pooling and Servicing Agreement; (viii) that the Other Parties will act in accordance with, and will refrain from taking any action that is forbidden by, the terms and conditions of the Pooling and Servicing Agreement; (ix) the constitutionality or validity of a relevant statute, rule, regulation or agency action is not in issue; (x) that the Trustee holds requisite title and rights to property involved in the transactions as contemplated by the Pooling and Servicing Agreement; (xi) all agreements other than the Pooling and Servicing Agreement with respect to which we have provided advice in our letter or reviewed in connection with our letter would be enforced as written; (xii) that there has not been any mutual mistake of fact or misunderstanding, fraud, duress or undue influence; and (xiii) that each of the Other Parties and any agent acting for it in connection with the Pooling and Servicing Agreement have acted without notice of any defense against the enforcement of any rights created by, or adverse claim to any property transferred pursuant to, the Pooling and Servicing Agreement. For purposes of the opinion in paragraph 5, we have also assumed, with your permission, that the REMIC I and REMIC II will each perform in California only the functions specified to be performed expressly through the Trustee in the Pooling and Servicing Agreement.

We confirm that we do not have any actual knowledge which has caused us to conclude that our reliance and assumptions cited in the two preceding paragraphs are unwarranted or that any information supplied in this letter is wrong. We also bring to your attention the fact that we were not present at and did not witness the execution or delivery of the Pooling and Servicing Agreement or the Certificates and, as to our opinions below regarding the execution and delivery of the Pooling and Servicing Agreement and the execution, authentication and delivery of the Certificates, we have relied solely on certifications and oral advice of the officers of the Trustee with respect thereto.

As used in this opinion with respect to any matter, the qualifying phrase "actual knowledge" or such similar phrase means the conscious awareness of facts or other information

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

by: (i) the lawyer signing this opinion; and (ii) any lawyer in this firm who has had active involvement in negotiating or preparing the Pooling and Servicing Agreement or preparing this opinion.

Based on the foregoing, and in reliance thereon, and subject to the qualifications, limitations and exceptions stated herein, we are of the opinion, having due regard for such legal considerations as we deem relevant, that:

1.     The Trustee is validly existing as a national banking association in good standing under the laws of the United States and has the requisite power and authority under the National Bank Act to enter into, and take all action required of it under, the Pooling and Servicing Agreement.

2.     The Trustee has executed and delivered the Pooling and Servicing Agreement and it is a valid and binding obligation of the Trustee, enforceable against the Trustee in accordance with its terms.

3.     The execution, delivery and performance by the Trustee of the Pooling and Servicing Agreement do not (i) violate or conflict with any provision of the Articles of Association, as amended, of the Trustee or its By-laws, as amended, (ii) violate or conflict with any law, rule or regulation of any governmental agency applicable to the Trustee, (iii) to our actual knowledge, violate or conflict with any judicial or governmental judgment, decree, injunction or order binding on the Trustee or its properties that would materially and adversely affect its ability to perform its obligations under the Pooling and Servicing Agreement, (iv) to our actual knowledge, violate or conflict with the terms of any material agreement or instrument, known to us, to which the Trustee is a party or by which it is bound, and (v) require the Trustee to obtain any approval, consent or waiver of any governmental agency or body (other than approvals, consents or waivers already obtained).

4.     The Trustee, in its capacity as trustee, has executed and caused to be authenticated and delivered the Certificates as required in the Pooling and Servicing Agreement.

5.     Assuming that the REMIC I and REMIC II each qualifies as a REMIC for federal income tax purposes, they will not be subject to any tax imposed by the State of California or any political subdivision thereof on their assets or income, except to the extent they are subject to the minimum franchise tax.

Our opinions as herein expressed are subject to the following qualifications and limitations:

1.     Our opinions are subject to the effect of bankruptcy, insolvency, reorganization, receivership, moratorium and other similar laws. This exception includes:

        a.     the Federal Bankruptcy Code and thus comprehends, among others, matters of turn-over, automatic stay, avoiding powers, fraudulent transfer, preference, discharge, conversion of a non-recourse obligation into a recourse claim, limitations on ipso facto and anti-assignment clauses and

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

the coverage of pre-petition security agreements applicable to property acquired after a petition is filed;

b.    all other Federal and state bankruptcy, insolvency (including without limitation, Sections 8, 11 and 13(e) of the Federal Deposit Insurance Act), reorganization, receivership, rehabilitation, liquidation, conservation, dissolution, moratorium, arrangement and assignment for the benefit of creditors laws that affect the rights of creditors generally or that have reference to or affect only creditors of specific types of debtors;

c.    state fraudulent transfer and conveyance laws; and

d.    judicially developed doctrines in this area, such as substantive consolidation of entities and equitable subordination.

2.    Our opinions are subject to the effect of general principles of equity, whether applied by a court of law or equity. This limitation includes principles:

a.    governing the availability of specific performance, injunctive relief or other equitable remedies, which generally place the award of such remedies, subject to certain guidelines, in the discretion of the court to which application for such relief is made;

b.    affording equitable defense (e.g., waiver, laches and estoppel) against a party seeking enforcement;

c.    requiring good faith and fair dealing in the performance and enforcement of a contract by the party seeking its enforcement;

d.    requiring reasonableness in the performance and enforcement of an agreement by the party seeking enforcement of the contract;

e.    requiring consideration of the materiality of (i) a breach and (ii) the consequences of the breach to the party seeking enforcement;

f.    requiring consideration of the impracticability or impossibility of performance at the time of attempted enforcement; and

g.    affording defenses based upon the unconscionability of the enforcing party's conduct after the parties have entered into the contract.

3.    Certain other rights, remedies and waivers contained in the Pooling and Servicing Agreement and the Certificates may be rendered ineffective, or limited by, applicable laws or judicial decisions governing such provisions, but such laws and judicial decisions do not, in our opinion, make the Pooling and Servicing Agreement inadequate for the practical realization of the benefits provided by the Pooling and Servicing Agreement.

-4-

**Sonnenschein**
SONNENSCHEIN NASH & ROSENTHAL LLP

4.    Our opinions are subject to the effect of the rules of law that:

a.    limit or affect the enforcement of provisions of a contract that purport to waive, or to require waiver of, (i) the obligations of good faith, fair dealing, diligence and reasonableness, (ii) broadly or vaguely stated rights, (iii) statutory, regulatory or constitutional rights, except to the extent that the statute, regulation or constitution explicitly allows waivers, (iv) unknown future defenses, and (v) rights to damages;

b.    provide that choice of law, forum selection, consent to jurisdiction, and jury waiver clauses in contracts are not necessarily binding and, with respect to California law, jury waiver clauses may be unenforceable;

c.    limit the availability of a remedy under certain circumstances where another remedy has been elected;

d.    provide a time limitation after which a remedy may not be enforced;

e.    govern and afford judicial discretion regarding the determination of damages and entitlement to attorneys' fees and other costs;

f.    may permit a party that has materially failed to render or offer performance required by the contract to cure that failure unless (i) permitting a cure would unreasonably hinder the aggrieved party from making substitute arrangements for performance, or (ii) it was important in the circumstances to the aggrieved party that performance occur by the date stated in the contract; and

g.    limit enforcement of time is of-the-essence clauses.

5.    We express no opinion as to the laws of any jurisdiction other than the laws of the States of California and New York (excluding local laws) and the federal laws of the United States of America.

6.    We express no opinion as to any legal issues identified in Section 19 of the Legal Opinion Accord of the American Bar Association except to the extent that such issues are specifically addressed herein.

This opinion is rendered on the date hereof and we have no continuing obligation hereunder to inform you of changes of law or fact subsequent to the date hereof or facts of which we have become aware after the date hereof.

**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

This opinion is solely for your benefit and may not be furnished to, or relied upon by, any other person or entity without the express prior written consent of the undersigned. This opinion is limited to the matters set forth herein; no opinion may be inferred or implied beyond the matters expressly stated in this letter.

Very truly yours,

SONNENSCHEIN NATH & ROSENTHAL LLP


**Sonnenschein**
SONNENSCHEIN NATH & ROSENTHAL LLP

Attachment "A"

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard
Suite 250
Minneapolis, Minnesota 55437

GMAC Mortgage Corporation
100 Witmer Road
Horsham, Pennsylvania 19044

# **EXHIBIT D**

## EXCLUDED INFORMATION

## Summary

The following summary is a very general overview of the offered certificates and does not contain all of the information that you should consider in making your investment decision. To understand the terms of the offered certificates, you should read carefully this entire document and the prospectus.

| | |
|---|---|
| Title of securities | GMACM Mortgage Pass-Through Certificates, Series 2005-AR4. |
| Issuer | GMACM Mortgage Loan Trust 2005-AR4. |
| Seller and Servicer | GMAC Mortgage Corporation, or GMACM, a Pennsylvania corporation, will be the seller and servicer of the mortgage loans. The servicer will be obligated to service the mortgage loans pursuant to the pooling and servicing agreement, dated as of the closing date, among the depositor, the servicer and the trustee. |
| | *We refer you to "Pooling and Servicing Agreement" and "The Seller and Servicer" in this prospectus supplement for further information on the seller and servicer.* |
| Depositor | Residential Asset Mortgage Products, Inc., an affiliate of GMAC Mortgage Corporation. |
| Trustee | Deutsche Bank National Trust Company. |
| Mortgage pool | 951 hybrid adjustable rate mortgage loans with an aggregate principal balance of approximately $386,070,613.57 as of the cut-off date, secured by first liens on one- to four-family residential properties. |
| Cut-off date | June 1, 2005. |
| Closing date | On or about June 28, 2005. |
| Distribution dates | The 19th of each month or, if the 19th is not a business day, the next business day, beginning in July 2005. |
| Scheduled final distribution date | With respect to each class of certificates, the distribution date in July 2035. The actual final distribution date for any class of certificates could be substantially earlier. |
| Form of certificates | Book-entry: Class A Certificates and Class M Certificates. |
| | Physical: Class R Certificates. |
| | *See "Description of the Certificates—Book-Entry Registration" in this prospectus supplement.* |
| Minimum denominations | Class A and Class M-1 Certificates: $25,000. |
| | Class M-2 and Class M-3 Certificates: $250,000. |
| | Class R Certificates: 20% percentage interests. |

risk of losses than holders of classes having earlier priority for distribution of principal. After the Certificate Principal Balances of the Class M Certificates have been reduced to zero, (i) the yield to maturity on the Class 2-A-2 Certificates will be extremely sensitive to losses on the group 2 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 2-A-1 Certificates and Class 2-A-2 Certificates, will be allocated to the Class 2-A-2 Certificates, (ii) the yield to maturity on the Class 3-A-2 Certificates will be extremely sensitive to losses on the group 3 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 3-A-1 Certificates and Class 3-A-2 Certificates, will be allocated to the Class 3-A-2 Certificates, (iii) the yield to maturity on the Class 4-A-2 Certificates will be extremely sensitive to losses on the group 4 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 4-A-1 Certificates and Class 4-A-2 Certificates, will be allocated to the Class 4-A-2 Certificates, and (v) the yield to maturity on the Class 5-A-2 Certificates will be extremely sensitive to losses on the group 5 mortgage loans and the timing of those losses because the entire amount of losses that would otherwise be allocated to the Class 5-A-1 Certificates and Class 5-A-2 Certificates, will be allocated to the Class 5-A-2 Certificates.

*Assumed Final Distribution Date:* The assumed final distribution date with respect to each class of the offered certificates is the distribution date in July 2035, which is the distribution date in the month immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its assumed final distribution date.

*Weighted Average Life:* Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security assuming no losses. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans in the related loan group is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement is the constant prepayment rate, or CPR. CPR does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans included in the trust.

The tables that begin on page S-105 have been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described under "Description of the Mortgage Pool" in this prospectus supplement and their performance. The tables assume, among other things, that:

(1)    as of the date of issuance of the offered certificates, the group 1 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $2,459,499.23 | 4.95931% | 360 | 358 | 2.75000% | 10.78940% |
| 2 | $17,355,096.03 | 5.23400% | 360 | 359 | 2.75000% | 11.23400% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.75000% | 34 | 12 | 2.50970% | 2.00000% | N/A |
| 2 | 2.75000% | 35 | 12 | 2.00000% | 2.00000% | 35 |

(2)    as of the date of issuance of the offered certificates, the group 2 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $1,609,535.66 | 5.60176% | 360 | 357 | 2.75000% | 10.60176% |
| 2 | $60,046,554.73 | 5.62853% | 360 | 359 | 2.74432% | 10.62853% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.75000% | 57 | 12 | 5.00000% | 2.00000% | N/A |
| 2 | 2.74432% | 59 | 12 | 5.00000% | 2.00000% | 59 |

(3)    as of the date of issuance of the offered certificates, the group 3 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $26,818,968.83 | 5.22473% | 360 | 360 | 2.75000% | 10.22473% |
| 2 | $131,713,240.77 | 5.39299% | 360 | 359 | 2.72958% | 10.39299% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.75000% | 60 | 12 | 5.00000% | 2.00000% | N/A |
| 2 | 2.72958% | 59 | 12 | 5.00000% | 2.00000% | 59 |

(4)     as of the date of issuance of the offered certificates, the group 4 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $11,135,189.10 | 5.43038% | 360 | 360 | 2.72084% | 10.43038% |
| 2 | $46,905,957.40 | 5.40920% | 360 | 359 | 2.74684% | 10.40920% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.72084% | 84 | 12 | 5.00000% | 2.00000% | N/A |
| 2 | 2.74684% | 83 | 12 | 5.00000% | 2.00000% | 83 |

(5)     as of the date of issuance of the offered certificates, the group 5 mortgage loans will have the following characteristics:

| Loan No. | Aggregate Unpaid Principal Balance | Mortgage Rate | Original Term to Scheduled Maturity (Months) | Remaining Term to Scheduled Maturity (Months) | Gross Margin | Maximum Mortgage Rate |
|---|---|---|---|---|---|---|
| 1 | $88,026,571.82 | 5.62833% | 360 | 359 | 2.74276% | 10.62833% |

| Loan No. | Minimum Mortgage Rate | Months to First Adjustment Date | Months Between Rate Adjustment Dates | Initial Periodic Rate Cap | Subsequent Periodic Rate Cap | Interest-Only Remaining Term (Months) |
|---|---|---|---|---|---|---|
| 1 | 2.74276% | 119 | 12 | 5.00000% | 2.00000% | 119 |

(6)     the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity (after taking into account the interest-only period), so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity (after taking into account the interest-only period);

(7)     the Seller will not repurchase any mortgage loan, as described under "Description of the Securities—Representations with Respect to Loans," "—Repurchases of Loans" and "Description of the Securities—Assignment of Loans" in the prospectus, and the servicer does not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust unless otherwise indicated with respect to the weighted average lives;

(8)     there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of CPR set forth in the tables;

(9)     there is no Prepayment Interest Shortfall or any other interest shortfall in any month;

(10)    payments on the certificates will be received on the 19th day of each month, commencing in July 2005;

(11)    there are no additional ongoing trust expenses payable out of the trust other than the servicing fee;

(12)    one-year LIBOR remains constant at 3.862% per annum; and

(13)    the certificates will be purchased on June 28, 2005.

Clauses (1) through (13) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the tables below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans in any group will prepay at a constant level of CPR until maturity or that all of the mortgage loans will prepay at the same level of CPR. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the various constant percentages of CPR specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans in the related loan group, or actual prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following tables indicate the weighted average life of each class of offered certificates, other than the Class R Certificates, and set forth the percentages of the initial Certificate Principal Balance of each class of offered certificates that would be outstanding after each of the distribution dates at the various percentages of CPR shown.

## Percentage of Initial Class 1-A Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial | 100 | 100 | 100 | 100 | 100 |
| June 2006 | 100 | 84 | 74 | 63 | 53 |
| June 2007 | 100 | 71 | 54 | 40 | 28 |
| June 2008 | 99 | 59 | 39 | 25 | 15 |
| June 2009 | 98 | 49 | 29 | 16 | 8 |
| June 2010 | 96 | 41 | 22 | 10 | 4 |
| June 2011 | 95 | 34 | 16 | 7 | 2 |
| June 2012 | 93 | 28 | 12 | 4 | 1 |
| June 2013 | 91 | 24 | 9 | 3 | 1 |
| June 2014 | 89 | 20 | 6 | 2 | * |
| June 2015 | 87 | 16 | 5 | 1 | * |
| June 2016 | 85 | 14 | 3 | 1 | * |
| June 2017 | 83 | 11 | 2 | * | * |
| June 2018 | 80 | 9 | 2 | * | * |
| June 2019 | 78 | 8 | 1 | * | * |
| June 2020 | 75 | 6 | 1 | * | * |
| June 2021 | 72 | 5 | 1 | * | * |
| June 2022 | 69 | 4 | * | * | * |
| June 2023 | 65 | 3 | * | * | * |
| June 2024 | 61 | 3 | * | * | * |
| June 2025 | 57 | 2 | * | * | * |
| June 2026 | 53 | 2 | * | * | * |
| June 2027 | 49 | 1 | * | * | * |
| June 2028 | 44 | 1 | * | * | * |
| June 2029 | 39 | 1 | * | * | * |
| June 2030 | 33 | 1 | * | * | * |
| June 2031 | 27 | * | * | * | * |
| June 2032 | 21 | * | * | * | * |
| June 2033 | 14 | * | * | * | * |
| June 2034 | 7 | * | * | * | * |
| June 2035 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.13 | 5.47 | 3.26 | 2.20 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.07 | 5.06 | 2.98 | 2.00 | 1.45 |

○ All percentages listed in the table above are rounded to the nearest 1%.

* Indicates a number greater than 0% but less than 0.5%.

(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

**Percentage of Initial Class 2-A-1 and Class 2-A-2 Certificate Principal Balance**

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ............................................... | 100 | 100 | 100 | 100 | 100 |
| June 2006.......................................... | 100 | 84 | 74 | 63 | 53 |
| June 2007.......................................... | 100 | 71 | 54 | 40 | 28 |
| June 2008.......................................... | 100 | 59 | 40 | 25 | 15 |
| June 2009.......................................... | 100 | 50 | 30 | 16 | 8 |
| June 2010.......................................... | 100 | 42 | 22 | 11 | 4 |
| June 2011.......................................... | 98 | 35 | 16 | 7 | 2 |
| June 2012.......................................... | 96 | 29 | 12 | 4 | 1 |
| June 2013.......................................... | 94 | 24 | 9 | 3 | 1 |
| June 2014.......................................... | 92 | 20 | 7 | 2 | * |
| June 2015.......................................... | 90 | 17 | 5 | 1 | * |
| June 2016.......................................... | 88 | 14 | 4 | 1 | * |
| June 2017.......................................... | 86 | 12 | 3 | * | * |
| June 2018.......................................... | 83 | 10 | 2 | * | * |
| June 2019.......................................... | 80 | 8 | 1 | * | * |
| June 2020.......................................... | 77 | 6 | 1 | * | * |
| June 2021.......................................... | 74 | 5 | 1 | * | * |
| June 2022.......................................... | 71 | 4 | 1 | * | * |
| June 2023.......................................... | 67 | 3 | * | * | * |
| June 2024.......................................... | 63 | 3 | * | * | * |
| June 2025.......................................... | 59 | 2 | * | * | * |
| June 2026.......................................... | 55 | 2 | * | * | * |
| June 2027.......................................... | 50 | 1 | * | * | * |
| June 2028.......................................... | 45 | 1 | * | * | * |
| June 2029.......................................... | 40 | 1 | * | * | * |
| June 2030.......................................... | 34 | 1 | * | * | * |
| June 2031.......................................... | 28 | * | * | * | * |
| June 2032.......................................... | 22 | * | * | * | * |
| June 2033.......................................... | 15 | * | * | * | * |
| June 2034.......................................... | 7 | * | * | * | * |
| June 2035.......................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.68 | 5.56 | 3.30 | 2.22 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.62 | 5.14 | 3.01 | 2.01 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.
(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.
(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

### Percentage of Initial Class 3-A-1 and Class 3-A-2 Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial .............................................. | 100 | 100 | 100 | 100 | 100 |
| June 2006 ......................................... | 100 | 84 | 74 | 63 | 53 |
| June 2007 ......................................... | 100 | 71 | 54 | 40 | 28 |
| June 2008 ......................................... | 99 | 59 | 39 | 25 | 14 |
| June 2009 ......................................... | 99 | 49 | 30 | 16 | 8 |
| June 2010 ......................................... | 99 | 42 | 22 | 10 | 4 |
| June 2011 ......................................... | 97 | 35 | 16 | 7 | 2 |
| June 2012 ......................................... | 95 | 29 | 12 | 4 | 1 |
| June 2013 ......................................... | 93 | 24 | 9 | 3 | 1 |
| June 2014 ......................................... | 91 | 20 | 6 | 2 | * |
| June 2015 ......................................... | 89 | 17 | 5 | 1 | * |
| June 2016 ......................................... | 87 | 14 | 3 | 1 | * |
| June 2017 ......................................... | 85 | 11 | 3 | * | * |
| June 2018 ......................................... | 82 | 9 | 2 | * | * |
| June 2019 ......................................... | 79 | 8 | 1 | * | * |
| June 2020 ......................................... | 76 | 6 | 1 | * | * |
| June 2021 ......................................... | 73 | 5 | 1 | * | * |
| June 2022 ......................................... | 70 | 4 | * | * | * |
| June 2023 ......................................... | 66 | 3 | * | * | * |
| June 2024 ......................................... | 63 | 3 | * | * | * |
| June 2025 ......................................... | 59 | 2 | * | * | * |
| June 2026 ......................................... | 54 | 2 | * | * | * |
| June 2027 ......................................... | 50 | 1 | * | * | * |
| June 2028 ......................................... | 45 | 1 | * | * | * |
| June 2029 ......................................... | 39 | 1 | * | * | * |
| June 2030 ......................................... | 34 | 1 | * | * | * |
| June 2031 ......................................... | 28 | * | * | * | * |
| June 2032 ......................................... | 21 | * | * | * | * |
| June 2033 ......................................... | 15 | * | * | * | * |
| June 2034 ......................................... | 7 | * | * | * | * |
| June 2035 ......................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.49 | 5.52 | 3.28 | 2.21 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.43 | 5.11 | 2.99 | 2.00 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.
(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.
(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

### Percentage of Initial Class 4-A-1 and Class 4-A-2 Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ..................................................... | 100 | 100 | 100 | 100 | 100 |
| June 2006................................................. | 100 | 84 | 74 | 63 | 53 |
| June 2007................................................. | 99 | 71 | 54 | 40 | 28 |
| June 2008................................................. | 99 | 59 | 39 | 25 | 14 |
| June 2009................................................. | 99 | 49 | 29 | 16 | 8 |
| June 2010................................................. | 99 | 42 | 22 | 10 | 4 |
| June 2011................................................. | 98 | 35 | 16 | 7 | 2 |
| June 2012................................................. | 98 | 30 | 12 | 4 | 1 |
| June 2013................................................. | 96 | 25 | 9 | 3 | 1 |
| June 2014................................................. | 94 | 21 | 7 | 2 | * |
| June 2015................................................. | 92 | 17 | 5 | 1 | * |
| June 2016................................................. | 89 | 14 | 4 | 1 | * |
| June 2017................................................. | 87 | 12 | 3 | * | * |
| June 2018................................................. | 84 | 10 | 2 | * | * |
| June 2019................................................. | 81 | 8 | 1 | * | * |
| June 2020................................................. | 78 | 7 | 1 | * | * |
| June 2021................................................. | 75 | 5 | 1 | * | * |
| June 2022................................................. | 72 | 4 | 1 | * | * |
| June 2023................................................. | 68 | 3 | * | * | * |
| June 2024................................................. | 64 | 3 | * | * | * |
| June 2025................................................. | 60 | 2 | * | * | * |
| June 2026................................................. | 56 | 2 | * | * | * |
| June 2027................................................. | 51 | 1 | * | * | * |
| June 2028................................................. | 46 | 1 | * | * | * |
| June 2029................................................. | 41 | 1 | * | * | * |
| June 2030................................................. | 35 | 1 | * | * | * |
| June 2031................................................. | 29 | * | * | * | * |
| June 2032................................................. | 22 | * | * | * | * |
| June 2033................................................. | 15 | * | * | * | * |
| June 2034................................................. | 7 | * | * | * | * |
| June 2035................................................. | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.87 | 5.57 | 3.30 | 2.21 | 1.59 |
| Weighted Average Life to Call (years)(1)(2) | 20.81 | 5.14 | 3.00 | 2.00 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.

* Indicates a number greater than 0% but less than 0.5%.

(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

**Percentage of Initial Class 5-A-1 and Class 5-A-2 Certificate Principal Balance**

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ............................................... | 100 | 100 | 100 | 100 | 100 |
| June 2006............................................ | 100 | 84 | 74 | 63 | 53 |
| June 2007............................................ | 100 | 71 | 54 | 40 | 28 |
| June 2008............................................ | 100 | 60 | 40 | 25 | 15 |
| June 2009............................................ | 100 | 50 | 30 | 16 | 8 |
| June 2010............................................ | 100 | 42 | 22 | 11 | 4 |
| June 2011............................................ | 100 | 36 | 17 | 7 | 2 |
| June 2012............................................ | 100 | 30 | 13 | 4 | 1 |
| June 2013............................................ | 100 | 26 | 9 | 3 | 1 |
| June 2014............................................ | 100 | 22 | 7 | 2 | * |
| June 2015............................................ | 100 | 19 | 5 | 1 | * |
| June 2016............................................ | 97 | 15 | 4 | 1 | * |
| June 2017............................................ | 95 | 13 | 3 | * | * |
| June 2018............................................ | 92 | 11 | 2 | * | * |
| June 2019............................................ | 89 | 9 | 1 | * | * |
| June 2020............................................ | 85 | 7 | 1 | * | * |
| June 2021............................................ | 82 | 6 | 1 | * | * |
| June 2022............................................ | 78 | 5 | 1 | * | * |
| June 2023............................................ | 74 | 4 | * | * | * |
| June 2024............................................ | 70 | 3 | * | * | * |
| June 2025............................................ | 66 | 2 | * | * | * |
| June 2026............................................ | 61 | 2 | * | * | * |
| June 2027............................................ | 55 | 1 | * | * | * |
| June 2028............................................ | 50 | 1 | * | * | * |
| June 2029............................................ | 44 | 1 | * | * | * |
| June 2030............................................ | 38 | 1 | * | * | * |
| June 2031............................................ | 31 | * | * | * | * |
| June 2032............................................ | 24 | * | * | * | * |
| June 2033............................................ | 16 | * | * | * | * |
| June 2034............................................ | 8 | * | * | * | * |
| June 2035............................................ | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 22.07 | 5.71 | 3.34 | 2.23 | 1.60 |
| Weighted Average Life to Call (years)(1)(2) | 22.00 | 5.25 | 3.02 | 2.01 | 1.45 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.
(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.
(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

### Percentage of Initial Class M-1, Class M-2 and Class M-3 Certificate Principal Balance

| Distribution Date | Percentage of Balance | | | | |
|---|---|---|---|---|---|
| CPR | 0% | 15% | 25% | 35% | 45% |
| Initial ....................................... | 100 | 100 | 100 | 100 | 100 |
| June 2006................................... | 100 | 100 | 100 | 100 | 100 |
| June 2007................................... | 100 | 100 | 100 | 93 | 78 |
| June 2008................................... | 100 | 100 | 92 | 75 | 58 |
| June 2009................................... | 99 | 99 | 68 | 49 | 32 |
| June 2010................................... | 99 | 89 | 51 | 31 | 17 |
| June 2011................................... | 98 | 75 | 38 | 20 | 9 |
| June 2012................................... | 97 | 63 | 28 | 13 | 5 |
| June 2013................................... | 95 | 53 | 21 | 8 | 3 |
| June 2014................................... | 94 | 44 | 15 | 5 | 2 |
| June 2015................................... | 92 | 37 | 11 | 3 | 1 |
| June 2016................................... | 90 | 30 | 8 | 2 | * |
| June 2017................................... | 87 | 25 | 6 | 1 | * |
| June 2018................................... | 85 | 21 | 4 | 1 | * |
| June 2019................................... | 82 | 17 | 3 | 1 | * |
| June 2020................................... | 79 | 14 | 2 | * | * |
| June 2021................................... | 76 | 11 | 2 | * | * |
| June 2022................................... | 72 | 9 | 1 | * | * |
| June 2023................................... | 69 | 7 | 1 | * | * |
| June 2024................................... | 65 | 6 | 1 | * | * |
| June 2025................................... | 60 | 5 | * | * | * |
| June 2026................................... | 56 | 4 | * | * | * |
| June 2027................................... | 51 | 3 | * | * | * |
| June 2028................................... | 46 | 2 | * | * | * |
| June 2029................................... | 41 | 2 | * | * | * |
| June 2030................................... | 35 | 1 | * | * | * |
| June 2031................................... | 29 | 1 | * | * | * |
| June 2032................................... | 22 | 1 | * | * | * |
| June 2033................................... | 15 | * | * | * | * |
| June 2034................................... | 7 | * | * | * | * |
| June 2035................................... | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life to Maturity (years)(1) | 20.92 | 9.69 | 6.05 | 4.55 | 3.55 |
| Weighted Average Life to Call (years)(1)(2) | 20.86 | 8.78 | 5.36 | 3.93 | 2.99 |

- All percentages listed in the table above are rounded to the nearest 1%.
* Indicates a number greater than 0% but less than 0.5%.

(1) The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

(2) The weighted average life to call has been prepared based on an additional assumption that the servicer exercises its option to purchase the mortgage loans and thereby cause a termination of the trust.

**This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristic and performance of the mortgage loans, which differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.**

## EXHIBIT E

### UNDERWRITER INFORMATION

Exhibit E-1

Prospectus supplement dated June 23, 2005
(To prospectus dated December 22, 2004)

# $381,630,100

## GMAC MORTGAGE CORPORATION
### Seller and Servicer

## GMACM MORTGAGE LOAN TRUST 2005-AR4
### Issuer

### Residential Asset Mortgage Products, Inc.
#### Depositor

## GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

The trust will hold a pool of one- to four-family residential first mortgage loans, segregated into five loan groups.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 10 classes of senior certificates

- 3 classes of mezzanine certificates

Credit enhancement for all of these certificates will be provided by subordination.

> **You should consider carefully the risk factors beginning on page S-11 in this prospectus supplement.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

Morgan Stanley and Co. Incorporated will offer the offered certificates to the public from time to time in negotiated transactions or otherwise at varying prices to be determined at the time of sale. The proceeds to the depositor from the sale of the offered certificates will be approximately 101.16% of their initial aggregate principal balance plus accrued interest, before deducting expenses of issuance payable by the depositor.

## Morgan Stanley

Any payments received by a holder of a Class R Certificate in connection with the acquisition of such Certificate will be taken into account in determining the income of such holder for federal income tax purposes. The IRS has issued regulations that require such payment to be included in income over time according to an amortization schedule that reasonably reflects the costs and benefits of holding the Class R Certificate over its expected life. The regulations also provide two more specific methods that will be accepted as meeting the general test set forth above for determining the timing and amount of income inclusion. One generally follows the method of inclusion used by the taxpayer for GAAP purposes, but not over a period shorter than the period over which the REMIC is expected to generate income. The other calls for ratable inclusion over the remaining anticipated weighted average life of the REMIC as of the time the Class R Certificate is transferred to the taxpayer. Holders of Class R Certificates should consult their tax advisors concerning the treatment of such payments for income tax purposes.

Purchasers of the Class R Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Class R Certificates.

For further information regarding the federal income tax consequences of investing in the Class R Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Class R Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—Taxation of Owners of REMIC Class R Certificates" in the prospectus.

## Penalty Protection

If penalties were asserted against purchasers of the offered certificates in respect of their treatment of the offered certificates for tax purposes, the summary of tax considerations contained, and the opinions stated, herein and in the prospectus may not meet the conditions necessary for purchasers' reliance on that summary and those opinions to exculpate them from the asserted penalties.

## Method of Distribution

In accordance with the terms and conditions of the underwriting agreement dated the date of this prospectus supplement, Morgan Stanley and Co. Incorporated will serve as the underwriter of the offered certificates — other than a de minimis portion of the Class R Certificates — and has agreed to purchase, and the depositor has agreed to sell, the offered certificates — other than a de minimis portion of the Class R Certificates. A de minimis portion of the Class R Certificates will be retained by GMACM and that portion is not offered hereby. The offered certificates being sold to the underwriter are referred to as the underwritten certificates. It is expected that delivery of the underwritten certificates, other than the Class R Certificates, will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Class R Certificates will be made at the offices of Morgan Stanley and Co. Incorporated, New York, New York, in each case, on or about June 28, 2005.

In connection with the underwritten certificates, the underwriter has agreed, in accordance with the terms and conditions of the underwriting agreement, to purchase all of the underwritten certificates if any of the underwritten certificates are purchased thereby.

The underwriting agreement provides that the obligations of the underwriter to pay for and accept delivery of the underwritten certificates are subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the underwriter may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the underwritten certificates, before deducting expenses payable by the depositor, will be approximately 101.16% of the aggregate Certificate Principal Balance of the underwritten certificates plus accrued interest thereon from the cut-off date, if applicable.

The underwriter may effect these transactions by selling the underwritten certificates to or through dealers, and those dealers, as agents, may receive compensation in the form of underwriting discounts, concessions or commissions from the underwriter. In connection with the sale of the underwritten certificates, the underwriter may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriter and any other dealers that participate with the underwriter in the distribution of the underwritten certificates, may be deemed to be underwriters and any profit on the resale of the underwritten certificates positioned by them may be deemed to be underwriting discounts and commissions under the Securities Act of 1933, as amended.

The underwriting agreement provides that the depositor will indemnify the underwriter, and that under limited circumstances the underwriter will indemnify the depositor against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

There is currently no secondary market for the offered certificates. The underwriter intends to make a secondary market in the offered certificates to be purchased by it, but is not obligated to do so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the prospectus under "Description of the Securities—Reports to Securityholders," which will include information as to the outstanding principal balance of the offered certificates. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of this information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

## Legal Matters

Certain legal matters relating to the certificates will be passed upon for the depositor by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California and for the underwriter by Stroock & Stroock & Lavan LLP, New York, New York.

## Ratings

It is a condition of the issuance of the offered certificates that they be rated as indicated on page S-6 of this prospectus supplement by Moody's Investors Service, Inc., or Moody's, and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or Standard & Poor's.

A security rating addresses the likelihood of the receipt by the holders of the offered certificates of distributions on the mortgage loans. The rating takes into consideration the structural and legal aspects associated with the offered certificates. The ratings on the offered certificates do not constitute statements regarding the possibility that the holders of the offered certificates might realize a lower than anticipated yield. A security rating does not address the likelihood of the receipt of amounts in respect of Prepayment Interest Shortfalls or Relief Act Shortfalls. A security rating is not a recommendation to buy,

**EXHIBIT F**

FORM OF UNDERWRITER'S
CERTIFICATE

June 23, 2005

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437

Re:    GMACM Mortgage Pass-Through Certificates, Series 2005-AR4

Pursuant to Section 4 of the Underwriting Agreement, dated June 23, 2005, among Residential Asset Mortgage Products, Inc., GMAC Mortgage Corporation and Morgan Stanley and Co. Incorporated (the "Underwriter") relating to the Certificates referenced above, the undersigned does hereby certify that:

(a)    The prepayment assumption used in pricing the above-referenced Certificates was 25% of the prepayment assumption as set forth in the Prospectus Supplement.

(b)    Set forth below is (i), the first price, as a percentage of the principal balance of the Certificates, at which 10% of the aggregate principal balance of the Certificates was sold to the public at a single price, if applicable, or (ii) if more than 10% of the Certificates have been sold to the public but no single price is paid for at least 10% of the aggregate principal balance of the Certificates, then the weighted average price at which the Certificates were sold expressed as a percentage of the principal balance of the Certificates, or (iii) if less than 10% of the aggregate principal balance of the Certificates has been sold to the public, the purchase price for the Certificates paid by the Underwriter expressed as a percentage of the principal balance of the Certificates calculated by: (1) estimating the fair market value of the Certificates as of June 23, 2005; (2) adding such estimated fair market value to the aggregate purchase price of the Certificates described in clause (i) or (ii) above; (3) dividing each of the fair market values determined in clause (1) by the sum obtained in clause (2); (4) multiplying the quotient obtained for the Certificates in clause (3) by the purchase price paid by the Underwriter for the Certificates; and (5) dividing the product obtained in clause (4) by the original principal balance of the Certificates:

| | | | |
|---|---|---|---|
| Class 1-A: | 100.812500 % | Class M-1: | 101.484375 % |
| Class 2-A-1: | 101.765625 % | Class M-2: | 100.500000 % |
| Class 2-A-2: | 101.359375 % | Class M-3: | 97.828125 % |
| Class 3-A-1: | 101.109375 % | | |
| Class 3-A-2: | 100.765625 % | | |
| Class 4-A-1: | 101.000000 % | | |
| Class 4-A-2: | 100.625000 % | | |
| Class 5-A-1: | 101.218750 % | | |
| Class 5-A-2: | 100.890625 % | | |

Exhibit F-1

The prices set forth above do not include accrued interest with respect to periods before closing.

MORGAN STANLEY AND CO. INCORPORATED

By:    _____

      Name:
      Title:

Exhibit F-2

**EXHIBIT G**

BID SHEET

(ON FILE WITH THE COMPANY AND UNDERWRITER)

Exhibit G-1

# EXHIBIT B

1  GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
   ROBERT A. GOODIN, State Bar No. 061302
2      rgoodin@goodinmacbride.com
   FRANCINE T. RADFORD, State Bar No. 168269
3      fradford@goodinmacbride.com
   ANNE H. HARTMAN, State Bar No. 184556
4      ahartman@goodinmacbride.com
5  505 Sansome Street, Suite 900
   San Francisco, California 94111
6  Telephone:    (415) 392-7900
   Facsimile:    (415) 398-4321
7
   THE CHARLES SCHWAB CORPORATION
8  LOWELL HAKY, State Bar No. 178526
9  211 Main Street
   San Francisco, California 94105
10 Telephone:    (415) 667-0622
   Facsimile:    (415) 667-1638
11
   GRAIS & ELLSWORTH LLP
12 DAVID J. GRAIS (*pro hac application to be submitted*)
   KATHRYN C. ELLSWORTH (*pro hac app. to be submitted*)
13 OWEN L. CYRULNIK (*pro hac application to be submitted*)
   LEANNE M. WILSON (*pro hac application to be submitted*)
14 70 East 55th Street
15 New York, New York 10022
   Telephone:    (212) 755-0100
16 Facsimile:    (212) 755-0052
17
   Attorneys for Plaintiff
18 The Charles Schwab Corporation
19
20         IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
21         IN AND FOR THE CITY AND COUNTY OF SAN FRANCISCO
22
   THE CHARLES SCHWAB CORPORATION,     No.
23
              Plaintiff,               COMPLAINT FOR RESCISSION AND
24                                     DAMAGES FOR:
   v.
25
                                       (1) VIOLATIONS OF §§ 25401 AND
26 BNP PARIBAS SECURITIES CORP.;           25501 OF THE CALIFORNIA
   CWMBS, INC.;                            CORPORATE SECURITIES ACT;
27 BANC OF AMERICA SECURITIES LLC;
   BANC OF AMERICA MORTGAGE          (2) VIOLATIONS OF §§ 11 AND 15 OF
28 SECURITIES, INC;

COMPLAINT

SUMMONS ISSUED
FILED
San Francisco County Superior Court

JUL 15 2010

CLERK OF THE COURT
BY: _____
           Deputy Clerk

P. NATT

CASE MANAGEMENT CONFERENCE SET

DEC 17 2010   9:00 AM

DEPARTMENT 212

CGC-10-501610

ORIGINAL

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| | |
|---|---|
| 1 | BANC OF AMERICA FUNDING CORPORATION; | **THE SECURITIES ACT OF 1933;** |
| 2 | CWALT, INC.; | |
| | COUNTRYWIDE FINANCIAL | **(3) VIOLATIONS OF §§ 12(a)(2) AND** |
| 3 | CORPORATION; | **15 OF THE SECURITIES ACT OF** |
| | CITIGROUP GLOBAL MARKETS, INC.; | **1933;** |
| 4 | CITIGROUP MORTGAGE LOAN TRUST, | |
| | INC.; | **(4) VIOLATIONS OF §§ 1572 AND** |
| 5 | RESIDENTIAL ACCREDIT LOANS, INC.; | **1710 OF THE CALIFORNIA CIVIL** |
| 6 | FIRST HORIZON ASSET SECURITIES | **CODE (NEGLIGENT** |
| | INC.; | **MISREPRESENTATION); and** |
| 7 | CREDIT SUISSE SECURITIES (USA) LLC; | |
| | CREDIT SUISSE FIRST BOSTON | **(5) RESCISSION OF CONTRACTS** |
| 8 | MORTGAGE SECURITIES CORP.; | **UNDER § 1689 ET SEQ. OF THE** |
| 9 | RESIDENTIAL ASSET MORTGAGE | **CALIFORNIA CIVIL CODE** |
| | PRODUCTS, INC.; | |
| 10 | DEUTSCHE BANK SECURITIES INC.; | |
| | FIRST TENNESSEE BANK N.A.; | |
| 11 | GOLDMAN, SACHS & CO.; | |
| 12 | GS MORTGAGE SECURITIES CORP.; | |
| | RBS SECURITIES, INC. F/K/A | |
| 13 | GREENWICH CAPITAL MARKETS, INC.; | |
| | HSBC SECURITIES (USA) INC.; | |
| 14 | WELLS FARGO ASSET SECURITIES | |
| | CORPORATION; | |
| 15 | WELLS FARGO BANK N.A.; | |
| 16 | MORGAN STANLEY & CO. INC.; | |
| | MORGAN STANLEY CAPITAL I INC.; | |
| 17 | SEQUOIA RESIDENTIAL FUNDING, INC.; | |
| | UBS SECURITIES, LLC; | |
| 18 | MORTGAGE ASSET SECURITIZATION | |
| | TRANSACTIONS, INC.; | |
| 19 | AND, | |
| | DOES 1-50, | |
| 20 | | |
| 21 | Defendants. | |

22    Plaintiff, THE CHARLES SCHWAB CORPORATION complains of Defendants

23    and for causes of action alleges as follows:

24    <u>**NATURE OF THIS ACTION**</u>

25    1.    This is an action for rescission and damages as a result of the violation by the

26    Defendants of the California Corporate Securities Act, the California Civil Code, the federal

27    Securities Act of 1933, and the common law. As alleged in detail below, the Defendants sold or

28

-2-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

issued to Charles Schwab Bank, N.A. (referred to in this Complaint as **Schwab**) 37 certificates in 36 securitization trusts backed by residential mortgage loans. Schwab paid $1.38 billion for those certificates. When they offered and then sold these certificates to Schwab, the Defendants made numerous statements to Schwab about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue as to material facts. Moreover, the Defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the Defendants made untrue statements, or omitted important information, about such material facts as the loan-to-value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans departed from their own standards in doing so.

2.    Defendants made such untrue or misleading statements about at least the following numbers of the loans in each of the 36 securitizations.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 846 | 1,597 | 53.0% |
| 2 | 1,079 | 2,274 | 47.4% |
| 3 | 356 | 779 | ·45.7% |
| 4 | 828 | 3,313 | 25.0% |
| 5 | 326 | 545 | 59.8% |
| 6 | 436 | 765 | 57.0% |
| 7 | 1,161 | 2,190 | 53.1% |
| 8 | 444 | 979 | 45.4% |
| 9 | 405 | 861 | 47.0% |
| 10 | 691 | 1,428 | 48.4% |
| 11 | 702 | 1,365 | 51.4% |
| 12 | 1,680 | 3,441 | 48.8% |
| 13 | 923 | 2,492 | 37.0% |
| 14 | 262 | 377 | 69.5% |
| 15 | 983 | 2,385 | 41.2% |
| 16 | 1,496 | 3,625 | 41.3% |
| 17[1] | 20 | 1,411 | 1.4% |

---

[1] Plaintiff was not able to perform a complete analysis of the loans in Securitizations 17 and 33 because the necessary data was not available. Plaintiff is informed and believes, and based thereon alleges,

-3-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 18 | 1,455 | 3,976 | 36.6% |
| 19 | 2,012 | 4,785 | 42.0% |
| 20 | 437 | 611 | 71.5% |
| 21 | 243 | 367 | 66.2% |
| 22 | 537 | 1,141 | 47.1% |
| 23 | 1,451 | 3,072 | 47.2% |
| 24 | 969 | 2,803 | 34.6% |
| 25 | 2,718 | 8,138 | 33.3% |
| 26 | 2,558 | 4,741 | 54.0% |
| 27 | 1,096 | 2,517 | 43.5% |
| 28 | 586 | 1,175 | 49.9% |
| 29 | 914 | 1,948 | 46.9% |
| 30 | 671 | 1,801 | 37.3% |
| 31 | 1550 | 3,250 | 47.7% |
| 32 | 281 | 541 | 51.9% |
| 33[1] | 17 | 951 | 1.8% |
| 34 | 795 | 1,662 | 47.8% |
| 35 | 422 | 724 | 58.3% |
| 36 | 591 | 1,114 | 53.1% |

Plaintiff is informed and believes, and based thereon alleges, that even more mortgage loans than those listed in the table above were the subject of untrue or misleading statements by the Defendants.[2]

3.     The certificates are "securities" within the meaning of the California Corporate Securities Act and the Securities Act of 1933. Under those Acts, the California Civil Code, and the common law, Plaintiff is entitled to rescind the purchase of the certificates or to be paid damages for losses on the certificates.

4.     Twelve securities dealers sold these certificates to Schwab. The dealers are Defendants BNP Paribas (which sold to Schwab a certificate in one securitization trust, which is referred to in this Complaint as Securitization No. 1); Banc of America Securities LLC (six

that discovery will demonstrate that Defendants made untrue or misleading statements about a similar percentage of the loans in Securitizations 17 and 33 as Defendants made in the Securitizations for which complete data was available.

[2] Allegations pled on information and belief are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

-4-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   securitizations, Securitizations Nos. 2 through 7); Citigroup Global Markets, Inc. (six

2   securitizations, Securitizations Nos. 10 through 15); Credit Suisse Securities (USA) LLC (one

3   securitization, Securitization No. 16); Credit Suisse First Boston Mortgage Securities Corp. (two

4   securitizations, Securitizations Nos. 17 and 18); Deutsche Bank Securities (one securitization,

5   Securitization No. 19); First Tennessee Bank, N.A. (two securitizations, Securitizations Nos. 20

6   and 21); Goldman, Sachs & Co. (two securitizations, Securitizations Nos. 22 and 23); Greenwich

7   Capital Markets, Inc. (two securitizations, Securitizations Nos. 24 and 25); HSBC Securities

8   (USA) Inc. (two securitizations, Securitizations Nos. 26 and 27); Morgan Stanley & Co Inc. (six

9   securitizations, Securitizations Nos. 28 through 33); and UBS Securities, LLC (three

10  securitizations, Securitizations Nos. 34 through 36). Bear, Stearns & Co. Inc. sold to Schwab two

11  certificates in two securitizations (Securitization Nos. 9 and 10). The other Defendants named in

12  this Complaint are liable to Plaintiff because they were the issuers of some of those certificates or

13  because they controlled some of those issuers.

## PARTIES

15      5.      Plaintiff is a corporation organized under the laws of Delaware with its principal

16  place of business in San Francisco, California.

17      6.      Defendant BNP Paribas Securities Corp. (referred to as **BNP**) is a corporation

18  organized under the laws of Delaware. BNP sold Schwab one of the certificates.

19      7.      Defendant Banc of America Securities LLC (referred to as **Banc of America**) is a

20  limited liability company organized under the laws of Delaware. Banc of America sold Schwab

21  seven of the certificates.

22      8.      Defendant Banc of America Mortgage Securities, Inc. (referred to as **Banc of**

23  **America Mortgage Securities**) is a corporation organized under the laws of Delaware. Banc of

24  America Mortgage Securities was the issuer of four of the certificates that Banc of America sold

25  to Schwab.

26      9.      Defendant Banc of America Funding Corporation (referred to as **Banc of America**

27  **Funding**) is a corporation organized under the laws of Delaware. Banc of America Funding was

28  the issuer of two of the certificates that Banc of America sold to Schwab.

-5-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1       10.    Defendant Citigroup Global Markets, Inc. (referred to as **Citigroup Global**) is a

2 corporation organized under the laws of New York. Citigroup Global sold Schwab six of the

3 certificates.

4       11.    Defendant Citigroup Mortgage Loan Trust, Inc. (referred to as **Citigroup**

5 **Mortgage**) is a corporation organized under the laws of Delaware. Citigroup Mortgage was the

6 issuer of four of the certificates that Citigroup Global sold to Schwab.

7       12.    Defendant Residential Accredit Loans, Inc. (referred to as **Residential Accredit**)

8 is a corporation organized under the laws of Delaware. Residential Accredit Loans, Inc. was the

9 issuer of one of the certificates that Citigroup Global sold to Schwab.

10       13.    Defendant Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse

11 First Boston LLC and referred to as **Credit Suisse**) is a limited liability company organized under

12 the laws of Delaware. Credit Suisse sold Schwab three certificates.

13       14.    Defendant Credit Suisse First Boston Mortgage Securities Corp. (referred to as

14 **CSFB Mortgage Securities**) is a corporation organized under the laws of Delaware. CSFB

15 Mortgage Securities was the issuer of one of the certificates that Credit Suisse sold to Schwab.

16       15.    Defendant Deutsche Bank Securities, Inc. (referred to as **Deutsche**) is a

17 corporation organized under the laws of Delaware. Deutsche sold Schwab one of the certificates.

18       16.    Defendant First Tennessee Bank N.A. (referred to as **First Tennessee**) is a

19 national banking association organized under the laws of the United States. First Tennessee sold

20 Schwab two of the certificates.

21       17.    Defendant First Horizon Asset Securities Inc. (referred to as **First Horizon**) is a

22 corporation organized under the laws of Delaware. First Horizon was the issuer of one of the

23 certificates that Citigroup Global sold to Schwab and the two certificates that First Tennessee sold

24 to Schwab.

25       18.    Defendant Goldman, Sachs & Co. (referred to as **Goldman Sachs**) is a limited

26 partnership organized under the laws of New York. Goldman Sachs sold Schwab two of the

27 certificates.

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-6-
**COMPLAINT**

19.     Defendant GS Mortgage Securities Corp. (referred to as **GS Mortgage**) is a corporation organized under the laws of Delaware. GS Mortgage was the issuer of one of the certificates that Goldman Sachs sold to Schwab.

20.     Defendant RBS Securities, Inc. (formerly known as Greenwich Capital Markets, Inc. and referred to as **Greenwich Capital**) is a corporation organized under the laws of Delaware. Greenwich Capital sold Schwab two of the certificates.

21.     Defendant CWALT, Inc. (referred to as **CWALT**) is a corporation organized under the laws of Delaware. CWALT was the issuer of one of the certificates that Credit Suisse sold to Schwab, one of the certificates that Deutsche sold to Schwab, one of the certificates that Bear, Stearns & Co. Inc. sold to Schwab, two of the certificates that Greenwich Capital Markets sold to Schwab, and one of the certificates that Banc of America sold to Schwab.

22.     Defendant Countrywide Financial Corporation is a corporation organized under the laws of Delaware. Schwab is informed and believes, and based thereon alleges, that CWALT existed for no purpose other than to receive and deposit loans into the trusts. Countrywide Financial Corporation controls or controlled CWALT. Under Section 15 of the Securities Act Countrywide Financial Corporation therefore is liable to Schwab jointly and severally with, and to the same extent as, CWALT.

23.     Defendant HSBC Securities (USA) Inc. (referred to as **HSBC**) is a corporation organized under the laws of Delaware. HSBC sold Schwab two of the certificates.

24.     Defendant Morgan Stanley & Co. Inc. (referred to as **Morgan Stanley**) is a corporation organized under the laws of Delaware. Morgan Stanley sold Schwab six of the certificates.

25.     Defendant Morgan Stanley Capital I Inc. (referred to as **Morgan Stanley Capital**) is a corporation organized under the laws of Delaware. Morgan Stanley Capital was the issuer of three of the certificates that Morgan Stanley sold to Schwab.

26.     Defendant Wells Fargo Asset Securities Corporation (referred to as **Wells Fargo Asset**) is a corporation organized under the laws of Delaware. Wells Fargo Asset was the issuer

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-7-
**COMPLAINT**

1    of the two certificates that HSBC sold to Schwab and one of the certificates that Morgan Stanley

2    sok    Schwab.

3        27.    Defendant Wells Fargo Bank, N.A. (referred to as **Wells Fargo Bank**) is a

4    national banking association organized under the laws of the United States. Plaintiff is informed

5    and believes, and based thereon alleges, that Wells Fargo Asset exists for no purpose other than to

6    receive and deposit loans into the trusts. During the relevant time period, Wells Fargo Bank

7    controlled Wells Fargo Asset. Under Section 15 of the Securities Act, 15 U.S.C. § 77o, Wells

8    Fargo Bank therefore is liable to Plaintiff jointly and severally with, and to the same extent as,

9    Wells Fargo Asset.

10        28.    Defendant Sequoia Residential Funding, Inc. (referred to as **Sequoia**) is a

11    corporation organized under the laws of Delaware. Sequoia was the issuer of one of the

12    certificates that Morgan Stanley sold to Schwab.

13        29.    Defendant Residential Asset Mortgage Products, Inc. (referred to as **Residential**

14    **Asset Mortgage**) is a corporation organized under the laws of Delaware. Residential Asset

15    Mortgage was the issuer of one of the certificates that Credit Suisse sold to Schwab, one of the

16    certificates that Goldman Sachs sold to Schwab, and one of the certificates that Morgan Stanley

17    sold to Schwab.

18        30.    Defendant UBS Securities, LLC (referred to as **UBS**) is a limited liability company

19    organized under the laws of Delaware. UBS sold Schwab three of the certificates.

20        31.    Defendant CWMBS, Inc. (referred to as **CWMBS**) is a corporation organized

21    under the laws of Delaware. CWMBS was the issuer of the certificate that BNP sold to Schwab,

22    one of the certificates that Bear, Stearns & Co. Inc. sold to Schwab, and two of the certificates

23    that UBS sold to Schwab.

24        32.    Defendant Mortgage Asset Securitization Transactions, Inc. (referred to as **MAST**)

25    is a corporation organized under the laws of Delaware. MAST was the issuer of one of the

26    certificates that UBS sold to Schwab.

27        33.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as

28    Does 1-50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will

-8-

**COMPLAINT**

GOODIN, MacBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    amend this Complaint to allege the true names and capacities of these Defendants when

2    ascertained. Plaintiff is informed and believes that each of the fictitiously named Defendants is

3    responsible in some manner for the occurrences alleged herein and proximately caused Plaintiff's

4    damages.

5                                **ASSIGNMENT OF CLAIMS**

6          34.    Schwab is a national banking association organized under the laws of the United

7    States and a wholly-owned subsidiary of Plaintiff. Its investments are managed by Charles

8    Schwab Treasury, a division of Charles Schwab & Co., which is a wholly-owned subsidiary of

9    Plaintiff. Charles Schwab Treasury is the entity to which the Defendants directed their

10   solicitations to purchase all securities referred to in this Complaint. Charles Schwab Treasury

11   received those solicitations and executed the purchase of all securities referred to in this

12   Complaint.

13         35.    On June 29, 2010, Schwab assigned all of its right, title, and interest in the claims

14   made in this Complaint to Plaintiff. A copy of the assignment is attached as Exhibit A.

15                              **JURISDICTION AND VENUE**

16         36.    This action is an unlimited civil case within the meaning of California Code of

17   Civil Procedure Section 88, in that, *inter alia*, the amount in controversy (as defined in California

18   Code of Civil Procedure Section 85(a)) exceeds twenty-five thousand dollars ($25,000). This

19   Court has subject-matter jurisdiction of Plaintiff's causes of action for rescission under Sections

20   25401 and 25501 of the California Corporate Securities Act, damages for negligent

21   misrepresentation, and rescission of its contracts to purchase the certificates. Under Section 22(a)

22   of the Securities Act of 1933, 15 U.S.C. § 77v(a), this Court also has jurisdiction over Plaintiff's

23   causes of action for violation of Sections 11, 12(a)(2), and 15 of that Act, 15 U.S.C. §§ 77k,

24   77l(a)(2), and 77o.

25         37.    Under Section 22(a) of the Securities Act, "no case arising under this title and

26   brought in any State court of competent jurisdiction shall be removed to any court of the United

27   States." Because there is not complete diversity between the Plaintiff and the Defendants, the

28

-9-

**COMPLAINT**

1    Federal courts have no jurisdiction of this action under 28 U.S.C. § 1332(a). This action is not

2    removable to Federal court.

3       38.    Defendants Banc of America, Citigroup Global, Credit Suisse, CWALT, CWMBS,

4    Deutsche, First Tennessee, Goldman Sachs, HSBC, Morgan Stanley, Greenwich Capital, Sequoia,

5    UBS, and Wells Fargo Bank are subject to personal jurisdiction in California because each of

6    them is registered to do business, and does business, in California. All of the Defendants are

7    subject to personal jurisdiction in California because they offered and sold, or controlled persons

8    that offered and sold, the certificates to Schwab "in California" within the meaning of Section

9    25008 of the California Corporate Securities Act.

10      39.    Venue is proper in this County because, among other reasons, the Defendants

11   offered and sold the certificates to Schwab in this County and because the violations of law

12   alleged in this Complaint, including the making of material untrue or misleading statements,

13   occurred in this County.

14                      **SECURITIZATION OF MORTGAGE LOANS**

15      40.    The securities that the Defendants sold Schwab are so-called **residential**

16   **mortgage-backed securities**, or **RMBS**, created in a process known as **securitization**.

17   Securitization begins with loans on which the borrowers are to make payments, usually monthly.

18   The entity that makes the loans is known as the **originator** of the loans. The process by which the

19   originator decides whether to make particular loans is known as the **underwriting** of loans. The

20   purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit

21   standing to repay them and only against sufficient collateral. In the loan underwriting process, the

22   originator applies its **underwriting standards**.

23      41.    In general, residential mortgage lenders may hold some of the mortgage loans they

24   originate in their own portfolio and may sell other mortgage loans they originate into

25   securitizations.

26      42.    In a securitization, a large number of loans, usually of a similar type, are grouped

27   into a **collateral pool**. The originator of those loans sells them (and, with them, the right to

28   receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The

-10-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

trust raises the cash to pay for the loans by selling **bonds**, usually called **certificates**, to investors such as Schwab. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

43.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part of the overall monthly cash flow from the loans in the collateral pool.

44.    In a more complex securitization, the cash flow is divided into different parts, usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into different **classes**, each with different rights. Each class of certificates is entitled to the cash flow in the tranche corresponding to that class.

45.    One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

46.    The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the senior classes of certificates may bear so little of that risk that they may be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully 10 times the historical average.

-11-

**COMPLAINT**

47.   All of the certificates referred to in this Complaint were senior certificates that were rated triple-A when Schwab purchased them.

*

48.   Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

49.   The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

*

50.   **Securities dealers**, like 12 of the Defendants, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

51.   Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file

-12-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    also includes notes from the person who underwrote the loan about whether and how the loan

2    complied with the originator's underwriting standards, including documentation of any

3    "compensating factors" that justified any departure from those standards.

4        52.    Potential investors in certificates are not given access to loan files. Instead, the

5    securities dealers that underwrite the sale of the certificates in a securitization are responsible for

6    gathering, verifying, and presenting to potential investors the information about the credit quality

7    of the loans that will be deposited into the trust. They do so by using information about the loans,

8    which has been compiled into a database known as a **loan tape**. The securities dealers use the

9    loan tape to compile numerous statistics about the loans, which are presented to potential

10   investors in a **prospectus supplement**, a disclosure document that the dealers are required to file

11   with the Securities and Exchange Commission.

12       53.    As alleged in detail below, the information that the Defendants presented to

13   Schwab about the credit quality of the loans in the collateral pools of the trusts contained many

14   statements that were material to the credit quality of those loans, but were untrue or misleading.

### TOLLING OF THE STATUTE OF LIMITATIONS

16       54.    Plaintiff is a putative member of the proposed classes in *Luther v. Countrywide

17   Financial Corporation*, Superior Court for the State of California County of Los Angeles No. BC

18   380698, filed on November 11, 2007; and *In re Wells Fargo Mortgage-Backed Certificates

19   Litigation*, United States District Court for the Northern District of California, No. 09-cv-01376-

20   SI, filed on March 27, 2009; the pendency of which has tolled the running of the statute of

21   limitations on the causes of action alleged in this Complaint.

### THE SALES OF THE CERTIFICATES

23       55.    The Defendants sold to Schwab 37 certificates in Securitizations Nos. 1 through

24   36. Details of each trust and each certificate are stated in Item 55 of Schedules 1 through 36 of

25   this Complaint. The Schedules correspond to Securitizations Nos. 1 through 36. Plaintiff

26   incorporates into this paragraph 55, and alleges as though fully set forth in this paragraph, the

27   contents of Item 55 of the schedules.

28

-13-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

56.    Defendants knew that Charles Schwab Treasury was responsible for locating, analyzing, and making investments for Schwab.

57.    Representatives of Defendants sent communications and solicitations to Charles Schwab Treasury in San Francisco for the purpose of inducing Charles Schwab Treasury to purchase the bonds for Schwab.

58.    The sale of these certificates occurred in California because representatives of the Defendants directed communications about the certificates and solicitations to purchase the bonds to Charles Schwab Treasury there, and because Charles Schwab Treasury received those communications and solicitations there.

## DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

59.    In connection with their offers and sales of the certificates to Schwab, each of the dealer Defendants sent numerous documents to Charles Schwab Treasury at its office in San Francisco. For each certificate, these documents included a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In each of these documents, each dealer made statements of material fact about the certificate that it offered and sold to Schwab. A true copy of the prospectus supplement for each securitization is available from the Securities and Exchange Commission's website.[3]

60.    Many of the statements of material fact that each dealer made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**I.    Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**A.    LTVs**

**1.    The materiality of LTVs**

61.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property

[3] A URL for each prospectus supplement is included in Item 55 of each schedule.

-14-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV is also a primary determinant of the severity of losses for those loans that do default. The lower the LTV, the lower the severity of losses on those loans that do default. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

62.    Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans and the associated certificates. Prepayment patterns affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

63.    In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Schwab purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

64.    An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the

-15-

**COMPLAINT**

1    LTV based on the incorrect appraised value understates the risk of the loan. It is also important to

2    note that, the higher the correct LTV, the more the risk is understated by an error in value of any

3    given magnitude. In the example above, though the risk of a loan with an LTV of 60% is greater

4    than the risk of one with an LTV of 54.5%, both imply a relatively safe loan because of the large

5    equity cushions. But a loan with an LTV of 90% is much riskier than one with an LTV of 81.8%.

6    In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former,

7    only 10%, just over half as much. Thus, a denominator that overvalues a property by just 10%

8    produces an overstatement of more than 80% in the homeowner's equity.

9        65.    For these reasons, a reasonable investor considers LTV critical to the decision

10    whether to purchase a certificate in a securitization of mortgage loans. Even small differences in

11    the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a

12    significant effect on both the risk and the rating of each certificate sold in that securitization and,

13    thus, are essential to the decision of a reasonable investor whether to purchase any such

14    certificate.

15        **2.    Untrue or misleading statements about the LTVs of the mortgage
            loans in the collateral pools of these securitizations**

16

17        66.    In the prospectus supplements and other documents they sent to Charles Schwab

18    Treasury, the Defendants made material untrue or misleading statements about the LTVs of the

19    mortgage loans in the collateral pools of these securitizations. Each such statement is identified in

20    Item 66 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 66, and

21    alleges as though fully set forth in this paragraph, the contents of Item 66 of the schedules.

22        67.    The mortgage loans in the collateral pools of these securitizations were divided

23    into groups. Payments on the certificates that Schwab purchased were to be made primarily from

24    the cash flows from the loans in the particular groups that were designated to support Schwab's

25    certificates. Because of the structure of the securitizations, however, in most cases the credit

26    quality of the loans in the other groups in the securitizations also was material to the risk of the

27    certificates that Schwab purchased.

28

-16-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

68.    The Defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the Defendants intended that these statements be understood as statements of fact. Charles Schwab Treasury did understand the statements about the LTVs as statements of fact. Plaintiff, Charles Schwab Treasury, and Schwab had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the Defendants made about those LTVs.

**3.    These statements were untrue because the stated LTVs of many of those mortgage loans were lower than their actual LTVs.**

69.    The stated LTVs of many of the mortgage loans in each securitization were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent.[4] The weighted-average LTVs presented in the prospectus supplements were also, therefore, untrue and misleading.

**a.    Use of an automated valuation model demonstrates that the Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

70.    Using a comprehensive, industry-standard automated valuation model (AVM), it is possible to determine the true market value of a certain property as of a selected date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

---

[4] References in this Complaint and the schedules to the denominator in the LTVs are to the appraised value of the properties as stated in the loan tapes. For the overwhelming majority of mortgage loans, the appraised value was used to calculate the stated LTVs in the loan tapes.

-17-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

71.    On many of the properties that secured the mortgage loans, the model reported that LTVs were understated. In particular, the model reported that the denominator (that is, the appraised value of the property as stated in the loan tape) that was used to determine the disclosed LTV was 105% or more of the true market value as determined by the model as of the time the loan was originated. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

72.    To take an example, in Securitization No. 1, there were 1,597 mortgage loans in the collateral pool. There was sufficient information for the model to determine the value of the properties that secured 930 of those loans. On 626 of those 930 properties, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $106,814,153. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of true market value on only 69 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominator was $11,194,470. Thus, the number of properties on which the value was overstated exceeded by more than nine times the number on which the value was understated, and the aggregate amount overstated was more than nine times the aggregate amount understated.

73.    On one of the loans in Securitization No. 1, the amount of the loan was $585,000 and the stated value of the property was $1,220,000, resulting in a stated LTV of 48%. The model, however, determined that the true value of the property was $794,000, resulting in a true LTV of 73.6%. Thus, the stated value was higher than the true value by 53.7%, and the stated LTV was lower than the true LTV by 34.7%. Both of these were huge discrepancies that were material to the credit quality of the loan.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-18-
COMPLAINT

74.     The overstated values of 626 properties made virtually every statement by the Defendants about the LTVs of the mortgage loans untrue or misleading. For example, the Defendants stated that all mortgage loans had an LTV of 100% or less. In fact, the mortgage loans on 196 of the 930 properties valued by the model had LTVs of over 100%. Defendants also stated that the weighted-average LTV of the loans was 73.84%. In fact, among the loans that the AVM was able to value, the weighted average LTV was 90.5%. These differences were material for the reasons stated above.

75.     The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans | 1,597 |
| Number of properties on which there was enough information for the model to determine a true market value | 930 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 626 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $106,814,153 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 69 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $11,194,470 |
| Number of loans with LTVs over 100%, as stated by Defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 196 |
| Weighted-average LTV, as stated by Defendants (group 4) | 73.84% |
| Weighted-average LTV, as determined by the model (group 4) | 90.5% |

76.     The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 76 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 76, and alleges as though fully set forth in this paragraph, the contents of Item 76 of the schedules.

        **b.    Subsequent sales of refinanced properties in the collateral pools indicate that Defendants' statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

77.     Of the mortgage loans in the collateral pools of these securitizations, many were taken out to refinance, rather than to purchase, properties. For those loans, the appraisal was the

-19-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   only basis for determining the value of the property because there is no sale price in a refinancing.

2   A substantial number of those properties have since been sold. In nearly all the pools, those

3   properties were sold for much less than the value ascribed to them in the LTV data reported in the

4   prospectus supplements and other documents that the Defendants sent to Charles Schwab

5   Treasury. The differences cannot be explained by the declines in house prices in the areas in

6   which those properties were located. Analysis of indices that track home prices in various

7   geographic areas shows that the differences between the values ascribed to these properties and

8   the prices at which the properties were sold are significantly greater than the declines in house

9   prices in the same geographical areas over the same periods (that is, between the making of each

10  mortgage loan and the corresponding sale). Thus, the large differences show that the values

11  ascribed to those properties, and to all properties in the collateral pools, in the LTV data reported

12  in the prospectus supplements and other documents that the Defendants sent to Charles Schwab

13  Treasury were too high, that the resulting LTVs were too low, and thus that the statements in the

14  prospectus supplements and other documents sent to Charles Schwab Treasury about the LTVs

15  were untrue or misleading.

16      78.    To take an example of Securitization No. 1, of the 1,597 mortgage loans in the

17  collateral pool, 812 were taken out to refinance, rather than to purchase, properties. For those 812

18  loans, the value (denominator) in the LTV was an appraised value rather than a sale price. Of

19  those 812 properties, 59 were subsequently sold for a total of approximately $30,927,350. The

20  total value ascribed to those same properties in the LTV data reported in the prospectus

21  supplements and other documents sent to Charles Schwab Treasury was $48,435,000. Thus, those

22  properties were sold for 63.9% of the value ascribed to them, a difference of 36.1%. This

23  difference is significantly greater than would have been predicted by the declines in house prices

24  in the areas in which those properties were located.

25      79.    The results of this analysis for the securitizations are stated in Item 79 of the

26  schedules of this Complaint. Plaintiff incorporates into this paragraph 79, and alleges as though

27  fully set forth in this paragraph, the contents of Item 79 of the schedules.

28

-20-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**4.    These statements were misleading because the Defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

80.    As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults, prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

81.    The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

82.    According to land records, many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to liens in addition to the lien of the

-21-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   mortgage in the pool at the time of the closing of these securitizations.[5] In twenty-four of the

2   securitizations, the Defendants failed to disclose any of these additional liens in the prospectus

3   supplements and other documents they sent to Charles Schwab Treasury. These additional liens

4   reduced the equity of the owners of the properties subject to them, and thereby increased the risk

5   that those owners would default in payment of the mortgage loan in the pool.

6       83.    To take an example, of the 2,274 properties that secured the mortgage loans in

7   Securitization No. 2, at least 669 were subject to undisclosed liens in addition to the lien of the

8   mortgage in the pool. The undisclosed additional liens on these properties reduced the owners'

9   equity in those properties by a weighted average of 91.5% and by an aggregate amount of

10  $32,261,150.

11      84.    On one of the loans, the original balance of the mortgage loan was $532,000, the

12  represented value of the property was $760,000, the owner's ostensible equity was $228,000, and

13  the reported LTV was 70%. On the date of the closing of this securitization, however, there were

14  undisclosed additional liens on this property of $200,000. Thus, the owner's true equity was only

15  $28,000, 87.7% less than the equity implied by the disclosed loan amount and value of the

16  property. In many cases, the amounts of the undisclosed additional liens were precisely equal to

17  the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases,

18  the amount of the undisclosed additional liens was much greater than the owner's ostensible

19  equity, putting the owner "under water" on the day on which this securitization closed.

20      85.    Similar numbers of additional undisclosed liens were found in each securitization

21  in which the Defendants did not disclose the existence of additional liens. Details of the

22  undisclosed additional liens in each securitization are stated in Item 85 of the schedules of this

23  Complaint. Plaintiff incorporates into this paragraph 85, and alleges as though fully set forth in

24  this paragraph, the contents of Item 85 of the schedules. Plaintiff is informed and believes, and

25  based thereon alleges, that discovery will demonstrate that the number of loans with additional

26  liens is substantially higher than those disclosed in the schedules.

27

28  _____
[5] Additional liens referred to in this Complaint and the schedules exclude liens on the loan tapes
that were originated on or before the date on which the mortgage loans in the pools were originated.

-22-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

86.    Because the Defendants did not disclose the existence or the amounts of these additional liens, all statements that they made about the LTVs of the mortgage loans were misleading.

### B.    Appraisals

87.    As discussed above in paragraph 64, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

88.    In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to pressure appraisers to appraise properties at values high enough to enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as "hitting the bid." In a purchase, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

89.    This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the Defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

-23-
**COMPLAINT**

1.    **These statements that the Defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

90.    The Defendants omitted to state that brokers and loan officers pressured appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid." This pressure came in many forms, including the following:

- the withholding of business if the appraisers refused to inflate values,

- the withholding of business if the appraisers refused to guarantee a predetermined value,

- the withholding of business if the appraisers refused to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give the brokers and loans officers the property values that they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc.

91.    The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 77 through 79 above, the appraisals of refinanced properties that were subsequently sold were overstated. Moreover, as alleged in paragraphs 70 through 76, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 9.1 | 9.5 |
| 2 | 2.0 | 2.8 |
| 3 | 6.2 | 5.8 |
| 4 | 2.1 | 2.2 |
| 5 | 2.9 | 4.2 |

-24-

COMPLAINT

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 6 | 2.5 | 2.7 |
| 7 | 2.8 | 3.4 |
| 8 | 4.3 | 6.0 |
| 9 | 5.8 | 6.8 |
| 10 | 3.8 | 5.5 |
| 11 | 3.3 | 2.3 |
| 12 | 3.0 | 3.5 |
| 13 | 1.9 | 2.1 |
| 14 | 4.1 | 5.3 |
| 15 | 2.1 | 2.9 |
| 16 | 3.1 | 3.9 |
| 17 | N/A | N/A |
| 18 | 1.7 | 1.4 |
| 19 | 3.6 | 3.6 |
| 20 | 9.0 | 15.3 |
| 21 | 4.6 | 4.5 |
| 22 | 4.8 | 5.1 |
| 23 | 2.6 | 3.1 |
| 24 | 1.7 | 1.4 |
| 25 | 1.8 | 1.5 |
| 26 | 6.0 | 7.7 |
| 27 | 3.3 | 4.2 |
| 28 | 3.4 | 3.8 |
| 29 | 4.1 | 5.3 |
| 30 | 2.9 | 4.1 |
| 31 | 3.1 | 3.0 |
| 32 | 1.7 | 3.5 |
| 33 | N/A | N/A |
| 34 | 3.8 | 4.4 |
| 35 | 3.0 | 4.0 |
| 36 | 3.1 | 6.7 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

92.     Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation, but rather were the result of pressure on the appraiser to "hit the bid."

-25-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**2.      The statements by the Defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

93.     Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

94.     USPAP includes the following provisions:

        (a)     Third USPAP Ethics Conduct Rule: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests."

        (b)     Fifth USPAP Ethics Conduct Rule: "An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions."

        (c)     Second USPAP Ethics Management Rule:

        It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

        1.      the reporting of a predetermined result (*e.g.*, opinion of value);

        2.      a direction in assignment results that favors the cause of the client;

        3.      the amount of a value opinion;

        4.      the attainment of a stipulated result; or

        5.      the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

95.     The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 19 discusses "Unacceptable Assignment Conditions in Real Property Appraisal Assignments." As background, Advisory Opinion 19 notes that many appraisers report requests for their services accompanied by such conditions as: "Approximate (or Minimum) value needed:

-26-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

_____"; "If this property will not appraise for at least _____, stop and call us immediately"; etc. About such conditions, Advisory Opinion 19 states:

> Certain types of conditions are unacceptable in any assignment because performing an assignment under such conditions violates USPAP. Specifically, an assignment condition is unacceptable when it:
>
> - precludes an appraiser's impartiality. Because such a condition destroys the objectivity and independence required for the development and communication of credible results;
>
> - limits the scope of work to such a degree that the assignment results are not credible, given the intended use of the assignment; or
>
> - limits the content of a report in a way that results in the report being misleading.

96.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 96 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 96, and alleges as though fully set forth in this paragraph, the contents of Item 96 of the schedules.

97.    Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

98.    Each of these statements referred to in paragraph 96 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-27-
COMPLAINT

*

99.    By each of the untrue and misleading statements referred to in paragraphs 66 and 96 above, the Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

**II.    Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

    **A.    The materiality of occupancy status**

100.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

101.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

    **B.    Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

102.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements about the number of properties in the collateral pool of each securitization that were the primary homes of their owners. To return to the example of Securitization No. 1, the Defendants stated that, of the 1,597 mortgage loans in the collateral pool, 1,498 were secured by primary residences and 99 were not. Details of each such statement in each securitization are stated in Item 102 of the schedules of this Complaint. Plaintiff

-28-
**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    incorporates into this paragraph 102, and alleges as though fully set forth in this paragraph, the

2    contents of Item 102 of the schedules.

3        103.    These statements were untrue or misleading because (i) the stated number of

4    mortgage loans secured by primary residences was higher than the actual number of loans in that

5    category; (ii) the stated number of mortgage loans not secured by primary residences was lower

6    than the actual number of loans in that category; or (iii) the Defendants omitted to state that the

7    occupancy status of a significant number of the properties that secured the mortgage loans in the

8    collateral pools was misstated because of fraud.

9        **C.    Basis of the allegations above that these statements about the occupancy
           status of the properties that secured the mortgage loans in the collateral pools**
10           **were untrue or misleading**

11        104.    Because they are less risky than other mortgage loans, mortgage loans on primary

12    residences usually have more favorable terms, including lower interest rates and more lenient

13    underwriting standards, than mortgage loans on second homes and investment properties.

14    Applicants for loans on second homes and investment properties therefore have an incentive to

15    state that the property will be their primary residence even when it will not. Plaintiff is informed

16    and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans

17    did so.

18        105.    A significant number of the properties in the collateral pool of each securitization

19    that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and

20    believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the

21    loan files of many more of the mortgage loans in the collateral pool.

22        106.    With respect to some of the properties that were stated to be primary residences,

23    the borrower instructed local tax authorities to send the bills for the taxes on the property to the

24    borrower at an address other than the property itself. This is strong evidence that the mortgaged

25    property was not the borrower's primary residence.

26        107.    In some states and counties, owners of a property are able to designate whether

27    that property is his or her "homestead," which may reduce the taxes on that property or exempt

28    the property from assets available to satisfy the owner's creditors, or both. An owner may

-29-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    designate only one property, which he or she must occupy, as his or her homestead. The fact that

2    an owner in one of these jurisdictions does not designate a property as his or her homestead when

3    he or she can do so is strong evidence that the property was not his or her primary residence. With

4    respect to some of the properties that were stated to be primary residences, the owner could have

5    but did not designate the property as his or her homestead. That omission is strong evidence that

6    the property was not the borrower's primary residence.

7        108.    With respect to some of the properties that were stated to be primary residences,

8    the borrower owned three or more properties. Thus it was reasonably likely that the borrower did

9    not live in the property that was stated to be owner-occupied.

10        109.    When a borrower who lives in a mortgaged property falls behind in his or her

11    payments, it is normally many months before foreclosure ensues, during which time the borrower

12    tries to become current in his or her payments or to modify the mortgage so as not to lose his or

13    her home. During this time, the borrower becomes progressively more delinquent (30 days past

14    due, 60 days past due, etc.). In the very rare circumstances in which a mortgage loan goes straight

15    from being current to either foreclosure or ownership by the lender, it is usually because the

16    borrower did not live in the property and so made no effort to remain in it, but instead abandoned

17    the property to the lender soon after he or she became unable to make the payments. In many of

18    the securitizations, there were mortgage loans in the collateral pools that were secured by

19    properties that were stated to be primary residences and that went straight from current to

20    foreclosure or ownership by the lender. It is more likely than not that the properties that secured

21    these mortgage loans were actually not primary residences.

22        110.    In Securitization No. 1, 112 owners of properties that were stated to be primary

23    residences instructed local tax authorities to send the bills for the taxes on that property to them at

24    a different address; 283 owners of properties that were stated to be primary residences could

25    have, but did not, designate that property as their homestead; and 27 owners of properties that

26    were stated to be primary residences owned three or more properties. Eliminating duplicates, 372

27    properties that were stated to be primary residences actually were not, for one or more of these

28    reasons. Thus, of the 1,498 properties that were stated to be primary residences, 372 actually were

-30-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   not, and the number of properties that were not primary residences was not 99, as Defendants

2   stated, but actually 471, a material difference. The numbers of such loans in the collateral pool of

3   each securitization are stated in Item 110 of the schedules of this Complaint. Plaintiff incorporates

4   into this paragraph 110, and alleges as though fully set forth in this paragraph, the contents of

5   Item 110 of the schedules.

6                                                  *

7       111.    By each of the untrue and misleading statements referred to in paragraph 102, the

8   Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

9   **III.    Untrue or Misleading Statements About the Underwriting Standards of the
            Originators of the Mortgage Loans in the Collateral Pools**

10          **A.    The materiality of underwriting standards and the extent of an originator's
                    departures from them**

12      112.    Originators of mortgage loans have written standards by which they underwrite

13  applications for loans. An important purpose of underwriting is to ensure that the originator

14  makes mortgage loans only in compliance with those standards and that its underwriting decisions

15  are properly documented. An even more fundamental purpose of underwriting mortgage loans is

16  to ensure that loans are made only to borrowers with credit standing and financial resources to

17  repay the loans and only against collateral with value, condition, and marketability sufficient to

18  secure the loans. An originator's underwriting standards, and the extent to which the originator

19  departs from its standards, are important indicators of the risk of mortgage loans made by that

20  originator and of certificates sold in a securitization in which mortgage loans made by that

21  originator are part of the collateral pool. A reasonable investor considers the underwriting

22  standards of originators of mortgage loans in the collateral pool of a securitization, and the extent

23  to which each originator departs from its standards, important to the decision whether to purchase

24  a certificate in that securitization.

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-31-
**COMPLAINT**

**B.    Untrue or misleading statements about the underwriting standards of originators of the mortgage loans in the collateral pools and about the extent to which those originators departed from their standards**

**1.    The untrue or misleading statements**

113.    In the prospectus supplements and other documents they sent to Charles Schwab Treasury, the Defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pool. Details of each such statement are stated in Item 113 of the schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 113, and alleges as though fully set forth in this paragraph, the contents of Item 113 of the schedules.

114.    Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the Defendants omitted to state that: (a) the originators were departing extensively from those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

**2.    Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools, and about the extent of their departures from those standards, were untrue or misleading**

**a.    The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

115.    Plaintiff is informed and believes, and based thereon alleges, before and during the time of these securitizations, many originators of mortgage loans relaxed their actual lending practices for loans they sold into securitizations, even though their stated underwriting standards may have remained unchanged. As a result of this relaxation, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

-32-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

116.    Based on an extensive empirical study of mortgage loans made and sold into securitizations during this period, economists at the University of Michigan and elsewhere found that the high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

117.    What these economists found about recent securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator Countrywide Home Loans Inc. as an example, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Countrywide Home Loans Inc. and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator departed from its underwriting standards in making the loan, often by failing to detect fraud in the application. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Countrywide Home Loans Inc. that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by departures from its underwriting standards.

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-33-
COMPLAINT



118.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, confirming the finding of the economists at the University of Michigan that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



-34-
COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

119.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of the following Exhibits to this Complaint: ·

| Exhibit | Originator |
|---------|------------|
| B | Bank of America N.A. |
| C | Countrywide Home Loans Inc. |
| D | EMC Mortgage Corporation |
| E | GMAC Mortgage Corporation |
| F | Morgan Stanley |
| G | PHH Mortgage Corporation |
| H | SunTrust Mortgage Inc. |
| I | Wells Fargo Bank N.A. |

Plaintiff incorporates into this paragraph 119, and alleges as though fully set forth in this paragraph, the contents of Figures 1 and 2 in each Exhibit.

**b.    The poor performance of the loans in these pools demonstrates that the originators departed extensively from their underwriting guidelines when making these loans.**

120.    As noted above, an EPD is strong evidence that the originator may have departed from its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced very high rates of EPDs. This much higher-than-normal rate of EPDs is strong evidence that the originators of those loans may have departed extensively from their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 120 of the schedules of this Complaint. Plaintiff incorporates into this paragraph 120, and alleges as though fully set forth in this paragraph, the contents of Item 120 of the schedules.

121.    A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have departed from their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which

-35-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the

2    collateral pools have experienced very high rates of delinquencies by this measure. This high rate

3    of delinquencies is strong evidence that the originators of those loans may have departed

4    extensively from their underwriting standards when making those loans. The number and percent

5    of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 121 of the

6    schedules of this Complaint. Plaintiff incorporates into this paragraph 121, and alleges as though

7    fully set forth in this paragraph, the contents of Item 121 of the schedules.

8        122.    A second common measure of delinquency is the number of loans on which the

9    borrowers are 30 or more days delinquent now. The mortgage loans in the collateral pools have

10   experienced very high rates of delinquencies by this measure, some as high as 57% of the loans as

11   of March 31, 2010. This much high rate of delinquencies is strong evidence that the originators of

12   those loans may have departed extensively from their underwriting standards when making those

13   loans. The number and percent of the loans in each pool that were 30 or more days delinquent on

14   March 31, 2010, are stated in Item 122 of the schedules of this Complaint. Plaintiff incorporates

15   into this paragraph 122, and alleges as though fully set forth in this paragraph, the contents of

16   Item 122 of the schedules.

17                                          *

18       123.    By each of the untrue and misleading statements referred to in paragraph 113

19   above, the Defendants materially understated the risk of the certificates that they offered and sold

20   to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that

21   discovery will yield additional evidence that the originators departed extensively from their

22   underwriting guidelines when making the mortgage loans in the collateral pools of these

23   securitizations.

24   **IV.    The Large Number of Mortgage Loans in the Collateral Pools About Which the
           Defendants Made Material Untrue or Misleading Statements Made Their Statements
25         About the Ratings of Schwab's Certificates Untrue and Misleading.**

26       124.    In the prospectus supplements and other documents they sent to Charles Schwab

27   Treasury, the Defendants made statements about the rating of each certificate by Moody's

28   Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. They stated that one or

-36-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1     more of those agencies rated each such certificate triple-A or above. Details of each such

2     statement are stated in Item 124 of the schedules of this Complaint. Plaintiff incorporates into this

3     paragraph 124, and alleges as though fully set forth in this paragraph, the contents of Item 124 of

4     the schedules.

5          125.    The ratings were important to the decision of any reasonable investor whether to

6     purchase the certificates. Many investors, including Schwab, have investment policies that require

7     a certain minimum rating for all investments. The policy of Schwab was to purchase only

8     certificates that were rated triple-A.

9          126.    These statements by the Defendants about the ratings of the certificates they sold

10    to Schwab were misleading because the Defendants omitted to state that the ratings did not take

11    into account all the material untrue or misleading statements about specific mortgage loans in the

12    collateral pool. These include:

13         (a)     loans in which the LTVs were materially understated;

14         (b)     loans in which the owner's equity in the property was reduced by 5% or more by

15    undisclosed additional liens;

16         (c)     loans that suffered EPDs, strong evidence that the originators may have made

17    undisclosed departures from the underwriting standards in making those loans; and

18         (d)     loans in which the properties were stated to be owner-occupied, but were not.

19         127.    In Securitization No. 1, there were 626 loans whose LTVs were materially

20    understated and 372 loans in which the properties were stated to be owner-occupied but were not.

21    Eliminating duplicates, there were 846 loans (or 53% of the loans in the collateral pool) about

22    which Defendants made untrue or misleading statements. The numbers of such loans in the

23    collateral pool of each securitization are stated in Item 127 of the schedules of this Complaint.

24    Plaintiff incorporates into this paragraph 127, and alleges as though fully set forth in this

25    paragraph, the contents of Item 127 of the schedules.

26         128.    Plaintiff is informed and believes, and based thereon alleges, that loan files and

27    other documents available only through discovery will prove that those statements were untrue or

28    misleading with respect to many more loans as well.

-37-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

129.    By these untrue and misleading statements, the Defendants materially understated the risk of the certificates that they offered and sold to Schwab. Moreover, Plaintiff is informed and believes, and based thereon alleges, that the Defendants materially understated the risk of the certificates that they offered and sold to Schwab.

### FIRST CAUSE OF ACTION

**UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES**
**(California Corporations Code §§ 25401, 25501)**

130.    This cause of action is alleged against the following Defendants:

| *Against Defendants:* | *In connection with Securitization:* |
| --- | --- |
| BNP | Securitization No. 1 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| Deutsche Bank | Securitizations Nos. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| UBS | Securitizations Nos. 34, 35, 36 |

131.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 129.

132.    In doing the acts alleged in the sale to Schwab of the certificates in the securitizations referred to above, the Defendants named above violated Sections 25401 and 25501 of the California Corporations Code by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133.    This action is brought within two years after the discovery of the untrue and misleading statements in the prospectus supplements and other documents that the Defendants sent to Charles Schwab Treasury, and within five years of Schwab's purchase of these

-38-

**COMPLAINT**

certificates, or within any applicable period as tolled by the pendency of the class actions referred

to above or others. Despite having exercised reasonable diligence, neither Plaintiff, Charles

Schwab Treasury, nor Schwab could reasonably have discovered earlier the untrue and

misleading statements in the prospectus supplements and other documents.

134.    Under California Corporations Code §§ 25401 and 25501, Plaintiff is entitled to

recover the consideration paid for each of these certificates, plus interest at the legal rate from the

date of purchase to the date on which it recovers the purchase price, minus the amount of income

received on the certificate. Pursuant to § 25501, and in anticipation of the remedies thereunder,

Plaintiff hereby offers to tender each certificate.

### SECOND CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS
### IN REGISTRATION STATEMENTS
#### (Section 11 of the Securities Act of 1933)

135.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitization: |
|---|---|
| Banc of America | Securitization No. 3 |
| CWALT | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Credit Suisse | Securitization No. 18 |
| Deutsche | Securitization No. 19 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitization No. 28 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |

136.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1

through 134.

137.    In doing the acts alleged, the Defendants named above violated Section 11 of the

Securities Act of 1933 in connection with the sale to Schwab of the certificates in the

securitizations referred to above.

-39-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1       138.   The certificates in these securitizations were issued pursuant or traceable to

2   registration statements. Details of each registration statement and each certificate are stated in

3   Item 55 of the schedules.

4       139.   Wells Fargo Asset is the depositor of the securitization listed above and therefore

5   is the issuer of the certificates in those securitizations. UBS acted as underwriter of the certificate

6   listed above.

7       140.   This action is brought within one year after the discovery of the untrue and

8   misleading statements in the registration statements, as amended by the prospectus supplements,

9   and within three years of these certificates having been sold to the public, or within any

10   applicable period as tolled by the pendency of the class actions referred to above or others.

11   Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab

12   did not and could not reasonably have discovered earlier the untrue and misleading statements in

13   the prospectus supplements.

14       141.   The registration statements, as amended by the prospectus supplements, contained

15   untrue statements of material fact and omitted to state material facts necessary in order to make

16   the statements, in the light of the circumstances under which they were made, not misleading.

17   These untrue and misleading statements included all of the untrue and misleading statements

18   described in paragraphs 59 through 129.

19       142.   Plaintiff expressly excludes from this cause of action any allegation that could be

20   construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

21   on claims of strict liability or negligence under the Securities Act of 1933.

22       143.   Schwab did not know when it purchased these certificates that the statements in

23   the registration statements, as amended by the prospectus supplements, were untrue or

24   misleading.

25       144.   Schwab has suffered a loss on each of these certificates.

26       145.   Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

27

28

-40-

**COMPLAINT**

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

### THIRD CAUSE OF ACTION

### UNTRUE OR MISLEADING STATEMENTS IN THE SALE OF SECURITIES
#### (Section 12(a)(2) of the Securities Act of 1933)

146.    This cause of action is alleged against the following Defendants:

| Against Defendant: | In connection with Securitization: |
|---|---|
| Banc of America | Securitization No. 3 |
| CWALT | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Credit Suisse | Securitization No. 18 |
| Deutsche | Securitization No. 19 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitization No. 28 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |

147.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 145.

148.    In doing the acts alleged, the Defendants named above violated Section 12(a)(2) of the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred to above.

149.    This action is brought within one year after the discovery of the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury, and within three years of these certificates having been sold to the public, or within any applicable period as tolled by the pendency of the class actions referred to above or others. Despite having exercised reasonable diligence, Plaintiff, Charles Schwab Treasury, and Schwab did not and could not reasonably have discovered earlier the untrue and misleading statements in the prospectus supplements and other written offering materials and oral communications that the dealers sent to Charles Schwab Treasury.

150.    Wells Fargo Asset is the depositor of the securitization listed above and therefore is the issuer of the certificates in that securitization. In connection with the offer and sale of these

-41-

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  certificates to Schwab, the issuer also made all of the statements of material fact about these

2  certificates that were in the prospectus supplements and other written offering materials and oral

3  communications that that the dealers sent to Charles Schwab Treasury.

4      151.   Plaintiff expressly excludes from this cause of action any allegation that could be

5  construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely

6  on claims of strict liability or negligence under the Securities Act of 1933.

7      152.   The Defendants named above solicited Schwab to purchase these certificates, and

8  sold the certificates to Schwab, by means of the prospectus supplements and other written

9  offering materials and oral communications.

10      153.   The prospectus supplements and other written offering materials and oral

11  communications that the dealers sent to Charles Schwab Treasury contained untrue statements of

12  material fact and omitted to state material facts necessary in order to make the statements, in the

13  light of the circumstances under which they were made, not misleading.

14      154.   Schwab did not know when it purchased these certificates that the statements in

15  the prospectus supplements and other written offering materials and oral communications that the

16  dealers sent to Charles Schwab Treasury were untrue or misleading.

17      155.   Schwab has suffered a loss on each of these certificates.

18      156.   Plaintiff is entitled to recover the consideration paid for each of these certificates,

19  plus interest at the legal rate from the date of purchase to the date on which it recovers the

20  purchase price, minus the amount of income received on each certificate. Pursuant to Section

21  12(a)(2), and in anticipation of the remedies thereunder, Plaintiff hereby offers to tender each

22  certificate.

23

24

25

26

27

28

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

-42-
**COMPLAINT**

## FOURTH CAUSE OF ACTION

### LIABILITY OF CONTROLLING PERSON
(Section 15 of the Securities Act of 1933)

157.    This cause of action is alleged against the following Defendant:

| Against Defendants: | In connection with Securitizations: |
|---|---|
| Countrywide Financial Corporation | Securitizations Nos. 3, 9, 18, 19, 24, 25 |
| Wells Fargo Bank | Securitizations Nos. 26, 27, 28 |

158.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 156.

159.    The Defendants named above is liable because, in doing the acts alleged, persons they controlled violated Sections 11 and 12(a)(2) of the Securities Act of 1933 in the sale to Schwab of the certificates in the securitizations referred to above.

160.    Countrywide Financial Corporation by or through stock ownership, agency, or otherwise, controlled CWALT within the meaning of Section 15 of the Securities Act of 1933.

161.    Wells Fargo Bank by or through stock ownership, agency, or otherwise, controlled Wells Fargo Asset within the meaning of Section 15 of the Securities Act of 1933.

162.    In doing the acts alleged, each controlled person named in paragraphs 161 is liable under Sections 11 and 12(a)(2) of the Securities Act of 1933 for the reasons alleged in paragraphs 1 through 156.

163.    The Defendants named above are therefore jointly and severally liable with and to the same extent as the person they controlled.

-43-
COMPLAINT

## FIFTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION
(California Civil Code §§ 1572 *et seq.* and 1709 *et seq.*, and Common Law)

164.    This cause of action is alleged against the following Defendants:

| Against Defendants: | In connection with Securitization: |
|---|---|
| BNP | Securitization No. 1 |
| CWMBS | Securitizations Nos. 1, 8, 35, 36 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Banc of America Mortgage Securities | Securitizations Nos. 2, 5, 6 |
| CWALT | Securitizations Nos. 3, 9,18, 19, 24, 25 |
| Banc of America Funding | Securitizations Nos. 4, 7 |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Citigroup Mortgage | Securitizations Nos. 10, 12, 13, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| CSFB Mortgage Securities | Securitization No. 16 |
| Residential Asset Mortgage | Securitizations Nos. 17, 22, 33 |
| Residential Accredit | Securitization No. 11 |
| Deutsche Bank | Securitization No. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| First Horizon | Securitizations Nos. 14, 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| GS Mortgage | Securitizations Nos. 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Wells Fargo Asset | Securitizations Nos. 26, 27, 28 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| Morgan Stanley Capital | Securitizations Nos. 29, 30, 31 |
| Sequoia | Securitization No. 32 |
| MAST | Securitization No. 34 |
| UBS | Securitizations Nos. 34, 35, 36 |

165.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 163.

166.    As alleged above, the Defendants named above made untrue or misleading representations regarding the LTVs of the mortgage loans in the collateral pools of these securitizations, the occupancy status of properties that secured the mortgage loans in these securitizations, underwriting guidelines of the originators, and related matters.

-44-

COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

167.   In making the representations referred to above, the Defendants intended to induce Schwab to rely on those representations in making its decision to purchase these certificates in these securitizations.

168.   When the Defendants made these representations, they had no reasonable ground for believing them to be true. Plaintiff is informed and believes, and based thereon alleges, that Defendants had access to the files on the mortgage loans in the collateral pools for these securitizations, and, had the Defendants inspected those files, they would have learned that the information they gave Charles Schwab Treasury contained untrue or misleading statements. In addition, Plaintiff is informed and believes, and based thereon alleges, that Defendants hired one or more "due-diligence contractors" to ascertain whether the mortgage loans in the collateral pools complied with the representations and warranties made about those loans, and these contractors reported to the Defendants that a material number of the loans in the collateral pools were different from the descriptions of those loans in the prospectus supplements. Thus, Plaintiff is informed and believes, and based thereon alleges, that the Defendants had access to information that either did make the Defendants aware, or should have made them aware had they heeded that information, that the representations they made to Charles Schwab Treasury contained material untrue or misleading statements about the mortgage loans in the collateral pools.

169.   When it purchased these certificates, Schwab did not know about the untrue and misleading statements alleged herein.

170.   Schwab reasonably and justifiably relied on the representations described above in analyzing and deciding to purchase these certificates. Had the Defendants not made these false and misleading representations, Schwab would not have purchased these certificates.

171.   As a direct and proximate result of the negligent misrepresentations by the Defendants, Schwab was damaged in an amount to be proved at trial.

-45-

**COMPLAINT**

## SIXTH CAUSE OF ACTION

### RESCISSION OF CONTRACT
(California Civil Code §§ 1689 and 1710, and Common Law)

172.    This cause of action is alleged against the following Defendants:

| Against Defendants: | In connection with Securitization: |
|---|---|
| BNP | Securitization No. 1 |
| Banc of America | Securitizations Nos. 2, 3, 4, 5, 6, 7, |
| Citigroup Global | Securitizations Nos. 10, 11, 12, 13, 14, 15 |
| Credit Suisse | Securitizations Nos. 16, 17, 18 |
| Deutsche Bank | Securitizations Nos. 19 |
| First Tennessee | Securitizations Nos. 20, 21 |
| Goldman Sachs | Securitizations Nos. 22, 23 |
| Greenwich Capital | Securitizations Nos. 24, 25 |
| HSBC | Securitizations Nos. 26, 27 |
| Morgan Stanley | Securitizations Nos. 28, 29, 30, 31, 32, 33 |
| UBS | Securitizations Nos. 34, 35, 36 |

173.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 171.

174.    Schwab purchased each certificate pursuant to a contract in writing between Schwab and the dealer from which it purchased that certificate. Each contract stated the consideration that Schwab paid each dealer for each certificate.

175.    In making each contract to purchase the certificates, Schwab relied on the truth of the statements that the Defendants named above made in the prospectus supplements and other offering materials. Because those statements were untrue or misleading, Schwab was mistaken about its basic assumptions underlying its purchase of each certificate, and this mistake had a material adverse effect on the agreed-upon exchange represented by Schwab's purchase of each certificate. Because the Defendants named above were responsible to provide accurate information in the prospectus supplements, Schwab did not assume, nor does it bear, the risk of the fundamental mistake underlying its decision to purchase these certificates.

COMPLAINT

GOODIN, MACBRIDE, SQUERI, DAY & LAMPREY, LLP
ATTORNEYS AT LAW
SAN FRANCISCO

176.    The Defendants named above obtained the consent of Schwab to the contracts to purchase the certificates by means of their assertion, as facts, of that which was not true, when those Defendants had no reasonable ground for believing those assertions to be true.

177.    Pursuant to California Civil Code. § 1689 *et seq.*, Plaintiff is entitled to rescind, and does hereby demand the rescission of, each contract for the sale and purchase of these certificates. Plaintiff offers to restore all benefits that Schwab has received under those contracts and is entitled to recover all consideration paid under them.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment as follows:

A.    On the first cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

B.    On the second cause of action, damages in an amount to be determined at trial;

C.    On the third cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

D.    On the fourth cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

E.    On the fifth cause of action, damages in an amount to be determined at trial;

F.    On the sixth cause of action, the consideration paid for each certificate with interest thereon, less the amount of any income received thereon, upon Plaintiff's tender of each certificate;

G.    All together with the costs of this action, the reasonable fees of Plaintiff's attorneys in this action, and such other and further relief as the Court may deem just.

-47-

**COMPLAINT**

Dated: July 15, 2010

GOODIN, MACBRIDE, SQUERI,
DAY & LAMPREY, LLP

By 
       Robert A. Goodin

LOWELL HAKY

GRAIS & ELLSWORTH LLP

Attorneys for Plaintiff
The Charles Schwab Corporation

-48-

**COMPLAINT**

# EXHIBIT C

1221 Avenue of the Americas
New York, NY 10020

## Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:    (212) 762-7291
Facsimile No:    (914) 729-2950
Email: David.Restaino@morganstanley.com

September 1, 2011

VIA OVERNIGHT MAIL

Residential Asset Mortgage Products, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attention: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated June 23, 2005 (the "Agreement"), relating to the sale of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 issued by Residential Asset Mortgage Products, Inc. (the "Company"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated ("Morgan Stanley") in respect of which the Company has agreed to indemnify and hold harmless Morgan Stanley and each person controlling Morgan Stanley.

The action is a complaint filed by The Charles Schwab Corporation, captioned <u>Charles Schwab Corp. v. BNP Paribas Securities Corp. et al.</u>, Case No. CGC-10-501610, in the Superior Court of the State of California, County of San Francisco.

The Complaint constitutes an action in respect of which the indemnification and contribution provisions of Sections 7.1 and 7.4 of the Agreement apply. The Complaint also names the Company as a defendant.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

1221 Avenue of the Americas
New York, NY 10020

## Morgan Stanley

**David P. Restaino, Executive Director**
**Legal and Compliance Division**
**Direct Dial:     (212) 762-7291**
**Facsimile No:   (914) 729-2950**
**Email:  David.Restaino@morganstanley.com**

September 1, 2011

VIA OVERNIGHT MAIL

GMAC Mortgage Corporation
100 Witmer
Horsham, Pennsylvania  19044
Attention:  President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated June 23, 2005, relating to the sale of GMACM Mortgage Pass-Through Certificates, Series 2005-AR4 issued by Residential Asset Mortgage Products, Inc. (the "Agreement"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated ("Morgan Stanley") in respect of which GMAC Mortgage Corporation has agreed to indemnify and hold harmless Morgan Stanley and each person controlling Morgan Stanley.

The action is a complaint filed by The Charles Schwab Corporation, captioned Charles Schwab Corp. v. BNP Paribas Securities Corp. et al., Case No. CGC-10-501610, in the Superior Court of the State of California, County of San Francisco.

The Complaint constitutes an action in respect of which the indemnification and contribution provisions of Sections 7.1 and 7.4 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

# EXHIBIT 3

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

Name of Debtor and Case Number: Residential Funding Company, LLC, Case No. 12-12019

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC)

❐ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

c/o Kevin H. Marino
Marino, Tortorella & Boyle, P.C.
437 Southern Boulvard
Chatham, New Jersey 07928

**Court Claim Number:**_____
(*If known*)

Filed on:_____

Telephone number: 973-824-9300        email: kmarino@khmarino.com

Name and address where payment should be sent (if different from above):

❐ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Telephone number:        email:

1. Amount of Claim as of Date Case Filed: $ unliquidated/contingent/subject to amendment

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❐ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

2. Basis for Claim: Obligation in Underwriting Agreement to indemnify and hold harmless from certain claims
(See instruction #2)

| 3. Last four digits of any number by which creditor identifies debtor: | 3a. Debtor may have scheduled account as: | 3b. Uniform Claim Identifier (optional): |
|---|---|---|
| __ __ __ __ | (See instruction #3a) | (See instruction #3b) |

4. Secured Claim (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ❐ Real Estate  ❐ Motor Vehicle  ❐ Other
Describe:
Value of Property: $_____ Annual Interest Rate_____% ❐ Fixed ❐ Variable
(when case was filed)
Amount of arrearage and other charges, as of the time case was filed, included in secured claim,

if any: $_____        Basis for perfection: _____

Amount of Secured Claim: $_____        Amount Unsecured: $_____

6. Claim Pursuant to 11 U.S.C. § 503(b)(9):
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

7. Credits. The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

8. Documents: Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and redacted copies of documents providing evidence of perfection of a security interest are attached. (*See instruction #8, and the definition of "redacted".*)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

9. Signature: (See instruction #9) Check the appropriate box.
❐ I am the creditor.  ❐ I am the creditor's authorized agent.        ❐ I am the trustee, or the debtor, or        ❐ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)        their authorized agent.        indorser, or other codebtor.
(See Bankruptcy Rule 3004.)        (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Kevin H. Marino
Title: Outside Counsel
Company: Marino, Tortorella & Boyle, P.C.        (Signature)        12·27·12 (Date)
Address and telephone number (if different from notice address above):

Telephone number: 973-824-9300        Email: kmarino@khmarino.com

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

❐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

❐ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

❐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

❐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

❐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

❐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

Amount entitled to priority:

$_____

* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 Modified (Official Form 10) (12/11) cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

### Items to be completed in Proof of Claim form

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Instructions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Claim Pursuant to 11 U.S.C. §503(b)(9):**
Check this box if you have a claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim. (See DEFINITIONS, below.)

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://www.kccllc.net/ResCap.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## SUMMARY OF CLAIM

On or about July 26, 2006, Morgan Stanley & Co. Incorporated, n/k/a Morgan Stanley & Co. LLC ("Morgan Stanley"), entered into an Underwriting Agreement ("Underwriting Agreement No. 1") relating to the sale of Residential Funding Mortgage Securities I, Inc. Mortgage Pass-Through Certificates, Series 2006-S6 issued by Residential Funding Mortgage Securities I, Inc. ("RFMS I, Inc."), the debtor in Case No. 12-12060. (Exhibit A.) Pursuant to sections 7.1 and 7.3 of Underwriting Agreement No. 1, RFMS I, Inc. and Residential Funding Corporation, a/k/a Residential Funding Company, LLC ("Residential Funding"), the debtor in Case No. 12-12019, agreed to indemnify Morgan Stanley and hold it harmless for certain claims and actions. (Id.)

On or about August 10, 2012, the Federal Deposit Insurance Corporation as Receiver for Colonial Bank filed in the Circuit Court of Montgomery County, Alabama, a complaint entitled Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust, Inc., et al. (the "Colonial Bank Action") against Morgan Stanley and others. (Exhibit B.) The Colonial Bank Action constitutes an action for which RFMS I, Inc. and Residential Funding agreed in Underwriting Agreement No. 1 to indemnify and hold Morgan Stanley harmless. By letters dated September 5, 2012, Morgan Stanley notified RFMS I, Inc. and Residential Funding of the Colonial Bank Action and their indemnification obligations with respect to that action. (Exhibit C.)

On or about July 27, 2007, Morgan Stanley entered into an Underwriting Agreement ("Underwriting Agreement No. 2") relating to the sale of Residential Funding Mortgage Securities I, Inc. Mortgage Pass-Through Certificates, Series 2007-S7 issued by RFMS I, Inc. (Exhibit D.) Pursuant to sections 7.1 and 7.3 of Underwriting Agreement No. 2, RFMS I, Inc.

and Residential Funding agreed to indemnify Morgan Stanley and hold it harmless for certain claims and actions. (Id.)

On or about November 4, 2011, the Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. filed in the District Court of Texas, Harris County a complaint entitled Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc. (the "Franklin Bank" Action") against Morgan Stanley. (Exhibit E.) The Franklin Bank Action constitutes an action for which RFMS I, Inc. and Residential Funding agreed in Underwriting Agreement No. 2 to indemnify and hold Morgan Stanley harmless. By letters dated November 10, 2011, Morgan Stanley notified RFMS I, Inc. and Residential Funding of the Franklin Bank Action and their indemnification obligations with respect to that action. (Exhibit F.)

# EXHIBIT A

## RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.

Mortgage Pass-Through Certificates, Series 2006-S6

| Initial Principal Amount | Class | Initial Pass-Through Rate |
| --- | --- | --- |
| $10,000,000 | Class A-1 Certificates | Variable |
| $20,000,000 | Class A-2 Certificates | Variable |
| $50,000,000 | Class A-3 Certificates | 6.25% |
| Notional | Class A-4 Certificates | 0.00% |
| $25,000,000 | Class A-5 Certificates | 6.00% |
| Notional | Class A-6 Certificates | 6.00% |
| $5,000,000 | Class A-7 Certificates | 6.00% |
| $208,333 | Class A-8 Certificates | 6.00% |
| $140,586,000 | Class A-9 Certificates | 6.00% |
| $9,754,000 | Class A-10 Certificates | 6.00% |
| $57,500,000 | Class A-11 Certificates | 6.00% |
| $102,866,700 | Class A-12 Certificates | 6.00% |
| $64,933,000 | Class A-13 Certificates | 6.00% |
| $25,000,000 | Class A-14 Certificates | 6.00% |
| $50,849,000 | Class A-15 Certificates | 6.00% |
| $14,502,000 | Class A-16 Certificates | 6.00% |
| $100 | Class R-1 Certificates | 6.00% |
| $66 | Class R-II Certificates | 6.00% |

## UNDERWRITING AGREEMENT

July 26, 2006

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, NY 10036

Ladies and Gentlemen:

Residential Funding Mortgage Securities I, Inc., a Delaware corporation (the "Company"), proposes to sell to you (also referred to herein as the "Underwriter") Mortgage Pass-Through Certificates, Series 2006-S6, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class R-I and Class R-II Certificates (collectively, the "Certificates"), other than a de minimis portion of each of the Class R Certificates, having the

5132915

aggregate principal amounts and Pass-Through Rates set forth above.  The Certificates, together with the Class A-V, Class A-P, Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates of the same series, will evidence the entire beneficial interest in the Trust Fund (as defined in the Pooling and Servicing Agreement referred to below), consisting primarily of a pool (the "Pool") of conventional, fixed-rate, one- to four-family residential first lien mortgage loans (the "Mortgage Loans") as described in the Prospectus Supplement (as hereinafter defined) to be sold by the Company.  A de minimis portion of each of the Class R Certificates will not be sold hereunder and will be held by Residential Funding Corporation ("Residential Funding").

The Certificates will be issued pursuant to a series supplement (the "Series Supplement"), dated as of July 1, 2006 (the "Cut-off Date"), to the standard terms of a pooling and servicing agreement, dated as of June 1, 2006 (the "Standard Terms", and together with the Series Supplement, the "Pooling and Servicing Agreement"), among the Company, as seller, Residential Funding, as master servicer, and U.S. Bank National Association, as trustee (the "Trustee").  The Certificates are described more fully in the Base Prospectus and the Prospectus Supplement (each as hereinafter defined), which the Company has furnished to you.

1.     Representations, Warranties and Covenants.

    1.1     The Company represents and warrants to, and agrees with you that:

        (a)     The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (No. 333-131201) on Form S-3 for the registration under the Securities Act of 1933, as amended (the "Act"), of Mortgage Pass-Through Certificates (issuable in series), including the Certificates, which registration statement has become effective, and a copy of which, as amended to the date hereof, has heretofore been delivered to you.  The Company proposes to file with the Commission pursuant to Rule 424(b) under the rules and regulations of the Commission under the Act (the "1933 Act Regulations") a prospectus supplement dated July 26, 2006 (the "Prospectus Supplement"), to the prospectus dated July 14, 2006 (the "Base Prospectus"), relating to the Certificates and the method of distribution thereof.  Such registration statement (No. 333-131201) including exhibits thereto and any information incorporated therein by reference, as amended at the date hereof, is hereinafter called the "Registration Statement"; and the Base Prospectus and the Prospectus Supplement and any information incorporated therein by reference, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (as defined herein) for use in connection with the offering of the Certificates, are hereinafter called the "Prospectus."

        (b)     The Registration Statement has become effective, and the Registration Statement as of the effective date (the "Effective Date," as defined in this paragraph), and the Prospectus, as of the date of the Prospectus Supplement, complied in all material respects with the applicable requirements of the Act and the 1933 Act Regulations; and the Registration Statement, as of the Effective Date, did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; and each Issuer Free Writing Prospectus (as defined herein) as of its date did not and at all times prior to the date of the Prospectus Supplement will not, and the Prospectus and

2

Designated Static Pool Information, taken together, as of the date of the Prospectus Supplement did not and as of the Closing Date will not, contain an untrue statement of a material fact and did not and will not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (except in the case of any Issuer Free Writing Prospectus, any omission with respect to information included in the definition of Senior Structure Information); provided, however, that neither the Company nor Residential Funding makes any representations or warranties as to the information contained in or omitted from the Registration Statement or the Prospectus or any amendment thereof or supplement thereto relating to the information therein that is Excluded Information (as defined herein); and provided, further, that neither the Company nor Residential Funding makes any representations or warranties as to either (i) any information contained in any Underwriter Prepared Issuer FWP (as defined herein) or Underwriter Free Writing Prospectus (as defined herein) except, in each case, to the extent of (x) any information set forth therein that constitutes Pool Information (as defined below) or (y) any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus, or (ii) any information contained in or omitted from the portions of the Prospectus identified by underlining or other highlighting as shown in Exhibit F (the "Underwriter Information"). The Effective Date shall mean the earlier of the date on which the Prospectus Supplement is first used and the time of the first Contract of Sale (as defined herein) to which such Prospectus Supplement relates. The initial effective date of the Registration Statement was within three years of the Closing Date. If the third anniversary of the initial effective date occurs within six months after the Closing Date, the Company will use best efforts to take such action as may be necessary or appropriate to permit the public offering and sale of the Certificates as contemplated hereunder. The Company acknowledges that the Underwriter Information constitutes the only information furnished in writing by you or on your behalf for use in connection with the preparation of the Registration Statement or the Prospectus, and the Underwriter confirms that the Underwriter Information is correct.

(c)   (i)   "ABS Informational and Computational Materials" shall have the meaning given such term in Item 1101 of Regulation AB.

(ii)   "Approved Offering Materials" means with respect to any class of Certificates anticipated to be rated in the highest category by any Rating Agency, collectively the following documents as most recently provided by the Company and designated in writing by the Company as Approved Offering Materials prior to the time of any Contract of Sale: (i) one or more term sheets, providing factual information about the Certificates and the structure and basic parameters thereof (excluding information about the subdivision of the senior classes into tranches), the basic terms of the subordination or other credit enhancements if known, factual information about the Mortgage Loans (which may include parameters or "stips" or tabular data prepared by the Company), the identity of and basic information about key parties to the transaction known to the Company, and the tax, ERISA and SMMEA characteristics of the Certificates, (ii) a term sheet supplement, containing risk factors and additional information of the type to appear in the Prospectus Supplement to the extent known, and (iii) the Base Prospectus, which may be provided by a weblink. Each of the items described in (i) and (ii) in the preceding sentence shall constitute an Issuer Free

3

Writing Prospectus and any additional information provided by the Underwriter shall constitute an Underwriter Free Writing Prospectus or Underwriter Prepared Issuer FWP, as the case may be. With respect to any class of Certificates anticipated to be rated in the second highest or a lower category by any Rating Agency, "Approved Offering Materials" means the Prospectus.

(iii)   "Contract of Sale" has the same meaning as in Rule 159 of the 1933 Act Regulations and all Commission guidance relating to Rule 159.

(iv)   "Designated Static Pool Information" shall mean the static pool information referred to in the Prospectus under the caption "Static Pool Information" but deemed to be excluded from the Registration Statement and Prospectus pursuant to Item 1105(d) of Regulation AB.

(v)   "Excluded Information" shall mean, with respect to each of the Registration Statement and the Prospectus, the information identified by underlining or other highlighting as shown on Exhibit E.

(vi)   "Free Writing Prospectus" shall have the meaning given such term in Rules 405 and 433 of the 1933 Act Regulations.

(vii)   "Issuer Free Writing Prospectus" shall mean any Free Writing Prospectus prepared by or on behalf of the Company and identified by the Company as an Issuer Free Writing Prospectus and relating to the Certificates or the offering thereof.

(viii)   "Issuer Information" shall mean any information of the type specified in clauses (1) – (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform), other than Underwriter Derived Information. Consistent with such definition, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason of the Company's review of the materials pursuant to Section 4.4(e) below and, consistent with Securities Offering Reform Questions and Answers, November 30, 2005 promulgated by the staff of the Commission, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason that the Underwriter has agreed not to use such Free Writing Prospectus without consent of the Company.

(ix)   "Permitted Additional Materials" shall mean information that is not ABS Informational and Computational Materials and (x) that are referred to in Section 4.4(c) so long as any Issuer Information provided by the Underwriter pursuant to Section 4.4(c) is limited to information included within the definition of ABS Informational and Computational Materials, (y) that constitute Certificate price, yield, weighted average life, subscription or allocation information, or a trade confirmation, or (z) otherwise with respect to which the Company has provided written consent to the Underwriter to include in a Free Writing Prospectus.

(x)   "Pool Information" means with respect to any Free Writing Prospectus, the information (including any Preliminary Pool Information) with

4

respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus.

(xi)    "Preliminary Pool Information" means with respect to any Free Writing Prospectus, the information with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus and designated "Preliminary Pool Information."

(xii)    "Senior Structure Information" shall mean, with respect to each class of Certificates anticipated to be rated in the highest category by any Rating Agency (collectively, the "Senior Certificates"), (i) the Pass-Through Rate if a fixed rate, or the formula for determining the Pass-Through Rate, (ii) the terms and the provider of any yield maintenance agreement, swap agreement or other agreement that provides payments payable on any class of the Senior Certificates, (iii) the terms and the provider of any surety bond, financial guaranty insurance policy, or other insurance policy regarding any class of the Senior Certificates not known to the Company when the Approved Offering Materials were prepared, (iv) the allocation to each class of Senior Certificates of the aggregate amount of the cashflow payable among the Senior Certificates collectively, and (v) the allocation to each class of Senior Certificates of the aggregate amount of any Realized Losses allocable to the Senior Certificates collectively, in each case, to the extent such information is not contained in the Approved Offering Materials.

(xiii)    "Underwriter Derived Information" shall refer to information of the type described in clause (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform) when prepared by the Underwriter, including traditional computational and analytical materials prepared by the Underwriter.

(xiv)    "Underwriter Free Writing Prospectus" shall mean all Free Writing Prospectuses prepared by or on behalf of the Underwriter other than any Underwriter Prepared Issuer FWP, including any Permitted Additional Materials.

(xv)    "Underwriter Prepared Issuer FWP" shall mean any Free Writing Prospectus or portion thereof prepared by or on behalf of the Underwriter that contains only a description of the final terms of the Certificates or of the offering of the Certificates after the final terms have been established for all classes of Senior Certificates.

(xvi)    "Written Communication" shall have the meaning given such term in Rule 405 of the 1933 Act Regulations.

(d)    The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the

5

requisite corporate power to own its properties and to conduct its business as presently conducted by it.

(e)  The Company was not, as of any date on or after which a bona fide offer (as used in Rule 164(h)(2) of the 1933 Act Regulations) of the Certificate is made an Ineligible Issuer, as such term is defined in Rule 405 of the 1933 Act Regulations. The Company shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

(f)  This Agreement has been duly authorized, executed and delivered by the Company.

(g)  As of the Closing Date (as defined herein) the Certificates will conform in all material respects to the description thereof contained in the Prospectus and the representations and warranties of the Company in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.2  Residential Funding represents and warrants to, and agrees with you that as of the Closing Date the representations and warranties of Residential Funding in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.3  The Underwriter represents and warrants to and agrees with the Company and Residential Funding that:

(a)  No purpose of the Underwriter relating to the purchase of the Class R Certificates by the Underwriter is or will be to enable the Company to impede the assessment or collection of any tax.

(b)  The Underwriter has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.

(c)  The Underwriter has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Certificates remain outstanding.

(d)  No purpose of the Underwriter relating to any sale of any of the Class R Certificates by the Underwriter will be to enable it to impede the assessment or collection of tax. In this regard, the Underwriter hereby represents to and for the benefit of the Company and Residential Funding that the Underwriter intends to pay taxes associated with holding the Class R Certificates (other than with respect to the portion of each of the Class R Certificates retained by Residential Funding), as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificates.

(e)  The Underwriter will, in connection with any transfer it makes of the Class R Certificates, obtain from its transferee the affidavit required by Section 5.02(f)(i)(B)(I) of the Pooling and Servicing Agreement, will not consummate any such

6

transfer if it knows or believes that any representation contained in such affidavit is false and will provide the Trustee with the Certificate required by Section 5.02(f)(i)(B)(II) of the Pooling and Servicing Agreement.

(f)     The Underwriter hereby certifies that (i) with respect to any classes of Certificates issued in authorized denominations or Percentage Interests of less than a notional amount of $2,000,000 or a Percentage Interest of 20% the fair market value of each such Certificate sold to any person on the date of initial sale thereof by the Underwriter will not be less than $100,000 and (ii) with respect to each class of Certificates to be maintained on the book-entry records of The Depository Trust Company ("DTC"), the interest in each such class of Certificates sold to any person on the date of initial sale thereof by the Underwriter will not be less than the minimum denomination indicated for such class of Certificates in the Prospectus Supplement.

(g)     The Underwriter will have funds available at U.S. Bank National Association, in the Underwriter's account at such bank at the time all documents are executed and the closing of the sale of the Certificates is completed, except for the transfer of funds and the delivery of the Certificates.  Such funds will be available for immediate transfer into the account of Residential Funding maintained at such bank.

(h)     As of the date hereof and as of the Closing Date, the Underwriter has complied with all of its obligations hereunder and all information contained in any Underwriter Free Writing Prospectus and in any Underwriter Prepared Issuer FWP as used in connection with any Contract of Sale and all Underwriter Information are accurate in all material respects (taking into account the assumptions explicitly set forth in such Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus), except to the extent of (x) any errors therein that are caused by errors or omissions in the Pool Information or (y) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(i)     Prior to the Closing Date, the Underwriter shall notify the Company and Residential Funding of the earlier of (x) the date on which the Prospectus Supplement is first used and (y) the time of the first Contract of Sale to which such Prospectus Supplement relates.

(j)     The Underwriter hereby further represents and agrees that, with respect to the United Kingdom:

(i)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the Certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the Issuer; and

(ii)    it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything

7

done by it in relation to the Certificates in, from or otherwise involving the United Kingdom.

(k)     In relation to each Member State of the European Economic Area which has implemented the Prospectus directive (each, a "Relevant Member State"), the Underwriter hereby represents and agrees that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of Certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Certificates to the public in that Relevant Member State at any time:

> (i)     to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

> (ii)    to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

> (iii)   in any other circumstances which do not require the publication by the Depositor of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this representation, the expression an "offer of Certificates to the public" in relation to any Certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Certificates to be offered so as to enable an investor to decide to purchase or subscribe the Certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

1.4     The Underwriter covenants and agrees to pay directly, or reimburse the Company or Residential Funding upon demand for (i) any and all taxes (including penalties and interest) owed or asserted to be owed by the Company or Residential Funding as a result of a claim by the Internal Revenue Service that the transfer of the Class R Certificates to the Underwriter hereunder or any transfer thereof by the Underwriter may be disregarded for federal tax purposes and (ii) any and all losses, claims, damages and liabilities, including attorney's fees and expenses, arising out of any failure of the Underwriter to make payment or reimbursement in connection with any such assertion as required in (i) above.  In addition, the Underwriter acknowledges that on the Closing Date immediately after the transactions described herein it will be the owner of the Class R Certificates (other than a de minimis portion of each of the Class R Certificates to be held by Residential Funding) for federal tax purposes, and the Underwriter

8

covenants that it will not assert in any proceeding that the transfer of the Class R Certificates from the Company to the Underwriter should be disregarded for any purpose.

2.      Purchase and Sale.  Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to you, and you agree to purchase from the Company, the Certificates (other than a de minimis portion of the Class R Certificates, which shall be transferred by the Company to Residential Funding) at a price equal to 98.53% of the aggregate certificate principal balance of the Certificates as of the Closing Date (as defined herein), plus accrued interest.  There will be added to the purchase price of the Certificates an amount equal to interest accrued thereon from the Cut-off Date up to but not including the Closing Date.  The purchase price for the Certificates was agreed to by the Company in reliance upon the transfer from the Company to the Underwriter of the tax liabilities associated with the ownership of the Class R Certificates.

3.      Delivery and Payment.  Delivery of and payment for the Certificates shall be made at the office of Mayer, Brown, Rowe & Maw LLP at 10:00 a.m., New York City time, on July 28, 2006 or such later date as you shall designate, which date and time may be postponed by agreement between you and the Company (such date and time of delivery and payment for the Certificates being herein called the "Closing Date").  Delivery of the 2006-S6, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15 and Class A-16 Certificates shall be made to you through the Depository Trust Company ("DTC") (such Certificates, the "DTC Registered Certificates"), and delivery of the Class R Certificates (the "Definitive Certificates") shall be made in registered, certificated form, in each case against payment by you of the purchase price thereof to or upon the order of the Company by wire transfer in immediately available funds.  The Definitive Certificates shall be registered in such names and in such denominations as you may request not less than two business days in advance of the Closing Date. The Company agrees to have the Definitive Certificates available for inspection, checking and packaging by you in New York, New York not later than 9:00 a.m. on the Closing Date.

4.      Offering by Underwriter.

4.1      It is understood that you propose to offer the Certificates for sale to the public as set forth in the Prospectus and you agree that all such offers and sales by you shall be made in compliance with all applicable laws and regulations.  Prior to the date of the first Contract of Sale made based on the Approved Offering Materials, you have not pledged, sold, disposed of or otherwise transferred any Certificate, Mortgage Loans or any interest in any Certificate.

4.2      It is understood that you will solicit offers to purchase the Certificates as follows:

(a)      Prior to the time you have received the Approved Offering Materials you may, in compliance with the provisions of this Agreement, solicit offers to purchase Certificates; provided, that you shall not accept any such offer to purchase a Certificate or any interest in any Certificate or Mortgage Loan or otherwise enter into any Contract of Sale for any Certificate, any interest in any Certificate or any Mortgage Loan prior to your conveyance of Approved Offering Materials to the investor.

9

(b)    Any Written Communication relating to the Certificates made by an Underwriter in compliance with the terms of this Agreement prior to the time such Underwriter has entered into a Contract of Sale for Certificates with the recipient shall prominently set forth the following statements (or a substantially similar statements approved by the Company):

> The information in this free writing prospectus, if conveyed prior to the time of your contractual commitment to purchase any of the Certificates, supersedes any information contained in any prior similar materials relating to the Certificates. The information in this free writing prospectus is preliminary, and is subject to completion or change. This free writing prospectus is being delivered to you solely to provide you with information about the offering of the Certificates referred to in this free writing prospectus and to solicit an offer to purchase the Certificates, when, as and if issued. Any such offer to purchase made by you will not be accepted and will not constitute a contractual commitment by you to purchase any of the Certificates, until we have accepted your offer to purchase Certificates.

> The Certificates referred to in these materials are being sold when, as and if issued. The issuer is not obligated to issue such Certificates or any similar security and the underwriter's obligation to deliver such Certificates is subject to the terms and conditions of the underwriting agreement with the issuer and the availability of such Certificates when, as and if issued by the issuer. You are advised that the terms of the Certificates, and the characteristics of the mortgage loan pool backing them, may change (due, among other things, to the possibility that mortgage loans that comprise the pool may become delinquent or defaulted or may be removed or replaced and that similar or different mortgage loans may be added to the pool, and that one or more classes of Certificates may be split, combined or eliminated), at any time prior to issuance or availability of a final prospectus. You are advised that Certificates may not be issued that have the characteristics described in these materials. The underwriter's obligation to sell such Certificates to you is conditioned on the mortgage loans and Certificates having the characteristics described in these materials. If for any reason the issuer does not deliver such Certificates, the underwriter will notify you, and neither the issuer nor any underwriter will have any obligation to you to deliver all or any portion of the Certificates which you have committed to purchase, and none of the issuer nor any underwriter will be liable for any costs or damages whatsoever arising from or related to such non-delivery.

(c)    Any Preliminary Pool Information shall not be provided to prospective investors unless such Preliminary Pool Information is accompanied by the Approved Offering Materials and the following statements (or substantially similar statements approved by the Company) appear prominently thereon:

The information set forth below, entitled "preliminary information", was derived from a preliminary pool of mortgage loans which is not representative of the mortgage loans that will comprise the final mortgage loan pool. The preliminary pool of mortgage loans represents only a subset of the final mortgage loan pool and mortgage loans that are included in the preliminary mortgage loan pool may be removed from the final mortgage loan pool. It is expected that the characteristics of the final mortgage loan pool will differ, and may differ materially, from the characteristics of the preliminary pool of mortgage loans and the preliminary information may differ materially from information of a similar type if derived from the final mortgage loan pool. Although the characteristics of the final mortgage loan pool are expected to be within the parameters for the mortgage loan characteristics as set forth in the tables entitled ["collateral stipulations - mortgage pool characteristics"] [accompanying Approved Offering Materials], they are not expected to conform in all material respects to the characteristics of the preliminary mortgage loan pool. You should refer to the parameters for the mortgage loan characteristics in the tables entitled ["collateral stipulations - mortgage pool characteristics"] in the accompanying [Approved Offering Materials].

4.3     It is understood that you will not enter into a Contract of Sale with any investor until the Approved Offering Materials have been conveyed to the investor with respect to the Certificates which are the subject of such Contract of Sale.

4.4     It is understood that you may prepare and provide to prospective investors certain Free Writing Prospectuses, subject to the following conditions:

(a)     Unless preceded or accompanied by a prospectus satisfying the requirements of Section 10(a) of the Act, the Underwriter shall not convey or deliver any Written Communication to any person in connection with the initial offering of the Certificates, unless such Written Communication (i) is made in reliance on Rule 134 under the Act, (ii) constitutes a prospectus satisfying the requirements of Rule 430B under the Act or (iii) constitutes a Free Writing Prospectus (as defined in Section 1.1(c) above) consisting solely of (x) information of a type included within the definition of ABS Informational and Computational Materials (as defined below), (y) Permitted Additional Materials or (z) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(b)     The Underwriter shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

11

(c)     It is understood and agreed that all information provided by the Underwriter to or through Bloomberg or Intex or similar entities for use by prospective investors, or imbedded in any CDI file provided to prospective investors, to the extent constituting a Free Writing Prospectus, shall be deemed an Underwriter Free Writing Prospectus.

(d)     All Free Writing Prospectuses provided to prospective investors, whether or not filed with the Commission, shall bear a legend including the following statement (or a substantially similar statement approved by the Company):

> "THE DEPOSITOR HAS FILED A REGISTRATION STATEMENT (INCLUDING A PROSPECTUS) WITH THE SECURITIES AND EXCHANGE COMMISSION (THE SEC) FOR THE OFFERING TO WHICH THIS COMMUNICATION RELATES.   BEFORE YOU INVEST, YOU SHOULD READ THE PROSPECTUS IN THAT REGISTRATION STATEMENT AND OTHER DOCUMENTS THE DEPOSITOR HAS FILED WITH THE SEC FOR MORE COMPLETE INFORMATION ABOUT THE DEPOSITOR AND THE OFFERING. YOU MAY GET THESE DOCUMENTS AT NO CHARGE BY VISITING EDGAR ON THE SEC WEB SITE AT *WWW.SEC.GOV*. ALTERNATIVELY, THE DEPOSITOR, ANY UNDERWRITER OR ANY DEALER PARTICIPATING   IN   THE   OFFERING   WILL ARRANGE TO SEND YOU THE PROSPECTUS AT NO CHARGE IF YOU REQUEST IT BY CALLING TOLL-FREE 1–800-XXX-XXXX."

Each of the Underwriter and the Company shall have the right to request additional specific legends or notations to appear on any Free Writing Prospectus and shall have the right to require changes regarding the use of terminology and the right to determine the types of information appearing therein with the approval of the other (which shall not be unreasonably withheld).

(e)     The Underwriter shall deliver to the Company and its counsel (in such format as reasonably required by the Company), no later than the business day prior to the date of the required filing under Section 5.10, an Underwriter Prepared Issuer FWP. To facilitate filing to the extent required by Section 5.10 or 5.11, as applicable, all Underwriter Derived Information shall be set forth in a document separate from any Underwriter Prepared Issuer FWP including Issuer Information. The Underwriter shall deliver to the Company one business day following a request by the Company all Preliminary Pool Information (or information based on or derived in whole or in part from Preliminary Pool Information) provided by it to any prospective investor.

(f)     The Underwriter shall provide the Company with a letter from Deloitte & Touche LLP, certified public accountants, prior to the Closing Date, satisfactory in form and substance to the Company, Residential Funding and their respective counsels and the Underwriter, to the effect that such accountants have

12

performed certain specified procedures, all of which have been agreed to by the Company and the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature that is included in any Underwriter Prepared Issuer FWP, other than any Pool Information therein and any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP, is accurate except as to such matters that are not deemed by the Company and the Underwriter to be material. The foregoing letter shall be at the expense of the Underwriter.

(g)      None of the information in any Free Writing Prospectus may conflict with the information then contained in the Registration Statement or any prospectus or prospectus supplement that is a part thereof. The Certificates described in any Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP will be of a type set forth in one of the categories listed beneath the heading "Description of Certificates" in the term sheet supplement included in the Approved Offering Materials and the description of the characteristics of the Certificates contained in such Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP shall not be inconsistent with the description of the Certificates beneath such heading in the term sheet supplement.

(h)      The Company shall not be obligated to file any Issuer Free Writing Prospectuses that have been determined to contain any material error or omission unless such Issuer Free Writing Prospectus has been provided to a prospective investor, in which case, the Underwriter shall cooperate with the Company to prepare a corrective Issuer Free Writing Prospectus that the Underwriter will provide to any such prospective investor and the Company shall file to the extent required herein. In the event that the Underwriter becomes aware that, as of the date on which an investor entered into a Contract of Sale, any Free Writing Prospectus prepared by or on behalf of the Underwriter and delivered to such investor contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading (such Free Writing Prospectus, a "Defective Free Writing Prospectus"), the Underwriter shall notify the Company thereof as soon as practical but in any event within one business day after discovery.

(i)      If the Underwriter does not provide any Free Writing Prospectuses to the Company pursuant to subsection (e) above, the Underwriter shall be deemed to have represented, as of the Closing Date, that it did not provide any prospective investors with any information in written or electronic form in connection with the offering of the Certificates that would constitute an Underwriter Prepared Issuer FWP.

(j)      In the event of any delay in the delivery by the Underwriter to the Company of any Underwriter Prepared Issuer FWP required to be delivered in accordance with subsection (e) above, or in the delivery of the accountant's comfort letter in respect thereof pursuant to subsection (f) above, the Company shall have the right to delay the release of the Prospectus to investors or to the Underwriter, to delay the Closing Date and to take other appropriate actions in each case as necessary in order to allow the Company to comply with its agreement set forth in Section 5.10 to file such Underwriter Prepared Issuer FWP by the time specified therein.

13

(k)    The Underwriter represents that it has in place, and covenants that it shall maintain, internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the 1933 Act Regulations with respect to the generation and use of Free Writing Prospectuses in connection with the offering of the Certificates. In addition, each Underwriter shall, for a period of at least three years after the date hereof, maintain written and/or electronic records of the following:

(i)    any Free Writing Prospectus used by the Underwriter to solicit offers to purchase Certificates to the extent not filed with the Commission;

(ii)    regarding each Free Writing Prospectus delivered by the Underwriter to an investor, the date of such delivery and identity of such investor; and

(iii)    regarding each Contract of Sale entered into by such Underwriter, the date, identity of the investor and the terms of such Contract of Sale, as set forth in the related confirmation of trade.

(l)    The Underwriter covenants with the Company that after the final Prospectus is available the Underwriter shall not distribute any written information concerning the Certificates to a prospective investor unless such information is preceded or accompanied by the final Prospectus. It is understood and agreed that the use of written information in accordance with the preceding sentence is not a Free Writing Prospectus and is not otherwise restricted or governed in any way by this Agreement.

(m)    The Underwriter shall not use any Free Writing Prospectus in connection with the solicitation of offers to purchase Certificates from any prospective investor in a class of Certificates with denominations of less than $25,000 or otherwise designated as a "retail" class of Certificates, and the Underwriter shall not authorize any such use of any Free Writing Prospectus by any dealer that purchases any such Certificates from the Underwriter.

4.5    You further agree that on or prior to the sixth day after the Closing Date, you shall provide the Company with a certificate, substantially in the form of Exhibit G attached hereto, setting forth (i) in the case of each class of Certificates, (a) if less than 10% of the aggregate certificate principal balance of such class of Certificates has been sold to the public as of such date, the value calculated pursuant to clause (b)(iii) of Exhibit G hereto, or, (b) if 10% or more of such class of Certificates has been sold to the public as of such date but no single price is paid for at least 10% of the aggregate certificate principal balance of such class of Certificates, then the weighted average price at which the Certificates of such class were sold expressed as a percentage of the certificate principal balance of such class of Certificates sold, or (c) the first single price at which at least 10% of the aggregate certificate principal balance of such class of Certificates was sold to the public, (ii) the prepayment assumption used in pricing each class of Certificates, and (iii) such other information as to matters of fact as the Company may reasonably request to enable it to comply with its reporting requirements with respect to each class of Certificates to the extent such information can in the good faith judgment of the Underwriter be determined by it.

14

4.6     The Underwriter agrees that (i) if the Prospectus is not delivered with the confirmation in reliance on Rule 172, it will include in every confirmation sent out the notice required by Rule 173 informing the investor that the sale was made pursuant to the Registration Statement and that the investor may request a copy of the Prospectus from the Underwriter; (ii) if a paper copy of the Prospectus is requested by a person who receives a confirmation, Underwriter shall deliver a printed or paper copy of such Prospectus; and (iii) if an electronic copy of the Prospectus is delivered by the Underwriter for any purpose, such copy shall be the same electronic file containing the Prospectus in the identical form transmitted electronically to the Underwriter by or on behalf of the Company specifically for use by the Underwriter pursuant to this Section 4.6; for example, if the Prospectus is delivered to the Underwriter by or on behalf of the Company in a single electronic file in pdf format, then the Underwriter will deliver the electronic copy of the Prospectus in the same single electronic file in pdf format. The Underwriter further agrees that (i) if it delivers to an investor the Prospectus in pdf format, upon the Underwriter's receipt of a request from the investor within the period for which delivery of the Prospectus is required, the Underwriter will promptly deliver or cause to be delivered to the investor, without charge, a paper copy of the Prospectus and (ii) it will provide to the Company any Underwriter Prepared Issuer FWP, or portions thereof, which the Company is required to file with the Commission in electronic format and will use reasonable efforts to provide to the Company such Underwriter Prepared Issuer FWP, or portions thereof, in either Microsoft Word® or Microsoft Excel® format and not in a pdf, except to the extent that the Company, in its sole discretion, waives such requirements.

5.     Agreements. The Company and you agree as follows:

5.1     Before amending or supplementing the Registration Statement or the Prospectus with respect to the Certificates, the Company will furnish you with a copy of each such proposed amendment or supplement.

5.2     The Company will cause the Prospectus Supplement to be transmitted to the Commission for filing pursuant to Rule 424(b) under the Act by means reasonably calculated to result in filing with the Commission pursuant to said rule.

5.3     If, during the period after the first date of the public offering of the Certificates in which a prospectus relating to the Certificates is required to be delivered under the Act, any event occurs as a result of which it is necessary to amend or supplement the Prospectus, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Prospectus is delivered to a purchaser, not misleading, or if it shall be necessary to amend or supplement the Prospectus to comply with the Act or the 1933 Act Regulations, the Company promptly will prepare and furnish, at its own expense, to you, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law.

5.4     If the Company or the Underwriter determines or becomes aware that any Written Communication (including without limitation any Free Writing Prospectus) or oral statement (when considered in conjunction with all information conveyed at the time of Contract of Sale) contains an untrue statement of material fact or omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading at the time that a Contract of Sale was entered into, either the Company or the Underwriter may

15

prepare corrective information with notice to the other party, and the Underwriter shall deliver such information in a manner reasonably acceptable to both parties, to any person with whom a Contract of Sale was entered into, and such information shall provide any such person with the following:

        (a)     Adequate disclosure of the contractual arrangement;

        (b)     Adequate disclosure of the person's rights under the existing Contract of Sale at the time termination is sought;

        (c)     Adequate disclosure of the new information that is necessary to correct the misstatements or omissions in the information given at the time of the original Contract of Sale; and

        (d)     A meaningful ability to elect to terminate or not terminate the prior Contract of Sale and to elect to enter into or not enter into a new Contract of Sale.

Any costs incurred to the investor in connection with any such termination or reformation shall be subject to Sections 7.1 and 7.2, as applicable.

        5.5     The Company will furnish to you, without charge, a copy of the Registration Statement (including exhibits thereto) and, so long as delivery of a prospectus by an underwriter or dealer may be required by the Act, as many copies of the Prospectus, any documents incorporated by reference therein and any amendments and supplements thereto as you may reasonably request; provided, however, that if the Prospectus is not delivered with the confirmation in reliance on Rule 172, you will provide the notice specified in Section 4.6 in every confirmation and will deliver a paper copy of the prospectus to those investors that request a paper copy thereof.

        5.6     The Company agrees, so long as the Certificates shall be outstanding, or until such time as you shall cease to maintain a secondary market in the Certificates, whichever first occurs, to deliver to you the annual statement as to compliance delivered to the Trustee pursuant to Section 3.18 of the Pooling and Servicing Agreement and the annual statement of a firm of independent public accountants furnished to the Trustee pursuant to Section 3.19 of the Pooling and Servicing Agreement, as soon as such statements are furnished to the Company.

        5.7     The Company will endeavor to arrange for the qualification of the Certificates for sale under the laws of such jurisdictions as you may reasonably designate and will maintain such qualification in effect so long as required for the initial distribution of the Certificates; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

        5.8     If the transactions contemplated by this Agreement are consummated, the Company or Residential Funding will pay or cause to be paid all expenses incident to the performance of the obligations of the Company and Residential Funding under this Agreement, and will reimburse you for any reasonable expenses (including reasonable fees and disbursements of counsel) reasonably incurred by you in connection with qualification of the Certificates for sale and determination of their eligibility for investment under the laws of such jurisdictions as you have reasonably requested pursuant to Section 5.7 above and the printing of

16

memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Certificates, and for expenses incurred in distributing the Prospectus (including any amendments and supplements thereto) to the Underwriter. Except as herein provided, you shall be responsible for paying all costs and expenses incurred by you, including the fees and disbursements of your counsel, in connection with the purchase and sale of the Certificates.

5.9    If, during the period after the Closing Date in which a prospectus relating to the Certificates is required to be delivered under the Act, the Company receives notice that a stop order suspending the effectiveness of the Registration Statement or preventing the offer and sale of the Certificates is in effect, the Company will advise you of the issuance of such stop order.

5.10    The Company shall file any Issuer Free Writing Prospectus, and any Underwriter Prepared Issuer FWP provided to it by the Underwriter under Section 4.4, not later than the date of first use thereof, except that:

(a)    any Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP or portion thereof otherwise required to be filed that contains only (1) a description of the final terms of the Certificates may be filed by the Company within two days of the later of the date such final terms have been established for all classes of Certificates and the date of first use, and (2) a description of the terms of the Certificates that does not reflect the final terms after they have been established for all classes of all Certificates is not required to be filed; and

(b)    if the Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP includes only information of a type included in the definition of ABS Informational and Computational Materials, the Company shall file the same within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b)(3) of the Act.

provided further, that prior to the filing of any Underwriter Prepared Issuer FWP by the Company, the Underwriter must comply with its obligations pursuant to Section 4.4 and that the Company shall not be required to file any Free Writing Prospectus to the extent such Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

5.11    The Underwriter shall file any Underwriter Free Writing Prospectus that has been distributed by the Underwriter in a manner reasonably designed to lead to its broad, unrestricted dissemination within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b)(3) of the Act or otherwise as required under Rule 433 of the Act; provided, however, that the Underwriter shall not be required to file any Underwriter Free Writing Prospectus to the extent such Underwriter Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

17

5.12    The Company acknowledges and agrees that the Underwriter is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the offering of securities contemplated hereby (including in connection with determining the terms of the offering) and not as a fiduciary to, or an agent of, the Company or any other person. Additionally, the Underwriter is not advising the company or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Underwriter shall have no responsibility or liability to the Company with respect thereto. Any review by the Underwriter of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Underwriter and shall not be on behalf of the Company.

6.    Conditions to the Obligations of the Underwriter. The Underwriter's obligation to purchase the Certificates shall be subject to the following conditions:

6.1    No stop order suspending the effectiveness of the Registration Statement shall be in effect, and no proceedings for that purpose shall be pending or, to the knowledge of the Company, threatened by the Commission; and the Prospectus Supplement shall have been filed or transmitted for filing by means reasonably calculated to result in a filing with the Commission pursuant to Rule 424(b) under the Act.

6.2    Since July 1, 2006 there shall have been no material adverse change (not in the ordinary course of business) in the condition of the Company or Residential Funding.

6.3    The Company shall have delivered to you a certificate, dated the Closing Date, of the President, a Senior Vice President or a Vice President of the Company to the effect that the signer of such certificate has examined this Agreement, the Approved Offering Materials, the Prospectus, the Pooling and Servicing Agreement and various other closing documents, and that, to the best of his or her knowledge after reasonable investigation:

(a)    the representations and warranties of the Company in this Agreement and in the Pooling and Servicing Agreement are true and correct in all material respects; and

(b)    the Company has, in all material respects, complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

6.4    Residential Funding shall have delivered to you a certificate, dated the Closing Date, of the President, a Managing Director, a Director or an Associate of Residential Funding to the effect that the signer of such certificate has examined the Pooling and Servicing Agreement and this Agreement and that, to the best of his or her knowledge after reasonable investigation, the representations and warranties of Residential Funding contained in the Pooling and Servicing Agreement and in this Agreement are true and correct in all material respects.

6.5    You shall have received the opinions of Mayer, Brown, Rowe & Maw LLP, special counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibits A-1, A-2 and A-3, and the opinion of Julianne M.

Linder, associate counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibit B.

6.6     You shall have received a negative assurance letter regarding the Prospectus from Sidley Austin LLP, counsel for the Underwriter, in form satisfactory to you.

6.7     The Underwriter shall have received from Deloitte & Touche LLP, certified public accountants, (a) a letter dated the date hereof and satisfactory in form and substance to the Underwriter and the Underwriter's counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "Description of the Mortgage Pool", "Pooling and Servicing Agreement", "Description of the Certificates" and "Certain Yield and Prepayment Considerations" agrees with the records of the Company and Residential Funding excluding any questions of legal interpretation and (b) the letter prepared pursuant to Section 4.4(f).

6.8     The Class A Certificates and Class R Certificates shall have been rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's") and Fitch Ratings ("Fitch"); the Class A Certificates (other than the Class A-16 Certificates) and Class R Certificates shall have been rated "Aaa" by Moody's Investors Services, Inc. ("Moody's") and the Class A-16 Certificates shall have been rated "Aa1" by Moody's.

6.9     You shall have received the opinion of Chapman and Cutler LLP, counsel to the Trustee, dated the Closing Date, substantially to the effect set forth in Exhibit C.

6.10    You shall have received the opinion of Faegre & Benson, LLP, special Minnesota tax counsel for the Company, dated the Closing Date, substantially to the effect set forth in Exhibit D.

6.11    You shall have received from Julianne M. Linder, associate counsel to the Company, a reliance letter with respect to any opinions delivered to the rating agencies, or you shall have been listed as an addressee on any such opinions.

The Company will furnish you with conformed copies of the above opinions, certificates, letters and documents as you reasonably request.

7.      Indemnification and Contribution.

7.1     The Company and Residential Funding, jointly and severally, agree to indemnify and hold harmless you and each person, if any, who controls you within the meaning of either Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement for the registration of the Certificates as originally filed or in any amendment thereof or other filing incorporated by reference therein, or in the Prospectus and Designated Static Pool Information, taken together, or incorporated by reference in the Prospectus (if used within the period set forth in Section 5.3 hereof and as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), or

19

caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (ii) caused by any untrue statement or alleged untrue statement of a material fact contained in any Issuer Free Writing Prospectus, or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (except any omission with respect to information included in the definition of Senior Structure Information), or (iii) caused by any untrue statement of a material fact or alleged untrue statement of a material fact contained in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, that in either case was caused by (x) any error or omission in any Pool Information or (y) or any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus; except insofar as such losses, claims, damages, or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon any information with respect to which the Underwriter has agreed to indemnify the Company pursuant to clause (i) of Section 7.2; provided, however, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information.

7.2    You agree to indemnify and hold harmless the Company, Residential Funding, their respective directors or officers and any person controlling the Company or Residential Funding within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of material fact contained in the Underwriter Information, or any omission or alleged omission to state therein any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Free Writing Prospectus (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Free Writing Prospectus), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (iii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Prepared Issuer FWP (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (iv) resulting from your failure to comply with Section 4.4(e) or Section 4.3 or failure to file any Underwriter Free Writing Prospectus required to be filed in accordance with Section 5.11; provided, however, that the indemnification set forth in clauses (ii) and (iii) of this Section 7.2 shall not apply to the extent of any error or omission in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus that was caused by any error or omission in any Pool Information; provided, further, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information. In addition, you agree to indemnify and hold harmless the Company, Residential Funding, their respective

20

directors or officers and any person controlling the Company or Residential Funding against any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) caused by, resulting from, relating to, or based upon any legend regarding original issue discount on any Certificate resulting from incorrect information provided by the Underwriter in the certificates described in Section 4.5 hereof.

       7.3     In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 7.1 or Section 7.2, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties. Such firm shall be designated in writing by you, in the case of parties indemnified pursuant to Section 7.1 and by the Company or Residential Funding, in the case of parties indemnified pursuant to Section 7.2. The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel reasonably satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation. Unless it shall assume the defense of any proceeding the indemnifying party shall not be liable for any settlement of any proceeding, effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. If the indemnifying party assumes the defense of any proceeding, it shall be entitled to settle such proceeding with the consent of the indemnified party or, if such settlement provides for release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the consent of the indemnified party.

       7.4     If the indemnification provided for in this Section 7 is unavailable to an indemnified party under Section 7.1 or Section 7.2 hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and Residential Funding on the one hand and the Underwriter on the other from the offering of the Certificates but also the relative fault of the Company or Residential Funding on the one hand and of the Underwriter on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The

21

relative fault of the Company and Residential Funding on the one hand and of the Underwriter on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriter, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

7.5    The Company, Residential Funding and the Underwriter agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in Section 7.4 above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 7 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim except where the indemnified party is required to bear such expenses pursuant to Section 7.4; which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party believes that it will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

7.6    The indemnity and contribution agreements contained in this Section 7 and the representations and warranties of the Company and Residential Funding in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by the Underwriter or on behalf of the Underwriter or any person controlling the Underwriter or by or on behalf of the Company or Residential Funding and their respective directors or officers or any person controlling the Company or Residential Funding and (iii) acceptance of and payment for any of the Certificates.

8.    Termination.  This Agreement shall be subject to termination by notice given to the Company and Residential Funding, if the sale of the Certificates provided for herein is not consummated because of any failure or refusal on the part of the Company or Residential Funding to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company or Residential Funding shall be unable to perform their respective obligations under this Agreement.  If you terminate this Agreement in accordance with this Section 8, the Company or Residential Funding will reimburse you for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been reasonably incurred by the Underwriter in connection with the proposed purchase and sale of the Certificates.

9.    Certain Representations and Indemnities to Survive.  The respective agreements, representations, warranties, indemnities and other statements of the Company, Residential Funding or the officers of any of the Company, Residential Funding, and you set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by you or on your behalf or made by or

22

on behalf of the Company or Residential Funding or any of their respective officers, directors or controlling persons, and will survive delivery of and payment for the Certificates.

10.     Notices.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Underwriter will be mailed, delivered or telegraphed and confirmed to you at Morgan Stanley & Co. Incorporated, 1585 Broadway, New York, NY 10036, or if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Mortgage Securities I, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President; or, if sent to Residential Funding will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Corporation, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President.

11.     Successors.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 7 hereof, and their successors and assigns, and no other person will have any right or obligation hereunder.

12.     Applicable Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

13.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

[SIGNATURE PAGES FOLLOW]

5132915

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE
SECURITIES I, INC.**

By: _____

Name:   Joseph Orning

Title:    Vice President


**RESIDENTIAL FUNDING CORPORATION**

By: _____

Name:   Tim Jacobson

Title:    Associate


The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**


By: _____

Name:

Title:

*Underwriting Agreement
(Class A and R)
RFMSI Series 2006-S6*

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**

By:_____

Name:  Joseph Orning
Title:    Vice President

**RESIDENTIAL FUNDING CORPORATION**

By:_____

Name:  Tim Jacobson
Title:    Associate

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By:_____

Name:  Valerie Kay
Title:    Managing Director

5132915

*Underwriting Agreement*
*(Class A and R)*
*RFMSI Series 2006-S6*

## EXHIBIT A-1

Mayer, Brown, Rowe & Maw LLP Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 32 of the Closing Set]

A-1

## EXHIBIT A-2

Mayer, Brown, Rowe & Maw LLP
Negative Assurance Letter (Underwriting Agreement)

[See Tab 33 of the Closing Set]

5132915

EXHIBIT A-3

Mayer, Brown, Rowe & Maw LLP Opinion
Tax Disclosure Letter (Underwriting Agreement)

[See Tab 34 of the Closing Set]

## EXHIBIT B

In-House Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 30 of the Closing Set]

EXHIBIT C

Opinion of Chapman and Cutler LLP
Counsel to Trustee

[See Tab 38 of the Closing Set]

5132915

## EXHIBIT D

Opinion of Faegre & Benson, LLP
Special Counsel to the Company

[See Tab 37 of the Closing Set]

## EXHIBIT E

### EXCLUDED INFORMATION

| | |
|---|---|
| Final scheduled distribution date ............ | July 25, 2036. The actual final distribution date could be substantially earlier. *See "Certain Yield and Prepayment Considerations" in this prospectus supplement.* |
| Form of certificates ................................. | Book-entry: Class A Certificates and Class M Certificates. |
| | Physical: Class R Certificates. |
| | *See "Description of the Certificates—General" in this prospectus supplement.* |
| Minimum denominations ........................ | Class A (other than the Class A-4, Class A-6 and Class A-11 Certificates), Class A-P and Class M-1 Certificates: $100,000. Class A-4 and Class A-6 Certificates: $1,000,000 notional amount. Class A-11 Certificates: $1,000. Class M-2 Certificates and Class M-3 Certificates: $250,000. Class A-V Certificates: $2,000,000 notional amount. Class R Certificates: 20% percentage interests. |
| Legal investment ..................................... | When issued, the Class A, Class R and Class M-1 Certificates will, and the Class M-2 Certificates and Class M-3 Certificates will not, be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended, or SMMEA. |
| | *See "Legal Investment" in this prospectus supplement and "Legal Investment Matters" in the accompanying prospectus.* |
| ERISA considerations .............................. | Subject to the considerations described in this prospectus supplement, the Class A Certificates and Class M Certificates are expected to be considered eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts. Sales of the Class R Certificates to such plans or retirement accounts are prohibited, except as permitted under "ERISA Considerations" in this prospectus supplement. |
| | *See "ERISA Considerations" in this prospectus supplement and in the accompanying prospectus.* |
| Yield Maintenance Agreement Provider .................................................... | Morgan Stanley Capital Services Inc. |

**Pass-Through Rates**

The yields to maturity on the offered certificates, other than the Principal Only Certificates, will be affected by their pass-through rates. Because the mortgage rates on the mortgage loans and the pass-through rates on the offered certificates, other than the Adjustable Rate Certificates and Variable Strip Certificates, are fixed, these rates will not change in response to changes in market interest rates. The pass through rate on the Variable Strip Certificates is based on the weighted average of the pool strip rates on the mortgage loans and these pool strip rates will not change in response to changes in market interest rates. Accordingly, if market interest rates or market yields for securities similar to such offered certificates were to rise, the market value of such offered certificates may decline.

**Purchase Price**

In addition, the yield to maturity on each class of the offered certificates will depend on, among other things, the price paid by the holders of the offered certificates and the related pass-through rate. The extent to which the yield to maturity of an offered certificate is sensitive to prepayments will depend, in part, upon the degree to which it is purchased at a discount or premium. In general, if a class of offered certificates is purchased at a premium and principal distributions thereon occur at a rate faster than assumed at the time of purchase, the investor's actual yield to maturity will be lower than anticipated at the time of purchase. Conversely, if a class of offered certificates is purchased at a discount and principal distributions thereon occur at a rate slower than assumed at the time of purchase, the investor's actual yield to maturity will be lower than anticipated at the time of purchase. For additional considerations relating to the yields on the offered certificates, see "Yield Considerations" and "Maturity and Prepayment Considerations" in the accompanying prospectus.

**Final Scheduled Distribution Date**

The final scheduled distribution date with respect to each class of the offered certificates is the distribution date in July 2036, which is the distribution date immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its final scheduled distribution date.

**Weighted Average Life**

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement, the prepayment assumption, represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of new mortgage loans. A prepayment assumption of 100% PSA assumes constant prepayment rates of 0.20% per annum of the then outstanding principal balance of the mortgage loans in the first month of the life of the mortgage loans and an additional 0.20% per annum in each month thereafter until the 30th month. Beginning in the 30th month and in each month thereafter during the life of the mortgage loans, 100% PSA assumes a constant prepayment rate of 6% per annum each month. As used in the tables below, "0% PSA" assumes prepayment rates equal to 0% of PSA—no prepayments. Correspondingly, "100% PSA" and "300% PSA" assumes prepayment rates equal to 100% of PSA and 300% of PSA, respectively, and so forth.

PSA does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans in this mortgage pool.

The tables captioned "Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of the Prepayment Assumptions" have been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described under "Description of the Mortgage Pool" in this prospectus supplement and their performance. The tables assume, among other things, that: (i) as of the date of issuance of the offered certificates, the mortgage loans have the following characteristics:

### Assumed Mortgage Loan Characteristics

|  | Discount Mortgage Loans, I/O* Term 120 Months | Non-Discount Mortgage Loans, I/O* Term 120 Months | Discount Mortgage Loans, Non-I/O* | Non-Discount Mortgage Loans, Non-I/O* |
|---|---|---|---|---|
| Aggregate principal balance.............. | $16,957,997.04 | $168,025,786.67 | $59,184,468.86 | $355,385,520.05 |
| Weighted average mortgage rate........ | 6.0930276732% | 6.6750% | 6.1236961307% | 6.6512% |
| Weighted average servicing fee rate .. | 0.2800000000% | 0.3300% | 0.2800000000% | 0.3313% |
| Weighted average original term to maturity (months) .......................... | 360 | 360 | 360 | 360 |
| Weighted average remaining term to maturity (months) .......................... | 358 | 359 | 358 | 359 |

* I/O refers to loans with an initial interest only period as indicated and further discussed on page S-65.

(ii)    the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity (after taking into account the interest-only period), so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity (after taking into account the interest-only period); (iii) neither Residential Funding nor the depositor will repurchase any mortgage loan, as described under "Mortgage Loan Program—Representations with Respect to Mortgage Loans" and "Description of the Certificates—Assignment of the Trust Assets" in the accompanying prospectus, and the master servicer will not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust; (iv) there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of PSA set forth in the tables; (v) there is no Prepayment Interest Shortfall or any other interest shortfall in any month; (vi) payments on the certificates will be received on the 25th day of each month, commencing on August 25, 2006; (vii) payments on the mortgage loans earn no reinvestment return; (viii) there are no additional ongoing trust expenses payable out of the trust; and (ix) the certificates will be purchased on July 28, 2006. Clauses (i) through (ix) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the tables below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans will prepay at a constant level of PSA until maturity or that all of the mortgage loans will prepay at the same level of PSA. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the various constant percentages of PSA specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans, or actual

prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following tables indicate the weighted average life of each class of offered certificates, other than the Interest Only Certificates and Residual Certificates, and set forth the percentages of the initial Certificate Principal Balance of each class of offered certificates that would be outstanding after each of the distribution dates at the various percentages of PSA shown.

## Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| Distribution Date | Class A-1 | | | | | Class A-2, Class A-3, Class A-5, Class A-7 and Class A-8 | | | | | Class A-9 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 99 | 97 | 92 | 90 | 88 | 100 | 100 | 94 | 89 | 84 | 98 | 94 | 91 | 90 | 90 |
| July 25, 2008 | 98 | 90 | 76 | 69 | 62 | 100 | 100 | 66 | 49 | 32 | 96 | 84 | 81 | 80 | 80 |
| July 25, 2009 | 97 | 82 | 54 | 42 | 31 | 100 | 98 | 27 | 0 | 0 | 94 | 74 | 70 | 68 | 48 |
| July 25, 2010 | 95 | 73 | 36 | 21 | 9 | 100 | 90 | 0 | 0 | 0 | 92 | 64 | 58 | 31 | 8 |
| July 25, 2011 | 94 | 65 | 22 | 6 | 0 | 100 | 83 | 0 | 0 | 0 | 89 | 54 | 32 | 3 | 0 |
| July 25, 2012 | 93 | 58 | 11 | 0 | 0 | 100 | 78 | 0 | 0 | 0 | 87 | 43 | 13 | 0 | 0 |
| July 25, 2013 | 91 | 52 | 3 | 0 | 0 | 100 | 74 | 0 | 0 | 0 | 84 | 33 | 0 | 0 | 0 |
| July 25, 2014 | 90 | 46 | 0 | 0 | 0 | 100 | 73 | 0 | 0 | 0 | 81 | 23 | 0 | 0 | 0 |
| July 25, 2015 | 88 | 41 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 79 | 14 | 0 | 0 | 0 |
| July 25, 2016 | 86 | 36 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 75 | 6 | 0 | 0 | 0 |
| July 25, 2017 | 84 | 31 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2018 | 81 | 27 | 0 | 0 | 0 | 100 | 67 | 0 | 0 | 0 | 66 | 0 | 0 | 0 | 0 |
| July 25, 2019 | 78 | 22 | 0 | 0 | 0 | 100 | 56 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 |
| July 25, 2020 | 74 | 18 | 0 | 0 | 0 | 100 | 46 | 0 | 0 | 0 | 54 | 0 | 0 | 0 | 0 |
| July 25, 2021 | 71 | 15 | 0 | 0 | 0 | 100 | 37 | 0 | 0 | 0 | 48 | 0 | 0 | 0 | 0 |
| July 25, 2022 | 67 | 11 | 0 | 0 | 0 | 100 | 28 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 63 | 8 | 0 | 0 | 0 | 100 | 19 | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 59 | 5 | 0 | 0 | 0 | 100 | 12 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 54 | 2 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 | 18 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 49 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 44 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | * | 0 | 0 | 0 | 0 |
| July 25, 2028 | 38 | 0 | 0 | 0 | 0 | 96 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 33 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 26 | 0 | 0 | 0 | 0 | 65 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 19 | 0 | 0 | 0 | 0 | 48 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 12 | 0 | 0 | 0 | 0 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 4 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 18.36 | 8.31 | 3.47 | 2.81 | 2.42 | 24.82 | 12.08 | 2.42 | 1.95 | 1.67 | 13.57 | 5.43 | 3.96 | 3.24 | 2.81 |

\*    Indicates a number that is greater than zero but less than 0.5%.

\*\*   The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-10 | | | | | Class A-11 | | | | | Class A-12 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% | 0% | 160% | 300% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 100 | 100 | 100 | 100 | 100 | 100 | 99 | 96 | 91 | 86 | 100 | 95 | 91 | 90 | 89 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 99 | 98 | 70 | 52 | 33 | 99 | 86 | 79 | 78 | 78 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 98 | 95 | 31 | 0 | 0 | 98 | 74 | 67 | 66 | 48 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 97 | 92 | 2 | 0 | 0 | 96 | 62 | 56 | 33 | 13 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 33 | 96 | 91 | 0 | 0 | 0 | 95 | 51 | 34 | 9 | 0 |
| July 25, 2012 | 100 | 100 | 100 | 58 | 0 | 95 | 90 | 0 | 0 | 0 | 93 | 40 | 17 | 0 | 0 |
| July 25, 2013 | 100 | 100 | 73 | 0 | 0 | 94 | 88 | 0 | 0 | 0 | 92 | 31 | 4 | 0 | 0 |
| July 25, 2014 | 100 | 100 | 0 | 0 | 0 | 93 | 87 | 0 | 0 | 0 | 91 | 22 | 0 | 0 | 0 |
| July 25, 2015 | 100 | 100 | 0 | 0 | 0 | 92 | 86 | 0 | 0 | 0 | 89 | 15 | 0 | 0 | 0 |
| July 25, 2016 | 100 | 100 | 0 | 0 | 0 | 92 | 86 | 0 | 0 | 0 | 87 | 8 | 0 | 0 | 0 |
| July 25, 2017 | 100 | 58 | 0 | 0 | 0 | 90 | 74 | 0 | 0 | 0 | 85 | 1 | 0 | 0 | 0 |
| July 25, 2018 | 100 | 0 | 0 | 0 | 0 | 89 | 63 | 0 | 0 | 0 | 83 | 0 | 0 | 0 | 0 |
| July 25, 2019 | 100 | 0 | 0 | 0 | 0 | 88 | 51 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 0 |
| July 25, 2020 | 100 | 0 | 0 | 0 | 0 | 87 | 41 | 0 | 0 | 0 | 75 | 0 | 0 | 0 | 0 |
| July 25, 2021 | 100 | 0 | 0 | 0 | 0 | 86 | 31 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2022 | 100 | 0 | 0 | 0 | 0 | 85 | 22 | 0 | 0 | 0 | 66 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 100 | 0 | 0 | 0 | 0 | 84 | 13 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 100 | 0 | 0 | 0 | 0 | 83 | 5 | 0 | 0 | 0 | 56 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 100 | 0 | 0 | 0 | 0 | 82 | 0 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 100 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 100 | 0 | 0 | 0 | 0 | 73 | 0 | 0 | 0 | 0 | 37 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 53 | 0 | 0 | 0 | 0 | 54 | 0 | 0 | 0 | 0 | 30 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 0 | 0 | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 14 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 21.41 | 11.1 | 7.18 | 5.38 | 4.42 | 22.95 | 13.53 | 2.53 | 2.00 | 1.70 | 15.83 | 5.39 | 4.00 | 3.26 | 2.82 |

**    The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-13 | | | | | Class A-14 | | | | | Class A-15 and Class A-16 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 98 | 98 | 98 | 98 | 98 | 106 | 106 | 106 | 106 | 106 | 98 | 101 | 100 | 100 | 100 |
| July 25, 2008 | 95 | 95 | 95 | 95 | 95 | 113 | 113 | 113 | 113 | 113 | 97 | 100 | 100 | 100 | 100 |
| July 25, 2009 | 92 | 92 | 92 | 92 | 92 | 120 | 120 | 120 | 120 | 120 | 96 | 100 | 100 | 100 | 100 |
| July 25, 2010 | 90 | 90 | 90 | 90 | 90 | 127 | 127 | 127 | 127 | 127 | 93 | 100 | 100 | 100 | 100 |
| July 25, 2011 | 87 | 87 | 87 | 87 | 87 | 135 | 135 | 135 | 135 | 135 | 91 | 100 | 100 | 100 | 100 |
| July 25, 2012 | 83 | 83 | 83 | 83 | 42 | 143 | 143 | 143 | 143 | 143 | 88 | 98 | 98 | 100 | 100 |
| July 25, 2013 | 80 | 80 | 80 | 56 | 0 | 152 | 152 | 152 | 152 | 152 | 85 | 95 | 94 | 94 | 88 |
| July 25, 2014 | 76 | 76 | 57 | 9 | 0 | 161 | 161 | 161 | 161 | 108 | 82 | 91 | 86 | 81 | 75 |
| July 25, 2015 | 73 | 73 | 27 | 0 | 0 | 171 | 171 | 171 | 171 | 72 | 79 | 85 | 75 | 67 | 55 |
| July 25, 2016 | 68 | 68 | 5 | 0 | 0 | 182 | 182 | 182 | 156 | 54 | 75 | 79 | 63 | 53 | 37 |
| July 25, 2017 | 64 | 64 | 0 | 0 | 0 | 193 | 193 | 193 | 133 | 40 | 71 | 72 | 51 | 39 | 26 |
| July 25, 2018 | 60 | 60 | 0 | 0 | 0 | 205 | 205 | 205 | 99 | 30 | 67 | 66 | 41 | 29 | 18 |
| July 25, 2019 | 55 | 55 | 0 | 0 | 0 | 218 | 218 | 218 | 79 | 22 | 63 | 60 | 32 | 22 | 13 |
| July 25, 2020 | 50 | 50 | 0 | 0 | 0 | 231 | 231 | 231 | 62 | 16 | 58 | 55 | 26 | 16 | 9 |
| July 25, 2021 | 44 | 44 | 0 | 0 | 0 | 245 | 245 | 245 | 49 | 12 | 53 | 50 | 20 | 12 | 6 |
| July 25, 2022 | 38 | 38 | 0 | 0 | 0 | 261 | 261 | 261 | 38 | 9 | 48 | 45 | 16 | 9 | 5 |
| July 25, 2023 | 32 | 32 | 0 | 0 | 0 | 277 | 277 | 277 | 30 | 6 | 42 | 40 | 13 | 6 | 3 |
| July 25, 2024 | 25 | 25 | 0 | 0 | 0 | 294 | 294 | 294 | 23 | 4 | 36 | 36 | 10 | 5 | 3 |
| July 25, 2025 | 18 | 18 | 0 | 0 | 0 | 312 | 312 | 231 | 18 | 3 | 30 | 32 | 8 | 3 | 2 |
| July 25, 2026 | 11 | 11 | 0 | 0 | 0 | 331 | 331 | 179 | 13 | 2 | 23 | 28 | 6 | 2 | 1 |
| July 25, 2027 | 3 | 4 | 0 | 0 | 0 | 351 | 351 | 144 | 10 | 1 | 15 | 24 | 5 | 1 | 1 |
| July 25, 2028 | 0 | 3 | 0 | 0 | 0 | 360 | 397 | 111 | 7 | 1 | 8 | 21 | 3 | 1 | * |
| July 25, 2029 | 0 | 0 | 0 | 0 | 0 | 360 | 255 | 80 | 5 | * | 0 | 18 | 3 | 1 | * |
| July 25, 2030 | 0 | 0 | 0 | 0 | 0 | 360 | 216 | 51 | 4 | * | 0 | 15 | 2 | * | * |
| July 25, 2031 | 0 | 0 | 0 | 0 | 0 | 360 | 179 | 24 | 3 | * | 0 | 12 | 1 | * | * |
| July 25, 2032 | 0 | 0 | 0 | 0 | 0 | 360 | 144 | 0 | 2 | 1 | 0 | 9 | 1 | * | * |
| July 25, 2033 | 0 | 0 | 0 | 0 | 0 | 292 | 111 | 0 | 1 | * | 0 | 7 | * | * | * |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 144 | 80 | 0 | 1 | * | 0 | 4 | * | * | * |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 51 | 0 | 0 | 0 | 0 | 2 | * | * | * |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 12.95 | 12.86 | 7.69 | 5.82 | 4.74 | 28.78 | 24.61 | 14.45 | 10.03 | 6.47 | 21.51 | 15.94 | 11.09 | 9.91 | 8.88 |

\* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-P 0% | 100% | 400% | 500% | Class M-1, Class M-2 and Class M-3 0% | 100% | 400% | 500% |
|---|---|---|---|---|---|---|---|---|
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 99 | 97 | 92 | 91 | 99 | 99 | 99 | 99 |
| July 25, 2008 | 98 | 93 | 82 | 71 | 98 | 98 | 98 | 98 |
| July 25, 2009 | 97 | 86 | 66 | 50 | 98 | 98 | 98 | 98 |
| July 25, 2010 | 96 | 80 | 54 | 34 | 97 | 97 | 97 | 97 |
| July 25, 2011 | 95 | 74 | 44 | 24 | 96 | 96 | 96 | 96 |
| July 25, 2012 | 94 | 69 | 35 | 16 | 95 | 93 | 89 | 87 |
| July 25, 2013 | 92 | 64 | 29 | 11 | 93 | 89 | 81 | 77 |
| July 25, 2014 | 91 | 59 | 23 | 8 | 92 | 85 | 71 | 65 |
| July 25, 2015 | 89 | 55 | 19 | 5 | 91 | 80 | 60 | 51 |
| July 25, 2016 | 88 | 51 | 15 | 4 | 89 | 74 | 48 | 38 |
| July 25, 2017 | 85 | 46 | 12 | 3 | 87 | 68 | 39 | 28 |
| July 25, 2018 | 83 | 42 | 10 | 2 | 85 | 62 | 31 | 21 |
| July 25, 2019 | 80 | 38 | 8 | 1 | 82 | 56 | 25 | 15 |
| July 25, 2020 | 77 | 35 | 6 | — | 79 | 51 | 19 | 11 |
| July 25, 2021 | 74 | 31 | 5 | — | 77 | 46 | 15 | 8 |
| July 25, 2022 | 71 | 28 | 4 | — | 73 | 42 | 12 | 6 |
| July 25, 2023 | 68 | 25 | 3 | — | 70 | 38 | 9 | 4 |
| July 25, 2024 | 64 | 23 | 2 | — | 67 | 33 | 7 | 3 |
| July 25, 2025 | 61 | 20 | 2 | — | 63 | 30 | 6 | 2 |
| July 25, 2026 | 56 | 17 | 1 | — | 59 | 26 | 4 | 2 |
| July 25, 2027 | 52 | 15 | 1 | — | 54 | 23 | 3 | 1 |
| July 25, 2028 | 48 | 13 | 1 | — | 50 | 20 | 2 | 1 |
| July 25, 2029 | 43 | 11 | — | — | 45 | 17 | 1 | — |
| July 25, 2030 | 39 | 9 | — | — | 39 | 14 | 1 | — |
| July 25, 2031 | 32 | 7 | * | * | 34 | 11 | * | * |
| July 25, 2032 | 26 | 6 | * | * | 28 | 9 | * | * |
| July 25, 2033 | 20 | 4 | * | * | 21 | 6 | * | * |
| July 25, 2034 | 13 | 2 | * | * | 14 | 4 | * | * |
| July 25, 2035 | 6 | 1 | * | * | 7 | 2 | * | * |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 19.91 | 11.56 | 4.51 | 3.75 | 20.36 | 15.17 | 10.69 | 9.63 | 8.90 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

† This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

# EXHIBIT F

# UNDERWRITER INFORMATION

F-1

Prospectus supplement dated July 26, 2006 (to prospectus dated July 14, 2006)

# $595,956,340

# RFMSI Series 2006-S6 Trust
## Issuing Entity

# Residential Funding Mortgage Securities I, Inc.
## Depositor

# Residential Funding Corporation
## Master Servicer and Sponsor

## Mortgage Pass-Through Certificates, Series 2006-S6

The trust will hold a pool of one- to four-family residential first lien mortgage loans.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 20 classes of senior certificates designated Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-V, Class A-P, Class R-I and Class R-II Certificates; and
- 3 classes of subordinated certificates designated Class M-1, Class M-2 and Class M-3 Certificates,

all as more fully described in the table on page S-5 of this prospectus supplement.

Credit enhancement for all of these certificates will be provided by additional classes of subordinated certificates which are not offered hereby.

Distributions on the certificates will be on the 25th of each month or, if the 25th is not a business day, on the next business day, beginning August 25, 2006.

> **You should consider carefully the risk factors beginning on page S-15 in this prospectus supplement.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

**The certificates represent interests only in the trust, as the issuing entity, and do not represent interests in or obligations of Residential Funding Mortgage Securities I, Inc., as the depositor, Residential Funding Corporation, as the sponsor, or any of their affiliates.**

Morgan Stanley & Co. Incorporated, as the underwriter, will purchase all but two classes of the senior certificates from the depositor in the amounts described in "Method of Distribution" on page S-100 of this prospectus supplement. The net proceeds to the depositor from the sale of these senior underwritten certificates will be approximately 98.53% of the aggregate certificate principal balance of these senior underwritten certificates plus accrued interest, before deducting expenses.

Bear, Stearns & Co. Inc., as an underwriter, will purchase three classes of subordinate certificates from the depositor in the amounts described in "Method of Distribution" on page S-100 of this prospectus supplement. The net proceeds to the depositor from the sale of these subordinate underwritten certificates will be approximately 96.11% of the aggregate certificate principal balance of these subordinate underwritten certificates plus accrued interest, before deducting expenses.

The offered certificates are offered by the issuing entity through the underwriters to prospective purchasers from time to time in negotiated transactions at varying prices to be determined at the time of sale. There is no underwriting agreement for the remaining two classes of senior certificates.

*Morgan Stanley*                    *Bear, Stearns & Co. Inc.*

Residential Funding will be designated as the "tax matters person" with respect to each REMIC as defined in the REMIC Provisions, as defined in the accompanying prospectus, and in connection therewith will be required to hold not less than 0.01% of the Residual Certificates.

Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Residual Certificates.

For further information regarding the federal income tax consequences of investing in the Residual Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Residual Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates" in the accompanying prospectus.

### State and Other Tax Consequences

In addition to the federal income tax consequences described in "Material Federal Income Tax Consequences," potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the certificates offered by this prospectus. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors should consult their tax advisors about the various tax consequences of investments in the certificates offered by this prospectus.

### Use of Proceeds

The net proceeds from the sale of the offered certificates to the underwriters will be paid to the depositor. The depositor will use the proceeds to purchase the mortgage loans or for general corporate purposes.

### Method of Distribution

In accordance with the terms and conditions of a senior underwriting agreement, dated July 26, 2006, Morgan Stanley & Co. Incorporated will serve as the underwriter and has agreed to purchase and the depositor has agreed to sell the senior certificates, other than the Class A-V Certificates and the Class A-P Certificates, except that a de minimis portion of the Residual Certificates will be retained by Residential Funding and that portion is not offered hereby. The certificates being sold to Morgan Stanley & Co. Incorporated are referred to as the senior underwritten certificates. It is expected that delivery of the senior underwritten certificates, other than the Residual Certificates, will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Residual Certificates, other than the de minimis portion retained by Residential Funding, will be made at the offices of Morgan Stanley & Co. Incorporated, New York, New York on or about June 29, 2006 against payment therefor in immediately available funds.

In accordance with the terms and conditions of a Class M underwriting agreement, dated July 26, 2006, Bear, Stearns & Co. Inc. will serve as the underwriter of the Class M Certificates and has agreed to purchase and the depositor has agreed to sell the Class M Certificates. The certificates being sold to Bear, Stearns & Co. Inc. are referred to as the subordinate underwritten certificates. It is expected that delivery of the subordinate underwritten certificates will be made only in book-entry form through the Same Day Funds Settlement System of DTC on or about July 28, 2006 against payment therefor in immediately available funds.

The senior underwriting agreement and the Class M underwriting agreement are collectively referred to in this prospectus supplement as the underwriting agreements and the senior underwritten certificates and the subordinate underwritten certificates are collectively referred to in this prospectus supplement as the underwritten certificates. Morgan Stanley & Co. Incorporated and Bear, Stearns & Co. Inc. are collectively referred to in this prospectus supplement as the underwriters.

In connection with the senior underwritten certificates and the subordinate underwritten certificates, respectively, the related underwriter has agreed, in accordance with the terms and conditions of its respective underwriting agreement, to purchase all of its respective underwritten certificates if any of those underwritten certificates are purchased thereby.

The underwriting agreements provide that the obligations of the underwriters to pay for and accept delivery of their respective underwritten certificates are subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the respective underwriters may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the senior underwritten certificates, before deducting expenses payable by the depositor, will be approximately 98.53% of the aggregate Certificate Principal Balance of the senior underwritten certificates plus accrued interest thereon from the cut-off date. Proceeds to the depositor from the sale of the subordinate underwritten certificates, before deducting expenses payable by the depositor, will be approximately 96.11% of the aggregate Certificate Principal Balance of the subordinate underwritten certificates plus accrued interest thereon from the cut-off date.

The underwriters may effect these transactions by selling their respective underwritten certificates to or through dealers, and those dealers may receive compensation in the form of underwriting discounts, concessions or commissions from the respective underwriter for whom they act as agent. In connection with the sale of the underwritten certificates, the underwriters may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriters and any dealers that participate with the underwriters in the distribution of the related underwritten certificates are also underwriters under the Securities Act. Any profit on the resale of the underwritten certificates positioned by an underwriter would be underwriter compensation in the form of underwriting discounts and commissions under the Securities Act.

Each underwriting agreement provides that the depositor will indemnify the related underwriter, and that under limited circumstances the related underwriter will indemnify the depositor, against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

The Class A-V Certificates and the Class A-P Certificates may be offered by the depositor from time to time directly or through an underwriter or agent in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. However, there is currently no underwriting arrangement in effect for these certificates. Proceeds to the depositor from any sale of the Class A-V Certificates or the Class A-P Certificates will equal the purchase price paid by their purchaser, net of any expenses payable by the depositor and any compensation payable to any underwriter or agent.

There is currently no secondary market for the offered certificates. Each underwriter intends to make a secondary market in the underwritten certificates to be purchased by it but is not obligated to do

so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the accompanying prospectus under "Description of the Certificates—Reports to Certificateholders" and in this prospectus supplement under "Pooling and Servicing Agreement—Reports to Certificateholders," which will include information as to the outstanding principal balance or notional amount of the offered certificates. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of this information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

## Legal Opinions

Certain legal matters relating to the certificates will be passed upon for the depositor by Mayer, Brown, Rowe & Maw LLP, New York, New York and for Morgan Stanley & Co. Incorporated and Bear, Stearns & Co. Inc. by Sidley Austin LLP, New York, New York.

## Ratings

It is a condition of the issuance of the Senior Certificates that they be rated "Aaa" or "Aa1" by Moody's Investors Service, Inc., or Moody's, "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or Standard & Poor's and Fitch Ratings, or Fitch. It is a condition of the issuance of the Class M-1, Class M-2 and Class M-3 Certificates that they be rated not lower than "AA", "A" and "BBB", respectively, by Fitch.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement. Moody's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the mortgage loans. Further, the ratings on the Interest Only Certificates do not address whether investors therein will recoup their initial investments. The rating on the Principal Only Certificates only addresses the return of its Certificate Principal Balance. The rating on the Residual Certificates only addresses the return of its Certificate Principal Balance and interest on the Residual Certificates at the related pass-through rate.

Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates. Standard & Poor's ratings on the offered certificates do not, however, constitute a statement regarding frequency of prepayments on the mortgages. See *"Certain Yield and Prepayment Considerations"* in this prospectus supplement.

The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the transaction structure. Fitch's ratings reflect its analysis of the riskiness of the underlying mortgage loans and the structure of the transaction as described in the operative documents. Fitch's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Further,

## EXHIBIT G

### UNDERWRITER'S CERTIFICATE

[See Tab 57 of the Closing Set]

# EXHIBIT B

 CT Corporation

**Service of Process
Transmittal**
08/14/2012
CT Log Number 521038193

TO:   Alita Wingfield, Managing Attorney
      Morgan Stanley Law Division
      1221 Avenue of the Americas, 35th Floor
      New York, NY 10020

RE:   **Process Served in Alabama**

FOR:  Morgan Stanley & Co. LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Federal Deposit Insurance Corporation, etc., Pltf. vs. Citigroup Mortgage Loan Trust Inc., etc., et al. including Morgan Stanley & Co. LLC, etc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Cover Sheet, Complaint, Attachment(s), Schedule(s) |
| **COURT/AGENCY:** | Montgomery County Circuit Court, TN<br>Case # 03CV201290103600 |
| **NATURE OF ACTION:** | Plaintiff claiming damages for untrue or misleading statements in a registration statements under section 11 of the alabama securities act 1933 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 08/14/2012 postmarked on 08/13/2012 |
| **JURISDICTION SERVED :** | Alabama |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after this summons and complaint were delivered |
| **ATTORNEY(S) / SENDER(S):** | Dennis R. Bailey<br>Rushton, Stakely, Johnston & Garrett, P.A.<br>184 Commerce Street<br>Montgomery, AL 36101-0270<br>334-206-3234 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/14/2012, Expected Purge Date: 09/13/2012<br>Image SOP<br>Email Notification, Andrea Carty-Abrahams Andrea.Carty@morganstanley.com<br>Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com<br>Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com<br>Email Notification, Crystal Pruden crystal.pruden@morganstanley.com<br>Email Notification, Alita Wingfield Alita.Wingfield@morganstanley.com<br>Email Notification, Lenise Davis lenise.davis@morganstanley.com<br>Email Notification, Osmond Fortin Osmond.Fortin@morganstanley.com<br>Email Notification, Marielle Messa Marielle.Messa@morganstanley.com<br>Email Notification, Marie Van Duyne<br>marie.van.duyne@morganstanleysmithbarney.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:** | C T Corporation System<br>Amy McLaren<br>2 North Jackson Street<br>Suite 605<br>Montgomery, AL 36104 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process
Transmittal**
08/14/2012
CT Log Number 521038193

TO:   Alita Wingfield, Managing Attorney
      Morgan Stanley Law Division
      1221 Avenue of the Americas, 35th Floor
      New York, NY 10020

RE:   **Process Served in Alabama**

FOR:  Morgan Stanley & Co. LLC (Domestic State: DE)

TELEPHONE:              800-592-9023

Page 2 of  2 / MA

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal
opinion as to the nature of action, the amount of damages, the
answer date, or any information contained in the documents
themselves. Recipient is responsible for interpreting said
documents and for taking appropriate action. Signatures on
certified mail receipts confirm receipt of package only, not
contents.

| State of Alabama<br>Unified Judicial System<br><br>Form C-34  Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>03-CV-2012-901036.00 |

## IN THE CIVIL COURT OF MONTGOMERY, ALABAMA
### FEDERAL DEPOSIT INSURANCE CORPORATION V. CITIGROUP MORTGAGE LOAN TRUST

MORGAN STANLEY & CO, CT CORPORATION SYSTEM 2 NO JACKSON ST, STE 605, MONTGOMERY, AL 36104

**NOTICE TO**

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION. IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY DENNIS R. BAILEY

WHOSE ADDRESS IS P.O. BOX 270, MONTGOMERY, AL 36101

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of      FEDERAL DEPOSIT INSURANCE
pursuant to the Alabama Rules of the Civil Procedure                                       CORPORATION

| 8/10/2012 3:16:00 PM | /s FLORENCE CAUTHEN | |
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested        /s DENNIS R. BAILEY
                                            Plaintiff's/Attorney's Signature

**RETURN ON SERVICE:**

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____            _____
Date                        Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>**03-CV-201**<br>Date of Filing:<br>08/10/2012 | ELECTRONICALLY FILED<br>8/10/2012 3:16 PM<br>CV-2012-901036.00<br>CIRCUIT COURT OF<br>MONTGOMERY COUNTY, ALABAMA<br>FLORENCE CAUTHEN, CLERK |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA
### FEDERAL DEPOSIT INSURANCE CORPORATION v. CITIGROUP MORTGAGE LOAN TRUST ET AL

**First Plaintiff:**  ☐ Business  ☐ Individual  ☑ Government  ☐ Other

**First Defendant:**  ☑ Business  ☐ Individual  ☐ Government  ☐ Other

**NATURE OF SUIT:**

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonnes
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/Enforcement of Agency Subpoena/Petition to Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP - Contempt of Court
☐ CONT - Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
☐ CVUD - Eviction Appeal/Unlawful Detainer
☐ FORJ - Foreign Judgment
☐ FORF - Fruits of Crime Forfeiture
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB - Protection From Abuse
☐ FELA - Railroad/Seaman (FELA)
☐ RPRO - Real Property
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP - Workers' Compensation
☑ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ **INITIAL FILING**        A ☐ **APPEAL FROM DISTRICT COURT**        O ☐ **OTHER**

R ☐ **REMANDED**        T ☐ **TRANSFERRED FROM OTHER CIRCUIT COURT**        _____

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ Yes   ☐ No

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**   BAI028        8/10/2012 3:12:18 PM        /s/ DENNIS R. BAILEY

**MEDIATION REQUESTED:**        ☐ Yes   ☐ No   ☑ Undecided

ELECTRONICALLY FILED
8/10/2012 3:16 PM
CV-2012-901036.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
FLORENCE CAUTHEN, CLERK

## IN THE CIRCUIT COURT OF
## MONTGOMERY COUNTY, ALABAMA

FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER FOR
COLONIAL BANK, a domestic
banking corporation,

        Plaintiff,

    v.

CITIGROUP MORTGAGE LOAN TRUST
INC., a corporation; CITIGROUP
FINANCIAL PRODUCTS INC., a
corporation; CITIGROUP GLOBAL
MARKETS INC., a corporation;
ALLY SECURITIES LLC, a limited
liability company; J.P. MORGAN
SECURITIES LLC, a limited
liability company; MORGAN
STANLEY & CO. LLC, a limited
liability company; and RBS
SECURITIES INC., a
corporation;

        Defendants.

Civil Action No.

_____

**JURY TRIAL DEMANDED**

## COMPLAINT

Comes now Plaintiff Federal Deposit Insurance
Corporation as Receiver for Colonial Bank for its Complaint
against Citigroup Mortgage Loan Trust Inc. (**CMLTI**);
Citigroup Financial Products Inc. (**Citigroup FP**); Citigroup
Global Markets Inc. (**Citigroup**); Ally Securities LLC
(formerly known as Residential Funding Securities, LLC and
doing business as GMAC RFC Securities, and referred to in
this Complaint as **GMAC**); J.P. Morgan Securities LLC
(formerly known as Bear, Stearns & Co. Inc. and referred to

in this Complaint as **Bear Stearns**); Morgan Stanley & Co.
LLC (formerly known as Morgan Stanley & Co. Inc. and
referred to in this Complaint as **Morgan Stanley**); and RBS
Securities Inc. (formerly known as Greenwich Capital
Markets, Inc. and doing business as RBS Greenwich Capital,
and referred to in this Complaint as **RBS**), and alleges as
follows:

## I.   NATURE OF THIS ACTION

1.   This is an action for damages caused by violation
of the Alabama Securities Act (**ASA**) and the Securities Act
of 1933 (**1933 Act**) by the defendants. As alleged in detail
below, defendants issued, underwrote, or sold six
securities known as "certificates," which were backed by
collateral pools of residential mortgage loans. Colonial
Bank (**Colonial**) paid approximately $222 million for the six
certificates. When they issued, underwrote, or sold the
certificates, the defendants made numerous statements of
material fact about the certificates and, in particular,
about the credit quality of the mortgage loans that backed
them. Many of those statements were untrue. Moreover, the
defendants omitted to state many material facts that were
necessary in order to make their statements not misleading.
For example, the defendants made untrue statements or
omitted important information about such material facts as
the loan-to-value ratios of the mortgage loans, the extent
to which appraisals of the properties that secured the
loans were performed in compliance with professional

2

appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

2. Based on an analysis of a random sample of the loans that backed the certificates that Colonial purchased, the defendants made such untrue or misleading statements about at least the following numbers of loans.

3

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[1] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 828 | 1,178 | 70.3% |
| 2 | 872 | 1,106 | 78.8% |
| 3 | 827 | 1,645 | 50.3% |
| 4 | 575 | 801 | 71.8% |
| 5 | 1,642 | 2,607 | 63.0% |
| 6 | 1,119 | 1,696 | 66.0% |

3. The certificates are "securities" within the meaning of the ASA and the 1933 Act. The defendants are

---

[1] The method of random sampling that Plaintiff used ensures that conclusions about the entire collateral pool have a margin of error of no more than plus or minus 5% at a confidence level of 95% (that is, one can be 95% certain that the true percentage in the collateral pool as a whole is within 5% of the percentage measured in the sample). For example, one can be 95% certain that the number of loans in Securitization No. 1 about which defendants made untrue or misleading statements or omissions is within 5% of 828, that is, between 787 and 869. The same margin of error should be applied to all information in this Complaint and accompanying Schedules that is based on a random sample of loans in a collateral pool, with one exception.

For Securitization No. 2, data was only available for 85 of the 1,106 loans that backed the certificate that Colonial purchased. For that securitization the margin of error is no more than plus or minus 10.2% at a confidence level of 95%.

4

liable under the following provisions of the ASA and the
1933 Act:

*As issuer:* CMLTI, which issued one of the certificates
that Colonial purchased, is liable as an "issuer" under
Section 11 of the 1933 Act.

*As underwriters:* The following defendants, which
underwrote the certificates that Colonial purchased, are
liable as "underwriters" under Section 11 of the 1933 Act:
Citigroup, which underwrote three of the certificates; RBS,
which underwrote two of the certificates; and Bear Stearns,
GMAC, and Morgan Stanley, each of which underwrote one of
the certificates.

*As sellers:* The following defendants, which sold
certain of the certificates to Colonial when they were
initially offered to the public, are liable as "sellers"
under Section 8-6-19(a)(2) of the ASA and Section 12(a)(2)
of the 1933 Act: Citigroup, which sold two of the
certificates; Morgan Stanley, which sold one of the
certificates; and RBS, which sold two of the certificates.

CMLTI is also liable as a seller under Section 8-6-
19(a)(2) of the ASA and Section 12(a)(2) of the 1933 Act
because it issued one of the certificates that Colonial
purchased when it was initially offered to the public.

*As control person:* Citigroup FP is liable as a
"controlling person" of CMLTI under Section 8-6-19(c) of
the ASA and Section 15 of the 1933 Act, 15 U.S.C. § 77o.

5

## II.  **PARTIES**

4.   The Federal Deposit Insurance Corporation (**FDIC**)
is a corporation organized and existing under the laws of
the United States of America. Under the Federal Deposit
Insurance Act, the FDIC is authorized to be appointed as
receiver for failed insured depository institutions. On
August 14, 2009, the FDIC was duly appointed the receiver
for Colonial. Under the Federal Deposit Insurance Act, the
FDIC as receiver succeeds to, and is empowered to sue and
complain in any court of law to pursue, all claims held by
banks for which it is the receiver. 12 U.S.C. §§ 1819,
1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial
has authority to pursue claims held by Colonial, including
the claims made against the defendants in this action.

5.   Defendant CMLTI is a corporation organized under
the laws of Delaware.

6.   Defendant Citigroup FP is a corporation organized
under the laws of Delaware. During the relevant time,
Citigroup FP controlled CMLTI. Under Section 8-6-19(c) of
the ASA and Section 15 of the 1933 Act, Citigroup FP
therefore is liable jointly and severally with, and to the
same extent as, CMLTI.

7.   Defendant Bear Stearns is a limited liability
company organized under the laws of Delaware.

8.   Defendant Citigroup is a corporation organized
under the laws of New York.

6

9.   Defendant GMAC is a limited liability company organized under the laws of Delaware.

10.  Defendant Morgan Stanley is a limited liability company organized under the laws of Delaware.

11.  Defendant RBS is a corporation organized under the laws of Delaware.

### III.   JURISDICTION AND VENUE

12.  This Court has subject matter jurisdiction pursuant to Alabama Code § 8-6-19.

13.  The amount in controversy exceeds the jurisdictional minimum of this Court.

14.  This Court has personal jurisdiction over the defendants pursuant to Alabama Rule of Civil Procedure 4.2.

15.  Venue is proper in this Court pursuant to Alabama Code § 6-3-7.

### IV.   SECURITIZATION OF MORTGAGE LOANS

16.  The securities that Colonial purchased are so-called **residential mortgage-backed securities,** or **RMBS,** created in a process known as **securitization.** Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan

7

underwriting process, the originator applies its
**underwriting standards.**

17. In general, residential mortgage lenders may hold
some of the mortgage loans they originate in their own
portfolios and may sell other mortgage loans they originate
into securitizations.

18. In a securitization, a large number of loans,
usually of a similar type, are grouped into a **collateral
pool.** The originator of those loans sells them (and, with
them, the right to receive the cash flow from them) to a
**trust.** The trust pays the originator cash for the loans.
The trust raises the cash to pay for the loans by selling
**securities,** usually called **certificates,** to investors such
as Colonial. Each certificate entitles its holder to an
agreed part of the cash flow from the loans in the
collateral pool.

19. In a simple securitization, the holder of each
certificate is entitled to a *pro rata* part of the overall
monthly cash flow from the loans in the collateral pool.

20. In a more complex securitization, the cash flow is
divided into different parts, usually called **tranches**
("tranche" is "slice" in French), and the certificates are
divided into different **classes,** each with different rights.
Each class of certificates is entitled to the cash flow in
the tranche corresponding to that class.

21. One way in which the cash flow is divided — and
the rights of different classes of certificates

8

distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

22. The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100

9

million of loans produced payments of at least $50 million
plus interest, that is, unless the loss rate on those loans
exceeded 50%, fully ten times the historical average. All
of the certificates referred to in this Complaint were
rated triple-A when Colonial purchased them.

23. Each securitization has a **sponsor,** the prime mover
of the securitization. Sometimes the sponsor is the
originator or an affiliate. In originator-sponsored
securitizations, the collateral pool usually contains loans
made by the originator that is sponsoring the
securitization. Other times, the sponsor may be an
investment bank, which purchases loans from one or more
originators, aggregates them into a collateral pool, sells
them to a trust, and securitizes them. The sponsor arranges
for title to the loans to be transferred to an entity known
as the **depositor,** which then transfers title to the loans
to the trust.

24. The obligor of the certificates in a
securitization is the trust that purchases the loans in the
collateral pool. Because a trust has few assets other than
the loans that it purchased, it may not be able to satisfy
the liabilities of an issuer of securities (the
certificates). The law therefore treats the depositor as
the **issuer** of a residential mortgage-backed certificate.

25. **Securities underwriters,** like Bear Stearns,
Citigroup, GMAC, Morgan Stanley, and RBS, play a critical
role in the process of securitization. They underwrite the

10

sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

26. Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

27. Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to

11

potential investors the information about the credit
quality of the loans that will be deposited into the trust.
They do so by using information about the loans that has
been compiled into a database known as a **loan tape**. The
securities underwriters use the loan tape to compile
numerous statistics about the loans, which are presented to
potential investors in a **prospectus supplement**, a
disclosure document that the underwriters are required to
file with the Securities and Exchange Commission. (Colonial
did not have access to the loan tapes before it purchased
the certificates, but Plaintiff has reviewed data from the
loan tapes in preparing this Complaint.)

28. As alleged in detail below, the information in the
prospectus supplements and other offering documents about
the credit quality of the loans in the collateral pools of
the trusts contained many statements that were material to
the credit quality of those loans, but were untrue or
misleading.

## V. DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

29. Colonial purchased certificates in six
securitizations (referred to in this Complaint as
Securitizations Nos. 1 through 6). Details of each
securitization and each certificate are stated in Item 29
of Schedules 1 through 6 of this Complaint, which
correspond to Securitizations Nos. 1 through 6. Plaintiff
incorporates into this paragraph 29, and alleges as though

12

fully set forth in this paragraph, the contents of Item 29
of the Schedules.

30. The prospectus supplement for each of the six
securitizations is available from the Securities and
Exchange Commission's website. A URL for each prospectus
supplement is included in Item 29 of the Schedules. The
prospectus supplements are incorporated into this Complaint
by reference.

31. In general, Plaintiff drew and analyzed a random
sample of 400 loans from the collateral pool of each
securitization in which Colonial purchased a certificate.[2]

32. Many of the statements of material fact that the
defendants made in the prospectus supplements were untrue
or misleading. These untrue or misleading statements
included the following.

**A.   Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**1.   LTVs**

**(a)   The materiality of LTVs**

33. The loan-to-value ratio of a mortgage loan, or
LTV, is the ratio of the amount of the mortgage loan to the
lower of the appraised value or the sale price of the

---

[2] For Securitization No. 2, data was only available for
85 of the 1,106 loans that backed the certificate that
Colonial purchased. For that securitization, Plaintiff
analyzed the 85 loans for which data was available.

13

mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

34. Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including

14

the life of the certificate and the timing and amount of cash that the investor will receive during that life.

35. In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

36. An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

37. For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus,

15

are essential to the decision of a reasonable investor
whether to purchase any such certificate.

### (b) Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations

38.  In the prospectus supplements, the defendants made
material untrue or misleading statements about the LTVs of
the mortgage loans in the collateral pools of these
securitizations. Each such statement is identified in Item
38 of the Schedules of this Complaint. Plaintiff
incorporates into this paragraph 38, and alleges as though
fully set forth in this paragraph, the contents of Item 38
of the Schedules.

39.  The defendants made these statements as statements
of fact. Plaintiff is informed and believes, and based
thereon alleges, that the defendants intended that these
statements be understood as statements of fact. Colonial
did understand the statements about the LTVs as statements
of fact. Colonial had no access to appraisal reports or
other documents or information from which it could verify
the LTVs of the mortgage loans other than the statements
that the defendants made about those LTVs.

### (c) An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.

40.  The stated LTVs of many of the mortgage loans in
the securitizations were significantly lower than the true

16

LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were, therefore, untrue and misleading.

41. Using a comprehensive, industry-standard automated valuation model (**AVM**), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

42. For many of the properties that secured the mortgage loans, the model determined that the LTVs presented in the prospectus supplements were understated. In particular, for many of the properties, the model determined that the denominator (that is, the appraised value of the property as stated in the loan tape and

17

compiled into the tables in the prospectus supplement) that
was used in the disclosed LTV was 105% or more of the true
market value as determined by the model as of the date on
which each individual mortgage loan closed. (The model
considered no transactions that occurred after that date.)
In contrast, the model determined that the denominator that
was used in the disclosed LTV was 95% or less of the true
market value on a much smaller number of properties. Thus,
the number of properties on which the value was overstated
exceeded by far the number on which the value was
understated, and the aggregate amount overstated exceeded
by far the aggregate amount understated.

43. For example, in Securitization No. 1, there were
1,178 mortgage loans that backed the certificate that
Colonial purchased. On 409 of the properties that secured
those loans, the model determined that the denominator that
was used in the disclosed LTV was 105% or more of the true
market value and the amount by which the stated values of
those properties exceeded their true market values in the
aggregate was $57,905,435. The model determined that the
denominator that was used in the disclosed LTV was 95% or
less of true market value on only 77 properties, and the
amount by which the true market values of those properties
exceeded the values reported in the denominators was
$9,378,801. Thus, the number of properties on which the
value was overstated exceeded by more than five times the
number on which the value was understated, and the

18

aggregate amount overstated was more than six times the aggregate amount understated.

44. On one of the loans in Securitization No. 1, the amount of the loan was $638,000 and the stated value of the property was $797,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $585,000, resulting in a true LTV of 109%. Thus, the stated value was higher than the true value by 36.3% and the stated LTV was lower than the true LTV by 29%. Both of these were huge discrepancies that were material to the credit quality of the loan.

45. The overstated values of 409 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all of the mortgage loans had an LTV of 95% or less. In fact, 121 of the mortgage loans had LTVs of over 95%. Defendants also stated that the weighted-average LTV of the loans in the collateral pool was 69.98%. In fact, the weighted-average LTV of the loans was 83.2%. These differences were material for the reasons stated above.

46. The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans that backed the certificate | 1,178 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 409 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $57,905,435 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 77 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $9,378,801 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 121 |
| Weighted-average LTV, as stated by defendants | 69.98% |
| Weighted-average LTV, as determined by the model | 83.2% |

47. The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item 47 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the Schedules.

> **(d) These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

48. As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

20

less likely that a decline in the value of the property
will wipe out the owner's equity and thereby give the owner
an incentive to stop making mortgage payments and abandon
the property. Because LTV affects the behavior of borrowers
so profoundly, accurate LTVs are essential to predicting
defaults and prepayments by borrowers. Also, as mentioned
above, LTV affects the severity of loss on those loans that
do default. The power of LTV to predict defaults,
prepayments, and severities is a major reason why
reasonable investors consider the LTVs of mortgage loans
important to the decision whether to purchase a certificate
in the securitization of those loans.

49. The predictive power of the LTV of a mortgage loan
is much reduced if there are additional liens on the same
property. Additional liens reduce the owner's equity in the
property and thereby increase the owner's incentive to stop
making mortgage payments and abandon the property if the
value of the property falls below the combined amount of
all of the liens on the property (a strategic default).
Additional liens also exacerbate delinquencies and defaults
because they complicate the servicing of mortgage loans and
the management of delinquencies and defaults. Servicers of
the first-lien mortgage must then deal not only with the
borrower, but also with the servicer of the second-lien
mortgage. For example, the servicer of a single mortgage
may want to grant a borrower forbearance while the borrower
is unemployed and allow him or her to add missed payments

21

to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

50. According to land records, many of the properties that secured mortgage loans in the collateral pools of the securitizations were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[3] The defendants failed to disclose in the prospectus supplements any of these additional liens. These additional liens increased the risk that those owners would default in payment of the mortgage loans.

51. To take an example, of the 1,178 properties that secured the mortgage loans that backed the certificate that Colonial purchased in Securitization No. 1, at least 403 were subject to liens in addition to the lien represented by the mortgage in the collateral pool. The defendants did not disclose in the prospectus supplement that those liens existed. Defendants stated that the weighted-average LTV of the properties was 69.98%, when, solely because of the additional liens on these 403 properties, the weighted-

---

[3]   In order to ensure that this calculation did not include liens that were paid off but were not promptly removed from land records, the additional liens referred to in this Complaint and the Schedules do not include liens that were originated on or before the date on which each mortgage loan in the pools was closed.

22

average combined LTV was 75.4%.[4] This is a significant difference.

52. On one of the loans, the original balance of the mortgage loan was $468,000, the represented value of the property was $585,000, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $117,000. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

53. Details of the undisclosed additional liens in the securitizations are stated in Item 53 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 53, and alleges as though fully set forth in this paragraph, the contents of Item 53 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

---

[4]     The combined LTV is the ratio of all loans on a property to the value of the property.

23

54. Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

## 2. Appraisals

55. As discussed above in paragraph 36, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

56. In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (**USPAP**), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those

24

statements were false because upwardly biased appraisals do
not conform to USPAP.

> (a) **The statements that the defendants made
> about the LTVs of the mortgage loans in
> the collateral pools were misleading
> because they omitted to state that the
> appraisals of a large number of the
> properties that secured those loans were
> biased upward, so that stated LTVs based
> on those appraisals were lower than the
> true LTVs of those mortgage loans.**

57. The defendants omitted to state that the
appraisals in these securitizations used inaccurate
property descriptions, ignored recent sales of the subject
and comparable properties, and used sales of properties
that were not comparable, all in order to inflate the
values of the appraised properties. The appraisals used to
compute the LTVs of many of the mortgage loans in the
collateral pools were biased upwards. As alleged in
paragraphs 41 through 47, in each trust, the number of
properties for which the value was overstated exceeded by
far the number for which the value was understated, and the
aggregate amount overstated exceeded by far the aggregate
amount understated. These ratios for each trust are
summarized in the following table:

25

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|:---:|:---:|:---:|
| 1 | 5.3 | 6.2 |
| 2 | 4.5 | 5.6 |
| 3 | 7.2 | 6.8 |
| 4 | 7.0 | 12.2 |
| 5 | 5.4 | 10.1 |
| 6 | 3.0 | 2.7 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

58. Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

> **(b) The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

59. Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

60. USPAP includes the following provisions:

26

(a)   USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)   USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)   USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

     (i)   develop an opinion of site value by an appropriate appraisal method or technique;

     (ii)  analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

     (iii) analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

61. The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory

27

Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

62. In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 62 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules.

63. Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

64. Each of the statements referred to in paragraph 62 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

65. By each of the untrue and misleading statements referred to in paragraphs 38 and 62 above, the defendants

28

materially understated the risk of the certificates that they issued, underwrote, or sold.

**B.  Untrue  or  Misleading  Statements  About  the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

### 1.   The materiality of occupancy status

66. Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

67. Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

### 2. Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations

68. In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that, of the 1,178 mortgage loans that backed the certificate that Colonial purchased, 1,133 were secured by primary residences and 45 were not. Details of each such statement in the securitizations are stated in Item 68 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 68, and alleges as though fully set forth in this paragraph, the contents of Item 68 of the Schedules.

69. These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

### 3. Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

70. Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and

30

more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many securitized loans did so.

71. A significant number of the properties in the collateral pools of the securitizations that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pools.

72. With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

73. In some states and counties, the owner of a property is able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of

these jurisdictions does not designate a property as his or
her homestead when he or she can do so is strong evidence
that the property was not his or her primary residence.
With respect to some of the properties that were stated to
be primary residences, the owner could have but did not
designate the property as his or her homestead. That
omission is strong evidence that the property was not the
borrower's primary residence.

74. When a borrower actually occupies a newly
mortgaged property, he or she normally notifies entities
that send bills to him or her (such as credit card
companies, utility companies, and local merchants) to send
his or her bills to the address of the newly mortgaged
property. Six months after the closing of the mortgage is
ample time to complete this process. Six months after the
closing of the mortgage, if the borrower is still receiving
his or her bills at a different address, it is very likely
that the borrower does not occupy the mortgaged property.
For each securitization, a credit reporting agency
specializing in mortgage loans compared the addresses in
the borrowers' credit reports to the addresses of the
mortgaged properties six months after the closing of the
mortgage loans. Many borrowers whose mortgage loans were
secured by properties that were stated in the loan tapes to
be owner-occupied did not receive any bills at the address
of the mortgaged property but did receive their bills at

32

another address or addresses. It is very likely that each
of these borrowers did not occupy the mortgaged property.

75. In Securitization No. 1, 88 owners of properties
that were stated to be primary residences instructed local
tax authorities to send the bills for the taxes on those
properties to them at different addresses; 215 owners of
properties that were stated to be primary residences could
have, but did not, designate those properties as their
homesteads; and 77 owners of properties that were stated to
be primary residences did not receive any of their bills
there six months after the mortgages were originated.
Eliminating duplicates, for one or more of these reasons,
315 of the 1,133 properties that were stated to be primary
residences actually were not. Thus, the number of
properties that were not primary residences was not 45, as
defendants stated, but at least 360, a material difference.
The numbers of such loans in the collateral pools of the
securitizations are stated in Item 75 of the Schedules of
this Complaint. Plaintiff incorporates into this paragraph
75, and alleges as though fully set forth in this
paragraph, the contents of Item 75 of the Schedules.

76. By each of the untrue and misleading statements
referred to in paragraph 68, the defendants materially
understated the risk of the certificates that they issued,
underwrote, or sold.

33

C.   **Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools**

   1.   **The materiality of underwriting standards and the extent of an originator's disregard of them**

77. Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans, and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

34

## 2. Untrue or misleading statements about the underwriting standards of originators of the mortgage loans

78. In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 78 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 78, and alleges as though fully set forth in this paragraph, the contents of Item 78 of the Schedules.

79. Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

35

3. **Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

(a) **The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

80. Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations the originators of the loans in the securitizations disregarded their stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

81. The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

82. Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator American Home Mortgage Corp. as an example, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and

36

sold into securitizations by American Home Mortgage Corp.
and that became 60 or more days delinquent within six
months after they were made. An EPD is strong evidence that
the originator did not follow its underwriting standards in
making the loan. Underwriting standards are intended to
ensure that loans are made only to borrowers who can and
will make their mortgage payments. Because an EPD occurs so
soon after the mortgage loan was made, it is much more
likely that the default occurred because the borrower could
not afford the payments in the first place (and thus that
the underwriting standards were not followed), than because
of changed external circumstances unrelated to the
underwriting of the mortgage loan (such as that the
borrower lost his or her job). The bars in Figure 1 depict
the incidence of EPDs in loans originated by American Home
Mortgage Corp. that were sold into securitizations. The
steady increase in EPDs is further evidence that the
deterioration in the credit quality of those loans was
caused by disregard of underwriting standards.

37



Figure 1: Percent of Loans Originated by American Home Mortgage Corp. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

83.   Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



84. Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for some of them are presented in Figures 1 and 2 of Exhibits A through D of this Complaint:

| Exhibit | Originator |
|---------|-----------|
| A | GMAC Mortgage LLC |
| B | National City Mortgage Co. |
| C | PHH Mortgage Corporation |
| D | SunTrust Mortgage Inc. |

> **(b)   The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

85. As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitizations experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 85 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 85, and alleges as though fully set forth in this paragraph, the contents of Item 85 of the Schedules.

86. A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced

40

very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 86 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 86, and alleges as though fully set forth in this paragraph, the contents of Item 86 of the Schedules.

87. A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on January 31, 2012, are stated in Item 87 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the Schedules.

88. By each of the untrue and misleading statements referred to in paragraph 78 above, the defendants materially understated the risk of the certificates that

41

they issued, underwrote, or sold. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

**D. The Large Number of Mortgage Loans in the Collateral Pools About Which the Defendants Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Colonial's Certificates Untrue and Misleading.**

89. In the prospectus supplements, the defendants made statements about the ratings of the certificates by ratings agencies. They stated that the ratings agencies rated each such certificate triple-A. Details of each such statement are stated in Item 89 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 89, and alleges as though fully set forth in this paragraph, the contents of Item 89 of the Schedules.

90. The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Colonial, have investment policies that require a certain minimum rating for all investments. The policy of Colonial was to purchase only certificates that were rated at least double-A.

91. These statements by the defendants about the ratings of the certificates they issued, underwrote, or sold were misleading because the defendants omitted to

42

state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a) loans whose LTVs were materially understated as shown by the AVM;

(b) loans whose LTVs were misleading as a result of undisclosed additional liens;

(c) loans for which the properties were stated to be owner-occupied, but were not; and

(d) loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans.

92. In Securitization No. 1, there were 409 loans whose LTVs were materially understated as shown by the AVM, 403 loans whose LTVs were misleading because of undisclosed additional liens, and 315 loans for which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 828 loans (or 70.3% of the loans that backed the certificate that Colonial purchased) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 92 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 92, and alleges as though fully set forth in this paragraph, the contents of Item 92 of the Schedules.

93. Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents

43

available only through discovery will prove that those
statements were untrue or misleading with respect to many
more loans as well.

94. By these untrue and misleading statements, the
defendants materially understated the risk of the
certificates that they issued, underwrote, or sold.

## VI.   STATUTES OF LIMITATIONS

95. All of the claims in this Complaint are timely.
Plaintiff became receiver for Colonial on August 14, 2009.
Under 12 U.S.C. § 1821(d)(14), the statutes of limitations
on all of Colonial's claims asserted in this Complaint that
had not expired as of August 14, 2009, are extended to no
less than three years from that date. This Complaint was
filed less than three years from August 14, 2009.

96. The statutes of limitations applicable to the
claims asserted in this Complaint had not expired as of
August 14, 2009, because a reasonably diligent plaintiff
would not have discovered until later than August 14, 2008,
facts that show that the particular statements referred to
in Items 29, 38, 62, 68, 78, and 89 of the Schedules to
this Complaint were untrue or misleading. Those are
statements about the 9,033 specific mortgage loans in the
collateral pools of the securitizations involved in this
action, not about residential mortgage loans or any type of
residential mortgage loan (e.g., prime, Alt-A, subprime,
etc.) in general. A reasonably diligent plaintiff did not
have access until after August 14, 2008, to facts about

44

those specific loans that show that the statements that
defendants made about those specific loans were untrue or
misleading. A reasonably diligent plaintiff did not have
access to the loan files compiled by the originators of
those specific mortgage loans nor to records maintained by
the servicers of those specific mortgage loans (from either
or both of which a reasonably diligent plaintiff may have
discovered facts that show that the statements that
defendants made about those specific loans were untrue or
misleading) because originators and servicers of loans and
securitization trustees do not make those files available
to certificateholders. Moreover, on and prior to August 14,
2008, there were not available to a reasonably diligent
plaintiff, even at considerable expense, data about those
specific loans that show that the statements that
defendants made about those specific loans were untrue or
misleading. Such data became available for the first time
in early 2010.

   97. When Colonial purchased the certificates involved
in this action, all of them were rated triple-A, the
highest possible rating, by at least two of Fitch, Moody's,
and Standard & Poor's, all Nationally Recognized
Statistical Rating Organizations (**NRSROs**) accredited by the
Securities and Exchange Commission. Sponsors of
securitizations submitted to the NRSROs the same
information about the loans in the collateral pools of
proposed securitizations that they included in the

45

prospectus supplements for those securitizations, including
in particular statements of the type referred to in Items
29, 38, 62, 68, 78, and 89 of the Schedules to this
Complaint. The NRSROs used and relied on that information
in rating the certificates to be issued in each
securitization.

98. The NRSROs monitored the certificates that they
rated after those certificates were issued. If an NRSRO
discovers facts that show that there was an untrue or
misleading statement about a material fact in the
information submitted to it for its use in rating a
certificate, then the NRSRO will withdraw its rating of
that certificate while it considers the impact of the
untrue or misleading statement, or it will downgrade the
rating of the certificate, usually to a rating below
investment grade.

99. As noted above, all of the certificates involved
in this action were rated triple-A at issuance by at least
two of Fitch, Moody's, and Standard & Poor's. Not one of
those NRSROs withdrew any of those ratings, or downgraded
any of them to below investment grade, before August 14,
2008. The date on which each certificate was first
downgraded below investment grade is stated in Item 29 of
the Schedules.

100. If a reasonably diligent plaintiff would have
discovered before August 14, 2008, facts that show that the
particular statements referred to in Items 29, 38, 62, 68,

46

78, and 89 of the Schedules to this Complaint were untrue
or misleading, then the NRSROs, which were monitoring the
certificates and are much more sophisticated than a
reasonably diligent plaintiff, would also have discovered
such facts and withdrawn or downgraded their ratings on the
certificates to below investment grade. The fact that none
of the NRSROs did so demonstrates that, before August 14,
2008, a reasonably diligent plaintiff could not have
discovered facts that show that those statements were
untrue or misleading.

101. Even if a reasonably diligent plaintiff would have
discovered before August 14, 2008, facts that show that the
particular statements referred to in Items 29, 38, 62, 68,
78, and 89 of the Schedules to this Complaint were untrue
or misleading, the claims on Securitizations Nos. 3, 5, and
6 would still be timely. As a purchaser of the
certificates, Colonial was, and Plaintiff as Receiver for
Colonial is, a member of the proposed classes in *In re
IndyMac Mortgage-Backed Securities Litigation*, United
States District Court for the Southern District of New
York, No. 09 Civ. 4583 and *New Jersey Carpenters Health
Fund v. Residential Capital, LLC*, United States District
Court for the Southern District of New York, No. 08-CV-
8781. The pendency of these actions has tolled the running
of the statutes of limitations on the claims in this
Complaint.

47

102. One of the securitizations from which Colonial
purchased certificates, Securitization No. 3, was included
in the original Class Action Complaint filed in *Police and
Fire Retirement System of the City of Detroit v. IndyMac
MBS, Inc.*, filed on May 14, 2009. That action became *In re
IndyMac*. That securitization was dismissed from *In re
IndyMac* on June 21, 2010.

103. Two of the securitizations from which Colonial
purchased certificates, Securitizations Nos. 5 and 6, were
included in the Consolidated First Amended Securities Class
Action Complaint filed in *New Jersey Carpenters* on May 16,
2009. Those securitizations were dismissed from *New Jersey
Carpenters* on March 31, 2010.

## VII.   CAUSES OF ACTION

### A.   Untrue or Misleading Statements in the Sale of Securities Under Section 8-6-19(a)(2) of the ASA

104. Plaintiff hereby incorporates by reference, as
though fully set forth, paragraphs 1 through 103.

105. Morgan Stanley underwrote and sold to Colonial one
certificate in Securitization No. 1. Morgan Stanley sent
communications and solicitations to Colonial in Montgomery,
Alabama, for the purpose of inducing Colonial to purchase
the certificate in Securitization No. 1. The sale of this
certificate occurred in Alabama because employees or agents
of   Morgan   Stanley   directed   communications   about   the
certificate and solicitations to purchase the certificate

48

to Colonial there, and because Colonial received those communications and solicitations there.

106. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 1, Morgan Stanley violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

107. Citigroup underwrote and sold to Colonial two certificates in Securitizations Nos. 2 and 4. Citigroup sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificates in Securitizations Nos. 2 and 4. The sale of these certificates occurred in Alabama because employees or agents of Citigroup directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

108. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 2 and 4, Citigroup violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary

49

in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

109. RBS underwrote and sold to Colonial two certificates in Securitizations Nos. 3 and 5. RBS sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificates in Securitizations Nos. 3 and 5. The sale of these certificates occurred in Alabama because employees or agents of RBS directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

110. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 3 and 5, RBS violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

111. CMLTI was the depositor of Securitization No. 2 and therefore is the issuer of the certificate in Securitization No. 2 that Colonial purchased. The sale of this certificate occurred in Alabama because employees or agents of Citigroup directed communications about the certificate and solicitations to purchase the certificate

50

to Colonial there, and because Colonial received those communications and solicitations there.

112. CMLTI prepared and signed the registration statement for the certificates in Securitization No. 2 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

113. The sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CMLTI is considered to have offered or sold the certificate to Colonial.

114. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 2, CMLTI violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

115. Plaintiff has disposed of all of the certificates.

116. Under Section 8-6-19 of the ASA, Plaintiff is entitled to recover the consideration paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date of disposition, minus the amount of income received on the certificate, minus the

51

greater of the value of the security when Plaintiff
disposed of it or the consideration that Plaintiff received
for the security.

### B.   Liability as a Controlling Person Under Section 8-6-19(c) of the ASA

117. Plaintiff hereby incorporates by reference, as
though fully set forth, paragraphs 1 through 116.

118. Citigroup FP, by or through stock ownership,
agency, or otherwise, controlled CMLTI within the meaning
of Section 8-6-19(c) of the ASA.

119. In doing the acts alleged, CMLTI violated Section
8-6-19(a)(2) of the ASA by offering or selling the
certificate in Securitization No. 2 that Colonial
purchased.

120. Citigroup FP is therefore jointly and severally
liable with and to the same extent as CMLTI.

### C.   Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act

121. Plaintiff hereby incorporates by reference, as
though fully set forth, paragraphs 1 through 120.

122. Colonial purchased the certificate in
Securitization No. 1 that Morgan Stanley sold to Colonial
when it was initially offered to the public.

123. Morgan Stanley solicited Colonial to purchase this
certificate, and sold the certificate to Colonial, by means
of the prospectus supplement and other written offering
materials and oral communications.

52

124. The prospectus supplement and other written offering materials and oral communications that Morgan Stanley sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

125. Colonial did not know when it purchased the certificate in Securitization No. 1 that the statements in the prospectus supplement and other written offering materials and oral communications that Morgan Stanley sent to Colonial were untrue or misleading.

126. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 1, Morgan Stanley violated Section 12(a)(2) of the 1933 Act.

127. Colonial purchased the certificates in Securitizations Nos. 2 and 4 that Citigroup sold to Colonial when they were initially offered to the public.

128. Citigroup solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplements and other written offering materials and oral communications.

129. The prospectus supplements and other written offering materials and oral communications that Citigroup sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

53

130. Colonial did not know when it purchased the certificates in Securitizations Nos. 2 and 4 that the statements in the prospectus supplements and other written offering materials and oral communications that Citigroup sent to Colonial were untrue or misleading.

131. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 2 and 4, Citigroup violated Section 12(a)(2) of the 1933 Act.

132. Colonial purchased the certificates in Securitizations Nos. 3 and 5 that RBS sold to Colonial when they were initially offered to the public.

133. RBS solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplements and other written offering materials and oral communications.

134. The prospectus supplements and other written offering materials and oral communications that RBS sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

135. Colonial did not know when it purchased the certificates in Securitizations Nos. 3 and 5 that the statements in the prospectus supplements and other written offering materials and oral communications that RBS sent to Colonial were untrue or misleading.

136. In doing the acts alleged in the sale to Colonial
of the certificates in Securitizations Nos. 3 and 5, RBS
violated Section 12(a)(2) of the 1933 Act.

137. CMLTI was the depositor of Securitization No. 2
and therefore is the issuer of the certificate that
Colonial purchased.

138. CMLTI prepared and signed the registration
statement for the certificates in Securitization No. 2 for
the purpose of soliciting investors, including Colonial, to
purchase certificates when they were initially offered to
the public, motivated at least in part by its own financial
interest or that of the direct seller.

139. This sale was in the initial offering of the
certificate and the certificate was sold by means of a
prospectus supplement. Therefore, under 17 C.F.R.
§ 230.159A(a), CMLTI is considered to have offered or sold
the certificates to Colonial.

140. In doing the acts alleged in the offer or sale to
Colonial of the certificate in Securitization No. 2, CMLTI
violated section 12(a)(2) of the 1933 Act.

141. Plaintiff expressly excludes from this cause of
action any allegation that could be construed as alleging
fraud or intentional or reckless conduct. This cause of
action is based solely on allegations of strict liability
or negligence under the 1933 Act.

142. When it failed on August 14, 2009, Colonial had
not discovered that the defendants made untrue or

55

misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

143. Plaintiff has suffered a loss on each of these certificates.

144. Plaintiff is entitled to recover damages.

## D.   **Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act**

145. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 144.

146. CMLTI is the depositor of Securitization No. 2 and therefore is the issuer of the certificate in Securitization No. 2 that Colonial purchased. In doing the acts alleged, CMLTI violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 2.

147. Bear Stearns underwrote Securitization No. 1. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 1.

148. Morgan Stanley underwrote Securitization No. 1. In doing the acts alleged, Morgan Stanley violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 1.

149. Citigroup underwrote Securitizations Nos. 2, 4, and 6. In doing the acts alleged, Citigroup violated

Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 2, 4, and 6.

150. RBS underwrote Securitizations Nos. 3 and 5. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 3 and 5.

151. GMAC underwrote Securitization No. 4. In doing the acts alleged, GMAC violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 4.

152. The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 29 of the Schedules.

153. The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 33 through 94.

154. Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

155. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging

57

fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

156. Colonial did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

157. When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

158. Colonial has suffered a loss on each of these certificates.

159. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### E.    Liability as a Controlling Person Under Section 15 of the 1933 Act

160. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 159.

161. Citigroup FP, by or through stock ownership, agency, or otherwise, controlled CMLTI within the meaning of Section 15 of the 1933 Act.

162. In doing the acts alleged, CMLTI violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling the certificate in Securitization No. 2 that

Colonial purchased when it was initially offered to the
public.

163. Citigroup FP is therefore jointly and severally
liable with and to the same extent as CMLTI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against
defendants for damages in an amount to be determined at
trial, but not less than $122.9 million, plus attorneys'
fees, costs of court, and pre- and post-judgment interest
at the appropriate allowable rates. Plaintiff further
requests that the Court order any and all other relief at
law and in equity to which Plaintiff is entitled.

59

## JURY DEMAND

**Plaintiff demands a trial by jury of all issues**

**triable by jury.**

Dated: August 10, 2012
        Montgomery, Alabama

*Dennis R. Bailey*   Digitally signed by DRB
DN: cn=DRB, o=Rushton Stakely,
ou=Litigation,
email=drb@rushtonstakely.com, c=US
Date: 2012.08.10 13:15:07 -05'00'

Dennis R. Bailey (BAI028)
R. Austin Huffaker (HUF006)
J. Evans Bailey (BAI062)

Of Counsel:

RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rushtonstakely.com (Dennis Bailey E-mail)
rah2@rushtonstakely.com (Austin Huffaker E-mail)
ebailey@rushtonstakely.com (Evans Bailey E-mail)

Of Counsel:

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 755-0100 (phone)
(212) 755-0052 (fax)

                    Attorneys for Plaintiff Federal
                    Deposit Insurance Corporation as
                    Receiver for Colonial Bank

60

**Defendants may be served via certified mail at:**

| | |
|---|---|
| Citigroup Mortgage Loan Trust Inc. | The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, Delaware 19801 |
| Citigroup Financial Products Inc. | Corporation Service Company 80 State Street Albany, New York 12207 |
| Citigroup Global Markets Inc. | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| Ally Securities LLC | Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 |
| J.P. Morgan Securities LLC | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| Morgan Stanley & Co. LLC | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| RBS Securities Inc. | Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 |

## EXHIBIT A TO THE COMPLAINT



Figure 1: Percent of Loans Originated by GMAC Mortgage LLC or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by GMAC Mortgage LLC or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT B TO THE COMPLAINT



Figure 1: Percent of Loans Originated by National City Mortgage Co. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by National City Mortgage Co. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT C TO THE COMPLAINT



Figure 1: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT D TO THE COMPLAINT



Figure 1: Percent of Loans Originated by SunTrust Mortgage Inc. Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by SunTrust Mortgage Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## SCHEDULE 1 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants Morgan Stanley and Bear Stearns.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Morgan Stanley.

**(b) Description of the trust:** Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2006-S6 was a securitization in July 2006 of 1,178 mortgage loans, in one pool. Residential Funding Mortgage Securities I, Inc. was the issuer of the securities in the trust. The mortgage loans were originated or acquired by Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding Corporation, GMAC Mortgage Corporation, an affiliate of Residential Funding Corporation, SunTrust Mortgage, and various undisclosed originators. Homecomings Financial Network, Inc. originated or acquired approximately 28.8% of the mortgage loans. GMAC Mortgage Corporation originated or acquired approximately 10.6% of the mortgage loans. SunTrust Mortgage originated or acquired approximately 11.9% of the mortgage loans. RFMSI 2006-S6 Pros. Sup. S-3, S-31, S-34, S-38. No other originator originated

or acquired more than approximately 9.6% of the mortgage loans. RFMSI 2006-S6 Pros. Sup. S-34.

**(c) Description of the certificate(s) that Colonial purchased:** Morgan Stanley and Bear Stearns were underwriters of the security that Colonial purchased. Morgan Stanley offered and sold to Colonial a senior certificate in this securitization, in class A-13, for which Colonial paid $64,645,980 plus accrued interest on September 20, 2006.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Standard & Poor's: AAA; Fitch: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s):** Standard & Poor's: CCC; Fitch: C; Moody's: Caa2.

**(f) Date on which the certificate(s) were downgraded below investment grade:** June 22, 2009.

**(g) URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1366203/000095011706 003194/a42426.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by Residential Funding Mortgage Securities I, Inc. with the SEC on form S-3 on January 20, 2006. Annexed to the registration statement

**SCHEDULE 1 OF THE COMPLAINT**                                    **Page 2**

was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

### Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, Morgan Stanley and Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, Morgan Stanley and Bear Stearns presented tables of statistics about the mortgage loans in the collateral pool. RFMSI 2006-S6 Pros. Sup. I-1 to I-5. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was "Weighted Average Loan-to-Value Ratio." There were 12 such tables in Appendix I to the prospectus supplement. In each table, the number of categories into which the loans were divided ranged from 2 to 47. Thus, in Appendix I to the prospectus supplement, Morgan Stanley and Bear Stearns made many untrue or misleading statements about

the original LTVs of the loans in the collateral pool.
RFMSI 2006-S6 Pros. Sup. I-1 to I-5.

(b) "The weighted average Loan-to-Value ratio at
origination of the Mortgage Loans will be approximately
69.98%." RFMSI 2006-S6 Pros. Sup. I-2.

(c) None of the mortgages in the collateral pool
have an original LTV in excess of 95.00%. RFMSI 2006-S6
Pros. Sup. I-2.

**Item 47. Details of the results of the AVM analysis for
the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 1,178 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 409 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $57,905,435 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 77 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,378,801 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 121 |
| Weighted-average LTV, as stated by defendants | 69.98% |
| Weighted-average LTV, as determined by the model | 83.2% |

**Item 53. Undisclosed additional liens:**

    **(a) Minimum number of properties with additional liens:** 403

    **(b) Weighted average CLTV with additional liens:** 75.4%

**Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Bear Stearns made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, described in Item 38, Morgan Stanley and Bear Stearns presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence" and "Second/Vacation." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RFMSI 2006-S6 Pros. Sup. I-4.

(b) In the "Occupancy Types of the Mortgage Loans" table, Morgan Stanley and Bear Stearns stated that of the 1,178 loans in the collateral pool, 1,133 were secured by primary residences, and 45 were not. RFMSI 2006-S6 Pros. Sup. I-4.

**SCHEDULE 1 OF THE COMPLAINT**                              **Page 5**

**Item 75. Details of properties that were stated to be owner-occupied, but were not:**

    (a) **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 88

    (b) **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 215

    (c) **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 77

    (d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 315

**Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-38 of the prospectus supplement, and pages 9 through 14 of the prospectus, Morgan Stanley and Bear Stearns made statements about the underwriting standards of Residential Funding. All of those statements are incorporated herein by reference.

One of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RFMSI 2006-S6 Pros. Sup. S-38.

**SCHEDULE 1 OF THE COMPLAINT**　　　　　　　　　　　　**Page 6**

Another one of these statements was that: "[A] determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." RFMSI 2006-S6 Pros. 12.

Another one of these statements was that: "[M]ortgage loans will generally be underwritten on the basis of the borrower's ability to make monthly payments . . . ." RFMSI 2006-S6 Pros. 12.

**Item 86. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 226

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 19.2%

**Item 87. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 180

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 15.3%

**Item 89. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 and S-102 through S-103 of the prospectus supplement, Morgan Stanley and Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization. Morgan

**SCHEDULE 1 OF THE COMPLAINT**                    **Page 7**

Stanley and Bear Stearns stated that Colonial's certificate was rated AAA by Standard & Poor's Rating Services, AAA by Fitch Ratings, and Aaa by Moody's. RFMSI 2006-S6 Pros. Sup. S-5. These were the highest ratings available from these rating agencies.

Morgan Stanley and Bear Stearns also stated that: "It is a condition of the issuance of the Senior Certificates that they be rated 'Aaa' or 'Aal' by Moody's Investor Service, Inc. . . . 'AAA' by Standard & Poor's . . . and Fitch Ratings . . . ." RFMSI 2006-S6 Pros. Sup. S-102.

**Item 92. Summary of loans about which the defendants made untrue or misleading statements:**

   **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 409

   **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 403

   **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 315

   **(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 828

   **(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 70.3%

## SCHEDULE 2 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CMLTI, Citigroup, and Citigroup FP.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Citigroup.

**(b) Description of the trust**: Citigroup Mortgage Loan Trust Inc. Mortgage Pass-Through Certificates, Series 2005-8 was a securitization in October 2005 of 2,830 mortgage loans, in three groups. CMLTI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated by Countrywide Home Loans, Inc., CitiMortgage, Inc., American Home Mortgage Investment Corp., PHH Mortgage Corp., Mortgage Access Corp. (D/B/A Weichert Financial Services), SunTrust Mortgage, Inc., MortgageIT, Inc., Quicken Loans Inc., National City Mortgage Co., and Wells Fargo Bank, N.A. CMLTI 2005-8 Pros. Sup. S-30. For the Group II loans, American Home Mortgage Investment Corp. originated approximately 94.60%; National City originated approximately 3.5%; PHH originated approximately 0.95%; SunTrust originated approximately 0.89%; and CitiMortgage originated

approximately 0.06%. CMLTI 2005-8 Pros. Sup. S-120 through S-121; 1-42.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup was the underwriter of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class II-A4A, for which Colonial paid $21,584,982 plus accrued interest on January 10, 2006. Colonial's certificate was primarily paid by the 1,106 loans in Group II.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

**(e) Current ratings of the certificate(s):** Moody's: Caa3; Standard & Poor's: CCC.

**(f) Date on which the certificate(s) were downgraded below investment grade:** February 4, 2009.

**(g) URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1257102/000095013605006833/file001.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMLTI with the SEC on form S-3 on August 25, 2005. Annexed to the registration statement was a prospectus. The prospectus

**SCHEDULE 2 OF THE COMPLAINT**                          **Page 2**

was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CMLTI and Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Appendix 1 of the prospectus supplement, CMLTI and Citigroup presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balance ranges of $31,501 to $50,000, $50,001 to $75,000, $75,001 to $100,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original LTV." There were 16 such tables in Appendix 1 for the loans in Group II. In each table the number of categories into which the loans were divided ranged from 1 to 22. Thus, in Appendix 1, CMLTI and Citigroup made many untrue or misleading statements about the original LTVs of the loans in Group II. CMLTI 2005-8 Pros. Sup. 1-37 through 1-42.

(b) "The weighted average loan-to-value ratio at origination of the Group II Mortgage Loans was approximately 69.21%." CMLTI 2005-8 Pros. Sup. S-38.

(c) "No Group II Mortgage Loan had a loan-to-value ratio at origination greater than approximately 100.00% or less than approximately 11.54%." CMLTI 2005-8 Pros. Sup. S-38.

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (Group II) | 1,106 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 468 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $46,995,861 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 104 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,378,668 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 65 |
| Weighted-average LTV, as stated by defendants | 69.21% |
| Weighted-average LTV, as determined by the model | 85.0% |

**Item 62. Untrue or misleading statements about
compliance with USPAP:**

In the prospectus supplement, CMLTI and Citigroup
made the following statement about the appraisals of
the properties that secured the mortgage loans
originated or acquired by National City
Mortgage: "All appraisals are required to conform to
the Uniform Standards of Professional Appraisal
Practice adopted by the Appraisal Standard Board of the
Appraisal Foundation. Each appraisal must meet the
requirements of Fannie Mae and Freddie Mac." CMLTI
2005-8 Pros. Sup. S-46.

In the prospectus supplement, CMLTI and Citigroup
also made statements about the appraisals of the
properties that secured the mortgage loans originated
or acquired by American Home: "Every American Home
mortgage loan is secured by a property that has been
appraised by a licensed appraiser in accordance with
the Uniform Standards of Professional Appraisal
Practice of the Appraisal Foundation." CMLTI 2005-8
Pros. Sup. S-51.

**Item 68. Untrue or misleading statements about owner-
occupancy of the properties that secured the
mortgage loans:**

In the prospectus supplement, CMLTI and Citigroup
made the following statements about the occupancy
status of the properties that secured the mortgage
loans in the collateral pool of this securitization.

**SCHEDULE 2 OF THE COMPLAINT**                    **Page 5**

(a)  In Appendix 1 of the prospectus supplement, described in Item 38, CMLTI and Citigroup presented a table entitled "Occupancy Status of the Group II Mortgage Loans." This table divided the mortgage loans into the categories "Owner Occupied," "Second Home," and "Investor." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the aggregate principal balance of the mortgage loans in each of these categories. CMLTI 2005-8 Pros. Sup. 1-39.

(b)  In the "Occupancy Status of the Group II Mortgage Loans" table, CMLTI and Citigroup stated that of the 1,106 mortgage loans in Group II, 734 were secured by primary residences, and 372 were not. CMLTI 2005-8 Pros. Sup. 1-39.

**Item 75.  Details of properties in Group II that were stated to be owner-occupied, but were not:**

    **(a)  Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 91

    **(b)  Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 182

    **(c)  Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 26

**SCHEDULE 2 OF THE COMPLAINT**                                    **Page 6**

**(d)  Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true**: 273

**Item 78.  Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-44 through S-46 of the prospectus supplement, CMLTI and Citigroup made statements about the underwriting standards of National City Mortgage. All of those statements are incorporated herein by reference.

One such statement was that: "The National City Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CMLTI 2005-8 Pros. Sup. S-45.

On pages S-49 through S-52 of the prospectus supplement, CMLTI and Citigroup made statements about the underwriting standards of American Home. All of those statements are incorporated herein by reference.

One such statement was that: "Exceptions to the underwriting standards are permitted where compensating factors are present." CMLTI 2005-8 Pros. Sup. S-50.

Another statement was that: "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." CMLTI 2005-8 Pros. Sup. S-52.

**Item 86. 90+ days delinquencies in Group II:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 22

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 2.0%

**Item 87. 30+ days delinquencies in Group II:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 18

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1.6%

**Item 89. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-15 through S-16 and S-136 of the prospectus supplement, CMLTI and Citigroup made statements about the ratings assigned to the certificates issued in this securitization. CMLTI and Citigroup stated that Colonial's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. CMLTI 2005-8 Pros. Sup. S-15. These were the highest ratings available from these two rating agencies.

CMLTI and Citigroup also stated: "It is a condition to the issuance of the certificates that each class of the Offered Certificates be rated not lower than the initial rating indicated for such class in the table [on pages S-15 through S-16 of the prospectus supplement]." CMLTI 2005-8 Pros. Sup. S-136.

Item 92. Summary of loans in Group II about which the
defendants made untrue or misleading
statements:

   (a) Number of loans whose LTVs were materially
understated as shown by the AVM: 468

   (b) Number of loans for which the properties were
stated to be owner-occupied but were not: 273

   (c) Eliminating duplicates, number of loans about
which the defendants made untrue or misleading
statements: 872

   (d) Eliminating duplicates, percent of loans about
which the defendants made untrue or misleading
statements: 78.8%

## SCHEDULE 3 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: RBS.

**(b) Description of the trust**: Residential Asset Securitization Trust 2006-A14CB was a securitization in November 2006 of 1,645 mortgage loans, in two groups. IndyMac MBS, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were acquired by IndyMac Bank, F.S.B. RAST 2006-A14CB Pros. Sup. S-53.

**(c) Description of the certificate(s) that Colonial purchased**: RBS was the underwriter of the security that Colonial purchased. RBS offered and sold to Colonial a senior certificate in this securitization, in class 1-A-1, for which Colonial paid $15,380,966 plus accrued interest on December 12, 2006. Colonial's certificate was primarily paid by the 379 mortgage loans in collateral allocation group 1.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Moody's: Aaa; Standard & Poor's: AAA; Fitch: AAA.

SCHEDULE 3 OF THE COMPLAINT                         Page 1

**(e) Current ratings of the certificate(s):**
Moody's: Caa3; Standard & Poor's: D; Fitch: D.

**(f) Date on which the certificate(s) were downgraded below investment grade:** October 27, 2008.

**(g) URL of prospectus supplement for this securitization:**

http://www.sec.gov/Archives/edgar/data/1090295/00011252
8206006779/b415507_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on February 24, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**SCHEDULE 3 OF THE COMPLAINT** **Page 2**

## Item 38.  Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(c) As of the cut-off date, the Weighted-Average Original Loan-to-Value Ratio of all of the loans in the collateral pool was 73.32%. RAST 2006-A14CB Pros. Sup. S-6.

(d) As of the cut-off date, the Weighted Average Original Loan-to-Value Ratio of the loans in collateral allocation group 1 was 67.82%. RAST 2006-A14CB Pros. Sup S-6.

(e) As of the cut-off date, the weighted average loan-to-value ratio of approximately 33.34% of the collateral allocation group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 67.82%. RAST 2006-A14CB Pros. Sup. S-25.

(f) As of the cut-off date, the weighted average combined loan-to-value ratios (including the second lien) of approximately 33.34% of the collateral allocation group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 73.97%. RAST 2006-A14CB Pros. Sup. S-25.

(g) "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2006-A14CB Pros. Sup. S-32.

(h) In the section of the prospectus supplement entitled the "Mortgage Pool," RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to 150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 13 such tables in the "Mortgage Pool" section for the loans in collateral allocation group 1. In each table the number of categories into which the loans were divided ranged from 2 to 35. Thus, in the "Mortgage Pool" section, RBS made many untrue or misleading statements about the original LTVs of the loans in collateral allocation group 1. RAST 2006-A14CB Pros. Sup. S-34 to S-39.

(i) "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in collateral allocation group 1 was approximately 67.82%." RAST 2006-A14CB Pros. Sup. S-35.

**SCHEDULE 3 OF THE COMPLAINT**                                    **Page 4**

(j)    In the "Mortgage Pool" section, RBS presented similar tables of statistics about the mortgage loans in the aggregate. In these tables, RBS similarly made many untrue or misleading statements about the original LTVs of all of the mortgage loans in the collateral pool. RAST 2006-A14CB Pros. Sup. S-46 to S-51.

(k)    "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 73.32%." RAST 2006-A14CB Pros. Sup. S-47.

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans in the collateral pool | 1,645 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 592 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $32,140,310 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 82 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,735,566 |
| Number of loans with LTVs over 100.00%, as stated by defendant | 0 |
| Number of loans with LTVs over 100.00%, as determined by the model | 103 |
| Weighted-average LTV, as stated by defendant | 73.32% |
| Weighted-average LTV, as determined by the model | 83.4% |

## Item 62. Untrue or misleading statements about compliance with USPAP:

In the prospectus supplement, RBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2006-A14CB Pros. Sup. S-55.

## Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In the "Mortgage Pool" section of the prospectus supplement, described in Item 38, RBS presented a table entitled "Occupancy Types for the Mortgage Loans in Collateral Allocation Group 1." This table divided the mortgage loans in collateral allocation group 1 into the categories "Primary Home," "Investment," and "Secondary Home." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

**SCHEDULE 3 OF THE COMPLAINT**                    **Page 6**

aggregate principal balance outstanding in each of these categories. RAST 2006-A14CB Pros. Sup S-38.

(b) In the "Occupancy Types for the Mortgage Loans in Collateral Allocation Group 1" table, RBS stated that of the 379 mortgage loans in collateral allocation group 1, 340 were secured by primary residences, and 39 were not. RAST 2006-A14CB Pros. Sup. S-38.

(c) In the "Mortgage Pool" section of the prospectus supplement, described in Item 38, RBS presented another table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Home," "Investment," and "Secondary Home." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2006-A14CB Pros. Sup. S-50.

(d) In the "Occupancy Types for the Mortgage Loans" table, RBS stated that of the 1,645 mortgage loans in the collateral pool, 1,338 were secured by primary residences, and 307 were not. RAST 2006-A14CB Pros. Sup. S-50.

Item 75. **Details of properties that were stated to be owner-occupied, but were not:**

(e) **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 115

(f) **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 193

(g) **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 132

(h) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 350

Item 78. **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-53 through S-56 of the prospectus supplement, RBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference.

One of these statements was that: "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." RAST 2006-A14CB Pros. Sup. S-54.

Another one of these statements was that: "Exceptions to underwriting standards are permitted in

situations in which compensating factors exist." RAST
2006-A14CB Pros. Sup. S-56.

**Item 85. Early payment defaults:**

   **(a) Number of the mortgage loans that suffered
   EPDs:** 22

   **(b) Percent of the mortgage loans that suffered
   EPDs:** 1.3%

**Item 86. 90+ days delinquencies:**

   **(a) Number of the mortgage loans that suffered 90+
   days delinquencies:** 830

   **(b) Percent of the mortgage loans that suffered
   90+ days delinquencies:** 50.5%

**Item 87. 30+ days delinquencies:**

   **(a) Number of the mortgage loans that were 30+
   days delinquent on January 31, 2012:** 711

   **(b) Percent of the mortgage loans that were 30+
   days delinquent on January 31, 2012:** 43.2%

**Item 89. Statements about the ratings of the
certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-115 through S-116
of the prospectus supplement, RBS made statements about
the ratings assigned to the certificates issued in this
securitization. RBS stated that Colonial's certificate
was rated Aaa by Moody's Investors Service, Inc., AAA
by Standard & Poor's, and AAA by Fitch, Inc. RAST 2006-
A14CB Pros. Sup. S-7. These were the highest ratings
available from these three rating agencies.

**SCHEDULE 3 OF THE COMPLAINT**                    **Page 9**

RBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . , Moody's Investors Services, Inc. . . . and Fitch, Inc. . . . ." RAST 2006-A14CB Pros. Sup. S-8.

RBS also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Standard & Poor's . . . and Fitch Inc. . . . and Aaa by Moody's Investors Service, Inc. . . . ." RAST 2006-A14CB Pros. Sup. S-115.

**Item 92. Summary of loans about which the defendants made untrue or misleading statements:**

(a) **Number of loans whose LTVs were materially understated as shown by the AVM:** 592

(b) **Number of loans for which the properties were stated to be owner-occupied but were not:** 350

(c) **Number of loans that suffered EPDs:** 22

(d) **Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 827

(e) **Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 50.3%

## SCHEDULE 4 TO THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants Citigroup and GMAC.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Citigroup.

**(b) Description of the trust:** Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S6 was a securitization in June 2007 of 1,400 mortgage loans, in two groups. Residential Funding Mortgage Securities I, Inc. was the issuer of the securities in the trust. The mortgage loans were originated or acquired by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC, Sierra Pacific Mortgage Co. Inc., and various undisclosed originators. Homecomings Financial originated or acquired approximately 45% of the group I loans; GMAC Mortgage originated or acquired approximately 13.5% of the group I loans; and Sierra Pacific Mortgage originated or acquired approximately 10.9% of the group I loans. RFMSI 2007-S6 Pros. Sup. S-3, S-39, S-42, S-48. No other seller sold to

**SCHEDULE 4 OF THE COMPLAINT**                    **Page 1**

Residential Funding more than 8.3% of the group I loans. RFMSI 2007-S6 Pros. Sup. S-42, S-44.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup and GMAC were underwriters of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $67,787,515 plus accrued interest on September 24, 2007. Colonial's certificate was primarily paid by the 801 mortgage loans in loan group I.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Standard & Poor's: AAA; Fitch: AAA; Moody's: Aaa.

**(e) Current ratings of the certificate(s):** Standard & Poor's: D; Fitch: D; Moody's: Caa2.

**(f) Date on which the certificate(s) were downgraded below investment grade:** April 8, 2009.

**(g) URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1399931/000093041307
005636/c49192_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by Residential Funding

**SCHEDULE 4 OF THE COMPLAINT**                               **Page 2**

Mortgage Securities I, Inc. with the SEC on form S-3 on February 12, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, Citigroup and GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, Citigroup and GMAC presented tables of statistics about the mortgage loans in group I. RFMSI 2007-S6 Pros. Sup. I-1. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 12 such tables in Appendix I for the loans in group I. In each table, the number of categories into which the loans were divided ranged from 2 to 46. Thus, in Appendix I to the prospectus

**SCHEDULE 4 OF THE COMPLAINT**                                    **Page 3**

supplement, Citigroup and GMAC made many untrue or misleading statements about the original LTVs of the loans in loan group I. RFMSI 2007-S6 Pros. Sup. I-1 to I-5.

(b) "The weighted average Loan-to-Value ratio at origination of the Group I Loans will be approximately 72.00%." RFMSI 2007-S6 Pros. Sup. I-2.

(c) None of the mortgages in group I have an original LTV in excess of 95%. RFMSI 2007-S6 Pros. Sup. I-2.

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (loan group I) | 801 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 320 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $53,139,309 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 46 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,357,907 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 130 |
| Weighted-average LTV, as stated by defendants | 72.00% |
| Weighted-average LTV, as determined by the model | 88.4% |

**Item 53. Undisclosed additional liens in group I:**

   **(a) Minimum number of properties with additional liens:** 266

   **(b) Weighted average CLTV with additional liens:** 74.9%

**Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

   In the prospectus supplement, Citigroup and GMAC made the following statements about the occupancy

**SCHEDULE 4 OF THE COMPLAINT**                    **Page 5**

status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, described in Item 38, Citigroup and GMAC presented a table entitled "Occupancy Types of the Group I Loans." This table divided the group I mortgage loans into the categories "Primary Residence" and "Second/Vacation." This table contained untrue or misleading statements about, among other data, the number of group I loans, the principal balance, and the percentage of group I loans in each of these categories. RFMSI 2007-S6 Pros. Sup. I-4.

(b) In the "Occupancy Types of the Group I Loans" table, Citigroup and GMAC stated that of the 801 loans in group I, 776 were secured by primary residences, and 25 were not. RFMSI 2007-S6 Pros. Sup. I-4.

**Item 75. Details of properties in loan group I that were stated to be owner-occupied, but were not:**

- **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 74**

- **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead: 132**

- **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 50**

**SCHEDULE 4 OF THE COMPLAINT**                          **Page 6**

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 208

### Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On page S-48 of the prospectus supplement, and pages 10 through 15 of the prospectus, Citigroup and GMAC made statements about the underwriting standards of Residential Funding. All of those statements are incorporated herein by reference.

One of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RFMSI 2007-S6 Pros. Sup. S-48.

Another one of these statements was that: "[A] determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." RFMSI 2007-S6 Pros. 13.

Another one of these statements was that: "[M]ortgage loans will generally be underwritten on the

basis of the borrower's ability to make monthly payments . . . ." RFMSI 2007-S6 Pros. 13 through 14.

**Item 86. 90+ days delinquencies in loan group I:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 196

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 24.5%

**Item 87. 30+ days delinquencies in loan group I:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 151

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 18.9%

**Item 89. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 through S-6 and S-137 through S-138 of the prospectus supplement, Citigroup and GMAC made statements about the ratings assigned to the certificates issued in this securitization. Citigroup and GMAC stated that Colonial's certificate was rated AAA by Standard & Poor's Rating Services, AAA by Fitch Ratings, and Aaa by Moody's. RFMSI 2007-S6 Pros. Sup. S-5. These were the highest ratings available from these rating agencies.

Citigroup and GMAC also stated that: "It is a condition of the issuance of the Senior Certificates that the Class I-A-4 . . . Certificates be rated 'Aaa' by Moody's Investor Service, Inc. . . . and that all of

the Senior Certificates be rated 'AAA' by Standard &
Poor's . . . and Fitch Ratings . . . ." RFMSI 2007-S6
Pros. Sup. S-137.

Item 92. Summary of loans in group I about which the
defendants made untrue or misleading
statements:

    (a) Number of loans whose LTVs were materially
understated as shown by the AVM: 320

    (b) Number of loans whose LTVs were misleading
because of undisclosed additional liens: 266

    (c) Number of loans for which the properties were
stated to be owner-occupied but were not: 208

    (d) Eliminating duplicates, number of loans about
which the defendants made untrue or misleading
statements: 575

    (e) Eliminating duplicates, percent of loans about
which the defendants made untrue or misleading
statements: 71.8%

### SCHEDULE 5 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: RBS.

**(b) Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS8 was a securitization in June 2007 of 2,607 mortgage loans, in one pool. Residential Accredit Loans, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC, and Wachovia Mortgage Corporation. Homecomings Financial originated or acquired approximately 44.2% of the mortgage loans; GMAC Mortgage originated or acquired approximately 17.2% of the mortgage loans; and Wachovia originated or acquired approximately 17% of the mortgage loans. RALI 2007-QS8 Pros. Sup. S-5, S-40 through S-41, S-47. No unaffiliated seller sold more than 5.5% of the mortgage

loans to Residential Funding. RALI 2007-QS8 Pros. Sup.
S-41.

(c) **Description of the certificate(s) that
Colonial purchased**: RBS was the underwriter of the
security that Colonial purchased. RBS offered and sold
to Colonial a senior certificate in this
securitization, in class A-5, for which Colonial paid
$5,417,280 plus accrued interest on September 17, 2007.

(d) **Ratings of the certificate(s) when Colonial
purchased them**: Fitch: AAA; Moody's: Aaa; Standard
&Poor's: AAA.

(e) **Current ratings of the certificate(s)**: Fitch:
D; Moody's: Caa3; Standard & Poor's: D.

(f) **Date on which the certificate(s) were
downgraded below investment grade**: December 16, 2008.

(g) **URL of prospectus supplement for this
securitization**:
http://sec.gov/Archives/edgar/data/1400095/000089109207
002629/e27723_424b5.txt

(h) **Registration statement pursuant or traceable
to which the certificate(s) were issued**: Certificates
in this trust, including the certificate that Colonial
purchased, were issued pursuant or traceable to a
registration statement filed by RALI with the SEC on
form S-3 on February 12, 2007. Annexed to the
registration statement was a prospectus. The prospectus
was amended from time to time by prospectus supplements

**SCHEDULE 5 OF THE COMPLAINT**                           **Page 2**

whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement entitled "Mortgage Loan Statistical Information," RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 49. Thus, in the "Mortgage Loan Statistical Information" section, RBS made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QS8 Pros. Sup. I-1 to I-7.

**SCHEDULE 5 OF THE COMPLAINT**                    **Page 3**

(b)  "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 74.15%." RALI 2007-QS8 Pros. Sup. I-7.

(c)  None of the mortgage loans in the collateral pool have an original LTV in excess of 100%. RALI 2007-Q8 Pros. Sup. I-7.

**Item 47.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 2,607 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 978 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $70,291,375 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 182 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,967,467 |
| Number of loans with LTVs over 100%, as stated by defendant | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 345 |
| Weighted-average LTV, as stated by defendant | 74.15% |
| Weighted-average LTV, as determined by the model | 90.8% |

**Item 53.  Undisclosed additional liens:**

   **(a)  Minimum number of properties with additional liens:** 743

   **(b)  Weighted average CLTV with additional liens:** 78.0%

**SCHEDULE 5 OF THE COMPLAINT**                    **Page 4**

## Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, described in Item 38, RBS presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation" and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RALI 2007-QS8 Pros. Sup. S-11, I-1.

(b) In the "Occupancy Types of the Mortgage Loans" table, RBS stated that of the 2,607 mortgage loans in the collateral pool, 1,841 were secured by primary residences, and 766 were not. RALI 2007-QS8 Pros. Sup. S-11; I-1.

## Item 75. Details of properties that were stated to be owner-occupied, but were not:

(a) **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 196

SCHEDULE 5 OF THE COMPLAINT                          Page 5

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 267

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 189

    **(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 489

**Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-45 through S-47 of the prospectus supplement, RBS made statements about the underwriting standards of Residential Funding Company. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QS8 Pros. Sup. S-46.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QS8 Pros. Sup. S-47.

**SCHEDULE 5 OF THE COMPLAINT**           **Page 6**

Another one of these statements was that: "Based
on the data provided in the application and certain
verifications, if required, a determination is made by
the original lender that the mortgagor's monthly
income, if required to be stated, will be sufficient to
enable the mortgagor to meet its monthly obligations on
the mortgage loan and other expenses related to the
property . . . ." RALI 2007-QS8 Pros. Sup. S-45.

**Item 85. Early payment defaults:**

    (a) **Number of the mortgage loans that suffered
EPDs:** 48

    (b) **Percent of the mortgage loans that suffered
EPDs:** 1.8%

**Item 86. 90+ days delinquencies:**

    (a) **Number of the mortgage loans that suffered 90+
days delinquencies:** 1,128

    (b) **Percent of the mortgage loans that suffered
90+ days delinquencies:** 43.3%

**Item 87. 30+ days delinquencies:**

    (a) **Number of the mortgage loans that were 30+
days delinquent on January 31, 2012:** 905

    (b) **Percent of the mortgage loans that were 30+
days delinquent on January 31, 2012:** 34.7%

**Item 89. Statements about the ratings of the
certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-112 through S-113
of the prospectus supplement, RBS made statements about
the ratings assigned to the certificates issued in this

**SCHEDULE 5 OF THE COMPLAINT**                    **Page 7**

securitization. RBS stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. RALI 2007-QS8 Pros. Sup. S-7. These were the highest ratings available from these rating agencies.

RBS also stated: "It is a condition of the issuance of the offered certificates . . . that they be rated 'AAA' by Fitch Ratings, . . . 'AAA' by Standard & Poor's Ratings Services, . . . and 'Aaa' by Moody's Investors Service, Inc. . . ." RALI 2007-QS8 Pros. Sup. S-112.

**Item 92. Summary of loans about which the defendant made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 978

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 743

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 489

    **(d) Number of loans that suffered EPDs:** 48

    **(e) Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 1,642

    **(f) Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 63.0%

## SCHEDULE 6 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant Citigroup.

### Item 29. Details of trust and certificate(s).

(a) **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS5 was a securitization in March 2007 of 1,696 mortgage loans, in one pool. Residential Accredit Loans, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, and GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC. Of the 1,696 mortgage loans in the collateral pool, approximately 47.1% and 0.4% by principal amount were originated by Homecomings Financial and GMAC Mortgage, respectively. RALI 2007-QS5 Pros. Sup. S-5, S-44.

(b) **Description of the certificate(s) that Colonial purchased:** Citigroup was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in class A-4 of this securitization, for which Colonial paid $47,560,056 plus accrued interest on October 10, 2007.

SCHEDULE 6 OF THE COMPLAINT                                      Page 1

**(c) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Moody's: Aaa; S&P: AAA.

**(d) Current ratings of the certificate(s)**: Fitch: D; Moody's: Caa3; S&P: D.

**(e) Date on which the certificate(s) were downgraded below investment grade**: December 16, 2008.

**(f) URL of prospectus supplement for this securitization**:
http://www.sec.gov/Archives/edgar/data/1390318/000089109207
001172/e26774_424b5.txt

**(g) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

### Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)   In Annex I of the prospectus supplement, "Mortgage
Loan Statistical Information," Citigroup presented tables
of statistics about the mortgage loans in the collateral
pool. Each table focused on a certain characteristic of the
loans (for example, original principal balance) and divided
the loans into categories based on that characteristic (for
example, loans with original mortgage loan balances of
$100,000 or less, $100,001 to $200,000, $200,001 to
$300,000, etc.). Each table then presented various data
about the loans in each category. Among these data was the
"Weighted Average LTV Ratio." There were 12 such tables in
"The Mortgage Loan Statistical Information" section for the
loans in the collateral pool. In each table the number of
categories into which the loans were divided ranged from 2
to 49. Thus, in "The Mortgage Loan Statistical Information"
section, Citigroup made many untrue or misleading
statements about the original LTVs of the loans in the
collateral pool. RALI 2007-QS5 Pros. Sup. I-1 to I-6.

(b)   "The weighted average loan-to-value ratio at
origination of the mortgage loans will be approximately
74.23%." RALI 2007-QS5 Pros. Sup. I-6.

(c)   None of the mortgage loans in the collateral pool
have an original LTV in excess of 100%. RALI 2007-QS5 Pros.
Sup. I-6.

**SCHEDULE 6 OF THE COMPLAINT**                                    **Page 3**

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,696 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 513 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $35,418,831 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 174 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,106,707 |
| Number of loans with LTVs over 100%, as stated by defendant | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 110 |
| Weighted-average LTV, as stated by defendant | 74.23% |
| Weighted-average LTV, as determined by the model | 84.4% |

**Item 53. Undisclosed additional liens:**

    **(a) Minimum number of properties with additional liens:** 708

    **(b) Weighted average CLTV with additional liens:** 81.2%

**Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

    In the prospectus supplement, Citigroup made the following statements about the occupancy status of the

**SCHEDULE 6 OF THE COMPLAINT**                                      **Page 4**

properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, described in Item 38, Citigroup presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation," and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in the collateral pool in each of these categories. RALI 2007-QS5 Pros. Sup. S-11; I-1.

(b) In the "Occupancy Types of the Mortgage Loans" table, Citigroup stated that of the 1,696 mortgage loans in the collateral pool, 1,156 were secured by primary residences and 540 were not. RALI 2007-QS5 Pros. Sup. S-11; I-1.

**Item 75.** **Details of properties that were stated to be owner-occupied, but were not:**

    **(a)** **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 110

    **(b)** **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 182

    **(c)** **Number of loans for which the owner of the property did not receive bills at the address of**

> **the mortgaged property but did receive bills at a
> different address:** 64
>
> **(d) Eliminating duplicates, number of loans about
> which one or more of statements (a) through (c) is
> true:** 288

**Item 78. Untrue or misleading statements about the
underwriting standards of the originators of the
mortgage loans:**

On pages S-42 through S-43 of the prospectus
supplement, Citigroup made statements about the
underwriting standards of Residential Funding Company, LLC.
All of those statements are incorporated herein by
reference.

One of these statements was that: "The adequacy of the
mortgaged property as security for repayment of the related
mortgage loan generally is determined by an appraisal in
accordance with appraisal procedure guidelines described in
the Seller Guide." RALI 2007-QS5 Pros. Sup. S-42.

Another one of these statements was that: "[A] mortgage
loan may be considered to comply with the underwriting
standards described above, even if one or more specific
criteria included in the underwriting standards were not
satisfied, if other factors positively compensated for the
criteria that were not satisfied." RALI 2007-QS5 Pros. Sup.
S-43.

Another one of these statements was that: "Based on the
data provided in the application and certain verifications,
if required, a determination is made by the original lender

**SCHEDULE 6 OF THE COMPLAINT**                                   **Page 6**

that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property. . . ." RALI 2007-QS5 Pros. Sup. S-42.

**Item 85. Early payment defaults:**

> **(a) Number of the mortgage loans that suffered EPDs:** 17

> **(b) Percent of the mortgage loans that suffered EPDs:** 1.0%

**Item 86. 90+ days delinquencies:**

> **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 755

> **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 44.5%

**Item 87. 30+ days delinquencies:**

> **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 610

> **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 36.0%

**Item 89. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-106 through S-107 of the prospectus supplement, Citigroup made statements about the ratings assigned to the certificates issued in this securitization. Citigroup stated that Colonial's certificate was rated AAA by Fitch Ratings, Aaa by Moody's

**SCHEDULE 6 OF THE COMPLAINT**                                 **Page 7**

Investors Service, and AAA by Standard & Poor's. RALI 2007-QS5 Pros. Sup. S-7. These were the highest ratings available from these three ratings agencies.

Citigroup also stated: "It is a condition of the issuance of the Senior Certificates . . . that they be rated 'AAA' by Fitch Ratings . . . 'AAA' by Standard & Poor's Ratings Services . . . and 'Aaa' by Moody's Investors Service . . . ." RALI 2007-QS5 Pros. Sup. S-106.

**Item 92. Summary of loans about which the defendant made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 513

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 708

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 288

    **(d) Number of loans that suffered EPDs:** 17

    **(e) Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 1,119

    **(f) Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 66.0%

# EXHIBIT C

1221 Avenue of the Americas
New York, NY 10020

## Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:    (212) 762-7291
Facsimile No:    (914) 729-2950
Email: David.Restaino@morganstanley.com

September 5, 2012

**Via US Mail**

Residential Funding Mortgage Securities I, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn:  President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 26, 2006 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2006-S6 issued by Residential Funding Mortgage Securities I, Inc. (the "Company"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which the Company has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Colonial Bank, captioned Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust Inc., in the Circuit Court of Montgomery County, Alabama.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

**David P. Restaino, Executive Director**
**Legal and Compliance Division**
Direct Dial:      (212) 762-7291
Facsimile No:    (914) 729-2950
Email:  David.Restaino@morganstanley.com

September 5, 2012

### Via US Mail

Residential Funding Corporation
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 26, 2006 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2006-S6 issued by Residential Funding Mortgage Securities I, Inc., we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which Residential Funding Corporation has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Colonial Bank, captioned Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust Inc., in the Circuit Court of Montgomery County, Alabama.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

# EXHIBIT D

## RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.

Mortgage Pass-Through Certificates, Series 2007-S7

| Initial Principal Amount | Class | Initial Pass-Through Rate |
|---|---|---|
| $15,000,000 | Class A-1 Certificates | 6.00% |
| $25,617,000 | Class A-2 Certificates | 6.00% |
| $75,000,000 | Class A-3 Certificates | 6.25% |
| $25,920 | Class A-4 Certificates | 6.25% |
| $3,126,080 | Class A-5 Certificates | 0.00% |
| $18,089,000 | Class A-6 Certificates | 6.00% |
| $13,836,000 | Class A-7 Certificates | 6.00% |
| $2,817,000 | Class A-8 Certificates | 6.00% |
| $6,930,000 | Class A-9 Certificates | 6.00% |
| $9,590,000 | Class A-10 Certificates | 6.00% |
| $26,352,000 | Class A-11 Certificates | 6.00% |
| $64,940,000 | Class A-12 Certificates | 6.00% |
| $97,411,000 | Class A-13 Certificates | 6.00% |
| $14,667,000 | Class A-14 Certificates | 6.00% |
| $19,360,000 | Class A-15 Certificates | 6.00% |
| $7,417,000 | Class A-16 Certificates | 6.00% |
| $25,019,000 | Class A-17 Certificates | 6.00% |
| $162,351,000 | Class A-18 Certificates | 6.00% |
| $41,444,000 | Class A-19 Certificates | 6.00% |
| $230,147,000 | Class A-20 Certificates | 6.00% |
| $40,188,000 | Class A-21 Certificates | 6.00% |
| $26,777,000 | Class A-22 Certificates | 6.00% |
| $66,463,000 | Class A-23 Certificates | 6.00% |
| $197,268,857 | Class A-24 Certificates | Variable |
| Notional | Class A-25 Certificates | Variable |
| $32,878,143 | Class A-26 Certificates | Variable |
| $197,268,857 | Class A-27 Certificates | Variable |
| Notional | Class A-28 Certificates | Variable |
| $32,878,143 | Class A-29 Certificates | Variable |
| $177,018,000 | Class A-30 Certificates | 6.00% |

5172419 07081029

| $197,268,857 | Class A-31 Certificates | Variable |
| Notional | Class A-32 Certificates | Variable |
| $32,878,143 | Class A-33 Certificates | Variable |
| $32,878,143 | Class A-34 Certificates | 0.00% |
| $184,117,600 | Class A-35 Certificates | Variable |
| $46,029,400 | Class A-36 Certificates | Variable |
| $100 | Class R Certificates | 6.00% |

## UNDERWRITING AGREEMENT

July 27, 2007

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Ladies and Gentlemen:

Residential Funding Mortgage Securities I, Inc., a Delaware corporation (the "Company"), proposes to sell to you (also referred to herein as the "Underwriter") Mortgage Pass-Through Certificates, Series 2007-S7, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-31, Class A-32, Class A-33, Class A-34, Class A-35 and Class A-36 Certificates (together with the Class A-V and Class A-P Certificates, the "Class A Certificates"), Class R Certificates (together with the Class A Certificates, the "Certificates"), other than a de minimis portion of the Class R Certificates, having the aggregate principal amounts and Pass-Through Rates set forth above. The Certificates, together with the Class M-1, Class M-2, Class M-3, Class B-1, Class B-2, Class B-3 and Class P Certificates of the same series, will evidence the entire beneficial interest in the Trust Fund (as defined in the Pooling and Servicing Agreement referred to below), consisting primarily of a pool (the "Pool") of conventional, fixed-rate, one- to four-family residential first lien mortgage loans (the "Mortgage Loans") as described in the Prospectus Supplement (as hereinafter defined) to be sold by the Company. A de minimis portion of the Class R Certificates will not be sold hereunder and will be held by Residential Funding Company, LLC ("Residential Funding").

The Certificates will be issued pursuant to a series supplement (the "Series Supplement"), dated as of July 1, 2007 (the "Cut-off Date"), to the standard terms of a pooling and servicing agreement, dated as of July 1, 2007 (the "Standard Terms", and together with the Series Supplement, the "Pooling and Servicing Agreement"), among the Company, as seller, Residential Funding, as master servicer, and U.S. Bank National Association, as trustee (the "Trustee"). The Certificates are described more fully in the Base Prospectus and the Prospectus Supplement (each as hereinafter defined), which the Company has furnished to you.

2

1.    Representations, Warranties and Covenants.

1.1    The Company represents and warrants to, and agrees with you that:

(a)    The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (No. 333-140614) on Form S-3 for the registration under the Securities Act of 1933, as amended (the "Act"), of Mortgage Pass-Through Certificates (issuable in series), including the Certificates, which registration statement has become effective, and a copy of which, as amended to the date hereof, has heretofore been delivered to you.  The Company proposes to file with the Commission pursuant to Rule 424(b) under the rules and regulations of the Commission under the Act (the "1933 Act Regulations") a prospectus supplement dated July 27, 2007 (the "Prospectus Supplement"), to the prospectus dated April 6, 2007 (the "Base Prospectus"), relating to the Certificates and the method of distribution thereof.  Such registration statement (No. 333-140614) including exhibits thereto and any information incorporated therein by reference, as amended at the date hereof, is hereinafter called the "Registration Statement"; and the Base Prospectus and the Prospectus Supplement and any information incorporated therein by reference, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (as defined herein) for use in connection with the offering of the Certificates, are hereinafter called the "Prospectus."

(b)    The Registration Statement has become effective, and the Registration Statement as of the effective date (the "Effective Date," as defined in this paragraph), and the Prospectus, as of the date of the Prospectus Supplement, complied in all material respects with the applicable requirements of the Act and the 1933 Act Regulations; and the Registration Statement, as of the Effective Date, did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; and each Issuer Free Writing Prospectus (as defined herein) as of its date did not and at all times prior to the date of the Prospectus Supplement will not, and the Prospectus and Designated Static Pool Information, taken together, as of the date of the Prospectus Supplement did not and as of the Closing Date will not, contain an untrue statement of a material fact and did not and will not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (except in the case of any Issuer Free Writing Prospectus, any omission with respect to information included in the definition of Senior Structure Information); provided, however, that neither the Company nor Residential Funding makes any representations or warranties as to the information contained in or omitted from the Registration Statement or the Prospectus or any amendment thereof or supplement thereto relating to the information therein that is Excluded Information (as defined herein); and provided, further, that neither the Company nor Residential Funding makes any representations or warranties as to either (i) any information contained in any Underwriter Prepared Issuer FWP (as defined herein) or Underwriter Free Writing Prospectus (as defined herein) except, in each case, to the extent of (x) any information set forth therein that constitutes Pool Information (as defined below) or (y) any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus, or (ii) any information contained in or omitted from the portions of the Prospectus identified by

3

underlining or other highlighting as shown in Exhibit F (the "Underwriter Information"). The Effective Date shall mean the earlier of the date on which the Prospectus Supplement is first used and the time of the first Contract of Sale (as defined herein) to which such Prospectus Supplement relates. The initial effective date of the Registration Statement was within three years of the Closing Date. If the third anniversary of the initial effective date occurs within six months after the Closing Date, the Company will use best efforts to take such action as may be necessary or appropriate to permit the public offering and sale of the Certificates as contemplated hereunder. The Company acknowledges that the Underwriter Information constitutes the only information furnished in writing by you or on your behalf for use in connection with the preparation of the Registration Statement or the Prospectus, and the Underwriter confirms that the Underwriter Information is correct.

(c)    (i)    "ABS Informational and Computational Materials" shall have the meaning given such term in Item 1101 of Regulation AB.

(ii)    "Approved Offering Materials" means with respect to any class of Certificates anticipated to be rated in the highest category by any Rating Agency, collectively the following documents as most recently provided by the Company and designated in writing by the Company as Approved Offering Materials prior to the time of any Contract of Sale: (i) one or more term sheets, providing factual information about the Certificates and the structure and basic parameters thereof (excluding information about the subdivision of the senior classes into tranches), the basic terms of the subordination or other credit enhancements if known, factual information about the Mortgage Loans (which may include parameters or "stips" or tabular data prepared by the Company), the identity of and basic information about key parties to the transaction known to the Company, and the tax, ERISA and SMMEA characteristics of the Certificates, (ii) a term sheet supplement, containing risk factors and additional information of the type to appear in the Prospectus Supplement to the extent known, and (iii) the Base Prospectus, which may be provided by a weblink. Each of the items described in (i) and (ii) in the preceding sentence shall constitute an Issuer Free Writing Prospectus and any additional information provided by the Underwriter shall constitute an Underwriter Free Writing Prospectus or Underwriter Prepared Issuer FWP, as the case may be. With respect to any class of Certificates anticipated to be rated in the second highest or a lower category by any Rating Agency, "Approved Offering Materials" means the Prospectus.

(iii)    "Contract of Sale" has the same meaning as in Rule 159 of the 1933 Act Regulations and all Commission guidance relating to Rule 159.

(iv)    "Designated Static Pool Information" shall mean the static pool information referred to in the Prospectus under the caption "Static Pool Information" but deemed to be excluded from the Registration Statement and Prospectus pursuant to Item 1105(d) of Regulation AB.

(v)    "Excluded Information" shall mean, with respect to each of the Registration Statement and the Prospectus, the information identified by underlining or other highlighting as shown on Exhibit E.

4

(vi)     "Free Writing Prospectus" shall have the meaning given such term in Rules 405 and 433 of the 1933 Act Regulations.

(vii)    "Issuer Free Writing Prospectus" shall mean any Free Writing Prospectus prepared by or on behalf of the Company and identified by the Company as an Issuer Free Writing Prospectus and relating to the Certificates or the offering thereof.

(viii)   "Issuer Information" shall mean any information of the type specified in clauses (1) – (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform), other than Underwriter Derived Information. Consistent with such definition, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason of the Company's review of the materials pursuant to Section 4.4(e) below and, consistent with Securities Offering Reform Questions and Answers, November 30, 2005 promulgated by the staff of the Commission, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason that the Underwriter has agreed not to use such Free Writing Prospectus without consent of the Company.

(ix)     "Permitted Additional Materials" shall mean information that is not ABS Informational and Computational Materials and (x) that are referred to in Section 4.4(c) so long as any Issuer Information provided by the Underwriter pursuant to Section 4.4(c) is limited to information included within the definition of ABS Informational and Computational Materials, (y) that constitute Certificate price, yield, weighted average life, subscription or allocation information, or a trade confirmation, or (z) otherwise with respect to which the Company has provided written consent to the Underwriter to include in a Free Writing Prospectus.

(x)      "Pool Information" means with respect to any Free Writing Prospectus, the information (including any Preliminary Pool Information) with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus.

(xi)     "Preliminary Pool Information" means with respect to any Free Writing Prospectus, the information with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus and designated "Preliminary Pool Information."

(xii)    "Senior Structure Information" shall mean, with respect to each class of Certificates anticipated to be rated in the highest category by any Rating Agency (collectively, the "Senior Certificates"), (i) the Pass-Through Rate if a fixed rate, or the formula for determining the Pass-Through Rate, (ii) the terms and the provider of any yield maintenance agreement, swap agreement or

5

other agreement that provides payments payable on any class of the Senior Certificates, (iii) the terms and the provider of any surety bond, financial guaranty insurance policy, or other insurance policy regarding any class of the Senior Certificates not known to the Company when the Approved Offering Materials were prepared, (iv) the allocation to each class of Senior Certificates of the aggregate amount of the cashflow payable among the Senior Certificates collectively, and (v) the allocation to each class of Senior Certificates of the aggregate amount of any Realized Losses allocable to the Senior Certificates collectively, in each case, to the extent such information is not contained in the Approved Offering Materials.

(xiii) "Underwriter Derived Information" shall refer to information of the type described in clause (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform) when prepared by the Underwriter, including traditional computational and analytical materials prepared by the Underwriter.

(xiv) "Underwriter Free Writing Prospectus" shall mean all Free Writing Prospectuses prepared by or on behalf of the Underwriter other than any Underwriter Prepared Issuer FWP, including any Permitted Additional Materials.

(xv) "Underwriter Prepared Issuer FWP" shall mean any Free Writing Prospectus or portion thereof prepared by or on behalf of the Underwriter that contains only a description of the final terms of the Certificates or of the offering of the Certificates after the final terms have been established for all classes of Senior Certificates.

(xvi) "Written Communication" shall have the meaning given such term in Rule 405 of the 1933 Act Regulations.

(d)     The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the requisite corporate power to own its properties and to conduct its business as presently conducted by it.

(e)     The Company was not, as of any date on or after which a bona fide offer (as used in Rule 164(h)(2) of the 1933 Act Regulations) of the Certificate is made an Ineligible Issuer, as such term is defined in Rule 405 of the 1933 Act Regulations. The Company shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

(f)     This Agreement has been duly authorized, executed and delivered by the Company.

(g)     As of the Closing Date (as defined herein) the Certificates will conform in all material respects to the description thereof contained in the Prospectus and the representations and warranties of the Company in the Pooling and Servicing Agreement will be true and correct in all material respects.

6

1.2     Residential Funding represents and warrants to, and agrees with you that as of the Closing Date the representations and warranties of Residential Funding in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.3     The Underwriter represents and warrants to and agrees with the Company and Residential Funding that:

(a)     No purpose of the Underwriter relating to the purchase of the Class R Certificates by the Underwriter is or will be to enable the Company to impede the assessment or collection of any tax.

(b)     The Underwriter has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.

(c)     The Underwriter has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Certificates remain outstanding.

(d)     No purpose of the Underwriter relating to any sale of the Class R Certificates by the Underwriter will be to enable it to impede the assessment or collection of tax. In this regard, the Underwriter hereby represents to and for the benefit of the Company and Residential Funding that the Underwriter intends to pay taxes associated with holding the Class R Certificates (other than with respect to the portion of the Class R Certificates retained by Residential Funding), as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificates.

(e)     The Underwriter will, in connection with any transfer it makes of the Class R Certificates, obtain from its transferee the affidavit required by Section 5.02(f)(i)(B)(I) of the Pooling and Servicing Agreement, will not consummate any such transfer if it knows or believes that any representation contained in such affidavit is false and will provide the Trustee with the Certificate required by Section 5.02(f)(i)(B)(II) of the Pooling and Servicing Agreement.

(f)     The Underwriter hereby certifies that (i) with respect to any classes of Certificates issued in authorized denominations or Percentage Interests of less than a notional amount of $2,000,000 or a Percentage Interest of 20% the fair market value of each such Certificate sold to any person on the date of initial sale thereof by the Underwriter will not be less than $100,000 and (ii) with respect to each class of Certificates to be maintained on the book-entry records of The Depository Trust Company ("DTC"), the interest in each such class of Certificates sold to any person on the date of initial sale thereof by the Underwriter will not be less than the minimum denomination indicated for such class of Certificates in the Prospectus Supplement.

(g)     The Underwriter will have funds available at U.S. Bank National Association, in the Underwriter's account at such bank at the time all documents are executed and the closing of the sale of the Certificates is completed, except for the transfer of funds and the delivery of the Certificates. Such funds will be available for immediate transfer into the account of Residential Funding maintained at such bank.

7

(h)    As of the date hereof and as of the Closing Date, the Underwriter has complied with all of its obligations hereunder and all information contained in any Underwriter Free Writing Prospectus and in any Underwriter Prepared Issuer FWP as used in connection with any Contract of Sale and all Underwriter Information are accurate in all material respects (taking into account the assumptions explicitly set forth in such Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus), except to the extent of (x) any errors therein that are caused by errors or omissions in the Pool Information or (y) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(i)    Prior to the Closing Date, the Underwriter shall notify the Company and Residential Funding of the earlier of (x) the date on which the Prospectus Supplement is first used and (y) the time of the first Contract of Sale to which such Prospectus Supplement relates.

(j)    The Underwriter hereby further represents and agrees that, with respect to the United Kingdom:

(i)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the Certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the Issuer; and

(ii)    it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything done by it in relation to the Certificates in, from or otherwise involving the United Kingdom.

(k)    In relation to each Member State of the European Economic Area which has implemented the Prospectus directive (each, a "Relevant Member State"), the Underwriter hereby represents and agrees that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of Certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Certificates to the public in that Relevant Member State at any time:

(i)    to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

8

(ii)     to any legal entity which has two or more of (1) an average of at
least 250 employees during the last financial year; (2) a total
balance sheet of more than €43,000,000 and (3) an annual net
turnover of more than €50,000,000, as shown in its last annual or
consolidated accounts; or

(iii)    in any other circumstances which do not require the publication by
the Depositor of a prospectus pursuant to Article 3 of the
Prospectus Directive.

For the purposes of this representation, the expression an "offer of Certificates to the public" in
relation to any Certificates in any Relevant Member State means the communication in any form
and by any means of sufficient information on the terms of the offer and the Certificates to be
offered so as to enable an investor to decide to purchase or subscribe the Certificates, as the same
may be varied in that Member State by any measure implementing the Prospectus Directive in
that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and
includes any relevant implementing measure in each Relevant Member State.

1.4     The Underwriter covenants and agrees to pay directly, or reimburse the
Company or Residential Funding upon demand for (i) any and all taxes (including penalties and
interest) owed or asserted to be owed by the Company or Residential Funding as a result of a
claim by the Internal Revenue Service that the transfer of the Class R Certificates to the
Underwriter hereunder or any transfer thereof by the Underwriter may be disregarded for federal
tax purposes and (ii) any and all losses, claims, damages and liabilities, including attorney's fees
and expenses, arising out of any failure of the Underwriter to make payment or reimbursement in
connection with any such assertion as required in (i) above.  In addition, the Underwriter
acknowledges that on the Closing Date immediately after the transactions described herein it will
be the owner of the Class R Certificates (other than a de minimis portion of the Class R
Certificates to be held by Residential Funding) for federal tax purposes, and the Underwriter
covenants that it will not assert in any proceeding that the transfer of the Class R Certificates
from the Company to the Underwriter should be disregarded for any purpose.

2.      Purchase and Sale. Subject to the terms and conditions and in reliance upon the
representations and warranties herein set forth, the Company agrees to sell to you, and you agree
to purchase from the Company, the Certificates (other than a de minimis portion of the Class R
Certificates, which shall be transferred by the Company to Residential Funding) at a price equal
to 97.92% of the aggregate certificate principal balance of the Certificates (other than the
Exchangeable and Exchanged Certificates transferred to the Trustee pursuant to Section 3 below)
as of the Closing Date (as defined herein), plus accrued interest.  There will be added to the
purchase price of the Certificates an amount equal to interest accrued thereon from the Cut-off
Date up to but not including the Closing Date.  The purchase price for the Certificates was
agreed to by the Company in reliance upon the transfer from the Company to the Underwriter of
the tax liabilities associated with the ownership of the Class R Certificates.

9

3.     Delivery and Payment. Delivery of and payment for the Certificates shall be made at the office of Mayer, Brown, Rowe & Maw LLP at 10:00 a.m., New York City time, on July 30, 2007 or such later date as you shall designate, which date and time may be postponed by agreement between you and the Company (such date and time of delivery and payment for the Certificates being herein called the "Closing Date"). Delivery of the 2007-S7, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-31, Class A-32, Class A-33, Class A-34, Class A-35 and Class A-36 Certificates shall be made to you through the Depository Trust Company ("DTC") (such Certificates, the "DTC Registered Certificates"), and delivery of the Class R Certificates (the "Definitive Certificates") shall be made in registered, certificated form, in each case against payment by you of the purchase price thereof to or upon the order of the Company by wire transfer in immediately available funds. Following the delivery of the Certificates to you as described in the preceding sentence, you shall transfer the Exchangeable and Exchanged Certificate (as defined in the Prospectus) in which you do not take an initial position in on the books of DTC on the Closing Date to the Trustee to hold in trust for the holders of the Certificates. The Definitive Certificates shall be registered in such names and in such denominations as you may request not less than two business days in advance of the Closing Date. The Company agrees to have the Definitive Certificates available for inspection, checking and packaging by you in New York, New York not later than 9:00 a.m. on the Closing Date.

4.     Offering by Underwriter.

4.1     It is understood that you propose to offer the Certificates for sale to the public as set forth in the Prospectus and you agree that all such offers and sales by you shall be made in compliance with all applicable laws and regulations. Prior to the date of the first Contract of Sale made based on the Approved Offering Materials, you have not pledged, sold, disposed of or otherwise transferred any Certificate, Mortgage Loans or any interest in any Certificate.

4.2     It is understood that you will solicit offers to purchase the Certificates as follows:

(a)     Prior to the time you have received the Approved Offering Materials you may, in compliance with the provisions of this Agreement, solicit offers to purchase Certificates; provided, that you shall not accept any such offer to purchase a Certificate or any interest in any Certificate or Mortgage Loan or otherwise enter into any Contract of Sale for any Certificate, any interest in any Certificate or any Mortgage Loan prior to your conveyance of Approved Offering Materials to the investor.

(b)     Any Written Communication relating to the Certificates made by an Underwriter in compliance with the terms of this Agreement prior to the time such Underwriter has entered into a Contract of Sale for Certificates with the recipient shall prominently set forth the following statements (or a substantially similar statements approved by the Company):

10

The information in this free writing prospectus, if conveyed prior to the time of your contractual commitment to purchase any of the Certificates, supersedes any information contained in any prior similar materials relating to the Certificates. The information in this free writing prospectus is preliminary, and is subject to completion or change. This free writing prospectus is being delivered to you solely to provide you with information about the offering of the Certificates referred to in this free writing prospectus and to solicit an offer to purchase the Certificates, when, as and if issued. Any such offer to purchase made by you will not be accepted and will not constitute a contractual commitment by you to purchase any of the Certificates, until we have accepted your offer to purchase Certificates.

The Certificates referred to in these materials are being sold when, as and if issued. The issuer is not obligated to issue such Certificates or any similar security and the underwriter's obligation to deliver such Certificates is subject to the terms and conditions of the underwriting agreement with the issuer and the availability of such Certificates when, as and if issued by the issuer. You are advised that the terms of the Certificates, and the characteristics of the mortgage loan pool backing them, may change (due, among other things, to the possibility that mortgage loans that comprise the pool may become delinquent or defaulted or may be removed or replaced and that similar or different mortgage loans may be added to the pool, and that one or more classes of Certificates may be split, combined or eliminated), at any time prior to issuance or availability of a final prospectus. You are advised that Certificates may not be issued that have the characteristics described in these materials. The underwriter's obligation to sell such Certificates to you is conditioned on the mortgage loans and Certificates having the characteristics described in these materials. If for any reason the issuer does not deliver such Certificates, the underwriter will notify you, and neither the issuer nor any underwriter will have any obligation to you to deliver all or any portion of the Certificates which you have committed to purchase, and none of the issuer nor any underwriter will be liable for any costs or damages whatsoever arising from or related to such non-delivery.

(c)     Any Preliminary Pool Information shall not be provided to prospective investors unless such Preliminary Pool Information is accompanied by the Approved Offering Materials and the following statements (or substantially similar statements approved by the Company) appear prominently thereon:

The information set forth below, entitled "preliminary information", was derived from a preliminary pool of mortgage loans which is not representative of the mortgage loans that will comprise the final mortgage loan pool. The preliminary pool of mortgage loans represents only a subset of the final mortgage loan

11

pool and mortgage loans that are included in the preliminary mortgage loan pool may be removed from the final mortgage loan pool. It is expected that the characteristics of the final mortgage loan pool will differ, and may differ materially, from the characteristics of the preliminary pool of mortgage loans and the preliminary information may differ materially from information of a similar type if derived from the final mortgage loan pool. Although the characteristics of the final mortgage loan pool are expected to be within the parameters for the mortgage loan characteristics as set forth in the tables entitled ["collateral stipulations - mortgage pool characteristics"] [accompanying Approved Offering Materials], they are not expected to conform in all material respects to the characteristics of the preliminary mortgage loan pool. You should refer to the parameters for the mortgage loan characteristics in the tables entitled ["collateral stipulations - mortgage pool characteristics"] in the accompanying [Approved Offering Materials].

4.3     It is understood that you will not enter into a Contract of Sale with any investor until the Approved Offering Materials have been conveyed to the investor with respect to the Certificates which are the subject of such Contract of Sale.

4.4     It is understood that you may prepare and provide to prospective investors certain Free Writing Prospectuses, subject to the following conditions:

(a)     Unless preceded or accompanied by a prospectus satisfying the requirements of Section 10(a) of the Act, the Underwriter shall not convey or deliver any Written Communication to any person in connection with the initial offering of the Certificates, unless such Written Communication (i) is made in reliance on Rule 134 under the Act, (ii) constitutes a prospectus satisfying the requirements of Rule 430B under the Act or (iii) constitutes a Free Writing Prospectus (as defined in Section 1.1(c) above) consisting solely of (x) information of a type included within the definition of ABS Informational and Computational Materials (as defined below), (y) Permitted Additional Materials or (z) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(b)     The Underwriter shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

(c)     It is understood and agreed that all information provided by the Underwriter to or through Bloomberg or Intex or similar entities for use by prospective investors, or imbedded in any CDI file provided to prospective investors, to the extent constituting a Free Writing Prospectus, shall be deemed an Underwriter Free Writing Prospectus.

12

(d)     All Free Writing Prospectuses provided to prospective investors, whether or not filed with the Commission, shall bear a legend including the following statement (or a substantially similar statement approved by the Company):

> "THE DEPOSITOR HAS FILED A REGISTRATION STATEMENT (INCLUDING A PROSPECTUS) WITH THE SECURITIES AND EXCHANGE COMMISSION (THE SEC) FOR THE OFFERING TO WHICH THIS COMMUNICATION RELATES.     BEFORE YOU INVEST, YOU SHOULD READ THE PROSPECTUS IN THAT REGISTRATION STATEMENT AND OTHER DOCUMENTS THE DEPOSITOR HAS FILED WITH THE SEC FOR MORE COMPLETE INFORMATION ABOUT THE DEPOSITOR AND THE OFFERING. YOU MAY GET THESE DOCUMENTS AT NO CHARGE BY VISITING EDGAR ON THE SEC WEB SITE AT *WWW.SEC.GOV*. ALTERNATIVELY, THE DEPOSITOR, ANY UNDERWRITER OR ANY DEALER PARTICIPATING   IN   THE   OFFERING   WILL ARRANGE TO SEND YOU THE PROSPECTUS AT NO CHARGE IF YOU REQUEST IT BY CALLING TOLL-FREE 1-800-XXX-XXXX."

Each of the Underwriter and the Company shall have the right to request additional specific legends or notations to appear on any Free Writing Prospectus and shall have the right to require changes regarding the use of terminology and the right to determine the types of information appearing therein with the approval of the other (which shall not be unreasonably withheld).

(e)     The Underwriter shall deliver to the Company and its counsel (in such format as reasonably required by the Company), no later than the business day prior to the date of the required filing under Section 5.10, an Underwriter Prepared Issuer FWP. To facilitate filing to the extent required by Section 5.10 or 5.11, as applicable, all Underwriter Derived Information shall be set forth in a document separate from any Underwriter Prepared Issuer FWP including Issuer Information. The Underwriter shall deliver to the Company one business day following a request by the Company all Preliminary Pool Information (or information based on or derived in whole or in part from Preliminary Pool Information) provided by it to any prospective investor.

5172419 07081029

(f)     The Underwriter shall provide the Company with a letter from Deloitte & Touche LLP, certified public accountants, prior to the Closing Date, satisfactory in form and substance to the Company, Residential Funding and their respective counsels and the Underwriter, to the effect that such accountants have performed certain specified procedures, all of which have been agreed to by the Company and the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature that is included in any Underwriter Prepared Issuer FWP, other than any Pool Information therein and any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP, is accurate except as to such matters that are not deemed by the Company and the Underwriter to be material. The foregoing letter shall be at the expense of the Underwriter.

(g)     None of the information in any Free Writing Prospectus may conflict with the information then contained in the Registration Statement or any prospectus or prospectus supplement that is a part thereof. The Certificates described in any Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP will be of a type set forth in one of the categories listed beneath the heading "Description of Certificates" in the term sheet supplement included in the Approved Offering Materials and the description of the characteristics of the Certificates contained in such Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP shall not be inconsistent with the description of the Certificates beneath such heading in the term sheet supplement.

(h)     The Company shall not be obligated to file any Issuer Free Writing Prospectuses that have been determined to contain any material error or omission unless such Issuer Free Writing Prospectus has been provided to a prospective investor, in which case, the Underwriter shall cooperate with the Company to prepare a corrective Issuer Free Writing Prospectus that the Underwriter will provide to any such prospective investor and the Company shall file to the extent required herein. In the event that the Underwriter becomes aware that, as of the date on which an investor entered into a Contract of Sale, any Free Writing Prospectus prepared by or on behalf of the Underwriter and delivered to such investor contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading (such Free Writing Prospectus, a "Defective Free Writing Prospectus"), the Underwriter shall notify the Company thereof as soon as practical but in any event within one business day after discovery.

(i)     If the Underwriter does not provide any Free Writing Prospectuses to the Company pursuant to subsection (e) above, the Underwriter shall be deemed to have represented, as of the Closing Date, that it did not provide any prospective investors with any information in written or electronic form in connection with the offering of the Certificates that would constitute an Underwriter Prepared Issuer FWP.

14

(j)      In the event of any delay in the delivery by the Underwriter to the Company of any Underwriter Prepared Issuer FWP required to be delivered in accordance with subsection (e) above, or in the delivery of the accountant's comfort letter in respect thereof pursuant to subsection (f) above, the Company shall have the right to delay the release of the Prospectus to investors or to the Underwriter, to delay the Closing Date and to take other appropriate actions in each case as necessary in order to allow the Company to comply with its agreement set forth in Section 5.10 to file such Underwriter Prepared Issuer FWP by the time specified therein.

(k)      The Underwriter represents that it has in place, and covenants that it shall maintain, internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the 1933 Act Regulations with respect to the generation and use of Free Writing Prospectuses in connection with the offering of the Certificates. In addition, each Underwriter shall, for a period of at least three years after the date hereof, maintain written and/or electronic records of the following:

(i)      any Free Writing Prospectus used by the Underwriter to solicit offers to purchase Certificates to the extent not filed with the Commission;

(ii)     regarding each Free Writing Prospectus delivered by the Underwriter to an investor, the date of such delivery and identity of such investor; and

(iii)    regarding each Contract of Sale entered into by such Underwriter, the date, identity of the investor and the terms of such Contract of Sale, as set forth in the related confirmation of trade.

(l)      The Underwriter covenants with the Company that after the final Prospectus is available the Underwriter shall not distribute any written information concerning the Certificates to a prospective investor unless such information is preceded or accompanied by the final Prospectus. It is understood and agreed that the use of written information in accordance with the preceding sentence is not a Free Writing Prospectus and is not otherwise restricted or governed in any way by this Agreement.

(m)     The Underwriter shall not use any Free Writing Prospectus in connection with the solicitation of offers to purchase Certificates from any prospective investor in a class of Certificates with denominations of less than $25,000 or otherwise designated as a "retail" class of Certificates, and the Underwriter shall not authorize any such use of any Free Writing Prospectus by any dealer that purchases any such Certificates from the Underwriter.

4.5      You further agree that on or prior to the sixth day after the Closing Date, you shall provide the Company with a certificate, substantially in the form of Exhibit G attached hereto, setting forth (i) in the case of each class of Certificates, (a) if less than 10% of the aggregate certificate principal balance of such class of Certificates has been sold to the public as of such date, the value calculated pursuant to clause (b)(iii) of Exhibit G hereto, or, (b) if 10% or more of such class of Certificates has been sold to the public as of such date but no single price is paid for at least 10% of the aggregate certificate principal balance of such class of Certificates, then the weighted average price at which the Certificates of such class were sold expressed as a

15

percentage of the certificate principal balance of such class of Certificates sold, or (c) the first single price at which at least 10% of the aggregate certificate principal balance of such class of Certificates was sold to the public, (ii) the prepayment assumption used in pricing each class of Certificates, and (iii) such other information as to matters of fact as the Company may reasonably request to enable it to comply with its reporting requirements with respect to each class of Certificates to the extent such information can in the good faith judgment of the Underwriter be determined by it.

4.6    The Underwriter agrees that (i) if the Prospectus is not delivered with the confirmation in reliance on Rule 172, it will include in every confirmation sent out the notice required by Rule 173 informing the investor that the sale was made pursuant to the Registration Statement and that the investor may request a copy of the Prospectus from the Underwriter; (ii) if a paper copy of the Prospectus is requested by a person who receives a confirmation, Underwriter shall deliver a printed or paper copy of such Prospectus; and (iii) if an electronic copy of the Prospectus is delivered by the Underwriter for any purpose, such copy shall be the same electronic file containing the Prospectus in the identical form transmitted electronically to the Underwriter by or on behalf of the Company specifically for use by the Underwriter pursuant to this Section 4.6; for example, if the Prospectus is delivered to the Underwriter by or on behalf of the Company in a single electronic file in pdf format, then the Underwriter will deliver the electronic copy of the Prospectus in the same single electronic file in pdf format. The Underwriter further agrees that (i) if it delivers to an investor the Prospectus in pdf format, upon the Underwriter's receipt of a request from the investor within the period for which delivery of the Prospectus is required, the Underwriter will promptly deliver or cause to be delivered to the investor, without charge, a paper copy of the Prospectus and (ii) it will provide to the Company any Underwriter Prepared Issuer FWP, or portions thereof, which the Company is required to file with the Commission in electronic format and will use reasonable efforts to provide to the Company such Underwriter Prepared Issuer FWP, or portions thereof, in either Microsoft Word® or Microsoft Excel® format and not in a pdf, except to the extent that the Company, in its sole discretion, waives such requirements.

5.    Agreements. The Company and you agree as follows:

5.1    Before amending or supplementing the Registration Statement or the Prospectus with respect to the Certificates, the Company will furnish you with a copy of each such proposed amendment or supplement.

5.2    The Company will cause the Prospectus Supplement to be transmitted to the Commission for filing pursuant to Rule 424(b) under the Act by means reasonably calculated to result in filing with the Commission pursuant to said rule.

5.3    If, during the period after the first date of the public offering of the Certificates in which a prospectus relating to the Certificates is required to be delivered under the Act, any event occurs as a result of which it is necessary to amend or supplement the Prospectus, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Prospectus is delivered to a purchaser, not misleading, or if it shall be necessary to amend or supplement the Prospectus to comply with the Act or the 1933 Act Regulations, the Company promptly will prepare and furnish, at its own expense, to you, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so

16

amended or supplemented will not, in the light of the circumstances when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law.

      5.4     If the Company or the Underwriter determines or becomes aware that any Written Communication (including without limitation any Free Writing Prospectus) or oral statement (when considered in conjunction with all information conveyed at the time of Contract of Sale) contains an untrue statement of material fact or omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading at the time that a Contract of Sale was entered into, either the Company or the Underwriter may prepare corrective information with notice to the other party, and the Underwriter shall deliver such information in a manner reasonably acceptable to both parties, to any person with whom a Contract of Sale was entered into, and such information shall provide any such person with the following:

      (a)     Adequate disclosure of the contractual arrangement;

      (b)     Adequate disclosure of the person's rights under the existing Contract of Sale at the time termination is sought;

      (c)     Adequate disclosure of the new information that is necessary to correct the misstatements or omissions in the information given at the time of the original Contract of Sale; and

      (d)     A meaningful ability to elect to terminate or not terminate the prior Contract of Sale and to elect to enter into or not enter into a new Contract of Sale.

Any costs incurred to the investor in connection with any such termination or reformation shall be subject to Sections 7.1 and 7.2, as applicable.

      5.5     The Company will furnish to you, without charge, a copy of the Registration Statement (including exhibits thereto) and, so long as delivery of a prospectus by an underwriter or dealer may be required by the Act, as many copies of the Prospectus, any documents incorporated by reference therein and any amendments and supplements thereto as you may reasonably request; provided, however, that if the Prospectus is not delivered with the confirmation in reliance on Rule 172, you will provide the notice specified in Section 4.6 in every confirmation and will deliver a paper copy of the prospectus to those investors that request a paper copy thereof.

      5.6     The Company agrees, so long as the Certificates shall be outstanding, or until such time as you shall cease to maintain a secondary market in the Certificates, whichever first occurs, to deliver to you the annual statement as to compliance delivered to the Trustee pursuant to Section 3.18 of the Pooling and Servicing Agreement and the annual statement of a firm of independent public accountants furnished to the Trustee pursuant to Section 3.19 of the Pooling and Servicing Agreement, as soon as such statements are furnished to the Company.

17

5.7     The Company will endeavor to arrange for the qualification of the Certificates for sale under the laws of such jurisdictions as you may reasonably designate and will maintain such qualification in effect so long as required for the initial distribution of the Certificates; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

5.8     If the transactions contemplated by this Agreement are consummated, the Company or Residential Funding will pay or cause to be paid all expenses incident to the performance of the obligations of the Company and Residential Funding under this Agreement, and will reimburse you for any reasonable expenses (including reasonable fees and disbursements of counsel) reasonably incurred by you in connection with qualification of the Certificates for sale and determination of their eligibility for investment under the laws of such jurisdictions as you have reasonably requested pursuant to Section 5.7 above and the printing of memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Certificates, and for expenses incurred in distributing the Prospectus (including any amendments and supplements thereto) to the Underwriter. Except as herein provided, you shall be responsible for paying all costs and expenses incurred by you, including the fees and disbursements of your counsel, in connection with the purchase and sale of the Certificates.

5.9     If, during the period after the Closing Date in which a prospectus relating to the Certificates is required to be delivered under the Act, the Company receives notice that a stop order suspending the effectiveness of the Registration Statement or preventing the offer and sale of the Certificates is in effect, the Company will advise you of the issuance of such stop order.

5.10    The Company shall file any Issuer Free Writing Prospectus, and any Underwriter Prepared Issuer FWP provided to it by the Underwriter under Section 4.4, not later than the date of first use thereof, except that:

(a)     any Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP or portion thereof otherwise required to be filed that contains only (1) a description of the final terms of the Certificates may be filed by the Company within two days of the later of the date such final terms have been established for all classes of Certificates and the date of first use, and (2) a description of the terms of the Certificates that does not reflect the final terms after they have been established for all classes of all Certificates is not required to be filed; and

(b)     if the Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP includes only information of a type included in the definition of ABS Informational and Computational Materials, the Company shall file the same within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b) of the Act.

18

provided further, that prior to the filing of any Underwriter Prepared Issuer FWP by the Company, the Underwriter must comply with its obligations pursuant to Section 4.4 and that the Company shall not be required to file any Free Writing Prospectus to the extent such Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

5.11    The Underwriter shall file any Underwriter Free Writing Prospectus that has been distributed by the Underwriter in a manner reasonably designed to lead to its broad, unrestricted dissemination within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b) of the Act or otherwise as required under Rule 433 of the Act; provided, however, that the Underwriter shall not be required to file any Underwriter Free Writing Prospectus to the extent such Underwriter Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

5.12    The Company acknowledges and agrees that the Underwriter is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the offering of securities contemplated hereby (including in connection with determining the terms of the offering) and not as a fiduciary to, or an agent of, the Company or any other person. Additionally, the Underwriter is not advising the Company or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Underwriter shall have no responsibility or liability to the Company with respect thereto. Any review by the Underwriter of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Underwriter and shall not be on behalf of the Company.

6.    Conditions to the Obligations of the Underwriter. The Underwriter's obligation to purchase the Certificates shall be subject to the following conditions:

6.1    No stop order suspending the effectiveness of the Registration Statement shall be in effect, and no proceedings for that purpose shall be pending or, to the knowledge of the Company, threatened by the Commission; and the Prospectus Supplement shall have been filed or transmitted for filing by means reasonably calculated to result in a filing with the Commission pursuant to Rule 424(b) under the Act.

6.2    Since July 1, 2007 there shall have been no material adverse change (not in the ordinary course of business) in the condition of the Company or Residential Funding.

6.3    The Company shall have delivered to you a certificate, dated the Closing Date, of the President, a Senior Vice President or a Vice President of the Company to the effect that the signer of such certificate has examined this Agreement, the Approved Offering Materials, the Prospectus, the Pooling and Servicing Agreement and various other closing documents, and that, to the best of his or her knowledge after reasonable investigation:

19

(a)    the representations and warranties of the Company in this Agreement and in the Pooling and Servicing Agreement are true and correct in all material respects; and

(b)    the Company has, in all material respects, complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

6.4    Residential Funding shall have delivered to you a certificate, dated the Closing Date, of the President, a Managing Director, a Director or an Associate of Residential Funding to the effect that the signer of such certificate has examined the Pooling and Servicing Agreement and this Agreement and that, to the best of his or her knowledge after reasonable investigation, the representations and warranties of Residential Funding contained in the Pooling and Servicing Agreement and in this Agreement are true and correct in all material respects.

6.5    You shall have received the opinions of Mayer, Brown, Rowe & Maw LLP, special counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibits A-1, A-2 and A-3, and the opinion of Bruce Bowen, associate counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibit B.

6.6    You shall have received a negative assurance letter regarding the Prospectus from Sidley Austin LLP, counsel for the Underwriter, in form satisfactory to you.

6.7    The Underwriter shall have received from Deloitte & Touche LLP, certified public accountants, (a) a letter dated the date hereof and satisfactory in form and substance to the Underwriter and the Underwriter's counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "Description of the Mortgage Pool", "Pooling and Servicing Agreement", "Description of the Certificates" and "Certain Yield and Prepayment Considerations" agrees with the records of the Company and Residential Funding excluding any questions of legal interpretation and (b) the letter prepared pursuant to Section 4.4(f).

6.8    The Class A Certificates and Class R Certificates shall have been rated, "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's") and Fitch Ratings ("Fitch").

6.9    You shall have received the opinion of Chapman and Cutler LLP, counsel to the Trustee, dated the Closing Date, substantially to the effect set forth in Exhibit C.

6.10    You shall have received the opinion of Faegre & Benson, LLP, special Minnesota tax counsel for the Company, dated the Closing Date, substantially to the effect set forth in Exhibit D.

6.11    You shall have received from Bruce Bowen, associate counsel to the Company, a reliance letter with respect to any opinions delivered to the rating agencies, or you shall have been listed as an addressee on any such opinions.

20

The Company will furnish you with conformed copies of the above opinions, certificates, letters and documents as you reasonably request.

7.    Indemnification and Contribution.

7.1    The Company and Residential Funding, jointly and severally, agree to indemnify and hold harmless you and each person, if any, who controls you within the meaning of either Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement for the registration of the Certificates as originally filed or in any amendment thereof or other filing incorporated by reference therein, or in the Prospectus and Designated Static Pool Information, taken together, or incorporated by reference in the Prospectus (if used within the period set forth in Section 5.3 hereof and as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (ii) caused by any untrue statement or alleged untrue statement of a material fact contained in any Issuer Free Writing Prospectus, or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (except any omission with respect to information included in the definition of Senior Structure Information), or (iii) caused by any untrue statement of a material fact or alleged untrue statement of a material fact contained in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, that in either case was caused by (x) any error or omission in any Pool Information or (y) or any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus; except insofar as such losses, claims, damages, or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon any information with respect to which the Underwriter has agreed to indemnify the Company pursuant to clause (i) of Section 7.2; provided, however, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information.

7.2    You agree to indemnify and hold harmless the Company, Residential Funding, their respective directors or officers and any person controlling the Company or Residential Funding within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of material fact contained in the Underwriter Information, or any omission or alleged omission to state therein any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Free Writing Prospectus (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Free Writing Prospectus), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which

21

they were made, not misleading, (iii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Prepared Issuer FWP (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (iv) resulting from your failure to comply with Section 4.4(e) or Section 4.3 or failure to file any Underwriter Free Writing Prospectus required to be filed in accordance with Section 5.11; provided, however, that the indemnification set forth in clauses (ii) and (iii) of this Section 7.2 shall not apply to the extent of any error or omission in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus that was caused by any error or omission in any Pool Information; provided, further, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information. In addition, you agree to indemnify and hold harmless the Company, Residential Funding, their respective directors or officers and any person controlling the Company or Residential Funding against any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) caused by, resulting from, relating to, or based upon any legend regarding original issue discount on any Certificate resulting from incorrect information provided by the Underwriter in the certificates described in Section 4.5 hereof.

7.3    In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 7.1 or Section 7.2, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties. Such firm shall be designated in writing by you, in the case of parties indemnified pursuant to Section 7.1 and by the Company or Residential Funding, in the case of parties indemnified pursuant to Section 7.2. The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel reasonably satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation. Unless it shall assume the defense of any proceeding the indemnifying party shall not be liable for any settlement of any proceeding, effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. If the indemnifying party assumes the defense of any proceeding, it

22

shall be entitled to settle such proceeding with the consent of the indemnified party or, if such settlement provides for release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the consent of the indemnified party.

7.4    If the indemnification provided for in this Section 7 is unavailable to an indemnified party under Section 7.1 or Section 7.2 hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and Residential Funding on the one hand and the Underwriter on the other from the offering of the Certificates but also the relative fault of the Company or Residential Funding on the one hand and of the Underwriter on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of the Company and Residential Funding on the one hand and of the Underwriter on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriter, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

7.5    The Company, Residential Funding and the Underwriter agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in Section 7.4 above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 7 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim except where the indemnified party is required to bear such expenses pursuant to Section 7.4; which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party believes that it will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

7.6    The indemnity and contribution agreements contained in this Section 7 and the representations and warranties of the Company and Residential Funding in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by the Underwriter or on behalf of the Underwriter or any person controlling the Underwriter or by or on behalf of the Company or Residential Funding and their respective directors or officers or any person controlling the Company or Residential Funding and (iii) acceptance of and payment for any of the Certificates.

23

8.    Termination.  This Agreement shall be subject to termination by notice given to the Company and Residential Funding, if the sale of the Certificates provided for herein is not consummated because of any failure or refusal on the part of the Company or Residential Funding to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company or Residential Funding shall be unable to perform their respective obligations under this Agreement.  If you terminate this Agreement in accordance with this Section 8, the Company or Residential Funding will reimburse you for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been reasonably incurred by the Underwriter in connection with the proposed purchase and sale of the Certificates.

9.    Certain Representations and Indemnities to Survive.  The respective agreements, representations, warranties, indemnities and other statements of the Company, Residential Funding or the officers of any of the Company, Residential Funding, and you set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by you or on your behalf or made by or on behalf of the Company or Residential Funding or any of their respective officers, directors or controlling persons, and will survive delivery of and payment for the Certificates.

10.    Notices.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Underwriter will be mailed, delivered or telegraphed and confirmed to you at Morgan Stanley & Co. Incorporated, 1585 Broadway, New York, New York 10036, or if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Mortgage Securities I, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President; or, if sent to Residential Funding will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Company, LLC, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention:  President.

11.    Successors.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred  to in Section 7 hereof, and their successors and assigns, and no other person will have any right or obligation hereunder.

12.    Applicable Law.   This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

[SIGNATURE PAGES FOLLOW]

24

5172419 07081029

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE
SECURITIES I, INC.**

By: _____

Name:  Heather Anderson

Title:    Vice President

**RESIDENTIAL FUNDING COMPANY, LLC**

By: _____

Name:  Marguerite Steffes

Title:    Associate

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By: _____

Name:

Title:

5172419 07081029

*Underwriting Agreement
(Class A and R)
RFMSI Series 2007-S7*

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**

By:_____

Name:  Heather Anderson

Title:   Vice President

**RESIDENTIAL FUNDING COMPANY, LLC**

By:_____

Name:  Marguerite Steffes

Title:   Associate

The foregoing Underwriting Agreement is hereby confirmed and accepted as of the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By:_____

Name:  Valerie Kay

Title:   Managing Director

## EXHIBIT A-1

Mayer, Brown, Rowe & Maw LLP Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 24 of the Closing Set]

## EXHIBIT A-2

Mayer, Brown, Rowe & Maw LLP
Negative Assurance Letter (Underwriting Agreement)

[See Tab 25 of the Closing Set]

Exhibit A-2

**EXHIBIT A-3**

Mayer, Brown, Rowe & Maw LLP Opinion
Tax Disclosure Letter (Underwriting Agreement)

[See Tab 26 of the Closing Set]

**EXHIBIT B**

In-House Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 22 of the Closing Set]

## EXHIBIT C

Opinion of Chapman and Cutler LLP
Counsel to Trustee

[See Tab 32 of the Closing Set]

## EXHIBIT D

Opinion of Faegre & Benson, LLP
Special Counsel to the Company

[See Tab 31 of the Closing Set]

## EXHIBIT E

### EXCLUDED INFORMATION

(See attached)

## Summary

The following summary provides a brief description of material aspects of this offering and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, you should read carefully this entire document and the accompanying prospectus.

| | |
|---|---|
| Issuing entity............................................. | RFMSI Series 2007-S7 Trust. |
| Title of securities..................................... | Mortgage Pass-Through Certificates, Series 2007-S7. |
| Depositor.................................................. | Residential Funding Mortgage Securities I, Inc., an affiliate of Residential Funding Company, LLC, or Residential Funding. |
| Master servicer and sponsor.................... | Residential Funding. |
| Subservicers............................................. | Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding, will subservice approximately 42.8% of the mortgage loans, by stated principal balance. GMAC Mortgage, LLC, an affiliate of Residential Funding, will subservice approximately 48.4% of the mortgage loans, by stated principal balance. |
| Trustee .................................................... | U.S. Bank National Association. |
| Originators .............................................. | Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding, originated approximately 26.1% of the mortgage loans, by stated principal balance. GMAC Mortgage, LLC, an affiliate of Residential Funding, originated approximately 41.5% of the mortgage loans, by stated principal balance. |
| Mortgage pool......................................... | 752 fixed rate mortgage loans with an aggregate principal balance of approximately $419,108,278 as of the cut-off date, secured by first liens on fee simple interests in one- to four-family residential properties or interests in shares issued by cooperative apartment corporations and the related proprietary leases. |
| Cut-off date............................................. | July 1, 2007. |
| Closing date ............................................ | On or about July 30, 2007. |
| Distribution dates.................................... | Beginning on August 27, 2007 and thereafter on the 25th of each month or, if the 25th is not a business day, on the next business day. |
| Final scheduled distribution date ............ | July 25, 2037. The actual final distribution date could be substantially earlier. See "Certain Yield and Prepayment Considerations" in this prospectus supplement. |

**Final Scheduled Distribution Date**

The final scheduled distribution date with respect to each class of the offered certificates is the distribution date in July 2037, which is the distribution date immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its final scheduled distribution date.

**Weighted Average Life**

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement, the prepayment assumption, represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of new mortgage loans. A prepayment assumption of 100% PSA assumes constant prepayment rates of 0.20% per annum of the then outstanding principal balance of the mortgage loans in the first month of the life of the mortgage loans and an additional 0.20% per annum in each month thereafter until the 30th month. Beginning in the 30th month and in each month thereafter during the life of the mortgage loans, 100% PSA assumes a constant prepayment rate of 6% per annum each month. As used in the tables below, "0% PSA" assumes prepayment rates equal to 0% of PSA—no prepayments. Correspondingly, "100% PSA" and "300% PSA" assumes prepayment rates equal to 100% of PSA and 300% of PSA, respectively, and so forth.

PSA does not purport to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans in this mortgage pool.

The tables below captioned "Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA" have been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described under "Description of the Mortgage Pool" in this prospectus supplement and their performance. The tables assume, among other things, that: (i) as of the date of issuance of the offered certificates, the mortgage loans have the following characteristics:

### Assumed Mortgage Loan Characteristics

| | Discount Mortgage Loans, Original I/O* Term 120 Months | Discount Mortgage Loans, Original I/O* Term 180 Months | Discount Mortgage Loans, Non-I/O* | Non-Discount Mortgage Loans, Original I/O* Term 120 Months | Non-Discount Mortgage Loans, Original I/O* Term 180 Months | Non-Discount Mortgage Loans, Non-I/O* |
|---|---|---|---|---|---|---|
| Aggregate principal balance .................... | $21,707,489.53 | $625,000.00 | $35,017,919.87 | $142,602,337.16 | $2,612,000.00 | $216,543,531.80 |
| Weighted average mortgage rate | 6.0338961786% | 5.7500000000% | 6.0218642205% | 6.4678% | 6.6811% | 6.4302% |
| Weighted average servicing fee rate ............... | 0.2500000000% | 0.2500000000% | 0.2500000000% | 0.2500% | 0.2500% | 0.2508% |
| Weighted average original term to maturity (months) ................... | 360 | 360 | 360 | 360 | 360 | 359 |
| Weighted average remaining term to maturity (months) ............ | 359 | 360 | 358 | 359 | 359 | 357 |

* I/O refers to loans with an initial interest only period as indicated and further discussed on page S-75.

(ii)    the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity (after taking into account the interest-only period), so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity (after taking into account the interest-only period); (iii) neither Residential Funding nor the depositor will repurchase any mortgage loan, as described under "Mortgage Loan Program—Representations with Respect to Mortgage Loans" and "Description of the Certificates—Assignment of the Trust Assets" in the accompanying prospectus, and the master servicer will not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust; (iv) there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of PSA set forth in the tables; (v) there is no Prepayment Interest Shortfall or any other interest shortfall in any month; (vi) payments on the certificates will be received on the 25th day of each month, commencing in August 2007; (vii) payments on the mortgage loans earn no reinvestment return; (viii) there are no additional ongoing trust expenses payable out of the trust; and (ix) the certificates will be purchased on July 30, 2007. Clauses (i) through (ix) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the tables below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans will prepay at a constant level of PSA until maturity or that all of the mortgage loans will prepay at the same level of PSA. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the various constant percentages of PSA specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans, or actual prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following tables indicate the weighted average life of each class of offered certificates, other than the Interest Only Certificates and Residual Certificates, and set forth the percentages of the initial Certificate Principal Balance of each class of offered certificates that would be outstanding after each of the distribution dates at the various percentages of PSA shown.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| | Class A-1, Class A-10, Class A-20, Class A-24, Class A-26, Class A-27, Class A-29, Class A-31, Class A-33, Class A-34, Class A-35 and Class A-36 | | | | | Class A-2 | | | | | Class A-3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Distribution Date | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 99 | 97 | 90 | 94 | 89 | 98 | 98 | 98 | 98 | 98 | 99 | 95 | 91 | 85 | 80 |
| July 25, 2009 | 99 | 97 | 90 | 82 | 66 | 91 | 71 | 71 | 71 | 71 | 99 | 91 | 76 | 61 | 46 |
| July 25, 2010 | 98 | 81 | 73 | 74 | 53 | 86 | 35 | 35 | 35 | 35 | 99 | 86 | 58 | 33 | 12 |
| July 25, 2011 | 97 | 73 | 65 | 53 | 41 | 81 | 0 | 0 | 0 | 0 | 99 | 82 | 45 | 16 | 0 |
| July 25, 2012 | 96 | 65 | 59 | 42 | 26 | 14 | 76 | 0 | 0 | 0 | 0 | 99 | 63 | 25 | 0 | 0 |
| July 25, 2013 | 95 | 59 | 53 | 34 | 18 | 8 | 71 | 0 | 0 | 0 | 0 | 99 | 56 | 11 | * | 0 |
| July 25, 2014 | 94 | 52 | 47 | 27 | 12 | 4 | 66 | 0 | 0 | 0 | 0 | 99 | 46 | * | 0 | 0 |
| July 25, 2015 | 93 | 47 | 42 | 22 | 9 | 2 | 60 | 0 | 0 | 0 | 0 | 98 | 37 | 0 | 0 | 0 |
| July 25, 2016 | 92 | 42 | 38 | 17 | 6 | 1 | 53 | 0 | 0 | 0 | 0 | 98 | 30 | 0 | 0 | 0 |
| July 25, 2017 | 90 | 38 | 34 | 14 | 4 | 1 | 42 | 0 | 0 | 0 | 0 | 99 | 24 | 0 | 0 | 0 |
| July 25, 2018 | 88 | 34 | 30 | 11 | 3 | * | 28 | 0 | 0 | 0 | 0 | 99 | 17 | 0 | 0 | 0 |
| July 25, 2019 | 86 | 30 | 26 | 9 | 2 | * | 16 | 0 | 0 | 0 | 0 | 99 | 12 | 0 | 0 | 0 |
| July 25, 2020 | 83 | 26 | 23 | 7 | 2 | * | 2 | 0 | 0 | 0 | 0 | 99 | 6 | 0 | 0 | 0 |
| July 25, 2021 | 80 | 23 | 20 | 6 | 1 | * | 0 | 0 | 0 | 0 | 0 | 94 | 2 | 0 | 0 | 0 |
| July 25, 2022 | 77 | 20 | 18 | 4 | 1 | * | 0 | 0 | 0 | 0 | 0 | 89 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 74 | 18 | 15 | 4 | * | * | 0 | 0 | 0 | 0 | 0 | 84 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 71 | 15 | 13 | 3 | * | * | 0 | 0 | 0 | 0 | 0 | 77 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 67 | 13 | 11 | 2 | * | * | 0 | 0 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 63 | 11 | 10 | 2 | * | * | 0 | 0 | 0 | 0 | 0 | 64 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 59 | 10 | 8 | 1 | * | * | 0 | 0 | 0 | 0 | 0 | 57 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 54 | 8 | 7 | 1 | * | * | 0 | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 50 | 7 | 5 | * | * | * | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 45 | 5 | 4 | * | * | * | 0 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 39 | 4 | 3 | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 33 | 3 | 3 | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 27 | 3 | 2 | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 21 | 2 | 1 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 14 | 1 | 1 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 7 | 1 | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 20.43 | 9.30 | 5.56 | 3.93 | 3.06 | 9.20 | 2.59 | 2.59 | 2.59 | 2.56 | 21.32 | 7.05 | 3.59 | 2.46 | 1.90 |

*  Indicates a number that is greater than zero but less than 0.5%.

**  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-4 | | | | | Class A-5 | | | | | Class A-6 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 106 | 100 | 100 | 100 | 100 | 99 | 95 | 90 | 85 | 80 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2009 | 113 | 0 | 0 | 0 | 0 | 99 | 91 | 75 | 61 | 46 | 95 | 95 | 95 | 95 | 95 |
| July 25, 2010 | 121 | 0 | 0 | 0 | 0 | 99 | 86 | 58 | 33 | 12 | 92 | 92 | 92 | 92 | 92 |
| July 25, 2011 | 128 | 0 | 0 | 0 | 0 | 99 | 82 | 45 | 16 | 0 | 90 | 90 | 90 | 90 | 57 |
| July 25, 2012 | 137 | 0 | 0 | 0 | 0 | 99 | 68 | 25 | 0 | 0 | 87 | 87 | 87 | 57 | 63 |
| July 25, 2013 | 145 | 0 | 0 | 0 | 0 | 99 | 56 | 11 | 0 | 0 | 83 | 83 | 83 | 73 | 0 |
| July 25, 2014 | 155 | 0 | 0 | 0 | 0 | 99 | 46 | * | 0 | 0 | 80 | 80 | 80 | 45 | 0 |
| July 25, 2015 | 165 | 0 | 0 | 0 | 0 | 98 | 37 | 0 | 0 | 0 | 76 | 76 | 73 | 18 | 0 |
| July 25, 2016 | 175 | 0 | 0 | 0 | 0 | 98 | 30 | 0 | 0 | 0 | 73 | 73 | 64 | 0 | 0 |
| July 25, 2017 | 187 | 0 | 0 | 0 | 0 | 99 | 24 | 0 | 0 | 0 | 69 | 69 | 60 | 0 | 0 |
| July 25, 2018 | 199 | 0 | 0 | 0 | 0 | 99 | 17 | 0 | 0 | 0 | 64 | 64 | 0 | 0 | 0 |
| July 25, 2019 | 211 | 0 | 0 | 0 | 0 | 99 | 12 | 0 | 0 | 0 | 60 | 60 | 0 | 0 | 0 |
| July 25, 2020 | 225 | 0 | 0 | 0 | 0 | 99 | 6 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 |
| July 25, 2021 | 239 | 0 | 0 | 0 | 0 | 95 | 2 | 0 | 0 | 0 | 50 | 34 | 0 | 0 | 0 |
| July 25, 2022 | 255 | 0 | 0 | 0 | 0 | 95 | 0 | 0 | 0 | 0 | 44 | 12 | 0 | 0 | 0 |
| July 25, 2023 | 271 | 0 | 0 | 0 | 0 | 89 | 0 | 0 | 0 | 0 | 38 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 289 | 0 | 0 | 0 | 0 | 84 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 307 | 0 | 0 | 0 | 0 | 78 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 327 | 0 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 | 19 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 348 | 0 | 0 | 0 | 0 | 64 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 370 | 0 | 0 | 0 | 0 | 57 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 394 | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 419 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 446 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 475 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 506 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 538 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 27.24 | 0.10 | 0.07 | 0.07 | 0.07 | 21.54 | 7.04 | 3.59 | 2.46 | 1.90 | 12.99 | 11.70 | 7.40 | 5.01 | 3.94 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| | Class A-7, Class A-8 and Class A-11 | | | | | Class A-9 | | | | | Class A-12 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Distribution Date | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 106 | 106 | 106 | 106 | 106 | 100 | 100 | 95 | 87 | 79 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 113 | 113 | 113 | 113 | 113 | 100 | 94 | 68 | 41 | 14 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 120 | 120 | 120 | 120 | 120 | 100 | 79 | 30 | 0 | 0 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 100 | 127 | 127 | 127 | 127 | 127 | 100 | 67 | 1 | 0 | 0 |
| July 25, 2012 | 100 | 100 | 100 | 100 | 100 | 135 | 135 | 135 | 135 | 56 | 100 | 58 | 0 | 0 | 0 |
| July 25, 2013 | 99 | 96 | 93 | 89 | 70 | 143 | 143 | 143 | 143 | 0 | 100 | 54 | 0 | 0 | 0 |
| July 25, 2014 | 98 | 91 | 74 | 77 | 38 | 152 | 152 | 152 | 76 | 0 | 100 | 52 | 0 | 0 | 0 |
| July 25, 2015 | 97 | 85 | 62 | 61 | 21 | 161 | 161 | 161 | 33 | 0 | 100 | 52 | 0 | 0 | 0 |
| July 25, 2016 | 96 | 78 | 50 | 46 | 12 | 171 | 171 | 171 | 16 | 0 | 100 | 42 | 0 | 0 | 0 |
| July 25, 2017 | 94 | 70 | 40 | 33 | 8 | 182 | 182 | 141 | 12 | 0 | 100 | 30 | 0 | 0 | 0 |
| July 25, 2018 | 92 | 62 | 32 | 24 | 5 | 193 | 193 | 113 | 8 | 0 | 100 | 19 | 0 | 0 | 0 |
| July 25, 2019 | 89 | 55 | 25 | 17 | 3 | 205 | 205 | 89 | 6 | 0 | 100 | 9 | 0 | 0 | 0 |
| July 25, 2020 | 86 | 48 | 20 | 12 | 2 | 218 | 218 | 71 | 4 | 0 | 100 | 1 | 0 | 0 | 0 |
| July 25, 2021 | 84 | 43 | 16 | 8 | 1 | 231 | 231 | 56 | 3 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2022 | 82 | 37 | 12 | 6 | 1 | 245 | 245 | 44 | 2 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 80 | 32 | 10 | 4 | * | 261 | 261 | 34 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 77 | 28 | 8 | 3 | * | 277 | 218 | 27 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 75 | 24 | 6 | 2 | * | 294 | 187 | 21 | * | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 73 | 21 | 4 | 1 | * | 312 | 159 | 16 | * | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 70 | 18 | 3 | 1 | * | 331 | 134 | 12 | * | 0 | 101 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 66 | 15 | 2 | * | * | 351 | 111 | 9 | * | 0 | 91 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 61 | 12 | 1 | * | * | 361 | 91 | 7 | * | 0 | 75 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 57 | 10 | 1 | * | * | 361 | 73 | 5 | * | 0 | 58 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 52 | 8 | 1 | * | * | 361 | 56 | 3 | * | 0 | 41 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 46 | 6 | * | * | * | 361 | 42 | 3 | * | 0 | 22 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 35 | 5 | * | * | * | 361 | 29 | 2 | * | 0 | 2 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 28 | 3 | * | * | * | 257 | 18 | 1 | * | 0 | 1 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 22 | 2 | * | * | * | 120 | 8 | 1 | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 14 | 1 | * | * | * | 8 | 0 | * | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 7 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life** (in years) | 21.16 | 14.04 | 10.98 | 9.37 | 7.15 | 28.58 | 21.66 | 14.12 | 7.68 | 5.02 | 24.38 | 7.61 | 2.49 | 1.80 | 1.47 |

\*   Indicates a number that is greater than zero but less than 0.5%.

\*\*  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-13 0% | 150% | 300% | 450% | 600% | Class A-14 0% | 150% | 300% | 450% | 600% | Class A-15 0% | 150% | 300% | 450% | 600% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 98 | 92 | 90 | 90 | 89 | 100 | 100 | 100 | 100 | 100 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2009 | 97 | 81 | 78 | 77 | 77 | 100 | 100 | 100 | 100 | 100 | 95 | 95 | 95 | 95 | 95 |
| July 25, 2010 | 95 | 69 | 66 | 55 | 27 | 100 | 100 | 100 | 100 | 100 | 92 | 92 | 92 | 92 | 92 |
| July 25, 2011 | 93 | 57 | 55 | 18 | 0 | 100 | 100 | 100 | 100 | 25 | 90 | 90 | 90 | 90 | 90 |
| July 25, 2012 | 91 | 46 | 30 | 0 | 0 | 100 | 100 | 100 | 42 | 0 | 87 | 87 | 87 | 87 | 87 |
| July 25, 2013 | 89 | 34 | 12 | 0 | 0 | 102 | 100 | 100 | 0 | 0 | 83 | 83 | 83 | 36 | 0 |
| July 25, 2014 | 87 | 22 | 0 | 0 | 0 | 100 | 100 | 91 | 0 | 0 | 80 | 80 | 80 | 0 | 0 |
| July 25, 2015 | 84 | 11 | 0 | 0 | 0 | 100 | 100 | 26 | 0 | 0 | 76 | 76 | 76 | 0 | 0 |
| July 25, 2016 | 82 | 2 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 73 | 73 | 58 | 0 | 0 |
| July 25, 2017 | 79 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 69 | 69 | 30 | 0 | 0 |
| July 25, 2018 | 74 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 64 | 64 | 6 | 0 | 0 |
| July 25, 2019 | 69 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 60 | 60 | 0 | 0 | 0 |
| July 25, 2020 | 64 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 |
| July 25, 2021 | 58 | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 50 | 53 | 0 | 0 | 0 |
| July 25, 2022 | 52 | 0 | 0 | 0 | 0 | 102 | 67 | 0 | 0 | 0 | 44 | 44 | 0 | 0 | 0 |
| July 25, 2023 | 45 | 0 | 0 | 0 | 0 | 100 | 35 | 0 | 0 | 0 | 38 | 38 | 0 | 0 | 0 |
| July 25, 2024 | 38 | 0 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 | 32 | 32 | 0 | 0 | 0 |
| July 25, 2025 | 30 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 26 | 11 | 0 | 0 | 0 |
| July 25, 2026 | 22 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 19 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 13 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 4 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 14.15 | 4.67 | 3.83 | 2.91 | 2.43 | 27.61 | 15.59 | 7.66 | 4.99 | 3.90 | 12.99 | 12.49 | 8.50 | 5.52 | 4.23 |

* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| | Class A-16 | | | | | Class A-17 | | | | | Class A-18 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Distribution Date | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 106 | 106 | 106 | 106 | 106 | 100 | 100 | 100 | 100 | 100 | 98 | 95 | 92 | 88 | 85 |
| July 25, 2009 | 113 | 113 | 113 | 113 | 113 | 100 | 100 | 100 | 100 | 100 | 97 | 86 | 74 | 63 | 52 |
| July 25, 2010 | 120 | 120 | 120 | 120 | 120 | 100 | 100 | 100 | 100 | 100 | 96 | 73 | 52 | 33 | 16 |
| July 25, 2011 | 127 | 127 | 127 | 127 | 127 | 100 | 100 | 100 | 100 | 100 | 97 | 61 | 33 | 11 | 1 |
| July 25, 2012 | 135 | 135 | 135 | 135 | 83 | 100 | 100 | 100 | 83 | 16 | 94 | 51 | 18 | 0 | 0 |
| July 25, 2013 | 143 | 143 | 143 | 143 | 0 | 100 | 100 | 100 | 45 | 0 | 93 | 42 | 7 | 0 | 0 |
| July 25, 2014 | 152 | 152 | 152 | 112 | 0 | 100 | 100 | 100 | 21 | 0 | 92 | 34 | 3 | 0 | 0 |
| July 25, 2015 | 161 | 161 | 161 | 49 | 0 | 100 | 81 | 77 | 9 | 0 | 91 | 27 | 0 | 0 | 0 |
| July 25, 2016 | 171 | 171 | 171 | 24 | 0 | 100 | 69 | 61 | 4 | 0 | 89 | 22 | 0 | 0 | 0 |
| July 25, 2017 | 182 | 182 | 182 | 17 | 0 | 100 | 63 | 49 | 3 | 0 | 87 | 17 | 0 | 0 | 0 |
| July 25, 2018 | 193 | 193 | 199 | 12 | 0 | 100 | 52 | 39 | 2 | 0 | 85 | 12 | 0 | 0 | 0 |
| July 25, 2019 | 205 | 205 | 166 | 9 | 0 | 100 | 44 | 31 | 2 | 0 | 81 | 8 | 0 | 0 | 0 |
| July 25, 2020 | 218 | 218 | 132 | 6 | 0 | 100 | 37 | 25 | 1 | 0 | 78 | 4 | 0 | 0 | 0 |
| July 25, 2021 | 231 | 231 | 108 | 4 | 0 | 100 | 31 | 20 | 1 | 0 | 75 | * | 0 | 0 | 0 |
| July 25, 2022 | 245 | 245 | 83 | 3 | 0 | 93 | 31 | 15 | 1 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 261 | 261 | 65 | 2 | 0 | 81 | 25 | 12 | * | 0 | 67 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 277 | 277 | 51 | 1 | 0 | 69 | 20 | 10 | * | 0 | 63 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 294 | 294 | 39 | 1 | 0 | 63 | 16 | 7 | * | 0 | 58 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 312 | 276 | 30 | * | 0 | 52 | 12 | 6 | * | 0 | 53 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 331 | 235 | 23 | * | 0 | 44 | 8 | 4 | * | 0 | 48 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 351 | 197 | 18 | * | 0 | 37 | 5 | 3 | * | 0 | 42 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 361 | 164 | 13 | * | 0 | 31 | 3 | 2 | * | 0 | 36 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 361 | 134 | 10 | * | 0 | 25 | 2 | 1 | * | 0 | 30 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 361 | 107 | 7 | * | 0 | 20 | 1 | 1 | * | 0 | 23 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 361 | 83 | 5 | * | 0 | 16 | 1 | * | * | 0 | 16 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 361 | 62 | 3 | * | 0 | 12 | * | * | * | 0 | 9 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 361 | 43 | 2 | * | 0 | 8 | * | * | * | 0 | * | 0 | 0 | 0 | 0 |
| July 25, 2035 | 361 | 26 | 1 | * | 0 | 5 | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 178 | 11 | * | * | 0 | 2 | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 29.01 | 22.98 | 15.38 | 8.22 | 5.15 | 28.58 | 20.08 | 11.19 | 6.39 | 4.47 | 18.24 | 5.85 | 3.30 | 2.47 | 2.04 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-19 | | | | | Class A-21 | | | | | Class A-22 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2012 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2013 | 100 | 100 | 100 | 100 | 0 | 100 | 100 | 93 | 89 | 70 | 100 | 100 | 100 | 66 | 23 |
| July 25, 2014 | 100 | 100 | 97 | 43 | 0 | 98 | 96 | 84 | 77 | 38 | 100 | 100 | 90 | 31 | 0 |
| July 25, 2015 | 100 | 97 | 74 | 20 | 0 | 97 | 85 | 74 | 61 | 21 | 100 | 100 | 72 | 14 | 0 |
| July 25, 2016 | 100 | 74 | 58 | 9 | 0 | 94 | 78 | 62 | 46 | 12 | 100 | 90 | 58 | 7 | 0 |
| July 25, 2017 | 100 | 58 | 47 | 4 | 0 | 92 | 70 | 50 | 33 | 8 | 100 | 72 | 46 | 5 | 0 |
| July 25, 2018 | 100 | 47 | 37 | 3 | 0 | 89 | 62 | 40 | 24 | 5 | 100 | 58 | 37 | 3 | 0 |
| July 25, 2019 | 100 | 37 | 30 | 2 | 0 | 86 | 53 | 32 | 17 | 3 | 100 | 46 | 29 | 2 | 0 |
| July 25, 2020 | 100 | 30 | 24 | 2 | 0 | 84 | 48 | 25 | 12 | 2 | 100 | 37 | 23 | 1 | 0 |
| July 25, 2021 | 100 | 24 | 19 | 1 | 0 | 80 | 43 | 20 | 8 | 1 | 100 | 29 | 18 | * | 0 |
| July 25, 2022 | 88 | 19 | 15 | 1 | 0 | 77 | 37 | 16 | 6 | * | 100 | 23 | 14 | * | 0 |
| July 25, 2023 | 77 | 15 | 12 | 1 | 0 | 73 | 32 | 12 | 4 | * | 100 | 18 | 11 | * | 0 |
| July 25, 2024 | 67 | 12 | 9 | * | 0 | 70 | 28 | 10 | 3 | * | 100 | 14 | 8 | * | 0 |
| July 25, 2025 | 58 | 9 | 7 | * | 0 | 66 | 24 | 8 | 2 | * | 89 | 11 | 6 | * | 0 |
| July 25, 2026 | 49 | 7 | 5 | * | 0 | 61 | 21 | 6 | 1 | * | 76 | 8 | 5 | * | 0 |
| July 25, 2027 | 42 | 5 | 4 | * | 0 | 57 | 18 | 4 | 1 | * | 63 | 6 | 4 | * | 0 |
| July 25, 2028 | 35 | 4 | 3 | * | 0 | 52 | 15 | 3 | * | * | 53 | 5 | 3 | * | 0 |
| July 25, 2029 | 29 | 3 | 2 | * | 0 | 46 | 12 | 2 | * | * | 45 | 4 | 2 | * | 0 |
| July 25, 2030 | 24 | 2 | 2 | * | 0 | 41 | 10 | 1 | * | * | 37 | 3 | 2 | * | 0 |
| July 25, 2031 | 19 | 2 | 1 | * | 0 | 35 | 8 | 1 | * | * | 30 | 2 | 1 | * | 0 |
| July 25, 2032 | 15 | 1 | 1 | * | 0 | 28 | 6 | * | * | * | 21 | 1 | 1 | * | 0 |
| July 25, 2033 | 11 | 1 | * | * | 0 | 22 | 5 | * | * | * | 17 | 1 | 1 | * | 0 |
| July 25, 2034 | 8 | * | * | * | 0 | 14 | 3 | * | * | * | 12 | 1 | 1 | * | 0 |
| July 25, 2035 | 5 | * | * | * | 0 | 7 | 1 | * | * | * | 7 | * | 1 | * | 0 |
| July 25, 2036 | 2 | * | * | 0 | 0 | * | * | * | * | * | 3 | * | * | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 28.51 | 19.82 | 11.00 | 6.22 | 4.43 | 21.16 | 14.04 | 10.96 | 9.37 | 7.15 | 29.01 | 22.13 | 12.83 | 6.89 | 4.72 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| Distribution Date | Class A-23 | | | | | Class A-30 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 99 | 98 | 93 | 89 | 86 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 98 | 87 | 76 | 66 | 56 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 74 | 97 | 75 | 56 | 39 | 23 |
| July 25, 2012 | 100 | 100 | 100 | 81 | 13 | 96 | 65 | 39 | 18 | 7 |
| July 25, 2013 | 100 | 100 | 100 | 43 | 0 | 95 | 55 | 25 | 8 | 2 |
| July 25, 2014 | 100 | 100 | 98 | 20 | 0 | 94 | 47 | 15 | 3 | 0 |
| July 25, 2015 | 100 | 100 | 75 | 9 | 0 | 93 | 39 | 8 | 1 | 0 |
| July 25, 2016 | 100 | 100 | 59 | 4 | 0 | 91 | 33 | 2 | 0 | 0 |
| July 25, 2017 | 100 | 100 | 48 | 3 | 0 | 90 | 28 | 0 | 0 | 0 |
| July 25, 2018 | 100 | 100 | 38 | 2 | 0 | 88 | 24 | 0 | 0 | 0 |
| July 25, 2019 | 100 | 100 | 30 | 2 | 0 | 86 | 19 | 0 | 0 | 0 |
| July 25, 2020 | 100 | 100 | 24 | 1 | 0 | 83 | 15 | 0 | 0 | 0 |
| July 25, 2021 | 100 | 100 | 19 | 1 | 0 | 80 | 12 | 0 | 0 | 0 |
| July 25, 2022 | 100 | 90 | 15 | 1 | 0 | 77 | 8 | 0 | 0 | 0 |
| July 25, 2023 | 100 | 78 | 12 | * | 0 | 73 | 6 | 0 | 0 | 0 |
| July 25, 2024 | 100 | 68 | 9 | * | 0 | 70 | 3 | 0 | 0 | 0 |
| July 25, 2025 | 100 | 59 | 7 | * | 0 | 66 | 1 | 0 | 0 | 0 |
| July 25, 2026 | 100 | 50 | 6 | * | 0 | 61 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 100 | 43 | 4 | * | 0 | 57 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 100 | 36 | 3 | * | 0 | 52 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 100 | 30 | 2 | * | 0 | 47 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 100 | 24 | 2 | * | 0 | 42 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 100 | 20 | 1 | * | 0 | 36 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 100 | 15 | 1 | * | 0 | 30 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 100 | 11 | * | * | 0 | 23 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 100 | 8 | * | * | 0 | 16 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 69 | 5 | * | * | 0 | 9 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 32 | 2 | * | * | 0 | 1 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 28.54 | 19.92 | 11.07 | 6.25 | 4.45 | 19.02 | 6.66 | 3.66 | 2.68 | 2.20 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

## Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| | Class A-P | | | | | Class M-1, Class M-2 and Class M-3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Distribution Date | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 99 | 97 | 94 | 92 | 90 | 99 | 99 | 99 | 99 | 99 |
| July 25, 2009 | 98 | 90 | 82 | 75 | 67 | 99 | 99 | 99 | 99 | 99 |
| July 25, 2010 | 98 | 82 | 67 | 54 | 43 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2011 | 97 | 74 | 55 | 39 | 27 | 97 | 97 | 97 | 97 | 97 |
| July 25, 2012 | 96 | 66 | 44 | 28 | 17 | 96 | 96 | 96 | 96 | 96 |
| July 25, 2013 | 95 | 60 | 36 | 21 | 11 | 95 | 92 | 90 | 87 | 83 |
| July 25, 2014 | 94 | 54 | 29 | 15 | 7 | 94 | 88 | 82 | 76 | 69 |
| July 25, 2015 | 92 | 48 | 24 | 11 | 4 | 93 | 82 | 72 | 62 | 52 |
| July 25, 2016 | 91 | 43 | 19 | 8 | 3 | 92 | 75 | 61 | 48 | 36 |
| July 25, 2017 | 90 | 39 | 15 | 6 | 2 | 90 | 68 | 49 | 34 | 23 |
| July 25, 2018 | 87 | 34 | 12 | 4 | 1 | 88 | 60 | 39 | 24 | 14 |
| July 25, 2019 | 85 | 30 | 10 | 3 | 1 | 86 | 53 | 31 | 17 | 9 |
| July 25, 2020 | 82 | 27 | 8 | 2 | * | 83 | 47 | 25 | 12 | 6 |
| July 25, 2021 | 79 | 24 | 6 | 1 | * | 80 | 41 | 20 | 9 | 3 |
| July 25, 2022 | 76 | 21 | 5 | 1 | * | 77 | 36 | 16 | 6 | 2 |
| July 25, 2023 | 73 | 18 | 4 | 1 | * | 74 | 31 | 12 | 4 | 1 |
| July 25, 2024 | 70 | 16 | 3 | * | * | 71 | 27 | 10 | 3 | 1 |
| July 25, 2025 | 66 | 13 | 2 | * | * | 67 | 23 | 7 | 2 | 1 |
| July 25, 2026 | 62 | 11 | 2 | * | * | 63 | 20 | 6 | 1 | * |
| July 25, 2027 | 58 | 10 | 1 | * | * | 59 | 17 | 4 | 1 | * |
| July 25, 2028 | 53 | 8 | 1 | * | * | 54 | 14 | 3 | 1 | * |
| July 25, 2029 | 49 | 7 | 1 | * | * | 50 | 12 | 2 | * | * |
| July 25, 2030 | 44 | 6 | 1 | * | * | 45 | 10 | 2 | * | * |
| July 25, 2031 | 38 | 4 | * | * | * | 39 | 8 | 1 | * | * |
| July 25, 2032 | 33 | 3 | * | * | * | 33 | 6 | 1 | * | * |
| July 25, 2033 | 27 | 3 | * | * | * | 27 | 5 | 1 | * | * |
| July 25, 2034 | 21 | 2 | * | * | * | 21 | 3 | * | * | * |
| July 25, 2035 | 14 | 1 | * | * | * | 14 | 2 | 1 | * | * |
| July 25, 2036 | 7 | * | * | * | * | 7 | 1 | * | * | * |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 20.27 | 9.43 | 5.76 | 4.14 | 3.27 | 20.43 | 13.63 | 10.74 | 9.27 | 8.40 |

* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

## EXHIBIT F

UNDERWRITER INFORMATION

(See attached)

Exhibit F-1

*Prospectus Supplement dated July 27, 2007 (to prospectus dated April 6, 2007)*

# $415,755,302

## RFMSI Series 2007-S7 Trust
### Issuing Entity

## Residential Funding Mortgage Securities I, Inc.
### Depositor

## Residential Funding Company, LLC
### Master Servicer and Sponsor

### Mortgage Pass-Through Certificates, Series 2007-S7

The trust will hold a pool of one- to four-family residential first lien mortgage loans.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 39 classes of senior certificates designated Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-31, Class A-32, Class A-33, Class A-34, Class A-35, Class A-36, Class A-V, Class A-P and Class R Certificates; and
- 3 classes of subordinated certificates designated Class M-1, Class M-2 and Class M-3 Certificates,

all as more fully described in the table on pages S-5 and S-6 of this prospectus supplement.

**Certain classes of offered certificates are exchangeable for other classes of offered certificates as more fully described in this prospectus supplement.**

Credit enhancement for all of these certificates will be provided by additional classes of subordinated certificates which are not offered hereby.

Distributions on the certificates will be on the 25th of each month or, if the 25th is not a business day, on the next business day, beginning August 27, 2007.

> You should consider carefully the risk factors beginning on page S-17 in this prospectus supplement.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

The certificates represent interests only in the trust, as the issuing entity, and do not represent interests in or obligations of Residential Funding Mortgage Securities I, Inc., as the depositor, Residential Funding Company, LLC, as the sponsor, or any of their affiliates.

Morgan Stanley & Co. Incorporated, as an underwriter, will purchase all but two classes of the offered senior certificates from the depositor in the amounts described in "Method of Distribution" on page S-117 of this prospectus supplement. The net proceeds to the depositor from the sale of these senior underwritten certificates will be approximately 97.92% of the aggregate certificate principal balance of these senior underwritten certificates plus accrued interest, before deducting expenses.

Residential Funding Securities, LLC, as an underwriter, will purchase the Class A-V Certificates from the depositor in the amounts described in "Method of Distribution" on page S-117 of this prospectus supplement. The net proceeds to the depositor from the sale of the Class A-V Certificates will be approximately 0.57% of the initial notional balance of the Class A-V Certificates plus accrued interest, before deducting expenses.

The offered certificates (other than the Class A-P Certificates and the Class M Certificates) are offered by the issuing entity through the underwriters to prospective purchasers from time to time in negotiated transactions at varying prices to be determined at the time of sale. There is no underwriting agreement for the remaining class of senior certificates and the Class M Certificates.

## Morgan Stanley                    GMAC RFC Securities

Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Residual Certificates.

For further information regarding the federal income tax consequences of investing in the Residual Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Residual Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates" in the accompanying prospectus.

### State and Other Tax Consequences

In addition to the federal income tax consequences described in "Material Federal Income Tax Consequences," potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the certificates offered by this prospectus. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors should consult their tax advisors about the various tax consequences of investments in the certificates offered by this prospectus.

### Use of Proceeds

The net proceeds from the sale of the offered certificates to the underwriter will be paid to the depositor. The depositor will use the proceeds to purchase the mortgage loans or for general corporate purposes.

### Method of Distribution

In accordance with the terms and conditions of a senior underwriting agreement, dated July 27, 2007, Morgan Stanley & Co. Incorporated will serve as the underwriter of, and has agreed to purchase and the depositor has agreed to sell, the senior certificates, other than the Class P Certificates, the Class A-V Certificates and the Class A-P Certificates, except that a de minimis portion of the Residual Certificates will be retained by Residential Funding and that portion is not offered hereby. The certificates being sold to Morgan Stanley & Co. Incorporated are referred to as the senior underwritten certificates. It is expected that delivery of the senior underwritten certificates, other than the Residual Certificates. will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Residual Certificates, other than the de minimis portion retained by Residential Funding, will be made at the offices of Morgan Stanley & Co. Incorporated, New York, New York on or about July 30, 2007 against payment therefor in immediately available funds.

In accordance with the terms and conditions of a Class A-V underwriting agreement, dated July 27, 2007, Residential Funding Securities, LLC will serve as the underwriter of the Class A-V Certificates and has agreed to purchase and the depositor has agreed to sell the Class A-V Certificates. The certificates being sold to Residential Funding Securities, LLC are referred to as the Class A-V Certificates. It is expected that delivery of the Class A-V Certificates will be made only in book-entry form through the Same Day Funds Settlement System of DTC on or about July 30, 2007 against payment therefor in immediately available funds.

The senior underwriting agreement and the Class A-V underwriting agreement are collectively referred to in this prospectus supplement as the underwriting agreements and the senior underwritten certificates and the Class A-V Certificates are collectively referred to in this prospectus supplement as the

underwritten certificates. Morgan Stanley & Co. Incorporated and Residential Funding Securities, LLC are collectively referred to in this prospectus supplement as the underwriters.

In connection with the senior underwritten certificates and the Class A-V Certificates, respectively, the related underwriter has agreed, in accordance with the terms and conditions of its respective underwriting agreement, to purchase all of its respective underwritten certificates if any of those underwritten certificates are purchased thereby.

The underwriting agreements provide that the obligations of the underwriters to pay for and accept delivery of their respective underwritten certificates are subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the respective underwriters may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the senior underwritten certificates, before deducting expenses payable by the depositor, will be approximately 97.92% of the aggregate Certificate Principal Balance of the senior underwritten certificates plus accrued interest thereon from the cut-off date. Proceeds to the depositor from the sale of the Class A-V Certificates, before deducting expenses payable by the depositor, will be approximately 0.57% of the initial Notional Amount of the Class A-V Certificates plus accrued interest thereon from the cut-off date.

The underwriters may effect these transactions by selling their respective underwritten certificates to or through dealers, and those dealers may receive compensation in the form of underwriting discounts, concessions or commissions from the respective underwriter for whom they act as agent. In connection with the sale of the underwritten certificates, the underwriters may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriters and any dealers that participate with the underwriters in the distribution of the related underwritten certificates are also underwriters under the Securities Act. Any profit on the resale of the underwritten certificates positioned by an underwriter would be underwriter compensation in the form of underwriting discounts and commissions under the Securities Act.

Each underwriting agreement provides that the depositor will indemnify the related underwriter, and that under limited circumstances the related underwriter will indemnify the depositor, against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

The Class A-P Certificates and the Class M Certificates may be offered by the depositor from time to time directly or through an underwriter or agent in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. However, there is currently no underwriting arrangement in effect for these certificates. Proceeds to the depositor from any sale of the Class A-P Certificates and the Class M Certificates will equal the purchase price paid by their purchaser, net of any expenses payable by the depositor and any compensation payable to any underwriter or agent.

There is currently no secondary market for the offered certificates. Each underwriter intends to make a secondary market in the underwritten certificates to be purchased by it but is not obligated to do so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the accompanying prospectus under "Description of the

## EXHIBIT G

### UNDERWRITER'S CERTIFICATE

[See Tab 47 of the closing set]

# EXHIBIT E

 CT Corporation

**Service of Process
Transmittal**
11/11/2011
CT Log Number 519473936

TO:  Alita Wingfield, Managing Attorney
     Morgan Stanley Law Division
     1221 Avenue of the Americas, 35th Floor
     New York, NY 10020

RE:  **Process Served in Texas**

FOR: Morgan Stanley & Co. LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Federal Deposit Insurance Corporation, as Receiver for Franklin Bank, S.S.B., Pltf. vs. Morgan Stanley & Company LLC, etc., Dft. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Citation, Original Petition, Exhibit(s) |
| **COURT/AGENCY:** | 151st Judicial District Court Harris County, TX Case # 201116/305 |
| **NATURE OF ACTION:** | Untrue or misleading statements in the sale of securities |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/11/2011 at 11:00 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | By 10:00 a.m. on the Monday next following the expiration of 20 days |
| **ATTORNEY(S) / SENDER(S):** | Marcos G. Ronquillo 1201 Elm St, Ste 1700 Dallas, TX 75270 214-939-8613 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/11/2011, Expected Purge Date: 12/11/2011 Image SOP Email Notification, Barbara Valente Barbara.Valente@morganstanley.com Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com Email Notification, Crystal Pruden crystal.pruden@morganstanley.com Email Notification, Alita Wingfield Alita.Wingfield@morganstanley.com Email Notification, Lenise Davis lenise.davis@morganstanley.com Email Notification, Osmond Fortin Osmond.Fortin@morganstanley.com Email Notification, Marielle Messa Marielle.Messa@morganstanley.com |
| **SIGNED:** | C T Corporation System |
| **PER:** | Beatrice Casarez |
| **ADDRESS:** | 350 North St Paul Street Suite 2900 Dallas, TX 75201 |
| **TELEPHONE:** | 214-932-3601 |

Page 1 of 1 / SG

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

RECEIPT NUMBER __427225_____    0.00
TRACKING NUMBER __72722003____    MTA

CAUSE NUMBER __201167305__

| PLAINTIFF: | FEDERAL DEPOSIT INSURANCE CORPORATION (AS RECEIVER | In The    151st |
| vs. | | Judicial District Court of |
| DEFENDANT: | MORGAN STANLEY & COMPANY LLC | Harris County, Texas |

CITATION CORPORATE

THE STATE OF TEXAS
County of Harris

*delivered: 11-11-11*
*by SCH2010*

TO: MORGAN STANLEY & COMPANY LLC (LIMITED LIABILITY COMPANY) BY SERVING
THROUGH ITS REGISTERED AGENT C T CORPORATION

350 NORTH SAINT PAUL STREET SUITE 2900 DALLAS TX 75201

Attached is a copy of __PLAINTIFF'S ORIGINAL PETITION FOR DAMAGES_____.

This instrument was filed on the ____4th__ day of ____November_____, 20__11__, in the
above cited cause number and court. The instrument attached describes the claim against you.

   **YOU HAVE BEEN SUED**; you may employ an attorney. If you or your attorney do not file a written answer with the
District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were
served this citation and petition, a default judgment may be taken against you.

**TO OFFICER SERVING:**

   This Citation was issued under my hand and seal of said Court, at Houston, Texas, this __7th__ day of
_____November_____, 20__11__.

*Chris Daniel*

**CHRIS DANIEL, District Clerk**
Harris County, Texas
201 Caroline, Houston, Texas 77002
P.O. Box 4651, Houston, Texas 77210

Issued at request of:
RONQUILLO, MARCOS G.
1201 ELM ST STE 1700
DALLAS, TX 75270
Tel: (214) 939-8613
Bar Number:   17226000

Generated by: CUERO, NELSON    7MM/YSW/9150902

**OFFICER/AUTHORIZED PERSON RETURN**

I received this citation on the _____ day of _____, 20____, at _____ o'clock ____.M., endorsed

the date of delivery thereon, and executed it at _____, _____,
                                                          (street address)                              (city)

in _____ County, Texas on the _____ day of _____, 20____, at _____ o'clock ____. M.,

by delivering to _____, by delivering to its
                        (the defendant corporation named in citation)

_____, in person, whose name is _____,
(registered agent, president, or vice-president)

a true copy of this citation, with a copy of the _____ Petition attached,
                                                 (description of petition, e.g., "Plaintiffs Original")

and with accompanying copies of _____.
                                  (additional documents, if any, delivered with the petition)

I certify that the facts stated in this return are true by my signature below on the _____ day of _____, 20____.

FEE: $ _____        By: _____
                            (signature of officer)
                       Printed Name: _____

                       As Deputy for: _____
_____                    (printed name & title of sheriff or constable)
Affiant Other Than Officer

On this day, _____, known to me to be the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was
executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, 20 _____

                                                 _____
                                                         Notary Public

N.INF.CITC.P

Filed 11 November 4 P4:40
Chris Daniel - District Clerk
Harris County
ED101J016578909
By: Sharon Carlton

CAUSE NO. _____

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE | § | IN THE DISTRICT COURT OF |
| CORPORATION AS RECEIVER FOR | § | |
| FRANKLIN BANK, S.S.B., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| MORGAN STANLEY & COMPANY LLC | § | |
| f/k/a MORGAN STANLEY & CO. INC., | § | |
| | § | |
| | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

### PLAINTIFF'S ORIGINAL PETITION FOR DAMAGES

## TO THE HONORABLE JUDGES OF SAID COURT:

Comes now Plaintiff, Federal Deposit Insurance Corporation as Receiver for Franklin

Bank, S.S.B., and files this Petition against Morgan Stanley & Company LLC (referred to as

**Morgan Stanley**); and as grounds therefor shows as follows:

### I. DISCOVERY CONTROL PLAN

1.    Plaintiff intends that discovery be conducted under Level 3 of Rule 190.4 of the

Texas Rules of Civil Procedure.

### II. NATURE OF THIS ACTION

2.    This is an action for damages caused by the violation of the Texas Securities Act

(**TSA**) and the federal Securities Act of 1933 (**1933 Act**) by Morgan Stanley. As alleged in detail

below, Morgan Stanley underwrote and sold to Franklin Bank, S.S.B. (referred to in this Petition

as **Franklin**) three securities known as "certificates," which were backed by residential mortgage

loans. Franklin paid $67,444,274 million for all of the certificates. When it underwrote and sold

these certificates to Franklin, Morgan Stanley made numerous statements of material facts about

the certificates and, in particular, about the credit quality of the mortgage loans that backed them.

Many of those statements were untrue. Moreover, Morgan Stanley omitted to state many

material facts that were necessary in order to make its statements not misleading. For example,

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 1 of 55

2011-67305 / Court: 151

Morgan Stanley made untrue statements, or omitted important information, about such material facts as the loan-to-value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

3.     Morgan Stanley made such untrue or misleading statements about at least the following numbers of the loans in each of the three securitizations.[1]

| Securitization No. | Number of Loans about which Morgan Stanley Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Morgan Stanley Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 428 | 752 | 57% |
| 2 | 47 | 188 | 25% |
| 3 | 170 | 460 | 37% |

Plaintiff is informed and believes, and based thereon alleges, that even more mortgage loans than those counted in the table above were the subject of untrue or misleading statements by Morgan Stanley.

4.     The certificates are "securities" within the meaning of the TSA and the 1933 Act. Morgan Stanley is liable under the following provisions of the TSA and the 1933 Act:

*As an underwriter:* Morgan Stanley underwrote all of the certificates that Franklin purchased. Morgan Stanley is liable as an "underwriter" under Section 11 of the 1933 Act.

*As a seller:* Morgan Stanley sold Franklin two of the certificates. Morgan Stanley is liable as a "seller" of the securities under Article 581-33 of the TSA and under Section 12(a)(2) of the 1933 Act.

---

[1] For securitizations that had multiple loan groups, the information in the table is only about loans in the group that primarily paid the certificate that Franklin purchased.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 2 of 55

### III. PARTIES

5.    Plaintiff is the receiver for Franklin. Under the Federal Deposit Insurance Act, the Federal Deposit Insurance Corporation, a corporation organized and existing under the laws of the United States of America, is authorized to be appointed as receiver for failed insured depository institutions. Under the Federal Deposit Insurance Act, Plaintiff is empowered to sue and complain in any court of law and to do so to pursue claims held by banks of which it is the receiver. 12 U.S.C. § 1819. Thus, Plaintiff has authority to pursue claims held by Franklin, including its claims made against the Defendant in this action.

6.    Defendant Morgan Stanley & Company, LLC (referred to as **Morgan Stanley**) is a limited liability company organized under the laws of Delaware and is authorized to do business in Texas. Morgan Stanley sold Franklin two of the certificates and underwrote all three of the certificates. At the time that it underwrote and sold the certificates, Morgan Stanley was known as Morgan Stanley & Co. Inc. Morgan Stanley may be served through its registered agent CT Corporation, 350 North Saint Paul Street, Suite 2900, Dallas, Texas 75201.

### IV. JURISDICTION AND VENUE

7.    The Court has jurisdiction because the amount in controversy in this action falls within the minimum jurisdictional limits of the Court.

8.    Morgan Stanley is subject to personal jurisdiction in Texas because it is registered to do business, and does business, in Texas. Morgan Stanley is also subject to personal jurisdiction in Texas because it offered and sold certificates to Franklin "in Texas" within the meaning of Article 581-33 of the TSA.

9.    Venue is proper in this County pursuant to Section 15.002(a)(1) of the Texas Civil Practice & Remedies Code because, among other reasons, all or a substantial part of the events or omissions that give rise to the claims occurred in Harris County, in that Morgan Stanley offered and sold the certificates to Franklin in this County and because the violations of law alleged in this Petition, including the making of material untrue or misleading statements,

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 3 of 55

occurred in this County. Venue is also proper under Section 15.002(a)(4) because Harris County
was the principal residence of Franklin at the time the claims accrued.

## V. SECURITIZATION OF MORTGAGE LOANS

10.    The securities that Franklin purchased are so-called **residential mortgage-backed
securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with
loans on which the borrowers are to make payments, usually monthly. The entity that makes the
loans is known as the **originator** of the loans. The process by which the originator decides
whether to make particular loans is known as the **underwriting** of loans. The purpose of
underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to
repay them and only against sufficient collateral. In the loan underwriting process, the originator
applies its **underwriting standards**.

11.    In general, residential mortgage lenders may hold some of the mortgage loans they
originate in their own portfolio and may sell other mortgage loans they originate into
securitizations.

12.    In a securitization, a large number of loans, usually of a similar type, are grouped
into a **collateral pool**. The originator of those loans sells them (and, with them, the right to
receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The
trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to
investors such as Franklin. Each certificate entitles its holder to an agreed part of the cash flow
from the loans in the collateral pool.

13.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part
of the overall monthly cash flow from the loans in the collateral pool.

14.    In a more complex securitization, the cash flow is divided into different parts,
usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into
different **classes**, each with different rights. Each class of certificates is entitled to the cash flow
in the tranche corresponding to that class.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 4 of 55

15.    One way in which the cash flow is divided — and the rights of different classes of
certificates distinguished — is by priority of payment or, put differently, risk of nonpayment.
The most **senior** class of certificates usually is entitled to be paid in full before the next most
senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral
pool are allocated first to the most **subordinate** class of certificates, then to the class above that,
and so on. The interest rate on each class of certificates is usually proportional to the amount of
risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest
rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred
to as the **waterfall**.

16.    The risk of a particular class of certificate is a function of both the riskiness of the
loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying
loans are quite risky, the senior classes of certificates may bear so little of that risk that they may
be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the
highest quality, with minimal credit risk.") For example, assume a securitization of $100 million
of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of
certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the
underlying loans are quite risky, the senior class of certificates would be paid in full as long as
the $100 million of loans produced payments of at least $50 million plus interest, that is, unless
the loss rate on those loans exceeded 50%, fully 10 times the historical average.

17.    All of the certificates referred to in this Petition were senior certificates that were
rated triple-A when Franklin purchased them.

18.    Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes
the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral
pool usually contains loans made by the originator that is sponsoring the securitization. Other
times, the sponsor may be an investment bank, which purchases loans from one or more

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 · Page 5 of 55

originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

*

19.    **Securities underwriters**, like Morgan Stanley, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

20.    Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

21.    Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans, which has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 6 of 55

Commission. (Franklin did not have access to the loan tape before it purchased the certificates, but Plaintiff has reviewed data from the loan tape in preparing this petition.)

22.    As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## VI. THE SALES OF THE CERTIFICATES

23.    Franklin purchased certificates in three securitizations (referred to in this Petition as Securitizations Nos. 1 through 3). Details of each trust and each certificate are stated in Item 23 of Schedules 1 through 3 of this Petition. The Schedules correspond to Securitizations Nos. 1 through 3. Plaintiff incorporates into this paragraph 23, and alleges as though fully set forth in this paragraph, the contents of Item 23 of the Schedules.

24.    Morgan Stanley sold two of the three certificates directly to Franklin. For each of those two certificates, Morgan Stanley sent numerous documents to Franklin at its office in Houston, Texas. These documents included a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In each of these documents, Morgan Stanley made statements of material fact about the certificate that it offered and sold to Franklin.

## VII. MORGAN STANLEY'S MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

25.    The prospectus supplement for each of the three securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 23 of each Schedule. Each Prospectus Supplement is incorporated into this Petition by reference.

26.    Many of the statements of material fact that Morgan Stanley made in the three prospectus supplements or in other documents that Morgan Stanley sent to Franklin were untrue or misleading. These untrue or misleading statements included the following.

**PLAINTIFF'S ORIGINAL PETITION**

A.    **Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of
the Mortgage Loans, and the Appraisals of the Properties, in the Collateral
Pools**

1.    **LTVs**

(a)    **The materiality of LTVs**

27.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the
mortgage loan to the lower of the appraised value or the sale price of the mortgaged property
when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000
has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of
the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in
the collateral pool of a securitization are therefore one of the most crucial measures of the risk of
certificates sold in that securitization. LTV is a primary determinant of the likelihood of default.
The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less
likely it is that a decline in the value of the property will wipe out the owner's equity, and
thereby give the owner an incentive to stop making mortgage payments and abandon the
property, a so-called strategic default. LTV is also a primary determinant of the severity of losses
for those loans that do default. The lower the LTV, the lower the severity of losses on those loans
that do default. Loans with lower LTVs provide greater "cushion," thereby increasing the
likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

28.    Beyond these fundamental effects on the likelihood and severity of default, LTVs
also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage
loans before maturity and when they do so) and therefore the expected lives of the loans and the
associated certificates. Prepayment patterns affect many aspects of certificates that are material
to the investors that purchase them, including the life of the certificate and the timing and
amount of cash that the investor will receive during that life.

29.    In addition, rating agencies use LTVs to determine the proper structuring and credit
enhancement necessary for securities, such as the certificates that Franklin purchased, to receive

Certified Document Number: 50466375 - Page 8 of 55

a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

30.    An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

31.    For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

        **(b)**     **Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

32.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 32 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 32, and alleges as though fully set forth in this paragraph, the contents of Item 32 of the Schedules.

33.    Morgan Stanley made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that Morgan Stanley intended that these statements be understood as statements of fact. Franklin did understand the statements about the LTVs as statements of fact. Franklin had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that Morgan Stanley made about those LTVs.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 9 of 55

        (c)      **These statements were untrue because an automated valuation model demonstrates that Morgan Stanley's statements about LTVs were based on overstated valuations of the properties in the collateral pools.**

34.    The stated LTVs of many of the mortgage loans in each securitization were significantly lower than the true LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were also, therefore, untrue and misleading.

35.    Using a comprehensive, industry-standard automated valuation model (AVM), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

36.    On many of the properties that secured the mortgage loans, the model reported that LTVs were understated. In particular, the model reported that the denominator (that is, the appraised value of the property as stated in the loan tape and compiled into the tables in the prospectus supplement) that was used to determine the disclosed LTV was 105% or more of the true market value as determined by the model as of the time the loan was originated. The model reported that the denominator that was used to determine the disclosed LTV was 95% or less of the true market value on a much smaller number of properties. Thus, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 10 of 55

37.    To take an example, in Securitization No. 1, there were 752 mortgage loans in the collateral pool. There was sufficient information for the model to determine the value of the properties that secured 416 of those loans. On 291 of those 416 properties, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $44,108,993. The model reported that the denominators that was used to determine the disclosed LTV was 95% or less of true market value on only 39 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominator was $4,187,799. Thus, the number of properties on which the value was overstated exceeded by more than seven times the number on which the value was understated, and the aggregate amount overstated was more than 10 times the aggregate amount understated.

38.    On one of the loans in Securitization No. 1, the amount of the loan was $489,177 and the stated value of the property was $643,654 resulting in a stated LTV of 76%. The model, however, determined that the true value of the property was $471,000, resulting in a true LTV of 103.9%. Thus, the stated value was higher than the true value by 36.7%, and the stated LTV was lower than the true LTV by 27.9%. Both of these were huge discrepancies that were material to the credit quality of the loan.

39.    The overstated values of 291 properties made virtually every statement by Morgan Stanley about the LTVs of the mortgage loans untrue or misleading. For example, Morgan Stanley stated that all mortgage loans had an LTV of 95% or less. In fact, the mortgage loans on 122 of the 416 properties valued by the model had LTVs of over 95%. Morgan Stanley also stated that the weighted-average LTV of the loans was 73.86%. Using only the loans that the model was able to value, the weighted-average LTV of those loans as stated in the loan tape was 74.5%. In fact, among the loans that the AVM was able to value, the weighted average LTV was 91.6%. These differences were material for the reasons stated above.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 11 of 55

40.    The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---|
| Number of loans | 752 |
| Number of properties on which there was enough information for the model to determine a true market value | 416 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 291 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $44,108,993 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 39 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,187,799 |
| Number of loans with LTVs over 95%, as stated by Morgan Stanley | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 122 |
| Weighted-average LTV, as stated by Morgan Stanley | 73.86% |
| Weighted-average LTV, for loans the model was able to value | 74.5% |
| Weighted-average LTV, as determined by the model | 91.6% |

41.    The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 41 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 41, and alleges as though fully set forth in this paragraph, the contents of Item 41 of the Schedules.

        (d)    **These statements were misleading because Morgan Stanley omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

42.    As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults,

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 12 of 55

prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

43.   The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

44.   According to land records, many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[2] In two of the securitizations, Morgan Stanley failed to disclose any of these additional liens in the prospectus supplements and in other documents that Morgan Stanley sent to Franklin. These additional liens reduced the equity of the owners of the properties subject to them, and thereby increased the risk that those owners would default in payment of the mortgage loan in the pool.

45.   To take an example, of the 752 properties that secured the mortgage loans in Securitization No. 1, at least 66 were subject to undisclosed liens in addition to the lien of the

---

[2] Additional liens referred to in this Petition and the Schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 13 of 55

mortgage in the pool. The undisclosed additional liens on these properties reduced the owners' equity in those properties by a weighted average of 52.7% and by an aggregate amount of $6,377,605.

46.    On one of the loans, the original balance of the mortgage loan was $558,250, the represented value of the property was $697,813, the owner's ostensible equity was $139,563, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $104,700. Thus, the owner's true equity was only $34,863 — 75% less than the equity implied by the disclosed loan amount and value of the property. In many cases, the amounts of the undisclosed additional liens were precisely equal to the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

47.    Similar numbers of additional undisclosed liens were found in each securitization in which Morgan Stanley did not disclose the existence of additional liens. Details of the undisclosed additional liens in each securitization are stated in Item 47 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

48.    Because Morgan Stanley did not disclose the existence or the amounts of these additional liens, all statements that it made about the LTVs of the mortgage loans were misleading.

### 2.    Appraisals

49.    As discussed above in paragraph 30, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 14 of 55

50.   In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that Morgan Stanley made about the LTVs of the mortgage loans in the collateral pools were misleading because it omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, Morgan Stanley stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

> **(a)   These statements that Morgan Stanley made about the LTVs of the mortgage loans in the collateral pools were misleading because it omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

51.   Morgan Stanley omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 35 through 41, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 7.5 | 10.5 |

Certified Document Number: 50466375 - Page 15 of 55

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
| --- | --- | --- |
| 2 | 1.8 | 1.3 |
| 3 | 4.7 | 5.1 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

52.    Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation.

> **(b)    The statements by Morgan Stanley about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

53.    Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

54.    USPAP includes the following provisions:

(a)    USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)    USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)    USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 16 of 55

     (i)     develop an opinion of site value by an appropriate appraisal method or technique;

     (ii)    analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

     (iii)   analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

55.    The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

56.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 56 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 56, and alleges as though fully set forth in this paragraph, the contents of Item 56 of the Schedules.

57.    Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

58.    Each of these statements referred to in paragraph 56 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

**PLAINTIFF'S ORIGINAL PETITION**

59.   By each of the untrue and misleading statements referred to in paragraphs 32 and 56
above, Morgan Stanley materially understated the risk of the certificates that it underwrote and
sold to Franklin.

**B.**   **Untrue or Misleading Statements About the Occupancy Status of the
Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.**   **The materiality of occupancy status**

60.   Residential real estate is usually divided into primary residences, second homes,
and investment properties. Mortgages on primary residences are less likely to default than
mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also
influences prepayment patterns.

61.   Occupancy status (that is, whether the property that secures a mortgage is to be the
primary residence of the borrower, a second home, or an investment property) is an important
measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a
securitization that are not secured by mortgages on primary residences is an important measure
of the risk of certificates sold in that securitization. Other things being equal, the higher the
percentage of loans not secured by primary residences, the greater the risk of the certificates. A
reasonable investor considers occupancy status important to the decision whether to purchase a
certificate in a securitization of mortgage loans.

**2.**   **Untrue or misleading statements about the occupancy status of the
properties that secured the mortgage loans in the collateral pools of
these securitizations**

62.   In the prospectus supplements and in other documents that Morgan Stanley sent to
Franklin, Morgan Stanley made statements about the number of properties in the collateral pool
of each securitization that were the primary residences of their owners. To return to the example
of Securitization No. 1, Morgan Stanley stated that, of the 752 mortgage loans in the collateral
pool, 718 were secured by primary residences and 34 were not. Details of each such statement in
each securitization are stated in Item 62 of the Schedules of this Petition. Plaintiff incorporates

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 18 of 55

into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules.

63.    These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

### 3.    Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

64.    Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans did so.

65.    A significant number of the properties in the collateral pool of each securitization that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pool.

66.    With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

67.    In some states and counties, owners of a property are able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate

Certified Document Number: 50466375 - Page 19 of 55

only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

68.    When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

69.    In Securitization No. 1, 51 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on that property to them at a different address; 108 owners of properties that were stated to be primary residences could have, but did not, designate that property as their homestead; and 40 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgage was originated. Eliminating duplicates, 173 properties that were stated to be primary residences actually were not, for one or more of these reasons. Thus, of the 718 properties that were stated to be primary residences, 173 actually were not, and the number of properties that were not primary residences was not 34, as Morgan Stanley stated, but at least 207, a material

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 20 of 55

difference. The numbers of such loans in the collateral pool of each securitization are stated in
Item 69 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 69, and
alleges as though fully set forth in this paragraph, the contents of Item 69 of the Schedules.

\*

70.    By each of the untrue and misleading statements referred to in paragraph 62,
Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to
Franklin.

C.    **Untrue or Misleading Statements About the Underwriting Standards of the
Originators of the Mortgage Loans in the Collateral Pools**

1.    **The materiality of underwriting standards and the extent of an
originator's disregard of them**

71.    Originators of mortgage loans have written standards by which they underwrite
applications for loans. An important purpose of underwriting is to ensure that the originator
makes mortgage loans only in compliance with those standards and that its underwriting
decisions are properly documented. An even more fundamental purpose of underwriting
mortgage loans is to ensure that loans are made only to borrowers with credit standing and
financial resources to repay the loans and only against collateral with value, condition, and
marketability sufficient to secure the loans. An originator's underwriting standards, and the
extent to which the originator does not follow its standards, are important indicators of the risk of
mortgage loans made by that originator and of certificates sold in a securitization in which
mortgage loans made by that originator are part of the collateral pool. A reasonable investor
considers the underwriting standards of originators of mortgage loans in the collateral pool of a
securitization, and whether an originator disregards its standards, important to the decision
whether to purchase a certificate in that securitization.

2.    **Untrue or misleading statements about the underwriting standards of
originators of the mortgage loans**

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 21 of 55

72.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements about the underwriting standards of the originators of the mortgage loans in the collateral pool. Details of each such statement are stated in Item 72 of the Schedules of this Petition. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 72, and alleges as though fully set forth in this paragraph, the contents of Item 72 of the Schedules.

73.    Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because Morgan Stanley omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

> **3.    Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**
>
> > **(a)    The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

74.    Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations, the originators of mortgage loans in these securitizations disregarded their stated underwriting standards. As a result of this relaxation, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

75.    The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 22 of 55

standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

76.    Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking loans originated by affiliates of Morgan Stanley, which originated 9.2% of the mortgage loans in these securitizations, Figure 1 shows the rising incidence of early payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Morgan Stanley and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Morgan Stanley that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 23 of 55



Figure 1: Percent of Loans Originated by Morgan Stanley or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination

77.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



Figure 2: Percent of Loans Originated by Morgan Stanley or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 24 of 55

78.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of Exhibits A to D of this Petition:

| Exhibit | Originator |
| --- | --- |
| A | IndyMac |
| B | GMAC Mortgage |
| C | Morgan Stanley |
| D | MortgageIT |

### (b)    The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.

79.    As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans.  The number and percent of the loans in each pool that suffered EPDs are stated in Item 79 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 79, and alleges as though fully set forth in this paragraph, the contents of Item 79 of the Schedules.

80.    A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 80 of the Schedules of

this Petition. Plaintiff incorporates into this paragraph 80, and alleges as though fully set forth in this paragraph, the contents of Item 80 of the Schedules.

81.    A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent as of July 31, 2011. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on July 31, 2011, are stated in Item 81 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 81, and alleges as though fully set forth in this paragraph, the contents of Item 81 of the Schedules.

\*

82.    By each of the untrue and misleading statements referred to in paragraph 72 above, Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

D.    **The Large Number of Mortgage Loans in the Collateral Pools About Which Morgan Stanley Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Franklin's Certificates Untrue and Misleading.**

83.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements about the rating of each certificate by Moody's Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. Morgan Stanley stated that one or more of those agencies rated each such certificate triple-A or above. Details of each such statement are stated in Item 83 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 83, and alleges as though fully set forth in this paragraph, the contents of Item 83 of the Schedules.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 26 of 55

84.    The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Franklin, have investment policies that require a certain minimum rating for all investments. The policy of Franklin was to purchase only certificates that were rated at least double-A.

85.    These statements by Morgan Stanley about the ratings of the certificates it underwrote and sold to Franklin were misleading because Morgan Stanley omitted to state that the ratings did not take into account all the material untrue or misleading statements about specific mortgage loans in the collateral pool. These include:

(a)    loans in which the LTVs were materially understated;

(b)    loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens;

(c)    loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans; and

(d)    loans in which the properties were stated to be owner-occupied, but were not.

86.    In Securitization No. 1, there were 291 loans whose LTVs were materially understated, 66 loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens, and 173 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 428 loans (or 57% of the loans in the collateral pool) about which Morgan Stanley made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 86 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 86, and alleges as though fully set forth in this paragraph, the contents of Item 86 of the Schedules.

87.    Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

88.    By these untrue and misleading statements, Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin. Moreover, Plaintiff is informed

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 27 of 55

and believes, and based thereon alleges, that Morgan Stanley materially understated the risk of
the certificates that it underwrote and sold to Franklin.

## VIII. STATUTE OF LIMITATIONS

89.    None of the claims in this Petition was barred by the statute of limitations on
November 7, 2008, the date on which Plaintiff became receiver for Franklin, because, even in the
exercise of reasonable diligence, Franklin should not have discovered, and did not discover, the
untrue or misleading statements by Morgan Stanley more than one year before that date. Under
12 U.S.C. § 1821(d)(14), the statute of limitations on all of the claims in this Petition is extended
to three years from November 7, 2008. Plaintiff discovered the untrue or misleading statements
by Morgan Stanley in 2011 in the course of its investigation of possible claims of Franklin that
Plaintiff is authorized to bring as receiver for Franklin. The claims in this Petition are timely.

## IX. CAUSES OF ACTION

### A.    Untrue or Misleading Statements in the Sale of Securities Under Article 581-33 of the TSA

90.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1
through 89.

91.    Morgan Stanley sent communications and solicitations to Franklin in Houston,
Texas, for the purpose of inducing Franklin to purchase the two certificates in Securitizations 1
and 2, which it sold to Franklin. The sale of these two certificates occurred in Texas because
employees or agents of Morgan Stanley directed communications about the certificates and
solicitations to purchase the certificates to Franklin there, and because Franklin received those
communications and solicitations there.

92.    In doing the acts alleged in the sale to Franklin of two certificates in Securitizations
1 and 2, Morgan Stanley violated Article 581-33 of the TSA by offering or selling securities in
this State by means of written communications that included untrue statements of material fact or
omitted to state material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 28 of 55

93.    Plaintiff has disposed of all of the certificates.

94.    Under Article 581-33 of the TSA, Plaintiff is entitled to recover the consideration
paid for each of these certificates, plus interest at the legal rate from the date of purchase to the
date on which it recovers the purchase price, minus the amount of income received on the
certificate, minus the greater of the value of the security when the plaintiff disposed of it or the
consideration that the plaintiff received for the security.

### B.    Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act

95.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1
through 94.

96.    Franklin purchased the two certificates that Morgan Stanley sold Franklin when
they were initially offered to the public.

97.    Morgan Stanley solicited Franklin to purchase these certificates, and sold the
certificates to Franklin, by means of the prospectus supplements and other written offering
materials and oral communications.

98.    The prospectus supplements and other written offering materials and oral
communications that Morgan Stanley sent to Franklin contained untrue statements of material
fact and omitted to state material facts necessary in order to make the statements, in the light of
the circumstances under which they were made, not misleading.

99.    Franklin did not know when it purchased these certificates that the statements in the
prospectus supplements and other written offering materials and oral communications that
Morgan Stanley sent to Franklin were untrue or misleading.

100.    In doing the acts alleged in the sale to Franklin of certificates in Securitizations 1
and 2, Morgan Stanley violated Section 12(a)(2) of the 1933 Act in the sale to Franklin of the
certificates in Securitizations 1 and 2.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 29 of 55

101. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

102. When it failed on November 7, 2008, Franklin had not discovered that Morgan Stanley made untrue or misleading statements about the certificates. Plaintiff discovered that Morgan Stanley made untrue or misleading statements in the sale of the securities in 2011 in the course of its investigation.

103. Plaintiff has suffered a loss on each of these certificates.

104. Plaintiff is entitled to recover its damages.

### C.    Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act

105. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 104.

106. Morgan Stanley is an underwriter of all of the certificates. In doing the acts alleged, Morgan Stanley violated Section 11 of the 1933 Act in connection with the sale to Franklin of each of the certificates in Securitizations 1 through 3.

107. The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 23 of the Schedules.

108. The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 25 through 88.

109. Franklin purchased each certificate before the issuer made an earning statement covering a period of at least twelve months generally available.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 30 of 55

110. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

111. Franklin did not know when it purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

112. When it failed on November 7, 2008, Franklin had not discovered that Morgan Stanley made untrue or misleading statements about the certificates. Plaintiff discovered that Morgan Stanley made untrue or misleading statements in the sale of the securities in 2011 in the course of its investigation.

113. Franklin has suffered a loss on each of these certificates.

114. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### X. CONDITIONS PRECEDENT

115. Pursuant to Texas Rule of Civil Procedure 54, all conditions precedent to Plaintiff's right to recover on all causes of action pleaded herein have been performed or have occurred.

### XI. REQUEST FOR A JURY TRIAL

116. Plaintiff requests a jury trial on all allegations and causes of action set forth herein as allowed by Texas law.

### XII. ATTORNEYS' FEES, COSTS, AND INTEREST

117. Plaintiff is entitled to recover reasonable and necessary attorneys' fees in accordance with Article 581-33 of the Texas Securities Act.

118. Plaintiff further prays that the court award it all costs of court and expenses. Plaintiff further prays that the court award Plaintiff all pre- and post-judgment interest under the applicable legal rates.

Certified Document Number: 50466375 - Page 31 of 55

## XIII.  PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff be awarded a judgment over and against defendant as set forth herein and for damages in an amount to be determined at trial, but not less than $9 million, plus attorney's fees, costs of court, pre and post judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff may show itself to be justly entitled.

Respectfully Submitted,

**GODWIN RONQUILLO PC**

By: _____
Marcos G. Ronquillo
Texas State Bar No. 17226000
Jose L. Gonzalez
Texas State Bar No. 08129100
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Ph: 214-939-8613
Fax: 214-527-3133

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
Leanne M. Wilson (*pro hac vice* to be submitted)
Grais & Ellsworth LLP
40 East 52nd Street
New York, New York 10022
Ph: 212-755-0100

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 32 of 55

## EXHIBIT A TO THE PETITION



**Figure 1: Percent of Loans Originated by IndyMac or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination**



**Figure 2: Percent of Loans Originated by IndyMac or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV**

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 33 of 55

## EXHIBIT B TO THE PETITION



Figure 1: Percent of Loans Originated by GMAC Mortgage Corporation or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by GMAC Mortgage Corporation or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 34 of 55

## EXHIBIT C TO THE PETITION



Figure 1: Percent of Loans Originated by Morgan Stanley or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Morgan Stanley or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 35 of 55

### EXHIBIT D TO THE PETITION



### SCHEDULE 1 OF THE PETITION

To the extent that this Schedule is incorporated by reference into allegations in the petition, those allegations are made against defendant Morgan Stanley.

**Item 23.     Details of trust and certificate(s).**

    **(a)     Dealer that sold the certificate(s) to Franklin:** Morgan Stanley.

    **(b)     Description of the trust:** Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S7 was a securitization in July 2007 of 752 mortgage loans, in one group. Residential Funding Mortgage Securities I, Inc. was the issuer of the securities in the trust. The mortgage loans were originated by Homecomings Financial, LLC, GMAC Mortgage, LLC, and various undisclosed originators. Approximately 26.1% of the mortgage loans were originated by Homecomings Financial, LLC. Approximately 41.5% of the mortgage loans were originated by GMAC Mortgage, LLC. RFMSI 2007-S7 Pros. Sup. S-3, S-35.

    **(c)     Description of the certificate(s) that Franklin purchased:** Morgan Stanley was an underwriter of the securities that Franklin purchased. Morgan Stanley offered and sold to Franklin a senior certificate in this securitization, in tranche A-1 for which Franklin paid $14,730,469 plus accrued interest on July 31, 2007.

    **(d)     Ratings of the certificate(s) when Franklin purchased them:** Standard & Poor's: AAA; Fitch: AAA.

    **(e)     Current ratings of the certificate(s):** Standard & Poor's: CCC; Fitch: C.

    **(f)     URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1404235/000093041307006336/c49581_424b5.txt

    **(g)     Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Franklin purchased, were issued pursuant or traceable to a registration statement filed by Residential Funding Mortgage Securities I, Inc. with the SEC on form S-3 on April 3, 2007. Annexed to the registration statement was a prospectus. The prospectus was

SCHEDULE 1 OF THE PETITION

Certified Document Number: 50466375 - Page 37 of 55

amended from time to time by prospectus supplements whenever a new series of
certificates was issued pursuant or traceable to that registration statement.

### Item 32.    Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement Morgan Stanley made the following statements
about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    "The weighted average Loan-to-Value ratio at origination of the Mortgage
Loans will be approximately 73.86%." RFMSI 2007-S7 Pros. Sup. I-2.

(b)    In Appendix I to the prospectus supplement, Morgan Stanley presented
tables of statistics about the mortgage loans in the collateral pool. RFMSI 2007-S07
Pros. Sup. I-1. Each table focused on a certain characteristic of the loans (for example,
principal balance) and divided the loans into categories based on that characteristic (for
example, loans with principal balances of $100,000 or less, $100,001 to $200,000,
$200,001 to $300,000, etc.). Each table then presented various data about the loans in
each category. Among these data was "Weighted Average Loan-to-Value Ratio." There
were 11 such tables in Appendix I to the prospectus supplement. In each table, the
number of categories into which the loans were divided ranged from two to 41. Thus, in
the prospectus supplement, Morgan Stanley made hundreds of statements about the
original LTVs of the loans in the collateral pool. RFMSI 2007-S7 Pros. Sup. I-1 to I-5.

(c)    None of the mortgages in the collateral pool have an original LTV in
excess of 95.00%. RFMSI 2007-S7 Pros. Sup. I-2.

**SCHEDULE I OF THE PETITION**

Certified Document Number: 50466375 - Page 38 of 55

**Item 41.    Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans | 752 |
| Number of properties on which there was enough information for the model to determine a true market value | 416 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 291 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $44,108,993 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 39 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,187,799 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 122 |
| Weighted-average LTV, as stated by defendants | 73.86% |
| Weighted-average LTV, for loans the model was able to value | 74.5% |
| Weighted-average LTV, as determined by the model | 91.6% |

**Item 47.    Undisclosed additional liens:**

(a)    Minimum number of properties with additional liens: 66

(b)    Total reduction in equity from additional liens: $6,377,605

(c)    Weighted-average reduction in equity from additional liens: 52.7%

**Item 62.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In Appendix I to the prospectus supplement, described in Item 32, Morgan Stanley presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence" and "Second/Vacation." The table made untrue and misleading statements about the number of mortgage loans, and gave five other pieces of information about them. RFMSI 2007-S7 Pros. Sup. I-4.

**SCHEDULE 1 OF THE PETITION**

(b)     In the "Occupancy Types of the Mortgage Loans" table, Morgan Stanley

stated that of the 752 loans in the collateral pool, 718 were secured by primary

residences and 34 were not. RFMSI 2007-S7 Pros. Sup. I-4.

**Item 69.     Details of properties that were stated to be owner-occupied, but were
not:**

   (a)   **Number of loans on which the owner of the property instructed tax
         authorities to send property tax bills to him or her at a different
         address: 51**

   (b)   **Number of loans on which the owner of the property could have, but
         did not, designate the property as his or her homestead: 108**

   (c)   **Number of loans on which the owner of the property did not receive
         bills at the address of the mortgaged property but did receive bills at
         a different address: 40**

   (d)   **Eliminating duplicates, number of loans about which one or more of
         statements (a) through (c) is true: 173**

**Item 72.     Untrue or misleading statements about the underwriting standards of
the originators of the mortgage loans:**

On pages S-42 through S-43 of the prospectus supplement, and pages 13 through

15 of the prospectus, Morgan Stanley made statements about the underwriting standards

of Residential Funding. All of those statements are incorporated herein by reference.

One of these statements was that: "[A] mortgage loan may be considered to

comply with the underwriting standards described above, even if one or more specific

criteria included in the underwriting standards were not satisfied, if other factors

positively compensated for the criteria that were not satisfied." RFMSI 2007-S7 Pros.

Sup. S-42.

Another one of these statements was that: "[A] determination is made as to

whether the prospective borrower has sufficient monthly income available to meet the

borrower's monthly obligations on the proposed mortgage loan and other expenses

related to the home, including property taxes and hazard insurance, and other financial

obligations and monthly living expenses." RFMSI 2007-S7 Pros. 13.

**SCHEDULE I OF THE PETITION**

Another one of these statements was that: "[M]ortgage loans will generally be underwritten on the basis of the borrower's ability to make monthly payments...." RFMSI 2007-S7 Pros. 13 to 14.

**Item 80.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 158

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 21.01%

**Item 81.**    **30+ days delinquencies in this securitization:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on July 31, 2011:** 95

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on July 31, 2011:** 12.63%

**Item 83.**    **Statements about the ratings of the certificate(s) that Franklin purchased:**

On pages S-5 and S-119 of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that Franklin's certificate was rated AAA by Standard & Poor's Rating Services and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated that: "It is a condition of the issuance of the Senior Certificates that they be rated 'AAA' by Standard & Poor's...and Fitch Ratings." RFMSI 2007-S7 Pros. Sup. S-119.

**Item 86.**    **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)**    **Number of loans whose LTVs were materially understated:** 291

    **(b)**    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 66

    **(c)**    **Number of loans in which the properties were stated to be owner-occupied but were not:** 173

    **(d)**    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 428

SCHEDULE 1 OF THE PETITION

Certified Document Number: 50466375 - Page 41 of 55

(e) **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 57%

## SCHEDULE 2 OF THE PETITION

To the extent that this Schedule is incorporated by reference into allegations in the petition, those allegations are made against defendant Morgan Stanley.

**Item 23.      Details of trust and certificate(s).**

    **(a)      Dealer that sold the certificate(s) to Franklin:** Morgan Stanley.

    **(b)      Description of the trust:** Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-7 was a securitization in October 2005 of 2,409 mortgage loans, in seven groups. Morgan Stanley was the issuer of the securities in the trust. The mortgage loans were originated or acquired by Morgan Stanley Mortgage Capital Inc., Morgan Stanley Credit Corporation, Hemisphere National Bank, MortgageIT, Inc., and various undisclosed originators. Of the 188 mortgage loans in loan group 2, Morgan Stanley Mortgage Capital Inc. originated or acquired approximately 68.45%, Morgan Stanley Credit Corporation originated or acquired approximately 0.35%, Hemisphere National Bank originated or acquired approximately 0.47%, and MortgageIT, Inc. originated or acquired approximately 26.06%. MSM 2005-7 Pros. Sup. S-23.

    **(c)      Description of the certificate(s) that Franklin purchased:** Morgan Stanley was an underwriter of the securities that Franklin purchased. Morgan Stanley offered and sold to Franklin a senior certificate in this securitization, in tranche 2-A-1 for which Franklin paid $27,678,649 plus accrued interest on January 10, 2006. Franklin's certificate was primarily paid by the 188 mortgage loans in loan group 2.

    **(d)      Ratings of the certificate(s) when Franklin purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

    **(e)      Current ratings of the certificate(s):** Moody's: Caa2; Standard & Poor's: B+.

    **(f)      URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/762153/000095013605006800/file001.htm

SCHEDULE 2 OF THE PETITION

Certified Document Number: 50466375 - Page 43 of 55

**(g)     Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Franklin purchased, were issued pursuant or traceable to a registration statement filed by Morgan Stanley Capital I Inc. with the SEC on form S-3 on June 28, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 32.     Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)     The weighted average original loan-to-value ratio of the mortgage loans in Loan Group 2 was 61.80%. MSM 2005-7 Pros. Sup. S-4.

(b)     The weighted average effective original loan-to-value ratio of the mortgage loans in Loan Group 2 was 61.72%. MSM 2005-7 Pros. Sup. S-4.

(c)     "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." MSM 2005-7 Pros. Sup. S-25.

(d)     "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in the Mortgage Pool by Aggregate Cut-off Date Pool Principal Balance is approximately 66.50%." MSM 2005-7 Pros. Sup. S-28.

(e)     In a section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans," Morgan Stanley presented tables of statistics about the mortgage loans in the collateral pool. MSM 2005-7 Pros. Sup. S-26 to S-58. Each table focused on a certain characteristic of the loans (for example, aggregate principal balance outstanding) and divided the loans into categories based on that characteristic (for example, loans with principal balances of $0.01 to $100,000, $100,000.01 to $200,000, $200,000.01 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Subject LTV."

**SCHEDULE 2 OF THE PETITION**

There were 12 such tables in the "Tabular Characteristics of the Mortgage Loans" section for the loans in the collateral pool. In each table, the number of categories into which the loans were divided ranged from three to 15. Thus, in the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley made hundreds of statements about the original LTVs of the loans in the collateral pool. MSM 2005-7 Pros. Sup. S-27 to S-30.

(f)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in the Mortgage Pool by Aggregate Cut-off Date Pool Principal Balance is approximately 66.50%." MSM 2005-7 Pros. Sup. S-28.

(g)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in the Mortgage Pool is approximately 66.34%." MSM 2005-7 Pros. Sup. S-28.

(h)    In a section of the prospectus supplement entitled "Tabular Characteristics of Loan Group 2," Morgan Stanley presented similar tables of statistics about the mortgage loans in Loan Group 2. In these tables, Morgan Stanley similarly made hundreds of statements about the original LTVs of the loans in Loan Group 2. MSM 2005-7 Pros. Sup. S-35 to S-38.

(i)    "The weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans by Aggregate Cut-off Date Loan Group 2 Balance is approximately 61.80%." MSM 2005-7 Pros. Sup. S-36.

(j)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in Loan Group 2 by Aggregate Cut-off Date Loan Group 2 Balance is approximately 61.72%." MSM 2005-7 Pros. Sup. S-36.

**SCHEDULE 2 OF THE PETITION**

Certified Document Number: 50466375 - Page 45 of 55

Item 41.    Details of the results of the AVM analysis:

| | |
|---|---|
| Number of loans in loan group 2 | 188 |
| Number of properties on which there was enough information for the model to determine a true market value | 105 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 45 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $2,789,823 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 25 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,178,673 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 4 |
| Weighted-average LTV, as stated by defendants | 61.8% |
| Weighted-average LTV, for loans the model was able to value | 62.0% |
| Weighted-average LTV, as determined by the model | 67.7% |

Item 47.    Undisclosed additional liens:

(a)    Minimum number of properties in loan group 2 with additional liens: 2

(b)    Total reduction in equity from additional liens: $226,000

(c)    Weighted-average reduction in equity from additional liens: 56.1%

Item 56.    Untrue or misleading statements about compliance with USPAP:

In the prospectus supplement, Morgan Stanley made the following statement about the appraisals of the properties that secured the mortgage loans originated or purchased by Morgan Stanley Mortgage Capital Inc.: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." MSM 2005-7 Pros. Sup. S-61.

In the prospectus supplement, Morgan Stanley made the following statement about the appraisals of the properties that secured the mortgage loans originated by MortgageIT, Inc.: "Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of

SCHEDULE 2 OF THE PETITION

Professional Appraisal Practice of the Appraisal Foundation." MSM 2005-7 Pros. Sup. S-62.

**Item 72.        Untrue or misleading statements about the purchasing guidelines and underwriting standards of the originators of the mortgage loans:**

On pages S-60 through S-61 of the prospectus supplement, Morgan Stanley made statements about the purchasing guidelines of Morgan Stanley Mortgage Capital Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "[C]ertain exceptions to the loan purchasing guidelines described herein are made in the event that compensating factors are demonstrated by a prospective borrower." MSM 2005-7 Pros. Sup. S-60.

Another one of these statements was that: "[A] determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property." MSM 2005-7 Pros. Sup. S-60 to S-61.

On pages S-61 through S-62 of the prospectus supplement, Morgan Stanley made statements about the underwriting standards of Morgan Stanley Credit Corporation. All of those statements are incorporated herein by reference.

One of these statements was that "One test to determine [a potential borrower's ability to make the proposed loan payments] is the debt-to-income ratio....MSCC typically allows for a debt-to-income ratio of 45%. Debt-to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors." MSM 2005-7 Pros. Sup. S-62.

On pages S-62 through S-64 of the prospectus supplement, Morgan Stanley made statements about the underwriting standards of MortgageIT, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "[E]xceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis." MSM 2005-7 Pros. Sup. S-64.

**SCHEDULE 2 OF THE PETITION**

**Item 79.**     **Early payment defaults:**

   **(a)**     Number of the mortgage loans in loan group 2 that suffered EPDs: 3

   **(b)**     Percent of the mortgage loans in loan group 2 that suffered EPDs: 1.6%

**Item 80.**     **90+ days delinquencies:**

   **(a)**     Number of the mortgage loans in loan group 2 that suffered 90+ days delinquencies: 28

   **(b)**     Percent of the mortgage loans in loan group 2 that suffered 90+ days delinquencies: 14.9%

**Item 81.**     **30+ days delinquencies in this securitization:**

   **(a)**     Number of the mortgage loans in loan group 2 that were 30+ days delinquent on July 31, 2011: 23

   **(b)**     Percent of the mortgage loans in loan group 2 that were 30+ days delinquent on July 31, 2011: 12.2%

**Item 83.**     **Statements about the ratings of the certificate(s) that Franklin purchased:**

On pages iii of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that Franklin's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth on page iii of this prospectus supplement by Standard & Poor's…and by Moody's Investors Service, Inc." The requirement for class 2-A-1, from which this certificate was to be paid, was for Aaa from Moody's and AAA from Standard & Poor's. MSM 2005-7 Pros. Sup. S-9.

Morgan Stanley also stated that: "It is a condition of the issuance of the Certificates that they receive the respective ratings set forth on page iii of this prospectus supplement by Standard and Poor's Ratings Services…and by Moody's Investors Service, Inc." The requirement for class 2-A-1, from which this certificate was to be paid, was for Aaa from Moody's and AAA from Standard & Poor's. MSM 2005-7 Pros. Sup. S-123.

SCHEDULE 2 OF THE PETITION

Certified Document Number: 50466375 - Page 48 of 55

Certified Document Number: 50466375 - Page 49 of 55

SCHEDULE 2 OF THE PETITION

**Item 86.**   Summary of loans in loan group 2 about which the defendants made
untrue or misleading statements:

(a)   Number of loans whose LTVs were materially understated: 45

(b)   Number of loans in which the owner's equity was reduced by 5% or
more by undisclosed additional liens: 2

(c)   Number of loans that suffered EPDs: 3

(d)   Eliminating duplicates, number of loans about which the defendants
made untrue or misleading statements: 47

(e)   Eliminating duplicates, percent of loans about which the defendants
made untrue or misleading statements: 25%

## SCHEDULE 3 OF THE PETITION

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against defendant Morgan Stanley.

**Item 23.**     **Details of trust and certificate(s).**

(a)     **Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A16 was a securitization in December 2005 of 460 mortgage loans, in one group. IndyMac MBS, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. RAST 2005-A16 Pros. Sup. S-21, S-27.

(b)     **Description of the certificate(s) that Franklin purchased:** Morgan Stanley and Credit Suisse were underwriters of the securities that Franklin purchased. Franklin purchased a senior certificate in this securitization, in tranche A-3 for which Franklin paid $25,035,156 plus accrued interest on January 10, 2006.

(c)     **Ratings of the certificate(s) when Franklin purchased them:** Standard & Poor's: AAA; Fitch: AAA.

(d)     **Current ratings of the certificate(s):** Standard & Poor's: CCC; Fitch: C.

(e)     **URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1347202/000095011705004964/a41088.txt

(f)     **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Franklin purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on August 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

Certified Document Number: 50466375 - Page 50 of 55

**Item 32.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    "With respect to approximately 35.95% of the mortgage loans by pool principal balance as of the cut-off date, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 72.38%, and the weighted average combined loan-to-value ratio (including the second lien) is approximately 86.57%." RAST 2005-A16 Pros. Sup. S-10.

(b)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2005-A16 Pros. Sup. S-16.

(c)    In "The Mortgage Pool" section of the prospectus supplement, Morgan Stanley presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A16 Pros. Sup. S-15 to S-19. Each table focused on a certain characteristic of the loans (for example, aggregate principal balance outstanding) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $350,000.01 to $400,000.00, $400,000.01 to $450,000.00, $450,000.01 to $500,000.00, etc.). Each table then presented various data about the mortgage loans in each category. In "The Mortgage Pool" section, Morgan Stanley presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans." This table divided the loans in the collateral pool into 13 categories of original LTV (for example, 30.01% to 35%, 35.01% to 40%, 40.01% to 45%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A16 Pros. Sup. S-18.

**SCHEDULE 3 OF THE PETITION**

(d)    "As of the Cut-off Date, the weighted average original Loan-to-Value

Ratio of the Mortgage Loans was approximately 71.37%." RAST 2005-A16 Pros. Sup.

S-18.

### Item 41.    Details of the results of the AVM analysis:

| | |
|---|---:|
| Number of loans | 460 |
| Number of properties on which there was enough information for the model to determine a true market value | 210 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 122 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $18,293,394 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 26 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,571,344 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 23 |
| Weighted-average LTV, as stated by defendants | 71.37% |
| Weighted-average LTV, for loans the model was able to value | 70.8% |
| Weighted-average LTV, as determined by the model | 82.3% |

### Item 62.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, Morgan Stanley made the following statements

about the occupancy status of the properties that secured the mortgage loans in the

collateral pool of this securitization.

In "The Mortgage Pool" section of the prospectus supplement described in Item

32, Morgan Stanley presented a table entitled "Occupancy Types for the Mortgage

Loans." This table divided the mortgage loans in the collateral pool into the categories

"Owner Occupied," "Investment," and "Second Home." The table made untrue and

misleading statements about the number of mortgage loans, the aggregate principal

balance outstanding, and the percent of aggregate principal balance outstanding in each

of these categories. RAST 2005-A16 Pros. Sup. S-19.

**SCHEDULE 3 OF THE PETITION**

In the "Occupancy Types for the Mortgage Loans" table, Morgan Stanley stated that of the 460 mortgage loans in the collateral pool, 413 were secured by primary residences and 47 were not. RAST 2005-A16 Pros. Sup. S-19.

**Item 69.** **Details of properties that were stated to be owner-occupied, but were not:**

    (a)  **Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 23**

    (b)  **Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 57**

    (c)  **Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 5**

    (d)  **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 77**

**Item 72.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-21 through S-23 of the prospectus supplement, Morgan Stanley made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Morgan Stanley stated that:

(a) "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A16 Pros. Sup. S-21.

(b) "IndyMac Bank's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property." RAST 2005-A16 Pros. Sup. S-21.

**Item 79.** **Early payment defaults:**

    (a)  **Number of the mortgage loans that suffered EPDs: 4**

    (b)  **Percent of the mortgage loans that suffered EPDs: 0.87%**

SCHEDULE 3 OF THE PETITION

**Item 80.**    **90+ days delinquencies:**

(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 127

(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 27.61%

**Item 81.**    **30+ days delinquencies in this securitization:**

(a)    Number of the mortgage loans that were 30+ days delinquent on July 31, 2011: 102

(b)    Percent of the mortgage loans that were 30+ days delinquent on July 31, 2011: 22.17%

**Item 83.**    **Statements about the ratings of the certificate(s) that Franklin purchased:**

On pages S-3 and S-58 of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that Franklin's certificate was rated AAA by Fitch Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Fitch, Inc. ("Fitch") and by Standard & Poor's." Morgan Stanley listed Franklin's certificate as rating AAA by Fitch, Inc. and AAA by Standard & Poor's Rating Services. RAST 2005-A16 Pros. Sup. S-3.

Morgan Stanley also stated: "It is a condition to the issuance of the classes of the senior certificates that they be rated AAA by Standard & Poor's . . . and AAA by Fitch, Inc. ("Fitch")." RAST 2005-A16 Pros. Sup. S-58.

**Item 86.**    **Summary of loans about which the defendants made untrue or misleading statements:**

(a)    Number of loans whose LTVs were materially understated: 122

(b)    Number of loans that suffered EPDs: 4

(c)    Number of loans in which the properties were stated to be owner-occupied but were not: 77

(d)    Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements: 170

SCHEDULE 3 OF THE PETITION

Certified Document Number: 50466375 - Page 54 of 55



(e) **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 37%

I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 4, 2011

Certified Document Number:        50466375 Total Pages: 55

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

# EXHIBIT F

(22) Avenue of the Americas
New York, NY 10020

# Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:     (212) 762-7291
Facsimile No:   (914) 729-2950
Email:  David.Restaino@morganstanley.com

November 10, 2011

## VIA OVERNIGHT MAIL

Residential Funding Mortgage Securities I, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 27, 2007 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S7 issued by Residential Funding Mortgage Securities I, Inc. (the "Company"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which the Company has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S B., captioned Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc., in the District Court of Texas, Harris County.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:     (212) 762-7291
Facsimile No:    (914) 729-2950
Email: David.Restaino@morganstanley.com

November 10, 2011

## VIA OVERNIGHT MAIL

Residential Funding Company, LLC
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 27, 2007 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S7 issued by Residential Funding Mortgage Securities I, Inc., we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which Residential Funding Company, LLC has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B., captioned Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc., in the District Court of Texas, Harris County.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

# EXHIBIT 4

B 10 Modified (Official Form 10) (12/11)

| UNITED STATES BANKRUPTCY **COURT FOR THE SOUTHERN DISTRICT OF NEW YORK** | **PROOF OF CLAIM** |
|---|---|

Name of Debtor and Case Number: Residential Funding Mortgage Securities I, Inc., Case No. 12-12060

NOTE: *This form should not be used to make a claim for an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) arising after the commencement of the case. A "request" for payment of an administrative expense (other than a claim asserted under 11 U.S.C. § 503(b)(9)) may be filed pursuant to 11 U.S.C § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property):
Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC)

❏ Check this box if this claim amends a previously filed claim.

Name and address where notices should be sent:

c/o Kevin H. Marino
Marino, Tortorella & Boyle, P.C.
437 Southern Boulvard
Chatham, New Jersey 07928

Telephone number: 973-824-9300        email: kmarino@khmarino.com

**Court Claim**
**Number:_____**
*(If known)*

Filed on:_____

❏ Check this box if you are aware that anyone else has filed a proof of claim relating to this claim. Attach copy of statement giving particulars.

Name and address where payment should be sent (if different from above):

Telephone number:        email:

**5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).** If any part of the claim falls into one of the following categories, check the box specifying the priority and state the amount.

**1. Amount of Claim as of Date Case Filed: $** unliquidated/contingent/subject to amendment

If all or part of the claim is secured, complete item 4.

If all or part of the claim is entitled to priority, complete item 5.

❏ Check this box if the claim includes interest or other charges in addition to the principal amount of the claim. Attach a statement that itemizes interest or charges.

❏ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

**2. Basis for Claim:** Obligation in Underwriting Agreement to indemnify and hold harmless from certain claims
(See instruction #2)

❏ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before the case was filed or the debtor's business ceased, whichever is earlier – 11 U.S.C. §507 (a)(4).

| **3.** Last four digits of any number by which creditor identifies debtor: | **3a.** Debtor may have scheduled account as: | **3b. Uniform Claim Identifier (optional):** |
|---|---|---|
| __ __ __ __ | (See instruction #3a) | (See instruction #3b) |

**4. Secured Claim** (See instruction #4)
Check the appropriate box if the claim is secured by a lien on property or a right of setoff, attach required redacted documents, and provide the requested information.

Nature of property or right of setoff: ❏ Real Estate ❏ Motor Vehicle ❏ Other
Describe:

Value of Property: $_____ Annual Interest Rate_____% ❏ Fixed ❏ Variable
(when case was filed)

Amount of arrearage and other charges, as of the time case was filed, included in secured claim,
if any: $_____        Basis for perfection: _____

Amount of Secured Claim: $_____        Amount Unsecured: $_____

❏ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

❏ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

❏ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

❏ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).

**Amount entitled to priority:**

**6. Claim Pursuant to 11 U.S.C. § 503(b)(9):**
Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.
$_____ (See instruction #6)

**7. Credits.** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. (See instruction #7)

**8. Documents:** Attached are **redacted** copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. If the claim is secured, box 4 has been completed, and **redacted** copies of documents providing evidence of perfection of a security interest are attached. *(See instruction #8, and the definition of "redacted".)*

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

$_____

\* *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**9. Signature:** (See instruction #9) Check the appropriate box.
❏ I am the creditor.   ▣ I am the creditor's authorized agent.   ❏ I am the trustee, or the debtor, or   ❏ I am a guarantor, surety,
(Attach copy of power of attorney, if any.)   their authorized agent.   indorser, or other codebtor.
(See Bankruptcy Rule 3004.)   (See Bankruptcy Rule 3005.)

I declare under penalty of perjury that the information provided in this claim is true and correct to the best of my knowledge, information, and reasonable belief.
Print Name: Kevin H. Marino
Title: Outside Counsel
Company: Marino, Tortorella & Boyle, P.C.        (Signature) *[signature]* 12·27·12        (Date)
Address and telephone number (if different from notice address above):

Telephone number: 973-824-9300        Email: kmarino@khmarino.com

**COURT USE ONLY**

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

B 10 Modified (Official Form 10) (12/11) cont.

## INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, exceptions to these general rules may apply.*

**Items to be completed in Proof of Claim form**

**Court, Name of Debtor, and Case Number:**
Fill in the federal judicial district in which the bankruptcy case was filed (for example, Central District of California), the debtor's full name, and the case number. If the creditor received a notice of the case from the bankruptcy court, all of this information is at the top of the notice.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the bankruptcy filing. Follow the instructions concerning whether to complete items 4 and 5. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card. If the claim is based on delivering health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information. You may be required to provide additional disclosure if an interested party objects to the claim.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As**:
Report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**3b. Uniform Claim Identifier:**
If you use a uniform claim identifier, you may report it here. A uniform claim identifier is an optional 24-character identifier that certain large creditors use to facilitate electronic payment in chapter 13 cases.

**4. Secured Claim:**
Check whether the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See Definitions.) If the claim is secured, check the box for the nature and value of property that secures the claim, attach copies of lien documentation, and state, as of the date of the bankruptcy filing, the annual interest rate (and whether it is fixed or variable), and the amount past due on the claim.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of the claim falls into any category shown, check the appropriate box(es) and state the amount entitled to priority. (See Definitions.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority

**6. Claim Pursuant to 11 U.S.C. §503(b)(9):**
Check this box if you have a claim arising from the value of any goods received by the Debtor within 20 days before May 14, 2012, the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim. (See DEFINITIONS, below.)

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach redacted copies of any documents that show the debt exists and a lien secures the debt. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary in addition to the documents themselves. FRBP 3001(c) and (d). If the claim is based on delivering health care goods or services, limit disclosing confidential health care information. Do not send original documents, as attachments may be destroyed after scanning.

**9. Date and Signature:**
The individual completing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what constitutes a signature. If you sign this form, you declare under penalty of perjury that the information provided is true and correct to the best of your knowledge, information, and reasonable belief. Your signature is also a certification that the claim meets the requirements of FRBP 9011(b). Whether the claim is filed electronically or in person, if your name is on the signature line, you are responsible for the declaration. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. If the claim is filed by an authorized agent, attach a complete copy of any power of attorney, and provide both the name of the individual filing the claim and the name of the agent. If the authorized agent is a servicer, identify the corporate servicer as the company. Criminal penalties apply for making a false statement on a proof of claim.

---

**DEFINITIONS**

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is a person, corporation, or other entity to whom debtor owes a debt that was incurred before the date of the bankruptcy filing. See 11 U.S.C. §101 (10).

**Claim**
A claim is the creditor's right to receive payment for a debt owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the clerk of the same bankruptcy court in which the bankruptcy case was filed.

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien.

A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

---

**INFORMATION**

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim or you may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at http://www.kccllc.net/ResCap.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), any applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.), and any applicable orders of the bankruptcy court.

## SUMMARY OF CLAIM

On or about July 26, 2006, Morgan Stanley & Co. Incorporated, n/k/a Morgan Stanley & Co. LLC ("Morgan Stanley"), entered into an Underwriting Agreement ("Underwriting Agreement No. 1") relating to the sale of Residential Funding Mortgage Securities I, Inc. Mortgage Pass-Through Certificates, Series 2006-S6 issued by Residential Funding Mortgage Securities I, Inc. ("RFMS I, Inc."), the debtor in Case No. 12-12060. (Exhibit A.) Pursuant to sections 7.1 and 7.3 of Underwriting Agreement No. 1, RFMS I, Inc. and Residential Funding Corporation, a/k/a Residential Funding Company, LLC ("Residential Funding"), the debtor in Case No. 12-12019, agreed to indemnify Morgan Stanley and hold it harmless for certain claims and actions. (Id.)

On or about August 10, 2012, the Federal Deposit Insurance Corporation as Receiver for Colonial Bank filed in the Circuit Court of Montgomery County, Alabama, a complaint entitled Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust, Inc., et al. (the "Colonial Bank Action") against Morgan Stanley and others. (Exhibit B.) The Colonial Bank Action constitutes an action for which RFMS I, Inc. and Residential Funding agreed in Underwriting Agreement No. 1 to indemnify and hold Morgan Stanley harmless. By letters dated September 5, 2012, Morgan Stanley notified RFMS I, Inc. and Residential Funding of the Colonial Bank Action and their indemnification obligations with respect to that action. (Exhibit C.)

On or about July 27, 2007, Morgan Stanley entered into an Underwriting Agreement ("Underwriting Agreement No. 2") relating to the sale of Residential Funding Mortgage Securities I, Inc. Mortgage Pass-Through Certificates, Series 2007-S7 issued by RFMS I, Inc. (Exhibit D.) Pursuant to sections 7.1 and 7.3 of Underwriting Agreement No. 2, RFMS I, Inc.

and Residential Funding agreed to indemnify Morgan Stanley and hold it harmless for certain claims and actions. (Id.)

On or about November 4, 2011, the Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. filed in the District Court of Texas, Harris County a complaint entitled Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc. (the "Franklin Bank Action") against Morgan Stanley. (Exhibit E.) The Franklin Bank Action constitutes an action for which RFMS I, Inc. and Residential Funding agreed in Underwriting Agreement No. 2 to indemnify and hold Morgan Stanley harmless. By letters dated November 10, 2011, Morgan Stanley notified RFMS I, Inc. and Residential Funding of the Franklin Bank Action and their indemnification obligations with respect to that action. (Exhibit F.)

# EXHIBIT A

## RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.

Mortgage Pass-Through Certificates, Series 2006-S6

| Initial Principal Amount | Class | Initial Pass-Through Rate |
|---|---|---|
| $10,000,000 | Class A-1 Certificates | Variable |
| $20,000,000 | Class A-2 Certificates | Variable |
| $50,000,000 | Class A-3 Certificates | 6.25% |
| Notional | Class A-4 Certificates | 0.00% |
| $25,000,000 | Class A-5 Certificates | 6.00% |
| Notional | Class A-6 Certificates | 6.00% |
| $5,000,000 | Class A-7 Certificates | 6.00% |
| $208,333 | Class A-8 Certificates | 6.00% |
| $140,586,000 | Class A-9 Certificates | 6.00% |
| $9,754,000 | Class A-10 Certificates | 6.00% |
| $57,500,000 | Class A-11 Certificates | 6.00% |
| $102,866,700 | Class A-12 Certificates | 6.00% |
| $64,933,000 | Class A-13 Certificates | 6.00% |
| $25,000,000 | Class A-14 Certificates | 6.00% |
| $50,849,000 | Class A-15 Certificates | 6.00% |
| $14,502,000 | Class A-16 Certificates | 6.00% |
| $100 | Class R-1 Certificates | 6.00% |
| $66 | Class R-II Certificates | 6.00% |

## UNDERWRITING AGREEMENT

July 26, 2006

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, NY 10036

Ladies and Gentlemen:

Residential Funding Mortgage Securities I, Inc., a Delaware corporation (the "Company"), proposes to sell to you (also referred to herein as the "Underwriter") Mortgage Pass-Through Certificates, Series 2006-S6, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class R-I and Class R-II Certificates (collectively, the "Certificates"), other than a de minimis portion of each of the Class R Certificates, having the

5132915

aggregate principal amounts and Pass-Through Rates set forth above. The Certificates, together with the Class A-V, Class A-P, Class M-1, Class M-2, Class M-3, Class B-1, Class B-2 and Class B-3 Certificates of the same series, will evidence the entire beneficial interest in the Trust Fund (as defined in the Pooling and Servicing Agreement referred to below), consisting primarily of a pool (the "Pool") of conventional, fixed-rate, one- to four-family residential first lien mortgage loans (the "Mortgage Loans") as described in the Prospectus Supplement (as hereinafter defined) to be sold by the Company. A de minimis portion of each of the Class R Certificates will not be sold hereunder and will be held by Residential Funding Corporation ("Residential Funding").

The Certificates will be issued pursuant to a series supplement (the "Series Supplement"), dated as of July 1, 2006 (the "Cut-off Date"), to the standard terms of a pooling and servicing agreement, dated as of June 1, 2006 (the "Standard Terms", and together with the Series Supplement, the "Pooling and Servicing Agreement"), among the Company, as seller, Residential Funding, as master servicer, and U.S. Bank National Association, as trustee (the "Trustee"). The Certificates are described more fully in the Base Prospectus and the Prospectus Supplement (each as hereinafter defined), which the Company has furnished to you.

    1.    <u>Representations, Warranties and Covenants</u>.

        1.1    The Company represents and warrants to, and agrees with you that:

        (a)    The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (No. 333-131201) on Form S-3 for the registration under the Securities Act of 1933, as amended (the "Act"), of Mortgage Pass-Through Certificates (issuable in series), including the Certificates, which registration statement has become effective, and a copy of which, as amended to the date hereof, has heretofore been delivered to you. The Company proposes to file with the Commission pursuant to Rule 424(b) under the rules and regulations of the Commission under the Act (the "1933 Act Regulations") a prospectus supplement dated July 26, 2006 (the "Prospectus Supplement"), to the prospectus dated July 14, 2006 (the "Base Prospectus"), relating to the Certificates and the method of distribution thereof. Such registration statement (No. 333-131201) including exhibits thereto and any information incorporated therein by reference, as amended at the date hereof, is hereinafter called the "Registration Statement"; and the Base Prospectus and the Prospectus Supplement and any information incorporated therein by reference, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (as defined herein) for use in connection with the offering of the Certificates, are hereinafter called the "Prospectus."

        (b)    The Registration Statement has become effective, and the Registration Statement as of the effective date (the "Effective Date," as defined in this paragraph), and the Prospectus, as of the date of the Prospectus Supplement, complied in all material respects with the applicable requirements of the Act and the 1933 Act Regulations; and the Registration Statement, as of the Effective Date, did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; and each Issuer Free Writing Prospectus (as defined herein) as of its date did not and at all times prior to the date of the Prospectus Supplement will not, and the Prospectus and

2

Designated Static Pool Information, taken together, as of the date of the Prospectus Supplement did not and as of the Closing Date will not, contain an untrue statement of a material fact and did not and will not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (except in the case of any Issuer Free Writing Prospectus, any omission with respect to information included in the definition of Senior Structure Information); provided, however, that neither the Company nor Residential Funding makes any representations or warranties as to the information contained in or omitted from the Registration Statement or the Prospectus or any amendment thereof or supplement thereto relating to the information therein that is Excluded Information (as defined herein); and provided, further, that neither the Company nor Residential Funding makes any representations or warranties as to either (i) any information contained in any Underwriter Prepared Issuer FWP (as defined herein) or Underwriter Free Writing Prospectus (as defined herein) except, in each case, to the extent of (x) any information set forth therein that constitutes Pool Information (as defined below) or (y) any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus, or (ii) any information contained in or omitted from the portions of the Prospectus identified by underlining or other highlighting as shown in Exhibit F (the "Underwriter Information"). The Effective Date shall mean the earlier of the date on which the Prospectus Supplement is first used and the time of the first Contract of Sale (as defined herein) to which such Prospectus Supplement relates. The initial effective date of the Registration Statement was within three years of the Closing Date. If the third anniversary of the initial effective date occurs within six months after the Closing Date, the Company will use best efforts to take such action as may be necessary or appropriate to permit the public offering and sale of the Certificates as contemplated hereunder. The Company acknowledges that the Underwriter Information constitutes the only information furnished in writing by you or on your behalf for use in connection with the preparation of the Registration Statement or the Prospectus, and the Underwriter confirms that the Underwriter Information is correct.

(c)    (i)    "ABS Informational and Computational Materials" shall have the meaning given such term in Item 1101 of Regulation AB.

(ii)    "Approved Offering Materials" means with respect to any class of Certificates anticipated to be rated in the highest category by any Rating Agency, collectively the following documents as most recently provided by the Company and designated in writing by the Company as Approved Offering Materials prior to the time of any Contract of Sale: (i) one or more term sheets, providing factual information about the Certificates and the structure and basic parameters thereof (excluding information about the subdivision of the senior classes into tranches), the basic terms of the subordination or other credit enhancements if known, factual information about the Mortgage Loans (which may include parameters or "stips" or tabular data prepared by the Company), the identity of and basic information about key parties to the transaction known to the Company, and the tax, ERISA and SMMEA characteristics of the Certificates, (ii) a term sheet supplement, containing risk factors and additional information of the type to appear in the Prospectus Supplement to the extent known, and (iii) the Base Prospectus, which may be provided by a weblink. Each of the items described in (i) and (ii) in the preceding sentence shall constitute an Issuer Free

3

Writing Prospectus and any additional information provided by the Underwriter shall constitute an Underwriter Free Writing Prospectus or Underwriter Prepared Issuer FWP, as the case may be. With respect to any class of Certificates anticipated to be rated in the second highest or a lower category by any Rating Agency, "Approved Offering Materials" means the Prospectus.

(iii)    "Contract of Sale" has the same meaning as in Rule 159 of the 1933 Act Regulations and all Commission guidance relating to Rule 159.

(iv)    "Designated Static Pool Information" shall mean the static pool information referred to in the Prospectus under the caption "Static Pool Information" but deemed to be excluded from the Registration Statement and Prospectus pursuant to Item 1105(d) of Regulation AB.

(v)    "Excluded Information" shall mean, with respect to each of the Registration Statement and the Prospectus, the information identified by underlining or other highlighting as shown on Exhibit E.

(vi)    "Free Writing Prospectus" shall have the meaning given such term in Rules 405 and 433 of the 1933 Act Regulations.

(vii)    "Issuer Free Writing Prospectus" shall mean any Free Writing Prospectus prepared by or on behalf of the Company and identified by the Company as an Issuer Free Writing Prospectus and relating to the Certificates or the offering thereof.

(viii)    "Issuer Information" shall mean any information of the type specified in clauses (1) – (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform), other than Underwriter Derived Information. Consistent with such definition, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason of the Company's review of the materials pursuant to Section 4.4(e) below and, consistent with Securities Offering Reform Questions and Answers, November 30, 2005 promulgated by the staff of the Commission, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason that the Underwriter has agreed not to use such Free Writing Prospectus without consent of the Company.

(ix)    "Permitted Additional Materials" shall mean information that is not ABS Informational and Computational Materials and (x) that are referred to in Section 4.4(c) so long as any Issuer Information provided by the Underwriter pursuant to Section 4.4(c) is limited to information included within the definition of ABS Informational and Computational Materials, (y) that constitute Certificate price, yield, weighted average life, subscription or allocation information, or a trade confirmation, or (z) otherwise with respect to which the Company has provided written consent to the Underwriter to include in a Free Writing Prospectus.

(x)    "Pool Information" means with respect to any Free Writing Prospectus, the information (including any Preliminary Pool Information) with

4

respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus.

(xi)    "Preliminary Pool Information" means with respect to any Free Writing Prospectus, the information with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus and designated "Preliminary Pool Information."

(xii)    "Senior Structure Information" shall mean, with respect to each class of Certificates anticipated to be rated in the highest category by any Rating Agency (collectively, the "Senior Certificates"), (i) the Pass-Through Rate if a fixed rate, or the formula for determining the Pass-Through Rate, (ii) the terms and the provider of any yield maintenance agreement, swap agreement or other agreement that provides payments payable on any class of the Senior Certificates, (iii) the terms and the provider of any surety bond, financial guaranty insurance policy, or other insurance policy regarding any class of the Senior Certificates not known to the Company when the Approved Offering Materials were prepared, (iv) the allocation to each class of Senior Certificates of the aggregate amount of the cashflow payable among the Senior Certificates collectively, and (v) the allocation to each class of Senior Certificates of the aggregate amount of any Realized Losses allocable to the Senior Certificates collectively, in each case, to the extent such information is not contained in the Approved Offering Materials.

(xiii)    "Underwriter Derived Information" shall refer to information of the type described in clause (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform) when prepared by the Underwriter, including traditional computational and analytical materials prepared by the Underwriter.

(xiv)    "Underwriter Free Writing Prospectus" shall mean all Free Writing Prospectuses prepared by or on behalf of the Underwriter other than any Underwriter Prepared Issuer FWP, including any Permitted Additional Materials.

(xv)    "Underwriter Prepared Issuer FWP" shall mean any Free Writing Prospectus or portion thereof prepared by or on behalf of the Underwriter that contains only a description of the final terms of the Certificates or of the offering of the Certificates after the final terms have been established for all classes of Senior Certificates.

(xvi)    "Written Communication" shall have the meaning given such term in Rule 405 of the 1933 Act Regulations.

(d)    The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the

5

requisite corporate power to own its properties and to conduct its business as presently conducted by it.

(e)     The Company was not, as of any date on or after which a bona fide offer (as used in Rule 164(h)(2) of the 1933 Act Regulations) of the Certificate is made an Ineligible Issuer, as such term is defined in Rule 405 of the 1933 Act Regulations. The Company shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

(f)     This Agreement has been duly authorized, executed and delivered by the Company.

(g)     As of the Closing Date (as defined herein) the Certificates will conform in all material respects to the description thereof contained in the Prospectus and the representations and warranties of the Company in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.2     Residential Funding represents and warrants to, and agrees with you that as of the Closing Date the representations and warranties of Residential Funding in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.3     The Underwriter represents and warrants to and agrees with the Company and Residential Funding that:

(a)     No purpose of the Underwriter relating to the purchase of the Class R Certificates by the Underwriter is or will be to enable the Company to impede the assessment or collection of any tax.

(b)     The Underwriter has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.

(c)     The Underwriter has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Certificates remain outstanding.

(d)     No purpose of the Underwriter relating to any sale of any of the Class R Certificates by the Underwriter will be to enable it to impede the assessment or collection of tax. In this regard, the Underwriter hereby represents to and for the benefit of the Company and Residential Funding that the Underwriter intends to pay taxes associated with holding the Class R Certificates (other than with respect to the portion of each of the Class R Certificates retained by Residential Funding), as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificates.

(e)     The Underwriter will, in connection with any transfer it makes of the Class R Certificates, obtain from its transferee the affidavit required by Section 5.02(f)(i)(B)(I) of the Pooling and Servicing Agreement, will not consummate any such

6

transfer if it knows or believes that any representation contained in such affidavit is false and will provide the Trustee with the Certificate required by Section 5.02(f)(i)(B)(II) of the Pooling and Servicing Agreement.

(f)    The Underwriter hereby certifies that (i) with respect to any classes of Certificates issued in authorized denominations or Percentage Interests of less than a notional amount of $2,000,000 or a Percentage Interest of 20% the fair market value of each such Certificate sold to any person on the date of initial sale thereof by the Underwriter will not be less than $100,000 and (ii) with respect to each class of Certificates to be maintained on the book-entry records of The Depository Trust Company ("DTC"), the interest in each such class of Certificates sold to any person on the date of initial sale thereof by the Underwriter will not be less than the minimum denomination indicated for such class of Certificates in the Prospectus Supplement.

(g)    The Underwriter will have funds available at U.S. Bank National Association, in the Underwriter's account at such bank at the time all documents are executed and the closing of the sale of the Certificates is completed, except for the transfer of funds and the delivery of the Certificates. Such funds will be available for immediate transfer into the account of Residential Funding maintained at such bank.

(h)    As of the date hereof and as of the Closing Date, the Underwriter has complied with all of its obligations hereunder and all information contained in any Underwriter Free Writing Prospectus and in any Underwriter Prepared Issuer FWP as used in connection with any Contract of Sale and all Underwriter Information are accurate in all material respects (taking into account the assumptions explicitly set forth in such Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus), except to the extent of (x) any errors therein that are caused by errors or omissions in the Pool Information or (y) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(i)    Prior to the Closing Date, the Underwriter shall notify the Company and Residential Funding of the earlier of (x) the date on which the Prospectus Supplement is first used and (y) the time of the first Contract of Sale to which such Prospectus Supplement relates.

(j)    The Underwriter hereby further represents and agrees that, with respect to the United Kingdom:

(i)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the Certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the Issuer; and

(ii)    it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything

7

done by it in relation to the Certificates in, from or otherwise involving the United Kingdom.

(k)      In relation to each Member State of the European Economic Area which has implemented the Prospectus directive (each, a "Relevant Member State"), the Underwriter hereby represents and agrees that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of Certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Certificates to the public in that Relevant Member State at any time:

(i)      to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(ii)     to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(iii)    in any other circumstances which do not require the publication by the Depositor of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this representation, the expression an "offer of Certificates to the public" in relation to any Certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Certificates to be offered so as to enable an investor to decide to purchase or subscribe the Certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

1.4      The Underwriter covenants and agrees to pay directly, or reimburse the Company or Residential Funding upon demand for (i) any and all taxes (including penalties and interest) owed or asserted to be owed by the Company or Residential Funding as a result of a claim by the Internal Revenue Service that the transfer of the Class R Certificates to the Underwriter hereunder or any transfer thereof by the Underwriter may be disregarded for federal tax purposes and (ii) any and all losses, claims, damages and liabilities, including attorney's fees and expenses, arising out of any failure of the Underwriter to make payment or reimbursement in connection with any such assertion as required in (i) above. In addition, the Underwriter acknowledges that on the Closing Date immediately after the transactions described herein it will be the owner of the Class R Certificates (other than a de minimis portion of each of the Class R Certificates to be held by Residential Funding) for federal tax purposes, and the Underwriter

8

covenants that it will not assert in any proceeding that the transfer of the Class R Certificates from the Company to the Underwriter should be disregarded for any purpose.

2.      Purchase and Sale. Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to you, and you agree to purchase from the Company, the Certificates (other than a de minimis portion of the Class R Certificates, which shall be transferred by the Company to Residential Funding) at a price equal to 98.53% of the aggregate certificate principal balance of the Certificates as of the Closing Date (as defined herein), plus accrued interest. There will be added to the purchase price of the Certificates an amount equal to interest accrued thereon from the Cut-off Date up to but not including the Closing Date. The purchase price for the Certificates was agreed to by the Company in reliance upon the transfer from the Company to the Underwriter of the tax liabilities associated with the ownership of the Class R Certificates.

3.      Delivery and Payment. Delivery of and payment for the Certificates shall be made at the office of Mayer, Brown, Rowe & Maw LLP at 10:00 a.m., New York City time, on July 28, 2006 or such later date as you shall designate, which date and time may be postponed by agreement between you and the Company (such date and time of delivery and payment for the Certificates being herein called the "Closing Date"). Delivery of the 2006-S6, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15 and Class A-16 Certificates shall be made to you through the Depository Trust Company ("DTC") (such Certificates, the "DTC Registered Certificates"), and delivery of the Class R Certificates (the "Definitive Certificates") shall be made in registered, certificated form, in each case against payment by you of the purchase price thereof to or upon the order of the Company by wire transfer in immediately available funds. The Definitive Certificates shall be registered in such names and in such denominations as you may request not less than two business days in advance of the Closing Date. The Company agrees to have the Definitive Certificates available for inspection, checking and packaging by you in New York, New York not later than 9:00 a.m. on the Closing Date.

4.      Offering by Underwriter.

4.1      It is understood that you propose to offer the Certificates for sale to the public as set forth in the Prospectus and you agree that all such offers and sales by you shall be made in compliance with all applicable laws and regulations. Prior to the date of the first Contract of Sale made based on the Approved Offering Materials, you have not pledged, sold, disposed of or otherwise transferred any Certificate, Mortgage Loans or any interest in any Certificate.

4.2      It is understood that you will solicit offers to purchase the Certificates as follows:

(a)      Prior to the time you have received the Approved Offering Materials you may, in compliance with the provisions of this Agreement, solicit offers to purchase Certificates; provided, that you shall not accept any such offer to purchase a Certificate or any interest in any Certificate or Mortgage Loan or otherwise enter into any Contract of Sale for any Certificate, any interest in any Certificate or any Mortgage Loan prior to your conveyance of Approved Offering Materials to the investor.

9

(b)     Any Written Communication relating to the Certificates made by an Underwriter in compliance with the terms of this Agreement prior to the time such Underwriter has entered into a Contract of Sale for Certificates with the recipient shall prominently set forth the following statements (or a substantially similar statements approved by the Company):

> The information in this free writing prospectus, if conveyed prior to the time of your contractual commitment to purchase any of the Certificates, supersedes any information contained in any prior similar materials relating to the Certificates. The information in this free writing prospectus is preliminary, and is subject to completion or change. This free writing prospectus is being delivered to you solely to provide you with information about the offering of the Certificates referred to in this free writing prospectus and to solicit an offer to purchase the Certificates, when, as and if issued. Any such offer to purchase made by you will not be accepted and will not constitute a contractual commitment by you to purchase any of the Certificates, until we have accepted your offer to purchase Certificates.

> The Certificates referred to in these materials are being sold when, as and if issued. The issuer is not obligated to issue such Certificates or any similar security and the underwriter's obligation to deliver such Certificates is subject to the terms and conditions of the underwriting agreement with the issuer and the availability of such Certificates when, as and if issued by the issuer. You are advised that the terms of the Certificates, and the characteristics of the mortgage loan pool backing them, may change (due, among other things, to the possibility that mortgage loans that comprise the pool may become delinquent or defaulted or may be removed or replaced and that similar or different mortgage loans may be added to the pool, and that one or more classes of Certificates may be split, combined or eliminated), at any time prior to issuance or availability of a final prospectus. You are advised that Certificates may not be issued that have the characteristics described in these materials. The underwriter's obligation to sell such Certificates to you is conditioned on the mortgage loans and Certificates having the characteristics described in these materials. If for any reason the issuer does not deliver such Certificates, the underwriter will notify you, and neither the issuer nor any underwriter will have any obligation to you to deliver all or any portion of the Certificates which you have committed to purchase, and none of the issuer nor any underwriter will be liable for any costs or damages whatsoever arising from or related to such non-delivery.

(c)     Any Preliminary Pool Information shall not be provided to prospective investors unless such Preliminary Pool Information is accompanied by the Approved Offering Materials and the following statements (or substantially similar statements approved by the Company) appear prominently thereon:

10

The information set forth below, entitled "preliminary information", was derived from a preliminary pool of mortgage loans which is not representative of the mortgage loans that will comprise the final mortgage loan pool. The preliminary pool of mortgage loans represents only a subset of the final mortgage loan pool and mortgage loans that are included in the preliminary mortgage loan pool may be removed from the final mortgage loan pool. It is expected that the characteristics of the final mortgage loan pool will differ, and may differ materially, from the characteristics of the preliminary pool of mortgage loans and the preliminary information may differ materially from information of a similar type if derived from the final mortgage loan pool. Although the characteristics of the final mortgage loan pool are expected to be within the parameters for the mortgage loan characteristics as set forth in the tables entitled ["collateral stipulations - mortgage pool characteristics"] [accompanying Approved Offering Materials], they are not expected to conform in all material respects to the characteristics of the preliminary mortgage loan pool. You should refer to the parameters for the mortgage loan characteristics in the tables entitled ["collateral stipulations - mortgage pool characteristics"] in the accompanying [Approved Offering Materials].

4.3     It is understood that you will not enter into a Contract of Sale with any investor until the Approved Offering Materials have been conveyed to the investor with respect to the Certificates which are the subject of such Contract of Sale.

4.4     It is understood that you may prepare and provide to prospective investors certain Free Writing Prospectuses, subject to the following conditions:

(a)     Unless preceded or accompanied by a prospectus satisfying the requirements of Section 10(a) of the Act, the Underwriter shall not convey or deliver any Written Communication to any person in connection with the initial offering of the Certificates, unless such Written Communication (i) is made in reliance on Rule 134 under the Act, (ii) constitutes a prospectus satisfying the requirements of Rule 430B under the Act or (iii) constitutes a Free Writing Prospectus (as defined in Section 1.1(c) above) consisting solely of (x) information of a type included within the definition of ABS Informational and Computational Materials (as defined below), (y) Permitted Additional Materials or (z) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(b)     The Underwriter shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

5132915

(c)     It is understood and agreed that all information provided by the Underwriter to or through Bloomberg or Intex or similar entities for use by prospective investors, or imbedded in any CDI file provided to prospective investors, to the extent constituting a Free Writing Prospectus, shall be deemed an Underwriter Free Writing Prospectus.

(d)     All Free Writing Prospectuses provided to prospective investors, whether or not filed with the Commission, shall bear a legend including the following statement (or a substantially similar statement approved by the Company):

> "THE DEPOSITOR HAS FILED A REGISTRATION STATEMENT (INCLUDING A PROSPECTUS) WITH THE SECURITIES AND EXCHANGE COMMISSION (THE SEC) FOR THE OFFERING TO WHICH THIS COMMUNICATION RELATES.    BEFORE YOU INVEST, YOU SHOULD READ THE PROSPECTUS IN THAT REGISTRATION STATEMENT AND OTHER DOCUMENTS THE DEPOSITOR HAS FILED WITH THE SEC FOR MORE COMPLETE INFORMATION ABOUT THE DEPOSITOR AND THE OFFERING. YOU MAY GET THESE DOCUMENTS AT NO CHARGE BY VISITING EDGAR ON THE SEC WEB SITE AT *WWW.SEC.GOV.* ALTERNATIVELY, THE DEPOSITOR, ANY UNDERWRITER OR ANY DEALER PARTICIPATING    IN    THE    OFFERING    WILL ARRANGE TO SEND YOU THE PROSPECTUS AT NO CHARGE IF YOU REQUEST IT BY CALLING TOLL-FREE 1–800-XXX-XXXX."

Each of the Underwriter and the Company shall have the right to request additional specific legends or notations to appear on any Free Writing Prospectus and shall have the right to require changes regarding the use of terminology and the right to determine the types of information appearing therein with the approval of the other (which shall not be unreasonably withheld).

(e)     The Underwriter shall deliver to the Company and its counsel (in such format as reasonably required by the Company), no later than the business day prior to the date of the required filing under Section 5.10, an Underwriter Prepared Issuer FWP. To facilitate filing to the extent required by Section 5.10 or 5.11, as applicable, all Underwriter Derived Information shall be set forth in a document separate from any Underwriter Prepared Issuer FWP including Issuer Information. The Underwriter shall deliver to the Company one business day following a request by the Company all Preliminary Pool Information (or information based on or derived in whole or in part from Preliminary Pool Information) provided by it to any prospective investor.

(f)     The Underwriter shall provide the Company with a letter from Deloitte & Touche LLP, certified public accountants, prior to the Closing Date, satisfactory in form and substance to the Company, Residential Funding and their respective counsels and the Underwriter, to the effect that such accountants have

performed certain specified procedures, all of which have been agreed to by the Company and the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature that is included in any Underwriter Prepared Issuer FWP, other than any Pool Information therein and any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP, is accurate except as to such matters that are not deemed by the Company and the Underwriter to be material. The foregoing letter shall be at the expense of the Underwriter.

(g)     None of the information in any Free Writing Prospectus may conflict with the information then contained in the Registration Statement or any prospectus or prospectus supplement is a part thereof. The Certificates described in any Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP will be of a type set forth in one of the categories listed beneath the heading "Description of Certificates" in the term sheet supplement included in the Approved Offering Materials and the description of the characteristics of the Certificates contained in such Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP shall not be inconsistent with the description of the Certificates beneath such heading in the term sheet supplement.

(h)     The Company shall not be obligated to file any Issuer Free Writing Prospectuses that have been determined to contain any material error or omission unless such Issuer Free Writing Prospectus has been provided to a prospective investor, in which case, the Underwriter shall cooperate with the Company to prepare a corrective Issuer Free Writing Prospectus that the Underwriter will provide to any such prospective investor and the Company shall file to the extent required herein. In the event that the Underwriter becomes aware that, as of the date on which an investor entered into a Contract of Sale, any Free Writing Prospectus prepared by or on behalf of the Underwriter and delivered to such investor contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading (such Free Writing Prospectus, a "Defective Free Writing Prospectus"), the Underwriter shall notify the Company thereof as soon as practical but in any event within one business day after discovery.

(i)     If the Underwriter does not provide any Free Writing Prospectuses to the Company pursuant to subsection (e) above, the Underwriter shall be deemed to have represented, as of the Closing Date, that it did not provide any prospective investors with any information in written or electronic form in connection with the offering of the Certificates that would constitute an Underwriter Prepared Issuer FWP.

(j)     In the event of any delay in the delivery by the Underwriter to the Company of any Underwriter Prepared Issuer FWP required to be delivered in accordance with subsection (e) above, or in the delivery of the accountant's comfort letter in respect thereof pursuant to subsection (f) above, the Company shall have the right to delay the release of the Prospectus to investors or to the Underwriter, to delay the Closing Date and to take other appropriate actions in each case as necessary in order to allow the Company to comply with its agreement set forth in Section 5.10 to file such Underwriter Prepared Issuer FWP by the time specified therein.

13

(k)     The Underwriter represents that it has in place, and covenants that it shall maintain, internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the 1933 Act Regulations with respect to the generation and use of Free Writing Prospectuses in connection with the offering of the Certificates. In addition, each Underwriter shall, for a period of at least three years after the date hereof, maintain written and/or electronic records of the following:

(i)     any Free Writing Prospectus used by the Underwriter to solicit offers to purchase Certificates to the extent not filed with the Commission;

(ii)     regarding each Free Writing Prospectus delivered by the Underwriter to an investor, the date of such delivery and identity of such investor; and

(iii)     regarding each Contract of Sale entered into by such Underwriter, the date, identity of the investor and the terms of such Contract of Sale, as set forth in the related confirmation of trade.

(l)     The Underwriter covenants with the Company that after the final Prospectus is available the Underwriter shall not distribute any written information concerning the Certificates to a prospective investor unless such information is preceded or accompanied by the final Prospectus. It is understood and agreed that the use of written information in accordance with the preceding sentence is not a Free Writing Prospectus and is not otherwise restricted or governed in any way by this Agreement.

(m)     The Underwriter shall not use any Free Writing Prospectus in connection with the solicitation of offers to purchase Certificates from any prospective investor in a class of Certificates with denominations of less than $25,000 or otherwise designated as a "retail" class of Certificates, and the Underwriter shall not authorize any such use of any Free Writing Prospectus by any dealer that purchases any such Certificates from the Underwriter.

4.5     You further agree that on or prior to the sixth day after the Closing Date, you shall provide the Company with a certificate, substantially in the form of Exhibit G attached hereto, setting forth (i) in the case of each class of Certificates, (a) if less than 10% of the aggregate certificate principal balance of such class of Certificates has been sold to the public as of such date, the value calculated pursuant to clause (b)(iii) of Exhibit G hereto, or, (b) if 10% or more of such class of Certificates has been sold to the public as of such date but no single price is paid for at least 10% of the aggregate certificate principal balance of such class of Certificates, then the weighted average price at which the Certificates of such class were sold expressed as a percentage of the certificate principal balance of such class of Certificates sold, or (c) the first single price at which at least 10% of the aggregate certificate principal balance of such class of Certificates was sold to the public, (ii) the prepayment assumption used in pricing each class of Certificates, and (iii) such other information as to matters of fact as the Company may reasonably request to enable it to comply with its reporting requirements with respect to each class of Certificates to the extent such information can in the good faith judgment of the Underwriter be determined by it.

14

4.6     The Underwriter agrees that (i) if the Prospectus is not delivered with the confirmation in reliance on Rule 172, it will include in every confirmation sent out the notice required by Rule 173 informing the investor that the sale was made pursuant to the Registration Statement and that the investor may request a copy of the Prospectus from the Underwriter; (ii) if a paper copy of the Prospectus is requested by a person who receives a confirmation, Underwriter shall deliver a printed or paper copy of such Prospectus; and (iii) if an electronic copy of the Prospectus is delivered by the Underwriter for any purpose, such copy shall be the same electronic file containing the Prospectus in the identical form transmitted electronically to the Underwriter by or on behalf of the Company specifically for use by the Underwriter pursuant to this Section 4.6; for example, if the Prospectus is delivered to the Underwriter by or on behalf of the Company in a single electronic file in pdf format, then the Underwriter will deliver the electronic copy of the Prospectus in the same single electronic file in pdf format. The Underwriter further agrees that (i) if it delivers to an investor the Prospectus in pdf format, upon the Underwriter's receipt of a request from the investor within the period for which delivery of the Prospectus is required, the Underwriter will promptly deliver or cause to be delivered to the investor, without charge, a paper copy of the Prospectus and (ii) it will provide to the Company any Underwriter Prepared Issuer FWP, or portions thereof, which the Company is required to file with the Commission in electronic format and will use reasonable efforts to provide to the Company such Underwriter Prepared Issuer FWP, or portions thereof, in either Microsoft Word® or Microsoft Excel® format and not in a pdf, except to the extent that the Company, in its sole discretion, waives such requirements.

5.     Agreements. The Company and you agree as follows:

5.1     Before amending or supplementing the Registration Statement or the Prospectus with respect to the Certificates, the Company will furnish you with a copy of each such proposed amendment or supplement.

5.2     The Company will cause the Prospectus Supplement to be transmitted to the Commission for filing pursuant to Rule 424(b) under the Act by means reasonably calculated to result in filing with the Commission pursuant to said rule.

5.3     If, during the period after the first date of the public offering of the Certificates in which a prospectus relating to the Certificates is required to be delivered under the Act, any event occurs as a result of which it is necessary to amend or supplement the Prospectus, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Prospectus is delivered to a purchaser, not misleading, or if it shall be necessary to amend or supplement the Prospectus to comply with the Act or the 1933 Act Regulations, the Company promptly will prepare and furnish, at its own expense, to you, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law.

5.4     If the Company or the Underwriter determines or becomes aware that any Written Communication (including without limitation any Free Writing Prospectus) or oral statement (when considered in conjunction with all information conveyed at the time of Contract of Sale) contains an untrue statement of material fact or omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading at the time that a Contract of Sale was entered into, either the Company or the Underwriter may

15

prepare corrective information with notice to the other party, and the Underwriter shall deliver such information in a manner reasonably acceptable to both parties, to any person with whom a Contract of Sale was entered into, and such information shall provide any such person with the following:

(a)     Adequate disclosure of the contractual arrangement;

(b)     Adequate disclosure of the person's rights under the existing Contract of Sale at the time termination is sought;

(c)     Adequate disclosure of the new information that is necessary to correct the misstatements or omissions in the information given at the time of the original Contract of Sale; and

(d)     A meaningful ability to elect to terminate or not terminate the prior Contract of Sale and to elect to enter into or not enter into a new Contract of Sale.

Any costs incurred to the investor in connection with any such termination or reformation shall be subject to Sections 7.1 and 7.2, as applicable.

5.5     The Company will furnish to you, without charge, a copy of the Registration Statement (including exhibits thereto) and, so long as delivery of a prospectus by an underwriter or dealer may be required by the Act, as many copies of the Prospectus, any documents incorporated by reference therein and any amendments and supplements thereto as you may reasonably request; provided, however, that if the Prospectus is not delivered with the confirmation in reliance on Rule 172, you will provide the notice specified in Section 4.6 in every confirmation and will deliver a paper copy of the prospectus to those investors that request a paper copy thereof.

5.6     The Company agrees, so long as the Certificates shall be outstanding, or until such time as you shall cease to maintain a secondary market in the Certificates, whichever first occurs, to deliver to you the annual statement as to compliance delivered to the Trustee pursuant to Section 3.18 of the Pooling and Servicing Agreement and the annual statement of a firm of independent public accountants furnished to the Trustee pursuant to Section 3.19 of the Pooling and Servicing Agreement, as soon as such statements are furnished to the Company.

5.7     The Company will endeavor to arrange for the qualification of the Certificates for sale under the laws of such jurisdictions as you may reasonably designate and will maintain such qualification in effect so long as required for the initial distribution of the Certificates; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

5.8     If the transactions contemplated by this Agreement are consummated, the Company or Residential Funding will pay or cause to be paid all expenses incident to the performance of the obligations of the Company and Residential Funding under this Agreement, and will reimburse you for any reasonable expenses (including reasonable fees and disbursements of counsel) reasonably incurred by you in connection with qualification of the Certificates for sale and determination of their eligibility for investment under the laws of such jurisdictions as you have reasonably requested pursuant to Section 5.7 above and the printing of

16

memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Certificates, and for expenses incurred in distributing the Prospectus (including any amendments and supplements thereto) to the Underwriter. Except as herein provided, you shall be responsible for paying all costs and expenses incurred by you, including the fees and disbursements of your counsel, in connection with the purchase and sale of the Certificates.

5.9    If, during the period after the Closing Date in which a prospectus relating to the Certificates is required to be delivered under the Act, the Company receives notice that a stop order suspending the effectiveness of the Registration Statement or preventing the offer and sale of the Certificates is in effect, the Company will advise you of the issuance of such stop order.

5.10    The Company shall file any Issuer Free Writing Prospectus, and any Underwriter Prepared Issuer FWP provided to it by the Underwriter under Section 4.4, not later than the date of first use thereof, except that:

(a)    any Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP or portion thereof otherwise required to be filed that contains only (1) a description of the final terms of the Certificates may be filed by the Company within two days of the later of the date such final terms have been established for all classes of Certificates and the date of first use, and (2) a description of the terms of the Certificates that does not reflect the final terms after they have been established for all classes of all Certificates is not required to be filed; and

(b)    if the Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP includes only information of a type included in the definition of ABS Informational and Computational Materials, the Company shall file the same within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b)(3) of the Act.

provided further, that prior to the filing of any Underwriter Prepared Issuer FWP by the Company, the Underwriter must comply with its obligations pursuant to Section 4.4 and that the Company shall not be required to file any Free Writing Prospectus to the extent such Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

5.11    The Underwriter shall file any Underwriter Free Writing Prospectus that has been distributed by the Underwriter in a manner reasonably designed to lead to its broad, unrestricted dissemination within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b)(3) of the Act or otherwise as required under Rule 433 of the Act; provided, however, that the Underwriter shall not be required to file any Underwriter Free Writing Prospectus to the extent such Underwriter Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

17

5.12    The Company acknowledges and agrees that the Underwriter is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the offering of securities contemplated hereby (including in connection with determining the terms of the offering) and not as a fiduciary to, or an agent of, the Company or any other person. Additionally, the Underwriter is not advising the company or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Underwriter shall have no responsibility or liability to the Company with respect thereto. Any review by the Underwriter of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Underwriter and shall not be on behalf of the Company.

6.    Conditions to the Obligations of the Underwriter. The Underwriter's obligation to purchase the Certificates shall be subject to the following conditions:

6.1    No stop order suspending the effectiveness of the Registration Statement shall be in effect, and no proceedings for that purpose shall be pending or, to the knowledge of the Company, threatened by the Commission; and the Prospectus Supplement shall have been filed or transmitted for filing by means reasonably calculated to result in a filing with the Commission pursuant to Rule 424(b) under the Act.

6.2    Since July 1, 2006 there shall have been no material adverse change (not in the ordinary course of business) in the condition of the Company or Residential Funding.

6.3    The Company shall have delivered to you a certificate, dated the Closing Date, of the President, a Senior Vice President or a Vice President of the Company to the effect that the signer of such certificate has examined this Agreement, the Approved Offering Materials, the Prospectus, the Pooling and Servicing Agreement and various other closing documents, and that, to the best of his or her knowledge after reasonable investigation:

(a)    the representations and warranties of the Company in this Agreement and in the Pooling and Servicing Agreement are true and correct in all material respects; and

(b)    the Company has, in all material respects, complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

6.4    Residential Funding shall have delivered to you a certificate, dated the Closing Date, of the President, a Managing Director, a Director or an Associate of Residential Funding to the effect that the signer of such certificate has examined the Pooling and Servicing Agreement and this Agreement and that, to the best of his or her knowledge after reasonable investigation, the representations and warranties of Residential Funding contained in the Pooling and Servicing Agreement and in this Agreement are true and correct in all material respects.

6.5    You shall have received the opinions of Mayer, Brown, Rowe & Maw LLP, special counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibits A-1, A-2 and A-3, and the opinion of Julianne M.

18

Linder, associate counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibit B.

6.6     You shall have received a negative assurance letter regarding the Prospectus from Sidley Austin LLP, counsel for the Underwriter, in form satisfactory to you.

6.7     The Underwriter shall have received from Deloitte & Touche LLP, certified public accountants, (a) a letter dated the date hereof and satisfactory in form and substance to the Underwriter and the Underwriter's counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "Description of the Mortgage Pool", "Pooling and Servicing Agreement", "Description of the Certificates" and "Certain Yield and Prepayment Considerations" agrees with the records of the Company and Residential Funding excluding any questions of legal interpretation and (b) the letter prepared pursuant to Section 4.4(f).

6.8     The Class A Certificates and Class R Certificates shall have been rated "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's") and Fitch Ratings ("Fitch"); the Class A Certificates (other than the Class A-16 Certificates) and Class R Certificates shall have been rated "Aaa" by Moody's Investors Services, Inc. ("Moody's") and the Class A-16 Certificates shall have been rated "Aa1" by Moody's.

6.9     You shall have received the opinion of Chapman and Cutler LLP, counsel to the Trustee, dated the Closing Date, substantially to the effect set forth in Exhibit C.

6.10    You shall have received the opinion of Faegre & Benson, LLP, special Minnesota tax counsel for the Company, dated the Closing Date, substantially to the effect set forth in Exhibit D.

6.11    You shall have received from Julianne M. Linder, associate counsel to the Company, a reliance letter with respect to any opinions delivered to the rating agencies, or you shall have been listed as an addressee on any such opinions.

The Company will furnish you with conformed copies of the above opinions, certificates, letters and documents as you reasonably request.

7.      Indemnification and Contribution.

7.1     The Company and Residential Funding, jointly and severally, agree to indemnify and hold harmless you and each person, if any, who controls you within the meaning of either Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement for the registration of the Certificates as originally filed or in any amendment thereof or other filing incorporated by reference therein, or in the Prospectus and Designated Static Pool Information, taken together, or incorporated by reference in the Prospectus (if used within the period set forth in Section 5.3 hereof and as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), or

19

caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (ii) caused by any untrue statement or alleged untrue statement of a material fact contained in any Issuer Free Writing Prospectus, or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (except any omission with respect to information included in the definition of Senior Structure Information), or (iii) caused by any untrue statement of a material fact or alleged untrue statement of a material fact contained in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, that in either case was caused by (x) any error or omission in any Pool Information or (y) or any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus; except insofar as such losses, claims, damages, or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon any information with respect to which the Underwriter has agreed to indemnify the Company pursuant to clause (i) of Section 7.2; provided, however, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information.

        7.2     You agree to indemnify and hold harmless the Company, Residential Funding, their respective directors or officers and any person controlling the Company or Residential Funding within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of material fact contained in the Underwriter Information, or any omission or alleged omission to state therein any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Free Writing Prospectus (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Free Writing Prospectus), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (iii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Prepared Issuer FWP (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (iv) resulting from your failure to comply with Section 4.4(e) or Section 4.3 or failure to file any Underwriter Free Writing Prospectus required to be filed in accordance with Section 5.11; provided, however, that the indemnification set forth in clauses (ii) and (iii) of this Section 7.2 shall not apply to the extent of any error or omission in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus that was caused by any error or omission in any Pool Information; provided, further, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information. In addition, you agree to indemnify and hold harmless the Company, Residential Funding, their respective

20

directors or officers and any person controlling the Company or Residential Funding against any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) caused by, resulting from, relating to, or based upon any legend regarding original issue discount on any Certificate resulting from incorrect information provided by the Underwriter in the certificates described in Section 4.5 hereof.

   7.3  In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 7.1 or Section 7.2, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them.  It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties.  Such firm shall be designated in writing by you, in the case of parties indemnified pursuant to Section 7.1 and by the Company or Residential Funding, in the case of parties indemnified pursuant to Section 7.2.     The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel reasonably satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation.  Unless it shall assume the defense of any proceeding the indemnifying party shall not be liable for any settlement of any proceeding, effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment.  If the indemnifying party assumes the defense of any proceeding, it shall be entitled to settle such proceeding with the consent of the indemnified party or, if such settlement provides for release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the consent of the indemnified party.

   7.4  If the indemnification provided for in this Section 7 is unavailable to an indemnified party under Section 7.1 or Section 7.2 hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and Residential Funding on the one hand and the Underwriter on the other from the offering of the Certificates but also the relative fault of the Company or Residential Funding on the one hand and of the Underwriter on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The

21

relative fault of the Company and Residential Funding on the one hand and of the Underwriter on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriter, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

7.5     The Company, Residential Funding and the Underwriter agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in Section 7.4 above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 7 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim except where the indemnified party is required to bear such expenses pursuant to Section 7.4; which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party believes that it will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

7.6     The indemnity and contribution agreements contained in this Section 7 and the representations and warranties of the Company and Residential Funding in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by the Underwriter or on behalf of the Underwriter or any person controlling the Underwriter or by or on behalf of the Company or Residential Funding and their respective directors or officers or any person controlling the Company or Residential Funding and (iii) acceptance of and payment for any of the Certificates.

8.     Termination.  This Agreement shall be subject to termination by notice given to the Company and Residential Funding, if the sale of the Certificates provided for herein is not consummated because of any failure or refusal on the part of the Company or Residential Funding to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company or Residential Funding shall be unable to perform their respective obligations under this Agreement. If you terminate this Agreement in accordance with this Section 8, the Company or Residential Funding will reimburse you for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been reasonably incurred by the Underwriter in connection with the proposed purchase and sale of the Certificates.

9.     Certain Representations and Indemnities to Survive.  The respective agreements, representations, warranties, indemnities and other statements of the Company, Residential Funding or the officers of any of the Company, Residential Funding, and you set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by you or on your behalf or made by or

22

on behalf of the Company or Residential Funding or any of their respective officers, directors or controlling persons, and will survive delivery of and payment for the Certificates.

10.    Notices.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Underwriter will be mailed, delivered or telegraphed and confirmed to you at Morgan Stanley & Co. Incorporated, 1585 Broadway, New York, NY 10036, or if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Mortgage Securities I, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President; or, if sent to Residential Funding will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Corporation, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President.

11.    Successors.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 7 hereof, and their successors and assigns, and no other person will have any right or obligation hereunder.

12.    Applicable Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

[SIGNATURE PAGES FOLLOW]

5132915

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**

By: _____

Name: Joseph Orning

Title:    Vice President

**RESIDENTIAL FUNDING CORPORATION**

By: _____

Name: Tim Jacobson

Title:    Associate

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By: _____

Name:

Title:

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**

By:_____

Name:  Joseph Orning

Title:    Vice President

**RESIDENTIAL FUNDING CORPORATION**

By:_____

Name:  Tim Jacobson

Title:    Associate

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By:_____

Name:  Valerie Kay

Title:    Managing Director

5132915

*Underwriting Agreement*
*(Class A and R)*
*RFMSI Series 2006-S6*

## EXHIBIT A-1

Mayer, Brown, Rowe & Maw LLP Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 32 of the Closing Set]

A-1

5132915

## EXHIBIT A-2

Mayer, Brown, Rowe & Maw LLP
Negative Assurance Letter (Underwriting Agreement)

[See Tab 33 of the Closing Set]

5132915

## EXHIBIT A-3

Mayer, Brown, Rowe & Maw LLP Opinion
Tax Disclosure Letter (Underwriting Agreement)

[See Tab 34 of the Closing Set]

## EXHIBIT B

In-House Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 30 of the Closing Set]

## EXHIBIT C

Opinion of Chapman and Cutler LLP
Counsel to Trustee

[See Tab 38 of the Closing Set]

C-1

## EXHIBIT D

Opinion of Faegre & Benson, LLP
Special Counsel to the Company

[See Tab 37 of the Closing Set]

EXHIBIT E

EXCLUDED INFORMATION

5132915

| | |
|---|---|
| Final scheduled distribution date ............ | July 25, 2036.  The actual final distribution date could be substantially earlier.  *See "Certain Yield and Prepayment Considerations" in this prospectus supplement.* |
| Form of certificates .................................. | Book-entry: Class A Certificates and Class M Certificates. |
| | Physical: Class R Certificates. |
| | *See "Description of the Certificates—General" in this prospectus supplement.* |
| Minimum denominations ......................... | Class A (other than the Class A-4, Class A-6 and Class A-11 Certificates), Class A-P and Class M-1 Certificates: $100,000.  Class A-4 and Class A-6 Certificates: $1,000,000 notional amount.  Class A-11 Certificates: $1,000.  Class M-2 Certificates and Class M-3 Certificates: $250,000.  Class A-V Certificates: $2,000,000 notional amount.   Class R Certificates: 20% percentage interests. |
| Legal investment ...................................... | When issued, the Class A, Class R and Class M-1 Certificates will, and the Class M-2 Certificates and Class M-3 Certificates will not, be "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984, as amended, or SMMEA. |
| | *See "Legal Investment" in this prospectus supplement and "Legal Investment Matters" in the accompanying prospectus.* |
| ERISA considerations .............................. | Subject to the considerations described in this prospectus supplement, the Class A Certificates and Class M Certificates are expected to be considered eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts.  Sales of the Class R Certificates to such plans or retirement accounts are prohibited, except as permitted under "ERISA Considerations" in this prospectus supplement. |
| | *See "ERISA Considerations" in this prospectus supplement and in the accompanying prospectus.* |
| Yield Maintenance Agreement Provider...................................................... | Morgan Stanley Capital Services Inc. |

**Pass-Through Rates**

The yields to maturity on the offered certificates, other than the Principal Only Certificates, will be affected by their pass-through rates. Because the mortgage rates on the mortgage loans and the pass-through rates on the offered certificates, other than the Adjustable Rate Certificates and Variable Strip Certificates, are fixed, these rates will not change in response to changes in market interest rates. The pass through rate on the Variable Strip Certificates is based on the weighted average of the pool strip rates on the mortgage loans and these pool strip rates will not change in response to changes in market interest rates. Accordingly, if market interest rates or market yields for securities similar to such offered certificates were to rise, the market value of such offered certificates may decline.

**Purchase Price**

In addition, the yield to maturity on each class of the offered certificates will depend on, among other things, the price paid by the holders of the offered certificates and the related pass-through rate. The extent to which the yield to maturity of an offered certificate is sensitive to prepayments will depend, in part, upon the degree to which it is purchased at a discount or premium. In general, if a class of offered certificates is purchased at a premium and principal distributions thereon occur at a rate faster than assumed at the time of purchase, the investor's actual yield to maturity will be lower than anticipated at the time of purchase. Conversely, if a class of offered certificates is purchased at a discount and principal distributions thereon occur at a rate slower than assumed at the time of purchase, the investor's actual yield to maturity will be lower than anticipated at the time of purchase. For additional considerations relating to the yields on the offered certificates, see "Yield Considerations" and "Maturity and Prepayment Considerations" in the accompanying prospectus.

**Final Scheduled Distribution Date**

The final scheduled distribution date with respect to each class of the offered certificates is the distribution date in July 2036, which is the distribution date immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its final scheduled distribution date.

**Weighted Average Life**

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement, the prepayment assumption, represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of new mortgage loans. A prepayment assumption of 100% PSA assumes constant prepayment rates of 0.20% per annum of the then outstanding principal balance of the mortgage loans in the first month of the life of the mortgage loans and an additional 0.20% per annum in each month thereafter until the 30th month. Beginning in the 30th month and in each month thereafter during the life of the mortgage loans, 100% PSA assumes a constant prepayment rate of 6% per annum each month. As used in the tables below, "0% PSA" assumes prepayment rates equal to 0% of PSA—no prepayments. Correspondingly, "100% PSA" and "300% PSA" assumes prepayment rates equal to 100% of PSA and 300% of PSA, respectively, and so forth.

PSA does not purport to be a historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans in this mortgage pool.

The tables captioned "Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of the Prepayment Assumptions" have been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described under "Description of the Mortgage Pool" in this prospectus supplement and their performance. The tables assume, among other things, that: (i) as of the date of issuance of the offered certificates, the mortgage loans have the following characteristics:

### Assumed Mortgage Loan Characteristics

|  | Discount Mongage Loans, I/O* Term 120 Months | Non-Discount Mortgage Loans, I/O* Term 120 Months | Discount Mortgage Loans, Non-I/O* | Non-Discount Mortgage Loans, Non-I/O* |
|---|---|---|---|---|
| Aggregate principal balance.............. | $16,957,997.04 | $168,025,786.67 | $59,184,468.86 | $355,385,520.05 |
| Weighted average mortgage rate........ | 6.0930276732% | 6.6750% | 6.1236961307% | 6.6512% |
| Weighted average servicing fee rate .. | 0.2800000000% | 0.3300% | 0.2800000000% | 0.3313% |
| Weighted average original term to maturity (months) .......................... | 360 | 360 | 360 | 360 |
| Weighted average remaining term to maturity (months) .......................... | 358 | 359 | 358 | 359 |

* I/O refers to loans with an initial interest only period as indicated and further discussed on page S-65.

(ii)    the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity (after taking into account the interest-only period), so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity (after taking into account the interest-only period); (iii) neither Residential Funding nor the depositor will repurchase any mortgage loan, as described under "Mortgage Loan Program—Representations with Respect to Mortgage Loans" and "Description of the Certificates—Assignment of the Trust Assets" in the accompanying prospectus, and the master servicer will not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust; (iv) there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of PSA set forth in the tables; (v) there is no Prepayment Interest Shortfall or any other interest shortfall in any month; (vi) payments on the certificates will be received on the 25th day of each month, commencing on August 25, 2006; (vii) payments on the mortgage loans earn no reinvestment return; (viii) there are no additional ongoing trust expenses payable out of the trust; and (ix) the certificates will be purchased on July 28, 2006. Clauses (i) through (ix) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the tables below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans will prepay at a constant level of PSA until maturity or that all of the mortgage loans will prepay at the same level of PSA. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the various constant percentages of PSA specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans, or actual

prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following tables indicate the weighted average life of each class of offered certificates, other than the Interest Only Certificates and Residual Certificates, and set forth the percentages of the initial Certificate Principal Balance of each class of offered certificates that would be outstanding after each of the distribution dates at the various percentages of PSA shown.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-1 | | | | | Class A-2, Class A-3, Class A-5, Class A-7 and Class A-8 | | | | | Class A-9 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 99 | 97 | 92 | 90 | 88 | 100 | 100 | 94 | 89 | 84 | 98 | 94 | 91 | 90 | 90 |
| July 25, 2008 | 98 | 90 | 76 | 69 | 62 | 100 | 100 | 66 | 49 | 32 | 96 | 84 | 81 | 80 | 80 |
| July 25, 2009 | 97 | 82 | 54 | 42 | 31 | 100 | 90 | 27 | 0 | 0 | 94 | 74 | 70 | 68 | 48 |
| July 25, 2010 | 95 | 73 | 36 | 21 | 9 | 100 | 83 | 0 | 0 | 0 | 92 | 64 | 58 | 38 | 8 |
| July 25, 2011 | 94 | 65 | 22 | 6 | 0 | 100 | 78 | 0 | 0 | 0 | 89 | 54 | 32 | 3 | 0 |
| July 25, 2012 | 93 | 58 | 11 | 0 | 0 | 100 | 74 | 0 | 0 | 0 | 87 | 43 | 13 | 0 | 0 |
| July 25, 2013 | 91 | 52 | 3 | 0 | 0 | 100 | 73 | 0 | 0 | 0 | 84 | 33 | 0 | 0 | 0 |
| July 25, 2014 | 90 | 46 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 81 | 23 | 0 | 0 | 0 |
| July 25, 2015 | 88 | 41 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 79 | 14 | 0 | 0 | 0 |
| July 25, 2016 | 86 | 36 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 75 | 6 | 0 | 0 | 0 |
| July 25, 2017 | 84 | 31 | 0 | 0 | 0 | 100 | 72 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2018 | 81 | 27 | 0 | 0 | 0 | 100 | 67 | 0 | 0 | 0 | 66 | 0 | 0 | 0 | 0 |
| July 25, 2019 | 78 | 22 | 0 | 0 | 0 | 100 | 56 | 0 | 0 | 0 | 60 | 0 | 0 | 0 | 0 |
| July 25, 2020 | 74 | 18 | 0 | 0 | 0 | 100 | 46 | 0 | 0 | 0 | 54 | 0 | 0 | 0 | 0 |
| July 25, 2021 | 71 | 15 | 0 | 0 | 0 | 100 | 37 | 0 | 0 | 0 | 48 | 0 | 0 | 0 | 0 |
| July 25, 2022 | 67 | 11 | 0 | 0 | 0 | 100 | 28 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 63 | 8 | 0 | 0 | 0 | 100 | 19 | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 59 | 5 | 0 | 0 | 0 | 100 | 12 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 54 | 2 | 0 | 0 | 0 | 100 | 4 | 0 | 0 | 0 | 18 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 49 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 44 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | * | 0 | 0 | 0 | 0 |
| July 25, 2028 | 38 | 0 | 0 | 0 | 0 | 96 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 33 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 26 | 0 | 0 | 0 | 0 | 65 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 19 | 0 | 0 | 0 | 0 | 48 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 12 | 0 | 0 | 0 | 0 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 4 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 18.33 | 8.31 | 3.47 | 2.81 | 2.42 | 24.82 | 12.08 | 2.42 | 1.95 | 1.67 | 13.57 | 5.43 | 3.96 | 3.24 | 2.81 |

* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

## Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| Distribution Date | Class A-10 | | | | | Class A-11 | | | | | Class A-12 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 100 | 100 | 100 | 100 | 100 | 99 | 99 | 96 | 91 | 86 | 99 | 95 | 91 | 88 | 89 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 98 | 98 | 70 | 52 | 33 | 98 | 86 | 79 | 78 | 78 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 97 | 97 | 31 | 0 | 0 | 97 | 74 | 67 | 66 | 66 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 96 | 96 | 2 | 0 | 0 | 95 | 62 | 56 | 33 | 48 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 55 | 95 | 91 | 0 | 0 | 0 | 93 | 51 | 34 | 9 | 13 |
| July 25, 2012 | 100 | 100 | 100 | 100 | 0 | 94 | 90 | 0 | 0 | 0 | 92 | 40 | 17 | 0 | 0 |
| July 25, 2013 | 100 | 100 | 73 | 0 | 0 | 93 | 89 | 0 | 0 | 0 | 91 | 31 | 4 | 0 | 0 |
| July 25, 2014 | 100 | 100 | 0 | 0 | 0 | 92 | 88 | 0 | 0 | 0 | 89 | 22 | 0 | 0 | 0 |
| July 25, 2015 | 100 | 100 | 0 | 0 | 0 | 92 | 87 | 0 | 0 | 0 | 87 | 15 | 0 | 0 | 0 |
| July 25, 2016 | 100 | 100 | 0 | 0 | 0 | 91 | 86 | 0 | 0 | 0 | 85 | 8 | 0 | 0 | 0 |
| July 25, 2017 | 100 | 100 | 0 | 0 | 0 | 90 | 74 | 0 | 0 | 0 | 83 | 1 | 0 | 0 | 0 |
| July 25, 2018 | 100 | 58 | 0 | 0 | 0 | 89 | 63 | 0 | 0 | 0 | 79 | 0 | 0 | 0 | 0 |
| July 25, 2019 | 100 | 0 | 0 | 0 | 0 | 88 | 51 | 0 | 0 | 0 | 75 | 0 | 0 | 0 | 0 |
| July 25, 2020 | 100 | 0 | 0 | 0 | 0 | 87 | 41 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2021 | 100 | 0 | 0 | 0 | 0 | 86 | 31 | 0 | 0 | 0 | 66 | 0 | 0 | 0 | 0 |
| July 25, 2022 | 100 | 0 | 0 | 0 | 0 | 85 | 22 | 0 | 0 | 0 | 61 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 100 | 0 | 0 | 0 | 0 | 84 | 13 | 0 | 0 | 0 | 56 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 100 | 0 | 0 | 0 | 0 | 83 | 5 | 0 | 0 | 0 | 50 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 100 | 0 | 0 | 0 | 0 | 82 | 0 | 0 | 0 | 0 | 44 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 100 | 0 | 0 | 0 | 0 | 81 | 0 | 0 | 0 | 0 | 37 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 100 | 0 | 0 | 0 | 0 | 73 | 0 | 0 | 0 | 0 | 30 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 100 | 0 | 0 | 0 | 0 | 54 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 0 | 0 | 0 | 0 | 0 | 34 | 0 | 0 | 0 | 0 | 14 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 0 | 0 | 0 | 0 | 0 | 12 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 21.41 | 11.1 | 7.18 | 5.38 | 4.42 | 22.95 | 13.53 | 2.53 | 2.00 | 1.70 | 15.83 | 5.39 | 4.00 | 3.26 | 2.82 |

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-13 | | | | | Class A-14 | | | | | Class A-15 and Class A-16 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% | 0% | 100% | 300% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 98 | 98 | 98 | 98 | 98 | 106 | 106 | 106 | 106 | 106 | 100 | 101 | 101 | 101 | 100 |
| July 25, 2008 | 95 | 95 | 95 | 95 | 95 | 113 | 113 | 113 | 113 | 113 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2009 | 92 | 92 | 92 | 92 | 92 | 120 | 120 | 120 | 120 | 120 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2010 | 90 | 90 | 90 | 90 | 90 | 127 | 127 | 127 | 127 | 127 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2011 | 87 | 87 | 87 | 87 | 56 | 135 | 135 | 135 | 135 | 135 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2012 | 83 | 83 | 83 | 56 | 42 | 143 | 143 | 143 | 143 | 143 | 97 | 97 | 96 | 95 | 95 |
| July 25, 2013 | 80 | 80 | 80 | 9 | 0 | 152 | 152 | 152 | 152 | 101 | 96 | 96 | 85 | 79 | 79 |
| July 25, 2014 | 76 | 76 | 57 | 0 | 0 | 161 | 161 | 161 | 108 | 24 | 95 | 91 | 63 | 53 | 41 |
| July 25, 2015 | 73 | 73 | 27 | 0 | 0 | 171 | 171 | 171 | 72 | 0 | 93 | 85 | 51 | 39 | 37 |
| July 25, 2016 | 68 | 68 | 5 | 0 | 0 | 182 | 182 | 156 | 54 | 0 | 96 | 79 | 41 | 29 | 26 |
| July 25, 2017 | 64 | 64 | 0 | 0 | 0 | 193 | 193 | 133 | 40 | 0 | 93 | 72 | 32 | 22 | 18 |
| July 25, 2018 | 60 | 60 | 0 | 0 | 0 | 205 | 205 | 123 | 30 | 0 | 91 | 66 | 26 | 16 | 12 |
| July 25, 2019 | 55 | 55 | 0 | 0 | 0 | 218 | 218 | 99 | 22 | 0 | 88 | 60 | 20 | 12 | 8 |
| July 25, 2020 | 50 | 50 | 0 | 0 | 0 | 231 | 231 | 79 | 16 | 0 | 85 | 55 | 16 | 9 | 5 |
| July 25, 2021 | 44 | 44 | 0 | 0 | 0 | 245 | 245 | 62 | 12 | 0 | 82 | 50 | 13 | 6 | 4 |
| July 25, 2022 | 38 | 38 | 0 | 0 | 0 | 261 | 261 | 49 | 9 | 0 | 79 | 45 | 10 | 5 | 2 |
| July 25, 2023 | 32 | 32 | 0 | 0 | 0 | 277 | 277 | 38 | 6 | 0 | 75 | 40 | 8 | 3 | 1 |
| July 25, 2024 | 25 | 25 | 0 | 0 | 0 | 294 | 294 | 30 | 4 | 0 | 71 | 36 | 6 | 2 | 1 |
| July 25, 2025 | 18 | 18 | 0 | 0 | 0 | 312 | 312 | 23 | 3 | 0 | 67 | 32 | 5 | 2 | 1 |
| July 25, 2026 | 11 | 11 | 0 | 0 | 0 | 331 | 331 | 18 | 2 | 0 | 63 | 28 | 3 | 1 | * |
| July 25, 2027 | 3 | 4 | 0 | 0 | 0 | 351 | 351 | 13 | 1 | 0 | 58 | 24 | 3 | 1 | * |
| July 25, 2028 | 0 | 0 | 0 | 0 | 0 | 360 | 255 | 10 | 1 | 0 | 53 | 21 | 2 | 1 | * |
| July 25, 2029 | 0 | 0 | 0 | 0 | 0 | 360 | 216 | 7 | 1 | 0 | 48 | 18 | 1 | * | * |
| July 25, 2030 | 0 | 0 | 0 | 0 | 0 | 360 | 179 | 5 | 0 | 0 | 42 | 15 | 1 | * | * |
| July 25, 2031 | 0 | 0 | 0 | 0 | 0 | 360 | 144 | 4 | 0 | 0 | 36 | 12 | 1 | * | * |
| July 25, 2032 | 0 | 0 | 0 | 0 | 0 | 144 | 111 | 3 | 0 | 0 | 30 | 9 | 1 | * | * |
| July 25, 2033 | 0 | 0 | 0 | 0 | 0 | 111 | 80 | 2 | 0 | 0 | 23 | 7 | * | * | * |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 80 | 51 | 1 | 0 | 0 | 15 | 4 | * | * | * |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 51 | 24 | 1 | 0 | 0 | 8 | 2 | * | * | * |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 12.95 | 12.86 | 7.69 | 5.82 | 4.74 | 28.78 | 24.61 | 14.45 | 10.03 | 6.47 | 21.51 | 15.94 | 11.09 | 9.91 | 8.88 |

\*  Indicates a number that is greater than zero but less than 0.5%.

\*\*  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-P | | | | | Class M-1, Class M-1 and Class M-3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 100% | 100% | 400% | 500% | 0% | 100% | 100% | 400% | 500% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2007 | 99 | 97 | 94 | 92 | 91 | 99 | 99 | 99 | 99 | 99 |
| July 25, 2008 | 98 | 93 | 82 | 76 | 71 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2009 | 97 | 86 | 66 | 58 | 50 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2010 | 96 | 80 | 54 | 43 | 34 | 97 | 97 | 97 | 97 | 97 |
| July 25, 2011 | 95 | 74 | 44 | 33 | 24 | 96 | 96 | 96 | 96 | 96 |
| July 25, 2012 | 94 | 69 | 35 | 24 | 16 | 95 | 93 | 89 | 87 | 85 |
| July 25, 2013 | 92 | 64 | 29 | 18 | 11 | 93 | 89 | 81 | 77 | 73 |
| July 25, 2014 | 91 | 59 | 23 | 14 | 8 | 92 | 85 | 71 | 65 | 58 |
| July 25, 2015 | 89 | 55 | 19 | 10 | 5 | 91 | 80 | 60 | 51 | 43 |
| July 25, 2016 | 88 | 51 | 15 | 8 | 4 | 89 | 74 | 48 | 38 | 30 |
| July 25, 2017 | 85 | 46 | 12 | 6 | 3 | 87 | 68 | 39 | 28 | 20 |
| July 25, 2018 | 83 | 42 | 10 | 4 | 2 | 85 | 62 | 31 | 21 | 14 |
| July 25, 2019 | 80 | 38 | 8 | 3 | 1 | 82 | 56 | 25 | 15 | 9 |
| July 25, 2020 | 77 | 35 | 6 | 2 | — | 79 | 51 | 19 | 11 | 6 |
| July 25, 2021 | 74 | 31 | 5 | 2 | — | 77 | 46 | 15 | 8 | 4 |
| July 25, 2022 | 71 | 28 | 4 | 1 | — | 73 | 42 | 12 | 6 | 3 |
| July 25, 2023 | 68 | 25 | 3 | 1 | * | 70 | 38 | 9 | 4 | 2 |
| July 25, 2024 | 64 | 23 | 2 | 1 | * | 67 | 33 | 7 | 4 | 1 |
| July 25, 2025 | 61 | 20 | 2 | * | * | 63 | 30 | 6 | 2 | 1 |
| July 25, 2026 | 56 | 17 | 1 | * | * | 59 | 26 | 4 | 2 | — |
| July 25, 2027 | 52 | 15 | 1 | * | * | 54 | 23 | 3 | 1 | — |
| July 25, 2028 | 48 | 13 | 1 | * | * | 50 | 20 | 2 | 1 | * |
| July 25, 2029 | 43 | 11 | * | * | * | 45 | 17 | 2 | — | * |
| July 25, 2030 | 37 | 9 | * | * | * | 39 | 14 | 1 | — | * |
| July 25, 2031 | 32 | 7 | * | * | * | 34 | 11 | 1 | * | * |
| July 25, 2032 | 26 | 6 | * | * | * | 28 | 9 | — | * | * |
| July 25, 2033 | 20 | 4 | * | * | * | 21 | 6 | — | * | * |
| July 25, 2034 | 13 | 2 | * | * | * | 14 | 4 | — | * | * |
| July 25, 2035 | 6 | 1 | * | * | * | 7 | 2 | * | * | * |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 19.91 | 11.56 | 5.68 | 4.51 | 3.75 | 20.36 | 15.17 | 10.69 | 9.63 | 8.90 |

\* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

# EXHIBIT F

## UNDERWRITER INFORMATION

Prospectus supplement dated July 26, 2006 (to prospectus dated July 14, 2006)

# $595,956,340

# RFMSI Series 2006-S6 Trust
## Issuing Entity

# Residential Funding Mortgage Securities I, Inc.
## Depositor

# Residential Funding Corporation
## Master Servicer and Sponsor

## Mortgage Pass-Through Certificates, Series 2006-S6

The trust will hold a pool of one- to four-family residential first lien mortgage loans.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 20 classes of senior certificates designated Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-V, Class A-P, Class R-I and Class R-II Certificates; and

- 3 classes of subordinated certificates designated Class M-1, Class M-2 and Class M-3 Certificates.

all as more fully described in the table on page S-5 of this prospectus supplement.

Credit enhancement for all of these certificates will be provided by additional classes of subordinated certificates which are not offered hereby.

Distributions on the certificates will be on the 25th of each month or, if the 25th is not a business day, on the next business day, beginning August 25, 2006.

---

**You should consider carefully the risk factors beginning on page S-15 in this prospectus supplement.**

---

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

**The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

**The certificates represent interests only in the trust, as the issuing entity, and do not represent interests in or obligations of Residential Funding Mortgage Securities I, Inc., as the depositor, Residential Funding Corporation, as the sponsor, or any of their affiliates.**

Morgan Stanley & Co. Incorporated, as the underwriter, will purchase all but two classes of the senior certificates from the depositor in the amounts described in "Method of Distribution" on page S-100 of this prospectus supplement. The net proceeds to the depositor from the sale of these senior underwritten certificates will be approximately 98.53% of the aggregate certificate principal balance of these senior underwritten certificates plus accrued interest, before deducting expenses.

Bear, Stearns & Co. Inc., as an underwriter, will purchase three classes of subordinate certificates from the depositor in the amounts described in "Method of Distribution" on page S-100 of this prospectus supplement. The net proceeds to the depositor from the sale of these subordinate underwritten certificates will be approximately 96.11% of the aggregate certificate principal balance of these subordinate underwritten certificates plus accrued interest, before deducting expenses.

The offered certificates are offered by the issuing entity through the underwriters to prospective purchasers from time to time in negotiated transactions at varying prices to be determined at the time of sale. There is no underwriting agreement for the remaining two classes of senior certificates.

*Morgan Stanley*                              *Bear, Stearns & Co. Inc.*

Residential Funding will be designated as the "tax matters person" with respect to each REMIC as defined in the REMIC Provisions, as defined in the accompanying prospectus, and in connection therewith will be required to hold not less than 0.01% of the Residual Certificates.

Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Residual Certificates.

For further information regarding the federal income tax consequences of investing in the Residual Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Residual Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates" in the accompanying prospectus.

### State and Other Tax Consequences

In addition to the federal income tax consequences described in "Material Federal Income Tax Consequences," potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the certificates offered by this prospectus. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors should consult their tax advisors about the various tax consequences of investments in the certificates offered by this prospectus.

### Use of Proceeds

The net proceeds from the sale of the offered certificates to the underwriters will be paid to the depositor. The depositor will use the proceeds to purchase the mortgage loans or for general corporate purposes.

### Method of Distribution

In accordance with the terms and conditions of a senior underwriting agreement, dated July 26, 2006, Morgan Stanley & Co. Incorporated will serve as the underwriter and has agreed to purchase and the depositor has agreed to sell the senior certificates, other than the Class A-V Certificates and the Class A-P Certificates, except that a de minimis portion of the Residual Certificates will be retained by Residential Funding and that portion is not offered hereby. The certificates being sold to Morgan Stanley & Co. Incorporated are referred to as the senior underwritten certificates. It is expected that delivery of the senior underwritten certificates, other than the Residual Certificates, will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Residual Certificates, other than the de minimis portion retained by Residential Funding, will be made at the offices of Morgan Stanley & Co. Incorporated, New York, New York on or about June 29, 2006 against payment therefor in immediately available funds.

In accordance with the terms and conditions of a Class M underwriting agreement, dated July 26, 2006, Bear, Stearns & Co. Inc. will serve as the underwriter of the Class M Certificates and has agreed to purchase and the depositor has agreed to sell the Class M Certificates. The certificates being sold to Bear, Stearns & Co. Inc. are referred to as the subordinate underwritten certificates. It is expected that delivery of the subordinate underwritten certificates will be made only in book-entry form through the Same Day Funds Settlement System of DTC on or about July 28, 2006 against payment therefor in immediately available funds.

The senior underwriting agreement and the Class M underwriting agreement are collectively referred to in this prospectus supplement as the underwriting agreements and the senior underwritten certificates and the subordinate underwritten certificates are collectively referred to in this prospectus supplement as the underwritten certificates. Morgan Stanley & Co. Incorporated and Bear, Stearns & Co. Inc. are collectively referred to in this prospectus supplement as the underwriters.

In connection with the senior underwritten certificates and the subordinate underwritten certificates, respectively, the related underwriter has agreed, in accordance with the terms and conditions of its respective underwriting agreement, to purchase all of its respective underwritten certificates if any of those underwritten certificates are purchased thereby.

The underwriting agreements provide that the obligations of the underwriters to pay for and accept delivery of their respective underwritten certificates are subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the respective underwriters may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the senior underwritten certificates, before deducting expenses payable by the depositor, will be approximately 98.53% of the aggregate Certificate Principal Balance of the senior underwritten certificates plus accrued interest thereon from the cut-off date. Proceeds to the depositor from the sale of the subordinate underwritten certificates, before deducting expenses payable by the depositor, will be approximately 96.11% of the aggregate Certificate Principal Balance of the subordinate underwritten certificates plus accrued interest thereon from the cut-off date.

The underwriters may effect these transactions by selling their respective underwritten certificates to or through dealers, and those dealers may receive compensation in the form of underwriting discounts, concessions or commissions from the respective underwriter for whom they act as agent. In connection with the sale of the underwritten certificates, the underwriters may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriters and any dealers that participate with the underwriters in the distribution of the related underwritten certificates are also underwriters under the Securities Act. Any profit on the resale of the underwritten certificates positioned by an underwriter would be underwriter compensation in the form of underwriting discounts and commissions under the Securities Act.

Each underwriting agreement provides that the depositor will indemnify the related underwriter, and that under limited circumstances the related underwriter will indemnify the depositor, against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

The Class A-V Certificates and the Class A-P Certificates may be offered by the depositor from time to time directly or through an underwriter or agent in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. However, there is currently no underwriting arrangement in effect for these certificates. Proceeds to the depositor from any sale of the Class A-V Certificates or the Class A-P Certificates will equal the purchase price paid by their purchaser, net of any expenses payable by the depositor and any compensation payable to any underwriter or agent.

There is currently no secondary market for the offered certificates. Each underwriter intends to make a secondary market in the underwritten certificates to be purchased by it but is not obligated to do

so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the accompanying prospectus under "Description of the Certificates—Reports to Certificateholders" and in this prospectus supplement under "Pooling and Servicing Agreement—Reports to Certificateholders," which will include information as to the outstanding principal balance or notional amount of the offered certificates. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. In addition, the depositor is not aware of any source through which price information about the offered certificates will be available on an ongoing basis. The limited nature of this information regarding the offered certificates may adversely affect the liquidity of the offered certificates, even if a secondary market for the offered certificates becomes available.

## Legal Opinions

Certain legal matters relating to the certificates will be passed upon for the depositor by Mayer, Brown, Rowe & Maw LLP, New York, New York and for Morgan Stanley & Co. Incorporated and Bear, Stearns & Co. Inc. by Sidley Austin LLP, New York, New York.

## Ratings

It is a condition of the issuance of the Senior Certificates that they be rated "Aaa" or "Aa1" by Moody's Investors Service, Inc., or Moody's, "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or Standard & Poor's and Fitch Ratings, or Fitch. It is a condition of the issuance of the Class M-1, Class M-2 and Class M-3 Certificates that they be rated not lower than "AA", "A" and "BBB", respectively, by Fitch.

The ratings assigned by Moody's to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the pooling and servicing agreement. Moody's ratings reflect its analysis of the riskiness of the mortgage loans and the structure of the transaction as described in the pooling and servicing agreement. Moody's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the mortgage loans. Further, the ratings on the Interest Only Certificates do not address whether investors therein will recoup their initial investments. The rating on the Principal Only Certificates only addresses the return of its Certificate Principal Balance. The rating on the Residual Certificates only addresses the return of its Certificate Principal Balance and interest on the Residual Certificates at the related pass-through rate.

Standard & Poor's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificateholders of payments required under the pooling and servicing agreement. Standard & Poor's ratings take into consideration the credit quality of the mortgage pool, structural and legal aspects associated with the certificates, and the extent to which the payment stream in the mortgage pool is adequate to make payments required under the certificates. Standard & Poor's ratings on the offered certificates do not, however, constitute a statement regarding frequency of prepayments on the mortgages. See "Certain Yield and Prepayment Considerations" in this prospectus supplement.

The ratings assigned by Fitch to mortgage pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which they are entitled under the transaction structure. Fitch's ratings reflect its analysis of the riskiness of the underlying mortgage loans and the structure of the transaction as described in the operative documents. Fitch's ratings do not address the effect on the certificates' yield attributable to prepayments or recoveries on the underlying mortgage loans. Further,

# EXHIBIT G

## UNDERWRITER'S CERTIFICATE

[See Tab 57 of the Closing Set]

# EXHIBIT B

 CT Corporation

**Service of Process
Transmittal**
08/14/2012
CT Log Number 521038193

**TO:**   Alita Wingfield, Managing Attorney
Morgan Stanley Law Division
1221 Avenue of the Americas, 35th Floor
New York, NY 10020

**RE:**   **Process Served in Alabama**

**FOR:**   Morgan Stanley & Co. LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Federal Deposit Insurance Corporation, etc., Pltf. vs. Citigroup Mortgage Loan Trust Inc., etc., et al. including Morgan Stanley & Co. LLC, etc., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Cover Sheet, Complaint, Attachment(s), Schedule(s) |
| **COURT/AGENCY:** | Montgomery County Circuit Court, TN
Case # 03CV201290103600 |
| **NATURE OF ACTION:** | Plaintiff claiming damages for untrue or misleading statements in a registration statements under section 11 of the alabama securities act 1933 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Montgomery, AL |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 08/14/2012 postmarked on 08/13/2012 |
| **JURISDICTION SERVED :** | Alabama |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after this summons and complaint were delivered |
| **ATTORNEY(S) / SENDER(S):** | Dennis R. Bailey
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street
Montgomery, AL 36101-0270
334-206-3234 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/14/2012, Expected Purge Date: 09/13/2012
Image SOP
Email Notification, Andrea Carty Abrahams Andrea.Carty@morganstanley.com
Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com
Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com
Email Notification, Crystal Pruden crystal.pruden@morganstanley.com
Email Notification, Alita Wingfield Alita.Wingfield@morganstanley.com
Email Notification, Lenise Davis lenise.davis@morganstanley.com
Email Notification, Osmond Fortin Osmond.Fortin@morganstanley.com
Email Notification, Marielle Messa Marielle.Messa@morganstanley.com
Email Notification, Marie Van Duyne
marie.van.duyne@morganstanleysmithbarney.com |
| **SIGNED:**
**PER:**
**ADDRESS:** | C T Corporation System
Amy McLaren
2 North Jackson Street
Suite 605
Montgomery, AL 36104 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process
Transmittal**
08/14/2012
CT Log Number 521038193

TO:     Alita Wingfield, Managing Attorney
        Morgan Stanley Law Division
        1221 Avenue of the Americas, 35th Floor
        New York, NY 10020

RE:     **Process Served in Alabama**

FOR:    Morgan Stanley & Co. LLC (Domestic State; DE)

TELEPHONE:                          800-592-9023

Information displayed on this transmittal is for CT Corporation's
record keeping purposes only and is provided to the recipient for
quick reference. This information does not constitute a legal
opinion as to the nature of action, the amount of damages, the
answer date, or any information contained in the documents
themselves. Recipient is responsible for interpreting said
documents and for taking appropriate action. Signatures on
certified mail receipts confirm receipt of package only, not
contents.

| State of Alabama | SUMMONS | Case Number: |
| Unified Judicial System | - CIVIL - | 03-CV-2012-901036.00 |
| Form C-34  Rev 6/88 | | |

### IN THE CIVIL COURT OF MONTGOMERY, ALABAMA
### FEDERAL DEPOSIT INSURANCE CORPORATION V. CITIGROUP MORTGAGE LOAN TRUST

**NOTICE TO**  MORGAN STANLEY & CO, CT CORPORATION SYSTEM 2 NO JACKSON ST, STE 605, MONTGOMERY, AL 36104

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY DENNIS R. BAILEY

WHOSE ADDRESS IS P.O. BOX 270, MONTGOMERY, AL 36101

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.
TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☐ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☑ Service by certified mail of this summons is initiated upon the written request of    FEDERAL DEPOSIT INSURANCE CORPORATION
pursuant to the Alabama Rules of the Civil Procedure

| 8/10/2012 3:16:00 PM | /s FLORENCE CAUTHEN | |
| Date | Clerk/Register | By |

☑ Certified mail is hereby requested

/s DENNIS R. BAILEY
Plaintiff's/Attorney's Signature

**RETURN ON SERVICE:**

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____

_____                    _____
Date                                                Server's Signature

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>**03-CV-201**<br>Date of Filing:<br>08/10/2012 | ELECTRONICALLY FILED<br>8/10/2012 3:16 PM<br>CV-2012-901036.00<br>CIRCUIT COURT OF<br>MONTGOMERY COUNTY, ALABAMA<br>FLORENCE CAUTHEN, CLERK |

## GENERAL INFORMATION

### IN THE CIRCUIT OF MONTGOMERY COUNTY, ALABAMA
**FEDERAL DEPOSIT INSURANCE CORPORATION v. CITIGROUP MORTGAGE LOAN TRUST ET AL**

**First Plaintiff:** ☐ Business  ☐ Individual  
☑ Government  ☐ Other

**First Defendant:** ☑ Business  ☐ Individual  
☐ Government  ☐ Other

### NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death  
☐ TONG - Negligence: General  
☐ TOMV - Negligence: Motor Vehicle  
☐ TOWA - Wantonnes  
☐ TOPL - Product Liability/AEMLD  
☐ TOMM - Malpractice-Medical  
☐ TOLM - Malpractice-Legal  
☐ TOOM - Malpractice-Other  
☐ TBFM - Fraud/Bad Faith/Misrepresentation  
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property  
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile  
☐ ACCT - Account & Nonmortgage  
☐ APAA - Administrative Agency Appeal  
☐ ADPA - Administrative Procedure Act  
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/Enforcement of Agency Subpoena/Petition to Preserve  
☐ CVRT - Civil Rights  
☐ COND - Condemnation/Eminent Domain/Right-of-Way  
☐ CTMP - Contempt of Court  
☐ CONT - Contract/Ejectment/Writ of Seizure  
☐ TOCN - Conversion  
☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division  
☐ CVUD - Eviction Appeal/Unlawful Detainer  
☐ FORJ - Foreign Judgment  
☐ FORF - Fruits of Crime Forfeiture  
☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition  
☐ PFAB - Protection From Abuse  
☐ FELA - Railroad/Seaman (FELA)  
☐ RPRO - Real Property  
☐ WTEG - Will/Trust/Estate/Guardianship/Conservatorship  
☐ COMP - Workers' Compensation  
☑ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:**   F ☑ **INITIAL FILING**       A ☐ **APPEAL FROM DISTRICT COURT**       O ☐ **OTHER**

R ☐ **REMANDED**       T ☐ **TRANSFERRED FROM OTHER CIRCUIT COURT** _____

**HAS JURY TRIAL BEEN DEMANDED?**   ☑ Yes  ☐ No

**RELIEF REQUESTED:**   ☑ MONETARY AWARD REQUESTED   ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**   BAI028       8/10/2012 3:12:18 PM       /s/ DENNIS R. BAILEY

**MEDIATION REQUESTED:**       ☐ Yes  ☐ No  ☑ Undecided

ELECTRONICALLY FILED
8/10/2012 3:16 PM
CV-2012-901036.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
FLORENCE CAUTHEN, CLERK

**IN THE CIRCUIT COURT OF**
**MONTGOMERY COUNTY, ALABAMA**

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR COLONIAL BANK, a domestic banking corporation,<br><br>    Plaintiff,<br><br>v.<br><br>CITIGROUP MORTGAGE LOAN TRUST INC., a corporation; CITIGROUP FINANCIAL PRODUCTS INC., a corporation; CITIGROUP GLOBAL MARKETS INC., a corporation; ALLY SECURITIES LLC, a limited liability company; J.P. MORGAN SECURITIES LLC, a limited liability company; MORGAN STANLEY & CO. LLC, a limited liability company; and RBS SECURITIES INC., a corporation;<br><br>    Defendants. | Civil Action No.<br>_____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Comes now Plaintiff Federal Deposit Insurance Corporation as Receiver for Colonial Bank for its Complaint against Citigroup Mortgage Loan Trust Inc. (**CMLTI**); Citigroup Financial Products Inc. (**Citigroup FP**); Citigroup Global Markets Inc. (**Citigroup**); Ally Securities LLC (formerly known as Residential Funding Securities, LLC and doing business as GMAC RFC Securities, and referred to in this Complaint as **GMAC**); J.P. Morgan Securities LLC (formerly known as Bear, Stearns & Co. Inc. and referred to

in this Complaint as **Bear Stearns**); Morgan Stanley & Co.
LLC (formerly known as Morgan Stanley & Co. Inc. and
referred to in this Complaint as **Morgan Stanley**); and RBS
Securities Inc. (formerly known as Greenwich Capital
Markets, Inc. and doing business as RBS Greenwich Capital,
and referred to in this Complaint as **RBS**), and alleges as
follows:

## I.   NATURE OF THIS ACTION

1.   This is an action for damages caused by violation
of the Alabama Securities Act (**ASA**) and the Securities Act
of 1933 (**1933 Act**) by the defendants. As alleged in detail
below, defendants issued, underwrote, or sold six
securities known as "certificates," which were backed by
collateral pools of residential mortgage loans. Colonial
Bank (**Colonial**) paid approximately $222 million for the six
certificates. When they issued, underwrote, or sold the
certificates, the defendants made numerous statements of
material fact about the certificates and, in particular,
about the credit quality of the mortgage loans that backed
them. Many of those statements were untrue. Moreover, the
defendants omitted to state many material facts that were
necessary in order to make their statements not misleading.
For example, the defendants made untrue statements or
omitted important information about such material facts as
the loan-to-value ratios of the mortgage loans, the extent
to which appraisals of the properties that secured the
loans were performed in compliance with professional

2

appraisal standards, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

2. Based on an analysis of a random sample of the loans that backed the certificates that Colonial purchased, the defendants made such untrue or misleading statements about at least the following numbers of loans.

| Securitization No. | Number of Loans about which Defendants Made Material Untrue or Misleading Statements[1] | Number of Loans that Backed the Certificates | Percentage of Loans about which Defendants Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 828 | 1,178 | 70.3% |
| 2 | 872 | 1,106 | 78.8% |
| 3 | 827 | 1,645 | 50.3% |
| 4 | 575 | 801 | 71.8% |
| 5 | 1,642 | 2,607 | 63.0% |
| 6 | 1,119 | 1,696 | 66.0% |

3.   The   certificates   are   "securities"   within   the
meaning  of  the  ASA  and  the  1933  Act.  The  defendants  are

---

[1]   The method of random sampling that Plaintiff used
ensures that conclusions about the entire collateral pool
have a margin of error of no more than plus or minus 5% at
a confidence level of 95% (that is, one can be 95% certain
that the true percentage in the collateral pool as a whole
is within 5% of the percentage measured in the sample). For
example, one can be 95% certain that the number of loans in
Securitization No. 1 about which defendants made untrue or
misleading statements or omissions is within 5% of 828,
that is, between 787 and 869. The same margin of error
should be applied to all information in this Complaint and
accompanying Schedules that is based on a random sample of
loans in a collateral pool, with one exception.

For Securitization No. 2, data was only available for
85 of the 1,106 loans that backed the certificate that
Colonial purchased. For that securitization the margin of
error is no more than plus or minus 10.2% at a confidence
level of 95%.

4

liable under the following provisions of the ASA and the
1933 Act:

*As issuer:* CMLTI, which issued one of the certificates
that Colonial purchased, is liable as an "issuer" under
Section 11 of the 1933 Act.

*As underwriters:* The following defendants, which
underwrote the certificates that Colonial purchased, are
liable as "underwriters" under Section 11 of the 1933 Act:
Citigroup, which underwrote three of the certificates; RBS,
which underwrote two of the certificates; and Bear Stearns,
GMAC, and Morgan Stanley, each of which underwrote one of
the certificates.

*As sellers:* The following defendants, which sold
certain of the certificates to Colonial when they were
initially offered to the public, are liable as "sellers"
under Section 8-6-19(a)(2) of the ASA and Section 12(a)(2)
of the 1933 Act: Citigroup, which sold two of the
certificates; Morgan Stanley, which sold one of the
certificates; and RBS, which sold two of the certificates.

CMLTI is also liable as a seller under Section 8-6-
19(a)(2) of the ASA and Section 12(a)(2) of the 1933 Act
because it issued one of the certificates that Colonial
purchased when it was initially offered to the public.

*As control person:* Citigroup FP is liable as a
"controlling person" of CMLTI under Section 8-6-19(c) of
the ASA and Section 15 of the 1933 Act, 15 U.S.C. § 77o.

## II.  PARTIES

4.    The Federal Deposit Insurance Corporation (**FDIC**)
is a corporation organized and existing under the laws of
the United States of America. Under the Federal Deposit
Insurance Act, the FDIC is authorized to be appointed as
receiver for failed insured depository institutions. On
August 14, 2009, the FDIC was duly appointed the receiver
for Colonial. Under the Federal Deposit Insurance Act, the
FDIC as receiver succeeds to, and is empowered to sue and
complain in any court of law to pursue, all claims held by
banks for which it is the receiver. 12 U.S.C. §§ 1819,
1821(d)(2)(A)(i). Thus, the FDIC as Receiver for Colonial
has authority to pursue claims held by Colonial, including
the claims made against the defendants in this action.

5.    Defendant CMLTI is a corporation organized under
the laws of Delaware.

6.    Defendant Citigroup FP is a corporation organized
under the laws of Delaware. During the relevant time,
Citigroup FP controlled CMLTI. Under Section 8-6-19(c) of
the ASA and Section 15 of the 1933 Act, Citigroup FP
therefore is liable jointly and severally with, and to the
same extent as, CMLTI.

7.    Defendant Bear Stearns is a limited liability
company organized under the laws of Delaware.

8.    Defendant Citigroup is a corporation organized
under the laws of New York.

6

9. Defendant GMAC is a limited liability company organized under the laws of Delaware.

10. Defendant Morgan Stanley is a limited liability company organized under the laws of Delaware.

11. Defendant RBS is a corporation organized under the laws of Delaware.

### III.  JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to Alabama Code § 8-6-19.

13. The amount in controversy exceeds the jurisdictional minimum of this Court.

14. This Court has personal jurisdiction over the defendants pursuant to Alabama Rule of Civil Procedure 4.2.

15. Venue is proper in this Court pursuant to Alabama Code § 6-3-7.

### IV.  SECURITIZATION OF MORTGAGE LOANS

16. The securities that Colonial purchased are so-called **residential mortgage-backed securities,** or **RMBS,** created in a process known as **securitization.** Securitization begins with loans on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. The purpose of underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to repay them and only against sufficient collateral. In the loan

7

underwriting    process,    the    originator    applies    its
**underwriting standards.**

17.  In general, residential mortgage lenders may hold
some of the mortgage loans they originate in their own
portfolios and may sell other mortgage loans they originate
into securitizations.

18.  In a securitization, a large number of loans,
usually of a similar type, are grouped into a **collateral
pool.** The originator of those loans sells them (and, with
them, the right to receive the cash flow from them) to a
**trust.** The trust pays the originator cash for the loans.
The trust raises the cash to pay for the loans by selling
**securities,** usually called **certificates,** to investors such
as Colonial. Each certificate entitles its holder to an
agreed part of the cash flow from the loans in the
collateral pool.

19.  In a simple securitization, the holder of each
certificate is entitled to a *pro rata* part of the overall
monthly cash flow from the loans in the collateral pool.

20.  In a more complex securitization, the cash flow is
divided into different parts, usually called **tranches**
("tranche" is "slice" in French), and the certificates are
divided into different **classes,** each with different rights.
Each class of certificates is entitled to the cash flow in
the tranche corresponding to that class.

21.  One way in which the cash flow is divided — and
the   rights   of   different   classes   of   certificates

8

distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

22. The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the certificates may bear so little of that risk that they may be rated as **triple-A**. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100

9

million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully ten times the historical average. All of the certificates referred to in this Complaint were rated triple-A when Colonial purchased them.

23.   Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

24.   The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has few assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore treats the depositor as the **issuer** of a residential mortgage-backed certificate.

25.   **Securities underwriters**, like Bear Stearns, Citigroup, GMAC, Morgan Stanley, and RBS, play a critical role in the process of securitization. They underwrite the

10

sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

26. Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called "loan files." For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

27. Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to

11

potential investors the information about the credit
quality of the loans that will be deposited into the trust.
They do so by using information about the loans that has
been compiled into a database known as a **loan tape**. The
securities underwriters use the loan tape to compile
numerous statistics about the loans, which are presented to
potential investors in a **prospectus supplement,** a
disclosure document that the underwriters are required to
file with the Securities and Exchange Commission. (Colonial
did not have access to the loan tapes before it purchased
the certificates, but Plaintiff has reviewed data from the
loan tapes in preparing this Complaint.)

28. As alleged in detail below, the information in the
prospectus supplements and other offering documents about
the credit quality of the loans in the collateral pools of
the trusts contained many statements that were material to
the credit quality of those loans, but were untrue or
misleading.

## V.   DEFENDANTS' MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

29. Colonial purchased certificates in six
securitizations (referred to in this Complaint as
Securitizations Nos. 1 through 6). Details of each
securitization and each certificate are stated in Item 29
of Schedules 1 through 6 of this Complaint, which
correspond to Securitizations Nos. 1 through 6. Plaintiff
incorporates into this paragraph 29, and alleges as though

12

fully set forth in this paragraph, the contents of Item 29
of the Schedules.

30. The prospectus supplement for each of the six
securitizations is available from the Securities and
Exchange Commission's website. A URL for each prospectus
supplement is included in Item 29 of the Schedules. The
prospectus supplements are incorporated into this Complaint
by reference.

31. In general, Plaintiff drew and analyzed a random
sample of 400 loans from the collateral pool of each
securitization in which Colonial purchased a certificate.[2]

32. Many of the statements of material fact that the
defendants made in the prospectus supplements were untrue
or misleading. These untrue or misleading statements
included the following.

**A. Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

**1. LTVs**

**(a) The materiality of LTVs**

33. The loan-to-value ratio of a mortgage loan, or
LTV, is the ratio of the amount of the mortgage loan to the
lower of the appraised value or the sale price of the

---

[2] For Securitization No. 2, data was only available for
85 of the 1,106 loans that backed the certificate that
Colonial purchased. For that securitization, Plaintiff
analyzed the 85 loans for which data was available.

13

mortgaged property when the loan is made. For example, a loan of $300,000 secured by a property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV also is a primary determinant of the severity of losses on a loan that defaults. The lower the LTV, the lower the severity of losses if the loan defaults. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

34. Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans. Prepayment patterns therefore affect many aspects of certificates that are material to the investors that purchase them, including

14

the life of the certificate and the timing and amount of cash that the investor will receive during that life.

35. In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Colonial purchased, to receive a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

36. An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, an inflated denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

37. For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus,

15

are essential to the decision of a reasonable investor whether to purchase any such certificate.

### (b) Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations

38. In the prospectus supplements, the defendants made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 38 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 38, and alleges as though fully set forth in this paragraph, the contents of Item 38 of the Schedules.

39. The defendants made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that the defendants intended that these statements be understood as statements of fact. Colonial did understand the statements about the LTVs as statements of fact. Colonial had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that the defendants made about those LTVs.

### (c) An automated valuation model demonstrates that the defendants' statements about the LTVs were untrue because they were based on overstated valuations of the properties in the collateral pools.

40. The stated LTVs of many of the mortgage loans in the securitizations were significantly lower than the true

16

LTVs because the denominators (that is, the value of the properties that secured those loans) that were used to determine the disclosed LTVs were overstated to a material extent. The weighted-average LTVs presented in the prospectus supplements were, therefore, untrue and misleading.

41. Using a comprehensive, industry-standard automated valuation model (**AVM**), it is possible to determine the true market value of a certain property as of a specified date. An AVM is based on objective criteria like the condition of the property and the actual sale prices of comparable properties in the same locale shortly before the specified date, and is more consistent, independent, and objective than other methods of appraisal. AVMs have been in widespread use for many years. The AVM on which these allegations are based incorporates a database of 500 million sales covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

42. For many of the properties that secured the mortgage loans, the model determined that the LTVs presented in the prospectus supplements were understated. In particular, for many of the properties, the model determined that the denominator (that is, the appraised value of the property as stated in the loan tape and

17

compiled into the tables in the prospectus supplement) that
was used in the disclosed LTV was 105% or more of the true
market value as determined by the model as of the date on
which each individual mortgage loan closed. (The model
considered no transactions that occurred after that date.)
In contrast, the model determined that the denominator that
was used in the disclosed LTV was 95% or less of the true
market value on a much smaller number of properties. Thus,
the number of properties on which the value was overstated
exceeded by far the number on which the value was
understated, and the aggregate amount overstated exceeded
by far the aggregate amount understated.

43. For example, in Securitization No. 1, there were
1,178 mortgage loans that backed the certificate that
Colonial purchased. On 409 of the properties that secured
those loans, the model determined that the denominator that
was used in the disclosed LTV was 105% or more of the true
market value and the amount by which the stated values of
those properties exceeded their true market values in the
aggregate was $57,905,435. The model determined that the
denominator that was used in the disclosed LTV was 95% or
less of true market value on only 77 properties, and the
amount by which the true market values of those properties
exceeded the values reported in the denominators was
$9,378,801. Thus, the number of properties on which the
value was overstated exceeded by more than five times the
number on which the value was understated, and the

18

aggregate amount overstated was more than six times the aggregate amount understated.

44. On one of the loans in Securitization No. 1, the amount of the loan was $638,000 and the stated value of the property was $797,000, resulting in a stated LTV of 80%. The model, however, determined that the true value of the property was $585,000, resulting in a true LTV of 109%. Thus, the stated value was higher than the true value by 36.3% and the stated LTV was lower than the true LTV by 29%. Both of these were huge discrepancies that were material to the credit quality of the loan.

45. The overstated values of 409 properties made virtually every statement by the defendants about the LTVs of the mortgage loans untrue or misleading. For example, the defendants stated that all of the mortgage loans had an LTV of 95% or less. In fact, 121 of the mortgage loans had LTVs of over 95%. Defendants also stated that the weighted-average LTV of the loans in the collateral pool was 69.98%. In fact, the weighted-average LTV of the loans was 83.2%. These differences were material for the reasons stated above.

46. The results of the valuations by the automated model in this example are summarized in the following table.

19

| | |
|---|---|
| Number of loans that backed the certificate | 1,178 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 409 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $57,905,435 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 77 |
| Aggregate amount by which the true market values of those properties exceeded their stated values | $9,378,801 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 121 |
| Weighted-average LTV, as stated by defendants | 69.98% |
| Weighted-average LTV, as determined by the model | 83.2% |

47. The model produced similar results for the mortgage loans in the collateral pools of each securitization. Details of the results of the model for each securitization are stated in Item 47 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the Schedules.

> **(d) These statements also were misleading because the defendants omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

48. As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the

20

less likely that a decline in the value of the property
will wipe out the owner's equity and thereby give the owner
an incentive to stop making mortgage payments and abandon
the property. Because LTV affects the behavior of borrowers
so profoundly, accurate LTVs are essential to predicting
defaults and prepayments by borrowers. Also, as mentioned
above, LTV affects the severity of loss on those loans that
do default. The power of LTV to predict defaults,
prepayments, and severities is a major reason why
reasonable investors consider the LTVs of mortgage loans
important to the decision whether to purchase a certificate
in the securitization of those loans.

49. The predictive power of the LTV of a mortgage loan
is much reduced if there are additional liens on the same
property. Additional liens reduce the owner's equity in the
property and thereby increase the owner's incentive to stop
making mortgage payments and abandon the property if the
value of the property falls below the combined amount of
all of the liens on the property (a strategic default).
Additional liens also exacerbate delinquencies and defaults
because they complicate the servicing of mortgage loans and
the management of delinquencies and defaults. Servicers of
the first-lien mortgage must then deal not only with the
borrower, but also with the servicer of the second-lien
mortgage. For example, the servicer of a single mortgage
may want to grant a borrower forbearance while the borrower
is unemployed and allow him or her to add missed payments

21

to the principal of the loan and to resume payments when he
or she is employed again. But the servicer of the second-
lien mortgage may refuse such forbearance and initiate
foreclosure and thereby force the borrower into default on
the first mortgage as well.

50. According to land records, many of the properties
that secured mortgage loans in the collateral pools of the
securitizations were subject to liens in addition to the
lien of the mortgage in the pool at the time of the closing
of these securitizations.[3] The defendants failed to disclose
in the prospectus supplements any of these additional
liens. These additional liens increased the risk that those
owners would default in payment of the mortgage loans.

51. To take an example, of the 1,178 properties that
secured the mortgage loans that backed the certificate that
Colonial purchased in Securitization No. 1, at least 403
were subject to liens in addition to the lien represented
by the mortgage in the collateral pool. The defendants did
not disclose in the prospectus supplement that those liens
existed. Defendants stated that the weighted-average LTV of
the properties was 69.98%, when, solely because of the
additional liens on these 403 properties, the weighted-

_____

[3]    In order to ensure that this calculation did not
include liens that were paid off but were not promptly
removed from land records, the additional liens referred to
in this Complaint and the Schedules do not include liens
that were originated on or before the date on which each
mortgage loan in the pools was closed.

22

average combined LTV was 75.4%.[4] This is a significant difference.

52. On one of the loans, the original balance of the mortgage loan was $468,000, the represented value of the property was $585,000, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $117,000. Thus, when all liens on the property were taken into account, the combined LTV of the loan was 100%, which was 20% higher than the stated LTV on that loan. This was a huge discrepancy that was material to the credit quality of the loan. In many cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

53. Details of the undisclosed additional liens in the securitizations are stated in Item 53 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 53, and alleges as though fully set forth in this paragraph, the contents of Item 53 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

---

[4]     The combined LTV is the ratio of all loans on a property to the value of the property.

23

54. Because the defendants did not disclose the existence or the amounts of these additional liens, all of the statements that they made about the LTVs of the mortgage loans were misleading.

## 2.   Appraisals

55. As discussed above in paragraph 36, an accurate denominator (value of the mortgaged property) is essential to calculating an accurate LTV. An accurate appraisal of the property, in turn, is essential to identifying an accurate denominator.

56. In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to calculate the LTVs of many mortgage loans to be overstated and, in turn, the LTVs to be understated. The defendants' statements regarding the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, the defendants stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those

24

statements were false because upwardly biased appraisals do not conform to USPAP.

> (a) **The statements that the defendants made about the LTVs of the mortgage loans in the collateral pools were misleading because they omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

57. The defendants omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 41 through 47, in each trust, the number of properties for which the value was overstated exceeded by far the number for which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table:

25

| Securitization No. | Ratio of Number of Properties Whose Value Was Overstated to Number Whose Value Was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|:---:|:---:|:---:|
| 1 | 5.3 | 6.2 |
| 2 | 4.5 | 5.6 |
| 3 | 7.2 | 6.8 |
| 4 | 7.0 | 12.2 |
| 5 | 5.4 | 10.1 |
| 6 | 3.0 | 2.7 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

58. Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraisers' actual findings of the values of the properties based on their objective valuations.

> **(b) The statements by the defendants about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

59. Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

60. USPAP includes the following provisions:

26

(a)  USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)  USPAP  Standards  Rule  1-4(a)  provides  that "When a sales comparison approach is necessary for credible assignment   results,   an   appraiser   must   analyze   such comparable sales data as are available to indicate a value conclusion."

(c)   USPAP  Standards  Rule  1-4(b)  provides  that "When a cost approach is necessary for credible assignment results, an appraiser must:

> (i)   develop an opinion of site value by an appropriate appraisal method or technique;
>
> (ii)  analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and
>
> (iii) analyze such comparable data as are available   to   estimate   the   difference between the cost new and the present worth of   the   improvements   (accrued depreciation)."

61.  The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they  "are  issued  to  illustrate  the  applicability  of appraisal   standards   in   specific   situations."   Advisory

27

Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

62. In the prospectus supplements, the defendants made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 62 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules.

63. Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

64. Each of the statements referred to in paragraph 62 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

65. By each of the untrue and misleading statements referred to in paragraphs 38 and 62 above, the defendants

28

materially understated the risk of the certificates that
they issued, underwrote, or sold.

**B.    Untrue or Misleading Statements About the
Occupancy Status of the Properties That Secured
the Mortgage Loans in the Collateral Pools**

### 1.    The materiality of occupancy status

66. Residential real estate is usually divided into
primary residences, second homes, and investment
properties. Mortgages on primary residences are less likely
to default than mortgages on non-owner-occupied residences
and therefore are less risky. Occupancy status also
influences prepayment patterns.

67. Occupancy status (that is, whether the property
that secures a mortgage is to be the primary residence of
the borrower, a second home, or an investment property) is
an important measure of the risk of a mortgage loan. The
percentage of loans in the collateral pool of a
securitization that are not secured by mortgages on primary
residences is an important measure of the risk of
certificates sold in that securitization. Other things
being equal, the higher the percentage of loans not secured
by primary residences, the greater the risk of the
certificates. A reasonable investor considers occupancy
status important to the decision whether to purchase a
certificate in a securitization of mortgage loans.

> **2.  Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

68.  In the prospectus supplements, the defendants made statements about the number of properties in the collateral pools of the securitizations that were the primary residences of their owners. To return to the example of Securitization No. 1, the defendants stated that, of the 1,178 mortgage loans that backed the certificate that Colonial purchased, 1,133 were secured by primary residences and 45 were not. Details of each such statement in the securitizations are stated in Item 68 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 68, and alleges as though fully set forth in this paragraph, the contents of Item 68 of the Schedules.

69.  These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

> **3.  Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading**

70.  Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and

30

more lenient underwriting standards, than mortgage loans on
second homes and investment properties. Applicants for
loans on second homes and investment properties therefore
have an incentive to state that the property will be their
primary residence even when it will not. Plaintiff is
informed and believes, and based thereon alleges, that
borrowers of many securitized loans did so.

71. A significant number of the properties in the
collateral pools of the securitizations that were stated to
be primary residences actually were not. Moreover,
Plaintiff is informed and believes, and based thereon
alleges, that there is additional evidence of occupancy
fraud in the loan files of many more of the mortgage loans
in the collateral pools.

72. With respect to some of the properties that were
stated to be primary residences, the borrower instructed
local tax authorities to send the bills for the taxes on
the property to the borrower at an address other than the
property itself. This is strong evidence that the mortgaged
property was not the borrower's primary residence.

73. In some states and counties, the owner of a
property is able to designate whether that property is his
or her "homestead," which may reduce the taxes on that
property or exempt the property from assets available to
satisfy the owner's creditors, or both. An owner may
designate only one property, which he or she must occupy,
as his or her homestead. The fact that an owner in one of

31

these jurisdictions does not designate a property as his or
her homestead when he or she can do so is strong evidence
that the property was not his or her primary residence.
With respect to some of the properties that were stated to
be primary residences, the owner could have but did not
designate the property as his or her homestead. That
omission is strong evidence that the property was not the
borrower's primary residence.

74. When a borrower actually occupies a newly
mortgaged property, he or she normally notifies entities
that send bills to him or her (such as credit card
companies, utility companies, and local merchants) to send
his or her bills to the address of the newly mortgaged
property. Six months after the closing of the mortgage is
ample time to complete this process. Six months after the
closing of the mortgage, if the borrower is still receiving
his or her bills at a different address, it is very likely
that the borrower does not occupy the mortgaged property.
For each securitization, a credit reporting agency
specializing in mortgage loans compared the addresses in
the borrowers' credit reports to the addresses of the
mortgaged properties six months after the closing of the
mortgage loans. Many borrowers whose mortgage loans were
secured by properties that were stated in the loan tapes to
be owner-occupied did not receive any bills at the address
of the mortgaged property but did receive their bills at

32

another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

75. In Securitization No. 1, 88 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on those properties to them at different addresses; 215 owners of properties that were stated to be primary residences could have, but did not, designate those properties as their homesteads; and 77 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgages were originated. Eliminating duplicates, for one or more of these reasons, 315 of the 1,133 properties that were stated to be primary residences actually were not. Thus, the number of properties that were not primary residences was not 45, as defendants stated, but at least 360, a material difference. The numbers of such loans in the collateral pools of the securitizations are stated in Item 75 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 75, and alleges as though fully set forth in this paragraph, the contents of Item 75 of the Schedules.

76. By each of the untrue and misleading statements referred to in paragraph 68, the defendants materially understated the risk of the certificates that they issued, underwrote, or sold.

.

33

C.   **Untrue or Misleading Statements About the
     Underwriting Standards of the Originators of the
     Mortgage Loans in the Collateral Pools**

     1.   **The materiality of underwriting standards and
          the extent of an originator's disregard of
          them**

77. Originators of mortgage loans have written
standards by which they underwrite applications for loans.
An important purpose of underwriting is to ensure that the
originator makes mortgage loans only in compliance with
those standards and that its underwriting decisions are
properly documented. An even more fundamental purpose of
underwriting mortgage loans is to ensure that loans are
made only to borrowers with credit standing and financial
resources to repay the loans, and only against collateral
with value, condition, and marketability sufficient to
secure the loans. An originator's underwriting standards,
and the extent to which the originator does not follow its
standards, are important indicators of the risk of mortgage
loans made by that originator and of certificates sold in a
securitization in which mortgage loans made by that
originator are part of the collateral pool. A reasonable
investor considers the underwriting standards of
originators of mortgage loans in the collateral pool of a
securitization, and whether an originator disregards its
standards, important to the decision whether to purchase a
certificate in that securitization.

34

## 2.   Untrue or misleading statements about the underwriting standards of originators of the mortgage loans

78.   In the prospectus supplements, the defendants made statements about the underwriting standards of the originators of the mortgage loans in the collateral pools. Details of each such statement are stated in Item 78 of the Schedules of this Complaint. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 78, and alleges as though fully set forth in this paragraph, the contents of Item 78 of the Schedules.

79.   Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because the defendants omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

35

3. **Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

(a) **The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

80. Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations the originators of the loans in the securitizations disregarded their stated underwriting standards. As a result, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

81. The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

82. Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking the originator American Home Mortgage Corp. as an example, Figure 1 shows the rising incidence of early payment defaults (or **EPDs**), that is, the percent of loans (by outstanding principal balance) that were originated and

36

sold into securitizations by American Home Mortgage Corp.
and that became 60 or more days delinquent within six
months after they were made. An EPD is strong evidence that
the originator did not follow its underwriting standards in
making the loan. Underwriting standards are intended to
ensure that loans are made only to borrowers who can and
will make their mortgage payments. Because an EPD occurs so
soon after the mortgage loan was made, it is much more
likely that the default occurred because the borrower could
not afford the payments in the first place (and thus that
the underwriting standards were not followed), than because
of changed external circumstances unrelated to the
underwriting of the mortgage loan (such as that the
borrower lost his or her job). The bars in Figure 1 depict
the incidence of EPDs in loans originated by American Home
Mortgage Corp. that were sold into securitizations. The
steady increase in EPDs is further evidence that the
deterioration in the credit quality of those loans was
caused by disregard of underwriting standards.

37



83.    Figure 2 shows the weighted-average disclosed LTVs
of the same loans and weighted-average disclosed credit
scores of the borrowers. These were nearly constant,
showing that the deterioration in the credit quality of the
loans was caused not by these disclosed factors, but rather
by undisclosed factors.



84. Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for some of them are presented in Figures 1 and 2 of Exhibits A through D of this Complaint:

| Exhibit | Originator |
|---------|------------|
| A | GMAC Mortgage LLC |
| B | National City Mortgage Co. |
| C | PHH Mortgage Corporation |
| D | SunTrust Mortgage Inc. |

> **(b)  The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.**

85.  As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitizations experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 85 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 85, and alleges as though fully set forth in this paragraph, the contents of Item 85 of the Schedules.

86.  A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced

40

very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered delinquencies of 90 days or more are stated in Item 86 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 86, and alleges as though fully set forth in this paragraph, the contents of Item 86 of the Schedules.

87. A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent at a given point in time. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. These high rates of delinquencies are strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on January 31, 2012, are stated in Item 87 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 87, and alleges as though fully set forth in this paragraph, the contents of Item 87 of the Schedules.

88. By each of the untrue and misleading statements referred to in paragraph 78 above, the defendants materially understated the risk of the certificates that

41

they issued, underwrote, or sold. Moreover, Plaintiff is
informed and believes, and based thereon alleges, that
discovery will yield additional evidence that the
originators disregarded their underwriting guidelines when
making the mortgage loans in the collateral pools of these
securitizations.

D. **The Large Number of Mortgage Loans in the
Collateral Pools About Which the Defendants Made
Material Untrue or Misleading Statements Made
Their Statements About the Ratings of Colonial's
Certificates Untrue and Misleading.**

89. In the prospectus supplements, the defendants made
statements about the ratings of the certificates by ratings
agencies. They stated that the ratings agencies rated each
such certificate triple-A. Details of each such statement
are stated in Item 89 of the Schedules of this Complaint.
Plaintiff incorporates into this paragraph 89, and alleges
as though fully set forth in this paragraph, the contents
of Item 89 of the Schedules.

90. The ratings were important to the decision of any
reasonable investor whether to purchase the certificates.
Many investors, including Colonial, have investment
policies that require a certain minimum rating for all
investments. The policy of Colonial was to purchase only
certificates that were rated at least double-A.

91. These statements by the defendants about the
ratings of the certificates they issued, underwrote, or
sold were misleading because the defendants omitted to

42

state that the ratings were affected by all of the material untrue or misleading statements about specific mortgage loans in the collateral pools. These include:

(a) loans whose LTVs were materially understated as shown by the AVM;

(b) loans whose LTVs were misleading as a result of undisclosed additional liens;

(c) loans for which the properties were stated to be owner-occupied, but were not; and

(d) loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans.

92. In Securitization No. 1, there were 409 loans whose LTVs were materially understated as shown by the AVM, 403 loans whose LTVs were misleading because of undisclosed additional liens, and 315 loans for which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 828 loans (or 70.3% of the loans that backed the certificate that Colonial purchased) about which defendants made untrue or misleading statements. The numbers of such loans in the collateral pools of the securitizations are stated in Item 92 of the Schedules of this Complaint. Plaintiff incorporates into this paragraph 92, and alleges as though fully set forth in this paragraph, the contents of Item 92 of the Schedules.

93. Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents

43

available only through discovery will prove that those
statements were untrue or misleading with respect to many
more loans as well.

94. By these untrue and misleading statements, the
defendants materially understated the risk of the
certificates that they issued, underwrote, or sold.

## VI. STATUTES OF LIMITATIONS

95. All of the claims in this Complaint are timely.
Plaintiff became receiver for Colonial on August 14, 2009.
Under 12 U.S.C. § 1821(d)(14), the statutes of limitations
on all of Colonial's claims asserted in this Complaint that
had not expired as of August 14, 2009, are extended to no
less than three years from that date. This Complaint was
filed less than three years from August 14, 2009.

96. The statutes of limitations applicable to the
claims asserted in this Complaint had not expired as of
August 14, 2009, because a reasonably diligent plaintiff
would not have discovered until later than August 14, 2008,
facts that show that the particular statements referred to
in Items 29, 38, 62, 68, 78, and 89 of the Schedules to
this Complaint were untrue or misleading. Those are
statements about the 9,033 specific mortgage loans in the
collateral pools of the securitizations involved in this
action, not about residential mortgage loans or any type of
residential mortgage loan (e.g., prime, Alt-A, subprime,
etc.) in general. A reasonably diligent plaintiff did not
have access until after August 14, 2008, to facts about

44

those specific loans that show that the statements that
defendants made about those specific loans were untrue or
misleading. A reasonably diligent plaintiff did not have
access to the loan files compiled by the originators of
those specific mortgage loans nor to records maintained by
the servicers of those specific mortgage loans (from either
or both of which a reasonably diligent plaintiff may have
discovered facts that show that the statements that
defendants made about those specific loans were untrue or
misleading) because originators and servicers of loans and
securitization trustees do not make those files available
to certificateholders. Moreover, on and prior to August 14,
2008, there were not available to a reasonably diligent
plaintiff, even at considerable expense, data about those
specific loans that show that the statements that
defendants made about those specific loans were untrue or
misleading. Such data became available for the first time
in early 2010.

97. When Colonial purchased the certificates involved
in this action, all of them were rated triple-A, the
highest possible rating, by at least two of Fitch, Moody's,
and Standard & Poor's, all Nationally Recognized
Statistical Rating Organizations (NRSROs) accredited by the
Securities and Exchange Commission. Sponsors of
securitizations submitted to the NRSROs the same
information about the loans in the collateral pools of
proposed securitizations that they included in the

45

prospectus supplements for those securitizations, including
in particular statements of the type referred to in Items
29, 38, 62, 68, 78, and 89 of the Schedules to this
Complaint. The NRSROs used and relied on that information
in rating the certificates to be issued in each
securitization.

98. The NRSROs monitored the certificates that they
rated after those certificates were issued. If an NRSRO
discovers facts that show that there was an untrue or
misleading statement about a material fact in the
information submitted to it for its use in rating a
certificate, then the NRSRO will withdraw its rating of
that certificate while it considers the impact of the
untrue or misleading statement, or it will downgrade the
rating of the certificate, usually to a rating below
investment grade.

99. As noted above, all of the certificates involved
in this action were rated triple-A at issuance by at least
two of Fitch, Moody's, and Standard & Poor's. Not one of
those NRSROs withdrew any of those ratings, or downgraded
any of them to below investment grade, before August 14,
2008. The date on which each certificate was first
downgraded below investment grade is stated in Item 29 of
the Schedules.

100. If a reasonably diligent plaintiff would have
discovered before August 14, 2008, facts that show that the
particular statements referred to in Items 29, 38, 62, 68,

46

78, and 89 of the Schedules to this Complaint were untrue
or misleading, then the NRSROs, which were monitoring the
certificates and are much more sophisticated than a
reasonably diligent plaintiff, would also have discovered
such facts and withdrawn or downgraded their ratings on the
certificates to below investment grade. The fact that none
of the NRSROs did so demonstrates that, before August 14,
2008, a reasonably diligent plaintiff could not have
discovered facts that show that those statements were
untrue or misleading.

101. Even if a reasonably diligent plaintiff would have
discovered before August 14, 2008, facts that show that the
particular statements referred to in Items 29, 38, 62, 68,
78, and 89 of the Schedules to this Complaint were untrue
or misleading, the claims on Securitizations Nos. 3, 5, and
6 would still be timely. As a purchaser of the
certificates, Colonial was, and Plaintiff as Receiver for
Colonial is, a member of the proposed classes in *In re
IndyMac Mortgage-Backed Securities Litigation*, United
States District Court for the Southern District of New
York, No. 09 Civ. 4583 and *New Jersey Carpenters Health
Fund v. Residential Capital, LLC*, United States District
Court for the Southern District of New York, No. 08-CV-
8781. The pendency of these actions has tolled the running
of the statutes of limitations on the claims in this
Complaint.

47

102. One of the securitizations from which Colonial purchased certificates, Securitization No. 3, was included in the original Class Action Complaint filed in *Police and Fire Retirement System of the City of Detroit v. IndyMac MBS, Inc.*, filed on May 14, 2009. That action became *In re IndyMac*. That securitization was dismissed from *In re IndyMac* on June 21, 2010.

103. Two of the securitizations from which Colonial purchased certificates, Securitizations Nos. 5 and 6, were included in the Consolidated First Amended Securities Class Action Complaint filed in *New Jersey Carpenters* on May 16, 2009. Those securitizations were dismissed from *New Jersey Carpenters* on March 31, 2010.

## VII. CAUSES OF ACTION

### A. Untrue or Misleading Statements in the Sale of Securities Under Section 8-6-19(a)(2) of the ASA

104. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 103.

105. Morgan Stanley underwrote and sold to Colonial one certificate in Securitization No. 1. Morgan Stanley sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificate in Securitization No. 1. The sale of this certificate occurred in Alabama because employees or agents of Morgan Stanley directed communications about the certificate and solicitations to purchase the certificate

48

to Colonial there, and because Colonial received those communications and solicitations there.

106. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 1, Morgan Stanley violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

107. Citigroup underwrote and sold to Colonial two certificates in Securitizations Nos. 2 and 4. Citigroup sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificates in Securitizations Nos. 2 and 4. The sale of these certificates occurred in Alabama because employees or agents of Citigroup directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

108. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 2 and 4, Citigroup violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary

49

in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

109. RBS underwrote and sold to Colonial two certificates in Securitizations Nos. 3 and 5. RBS sent communications and solicitations to Colonial in Montgomery, Alabama, for the purpose of inducing Colonial to purchase the certificates in Securitizations Nos. 3 and 5. The sale of these certificates occurred in Alabama because employees or agents of RBS directed communications about the certificates and solicitations to purchase the certificates to Colonial there, and because Colonial received those communications and solicitations there.

110. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 3 and 5, RBS violated Section 8-6-19(a)(2) of the ASA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

111. CMLTI was the depositor of Securitization No. 2 and therefore is the issuer of the certificate in Securitization No. 2 that Colonial purchased. The sale of this certificate occurred in Alabama because employees or agents of Citigroup directed communications about the certificate and solicitations to purchase the certificate

50

to Colonial there, and because Colonial received those communications and solicitations there.

112. CMLTI prepared and signed the registration statement for the certificates in Securitization No. 2 for the purpose of soliciting investors, including Colonial, to purchase certificates when they were initially offered to the public, motivated at least in part by its own financial interest or that of the direct seller.

113. The sale was in the initial offering of the certificate and the certificate was sold by means of a prospectus supplement. Therefore, under 17 C.F.R. § 230.159A(a), CMLTI is considered to have offered or sold the certificate to Colonial.

114. In doing the acts alleged in the offer or sale to Colonial of the certificate in Securitization No. 2, CMLTI violated Section 8-6-19(a)(2) of the ASA by offering or selling a security in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

115. Plaintiff has disposed of all of the certificates.

116. Under Section 8-6-19 of the ASA, Plaintiff is entitled to recover the consideration paid for each of these certificates, plus interest at the legal rate from the date of purchase to the date of disposition, minus the amount of income received on the certificate, minus the

51

greater of the value of the security when Plaintiff disposed of it or the consideration that Plaintiff received for the security.

## B.   Liability as a Controlling Person Under Section 8-6-19(c) of the ASA

117. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 116.

118. Citigroup FP, by or through stock ownership, agency, or otherwise, controlled CMLTI within the meaning of Section 8-6-19(c) of the ASA.

119. In doing the acts alleged, CMLTI violated Section 8-6-19(a)(2) of the ASA by offering or selling the certificate in Securitization No. 2 that Colonial purchased.

120. Citigroup FP is therefore jointly and severally liable with and to the same extent as CMLTI.

## C.   Untrue or Misleading Statements in the Sale of Securities Under Section 12(a)(2) of the 1933 Act

121. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 120.

122. Colonial purchased the certificate in Securitization No. 1 that Morgan Stanley sold to Colonial when it was initially offered to the public.

123. Morgan Stanley solicited Colonial to purchase this certificate, and sold the certificate to Colonial, by means of the prospectus supplement and other written offering materials and oral communications.

52

124. The prospectus supplement and other written offering materials and oral communications that Morgan Stanley sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

125. Colonial did not know when it purchased the certificate in Securitization No. 1 that the statements in the prospectus supplement and other written offering materials and oral communications that Morgan Stanley sent to Colonial were untrue or misleading.

126. In doing the acts alleged in the sale to Colonial of the certificate in Securitization No. 1, Morgan Stanley violated Section 12(a)(2) of the 1933 Act.

127. Colonial purchased the certificates in Securitizations Nos. 2 and 4 that Citigroup sold to Colonial when they were initially offered to the public.

128. Citigroup solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplements and other written offering materials and oral communications.

129. The prospectus supplements and other written offering materials and oral communications that Citigroup sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

53

130. Colonial did not know when it purchased the certificates in Securitizations Nos. 2 and 4 that the statements in the prospectus supplements and other written offering materials and oral communications that Citigroup sent to Colonial were untrue or misleading.

131. In doing the acts alleged in the sale to Colonial of the certificates in Securitizations Nos. 2 and 4, Citigroup violated Section 12(a)(2) of the 1933 Act.

132. Colonial purchased the certificates in Securitizations Nos. 3 and 5 that RBS sold to Colonial when they were initially offered to the public.

133. RBS solicited Colonial to purchase these certificates, and sold the certificates to Colonial, by means of the prospectus supplements and other written offering materials and oral communications.

134. The prospectus supplements and other written offering materials and oral communications that RBS sent to Colonial contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances in which they were made, not misleading.

135. Colonial did not know when it purchased the certificates in Securitizations Nos. 3 and 5 that the statements in the prospectus supplements and other written offering materials and oral communications that RBS sent to Colonial were untrue or misleading.

54

136. In doing the acts alleged in the sale to Colonial
of the certificates in Securitizations Nos. 3 and 5, RBS
violated Section 12(a)(2) of the 1933 Act.

137. CMLTI was the depositor of Securitization No. 2
and therefore is the issuer of the certificate that
Colonial purchased.

138. CMLTI prepared and signed the registration
statement for the certificates in Securitization No. 2 for
the purpose of soliciting investors, including Colonial, to
purchase certificates when they were initially offered to
the public, motivated at least in part by its own financial
interest or that of the direct seller.

139. This sale was in the initial offering of the
certificate and the certificate was sold by means of a
prospectus supplement. Therefore, under 17 C.F.R.
§ 230.159A(a), CMLTI is considered to have offered or sold
the certificates to Colonial.

140. In doing the acts alleged in the offer or sale to
Colonial of the certificate in Securitization No. 2, CMLTI
violated section 12(a)(2) of the 1933 Act.

141. Plaintiff expressly excludes from this cause of
action any allegation that could be construed as alleging
fraud or intentional or reckless conduct. This cause of
action is based solely on allegations of strict liability
or negligence under the 1933 Act.

142. When it failed on August 14, 2009, Colonial had
not discovered that the defendants made untrue or

55

misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements in the sale of each security in the course of its investigation in 2012.

143. Plaintiff has suffered a loss on each of these certificates.

144. Plaintiff is entitled to recover damages.

### D.   Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act

145. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 144.

146. CMLTI is the depositor of Securitization No. 2 and therefore is the issuer of the certificate in Securitization No. 2 that Colonial purchased. In doing the acts alleged, CMLTI violated Section 11 of the 1933 Act in connection with issuing the certificate in Securitization No. 2.

147. Bear Stearns underwrote Securitization No. 1. In doing the acts alleged, Bear Stearns violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 1.

148. Morgan Stanley underwrote Securitization No. 1. In doing the acts alleged, Morgan Stanley violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 1.

149. Citigroup underwrote Securitizations Nos. 2, 4, and 6. In doing the acts alleged, Citigroup violated

Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 2, 4, and 6.

150. RBS underwrote Securitizations Nos. 3 and 5. In doing the acts alleged, RBS violated Section 11 of the 1933 Act in connection with underwriting the certificates in Securitizations Nos. 3 and 5.

151. GMAC underwrote Securitization No. 4. In doing the acts alleged, GMAC violated Section 11 of the 1933 Act in connection with underwriting the certificate in Securitization No. 4.

152. The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 29 of the Schedules.

153. The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 33 through 94.

154. Colonial purchased each certificate before the issuer made generally available an earning statement covering a period of at least twelve months.

155. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging

fraud or intentional or reckless conduct. This cause of action is based solely on allegations of strict liability or negligence under the 1933 Act.

156. Colonial did not know when it purchased the certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

157. When it failed on August 14, 2009, Colonial had not discovered that the defendants made untrue or misleading statements about the certificates. Plaintiff discovered that the defendants made untrue or misleading statements about each security in the course of its investigation in 2012.

158. Colonial has suffered a loss on each of these certificates.

159. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### E.   Liability as a Controlling Person Under Section 15 of the 1933 Act

160. Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 159.

161. Citigroup FP, by or through stock ownership, agency, or otherwise, controlled CMLTI within the meaning of Section 15 of the 1933 Act.

162. In doing the acts alleged, CMLTI violated Sections 11 and 12(a)(2) of the 1933 Act by issuing, offering, or selling the certificate in Securitization No. 2 that

Colonial purchased when it was initially offered to the public.

163. Citigroup FP is therefore jointly and severally liable with and to the same extent as CMLTI.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against defendants for damages in an amount to be determined at trial, but not less than \$122.9 million, plus attorneys' fees, costs of court, and pre- and post-judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff is entitled.

## JURY DEMAND

**Plaintiff demands a trial by jury of all issues**

**triable by jury.**

Dated: August 10, 2012
     Montgomery, Alabama

*Dennis R. Bailey*
Digitally signed by DRB
DN: cn=DRB, o=Rushton Stakely,
ou=Litigation,
email=drb@rushtonstakely.com, c=US
Date: 2012.08.10 13:15:07 -05'00'

Dennis R. Bailey (BAI028)
R. Austin Huffaker (HUF006)
J. Evans Bailey (BAI062)

Of Counsel:

RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rushtonstakely.com (Dennis Bailey E-mail)
rah2@rushtonstakely.com (Austin Huffaker E-mail)
ebailey@rushtonstakely.com (Evans Bailey E-mail)

Of Counsel:

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
GRAIS & ELLSWORTH LLP
1211 Avenue of the Americas
New York, New York 10036
(212) 755-0100 (phone)
(212) 755-0052 (fax)

> Attorneys for Plaintiff Federal
> Deposit Insurance Corporation as
> Receiver for Colonial Bank

60

**Defendants may be served via certified mail at:**

| | |
|---|---|
| Citigroup Mortgage Loan Trust Inc. | The Corporation Trust Company Corporation Trust Center 1209 Orange Street Wilmington, Delaware 19801 |
| Citigroup Financial Products Inc. | Corporation Service Company 80 State Street Albany, New York 12207 |
| Citigroup Global Markets Inc. | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| Ally Securities LLC | Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 |
| J.P. Morgan Securities LLC | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| Morgan Stanley & Co. LLC | CT Corporation System 2 North Jackson Street, Suite 605 Montgomery, Alabama 36104 |
| RBS Securities Inc. | Corporation Service Company 2711 Centerville Road, Suite 400 Wilmington, Delaware 19808 |

## EXHIBIT A TO THE COMPLAINT



Figure 1: Percent of Loans Originated by GMAC Mortgage LLC or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by GMAC Mortgage LLC or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

62

### EXHIBIT B TO THE COMPLAINT



Figure 1: Percent of Loans Originated by National City Mortgage Co. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by National City Mortgage Co. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

## EXHIBIT C TO THE COMPLAINT



Figure 1: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by PHH Mortgage Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

64

## EXHIBIT D TO THE COMPLAINT



Figure 1: Percent of Loans Originated by SunTrust Mortgage Inc. Corporation or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by SunTrust Mortgage Inc. or its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

65

## SCHEDULE 1 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants Morgan Stanley and Bear Stearns.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Morgan Stanley.

**(b) Description of the trust:** Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2006-S6 was a securitization in July 2006 of 1,178 mortgage loans, in one pool. Residential Funding Mortgage Securities I, Inc. was the issuer of the securities in the trust. The mortgage loans were originated or acquired by Homecomings Financial Network, Inc., a wholly-owned subsidiary of Residential Funding Corporation, GMAC Mortgage Corporation, an affiliate of Residential Funding Corporation, SunTrust Mortgage, and various undisclosed originators. Homecomings Financial Network, Inc. originated or acquired approximately 28.8% of the mortgage loans. GMAC Mortgage Corporation originated or acquired approximately 10.6% of the mortgage loans. SunTrust Mortgage originated or acquired approximately 11.9% of the mortgage loans. RFMSI 2006-S6 Pros. Sup. S-3, S-31, S-34, S-38. No other originator originated

**SCHEDULE 1 OF THE COMPLAINT**                     **Page 1**

or acquired more than approximately 9.6% of the mortgage loans. RFMSI 2006-S6 Pros. Sup. S-34.

**(c)  Description  of  the  certificate(s)  that Colonial purchased:** Morgan Stanley and Bear Stearns were underwriters of the security that Colonial purchased. Morgan Stanley offered and sold to Colonial a senior certificate in this securitization, in class A-13, for which Colonial paid $64,645,980 plus accrued interest on September 20, 2006.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Standard & Poor's: AAA; Fitch: AAA; Moody's: Aaa.

**(e)  Current  ratings  of  the  certificate(s):** Standard & Poor's: CCC; Fitch: C; Moody's: Caa2.

**(f)  Date  on  which  the  certificate(s)  were downgraded below investment grade:** June 22, 2009.

**(g)  URL  of  prospectus  supplement  for  this securitization:** http://sec.gov/Archives/edgar/data/1366203/000095011706 003194/a42426.txt

**(h)  Registration  statement  pursuant  or  traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by Residential Funding Mortgage Securities I, Inc. with the SEC on form S-3 on January 20, 2006. Annexed to the registration statement

**SCHEDULE 1 OF THE COMPLAINT**                              **Page 2**

was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, Morgan Stanley and Bear Stearns made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, Morgan Stanley and Bear Stearns presented tables of statistics about the mortgage loans in the collateral pool. RFMSI 2006-S6 Pros. Sup. I-1 to I-5. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was "Weighted Average Loan-to-Value Ratio." There were 12 such tables in Appendix I to the prospectus supplement. In each table, the number of categories into which the loans were divided ranged from 2 to 47. Thus, in Appendix I to the prospectus supplement, Morgan Stanley and Bear Stearns made many untrue or misleading statements about

the original LTVs of the loans in the collateral pool.
RFMSI 2006-S6 Pros. Sup. I-1 to I-5.

(b) "The weighted average Loan-to-Value ratio at
origination of the Mortgage Loans will be approximately
69.98%." RFMSI 2006-S6 Pros. Sup. I-2.

(c) None of the mortgages in the collateral pool
have an original LTV in excess of 95.00%. RFMSI 2006-S6
Pros. Sup. I-2.

**Item 47. Details of the results of the AVM analysis for
the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate | 1,178 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 409 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $57,905,435 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 77 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $9,378,801 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 121 |
| Weighted-average LTV, as stated by defendants | 69.98% |
| Weighted-average LTV, as determined by the model | 83.2% |

**SCHEDULE 1 OF THE COMPLAINT**                    **Page 4**

**Item 53.  Undisclosed additional liens:**

    **(a) Minimum number of properties with additional liens:** 403

    **(b) Weighted average CLTV with additional liens:** 75.4%

**Item 68.  Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley and Bear Stearns made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, described in Item 38, Morgan Stanley and Bear Stearns presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence" and "Second/Vacation." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RFMSI 2006-S6 Pros. Sup. I-4.

(b) In the "Occupancy Types of the Mortgage Loans" table, Morgan Stanley and Bear Stearns stated that of the 1,178 loans in the collateral pool, 1,133 were secured by primary residences, and 45 were not. RFMSI 2006-S6 Pros. Sup. I-4.

**SCHEDULE 1 OF THE COMPLAINT**          **Page 5**

**Item 75. Details of properties that were stated to be owner-occupied, but were not:**

    (a) **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 88

    (b) **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 215

    (c) **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 77

    (d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 315

**Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-38 of the prospectus supplement, and pages 9 through 14 of the prospectus, Morgan Stanley and Bear Stearns made statements about the underwriting standards of Residential Funding. All of those statements are incorporated herein by reference.

One of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RFMSI 2006-S6 Pros. Sup. S-38.

**SCHEDULE 1 OF THE COMPLAINT**                                    **Page 6**

Another one of these statements was that: "[A] determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." RFMSI 2006-S6 Pros. 12.

Another one of these statements was that: "[M]ortgage loans will generally be underwritten on the basis of the borrower's ability to make monthly payments . . . ." RFMSI 2006-S6 Pros. 12.

**Item 86.  90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 226

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 19.2%

**Item 87.  30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 180

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 15.3%

**Item 89.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 and S-102 through S-103 of the prospectus supplement, Morgan Stanley and Bear Stearns made statements about the ratings assigned to the certificates issued in this securitization.  Morgan

**SCHEDULE 1 OF THE COMPLAINT**                    **Page 7**

Stanley and Bear Stearns stated that Colonial's certificate was rated AAA by Standard & Poor's Rating Services, AAA by Fitch Ratings, and Aaa by Moody's. RFMSI 2006-S6 Pros. Sup. S-5. These were the highest ratings available from these rating agencies.

Morgan Stanley and Bear Stearns also stated that: "It is a condition of the issuance of the Senior Certificates that they be rated 'Aaa' or 'Aal' by Moody's Investor Service, Inc. . . . 'AAA' by Standard & Poor's . . . and Fitch Ratings . . . ." RFMSI 2006-S6 Pros. Sup. S-102.

**Item 92. Summary of loans about which the defendants made untrue or misleading statements:**

   **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 409

   **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 403

   **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 315

   **(d) Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 828

   **(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 70.3%

### SCHEDULE 2 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants CMLTI, Citigroup, and Citigroup FP.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Citigroup.

**(b) Description of the trust:** Citigroup Mortgage Loan Trust Inc. Mortgage Pass-Through Certificates, Series 2005-8 was a securitization in October 2005 of 2,830 mortgage loans, in three groups. CMLTI was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated by Countrywide Home Loans, Inc., CitiMortgage, Inc., American Home Mortgage Investment Corp., PHH Mortgage Corp., Mortgage Access Corp. (D/B/A Weichert Financial Services), SunTrust Mortgage, Inc., MortgageIT, Inc., Quicken Loans Inc., National City Mortgage Co., and Wells Fargo Bank, N.A. CMLTI 2005-8 Pros. Sup. S-30. For the Group II loans, American Home Mortgage Investment Corp. originated approximately 94.60%; National City originated approximately 3.5%; PHH originated approximately 0.95%; SunTrust originated approximately 0.89%; and CitiMortgage originated

approximately 0.06%. CMLTI 2005-8 Pros. Sup. S-120 through S-121; 1-42.

**(c) Description of the certificate(s) that Colonial purchased:** Citigroup was the underwriter of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class II-A4A, for which Colonial paid $21,584,982 plus accrued interest on January 10, 2006. Colonial's certificate was primarily paid by the 1,106 loans in Group II.

**(d) Ratings of the certificate(s) when Colonial purchased them:** Moody's: Aaa; Standard & Poor's: AAA.

**(e) Current ratings of the certificate(s):** Moody's: Caa3; Standard & Poor's: CCC.

**(f) Date on which the certificate(s) were downgraded below investment grade:** February 4, 2009.

**(g) URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1257102/000095013605006833/file001.htm

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by CMLTI with the SEC on form S-3 on August 25, 2005. Annexed to the registration statement was a prospectus. The prospectus

**SCHEDULE 2 OF THE COMPLAINT**                                    **Page 2**

was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, CMLTI and Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Appendix 1 of the prospectus supplement, CMLTI and Citigroup presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balance ranges of $31,501 to $50,000, $50,001 to $75,000, $75,001 to $100,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original LTV." There were 16 such tables in Appendix 1 for the loans in Group II. In each table the number of categories into which the loans were divided ranged from 1 to 22. Thus, in Appendix 1, CMLTI and Citigroup made many untrue or misleading statements about the original LTVs of the loans in Group II. CMLTI 2005-8 Pros. Sup. 1-37 through 1-42.

(b)  "The weighted average loan-to-value ratio at origination of the Group II Mortgage Loans was approximately 69.21%." CMLTI 2005-8 Pros. Sup. S-38.

(c)  "No Group II Mortgage Loan had a loan-to-value ratio at origination greater than approximately 100.00% or less than approximately 11.54%." CMLTI 2005-8 Pros. Sup. S-38.

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans that backed the certificate (Group II) | 1,106 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 468 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $46,995,861 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 104 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $8,378,668 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 65 |
| Weighted-average LTV, as stated by defendants | 69.21% |
| Weighted-average LTV, as determined by the model | 85.0% |

**Item 62. Untrue or misleading statements about
compliance with USPAP:**

In the prospectus supplement, CMLTI and Citigroup
made the following statement about the appraisals of
the properties that secured the mortgage loans
originated or acquired by National City
Mortgage: "All appraisals are required to conform to
the Uniform Standards of Professional Appraisal
Practice adopted by the Appraisal Standard Board of the
Appraisal Foundation. Each appraisal must meet the
requirements of Fannie Mae and Freddie Mac." CMLTI
2005-8 Pros. Sup. S-46.

In the prospectus supplement, CMLTI and Citigroup
also made statements about the appraisals of the
properties that secured the mortgage loans originated
or acquired by American Home: "Every American Home
mortgage loan is secured by a property that has been
appraised by a licensed appraiser in accordance with
the Uniform Standards of Professional Appraisal
Practice of the Appraisal Foundation." CMLTI 2005-8
Pros. Sup. S-51.

**Item 68. Untrue or misleading statements about owner-
occupancy of the properties that secured the
mortgage loans:**

In the prospectus supplement, CMLTI and Citigroup
made the following statements about the occupancy
status of the properties that secured the mortgage
loans in the collateral pool of this securitization.

**SCHEDULE 2 OF THE COMPLAINT**                      **Page 5**

(a) In Appendix 1 of the prospectus supplement, described in Item 38, CMLTI and Citigroup presented a table entitled "Occupancy Status of the Group II Mortgage Loans." This table divided the mortgage loans into the categories "Owner Occupied," "Second Home," and "Investor." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of the aggregate principal balance of the mortgage loans in each of these categories. CMLTI 2005-8 Pros. Sup. 1-39.

(b) In the "Occupancy Status of the Group II Mortgage Loans" table, CMLTI and Citigroup stated that of the 1,106 mortgage loans in Group II, 734 were secured by primary residences, and 372 were not. CMLTI 2005-8 Pros. Sup. 1-39.

**Item 75. Details of properties in Group II that were stated to be owner-occupied, but were not:**

    **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 91

    **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 182

    **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 26

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 273

**Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-44 through S-46 of the prospectus supplement, CMLTI and Citigroup made statements about the underwriting standards of National City Mortgage. All of those statements are incorporated herein by reference.

One such statement was that: "The National City Underwriting Guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral." CMLTI 2005-8 Pros. Sup. S-45.

On pages S-49 through S-52 of the prospectus supplement, CMLTI and Citigroup made statements about the underwriting standards of American Home. All of those statements are incorporated herein by reference.

One such statement was that: "Exceptions to the underwriting standards are permitted where compensating factors are present." CMLTI 2005-8 Pros. Sup. S-50.

Another statement was that: "[E]xceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception." CMLTI 2005-8 Pros. Sup. S-52.

**Item 86.  90+ days delinquencies in Group II:**

    **(a)  Number of the mortgage loans that suffered 90+ days delinquencies:** 22

    **(b)  Percent of the mortgage loans that suffered 90+ days delinquencies:** 2.0%

**Item 87.  30+ days delinquencies in Group II:**

    **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 18

    **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 1.6%

**Item 89.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-15 through S-16 and S-136 of the prospectus supplement, CMLTI and Citigroup made statements about the ratings assigned to the certificates issued in this securitization. CMLTI and Citigroup stated that Colonial's certificate was rated AAA by Standard & Poor's and Aaa by Moody's. CMLTI 2005-8 Pros. Sup. S-15. These were the highest ratings available from these two rating agencies.

CMLTI and Citigroup also stated: "It is a condition to the issuance of the certificates that each class of the Offered Certificates be rated not lower than the initial rating indicated for such class in the table [on pages S-15 through S-16 of the prospectus supplement]." CMLTI 2005-8 Pros. Sup. S-136.

Item 92. Summary of loans in Group II about which the
defendants made untrue or misleading
statements:

   (a) Number of loans whose LTVs were materially
   understated as shown by the AVM: 468

   (b) Number of loans for which the properties were
   stated to be owner-occupied but were not: 273

   (c) Eliminating duplicates, number of loans about
   which the defendants made untrue or misleading
   statements: 872

   (d) Eliminating duplicates, percent of loans about
   which the defendants made untrue or misleading
   statements: 78.8%

## SCHEDULE 3 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: RBS.

**(b) Description of the trust**: Residential Asset Securitization Trust 2006-A14CB was a securitization in November 2006 of 1,645 mortgage loans, in two groups. IndyMac MBS, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were acquired by IndyMac Bank, F.S.B. RAST 2006-A14CB Pros. Sup. S-53.

**(c) Description of the certificate(s) that Colonial purchased**: RBS was the underwriter of the security that Colonial purchased. RBS offered and sold to Colonial a senior certificate in this securitization, in class 1-A-1, for which Colonial paid $15,380,966 plus accrued interest on December 12, 2006. Colonial's certificate was primarily paid by the 379 mortgage loans in collateral allocation group 1.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Moody's: Aaa; Standard & Poor's: AAA; Fitch: AAA.

**SCHEDULE 3 OF THE COMPLAINT**                        **Page 1**

(e) **Current ratings of the certificate(s):**
Moody's: Caa3; Standard & Poor's: D; Fitch: D.

(f) **Date on which the certificate(s) were
downgraded below investment grade:** October 27, 2008.

(g) **URL of prospectus supplement for this
securitization:**

http://www.sec.gov/Archives/edgar/data/1090295/00011252
8206006779/b415507_424b5.txt

(h) **Registration statement pursuant or traceable
to which the certificate(s) were issued:** Certificates
in this trust, including the certificate that Colonial
purchased, were issued pursuant or traceable to a
registration statement filed by IndyMac MBS, Inc. with
the SEC on form S-3 on February 24, 2006. Annexed to
the registration statement was a prospectus. The
prospectus was amended from time to time by prospectus
supplements whenever a new series of certificates was
issued pursuant or traceable to that registration
statement.

**SCHEDULE 3 OF THE COMPLAINT**                          **Page 2**

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(c) As of the cut-off date, the Weighted-Average Original Loan-to-Value Ratio of all of the loans in the collateral pool was 73.32%. RAST 2006-A14CB Pros. Sup. S-6.

(d) As of the cut-off date, the Weighted Average Original Loan-to-Value Ratio of the loans in collateral allocation group 1 was 67.82%. RAST 2006-A14CB Pros. Sup S-6.

(e) As of the cut-off date, the weighted average loan-to-value ratio of approximately 33.34% of the collateral allocation group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 67.82%. RAST 2006-A14CB Pros. Sup. S-25.

(f) As of the cut-off date, the weighted average combined loan-to-value ratios (including the second lien) of approximately 33.34% of the collateral allocation group 1 mortgage loans for which the originator of a first lien mortgage loan also originated a second lien mortgage loan was approximately 73.97%. RAST 2006-A14CB Pros. Sup. S-25.

**SCHEDULE 3 OF THE COMPLAINT**                     **Page 3**

(g) "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2006-A14CB Pros. Sup. S-32.

(h) In the section of the prospectus supplement entitled the "Mortgage Pool," RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balance) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000.00, $50,000.01 to $100,000.00, $100,000.01 to 150,000.00, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 13 such tables in the "Mortgage Pool" section for the loans in collateral allocation group 1. In each table the number of categories into which the loans were divided ranged from 2 to 35. Thus, in the "Mortgage Pool" section, RBS made many untrue or misleading statements about the original LTVs of the loans in collateral allocation group 1. RAST 2006-A14CB Pros. Sup. S-34 to S-39.

(i) "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in collateral allocation group 1 was approximately 67.82%." RAST 2006-A14CB Pros. Sup. S-35.

**SCHEDULE 3 OF THE COMPLAINT**                                    **Page 4**

(j)   In the "Mortgage Pool" section, RBS presented similar tables of statistics about the mortgage loans in the aggregate. In these tables, RBS similarly made many untrue or misleading statements about the original LTVs of all of the mortgage loans in the collateral pool. RAST 2006-A14CB Pros. Sup. S-46 to S-51.

(k)   "As of the Cut-off Date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 73.32%." RAST 2006-A14CB Pros. Sup. S-47.

**Item 47.  Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---:|
| Number of loans in the collateral pool | 1,645 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 592 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $32,140,310 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 82 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,735,566 |
| Number of loans with LTVs over 100.00%, as stated by defendant | 0 |
| Number of loans with LTVs over 100.00%, as determined by the model | 103 |
| Weighted-average LTV, as stated by defendant | 73.32% |
| Weighted-average LTV, as determined by the model | 83.4% |

**Item 62. Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, RBS made the following statement about the appraisals of the properties that secured the mortgage loans originated or acquired by IndyMac Bank, F.S.B.: "To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Profession [sic] Appraisal Practice." RAST 2006-A14CB Pros. Sup. S-55.

**Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In the "Mortgage Pool" section of the prospectus supplement, described in Item 38, RBS presented a table entitled "Occupancy Types for the Mortgage Loans in Collateral Allocation Group 1." This table divided the mortgage loans in collateral allocation group 1 into the categories "Primary Home," "Investment," and "Secondary Home." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of

**SCHEDULE 3 OF THE COMPLAINT**                    **Page 6**

aggregate principal balance outstanding in each of these categories. RAST 2006-A14CB Pros. Sup S-38.

(b) In the "Occupancy Types for the Mortgage Loans in Collateral Allocation Group 1" table, RBS stated that of the 379 mortgage loans in collateral allocation group 1, 340 were secured by primary residences, and 39 were not. RAST 2006-A14CB Pros. Sup. S-38.

(c) In the "Mortgage Pool" section of the prospectus supplement, described in Item 38, RBS presented another table entitled "Occupancy Types for the Mortgage Loans." This table divided all of the mortgage loans in the collateral pool into the categories "Primary Home," "Investment," and "Secondary Home." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2006-A14CB Pros. Sup. S-50.

(d) In the "Occupancy Types for the Mortgage Loans" table, RBS stated that of the 1,645 mortgage loans in the collateral pool, 1,338 were secured by primary residences, and 307 were not. RAST 2006-A14CB Pros. Sup. S-50.

**SCHEDULE 3 OF THE COMPLAINT**                                    **Page 7**

**Item 75.** **Details of properties that were stated to be owner-occupied, but were not:**

    **(e)** **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 115

    **(f)** **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 193

    **(g)** **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 132

    **(h)** **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 350

**Item 78.** **Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-53 through S-56 of the prospectus supplement, RBS made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference.

One of these statements was that: "IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral." RAST 2006-A14CB Pros. Sup. S-54.

Another one of these statements was that: "Exceptions to underwriting standards are permitted in

situations in which compensating factors exist." RAST
2006-A14CB Pros. Sup. S-56.

**Item 85. Early payment defaults:**

    **(a)** **Number of the mortgage loans that suffered
EPDs:** 22

    **(b)** **Percent of the mortgage loans that suffered
EPDs:** 1.3%

**Item 86. 90+ days delinquencies:**

    **(a)** **Number of the mortgage loans that suffered 90+
days delinquencies:** 830

    **(b)** **Percent of the mortgage loans that suffered
90+ days delinquencies:** 50.5%

**Item 87. 30+ days delinquencies:**

    **(a)** **Number of the mortgage loans that were 30+
days delinquent on January 31, 2012:** 711

    **(b)** **Percent of the mortgage loans that were 30+
days delinquent on January 31, 2012:** 43.2%

**Item 89. Statements about the ratings of the
certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-115 through S-116
of the prospectus supplement, RBS made statements about
the ratings assigned to the certificates issued in this
securitization. RBS stated that Colonial's certificate
was rated Aaa by Moody's Investors Service, Inc., AAA
by Standard & Poor's, and AAA by Fitch, Inc. RAST 2006-
A14CB Pros. Sup. S-7. These were the highest ratings
available from these three rating agencies.

RBS also stated: "The offered certificates will not be offered unless they are assigned the indicated ratings by Standard & Poor's . . . , Moody's Investors Services, Inc. . . . and Fitch, Inc. . . . ." RAST 2006-A14CB Pros. Sup. S-8.

RBS also stated: "It is a condition to the issuance of the senior certificates . . . that they be rated AAA by Standard & Poor's . . . and Fitch Inc. . . . and Aaa by Moody's Investors Service, Inc. . . . ." RAST 2006-A14CB Pros. Sup. S-115.

**Item 92. Summary of loans about which the defendants made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 592

    **(b) Number of loans for which the properties were stated to be owner-occupied but were not:** 350

    **(c) Number of loans that suffered EPDs:** 22

    **(d) Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 827

    **(e) Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 50.3%

## SCHEDULE 4 TO THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendants Citigroup and GMAC.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial**: Citigroup.

**(b) Description of the trust:** Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S6 was a securitization in June 2007 of 1,400 mortgage loans, in two groups. Residential Funding Mortgage Securities I, Inc. was the issuer of the securities in the trust. The mortgage loans were originated or acquired by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC, Sierra Pacific Mortgage Co. Inc., and various undisclosed originators. Homecomings Financial originated or acquired approximately 45% of the group I loans; GMAC Mortgage originated or acquired approximately 13.5% of the group I loans; and Sierra Pacific Mortgage originated or acquired approximately 10.9% of the group I loans. RFMSI 2007-S6 Pros. Sup. S-3, S-39, S-42, S-48. No other seller sold to

**SCHEDULE 4 OF THE COMPLAINT**                    **Page 1**

Residential Funding more than 8.3% of the group I loans. RFMSI 2007-S6 Pros. Sup. S-42, S-44.

(c) **Description of the certificate(s) that Colonial purchased:** Citigroup and GMAC were underwriters of the security that Colonial purchased. Citigroup offered and sold to Colonial a senior certificate in this securitization, in class 1-A-4, for which Colonial paid $67,787,515 plus accrued interest on September 24, 2007. Colonial's certificate was primarily paid by the 801 mortgage loans in loan group I.

(d) **Ratings of the certificate(s) when Colonial purchased them:** Standard & Poor's: AAA; Fitch: AAA; Moody's: Aaa.

(e) **Current ratings of the certificate(s):** Standard & Poor's: D; Fitch: D; Moody's: Caa2.

(f) **Date on which the certificate(s) were downgraded below investment grade:** April 8, 2009.

(g) **URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1399931/000093041307 005636/c49192_424b5.txt

(h) **Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by Residential Funding

**SCHEDULE 4 OF THE COMPLAINT**                              **Page 2**

Mortgage Securities I, Inc. with the SEC on form S-3 on February 12, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, Citigroup and GMAC made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Appendix I to the prospectus supplement, Citigroup and GMAC presented tables of statistics about the mortgage loans in group I. RFMSI 2007-S6 Pros. Sup. I-1. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Loan-to-Value Ratio." There were 12 such tables in Appendix I for the loans in group I. In each table, the number of categories into which the loans were divided ranged from 2 to 46. Thus, in Appendix I to the prospectus

**SCHEDULE 4 OF THE COMPLAINT**                         **Page 3**

supplement, Citigroup and GMAC made many untrue or misleading statements about the original LTVs of the loans in loan group I. RFMSI 2007-S6 Pros. Sup. I-1 to I-5.

(b) "The weighted average Loan-to-Value ratio at origination of the Group I Loans will be approximately 72.00%." RFMSI 2007-S6 Pros. Sup. I-2.

(c) None of the mortgages in group I have an original LTV in excess of 95%. RFMSI 2007-S6 Pros. Sup. I-2.

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate (loan group I) | 801 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 320 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $53,139,309 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 46 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,357,907 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 130 |
| Weighted-average LTV, as stated by defendants | 72.00% |
| Weighted-average LTV, as determined by the model | 88.4% |

**Item 53. Undisclosed additional liens in group I:**

**(a) Minimum number of properties with additional liens:** 266

**(b) Weighted average CLTV with additional liens:** 74.9%

**Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Citigroup and GMAC made the following statements about the occupancy

**SCHEDULE 4 OF THE COMPLAINT**                    **Page 5**

status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)  In Appendix I to the prospectus supplement, described in Item 38, Citigroup and GMAC presented a table entitled "Occupancy Types of the Group I Loans." This table divided the group I mortgage loans into the categories "Primary Residence" and "Second/Vacation." This table contained untrue or misleading statements about, among other data, the number of group I loans, the principal balance, and the percentage of group I loans in each of these categories. RFMSI 2007-S6 Pros. Sup. I-4.

(b)  In the "Occupancy Types of the Group I Loans" table, Citigroup and GMAC stated that of the 801 loans in group I, 776 were secured by primary residences, and 25 were not. RFMSI 2007-S6 Pros. Sup. I-4.

**Item 75. Details of properties in loan group I that were stated to be owner-occupied, but were not:**

   **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 74

   **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 132

   **(c) Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 50

**SCHEDULE 4 OF THE COMPLAINT**                          **Page 6**

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 208

## Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On page S-48 of the prospectus supplement, and pages 10 through 15 of the prospectus, Citigroup and GMAC made statements about the underwriting standards of Residential Funding. All of those statements are incorporated herein by reference.

One of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RFMSI 2007-S6 Pros. Sup. S-48.

Another one of these statements was that: "[A] determination is made as to whether the prospective borrower has sufficient monthly income available to meet the borrower's monthly obligations on the proposed mortgage loan and other expenses related to the home, including property taxes and hazard insurance, and other financial obligations and monthly living expenses." RFMSI 2007-S6 Pros. 13.

Another one of these statements was that: "[M]ortgage loans will generally be underwritten on the

**SCHEDULE 4 OF THE COMPLAINT**                              **Page 7**

basis of the borrower's ability to make monthly payments . . . ." RFMSI 2007-S6 Pros. 13 through 14.

**Item 86.  90+ days delinquencies in loan group I:**

   **(a)  Number of the mortgage loans that suffered 90+ days delinquencies:** 196

   **(b)  Percent of the mortgage loans that suffered 90+ days delinquencies:** 24.5%

**Item 87.  30+ days delinquencies in loan group I:**

   **(a)  Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 151

   **(b)  Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 18.9%

**Item 89.  Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-5 through S-6 and S-137 through S-138 of the prospectus supplement, Citigroup and GMAC made statements about the ratings assigned to the certificates issued in this securitization. Citigroup and GMAC stated that Colonial's certificate was rated AAA by Standard & Poor's Rating Services, AAA by Fitch Ratings, and Aaa by Moody's. RFMSI 2007-S6 Pros. Sup. S-5. These were the highest ratings available from these rating agencies.

Citigroup and GMAC also stated that: "It is a condition of the issuance of the Senior Certificates that the Class I-A-4 . . . Certificates be rated 'Aaa' by Moody's Investor Service, Inc. . . . and that all of

the Senior Certificates be rated 'AAA' by Standard &
Poor's . . . and Fitch Ratings . . . ." RFMSI 2007-S6
Pros. Sup. S-137.

**Item 92. Summary of loans in group I about which the
defendants made untrue or misleading
statements:**

    **(a) Number of loans whose LTVs were materially
understated as shown by the AVM:** 320

    **(b) Number of loans whose LTVs were misleading
because of undisclosed additional liens:** 266

    **(c) Number of loans for which the properties were
stated to be owner-occupied but were not:** 208

    **(d) Eliminating duplicates, number of loans about
which the defendants made untrue or misleading
statements:** 575

    **(e) Eliminating duplicates, percent of loans about
which the defendants made untrue or misleading
statements:** 71.8%

## SCHEDULE 5 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant RBS.

**Item 29. Details of trust and certificate(s).**

**(a) Dealer that sold the certificate(s) to Colonial:** RBS.

**(b) Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS8 was a securitization in June 2007 of 2,607 mortgage loans, in one pool. Residential Accredit Loans, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC, and Wachovia Mortgage Corporation. Homecomings Financial originated or acquired approximately 44.2% of the mortgage loans; GMAC Mortgage originated or acquired approximately 17.2% of the mortgage loans; and Wachovia originated or acquired approximately 17% of the mortgage loans. RALI 2007-QS8 Pros. Sup. S-5, S-40 through S-41, S-47. No unaffiliated seller sold more than 5.5% of the mortgage

loans to Residential Funding. RALI 2007-QS8 Pros. Sup. S-41.

**(c) Description of the certificate(s) that Colonial purchased**: RBS was the underwriter of the security that Colonial purchased. RBS offered and sold to Colonial a senior certificate in this securitization, in class A-5, for which Colonial paid $5,417,280 plus accrued interest on September 17, 2007.

**(d) Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Moody's: Aaa; Standard &Poor's: AAA.

**(e) Current ratings of the certificate(s)**: Fitch: D; Moody's: Caa3; Standard & Poor's: D.

**(f) Date on which the certificate(s) were downgraded below investment grade**: December 16, 2008.

**(g) URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1400095/000089109207 002629/e27723_424b5.txt

**(h) Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by RALI with the SEC on form S-3 on February 12, 2007. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements

**SCHEDULE 5 OF THE COMPLAINT**                                    **Page 2**

whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, RBS made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement entitled "Mortgage Loan Statistical Information," RBS presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 49. Thus, in the "Mortgage Loan Statistical Information" section, RBS made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QS8 Pros. Sup. I-1 to I-7.

**SCHEDULE 5 OF THE COMPLAINT**                    **Page 3**

(b) "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 74.15%." RALI 2007-QS8 Pros. Sup. I-7.

(c) None of the mortgage loans in the collateral pool have an original LTV in excess of 100%. RALI 2007-Q8 Pros. Sup. I-7.

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 2,607 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 978 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $70,291,375 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 182 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $6,967,467 |
| Number of loans with LTVs over 100%, as stated by defendant | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 345 |
| Weighted-average LTV, as stated by defendant | 74.15% |
| Weighted-average LTV, as determined by the model | 90.8% |

**Item 53. Undisclosed additional liens:**

   (a) **Minimum number of properties with additional liens:** 743

   (b) **Weighted average CLTV with additional liens:** 78.0%

**SCHEDULE 5 OF THE COMPLAINT**                    **Page 4**

## Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, RBS made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, described in Item 38, RBS presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation" and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in each of these categories. RALI 2007-QS8 Pros. Sup. S-11, I-1.

(b) In the "Occupancy Types of the Mortgage Loans" table, RBS stated that of the 2,607 mortgage loans in the collateral pool, 1,841 were secured by primary residences, and 766 were not. RALI 2007-QS8 Pros. Sup. S-11; I-1.

## Item 75. Details of properties that were stated to be owner-occupied, but were not:

(a) **Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 196

(b) **Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 267

(c) **Number of loans for which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address:** 189

(d) **Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 489

**Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-45 through S-47 of the prospectus supplement, RBS made statements about the underwriting standards of Residential Funding Company. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QS8 Pros. Sup. S-46.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QS8 Pros. Sup. S-47.

**SCHEDULE 5 OF THE COMPLAINT**                                    **Page 6**

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property . . . ." RALI 2007-QS8 Pros. Sup. S-45.

**Item 85. Early payment defaults:**

    **(a)** **Number of the mortgage loans that suffered EPDs:** 48

    **(b)** **Percent of the mortgage loans that suffered EPDs:** 1.8%

**Item 86. 90+ days delinquencies:**

    **(a)** **Number of the mortgage loans that suffered 90+ days delinquencies:** 1,128

    **(b)** **Percent of the mortgage loans that suffered 90+ days delinquencies:** 43.3%

**Item 87. 30+ days delinquencies:**

    **(a)** **Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 905

    **(b)** **Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 34.7%

**Item 89. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-112 through S-113 of the prospectus supplement, RBS made statements about the ratings assigned to the certificates issued in this

**SCHEDULE 5 OF THE COMPLAINT**                                         **Page 7**

securitization. RBS stated that Colonial's certificate was rated AAA by Fitch Ratings, AAA by Standard & Poor's, and Aaa by Moody's. RALI 2007-QS8 Pros. Sup. S-7. These were the highest ratings available from these rating agencies.

RBS also stated: "It is a condition of the issuance of the offered certificates . . . that they be rated 'AAA' by Fitch Ratings, . . . 'AAA' by Standard & Poor's Ratings Services, . . . and 'Aaa' by Moody's Investors Service, Inc. . . ." RALI 2007-QS8 Pros. Sup. S-112.

**Item 92. Summary of loans about which the defendant made untrue or misleading statements:**

    **(a) Number of loans whose LTVs were materially understated as shown by the AVM:** 978

    **(b) Number of loans whose LTVs were misleading because of undisclosed additional liens:** 743

    **(c) Number of loans for which the properties were stated to be owner-occupied but were not:** 489

    **(d) Number of loans that suffered EPDs:** 48

    **(e) Eliminating duplicates, number of loans about which the defendant made untrue or misleading statements:** 1,642

    **(f) Eliminating duplicates, percent of loans about which the defendant made untrue or misleading statements:** 63.0%

## SCHEDULE 6 OF THE COMPLAINT

To the extent that this Schedule is incorporated by reference into allegations in the Complaint, those allegations are made against defendant Citigroup.

## Item 29. Details of trust and certificate(s).

(a) **Description of the trust:** Residential Accredit Loans, Inc. Mortgage Asset-Backed Pass-Through Certificates, Series 2007-QS5 was a securitization in March 2007 of 1,696 mortgage loans, in one pool. Residential Accredit Loans, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated by Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding Company, LLC, and GMAC Mortgage, LLC, an affiliate of Residential Funding Company, LLC. Of the 1,696 mortgage loans in the collateral pool, approximately 47.1% and 0.4% by principal amount were originated by Homecomings Financial and GMAC Mortgage, respectively. RALI 2007-QS5 Pros. Sup. S-5, S-44.

(b) **Description of the certificate(s) that Colonial purchased:** Citigroup was the underwriter of the security that Colonial purchased. Colonial purchased a senior certificate in class A-4 of this securitization, for which Colonial paid $47,560,056 plus accrued interest on October 10, 2007.

SCHEDULE 6 OF THE COMPLAINT                                        Page 1

(c) **Ratings of the certificate(s) when Colonial purchased them**: Fitch: AAA; Moody's: Aaa; S&P: AAA.

(d) **Current ratings of the certificate(s)**: Fitch: D; Moody's: Caa3; S&P: D.

(e) **Date on which the certificate(s) were downgraded below investment grade**: December 16, 2008.

(f) **URL of prospectus supplement for this securitization**:
http://www.sec.gov/Archives/edgar/data/1390318/000089109207 001172/e26774_424b5.txt

(g) **Registration statement pursuant or traceable to which the certificate(s) were issued**: Certificates in this trust, including the certificate that Colonial purchased, were issued pursuant or traceable to a registration statement filed by Residential Accredit Loans, Inc. with the SEC on form S-3 on January 23, 2006. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

## Item 38. Untrue or misleading statements about the LTVs of the mortgage loans:

In the prospectus supplement, Citigroup made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

**SCHEDULE 6 OF THE COMPLAINT**                                        **Page 2**

(a)   In Annex I of the prospectus supplement, "Mortgage Loan Statistical Information," Citigroup presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, original principal balance) and divided the loans into categories based on that characteristic (for example, loans with original mortgage loan balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average LTV Ratio." There were 12 such tables in "The Mortgage Loan Statistical Information" section for the loans in the collateral pool. In each table the number of categories into which the loans were divided ranged from 2 to 49. Thus, in "The Mortgage Loan Statistical Information" section, Citigroup made many untrue or misleading statements about the original LTVs of the loans in the collateral pool. RALI 2007-QS5 Pros. Sup. I-1 to I-6.

(b)   "The weighted average loan-to-value ratio at origination of the mortgage loans will be approximately 74.23%." RALI 2007-QS5 Pros. Sup. I-6.

(c)   None of the mortgage loans in the collateral pool have an original LTV in excess of 100%. RALI 2007-QS5 Pros. Sup. I-6.

**SCHEDULE 6 OF THE COMPLAINT**                                      **Page 3**

**Item 47. Details of the results of the AVM analysis for the loans that backed the certificate:**

| | |
|---|---|
| Number of loans that backed the certificate | 1,696 |
| Number of loans on which the stated value was 105% or more of the true market value as determined by the model | 513 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as determined by the model | $35,418,831 |
| Number of loans on which the stated value was 95% or less of the true market value as determined by the model | 174 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $13,106,707 |
| Number of loans with LTVs over 100%, as stated by defendant | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 110 |
| Weighted-average LTV, as stated by defendant | 74.23% |
| Weighted-average LTV, as determined by the model | 84.4% |

**Item 53. Undisclosed additional liens:**

   **(a) Minimum number of properties with additional liens:** 708

   **(b) Weighted average CLTV with additional liens:** 81.2%

**Item 68. Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Citigroup made the following statements about the occupancy status of the

**SCHEDULE 6 OF THE COMPLAINT**                                    **Page 4**

properties that secured the mortgage loans in the collateral pool of this securitization.

(a) In Annex I of the prospectus supplement, described in Item 38, Citigroup presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans into the categories "Primary Residence," "Second/Vacation," and "Non-Owner Occupied." This table contained untrue or misleading statements about, among other data, the number of mortgage loans, the principal balance, and the percentage of mortgage loans in the collateral pool in each of these categories. RALI 2007-QS5 Pros. Sup. S-11; I-1.

(b) In the "Occupancy Types of the Mortgage Loans" table, Citigroup stated that of the 1,696 mortgage loans in the collateral pool, 1,156 were secured by primary residences and 540 were not. RALI 2007-QS5 Pros. Sup. S-11; I-1.

**Item 75. Details of properties that were stated to be owner-occupied, but were not:**

   **(a) Number of loans for which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address:** 110

   **(b) Number of loans for which the owner of the property could have, but did not, designate the property as his or her homestead:** 182

   **(c) Number of loans for which the owner of the property did not receive bills at the address of**

> **the mortgaged property but did receive bills at a different address:** 64

**(d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true:** 288

**Item 78. Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-42 through S-43 of the prospectus supplement, Citigroup made statements about the underwriting standards of Residential Funding Company, LLC. All of those statements are incorporated herein by reference.

One of these statements was that: "The adequacy of the mortgaged property as security for repayment of the related mortgage loan generally is determined by an appraisal in accordance with appraisal procedure guidelines described in the Seller Guide." RALI 2007-QS5 Pros. Sup. S-42.

Another one of these statements was that: "[A] mortgage loan may be considered to comply with the underwriting standards described above, even if one or more specific criteria included in the underwriting standards were not satisfied, if other factors positively compensated for the criteria that were not satisfied." RALI 2007-QS5 Pros. Sup. S-43.

Another one of these statements was that: "Based on the data provided in the application and certain verifications, if required, a determination is made by the original lender

**SCHEDULE 6 OF THE COMPLAINT**                                      **Page 6**

that the mortgagor's monthly income, if required to be stated, will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property. . . ." RALI 2007-QS5 Pros. Sup. S-42.

**Item 85. Early payment defaults:**

    **(a) Number of the mortgage loans that suffered EPDs:** 17

    **(b) Percent of the mortgage loans that suffered EPDs:** 1.0%

**Item 86. 90+ days delinquencies:**

    **(a) Number of the mortgage loans that suffered 90+ days delinquencies:** 755

    **(b) Percent of the mortgage loans that suffered 90+ days delinquencies:** 44.5%

**Item 87. 30+ days delinquencies:**

    **(a) Number of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 610

    **(b) Percent of the mortgage loans that were 30+ days delinquent on January 31, 2012:** 36.0%

**Item 89. Statements about the ratings of the certificate(s) that Colonial purchased:**

On pages S-7 through S-8 and S-106 through S-107 of the prospectus supplement, Citigroup made statements about the ratings assigned to the certificates issued in this securitization. Citigroup stated that Colonial's certificate was rated AAA by Fitch Ratings, Aaa by Moody's

**SCHEDULE 6 OF THE COMPLAINT**            **Page 7**

Investors Service, and AAA by Standard & Poor's. RALI 2007-
QS5 Pros. Sup. S-7. These were the highest ratings
available from these three ratings agencies.

Citigroup also stated: "It is a condition of the
issuance of the Senior Certificates . . . that they be
rated 'AAA' by Fitch Ratings . . . 'AAA' by Standard &
Poor's Ratings Services . . . and 'Aaa' by Moody's
Investors Service . . . ." RALI 2007-QS5 Pros. Sup. S-106.

Item 92. **Summary of loans about which the defendant made
untrue or misleading statements:**

    (a) **Number of loans whose LTVs were materially
understated as shown by the AVM:** 513

    (b) **Number of loans whose LTVs were misleading because
of undisclosed additional liens:** 708

    (c) **Number of loans for which the properties were
stated to be owner-occupied but were not:** 288

    (d) **Number of loans that suffered EPDs:** 17

    (e) **Eliminating duplicates, number of loans about
which the defendant made untrue or misleading
statements:** 1,119

    (f) **Eliminating duplicates, percent of loans about
which the defendant made untrue or misleading
statements:** 66.0%

# EXHIBIT C

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:      (212) 762-7291
Facsimile No:   (914) 729-2950
Email: David.Restaino@morganstanley.com

September 5, 2012

**Via US Mail**

Residential Funding Mortgage Securities I, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 26, 2006 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2006-S6 issued by Residential Funding Mortgage Securities I, Inc. (the "Company"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which the Company has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Colonial Bank, captioned Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust Inc., in the Circuit Court of Montgomery County, Alabama.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:   (212) 762-7291
Facsimile No:   (914) 729-2950
Email:  David.Restaino@morganstanley.com

September 5, 2012

**Via US Mail**

Residential Funding Corporation
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn:  President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 26, 2006 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2006-S6 issued by Residential Funding Mortgage Securities I, Inc., we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which Residential Funding Corporation has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Colonial Bank, captioned <u>Federal Deposit Insurance Corporation as Receiver for Colonial Bank v. Citigroup Mortgage Loan Trust Inc.</u>, in the Circuit Court of Montgomery County, Alabama.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

# EXHIBIT D

# RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.

Mortgage Pass-Through Certificates, Series 2007-S7

| Initial Principal Amount | Class | Initial Pass-Through Rate |
|---|---|---|
| $15,000,000 | Class A-1 Certificates | 6.00% |
| $25,617,000 | Class A-2 Certificates | 6.00% |
| $75,000,000 | Class A-3 Certificates | 6.25% |
| $25,920 | Class A-4 Certificates | 6.25% |
| $3,126,080 | Class A-5 Certificates | 0.00% |
| $18,089,000 | Class A-6 Certificates | 6.00% |
| $13,836,000 | Class A-7 Certificates | 6.00% |
| $2,817,000 | Class A-8 Certificates | 6.00% |
| $6,930,000 | Class A-9 Certificates | 6.00% |
| $9,590,000 | Class A-10 Certificates | 6.00% |
| $26,352,000 | Class A-11 Certificates | 6.00% |
| $64,940,000 | Class A-12 Certificates | 6.00% |
| $97,411,000 | Class A-13 Certificates | 6.00% |
| $14,667,000 | Class A-14 Certificates | 6.00% |
| $19,360,000 | Class A-15 Certificates | 6.00% |
| $7,417,000 | Class A-16 Certificates | 6.00% |
| $25,019,000 | Class A-17 Certificates | 6.00% |
| $162,351,000 | Class A-18 Certificates | 6.00% |
| $41,444,000 | Class A-19 Certificates | 6.00% |
| $230,147,000 | Class A-20 Certificates | 6.00% |
| $40,188,000 | Class A-21 Certificates | 6.00% |
| $26,777,000 | Class A-22 Certificates | 6.00% |
| $66,463,000 | Class A-23 Certificates | 6.00% |
| $197,268,857 | Class A-24 Certificates | Variable |
| Notional | Class A-25 Certificates | Variable |
| $32,878,143 | Class A-26 Certificates | Variable |
| $197,268,857 | Class A-27 Certificates | Variable |
| Notional | Class A-28 Certificates | Variable |
| $32,878,143 | Class A-29 Certificates | Variable |
| $177,018,000 | Class A-30 Certificates | 6.00% |

| | | |
|---|---|---|
| $197,268,857 | Class A-31 Certificates | Variable |
| Notional | Class A-32 Certificates | Variable |
| $32,878,143 | Class A-33 Certificates | Variable |
| $32,878,143 | Class A-34 Certificates | 0.00% |
| $184,117,600 | Class A-35 Certificates | Variable |
| $46,029,400 | Class A-36 Certificates | Variable |
| $100 | Class R Certificates | 6.00% |

## UNDERWRITING AGREEMENT

July 27, 2007

Morgan Stanley & Co. Incorporated
1585 Broadway
New York, New York 10036

Ladies and Gentlemen:

Residential Funding Mortgage Securities I, Inc., a Delaware corporation (the "Company"), proposes to sell to you (also referred to herein as the "Underwriter") Mortgage Pass-Through Certificates, Series 2007-S7, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-31, Class A-32, Class A-33, Class A-34, Class A-35 and Class A-36 Certificates (together with the Class A-V and Class A-P Certificates, the "Class A Certificates"), Class R Certificates (together with the Class A Certificates, the "Certificates"), other than a de minimis portion of the Class R Certificates, having the aggregate principal amounts and Pass-Through Rates set forth above. The Certificates, together with the Class M-1, Class M-2, Class M-3, Class B-1, Class B-2, Class B-3 and Class P Certificates of the same series, will evidence the entire beneficial interest in the Trust Fund (as defined in the Pooling and Servicing Agreement referred to below), consisting primarily of a pool (the "Pool") of conventional, fixed-rate, one- to four-family residential first lien mortgage loans (the "Mortgage Loans") as described in the Prospectus Supplement (as hereinafter defined) to be sold by the Company. A de minimis portion of the Class R Certificates will not be sold hereunder and will be held by Residential Funding Company, LLC ("Residential Funding").

The Certificates will be issued pursuant to a series supplement (the "Series Supplement"), dated as of July 1, 2007 (the "Cut-off Date"), to the standard terms of a pooling and servicing agreement, dated as of July 1, 2007 (the "Standard Terms", and together with the Series Supplement, the "Pooling and Servicing Agreement"), among the Company, as seller, Residential Funding, as master servicer, and U.S. Bank National Association, as trustee (the "Trustee"). The Certificates are described more fully in the Base Prospectus and the Prospectus Supplement (each as hereinafter defined), which the Company has furnished to you.

2

5172419 07081029

1.    Representations, Warranties and Covenants.

    1.1    The Company represents and warrants to, and agrees with you that:

       (a)    The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement (No. 333-140614) on Form S-3 for the registration under the Securities Act of 1933, as amended (the "Act"), of Mortgage Pass-Through Certificates (issuable in series), including the Certificates, which registration statement has become effective, and a copy of which, as amended to the date hereof, has heretofore been delivered to you. The Company proposes to file with the Commission pursuant to Rule 424(b) under the rules and regulations of the Commission under the Act (the "1933 Act Regulations") a prospectus supplement dated July 27, 2007 (the "Prospectus Supplement"), to the prospectus dated April 6, 2007 (the "Base Prospectus"), relating to the Certificates and the method of distribution thereof. Such registration statement (No. 333-140614) including exhibits thereto and any information incorporated therein by reference, as amended at the date hereof, is hereinafter called the "Registration Statement"; and the Base Prospectus and the Prospectus Supplement and any information incorporated therein by reference, together with any amendment thereof or supplement thereto authorized by the Company on or prior to the Closing Date (as defined herein) for use in connection with the offering of the Certificates, are hereinafter called the "Prospectus."

       (b)    The Registration Statement has become effective, and the Registration Statement as of the effective date (the "Effective Date," as defined in this paragraph), and the Prospectus, as of the date of the Prospectus Supplement, complied in all material respects with the applicable requirements of the Act and the 1933 Act Regulations; and the Registration Statement, as of the Effective Date, did not contain any untrue statement of a material fact and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading; and each Issuer Free Writing Prospectus (as defined herein) as of its date did not and at all times prior to the date of the Prospectus Supplement will not, and the Prospectus and Designated Static Pool Information, taken together, as of the date of the Prospectus Supplement did not and as of the Closing Date will not, contain an untrue statement of a material fact and did not and will not omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (except in the case of any Issuer Free Writing Prospectus, any omission with respect to information included in the definition of Senior Structure Information); provided, however, that neither the Company nor Residential Funding makes any representations or warranties as to the information contained in or omitted from the Registration Statement or the Prospectus or any amendment thereof or supplement thereto relating to the information therein that is Excluded Information (as defined herein); and provided, further, that neither the Company nor Residential Funding makes any representations or warranties as to either (i) any information contained in any Underwriter Prepared Issuer FWP (as defined herein) or Underwriter Free Writing Prospectus (as defined herein) except, in each case, to the extent of (x) any information set forth therein that constitutes Pool Information (as defined below) or (y) any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus, or (ii) any information contained in or omitted from the portions of the Prospectus identified by

underlining or other highlighting as shown in Exhibit F (the "Underwriter Information"). The Effective Date shall mean the earlier of the date on which the Prospectus Supplement is first used and the time of the first Contract of Sale (as defined herein) to which such Prospectus Supplement relates. The initial effective date of the Registration Statement was within three years of the Closing Date. If the third anniversary of the initial effective date occurs within six months after the Closing Date, the Company will use best efforts to take such action as may be necessary or appropriate to permit the public offering and sale of the Certificates as contemplated hereunder. The Company acknowledges that the Underwriter Information constitutes the only information furnished in writing by you or on your behalf for use in connection with the preparation of the Registration Statement or the Prospectus, and the Underwriter confirms that the Underwriter Information is correct.

(c)    (i)    "ABS Informational and Computational Materials" shall have the meaning given such term in Item 1101 of Regulation AB.

(ii)    "Approved Offering Materials" means with respect to any class of Certificates anticipated to be rated in the highest category by any Rating Agency, collectively the following documents as most recently provided by the Company and designated in writing by the Company as Approved Offering Materials prior to the time of any Contract of Sale: (i) one or more term sheets, providing factual information about the Certificates and the structure and basic parameters thereof (excluding information about the subdivision of the senior classes into tranches), the basic terms of the subordination or other credit enhancements if known, factual information about the Mortgage Loans (which may include parameters or "stips" or tabular data prepared by the Company), the identity of and basic information about key parties to the transaction known to the Company, and the tax, ERISA and SMMEA characteristics of the Certificates, (ii) a term sheet supplement, containing risk factors and additional information of the type to appear in the Prospectus Supplement to the extent known, and (iii) the Base Prospectus, which may be provided by a weblink. Each of the items described in (i) and (ii) in the preceding sentence shall constitute an Issuer Free Writing Prospectus and any additional information provided by the Underwriter shall constitute an Underwriter Free Writing Prospectus or Underwriter Prepared Issuer FWP, as the case may be. With respect to any class of Certificates anticipated to be rated in the second highest or a lower category by any Rating Agency, "Approved Offering Materials" means the Prospectus.

(iii)    "Contract of Sale" has the same meaning as in Rule 159 of the 1933 Act Regulations and all Commission guidance relating to Rule 159.

(iv)    "Designated Static Pool Information" shall mean the static pool information referred to in the Prospectus under the caption "Static Pool Information" but deemed to be excluded from the Registration Statement and Prospectus pursuant to Item 1105(d) of Regulation AB.

(v)    "Excluded Information" shall mean, with respect to each of the Registration Statement and the Prospectus, the information identified by underlining or other highlighting as shown on Exhibit E.

4

(vi) "Free Writing Prospectus" shall have the meaning given such term in Rules 405 and 433 of the 1933 Act Regulations.

(vii) "Issuer Free Writing Prospectus" shall mean any Free Writing Prospectus prepared by or on behalf of the Company and identified by the Company as an Issuer Free Writing Prospectus and relating to the Certificates or the offering thereof.

(viii) "Issuer Information" shall mean any information of the type specified in clauses (1) – (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform), other than Underwriter Derived Information. Consistent with such definition, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason of the Company's review of the materials pursuant to Section 4.4(e) below and, consistent with Securities Offering Reform Questions and Answers, November 30, 2005 promulgated by the staff of the Commission, "Issuer Information" shall not be deemed to include any information in a Free Writing Prospectus solely by reason that the Underwriter has agreed not to use such Free Writing Prospectus without consent of the Company.

(ix) "Permitted Additional Materials" shall mean information that is not ABS Informational and Computational Materials and (x) that are referred to in Section 4.4(c) so long as any Issuer Information provided by the Underwriter pursuant to Section 4.4(c) is limited to information included within the definition of ABS Informational and Computational Materials, (y) that constitute Certificate price, yield, weighted average life, subscription or allocation information, or a trade confirmation, or (z) otherwise with respect to which the Company has provided written consent to the Underwriter to include in a Free Writing Prospectus.

(x) "Pool Information" means with respect to any Free Writing Prospectus, the information (including any Preliminary Pool Information) with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus.

(xi) "Preliminary Pool Information" means with respect to any Free Writing Prospectus, the information with respect to the characteristics of the Mortgage Loans and administrative and servicing fees, as provided by or on behalf of the Company or Residential Funding to the Underwriter at the time most recent to the date of such Free Writing Prospectus and designated "Preliminary Pool Information."

(xii) "Senior Structure Information" shall mean, with respect to each class of Certificates anticipated to be rated in the highest category by any Rating Agency (collectively, the "Senior Certificates"), (i) the Pass-Through Rate if a fixed rate, or the formula for determining the Pass-Through Rate, (ii) the terms and the provider of any yield maintenance agreement, swap agreement or

5

other agreement that provides payments payable on any class of the Senior Certificates, (iii) the terms and the provider of any surety bond, financial guaranty insurance policy, or other insurance policy regarding any class of the Senior Certificates not known to the Company when the Approved Offering Materials were prepared, (iv) the allocation to each class of Senior Certificates of the aggregate amount of the cashflow payable among the Senior Certificates collectively, and (v) the allocation to each class of Senior Certificates of the aggregate amount of any Realized Losses allocable to the Senior Certificates collectively, in each case, to the extent such information is not contained in the Approved Offering Materials.

(xiii)    "Underwriter  Derived  Information"  shall  refer  to information of the type described in clause (5) of footnote 271 of Commission Release No. 33-8591 (Securities Offering Reform) when prepared by the Underwriter, including traditional computational and analytical materials prepared by the Underwriter.

(xiv)    "Underwriter Free Writing Prospectus" shall mean all Free Writing Prospectuses prepared by or on behalf of the Underwriter other than any Underwriter Prepared Issuer FWP, including any Permitted Additional Materials.

(xv)    "Underwriter Prepared Issuer FWP" shall mean any Free Writing Prospectus or portion thereof prepared by or on behalf of the Underwriter that contains only a description of the final terms of the Certificates or of the offering of the Certificates after the final terms have been established for all classes of Senior Certificates.

(xvi)    "Written Communication" shall have the meaning given such term in Rule 405 of the 1933 Act Regulations.

(d)    The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware and has the requisite corporate power to own its properties and to conduct its business as presently conducted by it.

(e)    The Company was not, as of any date on or after which a bona fide offer (as used in Rule 164(h)(2) of the 1933 Act Regulations) of the Certificate is made an Ineligible Issuer, as such term is defined in Rule 405 of the 1933 Act Regulations. The Company shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

(f)    This Agreement has been duly authorized, executed and delivered by the Company.

(g)    As of the Closing Date (as defined herein) the Certificates will conform in all material respects to the description thereof contained in the Prospectus and the representations and warranties of the Company in the Pooling and Servicing Agreement will be true and correct in all material respects.

6

1.2     Residential Funding represents and warrants to, and agrees with you that as of the Closing Date the representations and warranties of Residential Funding in the Pooling and Servicing Agreement will be true and correct in all material respects.

1.3     The Underwriter represents and warrants to and agrees with the Company and Residential Funding that:

(a)     No purpose of the Underwriter relating to the purchase of the Class R Certificates by the Underwriter is or will be to enable the Company to impede the assessment or collection of any tax.

(b)     The Underwriter has no present knowledge or expectation that it will be unable to pay any United States taxes owed by it so long as any of the Certificates remain outstanding.

(c)     The Underwriter has no present knowledge or expectation that it will become insolvent or subject to a bankruptcy proceeding for so long as any of the Certificates remain outstanding.

(d)     No purpose of the Underwriter relating to any sale of the Class R Certificates by the Underwriter will be to enable it to impede the assessment or collection of tax. In this regard, the Underwriter hereby represents to and for the benefit of the Company and Residential Funding that the Underwriter intends to pay taxes associated with holding the Class R Certificates (other than with respect to the portion of the Class R Certificates retained by Residential Funding), as they become due, fully understanding that it may incur tax liabilities in excess of any cash flows generated by the Class R Certificates.

(e)     The Underwriter will, in connection with any transfer it makes of the Class R Certificates, obtain from its transferee the affidavit required by Section 5.02(f)(i)(B)(I) of the Pooling and Servicing Agreement, will not consummate any such transfer if it knows or believes that any representation contained in such affidavit is false and will provide the Trustee with the Certificate required by Section 5.02(f)(i)(B)(II) of the Pooling and Servicing Agreement.

(f)     The Underwriter hereby certifies that (i) with respect to any classes of Certificates issued in authorized denominations or Percentage Interests of less than a notional amount of $2,000,000 or a Percentage Interest of 20% the fair market value of each such Certificate sold to any person on the date of initial sale thereof by the Underwriter will not be less than $100,000 and (ii) with respect to each class of Certificates to be maintained on the book-entry records of The Depository Trust Company ("DTC"), the interest in each such class of Certificates sold to any person on the date of initial sale thereof by the Underwriter will not be less than the minimum denomination indicated for such class of Certificates in the Prospectus Supplement.

(g)     The Underwriter will have funds available at U.S. Bank National Association, in the Underwriter's account at such bank at the time all documents are executed and the closing of the sale of the Certificates is completed, except for the transfer of funds and the delivery of the Certificates. Such funds will be available for immediate transfer into the account of Residential Funding maintained at such bank.

7

(h)     As of the date hereof and as of the Closing Date, the Underwriter has complied with all of its obligations hereunder and all information contained in any Underwriter Free Writing Prospectus and in any Underwriter Prepared Issuer FWP as used in connection with any Contract of Sale and all Underwriter Information are accurate in all material respects (taking into account the assumptions explicitly set forth in such Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus), except to the extent of (x) any errors therein that are caused by errors or omissions in the Pool Information or (y) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(i)     Prior to the Closing Date, the Underwriter shall notify the Company and Residential Funding of the earlier of (x) the date on which the Prospectus Supplement is first used and (y) the time of the first Contract of Sale to which such Prospectus Supplement relates.

(j)     The Underwriter hereby further represents and agrees that, with respect to the United Kingdom:

        (i)     it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act) received by it in connection with the issue or sale of the Certificates in circumstances in which Section 21(1) of the Financial Services and Markets Act does not apply to the Issuer; and

        (ii)    it has complied and will comply with all applicable provisions of the Financial Services and Markets Act with respect to anything done by it in relation to the Certificates in, from or otherwise involving the United Kingdom.

(k)     In relation to each Member State of the European Economic Area which has implemented the Prospectus directive (each, a "Relevant Member State"), the Underwriter hereby represents and agrees that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of Certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Certificates to the public in that Relevant Member State at any time:

        (i)     to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

8

(ii) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(iii) in any other circumstances which do not require the publication by the Depositor of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this representation, the expression an "offer of Certificates to the public" in relation to any Certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Certificates to be offered so as to enable an investor to decide to purchase or subscribe the Certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

1.4 The Underwriter covenants and agrees to pay directly, or reimburse the Company or Residential Funding upon demand for (i) any and all taxes (including penalties and interest) owed or asserted to be owed by the Company or Residential Funding as a result of a claim by the Internal Revenue Service that the transfer of the Class R Certificates to the Underwriter hereunder or any transfer thereof by the Underwriter may be disregarded for federal tax purposes and (ii) any and all losses, claims, damages and liabilities, including attorney's fees and expenses, arising out of any failure of the Underwriter to make payment or reimbursement in connection with any such assertion as required in (i) above. In addition, the Underwriter acknowledges that on the Closing Date immediately after the transactions described herein it will be the owner of the Class R Certificates (other than a de minimis portion of the Class R Certificates to be held by Residential Funding) for federal tax purposes, and the Underwriter covenants that it will not assert in any proceeding that the transfer of the Class R Certificates from the Company to the Underwriter should be disregarded for any purpose.

2. Purchase and Sale. Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, the Company agrees to sell to you, and you agree to purchase from the Company, the Certificates (other than a de minimis portion of the Class R Certificates, which shall be transferred by the Company to Residential Funding) at a price equal to 97.92% of the aggregate certificate principal balance of the Certificates (other than the Exchangeable and Exchanged Certificates transferred to the Trustee pursuant to Section 3 below) as of the Closing Date (as defined herein), plus accrued interest. There will be added to the purchase price of the Certificates an amount equal to interest accrued thereon from the Cut-off Date up to but not including the Closing Date. The purchase price for the Certificates was agreed to by the Company in reliance upon the transfer from the Company to the Underwriter of the tax liabilities associated with the ownership of the Class R Certificates.

9

3.    Delivery and Payment.  Delivery of and payment for the Certificates shall be made at the office of Mayer, Brown, Rowe & Maw LLP at 10:00 a.m., New York City time, on July 30, 2007 or such later date as you shall designate, which date and time may be postponed by agreement between you and the Company (such date and time of delivery and payment for the Certificates being herein called the "Closing Date"). Delivery of the 2007-S7, Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-31, Class A-32, Class A-33, Class A-34, Class A-35 and Class A-36 Certificates shall be made to you through the Depository Trust Company ("DTC") (such Certificates, the "DTC Registered Certificates"), and delivery of the Class R Certificates (the "Definitive Certificates") shall be made in registered, certificated form, in each case against payment by you of the purchase price thereof to or upon the order of the Company by wire transfer in immediately available funds. Following the delivery of the Certificates to you as described in the preceding sentence, you shall transfer the Exchangeable and Exchanged Certificate (as defined in the Prospectus) in which you do not take an initial position in on the books of DTC on the Closing Date to the Trustee to hold in trust for the holders of the Certificates. The Definitive Certificates shall be registered in such names and in such denominations as you may request not less than two business days in advance of the Closing Date. The Company agrees to have the Definitive Certificates available for inspection, checking and packaging by you in New York, New York not later than 9:00 a.m. on the Closing Date.

4.    Offering by Underwriter.

4.1    It is understood that you propose to offer the Certificates for sale to the public as set forth in the Prospectus and you agree that all such offers and sales by you shall be made in compliance with all applicable laws and regulations. Prior to the date of the first Contract of Sale made based on the Approved Offering Materials, you have not pledged, sold, disposed of or otherwise transferred any Certificate, Mortgage Loans or any interest in any Certificate.

4.2    It is understood that you will solicit offers to purchase the Certificates as follows:

(a)    Prior to the time you have received the Approved Offering Materials you may, in compliance with the provisions of this Agreement, solicit offers to purchase Certificates; provided, that you shall not accept any such offer to purchase a Certificate or any interest in any Certificate or Mortgage Loan or otherwise enter into any Contract of Sale for any Certificate, any interest in any Certificate or any Mortgage Loan prior to your conveyance of Approved Offering Materials to the investor.

(b)    Any Written Communication relating to the Certificates made by an Underwriter in compliance with the terms of this Agreement prior to the time such Underwriter has entered into a Contract of Sale for Certificates with the recipient shall prominently set forth the following statements (or a substantially similar statements approved by the Company):

5172419 07081029

> The information in this free writing prospectus, if conveyed prior
> to the time of your contractual commitment to purchase any of the
> Certificates, supersedes any information contained in any prior
> similar materials relating to the Certificates. The information in
> this free writing prospectus is preliminary, and is subject to
> completion or change. This free writing prospectus is being
> delivered to you solely to provide you with information about the
> offering of the Certificates referred to in this free writing
> prospectus and to solicit an offer to purchase the Certificates,
> when, as and if issued. Any such offer to purchase made by you
> will not be accepted and will not constitute a contractual
> commitment by you to purchase any of the Certificates, until we
> have accepted your offer to purchase Certificates.

> The Certificates referred to in these materials are being sold when,
> as and if issued. The issuer is not obligated to issue such
> Certificates or any similar security and the underwriter's obligation
> to deliver such Certificates is subject to the terms and conditions of
> the underwriting agreement with the issuer and the availability of
> such Certificates when, as and if issued by the issuer. You are
> advised that the terms of the Certificates, and the characteristics of
> the mortgage loan pool backing them, may change (due, among
> other things, to the possibility that mortgage loans that comprise
> the pool may become delinquent or defaulted or may be removed
> or replaced and that similar or different mortgage loans may be
> added to the pool, and that one or more classes of Certificates may
> be split, combined or eliminated), at any time prior to issuance or
> availability of a final prospectus. You are advised that Certificates
> may not be issued that have the characteristics described in these
> materials. The underwriter's obligation to sell such Certificates to
> you is conditioned on the mortgage loans and Certificates having
> the characteristics described in these materials. If for any reason
> the issuer does not deliver such Certificates, the underwriter will
> notify you, and neither the issuer nor any underwriter will have any
> obligation to you to deliver all or any portion of the Certificates
> which you have committed to purchase, and none of the issuer nor
> any underwriter will be liable for any costs or damages whatsoever
> arising from or related to such non-delivery.

(c)     Any Preliminary Pool Information shall not be provided to prospective
investors unless such Preliminary Pool Information is accompanied by the Approved Offering
Materials and the following statements (or substantially similar statements approved by the
Company) appear prominently thereon:

> The information set forth below, entitled "preliminary
> information", was derived from a preliminary pool of mortgage
> loans which is not representative of the mortgage loans that will
> comprise the final mortgage loan pool. The preliminary pool of
> mortgage loans represents only a subset of the final mortgage loan

11

pool and mortgage loans that are included in the preliminary mortgage loan pool may be removed from the final mortgage loan pool. It is expected that the characteristics of the final mortgage loan pool will differ, and may differ materially, from the characteristics of the preliminary pool of mortgage loans and the preliminary information may differ materially from information of a similar type if derived from the final mortgage loan pool. Although the characteristics of the final mortgage loan pool are expected to be within the parameters for the mortgage loan characteristics as set forth in the tables entitled ["collateral stipulations - mortgage pool characteristics"] [accompanying Approved Offering Materials], they are not expected to conform in all material respects to the characteristics of the preliminary mortgage loan pool. You should refer to the parameters for the mortgage loan characteristics in the tables entitled ["collateral stipulations - mortgage pool characteristics"] in the accompanying [Approved Offering Materials].

4.3    It is understood that you will not enter into a Contract of Sale with any investor until the Approved Offering Materials have been conveyed to the investor with respect to the Certificates which are the subject of such Contract of Sale.

4.4    It is understood that you may prepare and provide to prospective investors certain Free Writing Prospectuses, subject to the following conditions:

(a)    Unless preceded or accompanied by a prospectus satisfying the requirements of Section 10(a) of the Act, the Underwriter shall not convey or deliver any Written Communication to any person in connection with the initial offering of the Certificates, unless such Written Communication (i) is made in reliance on Rule 134 under the Act, (ii) constitutes a prospectus satisfying the requirements of Rule 430B under the Act or (iii) constitutes a Free Writing Prospectus (as defined in Section 1.1(c) above) consisting solely of (x) information of a type included within the definition of ABS Informational and Computational Materials (as defined below), (y) Permitted Additional Materials or (z) information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus.

(b)    The Underwriter shall comply with all applicable laws and regulations in connection with the use of Free Writing Prospectuses, including but not limited to Rules 164 and 433 of the 1933 Act Regulations and all Commission guidance relating to Free Writing Prospectuses, including but not limited to Commission Release No. 33-8591.

(c)    It is understood and agreed that all information provided by the Underwriter to or through Bloomberg or Intex or similar entities for use by prospective investors, or imbedded in any CDI file provided to prospective investors, to the extent constituting a Free Writing Prospectus, shall be deemed an Underwriter Free Writing Prospectus.

12

(d)     All Free Writing Prospectuses provided to prospective investors, whether or not filed with the Commission, shall bear a legend including the following statement (or a substantially similar statement approved by the Company):

> "THE DEPOSITOR HAS FILED A REGISTRATION STATEMENT (INCLUDING A PROSPECTUS) WITH THE SECURITIES AND EXCHANGE COMMISSION (THE SEC) FOR THE OFFERING TO WHICH THIS COMMUNICATION RELATES.   BEFORE YOU INVEST, YOU SHOULD READ THE PROSPECTUS IN THAT REGISTRATION STATEMENT AND OTHER DOCUMENTS THE DEPOSITOR HAS FILED WITH THE SEC FOR MORE COMPLETE INFORMATION ABOUT THE DEPOSITOR AND THE OFFERING. YOU MAY GET THESE DOCUMENTS AT NO CHARGE BY VISITING EDGAR ON THE SEC WEB SITE AT *WWW.SEC.GOV.* ALTERNATIVELY, THE DEPOSITOR, ANY UNDERWRITER OR ANY DEALER PARTICIPATING   IN   THE   OFFERING   WILL ARRANGE TO SEND YOU THE PROSPECTUS AT NO CHARGE IF YOU REQUEST IT BY CALLING TOLL-FREE 1–800-XXX-XXXX."

Each of the Underwriter and the Company shall have the right to request additional specific legends or notations to appear on any Free Writing Prospectus and shall have the right to require changes regarding the use of terminology and the right to determine the types of information appearing therein with the approval of the other (which shall not be unreasonably withheld).

(e)     The Underwriter shall deliver to the Company and its counsel (in such format as reasonably required by the Company), no later than the business day prior to the date of the required filing under Section 5.10, an Underwriter Prepared Issuer FWP. To facilitate filing to the extent required by Section 5.10 or 5.11, as applicable, all Underwriter Derived Information shall be set forth in a document separate from any Underwriter Prepared Issuer FWP including Issuer Information. The Underwriter shall deliver to the Company one business day following a request by the Company all Preliminary Pool Information (or information based on or derived in whole or in part from Preliminary Pool Information) provided by it to any prospective investor.

13

(f)        The Underwriter shall provide the Company with a letter from Deloitte & Touche LLP, certified public accountants, prior to the Closing Date, satisfactory in form and substance to the Company, Residential Funding and their respective counsels and the Underwriter, to the effect that such accountants have performed certain specified procedures, all of which have been agreed to by the Company and the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature that is included in any Underwriter Prepared Issuer FWP, other than any Pool Information therein and any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP, is accurate except as to such matters that are not deemed by the Company and the Underwriter to be material. The foregoing letter shall be at the expense of the Underwriter.

(g)        None of the information in any Free Writing Prospectus may conflict with the information then contained in the Registration Statement or any prospectus or prospectus supplement that is a part thereof. The Certificates described in any Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP will be of a type set forth in one of the categories listed beneath the heading "Description of Certificates" in the term sheet supplement included in the Approved Offering Materials and the description of the characteristics of the Certificates contained in such Underwriter Free Writing Prospectus or any Underwriter Prepared Issuer FWP shall not be inconsistent with the description of the Certificates beneath such heading in the term sheet supplement.

(h)        The Company shall not be obligated to file any Issuer Free Writing Prospectuses that have been determined to contain any material error or omission unless such Issuer Free Writing Prospectus has been provided to a prospective investor, in which case, the Underwriter shall cooperate with the Company to prepare a corrective Issuer Free Writing Prospectus that the Underwriter will provide to any such prospective investor and the Company shall file to the extent required herein. In the event that the Underwriter becomes aware that, as of the date on which an investor entered into a Contract of Sale, any Free Writing Prospectus prepared by or on behalf of the Underwriter and delivered to such investor contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading (such Free Writing Prospectus, a "Defective Free Writing Prospectus"), the Underwriter shall notify the Company thereof as soon as practical but in any event within one business day after discovery.

(i)        If the Underwriter does not provide any Free Writing Prospectuses to the Company pursuant to subsection (e) above, the Underwriter shall be deemed to have represented, as of the Closing Date, that it did not provide any prospective investors with any information in written or electronic form in connection with the offering of the Certificates that would constitute an Underwriter Prepared Issuer FWP.

14

(j)     In the event of any delay in the delivery by the Underwriter to the Company of any Underwriter Prepared Issuer FWP required to be delivered in accordance with subsection (e) above, or in the delivery of the accountant's comfort letter in respect thereof pursuant to subsection (f) above, the Company shall have the right to delay the release of the Prospectus to investors or to the Underwriter, to delay the Closing Date and to take other appropriate actions in each case as necessary in order to allow the Company to comply with its agreement set forth in Section 5.10 to file such Underwriter Prepared Issuer FWP by the time specified therein.

(k)     The Underwriter represents that it has in place, and covenants that it shall maintain, internal controls and procedures which it reasonably believes to be sufficient to ensure full compliance with all applicable legal requirements of the 1933 Act Regulations with respect to the generation and use of Free Writing Prospectuses in connection with the offering of the Certificates. In addition, each Underwriter shall, for a period of at least three years after the date hereof, maintain written and/or electronic records of the following:

(i)     any Free Writing Prospectus used by the Underwriter to solicit offers to purchase Certificates to the extent not filed with the Commission;

(ii)     regarding each Free Writing Prospectus delivered by the Underwriter to an investor, the date of such delivery and identity of such investor; and

(iii)     regarding each Contract of Sale entered into by such Underwriter, the date, identity of the investor and the terms of such Contract of Sale, as set forth in the related confirmation of trade.

(l)     The Underwriter covenants with the Company that after the final Prospectus is available the Underwriter shall not distribute any written information concerning the Certificates to a prospective investor unless such information is preceded or accompanied by the final Prospectus. It is understood and agreed that the use of written information in accordance with the preceding sentence is not a Free Writing Prospectus and is not otherwise restricted or governed in any way by this Agreement.

(m)     The Underwriter shall not use any Free Writing Prospectus in connection with the solicitation of offers to purchase Certificates from any prospective investor in a class of Certificates with denominations of less than $25,000 or otherwise designated as a "retail" class of Certificates, and the Underwriter shall not authorize any such use of any Free Writing Prospectus by any dealer that purchases any such Certificates from the Underwriter.

4.5     You further agree that on or prior to the sixth day after the Closing Date, you shall provide the Company with a certificate, substantially in the form of Exhibit G attached hereto, setting forth (i) in the case of each class of Certificates, (a) if less than 10% of the aggregate certificate principal balance of such class of Certificates has been sold to the public as of such date, the value calculated pursuant to clause (b)(iii) of Exhibit G hereto, or, (b) if 10% or more of such class of Certificates has been sold to the public as of such date but no single price is paid for at least 10% of the aggregate certificate principal balance of such class of Certificates, then the weighted average price at which the Certificates of such class were sold expressed as a

15

percentage of the certificate principal balance of such class of Certificates sold, or (c) the first single price at which at least 10% of the aggregate certificate principal balance of such class of Certificates was sold to the public, (ii) the prepayment assumption used in pricing each class of Certificates, and (iii) such other information as to matters of fact as the Company may reasonably request to enable it to comply with its reporting requirements with respect to each class of Certificates to the extent such information can in the good faith judgment of the Underwriter be determined by it.

4.6     The Underwriter agrees that (i) if the Prospectus is not delivered with the confirmation in reliance on Rule 172, it will include in every confirmation sent out the notice required by Rule 173 informing the investor that the sale was made pursuant to the Registration Statement and that the investor may request a copy of the Prospectus from the Underwriter; (ii) if a paper copy of the Prospectus is requested by a person who receives a confirmation, Underwriter shall deliver a printed or paper copy of such Prospectus; and (iii) if an electronic copy of the Prospectus is delivered by the Underwriter for any purpose, such copy shall be the same electronic file containing the Prospectus in the identical form transmitted electronically to the Underwriter by or on behalf of the Company specifically for use by the Underwriter pursuant to this Section 4.6; for example, if the Prospectus is delivered to the Underwriter by or on behalf of the Company in a single electronic file in pdf format, then the Underwriter will deliver the electronic copy of the Prospectus in the same single electronic file in pdf format. The Underwriter further agrees that (i) if it delivers to an investor the Prospectus in pdf format, upon the Underwriter's receipt of a request from the investor within the period for which delivery of the Prospectus is required, the Underwriter will promptly deliver or cause to be delivered to the investor, without charge, a paper copy of the Prospectus and (ii) it will provide to the Company any Underwriter Prepared Issuer FWP, or portions thereof, which the Company is required to file with the Commission in electronic format and will use reasonable efforts to provide to the Company such Underwriter Prepared Issuer FWP, or portions thereof, in either Microsoft Word® or Microsoft Excel® format and not in a pdf, except to the extent that the Company, in its sole discretion, waives such requirements.

5.     Agreements.  The Company and you agree as follows:

5.1     Before amending or supplementing the Registration Statement or the Prospectus with respect to the Certificates, the Company will furnish you with a copy of each such proposed amendment or supplement.

5.2     The Company will cause the Prospectus Supplement to be transmitted to the Commission for filing pursuant to Rule 424(b) under the Act by means reasonably calculated to result in filing with the Commission pursuant to said rule.

5.3     If, during the period after the first date of the public offering of the Certificates in which a prospectus relating to the Certificates is required to be delivered under the Act, any event occurs as a result of which it is necessary to amend or supplement the Prospectus, as then amended or supplemented, in order to make the statements therein, in the light of the circumstances when the Prospectus is delivered to a purchaser, not misleading, or if it shall be necessary to amend or supplement the Prospectus to comply with the Act or the 1933 Act Regulations, the Company promptly will prepare and furnish, at its own expense, to you, either amendments or supplements to the Prospectus so that the statements in the Prospectus as so

16

amended or supplemented will not, in the light of the circumstances when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law.

5.4      If the Company or the Underwriter determines or becomes aware that any Written Communication (including without limitation any Free Writing Prospectus) or oral statement (when considered in conjunction with all information conveyed at the time of Contract of Sale) contains an untrue statement of material fact or omits to state a material fact necessary to make the statements, in light of the circumstances under which they were made, not misleading at the time that a Contract of Sale was entered into, either the Company or the Underwriter may prepare corrective information with notice to the other party, and the Underwriter shall deliver such information in a manner reasonably acceptable to both parties, to any person with whom a Contract of Sale was entered into, and such information shall provide any such person with the following:

(a)     Adequate disclosure of the contractual arrangement;

(b)     Adequate disclosure of the person's rights under the existing Contract of Sale at the time termination is sought;

(c)     Adequate disclosure of the new information that is necessary to correct the misstatements or omissions in the information given at the time of the original Contract of Sale; and

(d)     A meaningful ability to elect to terminate or not terminate the prior Contract of Sale and to elect to enter into or not enter into a new Contract of Sale.

Any costs incurred to the investor in connection with any such termination or reformation shall be subject to Sections 7.1 and 7.2, as applicable.

5.5      The Company will furnish to you, without charge, a copy of the Registration Statement (including exhibits thereto) and, so long as delivery of a prospectus by an underwriter or dealer may be required by the Act, as many copies of the Prospectus, any documents incorporated by reference therein and any amendments and supplements thereto as you may reasonably request; provided, however, that if the Prospectus is not delivered with the confirmation in reliance on Rule 172, you will provide the notice specified in Section 4.6 in every confirmation and will deliver a paper copy of the prospectus to those investors that request a paper copy thereof.

5.6      The Company agrees, so long as the Certificates shall be outstanding, or until such time as you shall cease to maintain a secondary market in the Certificates, whichever first occurs, to deliver to you the annual statement as to compliance delivered to the Trustee pursuant to Section 3.18 of the Pooling and Servicing Agreement and the annual statement of a firm of independent public accountants furnished to the Trustee pursuant to Section 3.19 of the Pooling and Servicing Agreement, as soon as such statements are furnished to the Company.

17

5.7     The Company will endeavor to arrange for the qualification of the Certificates for sale under the laws of such jurisdictions as you may reasonably designate and will maintain such qualification in effect so long as required for the initial distribution of the Certificates; provided, however, that the Company shall not be required to qualify to do business in any jurisdiction where it is not now so qualified or to take any action that would subject it to general or unlimited service of process in any jurisdiction where it is not now so subject.

5.8     If the transactions contemplated by this Agreement are consummated, the Company or Residential Funding will pay or cause to be paid all expenses incident to the performance of the obligations of the Company and Residential Funding under this Agreement, and will reimburse you for any reasonable expenses (including reasonable fees and disbursements of counsel) reasonably incurred by you in connection with qualification of the Certificates for sale and determination of their eligibility for investment under the laws of such jurisdictions as you have reasonably requested pursuant to Section 5.7 above and the printing of memoranda relating thereto, for any fees charged by investment rating agencies for the rating of the Certificates, and for expenses incurred in distributing the Prospectus (including any amendments and supplements thereto) to the Underwriter. Except as herein provided, you shall be responsible for paying all costs and expenses incurred by you, including the fees and disbursements of your counsel, in connection with the purchase and sale of the Certificates.

5.9     If, during the period after the Closing Date in which a prospectus relating to the Certificates is required to be delivered under the Act, the Company receives notice that a stop order suspending the effectiveness of the Registration Statement or preventing the offer and sale of the Certificates is in effect, the Company will advise you of the issuance of such stop order.

5.10    The Company shall file any Issuer Free Writing Prospectus, and any Underwriter Prepared Issuer FWP provided to it by the Underwriter under Section 4.4, not later than the date of first use thereof, except that:

(a)     any Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP or portion thereof otherwise required to be filed that contains only (1) a description of the final terms of the Certificates may be filed by the Company within two days of the later of the date such final terms have been established for all classes of Certificates and the date of first use, and (2) a description of the terms of the Certificates that does not reflect the final terms after they have been established for all classes of all Certificates is not required to be filed; and

(b)     if the Issuer Free Writing Prospectus or Underwriter Prepared Issuer FWP includes only information of a type included in the definition of ABS Informational and Computational Materials, the Company shall file the same within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b) of the Act.

18

provided further, that prior to the filing of any Underwriter Prepared Issuer FWP by the Company, the Underwriter must comply with its obligations pursuant to Section 4.4 and that the Company shall not be required to file any Free Writing Prospectus to the extent such Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

        5.11   The Underwriter shall file any Underwriter Free Writing Prospectus that has been distributed by the Underwriter in a manner reasonably designed to lead to its broad, unrestricted dissemination within the later of two business days after the Underwriter first provides this information to investors and the date upon which the Company is required to file the Prospectus Supplement with the Commission pursuant to Rule 424(b) of the Act or otherwise as required under Rule 433 of the Act; provided, however, that the Underwriter shall not be required to file any Underwriter Free Writing Prospectus to the extent such Underwriter Free Writing Prospectus includes information in a Free Writing Prospectus or Prospectus previously filed with the Commission or that does not contain substantive changes from or additions to a Free Writing Prospectus previously filed with the Commission.

        5.12   The Company acknowledges and agrees that the Underwriter is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the offering of securities contemplated hereby (including in connection with determining the terms of the offering) and not as a fiduciary to, or an agent of, the Company or any other person. Additionally, the Underwriter is not advising the Company or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Underwriter shall have no responsibility or liability to the Company with respect thereto. Any review by the Underwriter of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Underwriter and shall not be on behalf of the Company.

      6.   Conditions to the Obligations of the Underwriter. The Underwriter's obligation to purchase the Certificates shall be subject to the following conditions:

        6.1   No stop order suspending the effectiveness of the Registration Statement shall be in effect, and no proceedings for that purpose shall be pending or, to the knowledge of the Company, threatened by the Commission; and the Prospectus Supplement shall have been filed or transmitted for filing by means reasonably calculated to result in a filing with the Commission pursuant to Rule 424(b) under the Act.

        6.2   Since July 1, 2007 there shall have been no material adverse change (not in the ordinary course of business) in the condition of the Company or Residential Funding.

        6.3   The Company shall have delivered to you a certificate, dated the Closing Date, of the President, a Senior Vice President or a Vice President of the Company to the effect that the signer of such certificate has examined this Agreement, the Approved Offering Materials, the Prospectus, the Pooling and Servicing Agreement and various other closing documents, and that, to the best of his or her knowledge after reasonable investigation:

(a)     the representations and warranties of the Company in this Agreement and in the Pooling and Servicing Agreement are true and correct in all material respects; and

(b)     the Company has, in all material respects, complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date.

6.4     Residential Funding shall have delivered to you a certificate, dated the Closing Date, of the President, a Managing Director, a Director or an Associate of Residential Funding to the effect that the signer of such certificate has examined the Pooling and Servicing Agreement and this Agreement and that, to the best of his or her knowledge after reasonable investigation, the representations and warranties of Residential Funding contained in the Pooling and Servicing Agreement and in this Agreement are true and correct in all material respects.

6.5     You shall have received the opinions of Mayer, Brown, Rowe & Maw LLP, special counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibits A-1, A-2 and A-3, and the opinion of Bruce Bowen, associate counsel for the Company and Residential Funding, dated the Closing Date and substantially to the effect set forth in Exhibit B.

6.6     You shall have received a negative assurance letter regarding the Prospectus from Sidley Austin LLP, counsel for the Underwriter, in form satisfactory to you.

6.7     The Underwriter shall have received from Deloitte & Touche LLP, certified public accountants, (a) a letter dated the date hereof and satisfactory in form and substance to the Underwriter and the Underwriter's counsel, to the effect that they have performed certain specified procedures, all of which have been agreed to by the Underwriter, as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Prospectus Supplement under the captions "Description of the Mortgage Pool", "Pooling and Servicing Agreement", "Description of the Certificates" and "Certain Yield and Prepayment Considerations" agrees with the records of the Company and Residential Funding excluding any questions of legal interpretation and (b) the letter prepared pursuant to Section 4.4(f).

6.8     The Class A Certificates and Class R Certificates shall have been rated, "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("Standard & Poor's") and Fitch Ratings ("Fitch").

6.9     You shall have received the opinion of Chapman and Cutler LLP, counsel to the Trustee, dated the Closing Date, substantially to the effect set forth in Exhibit C.

6.10     You shall have received the opinion of Faegre & Benson, LLP, special Minnesota tax counsel for the Company, dated the Closing Date, substantially to the effect set forth in Exhibit D.

6.11     You shall have received from Bruce Bowen, associate counsel to the Company, a reliance letter with respect to any opinions delivered to the rating agencies, or you shall have been listed as an addressee on any such opinions.

5172419 07081029

The Company will furnish you with conformed copies of the above opinions, certificates, letters and documents as you reasonably request.

7.    Indemnification and Contribution.

7.1    The Company and Residential Funding, jointly and severally, agree to indemnify and hold harmless you and each person, if any, who controls you within the meaning of either Section 15 of the Act or Section 20 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement for the registration of the Certificates as originally filed or in any amendment thereof or other filing incorporated by reference therein, or in the Prospectus and Designated Static Pool Information, taken together, or incorporated by reference in the Prospectus (if used within the period set forth in Section 5.3 hereof and as amended or supplemented if the Company shall have furnished any amendments or supplements thereto), or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (ii) caused by any untrue statement or alleged untrue statement of a material fact contained in any Issuer Free Writing Prospectus, or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading (except any omission with respect to information included in the definition of Senior Structure Information), or (iii) caused by any untrue statement of a material fact or alleged untrue statement of a material fact contained in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, that in either case was caused by (x) any error or omission in any Pool Information or (y) or any information accurately extracted from any Issuer Free Writing Prospectus and included in any Underwriter Prepared Issuer FWP or Underwriter Free Writing Prospectus; except insofar as such losses, claims, damages, or liabilities are caused by any such untrue statement or omission or alleged untrue statement or omission based upon any information with respect to which the Underwriter has agreed to indemnify the Company pursuant to clause (i) of Section 7.2; provided, however, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information.

7.2    You agree to indemnify and hold harmless the Company, Residential Funding, their respective directors or officers and any person controlling the Company or Residential Funding within the meaning of either Section 15 of the Act or Section 20 of the Exchange Act from and against any and all losses, claims, damages and liabilities (i) caused by any untrue statement or alleged untrue statement of material fact contained in the Underwriter Information, or any omission or alleged omission to state therein any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (ii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Free Writing Prospectus (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Free Writing Prospectus), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which

21

they were made, not misleading, (iii) caused by any untrue statement or alleged untrue statement of material fact contained in any Underwriter Prepared Issuer FWP (except for any information accurately extracted from any Issuer Free Writing Prospectus and included in such Underwriter Prepared Issuer FWP), or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (iv) resulting from your failure to comply with Section 4.4(e) or Section 4.3 or failure to file any Underwriter Free Writing Prospectus required to be filed in accordance with Section 5.11; provided, however, that the indemnification set forth in clauses (ii) and (iii) of this Section 7.2 shall not apply to the extent of any error or omission in any Underwriter Prepared Issuer FWP or any Underwriter Free Writing Prospectus that was caused by any error or omission in any Pool Information; provided, further, that none of the Company, Residential Funding or you will be liable in any case to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein relating to the Excluded Information. In addition, you agree to indemnify and hold harmless the Company, Residential Funding, their respective directors or officers and any person controlling the Company or Residential Funding against any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) caused by, resulting from, relating to, or based upon any legend regarding original issue discount on any Certificate resulting from incorrect information provided by the Underwriter in the certificates described in Section 4.5 hereof.

7.3    In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 7.1 or Section 7.2, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding. In any such proceeding, any indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties. Such firm shall be designated in writing by you, in the case of parties indemnified pursuant to Section 7.1 and by the Company or Residential Funding, in the case of parties indemnified pursuant to Section 7.2.    The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel reasonably satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation. Unless it shall assume the defense of any proceeding the indemnifying party shall not be liable for any settlement of any proceeding, effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. If the indemnifying party assumes the defense of any proceeding, it

22

shall be entitled to settle such proceeding with the consent of the indemnified party or, if such settlement provides for release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the consent of the indemnified party.

7.4    If the indemnification provided for in this Section 7 is unavailable to an indemnified party under Section 7.1 or Section 7.2 hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect not only the relative benefits received by the Company and Residential Funding on the one hand and the Underwriter on the other from the offering of the Certificates but also the relative fault of the Company or Residential Funding on the one hand and of the Underwriter on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of the Company and Residential Funding on the one hand and of the Underwriter on the other shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriter, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

7.5    The Company, Residential Funding and the Underwriter agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation or by any other method of allocation which does not take account of the considerations referred to in Section 7.4 above. The amount paid or payable by an indemnified party as a result of the losses, claims, damages and liabilities referred to in this Section 7 shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim except where the indemnified party is required to bear such expenses pursuant to Section 7.4; which expenses the indemnifying party shall pay as and when incurred, at the request of the indemnified party, to the extent that the indemnifying party believes that it will be ultimately obligated to pay such expenses. In the event that any expenses so paid by the indemnifying party are subsequently determined to not be required to be borne by the indemnifying party hereunder, the party which received such payment shall promptly refund the amount so paid to the party which made such payment. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

7.6    The indemnity and contribution agreements contained in this Section 7 and the representations and warranties of the Company and Residential Funding in this Agreement shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by the Underwriter or on behalf of the Underwriter or any person controlling the Underwriter or by or on behalf of the Company or Residential Funding and their respective directors or officers or any person controlling the Company or Residential Funding and (iii) acceptance of and payment for any of the Certificates.

23

8.    Termination.  This Agreement shall be subject to termination by notice given to the Company and Residential Funding, if the sale of the Certificates provided for herein is not consummated because of any failure or refusal on the part of the Company or Residential Funding to comply with the terms or to fulfill any of the conditions of this Agreement, or if for any reason the Company or Residential Funding shall be unable to perform their respective obligations under this Agreement.  If you terminate this Agreement in accordance with this Section 8, the Company or Residential Funding will reimburse you for all reasonable out-of-pocket expenses (including reasonable fees and disbursements of counsel) that shall have been reasonably incurred by the Underwriter in connection with the proposed purchase and sale of the Certificates.

9.    Certain Representations and Indemnities to Survive.  The respective agreements, representations, warranties, indemnities and other statements of the Company, Residential Funding or the officers of any of the Company, Residential Funding, and you set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by you or on your behalf or made by or on behalf of the Company or Residential Funding or any of their respective officers, directors or controlling persons, and will survive delivery of and payment for the Certificates.

10.    Notices.  All communications hereunder will be in writing and effective only on receipt, and, if sent to the Underwriter will be mailed, delivered or telegraphed and confirmed to you at Morgan Stanley & Co. Incorporated, 1585 Broadway, New York, New York 10036, or if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Mortgage Securities I, Inc., 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention: President; or, if sent to Residential Funding will be mailed, delivered or telegraphed and confirmed to it at Residential Funding Company, LLC, 8400 Normandale Lake Boulevard, Suite 250, Minneapolis, Minnesota 55437, Attention:  President.

11.    Successors.  This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 7 hereof, and their successors and assigns, and no other person will have any right or obligation hereunder.

12.    Applicable Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of law principles thereof, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

13.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, which taken together shall constitute one and the same instrument.

[SIGNATURE PAGES FOLLOW]

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**

By: _____

Name:  Heather Anderson
Title:   Vice President

**RESIDENTIAL FUNDING COMPANY, LLC**

By: _____

Name:  Marguerite Steffes
Title:   Associate

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By: _____
Name:
Title:

5172419 07081029

*Underwriting Agreement*
*(Class A and R)*
*RFMSI Series 2007-S7*

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this letter and your acceptance shall represent a binding agreement among the Company, Residential Funding and you.

Very truly yours,

**RESIDENTIAL FUNDING MORTGAGE SECURITIES I, INC.**

By:_____

Name:  Heather Anderson
Title:   Vice President

**RESIDENTIAL FUNDING COMPANY, LLC**

By:_____

Name:  Marguerite Steffes
Title:   Associate

The foregoing Underwriting Agreement
is hereby confirmed and accepted as of
the date first above written.

**MORGAN STANLEY & CO. INCORPORATED**

By:_____

Name:  Valerie Kay
Title:   Managing Director

*Underwriting Agreement
(Class A and R)
RFMSI Series 2007-S7*

## EXHIBIT A-1

Mayer, Brown, Rowe & Maw LLP Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 24 of the Closing Set]

## EXHIBIT A-2

Mayer, Brown, Rowe & Maw LLP
Negative Assurance Letter (Underwriting Agreement)

[See Tab 25 of the Closing Set]

**EXHIBIT A-3**

Mayer, Brown, Rowe & Maw LLP Opinion
Tax Disclosure Letter (Underwriting Agreement)

[See Tab 26 of the Closing Set]

## EXHIBIT B

In-House Opinion
Main Closing Opinion (Underwriting Agreement)

[See Tab 22 of the Closing Set]

## EXHIBIT C

Opinion of Chapman and Cutler LLP
Counsel to Trustee

[See Tab 32 of the Closing Set]

## EXHIBIT D

Opinion of Faegre & Benson, LLP
Special Counsel to the Company

[See Tab 31 of the Closing Set]

## EXHIBIT E

### EXCLUDED INFORMATION

(See attached)

Exhibit E-1

## Summary

The following summary provides a brief description of material aspects of this offering and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, you should read carefully this entire document and the accompanying prospectus.

Issuing entity............................................ RFMSI Series 2007-S7 Trust.

Title of securities...................................... Mortgage Pass-Through Certificates, Series 2007-S7.

Depositor................................................ Residential Funding Mortgage Securities I, Inc., an affiliate of Residential Funding Company, LLC, or Residential Funding.

Master servicer and sponsor..................... Residential Funding.

Subservicers.......................................... Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding, will subservice approximately 42.8% of the mortgage loans, by stated principal balance. GMAC Mortgage, LLC, an affiliate of Residential Funding, will subservice approximately 48.4% of the mortgage loans, by stated principal balance.

Trustee ................................................ U.S. Bank National Association.

Originators ........................................... Homecomings Financial, LLC, a wholly-owned subsidiary of Residential Funding, originated approximately 26.1% of the mortgage loans, by stated principal balance. GMAC Mortgage, LLC, an affiliate of Residential Funding, originated approximately 41.5% of the mortgage loans, by stated principal balance.

Mortgage pool........................................ 752 fixed rate mortgage loans with an aggregate principal balance of approximately $419,108,278 as of the cut-off date, secured by first liens on fee simple interests in one- to four-family residential properties or interests in shares issued by cooperative apartment corporations and the related proprietary leases.

Cut-off date........................................... July 1, 2007.

Closing date .......................................... On or about July 30, 2007.

Distribution dates.................................... Beginning on August 27, 2007 and thereafter on the 25th of each month or, if the 25th is not a business day, on the next business day.

Final scheduled distribution date ............ July 25, 2037. The actual final distribution date could be substantially earlier. *See "Certain Yield and Prepayment Considerations" in this prospectus supplement.*

S-3

**Final Scheduled Distribution Date**

The final scheduled distribution date with respect to each class of the offered certificates is the distribution date in July 2037, which is the distribution date immediately following the latest scheduled maturity date for any mortgage loan. No event of default, change in the priorities for distribution among the various classes or other provisions under the pooling and servicing agreement will arise or become applicable solely by reason of the failure to retire the entire Certificate Principal Balance of any class of certificates on or before its final scheduled distribution date.

**Weighted Average Life**

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security to the date of distribution to the investor of each dollar distributed in reduction of principal of the security. The weighted average life of the offered certificates will be influenced by, among other things, the rate at which principal of the mortgage loans is paid, which may be in the form of scheduled amortization, prepayments or liquidations.

Prepayments on mortgage loans are commonly measured relative to a prepayment standard or model. The model used in this prospectus supplement, the prepayment assumption, represents an assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of new mortgage loans. A prepayment assumption of 100% PSA assumes constant prepayment rates of 0.20% per annum of the then outstanding principal balance of the mortgage loans in the first month of the life of the mortgage loans and an additional 0.20% per annum in each month thereafter until the 30th month. Beginning in the 30th month and in each month thereafter during the life of the mortgage loans, 100% PSA assumes a constant prepayment rate of 6% per annum each month. As used in the tables below, "0% PSA" assumes prepayment rates equal to 0% of PSA—no prepayments. Correspondingly, "100% PSA" and "300% PSA" assumes prepayment rates equal to 100% of PSA and 300% of PSA, respectively, and so forth.

PSA does not purport to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the mortgage loans in this mortgage pool.

The tables below captioned "Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA" have been prepared on the basis of assumptions as listed in this paragraph regarding the weighted average characteristics of the mortgage loans that are expected to be included in the trust as described under "Description of the Mortgage Pool" in this prospectus supplement and their performance. The tables assume, among other things, that: (i) as of the date of issuance of the offered certificates, the mortgage loans have the following characteristics:

### Assumed Mortgage Loan Characteristics

| | Discount Mortgage Loans, Original I/O* Term 120 Months | Discount Mortgage Loans, Original I/O* Term 180 Months | Discount Mortgage Loans, Non-I/O* | Non-Discount Mortgage Loans, Original I/O* Term 120 Months | Non-Discount Mortgage Loans, Original I/O* Term 180 Months | Non-Discount Mortgage Loans, Non-I/O* |
|---|---|---|---|---|---|---|
| Aggregate principal balance ................... | $21,707,489.53 | $625,000.00 | $35,017,919.87 | $142,602,337.16 | $2,612,000.00 | $216,543,531.80 |
| Weighted average mortgage rate | 6.0338961786% | 5.7500000000% | 6.0218642205% | 6.4678% | 6.6811% | 6.4302% |
| Weighted average servicing fee rate .............. | 0.2500000000% | 0.2500000000% | 0.2500000000% | 0.2500% | 0.2500% | 0.2508% |
| Weighted average original term to maturity (months) ..................... | 360 | 360 | 360 | 360 | 360 | 359 |
| Weighted average remaining term to maturity (months) ............. | 359 | 360 | 358 | 359 | 359 | 357 |

* I/O refers to loans with an initial interest only period as indicated and further discussed on page S-75.

(ii) the scheduled monthly payment for each mortgage loan has been based on its outstanding balance, mortgage rate and remaining term to maturity (after taking into account the interest-only period), so that the mortgage loan will amortize in amounts sufficient for its repayment over its remaining term to maturity (after taking into account the interest-only period); (iii) neither Residential Funding nor the depositor will repurchase any mortgage loan, as described under "Mortgage Loan Program—Representations with Respect to Mortgage Loans" and "Description of the Certificates—Assignment of the Trust Assets" in the accompanying prospectus, and the master servicer will not exercise any option to purchase the mortgage loans and thereby cause a termination of the trust; (iv) there are no delinquencies or Realized Losses on the mortgage loans, and principal payments on the mortgage loans will be timely received together with prepayments, if any, at the respective constant percentages of PSA set forth in the tables; (v) there is no Prepayment Interest Shortfall or any other interest shortfall in any month; (vi) payments on the certificates will be received on the 25th day of each month, commencing in August 2007; (vii) payments on the mortgage loans earn no reinvestment return; (viii) there are no additional ongoing trust expenses payable out of the trust; and (ix) the certificates will be purchased on July 30, 2007. Clauses (i) through (ix) above are collectively referred to as the structuring assumptions.

The actual characteristics and performance of the mortgage loans will differ from the assumptions used in constructing the tables below, which is hypothetical in nature and is provided only to give a general sense of how the principal cash flows might behave under varying prepayment scenarios. For example, it is very unlikely that the mortgage loans will prepay at a constant level of PSA until maturity or that all of the mortgage loans will prepay at the same level of PSA. Moreover, the diverse remaining terms to maturity and mortgage rates of the mortgage loans could produce slower or faster principal distributions than indicated in the tables at the various constant percentages of PSA specified, even if the weighted average remaining term to maturity and weighted average mortgage rate of the mortgage loans are as assumed. Any difference between the assumptions and the actual characteristics and performance of the mortgage loans, or actual prepayment or loss experience, will affect the percentages of initial Certificate Principal Balances outstanding over time and the weighted average lives of the classes of offered certificates.

In accordance with the foregoing discussion and assumptions, the following tables indicate the weighted average life of each class of offered certificates, other than the Interest Only Certificates and Residual Certificates, and set forth the percentages of the initial Certificate Principal Balance of each class of offered certificates that would be outstanding after each of the distribution dates at the various percentages of PSA shown.

## Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| Distribution Date | Class A-1, Class A-10, Class A-20, Class A-24, Class A-26, Class A-27, Class A-29, Class A-31, Class A-33, Class A-34, Class A-35 and Class A-36 | | | | | Class A-2 | | | | | Class A-3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 99 | 97 | 94 | 92 | 89 | 100 | 98 | 98 | 98 | 98 | 99 | 95 | 95 | 90 | 80 |
| July 25, 2009 | 99 | 90 | 82 | 74 | 66 | 99 | 71 | 71 | 71 | 71 | 99 | 91 | 91 | 76 | 46 |
| July 25, 2010 | 98 | 81 | 66 | 53 | 41 | 91 | 35 | 35 | 35 | 35 | 99 | 86 | 86 | 58 | 12 |
| July 25, 2011 | 97 | 73 | 53 | 37 | 25 | 86 | 0 | 0 | 0 | 0 | 99 | 82 | 82 | 45 | 0 |
| July 25, 2012 | 96 | 65 | 42 | 26 | 14 | 81 | 0 | 0 | 0 | 0 | 99 | 68 | 63 | 25 | 0 |
| July 25, 2013 | 95 | 59 | 34 | 18 | 8 | 76 | 0 | 0 | 0 | 0 | 99 | 56 | 45 | 11 | 0 |
| July 25, 2014 | 94 | 52 | 27 | 12 | 4 | 71 | 0 | 0 | 0 | 0 | 99 | 46 | 25 | * | 0 |
| July 25, 2015 | 93 | 47 | 22 | 9 | 2 | 66 | 0 | 0 | 0 | 0 | 98 | 37 | 0 | 0 | 0 |
| July 25, 2016 | 92 | 42 | 17 | 6 | 1 | 60 | 0 | 0 | 0 | 0 | 98 | 30 | 0 | 0 | 0 |
| July 25, 2017 | 90 | 38 | 14 | 4 | 1 | 53 | 0 | 0 | 0 | 0 | 99 | 24 | 0 | 0 | 0 |
| July 25, 2018 | 88 | 34 | 11 | 3 | * | 42 | 0 | 0 | 0 | 0 | 99 | 17 | 0 | 0 | 0 |
| July 25, 2019 | 86 | 30 | 9 | 2 | * | 28 | 0 | 0 | 0 | 0 | 99 | 12 | 0 | 0 | 0 |
| July 25, 2020 | 83 | 26 | 7 | 1 | * | 16 | 0 | 0 | 0 | 0 | 99 | 6 | 0 | 0 | 0 |
| July 25, 2021 | 80 | 23 | 6 | 1 | * | 2 | 0 | 0 | 0 | 0 | 94 | 2 | 0 | 0 | 0 |
| July 25, 2022 | 77 | 20 | 4 | 1 | * | 0 | 0 | 0 | 0 | 0 | 89 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 74 | 18 | 4 | * | * | 0 | 0 | 0 | 0 | 0 | 84 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 71 | 15 | 3 | * | * | 0 | 0 | 0 | 0 | 0 | 77 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 67 | 13 | 2 | * | * | 0 | 0 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 63 | 11 | 2 | * | * | 0 | 0 | 0 | 0 | 0 | 64 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 59 | 10 | 1 | * | * | 0 | 0 | 0 | 0 | 0 | 57 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 54 | 8 | 1 | * | * | 0 | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 50 | 7 | * | * | * | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 45 | 5 | * | * | * | 0 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 39 | 4 | * | * | * | 0 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 33 | 3 | * | * | * | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 27 | 3 | * | * | * | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 21 | 2 | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 14 | 1 | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 7 | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 20.43 | 9.30 | 5.56 | 3.93 | 3.06 | 9.20 | 2.59 | 2.59 | 2.59 | 2.56 | 21.32 | 7.05 | 3.59 | 2.46 | 1.90 |

* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-4 | | | | | Class A-5 | | | | | Class A-6 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 106 | 0 | 0 | 0 | 0 | 99 | 95 | 90 | 85 | 80 | 98 | 98 | 95 | 92 | 90 |
| July 25, 2009 | 113 | 0 | 0 | 0 | 0 | 99 | 91 | 81 | 61 | 46 | 95 | 95 | 92 | 82 | 57 |
| July 25, 2010 | 121 | 0 | 0 | 0 | 0 | 99 | 86 | 58 | 33 | 12 | 92 | 92 | 90 | 68 | 33 |
| July 25, 2011 | 128 | 0 | 0 | 0 | 0 | 99 | 82 | 45 | 16 | 0 | 90 | 90 | 87 | 56 | 12 |
| July 25, 2012 | 137 | 0 | 0 | 0 | 0 | 99 | 68 | 25 | 0 | 0 | 87 | 87 | 83 | 46 | 0 |
| July 25, 2013 | 145 | 0 | 0 | 0 | 0 | 99 | 56 | 11 | 0 | 0 | 83 | 83 | 80 | 37 | 0 |
| July 25, 2014 | 155 | 0 | 0 | 0 | 0 | 99 | 46 | * | 0 | 0 | 80 | 80 | 76 | 30 | 0 |
| July 25, 2015 | 165 | 0 | 0 | 0 | 0 | 99 | 37 | 0 | 0 | 0 | 76 | 76 | 73 | 24 | 0 |
| July 25, 2016 | 175 | 0 | 0 | 0 | 0 | 99 | 30 | 0 | 0 | 0 | 73 | 73 | 69 | 18 | 0 |
| July 25, 2017 | 187 | 0 | 0 | 0 | 0 | 99 | 24 | 0 | 0 | 0 | 69 | 69 | 64 | 13 | 0 |
| July 25, 2018 | 199 | 0 | 0 | 0 | 0 | 99 | 17 | 0 | 0 | 0 | 64 | 64 | 60 | 0 | 0 |
| July 25, 2019 | 211 | 0 | 0 | 0 | 0 | 95 | 12 | 0 | 0 | 0 | 60 | 60 | 55 | 0 | 0 |
| July 25, 2020 | 225 | 0 | 0 | 0 | 0 | 89 | 6 | 0 | 0 | 0 | 55 | 55 | 50 | 0 | 0 |
| July 25, 2021 | 239 | 0 | 0 | 0 | 0 | 84 | 2 | 0 | 0 | 0 | 50 | 50 | 44 | 0 | 0 |
| July 25, 2022 | 255 | 0 | 0 | 0 | 0 | 78 | 0 | 0 | 0 | 0 | 44 | 44 | 38 | 0 | 0 |
| July 25, 2023 | 271 | 0 | 0 | 0 | 0 | 71 | 0 | 0 | 0 | 0 | 38 | 34 | 12 | 0 | 0 |
| July 25, 2024 | 289 | 0 | 0 | 0 | 0 | 64 | 0 | 0 | 0 | 0 | 32 | 12 | 0 | 0 | 0 |
| July 25, 2025 | 307 | 0 | 0 | 0 | 0 | 57 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 327 | 0 | 0 | 0 | 0 | 49 | 0 | 0 | 0 | 0 | 19 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 348 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 370 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 394 | 0 | 0 | 0 | 0 | 23 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 419 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 446 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 475 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 506 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 538 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 27.24 | 0.10 | 0.07 | 0.07 | 0.07 | 21.54 | 7.04 | 3.59 | 2.46 | 1.91 | 12.99 | 11.70 | 7.40 | 5.01 | 3.94 |

\* Indicates a number that is greater than zero but less than 0.5%.

\*\* The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| Distribution Date | Class A-7, Class A-8 and Class A-11 | | | | | Class A-9 | | | | | Class A-12 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 106 | 106 | 106 | 106 | 106 | 100 | 100 | 95 | 87 | 79 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 113 | 113 | 113 | 113 | 113 | 100 | 94 | 68 | 41 | 14 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 120 | 120 | 120 | 120 | 120 | 100 | 79 | 30 | 0 | 0 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 100 | 127 | 127 | 127 | 127 | 127 | 100 | 67 | 1 | 0 | 0 |
| July 25, 2012 | 100 | 100 | 100 | 100 | 100 | 135 | 135 | 135 | 135 | 56 | 100 | 58 | 0 | 0 | 0 |
| July 25, 2013 | 99 | 96 | 93 | 89 | 70 | 143 | 143 | 143 | 143 | 0 | 100 | 54 | 0 | 0 | 0 |
| July 25, 2014 | 98 | 91 | 74 | 77 | 38 | 152 | 152 | 152 | 76 | 0 | 100 | 52 | 0 | 0 | 0 |
| July 25, 2015 | 97 | 85 | 62 | 61 | 21 | 161 | 161 | 161 | 33 | 0 | 100 | 52 | 0 | 0 | 0 |
| July 25, 2016 | 96 | 78 | 50 | 46 | 12 | 171 | 171 | 177 | 16 | 0 | 100 | 42 | 0 | 0 | 0 |
| July 25, 2017 | 94 | 70 | 40 | 33 | 8 | 182 | 182 | 141 | 12 | 0 | 100 | 30 | 0 | 0 | 0 |
| July 25, 2018 | 92 | 65 | 32 | 24 | 5 | 193 | 193 | 113 | 8 | 0 | 100 | 19 | 0 | 0 | 0 |
| July 25, 2019 | 89 | 55 | 25 | 17 | 3 | 205 | 205 | 89 | 6 | 0 | 100 | 9 | 0 | 0 | 0 |
| July 25, 2020 | 86 | 48 | 20 | 12 | 2 | 218 | 218 | 71 | 4 | 0 | 100 | 1 | 0 | 0 | 0 |
| July 25, 2021 | 84 | 43 | 16 | 8 | 1 | 231 | 231 | 56 | 3 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2022 | 80 | 37 | 12 | 6 | 1 | 245 | 245 | 44 | 2 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2023 | 77 | 32 | 10 | 4 | * | 261 | 261 | 34 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 73 | 28 | 8 | 3 | * | 277 | 218 | 27 | 1 | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 70 | 24 | 6 | 2 | * | 294 | 187 | 21 | * | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 66 | 21 | 4 | 1 | * | 312 | 159 | 16 | * | 0 | 100 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 61 | 18 | 3 | 1 | * | 331 | 134 | 12 | * | 0 | 101 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 57 | 15 | 3 | * | * | 351 | 111 | 9 | * | 0 | 91 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 52 | 12 | 2 | * | * | 361 | 91 | 7 | * | 0 | 75 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 46 | 10 | 1 | * | * | 361 | 73 | 5 | * | 0 | 58 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 41 | 8 | * | * | * | 361 | 56 | 3 | * | 0 | 41 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 35 | 6 | 1 | * | * | 361 | 42 | 2 | * | 0 | 22 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 28 | 5 | * | * | * | 361 | 29 | 1 | * | 0 | 1 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 22 | 3 | * | * | * | 257 | 18 | 1 | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 14 | 2 | * | * | * | 120 | 8 | * | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 7 | 1 | * | * | * | 0 | 0 | 0 | * | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | | | | | | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 21.16 | 14.04 | 10.98 | 9.37 | 7.15 | 28.58 | 21.66 | 14.12 | 7.68 | 5.02 | 24.38 | 7.61 | 2.49 | 1.80 | 1.47 |

   Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

   This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-13 | | | | | Class A-14 | | | | | Class A-15 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 98 | 92 | 90 | 90 | 89 | 100 | 100 | 100 | 100 | 100 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2009 | 97 | 81 | 78 | 77 | 77 | 100 | 100 | 100 | 100 | 100 | 95 | 95 | 95 | 95 | 95 |
| July 25, 2010 | 95 | 69 | 66 | 55 | 27 | 100 | 100 | 100 | 100 | 100 | 92 | 92 | 92 | 92 | 92 |
| July 25, 2011 | 93 | 57 | 55 | 18 | 0 | 100 | 100 | 100 | 100 | 100 | 90 | 90 | 90 | 90 | 90 |
| July 25, 2012 | 91 | 46 | 30 | 0 | 0 | 102 | 100 | 100 | 42 | 23 | 87 | 87 | 87 | 87 | 87 |
| July 25, 2013 | 89 | 34 | 12 | 0 | 0 | 102 | 100 | 26 | 0 | 0 | 83 | 83 | 83 | 80 | 0 |
| July 25, 2014 | 87 | 22 | 0 | 0 | 0 | 100 | 91 | 0 | 0 | 0 | 80 | 80 | 80 | 36 | 0 |
| July 25, 2015 | 84 | 11 | 0 | 0 | 0 | 100 | 35 | 0 | 0 | 0 | 76 | 76 | 58 | 0 | 0 |
| July 25, 2016 | 82 | 2 | 0 | 0 | 0 | 100 | 6 | 0 | 0 | 0 | 73 | 73 | 30 | 0 | 0 |
| July 25, 2017 | 79 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 69 | 69 | 6 | 0 | 0 |
| July 25, 2018 | 74 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 64 | 64 | 0 | 0 | 0 |
| July 25, 2019 | 69 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 60 | 60 | 0 | 0 | 0 |
| July 25, 2020 | 64 | 0 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 55 | 55 | 0 | 0 | 0 |
| July 25, 2021 | 58 | 0 | 0 | 0 | 0 | 102 | 0 | 0 | 0 | 0 | 50 | 53 | 0 | 0 | 0 |
| July 25, 2022 | 52 | 0 | 0 | 0 | 0 | 67 | 0 | 0 | 0 | 0 | 44 | 44 | 0 | 0 | 0 |
| July 25, 2023 | 45 | 0 | 0 | 0 | 0 | 35 | 0 | 0 | 0 | 0 | 38 | 38 | 0 | 0 | 0 |
| July 25, 2024 | 38 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 32 | 32 | 0 | 0 | 0 |
| July 25, 2025 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 11 | 0 | 0 | 0 |
| July 25, 2026 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 19 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 14.15 | 4.67 | 3.83 | 2.91 | 2.43 | 27.61 | 15.59 | 7.66 | 4.99 | 3.90 | 12.99 | 12.49 | 8.50 | 5.52 | 4.23 |

*  Indicates a number that is greater than zero but less than 0.5%.

**  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-16 | | | | | Class A-17 | | | | | Class A-18 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 105 | 108 | 108 | 106 | 106 | 100 | 100 | 100 | 100 | 100 | 99 | 95 | 95 | 88 | 85 |
| July 25, 2009 | 113 | 113 | 113 | 113 | 113 | 100 | 100 | 100 | 100 | 100 | 98 | 86 | 92 | 74 | 52 |
| July 25, 2010 | 120 | 120 | 120 | 120 | 120 | 100 | 100 | 100 | 100 | 100 | 97 | 73 | 73 | 52 | 16 |
| July 25, 2011 | 127 | 127 | 127 | 127 | 127 | 100 | 100 | 100 | 100 | 100 | 96 | 61 | 53 | 33 | 11 |
| July 25, 2012 | 135 | 135 | 135 | 135 | 83 | 100 | 100 | 83 | 83 | 76 | 94 | 51 | 33 | 18 | 0 |
| July 25, 2013 | 143 | 143 | 143 | 143 | 0 | 100 | 100 | 100 | 45 | 16 | 93 | 42 | 18 | 7 | 0 |
| July 25, 2014 | 152 | 152 | 152 | 49 | 0 | 100 | 100 | 100 | 21 | 0 | 92 | 34 | 7 | 0 | 0 |
| July 25, 2015 | 161 | 161 | 161 | 24 | 0 | 100 | 100 | 77 | 9 | 0 | 91 | 27 | 0 | 0 | 0 |
| July 25, 2016 | 171 | 171 | 171 | 17 | 0 | 100 | 100 | 61 | 4 | 0 | 89 | 22 | 0 | 0 | 0 |
| July 25, 2017 | 182 | 182 | 182 | 12 | 0 | 100 | 100 | 49 | 3 | 0 | 87 | 17 | 0 | 0 | 0 |
| July 25, 2018 | 193 | 193 | 199 | 9 | 0 | 100 | 100 | 39 | 2 | 0 | 85 | 12 | 0 | 0 | 0 |
| July 25, 2019 | 205 | 205 | 166 | 6 | 0 | 100 | 100 | 31 | 2 | 0 | 81 | 8 | 3 | 0 | 0 |
| July 25, 2020 | 218 | 218 | 132 | 4 | 0 | 100 | 100 | 25 | 1 | 0 | 78 | 4 | 3 | 0 | 0 |
| July 25, 2021 | 231 | 231 | 108 | 3 | 0 | 100 | 93 | 20 | 1 | 0 | 75 | * | 0 | 0 | 0 |
| July 25, 2022 | 245 | 245 | 83 | 2 | 0 | 100 | 81 | 15 | 1 | 0 | 71 | 0 | 3 | 0 | 0 |
| July 25, 2023 | 261 | 261 | 65 | 1 | 0 | 100 | 69 | 12 | * | 0 | 67 | 0 | 0 | 0 | 0 |
| July 25, 2024 | 277 | 277 | 51 | * | 0 | 100 | 63 | 10 | * | 0 | 63 | 0 | 0 | 0 | 0 |
| July 25, 2025 | 294 | 294 | 39 | * | 0 | 100 | 52 | 7 | * | 0 | 58 | 0 | 0 | 0 | 0 |
| July 25, 2026 | 312 | 276 | 30 | * | 0 | 100 | 44 | 6 | * | 0 | 53 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 331 | 235 | 23 | * | 0 | 100 | 37 | 4 | * | 0 | 48 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 351 | 197 | 18 | * | 0 | 100 | 31 | 3 | * | 0 | 42 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 361 | 164 | 13 | * | 0 | 100 | 25 | 2 | * | 0 | 36 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 361 | 134 | 10 | * | 0 | 100 | 20 | 2 | * | 0 | 30 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 361 | 107 | 7 | * | 0 | 100 | 16 | 1 | * | 0 | 23 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 361 | 83 | 5 | * | 0 | 100 | 12 | 1 | * | 0 | 16 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 361 | 62 | 3 | * | 0 | 100 | 8 | * | * | 0 | 9 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 361 | 43 | 2 | * | 0 | 71 | 5 | * | * | 0 | * | 0 | 0 | 0 | 0 |
| July 25, 2035 | 361 | 26 | 1 | * | 0 | 71 | 5 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 178 | 11 | * | * | 0 | 33 | 2 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 29.01 | 22.98 | 15.38 | 8.22 | 5.15 | 28.58 | 20.08 | 11.19 | 6.29 | 4.47 | 18.24 | 5.85 | 3.30 | 2.47 | 2.04 |

\*   Indicates a number that is greater than zero but less than 0.5%.

\*\*  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-19 | | | | | Class A-21 | | | | | Class A-22 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 73 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2012 | 100 | 100 | 100 | 100 | 15 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2013 | 100 | 100 | 100 | 43 | 0 | 99 | 96 | 93 | 89 | 70 | 100 | 100 | 100 | 98 | 98 |
| July 25, 2014 | 100 | 97 | 88 | 20 | 0 | 98 | 88 | 84 | 77 | 38 | 100 | 100 | 98 | 97 | 84 |
| July 25, 2015 | 100 | 74 | 77 | 9 | 0 | 97 | 78 | 74 | 61 | 21 | 100 | 100 | 97 | 80 | 57 |
| July 25, 2016 | 100 | 58 | 67 | 4 | 0 | 98 | 70 | 62 | 46 | 12 | 100 | 100 | 94 | 60 | 46 |
| July 25, 2017 | 100 | 47 | 57 | 3 | 0 | 94 | 62 | 50 | 33 | 8 | 100 | 100 | 80 | 41 | 37 |
| July 25, 2018 | 100 | 37 | 48 | 2 | 0 | 92 | 55 | 40 | 24 | 5 | 100 | 100 | 60 | 27 | 29 |
| July 25, 2019 | 100 | 30 | 41 | 1 | 0 | 89 | 48 | 32 | 17 | 3 | 100 | 100 | 46 | 17 | 23 |
| July 25, 2020 | 100 | 24 | 34 | • | 0 | 86 | 43 | 25 | 12 | 2 | 100 | 100 | 32 | 12 | 18 |
| July 25, 2021 | 100 | 19 | 28 | • | 0 | 84 | 37 | 20 | 8 | 1 | 100 | 100 | 23 | 8 | 14 |
| July 25, 2022 | 100 | 15 | 23 | • | 0 | 80 | 32 | 16 | 6 | • | 100 | 88 | 18 | 6 | 11 |
| July 25, 2023 | 100 | 12 | 19 | • | 0 | 77 | 28 | 12 | 4 | • | 100 | 77 | 14 | 5 | 8 |
| July 25, 2024 | 100 | 9 | 15 | • | 0 | 73 | 24 | 10 | 3 | • | 89 | 67 | 11 | 4 | 6 |
| July 25, 2025 | 100 | 7 | 11 | • | 0 | 70 | 21 | 8 | 2 | • | 76 | 58 | 8 | 3 | 5 |
| July 25, 2026 | 100 | 5 | 8 | • | 0 | 66 | 18 | 6 | 1 | • | 63 | 49 | 6 | 2 | 4 |
| July 25, 2027 | 100 | 4 | 6 | • | 0 | 61 | 15 | 4 | • | • | 55 | 42 | 5 | 1 | 3 |
| July 25, 2028 | 100 | 3 | 4 | • | 0 | 57 | 13 | 3 | • | • | 45 | 35 | 4 | 1 | 2 |
| July 25, 2029 | 100 | 2 | 3 | • | 0 | 52 | 12 | 2 | • | • | 37 | 29 | 3 | • | 1 |
| July 25, 2030 | 100 | 2 | 2 | • | 0 | 46 | 10 | 1 | • | • | 30 | 23 | 2 | • | • |
| July 25, 2031 | 100 | 1 | 1 | • | 0 | 41 | 8 | • | • | • | 23 | 17 | 1 | • | • |
| July 25, 2032 | 100 | • | • | • | 0 | 35 | 6 | • | • | • | 17 | 12 | 1 | • | • |
| July 25, 2033 | 100 | • | • | • | 0 | 28 | 5 | • | • | • | 12 | 7 | • | • | • |
| July 25, 2034 | 100 | • | • | • | 0 | 22 | 3 | • | • | • | 7 | 3 | • | • | • |
| July 25, 2035 | 68 | • | • | • | 0 | 14 | 1 | • | • | • | 3 | 1 | • | • | • |
| July 25, 2036 | 32 | • | • | • | 0 | 7 | • | • | • | • | 49 | 0 | 0 | • | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 28.51 | 19.82 | 11.00 | 6.22 | 4.43 | 21.16 | 14.04 | 10.96 | 9.37 | 7.15 | 29.01 | 22.13 | 12.83 | 6.89 | 4.72 |

*   Indicates a number that is greater than zero but less than 0.5%.
**  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

## Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA

| Distribution Date | Class A-23 | | | | | Class A-30 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 100 | 100 | 100 | 100 | 100 | 100 | 98 | 93 | 89 | 86 |
| July 25, 2009 | 100 | 100 | 100 | 100 | 100 | 99 | 96 | 93 | 89 | 56 |
| July 25, 2010 | 100 | 100 | 100 | 100 | 100 | 98 | 87 | 76 | 66 | 23 |
| July 25, 2011 | 100 | 100 | 100 | 100 | 74 | 97 | 75 | 56 | 39 | 9 |
| July 25, 2012 | 100 | 100 | 100 | 81 | 13 | 96 | 65 | 39 | 18 | 2 |
| July 25, 2013 | 100 | 100 | 100 | 43 | 0 | 95 | 55 | 25 | 3 | 0 |
| July 25, 2014 | 100 | 100 | 98 | 20 | 0 | 94 | 47 | 15 | 0 | 0 |
| July 25, 2015 | 100 | 100 | 75 | 9 | 0 | 93 | 39 | 8 | 0 | 0 |
| July 25, 2016 | 100 | 100 | 59 | 4 | 0 | 91 | 33 | 2 | 0 | 0 |
| July 25, 2017 | 100 | 100 | 48 | 2 | 0 | 90 | 28 | 0 | 0 | 11 |
| July 25, 2018 | 100 | 100 | 38 | 2 | 0 | 88 | 24 | 0 | 0 | 0 |
| July 25, 2019 | 100 | 100 | 30 | 1 | 0 | 86 | 19 | 0 | 0 | 0 |
| July 25, 2020 | 100 | 100 | 24 | 1 | 0 | 83 | 15 | 0 | 0 | 0 |
| July 25, 2021 | 100 | 100 | 19 | 1 | 0 | 80 | 12 | 0 | 0 | 0 |
| July 25, 2022 | 100 | 90 | 15 | 1 | 0 | 77 | 8 | 0 | 0 | 0 |
| July 25, 2023 | 100 | 78 | 12 | * | 0 | 73 | 6 | 0 | 0 | 0 |
| July 25, 2024 | 100 | 68 | 9 | * | 0 | 70 | 3 | 0 | 0 | 0 |
| July 25, 2025 | 100 | 59 | 7 | * | 0 | 66 | 1 | 0 | 0 | 0 |
| July 25, 2026 | 100 | 50 | 6 | * | 0 | 61 | 0 | 0 | 0 | 0 |
| July 25, 2027 | 100 | 43 | 4 | * | 0 | 57 | 0 | 0 | 0 | 0 |
| July 25, 2028 | 100 | 36 | 3 | * | 0 | 52 | 0 | 0 | 0 | 0 |
| July 25, 2029 | 100 | 30 | 3 | * | 0 | 47 | 0 | 0 | 0 | 0 |
| July 25, 2030 | 100 | 24 | 2 | * | 0 | 42 | 0 | 0 | 0 | 0 |
| July 25, 2031 | 100 | 20 | 2 | * | 0 | 36 | 0 | 0 | 0 | 0 |
| July 25, 2032 | 100 | 15 | 1 | * | 0 | 30 | 0 | 0 | 0 | 0 |
| July 25, 2033 | 100 | 11 | 1 | * | 0 | 23 | 0 | 0 | 0 | 0 |
| July 25, 2034 | 100 | 8 | * | * | 0 | 16 | 0 | 0 | 0 | 0 |
| July 25, 2035 | 67 | 5 | * | * | 0 | 9 | 0 | 0 | 0 | 0 |
| July 25, 2036 | 32 | 2 | * | * | 0 | 1 | 0 | 0 | 0 | 0 |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life ** (in years) | 28.54 | 19.92 | 11.07 | 6.25 | 4.45 | 19.02 | 6.66 | 3.66 | 2.68 | 2.20 |

* Indicates a number that is greater than zero but less than 0.5%.

** The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

**Percent of Initial Certificate Principal Balance Outstanding at the Following Percentages of PSA**

| Distribution Date | Class A-P | | | | | Class M-1, Class M-2 and Class M-3 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0% | 150% | 300% | 450% | 600% | 0% | 150% | 300% | 450% | 600% |
| Initial Percentage | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| July 25, 2008 | 99 | 97 | 94 | 92 | 90 | 99 | 99 | 99 | 99 | 99 |
| July 25, 2009 | 98 | 90 | 82 | 75 | 67 | 99 | 99 | 99 | 99 | 99 |
| July 25, 2010 | 97 | 82 | 67 | 54 | 43 | 98 | 98 | 98 | 98 | 98 |
| July 25, 2011 | 96 | 74 | 55 | 39 | 27 | 97 | 97 | 97 | 97 | 97 |
| July 25, 2012 | 96 | 66 | 44 | 28 | 17 | 96 | 96 | 96 | 96 | 96 |
| July 25, 2013 | 95 | 60 | 36 | 21 | 11 | 95 | 92 | 90 | 87 | 83 |
| July 25, 2014 | 94 | 54 | 29 | 15 | 7 | 94 | 88 | 82 | 76 | 69 |
| July 25, 2015 | 92 | 48 | 24 | 11 | 4 | 93 | 82 | 72 | 62 | 52 |
| July 25, 2016 | 91 | 43 | 19 | 8 | 3 | 92 | 75 | 61 | 48 | 36 |
| July 25, 2017 | 90 | 39 | 15 | 6 | 2 | 90 | 68 | 49 | 34 | 23 |
| July 25, 2018 | 87 | 34 | 12 | 4 | 1 | 88 | 60 | 39 | 24 | 14 |
| July 25, 2019 | 85 | 30 | 10 | 3 | 1 | 86 | 53 | 31 | 17 | 9 |
| July 25, 2020 | 82 | 27 | 8 | 2 | * | 83 | 47 | 25 | 12 | 6 |
| July 25, 2021 | 79 | 24 | 6 | 1 | * | 80 | 41 | 20 | 9 | 3 |
| July 25, 2022 | 76 | 21 | 5 | 1 | * | 77 | 36 | 16 | 6 | 2 |
| July 25, 2023 | 73 | 18 | 4 | 1 | * | 74 | 31 | 12 | 4 | 2 |
| July 25, 2024 | 70 | 16 | 3 | * | * | 71 | 27 | 10 | 3 | 1 |
| July 25, 2025 | 66 | 13 | 2 | * | * | 67 | 23 | 7 | 2 | 1 |
| July 25, 2026 | 62 | 11 | 2 | * | * | 63 | 20 | 6 | 1 | * |
| July 25, 2027 | 58 | 10 | 1 | * | * | 59 | 17 | 4 | 1 | * |
| July 25, 2028 | 53 | 8 | 1 | * | * | 54 | 14 | 3 | 1 | * |
| July 25, 2029 | 49 | 7 | 1 | * | * | 50 | 12 | 2 | * | * |
| July 25, 2030 | 44 | 6 | * | * | * | 45 | 10 | 2 | * | * |
| July 25, 2031 | 38 | 4 | * | * | * | 39 | 8 | 1 | * | * |
| July 25, 2032 | 33 | 3 | * | * | * | 33 | 6 | 1 | * | * |
| July 25, 2033 | 27 | 3 | * | * | * | 27 | 5 | 1 | * | * |
| July 25, 2034 | 21 | 2 | * | * | * | 21 | 3 | * | * | * |
| July 25, 2035 | 14 | 1 | * | * | * | 14 | 2 | * | * | * |
| July 25, 2036 | 7 | 0 | * | * | * | 7 | 1 | * | * | * |
| July 25, 2037 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life** (in years) | 20.27 | 9.43 | 5.76 | 4.14 | 3.27 | 20.43 | 13.63 | 10.74 | 9.27 | 8.40 |

\*   Indicates a number that is greater than zero but less than 0.5%.

\*\*  The weighted average life of a certificate of any class is determined by (i) multiplying the amount of each net distribution of Certificate Principal Balance by the number of years from the date of issuance of the certificate to the related distribution date, (ii) adding the results, and (iii) dividing the sum by the aggregate of the net distributions described in (i) above.

This table has been prepared based on the structuring assumptions (including the assumptions regarding the characteristics and performance of the related mortgage loans, which may differ from the actual characteristics and performance thereof) and should be read in conjunction therewith.

## EXHIBIT F

UNDERWRITER INFORMATION

(See attached)

Exhibit F-1

*Prospectus Supplement dated July 27, 2007 (to prospectus dated April 6, 2007)*

# $415,755,302

## RFMSI Series 2007-S7 Trust
### Issuing Entity

# Residential Funding Mortgage Securities I, Inc.
### Depositor

# Residential Funding Company, LLC
### Master Servicer and Sponsor

#### Mortgage Pass-Through Certificates, Series 2007-S7

The trust will hold a pool of one- to four-family residential first lien mortgage loans.

The trust will issue these classes of certificates that are offered under this prospectus supplement:

- 39 classes of senior certificates designated Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class A-6, Class A-7, Class A-8, Class A-9, Class A-10, Class A-11, Class A-12, Class A-13, Class A-14, Class A-15, Class A-16, Class A-17, Class A-18, Class A-19, Class A-20, Class A-21, Class A-22, Class A-23, Class A-24, Class A-25, Class A-26, Class A-27, Class A-28, Class A-29, Class A-30, Class A-31, Class A-32, Class A-33, Class A-34, Class A-35, Class A-36, Class A-V, Class A-P and Class R Certificates; and
- 3 classes of subordinated certificates designated Class M-1, Class M-2 and Class M-3 Certificates,

all as more fully described in the table on pages S-5 and S-6 of this prospectus supplement.

**Certain classes of offered certificates are exchangeable for other classes of offered certificates as more fully described in this prospectus supplement.**

Credit enhancement for all of these certificates will be provided by additional classes of subordinated certificates which are not offered hereby.

Distributions on the certificates will be on the 25th of each month or, if the 25th is not a business day, on the next business day, beginning August 27, 2007.

> **You should consider carefully the risk factors beginning on page S-17 in this prospectus supplement.**

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the offered certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.

The Attorney General of the State of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.

The certificates represent interests only in the trust, as the issuing entity, and do not represent interests in or obligations of Residential Funding Mortgage Securities I, Inc., as the depositor, Residential Funding Company, LLC, as the sponsor, or any of their affiliates.

Morgan Stanley & Co. Incorporated, as an underwriter, will purchase all but two classes of the offered senior certificates from the depositor in the amounts described in "Method of Distribution" on page S-117 of this prospectus supplement. The net proceeds to the depositor from the sale of these senior underwritten certificates will be approximately 97.92% of the aggregate certificate principal balance of these senior underwritten certificates plus accrued interest, before deducting expenses.

Residential Funding Securities, LLC, as an underwriter, will purchase the Class A-V Certificates from the depositor in the amounts described in "Method of Distribution" on page S-117 of this prospectus supplement. The net proceeds to the depositor from the sale of the Class A-V Certificates will be approximately 0.57% of the initial notional balance of the Class A-V Certificates plus accrued interest, before deducting expenses.

The offered certificates (other than the Class A-P Certificates and the Class M Certificates) are offered by the issuing entity through the underwriters to prospective purchasers from time to time in negotiated transactions at varying prices to be determined at the time of sale. There is no underwriting agreement for the remaining class of senior certificates and the Class M Certificates.

# Morgan Stanley                    GMAC RFC Securities

Purchasers of the Residual Certificates are strongly advised to consult their tax advisors as to the economic and tax consequences of investment in the Residual Certificates.

For further information regarding the federal income tax consequences of investing in the Residual Certificates, see "Certain Yield and Prepayment Considerations—Additional Yield Considerations Applicable Solely to the Residual Certificates" in this prospectus supplement and "Material Federal Income Tax Consequences—REMICs—Taxation of Owners of REMIC Residual Certificates" in the accompanying prospectus.

### State and Other Tax Consequences

In addition to the federal income tax consequences described in "Material Federal Income Tax Consequences," potential investors should consider the state and local tax consequences of the acquisition, ownership, and disposition of the certificates offered by this prospectus. State tax law may differ substantially from the corresponding federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state or other jurisdiction. Therefore, prospective investors should consult their tax advisors about the various tax consequences of investments in the certificates offered by this prospectus.

### Use of Proceeds

The net proceeds from the sale of the offered certificates to the underwriter will be paid to the depositor. The depositor will use the proceeds to purchase the mortgage loans or for general corporate purposes.

### Method of Distribution

In accordance with the terms and conditions of a senior underwriting agreement, dated July 27, 2007, Morgan Stanley & Co. Incorporated will serve as the underwriter of, and has agreed to purchase and the depositor has agreed to sell, the senior certificates, other than the Class P Certificates, the Class A-V Certificates and the Class A-P Certificates, except that a de minimis portion of the Residual Certificates will be retained by Residential Funding and that portion is not offered hereby. The certificates being sold to Morgan Stanley & Co. Incorporated are referred to as the senior underwritten certificates. It is expected that delivery of the senior underwritten certificates, other than the Residual Certificates, will be made only in book-entry form through the Same Day Funds Settlement System of DTC, and that the delivery of the Residual Certificates, other than the de minimis portion retained by Residential Funding, will be made at the offices of Morgan Stanley & Co. Incorporated, New York, New York on or about July 30, 2007 against payment therefor in immediately available funds.

In accordance with the terms and conditions of a Class A-V underwriting agreement, dated July 27, 2007, Residential Funding Securities, LLC will serve as the underwriter of the Class A-V Certificates and has agreed to purchase and the depositor has agreed to sell the Class A-V Certificates. The certificates being sold to Residential Funding Securities, LLC are referred to as the Class A-V Certificates. It is expected that delivery of the Class A-V Certificates will be made only in book-entry form through the Same Day Funds Settlement System of DTC on or about July 30, 2007 against payment therefor in immediately available funds.

The senior underwriting agreement and the Class A-V underwriting agreement are collectively referred to in this prospectus supplement as the underwriting agreements and the senior underwritten certificates and the Class A-V Certificates are collectively referred to in this prospectus supplement as the

underwritten certificates. Morgan Stanley & Co. Incorporated and Residential Funding Securities, LLC are collectively referred to in this prospectus supplement as the underwriters.

In connection with the senior underwritten certificates and the Class A-V Certificates, respectively, the related underwriter has agreed, in accordance with the terms and conditions of its respective underwriting agreement, to purchase all of its respective underwritten certificates if any of those underwritten certificates are purchased thereby.

The underwriting agreements provide that the obligations of the underwriters to pay for and accept delivery of their respective underwritten certificates are subject to, among other things, the receipt of legal opinions and to the conditions, among others, that no stop order suspending the effectiveness of the depositor's registration statement shall be in effect, and that no proceedings for that purpose shall be pending before or threatened by the Securities and Exchange Commission.

The distribution of the underwritten certificates by the respective underwriters may be effected from time to time in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. Proceeds to the depositor from the sale of the senior underwritten certificates, before deducting expenses payable by the depositor, will be approximately 97.92% of the aggregate Certificate Principal Balance of the senior underwritten certificates plus accrued interest thereon from the cut-off date. Proceeds to the depositor from the sale of the Class A-V Certificates, before deducting expenses payable by the depositor, will be approximately 0.57% of the initial Notional Amount of the Class A-V Certificates plus accrued interest thereon from the cut-off date.

The underwriters may effect these transactions by selling their respective underwritten certificates to or through dealers, and those dealers may receive compensation in the form of underwriting discounts, concessions or commissions from the respective underwriter for whom they act as agent. In connection with the sale of the underwritten certificates, the underwriters may be deemed to have received compensation from the depositor in the form of underwriting compensation. The underwriters and any dealers that participate with the underwriters in the distribution of the related underwritten certificates are also underwriters under the Securities Act. Any profit on the resale of the underwritten certificates positioned by an underwriter would be underwriter compensation in the form of underwriting discounts and commissions under the Securities Act.

Each underwriting agreement provides that the depositor will indemnify the related underwriter, and that under limited circumstances the related underwriter will indemnify the depositor, against some liabilities under the Securities Act, or contribute to payments required to be made in respect thereof.

The Class A-P Certificates and the Class M Certificates may be offered by the depositor from time to time directly or through an underwriter or agent in one or more negotiated transactions, or otherwise, at varying prices to be determined at the time of sale. However, there is currently no underwriting arrangement in effect for these certificates. Proceeds to the depositor from any sale of the Class A-P Certificates and the Class M Certificates will equal the purchase price paid by their purchaser, net of any expenses payable by the depositor and any compensation payable to any underwriter or agent.

There is currently no secondary market for the offered certificates. Each underwriter intends to make a secondary market in the underwritten certificates to be purchased by it but is not obligated to do so. There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue. The offered certificates will not be listed on any securities exchange.

The primary source of information available to investors concerning the offered certificates will be the monthly statements discussed in the accompanying prospectus under "Description of the

# EXHIBIT G

## UNDERWRITER'S CERTIFICATE

[See Tab 47 of the closing set]

# EXHIBIT E

 CT Corporation

**Service of Process Transmittal**
11/11/2011
CT Log Number 519473936

TO: Alita Wingfield, Managing Attorney
Morgan Stanley Law Division
1221 Avenue of the Americas, 35th Floor
New York, NY 10020

RE: **Process Served in Texas**

FOR: Morgan Stanley & Co. LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Federal Deposit Insurance Corporation, as Receiver for Franklin Bank, S.S.B., Pltf. vs. Morgan Stanley & Company LLC, etc., Dft. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Citation, Original Petition, Exhibit(s) |
| **COURT/AGENCY:** | 151st Judicial District Court Harris County, TX Case # 201167305 |
| **NATURE OF ACTION:** | Untrue or misleading statements in the sale of securities |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Dallas, TX |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/11/2011 at 11:00 |
| **JURISDICTION SERVED :** | Texas |
| **APPEARANCE OR ANSWER DUE:** | By 10:00 a.m. on the Monday next following the expiration of 20 days |
| **ATTORNEY(S) / SENDER(S):** | Marcos G. Ronquillo 1201 Elm St, Ste 1700 Dallas, TX 75270 214-939-8613 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/11/2011, Expected Purge Date: 12/11/2011 Image SOP Email Notification, Barbara Valente Barbara.Valente@morganstanley.com Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com Email Notification, Kitoh Grey Kitoh.Grey@morganstanley.com Email Notification, Crystal Pruden crystal.pruden@morganstanley.com Email Notification, Alita Wingfield Alita.Wingfield@morganstanley.com Email Notification, Lenise Davis lenise.davis@morganstanley.com Email Notification, Osmond Fortin Osmond.Fortin@morganstanley.com Email Notification, Marielle Messa Marielle.Messa@morganstanley.com |
| **SIGNED:** **PER:** **ADDRESS:** **TELEPHONE:** | C T Corporation System Beatrice Casarez 350 North St Paul Street Suite 2900 Dallas, TX 75201 214-932-3601 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

RECEIPT NUMBER  427225         0.00
TRACKING NUMBER  72722003        MTA

CAUSE NUMBER  201167305

| | |
|---|---|
| **PLAINTIFF:**  FEDERAL DEPOSIT INSURANCE CORPORATION (AS RECEIVER | In The   151st |
| vs. | Judicial District Court of |
| **DEFENDANT:**   MORGAN STANLEY & COMPANY LLC | Harris County, Texas |

**CITATION CORPORATE**

THE STATE OF TEXAS
County of Harris

*delivered: 11-11-11
by scH2010*

TO: MORGAN STANLEY & COMPANY LLC (LIMITED LIABILITY COMPANY) BY SERVING
THROUGH ITS REGISTERED AGENT C T CORPORATION

350 NORTH SAINT PAUL STREET SUITE 2900  DALLAS TX 75201

Attached is a copy of   PLAINTIFF'S ORIGINAL PETITION FOR DAMAGES                          .

This instrument was filed on the _____4th_____ day of _____November_____, 20 _11_ , in the
above cited cause number and court. The instrument attached describes the claim against you.

   **YOU HAVE BEEN SUED;** you may employ an attorney. If you or your attorney do not file a written answer with the
District Clerk who issued this citation by 10:00 a.m. on the Monday next following the expiration of 20 days after you were
served this citation and petition, a default judgment may be taken against you.

**TO OFFICER SERVING:**

   **This Citation** was issued under my hand and seal of said Court, at Houston, Texas, this __7th__ day of
_____November_____, 20 _11_.

Issued at request of:
RONQUILLO, MARCOS G.
1201 ELM ST STE 1700
DALLAS, TX 75270
Tel: (214) 939-8613
Bar Number:  17226000

*Chris Daniel*
**CHRIS DANIEL, District Clerk**
Harris County, Texas
**201 Caroline, Houston, Texas 77002**
**P.O. Box 4651, Houston, Texas 77210**

Generated by: CUERO, NELSON    7MM/YSW/9150902

**OFFICER/AUTHORIZED PERSON RETURN**

I received this citation on the _____ day of _____, 20____, at _____ o'clock ___.M., endorsed

the date of delivery thereon, and executed it at _____, _____, _____.
                                                                  (street address)                              (city)

in _____ County, Texas on the _____ day of _____, 20 ____, at _____ o'clock ___. M.,

by delivering to _____, by delivering to its
                          (the defendant corporation named in citation)

_____, in person, whose name is _____,
(registered agent, president, or vice-president)

a true copy of this citation, with a copy of the _____ Petition attached,
                                                                (description of petition, e.g., "Plaintiffs Original")

and with accompanying copies of _____.
                                                      (additional documents, if any, delivered with the petition)

I certify that the facts stated in this return are true by my signature below on the _____ day of _____, 20____.

FEE: $ _____              By: _____
                                               (signature of officer)
                                 Printed Name: _____

                                 As Deputy for: _____
_____                        (printed name & title of sheriff or constable)
Affiant Other Than Officer

On this day, _____, known to me to be the person whose signature
appears on the foregoing return, personally appeared. After being by me duly sworn, he/she stated that this citation was
executed by him/her in the exact manner recited on the return.

SWORN TO AND SUBSCRIBED BEFORE ME, on this _____ day of _____, 20 _____

_____
Notary Public

N.INT.CITC.P

Filed 11 November 4 P4:40
Chris Daniel - District Clerk
Harris County
ED101J016578909
By: Sharon Carlton

CAUSE NO. _____

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE | § | IN THE DISTRICT COURT OF |
| CORPORATION AS RECEIVER FOR | § | |
| FRANKLIN BANK, S.S.B., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| MORGAN STANLEY & COMPANY LLC | § | |
| f/k/a MORGAN STANLEY & CO. INC., | § | |
| | § | |
| | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

**2011-67305 / Court: 151**

## PLAINTIFF'S ORIGINAL PETITION FOR DAMAGES

### TO THE HONORABLE JUDGES OF SAID COURT:

Comes now Plaintiff, Federal Deposit Insurance Corporation as Receiver for Franklin

Bank, S.S.B., and files this Petition against Morgan Stanley & Company LLC (referred to as

**Morgan Stanley**); and as grounds therefor shows as follows:

### I. DISCOVERY CONTROL PLAN

1.    Plaintiff intends that discovery be conducted under Level 3 of Rule 190.4 of the

Texas Rules of Civil Procedure.

### II. NATURE OF THIS ACTION

2.    This is an action for damages caused by the violation of the Texas Securities Act

(**TSA**) and the federal Securities Act of 1933 (**1933 Act**) by Morgan Stanley. As alleged in detail

below, Morgan Stanley underwrote and sold to Franklin Bank, S.S.B. (referred to in this Petition

as **Franklin**) three securities known as "certificates," which were backed by residential mortgage

loans. Franklin paid $67,444,274 million for all of the certificates. When it underwrote and sold

these certificates to Franklin, Morgan Stanley made numerous statements of material facts about

the certificates and, in particular, about the credit quality of the mortgage loans that backed them.

Many of those statements were untrue. Moreover, Morgan Stanley omitted to state many

material facts that were necessary in order to make its statements not misleading. For example,

PLAINTIFF'S ORIGINAL PETITION

Page 1

Morgan Stanley made untrue statements, or omitted important information, about such material facts as the loan-to-value ratios of the mortgage loans, the number of borrowers who did not live in the houses that secured their loans (that is, the number of properties that were not primary residences), and the extent to which the entities that made the loans disregarded their own standards in doing so.

3.      Morgan Stanley made such untrue or misleading statements about at least the following numbers of the loans in each of the three securitizations.[1]

| Securitization No. | Number of Loans about which Morgan Stanley Made Material Untrue or Misleading Statements | Number of Loans in the Securitization | Percentage of Loans about Which Morgan Stanley Made Material Untrue or Misleading Statements |
|---|---|---|---|
| 1 | 428 | 752 | 57% |
| 2 | 47 | 188 | 25% |
| 3 | 170 | 460 | 37% |

Plaintiff is informed and believes, and based thereon alleges, that even more mortgage loans than those counted in the table above were the subject of untrue or misleading statements by Morgan Stanley.

4.      The certificates are "securities" within the meaning of the TSA and the 1933 Act. Morgan Stanley is liable under the following provisions of the TSA and the 1933 Act:

*As an underwriter:* Morgan Stanley underwrote all of the certificates that Franklin purchased. Morgan Stanley is liable as an "underwriter" under Section 11 of the 1933 Act.

*As a seller:* Morgan Stanley sold Franklin two of the certificates. Morgan Stanley is liable as a "seller" of the securities under Article 581-33 of the TSA and under Section 12(a)(2) of the 1933 Act.

---

[1] For securitizations that had multiple loan groups, the information in the table is only about loans in the group that primarily paid the certificate that Franklin purchased.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 2 of 55

### III. PARTIES

5.    Plaintiff is the receiver for Franklin. Under the Federal Deposit Insurance Act, the Federal Deposit Insurance Corporation, a corporation organized and existing under the laws of the United States of America, is authorized to be appointed as receiver for failed insured depository institutions. Under the Federal Deposit Insurance Act, Plaintiff is empowered to sue and complain in any court of law and to do so to pursue claims held by banks of which it is the receiver. 12 U.S.C. § 1819. Thus, Plaintiff has authority to pursue claims held by Franklin, including its claims made against the Defendant in this action.

6.    Defendant Morgan Stanley & Company, LLC (referred to as **Morgan Stanley**) is a limited liability company organized under the laws of Delaware and is authorized to do business in Texas. Morgan Stanley sold Franklin two of the certificates and underwrote all three of the certificates. At the time that it underwrote and sold the certificates, Morgan Stanley was known as Morgan Stanley & Co. Inc. Morgan Stanley may be served through its registered agent CT Corporation, 350 North Saint Paul Street, Suite 2900, Dallas, Texas 75201.

### IV. JURISDICTION AND VENUE

7.    The Court has jurisdiction because the amount in controversy in this action falls within the minimum jurisdictional limits of the Court.

8.    Morgan Stanley is subject to personal jurisdiction in Texas because it is registered to do business, and does business, in Texas. Morgan Stanley is also subject to personal jurisdiction in Texas because it offered and sold certificates to Franklin "in Texas" within the meaning of Article 581-33 of the TSA.

9.    Venue is proper in this County pursuant to Section 15.002(a)(1) of the Texas Civil Practice & Remedies Code because, among other reasons, all or a substantial part of the events or omissions that give rise to the claims occurred in Harris County, in that Morgan Stanley offered and sold the certificates to Franklin in this County and because the violations of law alleged in this Petition, including the making of material untrue or misleading statements,

Certified Document Number: 50466375 - Page 3 of 55

occurred in this County. Venue is also proper under Section 15.002(a)(4) because Harris County
was the principal residence of Franklin at the time the claims accrued.

## V. SECURITIZATION OF MORTGAGE LOANS

10.    The securities that Franklin purchased are so-called **residential mortgage-backed
securities**, or **RMBS**, created in a process known as **securitization**. Securitization begins with
loans on which the borrowers are to make payments, usually monthly. The entity that makes the
loans is known as the **originator** of the loans. The process by which the originator decides
whether to make particular loans is known as the **underwriting** of loans. The purpose of
underwriting is to ensure that loans are made only to borrowers of sufficient credit standing to
repay them and only against sufficient collateral. In the loan underwriting process, the originator
applies its **underwriting standards**.

11.    In general, residential mortgage lenders may hold some of the mortgage loans they
originate in their own portfolio and may sell other mortgage loans they originate into
securitizations.

12.    In a securitization, a large number of loans, usually of a similar type, are grouped
into a **collateral pool**. The originator of those loans sells them (and, with them, the right to
receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The
trust raises the cash to pay for the loans by selling **securities**, usually called **certificates**, to
investors such as Franklin. Each certificate entitles its holder to an agreed part of the cash flow
from the loans in the collateral pool.

13.    In a simple securitization, the holder of each certificate is entitled to a *pro rata* part
of the overall monthly cash flow from the loans in the collateral pool.

14.    In a more complex securitization, the cash flow is divided into different parts,
usually called **tranches** ("tranche" is "slice" in French), and the certificates are divided into
different **classes**, each with different rights. Each class of certificates is entitled to the cash flow
in the tranche corresponding to that class.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 4 of 55

15.   One way in which the cash flow is divided — and the rights of different classes of certificates distinguished — is by priority of payment or, put differently, risk of nonpayment. The most **senior** class of certificates usually is entitled to be paid in full before the next most senior class, and so on. Conversely, losses from defaults in payment of the loans in the collateral pool are allocated first to the most **subordinate** class of certificates, then to the class above that, and so on. The interest rate on each class of certificates is usually proportional to the amount of risk that that class bears; the most senior certificates bear the least risk and thus pay the lowest rate of interest, the most subordinate, the opposite. This hierarchy of rights to payment is referred to as the **waterfall**.

16.   The risk of a particular class of certificate is a function of both the riskiness of the loans in the collateral pool and the seniority of that class in the waterfall. Even if the underlying loans are quite risky, the senior classes of certificates may bear so little of that risk that they may be rated triple-A. (According to Moody's, "[o]bligations rated Aaa are judged to be of the highest quality, with minimal credit risk.") For example, assume a securitization of $100 million of risky loans, on which the historical loss rate is 5%. Assume that there are two classes of certificates, a senior class of $50 million and a subordinate class of $50 million. Even though the underlying loans are quite risky, the senior class of certificates would be paid in full as long as the $100 million of loans produced payments of at least $50 million plus interest, that is, unless the loss rate on those loans exceeded 50%, fully 10 times the historical average.

17.   All of the certificates referred to in this Petition were senior certificates that were rated triple-A when Franklin purchased them.

18.   Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 5 of 55

originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The sponsor arranges for title to the loans to be transferred to an entity known as the **depositor**, which then transfers title to the loans to the trust.

*

19.    **Securities underwriters**, like Morgan Stanley, play a critical role in the process of securitization. They underwrite the sale of the certificates, that is, they purchase the certificates from the trust and then sell them to investors. Equally important, securities underwriters provide to potential investors the information that they need to decide whether to purchase certificates.

20.    Because the cash flow from the loans in the collateral pool of a securitization is the source of funds to pay the holders of the certificates issued by the trust, the credit quality of those certificates is dependent upon the credit quality of the loans in the collateral pool (and upon the place of each certificate in the waterfall). The most important information about the credit quality of those loans is contained in the files that the originator develops while making the loans, the so-called loan files. For residential mortgage loans, each loan file normally contains comprehensive information from such important documents as the borrower's application for the loan, credit reports on the borrower, and an appraisal of the property that will secure the loan. The loan file may also include notes from the person who underwrote the loan about whether and how the loan complied with the originator's underwriting standards, including documentation of any "compensating factors" that justified any departure from those standards.

21.    Potential investors in certificates are not given access to loan files. Instead, the securities underwriters are responsible for gathering, verifying, and presenting to potential investors the information about the credit quality of the loans that will be deposited into the trust. They do so by using information about the loans, which has been compiled into a database known as a **loan tape**. The securities underwriters use the loan tape to compile numerous statistics about the loans, which are presented to potential investors in a **prospectus supplement**, a disclosure document that the underwriters are required to file with the Securities and Exchange

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 6 of 55

Commission. (Franklin did not have access to the loan tape before it purchased the certificates, but Plaintiff has reviewed data from the loan tape in preparing this petition.)

22.    As alleged in detail below, the information in the prospectus supplements and other offering documents about the credit quality of the loans in the collateral pools of the trusts contained many statements that were material to the credit quality of those loans, but were untrue or misleading.

## VI. THE SALES OF THE CERTIFICATES

23.    Franklin purchased certificates in three securitizations (referred to in this Petition as Securitizations Nos. 1 through 3). Details of each trust and each certificate are stated in Item 23 of Schedules 1 through 3 of this Petition. The Schedules correspond to Securitizations Nos. 1 through 3. Plaintiff incorporates into this paragraph 23, and alleges as though fully set forth in this paragraph, the contents of Item 23 of the Schedules.

24.    Morgan Stanley sold two of the three certificates directly to Franklin. For each of those two certificates, Morgan Stanley sent numerous documents to Franklin at its office in Houston, Texas. These documents included a term sheet (or its equivalent), the prospectus supplement for the certificate that was filed with the SEC, and drafts of some of the statistical tables to be included in the prospectus supplement. In each of these documents, Morgan Stanley made statements of material fact about the certificate that it offered and sold to Franklin.

## VII. MORGAN STANLEY'S MATERIAL UNTRUE OR MISLEADING STATEMENTS ABOUT THE CERTIFICATES

25.    The prospectus supplement for each of the three securitizations is available from the Securities and Exchange Commission's website. A URL for each prospectus supplement is included in Item 23 of each Schedule. Each Prospectus Supplement is incorporated into this Petition by reference.

26.    Many of the statements of material fact that Morgan Stanley made in the three prospectus supplements or in other documents that Morgan Stanley sent to Franklin were untrue or misleading. These untrue or misleading statements included the following.

**PLAINTIFF'S ORIGINAL PETITION**

A.    **Untrue or Misleading Statements About the Loan-to-Value Ratios (LTVs) of the Mortgage Loans, and the Appraisals of the Properties, in the Collateral Pools**

1.    **LTVs**

(a)    **The materiality of LTVs**

27.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the amount of the mortgage loan to the lower of the appraised value or the sale price of the mortgaged property when the loan is made. For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of 60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most crucial measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are therefore one of the most crucial measures of the risk of certificates sold in that securitization. LTV is a primary determinant of the likelihood of default. The lower the LTV, the lower the likelihood of default. For example, the lower the LTV, the less likely it is that a decline in the value of the property will wipe out the owner's equity, and thereby give the owner an incentive to stop making mortgage payments and abandon the property, a so-called strategic default. LTV is also a primary determinant of the severity of losses for those loans that do default. The lower the LTV, the lower the severity of losses on those loans that do default. Loans with lower LTVs provide greater "cushion," thereby increasing the likelihood that the proceeds of foreclosure will cover the unpaid balance of the mortgage loan.

28.    Beyond these fundamental effects on the likelihood and severity of default, LTVs also affect prepayment patterns (that is, the number of borrowers who pay off their mortgage loans before maturity and when they do so) and therefore the expected lives of the loans and the associated certificates. Prepayment patterns affect many aspects of certificates that are material to the investors that purchase them, including the life of the certificate and the timing and amount of cash that the investor will receive during that life.

29.    In addition, rating agencies use LTVs to determine the proper structuring and credit enhancement necessary for securities, such as the certificates that Franklin purchased, to receive

a particular rating. If the LTVs of the mortgage loans in the collateral pool of a securitization are incorrect, the ratings of certificates sold in that securitization will also be incorrect.

30.    An accurate denominator (that is, the value of the property) is essential to an accurate LTV. In particular, a too-high denominator will understate, sometimes greatly, the risk of a loan. To return to the example above, if the property whose actual value is $500,000 is valued incorrectly at $550,000, then the ostensible LTV of the $300,000 loan falls from 60% to 54.5%, and the ostensible LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraised value understates the risk of the loan.

31.    For these reasons, a reasonable investor considers LTV critical to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTVs of the mortgage loans in the collateral pool of a securitization have a significant effect on both the risk and the rating of each certificate sold in that securitization and, thus, are essential to the decision of a reasonable investor whether to purchase any such certificate.

> **(b)    Untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations**

32.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made material untrue or misleading statements about the LTVs of the mortgage loans in the collateral pools of these securitizations. Each such statement is identified in Item 32 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 32, and alleges as though fully set forth in this paragraph, the contents of Item 32 of the Schedules.

33.    Morgan Stanley made these statements as statements of fact. Plaintiff is informed and believes, and based thereon alleges, that Morgan Stanley intended that these statements be understood as statements of fact. Franklin did understand the statements about the LTVs as statements of fact. Franklin had no access to appraisal reports or other documents or information from which it could verify the LTVs of the mortgage loans other than the statements that Morgan Stanley made about those LTVs.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 9 of 55

       (c)    **These statements were untrue because an automated valuation
model demonstrates that Morgan Stanley's statements about
LTVs were based on overstated valuations of the properties in
the collateral pools.**

34.    The stated LTVs of many of the mortgage loans in each securitization were

significantly lower than the true LTVs because the denominators (that is, the value of the

properties that secured those loans) that were used to determine the disclosed LTVs were

overstated to a material extent. The weighted-average LTVs presented in the prospectus

supplements were also, therefore, untrue and misleading.

35.    Using a comprehensive, industry-standard automated valuation model (AVM), it is

possible to determine the true market value of a certain property as of a specified date. An AVM

is based on objective criteria like the condition of the property and the actual sale prices of

comparable properties in the same locale shortly before the specified date and is more consistent,

independent, and objective than other methods of appraisal. AVMs have been in widespread use

for many years. The AVM on which these allegations are based incorporates a database of 500

million sales covering ZIP codes that represent more than 97% of the homes, occupied by more

than 99% of the population, in the United States. Independent testing services have determined

that this AVM is the most accurate of all such models.

36.    On many of the properties that secured the mortgage loans, the model reported that

LTVs were understated. In particular, the model reported that the denominator (that is, the

appraised value of the property as stated in the loan tape and compiled into the tables in the

prospectus supplement) that was used to determine the disclosed LTV was 105% or more of the

true market value as determined by the model as of the time the loan was originated. The model

reported that the denominator that was used to determine the disclosed LTV was 95% or less of

the true market value on a much smaller number of properties. Thus, the number of properties on

which the value was overstated exceeded by far the number on which the value was understated,

and the aggregate amount overstated exceeded by far the aggregate amount understated.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 10 of 55

37.    To take an example, in Securitization No. 1, there were 752 mortgage loans in the collateral pool. There was sufficient information for the model to determine the value of the properties that secured 416 of those loans. On 291 of those 416 properties, the model reported that the denominator that was used to determine the disclosed LTV was 105% or more of the true market value and the amount by which the stated values of those properties exceeded their true market values in the aggregate was $44,108,993. The model reported that the denominators that was used to determine the disclosed LTV was 95% or less of true market value on only 39 properties, and the amount by which the true market values of those properties exceeded the values reported in the denominator was $4,187,799. Thus, the number of properties on which the value was overstated exceeded by more than seven times the number on which the value was understated, and the aggregate amount overstated was more than 10 times the aggregate amount understated.

38.    On one of the loans in Securitization No. 1, the amount of the loan was $489,177 and the stated value of the property was $643,654 resulting in a stated LTV of 76%. The model, however, determined that the true value of the property was $471,000, resulting in a true LTV of 103.9%. Thus, the stated value was higher than the true value by 36.7%, and the stated LTV was lower than the true LTV by 27.9%. Both of these were huge discrepancies that were material to the credit quality of the loan.

39.    The overstated values of 291 properties made virtually every statement by Morgan Stanley about the LTVs of the mortgage loans untrue or misleading. For example, Morgan Stanley stated that all mortgage loans had an LTV of 95% or less. In fact, the mortgage loans on 122 of the 416 properties valued by the model had LTVs of over 95%. Morgan Stanley also stated that the weighted-average LTV of the loans was 73.86%. Using only the loans that the model was able to value, the weighted-average LTV of those loans as stated in the loan tape was 74.5%. In fact, among the loans that the AVM was able to value, the weighted average LTV was 91.6%. These differences were material for the reasons stated above.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 11 of 55

40.   The results of the valuations by the automated model in this example are summarized in the following table.

| | |
|---|---:|
| Number of loans | 752 |
| Number of properties on which there was enough information for the model to determine a true market value | 416 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 291 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $44,108,993 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 39 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,187,799 |
| Number of loans with LTVs over 95%, as stated by Morgan Stanley | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 122 |
| Weighted-average LTV, as stated by Morgan Stanley | 73.86% |
| Weighted-average LTV, for loans the model was able to value | 74.5% |
| Weighted-average LTV, as determined by the model | 91.6% |

41.   The model produced similar results for the mortgage loans in the collateral pool of each securitization. Details of the results of the model for each securitization are stated in Item 41 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 41, and alleges as though fully set forth in this paragraph, the contents of Item 41 of the Schedules.

> **(d)    These statements were misleading because Morgan Stanley omitted to state that there were additional liens on a material number of the properties that secured the mortgage loans in the collateral pools.**

42.   As mentioned above, the LTV of a mortgage loan is a key determinant of the likelihood that the mortgagor will default in payment of the mortgage. The lower the LTV, the less likely that a decline in the value of the property will wipe out the owner's equity and thereby give the owner an incentive to stop making mortgage payments and abandon the property. Because LTV affects the behavior of borrowers so profoundly, accurate LTVs are essential to predicting defaults and prepayments by borrowers. Also as mentioned above, LTV affects the severity of loss on those loans that do default. The power of LTV to predict defaults,

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 12 of 55

prepayments, and severities is a major reason why reasonable investors consider the LTVs of mortgage loans important to the decision whether to purchase a certificate in the securitization of those loans.

43.    The predictive power of the LTV of a mortgage loan is much reduced if there are additional liens on the same property. Additional liens reduce the owner's equity in the property and thereby increase the owner's incentive to stop making mortgage payments and abandon the property if the value of the property falls below the combined amount of all of the liens on the property (a strategic default). Additional liens also exacerbate delinquencies and defaults because they complicate the servicing of mortgage loans and the management of delinquencies and defaults. Servicers of the first-lien mortgage must then deal not only with the borrower, but also with the servicer of the second-lien mortgage. For example, the servicer of a single mortgage may want to grant a borrower forbearance while the borrower is unemployed and allow him or her to add missed payments to the principal of the loan and to resume payments when he or she is employed again. But the servicer of the second-lien mortgage may refuse such forbearance and initiate foreclosure and thereby force the borrower into default on the first mortgage as well.

44.    According to land records, many of the properties that secured mortgage loans in the collateral pool of each securitization were subject to liens in addition to the lien of the mortgage in the pool at the time of the closing of these securitizations.[2] In two of the securitizations, Morgan Stanley failed to disclose any of these additional liens in the prospectus supplements and in other documents that Morgan Stanley sent to Franklin. These additional liens reduced the equity of the owners of the properties subject to them, and thereby increased the risk that those owners would default in payment of the mortgage loan in the pool.

45.    To take an example, of the 752 properties that secured the mortgage loans in Securitization No. 1, at least 66 were subject to undisclosed liens in addition to the lien of the

---

[2] Additional liens referred to in this Petition and the Schedules exclude liens on the loan tapes that were originated on or before the date on which the mortgage loans in the pools were originated.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 13 of 55

mortgage in the pool. The undisclosed additional liens on these properties reduced the owners' equity in those properties by a weighted average of 52.7% and by an aggregate amount of $6,377,605.

46.    On one of the loans, the original balance of the mortgage loan was $558,250, the represented value of the property was $697,813, the owner's ostensible equity was $139,563, and the reported LTV was 80%. On the date of the closing of this securitization, however, there were undisclosed additional liens on this property of $104,700. Thus, the owner's true equity was only $34,863 — 75% less than the equity implied by the disclosed loan amount and value of the property. In many cases, the amounts of the undisclosed additional liens were precisely equal to the owner's ostensible equity, thereby reducing that equity by 100%, to zero. And in some cases, the amount of the undisclosed additional liens was much greater than the owner's ostensible equity, putting the owner "under water" on the day on which this securitization closed.

47.    Similar numbers of additional undisclosed liens were found in each securitization in which Morgan Stanley did not disclose the existence of additional liens. Details of the undisclosed additional liens in each securitization are stated in Item 47 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 47, and alleges as though fully set forth in this paragraph, the contents of Item 47 of the Schedules. Plaintiff is informed and believes, and based thereon alleges, that discovery will demonstrate that the number of loans with additional liens is substantially higher than those disclosed in the Schedules.

48.    Because Morgan Stanley did not disclose the existence or the amounts of these additional liens, all statements that it made about the LTVs of the mortgage loans were misleading.

### 2.    Appraisals

49.    As discussed above in paragraph 30, an accurate denominator (value of the mortgaged property) is essential to an accurate LTV. An accurate appraisal of the property, in turn, is essential to an accurate denominator.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 14 of 55

50.    In connection with these securitizations, there was undisclosed upward bias in appraisals of properties that secured mortgage loans and consequent understatement of the LTVs of those loans. This upward bias in appraisals caused the denominators that were used to determine the LTVs of many mortgage loans to be overstated and the LTVs themselves therefore to be understated. The statements that Morgan Stanley made about the LTVs of the mortgage loans in the collateral pools were misleading because it omitted to state that the appraisals of a material number of the properties that secured those loans were biased upwards. In addition, Morgan Stanley stated that the appraisals conformed to the Uniform Standards of Professional Appraisal Practice (USPAP), the professional standards that govern appraisers and appraisals (or to the standards of Fannie Mae and Freddie Mac, which required compliance with USPAP). Those statements were false because upwardly biased appraisals do not conform to USPAP.

> (a)    **These statements that Morgan Stanley made about the LTVs of the mortgage loans in the collateral pools were misleading because it omitted to state that the appraisals of a large number of the properties that secured those loans were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.**

51.    Morgan Stanley omitted to state that the appraisals in these securitizations used inaccurate property descriptions, ignored recent sales of the subject and comparable properties, and used sales of properties that were not comparable, all in order to inflate the values of the appraised properties. The appraisals used to compute the LTVs of many of the mortgage loans in the collateral pools were biased upwards. As alleged in paragraphs 35 through 41, in each trust, the number of properties on which the value was overstated exceeded by far the number on which the value was understated, and the aggregate amount overstated exceeded by far the aggregate amount understated. These ratios for each trust are summarized in the following table.

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 1 | 7.5 | 10.5 |

Certified Document Number: 50466375 - Page 15 of 55

| Securitization No. | Ratio of Number of Properties whose Value was Overstated to Number whose Value was Understated | Ratio of Amount of Overvaluation to Amount of Undervaluation |
|---|---|---|
| 2 | 1.8 | 1.3 |
| 3 | 4.7 | 5.1 |

These lopsided results demonstrate the upward bias in appraisals of properties that secured the mortgage loans in the collateral pools.

52.    Plaintiff is informed and believes, and based thereon alleges, that a material number of the upwardly biased appraisals were not statements of the appraiser's actual finding of the value of a property based on his or her objective valuation.

> **(b)    The statements by Morgan Stanley about compliance with USPAP were untrue because the appraisals of a large number of the properties that secured the mortgage loans were biased upward.**

53.    Appraisers and appraisals are governed by USPAP, which is promulgated by the Appraisal Standards Board. The Preamble to USPAP states that its purpose "is to promote and maintain a high level of public trust in appraisal practice." Both Fannie Mae and Freddie Mac require that appraisals comply with USPAP.

54.    USPAP includes the following provisions:

(a)    USPAP Standards Rule 2-1(b)(iii) requires that "Each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading."

(b)    USPAP Standards Rule 1-4(a) provides that "When a sales comparison approach is necessary for credible assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion."

(c)    USPAP Standards Rule 1-4(b) provides that "When a cost approach is necessary for credible assignment results, an appraiser must:

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 16 of 55

     (i)     develop an opinion of site value by an appropriate appraisal method or technique;

     (ii)    analyze such comparable cost data as are available to estimate the cost new of the improvements (if any); and

     (iii)   analyze such comparable data as are available to estimate the difference between the cost new and the present worth of the improvements (accrued depreciation)."

55.     The Appraisal Standards Board, which promulgates USPAP, also issues Advisory Opinions. Although the Advisory Opinions do not establish new standards or interpret USPAP, they "are issued to illustrate the applicability of appraisal standards in specific situations." Advisory Opinion 1 discussing "Sales History" states that "The requirement for the appraiser to analyze and report sales history and related information is fundamental to the appraisal process. Just as the appraiser must analyze pending and recent sales of comparable properties, the appraiser must take into account all pending and recent sales of the subject property itself."

56.     In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements that the appraisals of properties that secured the mortgage loans in the collateral pools were made in compliance with USPAP or with the appraisal standards of Fannie Mae and Freddie Mac, which required compliance with USPAP. Details of each such statement are stated in Item 56 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 56, and alleges as though fully set forth in this paragraph, the contents of Item 56 of the Schedules.

57.     Plaintiff is informed and believes, and based thereon alleges, that a material number of mortgage loans in the collateral pools had appraisals conducted that deviated from USPAP.

58.     Each of these statements referred to in paragraph 56 was untrue because the appraisals of a material number of the properties referred to in each such statement did not conform to USPAP.

**PLAINTIFF'S ORIGINAL PETITION**

59.    By each of the untrue and misleading statements referred to in paragraphs 32 and 56 above, Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin.

**B.    Untrue or Misleading Statements About the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pools**

**1.    The materiality of occupancy status**

60.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less likely to default than mortgages on non-owner-occupied residences and therefore are less risky. Occupancy status also influences prepayment patterns.

61.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan. The percentage of loans in the collateral pool of a securitization that are not secured by mortgages on primary residences is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans not secured by primary residences, the greater the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans.

**2.    Untrue or misleading statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools of these securitizations**

62.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements about the number of properties in the collateral pool of each securitization that were the primary residences of their owners. To return to the example of Securitization No. 1, Morgan Stanley stated that, of the 752 mortgage loans in the collateral pool, 718 were secured by primary residences and 34 were not. Details of each such statement in each securitization are stated in Item 62 of the Schedules of this Petition. Plaintiff incorporates

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 18 of 55

into this paragraph 62, and alleges as though fully set forth in this paragraph, the contents of Item 62 of the Schedules.

63.    These statements were untrue or misleading because (i) the stated number of mortgage loans secured by primary residences was higher than the actual number of loans in that category or (ii) the stated number of mortgage loans not secured by primary residences was lower than the actual number of loans in that category.

### 3.    Basis of the allegations above that these statements about the occupancy status of the properties that secured the mortgage loans in the collateral pools were untrue or misleading

64.    Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates and more lenient underwriting standards, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not. Plaintiff is informed and believes, and based thereon alleges, that borrowers of many nonconforming securitized loans did so.

65.    A significant number of the properties in the collateral pool of each securitization that were stated to be primary residences actually were not. Moreover, Plaintiff is informed and believes, and based thereon alleges, that there is additional evidence of occupancy fraud in the loan files of many more of the mortgage loans in the collateral pool.

66.    With respect to some of the properties that were stated to be primary residences, the borrower instructed local tax authorities to send the bills for the taxes on the property to the borrower at an address other than the property itself. This is strong evidence that the mortgaged property was not the borrower's primary residence.

67.    In some states and counties, owners of a property are able to designate whether that property is his or her "homestead," which may reduce the taxes on that property or exempt the property from assets available to satisfy the owner's creditors, or both. An owner may designate

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 19 of 55

only one property, which he or she must occupy, as his or her homestead. The fact that an owner in one of these jurisdictions does not designate a property as his or her homestead when he or she can do so is strong evidence that the property was not his or her primary residence. With respect to some of the properties that were stated to be primary residences, the owner could have but did not designate the property as his or her homestead. That omission is strong evidence that the property was not the borrower's primary residence.

68.   When a borrower actually occupies a newly mortgaged property, he or she normally notifies entities that send bills to him or her (such as credit card companies, utility companies, and local merchants) to send his or her bills to the address of the newly mortgaged property. Six months after the closing of the mortgage is ample time to complete this process. Six months after the closing of the mortgage, if the borrower is still receiving his or her bills at a different address, it is very likely that the borrower does not occupy the mortgaged property. For each securitization, a credit reporting agency specializing in mortgage loans compared the addresses in the borrowers' credit reports to the addresses of the mortgaged properties six months after the closing of the mortgage loans. Many borrowers whose mortgage loans were secured by properties that were stated in the loan tapes to be owner-occupied did not receive any bills at the address of the mortgaged property but did receive their bills at another address or addresses. It is very likely that each of these borrowers did not occupy the mortgaged property.

69.   In Securitization No. 1, 51 owners of properties that were stated to be primary residences instructed local tax authorities to send the bills for the taxes on that property to them at a different address; 108 owners of properties that were stated to be primary residences could have, but did not, designate that property as their homestead; and 40 owners of properties that were stated to be primary residences did not receive any of their bills there six months after the mortgage was originated. Eliminating duplicates, 173 properties that were stated to be primary residences actually were not, for one or more of these reasons. Thus, of the 718 properties that were stated to be primary residences, 173 actually were not, and the number of properties that were not primary residences was not 34, as Morgan Stanley stated, but at least 207, a material

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 20 of 55

difference. The numbers of such loans in the collateral pool of each securitization are stated in Item 69 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 69, and alleges as though fully set forth in this paragraph, the contents of Item 69 of the Schedules.

*

70.    By each of the untrue and misleading statements referred to in paragraph 62, Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin.

### C.    Untrue or Misleading Statements About the Underwriting Standards of the Originators of the Mortgage Loans in the Collateral Pools

#### 1.    The materiality of underwriting standards and the extent of an originator's disregard of them

71.    Originators of mortgage loans have written standards by which they underwrite applications for loans. An important purpose of underwriting is to ensure that the originator makes mortgage loans only in compliance with those standards and that its underwriting decisions are properly documented. An even more fundamental purpose of underwriting mortgage loans is to ensure that loans are made only to borrowers with credit standing and financial resources to repay the loans and only against collateral with value, condition, and marketability sufficient to secure the loans. An originator's underwriting standards, and the extent to which the originator does not follow its standards, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are part of the collateral pool. A reasonable investor considers the underwriting standards of originators of mortgage loans in the collateral pool of a securitization, and whether an originator disregards its standards, important to the decision whether to purchase a certificate in that securitization.

#### 2.    Untrue or misleading statements about the underwriting standards of originators of the mortgage loans

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 21 of 55

72.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements about the underwriting standards of the originators of the mortgage loans in the collateral pool. Details of each such statement are stated in Item 72 of the Schedules of this Petition. They included statements that the originators made mortgage loans in compliance with their underwriting standards and made exceptions to those standards only when compensating factors were present. Plaintiff incorporates into this paragraph 72, and alleges as though fully set forth in this paragraph, the contents of Item 72 of the Schedules.

73.    Plaintiff is informed and believes, and based thereon alleges, that these statements were untrue or misleading because Morgan Stanley omitted to state that: (a) the originators were disregarding those underwriting standards; (b) the originators were making extensive exceptions to those underwriting standards when no compensating factors were present; (c) the originators were making wholesale, rather than case-by-case, exceptions to those underwriting standards; (d) the originators were making mortgage loans that borrowers could not repay; and (e) the originators were failing frequently to follow quality-assurance practices necessary to detect and prevent fraud intended to circumvent their underwriting standards.

       **3.**      **Basis of the allegations that these statements about the underwriting standards of the originators of the mortgage loans in the collateral pools were untrue or misleading**

           **(a)**      **The deterioration in undisclosed credit characteristics of mortgage loans made by these originators**

74.    Plaintiff is informed and believes, and based thereon alleges, that before and during the time of these securitizations, the originators of mortgage loans in these securitizations disregarded their stated underwriting standards. As a result of this relaxation, securitized mortgage loans made between 2004 and the dates of these securitizations have experienced high rates of delinquency and default.

75.    The high rates of delinquency and default were caused not so much by any deterioration in credit characteristics of the loans that were expressly embodied in underwriting

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 22 of 55

standards and disclosed to investors, but rather by deterioration in credit characteristics that were not disclosed to investors.

76.    Plaintiff is informed and believes that what was true about recently securitized mortgage loans in general was true in particular of loans originated by the entities that originated the loans in the collateral pools of these securitizations, as the following figures demonstrate. Taking loans originated by affiliates of Morgan Stanley, which originated 9.2% of the mortgage loans in these securitizations, Figure 1 shows the rising incidence of early payment defaults (or EPDs), that is, the percent of loans (by outstanding principal balance) that were originated and sold into securitizations by Morgan Stanley and that became 60 or more days delinquent within six months after they were made. An EPD is strong evidence that the originator did not follow its underwriting standards in making the loan. Underwriting standards are intended to ensure that loans are made only to borrowers who can and will make their mortgage payments. Because an EPD occurs so soon after the mortgage loan was made, it is much more likely that the default occurred because the borrower could not afford the payments in the first place (and thus that the underwriting standards were not followed), than because of changed external circumstances unrelated to the underwriting of the mortgage loan (such as that the borrower lost his or her job). The bars in Figure 1 depict the incidence of EPDs in loans originated by Morgan Stanley that were sold into securitizations. The steady increase in EPDs is further evidence that the deterioration in the credit quality of those loans was caused by disregard of underwriting standards.



77.    Figure 2 shows the weighted-average disclosed LTVs of the same loans and weighted-average disclosed credit scores of the borrowers. These were nearly constant, showing that the deterioration in the credit quality of the loans was caused not by these disclosed factors, but rather by undisclosed factors.



**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 24 of 55

78.    Substantially the same facts are true of the mortgage loans originated and sold into securitizations by each of the originators of mortgage loans in the collateral pools of these securitizations. Figures for them are presented in Figures 1 and 2 of Exhibits A to D of this Petition:

| Exhibit | Originator |
|---------|-----------|
| A | IndyMac |
| B | GMAC Mortgage |
| C | Morgan Stanley |
| D | MortgageIT |

### (b)    The poor performance of the loans in these pools demonstrates that the originators disregarded their underwriting guidelines when making these loans.

79.    As noted above, an EPD is evidence that the originator may have disregarded its underwriting standards in making the loan. The mortgage loans in some of the collateral pools of these securitization experienced EPDs. These EPDs are evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered EPDs are stated in Item 79 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 79, and alleges as though fully set forth in this paragraph, the contents of Item 79 of the Schedules.

80.    A high rate of delinquency at any time in a group of mortgage loans is also evidence that the originators of those loans may have disregarded their underwriting standards in making the loans. A common measure of serious delinquency is the number of loans on which the borrowers were ever 90 or more days delinquent in their payments. The mortgage loans in the collateral pools have experienced very high rates of delinquencies by this measure. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that suffered 90 or more days delinquencies are stated in Item 80 of the Schedules of

this Petition. Plaintiff incorporates into this paragraph 80, and alleges as though fully set forth in this paragraph, the contents of Item 80 of the Schedules.

81.    A second common measure of delinquency is the number of loans on which the borrowers are 30 or more days delinquent as of July 31, 2011. This high rate of delinquencies is strong evidence that the originators of those loans may have disregarded their underwriting standards when making those loans. The number and percent of the loans in each pool that were 30 or more days delinquent on July 31, 2011, are stated in Item 81 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 81, and alleges as though fully set forth in this paragraph, the contents of Item 81 of the Schedules.

\*

82.    By each of the untrue and misleading statements referred to in paragraph 72 above, Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin. Moreover, Plaintiff is informed and believes, and based thereon alleges, that discovery will yield additional evidence that the originators disregarded their underwriting guidelines when making the mortgage loans in the collateral pools of these securitizations.

D.    **The Large Number of Mortgage Loans in the Collateral Pools About Which Morgan Stanley Made Material Untrue or Misleading Statements Made Their Statements About the Ratings of Franklin's Certificates Untrue and Misleading.**

83.    In the prospectus supplements and in other documents that Morgan Stanley sent to Franklin, Morgan Stanley made statements about the rating of each certificate by Moody's Investors Service, Standard & Poor's Rating Service, and Fitch Ratings. Morgan Stanley stated that one or more of those agencies rated each such certificate triple-A or above. Details of each such statement are stated in Item 83 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 83, and alleges as though fully set forth in this paragraph, the contents of Item 83 of the Schedules.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 26 of 55

84.   The ratings were important to the decision of any reasonable investor whether to purchase the certificates. Many investors, including Franklin, have investment policies that require a certain minimum rating for all investments. The policy of Franklin was to purchase only certificates that were rated at least double-A.

85.   These statements by Morgan Stanley about the ratings of the certificates it underwrote and sold to Franklin were misleading because Morgan Stanley omitted to state that the ratings did not take into account all the material untrue or misleading statements about specific mortgage loans in the collateral pool. These include:

(a)   loans in which the LTVs were materially understated;

(b)   loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens;

(c)   loans that suffered EPDs, strong evidence that the originators may have disregarded the underwriting standards in making those loans; and

(d)   loans in which the properties were stated to be owner-occupied, but were not.

86.   In Securitization No. 1, there were 291 loans whose LTVs were materially understated, 66 loans in which the owner's equity in the property was reduced by 5% or more by undisclosed additional liens, and 173 loans in which the properties were stated to be owner-occupied but were not. Eliminating duplicates, there were 428 loans (or 57% of the loans in the collateral pool) about which Morgan Stanley made untrue or misleading statements. The numbers of such loans in the collateral pool of each securitization are stated in Item 86 of the Schedules of this Petition. Plaintiff incorporates into this paragraph 86, and alleges as though fully set forth in this paragraph, the contents of Item 86 of the Schedules.

87.   Plaintiff is informed and believes, and based thereon alleges, that loan files and other documents available only through discovery will prove that those statements were untrue or misleading with respect to many more loans as well.

88.   By these untrue and misleading statements, Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin. Moreover, Plaintiff is informed

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 27 of 55

and believes, and based thereon alleges, that Morgan Stanley materially understated the risk of the certificates that it underwrote and sold to Franklin.

## VIII. STATUTE OF LIMITATIONS

89.    None of the claims in this Petition was barred by the statute of limitations on November 7, 2008, the date on which Plaintiff became receiver for Franklin, because, even in the exercise of reasonable diligence, Franklin should not have discovered, and did not discover, the untrue or misleading statements by Morgan Stanley more than one year before that date. Under 12 U.S.C. § 1821(d)(14), the statute of limitations on all of the claims in this Petition is extended to three years from November 7, 2008. Plaintiff discovered the untrue or misleading statements by Morgan Stanley in 2011 in the course of its investigation of possible claims of Franklin that Plaintiff is authorized to bring as receiver for Franklin. The claims in this Petition are timely.

## IX. CAUSES OF ACTION

### A.    Untrue or Misleading Statements in the Sale of Securities Under Article 581-33 of the TSA

90.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 89.

91.    Morgan Stanley sent communications and solicitations to Franklin in Houston, Texas, for the purpose of inducing Franklin to purchase the two certificates in Securitizations 1 and 2, which it sold to Franklin. The sale of these two certificates occurred in Texas because employees or agents of Morgan Stanley directed communications about the certificates and solicitations to purchase the certificates to Franklin there, and because Franklin received those communications and solicitations there.

92.    In doing the acts alleged in the sale to Franklin of two certificates in Securitizations 1 and 2, Morgan Stanley violated Article 581-33 of the TSA by offering or selling securities in this State by means of written communications that included untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 28 of 55

93.    Plaintiff has disposed of all of the certificates.

94.    Under Article 581-33 of the TSA, Plaintiff is entitled to recover the consideration
paid for each of these certificates, plus interest at the legal rate from the date of purchase to the
date on which it recovers the purchase price, minus the amount of income received on the
certificate, minus the greater of the value of the security when the plaintiff disposed of it or the
consideration that the plaintiff received for the security.

**B.    Untrue or Misleading Statements in the Sale of Securities Under Section
12(a)(2) of the 1933 Act**

95.    Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1
through 94.

96.    Franklin purchased the two certificates that Morgan Stanley sold Franklin when
they were initially offered to the public.

97.    Morgan Stanley solicited Franklin to purchase these certificates, and sold the
certificates to Franklin, by means of the prospectus supplements and other written offering
materials and oral communications.

98.    The prospectus supplements and other written offering materials and oral
communications that Morgan Stanley sent to Franklin contained untrue statements of material
fact and omitted to state material facts necessary in order to make the statements, in the light of
the circumstances under which they were made, not misleading.

99.    Franklin did not know when it purchased these certificates that the statements in the
prospectus supplements and other written offering materials and oral communications that
Morgan Stanley sent to Franklin were untrue or misleading.

100.    In doing the acts alleged in the sale to Franklin of certificates in Securitizations 1
and 2, Morgan Stanley violated Section 12(a)(2) of the 1933 Act in the sale to Franklin of the
certificates in Securitizations 1 and 2.

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 29 of 55

101.  Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

102.  When it failed on November 7, 2008, Franklin had not discovered that Morgan Stanley made untrue or misleading statements about the certificates. Plaintiff discovered that Morgan Stanley made untrue or misleading statements in the sale of the securities in 2011 in the course of its investigation.

103.  Plaintiff has suffered a loss on each of these certificates.

104.  Plaintiff is entitled to recover its damages.

### C.    Untrue or Misleading Statements in a Registration Statement Under Section 11 of the 1933 Act

105.  Plaintiff hereby incorporates by reference, as though fully set forth, paragraphs 1 through 104.

106.  Morgan Stanley is an underwriter of all of the certificates. In doing the acts alleged, Morgan Stanley violated Section 11 of the 1933 Act in connection with the sale to Franklin of each of the certificates in Securitizations 1 through 3.

107.  The certificates in these securitizations were issued pursuant or traceable to registration statements. Details of each registration statement and each certificate are stated in Item 23 of the Schedules.

108.  The registration statements, as amended by the prospectus supplements, contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. These untrue and misleading statements included all of the untrue and misleading statements described in paragraphs 25 through 88.

109.  Franklin purchased each certificate before the issuer made an earning statement covering a period of at least twelve months generally available.

PLAINTIFF'S ORIGINAL PETITION

Certified Document Number: 50466375 - Page 30 of 55

110. Plaintiff expressly excludes from this cause of action any allegation that could be construed as alleging fraud or intentional or reckless conduct. This cause of action is based solely on claims of strict liability or negligence under the 1933 Act.

111. Franklin did not know when it purchased these certificates that the statements in the registration statements, as amended by the prospectus supplements, were untrue or misleading.

112. When it failed on November 7, 2008, Franklin had not discovered that Morgan Stanley made untrue or misleading statements about the certificates. Plaintiff discovered that Morgan Stanley made untrue or misleading statements in the sale of the securities in 2011 in the course of its investigation.

113. Franklin has suffered a loss on each of these certificates.

114. Plaintiff is entitled to recover damages as described in 15 U.S.C. § 77k(e).

### X. CONDITIONS PRECEDENT

115. Pursuant to Texas Rule of Civil Procedure 54, all conditions precedent to Plaintiff's right to recover on all causes of action pleaded herein have been performed or have occurred.

### XI. REQUEST FOR A JURY TRIAL

116. Plaintiff requests a jury trial on all allegations and causes of action set forth herein as allowed by Texas law.

### XII. ATTORNEYS' FEES, COSTS, AND INTEREST

117. Plaintiff is entitled to recover reasonable and necessary attorneys' fees in accordance with Article 581-33 of the Texas Securities Act.

118. Plaintiff further prays that the court award it all costs of court and expenses. Plaintiff further prays that the court award Plaintiff all pre- and post-judgment interest under the applicable legal rates.

Certified Document Number: 50466375 - Page 31 of 55

## XIII.  PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff be awarded a judgment over and against defendant as set forth herein and for damages in an amount to be determined at trial, but not less than $9 million, plus attorney's fees, costs of court, pre and post judgment interest at the appropriate allowable rates. Plaintiff further requests that the Court order any and all other relief at law and in equity to which Plaintiff may show itself to be justly entitled.

Respectfully Submitted,

**GODWIN RONQUILLO PC**

By: _____

Marcos G. Ronquillo
Texas State Bar No. 17226000
Jose L. Gonzalez
Texas State Bar No. 08129100
1201 Elm Street, Suite 1700
Dallas, Texas 75270-2041
Ph: 214-939-8613
Fax: 214-527-3133

David J. Grais (*pro hac vice* to be submitted)
Mark B. Holton (*pro hac vice* to be submitted)
Leanne M. Wilson (*pro hac vice* to be submitted)
Grais & Ellsworth LLP
40 East 52nd Street
New York, New York 10022
Ph: 212-755-0100

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 32 of 55

# EXHIBIT A TO THE PETITION



Figure 1: Percent of Loans Originated by IndyMac or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by IndyMac or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 33 of 55

## EXHIBIT B TO THE PETITION



Figure 1: Percent of Loans Originated by GMAC Mortgage Corporation or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by GMAC Mortgage Corporation or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 34 of 55

## EXHIBIT C TO THE PETITION



Figure 1: Percent of Loans Originated by Morgan Stanley or Its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination



Figure 2: Percent of Loans Originated by Morgan Stanley or Its Affiliates 60+ Days Delinquent Six Months After Origination, by Quarter of Origination with Weighted-Average FICO and LTV

**PLAINTIFF'S ORIGINAL PETITION**

Certified Document Number: 50466375 - Page 35 of 55

## EXHIBIT D TO THE PETITION



## SCHEDULE 1 OF THE PETITION

To the extent that this Schedule is incorporated by reference into allegations in the petition, those allegations are made against defendant Morgan Stanley.

**Item 23.    Details of trust and certificate(s).**

    **(a)    Dealer that sold the certificate(s) to Franklin:** Morgan Stanley.

    **(b)    Description of the trust:** Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S7 was a securitization in July 2007 of 752 mortgage loans, in one group. Residential Funding Mortgage Securities I, Inc. was the issuer of the securities in the trust. The mortgage loans were originated by Homecomings Financial, LLC, GMAC Mortgage, LLC, and various undisclosed originators. Approximately 26.1% of the mortgage loans were originated by Homecomings Financial, LLC. Approximately 41.5% of the mortgage loans were originated by GMAC Mortgage, LLC. RFMSI 2007-S7 Pros. Sup. S-3, S-35.

    **(c)    Description of the certificate(s) that Franklin purchased:** Morgan Stanley was an underwriter of the securities that Franklin purchased. Morgan Stanley offered and sold to Franklin a senior certificate in this securitization, in tranche A-1 for which Franklin paid $14,730,469 plus accrued interest on July 31, 2007.

    **(d)    Ratings of the certificate(s) when Franklin purchased them:** Standard & Poor's: AAA; Fitch: AAA.

    **(e)    Current ratings of the certificate(s):** Standard & Poor's: CCC; Fitch: C.

    **(f)    URL of prospectus supplement for this securitization:** http://sec.gov/Archives/edgar/data/1404235/000093041307006336/c49581_424b5.txt

    **(g)    Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Franklin purchased, were issued pursuant or traceable to a registration statement filed by Residential Funding Mortgage Securities I, Inc. with the SEC on form S-3 on April 3, 2007. Annexed to the registration statement was a prospectus. The prospectus was

SCHEDULE 1 OF THE PETITION

Certified Document Number: 50466375 - Page 37 of 55

amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

**Item 32.        Untrue or misleading statements about the LTVs of the mortgage
loans:**

In the prospectus supplement Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)        "The weighted average Loan-to-Value ratio at origination of the Mortgage Loans will be approximately 73.86%." RFMSI 2007-S7 Pros. Sup. I-2.

(b)        In Appendix I to the prospectus supplement, Morgan Stanley presented tables of statistics about the mortgage loans in the collateral pool. RFMSI 2007-S07 Pros. Sup. I-1. Each table focused on a certain characteristic of the loans (for example, principal balance) and divided the loans into categories based on that characteristic (for example, loans with principal balances of $100,000 or less, $100,001 to $200,000, $200,001 to $300,000, etc.). Each table then presented various data about the loans in each category. Among these data was "Weighted Average Loan-to-Value Ratio." There were 11 such tables in Appendix I to the prospectus supplement. In each table, the number of categories into which the loans were divided ranged from two to 41. Thus, in the prospectus supplement, Morgan Stanley made hundreds of statements about the original LTVs of the loans in the collateral pool. RFMSI 2007-S7 Pros. Sup. I-1 to I-5.

(c)        None of the mortgages in the collateral pool have an original LTV in excess of 95.00%. RFMSI 2007-S7 Pros. Sup. I-2.

**SCHEDULE I OF THE PETITION**

**Item 41.    Details of the results of the AVM analysis:**

| | |
|---|---|
| Number of loans | 752 |
| Number of properties on which there was enough information for the model to determine a true market value | 416 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 291 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $44,108,993 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 39 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $4,187,799 |
| Number of loans with LTVs over 95%, as stated by defendants | 0 |
| Number of loans with LTVs over 95%, as determined by the model | 122 |
| Weighted-average LTV, as stated by defendants | 73.86% |
| Weighted-average LTV, for loans the model was able to value | 74.5% |
| Weighted-average LTV, as determined by the model | 91.6% |

**Item 47.    Undisclosed additional liens:**

(a)    Minimum number of properties with additional liens: 66

(b)    Total reduction in equity from additional liens: $6,377,605

(c)    Weighted-average reduction in equity from additional liens: 52.7%

**Item 62.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:**

In the prospectus supplement, Morgan Stanley made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

(a)    In Appendix I to the prospectus supplement, described in Item 32, Morgan Stanley presented a table entitled "Occupancy Types of the Mortgage Loans." This table divided the mortgage loans in the collateral pool into the categories "Primary Residence" and "Second/Vacation." The table made untrue and misleading statements about the number of mortgage loans, and gave five other pieces of information about them. RFMSI 2007-S7 Pros. Sup. I-4.

**SCHEDULE 1 OF THE PETITION**

(b)    In the "Occupancy Types of the Mortgage Loans" table, Morgan Stanley

stated that of the 752 loans in the collateral pool, 718 were secured by primary

residences and 34 were not. RFMSI 2007-S7 Pros. Sup. I-4.

**Item 69.    Details of properties that were stated to be owner-occupied, but were not:**

    **(a)    Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 51**

    **(b)    Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 108**

    **(c)    Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 40**

    **(d)    Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 173**

**Item 72.    Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:**

On pages S-42 through S-43 of the prospectus supplement, and pages 13 through

15 of the prospectus, Morgan Stanley made statements about the underwriting standards

of Residential Funding. All of those statements are incorporated herein by reference.

One of these statements was that: "[A] mortgage loan may be considered to

comply with the underwriting standards described above, even if one or more specific

criteria included in the underwriting standards were not satisfied, if other factors

positively compensated for the criteria that were not satisfied." RFMSI 2007-S7 Pros.

Sup. S-42.

Another one of these statements was that: "[A] determination is made as to

whether the prospective borrower has sufficient monthly income available to meet the

borrower's monthly obligations on the proposed mortgage loan and other expenses

related to the home, including property taxes and hazard insurance, and other financial

obligations and monthly living expenses." RFMSI 2007-S7 Pros. 13.

**SCHEDULE I OF THE PETITION**

Certified Document Number: 50466375 - Page 40 of 55

Another one of these statements was that: "[M]ortgage loans will generally be underwritten on the basis of the borrower's ability to make monthly payments...." RFMSI 2007-S7 Pros. 13 to 14.

**Item 80.**    **90+ days delinquencies:**

    **(a)**    **Number of the mortgage loans that suffered 90+ days delinquencies:** 158

    **(b)**    **Percent of the mortgage loans that suffered 90+ days delinquencies:** 21.01%

**Item 81.**    **30+ days delinquencies in this securitization:**

    **(a)**    **Number of the mortgage loans that were 30+ days delinquent on July 31, 2011:** 95

    **(b)**    **Percent of the mortgage loans that were 30+ days delinquent on July 31, 2011:** 12.63%

**Item 83.**    **Statements about the ratings of the certificate(s) that Franklin purchased:**

On pages S-5 and S-119 of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that Franklin's certificate was rated AAA by Standard & Poor's Rating Services and AAA by Fitch Ratings. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated that: "It is a condition of the issuance of the Senior Certificates that they be rated 'AAA' by Standard & Poor's...and Fitch Ratings." RFMSI 2007-S7 Pros. Sup. S-119.

**Item 86.**    **Summary of loans about which the defendants made untrue or misleading statements:**

    **(a)**    **Number of loans whose LTVs were materially understated:** 291

    **(b)**    **Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens:** 66

    **(c)**    **Number of loans in which the properties were stated to be owner-occupied but were not:** 173

    **(d)**    **Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements:** 428

SCHEDULE 1 OF THE PETITION

Certified Document Number: 50466375 - Page 42 of 55

(e) **Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements:** 57%

SCHEDULE 1 OF THE PETITION

## SCHEDULE 2 OF THE PETITION

To the extent that this Schedule is incorporated by reference into allegations in the petition, those allegations are made against defendant Morgan Stanley.

**Item 23.**    **Details of trust and certificate(s).**

(a)    **Dealer that sold the certificate(s) to Franklin:** Morgan Stanley.

(b)    **Description of the trust:** Morgan Stanley Mortgage Loan Trust, Mortgage Pass-Through Certificates, Series 2005-7 was a securitization in October 2005 of 2,409 mortgage loans, in seven groups. Morgan Stanley was the issuer of the securities in the trust. The mortgage loans were originated or acquired by Morgan Stanley Mortgage Capital Inc., Morgan Stanley Credit Corporation, Hemisphere National Bank, MortgageIT, Inc., and various undisclosed originators. Of the 188 mortgage loans in loan group 2, Morgan Stanley Mortgage Capital Inc. originated or acquired approximately 68.45%, Morgan Stanley Credit Corporation originated or acquired approximately 0.35%, Hemisphere National Bank originated or acquired approximately 0.47%, and MortgageIT, Inc. originated or acquired approximately 26.06%. MSM 2005-7 Pros. Sup. S-23.

(c)    **Description of the certificate(s) that Franklin purchased:** Morgan Stanley was an underwriter of the securities that Franklin purchased. Morgan Stanley offered and sold to Franklin a senior certificate in this securitization, in tranche 2-A-1 for which Franklin paid $27,678,649 plus accrued interest on January 10, 2006. Franklin's certificate was primarily paid by the 188 mortgage loans in loan group 2.

(d)    **Ratings of the certificate(s) when Franklin purchased them:** Moody's: Aaa;  Standard & Poor's: AAA.

(e)    **Current ratings of the certificate(s):** Moody's: Caa2; Standard & Poor's: B+.

(f)    **URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/762153/000095013605006800/file001.htm

SCHEDULE 2 OF THE PETITION

Certified Document Number: 50466375 - Page 43 of 55

(g)    **Registration statement pursuant or traceable to which the**

**certificate(s) were issued:** Certificates in this trust, including the certificate that Franklin

purchased, were issued pursuant or traceable to a registration statement filed by Morgan

Stanley Capital I Inc. with the SEC on form S-3 on June 28, 2005. Annexed to the

registration statement was a prospectus. The prospectus was amended from time to time

by prospectus supplements whenever a new series of certificates was issued pursuant or

traceable to that registration statement.

**Item 32.    Untrue or misleading statements about the LTVs of the mortgage
loans:**

In the prospectus supplement Morgan Stanley made the following statements

about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    The weighted average original loan-to-value ratio of the mortgage loans in

Loan Group 2 was 61.80%. MSM 2005-7 Pros. Sup. S-4.

(b)    The weighted average effective original loan-to-value ratio of the

mortgage loans in Loan Group 2 was 61.72%. MSM 2005-7 Pros. Sup. S-4.

(c)    "No Mortgage Loan had a Loan-to-Value Ratio at origination of more

than 100.00%." MSM 2005-7 Pros. Sup. S-25.

(d)    "The weighted average original Loan-to-Value Ratio of the Mortgage

Loans in the Mortgage Pool by Aggregate Cut-off Date Pool Principal Balance is

approximately 66.50%." MSM 2005-7 Pros. Sup. S-28.

(e)    In a section of the prospectus supplement entitled "Tabular Characteristics

of the Mortgage Loans," Morgan Stanley presented tables of statistics about the

mortgage loans in the collateral pool. MSM 2005-7 Pros. Sup. S-26 to S-58. Each table

focused on a certain characteristic of the loans (for example, aggregate principal balance

outstanding) and divided the loans into categories based on that characteristic (for

example, loans with principal balances of $0.01 to $100,000, $100,000.01 to $200,000,

$200,000.01 to $300,000, etc.). Each table then presented various data about the loans in

each category. Among these data was the "Weighted Average Original Subject LTV."

**SCHEDULE 2 OF THE PETITION**

There were 12 such tables in the "Tabular Characteristics of the Mortgage Loans" section for the loans in the collateral pool. In each table, the number of categories into which the loans were divided ranged from three to 15. Thus, in the "Tabular Characteristics of the Mortgage Loans" section, Morgan Stanley made hundreds of statements about the original LTVs of the loans in the collateral pool. MSM 2005-7 Pros. Sup. S-27 to S-30.

(f)    "The weighted average original Loan-to-Value Ratio of the Mortgage Loans in the Mortgage Pool by Aggregate Cut-off Date Pool Principal Balance is approximately 66.50%." MSM 2005-7 Pros. Sup. S-28.

(g)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in the Mortgage Pool is approximately 66.34%." MSM 2005-7 Pros. Sup. S-28.

(h)    In a section of the prospectus supplement entitled "Tabular Characteristics of Loan Group 2," Morgan Stanley presented similar tables of statistics about the mortgage loans in Loan Group 2. In these tables, Morgan Stanley similarly made hundreds of statements about the original LTVs of the loans in Loan Group 2. MSM 2005-7 Pros. Sup. S-35 to S-38.

(i)    "The weighted average original Loan-to-Value Ratio of the Group 2 Mortgage Loans by Aggregate Cut-off Date Loan Group 2 Balance is approximately 61.80%." MSM 2005-7 Pros. Sup. S-36.

(j)    "The weighted average original Effective Loan-to-Value Ratio of the Mortgage Loans in Loan Group 2 by Aggregate Cut-off Date Loan Group 2 Balance is approximately 61.72%." MSM 2005-7 Pros. Sup. S-36.

**SCHEDULE 2 OF THE PETITION**

Certified Document Number: 50466375 - Page 45 of 55

**Item 41.     Details of the results of the AVM analysis:**

| | |
|---|---:|
| Number of loans in loan group 2 | 188 |
| Number of properties on which there was enough information for the model to determine a true market value | 105 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 45 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $2,789,823 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 25 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $2,178,673 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 4 |
| Weighted-average LTV, as stated by defendants | 61.8% |
| Weighted-average LTV, for loans the model was able to value | 62.0% |
| Weighted-average LTV, as determined by the model | 67.7% |

**Item 47.     Undisclosed additional liens:**

    **(a)     Minimum number of properties in loan group 2 with additional liens:** 2

    **(b)     Total reduction in equity from additional liens:** $226,000

    **(c)     Weighted-average reduction in equity from additional liens:** 56.1%

**Item 56.     Untrue or misleading statements about compliance with USPAP:**

In the prospectus supplement, Morgan Stanley made the following statement about the appraisals of the properties that secured the mortgage loans originated or purchased by Morgan Stanley Mortgage Capital Inc.: "All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac." MSM 2005-7 Pros. Sup. S-61.

In the prospectus supplement, Morgan Stanley made the following statement about the appraisals of the properties that secured the mortgage loans originated by MortgageIT, Inc.: "Every MortgageIT mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of

**SCHEDULE 2 OF THE PETITION**

Certified Document Number: 50466375 - Page 46 of 55

Professional Appraisal Practice of the Appraisal Foundation." MSM 2005-7 Pros. Sup. S-62.

**Item 72.      Untrue or misleading statements about the purchasing guidelines and underwriting standards of the originators of the mortgage loans:**

On pages S-60 through S-61 of the prospectus supplement, Morgan Stanley made statements about the purchasing guidelines of Morgan Stanley Mortgage Capital Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "[C]ertain exceptions to the loan purchasing guidelines described herein are made in the event that compensating factors are demonstrated by a prospective borrower." MSM 2005-7 Pros. Sup. S-60.

Another one of these statements was that: "[A] determination is made by the original lender that the mortgagor's monthly income (if required to be stated) will be sufficient to enable the mortgagor to meet its monthly obligations on the mortgage loan and other expenses related to the property." MSM 2005-7 Pros. Sup. S-60 to S-61.

On pages S-61 through S-62 of the prospectus supplement, Morgan Stanley made statements about the underwriting standards of Morgan Stanley Credit Corporation. All of those statements are incorporated herein by reference.

One of these statements was that "One test to determine [a potential borrower's ability to make the proposed loan payments] is the debt-to-income ratio....MSCC typically allows for a debt-to-income ratio of 45%. Debt-to-income exceptions must be approved by the appropriate level underwriter, and supported by compensating factors." MSM 2005-7 Pros. Sup. S-62.

On pages S-62 through S-64 of the prospectus supplement, Morgan Stanley made statements about the underwriting standards of MortgageIT, Inc. All of those statements are incorporated herein by reference.

One of these statements was that: "[E]xceptions to these underwriting guidelines are considered, so long as the borrower has other reasonable compensating factors, on a case-by-case basis." MSM 2005-7 Pros. Sup. S-64.

**SCHEDULE 2 OF THE PETITION**

Certified Document Number: 50466375 - Page 47 of 55

**Item 79.**    **Early payment defaults:**

    **(a)**    Number of the mortgage loans in loan group 2 that suffered EPDs: 3

    **(b)**    Percent of the mortgage loans in loan group 2 that suffered EPDs: 1.6%

**Item 80.**    **90+ days delinquencies:**

    **(a)**    Number of the mortgage loans in loan group 2 that suffered 90+ days delinquencies: 28

    **(b)**    Percent of the mortgage loans in loan group 2 that suffered 90+ days delinquencies: 14.9%

**Item 81.**    **30+ days delinquencies in this securitization:**

    **(a)**    Number of the mortgage loans in loan group 2 that were 30+ days delinquent on July 31, 2011: 23

    **(b)**    Percent of the mortgage loans in loan group 2 that were 30+ days delinquent on July 31, 2011: 12.2%

**Item 83.**    **Statements about the ratings of the certificate(s) that Franklin purchased:**

On pages iii of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that Franklin's certificate was rated Aaa by Moody's Investors Service, Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated that: "On the closing date, the offered certificates must have ratings not lower than those set forth on page iii of this prospectus supplement by Standard & Poor's...and by Moody's Investors Service, Inc." The requirement for class 2-A-1, from which this certificate was to be paid, was for Aaa from Moody's and AAA from Standard & Poor's. MSM 2005-7 Pros. Sup. S-9.

Morgan Stanley also stated that: "It is a condition of the issuance of the Certificates that they receive the respective ratings set forth on page iii of this prospectus supplement by Standard and Poor's Ratings Services...and by Moody's Investors Service, Inc." The requirement for class 2-A-1, from which this certificate was to be paid, was for Aaa from Moody's and AAA from Standard & Poor's. MSM 2005-7 Pros. Sup. S-123.

**SCHEDULE 2 OF THE PETITION**

Certified Document Number: 50466375 - Page 48 of 55

Certified Document Number: 50466375 - Page 49 of 55

SCHEDULE 2 OF THE PETITION

**Item 86.**     Summary of loans in loan group 2 about which the defendants made untrue or misleading statements:

(a)   Number of loans whose LTVs were materially understated: 45

(b)   Number of loans in which the owner's equity was reduced by 5% or more by undisclosed additional liens: 2

(c)   Number of loans that suffered EPDs: 3

(d)   Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements: 47

(e)   Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements: 25%

## SCHEDULE 3 OF THE PETITION

To the extent that this Schedule is incorporated by reference into allegations in the complaint, those allegations are made against defendant Morgan Stanley.

**Item 23.    Details of trust and certificate(s).**

    **(a)    Description of the trust:** Residential Asset Securitization Trust, Mortgage Pass-Through Certificates, Series 2005-A16 was a securitization in December 2005 of 460 mortgage loans, in one group. IndyMac MBS, Inc. was the issuer of the securities in the trust. The mortgage loans in the collateral pool of this securitization were originated or acquired by IndyMac Bank, F.S.B. RAST 2005-A16 Pros. Sup. S-21, S-27.

    **(b)    Description of the certificate(s) that Franklin purchased:** Morgan Stanley and Credit Suisse were underwriters of the securities that Franklin purchased. Franklin purchased a senior certificate in this securitization, in tranche A-3 for which Franklin paid $25,035,156 plus accrued interest on January 10, 2006.

    **(c)    Ratings of the certificate(s) when Franklin purchased them:** Standard & Poor's: AAA; Fitch: AAA.

    **(d)    Current ratings of the certificate(s):** Standard & Poor's: CCC; Fitch: C.

    **(e)    URL of prospectus supplement for this securitization:**
http://sec.gov/Archives/edgar/data/1347202/000095011705004964/a41088.txt

    **(f)    Registration statement pursuant or traceable to which the certificate(s) were issued:** Certificates in this trust, including the certificate that Franklin purchased, were issued pursuant or traceable to a registration statement filed by IndyMac MBS, Inc. with the SEC on form S-3 on August 15, 2005. Annexed to the registration statement was a prospectus. The prospectus was amended from time to time by prospectus supplements whenever a new series of certificates was issued pursuant or traceable to that registration statement.

SCHEDULE 3 OF THE PETITION

Certified Document Number: 50466375 - Page 50 of 55

**Item 32.    Untrue or misleading statements about the LTVs of the mortgage loans:**

In the prospectus supplement Morgan Stanley made the following statements about the LTVs of the mortgage loans in the collateral pool of this securitization.

(a)    "With respect to approximately 35.95% of the mortgage loans by pool principal balance as of the cut-off date, at the time of origination of the first lien mortgage loan, the originator of the mortgage loan also originated a second lien mortgage loan that will not be included in the trust fund and is not reflected in the loan-to-value ratio tables included in this prospectus supplement. The weighted average loan-to-value ratio of such mortgage loans is approximately 72.38%, and the weighted average combined loan-to-value ratio (including the second lien) is approximately 86.57%." RAST 2005-A16 Pros. Sup. S-10.

(b)    "At origination, all of the Mortgage Loans had a Loan-to-Value Ratio of 100% or less." RAST 2005-A16 Pros. Sup. S-16.

(c)    In "The Mortgage Pool" section of the prospectus supplement, Morgan Stanley presented tables of statistics about the mortgage loans in the collateral pool. RAST 2005-A16 Pros. Sup. S-15 to S-19. Each table focused on a certain characteristic of the loans (for example, aggregate principal balance outstanding) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $350,000.01 to $400,000.00, $400,000.01 to $450,000.00, $450,000.01 to $500,000.00, etc.). Each table then presented various data about the mortgage loans in each category. In "The Mortgage Pool" section, Morgan Stanley presented a table entitled "Original Loan-to-Value Ratios for the Mortgage Loans." This table divided the loans in the collateral pool into 13 categories of original LTV (for example, 30.01% to 35%, 35.01% to 40%, 40.01% to 45%, etc.). The table made untrue and misleading statements about the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding in each of these categories. RAST 2005-A16 Pros. Sup. S-18.

**SCHEDULE 3 OF THE PETITION**

(d)    "As of the Cut-off Date, the weighted average original Loan-to-Value

Ratio of the Mortgage Loans was approximately 71.37%." RAST 2005-A16 Pros. Sup.

S-18.

### Item 41.    Details of the results of the AVM analysis:

| | |
|---|---|
| Number of loans | 460 |
| Number of properties on which there was enough information for the model to determine a true market value | 210 |
| Number of loans on which the stated value was 105% or more of the true market value as reported by the model | 122 |
| Aggregate amount by which the stated values of those properties exceeded their true market values as reported by the model | $18,293,394 |
| Number of loans on which the stated value was 95% or less of the true market value as reported by the model | 26 |
| Aggregate amount by which the true market values of those properties exceed their stated values | $3,571,344 |
| Number of loans with LTVs over 100%, as stated by defendants | 0 |
| Number of loans with LTVs over 100%, as determined by the model | 23 |
| Weighted-average LTV, as stated by defendants | 71.37% |
| Weighted-average LTV, for loans the model was able to value | 70.8% |
| Weighted-average LTV, as determined by the model | 82.3% |

### Item 62.    Untrue or misleading statements about owner-occupancy of the properties that secured the mortgage loans:

In the prospectus supplement, Morgan Stanley made the following statements

about the occupancy status of the properties that secured the mortgage loans in the

collateral pool of this securitization.

In "The Mortgage Pool" section of the prospectus supplement described in Item

32, Morgan Stanley presented a table entitled "Occupancy Types for the Mortgage

Loans." This table divided the mortgage loans in the collateral pool into the categories

"Owner Occupied," "Investment," and "Second Home." The table made untrue and

misleading statements about the number of mortgage loans, the aggregate principal

balance outstanding, and the percent of aggregate principal balance outstanding in each

of these categories. RAST 2005-A16 Pros. Sup. S-19.

**SCHEDULE 3 OF THE PETITION**

In the "Occupancy Types for the Mortgage Loans" table, Morgan Stanley stated that of the 460 mortgage loans in the collateral pool, 413 were secured by primary residences and 47 were not. RAST 2005-A16 Pros. Sup. S-19.

**Item 69.** Details of properties that were stated to be owner-occupied, but were not:

    (a) Number of loans on which the owner of the property instructed tax authorities to send property tax bills to him or her at a different address: 23

    (b) Number of loans on which the owner of the property could have, but did not, designate the property as his or her homestead: 57

    (c) Number of loans on which the owner of the property did not receive bills at the address of the mortgaged property but did receive bills at a different address: 5

    (d) Eliminating duplicates, number of loans about which one or more of statements (a) through (c) is true: 77

**Item 72.** Untrue or misleading statements about the underwriting standards of the originators of the mortgage loans:

On pages S-21 through S-23 of the prospectus supplement, Morgan Stanley made statements about the underwriting guidelines of IndyMac Bank, F.S.B. All of those statements are incorporated herein by reference. In particular, Morgan Stanley stated that:

(a) "Exceptions to these underwriting standards are permitted where compensating factors are present . . . ." RAST 2005-A16 Pros. Sup. S-21.

(b) "IndyMac Bank's underwriting standards for conventionally underwritten mortgage loans are based on traditional underwriting factors, including the creditworthiness of the mortgagor, the capacity of the mortgagor to repay the mortgage loan according to its terms, and the value of the related mortgaged property." RAST 2005-A16 Pros. Sup. S-21.

**Item 79.** Early payment defaults:

    (a) Number of the mortgage loans that suffered EPDs: 4

    (b) Percent of the mortgage loans that suffered EPDs: 0.87%

SCHEDULE 3 OF THE PETITION

Item 80.    90+ days delinquencies:

(a)    Number of the mortgage loans that suffered 90+ days delinquencies: 127

(b)    Percent of the mortgage loans that suffered 90+ days delinquencies: 27.61%

Item 81.    30+ days delinquencies in this securitization:

(a)    Number of the mortgage loans that were 30+ days delinquent on July 31, 2011: 102

(b)    Percent of the mortgage loans that were 30+ days delinquent on July 31, 2011: 22.17%

Item 83.    Statements about the ratings of the certificate(s) that Franklin purchased:

On pages S-3 and S-58 of the prospectus supplement, Morgan Stanley made statements about the ratings assigned to the certificates issued in this securitization. Morgan Stanley stated that Franklin's certificate was rated AAA by Fitch Inc. and AAA by Standard & Poor's Rating Services. These were the highest ratings available from these two rating agencies.

Morgan Stanley also stated: "The classes of certificates listed below will not be offered unless they are assigned the following ratings by Fitch, Inc. ("Fitch") and by Standard & Poor's." Morgan Stanley listed Franklin's certificate as rating AAA by Fitch, Inc. and AAA by Standard & Poor's Rating Services. RAST 2005-A16 Pros. Sup. S-3.

Morgan Stanley also stated: "It is a condition to the issuance of the classes of the senior certificates that they be rated AAA by Standard & Poor's. . . and AAA by Fitch, Inc. ("Fitch")." RAST 2005-A16 Pros. Sup. S-58.

Item 86.    Summary of loans about which the defendants made untrue or misleading statements:

(a)    Number of loans whose LTVs were materially understated: 122

(b)    Number of loans that suffered EPDs: 4

(c)    Number of loans in which the properties were stated to be owner-occupied but were not: 77

(d)    Eliminating duplicates, number of loans about which the defendants made untrue or misleading statements: 170

SCHEDULE 3 OF THE PETITION

Certified Document Number: 50466375 - Page 54 of 55



(e) Eliminating duplicates, percent of loans about which the defendants made untrue or misleading statements: 37%

SCHEDULE 3 OF THE PETITION

Certified Document Number: 50466375 - Page 55 of 55

I, Chris Daniel, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   November 4, 2011

Certified Document Number:          50466375 Total Pages: 55

Chris Daniel, DISTRICT CLERK
HARRIS COUNTY, TEXAS

In accordance with Texas Government Code 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com

# EXHIBIT F

1221 Avenue of the Americas
New York, NY 10020

# Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:    (212) 762-7291
Facsimile No:   (914) 729-2950
Email:  David.Restaino@morganstanley.com

November 10, 2011

## VIA OVERNIGHT MAIL

Residential Funding Mortgage Securities I, Inc.
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota 55437
Attn: President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 27, 2007 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S7 issued by Residential Funding Mortgage Securities I, Inc. (the "Company"), we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which the Company has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B., captioned Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc., in the District Court of Texas, Harris County.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino

1221 Avenue of the Americas
New York, NY 10020

## Morgan Stanley

David P. Restaino, Executive Director
Legal and Compliance Division
Direct Dial:     (212) 762-7291
Facsimile No:   (914) 729-2950
Email: David.Restaino@morganstanley.com

November 10, 2011

**VIA OVERNIGHT MAIL**

Residential Funding Company, LLC
8400 Normandale Lake Boulevard, Suite 250
Minneapolis, Minnesota  55437
Attn:  President

Dear Sir:

Pursuant to Sections 7.1 and 7.3 of the Underwriting Agreement dated July 27, 2007 (the "Agreement"), relating to the sale of Residential Funding Mortgage Securities I, Inc., Mortgage Pass-Through Certificates, Series 2007-S7 issued by Residential Funding Mortgage Securities I, Inc., we hereby notify you that an action has been instituted against Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co. LLC) ("Morgan Stanley") in respect of which Residential Funding Company, LLC has agreed to indemnify and hold harmless Morgan Stanley and each person who controls Morgan Stanley.

The action is a complaint filed by the Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B., captioned Federal Deposit Insurance Corporation as Receiver for Franklin Bank, S.S.B. v. Morgan Stanley & Company LLC f/k/a Morgan Stanley & Co. Inc., in the District Court of Texas, Harris County.

The Complaint constitutes an action in respect of which the indemnification provisions of Section 7.1 of the Agreement apply.

Pursuant to Section 7.3 of the Agreement, Morgan Stanley has employed Davis Polk & Wardwell LLP as counsel in this matter.

Very truly yours,

David P. Restaino