1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Lead Case No. 12-12020-mg   Adv. Proc. No. 12-02049-mg

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matters of:

7

8  RESIDENTIAL CAPITAL, LLC, et al.,

9              Debtors.

10  - - - - - - - - - - - - - - - - - - - -x

11  BURNETT,

12                  Plaintiff,

13              - against -

14  GMAC MORTGAGE, LLC,

15                  Defendant.

16  - - - - - - - - - - - - - - - - - - - -x

17              United States Bankruptcy Court

18              One Bowling Green

19              New York, New York

20              January 16, 2013

21              10:07 AM

22

23  B E F O R E:

24  HON. MARTIN GLENN

25  U.S. BANKRUPTCY JUDGE

1

2    (CC: Doc# 2544) Motion Pursuant to 11 U.S.C. 105, 363(b), (f)

3    and (m) and Fed. R. Bankr. P. 2002, 6004 and 9007 for Orders:

4    (A)(I) Authorizing and Approving Sale Procedures; (II)

5    Scheduling Bid Deadline and Sale Hearing; (III) Approving Form

6    and Manner of Notice Thereof; and (IV) Granting Related Relief

7    and (B)(I) Authorizing the Sale of Certain FHA Loans Free and

8    Clear of Liens, Claims, Encumbrances and Other Interests; (II)

9    Authorizing and Approving Mortgage Loan Purchase and Interim

10   Servicing Agreement; and (III) Granting Related Relief.

11

12   (CC: Doc# 2520) Debtors' Motion for a Supplemental Order Under

13   Bankruptcy Code Sections 363, 1107(a) and 1108 to the Final

14   Wages Order Authorizing the Debtors to Make Payments to the

15   Employees Under the Residential Capital, LLC Annual Incentive

16   Plan.

17

18   (Doc no. 2590) Hearing RE: Joint Motion for Findings of Fact,

19   Conclusions at Law Judgment and Order filed by Pamela Z. Hill.

20

21   Adj. Hearing Re: Cure Objections. (Related Document no. 61)

22

23

24

25

1

2 Doc# 2570 Adjournment of Hearing on Objections of Digital

3 Lewisville, LLC to Debtors' Motion for Orders (A)(I)

4 Authorizing and Approving Sale Procedures, Including Break-Up

5 Fee and Expense Reimbursement; (II) Scheduling Bid Deadline and

6 Sale Hearing; (III) Approving Form and Manner of Notice

7 Thereof; and (IV) Granting Related Relief and (B)(I)

8 Authorizing the Sale of Certain Assets Free and Clear of Liens,

9 Claims, Encumbrances, and Other Interests; (II) Authorizing and

10 Approving Asset Purchase Agreements Thereto; (III) Approving

11 the Assumption and Assignment of Certain Executory Contracts

12 and Unexpired Leases Related Thereto; and (IV) Granting Related

13 Relief.

14

15 Adversary proceeding: 12-02049-mg Burnett v. GMAC MORTGAGE, LLC

16 Pre-trial Conference

17

18

19

20 Transcribed by:  Penina Wolicki

21 eScribers, LLC

22 700 West 192nd Street, Suite #607

23 New York, NY 10040

24 (973)406-2250

25 operations@escribers.net

**4**

1

2  A P P E A R A N C E S :

3  MORRISON & FOERSTER LLP

4          Attorneys for Debtors

5          1290 Avenue of the Americas

6          New York, NY 10104

7

8  BY:   TODD M. GOREN, ESQ.

9          STEFAN W. ENGELHARDT, ESQ.

10         NORMAN S. ROSENBAUM, ESQ.

11         JORDAN A. WISHNEW, ESQ.

12         JENNIFER L. MARINES, ESQ.

13

14

15  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

16         Conflicts Counsel to Debtors

17         101 Park Avenue

18         New York, NY 10178

19

20  BY:   MARYANN GALLAGHER, ESQ.

21

22

23

24

25

1

2    KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP

3        Attorneys for Official Creditors' Committee

4        1177 Avenue of the Americas

5        New York, NY 10036

6

7    BY:   STEPHEN D. ZIDE, ESQ.

8        RACHAEL RINGER, ESQ.

9

10

11   WILMER CUTLER PICKERING HALE AND DORR LLP

12       Special Counsel to Creditors' Committee

13       250 Greenwich Street

14       New York, NY 10007

15

16   BY:   WILLIAM J. PERLSTEIN, ESQ.

17

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20       Office of the United States Trustee

21       33 Whitehall Street

22       21st Floor

23       New York, NY 10004

24

25   BY:   BRIAN S. MASUMOTO, ESQ.

1

2  UNITED STATES DEPARTMENT OF JUSTICE

3        United States Attorney's Office

4        86 Chambers Street

5        New York, NY 10007

6

7  BY:   JOSEPH N. CORDARO, AUSA

8

9

10  KIRKLAND & ELLIS, LLP

11        Attorneys for Ally Financial Inc. and Ally Bank

12        601 Lexington Avenue

13        New York, NY 10022

14

15  BY:   CRAIG A. BRUENS, ESQ.

16        ANTHONY GROSSI, ESQ.

17

18

19  KIRKLAND & ELLIS, LLP

20        Attorneys for Ally Financial Inc. and Ally Bank

21        200 North LaSalle

22        Chicago, IL 60654

23

24  BY:   NOAH J. ORNSTEIN, ESQ.

25

```
 1
 2   CLEARY GOTTLIEB STEEN & HAMILTON LLP
 3        Attorneys for Wilmington Trust
 4        One Liberty Plaza
 5        New York, NY 10006
 6
 7   BY:   MARK A. LIGHTNER, ESQ.
 8
 9
10   WHITE & CASE LLP
11        Attorneys for Ad Hoc Group Of Junior Secured Noteholders
12        1155 Avenue of the Americas
13        New York, NY 10036
14
15   BY:   HARRISON DENMAN, ESQ.
16
17
18   KELLEY DRYE & WARREN LLP
19        Attorneys for UMB Bank
20        101 Park Avenue
21        New York, NY 10178
22
23   BY:   CATHERINE L. THOMPSON, ESQ.
24
25
```

```
 1   ALLEN MATKINS LOCK GAMBLE MALLORY & NATSIS LLP

 2        Attorneys for Digital Lewisville, LLC

 3        1900 Main Street

 4        5th Floor

 5        Irvine, CA 92614

 6

 7   BY:  MICHAEL S. GREGER, ESQ.

 8

 9

10   MUNGER, TOLLES & OLSON LLP

11        Attorneys for Berkshire Hathaway

12        355 South Grand Avenue

13        35th Floor

14        Los Angeles, CA 90071

15

16   BY:  SETH GOLDMAN, ESQ. (TELEPHONICALLY)

17        THOMAS B. WALPER, ESQ. (TELEPHONICALLY)

18

19

20   BLANK ROME, LLP

21        Attorneys for PNC Mortgage

22        1201 Market Street

23        Wilmington, DE 19801

24

25   BY:  ALAN ROOT, ESQ. (TELEPHONICALLY)
```

1

2   ALSO PRESENT:  (TELEPHONICALLY)

3         CONRAD P. BURNETT, Pro Se

4         MICHAEL M. MOORE, Pro Se

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RESIDENTIAL CAPITAL, LLC, ET AL.                              10

1              P R O C E E D I N G S

2          THE COURT:  All right.  Please be seated.

3          We're here in Residential Capital, number 12-12020.

4    Mr. Goren?

5          MR. GOREN:  Thank you, Your Honor.  Before we get into

6    the agenda, I thought perhaps it would be helpful to give a

7    brief status update on a couple of the material matters going

8    on in the case.

9          THE COURT:  Thank you.

10         MR. GOREN:  First off, the sale.  We're moving forward

11   full bore for an anticipated closing of both the platform sale

12   and the whole loan sale by January 31st.  The company's

13   executives and employees, as well as its professionals, have

14   been working around the clock to try and get to that date;

15   reviewing contract assignments, cure claims, the like.  There's

16   a lot that needs to get done.

17         At this point, the largest contingency on the platform

18   sale is getting the consents from the GSEs.  There've been

19   round-the-clock discussions with the GSEs, trying to resolve

20   their consent to the assignment issues, as well as the related

21   cure claims; daily meetings and calls between them, to try and

22   get that done.  We think we're getting pretty close to the

23   consent to assignment and cure resolutions, but there's still a

24   bit of work that needs to be done on that.

25         While the sale order gives us the right, with the

RESIDENTIAL CAPITAL, LLC, ET AL.                    11

1   consent of the committee, to resolve cure claims without coming

2   back to the Court, because we expect that their resolutions

3   might be slightly more complex than typical, may have mutual

4   releases or the like, we figured we would probably put those on

5   notice of presentment, so everyone would have a chance to take

6   a look at them.

7             THE COURT:  Okay.

8             MR. GOREN:  So unless Your Honor has any questions on

9   the sale, I thought I'd also give a brief update on the

10  mediation process, as well.

11            THE COURT:  Please.

12            MR. GOREN:  That process began late last year.  From

13  the debtors' perspective, it's been extremely helpful and

14  productive so far.  We met with Judge Peck in person and

15  telephonically three times and expect to meet with him again,

16  maybe as early as next week.  We understand he's also been

17  speaking with a number of the other interested parties in the

18  case, just sort of going around getting their perspective on

19  the material issues and what they're looking for out of a

20  resolution here.

21            We believe he's been very constructive to the process

22  and will continue to be, going forward.  So we're hopeful to

23  make some material progress over the next month, as a result of

24  that.

25            As you may recall, at the time you appointed Judge

1   Peck as the mediator, you asked the parties to agree on an

2   acceptable form of mediation order.  Since Judge Peck -- from

3   speaking with him, he's still sort of getting the lay of the

4   land, speaking to the parties, sort of determining how he wants

5   to proceed here, we haven't yet put pen to paper on that.  But

6   we expect, probably, in short order, he'll come back to us and

7   sort of describe how he envisions the process working from

8   here; and we'll come back with a process-type order at that

9   point.

10          THE COURT:  Okay.

11          MR. GOREN:  Next, Your Honor, we note on the agenda

12   that you entered interim orders with respect to the foreclosure

13   review professionals, further interim orders, namely

14   PricewaterhouseCoopers, Hudson Cook, Pepper Hamilton, that

15   continues the final hearing on those professionals until

16   February 28th.

17          In large part, the reason for the second interim order

18   was, you might have seen in the news, that many -- that the

19   Federal Reserve Board and the OCC have reached tentative

20   resolution with a lot of large financial institutions about a

21   further settlement of those liabilities, sort of, to get money

22   more directly in the hands of consumers -- borrowers, rather

23   than professionals.

24          The debtors are still closely evaluating that in

25   consultation with the creditors' committee.  That process is

1    moving forward.  Obviously, we're in a very different position,

2    being in bankruptcy, than the other ones.  So there's a lot

3    more complexity.  And as soon as we have something more to

4    report on that, we'll be --

5              THE COURT:  I think I was previously advised that the

6    debtors and the committee and perhaps others were also engaged

7    in discussions with the Federal Reserve Board, in an effort to

8    try and reduce the costs associated with compliance with the

9    consent orders.  Has there been any further developments on

10   that front?

11             MR. GOREN:  Well, I mean, that's sort of related --

12             THE COURT:  That's part of it.

13             MR. GOREN:  -- to the settlement.  That was -- there

14   had been a lot of talk to the Federal Reserve Board about the

15   fact that, you know, why are we paying all this money to

16   professionals.  Let's figure out how much we're really going to

17   owe to borrowers and pay that money directly to borrowers,

18   without making us spend hundreds of millions of dollars to get

19   there.

20             So we're -- there's a number associated with ResCap-

21   Ally, in that settlement, and that -- nobody's signed up to

22   that number yet.  There's still a lot of discussions going on.

23             THE COURT:  Okay.

24             MR. GOREN:  Your Honor, I believe that takes us to the

25   first item on the agenda, which is the adversary proceeding

 1  matters, Burnett v. GMAC Mortgage.  We've been attempting to

 2  confirm an adjournment of this matter.  So, I'll turn it over

 3  to Mr. Rosenbaum, who's handling this.

 4              THE COURT:  All right, Mr. Rosenbaum?

 5              Is someone on the phone?  Is Mr. Burnett on the phone?

 6              MR. BURNETT:  Yes, this is Conrad Burnett.

 7              THE COURT:  All right.  I'm going to let Mr. Rosenbaum

 8  speak first, and then Mr. Burnett, I'll give you a chance to

 9  speak.

10              MR. ROSENBAUM:  Good morning, Your Honor.  Norm

11  Rosenbaum for the debtors.

12              Your Honor, this is the pre-trial conference on Mr.

13  Burnett's adversary proceeding against GMAC Mortgage.  We did

14  intend to adjourn this, but apparently did not communicate that

15  properly to Mr. Burnett.  I don't have too much to add here,

16  Your Honor.  We have reviewed the complaint.

17              I would note that Mr. Burnett's property was

18  foreclosed on in 2009 and the property went to a foreclosure

19  sale in 2010.  He has had -- commenced litigation against GMAC

20  in the past on actions that were dismissed.  He has filed

21  recently, this year, a lawsuit naming GMAC and others in

22  violation of the automatic stay.

23              We did ask that SilvermanAcampora reach out to Mr.

24  Burnett, I believe they left messages for him, to discuss the

25  adversary proceeding.  We think this is something that would

1  benefit from a conversation with Mr. Burnett, as to the ability

2  or the efficacy of this proceeding forward.  I think given the

3  allegations in the complaint, this is something we would very

4  much like to speak to him about, in terms of the timing.

5          He apparently is seeking a nondischargeability

6  determination on this --

7          THE COURT:  I've read this complaint.  I have no clue

8  what this is about.

9          MR. ROSENBAUM:  We tried our best to determine that,

10  Your Honor.  That's why we think a conversation with

11  SilvermanAcampora would make sense here.

12          THE COURT:  Anybody from SilvermanAcampora here?  Mr.

13  Zide, you're going to -- you're not from SilvermanAcampora,

14  but --

15          MR. ZIDE:  Yes.  Stephen Zide from Kramer Levin, on

16  behalf of the committee.  I know SilvermanAcampora has been

17  involved in this and has been reaching out to this party.

18  They're supposed to be here today.  We got an e-mail that some

19  sort of urgent emergency happened where they're going to be

20  late --

21          THE COURT:  Okay.

22          MR. ZIDE:  -- for this hearing.  They could probably

23  give you an update when they get here.

24          THE COURT:  All right.  Okay.

25          MR. ZIDE:  But they are involved in the process.

1          THE COURT:  Thank you, Mr. Zide.

2          MR. ROSENBAUM:  Well --

3          THE COURT:  Go ahead, Mr. Rosenbaum.

4          MR. ROSENBAUM:  -- I think it is that -- I'm not sure

5    they had sufficient contact information for Mr. Burnett, but

6    reached out to him, I think, via correspondence.

7          THE COURT:  Okay.  Mr. Burnett, do you want to be

8    heard?

9          MR. BURNETT:  Yes, Your Honor.  This complaint stems

10   from the notary Susan Turner, who authorized the sale of my

11   home to GMAC.  I have a consent order from the Commonwealth of

12   Pennsylvania that there was some unlawful notary acts involved

13   in the paperwork and transaction that authorized the sale of my

14   home.

15         My home was sold while I was under a refinance order

16   from GMAC.  There were two orders.  I was under contract to

17   refinance the home, and they still sold the home while I was

18   refinancing the property.  That's what this stems from.

19         THE COURT:  Mr. Burnett --

20         MR. BURNETT:  That's what my --

21         THE COURT:  -- Mr. Burnett, your complaint is three

22   pages -- slightly over two pages long.  I don't understand it.

23   I have no idea what it is you're complaining about.  So I urge

24   you -- hold on, Mr. Burnett.  Special counsel to the creditors'

25   committee was appointed to deal with consumer mortgage issues.

1  It's the law firm of SilvermanAcampora.  I urge you to speak

2  with a lawyer from SilvermanAcampora.  And at least it's been

3  represented that they've made an effort to be in touch with

4  you.  Because I will tell you right now, unless there's some

5  clarity to what you want, your case is going to be dismissed

6  very quickly.

7          I'm very sensitive to the issues raised by consumers.

8  And I want to give everybody a fair opportunity to raise their

9  issues here.  And I'm applying applicable standards.  I provide

10  more leeway to pro se litigants in terms of their pleading, but

11  I don't see what claim you're asserting in this short

12  complaint.

13          What I'm going to do is adjourn this pre-trial

14  conference until the next hearing on January 29th.  I am

15  directing you, Mr. Burnett, within the next week, you must be

16  in touch with lawyers from SilvermanAcampora, who are special

17  counsel to the creditors' committee to deal with borrowers.

18  They can't -- they don't represent you, but they will hopefully

19  be able to enlighten me with what, if any, issues you're

20  properly raising in this court.

21          If there's no greater clarity, and the debtor decides

22  to make a motion to dismiss, you can bring that on for that

23  January 29th hearing as well, Mr. Rosenbaum.  I mean, I --

24  obviously, I don't want you to have to waste your time or the

25  Court to have to waste its time preparing.

1       But when I reviewed the papers that you filed, I

2   couldn't understand what this was all about.  I'm going to give

3   you a further chance.  But the first thing you absolutely must

4   do, and I'm going to ask SilvermanAcampora to advise the Court

5   at the time of the next hearing when and whether they've

6   communicated with you, and see what the status is at that time.

7   If you reach an agreement with debtors' counsel to further

8   adjourn the conference because of some progress between you,

9   I'll certainly entertain that.  But otherwise, this will be on

10  the Court's calendar for January 29th.

11      Mr. Rosenbaum?

12      MR. ROSENBAUM:  Your Honor, may I just make one

13  suggestion?  If Mr. Burnett would like to contact me at my

14  office and provide us with his telephone number, and if he has

15  e-mail communication, I can relay that to SilvermanAcampora.

16      THE COURT:  That would be very helpful.  Will you do

17  that, Mr. Burnett, call Mr. Burnett.

18      MR. BURNETT:  Yes, I --

19      THE COURT:  Okay.

20      MR. BURNETT:  Yes, I will, Your Honor.  Mr. Rosenbaum,

21  would you forward your number to me, please?

22      THE COURT:  Well, he doesn't know how to forward the

23  number to you, because your complaint doesn't have an e-mail

24  address or a telephone number.

25      Mr. Zide, do you have the information?

1          MR. ZIDE:  I have the contact information for

2     SilvermanAcampora, if you would like it.

3          THE COURT:  Well, let's -- Mr. Burnett, do you have an

4     e-mail address?

5          MR. BURNETT:  Yes, I do.

6          THE COURT:  Could you tell us what your e-mail address

7     is?

8          MR. BURNETT:  It's my initials, CB1359@yahoo.com.

9          THE COURT:  Okay.  All right.  So Mr. Rosenbaum -- let

10    me just read it back.  CB1359@yahoo.com.  Is that correct, Mr.

11    Burnett?

12         MR. BURNETT:  Yes.

13         THE COURT:  Okay.  So Mr. Zide and Mr. Rosenbaum, have

14    it.  Mr. Zide will make sure that SilvermanAcampora has it.  So

15    you need to be in touch with the SilvermanAcampora people, and

16    let's see if we can make sense out of this, and then you can

17    speak further -- since you're not represented by counsel, Mr.

18    Rosenbaum can speak with you directly as well.  But otherwise,

19    I'm going to adjourn the hearing today and put it on the

20    calendar for January 29th.  All right, Mr. Burnett?

21         MR. BURNETT:  Thank you very much.

22         THE COURT:  Okay, Mr. Rosenbaum?

23         MR. ROSENBAUM:  Thank you, Your Honor.

24         THE COURT:  All right.

25         MR. ROSENBAUM:  I believe the committee wanted to make

1    a statement on one of the pending retention applications?

2                MR. MASUMOTO:  If I may, Your Honor?

3                THE COURT:  Mr. Masumoto?

4                MR. MASUMOTO:  Good morning, Your Honor.  Brian

5    Masumoto for the Office of the United States Trustee.  Your

6    Honor, we just wanted to make a brief statement for the record

7    regarding the retention of Wilmer Cutler Pickering Hale and

8    Dorr, a retention that the committee has put forth.

9                When we were first initially contacted about this

10   retention, we advised the committee of our concern with Wilmer

11   Hale's situation, whereby they currently represent PWC,

12   PricewaterhouseCoopers, with respect to the foreclosure review

13   and the consent order.  The proposed retention, as one of the

14   primary purposes, was in fact seeking to terminate the

15   foreclosure review process.  So we had -- from our perspective,

16   we saw a potential concern with Wilmer Hale on one hand

17   representing the committee, seeking to terminate what might be

18   a revenue stream of up to 250 million dollars, for a major

19   client of theirs, notwithstanding any ethical walls.

20               Having said that, as everyone has been made aware

21   about the current events regarding the Fed and the different

22   agreements, as well as statements in the press regarding

23   ResCap's desire to go along with the agreements that have been

24   put forth by the Federal Reserve Board, the issue that we were

25   concerned about should go away.  But we did want to indicate

1  for the record that should that expectation not come to be, and

2  in fact, the concern that we had about the potential conflict

3  continues, or persists in this case, we would want to be able

4  to raise that concern going forward.

5          We also wanted to reserve -- and I don't think it's

6  necessary to reserve -- but if, in fact, while retained for the

7  committee, in negotiations with the Fed, that there was any

8  agreement that ended up being detrimental to the estate vis-a-

9  vis PWC's role as a foreclosure review -- the foreclosure

10  review professional, we would obviously be -- would want to be

11  in a position to raise that, as a matter of conflict.

12          THE COURT:  Thank you very much, Mr. Masumoto.

13          MR. MASUMOTO:  Thank you, Your Honor.

14          THE COURT:  Mr. Zide?

15          MR. ZIDE:  Yes.  If I could just make a quick

16  statement on that?  Stephen Zide on behalf -- of Kramer Levin,

17  on behalf of the committee.

18          The committee fully understood the issue when they

19  retained Wilmer Hale.  This was fully disclosed.  The committee

20  appreciated it.  An ethical wall was put in place.  And the

21  committee also received a waiver from Wilmer Hale.

22          We also would just like to point out that the issues

23  with PWC are only one small component of what Wilmer Hale will

24  be doing.  There's going to be extensive negotiations with the

25  FRB.  Wilmer Hale is taking -- is going to be taking the lead

RESIDENTIAL CAPITAL, LLC, ET AL.                    22

1   on that for the committee.  Wilmer Hale is also here at the

2   hearing today.  So I just wanted to point that out --

3            THE COURT:  Okay.

4            MR. ZIDE:  -- for Your Honor.

5            THE COURT:  Obviously I'm not ruling on anything

6   today.  And we'll wait and see what direction this goes in and

7   what position the U.S. Trustee takes.  The only thing I would

8   say, Mr. Zide; the law about conflicts waives and ethical

9   screens in bankruptcy is quite different than it is outside of

10  bankruptcy.  There are decisions, including my decision in In

11  re Project Orange, that raise -- and there's a decision by

12  Judge Bernstein that I cite in Project Orange, that certainly

13  raise questions whether conflicts waivers and ethics screens

14  are effective to satisfy the disinterestedness standards under

15  the Bankruptcy Code.

16           I'm not ruling on anything now.  I'm just alerting you

17  right now.  We'll see whether -- I think the first thing to see

18  is whether you're able to satisfy the U.S. Trustee, and let's

19  see where we go.  But I just -- okay.

20           Mr. Rosenbaum?

21           MR. ROSENBAUM:  Your Honor, the next matter on the

22  agenda is the uncontested matters at page 7.  That's docket

23  number 2544, the motion to sell the FHA loans.  And I'll cede

24  the podium to Jennifer Marines.

25           MS. MARINES:  Good morning, Your Honor.  Jennifer

1  Marines, of Morrison & Foerster, on behalf of the debtors.  I

2  will be covering the debtors' motion for approval of procedures

3  in connection with the debtors' sale of certain of their FHA

4  insured loans.

5           THE COURT:  This is only a subset of the FHA loans

6  that the debtor holds, right?

7           MS. MARINES:  Exactly.  It's only a subset.  And I'll

8  explain that --

9           THE COURT:  Okay.

10          MS. MARINES:  -- in one moment.  As Mr. Goren

11 previously indicated, the debtors have been working diligently

12 to close the whole loan sale as well as the platform sale.  And

13 we intend to do so by the end of this month, if not shortly

14 thereafter.  But even after that closing, the debtors still

15 have significant and material assets on their books, namely

16 these loans that are insured by the FHA and the VA.  There is

17 approximate -- there are approximately one billion dollars'

18 worth of these loans on the debtors' books currently.

19          If it's okay with Your Honor, I would like to just

20 very, very briefly walk through how the FHA loans work within

21 the construct of the debtors' portfolio.

22          THE COURT:  Go ahead.

23          MS. MARINES:  So these are loans that are fully

24 secured by -- excuse me -- fully insured by the FHA.  So when a

25 borrower defaults on his or her loan and the debtor repossesses

1    that property and then forecloses on the property, the FHA

2    covers the delta between what the debtors receive from proceeds

3    of that foreclosure and the outstanding principal balance of

4    the loan.

5              So basically, these loans should be money good, but

6    they take about thirty to thirty-six months to fully monetize

7    in the ordinary course, sometimes longer, depending on states'

8    time frames for foreclosures.  And in some instances, the

9    borrowers themselves are in bankruptcy, and that extends the

10   process.

11             Historically, the debtors sell their FHA loans into

12   Ginnie Mae securitizations.  However, when one of these loans

13   becomes nonperforming because the borrower is not paying

14   principal and/or interest on these, under certain

15   circumstances, the debtors are required to repurchase these

16   loans.  Then they sit on the debtors' books until either the

17   loans become performing again, and the debtors are able to

18   resell them into the Ginnie Mae securitizations, or until the

19   debtors foreclose on the properties.

20             So through this motion, like Your Honor said, the

21   debtors are seeking to sell a subset of the FHA loans.  And the

22   debtors chose this subset based primarily on how easily a

23   potential purchaser could verify the loan value.  So basically

24   the --

25             THE COURT:  Are these all performing loans?

RESIDENTIAL CAPITAL, LLC, ET AL.                    25

1              MS. MARINES:  I'm sorry?

2              THE COURT:  Are these all performing loans?

3              MS. MARINES:  No, they're not performing.  By virtue

4   of that that, that's why they're sitting on the debtors' books.

5              THE COURT:  All right.  They were repurchased?

6              MS. MARINES:  They were repurchased.  I'm sorry.

7   These are on the debtor's books --

8              THE COURT:  Got it.

9              MS. MARINES:  -- because they were repurchased --

10             THE COURT:  Okay.  All right.

11             MS. MARINES:  -- from Ginnie Mae securitization.

12             But so the debtors chose this subset of loans

13  basically because these loans had the best collateral

14  documentation and had also been reviewed for compliance with

15  industry standards.  So the debtors believed that a potential

16  purchaser looking at these loans would be able to most easily

17  verify the value of these loans.

18             So if, through this process, the debtors are able to

19  secure an accept --

20             THE COURT:  So the one billion in loans, FHA/VA loans,

21  that are on the debtors' books, were all nonperforming that

22  were repurchased from securitizations?

23             MS. MARINES:  Yes, I believe that's correct.  And this

24  subset is approximately 130 million dollars' worth in value.

25             So if through this process the debtors are able to

1   secure an acceptable price for these loans, and acceptable

2   price is going to be determined in consultation with the

3   creditors' committee as well as AFI and the JSBs, because it's

4   their collateral -- so if we are able to receive an acceptable

5   price for these, the debtors may seek to sell additional pools

6   of loans at a later date, or we may allow these to monetize in

7   the ordinary course; whatever maximizes value for the estate

8   and the creditors.

9           As we noted in our papers, the debtors, prior to

10  bankruptcy, routinely sold large pools of loans as part of

11  their business practice, either to get cash or to relieve

12  themselves of the servicing costs that are associated with

13  these loans.  So while we do believe that this is in the

14  ordinary course of business, out of an abundance of caution,

15  and due to the sheer volume and dollar figure that's attached

16  to these loans, we wanted to seek court approval and also make

17  sure that everyone had notice of the sale and of the

18  procedures.

19          Throughout the process we've been in consultation with

20  the UCC as well as AFI and the JSBs.  And they -- we believe

21  that they all support the motion and the procedures.  The

22  procedures provide those parties with certain consultation

23  rights.  Among others, those are consultation rights with

24  respect to reviewing the bids that we receive, and then

25  determining what's highest and best, rejecting bids on an

1  aggregate or on a loan-by-loan basis, where the debtors and the
2  interested parties don't believe that the bid accurately
3  reflects the value of those loans.  And they also have
4  consultation rights with respect to determining not to proceed
5  with the sale and to let these monetize in the ordinary course
6  of business.

7       Only one party has filed papers in connection with the
8  papers, and that's the U.S. government.  They filed a
9  reservation of rights, noting their concern that the sale free
10 and clear of these loans will somehow affect whatever setoff
11 rights they may or may not have.  But I think all of the
12 parties, including the government, realizes that that's really
13 a sale objection and not an objection to the procedures today.
14 So for the purposes of what's going forward, we believe that
15 this matter is uncontested at this point.

16      With respect to the sale procedures, I would like to
17 note that we attempted to closely mimic the debtors' pre-
18 petition practices of selling these loans.  And we did this to
19 maximize interest from the normal industry players.  While
20 there's no formal auction that you generally see with respect
21 to a 363 sale, there is certainly a competitive bidding
22 process.  And if Your Honor has any specific questions about
23 the procedures now --

24      THE COURT:  I guess the question I have is, because
25 you have -- you reserved the right to withdraw loans from the

 1   pool --

 2          MS. MARINES:  Yes.

 3          THE COURT:  -- right?  How do you make that

 4   determination?  Do you get -- you get aggregate bids for an

 5   entire pool; how do you decide?  I mean, it's not a per-loan

 6   basis that people are bidding.

 7          MS. MARINES:  So there's a dual-step process.  In the

 8   first instance, the bidders will be receiving an offering

 9   memorandum and will be able to look at the loan tapes and make

10   a bid on an aggregate basis.  So we're asking for everyone to

11   make their highest and best bids.

12          Once we determine who the highest and best bidder is,

13   that successful bidder will be able to look at the loans on a

14   loan-by-loan basis and will get much more extensive diligence,

15   at which point, they can -- or actually they're required to

16   make a bid broken down on a loan-by-loan basis.  So I believe

17   the way that it works is that if they attribute value to a

18   single loan and we don't agree with that value or if it drags

19   down the whole aggregate price, then we are able, in

20   consultation with the interested parties, to pull that loan.

21          THE COURT:  Approximately how many loans are in this

22   pool?

23          MS. MARINES:  Sorry, I'm just looking back to our

24   financial advisor.

25          THE COURT:  I saw the aggregate.  And the value you've

1   ascribed to it, is that face value or are you using -- because

2   these were all nonperforming loans that you've bought back.

3   How have you placed a value on this pool of loans.

4           MS. MARINES:  I believe it's the carry value on the

5   debtors' books.  Oh, I'm sorry -- okay.  I apologize.  It's the

6   unpaid principal balance.  But we believe that we're going to

7   get very close to par on those.

8           THE COURT:  All right.  And the number of loans in

9   this pool?

10          MS. MARINES:  That I --

11          I apologize.

12          THE COURT:  That's okay.  I didn't mean to create a

13  whole --

14          MS. MARINES:  Many people are consulting, Your Honor.

15          THE COURT:  I can see that.  It wasn't a trick

16  question.

17          MS. MARINES:  650.

18          THE COURT:  600 and --

19          MS. MARINES:  650.

20          THE COURT:  Okay.  All right.  Does anybody else wish

21  to be heard with respect to the motion to approve bidding

22  procedures?  Mr. Zide?

23          MR. ZIDE:  Stephen Zide from Kramer Levin, on behalf

24  of the committee.  We agree with how she characterized the

25  motion.  We were intimately involved in setting up the process

1  and the procedures.  And we did focus on that issue that you

2  just mentioned, Your Honor, on how this process would work,

3  that there would be a number of bids coming in, and then there

4  would be a follow-up diligence process where they could seek to

5  lower the prices.  And then the commi -- the debtors, in

6  consultation with the committee, can take loans out of there.

7          We intend to be heavily involved in the process.  And

8  we're supportive of the debtors going out with this to see if

9  they can get a --

10          THE COURT:  So is it only the high bidder that gets to

11  do the detailed diligence?

12          MR. ZIDE:  Yes.

13          THE COURT:  So what happens?  They come back and they

14  do their diligence and they reduce the value by thirty million

15  dollars.  Okay, what happens then?  You're not satisfied

16  with -- I mean, are your only choices then to pull out the

17  loans that they questioned, or do you -- I mean, does the

18  second highest -- do you have a reserve second-highest bidder?

19  Do they get to -- do you get a chance to have them come do

20  their diligence?

21          I mean, it's all well and good when you get that

22  first-round bid, it's highest and best, and then they do their

23  diligence.  They're the only ones doing the diligence.  They

24  come back and you get sticker shock when they go to reduce the

25  price.  Is your only choice to pull loans out of it and sell

1   the smaller volume of loans?  You may -- the second highest

2   bidder may have been well in excess of the reduced amount of

3   the bid.

4               MR. ZIDE:  If I may?  I think the way it works, Your

5   Honor, is that I think the concern the debtors had was that no

6   bidder was going to make a high enough bid --

7               THE COURT:  They didn't want to do --

8               MR. ZIDE:  -- until they did the diligence.

9               THE COURT:  Right.

10              MR. ZIDE:  So even if someone offered a high bid, you

11  would never know where they're going to come out until they do

12  that extensive follow-up diligence.  And if where they come

13  back is not acceptable to the committee --

14              THE COURT:  Can you pull the whole sale?

15              MR. ZIDE:  I believe we could either pull the whole

16  sale or agree to the reduced price or just pull certain loans

17  out, yes.

18              THE COURT:  Okay.  All right, anybody else wish to be

19  heard?

20              MR. CORDARO:  Good morning, Your Honor.  Joseph

21  Cordaro, Assistant United States Attorney, on behalf of the

22  United States.  And just for the record, the number is 654.  I

23  know, because HUD is reviewing them.  They've been provided by

24  the debtors.

25              And I'm not going to rehash what we said in our

1  statement.  I will only say that one of the selling points, it

2  seemed, of the motion, was that the purchaser could be assured,

3  I think was the word, that the loans would qualify for FHA

4  insurance.  Obviously, that's a decision within the province of

5  HUD.  And notwithstanding whatever the motion defines as an

6  "interested party", when we're talking about FHA insurance,

7  we're talking about taxpayer dollars.  And the government is

8  clearly interested.

9         So I would hope that going forward, that we would be

10  consulted, at least, and kept abreast of how things are

11  developing.  Because we didn't know this was coming before the

12  motion was filed.  So going forward, we hope that, at least

13  with respect to this tranche of loans, and then any other loans

14  that the debtors may seek to sell that are FHA-insured, that we

15  would have notice and be able to look into these issues ahead

16  of time.

17         THE COURT:  Well, let me ask this.  I mean, when is

18  this -- if this process runs its course, when do you anticipate

19  actually coming to the Court to get final approval?

20         MS. MARINES:  On April 11th.

21         THE COURT:  Okay.  Have you and Mr. Cordaro or anyone

22  else from the government sat down and tried scope out how

23  you're going to solve the issues that the U.S. has raised?

24         MS. MARINES:  I believe --

25         THE COURT:  I mean, they're proceeds of loans that can

RESIDENTIAL CAPITAL, LLC, ET AL.                    33

1  be escrowed, some portion of it, to satisfy, what, if any

2  rights to setoff the government may have.  I mean, what's -- I

3  don't want to know the details of settlement negotiations, but

4  are you making progress in trying to resolve these issues with

5  the government?

6          The government's on every side of this.  I mean, they

7  own seventy-four percent of Ally, of AFI.  They -- so.

8          MS. MARINES:  Certainly, Your Honor, between now and

9  April 11th, we will -- we will --

10          THE COURT:  Don't wait till April 10th.

11          MS. MARINES:  Yeah -- no.

12          THE COURT:  Mr. Cordaro?

13          MR. CORDARO:  Thank you, Your Honor.  Unless the Court

14  has any further questions for the government --

15          THE COURT:  Well, I guess -- I want to know that

16  there's a process underway to try and resolve these issues.  I

17  don't want it to get to April and have a fire drill at the end,

18  because these issues are holding fire, the sale hearing is

19  adjourned, or whatever.  There should be plenty of time to try

20  and resolve these issue.

21          MR. CORDARO:  Yes, Your Honor.  And that was the

22  reason that we filed the statement now instead of later.

23  Though we acknowledge and think that it really is technically a

24  "sale objection", we wanted our position out now.  Because that

25  is exactly the situation we wanted to foreclose, the fire drill

1  in April.

2          THE COURT:  All right.  Do we have -- what hearings do

3  we have in February?  I mean, I'd like a status report at some

4  point in February about the efforts to resolve the issues with

5  the United States, so that assuming you get satisfactory bids,

6  that you can actually go ahead and close a sale.

7          And obviously, this is only the first of such sales.

8  You say you've got a billion dollars of these loans on the

9  books.  If you're successful here, I assume you're going to do

10  the same thing again, hopefully, soon.

11          MS. MARINES:  Okay.  That's, fine, Your Honor.  We

12  have --

13          THE COURT:  So do we have -- do you know, Mr. Goren,

14  do we -- I don't know, do we have --

15          MS. MARINES:  The 7th and the 28th in February.

16          THE COURT:  All right.  So let's do it for February

17  28th.  I'll give you some time to see whether you can make some

18  progress.  So let's get this on the agenda, Mr. Goren, for

19  February 28th.  And that gives you time to work with the United

20  States to see whether you can come to a -- this ought to be

21  solvable.

22          MR. GOREN:  I agree one hundred percent, Your Honor.

23  I mean, we've spoken preliminarily with the government.  We'll

24  continue speaking with them.

25          THE COURT:  Okay.

1           MR. GOREN:  Hopefully we'll get this resolved --

2           THE COURT:  Okay.

3           MR. GOREN:  -- before February 28th.

4           THE COURT:  All right.  So the motion is approved.

5           MR. GOREN:  Thank you, Your Honor.

6           THE COURT:  The motion is granted.  Thank you very

7   much.

8           MS. MARINES:  Thank you.  I have a copy of the black

9   line.  I believe chambers received it this morning.

10          THE COURT:  You know, I --

11          MS. MARINES:  I'm happy to hand it up.

12          THE COURT:  Hang on.  Let me see if I have it.  I have

13  it.  This is Exhibit 5 to the stack of what you gave me this

14  morning?

15          MS. MARINES:  Exhibit 3.  If you would like, I have

16  copies.

17          THE COURT:  No.  I have two documents, one labeled

18  Exhibit 3, one Exhibit 5.  Both are entitled "Black-Line of FHA

19  Sale Procedure Order".  Oh, one's sale approval order.

20          MS. MARINES:  The sale procedures order is Exhibit 3.

21          THE COURT:  Okay.  All right, got it.  Let me look at

22  it quickly, okay?  And actually I did look at this this

23  morning.  That's fine.  So it's granted.

24          MS. MARINES:  Thank you.

25          THE COURT:  Just -- we'll just get a disc from you.

1              MS. MARINES:  Absolutely.

2              THE COURT:  Okay, thank you very much.

3              MS. MARINES:  Thank you.  And I believe the next

4    matter is the annual incentive program, which is going forward

5    as a status conference.

6              THE COURT:  Status conference, right.  Mr. Goren?

7              MR. GOREN:  Thank you, Your Honor.  Todd Goren,

8    Morrison & Foerster, on behalf of the debtors.

9              As Ms. Marines just noted, this is just a status

10   conference on the debtors' motion to approve their annual

11   incentive plan payments.  Two objections were filed to the

12   motion, one by the creditors' committee, which I'm pleased to

13   report, we have resolved; and one by the U.S. Trustee.  We're

14   hopeful that we'll be able to resolve the U.S. Trustee's

15   objection, but we haven't yet been able to do so.

16             THE COURT:  Let me ask this.  Mr. Masumoto, is your

17   objection only as to payments to the KEIP participants?

18             MR. MASUMOTO:  No, Your Honor.  It's technically, I

19   guess, both the KEIP and the KERP.  We did not object to the

20   payments of the overwhelming majority of 2,800 other non-KEIP

21   and KERP participants.  We deferred to the debtors and the

22   committee as to whether or not that's justified under the

23   circumstances.

24             At the moment, to answer, again, directly to your

25   question, it's both the KEIP and the KERP that we have

1  outstanding.

2          THE COURT:  Okay.  And so Mr. Goren, how many people

3  were in the KEIP-KERP?  Really, where I'm going is, I mean, it

4  sounded to me -- it looked to me, that as to the vast majority

5  of employees who would be covered by the annual incentive plan,

6  there is no objection.  And so I'm raising the issue, if

7  there's no objection as to that, ask for approval for that

8  portion of it, and then work to resolve the remainder.  You

9  want to keep everybody hanging until you get the whole thing

10  worked out?

11          MR. GOREN:  No.  I think that's very productive.  I

12  think that does make a lot of sense for --

13          THE COURT:  Mr. Masumoto, is that acceptable to you?

14          MR. MASUMOTO:  Absolutely, Your Honor.  I just wanted

15  to make clear that based on my understanding, the AIP funding

16  pool was designed to be 33.4.  Based on the concessions of the

17  committee, that would be reduced by about 2.6 million dollars.

18  I just wanted to make it clear that the concessions that were

19  made don't enrich the remaining parties.  That pool would be

20  reduced --

21          THE COURT:  Okay, Mr. Zide, would it be acceptable to

22  the committee to have an order entered approving it as to all

23  of the employees who are not part of the KEIP and KERP?

24          MR. ZIDE:  Absolutely, Your Honor.

25          THE COURT:  Okay.  Mr. Goren, why don't you -- do an

1    order in a form acceptable to the committee and to the U.S.

2    Trustee.  Let's get that portion of it done.  See if you can

3    resolve the remaining issues with the U.S. Trustee.  If not,

4    get it on for the next hearing, and I'll deal with it.

5            MR. GOREN:  Okay.  So I mean, we'd like to set it for,

6    at this point, for an evidentiary hearing.  I think the next

7    hearing's on the 29th.

8            THE COURT:  Okay.

9            MR. GOREN:  So we'll do that.

10            THE COURT:  Depending on how long the next hearing is.

11    I'm not sure we're going to do an evidentiary hearing on the

12    29th.  If you need an evidentiary hearing, what I would suggest

13    is that you and Mr. Masumoto and committee's counsel, if

14    appropriate, contact chambers.  We'll have a telephone

15    conference.  I just want to get a better sense of what the

16    factual issues are going to be.  Is there any discovery that --

17    am I going to get written narrative direct with declarants

18    available for cross?  Does Mr. Masumoto wish to take any

19    depositions?

20            I take it the committee is -- you've satisfied your

21    objections as to everybody at this point, Mr. Zipe?

22            MR. ZIDE:  That's correct.

23            THE COURT:  So it's really just the U.S. Trustee, at

24    this point.  Okay.

25            MR. GOREN:  Yes.  I mean, if it's helpful, we -- based

1   on negotiations with the committee, we agreed to reduce the

2   pool by about eighteen percent.  So that's --

3           THE COURT:  Okay.  But I -- look, so let's proceed

4   this way.  Yes, we can -- you and Mr. Masumoto ought to

5   continue, or whichever of your colleagues is dealing with this.

6   See if you can resolve the issues.  If you need an evidentiary

7   hearing, arrange for a telephone conference next week one

8   afternoon, and we'll work out a schedule.  I just want to make

9   sure the ground rules are clear as to what's going to be

10  covered in the evidentiary hearing.  I'll give you a date for

11  it.

12          MR. GOREN:  Would there be a date before the end of

13  the month?  I mean, there's a lot of concern on the debtors'

14  part that --

15          THE COURT:  Sure.

16          MR. GOREN:  -- if the -- particularly if the sale

17  closing extends beyond the 31st, that it's critically important

18  to get this in place before then.

19          THE COURT:  Before when?

20          MR. GOREN:  Before the end of the month, if --

21          THE COURT:  I don't think so.  Look, it's possible.

22  Work with Mr. Masumoto -- work with Mr. Masumoto, see if you

23  can, as narrowly as possible, define the factual disputes to be

24  presented.  It is possible that you can have an evidentiary

25  hearing on the afternoon of January 29th.

1          MR. GOREN:  Okay.

2          THE COURT:  It's a fairly long agenda in the morning.

3    What'll stay, what'll go, I don't know.

4          MR. GOREN:  Not yet clear at this point.  But I'm

5    also -- I mean, from the AIP perspective, we have three

6    witnesses.  They've already submitted declarations.  I don't

7    know that --

8          THE COURT:  Do you want to take depositions, Mr.

9    Masumoto?

10          MR. MASUMOTO:  I just wanted to -- but --

11          THE COURT:  Are you going to put in any evidence?  Are

12    you going to just -- is this just going to be based on the

13    declarations of the debtors?

14          MR. MASUMOTO:  I assume so, Your Honor.

15          THE COURT:  Okay.  If -- do you anticipate cross-

16    examining?  I'm not pinning you down, but --

17          MR. MASUMOTO:  There may be cross-examination.

18          THE COURT:  So we probably could do the  -- I still

19    want to have a telephone conference next week.  See if you can

20    pin all this down.  If you have an agreement with Mr. Masumoto

21    that the only witnesses -- the only direct would be the written

22    declaration that were submitted in support of the motion,

23    possible cross-examination by Mr. Masumoto, it sounds like the

24    U.S. Trustee's not going to call any witnesses on its own.  And

25    so we probably could do an evidentiary hearing that afternoon.

 1              MR. GOREN:  Okay.  Thank you, Your Honor.

 2              THE COURT:  Mr. Zide, did you want to add something?

 3              MR. ZIDE:  Your Honor, could I just make -- I'd just

 4    like to make one clarification, because the debtors filed a

 5    reply to the proposed resolution.  And I just wanted to make

 6    clear for the record, that's not what was actually resolved

 7    with the committee.  It was actually a little more than that.

 8              THE COURT:  Just make sure that the order that you --

 9    a new order is going to be submitted.  It's going to deal with

10    the portion that I am approving now.

11              MR. ZIDE:  Yes.

12              THE COURT:  Make sure it's in a form satisfactory to

13    the U.S. Trustee and the committee, that will accurately

14    reflect what the agreement of the parties is.  And as to the

15    participants in the KEIP and KERP, I'm going to hear that

16    probably on the afternoon of the 29th.  Okay?

17              MR. GOREN:  Thank you.

18              THE COURT:  Thank you very much.  All right, thank

19    you, Mr. Goren.

20              MR. GOREN:  I'll turn the podium over to Mr.

21    Rosenbaum.

22              THE COURT:  Okay.

23              MR. ROSENBAUM:  Your Honor, Norm Rosenbaum for the

24    debtors.  The next matter on the agenda is the motion of Basic

25    Life Resources, docket number 2590.  I believe I heard Mr.

1  Moore had made an appearance.

2          THE COURT:  All right --

3          MR. MOORE:  Yes, Your Honor.  Michael Moore is here,

4  and also Pamela Hill.

5          THE COURT:  Go ahead.  You can go ahead and argue your

6  motion.

7          MR. MOORE:  Your Honor, you want me to argue the

8  motion?

9          THE COURT:  I want you to say anything in support of

10 your position in the motion.

11         MR. MOORE:  Our position is --

12         THE COURT:  I've reviewed the papers.

13         MR. MOORE:  Our position is, Your Honor, in response

14 to debtors' objection, is it was not timely filed.  And so

15 therefore, it should be dismissed.

16         THE COURT:  Well, you didn't file your motion on ECF.

17 It has to be filed on the electronic docket.  The only way it

18 got there is the debtor filed it there, and immediately

19 thereafter filed its objection.  And they were -- as they were

20 directed to by the Court.

21         They called.  The Court didn't have the motion.  The

22 debtor did.  The debtor had got it filed.  We instructed the

23 debtor, as soon as you file the motion -- it wasn't their

24 motion -- but as soon as the motion's filed, go ahead and file

25 your response.  A half hour after your motion finally appeared

1   on the Court's docket the objection was filed.  So with respect

2   to your seeking to strike the debtors' response, that's

3   overruled.

4          So go ahead and argue the merits of your position.

5          MR. MOORE:  Well, Your Honor, before we do that --

6          THE COURT:  No, go ahead and argue the merits of your

7   position.

8          MR. MOORE:  Well, what we filed was with the clerk of

9   the court.

10          THE COURT:  Excuse me.  Go ahead and argue the merits

11   of your position, or I will cut your off.  You have your

12   choice.  If you wish to argue the merits of your motion, now is

13   the time to do it.  I do not want to hear any argument about

14   the debtors, when the debtor filed its objection.  Are you

15   going to argue your motion or not?

16          MR. MOORE:  I think, Your Honor, that out motion

17   speaks for itself.

18          THE COURT:  Okay.

19          MR. MOORE:  That we do have an emergency, in the sense

20   that this ongoing amount of almost 15,000 dollars a day is

21   clearly something that should be addressed and resolved.  And I

22   think otherwise, our statement in -- is clearly set forth.

23          THE COURT:  Okay, thank you.  Mr. Rosenbaum, I don't

24   need to hear from you.  I'm going to take the matter under

25   submission, and I expect to enter an order resolving the motion

1  today.

2          MR. ROSENBAUM:  Thank you, Your Honor.

3          Sorry, Your Honor.  The next matter on is the cure

4  objections, Your Honor --

5          THE COURT:  Okay.

6          MR. ROSENBAUM:  -- at page 9 of the agenda.

7          THE COURT:  Thank you.

8          MR. ROSENBAUM:  Docket number 61.  And I'll turn the

9  podium over to Mr. Engelhardt.

10          MR. ENGELHARDT:  Hello, Your Honor.  Stephan

11  Englehardt of Morrison & Foerster on behalf of the debtors.

12          THE COURT:  Thank you.

13          MR. ENGELHARDT:  Your Honor, I'd just like to provide

14  a brief update on the status of the resolution of the cure

15  objection of Digital Lewisville and where the parties are with

16  respect to that matter.

17          The Digital cure objection relates to a transaction

18  that itself was part of a broader transaction, in particular, a

19  pre-petition purchase and sale agreement between debtor EPRE

20  LLC and AFI.  That transaction related to two different

21  properties:  a property in Eden Prairie, Minnesota, and a

22  property in Lewisville, Texas.

23          Both those properties house critical data centers for

24  the debtors, which themselves house data from both the debtors

25  and AFI.  The Eden Prairie facility was owned by the debtor

1  entity, and the Lewisville property is leased by GMAC Mortgage

2  from Digital Lewisville.

3          The purchase and sale agreement itself was executed in

4  order to allay concerns of AFI's and Ally Bank's regulators

5  concerning the housing of AFI and Ally Bank's data in buildings

6  that were subject to -- either owned or leased by entities in a

7  Chapter 11.  And the agreement was designed and crafted to be

8  an economically neutral transaction.  And it worked in the

9  following way.

10          The debtors conveyed a fifty-one percent property

11 interest in the Eden Prairie facility and a fifty-one percent

12 leasehold interest in the Lewisville lease to AFI, for a total

13 consideration of six million dollars.  The agreement itself

14 calls for a mandatory unwinding, if you will, of that

15 transaction, in advance of the sale of any -- closing of any

16 sale of the platform assets.  Thus, AFI will reconvey the

17 property right, reassign the lease back to the debtors, and the

18 same six-million-dollar consideration will go back to AFI.

19          The Digital Lewisville cure objection and sale

20 objection arises out of the Lewisville -- obviously, the

21 Lewisville lease portion of that transaction.  They asserted a

22 cure objection.  They asserted certain sales objections.  The

23 parties have been working diligently over the last month or so

24 to resolve those objections.  The parties are very near a

25 global resolution.

1          The debtors and Digital Lewisville have reached an

2    agreement in principle on the cure amount for a cure payment.

3    The parties are currently working through the reconveyance

4    transaction paperwork for that, for approval of the parties,

5    and also working out a manner in which AFI can have continued

6    access to the data in the data centers, after Ocwen occupies

7    those properties, for a certain period of time.

8          Subject to that, we'd like to adjourn this further to

9    January 29th.  By that time, we are hopeful we will have a

10   global resolution.  And if any -- I know Digital Lewisville

11   counsel is here.  And I do not know if anyone else wishes to be

12   heard.

13          THE COURT:  Does anybody wish to be heard?

14          MR. GREGER:  Very briefly, Your Honor.

15          THE COURT:  Just come on up to the microphone, so we

16   get a clear record.

17          MR. GREGER:  Good morning, Your Honor.  Michael Greger

18   of Allen Matkins Lock Gamble Mallory & Natsis, on behalf of

19   Digital Lewisville.  I have no comments with respect to

20   counsel's statements, other than the documents speak for

21   themselves, and we would object to any characterization.  We

22   believe that --

23          THE COURT:  Don't worry about it.  It's all going to e

24   blank in my mind after you leave here today.  You're hopefully

25   going to get this resolved.  I'll hear it on the 29th.  Okay?

RESIDENTIAL CAPITAL, LLC, ET AL.                    47

1           MR. GREGER:  Thank you, Your Honor.

2           THE COURT:  Thank you.

3           MR. ENGELHARDT:  If Your Honor has no further

4    questions --

5           THE COURT:  No, I don't, Mr. Englehardt --

6           MR. ENGELHARDT:  -- I will conclude.  I will --

7           THE COURT:  -- thank you very much.

8           MR. ENGELHARDT:  Thank you, Your Honor.  I'll turn the

9    podium back to Mr. Goren.

10          THE COURT:  Okay, Mr. Goren?

11          MR. GOREN:  Thank you, Your Honor.  Just to give a

12   brief update on some of the remaining cure objections.  We had

13   originally three on the agenda for today:  OceanFirst, BBNT and

14   PNC, sort of the category of SBO, service-by-others servicers.

15          THE COURT:  So I got a stipulation before.  Is that

16   going to resolve --

17          MR. GOREN:  Yes.  That's what I was just -- we reached

18   agreement with them on a form of stipulation.  Not terribly

19   substantive.  It really just deals with the mechanics of how

20   they'll get their advances back post-closing, because they've

21   got now -- whereas they used to come to one person, now they

22   have three or four different people they need to look to.  So

23   they just wanted some comfort on how the process would work, so

24   we entered into a stipulation with them about how it would

25   work.

RESIDENTIAL CAPITAL, LLC, ET AL.                    48

1        The committee has reviewed it.  The purchasers have

2    reviewed it.  So we're -- I think that stipulation should

3    resolve those objections.

4        THE COURT:  Why don't you do this, though.  Why don't

5    you put this -- the stipulation isn't online yet, right?

6        MR. GOREN:  No.

7        THE COURT:  No.  Why don't you do it on presentment,

8    five days, and it'll get entered.  I don't think there's --

9    since it's been reviewed by the committee and others, I don't

10   think there's going to be any objections to it.  Can it wait

11   that long to get entered?

12       MR. GOREN:  I don't think that's a problem.

13       THE COURT:  Okay.  So put it on presentment.

14       MR. GOREN:  And then finally, Your Honor, there was a

15   few others that were originally supposed to be scheduled today:

16   Wells Fargo and AFI.  Both have been adjourned to the 29th.

17       With respect to Wells Fargo, we finally got some

18   information from them yesterday as to what their asserted cure

19   claim is.  We sent it along to the ResCap businesspeople who

20   are reviewing it.  In the scheme of things, it's a relatively

21   small number, so we're fairly confident we'll be able to come

22   to a resolution with them in advance of the 29th, but it's been

23   set for hearing on the 29th.

24       With respect to AFI and Ally Bank, by way of updated,

25   Ocwen has confirmed to the debtors that they will not be taking

1   assumption of the Ally Bank servicing agreement, which was the

2   subject of lots of back-and-forth earlier in the case.  But

3   just so everything's clear, those loans will be serviced by

4   Ocwen in some capacity.  Ocwen has engaged Ally Bank directly

5   to enter into an agreement on substantially similar terms to

6   what our current agreement is.

7          The debtors weren't getting any value for that

8   agreement under the sale agreement anyway, so this is sort of

9   economically neutral to the debtors.

10          THE COURT:  Is there going to be a rejection damage

11   claim?

12          MR. GOREN:  I wouldn't think so, at this point.  I

13   mean, because we're not actually even rejecting the agreement.

14   It will just be terminated.  So it's -- so Ocwen --

15          THE COURT:  Okay.

16          MR. GOREN:  -- Ocwen's --

17          THE COURT:  Are there provisions for termination?

18          MR. GOREN:  What?

19          THE COURT:  Are there provisions that permit

20   termination?

21          MR. GOREN:  Yes.  I mean, we'll -- this will -- I

22   believe this will all be worked out.

23          THE COURT:  Okay.

24          MR. GOREN:  But it just -- because Ocwen is speaking

25   directly with Ally Bank about an agreement.  But if for some

RESIDENTIAL CAPITAL, LLC, ET AL.                    50

1    reason they're not able to do it, the loans will be serviced.

2    We have an estate subservicing agreement between the debtors

3    and Ocwen for any servicing that remains in the estate.  And we

4    would expect that if for some reason they're not able to do it,

5    we would be -- we would have those loans serviced in some

6    capacity, under that agreement.

7              THE COURT:  Okay, thank you.

8              MR. GOREN:  And that is the update on that, Your

9    Honor.  And I believe that is the end of the agenda.

10             THE COURT:  Okay.  Anybody else wish to be heard?

11             All right.  So Mr. Goren, you and Mr. Masumoto will

12   confer with respect to the annual incentive plan.  And Deanna's

13   out sick today, so you'll have to try tomorrow, see if you can

14   get a date and time for a telephone hearing.  I'm hopeful,

15   since it doesn't sound like there's going to be extensive

16   evidence, that we can do it on the afternoon of the 29th.

17   Okay?

18             MR. GOREN:  Okay.

19             THE COURT:  All right, thank you very much.  We're

20   adjourned.

21             MR. GOREN:  Thank you.

22        (Whereupon these proceedings were concluded at 11:01 AM)

23

24

25

1

2                              **I N D E X**

3

4                              RULINGS

5                                             Page        Line

6   FHA loan sale procedures motion is approved.    35          4

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

52

1

2                    C E R T I F I C A T I O N

3

4    I, Penina Wolicki, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9

10   _____

11   PENINA WOLICKI

12   AAERT Certified Electronic Transcriber CET**D-569

13

14   eScribers

15   700 West 192nd Street, Suite #607

16   New York, NY 10040

17

18   Date:  January 17, 2013

19

20

21

22

23

24

25