Hearing Date and Time: March 18, 2013 at 9:00 a.m. (Eastern Time)

Irena M. Goldstein
Jeffrey Chubak
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for Assured Guaranty*
*Municipal Corp. and Certain*
*of its Affiliates*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **RESIDENTIAL CAPITAL, LLC,** *et al.,* | : | **Case No. 12-12020 (MG)** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------------- x

### OBJECTION OF ASSURED GUARANTY MUNICIPAL CORP. AND CERTAIN AFFILIATES TO DEBTORS' MOTION PURSUANT TO BANKRUPTCY RULE 9019 FOR ORDER APPROVING RMBS TRUST SETTLEMENT AGREEMENTS

Assured Guaranty Municipal Corp. and certain of its affiliates (together, "Assured")
hereby object to the second supplemental motion, filed October 19, 2012 [Docket No. 1887] (as
supplemented by the initial and first supplemental motions, the "Motion") of Residential Capital,
LLC and its debtor affiliates (together, the "Debtors") pursuant to Rule 9019 of the Federal Rules
of Bankruptcy Procedure (the "Bankruptcy Rules") for an order approving the RMBS Trust
Settlement Agreements (as defined in the Motion) (the "Settlement Agreements"), and
respectfully represent:

### Preliminary Statement

1.    Assured provided financial guaranty insurance covering in excess of $1 billion of
residential mortgage-backed securities ("RMBS") backed by mortgage loans originated or
acquired by certain of the Debtors. Despite being the party with a real economic interest at

stake, the Debtors bypassed Assured and other monoline insurers and entered into the Settlement

Agreements with holders of RMBS represented by Talcott Franklin, P.C. (the "Talcott Franklin

Group") or Gibbs & Bruns LLP (the "Steering Committee Group") (together, the "Institutional

Investors").

2.    The settlement reached between the Debtors and Institutional Investors, which

would fix the claims of up to 392 securitization trusts that issued RMBS (the "Trusts"), is not

objectively fair or in the best interests of the Debtors' estates and their creditors.  Accordingly,

the Motion should be denied.

3.    The settlement does not stand alone – it is an integral part of the Debtors' efforts

to obtain a third party release for parent Ally Financial, Inc. ("AFI") and its nondebtor

subsidiaries (together with AFI, "Ally").[1]  Indeed, it was negotiated contemporaneously with

Plan Support Agreements, dated May 13, 2012, between the Debtors and Institutional Investors,

which require such investors to support the Debtors' efforts to obtain a release for Ally (the

"Plan Support Agreements").

4.    Because the settlement is part of the Debtors' efforts to settle its and its creditors'

claims against Ally, an insider, the Debtors are incorrect in contending that deference should be

afforded to their business judgment in determining whether to approve the settlement pursuant to

Bankruptcy Rule 9019.  *See* Motion at ¶62.  *See also Dewey & LeBoeuf LLP*, 478 B.R. 627, 641

(Bankr. S.D.N.Y. 2012) (in general a debtor's business judgment may be considered in

determining whether to approve a settlement under Bankruptcy Rule 9019).  Instead, the Motion

must be evaluated under the "entire fairness" standard under which the Debtors must establish to

---

[1] Assured reserves the right to object to the validity of any third party release for Ally at the appropriate time, whether in a plan or confirmation order or otherwise and whether required under the Plan Support Agreements or AFI Settlement Agreement (each as defined below) or otherwise.

the Court's satisfaction that the settlement is "objectively fair" to all parties, that is, that the settlement is "the product of both fair dealing and fair price." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006).

5.     Under the Settlement Agreements the amount of the Trusts' aggregate Allowed Claim (as defined below) is $8.7 billion and is reduced proportionately based on the original issue balance of Trusts that choose not to participate in the settlement.  In support of their contention that the aggregate Allowed Claim is reasonable, the Debtors rely, in part, upon the Original and Supplemental Declarations of Jeffrey A. Lipps (the "Lipps Declarations") and the Original and Supplemental Declaration of Frank Sillman (the "Sillman Declarations") in support of the Motion.  As set forth below and made clear in the Supplemental Lipps Declaration, attached as Exhibit 4 to the Motion, the monolines have stronger direct claims than those asserted by the Institutional Investors, and similarly, the Debtors may have stronger defenses to the Institutional Investors' claims.  Because these differences exist, the settlement is not fair to Assured and the other monolines because it is in large part a "one size fits all" settlement.[2]  The Sillman Declarations, as became clear during the deposition of Mr. Sillman, contain nothing more than an opinion based upon very few facts but many assumptions.   These declarations, thus, do not support the allowance of the aggregate Allowed Claim.

6.     After the aggregate Allowed Claim is determined, an Expert (as defined below) will be appointed to allocate the Allowed Claim.  Under the Settlement Agreements' allocation formula, each Trust that accepts the settlement will receive an "Allocated Claim" equal to the Allowed Claim amount multiplied by the Trust's Net Loss Percentage (each as defined below), *i.e.*, the losses the Expert estimates the Trust will suffer over its lifetime divided by the losses the

---

[2] As set forth elsewhere in this objection, the Motion and Settlement Agreements are woefully unclear as to how the settlement affects the monolines' claims.

Expert estimates all Trusts that accept the settlement will suffer over their lifetimes.  This calculation requires the Expert to estimate future losses for the Trusts.  *The Expert's determination will not be subject to judicial review.*

7.       Without details concerning what the Allowed Claim amount will be, the Expert's methodology for calculating the Net Loss Percentage, the allocation of the Allowed Claim across Trusts, creditors, and Debtors, and the real impact of the settlement on monoline insurers, the Court cannot possibly determine that the transaction is fair to all parties, and as a result, the Motion should be denied.[3]

8.       For related reasons, even if the Court were to apply a more debtor-friendly standard and consider the so-called *Iridium* factors in considering whether the settlement is fair and equitable, and thus, whether to approve the same, the Motion should still be denied because the Debtors cannot satisfy the third and fourth *Iridium* factors, namely, the Debtors have not demonstrated the settlement is in the paramount interests of creditors or that other parties in interest support the settlement.

9.       In this regard, the Debtors argue that the settlement is in the paramount interests of creditors because it provides "certainty."  *See* Motion at ¶45.  However, as noted above, the settlement provides little certainty with respect to the Allowed Claim amount or its allocation or the impact on monoline insurers.

10.      The Debtors further point to the support of Institutional Investors to satisfy the fourth *Iridium* factor, but this must fail (of course they support the settlement – they are parties to

---

[3] The Settlement Agreements purport to affect monoline insurers' claims.  *See* Settlement Agreements, Exhibit B at ¶5 ("To the extent any … financial guarantee insurer receives a distribution on account of the Allowed Claim, such distribution shall be credited at least dollar for dollar against the amount of any claim it files against [a] Debtor that does not arise under the Governing Agreements").  However, it is unclear what the practical effect of this provision (let alone its meaning), together with the remainder of the Settlement Agreements, will be on monoline insurers' pending claims against the Debtors.

it). What the Debtors must demonstrate, but cannot, is that the *other* parties in interest in the Debtors' cases, *i.e.*, parties in interest that are not party to, and have had no input into, but are (or may be) affected by the Settlement Agreements, such as monoline insurers, support the settlement. Moreover, any weight given to the support of the Institutional Investors must be discounted by the fact that they have received, and will receive, payments from the monoline insurers on account of the insured RMBS.

11.    Regardless of which standard applies, the Debtors' effort to delegate the determination of RMBS claims to the Expert under the Settlement Agreements is reason enough to deny the Motion. First, such delegation violates Assured's due process rights to have an opportunity to be heard by a court on its claims against the Debtors.[4] Second, the Debtors cannot delegate their responsibility under section 704(a)(5) of the Bankruptcy Code, made applicable under section 1106(a)(1) of the Bankruptcy Code, to examine proofs of claim and object to the allowance of improper claims. Finally, and most importantly, this Court may not delegate its obligation to rule on the law and facts underlying creditors' claims to an Expert.

12.    For these reasons, the Motion should be denied.

## Objection

### I.    The Court Must Evaluate the Settlement under the Entire Fairness Standard

13.    The Debtors claim that the Motion should be approved because the *Iridium* factors, which include consideration of the Debtors' business judgment, weigh in favor of approving the settlement. *See* Motion at ¶¶34-38. The Debtors are wrong.

14.    Settlements with insiders are subject to heightened scrutiny and must be evaluated under an "entire fairness" standard. *See, e.g.*, *Dewey*, 478 B.R. at 641 (citing *In re Innkeepers*

---

[4] Nothing in this objection is intended to waive Assured's rights to seek withdrawal of the reference for matters as to which Assured has the right to be heard before an Article III court.

*USA Trust*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)). Under this standard, consideration of

the *Iridium* factors is not sufficient to determine whether a settlement should be approved under

Bankruptcy Rule 9019. Rather, the proponents of the transaction must establish "to the court's

satisfaction that the transaction was the product of both fair dealing and fair price." *Disney*, 906

A.2d at 74. "Not even an honest belief that the transaction was entirely fair will be sufficient to

establish entire fairness. Rather, the transaction itself must be objectively fair." *Id. See also*

*Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) ("the test for fairness is not a bifurcated

one as between fair dealing and price. All aspects of the issue must be examined as a whole").

15.    The facts that (i) the Settlement Agreements themselves are not between a Debtor

and an insider (to the best of Assured's knowledge and belief) and (ii) the releases granted under

the Settlement Agreements do not apply to AFI or any officer or director of AFI (Settlement

Agreements § 7.01) do not mean that the Settlement Agreements were not entered into, in large

part, to benefit insiders.

16.    Indeed, from the very start, the Debtors have made clear that the bedrock of their

reorganization efforts are (i) the sale of certain assets, (ii) the Settlement Agreements, and (iii)

the Plan Support Agreements under which the Institutional Investors agree to support a plan of

reorganization under which Ally receives a release.[5] As set forth in the Affidavit of James

Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11

---

[5] Section 3.1 of the Plan Support Agreements requires the Institutional Investors to direct the indenture trustees of
the Trusts to "support confirmation of the Plan and approval of any settlement with Ally, whether or not such
settlement is provided for under a plan of reorganization, *including approval of third party releases in Ally's favor,
on terms no less favorable than the AFI Settlement Agreement*." *See* Plan Support Agreements § 3.1(i) (emphasis
supplied). The AFI Settlement Agreement, in turn, provides: "the holders of Claims and Interests shall be deemed
to provide a full discharge and release to [Ally] … from any and all Causes of Action … arising from or related in
any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or
sold by Debtors." *See* Settlement and Plan Sponsor Agreement § 3.1(d)(ii), attached to the Debtors' First Day
Affidavit as Exhibit 8 [Docket No. 6] (the "AFI Settlement Agreement").

Petitions and First Day Pleadings, dated May 14, 2012 [Docket No. 6] (the "<u>First Day Affidavit</u>"):

> *As part of the second phase of the plan process* [the first phase being the sales of certain assets] the Debtors obtained support for a restructuring plan premised upon the sales described above from AFI, and from holders of ResCap's junior secured notes holding approximately 37% of the outstanding notes. Besides for obtaining the support of a key creditor constituency, the settlement with the junior secured noteholders also has the benefit of reducing the estate's interest obligations by $350 million. *ResCap also obtained support from, and entered into a settlement agreement with, institutional investors in residential mortgage-backed securities issued by ResCap's affiliates. At present, institutional investors holding more than 25% of at least one class in each of 293 securitizations have agreed to support the reorganization* … If approved by the Bankruptcy Court, the institutional investor settlement would result in ResCap making an irrevocable offer to settle with trusts, and trusts accepting the deal would be granted a maximum Allowed Claim of $8.7 billion, which they would share with monoline representation and warranty claims.

First Day Affidavit at ¶108 (emphasis supplied).

17. The fact that the Debtors chose to negotiate a settlement with the Institutional Investors rather than the monolines, who bear the brunt of the economic risk of the settlement and who have extensive knowledge and experience concerning representation and warranty claims, reflects that the settlement is more about getting a release for Ally than achieving a fair and equitable deal.

18. In furtherance of their strategy, on June 11, 2012, the Debtors filed motions for orders authorizing the Debtors to assume the Plan Support Agreements and the Settlement Agreements with the Institutional Investors [Docket Nos. 318-20]. Originally, all such motions were to be heard on July 10, 2012. Subsequently, due to pressure from interested parties, the hearing on the Debtors' motions seeking approval of the Plan Support Agreements was adjourned to a date and time to be determined, while the initial Motion to approve the Settlement

Agreements was twice supplemented.  The Debtors' agreement to bifurcate the approval process

of the Settlement Agreements from the Plan Support Agreements does not alter the reality that

the two sets of agreements were negotiated simultaneously, are linked, and are designed, in part,

to provide a release to insider non-Debtors.

19.    Accordingly, this Court must evaluate the settlement under the "entire fairness"

standard.

## II.    The Settlement is Not Objectively Fair

### A.    There is No Support for an Allowed Claim of  $8.7 Billion

20.    The Debtors assert that $8.7 billion is a reasonable amount to settle the

outstanding claims relating to RMBS.  In support of their assertion, the Debtors rely upon the

Lipps and Sillman Declarations.  The Debtors' reliance is misplaced, particularly with respect

the Sillman Declarations.

21.    The Debtors filed the Original Sillman Declaration on June 11, 2012, which is

attached to the Debtors' initial Motion seeking approval of the settlement as Exhibit 8 [Docket

No. 320] in which Mr. Sillman asserted that he used the "Shelf Level Estimated Lifetime Loss"

methodology in support of his argument that the Allowed Claim was reasonable.   According to

Mr. Sillman:

> [T]he first step in estimating the range of potential repurchase
> liability for the Debtors ("Potential Repurchase Requirements") is
> developing the potential cumulative lifetime loss ranges for the
> Trusts ("Estimated Lifetime Losses").  The next step necessary to
> understand the Potential Repurchase Requirements is to determine
> the percentage of Estimated Lifetime Losses that the Debtor might
> agree to share with the Trusts ("Loss Share Rate") as a result of
> potential breaches of representations and warranties.

Original Sillman Declaration at ¶6.

22.     Mr. Sillman calculated Estimated Lifetime Losses by adding the "Actual Liquidated Losses," *i.e.*, the actual losses incurred when a loan is foreclosed and sold and the losses are allocated to a Trust, and "Forecasted Remaining Lifetime Losses," *i.e.*, the losses forecasted on the remaining unpaid principal balance ("Outstanding UPB") for the remaining life of a Trust.  *Id.* at ¶25.   Forecasted Remaining Lifetime Losses for the Trusts are determined by multiplying (i) the Outstanding UPB, (ii) the "Frequency Rate" assumptions, *i.e.*, "the projected likelihood that a group of loans will 'roll' from current or delinquent status to defaulted and liquidated," and (iii) "Severity Rate" assumptions, *i.e.*, the percentage of loans associated with a group of loans which default and are liquidated.  *Id.* at ¶¶27, 31, 35.   Mr. Sillman reviewed Frequency Rates from "at least one Series by Issue Year," *id.* at ¶32, as clarified by the Supplemental Sillman Declaration at ¶29, attached to the Motion as Exhibit 5, and compared such rates to those found in the RRMS Advisors Opinion Concerning Contemplated Settlement Amount for 530 Trusts, dated June 7, 2011 ("BofA Expert Report") and the Lehman Brothers Holdings Inc. Declaration of Zachary Trumpp filed January 12, 2012 ("Lehman Expert Declaration").  Original Sillman Declaration at ¶32.  Mr. Sillman determined the Severity Rate assumptions based on actual losses and adjusted them "to current market conditions based on the latest three month actual Severity Rates." *Id.* at ¶36.

23.     Loss Share Rate, according to Mr. Sillman, is the product of the "Breach Rate" and "Agree Rate."  *Id.* at ¶45.  The "Breach Rate" is calculated by multiplying the "Audit Rate," *i.e.*, "the percentage of loans in a given mortgage portfolio that are audited by the Trustee or other parties authorized under the Governing Agreements for the purpose of finding alleged representation and warranty breaches," *id.* at ¶47, by the "Demand Rate," *i.e.*, the rate by which the Trusts or monoline insurers make demand on the Debtors to repurchase loans in the Trust, *id.*

9

at ¶55.  The "Agree Rate" is "the percentage of Demands issued by the Trustee that the Seller agrees to repurchase or make whole."  *Id.* at ¶59.  As noted above, the Potential Repurchase Requirements is the product of Loss Share Rate and the Estimated Lifetime Losses.

24.    Every component of Loss Share Rate (*i.e.*, Breach Rate and its components, Audit and Demand Rate), Agree Rate, and most portions of Estimated Lifetime Losses are based upon one or all of (i) certain industry reports, (ii) the Debtors' buy-back experience with government-sponsored entities ("GSEs"), *i.e.*, Fannie Mae and Freddie Mac, (iii) the BofA Expert Report, (iv) the Lehman Expert Declaration, and (v) Mr. Sillman's personal work experience and three clients of Fortace, LLC, of which Mr. Sillman is a managing partner.  Very little of Mr. Sillman's opinion is based upon the actual loans at issue and it is notable that it does not include the Debtors' put back experience with the monoline insurers.  Indeed, Mr. Sillman did little work to confirm the relevance of the information he relied upon to the actual loans at issue.[6]

25.    For example, Mr. Sillman admitted he had not determined what loans "actually breach reps and warranties" but instead relied on the Debtors' "GSE repurchase rate work" as well as some "private label repurchase activity" that the Debtors completed (Sillman Dep. at 119:18-120:5, 126:15-16) and that "no other review of loan files went into … the conclusions expressed" in the Original Sillman Declaration.  *Id.* at 128:17. The vast majority of the repurchase analysis that Mr. Sillman relied upon related to the GSE transactions, as opposed to private label repurchase activity, and none of the GSE transactions overlapped "in any way" with the loans subject to the settlement. *Id.* at 126:25-127:4.

---

[6] Mr. Sillman likely had little time to do a more thorough analysis because the Debtors retained him *after* they had already entered into the Settlement Agreements. *See* Transcript of November 20, 2012 Deposition of Frank Sillman, a copy of which is attached hereto as Exhibit A ("Sillman Dep.") at 104:13-105:18.

26.     When asked how he computed the ranges for audit rates found in paragraph 53 of the Original Sillman Declaration, Mr. Sillman said "these individual assumptions were not the product of an additional mathematical equation.    They were based on my professional experience."  Sillman Dep. at 228:1-228:16.  Mr. Sillman could not produce back up for these numbers because "there's no other data to support these numbers other than my professional experience."  *Id.* at 228:14-16.  Mr. Sillman confirmed that similarly, there is no backup for his calculations of demand rates set forth in paragraph 56 of the Original Sillman Declaration.  *Id.* at 230:4-6.  Mr. Sillman could not produce any support for the Agree Rates he used in the Original Sillman Declaration.  Sillman Dep. at 271:1-272:17 ("[The lower and higher agree rate numbers] were based on my professional experience with agree rates for these buckets adjusted for the repurchase experience the debtor had and the higher agree rates than the industry as a whole for their GSE purchases").    In other words, Mr. Sillman created ranges for Agree Rates based upon his professional experience and adjusted the rates to reflect the Debtors' history with GSE repurchases, even though none of the GSE repurchases overlap with the loans subject to the Settlement Agreements.

27.     Mr. Sillman looked to the BofA Expert Report and Lehman Expert Declaration to confirm his calculation of Breach Rates (which are the product of Audit and Demand Rates – which he calculated based solely upon his professional experience and can produce no evidence supporting his calculations).  *See* Sillman Dep. at 237:12-19 ("I believe [the BofA Expert Report and the Lehman Expert Declaration] were relevant data points that the readers should or could look at in evaluating the breach rates and agree rates in my report").    Mr. Sillman, however, did not confirm that the BofA Expert Report and the Lehman Expert Declaration were "relevant data points" because he did not complete a "trust by trust" comparison of the BofA or Lehman loans

or their representations and warranties with the loans subject to the Settlement Agreements. Sillman Dep. at 243:7-15.

28.     Mr. Sillman was asked whether, in forming his conclusions, he took into consideration the fact that the Trusts at issue are alleged to have suffered $30 billion of losses, but for that same time period, the Debtors "received put back demands only with respect to loans with an original principal balance of roughly $1.37 billion." *Id.* at 183:6-18.  Mr. Sillman conceded that he factored that into consideration, but added, that he also took into consideration the fact that the Debtors had agreed to a claim of $8.7 billion. *Id.* at 183:21-184:7.  Thus, in a bit of circular reasoning, Mr. Sillman bases the reasonableness of the $8.7 billion settlement upon the fact that the Debtors agreed to pay $8.7 billion.

29.     Another less obvious example of Mr. Sillman's circular reasoning is his assumption with respect to Demand Rates.  Mr. Sillman argues he based his "Demand Rate assumptions on my repurchase demand experience," because (i) the Demand Rates for the GSEs (since his entire repurchase analysis relates to the Debtors' repurchase experience with GSEs) are not publically available, (ii) the "PLS [private label securities] litigation Demand Rates are unsubstantiated, appear to be inflated and are vigorously disputed by the Sellers," and (iii) there was no information concerning Demand Rate assumptions in the Lehman Expert Declaration or BofA Expert Report.  Original Sillman Declaration at ¶56.

30.     Mr. Sillman's repurchase demand experience is largely based upon his years at IndyMac and three clients.  Those three clients comprise one unidentified, allegedly confidential client, and the Debtors Residential Capital Funding Company and GMAC Mortgage, LLC. Sillman Dep. at 321:10-322:22.  In other words, the Demand Rates relating to private label securities are inflated and unsubstantiated, yet, it is exactly his experience in that industry that

serves as the basis for his conclusions regarding Demand Rates in the Original Sillman Declaration.

31.    Mr. Sillman's analysis also contradicts the Debtors' stated "position that a repurchase claim requires a loan-by-loan evaluation of *which* loans to repurchase." Supplemental Lipps Declaration at ¶119.

32.    To summarize, Mr. Sillman was given the unenviable task of opining on the reasonableness of the $8.7 billion Allowed Claim after the fact. He based much of his opinion supporting the reasonableness of the Allowed Claim on his "professional experience" but can produce no meaningful backup for his conclusion. As a result, the Debtors have not established that the $8.7 billion Allowed Claim is reasonable.

### B.    The Proposed Allocation of the Allowed Claim is a Mystery

33.    The proposed settlement does not satisfy the entire fairness standard for a number of reasons, the most obvious of which is that neither the Court nor creditors can determine what the impact of the settlement will be on the claims of the Trusts and the monoline insurers. Without details concerning the foregoing, it is impossible to determine whether the settlement is fair and, as a result, the Motion should be denied.

34.    Section 5.01 of the Settlement Agreements provide as follows with respect to allowance of the above-referenced claim:

> ResCap hereby makes an irrevocable offer to settle … with each of the ... Trusts (the … Trusts that timely agree to the terms of this Settlement Agreement being the "<u>Accepting Trusts</u>"). *In consideration for such agreement, ResCap will provide a general unsecured claim of $8,700,000,000 in the aggregate against the Seller Entities* [*i.e.*, Residential Funding Company LLC or GMAC Mortgage LLC] *and the Depositor Entities* [*i.e.*, Residential Funding Mortgage Securities I, Inc., Residential Funding Mortgage Securities II, Inc., Residential Asset Securities Corp., Residential Accredit Loans, Inc., and Residential Asset Mortgage Products, Inc.] (the "<u>Total Allowed Claim</u>"), *all of which shall be allocated*

*and implemented as provided in Section 6.01.*  For the avoidance of doubt, the Total Allowed Claim shall be allocated among the Accepting Trusts, subject to the provisions of this Settlement Agreement.    Subject to the provisions of this Settlement Agreement, the Accepting Trusts shall be allowed an aggregate claim in an amount calculated as set forth below (the "Allowed Claim"), which aggregate claim shall be allocated to each Accepting Trust pursuant to Article VI herein.

35.    Article 6 provides that "[e]ach Accepting Trust shall be allocated a share of the Allowed Claim against its Seller Entity and its Depositor Entity … calculated as set forth on Exhibit B hereto, for which such Seller Entity and Depositor Entity are jointly liable."  Exhibit B, in turn, provides that a "qualified financial advisor" (the "Expert") shall allocate the Allowed Claim among the Accepting Trusts according to the following general formula:

> (i)    *First*, the Expert shall calculate the amount of Net Losses for each Accepting Trust as a percentage of the sum of the Net Losses for all Accepting Trusts (such amount, the "Net Loss Percentage");

> (ii)    *Second*, the Expert shall calculate the "Allocated Claim" for each Accepting Trust by multiplying (A) the amount of the Allowed Claim by (B) the Net Loss Percentage for such Accepting Trust …

36.    The Settlement Agreements define "Net Losses" with respect to a particular Trust as "the amount of net losses for such … Trust that have been or are estimated to be borne by that trust from its inception date to its expected date of termination, as determined by the Expert … in accordance with the methodology described in Exhibit B."  Thus, the Settlement Agreements provide that Net Losses are to be determined by the Expert in accordance with the methodology set forth in Exhibit B, but Exhibit B leaves the calculation of Net Loss to the unknown Expert. In other words, without knowing today how the Expert calculates Net Losses, it is virtually impossible for Assured to determine what impact (if any) the settlement, if approved, would have on Assured's claims against the Debtors.

### C.      The Settlement is Not Fair to Monoline Insurers.

37.      The Debtors purport to affect the monoline insurers' claims by providing that
"[t]o the extent any credit enhancer or financial guarantee insurer receives a distribution on
account of the Allowed Claim, such distribution shall be credited at least dollar for dollar against
the amount of any claim it files against [a] Debtor that does not arise under the Governing
Agreements."  Settlement Agreements, Exhibit B at ¶5.  This language is as clear as mud.  As a
result it is virtually impossible for the monoline insurers to determine the practical effect of this
provision, together with the remainder of the Settlement Agreements, on monoline insurers'
pending claims against the Debtors.

38.      Moreover, lumping the monoline insurers' claims with those asserted by the
Institutional Investors (if that is what the Settlement Agreements contemplate) is not fair because
different standards of proof may be applicable to their respective claims.  Monoline insurers'
representation and warranty claims may be established by demonstrating that the representation
and warranty breaches increased the risk the insurer would suffer losses.  *See*, *e.g.*, *Assured
Guar. Mun. Corp. v. Flagstar Bank, FSB*, No. 11-cv-2375, 2012 WL 4373327, at *5 (S.D.N.Y.
Sept. 25, 2012) ("the Court concludes that plaintiff [monoline insurer] must only show that the
breaches materially increased its risk of loss.  Put another way, the causation that must here be
shown is that the alleged breaches caused plaintiff to incur an increased risk of loss"); *Syncora
Guarantee Inc. v. EMC Mortg. Corp.*, No. 09-cv-3106, 2012 WL 2326068, at *9 (S.D.N.Y. June
19, 2012) ("Syncora may establish a material breach of the [Insurance and Indemnity
Agreement] by proving that EMC's alleged breaches increased Syncora's risk of loss on the
Policy, irrespective of whether the breaches caused any of the HELOC loans to default").

39.      On the other hand, the standard applicable to RMBS certificate holders for
establishing representation and warranty claims, once any no-action clause requirements have

been satisfied, is not settled. In this regard, the Court in *Syncora* implied that the standard for

RMBS holders may be different from that applied to claims for breaches of representation and

warranty filed by monoline insurers. *Syncora*, 2012 WL 2326068, at *8 n.5 (the Court found that

a case cited by the mortgage banking company in defense of the action commenced by the

financial guarantee insurer was distinguishable in part because the alleged breach in that case

"affected the interests of note holders rather than the note insurer"). The Debtors' expert, Mr.

Lipps agrees with the foregoing. *See* Supplemental Lipps Declaration at ¶72 ("Thus, it is unclear

what burden of proof a court in a case between Debtors and the trustee or Institutional Investors

might place on the plaintiffs regarding materiality").

40.    Mr. Lipps pointed to another potential distinction between the level of proof

required by the monolines in light of the statutory and contractual claims, protections and relief

afforded to insurance companies versus the Trusts/Institutional Investors:

> Courts in the monoline insurance context have addressed the
> causation issue – most notably Justice Bransten in the *MBIA
> Insurance Co. v. Countrywide Financial Corp.* case. There, Justice
> Bransten held that MBIA was "not required to establish a direct
> causal connection between proven warranty breaches by
> [defendant] and MBIA's claims payment made pursuant to the
> insurance policies at issue" in order to prove that a breach was
> material. 936 N.Y.S. 2d 513, 527 (2012). In the same opinion,
> Justice Bransten nonetheless held that MBIA must still "prove that
> it was damaged as a direct result of the material
> misrepresentations," and denied MBIA's motion to strike
> Countrywide's defenses based on the intervening or superseding
> cause of the economic crisis. *Id.* at 522, 527. However, the court's
> ruling – in addition to providing mixed guidance – was based in
> substantial part on applicable insurance statutes, which are not
> relevant to the Investor or Trustee-initiated claims at issue in the
> RMBS Trust Settlements … It is unclear whether any portion of
> these rulings can be imported into the Institutional
> Investors/Trustee litigation context, or to what extent courts will
> look to the monolines insurance litigation for guidance.

Supplemental Lipps Declaration at ¶81.  While Mr. Lipps believes it is "unclear" if Institutional

Investors or indenture trustees would have the same burden, it is clear they would face hurdles

(particularly the Institutional Investors) monolines would not face under New York insurance

law.

41.    As Mr. Lipps noted, there are applicable insurance statutes which grant monoline

insurers greater advantages in lawsuits than the Institutional Investors in connection with RMBS.

*See MBIA Insurance Co. v. Countrywide Financial Corp*, 936 N.Y.S.2d 513, 521 (Sup. Ct. N.Y.

Cty. 2012) ("The court finds that in this insurance context, with MBIA as an insurance company

and Countrywide as an applicant for insurance … the claims are informed by New York

common law and *Insurance Law Sections* 3105 and 3106").

42.    Finally, Assured has made (and continues to make) (as have other monoline

insurers), actual payments to investors under its financial guaranty insurance policies.  In other

words, there can be no dispute that Assured is entitled to a claim based upon amounts it has

actually paid and will pay, versus some Expert's determination as to what the Net Losses will be.

43.    Accordingly, to the extent the settlement provides that monoline insurers have to

share in the Allowed Claim *pro rata* with the Institutional Investors, it is patently unfair and the

Motion should be denied.

**III.    The Debtors Cannot Satisfy the *Iridium Factors***

44.    Even assuming, arguendo, that instead of applying the entire fairness standard the

Court considers the *Iridium* factors in determining whether the settlement is fair and equitable,

and thus, whether to approve the same, the Motion should still not be granted.  As the Debtors

have noted, the *Iridium* factors include (i) "the paramount interests of creditors, including each

affected class's relative benefits and the degree to which creditors either do not object to or

affirmatively support the proposed settlement," and (ii) "whether other parties in interest support

17

the settlement." *Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (internal quotations and citations omitted). In addition, "[t]he bankruptcy court must exercise its own independent judgment in analyzing the *Iridium* factors." *Dewey*, 478 B.R. at 641.

### A.    The Third *Iridium* Factor Weighs Against Approval of the Settlement

45.    In support of the proposition that the settlement satisfies the third *Iridium* factor, *i.e.*, is in the paramount interests of creditors, the Debtors argue the "certainty" of the settlement "avoids the necessity of setting aside substantial reserves for the potential payment of [representation and warranty] claims, which could delay (and reduce) recoveries to other stakeholders," and the settlement would resolve contested claims disputes. Motion at ¶52-53.

46.    Although the settlement would resolve the Accepting Trusts' claims and litigating such claims would certainly prove expensive, the settlement by no means provides certainty to creditors affected by it. As noted above, the Court and creditors cannot possibly estimate the real world results of the proposed settlement, which include the Allowed Claim amount, the allocation of the Allowed Claim, and the impact of the settlement on monoline insurers' claims. As a result, creditors cannot determine whether the settlement is or is not beneficial and whether to support or oppose the same.

47.    This uncertainty is particularly worrisome for monoline insurers that have insured certain payment obligations with respect to RMBS and cannot predict how the Allowed Claim allocation will impact such RMBS and claims made (and to be made) on their financial guaranty insurance policies. Assured's well-founded concerns are compounded by the fact that the settlement was negotiated by Institutional Investors who carry no risk in connection with many transactions wrapped by monoline insurers, such as Assured, as opposed to the monoline insurers themselves.

B.      The Fourth *Iridium* Factor Weighs Against Approval of the Settlement

48.      In support of the proposition that the settlement satisfies the fourth *Iridium* factor,

*i.e.*, parties in interest generally support the settlement, the Debtors argue it is supported by a

significant percentage of holders of certificates issued by the Trusts, given that the Institutional

Investors hold certificates in an amount sufficient to direct 336 of the 392 Trusts to accept the

settlement.   Motion at ¶55.

49.      The Debtors' reliance on the support of the Institutional Investors is misplaced.

The fourth *Iridium* factor does not ask whether parties to the settlement support such settlement,

but rather, whether "*other* parties in interest" support the settlement.   Moreover, under Section

3.02 of the Settlement Agreements, the Institutional Investors have only covenanted to "maintain

holdings aggregating 25% of the voting rights in one or more classes of Securities of not less

than 235 of the Covered Trusts."   The Institutional Investors, as a result of their minority position

(among other reasons) may not have the power to direct a Trustee in a particular transaction[7] or

reflect the interests of the remaining holders of RMBS in such class or the other classes of the

relevant securitization transaction.

50.      Accordingly, it is misleading to suggest that Institutional Investors' support

reflects creditor sentiments in general; it certainly does not reflect the sentiments of the parties

who have the economic risk as well as the control rights with respect to a particular transaction,

*i.e.,* the monoline insurers.[8]

---

[7] The Institutional Investors and the Debtors acknowledge that monoline insurers can exercise the rights of the holders of RMBS in transactions where the insurers provided financial guaranty insurance.   *See* Settlement Agreements § 3.02 (for the purposes of determining whether or not the Institutional Investors maintain the required holdings of RMBS, trusts excluded "due to the exercise of voting rights by a third party guarantor or financial guaranty provider" are not counted).

[8] In addition to transactions for which monoline insurers issued financial guaranty policies covering the entire transactions, they also have issued financial guaranty insurance policies which partially "wrap" a transaction, *e.g.,* a class of RMBS issued by the Trust, in which case holders of RMBS in such class would have transferred the control

51.    As noted above, other parties in interest, including parties in interest with substantial amounts at stake such as Assured and other monoline insurers cannot support the settlement because it is unclear how their claims will be treated under the settlement. Accordingly, the settlement does not satisfy the foregoing *Iridium* factors and the Motion should be denied.

## IV.    The Settlement Agreements Violate Creditors' Due Process Rights

52.    "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313 (1950)).    Further, due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."    *Mullane*, 339 U.S. at  314.

53.    To ensure that creditors in bankruptcy cases receive due process, the Bankruptcy Code and Rules proscribe specific procedures that must be followed in connection with the claim allowance process. Under Bankruptcy Rule 3001, the Debtor is required to file an objection to a claim, and under section 502(b) of the Bankruptcy Code, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition."

54.    There will be no notice or hearing on the monoline insurers' claims if the Debtors' proposed procedure is adopted.  The allocation of the Allowed Claim to the Trusts and creditors will be in the hands of an unnamed Expert.  The Motion does not satisfy creditors' due

---

and voting rights with respect to such RMBS to the monoline insurers as well as secondary market transactions with investors in which voting rights were transferred to the monoline insurers.

process rights because, as set forth above, it is impossible to determine from the Motion what methodology the Expert will use in allocating the Allowed Claim or even what impact the Settlement Agreements have on the monoline insurers' claims. Moreover, because the Expert's decisions will not be subject to Court approval, Assured will have no recourse to the extent that the Expert's determinations impact its claims.

55.     Accordingly, the Motion should be denied because the Settlement Agreements do not afford Assured adequate notice or opportunity to object to the extent Assured's claims may be affected by the same.

## V.    The Settlement Agreements Improperly Delegate Claims Administration Duties to a Third Party

56.     Section 1106(a)(1) of the Bankruptcy Code provides that a debtor "shall … perform the duties of a trustee, as specified in paragraph … (5) … of section 704. Section 704(a)(5) of the Bankruptcy Code, in turn, provides that "[t]he trustee shall … examine proofs of claim and object to the allowance of any claim that is improper."

57.     A trustee cannot delegate its claims administration duties. *See In re Abraham*, 163 B.R. 772, 779 (Bankr. W.D. Tex. 1994) ("There is one trustee 'duty' that can never be delegated, and for which the trustee must *always* be held accountable … The trustee is ultimately responsible for the administration of the estate … The trustee can *not* delegate the ultimate responsibility or the decision making that is part and parcel of her office"); *In re R. Woolsey & Assocs., Inc.*, 454 B.R. 782 (Bankr. D. Idaho 2011) (same); *see also* United States Department of Justice    Handbook    for    Chapter    7    Trustees    (Oct.    1,    2012),    *available    at    h*ttp://www.justice.gov/ust/eo/private_trustee/library/chapter07/docs/ch7hb2012/Handbook_for_ Chapter_7_Trustees.pdf, at p. 4-20 ("It is critical that the trustee oversee the work performed").

58.    Yet delegating its claim administration duties to the Expert is precisely what the Debtors contemplate under the settlement.    Pursuant to the Settlement Agreements, the Expert may employ "the methodology described in Exhibit B" to determine Net Losses, and, in turn, allocation results.    However, Exhibit B does not specify a methodology for calculating Net Losses, but rather, provides "the Expert shall calculate the amount of Net Losses."    As noted above, without a detailed methodology, it is impossible to estimate how the Expert will allocate the Allowed Claim.    Moreover, under the Settlement Agreements the Expert's decision will not be subject to judicial review.

59.    The Debtors' entrusting the claim determination to an outside expert is particularly troubling because the Debtors themselves are in an excellent position to know the historical losses as well as to calculate the projected losses of the Trusts.    The Debtors have been a key player in the residential mortgage market.    *See* First Day Affidavit at ¶9 ("The Debtors are collectively the fifth largest servicer of residential mortgage loans in the United States … [o]nly Bank of America, NA, J.P. Morgan Chase Bank NA, Wells Fargo Bank, NA and CitiMortgage, Inc. service more mortgage loans than the Debtors").    In addition, the Debtors originated or purchased the residential mortgage loans that comprise the collateral for RMBS, then securitized and marketed the residential mortgage loans, all the while continuing to service such loans. Instead of fulfilling its fiduciary obligations to review RMBS-related claims based upon, a task, as set forth above they are more than qualified to do, the Debtors propose assigning the claim calculation to the Expert, who likely will not have the Debtors' experience and knowledge of the Trusts' claims, and whose methodology and assumptions remain unknown.

60.    In addition, this Court cannot delegate its decision making authority with respect to disputed claims to a third party.    In considering a fee committee's authority in *Adelphia*, Judge

Robert E. Gerber emphasized that the Bankruptcy Rules prohibit such committee's role from exceeding that of an expert and that final authority with respect to allowance of professional fee claims must remain with the bankruptcy court. Specifically, Judge Gerber stated:

> The determination as to whether or not fee requests should be authorized is vested with the bankruptcy court, and not anyone else, by delegated authority or otherwise … The [Bankruptcy] Rules … do not authorize, or contemplate, masters. A fee committee does not make determinations that are to be made by the Court. Rather, in large chapter 11 cases … a fee committee acts as both an advocate and a species of court-appointed expert, to make recommendations to the Court … But a fee committee's views, and opinions, do not rise to the level of judicial determinations, nor do they even carry a presumption of validity. As a case cited by the Fee Committee notes, "the touchstone for [judicial immunity's] applicability [is] performance of the function of resolving disputes between parties."

*In re Adelphia Commc'ns Corp.*, 348 B.R. 99, 106-07 (Bankr. S.D.N.Y. 2006) (citing *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 434 n.8 (1993)). *See also West v. Prudential Secs., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (cautioning, in a class action certification dispute, against the "delegation of judicial power to the plaintiffs" on account of their retained expert); *Caudill v. State Farm Mutual Auto Ins. Co.*, 779 N.W.2d 83, 87 (Mich. 2010) (citations omitted) ("there is no constitutional authority for [a] trial court to delegate specific judicial functions to an 'expert'"). As with *Adelphia*, judicial authority to determine Assured's claims or claims that will impact the value of Assured's claims must rest with this Court.

61.    Accordingly, the Motion should be denied to the extent that the Settlement Agreements provide for the improper delegation of claims administration responsibilities to the Expert.

WHEREFORE, Assured respectfully requests that the Court deny the Motion and grant

such further relief as the Court deems proper.

Dated: February 1, 2013                          Respectfully submitted,
        New York, New York


                                                /s/ Irena M. Goldstein
                                                Irena M. Goldstein
                                                Jeffrey Chubak
                                                PROSKAUER ROSE LLP
                                                Eleven Times Square
                                                New York, New York 10036
                                                Tel: (212) 969-3000
                                                Fax: (212) 969-2900

                                                *Attorneys for Assured Guaranty*
                                                *Municipal Corp. and Certain*
                                                *of its Affiliates*

33317906v5

**<u>EXHIBIT A</u>**

**(Sillman Deposition Transcript)**

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re:                              Case No:

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

                    Debtors.

-----------------------------------x


DEPOSITION OF FRANK SILLMAN

New York, New York

November 20, 2012

9:35 a.m.


Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27687

2

1
2
3
4          November 20, 2012
5             9:35 a.m.
6
7
8          Deposition of FRANK SILLMAN,
9    held at the offices of Kramer, Levin,
10   Naftalis & Frankel, 1177 Avenue of the
11   Americas, New York, New York, pursuant
12   to Notice, before Erica L. Ruggieri,
13   Registered Professional Reporter and
14   Notary Public of the State of New
15   York.
16
17
18
19
20
21
22
23
24
25

4

1
2          A P P E A R A N C E S: (Cont'd.)
3
4    FOR ALLY FINANCIAL INC.:
5       KIRKLAND & ELLIS, LLP
6       655 Fifteenth Street, N.W.
7       Washington D.C. 20005
8       BY: JONATHAN D. JANOW, ESQ.
9          jonathan.janow@kirkland.com
10
11   FOR WELLS FARGO:
12      ALSTON & BIRD, LLP
13      90 Park Avenue, 12th Floor
14      New York, New York 10016
15      BY: MICHAEL JOHNSON, ESQ.
16         michael.johnson@alston.com
17
18   FOR MBIA:
19      CADWALADER, WICKERSHAM & TAFT, LLP
20      One World Financial Center
21      New York, New York 10281
22      BY: JASON JURGENS, ESQ.
23         jason.jurgens@cwt.com
24         JOHN VASQUEZ, law clerk
25

3

1
2       A P P E A R A N C E S:
3
4    FOR THE OFFICIAL COMMITTEE
5    OF UNSECURED CREDITORS:
6       KRAMER, LEVIN, NAFTALIS & FRANKEL, LLP
7       1177 Avenue of the Americas
8       New York, New York 10036
9       BY: PHILIP BENTLEY, ESQ.
10         pbentley@kramerlevin.com
11         LAURENCE PETTIT, ESQ.
12         lpettit@kramerlevin.com
13         JEFFREY DUNLAP, ESQ.
14         jdunlap@kramerlevin.com
15
16   FOR THE DEBTORS:
17      MORRISON & FOERSTER, LLP
18      755 Page Mill Road
19      Palo Alto, CA 94304-1018
20      BY: DARRYL P. RAINS, ESQ.
21         drains@mofo.com
22
23
24
25

5

1
2       A P P E A R A N C E S: (Cont'd.)
3
4    FOR THE EXAMINER:
5       CHADBOURNE & PARKE, LLP
6       30 Rockefeller Plaza
7       New York, New York 10112
8       BY: MICHAEL DISTEFANO, ESQ.
9          mdistefano@chadbourne.com
10
11   FOR THE LAW DEBENTURE:
12      SEWARD & KISEL, LLP
13      One Battery Park Plaza
14      New York, New York 10004
15      BY: BENAY L. JOSSELSON, ESQ.
16         josselson@sewkis.com
17
18   FOR THE U.S. BANK:
19      SEWARD & KISSEL, LLP
20      One Battery Park Plaza
21      New York, New York 10004
22      BY: MARK D. KOTWICK, ESQ.
23         kotwick@sewkis.com
24
25

2  (Pages 2 to 5)

6

1
2     A P P E A R A N C E S: (Cont'd.)
3
4     FOR THE POTENTIAL OBJECTOR FGIC:
5      JONES DAY
6       555 South Flower Street, 15th Floor
7       Los Angeles, California 90071
8       BY: ERIN N. BRADY, ESQ.
9        enbrady@jonesday.com
10        STEVEN C. BENNETT, ESQ. (New York)
11        scbennett@jonesday.com
12
13     FOR DEUTSCHE BANK:
14      MORGAN, LEWIS & BOCKIUS, LLP
15       1701 Market Street
16       Philadelphia, Pennsylvania 19103
17       BY: JOHN C. GOODCHILD, III, ESQ.
18        jgoodchild@morganlewis.com
19
20     FOR THE ASSURED GUARANTY:
21      PROSKAUER ROSE, LLP
22       Eleven Times Square
23       New York, NY 10036-8299
24       BY: Irena M. Goldstein, ESQ.
25        igoldstein@proskauer.com

7

1
2     A P P E A R A N C E S: (Cont'd):
3
4     FOR BANK OF NEW YORK MELLON:
5      DECHERT, LLP
6       1095 Avenue of the Americas
7       New York, New York 10036
8       BY: MAURICIO ESPANA, ESQ.
9        mauricio.espana@dechert.com
10
11     FOR THE STEERING COMMITTEE INVESTORS:
12      GIBBS & BRUNS, LLP
13       1100 Louisiana, Suite 5300
14       Houston, Texas 77002
15       BY: DAVID SHEEREN, ESQ.
16        dsheeren@gibbsbruns.com
17        KATHY D. PATRICK, ESQ. (P.m. session)
18        kpatrick@gibbsbruns.com
19
20     FOR THE RMBS STEERING COMMITTEE:
21      ROPES & GRAY, LLP
22       800 Boylston Street
23       Boston, MA 02199-3600
24       BY: ANDREW G. DEVORE, ESQ.
25        andrew.devore@ropesgray.com

8

1
2     A P P E A R A N C E S: (Cont'd)
3
4     ALSO PRESENT:
5      ALAN FRANKEL, Coherent Economics
6      LANDON D. PARSONS, Moelis & Company
7      ALLY GIBLER, Moelis & Company
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

9

1
2        S T I P U L A T I O N S
3
4        IT IS HEREBY STIPULATED AND
5     AGREED, by and between counsel for the
6     respective  parties hereto, that the
7     filing, sealing and certification of
8     the within deposition shall be and the
9     same are hereby waived;
10        IT IS FURTHER STIPULATED AND
11     AGREED that all objections, except as
12     to the form of the question, shall be
13     reserved to the time of the trial;
14        IT IS FURTHER STIPULATED AND
15     AGREED that the within deposition may
16     be signed before any Notary Public
17     with the same force and effect as if
18     signed and sworn to before the Court.
19
20
21
22
23
24
25

3  (Pages 6 to 9)

10

1          FRANK SILLMAN
2          (Expert 9019 Exhibit 4, Mr.
3    Sillman's CV, marked for
4    identification, as of this date.)
5          (Expert 9019 Exhibit 5, Mr.
6    Sillman's expert report, marked for
7    identification, as of this date.)
8          (Expert 9019 Exhibit 6, Mr.
9    Sillman's supplemental expert report,
10   marked for identification, as of this
11   date.)
12   EXAMINATION BY
13   MR. BENTLEY:
14   Q.    Good morning, Mr. Sillman.
15   A.    Good morning.
16   Q.    For the record, I'm Philip
17   Bentley of the Kramer Levin law firm
18   representing the official committee of
19   unsecured creditors in this case.  You and
20   I have spoken before?
21   A.    (Witness nods.)  Right.
22   Q.    Good to see you again.
23   A.    Yeah.
24   Q.    And you've been through this
25   process before I take it?

11

1          FRANK SILLMAN
2    A.    Yes.
3    Q.    You've been deposed before?
4    A.    Yes.
5    Q.    Let's start by marking as
6    Exhibit 4 -- let's start -- let me start
7    again.
8          Let's start by marking as expert
9    9019-4 the CV that the debtors filed in
10   connection with your expert reports in
11   this case.
12         And just a word on terminology.
13   The exhibits are marked with this funny
14   designation expert 9019 and then a number.
15   I'm just going to call it Exhibit 4,
16   Exhibit 5, et cetera because I think
17   that's a bit simpler.
18   A.    Fine.
19   Q.    So let me hand you Exhibit 4 and
20   ask you if that in fact is the CV that the
21   debtors filed in connection with your
22   reports?
23         MR. RAINS:  If you know.
24   A.    Yes.
25   Q.    And it's reasonably accurate and

12

1          FRANK SILLMAN
2    up to date?
3    A.    Yes.
4    Q.    Let's start by talking about
5    your education and then move on to
6    employment.  You have a BA from UC at San
7    Diego?
8    A.    Yes.
9    Q.    And what year was that, if you
10   recall?
11   A.    I believe it was 1986.
12   Q.    Do you have any advanced
13   degrees?
14   A.    No.
15   Q.    What was your major at UC San
16   Diego?
17   A.    Psychology.
18   Q.    Did you study statistics or any
19   other quantitative matters?
20   A.    As part of that degree I did
21   take some statistics classes.
22   Q.    Do you have any formal education
23   since college?
24   A.    No.
25   Q.    Do you have any formal training

13

1          FRANK SILLMAN
2    of any sort since college, putting aside
3    your professional experience, just
4    focusing on formal training?
5    A.    No additional formal training.
6    Q.    So let's turn to -- strike that.
7          I take it you don't have any --
8    you haven't had any legal education?
9    A.    I have not.
10   Q.    And you don't consider yourself
11   to have any expertise in legal matters?
12   A.    No, I do not.
13   Q.    Let's turn to your employment
14   experience.  You started out at Shearson
15   Lehman?
16   A.    Correct.
17   Q.    And you were in the mortgage
18   business at Shearson?
19   A.    Yes.
20   Q.    It looks to me like you've been
21   in mortgage related businesses all of your
22   careers, do I have that right?
23   A.    Yes.
24   Q.    Can you briefly summarize for me
25   the principal aspects of your career that

4  (Pages 10 to 13)

14

FRANK SILLMAN

1  form the basis for the expert opinions
2  that you'll be offering to the court?
3      A.   Over my 25 plus years in the
4  mortgage banking business I have had
5  experience in loan origination, secondary
6  marketing, capital markets.  I'm an expert
7  in mortgage-backed securitizations and in
8  the review and analysis of repurchase
9  risks and liabilities.
10      Q.   When did you first get involved
11  with mortgage securitizations?
12      A.   At Shearson Lehman.
13      Q.   Wow, right back at the very
14  beginning of your career or close to it?
15      A.   Yes.
16      Q.   Can you just describe that
17  experience for me, your Lehman experience.
18      A.   So I was involved at various
19  positions therein, secondary marketing,
20  treasury and warehouse lending.  In my
21  treasury position and secondary marketing
22  position I was involved in the creation
23  and sale of mortgage-backed securities.
24      Q.   And did you continue to be

15

FRANK SILLMAN

1  involved in mortgage securitizations at
2  your next job at TCM/AHC Mortgage?
3      A.   No.  We did not -- we did not
4  create and sell mortgage-backed securities
5  at TCM/AHC Mortgage.
6      Q.   Can you briefly summarize your
7  responsibilities there as they -- as they
8  relate to the expertise that you'll be
9  offering in this case?
10      A.   So at TCM/AHC Mortgage I was
11  involved in the loan production.  So the
12  origination of loans and the sale of those
13  loans to other mortgage investors.  And as
14  part of that process we would be presented
15  loan repurchases.  So I was involved in
16  the review and negotiation of loan
17  repurchases.
18      Q.   What was your role in that
19  regard?
20      A.   I was the senior manager who
21  would review the recommendations made by
22  our underwriters and present the findings
23  to the principal of the mortgage company
24  so that he could make a decision as to

16

FRANK SILLMAN

1  whether or not he would repurchase the
2  loan.
3      Q.   You then moved on to IMB Bank.
4  Can you describe the positions you held
5  there and your responsibilities?
6      A.   Okay.  The first position that I
7  held there was senior vice president of
8  retail lending.  I was responsible for the
9  sales and marketing of residential
10  mortgages to consumers.  And then I was
11  promoted to head product development at --
12  at the bank.  My responsibilities there
13  were to design loan programs that could be
14  sold through the securitization process in
15  the secondary market.  Predominantly GSE
16  loans that were securitized and private
17  label loans that were securitized.
18      Q.   Over what period did you hold
19  that position?
20      A.   I don't remember the dates.  It
21  was a couple of years but I don't remember
22  the exact dates.
23      Q.   Okay.  What was your next
24  position at IMB Bank?

17

FRANK SILLMAN

1      A.   I believe my next position was
2  the head of sales and marketing for the
3  wholesale division.
4      Q.   And can you describe what that
5  entailed?
6      A.   That was we marketed it to
7  mortgage brokers.  We marketed our loan
8  products to mortgage brokers who would
9  deliver them to us.  We would underwrite
10  those, create loan documents and fund
11  those loans on behalf of the mortgage
12  brokers.  And then we would put those
13  loans into securitizations and sell them
14  in the secondary market.
15      Q.   And were these both private
16  label and GSE securitizations?
17      A.   Yes.
18      Q.   And over what period did you
19  hold that position?
20      A.   That position morphed into
21  taking on more responsibilities.  Again,
22  I'm -- you know, I would say it's -- I
23  held various loan production positions all
24  the way through 2008 but I don't recall

5  (Pages 14 to 17)

18

FRANK SILLMAN

1  the dates that I was responsible for these
2  individual divisions.
3      Q.   And when -- to the best that you
4  can recall when did you get promoted to
5  **executive vice president of the mortgage**
6  **banking group?**
7      A.   If I had to guess, I don't
8  remember the date, it was probably
9  somewhere around 2003-2004.  But I don't
10  recall the exact date.
11     Q.   And how did your
12  **responsibilities change when you, after**
13  **that promotion, as they related to loan**
14  **securitizations?**
15     A.   As I got promoted I took on more
16  responsibilities in relation to certain
17  divisions.  The retail division, the
18  correspondent division, the warehouse
19  lending division and then for a period of
20  time I was responsible for the secondary
21  marketing group that was responsible for
22  the securitization of our loans both to
23  the GSEs and private label.
24     Q.   While you were at IMB Bank did

19

FRANK SILLMAN

1  the bank sell any loans to the debtors?
2      A.   I don't recall.  They may have.
3  I just -- I don't recall.
4      Q.   And did your, did the loans that
5  **you securitized cover the gamut in terms**
6  **of loan types or did they fall under**
7  **certain types -- certain categories**
8  **principally?**
9      A.   Well, we did GSE loans, we did
10  private label securitization loans and we
11  did FHA loans.  So we did all three types
12  of loans.
13     Q.   Let me ask an ignorant question.
14  **By the way, a number of my questions today**
15  **are going to be ignorant so I hope**
16  **you'll --**
17         MR. RAINS:  So stipulated.
18         MR. BENTLEY:  So I'm relying on
19  Mr. Sillman to further my education in
20  this quite complicated area.
21     Q.   Tell me about FHA loans, how do
22  **they differ from GSE loans?**
23     A.   It's a program -- FHA is part of
24  HUD.  It's a program where FHA insures

20

FRANK SILLMAN

1  loans that are securitized principally
2  through Ginnie Mae.  So in many ways it's,
3  it's a direct insurance product as opposed
4  to the GSEs, where they don't directly
5  insure the loans.  And they are typically
6  lower loan to -- higher loan to value
7  lower down payment loans.
8      Q.   And a moment ago when I asked
9  **you about the types of loans, what I meant**
10  **to ask was prime, subprime, Alt-A.  Did**
11  **the loans you were securitizing cover the**
12  **gamut in that regard?**
13     A.   We did securitize prime jumbo
14  loans.  We securitized Alt-A loans and we
15  securitized subprime loans.  We also
16  securitized, I believe we securitized
17  HELOC loans also.
18     Q.   So you covered the spectrum of
19  **the principal types of loan products?**
20     A.   That's right.
21     Q.   Is IMB Bank the same thing as
22  **IndyMac?**
23     A.   Correct.
24     Q.   When in 2008 did you leave the

21

FRANK SILLMAN

1  bank?
2      A.   I resigned in September of 2008,
3  I believe.
4      Q.   That was an eventful month.
5      A.   Yes.
6      Q.   When did IMB Bank stop
7  **securitizing loans?  When did that**
8  **business dry up?**
9      A.   I don't remember.  I know that
10  the securitization markets got more
11  difficult in 2007 but I don't recall when
12  we did our last securitization.
13     Q.   Was it sometime in '07 or do you
14  **think it might be in '08?**
15     A.   I don't remember.
16     Q.   Was anybody securitizing in any
17  **meaningful numbers in '08?**
18     A.   I don't believe so but I
19  don't -- I don't recall.  The market had
20  gotten more difficult in, you know, late
21  2007.  So but I don't recall
22  securitization activity.
23     Q.   Is there a particular point
24  **during '07 when RMBS securitizations**

6  (Pages 18 to 21)

22

FRANK SILLMAN

1
2  pretty much dried up, summer, fall?  Can
3  you pinpoint it?
4       A.   I don't recall.  I remember two
5  thousand -- summer of 2007 liquidity was
6  more difficult but I don't recall.  I
7  don't recall when they stopped.
8       Q.   Fair enough.  You left IMB Bank
9  and you formed Fortace LLC?
10      A.   Correct.
11      Q.   When did you start Fortace?
12      A.   Right after we left, so that was
13  September.  I think we formed it the
14  latter part of September 2008.
15      Q.   Tell me about the forming of
16  that business.  You say we, who is we?
17      A.   Myself and Richard Wohl were the
18  founding partners of that business.
19      Q.   And have the two of you been the
20  two principals of Fortace ever since?
21      A.   We had been up until October of
22  last year.  I bought out Richard Wohl's
23  interest and he's no longer involved in
24  the business.
25      Q.   And while he was still at the

23

FRANK SILLMAN

1
2  business, was there any particular
3  division of responsibilities between the
4  two of you?
5       A.   I typically handled client
6  development and audit operations.  He
7  tended to handle more of the corporate
8  work.  So he was a trained attorney.  So
9  he would handle more of kind of contract
10  negotiations, corporate work that we would
11  do.
12      Q.   Corporate work, can you just
13  explain that to me a little bit, how it
14  differed from the work you did?
15      A.   He typically would focus on kind
16  of our business, corporate business
17  activities.  So negotiating leases and
18  agreements and contracts with our clients.
19  Those types of activities.
20      Q.   Understood.  I see.  In terms of
21  providing the services you were the lead
22  person?
23      A.   That's correct.
24      Q.   Is your wife involved in your
25  business?

24

FRANK SILLMAN

1
2       A.   She is.
3       Q.   And what is her role?
4       A.   She is a managing partner.
5       Q.   I don't mean to pry, I was just
6  curious.  I had heard that over the
7  grapevine.
8            Excuse me one second.
9            Just to return to something you
10  said a few minutes ago.  No, strike that.
11           So can you summarize for me the
12  sorts of work you have done for clients at
13  Fortace?
14      A.   We have done work analyzing
15  loans that they may decide to issue
16  repurchase demands for for clients.  And
17  we have -- or rescission requests.  And we
18  have done work defending clients against
19  repurchase demands.
20      Q.   Is that -- would you say that's
21  the principal part of the services you've
22  been providing at Fortace?
23      A.   It's one of the major services
24  that we were providing.  We do other
25  consulting work also.

25

FRANK SILLMAN

1
2       Q.   You've done some work for the
3  debtors, is that correct, prior to your
4  engagement in this matter?
5       A.   Yes.
6       Q.   Tell me what work you've done
7  for the debtors.
8       A.   We did some consulting work with
9  them.  We also reviewed loan files for
10  them in relation to some potential
11  litigation and -- litigation they had at
12  the time.
13      Q.   Over what period -- over what
14  period have you done work for the debtors
15  prior to -- strike that.  Let me start
16  again and try to be a little clearer.
17           In this matter, when were you
18  first contacted?
19      A.   I believe it was May of this
20  year.
21      Q.   It was after the settlement
22  agreement had been executed?
23      A.   Yes.
24      Q.   Prior to that time, over what
25  period had you been doing work for the

7  (Pages 22 to 25)

26

FRANK SILLMAN

1
2 debtors?
3    A.    I believe we started in early
4 2011. I don't recall exactly when we
5 started.
6    Q.    And who did you work with at the
7 debtors?
8    A.    We did most of the work with
9 their outside law firm. I don't recall --
10 there was a contact that was on some of
11 the calls. I don't remember their name.
12 Most of the work was done through their
13 outside counsel.
14    Q.    The Carpenter Lipps firm?
15    A.    Yes.
16    Q.    Who were the principal attorneys
17 there who you had contact with?
18    A.    Jen Battle.
19    Q.    And also Jeff Lipps to some
20 extent?
21    A.    Maybe on one call. Very rarely.
22 I don't recall but it was predominantly
23 Jen Battle.
24    Q.    Was all of the work you did in
25 connection with lawsuits or was some of it

27

FRANK SILLMAN

1
2 not?
3    A.    I'm trying to remember.
4 Predominantly it was lawsuits. I believe
5 there was some work we discussed with them
6 that wasn't related to a lawsuit. I
7 believe we did some work before one of the
8 plaintiffs filed their lawsuit. That's
9 why I'm trying to remember for you. So I
10 think we did work both not related to
11 litigation and in litigation.
12    Q.    In one instance you recall some
13 prelitigation work?
14    A.    Correct.
15    Q.    What were the lawsuits you
16 worked on?
17    A.    The MBIA litigation.
18    Q.    MBIA versus which debtor entity?
19    A.    I believe it was both entities,
20 RFC and GMAC if there was -- yeah.
21    Q.    They're two separate suits?
22    A.    Yes.
23    Q.    Any other lawsuits?
24    A.    For them?
25    Q.    For the debtors.

28

FRANK SILLMAN

1
2    A.    I don't recall work. There may
3 have been discussions about other cases
4 but I don't recall. The majority of our
5 work was done for those cases.
6    Q.    Those two lawsuits?
7    A.    Yeah. And I think the majority
8 of the work was the RFC case of the two
9 cases.
10    Q.    And can you describe for me the
11 work you did -- let me start again.
12       Did you stop working on those
13 projects when you took on your current
14 engagement?
15    A.    We stopped before we took on the
16 current engagement.
17    Q.    When did you stop?
18    A.    They asked us to stop any work
19 on it, might have been late April or early
20 May.
21    Q.    In anticipation of the work that
22 you are doing on your current profit
23 project?
24    A.    I don't know why they asked us.
25    Q.    Who asked you?

29

FRANK SILLMAN

1
2    A.    Jen Battle.
3    Q.    And what was the nature of the
4 work you'd been doing in the MBIA versus
5 RFC suit?
6    A.    We would develop audit
7 strategies and review loan files in
8 preparation for any work that we may need
9 to do in that case.
10    Q.    How many loan files did you
11 review?
12    A.    There were thousands. I don't
13 recall the number.
14    Q.    Are we talking tens of
15 thousands?
16    A.    No. I would say thousands.
17    Q.    Did you work with any other firm
18 in doing this loan review work?
19    A.    For other clients?
20    Q.    No. What I'm trying to
21 understand is this loan review project,
22 was it staffed entirely out of your firm?
23    A.    Yes.
24    Q.    How many people at your firm
25 were involved?

8  (Pages 26 to 29)

30

FRANK SILLMAN

1
2    A.   Well, it varied depending on the
3    volume but could have been anywhere from
4    ten to, I don't recall, 25, possibly.
5    Q.   Over what time period did that
6    work go on?
7    A.   It was a couple of months in
8    2011 and some work in 2012.
9    Q.   Did that result in any expert
10   report being presented?
11   A.   No.
12   Q.   Were you working with any other
13   experts in connection with the work you
14   did?
15   A.   No.
16   Q.   Would you say -- I'm trying to
17   understand the nature of the work you did.
18   Would you say you did a full loan -- a
19   full reunderwriting of the loans you
20   reviewed?
21   A.   In some cases.  In some cases we
22   reviewed the files to ensure the document,
23   the imaged file had a complete set of
24   documents.  So two types of work.
25   Q.   Okay.  I didn't follow that.

31

FRANK SILLMAN

1
2    Can you explain.
3    A.   So in some cases we did a full
4    reunderwriting of the file.  In some cases
5    we just reviewed the file to determine
6    whether a predetermined set of loan
7    documents were contained in the file.
8    Q.   Is there a reason you did the
9    full loan review for some files but not
10   for others?
11   A.   Just different objectives from
12   the client.  In one case they wanted to
13   understand the quality of the subset of
14   loans that they gave to us.  In another
15   case they wanted to understand how
16   complete the imaged files were.
17   Q.   Were you involved in selecting
18   the pool of loans that you reviewed?
19   A.   I was involved in the
20   discussions of, you know, the selection
21   process.  I don't know -- our firm didn't
22   pick the loan numbers.
23   Q.   Who did?
24   A.   I don't know who did.  We
25   received the loan numbers from Jen Battle

32

FRANK SILLMAN

1
2    but I don't know who at the firm picked
3    the loan numbers.
4    Q.   Do you know what the criteria or
5    method that was used in selecting the
6    loans?
7    A.   Which, the loan reunderwriting
8    population or the --
9    Q.   Yes.
10   A.   No, I don't recall.
11   Q.   Was that a random sample?
12   A.   I don't recall.
13   Q.   And again, sticking with the
14   loans that you reunderwrote.  You looked
15   at the loan files.  Did you look at any
16   documents outside the loan files?
17   A.   Rephrase the question.
18       MR. RAINS:  You are still again
19   asking him what he did previous to
20   this assignment.
21       MR. BENTLEY:  Correct.  Sure.
22   Q.   I'm asking about this loan
23   reunderwriting project you are describing.
24   A.   Right.
25   Q.   You looked at the loan files?

33

FRANK SILLMAN

1
2    A.   Correct.
3    Q.   Did you look at any documents or
4    information outside of the loan files?
5    A.   Yes.  We would typically use
6    their seller guide.  We would look at that
7    document.  We would -- as part of
8    preparing for the project, we would look
9    at governing agreements.  We may have
10   looked at documents from third-party
11   service providers, which is credit
12   reports.
13   Q.   Credit reports is an example of
14   the sort of documents you might have
15   looked at from third-party service
16   providers?
17   A.   Correct, that were outside the
18   imaged loan file.
19   Q.   When you do a loan
20   reunderwriting, what types of documents do
21   you generally get from third-party service
22   providers?
23   A.   It depends on an engagement by
24   engagement basis on what the client wants
25   us to incorporate in the reunderwriting

9  (Pages 30 to 33)

34

FRANK SILLMAN

1
2 project. So in some cases we may only
3 utilize the documents contained within the
4 imaged file and the seller guide or
5 underwriting guidelines. In other cases
6 they may ask us to go out and get
7 third-party documents such as an updated
8 credit report as part of that review.
9    Q.   Did you also look at pay
10 histories as part of the work you did in
11 connection with this RFC case?
12    A.   You know, I don't recall that
13 particular. I just don't remember what
14 the requirements were on that
15 reunderwriting project.
16    Q.   You also mentioned you looked at
17 certain documents to determine if the file
18 was complete. Sorry. Let me start again.
19 With respect to the
20 reunderwriting project you did, were some
21 of those files incomplete?
22    A.   I don't recall the results of
23 that project. It's possible that some of
24 those were incomplete. But I don't have
25 the information regarding the work that we

35

FRANK SILLMAN

1
2 did there.
3    Q.   Okay. And if some files were
4 incomplete, do you believe that would
5 create a flaw in the reunderwriting
6 process?
7    A.   There's a standard process under
8 which you reunderwrite these loans. It's
9 normal for some documents to be missing
10 from the imaged credit file as part of
11 that underwrite -- reunderwriting process.
12 And that would have to be evaluated on a
13 loan by loan, case by case basis.
14    Q.   Okay. Let's turn from this
15 subject and let me ask you more broadly
16 about the clients you've represented while
17 at Fortace. Some of them are loan
18 sellers?
19    A.   (Witness nods.)
20    Q.   And some of them are, would buy
21 side clients be a --
22    A.   Correct. They purchase loans.
23    Q.   -- a term you recognize?
24    A.   Yes.
25    Q.   So in the case of the surgical

36

FRANK SILLMAN

1
2 sellers you would generally advise them
3 about how to respond to put back demands?
4    A.   Yes.
5    Q.   And in the case of the buy side
6 clients you'd generally advise them about
7 put back demands they were considering
8 making?
9    A.   Yes. Help them determine the
10 audit population and then evaluate those
11 loans to help advise them on whether or
12 not they should require a repurchase
13 demand.
14    Q.   So focusing on the entire period
15 you've been at Fortace since you created
16 it up to now, what can you tell me about
17 when -- the loans that you've been
18 advising clients about, what portion of
19 them were originated before September '08
20 and what portion were originated after?
21 Is that something that matters when you
22 are doing your work?
23    MR. RAINS: Object to the form
24 of the question. It's compound.
25    A.   We generally worked on loans

37

FRANK SILLMAN

1
2 that were originated prior to 2008.
3    Q.   So help me understand how the
4 business has worked. Securitizations I
5 think you said mostly dried up in '07; is
6 that correct?
7    A.   I don't recall is my answer.
8    Q.   May have continued to some
9 extent into '08 but at a much lower level,
10 is that fair?
11    A.   Liquidity began to dry up in,
12 yes, late 2007, 2008.
13    Q.   Did there come a point when
14 securitizations resumed or increased in
15 number?
16    A.   Are we talking about private
17 label securitizations? Can you clarify
18 your question?
19    Q.   Sure. Let's start by that. I'm
20 just trying to get a general background.
21    A.   The private label, my -- my
22 understanding today and I'm, is that
23 private label securitizations are not at
24 the levels they were in 2005-2006.
25    Q.   But was there basically a major

10  (Pages 34 to 37)

38

FRANK SILLMAN

1    lull and then an uptick?
2    A.    Uptick and -- I'm sorry.
3    MR. RAINS:  Objection, vague and
4    ambiguous.
5    Q.    I know these terms are very
6    imprecise but did the market basically die
7    and then revive at some point?
8    MR. RAINS:  Same objection.
9    Vague and ambiguous.
10    A.    I'm not sure what time frame
11    that you are asking me to opine upon.
12    Q.    During 2009 or 2010, did the
13    number of private label securitizations at
14    some point substantially increase,
15    generally speaking?
16    A.    I didn't review that.  I haven't
17    reviewed what the securitization volume
18    was in 2009, 2010.  So I really can't
19    answer that question.
20    Q.    Has a lot of the business during
21    this post '08 period been what's called
22    re-remics'?
23    A.    I wouldn't -- I don't know.  I
24    didn't evaluate that as part of the work I

*(Line numbers 1-25; text above follows this ordering)*

39

FRANK SILLMAN

1    did on this project.
2    Q.    Can you tell me what a re-remic
3    is?
4    A.    It's basically the
5    resecuritization of loans that were
6    originally in remics securitizations.
7    Q.    And what does resecuritization
8    entail?
9    A.    I'm not an expert on re-remics.
10    Q.    Not part of your background?
11    A.    It's not part of my, yeah, my
12    background.
13    Q.    Fair enough.  Let me hand you
14    what's been marked as Exhibit 5.  And can
15    you tell me what this is?
16    A.    This is my original declaration.
17    Q.    By the way, before turning
18    further into this declaration let me ask
19    you a few unrelated questions.  Have you
20    testified before as an expert?
21    A.    I have not.
22    Q.    Have you ever prepared an expert
23    report?
24    A.    Prior to this, no.  Our cases

40

FRANK SILLMAN

1    have not gone to that stage.
2    Q.    So you've been retained as an
3    expert who might potentially file an
4    expert report but it hasn't come to the
5    expert report stage?
6    A.    Correct.
7    Q.    By the debtors?
8    A.    Yes.
9    Q.    In the MBIA versus RFC case?
10    A.    Yes.
11    Q.    And at the time that Jen Battle
12    asked you to stop work in that case did
13    you anticipate that it was still possible
14    you might be asked to provide expert
15    testimony for RFC?
16    A.    Rephrase your question.
17    Q.    You mentioned that at some point
18    in late April or early May Jen Battle
19    asked to you stop work on the two lawsuits
20    you were handling for the debtors?
21    A.    Yes.
22    Q.    And at that point before she
23    asked you to stop work did you anticipate
24    that you might be asked to provide expert

41

FRANK SILLMAN

1    testimony for the debtors?
2    A.    Yes.
3    Q.    For RFC?
4    A.    Yes.
5    Q.    And also for GMAC Mortgage?
6    A.    Yes.
7    Q.    Are there other matters where
8    you have been hired as somebody who might
9    potentially provide expert testimony?
10    A.    Yes.
11    Q.    By which clients?
12    A.    It's confidential.
13    MR. BENTLEY:  I won't ask.
14    MR. RAINS:  I'll let you ask if
15    it was ResCap or somebody else.
16    Q.    In any other matters for any of
17    the debtors?
18    A.    No.
19    Q.    Have you ever done any work for
20    Ally Financial or any of its affiliates
21    other than the debtors?
22    A.    No.
23    Q.    Have you authored any
24    publications in your field?

11  (Pages 38 to 41)

42

FRANK SILLMAN

1
2    A.    I have written articles that
3    have been published, yes.
4         MR. BENTLEY:  Darryl, I don't
5    believe we have been provided with a
6    list of Mr. Sillman's publications as
7    required by Rule 26.
8         MR. RAINS:  I don't know.
9         MR. BENTLEY:  I would ask that
10   you cure that deficiency.
11        MR. RAINS:  So let's huddle on a
12   break and find out what those are.
13   Q.    So let's return to that and if
14   it's possible to supply me with a list,
15   I'd like to return to that later.
16        Okay.  Can you turn, please, to
17   paragraph 2 of Exhibit 4.  And by the way
18   just so we are clear on terminology,
19   Exhibit 4 is the first declaration that
20   you filed in this case?
21   A.    (Witness nods.)
22   Q.    Correct?
23   A.    Correct.
24   Q.    And you subsequently filed a
25   supplemental declaration in September --

43

FRANK SILLMAN

1
2    A.    Correct.
3    Q.    -- correct?
4         So if I refer to this as your
5    first declaration or your initial
6    declaration, you'll know what I mean?
7    A.    Okay.
8    Q.    So please turn to paragraph 2 of
9    your initial declaration.  And as we have
10   already discussed to some degree, this
11   paragraph describes work you've done both
12   for sellers and for buy side clients?
13   A.    Correct.
14   Q.    Tell me a bit about your buy
15   side clients.  You referred to insurers
16   and lenders.  Can you describe that in a
17   bit more detail for me?
18   A.    They are -- they are or were
19   predominantly banks that purchased loans
20   or originated loans through their retail,
21   wholesale or correspondent origination
22   channels.
23   Q.    Can you identify those clients
24   or is that confidential?
25   A.    That's confidential.

44

FRANK SILLMAN

1
2    Q.    And tell me about the insurers
3    you've represented?
4    A.    We also did work with two
5    mortgage insurance companies that had us
6    review loans for potential insurance
7    rescission.
8    Q.    And same question as before.
9    Can you identify those clients or is that
10   confidential?
11   A.    That's confidential.
12   Q.    Can you help me understand a
13   little bit, again this is my ignorance in
14   the field, how those mortgage insurers
15   differed from monoline insurers like MBIA
16   or FGIC?
17   A.    The mortgage insurance, and I'm
18   not an insurance expert, but in general --
19   Q.    I'm not either.
20   A.    -- from my mortgage experience,
21   the mortgage insurance is typically issued
22   on a loan by loan basis.  So they issue a
23   certificate for each loan.  The monoline
24   insurers tended to secure -- insure
25   securitizations so they insured a pool of

45

FRANK SILLMAN

1
2    loans.  So it's kind of an individual
3    versus a pool process.
4    Q.    And these insurer clients you
5    represented, when you've been reviewing
6    possible put back demands they might make,
7    would this generally be when they are
8    reviewing a number of potential put back
9    demands against one particular company?
10   A.    The loans that we worked on were
11   typically from many originators not just
12   one particular originator.
13   Q.    But these mortgage insurers
14   would have insured a number of loans
15   provided by a particular originator and
16   they would then ask you to look at that
17   group of loans and consider making put
18   back demands; is that right?
19   A.    The way they allocated the loans
20   to us, it may have been for one particular
21   originator or may have been for multiple
22   originators.
23   Q.    But would they generally have
24   provided this mortgage insurance in bulk
25   as it were, that is to a whole bunch of

12  (Pages 42 to 45)

46

FRANK SILLMAN

1 loans at the same time?
2     A.    The mortgage insurers had
3 relationships with originators.  So they
4 may have done work with one particular
5 originator.  What's typical in the
6 industry is that the originator has
7 multiple mortgage insurance relationships.
8 How they allocate those depends on lots of
9 corporate objectives.  But there's
10 typically not a 1 to 1 relationship
11 between a mortgage insurer and an
12 originator.  So mortgage originators wrote
13 insurance for multiple originators.  And
14 originators got insurance from multiple
15 mortgage insurers.
16     Q.    They spread the business around?
17     A.    Yes.
18     Q.    And the loans that your clients
19 insured, were they generally loans that --
20 were they often loans that had been sold
21 into securitizations?
22     A.    They were both private label
23 securitization loans and GSE, Fannie,
24 Freddie originated loans.

47

FRANK SILLMAN

1     Q.    Your sell side clients, was that
2 mostly the debtors or what were portion of
3 your work for sell side clients was for
4 the debtors?
5     A.    That's confidential.
6     Q.    Okay.  Can you tell me whether
7 it's most of the work?
8     A.    Sell side work.  I'd have to
9 look at the numbers.  It's a large
10 portion.  I don't know that it's most.  I
11 don't have those numbers in front of me.
12     Q.    What can you tell me about -- I
13 don't mean to ask you to disclose
14 confidential information.  Without doing
15 that what can you tell me about the nature
16 of those other sellers?
17     A.    Many cases similar in the
18 origination and sales process to the
19 debtors.  So they originated loans,
20 purchased loans, originated their own
21 loans, gathered those loans, securitized
22 those loans, both to the GSEs and in
23 private label securitizations.
24     Q.    And just like with the debtors

48

FRANK SILLMAN

1 GMAC originated most of the loans it sold,
2 RFC purchased most of the loans it sold,
3 did you have the same variation among your
4 other sell side clients, some originated,
5 others purchased?
6     A.    Correct.
7     Q.    And did that difference
8 sometimes have a bearing on the work you
9 did?  Did it sometimes affect the process
10 you applied or the results you found?
11     A.    Which difference is that?
12     Q.    Whether your client had
13 originated the loans or had purchased from
14 others.
15     A.    The process that we went through
16 was similar whether or not the loan was
17 originated by our client or purchased by
18 our client.  The results, I don't remember
19 what -- I don't recall what the results
20 were by different segments.
21     Q.    Just one moment.  Let me hand
22 you what's been marked as Exhibit 6.  Do
23 you recognize that to be your
24 September 28, 2012, supplemental

49

FRANK SILLMAN

1 declaration in this case?
2     A.    Yes.
3     Q.    And tell me what Exhibit C is.
4         MR. RAINS:  Do you have another
5 copy?  No?  If not -- I'm okay.  I'm
6 okay.
7         MR. BENTLEY:  We do have another
8 if I can find it.
9     A.    The whole document is labeled
10 Exhibit C.  It's on -- in the upper right
11 it's all Exhibit C so which exhibit --
12     Q.    I'm sorry.  Then this is
13 confusing.  If you flip through -- shall I
14 come around and help you?  I think the
15 confusion is that this document may have
16 been filed as Exhibit C to something
17 else --
18     A.    Right.
19     Q.    -- but I'm talking about Exhibit
20 C to your supplemental declaration.
21     A.    Got it.
22     Q.    Now you found it?
23     A.    Yes.
24     Q.    Can you tell me what it is?

13  (Pages 46 to 49)

50

FRANK SILLMAN

1
2    A.    DBRS, it's the -- DBRS is the
3    name of the company, the rating agency.
4        Q.    And the report is called RMBS
5    Insight and it then continues?
6        A.    Yes.
7        Q.    And what does this report
8    describe?
9        A.    Their mortgage-backed securities
10   loss model and rating methodology.
11       Q.    Who is DBRS?
12       A.    They are a credit rating agency.
13       Q.    They are not affiliated with
14   Deutsche Bank, are they?
15       A.    I don't know whether or not they
16   are or are not.
17       Q.    Just wondering whether the DB?
18       A.    Yeah.
19       Q.    And this document describes a
20   model that they generate called insight;
21   is that correct?
22       A.    Yes.
23       Q.    And you annexed this to your
24   supplemental declaration I believe as an
25   example of a methodology that's commonly

51

FRANK SILLMAN

1
2    used in the business to estimate loan
3    losses, correct?
4        A.    Correct.
5        Q.    And do you believe that DBRS is
6    reliable and that the work they do should
7    be given some weight?
8        A.    One of the credit agencies that
9    rate bonds, I'm not familiar with their
10   track record as to the accuracy of their
11   model.
12       Q.    But is it one of the models that
13   you sometimes use in your work?
14       A.    I don't use their model in
15   particular.  The two models that we used
16   were the Intex model and the West Pat
17   model.  I attached this because I thought
18   they did a very good job of explaining the
19   process that many rating agencies use and
20   other models to use in evaluating mortgage
21   bonds and estimated loss models?
22       Q.    If you turn to page 39, you'll
23   see that this is called Appendix 2
24   Operational Risk Assessment.  Do you see
25   that?

52

FRANK SILLMAN

1
2    A.    Yes.
3        Q.    And I believe this describes the
4    review process that DBRS does to assess
5    whether loans have been originated in
6    accordance with the sellers underwriting
7    guidelines and for related matters?
8        MR. RAINS:  Objection.  The
9    document speaks for itself.
10       Q.    Is that what you understand this
11   to, this appendix to address?
12       A.    It discusses their originator
13   review process.
14       Q.    And if you look at page 40 at
15   the bottom of the page under the heading
16   Origination and Sourcing.  Do you see on
17   the second and third line it says that
18   DBRS reviews -- I'm paraphrasing -- DBRS
19   reviews the approval and monitoring
20   processes for third-party originators to
21   determine if the originate has strong
22   procedures and controls.
23       A.    I see those sentences.
24       Q.    Okay.  Now look, if you would,
25   to the bottom of page 42 and take a moment

53

FRANK SILLMAN

1
2    and read the last paragraph on that page.
3        A.    The last paragraph starting with
4    "Based on the above analysis"?
5        Q.    Correct.  It then says "The
6    performance, varied by originator and
7    servicer, generally fall between the
8    plus-minus 25 to 35 percent range for
9    originators and servicers excluding a
10   small number of irregular deals."
11       Do you have an understanding of
12   what -- what that sentence means, what
13   DBRS is saying?
14       A.    I don't know what numbers, what
15   they evaluated.  They did not share in
16   here their historical review history.  So
17   no, I can't opine on what they are trying
18   to say in that sentence.
19       Q.    And I don't actually mean to ask
20   you to opine on that.  I'm just trying to
21   see if you can help me understand it.  I
22   think what they are saying is that they
23   believe some originators have much
24   stronger practices than others and that
25   that has a significant effect on the

14  (Pages 50 to 53)

54

FRANK SILLMAN

1  quality of loan production.  Did I get
2  that right as you read this?
3
4        MR. RAINS:  Objection.  Asked
5  and answered.
6      A.    Yeah, I don't know.
7      Q.    Do you believe that different
8  originators, some have stronger practices
9  and procedures as it affects loan quality
10  than others?
11     A.    It's possible to have variations
12  in the strength of their controls.
13     Q.    If you were reviewing put back
14  requests with respect to loans originated
15  by Countrywide, the fact that Countrywide
16  originated them might affect your
17  analysis, right?
18     A.    Not necessarily.  I don't
19  predispose the work that gets done based
20  on who the originator is.  You are talking
21  about at the auditor level they are
22  following the audit strategy that we
23  develop with the client.
24     Q.    Fair enough.  But would you
25  agree that the level of breaches in loans

55

FRANK SILLMAN

1
2  may vary depending on who the originator
3  is and what the quality of their practice
4  is?
5        MR. RAINS:  Objection.  Asked
6  and answered.
7      A.    There may be variances in the
8  breach rates based on different
9  originators, based on, you know, certain
10  factors.
11     Q.    And do you have a view as to
12  whether GMAC Mortgage's origination
13  practices and controls, how they compare
14  to those of other originators?
15     A.    The review of GMAC's operational
16  controls were not part of the work that I
17  did in my declaration.  I relied on the
18  repurchase analysis that I did related to
19  the their GSE repurchases.
20     Q.    But do you have a view of this
21  based on the prior work you had done?
22     A.    The prior work that we had done
23  did not involve the review of their
24  operational practices, origination
25  practices.

56

FRANK SILLMAN

1
2      Q.    Okay.  Just so we are clear, you
3  don't have a view as to how GMAC
4  Mortgage's origination practices and
5  controls compare to those of other
6  originators?
7      A.    I discussed a little in my
8  declaration regarding the agree rates that
9  they had on their GSE.  But I don't have
10  an opinion, I did not review their
11  operational practices.
12     Q.    Do you have a -- strike that.
13        Help me with terminology if you
14  would.  RFC doesn't originate the loans
15  itself, rather it buys from others, right?
16     A.    I believe in the majority of the
17  case they purchase those loans.
18     Q.    Is there a label you use, a name
19  you use for companies who operate that way
20  as opposed to originating the loans
21  themselves?
22     A.    No.  It's more whether they
23  originate the loans in their retail, their
24  wholesale, their correspondent or their
25  conduit group is typically how the

57

FRANK SILLMAN

1
2  industry differentiates how the loans are
3  originated.
4      Q.    So which of those categories
5  does RFC fall in?
6      A.    They tend to be more in the
7  correspondent and conduit realm than in
8  the retail and wholesale.
9      Q.    And when you are looking at
10  loans that had been sold into a
11  securitization by a company like that,
12  that is a company that relies on
13  correspondent and conduit sources to
14  source its loans do you sometimes look at
15  the quality of that company's controls?
16     A.    When are you asking me when I
17  would do that.
18     Q.    In any assessment you might do
19  relating to loan quality, loan
20  performance, put back, et cetera?
21     A.    The engagement that we are on we
22  are typically asked to -- I guess you are
23  asking me on repurchase requests.  It's
24  focused on the objectives the client set
25  up which might be, did the loan meet the

15  (Pages 54 to 57)

58

FRANK SILLMAN

1  underwriting guidelines. If there were
2  any breaches, were they material and
3  adverse. So it's a confined project scope
4  on what they ask us to do.
5      **Q.   Understand.  Do you have a**
6  **view -- strike that.**
7          **When RFC sourced loans, did it**
8  **have certain practices and procedures for**
9  **due diligencing those loans?**
10     A.   According to their seller guide
11 they had certain policies or procedures
12 around approval of sellers of loans to
13 them and processes that they went through
14 to review the loans.  I did not as part of
15 the work that I did for them test the
16 scope of whether or not they performed
17 those functions.
18     **Q.   So is it fair to say you don't**
19 **have a view as to the quality of RFC's**
20 **practices and procedures in that regard?**
21     A.   I did not review their practices
22 and procedures so I don't have a view on
23 their practices and procedures.
24     **Q.   You can't say whether they are**

59

FRANK SILLMAN

1  **stronger than average, weaker than average**
2  **or in the middle?**
3      A.   As part of the work I did here,
4  I did not review that so that was outside
5  the scope of the work that I did.
6      **Q.   I'm just asking whether you have**
7  **a view based on anything.**
8      A.   I don't.
9      **Q.   Fair enough.  Let's turn back to**
10 **initial declaration and now let's turn to**
11 **paragraph 3.  And I promise you we are not**
12 **going to move at a glacial pace like this**
13 **all day.  We are going to move a lot**
14 **faster.**
15         **I want to ask you in particular**
16 **about the last sentence in this paragraph.**
17 **You refer here to -- what's the term you**
18 **use -- different loan types, loan**
19 **products?**
20     MR. RAINS:  Hold on.  What are
21 you directing -- are you asking him to
22 read something?
23     MR. BENTLEY:  The last sentence
24 of paragraph 3.

60

FRANK SILLMAN

1      MR. RAINS:  So what's the
2  question?
3      **Q.   There's a list here.  I just**
4  **want to get my terminology straight with**
5  **you so we are not talking past each other.**
6  **Is this a list of product types, loan**
7  **types?  What would you call it?**
8      A.   It's a mixture of both sales
9  outlets as it relates to Fannie Mae and
10 Freddie Mac.  And product types as it
11 relates to FHA prime, jumbo, Alt-A
12 subprime, home equity and closed end
13 seconds.
14     **Q.   So let's talk first about sales**
15 **outlets and then about product types.**
16 **Does your repurchase experience -- does**
17 **the repurchase experience that you have**
18 **encountered in your work at Fortace differ**
19 **when you are dealing with GSEs as distinct**
20 **from private label trusts?**
21     A.   The process was similar.
22     **Q.   Does the outcome tend to differ?**
23     A.   What do you mean by the outcome?
24     **Q.   Does the put back rate tend to**

61

FRANK SILLMAN

1  **be higher for example?**
2      A.   There are -- there are
3  different, you know, reps and warrants for
4  Fannie Mae for Freddie Mac versus FHA
5  versus -- depending on the type of vehicle
6  you sold in the other products there might
7  be different rep and warrant standards
8  that need to be met between these.
9      **Q.   And by and large the reps and**
10 **warranties for the GSE deals tend to be**
11 **stronger than for private label deals?**
12     MR. RAINS:  Objection.  No
13 foundation.  Calls for speculation.
14     **Q.   In your experience --**
15     A.   There are different reps and
16 warrant requirements from Fannie and
17 Freddie than there are from private label
18 securitizations.
19     **Q.   And in fact you actually address**
20 **that in your report?**
21     A.   I do discuss it in the report.
22     **Q.   Let's turn to that so I'm not**
23 **keeping you in suspense.  Paragraph 61.**
24     A.   61, okay.

16 (Pages 58 to 61)

62

FRANK SILLMAN

1
2    Q.   And the point you make in 61 is
3    that the reps and warranties in GSE deals
4    tend to be stronger than in private label
5    deals, right?
6    A.   I said the trusts governing
7    agreements.  So I'm -- was not trying to
8    make a -- you were asking me private label
9    deals in general and I'm discussing here
10   the trust governing agreements that I have
11   reviewed which were, I believe, eight of
12   the governing agreements, one from each
13   shelf as a representative sample.
14   Q.   Okay, fair enough.  So you are
15   limiting your response to these particular
16   private label deals?
17   A.   Correct.
18   Q.   And you then describe here some
19   of the principal respects in which the GSE
20   reps and warranties are stronger than
21   those in the governing agreements for
22   these trusts?
23   A.   Correct.
24   Q.   Let's turn back to paragraph 3
25   and now let's talk about product type.

63

FRANK SILLMAN

1
2    Am I right when you refer to
3    prime, jumbo, Alt-A and subprime, those
4    labels as you understand them generally
5    apply to first lien loans?
6    A.   Yes.
7    Q.   And then HELOC is a form of
8    second lien loan?
9    A.   In most cases, not always.
10   There are first mortgage HELOCs but
11   predominantly I believe the HELOCs are
12   second mortgages.
13   Q.   And in your experience do Alt-A
14   and subprime mortgage loans tend to yield
15   higher rep and warranty breaches than
16   prime jumbo?  And I'll refer you to
17   paragraph 58 of your declaration if you
18   want to look at that.  I'm going to object
19   to the form of the question as vague and
20   ambiguous?
21   A.   Can you restate the question for
22   me.
23   Q.   In your experience do Alt-A and
24   subprime mortgages tend to yield higher
25   rep and warranty breaches than prime jumbo

64

FRANK SILLMAN

1
2    mortgages?
3    A.   They tend to yield higher
4    alleged rep and warrant breaches.
5    Q.   And how much higher, can you
6    quantify that at all?
7    A.   I don't have the numbers in
8    front of me to be able to give you any
9    type of percentage differences.
10   Q.   Suppose you were asked by your
11   client to quantify that.  Could you do
12   that and how would you go about it?
13   A.   I wouldn't be able to quantify
14   it without looking at and doing more work
15   on what the actual experience is.  I do
16   know that it is -- my experience has been
17   it's higher, there's been a higher rate of
18   alleged rep and warrant breaches, but I
19   couldn't put a percentage on it.
20   Q.   Are there any publications that
21   address that to your knowledge?
22   A.   There may be that address it.
23   I'm not aware of them.
24   Q.   Do you know if anybody has
25   attempted to address that issue on an

65

FRANK SILLMAN

1
2    industry wide basis?
3    A.   It's -- it's possible in this
4    environment that that type of analysis has
5    been done -- I don't recall reading
6    anything or relying on anything that I
7    felt had a credible and reliable data
8    around that.
9    Q.   Have you attempted to search the
10   literature and determine whether anybody
11   has made a credible attempt to determine
12   that?
13   MR. RAINS:  Have you searched
14   the literature, that's the question.
15   A.   I have done some searches
16   relating to that and didn't find any work
17   that I believed had credible results.
18   Q.   Do you think that work could be
19   done or is there just not enough publicly
20   available data for anybody to reach
21   meaningful conclusions?
22   MR. RAINS:  Objection.  Vague
23   and ambiguous.
24   A.   Can you rephrase that.
25   Q.   Sure.  Suppose a client asks you

17  (Pages 62 to 65)

66

FRANK SILLMAN

1    FRANK SILLMAN
2    generally speaking as a matter of industry
3    averages how much higher are the alleged
4    rep and warranty breaches for Alt-A and
5    subprime mortgages compared to other kinds
6    of loan products?
7        A.  I don't believe I have --
8        MR. RAINS:  Hold on.  He hasn't
9    asked a question yet.
10       Q.  Do you think you could undertake
11   to answer that question?
12       A.  I have not seen information
13   available that would allow me to study
14   that question.
15       Q.  Have you attempted to determine
16   whether that question can be answered in a
17   meaningful way?
18       A.  I did do some work I discussed
19   in my, on agree rates that are publicly
20   available so I did do research as part of
21   the work I did on my declaration to
22   determine if there are other publicly
23   available information regarding breach
24   rates and agree rates and did not find any
25   credible information that would allow me

67

FRANK SILLMAN

1    to come to any conclusions on breach
2    rates.
3        Q.  Is part of the problem that an
4    awful lot of this data is simply not
5    publicly available?
6        A.  Yes.
7        Q.  And let me now broaden the
8    question.  Suppose the question is if you
9    are asked to determine how the rates of
10   alleged rep and warranty breaches compare
11   as between any particular types of loan
12   products, is that a question that can be
13   answered using publicly available data?
14       A.  Again you are asking for
15   industry wide comparisons?
16       Q.  Correct.
17       A.  I'm not aware of any publicly
18   available data that would allow for a
19   credible comparison between originators.
20       Q.  I'm talking about loan types?
21       A.  I'm sorry.
22       MR. RAINS:  Products.
23       A.  Yeah, products.  You are talking
24   about rep and warrant violations.

68

FRANK SILLMAN

1    FRANK SILLMAN
2        Q.  Correct.  And suppose now we
3    modify the question so we are not asking
4    about alleged breach rates but instead
5    we're asking about what you call loss
6    share rates.  Could that question be
7    addressed using publicly available data?
8        A.  There have been some expert
9    reports that you can discern the loss
10   share rates from.  The issues with that is
11   the underlying data you don't have access
12   to so I can't opine on whether or not
13   that's comparative to the debtors proposed
14   settlement because the data behind those
15   reports are not publicly available.
16       Q.  And which expert reports are you
17   referring to?
18       A.  The Bank of America expert
19   report and the Lehman expert declaration.
20       Q.  Now, I'm not asking you about
21   discerning loss share rates as to any
22   particular seller but rather as to
23   industry averages.  Is there publicly
24   available data from which one could reach
25   meaningful conclusions about average

69

FRANK SILLMAN

1    FRANK SILLMAN
2    industry loss share rates?
3        A.  On a product by product basis?
4        Q.  Yes.
5        A.  I'm not aware of any credible
6    sources that I have been able to evaluate
7    their underlying data that provide that
8    information.
9        Q.  And now let me ask the same
10   question but as to vintages.  Is there
11   publicly available data from which one
12   could reach meaningful conclusions about
13   how loss share rates varied depending on
14   the loan's vintage?
15       A.  Again, I'm not aware of any data
16   that's available that you can reach
17   credible conclusions and that I have been
18   able to view the underlying data behind
19   that.
20       Q.  In your -- strike that.
21       So now let's turn away from
22   industry averages and turn back to your
23   personal experience.  In your personal
24   experience is the vintage of a loan a
25   factor that can affect the likelihood of a

18  (Pages 66 to 69)

70

FRANK SILLMAN

1  put back?
2      A.  Yes.  There is some correlation
3  between the vintage of the loan and the
4  potential for an alleged rep-warrant
5  breach.
6      Q.  What correlation have you
7  observed?
8      A.  There's a segment of loans
9  originated from 2005 to 2007 that tended
10  to have higher alleged breach rates in the
11  work that I have done for my clients.
12      Q.  I want to understand what you
13  said.  You referred to a segment of loans
14  originated from '05 to '07.  Are you
15  saying that loans originated during that
16  period generally tend to have higher
17  alleged breach rates in your experience?
18      MR. RAINS:  Objection.
19  Misstates the witness's testimony.
20      MR. BENTLEY:  I'm trying to
21  understand it.
22      A.  Loans originated in that period
23  may have higher alleged breach rates or
24  reps and warrant violations than loans
25

71

FRANK SILLMAN

1  originated before or after that period.
2      Q.  And higher loss share rates as
3  well?
4      A.  The information that I have on
5  loss share rates outside of that period is
6  limited, I don't recall a comparison on
7  the loss share rate.
8      Q.  Let me now ask you about alleged
9  breach rates within this period of '05 to
10  '07.  Have you observed any differences in
11  alleged breach rates within that, during
12  different times within that period?
13      A.  You mean comparing 2005 to 2006
14  to 2007?
15      Q.  Exactly.
16      A.  No, I have not observed
17  meaningful differences in the alleged
18  breach rates in that period.
19      Q.  Do you believe that they tend to
20  be the same, everything else being equal?
21      A.  I believe that there aren't
22  meaningful differences between the alleged
23  breach rates in my professional
24  experience.
25

72

FRANK SILLMAN

1
2      Q.  Depending on when the loan was
3  origi- --- whether the loan was originated
4  in '05, '06 or '07?
5      A.  Yes.
6      MR. BENTLEY:  The reporter has
7  just requested a break and I think
8  this is a good time for a break.
9      MR. RAINS:  Sure enough.
10      (Whereupon, there is a recess in
11  the proceedings.)
12      Q.  Let me ask you a few follow-up
13  questions about topics we were just
14  discussing and then we are going to move
15  on.
16      In your experience have you
17  observed any differences in the put back
18  rates between first lien loans and second
19  lien loans?
20      A.  Can you clarify what you mean by
21  put back rates or do you --
22      Q.  What you call loss share rates.
23      A.  Okay.  Loss share rates.  No, I
24  have not observed differences.
25      Q.  In your experience did the loss

73

FRANK SILLMAN

1
2  share rates for first lien loans and
3  second lien loans tend to be roughly the
4  same?
5      A.  In my experience, yes.
6      Q.  And when I say second lien
7  loans, I mean to include HELOCs.  Did you
8  understand me to include HELOCs?
9      A.  Yes.
10      Q.  And let me now ask the same
11  questions but with respect to alleged
12  breach rates.  Have you observed in your
13  personal experience any differences
14  between the alleged breach rates for first
15  lien and second lien loans?
16      A.  I haven't experienced any
17  meaningful differences.  I don't want to
18  say that they are the same but there's no
19  meaningful differences between the breach
20  rates.
21      Q.  And again, you are not aware --
22  strike that.
23      Let me return briefly to your
24  work for RFC.  You said part of the work
25  you did was to look at imaged loan files,

19 (Pages 70 to 73)

74

FRANK SILLMAN

1    correct?
2    A.    Imaged loan files were part of
3    both of the projects, whether it was a
4    reunderwrite or a document in inventory
5    project.
6    Q.    So let's focus on the
7    reunderwriting project that you did for
8    RFC.  Some of the imaged loan files were
9    incomplete?
10    A.    I don't recall the results of
11    that review.
12    Q.    Let me broaden the question to
13    apply not just to imaged loan files but
14    all of the loan files you reviewed for RFC
15    as part of your reunderwriting project.
16    Were some of the loan files incomplete?
17    A.    We only looked at imaged loan
18    files as part of the RFC project.
19    Q.    And you don't recall whether
20    some were incomplete?
21    A.    I don't have the data around
22    what the results of that -- of those
23    audits were.
24    Q.    So let me then ask you more

75

FRANK SILLMAN

1    broadly.  Now, I'm not asking you just
2    about your RFC experience but the work,
3    the put back work you do generally.  When
4    you review a pool of loan files, if a
5    particular loan file is incomplete, do you
6    draw any conclusions based on that?
7    A.    It typically depends on a number
8    of factors, which documents are missing,
9    whether there are any facts in the file to
10    determine whether or not the doc was, the
11    document was likely there at the time that
12    the credit decision was made.  The reps
13    and warrants regarding loan documents and
14    any of the governing agreements.  So there
15    are many factors that go into
16    determination of whether or not a missing
17    doc is meaningful to our assessment.
18    Q.    And do you sometimes conclude
19    that the absence of the document is a
20    defect that could be remedied?
21    A.    Yes.  That's a standard process
22    in the industry from a repurchase
23    perspective is when missing docs are noted
24    out of an imaged file they may be

76

FRANK SILLMAN

1    requested from the originator or the
2    servicer.
3    Q.    And often the missing documents
4    can be obtained from the originator or the
5    servicer?
6    A.    Yes.  We frequently do get
7    missing documents from the originator and
8    the servicer or sometimes from other third
9    parties, involved in the origination of
10    the loan.
11    Q.    And in that instance you
12    wouldn't conclude that the fact that the
13    document was missing was a breach?
14    A.    Correct.
15    Q.    Sorry, I want to return one more
16    time to -- I want to return to the
17    questions I was just asking you about your
18    personal experience with respect to first
19    liens and second liens.  And I believe you
20    testified you haven't observed any
21    differences in the average loss share
22    rates or the average alleged breach rates
23    between those two types of loans?
24    A.    Not material differences

77

FRANK SILLMAN

1    between.
2    Q.    Does your answer change if you
3    distinguish between GSE deals and private
4    label deals, that is in private label
5    deals have you observed differences
6    between the average alleged breach rates
7    or the average loss share rates between
8    first and second lien loans?
9    MR. RAINS:  Objection.  Vague
10    and ambiguous.  Compound.
11    A.    I'm not sure I understand
12    exactly what you want me to compare here.
13    Q.    Okay.  Let me try again because
14    Mr. Rains is correct.  That was a compound
15    question.
16    Let me ask you to focus now on
17    the differences, if any, between first and
18    second lien loans in the private label
19    deals that you've worked on.  Have you
20    observed any differences between the
21    average breach rates -- the average
22    alleged breach rates?
23    A.    Between first and second liens
24    for private label securitizations?

20  (Pages 74 to 77)

78

FRANK SILLMAN

1    Q.    Exactly.
2    A.    I don't recall any material
3 differences between alleged breach rates
4 for first and second mortgages and private
5 label securitizations.
6    Q.    And how about any differences
7 between the loss share rates of first and
8 second lien loans in private label
9 securitizations?
10   A.    I have not observed material
11 differences between lost share rates for
12 first and second liens on private label
13 securitizations.
14   Q.    Let's turn back one more time to
15 paragraph 2 of your initial declaration
16 and I'm going to ask you about the last
17 sentence in that paragraph which begins
18 "As part of this work I have reviewed
19 contractual obligations." And it then
20 goes on.
21      Do you see that?
22   A.    Yes.
23   Q.    Why have you reviewed
24 contractual obligations as a part of your

79

FRANK SILLMAN

1 work?
2    A.    That was something that the
3 client would is me to give my thoughts on
4 as part after the engagement.
5    Q.    And you would look at the
6 governing agreements; is that right?
7    A.    Sections of the governing
8 agreements, yes.
9    Q.    And also the underwriting
10 guidelines?
11   A.    Yes.
12   Q.    Anything else you would look at?
13   A.    As it relates to the whole
14 sentence or the review of the contractual
15 obligations?
16   Q.    The latter.
17   A.    I could have looked at governing
18 agreements, seller guides and other
19 related underwriting guideline matrices,
20 any other agreements between the sellers
21 and my clients. So any master agreements,
22 other contractual agreements they had, I
23 might also look at those documents.
24   Q.    And in some projects you look at

80

FRANK SILLMAN

1 more of those sorts of documents and in
2 other projects you look at less?
3    A.    That's right. It depends on
4 whether the clients wants me to look at
5 those and give my thoughts.
6    Q.    In conducting this review is it
7 your goal to determine whether put back of
8 a particular loan is contractually
9 required?
10   A.    As part of my work that I have
11 already done?
12      MR. RAINS:  So I'm going to
13 object, vague and ambiguous.
14 Paragraph 2 talks about his work
15 experience generally.
16      MR. BENTLEY:  And that's what
17 I'm asking about.
18   Q.    In your work experience
19 generally is a reason that you look at
20 contractual documents that you are trying
21 to determine whether put back is
22 contractually required?
23   A.    The reason that I look at those
24 is ultimately the client sets the

81

FRANK SILLMAN

1 repurchased standard. They may request my
2 input in the development of that
3 repurchase standard that we will use when
4 evaluating the loans.
5    Q.    So you won't make the legal
6 judgment, the client will do that and they
7 will instruct you?
8    A.    Correct.
9    Q.    But you may play a role in -- in
10 the client's consideration of that issue?
11   A.    That's right.
12   Q.    And generally speaking, do you
13 advise that a client put back a loan if
14 you don't think he's legally obligated to
15 do so?
16   A.    They developed the repurchase
17 standard under which we make our
18 recommendations. So if the loan meets the
19 repurchase standard, we will make the
20 according recommendation and then they
21 decide after receiving our recommendation
22 whether or not they will send out a
23 repurchase demand or not.
24   Q.    And let me just focus you on

21  (Pages 78 to 81)

82

FRANK SILLMAN

1
2 sell side clients who are receiving the
3 repurchase agreements.
4      A.   Okay.
5      Q.   In your experience have you ever
6 advised that a client agreed to a put back
7 demand if you didn't think it was legally
8 required to do so?
9      A.   The test that we put the review
10 under is whether it met the repurchase
11 standard.  So it might have legal
12 components to it.  It might have business
13 components to it.  So it's not strictly a
14 legal determination.
15      Q.   Is it your understanding that
16 sometimes there are business components to
17 the decision whether or not to honor the
18 put back demand?
19      A.   Yes.
20      Q.   Can you describe that to me?
21      A.   They may feel that they are
22 getting too many frivolous demands and
23 they may decide that they are going to put
24 loans in to a gray area, an undetermined
25 area as to whether or not they should

83

FRANK SILLMAN

1
2 repurchase it or not and something that
3 they will have to negotiate with the
4 demander with.  So that's a scenario where
5 they may decide to not repurchase a loan
6 that otherwise might meet, you know, some
7 or all of the repurchase standard.
8      Q.   In your experience does a client
9 sometimes agree to repurchase a loan even
10 if it doesn't believe that repurchase is
11 legally required?
12      A.   I can't say whether that's ever
13 happened or not.  But it is not the
14 experience that I see.  If the client does
15 not believe the repurchase is warranted,
16 they have typically not agreed to
17 repurchase the loan.  That being said, in
18 all loan level repurchases they go into
19 this disagreement bucket in the middle.
20 So it's possible that a loan that they
21 don't believe they have a standard for
22 could be repurchased based on settled
23 negotiations.
24      Q.   To resolve a dispute over
25 whether it's required to be repurchased or

84

FRANK SILLMAN

1
2 not?
3      A.   More in kind of a bulk
4 resolution, yeah.  So whatever their
5 unresolved resolution process is.
6      Q.   Let me hand you the transcript
7 of a deposition that was taken last week,
8 losing track of time in this case, of John
9 Ruckdaschel.  Do you know who
10 Mr. Ruckdaschel is?
11      A.   I don't.
12      Q.   Okay.  I can represent to you
13 that he's an executive at the debtors who
14 has been involved -- who was involved in
15 the debtors' prepetition put back
16 experience.  Let me ask you to turn to
17 pages 37 and 38 of the transcript.  And
18 can you please take a minute and read it
19 starting at line 8 on page 37 and going
20 through to --
21      A.   It's pretty small.  Do you have
22 a larger -- I seem to have kind of the
23 Cliff notes version.
24      Q.   You have the, what we call the
25 Minuscript version.

85

FRANK SILLMAN

1
2      A.   Yes.
3      Q.   It's not Cliff notes.
4      A.   Okay.
5      Q.   It's not a paraphrase.
6      A.   It's just a little...
7      Q.   Let me loan you my copy and
8 please pardon the underscoring.  And I'm
9 going to look over your shoulder if you
10 don't mind.
11      A.   Sure, not a problem.
12      Q.   So we can both look at it
13 together.  So I'd like you to read from
14 line 6 on page 37 down to almost the
15 bottom of the page 38 and tell me when you
16 are done.
17      Tell me when you are ready.
18      A.   Okay.
19      Q.   So you see Mr. Ruckdaschel
20 testified on page 38 that the debtors
21 repurchase group, "would not repurchase a
22 loan where the -- the loss was not caused
23 by a breach of a rep or a warranty."  Do
24 you see that?
25      A.   Yes.

22  (Pages 82 to 85)

86

FRANK SILLMAN
1
2    Q.   It's in the middle of page 38.
3        Is that consistent with your
4    experience, namely that a seller generally
5    would not agree to repurchase a loan if it
6    believed that the loss on that loan had
7    not been caused by a breach?
8        MR. RAINS:  You are asking about
9    his experience generally?
10       MR. BENTLEY:  I am.
11   A.   Okay.  So just so that I
12   clarify, the question is should they
13   repurchase the loan if the loss was not
14   caused by a breach?
15   Q.   Correct.
16   A.   Okay.  That's a subjective
17   determination.  And it varied from client
18   to client.  Varied from loan to loan.  So
19   there -- there was this concept of if
20   there was a documented loss of job, the
21   borrower died, that they may consider not
22   repurchasing the loan because of those
23   facts.  I have in my experience seen my
24   clients deny a repurchase of a loan that
25   may have had a breach of rep and warrant

87

FRANK SILLMAN
1
2    because of those types of circumstances.
3    Q.   So let me just try to recap.
4    Would you agree sometimes it's clear that
5    the loss wasn't caused by a breach?  For
6    example, if the loan had perfect pay
7    history for several years and then the
8    borrower lost his job, would you agree
9    that that, in those circumstances you
10   would tend to believe that the loss wasn't
11   caused by the breach?
12       MR. RAINS:  Objection to form.
13       MR. JURGENS:  Objection.
14   Incomplete hypothetical.  Calls for
15   speculation.
16       Go ahead and answer if you can.
17   A.   I mean that's a theoretical
18   situation.  There's a lot of factors that
19   go into that determination.  So it's not
20   an easy theoretical question to answer.
21   The payment history, life events that you
22   are describing are one of the factors that
23   are taken into consideration both in the
24   person who received the demand and the
25   group that issues the demand.

88

FRANK SILLMAN
1
2    Q.   And a loan that continues to
3    perform for 3, 4, 5 years before
4    defaulting, would that be a factor that
5    would affect your judgment as to whether
6    the loss was likely caused by a breach?
7        MR. JURGENS:  Objection to form.
8        MR. SHEEREN:  Objection to form.
9        MR. BENNETT:  Could we just have
10   a stipulation that whatever objections
11   are one for all and all for one?
12       MR. RAINS:  Fine with me.
13       MR. BENTLEY:  Fine with me.
14   A.   Again, it depends on many
15   factors in the loan and the governing
16   agreements and the reps and warrants and
17   whether or not there were any reps and
18   warrants for perfect payment history or
19   not so --
20   Q.   Let's assume there were.  And
21   let's assume the only thing you are trying
22   to determine is whether the breach caused
23   the loss?
24       MR. RAINS:  It's an incomplete
25   hypothetical.  Calls for speculation.

89

FRANK SILLMAN
1
2        MR. BENTLEY:  I haven't finished
3    my question.
4        MR. RAINS:  Sorry, you paused.
5    Q.   Let me start again.  Let me try
6    to make it clear and as easy as I can for
7    you.  Okay.  So let me ask you to make a
8    couple of assumptions.  You are an expert,
9    you make assumptions, right?
10   A.   Yes.
11   Q.   Let me ask you to assume a loan
12   that performs for five years and then
13   defaults.  Would the fact that it had
14   performed for five years be a factor that
15   in your judgment would tend to suggest
16   that the breach may not have caused the
17   loss?
18       MR. JURGENS:  Objection to form.
19       MR. RAINS:  Objection.
20   Incomplete hypothetical.
21   A.   Are you asking me to opine from
22   what a firm who is receiving the
23   repurchase demand or for the firm who is
24   issuing the repurchase demand?
25   Q.   Let's assume you are advising

23  (Pages 86 to 89)

90

FRANK SILLMAN

1
2   seller who is being asked to repurchase a
3   loan.
4           MR. RAINS:  Same objection.
5       Q.   And let me ask you to assume, to
6   cure Mr. Rains's objection let me -- let
7   me say everything else being equal, would
8   the fact that a loan has performed for
9   five years before going into default be a
10  factor suggesting to you that the loss may
11  not have been caused by the breach?
12          MR. JURGENS:  Objection to form.
13          MR. RAINS:  Objection.
14  Incomplete hypothetical.
15      A.   So in the hypothetical situation
16  the client has set a repurchase standard
17  under which we make our recommendations.
18  So if that standard does not include an a
19  payment history provision to it, then we
20  would not make a -- we would make a
21  recommendation not taking into
22  consideration the payment history.  Now,
23  whether the client takes into
24  consideration the payment history or not
25  is something that's beyond our control.

91

FRANK SILLMAN

1
2       Q.   Let --
3       A.   So we follow -- you are asking
4   what we do in that situation.  We follow
5   what the requirements are of the
6   engagement.
7       Q.   Okay.  So let me ask you to make
8   a few more assumptions then.  Let me ask
9   you to assume that the client has set a
10  repurchase standard under which a loan
11  will not be repurchased unless the breach
12  has caused the loss.  Are you with me?
13      A.   Okay.  That's much vaguer than
14  the repurchase standards that we get from
15  our clients.  So...
16      Q.   Do they tend to drill down into
17  specifics that might, specific factors
18  that might bear on this loss causation?
19      A.   Yes.
20          MR. JURGENS:  Objection to form.
21      Q.   Can you give me some examples?
22      A.   Well, I know not the causation,
23  they give specific factors.  I'm sorry.
24  So they do set certain requirements.
25      Q.   So is payment history sometimes

92

FRANK SILLMAN

1
2   one of those elements?
3       A.   For example, with mortgage
4   insurers that it's written into their
5   contract they may include that.  So they
6   may not have to repurchase a loan if it
7   had made 24 months or 36 months according
8   to the contract they had with the mortgage
9   insurer.  If that was the case, they would
10  likely include that into the repurchase
11  standard and we would evaluate payment
12  history as part of that process.
13      Q.   By the way, have you seen any
14  pay performance reps in the governing
15  documents for the 392 trusts we are
16  looking at in this case?
17      A.   In the eight governing agreement
18  documents that I looked at, I don't recall
19  any payment history exclusions in those
20  eight documents.
21      Q.   So for example, no early payment
22  default reps?
23      A.   Now you are asking about early
24  payment default -- you know, I can't --
25  I'd have to review those documents again.

93

FRANK SILLMAN

1
2   I don't recall.
3       Q.   Fair enough.  Let's continue
4   with our hypothetical.  And let me ask you
5   to assume that the -- let me ask you to
6   assume that the governing agreement
7   doesn't have any performance, pay
8   performance representations.
9       A.   Okay.
10      Q.   Do clients sometimes set
11  guidelines for you to follow, factors for
12  you to look at that would relate to this
13  causation issue?
14          MR. JURGENS:  Objection to form.
15      A.   Which causation?  Explain it.
16  I'm not an attorney so I'm not an expert
17  on causation.
18      Q.   Okay, sure.  The issue of
19  whether the loss was caused by the breach.
20          MR. JURGENS:  Objection to form.
21      A.   Can you kind of restate the
22  question.  I'm not sure I --
23      Q.   Sure.
24          MR. RAINS:  Objection.  Vague
25  and ambiguous.

24  (Pages 90 to 93)

94

FRANK SILLMAN

1
2      Q.   You testified earlier that in
3   your experience some of your clients have
4   denied repurchase because of circumstances
5   such as a documented loss of a job or a
6   death.  Do you recall that?
7      A.   I don't recall what I said.
8      Q.   But is that the case, sometimes
9   your clients will refuse to repurchase a
10  loan because a life event had occurred?
11     A.   Yes.  We have had clients that
12  have refused to repurchase loans because
13  of a life event.
14     Q.   And generally speaking, have you
15  ever seen a client repurchase a loan where
16  there was -- where the loan performed for
17  three years and then subsequently went
18  into default?
19     A.   You are asking me for a specific
20  three-year and then went in default.  I
21  mean I don't -- I don't have those types
22  of specifics.  I can speak more generally
23  that clients that I have worked with have
24  repurchased loans where there has been a
25  good pay history yet they still repurchase

95

FRANK SILLMAN

1
2   the loan.  Whether it was exactly three
3   years or not, you know, I can't speak to
4   those specifics.
5           Again, in many of these cases
6   these types of loans are repurchased as
7   part of settled negotiations on unresolved
8   loans.  So I want to make sure that that's
9   clear.
10     Q.   So you are saying some
11  repurchases might be part of a bulk
12  settlement?
13     A.   That's right.
14     Q.   Okay.
15     A.   So some of those loans in those
16  scenarios might be part of a bulk
17  agreement to re- -- you know, to settle
18  outstanding repurchase demands.
19     Q.   In your experience are
20  repurchase demands ever made as to a loan
21  that is performing?
22     A.   Have I ever seen that?
23     Q.   Correct?
24     A.   Yes.
25     Q.   Is that common?

96

FRANK SILLMAN

1
2      A.   I don't know what you mean by
3   common.  I see it.  It's not in the
4   majority of the cases.  But we do see
5   loans where the loan payment history has
6   had 0 lates and they still require a
7   repurchase under the governing agreements.
8      Q.   Would you agree that in your
9   experience most of the time the put back
10  demand follows a default?
11     A.   Defaulted loans, liquidated
12  loans, make up the majority of the
13  repurchase demand requests that I have
14  seen.
15     Q.   Can we quantify that any
16  further?  Would you say the substantial
17  majority?
18     A.   Substantial majority.
19     Q.   Great majority?
20     A.   I mean it's the majority of
21  them.
22     Q.   And would you agree that most
23  put back demands are made within a year or
24  two after the origination of the loan?
25          MR. RAINS:  Objection.  Vague

97

FRANK SILLMAN

1
2   and ambiguous.
3      Q.   In your experience?
4      A.   In my experience the repurchase
5   demands that I have seen have been made
6   greater than a year after the origination.
7      Q.   Is it -- in your experience are
8   most put back demands made within a year
9   or two after origination?
10     A.   A year or two.  I mean that's a
11  broad range.  They are typically --
12     Q.   Let's say within two years.
13     A.   I regularly see repurchase
14  demand requests for loans that are outside
15  the two-year time frame that you are
16  asking about.
17     Q.   So what I -- here's what I want
18  to be clear on.  Can you tell me sitting
19  here today whether in your experience most
20  put back demands are made within two years
21  or less after origination?
22          MR. JURGENS:  Objection to form.
23     A.   I mean, that's too broad of a
24  question because there are -- I see
25  repurchase demands for loans that are --

25  (Pages 94 to 97)

98

```
 1          FRANK SILLMAN
 2   were originated in 2010, 2011.  I also see
 3   repurchase demands for loans that
 4   originated in 2005, 2006, 2007.  So -- and
 5   I don't have the numbers in front of me
 6   to -- or to give you a precise answer.  So
 7   the answer is I see repurchase demands
 8   that are issued within two years and
 9   outside of two years.
10       Q.   Suppose your client asks you to
11   try to answer that question by reviewing
12   your records.  Could you do it?
13          MR. RAINS:  Objection.  Vague
14       and ambiguous.
15       A.   Could I determine the percentage
16   that I have seen?
17       Q.   Yes.  I'm talking about your
18   experience that you are relying on in
19   forming your expert opinion.
20       A.   I would tell them that I see
21   repurchase requests that are within two
22   years of origination and after two years
23   and would not be able to tell them the
24   percentages I see in one bucket or the
25   other.
```

99

```
 1          FRANK SILLMAN
 2       Q.   I recognize you couldn't tell
 3   them that off the cuff but what I want to
 4   try to be clear on is could you get an
 5   answer to that question by looking at your
 6   records?
 7       A.   And I would be looking at other
 8   clients' confidential records to give -- I
 9   wouldn't access that information from
10   other confidential client work that we
11   have done.  So the answer is I would not
12   provide them with details.  Though I may
13   understand them, I would not provide them
14   to a client.
15       Q.   And I'm not suggesting that you
16   would ever disclose confidential details
17   to a client.  But you could look at the
18   details of your various client work and
19   reach an aggregate conclusion and you
20   could provide that conclusion to your
21   client, right?
22       A.   The aggregate conclusion is the
23   one that I have been giving you which is I
24   see pre-2, 2 years and post 2 years.  But
25   I would not be more specific because I
```

100

```
 1          FRANK SILLMAN
 2   might be giving away indirectly
 3   confidential client information about
 4   their activities, just in general all of
 5   my other clients' activities so I would
 6   provide them with the same type of answer
 7   I'm providing to you.
 8       Q.   In your experience have you ever
 9   seen a put back demand made after the loan
10   had been foreclosed on?
11       A.   Yes, I believe I have.
12       Q.   How many times?
13       A.   I wouldn't be able to tell you
14   how many times.  But it's not an uncommon
15   occurrence.
16       Q.   Can you speak to whether, when
17   that has happened in your experience, the
18   seller has agreed to put it back or not?
19       A.   That I -- and those details -- I
20   mean you are asking for extremely narrow
21   situations.  So it's not something a
22   client has asked me.  I have observed just
23   because we see the status of the loan from
24   a servicing perspective as part of the
25   work that we will do, but I have not -- I
```

101

```
 1          FRANK SILLMAN
 2   would not be able to -- to put those
 3   circumstances together with what the end
 4   resolution of that loan was.
 5       Q.   Are you familiar with any court
 6   rulings holding that once a loan has been
 7   foreclosed the seller is not legally
 8   required to put it back?
 9       A.   I'm not aware of.
10       Q.   Are you aware that that's an
11   issue that could affect whether put back
12   is legally required or not?
13          MR. SHEEREN:  Objection to form.
14       A.   So you are asking me -- I'm not
15   aware of the case so.  What's your
16   second -- I'm sorry.
17       Q.   I'm just trying to see whether
18   you are familiar with that issue at all.
19       A.   I am not.  I have not been in
20   discussions with that issue with any of my
21   clients.
22       Q.   We are moving on.
23       A.   Okay.  Do you want that back?
24       Q.   Yes.  Can you turn, please, to
25   paragraph 5 of your initial declaration.
```

26  (Pages 98 to 101)

102

FRANK SILLMAN

1           FRANK SILLMAN
2           By the way, before we turn to
3    paragraph 5.  Let me ask you to imagine
4    you are advising a seller about a put back
5    demand.  You review the loan file and you
6    conclude that the only breach is the
7    absence of flood insurance.  Do you have a
8    view on whether that would constitute a
9    material breach of a rep and warrant put
10   back?
11          MR. RAINS:  Objection.
12   Incomplete hypothetical.  Calls for
13       speculation.
14       A.   So in your hypothetical those
15   types of situations would either be
16   developed in the repurchase standard they
17   gave us to work under or if it's a new
18   scenario, the client would revise the
19   repurchase standard to include.  So we
20   don't advise the client outside of what
21   the repurchase standards are that we are
22   reunderwriting the loan to.
23       Q.   So it would be up to the client
24   to answer the question I posed?
25       A.   That's correct.

103

1           FRANK SILLMAN
2       Q.   Suppose the loan file contained
3    a hardship letter showing that the
4    borrower had died.  In your experience
5    does that sometimes lead a seller to
6    refuse put back?
7           MR. RAINS:  Objection.
8    Incomplete hypothetical.  Calls for
9        speculation.
10          MR. BENTLEY:  It's not a
11   hypothetical.  I'm asking him a
12       factual question.
13          MR. RAINS:  Objection.
14   Incomplete hypothetical.  Calls for
15       speculation.
16          Can you answer the question?
17       A.   So, again, that would, the
18   recommendation that we would make would be
19   in accordance with a repurchase standard.
20   So if the repurchase standard contained
21   guidance around a hardship letter, we
22   would follow the guidance that the client
23   gave us.
24       Q.   Okay.  Now we are going to turn
25   to paragraph 5.  The second sentence of

104

1           FRANK SILLMAN
2    this paragraph is what I'm going to focus
3    on.  It says, "I was asked to provide an
4    independent assessment of the total
5    allowed claim as defined in the RMBS Trust
6    Settlement Agreements and opine as to its
7    reasonableness."
8           Do you see that?
9       A.   Yes.
10      Q.   And the total allowed claim,
11   that's $8.7 billion?
12      A.   Yes.
13      Q.   Who first contacted you about
14   this matter?
15      A.   Jen Battle.
16      Q.   When did she contact you?
17      A.   I believe it was early May but,
18   you know, I'm not positive as to the date.
19   But that's around the time.
20      Q.   She contacted you after the
21   debtors had entered into the RMBS Trust
22   Settlement Agreement?
23      A.   Yes.
24      Q.   And I can tell you that that
25   agreement was executed on May 13th.

105

1           FRANK SILLMAN
2       A.   Okay.
3       Q.   And the debtors filed bankruptcy
4    the next day.
5           When she contacted you, had the
6    debtors filed bankruptcy?
7       A.   Contacted me to discuss
8    retaining me for this expert work?
9       Q.   When she contacted you to
10   discuss this expert work the first time.
11      A.   You know, I don't recall.
12   Because we were an ongoing -- we were
13   doing ongoing work and then they suspended
14   that work, I don't recall when.  I believe
15   it was -- we didn't have any discussions
16   regarding this potential work until after
17   they filed bankruptcy but I don't recall
18   exactly.
19      Q.   Turning back to the sentence I
20   quoted a moment ago.  The opinion you were
21   asked to provide was as to whether or not
22   the total allowed claim was reasonable; is
23   that correct?
24      A.   Yes.
25      Q.   So you were not asked to come up

27  (Pages 102 to 105)

106

FRANK SILLMAN

1  with an independent range of what a
2  reasonable settlement might be but -- but
3  rather to opine on whether a settlement
4  that had already been reached was
5  reasonable?
6      A.   No.  I think it's more accurate
7  to say -- I believe I did say that --
8  maybe it was in my conclusion -- it was
9  a -- yeah.  They asked me to develop an
10 opinion to whether or not to a reasonable
11 degree of certainty that the proposed
12 allowed claim of 8.7 billion appears to be
13 in the range of reasonableness.
14     Q.   So let's just be clear.  You
15 were asked to focus on the $8.7 --
16 $8.7 billion figure, right?
17     A.   The allowed claim, yeah.
18     Q.   $8.7 billion?
19     A.   Yes.  That was the allowed
20 claim.
21     Q.   And to determine whether that
22 fell within what you deemed to be the
23 range of reasonableness?
24     A.   Yes.

107

FRANK SILLMAN

1      Q.   Were you given a deadline for
2  completing your analysis?
3      A.   There were, I believe, some
4  court imposed deadlines for the filing of
5  my original declaration.
6      Q.   Now, you filed that declaration
7  on June 11th.  It's dated June 11th.
8      A.   Yeah.
9      Q.   Was that the deadline that you
10 were told about when you were initially
11 contacted?
12     A.   I don't remember the original
13 deadline.  It might have been June 11.  I
14 don't recall.
15     Q.   Were you told that you should
16 complete your work within a period of ten
17 days or thereabouts?
18     A.   There was a time frame that was
19 put together.  I don't remember if it was
20 ten days or not.  But there was a time
21 frame.
22     Q.   If you were told it was ten
23 days, you wouldn't disagree with that?
24     A.   I mean, it's not outside the

108

FRANK SILLMAN

1  realm of what it was.  But I just don't
2  remember how many days it was.
3      Q.   Were you told by -- your work
4  needed to be done within that time frame?
5      A.   There was a deadline for the --
6  or a court imposed filing date so I had to
7  get the work done and be able to file
8  within that court imposed filing date.
9      Q.   Was there discussion of a
10 deadline for you to complete your work
11 prior to the deadline for the filing?
12     A.   Yes.
13     Q.   And how much in advance of the
14 filing?
15     A.   I don't remember.  I think that
16 I -- we finished it and filed it maybe
17 that day or the day before I actually
18 completed the declaration.
19     Q.   Now, regardless of whether this
20 initial deadline was ten days or some
21 other length of time, did you in fact
22 complete your work within that deadline?
23     A.   Yes.
24     Q.   And did you feel that was enough

109

FRANK SILLMAN

1  time for you to complete your work?
2      A.   Yes.
3      Q.   Now you did later do further
4  work as to certain parts of your analysis,
5  right?
6      A.   Correct.
7      Q.   As to estimated lifetime losses?
8      A.   (Witness nods.)
9      Q.   Did you do further work after
10 June 11 as to any other part of your
11 analysis?
12     A.   Part of the supplemental work?
13     Q.   Correct.  I'm asking the
14 question a bit more broadly.  I'm not just
15 asking about your supplemental
16 declaration.  But you did certain work
17 after June 11 relating to this project?
18     A.   Yes.
19     Q.   Some of that work related to the
20 estimated lifetime losses?
21     A.   Yes.
22     Q.   Did you do any work other than
23 that after June 11?
24     MR. RAINS:  Are you excluding a

28 (Pages 106 to 109)

110

```
 1          FRANK SILLMAN
 2   supplemental declaration or are you
 3   including a --
 4       Q.   Look, I'm not trying to trip you
 5   up here.  Your supplemental declaration
 6   talks mostly about estimated lifetime
 7   losses?
 8       A.   Right.
 9       Q.   And then at the very end there's
10   a couple of paragraphs about methodologies
11   employed with respect to put back rates?
12       A.   Right.
13       Q.   And you annex two exhibits
14   relating to that subject, right?
15       A.   Correct.
16       Q.   So I don't mean to exclude that
17   work.  What I mean to ask is whether after
18   June 11 you did any further analysis of
19   loss share rates?
20       A.   No, I don't believe that I did
21   any additional loss share rate work.
22       Q.   At any time up to today?
23       A.   No, I don't believe I have done
24   additional loss share rate work.
25       Q.   Okay.  Because you believe --
```

111

```
 1          FRANK SILLMAN
 2   you are satisfied with the work you did on
 3   loss share rate that's reflected in your
 4   initial declaration?
 5       A.   Yes.
 6       Q.   Okay.
 7       A.   It's open.  You know, I may
 8   continue to do more work on that but I'm
 9   very confident in the work that I did on
10   loss share rate in the original
11   declaration.
12       Q.   Understood.  And have there been
13   any developments that have occurred
14   between June 11 and today that might
15   affect that analysis?
16       A.   I'm not aware of any
17   developments.
18          MR. RAINS:  You know, of course,
19       that we will ask him to do more work
20       after we see what your experts have to
21       say.
22          MR. BENTLEY:  I am aware of
23       that, Darryl.  I don't mean to exclude
24       that.  That's why I said additional
25       work through today.
```

112

```
 1          FRANK SILLMAN
 2          MR. RAINS:  Great.
 3       Q.   Do you expect to offer any
 4   expert opinion at the hearing on this
 5   matter other than the opinion set forth in
 6   the last sentence of your initial
 7   declaration?  And when I say last
 8   sentence, I don't mean the swearing under
 9   penalty of perjury.
10          MR. RAINS:  Object.  The
11       question calls for speculation.
12       A.   I'm not -- I may discuss other
13   or provide other opinions in that
14   testimony.
15       Q.   I'm not trying to tie your
16   hands --
17       A.   Okay.
18       Q.   -- or preclude you.  I'm just
19   trying to -- just asking whether you
20   currently anticipate that you may be doing
21   that.
22          MR. RAINS:  When he says he's
23       not trying to tie your hands, he's
24       trying to tie your hands.
25          MR. BENTLEY:  That's not fair.
```

113

```
 1          FRANK SILLMAN
 2   But it's funny.
 3       Q.   What I'm asking is whether you
 4   currently anticipate other topics that you
 5   may testify about?
 6       A.   We're in discussion about other
 7   potential topics.  But nothing that I have
 8   any final opinions on at this swearing.
 9       Q.   What other topics are you
10   currently contemplating that you might
11   testify about?
12       A.   Might be around loan level
13   reviews and those results.
14       Q.   Anything else?
15       A.   No.  As of now.
16       Q.   And when you say loan level
17   reviews, are there particular loans or
18   pools of loans that you are thinking of
19   possibly reviewing?
20       A.   Yes.  We are evaluating and
21   preparing to potentially review certain
22   loans that may be in the expert report,
23   the loan level expert report we would
24   reply to.
25       Q.   So you are referring to the
```

29 (Pages 110 to 113)

114

FRANK SILLMAN

1
2 sample of 1500 loans that the committee's
3 experts have looked at?
4     A.   Yes.
5     Q.   So in other words, you and your
6 colleagues at Fortace, might review those
7 loan files?
8     A.   Yes.
9     Q.   Anything else?  Any additional
10 work that you are contemplating possibly
11 doing?
12     A.   Not at this time.
13     Q.   Have you or any of your
14 colleagues looked at any of those loans
15 yet?
16     A.   I have not looked at any of the
17 results of any work that has been done on
18 those loans.
19     Q.   Has somebody been looking at
20 them?
21     A.   We have had some people looking
22 at loans.
23     Q.   Fortace employees?
24     A.   Fortace personnel, yes.
25     Q.   Have they been developing

115

FRANK SILLMAN

1
2 reunderwriting standards to do that work?
3     A.   Yes.
4     Q.   And those standards have been
5 developed?  That cake is baked?
6     A.   I don't believe that they are
7 finalized at this point.
8     Q.   In the course of developing
9 those standards what documents are your
10 colleagues looking at?
11     A.   We are looking at the governing
12 agreements, the seller guide.
13     Q.   Anything else?
14     A.   There may be other contractual
15 agreements, master commitments.
16     Q.   Anything else?
17     A.   I think that covers the
18 documents that we are using.
19     Q.   Pro supps?
20     A.   I consider that to be part of
21 the governing agreements or the
22 securitization documents.
23     Q.   Fair enough.  Seller guide is
24 the same thing as program guide or client
25 guide?

116

FRANK SILLMAN

1
2     A.   Yeah.
3     Q.   How many -- strike that.
4     Your colleagues are looking at
5 governing agreements for how many of the
6 deals?
7     A.   I don't know.  I'd have to talk
8 to them about it.  I don't know how many
9 we are looking at.
10     Q.   Is it more in the nature of --
11 is it more than a hundred?
12     A.   I believe it's less than a
13 hundred.
14     Q.   Is it one or two deals per
15 shelf?
16     A.   I don't know how many.  I'd have
17 to get back to you.
18     Q.   Probably closer to ten than to a
19 hundred?
20     A.   I mean I wouldn't want to put a
21 number on it.
22     Q.   And are your colleagues looking
23 at the loan files or has that work not yet
24 started?
25     A.   We have begun looking at loan

117

FRANK SILLMAN

1
2 files.
3     Q.   And anything -- anything else
4 other than the documents you already
5 mentioned, plus loan files?  That is, are
6 your clients -- are your colleagues going
7 outside the loan files?
8     A.   You know, I'd have to look at
9 the audit strategy document for this
10 review to answer that question.  I just
11 don't recall whether we are or are not.
12     Q.   Let's turn back to paragraph 5.
13 And I'm going to ask you about the third
14 sentence of the paragraph which states,
15 "However, I take no position on the
16 ability of any party to prove a breach of
17 representations and warranties under the
18 governing agreements and I assume for the
19 purposes of this declaration that such a
20 showing can be made against the debtors."
21     Do you see that?
22     A.   Yes.
23     Q.   Can you explain what you mean by
24 that?
25     A.   I don't know.  I think I have

30  (Pages 114 to 117)

118

FRANK SILLMAN

1  said it in the paragraph.
2  **Q.   So is it fair to say you are not**
3  **opining as to whether any of the claims**
4  **have legal merit?**
5     A.   Whether they would be able to
6  prove breaches of reps and warrants, yeah,
7  under the governing agreements.
8     **Q.   Or prove the requirements of put**
9  **back?**
10    A.   Correct.
11    **Q.   And by the way, you don't claim**
12 **to have any expertise in that issue, do**
13 **you?**
14       MR. RAINS:  Objection, vague and
15    ambiguous.
16    A.   Which area is that?
17    **Q.   Whether put back is legally**
18 **required?**
19    A.   I didn't render any legal -- I
20 don't have any legal training and didn't
21 provide any legal recommendations under
22 this work.
23    **Q.   And you don't claim to have the**
24 **expertise needed to provide legal**

119

FRANK SILLMAN

1  **opinions, right?**
2     A.   Correct.
3     **Q.   And you are not expressing a**
4  **view, I take it, as to whether any of the**
5  **debtors' legal defenses have merit?**
6     A.   Correct.
7     **Q.   And you are also not expressing**
8  **a view as to whether the facts relating to**
9  **any of the loans in the pool being settled**
10 **would legally warrant put back?**
11    A.   Yeah.  I'm not making a legal
12 assessment.
13    **Q.   Am I correct you've made no**
14 **attempt to determine the, what portion of**
15 **the loans in the pool actually breach reps**
16 **and warranties?**
17    A.   The work that I'm depending on
18 or relying on is the repurchased, GSE
19 repurchase rate work that was done between
20 Fannie, Freddie and the debtor where they
21 reviewed thousands of loans over a number
22 of years and looked at the actual loan by
23 loan file review and availed themselves to
24 the defenses of the governing agreements

120

FRANK SILLMAN

1  or any other legal arguments as part of
2  that process.  So it's that work and the
3  results of that work that's incorporated
4  in my work, in my declaration.
5     **Q.   I understand you are drawing**
6  **inferences from the debtors' put back**
7  **history with the GSEs, among other things?**
8     A.   Correct.
9     **Q.   So I just want to be clear, am I**
10 **correct you haven't looked at any one loan**
11 **within the pool that's being settled to**
12 **try to reach a view or express an opinion**
13 **as to whether that loan actually breaches**
14 **any reps and warranties?**
15    A.   We have not completed our loan
16 level review work.  And I'm relying on the
17 thousands of loans that went through the
18 debtors' repurchase process as the basis
19 for my original declaration.
20    **Q.   So I think I'm hearing the**
21 **answer to my question but I just want to**
22 **be clear.  In your June 11 declaration you**
23 **are not expressing any opinion as to**
24 **whether any particular loan breaches any**

121

FRANK SILLMAN

1  **reps and warranties?**
2        MR. RAINS:  Objection.  Vague
3     and ambiguous.  Asked and answered.
4     A.   I utilized the repurchase work
5  the debtor did with the GSEs to form the
6  basis for my original declaration.
7     **Q.   And in reaching the conclusions**
8  **in your initial declaration you didn't**
9  **look at any individual loan file in the**
10 **pool that's being settled?**
11    A.   I relied on the thousands of
12 loans that were reviewed by the debtor as
13 part of their process prelitigation.
14    **Q.   With respect, Mr. Sillman, I**
15 **don't think you answered my question.**
16       MR. BENTLEY:  Let me ask the
17    reporter to read it back.
18       MR. RAINS:  I think you answered
19    the question.  It's been asked and
20    answered.
21       MR. BENTLEY:  You know, Darryl,
22    it's a yes or no question and I got a
23    nonanswer.
24       Read it back, please.

31  (Pages 118 to 121)

122

1          FRANK SILLMAN
2      (Record read.)
3      MR. RAINS:  Same objections.
4      A.   I relied on the GSE repurchase
5  work that the debtor did with Fannie and
6  Freddie.
7      Q.   To date have you looked at any
8  loan file for any of the loans within the
9  pool that's being settled?
10     A.   We are in the process of
11 reviewing the loan files.
12     Q.   Have you yet looked at any loan
13 files?
14     MR. RAINS:  You mean him
15 personally or Fortace?
16     Q.   Let's break it into pieces.
17 Have you personally looked at any loan
18 file?
19     A.   I have not looked at the loan
20 files.
21     Q.   Prior to your signing your
22 June 11 declaration, did anybody at
23 Fortace look at any of the loan files for
24 the loans being settled?
25     A.   I relied on, we relied on, the

123

1          FRANK SILLMAN
2  work that the debtor did with the GSE
3  repurchases in forming the assumptions and
4  conclusions in my original declaration.
5      Q.   So that's a no?
6      A.   I relied on --
7      MR. BENTLEY:  Read back my
8  question.
9      Q.   It's a very simple factual
10 question.  I'm not asking you what you
11 relied on.  I'm asking you whether you
12 looked at any loan files?
13     MR. BENTLEY:  Read it back,
14 please.
15     (Record read.)
16     MR. RAINS:  Objection, vague and
17 ambiguous.  Asked and answered.
18     A.   I relied on the work that was
19 done by the debtor as part of their GSE
20 repurchase for the conclusions and
21 assumptions made in my original
22 declaration.
23     Q.   And you didn't look at any loan
24 files?
25     A.   I relied on the GSE repurchase

124

1          FRANK SILLMAN
2  work.
3      Q.   Did that involve looking at any
4  loan files?
5      A.   It revolved relying on the loan
6  file reviews that the debtor performed.
7      Q.   Is there a reason you are
8  resisting answering a simple question?
9      MR. RAINS:  Objection.
10 Argumentative.  Asked and answered.
11     MR. BENTLEY:  It's not asked and
12 answered for Christ's sake, Darryl.
13     Read it back.
14     MR. RAINS:  Of course it has.
15 It's been asked 15 times and --
16     MR. BENTLEY:  Is the answer no?
17 Because I sure can't tell what the
18 answer is.
19     MR. RAINS:  I think his answer
20 is very clear.
21     MR. BENTLEY:  The answer is he
22 did something else, it's not whether
23 he did this or not.
24     MR. RAINS:  That's his answer.
25 You don't like his answer but it's his

125

1          FRANK SILLMAN
2  answer.
3      MR. BENTLEY:  I'm fine with his
4  answer, he just hasn't answered my
5  question.
6      Can you read it back, please.
7      MR. RAINS:  Let's do this, let's
8  take a quick break.
9      MR. BENTLEY:  You know what, I
10 want an answer to my question before
11 you speak --
12     MR. RAINS:  I'm going to talk to
13 him about his answer to your question.
14     MR. BENTLEY:  I object.  You are
15 not supposed to talk to the witness
16 while a question is pending.
17     (Whereupon, there is a recess in
18 the proceedings.)
19     MR. RAINS:  I think we have
20 succeeded in clearing up some of the
21 ambiguities and confusion caused by
22 your question.  Why don't you put the
23 question to him again.
24     Q.   I know it's very confusing but
25 I'll state it again.  In connection with

32  (Pages 122 to 125)

126

FRANK SILLMAN

1    forming the opinions expressed in your
2    June 11 declaration, did you or any of
3    your colleagues look at any of the files
4    for the loans in the pool being settled.
5        A.    For the, my original declaration
6    I relied on the work that was done by
7    ResCap and the repurchase activity.  We
8    are now looking at loan files.  We are
9    currently looking at loan files.
10        Q.    So let's just unpack what you
11    just said.  You relied on the work that
12    was done by ResCap.  What work are you
13    referring to?
14        A.    To GSE and private label
15    repurchase activity work ResCap did.
16        Q.    Understood.  But was that as to
17    any of the loans that are in this pool
18    that's being settled?
19        A.    There may be in the private
20    label securities work loans that are
21    included in this settlement.  The vast
22    majority of the loans were related to
23    their GSE originations.
24        Q.    And none of the GSE deals

127

FRANK SILLMAN

1    overlap in any way with this settlement,
2    right?
3        A.    Correct.
4        Q.    Were you relying, when you
5    prepared this report, on any work that RFC
6    had done in looking at the loans that are
7    part of this settlement?
8        A.    Yes.  We did review some
9    information regarding their private label
10    securitization repurchase work.  What we
11    found, I think there's an exhibit, that
12    the vast majority of those repurchase
13    demands were unresolved.
14        Q.    So I'm going to return to that.
15    I know what you are referring to.  Putting
16    aside any loan reviews that RFC may have
17    done in connection with its prepetition
18    put back experience, did you or any of
19    your colleagues look at any loan files in
20    connection with the work that went into
21    your June 11 report?
22        A.    We relied on the company's work
23    for the information in the original
24    declaration and we are now looking at loan

128

FRANK SILLMAN

1    files that are contained within the 392
2    trusts.
3        Q.    And when you say the company's
4    work, are you referring to anything other
5    than the work the company did prepetition
6    in connection with its prepetition put
7    back negotiations?
8        A.    Yeah.  It was prepetition work.
9        Q.    In connection with -- done by
10    the debtor in connection with its
11    prepetition put back experience?
12        A.    Yes.
13        Q.    And no other review of loan
14    files went into your, the conclusions
15    expressed in your June 11 declaration?
16        A.    That's right.
17        Q.    Okay.  We are there.  We got an
18    answer.  Thank you.  Let's move on.
19        A.    I would say no additional loan
20    work.
21        MR. BENTLEY:  I'm about to
22    change topics.  If people want to take
23    a break, this is fine or we can keep
24    going.

129

FRANK SILLMAN

1        MR. RAINS:  Let's take a break.
2    Sounds good.
3    (Luncheon recess taken at 12:09 p.m.)
4
5                    *  *  *
6
7    A F T E R N O O N   S E S S I O N
8        (Time noted:  1:22 p.m.)
9    F R A N K   S I L L M A N,   resumed and
10    testified as follows:
11    EXAMINATION BY (Cont'd.)
12    MR. BENTLEY:
13        Q.    Mr. Sillman, Good afternoon.
14        A.    Good afternoon.
15        Q.    Let's go back to paragraph 5 of
16    your initial declaration.  And I'm going
17    to ask you about the carryover sentence
18    that starts at the bottom of page 3 and
19    carries over to page 4.  So if you can
20    take a moment and read that, and tell me
21    when you are ready.
22        A.    Okay.
23        Q.    Does this sentence list all of
24    the data and agreements that you reviewed

33  (Pages 126 to 129)

130

1           FRANK SILLMAN
2    in connection with preparing your initial
3    declaration?
4        A.    There may have been additional
5    documents that I reviewed that we provided
6    to the data room as part of the work.
7        Q.    This was your attempt to
8    comprehensibly state the data and
9    documents that you reviewed in connection
10   with preparing your report?
11            MR. RAINS:  Objection.
12       Misstates the witness's testimony.
13       A.    This -- I don't believe this
14   paragraph was to try to include all of the
15   information and documents that I reviewed.
16   If there were additional documents, we
17   provided those to the data room.
18       Q.    Is it fair to say these are the
19   principal documents and data you reviewed
20   in connection with preparing your June 11
21   declaration?
22            MR. RAINS:  Objection.  Vague
23       and ambiguous.
24       A.    These documents represent some
25   of the core documents that I utilized.

131

1           FRANK SILLMAN
2    But again, in addition to the documents I
3    provided to the data room.
4        Q.    Was it your intent in preparing
5    this sentence to list the principal
6    documents you looked at?
7             MR. RAINS:  Objection.  Vague
8        and ambiguous.
9        A.    The intention of the sentence
10   was to try to identify some of the
11   principal documents utilized in developing
12   this declaration.
13       Q.    Does the report identify
14   anywhere else what other documents you, or
15   data, you considered?
16       A.    I may have throughout it.  I'd
17   have to read the rest of it.  But if there
18   was any other information that was
19   considered as part of this process I
20   provided it to be included in the data
21   room.
22       Q.    Item 6 in this sentence says you
23   reviewed governing agreements from one
24   trust for each of the shelves.  Is that a
25   correct statement?

132

1           FRANK SILLMAN
2        A.    Yes.
3        Q.    Did you believe it was
4    sufficient to review the governing
5    agreements for just one trust for each
6    shelf?
7        A.    Yes.
8        Q.    And why is that?
9        A.    I wasn't looking to read the
10   governing agreements to render any type of
11   legal opinion on its requirements but to
12   get familiar with the types of reps and
13   warrants that these shelves had.
14       Q.    For what purpose?
15       A.    Just an understanding of the
16   types of reps and warrants that the debtor
17   made on these trusts.
18       Q.    And was that relevant to your
19   conclusions?
20       A.    It was useful as background
21   information for me to understand the
22   general types of reps and warrants that
23   were made versus potentially Fannie Mae or
24   Freddie Mac reps and warrants.
25       Q.    Did you also think it was useful

133

1           FRANK SILLMAN
2    as a basis for comparing the debtors' reps
3    and warrants to the reps and warrants
4    you've seen for other sellers in your
5    personal experience?
6        A.    It was helpful to compare and
7    contrast that against work we have done
8    for other clients.
9        Q.    That was one of the elements
10   that went into your expert opinion?
11       A.    It was a factor considered.
12       Q.    Let me ask you now about items 1
13   through 4 of this sentence.  These are
14   things that you looked at to determine the
15   estimated lifetime losses for the trusts?
16       A.    Yes.  They were -- there was
17   information that I used to develop the
18   assumptions for our estimated lifetime
19   loss model.
20       Q.    Did you look at those also for
21   the purpose of developing your loss share
22   rate or just to determine lifetime losses?
23       A.    Just to determine lifetime
24   losses.
25       Q.    So to determine lifetime

34  (Pages 130 to 133)

134

FRANK SILLMAN

1  losses -- well, we are down to just one
2  remaining item in this sentence, number 5.
3      A.   Okay.
4      Q.   In addition to the governing
5  agreements from the trusts, which you
6  already testified about.  You looked at
7  the debtors repurchase experience with
8  Freddie Mac and Fannie Mae.  What
9  documents did you look at to understand
10  that?
11      A.   I looked at the -- let me get
12  the name of the document.  Exhibit A,
13  Inside Mortgage Finances Special Report
14  Analyzing GSE Mortgage Buyback Demands.
15      Q.   And Exhibit A to your report is
16  a portion of that document?
17      A.   Yes.  This is -- this was one
18  section, the section that contained the
19  information that I referred to and then we
20  provided the entire document to the data
21  room.
22      Q.   Let's turn now to the next
23  sentence in this paragraph.  You say, "In
24  those areas where actual data for the

135

FRANK SILLMAN

1  trusts is not available, such as audit
2  rates, demand rates, breach rates and
3  agree rates as defined and detailed below,
4  I utilized assumptions and developed my
5  own models based on my own experience and
6  industry data where available."  And it
7  then continues.
8         This sentence describes the data
9  you looked at to come up with your loss
10  share rate?
11      A.   Correct.
12      Q.   And the different rates that are
13  mentioned in this sentence, these are
14  elements that go into the calculation of
15  the loss share rate?
16      A.   That's correct.
17      Q.   Is this a relatively complete
18  statement of the data you considered in
19  determining those rates?
20         MR. RAINS:  Objection, vague and
21  ambiguous.
22      Q.   Actually, it is a bad question,
23  so let me withdraw it and try again.
24         Let me ask you first, you say in

136

FRANK SILLMAN

1  those areas where actual data for the
2  trusts is not available such as audit
3  rates, et cetera.  Can you explain what
4  you meant, that actual data for the trusts
5  was not available?
6      A.   So, you know, data regarding the
7  audit rates, demand rates, breach rates
8  and agree rates, let me talk about the
9  first three first.  The debtor was not
10  able to provide the audit rates for the
11  private label securitization or the GSE
12  work, was not able to provide demand rates
13  for either GSE or PLS and neither breach
14  rates for the PLS was able to get
15  breach rates for the GSEs and agree rates
16  for the GSEs from the IMF report.  So
17  where that data wasn't available I
18  utilized assumptions and developed my own
19  models.
20      Q.   You say the debtor was not able
21  to provide the audit rates for its
22  prepetition -- for its prepetition put
23  back experience.  Is that what you are
24  referring to?

137

FRANK SILLMAN

1      A.   That's correct.  So that would
2  be something that the debtor would not
3  have known that would have been known, for
4  example, on PLS to the trustees or the
5  insurance companies.
6      Q.   The debtor wouldn't have known
7  what the audit rate used by the trustees
8  was, correct?
9      A.   That's right.
10      Q.   But the debtor would know what
11  the loss share rate was, wouldn't it?
12      A.   For which?  For the PLS or for?
13      Q.   Yes.  Let's focus on the debtors
14  prepetition PLS put back experience.  We
15  are going to be talking about that for the
16  next few minutes.  I want to focus you on
17  that.
18      A.   Okay, okay.
19      Q.   You've pointed out that the
20  debtor didn't have access to the audit
21  rate used by the trustees?
22      A.   Correct.
23      Q.   But the debtor knew what
24  percentage of demanded put backs it agreed

35  (Pages 134 to 137)

138

FRANK SILLMAN

1  to, right?
2      A.   Well, there is a schedule that I
3  provide that develops that.  If I could
4  get a copy of that, that would be helpful.
5      Q.   Let's do that.  Unfortunately
6  it's very large.  You know what I'd like
7  to do to save a few trees is let me mark
8  as the next exhibit, namely Exhibit 7,
9  just the first page, the summary page of
10 the schedule that you were just referring
11 to.  And then if you'd like to see the
12 backup, I'm happy to give that to you.  I
13 just don't want to necessarily make it
14 part of the record unless we have to.
15     A.   Okay.
16         (Expert 9019 Exhibit 7, Fortace
17         Analysis PLS Demand Data Summary,
18         Bates RC-9019_00045459, marked for
19         identification, as of this date.)
20     Q.   So I have marked as Exhibit 7 a
21 single page document with Bates numbers
22 RC-9019_00045459.  And it's headed Fortace
23 Analysis PLS Demand Data Summary.
24     Is this the spreadsheet you were

139

FRANK SILLMAN

1  referring to?
2      A.   Yes.
3      Q.   And tell me what this shows.
4      A.   Give me a second to --
5      Q.   Certainly.
6      A.   -- look it over.
7      Q.   Take all the time you need.
8      A.   Okay.
9      Q.   So let me return then to the
10 question I asked you when you referred to
11 your schedule.  Did you have sufficient
12 data available to you to compute the
13 debtors prepetition loss share rate?
14     A.   To calculate that based on this
15 information?
16     Q.   Let's start with this
17 information.  Well, strike that.
18         This spreadsheet summarizes the
19 information you gathered to see if you
20 could answer that question; is that right?
21     A.   No.  This information was
22 provided by the debtor regarding their PLS
23 demands so that I could understand the
24 repurchase process that the debtor went

140

FRANK SILLMAN

1  through on PLS demands.
2      Q.   So the debtor prepared this
3  spreadsheet, both the single page we are
4  looking up plus all the backup that came
5  with it?
6      A.   No.  The -- the backup was
7  provided, the detail was provided by the
8  debtor.  And I summarized the information
9  in Table 1 and Table 2 and --
10     Q.   So you prepared Table 1 and
11 Table 2?
12     A.   Correct.
13     Q.   Namely the two tables shown on
14 Exhibit 7?
15     A.   Yes.
16     Q.   And what was your intent in
17 preparing this document?
18     A.   Similar to the work that we did
19 with the GSE repurchase data.  We wanted
20 to review the PLS repurchase demand data
21 to see if we could garner any information
22 that would help us in developing our
23 assumptions.
24     Q.   So this document divides the

141

FRANK SILLMAN

1  debtors prepetition PLS history into three
2  categories; is that correct?
3      A.   Yes.
4      Q.   Nonvoluntary, voluntary and
5  unknown?
6      A.   Correct.
7      Q.   Can you tell me what those three
8  categories represent?
9      A.   Yes.  So nonvoluntary, and
10 that's nomenclature that's developed by
11 the debtor, means that this repurchase
12 demand was received from the trustee or
13 the insurer and not instigated or
14 initiated by the company or the debtor.
15     Q.   In other words --
16     A.   So these are inbound repurchase
17 demands that or rescission requests that
18 the company would have received from
19 trustees or insurers.
20     Q.   So this category shows the
21 debtors responses to put back demands,
22 right?
23     A.   Yes.
24     Q.   And the category voluntary is

36  (Pages 138 to 141)

142

FRANK SILLMAN

1    what?
2        A.   Where they reviewed the loan
3    file internally, possibly as part of a
4    post funding QC process where they
5    identified loans that they felt met the
6    repurchase standard and notified the
7    appropriate trustee or insurer.
8        Q.   What is a post funding QC
9    process?
10       A.   That's where lenders review a
11   sample of loans that close to see if there
12   are any underwriting compliance or other
13   errors in the origination process.
14       Q.   And what's the -- do you have an
15   understanding as to what the debtors
16   purpose was in doing that?
17       A.   It's standard in the industry to
18   select a group of loans post closing.
19   One, it's a requirement for the GSEs to do
20   that and it's typically because the GSEs
21   make up such a large percentage of their
22   volume, it's typically utilized for all
23   types of loans to review the origination
24   process.
25

143

FRANK SILLMAN

1        Q.   And is there a reason the debtor
2    does this for PLS?
3            MR. JURGENS:  Objection to form.
4            MR. RAINS:  Calls for
5    speculation.  Go ahead.
6        A.   I'm not aware of, you know, why
7    they chose these loans and what their
8    policies are for QC'ing loans that go into
9    PLS securities.
10       Q.   Did you or your team make any
11   effort to try to understand the nature of
12   the debtors practices and procedures in
13   that regard?
14           MR. RAINS:  Objection, vague and
15   ambiguous.
16       A.   We discussed when they provided
17   this data what these various categories
18   were.  And they could not tell us under
19   what initiative these voluntary loans were
20   selected.  So their records -- they
21   explained to us their records didn't
22   reflect you how the loans were created as
23   voluntary demands.
24       Q.   Who participated in these
25

144

FRANK SILLMAN

1    discussions?
2        A.   I did, Michelle Minier and Jeff
3    Cancelliere.
4        Q.   Who is Mr. Cancelliere?
5        A.   He works for the debtor.
6        Q.   Do you know what he does there
7    or what he did at the time of these
8    discussions?
9        A.   Yeah.  He -- my understanding
10   was he was involved in the risk group for
11   the company.
12       Q.   So did he, to your knowledge,
13   did he participate in the post funding QC
14   process?
15       A.   That -- in my conversations with
16   him that wasn't my understanding.  I
17   interfaced with him in this regard.  He
18   was the person that collected this
19   information for us at the company.
20       Q.   So were you able to ascertain
21   what portion of the loans that you
22   described as voluntary, were reviewed as
23   part of the post funding QC process?
24           MR. JURGENS:  Objection to form.
25

145

FRANK SILLMAN

1        A.   I answered that already.  In
2    that they did not have the data available
3    to ascertain under what program these
4    voluntary demands were developed.
5        Q.   Did you have any understanding
6    what other programs may have given rise to
7    these voluntary repurchases?
8        A.   We had some discussions around
9    trying to better understand the types of
10   loans that would be included in the
11   voluntary.  And Jeff was not able to give
12   us any data around how these were created.
13       Q.   And just so we are clear.  I
14   meant to ask you about other programs, not
15   types of loans.  Do you have any
16   understanding of what programs other than
17   post funding QC programs led to these
18   voluntary repurchases?
19           MR. SHEEREN:  Objection to form.
20       A.   In my conversations with him
21   they didn't discuss the types of programs
22   that led to these voluntary because the
23   data was not available.  So they weren't
24   able to speak to how these loans came to
25

37 (Pages 142 to 145)

146

1          FRANK SILLMAN
2    be categorized as voluntary.
3        Q.   And do you know if it would be
4    possible now to reconstruct or come up
5    with that information?
6        A.   I don't know if anything has
7    changed.  They were not able to provide
8    that information at the time that we
9    requested this data.
10       Q.   Did you reach a conclusion about
11   whether the voluntary repurchases had any
12   bearing on the issues you were analyzing?
13       A.   We looked at all of the PLS
14   demands including the voluntary in
15   developing the conclusions that we had in
16   my report.
17       Q.   What weight -- strike that.
18          Table 2 addresses nonvoluntary
19   repurchases only.  Why did you isolate out
20   the nonvoluntary?
21       A.   I wanted to understand better
22   the state of the repurchase demands that
23   were made by trustees or insurers.
24       Q.   Am I right the only difference
25   between the Table 1 box relating to

147

1          FRANK SILLMAN
2    nonvoluntary and Table 2 is that Table 2
3    adds percentages, did I get that right?
4        A.   Well, it has the additional
5    categories, it has the three categories as
6    opposed to the one.
7        Q.   The third category meaning
8    percentages?
9        A.   No.  I'm sorry.  Voluntary,
10   nonvoluntary and unknown.  But just for
11   voluntary, yes, it was percentages so that
12   I can get an understanding of the status
13   similar to what we see in the GSE report
14   on the state of the repurchase demands.
15       Q.   And did you attribute any
16   significance to the data shown here about
17   voluntary repurchases?
18       A.   Other than the fact that the
19   vast majority of the voluntary were agrees
20   and repurchased.  It didn't have the same
21   type of informational value regarding the
22   repurchase demand process.
23       Q.   So did these numbers about
24   voluntary repurchases play any role in
25   your calculation of the debtors loss share

148

1          FRANK SILLMAN
2    rate?
3        A.   All of this information, this
4    was one of many factors, all of this
5    information was utilized in our
6    determination of loss share rate,
7    including the fact that 77 percent of the
8    PLS demands were either disagrees or
9    pending reviews, so unresolved at the time
10   that we received this information
11   87 percent.
12       Q.   But I just want to stick with
13   the voluntary category for a moment and
14   understand whether you took that into
15   account in any specific way in reaching
16   the conclusions in your report?
17       A.   It was one of the factors that
18   went into the development of our
19   assumptions.
20       Q.   How did it affect your
21   assumptions?
22       A.   We looked at the PLS demands on
23   a nonvoluntary/voluntary and didn't really
24   factor in the unknown.  But it was one of
25   the factors to try to understand the

149

1          FRANK SILLMAN
2    validity of the repurchase demands
3    experience that the debtor had with PLS.
4        Q.   Here's what I'm trying to
5    understand.  If there were no voluntary
6    repurchase activity at all for the debtor
7    prepetition would that change your
8    conclusions or your analysis in any way?
9        A.   Since it was a factor it would
10   have had -- what it told me was that the
11   debtor did have some loans that they felt
12   met the repurchase standard and they
13   voluntarily acknowledged that and notified
14   the appropriate parties.  So that factored
15   into my declaration.
16       Q.   Did it affect the numbers in
17   your conclusions in any way?
18       A.   It's one of the factors.  I
19   can't break out what detailed effect it
20   had.  But it was factored into my
21   analysis.
22       Q.   If the debtors had voluntarily
23   put back twice as many loans would that
24   have affected your analysis?
25       A.   Because the voluntary

38  (Pages 146 to 149)

150

FRANK SILLMAN

1  repurchases were a factor in the analysis,
2  no matter what the numbers were it would
3  have been considered in my analysis.
4      **Q.  I understand.  Would it have**
5  **changed your conclusions in any way if the**
6  **debtors voluntary put backs had been**
7  **double what --**
8      MR. RAINS:  Objection.
9      Incomplete hypothetical.  Calls for
10     speculation.
11     A.  It's speculation around what I
12 would have done in the case of different
13 information.  I can't speak to that.  I
14 evaluated the information as it was
15 presented to us and took it into
16 consideration in developing my
17 declaration.
18     **Q.  And can you tell me what**
19 **significance, if any, you attributed to**
20 **these voluntary repurchase numbers?**
21     A.  I believe I answered that.  You
22 told me that the company had acknowledged
23 that some of the loans they originated had
24 met the repurchase standard that would

151

FRANK SILLMAN

1  have required them to notify the trustee
2  or the insurer.
3      **Q.  Did you take those data points**
4  **and use them in any quantitative analysis?**
5      A.  These data points on this we
6  did.
7      **Q.  The voluntary data points.**
8      A.  There isn't a quantitative
9  schedule that was developed solely from
10 the voluntary repurchase demands.
11     **Q.  Or anything quantitative done**
12 **with those numbers?**
13     A.  With the voluntary numbers?
14     **Q.  Correct.**
15     A.  They were a factor in the
16 analysis.  I don't know how else to --
17     **Q.  That's all you can say about**
18 **them, that's fine.**
19     A.  Yeah.
20     **Q.  Let's turn to the nonvoluntary**
21 **category.  It states near the top of the**
22 **page that this covers demands received**
23 **from late 2007 to May 2012.  Do you see**
24 **that?**

152

FRANK SILLMAN

1      A.  Yes.
2      **Q.  And that data was not available**
3  **for the period prior to late '07.  Do I**
4  **understand that correctly?**
5      A.  That's correct.  That's what the
6  debtors told us.
7      **Q.  Do you have any understanding of**
8  **the number of demands that were made prior**
9  **to late '07?**
10     A.  This is all the information that
11 we have that the letter was able to
12 provide on the PLS demand data.  We asked
13 for it.  This is -- you have what we
14 received.
15     **Q.  So you drew no conclusions about**
16 **whether the pre late '07 demands were --**
17 **what number they might be, large or small?**
18     A.  I couldn't make any
19 determinations about that without having
20 the data.
21     **Q.  Okay.  As far as you know, it**
22 **could be a very small number?**
23     MR. RAINS:  Objection.  Calls
24     for speculation.

153

FRANK SILLMAN

1      A.  I don't have any idea.
2      **Q.  The rate of put back demands did**
3  **go up significantly following late '07,**
4  **didn't they?**
5      A.  What do you mean the timing?
6      **Q.  Starting in late '07, the number**
7  **of put back demands made against these**
8  **debtors and other sellers tended to go up,**
9  **didn't it?**
10     A.  You mean industry wide?
11     **Q.  Yeah.**
12     A.  I don't have access to industry
13 wide statistics on demands that were made
14 but it's my understanding that demands
15 were larger in 2008 then they were in
16 2005.
17     **Q.  And you actually discuss this in**
18 **your declaration?**
19     A.  Right.
20     **Q.  So let's turn to where you**
21 **discussed it.  Paragraphs 19 and 20.  What**
22 **did you base these paragraphs on, your**
23 **general experience?**
24     A.  Which paragraphs?

39 (Pages 150 to 153)

154

1      FRANK SILLMAN
2      Q.   19 and 20.
3      A.   Yes.  Based on my professional
4   experience and based on information noted
5   in paragraph 20.
6      Q.   So the unemployment rate went up
7   substantially, starting in when?
8      A.   The beginning of -- what I state
9   is the beginning of late 2007 the U.S.
10  economy entered the worst recession since
11  the great depression and it affected
12  employment, credit, gross domestic product
13  and the housing market.
14     Q.   And you say in the next
15  paragraph -- sorry.  And at around the
16  same time the housing prices plummeted,
17  right?
18     A.   I'd categorize it as having a
19  devastating effect on the housing market,
20  loan performance and housing prices.
21     Q.   And you say in the next sentence
22  housing prices were plummeting.  And in
23  the next paragraph you note that the GSEs,
24  monolines and investors to pursue rep and
25  warranty claims at elevated rates?

155

1      FRANK SILLMAN
2      A.   Yes.
3      Q.   So the rates of put back demands
4   went up starting when?
5      A.   In 2007-2008.
6      Q.   By the way, had it been
7   anticipated, do you have an understanding
8   as to whether this sharp decline in
9   housing prices had been anticipated --
10     MR. RAINS:  Objection to form.
11     Q.   -- prior to October 2007?
12     A.   Participated by?
13     Q.   The participants in the RMBS
14  securitization market?
15     A.   I'd have no way --
16     MR. RAINS:  Objection.  Calls
17  for speculation.
18     A.   I'd have no way to know what
19  they knew.
20     Q.   And I mean, at the time you were
21  a senior executive at IndyMac, correct?
22     A.   (Witness nods.)
23     Q.   Did you anticipate the
24  plummeting home prices?
25     A.   I did not.

156

1      FRANK SILLMAN
2      Q.   Do you anticipate that the
3   company economy might go into a recession?
4      A.   I do not.
5      Q.   And do you believe that large
6   numbers of your colleagues did in fact
7   anticipate these things?
8      A.   I can't speak to what they
9   thought.
10     Q.   Do you think you were in the
11  minority in not anticipating this?
12     A.   I don't know.  I have no way of
13  knowing.
14     Q.   Think you were part of a large
15  crowd, weren't you?
16     A.   I have no way of knowing what
17  other people were thinking.
18     Q.   And these factors increased
19  delinquency rates in home mortgage loans,
20  didn't they?
21     MR. SHEEREN:  Objection to form.
22     A.   I believe that these were
23  factors in delinquency rates.
24     Q.   For example, if somebody was
25  laid off that might tend to lead to his

157

1      FRANK SILLMAN
2   defaulting on a loan?
3      MR. SHEEREN:  Objection to form.
4      MR. RAINS:  Objection.
5   Incomplete hypothetical.
6      A.   Unemployment doesn't help
7   payment histories.  I can say that.  I
8   don't know what cause and effect there
9   were to the changes in delinquencies.
10  There were many factors that were
11  involved.  Being unemployed wouldn't be
12  one that would necessarily help
13  delinquency rates.
14     Q.   I understand you are not an
15  economist or a statistician so I'm not
16  asking you to give an opinion along those
17  lines.
18     A.   Okay.
19     Q.   I am asking you as a participant
20  in the market going back to '06, '07 and
21  as part of for the past 4 years did you
22  have an understanding that there was some
23  connection between rising unemployment and
24  rising homeowner defaults?
25     MR. SHEEREN:  Objection to form.

40  (Pages 154 to 157)

158

FRANK SILLMAN

1         A.    Is this at a particular time?
2         Q.    Let's say over the past 2, 3,
3    years.
4         A.    I believe that rising
5    unemployment is a factor in rising
6    delinquencies.
7         Q.    It can contribute to rising
8    delinquencies?
9         A.    It can contribute.
10        Q.    And plummeting home prices can
11   also contribute to rising delinquencies?
12        A.    That's in theory probably more
13   indirect.  I have not studied whether or
14   not borrowers that have lower home
15   appreciation or lower equity in their
16   homes are delinquent more.  There have
17   been some that have floated that theory.
18   I'm just not an expert.  That's back to
19   more of an economist view of the process.
20        Q.    Fair enough.  So you don't have
21   a view on that issue?
22        A.    Right.
23        Q.    Would you agree with me that
24   plummeting home prices tends to increase

159

FRANK SILLMAN

1    the loss severity?
2         MR. SHEEREN:  Objection to form.
3         Q.    That's something I think you do
4    claim to that an expert on?
5         A.    Yeah.
6         MR. SHEEREN:  Objection to form.
7         A.    Loss severity is driven in part
8    by the value that the servicer is able to
9    dispose of the home at liquidation.  So
10   there is a correlation between housing
11   prices and severities.
12        Q.    And that's something you looked
13   at as part of analyzing lifetime losses
14   for the trusts, correct?
15        A.    Yes.
16        Q.    So you believe that's a
17   significant causal relationship?
18        MR. JURGENS:  Objection to form.
19        MR. RAINS:  Objection, vague and
20   ambiguous.
21        A.    There's a relationship between
22   the value of a house and the severity.
23   And that was utilized in our initial
24   declaration and in our subsequent

160

FRANK SILLMAN

1    declaration about the estimated loss
2    models.
3         Q.    So delinquency rates went up
4    following '07.  Would you agree that a
5    fair number of -- a certain number of the
6    delinquent loans in the pool that's being
7    settled could have gone delinquent for
8    reasons having nothing to do with breaches
9    of reps and warranties?
10        MS. PATRICK:  Objection to form.
11        MR. RAINS:  Objection to form.
12   Calls for speculation.
13        A.    I have not evaluated the
14   millions of loans associated with all of
15   the trusts and so I couldn't answer the
16   question as to whether or not that was the
17   case.
18        Q.    Let's turn back to Exhibit 7 and
19   we are going to focus now on Table 2.  Can
20   you tell me how you computed the numbers
21   in the first line, the agree line?
22        A.    That was taken from the data
23   that was provided by the debtor where they
24   noted that they agreed to repurchase the

161

FRANK SILLMAN

1    loan.
2         Q.    And so what does this line of
3    data show?
4         A.    It shows that of the PLS demands
5    they received during this time frame, they
6    agreed to repurchase based on the original
7    principal balance a percentage of
8    10.36 percent.
9         Q.    And the next line shows
10   repurchase demands that were --
11        A.    Cancel the rescinded.  So again
12   their status category, that represented
13   repurchase demands that were given to them
14   that the trustee or insurer or demander
15   rescinded or canceled after sending them
16   the repurchase demand.
17        Q.    So usually this would be when
18   the demanding party was persuaded that it
19   wasn't a put backable loan?
20        A.    Yeah.  So it didn't meet the
21   repurchase standard.
22        Q.    And the next line?
23        A.    Disagree, rescission requested.
24   So that's where the company had reviewed

41 (Pages 158 to 161)

162

FRANK SILLMAN

1
2  the loans and disagreed that the loan met
3  the repurchase standard.  And the
4  rescission is, you are asking them to
5  rescind the demand.
6      Q.   And what about the next line,
7  pending review?
8      A.   Pending review is a category
9  again from the debtor of loans that was
10  somewhere in the review process at the
11  company.  So it may have been reviewed
12  pending manager approval.  It may be in
13  the queue to be reviewed.  It may be in
14  the process of being reviewed by an
15  underwriter.  So it's somewhere in that
16  review process.
17     Q.   Do you have any understanding of
18  how the loans in that category, pending
19  review, compare to the loans in the other
20  categories?  Are they just a big unknown,
21  a big black box?
22     A.   What are you asking me about
23  those loans?
24     Q.   Can you make any conclusions
25  about the likelihood that had those

163

FRANK SILLMAN

1
2  loans -- had the put back process finished
3  as to those loans, what the outcome would
4  have been?
5      A.   I don't have any way to
6  determine that.  All I know is that they
7  are currently unresolved.
8      Q.   So had they been resolved the
9  agree rate might have been 10.36 percent
10  or it might have been less or it might
11  have been more, you just don't know?
12     A.   I don't know.
13         MR. RAINS:  Objection.  Calls
14  for speculation.
15     A.   So agree and the cancel rate
16  numbers would -- or the disagree would
17  change based on the disposition of the
18  pending review files.
19     Q.   Sure.  So for purposes of your
20  calculations do you believe it's
21  appropriate to just disregard the pending
22  review category, take it out of the
23  equation, so to speak, or should it be
24  considered in some way?
25     A.   I believe it should be

164

FRANK SILLMAN

1
2  considered.  I considered it in my
3  analysis as unresolved.
4      Q.   I guess here's what I'm trying
5  to understand.  Based on the data shown in
6  Table 2 can you tell me what the debtors
7  nonvoluntary put back rate was with
8  respect to prepetition PLS demands?
9      A.   What do you mean put back rate?
10  You mean their agree rate?
11     Q.   I mean the loss share rate.
12     A.   I don't believe that you can
13  develop a sound and confident loss share
14  rate on PLS demands based on the status of
15  the PLS demands with the debtor
16  prepetition.  Since 87 percent of them
17  were unresolved I don't believe that I
18  could come to a credible conclusion.
19     Q.   Where do you get 87 percent
20  from?
21     A.   If I add the disagree and the
22  pending review together.  So that's
23  87 percent of the loans are unresolved.
24  They are not agrees or cancels, right,
25  which are the...

165

FRANK SILLMAN

1
2      Q.   So let me try again.  Based on
3  the data in Table 2 can you determine the
4  debtors prepetition agree rate for PLS
5  demands?
6      A.   I don't believe you can since
7  87 percent of the demands are unresolved.
8      Q.   But let's break that down.
9  65 percent in round numbers were
10  disagreed?
11     A.   Correct.
12     Q.   Then I ask you can you tell
13  anything about the loans that are pending
14  review and how they would likely fall into
15  the agree category or the disagree
16  category.  And is your answer still you
17  can't tell?
18     A.   I can't tell.  I wouldn't want
19  to speculate.
20     Q.   So wouldn't it be appropriate to
21  take that out of the equation and say the
22  debtors prepetition PLS agree rate is 10
23  percent -- 10.36 percent?
24         MS. PATRICK:  Objection to form.
25     A.   No, I don't believe you can

42  (Pages 162 to 165)

166

FRANK SILLMAN

1                FRANK SILLMAN
2  gather that information from this since
3  87 percent are still unresolved.  I don't
4  believe you can come to that conclusion.
5      **Q.  Okay.  Let me turn to a related**
6  **topic.  The demands that are reflected**
7  **here.  What sort of parties made these**
8  **demands?  Are some of them monoline**
9  **insurers?**
10     A.  Some monoline insurers.  Some
11  more MI companies and I believe a small
12  portion of them were also private label
13  securities trustees.  Mostly monolines and
14  MI.
15     **Q.  What is an MI company?**
16     A.  Mortgage insurance.
17     **Q.  Do you have any understanding of**
18  **the breakdown between monolines and**
19  **mortgage insurance companies?**
20     A.  They may have -- in the large
21  set of spreadsheets there, they may have
22  provided that information.  I'd have to
23  review it to determine whether that
24  information was provided to us or not.
25     **Q.  The spreadsheet that backed up**

167

1                FRANK SILLMAN
2  **Exhibit 7 contained information from a**
3  **sheet that would compute what portion on**
4  **the of the prepetition demands were**
5  **monolines versus MI companies versus**
6  **trustees?**
7     A.  I don't know.  I'd have to look
8  at it.  I don't recall all the fields that
9  were on there.  So if you --
10     **Q.  So my goal of saving trees I'm**
11  **going to abandon and let's mark as**
12  **Exhibit 8 --**
13     A.  Maybe give me one page in the --
14     **Q.  I think we have to mark it or we**
15  **are going to cause confusion.  I'm going**
16  **to mark as Exhibit 8 the entire**
17  **spreadsheet, including both the cover page**
18  **that was marked as Exhibit 7 plus all of**
19  **the backup.**
20     **(Expert 9019 Exhibit 8, entire**
21  **spreadsheet marked as Exhibit 7 plus**
22  **all of the backup, marked for**
23  **identification, as of this date.)**
24     **Q.  You've now had a chance to**
25  **review this spreadsheet?**

168

FRANK SILLMAN

1                **FRANK SILLMAN**
2     A.  I'm in the process right now.
3     **Q.  Sorry, take your time.**
4     A.  Okay, I see --
5       MR. RAINS:  Wait for him to ask
6  a question.
7     **Q.  So let me reask what I asked you**
8  **a moment ago.  Namely, can you tell from**
9  **Exhibit 8 what portion of the prepetition**
10  **PLS demands against the debtors were**
11  **monolines, what portion were MI companies**
12  **and what portion were trustees?**
13     A.  There is in column C titled
14  Notification Received From, there are
15  names of institutions listed there.  So I
16  couldn't tell you right now where or what
17  portion of these demands came from each of
18  those groups.  But I could figure that
19  out.  I might need to get some additional
20  clarification from the company.  There are
21  names on here of companies that were
22  purchasers of loans that also may have
23  been trustees on securitizations.  So I
24  would need to understand what role they
25  played as it relates to these demands.

169

1                FRANK SILLMAN
2     **Q.  Fair enough.  By the way, let me**
3  **ask you a related question which is in**
4  **your experience advising sellers about how**
5  **to respond to put back demands, often the**
6  **demands have been made by monoline**
7  **insurers?**
8     A.  I have had clients that had
9  demand for monoline insurers.
10     **Q.  Through that experience have you**
11  **developed an understanding of whether the**
12  **put back rules that govern monoline**
13  **insurers differ from the rules that govern**
14  **the put-back claims of uninsured trusts?**
15     A.  Nonmonoline trusts?
16     **Q.  Correct.**
17     A.  I have not done that evaluation
18  of the reps and warrants of monoline deals
19  versus nonmonoline deals.
20     **Q.  Is it fair to say you don't have**
21  **any basis to say whether the put back**
22  **claim would be stronger because it's made**
23  **by a monoline insurer than made by an**
24  **uninsured trust?**
25     A.  For purposes of my declaration I

43  (Pages 166 to 169)

170

```
 1              FRANK SILLMAN
 2   haven't done any legal analysis work, one,
 3   because that's not my area of expertise
 4   between those two.  And the clients I have
 5   done work for that have had monoline
 6   demands we set a repurchase standard and
 7   we have followed that repurchase standard
 8   in reunderwriting files.
 9       Q.   For purposes of forming the
10   opinions set forth in your declaration,
11   did you make any assumptions about how
12   monoline put back claims might compare to
13   those of uninsured trusts?
14       A.   For purposes of my declaration I
15   did not take into consideration any legal
16   arguments regarding potential differences
17   in reps and warrants between monoline and
18   nonmonoline securitizations.
19       Q.   Or any effect that might have on
20   the put back rate involving a monoline
21   compared to that involving an uninsured
22   trust?
23       A.   Can you ask me that question one
24   more time?
25       Q.   In looking at the debtors put
```

171

```
 1              FRANK SILLMAN
 2   back history, did you make any
 3   distinctions between put back demands made
 4   by monolines and those made by uninsured
 5   trusts?
 6       A.   The repurchase history that we
 7   relied on predominantly in the declaration
 8   was the GSE repurchase history.  And those
 9   GSE loans that went through that
10   repurchase process were not insured by
11   monoline insurers.  So the work that was
12   done and the conclusions and assumptions
13   that were derived from that work did not
14   differentiate monoline versus nonmonoline
15   securities.
16       Q.   Are you saying the debtors GSE
17   experience formed the principal basis for
18   your conclusions about the debtors loss
19   share rate?
20       A.   It didn't principally.  But it
21   was a factor in the assumptions that I
22   made in my original declaration.
23       Q.   And did you take the distinction
24   between monolines and nonmonolines into
25   account in any respect in doing your
```

172

```
 1              FRANK SILLMAN
 2   analysis?
 3       A.   I did not perform a legal
 4   analysis and therefore did not factor that
 5   into the work we did on our initial
 6   declaration.
 7       Q.   Loss share rate as you define it
 8   is the product of breach rate and agree
 9   rate, correct?
10       A.   Let me validate.  Yeah,
11   multiplying the breach rate times the
12   agree rate.
13       Q.   So in looking at the debtors
14   prepetition PLS history and trying to
15   judge whether that should play any role in
16   your opinion, did you consider the alleged
17   breach rate that could be -- did you
18   consider whether an alleged breach rate
19   could be derived from the debtors
20   prepetition put back experience?
21       MR. RAINS:  Objection, vague and
22   ambiguous.
23       A.   The breach rate is determined,
24   as I state on page 20 paragraph 57, by
25   multiplying the audit rate times the
```

173

```
 1              FRANK SILLMAN
 2   demand rate.  And since the audit rate was
 3   not provided by the company there was no
 4   way to try to determine the breach rate
 5   from the information that we received from
 6   the company.
 7       Q.   Audit rates aren't always
 8   reported, right?
 9       A.   That's correct.
10       Q.   And so if you are looking at the
11   put back experience of a particular seller
12   and you can't find the audit rate, it's
13   sometimes possible to compute the breach
14   rate, isn't it?
15       A.   Well, if you don't have the
16   audit rate, then my methodology you can't
17   compute the breach rate.
18       Q.   But can you do it in a different
19   way?
20       A.   I'm not aware of a different way
21   to do that.
22       Q.   What if you simply look at the
23   number of loans sold by the seller and how
24   many of them were the subject of a put
25   back demand?  Wouldn't that get you to the
```

44 (Pages 170 to 173)

174

FRANK SILLMAN

1 same place?
2     MS. PATRICK: Objection to form.
3     A. It's a different calculation.
4     **Q. I realize. Doesn't it get you**
5 **to the same place?**
6     MS. PATRICK: Same objection.
7     MR. RAINS: Objection. Vague
8 and ambiguous.
9     A. It's a different calculation.
10 It's a calculation but it's a different
11 calculation.
12     **Q. Would it yield the same result**
13 **or a different result?**
14     A. It would yield a different
15 result because it's a different
16 calculation.
17     **Q. Is it your view that you gave --**
18 **strike that.**
19     **Did you give any consideration**
20 **in forming your opinion to the number of**
21 **put back demands made against the debtors**
22 **prepetition?**
23     A. The number you mean, which
24 number?

1 same place?
2     MS. PATRICK: Objection to form.
3     A. It's a different calculation.
4     **Q. I realize. Doesn't it get you**
5     **to the same place?**
6     MS. PATRICK: Same objection.
7     MR. RAINS: Objection. Vague
8     and ambiguous.
9     A. It's a different calculation.
10 It's a calculation but it's a different
11 calculation.
12     **Q. Would it yield the same result**
13 **or a different result?**
14     A. It would yield a different
15 result because it's a different
16 calculation.
17     **Q. Is it your view that you gave --**
18 **strike that.**
19     **Did you give any consideration**
20 **in forming your opinion to the number of**
21 **put back demands made against the debtors**
22 **prepetition?**
23     A. The number you mean, which
24 number?

176

FRANK SILLMAN

1     **Q. So it would be a sale in**
2 **satisfaction of the mortgage?**
3     A. I'm not sure that I'm the
4 expert. Mortgages work differently in
5 each of the states. When the property is
6 liquidated, the losses associated with
7 that are passed on to the trust.
8     **Q. So let me just show you your**
9 **report so we don't have to go back and**
10 **forth on this. Look at paragraph 25 of**
11 **your initial declaration. And item A in**
12 **the first sentence refers to, "The actual**
13 **losses that are incurred when a loan is**
14 **foreclosed and sold through a short sale,**
15 **REO or other final disposition."**
16     **Do you see that?**
17     A. Yes.
18     **Q. And that's what you've defined**
19 **as the actual liquidated loss?**
20     A. Yes.
21     **Q. Okay. And do you have any way**
22 **of knowing whether after a liquidation of**
23 **that sort the trust would still hold the**
24 **mortgage?**

175

FRANK SILLMAN

1     MR. RAINS: He said put back
2 demands.
3     **Q. Let me try it again because my**
4 **question wasn't very clear. You've**
5 **computed that the debtors -- sorry, that**
6 **the trusts -- let me start again. You've**
7 **computed that the loans subject to the**
8 **proposed settlement have losses,**
9 **liquidated losses to date of about**
10 **$30 billion, correct?**
11     A. Correct.
12     **Q. And by the way, by liquidated**
13 **losses what do you mean?**
14     A. It means when there's a loss
15 that's passed on to the trust when the
16 loan is liquidated.
17     **Q. So are all of those losses on**
18 **account of either foreclosure or some**
19 **other sale?**
20     A. Short sale, yes. There's a
21 number of categories that would consider
22 the loan liquidated. And any losses
23 associated with that are reported as
24 liquidated losses.

177

FRANK SILLMAN

1     A. That would be a --
2     MR. JURGENS: Objection to form.
3     MS. PATRICK: Objection to form.
4     A. -- a legal question that may be
5 discussed in the governing agreements but
6 outside the scope of what -- what I looked
7 at for my declaration.
8     **Q. Okay. Fair enough. But you've**
9 **computed that the debtors -- the**
10 **liquidated losses on the loans in the**
11 **trusts to date are approximately**
12 **$30 billion?**
13     A. That's the information that I
14 received from Intex and LP, loan
15 performance.
16     **Q. And does Table 2 of Exhibit 7**
17 **show that, tell you the dollar value of**
18 **put back demands made against the debtors**
19 **with respect to these trusts from late**
20 **2007 until the petition -- until May 2012?**
21     A. I'm not sure -- you are asking
22 the detailed schedule information?
23     **Q. Exhibit 7, the cover page.**
24     A. Oh, the cover page.

45 (Pages 174 to 177)

178

FRANK SILLMAN
1
2    Q.   The summary page.
3    A.   Okay.
4         MR. RAINS:  Ask the question
5    again, please.
6         MR. BENTLEY:  Sure.
7    Q.   Look at Table 1, last line
8    labeled Grand Total.
9    A.   Uh-hum.
10   Q.   And does this tell you that
11   between late '07 and May 2012 a total of
12   15,481 put back demands were made, PLS
13   demands were made on the debtors?
14   A.   Nonvoluntary?
15   Q.   That's what demands are, right?
16   A.   Right.
17   Q.   So did I get that right?
18   A.   Yes.
19   Q.   And does this tell you that
20   during that same time period the original
21   principal balance for those loans was, in
22   round numbers, $1.37 billion?
23   A.   Yes.  That's information that
24   was provided to me by the company.
25   Q.   Did you give any consideration

179

FRANK SILLMAN
1
2    in forming your conclusions to the fact
3    that loans with that aggregate original
4    principal balance were the subject of put
5    back demands -- sorry.
6         Did you give any consideration
7    to the relationship between that number,
8    the $1.37 billion, and the $30 billion of
9    liquidated losses for these trusts?
10        MS. PATRICK:  Objection to form.
11        MR. RAINS:  Objection.  Vague
12   and ambiguous.
13   A.   These demands --
14        MR. RAINS:  Ignore them.  Just
15   go ahead and answer.
16   A.   These demands may or may not
17   correlate to the liquidated loans that
18   make up the $30 billion in actual
19   liquidated losses.
20   Q.   Okay.  If the debtor had agreed
21   to put back, then the loan would no longer
22   be in the trust.  That's part of your
23   point?
24   A.   If they had repurchased the loan
25   they may have repurchased the loan from

180

FRANK SILLMAN
1
2    the trust or they may have, you know,
3    settled some dollar amount related to the
4    loss of the trust if they agreed.
5    Q.   But these are all of the put
6    back -- so my question is did you give any
7    consideration to the fact that all of the
8    prepetition put back demands against the
9    debtor during this period were for loans
10   with a total principal balance of only
11   1.37 billion whereas the loans in the
12   trusts being settled had suffered
13   losses -- had suffered $30 billion of
14   losses.  Did the relationship between
15   those two numbers have any significance to
16   you?
17        MR. RAINS:  Objection.  Vague
18   and ambiguous.
19   A.   The original principal balance
20   of the nonvoluntary was one of the numbers
21   that we looked at, one of the factors that
22   we considered.  But since the vast
23   majority of them were unresolved we
24   weren't able to draw any conclusions from
25   the information.

181

FRANK SILLMAN
1
2    Q.   By the way, you say the vast
3    majority were unresolved.  That's not
4    true, is it?  22.54 percent were
5    unresolved.
6    A.   No, the 64.76 is also
7    unresolved, right.  There's a disagree so
8    we have a pending demand that has not been
9    rescinded or canceled and you have the
10   company who is disagreeing with either the
11   underlying facts or that it meets the
12   repurchase standards.  So it is
13   unresolved.
14   Q.   But it's been resolved as far as
15   the better is debtor is concerned in its
16   put back negotiations, correct?
17        MR. RAINS:  Objection.  Vague
18   and ambiguous.  Misstates the
19   witness's testimony.
20        MS. PATRICK:  Objection to form.
21   A.   Yeah.  The resolved for purposes
22   of our analysis here is when they come to
23   an agreement to repurchase or cancel and
24   rescind, all others are still in the
25   unresolved category.

46 (Pages 178 to 181)

182

1          FRANK SILLMAN
2      Q.   Well, look at paragraph 59 of
3  your declaration.  The first sentence
4  states, "The agree rate is the percentage
5  of demands issued by the trustee that the
6  seller agrees to repurchase or make
7  whole."  Correct?
8      A.   Yes.
9      Q.   So the agree rate for the
10  debtors shown on Exhibit 7 is just
11  10.36 percent, correct?
12      A.   Yes.
13      Q.   And the 64 percent would not be
14  unresolved in the sense you use -- sorry,
15  using the approach you take in your
16  declaration the 64.76 percent would be the
17  reject rate, the opposite of the agree
18  rate, correct?
19      A.   This --
20          MS. PATRICK:  Objection to form.
21      A.   The information that we utilized
22  is the loans all had a determination as
23  we -- as they made their way through the
24  process.  And so the disagree rate would
25  not be it.  It would be the canceled and

183

1          FRANK SILLMAN
2  rescinded rate would be the opposite to
3  the agree rate.  So they all have to be
4  resolved.  So it's not the disagree.  It's
5  the cancel and rescinded or agree.
6      Q.   Okay.  Let's move on.  And I
7  don't think I got an answer to my
8  question.  In forming your conclusions did
9  you attribute any significance to the fact
10  that the debtors had suffered -- sorry,
11  the trusts whose loans are being settled
12  have suffered $30 billion in losses but
13  during the period shown on Exhibit 7 the
14  debtors received put back demands only
15  with respect to loans with an original
16  principal balance of roughly 1.37 billion,
17  did you give any significance to those
18  facts?
19          MR. RAINS:  Objection, compound.
20      Vague and ambiguous.
21      A.   It was a factor.  This takes it
22  through demands that were received by the
23  debtor through May 2012, at the same time
24  they entered into a settlement agreement
25  agreeing to -- agreeing to an allowed

184

1          FRANK SILLMAN
2  claim for 8.7 billion.  So I took into
3  consideration the 1.3 billion and the fact
4  that the trustees had also negotiated an
5  allowed claim of 8.7.  So I had to take
6  into consideration the fact that there was
7  a claim.
8      Q.   So one of the things you took
9  into consideration in forming your
10  conclusion was that the debtors had agreed
11  to an aggregate settlement of
12  $8.7 billion?
13      A.   We are talking about the PLS
14  demand data.  I could not ignore the fact
15  that in addition to the 1.3 billion in
16  demands there was also a proposed
17  settlement of 8.7 billion.  So it was a
18  factor in the development of my
19  declaration.
20      Q.   Let's go back to paragraph 5 of
21  your declaration.
22          MS. PATRICK:  5?
23          MR. BENTLEY:  Correct.
24          MR. RAINS:  I'm sorry, where?
25          MS. PATRICK:  5.

185

1          FRANK SILLMAN
2          MR. BENTLEY:  5.
3          MR. RAINS:  That's so
4  demoralizing.  We made it up to 50 --
5          MR. BENTLEY:  Darryl, I'm going
6  doing it just to demoralize you.
7          MR. RAINS:  We started at 5 over
8  an hour ago and we are still stuck in
9  5.
10          MR. BENTLEY:  I think that means
11  we are going to go for days.
12          MR. BENNETT:  He likes 5.
13          MR. BENTLEY:  Don't lose hope,
14  Darryl.
15      Q.   I want to focus you on the last
16  sentence and specifically the portion that
17  says "I utilized assumptions and developed
18  my own models based on my own experience
19  and industry data where available."
20          So your reference to your own
21  experience, the way you used your own
22  experience in developing your models is
23  described later in this declaration; is
24  that right?
25      A.   Yes.

47 (Pages 182 to 185)

186

FRANK SILLMAN

1
2      Q.   It's described on pages 16 to 23
3  of your declaration?
4      A.   Yes.  Those are areas where I
5  discuss my experience with these rates.
6  Yes.
7      Q.   Now, going back to the sentence
8  I just quoted.  You say you also used
9  industry data where available.  What
10 industry data are you referring to?
11     A.   I looked at Freddie Mac and
12 Fannie Mae's repurchase data.
13     Q.   Anything else?
14     A.   Let me read through.
15     Q.   And actually, sorry.  When you
16 say Freddie Mac and Fannie Mae repurchase
17 data, you are referring to the data --
18     A.   In the IMF report.
19     Q.   The excerpt annexed as Exhibit
20 A?
21     A.   Yes.
22     Q.   Okay.  Anything else?
23     A.   Let me read through this.  Your
24 question was in regards to industry data?
25     Q.   Correct.

187

FRANK SILLMAN

1
2      A.   So I also looked at the FHFA OIG
3  report.
4      Q.   Which you discuss in?
5      A.   Paragraph 49 -- 48.
6      Q.   Okay.  Anything else?
7      A.   I did review the BofA expert
8  report and the Lehman expert declaration.
9      Q.   And specifically the BofA report
10 annexed as Exhibit C?  And the Lehman
11 declaration annexed as Exhibit D?
12     A.   Let me take a look.  Yes.  And
13 the FHFA OIG report as Exhibit E.
14     Q.   Did you consider any other
15 industry data?
16     A.   Just as it relates to these
17 pages in question, is that what you are
18 asking me?
19     Q.   I'm referring to the sentence in
20 paragraph 5 which refers to your using
21 assumptions in developing models based on
22 industry data.
23     A.   I would need to also look at the
24 complete list of the documents I have
25 provided to the data room so that I make

188

FRANK SILLMAN

1
2  sure that I cover all of the industry data
3  that I utilized.
4      Q.   Are these the only sorts of
5  industry data that you describe in your
6  report, the ones you've just mentioned?
7      A.   I'll have to go through the
8  report.
9      Q.   Take your time.
10     A.   I also reviewed some information
11 regarding Bank of America's settlements
12 with Fannie Mae and Freddie Mac.
13     Q.   And that is referred to?
14     A.   Paragraph 22.  I also make a
15 reference to the Compass Pointe exhibit,
16 which is Exhibit B.
17     Q.   And where do you refer to that?
18     A.   In paragraph 20 at the top of
19 page 10.
20     Q.   And that's part of your
21 calculation of loss rates not loss share
22 rates, right?
23     A.   No.  I didn't -- I don't believe
24 I used it for that purpose.  That was just
25 under the loan repurchase trend section.

189

FRANK SILLMAN

1
2      Q.   I see.  Yes.  My mistake.
3      A.   And then let me finish up here.
4  We are only talking about my original
5  declaration, my first declaration?
6      Q.   Correct.
7      A.   Yes.  Those are the documents I
8  refer to in my declaration.
9          MR. BENTLEY:  Your counsel will
10 be thrilled to know I'm not going to
11 ask you about paragraph 6.
12         MR. RAINS:  There's no going
13 back after this.
14     Q.   Paragraph 6 describes the way
15 you ended up computing loss share rate,
16 right?
17         MR. RAINS:  Objection.
18 Misstates the paragraph.
19         MR. BENTLEY:  How did I get it
20 wrong?
21     A.   It discusses two of the steps.
22 The first step in determining estimated
23 lifetime losses and then the second step
24 is determining a loss share rate.  And for
25 all of these rates I developed ranges but

48  (Pages 186 to 189)

190

```
 1           FRANK SILLMAN
 2   a loss share rate range.  So it's both, I
 3   discuss both of them.
 4       Q.   I understand that the
 5   computation of each of these two elements
 6   involves a number of steps.  But does this
 7   paragraph 6 accurately summarize from a
 8   big picture standpoint your whole analysis
 9   used to develop loss share rate -- I'm
10   sorry -- used to estimate the debtors --
11   let me start again.  I think I mucked it
12   up.
13           Does this paragraph accurately
14   summarize the method you used to estimate
15   the debtors potential repurchase
16   requirements?
17       A.   It allowed me to estimate the
18   range of reasonableness for the allowed
19   claim.  And that was done in two steps,
20   step one and step two.
21       Q.   Which are described here?
22       A.   Yes.
23       Q.   So basically to compute
24   potential repurchase requirements you
25   calculated an estimated lifetime of
```

191

```
 1           FRANK SILLMAN
 2   losses, you then calculated loss share
 3   rate and you multiplied the one by the
 4   other?
 5       A.   That's correct.  In ranges so
 6   it's not a single number.  It's a lower
 7   range and a higher range.
 8       Q.   Understood.  And your
 9   computation of estimated lifetime losses
10   is contained in the section starting on
11   page 11 of your report, correct?
12       A.   Yes.  That's the section.
13       Q.   And your computation of loss
14   share rate is addressed in the section
15   starting on page 16 of your report.
16       A.   Yes.  Paragraph 44.
17       Q.   So this is basically --
18   paragraph 6 is basically a nutshell
19   summary of computations you performed?
20           MR. RAINS:  Objection.  Vague
21   and ambiguous.  Misstates the
22   witness's testimony.
23       A.   It discusses the two steps that
24   I utilized first in developing the
25   estimated lifetime loss ranges and then
```

192

```
 1           FRANK SILLMAN
 2   this next step in estimating the loss
 3   share rate ranges.
 4       Q.   So all of your calculations on
 5   pages 16 to 23, the upshot of those
 6   calculations is the loss share rate,
 7   correct?
 8       A.   Yes.  The result of the work
 9   that's done starting on page 16, paragraph
10   44 and ending on page 23, paragraph 66.
11       Q.   There's a number of different
12   components, retrade, agree rate and audit
13   rate and demand rate.  But the purpose of
14   all of those is to come up with the -- the
15   collective result of all of those is the
16   loss share rate?
17       A.   Right.
18       Q.   Now, going back to paragraph 6
19   in the second sentence describing loss
20   share rate, you describe loss share rate
21   as, "The percentage of estimated lifetime
22   losses that the debtors might agree to
23   share with the trusts."
24           Do you see that?
25       A.   Yes.
```

193

```
 1           FRANK SILLMAN
 2       Q.   So was it deliberate on your
 3   part to use the word "might" rather than
 4   would?
 5       A.   What I was developing -- what I
 6   developed for this is a range of
 7   reasonable loss share rates.  And whether
 8   or not the debtor would agree to a loss
 9   share rate ultimately agree to a loss
10   share rate or an allowed claim that you
11   could calculate a loss share rate is
12   something for the others to decide, not me
13   to impose by using the word "would."
14       Q.   For example, your calculations
15   are all predicated on the assumption that
16   a breach of rep and warranties can be
17   proved against the debtors as a legal
18   matter, right?  We talked about that
19   earlier.
20       A.   Let me get to -- what paragraph
21   are you referring --
22       Q.   5.  Third sentence.
23           MR. RAINS:  What was the
24   question again?
25       Q.   You assume for purposes of your
```

49 (Pages 190 to 193)

194

FRANK SILLMAN

1  FRANK SILLMAN
2  declaration that a showing can be made
3  against the debtors that reps and
4  warranties were breached under the
5  governing agreements, correct?
6      A.  Let me reread the sentence.
7      What was your question?
8      MR. BENTLEY:  Can you read it
9  back.
10     (Record read.)
11     A.  What I said was however, I take
12 no position on the ability of any party to
13 prove a breach of representations and
14 warranties under the governing agreements.
15 And I assume for the purposes of this
16 declaration that a showing can be made
17 against the debtors.
18     Q.  Now, as an expert you are
19 familiar with the use of assumptions in
20 forming your conclusions?
21     A.  Yes.
22     Q.  An assumption is something that
23 somebody gives to you and you accept
24 without vouching for it, fair?
25     A.  That someone gives to me as the

195

1  FRANK SILLMAN
2  expert?
3      Q.  It's an assumption that you
4  don't vouch -- you don't vouch for the
5  accuracy of the assumption as an expert,
6  correct?
7      A.  It's not based on specific data.
8      Q.  You are told to assume
9  something, correct?
10     A.  No.  I don't believe that in
11 this scenario that I'm being told to
12 assume certain assumptions.  I'm --
13     Q.  You weren't instructed by
14 counsel to make this assumption?
15     A.  To make which assumption?
16     Q.  The assumption referred to in
17 the sentence we just read?
18     MR. RAINS:  Objection.  Vague
19 and ambiguous.
20     A.  I'm not sure what you're --
21     Q.  We just read the sentence that
22 says in part "I assume for purposes of
23 this declaration that such a showing can
24 be made against the debtors."  Weren't you
25 instructed by counsel to make that

196

1  FRANK SILLMAN
2  assumption or did you come up with that on
3  your own?
4      A.  I'm trying to remember how we --
5  how I came up with this.
6      Q.  Weren't you instructed by
7  Kirkland & Ellis to make that assumption?
8      A.  I don't recall whether I was or
9  wasn't.
10     Q.  Well putting aside --
11     MR. RAINS:  Did you say Kirkland
12 & Ellis?
13     MR. BENTLEY:  I did.
14     MR. RAINS:  Were you instructed
15 by Kirkland & Ellis to make that
16 assumption?
17     THE WITNESS:  I don't believe I
18 was.
19     Q.  Were you instructed by Morrison
20 & Foerster to make that assumption?
21     A.  I don't -- I don't recall as
22 to -- I don't believe it was Kirkland &
23 Ellis.  But I don't recall whether or not
24 that particular sentence was discussed
25 with Morrison & Foerster or not.  I just

197

1  FRANK SILLMAN
2  don't remember.
3      Q.  So was it your own decision to
4  make that assumption?
5      A.  I don't recall is what I'm
6  saying.  I don't recall.  You asked me
7  whether Morrison & Foerster instructed or
8  whether I came up with it.  I don't recall
9  that particular language.
10     Q.  Do you think it's appropriate to
11 use this assumption in your report?
12     A.  Yes.  I think it's appropriate
13 to use that assumption.
14     Q.  Why is that?
15     A.  The whole sentence, part of the
16 sentence.
17     Q.  Do you have a clear
18 understanding of what you assumed?
19     A.  I believe I do.
20     Q.  What did you assume?
21     A.  I assumed in the first part that
22 I didn't take a position on the ability of
23 any party to prove a breach of rep and
24 warrants under the governing agreements.
25 And I assumed that they could make or

50 (Pages 194 to 197)

198

1          FRANK SILLMAN
2   could make such a showing of a breach of
3   reps and warrants against the company or
4   against the debtors.
5          Q.   Why did you choose to make that
6   assumption?
7          A.   I guess because it's important
8   in the analysis of whether or not they may
9   or may not be responsible for some portion
10  of the loss share.
11         Q.   Can you explain that to me?
12         A.   I'm not sure what --
13         Q.   I asked you why did you choose
14  to make that assumption and your response
15  was I guess because it's important in the
16  analysis of whether or not they may or may
17  not be responsible for some portion of the
18  loss share.  I don't understand that.  Can
19  you explain it to me?
20         A.   That's my understanding of what
21  it means.  So I'm --
22         Q.   Can you give me any further
23  explanation of why you chose to make this
24  assumption?
25         MR. RAINS:  Object to the form

199

1          FRANK SILLMAN
2   of the question as vague and
3   ambiguous.
4          A.   I have answered it.  I don't
5   know how to put it a different way.
6          Q.   When you make an assumption if
7   the court then concludes that the assumed
8   facts are not true, does that affect your
9   conclusions generally as an expert.
10         MR. RAINS:  Objection, vague and
11  ambiguous.
12         A.   Ask me the question again.
13         Q.   You are familiar as an expert
14  with the process of making assumptions?
15         A.   Yes.
16         Q.   You don't vouch for the facts
17  that you assume.  You just assume them,
18  right?
19         A.   Yes.
20         Q.   And it's possible that the court
21  might find that the assumed facts are not
22  true, right?
23         A.   It's possible, yeah.
24         Q.   And generally speaking, when
25  that happens that might affect the

200

1          FRANK SILLMAN
2   validity of your conclusions, right?
3          A.   That could, yeah.
4          Q.   Because they rest on the
5   assumptions and if the assumptions aren't
6   true, then the conclusions may not be true
7   either.
8          A.   Okay.
9          Q.   You agree with that?
10         A.   I understand it, yes.
11         Q.   And would you agree that that's
12  true here to that this assumption that you
13  describe in paragraph 5 is not true then
14  that could undermine the validity of your
15  conclusions?
16         MS. PATRICK:  Objection to form.
17         A.   I can't speculate on what the
18  court might decide based on any of the
19  assumptions that I made in the agreement.
20         Q.   I'm asking you to assume now,
21  which is something you do as an expert,
22  assume that the court finds that this
23  assumption was unwarranted.  Would that
24  impact the validity of your conclusions?
25         MR. RAINS:  Objection.

201

1          FRANK SILLMAN
2   Incomplete hypothetical.  Calls for
3   speculation.
4          A.   Yeah, I can't speculate on what
5   the court might decide if one or more of
6   the assumptions they deemed are not valid.
7          Q.   If the court were to find that
8   the debtor is not liable for a certain
9   portion of the rep and warranty claims,
10  that might affect the validity of your
11  conclusions, right?
12         MS. PATRICK:  Objection to form.
13         MR. RAINS:  Well, it doesn't
14  talk about a certain portion here.
15  Where are you getting that?
16         MR. BENTLEY:  The whole --
17         MR. RAINS:  I object to the form
18  of the question.  Misstates the
19  witness's testimony and his
20  declaration.
21         Q.   Can you answer?
22         A.   I'm not sure what the question
23  is.  Can you repeat it?
24         Q.   Just give me one moment.
25         If the court were to conclude

51 (Pages 198 to 201)

202

FRANK SILLMAN

1
2  that the debtors are not liable for
3  certain of the rep and warranty claims,
4  would that affect the validity of your
5  conclusion?
6          MR. RAINS:  Objection.
7  Misstates the witness's testimony.
8  Calls for speculation.
9      A.  I have no opinion as to what the
10  court might do and how that might affect
11  the outcome.
12      Q.  Just so we are clear, I'm not
13  asking you to speculate about what the
14  court might do.  I'm asking you to assume
15  that the court concludes that the debtors
16  are not liable for certain of their rep
17  and warranty claims.  Might that impact
18  the validity of your conclusions?
19          MS. PATRICK:  Objection to form.
20          MR. RAINS:  Objection.
21  Incomplete hypothetical.
22      A.  In this hypothetical I don't
23  know what type of impact that might have
24  on the conclusions.
25      Q.  As far as you know, it might

203

FRANK SILLMAN

1
2  undercut your conclusions?
3          MS. PATRICK:  Objection to form.
4          MR. RAINS:  Same objection.
5      A.  I have no basis to speculate as
6  to in this hypothetical on what might
7  happen.
8      Q.  Let's turn back.
9          MR. RAINS:  If you are going to
10  a new topic, we have been going over
11  an hour and a half.  I have been
12  waiting for a convenient space here.
13  Is this a good point?
14          MR. BENTLEY:  This is a fine
15  time for a break.
16          (Whereupon, there is a recess in
17  the proceedings.)
18      Q.  Before we turn back to the
19  declaration I do have one topic that I'd
20  like to briefly return to that you
21  testified about earlier, the MBIA suit
22  against RFC and the work you did there
23  reunderwriting loan files.
24          Did you determine a breach rate
25  or a range of breach rates?

204

FRANK SILLMAN

1
2      A.  We never finished the project or
3  that engagement for the reunderwriting.
4  So we did not come to any type of agree or
5  breach rates.
6      Q.  Please turn to page 17 of your
7  declaration.  What is audit rate as you
8  use that term?
9      A.  The percentage of loans in a
10  given mortgage portfolio that are audited
11  by the trustee or other parties authorized
12  under the governing agreements for the
13  purpose of finding alleged representation
14  and warranty breaches.
15      Q.  And audit rate is a component of
16  calculating breach rate?
17      A.  Yes.
18      Q.  You multiply audit rate by?
19      A.  The demand rate.
20      Q.  Demand rate to get breach rate?
21      A.  Correct.
22      Q.  Let me ask you about your
23  calculation of audit rate.  You don't know
24  what the trustees' audit rate was, right?
25      A.  Correct.  A sample, since a

205

FRANK SILLMAN

1
2  trustee's audit selection.  So it's a
3  hypothetical.
4      Q.  But you concluded that a certain
5  report from the office of the inspector
6  general of FHFA provided some valuable
7  insight into your calculation of the audit
8  rate?
9      A.  Well, into the methodology that
10  Freddie Mac used in their audit rate
11  selection or audit rate determination
12  process.
13      Q.  So what I'm trying to understand
14  is this report wasn't about Fannie or
15  Freddie.  What was the significance of
16  this, of the FHFA report to your report?
17      A.  It gave some insight, publicly
18  available insight into the thought process
19  behind the development of audit rates by
20  trustees or investors.
21      Q.  Okay.  Well, it gave you insight
22  into the thought process of certain people
23  at FHFA, correct?
24      A.  No, they discussed in their
25  document some processes that Freddie Mac

52 (Pages 202 to 205)

206

1                FRANK SILLMAN
2  used in developing their loan audit
3  selection criteria audit rate.
4      Q.    So do you think this report shed
5  valuable light on Freddie Mac's audit
6  process?
7      A.    Yes.
8      Q.    And what light did it shed?
9      A.    They discussed and if you have a
10 copy of the report.
11     Q.    It's --
12     A.    Is it in --
13     Q.    It is attached to your
14 declaration as Exhibit E.
15     A.    Let me review the document.
16         Okay.  So if you look -- if you
17 want to ask your question again.  I'm
18 sorry.
19     Q.    Sure.  In your view what light
20 did this FHFA OIG report shed on your
21 calculation of audit rate?
22     A.    If you look, for example, on
23 page 18, paragraph B of the report.
24     Q.    This is --
25     A.    Page 84 of 110 I believe of the

207

1                FRANK SILLMAN
2  declaration.
3      Q.    Sorry.  You are looking at
4  Exhibit E to the declaration?
5      A.    Yes.  I'm looking at the FHFA
6  report.
7      Q.    Which is Exhibit E.  And you are
8  looking at page 18 of that report?
9      A.    Yes.
10     Q.    Okay.  Please continue.
11     A.    Paragraph B starts about a third
12 of the way down.  So it talked about
13 concerns regarding the fact it didn't
14 revise its loan review process.
15     Q.    It being Freddie Mac?
16     A.    It being Freddie Mac.  And that
17 the second sentence, "Freddie Mac reviews
18 intensively for repurchase claims only
19 those loans that go into foreclosure or
20 experience payment problems during the
21 first two years following origination.
22 Loans that default thereafter are reviewed
23 at dramatically lower rates."  It goes on
24 to discuss --
25     Q.    So let me stop you there.  Did

208

1                FRANK SILLMAN
2  you understand this to be an accurate
3  description of Freddie Mac's loan review
4  processes?
5      A.    Based on what the FHFA examiner
6  found, yes.
7      Q.    Okay.  Please continue.
8      A.    They go on to discuss what
9  Freddie Mac's management believed were
10 the, was the right policy to review these
11 loans or audit these loans based on
12 certain criteria he lays out here.  The
13 upshot is at the end of the report Freddie
14 Mac's management responded that they would
15 modify their audit rate selection criteria
16 going forward to expand it beyond the
17 loans that go into default or have payment
18 problems during the first two years.
19     Q.    And can you show me what you are
20 referring to?  Are you referring to
21 Exhibit A starting on page 38?
22     A.    No, no.  I'm still in the same
23 Exhibit E.
24     Q.    And sorry, I misspoke.  I meant
25 to ask are you referring to Appendix A

209

1                FRANK SILLMAN
2  which starts on page 38 of Exhibit E?
3      A.    Page 38.
4          MR. RAINS:  I think the record
5  should reflect he wasn't referring to
6  Appendix A before because he just
7  turned several pages to look at it for
8  the first time.
9          MR. BENTLEY:  Let's get an
10 answer because I'd like to know what
11 he was referring to.
12     A.    Yes.  Finding one of that
13 letter --
14     Q.    Can you tell me what page you
15 are looking at?
16     A.    I'm looking at page 39.  It's
17 really better summarized on page 34,
18 paragraph 3.
19     Q.    Which paragraph are you
20 referring to?
21     A.    The second paragraph in that
22 paragraph 3.
23     Q.    Tell me specifically.
24     A.    Starting with the sentence "In
25 response to that opinion Freddie Mac

53 (Pages 206 to 209)

210

FRANK SILLMAN
1   management agreed to perform out of sample
2   testing of loans not currently reviewed
3   for repurchase claims.  Freddie Mac
4   commenced such testing."
5       Q.   I'm sorry, I just found it.
6   Sorry, go ahead.
7       A.   You want me to start again.
8       Q.   No.  Pick up where you were.
9       A.   "In February 2011 at the urging
10  of the FHFA senior examiner management
11  agreed to review a sample of a thousand
12  interest-only loans originated during the
13  housing boom that went into foreclosure
14  more than two years after origination.
15  The draft results of that sample were
16  disclosed to FHFA on August 31, 2011, and
17  they revealed that at least 15 percent of
18  such loans, a higher percentage than
19  anticipated by Freddie Mac management in
20  connection with the BofA settlement
21  include representations and warranty
22  defects and are subject to repurchase
23  claims to loan sellers.  However, the
24  final repurchase rate may be lower.  Final

211

FRANK SILLMAN
1   results are expected in about three
2   months."
3       Next paragraph.  "Moreover as
4   discussed in footnote 58 and the
5   accompanying text, on May 26, 2011, a
6   Freddie Mac senior manager who provided
7   management estimates to the Freddie Mac
8   board of directors in late 2010 advised
9   the board of directors that the enterprise
10  could recover from 500 million to 1
11  billion net in additional revenue through
12  the use of a more expansive loan review
13  process."
14      Q.   Is it your conclusion based on
15  those two -- strike that.  Let me back up
16  a moment.
17      You were previously reading from
18  page 18 of Exhibit E, which says, to
19  summarize, that Freddie Mac's existing
20  process was to intensively review loans
21  that have payment problems during the
22  first two years after origination but to
23  review loans that default thereafter at
24  dramatically lower rates.  Is that a fair

212

FRANK SILLMAN
1   summary of what Freddie's practice is --
2       A.   According to the FHFA.
3       Q.   That's described here?
4       A.   Yes.
5       Q.   Did Freddie change that
6   practice?
7       A.   This report doesn't -- what page
8   was that?  Yeah.  Page 34 notes that a
9   Freddie Mac senior manager advised the
10  board of directors but it does not address
11  what ultimately was changed with Freddie
12  Mac.
13      Q.   And do you have an understanding
14  as to whether Freddie Mac did ultimately
15  change this practice?
16      A.   I have not seen a follow-up
17  report regarding Freddie Mac's response to
18  that.  The concept is not whether or not
19  Freddie Mac actually did change.  It gives
20  insight into the audit rate selection
21  process both existing at Freddie Mac and
22  what might be improved to the extent that
23  they changed it.  But it's the first
24  publicly available audit rate selection

213

FRANK SILLMAN
1   criteria that I believe that has been
2   published from a large market participant
3   like Freddie Mac so it was a factor in the
4   consideration in creating my audit rate
5   assumptions in addition to my professional
6   experience.
7       Q.   So I want to understand what
8   inferences you drew from this report.  Am
9   I right, one inference, what you are
10  saying is that audits of loans that
11  default more than two years after
12  origination can in some circumstances
13  result in repurchases?
14      A.   Yes.
15      Q.   And this report describes some
16  of those circumstances?
17      A.   Yes.
18      Q.   Do you draw any other
19  conclusions from this report?
20      A.   It supports the assumptions that
21  I utilized in my audit rate ranges that I
22  developed for my original declaration.
23      Q.   And what use did you make of
24  this in developing your audit rates?

54 (Pages 210 to 213)

214

FRANK SILLMAN

1           **FRANK SILLMAN**
2    A.   It validated for me the similar
3  audit rate experience that I had working
4  with my clients who audited loans for the
5  purpose of sending out repurchase demands.
6  So the ranges that I came up with, the 65
7  to 69 percent audit rate ranges were based
8  on similar but a little different process
9  that Freddie Mac undertook.  It was more
10  expansive.  It was like the audit rate
11  methodology that FHFA recommended to
12  Freddie Mac use in their review of
13  defaulted loans.
14    **Q.   You say that the FHFA report**
15  **validated for you the similar audit rate**
16  **experience that you had working with your**
17  **clients.  How did it validate that?**
18    A.   The selection criteria that the
19  clients that I worked with used, the
20  experience that I had at IMB bank was
21  similar to the audit rate methodology that
22  FHFA recommended that Freddie Mac use on a
23  go-forward basis.
24    **Q.   Now, you're referring to the**
25  **experience you had at IMB bank and also**

215

1           **FRANK SILLMAN**
2  **the experience you had advising clients**
3  **while at Fortace?**
4    A.   Yes.
5    **Q.   Tell me about your experience at**
6  **IMB.**
7    A.   I was in charge at various times
8  of our wholesale, our correspondent and
9  also our secondary marketing group there.
10  And as buyers of loans we regularly would
11  develop audit rate selection criteria to
12  determine which loans we would review for
13  potential repurchase demands back to those
14  wholesale and correspondent sellers.
15    **Q.   And did you audit the same**
16  **percentage of loans that defaulted in year**
17  **5 as those that defaulted in year 1 after**
18  **origination?**
19      MR. JURGENS:  Objection to form.
20    A.   The same percentage?
21    **Q.   Did your audit rate vary**
22  **depending on the number of years that**
23  **occurred between origination and default?**
24      MR. JURGENS:  Objection to form.
25    A.   The time to default was one of

216

1           FRANK SILLMAN
2  the factors that went into the audit rate
3  selection process.
4    **Q.   So there was some reduction of**
5  **the audit rate as you went out an**
6  **additional number of years?**
7      MR. JURGENS:  Objection to form.
8    A.   That's just wouldn't factors is
9  the time factor.  Didn't necessarily mean
10  that we didn't review loans that were
11  originated 5 years earlier, 4 years
12  earlier.  There could be other factors and
13  reasons why we might audit loans for a
14  potential repurchase demand.
15    **Q.   I understand.  But you reviewed**
16  **years that defaulted in year 5 -- loans**
17  **that defaulted in year 5 at a lower rate**
18  **than loans that defaulted in year 1?**
19      MR. JURGENS:  Objection to form.
20    A.   I'm not sure -- I don't have
21  that data in front of me to be able to
22  tell you in fact that's what we did.  The
23  time to default was one of the factors
24  that was deployed, delinquency, product
25  types, the seller, were all factors that

217

1           FRANK SILLMAN
2  went into the audit rate selection
3  process.
4    **Q.   And when you say the time to**
5  **default was one of the factors, a greater**
6  **time to default would lead to a lower**
7  **audit rate, correct?**
8      MR. JURGENS:  Objection to form.
9    A.   There are many factors that are
10  involved in that audit rate selection
11  process.  So it was one of the factors
12  that was involved in that selection
13  criteria.
14    **Q.   Everything else being equal**
15  **would a greater number of years to default**
16  **result in a less likelihood of audit?**
17      MR. JURGENS:  Objection to form.
18      MS. PATRICK:  Objection to form.
19    A.   Theoretical?
20    **Q.   No, I'm asking you about the IMB**
21  **experience you are describing.**
22    A.   I don't have the data from what
23  the actual audit rate selections were for
24  each one of those years.  So you are
25  asking me to opine on actual audit rates

55 (Pages 214 to 217)

218

FRANK SILLMAN

1   that we did at IMB and I can't speak to
2   those numbers at that level of
3   granularity.
4       Q.   Okay.  Let's go back to the FHFA
5   report and Freddie Mac's practice of
6   reviewing loans that default more than two
7   years out at dramatically lower rates than
8   loans that default earlier.
9           According to the report Freddie
10  Mac's reason for doing that -- according
11  to the report Freddie Mac's likely reason
12  for doing that?
13      A.   What page?
14      Q.   I'm sorry.
15          MR. RAINS:  What page are you
16  on?
17      Q.   Look at page 18.  Near the
18  bottom of the page referring to Freddie
19  Mac's management, it says, "In their view
20  loans that had demonstrated a consistent
21  payment history over the first two years
22  following origination and then defaulted
23  in later years (i.e. years 3 through 5
24  after origination) likely did so for a
25

219

FRANK SILLMAN

1
2   reason such as loss of employment which is
3   unrelated to a representation and
4   warranties defect."
5           Do you see that?
6       A.   Yes.
7       Q.   And do you have any reason to
8   believe that wasn't the reason that
9   Freddie Mac's management followed this
10  policy?
11          MR. RAINS:  Objection.  Calls
12  for speculation.  No foundation.
13      A.   No, I don't have any idea as to
14  why they decided to follow that policy.
15      Q.   Did you make any attempt to
16  speak with Freddie Mac management or
17  otherwise to better understand their
18  reasons for following this policy?
19      A.   No, I did not.
20      Q.   Did you make any attempt to
21  determine whether they subsequently
22  changed this policy?
23      A.   I did check to see if there was
24  a follow-up audit review and was not able
25  to find it.

220

FRANK SILLMAN

1
2       Q.   Okay.  So as far as you know
3   they may still pursue this same practice
4   today?
5       A.   That might be the case.
6       Q.   Now, you referred in paragraph
7   52 to your experience with your clients.
8   Are you talking now about your sell side
9   clients, your buy side clients or both?
10  Sorry, this would be the buy side clients,
11  correct?
12      A.   Yes.
13      Q.   How many clients are you
14  referring to when you say that this is the
15  practice you observed?
16      A.   Three clients.
17      Q.   Three clients.
18      A.   Three clients and my experience
19  at IMB.
20      Q.   And you refer in the middle of
21  paragraph 52 to a, "More prevalent
22  industry practice."  Do you base your
23  understanding of that industry practice
24  merely on those three clients plus IMB?
25      A.   And discussions with other

221

FRANK SILLMAN

1
2   colleagues in the industry.
3       Q.   Who?
4       A.   I don't recall who at these
5   other institutions.  But over the years I
6   had discussions with them on what their
7   policies were.
8       Q.   And how many colleagues are you
9   referring to?
10      A.   Probably two or three colleagues
11  at other major banks.
12      Q.   And what did they tell you?
13      A.   They were similar to the process
14  that we had at that time at IMB bank for
15  determining the audit rate selection.
16      Q.   Did you consult any other
17  sources to form this view?
18      A.   No.  My own expert experience
19  and the information that I garnered from
20  the memorandum.
21      Q.   What you've just described?
22      A.   Yes.
23      Q.   Did you look at any reports
24  issued by rating agencies?
25      A.   For audit rate selection?

56 (Pages 218 to 221)

222

1          FRANK SILLMAN
2      Q.   For information bearing on the
3  selection of your audit rate.
4      A.   I did not look at any credit
5  agency reports or memorandums.
6      Q.   Do you think reports by Moody's
7  or other credit rating agencies might have
8  some significant bearing on this issue?
9      A.   I'd have to see the reports and
10  see if they are credible.
11      Q.   Okay.  But you didn't make any
12  attempt to look for such reports when you
13  prepared your report?
14      A.   I did.  I didn't find any
15  reports that I thought were credible.
16      Q.   Did you find any reports by
17  Moody's?
18      A.   I don't recall whether I found
19  any Moody's reports.
20      Q.   Let's turn to the table on page
21  19.  How did you calculate the numbers in
22  this table?
23      A.   I believe this was provided on
24  the -- one of the spreadsheets we used in
25  our model we provided to the data room.

223

1          FRANK SILLMAN
2      MR. BENTLEY:  Let's mark as
3  Exhibit 9 a three-page spreadsheet
4  bearing Bates numbers ending in -- I
5  guess it's just one Bates number on
6  all three pages.  30.1.612
7  RC-9019_00000001.  This is the very
8  first document put into the data room.
9      (Expert 9019 Exhibit 9,
10  three-page spreadsheet, Bates 30.1.612
11  RC-9019_00000001, marked for
12  identification, as of this date.)
13      MR. BENTLEY:  It's a three-page
14  spreadsheet and the heading on the
15  first page says Fortace Trusts
16  Analysis Comparisons.
17      A.   Also if it's possible to pull it
18  up just so I can.
19      Q.   Yes.
20      A.   Actually I believe there's a
21  subsequent version of this also.
22      Q.   Is the subsequent version
23  similar in format?
24      A.   I believe so, yes.
25      Q.   Just some of the numbers are

224

1          FRANK SILLMAN
2  different?
3      A.   Yes.
4      Q.   So is this the street or is this
5  or the subsequent version of it the
6  spreadsheet you were referring to when you
7  said you had a spreadsheet that calculated
8  the --
9      A.   Let me look at it to make sure
10  that --
11      Q.   -- the audit rate assumptions
12  set forth in the table in paragraph 53 of
13  your report.
14      A.   We also have -- I believe
15  there's a subsequent one also.  Let me
16  review the spreadsheet.
17      Q.   Sure, take your time.
18      A.   Yes, so this is -- I don't know
19  if this is the latter version but it still
20  has the information we are discussing here
21  which is the projected audit rate at the
22  lower and higher ranges.
23      Q.   Okay.  So just to be clear,
24  Exhibit 9 or possibly a later version of
25  Exhibit 9 contains the calculations you

225

1          FRANK SILLMAN
2  were referring to a few minutes ago?
3      A.   Yes.
4      Q.   The calculations you used to
5  derive the audit rate ranges shown in the
6  table on paragraph 53 of your report?
7      A.   Right.  The total average of
8  65 percent and 69 percent.
9      Q.   Okay.  But how did you compute
10  each of the individual ranges shown on
11  this table?  For example, the first line,
12  trusts, liquidated loans, a range of 70 to
13  75 percent.  How did you compute those
14  numbers?
15      A.   That was based on my
16  professional experience with audit rate
17  percentages.
18      Q.   So do you compute it or did you
19  just -- does that number -- is that number
20  the product of any calculations?
21      A.   It's the product of my
22  professional experience.  There's not an
23  additional calculation.
24      Q.   You just came up with that
25  number?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

226

FRANK SILLMAN

1
2    A.   I didn't just come up with it.
3    It's based on my professional experience.
4    Q.   How did you come up with it?
5        MR. RAINS:  Objection.  Asked
6    and answered.
7    Q.   How did you pick 70 percent
8    rather than 60 or 80 percent?
9        MR. RAINS:  Asked and answered.
10   A.   I came up with it based on my
11   professional experience.  I developed a
12   range to take into consideration the
13   variability of each one of these
14   categories.
15   Q.   Did you compute any of the
16   numbers shown in paragraph 53 other than
17   the average that's shown at the bottom of
18   the table?
19   A.   The assumptions for each
20   wouldn't delinquency buckets were based on
21   my professional experience.
22   Q.   But you didn't perform any
23   calculations to derive any of these
24   numbers?
25       MR. RAINS:  Which numbers?

227

FRANK SILLMAN

1
2        MR. BENTLEY:  All of the numbers
3    in the table in paragraph 53 other
4    than the total average numbers shown
5    on the last line.
6    A.   The numbers for each of those
7    are assumptions based on my professional
8    experience.  So I developed those
9    assumptions and input them into the model.
10   Q.   How did you develop them?  Were
11   there any steps that went into the
12   development?
13   A.   Based on my professional
14   experience for these categories of loans
15   that's how I developed the assumptions.
16   Q.   Did you start with the total
17   average range of 65 to 69 and then back
18   into the component ranges?
19   A.   I did not.
20   Q.   And can you shed any more light
21   on how you came up with the various ranges
22   shown here, other than the total average
23   range?
24   A.   Based on my professional
25   experience.

228

FRANK SILLMAN

1
2    Q.   It wasn't a quantitative
3    calculation?
4    A.   It wasn't a -- you are asking me
5    is this a product of a mathematical
6    equation?
7    Q.   Correct.
8    A.   It was -- these individual
9    assumptions were not the product of an
10   additional mathematical equation.  They
11   were based on my professional experience.
12   Q.   And there's no backup to these
13   numbers?
14   A.   There is no -- there's no other
15   data to support these numbers other than
16   my professional experience.
17   Q.   If I ask you the same questions
18   about the numbers shown in the table on
19   paragraph -- in paragraph 56 of your
20   report are your answers the same?
21       MR. RAINS:  Objection.  Vague
22   and ambiguous.  Compound.
23       MR. BENTLEY:  You can walk
24   through all these questions again,
25   Darryl.

229

FRANK SILLMAN

1
2    A.   I followed the same process
3    based on my professional experience in
4    determining the assumptions for each of
5    the lower and higher ranges in paragraph
6    56.
7    Q.   Did you prepare any calculations
8    that went in to the derivation of these
9    numbers, that is on paragraph -- in
10   paragraph 56?
11   A.   There aren't any additional
12   calculations to derive the assumptions
13   other than the calculations for the total
14   average.
15   Q.   Let me try to be clear.  The
16   total average numbers you derived from the
17   numbers above it in -- in the table?
18   A.   And they are weighted against
19   the estimated trust lifetime losses.  So
20   they are a function of a calculation in
21   the model.
22   Q.   But each of the numbers other
23   than the total average has no calculation
24   backing it up?
25   A.   That's right.  It's an

58  (Pages 226 to 229)

230

FRANK SILLMAN

1  assumption based on my professional
2  experience.
3  Q.  And there's no backup documents
4  or data supporting these numbers?
5  A.  That's correct.
6  Q.  Let's move on to breach rate.
7  And as we discussed before, breach rate is
8  simply the product of audit rate and
9  demand rate, correct?
10  A.  Correct.
11  Q.  So the derivation of this was
12  simply math?
13  A.  That's correct.  And then again
14  weighted against the estimated trust
15  lifetime losses for the averages.
16  Q.  Now, in paragraphs 57 and 58,
17  you refer to the breach rates used in the
18  BofA expert report and the Lehman expert
19  report, right?
20  A.  Yes.  I discussed them.
21  Q.  So you attempted to determine
22  what breach rate had been used in
23  connection with the BofA settlement,
24  right?

231

FRANK SILLMAN

1  A.  Yes.
2  Q.  And you concluded that the
3  breach rate that was used in connection
4  with that settlement was 36 percent?
5  A.  Yes.
6  Q.  And you based that on the BofA
7  expert report that's annexed as Exhibit C
8  to your report?
9  A.  Let me take a look.  Let me
10  review the report.
11  Q.  When you are finished reviewing
12  the report, and please take as much time
13  as you need, I'm going to ask you about
14  the last page of the BofA expert report.
15  A.  Okay.  Okay.
16  Q.  So let me just repeat the
17  question I asked before you pulled the
18  report.  I said -- I asked you based that
19  BofA expert -- you based that on the BofA
20  expert report that's annexed as Exhibit C
21  to your report?
22  MR. RAINS:  Objection.  Vague
23  and ambiguous.
24  Q.  You know what let me start

232

FRANK SILLMAN

1  again.
2  You testified a few minutes ago
3  that you concluded that the breach rate
4  that was used in connection with the BofA
5  settlement was 36 percent?
6  A.  Well, the expert report.
7  Q.  And you based your conclusion on
8  the BofA expert report that's annexed as
9  Exhibit C, correct?
10  A.  What -- the conclusion for that
11  section?
12  Q.  The conclusion shown in the
13  table in paragraph 57.
14  MR. RAINS:  The 36 percent?
15  MR. BENTLEY:  Correct.
16  A.  The 36 percent was obtained from
17  the BofA expert report.
18  Q.  And that's shown on page 8 of
19  the BofA expert report?
20  A.  Yes.
21  Q.  Before continuing with breach
22  rate let me ask you similar questions
23  about agree rate and the agree rates
24  stated in the BofA expert report.  Look at

233

FRANK SILLMAN

1  paragraph 62 of your declaration.  It
2  compares your agree rate to the one used
3  in the BofA and Lehman expert reports.
4  Do you see that?
5  A.  Yes.
6  Q.  And it shows a BofA agree rate
7  of 40 percent?
8  A.  Correct.
9  Q.  And you base that on the
10  number -- you base that on the, what the
11  BofA expert called his success rate?
12  A.  Correct.
13  Q.  And that's the number shown in
14  his table on page 8 --
15  A.  Correct.
16  Q.  -- of Exhibit C?
17  A.  Under breach rate and success
18  rate.
19  Q.  And then on page 23, paragraph
20  65 of your declaration, you compare your
21  loss share rate to the loss share rate
22  shown in the BofA expert report.  Do you
23  see that?
24  A.  I don't believe the BofA shows

59 (Pages 230 to 233)

234

FRANK SILLMAN

1    an expert, a loss share rate, excuse me.
2    We calculated that by taking the estimated
3    losses divided by their higher and lower
4    range in the settlement columns.  I
5    believe that was in our spreadsheet.  We
6    can take a look at that.
7        Q.    Maybe this will help you.  Did
8    you -- to compute the 14 percent loss
9    share rate shown in your table in
10   paragraph 65 did you derive that from the
11   36 percent breach rate and the 40 percent
12   success rate shown on page 8 --
13       A.    Yes.
14       Q.    -- of the BofA expert report?
15       A.    Yeah, the same amount.
16       Q.    You simply multiplied 36 percent
17   by 40 percent?
18       A.    Yes, I believe that's the case.
19       Q.    And to get your Lehman agree
20   rates --
21       A.    I'm sorry.
22       Q.    I have got to review that.  So
23   I'm going to ask you now about how you
24   derived the breach rate, agree rate and

235

FRANK SILLMAN

1    loss share rate you used for Lehman.  You
2    derived those from the Lehman expert
3    report attached as Exhibit D to your
4    declaration?
5        A.    Let me take a look at that
6    report.
7        Q.    And take your time but when you
8    are done I'm going to focus you on
9    paragraphs 19, 20 and 21 of that document.
10       A.    Okay.
11           Okay.
12       Q.    Let me focus you first on the
13   table shown in paragraph 57 of your
14   declaration, and specifically the line
15   relating to Lehman.  Did you derive these
16   Lehman breach rate assumptions from
17   paragraphs 19 and 21 of the Lehman expert
18   declaration?
19       A.    Yes.
20       Q.    And turn now to paragraph 62 of
21   your report.  And look at the Lehman
22   numbers in the table there.  Did you
23   derive those Lehman agree rate assumptions
24   from paragraphs 20 and 21 of the Lehman

236

FRANK SILLMAN

1    expert report?
2        A.    Yes.
3        Q.    And turn now to paragraph 65 of
4    your report, which shows certain Lehman
5    loss share rate assumptions.  Did you
6    derive those by simply multiplying your
7    Lehman breach rate by your Lehman agree
8    rate?
9        A.    Yes.  They are not mine but,
10   yes, from the --
11       Q.    Understood.
12       A.    From Lehman's, yes.
13       Q.    The numbers you put in your
14   tables for the Lehman breach rate and
15   agree rate?
16       A.    Yes.
17       Q.    Did you know whether the ResCap
18   board of directors, when it approved the
19   settlement, considered the BofA settlement
20   and the Lehman settlement?
21       A.    I don't have any information
22   about what the board considered as part of
23   the settlement.
24       Q.    We will move on.

237

FRANK SILLMAN

1        A.    Okay.
2        Q.    You thought it was appropriate
3    in your report to compare the breach rate
4    that you had computed for the trusts being
5    settled to the breach rates used in the
6    BofA settlement and used by the Lehman
7    expert report, correct?
8        A.    I thought it was informational
9    for the readers of the report to
10   understand other experts breach rates.
11       Q.    You thought those other experts
12   breach rates might have some relevance to
13   the estimation of breach rates for the
14   debtors?
15       A.    I believe that they were
16   relevant data points that the readers
17   should or could look at in evaluating the
18   breach rates and agree rates in my report.
19       Q.    And what significance, if any,
20   did you think the readers should attribute
21   to them?
22       A.    Well, I wasn't imposing any
23   thought process that the readers should go
24   through.  It's just available data points

60  (Pages 234 to 237)

238

FRANK SILLMAN

1  out in the market.  I don't have any
2  detailed data behind the BofA report or
3  the Lehman declaration to validate their
4  numbers or evaluate their assumption
5  valuation process.  So I'm not speaking by
6  adding these in here as these are
7  important data points.  They are just
8  other data points for similar types of
9  settlements that are available in the
10 market.
11     Q.   Well, so let me ask you this.
12 In evaluating the reasonableness of the
13 $8.7 billion settlement, do you think that
14 the BofA settlement and the Lehman
15 settlement are meaningful data points?
16         MR. RAINS: Objection. Vague
17    and ambiguous.
18     A.   They are data points that the
19 reader can take into consideration.  There
20 are other factors that would create
21 differences or variations between any one
22 of the data points that I presented in the
23 declaration and the data points that I use
24 or the assumptions that I used in, for

239

FRANK SILLMAN

1  example, breach and agree rates.
2         So without knowing the
3  underlying data, the construction of the
4  loans on a trust by trust basis, you can't
5  do an apples to apples comparison between
6  the two.  But they are nonetheless
7  available data points that I felt was
8  useful for the reader.
9      Q.   Now, a certain amount of data is
10 available about the loans that were
11 settled in the BofA settlement, right?
12     A.   You are talking about remittance
13 data?
14     Q.   Data about a loan product type.
15     A.   I mean there's various data
16 points that are available.  I don't know
17 if the product types are available.
18     Q.   Did you make an attempt to
19 determine the predominant types of loan
20 products that were subject to the BofA
21 settlement?
22     A.   There was some information that
23 was summarized in their expert reports
24 generally about some of the product types.

240

FRANK SILLMAN

1  But the 500 plus trusts to the 392 trusts,
2  we did not do a loan by loan or product by
3  product comparison.
4      Q.   Didn't you conclude that the
5  collateral, the loans that were part of
6  the BofA settlement were predominantly
7  Alt-A, subprime, prime and pay option ARM
8  with a diminutive amount of HELOC and
9  second lien residential mortgage loans?
10     A.   Where is that in the --
11     Q.   Let me find that for you.  Turn
12 back to Exhibit 9.  The language I was
13 just quoting from is near the top right
14 corner of the first page.
15     A.   Let me take a look at their -- I
16 see it on the schedule.
17     Q.   And I believe you'll find that
18 you took this quotation from page 1 of
19 Brian Lin's report, namely the BofA expert
20 report?
21     A.   Yes.
22     Q.   Do you see the sentence I just
23 read?
24     A.   Yes.

241

FRANK SILLMAN

1      Q.   You don't have any reason to
2  believe that's not true, right?
3      A.   I don't.  But I didn't validate
4  it.  And didn't compare the percentages to
5  the percentages in the 392 trusts or the
6  debtors trusts.
7      Q.   Did you look at the types of
8  loan products in the debtors trusts?
9      A.   Can you be more specific?
10     Q.   Can you say what are the
11 predominant types of loan products in the
12 trusts whose claims are being settled?
13     A.   I think there was a spreadsheet
14 that we provided to the data room that
15 contained balances by entity and by shelf.
16 That's one of the ones RC 9019 No. 2,
17 bunch of zeros No. 2.
18     Q.   And I'm looking at the
19 spreadsheet.  What are you referring to?
20     A.   So there is, if you look at the
21 product per trust list column C.
22     Q.   You know what, let me mark that
23 spreadsheet as the next exhibit so that we
24 have a clear record.

61  (Pages 238 to 241)

242

FRANK SILLMAN

1    FRANK SILLMAN
2        MR. BENTLEY:  Exhibit 10 is a
3    spreadsheet entitled Fortace Trusts
4    Summary By Entity Shelf, By Product.
5    And it bears Bates number RC
6    9019_00000002.
7        (Expert 9019 Exhibit 10, Fortace
8    Trusts Summary By Entity Shelf, By
9    Product, Bates RC 9019_00000002,
10    marked for identification, as of this
11    date.)
12        Q.    And does this spreadsheet show
13    you the distribution by loan type of the
14    loans whose claims are being settled?
15        A.    Now, these are broad product
16    categories for each of these trusts so
17    Alt-A or jumbo, subprime, jumbo A, so it
18    does...
19        Q.    Can you tell me the percentages
20    by deal balance, original deal balance of
21    the different --
22        A.    I don't have that.  I didn't do
23    that calculation in this spreadsheet.
24        Q.    Did you do that calculation as
25    part of your work that went into your

243

FRANK SILLMAN

1    FRANK SILLMAN
2    report?
3        A.    We looked at the overall
4    distribution of the products and looked at
5    those characteristics whether it was Alt-A
6    or subprime or jumbo A, HELOC.
7        Q.    Did you then make a systematic
8    attempt of any sort to compare the
9    distribution of loan products in the
10    debtors trusts with the distribution of
11    loan products in the trusts whose claims
12    were being settled in the BofA settlement?
13        A.    We did not do a trust by trust
14    comparison of the BofA proposed settled
15    trust and the ResCap settled trusts.
16        Q.    Same question with respect to
17    the Lehman settlement.
18        A.    We did not do a trust by trust
19    analysis.
20        Q.    Did you look at the reps and
21    warranties in sample governing agreements
22    with respect to the BofA settlement?
23        A.    We did not.
24        Q.    Are you sure about that?
25        A.    In the BofA?

244

FRANK SILLMAN

1    FRANK SILLMAN
2        Q.    Yes.  Didn't you do that both
3    for the BofA settlement and the Lehman
4    settlement?
5        A.    Can you show me the paragraph
6    where I discuss that?
7        Q.    It's not in your report.
8        MR. RAINS:  So is this a
9    guessing game?  You want to refresh
10    his recollection, test his memory?
11    What --
12        MR. BENTLEY:  I'm asking him if
13    he can recall whether he did this sort
14    of analysis.
15        A.    In the course of my work I may
16    have looked at Bank of America or Lehman.
17    But it was not in my report.  I don't
18    remember off the top of my head what
19    the -- what work was done with those
20    governing agreements.
21        Q.    Now, by the way, you did compare
22    the reps and warranties in the governing
23    agreements for the trusts with the reps
24    and warranties that were typical for the
25    trusts that you had personal experience

245

FRANK SILLMAN

1        FRANK SILLMAN
2    with in your put back work?
3        A.    I had already done work related
4    to the clients that we had -- we would
5    receive inbound repurchase demands.  So I
6    understood representative samples again of
7    the types of reps and warrants that my
8    other clients had and did compare those to
9    the types of reps and warrants again in
10    the trusts against sample but not for all
11    392 trusts.
12        Q.    And what conclusions did you
13    reach?
14        A.    That in some cases the reps and
15    warrants were similar.  In some cases they
16    varied.
17        Q.    Didn't you conclude that the
18    reps and warranties in the deals that you
19    had experience with outside of the ResCap
20    context, tended to be stronger than the
21    reps and warranties in the trusts covered
22    by this settlement?
23        A.    There were areas where my other
24    clients reps and warrants were stronger
25    than the ResCap reps and warrants.

62 (Pages 242 to 245)

246

FRANK SILLMAN

1
2    Q.   And didn't you take that into
3 consideration in computing some of the
4 rates that you address in your report?
5    A.   The main attribute that I looked
6 at was the repurchase history the debtor
7 had with the GSEs.
8    Q.   We are going to get to that.
9 But I'm asking you whether you also took
10 into account --
11    A.   I believe there's a schedule
12 that I did that showed reconciliation of
13 the reps and warrants.  It would be good,
14 it would be helpful to look at that.
15    Q.   Okay.  But what I'm asking you
16 now is did the fact that the reps and
17 warranties in some of your clients' deals
18 were stronger than those in the trusts
19 being settled here factor into your
20 conclusions?
21    A.   Well, I'd like to review the
22 spreadsheet that I provided regarding
23 that.
24    Q.   Okay.  You can't answer my
25 question without seeing --

247

FRANK SILLMAN

1
2    A.   I need to refresh my memory with
3 the document.
4    Q.   Did you do any -- did you give
5 any consideration to the vintages of the
6 loans in the BofA settlement?
7    A.   What do you mean take into
8 consideration the vintages?
9    Q.   Did --
10    A.   I provided information in here
11 of data points from on the expert reports.
12 But that was after the work that I did on
13 my conclusions.  So the data points or the
14 data behind didn't influence the
15 assumptions that I developed.
16    MR. BENTLEY:  I'm moving on to
17 another topic.  I'm happy to keep
18 going or we could take a break here.
19    MR. RAINS:  Let's take a quick
20 break.
21    (Whereupon, there is a recess in
22 the proceedings.)
23    Q.   Let's turn to the subject of the
24 agree rate.
25    A.   Okay.

248

FRANK SILLMAN

1
2    Q.   You discussed this, paragraphs
3 59 to 63, in your report, correct?
4    A.   Yes.
5    Q.   Before we go into details can
6 you give me an overview of what
7 methodology, if any, did you apply in
8 computing the agree rate?
9    A.   I believe there was a
10 spreadsheet that I did that did some
11 analysis.
12    Q.   Are you referring to Exhibit 9?
13    A.   I don't believe.  Let me take a
14 look at Exhibit 9.
15    Q.   And if you look at page 2 of
16 Exhibit 9 it shows a lower range and a
17 higher range for breach rate among
18 other -- I'm sorry -- for -- yes, for
19 agree rate, among other things.
20    A.   That's one of the spreadsheets.
21 There's another spreadsheet that we
22 provided to the data room that reconciled
23 I believe the GSE agree rates to the agree
24 rate assumption ranges.
25    Q.   Give us a moment, we are going

249

FRANK SILLMAN

1
2 to try to -- can you help us find it?
3    A.   You know, I mean -- I don't
4 remember the name of it or the Bates
5 number.
6    Q.   My crack assistant team has
7 found it.
8    A.   Okay, good.
9    Q.   I may have spoken too soon.
10    A.   There's a lot of documents.
11    MR. BENTLEY:  Let's go off the
12 record for a moment.
13    MR. RAINS:  You want him to just
14 walk over to the screen and look at
15 it?
16    Hold on.  Let's first get the
17 question on the record and then he'll
18 look at it and then he'll come back
19 and he'll give you the answer on the
20 record.
21    So what's the question you want
22 him to answer?
23    MR. BENTLEY:  The question is
24 already on the record.
25    MR. RAINS:  What is the question

63  (Pages 246 to 249)

250

FRANK SILLMAN

1  you want him to answer?
2     MR. BENTLEY:  He said there's a
3  spreadsheet that contains some
4  calculations to get you from GSE rates
5  to his agree rate and we are trying to
6  find the spreadsheet.
7     Q.   Is that it?
8     A.   Let me take a look at it.
9     Q.   Sure.  Take your time.
10    A.   This is the -- looks like, yeah,
11 this looks like the PLS demand data, not
12 the reconciliation.  No.
13    Q.   That's not it?
14    A.   This is not it.
15       (Brief recess.)
16       MR. BENTLEY:  For the record, we
17 have been attempting to locate the
18 spreadsheet that Mr. Sillman was
19 referring to.
20    Q.   Would it be possible at a break
21 for you to locate the spreadsheet that you
22 have in mind?
23    A.   I don't have any idea -- I
24 didn't bring any information with me.

251

FRANK SILLMAN

1     Q.   Can I ask you then, if you
2  would, after the deposition, identify for
3  us the spreadsheet in question?
4     A.   I can do that.
5       MR. BENTLEY:  Let's go off the
6  record.
7       (Brief recess.)
8       MR. BENTLEY:  We have agreed
9  that while we are locating and
10 printing copies of the spreadsheet
11 that Mr. Sillman referred to, Erin
12 Brady is going to ask her questions
13 and then I will resume and conclude
14 with my questions when she's done and
15 then I believe there's at least one
16 other questioner who will follow.
17 EXAMINATION BY
18 MS. BRADY:
19    Q.   Hi, Mr. Sillman, I'm Erin Brady.
20 I represent FGIC.  I just have a few
21 documents I want to basically walk through
22 with you, ask you some questions.  I
23 should be relatively quick.  I apologize,
24 I'm a little out of order because I wasn't

252

FRANK SILLMAN

1  quite expecting to jump in quite yet.
2       I'm going to hand you a copy of
3  an exhibit that's been marked 9019-54.
4  And I'll represent to you that this is the
5  form 10-K that was filed by Ally
6  Financial.
7       Have you seen this document?
8  This is an excerpt of the document.  Have
9  you reviewed Ally's form 10-Q filed for
10 the period ending March 31, 2012?
11    A.   I have not.
12    Q.   Okay.  I want to first direct
13 your attention to page 68, which is the
14 first page of the excerpt here.  In that,
15 at the very last paragraph there, on page
16 68, the paragraph begins "The risk of
17 repurchase or indemnification."
18    A.   Uh-hum.
19    Q.   I want to direct your attention
20 to the second sentence there that reads,
21 "We believe in general the longer a loan
22 performs prior to default the less likely
23 it is that an alleged breach of
24 representation and warranty will be found

253

FRANK SILLMAN

1  to have a material and adverse effect on
2  the loan's performance."
3       Do you agree with that?
4     A.   Can I take some time to read the
5  document?
6     Q.   Absolutely.  Go ahead.
7     A.   Okay, can you ask the question
8  again?
9     Q.   Sure.  I just wanted to see if
10 you agree with the statement that Ally
11 made in its 10-Q for the period ending
12 March 31, 2012, that "We believe that in
13 general the longer a loan performs prior
14 to default the less likely it is that an
15 allege breach of representation and
16 warranty will be found to have a material
17 adverse on the loan's performance."
18       MS. PATRICK:  Objection to form.
19       MR. RAINS:  The question is
20 vague and ambiguous.  Calls for
21 speculation.
22    A.   I don't have any basis to
23 determine whether or not the longer a loan
24 performs the less likely it will be found

64 (Pages 250 to 253)

254

FRANK SILLMAN

1 to have a material and adverse impact.
2     **Q.   That's not something you learned**
3 **or you have come to understand in your**
4 **professional experience?**
5          MS. PATRICK:  Same objection.
6     A.   I don't have any statistics
7 around that information.  So that's a very
8 specific claim or scenario that they are
9 painting in their 10-Q and I don't have
10 any specific data around how to properly
11 answer that question based on my
12 experience.
13    **Q.   Okay.  And I'd like to direct**
14 **your attention to the last page of the**
15 **excerpt that I gave you, page 73.  And**
16 **could you read the paragraph, the section**
17 **below the title Potential Losses?**
18    A.   Okay.
19    **Q.   The first sentence there reads,**
20 **"We," meaning Ally, "currently estimate**
21 **that ResCap's reasonably possible losses**
22 **over time related to the litigation**
23 **matters and potential repurchase**
24 **obligations and related claims described**

255

FRANK SILLMAN

1 **above" -- and you can read the above if**
2 **you need to -- "could be between 0 and 4**
3 **billion over existing accruals.  Did you**
4 **take this into account when you did your**
5 **report?**
6    A.   I did not utilize their
7 information from this 10-Q because I don't
8 have any basis and don't understand their
9 accounting policies, their reserve
10 policies.  And they also qualify this as
11 saying the estimated range is based on
12 significant judgment and numerous
13 assumptions that are subject to change of
14 which could be material.
15    **Q.   Just so I understand, this**
16 **disclosure that was made approximately**
17 **45 days before the, your analysis began,**
18 **you didn't believe that it was relevant to**
19 **your report -- or to your analysis?**
20    A.   No, I didn't say that.  What I'm
21 saying is that the information that they
22 put in here they caveat tremendously.
23 Therefore, without understanding the
24 underlying accounting practices and data

256

FRANK SILLMAN

1 that they relied on to make this, in their
2 own words, it consisted of significant
3 judgment and numerous assumptions subject
4 to change and which could be material.
5    **Q.   Did you ask any questions of the**
6 **debtors or Ally with regard to how they**
7 **came up with this number so you could**
8 **further understand and take it into**
9 **consideration in your report?**
10    A.   I had some discussions with the
11 debtor regarding their reserves and
12 accruals.  And I did not receive any
13 information from them regarding the
14 underlying data and models associated with
15 developing their accruals at Ally Bank.
16 So I discussed that with the company, with
17 ResCap, and asked for that information and
18 was not provided that information.
19    **Q.   Who did you discuss it with?**
20    A.   Jeff Cancelliere.
21    **Q.   And you asked for it and he**
22 **didn't provide it or you didn't ask for it**
23 **and he didn't provide it?**
24    A.   No.  We discussed getting that

257

FRANK SILLMAN

1 information.  He was going to check to see
2 if he could get us that information.  And
3 I never received that information.
4    **Q.   Okay.  If you had that**
5 **information, would you have factored it**
6 **into your analysis?**
7          MR. RAINS:  Objection.  Calls
8 for speculation.
9    A.   I have no idea what data would
10 be provided, what kind of backup, how much
11 information I would get.  So I can't
12 speculate about what I might do with that
13 data.
14    **Q.   As somebody who is coming up**
15 **with an opinion would it be helpful to you**
16 **to at least know what that data was.**
17 **Would you want to have it in evaluating,**
18 **regardless of whether you took it into**
19 **consideration, is it something that you**
20 **would want to know in evaluating the value**
21 **of your analysis?**
22          MR. RAINS:  Objection.
23 Compound.  Vague and ambiguous.
24    A.   Which data are you referring to?

65 (Pages 254 to 257)

258

FRANK SILLMAN

1
2    Q.   The data that you asked for and
3   didn't receive.
4    A.   So data on accounting policies,
5   reserve amounts, models to determine those
6   reserves amounts?
7    Q.   Right.  How they came up with
8   the number in there.
9    A.   Those are data points that could
10  be helpful but I would have to validate
11  those data points to determine whether or
12  not they would be helpful in my
13  declaration.
14       MS. BRADY:  I want to mark as
15  Exhibit 11 an e-mail string beginning
16  with Bates number 00092076.
17       (Expert 9019 Exhibit 11, e-mail
18  string, beginning Bates number
19  00092076, marked for identification,
20  as of this date.)
21   A.   Okay.  Let me read through this.
22  So this starts from the most recent back
23  to --
24   Q.   Yes.
25   A.   Okay.  Okay.  I have not seen

259

FRANK SILLMAN

1
2   this document or schedule before.
3    Q.   If you had seen it would you
4   would you have considered it in your
5   analysis?
6       MR. RAINS:  Objection.  Calls
7   for speculation.
8    A.   I don't know the basis behind
9   any of these numbers.  I don't understand
10  necessarily what they are doing.  I guess
11  it's a spreadsheet.  So I would have to do
12  more work to better understand the basis
13  behind these numbers and how they were
14  calculated.
15   Q.   So according to the e-mail the
16  spreadsheet is supporting or is presented
17  to support Ally's disclosure of the
18  reasonably possible range of losses in
19  excess of what they had previously
20  recorded for R&W litigation and other
21  related matters.  And it appears that this
22  is going into the -- in preparation for
23  the 3/31 2012 10-Q exhibit.  Would you in
24  doing your analysis want to further
25  understand the analysis that was done in

260

**FRANK SILLMAN**

1
2   this chart?
3       MR. RAINS:  Objection.  No
4   foundation.  Calls for speculation.
5    A.   Before I could make a decision
6   as to whether or not I think this would be
7   a good set of data points for me to
8   evaluate, I'd have to understand the basis
9   behind all the numbers and the underlying
10  calculations.  So I couldn't speculate as
11  to whether or not this would be helpful or
12  not.  The e-mail chain doesn't explain how
13  they come up with these numbers, what
14  these numbers mean.
15   Q.   Okay.
16       MS. BRADY:  I'm going to mark
17  this as Exhibit 12, this is Bates
18  numbers 00054001 through 005.
19       (Expert 9019 Exhibit 12,
20  document with attachment, Bates
21  00054001 through 005, marked for
22  identification, as of this date.)
23   Q.   I just ask you to take a look at
24  this document and the attachment?
25   A.   I have not seen this memo or

261

FRANK SILLMAN

1
2   slides before.
3    Q.   Did you have any input into
4   this -- I believe that this was created
5   before you were retained as an expert in
6   this case, correct?
7    A.   Correct.
8    Q.   So is it safe to say that you
9   had -- you didn't have any involvement in
10  coming up with the 19.72 percent defect
11  rate?
12   A.   I did not.
13   Q.   Okay.
14       MS. BRADY:  Moving along.  This
15  is Exhibit 13.  This is an excerpt of
16  the form 10-K that Ally filed for the
17  fiscal year ended December 31st, 2011.
18       (Expert 9019 Exhibit 13, excerpt
19  of the Ally form 10-K filed
20  December 31st, 2011, marked for
21  identification, as of this date.)
22   Q.   And I want to direct your
23  attention to page 98 of this in the
24  subheading labeled Private Label
25  Securitization.  And specifically to the

66 (Pages 258 to 261)

262

FRANK SILLMAN

1
2  last paragraph. But if you want to read
3  through that section quickly.
4      A.    What section in particular?
5      Q.    I want to direct your attention
6  to the last paragraph on page 98.
7      A.    Okay.
8      Q.    Okay. On the last paragraph of
9  page 98 the second sentence Ally says, "In
10  order to successfully assert a claim it is
11  our position that a claimant must prove a
12  breach of the representation and
13  warranties that materially and adversely
14  affects the interest of the investor in
15  the allegedly defective loan." And what I
16  want to ask you is did you -- was this
17  factor -- was this position factored into
18  your analysis in any way?
19      A.    Our analysis focused on the
20  historic repurchase rate analysis that we
21  did primarily with the GSEs under which
22  their repurchase department would review
23  thousands of loans over years and they
24  would assert certain claims including
25  legal claims in order to dispute

263

FRANK SILLMAN

1
2  repurchase demands. And so that was built
3  into or factored into the agree rate
4  assumptions that I utilized in my
5  declaration.
6      Q.    So just so I understand, so you
7  are saying that the analysis that you did
8  in your declaration factors in legal
9  analysis --
10      A.    It factors in work the company
11  did prelitigation in reviewing and
12  defending itself against repurchase claims
13  which does include any legal theories they
14  pursued as part of that process.
15      Q.    Can you explain to me how it
16  factors it in? Where exactly is it
17  factored into the analysis?
18      A.    Well, it's factored in the agree
19  rates, the historic agree rates that the
20  company has, in particular with the GSEs.
21      Q.    Okay. So we don't have the
22  exhibit up anymore but is that the agree
23  rate, the 10 percent agree rate that
24  Mr. Bentley had up on the board for a
25  while?

264

FRANK SILLMAN

1
2      A.    No. It's the GSE agree rate of
3  I believe it's 67 percent.
4      Q.    So the legal causation issues
5  are factored into that 67 percent agree
6  rate?
7      A.    There are legal defenses from my
8  understanding of their repurchase process
9  factored in potential legal defenses.
10      Q.    I guess this is kind of a
11  slightly different question. Is there --
12  in your experience is there a difference
13  between the ultimate agree rates on GSE
14  loans and PLS loans?
15      A.    There are at times similarities
16  between the two and times where I found
17  with clients there's differences between
18  agree rates for GSE and agree rates for
19  PLS.
20      Q.    And between the two which one is
21  higher, lower?
22      A.    I wouldn't be able to kind of
23  look at my whole client base and
24  experience to give you a comparison. But
25  sometimes they have been very similar.

265

FRANK SILLMAN

1
2  Other times the GSE agree rates have been
3  higher.
4      Q.    Okay.
5          MS. BRADY: I have one last
6  document. This is going to be
7  Exhibit 14. This is an e-mail chain
8  beginning with Bates number 00053182
9  and concluding with 224.
10          (Expert 9019 Exhibit 14, e-mail
11  chain, Bates 00053182 through 224,
12  marked for identification, as of this
13  date.)
14      Q.    There was some testimony earlier
15  about some language in, I think it ended
16  up in paragraph 5 of your declaration,
17  regarding the assumption of liability for
18  purposes of your analysis. I think this
19  e-mail will likely refresh your
20  recollection as to where that came from.
21  Have you seen a copy of this e-mail? Was
22  it forwarded to you ever?
23          MR. RAINS: Objection. Vague
24  and ambiguous. Compound.
25      A.    The e-mail is just this first

67  (Pages 262 to 265)

266

FRANK SILLMAN

1          FRANK SILLMAN
2  page?
3     **Q.  Right.  Attached to it is a**
4  **redline of your declaration sent by the**
5  **sender of the e-mail presumably, which is**
6  **Patrick Brian.**
7     A.  I have not seen this e-mail.
8     **Q.  Did you receive instructions**
9  **to -- does this refresh your recollection,**
10 **I guess --**
11    A.  Can I read it?
12    **Q.  Yeah, go ahead.**
13    A.  Okay.  I need to look at the
14 redlines here also.  How do I identify
15 those?
16      MR. RAINS:  You want him to look
17 at the attachment or no?
18      MS. BRADY:  He doesn't need to.
19    **Q.  Were those comments -- were you**
20 **given comments by Morrison & Foerster**
21 **regarding adding into your declaration the**
22 **assumption or saying that your declaration**
23 **was assuming liability for purposes of the**
24 **analysis?**
25    A.  I was asked this earlier.  I

267

FRANK SILLMAN

1  don't recall -- I didn't receive this
2  e-mail.  I don't recall whether or not I
3  received any red line comments regarding
4  assuming liability for purposes of his
5  analysis.  So I don't recall whether or
6  not I did or didn't.  But I did not
7  receive this e-mail.
8    **Q.  Were you aware during the course**
9  **of receiving comments on your declaration**
10 **that comments were coming in from Kirkland**
11 **& Ellis, who represents Ally, and from**
12 **Kathy Patrick, who represents a group of**
13 **trustees?**
14      MS. PATRICK:  Objection, form.
15    A.  I was aware that Jen Battle was
16 reviewing my declaration.  I was not aware
17 of any comments from Kathy Patrick.
18      MR. RAINS:  Or Kirkland & Ellis.
19    A.  Or Kirkland & Ellis, I'm sorry.
20    **Q.  One last question.  When was it**
21 **conveyed to you that the settlement was**
22 **for $8.7 billion?  At what point following**
23 **your retention was that information**
24 **conveyed to you?**

268

FRANK SILLMAN

1    A.  I don't recall the date.  We met
2  in New York.  I don't recall the date.
3  But I can get you that date.  I just don't
4  have it off the top of my head where we
5  discussed retaining Fortace to be the
6  expert on this engagement.  I don't recall
7  when the $8.7 billion figure of the
8  allowed claim was provided to me.  It's
9  possible that I received at that meeting a
10 copy of the settlement agreement or it may
11 have been e-mailed to me after that
12 meeting.  Somewhere around that time that
13 we met in New York.  But I don't remember
14 when.
15    **Q.  So at the outset or very early**
16 **on before the analysis?**
17    A.  Early in my engagement, yes.
18 Before my -- yes, before I began my
19 analysis I received a copy of the
20 settlement agreement.
21    Q.  Okay.
22      MS. BRADY:  That's all I have
23 for you, Mr. Sillman.  Thank you.
24 BY MR. BENTLEY:

269

FRANK SILLMAN

1    **Q.  Hello again, Mr. Sillman.  I'm**
2 **back.  Before we switched questioners I**
3 **asked you what general methodology you**
4 **employed in calculating your agree rate**
5 **and you told me that your calculations**
6 **were set forth in a spreadsheet.**
7      MR. BENTLEY:  Let me mark as
8 Exhibit 15, a one-page spreadsheet
9 entitled Fortace LLC Supplemental
10 Declaration, Debtor GSE to PLS Agree
11 Rate Range Reconciliation.  And at the
12 bottom of the page it has document
13 number ending in 66117.
14    (Expert 9019 Exhibit 15, Fortace
15 LLC Supplemental Declaration, Debtor
16 GSE to PLS Agree Rate Range
17 Reconciliation, Bates ending 66117,
18 marked for identification, as of this
19 date.)
20    **Q.  Is this the spreadsheet you were**
21 **referring to?**
22    A.  Yes.  There's actually two
23 spreadsheets.  There is the one model
24 spreadsheet that we used and this

68  (Pages 266 to 269)

270

FRANK SILLMAN
1   FRANK SILLMAN
2   spreadsheet.  So I want to make sure it's
3   clear that both spreadsheets were utilized
4   in calculating and validating the agree
5   rate assumptions.
6        Q.   Is Exhibit 9 the other
7   spreadsheet you are referring to?
8        A.   Yes.
9        Q.   Let's look at that first before
10  we turn to Exhibit 15.  This spreadsheet
11  addresses agree rate on page 2?
12       A.   Correct.
13       Q.   Is that what you are referring
14  to?
15       A.   Yes.
16       Q.   And so on page 2 there's a
17  column for projected agree rate and it
18  shows a lower range and a higher range for
19  projected agree rate.  Do you see that?
20       A.   Yes.
21       Q.   Is there any other discussion of
22  agree rate in this document?
23       A.   I think I have the agree rates
24  on the first page, page 1, if you look to
25  the line agree rates.

271

1   FRANK SILLMAN
2        Q.   And that's simply the same agree
3   rate percentages that show up in your
4   report?
5        A.   That's correct.
6        Q.   Is agree rate addressed anywhere
7   else in this exhibit?
8        A.   I can't read the third page.
9             MR. BENTLEY:  Can you bring it
10       up on the screen?
11       A.   Let me look it up here.  Yes, in
12  this model it's just page 1 and 2.
13       Q.   Are there any -- is there
14  anything in this document that shows you
15  how you derived your agree rates?
16       A.   The average agree rates again
17  were the weighted average calculation of
18  the agree rates by the delinquency buckets
19  for both the lower and higher so.
20       Q.   So let me just see if I
21  understand.  Page 2 of Exhibit 9 shows low
22  and high ranges of agree rates both as a
23  total number and broken out by buckets?
24       A.   Yes.
25       Q.   And other than that is there any

272

1   FRANK SILLMAN
2   anything relating in any way to agree
3   rates on page 2 of this document?
4        A.   No.  That column referred here
5   as formula column H is where I calculate
6   the overall trust agree rate assumptions
7   for the lower and higher ranges.
8        Q.   But nothing in this document
9   shows how you got to the lower and higher
10  agree rate numbers shown for the various
11  buckets?
12       A.   That's correct.  Those were
13  based on my professional experience with
14  agree rates for these buckets adjusted for
15  the repurchase experience the debtor had
16  and the higher agree rates than the
17  industry as a whole for their GSE
18  repurchases.
19       Q.   Let's take it step by step.  I'm
20  going to ask you more about Exhibit 15 in
21  a moment.  But just to jump to the bottom
22  line, does Exhibit 15 show how you
23  computed the 41 to 47 percent agree rate
24  range?
25       A.   This was a validation step that

273

1   FRANK SILLMAN
2   I went through to validate the assumptions
3   that I utilized in Exhibit 9, in the model
4   in Exhibit 9, to calculate the agree
5   rates.
6        Q.   When did you prepare Exhibit 15?
7        A.   This actual sheet in this
8   condition was produced after the filing of
9   my original declaration but based on
10  calculations that I did prior to my
11  original declaration.
12       Q.   Is there any reason that this
13  document refers in the heading to
14  supplemental declaration?
15       A.   I don't know whether or not
16  timing wise when this was added to the
17  data room.  That might be during the time,
18  you know, when the supplemental
19  declaration was filed.
20       Q.   Did you compute the 41 to
21  47 percent range in the method shown on
22  Exhibit 15 and then back into the
23  component parts shown on page 2 of
24  Exhibit 9 or did you do it the other way
25  around?

69  (Pages 270 to 273)

274

FRANK SILLMAN

1
2    A.   I did it the other way around.
3   So I first went through and input
4   assumptions regarding the projected agree
5   rates for the lower and higher ranges by
6   these delinquency buckets.
7        Q.   So how did you calc- --- and you
8   are referring now, I believe, to
9   Exhibit 9, page 2, column H.
10       A.   Correct.  It's column P in the
11  spreadsheet but the calculation call it
12  column H, yeah.
13       Q.   So I'm going to focus on column
14  H on page 2 of Exhibit 9.  And let's focus
15  first on the lower range.  So this shows,
16  the first number in this column is
17  42 percent.  And the number at the bottom
18  is 41 percent.  How do those numbers
19  relate to each other?
20       A.   The bottom number is a weighted
21  average.  And since -- in this scenario on
22  the estimated trusts lifetime losses the
23  vast majority of the losses had already
24  occurred in what I call trust liquidated
25  losses.  That number weights the weighted

275

FRANK SILLMAN

1
2   average more than the other categories,
3   the other line items.
4        Q.   Is the 42 percent also a total
5   and it's different from 41 just because of
6   rounding issues?
7        A.   No.  Independently -- the 41 is
8   just a product of the projected agree
9   rates for each one of the buckets times
10  the corresponding estimated trust's
11  lifetime losses.  So the 41 is just a
12  result of those calculations.
13       Q.   And what is the 42 percent?
14       A.   Which 42 percent?
15       Q.   At the top of column H.
16       A.   So the row 21 in column P.
17  Yeah.  The one associated on the line
18  trusts, liquidated loans 42 percent?
19       Q.   Correct.
20       A.   So that is my assumption for the
21  agree rate for trusts liquidated loans.
22  And the next is my assumption for current
23  nonmodified loans.
24       Q.   I see.
25       A.   And so on down the line.  So I

276

FRANK SILLMAN

1
2   developed these assumptions by buckets
3   first.
4        Q.   How did you develop these
5   percentages?
6        A.   So I took my experience with
7   agree rates by these bucket categories and
8   I adjusted them for the higher experience,
9   agree rate experience the debtor had with
10  the GSEs versus the industry as a whole.
11  And then I further adjusted it for the
12  debtors rep and warrants overall
13  comparative to other industry PLS reps and
14  warrants.
15       Q.   Now, the three steps you just
16  described are shown on Exhibit 15,
17  correct?
18       A.   In aggregate, correct.
19       Q.   And you are saying that you
20  applied those same three steps to derive
21  the percentage for each of the buckets in
22  column H?
23       A.   That's correct.
24       Q.   Let's turn to Exhibit 15 then
25  and go step-by-step.

277

FRANK SILLMAN

1
2        A.   Okay.
3        Q.   Step one was you referred to
4   your personal experience at Fortace
5   advising both sell side and buy side
6   clients?
7        A.   Yes.  Also including my
8   experience at IndyMac Bank.
9        Q.   And how many Fortace clients did
10  you consider in doing this calculation?
11       A.   Three.
12       Q.   Can you identify them?
13       A.   No, I cannot.
14       Q.   Because they are confidential?
15       A.   Yes.
16       Q.   Okay.  Can you tell me about
17  characteristics of the loans that you
18  advised them on and how they compare to
19  the characteristics of the loans in the
20  pools being settled?
21       A.   In general they were Alt-A,
22  jumbo A, subprime, and HELOC originators.
23       Q.   Did you do any attempt to
24  quantify what portion of their loans fell
25  into each of those categories?

70  (Pages 274 to 277)

278

1       FRANK SILLMAN
2     A.  I did not as part of this
3 analysis.
4     Q.  Did you attempt to quantify the
5 vintages of their loans as part of this
6 analysis?
7     A.  The vintages were similar
8 vintages to the vintages, the same time
9 period majority from 2005 to 2007.
10     Q.  Did you attempt to quantify how
11 the vintages broke out as between the
12 different years within that time frame?
13     A.  I did not do the further
14 analysis.  I didn't feel that was
15 necessary as part of my assumption
16 development.
17     Q.  Did you make any attempt to
18 compare how the reps and warranties
19 governing those loans compared to the reps
20 and warranties in the governing agreements
21 for the debtors?
22     A.  In general I did do that.
23 That's one of the discounts applied in my
24 Exhibit 15 document.
25     Q.  Okay.  So we will turn back to

279

1       FRANK SILLMAN
2 that in a moment.  And over what years
3 were the put back demands and put back
4 responses that -- of the three clients you
5 are referring to?
6     A.  And the IndyMac experience.
7 They related to originations primarily
8 from 2005 to 2007.
9     Q.  I'm actually asking a different
10 question which is when were the put back
11 demands?  How long after origination?
12     A.  They were 2008 -- let me step
13 back.  IndyMac they were 2006 through
14 2008.  At my Fortace clients they were
15 2009 through part of 2012.
16     Q.  And did you attempt to -- did
17 you give any consideration to the length
18 of time between the origination and the
19 put back demands in the client experience
20 that you were basing your opinion on?
21     A.  I did not, with my experience
22 with, at IndyMac Bank and with my Fortace
23 clients, did not see any differences in
24 when the demand was presented and the
25 agree rates.

280

1       FRANK SILLMAN
2     Q.  Did you make any attempts to
3 quantify the length of time between
4 originations and demands?
5     MR. JURGENS:  Objection to form.
6     A.  I didn't see that as a factors
7 that influenced the agree rates in the
8 work that I had been involved with.
9     Q.  So you didn't do any such
10 calculation?
11     A.  It was not included in my agree
12 rate calculation.
13     Q.  Now, what were the agree rates
14 of these three clients that you are
15 referring to?
16     A.  And IndyMac.  They ranged in
17 general from a low of around 37 to a high
18 of 42 percent.
19     Q.  One of the three clients was 37
20 and another was --
21     A.  No.  At different times the
22 agree rates, depending on who the demander
23 was, when the demands were made might
24 change how they negotiated and came to
25 agree rates.  So in general I would see

281

1       FRANK SILLMAN
2 the agree rates fluctuate which is why I
3 came up with this concept of ranges so
4 that I could take into consideration the
5 variability in all of these assumptions.
6     Q.  Now, a low of 37, high of 42,
7 those are very specific numbers.  Where
8 did you get those numbers from?
9     A.  They are based on my
10 professional experience in working with
11 repurchases.
12     Q.  But each of those numbers had to
13 be calculated, right?  It's not a number
14 you walked around carrying in your head,
15 is it?
16     A.  It's a number -- it's an
17 important number for your clients.  It's
18 one of the factors that they evaluate
19 various audit firms for as ultimately what
20 types of agree rates do they get based on
21 certain audit firms, all other things
22 being held equal.  So it is one that I am
23 familiar with from a global perspective.
24     Q.  So in computing this 37 to
25 42 percent range that you used in your, in

71 (Pages 278 to 281)

282

FRANK SILLMAN

1  forming your conclusions, did you consult
2  any documents?
3      A.   I did not consult any documents.
4      Q.   You just knew those numbers by
5  memory?
6      A.   I do know those numbers by
7  memory.
8      Q.   This was the experience of three
9  clients.  Were they sell side or buy side?
10     A.   And IndyMac.
11     Q.   Sure.  Were the three Fortace
12  clients sell side?
13     A.   Yes.
14     Q.   How many sell side clients did
15  you have altogether who you advised on --
16  with respect to put back demands?
17     A.   For what period?  I mean, we had
18  clients come and go so.
19     Q.   From '09 through this year.
20     A.   Five clients.
21     Q.   About five sell side clients?
22     A.   Yes.
23     Q.   Why did you pick these three and
24  not the other two?

283

FRANK SILLMAN

1      A.   Just because of the volume of
2  work that we did for them or have done for
3  them is not significant.  The three --
4      Q.   The two --
5      A.   Yeah.  Two of the five we have
6  not done significant work for.
7      Q.   Did you consider including your
8  buy side clients in doing this analysis?
9      A.   Give me a second.  Let me just
10  recall.  The work we did for the buy side
11  was, in many cases, we did not receive
12  back the ultimate agree rate data for
13  those clients.  The three clients I picked
14  were ones where I received back agree rate
15  feedback.
16     Q.   Did you receive the ultimate
17  agree rate data for any of your buy side
18  clients?
19     A.   I may have received agree rate
20  data for those clients but I'm not sure.
21     Q.   Did you give any consideration
22  to including them in your analysis?
23     A.   I did consider them in
24  determining my analysis but felt that the

284

FRANK SILLMAN

1  data from the three that I selected and my
2  IndyMac experience was more on point and
3  more robust than the information that was
4  provided to me.
5      Q.   What was the basis for that
6  conclusion?
7      A.   The amount of loans that we did
8  for them and the data that was provided to
9  us regarding the agree rates.
10     Q.   That explains how you concluded
11  it was more robust.  But how about more on
12  point?
13     A.   They were sell side clients,
14  very similar in structure to ResCap.
15     Q.   In what sense?
16     A.   In that they sold
17  securitizations with Alt-A, subprime,
18  jumbo A loans.
19     Q.   And that wasn't true of your buy
20  side clients?
21     A.   Some of the buy side clients
22  sold whole loan to companies like ResCap.
23  Some didn't have as robust of a
24  correspondent or conduit business as

285

FRANK SILLMAN

1  ResCap.
2      Q.   So let's go back for a second to
3  Exhibit 9 and the second page in
4  particular.  Pardon me if you said this
5  already but the three step analysis you
6  did, you did it first -- you did it
7  separately for liquidated loans, for
8  current nonmodified and for each of the
9  other categories that are listed here?
10     A.   Yes.  I made a net adjustment
11  similar to what I did on Exhibit 15 for
12  each of the categories and then it was
13  calculated on a weighted average basis.
14     Q.   But how did you determine for
15  example to use 42 percent for liquidated
16  loans but only 13 per- -- I'm sorry --
17  well, the different percentages for
18  different categories?
19     A.   My experience was that some of
20  the categories had varying agree rates
21  such as trust liquidated loans versus
22  current nonmodified or current modified
23  loans.  And some of the categories such as
24  30 to 59, 60 to 89, 90 plus and REO had

72  (Pages 282 to 285)

286

1           FRANK SILLMAN
2  and foreclosure categories typically had
3  similar agree rates.
4      Q.   I see.  In this column you used
5  42 percent for many of the buckets.  You
6  used a lower number just for the current
7  nonmodified and the current modified
8  bucket?
9      A.   Right.  That's what I was just
10 complaining.
11     Q.   So tell me again why did you use
12 a much smaller number for the current
13 nonmodified buckets?
14     A.   My experience has been that the
15 agree rates for that bucket are less than
16 the liquidated loans bucket.
17     Q.   Is that because the default
18 hasn't yet occurred, whereas for the other
19 buckets the default occurred as much as
20 several years before?
21         MS. PATRICK:  Objection.
22 Modify?  Objection, form.  There's a
23 default in the current bucket.
24     A.   Yeah.  Can you rephrase it,
25 please.

287

1           FRANK SILLMAN
2      Q.   Sure.  Why did you give so much
3  lower percentage for current nonmodified
4  than you did for most of the other
5  buckets?
6      A.   My experience with at the bank
7  and with my clients were that they agreed
8  to repurchase far less loans that were
9  current nonmodified.
10     Q.   Did you give any consideration
11 to -- did your 13 percent figure take into
12 account put back demands that might be
13 made in the future after the loan had
14 defaulted or was the 13 percent not
15 addressing that?
16     A.   The 13 percent for this model
17 addresses the buckets that they are in at
18 the time that we do this analysis.
19     Q.   Okay.  Let's turn back to
20 Exhibit 15.  You've explained to me the
21 first line, the 37 to 42 percent range.
22 Can you explain to me the second line?
23     A.   Plus debtor higher GSE agree
24 rates versus industry GSE agree rates?
25     Q.   Correct.

288

1           FRANK SILLMAN
2      A.   That adjustment I made based on
3  the IMF report.
4      Q.   Exhibit A to your declaration?
5      A.   Correct.
6      Q.   Okay.  Based on anything else or
7  just that?
8      A.   Based on that.
9      Q.   And how did you derive the 7 to
10 9 percent range?
11     A.   I looked at the difference
12 between the debtors GSE agree rates and
13 the industry's agree rates and tried to
14 quantify or did quantify what I believed
15 to be the difference of how that would
16 affect the PSL agree -- PLS agree rates.
17     Q.   So let's turn to paragraph 63 of
18 your report.
19         MR. RAINS:  This is still the
20 initial one?
21         MR. BENTLEY:  The initial
22 report.
23     Q.   And I meant to say 63.
24 Paragraph 63 of your initial declaration.
25 You refer there to the debtors having

289

1           FRANK SILLMAN
2  agree rates for the GSEs of 67.56 percent
3  compared to the industry as a whole agree
4  rate of 49.54 percent, right?
5      A.   Correct.
6      Q.   Was it on the basis of those
7  numbers that you derived your 7 to
8  9 percent range?
9      A.   Yes.  With some additional
10 analysis.  If we look at my Exhibit A
11 there were -- for the industry as a whole
12 what they deemed the grand total on page
13 31 of the declaration there was still
14 12.8 percent pending versus -- for the
15 industry as a whole versus 2.8 percent for
16 GMAC.  So I made this adjustment knowing
17 that there were still loans that might --
18 that the industry as a whole might agree
19 to.  So I came up with my assumption for 7
20 to 9 percent taking into consideration the
21 differences between those two and the
22 differences in the pending percentage.
23     Q.   And was there a calculation you
24 performed to get from the numbers you just
25 mentioned in Exhibit A to the 7 to

73 (Pages 286 to 289)

290

FRANK SILLMAN

1 9 percent range?
2 A.    There isn't further
3 calculations.  That was a calculation --
4 and assumption I developed to put into my
5 calculation.
6 Q.    But what I'm asking is to get
7 from the numbers in Exhibit A to a 7 to
8 9 percent range I can't figure out, at
9 least if I were doing it, how I would get
10 to 7 to 9 percent.  I'm trying to
11 understand if there were a series of steps
12 with numbers attached to each?
13 MR. RAINS:  Object to the form
14 of the question.
15 A.    The process I utilized was I
16 developed an assumption based on the
17 information in that report and applying it
18 to the PLS rates that I had had experience
19 with.  And the result of that work was the
20 7 to 9 percent.
21 Q.    Sir, am I right no calculation
22 went into the 7 to 9 percent?
23 MR. RAINS:  Objection.
24 Misstates the witness's testimony.
25

291

FRANK SILLMAN

1 A.    I did the calculations to come
2 up with the 7 to 9 percent.
3 Q.    Can you show me the calculation?
4 A.    I don't have them written
5 anywhere.  I did the calculations to
6 determine what I thought the assumptions
7 should be.
8 Q.    Did you do in your head?
9 A.    Yes.
10 Q.    Wow.  Can you repeat it for me,
11 please.  Because you are way better than
12 me at math I think.
13 A.    I looked at the agree rate
14 differences between the two.
15 Q.    I understand the concepts you
16 explained.  But what I'm trying to ask you
17 is was there then a calculation, a series
18 of numbers, addition, subtraction,
19 division, anything like that?
20 A.    There was assumption I developed
21 from that information that I discussed to
22 come up with the 7 to 9 percent.
23 Q.    So did you just take the
24 percentages in Exhibit A that we were

292

FRANK SILLMAN

1 discussing and then apply your
2 professional judgment based on your
3 experience to get to 7 to 9 percent?
4 A.    Yes.
5 Q.    With no calculations that you
6 could point to?
7 A.    No written calculations.
8 Q.    Or any mental calculations that
9 you could describe beyond the general
10 process you just -- you've testified
11 about?
12 A.    I described the process that I
13 went through to come up with the 7 to
14 9 percent.
15 Q.    And there were no specific steps
16 to get from the several numbers in Exhibit
17 A to the 7 to 9 percent?
18 MR. RAINS:  Objection.
19 Misstates the witness's testimony.
20 A.    I utilized that information to
21 derive an assumption of 7 to 9 percent.
22 Q.    And you can't tell me any
23 further steps in that process?
24 A.    I did many steps to come up with
25

293

FRANK SILLMAN

1 my agree rates.  I did further validation
2 of the agree rates in Exhibit 15.  I went
3 through a thoughtful process to come up
4 with the assumptions in that process.  So
5 there was a lot of calculations involved
6 in the development of the agree rates.
7 Q.    But there are no calculations
8 you created other than the ones on the
9 spreadsheets we have looked at so far and
10 in your report?
11 MR. RAINS:  Objection.  Asked
12 and answered.
13 A.    The calculations that were done
14 are shown in Exhibit 9, Exhibit 15.  And
15 the development of those assumptions were
16 done based on my professional experience.
17 Q.    Let's turn to the third line in
18 the top box on Exhibit 15.  The one that
19 says, "Minus lesser debtor PLS versus
20 industry PLS reps and warrants."
21 Do you see that?
22 A.    Yes.
23 Q.    And can you describe to me what
24 that addresses?

74  (Pages 290 to 293)

294

1          FRANK SILLMAN
2     A.   Based on the customers that I
3  based the PLS agree rates on the top line,
4  those these customers and my IndyMac
5  experience, I compared the debtors PLS
6  reps and warrants again utilizing the
7  eight sample trust governing agreements
8  that I looked at versus similar documents
9  for similar customers and felt that in
10 some cases the debtors reps and warrants
11 were less, in some cases they were
12 similar, to other industry PLS reps and
13 warrants.  So I felt it was warranted to
14 discount for the debtors lesser reps and
15 warrants in the agreements that I
16 reviewed.
17    Q.   You concluded that overall the
18 debtors reps and warrants were less strong
19 than that of the other sellers that you
20 were looking at?
21    A.   Correct.  PLS, yes.
22    Q.   And the lesser strength of the
23 reps and warrants warranted an adjustment
24 of the agree rate?
25         MS. PATRICK:  Objection, form.

295

1          FRANK SILLMAN
2     A.   I believe they -- in order to
3  come up with a valid range of agree rates
4  warranted a reduction in the agree rate
5  assumptions.
6     Q.   Now, you've testified you looked
7  at eight sample governing agreements for
8  the trusts that are, whose claims are
9  being settled?
10    A.   Yeah.  One from each of the
11 shelves.
12    Q.   And then did you look at
13 governing agreements for each of the three
14 Fortace clients that you mentioned?
15    A.   I was familiar with the general
16 reps and warrants from my other Fortace
17 clients.
18    Q.   Now, your other Fortace clients
19 you represented them in connection with
20 multiple deals each, correct?
21    A.   Yes.
22    Q.   And their reps and warrants
23 varied from deal to deal?
24    A.   Generally reps and warrants on a
25 shelf basis were similar.  From shelf to

296

1          FRANK SILLMAN
2  shelf they may have changed.
3     Q.   Did you perform any system --
4  did you attempt to review the reps and
5  warrants of those clients in any
6  systematic way?
7     A.   I based it on my professional
8  experience and actual repurchase agree
9  rate experience with them in regards to
10 their reps and warrants.
11    Q.   And are there -- is there any
12 work product that you or your team
13 generated reflecting your review of the
14 reps and warrants of these other clients?
15    A.   There isn't any information that
16 I relied on that we did not provide to the
17 data room or in the exhibits.  It's
18 confidential information.  So we didn't
19 document any of the work.  This was based
20 on my professional experience with the
21 Fortace clients.
22    Q.   Let's just try to make sure we
23 have a clear record.  Did you go back and
24 look at the reps and warrants of these
25 other clients for purposes of performing

297

1          FRANK SILLMAN
2  your analysis or did you instead simply
3  rely on your general experience in
4  representing those clients?
5         MR. RAINS:  Or something else.
6  Tell him what you did.
7     A.   I relied on my familiarity with
8  the reps and warrants from my other
9  clients in comparing them to the reps and
10 warrants in the governing agreements that
11 I reviewed.
12    Q.   So you didn't conduct any rep
13 and warrant review of those other clients
14 for purposes of this analysis?
15    A.   I didn't do any additional rep
16 and warrant review other than the rep and
17 warrant review that I explained to you
18 that I did.
19    Q.   That you had done previously in
20 connection with your work for those other
21 clients?
22    A.   Correct.
23    Q.   And same question with respect
24 to IndyMac.  Did you go back and look at
25 the reps and warrants for any IndyMac

75  (Pages 294 to 297)

298

FRANK SILLMAN

1  FRANK SILLMAN
2  deals for purposes of this analysis?
3      A.   I was familiar with the reps and
4  warrants that we made at IndyMac as part
5  of the work that I did there.  So, again,
6  I relied on the information that I
7  ascertained during my time at IndyMac.
8      Q.   And did you do any quantitative
9  analysis to get from your knowledge of the
10 various reps and warrants to the 3 to
11 4 percent range reflected on Exhibit 15?
12     A.   That was an assumption derived
13 from my professional experience on how the
14 differences in the reps and warrants might
15 affect the agree rates.
16     Q.   It wasn't based on any
17 statistical analysis of correlations
18 between different sorts of reps and
19 warrants and resulting agree rates?
20     A.   It's based on my professional
21 experience.  It's not on a statistical
22 analysis.
23     Q.   So I mean could the proper
24 number be 5 or 6 instead of 3 or
25 4 percent?

299

FRANK SILLMAN

1  FRANK SILLMAN
2      A.   I created higher and lower
3  ranges to take into consideration the
4  potential variability in agree rates.  And
5  this was a step that was done to further
6  validate the work that I had done on the
7  bucket by bucket basis for the lower and
8  higher ranges.
9      Q.   But when you did that bucket by
10 bucket analysis, you didn't do any
11 quantitative analysis of the impacts of
12 reps and warranties, did you?
13     A.   As part of the development of
14 these assumptions I did take into
15 consideration these two factors in the
16 development of these assumptions.
17     Q.   I understand.  I'm asking a
18 different question, which is you didn't do
19 any quantitative analysis of the impact
20 that rep and warranty differences have on
21 agree rates?
22     A.   I'm not sure I understand what
23 you mean by quantitative analysis.  I
24 performed analysis in developing my
25 assumptions.

300

FRANK SILLMAN

1  FRANK SILLMAN
2      MR. JURGENS:  Can we take a
3  break?  Is this a good time.
4      MR. RAINS:  We only have like
5  five minutes so.  Whether it's 5 or 7
6  or whatever let's not take a break
7  now.  Let's push through the end.
8      MR. BENTLEY:  Let's push through
9  and --
10     MR. JURGENS:  Then I'm just
11 going to say for the record that MBIA
12 is very unhappy that we got no time at
13 all despite the fact that we were
14 promised approximately an hour at the
15 beginning of the deposition.  I'm also
16 reserving MBIA's right to compel
17 Mr. Sillman to identify the three
18 clients that he's referred to several
19 times today in light of the fact that
20 he relied on his experience doing work
21 for those clients in rendering the
22 expert opinions that were the subject
23 of his declarations.
24     MR. BENTLEY:  Let's go off the
25 record.

301

FRANK SILLMAN

1  FRANK SILLMAN
2      MR. RAINS:  Who promised you one
3  hour today?
4      MR. JURGENS:  Mr. Bentley.
5      MR. BENTLEY:  Let's go off the
6  record.  Can we go off the record for
7  a minute, Darryl?
8      MR. RAINS:  The witness has been
9  here since 9:00, right?  It's now 6:30
10 and I'd like to get him out.  We only
11 have a few number of minutes left.
12     MR. BENTLEY:  What do we have on
13 your clock?
14     MR. RAINS:  I wrote down we
15 should stop at 6:30.  I'm not
16 counting --
17     MR. BENTLEY:  Can we go off the
18 record?
19     MR. RAINS:  Sure.
20     (Whereupon, there is a recess in
21 the proceedings.)
22 BY MR. BENTLEY:
23     Q.   Exhibit A to your report
24 addresses GSE buyback experience?
25     MR. RAINS:  Actually can I

76  (Pages 298 to 301)

302

FRANK SILLMAN

1 interrupt you? I want to put on the
2 record just quickly that there has
3 been a dispute up until now about how
4 long this deposition is going to go
5 and all parties have agreed that the
6 deposition will go another 20 minutes
7 until 7:00 and then it will end and no
8 party will seek to have it reopened.
9 So that's the agreement. Sorry to
10 interrupt.
11 **Q. That's fine. So let me start my**
12 **question again. Exhibit A to your initial**
13 **declaration addresses GSE buyback**
14 **experience for the years 2006 to 2008,**
15 **correct?**
16 A. Yes.
17 **Q. Did you consider -- did you give**
18 **any consideration to whether GSE buyback**
19 **experience for later years might also be**
20 **pertinent?**
21 A. I considered the 2006 to 2008
22 period because it was most similar to the
23 period of time associated with the 392
24 trusts.

303

FRANK SILLMAN

1 **Q. How was it most similar?**
2 A. It's the origination activity
3 from 2006 to 2008.
4 **Q. Isn't Exhibit 1 about the**
5 **buyback activity during 2006 to 2008?**
6 A. Yes. Yes. Buybacks issued
7 which would have related to originations,
8 you know, prior to and including this
9 similar period to the PLS trusts.
10 **Q. Let's just be clear. Exhibit A**
11 **addresses buyback demands and requests --**
12 **buyback demands and responses that**
13 **occurred during the years '06 to '08,**
14 **correct?**
15 A. On mortgages securitized from
16 2006 to 2008, yes. So it focuses on when
17 the mortgages were securitized.
18 **Q. Your view is that this report**
19 **addresses buyback demands made during**
20 **later years with respect to securiti- --**
21 A. I'm just reading the note --
22 **Q. -- with respect to**
23 **securitizations that occurred between 2006**
24 **and 2008?**

304

FRANK SILLMAN

1 A. I'm reading the note on the
2 bottom of page 31. Data coverage
3 repurchase demands on mortgages -- 31 of
4 the declaration.
5 **Q. 31 of? 31 of your declaration?**
6 A. Yeah, right there.
7 **Q. I don't see a page 31.**
8 A. It's page 31 of the declaration.
9 I'm sorry.
10 **Q. Oh, okay. It's page 22 --**
11 A. -- of the report and 31 of the
12 110 in the declaration.
13 **Q. And what are you reading?**
14 A. I'm looking at the bottom of
15 where it says note. Data cover repurchase
16 demands on mortgage securitized by Fannie
17 Mae and Freddie Mac from 2006 through
18 2008.
19 **Q. I see. Okay. Did you give any**
20 **consideration to the demand rate shown on**
21 **this document as to GMAC compared to the**
22 **demand -- the grand total demand rate**
23 **shown on this document?**
24 A. Which column are you referring

305

FRANK SILLMAN

1 to?
2 **Q. The second column. Or the**
3 **second column under the heading Repurchase**
4 **Demands?**
5 A. The percentage of assets?
6 **Q. Correct?**
7 A. Is that the column?
8 **Q. Yeah.**
9 A. The 1.49 percent?
10 **Q. Correct. Compared to**
11 **2.40 percent. And what I'm asking you is**
12 **while you were preparing your report did**
13 **you give any consideration to that factor?**
14 A. I did evaluate the 1.49 versus
15 the 2.40 overall. But determined that the
16 repurchased column number, the
17 67.56 percent was the meaningful number
18 from the information provided on, in this
19 report.
20 **Q. Did you take the percentage**
21 **assets column into account in reaching**
22 **your conclusions?**
23 A. I evaluated in reaching my
24 conclusions. It was a factor. But the

77 (Pages 302 to 305)

306

1         FRANK SILLMAN
2  overriding factor was the actual agree
3  rate experience the debtor had with Fannie
4  and Freddie.
5         MR. BENTLEY:  Thank you,
6  Mr. Sillman.  I have nothing further
7  at this time.
8         THE WITNESS:  Thank you.
9         MR. BENTLEY:  For the record,
10  I'd like to say I actually finished in
11  exactly five minutes.
12         MR. JURGENS:  Well, thank you,
13  Mr. Bentley.  And thank you,
14  Mr. Sillman, for accommodating us.
15  EXAMINATION BY
16  MR. JURGENS:
17     Q.   My name is Jason Jurgens, I'm
18  from Cadwalader, Wickersham & Taft.  We
19  represent MBIA.  I just wanted to ask you
20  a couple of questions about your report
21  and what you did and what you didn't do in
22  the time that I have.
23         First question I have, demand
24  rate.  How do you define that in the
25  report?

307

1         FRANK SILLMAN
2     A.   Let me go to that section.
3     Q.   It's paragraph 55, I believe.  I
4  couldn't find an actual definition in that
5  section.
6     A.   Okay.  The demand rate is the
7  rate at which the trustee or similar party
8  would issue demands to repurchase loans.
9     Q.   And that's -- is that a
10  percentage of the loans that are audited
11  or is it a percentage of the total pool of
12  loans in the trust?
13     A.   It's a percentage of the loans
14  that are in the audit rate or are audited.
15     Q.   Okay.  Thanks for clarifying
16  that.  You mentioned earlier in your
17  testimony that you recall either getting a
18  hard copy of the settlement agreement or
19  an e-mail version of it, electronic
20  version via e-mail.  Did I recall that
21  correctly?
22     A.   That's correct.
23     Q.   Did you review the settlement
24  agreement from beginning to end?
25     A.   I did review the settlement

308

1         FRANK SILLMAN
2  agreement.
3     Q.   And do you remember seeing any
4  provision in the settlement agreement that
5  determined how the total allowed claim
6  would be allocated between and among the
7  different trusts that opted into the
8  settlement agreement?
9     A.   I do remember seeing some
10  language regarding allocation.
11     Q.   Is there anything in your
12  report -- sorry, withdraw that.
13         When you were asked to opine on
14  the reasonableness of the $8.7 billion
15  total allowed claim, did you consider at
16  all the allocation mechanism in the
17  settlement agreement?
18     A.   I did not.  That was not part of
19  my declaration.
20     Q.   Now, you mentioned earlier the
21  West Pat model; is that correct?
22     A.   Yes.
23     Q.   And in your supplemental
24  declaration I believe you disclosed that
25  you looked at the West Pat model and

309

1         FRANK SILLMAN
2  considered that in connection with coming
3  up with some of your loss estimates,
4  correct?
5     A.   Correct.
6     Q.   Do you know whether the West Pat
7  model is a dynamic model or a static?
8     A.   What do you mean by dynamic
9  versus static?
10     Q.   Dynamic in the sense that the --
11  well, let me back up one step.  I'm sorry,
12  I'm going really fast.  So the way I
13  understand how models work is oftentimes
14  vendors will update the model with new
15  information as it comes in.  So if every
16  month, let's say, they get new bond
17  performance information or maybe loan
18  performance information, they may update
19  their model on a monthly basis.  Some do
20  it quarterly, some do it more frequently
21  than that.  When I use the phrase "dynamic
22  model," that's what I'm talking about.  Do
23  you understand that?
24     A.   Yes, the West Pat model does
25  accommodate the ability to refresh the

78 (Pages 306 to 309)

310

1          FRANK SILLMAN
2    data. For purposes of what we did in our
3    supplemental declaration we looked at
4    developing the estimated lifetime loss one
5    time. So we didn't continue month over
6    month and refresh that.
7        Q.   Okay. If somebody went back to
8    West Pat today, could they replicate what
9    you did back in June?
10       A.   If -- I'm not an expert with the
11   West Pat had model so I would have to ask
12   them to see if they had the same inputs,
13   could they replicate. That's something I
14   can follow-up. I'm just -- I'm not
15   familiar. I don't license that model.
16       Q.   Well, we can leave a spot in the
17   transcript then for you to follow up with
18   an answer to that question whether or not
19   we can replicate what you did related to
20   calculating an estimate of lifetime losses
21   using West Pat.
22   (Insert.)_____.
23       Q.   You mentioned a few times today
24   that when you did work with your clients
25   they often had their own repurchase

311

1          FRANK SILLMAN
2    standard that they would give to you in
3    connection with the work that you do for
4    them, the reps and warranties analysis.
5    Did I recall that correctly?
6        A.   Pretty much. We worked together
7    so it may be the case they already had a
8    repurchase standard they wanted us to
9    audit to or we may have had discussions
10   back and forth about what the appropriate
11   repurchase standard might be. But in the
12   end they decided what the ultimate
13   repurchase standard was.
14       Q.   And did each client have a
15   different repurchase standard?
16       A.   They varied, some more or less
17   than others.
18       Q.   And would the ultimate agree
19   rate for your individual clients depend
20   upon the repurchase standard that you were
21   asked to apply?
22       A.   That could affect the agree
23   rate.
24       Q.   Could we just look at paragraph
25   18 of your declaration quickly?

312

1          FRANK SILLMAN
2        A.   Yes.
3        Q.   Page 8 reads "Generally the
4    standard for analyzing a breach of
5    representations and warranties requires an
6    assessment of, A, whether the alleged loan
7    defect or alleged breach is an actual and
8    material breach of representations and
9    warranties, and, B, whether such breach
10   was material and adverse to the interests
11   of the certificate holders in the mortgage
12   loans." Then you define that cumulatively
13   as the R&W repurchase standard. Do you
14   see that?
15       A.   Yes.
16       Q.   That's a different repurchase
17   standard than the one you testified about
18   earlier working on with each of these
19   different clients where it varied
20   different -- it varied from client to
21   client; is that correct?
22       A.   The variances between client to
23   client might not vary in these two
24   categories just the underlying factors for
25   each of those categories. So what would

313

1          FRANK SILLMAN
2    be considered the alleged defect or
3    alleged breach and then what their
4    standards were for material and adverse.
5    So it's not necessarily mutually
6    exclusive.
7        Q.   Did the debtors give you any R&W
8    standard or repurchase standard when you
9    did your work for them?
10       A.   The work we did prior?
11       Q.   Yeah, prior.
12       A.   To the bankruptcy?
13       Q.   Yes.
14       A.   We were in the process of
15   finalizing the repurchase standard as part
16   of the work that we did for them as we
17   were reviewing the loans. The repurchase
18   standard tends to be dynamic in that you
19   try to develop all of the possible
20   scenarios that might go into a repurchase
21   standard but things come up based on the
22   work that you do that causes you to modify
23   the repurchase standard. So it's not a
24   static standard.
25       Q.   Am I correct that the repurchase

                        79  (Pages 310 to 313)

314

FRANK SILLMAN

1
2 standard might change depending on whether
3 or not you are doing a litigation analysis
4 for the client as opposed to say an
5 analysis in the context of whole loan
6 transaction that you might be vetting for
7 the client?
8     A.   Can you explain again what were
9 you are asking in a little bit more
10 detail?
11     Q.   Sure.  I assume this is the
12 case, I don't know.  But when you come in
13 to do work for a client in the context of
14 evaluating or doing a reps and warranties
15 type analysis I take it that the client
16 has some goal in mind that they are
17 seeking to achieve by having you do work
18 for them, correct?
19     A.   Yeah.  They want to resolve the
20 repurchase demands.
21     Q.   In some context I assume that
22 the client's goal is a business goal, they
23 just want to reach some business
24 objective.  It may be perhaps evaluating
25 whether to go forward with purchasing a

315

FRANK SILLMAN

1
2 pool of loans, it may be some other
3 business objective.  Is that a fair
4 assumption on my part?
5     A.   Yes.  My clients tend to have
6 business objectives to the engagements
7 they engage us.
8     Q.   And in some context, like the
9 context of your work for RFC in connection
10 with the MBIA litigation, I take it that
11 there was a litigation overlay, let's say,
12 or an advocacy overlay to the work that
13 you were doing for them, correct?
14     A.   What do you mean by --
15     Q.   Were the lawyers who are
16 representing RFC in the civil litigation
17 involved in crafting the repurchase
18 standard that you said was a work in
19 progress?
20     A.   Yes.
21     Q.   Now, one more question I had --
22 one more area really.  Are you aware that
23 some of the trusts that, of the 392, never
24 made a single put back demand to any of
25 the debtors?

316

FRANK SILLMAN

1
2     A.   I believe that's the -- I
3 believe I understand that to be the case
4 though I cannot tell you which of the 392
5 did.  I do believe reading or hearing that
6 that was the case.
7     Q.   Do you know whether over 300
8 trusts never made a put back demand?
9     A.   Is this prior to -- are you
10 talking about prior to the allowed claim?
11     Q.   So do you consider the allowed
12 claim to be a put back demand, a big bulk
13 put back demand?
14         MR. RAINS:  Which question -- he
15 was in the middle of answering your
16 earlier question.  So --
17         MR. JURGENS:  Sure.  Let's go
18 back.
19     Q.   On the chart that we were
20 looking at earlier, the PLS demand data
21 chart that was prepared --
22     A.   Right.
23     Q.   -- was that prepared prior to
24 the settlement agreement?
25     A.   I don't know the answer to that.

317

FRANK SILLMAN

1
2 I received it from the debtor after the
3 settlement agreement was done.  I don't
4 know when the time -- I don't know if the
5 detailed spreadsheets have any dates on
6 there.
7     Q.   There are 392 trusts that are
8 part of the proposed settlement, correct?
9     A.   Right.
10     Q.   Do you know how many of the 392
11 trusts never made a single put back demand
12 prior to the total allowed claim being
13 approved?
14     A.   I do not.
15     Q.   Would it surprise you that over
16 300 of the trusts never made a single put
17 back demand prior to the total allowed
18 claim being agreed to?
19     A.   That wouldn't surprise me.
20     Q.   Did you take into account the
21 fact that a large number of the trusts
22 never made a put back demand when you came
23 up with your opinion that the $8.7 billion
24 total allowed claim fell within the range
25 of reasonableness?

80  (Pages 314 to 317)

318

FRANK SILLMAN

1
2      A.   My understanding is there's
3  certain hurdles that trusts need to get
4  over in order to make a put back claim.
5  So it's possible and not surprising that
6  300 of them had not met that standard
7  prior to the settlement agreement.
8      Q.   Did you factor that into your
9  analysis, the fact that a large number of
10  the trust members made a single put back
11  demand?
12      A.   There are many reasons why these
13  trusts may not have qualified to make a
14  demand.  So that was not part of the
15  analysis.  Whether they had met the legal
16  standards as defined in the governing
17  agreements, I did not, was not asked to
18  evaluate that as part of the declaration.
19      Q.   How could potential repurchase
20  liability for the debtors arise without
21  the trusts making a put back demand?
22      MR. RAINS:  Objection.  Calls
23  for a legal conclusion.
24      A.   Yeah, I'm just not an attorney.
25  I can't speak as to why they did or didn't

319

FRANK SILLMAN

1
2  or could or couldn't make a repurchase
3  demand.
4      Q.   Earlier you testified in sum or
5  substance that there were certain
6  defenses, litigation defenses that you
7  believed were built in to the agree rate
8  assumptions that you were making.  Did I
9  recall that testimony correctly?
10      A.   That's correct.  The company, as
11  part of their repurchase process, would
12  evaluate certain legal defenses.
13      Q.   Do you know what legal defenses
14  the companies considered in connection
15  with agreeing or disagreeing to repurchase
16  a loan?
17      A.   I was told that that was part of
18  their process.  We did not get into each
19  of the different legal defenses they used
20  in each one of the individual loans.
21      Q.   So other than the assumptions
22  you made with respect to the agree rates,
23  you didn't factor in any other litigation
24  risk discounts in connection with
25  attempting to analyze whether the

320

FRANK SILLMAN

1
2  $8.7 billion total allowed claim fell
3  within the range of reasonableness; is
4  that correct?
5      MR. RAINS:  Objection.
6  Misstates his testimony.
7      Go ahead.
8      A.   That was -- the legal strategies
9  and the valuation of their legal options
10  was part of their agree -- I mean their
11  repurchase process.  So it was factored
12  in.
13      Q.   Put that aside.  Other than the
14  agreed rate, the assumptions you made
15  about the agreed rate, did you consider
16  any other litigation risk discounts that
17  might be applicable in determining whether
18  or not the $8.7 billion total allowed
19  claim fell within the range of
20  reasonableness?
21      A.   I considered the legal
22  considerations the company took in its
23  repurchase process in my declaration.
24      Q.   But the statute of limitations,
25  arguments, things like that you didn't

321

FRANK SILLMAN

1
2  take into consideration independent of
3  whatever the companies may have done, or
4  not the companies really, the GSEs, right,
5  took into consideration?
6      MR. RAINS:  Objection.  Vague
7  and ambiguous.
8      MR. JURGENS:  Fair enough.  I
9  withdraw the question.
10      Q.   My last question and my last
11  minute.  Focusing on your three clients at
12  Fortace whose -- focusing on the three
13  clients at Fortace whose repurchase
14  experience and agree rate experience you
15  considered in connection with preparing
16  your report, did any of the repurchase
17  work that you did for them involve first
18  liens?
19      A.   Yes.
20      Q.   Could you put a percentage on
21  the first liens versus second liens that
22  you considered for your three clients?
23      A.   I considered both, IndyMac and
24  the Fortace clients.  But I can't put a --
25      Q.   Put aside IndyMac for a second.

81  (Pages 318 to 321)

322

```
1        FRANK SILLMAN
2  Just focusing on the three clients.  Is
3  one of the three clients the debtors RFC
4  or --
5      A.   I cant disclose.
6      Q.    Well, no, but just when you say
7  there are three clients, does that include
8  the debtors or is that exclusive of the
9  debtors?
10     A.   That includes the debtors and --
11     Q.    And are you treating GMAC and
12  RFC as two of the three?
13     A.   We treated those clients
14  separately and they were considered
15  separately and --
16     Q.    So when you were telling
17  Mr. Bentley earlier that in making your
18  assumptions about different things that
19  you looked to your experience with three
20  clients, it's really the debtors plus one
21  other client; is that right?
22     A.   That's correct.
23     Q.    And for that one other client,
24  did you evaluate repurchase demands made
25  with respect to first liens?
```

323

```
1        FRANK SILLMAN
2      A.   They were predominantly first
3  liens.
4      Q.    Okay.
5          MR. JURGENS:  Okay.  That's all
6  the questions that I have.
7          MR. RAINS:  Thanks everyone.
8          (Time noted:  7:01 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

324

```
1
2   STATE OF _____ )
3                          ) :ss
4   COUNTY OF _____ )
5
6
7        I, FRANK SILLMAN, the witness
8   herein, having read the foregoing
9   testimony of the pages of this deposition,
10  do hereby certify it to be a true and
11  correct transcript, subject to the
12  corrections, if any, shown on the attached
13  page.
14
15
16  _____
17         FRANK SILLMAN
18
19
20  Sworn and subscribed to before
21  me, this        day of
22           , 2012.
23
24  _____
25      Notary Public
```

325

```
1
2          C E R T I F I C A T I O N
3   STATE OF NEW YORK     )
4                        ) ss.:
5   COUNTY OF NEW YORK    )
6
7        I, ERICA L. RUGGIERI, RPR and a
8   Notary Public within and for the State
9   of New York, do hereby certify:
10       That I reported the proceedings
11  in the within-entitled matter, and
12  that the within transcript is a true
13  record of such proceedings.
14       I further certify that I am not
15  related by blood or marriage, to any
16  of the parties in this matter and
17  that I am in no way interested in
18  the outcome of this matter.
19       IN WITNESS WHEREOF, I have
20  hereunto set my hand this 21st day
21  of November, 2012.
22
23
24       ERICA L. RUGGIERI, RPR
25
```

82  (Pages 322 to 325)