MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Darryl P. Rains

*Counsel for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ------------------------------------------------ ) | | |
| In re: ) | Case No. 12-12020 (MG) | |
| ) | | |
| RESIDENTIAL CAPITAL, LLC, <u>*et al*</u>., ) | Chapter 11 | |
| ) | | |
| Debtors. ) | Jointly Administered | |
| ------------------------------------------------ ) | | |

**DEBTORS' REPLY BRIEF RE *IRIDIUM* FACTORS IN SUPPORT OF MOTION FOR
APPROVAL OF RMBS SETTLEMENT AGREEMENTS**

REDACTED

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

 SUMMARY OF THE EVIDENCE.............................................................................9

ARGUMENT:  THE IRIDIUM FACTORS..................................................................20

I.      THE RMBS SETTLEMENT WAS THE PRODUCT OF ARM'S LENGTH
        NEGOTIATIONS...............................................................................................25

        A.      Ally Did Not Direct or Control the Settlement Negotiations ...............28

        B.      Ally Did Not Cause the Debtors to Agree to a Too-High $8.7 Billion
                Allowed Claim.......................................................................................31

        C.      The Debtors Did Not Collude with Ally to Induce the Investors to Support
                Plan Releases in Ally's Favor................................................................32

II.     THE $8.7 BILLION CLAIM FALLS WITHIN A REASONABLE RANGE .............35

        A.      The $8.7 Billion Allowed Claim Bears a Reasonable Relationship to
                Aggregate Losses...................................................................................37

        B.      The $8.7 Billion Allowed Claim Bears a Reasonable Relationship to
                Loans with Material Defects...................................................................38

        C.      The $8.7 Billion Allowed Claim Bears a Reasonable Relationship to
                Potential Damages After Adjustments for Legal Defenses .................43

                1.      The Debtors' Loss Causation Defense ......................................44

                2.      The Debtors' Statute of Limitations Defense...........................47

                3.      The Debtors' "Election of Remedies" Defense.........................49

        D.      The Objectors' Criticisms of the Settlement Amount Are Not Supported
                By the Evidence......................................................................................51

                1.      Ally's "Representation and Warranty" Accounting Reserves.................51

                2.      Ally's Form 10-Q Disclosure Regarding "Reasonably Possible"
                        Losses ......................................................................................52

                3.      The Debtors' Comparisons to the Bank of America and Lehman
                        Brothers Claims .......................................................................55

III.    THE RMBS SETTLEMENT AVOIDS COMPLEX AND PROTRACTED
        LITIGATION AND CONFERS OTHER NON-CASH BENEFITS UPON THE
        ESTATE ...........................................................................................................58

IV.     OPPOSITION FROM SOME CREDITORS IS NOT GROUNDS FOR
        WITHHOLDING APPROVAL OF THE SETTLEMENT...........................................60

CONCLUSION ..........................................................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allegheny Ludlum Corp. v. United States,*
   367 F.3d 1339 (Fed. Cir. 2004) .......................................................................25

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*
   No. 11Civ. 2375(JSR), 2012 WL 4373327 (S.D.N.Y. Sept. 25, 2012) ................46

*Freund v. Washington Square Press, Inc.,*
   34 N.Y.2d 379 (1974)...........................................................................................44

*Golden Cycle, LLC v. Allan,*
   No. 16301, 1998 Del. Ch. LEXIS 237...................................................................23

*Hernandez v. Bank of Nova Scotia,*
   908 N.Y.S.2d 45 (N.Y. App. Div. 1st Dep't 2010). No .......................................47

*In re Adelphia Comm'ns. Corp.,*
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ..................................................................26

*In re Adelphia Commc'ns Corp.,*
   327 B.R. 143 (Bankr. S.D.N.Y. 2005) ............................................................21, 36

*In re Ambac Fin. Group, Inc.,*
   No. 10-B-15973, 2011 Bankr. LEXIS 4289 (Bankr. S.D.N.Y. Sept. 13, 2011) ....26

*In re AppliedTheory Corp.,*
   2008 Bankr. LEXIS 1373 (Bankr. S.D.N.Y. Apr. 24, 2008) .................................22

*In re BGI, Inc.,*
   465 B.R. 365 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ................................................38

*In re Bruno Mach. Corp.,*
   435 B.R. 819 (Bankr. N.D.N.Y. 2010)..................................................................25

*In re Budget Rent A Car Corp. Shareholders Litig.,*
   C.A. No. 10,418, 1991 Del. Ch. LEXIS 29 (Del. Ch. Mar. 15, 1991) ..................23

*In re Chemtura Corp.,*
   439 B.R. 561 (Bankr. S.D.N.Y. 2010) ..................................................................38

*In re Copperfield Investments, LLC,*
   401 B.R. 87 (Bankr. E.D.N.Y. 2009) ....................................................................62

ii

*In re Dewey & Leboeuf LLP*,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ........................................................... 22, 24

*In re Doctors Hosp. of Hyde Park, Inc.*,
    474 F.3d 421 (7th Cir. 2007) ............................................................................. 38

*In re Drexel Burnham Lambert Grp., Inc.*,
    134 B.R. 499 (Bankr. S.D.N.Y. 1991) ...................................................... 20, 23, 63

*In re General Motors Corp.*,
    407 B.R. 463 (Bankr. S.D.N.Y. 2009) ............................................................... 24

*In re Hibbard Brown & Co. Inc.*,
    217 B.R. 41 (Bankr. S.D.N.Y. 1998) .................................................................. 21

*In re Hilsen*,
    404 B.R. 58 (Bankr. E.D.N.Y. 2009) ...................................................... 26, 36, 62

*In re Homesteads Cmty. at Newtown LLC*,
    04-30417, 2012 Bankr. LEXIS 3828 (Bankr. D. Conn. Aug. 21, 2012) ............... 38

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) .................................................................... passim

*In re MF Global Inc.*,
    466 B.R. 244 (Bankr. S.D.N.Y 2012) ...................................................... 20, 21, 35

*In re Milazzo*,
    450 B.R. 363 (Bankr. D. Conn. 2011) ................................................................ 62

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1102 (3d Cir.1979) ............................................................................. 36

*In re Rock & Republic Enters.*,
    No. 10-11728(AJG) 2011 Bankr. LEXIS 5028 (Bankr. S.D.N.Y. Dec. 22, 2011) ........ 22

*In re Southeast Banking Corp.*,
    314 B.R. 250 (Bankr. S.D. Fla. 2004) ................................................................ 63

*In re Stone Barn Manhattan LLC*,
    405 B.R. 68 (Bankr. S.D.N.Y. 2009) .................................................................. 35

*In re Teltronics Servs., Inc.*,
    762 F.2d 185 (2d Cir.1985) ............................................................................... 35

*In re Town, LLC*,
    09-11827 SMB, 2009 WL 2883047 (Bankr. S.D.N.Y. July 27, 2009) .................... 36

sf-3223258 v41

*In re Tribune Co.*,
   464 B.R. 126 (Bankr. D. Del. 2011)............................................................................26

*In re Vazquez,*
   325 B.R. 30 (Bankr. S.D. Fla. 2005) ........................................................................62

*In re W.T. Grant Co.*,
   699 F.2d 599 (2d Cir. 1983) ......................................................................................21

*Kahn v. Tremont Corp.*,
   694 A.2d 422 (Del. 1997)..........................................................................................23

*Kunstsammlungen Zu Weimar v. Elicofon,*
   536 F. Supp. 829 (E.D.N.Y. 1981)...........................................................................48

*Lehman Bros. Holding v. Laureate Realty Servs.*,
   No. 1:04-cv-1432-RLY-TAB, 2007 U.S. Dist. LEXIS 76940 (S.D. Ind. Sept. 28,
   2007)...........................................................................................................................45

*Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas, No. 4:10cv0212SWW*,
   2012 U.S. Dist. LEXIS 87265 (E.D. Ark. June 25, 2012).......................................48

*MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.*,
   Case No. 11-cv-02542-JRT/TNL, 2012 WL 4511065 (D. Minn. Oct. 1, 2012)..............49, 50

*MBIA Insurance Corp. v. Countrywide Financial Corp.*,
   936 N.Y.S.2d 513 (2012) ..........................................................................................47

*Meyercord v. Curry,*
   38 A.D.3d 315 (N.Y. Sup. Ct., Ap. Div. 1st Dep. 2007).........................................44

*Mission Iowa Wind Co. v. Enron Corp.*,
   291 B.R. 39 (S.D.N.Y. 2003) ....................................................................................24

*Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter
   Commc'ns)*,
   419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................................23, 26

*Nellis v. Shugrue,*
   165 B.R. 115 (S.D.N.Y. 1994) ..................................................................................20

*Police & Fire Ret. Sys. of the City v. Ambac Fin. Group, Inc.*,
   11-CV-7529, 2011 U.S. Dist. LEXIS 149610 (S.D.N.Y. Dec. 29, 2011)...............36

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
   390 U.S. 414 (1968) ..................................................................................................21

sf-3223258 v41

*Syncora Guarantee, Inc. v. EMC Mortgage Corp.*,
  874 F. Supp. 2d 328 (S.D.N.Y. 2012) ........................................................................45, 46

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*,
  No. 2:08-cv-1448 ........................................................................................................45, 47

**STATUTES**

19 U.S.C. § 1677(5)(f) .........................................................................................................25

N.Y. CPLR § 206 ................................................................................................................48

N.Y. CPLR § 213(2) ...........................................................................................................47

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 9019(a) ....................................................................................................20

Lawrence B. Solum, *Moore's Federal Practice—Civil,* § 134.02[1][d] ...........................49

v

Residential Capital, LLC and its affiliated debtors and debtors-in-possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") submit this reply brief in support of their Rule 9019 motion for approval of the RMBS Trust Settlement Agreement.

## INTRODUCTION

On November 21, 2012, this Court approved the sale, for $3 billion, of the Debtors' mortgage origination and servicing businesses.  It was the first time any bankrupt mortgage origination and servicing business had been sold, out of bankruptcy, as a fully-functioning and operating business.  The $3 billion in proceeds will go to benefit the estate's creditors.

This successful result was made possible, in part, by the settlement that is the subject of this motion.  Because of the settlement, the RMBS trustees agreed not to object to the assignment of pooling and servicing agreements free and clear of representation and warranty claims.  Because of the settlement, the RMBS trustees agreed to defer, and cap the amount of, their cure claims.  Because of the settlement, Ocwen, the winning bidder, agreed to pay a purchase price well in excess of expectations and far above what it would have offered had it faced a contested hearing, unlimited cure claims, and opposition from the RMBS trustees.

As the beneficiaries of the sale, the estate's creditors should appreciate, more than most, the benefits conveyed by the proposed settlement.  Instead, having already secured the benefits, various creditors seek to stop the settlement that secured those benefits.

The objectors say their opposition is based on evidence obtained through discovery.  (*E.g.*, Comm. Obj. at 1.)  That is not true.  The objectors made up their minds to oppose the settlement long before discovery had commenced.  Before any depositions had been taken, Wilmington Trust asserted the settlement is a "secret deal" that doesn't "smell right" and is

based on "collusion." (Ex. 1[1] at 91:5-8; Rep. of Wilmington Trust ¶ 5, ECF No. 1479.) Before

any discovery had been taken, FGIC sent instructions to the RMBS trustees to oppose the

settlement. Before any discovery had been taken, MBIA directed the trustees not to even

consider the settlement. (Debtors' Status Rep. at 6 n.3, Ex. A, ECF No. 1470.)

Before any depositions had been taken, the Official Committee of Unsecured Creditors

(the "Committee") concluded the settlement should be rejected because the Committee was not

included in its negotiations. The Committee wanted settlement discussions folded into overall

discussions of the bankruptcy plan — discussions in which it hoped to play a leading role. (Ex. 1

at 67:14-68:1.) That continues to be its position today. What the Committee wants — what it

has sought throughout this case — is for the settlement to be rejected and the matter relegated to

a "global negotiation process" addressing "all of the major issues in the case." (Comm. Obj. at

2, 47.)

These are not principled objections based on evidence adduced in discovery, or even on

the merits of the settlement. They are objections driven by a hope that global negotiations might

yield for the creditors who run the Committee (at the expense of other creditors) a slightly bigger

payoff.

But self-interested hopes for a different outcome are not a legitimate basis for opposing

the settlement. To stop the settlement, the objectors must show it fails to comply with the

standards set out in *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007).

Accordingly, the objectors have promised to prove that: (i) the settlement did not result from

arms-length bargaining because Tim Devine (Ally's director of litigation) "dominated and

controlled" the negotiations; (ii) the allowed claim is "considerably" too high in light of the risks

---

[1] "Ex. __," refers to the exhibits attached to the Declaration of LaShann A. DeArcy dated
January 15, 2013.

sf-3223258 v41

and possible benefits of continued litigation; and (iii) the settlement was improperly conditioned upon an agreement, by the investors, to enter into a plan support agreement giving Ally and its affiliates third-party releases.  (*E.g.*, Comm. Obj. at 1-3.)  These are promises the objectors will not be able to keep.

*Arm's Length Bargaining*.  The Committee asserts the settlement must be rejected because Mr. Devine "dominated and controlled" the negotiations.  (Comm. Obj. at 1.)  FGIC claims "AFI took control of the settlement process, and used the process to advance its own interests."  (FGIC Obj. at 2.)  MBIA goes so far as to say the "entire purpose" of the settlement was "to secure for Ally" a "broad release from ResCap-related liability."  (MBIA Obj. at 1.)

These are serious allegations.  They impugn the integrity not only of Mr. Devine, but also that of Tammy Hamzehpour, ResCap's general counsel, who had day-to-day responsibility for the settlement negotiations.  They impugn the integrity of the Morrison & Foerster lawyers who conducted the negotiations, the ResCap LLC directors who approved the settlement, and the Morrison Cohen attorneys who advised the independent directors on the board.

Serious accusations should never be made unless they can be backed up by solid evidence.  The objectors do not back them up here.  Later in this brief we will summarize the history of the negotiations and show the role Mr. Devine did, and did not, play.  But three points are worth making now.

*First*, Mr. Devine had no ability to control, and did not control, any other person involved in the settlement negotiations.  Ms. Hamzehpour has never reported to him; Morrison & Foerster does not report to him; Morrison Cohen does not report to him.  Mr. Devine does not control their actions, compensation, or bonuses.  Nor does Mr. Devine hold any sway over ResCap's directors.  Indeed, some of them do not even know who he is.

3

*Second*, Mr. Devine did not lead the most critical negotiation sessions.  Mr. Devine attended some of the initial meetings and calls involving the Steering Committee Group and the Talcott Franklin Group.  He continued to contribute his thoughts and recommendations by email.  He was involved in negotiating the plan support agreement.  He kept in close contact with both Gary Lee and Kathy Patrick.

But the key negotiations over the amount of the allowed claim took place in a flurry of telephone calls on May 7, followed by a marathon face-to-face meeting at Morrison & Foerster's offices on May 8 and 9, 2012.  By the time these negotiations occurred, Ms. Hamzehpour had moved into an office at Morrison & Foerster.  Many of ResCap's directors also spent their days there.  Ms. Patrick and her team, representing the Steering Committee, took over one of the firm's conference rooms.  At the beginning of the negotiating sessions, on May 7, the investors and the Debtors were $5.5 billion apart.  Over the course of three days, the parties negotiated nearly round-the-clock.  The negotiations culminated in competing take-it-or-leave-it offers.  Ms. Patrick's final take-it-or-leave-it demand — $9 billion — was rejected.  But ResCap's walk-away offer — $8.7 billion — was ultimately accepted.

Mr. Devine didn't control these negotiations.  He played no direct role in the offers and counter-offers that ultimately produced the settlement.  Nor did Mr. Devine appear at the meeting of ResCap's directors at which the settlement was approved.  How could Mr. Devine "dominate and control" the Debtors' directors when he never spoke to them about the settlement?

*Third*, the objectors' argument is not just that Mr. Devine "dominated and controlled" the Debtors, but that he caused them to agree to a *too-high* settlement amount.  The evidence shows, however, that Mr. Devine worked in precisely the opposite direction.  When he communicated

4

with the Debtors' negotiating team, Mr. Devine suggested arguments for *lower* numbers.  He

recommended *more aggressive* negotiating strategies.  He argued in favor of the Debtors'

defenses.  He did, in other words, what one would expect any lawyer who had spent years

defending mortgage litigation to do.

This evidence is incontrovertible, and it puts the lie to the objectors' claim that Mr.

Devine caused the Debtors to agree to an improperly high settlement in order to advance Ally's

own interests.

*The Amount of the Allowed Claim*.  The Court will be bombarded with numbers at the

hearing.  We will, later in this brief, explain the numbers and summarize the evidence regarding

them.  But, in general, there are three sets of numbers by which the proposed allowed $8.7

billion claim should be measured.

The first is "aggregate losses."  This number represents all of the losses, both realized and

projected to occur in the future, which will be suffered by the owners of the mortgage-backed

securities that are the subject of the settlement.  It represents the theoretical maximum investors

could recover at trial if they were able to establish the Debtors materially breached their

representations and warranties as to every security covered by the settlement and could

successfully overcome all the Debtors' legal defenses.

There is not much dispute over the amount of aggregate losses suffered by the investors.

They have already suffered over $30 billion in collateral losses.  (Sillman Decl. ¶ 26, ECF No.

320-8.)  And, depending on what assumptions are used, they are projected to lose another $13

billion to $19 billion in the future. (Ex. 2; Sillman Decl. ¶ 40, ECF No. 320-8.)  The objectors do

not challenge these figures.  (Ex. 3 at 61:7-62:12.)  The proposed $8.7 billion allowed claim

represents 19.7% of the aggregate losses that the investors could, theoretically, seek to recover at trial.[2]

The second set of numbers, often called the "defect rate," reflects the percentage of loans as to which there has been a material breach of the Debtors' representations and warranties. The defect rate reflects the investors' ability to prove a *prima facie* case; that is, to prove the Debtors materially breached their contractual representations or warranties.

Defect rates, as one might imagine, are hotly disputed. In pre-petition litigation against the Debtors, investors (and insurers like MBIA and FGIC) usually alleged defect rates ranging from 80% to 100%. (*See infra* II.B.) During settlement negotiations, the Steering Committee Group said it would, if forced to litigate, file a complaint alleging a 90% defect rate. (Hamzehpour at ___.) This implies the Steering Committee Group's complaint would have sought damages of over $44 billion.

At the other end of the spectrum, the objectors engaged a loan examiner to "re-underwrite" a sample of 1,500 loan files. He concluded that 28.74% of the loan files he reviewed had material defects. (Morrow Rep. at 69.) This defect rate, if accepted, would produce a damages claim of $16.5 billion. (Cornell Rep. ¶ 68; Ex. 3 at 64:3-9.) There are several reasons for concluding the objectors' figures are too low. Mr. Sillman, the Debtors' expert, reviewed the same 1,500 loans and found material defects in 43.5% of them. Mr. Sillman's defect rate would produce a damages claim of from approximately $18.9 billion to $21.6 billion. (Sillman Reply Decl. ¶¶ 5, 6.)

---

[2] Based on aggregate losses of $44.1 billion, which was the projection of aggregate losses presented to ResCap LLC's board of directors on May 9, 2012, when the settlement was approved. (Ex. 4 at RC-9019_00054004.)

The proposed $8.7 billion allowed claim represents about one-half of the damages resulting from the objectors' 28.74% defect rate, 41% to 46% of the damages produced by Mr. Sillman's 43.5% defect rate, and just 19% to 22% of the damages implied by the Steering Committee Group's 90% defect rate.  (Sillman ____.)

The third set of numbers is the range of likely litigation outcomes after adjustment for legal defenses.  As with defect rates, the merits of the Debtors' available legal defenses — primarily loss causation and statute of limitations — are hotly contested.

At the low end, Wilmington Trust argues that the range of likely outcomes, after adjustment for loss causation and statute of limitations defenses, is from $811 million to $4.452 billion.  (Wilmington Trust Obj. ¶ 11.)  The Committee says the reasonable range is from $2.7 billion to $3.3 billion.  (Cornell Rep. ¶ 15.)  At the high end, Triaxx says the minimum reasonable amount is $11.3 billion.  (Ex. 5 ¶ 3.)  And the Steering Committee Group asserts its likely recovery would be $18.4 billion to $19.6 billion.  (Steering Comm. Stmt. ¶ 19, ECF No. 1739.)

Mr. Sillman, the Debtors' expert, comes out in the middle.  Using data obtained from third-party vendors, the Debtors' historical loan repurchase experience, his review of 1,500 loan files, and his own professional experience, he determined that likely damages at trial, after adjustment for available defenses and litigation costs, would range from approximately $7.8 billion to $10.2 billion.  (Sillman Reply Decl. ¶ 7.)

The proposed $8.7 billion allowed claim measures up well when compared to these three sets of numbers.  The objectors' positions, on the other hand, are completely one-sided.  The objectors focus entirely upon defense arguments and ignore plaintiffs' counter-arguments.  They want to live in a world where plaintiffs' lawyers never win and defendants' arguments always

sf-3223258 v41

carry the day.  But the Debtors were required to — and properly did — consider not only their own position, but also the risk a judge might find against them with regard to defect rates and/or legal defenses.

_The Plan Support Agreement and Ally Settlement_.  The objectors say they will prove "an essential condition of the Settlement was an agreement by the investors  . . . to a Plan Support Agreement that provides Ally broad estate and third-party releases."  (_E.g._, Comm. Obj. at 2-3.)  But the proposed settlement agreement is not conditioned on Ally receiving estate or third-party releases.  The Court may approve the settlement without approving any form of plan proposed by the Debtors.  The Court will remain free to approve, or reject, third-party releases and any other aspect of any subsequent proposed plan.

The objectors' argument misleadingly conflates three separate agreements — the plan support agreement, the RMBS settlement, and the Ally settlement.  But the RMBS settlement and Ally settlement were negotiated separately.  Moreover, the objectors will not prove any connection between the plan support agreement and the amount of the allowed claim.  Instead, the evidence will show the plan support agreement was connected to the Ally settlement and, in particular, Ally's agreement to make a substantial payment to the Debtors' estates.

The Ally settlement calls for Ally to pay $750 million to the Debtors' estates in return for plan releases.  (Ex. 56 at § 2.1(a).)  Ally did not want to pay $750 million without the support of a major creditor group.  For their part, the investors would not agree to a plan support agreement without a substantial Ally financial contribution.  Under the plan support agreement, Ally must live up to its commitment to pay $750 million to the Debtors' estate.  In return, the investors committed to support a plan that included estate and third-party releases in Ally's favor.  (Ex. 57 at § 3.1(i).)

8

The plan support agreement is thus linked to Ally's contribution to the Debtors' estate, not to the amount of the proposed $8.7 billion allowed claim. Moreover, the evidence will show the investors were prepared to settle their claims without a plan support agreement if Ally refused to make an acceptable payment in return for plan releases.

The objectors, then, will not live up to the promises they have made. They will not prove that Ally dominated or controlled the settlement negotiations, that the amount of the proposed allowed claim is unreasonable, or that the settlement resulted from collusion. They will not succeed in showing that any prong of the *Iridium* test remains unsatisfied.

This brief addresses the *Iridium* factors that are in dispute in this matter. In Section I, we show the proposed settlement was the product of arms-length bargaining. In Section II, we demonstrate that the proposed $8.7 billion allowed claim falls within the range of reasonableness and reflects a proper balancing of litigation risks and benefits. In Section III, we show that the settlement will avoid protracted and expensive litigation and confer substantial non-cash benefits. In Section IV, we address the objectors' claim that the settlement is not supported by other creditor constituencies.

## SUMMARY OF THE EVIDENCE

The debtors underwrote and sold 392 separate offerings (or "securitizations") of private-label mortgage-backed securities between 2004 and 2007. The securitizations had original principal balances totaling $221 billion. (Ex. 6.) The securities were mainly sold to large institutional investors.

The securities purchase agreements for these offerings contained a large number of representations and warranties regarding the mortgage loans underlying the securitizations. The representations concerned the loans' value, quality and risks, including loan-to-value ratios,

borrowers' incomes, credit scores, owner occupancy, appraisal values and compliance with stated underwriting standards.

The investors contend a large portion of the mortgage loans in the securitizations did not comply with the Debtors' representations and warranties. The proposed settlement will resolve all claims arising from these claimed breaches of representations and warranties. The investors also claim the Debtors breached several obligations relating to the servicing of the underlying loans. Those claims will be resolved as well.

*The Investors*. The investors are organized into two groups. One group, called the Steering Committee Group, is comprised of several large money managers, including PIMCO, BlackRock, Western Asset Management, MetLife, ING and Goldman Sachs. Together, these investors own at least 25% of the voting rights in 300 of the securitizations issued by the Debtors. (Ex. 6.) The original principal balance of these securitizations was $172 billion. (*Id.*) The Steering Committee Group itself is represented by Gibbs & Bruns and Ropes & Gray.

The second group, the Talcott Franklin Group, is comprised of a variety of large money managers and insurance funds, including Anchor Bank, Caterpillar Life Insurance Company, Ellington Management Group, LLC, Heartland Bank and the First National Banking Company. These investors own at least 25% of the voting rights in 31 of the Debtors' securitizations. (*Id.*) The original principal balance of these securitizations was $14.1 billion.

Together, the two groups have at least 25% of the voting rights in one or more classes of securities in 334 securitizations. Those securitizations had original principal balances totaling $188.6 billion. (*Id.*)

The proposed settlement does not just cover the securitizations owned by the Steering Committee Group and the Talcott Franklin Group. It extends to all 392 securitizations issued by

10

the Debtors.  The trustees for all 392 securitizations will have the option to cause the trusts they

control to participate in the settlement and share in the proposed allowed claim.  (Exs. 58 and 59

at § 6.01.)

*The Investors' Potential Claims*.  On October 17, 2011, the Steering Committee Group

sent a demand letter to Ally's general counsel claiming the mortgage-backed securities

purchased by its members were backed by loans afflicted with widespread breaches of the

representations and warranties contained in the securitizations' securities purchase agreements.

(Ex. 7.)  Those agreements established special contractual remedies for breaches of the

agreements' representations and warranties.  They obligated the Debtors, upon demand, to cure

any breaches by repurchasing or replacing non-conforming loans.  (*See, e.g.*, Ex. 8.)  The

demand letter claimed the Debtors had failed to comply with these cure, repurchase, or replace

obligations.  The letter also claimed the Debtors, as master servicers of the loans included in the

trusts, had breached their servicing obligations by engaging in foreclosure practices using

deficient documentation, filing improper or inaccurate foreclosure proceedings, and failing "to

enforce the seller's obligations to cure, substitute, or repurchase loans" as required under the

governing agreements.  (Ex. 7 at II_RESCAP0000088.)  The letter threatened legal proceedings

against the Debtors, Ally, and their affiliates for breach of these contractual obligations.  (*Id*.)

Ally referred the letter to the Debtors' in-house attorneys.  (Ex. 9.)  They, in turn,

requested a face-to-face meeting with the Steering Committee Group's attorneys.  That meeting

took place on November 21, 2011.  (Ex. 10; Hamzehpour at ___.)  Following the meeting, the

parties agreed to negotiate confidentiality and tolling, or "forbearance," agreements.  These

agreements were completed on February 17, 2012.  (Ex. 11.)

sf-3223258 v41

*Settlement Negotiations – First Phase – March 22 to April 24, 2012*.  After a slow start, with time spent on confidentiality and tolling agreements, settlement talks sprang to life in late March 2012 and took on a new pace and a new sense of urgency.

The parties needed to understand the securitizations owned by the Steering Committee Group's members.  They needed to know their characteristics — loan types, representations and warranties, default rates, and aggregate losses.  To start the process, on March 22, 2012, the Steering Committee Group sent the Debtors an empty spreadsheet template.  (Ex. 12.)  The spreadsheet's columns called for a vast array of information regarding the loans included in the Debtors' 392 securitizations.  The Debtors' task was to fill in the spreadsheet.

For the next three weeks, a team of ResCap employees, led by Jeff Cancelliere (ResCap's Risk Director), and John Rucksdaschel (a ResCap Associate General Counsel), gathered the requested information.  (Ex. 13.)  Much of the information was purely factual, such as the numbers of loans involved, their delinquency status, their total realized losses, etc. (Ex. 12.)  But other parts of the spreadsheet were, in essence, the beginnings of settlement negotiations.

An initial dispute arose over the statute of limitations.  The Steering Committee Group initially requested data for offerings made before 2004.  The Debtors argued that claims related to securitizations made before 2004 would be barred by the statute of limitations.  The Steering Committee Group eventually agreed to limit its data requests to securitizations completed between 2004 and 2007.  (Hamzehpour at ___.)  Other parts of the spreadsheet called for information regarding aggregate losses.  This required the Debtors not only to gather and report data regarding losses already incurred by investors, but also to predict likely future losses.

The Steering Committee and the Debtors disagreed on the assumptions and methodologies to be used for these predictions.  The Steering Committee Group used aggressive

sf-3223258 v41

REDACTED

default assumptions, severity rates[3] and other metrics, to arrive at claimed lifetime aggregate

losses of over $48 billion.  (Cancelliere at ___.)  Mr. Cancelliere's model, by contrast, predicted

future default rates using the collateral characteristics of each loan pool, such as delinquency

status, loan-to-value ratios, FICO scores and geography.  (Cancelliere at ___; Ex. 6.)  Using this

data, Mr. Cancelliere predicted that investors would suffer total aggregate losses of $44.1 billion.

(Ex. 2.)

The Debtors sent Mr. Cancelliere's spreadsheet to the Steering Committee Group's

lawyers on April 16, 2012.  (Ex. 13.)  The Debtors then arranged a face-to-face settlement

meeting.  The meeting was scheduled for April 25, 2012, at Morrison & Foerster's offices in

New York.[4]

In preparation for the meeting, the Debtors asked their financial advisor, Mark Renzi

from FTI Consulting, to prepare a settlement presentation.  Using data obtained from Mr.

Cancelliere's spreadsheet, Mr. Renzi prepared a PowerPoint presentation showing a

"hypothetical range of potential litigation claims."  (Ex. 15 at RC-9019_00093239.)  As

originally prepared by Mr. Renzi, the presentation used "implied defect rates" of 10%, 15%, and

20%, which generated potential claim amounts of from $4.4 to $8.8 billion.  (*Id.*)  These defect

rates were based on historical post-funding audit defect rates ranging from     % to     %.  (*Id.*

at 60.)  A subsequent draft used potential claim amounts of $4, $5, and $6 billion.

---

[3]  "Severity rate" refers to the amount of actual losses after taking into account foreclosure proceeds and
expenses.  (Cancelliere at ___.)  Thus, if an investor recovers $50,000 on a $100,000 loan after counting
foreclosure proceeds and all other payments, the severity rate is 50%.

[4]  On the same day, the Debtors received a call from Talcott Franklin asserting claims on behalf of his
clients.  (Ex. 14.)

13

Two days before the meeting, Mr. Devine wrote an email to Ms. Hamzehpour in which

he recommended that an even lower range be used:  "would like to recommend 3, 4, 6 rather than

4, 5, 6 as low medium high.  Thought is that we creat [*sic*] flexibility for discussion re potential

losses beyond reserves."  (Ex. 17.)  He added:  "Point is not to persuade KP that such range is

correct.  She will have strong instinct to dispute it as unrealistically low.  We are ok with her

informing us otherwise."  (*Id*.)  Ms. Hamzehpour forwarded Mr. Devine's recommendation to

Gary Lee, and the final FTI presentation used Mr. Devine's lower $3, $4, and $6 billion range.

(Ex. 18 at RC-9019_00047837.)

*Settlement Negotiations – Second Phase – April 25 to May 13, 2012*.  The settlement

meeting took place, as scheduled, on April 25.  It lasted more than two hours.  Mr. Lee and Ms.

Hamzehpour represented the Debtors, assisted by Mark Renzi from FTI.  The Debtors argued

that their exposure to representation and warranty claims ranged from $3 to 6 billion, based on

estimated aggregate losses of $44.1 billion and defect rates ranging from 7% to 14%.

(Hamzehpour at ___; Ex. 18 at RC-9019_00047831.)  The Steering Committee Group responded

that the Debtors' range was "not close."  The Steering Committee Group did not make any

formal counter-offer.  But it said its aggregate losses totaled over $48 billion, that defect rates on

the loans approached 90%, and that the group's claim in litigation would be for as much as $44

billion.  (Hamzehpour at ___.)

The parties continued to talk in the days following the meeting.  They exchanged

additional information regarding repurchase rates, monoline claims, and projected bankruptcy

waterfalls.  (*E.g.*, Ex. 19; Ex. 20; Ex. 21.)  The Debtors also gave the Steering Committee Group

access to their online dataroom.  (Ex. 22.)

sf-3223258 v41

On Thursday, May 3, 2012, the Debtors made a second settlement presentation. This time, the attendees included a number of the investors in the Steering Committee Group. Mr. Lee, who led the discussion for the Debtors, presented an updated version of the April 25 PowerPoint presentation. (Ex. 16.) The Steering Committee Group again rejected the presentation and made no counter-offer.

The following day, Mr. Lee had a series of calls with Kathy Patrick, the lead lawyer representing the Steering Committee Group. They made significant progress on the structure of a possible settlement. Mr. Lee later summarized the calls in an email to Ms. Hamzehpour and Mr. Devine. He wrote that what Ms. Patrick had "proposed today is as follows:"

1. ResCap and the KP group will settle all claims (including servicing and contract claims) other than securities claims (which she does not control).

2. The settlement will be effectuated through a motion under Rule 9019 of the Bankruptcy Code (on notice and subject to a hearing). The motion will be filed as early as possible in the ResCap case (possibly on day 1).

3. In exchange, Rescap will give the KP group an allowed claim that will be characterized as a cure payment (ie to cure loan repurchases and service defects).

4. The KP group will enter into a plan support agreement which would support the DIP, sale, sale process, servicing, shared services and plan releases provided that Ally contributes no less than $x in cash.

5. KP also intimated a willingness to do a back-stop deal with Ally in the event the plan fails (only a sale occurs and the releases fail). In other words she is willing to agree a deal with Ally even if the third party releases-settlement through a plan fail.

sf-3223258 v41

(Ex. 23.)[5]  Ms. Patrick did not, however, propose any amount for the allowed claim.  Ms. Patrick

also emphasized that her willingness to enter into a plan support agreement was expressly tied to

Ally's willingness to make a substantial payment to the Debtors' estate — the amount of which

remained up in the air.

All that began to change on May 7.  Early in the day, Ms. Patrick told Gary Lee that her

clients' claims were worth $25 billion.  (Hamzehpour at ___.)  She later made a settlement

demand of $11.5 billion, based on a defect rate of 23 percent.  (Hamzehpour at ___.)  The

Debtors rejected that offer, but Mr. Lee suggested he might be able to get the Debtors up to an

allowed claim of $8 billion.  (Hamzehpour at ___.)

Mr. Lee and Ms. Patrick continued to have telephone calls throughout the day.  At 9 p.m.,

Ms. Patrick sent an email to Mr. Lee.  She wrote:  "the number you just suggested is a problem.

At a defect rate of 22 percent, the stated claim is 10.0 billion.  That insulates the settlement

substantially from objectors because it is certainly within the realm of reason.  I can deliver a

deal at 10 bn.  Please get your last and best."  (Ex. 24.)

Mr. Lee reported these communications to Ms. Hamzehpour and Mr. Devine later that

evening.  He summarized the state of play this way:

> KP – after several calls this evening – has come back at 10bn (all
> in pls and rw) with a 22pc defect rate.  Her view is that she can get
> her clients there, its within industry benchmark etc.  She doesn't
> think there's much room but is asking for last and best.  She thinks
> this number allows her to dis-arm other rmbs holders as this ties to
> other rmbs defect rates.

(Ex. 25.)

---

[5] The Debtors rejected Ms. Patrick's request to have the allowed claim "characterized as a cure payment"
because of the broader implications such a treatment would have for the estate.

16

REDACTED

That wasn't the end of Mr. Lee's day on May 7.  He continued to talk by phone with Ms. Patrick.  By 11 p.m., he had detected a little more willingness to compromise.  He updated Ms. Hamzehpour and Mr. Devine that he was "getting a signal she may go a little lower [than $10B] but not much."  (Ex. 26.)

The next day — May 8 — Mr. Lee told Ms. Patrick she had one more day.  Either there would be a settlement in the next twenty-four hours, or settlement talks would have to wait until after a bankruptcy petition was filed.  (Hamzehpour at ___.)  Mr. Lee invited Ms. Patrick and her team to Morrison & Foerster's offices for face-to-face negotiations.  Ms. Hamzehpour was already there, as were the Debtors' directors.  (Hamzehpour at ___.)

In advance of the meeting, the Debtors set about challenging Ms. Patrick's claimed     % defect rate.  Mr. Cancelliere argued that many of the Debtors' securitizations had not experienced historical defect rates as high as     %, although "in some cases you could possibly get there or potentially higher when looking at full reps and lower credit product."  (Ex. 27.)  Mr. Devine chimed in by email, asking whether the Debtors could "pick away at the 10 billion" and "preserve the [    %] defect rate."  (Ex. 28 at RC-9019_00049155.)  This approach, he argued, would allow the Steering Committee Group to use the     % defect rate as a precedent in other cases while lowering the Debtors' allowed claim.  (Id.)  The Debtors pursued both strategies.

The face-to-face negotiations started in the afternoon on May 8 and continued into the next morning.  Eventually, Ms. Patrick made what she termed her "final walk-away" demand — a $9 billion allowed claim.  After consulting with Ms. Hamzehpour, Mr. Lee rejected the demand on behalf of the Debtors.  (Hamzehpour at ____.)

Then Mr. Lee and Ms. Hamzehpour asked Ms. Patrick to step into a different conference room.  There they conveyed the Debtors' "last and best offer" of $8.7 billion, "take it or leave

17

it," subject to approval by the Debtors' directors.  (Hamzehpour at ___.)  Ms. Patrick, on behalf

of the Steering Committee Group, accepted the offer.  It was well after midnight.  (Hamzehpour

at ___.)  Later that morning, the terms of the settlement were presented to the Talcott Franklin

Group on a take-it-or-leave-it basis.  The Talcott Franklin Group decided to join in the

settlement.  (Ex. 29.)

ResCap's board held a special meeting at 3 p.m. on May 9.  Mr. Lee, Ms. Hamzehpour,

Mr. Cancelliere, and Mr. Renzi presented the settlement's terms and provisions.  They also

showed the directors a chart summarizing the settlement's terms and comparing them to a recent

settlement reached by Bank of America as well as to settlement proceedings involving Lehman

Brothers.  (Ex. 30.)  After discussion, the directors voted to approve the settlement.

The next four days were devoted to preparing the settlement agreements.  (*See, e.g.*, Ex.

31, Ex. 32.)  Separate agreements were signed with the Steering Committee Group and the

Talcott Franklin Group on May 13.  (Ex. 33.)  The Debtors filed petitions for bankruptcy the

following day.

Over a period of three weeks, the parties had closed a gap of over $40 billion.  $5.5

billion of that gap was erased in a few hectic days and nights of marathon negotiations.  The

investors had moved from an initial threatened claim of $44 billion, to a threatened claim of $25

billion, to settlement demands of $11.5 billion and $10 billion and $9 billion, and finally to an

agreed-upon allowed claim of $8.7 billion.

sf-3223258 v41



*The Plan Support Agreements*.  The Steering Committee Group and the Talcott Franklin

Group also signed plan support agreements with the Debtors and Ally on May 13, 2012.  The

plan support agreements were of intense interest to Ally during the course of the settlement

negotiations.  Ally plainly wanted the support of a major group of creditors for a reorganization

plan that would give Ally releases by the Debtors and third parties.  (Hamzehpour at ___.)  Ally

suggested it would not agree to pay $750 million to obtain those releases without knowing a

major creditor group would support them.  (Hamzehpour at ___.)

    For their part, the investors were interested in obtaining the highest possible financial

payment from Ally.  That is why the Steering Committee Group insisted on seeing, and

understanding, FTI's waterfall analysis.  It wanted a measure of comfort that an allowed claim,

given in settlement, would actually result in a significant monetary recovery.  If Ally's payment

was not large enough, the Steering Committee Group was willing to proceed with the settlement without entering into a plan support agreement.  (Hamzehpour at __; Ex. 23.)

Under the plan support agreements, the Debtors committed to submit a proposed plan of reorganization and use their "best efforts to effectuate and consummate the" proposed plan. (*E.g.*, Ex. 57 at § 2.2(a).)  The proposed plan "will incorporate a settlement with Ally . . . pursuant to which Ally will agree to contribute [$750 million] to the Debtors' estates for, among other things, Debtor Releases and Third Party Releases . . . subject to Bankruptcy Court approval as part of the Plan."  (Ex. 57 at Ex. B.)

The plan support agreements obligated Ally to "consent to" the RBMS settlement and comply with the terms of its settlement with the Debtors, including the payment of $750 million for the benefit of the Debtors' estate.  (Ex. 57 at §§ 4(a), 4(b).)  For their part, the agreements obligated the investors to "use commercially reasonable efforts" to support the Debtors' first day motions, restructuring efforts, and stays of litigation, and to vote in favor of the plan of reorganization prepared by the Debtors.

## ARGUMENT:  THE *IRIDIUM* FACTORS

This Court has authority to "approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  "Settlements and compromises are favored in bankruptcy as they minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate." *In re MF Global Inc.*, 466 B.R. 244, 247 (Bankr. S.D.N.Y 2012); *see Iridium*, 478 F.3d at 455 (settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate").[6]

---

[6] The decision to approve or deny a particular settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court.  *See In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994).  A court may

sf-3223258 v41

Before the Court may approve a settlement, it must determine that the settlement is fair,

equitable, and in the best interests of the estate.  *Protective Comm. for Indep. Stockholders of*

*TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *In re MF Global Inc.*, 466

B.R. at 247.  The parties seeking approval of a settlement bear the burden of proof on this issue.

*See In re MF Global Inc.*, 466 B.R. at 248.

To make that determination, the Court need not decide the numerous issues of law and

fact raised by a compromise or settlement.  All it must do is "'canvass the issues and see whether

the settlement falls below the lowest point in the range of reasonableness.'"  *In re Adelphia*

*Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.*, 699

F.2d 599, 608 (2d Cir. 1983)).  The Court does not need to "conduct a 'mini-trial'" but "only

need be apprised of those facts that are necessary to enable it to evaluate the settlement and to

make a considered and independent judgment." *In re Adelphia*, 327 B.R. at 159.

The Second Circuit's *Iridium* decision sets out seven interrelated factors that the Court

should use in determining whether the settlement is fair, equitable, and in the best interests of the

estate, and whether the settlement amount falls within the range of reasonableness.  *See Iridium*,

478 F.3d at 462.  Those factors are:

> (1) the balance between the litigation's possibility of success and
> the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and
> delay, including the difficulty in collecting on the judgment;
> (3) the paramount interests of the creditors, including each affected
> class's relative benefits and the degree to which creditors either do
> not object to or affirmatively support the proposed settlement;
> (4) whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and [t]he
> experience and knowledge of the bankruptcy court judge
> reviewing, the settlement; (6) the nature and breadth of releases to

---

exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown &
Co.*, Inc., 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998) (citing cases).

sf-3223258 v41

be obtained by officers and directors; and (7) the extent to which
the settlement is the product of arm's length bargaining.

(*Id.* (internal quotations omitted).)

FGIC contends the *Iridium* test should not be applied, and that the Court should instead

apply a higher "entire fairness" standard.  (FGIC Obj. ¶ 36.)  Other objectors argue more

generally that the settlement should be subject to "heightened scrutiny."  (Comm. Obj. at 12-13;

MBIA Obj. at 22.)

There is no legal basis for these arguments.  Indeed, this Court rejected the same

arguments just two months ago in *In re Dewey & Leboeuf LLP*, 478 B.R. 627, 641 (Bankr.

S.D.N.Y. 2012).  This Court found that — unlike other issues, as to which the bankruptcy code

"directs bankruptcy courts to comply with nonbankruptcy law" — Rule 9019 requires only the

application of federal bankruptcy law.  State law notions of business judgment and entire fairness

do not apply.  *See In re Rock & Republic Enters.*, No. 10-11728(AJG), 2011 Bankr. LEXIS

5028, at *5 n.3 (Bankr. S.D.N.Y. Dec. 22, 2011) (Gonzalez, J.) ("[w]here a settlement is brought

before the Court, the 9019 standard governs rather than a business judgment or a business

judgment 'plus' standard"); *In re AppliedTheory Corp.*, 2008 Bankr. LEXIS 1373, at *22 (Bankr.

S.D.N.Y. Apr. 24, 2008) (Gerber, J.) ("on a motion for approval of a settlement under Fed. R.

Bankr. P. 9019 (as contrasted, *e.g.*, to a motion under section 363) [the business judgment rule] is

not the test").[7]

FGIC and the Committee contend, however, that "entire fairness" or "heightened

scrutiny" must be applied because the proposed settlement is a transaction involving "insiders."

---

[7] A debtor's business judgment, at most, may simply be considered as a factor, among the others
identified in *Iridium*, to be considered by the Court in evaluating a settlement's merits.  *Dewey &
Leboeuf*, 478 B.R. at 641 ("under *Rule 9019* a debtor's business judgment is only one factor in a
bankruptcy court's determination.  The bankruptcy court must exercise its own independent
judgment in analyzing the *Iridium* factors").

sf-3223258 v41

(FGIC Obj. ¶ 36; Comm. Obj. at 13.)  Neither objector, however, explains how a settlement between the Debtors, on the one hand, and investors pressing claims against them for tens of billions of dollars, on the other, can be considered a settlement between insiders.

Delaware's standards for scrutiny of corporate decisions (business judgment or entire fairness) are applied depending on the disinterestedness of a corporation's decisionmakers — its directors and officers.  The business judgment standard is used when directors are disinterested; the entire fairness standard is applied when a controlling shareholder stands on both sides of the transaction, or when directors are conflicted and have a direct personal interest in the transaction. *See, e.g., Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997) ("when a controlling shareholder stands on both sides of a transaction the conduct of the parties will be viewed under the more exacting standard of entire fairness as opposed to the more deferential business judgment standard"); *Golden Cycle, LLC v. Allan*, No. 16301, 1998 Del. Ch. LEXIS 237, **34-35, (Del. Ch. Dec. 10, 1998) ("[t]he entire fairness of a transaction will be scrutinized where a majority of the directors approving of the transaction were interested or where a majority stockholder stands on both sides of the transaction") (*quoting In re Budget Rent A Car Corp. Shareholders Litig.*, C.A. No. 10,418, 1991 Del. Ch. LEXIS 29, *9 (Del. Ch. Mar. 15, 1991). Under these cases, the proper questions are whether the Debtors stood on both sides of the transaction, and whether a majority of ResCap's directors stood to benefit personally from the settlement.  The answer to those questions — which the objectors do not even attempt to answer — is clearly no.[8]

---

[8] Unlike this case, the cases cited by FGIC and the Committee involved settlements involving a controlling insider.  *In re Drexel*, 134 B.R. 493 (settlement between the debtor and one of its executives); *Morgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC (In re Charter Commc'ns)*, 419 B.R. 221, 241 (Bankr. S.D.N.Y. 2009) (because settlement was reviewed and approved by independent directors, settlement with debtor's chairman and controlling

23

This Court applied the proper analysis in *Dewey & Leboeuf.*  In that case, this Court considered a 9019 motion for approval of "a series of settlements with Debtor's former partners."  *478 B.R.* at 632.  An objector "argue[d] that in conducting its *Rule 9019* analysis the Court should apply the heightened scrutiny of the 'entire fairness' doctrine — as opposed to the business judgment standard — because, it allege[d], the Debtor [was] settling claims with insiders."  *Id.* at 641.  This Court recognized that the question was not whether the former partners had once been allied with the Debtor; it was, instead, whether they were on both sides of the proposed settlement.  *Id.* at 642 (settlements with former partners were "not related party transactions that, in other contexts, make application of the entire fairness doctrine appropriate").

Here, the Debtors — and, in particular, its directors — do not in any sense stand on both sides of the proposed settlement.  The directors have no relationship to, or affiliation with, the Steering Committee Group or the Talcott Franklin Group.  They do not sit on Ally's board.  And they do not stand to benefit personally from approval of the settlement.  Accordingly, there is no basis upon which to invoke "entire fairness" or "heightened scrutiny."

Finally, the Committee argues that "heightened scrutiny" should be applied because of the proposed settlement's "sheer size."  (Comm. Obj. at 12.)  But this is one area of life where size doesn't matter.  No case says a higher legal standard of review should be applied to large settlements, and the cases cited by the Committee do not say any such thing.[9]

---

shareholder "should be evaluated under the standards applicable to approval of bankruptcy settlements in this Circuit and not under the 'entire fairness' standard of Delaware law applicable to transactions with controlling insiders").

[9] *See In re General Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009) (pre-petition sale approved because there was "'articulated business justification' and a 'good business reason' for proceeding with the sale without awaiting the final confirmation of a plan"), *id.* at 492 n.54 ("proportionate value of the assets to the estate as a whole" tipped "mildly against approval"); *Mission Iowa Wind Co. v. Enron Corp.*, 291 B.R. 39 (S.D.N.Y. 2003) (court should "make an

24

Accordingly, neither the "entire fairness" standard nor some other form of "heightened scrutiny" should be applied to this motion. The proposed settlement should be judged based on Rule 9019's familiar tests: Is the settlement fair, equitable, and in the best interests of the estate? Is the settlement amount within the range of reasonableness? Does the settlement satisfy the *Iridium* factors?

The objectors concede that some of the *Iridium* factors have been met. As a result, only four of them will be litigated at the hearing:

- Whether the settlement is the product of "arm's-length bargaining;"

- Whether the amount of the allowed claim falls within the "range of reasonableness," in that it properly balances "the litigation's possibility of success and the settlement's future benefits;"

- Whether the settlement would avoid protracted and expensive litigation and confer other non-cash benefits upon the estate; and

- Whether the settlement is "objected to" or "not affirmatively supported by" an adequate number of disinterested creditors.

To those issues we now turn.

## I.   THE RMBS SETTLEMENT WAS THE PRODUCT OF ARM'S LENGTH NEGOTIATIONS.

A settlement is at "arm's length" if it is made "between two unrelated and unaffiliated parties" or "between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflicts of interest arise." *In re Bruno Mach. Corp.*, 435 B.R. 819, 834 (Bankr. N.D.N.Y. 2010); *accord Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348-49 (Fed. Cir. 2004) (adopting *Black's Law Dictionary* definition to evaluate meaning of "arm's length" as used in 19 U.S.C. § 1677(5)(f)).

---

independent determination" that the "allocation [of the sale] was fair and reasonable" rather than "defer[ring] in conclusory fashion to the debtors' business judgment").

sf-3223258 v41

Several fact patterns may support a conclusion that a settlement was made at arm's length.  Courts look at the "divergent economic interests" of the negotiating parties.  *In re Charter Comm'ns.*, 419 B.R. at 256.  They look at the negotiating history, including the making of counter-proposals, concessions, and modifications during the negotiations.  *See id.* at 256; *accord In re Tribune Co*., 464 B.R. 126, 156 (Bankr. D. Del. 2011).  They look at the duration of the negotiations.  S*ee In re Ambac Fin. Group, Inc.*, No. 10-B-15973, 2011 Bankr. LEXIS 4289, at *22-23 (Bankr. S.D.N.Y. Sept. 13, 2011); *In re Adelphia Comm'ns. Corp.*, 368 B.R. 140, 169 (Bankr. S.D.N.Y. 2007).  And courts look at the tone, or contentiousness, of the negotiations.  *See In re Charter Communs.*, 419 B.R. at 256; *In re Hilsen*, 404 B.R. 58, 77 (Bankr. E.D.N.Y. 2009).

All of these factors show the settlement here was the result of "arm's-length" bargaining.  The settlement is between "unrelated and unaffiliated parties."  The Debtors have no affiliation or relationship with the investors who invested in the Debtors' 392 securitizations — other than the contractual relationships that form the basis of the investors' claims. The Debtors and investors have "divergent financial interests."  The investors had every incentive to maximize the size of their allowed claim.  The Debtors, by contrast, wished to keep the allowed claim within a reasonable range, based on the merits of the investors' claims and the risks and costs of continued litigation, for both substantive and practical reasons — they had a fiduciary duty to husband the estate's assets, and they wished to avoid criticisms from other creditors.

The settlement resulted from negotiations that lasted for weeks and concluded in a marathon day-and-night negotiating session.  They involved heated, high-stakes, hard bargaining between parties with a lot on the line.  They were characterized by several rounds of demands

26

and counter-offers, concessions, modifications, and rejections.  And they culminated in competing "take-it-or-leave it" offers — one rejected, one accepted.

The objectors claim, however, that the settlement is not an arm's length one.  In making this charge, the objectors take on at least three evidentiary challenges.

*First*, the objectors must prove the Debtors — specifically, their general counsel, Tammy Hamzehpour; their outside counsel, Morrison & Foerster; their directors; and the law firm representing the independent directors, Morrison Cohen — were "dominated and controlled" by Tim Devine, Ally's director of litigation.  (*E.g.*, Comm. Obj. at 1, 6 ("the settlement negotiations were dominated and controlled by the Debtors' corporate parent, Ally Financial," which "hijacked" the settlement process); MBIA Obj. at 2; FGIC Obj. at 5-6.)

*Second*, the objectors must prove that Mr. Devine used his purported control and domination to force the Debtors to agree to an unreasonably high settlement amount.  (*E.g.*, Comm. Obj. at 14 ("the negotiations were not, in fact, arm's length but were dominated by Ally for its own purposes, and the resulting settlement number is substantially too high"); MBIA Obj. at 23; Wilmington Trust Obj. ¶ 8.)

And *third*, the objectors must prove that Mr. Devine's efforts to obtain a plan support agreement somehow compromised the negotiations between the Debtors and the investors.  The objectors claim the plan support agreement was "an essential condition of the Settlement" and that, "in exchange for" the Steering Committee Group's support, "the Debtors agreed to an Allowed Claim some $4 billion more" than it should have.  (Comm. Obj. at 2-3, 15; *see also* Wilmington Trust Obj. at 9 ("to avoid the risk that Patrick might seek to increase AFI's cash contribution, the Debtors not only inflated, but also skewed, the settlement to favor Patrick's

27

clients").)  This is the "collusion" or "linkage" argument pressed for months by the objectors.

(*See, e.g.*, Ex. 1 at 91:5-8; Rep. of Wilmington Trust ¶ 5, ECF No. 1479).)

The objectors do not have evidence to support any of these three charges.

**A.    Ally Did Not Direct or Control the Settlement Negotiations.**

The objectors claim that Mr. Devine "dominated and controlled" the Debtors' general

counsel, board of directors, and two outside law firms.  (Comm. Obj. at 15-16, 21 n.17; FGIC

Obj. at 3-5, 18-19; MBIA Obj. at 22-24; Wilmington Trust Obj. at 4-5.)  To do this, Mr. Devine

would have needed sufficient power and influence to dominate and control all these professional

people.  He would have had to have control over their compensation, promotions, reputations, or

other material personal interests.  And he would have needed willing subjects — persons with

the motive to advance Ally's interests at the expense of their own fiduciary duties.

The objectors will not offer any evidence that Mr. Devine had the ability to dominate or

control ResCap's executives, directors, or outside law firms.  None of these persons reports to

Mr. Devine, and Mr. Devine does not control their actions, compensation, or bonuses.

Nor will the objectors offer any evidence that Mr. Devine attempted to dominate or

control these people.  What would that evidence look like?  One would expect to see evidence

that Mr. Devine told these professional people what they must do.  That he told them what would

happen if they didn't do as he asked.  That he offered them some form of incentive to do his

bidding.  And one would expect to see evidence that the Debtors' senior executives, directors,

and outside law firms were willing to compromise their integrity, and their duties, in order to

receive whatever Mr. Devine had promised them.

The objectors will not offer evidence of this kind because there isn't any.  Instead, the

objectors will merely offer evidence that Mr. Devine was an active participant in the settlement

negotiations.  That is true, of course.  Mr. Devine attended early meetings with Ms. Patrick,

28

negotiated the confidentiality and tolling agreements, contributed to collecting data responsive to the Steering Committee Group's initial spreadsheet, and made recommendations regarding the April 25, 2012, settlement presentation to the Steering Committee Group.  (*See, e.g.*, Ex. 34; Ex. 35; Ex. 17)  As a lawyer with substantial experience defending representation and warranty claims, he shared his views and advice with Mr. Lee and Ms. Hamzehpour.  He also engaged directly with Ms. Patrick and Talcott Franklin on the plan support agreement.  (*See, e.g.*, Ex. 36; Ex. 37.)

But when it came to the critical negotiations, the Debtors relied exclusively on Ms. Hamzehpour and their outside counsel at Morrison & Foerster.  (Hamzehpour at __; Ex. 38 at 223:2-3; 364:23-365:3.)  There is a big difference, of course, between Mr. Devine's active participation as counsel for Ally and the notion that he "dominated and controlled" the Debtors. This can be shown by the manner in which the amount of the proposed $8.7 billion allowed claim was determined.  The allowed claim was agreed to after a flurry of telephone calls on May 7, followed by a marathon face-to-face meeting at Morrison & Foerster's offices on May 8 and 9, 2012.  These final negotiations were handled by Mr. Lee and Ms. Hamzehpour, not Mr. Devine. (Hamzehpour at ___; Dep. Ex. 36; Ex. 37.)  Mr. Devine also did not appear at the May 9 meeting of ResCap LLS's directors at which the settlement was approved.

What do the objectors say in response?  They say Mr. Devine "played the central role," while Ms. Hamzehpour and Mr. Lee played a "passive role," because Mr. Devine sent more emails.  (FGIC Obj. ¶ 1 n.3, ¶ 12 (describing FGIC's so-called "quantitative analysis"); Wilmington Trust Obj. at 4.)  Counting emails, of course, does not prove Mr. Devine dominated or controlled the Debtors.  It does not even prove that Mr. Devine was more involved in the settlement negotiations than Mr. Lee or Ms. Hamzehpour.  The evidence will show that Mr. Lee

used the telephone to negotiate with Ms. Patrick.  (*See* Ex. 38 at 138:11-16 ("Gary Lee was

having a variety of conversations with Kathy Patrick during that period, some of which I would

have been included on some of which I wouldn't have been included on").)  Of course, Mr. Lee

and Ms. Hamzehpour did not need emails or telephone calls during the negotiations held on May

8 and 9.  Those negotiations were conducted in person.  (Hamzehpour at ___.)[10]

Worse, the objectors don't know how to count.  Their purported "quantitative analysis"

ignores all the privileged emails written by Ms. Hamzehpour and Mr. Lee that were withheld

from production but listed on the Debtors' privilege logs.  Mr. Lee, for example, authored 151

emails that were withheld as privileged.  (Ex. 99.)  And FGIC started its email count in the

summer of 2011, long before actual settlement talks began, and long before Mr. Lee was

engaged to negotiate the settlement.  (FGIC Obj. ¶ 12.)  This tactic dramatically inflated the

count of Mr. Devine's emails.

The objectors also seize on a statement by Mr. Devine that on May 9 — that is, after the

amount of the allowed claim had been agreed to, and while the parties were continuing to discuss

the terms of the plan support agreement — he was "driving a deal to conclusion."  (Comm. Obj.

at 16; Wilmington Trust Obj. at 5.)  The objectors, however, leave out the context of Mr.

Devine's statement.  Mr. Devine's comment referred to the drafting of the settlement agreement

and plan support agreement, not the already-agreed-to allowed claim.  (*See* Ex. 38 at 242:23-

245:2; Ex. 42.)

Finally, the Committee cites, as "a decisive communication," a May 9, 2012, email from

Mr. Devine to Mr. Lee stating: "Ally will support the $8.7 billion allowed claim.  There is no

---

[10] FGIC also argues that "Devine was often the only person who dealt with the [Talcott Franklin
Group]."  (FGIC Obj. ¶ 19.)  In fact, Jamie Levitt of Morrison & Foerster was in frequent contact
with Talcott Franklin PC to discuss the terms of the settlement agreement.  (*See, e.g.*, Ex. 39;
Ex. 40; Ex. 41.)

sf-3223258 v41

new Ally money.  Hard stop at 750 + 200 + 100."  (Comm. Obj. at 16 (*quoting* Ex. 36 at RC-

9019_00049196).)  Why is this "decisive?"  The Committee does not say.  (*Id.*)  The email was

sent in response to one final effort by Mr. Lee to get a larger financial contribution from Ally.

The email reflects Ally's response:  that it will not pay more than $750 million; that it consents

to the plan support agreement; and that it will pay $750 million in cash to the Debtors' estates,

plus an additional $200 million in projected profits from the continued servicing of Ally's loans,

and $100 million in projected profits from continued loan brokerage activities with Ally.  (*See*

Hamzehpour at ____.)

        This evidence falls far short of establishing that Mr. Devine "dominated and controlled"

the Debtors.  The objectors will fail to keep their promise to prove that Ally controlled the

negotiations leading to the settlement.

> **B.      Ally Did Not Cause the Debtors to Agree to a Too-High $8.7 Billion
>          Allowed Claim.**

        It would not be enough, of course, for the objectors to prove that Mr. Devine "dominated

and controlled" the Debtors.  The objectors must prove the settlement is unfair; their argument

only works if Mr. Devine used his purported domination and control to cause the Debtors to

agree to an *unreasonably high* allowed claim.  And that is what the objectors have promised to

prove.  (*See* Comm. Obj. at 1-2 (settlement negotiations produced "a settled claim amount that

appears to be considerably higher than any non-conflicted fiduciary would have reached"); FGIC

Obj. ¶ 39 (settlement negotiations produced "an excessively large allowed claim").)

        But the objectors will not offer any evidence showing Mr. Devine caused the Debtors to

agree to a higher allowed claim.  What would that evidence look like?  One would expect to see

evidence that Mr. Devine proposed a higher allowed claim than that proposed by the Debtors.

That he argued with the Debtors to allow a higher claim.  That he offered justifications or

sf-3223258 v41

support for a higher allowed claim amount.  And one would expect to see evidence that the

Debtors acquiesced to his proposed higher amount.

The objectors will not offer any evidence of this kind because there isn't any.  Indeed, all

the evidence shows just the opposite.  In the few instances where Mr. Devine actually addressed

the amount of the allowed claim, he consistently recommended a *lower* amount.  For example:

- For the Debtors' first meeting with Ms. Patrick on April 25, 2012, the Debtors initially planned to show settlement ranges of 4, 5, and 6 billion.  Mr. Devine "recommend[ed] 3, 4, 6 [billion] rather than 4, 5, 6 [billion] as low medium high [settlement ranges]."  (Ex. 17; Ex. 43.)

- When, on May 7, Ms. Patrick offered a $10 billion settlement, Mr. Devine suggested that "[i]f we can persuade her team that they are using wrong severities etc, and can preserve the defect rate, we can pick away at the 10Billion."  (Ex. 26; *see also* Ex. 44.)

- On May 8, with the investors at $10 billion, Mr. Devine suggested to Mr. Lee a plan to get an $8 billion settlement: "Isn't the obvious answer that [Patrick] states her 22% -- 11 billion or whatever – and then takes an appropriate haircut (analogous to the 36% to 14% haircut she took in BoA) to get to a lower $ number ($8B?) as stipulated allowed claim?" (Ex. 44.)

- While the settlement agreement documents were being drafted, Mr. Devine opposed a suggestion that the amount of the allowed claim should be increased.  (Ex. 45.)

Mr. Devine didn't cause the Debtors to agree to an unreasonably high allowed claim, and

the objectors have no evidence to argue otherwise.

### C.    The Debtors Did Not Collude with Ally to Induce the Investors to Support Plan Releases in Ally's Favor.

The objectors say they will prove the Debtors colluded with Mr. Devine to offer an

allowed claim "some $4 billion more" than the settlement is worth "in exchange for" the

Steering Committee Group's support for estate and third-party releases in Ally's favor.  (Comm.

Obj. at 3, 15; *see also* Wilmington Trust Obj. at 9; Ex. 1 at 91:5-8 (settlement a product of

"collusion"); Rep. of Wilmington Trust ¶ 5, ECF No. 1479 (plan support resulted from "secret

deal").)  The objectors thus claim the amount of the proposed allowed claim is "linked" or

"conditioned" on the investors' consent to a plan support agreement.[11]

But the objectors will not offer any evidence of collusion, and will not prove any linkage

between the allowed claim and the plan support agreement.  What would that evidence look like?

One would expect to see evidence that Mr. Devine and the Debtors made some agreement to

induce the Steering Committee Group to consent to a plan support agreement.  That the Debtors

would not settle without a plan support agreement.  That the Steering Committee Group

demanded additional compensation, in the form of a larger allowed claim, as the price for its

support.  And one would expect to see evidence that the Debtors agreed to offer a higher allowed

claim in exchange for the Steering Committee Group's consent to a plan support agreement.

The objectors will not offer evidence of this kind because there isn't any.  Indeed, the

Debtors and the Steering Committee Group were both prepared to enter into the settlement

without any plan support agreement.  (*E.g.*, Marano at __; Hamzehpour at __; Ex. 23.)  And the

investors didn't demand any additional compensation, in the form of an increased allowed claim,

for their consent to a plan support agreement.  (Hamzehpour at ____.)

Instead, it was Ally that conditioned its support for the settlement upon obtaining a plan

support agreement.  That is neither surprising nor wrong.  The objectors argue that Ally

---

[11] *See* Comm. Obj. at 2-3 ("an essential condition of the Settlement was an agreement by the investors . . .
to a Plan Support Agreement that provides Ally broad estate and third-party releases in exchange for a
capped $750 million contribution to the estates"); MBIA Obj. at 1 ("[t]he entire purpose of the putative
'settlement' was not, in fact, to resolve claims held against the Debtors, but to secure for [Ally] the broad
release from ResCap-related liability that it desperately seeks so that it can proceed with an initial public
offering"); FGIC Obj. ¶ 2 ("ResCap allowed AFI to make agreeing to the PSA a pre-requisite to the
Settlement and allowance of the Institutional Investors' claim, as AFI dominated the negotiation of the
Settlement").

negotiated "with one overriding objective in mind:  obtaining the Institutional Investors' support

for a release of all estate and third-party claims against Ally." (Comm. Obj. at 14-15; *see also*

Wilmington Trust Obj. at 5.)  That may be true.  The evidence clearly shows Ally wanted third

party releases and wanted creditor support for a plan including those releases.  It negotiated hard

to get what it wanted.

But Ally did nothing wrong in negotiating to advance its interests in arm's length

negotiations with the Debtors and the investors.  It did not attempt to link its demands to the

amount of the allowed claim.  Indeed, the negotiations over a reorganization plan, including third

party releases, were separate from the negotiations over the RMBS settlement.  The plan

negotiations were handled, for the Debtors, by a committee of independent directors, and, for

Ally, by a negotiating team led by Michael Carpenter, Ally's chief executive officer.  Neither

Mr. Devine nor the Steering Committee Group played any role in the negotiations.  (Ex. 38 at 95,

157:21-24, 225:19-21; Marano at ___.)

Mr. Devine said that Ally would not support the settlement unless the Steering

Committee Group and Talcott Franklin Group both supported a reorganization plan including

third-party releases.  For their part, the investors told Mr. Devine they would not support a

reorganization plan that did not include a substantial financial payment by Ally for the benefit of

creditors.  As Mr. Devine explained in his deposition:

> Kathy Patrick understood that the negotiation of a dollar number
> between AFI and ResCap was going on separately from the
> discussions over the RMBS settlement.  Notwithstanding that, she
> understood that she had no direct role or − or standing to bargain
> for a number there since the number – since that agreement was
> between the estate and Ally.  She did care about the number and
> she told me that she cared about the number for the obvious reason
> that she wanted to maximize that figure from Ally Financial.

(Ex. 38 at 143:10-22.)

34

The Steering Committee Group also had a good grasp on what would happen if it rejected the plan support agreement proffered by Mr. Devine. The investors could reach the same settlement with the Debtors with the same $8.7 billion allowed claim. They would then have the largest claim against the estate and would be in a lead position to assert claims against Ally.

What do the objectors offer in response? One document. (Comm. Obj. at 18; FGIC Obj. ¶ 7; Ex. 46.) On May 12, 2012 — after the amount of the allowed claim was set, and the day before final agreements were signed — Mr. Devine wrote an email to Mr. Lee and other Morrison & Foerster lawyers in which he wrote: "Had call with KP. We told her PSA support – whole hog – is drop dead." The Committee and FGIC claim this comment proves that Ally conditioned the RBMS settlement on the Steering Committee Group's consent to a plan support agreement. (*Id*.) But Mr. Devine had a different, and far more plausible, explanation. He explained he told Ms. Patrick "she had to support the PSAs in full," and "that if she wanted our participation in the PSA she needed to support it." (Ex. 38 at 281:12-282:8.)

Mr. Devine's efforts to secure the Steering Committee Group's consent to a plan support agreement thus did not compromise the Debtors' interests. He had no impact on the amount of the allowed claim included in the RMBS settlement. (*See* Mack at __; Ex. 38 at 95:15-25.) No evidence will show the Debtors colluded with Ally to offer the Steering Committee Group a higher allowed claim in return for its consent to a plan support agreement.

## II.    THE $8.7 BILLION CLAIM FALLS WITHIN A REASONABLE RANGE.

A settlement amount must be reasonable. A settlement cannot be approved if the settlement amount falls "below the lowest point in the range of reasonableness." *In re Stone Barn Manhattan LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) (*quoting In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir.1985); *see also In re MF Global Inc.*, 466 B.R. at 247 ("court's

35

responsibility is to 'canvass the issues and see whether the settlement falls below the lowest

point in the range of reasonableness'").

"It is not the court's task to determine whether the settlement proposed by the parties is

the best possible, or fairest, or most appropriate resolution of the dispute." *In re Hilsen*, 404

B.R. at 70 ("such an assessment would be tantamount to the court becoming a principal, rather

than a neutral, in the parties' negotiations"). *See also In re Adelphia Commc'ns Corp.*, 327 B.R.

143, 159 ("[t]he settlement need not be the best that the debtor could have obtained"), *adhered to*

*on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005) (*citing In re Penn Cent. Transp. Co.*,

596 F.2d 1102, 1114 (3d Cir.1979)).  Indeed, "the court may approve the compromise even if it

believes that the debtor will prevail at trial." *In re Town, LLC*, 09-11827 SMB, 2009 WL

2883047 (Bankr. S.D.N.Y. July 27, 2009) (citations omitted).  All the Court must do is fix the

range of reasonable outcomes and determine whether the settlement amount falls within that

range. *In re Hilsen*, 404 B.R. at 70; *Police & Fire Ret. Sys. of the City v. Ambac Fin. Group,*

*Inc.*, 11-CV-7529, 2011 U.S. Dist. LEXIS 149610 at *8 (S.D.N.Y. Dec. 29, 2011) ("courts are to

upset such settlements only in the face of considerable evidence suggesting that the agreement is

unreasonable").

The proposed $8.7 billion claim falls comfortably within a range of reasonable outcomes

given the risks and expense of continued litigation.  The reasonableness of the allowed claim

should be measured against three sets of numbers:  "aggregate losses," losses on loans with

"material defects," and estimated damages after adjustments for legal defenses.  The evidence

will show the proposed allowed claim measures up against each of these standards.

36

A.    **The $8.7 Billion Allowed Claim Bears a Reasonable Relationship to Aggregate Losses.**

The first measure is "aggregate losses."  Aggregate losses are comprised of all of the losses, realized and projected to occur in the future, that will be suffered by the owners of the mortgage-backed securities that are the subject of the settlement.  They represent the theoretical maximum amount investors could recover at trial if they were able to establish that the Debtors materially breached their representations and warranties as to every security covered by the settlement and successfully overcame all of the Debtors' legal defenses.

There is no real dispute over the amount of aggregate losses suffered by the investors.  The objectors' experts have not offered any opinions on the amount of aggregate losses, and they have not found any fault with the analysis of aggregate losses performed by the Debtors' experts.  (*See, e.g.*, Cornell Rep. ¶ 68; Brown Rep. ¶ 30; Ex. 3 at 60-62; Ex. 47 at 36-37.)

The objectors may argue, however, about the relevancy of aggregate losses.  And it is true that winning a verdict for the full amount of aggregate losses would be like hitting a grand slam.  But aggregate losses serve as a useful reference point, especially because, unlike the other measures of the range of reasonableness, the amount of aggregate losses is not in serious dispute.

Investors have already suffered over $30 billion in collateral losses.  And, depending on what assumptions are used, they will lose another $13.5 billion to $19.8 billion in coming years.  Total aggregate losses thus range (depending on the witness's assumptions and methods) from $43.5 billion to $49.8 billion.  Jeff Cancelliere, the Debtors' in-house risk manager, will testify that aggregate losses are projected to be 44.1 billion, based on sophisticated computer modeling using detailed information obtained from third-party vendors.  (Cancelliere at ___.)  The Debtors' loan underwriting expert, Frank Sillman, arrived at a similar range of aggregate losses — $43.5 billion to $49.8 billion — using a similar method of analysis.

37

(Sillman Reply Decl. ¶ 30.)  The Steering Committee Group similarly argued, in settlement talks, that aggregate losses exceeded $48 billion.  (Cancelliere at _____.)

The proposed $8.7 billion allowed claim represents 19.7% of the aggregate losses that the investors could, theoretically, seek to recover at trial.[12]  That is a fair compromise.  Other courts have approved settlements in that range.  *See, e.g., In re BGI, Inc.*, 465 B.R. 365, 379 (Bankr. S.D.N.Y. 2012) (Glenn, J.) (settlement approved at 17% of potential liability); *In re Chemtura Corp.*, 439 B.R. 561, 570 (Bankr. S.D.N.Y. 2010) (settlement approved at 41% of potential damages); *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 430 (7th Cir. 2007) (settlement approved at 18% of maximum potential exposure); *In re Homesteads Cmty. at Newtown LLC*, 04-30417, 2012 Bankr. LEXIS 3828, *93-95 (Bankr. D. Conn. Aug. 21, 2012) (settlement approved at 17% of maximum exposure).

### B.    The $8.7 Billion Allowed Claim Bears a Reasonable Relationship to Loans with Material Defects.

The second measure is loans with "material defects."  A "defect rate" reflects the percentage of loans as to which there has been a material breach of the Debtors' representations and warranties.  The defect rate reflects the investors' ability to prove a *prima facie* case; it is the percentage of loans as to which the Debtors materially breached their contractual obligations.

Unlike aggregate losses, defect rates will be hotly disputed at the hearing.  The range of defect rates to be offered at trial is from 28.74% to over 90%, and the amount of damages suffered on loans with material defects ranges from $16.5 billion to over $44 billion.

At the low end, the Committee's witness, Mr. Morrow, selected a sample of 1,500 loan files and concluded that 28.74% of the loans had material defects. (*See* Morrow Rep. at 69.)

---

[12] This figure is calculated using Mr. Cancelliere's $44.1 billion projection of aggregate losses, which was the figure presented to ResCap LLC's board of directors on May 9, 2012. (Ex. 4 at RC-9019_00054004.)

sf-3223258 v41

Dr. Cornell, the Committee's economist, concluded that this figure, if accepted, would produce a damages claim of $16.5 billion. (*See* Cornell Rep. ¶ 68; Ex. 3 at 64. **)**

At the other end of the spectrum, the Debtors have been sued in a large number of cases alleging material defects. The complaints in those cases typically allege defect rates of from 80% to 100%. The following chart shows defect rates from the Debtors' pre-petition lawsuits:

| PLAINTIFF | DATE FILED | No. OF TRUSTS | BASIS FOR ALLEGATION | DEFECT RATES ALLEGED |
|---|---|---|---|---|
| **MBIA v. RFC** | 2008 | 5 | Loan file review | 88% |
| **MBIA v. GMACM** | 2010 | 3 | Loan file review | 89% |
| **FGIC (12 suits)** | 2011-2012 | 20 | Loan file review, loan data review, AVMs[13] | 30%-97.6% |
| **Assured Guar.** | 2012 | 2 | Loan file review | 43%-85% |
| **FHFA** | 2011 | 21 | Loan data review, AVMs | 100% |
| **Mass Mutual** | 2011 | 18 | Loan data review, AVMs | 94.44%-100% |
| **Allstate** | 2011 | 25 | Loan data review, AVMs | 37%-100% |
| **Huntington** | 2011 | 5 | Loan data review, AVMs | 94.44%-100% |
| **Stichting** | 2011 | 6 | Loan data review, AVMs | 94.44%-100% |

---

[13] Automated Valuation Model.

sf-3223258 v41

The Steering Committee Group has taken up residence at the higher end of the range.  It informed the Debtors that it would, if forced to litigate, file a complaint alleging a 90% defect rate.  (Hamzehpour at _____.)  The amount of damages resulting from a 90% defect rate would be $39.1 billion to $44.8 billion.

The Debtors, of course, have significant knowledge about their own defect rates, both through their historical experience in repurchasing defective loans and through periodic quality control audits.  As a result, the Debtors knew they had no realistic hope for a complete victory at trial.  Reviews of thousands of loan files over the years have revealed numerous material breaches of the Debtors' representations and warranties.  Accordingly, the Debtors' best possible outcome at trial would be an adverse verdict in the billions of dollars.

One source of information about the Debtors' defect rates comes from its historical repurchase experience.  The Debtors' agreements with investors give the trustees of the 392 securitizations, as well as bond insurers like MBIA and FGIC, the right to review individual loan files and request the repurchase of loans found to violate a representation or warranty.  The Debtors reviewed those requests, considered possible defenses, and then decided either to make the requested repurchase or dispute the request.  (*See* Ex. 48 at 30:11-19, 52:7-61:4, 124:25-127:16.)  The Debtors' historical repurchase experience thus provides some evidence of the Debtors' defect rates.  The repurchase rate operates, in some senses, as a floor for the Debtors' litigation exposure, in that each decision to repurchase a loan represents the Debtors' own admission that the loan file evidenced a material defect.

The Debtors' repurchase rate on the loans at issue here was 14%.  In another 4% of the cases, the party requesting repurchase rescinded its request.  That means the vast majority of repurchase requests — 82% — remains unresolved and in dispute.  A repurchase rate of 14%

implies maximum losses to investors of approximately $6 billion to $7 billion.  The 82% of loans still in dispute — that is, the loans that would be the subject of litigation — represent approximately $35.7 billion to $40.8 billion in additional potential losses.[14]

The other source of information about the Debtors' defect rates comes from its internal post-funding audit program.  (Cancelliere at ___.)  The Debtors routinely audited their loan files. Some of the loans were selected for audit on a random basis.  Other loans were targeted because they exhibited some form of data anomaly or because they incurred an early default.  These various types of post-funding audits showed material underwriting defect rates of from   % to    %, depending on vintage and product type.  (Cancelliere at ___.)  These defect rates imply losses to investors of from $      billion to $      billion.

While the Debtors' historical repurchase and audit experience provide useful information, they do not constitute the final word on the Debtors' defect rates.  They only show the Debtors' own view of its liability.  The investors, of course, do not share the Debtors' view, just as the investors would not accept Mr. Morrow's 28.74% defect rate without challenge.

Indeed, Mr. Morrow's loan re-underwriting methodology has at least three obvious defects.  First, Mr. Morrow improperly excluded 319 loans, or 21% of his 1,500 loan sample, because the loan files lacked adequate documentation.  (Morrow Rep. at 6 n.1.)  But one of the Debtors' representations and warranties was that full documentation would be preserved.  (*See e.g.* Ex. 49 at RC00057523; Ex. 50 at RC00062578.)  Incomplete loan files are therefore a breach of the Debtors' representations and warranties.  In fact, Mr. Morrow concluded that other

---

[14] The Committee also argues that these incomplete figures show a "breach rate" of only 4%, because the Debtors have only received specific repurchase demands of an aggregate $1.8 billion in loans (original principal balance) out of $45 billion in original principal balance for loans that have already liquidated. (Comm. Obj. at 27; Cornell Rep. ¶ 81.)  This figure is flawed because it erroneously assumes that the $1.8 billion in specific repurchase demands includes *all* defective loans across *all* 392 trusts.

loan files (with fewer missing documents) reflected material defects because of missing

documentation.  If he had treated all loans with missing documents consistently, Mr. Morrow's

defect rate would jump to nearly 45%.

Second, Mr. Morrow found that 271 loans, or 24.8% of his 1,500 loan sample, had

defects that his team concluded were not material.  (Morrow Rep. ¶ 110.)  Investors, of course,

would allege that most, if not all, of these defects were material.  If Mr. Morrow had concluded

these 271 loans had material defects, his defect rate would jump to 53.6%.

And third, Mr. Morrow failed to take several standard steps typically taken by loan

examiners.  He did not obtain a new property appraisal, check owner occupancy, verify borrower

income, obtain a title report, or obtain a new credit report.  The pre-petition complaints against

the Debtors relied heavily on such steps, and the investors in this matter could be expected to

take similar steps.  Mr. Morrow simply skipped them.  (*See* Ex. 51 at 105-106.)

The Debtors' loan underwriting expert, Frank Sillman, has re-underwritten the same

1,500 loan files reviewed by Mr. Morrow.  Using a more neutral approach, Mr. Sillman

concluded that 43.5% of the loans had material defects. (Sillman Reply ¶ 5.)  A defect rate of

43.5% implies losses ranging from approximately $18.9 to 21.6 billion.

The proposed $8.7 billion allowed claim represents a substantial discount off the breach

rates that will be presented at trial.  It is about 53% of the $16.5 billion in damages calculated

using Mr. Morrow's defect rate.  It is 41% to 46% of the damages estimated using Mr. Sillman's

43.5% defect rate.  And it is only 19% to 22% of the damages that would be claimed using the

Steering Committee Group's 90% defect rate.

sf-3223258 v41

### C.    The $8.7 Billion Allowed Claim Bears a Reasonable Relationship to Potential Damages After Adjustments for Legal Defenses.

The third measure is the range of likely litigation outcomes after adjustment for legal defenses.  Defect rates, as shown above, allow calculation of losses incurred on loans as to which investors could prove a *prima facie* claim.  But to estimate recoverable damages, those losses must be discounted to account for the Debtors' legal defenses.

The merits of those defenses will be disputed at the hearing.  Some of the objectors argue the proposed $8.7 billion allowed claim does not reflect enough downward adjustment given the strength of the Debtors' loss causation, statute of limitations, and election of remedies defenses.[15] (Comm. Obj. at 30-37; Wilmington Trust Obj. ¶ 15.)  The Committee calculates that the Debtors' liability exposure, after adjustment for legal defenses, is only $2.7 billion to $3.8 billion.  (Comm. Obj. at 29.)  The Committee even asserts, without any evidence, that "the Debtors appear not to have advanced [several "strong potential defenses"] in settlement negotiations."  (Comm. Obj. at 5.)

That assertion will be proven false at trial.  The short answer is that legal defenses *were* considered by the Debtors and were aggressively asserted in settlement negotiations.  As noted above, the proposed allowed claim reflects a discount of from nearly 50% to 80% off of the losses suffered on loans with material defects.  This discount is the product of the assertion of the Debtors' legal defenses.

Those defenses were considered and factored into the settlement in at least two ways.  First, the Debtors' historical repurchase rates reflect consideration of available legal defenses, including loss causation and statute of limitations.  The Debtors did not agree to repurchase loans

---

[15] The monoline insurance objectors — MBIA and FGIC — do not join in these criticisms, because they have taken the other side of the arguments in their litigation against the Debtors and other mortgage companies.  (Ex. 60 ¶ 154; Ex. 61 ¶ 75; Ex. 62 ¶ 50.)

sf-3223258 v41

where they believed they had valid legal defenses.  The Debtors' board of directors considered

these historical repurchase rates in evaluating the proposed settlement and used them as a

reference point in deciding to approve the settlement.  (Ex. 4 at RC-9019_00054004.)  And

second, the Debtors' lawyers have significant experience defending RMBS cases, and the

Debtors' directors have been keenly interested in the Debtors' representation and warranty

litigation since 2008.  The Debtors' directors and lawyers were fully up-to-speed on the strengths

and weaknesses of the Debtors' legal defenses.  The Debtors will offer the testimony of Jeffrey

Lipps, the Debtors' principal outside counsel for RMBS-related litigation, to explain these

strengths and weaknesses.

Interestingly, the objectors acknowledge that what they call, in some parts of their briefs,

"potent" and "strong" defenses, are really "hotly contested," based on "extremely limited" case

law, "uncertain," "complex," and "not without doubt."  (*E.g.*, Comm. Obj. at 4, 5, 29, 35, 41.)

There are no magic bullets.  So the real issue is whether the discount obtained by the Debtors, in

recognition of their legal defenses, was big enough.  The evidence will show it was.

### 1.    The Debtors' Loss Causation Defense.

A plaintiff may only recover damages that are the foreseeable consequence of a material

breach of the agreement.  *See Freund v. Washington Square Press, Inc.,* 34 N.Y.2d 379, 382

(1974) ("[t]he law awards damages for breach of contract to compensate for injury caused by the

breach – injury which was foreseeable, *i.e.*, reasonably within the contemplation of the parties, at

the time the contract was entered into").

But "foreseeability of damages" is not the same thing as "loss causation."  Loss causation

is the requirement that a defendant's misrepresentation directly caused the loss complained of by

he plaintiff.  *See Meyercord v. Curry,* 38 A.D.3d 315, 316 (N.Y. Sup. Ct., Ap. Div. 1st Dep.

sf-3223258 v41

2007) ("[p]laintiff must show . . . that the misrepresentations directly caused the loss about which plaintiff complains").

As a result, the Debtors could not assert a "loss causation" defense based on case law. Instead, the Debtors (like other defendants in representations and warranties cases) have argued that a provision of its agreements creates a "loss causation" requirement as a matter of contract. The provision states that no liability will arise for breaches of representations or warranties unless the breach "materially and adversely affect the interests" of the investors. (*See, e.g.,* Ex. 49 at RC00057522; Ex. 50 at RC00062577.)

This argument has had only limited success. *Compare Lehman Bros. Holding v. Laureate Realty Servs.*, No. 1:04-cv-1432-RLY-TAB, 2007 U.S. Dist. LEXIS 76940 at *36 (S.D. Ind. Sept. 28, 2007) (motion to dismiss denied; "material and adverse effect" a question for jury) *with Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, No. 2:08-cv-1448 JCM(RJJ), 2011 U.S. Dist. Lexis 145026 at *3-4 (D. Nev. Dec. 15, 2011) (material and adverse effect measured at time of closing).

The two most recent and relevant decisions come from this district. In *Syncora Guarantee, Inc. v. EMC Mortgage Corp.*, 874 F. Supp. 2d 328 (S.D.N.Y. 2012), Judge Crotty rejected the defendants' "loss causation" argument, concluding the investors did not have to prove that breaches of representations or warranties "caused actual adverse effect." All the investors needed to prove is that the alleged breaches "increased the risk" faced by investors. (*Id.* at 339.) Moreover, the increased risk must be measured at the time the representations and warranties are made. The court held that "the parties' written agreements do not provide that breaches of representations or warranties must cause any [loan] to default, before the Note Insurer can enforce its remedies under the repurchase provision." (*Id.* at 335.)

45

And in *Assured Guaranty Municipal Corp. v. Flagstar Bank*, FSB, No. 11Civ. 2375(JSR), 2012 WL 4373327 (S.D.N.Y. Sept. 25, 2012), Judge Rakoff followed *Syncora* in holding that loss causation is not required in order to make out a claim for breach of representations or warranties. Judge Rakoff interpreted the contract's "material and adverse effect" language to require only that the alleged breach of a representation or warranty "materially increased [the] risk of loss." (*Id*. at *4.)

The objectors give short shrift to these cases. (*See* Comm. Obj. at 36.) But they are the most relevant cases on the loss causation issue in representation and warranty cases. Moreover, the Debtors cannot assume these cases will be limited to the insurance context, as the Committee mistakenly argues. (*See* Comm. Obj. at 36-37.) The language interpreted in those cases was not insurance language; it was the same type of contractual "material and adverse effect" language that exists in the agreements for the securitizations in this matter.

The Committee engaged Dr. Cornell to demonstrate that "most of the harm suffered by the Trusts was caused not by any defects in the loans' underwriting, but instead by such factors as the steep decline in housing prices and the sharp rise in unemployment." (Comm. Obj. at 5.) But Dr. Cornell was asked to assume that loss causation is a permitted defense in breach of contract cases. He was also asked to assume that his approach of calculating "incremental losses" would be acceptable in court. (Ex. 3 at 40:11-15.) No court, however, has ever adopted his approach, as Dr. Cornell acknowledged. (Ex. 3 at 42:1-21 ("I kind of doubt that anyone" has used his methodology).) Dr. Cornell admitted his analysis does not comply with the loss causation principles set out in *Syncora* or *Assured Guaranty*. (Ex. 3 at 52:15-54:10.) Under those cases, a breach has a "material and adverse effect" if it materially increases an investor's risk of loss. All of the loans classified by Mr. Morrow as having a "material defect" meet this

test.  (Ex. 51 at 41:25-42:6.)   No additional "loss causation" discount is appropriate under those decisions.

Moreover, Dr. Cornell's approach depends on evidence of post-origination defaults. (Ex. 3 at 49:1-4.)  But many courts have held that the accuracy of representations and warranties must be determined as of the date a loan was originated.  *See MBIA Insurance Corp. v. Countrywide Financial Corp.,* 936 N.Y.S.2d 513, 527 (2012); *Wells Fargo Bank,* 2011 U.S. Dist. Lexis 145026 at *3-4  (closing date is relevant time for assessing existence of material breach as long as plaintiff did not cite to post-closing events).  Dr. Cornell admitted his work could not be used if post-origination evidence is not allowed.  (Ex. 3 at 50:6-11.)

If Dr. Cornell's approach were adopted, a complete victory on loss causation (based on Mr. Morrow's 28.74% defect rate) would reduce the Debtors' likely damages to $3.8 billion. (Comm. Obj. at 31.)  In other words, using the lowest defect rate to be offered at trial, and assuming a 100% chance of victory on loss causation using Dr. Cornell's approach, the best the Debtors could do would be a liability verdict of $3.8 billion.  By contrast, the Steering Committee Group argues that its reasonable damages expectation ranges from $18.4 billion to $19.6 billion, and that the "Debtors are unlikely to be able to assert any effective 'causation defense' to reduce their repurchase liability."  (Steering Comm. Stmt. at 14.)  The proposed allowed claim falls fairly and reasonably between these two positions.

### 2.    The Debtors' Statute of Limitations Defense.

Breach of contract claims are subject to a six-year statute of limitations under New York law.  N.Y. CPLR § 213(2); *Hernandez v. Bank of Nova Scotia,* 908 N.Y.S.2d 45, 46 (N.Y. App. Div. 1st Dep't 2010).  No one seems to dispute the applicability of this statute.  The debate is over (i) when it begins to run, and (ii) whether it can be tolled.

sf-3223258 v41

The Committee claims the statute of limitations bars all claims related to loans originated in 2004, 2005, and the first part of 2006.  (Comm. Obj. at 37.)  And Dr. Cornell, again using Mr. Morrow's 28.74% defect rate, has estimated that a complete victory on the statute of limitations defense would reduce the Debtors' damages to $12.1 billion.  (Cornell Rep. ¶¶ 64-67 n.35.)

But the Steering Committee Group argues that a claim for breach of a representation or warranty does "not accrue until one is 'discovered' and repurchase is refused."  (Steering Comm. Stmt. at 14 n.17.)  *See Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas, No. 4:10cv0212SWW,* 2012 U.S. Dist. LEXIS 87265, at *12-13 (E.D. Ark. June 25, 2012).  It also argues that the statute of limitations should be equitably tolled because the Debtors, as the master servicers of the loans, had the contractual obligation "to pursue the repurchase claims."  (Steering Comm. Stmt. at 15.)  According to the Steering Committee Group, equity will preclude the Debtors from asserting a statute of limitations defense when the Debtors themselves had the obligation to assert the claims:  "equitable tolling precludes the Master Servicers . . . from raising their own failure to pursue those claims as a limitations defense."  (*Id.*)[16]

The case law on the "accrual" and "equitable tolling" issues in this context is largely undeveloped.  (Lipps Reply Decl. ¶ 22.)  But at least one court has rejected statute of limitations arguments in the representation and warranty arena based on the "repurchase demand" requirement.  *See Lehman Bros. Holdings, Inc., infra.*  And courts have upheld New York's general requirement that conditions precedent — such as demands for compliance — must be satisfied before the statute of limitations begins to run.  *See* NY CPLR § 206; *Kunstsammlungen Zu Weimar v. Elicofon,* 536 F. Supp. 829, 848-49 (E.D.N.Y. 1981).

---

[16] The Committee counters that the trustees also had the ability to assert breach of contract claims, making the equitable tolling argument "inapplicable."  (Comm. Obj. at 37.)

sf-3223258 v41

Dr. Cornell concluded that a complete victory on the statute of limitations defense would reduce the Debtors' likely damages to $12.1 billion. The Steering Committee Group says its reasonable damages expectation ranges from $18.4 billion to $19.6 billion, and that "there is little likelihood Debtors could prevail on any statute of limitations defense." (Steering Comm. Stmt. at 14.) The Debtors' position fairly compromises these two positions.

### 3.    The Debtors' "Election of Remedies" Defense.

The Committee also complains the Debtors failed in negotiations to make an election of remedies argument "that could have helped leverage a more moderate settlement." (Comm. Obj. at 40.) The argument is based on *MASTR Asset Backed Securities Trust 2006-HE3 v. WMC Mortgage Corp.,* Case No. 11-cv-02542-JRT/TNL, 2012 WL 4511065 at *7 (D. Minn. Oct. 1, 2012). The Committee does not explain how the Debtors could have used this October 2012 decision to help "leverage" a settlement reached in May 2012.

No matter. The *MASTR Asset* decision has no precedential value in this Court. *See, e.g.,* Lawrence B. Solum, *Moore's Federal Practice—Civil,* § 134.02[1][d] (Matthew Bender 3d ed.). Moreover, the repurchase provisions in the Debtors' agreements are different than those in *MASTR Asset*. *MASTR Asset* held that, once a creditor has foreclosed on the collateral for a loan, it has elected its remedy and cannot, thereafter, assert a breach of contract claim based on representations or warranties. *See id.* at 13-14. In reaching its conclusion, the court relied heavily on the specific language of the agreement before it and concluded: "absent a strong textual indication to the contrary the Court will not elevate form over substance to hold that a mortgage loan exists independently of the mortgage or deed trust which secures it." *See id.* at 5, 13.

Here, by contrast, a number of the Debtors' agreements seem to contemplate the repurchase of foreclosed mortgage loans. For example, many of the Debtors' pooling and

49

servicing agreements include a definition of the purchase price for a loan to be repurchased.  The

definition expressly applies to "REO" properties, REO being the acronym for properties acquired

by the servicer through either foreclosure or a deed in lieu of foreclosure.  (Ex. 64.)  Other

agreements define "repurchase price" as 100% of the outstanding loan balance "without

reduction for any amounts charged off."  (*E.g.*, Ex. 65.)  The investors could argue these

provisions allow a repurchase remedy even after a loan has been written off following

foreclosure.  Similarly, the Debtors' agreements include a definition of "subsequent recoveries"

that seems to permit the repurchase of loans after the underlying mortgage has been foreclosed.

The definition refers specifically to recoveries relating to breaches of representations and

warranties after "an REO Disposition."  (Ex. 65 at 29.)

Even some of the objectors acknowledge that the Debtors would face an uphill battle in

seeking to have *MASTR Asset* applied as a defense in its favor.  FGIC concedes "the language of

the transaction documents themselves belies any arguable application to FGIC of the . . . rule

articulated in the recent decision of a District Court in Minnesota."  (FGIC Obj. ¶ 56.)

The Committee claims that, were the *MASTR Asset* decision to be applied to this case, it

"would eliminate all liability for all loans that have already been foreclosed, and much of the

potential liability associated with loans that have not been."  (Comm. Obj. at 40.)  Its expert, Dr.

Cornell, calculates that the Debtors' liability, after application of *MASTR Asset* (using Mr.

Morrow's 28.74% defect rate), would be only $6 billion.  (*See* Cornell Rep. ¶ 68, n.35; Ex. 3 at

94.)  The Steering Committee Group, by contrast, contends the case is inapplicable (as does

FGIC), and that the Debtors' likely damages exposure is from $14.7 billion to $19.6 billion.  (*See*

Steering Comm. Stmt. at 11.)  The agreed-upon allowed claim of $8.7 billion is a fair

compromise between these two positions.

sf-3223258 v41

### D.    The Objectors' Criticisms of the Settlement Amount Are Not Supported By the Evidence.

In addition to their arguments about legal defenses, the objectors make three other criticisms of the proposed $8.7 billion allowed claim.  These criticisms consist, at bottom, of finding a lower number in some other context and then arguing the proposed $8.7 billion claim is, by comparison, too high.  In each case, the flaw in the objectors' argument is obvious — the objectors compare apples to oranges.

### 1.    Ally's "Representation and Warranty" Accounting Reserves.

Ally's financial statements have typically included a reserve for "representation and warranty" liability.  In late 2011 and early 2012, this reserve ranged from $811 million to $829 million.  (*See* Ally Fin. 10-Q (Aug. 9, 2011) at 83; Ally Fin. 10-Q (Apr. 27, 2012) at 69.)  The objectors argue that this reserve proves the proposed $8.7 billion allowed claim is too high, because the allowed claim "dramatically exceed[s] any estimate the Board had previously received relating to the potential liability for these claims."  (Wilmington Trust Obj. at 2; *see also* Comm. Obj. at 18; FGIC Obj. ¶ 16.)

Reserves are mandated by generally accepted accounting principles.  Those principles call for a reserve against contingent future claims only if a future loss is "probable" and the amount of that loss is "reasonably estimable." (FASB, Stmt. of Fin. Acct. Standards No. 5 at 6.)  The objectors do not show that litigation liability to the Steering Committee Group or Talcott Franklin Group was both "probable" and "reasonably estimable" as of March 31, 2012 (the date of Ally's last pre-petition financial statement).  Ally, on the other hand, concluded that its potential liability to investors was not reasonably estimable and, therefore, not a proper item for inclusion in the reserve.  (*See*, *e.g.*, Ex. 52 at RC40021337; Ex. 53 at RC-9019_00093819.)

Moreover, the "representation and warranty" reserve was expressly described by Ally as limited only to potential non-litigation loan repurchase activity.  (Ally Fin. 10-K at 225 (Feb. 28, 2012).)

Thus, the objectors' comparisons to Ally's non-litigation repurchase liability reserve are, at best, misleading.  The reserve did not address the Debtors' potential liability to investors because, under GAAP, that liability was not "reasonably estimable."  And the reserve expressly did not purport to cover future litigation liability; it only addressed probable future repurchase activity.  The objectors' comparison of the proposed $8.7 billion allowed claim to reserve amounts of from $811 million to $829 million does nothing to show the settlement is outside a reasonable range.

### 2.    Ally's Form 10-Q Disclosure Regarding "Reasonably Possible" Losses.

In October 2010, the SEC issued a new guidance letter to financial institutions.  The letter called for disclosure of potential litigation losses in situations where the losses were not probable or reasonably estimable and, thus, were not accrued for in a reserve.  The letter instructed financial institutions to disclose:

> the contingency . . . when there is at least a reasonable possibility that a loss or an additional loss has been incurred.  The disclosure should indicate the nature of the contingency and give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

[SEC Sample Letter at 2 (Oct. 2010), *available at*

http://www.sec.gov/divisions/corpfin/guidance/cfoforeclosure1010.htm..][17]

---

[17] "Reasonably possible" is defined as "[t]he chance of the future event or events occurring is more than remote but less than likely." (FASB, Stmt. of Fin. Acct. Standards No. 5 at 4.)

sf-3223258 v41

Throughout 2011, Ally complied with this guidance by disclosing it faced "reasonably possible" future losses but could not make an estimate of those losses.  For example, Ally's Form 10-Q for the quarter ending June 30, 2011, stated:

> We believe it is reasonably possible that losses beyond amounts currently reserved for the litigation matters and potential repurchase obligations and related claims described above could occur, and such losses could have a material adverse impact on our results of operations, financial position or cash flows.  However, based on currently available information, we are unable to estimate a range of reasonably possible losses above reserves that have been established.

(Ally Fin. 10-Q at 87 (Aug. 9, 2011).)

At the end of the first quarter of 2012, however, Ally, for the first time, attempted to estimate its "reasonably possible" future losses (above the amount of its reserves).  It disclosed, in a footnote, that "[w]e currently estimate that ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims described above could be between $0 and $4 billion over existing accruals."  (Ally Fin. 10-Q at 73 (April 27, 2012).)  Ally cautioned readers, however, that losses higher than the disclosed range could occur:

> We believe it is reasonably possible that losses beyond the amounts currently reserved for litigation described in Note 24 to the Consolidated Financial Statements and potential repurchase obligations and related claims with respect to our Mortgage Companies discussed above could occur . . . [but] based on currently available information, we are unable to estimate a range of reasonably possible losses above reserves that have been established.

*Id.* at 122.

The objectors argue that this disclosure shows the proposed $8.7 billion allowed claim is too high, because the $0 to $4 billion range must be read as setting the absolute highest amount of the Debtors' potential liability.  (Comm. Obj. at 18; Wilmington Trust Obj. at 2, 6; FGIC Obj.

¶ 17.)  It does no such thing.  The $0 to $4 billion range addresses a different exposure, based on different assumptions, than does the proposed $8.7 billion allowed claim.

The $0 to $4 billion range estimates the liability the Debtors would have faced had they continued as going concern outside of bankruptcy.  It is based on the Debtors' non-litigation loan repurchase history, with additional amounts added following "stress-testing" and for other possible losses.  (*See* Ex. 54 at RC40074017-18; Ex. 38. at 135-136.)  The reason for this is obvious — the Debtors' entire experience with repurchase liability relating to the 392 trusts had been non-litigation repurchase demands for individual loans.  Indeed, at the time Ally issued its Form 10-Q, not one trust had brought a lawsuit against the Debtors.  Moreover, the vast majority of trusts had not even made a repurchase demand.  For this reason, the $0 to $4 billion range focused on repurchase demands by "active" trusts — that is, trusts that had made repurchase demands — while allowing only residual amounts for "inactive" trusts.  (*See* Ex. 54 at RC40074017-18; Ex. 38. at 135-136.)  The $0 to $4 billion range thus assumes that most trusts will never make a single repurchase demand or commence a lawsuit against the Debtors.

Contrast these facts with the proposed $8.7 billion allowed claim.  It is based on the assumption that *all* 392 trusts will assert *all* their claims against the Debtors through the proof of claims process in bankruptcy.  Procedural hurdles to commencing litigation — such as the need for 25% of the certificate holders to give a trustee instructions to sue — do not exist.

The Debtors' rebuttal expert, Professor Katherine Schipper, has concluded that Ally's $0 to $4 billion "reasonably possible losses" disclosure cannot fairly be compared to the proposed $8.7 billion allowed claim, because the disclosure is based on business-as-usual assumptions, while the allowed claim assumes a global resolution of all claims.  (Schipper Report ¶¶ 37-38.)

Ally's $0 to $4 billion estimated range of possible losses, and the Debtors' proposed $8.7 billion allowed claim, are apples and oranges.  The objectors' efforts to compare the two does nothing to show the settlement is outside a reasonable range.

### 3.    The Debtors' Comparisons to the Bank of America and Lehman Brothers Claims.

Shortly before it settled with the Debtors, the Steering Committee Group announced a proposed $8.5 billion settlement with Bank of America.  The objectors argue that comparisons to the Bank of America settlement are "fundamentally flawed" and "unconscionably deceptive." (Comm. Obj. at 19; FGIC Obj. at 13.)  The objectors claim that, when compared fairly, Bank of America obtained a much larger "discount" than the Debtors.  (FGIC Obj. ¶ 19; Wilmington Trust Obj. ¶¶ 13-14.)  The objectors make similar arguments regarding comparisons to the estimated claims size in the *Lehman Brothers* bankruptcy.  (*Id.*)

The objectors' criticisms are what is misleading.  This can be seen by comparing the three relevant measurements — aggregate losses, defect rates, and litigation defense discounts — between the Bank of America settlement, the *Lehman Brothers* estimated claim, and the proposed settlement before this Court.

Information regarding the Bank of America settlement is incomplete and in dispute. Most of the information comes from a short "opinion" prepared by Brian Lin, a "tactical mortgage strategist" hired by counsel for one of the trustees involved in the litigation.  (Ex. 55.) Mr. Lin's opinion notes that the investors in that matter asserted aggregate losses of $107.8 billion, while Bank of America claimed aggregate losses would reach only $61.3 billion to $76.8 billion.  (*Id.* at RC-9019_00003926.)  Mr. Lin chose to use Bank of America's estimates of aggregate losses.  To these numbers Mr. Lin applied a 36% defect rate and a legal defenses (or

"success rate") discount of 40%, which produced an estimate of likely damages of from $8.8 billion to $11 billion.  (RC-9019_00003932.)

Information regarding the *Lehman Brothers* claim size is also spotty.[18]  Most of the information comes from a series of declarations filed by Zachary Trumpp, a Lehman Brothers employee.  Mr. Trumpp used a range of aggregate losses of from $12.9 billion to $17.1 billion. He then applied defect rates of 30% and 35% and a legal defenses discount (or what he called a "validation  rate") of 40% to arrive at a range of likely damages of from $1.1 billion to $2.4 billion.  (Ex. 66.)

These figures compare nicely to the sets of numbers that will be offered in evidence in this matter:

|  | Bank of America | Lehman Brothers | ResCap |
|---|---|---|---|
| Aggregate Losses | $61.3 billion | $12.9 billion | $44.1 billion[19] |
| Defect Rate | 36% | 35% | 43.5%[20] |

---

[18] The *Lehman Brothers* matter does not involve a proposed settlement.  After nearly four years of litigation, the parties agreed to establish a reserve for representation and warranty claims, so as to allow other creditors to receive payments on their claims.  The parties made submissions regarding the proposed amount of the reserves, from which the referenced data was obtained.

[19] Based on Mr. Cancelliere's analysis.  (Ex. 6.)

[20] Based on loan re-underwriting by Mr. Sillman (Sillman Reply Decl. ¶ 5).

sf-3223258 v41

REDACTED

| | | | |
|---|---|---|---|
| **Legal Defenses Discount** | 40% | 40% | 41%-47%[21] |
| **Likely Damages** | $8.8 billion to $11 billion | $1.1 billion to $2.4 billion | $7.8 billion to $10.2 billion[22] |

The objectors argue, however, that a comparison chart given to ResCap LLC's board of directors was "misleading" and "deceptive" because it compared the Debtors' implied 19.7% defect rate — a rate calculated after considering discounts for legal defenses — with Bank of America's and Lehman Brother's pre-discount defect rates of 36% and 35%. (FGIC Obj. at 13; Wilmington Trust Obj. at 7-8.) But the chart was clear: it expressly disclosed that Bank of America's defect rate was "prior to litigation adjustments." (Ex. 4 at RC-9019_00054004.) The chart also informed ResCap LLC's directors that the Debtors' "historical post fund audit defect rate range is   %-   % varying by product/vintage, with the weighted average defect rate at    %." (*Id*.)

These comparisons show that the proposed allowed claim here is fairly in line with the analyses performed in other cases, and uses roughly the same defect rates and discounts for legal defenses. They do not show, as the objectors claim, that Bank of America got a much better deal.

---

[21] Based on report by Mr. Sillman. (Sillman Reply Decl. ¶ 30.)

[22] Based on Reply Declaration Mr. Sillman. (Sillman Reply Decl. ¶ 7.)

sf-3223258 v41

### III.    THE RMBS SETTLEMENT AVOIDS COMPLEX AND PROTRACTED LITIGATION AND CONFERS OTHER NON-CASH BENEFITS UPON THE ESTATE.

The *Iridium* decision instructs this Court to consider, as one factor, "the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment." *Iridium*, 478 F.3d at 462.  The Debtors will offer the testimony of two experts to establish the massive expense and delay that would result if the settlement is not approved.

William J. Nolan, from FTI, has prepared an exhaustive study of the professional fees incurred in large bankruptcy cases.  He will testify that professional fees are 18% higher, on average, when claims are litigated.  (Nolan Decl. ¶ 15, Ex. A, ECF No. 320-7.)  Mr. Nolan has concluded that a delay of even six months could increase professional fees by $28 to $114 million. (Nolan Decl. ¶ 22, ECF No. 320-7.)[23]

Mr. Lipps, who is the Debtors' principal outside counsel for representation and warranty litigation, will testify regarding the costs of continued discovery and litigation based on his years of defending the Debtors in similar cases.  He will explain the resources that would be necessary to produce the tens of millions of documents, and defend the hundreds of depositions, that would likely occur if the claims of the 392 securitizations are not settled.  Mr. Lipps estimates that, if litigation were to commence, the estate would incur tens of millions of dollars in attorneys' fees, expert witness fees, and vendor costs.  He also explains that the Debtors no longer have adequate personnel or staff to handle the Debtors' expected discovery obligations, and would need to hire additional staff if the settlement is not approved.  [(Lipps Decl. ¶¶ 70-78, ECF No. 320-9.)]

---

[23] This analysis did not include other increased costs, such as additional interest, additional adequate protection payments, and increased United States Trustee fees.  (Nolan Decl. ¶ 22, ECF No. 320-7.)

sf-3223258 v41

The objectors, in contrast, say the risk of continued litigation expenses does not weigh in the Debtors' favor for two reasons. First, the objectors say the Court should reject the opinions of Messrs. Nolan and Lipps. (MBIA Obj. at 20 n.17 ("Mr. Nolan's expert opinion should be given no weight"); FGIC Obj. ¶ 54.) These claims cannot be reconciled with the Committee's position, which is that Mr. Lipps addresses "the legal and factual merits of the Trusts' claims, and does so in a detailed and sophisticated manner." (Comm. Obj. at 4.) Indeed, the Committee "has little quarrel with the soundness of many of Mr. Lipps' legal and factual conclusions." (*Id.* at 23.)

In any event, MBIA's and FGIC's criticisms of Mr. Nolan and Mr. Lipps are not really attacks on the obvious truth that litigating the claims of 392 securitizations would be massively expensive. Neither offers any evidence or argument, for example, that continued litigation would be cheap and efficient. Indeed, MBIA concedes that "complex litigation is expensive." (MBIA Obj. at 20 n.17.)

Second, the Committee contends that the expense and delay of litigation could be avoided through the "estimation" process. (Comm. Obj. at 2, 43-45.) According to the Committee, this Court could avoid litigation costs by "strategically" deploying "estimation techniques" such as ruling on key issues affecting liability, appointing an independent expert, or holding a "full-scale estimation trial." (*Id.* at 44.) The Committee declines, of course, to explain how much time and expense these "techniques" might save. More importantly, the estimation process would, more than likely, simply impose another layer of litigation costs upon the Debtors. Any estimation procedure would, no doubt, be heavily contested, and would not in any event lead to any final resolution of the investors' claims. The investors' right to prosecute their claims would remain intact, leading to a second round of litigation.

sf-3223258 v41

The Committee also disregards the lessons from the *Lehman Brothers* and *Washington Mutual* bankruptcies.  For example, the *Lehman Brothers* bankruptcy commenced on September 15, 2008.  It took three-and-a-half years for the court to establish a $5 billion reserve for disputed representation and warranty claims, and there is still no schedule for litigating or resolving those claims.  *See* Ex. 67.  In the meantime, Lehman's operating businesses have shut down and professional fees associated with the bankruptcy have exceeded $ 1.75 billion.  *See id.* Exs. 68, 69.

Here, by contrast, the settlement paved the way for the Debtors' successful $3 billion sale of their operating mortgage origination and servicing businesses.  That sale would not have been possible without the settlement, because as part of the Settlement process the RMBS trustees agreed to waive their objections and cap their cure claims.[24]  And the settlement holds out the prospect of resolving the largest claim against the Debtors' estates less than one year following the filing of the Debtors' petitions.

Absent a settlement, this Court faces the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay.  The expense could well reach into the hundreds of millions of dollars, and the delay could last years.  These facts weigh in favor of the settlement's approval.  *Iridium*, 478 F.3d at 462.

## IV.    OPPOSITION FROM SOME CREDITORS IS NOT GROUNDS FOR WITHHOLDING APPROVAL OF THE SETTLEMENT.

The Committee and MBIA (a member of the Committee) argue that the proposed settlement "has provoked widespread opposition by all other major creditor groups," and that this opposition militates against approval of the settlement.  (Comm. Obj. at 22; MBIA Obj. at 8.)

---

[24] *See* Revised Joint Omnibus Scheduling Order ¶ 18, ECF No. 945.

sf-3223258 v41

The *Iridium* decision notes that a court should consider "the degree to which creditors either do not object to or affirmatively support the settlement." *Iridium*, 478 F.3d at 462. Support from creditors, and especially members of the Committee, should therefore be one factor considered by this Court.  And that is understandable — members of a creditors committee owe a fiduciary duty to all creditors and can be expected to exercise that duty in good faith. Unfortunately, here the Committee's position appears to have been influenced by certain of its members — members who came to the proposed settlement with their minds made up.

On May 25, 2012 — just eleven days after the Debtors filed their petitions in bankruptcy, and before this motion was even filed — FGIC had already decided the proposed settlement was not in its interests.  FGIC sent a letter to the trustee for the trusts it had insured, informing it that the "terms of the Settlement Agreement … may be materially adverse to FGIC's interests."  (Ex. 69 at Ex. 5 at 13.)  FGIC's letter goes on to "[direct the Trustee] not to vote in favor of, or opt into, the Settlement Agreement."  (*Id*. at 13.)

MBIA at least waited until after this motion was filed before making its position known. On July 23, 2012, MBIA sent a letter to its trustee directing it not to accept or even consider any settlement proposal:

> We hereby instruct you to not consider or accept any settlement or compromise offers relating to any claims that may belong to the above-referenced Trusts, including, but not limited to the RMBS Trust Settlement Agreement, dated as of May 13, 2012.

(Ex. 70 at Ex. 5 at 6.)  Moreover, another Committee member — Wilmington Trust — has long argued that the trusts' claims should be subordinated.  (*See, e.g.*, Wilmington Trust Obj. ¶¶ 35-38.)

61

The Committee consists of nine members.  Three of them are the trustees of the trusts that are the subject of settlement agreement.[25]  We understand the trustees have recused themselves from the Committee's deliberations regarding the proposed settlement.  FGIC, MBIA, and Wilmington Trust, however, apparently have not recused themselves from the Committee's deliberations, notwithstanding their own individual interests in the matters covered by the settlement.  The Debtors submit that, once these three Committee members concluded the settlement was not in their own interests, they (like the trustees) should have recused themselves from any further Committee deliberations.  By not having done so, the Committee's position on this motion is tainted by its members' conflicted interests.

Based on the foregoing, the deference sometimes afforded to the views of other creditors, under *Iridium*, should not be afforded here.  *See In re Copperfield Investments, LLC*, 401 B.R. 87, 95-96 (Bankr. E.D.N.Y. 2009) ("This does not mean, however, that a creditor — even a creditor holding the overwhelming majority of claims in the case — may arbitrarily veto a settlement that otherwise satisfies the criteria for approval"); *In re Hilsen*, 404 B.R. at 70-71 (collecting cases).  To allow otherwise "would permit creditors who wish merely to exact their 'pound of flesh' from the debtors to overrule the wisdom of an impartial third party engaged to canvas the facts and collect what funds are available." *In re Milazzo*, 450 B.R. 363, 380 (Bankr. D. Conn. 2011) (*quoting In re Vazquez,* 325 B.R. 30, 37 n.8 (Bankr. S.D. Fla. 2005)).

The investors who support the settlement are some of the most sophisticated financial investors in the world, and they hold the largest claims, by far, against the Debtors' estates.  The proofs of claim they would file absent a settlement would presumably exceed $45 billion and

---

[25] U.S. Bank, The Bank of New York Mellon Trust Company, and Deutsche Bank Trust Company.

sf-3223258 v41

would dwarf all the other claims against the estate.  Thus, one could fairly say that the creditors

holding a large majority of claims (measured by claim size) support the settlement.

The objectors have their own reasons for opposing the settlement.  But their reasons are

not related to the settlement's merits, and are not related to the *Iridium* factors.  The objectors'

concerns are much more prosaic — they wish to torpedo the settlement in order to create an

opportunity for a greater recovery for themselves.  Self-interested objections of this sort are not a

legitimate basis for denying approval of the settlement.  *See In re Southeast Banking Corp.*, 314

B.R. 250, 274 (Bankr. S.D. Fla. 2004) (accepting creditors' objections "would provide an

undeserved windfall to the Objecting Parties"); *In re Drexel Burnham Lambert Group, Inc.*, 134

B.R. 499, 507 (Bankr. S.D.N.Y. 1991) (objections of unsecured creditors rejected where offered

only "speculative and unpredictable prospect" of settlement terms that would "be greater than

that which is offered by the settlement").

## CONCLUSION

The evidence will show that the objectors' opposition to the proposed settlement is not

based on its merits.  And the evidence will show that the *Iridium* factors weigh in favor of the

settlement's approval.

The settlement is the product of arms-length negotiations and is fair, equitable, and in the

best interests of the estate.  The amount of the allowed claim falls within the range of reasonable

outcomes in light of the risks and rewards of litigation.

For these reasons, the Debtors respectfully request that their motion for approval of the

RMBS settlement agreement be granted.

63

New York, New York
Dated: January 15, 2012

/s/ Darryl P. Rains
Gary S. Lee
Anthony Princi
Darryl P. Rains
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*

64