MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Gary S. Lee
Anthony Princi
Darryl P. Rains

*Counsel for the Debtors and
Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Case No. 12-12020 (MG) |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ----------------------------------------------------------------- | ) | |

## DEBTORS' REPLY BRIEF RE NON-*IRIDIUM* ISSUES IN SUPPORT OF MOTION FOR APPROVAL OF RMBS SETTLEMENT AGREEMENTS

REDACTED

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

I.    THE BOARD OF DIRECTORS' SETTLEMENT APPROVAL PROCESS
ENTITLES THEM TO THE PROTECTIONS OF THE BUSINESS JUDGMENT
RULE ......................................................................................................................3

    A.    ResCap's Directors Had Adequate Time to Consider the Settlement ...................4

    B.    The Presentations Made by the Board's Advisors Adequately Informed the
Directors Regarding the Settlement .........................................................................8

    C.    ResCap LLC's Directors Understood the Settlement's Key Terms ....................13

    D.    ResCap LLC's Directors Properly Approved Amendments to the Proposed
Settlement ..............................................................................................................14

II.    THE SETTLEMENT'S RELEASE PROVISIONS ARE FAIR AND
EQUITABLE TO CREDITORS ........................................................................15

    A.    Claims Based on Breaches of Representations and Warranties ..........................16

    B.    Claims Based on Breaches of Servicing Obligations ...........................................17

    C.    Claims Based on Fraudulent Inducement ............................................................18

    D.    Claims Arising Under the Securities Laws...........................................................19

    E.    Claims Against ResCap LLC ...............................................................................19

III.    THE PARTIES TO THE RMBS SETTLEMENT HAVE STANDING TO
EFFECT THE SETTLEMENT ..........................................................................20

    A.    The Investors Have Authority to Act for the Trusts.............................................20

    B.    The RMBS Trustees Have Been Instructed to Approve the Settlement and
Have Concluded the Allowed Claim is Reasonable .............................................22

IV.    THE ALLOCATION FORMULA FOR PARTICIPATING TRUSTS IS FAIR
TO CREDITORS..................................................................................................23

V.    THE TRUSTS' CLAIMS SHOULD NOT BE SUBORDINATED ................26

VI.    THE SETTLEMENT NEED NOT ALLOCATE LIABILITY AMONG THE
DEBTORS .............................................................................................................28

VII.    THE SETTLEMENT'S ATTORNEYS' FEES PROVISION DOES NOT
CIRCUMVENT COURT REVIEW...................................................................28

VIII.    THE PROHIBITION ON USING THE SETTLEMENT IN SUBSEQUENT
PROCEEDINGS COMPLIES WITH FEDERAL LAW ..................................29

IX.    THE CREDITORS MAY NOT ASSERT FIDUCIARY DUTY CHALLENGES
TO THE SETTLEMENT .....................................................................................31

CONCLUSION ....................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACC Bondholders Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.),*
    361 B.R. 337 (S.D.N.Y. 2007) ............................................................................21

*Ad Hoc. Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.),*
    412 B.R. 53 (S.D.N.Y. 2008) ...............................................................................1

*Albert v. Alex. Brown Mgmt. Servs., Inc.,*
    Nos. Civ. A. 762-N, Civ. A. 763-N, 2005 WL 2130607 ..........................................4

*Apple, Inc. v. Motorola Mobility, Inc.,*
    No. 11-Cv-178-bbc , 2012 WL 5416941 (W.D. Wis. 2012).....................................30

*Bayer v. Wilmington Materials,*
    No. 12549, 1997 Del. Ch. LEXIS 97 (Del. Ch. June 27, 1997) ...............................7

*Berman v. Le Beau Inter-America, Inc.,*
    62 B.R. 262 (S.D.N.Y. 1986) ...............................................................................9

*Bezio v. General Elec. Co.,*
    655 F. Supp. 2d 162 (N.D.N.Y. 2009) ...................................................................24

*Blackmore Partners, L.P. v. Lind Energy, LLC,*
    No. Civ. A. 454-N, 2005 WL 2709639 (Del. Ch. Oct. 14, 2005) ............................7

*Cede & Co. v. Technicolor, Inc.,*
    634 A.2d 345 (Del. 1993)......................................................................................2

*CFIP Master Fund, Ltd. v. Citibank, N.A.,*
    738 F. Supp. 2d 450 (S.D.N.Y. 2010) ...................................................................21

*Citron v. Fairchild Camera & Instrument,*
    569 A.2d 53 (Del. 1989)......................................................................................6, 7

*Citron v. Fairchild Camera & Instrument Corp.,*
    No. Civ. A. 6085, 1988 WL 53322 (Del. Ch. May 19, 1988) .................................12

*CML V, LLC v. Bax,*
    6 A.3d 238 (Del. Ch. 2010), aff'd, 28 A.3d 1037 (Del. 2011) ...............................31

## TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Eisenberg v. Chicago Milwaukee Corp.*,
  537 A.2d 1051 (Del. Ch. 1987) ............................................................................8

*F.D.I.C. v. Castetter*,
  184 F.3d 1040 (9th Cir. 1999) ...........................................................................13

*Feely v. NHAOGC, LLC*,
  No. CIV. A. 7304-VCL, 2012 WL 5949209 (Del. Ch. Nov. 28, 2012) ................31

*First Bank Richmond, N.A. v. Credit Suisse First Boston Corp.*,
  No. 1:07-cv-1262, 2008 U.S. Dist. LEXIS 73267 ..............................................21

*Hicks v. Morgan Stanley & Co.*,
  No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890 ...................................24

*In re AOL Time Warner ERISA Litig.*,
  No. 02 Civ. 8853 (SWK), 2006 U.S. Dist. LEXIS 70474 ...................................24

*In re BH S&B Holdings LLC (In re BH S&B Holdings LLC)*,
  420 B.R. 112 (Bankr. S.D.N.Y. 2009) *aff'd*, 807 F. Supp. 2d 199 (Bankr. S.D.N.Y.
  2009)....................................................................................................................3-4

*In re Collecting Concepts*,
  296 B.R. 683 (Bankr. E.D. Va. 2001) ...........................................................21, 22

*In re Dewey & Leboeuf LLP*,
  478 B.R. 627 (Bankr. S.D.N.Y. 2012) ...............................................................25

*In re Drexel Burnham Lambert Group, Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992) ...............................................................25

*In re Giant Interactive Group, Inc. Sec. Litig.*,
  279 F.R.D. 151 (S.D.N.Y. 2011).........................................................................24

*In re Goldman Sachs Group, Inc. S'holder Litig.*,
  No. 5215-VCG, 2011 Del. Ch. LEXIS 151 (Del. Ch. Oct. 12, 2011), *aff'd sub. nom.*
  *SEPTA v. Blankefein,,* No. Civ. A. 6085, 1988 WL 53322, at *17 (Del. Ch. May 19,
  1988).....................................................................................................................12

*In re Initial Pub. Offering Sec. Litig.*,
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) .................................................................24

*In re RJR Nabisco, Inc. Shareholders Litig.*,
  No. CIV. A. No. 10389, 1989 WL 7036 .............................................................7-8

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*In re Rosenberg*,
  419 B.R. 532 (Bankr. E.D.N.Y. 2009) .................................................................................. 1

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006).................................................................................................. 8

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006) ............................................ 3, 4

*In re Warner Chilcott Ltd. Sec. Litig.*,
  No. 06 CIV. 11515 (WHP), 2009 WL 2025160 (S.D.N.Y. July 10, 2009) ......................... 24

*In re WorldCom, Inc. ERISA Litig.*,
  No. 02 Civ. 4816, 2004 U.S. Dist. LEXIS 20671 (S.D.N.Y. Oct. 18, 2004), *vac'd in
  part, on other grounds*, No. 02 Civ. 4816 (DLC), 2004 U.S. Dist. LEXIS 22952
  (S.D.N.Y. Nov. 16, 2004).............................................................................................. 24

*Keyser v. Commonwealth Nat'l Fin. Corp.*,
  644 F. Supp. 1130 (M.D. Pa. 1986)............................................................................... 6, 7

*LaBarbera v. A. Morrison Trucking, Inc.*,
  197 Fed. Appx. 18 (2d Cir. 2006)................................................................................... 22

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*,
  930 A.2d 92 (Del. 2007)................................................................................................ 31

*O'Toole v. McTaggart (In re Trinsum Group, Inc.)*,
  466 B.R. 596 (Bankr. S.D.N.Y. 2012) ........................................................................... 2, 3

*Official Comm. of Subordinated Bondholders v. Integrated Res. (In re Integrated Res.)*,
  147 B.R. 650 (S.D.N.Y. 1992) ....................................................................................... 2

*PRL USA Holdings, Inc. v. U.S. Polo Ass'n*,
  No. 99 CV 10199 (GBD) 2006 U.S. Dist. LEXIS 46065, at **16-19 (S.D.N.Y. 2006)
  *aff'd*, 520 F.3d 109 (2d Cir. 2008).................................................................................. 30

*Selectica, Inc. v. Versata Enters.*,
  No. C.A. 4241-VCN, 2010 WL 703062, at *17  (Del. Ch. Feb. 26, 2010)........................ 8-9

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
  416 F.3d 229 (3d Cir. 2005) .......................................................................................... 2

*Sterling Fed. Bank, F.S.B. v. Credit Suisse First Boston Corp.*,
  No. 07-C-2922, 2008 U.S. Dist. LEXIS 92759.............................................................. 21

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*,
  No. 99 C. 7049, 2001 WL 1263408 (N.D. Ill. 2001) ............................................................... 30

*Walnut Place LLC v. Countrywide Home Loans, Inc.*,
  No. 650497/11, 2012 N.Y. Misc. LEXIS 1537 (Sup. Ct. 2012),
  *aff'd*, 96 A.D. 3d 648, 948 N.Y.S.2d 580 (1st Dep't 2012) .................................................... 21

### STATUTES, RULES, & REGULATIONS

8 Del. C. § 141(e) .......................................................................................................................... 9

11 U.S.C.
  § 365 ........................................................................................................................................ 18
  § 502 ........................................................................................................................................ 16
  § 509 ........................................................................................................................................ 16
  § 510 ....................................................................................................................... 16, 26, 27, 28

Fed. R. Evid. 408 ..................................................................................................................... 30, 31

Residential Capital, LLC and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") submit this reply brief in support of their Rule 9019 motion for approval of the RMBS Trust Settlement Agreements. The objectors' *Iridium*-based arguments are dealt with in the Debtors' other reply brief. This brief addresses nine additional objections that are not related to any *Iridium* factor — primarily about the approval process followed by ResCap LLC's board of directors, but also about the scope of releases, the allocation of settlement proceeds, subordination, and standing, among other things.[1]

## INTRODUCTION

ResCap LLC's board of directors followed the right process in considering and approving the settlement before the Court. The directors have a tremendous amount of experience with representation and warranty litigation. They received regular briefings from their advisors about the Debtors' exposure to representation and warranty liabilities. They had previously reviewed and approved several other large settlements with regulators related to the Debtors' mortgage-backed securities. The directors brought all this experience to bear when they considered the present settlement.

The directors also were given periodic updates on the status of the settlement negotiations, and received presentations and advice from their legal and financial advisors before approving the settlement. The directors were entitled to rely on these experts' advice and counsel.

---

[1] The distinction between objections based on the *Iridium* factors and objections falling outside the *Iridium* framework is an important one. After all, courts should not engage in a free-floating consideration of every criticism leveled against any term of a proposed settlement. The *Iridium* decision sets out the approved standards for analyzing a settlement under Rule 9019. *See Ad Hoc. Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.)*, 412 B.R. 53, 60 (S.D.N.Y. 2008) (*Iridium* factors "summarize[]" the analysis to be used to apply "fair and equitable standard"); *In re Rosenberg*, 419 B.R. 532, 536 (Bankr. E.D.N.Y. 2009) (*Iridium* "summarized the factors that a court must consider when deciding whether a settlement falls above or below the lowest point in the range of reasonableness"). Other criticisms, if considered at all, should be given lesser weight.

The directors' process thus complied, in all respects, with the directors' fiduciary duties and Delaware law. This Court, of course, must, in reviewing the board's decision-making process, apply the business judgment rule.[2] It must presume the directors' decision was made on an informed basis, in good faith, and in the honest belief that the settlement is in the Debtors' best interests.[3] The objectors can only rebut this presumption with contrary evidence showing that the settlement was made in bad faith or is so illogical that it cannot be attributed to any rational business purpose.[4] Meeting this evidentiary burden is "a near-Herculean task." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005).

The objectors do not allege bad faith, and their submissions fall far short of showing the settlement lacks any rational business purpose. Indeed, the evidence shows the directors approved the settlement in good faith and after carefully considering its pros and cons. They approved it after receiving the advice and counsel of their legal and financial advisors. And they approved it after considering the consequences of not settling, including the potential impact on the Debtors' efforts to sells its operating businesses and the risks of continued litigation. The settlement plainly advances the Debtors' interests, and the directors fully understood that when they approved the settlement. The objectors' attacks on the board's process thus cannot overcome the presumptions afforded by the business judgment rule.

---

[2] Delaware's version of the business judgment rule applies here because ResCap LLC is a Delaware limited liability company. *See O'Toole v. McTaggart (In re Trinsum Group, Inc.)*, 466 B.R. 596, 613 (Bankr. S.D.N.Y. 2012); *cf. Official Comm. of Subordinated Bondholders v. Integrated Res. (In re Integrated Res.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

[3] The business judgment rule says a Court must "presum[e] that business decisions made by corporate directors are made on an informed basis, in good faith and in the honest belief that actions taken are in the corporation's best interest." *O'Toole v. McTaggart (In re Trinsum Group, Inc.)*, 466 B.R. 596, 613 (Bankr. S.D.N.Y. 2012) (*citing In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006); *see also The Official Comm. of Subordinated Bondholders v. Integrated Res. (In re Integrated Res.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992).

[4] The business judgment rule "posits a powerful presumption in favor of actions taken by . . . directors in that a decision made by a loyal and informed board will not be overturned by the courts unless it cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (*quoting Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).

The objectors' other criticisms concern narrower issues.  None of them constitutes grounds for withholding approval to the settlement.

## I.    THE BOARD OF DIRECTORS' SETTLEMENT APPROVAL PROCESS ENTITLES THEM TO THE PROTECTIONS OF THE BUSINESS JUDGMENT RULE.

The objectors attack the ResCap LLC's board of directors' approval of the settlement. (Comm. Obj., at 18; Wilmington Trust Obj., at 2; MBIA Obj., at 6; FGIC Obj., at 14.)  Their criticisms can be grouped into three categories.  The first category consists of "timing" criticisms – the board materials were delivered too close to the board meeting, the board's deliberations were too quick, or the board meeting was too short.  The second category consists of "presentation" criticisms – the presentations and materials provided to the directors by their professional advisors were inadequate, incorrect, or omitted necessary analyses.  The third category consists of personal attacks on the directors themselves – the directors were "uninformed" or confused about the settlement's terms.

The objectors' criticisms all focus on the "due care" element of the business judgment rule.  As a result, they necessarily must focus exclusively on the *process* by which the directors' decision was made.  *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del Ch. 2005) (due care inquiry does not permit review of the substance, or merits, of the challenged decision)*, aff'd*, 906 A.2d 27 (Del. 2006).  The business judgment rule protects the directors' decision so long as "the decision made was the product of a process that was *either* deliberately considered in good faith or was otherwise rational."  *Id.* (*quoting In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)); *see also In re Trinsum Group, Inc.*, 466 B.R. at 610.

The "due care" evidentiary presumption can be overcome only with evidence that the directors used an "irrational" process amounting to gross negligence.  *In re BH S&B Holdings LLC (In re BH S&B Holdings LLC)*, 420 B.R. 112, 146-47 (Bankr. S.D.N.Y. 2009) (*citing In re*

3

*Tower Air, Inc.*, 416 F.3d at 238), *aff'd*, 807 F. Supp. 2d 199 (Bankr. S.D.N.Y. 2009); *Disney*,

907 A.2d at 749-50.  "[G]ross negligence has been defined as a 'reckless indifference to or a

deliberate disregard of the whole body of stockholders' or actions which are 'without the bounds

of reason.'"  *Disney*, 907 A.2d at 750 (*quoting Tomczak v. Morton Thiokol, Inc.*, No. Civ. A.

7861, 1990 WL 42607 (Del. Ch. Apr. 5, 1990)); *accord Albert v. Alex. Brown Mgmt. Servs., Inc.*,

Nos. Civ. A. 762-N, Civ. A. 763-N, 2005 WL 2130607, at *4 (gross negligence "'involves a

devil-may-care attitude or indifference amounting to recklessness'") (citation omitted).

    The objectors' process criticisms fall far short of establishing gross negligence.  ResCap

LLC's directors spent adequate time on the decision to approve the settlement, relied on advice

and presentation materials from their advisors that were fair, accurate, and adequate to the task,

and understood the settlement's key terms and provisions.

### A.    ResCap's Directors Had Adequate Time to Consider the Settlement.

    The objectors argue that ResCap LLC's directors spent too little time on their approval of

the settlement.  (Comm. Obj., at 18-21; FGIC Obj., at 12-17; Wilmington Trust Obj., at 6, 7.)

They complain that the directors did not receive materials for the meeting until "a mere 22

minutes" before the meeting, and "spent only half an hour deliberating" over the settlement

before approving it.  (FGIC Obj., at ¶¶ 23, 24, 25.)

    But the ResCap LLC board of directors had plenty of time to understand and consider the

settlement before approving it.  After all, it is not as though the settlement were written upon a

clean slate.

    The ResCap LLC board of directors has a long history and deep familiarity with

representation and warranty claims.  The first representation and warranty case was filed against

the Debtors in 2008.  More were filed in 2009, 2010, 2011, and 2012.  By the time they filed for

bankruptcy, the Debtors had been named in 42 lawsuits across the country arising from their

issuance or sale of mortgage-backed securities.  (Lipps Decl., at ¶ 7.)  These actions concerned the same representations and warranties that are at issue here.

ResCap LLC's board of directors received regular presentations and updates regarding these representation and warranty litigation matters.  Periodically at board meetings, the Debtors' lawyers, risk managers, and accountants made presentations regarding the Debtors' potential liability, damages exposure, legal defenses, and accounting reserves.[5]  Moreover, three of the directors — Messrs. Marano, Abreu, and Whitlinger — are mortgage professionals and officers of the company.  They brought their intimate understanding of the Debtors' business, and risks, into the board's meetings.  As a result, the directors were fully conversant with the claimed breaches of representations and warranties, defect rates, legal defenses, claimed damages, and potential liability associated with the Debtors' representation and warranty litigation.

Of course, the directors were also up-to-speed on the Debtors' non-litigation loan repurchase program and its internal post-funding audit program.  The directors received regular reports from the Debtors' risk managers and accountants regarding the volume of repurchase demands, defect rates, and loan repurchases.  The directors on ResCap LLC's audit committee also approved the reserves booked every quarter to cover representation and warranty repurchase liability.[6]  The directors were thus well aware of the Debtors' potential liability for loan repurchases.

But that is not all.  In December 2010, the Debtors entered into a $461.5 million settlement with Fannie Mae, as well as a separate additional settlement with Freddie Mac.  The settlements covered representation and warranty liability claims, and servicing claims, like those involved here.  (*See* Ally Form 8-K, at 2 (Dec. 23, 2010).)  ResCap LLC's directors received a

---

[5] *See, e.g.*, Marano  at ___; Ex. 70; Ex. 71; Ex. 72; Ex. 73; Ex. 74; Ex. 75; Ex. 76; Ex. 77; Ex. 78)
[6] *See, e.g.*, Ex. 80; Ex. 77; Ex. 81; Ex. 82.

number of presentations regarding these settlements and finally approved them at a board

meeting held on December 12, 2010. (Ex. 79.)

More recently, in early 2012, the Debtors entered into two additional large settlements

related to the Debtors' mortgage-backed securities.  The first, a settlement with the U.S.

Department of Justice and the attorneys general of 49 states, resolved potential claims arising out

of origination and servicing activities.  (*See* Ally Form 10-Q, at 66-67 (Apr. 27, 2012).)  The

second, a settlement with the Federal Reserve, resolved similar claims for $207 million.  (*Id.*)

ResCap LLC's directors received a number of presentations regarding these settlements and

approved them on January 25, 2012.  (Ex. 83.)

So ResCap LLC's directors had a deep well of experience upon which to draw in

evaluating the proposed settlement now before the Court.  This experience helps explain why a

multi-hour board meeting to consider the settlement was not necessary.   *Citron v. Fairchild*

*Camera & Instrument*, 569 A.2d 53, 67 (Del. 1989) (business judgment properly exercised

because board had "been considering the possibility that the company would be sold for two

years" and thus "knew enough . . .  to make a rational choice"); *see also Keyser v.*

*Commonwealth Nat'l Fin. Corp.*, 644 F. Supp. 1130, 1148 (M.D. Pa. 1986) (board acted

properly because it had "been discussing potential merger partners for close to a year," had

become "fairly familiar with merger discussions and its [sic] intricacies," and the "terms and

conditions of merger proposals from [the hostile offeror] were very familiar to the directors by

the time they met").

But the directors did not simply draw upon their background and experience.  They also

received regular updates throughout the settlement's negotiations.  In the weeks leading up to the

Debtors' petition for bankruptcy, ResCap LLC's directors met, or held calls, almost every day,

and sometimes did so several times a day.  (*See, e.g.*, Marano at ___; Whitlinger at _____.)  These
meetings often included the board's financial and legal advisors.  (*Id.*)  The Debtors' attorneys
used these opportunities to brief the directors on the status of settlement negotiations.

The directors thus used due care in deciding to approve the settlement — notwithstanding
the length of the final board meeting at which they approved the settlement.  After all, there are
no fixed minimum time limits for receipt of board materials, or for the length of board meetings,
under Delaware law.  *Bayer v. Wilmington Materials*, No. 12549, 1997 Del. Ch. LEXIS 97, at
*16 (Del. Ch. June 27, 1997) ("[t]here is no requirement under Delaware law that a board
meeting last a minimum amount of time to be sufficient for the directors to fully consider a
proposal").  All that is required is that board members be given enough time to adequately
perform their duties.  *Citron*, 569 A.2d at 67 (board operating under three-hour deadline "knew
enough . . . to make a rational choice"); Model Bus. Corp. Act Annot. § 8.30, Official Comment
at 8-195 (4th ed. 2008) ("there is no one way for 'becoming informed,'… —— 'how to' and 'how
much' — are matters of reasonable judgment for the director to exercise").

The amount of time and information needed by directors to adequately perform their
duties depends, of course, on the decision before them.  "Exactly what procedures the law
requires varies according to the nature and importance of the considered transaction," and a
board's procedural choices "are within the core of what is protected by the business judgment
rule."  *Blackmore Partners, L.P. v. Lind Energy, LLC*, No. Civ. A. 454-N, 2005 WL 2709639, at
*8 (Del. Ch. Oct. 14, 2005).  Even where a board acts under "extreme time pressure," "[i]f it
exercises informed judgment in the circumstances, considers the risks posed by the deadline
imposed, and concludes that it is prudent to act and acts with care, it has satisfied its duty."  *In re
RJR Nabisco, Inc. Shareholders Litig.*, No. CIV. A. No. 10389, 1989 WL 7036, at **1165-66

(Del. Ch. Jan. 31, 1989); *see also Eisenberg v. Chicago Milwaukee Corp.*, 537 A.2d 1051, 1056

n.6 (Del. Ch. 1987) ("while the directors did act with haste, there is no showing on this record

that their decision to make the Offer was not a reasoned or an informed one").

By the time the settlement was presented to the directors for a final vote on May 9, 2012,

ResCap LLC's directors were already familiar with the issues presented by the proposed

settlement.  They had years of experience with the relevant issues and had held many previous

meetings to discuss the issues underlying the settlement.  The directors' deliberations at that final

meeting were more-than-adequate to satisfy the business judgment rule's "due care" standard.

The directors' decision to approve the settlement is therefore entitled to the presumptions

afforded by the business judgment rule.

**B.    The Presentations Made by the Board's Advisors Adequately
Informed the Directors Regarding the Settlement.**

The objectors also complain about the presentations made, and materials used, by the

board of directors' professional advisors.  They argue the presentations did not include any

"expert opinion" regarding the settlement's fairness, any "estimate" of likely litigation outcomes,

any "meaningful legal or factual analysis," or any consideration of "litigation defenses."  (*E.g.*,

Comm. Obj., at 19; FGIC Obj., at ¶¶ 25-29.)  These criticisms are not supported by the evidence.

ResCap LLC's directors, of course, were entitled to rely on the advice of their

professional advisors.  Delaware law "protect[s] directors who rely in good faith upon

information presented to them from various sources, including 'any other person as to matters

the member reasonably believes are within such person's professional or expert competence and

who has been selected with reasonable care by and on behalf of the corporation.'"  *In re Walt

Disney Co. Derivative Litig.*, 906 A.2d 27, 60 (Del. 2006) (*quoting* 8 Del. C. § 141(e)); *see also

Selectica, Inc. v. Versata Enters.*, No. C.A. 4241-VCN, 2010 WL 703062, at *17  (Del. Ch. Feb.

26, 2010) ("where a board has relied on an expert's advice in making a decision, a due care claim
challenging that decision must establish such facts as would make reliance on the expert opinion
unreasonable"); *Berman v. Le Beau Inter-America, Inc.*, 62 B.R. 262, 268 (S.D.N.Y. 1986)
(directors had a "right . . . to rely upon the financial statements of the accountants and . . . the
reports of their highly qualified attorneys"); 8 Del. C. § 141(e) ("directors . . . shall . . . be fully
protected in relying in good faith . . . upon such information, opinions, reports . . . by any other
person as to matters the member reasonably believes are within such other person's professional
or expert competence").

ResCap LLC's directors, then, cannot be found to have acted without due care if they
relied, in good faith, on the recommendations and advice of the board's advisors.  The evidence
shows they did.  At its May 9, 2012 meeting, ResCap LLC's board of directors heard
presentations from, reviewed materials prepared by, and received legal advice from Morrison &
Foerster, Mark Renzi (the Debtors' financial advisor), Ms. Hamzehpour (ResCap's general
counsel), Jeff Cancelliere (ResCap's director of risk management), and Morrison Cohen (counsel
to ResCap LLC's independent directors).  Mr. Lee led a discussion of the settlement's key terms
and merits.  Mr. Cancelliere "described the breakdown of collateral included in the proposed
PLS settlement vis-à-vis the proposed settlement amount."  (Ex. 84 at RC-9019_00054006.)  Mr.
Cancelliere "also discussed settlement defect rates and the percentage of R&W and PLS
litigation claims that are attributed to GMAC Mortgage, LLC and to Residential Funding
Company, LLC."  (*Id.*)  Mr. Renzi "reviewed and discussed the key assumptions in the
preliminary economic recovery analysis of preliminary agreements reached with certain

constituencies."  (*Id*.)  Messrs. Lee, Cancelliere, and Renzi all "responded to various related questions asked by members of the Board."  (*Id*.)[7]

The board's advisors also explained the math behind the amount of the allowed claim. One page of the presentation summarized the calculations made by Mr. Cancelliere regarding the investors' aggregate losses, the securitizations' original principal balances, and ResCap's own historical post-fund audit defect rates.  The presentation also made comparisons to the recent *Bank of America* settlement and the *Lehman Brothers* claim amount:

---

[7] The directors' advisors all recommended the settlement as fair, equitable, and in the best interests of the estate. The objectors assert that no expert opinion was offered regarding the fairness of the settlement, but the evidence shows the directors' advisors – all experts in their fields – offered their opinions and advice in favor of the settlement.

REDACTED

### 2004-2007 PLS R&W Analysis

| | | A | B | C | D |
|---|---|---|---|---|---|
| | | | **ResCap Issued Deals** | | |
| | | | ResCap Issuance | KP Group | % of Total Issue |
| 1 | Deal Collat (a) | Original Balance | 226,029.3 | 171,250.8 | 76% |
| 2 | | Current Balance | 63,284.8 | 49,238.1 | 78% |
| | | % Delinquent | 28% | 29% | |
| 3 | | Cume Loss To Date | 29,891.9 | 22,694.1 | 76% |
| 4 | | Projected Loss | 14,225.7 | 10,937.4 | 77% |
| 5 | | Est Lifetime Loss | 44,117.5 | 33,631.5 | 76% |
| 6 | | Est Lifetime Loss % of Orig Bal | 19.5% | 19.6% | |
| 13 | Settle Amt | **ResCap Settlement - 19.72% Defect** | **8,700.0** | **6,632.1** | 76% |
| 14 | | Lehman Claim Amount - 35% Defect | 15,441.1 | 11,771.0 | 76% |
| 15 | | BofA Baseline - 36% Defect | 15,882.3 | 12,107.4 | 76% |

*(a) Collateral and Bond information sourced from Intex files*

**Key Notes:**
1) KP's Investor group covers 82% of RFC issued non-wrapped deals and 88% of GMACM issued non-wrapped deals
2) KP's Investor group covers 63% of RFC issued wrapped deals and 28% of GMACM issued wrapped deals
3) ResCap historical post fund audit defect rate range is      % varying by product/vintage, with the weighted average defect rate at      % (Subprime PFA defect not available therefore Alt A is applied to those deals)
4) ResCap projected losses based on third party vendor model (ADCO LDM), and the model was calibrated to fit ResCap collateral performance by product/vintage
5) ResCap projected severity based on Moody's baseline HPI forecast and ADCO model loss estimations
6) There could be amounts conceded if the true defect rate is below the 19.72% based on actual loan file reviews and application of litigation defenses.
7) Lehman bankruptcy estimated claim amount for plan voting based on 35% defect rate. The defect rate could be higher as claims are resolved.
8) BofA proposed settlement defect rate set at 36% prior to litigation adjustments
9) KP has factored into the analysis the estimated recovery amount through bankruptcy, as well as third party releases.

(Ex. 4 at RC-9019_00054004.)

The objectors criticize this chart.  They say it improperly cites to a defect rate of 36% for the *Bank of America* settlement and a 35% defect rate for the *Lehman Brothers* litigation, when, they claim, "the relevant defect rate in the Bank of America settlement was only 14% and in Lehman Brothers, a range of 9% to 14% was used."  (FGIC Obj., at ¶ 28; *see also* Comm. Obj., at 19-20.)  The objectors misstate the facts and misunderstand what "relevant" means.  The defect rates used in the *Bank of America* settlement by Mr. Lin, the Bank of New York's expert, was 36%, not 14%.  (Ex. 55.)  The objectors apparently mean to argue that, after using the 36%

defect rate, Mr. Lin applied an additional discount, which he called the "success" rate, to account

for litigation defenses.  (*Id.*)  The resulting settlement was 14% of what Mr. Lin said were the

total losses suffered by Bank of America's bondholders.  (*Id.*)  The objectors say only this last

number is relevant but, of course, both numbers are "relevant" comparisons.  For example, the

defect rates offered by Mr. Morrow and Mr. Sillman, the parties' respective loan reviewers, are

before discounts for legal defenses.  And the   % to     % post-funding audit defect rates

presented to the directors are before any litigation discounts.  Moreover, Mr. Cancelliere's chart

clearly alerted the directors that the 36% *Bank of America* defect rate was "prior to litigation

adjustments."  (Ex. 4 at RC-9019_00054004).  Similarly, the defect rates used in the *Lehman*

*Brothers* claim calculation were 30% and 35%, not 9% to 14%, as the objectors claim.  (Ex. 30.)

The objectors, of course, can always argue that the advisors' presentations could have

been more detailed, had more information, or been more perfect.  But perfection is not required.

"The business judgment rule . . . only requires the board to *reasonably* inform itself; it does not

require perfection or the consideration of every conceivable alternative."  *In re Goldman Sachs*

*Group, Inc. S'holder Litig.*, No. 5215-VCG, 2011 Del. Ch. LEXIS 151, at *42 (Del. Ch. Oct. 12,

2011), *aff'd sub. nom. SEPTA v. Blankefein,*, No. Civ. A. 6085, 1988 WL 53322, at *17 (Del.

Ch. May 19, 1988) ("[i]n the world of business (as elsewhere), persons are often (or always)

required to act on less than perfect of complete information").

The objectors also claim the directors' advisors did not explain the Debtors' "litigation

defenses."  (*E.g.*, Comm. Obj., at 19; FGIC Obj., at 19; Wilmington Trust Obj., at 8.)  The

evidence shows this claim is false.  The directors, of course, were already well-versed in the

basics of common litigation defenses as a result of their years of experience with representation

and warranty cases.  The three executive directors, in particular, had day-to-day familiarity with

the ins-and-outs of those litigation defenses.  The directors also had the benefit of analyses showing the effect of discounts for litigation defenses.  (*E.g.*, Ex. 54 (audit committee presentation showing potential losses after adjustment for litigation defenses).)  And the chart presented to the directors at the May 9, 2012 board meeting referred, in two places, to the effect of "litigation defenses" and "litigation adjustments."  (Ex. 4 at RC-9019_00054004 nn. 6 & 8.).  Most importantly, the settlement amount itself – at 19.7% of aggregate losses – reflects an obvious compromise, based on litigation defenses, of the damages that would be sought in litigation.

The objectors' criticisms of the presentations and materials provided to ResCap LLC's directors thus fail to show that the directors acted irrationally or with gross negligence.  The objectors do not offer evidence sufficient to overcome the business judgment rule's evidentiary presumption that the directors acted with due care.

### C.    ResCap LLC's Directors Understood the Settlement's Key Terms.

Some objectors also attack individual directors, saying they had "a fundamental misunderstanding of key settlement terms."  (FGIC Obj., at 15; *accord* Comm. Obj. at 20.)  These criticisms are based largely on excerpts of deposition testimony, where the objectors quizzed the directors without showing them the settlement agreement or other relevant documents.

But the objectors cannot prove a lack of due care simply by applying an unfair memory test.  "[A]d hominem attacks on the directors' capabilities" or claims "that the directors did not comprehend, or act appropriately upon, the information they received" do not show a failure to exercise due care.  *F.D.I.C. v. Castetter*, 184 F.3d 1040, 1045 (9th Cir. 1999).

### D.    ResCap LLC's Directors Properly Approved Amendments to the Proposed Settlement.

The settlement agreement has gone through several amendments, the most significant of which was the removal of the so-called "HoldCo Election." The Committee and Wilmington Trust — both of which opposed the election and argued successfully for its removal — now complain that ResCap LLC's board of directors acted improperly in removing it. (Comm. Obj., at 21 & n.7; Wilmington Trust Obj., at 11-12.)

The evidence shows, though, that ResCap LLC's directors carefully considered the removal of the HoldCo Election and acted in the Debtors' best interests in removing it. The HoldCo Election limited the portion of the proposed $8.7 billion allowed claim that could be allocated to ResCap LLC. (Ex. 85; Ex. 86.) The HoldCo Election provoked an outcry from creditors, including the senior unsecured noteholders and junior secured bondholders. In advance of a scheduled court hearing on September 19, 2012, the Debtors provided details of a proposal to remove the HoldCo Election to Ms. Hamzehpour and Mr. Marano. (Hamzehpour at ___.) The entire matter was aired before the Court at the September 11 hearing, and an agreement in principle was reached on the record to eliminate the HoldCo Election. (Sept. 19, 2012 H'rg Tr. at 114:17-116:9.) Ms. Hamzehpour and the Debtors' counsel then presented the substance of the proposed amendment eliminating the HoldCo Election to ResCap LLC's directors. (Hamzehpour at ___; Marano at ___.)

Wilmington Trust claims "it is unclear whether the [ResCap LLC board of directors] ever met to approve this additional subsequent amendment." (Wilmington Trust Obj., at 12.) The undisputed evidence will show it did. The objectors' claim that ResCap LLC's directors acted improperly in approving the removal of the HoldCo Election will not be proven at trial.

14

## II.    THE SETTLEMENT'S RELEASE PROVISIONS ARE FAIR AND EQUITABLE TO CREDITORS.

The settlement agreement releases the Debtors (except ResCap LLC), and their officers, directors, and employees, from all claims "that arise under the Governing Agreements."  (Exs. 58 & 59 § 7.01.)  "Governing Agreements" is defined to include the various agreements used in the sale and servicing of mortgage-backed securities.  Section 7.01 goes on to identify the claims included within the release, including claims relating to:

- "the origination and sale of mortgage loans," including claims for breach of "representations and warranties made in connection with such sale;"

- "allegedly defective, incomplete, or non-existent documentation;" and

- "the servicing of" mortgage loans, including claims "relating to the timing of collection efforts or foreclosure efforts."

(Exs. 58 & 59 § 7.01.)

The agreement also provides that certain claims are not released.  These include:  claims against ResCap LLC; "individual direct claims for securities fraud or other disclosure-related claims;" and claims arising after the agreement's effective date.  In addition, the settlement expressly carves out certain claims belonging to third party guarantors or guaranty providers:

Section 8.03    Financial-Guaranty Provider Rights and Obligations.  To the extent that any third party guarantor or financial-guaranty provider with respect to any Settlement Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Settlement Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

(Exs. 58 & 59 § 8.03.)

MBIA and FGIC both criticize this carve-out as "unclear" and "ambiguous," and argue

the settlement should be rejected for this reason.  (MBIA Obj., at 11-15; FGIC Obj., at 20-23.)

But the release, and the carve-out, are neither unclear nor unfair.

The insurers' claims fall into three categories:  (1) claims based on breaches of

representations and warranties;[8] (2) servicing-based claims;[9] and (3) claims for fraudulent

inducement of their insurance policies.[10]  The first two categories are expressly included within

the release set out in section 7.01.  The third category's claims — for fraudulent inducement —

are not expressly mentioned in section 7.01.  But, as we explained in our moving papers, the

Debtors believe that any such claims would be duplicative of the trusts' breach of contract

claims, because they arise from the representations and warranties incorporated from the

governing agreements into the Debtors' applications for insurance.[11]

### A.    Claims Based on Breaches of Representations and Warranties.

MBIA's and FGIC's claims arising from alleged breaches of representations and

warranties are based on the governing agreements and are not "independent" of the rights created

by those agreements.  MBIA's and FGIC's representations and warranties claims arise from

statements contained in the governing agreements for each securitization.  The governing

agreements also impose, on the Debtors, certain cure, substitution, or repurchase obligations for

loans sold in violation of those representations and warranties.  MBIA and FGIC contend the

---

[8] *See, e.g.*, Ex. 87 at 4 ("MBIA has a claim for compensatory damages plus interest with respect to its claims that the
ResCap Securitization Sponsors breached their obligations to repurchase loans that evidence breaches of
representations and warranties"); Ex. 88 at 7 ("These claims include . . .  " breach of the applicable Sponsor's duty
to repurchase, cure, or substitute defective Mortgage Loans").

[9] *See, e.g.*, Ex. 87 at 4 ("MBIA holds servicing claims against RFC and Homecomings"); Ex. 88 ("breach of the
applicable Sponsor's duties regarding the servicing of the Mortgage Loans").

[10] *See, e.g.*, Ex. 87 at 4 ("MBIA has a claim for rescissory damages with respect to its fraudulent inducement"); Ex.
88 at 12 ("FGIC has alleged that GMACM or RFC, as relevant, fraudulently induced FGIC into issuing Policies for
the Transactions").

[11] The Debtors reserve all rights with respect to any claims asserted by FGIC and MBIA, including the right to seek
to disallow and/or subordinate those claims under sections 502, 509 and 510 of the Bankruptcy Code.

Debtors breached those obligations by failing to "either (i) cure such breach in all material respects or (ii) . . . repurchase such [loan] at the Repurchase Price, or . . . substitute one or more [eligible substitute loans]." (*E.g.*, Ex. 89 § 3.1 (d)).

MBIA's and FGIC's rights to pursue claims against the Debtors for failure to cure, repurchase, or replace loans sold in breach of representations or warranties thus arise from the governing agreements. For example, MBIA's insurance agreement with the Debtors provides that its "remedy with respect to any defective Home Equity Loans under Section 3.1 of the Purchase Agreement shall be limited to the remedies specified in the Purchase Agreement." (Ex. 90 § 2.01(m).) FGIC's insurance agreements contained similar provisions. (Ex. 91 § 2.01(a)(xii).)

MBIA's and FGIC's rights, then, are based upon the governing agreements. They are not independent of the rights created by those agreements and are, in essence, derivative of the investors' and RMBS trustees' claims. Accordingly, claims based on breaches of representations and warranties are released under the settlement.

### B. Claims Based on Breaches of Servicing Obligations.

MBIA and FGIC claim they have suffered losses, in part, as a result of the Debtors' breaches of their servicing obligations. They say the Debtors, among other things, failed to pursue loss mitigation strategies, failed to conduct property inspections, and failed to pursue foreclosure sales and other loss recovery remedies. (Ex. 61 at 51; Ex. 92 at 94.) They claim their losses on insured loans were exacerbated by these servicing breaches. (*Id.*)

But MBIA's and FGIC's rights to assert claims for breaches of servicing obligations arise out of, and are based upon, the governing agreements. The Debtors' servicing obligations are set out in pooling and servicing agreements between the investors and trustees. MBIA and FGIC have rights to enforce the Debtors' servicing obligations only because the underlying servicing

17

obligations are incorporated by reference into their insurance agreements.  (*See, e.g*, Ex. 91
§ 2.02(l) ("[a]ll Mortgage Loans will be serviced in all material respects in compliance with the
Pooling and Servicing Agreement").)  MBIA's and FGIC's rights, then, are not "independent" of
the governing agreements.

    To be sure, section 7.01 only releases servicing claims "to the extent assumed pursuant to
Section 365 of the Bankruptcy Code by as assignee to the applicable Debtor."  MBIA and FGIC
may have servicing claims that were not assumed under section 365.  But the settlement
agreement releases all other claims relating to "the servicing of the Mortgage Loans," "including
any claim relating to the timing of collection efforts or foreclosure efforts."  (Exs. 58 & 59
§ 7.01.)  Accordingly, MBIA's and FGIC's claims against the Debtors for alleged breaches of
servicing obligations are released by the settlement.

### C.    Claims Based on Fraudulent Inducement.

    MBIA's and FGIC's third category of claims consists of fraudulent inducement claims
against the Debtors.  These claims are not expressly mentioned in section 7.01.  (Exs. 58 & 59
§ 7.01.)  But the Debtors believe they "arise under the Governing Agreements," because the
allegedly fraudulent representations used to "induce" MBIA and FGIC to enter into insurance
agreements were the representations and warranties contained in the governing agreements.
Those representations and warranties are simply incorporated by reference into the Debtors'
applications for insurance.  (Ex. 93 § 2.01; Ex. 94 § 2.01.)

    If the Debtors' view is correct, then MBIA's and FGIC's fraudulent inducement claims
fall within the scope of the release set out in section 7.01.  MBIA and FGIC, of course, may
argue that their fraudulent inducement claims exist independently of the governing agreements.
If the Court accepts their view, then the claims would not be released under the settlement (due
to the carve-out for "independent" claims established in section 8.03).

18

This issue need not be litigated now.  Many interested parties may wish to address this issue as part of a contested proceeding on MBIA's and FGIC's claims.  The issue may be reserved until MBIA's and FGIC's claims are presented in a contested hearing.

### D.    Claims Arising Under the Securities Laws.

The New Jersey Carpenters Health Fund (joined by Union Central and Cambridge Place) seeks clarification that its securities claims are not included within section 7.01's release provision.  The settlement agreement adequately addresses its concern.  It expressly carves out securities claims:  "For the avoidance of doubt, this release does not include individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities."  (Exs. 58 & 59 § 7.01.)

### E.    Claims Against ResCap LLC.

The settlement agreement, in its current form, preserves all claims against ResCap LLC.  This is the result of the agreement to remove the so-called "HoldCo Election."  (Ex. 85.)

Two objectors – the Committee and Wilmington Trust — complain that the HoldCo Election's removal has injured ResCap LLC by exposing it to "billions in previously released liability."  (Wilmington Trust Obj., at 11; *see* Comm. Obj., at 11, n.9 (reinstatement of claims against ResCap LLL is "troubling").  This is a big about-face for these parties, as they vociferously opposed the HoldCo Election and successfully advocated for its removal.  (*See, e.g.*, Ex. 95; Ex. 96 at 33:7-10.)

The objectors' complaining is also hard to take seriously.  For while they try to create, on the one hand, the impression that ResCap LLC faces "billions of potential liability" that will have to be "fully litigated or estimated at or after confirmation," on the other hand they concede "no such claims had ever been alleged" previously, and ResCap LLC "was never told there was any legal basis for ResCap LLC to have any liability."  (Wilmington Trust Obj., at 11; *see*

Comm. Obj., at 11, n.9.)  The Debtors, by contrast, have consistently maintained that their

potential liability for representations and warranties claims lies primarily with Residential

Funding Corporation and GMAC Mortgage, the two subsidiaries directly involved in the

origination and sale of mortgage-backed securities.  The evidence at trial will support this long-

held position.

The Debtors reached the conclusion that, in order to mollify criticisms from certain

creditors, the best course of action was to remove the HoldCo Election and preserve any

potential claims against ResCap LLC for resolution at a later date.  That conclusion does not

form a valid basis for rejecting the proposed settlement in its current form.

### III.    THE PARTIES TO THE RMBS SETTLEMENT HAVE STANDING TO EFFECT THE SETTLEMENT.

Some objectors argue that the Steering Committee Group and Talcott Franklin Group

lack standing to enter into the settlement.  (MBIA Obj., at 8-11; Wilmington Trust Obj., at 14-

17; FGIC Obj., at 3 n.7.)  According to these objectors, the RMBS trustees are the real parties in

interest, and any ruling on the settlement would be no more than an "advisory opinion."  (*Id*.)

MBIA's and Wilmington Trust's arguments ignore the plain language of the governing

agreements, as well as the RMBS trustees' affirmation that the settlement's allowed claim "falls

within a reasonable range."  (RMBS Trustees' Statement, at ¶¶ 2, 12.)

### A.    The Investors Have Authority to Act for the Trusts.

The governing agreements give the investors – the beneficiaries of the trusts that hold

mortgage loans – the express authority to act for the trusts.  Under the pooling and servicing

agreements' "no-action" provisions, the investors have authority to enter into "any suit, action or

proceeding in equity or at law." (Ex. 97 § 11.03(c).)[12]

The investors can do this in two ways. First, if the investors hold a certain percentage of

a trust's shares, usually 25%, they can direct the trustees by written request. (Ex. 97 § 11.03(c);

Ex. 98 § 5.06.) That is what has happened here. Second, if the trustee fails to act, the investors

have the right to act independently. (Ex. 97 § 11.03(c); Ex. 98 § 5.06.)

This means that both the investors and the trustees have the right (depending on the

circumstances) to assert claims against the Debtors. *See CFIP Master Fund, Ltd. v. Citibank,*

*N.A.*, 738 F. Supp. 2d 450, 477-78 (S.D.N.Y. 2010) (trust beneficiary may commence litigation

in compliance with trust agreement's "no-action" clause); *Sterling Fed. Bank, F.S.B. v. Credit*

*Suisse First Boston Corp.*, No. 07-C-2922, 2008 U.S. Dist. LEXIS 92759, at **34-35 (N.D. Ill.

Nov. 14, 2008) (certificate holders permitted to bring suit under no-action clause); *First Bank*

*Richmond, N.A. v. Credit Suisse First Boston Corp.*, No. 1:07-cv-1262, 2008 U.S. Dist. LEXIS

73267, at **33-34 (S.D. Ind. Sept. 24, 2008) (same).

The governing agreements' no-action provisions explain why the cases cited by MBIA

and Wilmington Trust do not apply. For example, Wilmington Trust relies heavily on *Walnut*

*Place LLC v. Countrywide Home Loans, Inc.,* No. 650497/11, 2012 N.Y. Misc. LEXIS 1537, at

*6 (Sup. Ct. 2012), *aff'd*, 96 A.D. 3d 648, 948 N.Y.S.2d 580 (1st Dep't 2012). But, in that case,

the beneficiaries had not complied with a contractual pre-condition allowing the trustees, in the

first instance, to investigate and pursue the claims. *Id* at *19. The beneficiaries also "failed to

allege sufficient voting rights" to demonstrate compliance with the trust's no-action clause's

requirements. *Id*. at *12 n.11. For its part, MBIA relies on *In re Collecting Concepts*, 296 B.R.

---

[12] The power to assert claims necessarily includes the power to settle those same claims. *See ACC Bondholders Group v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 355 (S.D.N.Y. 2007) (authority to litigate "includes the authority to settle those disputes").

683, 691 (Bankr. E.D. Va. 2001), and *LaBarbera v. A. Morrison Trucking, Inc.*, 197 Fed. Appx.

18, 20 (2d Cir. 2006). Neither of these cases, however, involved claims by trust beneficiaries

with authority to act for the trusts. *Collecting Concepts* held only that a junior employee had no

right to settle a claim under the doctrine of apparent authority. *In re Collecting Concepts*, 296

B.R. 683, 685 (Bankr. E.D. Va. 2001). And *LaBarbera* held only that an attorney, union official,

and clerical employee did not have authority to settle claims belonging to certain trusts where the

trust agreements "vest settlement authority solely in the trustees." *LaBarbera*, 197 Fed. Appx. at

20.

Moreover, the settlement agreement does not call for an "advisory opinion." The

agreement requires the investors to "provide the relevant Trustee with Direction to accept the

settlement and compromises" set out in the agreement. (Exs. 58 & 59 § 4.01.) That commitment

constitutes adequate consideration for the settlement, and it gives the Court a legal basis for

ruling on the settlement's fairness.

The Steering Committee Group and Talcott Franklin Group thus have authority to make

the settlement proposed here, either by directing the trustees to accept the settlement or through

direct action.

## B.    The RMBS Trustees Have Been Instructed to Approve the Settlement and Have Concluded the Allowed Claim is Reasonable.

MBIA and Wilmington Trust also miss the boat when they claim "the Trusts and trustees

have indicated no intention" to accept "any direction to accept any settlement offer." (*E.g.*,

MBIA Obj., at 9.) That may be technically true — the trustees may not have stated their

"intentions." But look at what they *have* done.

To start, the trustees have chosen not to object to the proposed settlement. (*See* RMBS

Trustees' Statement, at 7.) That is a pretty good indication of how the trustees view the

22

settlement.  In addition, the trustees have concluded the settlement's proposed $8.7 billion

allowed claim "falls within a reasonable range." (RMBS Trustees' Statement, at 2-3.)  The

trustees have also proposed a revised allocation formula that they believe "is fair and equitable

to" the trusts.  (*Id*. ¶ 12.)

There is no basis, then, for the objectors' concern that the trustees may, after all is said

and done, reject the proposed settlement.

### IV.    THE ALLOCATION FORMULA FOR PARTICIPATING TRUSTS IS FAIR TO CREDITORS.

The Committee, MBIA, Triaxx, and Amherst argue that the settlement's allocation

formula for distributing the allowed claim among participating trusts is "flawed" and "unfair."

(Comm. Obj., at 43-44; MBIA Obj., at 20-22; Triaxx Obj., at 4-6; Amherst Obj., at 4-5.)  They

oppose approval of the settlement on this ground.

The proposed settlement allocates the allowed claim among participating trusts based on

the losses each trust will suffer.  (Exs. 58 & 59, Ex. B.) The allocation formula says, simply, that

each trust will receive a *pro rata* share of the allowed claim based on the trust's losses as a

percentage of the losses of all participating trusts.  (*Id*.)  This means, as one objector notes, that

"the trusts that have incurred more losses [will] receive a greater share of the Allowed Claim."

(MBIA Obj., at 19; June 21, 2012 Triaxx Obj., at 3; *id*. at § 6.03.)

The Committee and MBIA say this simple formula is too simple, because it does not take

into account the strengths and weaknesses of each trust's claims.  The trusts, MBIA says, are

"not similarly situated." (MBIA Obj., at 15; *see also* Comm. Obj., at 46.)  Some trusts are more,

or less, exposed to certain legal defenses, and some trusts may have stronger, or weaker, claims

for breaches of representations and warranties due to differences in the governing agreements.

(*Id.*)  According to these objectors, "[t]he strength of a Trust's potential claims therefore must be built into the allocation formula."  (Comm. Obj., at 44.)

The fact that some trusts' claims may prove stronger or weaker than others does not mean an allocation formula based on losses is improper.  After all, "[a]n allocation formula need only have a reasonable and rational basis" in order to be "fair and adequate."  *In re Warner Chilcott Ltd. Sec. Litig.*, No. 06 CIV. 11515 (WHP), 2009 WL 2025160, at *2 (S.D.N.Y. July 10, 2009); *see also In re Giant Interactive Group, Inc. Sec. Litig.*, 279 F.R.D. 151, 163 (S.D.N.Y. 2011) ("[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel"); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 479 (S.D.N.Y. 2009) (same); *accord Bezio v. General Elec. Co.*, 655 F. Supp. 2d 162, 167 (N.D.N.Y. 2009).

Allocating a recovery based upon each claimant's share of losses is a widely-accepted method that has been routinely approved by courts.  *See, e.g.*, *In re AOL Time Warner ERISA Litig.*, No. 02 Civ. 8853 (SWK), 2006 U.S. Dist. LEXIS 70474, at **31-32 (S.D.N.Y. Sept. 27, 2006) (plan of allocation distributing recovery based upon decrease in value of each class member's holdings was "fair and reasonable"); *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (RJH), 2005 U.S. Dist. LEXIS 24890, at **20-21 (S.D.N.Y. Oct. 24, 2005) (settlement proceeds "based on [*pro rata*] investment loss is reasonable"); *In re WorldCom, Inc. ERISA Litig.*, No. 02 Civ. 4816, 2004 U.S. Dist. LEXIS 20671, at *29 (S.D.N.Y. Oct. 18, 2004) (settlement approved where "plan of allocation is based on the proportional share of the loss of each participant" so that the "more a class member lost, the more that person will receive"), *vac'd in part, on other grounds*, No. 02 Civ. 4816 (DLC), 2004 U.S. Dist. LEXIS 22952 (S.D.N.Y. Nov. 16, 2004).

The Debtors, of course, do not oppose efforts to refine the allocation formula in order to take into account the merits of each trust's claims.  The trustees, working with their financial advisor, have recently proposed a revised allocation methodology.  (RMBS Trustees' Statement, at ¶ 9.)  The Debtors understand that the trustees are consulting with objectors, including the Committee and MBIA, regarding this proposed change.  The Debtors will welcome any reasonable revision to the allocation formula that is satisfactory to the RMBS trustees, the objectors, and other interested parties.

But adoption of the proposed revised allocation formula is not a precondition to approval of the settlement.  What the Committee and MBIA seem to want is a formula that would require analysis of, and judgments about, the merits of each trust's claim and each of the Debtors' defenses.  This approach would effectively require litigation over the merits of 392 trusts' claims.  It would be nearly as costly and arduous as the litigation the settlement is intended to avoid.

*Iridium* establishes that settlement is a preferable alternative to "an expensive and complex lawsuit."  *Iridium* at 460, 465; *see also In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992) ("[c]ompromises are favored by the courts because they allow the estate to avoid the expenses and burdens associated with litigating contested claims"); *In re Dewey & Leboeuf LLP*, 478 B.R. 627, 642 (Bankr. S.D.N.Y. 2012) (settlement protected estate from expense of litigating four hundred adversary proceedings).  The settlement allocation formula need not achieve a result as exact as would litigation precisely because the settlement is meant to avoid the cost and expense of litigation.

The Committee and MBIA also claim the allocation formula creates undesirable incentives, which might induce trusts with strong claims to opt out of the settlement.  (Comm.

Obj., at 43).  There is no evidence, so far, to support this belief.  No trustee has expressed any

intention to opt out of the settlement, and the trustees have all informed the Court that, in their

view, the proposed $8.7 billion allowed claim is reasonable.  (RMBS Trustees' Statement, at 2-

3.)  Moreover, any trust choosing to opt out would face a daunting task – to achieve through

litigation a result better than the one offered in the settlement.  A non-participating trust would

bear the burden of litigating its claims, at its own expense, without any assurance of a successful

outcome.  The trustees have no powerful incentive to opt out of the settlement.

### V.    THE TRUSTS' CLAIMS SHOULD NOT BE SUBORDINATED.

Several objectors – Wilmington Trust, AIG, Allstate, Massachusetts Mutual Life,

Prudential, and Aurelieus, among them – object to the settlement on the ground that the proposed

$8.7 billion allowed claim is not expressly subordinated to other claims.  (*E.g.*, Wilmington Trust

Obj., at 21-23; AIG Obj., at 3-7.)  Most of these objectors do not affirmatively argue the allowed

claim *must* be subordinated.  (*Id*.)  They ask, instead, only that the subordination issue be

preserved and decided at a later date.  (Wilmington Trust Obj., at 21 (allowed claim "should

clearly preserve the issue"); AIG Obj., at 4 (the Court should "expressly provide in any order . . .

that any Allowed Claim is not deemed to be an unsubordinated claim . . . and that all

arguments . . . are fully reserved, without prejudice"); *see also* Comm. Obj., at 41 n. 33 ("the

Court need not resolve the priority of the Allowed Claim at this time").)

The Debtors agree that subordination need not be addressed as part of the settlement

approval process.  But the Debtors disagree with the objectors' underlying premise – that

contractual representation and warranty claims should be subordinated under section 510(b) of

the Bankruptcy Code.

Section 510(b) provides for the subordination of claims arising from the purchase or sale

of securities.  It provides, in part, that a claim "for damages arising from the purchase or sale of"

a "security of the debtor or of an affiliate of the debtor" "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b).

Wilmington Trust – the only objector taking an affirmative position on subordination – argues that the representation and warranty claims covered by the settlement are claims "arising from the purchase or sale" of the Debtors' securities for purposes of section 510(b). (Wilmington Trust Obj., at 21-23.)  That is a mischaracterization of the claims.  The investors' representation and warranty claims do not arise from a purchase or sale transaction, but pursuant to contractual relationships between the Debtors and the trusts.  The Debtors' pooling and servicing agreements obligated the Debtors to cure, repurchase, or replace any defective loans included in the mortgage pools.  That obligation arose whenever the trustees, or the Debtors, uncovered a non-conforming loan.  (*See, e*.g., Ex. 97 § 2.03(a).)  It is the alleged breach of these cure, repurchase, or replace obligations, rather than any misrepresentation made in connection with the purchase or sale of securities, that forms the basis of the trusts' claims.  (Ex. 7.)

Wilmington Trust argues, in response, that "absent the sale and purchase by investors of RMBS securities the Trusts would have suffered no damages justifying the R&W claims." (Wilmington Trust Obj., at 23.)  This argument doesn't fly under section 510(b).  Section 510(b) only provides for subordination of claims arising from the purchase or sale of securities, not claims relating to securities that were once purchased or sold.  Wilmington Trust's argument would stretch section 510(b) way beyond its bounds.

The Court should therefore defer addressing the subordination issue at this time. Eventually, however, the Court should conclude that the proposed $8.7 billion allowed claim is not subordinated pursuant to section 510(b).

27

## VI.    THE SETTLEMENT NEED NOT ALLOCATE LIABILITY AMONG THE DEBTORS.

One objector – Wilmington Trust – complains the settlement does not acknowledge the "conflicts of interests among the various Debtors." (Wilmington Trust Obj., at 13.) Wilmington Trust does not identify any specific conflict of interests. (*Id*.) But it appears to be making the unremarkable point that some of the Debtors may face more, or less, liability for breaches of representations and warranties than others. (*Id.*)

The proposed settlement allows a single "general unsecured claim of $8,700,000,000" in the aggregate against the Seller Entities and the Depositor Entities, which together constitute all of the Debtors except ResCap LLC. (RMBS Settlement Agreement § 5.01, ECF Nos. 320-2, 320-4.) The agreement does not, in its current form, purport to allocate liability for the allowed claim among the various Debtors. The Debtors believe that any final determination regarding allocation of the allowed claim among the Debtors need not be made in connection with approval of the settlement. The Debtors will recommend, at the appropriate time, a formula for allocating the allowed claim among the Debtors.

## VII.    THE SETTLEMENT'S ATTORNEYS' FEES PROVISION DOES NOT CIRCUMVENT COURT REVIEW.

The settlement agreement includes an attorneys' fees provision. The provision awards to the investors' attorneys a 5.7% share of the proposed $8.7 billion allowed claim. (Ex. 59, Ex. C.) The attorneys' fees provision thus has no direct impact on the Debtors – it does not add to the amount of any claim against the Debtors' estates.

The attorneys' fees provision, however, goes on to provide that the Debtors may agree to pay the attorneys' fees in cash, rather than as part of the allowed claim, without any "fee application or further order of the Bankruptcy Court." (Exs. 58 & 59 § 6.03.) The conversion, from a percentage share of the allowed claim to cash, would be made by agreement among

28

counsel, who must insure the cash payment "is equal to the cash value of [the attorneys']
respective portions of the Allowed Claim."  (*Id.*)

Some objectors criticize this claim-to-cash conversion provision.  They say the
conversion formula "lends itself to abuse" and improperly circumvents Court supervision over
the fee award.  (*E.g.*, Comm. Obj., at 46; MBIA Obj., at 24; Wilmington Trust Obj., at 17-21.)
These concerns are overblown.

The conversion formula requires that any cash payment must be "equal to the cash value"
of the attorneys' share of the allowed claim.  Counsel, of course, have every incentive to insure
the conversion from allowed claim to cash is fair.  There is no unreasonable risk of abuse, and
the objectors articulate none.

The attorneys' fees provision also does not circumvent Court review.  The Court, of
course, may consider the fees provision as part of its overall review of the settlement.  What the
objectors seem to argue is that the later conversion from allowed claim to cash should be subject
to an additional judicial review.  The Debtors believe this extra step is not necessary and will
only lead to unnecessary delay and expense.  The settlement may be approved without requiring
a separate review of the cash conversion option.

## VIII.   THE PROHIBITION ON USING THE SETTLEMENT IN SUBSEQUENT
PROCEEDINGS COMPLIES WITH FEDERAL LAW.

The settlement agreement contains a provision barring use of the settlement "as an
admission of, or to prejudice in any way, Ally" or its affiliates.  (Ex. 102 § 10.13.)  The provision
goes on to bar use of any materials related to the settlement, including the expert reports,
exhibits, declarations, and other evidence submitted in connection with this motion, "as evidence
… in any court proceeding."  (*Id.*)

29

The Committee objects to this provision on two grounds.  (Comm. Obj., at 44-45).  It says, first, that the settlement, and the evidence submitted in support of the settlement, are "likely to be highly relevant to setting Ally's own potential R&W liability."  (*Id*.)  And second, the Committee says precluding the subsequent use of expert reports would "require these experts to duplicate their work in further proceedings."  (*Id*.)  These objections miss the point.

Rule 408 of the Federal Rules of Evidence bars the use of evidence regarding efforts to settle or compromise a dispute "to prove or disprove the validity or amount of a disputed claim." Fed. R. Evid. 408(a).  Under this rule, the settlement negotiations and amount could not be admitted as evidence to prove "Ally's own potential R&W liability" — regardless of whether any party believed that evidence would be "highly relevant" to Ally's claimed liability.

Moreover, parties are clearly permitted to make agreements restricting the use of evidence in subsequent proceedings.  "[T]here is nothing in the law that disallows parties from voluntarily agreeing in advance to limit the admissibility of particular evidence." *Vigortone AG Prods., Inc. v. PM AG Prods., Inc.*, No. 99 C. 7049, 2001 WL 1263408, at *1 (N.D. Ill. 2001); *PRL USA Holdings, Inc. v. U.S. Polo Ass'n*, No. 99 CV 10199 (GBD) 2006 U.S. Dist. LEXIS 46065, at **16-19 (S.D.N.Y. 2006) (exclusion of evidence pursuant to settlement agreement), *aff'd*, 520 F.3d 109 (2d Cir. 2008); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-Cv-178-bbc , 2012 WL 5416941 (W.D. Wis. 2012) (granting in part motion to preclude evidence based on agreements).  The objectors here have made confidentiality agreements pursuant to which they have agreed to limit the use of evidence to only this proceeding, and not to use such evidence for any other purpose.

It does not matter, then, that objectors believe the evidence might be "highly relevant," and that requiring experts to do additional work would be duplicative.  Federal Rule of Evidence Rule 408, and the parties' agreements, control the use of evidence in subsequent proceedings.

### IX.    THE CREDITORS MAY NOT ASSERT FIDUCIARY DUTY CHALLENGES TO THE SETTLEMENT.

Some of the objectors' criticisms of the settlement are, by their nature, fiduciary duty claims.  The Committee's objection makes this point explicitly.  It repeatedly purports to contrast the Debtors' actions with what it says a "non-conflicted fiduciary" would have done.  (Comm. Obj., at 28-30.)  FGIC's objection similarly charges that "the Debtors and ResCap Board breached their fiduciary duty to creditors."  (FGIC Obj., at 19.)

Under Delaware law, the directors of an insolvent corporation do not owe fiduciary duties directly to the corporation's creditors.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).  Their duty is "to maximize the value of the insolvent corporation for the benefit of all those having an interest in it" — whether creditors or stockholders.  *Id.* at 103.  These same rules apply to Delaware limited liability companies.  *Feely v. NHAOGC, LLC*, No. CIV. A. 7304-VCL, 2012 WL 5949209, at *8 n. 1 (Del. Ch. Nov. 28, 2012), (*quoting In re Atlas Energy Res. LLC*, No. CIV. A. 4589-VCN, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010) ("'in the absence explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors … apply in the [LLC] context'").

Creditors may not, under Delaware law, attempt to enforce fiduciary duties in the stead of corporate entities.  *CML V, LLC v. Bax*, 6 A.3d 238 (Del. Ch. 2010), *aff'd*, 28 A.3d 1037 (Del. 2011).  Only shareholders, or "members," of limited liability companies may act derivatively on behalf of the company.  *Id.* at 241.

31

## CONCLUSION

The objections addressed in this reply brief do not concern the *Iridium* factors which should form the framework for the Court's analysis.  If considered at all, they should be given lesser weight.

The objectors have not offered evidence sufficient to show that ResCap LLC's board of directors acted with gross negligence in approving the settlement.  They have not offered evidence undermining the settlement's release provisions or the standing of the investors to enter into the settlement.  Nor have the objectors offered any basis for rejecting the settlement's allocation formula, attorneys' fees provision, or any other provision.

The Debtors respectfully request that their motion for approval of the RMBS settlement agreement be granted.

New York, New York
Dated: January 15, 2012

 /s/ Darryl P. Rains                                     
Gary S. Lee
Anthony Princi
Darryl P. Rains
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468-8000
Facsimile: (212) 468-7900

*Counsel to the Debtors and
Debtors in Possession*