UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:                                           ) Case No. 12-12020 (MG)
                                                 )
RESIDENTIAL CAPITAL, LLC, et al.,                ) Chapter 11
                                                 )
                    Debtors.                     ) Jointly Administered
                                                 )

---

### REPLY DECLARATION OF JEFFREY A. LIPPS

I, Jeffrey A. Lipps, declare:

1. I am a partner with Carpenter Lipps & Leland LLP, 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215.

2. Since I submitted my supplemental declaration on September 28, 2012, there have been a number of developments in residential mortgage-backed securities ("RMBS") case law. Additionally, several parties have submitted pleadings with additional arguments supporting and opposing the RMBS Trust Settlement. I make this reply declaration to address these developments and arguments. None of the additional cases or arguments I have considered alters my original opinion that the RMBS Trust Settlement resolves the potential claims against the Debtors in a reasonable and fair range.

**I.    REPURCHASE OF FORECLOSED MORTGAGE LOANS**

3. I was asked in my deposition about a case issued by a Minnesota District Court, purporting to apply New York law, which was issued after I finalized my supplemental declaration in support of the Debtors' Motion. That case is *MASTR Asset Backed Sec. Trust 2006-HE3 v. WMC Mortg. Corp.*, Case No. 11-CV-02542, 2012 U.S. Dist. LEXIS 142579 (D. Minn. Oct. 1, 2012). Some objectors use this case to argue that the Trusts' losses on previously liquidated mortgage loans should not be considered as a potential exposure for the

1

Debtors in evaluating the reasonableness of the $8.7 billion allowed claim. I disagree with this assertion.

4.     The court in *MASTR Asset* dismissed repurchase claims brought with respect to foreclosed loans. If litigated, parties pursuing repurchase claims on account of foreclosed mortgages have credible arguments to distinguish the holding in *MASTR Asset* because the repurchase provisions in the Debtors' transaction documents are significantly different than those in *MASTR Asset*.

5.     The court's holding in *MASTR Asset* was based heavily on the fact that the specific language of the repurchase provisions in that case did not clearly provide for repurchase of foreclosed mortgages. Under the contracts at issue in *MASTR Asset*, "Mortgage Loan" was defined as "the Mortgage File, the servicing file, the Monthly Payments, Principal Prepayments, **Liquidation Proceeds**, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds…." *Id.* at *6 (emphasis in original). While Liquidation Proceeds might exist post-foreclosure, many of the other items in the list would not. *See id.* at *16-18. Given that the other parts of the Mortgage Loan definition and the other provisions of the contract did not clearly contemplate repurchase of foreclosed mortgages, the court did not interpret the isolated reference to Liquidation Proceeds to allow for the repurchase of foreclosed loans. *See id.* The court found that any other interpretation would be contrary to both the apparent intent of the parties and common sense. *See id.* at *15. The court stated that the interpretation of the Purchase Agreement is in line with the Black's Law Dictionary definition of mortgage loan, and "absent a strong textual indication to the contrary the Court will not elevate form over substance to hold that a mortgage loan exists independently of the mortgage or deed of trust which secures it." *Id.* at *20.

6. In contrast, a review of the Debtors' transaction documents reveals that they have express language that appears to contemplate the repurchase of liquidated loans.

7. An example of language specifically contemplating repurchase can be found in the Debtors' RASC 2005-EMX5 Pooling and Servicing Agreement ("PSA"). This agreement defines the "Purchase Price" for a repurchased loan:

> With respect to any Mortgage Loan (*or REO Property*) required to be or otherwise purchased on any date pursuant to Section 2.02, 2.03, 2.04 or 4.07, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof plus the principal portion of any related unreimbursed Advances . . . .

RASC 2005-EMX5 PSA at 22 (emphasis added); *see also* RFMSI 2007-SP9 PSA, Standard Terms at 22 (same); RAMP 2006-RZ1 PSA at 27-28 (same); RALI 2004-QA1 PSA, Standard Terms at 21 (same); RFMSII 2006-HSA1 PSA at 22 (substantially the same). The reference in the PSA to REO Property indicates that foreclosed properties are included, because REO Property is defined as property acquired by the servicer "*through foreclosure or deed in lieu of foreclosure in connection with a defaulted Mortgage Loan.*" See, e.g., RASC 2005-EMX5 PSA at 29; RFMSI 2007-SP9 PSA, Standard Terms at 25 (same); RAMP 2006-RZ1 PSA at 35 (same); RALI 2004-QA1 PSA, Standard Terms at 25 (same); RFMSII 2006-HSA1 PSA at 29 (same).

8. Unlike the contracts reviewed in *MASTR Asset*, other provisions in the Debtors' transaction documents also arguably contemplate the repurchase of foreclosed mortgages. For instance, in the RFMSII 2007-HSA3 securitization, the Repurchase Price is defined as:

> an amount equal to the sum of (a) 100% of the Loan Balance thereof (*without reduction for any amounts charged off*[)]....

RFMSII 2007-HSA3 Indenture, Definitions Annex at 42 (emphasis added). This inclusion of amounts charged off as uncollectible indicates that the contract likely provides for the repurchase

3

of foreclosed loans. Similarly, the GMACM 2006-HE4 transactional definition of Repurchase Price includes an add-back for written-off principal for foreclosed loans. *See* GMACM 2006-HE4 Indenture, Definitions Annex at 26.

    9.    The definition of "Subsequent Recoveries" in the Debtors' Sale Agreements also can be construed to indicate that foreclosed loans are eligible for repurchase:

> As of any Distribution Date, amounts received by the Master Servicer (net of any related expenses permitted to be reimbursed pursuant to Section 3.10) or surplus amounts held by the Master Servicer to cover estimated expenses (***including, but not limited to, recoveries in respect of the representations and warranties made by the related Seller pursuant to the applicable Seller's Agreement and assigned to the Trustee pursuant to Section 2.04***) ***specifically related to a Mortgage Loan that was the subject*** of a Cash Liquidation or ***an REO Disposition*** prior to the related Prepayment Period that resulted in a Realized Loss.

RFMSI 2007-S9 PSA, Standard Terms at 30; *see also* RASC 2005-EMX5 PSA at 32 (substantially the same); RAMP 2006-RZ1 PSA at 38 (substantially the same); RALI 2004-QA1 PSA, Standard Terms at 29 (same). REO disposition, in turn, is defined as a determination by the Master Servicer that it has received all the payments it expects to be finally recoverable from the sale or disposition of REO Property. *See, e.g.*, RFMSI 2007-S9 PSA, Standard Terms at 25; RASC 2005-EMX5 PSA at 29; RAMP 2006-RZ1 PSA at 34-35; RALI 2004-QA1 PSA, Standard Terms at 24. As noted above, REO Property is specifically defined as property acquired by the Master Servicer "through foreclosure or deed in lieu of foreclosure." RFMSI 2007-S9 PSA, Standard Terms at 25. Thus, the Sale Agreements contemplate a situation in which the Master Servicer makes Subsequent Recoveries (i.e., recoveries for breaches of representations and warranties) even after the Master Servicer has disposed of REO Property (i.e., property obtained by the Master Servicer through foreclosure or deed in lieu of foreclosure).

4

10. Because the Debtors' transaction documents arguably provide a contractual mechanism for repurchase of loans that have been through the foreclosure process, the Debtors may have difficulty arguing that the *MASTR Asset* holding applies to their securitizations.

11. In addition to the language of the Debtors' transaction documents differing from the language of the contracts in *MASTR Asset*, it is my opinion that the court incorrectly assumed that a loan is always merged out of existence by a foreclosure, and the court's analysis will not be directly applicable to many of the mortgage loans in the Debtors' securitizations. *See MASTR Asset* at *14-15. While the Debtors' transaction documents provide that their interpretation is governed by New York law, the effect of foreclosure on a loan would be governed by the real property law of each jurisdiction where a foreclosure occurred. The Minnesota court's claim that the mortgage loan was merged out of existence was based on an 1883 case from New York and a recent case from Illinois. However, other jurisdictions may not always follow this rule. For instance, in states which allow for deficiency judgments on foreclosed mortgages, the lender generally has two claims on a defaulted loan: (a) the *in rem* right to foreclose on the property and (b) a separate *in personam* right to pursue the borrower for unpaid amounts. Because the *in personam* rights continue post-foreclosure, the mortgage loans in those jurisdictions continue to exist post-foreclosure.

12. In addition, I am aware of cases in Ohio in which courts have used their equitable powers to vacate a foreclosure judgment and reinstate the lien because the borrower and lender agreed to do so. This practice suggests that a mortgage loan continues to have at least some post-foreclosure existence. Given the fact that mortgage loans seem to have some existence post-foreclosure under applicable state law, a court may not apply the merger doctrine, particularly in

5

light of the language of the Debtors' transaction documents indicating that foreclosed loans may be eligible for repurchase.

13.    While an argument could be made that liquidated loans cannot be repurchased under the decision in *MASTR Asset*, there remains substantial uncertainty whether other courts considering representation and warranty claims would agree with the decision in *MASTR Asset*. Among other factors, it is noteworthy that the case was decided very recently, on October 1, 2012, and has not yet been tested on appeal. In addition, this decision is not binding authority in New York or elsewhere. Because the law is still developing around this issue, this case does not change my opinion that the RMBS Trust Settlement is fair and reasonable and the settlement amount is within a reasonable range.

## II.    STATUTE OF LIMITATIONS

14.    I have become aware of a new argument made by the Institutional Investors: The Trusts' breach of contract claims against the Debtors are equitably tolled. The Institutional Investors contend that the Debtors cannot rely on the statute of limitations defense given the Debtors' dual role as Seller and Master Servicer for the securitizations because the Debtors, when acting as Master Servicer, were obligated to pursue repurchase by the Seller of loans that had breached a representation. According to the Institutional Investors, because the Debtors should have pursued repurchase claims against themselves prior to the expiration of the statute of limitations, the Debtors cannot rely on the statute of limitations as a defense.

15.    I am aware of no court that has addressed the Institutional Investors' argument. Thus, while the Debtors would have logical counter-arguments that equitable tolling is inapplicable to Trusts' contract claims against the Debtors, there is no way to predict whether those counter-arguments would ultimately prevail.

6

16. Under the transaction documents for Debtor Residential Funding Company, LLC's ("RFC") securitizations, RFC does serve as both the Seller and Master Servicer. *See, e.g.,* RAMP 2005-EFC6 Assignment and Assumption Agreement at 1; RASC 2007-EMX1 Assignment and Assumption Agreement at 1. Under the transaction documents for Debtor GMAC Mortgage Corporation's ("GMACM") securitizations, GMACM serves as both the Seller and the Servicer. *See, e.g.,* GMACM 2006-HE4 Servicing Agreement at 1. Under the transaction documents, the Master Servicer (or Servicer) is obligated to request that the Seller cure or repurchase loans that breach representations:

> ***Upon the discovery*** by the Depositor, ***the Master Servicer***, the Certificate Insurer, the Trustee or the Custodian of a breach of any of the representations and warranties made in the Assignment Agreement in respect of any Mortgage Loan or of any Repurchase Event which materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in such Mortgage Loan, ***the party discovering such breach shall give prompt written notice to the other parties and the Certificate Insurer*** (the Custodian being so obligated under a Custodial Agreement). ***The Master Servicer shall promptly notify Residential Funding of such breach or Repurchase Event and request that Residential Funding either*** (i) ***cure such breach or Repurchase Event*** in all material respects within 90 days from the date the Master Servicer was notified of such breach or Repurchase Event or (ii) ***purchase such Mortgage Loan*** from the Trust Fund at the Purchase Price and in the manner set forth in Section 2.02.

RASC 2007-EMX1 PSA at 63-64; *see also* RASC 2006-KS3 PSA at 75-76 (substantially the same as RASC 2007-EMX1); RFMSII 2006-HSA5 Servicing Agreement at 4 ("***The Master Servicer***, on behalf of and subject to the direction of the Indenture Trustee, as pledgee of the Home Equity Loans, or the Issuer or the Credit Enhancer, ***shall enforce the representations and warranties of the Seller pursuant to the Purchase Agreement.***"); GMACM 2006 HE-4 Servicing Agreement at 4-5 (substantially the same as RFMSII 2006-HSA5).

17. Equitable tolling is recognized by courts in New York and is available to extend the statute of limitations period for certain claims, including claims for breach of contract. *See, e.g., First Am. Title Ins. Co. v. Fiserve Fulfillment Servs.* 06 Civ. 7132, 2008 U.S. Dist. LEXIS 7344, at *12 (S.D.N.Y. Jan. 25, 2008). Moreover, as noted by the Institutional Investors, equitable tolling has been used to toll the limitations period for claims "where the one claiming the benefit of the statute of limitations is the one charged in law with the duty of asserting and enforcing the claim before the statute runs." *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (quoting *PET, Inc. v. Lustig*, 77 A.D.2d 455, 457 (N.Y. App. Div. 1980)).

18. The Debtors would, however, have several counter-arguments against application of equitable tolling to the Trusts' breach of contract claims. As an initial matter, the doctrine is only available in "rare and exceptional circumstances." *Moody v. Morris*, 608 F. Supp. 2d 575, 580 (S.D.N.Y. 2009) (internal citations, alterations, and quotations omitted). As acknowledged by the Unsecured Creditors' Committee (the "Committee"), the cases involving equitable tolling often involve a defendant that controlled the person or entity capable of timely enforcing the tolled claim. *See PET, Inc. v. Lustig*, 77 A.D.2d 455, 457 (N.Y. App. Div. 1980) (claims of corporation tolled against CEO and stockholder); *A.F.L. Falck, S.p.A. v. E.A. Karay Co.*, 722 F. Supp. 12, 16 (S.D.N.Y. 1989) (claims of corporation tolled against president and sole shareholder of corporation); *Croce v. Kurnit*, 565 F. Supp. 884, 892 (S.D.N.Y. 1982) (claims of estate tolled against counsel for the estate). In such situations, the claim may be tolled while the defendant is effectively the sole person or entity capable of enforcing the claim. *See, e.g., Croce*, 565 F. Supp. at 892. In the Debtors' securitizations, however, other parties to the transaction documents—the Trustees (both independently and at the request of the Institutional Investors),

and, if the transaction is insured, the Credit Enhancer—are empowered to demand repurchase of loans in breach of a representation or warranty. *See, e.g.*, RAMP 2005-EFC7 PSA at 52-53; RFMSII 2007-HSA3 Insurance Agreement at 8.

19. Moreover, even assuming that the Master Servicer has an obligation to pursue a repurchase claim against the Seller under the transaction documents, the Debtors could argue that this obligation only arises "upon the discovery" of a "breach" that "materially and adversely affects the interests of the Certificateholders or Certificate Insurer…." *See, e.g.*, RASC 2007-EMX1 PSA at 63. Because the Debtors have not re-underwritten the overwhelming majority of the loans in the Trusts, the Debtors have an argument that, at this time, they are under no obligation to pursue repurchase of the vast majority of the loans.

20. Further, the Debtors would likely argue that the Master Servicer did not, in fact, have a legal "duty of asserting and enforcing the claim before the statute runs," *see PET, Inc.*, 77 A.D.2d at 457, but instead only had an obligation to request cure or repurchase by the Seller, *see, e.g.*, RASC 2007-EMX1 PSA at 63-64.

21. I would expect, however, that counsel for the Institutional Investors would vigorously dispute these counter-arguments, and some—in particular, the "upon discovery" clause argument—are likely to require extensive fact discovery to resolve.

22. In short, equitable tolling provides another avenue for an aggressive plaintiff to evade application of the statute of limitations defense. Because no court has addressed whether a trust's claims for breaches of representations and warranties can be equitably tolled and because reasonable arguments can be advanced for and against application of the doctrine, equitable tolling injects additional uncertainty into the analysis of the potential outcome of litigation between the Debtors and the Trusts.

### III.   "LITIGATION RISK ANALYSIS"

23.   During my deposition, I was asked whether I assigned probabilities and dollar values to the various potential outcomes in litigation (as used by the Committee, "Litigation Risk Analysis"). For the reasons provided in my deposition and for the reasons set forth below, I did not use Litigation Risk Analysis in evaluating the RMBS Trust Settlement.

24.   In a case involving a well-settled area of law, Litigation Risk Analysis may be a reasonable means for an attorney advising a client on settlement to analyze the settlement. For example, a seasoned personal injury attorney may have little difficulty predicting a range of potential damage awards in a routine slip-and-fall case in which the injury is a broken leg. Because broken-leg claims are routinely litigated through trial and appeal, and routinely settled, and because the claims and defenses asserted in such cases are fairly well-settled, an attorney can more reliably provide a range of possible outcomes for the client when advising the client whether to settle and within what dollar range.

25.   In a developing area of law, such as this one, however, an attorney cannot reliably or meaningfully assign probabilities to the potential outcomes. As I explained in my supplemental declaration, there are numerous unresolved issues of law in the fledgling area of representation and warranty litigation that have either not been addressed by the courts yet or have been decided differently by different courts. Very little appellate authority has been generated on any of the myriad legal and factual issues described in my supplemental declaration. In order to conduct Litigation Risk Analysis on an RMBS case, an attorney would have to assign highly speculative percentages to the resolution of all of these issues. The end product is little better than guesswork and therefore provides no meaningful guidance.

26.   By way of example, if courts across the country uniformly held that the Institutional Investors have to prove the breach of a representation or warranty proximately

10

caused a loan to default in order to force the Debtors to repurchase the loan, the Debtors' repurchase exposure would decrease dramatically—potentially by billions of dollars. But as explained in my supplemental declaration, the case law on loss causation in the RMBS context is mixed, and as a result, an attorney cannot (with any meaningful precision) assign a probability that the issue would be resolved in the Debtors' favor. As noted in my supplemental declaration, the loss causation issue is just one of a multitude of such unresolved RMBS issues.

27.  It cannot be seriously disputed that the outputs generated by Litigation Risk Analysis are only as reliable as the inputs. Because the key step in Litigation Risk Analysis—assigning probabilities to the various outcomes in an RMBS case—cannot be done with any precision, Litigation Risk Analysis cannot reliably be used to analyze the reasonableness of the RMBS Trust Settlement.

### IV.  RELEVANT DATA POINTS

28.  As discussed in my deposition, in forming my opinion on the reasonableness of the amount of the RMBS Trust Settlements, I considered a number of different available data points, which together with the legal analysis described in my supplemental declaration and this reply declaration allowed me to reach my conclusion.

29.  When advising a client on whether to settle a claim, attorneys often look to the terms of other comparable settlements. Thus, in my analysis of whether the RMBS Trust Settlement was reasonable, I considered settlements of similar claims.

30.  Specifically, I considered Bank of America's $8.5 billion settlement with certain institutional investors ("BofA Settlement"). The BofA Settlement covered 530 trusts, and Brian Lin, Bank of America's expert, assumed a defect rate of 36% in his publicly filed expert report in support of the reasonableness of the settlement.

31.    I also considered the assumptions utilized in setting loss reserves for Lehman Brothers Holdings Inc. ("LBHI"). In estimating these reserves, LBHI's expert used a low defect rate of 30% and a high defect rate of 35%.

32.    In addition, the Debtors internally tracked repurchase metrics, and I considered this repurchase data in reaching my opinion. As an example, before a single repurchase demand was made by MBIA Insurance Corporation ("MBIA"), the Debtors voluntarily repurchased more than 65 million dollars of loans from the 5 transactions at issue in *MBIA Ins. Corp. v. Residential Funding Co., LLC,* Case No. 603552/2008 (N.Y. Sup. Ct.). As MBIA noted in its complaint, when MBIA sent repurchase demands for 692 defaulted loans to RFC in May 2008, RFC and MBIA were able to reach an agreement with regard to approximately 24% of those loans before MBIA filed suit against RFC. *See* First Amended Complaint, *MBIA Ins. Corp. v. Residential Funding Co., LLC,* Case No. 603552/2008 (N.Y. Sup. Ct.), at ¶96

33.    As of June 2012, the 392 Trusts subject to the RMBS Trust Settlement had sustained roughly $30.3 billion dollars in losses on mortgages serving as collateral, and the Debtors had already voluntarily (i.e., without a court order or judgment) repurchased approximately $1.16 billion dollars of mortgages from the Trusts, or roughly 3.8%.

34.    Additionally, in forming my opinions, I considered the allegations lodged by plaintiffs in RMBS cases against the Debtors. For example, in its case against RFC, MBIA alleged that more than 88% of the loans reviewed breached representations and warranties. *See* First Amended Complaint, *MBIA Ins. Corp. v. Residential Funding Co., LLC,* Case No. 603552/2008 (N.Y. Sup. Ct), at ¶50. In other complaints alleging representation and warranty claims, the plaintiffs have asserted defect rates between 30% and 97%. *See* Complaint *FGIC v. Ally Financial, Inc., et al.,* Case No. 12-CV-01860-PAC (S.D.N.Y.), at ¶186 (alleging defect rate

of "at least 30%"); Complaint *FGIC v. Ally Financial, Inc., et al.*, Case No. 12-CV-01658-PAC (S.D.N.Y.), at ¶167 (alleging defect rate of 97.6%); Complaint, *Assured Guaranty Mutual Corp. f/k/a Financial Securities Assurance Inc. v. GMAC Mortgage LLC, et al.* No. 12-cv-03776-JPO, at ¶99 (alleging that the "vast majority" of loans reviewed did not comply with the underwriting guidelines); Complaint *MBIA Insurance Co. v. GMAC Mortgage, LLC,* No. 600837/2010 (N.Y. Sup. Ct.), at ¶75 (alleging defect rate of "at least 89%"). While I believe, based on my experience litigating claims brought against the Debtors, that such allegations grossly exaggerate the defect rate of loans in the Debtors' securitizations, because these disputed issues have not yet been litigated to resolution, I still considered such allegations in determining the high end of potential exposure.

## V.    DR. CORNELL'S REPORT

35. I have reviewed Dr. Cornell's expert report estimating the losses the Trusts sustained that are attributable to defects in underwriting. Based on Mr. Morrow's re-underwriting of loans from the Trusts, and prior to discounting for certain defenses, Dr. Cornell concludes that $16.5 billion of the Trusts' projected $45.2 billion in lifetime losses will be suffered on loans with material underwriting defects. See Cornell Report at ¶68. Dr. Cornell then analyzes the amount the Debtors' liability would be reduced if the Debtors were able to successfully assert the loss causation and statute of limitations defenses. *See id.* at ¶48. However, Dr. Cornell's report fails to provide the likelihood that those defenses will be accepted by a court. Without assigning a probability that a given defense will succeed, the dollar reduction associated with the successful assertion of that defense is of negligible value in evaluating the reasonableness of a settlement. Thus, Dr. Cornell's analysis of the impact of the Debtors' defenses does not alter my conclusion that the RMBS Trust Settlement is reasonable.

36. Although not styled as such, Dr. Cornell's analysis is akin to the Litigation Risk Analysis that the Committee implies should be utilized in evaluating the RMBS Trust Settlement. *See* Committee's Objection at 24 (describing "litigation risk analysis" as the process of "assigning dollar amounts and percentage likelihoods to a range of potential outcomes."). With Cornell's report (and the Committee Objection that incorporates it), the Committee is attempting to assign dollar amounts to a range of potential outcomes based on the possibility that certain defenses will prevail.

37. But Dr. Cornell and the Committee have skipped the essential step of assigning the probabilities that those defenses will apply based on the current case law. If, for example, courts across the country consistently rejected the Debtors' loss causation defense, the fact that the Debtors' successful assertion of the defense could reduce the Debtors' potential liability to $3.8 billion would be of little assistance in evaluating the reasonableness of the RMBS Trust Settlement.

38. In reaching his reduction for the Debtors' loss causation defense, Dr. Cornell assumed the defense would succeed. *See* Cornell Deposition Tr. at 20-21. As explained in my supplemental declaration, the loss causation defense on which Dr. Cornell's discount is premised has not been uniformly accepted in the courts. *See* Lipps Supplemental Declaration at ¶¶74-82, 104-109. Without a probability that the Debtors will succeed on the defense, Dr. Cornell's estimated reduction provides little information about the Debtors' potential repurchase exposure. Indeed, Dr. Cornell admitted that his report would have to be revised if the Court rejected the Debtors' position on loss causation. *See* Cornell Deposition Tr. at 54 (admitting that if the Court were to rule in favor of the Steering Committee's position on loss causation, "as [the report] currently stands, it could not be used").

39. Similarly, Dr. Cornell's report does not provide the probability that the Debtors' statute of limitations defense will prevail. *See* Cornell Deposition Tr. at 17-19 (stating that he assumed the statute of limitations defense would apply to certain trusts and that he is not offering an opinion as to the probability that the statute of limitations defense will apply). As noted above, the Institutional Investors' argument on equitable tolling is untested and could potentially defeat the Debtors' statute of limitations defense. Furthermore, as noted in my supplemental declaration, courts interpreting the Debtors' transaction documents could conclude that the repurchase obligation is a separate cause of action from that for breach of a representation or warranty, and as a result, find that the statute of limitations only begins to run when the Debtors fail to repurchase non-compliant loans. Because of the uncertainty regarding application of the statute of limitations, Dr. Cornell's estimated reductions for application of the statute of limitations, without more, provide limited insight on the Debtors' potential repurchase exposure.

40. Because Dr. Cornell's estimation of the impact of the Debtors' defenses does not incorporate the probability that the Debtors' defenses will fail, Dr. Cornell's report does not alter my opinion that the RMBS Trust Settlement is reasonable.

## VI. CONCLUSION

41. Based on the factors described in my original declaration, my supplemental declaration, and my deposition, as well as the developments and factors described above, I conclude that the RMBS Trust Settlement resolves the potential claims against the Debtors in a reasonable and fair range.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true to the best of my knowledge, information, and belief. Executed on January 15, 2013, at Columbus, Ohio.

_____
Jeffrey A. Lipps