UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------  x
In re:                                                        :    Chapter 11
                                                              :
RESIDENTIAL CAPITAL, LLC, et al.,                             :    Case No. 12-12020 (MG)
                                                              :
Debtors                                                       :    Jointly Administered
                                                              :
------------------------------------------------------------  x

Expert Report of Katherine Schipper

January 15, 2013

**I.     Assignment**

1.     I have been asked by Morrison & Foerster LLP, counsel for the Debtors, to review, evaluate and respond to certain statements made in objections to the proposed settlement between the Debtors and the investors who invested in the Debtors' 392 securitizations ("Investors").  Specifically, I have been asked to address whether the fact that Residential Capital, LLC ("ResCap") disclosed a range of reasonably possible losses related to litigation matters and potential repurchase obligations and related claims of between $0 and $4 billion, over existing accruals, means that the $8.7 billion settlement between the Debtors and Investors is per se unreasonable.

2.     My analysis is ongoing, and I may supplement or refine my opinions and analyses in light of additional information.

**II.    Professional Background and Qualifications**

3.     I am the Thomas F. Keller Professor of Business Administration at Duke University's Fuqua School of Business and a member of the accounting area.  I hold a Bachelor of Arts (BA) degree from the University of Dayton and Master of Business Administration (MBA), Master of Arts (MA) and Doctor of Philosophy (PhD) degrees from the University of Chicago.  In 1996, I was awarded an honorary Master of Laws (LLM) degree from Notre Dame University.  In 2011, I was awarded honorary doctorates in Economics from Norwegian School of Economics and Stockholm School of Economics.

4.     Throughout my career, I have held several academic appointments.  I was on the faculties of the Graduate School of Business at the University of Chicago and of Carnegie-Mellon University.  I was also a visiting scholar at the University of Glasgow, Chinese University of Hong Kong, Peking University, and Singapore Management University.

5.      From 2001 through 2006, I was a member of the Financial Accounting Standards Board (FASB), the private sector organization with responsibility for establishing standards of financial accounting and reporting for companies such as Ally Financial, Inc. ("Ally"). I served as one of the seven full-time members of the Board.

6.      I am a frequent speaker on matters related to financial reporting quality, financial reporting standard setting, and international accounting convergence. I have published research papers on a wide range of topics in financial reporting, corporate finance, and corporate governance.

7.      I served the American Accounting Association as President, Director of Research, and President of the Financial Accounting and Reporting Section. I was named the American Accounting Association's Outstanding Educator and Distinguished International Lecturer. In August 2007, I was elected to the Accounting Hall of Fame.

8.      I am a Director, member of the Audit Committee, and member of the Data Security and Operations Risk Committee of Official Payments Inc., a public company. I have also been a member of the governing board of Acorn Fund, a mutual fund. I am a member of the governing board and Audit Committee of the University of Dayton, a not-for-profit entity.

9.      My resume is included as Exhibit 1. I have previously testified in a confidential arbitration proceeding.

**III.    Materials and Other Information Considered**

10.     In connection with my work on this matter, I have considered the documents listed in Exhibit 2.

**IV.    Opinion Summary**

11.     In my opinion, and based on the documents I have analyzed, the fact that ResCap disclosed a range of reasonably possible losses related to litigation matters and potential

repurchase obligations and related claims of between $0 and $4 billion, over existing accruals, does not mean that the $8.7 billion settlement is per se unreasonable.

**V.    Background**

12. ResCap was a wholly owned mortgage subsidiary of Ally. On May 13, 2012, the ResCap Board determined to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Those filings occurred on May 14, 2012.[1]

13. Prior to the filings, on May 9, 2012, the ResCap Board approved a settlement agreement between the Debtors and Investors.[2] The settlement agreement describes the claims that are resolved and those that are not. For example, the settlement agreement resolved all claims "that arise under the Governing Agreements."[3] The settlement lists other claims that are resolved, including, but not limited to, claims regarding "the origination and sale of mortgage loans," including claims for breach of "representations and warranties made in connection with such sale or with respect to the noticing and enforcement of any remedies in respect of alleged breaches of such representations and warranties"; and "allegedly defective, incomplete, or non-existent documentation."[4] The settlement agreement did not resolve claims against ResCap LLC, "individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities," claims that first arise after the agreement's effective date, and claims belonging to "any third party guarantor or financial-guaranty provider."[5]

---

[1] Ally Financial Inc. Form 8-K, May 14, 2012.
[2] Minutes of the Special Meeting of the Board of Residential Capital, LLC, May 9, 2012, RC-9019_00054006–7.
[3] Third Amended and Restated RMBS Trust Settlement Agreement between Residential Capital, LLC and the Institutional Investors, September 21, 2012, § 7.01.
[4] Third Amended and Restated RMBS Trust Settlement Agreement between Residential Capital, LLC and the Institutional Investors, September 21, 2012, § 7.01.
[5] Third Amended and Restated RMBS Trust Settlement Agreement between Residential Capital, LLC and the Institutional Investors, September 21, 2012, §§ 7.01, 8.02, and 8.03.

14.     The Official Committee of Unsecured Creditors, the Financial Guaranty Insurance Company (FGIC), and Wilmington Trust, National Association (the "Creditors") have objected to the settlement.  My understanding of the statements made by the Creditors is that one of the bases for their objection is the claim that the proposed settlement between ResCap and Investors in certain securitization trusts is per se unreasonable because Ally had previously disclosed in its Form 10-Q for the quarter ending March 31, 2012, dated April 27, 2012, a range of reasonably possible losses, over existing accruals,[6] for certain litigation matters, potential repurchase obligations and related claims of $0 to $4 billion, while the actual settlement amount is $8.7 billion.

15.     The objection filed by the Official Committee of Unsecured Creditors states, for example:

> "the Debtors agreed to an Allowed Claim some *$4 billion more* than the highest value they had ever publicly attributed to their R&W liability…"[7]

This statement suggests a comparison between the settlement amount ($8.7 billion) and the total of accrued losses (approximately $800 million) plus the top end of the range of disclosed reasonably possible losses ($4 billion).[8]

16.     The objection filed by FGIC, in describing the $8.7 billion settlement, states that:

> "$8.7 Billion is more than double the Debtors' own publicly-stated estimates from two weeks earlier, which estimates themselves

---

[6] The existing accrual was approximately $811 million.  Ally Financial Inc. Form 10-Q for the quarterly period ended March 31, 2012, Note 24, at 69.
[7] Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr. P 9019 for Approval of the RMBS Trust Settlement Agreements, at 15 (emphasis in original).
[8] The Official Committee of Unsecured Creditors provides another comparison on page 18 of its objection.  That comparison references the top of the estimated range of disclosed reasonably possible losses for litigation, repurchase obligations, and related claims over existing accruals as $4.041 billion and indicates that the ResCap Board "was asked to approve a settlement nearly *double* that amount." (emphasis in original) This comparison is apparently between the settlement amount and the top end of the disclosed range of reasonably possible losses.

5

>> were 400% higher than the Debtors' reserves for the same claims."[9]

and that:

> "$8.7 Billion grossly overstates the value of the settled claims" and that "[o]nly two weeks before the Debtors believed that the *maximum* liability they could face was $4 Billion."[10]

The first of these two statements suggests a comparison between the settlement amount ($8.7 billion) and the top end of the range of disclosed reasonably possible losses ($4 billion); it does not suggest a comparison between the settlement amount and the total of accrued losses (approximately $800 million) and the top end of the range, because $8.7 billion is less than twice that total ($4 billion + $800 million or $4.8 billion). The second of these two statements suggests a comparison between the settlement amount and the top end of the range of disclosed reasonably possible losses.

17.    The objection filed by Wilmington Trust, National Association states that:

> "[o]n May 9, 2012, the Board met to approve the $8.7 billion RMBS Settlement, an amount more than twice the high-end estimate reviewed by the Audit Committee just eight days earlier."[11]

This statement suggests a comparison between the settlement amount and the top end of the range of disclosed reasonably possible losses.

18.    Based on my understanding of the statements made by the Creditors, the Creditors are stating that the proposed settlement is per se unreasonable based on a comparison of the range of disclosed reasonably possible losses, over accruals, with the actual settlement amount or based

---

[9] Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P 9019 for Approval of the RMBS Trust Settlement Agreements, at 16.
[10] Objection of Financial Guaranty Insurance Company to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements, at 20 (emphasis in original).
[11] Objection of Wilmington Trust, National Association to the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements, at 6.

6

on a comparison of the total of the existing accruals plus the range of disclosed reasonably possible losses with the actual settlement amount. In this opinion, I focus on the former comparison; however, my opinion is unchanged if the latter comparison is considered.

## VI.  Assumptions Made in this Assignment

19.    For purposes of this assignment I have made the following assumption: the Form 10-Q of Ally, presenting the consolidated financial statements and footnote disclosures of Ally and its consolidated subsidiaries, including ResCap, is prepared in accordance with U.S. GAAP on a going-concern basis.

## VII.  Basis for Opinion

### A.   Authoritative Guidance from U.S. GAAP

20.    The U.S. GAAP guidance ("guidance") that defines a loss contingency and provides recognition, measurement, and disclosure guidance for a loss contingency is in Accounting Standards Codification (ASC) 450. The definition of a loss contingency is:

> An existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur. The term loss is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses.[12]

21.    The guidance describes that loss contingencies vary as to their likelihood, that is, their degree of uncertainty:

> **450-20-25-1** When a **loss contingency** exists, the likelihood that the future event or events will confirm the loss or impairment of an asset or the incurrence of a liability can range from **probable** to **remote**. As indicated in the definition of **contingency**, the term *loss* is used for convenience to include many charges against income that are commonly referred to as expenses and others that are commonly referred to as losses. The Contingencies Topic uses

---

[12] ASC, Master Glossary.

7

> the terms *probable*, **reasonably possible**, and *remote* to identify three areas within that range (emphasis in original).

22. The thresholds of probable, reasonably possible, and remote are defined, but not quantified, in the guidance. Specifically, probable is defined to mean that the future event or events that will confirm the loss are likely to occur. Reasonably possible is defined to mean that the chance of the future event or events occurring is more than remote, but less than likely. Remote is defined to mean that the chance of the future event or events occurring is slight.[13]

23. ASC 450 states that it "deals with uncertainty by requiring a probability threshold for recognition of a loss contingency and that the amount of loss be reasonably estimable."[14]

24. ASC 450 provides guidance as to when a loss contingency should be accrued:

> **450-20-25-2** An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
>
> a. Information available before the financial statements are issued or are available to be issued (as discussed in Section 855-10-25) indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. Date of the financial statements means the end of the most recent accounting period for which financial statements are being presented. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.
>
> The purpose of those conditions is to require accrual of losses when they are reasonably estimable and relate to the current or a prior period. … As discussed in paragraph 450-20-50-5, disclosure is preferable to accrual when a reasonable estimate of loss cannot be made. Further, even losses that are reasonably estimable shall not be accrued if it is not probable that an asset has been impaired or a liability has been incurred at the date of an entity's financial

---

[13] ASC, Master Glossary.
[14] ASC 450-20-05-5.

8

statements because those losses relate to a future period rather than the current or a prior period.

25. ASC 450 also provides guidance as to disclosures of loss contingencies:

> **450-20-50-3** Disclosure of the **contingency** shall be made if there is at least a reasonable possibility that a loss or an additional loss may have been incurred and either of the following conditions exists:
>
> a. An accrual is not made for a **loss contingency** because any of the conditions in paragraph 450-20-25-2 are not met.
>
> b. An exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 450-20-30-1.

### B. Disclosure of ResCap's Reasonably Possible Losses Related to Litigation, Repurchase Obligations and Related Claims

26. Ally's Form 10-Q for the quarter ending March 31, 2012 contains a loss contingency accrual related to litigation, repurchase obligations and related claims. This amount is recognized as a liability on the consolidated balance sheet that includes the balance sheet of ResCap, Ally's subsidiary.

27. Ally's Form 10-Q for the quarter ending March 31, 2012 also contains the following footnote disclosure:

> **Potential Losses**
>
> We currently estimate that ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims described above could be between $0 and $4 billion over existing accruals. This estimated range is based on significant judgment and numerous assumptions that are subject to change, and which could be material. However, as a result of ResCap's current financial position, we believe ResCap's ability to pay for any such losses is very limited. Refer to Note 1 to the Condensed Consolidated Financial Statements for a discussion of reasonably possible losses in connection with a ResCap bankruptcy filing.[15]

---

[15] Ally Fin. Inc. Quarterly Report (Form 10-Q) at 73 (Apr. 27, 2012).

28. The range of reasonably possible losses over existing accruals disclosed in Ally's Form 10-Q provides information about a loss contingency that does not meet both of the ASC 450 requirements for recognition.

29. The disclosure of ResCap's reasonably possible range of losses over existing accruals related to litigation matters, potential repurchase obligations and related claims contains the following qualifying statement: "The estimated range is based on significant judgment and numerous assumptions that are subject to change, and which could be material."[16] That is, if one or more of the assumptions used to estimate the range of disclosed reasonably possible losses were to change, so too could the range of reasonably possible losses change, and so too could the actual outcome of the loss contingency differ from an amount that is within the (previously disclosed) range of reasonably possible losses. For example, when estimating, for financial statement disclosure purposes, a range of reasonably possible losses associated with claims, an entity would need to make assumptions about the behavior of those who are permitted, or could be permitted, to assert those claims. If the actual behavior were to differ from those assumptions, the actual outcome of the loss contingency could be different from an amount that lies within the range of disclosed reasonably possible losses.

30. The disclosure of a range of reasonably possible losses, over existing accruals, related to litigation matters, potential repurchase obligations and related claims as of a balance sheet date is a requirement of U.S. GAAP. That disclosure is intended to provide information to users of financial reports. In my opinion, that disclosure does not constrain the entity that creates the disclosure from taking future actions, including negotiating a settlement of those claims, nor does it purport to forecast the actual outcome of those settlement negotiations. The reason is that

---

[16] *Id.*

the assumptions that are used to develop the estimate of the range of reasonably possible losses may not be made under the circumstances that exist in a negotiated settlement.

31.     As discussed above, Ally's Form 10-Q for the quarter ending March 31, 2012 disclosed a range of reasonably possible losses related to litigation, repurchase obligations, and related claims of $0 to $4 billion, over existing accruals.  The process of arriving at those estimates is discussed in an Accounting Policy Memorandum dated April 27, 2012, entitled, "Legal/Rep and Warrant – Range of Reasonably Possible Loss Disclosure Considerations – Q1 2012" (April 27, 2012 Policy Memorandum).[17]  The April 27, 2012 Policy Memorandum notes, as was disclosed in the Form 10-Q, that the estimated range is based on significant judgment and numerous assumptions that are subject to change.[18]

32.     The April 27, 2012 Policy Memorandum includes a table (the "Table") that summarizes the estimate of the top end of the range of reasonably possible losses.  The Table was also included in materials provided to the Audit Committee.[19]

---

[17] Memo from Accounting Policy to Files re Legal/Rep and Warrant – Range of Reasonably Possible Loss Disclosure Considerations – Q1 2012 (Apr. 27, 2012), RC-9019_00093832–5 at 1-3.

[18] The April 27, 2012 Policy Memorandum states that "a great deal of uncertainty remains and the determinations remain subject to a great deal of variability" and that "[t]hese types of estimates require management to utilize significant judgment in order to make both the determination of whether a reasonable estimated range can be made, as well [as] in the determination of that range."  *Id.* at RC-9019_00093832.

[19] Memo to Members of the Residential Capital, LLC Audit Committee re Residential Capital, LLC Audit Committee Meeting, April 30, 2012, with attached Audit Committee Supplemental Materials (Apr. 27, 2012), RC40022273–367 at 276.

33. The estimated range of reasonably possible losses assumes exposure through 2013 and beyond, as indicated by the statements "data projections through 2013" in note (A), "Estimated non-wrapped potential exposure beyond 2013" in the first line under "Additional items:" and "[e]stimated lifetime losses" in note (C).[20]

34. The Table shows the existing accrual (labeled "1Q12 recorded reserve for probable losses") of $811 million and an estimation of possible losses that involves exposure to four types of claims, that is, four components: (1) Active Reserve, (2) Inactive Wrapped PLS, (3) Inactive Whole Loan Investors, and (4) Non-Wrapped PLS. The "Active Reserve" component estimates the sensitivity (or stress test) exposure to claims of alleged breaches of representations and warranties that have already been reserved for by ResCap.[21]

35. The "Inactive Wrapped PLS" and the "Non-Wrapped PLS" components estimate the exposure to claims of alleged breaches of representations and warranties that may be filed in the

---

[20] RC-9019_00093832–5 at -34.
[21] Jeffrey Cancellieri Tr. at 93:25-94:12 (Nov. 14, 2012).

12

future on deals that have not had any repurchase claims.[22] The "Inactive Whole Loan Investors" component estimates the exposure to claims of alleged breaches of representations and warranties that may be filed in the future, for private investors whose loans were not purchased through an issued security.[23]

36.     The April 27, 2012 Policy Memorandum considers, among other things, activity by trustees at the behest of their investors and the extent of investor power to compel trustees to make claims. The description in that Policy Memorandum indicates that inherent in the estimates of the "active" and "inactive" components of the estimate are assumptions about the behavior of investors that comprise each category.

37.     Based on the accounting for loss contingencies, estimating losses for the components summarized in the Table assumes the resolution of representation and warranty claims over time as they occur in the normal course of business. This assumption could change, for example, if the claims were to be resolved all at once in a single negotiated global settlement. To the extent that the circumstances of the negotiation process, and the outcome of that negotiation process, are different from the assumptions made in these estimates, the resulting calculations would be different. Therefore, calibrating the settlement amount against the range of disclosed reasonably possible losses would not indicate that the settlement is per se unreasonable.

38.     To summarize, in my opinion, loss contingency disclosures under U.S. GAAP have the following features: (1) they are intended to provide financial statement users with information about a loss contingency that does not meet both of the ASC 450 requirements for recognition; (2) they are based on the entity's assumptions, which are subject to change; and (3) they are based on assumptions that may not be made under the circumstances that exist in a negotiated

---

[22] Jeffrey Cancellieri Tr. at 94:18-96:14 (Nov. 14, 2012).
[23] Jeffrey Cancellieri Tr. at 95:9-22 (Nov. 14, 2012).

settlement that resolves the outcome of the loss contingency. Because of these features, in my opinion, the fact that ResCap disclosed a range of reasonably possible losses related to litigation matters, potential repurchase obligations, and related claims, over existing accruals, of between $0 and $4 billion does not mean that the $8.7 billion settlement is per se unreasonable.

*[signature: Katherine Schipper]*

Katherine Schipper
January 15, 2013