MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York 10104
Telephone: (212) 468 8000
Facsimile: (212) 468 7900
Gary S. Lee
Anthony Princi
Darryl Rains

*Counsel for the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, et al., | Chapter 11 |
| Debtors. | Jointly Administered |

**REPLY DECLARATION OF FRANK SILLMAN IN SUPPORT OF DEBTORS'
MOTION PURSUANT TO FED. R. BANKR. P. 9019 FOR APPROVAL OF THE
<u>RMBS TRUST SETTLEMENT AGREEMENTS</u>**

1. I serve as Managing Partner for Fortace, LLC ("Fortace"), an advisory and consulting firm to banks, mortgage companies, insurance companies, trustees and other investors. I submit this Declaration at the request of Debtors in response to the report and deposition of the Unsecured Creditors' Committee's expert, J.F. Morrow. My credentials and experience are described in my prior declarations.

2. In my industry experience as well as in my work with Fortace, I have reviewed thousands of loans for the purpose of evaluating repurchase demands.

3.      I was asked by counsel for the Debtors to respond to the loan re-underwriting analysis performed by the Committee's expert, J.F. Morrow. To that end, and in conjunction with selected Fortace personnel under my supervision, I performed a review of the sample of 1500 loans selected by the Committee's expert, Bradford Cornell. Except as otherwise indicated, all statements in this Reply Declaration are based upon my review of these documents, my discussions with the Debtors and their professionals, and my personal knowledge and expert experience.

4.      If I were called upon to testify, I could and would testify to each of the facts and opinions set forth below.

I.    **SUMMARY OF OPINIONS**[1]

5.      **Opinion 1: 43.5% of the Loans in the Sample Population Had Material Defects.** My team re-underwrote the 1500 sample loans selected by the Committee's expert, Bradford Cornell. I determined that the loans have a material defect rate of 43.5%. Mr. Morrow's 28.7% defect rate is flawed because he failed to thoroughly re-underwrite the loans, did not properly apply the applicable underwriting guidelines, and erroneously excluded 319 loans, or 21% of the selected population, from his analysis.

6.      **Opinion 2: The Losses Associated with Loans with Material Defects Range from $18.9 Billion to $21.6 Billion.** I next applied my material defect rate to the undisputed total estimated lifetime losses for the Trusts previously described in my earlier declarations. Under this analysis, the losses on loans with material defects ranges from $18.9 to $21.6 billion.

---

[1] To clarify the issues and seek greater consistency with the use of terms by the various parties throughout the briefings, I use the following terms: (1) "*defect rate*" refers to the percentage of loans with material breaches of representations and warranties; and (2) "*discount rate*" refers to the percentage of materially defective loans which the Debtors would be liable for after consideration of available defenses, counterarguments, and litigation costs.

7. **Opinion 3: After Factoring in Available Defenses, Counterarguments, and Litigation Costs, the Debtors' Likely Damages Would Range From $7.8 to $10.2 Billion.** I discount the losses from material defects to account for available defenses, counterarguments, and litigation costs, using the 41% to 47% discount rate described in my earlier declarations. Application of this discounted rate produced an estimated range of exposure from $7.8 to $10.2 billion.

## II. THE RE-UNDERWRITING RESULTS SHOW THAT APPROXIMATELY 43.5% OF THE MORTGAGE LOANS HAVE MATERIAL DEFECTS

8. My underwriting review of the same 1500 loans used in Mr. Morrow's and Dr. Cornell's analyses yielded a 43.5% defect rate. In this section, I describe the methodology followed to re-underwrite the loan files and then discuss the results.

### A. Methodology

9. I worked with and supervised a team of 42 underwriters (the "Underwriters") and 3 underwriting managers (the "Underwriting Managers") in conducting a detailed review of the 1500 loans. The Underwriters have a minimum of three years of experience in one or more of the following areas: residential mortgage underwriting, mortgage loan auditing, mortgage loan quality control and mortgage re-underwriting experience. The Underwriting Managers have five or more years of experience in one or more of these same areas.

10. As a first step, my team of Underwriters, Underwriting Managers and I familiarized ourselves with the applicable underwriting guidelines and automated underwriting system (AUS) loan approval formats to ensure that our re-underwriting analysis of the loan files was based on those requirements. These included the GMAC RFC Client Guides, GMAC RFC

3

Client Guide Bulletins, other Lender underwriting guidelines, as applicable, and AUS Loan Approval formats.

11. Next, my team conducted a review of the loan file (where available) for each of the 1500 loans, and recalculated and recorded various credit and other metrics relevant to the underwriting analysis. These metrics included, among others, the debt-to-income ratio, loan-to-value ratio, and combined loan-to-value ratio. My team also otherwise reviewed the loans for compliance with the AUS loan approval or applicable underwriting guidelines.

12. The re-underwriting process included, among other things, a review of the following characteristics and a comparison of those characteristics to the applicable underwriting guidelines or AUS, as applicable:

(a) <u>Income</u>:  The income related documentation, if any, required to satisfy the underwriting guidelines;

(b) <u>Employment</u>:  The employment related documentation, if any, required to satisfy the underwriting guidelines;

(c) <u>Assets</u>:  The asset related documentation, if any, required to satisfy the underwriting guidelines;

(d) <u>Appraisal</u>:  The appraisal related documentation, if any, required to satisfy the underwriting guidelines;

(e) <u>Credit</u>:  The credit related documentation, if any, required to satisfy the underwriting guidelines;

(f) <u>Insurance</u>:  The insurance documentation, if any, required to satisfy the underwriting guidelines;

4

(g) <u>Title</u>: The title documentation, if any, required to satisfy the underwriting guidelines; and

(h) <u>Transaction details</u>: The transaction related documentation, if any, including the Purchase Contract if applicable, required to satisfy the underwriting guidelines.

13. During the course of the review, my team used various industry-accepted third-party re-verification tools to help validate origination information.

(a) <u>MERS</u>: The MERS Link report allowed the Underwriters to check if there were any undisclosed mortgages at the time of origination of the subject loan that were not disclosed by the borrower and not included in their debt-to-income ratios.

(b) <u>Accurint</u>: The Deep Skip Search report allowed the Underwriters to validate whether or not the borrower(s) were associated with the subject property during the required period after the close of the subject loan for owner occupied transactions.

(c) <u>The Work Number</u>: The Current and Previous Employment report available through The Work Number allowed the Underwriters to validate income and employment for borrowers whose employers provide employment data to The Work Number.

(d) <u>Verbal Verification of Employment (VVOE)</u>: If the Underwriters were unable to obtain the employment information from The Work Number, then he or she might elect to obtain the employment information directly from the employer and record the results on a VVOE form.

14. The Underwriters recorded the results of their review on a spreadsheet template, entitled "Re-Underwriting Findings Summary Report," that I designed for this purpose.

15. Once the Underwriters completed their work, the Underwriting Managers performed quality control checks on a portion of the results to assess the accuracy and

completeness of the information presented. As part of these reviews, the Underwriting Managers validated the accuracy of the Underwriters' findings against the data and documents in the imaged loan files, checked some or all of the Underwriters' calculations, and referred to the applicable guidelines or AUS as needed.

16. After the Underwriting Managers completed their review of the findings, I then reviewed the Re-Underwriting Findings Summary Report for each and every one of the loans, and made the ultimate determination as to whether a loan was "materially defective" based on the information available. To the extent I deemed it necessary or desirable to refer to the actual loan file or underwriting guidelines, the AUS or Loan Approval, the governing agreements or to any portion of the backup provided by Mr. Morrow, those materials were available to me and I made use of them. I also had conversations with the Underwriters and Underwriting Managers on my team during which I posed questions and obtained clarification regarding various aspects of the loans reviewed if I felt it was necessary.

17. If the loan was underwritten substantially in accordance with the applicable guidelines or AUS, I designated the loan to be in substantial compliance ("In Substantial Compliance").

18. If the loan was deemed to have defects that materially increased the risk of the loan, I deemed the loan to be materially defective ("Materially Defective").[2]

19. In addition to making an independent assessment of each loan file, I also considered the various backup materials provided by Mr. Morrow in connection with his report, including Mr. Morrow's re-underwriting data and survey results, and the survey questions that Mr. Morrow's team was asked to answer.

---

[2] For purposes of this expedited review, I used a lack of substantial compliance with applicable guidelines as a proxy for breaches of contractual representations and warranties, as did Mr. Morrow; consideration of additional information, including specific aspects of the securitization transaction documents, could impact the results.

6

20. I found many cases where I disagreed with Mr. Morrow's conclusions and found loans to be materially defective where he had not. I found that 188 of the loans that Mr. Morrow deemed Investment Quality were, in fact, Materially Defective.

21. With regard to those instances where I agreed with Mr. Morrow's ultimate conclusion, I did not uncover any information suggesting that the originator's underwriter did not make a good faith determination about the loan at the time of origination. Indeed, it is possible that the originator's underwriters had documents or information available to them at the time about the particular circumstances of a given loan application that neither Mr. Morrow nor I possessed during our analysis of these loans over five years after they were originally considered.

### B.     Results

22. Based on the review of the loan files described above, I concluded that 652 loans in the 1500 loan sample had material underwriting defects, or 43.5% of the sample loans. However, my defect rate of 43.5% would have been higher if I had considered all of the issues plaintiffs' experts are seeking out as potential breaches of representations and warranties, rather than using a conservative approach.

### C.     Mr. Morrow's Re-Underwriting Methodology is Flawed

23. I reviewed the underwriting methodology used by the Unsecured Creditors' Committee's expert, Mr. Morrow, as described in his expert report. I found that Mr. Morrow's approach was flawed in several respects.

24. First, Mr. Morrow's team failed to even attempt to underwrite the full 1500 loans in the sample. Instead, Mr. Morrow excluded 319 loans, or 21% of the selected population, based on missing loan documentation, without offering any reasonable explanation for this exclusion. Indeed, elsewhere in his report, Mr. Morrow sometimes considered missing

7

loan documentation such as income, asset or employment information to be a material defect.[3] Yet, for these 319 loans, which are missing those same types of loan documents, Mr. Morrow simply excluded them from the re-underwriting sample and did not count them as materially defective. In my professional experience with thousands of repurchase demands, underwriters routinely cite missing documents as a material defect. In my own review, I found 282, or 88%, of the erroneously excluded loans, to be missing key loan documents and therefore considered them to be materially defective for purposes of my analysis. This finding contributed to my overall higher estimated material defect rate of 43.5%.

25. Second, Mr. Morrow's use of an overly restrictive "survey" to direct his underwriting team did not approximate what was required under the applicable underwriting guidelines. Mr. Morrow's team used a "checklist" that unduly limited the discretion of his underwriters and dictated the scope of their analysis based on answers to previous questions and Mr. Morrow's own restrictive formulation of applicable compensating factors. The checklist was not, and could not be, as comprehensive as the applicable underwriting guidelines, which are hundreds of pages long. This rigid question-by-question process is inconsistent with the holistic way that the applicable guidelines were intended to be applied, and likely caused Mr. Morrow to miss many more loans with material defects. The origination underwriting process involved a comprehensive analysis of the entire loan file (including compensating factors) to determine whether, based on the totality of information in the file, a given loan was a sound credit risk. A final decision could not have been reached by looking only at individual underwriting components or by placing the most weight on a single component. On the contrary, risk components are specific to each mortgage request, and underwriting is, in substantial part, a

---

[3] Morrow Report at ¶ 70.

subjective determination based on the loan file as a whole; these aspects of loan underwriting cannot be captured by the use of a mere checklist.

26.  Finally, Mr. Morrow's 28.7% material defect rate was misleadingly low because he failed to review loans for issues that plaintiffs' experts routinely address.  For example:

(a)  Mr. Morrow wrongly assumed that the sample loans met the appraisal requirements without any attempt to conduct a retrospective review of the original appraisal.[4]  But plaintiffs routinely use various techniques, including retrospective appraisal reviews, to revalue the property at the time of purchase.  This allows plaintiffs to re-assess the stated loan-to-value ratios.  Based on these reappraisals, plaintiffs typically find substantially higher loan-to-value ratios than those reported by the Debtors.  In my experience, this finding increases the alleged percentage of material defects.

(b)  Mr. Morrow did not take any steps to verify owner occupancy.[5]  But like the use of appraisal models, plaintiffs often use public records or other forensic services to re-evaluate whether the borrower actually occupies the property.  Plaintiffs typically find substantially lower owner-occupancy percentages than those reported by the Debtors.  In my experience, this finding increases the alleged percentage of material defects.

(c)  Plaintiffs also typically perform other re-verifications beyond what is available in the loan files and tapes.  These procedures include, among others, new credit reports to access potential undisclosed debt and re-verify income and employment details such as title, job responsibilities, and employment dates.[6]  Mr. Morrow failed to consider these issues in

---

[4]  Morrow Report at ¶ 84; Morrow Deposition Tr. at 106.

[5]  Morrow Report at ¶ 58; Morrow Deposition Tr. at 105.

[6]  Instead of seeking to re-verify borrower income, Mr. Morrow concludes the guidelines "provided no practical

9

his re-underwriting methodology.[7] In my experience, these additional re-verification procedures also increase the alleged percentage of material defects. During the course of our re-underwriting, we found certain defects based on these re-verifications. For instance in Loan No. 438032666, the verification of employment performed during the re-underwriting found that the co-borrower was not employed at the employer represented on her loan application at the time of the loan's closing thereby invalidating the co-borrower's income and increasing the debt-to-income ratio above the applicable underwriting guidelines. In another example, Loan No. 7441453966, a MERS search revealed the borrower had three properties secured by mortgages that were not disclosed on the loan application or found on the borrower's credit report, and therefore were not factored in the underwriting decision at the time of origination. The principal, interest, taxes and insurance payments on these undisclosed mortgages caused the debt-to-income ratio to exceed the applicable underwriting guidelines.

27.     These omissions in Mr. Morrow's underwriting process explain why his material defect rate is considerably lower than mine, and also explain why 43.5% is a more realistic number than Mr. Morrow's artificially deflated 28.7% defect rate.

---

guidance" on how to determine "reasonableness" of stated income, and then seizes the opportunity to simply make up a standard "based on [his] underwriters and on the industry norms for determining whether an income was reasonable." Morrow Report at ¶ 69. Not only does this approach fail to consider what a plaintiff's expert would do, but it also contradicts the underwriting guidelines at issue, which often instruct underwriters to evaluate the file for reasonableness based on other factors such as job title, position, employment history, assets, and/or credit history to determine whether they were consistent with stated income. Mr. Morrow improperly imposes his own underwriting standards during his re-underwriting process. The applicable underwriting guidelines did not require or recommend the use of the Bureau of Labor Statistics (BLS) data for the purpose of underwriting stated income loans. Additionally, BLS doesn't survey self-employed individuals or provide any income data for self-employed individuals. Since self-employed borrowers make up a substantial portion of stated income loans, any use of BLS data in the evaluation of stated income loans is invalid.

[7] Morrow Report at ¶ 58; Morrow Deposition Tr. at 105-106.

III. **THE LOSSES ON LOANS WITH MATERIAL DEFECTS RANGE FROM $18.9 BILLION TO $21.6 BILLION**

28. By applying my underwriting-based defect rate of 43.5% to my previous calculation of the expected range of total estimated lifetime losses (which none of the objectors has challenged), I calculated an expected range of losses for loans with material defects of $18.9 to $21.6 billion.

29. Dr. Cornell applied a different methodology, attempting to calculate the dollar amount of just the losses *attributable* to the material defect, rather than the total losses associated with loans containing material defects. I disagree with Dr. Cornell's methodology for two reasons. First, it is inconsistent with the Governing Agreements, which specify a formula for the "repurchase price" that is to be paid for repurchase of a defective loan (and which is different from Dr. Cornell's methodology). Second, it is inconsistent with the industry standard of how losses are realized on repurchases. For example, with Fannie Mae, a lender is required to either (1) repurchase the loan[8], in which case the lender absorbs the total loan losses, or (2) in the case of a loan that was already liquidated, the lender is responsible to "make whole" the loss or required to reimburse Fannie Mae for the entire loss[9], not just the portion of the losses attributable to the material defect. This approach, in contrast to the one used by Dr. Cornell, is also consistent with my industry experience as to how repurchase prices are typically calculated.

---

[8] Fannie Mae Seller Guide I, 208.01: Repurchase as Result of Warranty Violations (01/31/06) ("If our underwriting performance review discloses (or we otherwise learn) that a mortgage did not meet our requirements because it was in violation of a contractual warranty (including instances of fraud or misrepresentation), we will require the selling lender to repurchase the mortgage or property (or our participation interest in the mortgage). We also may require repurchase if any warranty the selling lender made is untrue—whether or not the lender had actual knowledge of the untruth—unless the warranty specifically states that a violation does not exist [and] unless the lender had actual knowledge of the untruth. The fact that a mortgage has passed our quality assurance review or any other review we performed does not in any way limit our right to require repurchase if we later discover a warranty breach. In some instances, we may permit the lender to correct a warranty violation, rather than requiring it to repurchase the mortgage.").

[9] Fannie Mae Seller Guide I, 208.01: Repurchase as Result of Warranty Violations (01/31/06) ("We may request either the immediate repurchase of a property or an indemnification against any losses we may subsequently incur when a post-foreclosure underwriting review reveals significant underwriting deficiencies.").

11

IV. **AFTER FACTORING IN AVAILABLE DEFENSES, COUNTERARGUMENTS, AND LITIGATION COSTS, THE DEBTORS' LIKELY DAMAGES RANGE FROM $7.8 TO $10.2 BILLION**

30. After determining the percentage of loans with material defects, I discounted those findings for available defenses, counterarguments, and litigation costs. To do so, I applied my previously described discount rate of 41% to 47% to the defect rate determined by my re-underwriting work. This provided a final range of reasonable exposure of between $7.8 billion and $10.2 billion.

| Estimated Lifetime Losses | | x | Defect Rate | = | Losses on Defective Loans | | x | Discount Rate Range | | = | Final Range of Likely Damages | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Low | High | | | | Low | High | | Low | High | | Low | High |
| $43.5 | $49.8 | | 43.5% | | $18.9 | $21.6 | | 41% | 47% | | $7.8 | $10.2 |

V. **THE OBJECTORS' RELIANCE ON THE DEBTORS' PLS REPURCHASE DATA DOES NOT CONTRADICT A REASONABLE DISCOUNT RATE BETWEEN 41% AND 47%**

31. Contrary to the suggestion of Mr. Brown and Dr. Cornell[10], the Debtors' PLS repurchase data does not undermine my estimated overall likely discount rate range of 41% to 47%. Rather, the Debtors' PLS repurchase data is of extremely limited guidance because so few of the PLS-related repurchase demands directed to the Debtors have been fully resolved to date. The following chart summarizes the available data[11] regarding loans for which repurchase demands were made to the Debtors and the Debtors had an opportunity to review and respond to the demands.[12]

---

[10] Brown Report at ¶¶ 26-28; Cornell Report at ¶ 81.

[11] RC-9019_00056670.xls.

[12] I omitted from this chart the 3,490 loans for which a repurchase demand had been made, but the loan was still pending review, because ResCap had not yet had an opportunity to take a position as to those loans.

12



32.  As shown in the chart above, the Debtors have already made a final decision to agree to repurchase or make whole the party asserting the repurchase demand on approximately 14% of *all* PLS repurchase demands. In only 4% of the cases fully reviewed by the Debtors did the demanding party agree to withdraw or rescind the repurchase request. The vast majority of the repurchase demands (82%) represent a disagreement between the parties.

33.  The available PLS repurchase data makes clear that even the Debtors are likely to concede a *minimum* of 14% of the repurchase demands are valid and the loans should be repurchased. This percentage would undoubtedly rise given that a portion of the remaining 82% unresolved PLS repurchase demands would also likely result in repurchases after trial, should each demand be litigated.[13] The Objectors' experts erroneously focus solely on the small percentage of loans that the Debtors have currently agreed to repurchase, and completely disregard the 82% of repurchase demands that remain unresolved.

34.  Ultimately, I concluded that the unresolved demands, together with the 14% minimum, would likely end up in the same 41% to 47% discount range that I calculated based on the Debtors' robust GSE repurchase demand data, the Settlement Trusts' representations and warranties, and my industry experience.

---

[13] Brown Deposition Tr. at 56 (admitting unresolved demands could "Possibly" be losses in litigation).

## CONCLUSION

35. Based on my analysis described above, as well as my prior work on this matter, it is my opinion to a reasonable degree of certainty that the proposed Allowed Claim of $8.7 billion appears to be in the range of reasonableness. I swear under the penalty of perjury that the foregoing is true and correct.


Executed on this 15th day of January, 2013 in _Los Angeles, CA_.

_____
Frank Sillman