GIBBS & BRUNS LLP
Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Residential Capital, LLC, et al. | Case No. 12-12020 (MG) |
| Debtors. | Jointly Administered |

**THE STEERING COMMITTEE INVESTORS' CONSOLIDATED REPLY**
**TO THE OBJECTIONS TO THE RMBS TRUST SETTLEMENT AGREEMENT**

# TABLE OF CONTENTS

I.   The $8.7 Billion Allowed Claim Is Not Unreasonably Large ............................................. 1

   A.   Claim Size and the Existing Litigation Discount ..................................................... 2

      1.   Claim Size ..................................................................................................... 2

      2.   The Existing Litigation Discount .................................................................. 4

   B.   The Committee's Objection Is Premised on the Assumption that the Debtors' Legal Defenses Are Highly Likely to Prevail............................................ 5

   C.   The Debtors' Legal Defenses Are Unlikely to Prevail ............................................ 6

      1.   Causation........................................................................................................ 6

         a.   Neither the Common Law Nor the Contracts at Issue Impose a Causation Requirement................................................................ 7

         b.   Alleged Delay in Asserting the Trusts' Claims Provides No Basis for Imposing an Extra-Contractual Causation Requirement ……………..................................................... 9

      2.   Defenses Based on the Trusts' Alleged Failure to Pursue Their Claims in a Timely Fashion .......................................................................... 11

         a.   The Equitable Bar  ............................................................................ 11

            i.   The Debtors' Obligations to Identify, Give Notice of, and Pursue Repurchase of Defective Mortgages on Behalf of the Trusts, and Their Failure to Do So ................................................. 12

            ii.   The Debtors' Misconduct Bars Its Assertion of a Statute of Limitations Defense ........................................................................ 14

            iii.   The Debtors' Misconduct Bars Its Assertion of an Election of Remedies Defense ........................................................................ 16

         b.   The Statute of Limitations Defense Lacks Merit............................. 19

         c.   The Election of Remedies Defense Lacks Merit ............................. 19

II.   The Settlement Allocation Formula is Not Flawed ........................................................... 22

III.   The Scope of Claims Released By the Trust is Clear on the Face of the Settlement ........ 22

IV.   There Are No Standing or Constitutional Impediments .................................................... 23

V.   The Objections Regarding Subordination are Premature .................................................. 24

VI.   The Objections to the Provision of the Settlement Allocating Claims to Counsel Are Meritless ............................................................................................................................ 24

VII.   Conclusion ........................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Accord Syncora Guarantee, Inc. v. EMC Mortg. Corp.*,
    2012 WL 2326068 (S.D.N.Y. 2012) ................................................................. 8

*Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*,
    2012 WL 4373327 (S.D.N.Y. 2012) ............................................................ 7, 8

*Banco de Desarrollo Agropecuario, S.A. v. Gibbs*,
    709 F. Supp. 1302 (S.D.N.Y. 1989) ............................................................... 14

*Benincasa v. Garrubbo*,
    141 A.D.2d 636 (2d Dept. 1988) ................................................................... 17

*Bulgartaba Holding AD v. Republic of Iraq*,
    2011 WL 6015759 (2d Cir. 2011) ................................................................. 14

*Croce v. Kurnit*,
    565 F. Supp. 884 (S.D.N.Y. 1982) ................................................................. 14

*Days Inn Worldwide, Inc. v. Hazard Mgmt. Group, Inc.*,
    2012 WL 5519356 (S.D.N.Y. 2012) ............................................................... 9

*General Stencil, Inc. v. Chiappa*,
    18 N.Y.2d 125 (1966) .................................................................. 11, 14, 15, 17

*Glus v. Brooklyn East. Dist. Term.*,
    359 U.S. 231 (1959) ..................................................................................... 11

*IIT v. Cornfeld*,
    619 F.2d 909 (2d Cir. 1980) ......................................................................... 14

*In re Dewey & LeBoeuf LLP*,
    640 (Bankr. S.D.N.Y. 2012) ............................................................................ 2

*Khadka v. American Home Mortg. Serv., Inc.*,
    2012 WL 5252078 (N.Y. Sup. Ct. 2012) ...................................................... 18

*Kooleraire Serv. & Installation Corp. v. Board of Ed. Of City of New York*,
    28 N.Y.2d 101 (1971) ................................................................................... 18

*LaSalle Bank Nat. Assn. v. Lehman Bros. Holdings, Inc.*,
    237 F.Supp.2d 618 (D. Md. 2002) ................................................................ 19

*Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas*,
    2012 WL 2389868 (E.D. Ark. 2012) ............................................................. 19

*Levy v. Braverman*,
 24 A.D.2d 430 (1st Dept. 1965) ...................................................................... 10

*Mastr Asset Backed Sec. Trust 2006 HE3 v. WMC Mortg. Corp.*,
 2012 WL 4511065 (D. Minn. 2012) .............................................................. 16

*Matter of Coger v. Cusumano*,
 191 A.D.2d 493 (1993) ................................................................................... 10

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*,
 23 F. Supp. 2d 439 (S.D.N.Y. 1998) ............................................................. 14

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
 84 N.Y.2d 430 (1994) ....................................................................................... 8

*Ogle v. Fidelity & Deposit Co.*,
 586 F.3d 143 (2d Cir. 2009) .......................................................................... 25

*Pecorella v. Greater Buffalo Press, Inc.*,
 107 A.D.2d 1064, (4th Dept. 1985) ............................................................... 10

*Pet, Inc. v. Lustig*,
 77 A.D.2d 455 (N.Y. App. Div. 1980) ........................................................... 14

*Putter v. North Shore. Univ. Hosp.*,
 7 N.Y.3d 548 (2006) ...................................................................................... 14

*Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*,
 13 N.Y.3d 398 (2009) .................................................................................... 21

*Rubinstein v. Rubinstein*,
 23 N.Y.2d 293 (1968) ...................................................................................... 9

*Scheiber v. Dolly Lab., Inc.*,
 293 F.3d 1014 (7th Cir. 2002) ....................................................................... 10

*Uciechowski v. Ehlrich*,
 221 A.D.2d 866 (1995) ................................................................................... 10

*Vacold LLC v. Cerami*,
 545 F.3d 114 (2d Cir. 2008) ............................................................................ 9

*Williamson v. Stallone*,
 28 Misc.3d 738 (Sup. Ct. N.Y. Cnty. 2010) ................................................. 10

*Zaitchick v. American Motorists Inc. Co.*,
 554 F.Supp. 209 (S.D.N.Y. 1982) ................................................................. 17

*Zurakov v. Register.com, Inc.*,
    304 A.D.2d 176 (1st Dept. 2003).......................................................................................... 21

**Other Authorities**

N.Y. C.P.L.R. § 5001.................................................................................................................. 3

N.Y. C.P.L.R. § 5004.................................................................................................................. 3

Securitization of Financial Assets §§ 1604[B][1]........................................................................ 20

TO THE HONORABLE MARTIN GLENN:

The Steering Committee of Institutional Investors files this reply to address objections to

Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement

Agreement filed by: (i) the Official Committee of Unsecured Creditors (the "Committee"), (ii)

Financial Guaranty Insurance Company ("FGIC"), (iii) MBIA Insurance Corporation ("MBIA"),

(iv) Wilmington Trust, National Association ("Wilmington"), (v) Amherst Advisory &

Management, LLC ("Amherst"), (vi) New Jersey Carpenters Health Fund, as lead securities

plaintiff (the "Lead Securities Plaintiff"), and (vii) AIG Asset Management (U.S.), LLC

("AIG"), (viii) Triaxx Prime CSO 2006-1 LLC, et al. ("Triaxx").

## I.    The $8.7 Billion Allowed Claim Is Not Unreasonably Large

The Committee, echoed by FGIC, objects that the proposed $8.7 billion allowed claim is

unreasonably large.  This position cannot be squared with the Committee's evidence that:  (1) the

loans Debtors sold to the Trusts were so rife with breaches of representations and warranties that

– *in the estimation of the Committee's own experts* – the Trusts are entitled to demand the

repurchase of <u>$16.5 billion in mortgages</u>, exclusive of billions of dollars in prejudgment interest

that would also be due and owing on the Trusts' claims; and (2) Debtors' only chance to reduce

this amount to a sum *approaching* the $8.7 billion settlement would require Debtors to prevail on

a series of tenuous legal arguments that, if unsuccessful, expose the Debtors (and all other

interested creditors) to a claim more than twice the size of Debtors' proposed settlement.

In light of these facts, the Committee's objection is meritless.  The $8.7 billion settlement

is within the "range of reasonableness"[1] unless the legal arguments advanced by the Committee

---

[1] "A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable, and in the best interests
of the estate before it may approve it.  In so doing, the Court need not decide the numerous issues of law and fact
raised by a compromise or settlement, but must only canvass the issues and see whether the settlement falls below

are so clearly correct, and so overwhelming likely to prevail, that it can be said with certainty that they justify a massive *additional* discount beyond the discount already included in the settlement. They are not. Rather, the legal arguments on which the Committee's objection hinges are, if pressed, likely to fail, at greatly increased cost and greatly reduced recovery for all creditors *except* the RMBS Trusts.

### A.    Claim Size and the Existing Litigation Discount

#### 1.    Claim Size

The Committee does not dispute (because it cannot) that Debtors sold huge numbers of residential mortgages to the Trusts that breached Debtors' representations and warranties. Nor does the Committee dispute (because it cannot) that these breaches of representations and warranties give rise to repurchase claims in favor of the Trusts against the Debtors. What is in dispute is the size of these claims, *i.e.*, the amounts that would be owed to the Trusts by the Debtors if the Trusts were to successfully enforce their repurchase claims.

To address this issue, the Committee retained an expert, J.F. Morrow, who, together with a team of mortgage underwriters from Analytics Focus LLC, performed a forensic re-underwriting of a statistically significant sample of loans from the Trusts in order to estimate the extent of the breaches of representations and warranties.[2] The Committee also retained California Institute of Technology Professor Bradford Cornell to determine (among other things) the losses associated with Debtors' defective mortgages, *i.e.*, the amounts Debtors would owe to the Trusts if the Trusts successfully enforced their repurchase claims. These experts conclude

---

the lowest point in the range of reasonableness." *In re Dewey & LeBoeuf LLP*, 640 (Bankr. S.D.N.Y. 2012) (Glenn, J.) (citations and quotations omitted).

[2] *See* Expert Report of J. R. Morrow, Exhibit B to The Official Committee of Unsecured Creditors' Federal Rule of Civil Procedure 26(A)(2) Expert Disclosures ("Morrow Report").

that "the gross losses suffered with respect to loans with material defects total approximately

$16.5 billion."[3]  As stated by the Committee and its experts:

> [D]efective loans account for 36.6% of losses to date among sample loans,
> implying that *36.6% of the $45.2 billion in overall lifetime losses will occur on
> loans with material underwriting defects.*[4] . . .
>
> [A]ssuming that 'lifetime' loan losses will reach $45.2 billion – the mid-point of
> the range estimated by Mr. Sillman[5] – the re-underwriting results imply that *total
> losses on loans with material underwriting defects will total $16.5 billion* . . . .[6]

Thus, by the Committee's own estimate, the Trusts' claims, before discounts premised on the

successful prosecution of legal defenses, total at least $16.5 billion.

As large as it is, the Committee's $16.5 billion estimate actually understates the claim

size.  First, it overlooks a key element of the Trusts' claims:  prejudgment interest.  The Trusts'

claims are governed by New York law, which requires a mandatory award of prejudgment

interest, calculated at 9% per annum from the date of loss.[7]  This prejudgment interest would

---

[3] *See* Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion Pursuant to Fed. R. Bankr.
P. 9019 for Approval of the RMBS Trust Settlement Agreements ("Committee Objection") at 29 (emphasis added).

[4] *Id.* at 28 n. 35 (emphasis added).

[5] Frank Sillman is Debtors' expert.  He estimated the Trusts' lifetime losses (actual and projected) and repurchase
claim size.  *See* Declaration of Frank Sillman in Support of Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for
Approval of the RMBS Trust Settlement Agreements (Docket No. 320-8).  Neither the Committee nor its experts
challenge Sillman's estimate of lifetime Trust loan losses.

[6] *See* Expert Report of Bradford Cornell, Ph.D., Exhibit A to The Official Committee of Unsecured Creditors'
Federal Rule of Civil Procedure 26(A)(2) Expert Disclosures ("Cornell Report") at 28 (emphasis added).

[7] New York law provides for mandatory 9% prejudgment interest from the date of the injury.  N.Y. C.P.L.R. §§
5001, 5004.  The repurchase claims arise under the PSAs for the Trusts, which are governed by New York law.  *See*
PSA  at § 11.04 ("PSA" means and refers to the Pooling and Servicing Agreements governing the Trusts.  Unless
otherwise indicated, citations to the PSA are to the PSA attached as Exh. 6 to the Debtors' original 9019 Motion
(Docket No. 320-5, 320-6).

total approximately $3 billion,[8] increasing the size of the Trusts' claims (before considering legal

defenses) to **$19.5 billion**, i.e., more than <u>twice</u> the size of the proposed $8.7 billion settlement.

In addition, the loan file review by the Committee's expert likely understates the claim

size because it is premised on a number of aggressive assumptions designed to minimize the

defect rate.[9]  The effects of these assumptions can be seen in the fact that, in contrast to the

28.7% defect rate found by the Committees' expert, when the Debtors expert reviewed the same

loan file sample, he found a 43.5% defect rate.[10]

### 2.    The Existing Litigation Discount

Because the Committee accepts that the Trusts have an enormous potential claim against

the Debtors, the Committee's objection is <u>not</u> that the settlement overvalues the Trusts' claims.

Rather, its objection is that the settlement under-values the Debtors' purported legal defenses to

the claims. What the Committee fails to acknowledge, however, is that the $8.7 billion proposed

settlement amount <u>already</u> includes a *$7.8 billion discount below* the Committee's already

conservative $16.5 billion estimate of the claim size.  When mandatory prejudgment interest is

included, the discount rises to *$10.8 billion*.

Thus, the Committee's objection is premised entirely on the notion that the Debtors' legal

defenses are so compelling, and would have such a dramatic effect on the Trusts' claim size, that

the existing discount is *unreasonably* small in comparison.   These are surely matters of

---

[8] Assuming the Trusts' realized losses of $30.3 billion occurred at a constant rate over the last six years (an assumption that almost certainly understates the actual interest due), 9% prejudgment interest on the $16.5 billion claim size estimated by the Committee's experts would be approximately $3 billion.

[9] For example, the Committee's re-underwriting expert excluded from his sample all so-called incomplete loan files (despite the fact that the absence of required documentation is itself a defect), and excluded as "immaterial" breaches loan files that did not include title policies or evidence of a first lien (despite the fact that these defects can create significant losses upon foreclosure).  *See, e.g.* Morrow Report at ¶ 57.

[10] *See* Supplemental Sillman Report, filed by Debtors in connection with their reply in support of the Debtors' 9019 Motion.

judgment: Debtors, for the sake of all their creditors, made the reasoned judgment that a fifty

percent discount from a certain and catastrophic liability was *reasonable*. The Committee, in

contrast, prefers to gamble based on the indefensible assumption that the Debtors' defenses are

virtually *certain* to succeed, and so urges the court to dragoon innocent creditors into a multi-

billion high stakes gamble that risks billions in additional losses. Neither the law, nor Rule 9019,

permits such an extreme result.

**B.**    **The Committee's Objection Is Premised on the Assumption that the Debtors' Legal Defenses Are Highly Likely to Prevail**

According to the Committee, if Debtors prevail on certain causation and limitations

defenses the Trusts' claims could be reduced to as low as $2.7 billion, (and perhaps lower, by an

unspecified amount, if an election of remedies defense is successful).[11] Thus, the Committee

argues that $13.8 billion of the total $16.5 billion claim size is placed "at risk" by the Debtors'

legal defenses. However, the proposed $8.7 billion settlement *already* includes a $7.8 billion

discount below the Committees' $16.5 billion claim size estimate. Thus, the settlement *already*

credits the Debtors with a _56%_ probability of: (i) prevailing on *all* of the defenses the Committee

advocates, (ii) capturing *all* of the $13.8 billion "at risk," and (iii) reducing the Trusts' claim to

$2.7 billion.[12] When mandatory prejudgment interest is included, the existing discount balloons

to a _67%_ probability of complete success for the Debtors.[13] Even if prejudgment interest is

---

[11] Committee Objection at 29.

[12] A 56% probability of capturing $13.8 billion has a discounted "value" of $7.8 billion (13.8 x .56 = 7.8).

[13] When mandatory prejudgment interest is added to the Committee's estimate of the Trusts' claims: (1) the claim size rises to $19.5 billion (as explained *supra*); (2) the existing discount rises to $10.8 billion (19.5 – 10.8 = 8.7); (3) the $2.7 billion value that the Committee assigns to the Trusts' claims if the Debtors prevails on their causation and limitations defenses increases to $3.4 billion; and (4) the amount that is placed "at risk" by the Debtors defenses increases to $16.1 billion (19.5 – 3.4 = 16.1). Thus, where prejudgment interest is included, the existing $10.8 billion discount factors in a 67% probability that the Debtors will prevail on its causation and limitations defenses and capture the entire $16.1 billion placed at risk by these defenses (16.1 x .67 = 10.8).

ignored, and it is assumed that the Debtors' legal defenses, if successful, could reduce the Trusts' claims to zero – a position that not even the Committee advances – the settlement still factors in a *47%* probability that the Debtors will prevail on all of their legal defenses.

The Committee's objection ignores these facts. It inexplicably argues that "the Debtors' legal defenses need not be sure-fire winners, but need only be *credible*, to call into doubt the merits of the Settlement."[14] The Committee is wrong. The settlement already credits these defenses as being far more than "credible." It accounts for a nearly 70% probability that they will prevail. Thus, for the settlement to be unreasonable, the Debtors' defenses would "need to be sure-fire winners." They are not remotely so (as discussed below). Indeed, the Committee itself admits "*it is uncertain whether and to what extent each of these defenses would operate to reduce the Debtors' RMBS liability*."[15]

### C.    The Debtors' Legal Defenses Are Unlikely to Prevail

The Debtors' legal defenses fall into two categories: (1) causation and (2) defenses based on the alleged failure of the Trusts to pursue their claims in a timely fashion. Neither has merit.

### 1.    Causation

The Committee advances two meritless arguments as to why the Trusts are entitled to recover only losses <u>caused</u> by breaches of representations and warranties (*i.e.*, losses that would not have occurred but for the breaches): (1) New York common law ostensibly requires a showing of causation to recover for breach of contract; and (2) the Trusts allegedly cannot enforce their repurchase remedy because the Trusts unreasonably delayed asserting their claims. Each is addressed below.

---

[14] Committee Objection at 30 (emphasis added).

[15] *Id.* at 29 (emphasis added).

### a.    Neither the Common Law Nor the Contracts at Issue Impose a Causation Requirement

The Committee claims that "black letter law" requires a showing of loss causation in an action to recover damages for breach of contract.  However, the pooling and servicing agreements ("PSAs") governing the Trusts provide that, where there is a breach of a representation or warranty regarding a mortgage, the "sole remedy" shall be repurchase by the seller at the price at which the mortgage was sold.[16]  Thus, the Trusts are not seeking to recover contract damages, to which a causation requirement applies under the common law.

*No case* cited by the Committee suggests, much less holds, that loss causation applies to actions to enforce a contractual repurchase requirement.  In fact, this precise argument was recently rejected by Judge Rakoff in a case addressing a virtually identical repurchase provision:

> Flagstar's primary argument in support of its summary judgment is that Assured failed to prove that the breaches [of representations and warranties regarding mortgages] caused Assured actual losses.  Of course, causation is ordinarily an essential element of damages in a breach of contract action.  But, as any first year law student knows, "causation" is far from a self-defining term, and raises all sorts of questions, such as whether the causation must be direct or indirect, transactional, proximate, risk-related, or whatever. Here, moreover, the damages being sought derive in substantial part from defendants' alleged failure to repurchase the loans, *a contractual remedy that was not tied to plaintiff's suffering any damages from the alleged breach.*[17]

Implying a loss causation requirement into a contract that provides par value repurchase as the "sole remedy" for a breach of a representation and warranty would turn the parties' bargain on its head.  When the contracts were signed, Debtors obtained the benefit of limiting the Trusts' remedy to repurchase; in return, they agreed to accept <u>all</u> risk of loss (whatever the

---

[16] *See* PSA at § 2.04.

[17] *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 2012 WL 4373327, at *3 (S.D.N.Y. 2012) (citations and quotations ommitted).

cause) associated with defective mortgages.[18]  Having elected this bargain, Debtors cannot now

upset it by importing inapposite common law limitations on the determination of *damages* to a

repurchase remedy the parties agreed would be the "*sole* remedy" for a breach.  New York law is

clear that "a limitation on liability provision in a contract represents the parties' agreement on the

allocation of risk of economic loss in the event that the contemplated transaction is not fully

executed, *which the courts should honor*."[19]

The Committee tellingly points to no language in the contract that refers to, much less

includes, a causation requirement in the repurchase remedy.  There is none:  by agreeing on both

the remedy *and the price at which it would be enforced*, the parties foreclosed any effort by

either of them to argue about whether the defect "caused" the loss *or any consequential damages

flowing from the loss*.  As Judge Rakoff explained in *Flagstar Bank*, loss causation plays no part

in the repurchase remedy because the contracts:

> do not mention 'cause,' 'loss' or 'default' with respect to defendants' repurchase
> obligations . . . [and] [i]f the sophisticated parties had intended that the plaintiff be
> required to show direct loss causation, they could have included that in the
> contract, but they did not do so, and the Court will not include that language now
> under the guise of interpreting the writing.[20]

In a marked understatement, the Committee admits "these cases introduce an element of

uncertainty regarding the application of the black letter damage causation rule discussed above."

They do far more than that.  These cases, on fact patterns identical to those at issue here, confirm

---

[18] "Representations and warranties are used to allocate the risk of defective mortgage loans among the mortgage originators, issuers of the securities and investors who purchase them."  American Securitization Forum News Release: ASF Releases Model Representations and Warranties to Bolster Risk Retention and Transparency in Mortgage        Securitizations        (Dec.        15,        2009)        *available        at* http://www.americansecuritization.com/Workarea/DownloadAsset.aspx?id=6706

[19] *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994) (emphasis added).

[20] *Flagstar Bank*, 2102 WL 4373327, at *5.  *Accord Syncora Guarantee, Inc. v. EMC Mortg. Corp.*, 2012 WL 2326068 (S.D.N.Y. 2012).

that any attempt to impose a loss causation requirement on the Trusts' repurchase claims is a losing proposition.

### b. Alleged Delay in Asserting the Trusts' Claims Provides No Basis for Imposing an Extra-Contractual Causation Requirement

The Committee's remaining attempt to impose a causation requirement can be summarized as follows: (i) enforcement of the repurchase remedy is an attempt to obtain the equitable remedy of specific performance, which is subject to equitable defenses, (ii) the Debtors can raise the equitable defense that the Trusts delayed in seeking to enforce the repurchase remedy, ostensibly because Debtors' were somehow prejudiced by the delay, and (iii) on the basis of this equitable defense, a court could refuse to enforce the "sole" repurchase remedy and, instead, require the Trusts to pursue a common law breach of contract claim for damages, for which causation would be an element.  This argument is meritless for many reasons.

First, an express "sole remedy" in a contract, such as a liquidated damages provision or the repurchase remedy provided for here, is <u>not</u> subject to equitable defenses.[21]  Therefore, any claim that the Trusts' unduly delayed in seeking to enforce the repurchase remedy is irrelevant.

Next, the repurchase remedy is not an attempt by the Trusts to compel Debtors to *perform* the representations and warranties they breached, i.e. to make them "true."  Rather, the Trusts are seeking to recover the "sole remedy" to which they are entitled if the representations are *not* true: repurchase of the relevant mortgage at the purchase price.  Where, as here, a contract contains a sole remedy, equitable relief such as specific performance is not even available.[22]

---

[21] "When a party signs a contract containing a liquidated damages clause, he is bound by it; recovery is simply a matter of contract <u>and is not subject to equitable defenses</u> or mitigation."  *Days Inn Worldwide, Inc. v. Hazard Mgmt. Group, Inc.*, 2012 WL 5519356, at *4 (S.D.N.Y. 2012) (emphasis added).

[22] *Rubinstein v. Rubinstein*, 23 N.Y.2d 293, 298 (1968) ("For there to be a complete bar to equitable relief there must be something more, such as explicit language in the contract that the liquidated damages provision was to be the sole remedy."); *Vacold LLC v. Cerami*, 545 F.3d 114, 130-31 (2d Cir. 2008) (same).

Finally, even if the Debtors' could *theoretically* invoke equitable defenses based on timeliness, any attempt to do so would almost certainly fail. This is so because (as explained in more detail in the following section) it is the *Debtors themselves* who are the cause of any such delay. Under the PSAs, *Debtors themselves*, in their role as Master Servicers for the Trusts, were assigned the primary duty and obligation to identify defective mortgages, notify the relevant parties, and seek repurchase of the mortgages on behalf of the Trusts.[23] The Committee upends every concept of "equity" when it suggests the Debtors could knowingly sell billions of dollars of defective mortgages *to* the Trusts, assume responsibility to identify and demand the repurchase of defective loans *for* the Trust, fail to do so to conceal their own wrongdoing *from* the Trusts, and then interpose the very same wrongdoing and disregard of their contractual obligations as an *equitable* defense *against* the Trusts. "Under the doctrine of unclean hands, a litigant who is guilty of inequitable conduct with reference to the subject matter of the transaction in suit is not entitled to recover."[24] This doctrine applies with equal force to one seeking to invoke an equitable defense in its favor.[25]

---

[23] *See* PSA at §§ 2.04, 3.02(b) (obligating Residential Funding Corp., as Master Servicer, to identify defective mortgages, notify the relevant parties, and seek repurchase of the mortgages on behalf of the Trusts).

[24] *Williamson v. Stallone*, 28 Misc.3d 738, 753 (N.Y. Sup. Ct. 2010). *Accord Pecorella v. Greater Buffalo Press, Inc.*, 107 A.D.2d 1064, (N.Y. App. Div. 1985) ("The party seeking equity must do equity, i.e., he must come into court with clean hands. The misconduct which will bar equitable relief need not be sufficient to constitute the basis of a legal action; any willful conduct which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean as long as the conduct pertains to the matter in litigation.") (citations and quotations omitted); *Levy v. Braverman*, 24 A.D.2d 430, 430 (N.Y. App. Div. 1965) ("The doctrine of 'clean hands' is a fundamental principle of equity as well as of public policy. Where a litigant has himself been guilty of inequitable conduct with reference to the subject matter of the transaction in suit, a court of equity will refuse him affirmative aid.").

[25] *See, e.g. Uciechowski v. Ehlrich*, 221 A.D.2d 866, 868 (N.Y. App. Div. 1995) (defendant "which appears to have come into court with unclean hands, should not be permitted to assert such an equitable defense [laches] against petitioner."); *Matter of Coger v. Cusumano*, 191 A.D.2d 493, 495 (N.Y. App. Div. 1993) ("the appellants 'unclean hands' prevent him for invoking any equitable defense such as those which he as alleged."); *Scheiber v. Dolly Lab., Inc.*, 293 F.3d 1014, 1022 (7th Cir. 2002) (Posner, J.) ("unclean hands can be asserted in opposition to an equitable defense as well as being assertible as a defense to a claim for equitable relief.")

2.      **Defenses Based on the Trusts' Alleged Failure to Pursue Their Claims in a Timely Fashion**

The Committee advances two additional legal defenses, both of which are premised on an alleged failure of the Trusts to pursue their repurchase claims on a timely basis.  First, the Committee claims certain of the Trusts' repurchase claims are barred by the statute of limitations.  Next, the Committee argues certain claims are barred by the election of remedies doctrine, because the Trusts allegedly failed to pursue claims on certain mortgages until after such mortgages had been foreclosed on and liquidated.  These defense not only lack merit, Debtors are equitably barred from asserting them.

a.      **The Equitable Bar**

All defenses premised on the Trusts' alleged failure to timely pursue their repurchase claims face a threshold barrier:  Debtors themselves were the cause of any such delay, because it is the Debtors themselves, in their role as Master Servicer for the Trusts, who failed to discharge their responsibility to identify defective mortgages, notify the relevant parties, and seek repurchase of the mortgages on behalf of the Trusts.  Thus, any attempt by the Debtors to take advantage of their own failure to discharge their obligations to the Trusts would fail:

> The principle that *a wrongdoer should not be able to take refuge behind the shield of his own wrongdoing* is a truism.  The United States Supreme Court has espoused the doctrine in these terms: 'To decide the case we need look no further than the maxim that *no man may take advantage of his own wrong*.  Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts . . . .'[26]

This "deeply rooted" principle plainly applies here.

---

[26] *General Stencil, Inc. v. Chiappa*, 18 N.Y.2d 125, 127-28 (N.Y. 1966) (*quoting Glus v. Brooklyn East. Dist. Term.*, 359 U.S. 231, 232-33 (1959)) (emphasis added).

### i. The Debtors' Obligations to Identify, Give Notice of, and Pursue Repurchase of Defective Mortgages on Behalf of the Trusts, and Their Failure to Do So

The Trusts repurchase claims arise from the sale of hundreds of billions of dollars of residential mortgages by Debtors GMAC Mortgage LLC ("GMACM") and Residential Funding Company LLC ("RFC") to the Trusts.[27]  As part of these transactions, GMACM and RFC made certain representations and warranties regarding the mortgages, and promised to repurchase any defective mortgage that failed to comply with these representations and warranties.[28]  GMACM and RFC also contracted for the right to earn fees as "Master Servicer" for the Trusts, and were charged under the governing PSA with taking all reasonable actions necessary to collect on the mortgages sold into the Trusts, including enforcing all of the Trusts' rights with respect to the mortgages GMACM and RFC sold to the Trusts.[29]  Included in the Master Servicers' obligations was the obligation to notify the Trustees, and the other parties to the transaction, of the existence of defective mortgages,[30] and demand that such mortgages be repurchased.[31]  If a seller refuses to repurchase a defective mortgage, the PSA obligates the Master Servicer to enforce the Trust's repurchase rights *in a timely manner*, including *by bringing suit on behalf of the Trusts*:

---

[27] Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreement (Docket No. 1887) ("Debtors' Second Supplemental Motion") at ¶¶ 1, 10.

[28] Debtors' Second Supplemental Motion at ¶ 11 and 12.

[29] *See* Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC in Support of Chapter 11 Petitions and First Day Pleadings (Docket No. 6) ("Whitlinger Aff.") at ¶¶ 25-37.

[30] *See* PSA at § 2.04 ("Upon the discovery by the . . . Master Servicer . . . of any breach of any of the representations and warranties made in a Seller's agreement that have been assigned to the Trustee . . . in respect of any Mortgage Loan . . . the party discovering such breach shall give prompt written notice to the other parties.").

[31] *Id.* at § 2.04 ("The Master Servicer shall promptly notify Residential Funding of such breach [of a representation or warranty] and request that Residential Funding either (i) cure such breach in all material respects within 90 days from the date the Master Servicer was notified of such breach or (ii) purchase such Mortgage Loan from the Trusts Fund at the Purchase Price and in the manner set forth in Section 2.02 . . . .").

> As part of its servicing activities hereunder, *the Master Servicer, for the benefit of the Trustee and the Certificateholders, shall* use its reasonable best efforts *to enforce the obligations . . . of each Seller under the related Seller's Agreement . . . including without limitation to purchase a Mortgage Loan on account of . . . a breach of a representation or warranty*, as described in Section 2.04.  Such enforcement, *including, without limitation, the legal prosecution of claims . . .* and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent *and at such time* as the Master Servicer would employ in its good faith business judgment and which are normal and usual in its general mortgage servicing business.[32]

Finally, under the PSA, the Master Servicer is required to deliver to the Trustee an annual "servicer compliance statement" representing that it "has fulfilled all of its obligations under this Agreement in all material respects."[33]

Notwithstanding these obligations, and notwithstanding the massive volume of defective mortgages in the Trusts (of which Debtors were plainly aware[34]), Debtors made <u>no effort</u> to discharge their obligation to identify defective mortgages, notify the parties of such defects, request repurchase, and prosecute repurchase claims on behalf of the Trusts.  Worse still, each year the Debtors lied about their compliance with these obligations, misrepresenting in writing to the Trustees in "servicer compliance statements" that they had fulfilled all of their obligations as Master Servicer, including the obligation to pursue repurchase claims.

Now, the Committee asserts Debtors should be permitted to rely on their own deception and delay to insulate themselves from repurchase liability by invoking statute of limitation and election of remedies defenses.  Any attempt to do so runs headlong into the "deeply rooted"

---

[32] *Id*. at § 3.02(b) (emphasis added).

[33] *Id*. at § 3.12(B).

[34] The Committee's sampling of loan files in the Trusts concluded that a startling <u>28.7%</u> of the mortgages in the Trusts were defective.  *See* Cornell Report at ¶ 35.  The Debtors would have known of the presence of these defective loans because: (i) they originated the defective loans; (ii) as Master Servicer they had custody of the loan files for the mortgages at all times; *see* PSA § 2.01; and, (iii) as Master Servicer they would have repeatedly been confronted with multiple breaches of representations and warranties in connection with their servicing of the mortgages.  *See* Whitlinger Aff. at ¶ 18-20.

13

principle that "a wrongdoer should not be able to take refuge behind the shield of his own wrongdoing."[35]

### ii.    The Debtors' Misconduct Bars Its Assertion of a Statute of Limitations Defense

Under the doctrine of equitable tolling, courts "will not permit the statute of limitations to run where," as here, "the one claiming the benefit of the statute is the one charged in law with the duty of asserting and enforcing the claim before the statute runs."[36] The doctrine of equitable tolling thus prevents Debtors from now raising their own failure as Master Servicer to pursue the Trust's repurchase claims as a limitations *defense* to the Trusts' demand that *they*—as Mortgage Sellers—must repurchase defective mortgage loans.[37]

The doctrine of equitable estoppel would likewise bar any effort by the Debtors to assert a statute of limitations defense to the Trusts' repurchase claims:

> Equitable estoppel will preclude a defendant from using the statute of limitations as a defense where it is the defendant's affirmative wrongdoing which produced the long delay between accrual of the cause of action and the institution of the legal proceeding.  . . .  Equitable estoppel is appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the defendant.[38]

---

[35] *General Stencil*, 18 N.Y.2d at 127.

[36] *Banco de Desarrollo Agropecuario, S.A. v. Gibbs*, 709 F. Supp. 1302, 1310 (S.D.N.Y. 1989) (quoting *Pet, Inc. v. Lustig*, 77 A.D.2d 455 (N.Y. App. Div. 1980)).

[37] *Banco de Desarrollo*, 709 F. Supp. 1310 ("Defendants "certainly could not be expected to bring an action . . . when such an action would simply focus attention on [their] own wrongdoing.") (citing *IIT v. Cornfeld*, 619 F.2d 909, 930 (2d Cir. 1980)); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 448 (S.D.N.Y. 1998) ("It cannot be expected that [the parties with designated responsibility for bringing suit], who were involved in the alleged corrupt behavior, would bring this behavior to the attention of the courts."); *Croce v. Kurnit*, 565 F. Supp. 884, 892 (S.D.N.Y. 1982) ("Although it is understandable that Kurnit did not investigate or pursue claims against his own interest, he may not now claim the benefit of the statute of limitations.").

[38] *Putter v. North Shore. Univ. Hosp.*, 7 N.Y.3d 548, 553 (N.Y. 2006).  *Accord Bulgartaba Holding AD v. Republic of Iraq*, 2011 WL 6015759, at *2 (2d Cir. 2011).

Here, the Debtors not only engaged in misconduct, by breaching their obligations as Master Servicer to pursue repurchase claims on behalf of the Trusts, they also misrepresented, on an annual basis, that they had *complied* with their obligations to pursue any such claims. On these facts, equitable estoppel bars Debtors from asserting a limitations defense.

The Committee's only response to these facts and law is to suggest that, because the Trustees were also permitted (but not obligated) to request repurchase of defective loans,[39] this somehow excused Debtors' misconduct. In the Committee's view, the *possibility* that the Trusts *could* assert claims[40] permits Debtors to assert the statute of limitations as a defense and thereby "take refuge behind the shield of [their] own wrongdoing."[41] The Committee is wrong.

The Trusts were innocent victims of this scheme. The Trusts relied on the Debtors express obligation to enforce the Trusts' repurchase claims, because it was the Debtors, as Master Servicers, who were assigned this important role in the structure of the transactions. The Trustees, moreover, were not obligated to pursue repurchase claims because that *obligation* was assigned to the Debtors as Master Servicers.[42] Debtors had actual knowledge of breaches of representations and warranties, as a result of their involvement in originating and servicing the mortgages, yet they failed to satisfy their obligation to notify the other parties of these claims or to pursue the resulting repurchase claims. The Trusts and their Trustees had no such knowledge. Debtors affirmatively misrepresented, year after year in ironically named "servicer compliance

---

[39] *See* PSA at § 2.04 ("If the Master Servicer is Residential Funding, then the Trustee shall also have the right to give the notification and require the purchase or substitution provided for in the second preceding paragraph in the event of such a breach of a representation or warranty made by Residential Funding in the Assignment Agreement.").

[40] The Master Servicer, however, had custody of all of the relevant loan files and documents. *See* PSA at § 2.01.

[41] *General Stencil*, 18 N.Y.2d at 127.

[42] PSA at § 2.04 ("the Trustee shall also <u>have the right</u> to give the notification and require the purchase . . . .") (emphasis added).

statements," that they *had* performed all of their obligations as Master Servicer, *including* the obligation to pursue repurchase claims.  The Trusts relied on these false statements, through their Trustee who received them and who, under the PSA, was entitled to "conclusively rely" on them.[43]  On these facts, Debtors are barred from profiting from their own wrongs:  the doctrines of equitable tolling and equitable estoppel plainly apply.

### iii.    The Debtors' Misconduct Bars Its Assertion of an Election of Remedies Defense

The remaining defense relied on by the Committee, "election of remedies," turns on a recent decision from the District of Minnesota, *WMC Mortgage*, which held that the "sole remedy" of repurchase for a breach of a representation or warranty is not available where the mortgage has been liquidated through foreclosure.[44]  According to the Committee, because the Trusts failed to assert their repurchase claims with respect to certain mortgages until after they had been liquidated through foreclosure, these claims are barred because the Trusts cannot satisfy the alleged condition of delivering an existing non-foreclosed mortgage in connection with a repurchase demand.

Even if the *WMC* decision is correct (and it is not), it does not apply here.  It was the Debtors, as Master Servicer, who caused the delay on which this defense is premised.  If the Debtors had pursued repurchase claims when they became known to them, the foreclosures about which the Committee complains would never have occurred.  Moreover, it was Debtors, as

---

[43] *Id*. at § 8.01(c)(iii) ("the Trustee may *conclusively rely*, as to the truth of the statements and the correctness of the opinions expressed therein, upon an certificates or opinions furnished to the Trustee by . . . the Master Servicer") (emphasis added).

[44] *Master Asset Backed Sec. Trust 2006 HE3 v. WMC Mortg. Corp.*, 2012 WL 4511065 (D. Minn. 2012).

Master Servicers, who directed and carried out the foreclosures at issue.[45]   Thus, Debtors must

point to *their own* lack of notice and *their own* foreclosure on mortgages and *their own* failure to

assert repurchase claims before they foreclosed, to defend the Trusts' repurchase claims *against*

*themselves*.  As with the statute of limitations, any attempt by the Debtors to rely on this defense

would run counter to the "deeply rooted" principle that "a wrongdoer should not be able to take

refuge behind the shield of his own wrongdoing." [46]

The doctrine of equitable estoppel also bars Debtors from asserting that the Trusts cannot

satisfy the alleged "condition" of delivering an un-foreclosed  mortgage in a repurchase demand:

Debtors were the ones who foreclosed on the Trusts' mortgages *without* making such a demand,

even though they were *obligated* to do so.[47]   The Trusts find themselves asserting repurchase

claims on foreclosed mortgages *because* Debtors liquidated mortgages *without* making

repurchase claims *against themselves*, as they were required to do.   The Trusts' injury is

compounded by Debtors' repeated misrepresentations (on which the Trustees were entitled to

"conclusively rely") that they had performed all of the obligations as Master Servicers, including

the obligation to pursue repurchase claims against themselves.   Thus, equitable estoppel would

bar the Debtors from relying on an election of remedies defense.

The well established rule that "a party to a contract cannot rely on the failure of another

to perform a condition precedent where he has frustrated or prevented the occurrence of the

---

[45]  *See* PSA § 3.01(a) (authorizing the Master Servicer to commence, prosecute, and complete foreclosure proceedings on mortgages in the Trusts where the Master Servicer "believes it appropriate in its good faith business judgment.")

[46] *General Stencil*, 18 N.Y.2d at 127.

[47] *Benincasa v. Garrubbo*, 141 A.D.2d 636, 638-39 (N.Y. App. Div. 1988) (equitable estoppel can excuse non-performance of contractual condition precedent) *Zaitchick v. American Motorists Inc. Co.*, 554 F.Supp. 209, 216-17 (S.D.N.Y. 1982) (same).

condition,"[48] also bars an election of remedies defense.  The Trusts' ability to satisfy the alleged

condition of delivering non-foreclosed mortgages in support of repurchase claims was both

frustrated and prevented by the *Debtors'* foreclosure on defective mortgages and the *Debtors'*

failure to assert repurchase claims before they foreclosed on the defective loans.  The fact that

the Debtors' actions in this respect breached express obligations to the Trusts, and were

accompanied by misrepresentations concealing these facts, makes application of this equitable

rule all the more appropriate here.

The Committee's only response to these facts is to suggest that: (i) the Debtors'

misconduct should be ignored because the PSAs permit the Master Servicer to exercise

discretion in deciding whether to pursue foreclosure or repurchase claims; or (ii) the Trusts

should be barred by estoppel from complaining about the Master Servicer's foreclosures because

they did not do so at the time.  These arguments are frivolous.  The Debtors, as Master Servicers,

were required to exercise "reasonable discretion" and "good faith business judgment" in

determining the proper course of action with respect to defaulted mortgages.[49]  If foreclosing on

a defective mortgage extinguishes the Trust's repurchase claims (as the Committee now claims),

and thereby increases the Trust's loss on a mortgage, a decision to do so *cannot* be an exercise of

reasonable discretion or good faith business judgment, particularly if the Master Servicer is

doing so to insulate itself from the repurchase claim it is acting to extinguish.  Nor can it be the

case that the Debtors could rely on equitable principles of  estoppel to insulate themselves from

---

[48] *Kooleraire Serv. & Installation Corp. v. Board of Ed. Of City of New York*, 28 N.Y.2d 101, 106 (N.Y. 1971). *Accord Khadka v. American Home Mortg. Serv., Inc.*, 2012 WL 5252078, at *3 (N.Y. Sup. Ct. 2012) ("It is a fundamental principle of equity that a party to a contract may not insist upon performance of a condition precedent when its nonperformance has been caused by the party himself.") (citing cases).

[49] *See* PSA at §§ 3.02(b), 3.14(a) (emphasis added).

18

responsibility for foreclosing on defective mortgages when they repeatedly misrepresented to the Trustee's that they were complying with all of their obligations as Master Servicers.[50]

### b.      The Statute of Limitations Defense Lacks Merit

Even if the Debtors' statute of limitations defense could overcome the equitable defenses to it, it would still lack merit for numerous reasons.  First, it ignores the fact that the breach at issue is the Debtors' failure to repurchase a mortgage *after* a demand has been made.  Here, Debtors utterly failed in their obligation as Master Servicers to seek the repurchase of defective mortgages before they sought bankruptcy protection:  because Debtors made no demands, no demands to repurchase have been refused, so the statute of limitations has yet to commence running.[51]

Moreover, success on the limitations defense also would not decrease Debtors' liability to the Trusts.  Proving that limitations has run on certain of the Trusts' repurchase claims would extinguish one set of claims against Debtors, only to immediately give rise to another set of claims against Debtors, for the same amount, for breaching their obligation under the PSA, as Master Servicers, to timely assert repurchase claims on behalf of the Trusts.

### c.      The Election of Remedies Defense Lacks Merit

The Committee's election of remedies defense is based on a single decision from the District of Minnesota, *WMC Mortgage*.  That case held no right of repurchase exists after the foreclosure of a defective mortgage because no mortgage remains to return to the mortgage

---

[50] *Id*. at § 3.12(B).

[51] *Lehman Bros. Holdings, Inc. v. Nat'l Bank of Arkansas*, 875 F.Supp.2d 911, 916-17 (E.D. Ark. 2012) (applying New York law) (and holding limitations on mortgage repurchase claim runs from the date that seller refuses demand to repurchase); *see also LaSalle Bank Nat. Assn. v. Lehman Bros. Holdings, Inc.*, 237 F.Supp.2d 618, 638 (D. Md. 2002) ("Under New York law, a loan seller's failure to repurchase non-conforming loans upon demand as required by a contract is an independent breach of the contract . . . .")

seller.[52]  The *WMC Mortgage* decision is wrongly decided.  It is premised on an overly technical reading of the contracts that failed to consider either the function of representations and warranties (and the repurchase obligation tied to them), or the custom and practice in the mortgage industry in which foreclosed loans are routinely repurchased.

As noted above, "[r]epresentations and warranties are used to allocate the risk of defective mortgage loans among the mortgage originators, issuers of the securities and investors who purchase them."[53]  Investors in RMBS notes place great reliance on these representations and warranties because they allow investors to assume that the credit quality of the mortgages securing the notes is as represented.[54]  An interpretation that the repurchase obligation terminates upon foreclosure is inconsistent with the expectation of the parties and the allocation of risk on which they agreed.

A proper mortgage foreclosure occurs because it is the last, best method to maximize the recovery on a defaulted mortgage.  Where a mortgage is defective, and therefore subject to a repurchase, foreclosure is rarely the best method to maximize recovery:  it occurs almost always at a loss, while a repurchase remedy would permit the Trust to recover the full amount of the remaining mortgage.  Neither the Trusts nor their investors, in other words, bargained to bear even a penny of loss on a defective mortgage:  the sellers agreed those losses were theirs, in their entirety.  Any loss suffered on a defective loan should, consistent with the agreement of the

---

[52] *WMC Mortg. Corp.*, 2012 WL 4511065.

[53] American Securitization Forum News Release: ASF Releases Model Representations and Warranties to Bolster Risk Retention and Transparency in Mortgage Securitizations (Dec. 15, 2009) *available at* http://www.americansecuritization.com/Workarea/DownloadAsset.aspx?id=6706

[54] *See* Jason H.P. Kravitt and Robert E. Gordon, Securitization of Financial Assets §§ 1604[B][1] (noting that representations and warranties are "among the most important provisions in the sale agreement").

parties, be borne by the party to whom the risk of loss on defective mortgages was allocated:  the

mortgage seller.  That is true *regardless* of when the repurchase remedy is pursued.

The *WMC Mortgage* court failed to consider these facts because it focused solely on the

definition of a "mortgage loan" that was subject to repurchase.  By giving no consideration to the

parties' pre-existing allocation of the risk of loss on *defective* mortgages, the *WMC Mortgage*

court failed to follow the rule that "particular words should be considered, not as if isolated from

the context, but in light of the obligation as a whole and the intention of the of the parties as

manifested thereby."[55]

The *WMC Mortgage* court also failed to consider evidence of the custom and practice in

the mortgage industry with respect to repurchase obligations and foreclosed mortgages.  "Under

New York law, [a] contract must be construed according to the custom and practice prevailing in

a particular trade."[56]  An examination of the relevant custom and practice would have revealed

that the custom and practice in the mortgage loan securitization industry is, and has been since its

inception, that responsible parties repurchase defective mortgages regardless of whether they

have already been liquidated through foreclosure.[57]  This evidence, combined with a

consideration of the parties' allocation of risk, leads to the conclusion that foreclosure on a

defective mortgage does not preclude a repurchase claim.

Finally, as was true with the Committee's other defenses, even if the Debtors could

successfully assert an election of remedies defense, it would not decrease their liability to the

---

[55] *Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 13 N.Y.3d 398, 404 (N.Y. 2009).

[56] *Zurakov v. Register.com, Inc.*, 304 A.D.2d 176, 180 (N.Y. App. Div. 2003).

[57] *See* Memorandum of Law of Amicus Curia Amherst Advisory & Management LLC and the Association of
Mortgage Investors in Opposition to Motion to Dismiss Plaintiffs' Complaint by UBS Real Estate Securities, Inc. at
12-17, Docket No. 38-1 in Case 1:12-cv-07322-HB; *Mastr Adjustable Rate Mortgages Trust 2006-OA2, et al. v.
UBS Real Estate Sec., Inc.*, in the United States District Court for the Southern District of New York (gathering and
summarizing evidence of industry custom and practice regarding the repurchase of foreclosed mortgages).

Trusts.  Proving that foreclosure on defective mortgages eliminated the Trusts' *right* to pursue repurchase claims would simply establish the measure of Debtors' liability for *failing* to discharge their obligation to pursue the Trusts' valid repurchase claims prior to foreclosure.  This substitution of claims would not reduce, in any way, the amount Debtors would otherwise owe to the Trusts on the repurchase claims.

## II.      The Settlement Allocation Formula is Not Flawed

The Committee, MBIA, Amherst, and Triaxx assert that the formula for allocating the settlement amount among the Trusts is flawed.  Before addressing this point, it is worth noting that Amherst and Triaxx represent only *two* certificateholders—out of tens of thousands—who object to the well-publicized allocation formula embodied in the settlement.  According to these objectors, this formula fails to account for alleged differences among the Trusts.  This objection is unfounded:  the relative rates at which losses occur among trusts is a more than reasonable proxy for determining the excess losses associated with breaches of representations and warranties in each trust.[58]

However, there is no need for the Court to resolve this issue.  In connection with their diligence regarding the proposed settlement, the RMBS Trustees performed a statistical sampling of the mortgages in the Trusts and have agreed to use their independent expert to construct a trust allocation scheme based on that statistical sampling.  The Debtors and the Steering Committee have provided the proposed amended allocation formula to the objectors.  After meeting and conferring with the objectors, this formula will be filed with the Court.

## III.     The Scope of Claims Released By the Trust is Clear on the Face of the Settlement

FGIC, MBIA and the Lead Securities Plaintiff complain that the scope of claims released by the Settlement Agreement is unclear.  FGIC and MBIA, as monoline insurers for the Trusts,

---

[58] Not all collateral losses are associated with defective mortgages.

want to ensure that claims belonging to them are not released.  Likewise, the Lead Securities

Plaintiff wants to ensure that the securities claims of its class members are not released.  The

Settlement Agreement disposes of these concerns.

The intention and effect of Articles VII and VIII of the settlement agreement are clear:

the only claims released are claims that belong to the Trusts.  The release language of Section

7.01 includes the phrase "any Persons claiming by, though or on behalf of such Accepting Trust

or the Trustees" to make clear that the release applies to any person, other than the Trustees,

purporting to assert claims owned by the Trusts, such as if investors attempted to assert a

derivative repurchase action on behalf of a given Trust.  Nothing in this language affects MBIA,

FGIC, or the Lead Securities Plaintiff's claims, unless they seek to assert claims that belong not

to them, but to the Trusts themselves.  Section 8.02 also expressly excludes monoline claims that

are independent of the Trusts' claims from the scope of the release.  Sections 7.01 and 8.04

expressly exclude securities claims from the scope of the release.  No amendments or

modifications are necessary to clarify these points.

## IV.    There Are No Standing or Constitutional Impediments

MBIA and Wilmington Trust argue the Court should decline to rule on the 9019 Motion

because the claims at issue belong to the RMBS Trustees, on behalf of the Trusts, and not to the

RMBS investors who negotiated and executed the settlement agreements.  As they see it, this

fact deprives the RMBS investors of standing and puts the Court in the position of rendering an

advisory opinion.  These objections are meritless.  Debtors have unquestioned standing as the

obligors on these claims.  It is *they*, not the RMBS trust investors, who have brought the 9019

Motion before the Court.  Moreover, at the Court's request, the RMBS Trustees are filing a

statement with the Court contemporaneously with the filing of this reply that "the RMBS

23

Trustees have determined that the Allowed Claim falls within a reasonable range to resolve the

Settling Trusts' Repurchase Claims and the Debtors' proposed Revised Claim Allocation

Methodology for allocating the Allowed Claim among the Settling Trusts is fair and equitable to

those trusts." Thus, there is also nothing advisory about the opinion that the Court would render.

## V.    The Objections Regarding Subordination are Premature

AIG and Wilmington Trust raise issues regarding the priority of the allowed claim

contemplated by the proposed settlement, and ask that the Court make clear that such issues are

not being decided by the 9019 motion.  The priority *vel non* of the allowed claim is not at issue

in the Debtors' 9019 Motion.  The Trusts reserve all rights to respond to a motion to subordinate

the allowed claim if and when it is made.

## VI.    The Objections to the Provision of the Settlement Allocating Claims to Counsel Are Meritless

The Committee, MBIA, and Wilmington Trust raise various objections regarding the

attorneys' fees portion of the proposed settlement.  Section 6.04 of the settlement agreements

provides that counsel for the RMBS investors (who acted to pursue the Trusts' claims before

Debtors' bankruptcy, negotiated the proposed settlement, and have advocated for the settlement

and in favor of the rights of the Trusts in this proceeding) will receive a portion of the allowed

claim contemplated by the settlement (and not any additional claims).  Notably, the Trustees,

who act for the Trusts and ultimately for the benefit of certificateholders, do not object to such

claim allocation to counsel.

MBIA and Wilmington Trust complain that the Debtors have not complied with

procedural requirements for the payment of fees by a debtor.  However, the Debtors are not

paying attorneys' fees at all – there is merely a portion of the allowed claim that is being

allocated to compensate counsel.  The allowed claim for which the Trusts would settle their

repurchase claim is $8.7 billion *regardless* of attorneys' fees.  The fact that the settlement

provides that the Trusts' claim would be reduced to compensate contingent fee counsel who

obtained the recovery for the Trusts is not surprising; nor is it a matter requiring bankruptcy

court supervision or approval.  In addition, since no claims are being allowed against the parent

entity Residential Capital, LLC, Wilmington Trust has no standing at all to object to the portions

of the claim being allocated to compensate counsel (or any other portion of the settled claim, for

that matter).[59]

The Committee and Wilmington Trust also argue that it is impermissible for the Debtors to

pay the cash value of the portion of the allowed claim allocated to counsel.  The objectors,

however, ignore the fact that this is merely an option – not an obligation – of the Debtors.  The

suggestion that the Debtors would agree to pay this unsecured claim above cash value is

specious.  Nevertheless, to resolve this objection, counsel to the Steering Committee are willing

to agree that any payment based on the agreed cash value of the claim be subject to Committee

consent, which is not to be unreasonably withheld, or, in the absence of Committee consent, only

upon motion to the Court by the Debtors or Steering Committee counsel.

## VII.    Conclusion

For all the foregoing reasons, the objections to the Debtors 9019 Motion should be

rejected, and the RMBS Trust Settlement Agreements should be approved.

---

[59] Wilmington Trust argues that section 1129(a)(4) is implicated in this circumstance.  As noted above, it is not the
Debtors that are paying such fees, but instead counsel receives a portion of the allowed claim which would
otherwise go to the Trusts.  Indeed, section 1129(a)(4) cannot be implicated because no plan is before the Court.  In
addition, the Debtors are within their rights to allow a claim for attorneys' fees as prepetition unsecured claims arise
in other circumstances, none of which implicate section 1129(a)(4).  *See, e.g.*, *Ogle v. Fidelity & Deposit Co.*, 586
F.3d 143 (2d Cir. 2009) (post-petition attorneys' fees and expenses allowed as general unsecured claim under
prepetition indemnity agreement).

Dated:   January 15, 2013
         New York, New York

/s/ Kathy D. Patrick

Kathy D. Patrick, Esq. (*pro hac vice*)
Robert J. Madden, Esq. (*pro hac vice*)
GIBBS & BRUNS LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile:  (713) 750-0903

-AND-

ROPES & GRAY LLP
Keith H. Wofford, Esq. (KW-2225)
D. Ross Martin, Esq. (DM-2947)
1211 Avenue of the Americas
New York, NY 10036-8704
Telephone:  (212) 596-9000
Facsimile:  (212) 596-9090

*Attorneys for the Steering Committee Group of RMBS Holders*