**Hearing Date and Time: March 18, 2013 at 9:00 a.m. (ET)**
**Objection Deadline: December 3, 2012 at 4:00 p.m. (ET)**

Gregory M. Petrick
Jonathan M. Hoff
Ingrid Bagby
Jason Jurgens
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York 10281
Telephone: (212) 504-6000
Facsimile: (212) 504-6666

-and-

Mark C. Ellenberg
CADWALADER, WICKERSHAM & TAFT LLP
700 Sixth Street, N.W.
Washington, DC 20001
Telephone: (202) 862-2200
Facsimile: (202) 862-2400

*Attorneys for MBIA Insurance Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **RESIDENTIAL CAPITAL, LLC,** *et al.*, | **Case No. 12-12020 (MG)** |
| **Debtors.** | **(Jointly Administered)** |

---------------------------------------------------------x

**OBJECTION OF MBIA INSURANCE CORPORATION TO**
**DEBTORS' MOTION PURSUANT TO FED. R. BANKR. P. 9019**
**FOR APPROVAL OF THE RMBS TRUST SETTLEMENT AGREEMENTS**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND.....................................................................................................3

      A.     Debtors And Their RMBS Securitization Business...................................................3

      B.     MBIA And Its Role As Financial Guaranty Insurer ...............................................3

      C.     MBIA's Litigation Claims Against Debtors.............................................................4

      D.     The Debtors' RMBS Settlement Negotiations..........................................................5

ARGUMENT ...............................................................................................................................7

I     THE DEBTORS SEEK AN INAPPROPRIATE ADVISORY OPINION
       APPROVING AN ILLUSORY SETTLEMENT OF CLAIMS NOT HELD BY
       THE PARTIES TO THE SETTLEMENT AGREEMENTS...............................................8

      A.     The Investors Have No Authority to Settle...............................................................8

      B.     It Is Unconstitutional For A Federal Court To Issue An Advisory Opinion ...........9

II    THE SETTLEMENT AGREEMENTS WERE DELIBERATELY DRAFTED TO
       BE UNCLEAR AND AMBIGUOUS REGARDING THE SCOPE OF THE
       CONTEMPLATED RELEASES AS THEY RELATE TO THE CLAIMS OF
       FINANCIAL GUARANTY INSURERS .......................................................................11

III   THE DEBTORS FAILED TO SATISFY THEIR BURDEN OF PROVING
       THAT THE SETTLEMENT AGREEMENTS ARE FAIR AND REASONABLE,
       AND OTHERWISE IN THE DEBTORS' OR CREDITORS' BEST INTERESTS ........15

      A.     The $8.7 Billion Total Allowed Claim Provides A Windfall To Certain
            Settling Trusts .........................................................................................................15

      B.     The Allocation Mechanism Provides A Windfall To Certain Settling
            Trusts At The Expense Of Other Settling Trusts And Non-Settling
            Creditors.................................................................................................................18

**PAGE**

C.    The Debtors' Experts Fail To Present Any Analysis That Would Assist The Debtors In Satisfying Their Burden To Establish That The $8.7 Billion Total Allowed Claim Is Fair And Reasonable ........................................... 19

      1.    Mr. Sillman's Analysis Is Fatally Flawed And Should Be Disregarded .................................................................................... 20

      2.    The Lipps Analysis Does Not Contain Matters That Are Appropriate For Expert Testimony ................................................ 22

IV    ALLY'S INFLUENCE AND CONTROL OVER THE SETTLEMENT NEGOTIATIONS PRECLUDES A FINDING THAT ARM'S-LENGTH BARGAINING OCCURRED ........................................................................... 22

V    THE SETTLEMENT AGREEMENTS' ATTORNEYS' FEES PROVISION HARMS CREDITORS ............................................................................... 24

CONCLUSION ........................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

<u>CASES:</u>

In re Adelphia Commc'ns Corp.,
    441 B.R. 6 (Bankr. S.D.N.Y. 2010) ..................................................................................24

In re Adelphia Commc'ns Corp.,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) <u>aff'd</u>, 337 B.R. 475 (S.D.N.Y. 2006) .................. 10-11

In re Adirondack Ry. Corp.,
    95 B.R. 867 (N.D.N.Y. 1988) ..........................................................................................11

Aetna Life Ins. Co. v. Haworth,
    300 U.S. 227 (1937)..........................................................................................................10

In re "Agent Orange" Prod. Liab. Litig.,
    818 F.2d 179 (2d Cir. 1987).............................................................................................19

Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.,
    90 F.3d 671 (2d Cir. 1996)...............................................................................................10

Cheng v. K & S Diversified Inv., Inc. (In re An-Tze Cheng),
    308 B.R. 448 (B.A.P. 9th Cir. 2004), <u>aff'd</u>, 160 Fed. Appx. 644 (9th Cir. 2005)..................24

In re Collecting Concepts, Inc.,
    296 B.R. 683 (Bankr. E.D. Va. 2001).................................................................................8

Daubert v. Merrell Dow Pharmaceuticals,
    509 U.S. 579 (1993)..........................................................................................................21

In re Dewey & LeBoeuf LLP,
    No. 12-12321, 2012 Bankr. LEXIS 4727 (Bankr. S.D.N.Y. Oct. 9, 2012) .............................7

In re Drexel Burnham Lambert Group,
    995 F.2d 1138 (2d Cir. 1993)..............................................................................................8

In re Drexel Burnham Lambert Group, Inc.,
    134 B.R. 493 (Bankr. S.D.N.Y. 1991)...............................................................................22

Flast v. Cohen,
    392 U.S. 83 (1968)............................................................................................................10

In re HA 2003, Inc.,
    310 B.R. 710 (Bankr. N.D. Ill. 2004) ...............................................................................10

**PAGE(S)**

Hernandez v. Bank of Nova Scotia,
    76 A.D.3d 929 (1st Dep't 2010) ........................................................................16

In re Hess,
    404 B.R. 747 (Bankr. S.D.N.Y. 2009) ................................................................16

HSBC Bank USA v. Fane (In re MF Global Inc.),
    466 B.R. 244 (Bankr. S.D.N.Y. 2012) ...............................................................7, 8

In re HyLoft, Inc.,
    451 B.R. 104 (Bankr. D. Nev. 2011) ..................................................................11

In re Innkeepers USA Trust,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) ..................................................................8

In re Iridium Operating LLC,
    478 F.3d 452 (2d Cir. 2007)............................................................................7, 22

Kenton County Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines, Inc.),
    374 B.R. 516 (Bankr. S.D.N.Y. Aug. 27, 2007),
    aff'd, 309 Fed. Appx. 455 (2d. Cir. 2009) ............................................................9

In re Kids Creek Partners, L.P.,
    248 B.R. 554 (Bankr. N.D. Ill. 2000), aff'd,
    Nos. 00C4076, 94 B 23947, 2000 WL 1761020 (N.D. Ill. Nov. 30, 2000)...........................24

LaBarbera v. A. Morrison Trucking, Inc.,
    Nos. 04-5927, 04-5928, 2006 WL 2091227 (2d Cir. July 20, 2006)........................................8

In re Lion Capital Group,
    49 B.R. 163 (Bankr. S.D.N.Y. 1985) ..................................................................19

Lippe v. Bairnco Corp.,
    288 B.R. 678 (S.D.N.Y. 2003).............................................................................22

In re Louise's, Inc.,
    211 B.R. 798 (D. Del. 1997)................................................................................23

Marx & Co. v. Diners Club, Inc.,
    550 F.2d 505 (2d Cir. 1977)................................................................................22

In re Matco Elecs. Group, Inc.,
    287 B.R. 68 (Bankr. N.D.N.Y. 2002) .................................................................23

In re Mediators, Inc.,
    No. 91B 12980, 1996 WL 673759 (S.D.N.Y. Nov. 21, 1996) .............................10

**PAGE(S)**

Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC),
    478 F.3d 452 (2d Cir. 2007) ............................................................................................ 7

Official Comm. of Unsecured Creditors v. Pardee (In re Stanwich Fin. Servs. Corp.),
    377 B.R. 432 (Bankr. D. Conn. 2007) ............................................................................ 8

In re Shilo Inn,
    285 B.R. 726 (Bankr. D. Or. 2002) ................................................................................. 8

Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),
    423 F.3d 166 (2d Cir. 2005) ............................................................................................ 9

In re SPhinX, Ltd.,
    351 B.R. 103 (Bankr. S.D.N.Y. 2006), aff'd, 371 B.R. 10 (S.D.N.Y. 2007) ........... 10

United States Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors
    Liquidation Co.,
    475 B.R. 347 (S.D.N.Y. 2012) ..................................................................................... 10


**STATUTES & OTHER AUTHORITIES:**

11 U.S.C.
    § 101(31)(B)(iii) ............................................................................................................ 22
    § 502 (b)(1) .................................................................................................................... 16
    § 558 .............................................................................................................................. 16

N.Y. C.P.L.R. § 213(2) (McKinney 2004) ................................................................................. 16

Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed Securities
    Litigation Handbook, § 3:45; Specific denials and defenses – Limitations and laches
    (2012) ............................................................................................................................. 16

MBIA Insurance Corporation ("*MBIA*"), a creditor of the debtors in the above-captioned chapter 11 cases (the "*Debtors*"), respectfully submits this objection to (1) the Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320]; (2) the Debtors' Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1176]; and (3) the Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements (the "*Motion*") [Docket No. 1887].[1]

## PRELIMINARY STATEMENT

The Debtors' prepetition decision to grant an allowed claim of up to $8.7 billion for contractual loan repurchase claims related to breaches of representations and warranties held by 392 separate Trusts was not really a settlement, but instead a thinly veiled mechanism to promote an Ally Financial-sponsored plan. The entire purpose of the putative "settlement" was not, in fact, to resolve claims held against the Debtors, but to secure for Ally Financial, Inc. ("*Ally*") the broad release from ResCap-related liability that it desperately seeks so that it can proceed with an initial public offering. As set forth herein, the Debtors have failed to meet their burden under Iridium to demonstrate that the Settlement Agreements and $8.7 billion total allowed claim are fair and reasonable. Accordingly, the Motion should be denied.

First, the Motion seeks an improper and unconstitutional advisory opinion concerning the proposed settlement's fairness because the Settlement Agreements (defined below) are not between the Debtors and the actual claimholders – the trustees.

Second, the Settlement Agreements do not contain clear, specific and concrete terms, specifically related to the claims of financial guaranty insurers, such as MBIA. The releases in

---

[1]    This Objection modifies and supersedes MBIA's notice concerning the "range of reasonableness," dated November 16, 2012. MBIA does not join in or adopt the arguments set forth in the Objection Of The Official Committee Of Unsecured Creditors To The Debtors' Motion Pursuant To Fed. R. Bankr. P. 9019 For Approval Of The RMBS Trust Settlement Agreements, dated December 3, 2012.

the Settlement Agreements appear to exclude the monolines' claims.  Yet, there appears to be disagreement among those associated with the Debtors who were involved in the negotiation, approval and execution of the Settlement Agreements as to whether this is the case.  Such vague and unclear terms do not meet the standards of Rule 9019.

Third, the Debtors failed to meet their Iridium burden to establish that the $8.7 billion total allowed claim is reasonable and in the best interests of the Debtors and the creditors.  In particular, the Debtors failed to consider the independent characteristics of the Trusts, thereby inviting certain settling Trusts to receive a windfall to the detriment of other creditors.  For example, the Debtors did not consider the individual litigation risks resulting from potential statute of limitations defenses that certain of the 392 Trusts – but not other Trusts – would have faced if they actually litigated their claims.  The Settlement Agreements also created a significant risk of adverse selection: Trusts with relatively weak claims that may be meritless are likely to participate, while those with stronger claims may not.  This presents the Debtors with the worst of both worlds: they will be forced to overcompensate Trusts holding weak claims, but still have to find a means for resolving stronger claims.  Under these circumstances, the Court has no basis for making the finding requested by Debtors in Paragraph 5 of the Proposed Order[2] that the settlement is "fair and reasonable to, and in the best interest of" each individual Trust and the beneficiaries of each individual Trust.  Moreover, the Debtors' expert analysis and methodologies are unreliable, and reflect flaws that, when corrected, significantly undermine the Debtors' ability to satisfy their burden under Iridium.

Fourth, Ally improperly compromised the arm's-length nature of the settlement negotiations through its pervasive control over the settlement negotiations to achieve its goal of

---

[2]    The proposed Order Granting Debtors; Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements (**"Proposed Order**) is Exhibit 1 to the Motion.

obtaining a third-party release for minimum consideration at the expense of the Debtors and their creditors.

<u>Fifth</u>, the Debtors harmed creditors by including a provision in the Settlement Agreements that provides for the attorneys of certain Trust Beneficiaries (and the investment advisors to certain Trust Beneficiaries) to receive compensation for attorneys' fees through an allowed claim that could exceed $450 million, which claim will receive priority treatment.

## **FACTUAL BACKGROUND**[3]

### **A. Debtors And Their RMBS Securitization Business**

Between 2004 and 2007, the Debtors sponsored 392 private label securitizations ("***PLS***"), each involving thousands of residential mortgage loans sold by the Debtors into 392 different trusts (the "***Trusts***").    The Trusts issued to investors (the "***RMBS Investors" or "Trust Beneficiaries***") securities or certificates backed by the mortgage loans that they held.    Each Trust involved distinct collateral such as first or second lien mortgage loans or home equity lines of credit ("***HELOCs***").    The Debtors made various representations and warranties regarding the quality and character of the mortgage loans they sold into the Trusts through a series of agreements that governed each individual transaction (the "***Governing Agreements***").[4]    The Debtors provided different representations and warranties in connection with different Trusts.

### **B. MBIA And Its Role As Financial Guaranty Insurer**

To increase marketability and mitigate the risk to the RMBS Investors of a potential shortfall in anticipated cash flows to certain Trusts, the Debtors sometimes purchased financial

---

[3]    Examples of evidence that MBIA contends will support its Objection at the hearing are attached to the Declaration of Jared Stanisci.

[4]    The Governing Agreements, as defined in the Settlement Agreements, include Purchase and Sale Agreements, Assignment and Assumption Agreements, and Pooling and Servicing Agreements entered into by the Debtors and other parties thereto, including, in some instances, affiliates of the Debtors, such as the depositor.

guaranty insurance policies from financial guaranty insurers or "monolines," such as MBIA. The monolines guaranteed to investors that, in the event there was a shortfall in cash flows to the Trust, the insurer would make certain payments with respect to current interest and ultimate principal to the Trust for the benefit of the RMBS Investors.  In connection with issuing the insurance policies, the monolines entered into insurance agreements with the Debtor that sponsored the transaction.  In the insurance agreements, the monolines received representations and warranties from the Debtors concerning the mortgage loans sold into the insured Trusts. Between 2004 and 2007, the Debtors sponsored 61 securitizations that were either fully or partially insured or "wrapped" by a monoline.

Between October 28, 2004 and May 30, 2007, MBIA provided financial guaranty insurance policies for eight Trusts relevant here.  The collateral underlying the MBIA-insured transactions consisted primarily of second lien mortgage loans.  The Debtors made numerous contractual representations and warranties to MBIA in connection with the issuance of MBIA's insurance policies, including representations to induce MBIA to enter into insurance agreements in the first instance.   These representations and warranties concerned the quality and documentation of the collateral underlying the MBIA-insured Trusts, and the underwriting standards that the Debtors applied in connection with acquiring and originating the mortgage loans sold to the MBIA-insured Trusts.

### C.  MBIA's Litigation Claims Against Debtors

MBIA timely commenced two separate civil actions against debtors Residential Funding Company, LLC ("**RFC**") and GMAC Mortgage, LLC ("**GMACM**"):   MBIA Ins. Corp. v. Residential Funding Co., LLC, Index No. 603552/2008 (Sup. Ct. N.Y. Co.) and MBIA Ins. Corp. v. GMAC Mortgage, LLC, Index No. 600837/2010 (Sup. Ct. N.Y. Co.).  In both actions, the courts denied the ResCap defendants' motions to dismiss.  The two actions are currently stayed. MBIA sought rescissory damages in excess of $2.0 billion, which generally reflects the total

approximate insurance claims that MBIA has paid to date and expects to pay in the future.[5]  In

both actions, MBIA asserted various causes of action against the Debtors, including the

following:

- Fraudulent Inducement:  RFC and GMACM made false statements and representations to
  MBIA, and thus fraudulently induced MBIA to enter into the MBIA insurance
  agreements.

- Material Breach Of Contract:  RFC and GMACM materially breached the MBIA
  insurance agreements in their entirety by denying MBIA the benefit of its bargain by,
  among other things, including tens of thousands of loans in the MBIA-insured Trusts in
  breach of the Debtors' contractual representations and warranties to MBIA.

- Breach Of Contract (Repurchase Claims):  RFC and GMACM breached their contractual
  obligations to repurchase individual loans that the Debtors included in the MBIA-insured
  Trusts in breach of the applicable representations and warranties.  Such breaches
  materially and adversely affected MBIA's interests.  The Debtors eventually repudiated
  their repurchase obligations.

- Breach Of Contract (Servicing):  RFC and GMACM breached their contractual
  obligations to properly service mortgage loans.

### D.  The Debtors' RMBS Settlement Negotiations

On or about October 17, 2011, the Debtors' ultimate corporate parent, Ally, received a

letter from Kathy D. Patrick of Gibbs & Bruns.  In her letter, Ms. Patrick purported to represent

various RMBS Investors in a number of Debtor-sponsored transactions.  Ms. Patrick outlined

evidence supporting claims that certain Trusts purportedly had against Ally and the Debtors.

Ally referred Ms. Patrick to ResCap's General Counsel, Tammy Hamzehpour.  On or about

February 3, 2012, the Debtors entered into certain tolling agreements with Ms. Patrick's clients.

In or around April 2012, the Debtors and Ally's Chief Litigation Counsel, Timothy

Devine, began substantive negotiations with Ms. Patrick concerning what ultimately became the

---

[5]    MBIA timely filed proofs of claim against debtors Residential Capital, LLC; Residential Funding
Company, LLC; GMAC Mortgage, LLC; Residential Asset Mortgage Products, Inc.; Residential Funding
Mortgage Securities II, Inc.; and Homecomings Financial, LLC in relation to the litigation claims
described herein.

settlement agreements that are the subject of the Debtors' pending Rule 9019 motion (the "**Settlement Agreements**").[6]  Inextricably intertwined with the negotiation of the Settlement Agreements were the Debtors' negotiations with Ally concerning a monetary contribution from Ally to the Debtors in exchange for the release of all claims against Ally related to the Debtors.

On or about May 9, 2012, Ms. Patrick, the Debtors' attorneys at Morrison and Foerster ("**M&F**"), Mr. Devine and Ally's attorneys at Kirkland & Ellis ("**Kirkland**") reached an agreement, in principle, for an allowed claim of up to $8.7 billion for the 392 Trusts.  In exchange for an allowed claim, any settling Trust would agree to release certain loan repurchase claims arising out of the Debtors' breaches of representations and warranties in the Governing Agreements, as well as certain servicing-based claims.  Any settling Trust also would have to agree to a plan support agreement ("**PSA**") that contemplated a plan that would include broad, non-voluntary third-party releases for Ally and the Debtors.

Later on May 9, M&F advised the ResCap Board of Directors for the first time about the parameters of the agreement with Ms. Patrick.  After a perfunctory and limited discussion, and with the benefit of no meaningful legal or quantitative analysis, the ResCap Board voted to approve a settlement that would provide the $8.7 billion total allowed claim to the Trusts.  Thereafter, M&F further negotiated the terms and details of a settlement agreement with Ms. Patrick, and a substantively identical agreement with a second group of investors represented by Talcott Franklin.  On May 13, 2012, M&F, Ms. Patrick, Kirkland and Mr. Devine finalized the terms of a written settlement agreement, which was subsequently amended by the parties.  Ally approved the May 13 settlement agreement and agreed to pay $750 million to settle claims that the Debtors held against it.  Under the terms of the May 13 settlement agreement, the Trust

---

[6]   The initial prepetition settlement agreement entered on May 13, 2012 has been amended multiple times and superseded.  The operative versions of the settlement agreements, which are the subject of the Motion, are referred to herein as the "Settlement Agreements."

Beneficiaries and their respective Trusts would agree to enter into a PSA with the Debtors and Ally. The PSA contemplated the Debtors and third parties releasing claims against Ally in a plan sponsored by Ally.

As they are currently constituted, the Settlement Agreements provide for, among other things, an $8.7 billion total allowed claim, approximately 5.5% of which would be allocated directly to Ms. Patrick and the attorneys for the Trust Beneficiaries. The Settlement Agreements require Trusts to "opt in" to the settlement. If any Trust elects not to "opt in," the total allowed claim is reduced by such Trust's percentage of all of the Trusts' aggregate original principal balance. What remains is an "Allowed Claim" to be shared by all settling Trusts. The Settlement Agreements allocate the Allowed Claim among participating settling Trusts based upon an unnamed expert's unreviewable opinion as to each settling Trust's *pro rata* share of the lifetime collateral losses that all settling Trusts are estimated to incur.

## ARGUMENT

Settlements outside of a plan of reorganization must be approved by the bankruptcy court pursuant to Rule 9019. Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC), 478 F.3d 452, 455 (2d Cir. 2007). A court may not simply defer to a debtor's business judgment with respect to a proposed settlement, but rather must evaluate the settlement to make a considered and independent determination as to whether the settlement is "fair, equitable, and in the best interests of the estate." HSBC Bank USA v. Fane (In re MF Global Inc.), 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012) (Glenn, J.); In re Dewey & LeBoeuf LLP, No. 12-12321, 2012 Bankr. LEXIS 4727, at *31-34 (Bankr. S.D.N.Y. Oct. 9, 2012) (Glenn, J.). To determine whether a proposed settlement is "fair and equitable," and thus in the best interests of the estate, courts consider the seven factors articulated by the Second Circuit in In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007). The burden of establishing that the "Iridium

factors" weigh in favor of approving a settlement lies with the settlement proponent.  See In re

MF Global, 466 B.R. at 248.  Here, the Debtors have failed to satisfy that burden.

   The Court also must consider the interests of non-settling third parties.  See Official

Comm. of Unsecured Creditors v. Pardee (In re Stanwich Fin. Servs. Corp.), 377 B.R. 432, 437

(Bankr. D. Conn. 2007), (citing In re Drexel Burnham Lambert Group, 995 F.2d 1138, 1146-47

(2d Cir. 1993)).  Here, the Settlement Agreements are not in the best interests of the Debtors or

their creditors, and are particularly unfair to non-settling creditors.  Moreover, currently no major

impaired creditor constituency supports the Settlement Agreements, and there is overwhelming

hostility towards the Motion.[7]  Under these circumstances, and for the reasons set forth below,

the Court should deny the Motion.

## I.    The Debtors Seek An Inappropriate Advisory Opinion Approving An Illusory Settlement Of Claims Not Held By The Parties To The Settlement Agreements

### A.    The Investors Have No Authority To Settle

   Courts should not approve a Rule 9019 settlement where one of the parties to the

purported settlement lacks authority to settle the relevant claims.  See In re Collecting Concepts,

Inc., 296 B.R. 683, 691 (Bankr. E.D. Va. 2001); see also LaBarbera v. A. Morrison Trucking,

Inc., Nos. 04-5927, 04-5928, 2006 WL 2091227, at *1 (2d Cir. July 20, 2006) (trust beneficiaries

lack authority to enter into a settlement where relevant "trust agreements vest settlement

authority solely in the trustees").  Here, the Court should not approve the Settlement Agreements

because they do not reflect an actual agreement between the relevant parties with authority to

settle the claims held by the Trusts against the Debtors.  Rather, the Settlement Agreements are

between the Debtors and certain Trust Beneficiaries or the investment advisors of certain Trust

---

[7]   The Trust Beneficiaries are not creditors of the Debtors with respect to the claims at issue in the Motion. Where investors, like the Trust Beneficiaries, have purchased beneficial interests in loans that have been pooled in debtor-sponsored trusts, "the trusts, and not the certificateholders, [are] the debtors' creditors."  In re Innkeepers USA Trust, 448 B.R. 131, 142 (Bankr. S.D.N.Y. 2011), (citing In re Shilo Inn, 285 B.R. 726, 729 (Bankr. D. Or. 2002)).

Beneficiaries. These Trust Beneficiaries and the investment advisors stand in the same posture as the trust beneficiaries in <u>LaBarbera</u>.[8] They do not have actual authority to settle any of the Trusts' claims.[9]

### B.    It Is Unconstitutional For A Federal Court To Issue An Advisory Opinion

Further, the Trusts and their respective trustees have not yet accepted any direction to accept any settlement offer. Indeed, the Trusts and trustees have indicated no intention to do so pending the Motion. This construct raises an entirely separate basis to deny the Motion: the Motion does not seek approval of a ripe settlement agreement that will be consummated between the Debtors and any creditors. Rather, the Motion seeks an improper and unconstitutional advisory opinion about both compliance with Rule 9019 <u>and</u> the fairness of the proposed settlement to each of the individual Trusts, as well as the Trust Beneficiaries of each individual Trust. *See* Proposed Order at ¶5. The trustees intend to rely on that advisory opinion to decide whether to enter into the Settlement Agreements. Indeed, if the Motion is granted and the Settlement Agreements are approved, no claims actually would be resolved. The release of any claims remains conditioned on the trustees' belated decision to agree to the settlement that is the subject of the Motion. <u>See</u> Motion, ¶ 16. This is precisely the type of contingent or hypothetical

---

[8]    In <u>LaBarbera</u>, certain ERISA trusts held delinquent contribution claims against an employer. The employer purported to enter into a settlement agreement with (i) an attorney who sometimes represented the trusts and sometimes a union representing the trusts' employee beneficiaries; (ii) a union official; and (iii) a clerical employee of the trusts. The Second Circuit held that the counterparties lacked authority to settle the claims because "the trust agreements vest[ed] settlement authority solely in the trustees."

[9]    The sample Purchase and Sale Agreement that Debtors filed with their original 9019 motion [Docket No. 320] vests authority to pursue remedial actions <u>solely</u> in the trustees. <u>See</u> Section 11.03. Where a trustee has sole authority to commence remedial procedures, the power to negotiate and agree upon settlements is inherent therein. <u>See</u> <u>Kenton County Bondholders Comm. v. Delta Air Lines (In re Delta Air Lines, Inc.)</u>, 374 B.R. 516, 527 (Bankr. S.D.N.Y. Aug. 27, 2007), (<u>citing</u> <u>Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)</u>, 423 F.3d 166, 174-75 (2d Cir. 2005)), <u>aff'd</u>, 309 Fed. Appx. 455 (2d. Cir. 2009).

event that courts have found to be non-justiciable.[10]  See, e.g., Flast v. Cohen, 392 U.S. 83, 100 (1968) (stating that "[a] proper party is demanded so that federal courts will not be asked to decide . . . a case which is of a 'hypothetical or abstract character'"); Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241 (1937) (noting that federal courts are not authorized to issue "opinion[s] advising what the law would be upon a hypothetical state of facts"); Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp., 90 F.3d 671, 676 (2d Cir. 1996) (finding no case or controversy where a court was asked to decide an issue dependent on a hypothetical outcome in a separate pending litigation); United States Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co., 475 B.R. 347, 367 (S.D.N.Y. 2012) (finding a case non-justiciable where the existence of a case or controversy depended on "hypotheticals"); In the Matter of the Mediators, Inc., No. 91B 12980, 1996 WL 673759 (S.D.N.Y. Nov. 21, 1996); In re HA 2003, Inc., 310 B.R. 710, 722 (Bankr. N.D. Ill. 2004) (holding that a bankruptcy court could not "prospectively declare" that a settlement was fair where one of the parties to the settlement had not yet signed the settlement agreement).

Additionally, this Court lacks the ability to rule on the fairness of the settlement from the perspective of the Trusts and other non-debtor parties.  See In re SPhinX, Ltd., 351 B.R. 103, 109-10 (Bankr. S.D.N.Y. 2006), aff'd, 371 B.R. 10 (S.D.N.Y. 2007); see also In re Adelphia Commc'ns Corp., 327 B.R. 143, 174 (Bankr. S.D.N.Y. 2005) (holding that, under Rule 9019, a

---

[10]    The Trust Beneficiaries' purported ability to "direct" the trustees does not provide the requisite certainty.  According to the Debtors, the Trust Benficiaries' ability to direct the trustees remains wholly contingent on the trustees' independent decision to accept such a direction, which is subject to any contrary instructions from other trust beneficiaries and other stakeholders, as well as rights the trustees may have to receive indemnity from the directing investors.  See Motion, ¶ 22 ("If a Trust does not accept the settlement – for any reason, including a decision by a Trustee or a monoline insurer that has contractual rights with regard to a particular Trust – that Trust remains free to assert a claim in the bankruptcy cases . . . ."). The Settlement Agreements expressly disclaim indemnification for the trustees. MBIA has not seen any evidence that Trust Beneficiaries own the beneficial interests necessary to provide any such direction to any trustee.

bankruptcy court only has jurisdiction to consider "the needs and concerns of the estate"), aff'd, 337 B.R. 475 (S.D.N.Y. 2006).

## II.    The Settlement Agreements Were Deliberately Drafted To Be Unclear And Ambiguous Regarding The Scope Of The Contemplated Releases As They Relate To The Claims Of Financial Guaranty Insurers

A Rule 9019 motion should be denied without "an agreement to terminate a controversy, demonstrating a meeting of the minds between the adversaries, complete with specific and concrete terms." In re Adirondack Ry. Corp., 95 B.R. 867, 873 (N.D.N.Y. 1988) (emphasis added). A proposed settlement agreement should be rejected when it is unclear precisely what claims are being released. See In re HyLoft, Inc., 451 B.R. 104, 116 (Bankr. D. Nev. 2011) (holding that settlement proponent bears burden of showing what claims are being settled under a compromise and declining to approve a settlement under Rule 9019 where the scope of a release was unclear). Otherwise, it is impossible to assess whether the proposed allowed claim is fair and reasonable to the estate and its creditors. Here, it is debatable whether the Settlement Agreements are clear on their face with respect to how they treat the monolines' claims.

The issue arises because M&F, Ms. Patrick, Kirkland and Mr. Devine deliberately drafted the Settlement Agreements to be unclear and ambiguous with the hope that creditors holding *bona fide* claims, such as MBIA, would be misled into supporting the settlement. Article VII of the Settlement Agreements provides, in relevant part, that the Trusts accepting the proposed settlement and their beneficiaries shall release claims "that arise under the Governing Agreements." The parties defined "Governing Agreements" to include "certain applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the Settlement Trusts." Notably, the parties did not include within the scope of the term "Governing Agreements" insurance agreements, such as those that MBIA entered into with the Debtors, which form the basis for MBIA's litigation claims, including MBIA's claims for material breach of the MBIA

insurance agreements and MBIA's separate repurchase breach claims.  However, in Section 7.01 of the Settlement Agreements, the parties provided a non-exclusive list of particular claims that they contemplated falling within the scope of the releases, including claims "***arising out of and/or relating to*** (i) the origination and sale of mortgage loans to the Accepting Trusts (including, without limitation, the liability of any Debtors that are party to a Pooling and Servicing Agreement with respect to representations and warranties made in connection with such sale or with respect to the noticing and enforcement of any remedies in respect of alleged breaches of such representations and warranties)." (emphasis added).  It is unclear whether this "relating to" language is broad enough to include MBIA's direct claims against the Debtors arising under its insurance agreements.

Section 8.03 of the Settlement Agreements appears to resolve this potential ambiguity:

> <u>Financial-Guaranty Provider Rights and Obligations</u>. To the extent that any third party guarantor or financial-guaranty provider with respect to any Settlement Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Settlement Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

On its face, the broad language of Section 8.03 appears to exclude all of the claims of the monolines, such as MBIA, from the scope of the releases.  MBIA's pending litigation claims arise under the insurance agreements – not the Governing Agreements – and therefore should be considered "independent" of the rights and claims being asserted by the Trusts.  Nevertheless, MBIA's claims are based in part on the Debtors' false representations and warranties that are incorporated by reference into the insurance agreements from the applicable Governing Agreements.  This creates a possibility that the Debtors may argue that MBIA's claims arising under the MBIA insurance agreements are not, in fact, "independent," and therefore, could be released if the Trusts benefitting from MBIA financial guaranty policies participated in the proposed settlement.

Remarkably, the individuals responsible for negotiating, approving and executing the Settlement Agreements for the Debtors do not agree about what, if any, impact the Settlement Agreements would have on MBIA's claims. Certain individuals share MBIA's understanding of the Settlement Agreements as they relate to monoline claims. For example, ResCap's General Counsel, Tammy Hamzehpour, executed the Settlement Agreements. She believed that all of the monolines' claims were <u>excluded</u> from the scope of the release. Tom Marano, ResCap's CEO and the Chairman of the Board of Directors, voted to approve the Settlement Agreements. Like Ms. Hamzehpour, Mr. Marano believed that the Settlement Agreements had no impact on the monolines' claims. Rather, he believed that Section 8.03 was designed to give the monolines "flexibility" to pursue their own claims. James Whitlinger, ResCap's CFO and an inside director who voted to approve the Settlement Agreements, testified that Section 8.03 "speaks for itself." Whitlinger deferred to Ms. Hamzehpour's understanding of the Settlement Agreements' impact on the monolines' claims.[11]

At the same time, those who negotiated the Settlement Agreements had a different understanding than MBIA and those at the Debtors who executed and approved the Settlement Agreements. For example, Mr. Devine believed that <u>all</u> of the monolines' claims, including claims arising under the insurance agreements, would be released if the Trusts in the insured securitizations participated in the settlement. Contemporaneous emails also indicate that Ally conditioned its approval of the May 13 settlement agreement on achieving a release that extinguished all monoline claims. Indeed, Mr. Devine expressed this condition to M&F in connection with negotiating and finalizing the May 13 settlement agreement.

---

[11] Still others associated with the Debtors had different views and understandings. For example, one of the Debtors' experts, Jeffrey Lipps, believed that the settlement could be read to release the monolines' breach of contract claims, including claims for material breach of contract, breach of servicing obligations and repurchase breach claims predicated on breaches of individual representations and warranties as to individual loans. Mr. Lipps did not believe that the monolines' fraudulent inducement claims could be seen as within the scope of the proposed releases.

The contemporaneous email record and Mr. Devine's recent deposition testimony demonstrate that those who negotiated and drafted the Settlement Agreements, including Mr. Devine, M&F and Ms. Patrick, underlined deliberately drafted the Settlement Agreements to be ambiguous about their impact on the claims held by the monolines and others.  According to Mr. Devine, M&F and Ms. Patrick consciously drafted Section 8.03 to appear as a broad exclusion, while "carefully" including the phrase "to the extent that" to reinforce Ally's and the Debtors' view that the monolines did not hold any "independent" claims.  As a result of this drafting gamesmanship, Mr. Devine believed that all of the monolines' claims, including claims arising under insurance agreements, would be released if the insured Trusts participated in the settlement.[12]

Contemporaneous emails also indicate that M&F recognized that the Settlement Agreements were ambiguous as they related to extinguishing the monolines' claims.  Instead of clarifying certain relevant provisions, such as Section 5.01 (which defined "***Allowed Claim***"), M&F allowed them to remain unclear.  In other instances, M&F proposed comprehensive changes that would have clarified the intended adverse impact of the Settlement Agreements on monoline claims, only to remove the proposed language after Ms. Patrick objected to the transparency.  In particular, Ms. Patrick counseled M&F that the clarifying language was unnecessary, given the literal scope of the definition of "Allowed Claim," which she believed was broad enough to indirectly encompass all of the monolines' claims, with the exception of certain indemnity claims.  While Ms. Patrick's legal analysis and rationale was flawed,[13] she

---

[12]   M&F and Ally attempted to surreptitiously embed other mechanisms in the May 13 settlement agreement to avoid potential litigation claims.  For example, in connection with the May 13 settlement agreement, Ally intended to rely on the settling Trusts' agreement to support an Ally-sponsored plan that included non-voluntary third-party releases of claims, including securities claims expressly excluded from the scope of the original settlement agreements.

[13]   On May 13, 2012, Ms. Patrick wrote:  "a) the monolines have rights as subrogated certificateholders when they pay claims, those arise under the Trust agreements (which contain that language) so all you

achieved her goal.  M&F, Kirkland and Mr. Devine agreed to delete the clarifying language,

thereby leaving the Settlement Agreements misleading with respect to the monolines' claims.

**III.    The Debtors Failed To Satisfy Their Burden Of Proving That The Settlement Agreements Are Fair And Reasonable And Otherwise In The Debtors' Or Creditors' Best Interests**

**A.    The $8.7 Billion Total Allowed Claim Provides A Windfall To Certain Settling Trusts**

Each of the 392 Trusts is a separate creditor; they are not similarly situated.

Nevertheless, the Settlement Agreements treat all of the Trusts as homogeneous, differing only

in size.  This creates a risk of adverse selection as Trusts with relatively weak or meritless claims

are more likely to participate in the settlement to receive a windfall.  The Debtors have presented

no evidence that the Settlement Agreements address the differing merits of the claims belonging

to each individual Trust.   Absent such evidence, the Court should not enter the Debtors'

Proposed Order, which seeks a decree that the settlement is "fair and reasonable to, and in the

best interest of" each individual Trust and the Trust Beneficiaries of each individual Trust "as a

compromise of each joining Trust's asserted claims against the Debtors."  See Proposed Order at

¶ 5.

The merits of each Trust's claims vary depending on the facts and circumstances relevant

to that Trust, including vintage, the terms of the applicable Governing Agreements, and the

collateral it holds.[14]  For example, the statute of limitations in New York for breach of contract

---

need to do for that is to say the Trusts; b) separately, the Credit Enhancers have separate indemnity claims, and those arise under separate agreements. . . ."  While MBIA does have rights as a subrogee, it has independent rights, including direct rights under the applicable insurance agreements and as a third-party beneficiary under the applicable purchase agreements.  See, e.g., Indenture, dated as of September 28, 2006, between Home Equity Loan Trust 2006-HSA5, as Issuer, and JPMorgan Chase Bank, N.A., as Indenture Trustee, § 4.12; Home Equity Loan Purchase Agreement, dated as of September 28, 2006, between RFC, as Seller, and Residential Funding Mortgage Securities II, Inc., as Purchaser, § 8.11.

[14]    The attorneys for the Trust Beneficiaries continue to ignore the distinctness of each of the 392 Trusts, and the separate litigation risks that they each face by assuming that the experience of MBIA, and the basis for the claims it holds against the Debtors, would be applicable to all of the Trusts.  See Steering Committee Investors' Statement In Support Of Settlement And Response To Settlement Objections, dated

claims is six years.[15]    The Debtors' own expert, Jeffrey Lipps, stated in his supplemental

declaration that, if the Debtors were confronted with claims by Trusts formed in 2004 and 2005,

the Debtors inevitably would have made strong arguments that the statute of limitations for each

Trust's repurchase and servicing claims began to run from the closing when the Debtors made

the representations and warranties that were breached.    If the applicable state statute of

limitations bars enforceability of a claim, that claim is not allowable.    In re Hess, 404 B.R. 747,

749 (Bankr. S.D.N.Y. 2009) (Glenn, J.), (citing 11 U.S.C. §§ 502 (b)(1), 558).

Here, 144 of the 392 Trusts were formed more than six years before the Debtors filed for

bankruptcy on May 14, 2012, and failed to commence timely litigation (or enter into timely

tolling agreements).[16]    Those Trusts represent 33.3% of the aggregate original principal balance

of the 392 Trusts, and 17.6% of the aggregate lifetime collateral losses of the Trusts estimated by

the Debtors' own expert, Mr. Sillman.    Under Section 5.01 of the Settlement Agreements, if only

these Trusts were to agree to the Settlement Agreements, they would account for and receive an

aggregate allowed claim of $2.9 billion.

---

October 5, 2012 ("Steering Committee Br."), ¶ 3 ("[i]f the Court were to estimate Debtors' repurchase
exposure using the same data set that creditors MBIA and FGIC have used to support their own
repurchase claims on mortgages held by the same trusts, Debtors' repurchase exposure would be even
higher [than the original high-end range estimated by Sillman], ranging from $31 to $44 billion, or even
more." (emphasis removed)), ¶ 16.    There is no basis for such an assumption.    MBIA, as the financial
guaranty provider, is differently situated than the Trusts and the Trust Beneficiaries.    Moreover, MBIA
actually commenced litigation, took extensive discovery of the Debtors in connection with such actions,
and defeated motions to dismiss.    Thus, despite the Trust Beneficiaries' assertion to the contrary (id.),
MBIA can credibly contend that the Debtors have not met their burden of establishing that the settlement
is reasonable, notwithstanding MBIA's own experience.

[15]    N.Y. C.P.L.R. § 213(2) (McKinney 2004); Hernandez v. Bank of Nova Scotia, 76 A.D.3d 929, 930
(1st Dep't 2010); see also Talcott J. Franklin & Thomas F. Nealon III, Mortgage and Asset Backed
Securities Litigation Handbook, § 3:45; Specific denials and defenses – Limitations and laches (2012).

[16]    Indeed, according to the Debtors' own records and their experts' analyses, over 300 of the 392 Trusts
never issued a single repurchase demand to the Debtors.    Of those that did make repurchase demands, 45
Trusts demanded that the Debtors repurchase no more than one or two loans.

In light of Mr. Lipps' opinion, when negotiating the total allowed claim, the Debtors should have insisted on a substantial discount being applied to those older Trusts' claims in recognition of the additional litigation risks they faced.  At a minimum, the Debtors should have addressed this risk in the allocation mechanism included in the Settlement Agreements.  The Debtors did neither.  In fact, M&F, Ms. Patrick and Mr. Devine intentionally included Trusts with potentially time-barred claims within the scope of the Settlement Agreements.[17]  M&F and Mr. Devine consciously agreed to do so to maximize the "footprint" of potential creditors they could assert were participating in the settlement, all in an effort to create a sense of "inevitability" that would "neutralize" potential objectors.  M&F expressly directed those involved with calculating the "footprint" to ignore the statute of limitations defenses.  The Debtors thus improperly increased the size of the total allowed claim to the detriment of both non-settling and certain settling creditors.  The Debtors also exposed themselves to an adverse selection of Trusts settling their claims.

The Debtors also did not account for certain differences in the applicable Governing Agreements and representations and warranties among the 392 Trusts.  For example, of the 268 Trusts for which a complete collection of the Governing Agreements are publicly available, approximately 80% did not receive protection through representations and warranties concerning the underwriting standards Debtors used to acquire and originate loans.  One of the Debtors' attorneys, Katharine Crost of Orrick, raised this exact problem.  On May 13, 2012, Crost noted: "Allocating the Allowed Claim on a *pro rata* basis in accordance with losses in each trust does not attempt to allocate the Allowed Claim based on harm to the respective trusts based on possible breaches of reps and warranties by ResCap."  The Debtors inexplicably ignored Ms.

---

[17]    Originally, in or around February 2012, Ms. Patrick and the Debtors entered into a tolling agreement related to only 245 Trusts within the scope of the Settlement Agreements.  That tolling agreement excluded Trusts formed in 2004.  When negotiating the Settlement Agreements in April and May of 2012, Ms. Patrick requested that the Debtors include the 2004 Trusts within its scope.  The Debtors obliged.

Crost's concern to the detriment of the settling Trusts who received relatively strong representations and warranties.

**B.    The Allocation Mechanism Provides A Windfall To Certain Settling Trusts At The Expense Of Other Settling Trusts And Non-Settling Creditors**

The Debtors included two related provisions in the Settlement Agreement that are unfair to creditors, as they create windfalls for certain settling Trusts at the expense of both non-settling and settling creditors.  Accordingly, the Debtors fail to satisfy their burden under <u>Iridium</u>.  The Debtors also cannot justify the decree and relief requested in Paragraph 5 of the Proposed Order that they have presented to the Court.

Section 5.01 provides that the <u>original</u> <u>principal</u> <u>balance</u> of the settling Trusts determines the ultimate size of the total allowed claim.  This mechanism for establishing the size of the total allowed claim is unfair to non-settling creditors.  The total allowed claim amount does not reflect the value of any Trust's right to demand repurchases based on breaches of representations and warranties.  It also does not attempt to approximate the harm suffered by any settling Trust arising from loans evidencing breaches of representations and warranties.  All that seems to matter is the original size of the Trust.

At the same time, the Settlement Agreements call for the total allowed claim to be allocated by an unnamed expert based on each settling trust's *pro rata* share of <u>estimated</u> <u>lifetime</u> <u>collateral</u> <u>losses</u> of the settling Trusts.  <u>See</u> Settlement Agreements, § 6.01, Ex. B.  This allocation method does not distinguish between the claims of settling Trusts that are subject to potential litigation defenses and those that are not.  <u>See</u> Declaration of CJ Brown, dated December 3, 2012 ("***Brown Decl.***"), ¶ 45.  This asymmetry creates intractable fairness problems, as well.[18]  When a settling Trust with a relatively high original principal balance elects to

---

[18]    The unnamed expert contemplated by the Settlement Agreements creates an entirely separate problem.  Exhibit B to the Settlement Agreements provides that an unnamed "qualified financial advisor"

participate in the Settlement Agreements, it is, in effect, contributing more to the allowed claim amount than a settling Trust with a relatively low original principal balance. But the settling Trusts do not receive an allocation based on their contribution to the overall allowed claim amount. Rather, the allocation is tied to each settling Trust's *pro rata* share of collateral losses – which is an entirely different metric. This causes unfairness to certain settling Trusts.

To be fair to any non-settling creditors, the settling Trusts' share of the estate as reflected by the allowed claim should be reduced by the actual value of the claims held by each Trust that does not settle. In theory, if all 392 Trusts opt in, the value of each Trust's individual allowed claim is quantifiable, and could increase, depending on the ultimate composition of the settling Trusts. For certain Trusts, the hypothetical value of their individual claim would be greater than the reduction in the total allowed claim that would occur if they elected not to participate in the settlement. See Brown Decl. ¶ 46. Such a potential inequitable result demonstrates why the asymmetrical mechanisms that the Debtors used to determine and allocate the allowed claim render the Settlement Agreements unfair to non-settling creditors, as well.

### C.    The Debtors' Experts Fail To Present Any Analysis That Would Assist The Debtors In Satisfying Their Burden To Establish That The $8.7 Billion Total Allowed Claim Is Fair And Reasonable

A settlement should not be approved where the support for a key element of the settlement is to be found in "unsubstantiated gratuitous declarations." In re Lion Capital Group, 49 B.R. 163, 189 (Bankr. S.D.N.Y. 1985). Here, the Debtors did not retain any experts to assist

---

(the "***Expert***") will "make any determinations and perform any calculations required in connection with the Allocation of the Allowed Claim among the Accepting Trusts." This unnamed Expert is not subject to court oversight, cannot explicitly have his or her calculations challenged, and apparently has complete discretion as to how he or she performs his or her work. Further, the Settlement Agreements and Motion are silent as to how this Expert will be selected and compensated. Moreover, the Expert will necessarily have to exercise broad discretion, because of a key term in the Plan of Allocation, "Net Losses," is essentially undefined. Such a broad delegation authority, with no explicit accountability, is impermissible and should not be approved. See In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 179, 185 (2d Cir. 1987) ("no principle of law authorize[es] such a broad delegation of judicial authority to private parties").

them with negotiating or evaluating the reasonableness of the $8.7 billion total allowed claim before agreeing on the amount.  In support of the Motion, however, the Debtors asked three experts to provide after-the-fact opinions regarding the purported reasonableness of the proposed Settlement Agreements.  The three experts are Frank Sillman, Jeffrey Lipps and William J. Nolan.[19]  The analyses of the Debtors' experts fall well short of satisfying the Debtors' burden to establish that the $8.7 billion total allowed claim is reasonable, and that the Settlement Agreements otherwise meet the standards set forth in Iridium.

### 1.    Mr. Sillman's Analysis Is Fatally Flawed And Should Be Disregarded

Mr. Sillman purported to value the Debtors' potential liability for their breaches of representations and warranties.  He used models obtained from third-party vendors and information from the Debtors to calculate the estimated lifetime collateral losses to be incurred by each Trust.  Mr. Sillman then calculated a "loss share rate" by using a combination of his undocumented personal "experience," and data related to how Government Sponsored Entities ("**GSEs**") (like Fannie Mae and Freddie Mac) asserted repurchase demands.  Mr. Sillman multiplied the various assumptions comprising his "loss share rate" by his lifetime collateral loss estimates to develop "ranges of reasonableness."  Mr. Sillman opined that the $8.7 billion total allowed claim falls within his "range of reasonableness," of between $6.4 and $9.7 billion.[20]

---

[19]    Mr. Nolan's expert opinion should be given no weight.  Mr. Nolan opined that complex litigation is expensive.  This is not an appropriate subject for expert testimony.  It is a tautology and should be disregarded.

[20]    In his original Declaration, Mr. Sillman created a "range of reasonableness" of between $6.7 billion and $10.3 billion.  Sillman Decl. ¶68.  In his Supplemental Declaration, Mr. Sillman revised his assumptions regarding his estimated lifetime collateral loss figures downward but did not recalculate his "range of reasonableness." MBIA's expert, Mr. Brown, recalculated Mr. Sillman's "range of reasonableness" using Mr. Sillman's methodology but with the estimated lifetime collateral loss assumptions set forth in the Sillman Supplemental Declaration.  If Mr. Sillman had recalculated his "range of reasonableness" on that basis, it would be between $6.4 billion and $9.7 billion.  See Brown Decl. ¶ 21.  Inexplicably, the Steering Committee continues to refer to Mr. Sillman's superseded "range of reasonableness."  See Steering Committee Br., ¶¶ 3, 12.

For the following reasons, and those discussed in the Brown Declaration, Mr. Sillman's analysis is fatally flawed[21] and should be ignored:

- Mr. Sillman's analysis is not scientific or replicable. It is based in substantial part on his personal "experience" in the industry consisting almost entirely of his work for IndyMac Bank and as a litigation consultant for the Debtors in their defense of MBIA's litigation. None of his professional experience or observations are documented. Many of the assumptions underlying Mr. Sillman's analysis are without any basis and cannot be verified.

- Mr. Sillman's opinion that the $8.7 billion total allowed claim was reasonable was based, in part, on the fact that the Debtors agreed to the $8.7 billion total allowed claim. Mr. Sillman inexplicably considered the $8.7 billion total allowed claim to be an important factor in determining what data to ignore, and what assumptions to make, in connection with opining on the reasonableness of the total allowed claim. It is unclear what assumptions Mr. Sillman would have made if the $8.7 billion allowed claim had not been agreed to by the Debtors before he did his analysis.

- Mr. Sillman arbitrarily ignored the Debtors' actual repurchase demand experience with the Trusts, opting instead to consider the demand experience of GSEs which, by Mr. Sillman's own admission, stand in an entirely different position than trusts in private label securitizations, such as the Trusts. Mr. Sillman contended in his declaration that the Debtors' actual repurchase demand experience with the Trusts – consisting of over 15,000 repurchase demands – was not substantial enough to be informative. Yet, during his deposition, he conceded that his work for the Debtors in connection with their analysis of repurchase demands informed his assumptions. Moreover, there is no evidence in the record that Mr. Sillman has any experience negotiating GSE repurchase demands.

- Had Mr. Sillman used the Debtors' actual repurchase demand experience with the Trusts to calculate his "range of reasonableness" – and made no other changes to his methodology – his "range of reasonableness" would have been reduced to between $2.2 billion to $2.9 billion, leaving the $8.7 billion total allowed claim in excess of Mr. Sillman's "range of reasonableness." See Brown Decl. ¶¶ 23-31.

- Mr. Sillman failed to properly consider the litigation risk faced by Trusts subject to a defense based on the statute of limitations. Had Mr. Sillman correctly considered the litigation risk based on this potential defense to certain Trusts' claims (a risk identified by Mr. Lipps), Mr. Sillman's total lifetime collateral loss estimates would have been reduced, thereby decreasing his "range of reasonableness," even accepting Mr. Sillman's so-called "loss share analysis" and other assumptions to be accurate and methodologically sound. Mr. Sillman's "range of reasonableness" is reduced even

---

[21]    See Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993).

further when applying a statute of limitations risk discount and accounting for the Debtors' actual repurchase demand experience with the Trusts. The $8.7 billion total allowed claim is significantly in excess of Mr. Sillman's "range of reasonableness" as corrected for these errors. See Brown Decl. ¶¶ 32-44.

- Mr. Sillman treated the Trusts as homogenous commodities. In doing so, he failed to adequately consider the differences between the different Trusts, including their vintages, the collateral they involved, the representations and warranties they received from the Debtors, and whether they involved financial guaranty insurance.

### 2. The Lipps Analysis Does Not Contain Matters That Are Appropriate For Expert Testimony

Mr. Lipps purports to be an expert on RMBS litigation, particularly with respect to the defenses available to defendants such as the Debtors. His entire declaration consists of a legal discussion that is not an appropriate subject for expert testimony.[22] Mr. Lipps failed to review or account for differences in possible defenses or representations and warranties among the 392 Trusts. He failed to assign any particular value to the specific defenses he discussed, or discuss how the Trusts' individualized litigation risks impacted the aggregate amount of the Debtors' potential liability. His "reasonableness" opinion is therefore impermissibly conclusory.

### IV. Ally's Influence And Control Over The Settlement Negotiations Preclude A Finding That Arm's-Length Bargaining Occurred

Iridium requires the Court to consider whether the Settlement Agreements were the product of arm's-length bargaining. In re Iridium Operating LLC, 478 F.3d at 462. When insiders, including persons in control of a debtor,[23] obtain benefits in connection with a settlement agreement, "closer scrutiny" is required to determine "whether a settlement is fair and reasonable." In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991). This is especially true when a settlement agreement is, in reality, a vehicle for one

---

[22] For this reason, Mr. Lipps' declaration is subject to challenge. See, e.g., Marx & Co. v. Diners Club, Inc., 550 F.2d 505, 509-10 (2d Cir. 1977). Mr. Lipps' declaration is also subject to challenge because he acted as an advocate in the very matters about which the Debtors propose to offer his expert testimony. See, e.g., Lippe v. Bairnco Corp., 288 B.R. 678, 688 (S.D.N.Y. 2003).

[23] 11 U.S.C. § 101(31)(B)(iii).

interested party (here, Ally) to implement a plan of reorganization guaranteed to be more favorable to it than to all other interested parties. Such a settlement agreement "cannot be fairly denoted a Rule 9019 compromise." In re Louise's, Inc., 211 B.R. 798, 802 (D. Del. 1997).

Ally's pervasive control and influence over the negotiations between the Debtors and Ms. Patrick compromised the arm's-length nature of the settlement negotiations.[24] Ally controlled virtually every aspect of the Debtors' negotiation of the Settlement Agreements, such that Ally's interests took precedence over obtaining a reasonable settlement for the Debtors and their creditors.[25] As a result of Ally's inappropriate influence over the settlement negotiation process, the ResCap Board of Directors failed to receive an unvarnished objective assessment of the relevant risks and value of the claims being settled. Instead, the ResCap Board of Directors agreed, on an uninformed basis, to a settlement agreement intended to advance the interest of Ally in securing a broad, non-voluntary third-party release in exchange for minimal

---

[24] The Debtors' attorneys also lacked the requisite "competency and experience" with RMBS litigation to negotiate the Settlement Agreements, as it was clear they were not experienced in "similar cases." In re Iridium Operating LLC, 478 F.3d at 462; In re Matco Elecs. Group, Inc., 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002). M&F lacked the requisite experience with RMBS litigation to evaluate the Debtors' exposure to claims from the Trusts. M&F was consistently confused and perplexed by RMBS-related concepts during negotiations. Anthony Princi of M&F candidly admitted as much when he acknowledged to his colleagues that Ms. Patrick "actually knows how this stuff works a lot better than we do I'm sorry to admit." This reliance on Ms. Patrick proved to be detrimental to the Debtors, as Ms. Patrick made mistakes in her legal analysis adversely affecting the Debtors and creditors. M&F also inexplicably ignored advice from the Debtors' other legal professionals. For example, M&F ignored concerns raised by Katharine Crost of Orrick about the proposed settlement. M&F also overruled recommendations by David Beck of Carpenter Lipps that would have benefited the Debtors.

[25] For example, the Debtors rushed the settlement negotiations and the Motion to accommodate timing concerns and deadlines imposed by Ally related to Ally's business needs. The Debtors also agreed to remove securities claims from the scope of the releases at Ally's request. Similarly, the Debtors requested that Talcott Franklin rescind his clients' direction to their respective trustees to commence litigation against Ally. The Debtors further insisted that Talcott Franklin release claims against third parties who might bring indemnity or contribution claims against Ally.

consideration so that Ally could pursue an initial public offering once free of ResCap-related exposure.[26]

## V.    The Settlement Agreements' Attorneys' Fees Provision Harms Creditors

The Debtors further harmed creditors by including a provision in the Settlement Agreements for the payment of an excessive allowed claim of over $450 million as compensation to the attorneys for certain of the Trust Beneficiaries and their investment advisors for their attorneys' fees, without the Debtors considering whether such a fee payment was reasonable.[27]   There is no explicit authorization within the Bankruptcy Code for the payment of counsel fees to a non-creditor of the estate.   Fees have been awarded to creditors' or equity holders' counsel as part of a settlement in limited instances, such as when settlements facilitated a consensual plan of reorganization, and then only after a finding that the fees were reasonable. See, e.g., In re Adelphia Commc'ns Corp., 441 B.R. 6 (Bankr. S.D.N.Y. 2010); Transcript of Oral Argument at 43:8-17, In re Northwest Airlines Corp., No. 05-17930 (Bankr. S.D.N.Y. May 16, 2007).   The separate allowed claims for the Trust Beneficiaries' attorneys' fees also should be rejected because the attorneys' fee provision is unfair to creditors.   The Settlement Agreements contemplate the Debtors paying such fees "in cash, in an amount that [counsel] respectively agree[s] is equal to the cash value of their respective portions of the Allowed Claim, and in any such event, no estate retention application, fee application or further order of the Bankruptcy Court shall be required as a condition of the Debtors making such agreed

---

[26]    The Debtors did not negotiate a settlement amount with Ally that reflected the value of potential claims held by the Debtors against Ally.  Indeed, they made no effort to value such claims.  Rather, the outside directors negotiated a "headline number" with Ally that would make the Ally-sponsored plan seem credible to the public.

[27]    The agreement to this substantial allowed claim for the Trust Beneficiaries' counsel fees constituted a breach of the Debtors' "fiduciary duty to object to claims in order to maximize payment by the estate on legitimate claims."  See Cheng v. K & S Diversified Inv., Inc. (In re An-Tze Cheng), 308 B.R. 448, 454 (B.A.P. 9th Cir. 2004), aff'd, 160 Fed. Appx. 644 (9th Cir. 2005); In re Kids Creek Partners, L.P., 248 B.R. 554, 561-62 (Bankr. N.D. Ill. 2000), aff'd, Nos. 00C4076, 94 B 23947, 2000 WL 1761020.

allocation." Such a procedure effectively transforms the payment into an administrative claim, with no Court-oversight whatsoever, to the detriment of creditors.

## CONCLUSION

For all of these reasons, MBIA respectfully objects to the Motion, and requests that the Court deny the Motion in its entirety.

Dated:     New York, New York
           December 3, 2012

                                        CADWALADER, WICKERSHAM & TAFT LLP

                                        By:     /s/ Gregory M. Petrick
                                        Gregory M. Petrick
                                        Jonathan M. Hoff
                                        Ingrid Bagby
                                        Jason Jurgens
                                        CADWALADER, WICKERSHAM & TAFT LLP
                                        One World Financial Center
                                        New York, New York 10281
                                        Telephone: (212) 504-6000
                                        Facsimile: (212) 504-6666

                                        -and-

                                        Mark C. Ellenberg
                                        CADWALADER, WICKERSHAM & TAFT LLP
                                        700 Sixth Street, N.W.
                                        Washington, DC 20001
                                        Telephone: (202) 862-2200
                                        Facsimile: (202) 862-2400

                                        *Attorneys for MBIA Insurance Corporation*