# EXHIBIT RR.1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,      12-12020(MG)

Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

New York, New York

November 19, 2012

10:17 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

102

TIMOTHY DEVINE

1  TIMOTHY DEVINE
2  period ended March 31, 2012.  But I -- but
3  I'm in no position to authenticate that
4  this document is what the front page of it
5  indicates it is.  That's not in my job.
6      Q.  It's already been authenticated,
7  Mr. Devine.  You saw the 10-Q at the time
8  it was filed?
9      A.  I can't say I saw the 10-Q.  I
10 probably saw parts of it.
11     Q.  Did you participate in its
12 preparation?
13     A.  I gave advice to the client in
14 connection with its preparation.
15     Q.  The 10-Q was filed on April 27,
16 2012, right?
17     A.  I don't know.
18     Q.  Take a look at page 73.
19     A.  Okay.
20     Q.  And directing your attention to
21 the heading Potential Losses, Litigation
22 Repurchase Obligations and Related Claims.
23 Do you see that?
24     A.  Yes.
25     Q.  Did you participate in the

103

1  TIMOTHY DEVINE
2  preparation of any of the material under
3  this heading?
4      A.  Yes.
5      Q.  The paragraphs under that
6  heading, until you get to the number 25
7  that says Subsequent Events, up until
8  that, those are part of note 24, which
9  begins on page 66, correct?
10     A.  It may be a copying issue but I
11 have a blank page at page 66.
12     Q.  Okay.  On the other side of it.
13 On the other side of what appears on this
14 copy of the exhibit to be a blank, you see
15 the notes?  This is all part of note 24,
16 right, that runs from that page, and it
17 doesn't have -- it's a copying error, the
18 66 which is on the back.  It runs from
19 there to page 73.  Can we agree on that?
20     A.  I -- I -- what are we agreeing
21 on, sorry?
22     Q.  That note 24 -- let's -- let's
23 do it this way.  That the material on page
24 73 up until you get to the note 25 begins
25 on the page following page number 65 in

104

1  TIMOTHY DEVINE
2  this exhibit -- it's all part of note 24,
3  isn't it?
4      MR. PRINCI:  Objection as to
5  form.
6      A.  Yeah, I don't know.  I -- I --
7  I -- I guess it is.
8      Q.  You guess it is.
9      A.  I'm reading this with you right
10 now, okay?
11     Q.  Okay.  And note 24 deals with
12 contingencies and other risks; is that
13 correct?
14     A.  At this page that looks like it
15 might be page 66 there's a heading 24,
16 Contingencies and Other Risks.
17     Q.  And among the contingencies
18 addressed are loan repurchase obligations
19 related to loan sales, correct?
20     A.  Where -- where are you looking?
21     Q.  On pages 68 and 69.  One of the
22 contingencies identified in note 24 is
23 Loan Repurchases and Obligations Related
24 to Loan Sales, right?
25     A.  That seems to be correct.  I'm

105

1  TIMOTHY DEVINE
2  just reading this page 68 and that's --
3  that's what that heading says, Loan
4  Repurchases and Obligations Related to
5  Loan Sales.
6      Q.  Okay.  And those obligations are
7  described with a number of types of
8  transactions, including government
9  sponsored enterprises or GSEs, right?
10     A.  Well, at this point you are
11 asking me to characterize the structure
12 and content of the document.  And I'm just
13 not in a position to do that.
14     MR. BRYAN:  Maybe if you could
15 direct the witness to a particular
16 part where there's a reference to
17 GSEs, do it that way.
18     Q.  On the bottom of page 69
19 government sponsored enterprises are
20 listed as one category, are they not?
21     A.  What I can tell you is I see at
22 the bottom of page 69 a paragraph
23 beginning right at the bottom of the page,
24 the heading of which is Government
25 Sponsored Enterprises.

27 (Pages 102 to 105)

Page 134

TIMOTHY DEVINE

person who wrote it, but it appears to represent the information submitted as part of a fourth quarter 2011 CCAR submission.

Q. Okay.

A. And to include data projections through 2013.

Q. And then the additional items below adjusted that to make a presentation that ran through the first quarter of 2012, correct?

A. Yes. If what you are asking is does this slide as a whole describe the identified potential exposures as of first quarter 2012, the answer is yes.

Q. The first line under additional items says "Estimated nonwrapped potential exposure beyond 2013." What did that refer to?

A. Well, I can tell you sitting here today what, as I recall, what it referred to.

Q. We can only ask for your recollection, Mr. Devine.

Page 135

TIMOTHY DEVINE

A. Okay. So as I recall sitting here today, the estimated nonwrapped potential exposure beyond 2013 represented estimated lifetime losses, which I'm testing with the note here, multiplied by risks post fund audit defect rates adjusted for litigation defenses. Risk referred to Todd Kushman's group. And so that would have been -- what I don't remember is nonwrapped potential exposure beyond 2013, whether that would have included anything beyond private label securities nonwrapped potential exposure. I just don't remember.

Q. The next line under Additional Items says "Adj. for application of defect rate at a nonloan level for nonwrapped PLS and additional provision for wrapped PLS." Do you see that?

A. I see it, yeah.

Q. And that shows an adjustment of $500 million upwards for nonwrapped and wrapped PLS exposure, right?

A. Well, it represents application

Page 136

TIMOTHY DEVINE

of a defect rate of a nonloan level for those populations.

Q. Okay. And the next line under Additional Items says "Potential investor/securities litigation." Do you see that?

A. Yes, I see it.

Q. Is the amount shown for that item $400 million, the estimate of exposure for securities fraud claims at that point?

A. No.

Q. Okay. What does it represent?

A. As I sit here today, my memory is that it represents the estimated top end of the range of reasonably possible losses for ResCap over time related to litigation and -- repurchase obligation of related claims. Meaning, as I understand, that would have been subject to certain stresses beyond what the estimated exposure would have been.

Q. Mr. Devine, I was only focusing on the line that says "Potential

Page 137

TIMOTHY DEVINE

investor/securities litigation." And there's a $400 million number next to that. Wasn't that some estimate of the possible or reasonably possible range of loss for securities litigation?

MR. BRYAN: Object to form.

A. Yeah. Well, there's a lot of detail behind that line. And as I sit here today, I just can't remember the detail. But as I recall, that would have been a number subject to a variety of stresses that were imposed on the process from outside of this sort of legal advisory function.

Q. Right. Okay.

A. That's the more complete answer.

Q. Let me show you what's been marked previously as Exhibit 83.

A. Thank you.

Q. Which is an e-mail chain on May 4, 2012. There are two e-mails in this exhibit. Did you receive the one from Mr. Lee on May 4?

A. Yeah, it looks like I did. Yes.

35 (Pages 134 to 137)

246

TIMOTHY DEVINE

today, I don't remember what that set off curve ball was but I was persuaded by my own counsel that it was something unfavorable to us and so I said it's out, no value.

Q. At the time you sent your e-mail at 10:05 on May 9th, did you understand what setoff curve ball you were referring to?

A. As I sit here today, I don't remember. I confess I may very well not have understood what I was talking about.

Q. Is it your testimony, Mr. Devine, that you were sending e-mails around at this point in the negotiations, May 9th, 2012, without understanding what it was you were talking about?

MR. BRYAN: Objection to form. Argumentative. Misstates his testimony.

A. What I mean to say is that it occurs to me and appears to me based on the cadence of these e-mails and the timing, although frankly I don't -- I

247

TIMOTHY DEVINE

don't remember sitting here today what the ultimate timing of a deal was, when hands were shaken on final language. I'm kind of eager to see where that -- where that goes and where it ends. I wonder how close we were at May 9th at 10:05. But I will tell you that I was, I had a sense that a deal was doable and I didn't want anything getting in the way of the essential deal as I had understood it to take shape.

So if somebody told me at some time before 10:05 on Wednesday, May 9th somebody was throwing a curve ball setoff or otherwise into the negotiations I may well have taken the time to figure out what they were talking about in consultation with my counsel. If it was too complicated or irrelevant to what my self understood scope was, maybe I listened and maybe I got half or more of it. I did recognize it as a potential obstacle of getting a deal done and so I was not ready to allow it to become part

248

TIMOTHY DEVINE

of the conversation, at least from my perspective in the deal.

Q. Mr. Devine, given what you have claimed is your limited expertise, why were you injecting yourself into the discussion on these matters? Why didn't you just let Mr. Schrock and Mr. Lee hash it out?

MR. BRYAN: Objection as to form.

A. I was driving a deal to conclusion.

Q. What deal?

A. The deal that is represented in gross by the resolution between the ResCap estate and the RMBS claimants, both the Kathy Patrick and Talcott Franklin in the one sense and also the tripartite agreement between Ally, the ResCap entities and the claimants. And I thought it was a good deal and I still to this day think it's a good deal. And I saw that to my mind anyway the essential elements of a deal had been worked out that were

249

TIMOTHY DEVINE

favorable and fair to all concerned and I wanted to get the deal done as I understood we were on a certain timeline.

Q. Looking at the top e-mail in the chain from Mr. Lee to yourself, among others, at 10:54 a.m. on May 9th, did you receive that e-mail?

A. It looks like I did, yes.

Q. And Mr. Lee wrote, "We will be seeking ResCap board approval today. Does Ally's board need to approve as it is signing the PSA and ResCap is agreeing to settle a claim in excess of 25 million, which requires Ally approval under Ally's governance framework. Please let us know."

Did AFI's board need to approve?

A. I don't know.

Q. Did Mr. Lee, to your knowledge, receive a response to his inquiry?

A. I don't know.

Q. Does Mr. Lee's reference to the ResCap board -- his reference to seeking ResCap board approval today, meaning

63 (Pages 246 to 249)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

270

TIMOTHY DEVINE

2 party to the agreement has or may have at
3 any time up to and including the date of
4 the release.
5    Q.  Did you intend to include within
6 the word "everything" claims that might be
7 asserted by any of the monolines?
8    A.  My understanding at the time was
9 that the monolines would participate and
10 were contemplated to participate in the
11 settlement.
12    Q.  But by May 10th the settlement
13 was already signed up, wasn't it?
14       MR. PRINCI:  Objection as to
15    form.
16    A.  I don't know.
17    Q.  Okay.  Let's put it this way.
18 You knew it had been approved by the
19 ResCap board, didn't you?
20    A.  No.
21    Q.  You didn't?
22    A.  No.
23    Q.  So when you said everything in
24 this e-mail, did you intend or not intend
25 to include a release by the monolines of

271

TIMOTHY DEVINE

2 their claims?
3       MR. BRYAN:  Object to form.  I
4    knew -- I certainly knew that the
5    monolines were not a signatory party
6    to the settlement.  But it was my
7    understanding that the claims that
8    they would or could enunciate in
9    connection with the securities subject
10    of the settlement would be included
11    within the scope of the allowed claim.
12    Q.  You said, "And we can define
13 securities claims narrowly."  What do you
14 mean by that?
15    A.  What I meant by securities
16 claims was claims brought by securities
17 holders on traditional federal securities
18 law or state blue sky or the closely
19 Allied state common law fraud claims that
20 would be characterized typically as a
21 securities based claim.
22    Q.  A bit further down in your
23 e-mail you said "The circle is squared at
24 the plan.  KP can only get us the
25 everything but securities settlement

272

TIMOTHY DEVINE

2 release because that is the full extent of
3 her representation.  She has been clear
4 about that.  Same as in her" BofA -- "B of
5 New York Mellon work, etc."
6    Do you see that?
7    A.  Yes, I do see that.
8    Q.  And then you said "But notice,
9 though her clients don't release
10 securities claims, they sign plan support
11 agreements and the plan includes very
12 simple comprehensive releases, which of
13 course include third-party release of all
14 claims which of course includes securities
15 claims.  Presto.  So while she can't
16 represent parties in giving up their
17 securities claims, clients face a choice,
18 either sign up with the settlement to make
19 sure your trust receives monies under the
20 waterfall in which case you need to sign
21 the plan support agreement and support the
22 plan.  And the plan wipes out all their
23 claims of any sort.  This is the beauty of
24 it."
25    Do you see that?

273

TIMOTHY DEVINE

2    A.  I see that.
3    Q.  So you were explaining how
4 execution of the plan support agreement
5 achieved releases of securities claims
6 even if the settlement agreement itself
7 did not, correct?
8    A.  What I was explaining is that in
9 signing up for the settlement agreement
10 between ResCap and -- with ResCap those
11 parties were committing to sign a plan
12 support agreement simultaneously, which to
13 my understanding represented their
14 valuation of the securities claims they
15 were giving up and therefore they were
16 supporting a plan which would include
17 release of securities claims against the
18 debtor and release of securities claims,
19 such as they might be, against Ally
20 Financial.
21    Q.  And you thought that was pretty
22 clever, didn't you?
23       MR. BRYAN:  Object to form.
24       MR. PRINCI:  Objection as to
25    form.

69 (Pages 270 to 273)