# EXHIBIT SS.1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

　　　　　Debtors.

-----------------------------------x

VIDEOTAPE DEPOSITION OF TAMMY HAMZEPHOUR

New York, New York

November 13, 2012

9:43 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27903

12-12020-mg    Doc 2812-48    Filed 02/01/13    Entered 02/01/13 16:20:44    Exhibit SS.1
Pg 3 of 6

26

**TAMMY HAMZEPHOUR**
A. I believe it was the 21st. I don't know for sure.
    MR. KAUFMAN: Let's mark, as the next exhibit, an e-mail chain on November 19, 2011, Bates number ResCap 0000097 and 98.
    (9019 Exhibit 69, 11/19/11 e-mail chain, Bates number ResCap 0000097 and 98, marked for identification, as of this date.)
Q. Looking at the e-mail appearing at the top of the first page of the exhibit, you were the author of that e-mail, were you not?
A. Yes.
Q. And does that confirm to you that the meeting with Ms. Patrick was on November 21st?
A. Yes, that's right.
Q. Who attended that meeting?
A. Ms. Patrick was there. One or two people were with her, I don't remember their names. I was there, my litigation colleague, David Hagens, was there from

27

TAMMY HAMZEPHOUR
the Minneapolis office. Also my capital markets partner, John Ruckdaschel, was there, and Tim Devine from Ally.
Q. How long did the meeting last?
A. Three hours, maybe. I don't remember exactly.
Q. Can you please describe for me, in as much detail as you can remember, what the discussion was?
A. Ms. Patrick did most of the talking in the beginning of meeting. She talked to us a bit about who her investor clients were and their holdings that were represented across the spectrum of our securitization deals. She indicated that they believed they have claims against us and against Ally.
    We talked about some of the work she had done in preparation for the meeting, and she mentioned that she had reviewed our prospectuses for the deals, that she had reviewed loan and servicing agreements, that she was familiar with the structure and the language and the

28

TAMMY HAMZEPHOUR
disclosures as across those deals, and that she had created a matrix of rep and warranty language, basically, among the deals.
    She spoke a little bit about her pending settlement with Bank of America.
    She mentioned that she had not notified any of the trustees about the meeting we were having, because we asked if the trustees knew that she was there, and she said no.
    Talked about her theory of the case. She felt that she had claims, rep and warranty breaches, also servicing claims; and she felt that they had extended both to GMAC Mortgage and RFC, who were sponsors of different securitizations in which her investors had an interest.
    And also that they viewed Ally, likewise, as responsible.
Q. Who said what on the ResCap and Ally side, as best you can remember?
    MR. RAINS: Objection. Vague

29

TAMMY HAMZEPHOUR
and ambiguous.
Q. Can you remember anything that you, Mr. Devine, Mr. Hagens, and Mr. Ruckdaschel said during the course of the meeting?
A. I remember Mr. Ruckdaschel asking her some questions about deal structures, certain provisions in the agreements, and they compared views on what those might be, what the answers to those issues might be. Tim asked her what she would see as success from a discussion. She was clearly there asking for a settlement negotiation, and so he asked her what her view of success would look like.
    We just -- you know, there was the normal back and forth of any meeting. I don't remember anything more specific than that.
Q. When Mr. Devine asked Ms. Patrick what her view of success was, what did she say?
A. That she would like to arrive at

8 (Pages 26 to 29)

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

```
                                          58
 1              TAMMY HAMZEPHOUR
 2   Ms. Patrick take place on April 25, 2012?
 3       A.   Yes.
 4       Q.   And was a waterfall presentation
 5   given to her during that meeting?
 6       A.   Yes.
 7       Q.   Did the presentation incorporate
 8   the 3, 4, 6 numbers recommended by
 9   Mr. Devine for the low, medium and high
10   valuations of ResCap's RMBS exposure?
11       A.   Yes, I believe it did.
12       Q.   Did it also incorporate
13   Mr. Devine's recommendation to use
14   $750 million rather than $1 billion as
15   AFI's potential contribution towards a
16   settlement?
17       A.   I believe there were a range of
18   potential AFI contributions reflected.
19   750 would have been the highest one in the
20   range.
21       Q.   Okay.  Who attended the meeting
22   on April 25th with Ms. Patrick?
23       A.   There were a lot of people.
24   Maybe as many as are in this room.  I'll
25   tell you the ones I can remember.  Gary
```

```
                                          59
 1              TAMMY HAMZEPHOUR
 2   Lee was there, Tim Devine, Mark Renzi from
 3   FTI, I believe John Ruckdaschel was
 4   present, Ms. Patrick.  At least one, maybe
 5   two of her colleagues.  I believe Marc
 6   Puntus or Sam Greene, one or the other,
 7   from Centerview Partners was there for at
 8   least part of the meeting.  I don't
 9   remember if they stayed for the whole
10   meeting.  And there may have been one or
11   more MoFo lawyers there, I don't recall.
12       Q.   You were there?
13       A.   Sure.  I was there.  I couldn't
14   tell you who was in the room if I weren't
15   there.
16       Q.   Who led the meeting?
17       A.   Gary Lee.
18       Q.   Did you --
19       A.   From a legal perspective Gary
20   Lee.  There were parts of the meeting that
21   different people were handling so.
22       Q.   What part, if any, did you
23   handle?
24       A.   I didn't take the lead on any of
25   the issues other than we had a short
```

```
                                          60
 1              TAMMY HAMZEPHOUR
 2   discussion on servicing standards.  And we
 3   talked about part of Ms. Patrick's
 4   interest and that of her clients was in
 5   not only achieving a monetary settlement
 6   but also a settlement that would provide
 7   enhanced servicing standards for their
 8   investors' continuing interest in these
 9   loans.
10       Q.   Who made the waterfall
11   presentation?
12       A.   I believe Mark Renzi from FTI
13   did that.
14       Q.   What was Mr. Devine's role
15   during the meeting as you understood it?
16       A.   What was his role?
17       Q.   What did he do?
18       A.   He was in the meeting.  I don't
19   remember specific parts of the
20   conversation that he led.  There were --
21   there was discussion around the waterfall
22   and the ranges of recoveries, losses, et
23   cetera, that were the topic of discussion
24   around the settlement.  He participated in
25   that.
```

```
                                          61
 1              TAMMY HAMZEPHOUR
 2       Q.   Let's mark as the next exhibit
 3   an e-mail chain on April 27, 2012.  Bates
 4   numbers RC 9019_00048974 to 75.
 5           (9019 Exhibit 80, e-mail chain
 6       on April 27, 2012, Bates RC
 7       9019_00048974 to 75, marked for
 8       identification, as of this date.)
 9       Q.   The first e-mail on the second
10   part of the exhibit at the bottom part of
11   that page is from Mr. Devine to Kathy
12   Patrick at 5:44 p.m.  Do you see that?
13       A.   Yes.
14       Q.   And Mr. Devine asked her to call
15   him to touch base on next steps, right?
16       A.   Yes.
17       Q.   Did he copy you on his e-mail to
18   Ms. Patrick in the first instance?
19       A.   I don't see that I am copied on
20   that.
21       Q.   The next e-mail is from
22   Ms. Patrick to Mr. Devine responding to
23   Mr. Devine's e-mail, correct?
24       A.   Yes.
25       Q.   And you are not copied on that
```

**Page 110**

TAMMY HAMZEPHOUR

to make sure I grab the right one.
    I'm going to turn your attention to what's been previously marked as 9019-89. That is the RMBS settlement agreement. Do you recall reading that document earlier today?
    A.   Yes.
    Q.   And this is the one with Talcott Franklin or is this the Steering Committee one? I apologize.
    A.   This is the Steering Committee.
    Q.   And you signed this document, right?
    A.   Yes.
    Q.   Did you read it?
    A.   Yes.
    Q.   I'm going to have you focus on just a couple of provisions in the document. When did you first read this document?
    A.   In any version?
    Q.   Yes.
    A.   When it was originally put out as a draft.

**Page 111**

TAMMY HAMZEPHOUR

    Q.   And when was that?
    A.   It was in early May.
    Q.   And how many drafts of this agreement did you read?
    A.   I don't remember.
    Q.   Was it more than five? Less than five?
    A.   I don't remember how many drafts.
    Q.   Okay. I'm going to turn your attention to section 6.04, which is on page 7. And the section is entitled Legal Fees.
    A.   Yes.
    Q.   Do you recall reviewing this section of the agreement?
    A.   I remember this section of the agreement, yes.
    Q.   And what does this section generally provide?
    A.   It provides for counsel to the Steering Committee of investors to receive legal fee payments.
    Q.   And what is your understanding

**Page 112**

TAMMY HAMZEPHOUR

of how that -- how those legal fee payments work?
    A.   That they come out of the allowed claim.
    Q.   And do you have an understanding of the amount of those legal fees?
    A.   It's some percentage. I don't recall.
    Q.   Did you provide any comments or edits or other instructions with respect to the legal fees section of the RMBS settlement?
    A.   I don't -- I don't believe I did.
    Q.   Who negotiated the legal fees section of the RMBS settlement agreement?
    A.   That would be Morrison & Foerster.
    Q.   Do you know if they commented or provided any edits or other communications with respect to the legal fees section?
    A.   I don't remember. There were a number of drafts. I don't remember what the markups were of each one.

**Page 113**

TAMMY HAMZEPHOUR

    Q.   Do you recall -- withdrawn.
    In reviewing the settlement agreement and section 6.04, did you make any assessment of whether or not the legal fees provided for for the Steering Committee counsel were reasonable?
    A.   No. I didn't -- I didn't determine it one way or the other.
    Q.   You didn't do it at all?
    A.   No. I mean I didn't -- I didn't consider an analysis of whether I thought they were reasonable fees.
    Q.   Do you think that was an important thing to do?
    A.   No.
    Q.   Why not?
    A.   They weren't -- they weren't fees that the debtors were paying. So I'm not sure why I would set the fees for these investors between themselves and their lawyer.
    Q.   Right. But you testified earlier that the fees that they received were going to come out of the allowed

**Page 114**

TAMMY HAMZEPHOUR

1 claim.
2  A. That's right.
3  Q. Okay. Do you know if anybody at ResCap made any determination as to whether the legal fees in provision RMBS settlement agreement was -- provided reasonable fees for the Steering Committee's counsel?
4  A. I don't believe so.
5  Q. Let's turn to section 8.02. Are you familiar with -- section 8.02 is entitled Financial Guarantee Provider Rights and Obligations. Do you see that?
6  A. Yes.
7  Q. Are you familiar with this section of the agreement?
8  A. Yes.
9  Q. What is your understanding of this section of the agreement.
10 A. That the releases provided don't act to release claims of financial guarantee providers.
11 Q. Is that any claims of financial guarantee providers or certain claims?

**Page 115**

TAMMY HAMZEPHOUR

A. That relate to the settlement trust.
Q. So any claims of the financial guarantee providers that relate to the settlement trust, it is your understanding that section 8.02 carves those out of the agreement?
    MR. RAINS: Objection. Calls for a legal conclusion.
    MR. SIDMAN: I'm just asking her to clarify her statement.
    MR. RAINS: My objection stands. You can go ahead and answer.
A. I think the language speaks for itself.
Q. What is your understanding of the claims of financial guarantee providers?
A. My understanding is that there were certain securitizations that had bond insurance coverage. And that as those trusts took losses, some of the insurers paid out claims. And so they have made claims against us with respect to their

**Page 116**

TAMMY HAMZEPHOUR

insurance contracts as well as representation and warranty claims under those pooling and servicing agreements.
Q. So you talk about two sets of claims. You are talking about claims under the insurance contracts and then claims with respect -- representation and warranty claims --
A. Yes.
Q. -- under the PSA?
A. Right.
Q. Let's break that down. What is your understanding with respect to the financial guarantee with respect to their insurance agreements?
A. The insurance carriers have alleged that they were fraudulently induced to issue those insurance policies.
Q. Any other claims based on the insurance agreement that you are aware of?
A. I don't recall all the claims that were spelled out in the complaints.
Q. Sure. Who has filed complaints if you recall?

**Page 117**

TAMMY HAMZEPHOUR

A. MBIA has filed complaints. FGIC has filed complaints. I think Allstate. I can't remember if there's another one.
Q. And when these complaints came in, did you review those?
A. Yes.
Q. So is your understanding of the monoline claims based on a review of those complaints?
A. Review of the complaints, discussions with my counsel, internal business discussions, meetings we have had with those parties.
Q. Let me ask you a question just so I understand your understanding of the mono -- the financial guarantee carveout in section 8.02 of the contract, okay?
A. Uh-hum.
Q. Please say yes or no. Just so the court reporter can hear -- take down your response.
A. Yes.
Q. Okay. What if a particular financial guarantee insurer trusts decides