# EXHIBIT VV.1

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

In Re:                                    Case No.

RESIDENTIAL CAPITAL, LLC, et. al,    12-12020(MG)

        Debtors.

------------------------------------x

VIDEOTAPE DEPOSITION OF THOMAS MARANO

New York, New York

November 12, 2012

9:56 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27645

## Page 146

THOMAS MARANO

1 dated May 9, 2012, notifying the board
2 of a meeting on May 9, 2012, at
3 3:00 p.m., attached to which is a
4 several page analysis that was
5 presented at that meeting. Bates
6 numbers RC 9019_0093180 through 3183.
7     (9019 Exhibit 60, e-mail from
8 Gary Lee dated May 9, 2012, Bates RC
9 9019_0093180 through 3183, marked for
10 identification, as of this date.)
11     Q.   Let me show you what we have
12 marked. Did you receive this e-mail and
13 the attachment from Mr. Lee on May 9,
14 2012?
15     MR. PRINCI: Just give me one
16 minute to read the document.
17     A.   Yes.
18     Q.   And Mr. Lee attached or sent his
19 e-mail at 2:38 p.m. on May 9th. Do you
20 see that?
21     A.   Yes.
22     Q.   And that was 22 minutes before
23 the scheduled meeting at 3:00 p.m., right?
24     A.   Yes.

## Page 147

THOMAS MARANO

1     Q.   Is that when you first received
2 the supporting materials he attached to
3 his e-mail?
4     A.   I honestly couldn't tell you but
5 I'm sure I got them at that time.
6     Q.   Okay. Were any other written
7 materials besides the ones attached as
8 part of this exhibit provided to the board
9 in advance of the meeting?
10     A.   Not that I can recall.
11     Q.   Were you and other members of
12 the board told before the May 9th meeting
13 the terms of the proposed settlement with
14 Ms. Patrick?
15     A.   My recollection was that the
16 discussion with Ms. Patrick was fluid up
17 until the board meeting. And so I
18 can't -- I can't recall, you know, if --
19 you know, it was just fluid. It was
20 ongoing. We were apprised periodically.
21 But it was a fluid negotiation.
22     Q.   Wasn't the board being asked to
23 approve the settlement at the May 9th
24 meeting?

## Page 148

THOMAS MARANO

1     A.   Yes.
2     Q.   So my question is -- well, let
3 me see if I understood your answer. Are
4 you telling me that until the meeting was
5 actually held neither you nor the other
6 board members knew the terms that had been
7 negotiated and agreed upon in principal?
8     A.   No, that's not what I'm saying.
9     Q.   Okay. So my question is did you
10 know the terms of the negotiated deal
11 prior to the May 9th board meeting?
12     A.   I was aware of the general
13 concepts. Negotiations were going down to
14 the wire. I don't know if it moved a
15 little bit between my prior knowledge and
16 the time of the board meeting. It was
17 extremely fluid.
18     Q.   How much prior to the May 9th
19 meeting could you have been aware of the
20 final negotiated terms as fluid as you've
21 described the negotiations?
22     MR. PRINCI: Objection to form.
23     Q.   What's the earliest you could
24 have been aware?

## Page 149

THOMAS MARANO

1     MR. PRINCI: Objection as to
2 form.
3     A.   Well, I -- I knew there was some
4 level of negotiation going on back in
5 October.
6     Q.   That wasn't my question. Since
7 you've testified that the negotiations
8 with Ms. Patrick were so fluid right up to
9 the May 9th meeting that you are not sure
10 when you found out about the terms that
11 were agreed upon, I'm trying to find out
12 what's the earliest possible time before
13 May 9th, given how fluid everything was
14 when you could have learned --
15     MR. PRINCI: Objection as to
16 form.
17     Q.   -- what the terms were?
18     MR. PRINCI: Misstates his
19 testimony.
20     A.   The earliest possible time would
21 have been within a few days or hours.
22     Q.   Okay. Could have been as late
23 as a few hours before the meeting is what
24 you are saying?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

150

THOMAS MARANO

1  
2  A. Could very easily have been.
3  Q. Okay. Prior to the proposed
4  agreement with Ms. Patrick being presented
5  to the board for formal approval did you
6  authorize an agreement in principal on the
7  terms that were ultimately presented?
8     MR. PRINCI: Objection to form.
9  A. I was kept appraised of the
10 negotiations that were going on with
11 Ms. Patrick by Gary Lee and Tammy
12 Hamzephour. And I told them to keep
13 working on trying to get the best deal
14 possible.
15 Q. My question was prior to the
16 time the agreement was formally presented
17 to the board for approval, had you
18 authorized -- had you authorized an
19 agreement in principal on the terms that
20 were ultimately presented to the board?
21    MR. PRINCI: Objection as to
22    form.
23 A. I -- I don't think so. I
24 authorized negotiations.
25 Q. Okay. We have seen that as of

151

THOMAS MARANO

1  
2  April 27, 2012, when AFI's 10-Q was filed
3  just 12 days before this May 9th board
4  meeting, the range of reasonable possible
5  values for RMBS liability was some where
6  within 0 to $4 billion, right?
7     MR. PRINCI: Objection.
8  A. That was what was disclosed on
9  the Q.
10 Q. Okay. And we looked before at
11 the presentation to the ResCap audit
12 committee, which you've testified you
13 reviewed, that showed that as late as
14 May 1, just a week or so before this
15 May 9th board meeting, the reasonably
16 possible top range of loss on all RMBS
17 claims, including securities fraud claims,
18 was only about $4 billion, correct?
19 A. Correct.
20 Q. And do you recall, you are
21 welcome to look at it if you wish, but you
22 recall that if you focused solely on the
23 claims being settled with Ms. Patrick,
24 that is the put-back claims, the top range
25 of loss shown in that May 1st presentation

152

THOMAS MARANO

1  
2  was only in the range of a billion one?
3     MS. PATRICK: Objection to form.
4  A. Which document was that in?
5  Q. It's Exhibit 55, the chart on
6  page 2 of the presentation materials?
7  A. Okay. So you are referring to
8  the rep and warranty disclosure items?
9  Q. Yes. That showed that the top
10 end range of loss for those claims was
11 $1.16 billion?
12    MS. PATRICK: Same objection.
13 A. I don't -- okay. So you used
14 the phrase "put back." You mean rep and
15 warranty claim?
16 Q. Yes.
17 A. That is correct for that limited
18 subset of PLS.
19 Q. And if you include all the
20 subsets of PLS the May 1st presentation
21 materials reflect a total reasonable -- a
22 top end -- top of the range of reasonably
23 possible loss of $2.69 billion, right?
24    MS. PATRICK: Objection to form.
25 A. I think you are mixing apples

153

THOMAS MARANO

1  
2  and oranges there. Ms. Patrick's universe
3  of deals was broader than the universe of
4  deals that's in this document here.
5  Q. Oh, really?
6  A. Yeah.
7  Q. What other -- what other claims
8  do you believe Ms. Patrick was -- was
9  threatening to assert beyond those that
10 are set forth in that exhibit?
11 A. She had a broader universe. It
12 went from '04 to '07. It was all claims.
13 It was all types of claims. It was a
14 broader scope than what's in that document
15 there. Covered a broader time period.
16 Covered more transactions. Covered more
17 claims.
18 Q. Does -- does Exhibit 55 purport
19 to limit the time frame over which the
20 claims would be asserted?
21 A. It's not the --
22    MR. PRINCI: Objection to form.
23 A. It's not the time frame that the
24 claims would be asserted.
25 Q. Withdrawn.

39 (Pages 150 to 153)

|  | 198 |  | 200 |
|---|---|---|---|
| | THOMAS MARANO | | THOMAS MARANO |

1             **THOMAS MARANO**
2     form.
3     A. You know, I believe what this is
4  saying and -- 8.02 basically releases --
5  it says that the financial guarantors are
6  not released by the waivers in Article 7.
7     **Q. I see you are reading the**
8  **agreement. I don't want to interrupt. Is**
9  **that your answer?**
10    A. Yes.
11    **Q. So do you have an understanding**
12 **as to whether if the settlement agreement**
13 **that's Exhibit 58 becomes, is approved by**
14 **the court and becomes effective that**
15 **financial guarantee providers like MBIA**
16 **still will have claims to pursue against**
17 **the debtors?**
18      MR. PRINCI: Objection, the
19      document speaks for itself but you can
20      answer to the extent you --
21    A. I believe you can file your own
22 claim.
23    **Q. Do you have an understanding as**
24 **to what types of claims financial**
25 **guarantee providers like MBIA could file?**

           **THOMAS MARANO** (199)

1             **THOMAS MARANO**
2     A. I can't tell you the nuances of
3  the claims because I'm not a lawyer.
4     **Q. What is your understanding as to**
5  **why section 8.02 of the settlement**
6  **agreement was included in the RMBS**
7  **settlement?**
8     A. I believe that Kathy Patrick had
9  not actually signed up the monolines as I
10 refer to them so the MBIA's and the FGICs
11 and this way you had the -- or the
12 monolines had flexibility.
13    **Q. Let's talk about another**
14 **provision in Exhibit 58, the settlement**
15 **agreement. Are you aware that pursuant to**
16 **the settlement agreement if it gets**
17 **approved and it is effective that counsel**
18 **for the institutional -- the RMBS**
19 **institutional investors will have their**
20 **fees paid by the debtors?**
21    A. Say that last part again.
22      MS. PATRICK: Objection, form.
23    **Q. Let me restate the question.**
24 **Are you aware that if the RMBS settlement**
25 **agreement is approved and becomes a factor**

           **THOMAS MARANO** (200)

1             **THOMAS MARANO**
2  **that counsel for the institutional**
3  **investors will have their fees paid by the**
4  **debtors?**
5       MS. PATRICK: Objection to form.
6       MR. PRINCI: Objection to form.
7     A. Yeah. I believe that the fees
8  will be paid, yes.
9     **Q. Do you have an understanding as**
10 **to the amount of those fees that would be**
11 **paid by the debtors?**
12    A. I don't recall. And it may be
13 in the document. I just don't recall.
14    **Q. Okay. When the -- I think you**
15 **previously discussed the May 9th board**
16 **meeting at which the settlement agreement**
17 **was considered. Was there any discussion**
18 **at that meeting regarding the payment of**
19 **the institutional investors' counsel fees?**
20    A. I don't recall if that was a
21 matter of discussion at the board meeting.
22    **Q. Okay. Have you or anyone else**
23 **on behalf of the debtors evaluated the**
24 **reasonableness of the fees that would be**
25 **paid to counsel to the institutional**

           **THOMAS MARANO** (201)

1             **THOMAS MARANO**
2  **investors pursuant to the settlement**
3  **agreement?**
4       MS. PATRICK: Objection to form.
5     A. I have not looked at the
6  reasonableness. I'm not -- again, I don't
7  recall that I even knew what that number
8  was.
9     **Q. Are you aware whether anyone on**
10 **behalf of the debtors has requested either**
11 **bills or time sheets from counsel to the**
12 **RMBS investors to substantiate fees that**
13 **will be paid to them under the settlement**
14 **agreement?**
15      MR. PRINCI: Objection to form.
16      MS. PATRICK: Same objection.
17    A. I'm not the best person to
18 answer that. My chief financial officer
19 keeps track of all that information. If
20 we received it, he'll have it.
21    **Q. Okay. Is that -- that's**
22 **Mr. Whitlinger?**
23    A. Whitlinger.
24    **Q. Okay. Whitlinger. I'm sorry.**
25      **Give me one moment.**