# EXHIBIT WW.1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Case No:

RESIDENTIAL CAPITAL, LLC, et. al, 12-12020(MG)

Debtors.

-----------------------------------x

DEPOSITION OF FRANK SILLMAN

New York, New York

November 20, 2012

9:35 a.m.

Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27687

FRANK SILLMAN

said it in the paragraph.

**Q. So is it fair to say you are not opining as to whether any of the claims have legal merit?**

A. Whether they would be able to prove breaches of reps and warrants, yeah, under the governing agreements.

**Q. Or prove the requirements of put back?**

A. Correct.

**Q. And by the way, you don't claim to have any expertise in that issue, do you?**

MR. RAINS: Objection, vague and ambiguous.

A. Which area is that?

**Q. Whether put back is legally required?**

A. I didn't render any legal -- I don't have any legal training and didn't provide any legal recommendations under this work.

**Q. And you don't claim to have the expertise needed to provide legal**



**FRANK SILLMAN**

**opinions, right?**

A. Correct.

**Q. And you are not expressing a view, I take it, as to whether any of the debtors' legal defenses have merit?**

A. Correct.

**Q. And you are also not expressing a view as to whether the facts relating to any of the loans in the pool being settled would legally warrant put back?**

A. Yeah. I'm not making a legal assessment.

**Q. Am I correct you've made no attempt to determine the, what portion of the loans in the pool actually breach reps and warranties?**

A. The work that I'm depending on or relying on is the repurchased, GSE repurchase rate work that was done between Fannie, Freddie and the debtor where they reviewed thousands of loans over a number of years and looked at the actual loan by loan file review and availed themselves to the defenses of the governing agreements



FRANK SILLMAN

or any other legal arguments as part of that process. So it's that work and the results of that work that's incorporated in my work, in my declaration.

**Q. I understand you are drawing inferences from the debtors' put back history with the GSEs, among other things?**

A. Correct.

**Q. So I just want to be clear, am I correct you haven't looked at any one loan within the pool that's being settled to try to reach a view or express an opinion as to whether that loan actually breaches any reps and warranties?**

A. We have not completed our loan level review work. And I'm relying on the thousands of loans that went through the debtors' repurchase process as the basis for my original declaration.

**Q. So I think I'm hearing the answer to my question but I just want to be clear. In your June 11 declaration you are not expressing any opinion as to whether any particular loan breaches any**



**FRANK SILLMAN**

**reps and warranties?**

MR. RAINS: Objection. Vague and ambiguous. Asked and answered.

A. I utilized the repurchase work the debtor did with the GSEs to form the basis for my original declaration.

**Q. And in reaching the conclusions in your initial declaration you didn't look at any individual loan file in the pool that's being settled?**

A. I relied on the thousands of loans that were reviewed by the debtor as part of their process prelitigation.

**Q. With respect, Mr. Sillman, I don't think you answered my question.**

MR. BENTLEY: Let me ask the reporter to read it back.

MR. RAINS: I think you answered the question. It's been asked and answered.

MR. BENTLEY: You know, Darryl, it's a yes or no question and I got a nonanswer.

Read it back, please.

FRANK SILLMAN

(Record read.)

MR. RAINS: Same objections.

A. I relied on the GSE repurchase work that the debtor did with Fannie and Freddie.

**Q. To date have you looked at any loan file for any of the loans within the pool that's being settled?**

A. We are in the process of reviewing the loan files.

**Q. Have you yet looked at any loan files?**

MR. RAINS: You mean him personally or Fortace?

**Q. Let's break it into pieces. Have you personally looked at any loan file?**

A. I have not looked at the loan files.

**Q. Prior to your signing your June 11 declaration, did anybody at Fortace look at any of the loan files for the loans being settled?**

A. I relied on, we relied on, the



FRANK SILLMAN

work that the debtor did with the GSE repurchases in forming the assumptions and conclusions in my original declaration.

**Q. So that's a no?**

A. I relied on --

MR. BENTLEY: Read back my question.

**Q. It's a very simple factual question. I'm not asking you what you relied on. I'm asking you whether you looked at any loan files?**

MR. BENTLEY: Read it back, please.

(Record read.)

MR. RAINS: Objection, vague and ambiguous. Asked and answered.

A. I relied on the work that was done by the debtor as part of their GSE repurchase for the conclusions and assumptions made in my original declaration.

**Q. And you didn't look at any loan files?**

A. I relied on the GSE repurchase



FRANK SILLMAN

work.

**Q. Did that involve looking at any loan files?**

A. It revolved relying on the loan file reviews that the debtor performed.

**Q. Is there a reason you are resisting answering a simple question?**

MR. RAINS: Objection. Argumentative. Asked and answered.

MR. BENTLEY: It's not asked and answered for Christ's sake, Darryl. Read it back.

MR. RAINS: Of course it has. It's been asked 15 times and --

MR. BENTLEY: Is the answer no? Because I sure can't tell what the answer is.

MR. RAINS: I think his answer is very clear.

MR. BENTLEY: The answer is he did something else, it's not whether he did this or not.

MR. RAINS: That's his answer. You don't like his answer but it's his



FRANK SILLMAN

answer.

MR. BENTLEY: I'm fine with his answer, he just hasn't answered my question.

Can you read it back, please.

MR. RAINS: Let's do this, let's take a quick break.

MR. BENTLEY: You know what, I want an answer to my question before you speak --

MR. RAINS: I'm going to talk to him about his answer to your question.

MR. BENTLEY: I object. You are not supposed to talk to the witness while a question is pending.

(Whereupon, there is a recess in the proceedings.)

MR. RAINS: I think we have succeeded in clearing up some of the ambiguities and confusion caused by your question. Why don't you put the question to him again.

**Q. I know it's very confusing but I'll state it again. In connection with**

**FRANK SILLMAN**

**forming the opinions expressed in your June 11 declaration, did you or any of your colleagues look at any of the files for the loans in the pool being settled.**

A. For the, my original declaration I relied on the work that was done by ResCap and the repurchase activity. We are now looking at loan files. We are currently looking at loan files.

**Q. So let's just unpack what you just said. You relied on the work that was done by ResCap. What work are you referring to?**

A. To GSE and private label repurchase activity work ResCap did.

**Q. Understood. But was that as to any of the loans that are in this pool that's being settled?**

A. There may be in the private label securities work loans that are included in this settlement. The vast majority of the loans were related to their GSE originations.

**Q. And none of the GSE deals**



**FRANK SILLMAN**

**overlap in any way with this settlement, right?**

A. Correct.

**Q. Were you relying, when you prepared this report, on any work that RFC had done in looking at the loans that are part of this settlement?**

A. Yes. We did review some information regarding their private label securitization repurchase work. What we found, I think there's an exhibit, that the vast majority of those repurchase demands were unresolved.

**Q. So I'm going to return to that. I know what you are referring to. Putting aside any loan reviews that RFC may have done in connection with its prepetition put back experience, did you or any of your colleagues look at any loan files in connection with the work that went into your June 11 report?**

A. We relied on the company's work for the information in the original declaration and we are now looking at loan



FRANK SILLMAN

files that are contained within the 392 trusts.

**Q. And when you say the company's work, are you referring to anything other than the work the company did prepetition in connection with its prepetition put back negotiations?**

A. Yeah. It was prepetition work.

**Q. In connection with -- done by the debtor in connection with its prepetition put back experience?**

A. Yes.

**Q. And no other review of loan files went into your, the conclusions expressed in your June 11 declaration?**

A. That's right.

**Q. Okay. We are there. We got an answer. Thank you. Let's move on.**

A. I would say no additional loan work.

MR. BENTLEY: I'm about to change topics. If people want to take a break, this is fine or we can keep going.



FRANK SILLMAN

MR. RAINS: Let's take a break. Sounds good.

(Luncheon recess taken at 12:09 p.m.)

* * *

A F T E R N O O N S E S S I O N

(Time noted: 1:22 p.m.)

F R A N K S I L L M A N, resumed and testified as follows:

EXAMINATION BY (Cont'd.)

MR. BENTLEY:

**Q. Mr. Sillman, Good afternoon.**

A. Good afternoon.

**Q. Let's go back to paragraph 5 of your initial declaration. And I'm going to ask you about the carryover sentence that starts at the bottom of page 3 and carries over to page 4. So if you can take a moment and read that, and tell me when you are ready.**

A. Okay.

**Q. Does this sentence list all of the data and agreements that you reviewed**

FRANK SILLMAN

**Q. Well, look at paragraph 59 of your declaration. The first sentence states, "The agree rate is the percentage of demands issued by the trustee that the seller agrees to repurchase or make whole." Correct?**

A. Yes.

**Q. So the agree rate for the debtors shown on Exhibit 7 is just 10.36 percent, correct?**

A. Yes.

**Q. And the 64 percent would not be unresolved in the sense you use -- sorry, using the approach you take in your declaration the 64.76 percent would be the reject rate, the opposite of the agree rate, correct?**

A. This --

MS. PATRICK: Objection to form.

A. The information that we utilized is the loans all had a determination as we -- as they made their way through the process. And so the disagree rate would not be it. It would be the canceled and



FRANK SILLMAN

rescinded rate would be the opposite to the agree rate. So they all have to be resolved. So it's not the disagree. It's the cancel and rescinded or agree.

**Q. Okay. Let's move on. And I don't think I got an answer to my question. In forming your conclusions did you attribute any significance to the fact that the debtors had suffered -- sorry, the trusts whose loans are being settled have suffered $30 billion in losses but during the period shown on Exhibit 7 the debtors received put back demands only with respect to loans with an original principal balance of roughly 1.37 billion, did you give any significance to those facts?**

MR. RAINS: Objection, compound. Vague and ambiguous.

A. It was a factor. This takes it through demands that were received by the debtor through May 2012, at the same time they entered into a settlement agreement agreeing to -- agreeing to an allowed



FRANK SILLMAN

claim for 8.7 billion. So I took into consideration the 1.3 billion and the fact that the trustees had also negotiated an allowed claim of 8.7. So I had to take into consideration the fact that there was a claim.

**Q. So one of the things you took into consideration in forming your conclusion was that the debtors had agreed to an aggregate settlement of $8.7 billion?**

A. We are talking about the PLS demand data. I could not ignore the fact that in addition to the 1.3 billion in demands there was also a proposed settlement of 8.7 billion. So it was a factor in the development of my declaration.

**Q. Let's go back to paragraph 5 of your declaration.**

**MS. PATRICK: 5?**

MR. BENTLEY: Correct.

MR. RAINS: I'm sorry, where?

MS. PATRICK: 5.



FRANK SILLMAN

MR. BENTLEY: 5.

MR. RAINS: That's so demoralizing. We made it up to 50 --

MR. BENTLEY: Darryl, I'm going doing it just to demoralize you.

MR. RAINS: We started at 5 over an hour ago and we are still stuck in 5.

MR. BENTLEY: I think that means we are going to go for days.

MR. BENNETT: He likes 5.

MR. BENTLEY: Don't lose hope, Darryl.

**Q. I want to focus you on the last sentence and specifically the portion that says "I utilized assumptions and developed my own models based on my own experience and industry data where available."**

**So your reference to your own experience, the way you used your own experience in developing your models is described later in this declaration; is that right?**

A. Yes.