# Exhibit 3

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors

------------------------------------------------

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

------------------------------------------------

      DEPOSITION OF BRADFORD CORNELL

        DATE: December 21, 2012

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

      TRANSCRIPT of the deposition, said deposition being conducted pursuant to Rules Governing Civil Practice in the Superior Court of New Jersey, by and before MARK IUZZOLINO, Certified Court Reporter, License No. X101103, at the offices of Morrison Foerster, LLP, 1290 6th Avenue, New York, NY on December 21, 2012, commencing at 10:11 a.m.

1      Q.    You don't know one way or the other?

2      A.    Correct.

3      Q.    You didn't consider the possibility

4   that plaintiffs in this case would demand the

5   face value of all the loans back as the remedy

6   that they're entitled to?

7           MR. BENTLEY:   Objection to form.

8      A.    Well, I was aware that it was a

9   possibility.  It's not a possibility that I

10  analyzed.

11     Q.    In paragraph 28 you tell us in the

12  first sentence that you set out to measure

13  incremental losses caused by underwriting

14  defects.  Is that correct?

15     A.    Yes.

16     Q.    Why did you do that?

17     A.    Because that's all I had data on.

18     Q.    Is that the way damages are

19  calculated in a breach-of-contract case?

20          MR. BENTLEY:   Objection to form.

21     A.    Well, the way I understood it, they

22  would be calculated as damages caused by

23  breaches.  Now, breaches in underwriting

24  defects are presuming -- presumably overlapping

25  concepts, but they are not identical, so I'm

1           Is measuring incremental damages or
2   incremental losses the right approach in a
3   breach-of-contract case?
4           MR. BENTLEY:  Objection to form.
5       A.  You would have to ask Mr. Bentley and
6   his colleagues that.
7       Q.  Are you aware of any Court that has
8   adopted your approach to doing a regression
9   analysis to see what impact the financial
10  crisis had on mortgage values?
11      A.  I haven't looked one way or the
12  other.
13      Q.  As far as you know, you're blazing
14  the trail?
15          MR. BENTLEY:  Objection to form.
16      A.  Well, this is -- I mean, regression
17  analysis is undoubtedly used in all sorts of
18  economic studies.  But in this particular
19  application to try to set a horizon, I kind of
20  doubt that anyone's had the call to do that
21  prior.
22      Q.  Can I ask you to turn to page -- or
23  to paragraph 43?  I'm focused on the first
24  couple of sentences where you describe for us
25  the question that you posed for yourself and

1      Q.    Have you studied any of the cases

2   that say a plaintiff doesn't have to prove loss

3   causation in a rep and warranty case like this?

4            MR. BENTLEY:  Objection.  Asked and

5       answered.

6      A.    No, I've not studied that.

7      Q.    Did you look at Judge Rakoff's

8   decision in Assured Guaranty?

9            MR. BENTLEY:  Same objection.

10     A.    I think that was one of the ones that

11  was brought up in the discussion.  I didn't

12  read the whole decision, but I recall a

13  reference to that in discussions with the

14  Kramer Levin attorneys.

15     Q.    Is the work you did consistent with

16  Judge Rakoff's decision in Assured Guaranty?

17           MR. BENTLEY:  Objection to form.

18     A.    I couldn't tell you.

19     Q.    Is your work consistent with Judge

20  Crotty's decision in the Syncora case?

21           MR. BENTLEY:  Objection to form.

22     A.    Same answer:  I couldn't tell you.

23     Q.    In any event, you didn't attempt to

24  model or design your work to be consistent with

25  those two cases, did you?

1    A.    Not specifically, no.

2    Q.    I may have asked you this, but if

3    not, let me ask it again.

4          Did you review the plaintiff's brief

5    in connection with this motion?

6          MR. BENTLEY:  Which brief are you

7       talking about?

8          MR. RAINS:  By the Steering

9       Committee.

10   Q.    The Steering Committee's brief in

11   support of this motion.

12   A.    I think so, but I can't tell you for

13   sure.

14   Q.    Do you recall reading the section in

15   their brief on how they would approach loss

16   causation?

17   A.    No, I don't recall.

18   Q.    Do you understand, sir, that in there

19   view, at least, they don't have to prove loss

20   causation?

21   A.    I was aware that there was that

22   alternative position, yes.

23   Q.    You didn't attempt to analyze that

24   perspective, did you?

25         MR. BENTLEY:  Objection to form.

1    A.    Not directly, no.

2    Q.    And is it true, sir, that if the

3  Court sides with the Steering Committee and its

4  position on the loss causation, your opinion

5  would be irrelevant?

6         MR. BENTLEY:  Objection to form.

7    A.    Well, it might be possible to go back

8  through my report and opinion and take out

9  certain parts and make it relevant, but as it

10  currently stands, it could not be used.

11    Q.    Could I ask you to turn to

12  paragraph 43?  This is the same sentence we

13  were looking at before the break where you told

14  us the question that you framed.  There's

15  another part of it I'd like you to help me

16  understand.

17         You focus in your analysis -- as you

18  say here in your question, you focus on

19  default.  Right?

20    A.    Yes.

21    Q.    What you tested was the risk of

22  default?

23    A.    Yes.

24    Q.    But earlier in your report, all the

25  way back to paragraph 28, another sentence we

1   loss?

2        A.   Well, I've done --

3             MR. BENTLEY:  Objection to form.

4        A.   -- I've done a lot of things in the

5   tables, and some of them measure loss, so I'm

6   not sure that's right.

7        Q.   In paragraph 43 when you describe

8   your regression analysis, you tell us you

9   linked to risk of default.

10            That's true.  Correct?

11       A.   In the regression that was pure

12  probability of default, yes.

13       Q.   Let me ask you to turn to a different

14  section of your report.  I'm now back -- I'm

15  starting at paragraph 68.

16            Would you take a moment to review

17  that, please?

18       A.   Yes.

19       Q.   I wanted to ask you some questions

20  about a few of the numbers that appear in that

21  paragraph.  The first number that shows up is a

22  number that you call "lifetime loan losses" of

23  45.2 billion.

24            Do you see that reference?

25       A.   Yes.

1    Q.   You got that number from Mr. Sillman?

2    A.   Yes.

3    Q.   You call it the "midpoint" in the

4  range of aggregate losses that he estimated.

5  Correct?

6    A.   Yes.

7    Q.   Did you review the methodology that

8  Mr. Sillman used to come up with his aggregate

9  loss range?

10   A.   Yes.

11   Q.   Did you find anything wrong with it?

12   A.   As per what it was, no, I don't think

13  I did.  I don't think I found any indication of

14  errors as to the number it was.  It didn't

15  include, for example, an horizon, but he didn't

16  say that did it, so I didn't find a problem

17  with it.

18   Q.   Right.  He didn't purport to apply

19  any discounts.  Correct?

20   A.   Correct.

21   Q.   He tried to calculate only what is

22  the maximum -- or what is the predicted amount

23  of losses that the owners of these securities

24  will incur over their lifetime.  Right?

25   A.   That's right.

1      Q.   And you didn't find any problem with
2   the work he did to calculate that number?
3      A.   I don't recall finding problems with
4   that.
5      Q.   And that's why you use it in your
6   report.  Right?
7      A.   Well, I use it as an example
8   attributable to Sillman.  But, as I said, when
9   I looked at it, I did not find a problem with
10  that number for lifetime losses.  I recall that
11  it was 30 billion of realized losses and
12  another 15 or so that would be realized.
13     Q.   Are you going to offer your own
14  opinion at trial on lifetime aggregate losses?
15     A.   Well, as I sit here now, I can't tell
16  you anything I'd do beyond what's in my report.
17  And at this point I haven't made an independent
18  estimate of that.
19     Q.   The next number that appears just a
20  few lines down is the number 16.5 billion.
21          Can you tell us what that is?
22     A.   If you go to the footnote, I think it
23  gives you the exact calculation.
24     Q.   Footnote 35?
25     A.   Yes.

1    A.    So I think that the 16 is just 36.6

2    applied to 45.2.

3    Q.    So, in your view, the 16.5 billion is

4    a number that tells us the total aggregate

5    losses that will be suffered on that portion of

6    the loans for which Mr. Morrow found material

7    defects?

8    A.    Ignoring any horizon elements or

9    causation offsets, yes.

10    Q.    Right. And I say -- obviously he

11    didn't look at all 1.6 million loans. It's

12    projecting his material defects work out over

13    the entire loan population. Right?

14    A.    That's right.

15    Q.    So if -- let me say this differently

16    to make sure I have it.

17          You, in your opinion, talk about

18    three setoffs: loss causation, statute of

19    limitations, and election of revenues. Right?

20    A.    Well, there's also the time horizon

21    effect, which reduces them as well.

22    Q.    Isn't that loss causation?

23    A.    Oh, you're calling that -- well, I

24    was causing the crash offset "loss causation"

25    and the horizon "the horizon." But if you put

1      Q.    And so, the 6 billion number, is it

2   fair to say that your analysis concludes that

3   if the Court were to find that that

4   election-of-remedies defense was valid as you

5   calculate it, that would reduce the claim size

6   down to 6 billion without regard to any other

7   defenses?

8      A.    Yes, if you just took Sillman's data

9   and applied that.

10      Q.    Understand.

11            Okay.  Let's go back.  We were

12   talking a moment ago about Mr. Green's,

13   Professor Green's critique of your regression

14   analysis, and we were talking about whether

15   removing groups of loans from the sample each

16   month in the regression analysis, whether that

17   affected whether each succeeding sample was a

18   random sample.

19            Do you recall that?

20      A.    Yes.

21      Q.    All right.  And did you do any kind

22   of analysis or study to determine whether or

23   not, in each month after you reviewed loans,

24   whether the remaining loan sample was still

25   random such that you could have statistically