# Exhibit 33

Outlook E-mail

| | |
|---|---|
| **From:** | Clark, Daniel E. |
| **Sent:** | 5/13/2012 10:32:53 PM |
| **To:** | Levitt, Jamie A.; 'Talcott J. Franklin'; 'Jerry Phelps' |
| **Cc:** | Lee, Gary S.; 'Timothy.Devine@ally.com'; 'nornstein@kirkland.com'; Princi, Anthony; 'rcieri@kirkland.com' |
| **Subject:** | RE: Execution Copies -- CONFIDENTIAL AND FOR SETTLEMENT PURPOSES ONLY |
| **Attachments** | TF Settlement Agreement 5-13-12 - Execution Copy.pdf; Talcott Frankling PSA - Execution Copy.pdf |

All -

Attach please find new execution copies. There was a glitch in the signature and notice pages. No other changes were made.

Thanks,
Dan Clark

Daniel E. Clark
Associate
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
(212)336-4386


<<...>> <<...>>

_____

| | |
|---|---|
| **From:** | Levitt, Jamie A. |
| **Sent:** | Sunday, May 13, 2012 9:58 PM |
| **To:** | 'Talcott J. Franklin'; Jerry Phelps |
| **Cc:** | Lee, Gary S.; 'Timothy.Devine@ally.com'; 'nornstein@kirkland.com'; Princi, Anthony; 'rcieri@kirkland.com' |
| **Subject:** | Execution Copies -- CONFIDENTIAL AND FOR SETTLEMENT PURPOSES ONLY |

Tal and Jerry:

Attached are execution copies of the Settlement Agreement and Plan Support Agreement.   Exhibits will follow in separate emails, to the extent you don't already have them.

Please send signature pages.

Thanks.

Jamie


<< File: TF Settlement Agreement 5-13-12 - Execution Copy - 2.pdf >>  << File: Talcott Frankling PSA - Execution Copy - 1.pdf >>

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

**EXECUTION COPY**

## RMBS TRUST SETTLEMENT AGREEMENT

This RMBS Trust Settlement Agreement is entered into as of May 13, 2012, by and between Residential Capital, LLC and its direct and indirect subsidiaries (collectively, "ResCap" or the "Debtors"), on the one hand, and the Institutional Investors (as defined below), on the other hand (the "Settlement Agreement"). Each of ResCap and the Institutional Investors may be referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, certain ResCap entities were the Seller, Depositor, Servicer and/or Master Servicer for the securitizations identified on the attached Exhibit A (the "Trusts");

WHEREAS, certain ResCap entities are parties to certain applicable Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the Trusts (the "Governing Agreements"), and certain ResCap entities have, at times, acted as Master Servicer and/or Servicer for the Trusts pursuant to certain of the Governing Agreements;

WHEREAS, pursuant to the Governing Agreements, certain ResCap entities have contributed or sold loans into the Trusts (the "Mortgage Loans");

WHEREAS, the Institutional Investors have alleged that certain loans held by the Trusts were originally contributed in breach of representations and warranties contained in the Governing Agreements, allowing the Investors in such Trusts to seek to compel the trustee or indenture trustee (each, a "Trustee") to take certain actions with respect to those loans, and further have asserted past and continuing covenant breaches and defaults by various ResCap entities under the Governing Agreements;

WHEREAS, the Institutional Investors have indicated their intent under the Governing Agreements for each Trust in which the Institutional Investors collectively hold or are authorized investment managers for holders of at least 25% of a particular tranche of the Securities (as defined below) held by such Trust either to seek action by the Trustee for such Trust or to pursue claims, including but not limited to claims to compel ResCap to cure the alleged breaches of representations and warranties, and ResCap disputes such claims and allegations of breach and waives no rights, and preserves all of its defenses, with respect to such allegations and putative cure requirements;

WHEREAS, the Institutional Investors are jointly represented by Talcott Franklin P.C.; Miller, Johnson, Snell & Cummiskey, P.L.C.; and Carter Ledyard & Milburn LLP, and have, through counsel, engaged in arm's length settlement negotiations with ResCap that included the exchange of confidential materials;

WHEREAS, ResCap contemplates filing petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

{00315282-4}
30511482_7

30511482_9
ny-1040920

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

WHEREAS, ResCap and the Institutional Investors have reached agreement on a plan support agreement (the "Plan Support Agreement") pursuant to which the Institutional Investors will support the confirmation of a chapter 11 plan for ResCap;

WHEREAS, Ally Financial Inc. and its subsidiaries and affiliates, other than ResCap (collectively, "Ally") have agreed to a settlement with ResCap in return for releases of any alleged claims held by ResCap and certain third parties against Ally;

WHEREAS, ResCap and the Institutional Investors have reached agreement concerning all claims under the Governing Agreements; and

WHEREAS, the Parties therefore enter into this Settlement Agreement to set forth their mutual understandings and agreements for terms for resolving the disputes regarding the Governing Agreements.

## AGREEMENT

NOW, THEREFORE, after good faith, arm's length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

## ARTICLE I.  DEFINITIONS.

As used in this Settlement Agreement, in addition to the terms otherwise defined herein, the following terms shall have the meanings set forth below (the definitions to be applicable to both the singular and the plural form of each term defined if both forms of such term are used in this Settlement Agreement).  Any capitalized terms not defined in this Settlement Agreement shall have the definition given to them in the Governing Agreements.

Section 1.01    "Bankruptcy Code" shall mean title 11 of the United States Code;

Section 1.02    "Direction" shall mean the direction by the Institutional Investors, to the extent permitted by the Governing Agreements, directing any Trustee to take or refrain from taking any action; *provided, however*, that in no event shall the Institutional Investors be required to provide a Trustee with any security or indemnity for action or inaction taken at the direction of the Institutional Investors and the Institutional Investors shall not be required to directly or indirectly incur any costs, fees, or expenses to compel any action or inaction by a Trustee, except that the Institutional Investors shall continue to retain contingency counsel;

Section 1.03    "Effective Date" shall have the meaning ascribed in Section 2.01;

Section 1.04    "Governmental Authority" shall mean any United States or foreign government, any state or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to the foregoing, or

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045564

**MoFo Draft of 5/13/12**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

any other authority, agency, department, board, commission, or instrumentality of the United States, any State of the United States or any political subdivision thereof or any foreign jurisdiction, and any court, tribunal, or arbitrator(s) of competent jurisdiction, and any United States or foreign governmental or non-governmental self-regulatory organization, agency, or authority (including the New York Stock Exchange, Nasdaq, and the Financial Industry Regulatory Authority);

Section 1.05    "Institutional Investors" shall mean the authorized investment managers and Investors identified in the attached signature pages;

Section 1.06    "Investors" shall mean all certificateholders, bondholders and noteholders in the Trusts, and their successors in interest, assigns, pledgees, and/or transferees;

Section 1.07    "Person" shall mean any individual, corporation, company, partnership, limited liability company, joint venture, association, trust, or other entity, including a Governmental Authority;

Section 1.08    "Petition Date" means the date on which ResCap files petitions under chapter 11 of the Bankruptcy Code;

Section 1.09    "Plan" has the meaning ascribed to it in the Plan Support Agreement; and

Section 1.10    "Restructuring" shall have the meaning ascribed to it in the Plan Support Agreement.

## ARTICLE II.  SETTLEMENT PROCESS.

Section 2.01    Effective Date.  This Settlement Agreement shall be effective immediately except as to the granting of allowed claims to the Trusts and the releases set forth herein.  The claims allowance and releases shall only be effective, with respect to Trusts that timely accept the compromise, on the date on which the Bankruptcy Court enters an order approving the settlement contemplated hereby (the "Effective Date").

Section 2.02    Bankruptcy Court Approval.  The Debtors shall (a) orally present this Settlement Agreement in court on the Petition date, including the agreed amount of the Allowed Claim (as defined below), (b) file a motion in the Bankruptcy Court as soon as practicable, but in no event later than fourteen (14) days after the Petition Date, seeking authority to perform under this Settlement Agreement and for approval of this Settlement Agreement and the compromise contained herein, and (c) obtain an order from the Bankruptcy Court approving such motion by the earlier of (i) 60 days after the Petition Date and (ii) the date on which the Disclosure Statement is approved by the Bankruptcy Court.  The Trustee for each Trust may accept the offer of a compromise contemplated by this Settlement Agreement in writing pursuant to a form of acceptance to be included in the proposed order for approval of this Settlement Agreement to be submitted to the Bankruptcy Court.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

**MoFo Draft of 5/13/12**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

Section 2.03    <u>Standing</u>.  The Debtors agree that the Institutional Investors are parties in interest in the chapter 11 cases of ResCap for the purposes of enforcing rights and complying with obligations under this Settlement Agreement and the Plan Support Agreement.

### ARTICLE III. <u>REPRESENTATIONS AND WARRANTIES.</u>

Section 3.01    <u>Holdings and Authority</u>.  Lead counsel to the Institutional Investors, Talcott Franklin P.C., has represented to ResCap that its clients have, or will have as of 45 days from the Petition Date, aggregate holdings of securities of greater than 25% of the voting rights in one or more classes of the securities, certificates or other instruments backed by the mortgages held by each of the Covered Trusts (as defined in the Plan Support Agreement).  Each Institutional Investor represents that (i) it has the authority to take the actions contemplated by this Settlement Agreement, to the extent that it has the authority with respect to any other entities, account holders, or accounts for which or on behalf of which it is signing this Settlement Agreement, and (ii) it holds, or is the authorized investment manager for the holders of, the securities listed in a schedule (the "Schedule"), which Schedule will be provided to ResCap no later than 45 days after the Petition Date and will list the securities in the respective amounts set forth therein by CUSIP number, and which Schedule is accurate as of the date it is provided by the Institutional Investors or Talcott Franklin P.C.  The Parties agree that the aggregate amounts of Securities collectively held by the Institutional Investors for each Trust may be disclosed publicly, but that the individual holdings shall remain confidential, subject to review only by ResCap, Ally, the Bankruptcy Court, the Office of the United States Trustee, and any official committee of creditors that may be appointed in the Chapter 11 Cases.

Section 3.02    <u>Purchasers and Assigns</u>.  The Institutional Investors collectively hold, or will hold as of 45 days after the Petition date, Securities representing in aggregate 25% of the voting rights in one or more classes of Securities of the Covered Trusts.  The Institutional Investors, collectively, shall maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 80% of the Covered Trusts (the "<u>Requisite Holdings</u>") until the earliest of: (i) confirmation of the Plan, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, (iv) a Debtor Termination Event, or (v) an Ally Termination Event; provided, however, that any reduction in Requisite Holdings caused by exclusion of one or more trusts due to the exercise of Voting Rights by a third party guarantor or financial guaranty provider shall not be considered in determining whether the Requisite Holdings threshold has been met.  If the Requisite Holdings are not maintained, each of Ally and ResCap shall have the right to terminate the Settlement Agreement, but neither Ally nor ResCap shall terminate the Settlement Agreement before it has conferred in good faith with the Institutional Investors concerning whether termination is warranted.  For the avoidance of doubt, other than as set forth above, this Settlement Agreement shall not restrict the right of any Institutional Investor to sell or exchange any Securities issued by a Trust free and clear of any encumbrance.  The Institutional Investors will not sell any of the Securities for the purpose of avoiding their obligations under this Settlement Agreement, and each Institutional Investor commits to maintain at least one position in one of the Securities in one of the Trusts until the earliest of the dates set forth above.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                        RC-9019_00045566

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

If the Debtor or Ally reach a similar agreement to this with another bondholder group, the Debtor and Ally will include a substantially similar proportionate holdings requirement in that agreement as contained herein.

## ARTICLE IV. DIRECTION TO TRUSTEES AND INDENTURE TRUSTEES.

Section 4.01    Direction to Trustees and Indenture Trustees.    The relevant Institutional Investors for each Trust shall, by the time of the filing of a motion to approve this Settlement Agreement, provide the relevant Trustee with Direction to accept the settlement and compromises set forth herein.  The Institutional Investors hereby agree to confer in good faith with ResCap as to any further or other Direction that may be reasonably necessary to effectuate the settlement contemplated herein, including those actions listed in Section 3.1 of the Plan Support Agreement, filing motions and pleadings with the Bankruptcy Court and making statements in open court in support of the Restructuring.

Section 4.02    No Inconsistent Directions.    Except for providing instructions in accordance with Section 4.01, the Institutional Investors agree that (i) between the date hereof and the Effective Date, with respect to the Securities on the Holdings Schedule, they will not, individually or collectively, direct, vote for, or take any other action that they may have the right or the option to take under the Governing Agreements or to join with any other holders or the trustee of any note, bond or other security issued by the Trusts, to cause the Trustees to enforce (or seek derivatively to enforce) any representations and warranties regarding the Mortgage Loans or the servicing of the Mortgage Loans, and (ii) to the extent that any of the Institutional Investors have already taken any such action, the applicable Institutional Investor will promptly rescind or terminate such action.  Nothing in the foregoing shall restrict the ability of the Institutional Investors to demand that any other Investor who seeks to direct the Trustee for a Trust post any indemnity or bond required by the Governing Agreements for the applicable Trust.

Section 4.03    Amendments to Governing Agreements Regarding Financing of Advances.    The Institutional Investors agree to use commercially reasonable efforts (which shall not require the giving of any indemnity or other payment obligation or expenditure of out-of-pocket funds) to negotiate any request by the Debtors or the Trustees for Trusts that are being assumed, and if any Trustee shall require a vote of the certificate or note holders with respect thereto, shall vote in favor of (to the extent agreement is reached) any amendment to the relevant Governing Agreements and related documents requested by the Debtors in order to permit "Advances" (as it or any similar term may be defined in the Governing Agreements) to be financeable and to make such other amendments thereto as may be reasonably requested by the Debtors in accordance with any agreement to acquire all or substantially all of the Debtors' servicing assets pursuant to the Restructuring and the Plan, so long as such changes would not cause material financial detriment to the Trusts, their respective trustees, certificate or note holders, or the Institutional Investors.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00045567

**MoFo Draft of 5/13/12**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

## ARTICLE V.  ALLOWANCE OF CLAIM.

Section 5.01    The Allowed Claim.  ResCap hereby makes an irrevocable offer to settle, expiring at 5:00 p.m. prevailing New York time on the date that is forty five (45) days after the Petition Date, with each of the Trusts that timely agrees to the terms of this Settlement Agreement (the "Accepting Trusts"). In consideration for such agreement, ResCap will provide a general unsecured claim of $8,700,000,000 (the "Total Allowed Claim").  For the avoidance of doubt, the Total Allowed Claim shall be shared among any Trusts accepting the offer contained in this Section 5.01, subject to the provisions of this Settlement Agreement. Any Trusts accepting the offer contained in this Section 5.01, subject to the provisions of this Settlement Agreement shall be allowed claims in an amount calculated as set forth below (the "Allowed Claim"), but in no case shall the amount of the Allowed Claim exceed $8,700,000,000. The amount of the Allowed Claim shall equal (i) $8,700,000,000, less (ii) $8,700,000,000 multiplied by the percentage represented by (a) the total dollar amount of original principal balance for the Trusts not accepting the offer outlined above, divided by (b) the total dollar amount of original principal balance for all Trusts.

Section 5.02    Waiver of Setoff and Recoupment.  By accepting the offer to settle contained in Section 5.01, each accepting Trust irrevocably waives any right to setoff and/or recoupment such Trust may have against Ally and ResCap.

## ARTICLE VI. ALLOCATION OF ALLOWED CLAIM.

Section 6.01    The Allocation Schedule.  The allocation of the amounts of the Allowed Claim as to each Trust (each, an "Allocated Allowed Claim"), is set forth on Exhibit B hereto.

Section 6.02    Legal Fees.

(a)    ResCap and the Institutional Investors agree that Talcott Franklin P.C.; Miller, Johnson, Snell & Cummiskey, P.L.C.; and Carter Ledyard & Milburn LLP shall, on the Effective Date of the Plan, be paid legal fees as follows, as an integrated and nonseverable part of this Settlement Agreement.  First, Talcott Franklin P.C.; Miller, Johnson, Snell & Cummiskey, P.L.C.; and Carter Ledyard & Milburn LLP, as counsel to the Institutional Investors, shall be allocated by ResCap without conveyance to the Trustees the percentages of the Allowed Claim set forth on Exhibit C, without requirement of submitting any form of estate retention or fee application, for their work relating to these cases and the settlement.  Second, the Debtors and Institutional Investors may further agree at any time, that the Debtors may pay Talcott Franklin P.C.; Miller, Johnson, Snell & Cummiskey, P.L.C.; and Carter Ledyard & Milburn LLP in cash, in an amount that Talcott Franklin P.C.; Miller, Johnson, Snell & Cummiskey, P.L.C.; and Carter Ledyard & Milburn LLP respectively agree is equal to the cash value of their respective portions of the Allowed Claim, and in any such event, no estate retention application, fee application or further order of the Bankruptcy Court shall be required as a condition of the Debtors making such agreed payment.  Third, the Debtors agree and the settlement

{00315282-4}                                    -6-
30511482_7

30511482_9
ny-1040920

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

approval order shall provide that the amount of the Allowed Claim payable to Talcott Franklin P.C.; Miller, Johnson, Snell & Cummiskey, P.L.C.; and Carter Ledyard & Milburn LLP may be reduced to a separate claim stipulation for convenience of the parties.

(b)    In the event that, prior to acceptance of this compromise by a Trustee for a Trust other than an original Covered Trust (as defined in the Plan Support Agreement), counsel to Investors in such Trust cause a direction to be given by more than 25% of the holders of a tranche of such Trust to accept this compromise, then the same provisions as contained in Section 6.02(a) shall apply to such counsel, solely as to the amounts allocated to such Trust.  Such counsel shall be entitled to a share of the fee for such trust equal to the ratio of (a) 25% minus the percentage of such tranche held by Institutional Investors divided by (b) 25%.  Counsel would be required to identify itself and satisfy the Debtors and Institutional Investors as to the holdings of client-investors and that counsel caused such directions.

ARTICLE VII.        RELEASES.

Section 7.01    Releases.  Except as set forth in Article VIII, as of the Effective Date, with respect to each and every Trust for whom the Trustee accepts the compromise contemplated by this Settlement Agreement, the Investors, Trustee, Trust, and any Persons claiming by, through or on behalf of such Trustee (including Institutional Investors claiming derivatively) or such Trust (collectively, the "Releasors"), irrevocably and unconditionally grant a full, final, and complete release, waiver, and discharge of all alleged or actual claims, demands to repurchase, demands to cure, demands to substitute, counterclaims, defenses, rights of setoff, rights of rescission, liens, disputes, liabilities, losses, debts, costs, expenses, obligations, demands, claims for accountings or audits, alleged events of default, damages, rights, and causes of action of any kind or nature whatsoever, whether asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent, in contract, tort, or otherwise, secured or unsecured, accrued or unaccrued, whether direct or derivative, arising under law or equity, against ResCap that arise under the Governing Agreements.  Such released claims include, but are not limited to, claims arising out of and/or relating to (i) the origination, sale, or delivery of Mortgage Loans to the Trusts, including the representations and warranties made in connection with the origination, sale, or delivery of Mortgage Loans to the Trusts or any alleged obligation of ResCap to repurchase or otherwise compensate the Trusts for any Mortgage Loan on the basis of any representations or warranties or otherwise or failure to cure any alleged breaches of representations and warranties, (ii) the documentation of the Mortgage Loans held by the Trusts including with respect to allegedly defective, incomplete, or non-existent documentation, as well as issues arising out of or relating to recordation, title, assignment, or any other matter relating to legal enforceability of a Mortgage or Mortgage Note, or any alleged failure to provide notice of such defective, incomplete or non-existent documentation, (iii) the servicing of the Mortgage Loans held by the Trusts (including any claim relating to the timing of collection efforts or foreclosure efforts, loss mitigation, transfers to subservicers, advances, servicing advances, or

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00045569

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

claims that servicing includes an obligation to take any action or provide any notice towards, or with respect to, the possible repurchase of Mortgage Loans by the applicable Master Servicer, Seller, or any other Person), (iv) setoff or recoupment under the Governing Agreements against ResCap, and (v) any loan seller that either sold loans to ResCap or AFI that were sold and transferred to such Trust or sold loans directly to such Trust, in all cases prior to the Petition Date (collectively, all such claims being defined as the "Released Claims"). For the avoidance of doubt, this release does not include individual direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities.

Section 7.02    Release of Claims Against Investors. Except as set forth in Article VIII, as of the Effective Date, ResCap irrevocably and unconditionally grants to the Investors a full, final, and complete release, waiver, and discharge of all alleged or actual claims from any claim it may have under or arising out of the Governing Agreements. For the avoidance of doubt, nothing in this provision shall affect Ally's rights in any way.

Section 7.03    Agreement Not to Pursue Relief from the Stay. The Institutional Investors agree that neither they nor their successors in interest, assigns, pledges, delegates, affiliates, subsidiaries, and/or transferees, will seek relief from the automatic stay imposed by section 362 of the Bankruptcy Code in order to institute, continue or otherwise prosecute any action relating to the Released Claims; provided, however, nothing contained herein shall preclude the Institutional Investors or their advised clients from seeking any such relief with respect to direct claims for securities fraud or other disclosure-related claims arising from the purchase or sale of Securities. ResCap reserves its rights and defenses therewith.

Section 7.04    Inclusion of Accepting Trustees in Plan Exculpation Provisions. The Trustees of any Trust accepting the offer to settle described in Section 5.01 and their respective counsel shall be entitled to the benefit of any plan exculpation provision, if any, included in the Plan, which exculpation shall be no less favorable than the plan exculpation provisions extended to similarly situated creditors or parties in interest who are parties to any plan support agreement with ResCap.

Section 7.05    Servicing of the Mortgage Loans. Except as provided in Section 8.01, the release and waiver in Article VII includes all claims based in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts prior to the Petition Date. Provided, the foregoing language is not intended to release any claims against any person other than ResCap and Ally; provided, further, that the applicable Institutional Investor shall indemnify (i) any direct or indirect subsidiary of ResCap that is not a Debtor and/or (ii) Ally, against any and all harm in connection with any Institutional Investor pursuing such claim.

ARTICLE VIII.    CLAIMS NOT RELEASED

Section 8.01    Administration of the Mortgage Loans. The releases and waivers in Article VII herein do not include claims that first arise after the Effective Date which are based

{00315282-4}                    -8-
30511482_7

30511482_9
ny-1040920

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

in whole or in part on any actions, inactions, or practices of the Master Servicer, Servicer, or Subservicer as to the servicing of the Mortgage Loans held by the Trusts in their aggregation and remittance of Mortgage Loan Payments, accounting for principal and interest, and preparation of tax-related information, in connection with the Mortgage Loans and the ministerial operation and administration of the Trusts and the Mortgage Loans held by the Trusts, for which the Master Servicer, Servicer, or Subservicer received servicing fees, unless, as of the date hereof, the Institutional Investors, have or should have knowledge of the actions, inactions, or practices of ResCap in connection with such matters.

Section 8.02    Financial-Guaranty Provider Rights and Obligations. To the extent that any third party guarantor or financial-guaranty provider with respect to any Trust has rights or obligations independent of the rights or obligations of the Investors, the Trustees, or the Trusts, the releases and waivers in Article VII are not intended to and shall not release such rights.

Section 8.03    Settlement Agreement Rights. The Parties do not release or waive any rights or claims against each other to enforce the terms of this Settlement Agreement or the Allowed Claim.

Section 8.04    Disclosure Claims. The releases and waivers in Article VII do not include any claims based on improper disclosures under federal or state securities law.

Section 8.05    Reservation of Rights. Notwithstanding anything in this Settlement Agreement to the contrary, the Institutional Investors have not waived their right to file an objection to a motion of the holders of the ResCap 9 5/8% bonds requesting payment of any interest on account of their ResCap 9 5/8% bond claims that may be due and owing after the Petition Date.

ARTICLE IX. RELEASE OF UNKNOWN CLAIMS.

Each of the Parties acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH, IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

The Parties acknowledge that inclusion of the provisions of this Article IX to this Settlement Agreement was a material and separately bargained for element of this Settlement Agreement.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045571

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

## ARTICLE X.  OTHER PROVISIONS

Section 10.01  Voluntary Agreement.  Each Party acknowledges that it has read all of the terms of this Settlement Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Settlement Agreement voluntarily and without duress.

Section 10.02  No Admission of Breach or Wrongdoing.  ResCap has denied and continues to deny any breach, fault, liability, or wrongdoing.  This denial includes, but is not limited to, breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any securitizations, including those for which ResCap was the Seller, Servicer and/or Master Servicer.  Neither this Settlement Agreement, whether or not consummated, any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that ResCap has or could have asserted.

Section 10.03  No Admission Regarding Claim Status.  ResCap expressly states that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, then neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of ResCap that any claims asserted by the Institutional Investors are not contingent, unliquidated or disputed.  The Institutional Investors expressly state that in the event this Settlement Agreement is not consummated or is terminated prior to the Effective Date, neither this Settlement Agreement, nor any proceedings relating to this Settlement Agreement, nor any of the terms of the Settlement Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the Institutional Investors that any claims asserted by the Institutional Investors and Trustees are not limited to the amounts set forth in this Settlement Agreement or are of any particular priority.

Section 10.04  Counterparts.  This Settlement Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Settlement Agreement.  Delivery of a signature page to this Settlement Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Settlement Agreement.

Section 10.05  Joint Drafting.  This Settlement Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Settlement Agreement, no provision shall be construed and interpreted for or against any of the Parties because such provision or any other provision of the Settlement Agreement as a whole is purportedly prepared or requested by such Party.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00045572

**MoFo Draft of 5/13/12**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

Section 10.06  Entire Agreement.  This document contains the entire agreement between the Parties, and may only be modified, altered, amended, or supplemented in writing signed by the Parties or their duly appointed agents.  All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Settlement Agreement and the Plan Support Agreement.

Section 10.07  Specific Performance.  It is understood that money damages are not a sufficient remedy for any breach of this Settlement Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief from the Bankruptcy Court as a remedy for any such breach. The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

Section 10.08  Authority.  Each Party represents and warrants that each Person who executes this Settlement Agreement on its behalf is duly authorized to execute this Settlement Agreement on behalf of the respective Party, and that such Party has full knowledge of and has consented to this Settlement Agreement.

Section 10.09  No Third Party Beneficiaries.  There are no third party beneficiaries of this Settlement Agreement.

Section 10.10  Headings.  The headings of all sections of this Settlement Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

Section 10.11  Notices.  All notices or demands given or made by one Party to the other relating to this Settlement Agreement shall be in writing and either personally served or sent by registered or certified mail, postage paid, return receipt requested, overnight delivery service, or by electronic mail transmission, and shall be deemed to be given for purposes of this Settlement Agreement on the earlier of the date of actual receipt or three days after the deposit thereof in the mail or the electronic transmission of the message.  Unless a different or additional address for subsequent notices is specified in a notice sent or delivered in accordance with this Section, such notices or demands shall be sent as follows:

> To: Institutional Investors
> c/o Talcott Franklin
> 208 N. Market Street
> Suite 200
> Dallas, Texas 75202
> Tel: 214-736-8730
> Email: tal@talcottfranklin.com
> --and--
> Miller, Johnson, Snell & Cummiskey, P.L.C.
> 250 Monroe Avenue NW

{00315282-4}
30511482_7

30511482_9
ny-1040920

-11-

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

MoFo Draft of 5/13/12
Attorneys' Work Product
Privileged and Confidential
For Settlement Purposes Only

Suite 800
P.O. Box 306
Grand Rapids, MI 49501-0306
Tel: 616.831.1748
Email: sarbt@millerjohnson.com
--and--
Carter Ledyard & Milburn LLP
2 Wall Street
New York, New York 10005
Tel.: 212-238-8607
Email: gadsden@clm.com

To:    ResCap
c/o Gary S. Lee
Jamie A. Levitt
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-468-8000
Email: glee@mofo.com
       jlevitt@mofo.com

Section 10.12 <u>Disputes</u>.  This Settlement Agreement, and any disputes arising under or in connection with this Settlement Agreement, are to be governed by and construed in accordance with the laws of the State of New York, without giving effect to the choice of laws principles thereof.  Further, by its execution and delivery of this Settlement Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Settlement Agreement, *provided, however*, that, upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Settlement Agreement.

**[REST OF PAGE INTENTIONALLY LEFT BLANK]**

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045574

**MoFo Draft of 5/13/12**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

Dated the _____ day of May, 2012.


Residential Capital, LLC
for itself and its direct and indirect subsidiaries


Signature: _____

Name: _____

Title: _____

{00315282-4}                                  -13-
30511482_7

30511482_9
ny-1040920

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045575

**MoFo Draft of 5/12/12 5 am**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

## EXHIBIT A

**TRUSTS**

{00315282-4}
30511482_9
ny-1040920

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045576

**MoFo Draft of 5/12/12 5 am**
**Attorneys' Work Product**
**Privileged and Confidential**
**For Settlement Purposes Only**

## EXHIBIT B

**ALLOCATION OF ALLOWED CLAIM**

{00315282-4}
30511482_9
ny-1040920

-15-

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045577

EXECUTION COPY

## PLAN SUPPORT AGREEMENT

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

This PLAN SUPPORT AGREEMENT (together with all exhibits attached hereto, the "Agreement") is made and entered into as of May 13, 2012, by and among:

(a)   Residential Capital, LLC ("ResCap") and certain of its direct and indirect subsidiaries (collectively, the "Debtors");[1]

(b)   Ally Financial Inc., on behalf of its direct and indirect subsidiaries other than the Debtors, (collectively, "Ally"); and

(c)   the undersigned holders, and authorized investment managers for holders, of Securities (as defined below) backed by mortgage loans held by the Covered Trusts (as defined below) (each, a "Consenting Claimant" and collectively, the "Consenting Claimants").

The Consenting Claimants, together with the Debtors and Ally, are defined collectively as the "Parties."

---

[1]   The Debtors are:  Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045578

## RECITALS

**WHEREAS**, each of the Debtors is contemplating filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

**WHEREAS**, the Consenting Claimants hold, and/or are authorized investment managers for holders of, certain notes, bonds and/or certificates (collectively, the "Securities") backed by mortgage loans held by certain of the securitization trusts identified on the attached **Exhibit A** (the "Covered Trusts"), and the Covered Trusts assert claims (each, a "Rep and Warranty Claim"), as defined in section 101(5) of the Bankruptcy Code, against the Debtors arising out of alleged breaches of representations and warranties and other provisions contained in Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and/or other agreements governing the securitization of mortgage loans by and activities of the Covered Trusts (collectively, the "Governing Agreements");

**WHEREAS**, the Consenting Claimants have indicated their intent under the Governing Agreements to seek action by the trustees under the Covered Trusts (each a "Trustee") to compel the Debtors or Ally to cure the alleged breaches of representations and warranties, and to assert other breaches, and the Debtors and Ally dispute such allegations of breach and waive no rights, and preserve all of their defenses, with respect to such allegations and putative cure requirements;

**WHEREAS**, the Debtors and the Consenting Claimants have engaged in arm's-length, good faith negotiations regarding the restructuring of the Debtors and have agreed upon (i) a term sheet, as set forth in **Exhibit B** attached hereto (the "Plan Term Sheet"), for a chapter 11 plan of reorganization, (ii) a proposed settlement that the Debtors will pursue and diligently prosecute pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure that would resolve claims of the trustees for the Covered Trusts and other RMBS trusts (the "Other RMBS Trusts" and, together with the Covered Trusts, the "Trusts"), against the Debtors (the "RMBS Trust Settlement Agreement"), and (iii) a settlement between the Debtors and Ally, to be embodied in a chapter 11 plan of reorganization (such plan, the "Plan", and such agreement, the "AFI Settlement Agreement" a copy of which is attached as Exhibit 4 to the Plan Term Sheet), pursuant to which Ally will contribute value, including a cash contribution in an amount of no less than $750 million (the "Cash Contribution") to ResCap to facilitate the Plan in exchange for Ally and ResCap resolving claims asserted by each against the other and resolving third party claims alleged against Ally relating to ResCap;[2]

---

[2]    For the avoidance of doubt, as used herein, the term "Plan" means a chapter 11 plan of reorganization that contains the same terms set forth in, and is otherwise consistent with, the Plan Term Sheet, the AFI Settlement Agreement and this Agreement. In the event of any inconsistencies with the terms and conditions of this Agreement and the Plan Term Sheet, the terms and conditions of the Plan Term Sheet shall control. Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan Term Sheet and the AFI Settlement Agreement.

2

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                                    RC-9019_00045579

EXECUTION COPY

**WHEREAS**, in accordance with the terms of this Agreement, the Parties have agreed to work together to facilitate consummation of the RMBS Trust Settlement Agreement, the AFI Settlement Agreement, the Plan Term Sheet and confirmation of the Plan and the transactions contemplated thereby (collectively, the "Restructuring"); and

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**Section 1.**     **The Settlement and the Restructuring.**

(a)     The Restructuring will be implemented pursuant to cases commenced by the Debtors under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") in accordance with this Agreement;

(b)     On or prior to May 14, 2012, the Debtors shall file voluntary petitions commencing the Chapter 11 Cases in the Bankruptcy Court (the date of such filings, the "Petition Date");

(c)     Each of the Parties agrees to negotiate in good faith the Definitive Documents (as defined in the Plan Term Sheet), including the Plan and a disclosure statement describing the Plan (the "Disclosure Statement"), both of which shall contain the same terms set forth in, and be materially consistent with, the Plan Term Sheet and AFI Settlement Agreement, and, shall be materially consistent with the methodology of allocation of sale proceeds, settlement proceeds, and all other matters that determine distributions to creditors as set forth in the May 9, 2012 and May 12, 2012 Executive Summaries (the "Executive Summaries") given by Debtors' counsel to the steering committee appointed by the Consenting Claimants (the "Steering Committee"), and the Plan or a motion filed in connection with the sale of the Debtors' mortgage loan origination business shall provide for the assumption and assignment of all or substantially all of the pooling and servicing agreements (and any similar agreements) of the Trusts; and

(d)     Each of the Parties acknowledges that one or more of the Consenting Claimants may act as an investment manager or investment adviser for other entities that are not a Consenting Claimant (each, a "Consenting Claimant Client"). The Consenting Claimant Clients hold or may hold individual claims against one or more of the Debtors or against Ally that do not belong to the Consenting Claimants. Nothing in this Agreement shall be deemed to waive or compromise the right of any Consenting Claimant Client to appear on its own behalf in the Debtors' Chapter 11 cases to pursue any of their respective rights. By their signatures hereunder, all Parties acknowledge that the Consenting Claimants do not waive, release or extinguish any claims under the securities or anti-fraud laws of the United States or of any state belonging to any Consenting Claimant Client.

3

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00045580

## Section 2.    The Debtors' Obligations Under this Agreement.

### 2.1    Settlement of Allowed Claims

As long as a Debtor Termination Event or Ally Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors agree to:

(a)    Issue a press release describing the RMBS Trust Settlement Agreement, including the agreed allowed claim amount, on the morning of the Petition Date; file a motion in the Bankruptcy Court as soon as practicable, but in no event later than fourteen (14) days after the Petition Date for approval of the RMBS Trust Settlement Agreement and the compromise contained therein; and obtain an order from the Bankruptcy Court approving such motion by the earlier of (i) 60 days after the Petition Date and (ii) the date on which the Disclosure Statement is approved by the Bankruptcy Court;

(b)    for 60 days following the Petition Date, offer to all Other RMBS Trusts a settlement of their claims on the same economic terms as for the Covered Trusts; and

(c)    take any and all other reasonably necessary actions in furtherance of the RMBS Trust Settlement Agreement and the compromise contemplated thereby.

### 2.2    Implementation of the Restructuring.

As long as a Debtor Termination Event has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors agree to:

(a)    Use best efforts to effectuate and consummate the Restructuring contemplated by the Plan Term Sheet, including the AFI Settlement Agreement, so long as the AFI Settlement Agreement includes the Cash Contribution, in accordance with the deadlines and conditions specified in the milestones set forth on **Exhibit C** attached hereto (the "**Milestones**");

(b)    file a motion in the Bankruptcy Court within 21 days after the Petition Date seeking authority to perform under this Agreement and to use their commercially reasonable efforts to obtain an order from the Bankruptcy Court approving such motion contemporaneously with approval of the Disclosure Statement;

(c)    obtain any and all required regulatory approvals and material third-party approvals for confirmation and effectiveness of the Plan; and

(d)    take any and all reasonably necessary actions in furtherance of the Plan.

Notwithstanding anything in this Agreement to the contrary, the Consenting Claimants have not waived their right to file an objection to a motion of the holders of the ResCap 9 5/8% bonds

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045581

requesting payment of any interest on account of their ResCap 9 5/8% bond claims that may be due and owing after the Petition Date.

The Debtors also agree to move, as part of the motion to approve this Agreement, for permission for the filing under seal of any Rule 2019 disclosure required in the Bankruptcy Case, subject to confidential review solely by the Court, the Office of the United States Trustee, any official committee of unsecured creditors appointed in the Chapter 11 Cases, and Ally.

**2.3    Conditions Precedent to Payment by Debtors.**

Notwithstanding the filing of the motion described in section 2.1(a) with the Bankruptcy Court, or entry of an order of the Bankruptcy Court approving such motion, no payment shall be made to the Covered Trusts prior to the effective date of the Plan.

**2.4    The Debtors' Fiduciary Obligations.**

Notwithstanding anything contained in this Agreement to the contrary, following the good faith determination by the Debtors and their respective Boards of Directors that a proposal or offer for a chapter 11 plan or other restructuring transaction that is not consistent with the transaction contemplated hereby (an "Alternative Restructuring") constitutes a proposal that is reasonably likely to be more favorable than the Restructuring to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties, and receipt of approval by the Debtors' Boards of Directors to pursue such Alternative Restructuring, the Debtors may immediately terminate their obligations under this Agreement by written notice to counsel for the Consenting Claimants and Ally, and all obligations of the Consenting Claimants and their obligees under this Agreement shall be terminated immediately; provided, however, that an Alternative Restructuring shall be no less favorable to the Consenting Claimants than the Restructuring contemplated by the Plan.

**Section 3.    The Consenting Claimants' Obligations Under this Agreement.**

**3.1    Support of Restructuring.**

As long as a Consenting Claimant Termination Event (as defined herein) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Consenting Claimants each agree to, and, promptly after the execution of this Agreement, shall Direct the Trustees, in accordance with the terms and conditions of the Governing Agreements, to:

(a)    Support (as defined below) the prosecution of the Debtors' first- and second-day pleadings (including interim and final relief thereof, as applicable) including those pleadings listed on **Exhibit D** hereto; provided that if giving any Direction is impracticable, the Consenting Claimant Steering Committee shall request and Support the Trustees to accommodate the relief sought by the Debtors;

(b)    Use commercially reasonable efforts (including a public statement of counsel requesting others to join), which do not require the expenditure of funds or undertaking of any obligation, to obtain agreement to this Agreement and the

5

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00045582

RMBS Trust Settlement Agreement from holders of Securities backed by mortgage loans held by the Covered Trusts other than the Consenting Claimants party to this Agreement on the first day of its execution, substantially in the form attached hereto as **Exhibit E**;

(c)     Support the Debtors' efforts to pursue the Restructuring contemplated by the Plan Term Sheet and the AFI Settlement Agreement (including the Cash Contribution set forth therein);

(d)     Support the Debtors' prosecution of their Chapter 11 Cases consistent with this Agreement, the Plan Term Sheet, and the AFI Settlement Agreement, including the Cash Contribution set forth therein and take no action otherwise adverse to the Debtors during the Chapter 11 Cases;

(e)     Support entry of an injunction staying litigation against Ally and current and former directors and officers of Ally and ResCap during the pendency of the Chapter 11 Cases;

(f)     Permit all disclosures in the Disclosure Statement and any filings by the Debtors and Ally with any regulatory agency to which the Debtors and Ally may be subject, of the contents of this Agreement, including the aggregate amount and nature of Rep and Warranty Claims;

(g)     Support entry of any order approving the Disclosure Statement to permit solicitation of the Plan;

(h)     Direct the Trustees to vote to accept the Plan, provided, however, that (i) the Bankruptcy Court has entered an order approving the Disclosure Statement, (ii) the Consenting Claimants have been properly solicited pursuant to section 1125 of the Bankruptcy Code, and (iii) the material terms of the Plan and the Disclosure Statement are consistent with the terms of the Plan Term Sheet and incorporate terms no less favorable than the AFI Settlement Agreement; and

(i)     Support confirmation of the Plan and approval of any settlement with Ally, whether or not such settlement is provided for under a plan of reorganization, including approval of third party releases in Ally's favor, on terms no less favorable than the AFI Settlement Agreement (including the Cash Contribution set forth therein), or any comparable sale under Section 363 of the Bankruptcy Code that provides and is conditioned on the same AFI Settlement Agreement (including the Cash Contribution set forth therein) and provides the same benefits to the Trusts and take no action otherwise adverse to Ally during the Chapter 11 Cases.

"Support" means to take commercially reasonable actions that do not require the expenditure of funds or undertaking of any obligations, including active participation in court hearings by counsel to the Consenting Claimants, attending meetings, and working with the Trustees to facilitate acceptance of the compromise contemplated by the Settlement Agreement. The Debtors and Ally acknowledge that the Consenting Claimants' Support obligation is made for

6

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

themselves and, to the extent each of them has the authority, with respect to any other entities, account holders, or accounts for which or on behalf of which it is signing this Agreement. The Consenting Claimants reasonably believe, and will inform the Bankruptcy Court and the Trustees, that the contemplated Plan is in the best interests of holders of Securities in the Trusts. This agreement of Support does not bar any Consenting Claimant Client from taking any contrary position. "Direct" means to provide, and "Direction" means, a written direction, but does not require the giving of any indemnity or other payment obligation.

## 3.2 Amendments to Governing Agreements.

The Consenting Claimants agree to use commercially reasonable efforts (which shall not require the giving of any indemnity or other payment obligation or expenditure of out-of-pocket funds) to negotiate any request by the Debtors or the Trustees for Trusts that are being assumed, and if any Trustee shall require a vote of the certificate or note holders with respect thereto, shall vote in favor of (to the extent agreement is reached) any amendment to the relevant Governing Agreements and related documents requested by the Debtors in order to permit "Advances" (as it or any similar term may be defined in the Governing Agreements) to be financeable and to make such other amendments thereto as may be reasonably requested by the Debtors in accordance with any agreement to acquire all or substantially all of the Debtors' servicing assets pursuant to the Restructuring and the Plan, so long as such changes would not cause material financial detriment to the Trusts, their respective trustees, certificate or note holders, or the Consenting Claimants.

## 3.3    Transfer of Claims or Securities.

The Consenting Claimants currently and collectively hold Securities representing in aggregate 25% of the voting rights in one or more classes of Securities of not less than 290 of the Covered Trusts. The Consenting Claimants, collectively, shall maintain holdings aggregating 25% of the voting rights in one or more classes of Securities of not less than 235 of the Covered Trusts ("Requisite Holdings") until the earliest of: (i) confirmation of the Plan, (ii) December 31, 2012, (iii) a Consenting Claimant Termination Event, (iv) a Debtor Termination Event, or (v) an Ally Termination Event; provided, however, that any reduction in Requisite Holdings caused by: (a) sales by Maiden Lane I and Maiden Lane III; or(b) exclusion of one or more trusts due to the exercise of Voting Rights by a third party guarantor or financial guaranty provider, shall not be considered in determining whether the Requisite Holdings threshold has been met. If the Requisite Holdings are not maintained, each of Ally and ResCap shall have the right to terminate the Agreement, but neither Ally nor ResCap shall terminate the Agreement before each it has conferred in good faith with the Consenting Claimants concerning whether termination is warranted. For the avoidance of doubt, other than as set forth above, this Agreement shall not restrict the right of any Consenting Claimant to sell or exchange any Securities issued by a Trust free and clear of any encumbrance. The Consenting Claimants will not sell any of the Securities for the purpose of avoiding their obligations under this Agreement, and each Consenting Claimant commits to maintain at least one position in one of the Securities in one of the Trusts until the earliest of the dates set forth above. If the Debtor or Ally reach a similar agreement to this with another bondholder group, the Debtor and Ally will include a substantially similar proportionate holdings requirement in that agreement as contained herein.

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                          RC-9019_00045584

**3.4**    **Further Acquisition of Claims or Securities.**

This Agreement shall in no way be construed to preclude the Consenting Claimants or any of their affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional Securities or claims against the Debtors following the Consenting Claimants' execution of the Agreement; provided, however, that any such additional Securities acquired by a commonly managed portfolio of the Consenting Claimants that are signatory hereto shall automatically be deemed to be subject to the terms of this Agreement. The Consenting Claimants further agree that they will not knowingly create any subsidiary or affiliate for the sole purpose of acquiring any Securities without causing such affiliate to become a Party hereto prior to such acquisition.

**3.5**    **Representation of the Consenting Claimants' Holdings.**

Each of the Consenting Claimants represents that:

(a)    it has the authority to take the actions contemplated by this Agreement, to the extent that it has the authority with respect to any other entities, account holders, or accounts for which or on behalf of which it is signing this Agreement;

(b)    it holds, or is the authorized investment manager for the holders of, the securities listed in the schedule attached hereto as **Exhibit F**, in the respective amounts set forth therein by CUSIP number, that such schedule was materially accurate as of the date set forth for the respective institution, and that since the date set forth for the Consenting Claimant the Consenting Claimant has not, in the aggregate, materially decreased the Consenting Claimant's holdings in the Securities;

(c)    in connection with the Direction to be provided to the Trustees hereunder, it shall deliver to the Debtors and Ally signed copies of the holdings certifications it provides to the Trustees of the Covered Trusts promptly after the certifications are provided to the Trustees; and

(d)    lead counsel to the Consenting Claimants, Gibbs & Bruns, has represented to ResCap that the Consenting Claimants have aggregate holdings of securities of greater than 25% of the voting rights in one or more classes of the securities, certificates or other instruments backed by the mortgages held by each of the Covered Trusts (as defined in the Plan Support Agreement).

The Debtors and the Consenting Claimants agree that the aggregate amount of the holdings of capitalized securities of the Consenting Claimants may be disclosed publicly, but that the individual holdings shall remain confidential, subject to review by the Bankruptcy Court, the Office of the United States Trustee, and any official committee of unsecured creditors appointed in the Chapter 11 Cases, and the Debtors shall, in connection with seeking approval of entry into this Agreement, seek a protective order as to such holdings.

**3.6**    **Fiduciary Obligations of Consenting Claimants if Serving On Creditors' Committee.**    Any Consenting Claimants who serve on the official committee of unsecured

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                RC-9019_00045585

creditors appointed in the Chapter 11 Cases shall not be restricted in any manner by this Agreement from taking any actions or inaction in its capacity as a member of that committee.

**Section 4.    Obligations of Ally Under this Agreement**

(a)    Ally consents to, and shall not object to, approval of the RMBS Trust Settlement Agreement or any allowance of the claims of the Trusts in any amount at or less than the aggregate amount of $8,700,000,000, or to any allocation of such claims among the Trusts reasonably proposed by the Consenting Claimants.

(b)    Ally shall comply with the AFI Settlement Agreement in accordance with the terms and conditions thereof.

**Section 5.    <u>Mutual Obligations of the Parties Under this Agreement.</u>**

As long as a Termination Event has not occurred or has occurred but has been duly waived in accordance with the terms hereof, each of the Parties agrees that it shall not:

(a)    directly or indirectly seek, solicit, support, or vote in favor of any Alternative Restructuring that could reasonably be expected to prevent, delay, or impede the Restructuring contemplated by the Plan Term Sheet and the AFI Settlement Agreement or that is inconsistent with this Agreement, unless the Debtors, the Requisite Consenting Claimants and Ally have all agreed, in writing, to pursue an Alternative Restructuring;

(b)    directly nor indirectly (i) engage in, continue, or otherwise participate in any negotiations regarding any Alternative Restructuring, (ii) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternative Restructuring, or (iii) withhold, withdraw, qualify, or modify its approval or recommendation of this Agreement, the Plan Term Sheet, the Plan, the Restructuring, or the AFI Settlement Agreement, including the Cash Contribution set forth therein;

(c)    encourage any other entity to object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with the Restructuring;

(d)    take any action that is inconsistent with this Agreement, the Plan Term Sheet, the AFI Settlement Agreement, including the Cash Contribution set forth therein, or the Plan, or that would obstruct or delay approval of the Disclosure Statement or confirmation and consummation of the Plan; and

(e)    Notwithstanding anything else in this Agreement to the contrary (including Section 2), (i) if a Consenting Claimant or its investment advisor has in place an informational wall with respect to this matter, it shall not be a breach of this Agreement if persons screened from confidential information make public statements with respect to this matter, or take actions with respect to other claims and securities that are not subject to this Agreement, that do not support the Restructuring, Plan, or RMBS Trust Settlement Agreement, and (ii) the Debtors

9

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045586

EXECUTION COPY

and Ally shall have the right to consider and pursue any Alternative Restructuring that is not materially worse for the Consenting Claimants.

## Section 6.    Termination.

### 6.1    Consenting Claimant Termination Events.

The term "Consenting Claimant Termination Event," wherever used in this Agreement, means any of the following events (whatever the reason for such Termination Event and whether it is voluntary or involuntary):

(a)    Any of the Debtors or Ally has breached any material provision of this Agreement or the RMBS Trust Settlement Agreement and any such breach has not been duly waived by the Requisite Consenting Claimants;

(b)    any material modification is made to the Plan Term Sheet or the Plan that is not in form and substance satisfactory to the Requisite Consenting Claimants;

(c)    any of the Definitive Documents (as defined in the Plan Term Sheet), including the Plan, is filed with the Bankruptcy Court by the Debtors and is inconsistent with the Plan Term Sheet in any material respects, unless otherwise acceptable to the Requisite Consenting Claimants;

(d)    the Bankruptcy Court has entered an order in any of the Chapter 11 Cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer, or (iii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in sub-clauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(e)    conversion or dismissal of the Chapter 11 Cases of any of the Debtors;

(f)    any termination or lifting of any of the Debtors' exclusivity to file a plan of reorganization;

(g)    any breach or termination of (i) any purchase and sale agreement for the Debtors' mortgage loan origination business or loans held for sale business or (ii) the AFI Settlement Agreement;

(h)    any default or event of default under any debtor-in-possession financing obtained by the Debtors;

(i)    any order entered permitting Ally to lift the automatic stay provided under Bankruptcy Code section 362 (the "Automatic Stay") that has a material adverse effect on the Consenting Claimants;

10

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045587

**EXECUTION COPY**

(j)    any order granted to any other secured lender to lift the Automatic Stay with respect to any material assets of the Debtors that has a material adverse effect on the Consenting Claimants;

(k)    any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable, or the filing of a motion to reject this Agreement; or

(l)    the Debtors fail to comply with the deadlines and conditions set forth in the Milestones.

**6.2    Debtor and Ally Termination Events.**

The terms "Debtor Termination Event" and "Ally Termination Event," wherever used in this Agreement, mean a breach of any material provision of this Agreement or the RMBS Trust Settlement Agreement by Consenting Claimants, whatever the reason for such Termination Event and whether it is voluntary or involuntary.

**6.3    Beneficiaries of Termination Rights.**

The Consenting Claimant Termination Events, the Debtor Termination Events, and the Ally Termination Events (collectively, "Termination Events") in Section 6 are intended solely for the benefit of the Debtors, Ally and the Consenting Claimants; provided, however, that the Consenting Claimants, Ally or a Debtor may not seek to terminate this Agreement based upon a material breach or a failure of a condition (if any) in this Agreement arising out of its own actions or omissions.

**6.4    Termination Event Procedures.**

Upon the occurrence of a Debtor Termination Event or an Ally Termination Event, this Agreement shall automatically terminate without further action of the Parties or action or order of the Bankruptcy Court unless no later than five (5) business days after the occurrence of such Termination Event, the occurrence of such Termination Event is waived in writing by the Debtors or Ally, respectively. Upon the occurrence of a Consenting Claimant Termination Event, this Agreement shall only terminate after the Requisite Consenting Claimants provide Ally and the Debtors with three-days' advance written notice of termination. In the event the Agreement is terminated, the Parties shall not have any continuing liability or obligation under the Agreement and each Party shall have all the rights and remedies available to it under applicable law; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of termination.

The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the Automatic Stay in connection with giving any such notice (and agree not to object to any non-breaching Party seeking to lift the Automatic Stay in connection with giving any such notice, if necessary). Any such termination (or partial termination) of the Agreement shall not restrict the Parties' rights and remedies for any breach of the Agreement by any Party, including, but not limited to, the reservation of rights set forth in Section 8 hereof.

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY
RC-9019_00045588

**6.5    Mutual Consent to Termination.**

In addition to the Termination Events set forth in sections 6.1 and 6.2 hereof, this Agreement shall be terminable immediately upon written notice to all of the Parties of the written agreement of the Requisite Consenting Claimants, the Debtors and Ally to terminate this Agreement.

**6.6    Termination As a Result of the Effective Date.**

On the effective date of the Plan, the Plan shall supersede and replace this Agreement.

**Section 7.    <u>Mutual Representations, Warranties, and Covenants.</u>**

Each Party makes the following representations, warranties, and covenants to each of the other Parties, each of which are continuing representations, warranties, and covenants:

**7.1    Good Faith.**

The Parties agree to negotiate in good faith all of the documents and transactions described in the Plan Term Sheet and in this Agreement.

**7.2    Enforceability.**

Subject to Section 10.8 of this Agreement and the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legal, valid, and binding obligation, enforceable against the Debtors, Ally and the Consenting Claimants in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**7.3    No Consent or Approval.**

Except as expressly provided in this Agreement, no consent or approval is required by any other entity in order for it to carry out the provisions of this Agreement.

**7.4    Power and Authority.**

The Parties are duly organized, validly existing, and in good standing under the laws of their jurisdictions of organization and the Parties have all requisite corporate, partnership, or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement and the Plan Term Sheet.

**7.5    Authorization.**

The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, or limited liability company action on its part.

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045589

**7.6    Governmental Consents.**

Subject to the provisions of section 10.8 of the Agreement, the execution, delivery, and performance by the Parties of this Agreement does not and shall not require any registration or filing with or consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body, except such filings as may be necessary and/or required under the federal securities laws or as necessary for the approval of a disclosure statement and confirmation of the Plan by the Bankruptcy Court.

**7.7    No Conflicts.**

The execution, delivery, and performance of this Agreement, after taking into account screening walls, does not and shall not: (a) violate any provision of law, rule, or regulation applicable to it or, in the case of the Debtors, any of its subsidiaries; (b) violate its certificate of incorporation, bylaws (or other formation documents in the case of a limited liability company) or, in the case of the Debtors, those of any of its subsidiaries; or (c) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or, in the case of the Debtors, any of its subsidiaries is a party.

**Section 8.    No Waiver of Participation and Preservation of Rights.**

The Plan Term Sheet provides for an agreed plan treatment with respect to claims held by the Consenting Claimants against the Debtors and for releases of claims held by, among others, the Consenting Claimants against Ally. Subject to the terms and conditions contained in Plan Term Sheet and the RMBS Trust Settlement Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair, or restrict the ability of the Consenting Claimants to protect and preserve their rights, remedies, and interests, including their claims against any of the Debtors, any liens or security interests they may have in any assets of any of the Debtors, or their full participation in the Chapter 11 Cases, except as may be inconsistent with the provisions of this Agreement. Without limiting the foregoing sentence in any way, if the transactions contemplated by this Agreement or otherwise set forth in the Plan Term Sheet are not consummated as provided herein, if a Termination Event occurs or if this Agreement is otherwise terminated for any reason, the Parties each fully reserve any and all of their respective rights, remedies and interests.

**Section 9.    Acknowledgement.**

THIS AGREEMENT, THE PLAN TERM SHEET, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE. THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PLAN FROM THE CONSENTING CLAIMANTS UNTIL THE CONSENTING CLAIMANTS HAVE BEEN PROVIDED WITH COPIES OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH

13

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

EXECUTION COPY

PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.

### Section 10.    Miscellaneous Terms.

**10.1    Voluntariness; Binding Obligation; Assignment.**

(a)    **Voluntariness.**  Each Party acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Agreement voluntarily and without duress.

(b)    **Binding Obligation.**  Subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is a legally valid and binding obligation of the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in the Chapter 11 Cases, enforceable in accordance with its terms, and shall inure to the benefit of the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators, and representatives. Nothing in this Agreement, express or implied, shall give to any Entity, other than the Parties and their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, successors, assigns, heirs, executors, administrators, and representatives, any benefit or any legal or equitable right, remedy or claim under this Agreement.

(c)    **Assignment.**  No rights or obligations of any Party under this Agreement may be assigned or transferred to any other entity except as provided in Section 3.3.

(d)    **Several Obligations of Consenting Claimants.**  The representations, warranties and covenants applicable to each of the Consenting Claimants shall be several and neither joint nor joint and several.

**10.2    Further Assurances.**

The Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the agreements and understandings of the Parties, whether the same occurs before or after the date of this Agreement.

**10.3    No Admission of Breach or Wrongdoing.**

The Debtors and Ally have denied and continue to deny any breach, fault, liability, or wrongdoing. This denial includes breaches of representations and warranties, violations of state or federal securities laws, and other claims sounding in contract or tort in connection with any

14

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045591

**EXECUTION COPY**

securitizations, including those for which the Debtors or Ally were the Seller, Servicer and/or Master Servicer. Neither this Plan Support Agreement nor the RMBS Trust Settlement Agreement, whether or not consummated, any proceedings relating to this Plan Support Agreement or the RMBS Trust Settlement Agreement, nor any of the terms of the Plan Support Agreement or the RMBS Trust Settlement Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the Debtors or Ally with respect to any claim or of any breach, liability, fault, wrongdoing, or damage whatsoever, or with respect to any infirmity in any defense that the Debtors or Ally have or could have asserted.

**10.4    No Admission Regarding Claim Status.**

The Debtors and Ally expressly state that neither this Agreement, whether or not consummated, any proceedings relating to this Agreement, nor any of the terms of this Agreement, whether or not consummated, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the Debtors or Ally that any claims asserted by the Consenting Claimants are not contingent, unliquidated or disputed. The Consenting Claimants expressly state that in the event this Agreement is not consummated or is terminated, neither this Agreement, nor any proceedings relating to this Agreement, nor any of the terms of this Agreement, shall be construed as, or deemed to be evidence of, an admission or concession on the part of the Consenting Claimants that any claims asserted by the Consenting Claimants and Trustees are not limited to the amounts set forth in this Agreement or are of any particular priority.

**10.5    Headings.**

The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**10.6    Governing Law.**

THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CHOICE OF LAWS PRINCIPLES THEREOF.

Further, by its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees that the United States District Court for the Southern District of New York shall have jurisdiction to enforce this Agreement, provided, however, that, upon commencement of the Chapter 11 Cases, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

**10.7    Complete Agreement, Interpretation, and Modification.**

(a)    **Complete Agreement.** This Agreement and the Plan Term Sheet constitute the complete agreement between the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, between or among the Parties with respect thereto.

15

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045592

(b)    **Interpretation.**  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement shall interpret it in a neutral manner.  There shall be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

(c)    **Modification of Restructuring Agreements.**  This Agreement and the Plan Term Sheet may only be modified, altered, amended, or supplemented by an agreement in writing signed by the Debtors, Ally and the Consenting Claimants.

## 10.8    Execution.

This Agreement may be executed and delivered (by facsimile or otherwise) in any number of identical counterparts, each of which, when executed and delivered, shall be deemed an original and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

## 10.9    Remedies.

(a)    <u>Specific Performance</u>.

It is understood that money damages are not a sufficient remedy for any breach of this Agreement, and the Parties shall have the right, in addition to any other rights and remedies contained herein, to seek specific performance, injunctive, or other equitable relief from the Bankruptcy Court as a remedy for any such breach.  The Parties hereby agree that specific performance shall be their only remedy for any violation of this Agreement.

## 10.10    Settlement Discussions.

This Agreement and the Restructuring are part of a proposed settlement among the Parties with respect to the Plan treatment of claims including the Rep and Warranty Claims.  Nothing herein shall be deemed an admission of any kind by ResCap, Ally and the Consenting Claimants.  To the extent provided by Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

## 10.11    Consideration.

The Debtors, Ally and the Consenting Claimants hereby acknowledge that no consideration, other than that specifically described herein and in the Plan shall be due or paid to the Consenting Claimants for their agreement to support confirmation of the Plan in accordance with the terms and conditions of this Agreement, other than the Debtors' agreement to use commercially reasonable efforts to obtain approval of the Disclosure Statement and to seek confirmation of the Plan in accordance with the terms and conditions of the Plan.

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                                    RC-9019_00045593

**10.12  Third Party Beneficiaries.**

There are no third party beneficiaries of this Agreement.

**10.13  Notices.**

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier, or by registered or certified mail (return receipt requested) to the following addresses (or at such other addresses or facsimile numbers as shall be specified by like notice):

    (a)    if to the Debtors to: Residential Capital, LLC, 8400 Normandale Lake Boulevard, Suite 350, Minneapolis, Minnesota 55437; Attn: Tammy Hamzehpour; with copies to: Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn: Larren Nashelsky, Gary Lee and Anthony Princi;

    (b)    if to the Consenting Claimants to: Talcott Franklin, P.C., 208 N. Market Street Suite 200, Dallas, Texas 75202, Attn: Talcott Franklin; and Miller, Johnson, Snell & Cummiskey, P.L.C., 250 Monroe Avenue NW, Suite 800, P.O. Box 306 Grand Rapids, MI 49501-0306, Attn: Thomas P. Sarb; and Carter Ledyard & Milburn LLP, 2 Wall Street, New York, New York 10005, Attn: James Gadsden; and

    (c)    if to Ally to: Ally Financial, Inc., 200 Renaissance Center, P.O. Box 200, Detroit, Michigan 48265-2000, Attn: William Soloman; with copies to: Kirkland & Ellis, 601 Lexington Avenue, New York, NY 10022, Attn: Ray Schrock.

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

*          *          *          *          *

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY                    RC-9019_00045594

IN WITNESS WHEREOF, the Parties have entered into this Agreement on the day and year first above written.

**RESIDENTIAL CAPITAL, LLC, on behalf of itself and its subsidiaries**

By: _____
Name: _____
Its: _____

**ALLY FINANCIAL, INC., on behalf of Ally**

By: _____
Name: _____
Its: _____

Dated: _____, 2012

**CONSENTING CLAIMANT**

By: _____
Name: _____
Its: _____
Telephone: _____
Facsimile: _____

Description of Rep and Warranty Claims held by Consenting Claimant:

_____

Description and aggregate amount of any additional claims against the Debtors other than Rep and Warranty Claims:

Description: _____

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

EXECUTION COPY

# EXHIBIT A

## COVERED TRUSTS

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045596

EXECUTION COPY

# EXHIBIT B

## PLAN TERM SHEET

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045597

EXECUTION COPY

# EXHIBIT C

## MILESTONES

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

EXECUTION COPY

## MILESTONES

The Debtors' failure to comply with the following milestones will result in a Termination Event under Section 6 of this Agreement:

1. Obtain interim approval of debtor-possession financing on or before May 18, 2012.
2. Obtain, final approval of debtor-possession financing on or before 50 days following the Petition Date.
3. Obtain approval of this Agreement by the earlier of (i) 60 days following the Petition Date and (ii) the date on which the Bankruptcy Court enters an order approving the Disclosure Statement.
4. Obtain entry of an order of the Bankruptcy Court approving the compromises contemplated by the RMBS Trust Settlement Agreement on or before 60 days following the Petition Date,
5. Obtain approval the Disclosure Statement on or before 90 days following the Petition Date.
6. Obtain approval of proposed bidding procedures for the sales of assets contemplated in the Executive Summaries on or before 90 days following the Petition Date.
7. Obtain confirmation of the Plan on or before October 31, 2012.
8. On or before December 15, 2012, the effective date of the Plan shall have occurred.

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

EXECUTION COPY

## **EXHIBIT D**

## **FIRST AND SECOND DAY PLEADINGS**

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045600

EXECUTION COPY

# EXHIBIT E

## JOINDER ACKNOWLEDGEMENT

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

RC-9019_00045601

EXECUTION COPY

## JOINDER ACKNOWLEDGEMENT

This joinder (this "Joinder") to the Plan Support Agreement, dated as of May 13, 2012 (the "Agreement"), by and among (i) Residential Capital, LLC ("ResCap") and certain of its direct and indirect subsidiaries (collectively, the "Debtors"), (ii) Ally Financial Inc. on behalf of its direct and indirect subsidiaries other than the Debtors, and (iii) the Consenting Claimants (as defined therein, is made by [_____] (the "Joining Party") and is executed and delivered as of [_____], 2012. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

1. **Agreement to be Bound.**  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Claimant" and a "Party" for all purposes under the Agreement.

2. **Representations and Warranties.**  The Joining Party hereby represents and warrants that it holds, or is the authorized investment manager for the holders of, the securities listed on the signature page hereto, in the respective amounts set forth therein by CUSIP number, that such holdings are materially accurate as of the date hereof, and that since the date set forth the Joining Party (a) has not, in the aggregate, materially decreased the Joining Party's holdings in the Securities and (b) makes the representations and warranties set forth in Section 3 of the Agreement to each other Party.

3. **Governing Law.** This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4. **Notice.**  All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:
[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

**EXECUTION COPY**

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By: _____

       Name:

       Title:


Holdings Information (by CUSIP #):

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY

EXECUTION COPY

# EXHIBIT F

## CONSENTING HOLDERS' HOLDINGS INFORMATION

To Be Filed Under Seal

ny-1040929

CONFIDENTIAL – PROFESSIONALS' EYES ONLY