# Exhibit 38

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x

In Re: Cae No:

RESIDENTIAL CAPITAL, LLC, et. al,     12-12020(MG)

                Debtors.

-----------------------------------x


     VIDEOTAPE DEPOSITION OF TIMOTHY DEVINE

            New York, New York

            November 19, 2012

               10:17 a.m.




Reported by:
ERICA L. RUGGIERI, RPR
JOB NO: 27973

1        TIMOTHY DEVINE

2    Q.   I'm not asking you to speculate.
3 I'm asking you to tell me at the time that
4 you were preparing to provide this
5 waterfall presentation to Ms. Patrick in
6 connection with proposed settlement with
7 her, wasn't it your understanding that AFI
8 in return for whatever contribution it
9 would be making to that settlement was
10 going to require releases from both the
11 PLS claimants as well as ResCap?
12   A.   Couple -- couple points in
13 response.  One, I wasn't preparing the
14 waterfall.
15        Two, we were not negotiating,
16 Kathy Patrick and me -- Kathy Patrick and
17 I with regard to whether or not the 750
18 would be consideration for anything that
19 the debtor received in connection with the
20 resolution of a debtor and Kathy Patrick
21 settlement agreement.
22   Q.   Weren't those things all being
23 negotiated together, Mr. Devine?
24   A.   The 750 was not being negotiated
25 with Kathy Patrick.

135

1          TIMOTHY DEVINE
2      A.    Okay.  So as I recall sitting
3  here today, the estimated nonwrapped
4  potential exposure beyond 2013 represented
5  estimated lifetime losses, which I'm
6  testing with the note here, multiplied by
7  risks post fund audit defect rates
8  adjusted for litigation defenses.  Risk
9  referred to Todd Kushman's group.  And so
10 that would have been -- what I don't
11 remember is nonwrapped potential exposure
12 beyond 2013, whether that would have
13 included anything beyond private label
14 securities nonwrapped potential exposure.
15 I just don't remember.
16     Q.    The next line under Additional
17 Items says "Adj. for application of defect
18 rate at a nonloan level for nonwrapped PLS
19 and additional provision for wrapped PLS."
20           Do you see that?
21     A.    I see it, yeah.
22     Q.    And that shows an adjustment of
23 $500 million upwards for nonwrapped and
24 wrapped PLS exposure, right?
25     A.    Well, it represents application

136

```
 1                TIMOTHY DEVINE
 2   of a defect rate of a nonloan level for
 3   those populations.
 4        Q.    Okay.  And the next line under
 5   Additional Items says "Potential
 6   investor/securities litigation."  Do you
 7   see that?
 8        A.    Yes, I see it.
 9        Q.    Is the amount shown for that
10   item $400 million, the estimate of
11   exposure for securities fraud claims at
12   that point?
13        A.    No.
14        Q.    Okay.  What does it represent?
15        A.    As I sit here today, my memory
16   is that it represents the estimated top
17   end of the range of reasonably possible
18   losses for ResCap over time related to
19   litigation and -- repurchase obligation of
20   related claims.  Meaning, as I understand,
21   that would have been subject to certain
22   stresses beyond what the estimated
23   exposure would have been.
24        Q.    Mr. Devine, I was only focusing
25   on the line that says "Potential
```

138

1          TIMOTHY DEVINE
2     Q.    And is the e-mail above that
3  your response to Mr. Lee?
4     A.    Yes.  That's what it looks like.
5     Q.    Mr. Lee referred to a call or
6  meeting with Ms. Patrick that day.  And
7  you said our notes match.  Were you and
8  Mr. Lee both on a call with Mr. Patrick --
9  sorry -- with Ms. Patrick on May 4th?
10     A.    I -- I don't remember.  What --
11  what I do remember is that Gary Lee was
12  having a variety of conversations with
13  Kathy Patrick during that period, some of
14  which I would have been included on and
15  some of which I wouldn't have been
16  included on.
17     Q.    Well, he was summarizing in an
18  e-mail what Ms. Patrick had proposed that
19  day.  And you said, "Our notes match."  So
20  you must have been on that call, right?
21          MR. PRINCI:  Objection as to
22     form.
23     A.    Yeah, might.  The reason I
24  clarified my answer is that it could be
25  that he was summarizing calls or meetings

143

1          TIMOTHY DEVINE
2      Q.    Yes.
3      A.    No, she did not indicate that to
4  me.
5      Q.    Did she indicate that it was
6  important?
7      A.    Yes.
8      Q.    Okay.  What did she say about
9  that?
10     A.    Kathy Patrick understood that
11 the negotiation of a dollar number between
12 AFI and ResCap was going on separately
13 from the discussions over the RMBS
14 settlement.  Notwithstanding that, she
15 understood that she had no direct role
16 or -- or standing to bargain for a number
17 there since the number -- since that
18 agreement was between the estate and Ally.
19 She did care about the number and she told
20 me that she cared about the number for the
21 obvious reason that she wanted to maximize
22 that figure from Ally Financial.
23     Q.    But as of May 4th, had she
24 expressed an amount that she expected from
25 AFI if she were going to proceed with a

157

1           TIMOTHY DEVINE

2    stalking horse for the -- for a certain

3    class of assets that were being offered

4    for sale in the estate.  But -- but I

5    confess, I didn't know what it was then

6    and frankly I don't know what it is now.

7         Q.   What did you mean by 100 for

8    originations?

9         A.   Similar answer.  I understood

10   that the teams working on the Ally and

11   ResCap settlement had come up with this

12   sort of shorthand to represent what I was

13   made to understand was the Ally cash

14   contribution to the Ally and ResCap

15   settlement, which is the settlement to

16   which this sentence here refers.  "Assume

17   750 Ally cash plus 200 for HFS plus 100

18   for originations constitute the Ally" cash

19   contribution to the settlement.  That's

20   the Ally ResCap settlement that's being

21   described.  And as I said before, I really

22   did not participate in or have any

23   responsibility in working on that, those

24   settlement discussions.

25        Q.   Who was it that gave you those

223

```
 1              TIMOTHY DEVINE
 2      A.    In connection with the
 3   resolution with Kathy Patrick, no.
 4      Q.    Were you -- okay.  So what you
 5   just said is incorrect, right?  It had
 6   nothing to do with your advising the
 7   client on that number.  I'm asking you
 8   whether you were comfortable as Ally's
 9   lawyer with an $8.7 billion number based
10   on the information Mr. Cancelliere gave to
11   you in his May 9th e-mail?
12           MR. PRINCI:  Objection as to
13      form.
14           MR. BRYAN:  Objection as to
15      form.
16      A.    That's how I understood your
17   question.
18      Q.    Right, okay.  So that was the
19   client, AFI?
20      A.    Correct.
21      Q.    Okay.  Do you recall one way or
22   another whether an $8.7 billion allowed
23   claim had been agreed to as of May 9th,
24   2012, at 7:17 a.m.?
25      A.    Do I recall that right now
```

225

1        TIMOTHY DEVINE
2    Q.   Okay.  Did there come a time
3 when you learned who it was, what
4 individuals were negotiating a settlement
5 between ResCap and AFI?
6    A.   Yes.
7    Q.   Okay.  When did you learn that?
8    A.   I don't remember when I learned
9 that.
10    Q.   Did you learn it before or after
11 the ResCap board gave its approval to the
12 settlement with Kathy Patrick?
13    A.   I don't know.
14    Q.   Okay.  What individuals did you
15 come to learn negotiated the settlement
16 between AFI and ResCap?
17    A.   Well, I may or may not be
18 correct but you are asking me for my
19 understanding.  It was Mike Carpenter for
20 AFI with the independents of the ResCap
21 board.
22    Q.   During the course of the
23 negotiations with Ms. Patrick, up until
24 May 9th, weren't you -- weren't you being
25 kept advised about the progress of

242

1           TIMOTHY DEVINE
2   conversations were moving on from sort of
3   rep and warrant general conversations to
4   agreements that would take meaning within
5   the concept of a bankruptcy, I was
6   indicating that I am not bankruptcy expert
7   and would not be the right person to
8   negotiate terms of an agreement in that
9   context.
10          I would have thought that given
11  the population of the recipients of this
12  e-mail I sent, that Gary Lee would have
13  picked up the conversation with Talcott
14  Franklin.  And it looks like at the top of
15  this Exhibit 148 that that's exactly what
16  happened.  That Gary Lee responded and
17  said we can send him a revised agreement
18  and PSA when we get next draft from KP.
19          MR. KAUFMAN:  Let's mark as
20      Exhibit 149 an e-mail chain on
21      May 9th, 2012.  Bates numbers RC
22      9019_00049216 and 9217.
23          (9019 Exhibit 149, e-mail chain
24      on May 9th, 2012, Bates RC
25      9019_00049216 and 9217, marked for

243

1     TIMOTHY DEVINE

2     identification, as of this date.)

3     A.    Thank you.

4     Q.    Directing your attention to the
5 first e-mail in the chain, which appears
6 at the bottom of the first page and goes
7 over to the top of the second page. Did
8 you receive that e-mail from Mr. Schrock?

9     A.    It looks like I did.

10    Q.    Mr. Schrock wrote in this
11 e-mail, "And, Gary, as you know, the pure
12 cash number in the settlement agreement as
13 plan sponsor is $750 million. I do not
14 want this lost in translation among the
15 group, please."

16          Do you see that?

17    A.    Yes, I do.

18    Q.    Do you know why Mr. Schrock
19 wanted to make that clear to Mr. Lee?

20          MR. BRYAN: Object to form.

21          MR. PRINCI: Objection as to
22     form.

23    A.    No, I don't know why he wanted
24 to make it clear.

25    Q.    Did you receive Mr. Lee's

244

1              TIMOTHY DEVINE

2      response at 10:01 a.m. on May 9th?

3          A.   It looks like I did.

4          Q.   There Mr. Lee said REDACTED "That's what

5      I gather.  Also we are allocating 10

6      percent to LLC only."  Do you see that?

7          A.   I do see that.

8          Q.   Did you understand Mr. Lee's

9      reference to LLC was to Residential

10     Capital, LLC?

11         A.   I don't recall whether I

12     understood that to mean that.

13         Q.   As you sit here today, do you

14     understand it now?

15         A.   I should tell you that I did not

16     consider myself responsible for any

245

1          TIMOTHY DEVINE

2     REDACTED

3     Q.   Right.  Nevertheless, four
4 minutes later you responded to Mr. Lee
5 with an e-mail that said "And the setoff
6 curve ball must be waived, no value."
7 Right?
8     A.   That's what it looks like.
9     Q.   Are you saying that you were
10 able to send that e-mail without
11 understanding what Mr. Lee was talking
12 about in the e-mail to which you
13 responded?
14          MR. PRINCI:  Objection to form.
15          MR. BRYAN:  Objection as to
16     form.
17     A.   What I will tell you is that it
18 was made known to me at some point, and if
19 these numbers -- if these times are
20 correct, at some point on either Tuesday,
21 May 8th, Wednesday, May 9th, that there
22 was some sort of a setoff argument being
23 advanced by, I assume it was by either
24 Kathy Patrick or Talcott Franklin or one
25 of the counterparties and as I sit here

281

1              TIMOTHY DEVINE
2      A.    Well, I sent an e-mail to Gary
3   Lee, Jamie Levitt, Noah Ornstein and John
4   Ruckdaschel, cc'd Cieri and Schrock at
5   4:29.
6      Q.    Right.  And you sent that e-mail
7   in response to Mr. Lee's e-mail at 4:26 on
8   May 12th, didn't you?
9      A.    Yeah, I'm not sure if it's in
10  response but I did send him an e-mail a
11  couple minutes later.
12     Q.    And you wrote, "Got it.  Had
13  call with KP.  We told her PSA support
14  whole hog is drop dead."  That's what you
15  wrote, right?
16     A.    That's what I wrote.
17     Q.    And is that what you told
18  Ms. Patrick?
19     A.    I don't remember if I told her
20  whole hog but if I read this sitting here
21  now, it looks like I was communicating to
22  that group that I told her that she had to
23  support the PSAs in full.  And that that
24  was a provision that Ally would insist on
25  to the extent Ally could insist on

282

1              TIMOTHY DEVINE

2    anything.

3         Q.   And by using the phrase "drop

4    dead" you meant it was nonnegotiable from

5    Ally's perspective, right?

6         A.   I meant that if she wanted our

7    participation in the PSA she needed to

8    support it.

9              MR. KAUFMAN:  Let's mark as the

10        next exhibit an e-mail chain on

11        May 13, 2012 between Mr. Devine and

12        Talcott Franklin.

13             (9019 Exhibit 155, e-mail chain

14        dated May 13, 2012 between Mr. Devine

15        and Talcott Franklin, marked for

16        identification, as of this date.)

17        A.   Okay.

18        Q.   Looking at the first e-mail in

19   this chain which starts at the bottom of

20   the first page, did you send that e-mail

21   to Mr. Franklin at 12:16 p.m. on

22   May 13th -- I'm sorry -- at 1:28 p.m. on

23   May 12th?

24        A.   It looks like I did.  Again, I'm

25   not sure of the timing but it looks like I

364

1  TIMOTHY DEVINE

2  represent clients who did or did not under

3  the relevant documents have contract

4  claims against ResCap.  And that was

5  natural because I had been dealing with

6  that kind of assertion of claim, although

7  not by investors and trustees but rather

8  by the monolines against the ResCap

9  entities theretofore.

10          At some point ResCap began to

11  consider a Chapter 11 restructuring.  I

12  did not represent ResCap at all in

13  connection with this Chapter 11

14  restructuring, unless you consider the

15  nature of our discussions according to the

16  common interest or joint defense privilege

17  in which case that's why I don't blame you

18  for misunderstanding the nature of what I

19  just talked about.  But so, yes, I did

20  represent ResCap in connection with the

21  sort of bilateral claim of Kathy Patrick's

22  clients against the ResCap entities and

23  rep and warrant.  Once the context of the

24  restructuring became a part of that

25  dialogue, ResCap was represented by Gary

365

1           TIMOTHY DEVINE
2      Lee of MoFo.  I never represented ResCap
3      on a bankruptcy related resolution.  At
4      least unless you -- as I say, I did
5      continue to advise ResCap in connection
6      with plain sort of legal analysis on rep
7      and warrant issues but not so much as
8      would be implicated in connection with the
9      filing.
10          Q.    Thank you for that and let me
11     try to make sure I understand correctly.
12     To try to summarize.  In the beginning of
13     from October for some period of time in
14     the initial stages that you've described
15     as essentially information gathering
16     stages, you were representing ResCap.  By
17     the end, by the April and May time period
18     that we have looked at a variety of
19     e-mails by that time period you were no
20     longer representing ResCap, you would have
21     solely been representing AFI, is that
22     correct, am I bracketing the change in
23     role correctly?
24          A.    No.  I think you are missing one
25     part of it.  But it's -- it's