# Exhibit 48

# In The Matter Of:

*MBIA INSURANCE CORPORATION*
*v.*
*RESIDENTIAL FUNDING COMPANY, LLC*

---

## *DORIAN G. WHEALDON - Vol. 1*
### *June 7, 2011*

---

## *CONFIDENTIAL*

**MERRILL CORPORATION**

LegaLink, Inc.

225 Varick Street
10th Floor
New York, NY 10014
Phone: 212.557.7400
Fax: 212.692.9171

CONFIDENTIAL
DORIAN G. WHEALDON - 6/7/2011

## Page 30

09:47:30 1 into the teams at that point. And I went
09:47:33 2 into the institutional team as an underwriter
09:47:37 3 from the audit area. The institutional team
09:47:46 4 was the team that dealt with the larger
09:47:48 5 companies that sold loans to RFC. I stayed
09:47:53 6 in underwriting until, I think, 2000, when I
09:47:58 7 went to client repurchase.
09:48:02 8 Q. Underwriting or audit?
09:48:03 9 A. Underwriting. I was only in the QC area
09:48:07 10 not -- maybe a year.
09:48:08 11 Q. About a year. Okay, so you went back to
09:48:11 12 underwriting around 1995?
09:48:13 13 A. Right.
09:48:13 14 Q. Okay. And, I'm sorry, when you went back
09:48:16 15 into underwriting what did you do?
09:48:17 16 A. Underwrote first mortgages, evaluated the
09:48:22 17 credit risk of the loans that the clients
09:48:24 18 were selling -- or trying to sell to
09:48:30 19 Residential Funding Corporation.
09:48:30 20 Q. Okay. And how long did you do that?
09:48:36 21 A. Until 2000.
09:48:38 22 Q. Okay. And then what?
09:48:40 23 A. I went into client repurchases.
09:48:44 24 Q. Okay. And what do you mean by, "Client
09:48:46 25 repurchases"?

## Page 31

09:48:47 1 A. Loans that were audited by the audit area
09:48:51 2 that was reformed and then sent to
09:48:54 3 repurchase, the repurchase area to go back to
09:48:58 4 the clients to request that they repurchase
09:49:01 5 the loan from RFC or the security due to a
09:49:04 6 breach of the reps and warrants that they
09:49:08 7 made to RFC.
09:49:17 8 Q. Okay. And how long did you do that job?
09:49:23 9 A. I did that until they formed the investor
09:49:26 10 repurchase portion under the -- the client
09:49:31 11 repurchase manager. And I don't know the
09:49:35 12 exact date. It was either the end of 2007 or
09:49:38 13 the first part -- or end of 2006 or the first
09:49:42 14 part of 2007, the -- that transferred from
09:49:46 15 what was structured finance to the repurchase
09:49:50 16 area.
09:49:56 17 Q. Okay. As we go through this if we see -- if
09:50:04 18 you see any documents that I show you that
09:50:06 19 can refresh your recollection as to when you
09:50:08 20 went into investor repurchase --
09:50:11 21 A. Uh-huh.
09:50:11 22 Q. -- can you let me know?
09:50:13 23 A. Yes.
09:50:13 24 Q. Okay. All right. So let's -- let's focus on
09:50:28 25 the years 2005 to 2007.

## Page 32

09:50:32 1 A. Okay.
09:50:32 2 Q. Okay. I take it part of that time you were
09:50:38 3 in loan repurchase and maybe part of that
09:50:42 4 time you were investor -- in investor
09:50:44 5 repurchase?
09:50:45 6 A. Yeah. The -- from 2005 and 2006, that -- the
09:50:51 7 majority of that would be client repurchase.
09:50:53 8 Q. Client repurchase. Okay. When you were in
09:50:58 9 client repurchase in those years what was
09:51:02 10 your -- what was your job responsibility?
09:51:05 11 A. To look at what audit had found, to look at
09:51:12 12 the contract with the client, the guidelines
09:51:17 13 to see if they were an actual breach, if it
09:51:19 14 was something that was negotiated, and then
09:51:21 15 put it back to the client if there was a
09:51:23 16 breach of the reps and warrants.
09:51:25 17 Q. Okay. When you're referring to,
09:51:27 18 "Guidelines," in that context you're talking
09:51:28 19 about RFC's guidelines?
09:51:29 20 A. Yes.
09:51:30 21 Q. And those guidelines as reflected in what's
09:51:33 22 called the client guide?
09:51:35 23 A. Client guide, uh-huh.
09:51:38 24 Q. You've got to say --
09:51:40 25 A. Yes.

## Page 33

09:51:41 1 Q. Okay. Did you have a title?
09:51:43 2 A. We were -- I was a senior repurchase account
09:51:46 3 manager, but that title changed numerous
09:51:50 4 times with restructuring.
09:51:53 5 Q. Okay. Who did you report to during those --
09:51:56 6 that 2005, 2006 time frame when you were in
09:52:01 7 client repurchase?
09:52:06 8 A. Judy Dallman.
09:52:06 9 Q. What was her --
09:52:08 10 A. She was the manager of the client repurchase
09:52:10 11 area.
09:52:16 12 Q. Did anyone report to you?
09:52:19 13 A. No.
09:52:20 14 Q. Were there other people in the client
09:52:21 15 repurchase area?
09:52:22 16 A. Yes.
09:52:22 17 Q. Okay. You don't have an organization chart
09:52:34 18 for this part of the -- of the company, so
09:52:35 19 I'm going to have to try to --
09:52:35 20 A. Okay.
09:52:37 21 Q. -- figure out an organization chart.
09:52:39 22    What division or group was client
09:52:40 23 repurchase in?
09:52:42 24 A. They were under -- at that point -- I'm
09:52:46 25 not -- I don't remember who Judy reported to.

9 (Pages 30 to 33)

CONFIDENTIAL
RC-9019_00039264

CONFIDENTIAL
DORIAN G. WHEALDON – 6/7/2011

## Page 50

10:12:10 1  repurchases, did you have any other
10:12:13 2  responsibilities between 2005 and the time
10:12:15 3  you went to investor repurchase?
10:12:17 4  A. No.
10:12:39 5  Q. Now, you mentioned that you would be involved
10:12:46 6  with client repurchases after you got --
10:12:49 7  after the audit group audited the loans, is
10:12:54 8  that --
10:12:54 9  A. Yes.
10:12:55 10  Q. Did I get that right?
10:12:58 11  A. Yes.
10:12:58 12  Q. All right. Once -- what -- once the audit
10:13:02 13  group had -- well, withdrawn.
10:13:05 14  Was the audit group in the same division
10:13:08 15  or group as client repurchase?
10:13:11 16  A. I'm not sure.
10:13:13 17  Q. The corporate -- in terms of the corporate
10:13:16 18  organizational chart, was audit in the same
10:13:20 19  sort of reporting line as client repurchase?
10:13:28 20  A. I know Will Thompson was the manager over the
10:13:36 21  audit group and he did report up to
10:13:38 22  Lisa Gess, but that's as far as I know.
10:13:42 23  Q. Okay. Okay. Once the -- once the audit
10:13:48 24  group made their findings with respect to a
10:13:52 25  particular loan, what would happen to that --

## Page 51

10:14:00 1  and assuming that they believed that the loan
10:14:03 2  should be repurchased, I take it they would
10:14:06 3  make a decision about whether the loan should
10:14:08 4  be repurchased?
10:14:08 5  MS. BATTLE: Objection to the form
10:14:09 6  of the question.
10:14:11 7  MR. HOFF: I'll withdraw that.
10:14:13 8  Let me try it again.
10:14:14 9  BY MR. HOFF:
10:14:15 10  Q. Did -- when audit reviewed -- audited the
10:14:18 11  loans, did audit reach some conclusion with
10:14:21 12  respect to whether the loan should be
10:14:23 13  repurchased?
10:14:24 14  A. Yes.
10:14:24 15  Q. All right. And what would happen after audit
10:14:35 16  made that determination?
10:14:37 17  A. They would send it over to the repurchase
10:14:40 18  area.
10:14:40 19  Q. Okay. And was -- was that a final decision
10:14:45 20  by audit and then the repurchase people were
10:14:50 21  just going to process?
10:14:51 22  A. No.
10:14:51 23  Q. All right. What would happen -- can you
10:14:53 24  describe the procedure for me?
10:14:55 25  A. You'd review the documentation that audit

## Page 52

10:15:00 1  secured, I guess would be the word, look at
10:15:04 2  the loan file itself, look at if there was
10:15:09 3  any negotiated commitments -- pardon me --
10:15:14 4  and whether it was an actual breach of the
10:15:16 5  reps and warrants or -- that they made to us
10:15:20 6  or not.
10:15:20 7  Q. Okay. And if it turns out that there was a
10:15:23 8  breach of the reps and warrants --
10:15:24 9  A. Then we would request repurchase from the
10:15:27 10  client.
10:15:27 11  Q. Okay. Who made the determination as to
10:15:30 12  whether or not -- well, withdrawn.
10:15:33 13  I take it that by the time the loan gets
10:15:41 14  from audit to -- to the repurchase group,
10:15:41 15  audit had made -- reached a conclusion that
10:15:44 16  there was a breach of reps and warrants; is
10:15:46 17  that fair?
10:15:47 18  MS. BATTLE: Objection.
10:15:49 19  BY MR. HOFF:
10:15:49 20  Q. You can answer.
10:15:50 21  MS. BATTLE: You can answer.
10:15:51 22  THE WITNESS: Oh. No, I
10:15:52 23  wouldn't -- I wouldn't categorize it that
10:15:55 24  way.
10:15:55 25  MR. HOFF: Okay.

## Page 53

10:15:56 1  BY MR. HOFF:
10:15:56 2  Q. How would you -- how would you describe it?
10:15:58 3  A. Audit always looked to just the client guide.
10:16:00 4  They didn't always necessarily look to what
10:16:03 5  commitments we had outstanding with that
10:16:11 6  client and the materiality, so sometimes they
10:16:16 7  were overturned and we would not pursue a
10:16:22 8  repurchase.
10:16:24 9  Q. Okay. And who would make the ultimate
10:16:31 10  decision as to whether a repurchase should be
10:16:34 11  pursued?
10:16:34 12  A. The repurchase account manager.
10:16:37 13  Q. Okay. So for the -- the accounts that you
10:16:38 14  were responsible for, you make the
10:16:39 15  final determination?
10:16:40 16  A. Right.
10:16:40 17  Q. Did someone have to approve your
10:16:43 18  determination?
10:16:44 19  A. No.
10:16:44 20  Q. And that would go -- that would be the same
10:16:46 21  for the other senior and other regular
10:16:48 22  repurchase managers?
10:16:49 23  A. Yes.
10:16:49 24  Q. Okay. So if the regular -- the non-senior
10:16:53 25  repurchase managers made a determination as

14 (Pages 50 to 53)

CONFIDENTIAL

RC-9019  00039269

CONFIDENTIAL
DORIAN G. WHEALDON - 6/7/2011

**Page 54**

```
10:16:57  1   to whether or not a repurchase should occur,
10:17:05  2   there wasn't any -- the senior people didn't
10:17:07  3   have to review that decision?
10:17:08  4   A.  Initially when they first started in the area
10:17:11  5      we would review their decisions and -- for
10:17:16  6      training to make sure that they were doing it
10:17:18  7      properly.
10:17:19  8   Q.  Okay.  But once -- that's a -- that's more of
10:17:22  9      a quality control issue, correct?
10:17:23 10   A.  Right.
10:17:24 11   Q.  So once you felt the -- the senior managers
10:17:27 12      felt that these people were trained, they had
10:17:30 13      the -- they had the final call, so to speak,
10:17:32 14      on the repurchase decision?
10:17:33 15   A.  Yes.  That's what the position was.
10:17:35 16   Q.  Okay.  Was there any circumstance where
10:17:40 17      someone senior to the repurchase managers and
10:17:43 18      senior repurchase managers would weigh in on
10:17:48 19      a repurchase decision?
10:17:50 20           MS. BATTLE:  Objection to the
10:17:51 21      form.
10:17:51 22           THE WITNESS:  If you needed -- you
10:17:54 23      know, if you weren't sure about something you
10:17:57 24      could go to the manager or someone else for
10:18:00 25      instruction or debate.  But on a normal
```

**Page 55**

```
10:18:08  1      process, no.
10:18:13  2           MR. HOFF:  Okay.
10:18:13  3   BY MR. HOFF:
10:18:14  4   Q.  Other than breaches of representations and
10:18:15  5      warranties, were there any other
10:18:17  6      circumstances under which RFC would request
10:18:23  7      that a loan seller repurchase a loan?
10:18:28  8   A.  We did start early payment default
10:18:32  9      repurchases, that might have been 2007, but
10:18:41 10      I'm thinking it actually may have been 2008.
10:18:44 11   Q.  Okay.  Was -- were you in -- at the time that
10:18:49 12      the early payment default repurchases started
10:18:53 13      were you still in client repurchase?
10:18:59 14   A.  I don't recall.
10:19:00 15   Q.  Okay.  And are you saying that the early
10:19:06 16      payment default repurchase requests were not
10:19:10 17      based upon a breach of representations and
10:19:13 18      warranties?
10:19:14 19   A.  That was -- pardon me -- that was a
10:19:17 20      representation and warranty.
10:19:18 21   Q.  Okay.  Okay.  I just want to be clear.  What
10:19:21 22      I tried to ask you --
10:19:23 23   A.  Oh, I'm sorry.
10:19:24 24   Q.  -- was whether there were any circumstances
10:19:28 25      other than a breach of a representation or
```

**Page 56**

```
10:19:30  1      warranty where RFC would seek a client
10:19:33  2      repurchase from a loan seller who sold a loan
10:19:36  3      to RFC?
10:19:37  4   A.  No.
10:19:38  5   Q.  Okay.  Now, you mentioned two circumstances
10:19:47  6      under which a repurchase manager may overrule
10:19:55  7      a -- an audit recommendation for repurchase,
10:20:02  8      negotiated commitments and materiality, was
10:20:06  9      that a fair characterization?
10:20:09 10   A.  Yes.
10:20:09 11   Q.  Were there any other circumstances under
10:20:12 12      which the repurchase manager would overrule a
10:20:18 13      repurchase recommendation by audit?
10:20:23 14   A.  Not that I can think of.
10:20:25 15   Q.  Okay.  When you reviewed the -- the -- the
10:20:43 16      loans, did you do a -- your own audit of
10:20:46 17      those loans?
10:20:48 18           MS. BATTLE:  Objection to the
10:20:49 19      form.
10:20:50 20           THE WITNESS:  No.
10:20:51 21           MR. HOFF:  Okay.
10:20:52 22   BY MR. HOFF:
10:20:53 23   Q.  Would it be fair to say that you just
10:20:54 24      reviewed the file that -- the -- withdrawn.
10:20:59 25           Would it be fair to say that you -- your
```

**Page 57**

```
10:21:01  1      procedure was to review the analysis done by
10:21:04  2      the auditor and then check to see if there
10:21:07  3      were any separate agreements that RFC had
10:21:13  4      with the particular loan seller?
10:21:15  5   A.  Yes.
10:21:16  6   Q.  Okay.  Were there occasions where you would
10:21:20  7      obtain additional information that was not in
10:21:24  8      the auditor's analysis?
10:21:27  9   A.  Yes.
10:21:28 10   Q.  Can you describe the circumstances under
10:21:30 11      which that would happen?
10:21:31 12   A.  We would look at servicing notes to see if we
10:21:35 13      could find out what the reason was for
10:21:37 14      default if there was a default, to see if
10:21:42 15      the -- a BPO had been done to support or not
10:21:46 16      support the value.  Any other questions we
10:21:52 17      usually took back to audit to do additional
10:21:55 18      research themselves.
10:21:59 19   Q.  Okay.  You mentioned a BPO.  What is that?
10:22:04 20   A.  Broker's price opinion.
10:22:06 21   Q.  Okay.  And where would you get a BPO?
10:22:11 22   A.  The servicing area obtained BPO's when the
10:22:14 23      loan went into foreclosure.
10:22:16 24   Q.  And what exactly is a BPO?  What is it,
10:22:21 25      broker's price --
```

15 (Pages 54 to 57)

CONFIDENTIAL                                        RC-9019_00039270

CONFIDENTIAL
DORIAN G. WHEALDON - 6/7/2011

## Page 58

10:22:23 1    A. Price opinion. It's just a broker familiar
10:22:24 2    with the area. I don't even know if they do
10:22:29 3    more than a drive-by. Sometimes there were
10:22:32 4    interior BPO's done and try to determine what
10:22:34 5    the current value of the property was.
10:22:34 6    Q. It's --
10:22:37 7    A. It's just an opinion of value.
10:22:40 8    Q. Well, is it an appraisal?
10:22:42 9    A. No.
10:22:43 10    Q. Okay. Because an appraisal is also an
10:22:45 11    opinion of value, right?
10:22:46 12    A. A more detailed opinion of value.
10:22:49 13    Q. So how would you get the BPO? How would RFC
10:22:55 14    obtain a BPO?
10:22:56 15    A. The servicing area would obtain the BPO and
10:23:00 16    we could request a copy.
10:23:01 17    Q. Okay. And you said you looked at servicing
10:23:04 18    notes?
10:23:04 19    A. Yes.
10:23:05 20    Q. What -- when you say, "Servicing," what are
10:23:08 21    you referring to?
10:23:09 22    A. The actual collection of the payments.
10:23:13 23    There's an area that services the loan,
10:23:17 24    brings in the money, disburses the money out
10:23:19 25    to whoever it needs to be disbursed to and

## Page 59

10:23:25 1    they're in contact with the borrowers during
10:23:27 2    the process if there's reason to be in
10:23:29 3    contact with the borrowers.
10:23:30 4    Q. Okay. And so there was -- just so we're
10:23:35 5    clear, within RFC was there a -- a group or a
10:23:39 6    unit that was responsible for servicing a
10:23:41 7    loan?
10:23:41 8    A. Yes.
10:23:42 9    Q. And that's the group that you would get
10:23:45 10    that -- that information from?
10:23:47 11    A. Right.
10:23:47 12    Q. Okay. And when you refer to servicing notes,
10:23:50 13    what are you talking about?
10:23:51 14    A. Notes that they make into the servicing
10:23:54 15    system regarding conversations that they had
10:23:57 16    or what's been going on with the loan -- the
10:24:00 17    loan itself, not the loan file.
10:24:02 18    Q. Okay. So there was some -- some kind of
10:24:05 19    database that -- in which the servicing group
10:24:09 20    would enter information about the status of
10:24:12 21    the loan?
10:24:13 22    A. Yes.
10:24:13 23    Q. And you had direct access to that?
10:24:16 24    A. Yes.
10:24:17 25    Q. How did you access that?

## Page 60

10:24:18 1    A. Through the computer.
10:24:21 2    Q. Was there a particular file or program that
10:24:25 3    you utilized?
10:24:26 4    A. It was called LSAM and Capstead.
10:24:29 5    Q. Can you spell that?
10:24:31 6    A. Just the initials, L-S-A-M, and Capstead,
10:24:36 7    C-A-P-S-T-E-A-D.
10:24:40 8    Q. Okay. Were those two different databases?
10:24:43 9    A. They were kind of integrated. At one point
10:24:46 10    they were separate and I think they were
10:24:47 11    integrated into one.
10:24:48 12    Q. Okay.
10:24:49 13    A. Pardon me.
10:24:49 14    Q. And there was just some icon on your computer
10:24:55 15    you could go to?
10:24:56 16    A. Yes.
10:24:56 17    Q. Okay. And you just clicked onto that and --
10:25:00 18    A. And entered a password.
10:25:01 19    Q. And entered a password and then you would try
10:25:04 20    to search for a loan number?
10:25:09 21    A. Uh-huh.
10:25:09 22    Q. And what type of information were in the
10:25:12 23    servicing loans?
10:25:13 24    A. There would be payment history of the loan
10:25:15 25    itself, any contact they had with the

## Page 61

10:25:18 1    borrower, who the foreclosure attorney was if
10:25:22 2    it was in foreclosure, when it went to sale,
10:25:24 3    if it sold, if it was a short sale. Anything
10:25:28 4    to do with the loan itself, the...
10:25:32 5    Q. Okay. Did you -- and did you actually talk
10:25:35 6    to people in the servicing group or you just
10:25:37 7    relied on the notes?
10:25:39 8    A. We did talk to them, but usually not about a
10:25:46 9    specific loan.
10:25:47 10    Q. Okay. The servicing group was located in
10:25:51 11    Dallas?
10:25:52 12    A. The people that we usually talked to were in
10:25:56 13    master servicing and they were in California.
10:25:59 14    Q. Okay. Where in California?
10:26:01 15    A. Universal City.
10:26:03 16    Q. Okay. Interesting. If you've been to
10:26:13 17    Universal City you'd understand my reaction.
10:26:18 18    That's where Universal Studios is.
10:26:21 19    A. Oh, okay.
10:26:22 20    Q. And when I -- you know, when I asked you
10:26:28 21    about your procedure for reviewing loans from
10:26:31 22    QA and you said you reviewed what they did,
10:26:35 23    but didn't audit, was that similar to the
10:26:38 24    procedure that the other senior product --
10:26:41 25    senior repurchase managers and the regular

16 (Pages 58 to 61)

CONFIDENTIAL                                                    RC-9019_00039271

CONFIDENTIAL
DORIAN G. WHEALDON - 6/7/2011

**Page 122**

```
12:02:51  1      they reported to -- no, I think they reported
12:02:55  2      to Brenda Maze, that looked at fraudulent
12:03:03  3      loans.
12:03:03  4   Q. You mean fraud committed by borrowers or the
12:03:07  5      lenders -- or the sellers, rather?
12:03:10  6   A. Committed by anyone.
12:03:11  7   Q. By anyone. Okay.
12:03:12  8   A. There was some condominiums in Chicago or
12:03:15  9      something. I don't know.
12:03:16 10   Q. Okay. So Mr. Johnson says to Suzanne Li, "It
12:03:20 11      has come to my attention that Tim Witten and
12:03:23 12      group put together a thorough analysis of a
12:03:25 13      large group of repurchased loans in the past
12:03:27 14      few days, perhaps it will include loan level
12:03:29 15      comments for some of the loans on this list?"
12:03:31 16      That's a question. Do you see that?
12:03:32 17   A. Yes.
12:03:33 18   Q. Okay. Do you know who Tim Witten is?
12:03:37 19   A. I know the name, but I don't know what his
12:03:40 20      position was.
12:03:40 21   Q. Okay. In looking at the -- this e-mail and
12:03:47 22      the -- the memo in the back that was authored
12:03:50 23      by Ms. Dallman and Mr. Witten, does that
12:03:53 24      refresh your recollection that there was an
12:03:58 25      analysis done relating to an increase in
```

**Page 123**

```
12:04:02  1      loans subject to repurchase?
12:04:05  2   A. I was not involved in the analysis and I -- I
12:04:09  3      have no recollection.
12:04:11  4   Q. Okay.
12:04:11  5   A. You would probably need to ask Judy Dallman.
12:04:14  6   Q. I intend to and I just want to know what you
12:04:17  7      know.
12:04:18  8   A. Sure.
12:04:18  9   Q. Okay. Now, taking a look at the -- the memo
12:04:26 10      itself, the Dallman, Witten memo --
12:04:30 11   A. Okay.
12:04:30 12   Q. -- did you have -- do you recall having any
12:04:38 13      involvement in -- in the analysis that was
12:04:42 14      done relating to this memo?
12:04:44 15   A. No, I do not recall --
12:04:46 16   Q. Okay.
12:04:47 17   A. -- being involved in this.
12:04:48 18   Q. Okay. In the first paragraph of the memo
12:05:00 19      Ms. Dallman and Mr. Witten indicate
12:05:04 20      that 85 percent of the referrals for loan
12:05:08 21      repurchase come from the -- either the
12:05:11 22      quality audit or the quality investigations
12:05:13 23      groups. Do you see that?
12:05:14 24   A. Yes.
12:05:14 25   Q. Is that consistent with your understanding
```

**Page 124**

```
12:05:17  1      about the 85 percent?
12:05:18  2   A. I cannot address the percentage.
12:05:20  3   Q. Is it -- the large majority of loans --
12:05:25  4   A. I would say the majority came from there, but
12:05:27  5      I don't know what the percentage is.
12:05:28  6   Q. Okay. And the last sentence of that first
12:05:32  7      paragraph says that, "The predominant
12:05:34  8      findings are related to misrepresentations of
12:05:36  9      loan level information, i.e., employment,
12:05:40 10      income, occupancy, undisclosed debt and
12:05:43 11      appraised value." Do you see that?
12:05:44 12   A. Yes.
12:05:44 13   Q. Is that conclusion consistent with your
12:05:47 14      recollection of the predominant types of
12:05:49 15      findings that audit was making with respect
12:05:55 16      to loans being recommended for repurchase in
12:05:59 17      the late 2006 time frame?
12:06:03 18   A. Yes, that would appear to be correct.
12:06:05 19   Q. On the second page of the memo with the last
12:06:57 20      three Bates numbers 836, in the -- there's
12:07:00 21      a -- there's a section under the first box
12:07:10 22      called, "Repurchase ended, no longer being
12:07:15 23      pursued." Do you see that?
12:07:16 24   A. Yes.
12:07:16 25   Q. Now, were there circumstances where there --
```

**Page 125**

```
12:07:21  1      well, do you know -- do you understand what
12:07:22  2      she's referring to by, "Repurchase ended, no
12:07:25  3      longer being pursued"?
12:07:27  4   A. Yes.
12:07:27  5   Q. What does that mean?
12:07:28  6   A. That means that for a number of different
12:07:31  7      reasons that the client repurchase is not
12:07:34  8      being pursued, it probably was rescinded.
12:07:37  9   Q. Okay. Is that a situation where the
12:07:42 10      repurchase managers would agree with an audit
12:07:46 11      recommendation for repurchase, but for
12:07:49 12      whatever reason the effort to seek repurchase
12:08:00 13      terminated?
12:08:00 14   A. Okay. I'm confused by your question.
12:08:03 15   Q. Okay. I'm trying -- here, let me try it
12:08:07 16      again. I'm trying to understand whether
12:08:09 17      this, "Repurchase ended, no longer being
12:08:11 18      pursued," refers to a situation where audit
12:08:14 19      recommended repurchase and the repurchase
12:08:16 20      manager overruled or whether it's a situation
12:08:19 21      where the repurchase manager agreed with the
12:08:23 22      repurchase recommendation, but for whatever
12:08:26 23      reason the repurchase never was followed
12:08:29 24      through.
12:08:31 25   A. No, it -- it would not be that it wasn't
```

32  (Pages 122 to 125)

CONFIDENTIAL                                    RC-9019  00039287

CONFIDENTIAL
DORIAN G. WHEALDON - 6/7/2011

Page 126

```
12:08:35 1    followed through. Normally what would have
12:08:37 2    happened was a repurchase request went to the
12:08:40 3    client, the client may have provided
12:08:42 4    additional documentation that alleviated the
12:08:45 5    concern and the repurchase would be
12:08:47 6    rescinded. It could be that there was a
12:08:50 7    settlement made with them where we
12:08:54 8    repurchased -- they repurchased so many, we
12:08:57 9    offset with so many. There were negotiations
12:09:01 10   that also went on.
12:09:02 11   Q. Okay.
12:09:03 12   A. I don't know under what context she's
12:09:07 13   reporting this, so I don't know what she's
12:09:11 14   including in her numbers.
12:09:13 15   Q. Okay. But --
12:09:17 16   A. It kind of says here.
12:09:18 17   Q. Okay. But do you understand this to not take
12:09:22 18   into -- withdrawn.
12:09:23 19       Do you understand what she's referring to
12:09:24 20   here as being a situation where the
12:09:27 21   repurchase management agreed with the
12:09:32 22   repurchase recommendation of audit in the
12:09:35 23   first instance as opposed to overruling the
12:09:39 24   repurchase recommendation?
12:09:43 25   A. She probably could answer it better. But
```

Page 127

```
12:09:46 1    just reading this, it would look like they
12:09:55 2    were ones pursued and a decision later made
12:09:59 3    not to -- like, "Seller out of business,"
12:10:01 4    there's no one to pursue. "Client
12:10:03 5    accommodation," would be where we may have
12:10:06 6    entered into some negotiations to split
12:10:08 7    losses, whatever. "Pay off," is
12:10:11 8    self-explanatory. So I don't know what all
12:10:14 9    she took into consideration to do this.
12:10:16 10   Q. Okay. Well, let's talk about client
12:10:18 11   accommodations. I had asked you earlier if
12:10:20 12   you recalled any situation where a repurchase
12:10:29 13   determination that was made by the repurchase
12:10:31 14   manager was not completed because of
12:10:38 15   considerations for client accommodations. Do
12:10:41 16   you recall that?
12:10:41 17       MS. BATTLE: Objection. That
12:10:42 18   wasn't what you asked her before.
12:10:44 19   BY MR. HOFF:
12:10:45 20   Q. You can answer.
12:10:46 21   A. I think it's terminology.
12:10:48 22   Q. Okay.
12:10:48 23   A. I would call it a negotiation and not an
12:10:51 24   accommodation.
12:10:51 25   Q. Uh-huh.
```

Page 128

```
12:10:52 1    A. We never just didn't pursue because we liked
12:10:56 2    the client. That to me would be the
12:10:59 3    accommodation.
12:11:00 4    Q. Okay.
12:11:01 5    A. A negotiation where we asked for a number of
12:11:05 6    repurchases and based on financials provided
12:11:07 7    from the client that, you know, we would
12:11:13 8    bankrupt them if they repurchased all of
12:11:15 9    them, maybe it's a settlement over time or a
12:11:18 10   payment over time, there would be
12:11:20 11   negotiations with that client. I don't
12:11:22 12   really consider that an accommodation.
12:11:24 13   Q. Okay. Were there circumstances where the
12:11:32 14   loans would be repriced to reflect the --
12:11:41 15   deviation from the -- the terms under which
12:11:43 16   RFC bought the loan?
12:11:46 17   A. That could happen. I don't know that it
12:11:49 18   could happen on a large basis. But in
12:11:52 19   general that -- that may happen.
12:11:54 20   Q. Okay. If you look at the -- in the box on
12:11:57 21   the first line under, "Issues resolved," it
12:11:59 22   says --
12:12:00 23   A. Right.
12:12:00 24   Q. -- one of the -- one of the -- one of the
12:12:05 25   reasons for resolution of the -- the
```

Page 129

```
12:12:10 1    repurchase request was repriced. Do you see
12:12:13 2    that?
12:12:13 3    A. Yes.
12:12:14 4    Q. And that means that -- is that -- did you
12:12:17 5    understand that to mean that the -- that the
12:12:19 6    loans were repriced -- the loans that were
12:12:23 7    deviations from the -- from the terms under
12:12:25 8    which RFC bought the loan, were repriced to
12:12:28 9    reflect the risk of that determination -- of
12:12:30 10   that deviation, rather?
12:12:33 11   A. Again, I can't -- that would be my
12:12:36 12   understanding, but I have no idea what
12:12:39 13   context she was using.
12:12:40 14   Q. Okay. But in your experience that happened?
12:12:42 15   A. On a limited basis.
12:12:43 16   Q. Okay. And how do you know it was on a
12:12:47 17   limited basis?
12:12:47 18   A. I guess just from the ones that I was
12:12:50 19   involved in.
12:12:50 20   Q. Okay. That raises a good question.
12:12:54 21       Did you have any understanding as to what
12:12:57 22   the -- what repurchase activities were being
12:13:04 23   undertaken by the other repurchase managers
12:13:07 24   in the group?
12:13:08 25   A. No.
```

33 (Pages 126 to 129)

CONFIDENTIAL                                                        RC-9019  00039288