# Exhibit 51

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------

In re:

RESIDENTIAL CAPITAL, LLC, et al.,

Debtors

---------------------------------------------

Case No. 12-12020 (MG)

Chapter 11

Jointly Administered

---------------------------------------------

DEPOSITION OF J.F. MORROW

DATE: December 17, 2012

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911  Fax: 212-273-9915

TRANSCRIPT of the deposition, said deposition being conducted pursuant to Rules Governing Civil Practice in the Superior Court of New Jersey, by and before MARK IUZZOLINO, Certified Shorthand Reporter, License No. X101103, at the offices of Morrison Foerster, LLP, 1290 6th Avenue, New York, NY, on December 17, 2012, commencing at 9:18 a.m.

1   say, "We lost our title policy.  Please provide

2   us a new one," that really is a remedial-type

3   thing.  Most of the loans were closed by title

4   companies, and they filed the deed of trust

5   themselves.  So it's easily remedial.  It's not

6   really a material defect when these loans are

7   as old as they are.

8        Q.   Can you give me another example of a

9   defect that you'd consider not to be material?

10       A.   A flood insurance.  Same as your

11  hazard insurance:  If flood insurance is

12  required, they'll force-place -- ResCap would

13  force-place flood insurance.

14       Q.   What other examples of nonmaterial

15  defects?

16       A.   A missing deed of trust would be one

17  because these loans are old.  We have a title

18  insurance that guarantees the position.  And

19  you can go to the county recorder and get a

20  copy of it, so it's not as easily remedial.

21       Q.   Can you give me other examples of

22  defects that you consider not to be material?

23       A.   Those are the four that were

24  utilized.

25       Q.   In any event, it's your opinion that

1   for the 313 loans cited in your opinion, those

2   loans had defects that were sufficiently

3   material that, in your judgment, they

4   materially and adversely affected the risk of

5   the loan?

6        A.   Yes.

7        Q.   Sir, do you know if ResCap's board of

8   directors was aware of all of the lawsuits by

9   MBIA and FGIC and others that alleged much

10  higher breach rates than you found?

11            MR. DAILEY:  Objection.

12            MR. BULL:  Objection.

13       A.   No.

14       Q.   Did you make any effort to understand

15  what the board of directors had before it when

16  it decided to make the settlement that's at

17  issue here?

18       A.   No.

19       Q.   Do you have any view about what the

20  plaintiffs in this matter would have alleged

21  their material defects to be if they had filed

22  a complaint?

23            MR. BENTLEY:  What plaintiffs are you

24       talking about?

25       Q.   Sir, go ahead.

 1      A.   Yes.

 2      Q.   Are you prepared to testify?

 3      A.   If asked.

 4      Q.   Well, are you planning on it?

 5           MR. BENTLEY:  Objection to form.

 6      A.   As far as I know, yes.

 7      Q.   What you'll tell the judge is that

 8  28.74 percent of the loans had material defects

 9  and were not in compliance with ResCap's

10  guidelines --

11           MR. BENTLEY:  Objection.

12      Q.   -- right?

13           MR. BENTLEY:  Objection to form.

14      A.   What I will tell or explain to the

15  judge is my opinion, which is much more

16  complete than what you stated.

17      Q.   The punchline is, 28.74 percent of

18  the loans had material defects.  Right?

19           MR. BULL:  Objection.

20           MR. BENTLEY:  Objection.

21      A.   Of 1,089 loans.  I'm not a

22  statistician as far as applicability to any

23  other portfolio other than this.

24      Q.   You'll say that those 313 loans

25  didn't comply with ResCap's guidelines.  Right?

1      A.   That were material defective loans,
2  yes.
3      Q.   And you'll say that they didn't
4  comply with the prospectus supplements
5  applicable to those securities.  Correct?
6      A.   No, I will not go that far because
7  that's not what I said here.
8           What I will say is that based on the
9  description of the underwriting section of the
10 ProSups, it did not meet that.  I'm not the
11 complete --
12     Q.   Okay.  That's helpful.  Thank you.
13          So back to that heading on page 64.
14 Do you have that in front of you?
15     A.   Yes.
16     Q.   You use the phrase, "appropriately
17 and objectively re-underwritten."
18          Do you see that?
19     A.   Yes.
20     Q.   Okay.  Those are your 20 reviewers?
21 Right?
22     A.   Yes.
23     Q.   You obtained them from -- what was
24 the name of the group, Analytic --
25     A.   Focus.

1    A.    Well, yes, the originator's

2    guidelines if they're different than ResCap

3    guidelines but applicable to the loan.  So

4    those were the ones that they would look at.

5        Q.    Did your reviewers take any steps to

6    reverify income?

7        A.    No.

8        Q.    Did they take any steps to run a

9    title report?

10       A.    Beyond the scope we were asked to do.

11       Q.    Did your reviewers check to see if

12   the property or the security was encumbered by

13   other mortgages or liens?

14       A.    Beyond the scope we were asked to

15   look at.

16       Q.    Did your reviewers take any steps to

17   verify owner occupancy?

18       A.    Other than being obvious in the loan

19   file, no.

20       Q.    They didn't go out, for example, and

21   do an Internet search or a tax record search or

22   something to see what the owner was saying was

23   his principal place of occupancy?

24       A.    Correct, we did not.

25       Q.    Did your reviewers run credit reports

1   on the borrowers?

2        A.   No.

3        Q.   They didn't try to check or verify

4   FICO scores, for example?

5        A.   No.  And there's a real question

6   whether you have it under privacy acts whether

7   you could do what you're saying.

8        Q.   Did you try to reappraise any of the

9   properties?

10       A.   No.

11       Q.   Did you run any automated valuation

12  model work on any of the properties?

13       A.   No.

14       Q.   Was there a reason why you didn't do

15  more on appraisals?

16       A.   In what sense?

17       Q.   Well, you said that your people

18  confirmed that the loans conform to the

19  requirements in the industry when it comes to

20  appraisal.

21       A.   Right.

22       Q.   How did they do that?

23       A.   They reviewed either the appraisal,

24  or the AVM, or whatever was used as that met

25  the criteria for ResCap and that there was