# Exhibit 55



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
10 East 40th Street New York, NY 10016
www.rrmsco.com

Brian Lin
Managing Director
RRMS Advisors
10 East 40th Street
New York, NY 10016

June 7, 2011

The Bank of New York Mellon
One Wall Street, 11th Floor
New York, NY 10286

Subject:   Opinion Concerning Contemplated Settlement Amount for 530 Trusts

Gentlemen:

Attached please find my independent opinion regarding the contemplated settlement amount for 530 Trusts rendered at the request of your counsel, Mayer Brown.

Should you have any question, please feel free to contact me at (212) 843-9413.

Yours truly,

*[signature: Brian Lin]*

Brian Lin
Managing Director



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
*Settlement Amount Opinion*
*Prepared for: The Bank of New York Mellon*
*June 7, 2011*

## Engagement

The Bank of New York Mellon (BNYM) currently acts as Trustee on behalf of the named Trusts and respective investors. In this capacity, BNYM has engaged me to render an independent professional opinion relating to the settlement amount of 530 Trusts (Settlement Portfolio). The underlying collateral are comprised predominately of Alt "A", Subprime, Prime and Pay-Option Arm with a diminutive amount of HELOC and Second Lien residential mortgage loans.

## Gibbs & Bruns Spreadsheet

## Opinion Summary

I, in conjunction with selected RRMS Advisors personnel under my supervision, have performed a review of the "All Consortium Deals" summarized in the spreadsheet provided by the Investor Group represented by Gibbs & Bruns (Investor Group). Based on the review performed and discussions with representatives from the Investor Group, the presentation appears reasonable with respect to the overall methodology utilized in calculating the settlement amount.

The pros and cons of their calculations are as follows:
**Pros:**
- Obtaining collateral information from a publicly available third party source.
- Stratification of aggregate population according to performance status.
- Logical calculations in order to determine projected losses.
- Logical calculations and utilization of "Breach Rate" and "Success Rate" haircuts.

**Cons:**
- Questionable default and loss severity assumptions.
- Aggressive "Breach Rate" and "Success Rate" assumptions.

**Assumptions:**
- Collateral information is as of the February 2011 remittance reports, and has been obtained from Intex.

## Detailed Opinion

Using certain assumptions obtained from Intex, Bank of America (BofA) mortgage research, along with a forensic underwriting review performed by an independent third party, the Investor Group has estimated BofA's exposure amount under various scenarios.

The first step in the methodology was to stratify the Settlement Portfolio on the basis of collateral type and performance status. Up to date balances were obtained from Intex with respect to non-delinquent loans as well as loans greater than 60 days delinquent (which also included the population of loans in bankruptcy, foreclosure and REO). The population of previously modified current loans was also

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

1

RC-9019_00003925



**RRMS ADVISORS**
*Tactical Mortgage Strategists*

Settlement Amount Opinion
Prepared for: The Bank of New York Mellon
June 7, 2011

obtained from LoanPerformance, courtesy of MetLife. Please note that without verification, I have accepted the balances presented within each stratification bucket as being correct, and have drawn a conclusion accordingly. In addition, categorizing the pool on this basis proved logical since it allowed for the application of various default and loss assumptions to the different performance status buckets of the portfolio.

At the core of the analysis was the utilization of default and loss severity assumptions. Loss severity, the percentage of lost principal when a loan is foreclosed or sold, was directly obtained from Intex by utilizing data for the three most recent months (averaging 66% for the entire Settlement Portfolio). While based on historical information, this data point can be considered limited since it presents a very short-term time period sample. There is no guarantee that this degree of loss severity will be consistent going forward and based on longer-term trends observed in research reports and other publications, severity rates have in actuality been lower. As for default rates, this particular data was in part taken from Amherst and BofA mortgage research reports. For the population examined in these reports, it was projected that the default rate for loans over 60 days delinquent was approximately 90%. Using this data, a default rate of 50% was derived for the remaining population of the portfolio which represented the current non-modified loans (including loans 30 days delinquent). Furthermore, a 90% default rate assumption was made for previously modified current loans. Although I categorize these calculations as logical, I did not verify any assumptions used to calculate the projected loan default and loss severity figures of the underlying collateral in the research reports.

Default and loss severity rates were then applied to each performance status bucket of the Settlement Portfolio, resulting in a calculation of aggregate actual/projected losses. The actual/estimated loss figure was derived as follows: The sum of (a) actual realized losses ($25B -- obtained from Intex), (b) projected losses on loans 60+ days delinquent as well as on previously modified current loans ($50.4B), and (c) projected losses on non-modified current loans (including loans 30 days delinquent) ($32.4B) totals $107.8B. While the assumptions used to project losses can be debated, the mathematical formulas utilized to obtain the results are clear-cut and unquestionable.

After actual and estimated losses were calculated, certain haircuts were applied. The first, "Breach Rate", is the percentage of representation & warranties breached for defected loans in the portfolio; not every loan experiencing a loss was covered by the representations & warranties given to private label securities. As a result, this haircut represents the percentage of loans found defective which were submitted to BofA for repurchase. There is a possibility that BofA may offer resistance relating to some of these loans, resulting in a buyback rejection; thus the "Success Rate" represents the percentage of loans submitted to BofA which would actually be repurchased. The product of (a) the actual/estimated losses of the Settlement Portfolio, (b) the "Breach Rate", and (c) the "Success Rate", represents the expected settlement amount. In my opinion, the calculation and utilization of these particular haircuts is logical since BofA's willingness and legal obligation to repurchase certain loans represents the largest hurdle from Investor Group's perspective.

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

2

RC-9019_00003926



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
Settlement Amount Opinion
Prepared for: The Bank of New York Mellon
June 7, 2011

The "Breach Rate" and "Success Rate" were obtained by a third party who completed a forensic underwriting project of a non-agency whole loan portfolio. This review consisted of approximately 250,000 loans of similar product types, and of the same origination period as the Settlement Portfolio. It was observed that there was an instance of a breach in approximately 60% of the loans examined and the actual repurchase rate of these loans by the originator ranged between 50% and 75%. I was not able to verify these figures since I was not given access to any documents or specifics pertaining to this underwriting review. However, based on the limited amount of publicly available information and my industry knowledge, it is my opinion that these percentages are too high.

Utilizing a range of "Breach Rates" and "Success Rates", expected settlement amounts were calculated for each performance status bucket of the Settlement Portfolio. Using BofA's haircut assumptions provided by Investor Group, the settlement amount totals $15.5B. Using assumptions from the Investor Group's analysis which are relatively more severe, the totals range from $27.0B to $52.6B.

In conclusion, although I classify certain assumptions as disputable to some degree, the overall methodology utilized is reasonable for the purposes of Investor Group's presentation.

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

3

RC-9019_00003927



**RRMS ADVISORS**
*Tactical Mortgage Strategists*

Settlement Amount Opinion
Prepared for: The Bank of New York Mellon
June 7, 2011

## April 11, 2011 BofA Presentation

### Opinion Summary

I, in conjunction with selected RRMS Advisors personnel under my supervision, have performed a review of the "Presentation to Gibbs & Bruns" dated April 11, 2011 provided by BofA. Based on the review performed and discussions with representatives from BofA, the presentation appears reasonable with respect to the overall methodology utilized in calculating the settlement amount.

The pros and cons of their calculations are as follows:
### Pros:
  - Utilized a reference mortgage pool representing actual repurchase experience.
  - Reasonable approach in calculating "Defect Rates" for the Settlement Portfolio.

### Cons:
  - Comparison basis between conforming and non-conforming portfolios.
  - Inconsistent methodology in calculating certain percentages for the subprime portion of the Settlement Portfolio.
  - Lack of historical data to confirm BofA's "Defect Rates" and "Lesser Representation" haircut assumptions.

### Assumptions:
  - All collateral information is as of March 31, 2011.

### Detailed Opinion

Using certain assumptions based on the collateral performance of a GSE portfolio originated between 2004 and 2008, BofA has estimated their exposure as being approximately $4.0B with respect to the current negotiations with the Investor Group. In comparing the severely delinquent and defaulted populations of the GSE and the Settlement Portfolio (which include loans 180+ days delinquent), four separate haircuts were applied to their analysis in order to support the proposed settlement amount. I believe it would have been easier to compare two analogous portfolios rather than to utilize a comparison between conforming and non-conforming portfolios. However, due to the lack of available information, I am of the view that utilization of a GSE portfolio based on actual repurchase experience is a proper alternative with appropriate adjustments.

Please note that without verification, I have accepted the balances for each stratification bucket as being correct.

The first haircut in their analysis is the "Defect Rate", which represents the percentage of GSE buyback requests experienced by BofA. This information was available for the entire GSE portfolio, was categorized for each product type and further stratified by the number of payments the borrower has

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

4

RC-9019_00003928



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
*Settlement Amount Opinion*
*Prepared for: The Bank of New York Mellon*
*June 7, 2011*

made. The "Defect Rates" for each bucket were applied to the corresponding portion of the Settlement Portfolio, and were re-weighted according to the balance of the Investor Group loans found within each bucket. Given that the subprime portion of the GSE portfolio was insignificant, these particular "Defect Rates" were not simply assigned to the subprime portion of the Settlement Portfolio, but rather were determined as described below.

In order to calculate the "Defect Rates" of the subprime portion of the Settlement Portfolio, the balances of the two aggregate portfolios were similarly stratified according to documentation type and the number of payments made by the borrower. For each of these buckets, the "Defect Rates" of the GSE portfolio were calculated based on actual loan performance. As before, these rates were then assigned to the corresponding bucket of the aggregate Settlement Portfolio, and weighted average "Defect Rates" were calculated which were assigned to the subprime portion of the Settlement Portfolio. With "Defect Rates" available for each product type, these percentages were obtained according to the number of payments made by borrowers and for the aggregate Settlement Portfolio. I find this approach for determining the "Defect Rates" of the Settlement Portfolio to be a reasonable and logical first step in their methodology.

Taking the "Defect Rates" for each bucket according to the number of payments made by the borrower, a factor was then applied to each figure to account for expected claims for the forward unsettled portion with Fannie Mae. Relatively more loans will be bought back currently found in the bucket representing borrowers making more than 36 payments compared to those who have made between zero and 12 payments; thus the rationale for applying a higher factor to the former. In my opinion, the application of a factor to the calculated "Defect Rates" is reasonable, although I cannot validate the accuracy of each individual factor due to a lack of publicly available information.

The next haircut was based on "Lesser Representation", since the GSE portfolio received stronger reps & warranties because borrower misrepresentation would not be a basis for a claim within the Settlement Portfolio. Once again, stratifying the balances of the GSE portfolio according to product type and the number of payments made by the borrower, a figure for each bucket was calculated which represented the percentage of GSE loans repurchased due to borrower misrepresentation. In also stratifying the Settlement Portfolio in a similar fashion, the "Lesser Representation" haircuts for each bucket were applied to the corresponding portion of the Settlement Portfolio, and were re-weighted according to the balance of the Investor Group loans found within each bucket. As before, since the subprime portion of the GSE portfolio is insignificant, the Alt-A "Lesser Representation" haircuts were simply applied to the subprime portion of the Settlement Portfolio. I find this approach for determining the "Lesser Representation" haircut of the Settlement Portfolio to be reasonable. Please note that I find an inconsistency in their methodology pertaining to the manner in which figures were derived for the subprime portion of the GSE portfolio. Initially, while a complex analysis was undertaken in order to assign "Defect Rates" to the subprime portfolio, the Alt-A "Lesser Representation" haircuts were just assumed for the subprime portion of the Settlement Portfolio without any further calculations. The

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

5



**RRMS ADVISORS**
*Tactical Mortgage Strategists*
Settlement Amount Opinion
Prepared for: The Bank of New York Mellon
June 7, 2011

inconsistent methodology is still acceptable given the similarity of the two product types for these two attributes.

The "Lesser Representation" haircut is decreased since there could be instances within the Settlement Portfolio where other defects exist for a loan in addition to borrower misrepresentation. Based on BofA's experience, approximately half of private label loans with borrower misrepresentations still need to be repurchased because of these additional defects. This explains the 50% adjustment for each of the "Lesser Representation" haircuts. Based on my industry experience, the application of a factor is reasonable since repurchased loans will possibly have multiple simultaneous breaches. However, I cannot validate the accuracy of applying a factor of exactly 50%.

The third haircut is "Causation", which is based on whether there were material and adverse underwriting defects for the loans. In the case where only 0 - 12 payments were made by the borrower, it can be implied 100% of the time that faulty underwriting contributed to the loan default. These percentages were reduced as more payments were made on the loans, the logic being that the default for these loans was due to some factor other than the underwriting process (i.e., a borrower job loss). Different haircuts were applied to the various product types due to their distinctive payment requirements. A larger causation factor was applied to an option ARM making the same number of total payments as was applied to a fully amortizing loan, since the required payments are much lower. Thus, if the two loan types default after the same number of payments, there is a higher probability of underwriting irregularities with the option ARM. The percentages for Interest-Only loans simply take the average of the corresponding fully amortizing and option ARM percentages. Given that the amount of publicly available information is limited, the accuracy of each of these haircuts is difficult to quantify. In part for these reasons, I did not take these haircuts into consideration for my calculation.

The final haircut is "Presentation", which attempts to quantify whether senior certificate holders would commit to the expenses and time requirement to take action based on the projected amount of losses they would experience. Thus, with BofA's expectations being that the less senior classes will be written down, there is a reduced likelihood that legal action will proceed. Therefore, in the cases with no expected senior losses, BofA assumes no liability exposure whatsoever. In my opinion, the utilization of this haircut may not be necessary, since the Investor Group has already undertaken action(s) to recover damages.

The four haircuts which have been described were utilized in order to estimate a total settlement amount. The settlement amount results in approximately $4.0B by multiplying each of the haircuts by the projected and actual losses of the Settlement Portfolio.

In conclusion, although certain haircuts are difficult to validate and may require a proper expert to address the legal interpretation of their merits, the overall methodology utilized is reasonable for the purpose of BofA's presentation.

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

6

RC-9019_00003930



**RRMS ADVISORS**
*Tactical Mortgage Strategists*

*Settlement Amount Opinion*
*Prepared for: The Bank of New York Mellon*
*June 7, 2011*

### Recommendation

In calculating a reasonable settlement figure, I utilized a mix of the methodologies found in the Investor Group and BofA presentations. As per my analysis below, the settlement range of approximately $8.8 to $11 billion is reasonable without applying any legal haircuts.

### Methodology and Calculations

Given that information was obtained from publicly available third-party sources, my analysis began with the Intex / LoanPerformance collateral balances (as provided by Investor Group) of the portfolio which was stratified according to delinquency status. This consisted of (1) a $72.5 billion balance for loans greater than 60 days delinquent (which also included the population in bankruptcy, foreclosure and REO); (2) a $12.8 billion balance for previously modified current loans and (3) a $98.6 billion balance for non-modified current loans (including loans 30 days delinquent). In addition, aggregate realized losses of $25 billion were also taken into account.

Based on publicly available information pertaining to historical mortgage loan performance, I determined reasonable default and loss severity percentages which would be applied to each delinquency bucket of the portfolio. The corresponding plateaus are dependent upon product type and loan size, but when weighted according to the actual collateral composition of the portfolio, loss severity is approximately 60%. In addition, based on information provided by BofA, the historical loss severity for the loans within the Settlement Portfolio is approximately 45%. Thus, these were the ranges utilized in my assumptions.

With respect to the default of previously modified current loans, performance has improved dramatically since the first round of loan modifications in early 2009 due to more aggressive methods taken by both servicers and the government. From recent trends in applicable research reports, defaults for these loans have ranged between 20% and 60%, depending on when the modification took place. In taking an average of the two figures as well as considering the stronger recent performance, I feel that a default rate for previously modified current loans ranging from 35% to 40% is reasonable.

High default rates seem to be leveling off based on historical data and research reports with regard to non-modified current loans (including loans 30 days delinquent). As before with loss severities, these particular plateaus vary depending on product type and year of origination, but when weighted according to the actual collateral composition of the portfolio, the default rate ranges between 11% and 16%. These percentages have been utilized for this portion of the portfolio.

A default rate of 90% was utilized for loans greater than 60 days delinquent, which was supported by an industry research report. It is rational to assume that once a loan becomes severely delinquent, it is uncommon for such loan to achieve performing status once again.

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

7

RC-9019_00003931



**RRMS ADVISORS**
*Tactical Mortgage Strategies*

*Settlement Amount Opinion*
*Prepared for: The Bank of New York Mellon*
*June 7, 2011*

The last variables used in my analysis were the "Breach" and "Success" rates which represent the amount of loans effectively submitted to BofA for repurchase. Given the lack of meaningful public information regarding this data, I feel it would be reasonable to utilize BofA's percentages for both rates since they are based on the performance of a mortgage pool representing actual repurchase experience. Specifically, a "Breach" rate of 36% and a "Success" rate of 40% were utilized.

Please note that these were the only haircuts utilized in my analysis. The three other haircuts used in the BofA presentation were not included in my analysis due the lack of available data and furthermore, would require a proper expert to address any particular legal interpretation issues.

In conclusion, utilizing the stratified collateral balances of the portfolio and my re-calculated variables, a settlement figure somewhere between $8.8 and $11 billion is reasonable. In my opinion, given the degree of assumptions used in my analysis, a small variance to the range indicated above is still reasonable. Please see the tables below for my assumptions and settlement range.

**Low Range**

| Description | Balance[1] | Default Rate | Severity Rate | Losses | Breach Rate | Success Rate | Settlement |
|---|---|---|---|---|---|---|---|
| Liquidated Loans | | | | $25.0 | 36.0% | 40.0% | $3.6 |
| 60+ Delinquent Loans | $72.5 | 90.0% | 45.0% | $29.4 | 36.0% | 40.0% | $4.2 |
| Mod. Current Loans | $12.8 | 35.0% | 45.0% | $2.0 | 36.0% | 40.0% | $0.3 |
| Non-Mod Current Loans / D30 | $98.6 | 11.0% | 45.0% | $4.9 | 36.0% | 40.0% | $0.7 |
| | | | | | | | $8.8 |

**High Range**

| Description | Balance[1] | Default Rate | Severity Rate | Losses | Breach Rate | Success Rate | Settlement |
|---|---|---|---|---|---|---|---|
| Liquidated Loans | | | | $25.0 | 36.0% | 40.0% | $3.6 |
| 60+ Delinquent Loans | $72.5 | 90.0% | 60.0% | $39.2 | 36.0% | 40.0% | $5.6 |
| Mod. Current Loans | $12.8 | 40.0% | 60.0% | $3.1 | 36.0% | 40.0% | $0.4 |
| Non-Mod Current Loans / D30 | $98.6 | 16.0% | 60.0% | $9.5 | 36.0% | 40.0% | $1.4 |
| | | | | | | | $11.0 |

*Note 1: The settlement range of approximately $8.8 - $11 billion was based on the balance of 543 Trusts provided by the Investor Group. It is reasonable to assume the settlement range would be lower, given that 530 Trusts are now being considered for the contemplated settlement portfolio.*

Yours truly,

*Brian Lin*

Brian Lin
Managing Director

Brian Lin
RRMS Advisors
Managing Director
Telephone: 212-843-9413
10 East 40th Street New York, NY 10016

8