# Exhibit 56

*EXECUTION VERSION*

*TO BE SIGNED BY THE PARTIES*
*IMMEDIATELY FOLLOWING THE PETITION DATE*

## SETTLEMENT AND PLAN SPONSOR AGREEMENT

THIS SETTLEMENT AND PLAN SPONSOR AGREEMENT (the "Agreement"), dated as of May 14, 2012 (the "Execution Date"), is made and entered into by and among Residential Capital, LLC and certain of its direct and indirect subsidiaries, as debtors and debtors-in-possession on behalf of each such entity and its estate (collectively, the "Debtors"),[1] and Ally Financial Inc. ("AFI"), on behalf of its direct and indirect subsidiaries and affiliates other than the Debtors and the Debtors' direct and indirect subsidiaries (collectively, "Ally") (each of the Debtors and Ally is a "Party", and collectively, the "Parties").

## RECITALS

WHEREAS, on the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") commencing cases (the "Chapter 11 Cases"), which are proposed to be jointly administered for procedural purposes;

WHEREAS, the Debtors believe certain claims exist against Ally related to the corporate relationship between the Debtors and Ally, including with respect to certain transactions between the Debtors and Ally, including equitable subordination, debt recharacterization, fraudulent conveyance, avoidance liability under federal or state laws, and other causes of action under theories of veil piercing and alter ego liability;

WHEREAS, Ally denies each allegation of the Debtors and has substantial claims against the Debtors;

---

[1] The Debtors are: Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACM REO LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC REO LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

12-12020-mg    Doc 683-1    Filed 05/14/12    Entered 05/14/12 16:43:05    Exhibit 56
Pg 3 of 312

*EXECUTION VERSION*

WHEREAS, certain entities, including AFI, GMAC Mortgage Group LLC, Ally Securities LLC, and Ally Bank have been named as defendants in lawsuits brought by third parties in connection with, or arising from, the Debtors' business activities, including with respect to residential mortgage backed securities issued and/or sold by the Debtors; and

WHEREAS, the Debtors and Ally have resolved all issues and disputes between and among the Parties, and have agreed upon a term sheet for a chapter 11 plan of reorganization for the Debtors' restructuring and to implement the terms of the settlement contained herein.

NOW, THEREFORE, in consideration of the promises and mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I

### Definitions

Section 1.1    *Terms Defined in the Preamble and Recitals*.  The following terms shall have the meaning ascribed thereto in the preamble and recitals of this Agreement: Ally; AFI; Bankruptcy Code; Bankruptcy Court; Chapter 11 Cases; Debtors; Execution Date; Parties and Party; and Petition Date.

Section 1.2    *Other Defined Terms.*  The following definitions shall apply and constitute a part of this Agreement and all annexes and exhibits hereto:

"Ally Bank MSR" means the mortgage servicing rights held by Ally Bank.

"Allowed Claims" means the claims to be allowed under the Plan pursuant to Section 3.1(e).

"Ally Claims" means the Claims of Ally against the Debtors as described in Section 3.1(e) of this Agreement.

"Ally Contribution" means such term as defined in Section 2.1.

"Ally DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached to the Plan Term Sheet as Exhibit 3.

"Ally LOC " means such term as defined in Section 3.1(e).

"Ally Revolver" means such term as defined in Section 3.1(e).

"Bankruptcy Court Order" means an order of the Bankruptcy Court entered after notice and a hearing.

"Barclays DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached to the Plan Term Sheet as Exhibit 6.

"Cash" means legal tender of the United States of America.

"Cash Collateral Order" means the order attached hereto as Exhibit 1.

"Cash Contribution" means such term as defined in Section 2.1(a).

"Causes of Action" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors, and/or the bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending on the Effective Date or instituted after the Effective Date against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

"Claim" means a claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"Confirmation Order" means an order, in form and substance satisfactory to both Parties, confirming the Plan.

"Consent Materials" means (a) the Board of Governors of the Federal Reserve System Consent Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC, the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, and (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012.

"Consumer Lending Origination Support" means Ally's support of ResCap's consumer origination channel through Ally Bank's continued (a) origination of conforming loans brokered by ResCap to Ally Bank pursuant to the Client Agreement governing broker activity, (b) performance under the GNMA Origination Agreement, and (c) offering of such other products, such as the origination of jumbo loans and the Purchase Power lending program, consistent with current practices.

"Current Program" means such term as defined in Section 2.2(b).

"Data Center Transaction" means that certain sale and buy-back transaction between AFI and the Debtors of the Debtors' real estate interests in the data center property known as "Shady Oak" (MN) and the data center in Lewisville, TX as set forth in Exhibit 2.

"Debtors' Obligations" means such term as defined in Section 3.1.

"Disclosure Statement" means the disclosure statement for the Plan, as amended, supplemented or modified from time to time, in form and substance reasonably acceptable to both Parties, including all exhibits and schedules thereto, and as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

"Effective Date" means the date of substantial consummation of the Plan, which shall be the first business day upon which all conditions precedent to the effectiveness of the Plan are satisfied or waived in accordance with the Plan.

"Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction), which has not been modified, amended, reversed, vacated, or stayed, is in full force and effect, and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or motion for new trial, stay, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, stay, reargument, or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

"GNMA Origination Agreement" means the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement with respect to the FHA, USDA, and VA Residential Mortgage Loans (as such terms are defined therein) between Ally Bank, as Seller, and GMAC Mortgage, LLC, as Purchaser.

"GNMA Origination Order" means the Bankruptcy Court Order approving the GNMA Origination Agreement.

"Governing Documents" means articles or certificates of incorporation and bylaws (or other formation documents relating to limited liability companies, limited partnerships, or other forms of entity).

"HFS APA" means such term as defined in Section 2.1(b).

"HFS Portfolio" means ResCap's held-for-sale portfolio of mortgage loans, which are the subject of the HFS APA.

"HFS Sale Price" means such term as defined in Section 2.1(b).

"Interest" means any "Equity Security," as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date.

"Milestones" means the deadlines and conditions set forth in Exhibit A attached hereto.

"<u>Person</u>" means such term as defined in section 101(41) of the Bankruptcy Code.

"<u>Plan</u>" means the Debtors' chapter 11 plan, together will all addenda, exhibits, schedules, or other attachments, if any, including the Plan Supplement, and as may be amended, modified, or supplemented from time to time, in form and substance satisfactory to the Debtors and Ally, as set forth in more detail in the Plan Term Sheet.

"<u>Plan Supplement</u>" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan to be filed with the Bankruptcy Court on notice to parties-in-interest, and additional documents to be filed before the Effective Date as supplements or amendments to the Plan Supplement.

"<u>Plan Term Sheet</u>" means the chapter 11 plan term sheet, dated May 14, 2012, which is <u>Exhibit 4</u> to this Agreement.

"<u>Purchaser</u>" means the buyer of certain of the Debtors' assets in the ResCap Asset Sale.

"<u>Released Parties</u>" means Ally, and each of theirs and the Debtors' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives.

"<u>Reorganized Debtors</u>" means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

"<u>ResCap Asset Sale</u>" means the sale of certain of the Debtors' assets pursuant to an Asset Purchase Agreement between the Debtors and Nationstar Mortgage LLC, or such other higher or better offer as may be selected by the Debtors pursuant to the bidding procedures established pursuant to such agreement.

"<u>Restructuring</u>" means the Plan and the transactions contemplated in relation thereto.

"<u>Run Off Period</u>" means such term as defined in Section 2.2(b).

"<u>Section 363 Sale</u>" means a sale under section 363 of the Bankruptcy Code prior to, and outside of, the Plan.

"<u>Shared Services Agreement</u>" means the shared services agreement, dated May 13, 2012, by and between AFI and the Debtors, to be approved by the Bankruptcy Court.

"<u>Solicitation Procedures</u>" means the procedures for soliciting acceptance or rejection of the Plan from each holder of an impaired Claim or Interest that is entitled to vote to accept or reject the Plan.

"<u>Subservicing Agreement</u>" means the Amended and Restated Servicing Agreement, dated May 13, 2012, by and between Ally Bank, as owner, and GMAC Mortgage, LLC, as Servicer.

"<u>Subservicing Agreement Order</u>" means a Bankruptcy Court Order approving the Subservicing Agreement.

"<u>Stalking Horse Bidder</u>" means Nationstar Mortgage LLC, as the initially designated bidder for the assets to be purchased in connection with the ResCap Asset Sale.

"<u>Third Party Release</u>" means such term as defined in the section entitled Third Party Releases.

"<u>Transition Services Agreement</u>" means the transition services agreement to be negotiated with the Purchaser in connection with the ResCap Asset Sale.

## ARTICLE II

### Ally Obligations

Section 2.1    *Ally Contribution*.  Ally hereby agrees to make the following contributions to the Debtors:

(a)    **Cash Contribution**.  Upon satisfaction of the conditions set forth in Section 5.2 hereof, AFI will make a Cash contribution to the Debtors in the amount of $750,000,000 (the "<u>Cash Contribution</u>"); paid to fund the settlement of pending and future claims and to secure the releases in favor of the Released Parties set forth in Section 3.1(d), including third party releases under Section 3.1(d)(ii); provided that if AFI, in its sole discretion, agrees upon an acceptable purchase price for the Ally Bank MSR to be sold in conjunction with the Plan (via a contribution of the Ally Bank MSR by Ally to the Debtors immediately before the Effective Date), Ally shall negotiate with the Debtors in good faith to provide the Debtors with additional consideration from the sale of the Ally Bank MSR.

(b)    **HFS Stalking Horse Bid**.

(i)    Subject to the conditions set forth in Section 5.2 hereof, AFI will serve as a stalking horse bidder for the HFS Portfolio in the amount (the "<u>HFS Sale Price</u>") set forth in the asset purchase agreement attached as <u>Exhibit 5</u> hereto (the "<u>HFS APA</u>").    Ally shall not receive any break-up fee or other bid protections in the event ResCap receives a higher or better offer for the HFS Portfolio.

(ii)    Notwithstanding the foregoing, if the conditions set forth in Section 5.2 hereof are not satisfied and the ResCap Asset Sale is consummated pursuant to the Section 363 Sale, AFI shall purchase the HFS Portfolio for 87.5% of the HFS Sale Price, subject to higher or better offers, all as set forth in the HFS APA.

6

(c) **Shared Services Agreement**.  Subject to Bankruptcy Court approval, AFI will enter into and perform under the Shared Services Agreement with the Debtors during the Chapter 11 Cases attached hereto as Exhibit 7.

(d) **Cash Collateral Order**.  Subject to Bankruptcy Court approval, Ally shall provide ResCap with use of Cash Collateral pursuant to the terms of the Cash Collateral Order.

(e) **Transition Services Agreement**.  Subject to Bankruptcy Court approval, AFI will negotiate and, upon agreement of the parties, enter into a Transition Services Agreement with the Purchaser in connection with the ResCap Asset Sale.

(f) **Debtor-in-Possession Financing**. Subject to Bankruptcy Court approval, AFI will provide up to $220,000,000 of debtor-in-possession financing to the Debtors in accordance with the terms and conditions set forth in the Ally DIP Term Sheet attached hereto as Exhibit 3.

(g) **Support of Pension**. AFI will honor in the ordinary course of business, obligations under the Employees' Retirement Plan sponsored by GMAC Mortgage Group LLC.

(h) **Continued Consumer Lending Origination Support**. Subject to Bankruptcy Court approval, Ally Bank will provide Consumer Lending Origination Support to the Debtors during the Chapter 11 Cases through and until the closing of the ResCap Asset Sale.

Section 2.2    *ResCap Director and Officer Issues*.

(a) **Indemnification**.   AFI stands by and re-affirms its indemnification obligations under its Amended and Restated Certificate of Incorporation regarding ResCap's current and former Directors and Officers to the full extent of Delaware law.

(b) **Insurance**.   Ally will use commercially reasonable efforts to continue to renew its current blended directors and officers liability and fiduciary liability insurance program (the "Current Program"), for a period of six years following the Effective Date (the "Run Off Period"), on substantially the same terms and conditions as the Current Program and including prior acts coverage with respect to claims arising from acts or omissions that occurred prior to the Effective Date; provided that if Ally is unable to continue the Current Program for the entire Run Off Period despite its commercially reasonable efforts it shall promptly notify the Debtors and use best efforts to obtain run off coverage for the balance of the Run Off Period.

Section 2.3    *Ally Release.*  Subject to the Debtors' satisfaction of their obligations set forth in Section 3.1, on the Effective Date of the Plan, Ally shall release the Debtors and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, arising from or related in any way to the Debtors, including

those that any Ally entity would have been legally entitled to assert against any of the parties above in their own right (whether individually or collectively), other than the Allowed Claims.

Section 2.4    *Ally Plan Sponsor Obligations.*

(a)    **Support of Restructuring**.  As long as this Agreement has not been terminated in accordance with Article VII, AFI agrees to:

(i)    support the relief requested in each of the Debtors' first day pleadings (including interim and final relief thereof, as applicable);

(ii)    support the Debtors' efforts to pursue the Restructuring contemplated by the Plan Term Sheet;

(iii)    support the Debtors' prosecution of their Chapter 11 Cases consistent with this Agreement and the Plan Term Sheet;

(iv)    support entry of an order approving the Disclosure Statement to permit solicitation of the Plan;

(v)    vote to accept the Plan, provided that (i) the Bankruptcy Court has entered an order approving the Disclosure Statement, (ii) the Consenting Claimants have been properly solicited pursuant to section 1125 of the Bankruptcy Code, (iii) the material terms of the Plan and the Disclosure Statement are consistent with terms of the Plan Term Sheet and incorporate the terms of the AFI Settlement Agreement, and (iv) the Plan and the Disclosure Statement are satisfactory to the Consenting Claimants; and

(vi)    support confirmation of the Plan and approval of this Agreement incorporated therein.

(b)    **Transfer of Claims**.  AFI hereby agrees, for so long as this Agreement shall remain in effect, not to sell, assign, transfer, pledge, hypothecate or otherwise dispose of, directly or indirectly, any of the Ally Claims or any right related thereto and including any voting rights associated with such Ally Claims.

(c)    **Further Acquisition of Claims**.  This Agreement shall in no way be construed to preclude AFI or any of its affiliates (as defined in section 101(2) of the Bankruptcy Code) from acquiring additional claims following its execution of this Agreement; provided, that any such additional claims acquired by AFI shall automatically be deemed to be subject to the terms of this Agreement unless AFI does not have the authority to make any such additional claim subject to the Agreement.  AFI further agrees that it will not create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any of the Debtors without causing such affiliate to become a Party hereto prior to such acquisition.

(d)    **Representations of AFI's Holdings**.  AFI represents that, as of the date hereof (i) it is the legal owner of the Ally Claims; and (ii) it has full power to vote, dispose of, and compromise the Ally Claims.

8

12-12020-mg    Doc 383-56    Filed 02/01/13    Entered 02/01/13 16:43:05    Exhibit 56
Pg 10 of 312

**EXECUTION VERSION**

# ARTICLE III

## Debtors' Obligations

Section 3.1    *Debtors' Obligations*.  The Debtors hereby agree to do the following and to use good faith efforts to do the following:

(a)    **Agreement**.  The Debtors shall file this Agreement on the Petition Date and shall use commercially reasonable efforts to obtain approval of the Debtors' obligations under this Agreement contemporaneously with approval of the Disclosure Statement.

(b)    **Plan**.  The Debtors shall use good faith efforts to file and prosecute the Plan as set forth in the Plan Term Sheet.

(c)    **Regulatory Obligations**.  The Debtors shall perform all of the obligations required under the Consent Materials, and fund any and all costs related to such performance during the Chapter 11 Cases through and until the closing of the ResCap Asset Sale.  The Debtors shall (i) escrow proceeds from the ResCap Asset Sale in an amount to be agreed upon between Ally and Debtors (or determined by the Bankruptcy Court to the extent no agreement can be reached) for the purpose of funding any and all remaining obligations under the Consent Materials following the ResCap Asset Sale, or (ii) the Purchaser shall assume such obligations as part of the ResCap Asset Sale on terms reasonably acceptable to Ally.

(d)    **Plan Releases**.  The Confirmation Order and Plan shall include the following provisions in the Plan and the Confirmation Order or such other release provisions as are acceptable to Ally.

(i)    Debtor Releases.  On and as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including: (a) the discharge of debt and all other good and valuable consideration provided pursuant to the Plan; (b) pursuant to the terms of this Agreement; and (c) the services of the Debtors' present officers and directors in facilitating the expeditious implementation of the restructuring contemplated by the Plan, each of the Debtors shall provide a full discharge and release to the Released Parties (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors)) and their respective properties from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors or Reorganized Debtors would have been legally entitled to assert against a Released Party in their own right (whether individually or collectively) or that any holder of a Claim or Interest or other entity, would have been legally entitled to assert on behalf of any of the Debtors or any of their Estates, including those in any way related to the Bankruptcy Cases or the Plan to the fullest extent of the law; provided that Ally shall reaffirm its obligations under Section 2.2 in conjunction with the Plan; provided, further, that the Debtors' rights to any insurance shall not be adversely affected.

9

(ii)    Third Party Releases.  On and as of the Effective Date, the holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases or the Plan; provided that claims of the Debtors' directors and officers against Ally pursuant to Ally's indemnification obligations and Section 2.2 hereof (as well as any applicable insurance related thereto) shall not be released.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Section 3.1(d)(ii) (the "Third Party Releases"), and further, shall constitute its finding that the Third Party Releases are: (a) in exchange for the good, valuable, and substantial consideration provided by the Released Parties; (b) in the best interests of the Debtors and all holders of Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; (e) justified by truly unusual circumstances; (f) an essential component and important to the success of the Plan; (g) resulted in increased distributions to the creditors that would otherwise have been unavailable; (h) the result of an identity of interest between the Debtors and the Released Parties regarding the restructuring; and (i) a bar to any party asserting any claim released by the Third Party Release against any of the Released Parties.  The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, damages, demands, debts, rights, suits, Causes of Action, judgments, or liabilities released pursuant to the Plan.

(e)    **Allowed Claims**.  The Confirmation Order shall allow all Claims in full that arise (i) under the Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), among the GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers, Residential Capital, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, and Homecomings Financial, LLC, as guarantors, AFI as initial lender and agent, and Wells Fargo Bank, N.A., as first priority collateral agent  (the "Ally Revolver"), (ii) under the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), by and among GMAC Mortgage, LLC and Residential Funding Company, LLC, as borrowers, Residential Capital, LLC, RFC Asset Holdings II, LLC, Passive Asset Transactions, LLC, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, Homecomings Financial, LLC, and Equity Investment I, LLC, as guarantors, and AFI as lender and agent (the "Ally LOC"), and (iii) claims from and after the Petition Date, which are held by Ally against the Debtors and arise in the ordinary course of business or otherwise agreed to by the Debtors and Ally.

Section 3.2    *Debtors Plan Support Obligations.*

(a)    **Implementation of the Restructuring**.  As long as this Agreement has not been terminated in accordance with Article VII, the Debtors agree to:

10

(i)    effectuate and consummate the Restructuring contemplated by the Plan Term Sheet in accordance with the Milestones;

(ii)    obtain any and all required regulatory approvals and material third-party approvals for the Restructuring; and

(iii)    take any and all reasonably necessary actions in furtherance of the Restructuring.

(b)    **Representation of the Debtors**.  None of the materials and information provided by or on behalf of the Debtors to AFI in connection with the Restructuring, when read or considered together, contains any untrue statement of a material fact or omits to state a known material fact necessary in order to prevent the statements made therein from being materially misleading.

(c)    **Alternative Restructuring**.  Notwithstanding anything contained in this Agreement to the contrary, following the good faith determination by the Debtors and their respective Boards of Directors that a proposal or offer for a chapter 11 plan or other restructuring transaction that is not consistent with the Plan Term Sheet (an "Alternative Restructuring") constitutes a proposal that is reasonably likely to be more favorable to the Debtors' estates, their creditors, and other parties to whom the Debtors owe fiduciary duties than the Restructuring, and receipt of approval by the Boards of Directors to pursue such Alternative Restructuring, the Debtors may immediately terminate their obligations under this Agreement (and Ally shall have similar termination rights as set forth in section 7.3) by written notice to Ally.

## ARTICLE IV

## Mutual Plan Support Obligations

Section 4.1    *Mutual Plan Support Obligations*.  As long as this Agreement has not been terminated in accordance with Article VII, each of the Parties agrees that it:

(a)    shall negotiate in good faith the Definitive Documents (as defined in the Plan Term Sheet), including the Plan and Disclosure Statement, both of which shall contain the same terms set forth in, and be consistent with, the Plan Term Sheet and this Agreement;

(b)    shall not directly or indirectly seek, solicit, support, or vote in favor of any alternative restructuring that could reasonably be expected to prevent, delay, or impede the Restructuring contemplated by the Plan Term Sheet or that is inconsistent with this Agreement, unless the Debtors and AFI have agreed, in writing, to pursue an alternative restructuring;

(c)    shall not directly nor indirectly (i) engage in, continue, or otherwise participate in any negotiations regarding any alternative restructuring, (ii) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any alternative restructuring or (iii) withhold, withdraw, qualify, or

11

modify its approval or recommendation of this Agreement, the Plan Term Sheet, the Plan, or the Restructuring;

(d)    shall not encourage any other entity to object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with the Restructuring; and

(e)    shall not take any action that is inconsistent with this Agreement, the Plan Term Sheet, or the Plan, or that would obstruct or delay approval of the Disclosure Statement or confirmation and consummation of the Plan.

## ARTICLE V

## Conditions to Effectiveness of the Agreement

Section 5.1    *Conditions to Effectiveness*.  This Agreement is effective immediately upon satisfaction of the following conditions precedent:

(a)    **Bankruptcy Filing.**  The Debtors shall have filed cases under chapter 11 of the Bankruptcy Code on or before May 15, 2012.

(b)    **Data Center Transaction.**  The Data Center Transaction shall have been executed on or before the date that the Debtors file their cases under chapter 11 of the Bankruptcy Code.

Section 5.2    *Additional Conditions to Effectiveness*.  Ally's obligations pursuant to Section 2.1(a), Section 2.2(b)(i) and Section 2.3 shall only apply upon the satisfaction of the following conditions precedent:

(a)    **Plan and Confirmation Order.**  The Plan and the Confirmation Order shall incorporate the terms and conditions of this Agreement and shall include the Third Party and Debtor Releases.

(b)    **Bankruptcy Court Approval.**  The Bankruptcy Court shall have entered the Confirmation Order, which shall have become a Final Order.

(c)    **Plan Effective Date.**  The Effective Date shall have occurred.

## ARTICLE VI

## Representations And Warranties Of The Parties

The Parties, solely on behalf of themselves and their respective subsidiaries, represent and warrant as of the Effective Date:

Section 6.1    *Due Organization, Standing, and Authority*.  Such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation.  Subject to entry of the Bankruptcy Court Orders set forth herein, such Party has all necessary power and

authority to execute, deliver, and perform its obligations under this Agreement as contemplated by its Governing Documents.

Section 6.2    *Authorization and Validity of the Agreement*.  Subject to entry of the Bankruptcy Court Orders set forth herein, the execution, delivery, and performance of this Agreement (a) are within such Party's powers, (b) have been duly authorized by all necessary action on its behalf and all necessary consents or approvals have been obtained and are in full force and effect, and (c) do not violate any of the terms and conditions of (i) such Party's Governing Documents, (ii) any applicable law, or (iii) any contract to which it is a party.

Section 6.3    *Enforceability*.  This Agreement has been duly executed and delivered on behalf of such Party and constitutes a legal, valid, and binding obligation of such Party enforceable against it in accordance with its terms and the terms of the Plan and Confirmation Order.

Section 6.4    *Acknowledgment of Party*.  Each Party acknowledges that, except with respect to the representations and warranties made in this Agreement: (a) it has relied on its own independent investigation, and has not relied on any information or representations furnished by any Party or any representative or agent thereof in determining whether or not to enter into this Agreement; (b) it has conducted its own due diligence as well as undertaken the opportunity to review information, ask questions, and receive satisfactory answers concerning the terms and conditions of this Agreement; and (c) it possesses the knowledge, experience, and sophistication to allow it to fully evaluate and accept the merits and risks of entering into the transactions contemplated by this Agreement.

## ARTICLE VII

## Termination of the Agreement

Section 7.1    *Termination of the Agreement by Ally*.  This Agreement shall automatically terminate upon failure to satisfy any of the conditions set forth in Article III, Article IV or Article V hereof, any breach of the Debtors of their obligations under this Agreement, or in the event satisfaction of such conditions becomes a legal impossibility; provided that Ally may waive conditions or a breach by the Debtors in its sole discretion.

Section 7.2    *Termination of the Agreement by the Debtors.*  This Agreement may be terminated by the Debtors upon failure to satisfy any of the conditions set forth in Article V or the breach of any of Ally's obligations under Article II hereof; provided that Ally shall have 15 days to cure any such alleged breach of Article II or the Debtors' exercise of their rights pursuant to Section 3.2(c).

Section 7.3    *Additional Termination Events*.  Unless waived in writing by Ally, this Agreement shall terminate automatically if:

(a)    any material modification is made to the Plan Term Sheet or the Plan that is not in form and substance satisfactory to AFI and the Debtors;

13

(b)    any of the Definitive Documents (as defined in the Plan Term Sheet), including the Plan, is filed with the Bankruptcy Court by the Debtors and is inconsistent with the Plan Term Sheet in any material respects, unless otherwise acceptable to AFI;

(c)    the Bankruptcy Court has entered an order in any of the Debtors' chapter 11 cases appointing (i) a trustee under chapter 7 or chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in sub-clauses (3) and (4) of section 1106(a) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

(d)    the obligations of the Debtors under any debtor-in-possession credit facility are accelerated;

(e)    any of the Debtors' chapter 11 cases is dismissed;

(f)    the Debtors publicly announce their intention not to support the Restructuring or provide written notice to AFI of their intention to do so;

(g)    the Debtors' Boards of Directors approve an Alternative Restructuring or the Debtors execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring;

(h)    any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable; and

(i)    the Debtors fail to achieve any of the Milestones.

Section 7.4    *Automatic Termination*.  Unless extended in writing by the Debtors, Ally and Purchaser, this Settlement Agreement shall terminate automatically if (i) the Confirmation Order has not been entered on or before October 31, 2012, or (ii) any of the conditions set forth in Article V have not been satisfied on or before December 15, 2012.

Section 7.5    *Termination Event Procedure*.  The Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder solely in connection with giving any termination notice (and agree not to object to any non-breaching Party seeking to lift the automatic stay solely in connection with giving any such notice, if necessary), subject to all rights of the Party to contest any such alleged Termination.

Section 7.6    *Survival*.  Notwithstanding termination of this Agreement pursuant to this Article VII, Ally's obligations in Section 2.1(b)(ii)-(h), and Section 2.2 shall survive; provided that Ally shall have no remaining obligations under this Agreement to the extent of a breach by the Debtors of Section 3.1(a) or 3.1(b) hereof unless such breach was as a result of the Debtors' determination to pursue an Alternative Restructuring in accordance with the terms hereof, in which case Ally's only remaining obligations shall be those set forth in Section 2.1(c) and (d); provided further that, notwithstanding anything in this Agreement to the contrary, in the event of any Alternative Restructuring or any termination of this Agreement on account thereof, Ally's only remaining obligations shall be those set forth in Section 2.1(c) and (d) hereof.

## ARTICLE VIII

### Miscellaneous

Section 8.1    *Notices*.  All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given:  (a) when personally delivered; (b) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter, if transmitted by facsimile, e-mail, or telecopier with confirmation of receipt; (c) five business days after being mailed by certified mail, return receipt requested, first class postage prepaid; or (d) one business day after being sent by nationally recognized overnight courier; in each case, to the following addresses, or to such other addresses as a Party may from time to time specify by notice to the other Parties given pursuant hereto.

If to the Debtors, to:

> Tammy Hamzehpour
> Residential Capital LLC
> 1100 Virginia Drive
> Fort Washington, PA  19034

And with a copy to (which copy shall not constitute notice):

> Mr. Larren M. Nashelsky
> Mr. Gary S. Lee
> Morrison & Foerster
> 1290 Avenue of the Americas
> New York, NY 10100

If to Ally, to:

> Mr. William B. Solomon Jr.
> Ally Financial Inc.
> 200 Renaissance Center
> Mail Code 482-B09-B11
> Detroit, Michigan 48265

And with a copy to (which copy shall not constitute notice):

> Mr. Richard M. Cieri
> Mr. Ray C. Schrock
> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022

Section 8.2    *Specific Performance*.  Each Party acknowledges that the other Party would be irreparably damaged if this Agreement were not performed in accordance with its

specific terms or were otherwise breached. Accordingly, each Party's sole remedy shall be to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically the terms of this Agreement.

Section 8.3    *Governing Law/Jurisdiction*. This Agreement, the rights and duties of the Parties and all other matters arising out of or relating to this Agreement (whether in contract, tort, or otherwise) will be governed by and construed, enforced, and performed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of laws that would require the application of laws of another jurisdiction. The Parties acknowledge and agree that the Bankruptcy Court shall have the exclusive jurisdiction over this Agreement and that any claims arising out of or related to the interpretation and enforcement of this Agreement shall be properly brought only before the Bankruptcy Court. If and to the extent that the Chapter 11 Cases are closed or dismissed, the United States District Court located in the borough of Manhattan in New York City shall have exclusive jurisdiction over this Agreement and any such claims. This provision shall not constitute a consent by any Party to personal jurisdiction over it for any purpose, other than with respect to the enforcement of this Agreement.

Section 8.4    *Entire Agreement*. This Agreement contains the entire agreement between the Parties with respect to the subject matter hereof and there are no agreements, understandings, representations, or warranties between the Parties other than those set forth or referred to herein.

Section 8.5    *Acknowledgement*. THIS AGREEMENT, THE PLAN TERM SHEET, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF VOTES FOR THE ACCEPTANCE OF A CHAPTER 11 PLAN FOR THE PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE. THE DEBTORS WILL NOT SOLICIT ACCEPTANCES OF THE PLAN FROM AFI UNTIL AFI HAS BEEN PROVIDED WITH COPIES OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. EACH PARTY FURTHER ACKNOWLEDGES THAT NO SECURITIES OF ANY DEBTOR ARE BEING OFFERED OR SOLD HEREBY AND THAT THIS AGREEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OF ANY DEBTOR.

Section 8.6    *Amendment and Waiver*. This Agreement may not be amended, and no right or obligation under this Agreement may be waived, except by written instrument signed by the Parties.

Section 8.7    *Severability*. Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic and legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to the Parties. Upon any determination that any term or other provision is invalid, illegal, or incapable of being enforced, each Party hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of this Agreement as closely as possible in a

16

mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 8.8    *Reliance on Representations.*  All representations, warranties, agreements, covenants, and obligations herein are material, and shall be deemed to have been relied upon by the other Parties.

Section 8.9    *Successors and Assigns.*  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, and is intended to be binding upon any chapter 11 or chapter 7 trustee, any successor trustee, and the estates of any or all of the Debtors.  Without in any manner limiting the scope, extent, or effect of the foregoing, no Party hereto shall transfer, assign, or otherwise dispose of their right, title, and interests in and to any claims or causes of action of such Party that are the subject of this Agreement, and any such transfer shall be void and of no force and effect unless and until such transferee or assignee agrees in writing at the time of such transfer or assignment to be bound by this Agreement in its entirety without revision.

Section 8.10    *No Admission of Liability.*  This Agreement is not an admission of any liability, but is a compromise and settlement and this Agreement shall not be treated as an admission of liability.  All communications (whether oral or in writing) between and/or among the Parties, their counsel, and/or their respective representatives relating to, concerning, or in connection with this Agreement, or the matters covered hereby and thereby, shall be governed and protected in accordance with the Federal Rule of Evidence 408 and New York Civil Practice Law and Rules Section 4547 to the fullest extent permitted by law.

Section 8.11    *Interpretation.*  This Agreement has been jointly drafted by the Parties at arm's-length and each Party has had ample opportunity to consult with independent legal counsel.  No provision or ambiguity in this Agreement shall be resolved against any Party solely by virtue of its participation in the drafting of this Agreement.

Section 8.12    *Expenses.*  Except as specifically provided otherwise, the Parties shall be responsible for the payment of their own respective costs and expenses (including reasonable attorneys' fees) in connection with the negotiation, participation, execution, and delivery of, and the observance or performance of their obligations under, this Agreement.  Nevertheless, in any action or proceeding to enforce this Agreement, the prevailing Party shall be entitled to payment of its reasonable costs and expenses (including reasonable attorneys' fees).  The Parties agree that claims for enforcement of this Agreement shall not be released by any of the provisions contained herein.

Section 8.13    *Captions.*  The captions of this Agreement are for convenience only and are not a part of this Agreement and do not in any way limit or amplify the terms and provisions of this Agreement and shall have no effect on its interpretation.

Section 8.14    *Counterparts.*  This Agreement may be executed in counterparts, by either an original signature or signature transmitted by facsimile transmission, other electronic copy, or other similar process and each copy so executed shall be deemed to be an original and all copies so executed shall constitute one and the same agreement.

Section 8.15   *Further Assurances*.  From time to time, upon request, the Parties shall, without further consideration, promptly execute, deliver, acknowledge, and file all such further documents, agreements, certificates, and instruments and do such further acts as the persons or entities entitled to the benefit of this Agreement may reasonably require to effectuate the transactions contemplated by this Agreement.

Section 8.16   *Taxes*.  It is acknowledged and agreed to by each of the Parties hereto that each such Party shall be responsible for paying all taxes, if any, arising out of any payments or transfers made to it pursuant hereto and that it shall pay all such taxes in accordance with applicable law.

Section 8.17   *Construction of Agreement*.  Each of the functional words "each", "every", "any", and "all" shall be deemed to include each of the other functional words.  This Agreement or any uncertainty or ambiguity herein shall not be construed against any one party but shall be construed as if all parties to this Agreement jointly prepared all aspects of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**EXECUTION COPY**

**RESIDENTIAL CAPITAL, LLC for itself and its debtor subsidiaries**

By: _____
    Name:  Jonathan Ilany
    Title:  Independent Director

By: _____
    Name:  John E. Mack
    Title:  Independent Director

**ALLY FINANCIAL INC. on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)**

By: _____
    Name:
    Title:

*EXECUTION VERSION*

**ALLY FINANCIAL INC. on behalf of itself and its subsidiaries and affiliates (excluding the Debtors and their direct and indirect subsidiaries)**

By: _____
Name: Michael A. Carpenter
Title: Chief Executive Officer

*EXECUTION VERSION*

## Exhibit A

## MILESTONES

## MILESTONES

The Debtors' failure to comply with the following milestones (the "Milestones") will result in a termination under Section 7.3 of this Agreement, unless waived pursuant to the terms of this Agreement:

1)      The Debtors shall have commenced the Chapter 11 Cases on or before May 15, 2012;

2)      On or before the Petition Date, the Debtors shall have:

    a)      executed the Asset Purchase Agreement with the Stalking Horse Bidder that is in form, scope, and substance satisfactory to AFI;

    b)      executed the Held-For-Sale Asset Purchase Agreement with AFI that is in form, scope, and substance satisfactory to AFI;

    c)      executed the Barclays DIP Financing Facility that is substantially consistent with the term sheet attached as  Exhibit 6 to this Agreement; and

    d)      agreed upon the term sheet for the Ally DIP Financing Facility that is substantially consistent with the form as Exhibit 3 attached to this Agreement.

3)      On or before May 18, 2012, the Debtors shall have obtained entry of orders of the Bankruptcy Court on an interim basis approving the Barclays DIP Financing Facility and the Ally DIP Financing Facility that are in form, scope, and substance satisfactory to AFI;

4)      On or before May 18, 2012, the Debtors shall have obtained entry of the Cash Collateral Order, on an interim basis, in form, scope, and substance satisfactory to AFI;

5)      On or before May 18, 2012, the Debtors shall have filed with the Bankruptcy Court a motion to approve their proposed bidding procedures with respect to the ResCap Asset Sale, which bidding procedures will propose a timeline for the asset sale consistent with the terms of the Plan Term Sheet and provide for the ResCap Asset Sale to be approved in conjunction with the Plan;

6)      On or before May 18, 2012, the Debtors shall have entered into the following agreements and have obtained entry of the following Bankruptcy Court Orders on an interim basis, in each case in form, scope and substance satisfactory to the Debtors and AFI:

    a)      the Subservicing Agreement and the Subservicing Agreement Order;

    b)      the Shared Services Agreement and the Shared Services Agreement Order; and

    c)      the GNMA Origination Agreement and the GNMA Origination Order.

7)      On or before May 25, 2012, the Debtors shall have filed a motion, in form and substance satisfactory to AFI, to extend the automatic stay of section 362(a) of the Bankruptcy Code to AFI and certain of its affiliates;

8)      On or before June 15, 2012, the Debtors shall have filed a motion seeking the Bankruptcy Court's approval of this Agreement;

9)      On or before June 15, 2012, the Debtors shall have filed with the Bankruptcy Court the Plan, Disclosure Statement, a motion to approve the Disclosure Statement, and a motion to approve solicitation procedures in relation to the Plan and Disclosure Statement, all of which shall be in form and substance satisfactory to AFI;

10)     On or before 50 days following the Petition Date, the Debtors shall have obtained entry of the Bankruptcy Court of Final Orders approving the Barclays DIP Financing Facility, Ally DIP Financing Facility, the Shared Servicing Agreement, the GNMA Origination Agreement and the Subservicing Agreement, in each case in form, scope and substance satisfactory to AFI;

11)     On or before ninety (90) days following the Petition Date], the Bankruptcy Court shall have entered (a) an order approving the Disclosure Statement, which shall be in form and substance satisfactory to AFI, (b) an order approving the Debtors' proposed bidding procedures related to the ResCap Asset Sale, in each case in form and substance satisfactory to the Debtors and AFI, and (c) an order approving this Agreement;

12)     On or before October 31, 2012, the Bankruptcy Court shall have entered the Confirmation Order, which such order will grant final approval of the Plan, the ResCap Asset Sale and the Agreement, in the form and substance satisfactory to AFI; and

13)     On or before December 15, 2012, the effective date of the Plan shall have occurred.

**Exhibit 1**

**CASH COLLATERAL ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Case No. 12- |
| | ) | |
| RESIDENTIAL CAPITAL, LLC, et al.,[1] | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

### INTERIM ORDER UNDER
### SECTIONS 105, 361, 362, 363, AND 364 OF THE BANKRUPTCY
### CODE AND BANKRUPTCY RULES 2002, 4001, 6004, AND 9014 (I)
### AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING
### ON A SECURED SUPERPRIORITY BASIS, (II) AUTHORIZING THE DEBTORS
### TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION
### TO ADEQUATE PROTECTION PARTIES AND (IV) PRESCRIBING THE FORM
### AND MANNER OF NOTICE AND SETTING TIME FOR THE FINAL HEARING

Upon the motion, dated May ___, 2012, (the "**Motion**")[2] of the above-captioned debtors

and debtors in possession (collectively, the "**Debtors**") filed in these chapter 11 cases (the

"**Chapter 11 Cases**")[3] for entry of interim and final orders under sections 105, 361, 362, 363(c),

and 364 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 4001,

---

[1]    The Debtors are:  Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX (Lots-Other), LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACM Borrower LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecomings Financial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Borrower LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.

[2]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Motion.

[3]    These Chapter 11 Cases were commenced on May ___, 2012 (the "**Petition Date**").

6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),

seeking:

(I)    authorization for

(a)  GMAC Mortgage, LLC and Residential Funding Company, LLC

(collectively, the "**Borrowers**") to use Cash Collateral and all other Prepetition

Collateral (each as defined below) pursuant to sections 361, 362 and 363 of the

Bankruptcy Code, as set forth herein;

(b)  the Debtors to provide adequate protection to Ally Financial Inc.

("**AFI**")

(x) as lender under the Amended and Restated Credit Agreement,

dated as of December 30, 2009 (as amended, supplemented or otherwise

modified, the "**AFI Revolver Loan**"), among the Borrowers, Residential

Capital, LLC, GMAC Residential Holding Company, LLC,  GMAC-RFC

Holding Company, LLC, and Homecomings Financial, LLC (together

with certain other affiliates of the Borrowers as guarantors or obligors,

collectively, the "**AFI Revolver Guarantors**"), AFI as initial lender (the

"**AFI Revolver Lender**") and agent for the AFI Revolver Lender, and

Wells Fargo Bank, N.A., as First Priority Collateral Agent, and

(y) as secured party under the Amended and Restated First Priority

Pledge and Security Agreement and Irrevocable Proxy dated as of

December 30, 2009 (as amended, supplemented or otherwise modified, the

"**AFI Revolver Security Agreement**," and together with the AFI Revolver

Loan, collectively, the "**AFI Revolver**"), among the Borrowers, the AFI

Revolver Guarantors and certain other affiliates of the Borrowers, the AFI

Revolver Lender, as agent for the AFI Revolver Lender, and Wells Fargo

Bank, N.A. as First Priority Collateral Agent and Collateral Control

Agent;

(c) the Debtors to provide adequate protection to AFI

(x) as lender under the Amended and Restated Loan Agreement,

dated as of December 30, 2009 (as amended, supplemented or otherwise

modified, the "*AFI LOC Loan*"), by and among GMAC Mortgage, LLC

and Residential Funding Company, LLC, as borrowers (in such capacity,

the "*AFI LOC Borrowers*"), Residential Capital, LLC, RFC Asset

Holdings II, LLC, Passive Asset Transactions, LLC, GMAC Residential

Holding Company, LLC, GMAC-RFC Holding Company, LLC,

Homecomings Financial, LLC, and Equity Investment I, LLC as

guarantors (the "*AFI LOC Guarantors*"), AFI as lender (the "*AFI LOC*

*Lender*" and, together with the AFI Revolver Lender, collectively, the

"*AFI Lender*") and agent for the AFI LOC Lender, and

(y) as a secured party under the Amended and Restated Pledge and

Security Agreement and Irrevocable Proxy (as amended, supplemented or

otherwise modified, the "*AFI LOC Security Agreement*," and together

with the AFI LOC Loan, collectively, the "*AFI LOC*"), dated as of

December 30, 2009, among the Borrowers and the AFI LOC Guarantors,

and the AFI LOC Lender, GMAC Investment Management, LLC, as

secured parties; and

3

(d) the Debtors to provide adequate protection to the holders (the "***Junior Secured Noteholders***") of the 9.625% Junior Secured Guaranteed Notes due 2015 (the "***Junior Secured Notes***") issued under that certain Indenture (the "***Indenture***" and, together with the Junior Secured Notes, the Security Documents (as defined in the Indenture) and all other documents executed in connection therewith, the "***Junior Secured Notes Documents***") dated as of June 6, 2008, among Residential Capital, LLC, as issuer, GMAC Residential Holding Company, LLC, GMAC-RFC Holding Company, LLC, GMAC Mortgage, LLC, Residential Funding Company, LLC, and Homecoming Financial, LLC as guarantors (the "***Junior Secured Notes Guarantors***" and, together with the AFI Revolver Guarantors and the AFI LOC Guarantors, the "***Guarantors***"), and U.S. Bank National Association, as trustee (the "***Trustee***") for the benefit of the Junior Secured Noteholders; (ii) the Trustee, as trustee under the Indenture; and (iii) Wells Fargo Bank, N.A., as collateral agent under the Junior Secured Note Documents (the "***Collateral Agent***" and, together with the Junior Secured Parties and the Trustee, the "***Junior Secured Parties***").  All obligations of the Debtors arising under the Junior Secured Notes Documents shall collectively be referred to herein as the "***Junior Secured Notes Obligations***";

(II)    authorization for the Debtors' waiver and release of any right to surcharge against the Prepetition Collateral (hereinafter defined) and the AFI DIP Loan Collateral (hereinafter defined) pursuant to section 506(c) of the Bankruptcy Code, as set forth herein;

(III)    authorization for the Debtors' waiver and release of any right to seek a court order invalidating or otherwise voiding AFI Lender's and the Junior Secured Parties'

4

security interests in their respective collateral pursuant to section 552(b)(1) of the Bankruptcy
Code, as set forth herein;

(IV)    authorization for the AFI LOC Borrowers to request postpetition draws
under the AFI LOC in an aggregate principal amount not to exceed $150 million, no more than
$__ of which will be available upon the entry of the Interim Order (as hereinafter defined) and
the balance of which will be available upon the entry of the Final Order (as hereinafter defined),
*provided* that up to an additional $70 million in postpetition draws may be made available to the
AFI LOC Borrowers under the AFI LOC if the AFI LOC Borrowers and AFI agree upon written
mutually satisfactory terms for such incremental $70 million before the Final Hearing, *provided
further* that the aggregate amount of AFI LOC prepetition and postpetition draws (plus any
unpaid, interest, expenses or other costs payable thereunder) may not exceed $600 million (the
"***AFI DIP Loan***") pursuant to the terms of the Eighth Amendment to the AFI LOC (the "***AFI
LOC Amendment***"), the principal terms of which are included on the term sheet that is attached
the Motion as **Exhibit 1**, and the terms of the Interim Order and Final Order (as hereinafter
defined); and

(V)    authorization for the AFI LOC Borrowers to execute the AFI LOC
Amendment, and perform such other and further acts as may be required in connection with the
AFI LOC Amendment and the AFI LOC;

(VI)    the grant of superpriority administrative expense claims to the AFI Lender
in its capacity as the lender under the AFI DIP Loan (in such capacity, the "***AFI DIP Lender***");

(VII)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the
"***Interim Hearing***") for this Court to consider entry of the interim order (the "***Interim Order***") in
substantially the form annexed to the Motion authorizing the Borrowers (collectively, the

"**Loan Parties**") to (a) use Cash Collateral and granting adequate protection to AFI Lender and the Junior Secured Parties (collectively, as applicable, the "**Adequate Protection Parties**"), and (b) to obtain postpetition secured superpriority financing under the AFI DIP Loan to fund, in a manner consistent with past practices, the repurchase of whole loans from Ginnie Mae pools in order to (i) avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (ii) effect foreclosures, conveyances or other normal course loss mitigation activities with respect to the related properties in connection with the submission of HUD Claims (as hereinafter defined), and (iii) allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified, in each case, pursuant to the terms of the Interim Order and the Final Order;

(VIII) to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "**Final Hearing**") for this Court to consider entry of the final order (the "**Final Order**") in substantially the form annexed to the Motion authorizing the Loan Parties on a final basis to use Cash Collateral and obtain the AFI DIP Loan, and providing such additional relief on a final basis as set forth therein.

**WHEREAS**, the Interim Hearing was held by this Court on _____, 2012 at _:___ _.m.

**NOW THEREFORE**, upon the record established at the Interim Hearing, and all objections to the entry of this Interim Order having been withdrawn, resolved or overruled by the Court, and after due deliberation and consideration, and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction.*  The Court has jurisdiction over this matter pursuant to 28 U.S.C.

§ 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is

proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice.*  Notice of the Motion, the relief requested therein and the Interim Hearing

was given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United

States Trustee for the Southern District of New York; (b) the office of the United States Attorney

General; (c) the office of the New York Attorney General; (d) the office of the United States

Attorney for the Southern District of New York; (e) the Internal Revenue Service; (f) the

Securities and Exchange Commission; (g) the Administrative Agent and its counsel; (h) the

Collateral Agent; (i) Barclays Bank PLC ("***Barclays***"), as the Administrative Agent under the

Barclays DIP Facility; (j) The Bank of New York Mellon, as indenture trustee under the Pre-

Petition GSAP Facility; (k) Barclays Bank PLC, as administrative agent under the Pre-Petition

GSAP Facility; (l) Ally Financial, Inc. and its counsel, Kirkland & Ellis LLP; (m) Ally Bank and

its counsel, Kirkland & Ellis LLP; (n) Citibank, N.A. as secured lender under the MSR Facility;

(o) U.S. Bank National Association, as Trustee for the Junior Secured Notes, and its counsel,

Kelley Drye & Warren LLP, as collateral agent for the Prepetition Junior Secured Notes, as

collateral agent for the Prepetition Ally Revolver, and as collateral control agent under the

Intercreditor Agreement, dated as June 6, 2008; (q) BMMZ, as buyer under the Pre-Petition Ally

Repo Facility; (r) Fannie Mae; (s) Freddie Mac; (t) Ginnie Mae; [(u) servicers and sub-servicers

under the Designated Servicing Agreements and the Specified Servicing Agreements (each term

as defined in the DIP Credit Agreement); (v) the MBS Trustees (as defined in the DIP Credit

Agreement);] (x) Nationstar Mortgage LLC and its counsel; and (y) the parties included on the

Debtors' list of fifty (50) largest unsecured creditors (collectively, the "***Notice Parties***").  The Court finds that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

      3.    *Debtors' Stipulations.*  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph [24] below), the Debtors admit, stipulate and agree that:

      (a)    the Debtors' proposed chapter 11 plan (the "***Plan***") incorporates a settlement between AFI and the Debtors of all claims held by AFI and Ally Bank (together with their subsidiaries and affiliates, excluding Residential Capital, LLC and its subsidiaries, "***Ally***") against the Debtors, and of all claims held by the Debtors against Ally, as set forth in the Settlement and Plan Sponsor Agreement dated as of May [13], 2012 (the "***Ally Settlement Agreement***"), and the Debtors have agreed to use commercially reasonable efforts to seek this Court's approval of the Plan (and the Ally Settlement Agreement, whether under the Plan or otherwise);

      (b)    As of the Petition Date, the aggregate principal amount outstanding (i) under the AFI Revolver was at least $749,000,000, (ii) under the AFI LOC was at least $380,000,000, and (iii) under the Junior Secured Notes Documents was at least $2,120,452,000, in each case plus accrued and unpaid interest thereon, reimbursement obligations in respect thereof and additional fees and expenses and other amounts now or hereafter due under the Junior Secured Notes Documents (including any fees and expenses of the Junior Secured Parties' attorneys and financial advisors that are chargeable or reimbursable under the Junior Secured Notes Documents) and other obligations incurred in connection therewith (collectively, the "***Prepetition Obligations***");

8

(c)    the Junior Secured Notes Obligations constitute legal, valid and binding obligations of the Loan Parties, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code);

(d)    no portion of the Junior Secured Notes is subject to avoidance, recharacterization, recovery, subordination, setoff, or counterclaim pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(e)    the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI LOC, including the liens and security interests in

(x) certain of the accounts described in the *Amended Interim Order (A) Authorizing, But Not Directing, the Debtors to Continue Their Existing Cash Management System, Bank Accounts and Business Forms, (B) Granting Postpetition Intercompany Claims Administrative Expense Priority, (C) Authorizing Continued Investment of Excess Funds in Investment Accounts and (D) Authorizing Continued Intercompany Arrangements and Historical Practices*, which was entered by this Court on _____, 2012 [Docket No. ___] (the "***Interim Cash Management Order***"), and

(y) in the other personal and real property constituting "Collateral" under, and as defined in, the AFI LOC (the "***AFI LOC Collateral***"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 14(g), (B) certain liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 below), and (C) certain liens and security interests granted to secure the AFI DIP Loan;

(f)    the Debtors have granted liens and security interests to the AFI Lender pursuant to and in connection with the AFI Revolver, including the liens and security interests in

certain of the accounts described in the Interim Cash Management Order, and in the other personal and real property constituting "Collateral" under, and as defined in, the AFI Revolver (the "**AFI Revolver Collateral**," and together with the AFI LOC Collateral, collectively, the "**AFI Lender Collateral**"), and such liens and security interests are presently subject and subordinate only to (A) the Carve Out, as defined in paragraph 14(g), and (B) certain liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 below);

(g)    the liens and security interests granted to the Junior Secured Parties pursuant to the Junior Secured Notes Documents and in connection with Junior Secured Notes (the "**Junior Secured Notes Liens**") are valid, binding, perfected, and enforceable first priority liens on and security interests in the personal and real property constituting "Collateral" under, and as defined in, the Junior Secured Notes Documents (together with the AFI Lender Collateral, the "**Prepetition Collateral**") and (i) were granted to, or for the benefit of, the Junior Secured Parties for fair consideration and reasonably equivalent value; (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) are subject and subordinate only to (A) the liens and security interests granted to the AFI Lender under the AFI Revolver, all subject to the terms and conditions of the Intercreditor Agreement, dated as of June 6, 2008 (as amended, the "**Intercreditor Agreement**" and, together with the instruments and agreement evidencing or providing for the issuance of the Prepetition Obligations, the "**Existing Agreements**"), (B) the Carve Out, and (C) the liens and security interests granted to secure the Adequate Protection Obligations (as defined in paragraph 14 below); and

(h)     the Collateral securing the Junior Secured Notes Obligations includes, among others, the categories of assets set forth on Exhibit [__];

(i)     no setoffs, recoupments, offsets, defenses or counterclaims to any of the Junior Secured Notes Obligations exist, and no portion of the Junior Secured Notes Obligations or any payments made to any or all of the Junior Secured Parties are subject to avoidance, recharacterization, recovery, subordination, attach, recoupment, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except for the priming contemplated herein;

(j)     there are no claims, defenses, or causes of action against the Junior Secured Parties with respect to the Junior Secured Notes Documents (the "***Junior Secured Parties Claims***");

(k)     subject to the reservation of rights set forth in paragraph 25 below, each Debtor and its estate shall be deemed to have forever waived, discharged and released each of the Junior Secured Parties in their respective capacities as such and their respective affiliates, members, managers, equity security holders, agents, attorneys, financial advisors, consultants, officers, directors, and employees of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights, whether arising at law or in equity, relating to and/or otherwise in connection with the Junior Secured Notes Obligations and the Junior Secured Notes Liens, or the debtor creditor relationship between the Junior Secured Parties and the Debtors, including, without limitation, (x) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law, and (y) any right or basis to challenge or object to the amount,

validity or enforceability of the Junior Secured Notes Obligations, or the validity, enforceability, priority or non-avoidability of the Junior Secured Notes Liens securing the Junior Secured Notes Obligations;

(l)      the Adequate Protection Parties retain, and have not waived or otherwise prejudiced, any of their rights, claims, defenses or counterclaims at law or in equity with respect to the Debtors or any other Person or Governmental Unit (each such term as defined in the Bankruptcy Code); and

(m)      prior to the Petition Date, the AFI LOC Borrowers funded the repurchase of whole loans (the "**_Repurchased Loans_**") from Ginnie Mae pools in order (i) to avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (ii) to effect foreclosures, conveyances or other normal course loss mitigation activities of the related properties in connection with the submission of HUD Claims (as defined below), and (iii) to allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified (collectively, the "**_GNMA Buyouts_**"), and for additional reasons determined at the Debtors' discretion.  Following the GNMA Buyouts, the AFI LOC Borrowers submit a claim to the Secretary of the U.S. Department of Housing and Urban Development (such a claim, a "**_HUD Claim_**") for payments of amounts related to the Repurchased Loans insured by the Federal Housing Administration (the "**_FHA_**") or guaranteed by the U.S. Department of Veterans Affairs ("**_VA_**"), as applicable.  Following a period of review and processing of a HUD Claim, it is typically converted to cash that is remitted to the AFI LOC Borrowers.  The AFI LOC Borrowers will continue to fund GNMA Buyouts with the proceeds of the AFI DIP Loan on a postpetition basis and with Cash Collateral (as hereinafter defined) under the AFI Revolver Loan and submit HUD Claims in the ordinary course of business.

4.      *Certain Findings Regarding the Use of Cash Collateral and the AFI DIP Loan.*

(a)      Good cause has been shown for entry of this Interim Order.  The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of Cash Collateral.  The use of Cash Collateral, will, therefore, help preserve the going concern value of the Debtors and their estates and will enhance the prospects for successful Chapter 11 Cases.

(b)      The Debtors have an immediate need to obtain the financing available under the AFI DIP Loan in order to permit the orderly continuation of the operation of their businesses, including the continued funding of GNMA Buyouts to ensure their compliance with the GNMA Mae Guide and maintain their current issuer status.  The Debtors' access to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)      The Debtors are unable to obtain financing on more favorable terms from sources other than the AFI DIP Lender under the AFI DIP Loan.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the AFI DIP Lender, subject to the Carve Out (as defined below) as provided for herein, the AFI DIP Liens (as defined below) and the AFI Superpriority Claims (as defined below) upon the terms and conditions set forth in this Interim Order and in the AFI DIP Loan.

(d)      The terms of the AFI DIP Loan are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(e)     The AFI DIP Loan has been negotiated in good faith and at arm's length among the Debtors and the AFI DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the AFI DIP Loan, including (i) all future draws remitted to the AFI LOC Borrowers pursuant to the AFI DIP Loan, and (ii) any other obligations under the AFI DIP Loan (clauses (i) and (ii) collectively, the "***AFI DIP Obligations***"), shall be deemed to have been extended by the AFI DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     Based on the record established in the Court at the Interim Hearing, the terms of the Debtors' use of Cash Collateral appear to be fair and reasonable, and reflect the Debtors' and their respective managers' and directors' exercise of prudent business judgment consistent with their fiduciary duties.  Entry of this Interim Order is in the best interests of the Debtors' estates and creditors.

(g)     The terms of the use of the Cash Collateral have been the subject of extensive negotiations conducted in good faith and at arm's-length among the Debtors and the Adequate Protection Parties, and the Adequate Protection Parties are found to have acted in "good faith" in connection with the negotiation and entry of this Interim Order, and are entitled to the protections provided to good faith lenders under section 364(e) of the Bankruptcy Code.

(h)     The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the AFI DIP

Loan in accordance with this Interim Order is therefore in the best interest of the Debtors'
estates.

5.      *Authorization for the AFI LOC Amendment and for Continued Borrowings Under
the AFI LOC*.

(a)     The Debtors are hereby authorized and directed to continue to perform
under the AFI LOC.  Further, the AFI LOC Borrowers are hereby authorized to execute the AFI
LOC Amendment.  Each of the AFI LOC Borrowers is hereby authorized to borrow money
pursuant to the AFI DIP Loan, and the AFI DIP Loan Guarantors (as defined in the AFI LOC
Amendment) are hereby authorized to unconditionally guaranty (on a joint and several basis)
such borrowings and the AFI LOC Borrowers' joint and several obligations with respect to such
borrowings up to an aggregate principal or face amount not to exceed $150 million, no more than
$__ of which will be available upon the entry of this Interim Order and the balance of which will
be available upon the entry of the Final Order, *provided* that up to an additional $70 million in
postpetition draws may be made available to the AFI LOC Borrowers under the AFI LOC if the
AFI LOC Borrowers and AFI agree upon written mutually satisfactory terms for such
incremental $70 million before the Final Hearing, *provided further* that the aggregate amount of
AFI LOC prepetition and postpetition draws (plus any unpaid, interest, expenses or other costs
payable thereunder) authorized under the Final Order may not exceed $600 million.

(b)     In furtherance of the foregoing and without further approval of this Court,
each Debtor is authorized and directed to perform all acts, to make, execute and deliver all
instruments and documents (including the execution or recordation of security agreements,
mortgages and financing statements), and to accrue all fees, payment of which shall be waived
subject to consummation of a Plan pursuant to the terms of the Ally Settlement Agreement, that

15

may be reasonably required or necessary for the Debtors' performance of their obligations under the AFI DIP Loan, including:

> (i)    the execution, delivery and performance of the AFI LOC Amendment;

> (ii)    the performance of all other acts required under or in connection with the AFI DIP Loan pursuant to the AFI LOC, as amended by the AFI LOC Amendment (including the indemnity provisions contained therein).

(c)    Upon execution and delivery of the AFI LOC Amendment, the AFI DIP Loan shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with their terms and this Order.  No obligation, payment, transfer or grant of security under the AFI DIP Loan or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    *AFI DIP Loan Liens*.  As security for the AFI DIP Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution, recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the AFI Lender, the following security interests and liens are hereby granted to the AFI Lender (all tangible and intangible property, whether real or personal, identified in clauses (a) and (b) below being collectively referred to as the "*AFI DIP Loan Collateral*"); all such liens and security interests granted to the AFI Lender pursuant to this Interim Order, the "*AFI DIP Liens*", subject and subordinate only to the payment of the Carve Out:

(a)      Pursuant to sections 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority security interest in and lien upon all right, title and interest in all Repurchased Loans (including the related mortgage notes, mortgage, or any assignments of mortgage) and HUD Claims funded with the proceeds of the AFI DIP Loan, together with all proceeds, products, and supporting obligations with respect thereto; and

(b)      Pursuant to sections 364(d) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priming security interest in and lien upon all property of the Debtors, whether existing on the Petition Date or thereafter arising, coming into existence or acquired, whether tangible or intangible, whether real or personal, together with all proceeds and products thereof, that constitutes the AFI LOC Collateral (other than the property described in (a) of this paragraph).

7.    *Superpriority Claims*.

(a)      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the AFI DIP Obligations shall constitute allowed claims against each of the Debtors (without the need to file a proof of claim) with priority over any and all administrative expenses, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under section 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order, to the extent therein approved), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, including any superpriority claims granted as adequate protection in favor of the Debtors' pre-petition secured lenders or other secured parties in the Cases (the "*Superpriority Claims*"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or

17

attachment, which Superpriority Claims shall be subject only to the Carve Out to the extent specifically provided for herein and shall be junior to the "Superpriority Claims" granted in respect of the obligations under the Barclays DIP Facility (as defined hereinafter) pursuant to section 364(c)(1) of the Bankruptcy Code (the "***Barclays 364(c)(1) Claims***") as provided in paragraph 11 of the Barclays DIP Order;[4] *provided*, that the Barclays 364(c)(1) Claims are junior to the AFI Lender's rights in the AFI DIP Loan Collateral and all proceeds and other consideration received upon the sale, exchange, transfer or other disposition thereof.

8.      *Perfection of the AFI DIP Liens.*

(a)      The AFI DIP Lender is hereby authorized, but not required, to file or record financing statements, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted hereunder.  Whether or not the AFI DIP Lender shall, in its sole discretion, choose to file such financing statements, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Order.

---

[4]      The "***Barclays DIP Order***" means either the *Interim Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (III) Granting Related Relief* or the *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform Under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, (II) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C) and (III) Granting Related Relief*, as applicable.

(b)    A certified copy of this Interim Order may, in the discretion of the AFI

DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of

such financing statements, mortgages, notices of lien or similar instruments, and all filing offices

are hereby authorized and directed to accept such certified copy of this Interim Order for filing

and recording.    For the avoidance of doubt, the automatic stay of section 362(a) of the

Bankruptcy Code shall be modified to the extent necessary to permit the AFI Lender, and the

Secured Parties to take all actions, as applicable, referenced in this paragraph [8].

9.    *Use of AFI DIP Loan Proceeds.*  The proceeds of the AFI DIP Loan shall be used

solely to fund GNMA Buyouts to the extent necessary in order to (a) avoid Debtor GMAC

Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the

Ginnie Mae Guide, (b) effect foreclosures, conveyances or other normal course loss mitigation

activities of the related properties in connection with the submission of HUD Claims, and (c)

allow for trial modifications under programs implemented by the Debtors for which the related

loans and borrowers are qualified.  For the avoidance of doubt, no proceeds may be used to fund

the purchase of whole loans for any other purpose, including for non-compliance with eligibility

representations, lack of insurance or guaranty, or for title defects, or for any other purpose other

than as identified in the first sentence of this paragraph.

10.    *Conditions Precedent to AFI DIP Loan Draws.*  Notwithstanding the terms of the

AFI DIP Loan, the AFI LOC Borrowers shall not be permitted to draw under the AFI DIP Loan

unless the following conditions are satisfied:

(a)    the Debtors shall have performed and shall be current on all of their

obligations required under (a) the Board of Governors of the Federal Reserve System Consent

Order, dated April 13, 2011, by and among AFI, Ally Bank, ResCap, GMAC Mortgage, LLC,

the Board of Governors of the Federal Reserve System, and the Federal Deposit Insurance Corporation, (b) the consent judgment entered by the District Court for the District of Columbia, dated February 9, 2012, (c) the Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as amended, dated February 10, 2012, and (d) all related agreements with Ally (collectively, the "***Consent Obligations***");

(b)    the Bankruptcy Court shall have entered the *Interim Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business* in form and substance satisfactory to the AFI Lender;

(c)    the Bankruptcy Court shall have entered the Interim Cash Management Order in form and substance reasonably satisfactory to the AFI Lender; and

(d)    the Debtors shall use good faith efforts to comply with all requirements attendant to their position as subsidiaries of a Bank Holding Company;

(e)    no Termination Event (as hereinafter defined) shall have occurred and be continuing.

11.    *Cash Collateral.*    The Debtors' cash and cash equivalents on deposit or maintained in any account or accounts by the Debtors that is subject to a security interest in favor of the AFI Lender or the Junior Secured Parties and cash and cash equivalents generated by the collection of accounts receivable, sale of inventory or other disposition of the Prepetition Collateral constitutes proceeds of the Prepetition Collateral and, therefore, are and shall be deemed to be cash collateral of the Adequate Protection Parties within the meaning of section 363(a) of the Bankruptcy Code for the purposes hereof and under the terms hereof

(collectively, and together with all cash and cash equivalents otherwise constituting Prepetition Collateral and the AFI DIP Loan Collateral, the "**Cash Collateral**").

12.    *Reporting.*  The Debtors have delivered to the Adequate Protection Parties a 20-week forecast of anticipated cash receipts and disbursements for such period (the "**Initial 20-Week Forecast**"), a copy of which is attached hereto as **Exhibit A**.  In lieu of the reporting requirements set forth in the documents underlying the Prepetition Obligations, the Debtors shall deliver to the Adequate Protection Parties: (i) beginning on the first Monday immediately following five (5) weeks after the Petition Date (or if the Petition Date is a Monday, beginning five (5) weeks after the Closing Date), as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) business day following each four-week period ended six (6) business days prior to such date, an updated 20-week forecast (an "**Updated Forecast**") for the following 20-week period (each such subsequent forecast delivered after the Initial 20-Week Forecast shall be, for the period of its applicability, referred to herein as the "**Forecast**") that is in form satisfactory to the AFI Lender; (ii) beginning on the first Monday immediately following three (3) weeks after the Petition Date (or if the Petition Date is a Monday, beginning three (3) weeks after the Petition Date), as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) business day following the two-week period ended six (6) business days prior to such date, a bi-weekly variance report for each prior two (2) week period setting forth, for such two-week period (x) actual results noting therein aggregate variances from amounts set forth for the two-week period in the relevant Forecast, (y) with respect to the AFI LOC, a report, in form and detail satisfactory to the AFI Lender, of all deposits into and withdrawals from the concentration account established and maintained pursuant to the AFI LOC, and (z) with respect to the AFI Revolver, a report, in form and detail satisfactory to the AFI Lender, of all deposits

into and withdrawals from the concentration account established and maintained pursuant to the

AFI Revolver; provided that on any date on which an Updated Forecast is provided, the variance

report shall set forth actual results against the amounts projected in the relevant Forecast for the

prior four-week period; and (iii) no later than the fifteenth (15) business day of each calendar

month, a collateral report that reflects updated values as of the end of the prior calendar month

(each such revised report, for the period of its applicability, to be referred to herein as the

"*Collateral Report*"). Thereafter, promptly following request by either AFI Lender or the

Trustee, the Debtors shall make themselves reasonably available to discuss such Forecast and the

details thereof.

13. *Authorization of Use of Cash Collateral.* Subject to the terms hereof, including

all reservations of rights herein, the Loan Parties are authorized to use Cash Collateral during the

period from the Petition Date through and including the Termination Date (as defined in

paragraph 18 below) solely for the purposes detailed within the Initial 20-Week Forecast and

each subsequent Forecast and, in the case of the AFI Revolver Loan Cash Collateral, to fund

GNMA Buyouts, subject to the restriction on the use thereof for such purpose set forth in the first

sentence of paragraph 9. Each Forecast will be subject to the written approval of the AFI

Lender, which shall use reasonable efforts to deliver its approval, or non-approval, as the case

may be, to the Debtors within two business days of the receipt of the Forecast. The Debtors are

enjoined and prohibited from using Cash Collateral and other Prepetition Collateral at any time,

except as set forth in this Interim Order.

14. *Adequate Protection.* Subject to the provisions of paragraph 26 hereof, the

Adequate Protection Parties are entitled, pursuant to sections 362, 363(c)(2), and 364 of the

Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including

Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition
Collateral to the extent of their interests therein, including any such diminution resulting from
the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral,
including Cash Collateral, the priming of the AFI Lenders' liens on the AFI LOC Collateral by
the Carve Out and AFI DIP Loan, and the automatic stay pursuant to section 362 of the
Bankruptcy Code (such diminution in value, if any, the "***Adequate Protection Obligations***").  As
adequate protection, the Adequate Protection Parties are granted the following:

(a)      The AFI Lender, in its capacity as AFI LOC Lender, shall receive:

(i)      as security for the Adequate Protection Obligations, effective and
perfected upon the Petition Date and without the necessity of the execution by the
Debtors (or recordation or other filing) of security agreements, control
agreements, pledge agreements, financing statements, mortgages or other similar
documents, or the possession or control by the AFI Lender of any collateral,
additional and replacement continuing, valid, binding, enforceable, non-avoidable
and automatically perfected security interests and liens on all of the collateral
securing the AFI LOC (the "***Adequate Protection Liens***").   The Adequate
Protection Liens shall not be subject or subordinate to any lien or security interest
that is avoided and preserved for the benefit of the Loan Parties and their estates
under section 551 of the Bankruptcy Code.  The Adequate Protection Liens shall
be (i) senior to the (A) existing liens granted to the AFI Lender under the AFI
LOC, (B) junior liens  in the AFI LOC Collateral granted under paragraph 11 of
the Barclays DIP Order to secure the obligations under the Barclays DIP Facility
under the Debtors' postpetition debtor-in-possession financing facility ("***Barclays***

***DIP Facility***"), (C) Adequate Protection Liens granted to the AFI Lender in its capacity as AFI Revolver Lender, and (D) Adequate Protection Liens granted to the Junior Secured Parties, and (ii) junior to the Carve Out and the AFI DIP Liens;

      (ii)     superpriority administrative expense claims as and to the extent provided in section 507(b) of the Bankruptcy Code with priority in payment over any and all unsecured claims and administrative expense claims, now existing or after arising, of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including sections 326, 328, 330, 331, 503(b), 506(c) and 726 of the Bankruptcy Code   (a "***507(b) Claim***"), which 507(b) Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, and shall at all times be senior to the rights of the Loan Parties, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code subject and subordinate only to the Carve Out and that shall be (x) senior to the 507(b) Claims granted to the Junior Secured Parties, and (y) *pari passu* with the 507(b) Claims granted to Citibank, N.A. and the AFI Lender on account of the AFI Revolver; and

      (iii)    adequate protection payments ("***Adequate Protection Payments***") consisting of accrued and unpaid prepetition interest as well as current postpetition payments of interest at the non-default rate set forth in the AFI LOC (the foregoing to include all unpaid prepetition interest)

(b)     AFI Lender, in its capacity as the AFI Revolver Lender, shall receive:

(i)      Adequate Protection Liens on all of the collateral securing the AFI Revolver and on the Repurchased Loans on the repurchase of which is funded through the use of AFI Revolver Loan Cash Collateral, which shall be (x) junior only to the existing liens granted to the AFI Revolver Lender under the AFI Revolver, and (y) senior to (A) the existing liens granted to the Junior Secured Parties, and (B) Adequate Protection Liens granted to the Junior Secured Parties;

(ii)      additional Adequate Protection Liens on all of the collateral securing the AFI LOC, which shall be (x) junior to the (A) existing liens granted to the AFI Lender under the AFI LOC, (B) Adequate Protection Liens granted to the AFI LOC Lender, (C) the liens granted under paragraph 11 of the Barclays DIP Order to secure the obligations under the Barclays DIP Facility (the "*Barclays DIP Liens*") and (D) the AFI DIP Liens, and (y) senior to the Adequate Protection Liens granted to the Junior Secured Parties on the collateral securing the AFI LOC as set forth below;

(iii)      507(b) Claims that are (x) senior to the 507(b) Claims granted to the Junior Secured Parties and (y) *pari passu* with the 507(b) Claims granted to Citibank and the AFI Lender on account of the AFI LOC (but senior to the claims referred to in this clause (y) to the extent relating to Cash Collateral that is used to fund GNMA Buyouts); and

(iv)      Additional Adequate Protection Liens on all of the equity of GMACM Borrower, LLC and RFC Borrower, LLC (the "*Barclays DIP Borrowers*"), which shall be senior to the Adequate Protection Liens granted to the Junior Secured Parties on the equity of the DIP Borrowers;

25

(v)     Adequate Protection Payments consisting of accrued and unpaid prepetition interest as well as current postpetition payments of interest at the non-default rate set forth in the AFI Revolver (the foregoing to include all unpaid prepetition interest) calculated based on the AFI Revolver balance of $400 million; provided that if that certain Plan Support Agreement between AFI, certain Junior Secured Noteholders, and the Debtors (the "***Junior Notes PSA***") is terminated pursuant to its terms, the AFI Lenders shall be entitled to payment of interest on the full amount outstanding under the AFI Revolver, including all accrued and unpaid interest thereon; and

(c)     the Junior Secured Parties shall receive:

(i)     Adequate Protection Liens on all of the collateral securing the AFI Revolver, which shall be junior to the (x) existing liens granted to the AFI Lender under the AFI Revolver, (y) Adequate Protection Liens granted to the AFI Lender in its capacity as AFI Revolver Lender and (z) existing liens granted to the Junior Secured Parties, *provided*, that the enforcement of the Adequate Protection Liens shall be subject to, in all respects, the Intercreditor Agreement and paragraph 21 below;

(ii)     additional Adequate Protection Liens on all of the collateral securing the AFI LOC, which shall be junior to (x) all existing liens and Adequate Protection Liens granted to the AFI Lender (on both the AFI LOC and the AFI Revolver), (y) the Barclays DIP Liens and (z) the AFI DIP Liens;

(iii)    additional Adequate Protection Liens on all of the equity interests of the DIP Borrowers, which shall be junior to the Adequate Protection Liens granted to the AFI Revolver Lender on the equity of the DIP Borrowers;

(iv)    to the extent the Adequate Protection Liens are insufficient to provide adequate protection, 507(b) Claims that are junior to the 507(b) Claims granted to the DIP Lenders under the DIP Facility and all 507(b) Claims granted to the AFI Revolver Lender but *pari passu* with any and all other 507(b) Claims; and

(v)    The Debtors shall promptly pay the reasonable fees and expenses of (i) the Trustee (including the reasonable fees and expenses of Kelley Drye & Warren LLP), and (ii) that certain Ad Hoc Committee of Holders of Junior Secured Notes represented by White & Case LLP (including the reasonable fees and expenses of White & Case LLP and Houlihan Lokey); *provided* that none of such fees and expenses as adequate protection payments hereunder shall be subject to further approval by the Court or the United States Trustee Guidelines, but such professional shall provide copies of summary invoices and statements (subject in all respects to applicable privilege or work product doctrines) to the official committee of unsecured creditors appointed in the Cases (the "***Committee***") and the U.S. Trustee, and the Debtors shall promptly pay all reasonable fees and expenses not subject to objection of the U.S. Trustee within ten business days after the receipt of such invoices.  No recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, however, that the Court shall have

27

jurisdiction to determine any dispute concerning such invoices, *provided, further*, however, that nothing shall prejudice the rights of any party to seek to recharacterize any such payments, upon motion and further order of the Court, as payments of principal under the Junior Secured Notes.

(d)    Notwithstanding anything to the contrary in this Order, the sum of the obligations under the (x) AFI DIP Loan, (y) the AFI LOC Loan and (z) the Adequate Protection Obligations in respect of the AFI LOC Loan that shall be senior to the Barclays DIP Liens in the AFI LOC Collateral granted in paragraph 11 of the Barclays DIP Order, in the aggregate, shall not exceed $600,000,000.

(e)    All 507(b) claims granted herein are junior and subordinate to all administrative expense claims granted priority under section 364(c)(1) of the Bankruptcy Code whether under this order, the Barclays DIP Order, or otherwise.

(f)    All reasonable, documented fees, and expenses incurred or accrued by the AFI Lender, including reasonable documented fees and expenses of counsel, shall accrue during the Chapter 11 Cases and be waived by AFI Lender subject to confirmation of the Plan that is in accordance with the terms of the Ally Settlement Agreement.    In the event that a Plan incorporating the Ally Settlement Agreement in accordance with the terms thereof is confirmed, AFI Lenders reserves all rights to assert claims against the Debtors' estates for payment of all such fees and expenses.    In the event that a Plan incorporating the Ally Settlement Agreement in accordance with the terms thereof is not confirmed, the Debtors shall pay all of the AFI Lenders such fees and expenses.

(g)     For purposes hereof, the "*Carve Out*"[5] shall mean the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code and section 3717 of title 31 of the United States Code, and (ii) at any time after the first business day after the occurrence and during the continuance of a Termination Event hereunder, and delivery of notice thereof to the U.S. Trustee and each of the lead counsel for the Debtors (the "*Carve Out Notice*"), to the extent allowed at any time, whether by interim order, procedural order or otherwise, the payment of accrued and unpaid professional fees, costs and expenses (collectively, the "*Professional Fees*") incurred by persons or firms whose retention is approved pursuant to sections 327 and 1103 of the Bankruptcy Code after the Business Day following delivery of the Carve Out Notice and allowed by this Court, in an aggregate amount not exceeding $25 million (the "*Carve Out Cap*") (plus all unpaid Professional Fees allowed by this Court at any time that were incurred on or prior to the Business Day following delivery of the Carve Out Notice, whether paid or unpaid); provided further that (A) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Adequate Protection Parties, (B) so long as no event of default shall have occurred and be continuing, the Carve Out shall not be reduced by the payment of fees and expenses allowed by this Court and payable under sections 328, 330 and 331 of the Bankruptcy Code, and (C) nothing in this Interim Order shall impair the right of any party to object to any such fees or expenses to be paid by the Debtors' estates.

15.     *Replacement Liens*.  Pursuant to section 363(e) and (f) of the Bankruptcy Code or otherwise, the AFI Revolver Lender shall receive first priority replacement liens and the Junior

---

[5]     The Carve Out is intended to mirror the Barclays' Carve Out (and not be in addition to).  Allocation of the $25 million Carve Out monies between the Barclays' DIP collateral and AFI Collateral TBD.

Secured Parties shall receive second priority replacement liens (collectively, the "**Replacement Liens**"), junior only to the Replacement Liens granted to the AFI Revolver Lender, on all of the equity of the DIP Borrowers as adequate protection for the transfer of the Initial Purchased Assets (as defined in the Barclays DIP Order).

16.    *Additional Adequate Protection.*

(a)    Covenants:  As additional adequate protection:

(i)    the Debtors shall maintain (x) their cash management system and (y) the treatment of any and all claims on account of postpetition distributions and transfers by the Loan Parties to any Affiliated Debtor (the "**Priority Intercompany Claim**"), in each case, in a manner consistent with such arrangements and treatment described in the Interim Cash Management Order, without further modification thereto;

(ii)    the Debtors shall use good faith efforts to be in compliance with all requirements attendant to their position as subsidiaries of a Bank Holding Company;

(iii)    the Debtors shall continue to perform and remain current with, and require that all of the Debtors continue to perform and remain current with, all of their obligations under the Consent Obligations;

(iv)    the Debtors shall comply with the terms of the Amended and Restated Servicing Agreement by and between Ally Bank, as Owner, and GMAC Mortgage, LLC, as Servicer, dated as of May [__], 2012;

(v)    the Debtors shall comply with the terms of the *Interim Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the*

*Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business*, which was entered by this Court on _____, 2012 [Docket No. ___], and the *Final Order Pursuant to Sections 105(A) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under the Ally Bank Servicing Agreement in the Ordinary Course of Business*;

(vi)     the Debtors shall use the AFI DIP Loan proceeds to fund only the GNMA Buyouts; and

(vii)    the Debtors shall perform and comply with all obligations under the Ally Settlement in accordance with the terms thereof.

(b)     Reporting:   As further adequate protection hereunder, the Debtors shall comply with the reporting requirements set forth in paragraph 12 (the "***Reporting Requirements***").   Further, the Adequate Protection Parties shall receive copies of all reports provided to the DIP Lenders pursuant to the DIP Facility and the DIP order.

(c)     Section 552 Waiver.   Upon entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code is deemed waived with respect to the Prepetition Collateral.

17.     *Exercise of Rights and Remedies against Deposit Accounts*.   Notwithstanding anything to the contrary contained in any instrument or agreement to which the Loan Parties, or any Loan Party, are party or subject, or in any order entered by this Court, no Person (as defined by the Bankruptcy Code) that holds or has lien or other security interest on any demand deposit or other accounts of a Loan Party may exercise any rights or remedies against any such account (including by way of set off), whether pursuant to an account control agreement or otherwise, without first providing seven days written notice (by facsimile electronic mail, overnight mail or

hand delivery) to the U.S. Trustee, counsel to the Debtors, counsel to any statutory committee appointed in the Debtors' chapter 11 cases, counsel for the AFI Lender, counsel to the Junior Secured Notes, counsel for Citibank, N.A. and counsel for Barclays (the "Account Notice Parties").  The AFI Lender hereby acknowledges and stipulates that its liens on any demand deposit or other account, whether such lien arises under a prepetition control agreement or under this Order, attach only to the proceeds of its collateral, and such liens do not attach to amounts on deposit in any such account to the extent such amount constitutes the proceeds of any other Person's collateral or property that was unencumbered prior to its being deposited in such an account.  In the event any Person asserts the occurrence and continuance of a default or an event of default and the right to exercise remedies with respect to such an account, the Debtors within three days will prepare and serve on the Account Notice Parties a detailed accounting of each Person's interest in the amounts on deposit in such account.  All parties rights to review and object to such accounting are hereby preserved.  Each Account Notice Party shall serve on the others a notice of objections with respect to such accounting within 5 days following service thereof. Any unresolved disputes with the Debtors' accounting shall be determined by this Court at a hearing to be held on not less than 15 days written notice to the Account Notice Parties.  All amounts in dispute shall remain on deposit in such account pending Court order.   No commingling of amounts on deposit in any such account shall in any way adversely affect, detract from, or otherwise impair the perfection of any Person's lien on such proceeds.

18.    *Termination.*  The Loan Parties' right to use Prepetition Collateral, including Cash Collateral, pursuant to this Interim Order shall automatically terminate (the date of any such termination, the "***Termination Date***") without further notice or order of the court (x) on the effective date of a Plan for any Debtor or (y) upon written notice (the "***Termination Notice***") to

the Loan Parties (with a copy to counsel for the official committee of unsecured creditors (the

"***Creditors' Committee***" and the Administrative Agent and the Collateral Agent under the

Barclays DIP Facility), if appointed in the Chapter 11 Cases, and the United States Trustee) after

the occurrence and during the continuance of any of the following events (unless waived by the

Adequate Protection Parties, "***Termination Events***") beyond any applicable grace period set

forth below:

(a)    the occurrence and continuance of an event of default under the Barclays

DIP Facility, or if the Barclays DIP Facility has been paid in full, an event, condition or

occurrence that would have been event of default under the Barclays DIP Facility;

(b)    the occurrence and continuance of an event of default under the AFI DIP

Loan;

(c)    the Debtors seek to reject under section 365 of the Bankruptcy Code, or

otherwise, either the Master Servicing Agreement (1st Lien Mortgages Servicing Released) dated

as of April 16, 2006 and amended as of June 1, 2007 between Residential Funding Company,

LLC (f/k/a Residential Funding Corporation) and Ally Bank (f/k/a GMAC Bank) or the Master

Servicing Agreement (1st Lien Mortgages Servicing Retained) dated as of August 15, 2005 and

amended as of March 31, 2006 between Residential Funding Company, LLC (f/k/a Residential

Funding Corporation) and Ally Bank (f/k/a GMAC Bank);

(d)    failure to perform or remain current on all of the Consent Obligations;

(e)    failure to obtain entry of the *Interim Order Pursuant to Sections*

*105(A)and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform under*

*the Ally Bank Servicing Agreement in the Ordinary Course of Business* in form and substance

satisfactory to the AFI Lender within five days of the Petition Date;

(f)     failure to satisfy the Reporting Requirements that continues unremedied for a period of five (5) business days after the date of such failure;

(g)     failure of the Loan Parties to comply with any other covenant or agreement specified in this Interim Order that continues unremedied for a period of five (5) business days after the date of such failure;

(h)     any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 Cases) shall occur under any material document or agreement that relates to the Prepetition Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of the Adequate Protection Parties, as applicable;

(i)     any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 Cases) shall occur under any material document or agreement that relates to the Prepetition Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of the Adequate Protection Parties, as applicable;

(j)     any of the material Chapter 11 Cases shall be dismissed or converted to a chapter 7 case; or a chapter 11 trustee with plenary powers, a responsible officer or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the material Chapter 11 Cases;

(k)     appointment of a trustee (or comparable person) or a responsible officer or examiner with expanded powers in any of the material Chapter 11 Cases (or any of the Debtors or their affiliates seeking or supporting such appointment);

(l)      this Court shall enter an order granting relief from the automatic stay as to any Prepetition Collateral which has an aggregate value in excess of $25 million and such order shall not, at any time, be subject to stay pending appeal;

(m)      a court shall enter an order amending, supplementing, staying, vacating or otherwise modifying the Cash Collateral Orders except as otherwise agreed to in writing by the Adequate Protection Parties, or the Cash Collateral Orders shall cease to be in full force and effect; provided that no event of default shall occur to the extent that any such amendment, supplement or other modification is made in compliance with the Cash Collateral Orders and is not adverse, in the reasonable judgment of the Adequate Protection Parties, as applicable;

(n)      entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior to or *pari passu* with the claims of the Adequate Protection Parties or any lien or security interest that is senior to or *pari passu* with the liens and security interests securing the AFI Revolver, the AFI LOC, or the Junior Secured Notes, except as provided herein;

(o)      entry of an order authorizing recovery from Prepetition Collateral, including Cash Collateral, for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than as may be provided in the Cash Collateral Orders, or certain *de minimis* amounts as may be agreed to by the Adequate Protection Parties;

(p)      any judgment in excess of $10 million as to any postpetition obligation not covered by insurance shall be rendered against the Debtors and the enforcement thereof shall not effectively be stayed at all times; or there shall be rendered against the Debtors a non-monetary judgment with respect to a postpetition event which has or could reasonably be expected to have

a material adverse effect on the property, business or condition (financial or otherwise) of the Debtors taken as a whole or the ability of the Debtors to perform their obligations under this Interim Order; or

(q)      any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables (including reclamation claims) other than payments authorized by the Court.

The Loan Parties shall, within two business days of an occurrence of a Termination Event, provide the corresponding Termination Notice to the parties set forth above.

19.      *Remedies After Termination Event.*

(a)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit

(i)      the Adequate Protection Parties to, immediately upon the occurrence and during the continuation of a Termination Event, and issuance of a the Termination Notice, terminate the right of the Loan Parties to use Prepetition Collateral, including Cash Collateral;

(ii)      In no event shall the Adequate Protection Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral.  The delay or failure of the Adequate Protection Parties to exercise rights and remedies under the Prepetition Obligations or this Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the Prepetition Obligations; and

(iii)    the AFI DIP Lender to exercise all rights and remedies under the AFI DIP Loan, and, to the extent provided for in the AFI DIP Loan, to take any or all of the following actions without further order of or application to this Court: (a) cease to make any extensions of credit or loans or advances to the Debtors; (b) declare all AFI DIP Obligations to be immediately due and payable without presentment, demand, protest or notice; (c) the AFI DIP Lender shall exercise any and all remedies available to it under the AFI DIP Loan; (d) take any other actions or exercise any other rights or remedies permitted under this Order, the AFI DIP Loan, or applicable law to realize upon the AFI DIP Loan Collateral and/or effect the repayment and satisfaction of the DIP Obligations; subject to the AFI DIP Lender providing seven (7) days written notice (by facsimile, telecopy, electronic mail or otherwise) to the U.S. Trustee, counsel to the Debtors ,counsel to any Committee and counsel to the Administrative Agent and Collateral Agent under the Barclays DIP Facility, prior to exercising any enforcement rights or remedies in respect of the Collateral (other than the rights described in clauses (a) and (b) above (to the extent they might be deemed remedies in respect of the Collateral) and other than with respect to the placement of administrative holds on any other deposit accounts or securities accounts).  All rights of the AFI DIP Lender and Adequate Protection Parties are subject to paragraphs 13[(e)-(g)] of the Barclays DIP Order.

(b)    In any hearing regarding any exercise of rights or remedies by the AFI Lender, the only issue that may be raised by the Debtors and any party in interest shall be whether, in fact, a Termination Event has occurred and is continuing, and neither the Debtors nor

any party in interest shall be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the AFI DIP Lender set forth in this Order or the AFI DIP Loan.  In no event shall the AFI DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the AFI DIP Loan Collateral.

(c)      Subject to the provisions of the Junior Notes PSA or further order of the Court, following the occurrence of an event of default under the Prepetition Obligations, the Junior Secured Parties may not exercise any rights or remedies under the Junior Secured Notes Documents or this Interim Order unless and until all the indebtedness of the AFI Lender attributable to the AFI Revolver, including the Adequate Protection Liens, 507(b) Claims, and Adequate Protection Payments granted to the AFI Lender on account the AFI Revolver pursuant to the terms of this Interim Order (collectively, the "*AFI Revolver Payable*"), has been paid in full in cash and all commitments under the AFI Revolver and AFI Revolver Payable have been terminated or an amount sufficient to satisfy the AFI Revolver Payable has been escrowed by the Debtors (calculated in accordance with the Junior Notes PSA to the extent then in effect).  If, prior to the payment in full in cash of all of the AFI Revolver Payable and all commitments under the AFI Revolver and AFI Revolver Payable having been terminated, the Junior Secured Parties or any other party holding a claim junior to the AFI Revolver Payable receive(s) any Prepetition Collateral or proceeds thereof, such Prepetition Collateral or proceeds thereof shall be considered to be held in trust for the benefit of the AFI Revolver Lender and shall be immediately payable to the AFI Revolver Lender.  For the avoidance of doubt, other than the use of the Carve Out in accordance with the terms of this Interim Order, the Loan Parties may not

use the Prepetition Collateral or Cash Collateral to challenge in any manner the claims and liens of the Adequate Protection Parties.

20.    *Limitation On Charging Expenses Against Prepetition Collateral and AFI DIP Loan Collateral.*  Subject only to, and effective upon entry of, the Final Order, and only to the extend provided for therein, except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Prepetition Collateral and AFI DIP Loan Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Adequate Protection Parties or AFI DIP Lender, as applicable and no such consent shall be implied from any other action, inaction, or acquiescence by the Adequate Protection Parties or AFI DIP Lender, as applicable.

21.    *Reservation Of Rights Of The Adequate Protection Parties.*  The Adequate Protection provided herein is reasonable and sufficient to protect the interests of the Adequate Protection Parties.  Notwithstanding any other provision hereof, the grant of Adequate Protection to the Adequate Protection Parties pursuant hereto is without prejudice to the right of the Adequate Protection Parties to seek modification of the grant of Adequate Protection provided hereby so as to provide different or additional Adequate Protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Nothing herein shall be deemed to waive, modify or otherwise impair the rights of the Adequate Protection Parties under the Existing Agreements, and the Adequate Protection Parties expressly reserve all rights and remedies that the Adequate Protection Parties now or may in the future have under the Existing Agreements and/or applicable law in connection with all defaults and

events of default.  Except as expressly provided herein, nothing contained in this Interim Order

(including the authorization to use any Prepetition Collateral, including Cash Collateral) shall

have the effect of, or shall be construed as having the effect of, amending or waiving any

covenant, term or provision of the Existing Agreements, or any rights or remedies of the

Adequate Protection Parties thereunder, including any right to argue that failure to strictly

comply with any such covenant, term or provision during the course of the Chapter 11 Cases or

that any use of Prepetition Collateral, including Cash Collateral, permitted or contemplated

hereby constitutes a default or event of default that is not subject to cure under section 1124 of

the Bankruptcy Code or otherwise despite any consent or agreement contained herein.

22.    *Reservation Of Rights Of The Debtors.*    The foregoing Adequate Protection

provisions contained in this Interim Order shall be without prejudice to the rights of the Debtors

to object to the Adequate Protection Parties' request for any other, further or additional Adequate

Protection.  Nothing in this Interim Order shall be deemed to waive, modify or otherwise impair

the respective rights of the Debtors under the Existing Agreements, and the Debtors expressly

reserve all rights and remedies that each has now or may in the future have under the Existing

Agreements and/or applicable law (subject to paragraphs 3 and 25).

23.    *Reservation of Rights of the Junior Secured Parties*.  The Junior Secured Parties

hereby reserve their rights to assert arguments that the adequate protection provided hereunder is

insufficient on account of diminution in value of the AFI Revolver Collateral resulting from the

Barclays DIP Loan; *provided*, that the Junior Secured Parties shall not assert any such

arguments, if at all, prior to January 1, 2013, with such date subject to extension solely at the

discretion of the Junior Secured Parties, and that the assertion of such arguments may in no way

adversely affect Ally.

24.    *Perfection Of Adequate Protection Liens.*  The Adequate Protection Parties are authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over or take any other action in order to validate and perfect the liens and security interests granted to it hereunder.  Whether or not the Adequate Protection Parties shall, in their sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the Petition Date.

25.    *Preservation Of Rights Granted Under The Interim Order.*

(a)    Except as permitted in this Interim Order, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order to the Adequate Protection Parties shall be granted or allowed while any portion of the Adequate Protection Obligations remain outstanding, and Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Loan Parties' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Except as otherwise provided for herein, no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the AFI DIP Lender shall be granted or allowed while any portion of the AFI DIP Loan or the commitments thereunder or the DIP Obligations remain outstanding, and the AFI DIP Liens shall not be (i) subject or junior to any

lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under

section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other

lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise

(other than the Carve Out and as expressly provided in this Order).

(c)       Unless all AFI DIP Obligations shall have been indefeasibly paid in full,

the Debtors shall not seek (i) any modifications or extensions of this Order without the prior

written consent of the AFI DIP Lender, and no such consent shall be implied by any other action,

inaction or acquiescence by the AFI DIP Lender, or (ii) an order converting or dismissing any of

the Chapter 11 Cases.  If an order dismissing any of the Chapter 11 Cases under section 305 or

1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in

accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims

and AFI DIP Liens granted to the AFI DIP Lender pursuant to this Interim Order shall continue

in full force and effect, shall maintain their priorities as provided in this Interim Order and shall,

notwithstanding such dismissal, remain binding on all parties in interest until all AFI DIP

Obligations shall have been indefeasibly paid in full in cash and the commitments under the AFI

DIP Loan have been terminated in accordance with the AFI DIP Loan and (ii) this Bankruptcy

Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the

Superpriority Claims and AFI DIP Liens.

(d)       If an order dismissing any of the Chapter 11 Cases under section 1112 of

the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance

with sections 105 and 349 of the Bankruptcy Code) that (i) the 507(b) Claims, the other

administrative claims granted pursuant to this Interim Order and the Adequate Protection Liens

shall continue in full force and effect and shall maintain their priorities as provided in this

Interim Order until all Adequate Protection Obligations shall have been paid and satisfied in full

(and that such 507(b) Claims, the other administrative claims granted pursuant to this Interim

Order and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding

on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such

dismissal, for the purposes of enforcing the claims, liens and security interests referred to in

clause (i) above.

(e)     If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the

validity, priority or enforceability of any Adequate Protection Obligations incurred prior to the

actual receipt of written notice by the Adequate Protection Parties of the effective date of such

reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the

Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification or vacatur,

any use of Prepetition Collateral, including Cash Collateral, or any Adequate Protection

Obligations incurred by the Loan Parties hereunder, as the case may be, prior to the actual receipt

of written notice by the Adequate Protection Parties of the effective date of such reversal, stay,

modification or vacatur shall be governed in all respects by the original provisions of this Interim

Order, and the Adequate Protection Parties shall be entitled to all of the rights, remedies,

privileges and benefits granted in this Interim Order with respect to all uses of Prepetition

Collateral, including Cash Collateral, and all Adequate Protection Obligations.

(f)     If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the

validity of any DIP Obligations incurred prior to the actual receipt by the AFI Lender of written

notice of the effective date of such reversal, stay, modification or vacation or (ii) the validity or

43

enforceability of the AFI DIP Liens and Superpriority Claims authorized or created hereby or pursuant to the AFI DIP Loan with respect to any DIP Obligations. Notwithstanding any such reversal, stay, modification or vacation, the DIP Obligations incurred by the Debtors pursuant to the AFI DIP Loan, prior to the actual receipt by the AFI DIP Lender of written notice of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the AFI DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the AFI DIP Loan.

(g)     The Adequate Protection Payments shall not be subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance in the Chapter 11 Cases or any subsequent chapter 7 case.

(h)     Except as expressly provided in this Interim Order or in the Prepetition Obligations, the Adequate Protection Obligations, the 507(b) Claims and all other rights and remedies of the Adequate Protection Parties granted by the provisions of this Interim Order and the Prepetition Obligations shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases or by any other act or omission, or (ii) the entry of an order confirming a Plan in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining Adequate Protection Obligations. The terms and provisions of this Interim Order and the Prepetition Obligations shall continue in the Chapter 11 Cases, in any successor cases, or in any superseding chapter 7 cases under the Bankruptcy Code, and the Adequate Protection Liens, the 507(b) Claims, the other administrative claims granted pursuant to this Interim Order, and all

other rights and remedies of the Adequate Protection Parties granted by the provisions of this

Interim Order and the Prepetition Obligations shall continue in full force and effect until all

Adequate Protection Obligations are indefeasibly paid in full in cash.  Notwithstanding anything

contained in this paragraph, nothing in this Interim Order shall (i) limit the Debtors' rights, if

any, with respect to unimpairment of the Debtors' prepetition debt or (ii) be deemed to modify

the Prepetition Obligations.

(i)    Except as expressly provided in this Interim Order or in the AFI DIP

Loan, the AFI DIP Liens, the Superpriority Claims and all other rights and remedies of the AFI

DIP Lender granted by the provisions of this Interim Order and the AFI DIP Loan shall survive,

and shall not be modified, impaired or discharged by (i) the entry of an order converting any of

the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the

Chapter 11 Cases, terminating the joint administration of these Chapter 11 Cases or by any other

act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the

Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have

waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this

Interim Order and the AFI DIP Loan shall continue in these Chapter 11 Cases, in any successor

cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7

cases under the Bankruptcy Code, and the AFI DIP Liens, the Superpriority Claims and all other

rights and remedies of the AFI DIP Lender granted by the provisions of this Interim Order and

the AFI DIP Loan shall continue in full force and effect until the DIP Obligations are

indefeasibly paid in full.

26.    *Effect Of Stipulations On Third Parties.*  The stipulations, admissions, and

releases contained in paragraph [3(b)-3(h)] of this Order, shall be binding on the Debtors upon

entry of this Interim Order, subject to the terms of paragraph 3, effective as of the Petition Date.

The stipulations, admissions, and releases contained in paragraph [3(b)-3(h)] of this Order, shall

be binding on all parties in interest, including any Committee, unless, and solely to the extent

that, any party in interest files an objection to this Interim Order challenging such stipulations,

admissions, releases, or otherwise asserting any claims or causes of action on behalf of the

Debtors' estates against the Junior Secured Parties (an "*Objection*"), in each case no later than

the later of seventy-five (75) days after entry of this Interim Order.  If no such Objection is

timely filed then, without further order of this Court, all of the stipulations, admissions and

releases set forth in paragraph [3] shall be binding on all parties in interest in the Chapter 11

Cases and shall not be subject to challenge or modification in any respect.  If such an Objection

is timely filed, the stipulations, admissions and releases shall nonetheless remain binding on all

parties in interest and shall be preclusive except to the extent that any such stipulations,

admissions and releases are expressly challenged pursuant to such timely filed Objection, and

there is an order sustaining such Objection.  Notwithstanding anything to the contrary, if the

Junior Notes PSA is terminated, the stipulation contained in paragraph 3(g)(ii)(A) or this Interim

Order shall not be binding on the Junior Secured Notes.

27.    *Reservation of Rights.*  Notwithstanding anything herein to the contrary, this

Order shall not modify or affect the terms and provisions of, nor the rights and obligations under,

the Consent Obligations.

28.    *Limitation On Use Of Prepetition Collateral and Proceeds of AFI DIP Loan.*  The

Loan Parties shall use the proceeds of the Prepetition Collateral, including Cash Collateral, and

the proceeds of the AFI DIP Loan solely as provided in this Interim Order.  Notwithstanding

anything herein or in any other order of this Court to the contrary, no Prepetition Collateral,

including Cash Collateral, or the proceeds thereof, or the proceeds of the AFI DIP Loan, or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Prepetition Obligations, or to any of the liens or claims granted under this Interim Order or the Prepetition Obligations, (b) assert any claims and defenses or any other causes of action against the AFI Lender or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the AFI Lender's assertion, enforcement or realization on the Prepetition Collateral in accordance with the Prepetition Obligations or this Interim Order, (d) seek to modify any of the rights granted to the AFI Lender hereunder or under the Prepetition Obligations, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted hereunder; *provided*, that without duplication of the limitations on the use of the Carve Out, up to $100,000 in the aggregate of such proceeds may be used to pay allowed fees and expenses of professionals to any Court-appointed committee to investigate (but not initiate or prosecute any claims with respect to) any Ally Debt Claims or Junior Secured Parties Claims.

29.    *Waiver of Setoff and Recoupment Rights*.    The parties on whose behalf the Borrowers are making servicer advances hereby waive any and all rights of setoff or recoupment against the Debtors and AFI to the extent such advances are directly funded by Cash Collateral.

30.    *Notice to MBS Trustees Regarding Advance Facility and Debtors' Status as an Advancing Person/Advancing Counterparty*.    The Debtors shall serve this Interim Order and the notice of the Final Hearing on all MBS trustees or other persons for which it is servicing mortgage loans.  Service of this Interim Order in accordance with the preceding sentence shall

constitute notice and payment direction by the Debtors as the master servicer and servicer to each MBS trustee or other person for which it is servicing mortgage loans (other than the GSEs) to pay, or cause to be paid, all collections with respect to, and all other proceeds of, receivables to the applicable Debtor, as the party to whom the master servicer's or servicer's advance reimbursement rights have been sold, assigned and/or pledged, and each MBS trustee shall pay, or cause to be paid, all collections with respect to, and all other proceeds of, receivables to the applicable Debtor, as the party to whom the master servicer's or servicer's advance reimbursement rights have been sold, assigned and/or pledged (as such party may be otherwise defined) as so provided.

31.     *Waiver of Claims and Causes of Action.*  Without prejudice to the rights of any other party, the Debtors waive any and all claims and causes of action against the AFI Lender and its respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors related to this Interim Order or the negotiation of the terms thereof.

32.     *Binding Effect; Successors and Assigns.*  Subject to paragraph 26, the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases, including the Adequate Protection Parties, the Creditors' Committee and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the Adequate Protection Parties and the Debtors and their respective successors and assigns, *provided*, that, except to the extent expressly set forth in this Interim Order, the Adequate Protection Parties shall have no obligation to permit the use of

Prepetition Collateral, including Cash Collateral, or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

33.    *Limitation of Liability.*  Subject to entry of the Final Order, solely in connection with permitting the use of Prepetition Collateral, including Cash Collateral, or exercising any rights or remedies as and when permitted pursuant to this Interim Order or the Prepetition Obligations, the Adequate Protection Parties shall not be deemed, from and after the Petition Date, to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon the Adequate Protection Parties any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

34.    *No Impact on Certain Contracts/ Transactions.*  No rights of any entity under sections 555, 556, 559, 560 and 561 of the Bankruptcy Code shall be affected by the entry of this Interim Order as to any contract or transaction of the kind listed in such sections of the Bankruptcy Code.

35.    *Effectiveness.*  This Interim Order shall take effect immediately upon entry and shall constitute findings of fact and conclusions of law.  This Interim Order is effective *nunc pro tunc* as of the Petition Date.

36.    *Final Hearing Notice*.  The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties that received

notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any committee after the same has been appointed, or committee counsel, if the same shall have been appointed.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections; which objections shall be served upon (a) counsel to the Debtors, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York, 10104, Attn:  Larren Nashelsky, Gary Lee and Todd Goren; (b) counsel for Ally Bank, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn.:  Richard M. Cieri, Ray C. Schrock, and Stephen E. Hessler; (c) counsel to U.S. Bank National Association, Kelley Drye & Warren LLP, 101 Park Avenue, New York, New York 10178, Attn: Eric R. Wilson and Benjamin D. Feder; (d) counsel to the Ad Hoc Group of Junior Secured Notes, White & Case LLP, 1155 Avenue of the Americas, New York, New York, 10036, Attn.:  Gerard Uzzi and Harrison Denman; (e) the Office of the United States Trustee for the Southern District of New York at 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn.:  [__]; (f) the Debtors' postpetition lenders; and (g) counsel to any official statutory committee appointed in these cases and shall be filed with the Clerk of the United States Bankruptcy Court, Southern District of New York, in each case to allow actual receipt by the foregoing no later than _____ __, 2012 at _:__ _.m. prevailing Eastern time (with any replies filed by _____ __, 2012 at _:__ _.m.).

   37. *Objections Overruled.*  Any objection that has not been withdrawn or resolved is, to the extent not resolved, hereby overruled.

Dated: _____ __, 2012
    New York, New York

           _____
           UNITED STATES BANKRUPTCY JUDGE

**Exhibit 2**

**DATA CENTER TRANSACTION**

# PURCHASE AND SALE AGREEMENT

between

**EPRE LLC**, a Delaware limited liability company,

as Seller,

and

**ALLY FINANCIAL INC.**, a Delaware corporation,

as Purchaser

May 9, 2012

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is executed as of the 9th day of May, 2012 (the "Effective Date"), by and between **EPRE LLC**, a Delaware limited liability company ("Seller"), and **ALLY FINANCIAL INC.**, a Delaware limited liability company ("Purchaser").

## 1.    DEFINITIONS AND EXHIBITS.

**1.1 Definitions**.  In this Agreement, the following defined terms have the meanings set forth for them in the Section of this Agreement indicated below:

| Term | | Term | |
|---|---|---|---|
| Agreement | Opening | Permitted Exceptions | Section 3.1 |
| Asset Closing | Section 9.1 | Property | Section 2.1(b) |
| Closing | Section 2.4 | Property Interest | Section 2.1 |
| Closing Date | Section 7.1 | Purchaser | Opening |
| Effective Date | Opening | Purchase Price | Section 2.4 |
| First Assignment of Leasehold | Section 2.3 | Repurchase | Section 9.1 |
| GMAC | Section 2.3 | Repurchase Closing | Section 9.1 |
| Improvements | Section 2.1(b) | Repurchase Price | Section 9.1 |
| Land | Section 2.1(a) | Seller | Opening |
| Lease | Section 2.3 | Shared Services Agreement | Section 8.1 |
| Leasehold Interest | Section 2.3 | Transfer Taxes | Section 7.2(d) |
| Other Costs | Section 7.2(d) | | |

**1.2 Exhibits**.  The Exhibits listed below are attached to and incorporated into this Agreement.  In the event of any inconsistency between such Exhibits and the terms and provisions of this Agreement, the terms and provisions of the Exhibits shall control.  The Exhibits to this Agreement are:

| EXHIBIT A | Legal Description of the Land |
|---|---|
| EXHIBIT B | Form of Deed |
| EXHIBIT C | Assignment of Leasehold Interest |

## 2.    PURCHASE AND SALE OF THE PROPERTY INTEREST.

**2.1 Sale**.  For the consideration hereinafter set forth, and subject to the provisions contained herein, Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase from Seller, an undivided fifty-one percent (51%) interest in the following (the "Property Interest"):

(a) The real property located at 6875 Shady Oak Road in Hennepin County, Minnesota described in Exhibit A, together with all of Seller's right, title and interest to reversions, remainders, easements, rights-of-way, appurtenances, hereditaments and water and mineral rights appertaining to or otherwise benefiting or used in connection with such real property, together with all of Seller's right, title and interest in and to any strips of land, streets, and alleys abutting or adjoining such real property (the "Land"); and

(b) All existing buildings or other improvements, structures, open parking facilities and fixtures placed, constructed, installed or located on the Land, and all plants, trees, and other appurtenances located upon, over or under the Land (collectively, the "Improvements";

the Land and Improvements are sometimes hereinafter collectively referred to as the "Property").

**2.2 Title**. After the Closing (defined below), title to the Property shall be held by Purchaser and Seller as tenants-in-common.

**2.3 Leasehold Interest.** The acquisition and sale of the Property Interest is conditioned upon the assignment by GMAC Mortgage LLC, an affiliate of Seller ("GMAC"), to Purchaser of an undivided fifty-one percent (51%) interest in certain Lease Agreement dated as of July 30, 2002, as amended by that certain First Amendment to Lease Agreement dated March 23, 2004, that certain Second Amendment to Lease Agreement dated November 4, 2005, and that certain Third Amendment to Lease Agreement dated August 25, 2011 (collectively, the "Lease") between Breof Convergence, LP, a Delaware limited partnership, as assignee of Lewisville LSF, L.P., as landlord and GMAC, as tenant (the "Leasehold Interest") pursuant to the Assignment of Leasehold Interest attached hereto as Exhibit C (the "First Assignment of Leasehold Interest"),

**2.4 Purchase Price**. The purchase price for the Property Interest and the Leasehold Interest shall be Six Million Dollars ($6,000,000) (the "Purchase Price"), which Purchase Price was determined based on fair market value appraisals of the Property Interest and Leasehold Interests. The Purchase Price shall be paid at the closing of the purchase contemplated hereby (the "Closing") in cash, by certified check, cashier's check, wire transfer, or other immediately available funds.

**3.    SELLER'S REPRESENTATIONS AND WARRANTIES.**

Seller represents and warrants to Purchaser as follows:

**3.1 Title**.  Seller holds good and marketable title to the Land in fee simple absolute, free and clear of all matters affecting title, except for (i) taxes not yet due and payable, (ii) all zoning and other regulatory laws and ordinances affecting the Property, (iii) all matters shown or that would be shown on a current ALTA survey of the Property, and (iv) those liens and other matters of record as of the Effective Date affecting any of the Property (collectively, the "Permitted Exceptions").  None of the Permitted Exceptions will materially affect Purchaser's acquisition, ownership, use or enjoyment of the Property Interest.

**3.2 No Possessory Rights**.  Except for any rights of possession granted under the Permitted Exceptions, there are no parties in possession of any of the Property except Seller and Purchaser, and there are no other rights of possession or use which have been granted to any third party or parties.

**3.3 No Third-Party Interests**.  Seller has not granted to any party any option, contract or other agreement with respect to the purchase or sale of the Property.

**3.4 No Actions**.  There are no actions, suits, proceedings or claims pending or to Seller's knowledge threatened with respect to or in any manner affecting any of the Property or the ability of Seller to consummate the transaction contemplated by this Agreement.

**3.5 Eminent Domain; Special Assessments**.  There are no pending or, to Seller's knowledge, threatened condemnation or similar proceedings affecting any of the Property.

**3.6 Access**.  Seller has no knowledge of any fact or condition that would result or could result in the termination or reduction of the current access to or from the Property to existing thoroughfares or of any reduction in or to a sewer or other utility services currently servicing the Property.

**3.7 Authority**.  Seller is a limited liability company duly organized and existing and in good standing under the laws of the State of Delaware.  Seller has the full right and authority to enter into this Agreement and consummate the transactions contemplated by this Agreement.  All requisite company action has been taken by Seller in connection with the execution of this Agreement and the documents referenced herein and the consummation of the transactions contemplated hereby.  Each of the Persons signing this Agreement on behalf of Seller is authorized to do so.

**3.8 Consents; Restrictions; Binding Obligations**.  No third party approval or consent is required to enter into this Agreement or the documents referenced herein or to consummate the transactions contemplated hereby except for any such approval or consent that has already been received.  To Seller's knowledge, the entering into and consummation of the transactions contemplated hereby will not conflict with or, with or without notice or the passage of time or both, constitute a default under, any loan agreement, security agreement, lease or other agreement to which Seller is a party or by which Seller may be bound or any law, rule, license, regulation, judgment, order or decree governing or affecting Seller or the Property.  This Agreement and all documents referenced herein to be executed by Seller are and shall be valid and legally binding obligations of Seller.

**3.9 No Additional or Implied Warranties**.  Purchaser acknowledges that Purchaser and Purchaser's representatives have fully inspected the Property or will have done so prior to Closing, are or will be fully familiar with the financial and physical (including, without limitation, environmental) condition thereof as of Closing, and that the Property Interest will be purchased by Purchaser in "AS-IS" and "WHERE IS" condition and with all existing defects (patent and latent) as a result of such inspections and investigations and not in reliance on any agreement, understanding, condition, warranty (including without limitation warranties of habitability, merchantability or fitness for a particular purpose) or representations made by Seller or any agent, employee or principal of Seller or any other party as to the financial or physical (including, without limitation, environmental) condition of the Property, or as to any other matter whatsoever, including, without limitation, as to any permitted use thereof, the zoning classification thereof or compliance with any federal, state or local laws, as to the income or expense in connection therewith, or as to any other matter in connection therewith.  Purchaser acknowledges that, except as otherwise expressly provided in Section 3, neither Seller nor any agent or employee of Seller, nor any other party acting on behalf of Seller has made or shall be deemed to have made any such agreement, condition, representation or warranty either expressed or implied and that Purchaser assumes the risk that adverse physical, environmental, economic or legal conditions may not have been revealed by Purchaser's investigation.  The limitations set forth in this Section 3.11 shall not be deemed to supersede, restrict, modify, replace or eliminate any representations or warranties of Seller expressly set forth in this Agreement.  This section shall survive the Closing and shall be deemed incorporated by reference and made a part of all documents delivered by Seller to Purchaser in connection with the sale of the Property Interest.

4.    **PURCHASER'S REPRESENTATIONS AND WARRANTIES.**

Purchaser represents and warrants to Seller as follows:

**4.1 Authority**.  Purchaser is a corporation duly organized and existing and in good standing under the laws of the State of Delaware.  Purchaser has the full right and authority to enter into this Agreement and consummate the transactions contemplated by this Agreement.  All requisite corporate action has been taken by Purchaser in connection with the execution of this Agreement and the documents referenced herein and the consummation of the transactions contemplated hereby.  Each of the Persons signing this Agreement on behalf of Purchaser is authorized to do so.

**4.2 Consents; Restrictions; Binding Obligations**.  No third party approval or consent is required to enter into this Agreement or the documents referenced herein or to consummate the

transactions contemplated hereby. To Purchaser's knowledge, the entering into and consummation of the transactions contemplated hereby will not conflict with or, with or without notice or the passage of time or both, constitute a default under, any loan agreement, security agreement, lease or other agreement to which Purchaser is a party or by which Purchaser may be bound or any law, rule, license, regulation, judgment, order or decree governing or affecting Purchaser or the Property. This Agreement and all documents required hereby to be executed by Purchaser are and shall be valid and legally binding obligations of Purchaser.

## 5.    SELLER'S UNDERTAKINGS PENDING CLOSING.

**5.1 Operation of the Property**. Until the earlier of the Closing or the termination of this Agreement, Seller shall:

(a) Status of Title. Not do anything, or permit anything to be done, that would impair or modify the status of title.

(b) Operation. Operate and maintain the Property in the same manner as immediately prior to the Effective Date, reasonable wear and tear excepted.

(c) Contracts. Not enter into any lease, service contract or other contract that, following Closing, will be binding upon Purchaser or the Property without, in each instance, obtaining the prior written approval of Purchaser.

(d) Transfer. Not cause or permit the transfer, conveyance, sale, assignment, pledge, mortgage, or encumbrance of any of the Property.

## 6.    PURCHASER'S OBLIGATION TO CLOSE.

**6.1 Conditions**. Purchaser shall not be obligated to close the transaction contemplated hereunder unless each of the following conditions shall be satisfied on the Closing Date:

(a) Accuracy of Representations. The representations and warranties of Seller in this Agreement shall be true and correct on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, and Seller shall so certify.

(b) Condition of Repair. The Improvements shall be in substantially the same condition and repair as on the date hereof.

(c) Seller's Performance. Seller shall have performed all covenants and obligations and complied with all conditions required by this Agreement to be performed or complied with by Seller on or before the Closing Date.

## 7.    CLOSING.

**7.1 Time of Closing**. The Closing shall take place via mail on May 9, 2012, or such earlier or other date as may be mutually acceptable to the parties (the "Closing Date").

**7.2 Deliveries**. At the Closing the following shall occur:

(a) Deed. Seller shall deliver to Purchaser a duly executed and acknowledged deed, in substantially the form and content of Exhibit B, containing general warranties of title and

conveying the Property Interest to Purchaser, free and clear of all matters affecting title, except for those matters of record.

(b) <u>Purchase Price</u>.  Purchaser shall pay to Seller the Purchase Price as provided in Section 2.2.

(c) <u>Transfer Taxes and Other Costs</u>.  Purchaser shall pay any and all city, county and state transfer taxes or documentary stamp taxes applicable to the sale of the Property Interest (collectively, the "<u>Transfer Taxes</u>") and any and all other third party fees, costs and expenses (including the reasonable attorneys' fees of Seller) applicable to the sale of the Property Interest (collectively, "<u>Other Costs</u>").

(d) <u>Shared Services Agreement</u>.  Seller and Purchaser shall have agreed in principal to the Shared Services Agreement (as defined below), which, upon its effectiveness, the operation of the Property  shall be governed after the Closing (the "<u>Shared Services Agreement</u>").

(e) <u>Additional Documents</u>.  Seller and Purchaser shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments and all other instruments and documents as may be reasonably necessary in order to complete the transaction herein provided and to carry out the intent and purposes of this Agreement.

## 8.    POST-CLOSING OBLIGATIONS.

**8.1 Operation of the Property**.  Seller's and Purchaser's duties, obligations and authority with respect to the Property and all consents, approvals and other decisions regarding the Property shall be set forth in the Shared Services Agreement.

**8.2 Partition.**  Seller and Purchaser each covenants that after the Closing it shall not bring, nor be entitled to bring, an action for partition of the Property.

**8.3 Indemnity**.

(a) <u>Purchaser Indemnity</u>.  Purchaser shall defend, indemnify and hold harmless Seller and each affiliate of Seller for, from and against any and all claims, demands and liability directly or indirectly related to the acts or omissions of Purchaser relating to this Agreement or the Property during the period from and after the Closing Date through the date on which Purchaser transfers all of the Property Interest back to Seller pursuant to <u>Section 9.11</u> hereof.  Purchaser's indemnity obligation hereunder shall survive the Closing.

(b) <u>Seller Indemnity</u>.  Seller shall defend, indemnify and hold harmless Purchaser for, from and against any and all claims, demands and liability directly or indirectly related to the acts or omissions of Seller relating to this Agreement or the Property.  Seller's indemnity obligation hereunder shall survive the Closing.

**8.4 Retroactive Transfer Taxes**.  In the event that it is determined that Transfer Taxes are not due at the Closing or the Repurchase Closing, but are later determined to be due, Purchaser shall promptly pay such Transfer Taxes and shall indemnify Seller in connection with the same.  Purchaser's indemnity obligation under this <u>Section 8.4</u> shall survive the Closing.

## 9.    REPURCHASE RIGHT.

9.1 Repurchase. Seller shall re-purchase the Property Interest from Purchaser (the "Repurchase") at any time from and after the closing of the sale of all or substantially all of the assets of Seller and/or its affiliates to one or more purchasers (the "Asset Closing"), but in no event later than December 31, 2014. The closing of the Property Interest (the "Repurchase Closing") shall take place on a date mutually agreed upon between Seller and Purchaser, but in any event, within 30 days after notice from Seller to Purchaser that Seller is exercising its right to purchase the Property Interest. Subject to the terms of this Section 9.1, Seller shall be entitled to exercise its right to purchase the Property Interest on the day immediately prior to the Asset Closing. As a condition to the Repurchase Closing, at least five (5) business days' prior to the Asset Closing, Seller shall deliver, or cause to be delivered, documentation reasonably acceptable to Purchaser, providing Purchaser, for a period of at least twelve (12) months, with an option to extend such time period for an additional twelve (12) months at Purchaser's option, after the Asset Closing, with (i) the right to possession of that portion of the Premises set forth in the Lease (subject to the terms of the Lease) and the Property occupied by Purchaser as of the Effective Date, and (ii) those services as set forth in the Shared Services Agreement or any other agreement executed by Purchaser and the purchaser of Seller's assets as set forth above. Purchaser's right to possession of the Premises and Property as set forth in the preceding sentence shall be subject to Purchaser's agreement to payment of a portion of the rent under the Lease, a rent payment for the portion of the Property then occupied by Purchaser reasonably acceptable to Purchaser and such other terms which are customarily agreed to by subtenants (for the Premises) and tenants(for the Property), as applicable, and which are otherwise reasonably acceptable to Purchaser.

Deliveries. At the Repurchase Closing, the following shall occur:

(i)    Deed. Purchaser shall deliver to Seller a duly executed and acknowledged deed, in substantially the form and content of the deed the Seller delivered to Purchaser in connection with the Closing, which form of deed is attached as Exhibit B, containing general warranties of title and conveying the Property Interest to Seller, free and clear of all matters affecting title, except for the Permitted Exceptions.

(ii)    Purchase Price. Seller shall pay to Purchaser a purchase price of Six Million Dollars ($6,000,000) (the "Repurchase Price") in connection with the Repurchase and the assignment of leasehold interest described in subsection (v) below. The Repurchase Price shall be paid at the Repurchase Closing in cash, by certified check, cashier's check, wire transfer, or other immediately available funds.

(iii)    Transfer Taxes and Other Costs. Purchaser shall pay any and all Transfer Taxes and Other Costs in connection with the transactions described in this Section 9.1.

(iv)    Additional Documents. Seller and Purchaser shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all conveyances, assignments and all other instruments and documents as may be reasonably necessary in order to complete the transaction provided above with respect to the Repurchase.

(v)    Assignment of Leasehold Interest. Purchaser and GMAC shall have executed an Assignment of Leasehold Interest in substantially the same form and substance as the First Assignment of Leasehold Interest pursuant to which Purchaser shall assign back to GMAC the Leasehold Interest.

## 10.    GENERAL PROVISIONS.

**10.1    Construction.**  As used in this Agreement, the singular shall include the plural and any gender shall include all genders as the context requires and the following words and phrases shall have the following meanings:  (a) "including" shall mean "including without limitation"; (b) "provisions" shall mean "provisions, terms, agreements, covenants and/or conditions"; (c) "lien" shall mean "lien, charge, encumbrance, title retention agreement, pledge, security interest, mortgage and/or deed of trust"; (d) "obligation" shall mean "obligation, duty, agreement, liability, covenant and/or condition"; (e) "any of the Property" shall mean "the Property or any part thereof or interest therein"; (f) "any of the Land" shall mean "the Land or any part thereof or interest therein"; and (g) "any of the Improvements" shall mean "the Improvements or any part thereof or interest therein."

**10.2    Further Assurances.**  Each of the parties hereto undertakes and agrees to execute and deliver such documents, writings and further assurances as may be required to carry out the intent and purposes of this Agreement.

**10.3    Entire Agreement.**  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto.  No waiver of any of the provisions of this Agreement shall be valid unless in writing and signed by the party against whom such waiver is sought to be enforced.  This Agreement contains the entire agreement between the parties relating to the purchase and sale of the Property Interest.  All prior negotiations between the parties are merged in this Agreement, and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between the parties other than as herein set forth.

**10.4    Survival.**  All of the parties' representations, warranties, covenants and agreements hereunder, to the extent not fully performed or discharged by or through the Closing, shall not be deemed merged into any instrument delivered at Closing, shall survive Closing, and shall remain fully enforceable thereafter.

**10.5    Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the state on Minnesota.

**10.6    Headings.**  The headings of Articles and Sections of this Agreement are for purposes of convenience and reference and shall not be construed as modifying the Articles or Sections in which they appear.

**10.7    Assignment.**  Seller may transfer and assign its rights under Section 9, in whole but not in part, to any purchaser of all or substantially all of its assets. Except as provided in the prior sentence, neither Seller nor Purchaser shall sell, assign or transfer this Agreement, without the prior written consent of the other, which may be granted or withheld in its sole discretion.

**10.8    Time of Essence.**  Time is of the essence with respect to the parties' obligations hereunder.

**10.9    Attorneys' Fees.**  If either party commences an action to enforce the terms of, or resolve a dispute concerning, this Agreement, the court shall award the prevailing party in such action all costs and expenses incurred by such party in connection therewith, including reasonable attorneys' fees.

**10.10  Severability.**  If any provision of this Agreement is declared void or unenforceable by a final judicial or administrative order, this Agreement shall continue in full force and effect, except that the void or unenforceable provision shall be deemed deleted and replaced with a provision as similar in terms to such void or unenforceable provision as may be possible and be valid and enforceable.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date(s) set forth below, but as of the Effective Date.

SELLER:

**EPRE LLC**, a Delaware limited liability company

Date: As of May 9, 2012

By: _____
Name: JAMES WHITLING
Title: CFO

PURCHASER:

**ALLY FINANCIAL INC.**, a Delaware corporation

Date: As of May 9, 2012

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date(s) set forth below, but as of the Effective Date.

SELLER:

**EPRE LLC**, a Delaware limited liability company

Date:  As of May 9, 2012

By: _____
Name: _____
Title: _____

PURCHASER:

**ALLY FINANCIAL INC.**, a Delaware corporation

Date:  As of May 9, 2012

By: _____
Name: EVAN NICULAS
Title: PRESIDENT, ALLY SERVICING and
CHIEF PROCUREMENT OFFICER,
ALLY FINANCIAL INC.

# EXHIBIT A

## LEGAL DESCRIPTION

PARCEL 1:

That part of Lot 1, Block 2, Shady Oak Industrial Park, Hennepin County, Minnesota lying West of a line drawn at a right angle to the South line of said Lot 1 from a point on said South line distant 340.84 feet West of the Southeast corner of said Lot 1.

PARCEL 2:

Appurtenant non-exclusive easement for roadway purposes over the Southeasterly and Southerly 30 feet of the part of Lot 2, Block 2, Shady Oak Industrial Park, lying Westerly of the Easterly 124.98 feet of said Lot 2, as set forth in Mutual Easement Agreement, dated August 21, 2000, filed August 28, 2000, as Document Number  7345470, Office of the County Recorder, Hennepin County, Minnesota.

## EXHIBIT B

## FORM OF DEED

_____
(RESERVED FOR RECORDING DATA)

**LIMITED WARRANTY DEED**

STATE DEED TAX DUE HEREON:  $1.70

Dated as of May 9, 2012

    FOR VALUABLE CONSIDERATION, **EPRE LLC**, a Delaware limited liability company, ("Grantor"), does hereby convey and warrant to **ALLY FINANCIAL INC.**, a Delaware corporation, ("Grantee"), an undivided 51% interest as tenant-in-common in the real property in Hennepin County, Minnesota, described on Exhibit A attached hereto (the "Property"), together with all hereditaments and appurtenances belonging thereto, subject to all matters of record.

    This Deed conveys after-acquired title. Grantor warrants that Grantor has not made, done, executed or suffered any act or thing whereby the herein-described property or any part hereof, now or at any time hereafter, shall or may be imperiled, charged or encumbered in any manner, and Grantor will warrant the title to the herein-described property against all persons claiming the same from or through Grantor as a result of any such act or thing.

Grantor and Grantee each covenants that it shall not bring, nor be entitled to bring, an action for partition of the Property.

Grantor certifies that Grantor does not know of any wells on the Property.

*[Signature Page Follows]*

{ 01034116.1 07401-0101 5/7/2012 11:24:17 AM }

EPRE LLC, a Delaware limited liability company

By: _____
Name:_____
Title: _____

STATE OF NEW YORK    )
            ) SS:
COUNTY OF NEW YORK   )

  On the ____ day of _____ in the year 2012, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person or entity on behalf of which the individual acted, executed the instrument.

_____
NOTARY PUBLIC
Type/Print Name: _____     [SEAL]
My commission expires: _____

ALLY    FINANCIAL    INC.,    a    Delaware corporation

By: _____

Name:_____

Title: _____


STATE OF NEW YORK            )
                             ) SS:
COUNTY OF NEW YORK           )


On the ____ day of _____ in the year 2012, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person or entity on behalf of which the individual acted, executed the instrument.


_____
NOTARY PUBLIC
Type/Print Name: _____          [SEAL]
My commission expires: _____


This instrument was drafted by David W. Fell, Esq., Lowe, Fell & Skogg, LLC, 370 17th Street, Suite 4900, Denver, Colorado 80202.

Tax statements for the real property described in Exhibit A to this instrument should be sent to:
Ally Financial Inc., a Delaware corporation

Ally Financial Inc.
c/o GMAC Financial Services
Global Real Estate
1100 Virginia Drive
Mail Code 190-FTW-M98
Fort Washington, PA 19034


_____
_____

## EXHIBIT A

## LEGAL DESCRIPTION

TAX ID NO: 01-116-22-44-0017

PARCEL 1:

That part of Lot 1, Block 2, Shady Oak Industrial Park, Hennepin County, Minnesota lying West of a line drawn at a right angle to the South line of said Lot 1 from a point on said South line distant 340.84 feet West of the Southeast corner of said Lot 1.


PARCEL 2:

Appurtenant non-exclusive easement for roadway purposes over the Southeasterly and Southerly 30 feet of the part of Lot 2, Block 2, Shady Oak Industrial Park, lying Westerly of the Easterly 124.98 feet of said Lot 2, as set forth in Mutual Easement Agreement, dated August 21, 2000, filed August 28, 2000, as Document Number 7345470, Office of the County Recorder, Hennepin County, Minnesota.

## EXHIBIT C

## FORM OF ASSIGNMENT OF LEASEHOLD INTERST

### ASSIGNMENT OF LEASEHOLD INTEREST

THIS ASSIGNMENT OF LEASEHOLD INTEREST (this "Assignment") is executed as of the 9th day of May 2012 (the "Effective Date"), by and between **GMAC MORTGAGE LLC**, a Delaware limited liability company, fka GMAC Mortgage Corporation ("Assignor"), and **ALLY FINANCIAL INC.**, a Delaware corporation ("Assignee").

### RECITALS

A.      Pursuant to that certain Lease Agreement dated as of July 30, 2002, as amended by that certain First Amendment to Lease Agreement dated March 23, 2004, that certain Second Amendment to Lease Agreement dated November 4, 2005, and that certain Third Amendment to Lease Agreement dated August 25, 2011 (collectively, the "Lease"), Breof Convergence, LP, a Delaware limited partnership, as assignee of Lewisville LSF, L.P. ("Landlord") leased approximately 78,413 square feet of real property designated as Building 3 of the project commonly referred to as Convergence Office Center in Lewisville, Texas, as more fully described in the Lease (the "Premises"), to Assignor, as tenant.

B.      Section 11 of the Lease provides that Assignor may assign the Lease without Landlord's consent to an Affiliate (as defined in the Lease) of Assignor.  Assignee is an Affiliate of Assignor.

C.      Assignor now wishes to assign an undivided fifty-one percent (51%) leasehold interest (the "Leasehold Interest") to Assignee in accordance with the terms of this Assignment.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignment of Leasehold Interest.  As of the Effective Date, Assignor does hereby grant, bargain, sell, assign, transfer and set over unto Assignee the Leasehold Interest, together with all rights and benefits thereunder, to have and to hold the same unto Assignee, its successor and assigns.

2.      Assumption of Leasehold Interest.  As of the Effective Date, Assignee hereby assumes the obligations of Assignor under the Lease to the extent of  the Leasehold Interest.  Assignor's and Assignee's duties, obligations and authority with respect to the Lease, the Premises and all consents, approvals and other decisions regarding the Premises, the Lease and matters relating to or between the Landlord and the tenant under the Lease are set forth in that certain Shared Services Agreement between Assignor and Assignee, which, upon its effectiveness, shall govern the operations of the Premises after the transfer described herein.

3.      Further Assurances.  It is the intention of the parties hereto that the Leasehold Interest shall be fully and absolutely transferred by Assignor to Assignee.  Assignor therefore agrees that it shall execute any additional documents that may hereafter reasonably be requested by Assignee in order more fully to effectuate such transfer and assignment.

4.      Representations and Warranties.  Assignor hereby represents and warrants that, as of the Effective Date:

a.    Assignor is the sole holder of the lessee's or tenant's interest in the Lease and the same has not been assigned or pledged;

b.    To the best of Assignor's actual knowledge, there exist no matters of title or record which would impair Assignor's transfer of the Leasehold Interest to Assignee or the right of Assignee to acquire and hold the Leasehold Interest in the Premises;

c.    Assignor has fully power and authority to enter into this Assignment and no approval of any third party is required ;

d.    There have been no amendments, oral or written, to the terms of the Lease, other than those set forth in Recital A above; and

e.    There exists no event of default and no circumstance which would, with the giving of notice or the passage of time or both, constitute an event of default under the Lease by Assignor or, to the best of Assignor's actual knowledge, Landlord.

5.    <u>Indemnity</u>.

a.    Assignee shall defend, indemnify and hold harmless Assignor and its affiliates for, from and against any and all claims, demands and liability (i) arising under or relating to the Lease that are directly or indirectly related to the failure of Assignee to perform or otherwise comply with all of the terms, covenants and agreements of the Lease which accrue during the period from and after the Effective Date through the date on which Assignee transfers all of the Leasehold Interest back to Assignor pursuant to <u>Section 7</u> below, or (ii) arising from or relating to Assignee's breach of this Assignment.

b.    Assignor shall defend, indemnify and hold harmless Assignee and its affiliates for, from and against any and all claims, demands and liability (i) arising under or relating to the Lease prior to or following the Effective Date that are directly or indirectly related to the failure of Assignor to perform or otherwise comply with all of the terms, covenants and agreements of tenant under the Lease, or (ii) arising from or relating to Assignor's breach of this Assignment, including, without limitation, a breach of the representations contained herein.

6.    <u>Re-Assignment Right</u>.

(b) <u>Re-Assignment</u>.  The Leasehold Interest shall be re-assigned to Assignor by Assignee (the "<u>Re-Assignment</u>") at any time from and after the closing of the sale of all or substantially all of the assets of Seller and/or its affiliates to one or more purchasers (the "<u>Asset Closing</u>"), but in no event later than December 31, 2014.  The closing of the Re-Assignment (the "<u>Re-Assignment Closing</u>") shall take place on a date mutually agreed upon between Assignor and Assignee, but in any event, within thirty (30) days after notice from Assignor to Assignee that Assignor is exercising its right to have the Leasehold Interest re-assigned to Assignor.  Subject to the terms of this Section 6, Seller shall be entitled to exercise its right to the Re-Assignment on the day immediately prior to the Asset Closing.

(c) <u>Deliveries</u>.  At the Re-Assignment Closing the following shall occur:

(A) <u>Assignment</u>.    Assignee and Assignor shall deliver to each other a counterpart of a duly executed and acknowledged assignment of leasehold interest, in substantially the form and content of this Assignment.

(B) Additional Documents.  Assignee and Assignor shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all assignments and all other instruments and documents as may be reasonably necessary in order to complete the transaction provided above with respect to the Re-Assignment.

(C) Repurchase of Property Interest.  Reference is made to the Purchase and Sale Agreement dated as of May 9, 2012 between EPRE LLC, as seller, and Purchaser, as buyer, with respect to certain property in Hennepin County, Minnesota, and the Repurchase Closing (as defined therein) shall have occurred or shall occur simultaneously with the Re-Assignment Closing.

(d) Assignment.  Assignor may transfer and assign its rights under this Section 6, in whole but not in part, to any purchaser of all or substantially all of its assets.

7.    Counterparts.  This Assignment may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Assignment.

8.    Binding Effect.  This Assignment shall be for the benefit of, and shall bind and inure to, Assignor, Assignee and their respective successors and assigns.

9.    Fees and Expenses.  Assignee shall pay any third party costs, fees, taxes and expenses (including the reasonable attorneys' fees of Assignor) applicable to the assignment of the Leasehold Interest to Assignee and Assignee shall pay any third party costs, fees, taxes and expenses (including the reasonable attorneys' fees of Assignor) applicable to the Re-Assignment of the Leasehold Interest to Assignor, in each case when due.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

ASSIGNOR:

**GMAC MORTGAGE LLC**, a Delaware limited liability company

By:_____
Name:_____
Title:_____

ASSIGNEE:

**ALLY FINANCIAL INC.**, a Delaware corporation

By:_____
Name:_____
Title:_____



Doc No **T4953858**

Certified, filed and/or recorded on
5/10/12 2:59 PM
Office of the Registrar of Titles
Hennepin County, Minnesota
Rachel Smith, Acting Registrar of Titles
Mark V. Chapin, County Auditor and Treasurer

Deputy 55                                    Pkg ID 802925C

**Doc Name: Limited Warranty Deed**

| | |
|---|---|
| Certified Copy of any document | $10.00 |
| Document Recording Fee | $46.00 |
| State Deed Tax (.0033 rate) | $1.65 |
| Conservation Fee | $5.00 |
| Environmental Response Fund (SDT .0001) | $0.05 |
| *Document Total* | $62.70 |

**Existing Certs**              **New Certs**

1315177

STATE OF MINNESOTA, COUNTY OF HENNEPIN
Certified to be a true and correct copy of the
original on file and of record in my office

MAY 1 0 2012

Rachel Smith, Acting Registrar of Titles

By_____ Deputy

This cover sheet is now a permanent part of the recorded document.

01-116-22-44001

_undivided 51%_
_int_

_____

(RESERVED FOR RECORDING DATA)

## LIMITED WARRANTY DEED

STATE DEED TAX DUE HEREON: $1.70

Dated as of May 9, 2012

      FOR VALUABLE CONSIDERATION, **EPRE LLC**, a Delaware limited liability company, ("Grantor"), does hereby convey and warrant to **ALLY FINANCIAL INC.**, a Delaware corporation, ("Grantee"), an undivided 51% interest as tenant-in-common in the real property in Hennepin County, Minnesota, described on Exhibit A attached hereto (the "Property"), together with all hereditaments and appurtenances belonging thereto, subject to all matters of record.

     -   This Deed conveys after-acquired title. Grantor warrants that Grantor has not made, done, executed or suffered any act or thing whereby the herein-described property or any part hereof, now or at any time hereafter, shall or may be imperiled, charged or encumbered in any manner, and Grantor will warrant the title to the herein-described property against all persons claiming the same from or through Grantor as a result of any such act or thing.

Grantor and Grantee each covenants that it shall not bring, nor be entitled to bring, an action for partition of the Property.

Grantor certifies that Grantor does not know of any wells on the Property.

*[Signature Page Follows]*

RETURN TO _First Am_

First American Title Insurance Co.
National Commercial Services
801 Nicollet Mall, Suite 1900
Minneapolis, MN 55402
NCS_____MPLS(CH)

{ 01034116.1 07401-0101 5/7/2012 11:24:17 AM }

EPRE LLC, a Delaware limited liability
company

By: _____

Name: _JAMES WHITLINGER_

Title: _CFO_

STATE OF NEW YORK          )
                                            ) SS:
COUNTY OF NEW YORK      )

On the 9th day of May in the year 2012, before me, the undersigned, personally appeared JAMES
WHITLINGER, personally known to me or proved to me on the basis of satisfactory evidence to be the
individual whose name is subscribed to the within instrument and acknowledged to me that he/she
executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or
the person or entity on behalf of which the individual acted, executed the instrument.

_____

NOTARY PUBLIC
Type/Print Name: Nilene R. Evans_____          [SEAL]
My commission expires: December 31, 2013_____

NILENE R. EVANS
Notary Public, State of New York
No. 314752880
Qualified in New York County
Commission Expires December 31, 2013

{ 01034116.1 07401-0101 5/7/2012 11:24:17 AM }

ALLY FINANCIAL INC., a Delaware
corporation

By: _Cathy L Quenneville_
Name: Cathy L. Quenneville
Title: Corporate Secretary

STATE OF MICHIGAN        )
                         ) SS.
COUNTY OF WAYNE          )

The foregoing instrument was acknowledged before me this _4th_ day of May 2012 by
_Cathy L. Quenneville_, _Corporate Secretary_ of
Ally Financial Inc., a Delaware corporation, on behalf of the corporation.

_April A. Ellenburg_
Notary Public
Acting in the _Wayne_ County, Michigan
My commission expires _April 25 2012_

APRIL A. ELLENBURG
NOTARY PUBLIC, STATE OF MI
COUNTY OF MACOMB
MY COMMISSION EXPIRES Apr 25, 2013
ACTING IN THE COUNTY OF _Wayne_

This instrument was drafted by David W. Fell, Esq., Lowe, Fell & Skogg, LLC, 370 17th Street, Suite
4900, Denver, Colorado 80202.

Tax statements for the real property described in Exhibit A to this instrument should be sent to:
Ally Financial Inc., a Delaware corporation

Ally Financial Inc.
c/o GMAC Financial Services
Global Real Estate
1100 Virginia Drive
Mail Code 190-FTW-M98
Fort Washington, PA 19034

## EXHIBIT A

## LEGAL DESCRIPTION

TAX ID NO: 01-116-22-44-0017

PARCEL 1:

That part of Lot 1, Block 2, Shady Oak Industrial Park, Hennepin County, Minnesota lying West of a line drawn at a right angle to the South line of said Lot 1 from a point on said South line distant 340.84 feet West of the Southeast corner of said Lot 1.

PARCEL 2:

Appurtenant non-exclusive easement for roadway purposes over the Southeasterly and Southerly 30 feet of the part of Lot 2, Block 2, Shady Oak Industrial Park, lying Westerly of the Easterly 124.98 feet of said Lot 2, as set forth in Mutual Easement Agreement, dated August 21, 2000, filed August 28, 2000, as Document Number 7345470, Office of the County Recorder, Hennepin County, Minnesota.

# MINNESOTA·REVENUE

**DT1**

## Deed Tax

Form DT1 may be used to document your claim for an exempt or minimum tax transfer. Note: In the absence of a qualifying reason, deed tax must be based on at least the fair market value of the property being conveyed (M.S. 287.20, subd. 2). The "full" deed tax rate is .0033 (.0034 for Hennepin and Ramsey counties).

**Deed tax**

| Name of grantor | Enter reason code (see below) |
|---|---|
| EPRE LLC, a Delaware limited liability cmpany | 16 |

| Name of grantee | |
| ALLY FINANCIAL, INC., a Delaware corporation | |

| Property ID number | Deed tax amount |
| 01-116-22-44-0017 | $1.70 |

Minimum tax = $1.65
($1.70 for Hennepin and Ramsey counties)

### Grantor, grantee or representative, sign below

*I declare that the information on this certificate is correct and complete to the best of my knowledge and belief.*
*I understand that there are penalties for underpayment of tax (M.S. 287.31 and M.S. 287.325).*

**Sign here**

| Signature of grantor/grantee or authorized agent | Title | Date |
|---|---|---|
| *[signature]* | CFO | 5/9/12 |

| Print name | E-mail address (optional) | Daytime phone |
| JAMES WHITLINGER | JIM.WHITLINGER@GMACM.com | 215 734 5806 |

| Address | City | State | Zip code |
| 1100 Virginia Drive | FT Washington | PA | 19034 |

If you have questions, call 651-556-4721. TTY: Call 711 for Minnesota Relay. Fax: 651-297-1939.

## Reason codes

**Exempt transfers**

**1** Transfer of real property by court order. The change in ownership must result from the order itself.

**2** Transfer of real property through certificate of sale issued to the purchaser in a mortgage or lien foreclosure sale.

**3** Transfer of real property through a certificate of redemption issued to the redeeming mortgagor, their heir, devisee or representative.

**4** Deed to or from the federal government.

**5** Deed conveying real property located within the historic boundaries of a federally recognized American Indian tribe if the grantor or grantee is the tribal government or member of a tribe.

**6** Deed between the parties to a marriage dissolution pursuant to the terms of the dissolution decree.

**7** Deed conveying a cemetery lot or lots.

**8** Deed by a personal representative distributing the decedent's property according to the terms of the will or probate court order.

**9** Transfer on death deed defined under M.S. 507.071.

**10** Deed between co-owners partitioning their undivided interest in the same piece of property.

**11** Deed to a builder for the purpose of obtaining financing to build an improvement for the grantor. Upon completion the real property is reconveyed to the land owner.

**12** Transfer pursuant to a permanent school fund land exchange under M.S. 92.121 and related laws.

**13** Deed or other instrument that grants, creates, modifies or terminates an easement.

**14** Deed transferring real property pursuant to a Ch. 11 or Ch. 12 plan of reorganization.

**15** Deed resulting from a business conversion as listed in M.S. 287.21.

**Minimum tax transfers**

Designated transfers (codes 16 through 20).

**16** Deed between a sole owner and entity owned directly or indirectly by that sole owner, or between two entities owned directly or indirectly by the sole owner.

**17** Deed between a husband and wife and an entity owned directly or indirectly by the couple, or between two entities owned directly or indirectly by the couple.

**18** Deed between co-owners and an entity owned directly or indirectly by the co-owners, or between two entities owned directly or indirectly by the co-owners.

**19** Deed between a grantor and a revocable trust created by that grantor.

**20** Deed transferring substantially all assets of a corporation pursuant to a reorganization under IRC section 368(a).

**21** Deed transferring substantially all assets of a partnership pursuant to a continuation under IRC section 708.

**Ownership change provision:** Any ownership change in the grantee/transferee entity within six months after a designated transfer triggers a **retroactive deed tax.**

**22** Deed of real property resulting from the consolidation or merger of two or more corporations, limited liability companies, or partnerships, or any combination of such entities.

**23** Deed gifting real property.

**24** Deed given in lieu of foreclosure. Deed includes non-merger language and the FMV of the property minus the mortgage lien is $500 or less.

**25** Deed correcting error for less than $500 of consideration (corrective deed).

**26** Deed from an intermediary as part of an IRC section 1031 exchange. The intermediary's total document fee for the transfer is $500 or less. A "full" deed tax was paid on the FMV of the real property when the transfer was made to the intermediary.

**27** Deed written between a principal and agent, and the agent's total compensation for the entire transaction, monetary or otherwise, is less than $500.

**28** If above codes do not apply, use Code 28 and explain below or attach a separate sheet.

(Rev 11/08)

## ASSIGNMENT OF LEASEHOLD INTEREST

THIS ASSIGNMENT OF LEASEHOLD INTEREST (this "Assignment") is executed as of the 9th day of May 2012 (the "Effective Date"), by and between **GMAC MORTGAGE LLC**, a Delaware limited liability company, fka GMAC Mortgage Corporation ("Assignor"), and **ALLY FINANCIAL INC.**, a Delaware corporation ("Assignee").

## RECITALS

A.    Pursuant to that certain Lease Agreement dated as of July 30, 2002, as amended by that certain First Amendment to Lease Agreement dated March 23, 2004, that certain Second Amendment to Lease Agreement dated November 4, 2005, and that certain Third Amendment to Lease Agreement dated August 25, 2011 (collectively, the "Lease"), Breof Convergence, LP, a Delaware limited partnership, as assignee of Lewisville LSF, L.P. ("Landlord") leased approximately 78,413 square feet of real property designated as Building 3 of the project commonly referred to as Convergence Office Center in Lewisville, Texas, as more fully described in the Lease (the "Premises"), to Assignor, as tenant.

B.    Section 11 of the Lease provides that Assignor may assign the Lease without Landlord's consent to an Affiliate (as defined in the Lease) of Assignor. Assignee is an Affiliate of Assignor.

C.    Assignor now wishes to assign an undivided fifty-one percent (51%) leasehold interest (the "Leasehold Interest") to Assignee in accordance with the terms of this Assignment.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    Assignment of Leasehold Interest. As of the Effective Date, Assignor does hereby grant, bargain, sell, assign, transfer and set over unto Assignee the Leasehold Interest, together with all rights and benefits thereunder, to have and to hold the same unto Assignee, its successor and assigns.

2.    Assumption of Leasehold Interest. As of the Effective Date, Assignee hereby assumes the obligations of Assignor under the Lease to the extent of the Leasehold Interest. Assignor's and Assignee's duties, obligations and authority with respect to the Lease, the Premises and all consents, approvals and other decisions regarding the Premises, the Lease and matters relating to or between the Landlord and the tenant under the Lease are set forth in that certain Shared Services Agreement between Assignor and Assignee, which, upon its effectiveness, shall govern the operations of the Premises after the transfer described herein.

3.    Further Assurances. It is the intention of the parties hereto that the Leasehold Interest shall be fully and absolutely transferred by Assignor to Assignee. Assignor therefore agrees that it shall execute any additional documents that may hereafter reasonably be requested by Assignee in order more fully to effectuate such transfer and assignment.

4.    Representations and Warranties. Assignor hereby represents and warrants that, as of the Effective Date:

    a.    Assignor is the sole holder of the lessee's or tenant's interest in the Lease and the same has not been assigned or pledged;

b.     To the best of Assignor's actual knowledge, there exist no matters of title or record which would impair Assignor's transfer of the Leasehold Interest to Assignee or the right of Assignee to acquire and hold the Leasehold Interest in the Premises;

c.     Assignor has fully power and authority to enter into this Assignment and no approval of any third party is required ;

d.     There have been no amendments, oral or written, to the terms of the Lease, other than those set forth in Recital A above; and

e.     There exists no event of default and no circumstance which would, with the giving of notice or the passage of time or both, constitute an event of default under the Lease by Assignor or, to the best of Assignor's actual knowledge, Landlord.

5.     <u>Indemnity</u>.

a.     Assignee shall defend, indemnify and hold harmless Assignor and its affiliates for, from and against any and all claims, demands and liability (i) arising under or relating to the Lease that are directly or indirectly related to the failure of Assignee to perform or otherwise comply with all of the terms, covenants and agreements of the Lease which accrue during the period from and after the Effective Date through the date on which Assignee transfers all of the Leasehold Interest back to Assignor pursuant to <u>Section 7</u> below, or (ii) arising from or relating to Assignee's breach of this Assignment.

b.     Assignor shall defend, indemnify and hold harmless Assignee and its affiliates for, from and against any and all claims, demands and liability (i) arising under or relating to the Lease prior to or following the Effective Date that are directly or indirectly related to the failure of Assignor to perform or otherwise comply with all of the terms, covenants and agreements of tenant under the Lease, or (ii) arising from or relating to Assignor's breach of this Assignment, including, without limitation, a breach of the representations contained herein.

6.     <u>Re-Assignment Right</u>.

(a) <u>Re-Assignment</u>.  The Leasehold Interest shall be re-assigned to Assignor by Assignee (the "<u>Re-Assignment</u>") at any time from and after the closing of the sale of all or substantially all of the assets of Seller and/or its affiliates to one or more purchasers (the "<u>Asset Closing</u>"), but in no event later than December 31, 2014.  The closing of the Re-Assignment (the "<u>Re-Assignment Closing</u>") shall take place on a date mutually agreed upon between Assignor and Assignee, but in any event, within thirty (30) days after notice from Assignor to Assignee that Assignor is exercising its right to have the Leasehold Interest re-assigned to Assignor.  Subject to the terms of this Section 6, Seller shall be entitled to exercise its right to the Re-Assignment on the day immediately prior to the Asset Closing.

(b) <u>Deliveries</u>.  At the Re-Assignment Closing the following shall occur:

(A) <u>Assignment</u>.   Assignee and Assignor shall deliver to each other a counterpart of a duly executed and acknowledged assignment of leasehold interest, in substantially the form and content of this Assignment.

(B) <u>Additional Documents</u>.   Assignee and Assignor shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, any and all assignments and all other instruments and documents as may be reasonably

necessary in order to complete the transaction provided above with respect to the Re-Assignment.

       (C) <u>Repurchase of Property Interest</u>. Reference is made to the Purchase and Sale Agreement dated as of May 9, 2012 between EPRE LLC, as seller, and Purchaser, as buyer, with respect to certain property in Hennepin County, Minnesota, and the Repurchase Closing (as defined therein) shall have occurred or shall occur simultaneously with the Re-Assignment Closing.

    (c) <u>Assignment</u>. Assignor may transfer and assign its rights under this <u>Section 6</u>, in whole but not in part, to any purchaser of all or substantially all of its assets.

    7.    <u>Counterparts</u>. This Assignment may be executed in counterparts, each of which shall constitute an original and all of which taken together shall constitute one and the same Assignment.

    8.    <u>Binding Effect</u>. This Assignment shall be for the benefit of, and shall bind and inure to, Assignor, Assignee and their respective successors and assigns.

    9.    <u>Fees and Expenses</u>. Assignee shall pay any third party costs, fees, taxes and expenses (including the reasonable attorneys' fees of Assignor) applicable to the assignment of the Leasehold Interest to Assignee and Assignee shall pay any third party costs, fees, taxes and expenses (including the reasonable attorneys' fees of Assignor) applicable to the Re-Assignment of the Leasehold Interest to Assignor, in each case when due.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

ASSIGNOR:

**GMAC MORTGAGE LLC**, a Delaware limited liability company

By: _____
Name: _____ James Whitlinger _____
Title: _____ CFO _____

ASSIGNEE:

**ALLY FINANCIAL INC.**, a Delaware corporation

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, Assignor and Assignee have executed and delivered this Assignment as of the Effective Date.

ASSIGNOR:

**GMAC MORTGAGE LLC**, a Delaware limited liability company

By:_____
Name:_____
Title:_____


ASSIGNEE:

**ALLY FINANCIAL INC.**, a Delaware corporation

By:_____
Name: _EVAN NICULAS_
Title: _PRESIDENT, ALLY SERVICING_ and
CHIEF PROCUREMENT OFFICER.
ALLY FINANCIAL INC.

12-12020-mg    Doc 66-3    Filed 05/14/12    Entered 05/14/12 10:37:54    Exhibit 3
Pg 108 of 312

# Exhibit 3

## ALLY DIP FINANCING FACILITY

*Attorney-Client Communication*
*Attorney Work Product*
*Legally Privileged & Confidential*
**DRAFT 05/13/12**

**This submission contains confidential business information. Any public disclosure of this information could harm the commercial or financial interest of Ally Financial Inc. and its affiliates (collectively, "Ally"). If disclosed, this information would permit Ally's competitors to learn details of Ally's business plans. Accordingly, we request, pursuant to 5 U.S.C. Section 552(b)(4), confidential treatment of this document. Also we request notification if anyone submits a Freedom of Information Act request for a copy of this document.**

This preliminary, non-binding term sheet (this "**Term Sheet**") is confidential and its contents or existence may not be distributed, disclosed or discussed with any other party. This Term Sheet shall be governed by Rule 408 of the Federal Rules of Evidence and any and all similar and applicable rules and statutory provisions governing the non-admissibility of settlement discussions.

This Term Sheet is provided as a basis for discussion, and summarizes the terms and provisions of any definitive documentation that is being or will be provided in connection with the proposed transaction described herein. To the extent of any discrepancy between this Term Sheet and such definitive documentation, the terms and provisions of such definitive documentation will control.

| ALLY FINANCIAL INC. POST-PETITION DRAWS UNDER LINE OF CREDIT | |
|---|---|
| *LOC:* | That certain Amended and Restated Loan Agreement, dated as of December 30, 2009, by and among Residential Capital, LLC, GMAC Mortgage, LLC, Residential Funding Company, LLC, Passive Asset Transactions, LLC, RFC Asset Holdings II, LLC, Equity Investment I, LLC and GMAC Inc. (now known as Ally Financial, Inc. "**AFI**"), as amended by the First Amendment, dated as of April 30, 2010, as further amended by the Second Amendment, dated as of May 14, 2010, as further amended by the Third Amendment, dated as of August 31, 2010, as further amended by the Fourth Amendment, dated as of December 23, 2010, as further amended by the Fifth Amendment, dated as of April 18, 2011, as further amended by the Sixth Amendment, dated as of May 27, 2011, as further amended by the Seventh Amendment, dated as of April 10, 2012 (as further amended or supplemented, the "**LOC**"), including, without limitation, the other Facility Documents (as defined in the LOC) (each as amended or supplemented). |
| *Commitment:* | Notwithstanding the commencement of cases under the United States Bankruptcy Code (the "**Cases**") by one or more borrowers under the LOC, AFI will permit postpetition draws to be requested under the LOC, and will honor such draw requests, subject to entry by the Bankruptcy Court of a DIP order or orders approving the postpetition extension of credit pursuant to the terms hereof, in an aggregate amount not to exceed $150,000,000 (such commitment, the "**Buyout Funding Commitment**"). |
| *Availability Period:* | Subject to satisfaction of the conditions precedent referred to herein, the Buyout Funding Commitment will be available between [●], 2012 and [●], 2013. |
| *Draw Requests:* | Subject to the Amendment described below, as provided for the in the LOC. |

1

| *Use of Proceeds:* | The postpetition extensions of credit under the Buyout Funding Commitment may only be used, in a manner consistent with past practices, to fund (A) the repurchase of whole loans from Ginnie Mae pools in order to avoid GMAC Mortgage being in violation of delinquency triggers applicable to it under Chapter 18 of the Ginnie Mae Guide, (B) to effect foreclosures and conveyances of the related properties in connection with the submission of HUD Claims, and (C) to allow for trial modifications under programs implemented by the Debtors for which the related loans and borrowers are qualified. For the avoidance of doubt, no proceeds may be used to repurchase whole loans for any other purpose, including without limitation, for non-compliance with eligibility representations, lack of insurance or guaranty, or for title defects. |
|---|---|
| *Cash Collateral:* | The postpetition credit extended under the Buyout Funding Commitment will be included in a cash collateral and DIP order that permits use of LOC cash collateral during the pendency of the Cases, subject to the terms of such order. |
| *Collateral:* | Perfected first lien on the repurchased whole loans in addition to all other collateral pledged prepetition to secure the LOC, and a superpriority administrative claim with respect to the repurchased whole loans senior to the superpriority administrative claim of the Barclays DIP Lenders, together with a superpriority administrative claim in an amount equal to the principal and interest on the draws made under the Buyout Funding Commitment junior to the superpriority administrative claim of the Barclays DIP Lenders, except with respect to the Lenders' rights in the repurchased loans and proceeds thereof. The "**Barclays DIP Lenders**" mean the lenders under the $1,450,000,000 Secured Debtor-in-Possession Credit Agreement, agented by Barclays Bank PLC, and provided to the debtors in connection with the Cases (the "**Barclays DIP Facility**"). |

2

| | | |
|---|---|---|
| ***Conditions*** | 1. | Entry of a DIP order, in form and substance satisfactory to AFI, permitting the postpetition credit extensions under the Buyout Funding Commitment, granting perfected first priority liens in the whole loans repurchased with the proceeds of such postpetition credit extensions, extending the pre-petition liens on collateral under the LOC to secure the postpetition credit extensions under the Buyout Funding Commitment, granting the administrative claims described above under "Collateral", permitting the execution, delivery and performance of the Amendment described below, and otherwise granting the protections customarily afforded to lenders under debtor-in-possession credit facilities (collectively, the "**AFI DIP Order(s)**"). |
| | 2. | Execution, delivery and performance by the parties to the LOC, and approval by the Court in the AFI DIP Order(s), of an eighth amendment to the LOC (the "**Amendment**"), in form and substance satisfactory to AFI, to restrict the use of proceeds for the purposes described above, modify the conditions precedent under the LOC to permit the Buyout Funding Commitment to be effected, to modify the prepayment and repayment provisions of the LOC as described below, to add events of default and conditions to borrowing congruent with those in the Barclays DIP Facility and customary for lenders under debtor-in-possession credit facilities, and to make the technical and conforming edits necessary to accommodate the Buyout Funding Commitment. |
| | 3. | After giving effect to the Amendment, all conditions precedent to the funding of advances under the LOC shall apply in respect of draw requests under the Buyout Funding Commitment. |
| | 4. | All collateral eligibility requirements under the LOC shall apply in respect of the loans purchased with the proceeds of the Buyout Funding Commitment. |
| ***Interest:*** | | Interest will accrue postpetition on amounts drawn under the Buyout Funding Commitment at the rate of LIBOR + 400bps, with a LIBOR Floor of 1.25%. Interest will be payable monthly on the last day of each applicable interest period, and on the maturity or earlier repayment of advances under the Buyout Funding Commitment. Customary breakage costs, consistent with the Barclays DIP Facility, will be payable if applicable. |
| ***Prepayment:*** | | As provided for in the LOC. Amounts voluntarily prepaid under the Buyout Funding Commitment may not be reborrowed. |
| ***Repayment:*** | | As provided for in the Amendment, mandatory repayment of all obligations will be due upon the earliest of (i) contemplated sale(s) of the Debtors' assets, (ii) the effectiveness of a plan of reorganization, (iii) a stated maturity date consistent with the maturity of the A-1 term loan under the Barclays DIP Facility, and (iv) the occurrence of an event of default, provided that in any event all outstanding obligations shall be repaid in full contemporaneously with the repayment of the Barclays DIP Facility. The Amendment will deem repayments to be made first to indebtedness drawn under the Buyout Funding Commitment, and second to the pre-petition indebtedness under the LOC. |
| ***Representations and Warranties:*** | | After giving effect to the Amendment, as provided for in the LOC. |
| ***Affirmative Covenants:*** | | After giving effect to the Amendment, as provided for in the LOC. |

3

| | |
|---|---|
| ***Negative Covenants:*** | After giving effect to the Amendment, as provided for in the LOC. |
| ***Events of Default:*** | After giving effect to the Amendment, as provided for in the LOC. |
| ***Governing Law:*** | New York and the Bankruptcy Code. |
| ***Fees and Expenses:*** | All fees and expenses of counsel to AFI in connection with the Buyout Funding Commitment shall be payable by GMAC Mortgage. |

12-12020-mg    Doc 883-5    Filed 05/14/12    Entered 05/14/12 10:37:04    Exhibit 5
Pg 113 of 312

**Exhibit 4**

## PLAN TERM SHEET

**RESIDENTIAL CAPITAL LLC AND
CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES**

**TERM SHEET FOR PROPOSED
JOINT CHAPTER 11 PLAN OF REORGANIZATION**

This term sheet (the "Term Sheet") describes the principal terms of a proposed joint plan (the "Plan") of reorganization (the "Reorganization") of Residential Capital LLC ("ResCap" or the "Company") and each subsidiary of the Company that files as a debtor in possession in a case in the United States Bankruptcy Court for the Southern District of New York (collectively, the "Debtors").

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

| PARTIES: | |
|---|---|
| **Debtors** | The following entities are Debtors under the Plan: Ditech, LLC; DOA Holding Properties, LLC; DOA Holdings NoteCo, LLC; DOA Properties IX LLC; EPRE LLC; Equity Investment I, LLC; ETS of Virginia, Inc.; ETS of Washington, Inc.; Executive Trustee Services, LLC; Foreign Obligation Exchange, Inc. 2003-H12; Foreign Obligation Exchange, Inc. 2003-H14; GMAC Model Home Finance I, LLC; GMAC Mortgage USA Corporation; GMAC Mortgage, LLC; GMAC Residential Holding Company, LLC; GMACR Mortgage Products, LLC; GMAC-RFC Holding Company, LLC; GMACRH Settlement Services, LLC; HFN REO SUB II, LLC; Home Connects Lending Services, LLC; Homecoming Finanial, LLC; Homecomings Financial Real Estate Holdings, LLC; Ladue Associates, Inc.; Passive Asset Transactions, LLC; PATI A, LLC; PATI B, LLC; PATI Real Estate Holdings, LLC; Phoenix Residential Securities, LLC; RAHI A, LLC; RAHI B, LLC; RAHI Real Estate Holdings, LLC; RCSFJV2004, LLC; Residential Accredit Loans, Inc.; Residential Asset Mortgage Products, Inc.; Residential Asset Securities Corporation; Residential Capital, LLC; Residential Consumer Services of Alabama, LLC; Residential Consumer Services of Ohio, LLC; Residential Consumer Services of Texas, LLC; Residential Consumer Services, LLC; Residential Funding Company, LLC; |

| | Residential Funding Mortgage Exchange, LLC; Residential Funding Mortgage Securities I, Inc.; Residential Funding Mortgage Securities II, Inc.; Residential Funding Real Estate Holdings, LLC; Residential Mortgage Real Estate Holdings, LLC; RFC Asset Holdings II, LLC; RFC Asset Management, LLC; RFC Construction Funding, LLC; RFC SFJV-2002, LLC; and RFC-GSAP Servicer Advance, LLC.<br><br>The Plan proposes partial consolidation for Plan purposes only with the following Debtor entities: (a) ResCap, GMAC Residential Holding Company, LLC ("GMACM Holding"), and GMAC-RFC Holding Company, LLC ("RFC Holding" and, together with ResCap and GMACM Holding, the "ResCap Debtors"); (b) each of the Debtor subsidiaries of GMACM Holding (collectively, the "GMACM Debtors"); and (c) each of the Debtor subsidiaries of RFC Holding (collectively, the "RFC Debtors"). |
| **DIP Lenders** | Barclays Bank PLC and any other lenders that are parties to the DIP Financing Facility |
| **Purchaser** | Nationstar Mortgage LLC (the "Stalking Horse Bidder") or, if the Stalking Horse Bidder is not the Winning Bidder at the Auction, the Winning Bidder. |
| **Prepetition Secured Lenders[1]** | (a) Ally Financial Inc. ("AFI" and, together with its direct and indirect subsidiaries (other than ResCap and its subsidiaries, collectively, "Ally") under (i) that certain senior secured credit facility agreement (the "AFI Revolver"), as amended and restated on December 30, 2009, and (ii) that certain secured loan agreement, as amended and restated on December 30, 2009 (the "AFI LOC");<br><br>(b) Citibank N.A. ("Citibank") under that certain $158 million revolving facility (the "Citibank MSR Facility"); and<br><br>(c) Federal National Mortgage Association ("Fannie Mae"), under that certain Term Sheet dated August 10, 2010, as amended and restated as of January 18, 2011 and as further amended on July 29, 2011 (the "FNMA EAF Facility"). |

---

[1] This Term Sheet is conditioned upon the GSAP Facility and BMMZ Repo Facility being refinanced by the DIP Financing Facility.

| | |
|---|---|
| **Junior Secured Noteholders** | Holders of 9.625% junior secured notes due 2015 issued by ResCap (the "Junior Secured Notes"). |
| **Senior Unsecured Noteholders** | Holders of senior unsecured notes (the "Senior Unsecured Notes") consisting of U.S. dollar denominated notes maturing between June 2012 and June 2015, euro denominated notes maturing in May 2012, and U.K. sterling denominated notes maturing between May 2013 and July 2014, each issued by ResCap, under the Indenture dated as of June 24, 2005, and certain supplements thereto. |
| **Treatment of Subservicing Agreement** | The Bankruptcy Court shall enter an order, approving the continued performance under the Subservicing Agreement attached hereto as Exhibit 1 on an interim basis within five (5) business days of the Petition Date, and on a final basis within fifty (50) days of the Petition Date, unless Ally in its sole discretion extends such dates. |
| **Treatment of Shared Services Agreement** | The Bankruptcy Court shall enter an order approving the performance under the Shared Services Agreement attached to the Ally Settlement Agreement as Exhibit 7 on an interim basis within five (5) business days of the Petition Date, and on a final basis within fifty (50) days of the Petition Date, unless Ally in its sole discretion extends such dates. |
| **Treatment of GNMA Forward Flow Agreement** | The Bankruptcy Court shall enter an order, approving the continued performance under the GNMA Forward Flow Agreement attached hereto as Exhibit 2 on an interim basis within five (5) business days of the Petition Date, and on a final basis within fifty (50) days of the Petition Date, unless Ally in its sole discretion extends such dates. |
| **Automatic Stay Extension Motion** | The Debtors shall file a motion to extend the automatic stay under section 362 of the Bankruptcy Code to Ally during the Debtors' chapter 11 cases. |
| **Subordination Rights** | Except as expressly provided otherwise (including modification pursuant to the Plan Support Agreements), the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code. |
| | |
| **PLAN OF REORGANIZATION:** | |
| **Initiation of Chapter 11 Cases** | No later than May 14, 2012 (the "Petition Date"), each of the Debtors shall file with the Bankruptcy Court a voluntary |

| | petition under Chapter 11 of the Bankruptcy Code.  Within thirty (30) days of the Petition Date, the Debtors shall file the Plan and related disclosure statement (the "Disclosure Statement") that incorporate, and are consistent with, the terms of this Term Sheet, and shall use commercially reasonable efforts to satisfy the terms of this Term Sheet, including the Consummation of the Plan.<br><br>The Plan and Disclosure Statement shall be in form and substance satisfactory to the Debtors, Ally, and other parties that are party to the Plan Support Agreements. |
|---|---|
| **Plan Treatment** | The Plan shall address, among other things:  (a) obligations under the DIP Financing Facility; (b) obligations under the Prepetition Secured Facilities; (c) obligations under the Junior Secured Notes; (d) other secured obligations; (e) obligations under the Senior Unsecured Notes; (f) general unsecured obligations; (g) statutorily subordinated obligations; (h) intercompany obligations; and (i) equity interests including common stock, partnership interests, or other ownership interests, and rights related thereto. |
| **Ally Settlement Agreement** | The Plan will incorporate a settlement with Ally, as described in this Term Sheet and as set forth in the Ally Settlement Agreement pursuant to which Ally will agree to contribute the value set forth in the Ally Settlement Agreement to the Debtors' estates for, among other things, Debtor Releases and Third Party Releases (each as defined below), subject to Bankruptcy Court approval as part of the Plan. |
| **Plan Funding** | The Plan will be funded with the proceeds derived from: (a) the Debtors' asset sale executed pursuant to the Platform Asset Purchase Agreement, attached hereto as Exhibit 4 (b) the Ally Settlement Agreement; (c) the Debtors' asset sale executed pursuant to the HFS Asset Purchase Agreement, attached to the Ally Settlement Agreement as Exhibit 5 ; and (d) other sales of the Debtors' assets (whether occurring before or after the Effective Date).<br><br>The Ally Settlement proceeds will be allocated in any manner consistent with the Plan Support Agreements among the ResCap Debtors, GMACM Debtors, and RFC Debtors in the Debtors' sole discretion. |

| | |
|---|---|
| **TREATMENT OF CLAIMS AND INTERESTS:** | |
| **I.    RESCAP DEBTORS** | |
| **Administrative Expense Claims** | Unclassified.   On or as soon as practicable after the Effective Date, each holder of an allowed Administrative Expense Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. |
| **Priority Tax Claims** | Unclassified.   On or as soon as practicable after the Effective Date, each holder of an allowed Priority Tax Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Class R-1:  Other Priority Claims** | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed Other Priority Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| **Class R-2:  AFI Revolver Claims** | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Except as otherwise provided under the Ally Settlement Agreement, on or as soon as practicable after the Effective Date, each holder of an allowed AFI Revolver Claim shall be satisfied by payment in full in cash in accordance with, and to the extent modified by, the Junior Secured Notes Plan Support Agreement, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

| Class R-3: Other Secured Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code. On or as soon as practicable after the Effective Date, each holder of an allowed Other Secured Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
|---|---|
| Class R-4: Junior Secured Notes Claims | Impaired; entitled to vote on the Plan. The Junior Secured Notes Claims shall be Allowed in the aggregate amount of not less than $2,120,452,000.<br><br>Each holder of a Junior Secured Notes Claim shall receive, in full and final satisfaction of such a Claim and after giving full effect to the terms of the Junior Secured Notes Plan Support Agreement, treatment consistent with section 1129(b)(2)(A)(ii) of the Bankruptcy Code. |
| Class R-5: Senior Unsecured Notes Claims | Impaired; entitled to vote on the Plan. The Senior Unsecured Notes Claims shall be Allowed in the aggregate amount of principal plus interest prior to the Petition Date.<br><br>Each holder of an Allowed Senior Unsecured Notes Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the ResCap Unsecured Claims Pool. |
| Class R-6: Junior Secured Notes Deficiency Claims | Impaired; entitled to vote on the Plan. Each holder of an Allowed Junior Secured Notes Deficiency Claim shall receive, in full and final satisfaction of such Claim, its pro rata share of the ResCap Unsecured Claims Pool; provided that at the Debtors' option, if the Junior Secured Notes Plan Support Agreement becomes effective, each holder of a Junior Secured Note will be deemed to have waived its right to receive any recovery on account of the Class R-9 Junior Secured Notes Deficiency Claims. |
| Class R-7: General Unsecured Claims | Impaired; entitled to vote on the Plan. Each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the ResCap Unsecured Claims Pool, unless the holder and applicable Debtor otherwise agree to a different treatment. |

| Class R-8: Intercompany Claims | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Unless the Junior Secured Claims have been paid in full based upon their Secured Claims, Allowed Intercompany Claims shall receive in full satisfaction of such Allowed Intercompany Claims an amount equal to its pro rata share of ResCap Unsecured Claims Pool. |
| --- | --- |
| **Class R-9: Section 510(b) Claims** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Section 510(b) Claims shall receive no recovery on account of such claims. |
| **Class R-10: Equity Interests** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Equity Interests shall receive no recovery on account of such interests. |
| | |

## II.    GMACM DEBTORS

| Administrative Expense Claims | Unclassified.   On or as soon as practicable after the Effective Date, each holder of an allowed Administrative Expense Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; provided that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. |
| --- | --- |
| **Priority Tax Claims** | Unclassified.   On or as soon as practicable after the Effective Date, each holder of an allowed Priority Tax Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

| Class GS-1:  Other Priority Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed Other Priority Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; _provided_, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
| --- | --- |
| Class GS-2:  AFI Revolver Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Except as otherwise provided under the Ally Settlement Agreement, on or as soon as practicable after the Effective Date, each holder of an allowed AFI Revolver Claim shall be satisfied by payment in full in cash in accordance with, and to the extent modified by, the Junior Secured Notes Plan Support Agreement or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class GS-3:  AFI LOC Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Except as otherwise provided under the Ally Settlement Agreement, on or as soon as practicable after the Effective Date, each holder of an allowed AFI LOC Claim shall be satisfied by payment in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class GS-4:  Citibank Secured Lender Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed Citibank Secured Lender Claim shall be satisfied by payment in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class GS-5:  FNMA EAF Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed FNMA EAF Claim shall be satisfied by payment in full in cash or otherwise receive treatment consistent with the provisions of section |

| | 1129(a)(9) of the Bankruptcy Code. |
|---|---|
| **Class GS-6:  Other Secured Claims** | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed Other Secured Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **Class GS-7:  Junior Secured Notes Claims** | Impaired; entitled to vote on the Plan.  The Junior Secured Notes Claims shall be Allowed in the aggregate amount of not less than $2,120,452,000.<br><br>Each holder of a Junior Secured Notes Claim shall receive, in full and final satisfaction of such a Claim and after giving full effect to the terms of the Junior Secured Notes Plan Support Agreement, treatment consistent with section 1129(b)(2)(A)(ii) of the Bankruptcy Code. |
| **Class GS-8:  Junior Secured Notes Deficiency Claims** | Impaired; entitled to vote on the Plan.  Each holder of an Allowed Junior Secured Notes Deficiency Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the GMACM Unsecured Claims Pool, in accordance with, and to the extent modified by, the Junior Secured Notes Plan Support Agreement, unless the holder and applicable Debtor otherwise agree to a different treatment.<br><br>Under no circumstances shall a Junior Secured Noteholder be entitled to receive aggregate distributions in excess of its Allowed Claims. |
| **Class GS-9: Rep and Warranty Contract Claims** | Impaired; entitled to vote on the Plan.  Each holder of an Allowed Rep and Warranty Contract Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the GMACM Unsecured Claims Pool, unless the holder and applicable Debtor otherwise agree to a different treatment. |
| **Class GS-10:  General Unsecured Claims[2]** | Impaired; entitled to vote on the Plan.  Each holder of an Allowed General Unsecured Claim shall receive, in full and |

---

[2]   This Term Sheet assumes that the medium-term unsecured peso-denominated notes maturing in June 2012 issued by the non-Debtor Mexican subsidiary of ResCap and guaranteed by various Debtors will

| | final satisfaction of such Claim, an amount equal to its pro rata share of the GMACM Unsecured Claims Pool, unless the holder and applicable Debtor otherwise agree to a different treatment. |
|---|---|
| **Class GS-11: Intercompany Claims** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Unless the Junior Secured Claims have been paid in full based upon their Secured Claim, Allowed Intercompany Claims shall receive in full satisfaction of such Allowed Intercompany Claims an amount equal to its pro rata share of ResCap Unsecured Claims Pool. |
| **Class GS-12: Section 510(b) Claims** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) Claims shall receive no recovery on account of such claims. |
| **Class GS-13: Equity Interests** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Equity Interests shall receive no recovery on account of such interests. |
| | |
| **II.    RFC DEBTORS** | |
| **Administrative Expense Claims** | Unclassified.    On or as soon as practicable after the Effective Date, each holder of an allowed Administrative Expense Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; _provided_ that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business shall be paid in full in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions. |
| **Priority Tax Claims** | Unclassified.    On or as soon as practicable after the Effective Date, each holder of an allowed Priority Tax Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |

---

no longer constitute obligations of the Debtors following an exchange offer in Mexico in connection with the pending sale of equity of the subsidiary.

| Class RS-1:  Other Priority Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed Other Priority Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; _provided_, that Other Priority Claims that arise in the ordinary course of the Debtors' business and that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. |
|---|---|
| Class RS-2:  AFI Revolver Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Except as otherwise provided under the Ally Settlement Agreement, on or as soon as practicable after the Effective Date, each holder of an allowed AFI Revolver Claim shall be satisfied by payment in full in cash in accordance with, and to the extent modified by the Junior Secured Notes Plan Support Agreement or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class RS-3:  AFI LOC Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Except as otherwise provided under the Ally Settlement Agreement, on or as soon as practicable after the Effective Date, each holder of an allowed AFI LOC Claim shall be satisfied by payment in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class RS-4:  Other Secured Claims | Unimpaired; deemed to accept and not entitled to vote on the Plan pursuant to section 1126(f) of the Bankruptcy Code.  On or as soon as practicable after the Effective Date, each holder of an allowed Other Secured Claim shall be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| Class RS-5:  Junior Secured Notes Claims | Impaired; entitled to vote on the Plan.  The Junior Secured Notes Claims shall be Allowed in the aggregate amount of not less than $2,120,452,000.

Each holder of a Junior Secured Notes Claim shall receive, |

| | in full and final satisfaction of such a Claim and after giving full effect to the terms of the Junior Secured Notes Plan Support Agreement, treatment consistent with section 1129(b)(2)(A)(ii) of the Bankruptcy Code. |
|---|---|
| **Class RS-6:  Junior Secured Notes Deficiency Claims** | Impaired; entitled to vote on the Plan.  Each holder of an Allowed Junior Secured Notes Deficiency Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the RFC Unsecured Claims Pool in accordance with, and to the extent modified by, the Junior Secured Notes Plan Support Agreement, unless the holder and applicable Debtor otherwise agree to a different treatment.<br><br>Under no circumstances shall a Junior Secured Noteholder be entitled to receive aggregate distributions in excess of its Allowed Claims. |
| **Class RS-7: Rep and Warranty Contract Claims** | Impaired; entitled to vote on the Plan.  Each holder of an Allowed Rep and Warranty Contract Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the RFC Unsecured Claims Pool, unless the holder and applicable Debtor otherwise agree to a different treatment. |
| **Class RS-8:  General Unsecured Claims** | Impaired; entitled to vote on the Plan.  Each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, an amount equal to its pro rata share of the RFC Unsecured Claims Pool, unless the holder and applicable Debtor otherwise agree to a different treatment. |
| **Class RS-9: Intercompany Claims** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims shall receive no recovery on account of such claims. |
| **Class RS-10: Section 510(b) Claims** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Section 510(b) Claims shall receive no recovery on account of such claims. |
| **Class RS-11: Equity Interests** | Impaired; deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Equity Interests shall receive no recovery on account of such interests. |
| | |

| | **CONDITIONS TO CONFIRMATION & EFFECTIVE DATE:** |
|---|---|
| | The Plan shall contain various usual and customary conditions precedent to confirmation and to the Effective Date that must be satisfied or waived.<br><br>Such conditions to the Effective Date shall include, without limitation, the following: |
| | (a)   the Plan shall be in form and substance consistent in all material respects with this Term Sheet and satisfactory to the Debtors, Ally and the Consenting Holders;<br><br>(b)   all AFI Revolver Claims and AFI LOC Claims, and additional Claims held by Ally, are Allowed in full and approved by the Bankruptcy Court without subordination of any kind unless otherwise agreed by Ally;<br><br>(c)   the Bankruptcy Court shall have entered the Confirmation Order, which such order will grant final approval of the Plan, the Asset Sales, the Debtor Releases, the Third Party Releases, and the Ally Settlement Agreement, all in the form and substance satisfactory to the Debtors, Ally and the Consenting Holders;<br><br>(d)   the Ally Settlement Agreement shall remain in full force and effect;<br><br>(e)   the HFS Asset Purchase Agreement shall be approved by the Bankruptcy Court in form and substance acceptable to the Debtors, the Consenting Holders, and Ally if Ally is the purchaser of such assets;<br><br>(f)   the Platform Asset Purchase Agreement shall have been approved by the Bankruptcy Court in form and substance satisfactory to the Debtors and Ally;<br><br>(g)   all material governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by this Term Sheet, including the Asset Sales, shall have been obtained and be in full force and effect, and all applicable waiting periods |

|  | shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; |
|  | (h)     at no time shall the Bankruptcy Court have approved the appointment of an examiner with expanded powers; |
|  | (i)     at no time shall the Bankruptcy Court have approved the appointment of a trustee; and |
|  | (j)     no reduction in the value of Petition Date Collateral (as defined in the Junior Notes Plan Support Agreement) due to (i) the successful challenge of the validity of the liens on such Petition Date Collateral or (ii) a determination that any asset or assets that were designated by a Debtor as being Petition Date Collateral do not constitute Joint Collateral (as defined in the Junior Notes Plan Support Agreement), in an aggregate amount (taking into account additional Joint Collateral that was not specified as Petition Date Collateral) for all such assets that exceeds one hundred million dollars ($100,000,000), based on the Debtors' book value as of February 29, 2012. |
| **DEFINITIVE DOCUMENTS:** |  |
|  | The transactions described in this Plan Term Sheet are subject in all respects to, among other things, definitive documentation, including: |
|  | (a)     the Ally Settlement Agreement; |
|  | (b)     the Platform Asset Purchase Agreement, in which the Debtors shall, among other things, effectuate the sale to Purchaser of the Debtors' mortgage loan origination and servicing platform, including mortgage servicing rights and servicer advances, and certain other assets, in exchange for Purchaser's payment of a cash purchase price of approximately $2.3 billion, plus other consideration, including reimbursements for prior expenses and the assumption of certain liabilities as set forth in the |

| | Platform Asset Purchase Agreement; |
|---|---|
| | (c) the HFS Asset Purchase Agreement, in which the Debtors shall, among other things, effectuate the sale to Ally of the Purchased Assets, as defined in the HFS Asset Purchase Agreement; |
| | (d) the Plan, the Disclosure Statement and the documents to be included in the Plan Supplement; |
| | (e) the Cash Collateral Order; |
| | (f) the DIP Financing Facility; |
| | (g) the Subservicing Agreement; |
| | (h) the Shared Services Agreement; |
| | (i) the GNMA Forward Flow Agreement; and |
| | (j) the Transition Services Agreement. |
| **RELEASES AND EXCULPATIONS:** | |
| **Releases** | The Plan shall contain Debtor and third party releases consistent with the Ally Settlement Agreement.<br><br>The Order of the Bankruptcy Court confirming the Plan will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, damages, demands, debts, rights, suits, Causes of Action, judgments, or liabilities released pursuant to the Plan.<br><br>In addition, the Plan will include a mutual release of all claims between and among Ally and the holders of the Junior Secured Note Claims, which shall be in form and substance reasonably satisfactory to Ally and the Consenting Holders. |
| **Exculpation** | The Debtors, Ally, the Consenting Holders, Trustees for Trusts that accept the compromise proposed in the RMBS Trust Settlement Agreement in accordance with the terms therein, provided such agreement is approved and continues to be in effect, and their respective Representatives shall neither have, nor incur any liability to any entity for any |

| | pre-petition or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming, or effecting the Consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other pre-petition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company; provided, that the foregoing provisions of this exculpation shall have no effect on the liability of any entity that results from any such act or omission that is determined in a final order to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan. |
|---|---|
| **OTHER PRINCIPAL PLAN TERMS:** | |
| **Executory Contracts and Unexpired Leases** | Executory contracts and unexpired leases shall be rejected by the Debtors unless set forth on a schedule of assumed contracts and leases to be attached to the Platform Asset Purchase Agreement with Purchaser or otherwise assumed or rejected, prior to the Effective Date. |
| **Indemnification of Officers and Directors** | As set forth in the Ally Settlement Agreement. |
| **Compromise and Settlement** | The Plan shall contain customary provisions for the compromise and settlement of Claims stating that, notwithstanding anything in the Plan to the contrary, the allowance, classification, and treatment of allowed Claims and equity interests and their respective distributions take into account and conform to the relative priority and rights of such Claims and interests. |
| **Retention of Jurisdiction** | The Plan shall provide for a broad retention of jurisdiction by the Bankruptcy Court, including for: (a) resolution of Claims; (b) allowance of compensation and expenses for pre-Effective Date services; (c) resolution of motions, adversary proceedings, or other contested matters; (d) entering such orders as necessary to implement or consummate the Plan and any related documents or agreements; (e) enforcement of the Plan Injunction; and (f) other purposes. |

| | |
|---|---|
| **Resolution of Disputed Claims** | The Plan shall provide customary terms for the resolution of disputed Claims and any reserves therefore. |
| **Liquidating Trust** | The Plan shall contain customary provisions for the establishment of a Liquidating Trust to administer the assets of the Debtors' Estates on and after the Effective Date in accordance with the Plan. The Liquidating Trust shall be subject to the oversight committee consistent with the provisions of Junior Secured Notes Plan Support Agreement. |
| **Additional Provisions** | The Plan shall contain other provisions customarily found in other similar plans of reorganization. |
| | |
| **DEFINITIONS:** | |
| | "Administrative Expense Claim" means any claim for costs and expenses of administration under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) any actual and necessary costs and expenses incurred after the Petition Date of preserving the Debtors' estates and operating the businesses of the Debtors; (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses allowed by the Bankruptcy Court under sections 327, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date; and (c) all fees and charges assessed against the Debtors' estates under section 1930, chapter 123, of title 28, United States Code. |
| | "AFI" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "AFI LOC" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "AFI LOC Claim" means any Secured Claim of AFI arising under the AFI LOC. |
| | "AFI Revolver" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "AFI Revolver Claim" means any Secured Claim of AFI arising under the AFI Revolver. |

| | |
|---|---|
| | "Allowed" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is scheduled by the Debtors in their Schedules as neither disputed, contingent nor unliquidated, and as to which the Debtors or other party in interest have not filed an objection by the Claims Objection Bar Date; (b) a Claim that either is not a Disputed Claim or has been Allowed by a Final Order; (c) a Claim that is Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (d) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been Allowed by a Final Order; (e) a Claim that is Allowed pursuant to the terms of the Plan; or (f) a Disputed Claim as to which a proof of Claim has been timely filed and as to which no objection has been filed by the Claims Objection Bar Date. |
| | "Ally" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "Ally DIP Financing Facility" means the debtor-in-possession financing facility to be provided to the Debtors, attached hereto as Exhibit 3. |
| | "Ally Settlement Agreement" means the agreement between Ally and the Debtors, attached hereto as Exhibit 5. |
| | "Asset Sales" means, collectively, the sale of the Debtors' servicing platform together with substantially all of the Debtors' owned agency mortgage servicing rights pursuant to the Platform Asset Purchase Agreement, and the sale of certain of Ally's collateral pursuant to the HFS Asset Purchase Agreement. |
| | "Auction" means an auction held in connection with the Asset Sales pursuant to the bidding procedures. |
| | "Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. |
| | "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York. |

| | "Cash Collateral Order" means an order of the Bankruptcy Court authorizing the Debtors to use Ally's cash collateral. |
| | "Causes of Action" means all actions, causes of action, Claims, liabilities, obligations, rights, suits, debts, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third party claims, indemnity claims, contribution claims, or any other claims, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date. |
| | "Chapter 11 Cases" mean (a) when used with reference to a particular Debtor, the chapter 11 case to be filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases for all of the Debtors. |
| | "Citibank" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "Citibank MSR Facility" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "Citibank Secured Lender Claim" means any Secured Claim of Citibank arising under the Citibank MSR Facility. |
| | "Claim" has the meaning set forth in 11 U.S.C. § 101(5). |
| | "Company" means such term as defined in the preamble. |
| | "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to, among others, section 1129 of the Bankruptcy Code. |
| | "Consummation" means the occurrence of the Effective Date. |
| | "Creditor" means any holder of a Claim. |

| | "Debtor" means one of the Debtors, in its individual capacity as a debtor and debtor in possession in the Chapter 11 Cases. |
|---|---|
| | "Debtors" means such term as defined in the preamble. |
| | "DIP Financing Facility" means that certain Debtor-in-Possession Credit Agreement, dated on or around May 14, 2012, by and between the Debtors and Barclays Bank Plc, attached hereto as Exhibit 6. |
| | "Disclosure Statement" means such term as defined in the section entitled "Initiation of Chapter 11 Cases." |
| | "DOJ/AG Settlement" means that certain Consent Judgment filed on March 12, 2012 in the United States District Court for the District of Columbia to which ResCap and AFI, among others, are parties. |
| | "Effective Date" means the date of substantial consummation of the Plan, which shall be the first business day upon which all conditions precedent to the effectiveness of the Plan are satisfied or waived in accordance with the Plan. |
| | "Estate" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 case pursuant to section 541 of the Bankruptcy Code. |
| | "Equity Interest" means an equity security (as defined in section 101 of the Bankruptcy Code) in any of the Debtors. |
| | "Fannie Mae" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "FNMA EAF Claim" means any Secured Claim of Fannie Mae arising under the FNMA EAF Facility. |
| | "FNMA EAF Facility" means such term as defined in the section entitled "Prepetition Secured Lenders." |
| | "FRB Consent Order" means that certain Consent Order dated April 13, 2011 among ResCap, GMAC Mortgage, LLC, AFI, the Federal Reserve Board and the Federal Deposit Insurance Company. |

|  | "General Unsecured Claim" means any and all Claims against any of the Debtors that are not a/an (a) Administrative Expense Claim; (b) Priority Tax Claim; (c) Other Priority Claim; (d) Secured Lender Claim; (e) Junior Secured Notes Claim; (f) Other Secured Claim; (g) Senior Unsecured Notes Claim; (h) Junior Secured Notes Deficiency Claim; (i) Rep and Warranty Contract Claim; or (j) Intercompany Claim. |
|---|---|
|  | "GMACM Debtors" means such term as defined in the section entitled "Debtors." |
|  | "GMACM Unsecured Claims Pool" means the proceeds of any assets allocable to the GMACM Debtors remaining after distributions have been made under the Plan to each holder of an Allowed Administrative Expense Claim, Priority Tax Claim, Other Priority Tax Clam, Secured Lender Claim, Junior Secured Notes Claim, or Other Secured Claim against the GMACM Debtors. |
|  | "GNMA Forward Flow Agreement" means that Amended and Restated Master Mortgage Loan Purchase and Sale Agreement between Ally Bank as Seller, and GMAC Mortgage, LLC as Purchaser, dated as of May 1, 2012. |
|  | "HFS Asset Purchase Agreement" means that certain asset purchase agreement dated on or around May 14 by and between Ally and the Debtors, attached to the Ally Settlement Agreement as Exhibit 5. |
|  | "Impaired" has the meaning set forth in section 1124 of the Bankruptcy Code. |
|  | "Intercompany Claims" means any and all Claims of a Debtor against another Debtor. For the avoidance of doubt, Intercompany Claims do not include Claims that Ally may assert against the Debtors. |
|  | "Intercreditor Agreement" means the agreement dated as of June 6, 2008, among Wells Fargo Bank, N.A., as First Priority Collateral Agent for the First Priority Secured Parties under the First Priority Documents, Wells Fargo Bank, N.A., as Second Priority Collateral Agent for the Second Priority Secured Parties under the Second Priority Documents, Wells Fargo Bank, N.A., as Third Priority Collateral Agent for the Third Priority Secured Parties under |

| | the Third Priority Documents, Ally, in its capacity as agent for the Lenders under the Loan Agreement, U.S. Bank National Association, as Trustee under the 2010 Indenture, U.S. Bank National Association, as Trustee under the 2015 Indenture, Residential Funding Company, LLC, GMAC Mortgage, LLC, and Residential Capital, LLC. |
|---|---|
| | "Junior Secured Notes" means such term as defined in the section entitled "Junior Secured Noteholders." |
| | "Junior Secured Notes Claim" means any Secured Claim of the Junior Secured Noteholders under the Junior Secured Notes. |
| | "Junior Secured Notes Deficiency Claims" means any Claim of the Junior Secured Noteholders under the Junior Secured Notes to the extent such Claims are not Secured Claims. |
| | "Liquidating Trust" means the trust formed pursuant to the Plan for the purpose of holding, administering, and liquidating Estate assets on and after the Effective Date. |
| | "Other Priority Claim" means any Claim, other than an Administrative Expense Claim or Priority Tax Claim, that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code. |
| | "Other Secured Claim" means any Secured Claim other than Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, Secured Lender Claims or Junior Secured Claims. For the avoidance of doubt, Other Secured Claims shall include Claims arising under the Barclays GSAP Facility. |
| | "Petition Date" means such term as defined in the section entitled "Initiation of the Chapter 11 Cases." |
| | "Plan" means such term as defined in the preamble. |
| | "Plan Injunction" means that, from and after the Effective Date, all entities are permanently enjoined from commencing or continuing in any manner, any Cause of Action released or to be released pursuant to the Plan or the Confirmation Order. |

|  | "Plan Supplement" means, with respect to the Plan, all exhibits, appendices, Plan supplement documents and related documents. |
|  | "Plan Support Agreements" means the three plan support agreements to support the Plan among the Debtors and each of (i) Ally and members of the ad hoc committee of unaffiliated holders of the Junior Secured Notes holding at least 50% of all Junior Secured Notes (the "Junior Secured Notes Plan Support Agreement"), (ii) Ally and certain holders of securities backed by mortgage loans sold by the Debtors, and (iii) Ally Financial Inc., respectively. |
|  | "Platform Asset Purchase Agreement" means that certain asset purchase agreement dated on or around May 14 by and between Purchaser and the Debtors, attached hereto as Exhibit 4. |
|  | "Priority Tax Claim" means any Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
|  | "Reorganization" means such term as defined in the preamble. |
|  | "Reorganized Debtors" means, collectively, the Debtors after the Effective Date. |
|  | "Representatives" means such person or entity's respective members, partners, equity-holders, officers, directors, employees, representatives, advisors, attorneys, agents and professionals, each solely in its capacity as such. |
|  | "ResCap" means such term as defined in the preamble. |
|  | "ResCap Debtors" means such term as defined in the section entitled "Debtors." |
|  | "ResCap Unsecured Claims Pool" means the proceeds of any assets allocable to the ResCap Debtors remaining after distributions have been made under the Plan to each holder of an Allowed Administrative Expense Claim, Priority Tax Claim, Other Priority Tax Clam, Secured Lender Claim, Junior Secured Notes Claim, or Other Secured Claim against the GMACM Debtors. |

| | "RFC Debtors" means such term as defined in the section entitled "Debtors." |
| --- | --- |
| | "RFC Unsecured Claims Pool" means the proceeds of any assets allocable to the RFC Debtors remaining after distributions have been made under the Plan to each holder of an Allowed Administrative Expense Claim, Priority Tax Claim, Other Priority Tax Clam, Secured Lender Claim, Junior Secured Notes Claim, or Other Secured Claim against the RFC Debtors. |
| | "RMBS Trust Settlement Agreement" means the agreement dated as of May 13, 2012 among Residential Capital, LLC and its direct and indirect subsidiaries and certain Institutional Investors, attached hereto as Exhibit 7. |
| | "Section 510(b) Claims" means any Claim arising from rescission of a purchase or sale of security (including any Interest) of the Debtors, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim. |
| | "Secured Claim" means any Claim that is secured by a lien on property in which a Debtor's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code. |
| | "Secured Lender Claim" means any AFI Revolver Claim, AFI LOC Claim, Citibank Secured Lender Claim, or FNMA EAF Claim. |
| | "Senior Unsecured Claim" means any Claim of the Senior Unsecured Noteholders under the Senior Unsecured Notes. |
| | "Senior Unsecured Notes" means such term as defined in the section entitled "Senior Unsecured Noteholders." |
| | "Shared Services Agreement" means the agreement between Ally and the Debtors, attached hereto as Exhibit 8. |

| | |
|---|---|
| | "Stalking Horse Bidder" means such term as defined in the section entitled "Purchaser." |
| | "Subservicing Agreement" means the agreement between Ally Bank and the Debtors, attached hereto as Exhibit 1. |
| | "Term Sheet" means such term as defined in the preamble. |
| | "Transition Services Agreement" means the agreement between Ally and the Debtors, attached hereto as Exhibit 9. |
| | "Trustees" means the indenture trustees for the Trusts. |
| | "Trusts" means the securitization trusts identified on Exhibit A to the RMBS Trust Settlement Agreement. |
| | "Unimpaired" means Claims that are not Impaired. |
| | "Winning Bidder" means the party who submits the winning bid for the purchase of substantially all of the Debtors' assets with an accompanying asset purchase agreement. |

# EXHIBIT 1
**"Subservicing Agreement"**

**EXHIBIT 2**
**"GNMA Forward Flow Agreement"**

**EXHIBIT 3**
**"Ally DIP Financing Facility"**

# EXHIBIT 4
## "Platform Asset Purchase Agreement"

12-12020-mg    Doc 683-5    Filed 05/14/12    Entered 05/14/12 10:37:54    Exhibit 5 Pg 143 of 312

**EXHIBIT 5**
**"Ally Settlement Agreement"**

**EXHIBIT 6**
**"Barclays DIP Financing Facility"**

12-12020-mg    Doc 6636    Filed 05/14/21    Entered 05/14/21 10:37:04    Exhibit 56
Pg 145 of 312

**EXHIBIT 7**
**"RMBS Trust Agreement"**

**EXHIBIT 8**
**"Shared Services Agreement"**

# EXHIBIT 9
**"Transition Services Agreement"**

# Exhibit 5

## HFS APA

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

Between

**ALLY FINANCIAL INC.**

and

**BMMZ HOLDINGS LLC**

and

**RESIDENTIAL CAPITAL, LLC**

**RESIDENTIAL FUNDING COMPANY, LLC**

**GMAC MORTGAGE, LLC**

and

**THE ADDITIONAL SELLERS IDENTIFIED ON SCHEDULE A HERETO**

dated as of

**May 13, 2012**

# TABLE OF CONTENTS

**Page**

ARTICLE I.        DEFINITIONS AND INTERPRETATION ..................................................... 1

    Section 1.1        Definitions.................................................................................... 1
    Section 1.2        Interpretation.............................................................................. 16

ARTICLE II.        PURCHASE AND SALE OF ASSETS ......................................................... 17

    Section 2.1        Purchase and Sale of Assets ....................................................... 17
    Section 2.2        Excluded Assets.......................................................................... 18
    Section 2.3        Post-Closing Asset Deliveries ................................................... 19
    Section 2.4        Conveyance of Assets by Affiliate Sellers.................................. 19
    Section 2.5        Non-Assignable Purchased Assets; Necessary Consents ................. 19
    Section 2.6        Retained Liabilities .................................................................... 20
    Section 2.7        Closing ....................................................................................... 20
    Section 2.8        Ancillary Agreements ................................................................ 20
    Section 2.9        Deliveries by Purchaser ............................................................. 21
    Section 2.10        Deliveries by Sellers .................................................................. 21
    Section 2.11        Consumer Privacy Matters ........................................................ 22
    Section 2.12        "As Is, Where Is" Transaction ................................................... 22

ARTICLE III.        PURCHASE PRICE; ADJUSTMENT; ALLOCATION ............................. 22

    Section 3.1        Purchase Price; Payment of Purchase Price....................................... 22
    Section 3.2        Purchase Price Adjustment; Final Payment ...................................... 23
    Section 3.3        Allocation of the Purchase Price for Tax Purposes .......................... 25

ARTICLE IV.        REPRESENTATIONS AND WARRANTIES OF SELLERS..................... 25

    Section 4.1        Organization and Authority ................................................................ 25
    Section 4.2        Non-Contravention ..................................................................... 26
    Section 4.3        Consents and Approvals ............................................................. 26
    Section 4.4        Title to Assets ............................................................................. 27
    Section 4.5        Mortgage Loan Portfolio............................................................ 27
    Section 4.6        [Reserved.] ................................................................................. 27
    Section 4.7        Litigation and Claims................................................................. 27
    Section 4.8        Brokers, Finders and Financial Advisors.......................................... 27
    Section 4.9        Whole Loans ............................................................................... 27
    Section 4.10        Mortgage Securities ................................................................... 29

ARTICLE V.        REPRESENTATIONS AND WARRANTIES OF PURCHASER .............. 30

    Section 5.1        Organization and Authority ................................................................ 30
    Section 5.2        Non-Contravention ..................................................................... 30
    Section 5.3        Consents and Approvals ............................................................. 30
    Section 5.4        Financing..................................................................................... 30
    Section 5.5        Non-reliance............................................................................... 31
    Section 5.6        Brokers, Finders and Financial Advisors.......................................... 31

ARTICLE VI.        PRE-CLOSING MATTERS AND OTHER COVENANTS ........................ 31

    Section 6.1        Subsequent Actions; Further Assurances ........................................... 31
    Section 6.2        Third Party Consents................................................................... 31

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---:|
| Section 6.3 | Access to Information | 31 |
| Section 6.4 | Records; Post-Closing Access to Information | 32 |
| Section 6.5 | Interim Operations | 33 |
| Section 6.6 | Mortgage Approvals and Licenses | 34 |
| Section 6.7 | Notices of Certain Events | 34 |
| Section 6.8 | Tax Matters | 35 |
| Section 6.9 | Insurance | 35 |
| Section 6.10 | Mortgage Loan Schedules | 35 |
| Section 6.11 | Schedules and Disclosure Memorandum | 36 |
| Section 6.12 | Bankruptcy Actions | 36 |
| Section 6.13 | Antitrust Clearances and Obligations | 37 |
| Section 6.14 | Post-Closing Amounts Received and Paid | 38 |
| Section 6.15 | Confidentiality | 38 |
| Section 6.16 | Delivery of Mortgage Files | 39 |
| Section 6.17 | Third Party Servicing Agreement | 40 |
| Section 6.18 | Transfer of Servicing | 40 |
| Section 6.19 | Use of Proceeds | 41 |
| Section 6.20 | Electronic Data Files | 42 |
| Section 6.21 | Transfer of Assets to DIP Borrowers | 42 |
| Section 6.22 | Mortgage Loan Modifications | 42 |
| ARTICLE VII. | BANKRUPTCY COURT MATTERS | 42 |
| Section 7.1 | Competing Transaction | 42 |
| Section 7.2 | Bankruptcy Court Filings | 43 |
| ARTICLE VIII. | CONDITIONS | 43 |
| Section 8.1 | Conditions to Obligations of Purchaser and Sellers | 43 |
| Section 8.2 | Conditions to Obligations of Sellers | 44 |
| Section 8.3 | Conditions to Obligations of Purchaser | 45 |
| ARTICLE IX. | TERMINATION AND SURVIVAL | 46 |
| Section 9.1 | Termination | 46 |
| Section 9.2 | Procedure and Effect of Termination | 48 |
| Section 9.3 | No Survival | 48 |
| ARTICLE X. | MISCELLANEOUS | 48 |
| Section 10.1 | Expenses | 48 |
| Section 10.2 | Amendment; Waiver | 49 |
| Section 10.3 | Notices | 49 |
| Section 10.4 | Waivers | 50 |
| Section 10.5 | Counterparts | 51 |
| Section 10.6 | Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction | 51 |
| Section 10.7 | Assignment | 51 |
| Section 10.8 | No Third-Party Beneficiaries | 52 |
| Section 10.9 | Public Announcements | 52 |
| Section 10.10 | Severability | 52 |

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Section 10.11 | Specific Performance | 52 |
| Section 10.12 | Waiver of Bulk Transfer Laws | 52 |
| Section 10.13 | Personal Liability | 53 |
| Section 10.14 | Entire Agreement | 53 |
| Section 10.15 | Parent Guaranty | 53 |

**SCHEDULES**

| | |
|---|---|
| Schedule A | Additional Sellers |
| Schedule B | Contents of Credit File |
| Schedule C | DIP Financing Agreements |
| Schedule D | Knowledge of Sellers |
| Schedule E | Mortgage Securities |
| Schedule F | Purchase Price Schedule |
| Schedule 4.3 | Seller Consents and Approvals |
| Schedule 4.5 | Mortgage Loan Data Fields |
| Schedule 5.3 | Purchaser Consents and Approvals |
| Schedule 6.12(f) | Terms of the Chapter 11 Plan |

**EXHIBITS**

| | |
|---|---|
| Exhibit 1 | Sale Approval Order |
| Exhibit 2 | Sale Procedures |
| Exhibit 3 | Sale Procedures Order |

**DISCLOSURE MEMORANDUM**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement, dated as of May 13, 2012, is entered into between Ally Financial Inc., a Delaware corporation ("Parent") and BMMZ Holdings LLC, a Delaware limited liability company ("Purchaser"), and Residential Capital, LLC ("ResCap"), Residential Funding Company, LLC ("RFC"), and GMAC Mortgage, LLC ("GMAC Mortgage"), each of which is a Delaware limited liability company, and the additional sellers identified on Schedule A hereto (together with ResCap, RFC and GMAC Mortgage, "Sellers").

**WHEREAS**, Sellers, together with other Affiliates (as hereinafter defined), intend to file voluntary petitions ("Petitions") for relief (collectively, the "Bankruptcy Case") under Chapter 11 of Title 11, U.S.C. §§ 101, *et seq*., as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on or shortly after the date this Agreement is executed;

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser (or Purchaser's assignee or assignees pursuant to Section 10.7 hereof) wishes to purchase from Sellers, the Purchased Assets (as hereinafter defined); and

**WHEREAS**, Sellers, as debtors and debtors-in-possession, will continue in the possession of their respective assets pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.1    Definitions**.  As used in this Agreement, the following terms have the meanings set forth below:

"Acceptable Servicing Procedures" means the procedures, including collection and loan administration procedures, for servicing mortgage loans using the same standard of care that Sellers customarily employ and exercise in servicing and administering similar mortgage loans for their own account, which shall be in compliance with Applicable Law.

"Accrued Interest" means interest accrued in accordance with the AFI Global Accounting Policy #2255 whereby interest is accrued up to the date the Whole Loan is classified as 60 days delinquent or, in the case the Whole Loan was previously modified, has had a sustained period of repayment performance of at least six months by the borrower.

"Adjustment Amount" has the meaning specified in Section 3.2(b).

"Adjustment Report" has the meaning specified in Section 3.2(d).

"Advances" means, with respect to each Mortgage Loan, the aggregate outstanding amount that, as of any date of determination, has been advanced directly by Sellers from their own funds or from funds advanced under any loan facility in connection with servicing of such Mortgage Loans in accordance with Acceptable Servicing Procedures solely with respect to Taxes, insurance premiums and corporate advances as permitted by Applicable Requirements, including in each case the right to reimbursement for, and enforce payment of, such Advances. For the avoidance of doubt, "Advances" shall not include (i) any HELOC draws and (ii) any advances of, or on account of, principal and interest.

"Affiliate" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 20% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by Contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.  Notwithstanding the foregoing, for purposes of this Agreement, unless otherwise specifically provided, Affiliates of Sellers include only direct or indirect Subsidiaries of ResCap, and other Affiliates of Purchaser are excluded from the definition of Sellers' Affiliates and references to Affiliates of Purchaser exclude Sellers and their Affiliates.

"Affiliate Purchased Assets" has the meaning specified in Section 2.4(a).

"Affiliate Seller " has the meaning specified in Section 2.4(a).

"Agency " means a government-sponsored secondary mortgage market enterprise or Government Entity acquiring, owning or guaranteeing Mortgage Loans, including for purposes of this Agreement, Fannie Mae, Ginnie Mae, Freddie Mac, FHA and HUD.

"Agreement" or "this Agreement" means this Asset Purchase Agreement, together with the Exhibits, Schedules and Disclosure Memorandum attached hereto, as any of them may be amended from time to time.

"Allocation Schedule" has the meaning specified in Section 3.3(a).

"ALTA " means the American Land Title Association or any successor thereto.

"Alternative Restructuring" means a proposal or offer for a chapter 11 plan or other restructuring transaction which Sellers and their respective Boards of Directors have determined in good faith constitutes a proposal that is reasonably likely to be more favorable to Sellers' estates, their creditors and other parties to whom Sellers owe fiduciary duties than the Chapter 11 Plan.

"Amended Disclosure Memorandum" has the meaning specified in Section 6.11(b).

"Ancillary Agreements " has the meaning specified in Section 2.8.

"Antitrust Authority " has the meaning specified in Section 6.13(b).

701584139 10488637

"Applicable Law" means, as of the time of reference and as applicable, any Law that is applicable to the Purchased Assets.

"Applicable Requirements" means and includes, as of the time of reference, with respect to the origination, purchase, sale and servicing of Mortgage Loans, (in each case to the extent applicable to any particular Mortgage Loan): (i) contractual obligations of Sellers (except those rendered unenforceable by the Bankruptcy Code), including with respect to any Mortgage Loan Document or any other commitment or other contractual obligation relating to a Mortgage Loan, (ii) Applicable Laws, (iii) other applicable requirements and guidelines of any Government Entity and (iv) applicable requirements of MERS.

"April Collateral Exceptions Report" means the collateral exceptions report prepared by Sellers' custodians in April 2012 and most recently updated as of May 6, 2012, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in its possession, to the extent applicable, or have document deficiencies.  No Seller shall have any obligation to deliver any documents included in the April Collateral Exceptions Report or cure any document deficiencies identified in the April Collateral Exceptions Report.

"Auction" has the meaning specified in the Sale Procedures Order.

"Bankruptcy Case" has the meaning specified in the preamble.

"Bankruptcy Code" has the meaning specified in the preamble.

"Bankruptcy Court" has the meaning specified in the preamble.

"Bankruptcy Exceptions" means (i) as a result of Sellers operating as debtors in possession under the Bankruptcy Code, (a) Sellers' inability to maintain the services of their officers or other employees, including the possibility that a substantial number of Sellers' employees have left, or will leave, their positions, and (b) vendors and counterparties of Sellers failing to continue to perform their obligations to Sellers, and (ii) any limitation or obligation imposed on Sellers by Order of the Bankruptcy Court or the DIP Financing Agreements.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Bill of Sale" means one or more bills of sale to be executed by Sellers and Purchaser in respect of certain Purchased Assets, in a customary form as mutually agreed between Sellers and Purchaser.

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

"Chapter 11 Plan" shall mean the Chapter 11 plan of reorganization, in form and substance in accordance with the terms set forth in Schedule 6.12(f) and otherwise satisfactory to Sellers and Purchaser, which shall be confirmed by the Bankruptcy Court in accordance with section 1129 of the Bankruptcy Code.

3

"Chapter 11 Plan Effective Date" shall mean the date upon which all the conditions to effectiveness of the Chapter 11 Plan shall have been satisfied or waived and the transactions contemplated hereunder shall have been substantially consummated.

"Claims" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown.

"Closing" has the meaning specified in Section 2.7.

"Closing Collateral Exceptions Report" means the collateral exceptions report generated by Sellers' custodians upon Sellers' request and at Purchaser's expense, with respect to each Whole Loan included in the Purchased Assets hereunder, identifying on the "Custodial Exceptions" tabs of such report which of the Mortgage Loan Documents are not in Sellers' possession, to the extent applicable, or have document deficiencies. No Seller shall have any obligation to deliver any documents included in the Closing Collateral Exceptions Report or cure any document deficiencies identified in the Closing Collateral Exceptions Report.

"Closing Date" means the date upon which the Closing occurs.

"Closing Date Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Closing Date Purchase Price" has the meaning specified in Section 3.2(a).

"Collateral Exceptions Report" means the April Collateral Exceptions Report or the Closing Collateral Exceptions Report, as applicable.

"Competing Transaction" has the meaning specified in Section 7.1.

"Confidential Information" has the meaning specified in Section 6.15(a).

"Confirmation Order" means the order of the Bankruptcy Court confirming the Chapter 11 Plan in accordance with section 1129 of the Bankruptcy Code.

"Consent" means the Permits, authorizations, consents, waivers, approvals and licenses from third parties or Government Entities necessary to consummate this Agreement and the transactions contemplated hereby and for Purchaser to hold the Purchased Assets after the Closing.

"Consent Order" means the Consent Order entered into on April 13, 2011, by and among the FDIC, the FRB and Parent, Ally Bank, ResCap and GMAC Mortgage.

"Consumer Privacy Ombudsperson" has the meaning specified in Section 2.11.

"Contract" means any agreement, consensual obligation, promise, understanding, arrangement, commitment or undertaking of any nature (whether written or oral and whether express or implied), including leases, subleases, licenses, sublicenses, purchase orders, indentures and loan agreements (other than this Agreement and the Ancillary Agreements) (including each amendment, extension, exhibit, attachment, addendum, appendix, statement of work, change order and any other similar instrument or document relating thereto).

"Credit File" means with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains, if available, the documents described on Schedule B hereto, together with the credit documentation relating to the origination of such Mortgage Loan which may be maintained on microfilm, optical storage or any other comparable medium.

"Cut-off Date" means the last day of the month immediately preceding the month of the expected Closing Date or such other date as Purchaser and Sellers may agree.

"Cut-off Date Mortgage Loan Schedule" has the meaning specified in Section 4.5.

"Cut-off Date Purchase Price" has the meaning specified in Section 3.1(d).

"Determination" has the meaning specified in Section 3.3(a).

"DIP Financing Agreements" means the Debtor-in-Possession Loan and Security Agreements identified on Schedule C hereto, as such agreements may be amended from time to time.

"DIP Borrowers" means GMACM Borrower LLC, a wholly owned subsidiary of GMAC Mortgage, and RFC Borrower LLC, a wholly owned subsidiary of RFC.

"Disclosure Memorandum" has the meaning specified in Section 6.11(a).

"Disclosure Statement" has the meaning specified in Section 6.12(d).

"Dispute Notice" has the meaning specified in Section 3.2(c).

"DOJ/AG Settlement" means the Consent Judgment filed with the U.S. District Court for the District of Columbia on March 12, 2012 to which Parent, ResCap and GMAC Mortgage are parties.

"Electronic Data File" means test tape(s), sale tape(s) and/or transfer tape(s) containing Mortgage Loan information delivered or to be delivered by Sellers to Purchaser in connection with the transfer of the Whole Loans contemplated hereby.

"Enforceability Exceptions" has the meaning specified in Section 4.1.

"Escrow Payments" means the aggregate amount of the escrows for real estate taxes, insurance, private mortgage insurance, and other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to any Mortgage Loan.

"Excluded Assets" has the meaning specified in Section 2.2.

"Fannie Mae" means Fannie Mae, formerly known as The Federal National Mortgage Association, or any successor thereto.

"FDIC" means the Federal Deposit Insurance Corporation or any successor thereto.

"Fed Funds Rate" means, for any date, the weighted average of the rates set forth in the weekly statistical release H.15(519) (or any successor publication) published by the Board of Governors of the Federal Reserve System opposite the caption "Federal Funds (Effective)."

"FHA" means the Federal Housing Administration of HUD, or any successor thereto.

"FHA Loans" means mortgages insured by the FHA.

"Final Order" means an Order (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the Order has been affirmed by the highest court to which such Order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such Order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired; provided that the theoretical possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules, may be filed with respect to such order or judgment shall not prevent such Order from being considered a Final Order.

"FRB" means the Board of Governors of the Federal Reserve System.

"Freddie Mac" means Freddie Mac, formerly known as The Federal Home Loan Mortgage Corporation, or any successor thereto.

"GAAP" means United States generally accepted accounting principles, applied on a consistent basis.

"Ginnie Mae" means the Government National Mortgage Association, a body corporate organized and existing under the laws of the United States of America within HUD, or any successor thereto.

"GMAC Mortgage" has the meaning specified in the preamble.

"Government Entity" means any United States federal, state or local, or any supranational, court, judicial or arbitral body, administrative or regulatory body or other governmental or quasi-Government Entity with competent jurisdiction (including any political or other subdivision thereof), including the Agencies, the FHA, HUD, the VA, the FRB, the FDIC, the IRS, any state agency and any Antitrust Authority.

"Guaranteed Obligations" has the meaning specified in Section 10.15.

"HAMP" means the Treasury Department's Home Affordable Modification Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HARP" means the Treasury Department's Home Affordable Refinance Program established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HASP" means the Treasury Department's Homeowner Affordability and Stability Plan established in connection with the "Making Home Affordable" loan modification program, as in effect from time to time.

"HELOC" means a Mortgage Loan that is a home equity line of credit.

"Homes Act" means the Helping Families Save Their Homes Act of 2009, as amended.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"HUD" means the Department of Housing and Urban Development of the United States of America.

"Indebtedness" means (i) all indebtedness for borrowed money or for the deferred purchase price of property or services (other than current trade Liabilities incurred in the Ordinary Course of Business and payable in accordance with customary practices), (ii) any other indebtedness that is evidenced by a note, bond, debenture or similar instrument, (iii) liabilities under or in connection with letters of credit or bankers' acceptances or similar items, (iv) all obligations under financing leases, (v) all Liabilities secured by any Lien on any property, and (vi) all guarantee obligations.

"Independent Accounting Firm" means a nationally recognized independent accounting firm mutually chosen by Purchaser and ResCap.

"Insurance Policy" means (i) any private mortgage insurance or commitment of any private mortgage insurer to insure, (ii) any title insurance policy, (iii) any hazard insurance policy, (iv) any flood insurance policy, (v) any fidelity bond, direct surety bond, or errors and omissions insurance policy required by private mortgage insurers, (vi) any surety bonds required by state banking authorities for licensing purposes or (vii) any surety or guaranty agreement.

"Insurer" means an issuer of an Insurance Policy.

"IRS" means the Internal Revenue Service.

"Knowledge of Sellers" concerning a particular subject, the affairs of any Seller or the Purchased Assets, means the actual knowledge of any individual listed on Schedule D hereto.

"Law " means any law, statute, ordinance, rule, regulation, code, Order, Permit, or other legal requirement enacted, issued, promulgated, enforced, or entered by a Government Entity.

"Liabilities" means any and all Indebtedness, liabilities, costs, Losses, commitments and obligations of any kind, whether fixed, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability), and whether or not the same would be required by GAAP to be reflected in financial statements or disclosed in the notes thereto.

"Licenses" means the Permits required by Law or an Agency or other Government Entity in order to hold the Purchased Assets.

"Lien" means any lien, charge, pledge, deed of trust, right of first refusal, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option, proxy, hypothecation, voting trust agreement, transfer restriction, easement, servitude, encroachment, or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Loss" or "Losses" means any and all damages, losses, actions, proceedings, causes of action, Liabilities, claims, Liens, penalties, fines, demands, Taxes, assessments, awards, judgments, settlements, costs and expenses, including (i) court costs and similar costs of litigation; (ii) reasonable attorneys' and consultants' fees, including those incurred in connection with (a) investigating or attempting to avoid the matter giving rise to the Losses or (b) successfully establishing a valid right to indemnification for Losses; and (iii) interest awarded as part of a judgment or settlement, if any, but in any event "Loss" or "Losses" shall exclude punitive damages claimed, incurred or suffered by any Person (which exclusion does not include any such damages for which such Person is liable to a third party as a direct, out-of-pocket cost of such Person).

"Master Servicing Rights" means any and all rights of a Seller to master service the Mortgage Loans and to monitor the performance of the primary servicers, including to the extent applicable any and all rights of a Seller to the following: (a) any payments or monies received as compensation for master servicing the Mortgage Loans; (b) collection of any late fees, penalties or similar payments with respect to the Mortgage Loans; (c) administration and maintenance of all agreements or documents creating, defining or evidencing any such master servicing rights of the related Seller thereunder; (d) maintenance of all accounts and other rights to payment related to any of the property described in this paragraph; and (e) administration and maintenance of any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records, or other information pertaining to the applicable Mortgage Loans.

"Material Adverse Effect" means any condition, circumstance, event, state of facts, change or effect that is materially adverse to the Purchased Assets or to Sellers' ability to effect the transactions contemplated herein or to perform their obligations under this Agreement and the Ancillary Agreements; provided, that, for purposes of this Agreement, a Material Adverse Effect shall not include any condition, circumstance, event, state of facts, change or effect to the Purchased Assets resulting from (i) conditions, circumstances, events or changes to the housing or mortgage market or the mortgage servicing industry; (ii) the announcement or disclosure of the transactions contemplated herein, (iii) general economic, regulatory or political conditions or changes in the United States; (iv) military action or acts of terrorism; (v) changes in Law or

8

changes in GAAP or in the application of GAAP that become effective after the date hereof that Sellers are required to adopt in accordance therewith; (vi) actions taken or not taken, in each case, at the request of Purchaser; (vii) conditions in or changes to any financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or market index); (viii) changes in or with respect to any of the Agencies, including in their legal organization, responsibilities, oversight obligations or roles in the mortgage loan and securities markets; or (ix) any effects on the Purchased Assets resulting from the fact that Sellers will be operating as debtors-in-possession under the Bankruptcy Code; and provided further, that, in the case of each of clauses (i) , (iii), (iv), (v) and (vii), the Purchased Assets are not, or not reasonably likely to be, materially disproportionately affected by such condition, circumstance, event, state of facts, change or effect compared to similar assets of other Persons engaged in the conduct of similar businesses.

"MERS" means the Mortgage Electronic Registration System maintained by Merscorp Holdings, Inc.

"MERS Loan" means any Mortgage Loan registered on the MERS system for which MERS is listed as the record mortgagee or beneficiary on the related mortgage or assignment thereof.

"MIN" means the mortgage identification number issued to each MERS Loan.

"MOM Loan" means any Mortgage Loan that was registered on the MERS system at the time of origination thereof and for which MERS appears as the record mortgagee or beneficiary on the related mortgage.

"Mortgage File" means, with respect to any Mortgage Loan, a file pertaining to such Mortgage Loan that contains each of the Mortgage Loan Documents except as specified in any applicable Collateral Exceptions Report.

"Mortgage Loan" means any U.S. individual residential (one-to-four family) mortgage loan or other extension of credit secured by a Lien on U.S. real property of a borrower originated, purchased or serviced by a Seller or any Affiliate Seller (which may be a charged-off Mortgage Loan or the receivable with respect to a funded HELOC advance).

"Mortgage Loan Documents" means, for any Mortgage Loan:

(A)    either:

(i)    the original Mortgage Note, endorsed (on the Mortgage Note or an allonge attached thereto) "Pay to the order of _____ without recourse," and signed by facsimile signature in the name of the last holder of record by an authorized officer; or

(ii)    a copy of the Mortgage Note (endorsed as provided above) together with a lost note affidavit and indemnity, bearing all intervening endorsements, to the extent of any such endorsements, from the original payee to

an endorsement in blank, and if previously endorsed, signed in the name of the last endorsee by a duly qualified officer of the last endorsee;

(B)    the original mortgage, with evidence of recording thereon (and, in the case of a MOM Loan, with evidence of the MIN); provided, that (A) if the original mortgage has been delivered for recording to the public recording office of the jurisdiction in which the Mortgaged Property is located but has not yet been returned to the applicable Seller by such recording office, such Seller shall (i) provide to Purchaser a copy of the mortgage, and (ii) as soon as the original mortgage becomes available, deliver to Purchaser the original of such mortgage, with evidence of recording thereon, and (B) if such original mortgage is not available, has been lost or if such public recording office retains the original recorded mortgage, such Seller shall deliver or cause to be delivered to Purchaser a photocopy of such mortgage with the recording information included on such copy, certified by such Seller to be a copy of the original recorded mortgage;

(C)    unless such Mortgage Loan is a MERS Loan, the original assignment of the mortgage, from the applicable Seller signed by original signature of an authorized officer, in blank, which assignment shall be in form and substance acceptable for recording (except for the insertion of the names of the assignee and the recording information);

(D)    unless such Mortgage Loan is a MOM Loan, originals or copies of all recorded intervening assignments of the mortgage; provided, that (A) if any original intervening assignment of the mortgage has been delivered for recording to the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located but has not yet been returned to the applicable Seller by such recording office, such Seller shall deliver to Purchaser such original intervening assignment of the mortgage, with evidence of recording thereon, if and when such assignment of the mortgage becomes available, and (B) if such intervening assignment of the mortgage is not available or if such public recording office retains the original recorded intervening assignment of the mortgage, a Seller may deliver a photocopy of such intervening assignment of the mortgage showing evidence of recordation;

(E)    the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon, if any, or if such assumption, modification, consolidation or extension agreements are not available , a copy of such assumption, modification, consolidation or extension agreements; and

(F)    the original copy of the original lender's title insurance policy in the form of an ALTA mortgage title insurance policy and insuring Purchaser and its successors and assigns as to the first priority lien of the mortgage in the original principal amount of the Mortgage Loan or, if the original lender's title insurance policy has not been issued, the commitment to issue the same; provided, that this subsection (F) shall not apply to second lien Mortgage Loans.

"Mortgage Loan Schedule" has the meaning specified in Section 4.5.

701584139 10488637

"<u>Mortgage Note</u>" means, with respect to a Mortgage Loan, a promissory note or notes, a loan agreement or other evidence of Indebtedness with respect to such Mortgage Loan, secured by a mortgage or mortgages or a deed or deeds of trust, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"<u>Mortgage Securities</u>" means the trading/financing securities to be included in the Purchased Assets, which are identified on <u>Schedule E</u> hereto.

"<u>Mortgage Securities Purchase Price Percentage</u>" means 0.8194%.

"<u>Mortgaged Property</u>" means the real property securing repayment of the Indebtedness evidenced by a Mortgage Note pursuant to a related Mortgage Loan.

"<u>Mortgagor</u>" means the obligor on a Mortgage Note, the owner of the Mortgaged Property and the grantor or mortgagor named in the related mortgage and such grantor's or mortgagor's successors in title to the Mortgaged Property.

"<u>Nationstar</u>" means Nationstar Mortgage LLC.

"<u>Necessary Consent</u>" has the meaning specified in <u>Section 2.5</u>.

"<u>Non-performing</u>" means, with respect to any Mortgage Loan as of any date of determination, that (a) such Mortgage Loan is 30 or more days past due with respect to a scheduled payment of principal and interest, or (b) there exists an event of default under the terms of the related Mortgage Note or mortgage.

"<u>Order</u>" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree or verdict entered, issued, made or rendered by any Government Entity affecting such Person or any of its properties.

"<u>Ordinary Course of Business</u>" means the ordinary course of business of Sellers during the six months immediately preceding the date of this Agreement as modified from time to time in order to comply with the Consent Order, the DOJ/AG Settlement and any other change required by any Government Entity or MERS, and, from and after the Petition Date, in accordance with the budget contemplated by the DIP Financing Agreements.

"<u>Performing</u>" means, with respect to any Mortgage Loan as of any date of determination, such Mortgage Loan is current or fewer than 30 days past due with respect to a scheduled payment of principal and interest.

"<u>Permits</u>" means permits, concessions, grants, franchises, licenses, variances, exemptions, exceptions, clearances, registrations, qualifications, filings and other authorizations and approvals required or issued by any Government Entity and related to the Purchased Assets.

"<u>Permitted Liens</u>" means (i) statutory liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; <u>provided</u>, that an appropriate reserve is established therefor against the

701584139 10488637

carrying amount of the related assets; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business and the amount or validity of which is being contested in good faith by appropriate proceedings or the making of appropriate demands, notices or filings; <u>provided</u>, that an appropriate reserve is established therefor against the carrying amount of the related assets; and (iii) Liens that will be and are discharged or released either prior to, or simultaneously with the Closing; <u>provided</u>, that, except in the case of clause (i), such exceptions (a) do not render title to the property encumbered thereby unmarketable and (b) do not, individually or in the aggregate, materially detract from the value or use of such property for its current purposes.

"<u>Person</u>" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity or other entity or organization.

"<u>Petition Date</u>" means the date on which the Petitions in respect of the Bankruptcy Case are filed with the Bankruptcy Court.

"<u>Petitions</u>" has the meaning specified in the preamble.

"<u>Primary APA</u>" means that certain Asset Purchase Agreement, dated as of the date hereof, between Sellers, on the one hand, and Nationstar or another Winning Bidder that is acceptable to Sellers, on the other hand.

"<u>Primary Servicing Rights</u>" means any and all rights of a Seller to service the Mortgage Loans, including to the extent applicable any and all rights of a Seller to the following: (a) any payments or monies received for servicing the Mortgage Loans; (b) any late fees, penalties or similar payments with respect to the Mortgage Loans; (c) all agreements or documents creating, defining or evidencing any such servicing rights to the extent they relate to such servicing rights and all rights of the related Seller thereunder; (d) Escrow Payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto, subject to the rights of the related Mortgagor in such amounts; (e) all accounts and other rights to payment related to any of the property described in this paragraph; and (f) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records or other information pertaining to the Mortgage Loans or pertaining to the past, present or prospective servicing of the Mortgage Loans.

"<u>Privileged Documents</u>" has the meaning specified in <u>Section 2.3</u>.

"<u>Purchase Price</u>" has the meaning specified in <u>Section 3.1(a)</u>.

"<u>Purchase Price Adjustment Statement</u>" has the meaning specified in <u>Section 3.2(a)</u>.

"<u>Purchase Price Document Deficiency Multiplier</u>" means, for each Whole Loan Bucket, the multiplier to be applied to the Whole Loan Purchase Price Percentage for such Whole Loan Bucket based on the percentage of Mortgage Files in such Whole Loan Bucket determined to contain deficiencies (as set forth in the Closing Collateral Exceptions Report) as follows:

Percentage              Purchase Price

12

| Deficient | Document Deficiency Multiplier |
|---|---|
| < =6% | 1.033 |
| 8% | 1.029 |
| 10% | 1.021 |
| 12% | 1.013 |
| 15% | 1.000 |
| 18% | 0.979 |
| 20% | 0.962 |
| 22% | 0.948 |
| > =24% | 0.937 |

"<u>Purchase Price Schedule</u>" means <u>Schedule F</u> hereto which sets forth an example of the calculations to be made pursuant to <u>Section 3.1</u> in order to calculate the Purchase Price as if calculated as of December 31, 2011.

"<u>Purchased Assets</u>" has the meaning specified in <u>Section 2.1</u>.

"<u>Purchased Servicing Rights</u>" means (i) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by an SBO Servicer, the Master Servicing Rights, (ii) with respect to Mortgage Loans indicated on the Mortgage Loan Schedule as being primary serviced by a Seller, the Primary Servicing Rights and the Master Servicing Rights, and (iii) with respect to 41 Mortgage Loans as to which a Seller owns both the Primary Servicing Rights and the Master Servicing Rights, but which are indicated on the Mortgage Loan Schedule as being primary serviced by a third-party servicer on a subservicing basis, the Primary Servicing Rights and the Master Servicing Rights.

"<u>Purchaser</u>" has the meaning specified in the preamble.

"<u>Report Request Date</u>" has the meaning specified in <u>Section 3.1(d)</u>.

"<u>ResCap</u>" has the meaning specified in the preamble.

"<u>Retained Liabilities</u>" means any and all Liabilities of any kind or nature whatsoever of a Seller or any of its Affiliates, including but not limited to any Liabilities relating to the origination or securitization of Mortgage Loans by Sellers or any Affiliate of Sellers, including repurchase obligations relating thereto.

"<u>RFC</u>" has the meaning specified in the preamble.

"<u>Sale Approval Order</u>" means a Final Order or Final Orders of the Bankruptcy Court issued pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in substantially the form set forth in <u>Exhibit 1</u> hereto, authorizing and approving, among other things, (i) the sale, transfer and assignment of the Purchased Assets to Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Liens and (ii) that Purchaser is a

13

good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code. References to the "Sale Approval Order" in this Agreement shall be deemed to include the Confirmation Order provided (1) the Confirmation Order has been entered by the Bankruptcy Court by October 31, 2012, (2) the Chapter 11 Plan Effective Date has occurred by December 15, 2012, (3) the provisions of the Confirmation Order are reasonably acceptable to Purchaser, (4) the Confirmation Order has become a Final Order by December 15, 2012 and (5) Purchaser and Sellers agree, in their reasonable judgment, that the Sale Approval Order should be incorporated into the Confirmation Order.

"Sale Hearing" has the meaning specified in the Sale Procedures Order.

"Sale Motion" means the motion filed by Sellers with the Bankruptcy Court for the approval of the Sale Procedures Order and the Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, Parent and Sellers.

"Sale Procedures" means the Sale Procedures substantially in the form set forth in Exhibit 2, as such procedures may be amended and approved in the Sale Procedures Order and in form and substance reasonably satisfactory to Purchaser, Parent and Sellers.

"Sale Procedures Order" means a Final Order of the Bankruptcy Court, in the form set forth in Exhibit 3, with modifications, if any, to be in form and substance reasonably satisfactory to Purchaser that, among other things, approves the Sale Procedures and designates Purchaser as a "stalking horse bidder" for the Purchased Assets.

"SBO Loan" means a Mortgage Loan serviced by an SBO Servicer under an SBO Servicing Agreement.

"SBO Servicer" means the Person responsible for performing loan servicing functions with respect to a Mortgage Loan under an SBO Servicing Agreement.

"SBO Servicing Agreements" means the servicing agreements between any Seller, on the one hand, and any third-party servicer or subservicer, on the other hand.

"Section 363 Sale" means a sale process conducted by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

"Sellers" has the meaning specified in the preamble.

"Servicing File" means for each Mortgage Loan other than an SBO Loan, all loan documents and information (including any servicing tapes, images and conversion reports) received or obtained through the efforts of servicing the Mortgage Loan, which may be maintained on CD or DVD.  To the extent available, each Servicing File shall contain:  (a) documentation relating to any releases of collateral, (b) any correspondence between the current servicer of the mortgage and the Mortgagor, (c) payment history, (d) collection letters or form notices, and (e) foreclosure correspondence and legal notification.  For the SBO Loans, the term "Servicing File" means only such copies of the foregoing documents as shall have been provided by the primary servicer and retained by the master servicing group of the applicable Seller.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, of which (i) at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries or (ii) such Person or any other Subsidiary of such Person is a general partner (excluding any such partnership where such Person or any Subsidiary of such Person does not have a majority of the voting interest in such partnership).

"Tax" or "Taxes" means all (i) taxes, charges, fees, duties, levies, penalties or other assessments imposed by any federal, state, local or foreign Government Entity, including income, gross receipts, excise, property, sales, gain, use, license, custom duty, unemployment, capital stock, transfer, franchise, payroll, withholding, social security, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable thereto or attributable to any failure to comply with any requirement regarding Tax Returns, (ii) liability for the payment of any Taxes as a result of being or having been on or before the Closing Date a member of an affiliated, consolidated, combined or unitary group or other association, and (iii) any transferee or secondary Liability in respect of Taxes, and, in each case, any interest or penalty thereon or addition thereto, whether disputed or not.

"Tax Code" means the Internal Revenue Code of 1986, as amended.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any such document prepared on a consolidated, combined or unitary basis and also including any schedule or attachment thereto or amendment thereof.

"Third Party Servicing Agreement" means the servicing agreement to be executed by and between Purchaser and the Winning Bidder.

"Transaction Proceeds" mean the proceeds obtained by Sellers in connection with the payment of the Purchase Price pursuant to Article III hereof.

"Transfer Taxes" means any federal, state, county, local, foreign and other excise, sales, use, value added, transfer (including real property transfer or gains), conveyance, stamp, documentary transfer, filing, recording or other similar Tax, fee or charge, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties, resulting directly from the transactions contemplated by this Agreement.

"UPB" means, with respect to each Mortgage Loan as of any date of determination, the unpaid principal balance of such Mortgage Loan as of the close of business on such date of determination, after deduction and application of all payments of principal received by such date of determination.

"VA" means the Department of Veteran Affairs of the United States of America, or any successor thereto.

701584139 10488637

"VA Loans" means mortgages guaranteed by the VA.

"Whole Loan Bucket" means each of the following categories of Whole Loans included in the Purchased Assets, calculated as set forth in the Purchase Price Schedule: Performing First Lien, Non-Performing First Lien, Performing Second Lien, Non-Performing Second Lien, Other and HELOC Advances.

"Whole Loan Purchase Price Percentage" means, for the Whole Loans in each Whole Loan Bucket included in the Purchased Assets, the following percentages with respect to a Chapter 11 Plan and a Section 363 Sale, respectively, which shall be adjusted by applying the applicable Purchase Price Document Deficiency Multiplier to reflect the percentage of Mortgage Files determined to be deficient based on the Closing Collateral Exceptions Report:

| Whole Loan Bucket | Purchase Price Percentage with respect to a Chapter 11 Plan | Purchase Price Percentage with respect to a Section 363 Sale |
|---|---|---|
| Performing First Lien | 49.20% | 43.05% |
| Non-Performing First Lien | 34.50% | 30.1875% |
| Performing Second Lien | 52.80% | 46.20% |
| Non-Performing Second Lien | 17.10% | 14.9625% |
| Other | 40.00% | 35.00% |
| HELOC Advances | 58.80% | 51.45% |

"Whole Loans" means the first and second lien Mortgage Loans, HELOCs and other Mortgage Loans owned by Sellers and intended to be purchased by Purchaser, and any collateral, insurance, guaranty or other credit support arrangement related thereto, as identified on the Mortgage Loan Schedule, the Cut-off Date Mortgage Loan Schedule or the Closing Date Mortgage Loan Schedule, as applicable.

"Winning Bidder" means Nationstar or any other winning bidder for substantially all of the assets of Sellers contemplated to be sold by Sellers substantially on the terms and conditions set forth in the Primary APA.

**Section 1.2    Interpretation.**  For purposes of this Agreement:

(a)    The headings preceding the text of Articles and Sections included in this Agreement are for convenience only and shall not be deemed part of this Agreement or be given any effect in interpreting this Agreement.

(b)    The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement.

(c)    The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively.

(d)    Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable

agreement.  Reference to a Person in a particular capacity excludes such Person in any other capacity or individually.

(e)    Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.

(f)    Underscored references to Articles, Sections, paragraphs, clauses or Exhibits shall refer to those portions of this Agreement.  The use of the terms "hereunder," "hereby," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Article, Section, paragraph or clause of, or Schedule or Exhibit to, this Agreement.

(g)    All references to amounts denominated in dollars shall mean U.S. dollars, except where specifically noted otherwise.

(h)    Whenever any payment hereunder is to be paid in "cash," payment shall be made in U.S. dollars and the method for payment shall be by wire transfer of immediately available funds.

(i)    A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(j)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(k)    Each of the parties has participated in the drafting and negotiation of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if it is drafted by all the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS

**Section 2.1    Purchase and Sale of Assets**.  On the terms and subject to the conditions set forth herein, at the Closing, Sellers shall sell, convey, transfer, assign and deliver (or cause to be sold, conveyed, transferred, assigned and delivered) to Purchaser, and Purchaser shall purchase from Sellers, all of Sellers' right, title and interest in, to and under the following assets (collectively, the "Purchased Assets"), in each case free and clear of all Claims and Liens except

Permitted Liens, as approved for sale, transfer and assignment pursuant to the Sale Approval Order:

(a)    the pool of Whole Loans, servicing released to the extent of the Purchased Servicing Rights (including any and all Primary Servicing Rights and Master Servicing Rights included in the Purchased Servicing Rights owned by a Seller), and the right to all payments of Accrued Interest, principal, penalties, fees, charges and other amounts received or receivable on or in respect of the Mortgage Loans after the Closing Date (except to the extent that an SBO Servicer is entitled to such amounts under an SBO Servicing Agreement), together with the Mortgage Files and the Credit Files, and any and all proceeds of the foregoing; provided, that HELOCs shall only be included in the Purchased Assets if the condition set forth in Section 8.3(d)(i) is satisfied or waived by Purchaser;

(b)    the Mortgage Securities;

(c)    the Advances as of the Closing Date;

(d)    the Purchased Servicing Rights and the related Servicing Files;

(e)    the causes of action, lawsuits, judgments, refunds, choses in action, rights of recovery, rights of set-off, rights of recoupment, demands and any other rights or Claims, including those indicated by the presence of a "litigation flag" or indicated to be in bankruptcy or active foreclosure on the Mortgage Loan Schedule, including all preference or avoidance claims and actions of any of the Sellers, in each case that are related to the Purchased Assets, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code (provided, that Sellers shall be entitled to participate in the defense of any counterclaim);

(f)    all rights to receive mail and other communications addressed to Sellers that pertains to the Purchased Assets, including any mail and communications from any Person who holds any Whole Loan (or any interest therein), trustees, customers, suppliers, distributors and their respective representatives;

(g)    to the extent transferable, all rights under insurance policies and insurance proceeds directly relating to Whole Loans serviced pursuant to any servicing agreement, and all escrow accounts and any other accounts related to the Purchased Assets and all funds and property credited thereto; and

(h)    to the extent transferable, all guaranties, warranties, indemnities and similar rights in favor of any Seller or any Affiliate Seller to the extent related to any Purchased Asset.

**Section 2.2    Excluded Assets**.    Notwithstanding anything herein to the contrary, Sellers will not sell, assign, convey, transfer or deliver to Purchaser, and Purchaser will not purchase, acquire or assume or take assignment or delivery of, any and all assets, Contracts or rights that are not expressly Purchased Assets, whether tangible, real, personal or mixed (collectively, the "Excluded Assets").    For the avoidance of doubt, the servicing rights of SBO

18

Servicers under the SBO Servicing Agreements are not the property of Sellers and are Excluded Assets.

     **Section 2.3    Post-Closing Asset Deliveries.**    If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that any other materials or assets constituting Purchased Assets are still in the possession of such Seller or any Affiliate Seller, such Seller shall, or shall cause such Affiliate Seller to, promptly deliver them to Purchaser at no additional cost or expense to Purchaser.  If any Seller or Purchaser, in its reasonable discretion, determines after the Closing that other materials or assets constituting Excluded Assets were delivered to Purchaser in error, Purchaser shall promptly return them to the applicable Seller at Sellers' sole cost and expense.  In furtherance and not in limitation of the foregoing (and notwithstanding any provision in this Agreement to the contrary), each of Sellers and Purchaser acknowledges and agrees that it is neither Sellers' nor Purchaser's intention to sell, assign or transfer possession of any documents or communications of Sellers that are subject to Sellers' attorney-client privilege and/or the work-product immunity doctrine (the "Privileged Documents").  If it is discovered that any such Privileged Documents have been inadvertently or unintentionally turned over to Purchaser, Purchaser agrees, upon Sellers' request, to promptly turn over to Sellers or destroy such Privileged Documents, in each case at Sellers' sole cost and expense; provided, that (i) Purchaser shall in no way be obligated or responsible for reviewing, identifying or making a determination that any documents or communications in its possession are Privileged Documents and (ii) Purchaser shall not be obligated to take any actions under this Section 2.3 that may subject it to any liability or otherwise be in violation with any applicable Law.

     **Section 2.4    Conveyance of Assets by Affiliate Sellers**.

     (a)    Notwithstanding anything to the contrary contained in this Agreement, if it is determined by Sellers and Purchaser before, at or after the Closing that any direct or indirect Subsidiary of ResCap (an "Affiliate Seller") owns or possesses any assets or properties that would be deemed to be Purchased Assets if such Affiliate Seller were a Seller under this Agreement (such assets and properties, the "Affiliate Purchased Assets"), then Sellers shall, upon Purchaser's request, promptly cause such Affiliate Seller to transfer, assign, convey and deliver to Purchaser such Affiliate Purchased Assets in accordance with the terms and conditions of this Agreement; provided that Purchaser shall not be obligated to pay any additional amounts to Sellers in consideration for the transfer of such Affiliate Purchased Assets to Purchaser other than those amounts that Purchaser is obligated to pay to Sellers pursuant to Section 3.1.

     (b)    To the extent that any Affiliate Purchased Assets are transferred, assigned, conveyed and delivered by an Affiliate Seller to Purchaser pursuant to this Section 2.4, then each representation and warranty set forth in Article IV and each covenant in Article VI shall be deemed to be applicable to such Affiliate Seller as if such Affiliate Seller were a Seller and to such Affiliate Purchased Assets as if such Affiliate Purchased Assets were Purchased Assets.

     **Section 2.5    Non-Assignable    Purchased    Assets;    Necessary    Consents**.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any

Purchased Asset if an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder unless the Bankruptcy Court has entered a Final Order (which may include the Sale Approval Order) whose effectiveness has not been stayed providing that (i) such Necessary Consent is not required or (ii) the Purchased Assets shall be assigned or transferred regardless of any such Necessary Consent and there shall be no breach or adverse effect on the rights of Purchaser thereunder for the failure to obtain any such Necessary Consent. As Purchaser may reasonably request, if the Bankruptcy Court has not entered such an Order, Sellers and Purchaser will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser. If any such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Purchaser would not in fact receive all such rights, such Seller and Purchaser will cooperate in a mutually agreeable arrangement under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including, to the extent that such an arrangement would be permitted by Law and the related Contract, subcontracting, sub-licensing or sub-leasing to Purchaser, or under which such Seller would enforce for the benefit of Purchaser, with Purchaser assuming such Seller's obligations in accordance with this Agreement, any and all rights of such Seller against a third party thereto.

**Section 2.6    Retained Liabilities**.    Sellers shall retain and be responsible for all Retained Liabilities and Purchaser shall not have any obligation of any nature or kind with respect thereto.

**Section 2.7    Closing.**    Subject to the terms and conditions of this Agreement, the closing (the "Closing") of the transactions contemplated hereby shall take place at the offices of Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 on the second Business Day following the date on which the conditions set forth in Sections 8.1, 8.2 and 8.3 (other than those conditions that by their nature can be satisfied only at the Closing but subject to the fulfillment or waiver of those conditions) have been satisfied or waived but no earlier than 18 Business Days following the Cut-off Date nor, at Purchaser's option, later than the last Business Day of the month in which such conditions are satisfied or waived, or at such other time and place as the parties hereto may mutually agree.  At the Closing, Purchaser shall deliver the Purchase Price in accordance with Sections 2.9 and 3.1, the transfer of title to the Purchased Assets shall take place, and the appropriate parties shall take all actions required under Sections 2.8, 2.9 and 2.10 and all other actions not previously taken but required to be taken hereunder at or prior to the Closing Date.  It is a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement be concurrent requirements, and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

**Section 2.8    Ancillary Agreements**.    At the Closing, Sellers shall duly execute and deliver to Purchaser, and Purchaser shall duly execute and deliver to Sellers, as applicable, each of the following agreements (the "Ancillary Agreements"):

(a)    Bills of Sale;

(b)    Transfer Tax forms, if applicable, in the form required by Law;

(c)    such other agreements as may be entered into between the parties in connection with this Agreement;

(d)    all instruments or documents necessary to change the names of the individuals who have access to or are authorized to make withdrawals from or dispositions of all escrow or other accounts related to the Purchased Assets; and

(e)    any other documents that may be required by the Sale Approval Order or pursuant to any other direction by the Bankruptcy Court to be effected on or prior to the Closing.

**Section 2.9    Deliveries by Purchaser**.

(a)    At the Closing, Purchaser shall deliver to Sellers the following:

(i)    the Cut-off Date Purchase Price, in immediately available funds by wire transfer to an account or accounts designated by Sellers at least two Business Days prior to the Closing Date;

(ii)    the certificate to be delivered pursuant to Section 8.2(c);

(iii)    Ancillary Agreements duly executed by Purchaser; and

(iv)    such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Sellers, as may be necessary to effectuate the assignment of the Purchased Assets or to give effect to this Agreement or any Ancillary Agreement.

**Section 2.10    Deliveries by Sellers**.

(a)    At the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following:

(i)    the certificates to be delivered pursuant to Section 8.3(c);

(ii)    a receipt acknowledging payment of the Cut-off Date Purchase Price payable in accordance with Section 3.1(b);

(iii)    affidavits of Sellers' non-foreign status, in form and substance reasonably satisfactory to Purchaser, that comply with Section 1445 of the Tax Code and the regulations thereunder;

(iv)    Ancillary Agreements duly executed by the applicable Sellers;

21

(v)    if the Confirmation Order is received, a certified copy of the Confirmation Order, which shall be a Final Order;

(vi)    the Mortgage Files delivered pursuant to Section 6.16(a); provided, that if the Mortgage Files are in the possession of a custodian, Purchaser shall have received a trust receipt or similar document from such custodian acknowledging that such custodian holds the Mortgage Files for the benefit of Purchaser, and such custodian shall provide a copy of such trust receipt or similar document to Sellers; and

(vii)    such other customary instruments of transfer and assumption and other instruments or documents, in form and substance reasonably acceptable to Purchaser, as may be necessary to effect this Agreement, including Sellers' assignment of the Purchased Assets to Purchaser (or its assignee), or as may be required to give effect to any Ancillary Agreement.

**Section 2.11   Consumer Privacy Matters**.  The sale, if any, of customer lists, customer data and other consumer privacy information pursuant to this Agreement is subject to and shall conform to the recommendations of any consumer privacy ombudsperson that may be appointed pursuant to section 332 of the Bankruptcy Code (the "Consumer Privacy Ombudsperson") (to the extent that appointment of a Consumer Privacy Ombudsperson is determined to be necessary) in connection with the transactions contemplated in this Agreement.

**Section 2.12   "As Is, Where Is" Transaction**.  Purchaser hereby acknowledges and agrees that, except as expressly set forth in this Agreement, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets.  Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.  Purchaser further acknowledges that it is proceeding with its acquisition of the Purchased Assets, based solely upon its independent inspections and investigations and the representations and warranties herein and in the Ancillary Agreements.  Accordingly, except as expressly set forth in this Agreement, Purchaser will accept the Purchased Assets on the Closing Date "AS IS" and "WHERE IS."

# ARTICLE III.

## PURCHASE PRICE; ADJUSTMENT; ALLOCATION

**Section 3.1    Purchase Price; Payment of Purchase Price**.

(a)    Subject to the terms and conditions of this Article III, as aggregate consideration for the Purchased Assets, Purchaser will pay an aggregate amount in cash (the "Purchase Price") on the Closing Date equal to:

(i)    the product of (a) the sum, for each Whole Loan included in a Whole Loan Bucket (other than the Whole Loan Buckets related to HELOC Advances and Other), of the Whole Loan Purchase Price Percentage of the aggregate UPB of such Whole Loans included in such Whole Loan Buckets as of

the Cut-off Date, times (b) the applicable Purchase Price Document Deficiency Multiplier;

(ii)    the sum, for each Whole Loan included in a Whole Loan Bucket related to the HELOC Advances and Other, of the Whole Loan Purchase Price Percentage of the aggregate UPB of such Whole Loans included in such Whole Loan Buckets as of the Cut-off Date; provided, that if the condition in Section 8.3(d)(i) is not satisfied or waived by Purchaser, then the Purchase Price shall be reduced by an amount equal to the sum, for each Whole Loan that is a HELOC Advance, of the Whole Loan Purchase Price Percentage applicable to such HELOC Advances of the aggregate UPB of such HELOC Advances as of the Cut-off Date;

(iii)    for each Whole Loan, to the extent applicable, the aggregate amount of unpaid Accrued Interest as of the Cut-off Date; and

(iv)    the Mortgage Securities Purchase Price Percentage of the aggregate UPB of the Mortgage Securities included in the Purchased Assets as of the Cut-off Date.

(b)    As soon as reasonably practical following the Cut-off Date, but in no event later than 15 Business Days following the Cut-off Date (and, in any event, at least three Business Days prior to the Closing Date), Sellers shall deliver to Purchaser the Cut-off Date Mortgage Loan Schedule, prepared in good faith consistently with the preparation of the Mortgage Loan Schedule.  The Cut-off Date Mortgage Loan Schedule shall be subject to approval by Purchaser, such approval not to be unreasonably withheld, conditioned or delayed.

(c)    The April Collateral Exceptions Report has been delivered to Purchaser prior to the date hereof as document #16.8.2 in the data room established in connection with this Agreement.  Sellers shall have the right, but not the obligation, to remedy any document deficiencies identified in the April Collateral Exceptions Report up to and including the Report Request Date.

(d)    On the date that is twelve Business Days prior to the Closing Date, or such earlier date as the custodians shall require (the "Report Request Date"), Sellers shall instruct the custodians who prepared the April Collateral Exceptions Report to produce the Closing Collateral Exceptions Report and deliver it to Sellers and Purchaser as soon as reasonably practicable.  Purchaser shall be responsible for all costs, expenses and fees incurred in connection with the production of the Closing Collateral Exceptions Report. Not less than five Business Days prior to the Closing Date, Sellers will provide Purchaser with a statement of Sellers' good faith calculation of the Purchase Price as of the Cut-off Date (the "Cut-off Date Purchase Price") prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule.  The Closing Collateral Exceptions Report and the calculation of the Cut-off Date Purchase Price shall be subject to approval by Purchaser, such approval not to be unreasonably withheld, conditioned or delayed.

23

**Section 3.2    Purchase Price Adjustment; Final Payment**.

(a)    Post-Closing Determination.  As soon as reasonably practical following the Closing Date, but in no event later than 30 days following the Closing Date, Purchaser shall deliver to Sellers (i) the Closing Date Mortgage Loan Schedule and (ii) a statement (the "Purchase Price Adjustment Statement") setting forth Purchaser's calculation (prepared in a manner consistent with, and using the same principles, methodologies and policies as those set forth in, the Purchase Price Schedule) of the Purchase Price as of the Closing Date (the "Closing Date Purchase Price").  Sellers shall provide Purchaser and its representatives full cooperation, including full access to books, records and employees in connection with the preparation of the Purchase Price Adjustment Statement.

(b)    Purchase Price True-up.  Subject to Section 3.2(d), within 30 days of delivery of the Purchase Price Adjustment Statement (or within 15 days of the final determination of the Purchase Price in accordance with Section 3.2(d)), (i) if the Closing Date Purchase Price is less than the Cut-off Date Purchase Price, then Sellers shall pay to Purchaser an amount equal to such shortfall; and (ii) if the Closing Date Purchase Price is greater than the Cut-off Date Purchase Price, then Purchaser shall pay to Sellers an amount equal to such excess (in either event, the "Adjustment Amount").  The Adjustment Amount will (A) bear simple interest from the Closing Date to the date of payment at an interest rate equal to the Fed Funds Rate per annum as published in *The Wall Street Journal* as of the Closing Date and (B) be paid by wire transfer of immediately available funds to an account or accounts designated by the recipient thereof.

(c)    Objections.  Unless Sellers deliver written notice to Purchaser of an objection to all or a part of the Purchase Price Adjustment Statement (a "Dispute Notice") prior to the expiration of the 30-day period provided in Section 3.2(b) above, the Purchase Price Adjustment Statement shall become binding in its entirety at the end of such 30-day period.  The Dispute Notice shall set forth, in reasonable detail on a line-item by line-item basis, the basis for such dispute, the amounts involved and Sellers' determination of the Purchase Price.  If Sellers deliver a Dispute Notice to Purchaser within such period and the parties are unable to agree as to all issues in the Dispute Notice within the ten Business Day period immediately following the day after the Dispute Notice is received by Purchaser, then the Dispute Notice may be submitted by either Sellers or Purchaser to an Independent Accounting Firm to resolve the disputed items set forth therein in accordance with Section 3.2(d).

(d)    Dispute Resolution.  An Independent Accounting Firm shall conduct a review of the Dispute Notice and any supporting documentation submitted by either Purchaser or Sellers. The parties shall direct the Independent Accounting Firm to, as promptly as practicable and in no event later than 30 days following its receipt of the Dispute Notice, deliver to Sellers and Purchaser a report (the "Adjustment Report") setting forth in reasonable detail the Independent Accounting Firm's determination with respect to the issues specified in the Dispute Notice, and the revisions, if any, to be made to the Purchase Price Adjustment Statement together with supporting calculations.  The

24

Independent Accounting Firm has no authority to review or raise items not expressly identified in the Dispute Notice.  With respect to each disputed line item, such determination, if not in accordance with the position of either Sellers or Purchaser, shall not be in excess of the higher, nor less than the lower, of the amounts advocated by either Sellers or Purchaser in the Dispute Notice or the Purchase Price Adjustment Statement, respectively, with respect to such disputed line item.  Such Adjustment Report and the revisions, if any, to be made to the Purchase Price Adjustment Statement shall be final and binding on the parties, absent arithmetical error, and shall be deemed a final arbitration award that is enforceable against each of the parties in any court of competent jurisdiction, and the Purchase Price shall be adjusted according to such Adjustment Report and paid in accordance with Section 3.2(b)  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchaser.

**Section 3.3    Allocation of the Purchase Price for Tax Purposes**.

(a)    The Purchase Price shall be allocated among the Purchased Assets in accordance with Section 1060 of the Tax Code and the Treasury Regulations thereunder in a manner consistent with an allocation schedule (the "Allocation Schedule"), which Allocation Schedule shall be prepared by Purchaser and provided to Sellers for their review and the parties' mutual agreement within 90 days after the Closing Date.  The parties shall cooperate reasonably in attempting to reach such a mutual agreement.  If the Allocation Schedule is not mutually agreed upon within such period, the parties shall submit such dispute to an Independent Accounting Firm for a decision that shall be rendered in a timely manner in order to permit the timely filing of all applicable Tax forms.  The Independent Accounting Firm's review shall be final and binding on the parties except as otherwise required by a "determination" within the meaning of Section 1313(a) of the Tax Code or similar provision of other Tax law (a "Determination").  The fees and expenses of the Independent Accounting Firm shall be borne 50% by Sellers and 50% by Purchaser.

(b)    Each of Sellers and Purchaser shall (i) be bound by such allocation for purposes of determining Taxes (but not for any other purpose), (ii) prepare and file, and cause its Affiliates to prepare and file, its Tax Returns on a basis consistent with such allocation, and (iii) take no position, and cause its Affiliates to take no position, inconsistent with such allocation on any applicable Tax Return, except in each case as otherwise required by a Determination.  If the allocation set forth on the Allocation Schedule is disputed by any Government Entity with taxing authority, the party receiving notice of such dispute shall promptly notify the other party hereto concerning the existence of, material developments regarding, and resolution of such dispute.

## ARTICLE IV.

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as disclosed to Purchaser by Sellers in the Disclosure Memorandum, Sellers jointly and severally represent and warrant to Purchaser, as of the date hereof and as of the Closing Date (except to the extent any such representations and warranties shall have been

25

expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 4.1    Organization and Authority.**    Each Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate or other organizational power and authority to own, lease, hold and operate its properties and assets and to carry on its business as presently conducted. Each Seller has the corporate or other organizational power, authority and right to enter into and deliver this Agreement and the Ancillary Agreements to which it is a party, to perform its obligations hereunder and thereunder, and to complete the transactions contemplated hereby and thereby (subject to entry of the Sale Procedures Order, the Sale Approval Order and the Confirmation Order). The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and (subject to entry of the Sale Procedures Order, the Sale Approval Order and the Confirmation Order) validly authorized by all appropriate corporate or other organizational authority, and no other corporate or other organizational action on the part of any Seller is necessary to authorize the execution, delivery and performance by such Seller of this Agreement or any of the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby. This Agreement constitutes the valid and legally binding obligations of each Seller, enforceable against each Seller in accordance with its terms, except (i) as such enforceability may be limited by principles of public policy and subject to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditor's rights or by general equity principles (the "Enforceability Exceptions"); (ii) that enforceability of the provisions hereof requiring consummation of the transactions contemplated hereby is subject to entry of the Sale Approval Order or any other Order by the Bankruptcy Court; and (iii) that enforceability of all other provisions hereof is subject to entry of the Sale Procedures Order, the Confirmation Order and any other action by the Bankruptcy Court. Each Ancillary Agreement, when required by this Agreement to be delivered to Purchaser, will be duly and validly executed and delivered by each Seller that will be a party thereto, and upon such execution and delivery (assuming such Ancillary Agreement constitutes a valid and binding obligation of each other party thereto) will constitute the legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its respective terms, subject to the Enforceability Exceptions.

**Section 4.2    Non-Contravention.**    Assuming all Consents, declarations, filings or registrations set forth on Schedule 4.3 have been obtained or made, as applicable, and receipt of the Sale Approval Order and the Confirmation Order, the execution, delivery and performance of this Agreement and the Ancillary Agreement by Sellers and the consummation of the transactions contemplated hereby and thereby and the compliance by Sellers with the applicable terms and conditions hereof and thereof, do not and will not (a) conflict with or violate, result in a material breach or violation of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of any Seller, (ii) any Law or Order applicable to Sellers, or (iii) any material terms, conditions or provisions of any SBO Servicing Agreement or (b) result in the creation of any Lien, other than Permitted Liens, on the Purchased Assets.

26

**Section 4.3    Consents and Approvals**.  Upon entry of the Sale Approval Order and the Confirmation Order and the satisfaction of the conditions set forth therein, no material Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by any Seller in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated hereby or thereby, except for (i) Consents, declarations, filings and registrations listed on Schedule 4.3 or (ii) the failure to have which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, that Sellers are not making any representation with respect to any Consent, including Permits, or declarations, filings or registrations with, any Government Entity or any other Person that must be or may be made by Purchaser (as a result of facts and circumstances specific to Purchaser) in order to acquire the Purchased Assets.

**Section 4.4    Title to Assets**.  Upon entry of the Sale Approval Order at the Closing, Sellers shall transfer to Purchaser good and valid title to the Purchased Assets free and clear of any Lien, other than Permitted Liens.

**Section 4.5    Mortgage Loan Portfolio**.  Sellers have delivered to Purchaser Electronic Data Files dated as of March 31, 2012 that provide loan level information with respect to the Whole Loans, with the loan level fields being those described on Schedule 4.5 (collectively, the "Mortgage Loan Schedule," which term includes, except where the context requires otherwise, updated data tapes to be prepared as of (i) the close of business on the day immediately preceding the Cut-off Date (the "Cut-off Date Mortgage Loan Schedule"), and (ii) the close of business on the day immediately preceding the Closing Date (the "Closing Date Mortgage Loan Schedule"), each to be delivered pursuant to Section 6.10).  The information set forth in the Mortgage Loan Schedule is true, complete and correct in all material respects as of the date thereof and the information in each of the Cut-off Date Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule to be prepared and delivered to Purchaser in accordance with Section 6.10 will be true, complete and correct in all material respects as of their applicable dates.

**Section 4.6    [Reserved.]**

**Section 4.7    Litigation and Claims**.  Except as listed on Section 4.7 of the Disclosure Memorandum or as may be ordered by the Bankruptcy Court, as of the date hereof, (i) there is no action, suit, demand, inquiry, proceeding, claim, cease and desist letter, hearing or investigation by or before any Government Entity pending, or, to the Knowledge of Sellers, threatened in respect of the Purchased Assets that could materially and adversely affect the ability of Sellers to complete the transactions contemplated by this Agreement, and (ii) no Purchased Asset is subject to any material Order.

**Section 4.8    Brokers, Finders and Financial Advisors**.  Except for Centerview Partners LLC, whose fees will be paid by ResCap in the Bankruptcy Case, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers or any Affiliate Seller, or will be entitled to any brokers' or finders' fee or any other commission or similar fee from Sellers or any Affiliate Seller, in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment in respect thereof.

## Section 4.9    Whole Loans

(a)    Subject to the related Collateral Exception Reports, the Mortgage Loan Documents include customer information and originals or copies of all material documents (either in physical or electronic form) that are required in order to service such Whole Loan in accordance with Applicable Requirements.

(b)    Except as set forth on the Mortgage Loan Schedule and the Closing Date Mortgage Loan Schedule, no payment of principal or interest is more than 60 days past due on any Whole Loan.

(c)    Sellers are the sole owners and holders of each Whole Loan, and Sellers have full right and authority to sell and assign each Whole Loan to Purchaser pursuant to this Agreement.  Except as set forth on Section 4.9(c) of the Disclosure Memorandum, the Whole Loans have not been assigned or pledged by any Seller (except for pledges or other grants of security interests which will be released on or prior to the Closing), and Sellers have good and marketable thereto.

(d)    Each Whole Loan is genuine and constitutes the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms in all material respects, except as such enforcement may be limited by the Enforceability Exceptions.

(e)    Except as set forth on Section 4.9(e) of the Disclosure Memorandum, for each Whole Loan that is a first lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) the Lien of current real property taxes and assessments, (ii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iii) any state of facts an accurate land survey of the Mortgaged Property might show, (iv) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (v) other matters to which like properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(f)    Except as set forth on Section 4.9(f) of the Disclosure Memorandum, for each Whole Loan that is a second lien residential mortgage loan on the applicable Mortgaged Property, including all improvements on such Mortgaged Property, such lien is subject only to (i) any first lien, (ii) the Lien of current real property taxes and assessments, (iii) covenants, conditions, restrictions, rights of way, mineral right reservations, zoning and other land use restrictions, easements and other matters of public record as of the date of recording of the mortgage, (iv) any state of facts an accurate land survey of the Mortgaged Property might show, (v) such exceptions appearing of record that are acceptable to mortgage lending institutions generally in the area where the Mortgaged Property is located or specifically reflected in any appraisal obtained in connection with the origination of the Whole Loan, and (vi) other matters to which like

28

properties are commonly subject that do not materially interfere with the benefits of the security intended to be provided by such mortgage.

(g)    Except as set forth on Section 4.9(g) of the Disclosure Memorandum, no provision of any Whole Loan has been impaired, waived, altered or modified in any respect, except by written instrument that has been recorded, if required by Applicable Law or if necessary to maintain the lien priority of the Whole Loan, and that is included in the Mortgage Loan Documents relating to such Whole Loan.

(h)    Each Whole Loan that is a first lien Mortgage Loan is covered by either an ALTA mortgage title insurance policy acceptable to Sellers and issued by a title insurer duly qualified to do business in the jurisdiction where the Mortgaged Property is located, or such other generally used and acceptable form of policy and applicable endorsements acceptable to prudent mortgage lending institutions making loans in the area where the Mortgaged Property is located.

(i)    As of the date hereof and as of the Closing Date, no Whole Loan that is a first lien Mortgage Loan, has been satisfied, canceled or subordinated in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no Mortgaged Property has been released from the Lien of the related mortgage in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission.

(j)    As of the date hereof and as of the Closing Date, no Whole Loan that is a second lien Mortgage Loan has been satisfied or canceled in whole or in part or rescinded (other than pursuant to a statutory right of rescission), and no Mortgaged Property has been released from the Lien of the related mortgage in whole or in part, nor has any instrument been executed that would effect any such release, cancellation or rescission.

(k)    All improvements upon the Mortgaged Property pursuant to each Whole Loan are insured against loss by fire and such other hazards as are customary in the area where such Mortgaged Property is located, pursuant to insurance policies maintained by the Mortgagor or a blanket insurance policy maintained by Sellers or the applicable SBO Servicer.

(l)    Except with respect to the Whole Loans listed in Section 4.9(l) of the Disclosure Memorandum, none of the Whole Loans provides for recourse to or against Sellers.

**Section 4.10  Mortgage Securities**.  In connection with the sale and purchase of the Mortgage Securities hereunder, on the Closing Date Sellers shall convey to Purchaser (or, if applicable, its designee) all right, title and interest in the Mortgage Securities being delivered on the Closing Date free and clear of any and all Liens (including any counterclaim, defense or right of set off by or of the issuer of the Mortgage Securities).  The transfer of the Mortgage Securities by Sellers to Purchaser shall not require or cause Purchaser to assume, and shall not subject Purchaser to, any obligation, Liability or commitment to lend additional funds, including any outstanding contingent commitment.

# ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed to Sellers by Purchaser in writing on the date hereof, Purchaser represents and warrants to Sellers, as of the date hereof and as of the Closing Date (except to the extent any such representations and warranties shall have been expressly made as of a particular date, in which case such representations and warranties shall be made only as of such date), as follows:

**Section 5.1    Organization and Authority**.  Purchaser has been duly incorporated, and is validly existing and in good standing under the Laws of its jurisdiction of incorporation, has all corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party and to consummate the transactions contemplated hereby and thereby, and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements.  This Agreement has been, and the Ancillary Agreements to which it is a party will be, duly and validly executed and delivered by Purchaser and this Agreement constitutes, and each of the Ancillary Agreements to which it is a party will constitute, the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms, except as such enforceability may be limited by the Enforceability Exceptions.

**Section 5.2    Non-Contravention**.  The execution, delivery and performance of this Agreement and the Ancillary Agreements by Purchaser and the consummation of the transactions contemplated hereby and thereby and the compliance by Purchaser with the applicable terms and conditions hereof or thereof, do not and will not conflict with or violate, result in a material breach of or default (or an event which with notice or the passage of time or both would become a material breach or default) under, give rise to a right of termination, cancellation, acceleration of any material obligation or loss of any material benefit under (i) the organizational or governing documents of Purchaser or (ii) assuming all Consents, declarations, filings or registrations set forth on ~~Schedule 5.3~~ have been obtained or made, as applicable, any Law or Order applicable to Purchaser.

**Section 5.3    Consents and Approvals**.  No Consent of, or declaration, filing or registration with, any Government Entity or any other Person is required to be obtained or made, as applicable, by Purchaser in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements, or the consummation of the transactions contemplated by this Agreement or by any of the Ancillary Agreements, except for Consents, declarations, filings and registrations (i) listed on Schedule 5.3, or (ii) Consents, the failure to have which, individually or in the aggregate, would not reasonably be expected to materially impact the ability of Purchaser to consummate the transactions contemplated hereby and satisfy all its obligations hereunder.

**Section 5.4    Financing**.  Purchaser has and will have, as of the Closing Date, all necessary financial resources available to consummate the transactions contemplated hereby.

701584139 10488637

**Section 5.5    Non-reliance.**  Purchaser has not relied and is not relying on any representations, warranties or other statements whatsoever, whether written or oral (from or by Sellers, or any Person acting on their behalf) other than those expressly set out in this Agreement (or other related documents referred to herein) and acknowledges and agrees that, except for any fraud claim, it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

**Section 5.6    Brokers, Finders and Financial Advisors.**  Except for Evercore Partners Inc., whose fees will be paid by Parent, no agent, broker, investment banker, financial advisor or other firm or Person is or will be entitled to any brokers' or finder's fee or any other commission or similar fee in connection with the transactions contemplated hereby as a result of any action taken by Purchaser.

## ARTICLE VI.

## PRE-CLOSING MATTERS AND OTHER COVENANTS

**Section 6.1    Subsequent Actions; Further Assurances.**  Subject to the Bankruptcy Exceptions, Sellers and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things reasonably necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable, including, (i) opposing any objections to, appeals from or petitions to reconsider or reopen any such approval by Persons not a party to this Agreement and (ii) obtaining any Final Orders approving the transactions contemplated by this Agreement or the Ancillary Agreements, if required.  If at any time after the Closing, Purchaser shall consider or be advised that any assurances or any other actions or things are necessary or desirable (a) to vest, perfect or confirm ownership (of record or otherwise) in Purchaser, as applicable, its title or interest in the Purchased Assets or (b) otherwise to carry out this Agreement or the Ancillary Agreements, Sellers shall use commercially reasonable efforts to execute and deliver all bills of sale, instruments of conveyance, UCC filings, powers of attorney, assignments, assurances and orders and take and do all such other actions and things as may be reasonably requested by Purchaser, in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in the Purchased Assets.

**Section 6.2    Third Party Consents.**  Sellers and Purchaser shall use commercially reasonable efforts to obtain, as soon as reasonably practicable, all Necessary Consents, including from Government Entities and Insurers; ~~provided~~ that Purchaser shall not be required to agree to actions, conditions or restrictions that would materially impair the value to Purchaser of the Purchased Assets or have a materially adverse effect on the business of Purchaser or its Affiliates.  Each party hereto shall promptly provide the other parties with copies of any communication, including any written objection, litigation or administrative proceeding that challenges the transactions contemplated hereby received by such party from any Government Entity or any other Person regarding transactions contemplated hereby.

**Section 6.3    Access to Information.**  From and after the date of this Agreement until the Closing Date, Sellers shall afford to Purchaser and its accountants, counsel and other

representatives reasonable access, upon reasonable notice during normal business hours, to the Mortgage Files, Servicing Files and Credit Files for the Mortgage Loans and personnel with knowledge thereof; provided, that such access shall not unreasonably disrupt the business of Sellers and that nothing herein will obligate Sellers to violate any Applicable Law.

**Section 6.4    Records; Post-Closing Access to Information**.

(a)    On and after the Closing Date, Sellers shall execute, deliver, file and record any specific assignment, novation or other document and take any other action that may be necessary, customary or desirable and reasonably requested by Purchaser in connection with Sellers' delivery of the Mortgage Securities.

(b)    From and after the Closing Date, each party shall, and shall cause its Affiliates to, afford the other party and its counsel, accountants and other authorized representatives, with five Business Days' prior notice, reasonable access during normal business hours to the respective premises, properties, personnel, books and records and to any other assets or information, in each case relating to the Purchased Assets, that such other party reasonably deems necessary, including in connection with the Bankruptcy Case or any report or Tax Return required to be filed under applicable Law (but so as not to unduly disrupt the normal course of operations of Purchaser).

(c)    If and for so long as any party hereto is contesting or defending against any third-party charge, complaint, action, suit, proceeding, hearing, investigation, claim or demand, including in the Bankruptcy Case, in connection with (i) any transaction contemplated under this Agreement or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving the Purchased Assets or the Excluded Assets and Retained Liabilities in any respect, each other party hereto shall (A) reasonably cooperate with and assist it and its counsel and other advisors in the contest or defense, (B) make available its personnel (including for purposes of fact finding, consultation, interviews, depositions and, if required, as witnesses) and (C) provide such information, testimony and access to its books and records, in each case as shall be reasonably requested in connection with the contest or defense, all at the sole cost and expense (not including employee compensation and benefits costs) of the contesting or defending party.  For the avoidance of doubt, this ~~Section 6.4(c)~~ shall not apply with respect to disputes between the parties hereto.

(d)    Purchaser agrees, at Sellers' cost and expense, to make available, at the reasonable request of Sellers, any books and records that may be included in the Purchased Assets to the extent they may relate to Excluded Assets and, if necessary, to provide such original books and records to any purchaser of such Excluded Assets and to retain only a copy thereof, subject to the delivery by such purchaser of a non-disclosure agreement as reasonably requested by Purchaser.

(e)    Notwithstanding anything to the contrary in this Agreement, each of the parties will comply with federal and state laws and regulations regarding the

confidentiality and privacy relating to information collected and used in connection with the application for and processing and servicing of Mortgage Loans.

**Section 6.5    Interim Operations**.  Sellers covenant and agree that, after the date hereof and prior to the Closing, subject to the Bankruptcy Exceptions and except as (i) set forth in <u>Section 6.5</u> of the Disclosure Memorandum, (ii) expressly provided in or as a result of the consummation of this Agreement, (iii) provided in the DIP Financing Agreements, (iv) ordered by the Bankruptcy Court or (v) may be agreed in writing by Purchaser:

(a)    Sellers' business relating to the Purchased Assets shall be conducted in the Ordinary Course of Business in compliance with the Applicable Requirements and Acceptable Servicing Procedures; <u>provided</u>, that notwithstanding the foregoing, Sellers shall not be obligated to fund any draws under HELOCs except in accordance with any motion approved by the Bankruptcy Court;

(b)    Sellers and Affiliate Sellers shall service, or cause to be serviced, the Mortgage Loans in the Ordinary Course of Business and in accordance with all requirements of any Applicable Requirements and Acceptable Servicing Procedures. With respect to the Mortgage Loans, Sellers and Affiliate Sellers shall take no action, and refrain from taking action, which, in either case, would reasonably be expected to (i) impair the ability of Purchaser to realize on or enforce any Mortgage Note or the lien of the mortgage or any other document related thereto or (ii) jeopardize the rights or remedies available to Purchaser with respect to any Mortgage Loan or otherwise impair the ability of Purchaser to realize on the Mortgaged Property with respect to such Mortgage Loan.  For the avoidance of doubt, nothing in this Agreement shall prevent Sellers from making payments to former mortgagors pursuant to the Consent Order or from offering, and effecting refinancing of or modifications to, Mortgage Loans as contemplated by the terms of the DOJ/AG Settlement, or by HAMP, HARP, HASP or any similar program that Sellers have or may develop in the Ordinary Course of Business; <u>provided</u>, that Sellers shall promptly provide copies to Purchaser of any reports provided to the settlement master under the DOJ/AG Settlement with respect to such agreements, arrangements and actions;

(c)    Sellers and Affiliate Sellers shall not terminate or permit to lapse any material Permits that are necessary for the ownership or servicing of the Purchased Assets;

(d)    Sellers and Affiliate Sellers shall not change its servicing or administration practices with respect to the Whole Loans or the Mortgage Securities in any material respect, except in the Ordinary Course of Business;

(e)    With respect to any Purchased Asset, Sellers shall not, and shall use their best efforts to ensure that any Affiliates shall not: (i) agree to allow any form of relief from the automatic stay in the Bankruptcy Case; or (ii) fail to use commercially reasonable efforts to oppose any action by a third party to obtain relief from the automatic stay in the Bankruptcy Case;

701584139 10488637

(f)    Sellers and Affiliate Sellers shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions set forth in Article VIII, not being satisfied, or would make any representation or warranty of Sellers contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date or that would materially impair the ability of Sellers or Purchaser to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(g)    With respect to clauses (a) through (f) (inclusive), Sellers and Affiliate Sellers shall not enter into any Contract to do any of the foregoing, or authorize, recommend, propose or announce an intention to do, any of the foregoing.

Section 6.6    **Mortgage Approvals and Licenses**.  Promptly following execution of this Agreement, in each case to the extent not already obtained by Purchaser, Purchaser shall have filed or shall file all applications and use commercially reasonable efforts to (i) be approved (A) by HUD to hold FHA Loans and (B) by the VA to hold VA Loans, in each case to the extent necessary; (ii) obtain all necessary licenses in all states in which it proposes to hold the Purchased Assets; and (iii) obtain all other material Permits and Licenses that are necessary to hold the Purchased Assets.  All such actions shall be at Purchaser's cost and expense, and Sellers shall cooperate with, and use commercially reasonable efforts to provide assistance to, Purchaser in all such efforts.

Section 6.7    **Notices of Certain Events**.  From the date hereof until the Closing Date,

(a)    A Seller shall promptly notify Purchaser of:

(i)    any written notice or other written communication from any Person (including any notices or communications filed with the Bankruptcy Court other than notices or other written communications that provide for a copy to be provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)    any written notice or other written communication from any Government Entity in connection with the transactions contemplated by this Agreement;

(iii)    any change or fact with respect to any of Sellers' representations, warranties or obligations hereunder of which Seller becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Sellers of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied; or

(iv)    any Material Adverse Effect (but without giving effect to clause (ix) of the definition of Material Adverse Effect).

(b)    Purchaser shall promptly notify Sellers of

(i)      any written notice or other written communication from any Person (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or objecting to the consummation of any of the transactions contemplated by this Agreement;

(ii)     any written notice or other written communication from any Government Entity (other than notices or other written communications directed to Sellers or to the Bankruptcy Court, with a copy provided to Purchaser) in connection with the transactions contemplated by this Agreement; or

(iii)    any change or fact with respect to any of Purchaser's representations, warranties or obligations hereunder of which it becomes aware that, with notice or lapse of time or both, will or is reasonably expected to result in a material breach by Purchaser of this Agreement or otherwise result in any of the conditions set forth in Article VIII becoming incapable of being satisfied.

No disclosure by any party hereto pursuant to this Section 6.7 shall be deemed to amend or supplement the Disclosure Memorandum with respect thereto or prevent or cure any misrepresentation or breach of warranty for purposes of this Agreement.

**Section 6.8    Tax Matters**.

(a)      Purchaser shall pay and be responsible for all Transfer Taxes imposed in connection with the closings of the transactions contemplated hereby.  Sellers and Purchaser shall cooperate to timely prepare, and Purchaser shall file or cause to be filed any returns or other filings relating to such Transfer Taxes (unless Sellers are required by applicable Law to file the return), including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.

(b)      Sellers and Purchaser shall cooperate with each other and furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information (including access to books and records) and assistance relating to the Purchased Assets as is reasonably requested for the preparation or filing of any Tax Returns and for the satisfaction of legitimate Tax or accounting requirements.

**Section 6.9    Insurance**.  Purchaser and Sellers shall not take any action that may adversely affect the rights of the other with respect to any outstanding claims made or for new claims that may be made against insurance policies relating to the Purchased Assets purchased or maintained by Purchaser for the benefit of itself and its Subsidiaries and Affiliates that the other may or will have as of the Closing Date and shall use commercially reasonable efforts to cooperate with the other in the settlement or other resolution of such claims.

**Section 6.10    Mortgage Loan Schedules**.  Sellers shall deliver to Purchaser (i) an updated version of the Mortgage Loan Schedule within 15 Business Days after the end of each month during the period from the date hereof to the Closing Date, and (ii) the Cut-off Date Mortgage Loan Schedule as provided in Section 3.1(b).

**Section 6.11    Schedules and Disclosure Memorandum**.

(a)    Concurrently with the execution and delivery of this Agreement, Sellers are delivering to Purchaser the Schedules to be provided by Sellers identified in the Table of Contents (the "Schedules") and a disclosure memorandum (the "Disclosure Memorandum") that sets forth all of the items that it deems to be necessary or appropriate (i) as an exception to a provision of this Agreement, (ii) in response to an express disclosure requirement contained in a provision hereof or (iii) as an exception to one or more representations or warranties contained in Article IV, as applicable, or to one or more of the covenants of Sellers contained in this Agreement; provided, that the mere inclusion of an item in the Schedules or Disclosure Memorandum as an exception to a provision or representation or warranty shall not be deemed an admission by any Seller or Purchaser, as applicable, that such item represents a material exception or event, state of facts, circumstance, development, change or effect or that such item would reasonably be expected to have or result in a Material Adverse Effect; and provided, further, that any disclosures or exceptions made with respect to a section or subsection of this Agreement shall be deemed to qualify not only the specific section(s) referenced but also such other sections or subsections that may be affected thereby to the extent the relevance of such disclosure or exception to such other sections or subsections is readily apparent on its face.   In the event of an inconsistency between the statements in the body of this Agreement and those in the Schedules or Disclosure Memorandum, the statements in the Schedules or Disclosure Memorandum will control.

(b)    Sellers and Purchaser agree that, with respect to Sellers' representations and warranties contained in this Agreement, Sellers shall have the obligation until the Closing to correct, supplement or amend no later than five Business Days prior to the expected Closing Date the Disclosure Memorandum with respect to any matter arising or discovered after the date of this Agreement (whether or not existing or known at the date of this Agreement) that causes the representations and warranties of Sellers to be untrue or inaccurate in any material respect (as so amended, the "Amended Disclosure Memorandum"); provided, that until May 31, 2012, any such correction, supplement or amendment shall be taken into account when determining the accuracy, truth and correctness of the representations and warranties of Sellers for purposes of Article VIII, including the certificates to be delivered pursuant to Section 8.3(iii) except to the extent any such correction, supplement or amendment would reasonably be expected to result in a Material Adverse Effect, but thereafter, in no event shall any such correction, supplement or amendment be taken into account when determining the accuracy, truth and correctness of the representations and warranties of Sellers for purposes of Article VIII, including the certificates to be delivered pursuant to Section 8.3(c) except for the updates explicitly required by the representations set forth in Section 4.5 (which required updates shall only be taken into account when determining the accuracy, truth and correctness of such representations and warranties as of the Closing Date); and provided, further , that there is no obligation to update any representation that is as of a specified date.

**Section 6.12    Bankruptcy Actions**.

(a)     As soon as practicable, but not later than two Business Days after the date hereof, Sellers shall file Petitions for relief under Chapter 11 of the Bankruptcy Code. On the Petition Date, Sellers shall file, together with other customary "first day" motions, the Sale Motion with the Bankruptcy Court.

(b)     Sellers shall, and Sellers shall cause all of their Subsidiaries to, comply with all of the obligations of Sellers under the Sale Procedures Order (after entry of such Order by the Bankruptcy Court) and the Sale Approval Order (after the entry of such Order by the Bankruptcy Court).

(c)     Sellers shall use reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. Sellers shall serve on all required Persons in the Bankruptcy Case, including (i) all Persons who are known to possess or assert a Claim or Lien against or interest in any of the Purchased Assets, (ii) the IRS, (iii) all applicable state attorneys general, and local Government Entities, (iv) all applicable state and local Government Entities with taxing authority, (v) all other Persons required by any order of the Bankruptcy Court, and (vi) using their best efforts to serve any other Persons that Purchaser reasonably may request, any notice of the Sale Motion, the Sale Hearing, the Sale Procedures Order, the Sale Approval Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Sale Procedures Order, and any applicable local rules of the Bankruptcy Court.

(d)     Sellers shall, no later than 45 days from the date of this Agreement, prepare and file with the Bankruptcy Court:  (A) a Disclosure Statement with respect to the Chapter 11 Plan (the "Disclosure Statement") and (B) the Chapter 11 Plan.  The Chapter 11 Plan, any and all exhibits and attachments to the Chapter 11 Plan, the Disclosure Statement and the Orders approving the same (including the Confirmation Order), to the extent any of the foregoing impact the transactions contemplated under this Agreement, shall be in accordance with the terms set forth in Schedule 6.12(f) and reasonably acceptable in form and substance to Purchaser.

**Section 6.13   Antitrust Clearances and Obligations**.

(a)     Each of Purchaser and Sellers shall promptly after the date of this Agreement and in any event by July 1, 2012, prepare and file all notification and report forms required to be filed under the HSR Act with respect to the transactions contemplated by this Agreement, and request early termination of the waiting period under the HSR Act.  Purchaser, on the one hand, and Sellers, on the other hand, shall be responsible for payment of their own fees and expenses incurred in connection with or relating to the review of the transactions contemplated hereby pursuant to the HSR Act or their efforts to consummate the transactions contemplated hereby pursuant to this Section 6.13, and shall each bear the cost of 50% of the applicable filing fee under the HSR Act.

(b)     Each of Purchaser and Sellers shall (i) respond as promptly as practicable to any inquiries or requests for additional information or documentation received from

the Federal Trade Commission, the Department of Justice, any attorney general of any state of the United States, or any other antitrust or competition authority of any jurisdiction ("Antitrust Authority"); (ii) keep the other party reasonably informed of any communication received by such party from, or given by such party to, any Antitrust Authority regarding the transactions contemplated by this Agreement, and any communication received or given in connection with any proceeding by a private party regarding the transactions contemplated by this Agreement, in each case in a manner that protects attorney-client or attorney work product privilege; (iii) provide copies of any written communications received from or given to any Antitrust Authority unless prohibited by applicable Law; and (iv) permit the other party to review and incorporate the other party's reasonable comments in any communication given by it to any Antitrust Authority or in connection with any proceeding by a private party related to Antitrust Laws with any other person, in each case regarding the transactions contemplated under this Agreement and in a manner that protects attorney-client or attorney work product privilege.

(c)     Neither Purchaser nor Sellers shall, after the entry of the Sale Approval Order, agree to accept any agreement that would have the effect of delaying the consummation of any action contemplated by this Agreement without the written consent of the other party. For the avoidance of doubt, no party shall commit to or agree with any Antitrust Authority to stay, toll or extend any applicable waiting period under the HSR Act or other applicable Laws, without the prior written consent of the other parties.

(d)     Neither Purchaser nor any of its controlled Subsidiaries shall take any action or acquire any assets or securities of any other Person or agree to acquire assets or securities of any other Person if such action, acquisition or agreement would reasonably be expected to impair Purchaser's ability to consummate the transactions contemplated hereby.

**Section 6.14  Post-Closing Amounts Received and Paid**.   All amounts that are received by a Seller or any Affiliate of Seller in respect of any of the Purchased Assets with respect to a period following the Closing shall be received by such Person as agent, in trust for and on behalf of Purchaser and shall be paid pursuant to ~~Section 6.18(i)~~   All amounts that are received by Purchaser or any of its Affiliates following the Closing in respect of any Excluded Assets with respect to a period prior to the Closing shall be received by such Person as agent, in trust for and on behalf of Sellers, and Purchaser shall, on a monthly basis, pay or cause to be paid all such amounts over to Sellers by wire transfer of immediately available funds and shall provide Seller with information as to the nature and source of all such payments, including any invoice relating thereto.

**Section 6.15  Confidentiality**.

(a)     After the Closing, Sellers shall, and shall cause their respective Subsidiaries and instruct their respective Affiliates to, hold in confidence and not use in any manner detrimental to Sellers' business all Confidential Information concerning the Purchased Assets, except to the extent that such information can be shown to have been (i) in the public domain prior to the Closing or (ii) in the public domain at or after the

701584139 10488637

Closing through no fault of Sellers or any of their Affiliates or any of their respective representatives. If, after the Closing, Sellers or any of their Affiliates or any of their respective representatives are legally required to disclose any Confidential Information, Sellers shall to the extent permitted by Law (A) promptly notify Purchaser to permit Purchaser, at its expense, to seek a protective order or take other appropriate action and (B) cooperate as reasonably requested by Purchaser in Purchaser's efforts to obtain a protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information, but only at Purchaser's sole cost and expense. If, after the Closing and in the absence of a protective order, Sellers or any of their Affiliates or any of their respective Representatives are compelled as a matter of Law to disclose any such Confidential Information to a third party, such Person may disclose to the third party compelling disclosure only the part of such Confidential Information as is required by Law to be disclosed; provided, that to the extent permitted by Law, prior to any such disclosure, such Person consults in good faith with Purchaser and its legal counsel as to such disclosure and the nature and wording of such disclosure. "Confidential Information" shall mean any confidential information concerning the Purchased Assets, including methods of operation, products, prices, fees, costs, markets or other specialized information or proprietary matters.

(b)     If the Closing does not occur, each party shall, upon the written request of the other party, return to the other party or destroy (such destruction to be confirmed in writing to the other party upon written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) that constitutes Confidential Information of the other party, and not use any such information or knowledge for any purpose whatsoever, provided that a party may maintain such information to the extent required by Law or such party's established document retention policies (including any requirement to retain email on an automated email archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a legal dispute with the other party.

(c)     Notwithstanding the foregoing, the parties to this Agreement acknowledge that each of them (and each of their employees, representatives, or other agents) has been and is permitted to disclose to any and all persons, without limitation of any kind, the federal tax treatment and structure of this Agreement (including Confidential Information) and all materials of any kind (including opinions or other tax analyses) that are or have been provided to them relating to such federal tax treatment and structure. This provision is intended to qualify for the presumption that this Agreement is not offered under conditions of confidentiality as set forth in Treasury Regulation Section 1.6011-4(b)(3) and shall be interpreted to authorize disclosure only to the extent necessary to so qualify.

## Section 6.16   Delivery of Mortgage Files.

(a)     Not later than five Business Days prior to the Closing Date (or on such later date as Purchaser shall reasonably request), Sellers shall deliver to Purchaser or

701584139 10488637

Purchaser's custodian as Purchaser's designee the Mortgage File for each Mortgage Loan.

(b)        In connection with the transfer of any MERS Loan pursuant to Section 2.1 hereof, Sellers shall request that the MERS system indicate that such MERS Loan has been assigned to Purchaser.  Purchaser may, at its cost and in its discretion, direct Sellers to deliver for recording to the appropriate public recording office of the jurisdiction in which the Mortgaged Property is located, and cause to be duly recorded, any of the original assignments of mortgage.  Purchaser shall pay all recording fees relating to the recordation of the assignments of mortgage from a Seller to Purchaser and any intervening assignments.

(c)        Purchaser shall cause the notice required by Section 404 of the Homes Act to be provided within 30 days of the Closing Date to each Mortgagor with respect to each Mortgage Loan and each such notice shall, to the extent permitted by the Helping Families Act, specify (i) Purchaser or its assignee as designated by Purchaser on the Closing Date is a "creditor" for purposes of the Homes Act; (ii) the address of  Purchaser or its assignee as designated by Purchaser, as applicable; (iii) the Closing Date; (iv) that the entity selected by Purchaser to assume obligations to service the Mortgage Loan on the Closing Date is the contact person with authority to act on behalf of Purchaser or its assignee, as applicable; and (v) assignments of mortgage are not being recorded in connection with the sale of the Mortgage Loans.  If the Mortgage Loan is a MERS Loan, such notice shall state: "Ownership of your Mortgage Loan is also recorded on Mortgage Electronic Registrations System's registry at 1818 Library Street, Suite 300 Reston, Virginia 20190."

**Section 6.17  Third Party Servicing Agreement**.    Sellers and Purchaser shall use commercially reasonable efforts to cooperate with each other in order to negotiate and enter into the Third Party Servicing Agreement with the Winning Bidder, pursuant to which the Winning Bidder or its subservicer will provide servicing to Purchaser following the Closing Date.

**Section 6.18  Transfer of Servicing**.    Without limiting the generality of this Section 6.18, Sellers or their designees shall take, or cause to be taken, the following actions with respect to the Mortgage Loans (other than SBO Loans) prior to the Closing Date (or within such time as may otherwise be specified below) in order to effect the transfer of the servicing of such Mortgage Loans to Purchaser or its designee on the Closing Date:

(a)        Notice to Mortgagors.  Sellers (or their designees) shall inform in writing all Mortgagors of the change in servicer from any Seller (or its designee) to Purchaser (or its designee) all in accordance with Applicable Law and the terms of such "goodbye" letter (which may be combined, to the extent permitted by Applicable Law, with any "hello" letter to be sent to Mortgagors by Purchaser) shall be reasonably acceptable to Purchaser.

(b)        Transfer of Servicing.  On the Closing Date (or such later date as Purchaser shall reasonably request), Sellers shall transfer servicing of the related Mortgage Loans to Purchaser or its designee pursuant to the terms of this Agreement and

the procedures set forth in reasonable and customary servicing transfer instructions agreed to by Purchaser and Sellers.

(c)  <u>Delivery of Files</u>.  Within 10 Business Days after the Closing Date (or such later date as Purchaser shall reasonably request), Sellers shall forward to Purchaser the Servicing Files and the Credit Files for each Mortgage Loan.

(d)  <u>Payments Received Prior to the Closing Date</u>.  Sellers shall transfer all amounts received with respect to the Mortgage Loans on and after the Cut-off Date and prior to the Closing Date to Purchaser by wire transfer within three Business Days after the Closing Date to such account or accounts as may be designated by Purchaser to Sellers by prior written notice.

(e)  <u>Escrow Payments</u>.  The aggregate balances of all Escrow Payments as of the Closing Date shall be remitted to Purchaser by wire transfer within three Business Days after the Closing Date to such account or accounts as may be designated by Purchaser to Sellers by prior written notice.

(f)  <u>Reconciliation Statement</u>.  On the Closing Date or within three Business Days thereafter, Sellers shall provide Purchaser with an electronic accounting statement in a format agreed to by Sellers and Purchaser of the amounts received with respect to the Mortgage Loans on and after the Cut-off Date, Escrow Payments and remaining negative escrow balances, if any, sufficient to enable Purchaser to reconcile the amount of such payments with the accounts of the related Mortgage Loans.

(g)  <u>Notice to Hazard, Flood and Earthquake Insurers</u>.  Sellers shall deliver an electronic or written notice to all hazard, flood and earthquake insurance companies or their agents of the transfer of servicing within five Business Days after the Closing Date (or such other date as Purchaser shall reasonably request).

(h)  <u>Notice to Taxing Authorities and Tax Servicers</u>.  Sellers shall deliver an electronic or written notice to all taxing authorities and tax servicers and/or their agents of the transfer of servicing within five Business Days after the Closing Date (or such other date as Purchaser shall reasonably request).

(i)  <u>Payments Received After the Closing Date</u>.  Any payments with respect to the Mortgage Loans received by Sellers on the Closing Date or within 90 days after the Closing Date shall be remitted to Purchaser by wire transfer within two Business Day to such account or accounts as may be designated by Purchaser to Sellers by prior written notice, <u>provided</u>, that any payment received by Sellers for the purposes of a full payoff shall be forwarded to Purchaser within two Business Days of receipt by courier or overnight mail.

**Section 6.19  Use of Proceeds**.  In no event shall any Seller use the Transaction Proceeds under this Agreement to directly or indirectly fund any challenge, complaint, action, suit, proceeding, hearing, investigation, claim or demand, whether in law, equity or otherwise, either (a) against Purchaser or its Affiliates or (b) that has a material adverse effect on Purchaser or its Affiliates; <u>provided</u>, that this <u>Section 6.19</u> shall in no way prevent Sellers from using the

Transaction Proceeds to repay loans outstanding under the DIP Financing Agreements in accordance with the terms thereof.

**Section 6.20    Electronic Data Files**.  Sellers shall deliver to Purchaser an updated version of the Electronic Data Files, which shall provide loan level information with respect to the Whole Loans, with the loan level fields set forth on the Mortgage Loan Schedule, within 15 Business Days after the end of each month during the period from the date hereof to the Closing Date.

**Section 6.21    Transfer of Assets to DIP Borrowers**.  In accordance with the terms and conditions of the DIP Financing Agreements, promptly after approval of such agreements by the Bankruptcy Court, Sellers will transfer the Purchased Assets that are currently pledged to Purchaser under the Master Repurchase Agreement, dated as of December 21, 2011, as amended, by and among Purchaser, GMAC Mortgage, RFC and ResCap to the respective DIP Borrowers, and from and after that transfer, the DIP Borrowers will be "Additional Sellers" hereunder.

**Section 6.22    Mortgage Loan Modifications**.  With respect to each HAMP Loan and each Mortgage Loan that becomes subject to a HAMP modification agreement after the Cut-off Date, Purchaser shall, or shall cause its servicer to, comply with the terms of each modification agreement applicable to such Mortgage Loan and all guidelines, procedures and directives issued by the United States Treasury, Fannie Mae or Freddie Mac applicable to the servicing of such Mortgage Loan.  With respect to any Mortgage Loan that is the subject of an application for modification or is in its trial period pursuant to the terms of the related modification on the Closing Date, and is not a HAMP Loan, Purchaser shall, or shall cause its servicer to, accept and continue processing such pending loan modification requests and shall honor trial and permanent loan modifications entered into by the prior servicer in effect on the Closing Date, in all cases to the extent set forth on a schedule to be delivered by Sellers to Purchaser no later than June 1, 2012.  The parties hereto acknowledge and agree that the related Mortgagor on any such Mortgage Loan shall be deemed a third party beneficiary of this Section 6.22 with respect to its Mortgage Loan.

## ARTICLE VII.

## BANKRUPTCY COURT MATTERS

**Section 7.1    Competing Transaction**.  From the date hereof until the earlier of the entry of the Sale Procedures Order and the termination of this Agreement, no Seller shall and each Seller shall cause its Affiliates and such Seller's and Affiliates' respective officers, directors, managers, employees, representatives and agents not to, directly or indirectly, (i) engage in substantive negotiations or discussions with, or enter into any agreement or understanding with, any Person (other than Purchaser and its Affiliates, agents and representatives) concerning any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Purchased Assets (each a "Competing Transaction"), or (ii) furnish any non-public information concerning any of the Purchased Assets; provided, that notwithstanding the foregoing, Seller and its Affiliates shall be permitted to (a) communicate with prospective bidders concerning the proposed sale process, including the proposed timetable and the requirements for Qualified Bids (as defined in the Sale Procedures

Order), and (b) enter into confidentiality agreements with prospective bidders (no more favorable to such bidders than the Confidentiality Agreement) and take such other actions that may facilitate a prospective bidder's ability immediately to commence (or resume) diligence as soon as the Sale Procedures Order has been entered.  Following entry of the Sale Procedures Order, other than pursuant to and in compliance with the terms and conditions of the Sale Procedures Order, in no event may Sellers or their respective Affiliates initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (other than Purchaser and its Affiliates, agents and representatives) with respect to a Competing Transaction or accept an offer or proposal from any Person (other than Purchaser and its Affiliates, agents and representatives) with respect to a Competing Transaction.

**Section 7.2    Bankruptcy Court Filings**.  As promptly as practicable but no later than two Business Days following the execution of this Agreement, Sellers shall file Petitions for relief under Chapter 11 of the Bankruptcy Code and shall file, together with other customary "first day" motions, the Sale Motion with the Bankruptcy Court.  Subject to Section 7.1, Sellers shall thereafter pursue diligently the entry of the Sale Procedures Order and the Sale Approval Order.  Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Procedures Order and the Sale Approval Order and all parties hereto shall use their respective reasonable best efforts to obtain a finding demonstrating that Purchaser is a "good-faith" purchaser under Section 363(m) of the Bankruptcy Code, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court.  In the event the entry of the Sale Procedures Order or the Sale Approval Order shall be appealed, Sellers and Purchaser shall use their respective reasonable efforts to defend such appeal.

# ARTICLE VIII.

## CONDITIONS

**Section 8.1    Conditions to Obligations of Purchaser and Sellers**.  The respective obligations of each party to consummate the Closing shall be subject to the satisfaction, or waiver by Purchaser and Sellers, on or prior to the Closing Date of all of the following conditions precedent:

(a)    Sale Procedures Order.  The Sale Procedures Order (i) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (ii) shall not have been modified or amended in any manner materially adverse to Purchaser unless agreed to in writing by Purchaser in its sole discretion and (iii) shall have become a Final Order; provided, that the condition set forth in clause (iii) shall be waivable only by Purchaser on behalf of the parties.

(b)    Sale Approval Order.  The Sale Approval Order (i) shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, (ii) shall not have been modified or amended in any manner adverse to Purchaser unless agreed to in writing by Purchaser in its sole discretion and (iii) shall have become a Final Order.

43

(c)    The Confirmation Order.  The Confirmation Order shall have been entered by the Bankruptcy Court and not be subject to any stay of effectiveness, and the Chapter 11 Plan Effective Date shall have occurred as of or concurrently with the Closing Date; provided, that if the Confirmation Order has not been entered by October 31, 2012, or the Chapter 11 Plan Effective Date has not occurred by December 15, 2012, then this condition precedent shall be deemed to be waived by all parties.

(d)    No Law, Judgments, Etc.  No Government Entity of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Law or any decree, judgment, injunction or other Order, which is in effect and that restricts, prevents, prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement.  No proceeding or investigation by any Government Entity or other Person shall have been instituted that restricts, prevents, prohibits, makes illegal, enjoins or results in material damages in respect of the consummation of the transactions contemplated by this Agreement or any Ancillary Agreement.

(e)    Injunctions.  No Government Entity shall have issued an Order enjoining, restraining or prohibiting the completion of the transactions contemplated hereby and no suit, action or proceeding shall have been instituted by a Government Entity or any other Person that would reasonably be expected to have a Material Adverse Effect on the Purchased Assets or enjoin, restrain, prohibit or otherwise challenge the transactions contemplated by this Agreement, or that would be reasonably likely to prevent or make illegal the consummation of the transactions contemplated by this Agreement, and no Government Entity shall have notified Purchaser or Sellers in writing that this Agreement or the consummation of the transactions contemplated by this Agreement would in any manner constitute a violation of any Law and that it intends to commence any suit, action, or proceeding to restrain, enjoin or prohibit the transactions contemplated by this Agreement.

(f)    Agency Approvals.  Purchaser shall be approved (i) by HUD to hold FHA Loans and (ii) by the VA to hold VA Loans, in each case to the extent necessary.

(g)    Antitrust Clearances.  The waiting period applicable to the transactions contemplated by this Agreement under the HSR Act  shall have expired or been terminated.

**Section 8.2    Conditions to Obligations of Sellers**.  The obligations of Sellers to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date, of the following conditions:

(a)    Warranties of Purchaser True as of Closing Date.  The representations and warranties of Purchaser contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of Purchaser contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date hereof and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

44

(b)    <u>Compliance with Covenants</u>.    Purchaser shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by it on or prior to the Closing Date.

(c)    <u>Certificate</u>.    Sellers shall have received a certificate, signed by a duly authorized officer of Purchaser and dated the Closing Date, to the effect that the conditions set forth in <u>Sections 8.2(a)</u> and <u>8.2(b)</u> have been satisfied.

(d)    <u>Third Party Consents</u>.    All Consents set forth on <u>Schedule 5.3</u> shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Sellers, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

**Section 8.3    Conditions to Obligations of Purchaser**.  The obligations of Purchaser to consummate the Closing shall be subject to the satisfaction or waiver, at or prior to the Closing Date of each of the following conditions:

(a)    <u>Warranties of Sellers True as of Closing Date</u>.    The representations and warranties of Sellers or any Affiliate Seller contained herein that are qualified by materiality or Material Adverse Effect shall be accurate, true and correct in all respects, and all other representations and warranties of Sellers or any Affiliate Seller contained herein shall be accurate, true and correct in all material respects, in each case on and as of the date hereof and as of the Closing Date as though made at and as of such time (except to the extent expressly made as of an earlier date, in which case as of such date).

(b)    <u>Compliance with Covenants</u>.    Sellers shall have performed and complied with the covenants set forth in Sections 6.12(d) in all respects, and shall have performed and complied in all material respects with each of the covenants and agreements contained in this Agreement required to be performed and complied with by them on or prior to the Closing Date.

(c)    <u>Certificate</u>.    Purchaser shall have received certificates, signed by duly authorized officers of Sellers and dated the Closing Date, to the effect that the conditions set forth in <u>Sections 8.3(a)</u> and <u>8.3(b)</u> have been satisfied.

(d)    <u>Sale Approval Order</u>.

(i)    Solely with respect to the purchase of HELOCs under this Agreement, the Sale Approval Order shall have been entered and become a Final Order in form and substance reasonably satisfactory to Purchaser (including with respect to the treatment of HELOC advances); and

(ii)    With respect to obligations and benefits that can be realized prior to the Closing Date, Sellers shall have complied, in all material respects, with all of their obligations under, and Purchaser shall have received the benefits of, the Sale Approval Order.

(e)    Other Third Party Consents.  All Consents set forth on Schedule 4.3 shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to Purchaser, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.

(f)    Licenses .  Purchaser shall have obtained all Licenses and Permits necessary to own the Purchased Assets in all material respects, including those set forth in Section 6.6.

## ARTICLE IX.

## TERMINATION AND SURVIVAL

**Section 9.1    Termination**.  Notwithstanding anything to the contrary contained in this Agreement, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time on or prior to the Closing Date:

(a)    by the mutual written consent of Sellers and Purchaser;

(b)    by Sellers or Purchaser if any court of competent jurisdiction shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such Order shall have become a Final Order unless such Final Order or action was issued or taken at the request or with the support of the party seeking to terminate this Agreement (or any of its Affiliates); it being agreed that the parties hereto shall promptly appeal any such adverse order or other determination that is appealable (and argue such appeal with reasonable diligence);

(c)    by Purchaser, upon written notice to Seller if:

(i)    any condition to the obligations of Purchaser set forth in Sections 8.1 and 8.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser;

(ii)    there has been a material violation or breach by any Seller of any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period;

(iii)    Sellers do not file the Petitions within two Business Days of the date hereof;

(iv)    the Sale Motion is not filed on the Petition Date;

(v)    the Sale Procedures Order has not been entered by the Bankruptcy Court by June 18, 2012, or if the Sale Procedures Order, once entered, is changed

46

in a manner that is materially adverse to Purchaser without the consent of Purchaser in its sole discretion;

(vi)    the Sale Procedures Order does not provide for the final bid deadline to occur not later than 90 calendar days following the entry by the Bankruptcy Court of the Sale Procedures Order;

(vii)    the Auction, if any, is not concluded within seven Business Days following the final bid deadline;

(viii)    the Sale Hearing does not occur within 30 days following the conclusion of the Auction, or such other date as may be scheduled by the Bankruptcy Court that is no more than 40 days following the conclusion of the Auction;

(ix)    the Confirmation Order has not been entered by October 31, 2012 and the Sale Approval Order has not been entered and become a Final Order without stay of its effectiveness by November 15, 2012;

(x)    the Chapter 11 Plan Effective Date has not occurred by December 15, 2012 and the Sale Approval Order has not been entered and become a Final Order without stay of effectiveness by December 15, 2012;

(xi)    the Sale Approval Order once entered, is changed in a manner that is adverse to Purchaser without the consent of Purchaser in its sole discretion;

(xii)    any Seller seeks to have the Bankruptcy Court enter an order dismissing the Bankruptcy Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Bankruptcy Case of any Seller or converting the Bankruptcy Case of any Seller to a case under Chapter 7 of the Bankruptcy Code, or appoints a trustee in any Seller's Bankruptcy Case or an examiner with enlarged powers relating to the operation of Sellers' businesses, and such dismissal, conversion or appointment is not reversed or vacated within three business days after the entry thereof; or

(xiii)    Sellers' respective Boards of Directors approve an Alternative Restructuring or Sellers execute a letter of intent (or similar document) indicating their intention to pursue an Alternative Restructuring.

(d)    by Sellers, upon written notice to Purchaser:

(i)    if any condition to the obligations of Sellers set forth in ~~Sections~~ 8.1 and 8.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers; or

(ii)    if there has been a material violation or breach by Purchaser or any covenant, agreement, representation or warranty contained in this Agreement, which violation or breach (A) has not been cured within ten Business Days following the delivery of written notice of such violation or breach or (B) is not capable of being cured within a ten Business Day period.

(e)    automatically if the Bankruptcy Court shall enter an Order approving a Competing Transaction; provided, that if the Auction is held pursuant to the Sale Procedures, and Purchaser is designated as the Next-Highest Bidder (as such term is defined in the Sale Procedures), then this Agreement shall not terminate pursuant to this subsection (e) until the earlier of (i) the Bankruptcy Court approval of the "Successful Bid" (as such term is defined in the Sale Procedures); and (ii) 30 calendar days following the Auction.  While Purchaser remains the Next-Highest Bidder (as such term is defined in the Sale Procedures), the obligations of Purchaser and Sellers described in Sections 6.1 and 6.12(c) shall be held in abeyance until the purchase agreement with the bidder or purchase agreements with the bidders, as the case may be, who made the "Successful Bid" at the Auction (as such term is defined in the Sale Procedures) are terminated.

**Section 9.2    Procedure and Effect of Termination**.  In the event of termination of this Agreement and abandonment of the transactions contemplated by this Agreement by either or both of the parties pursuant to Section 9.1, three Business Days' written notice thereof shall forthwith be given by the terminating party to the other party and this Agreement shall terminate and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto; provided, that no notice shall be required with respect to termination pursuant to Section 9.1(e) and provided, further, that (a) this Section 9.2 and Article X (other than Section 10.15 ) shall survive the termination of this Agreement and (b) no such termination shall relieve any party from any Losses arising out of any breach of this Agreement by a party that occurs upon or prior to the termination of this Agreement.

**Section 9.3    No Survival**.  Sellers and Purchaser agree that all of the representations, warranties and covenants of Sellers and Purchaser contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date, except that the representations, warranties and covenants that by their terms survive the Closing Date shall survive the Closing Date.

## ARTICLE X.

## MISCELLANEOUS

**Section 10.1    Expenses**.  Except as otherwise provided in this Agreement or the Sale Procedures Order, (i) all expenses relating to the preparation of assignments, the transfer of ownership of MERS Loans, and other transfer taxes, fees and expenses shall be paid by Sellers, (ii) all expenses relating to the recording of assignments from Sellers to Purchaser shall be paid by Purchaser and (iii) all other costs and expenses incurred in connection with this Agreement and the consummation of the transactions hereunder shall be paid by the party incurring such expenses.  Following approval of the Sale Procedures Order, any claims arising from breaches by any Sellers of their obligations pursuant to the terms of this Agreement shall constitute

48

administrative expense claims against Sellers under Sections 503(b)(1) and 507(a)(1), as applicable, of the Bankruptcy Code.

     **Section 10.2  Amendment; Waiver**.  This Agreement may be amended, modified or supplemented only in writing signed by each of the parties hereto.  Any provisions of this Agreement may be waived, but only if such waiver is in writing and signed by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

     **Section 10.3  Notices**.  Any written notice to be given hereunder shall be deemed given: (a) when received if given in person or by nationally recognized courier; (b) on the date of transmission if sent by telecopy, e-mail or other wire transmission (receipt confirmed in each case); (c) five Business Days after being deposited in the U.S. mail, certified or registered mail, postage prepaid, return receipt requested; and (d) if sent by an internationally recognized overnight delivery service, the second Business Day following the date given to such overnight delivery service (specified for overnight delivery and receipt confirmed).  All notices shall be addressed as follows:

       if to Sellers, to:

       Residential Capital, LLC
       1177 Avenue of the Americas
       New York, New York 10036
       Facsimile:    646-257-2703
       Attention:    Mr. Thomas Marano
       Telephone:    646-257-2703
       email:       tom.marano@gmacrescap.com

       with copies to (which copies shall not constitute notice):

       Residential Capital, LLC
       1100 Virginia Drive
       Fort Washington, Pennsylvania 19034
       Facsimile:    866-572-7524
       Attention:    Tammy Hamzehpour, Esq., General Counsel
       Telephone:    215-682-1307
       email:       tammy.hamzehpour@gmacrescap.com

       *and*

701584139 10488637

Morrison & Foerster LLP
1290 Avenue of the Americas
New York, New York 10104
Facsimile:        212-468-7900
Attention:        Gary S. Lee, Esq.
Telephone:        212-468-8163
email:            glee@mofo.com

*and*

Attention:        Larren M. Nashelsky, Esq.
Telephone :       212-506-7365
email:            lnashelsky@mofo.com

if to Purchaser, to:

BMMZ Holdings LLC
c/o Ally Financial Inc.
200 Renaissance Center
Detroit, Michigan  48265
Facsimile:        313-656-6124
Attention:        William B. Solomon, VP and General Counsel
Telephone:        313-656-6128
email:            william.b.solomon@ally.com

with copies to (which copies shall not constitute notice):

Ally Financial Inc.
200 Renaissance Center, 12th Floor
Detroit, MI 48265
Facsimile:        313-656-6124
Attention:        William B. Solomon, VP and General Counsel
Telephone:        313-656-6128
email:            william.b.solomon@ally.com

*and*

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Facsimile:        312-706-8192
Attention:        Elizabeth A. Raymond
Telephone:        312-701-7322
email:            eraymond@mayerbrown.com

**Section 10.4   Waivers**.  The failure of a party to require performance of any provision hereof shall not affect its right at a later time to enforce the same.  No waiver by a party of any term, covenant, representation or warranty contained herein shall be effective unless in writing.

701584139 10488637

No such waiver in any one instance shall be deemed a further or continuing waiver of any such term, covenant, representation or warranty in any other instance.

**Section 10.5    Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**Section 10.6    Applicable Law; WAIVER OF JURY TRIAL; Venue and Retention of Jurisdiction**.

(a)    This Agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to any conflicts of law principles thereof or any other jurisdiction that would apply the law of another jurisdiction and, to the extent applicable, the Bankruptcy Code.

(b)    EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BETWEEN THE PARTIES HERETO ARISING OUT OF OR RELATING TO THIS AGREEMENT, AND THE TRANSACTIONS CONTEMPLATED HEREBY.

(c)    Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.3 hereof; provided, that if the Bankruptcy Case of Sellers has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(d)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 10.3.

**Section 10.7    Assignment**.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns; provided, that no assignment of either party's rights or obligations may be made without the written consent of the other party, which consent shall not be unreasonably withheld or delayed; and provided, further,

that Purchaser may assign this Agreement and any or all rights or obligations hereunder (including Purchaser's rights to purchase the Purchased Assets) to one or more Affiliates of Purchaser if any such Affiliate has at the Closing all Licenses necessary to own such Purchased Assets; provided, that Purchaser shall remain obligated to fulfill its obligations pursuant to this Agreement and for any damages arising from an unlawful breach hereof. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires.

**Section 10.8  No Third-Party Beneficiaries**. Except as provided in Section 6.22, this Agreement is solely for the benefit of the parties hereto, and no provision of this Agreement shall be deemed to confer any remedy, claim or right upon any third party, including any employee or former employee of Sellers or any participant or beneficiary in any benefit plan, program or arrangement.

**Section 10.9  Public Announcements**. Sellers and Purchaser each agree that they and their Affiliates shall not issue any press release or otherwise make any public statement or respond to any media inquiry with respect to this Agreement or the transactions contemplated hereby without the prior approval of the other parties, which shall not be unreasonably withheld or delayed, except as may be required by Law or by any stock exchanges having jurisdiction over Sellers, Purchaser or their Affiliates. Sellers, Affiliate Sellers and Purchaser will consult with each other regarding the content and timing of any internal announcements regarding the transactions contemplated by this Agreement and the Ancillary Agreements to Sellers' employees.

**Section 10.10  Severability**. Any term or provision of this Agreement that is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction or other authority declares that any term or provision hereof is invalid, void or unenforceable, the parties agree that the court making such determination shall have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, void or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.

**Section 10.11  Specific Performance**. The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that Purchaser shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court referenced in Section 10.6(c), this being in addition to any other remedy to which they are entitled at Law or in equity.

**Section 10.12  Waiver of Bulk Transfer Laws**. Seller and Purchaser agree to waive compliance with Article 6 of the Uniform Commercial Code as adopted in each of the

jurisdictions in which any of the Purchased Assets are located to the extent that such Article is applicable to the transactions contemplated hereby and any other bulk sale or bulk transfer or similar Law.

Section 10.13 Personal Liability.  This Agreement shall not create or be deemed to create or permit any personal liability or obligation on the part of any officer, director, employee, representative or investor of any party hereto.

Section 10.14 Entire Agreement.  This Agreement, together with the Ancillary Agreements, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof.

Section 10.15 Parent Guaranty.  Parent hereby irrevocably, absolutely and unconditionally guarantees to Sellers the prompt and full payment by Purchaser of all of Purchaser's monetary obligations under this Agreement and any Ancillary Agreements as and when payment is due and payable in accordance with the terms hereof and thereof (collectively, the "Guaranteed Obligations").  Parent acknowledges and agrees that, with respect to all Guaranteed Obligations, such guaranty constitutes a guaranty of payment and not of collection and shall not be conditioned or contingent upon the pursuit by Sellers of any remedies which they now or may hereafter have against Purchaser, whether at law, in equity or otherwise.  Upon receipt of written notice requesting payment of the Guaranteed Obligations, Parent shall forthwith make full payment of any amount due with respect thereto, at its sole cost and expense, to the extent that such payment has not previously been made by Purchaser.  This Section 10.15 shall terminate and be of no further force or effect upon and after the date that the Guaranteed Obligations shall have been paid in full.

*[SIGNATURES ON FOLLOWING PAGE]*

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement or caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first written above.

**ALLY FINANCIAL INC.**

By    _____
        Name:
        Title:

**BMMZ HOLDINGS LLC**

By    _____
        Name:
        Title:

**RESIDENTIAL CAPITAL, LLC**

By    _____
        Name:
        Title:

**RESIDENTIAL FUNDING COMPANY, LLC**

By    _____
        Name:
        Title:

**GMAC MORTGAGE, LLC**

By    _____
        Name:
        Title:

701584139 10488637

12-12020-mg    Doc 683-5    Filed 05/14/21    Entered 05/14/21 10:37:59    Exhibit 5
Pg 207 of 312

**GMACM BORROWER LLC**


By     _____
      Name:
      Title:


**RFC BORROWER LLC**


By     _____
      Name:
      Title:

701584139 10488637

12-12020-mg    Doc 683    Filed 05/14/12    Entered 05/14/12 10:37:54    Exhibit 9
Pg 208 of 312

## Exhibit 6

## BARCLAYS DIP FINANCING FACILITY

CONFIDENTIAL

**Residential Capital, LLC**

**$1,500,000,000 Superpriority Secured Debtor-in-Possession Credit Facility**
**("DIP Facility")**

**Summary of Indicative Terms and Conditions**
**March 29, 2012**

Residential Capital, LLC ("ResCap" or "Parent") has advised Barclays Bank PLC ("Barclays Bank") that Parent and certain of Parent's subsidiaries (together with the Parent, each, a "Debtor," and collectively, the "Debtors") are considering the filing of voluntary chapter 11 petitions (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The DIP Facility and its terms will be subject to Bankruptcy Court approval. Capitalized terms not otherwise defined shall have the meanings set forth in Exhibit A.

The terms presented in this summary of indicative terms and conditions (together with all exhibits attached hereto, this "Term Sheet") are intended for discussion purposes only, are indicative terms and do not constitute a commitment to lend. This Term Sheet shall not be construed as commitment on the part of, or engagement of, Barclays Bank, or any of their affiliates to provide, arrange, place, underwrite and/or participate in any or all of the DIP Facility and neither Barclays Bank nor any of its affiliates is under any obligation, as a result of this Term Sheet, to provide or offer to provide any such commitment or engagement. This Term Sheet is non-binding and the proposals contained herein are subject to, among other things, the completion of due diligence, internal credit approvals, legal review and the negotiation, documentation and execution of definitive documentation, which must be satisfactory to the lenders under the DIP Facility (in such capacities, the "DIP Lenders"). Only execution and delivery of definitive documentation relating to the transactions shall result in any binding or enforceable obligations of any party relating to the transactions. The terms contained herein are confidential and may not be shared with any other parties other than ResCap, its Directors, employees and advisors without our prior written consent.

| | |
|---|---|
| **Borrowers**: | (1) A newly formed special purpose entity (the "GMACM Borrower"), as a debtor and a debtor-in-possession, which entity shall be a Delaware limited liability company and wholly-owned subsidiary of GMAC Mortgage, LLC, a Delaware limited liability company ("GMACM"); and |
| | (2) A newly formed special purpose entity (the "RFC Borrower", and together with the GMACM Borrower, the "Borrowers"), as a debtor and a debtor-in-possession, which entity shall be a Delaware limited liability company and wholly-owned subsidiary of Residential Funding Company, LLC, a Delaware limited liability company ("RFC"). |
| **Guarantors**: | ResCap, each of the other Debtors and all existing and future material domestic wholly-owned subsidiaries of ResCap, with exceptions to be agreed (the "Guarantors" and together with the Borrowers, the "Loan Parties"), shall guarantee (the "Guaranty") all obligations of the Borrowers under the DIP Facility on a superpriority secured basis (the "Guaranteed |

CONFIDENTIAL

Obligations").

**Eligible Receivables Transferors:**

Upon the termination of the Existing GSAP Facility pursuant to the Interim Financing Order (each such term as defined below), the issuer under the Existing GSAP Facility will sell and contribute all servicing advance reimbursements owned by it and (i) generated by GMACM directly to the GMACM Borrower and (ii) generated by RFC directly to the RFC Borrower (collectively referred to herein as the "Receivables"), pursuant to pooling agreements in form and substance satisfactory to the Administrative Agent. From and after the termination of the Existing GSAP Facility pursuant to the Interim Financing Order, GMACM and RFC (collectively in their capacities as sellers, the "Sellers"), will sell and contribute all the Receivables they generate in their capacities as master servicers or servicers on behalf of various Eligible Servicing Agreements (as defined in Exhibit A hereto), directly to the GMACM Borrower and the RFC Borrower, respectively.

**Sellers of Certain Other Borrowing Base Collateral:**

After the termination of the Existing Ally Repo and the Existing EAF Facility (each term as defined below) pursuant to the Interim Financing Order, GMACM will sell and contribute its Eligible Mortgage Loans and Eligible FNMA Advance Reimbursements (as defined in Exhibit A hereto) related to Fannie Mae Contracts (as defined in Exhibit A hereto) to the GMACM Borrower and RFC will sell and contribute its Eligible Mortgage Loans to the RFC Borrower.

**Sole Lead Arranger and Sole Bookrunner:**

Barclays Bank (in such capacity, the "Lead Arranger").

**Administrative Agent:**

Barclays Bank (in such capacity, the "Administrative Agent").

**Collateral Agent:**

Barclays Bank or another financial institution acceptable to Barclays Bank and the Borrowers (in such capacity, the "Collateral Agent" and collectively with the Administrative Agent, the "Agents" and each, an "Agent").

**Verification Agent:**

American Mortgage Consultants, Inc., with reasonable fees of the Verification Agent to be paid by the Borrowers.

**DIP Lenders:**

The DIP Lenders shall be comprised of Barclays Bank and a syndicate of banks, financial institutions and other entities selected by Barclays Bank and which are reasonably acceptable to Parent; *provided* that without the consent of ResCap, the Lead Arranger will not syndicate any portion of the DIP Facility to Ally Financial Inc. ("AFI") or any of AFI's wholly owned subsidiaries that have been specified to the Lead Arranger by ResCap in writing within two (2) weeks after the date of the Commitment Letter to which this Term Sheet is attached (all such financial institutions and entities so identified, collectively, the "Disqualified Assignees").

**Servicers:**

Initially ResCap, RFC and GMACM (collectively, the "Servicers") will service and maintain the Borrowing Base Collateral (as defined below) in

CONFIDENTIAL

accordance with customary practices and the standard of care that applies to them when servicing comparable assets for third parties. Subject to the rights of third parties to appoint or remove a servicer of the Borrowing Base Collateral, the Required Lenders (as defined below) will have the right to appoint a third party servicer for the Borrowing Base Collateral upon the occurrence of an Event of Default (as defined below), unless the circumstances giving rise to such Event of Default shall have been cured.

**Custodian**:  To be determined by the Administrative Agent in consultation with the Borrowers, with reasonable fees of the Custodian to be paid by the Borrowers.

**Valuation Agents**:  To be determined by Required Lenders from time to time, with reasonable fees of the Valuation Agents to be paid by the Borrowers.

**Facility Types and Amounts**:  A superpriority senior secured credit facility of up to $1,500,000,000 (subject to reduction to not less than $1,450,000,000 if the EAF Commitments are removed from the Commitments (each term as defined below) as set forth below), which will consist of a revolving loan facility ("Revolving Facility") in an aggregate principal amount up to $200,000,000 (the "Revolving Commitments"), an A-1 term loan facility (the "A-1 Term Loan Facility") in an aggregate principal amount up to $1,100,000,000 (the "A-1 Term Loan Commitments"), an A-2 term loan facility (the "A-2 Term Loan Facility" and together with the A-1 Term Loan Facility, the "Term Loan Facilities") in an aggregate principal amount of $200,000,000 (the "A-2 Term Loan Commitments" and together with the A-1 Term Loan Commitments, the "Term Loan Commitments"; the Term Loan Commitments together with the Revolving Commitments, the "Commitments"). An aggregate principal amount of $50,000,000 of the A-1 Term Loan Commitments (the "EAF Commitments") shall be subject to the receipt of the consent of Fannie Mae as described further below under the section entitled "Collateral"

The loans under the Revolving Facility ("Revolving Loans"), loans under the A-1 Term Loan Facility ("A-1 Term Loans") and loans under the A-2 Term Loan Facility ("A-2 Term Loans" and collectively with A-1 Term Loans, "Term Loans"; Term Loans collectively with Revolving Loans, "Loans") shall be provided pursuant to a Superpriority Secured Debtor-in-Possession Credit Agreement (the "DIP Loan Agreement").

**Availability**:  Subject in each case to compliance with the terms, conditions and covenants set forth in the Loan Documents (as defined below):

    (a)    A-1 Term Loans in an aggregate principal amount up to $1,100,000,000 will be available in one drawing on the closing date for the DIP Facility (the "Closing Date");

    (b)    A-2 Term Loans in an aggregate principal amount of $200,000,000 will be available in one drawing on the Closing Date; and

        (c)    Revolving Loans in an aggregate principal amount up to $200,000,000 will be available on and after the Revolver Availability Date (as defined below); *provided* that Revolving Loans in an aggregate principal amount up to $150,000,000 will be available on the Closing Date.

Revolving Loans may be borrowed, repaid, and re-borrowed until the Termination Date. Any amounts prepaid or repaid under the Term Loan Facilities may not be re-borrowed.

**Use of Proceeds**:

Proceeds of Term Loans shall be used (i) to refinance the pre-existing GSAP receivables securitization facility (the "Existing GSAP Facility"), the BMMZ Holdings LLC whole loan repurchase facility (the "Existing Ally Repo") and the Fannie Mae EAF facility (the "Existing EAF Facility," and together with the Existing GSAP Facility and the Existing Ally Repo, collectively, the "Existing Facilities"), (ii) to fund the addition of new Eligible Assets (as defined below), (iii) to fund general corporate and working capital requirements, (iv) to pay interest, fees and expenses payable under the DIP Facility, and (v) to pay costs of administration of the Chapter 11 Cases in a manner consistent with the requirements of the Bankruptcy Code, in each case, in accordance with the Approved DIP Budget. Proceeds of Revolving Loans shall be used (i) to fund the addition of new Eligible Assets (as defined below) (ii) to fund general corporate and working capital requirements, (iii) to pay interest, fees and expenses payable under the DIP Facility, and (iv) to pay costs of administration of the Chapter 11 Cases in a manner consistent with the requirements of the Bankruptcy Code, in each case, in accordance with the Approved DIP Budget. The Approved DIP Budget will provide that up to $100,000,000 of the proceeds of the Term Loans shall be transferred on the Closing Date to an unrestricted account of ResCap to be used for general corporate purposes, including to fund servicing advances that will not be included in the Borrowing Base; *provided* that in no event shall ResCap use such proceeds to make payments on pre-petition debt. No proceeds of the Loans or the Collateral (as defined below), including cash collateral, shall be used for any purpose other than as provided for in the Approved DIP Budget.

No portion of the Loans, the Collateral (including any cash collateral) or the Carve Out (as defined below) shall be used (i) to challenge the validity, perfection, priority, extent or enforceability of the Loans and the other obligations under the DIP Facility (collectively, the "DIP Obligations"), or the liens on or security interests securing the DIP Obligations, (ii) to investigate or assert any other claims or causes of action against any DIP Lender, the Administrative Agent, the Collateral Agent or any other holder of any DIP Obligations, (iii) to challenge the validity, perfection, priority, extent or enforceability of the Existing GSAP Facility, or the liens on or security interests securing the Existing GSAP Facility (but may be used by professionals for any official committee to investigate such matters in an amount not to exceed $100,000), or (iv) for any act which has the effect of materially or adversely modifying or compromising the rights and remedies of any Agent or any DIP Lender as set forth herein and in the

CONFIDENTIAL

definitive loan documents for the DIP Facility, or which results in the occurrence of an Event of Default.

**Borrowing Base and Collateral Amount:**

Revolving Loans and A-1 Term Loans shall be provided subject to availability under the Borrowing Base, and A-2 Term Loans shall be provided subject to availability under the Collateral Amount, as set forth below under the section entitled "Ongoing Conditions to Each Borrowing."

The Borrowing Base will be calculated on a weekly basis as follows:

    (a)    up to an amount equal to the lesser of (i) 90% of the Book Value (to be defined) of Eligible Receivables and Eligible FNMA Advance Reimbursements (as each such term is defined in Exhibit A hereto) of the Borrowers and (ii) the Trigger Advance Rate (to be defined in a manner consistent with the Existing GSAP Facility, with conforming modifications)[1] of the Book Value of Eligible Receivables and Eligible FNMA Advance Reimbursements of the Borrowers; plus

    (b)    up to 50% of the Market Value (to be defined) of Eligible Mortgage Loans (as defined in Exhibit A hereto) or any "real estate owned" ("REO") resulting from a foreclosure related to any Eligible Mortgage Loan (the Eligible Mortgage Loans and REO resulting from a foreclosure related to any Eligible Mortgage Loan together with Eligible Receivables and Eligible FNMA Advance Reimbursements, the "Eligible Assets") of the Borrowers; plus

    (c)    100% of the aggregate amount of cash on deposit in the Borrower Accounts and the Concentration Account (each as defined below); minus

    (d)    applicable reserves established by the Administrative Agent in its Permitted Discretion and a reserve for the Carve-Out (as defined below).

"Permitted Discretion" means a determination made in good faith and in the exercise of commercially reasonable (from the perspective of a secured asset-based lender) business judgment.

The Administrative Agent may conduct a valuation of the Eligible Mortgage Loans from time to time in its Permitted Discretion.

The Collateral Amount will be calculated on a weekly basis as follows:

    (a)    up to an amount equal to the lesser of (i) 95% of the Book Value of Eligible Receivables and Eligible FNMA Advance

---

[1] Trigger Advance Rate will be modified to reflect a Stressed Time Percentage of 25%, taking into account the higher advance rates on the DIP Facility.

827415.18B-New York Server 6A - MSW

CONFIDENTIAL

Reimbursements of the Borrowers and (ii) the Trigger Advance Rate of the Book Value of Eligible Receivables and Eligible FNMA Advance Reimbursements of the Borrowers; <u>plus</u>

(b)    up to 75% of the Market Value of Eligible Mortgage Loans or any REO resulting from a foreclosure related to any Eligible Mortgage Loan of the Borrowers; <u>plus</u>

(c)    100% of the aggregate amount of cash on deposit in the Borrower Accounts and the Concentration Account (each as defined below); <u>minus</u>

(d)    applicable reserves established by the Administrative Agent in its Permitted Discretion and a reserve for the Carve-Out (as defined below).

**Certain Borrowing Base Reports:**    The Borrowers will provide a report as to the Borrowing Base Collateral on a monthly basis (the "<u>Monthly Report</u>") detailing the Eligible Assets, including the Book Value of all Eligible Receivables and Eligible FNMA Advance Reimbursements constituting Collateral and the Market Value of all Eligible Mortgage Loans constituting Collateral, in each case as determined by the Valuation Agents, in accordance with customary market practices and in a form to be agreed.   Reporting will include concentrations, losses, dilutions, aging buckets, as applicable, and other information customarily included in reports with respect to each type of asset.  Reporting also will include the Verification Agent's review and analysis of advance practices.  To the extent feasible, reports will be prepared in a manner consistent with existing reporting done by GMACM, RFC and the issuer under the Existing GSAP Facility, as applicable, for internal management purposes and with respect to the Existing Facilities or other existing securitizations or financing arrangements, as appropriate. The Monthly Report shall be in addition to the Borrowing Base and Collateral Amount reports to be provided weekly as described in clause (f) under "<u>Financial Reporting and other Reporting Requirements</u>" below.

**Cash Management :**    The GMACM Borrower shall establish and maintain three (3) deposit accounts (the "<u>GMACM Borrower Accounts</u>") into which all collections and receipts with respect to the GMACM Borrower's Eligible Mortgage Loans, Eligible Receivables and Eligible FNMA Advance Reimbursements, respectively, will be deposited.  The RFC Borrower shall establish and maintain two (2) deposit accounts (the "<u>RFC Borrower Accounts</u>" and collectively with the GMACM Borrower Accounts, the "<u>Borrower Accounts</u>") into which all collections and receipts with respect to the RFC Borrower's Eligible Mortgage Loans and Eligible Receivables, respectively, will be deposited.  The Borrower Accounts will be subject to control agreements in favor of the Collateral Agent, and the Borrowers will have no rights of withdrawal with respect to the Borrower Accounts except to request the transfer of funds to the Concentration Account, as described below, or to fund the payment of Permitted Expenditures (as defined below).

CONFIDENTIAL

Funds on deposit in the Borrower Accounts will be swept periodically at the Borrowers' request to a concentration account (the "Concentration Account") at ResCap, which will be subject to a control agreement in favor of the Collateral Agent. The Concentration Account will be a segregated account into which only funds swept from the Borrower Accounts will be deposited, and no other funds of the Loan Parties will be commingled with such funds. Except during a Dominion Period (as defined below), the Borrowers will be permitted to withdraw funds from the Concentration Account solely for four purposes: (i) at any time, funding Advances under Eligible Servicing Agreements and funding Eligible Advances under Fannie Mae Contracts (each such term as defined in Exhibit A hereto), (ii) at any time, transferring funds to a ResCap corporate account to be used for the payment of expenses in accordance with the Approved DIP Budget (inclusive of any permitted variances), (iii) on the Closing Date, for the transfer of an amount up to $100,000,000 to an unrestricted account of ResCap, (iv) at any time, for the funding of pipeline loan obligations in Ohio and Nevada and the repurchase of Eligible Mortgage Loans pursuant to obligations owed to government sponsored entities, and (v) at any time, to reimburse GMACM or RFC, as applicable, for any Eligible Advances initially funded out of ResCap corporate accounts (collectively, the "Permitted Expenditures"), in each case in accordance with the Approved DIP Budget.

As a condition to withdrawal of any funds from the Concentration Account or any Borrower Account, the Borrowers must satisfy all conditions described in the section below entitled "Ongoing Conditions to Each Borrowing" including certifying in writing to the Administrative Agent and the DIP Lenders that after giving effect to such withdrawal of funds and the use of such funds, no default or Event of Default would exist and the Borrowers will be in compliance with the Borrowing Base and the Collateral Amount. The Borrowers' certification as to compliance with the Borrowing Base and the Collateral Amount will include calculations of the Borrowing Base and the Collateral Amount, which calculations will reflect (i) cash balances in the Borrower Accounts and the Concentration Account as of the end of the preceding business day, (ii) a calculation of the Book Value of Eligible Receivables and Eligible FNMA Advance Reimbursements as of the end of the preceding business day, and (iii) a calculation of the Market Value of Eligible Mortgage Loans as of the date of the most recent Borrowing Base and Collateral Amount report provided to the Administrative Agent and the DIP Lenders, updated to reflect any Eligible Mortgage Loans that have been added, liquidated or paid off as of the end of the preceding business day, as described in clause (f) of the section below entitled "Financial Reporting and Other Reporting Requirements".

The GMACM Borrower or the RFC Borrower shall establish a deposit account (the "Collection Account"), into which all funds in the Borrower Accounts and the Concentration Account will be swept daily during a Dominion Period (as defined below), and applied to outstanding Loans. The Collection Account will be subject to the sole dominion and control of

**CONFIDENTIAL**

the Collateral Agent pursuant to a control agreement.

Other than the Borrower Accounts, the Concentration Account and the Collection Account, the Borrowers shall not be permitted to open any additional bank accounts, deposit accounts, checking accounts, money market funds, certificates of deposit or other similar accounts or financial instruments without the consent of the Administrative Agent, which consent shall not be unreasonably withheld.

**Maturity:**

The Loans will mature on the date (the "Termination Date") which is the earliest of (i) the date that is 18 months from the Closing Date, (ii) the date that is 45 days after entry of the Interim Financing Order if the Final Financing Order (as defined below) has not been entered prior to the expiration of such 45-day period, (iii) the effective date of a chapter 11 plan of reorganization for any Debtor, and (iv) the date on which maturity of the Loans is accelerated and the Commitments are terminated pursuant to the DIP Loan Agreement as a result of an Event of Default.

On the Termination Date, the Loans and other obligations shall be repaid, and the proceeds from, and recoveries on, the Collateral, if applicable, will be applied: first, to the amounts owing in respect of the Revolving Facility (including without limitation, fees, indemnities, and expense reimbursements); second, to amounts owing in respect of the A-1 Term Loan Facility (including without limitation, fees, indemnities, and expense reimbursements); and third, to amounts owing in respect of the A-2 Term Loan Facility (including without limitation, fees, indemnities, and expense reimbursements).

**Collateral / Superpriority Claim:**

As security for the obligations under the DIP Facility, the Debtors shall grant to the Collateral Agent, for itself and for the benefit of the DIP Lenders, valid and perfected security interests in, and liens on, all present and after-acquired property of the Debtors of any nature whatsoever constituting the following (together with all proceeds and products thereof, the "Collateral"):

(a) pursuant to Bankruptcy Code § 364(c)(2), a first priority, perfected lien upon all of the Debtors' right, title and interest in, to and under all Collateral that (x) is not otherwise encumbered by a validly perfected and enforceable security interest or lien on the bankruptcy filing date (the "Petition Date") or (y) becomes unencumbered as a result of the repayment of secured prepetition indebtedness with the proceeds of the DIP Facility, including, without limitation, a first priority, perfected lien on the Receivables and the Eligible Mortgage Loans (including any REO resulting from a foreclosure related to any Eligible Mortgage Loan) (collectively with the Collateral described in clause (c) below, the "Borrowing Base Collateral");

(b) pursuant to Bankruptcy Code § 364(c)(3), a junior, perfected lien upon all of the Debtors' right, title and interest in, to and under only the Collateral that is currently the collateral securing the

CONFIDENTIAL

obligations under the existing line of credit facility provided by AFI to which ResCap and certain of its affiliates are party (the "<u>Ally Line of Credit</u>"), subject to any validly perfected and enforceable security interest or lien in existence as of the Petition Date, valid and enforceable rights of setoff held by depository institutions (and any court-ordered replacement liens therefor of the same extent and priority), valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-petition claim is expressly permitted under the Bankruptcy Code) (collectively, the "<u>LOC Junior Lien Collateral</u>");

(c)  pursuant to Bankruptcy Code § 364(c)(3), a junior, perfected lien upon all of the Debtors' right, title and interest in, to and under only the Collateral that is currently the collateral securing the obligations under the existing credit facility provided by Citibank, N.A. ("<u>Citibank</u>") to which ResCap and certain of its affiliates are party (the "<u>MSR Facility</u>"), subject to any validly perfected and enforceable security interest or lien in existence as of the Petition Date, valid and enforceable rights of setoff held by depository institutions (and any court-ordered replacement liens therefor of the same extent and priority), valid liens perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-petition claim is expressly permitted under the Bankruptcy Code) (collectively, the "<u>MSR Junior Lien Collateral</u>" and together with the LOC Junior Lien Collateral, the "<u>Junior Lien Collateral</u>"); and

(d)  subject to the consent of Fannie Mae, pursuant to Bankruptcy Code § 364(d)(1), a first priority perfected priming lien upon all of the Debtors' right, title and interest in, to and under all Collateral comprised of Eligible FNMA Advance Reimbursements, including, without limitation, servicer advances; *provided* that, in the event the GMACM Borrower does not obtain the requisite consent from Fannie Mae as further described in <u>Exhibit A</u> hereto under the heading entitled "<u>Eligible FNMA Advance Reimbursements</u>," (i) such rights and interests shall not constitute Collateral, (ii) the EAF Commitments shall be automatically terminated on the Closing Date, and the A-1 Term Loan Commitments automatically reduced on a pro rata basis, and no DIP Lender shall have any obligation to make a Loan from its EAF Commitment and (iii) the Borrowers shall not use the proceeds of the Loans to refinance the Existing EAF Facility;

*provided* that the Collateral shall not include (i) any property to the extent the grant of a security interest therein is prohibited by law, (ii) any property to the extent the grant of a security interest therein requires the consent of a governmental authority that has not been obtained (e.g., Ginnie Mae), (iii) with respect to a first tier foreign subsidiary, the excess over 65% of the equity interests in such subsidiary if a pledge of such excess is reasonably likely to result in adverse tax consequences to the

CONFIDENTIAL

Loan Parties, (iv) the equity in any subsidiary of a first tier foreign subsidiary, (v) cash that as of the Petition Date was unencumbered and investment income earned thereon and (vi) other exceptions to be agreed with respect to the Junior Lien Collateral; provided further that the Collateral shall nevertheless include cash proceeds arising from the disposition of the property described in (i), (iii) and (iv) above.

The liens granted to the Collateral Agent for the benefit of the DIP Lenders on the Collateral described above are sometimes referred to as the "DIP Liens." For the avoidance of doubt, "MSR Junior Lien Collateral" shall include all collateral that currently secures the MSR Facility, whether or not the MSR Facility is terminated or refinanced.

The DIP Facility will be granted by all Loan Parties an allowed superpriority administrative expense claim ("Superpriority Claim") with priority over all other allowed chapter 11 and chapter 7 administrative expense claims, including expenses of a chapter 11 and chapter 7 trustee, subject and subordinate only to the Carve-Out, under Bankruptcy Code § 364(c)(1).

**Carve-Out :**    The DIP Liens and the Superiority Claim shall be subject to a carve-out for the following items (collectively, the "Carve-Out"): (i) all fees and expenses in an aggregate amount of up to $25,000,000 incurred by professionals of the Debtors and the official committee of unsecured creditors appointed in the Chapter 11 Cases following delivery of a notice (a "Carve-Out Notice") to the Debtors by the Administrative Agent of the occurrence of an Event of Default (the "Professionals Fee Cap"), (ii) allowed unpaid professional fees and disbursements incurred prior to the delivery of the Carve-Out Notice ("Prior Expenses"), (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Bankruptcy Court, and (iv) fees and expenses up to $500,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; *provided*, *however*, that the Carve-Out shall not include professional fees and disbursements incurred in connection with (a) any challenge to the validity, perfection, priority, extent or enforceability of the Loans and the other DIP Obligations under the DIP Facility, or the liens on or security interests securing the DIP Obligations, (b) any investigation or assertion of any other claims or causes of action against any DIP Lender, the Administrative Agent, the Collateral Agent or any other holder of any DIP Obligations, (c) any challenge to the validity, perfection, priority, extent or enforceability of the Existing GSAP Facility, or the liens on or security interests securing the Existing GSAP Facility (but may be used by professionals for any official committee to investigate such matters in an amount not to exceed $100,000), or (d) any act which has the effect of materially or adversely modifying or compromising the rights and remedies of any Agent or any DIP Lender as set forth herein and in the definitive loan documents for the DIP Facility, or which results in the occurrence of an Event of Default. Any payments of allowed professional fees incurred after an Event of Default shall reduce the amount of the Carve-Out by the amount of any such payment.

CONFIDENTIAL

As long as no Event of Default shall have occurred and be continuing and no Carve-Out Notice shall have been delivered, the Debtors shall be permitted to pay compensation and reimbursement of expenses, to the extent permitted by the Bankruptcy Court payable under sections 330 and 331 of the Bankruptcy Code, as the same may be payable, and the amount so paid shall not reduce the Carve-Out, provided that upon delivery of a Carve-Out Notice, the foregoing permission shall be limited to an amount equal to the Prior Expenses plus the Professional Fee Cap.

The provisions set forth in this section and in the previous section (entitled "Collateral / Superpriority Claim") shall be established by the Financing Orders (as defined below).

**Intercreditor Provisions:** The Interim Financing Order and the Final Financing Order (as defined below) shall include intercreditor provisions in form and substance satisfactory to the Administrative Agent, containing subordination terms with respect to the second priority lien of the Collateral Agent on the LOC Junior Lien Collateral and the MSR Junior Lien Collateral.

**Interest Rates:** Revolver: LIBOR + 4.00% per annum.
A-1 Term Loan: LIBOR + 4.00%, with a LIBOR floor of 1.25% per annum.
A-2 Term Loan: LIBOR + 6.00%, with a LIBOR floor of 1.25% per annum.

After the occurrence of an Event of Default, interest on all Loans and all other outstanding amounts will bear interest at a rate equal to 2.00% per annum plus the otherwise applicable rate and shall be payable on demand.

**Unused Line Fees:** The Borrowers shall pay to the Administrative Agent, for the account of the DIP Lenders under the Revolving Facility, an unused line fee calculated at 0.50-0.75% per annum multiplied by the difference between the Revolving Commitments and the aggregate outstanding Revolving Loans during the immediately preceding month, payable monthly in arrears.

**Rate and Fee Basis:** All per annum rates and fees will be computed on the basis of the actual number of days elapsed in the applicable period over a 360-day year, and shall be payable monthly in arrears and upon the maturity or termination of the DIP Facility.

**Other Fees:** The Borrowers shall pay such other fees to the Agents, the Lead Arranger and the DIP Lenders, including upfront fees to the DIP Lenders and an agency fee to the Administrative Agent and a collateral monitoring fee to the Collateral Agent, as set forth in separate fee letters.

**Mandatory Prepayments:** (i) The Borrowers will be required to prepay Revolving Loans within one (1) business day to the extent that aggregate outstanding Revolving Loans exceed the Revolving Commitments, in an amount equal to such excess amount (in cash without any prepayment premium or penalty, but

CONFIDENTIAL

including all LIBOR breakage costs).

(ii) The Borrowers will be required to prepay Revolving Loans and A-1 Term Loans and/or provide cash collateral within one (1) business day to the extent that aggregate outstanding Revolving Loans and A-1 Term Loans exceed the Borrowing Base, in an amount equal to such Borrowing Base shortfall (in cash without any prepayment premium or penalty, but including all LIBOR breakage costs).

(iii) The Borrowers will be required to prepay the Loans and/or provide cash collateral within one (1) business day to the extent that aggregate outstanding Loans exceed the Collateral Amount, in an amount equal to such Collateral Amount shortfall (in cash without any prepayment premium or penalty, but including all LIBOR breakage costs).

All mandatory prepayments pursuant to clause (ii) above shall be applied, first, to prepay amounts owed under the Revolving Facility, and, second to prepay amounts owed under the A-1 Term Loan Facility. All mandatory prepayments pursuant to clause (iii) above shall be applied, first, to prepay amounts owed under the Revolving Facility, second, to prepay amounts owed under the A-1 Term Loan Facility and third, to prepay amounts owed under the A-2 Term Loan Facility; provided that no mandatory prepayment of the A-2 Term Loans shall be made unless (a) all outstanding Revolving Loans and A-1 Term Loans have been paid in full, and (b) all commitments under the Revolving Facility shall have been cancelled.

The Borrowers will also be required to prepay the Loans within one (1) business day with: (i) 100% of the net cash proceeds received from the incurrence of indebtedness by the Loan Parties (other than indebtedness permitted under the DIP Facility); and (ii) 100% of the net cash proceeds of all sales or other dispositions of Collateral by the Loan Parties (including insurance and condemnation proceeds related to such Collateral but excluding any proceeds from any permitted liquidation or short sale, in the ordinary course of servicing, of REO) in which the DIP Lenders have either (A) a first-priority, perfected security interest or (B) a junior, perfected security interest, provided that any senior indebtedness secured by a first-priority, perfected security interest in such Collateral has been repaid in full (or the amounts necessary to satisfy such senior indebtedness in full have been set aside for the benefit of the senior debt holder) and any commitments with respect thereto terminated, or the requisite holders of such indebtedness have consented to the prepayment of Loans with such proceeds.

All mandatory prepayments or repayments pursuant to the immediately preceding paragraph shall be applied, first, to prepay amounts owed under the Revolving Facility, and, second, to prepay amounts owed under the A-1 Term Loan Facility, and third, to prepay amounts owed under the A-2 Term Loan Facility; provided that no mandatory prepayment of the A-2 Term Loans shall be made unless (a) all outstanding Revolving Loans and A-1 Term Loans have been paid in full, and (b) all commitments under the Revolving Facility shall have been cancelled.

CONFIDENTIAL

| | |
|---|---|
| **Optional Prepayments:** | The Loans may be prepaid in whole or in part from time to time without penalty or premium, but including all LIBOR breakage costs, subject to minimum amounts and notice requirements; *provided* that any voluntary prepayment of the Term Loans may not be made unless (a) all outstanding Revolving Loans have been paid in full, and (b) all commitments under the Revolving Facility have been cancelled; *provided further* that any voluntary prepayment of A-2 Term Loans may not be made unless (a) all outstanding Revolving Loans and outstanding A-1 Term Loans have been paid in full, and (b) all commitments under the Revolving Facility shall have been cancelled. |
| **Documentation:** | Definitive loan documentation (collectively, the "<u>Loan Documents</u>"), including a loan agreement, customary security related documentation, customary opinion letters of counsel to the Borrowers and Guarantors, and other agreements and documents related to the foregoing, as to all of the foregoing as mutually agreed, each in form and substance satisfactory to the Administrative Agent and the Borrowers. |
| **Representations and Warranties:** | Representations and warranties generally consistent with the Existing Facilities (to the extent applicable) and customary and appropriate representations and warranties for debtor in possession financings and financings secured by assets of the type included in the Collateral to be made throughout the term of the DIP Facility (subject to exceptions and other qualifications and limitations for materiality to be negotiated), including without limitation: |

(a) all necessary Bankruptcy Court authorizations and orders in connection with the DIP Facility, including without limitation, the Interim Financing Order and, after entry thereof, the Final Financing Order (as defined below) (i) are in full force and effect, not having been vacated, reversed, or stayed, and (ii) have not been amended or modified except as agreed to in writing by the Administrative Agent in its sole discretion;

(b) each of the AFI Cash Collateral Order, the EAF Cash Collateral Order (if applicable) and the MSR Order (each as defined below) (i) is in full force and effect, not having been vacated, reversed, or stayed, and (ii) has not been amended or modified except as agreed to in writing by the Administrative Agent in its sole discretion;

(c) the Sale Order (as defined below), at all times after entry thereof by the Bankruptcy Court, (i) is in full force and effect, not having been vacated, reversed, or stayed, and (ii) has not been amended or modified in any manner that would adversely affect the ability of any Borrower to repay the DIP Obligations in full in cash with the sale proceeds upon consummation of the sale;

(d) due organization, valid existence and good standing; requisite power and authority; qualifications;

827415.18B-New York Server 6A - MSW

CONFIDENTIAL

(e) necessary power, authority and legal right to own the Collateral and grant a security interest on and assign such Collateral;

(f) due authorization, execution and delivery;

(g) capital stock and ownership; accuracy of organizational structure chart;

(h) no conflict with laws or material post-petition obligations;

(i) binding obligation of Loan Documents;

(j) governmental approvals;

(k) no adverse actions by Freddie Mac, Fannie Mae and similar entities, as applicable;

(l) financial statements and projections;

(m) accuracy of Borrowing Base and Collateral Amount reports and other reports and disclosure;

(n) governmental regulation, including margin regulations and Investment Company Act;

(o) no default under the Loan Documents;

(p) no default under other material indebtedness or contracts (other than as a result of those events that customarily occur leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases and the continuation and prosecution thereof);

(q) delivery of specified prepetition indebtedness documents;

(r) taxes;

(s) ownership of property;

(t) compliance with laws;

(u) location of books and records;

(v) representations relating to the Collateral, including identification and scheduling of Eligible Assets, absence of liens and other encumbrances and other third party rights (except as expressly permitted under the Loan Documents), creation, perfection and first priority of DIP Liens on Borrowing Base Collateral;

(w) no (unstayed) adverse proceedings that could result in a Material Adverse Effect (as defined below);

CONFIDENTIAL

(x) Patriot Act;

(y) insurance;

(z) information relating to servicing contracts and servicer advances consistent with the Existing GSAP Facility;

(aa) employee benefit plans and labor matters;

(bb) material contracts and underlying documents relating to the Collateral and notices of modifications or terminations of any of the foregoing; and

(cc) no Material Adverse Effect following the date of the Commitment Letter to which this Term Sheet is attached.

"Material Adverse Effect" means a material adverse effect on and/or a material adverse development with respect to (i) the business, assets, properties, operations, liabilities or condition (financial or otherwise) of (A) either Borrower or (B) the Loan Parties, taken as a whole, in any such case, other than as a result of those events that customarily occur leading up to and following commencement of a proceeding under chapter 11 of the Bankruptcy Code and the Chapter 11 Cases and the continuation and prosecution thereof and provided that nothing disclosed (x) in the Annual Report on Form 10-K of Ally Financial Inc. for the year ended December 31, 2011, or (y) otherwise in writing to the Administrative Agent prior to the execution and delivery of the Commitment Letter to which this Term Sheet is attached, in any such case, shall, in and of itself and based solely on facts as disclosed therein (without giving effect to any developments not disclosed therein), be deemed to constitute a Material Adverse Effect; (ii) the ability of the Loan Parties, taken as a whole, to fully and timely perform the DIP Obligations; (iii) the legality, validity, binding effect or enforceability against a Loan Party of any Loan Document to which it is a party; (iv) the rights, remedies and/or benefits available to, or conferred upon, the Administrative Agent, the Collateral Agent, any DIP Lender or any other holder of DIP Obligations under any Loan Document; or (v) the Collateral, the Collateral Agent's DIP Liens (on behalf of itself, the DIP Lenders and the other holders of DIP Obligations) on the Collateral or the priority of such DIP Liens.

**Covenants**:

In addition to the financial covenants and reporting covenants under the DIP Facility, affirmative and negative covenants generally consistent with the Existing Facilities and customary and appropriate affirmative and negative covenants for debtor in possession financings and financings secured by assets of the type included in the Collateral (subject to exceptions and other qualifications and limitations for materiality to be negotiated), including without limitation:

(a) existence;
(b) payment of taxes and material post-petition obligations;

CONFIDENTIAL

(c)   maintenance of property;

(d)   performance and compliance with Loan Documents, servicing contracts and other underlying documents and contractual exercise of rights and remedies under underlying documents;

(e)   consent to assignment of servicing contracts, subject to permitted exceptions;

(f)   insurance;

(g)   maintenance of books and records; inspection rights, including reasonable access to the financial advisors of the Loan Parties (subject to confidentiality provisions to be set forth in the DIP Loan Agreement);

(h)   compliance with laws;

(i)   security interests; further assurances;

(j)   cash management systems and accounts (including separate cash management systems and accounts for the Borrowers);

(k)   custodial procedures;

(l)   commercially reasonable efforts to obtain a credit rating for the DIP Facility from Standard & Poor's and Moody's within 60 days after the Petition Date;

(m)   certain post-closing collateral matters to be agreed;

(n)   use of proceeds;

(o)   entry of the Final Financing Order (as defined below);

(p)   other covenants relating to servicing;

(q)   maintenance of governmental approvals and consents;

(r)   special covenants relating to the Eligible Assets;

(s)   indebtedness, including, without limitation, (i) a restriction on indebtedness in an aggregate amount not to exceed $600,000,000 (such amount to be reduced dollar for dollar by the amount, if any, by which indebtedness secured by liens on the MSR Junior Lien Collateral exceeds $200,000,000) that is secured by liens on the LOC Junior Lien Collateral that rank senior to or pari passu with the liens of the Collateral Agent, and (ii) a restriction on indebtedness in an aggregate amount not to exceed $200,000,000 (or a greater amount provided that the indebtedness secured by liens on the LOC Junior Lien Collateral is concurrently reduced by an amount equal to the amount by which indebtedness secured by liens on the MSR Junior Lien Collateral exceeds $200,000,000) that is secured by liens on the MSR Junior Lien Collateral that rank senior to or pari passu with the liens of the Collateral Agent;

(t)   liens, encumbrances and other rights of third parties, including, without limitation, (i) a restriction on liens on the LOC Junior Lien Collateral that rank senior to or pari passu with the liens of the Collateral Agent other than Ally's liens on the collateral securing the Ally Line of Credit and any adequate protection replacement liens on the LOC Junior Lien Collateral granted in relation thereto, such liens securing obligations in an aggregate amount not to exceed $600,000,000 (such amount to be reduced dollar for dollar by the amount, if any, by which indebtedness secured by liens on the MSR Junior Lien Collateral exceeds $200,000,000), and (ii) a restriction on liens on the MSR Junior

CONFIDENTIAL

Lien Collateral that rank senior to or pari passu with the liens of the Collateral Agent other than the liens of Citibank (or a replacement lender under a refinancing facility acceptable to the Administrative Agent) on the collateral securing the MSR Facility and any adequate protection replacement liens on the MSR Junior Lien Collateral granted to Citibank in relation thereto, such liens securing obligations in an aggregate amount not to exceed $200,000,000 (or a greater amount provided that the indebtedness secured by liens on the LOC Junior Lien Collateral is concurrently reduced by an amount equal to the amount by which indebtedness secured by liens on the MSR Junior Lien Collateral exceeds $200,000,000);

(u)   negative pledges;

(v)   restricted payments, other than those authorized in any "first day" or "second day" order reasonably acceptable to the Administrative Agent;

(w)   restrictions on subsidiary distributions;

(x)   investments (including acquisitions), loans and advances;

(y)   fundamental changes, including mergers, consolidations, liquidations and dissolutions;

(z)   affiliate transactions;

(aa)  amendments to agreements;

(bb)  optional payments and modifications to certain debt instruments and the Sale Agreement (as defined below);

(cc)  changes in fiscal year;

(dd)  hedging arrangements;

(ee)  dispositions and sales of Collateral or entering into any agreement to dispose or sell Collateral (only permitted if (A) pursuant to and in accordance with the terms of the Sale Agreement and the net proceeds shall be applied as required under the mandatory prepayment provisions of the DIP Loan Agreement, (B) such dispositions or sales constitute liquidations and/or short sales, in the ordinary course of servicing, of REO or (C) (i) both immediately prior and after giving effect to any such disposition or sale and any prepayments of DIP Obligations required to be made under the DIP Loan Agreement, no default or Event of Default shall exist or result therefrom, (ii) the consideration received for such assets shall be at least equal to the greater of fair market value (determined in good faith by the governing bodies of the Borrowers) and an amount determined based on the highest advance rates applicable to such assets (calculated on an aggregate basis for the assets in each transaction) under the DIP Facility, (iii) 100% of such consideration shall be paid in cash, and (iv) the net proceeds shall be applied as required under the mandatory prepayment provisions of the DIP Loan Agreement; *provided,* that the proceeds of all dispositions and sales of Borrowing Base Collateral (other than pursuant to clause (A) or (B) above) shall not exceed $25,000,000 in the aggregate from and after the Closing Date);

(ff)  continuation of employment of certain existing senior officers (to

827415.18B-New York Server 6A - MSW

be agreed upon and identified in the Loan Documents), or suitable replacement senior officers reasonably acceptable to the Administrative Agent;

(gg)  other superpriority claims;

(hh)  appointment of subservicers;

(ii)   defense and protection of the Collateral;

(jj)   no rejection by the Debtors of any servicing contract;

(kk)  no material changes to the Servicing Practices (to be defined, but in any case, to include modification programs, other than as set forth in any "first day" or "second day" order reasonably acceptable to the Administrative Agent) without prior approval of the Required Lenders (any such changes that would adversely affect the rights of the Administrative Agent, the Collateral Agent or any DIP Lender shall be deemed material, other than any material changes authorized in any "first day" or "second day" order reasonably acceptable to the Administrative Agent);

(ll)   servicing fees for Eligible Mortgage Loans shall not exceed 0.25% per annum of the outstanding principal balance of Eligible Mortgage Loans; and

(mm) special purpose entity restrictions (excluding bankruptcy remoteness) for the Borrowers.

**Financial Covenants:**

(a)  The Borrowers shall be required to perform against the Approved DIP Budget (as defined below), subject to aggregate variances on net cash flows (excluding servicing advances) of 20% measured every four (4) calendar weeks;

(b)  The Borrowers shall at all times maintain minimum liquidity of $50,000,000 in the aggregate (including, except during a Dominion Period or during the continuance of an Event of Default, amounts in the Concentration Account); and

(c)  The minimum liquidity of ResCap, on a consolidated basis with its subsidiaries (including the Borrowers), shall not be (i) less than $250,000,000 in the aggregate for four (4) consecutive business days or (ii) less than $75,000,000 in the aggregate at any time.

**Cash Dominion:**

With respect to the Concentration Account and the Borrower Accounts, the applicable depository institution and the Collateral Agent shall execute and deliver an account control agreement in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent, which shall provide, among other things, for such depository institution's agreement that, upon delivery by the Collateral Agent of a Dominion Notice (as defined below) to such depository institution, it will comply with instructions originated by the Collateral Agent directing the disposition of the funds in the deposit account without further consent by any Loan Party (such period of compliance, the "Dominion Period"). A "Dominion Notice" means a written notice from the Collateral Agent to the applicable depository institution that activates the Dominion Period. Unless the Administrative Agent is otherwise directed by DIP Lenders representing more than 66-2/3% of the aggregate commitments under the

CONFIDENTIAL

Revolving Facility, the Administrative Agent shall direct the Collateral Agent to send, and the Collateral Agent shall send, a Dominion Notice to the depository institutions at any time on or after the date of entry of the Final Financing Order that an Event of Default has occurred and is continuing; *provided that* if such Event of Default has been cured or waived, as applicable, then the Administrative Agent shall promptly direct the Collateral Agent to deliver, and the Collateral Agent shall promptly deliver, notice to the depository institutions that terminates the Dominion Period (a "Dominion Cancellation Notice"); *provided that* upon the third commencement of a Dominion Period, then notwithstanding satisfaction of the applicable criteria set forth in the immediately preceding proviso, the Administrative Agent shall not be required to direct the Collateral Agent to send a Dominion Cancellation Notice and the Collateral Agent shall not send a Dominion Cancellation Notice unless so directed by the Administrative Agent, and the Dominion Period shall continue until all obligations under the DIP Facility have been paid in full and all Commitments have been terminated.

During any Dominion Period, all funds in the Concentration Account and the Borrower Accounts will be swept on a daily basis into the Collection Account over which the Collateral Agent will have sole dominion and control, and all funds in the Collection Account will be applied (upon not less than five (5) days notice) first, to the amounts owing in respect of the Revolving Facility (including without limitation, fees, indemnities, and expense reimbursements); second, to amounts owing in respect of the A-1 Term Loan Facility (including without limitation, fees, indemnities, and expense reimbursements); and third, to amounts owing in respect of the A-2 Term Loan Facility (including without limitation, fees, indemnities, and expense reimbursements).

**Financial Reporting and Other Reporting Requirements:**

The Borrowers will provide on an as-requested basis other information reasonably requested by the Administrative Agent or the DIP Lenders, including reports and information respecting ResCap's and its subsidiaries' business, financial condition or prospects. All financial statements shall be prepared on a consolidated basis in accordance with generally accepted accounting principles in the United States ("US GAAP") applied on a basis consistent with prior periods (except as otherwise disclosed in such financial statements).

In addition to the monthly operating reports required under the United States Trustee Guidelines, the Borrowers will prepare (as applicable) and deliver to the Administrative Agent and the DIP Lenders:

(a) within thirty (30) days of the end of each of ResCap's fiscal months, a comparative unaudited consolidated balance sheet and income statement for ResCap and its subsidiaries in accordance with US GAAP for such fiscal month, together with such other information as the Administrative Agent may reasonably request, in each case in form and substance reasonably acceptable to the Administrative Agent;

CONFIDENTIAL

(b) within ninety (90) days after the end of each fiscal year, a comparative unaudited consolidated balance sheet and income statement for ResCap and its subsidiaries for such fiscal year, including such variance analysis as is consistent with the reports prepared for the audit committee of ResCap's board of directors; *provided* that to the extent audited consolidated ResCap financial statements are otherwise required, such audited financial statements shall be provided promptly following completion thereof;

(c) within forty-five (45) days after the end of each fiscal quarter, a comparative unaudited consolidated balance sheet and income statement for ResCap and its subsidiaries for such fiscal quarter, including such variance analysis as is consistent with the reports prepared for the audit committee of ResCap's board of directors; *provided* that to the extent any financial statements for such fiscal quarter have been provided to ResCap's noteholders or other creditors, such financial statements shall be provided concurrently to the Administrative Agent and the DIP Lenders;

(d) beginning on the first Monday immediately following five (5) weeks after the Closing Date (or if the Closing Date is a Monday, beginning five (5) weeks after the Closing Date), as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) business day following each four-week period ended six (6) business days prior to such date, (i) an updated 20-week cash flow forecast on a line item basis of cash receipts, disbursement and net cash flows, each as to the Borrowing Base Collateral, as well as Eligible Receivables, Eligible Mortgage Loans, Eligible FNMA Advance Reimbursements, and loan balances for the immediately following consecutive 20 weeks, set forth on a weekly basis, in form and substance acceptable to the Required Lenders (as used herein, the "Approved DIP Budget" means the Initial Approved DIP Budget (as defined below) or any such budget, as it replaces the Initial Approved DIP Budget or any other budget, as applicable) and (ii) a variance report showing actual net cash flows for the four (4) week period (the "4-Week Variance Report") ended six (6) business days prior to such date, noting aggregate variances (excluding servicing advances) from the Approved DIP Budget and otherwise providing the information required to be included in the 2-Week Variance Report (as defined below);

(e) beginning on the first Monday immediately following three (3) weeks after the Closing Date (or if the Closing Date is a Monday, beginning three (3) weeks after the Closing Date), a bi-weekly variance report (the "2-Week Variance Report"), as soon as available, but not later than 1:00 p.m. (New York City time) on the sixth (6th) business day following the two-week period ended six (6) business days prior to such date, for each prior two (2) week period included in the relevant Approved DIP Budget delivered

CONFIDENTIAL

pursuant to clause (d) above (x) showing, for such two-week period, actual results for the following, noting therein aggregate variances from amounts set forth for the two-week period in the relevant Approved DIP Budget: (A) net cash flow on a line item basis, (B) loan balances, (C) disposals of Eligible Assets and (D) any transfer, expiration or other loss of all or any part of any Servicing Contract; and (y) setting forth an explanation for all material variances; *provided*, however, the Borrowers shall not be required to provide a 2-Week Variance Report on any date on which they provide a 4-Week Variance Report;

(f) Borrowing Base and Collateral Amount reports related to the Borrowing Base Collateral consistent with the reporting provided in the draft DIP projections dated March 12, 2012 (the "Draft DIP Projections") and in form and substance reasonably acceptable to the Administrative Agent, (i) on a weekly basis beginning on the first Monday immediately following two (2) weeks after the Closing Date (or if the Closing Date is a Monday, beginning two (2) weeks after the Closing Date), as soon as available but not later than the sixth (6th) business day following the one-week period ended six (6) business days prior to such date, and (ii) within three (3) business days of any time any Borrower becomes aware that the Borrowing Base or the Collateral Amount, assuming it were calculated at such time, is less than 85% of the Borrowing Base or the Collateral Amount, respectively, calculated in the most recently delivered report;

(g) the Monthly Report and other information and reports to be determined, including a monthly report on payments to and receipts from AFI (as soon as available, but not later than the fifteenth (15th) business day of each calendar month);

(h) all reports and notices provided to AFI under the Ally Line of Credit relating to the LOC Junior Lien Collateral, in any case no less frequently than once per month, and every four (4) weeks, updated asset balance roll-forward projections consistent with those contained in the Draft DIP Projections;

(i) all reports and notices provided to Citibank under the MSR Facility relating to the MSR Junior Lien Collateral, in any case no less frequently than once per month, and every four (4) weeks, updated asset balance roll-forward projections consistent with those contained in the Draft DIP Projections;

(j) weekly updates from the Borrowers regarding the status of the Debtors' sale process and such other issues as may be reasonably requested by the Administrative Agent;

(k) notices of any changes of certain senior officers (to be identified in the Loan Documents);

827415.18B-New York Server 6A - MSW

CONFIDENTIAL

(l)   notices of any Material Adverse Effect and material events, as well as of the occurrence of any Default or Event of Default;

(m)   copies of notices from Fannie Mae, Freddie Mac, the FDIC, the U.S. Department of Justice, any state attorney general and other relevant agencies and governmental authorities to be agreed, including any notices of circumstances or events that could reasonably be expected to entitle any agency or governmental authority to revoke or suspend applicable approvals;

(n)   notices of other events relating to servicing arrangements or activities that could reasonably be expected to have a Material Adverse Effect;

(o)   notice of appointment of any subservicers; and

(p)   other reports and notices consistent with the Existing Facilities (to the extent applicable).

ResCap and the Borrowers shall make themselves available to discuss financial issues and issues regarding the restructuring with the Administrative Agent and the DIP Lenders on a bi-weekly basis. In addition, ResCap's and the Borrowers' management shall make themselves available for telephonic and in person meetings, on reasonable notice under the circumstances, to provide additional financial and restructuring information to the Administrative Agent and the DIP Lenders.

**Events of Default**:   Events of default (each, an "Event of Default") generally consistent with the Existing Facilities (to the extent applicable) and other customary and appropriate events of default for debtor in possession financings and financings secured by assets of the type included in the Collateral (subject to exceptions and other qualifications and limitations for materiality to be negotiated), including, without limitation:

(a)   any failure by the Loan Parties to (i) pay principal amounts under any Loans when due and payable, (ii) pay interest on any Loans when due and payable and the continuance of such failure to pay interest for three (3) business days, or (iii) make any other payment, deposit or remittance to be made by any Loan Party under any Designated Servicing Agreement (subject to any cure periods provided therein) or any Loan Document and the continuance of such failure to pay such other amounts for three (3) business days;

(b)   material inaccuracy of any representations or warranties made or deemed to have been made by any Loan Party or its subsidiary under any of the Loan Documents;

(c)   failure to satisfy the Borrowing Base or Collateral Amount maintenance requirements at any time and failure to remedy any

CONFIDENTIAL

Borrowing Base or Collateral Amount deficiency within one (1) business day;

(d)  any breach of certain affirmative covenants to be agreed upon, any negative covenant or any financial covenant under the DIP Loan Agreement;

(e)  (i) failure to deliver a Borrowing Base and Collateral Amount certificate within two (2) business days after the date it was due or (ii) failure to satisfy the reporting requirements (other than with respect to the delivery of Borrowing Base and Collateral Amount certificates) under the Loan Documents that continues unremedied for a period of five (5) business days after the date it was due;

(f)  any failure to perform or observe any term, covenant or agreement under the Loan Documents that is not otherwise specified as an Event of Default and that remains unremedied for fifteen (15) days;

(g)  any Loan Document ceases to be in full force and effect;

(h)  issues with enforceability of and validity of guaranties, collateral documents or other credit documents;

(i)  any event of default, early amortization event, termination event or other similar event (other than as a result of the commencement of the Chapter 11 Cases) shall occur under any material document or agreement that relates to the Collateral and such event could reasonably be expected to be materially adverse to the rights and interests of the Administrative Agent or the DIP Lenders;

(j)  any failure by any Loan Party or its subsidiaries to observe or perform certain specified covenants or agreements under any document or agreement that relates to the Collateral (subject to any cure periods provided therein);

(k)  the occurrence of certain adverse events or failures relating to servicing activities and servicing rights ownership, including, without limitation, termination of servicing rights in Servicing Contracts;

(l)  any liens, claims and other interests created by the Financing Orders shall cease to be valid, perfected and enforceable and of the same priority purported to be created thereby or any Loan Party or any of its affiliates shall challenge in any action the validity, perfection, enforceability or priority thereof;

(m)  dissolution;

(n)  certain ERISA events;

CONFIDENTIAL

(o)    dismissal of any of the Chapter 11 Cases (or any Loan Party or any of its affiliates seeking or supporting such dismissal) or conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or any Loan Party or any of its affiliates seeking or supporting such conversion);

(p)    appointment of a trustee (or comparable person) or a responsible officer or examiner with expanded powers (or any Loan Party or any of its affiliates seeking or supporting such appointment);

(q)    entry of an order granting relief from the automatic stay as to any Collateral, individually or in the aggregate with respect to any such other orders, with a value in excess of an amount to be agreed (or any Loan Party or any of its affiliates seeking or supporting such relief);

(r)    a court shall enter an order amending, supplementing, staying, vacating or otherwise modifying any Financing Order except as otherwise agreed to in writing by the Administrative Agent in its sole discretion and reasonably acceptable to the Lead Arranger (or any Loan Party or any of its affiliates applying for authority to do so) or a Financing Order shall cease to be in full force and effect; provided that no event of default shall occur to the extent that any such amendment, supplement or other modification is made in compliance with the Loan Documents and is not adverse, in the reasonable judgment of the Administrative Agent, to the rights and interests of the Administrative Agent and DIP Lenders;

(s)    one or more judgments for payment of money on a post-petition liability or debt in excess of an amount to be agreed;

(t)    pre-petition payments (other than as permitted by the Interim Financing Order, Final Financing Order or any "first day" or "second day" order, which "first day" or "second day" orders permitting any such payment are in form and substance satisfactory to the Administrative Agent) or as otherwise (i) ordered by the Bankruptcy Court and (ii) agreed to in writing by the Administrative Agent in its sole discretion;

(u)    non-compliance by any Loan Party with the terms of (i) the Interim Financing Order or Final Financing Order or (ii) any other order of the Bankruptcy Court (x) authorizing the use of cash collateral, (y) approving debtor-in-possession financing, or (z) granting adequate protection;

(v)    any event of default shall occur (after giving effect to any applicable grace periods) under any other debtor-in-possession financing facility provided to the Debtors or other postpetition material indebtedness of the Debtors;

(w)    a change of control (to be defined, but which shall, without

CONFIDENTIAL

limitation, include a change of control with respect to the direct and indirect ownership of the equity interests of each of the Borrowers);

(x)     suspension by a Loan Party of operation of its business, subject to exceptions and materiality qualifiers to be agreed;

(y)     the Sale Agreement is terminated, rescinded or revoked and is not replaced within sixty (60) days after such termination, rescission or revocation by another asset purchase agreement reasonably acceptable to the Administrative Agent and approved by an order of the Bankruptcy Court;

(z)     entry of a Bankruptcy Court order granting any superpriority claim (or claim of equivalent status) that is senior or pari passu with the claims under the DIP Facility or any lien or security interest that is senior to or pari passu with the liens and security interests securing the DIP Facility (or any Loan Party seeking or supporting such grant), except (i) for the Carve-Out, (ii) as expressly permitted by the DIP Facility, (iii) for the adequate protection replacement liens granted to AFI on account of the Ally Line of Credit on the collateral securing the Ally Line of Credit, which shall remain senior to the DIP Liens with respect to such collateral pools and (iv) for the adequate protection replacement liens granted to Citibank on account of the MSR Facility on the collateral securing the MSR Facility, which shall remain senior to the DIP Liens with respect to such collateral pools;

(aa)    (i) failure of the Sale Order to provide that the DIP Obligations will be repaid in full at the closing of the sale approved by the Sale Order, or (ii) failure of the DIP Obligations to be repaid in full at the closing of the sale approved by the Sale Order;

(bb)    any Loan Party or any of its affiliates shall seek to, or support any other person's motion or pleading to, (i) disallow the claims of any DIP Lender or challenge the liens held by the Collateral Agent or (ii) oppose a motion by any DIP Lender or any Agent to confirm its claims or liens, or, in any case of the foregoing, the Bankruptcy Court enters a final order granting such relief;

(cc)    entry of an order authorizing recovery from the Collateral for any cost of preservation or disposition thereof, under section 506(c) of the Bankruptcy Code or otherwise, other than as may be provided in the Financing Orders, or certain de minimus amounts or with the consent of the Administrative Agent; and

(dd)    filing of a motion, pleading or proceeding by any Loan Party or any of its affiliates that could reasonably be expected to have a Material Adverse Effect, or a determination by a court of competent jurisdiction with respect to any motion, pleading or proceeding brought by another party that could reasonably be

CONFIDENTIAL

expected to have a Material Adverse Effect.

**Remedies:**

Upon the occurrence and during the continuation of an Event of Default, the Administrative Agent and the Collateral Agent shall have customary remedies, including without limitation, one or more of the following: (i) reduce the amount of or terminate any outstanding commitments to make Loans or otherwise extend credit under the DIP Facility; (ii) charge the default rate of interest on the Loans; (iii) declare a portion or the entirety of the Loans to be due and payable; and (iv) upon five (5) days' written notice to the Borrowers and counsel to any court appointed committees and the office of the U.S. Trustee (the "Remedies Notice Period"), the automatic stay shall be deemed lifted, without further order of or application to the Bankruptcy Court, to permit the Collateral Agent to realize on all other Collateral and to exercise any and all remedies under the Loan Documents and, subject to any intercreditor rights with respect to Junior Lien Collateral, to set off or seize amounts in any bank accounts that are a part of the Collateral that are maintained with or under the control of the Collateral Agent, the Administrative Agent or any DIP Lender.  In addition, upon the occurrence and during the continuation of an Event of Default, the Collateral Agent, without notice, may exercise its remedies under the control agreements with respect to the Collection Account, the Concentration Account and the Borrower Accounts at the direction of the Administrative Agent to block withdrawals by the Borrowers, *provided*, that the Collateral Agent must provide five (5) days' notice before application of any amounts in such accounts to the DIP Obligations.

In any hearing before the Bankruptcy Court within the Remedies Notice Period, the only issue that may be raised by the Debtors and any party in interest, or considered by the Bankruptcy Court, shall be whether an Event of Default has occurred.

**Conditions Precedent to Initial Borrowings:**

Usual and customary conditions precedent for debtor in possession financing facilities (including, without limitation, no violation or conflicts, governmental, board and third party approvals, absence of material litigation and compliance with the USA Patriot Act), and such additional conditions precedent for the initial borrowing as the Administrative Agent shall deem appropriate, including those conditions set forth on Exhibit B hereto.

**Ongoing Conditions to Each Borrowing:**

Conditions to each extension of credit will include, without limitation:

(a)    the accuracy in all material respects of all representations and warranties in the Loan Documents (including, without limitation, the Material Adverse Effect and litigation representations);

(b)    there being no default or Event of Default in existence at the time of, or after giving effect to the making of, such extension of credit;

(c)    after giving effect to the extensions of credit requested, (i) the

CONFIDENTIAL

aggregate outstanding amount of Revolving Loans shall not exceed the Revolving Commitments; (ii) the aggregate outstanding amount of Revolving Loans and A-1 Term Loans shall not exceed the Borrowing Base; and (iii) the aggregate outstanding amount of Loans shall not exceed an amount equal to the lesser of (A) the Collateral Amount and (B) the aggregate amount of Loans authorized by the Interim Financing Order or Final Financing Order, as applicable;

(d)    not later than forty-five (45) days after the entry of the Interim Financing Order, the Bankruptcy Court shall have entered a Final Financing Order in form and substance satisfactory to the Lead Arranger in its sole discretion;

(e)    the availability of Loans under the Borrowing Base and the Collateral Amount (supported by a Borrowing Base and Collateral Amount certificate dated as of the borrowing date, which certificate will reflect (i) cash balances in the Borrower Accounts and the Concentration Account as of the end of the preceding business day, (ii) a calculation of the Book Value of Eligible Receivables and Eligible FNMA Advance Reimbursements as of the end of the preceding business day, and (iii) a calculation of the Market Value of Eligible Mortgage Loans as of the date of the most recent Borrowing Base and Collateral Amount report provided to the Administrative Agent and the DIP Lenders, updated to reflect any Eligible Mortgage Loans that have been added, liquidated or paid off as of the end of the preceding business day, as described in clause (f) of the section above entitled "~~Financial Reporting and Other Reporting Requirements~~");

(f)    prior written notice of the request for the Loan in accordance with the procedures set forth in the Loan Documents; and

(g)    the Interim Financing Order or the Final Financing Order, as the case may be, shall be in full force and effect, and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion and reasonably acceptable to the Lead Arranger.

**Assignments:**    The DIP Lenders may assign all, or in an amount of not less than $5,000,000, any part of, their respective shares of the DIP Facility to their affiliates or one or more banks, financial institutions or other entities that are eligible assignees (to be described in the Loan Documents) which (other than in the case of assignments made by or to Barclays Bank) are acceptable to the Administrative Agent and (prior to the occurrence of a Default) the Borrowers, such consent not to be unreasonably withheld or delayed; provided that such assignment is permitted under the Eligible Servicing Agreements; provided further that neither AFI nor any Disqualified Assignee shall be an eligible assignee without the consent of

827415.18B-New York Server 6A - MSW

CONFIDENTIAL

the Borrowers.  Upon such assignment, such affiliate, bank, financial institution or entity will become a DIP Lender for all purposes under the Loan Documents; provided, that assignments made to affiliates and other DIP Lenders will not be subject to the above described consent or minimum amount requirements.

**Voting**:                    Amendments, waivers and consents with respect to the Loan Documents shall require the approval of the Borrowers and DIP Lenders holding not less than a majority of the commitments and loans under the DIP Facility ("Required Lenders"), except that:

(a) the consent of each DIP Lender affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of maturity of any loan or reduce the amount or extend the payment date for, any required mandatory payments, (ii) reductions in the rate of interest or any fee or extensions of any due date thereof (provided that waivers of defaults or events of defaults or waivers of default interest shall not be deemed to be a reduction in the rate of interest or any fee under the loan documents) and (iii) increases in the amount or extensions of the expiry date of any DIP Lender's commitment;

(b) the consent of each DIP Lender shall be required to (i) modify the pro rata sharing requirements of the Loan Documents, (ii) permit any Loan Party to assign its rights under the DIP Facility, (iii) modify any of the voting percentages, (iv) release any Guarantor, except as otherwise permitted in the Loan Documents, or (v) release all or substantially all of the Collateral;

(c) amendments of the financial covenants (and definitions used therein) or the definition of availability under the Revolving Facility shall require the consent of (i) DIP Lenders holding a majority of the Revolving Loans and Revolving Commitments and (ii) DIP Lenders holding a majority of the outstanding Term Loans;

(d) the consent of each DIP Lender under the Revolving Facility shall be required to increase the advance rates or the Trigger Advance Rate or to add additional categories of assets to the definition of Eligible Assets.  Any other amendments to the definition of Borrowing Base or Collateral Amount (and definitions used therein) in a manner adverse to the interests of the DIP Lenders or in a manner that would make more credit available to any Borrower will require the consent of (i) DIP Lenders holding more than 66-2/3% of the aggregate amount of Revolving Loans and Revolving Commitments and (ii) DIP Lenders holding a majority of the outstanding Term Loans; and

(e) the consent of DIP Lenders holding a majority of outstanding Loans and Commitments of any class shall be required with respect to any amendment that by its terms adversely affects the

                                    rights of such class in respect of payments under the Loan
                                    Documents in a manner different than such amendment affects
                                    other classes.

**Miscellaneous:**                  Cost and yield protection, indemnification, breakage, tax gross-up, reserve
                                    requirement and expenses provisions customary and appropriate for
                                    facilities and transactions of this type.

**Governing Law and**               New York, except to the extent governed by the Bankruptcy Code.
**Jurisdiction:**

**Counsel to Lead**                 Skadden, Arps, Slate, Meagher & Flom LLP.
**Arranger and**
**Administrative Agent:**

CONFIDENTIAL

Exhibit A

## **Eligible Receivables**

Under the related receivables sale agreements (each, a "Receivables Sale Agreement"), certain specified pooling and servicing agreements, sale and servicing agreements or servicing agreements ("Servicing Agreements" or "Servicing Contracts") for the 238 residential mortgage-backed securitization trusts included in the Existing GSAP Facility (the "MBS Trusts") for which GMACM or RFC is the Servicer or subservicer will be designated as servicing agreements for which the related Receivables have been sold and contributed to the Borrowers pursuant to the Interim Financing Order and will be financed under the DIP Facility ("Designated Servicing Agreements").

An "Eligible Servicing Agreement" must contain an effective provision allowing for the assignment or pledge of the Servicer's rights to be reimbursed for certain advances ("Advances") under such Servicing Agreement and must meet certain other eligibility criteria to be determined, which shall be consistent with the terms and conditions under the Existing GSAP Facility.

The Advances will generally consist of (1) scheduled payments of principal and interest that have not been timely paid by mortgagors, (2) expenses associated with the preservation of a mortgaged property, including but not limited to property taxes, insurance premiums or other property-related expenses that have not been timely paid by mortgagors and (3) costs and expenses incurred in foreclosing upon, preserving and selling mortgaged properties, including but not limited to attorneys' and other professional fees and expenses incurred in connection with the foreclosure and liquidation or other proceedings arising in the course of servicing the mortgage loans.

An "Eligible Receivable" will be a Receivable created under a Designated Servicing Agreement that is an Eligible Servicing Agreement, and as to which the related representations and warranties are true and correct, and at the time the related Advance was made, it was reasonably determined by the Servicer to (i) be ultimately recoverable from the proceeds of the related mortgage loan, related liquidation proceeds or otherwise from the proceeds of or collections on the related mortgage loan and (ii) comply with all requirements for reimbursement under the related Designated Servicing Agreement, and was authorized pursuant to the terms of the related Servicing Agreement.  In addition, such Receivable (i) must constitute a "general intangible" or an "account" within the meaning of Section 9-102(a)(42) or Section 9-102(a)(2) (or the respective corresponding provision in effect in a particular jurisdiction) of the UCC in all applicable jurisdictions, (ii) must be denominated in U.S. dollars and is payable in the United States, (iii) all right, title and interest in and to such Receivable shall have been validly sold and/or contributed by GMACM or RFC to the GMACM Borrower or the RFC Borrower, respectively, (iv) as of the date such Receivable was acquired by GMACM or RFC, neither GMACM nor RFC had (A) taken any action that would impair the right, title and interest of the Collateral Agent therein, or (B) failed to take any action that was necessary to avoid impairing the Collateral Agent's right, title and interest therein; (v) the Advance related to such Receivable has been fully funded by GMACM or RFC using its own funds and/or amounts held for future distribution (to the extent permitted under the related Servicing Agreement) at least 24 hours before the related Payment Date (to be defined), and (vi) on the related Payment Date, all conditions precedent set forth in the transaction documents for funding have been satisfied with respect to such Receivable.

Although Receivables that are not Eligible Receivables will not generate borrowing capacity under the Borrowing Base, all receivables originated by GMACM and RFC (eligible and ineligible) will be required to be sold to the Borrowers.

Ex. A-1

CONFIDENTIAL

## Eligible FNMA Advance Reimbursements

"Eligible FNMA Advance Reimbursements" constitute reimbursement rights for advances that are grouped into the following three categories that comprise all of the following outstanding advances (collectively, "Eligible Advances") required to be made by GMACM under the Fannie Mae Servicing Guide with respect to the mortgage loans serviced by GMACM ("Mortgage Loans"): (i) P&I Delinquency Advances (to be defined)), including Foreclosure Advances (a "Foreclosure Advance" is an advance of principal required to be remitted to an MBS trust as the result of an action taken during the preceding month with respect to a property reported under Fannie Mae Action Codes 70, 71 or 72, in any such case at the start of the month in which the advance is due); (ii) T&I Escrow Advances (to be defined); and (iii) Advances qualifying as Corporate Servicing Advances (to be defined) (each a "Corporate Servicing Advance ").

As a condition to any reimbursement rights for Eligible Advances qualifying as Eligible FNMA Advance Reimbursements, the Agents shall have received an agreement from Fannie Mae, in form and substance satisfactory to the Administrative Agent (including with respect to a subordination of Fannie Mae's rights to setoff and recoupment under the Fannie Mae Servicing Contracts to the DIP Obligations), which shall, among other things, acknowledge Collateral Agent's security interest in the Eligible FNMA Advance Reimbursements, or other arrangements shall have been made satisfactory to the Administrative Agent.

"Fannie Mae Contracts" means the Mortgage Selling and Servicing Contracts between GMACM and Fannie Mae, the applicable Master Commitments between GMACM and Fannie Mae, and the applicable Schedules of Mortgages (Form 2005), in each case, as such agreements may be amended, amended and restated, supplemented or otherwise modified from time to time.

## Eligible Mortgage Loans

"Eligible Mortgage Loan" means a mortgage loan secured by a first or second lien mortgage on a one to four family residential property and (i) as to which the representations and warranties set forth in the DIP Loan Agreement including the representations and warranties relating to such mortgage loans set forth in Exhibit B to the Existing Ally Repo are correct as of each date on which Loans are outstanding under the DIP Facility and (ii) which is, in the sole discretion of the Administrative Agent eligible for sale to a prudent third party investor in mortgage loans in the secondary market.

CONFIDENTIAL

Exhibit B

## Conditions Precedent to Borrowings under the DIP Facility

**Initial Conditions to Term Loans and Initial Revolving Loans:**

The availability of the Term Loans and up to $150,000,000 in aggregate principal amount of Revolving Loans (the "Initial Revolving Loans") shall be conditioned upon satisfaction (or waiver) of the following conditions precedent:

(a) The Loan Parties shall have each commenced the Chapter 11 Cases in the Bankruptcy Court under the Bankruptcy Code by no later than May 18, 2012.

(b) No trustee or examiner with expanded powers pursuant to section 1104(c) of the Bankruptcy Code, shall have been appointed or designated with respect to any Borrower or any Guarantor or their respective business, properties or assets.

(c) All of the "*first day*" and "*second day*" orders entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases shall be in form and substance reasonably satisfactory to Administrative Agent.

(d) The Loan Parties shall have executed and delivered satisfactory definitive financing documentation with respect to the DIP Facility, including a credit agreement, guarantees and other customary legal documentation mutually satisfactory to the Borrowers and the DIP Lenders.

(e) The DIP Lenders, the Agents and the Lead Arranger shall have received all fees required to be paid, and all expenses for which invoices have been presented, on or before the Closing Date.

(f) All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations of ResCap and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect.

(g) The Administrative Agent and the DIP Lenders shall have received (i) the audited consolidated financial statements of ResCap for the two most recent fiscal years ended prior to the Closing Date as to which such financial statements are available, (ii) unaudited interim consolidated financial statements of ResCap for each monthly period and quarterly period ended subsequent to the date of the latest financial statements delivered pursuant to clause (i) of this paragraph and at least thirty (30) days prior to the Closing Date, and (iii) a reasonably detailed receipts and disbursements forecast for the Borrowers on a line item basis in form and substance acceptable to the Administrative Agent and the Required Lenders for the 20 weeks commencing with the week that

CONFIDENTIAL

includes the Petition Date (the "Initial Approved DIP Budget").

(h)    The Administrative Agent shall have received such closing documents as are customary for transactions of this type or as it may reasonably request, including but not limited to resolutions, good standing certificates in each Loan Party's jurisdiction of organization, incumbency certificates, flood insurance certificates and related endorsements (to the extent required by applicable law), customary opinions of counsel, organizational documents, other information required by bank regulatory authorities under applicable "*know-your-customer*" and anti-money laundering rules and regulations, including the Patriot Act, all in form and substance reasonably acceptable to the Administrative Agent.

(i)    The Administrative Agent shall have received (i) valuations of the Eligible Mortgage Loans included in the Borrowing Base as specified by the Administrative Agent from independent appraisers satisfactory to the Administrative Agent engaged directly by the Administrative Agent and (ii) if the EAF Commitments have not been terminated, an initial verification agent report on the servicing advance and reimbursement procedures and practices with respect to Eligible FNMA Advance Reimbursements included in the Borrowing Base, which valuations and report shall be in form and substance satisfactory to the Administrative Agent.

(j)    The Administrative Agent shall have received a Borrowing Base and Collateral Amount certificate as of a date as recent as reasonably practicable (or if available, no more than seven (7) business days prior to the most recent Saturday prior to the Closing Date) with customary supporting documentation and supplemental reporting to be agreed upon between the Administrative Agent and the Borrowers, which Borrowing Base and Collateral Amount certificate shall calculate the pro forma Borrowing Base and Collateral Amount (after giving effect to the amounts to be borrowed on the Closing Date).

(k)    Substantially concurrently with the initial borrowings under the Term Loan Facilities, repayment in full of all obligations under the Existing Facilities, termination of the commitments thereunder and release of all liens, if any, granted thereunder (with such prepayment in full, termination and release being evidenced by payoff letters reasonably acceptable to the Administrative Agent or, if such letters are not available, appropriate provisions in the Interim Financing Order confirming such terminations and releases), which repayment shall be made with the initial borrowings under the Term Loan Facilities.

(l)    Compliance with all applicable requirements of Regulations U, T and X of the Board of Governors of the Federal Reserve

CONFIDENTIAL

System.

(m)  Not later than four (4) days following the commencement of the Chapter 11 Cases, entry of an interim order approving the DIP Facility in form and substance satisfactory to the Administrative Agent in its sole discretion (the "Interim Financing Order"), which Interim Financing Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to the Lead Arranger in its sole discretion, (ii) authorize the extensions of credit in respect of the Revolving Facility and the Term Loan Facilities, each in the amounts and on the terms set forth herein, (iii) grant the superpriority claim status and other collateral and liens referred to above, including without limitation, a lien on the MSR Junior Lien Collateral, (iv) approve the payment by the Borrowers of the fees provided for herein, (v) approve the repayment in full of the Existing Facilities from the proceeds of the Term Loans and the release of all liens securing the Existing Facilities, (vi)  provide that (A) the sales of the Receivables from the issuer under the Existing GSAP Facility to the Borrowers, (B) the sales of future Receivables from GMACM or RFC to the Borrowers, (C) the sales of the Eligible Mortgage Loans from GMACM and RFC to the Borrowers and (D) the sales of the Eligible FNMA Advance Reimbursements from GMACM to the GMACM Borrower shall, in each case of the foregoing, be true sales and contributions and constitute absolute and unconditional, non-avoidable transfers of all right, title and interest in the subject property, (vii) provide that each Borrower is a separate and distinct legal entity from the issuer under the Existing GSAP Facility, GMACM and RFC, and that the DIP Lenders are extending credit in reliance upon the separateness of each Borrower and true sale and contribution of the Receivables and the Eligible Mortgage Loans to the Borrowers, and of the Eligible FNMA Advance Reimbursements to the GMACM Borrower, and that the Borrowers shall not be subject to consolidation into the estate of the issuer under the Existing GSAP Facility, GMACM, RFC or any other Debtor (in any such case, whether through the doctrine of substantive consolidation, veil piercing or any similar remedy), (viii) provide for the waiver of section 506(c) of the Bankruptcy Code by the Debtors as to the Collateral, and (ix) not have been (x) stayed, vacated or reversed, or (y) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion.

(n)  Entry of one or more orders, in form and substance satisfactory to the Administrative Agent in its sole discretion, authorizing the Debtors to use the cash collateral of AFI under the Ally Revolver and the Ally Line of Credit and granting adequate protection (collectively, the "~~AFI Cash~~

CONFIDENTIAL

Collateral Order"), which AFI Cash Collateral Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to the Administrative Agent in its sole discretion, and (ii) not have been (x) stayed, vacated or reversed, or (y) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion.

(o)   If the consent of Fannie Mae (as described under the section of the Term Sheet entitled "Collateral/Superpriority Claim") is not obtained and the proceeds of the DIP Facility are not used to refinance the Existing EAF Facility, entry of one or more orders, in form and substance satisfactory to the Administrative Agent in its sole discretion, authorizing the Debtors to use the cash collateral of Fannie Mae under the Existing EAF Facility and granting adequate protection (collectively, the "EAF Cash Collateral Order"), which EAF Cash Collateral Order (i) shall have been entered on such prior notice to such parties as may be satisfactory to the Administrative Agent in its sole discretion, and (ii) not have been (x) stayed, vacated or reversed, or (y) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion.

(p)   Entry of an order, in form and substance satisfactory to the Administrative Agent in its sole discretion (the "MSR Order"), approving and authorizing the Debtors to either (i) enter into a debtor-in-possession financing facility refinancing the MSR Facility, or (ii) use the cash collateral of Citibank under the MSR Facility and granting adequate protection, which MSR Order (x) shall have been entered on such prior notice to such parties as may be satisfactory to the Administrative Agent in its sole discretion, and (y) not have been (A) stayed, vacated or reversed, or (B) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion.

(q)   The Debtors shall have entered into an asset purchase agreement or other agreement (including pursuant to a plan of reorganization or liquidation that provides for repayment in full in cash of the DIP Obligations on the effective date and is in form and substance reasonably satisfactory to the Administrative Agent) (the "Sale Agreement"), in form and substance reasonably satisfactory to the Administrative Agent, with a stalking horse bidder providing for the sale of the Loan Parties' assets (including, without limitation, the mortgage servicing rights of the Parent and its subsidiaries), and the Debtors shall have filed with the Bankruptcy Court a motion seeking entry of orders by the Bankruptcy Court, respectively, approving the Sale Agreement (the "Sale Order"), which Sale Order shall be in form and substance reasonably satisfactory to the Administrative Agent, and

Ex. C-4

CONFIDENTIAL

approving bidding procedures in connection with the sale contemplated thereby.

(r)    Operational changes to track and allocate expenses relating to Existing Facilities by asset type and facility shall have been implemented and cash management systems consistent with the requirements under the DIP Facility and otherwise satisfactory to the Administrative Agent (including with respect to cash dominion) shall have been established by the Borrowers and an order approving such cash management systems and arrangements shall have been entered by the Bankruptcy Court, in form and substance reasonably satisfactory to Administrative Agent, and shall be in full force and effect.

(s)    The Loan Parties are in pro forma compliance with the terms of the DIP Facility, including the Borrowing Base and the Collateral Amount (after giving effect to the amounts to be borrowed on the Closing Date).

(t)    The Eligible Receivables, Eligible Mortgage Loans and other assets comprising Borrowing Base Collateral shall have been scheduled or otherwise identified in reasonable detail to the Administrative Agent, in form and substance satisfactory to the Administrative Agent, and the Administrative Agent shall be satisfied that all such Eligible Receivables, Eligible Mortgage Loans and other assets are subject to no liens other than the DIP Liens.

(u)    No change, development, circumstance or event that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect.

(v)    No defaults or events of default, both immediately prior to and after giving effect to the amounts to be borrowed on the Closing Date, shall, in each case, have occurred under any of the Loan Documents for the DIP Facility.

(w)    Delivery of updated lien searches (including with respect to tax liens).

(x)    Receipt by the Administrative Agent of evidence of satisfactory Servicing Practices.

(y)    Availability of the EAF Commitments shall be subject to the receipt of the consent of Fannie Mae as described further above under the section entitled "~~Collateral~~"

(z)    Availability of the Initial Revolving Loans shall be subject to the condition that the maximum amount of the Term Loan Commitments available shall have been borrowed on the Closing Date.

(aa)    The Borrowers shall have provided to the Administrative Agent a written description of all servicing fees relating to the Eligible Mortgage Loan portfolio of the Borrowers, which

CONFIDENTIAL

description shall be in form and substance satisfactory to the Administrative Agent.

**Initial Conditions to Subsequent Revolving Loans:**

Except for the Initial Revolving Loans, the availability of the Revolving Loans shall be conditioned upon the satisfaction (or waiver) of the following conditions precedent in addition to those set forth above in the section entitled "Initial Conditions to Term Loans and Initial Revolving Loans" (the date upon which all such conditions shall be satisfied or waived, the "Revolver Availability Date"):

(a)     The Closing Date shall have occurred.

(b)     A final order approving the DIP Facility, in form and substance satisfactory to the Administrative Agent in its sole discretion (the "Final Financing Order" and together with the Interim Financing Order, the "Financing Orders" and individually, a "Financing Order"), shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been (i) vacated, reversed, or stayed, or (ii) amended or modified except as otherwise agreed to in writing by the Administrative Agent in its sole discretion and reasonably acceptable to the Lead Arranger.

(c)     The maximum amount of the available Term Loan Commitments shall have been borrowed on the Closing Date.

827415.18B-New York Server 6A - MSW

12-12020-mg    Doc 883-5    Filed 05/14/12    Entered 05/14/12 10:37:34    Exhibit 5
Pg 246 of 312

**Exhibit 7**

**SHARED SERVICES AGREEMENT**

EXECUTION VERSION

**Shared Services Agreement**

by and between

**Ally Financial Inc.**
**and**
**Residential Capital, LLC**

**Effective as of May  ___, 2012**

1.   **DEFINITIONS.** ................................................................................................. *1*

    **1.1**   Definitions. ........................................................................................ 1

2.   **TERM AND RENEWAL** ................................................................................. *4*

    **2.1**   Initial Term. ...................................................................................... 4

    **2.2**   Renewal. ............................................................................................ 4

3.   **SERVICES.** ...................................................................................................... *5*

    **3.1**   Services. ............................................................................................. 5

    **3.2**   Additional Services. .......................................................................... 6

    **3.3**   Changes to Services/Change Control Procedures. ............................ 6

    **3.4**   Recipients' Obligations. .................................................................... 7

    **3.5**   Required Consents. ............................................................................ 7

    **3.6**   Security Level; Additional Security Measures. ................................ 8

4.   **USE OF AFFILIATES AND SUBCONTRACTORS.** ................................ *8*

    **4.1**   Affiliates and Subcontractors. .......................................................... 8

    **4.2**   Compliance. ....................................................................................... 9

5.   **RELATIONSHIP MANAGEMENT.** ............................................................ *9*

    **5.1**   Relationship Managers. ..................................................................... 9

    **5.2**   Governance Model. ........................................................................... 9

    **5.3**   Reports. .............................................................................................. 9

    **5.4**   Regulatory Review. ......................................................................... 10

    **5.5**   Books and Records; Audit. .............................................................. 10

    **5.6**   Books and Records; Audit. .............................................................. 10

    **5.7**   Informal Dispute Resolution Procedures. ....................................... 10

    **5.8**   Continued Performance. .................................................................. 10

6.   **FACILITIES.** ................................................................................................ *11*

    **6.1**   Use of Recipient Facilities. ............................................................. 11

    **6.2**   Supplier Facilities and Systems. ..................................................... 12

    **6.3**   Physical Security for Facilities. ...................................................... 12

7.   **INTELLECTUAL PROPERTY AND PROPRIETARY RIGHTS** ............. *12*

    **7.1**   Ownership of Pre-Existing Intellectual Property. ........................... 12

    **7.2**   Development of Intellectual Property. ............................................. 12

    **7.3**   Limited License to Use Supplier Work Processes and Software. ..... 13

    **7.4**   No Implied Licenses. ....................................................................... 13

8.   **RECIPIENT DATA.** .................................................................................... *13*

    **8.1**   Definition. ........................................................................................ 13

    **8.2**   Ownership. ....................................................................................... 13

    **8.3**   Data Security. .................................................................................. 14

9.   **CONFIDENTIALITY.** ................................................................................. *14*

    **9.1**   Obligations. ..................................................................................... 14

    **9.2**   Excluded Information ...................................................................... 14

    **9.3**   Compelled Disclosure. .................................................................... 15

    **9.4**   Return of Information. ..................................................................... 15

    **9.5**   Exception. ........................................................................................ 15

| | | |
|---|---|---|
| **9.6** | Obligations. | 15 |
| **9.7** | Loss of Confidential Information. | 16 |
| **9.8** | No Implied Rights. | 16 |
| **10.** | **COMPENSATION.** | **16** |
| **10.1** | General. | 16 |
| **10.2** | Taxes. | 16 |
| **10.3** | Invoicing and Payment. | 16 |
| **11.** | **REPRESENTATIONS AND WARRANTIES.** | **17** |
| **11.1** | Services. | 17 |
| **11.2** | Maintenance. | 17 |
| **11.3** | Authorization. | 17 |
| **11.4** | Viruses. | 17 |
| **11.5** | Disclaimer. | 17 |
| **12.** | **INSURANCE.** | **17** |
| **12.1** | Insurance. | 17 |
| **12.2** | Risk of Loss. | 18 |
| **13.** | **INDEMNIFICATION AND LIMITATIONS ON LIABILITY.** | **18** |
| **13.1** | Indemnification. | 18 |
| **13.2** | Limitations on Liability. | 21 |
| **13.3** | Indemnification and Limitations on Liability Relating to Negligence and Strict Liability. | 22 |
| **13.4** | Exclusive Remedy. | 23 |
| **13.5** | Insurance. | 23 |
| **14.** | **TERMINATION.** | **23** |
| **14.1** | Termination. | 23 |
| **14.2** | Termination Following Sale. | 24 |
| **14.3** | Election of Terminating Party. | 24 |
| **14.4** | Survival. | 24 |
| **14.5** | Rights Upon Termination or Expiration; Sale. | 24 |
| **14.6** | Dedicated Assets. | 25 |
| **14.7** | Transition Services Agreement. | 25 |
| **15.** | **FULLY INTEGRATED AGREEMENT.** | **25** |
| **16.** | **GENERAL.** | **26** |
| **16.1** | Acknowledgement. | 26 |
| **16.2** | Binding Effect; No Assignment. | 26 |
| **16.3** | Counterparts. | 27 |
| **16.4** | Entire Agreement. | 27 |
| **16.5** | Force Majeure. | 27 |
| **16.6** | Further Assurances. | 28 |
| **16.7** | Governing Law; Jurisdiction and Forum; Waiver Of Jury Trial. | 28 |
| **16.8** | Headings. | 28 |
| **16.9** | Independent Contractors. | 28 |

**16.10**   Notices.   ...............................................................................................  28

**16.11**   Public Announcements.   ...............................................................  29

**16.12**   Amendments and Waivers.   ............................................................  29

**16.13**   Severability.   ...............................................................................  30

**16.14**   No Third Party Beneficiaries.   ........................................................  30

**16.15**   Order of Precedence...........................................................................  30

iii

# SCHEDULES

Schedule A-1        Parent Services
Schedule A-2        Reverse Services
Schedule A-3        Planned IT Projects
Schedule B          Governance Model
Schedule C          Pricing Methodology
Schedule C-1        Pricing for Parent Services
Schedule C-2        Pricing for Reverse Services
Schedule D-1        List of AFI Recipients and Supported Facilities
Schedule D-2        List of ResCap Recipients and Supported Facilities
Schedule E          Form of Supplement

iv

# SHARED SERVICES AGREEMENT

This Shared Services Agreement (this "**Agreement**") is entered into on this __ day of May    , 2012 and effective as of  the date this Agreement is approved by the Bankruptcy Court (the "**Effective Date**") by and between Residential Capital, LLC, a Delaware limited liability company ("**ResCap**") and Ally Financial Inc., a Delaware Corporation ("**AFI**").

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and for other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows.

## 1.                              DEFINITIONS.

**1.1**   Definitions.  As used in this Agreement, the following terms have the following meanings:

"**Additional Services**" has the meaning set forth in **Section 3.2**.

"**Affiliate**" means, with respect to any specified Person, (a) those other Persons with respect to which such specified Person directly or indirectly owns or controls more than 50% of the voting equity securities of such other Person, (b) those other Persons that directly or indirectly own or control more than 50% of the voting equity securities of such specified Person, and (c) as to the Persons identified in the preceding clauses (a) and (b), those Persons that directly or indirectly own or control more than 50% of the voting equity securities of such identified Persons; provided, however, that, for purposes of this Agreement:  (a) ResCap and its direct and indirect Subsidiaries shall not be deemed to be Affiliates of AFI; and (b) only the direct and indirect Subsidiaries of ResCap shall be deemed to be the Affiliates of ResCap.

"**Bankruptcy Court**" means the bankruptcy court in which the chapter 11 case(s) of ResCap and/or its Subsidiaries are pending.

"**Bankruptcy Code**" means title 11 of the United States Code**.**

"**Buyer**" means one or more purchasers of all or substantially all of the assets of ResCap and certain of its Subsidiaries pursuant to the Sale.

"**Change**" means any change or modification in the Services, or the schedule for performing such Services.

"**Charges**" has the meaning set forth in **Schedule C**.

"**Claim**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Claim Notice**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Completion**" has the meaning set forth in **Section 14.3(c)(3)**.

"**Confidential Information**" has the meaning set forth in **Section 9.1**.

"**Customized Services**" has the meaning set forth in **Section 3.3(a)**.

"**Damages**" has the meaning set forth in **Section 13.1(a)**.

"**Dedicated Assets**" means any Supplier's third party contracts, Supplier Equipment, Supplier

Personnel and Supplier Software primarily dedicated to providing Services to Recipient.

"**Equipment**" means computer and telecommunications equipment (without regard to the entity owning or leasing such equipment) including:  (a) servers, personal computers, and associated attachments, accessories, peripheral devices, printers, cabling and other equipment; and (b) private branch exchanges, multiplexors, modems, CSUs/DSUs, hubs, bridges, routers, switches and other telecommunications equipment.

"**Force Majeure Event**" has the meaning set forth in **Section 16.5(a)**.

"**Functional Service Areas**" means the categories of Parent Services or Reverse Services that are set forth under **Schedule C-1** or **Schedule C-2**, as applicable

"**Governmental Authority**" means any government or political subdivision, board, commission or other instrumentality thereof, whether federal, state, local or foreign.

"**Include**" and its derivatives means including without limitation.  This term is as defined whether or not capitalized in this Agreement.

"**Indemnified Parties**" has the meaning set forth **Section 13.1(a)**.

"**Indemnifying Party**" has the meaning set forth **Section 13.1(d)**.

"**Initial Term**" has the meaning set forth in **Section 2.1**.

"**Intellectual Property**" or "**IP**" means any of the following, whether subsisting now or in the future anywhere in the world:  (a) patents and pending patent applications; (b) trademarks, service marks, trade names and trade dress, and associated goodwill and rights of publicity and all rights associated therewith; (c) copyrights, including copyrights in works of authorship and computer Software; (d) confidential and proprietary information, including trade secrets and proprietary algorithms; (e) data base rights; (f) design rights and rights in designs; (g) rights in domain names; (h) rights in know-how; (i) all other intellectual property rights subsisting now or in the future, anywhere in the world; and (j) registrations, right to register and pending applications for registration of the foregoing, renewals, extensions, continuations, divisions or reissues thereof now or hereafter in force throughout the world (including rights in any of the foregoing); and (k) any and all causes of action arising from or related to any of the foregoing.

"**Intellectual Property Rights**" means any and all common law, statutory and other rights in Intellectual Property honored and/or enforceable under any Laws.

"**Law**" means any applicable order, writ, injunction, decree, judgment, ruling, statute, law, rule or regulation of any federal, state, municipal or local government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, court or tribunal or any arbitrator or arbitral body.

"**New Developments**" means new Systems implemented by Supplier that are substantially different from the existing Systems, including major replacements to existing Systems and any directly related major replacements to work processes, policies and procedures implemented by Supplier.

"**Parent Services**" has the meaning set forth in **Section 3.1(a)**.

"**Parties**" means AFI and ResCap.

"**Person**" means any individual, partnership, firm, corporation, association, joint venture, limited

liability company, trust or other entity, or any governmental entity.

"**Plan**" means ResCap's and certain of its Subsidiaries' chapter 11 plan(s) of reorganization or liquidation under the Bankruptcy Code.

"**Planned IT Projects**" has the meaning set forth in **Section 3.1(g)**

"**Pre-Existing Intellectual Property**" has the meaning set forth in **Section 7.1**.

"**Recipient**" (i) in the case of Parent Services means ResCap and its Affiliates listed on **Schedule D-1**, and (ii) in the case of Reverse Services means AFI and its Affiliates listed on **Schedule D-2**.

"**Recipient Data**" has the meaning set forth in **Section 8.1**.

"**Recipient Equipment**" means all Equipment owned or leased by a Recipient and used in connection with the Services.

"**Recipient Facilities**" has the meaning set forth in **Section 6.1(a)**.

"**Recipient Software**" means all Software owned by, or provided under license to, Recipient and used in connection with the Services (and all modifications, replacements, upgrades, enhancements, documentation, materials and media relating to the foregoing).

"**Recipient System**" means an interconnected grouping of Recipient Equipment and/or Recipient Software used in connection with the Services, and all additions, modifications, substitutions, upgrades or enhancements thereto.

"**Relationship Manager**" has the meaning set forth in **Section 5.1**.

"**Required Consents**" means the consents, if any, required from third parties in connection with Supplier's provision, and Recipient's receipt, of the Services.

"**Reverse Services**" has the meaning set forth in **Section 3.1(a)**.

"**Sale**" means a sale of all or substantially all of the assets of ResCap and/or certain of its Subsidiaries pursuant to the Plan or section 363 of the Bankruptcy Code.

"**Services**" means all or any of Parent Services, Reverse Services, Customized Services, Termination Assistance Services, provided by a Supplier, as applicable given the context.

"**Software**" means programs and programming (including the supporting documentation, media, on-line help facilities and tutorials).

"**Statement(s) of Work**" means the mutually agreed internal documents that set forth the Services in respect of the Functional Service Areas that are identified in **Schedule A-1** or **Schedule A-2** , as applicable.

"**Subcontractors**" means Supplier's contractors or other agents of Supplier that perform a portion of the Services.

"**Subsidiaries**" means, with respect to any specified Person, those other Persons with respect to which such specified Person directly or indirectly owns or controls more than 50% of the voting equity securities of such other Person.

"**Supplement**" has the meaning set forth in **Section 3.2**.

"**Supplier**" means (i) in the case of Parent Services, AFI and any AFI Affiliates that provide

such Services, and (ii) in the case of Reverse Services, ResCap, and any ResCap Affiliates that
provide such Services.  For purposes of clarity, all references to "Supplier" refer only to the
Party that is acting as the "Supplier" with respect to the Equipment, Software and other
applicable responsibilities for the Services being performed by such Party in its capacity as the
"Supplier".

"**Supplier Equipment**" means Equipment owned or leased by the Party that in its capacity as the
"Supplier" hereunder, or an Affiliate or Subcontractor of such Party, and used in connection with
the Services.

"**Supplier Facilities**" has the meaning given in **Section 6.2**.

"**Supplier Personnel**" means those employees, representatives, contractors, Subcontractors and
agents of the Party that is acting in its capacity as the "Supplier" hereunder, who perform any
Services under this Agreement.

"**Supplier Software**" means all software programs and programming owned by, or provided
under license to, the Party that is acting in its capacity as the "Supplier" and used to provide the
Services (and all modifications, replacements, upgrades, enhancements, documentation,
materials and media relating to the foregoing).

"**Supplier System**" means an interconnected grouping of Supplier Equipment and/or Supplier
Software used in connection with the Services, and all additions, modifications, substitutions,
upgrades or enhancements thereto.

"**Systems**" means Recipient Systems and Supplier Systems or any of them.

"**Term**" has the meaning set forth in **Section 2.2.**

 "**Termination Assistance Services**" has the meaning set forth in **Section 14.5(a)**

"**Termination Service Periods**" has the meaning set forth in **Section 14.5(a)**.

"**Third Party Claim**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Third Party Claim Notice**" has the meaning set forth in **Section 13.1(d)(1)**.

"**Transition Services Agreement**" has the meaning set forth in **Section 14.5(a)**.

## 2.                             TERM AND RENEWAL

    **2.1**   Initial Term .  The initial term of this Agreement begins on the Effective Date and
continues through and until midnight Eastern Time on the one (1) year anniversary of the date
on which ResCap and  certain of  its Subsidiaries file voluntary petitions ("**Petitions**") for
relief under Chapter 11 of the Bankruptcy Code, as amended (the "**Initial Term**"), unless
earlier terminated or extended in accordance with the terms of this Agreement and except for
any Service that has been terminated in accordance with the terms of this Agreement.

    **2.2**   Renewal.  The Initial Term will be automatically extended for additional periods
of one (1) year each unless either Party provides to the other Party written notice of
nonrenewal at least three (3) month prior to the expiration of the then-current Term.  The
Initial Term as extended by any such additional period(s) (if any) shall be referred to as the
"**Term**".

3.                     **SERVICES.**

> **3.1**  Services.

> (a) Performance.  AFI will provide the Services within each of the Functional Service Areas listed in **Schedule A-1** (the "**Parent Services**"), and ResCap will provide the Services within each of the Functional Service Areas listed in **Schedule A-2** (the "**Reverse Services**"), in each case beginning on the Effective Date.  Services provided by a Supplier under this Agreement may be provided by that Supplier directly or through any of its Affiliates and/or Subcontractors at Supplier's discretion.  A Supplier will not be relieved of any of its obligations under this Agreement as a result of the provision of Services by any of Supplier's Subsidiaries or other Supplier Personnel pursuant to this **Section 3.1(a)**.  Supplier agrees that it will not enter into any new Subcontracting arrangement that would involve the transfer to a Subcontractor or another third party of Recipient's personal information, without the prior written consent of the other Party.  The Supplier Personnel providing Services will at all times be qualified to provide the Services assigned to them.

> (b) Recipients and Facilities.  Supplier will provide the Services to Recipient at the Recipient Facilities for which such Services are provided as of the Effective Date or, with respect to any particular Services, such other locations as may be specifically identified in **Schedule D-1** or **Schedule D-2** with respect to such Services.  Supplier will negotiate in good faith to provide Services in support of any new Recipient or additional Recipient Facility, but shall not be obligated to provide Services to new Recipients or additional Recipient Facilities unless the pricing and terms for such new Recipients or facilities has been agreed upon by the Parties.

> (c) Service Standards.  Supplier will perform or cause to be performed the Services referenced in the applicable Statement(s) of Work, to Recipient (i) with reasonable skill, care and diligence; and (ii) performed in substantially the same manner (including historic levels of service, historical usage levels and geographic provisioning) that such Services were generally performed by Supplier for Recipient immediately prior to the Effective Date and thereafter in substantially the same manner (including historic levels of service, historical usage levels and geographic provisioning) as Supplier generally performs such Services for its own businesses in accordance with its then-current processes and procedures (except to the extent such Services differ because of the need to follow legal corporate formalities and to keep Recipient Data separate from Supplier data, or as may be mutually agreed through the Parties' change control principles pursuant to **Sections 3.2** and **3.3** ).  In no event will Supplier be required to make any customization to the Services (or Supplier's associated Systems or processes) that are unique to Recipient, except for customizations that are expressly agreed upon in accordance with **Sections 3.2** and **3.3**.  Each Party acting in its capacity as Recipient shall, and such Party shall cause all of its Affiliates that are Recipients to, comply with any applicable terms and conditions of third party contracts used by Supplier in connection with the Services.

> (d) Implied Services.  If any services, functions or responsibilities performed by Supplier for Recipient as of the Effective Date are not specifically described in this Agreement but are necessary for Supplier to perform or provide the Services described in this

Agreement in accordance with **Section 3.1(c)**, such services, functions or responsibilities shall be deemed to be included within the scope of the Services to the same extent and in the same manner as if specifically described in this Agreement, except to the extent otherwise specified in this Agreement and excluding all services, functions and responsibilities of Recipient under this Agreement (including any services, functions or responsibilities not specifically described in this Agreement but are necessary for Recipient to perform or provide such services, functions and responsibilities described in this Agreement). Except as otherwise expressly provided in this Agreement, as between the Parties, Supplier shall be responsible for providing the facilities, personnel and other resources as necessary to provide the Services consistent with the requirements of **Section 3.1(c)**.

(e) <u>Not a Requirements Contract</u>. This Agreement will not be construed as a requirements contract and will not be interpreted to prevent Recipient from obtaining from third parties, or providing itself, any or all of the Services or similar services.

(f) <u>Dedicated Assets</u>. Upon the reasonable request of either Party, the Parties will work together in good faith to identify the Dedicated Assets, and with respect to Supplier Personnel that are Dedicated Assets, on a Service-by-Service basis: (i) the number of individuals providing such Service; (ii) the title of each such individual providing such Service (e.g., senior accountant, deputy general counsel, human resources manager, etc.); and (iii) the amount of time that each such individual spends providing such Service on a full-time equivalent (FTE) basis (e.g., 0.4 FTE).

(g) <u>Planned IT Projects</u>. **Schedule A-3** to this Agreement sets forth a list of IT projects that are planned or ongoing as of the Effective Date (the "**Planned IT Projects**"). ResCap acknowledges and agrees that (i) the Services will be modified during the Term by and in accordance with each Planned IT Project, and (ii) the Planned IT Projects are necessary for the maintenance, upgrade, safety, or security of the AFI environment. ResCap will pay to AFI the portion of each Planned IT Project as applicable to Recipient, in accordance with **Schedule A-3** so long as ResCap or its Affiliates continue to receive Services that are based on or involve the use of AFI's IT environment. ResCap will provide to AFI cooperation and assistance as necessary or reasonably requested by AFI to allow AFI to implement each Planned IT Project.

**3.2** <u>Additional Services</u>. A Party may, from time to time during the Term, upon at least ninety (90) days prior written notice to the other Party, request that the other Party provide additional services, functions and responsibilities not within the scope of the Services provided by the performing Party ("**Additional Services**"). Any such Additional Services will be provided under supplements to **Schedule A-1** or **Schedule A-2**, as applicable entered into by the Parties ("**Supplements**") for the charges set forth therein and mutually agreed upon. Supplements shall be in the form of **Schedule E**. During the ninety (90) day period after the Effective Date, the Parties will work together to define a process reasonably satisfactory to the Parties that will be used to (a) submit and prioritize requests for Additional Services and (b) create and execute Supplements for Additional Services.

**3.3** <u>Changes to Services/Change Control Procedures</u>.

**(a)** Customized Services.  Supplier shall only provide Services customized for Recipient ("**Customized Services**") in accordance with this **Section 3.3**, and shall not otherwise be required to make customizations to the Services or Supplier Systems.

**(b)** Changes Requested by Recipients.  Recipient from time to time, upon at least thirty (30) days notice may require that the Supplier decrease or reasonably increase the Services provided to Recipient and the Charges shall be modified in accordance with the procedures set forth in Exhibit C. A Party may, from time to time during the Term, upon at least ninety (90) days prior written notice to the other Party, request that the other Party provide Customized Services.  If the Parties mutually agree on the provision of Customized Services, such request for Customized Services and such Customized Services will be provided under Supplements to **Schedule A-1** or **Schedule A-2**, as applicable.  Before Supplier is required to provide any Customized Services, the Parties shall jointly agree on the applicable Charges for any agreed Customized Services, including any Charges that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with any changes to the Services.

**(c)** Changes Required by Applicable Law.  If Customized Services are necessary in order to comply with applicable Laws or changes to Supplier's third party contracts, Supplier will provide such Customized Services unless (i) such Customized Services require a material change to a Supplier System, or the implementation of a new Supplier System, or (ii) providing such Customized Services is not practicable given the then-current characteristics of the Supplier Systems, and the use thereof for Supplier and its Affiliates, and subject to the Parties jointly agreeing on the applicable Charges for such Customized Services.  Any such Customized Services will be provided under Supplements to **Schedule A-1** or **Schedule A-2**, as applicable.  The Parties will negotiate in good faith in order to promptly agree on the applicable charges for any such necessary Customized Services.  If providing such Customized Services is not practicable given the Supplier Systems, Recipient may purchase such services from a third party, provided that the Parties must agree on (A) the activities required to transition the affected Services from Supplier to such third party, (B) the impact on the remaining Services, and (C) the Charges associated with removing such Services and (D) the Charges for the remaining Services.

**3.4**  Recipients' Obligations.  Supplier's failure to perform its obligations under this Agreement will be excused (and any rights of the Recipient arising as a consequence of such failure will not be exercised by the Recipient) if and to the extent such Supplier non-performance is caused by (a) the wrongful or tortuous actions of Recipient or a third party contractor performing obligations on behalf of Recipient under this Agreement, or (b) the failure of Recipient or such a third party contractor to perform such Recipient's obligations under this Agreement.  Recipient will be responsible for any additional costs incurred by Supplier in connection with providing the Services as a result of any such failure.  Supplier will use commercially reasonable efforts to perform its obligations notwithstanding such failure, provided that Recipient works with Supplier through the Relationship Managers to remedy the failure.

**3.5**  Required Consents.

**(a)** <u>Responsibility</u>.  Each Party will be responsible for obtaining any Required Consents required under its own third party contracts pertaining to any Software, Equipment, Systems or other materials or associated services required in connection with the Services under this Agreement.  Such responsibility shall include the administrative activities necessary to obtain the Required Consents and payment of the fees and/or expenses associated with obtaining the Required Consents.  In the event of a pending Sale or upon termination of any Service(s) or this Agreement, the Parties will cooperate in order to determine and obtain any Required Consents necessary in order to transition any Software, Equipment, Systems or other materials to the other Party and/or the Buyer(s).

**(b)** <u>Contingent Arrangements</u>.  If, despite using commercially reasonable efforts, either Party is unable to obtain a Required Consent for which it is responsible under **Section 3.5(a)**, such Party will use commercially reasonable efforts to obtain a replacement license, product or right, as applicable.  If such replacement cannot be obtained using commercially reasonable efforts, the Parties will work together in good faith to develop a mutually acceptable alternative arrangement that is sufficient to enable Supplier to provide, and Recipient to receive the Services without such Required Consent.  The Party responsible for obtaining the Required Consent will be financially responsible for the costs of such alternative arrangement.  If the Parties can not reach a resolution under **Section 3.5** either Party may require that the affected Services be discontinued in which case the Charges for Services will be equitably adjusted to account for such discontinuation.

**3.6** <u>Security Level; Additional Security Measures</u>.  Supplier may take physical or information security measures (a) that affect the manner in which the Services are provided to maintain Supplier's current level (or, if greater, an industry-standard level) of physical and electronic security (including data security and data privacy) during the Term and (b) that address any new security-related issues, including compliance with applicable law and governmental orders related to security and issues in connection with new technologies or threats.  Supplier shall provide Recipient reasonable, prior written notice of any such physical or information security measures that are material to Supplier's delivery of the Services.  Recipient shall provide all assistance reasonably requested by Supplier in connection with such security measures.  Recipient shall pay to Supplier increased Charges for the applicable Services that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with such security measures with respect to the Services provided to Recipient under this Agreement.

**4.**                          **USE OF AFFILIATES AND SUBCONTRACTORS.**

**4.1** <u>Affiliates and Subcontractors</u>.

**(a)** <u>Use of Affiliates and Subcontractors</u>.  Subject to **Section 3.1(a)**, Supplier will have the right to use Affiliates and Subcontractors to assist Supplier in the provision of the Services.  Supplier shall adhere to Supplier's then-current "Third Party Vendor Management" policies when engaging Subcontractors to perform Services under this Agreement.  In respect of any material Services for which Supplier desires to engage a Subcontractor, Supplier shall seek and obtain Recipient's approval of such Subcontractor, which approval Recipient shall not unreasonably withhold or delay; provided, however, that

all Subcontractors engaged or otherwise performing services for Supplier as of the Effective Date are hereby deemed approved by Recipient.

(b) Supplier Responsibility for Affiliates and Subcontractors. Supplier shall remain responsible for the Services performed by its Affiliates and Subcontractors to the same extent as if such Services were performed by such Supplier. In the event that Supplier's subcontractor(s) fails to perform their obligations for which Supplier is utilizing them under this Agreement, Supplier will not be responsible or liable for such failure. However, Supplier will exercise any rights that it may have under its contract with the Subcontractor to cause the Subcontractor to resolve or cure any such failure within a reasonable time period, taking into consideration the circumstances of such failure, the nature of the services and the impact that such failure has on the Recipient. If such failure is not resolved or cured within a reasonable time period, Supplier will exercise any rights that it may have under its contract with the Subcontractor in the same manner that Supplier responds to such failure with respect to the services such Subcontractor provides for Supplier or Supplier's Affiliates businesses, taking into consideration the circumstances of such failure, the nature of the services and the impact that such failure has on the Recipient. Supplier shall be Recipient's sole point of contact regarding the Services, including with respect to payment. In addition, each Party, in its capacity as Supplier, will monitor and manage (including any necessary audits as to data privacy and security) its Subcontractors being used to perform Services for Recipient in compliance with Supplier's third party vendor management policies and procedures throughout the Term and any renewal or extension of the Agreement.

**4.2** Compliance. Supplier will cause its employees and agents as well as the employees of its Affiliates and Subcontractors while at Recipient Facilities, to comply with the personnel, operational, safety and security procedures, policies, rules and regulations applicable to Recipient employees and agents and the Recipient Facilities, of which they have been given notice in advance by Recipient.

**5.**           **RELATIONSHIP MANAGEMENT.**

**5.1** Relationship Managers. Each Party will appoint an individual (each, a "**Relationship Manager**") who, from the Effective Date until replaced by the appointing Party, will serve as that Party's representative under this Agreement. Each Relationship Manager will (a) have overall responsibility for managing and coordinating the performance of the appointing Party's obligations under this Agreement, and (b) be authorized to act for and on behalf of the appointing Party concerning all matters relating to this Agreement. Neither Party will reassign a Relationship Manager, unless it provides at least ten (10) days prior written notice to the other Party. If a Relationship Manager ceases to be employed by the Party that appointed it or is reassigned by such Party, such Party will promptly appoint a new Relationship Manager and provide written notice to the other Party of the new Relationship Manager so appointed.

**5.2** Governance Model. The Parties will conduct meetings and manage interactions in accordance with the governance model described in **Schedule B**.

**5.3**  Reports.  Each Party will provide to the other Party the reports described in the applicable Statement of Work, in the format and at the frequencies specified therein.  In addition, ResCap will provide AFI access to such information and reports in their possession and control about ResCap and its direct and indirect Affiliates as AFI requests from time to time for regulatory reporting, audit, risk management, compliance, corporate governance, bank and/or bank holding company supervision and/or examination, and or other business purposes.

**5.4**  Regulatory Review.  Each Party will notify the other promptly of any formal request or order by a governmental agency or regulator or any internal or external audit examination or request to examine records regarding Recipient that are maintained by Supplier or to audit Supplier's performance of the Services.  Supplier will cooperate with any such examination or audit.  Recipient will reimburse Supplier for the actual and reasonable out-of-pocket costs Supplier incurs in connection with that examination or audit.

**5.5**  Books and Records; Audit.  Each Party acting in its capacity as a Supplier will, and will cause its Affiliates providing Services hereunder to, keep books of account and other records, in reasonable detail and in accordance with generally accepted accounting principles, consistently applied, as to the Charges for providing the Services to Recipient pursuant to this Agreement, and shall make such books of account and other records available to Recipient (and to any Governmental Authority that desires to audit Recipient) for inspection during normal business hours in a non-disruptive manner so as not to disrupt Supplier's business operations during the Term and for twenty-four (24) months thereafter for the purpose of performing audits and inspections of Supplier, related to the Services performed under this Agreement to: verify the accuracy of Charges and invoices.

**5.6**  Each Party acting in its capacity as a Supplier shall, and will cause its Affiliates providing Services hereunder to, use commercially reasonable efforts to provide to such auditors, inspectors, regulators, and representatives, at Recipient's sole cost and expense, such assistance as they reasonably require.  Recipient's auditors and other representatives shall comply with Supplier's security and confidentiality policies, procedures and requirements.  All such inspections or audits may be performed only by an independent third party auditing firm of national standing that has a written agreement with Recipient in which such third party agrees (i) to confidentiality obligations no less protective of Supplier than Recipient's confidentiality obligations under this Agreement and (ii) not to share with Recipient the Supplier information provided in connection with such inspection or audit, other than the findings and conclusions of the audit report.

**5.7**  Informal Dispute Resolution Procedures.  The informal dispute resolution procedures applicable to disputes under or in connection with this Agreement are set forth in **Schedule B**.

**5.8**  Continued Performance.  Each Party agrees that it will, unless otherwise directed by the other Party, continue performing its obligations under this Agreement while any dispute is being resolved until this Agreement expires or is terminated in accordance with its terms, provided, however, that in the case of a dispute with regards to a Party's alleged failure to pay amounts in excess of two (2) times the average monthly Charges for the Services provided

ny-1040886

hereunder to such Party or its Affiliates, Supplier may suspend its performance of the Services until the earlier of such dispute is resolved or this Agreement is terminated; provided further, that if Recipient pays such disputed amounts, (a) Supplier will continue to perform its obligations under this Agreement and (b) such payment will not constitute a waiver of any claims Recipient may have with respect to such disputed amounts.

**6.**                                  **FACILITIES.**

     **6.1**    Use of Recipient Facilities .

        **(a)**    General.    Except as expressly set forth otherwise in any applicable Statement(s) of Work, each Party will, and will cause its Affiliates to, acting in its capacity as "Recipient", provide to Supplier, at no charge, the space, office furnishings, janitorial service, telephone service, utilities (including air conditioning) and office-related equipment, supplies, and duplicating services at Recipient's premises that Supplier may reasonably need to provide the Services (collectively, the "**Recipient Facilities**").    In addition, each Party will, and will cause its Affiliates to, acting in its capacity as "Recipient" provide necessary storage space for backup data files related to the Services and will provide additional storage space that may be required by any change in retention schedules required by Recipient.    Supplier's employees will have reasonable access to the Recipient Facilities twenty-four hours a day, seven days a week; provided, however, that in times of emergency, turnaround or significant maintenance or construction activity, access may be restricted or denied if not required in connection with such emergency, turnaround, maintenance or construction.    In such an event, Supplier will be excused from its performance of the Services to the extent Supplier is unable to provide the Services in accordance with the requirements of this Agreement as a result of such restricted access.

        **(b)**    Relocation.    If Recipient contemplates or makes a final decision to alter or relocate any of the Recipient Facilities or if a Change of Control is pending that will require Supplier to relocate any of its personnel or Equipment from any Recipient Facility and the alteration or relocation could reasonably be expected to impact the Services (including the cost to perform, timing, ability to perform or level of performance) then Recipient will provide Supplier with sufficient advance notice of that fact to allow Supplier a reasonable amount of time to prepare for and implement the alteration or relocation as it impacts Supplier.    The Parties acknowledge that in the case of a Change of Control it is likely that personnel and Equipment of each Party will be required to be relocated from the other Party's facilities.    The Parties will work together in good faith for a planned and orderly process for such relocation, timed as much as possible to coincide with the scheduled completion of migration of all Services provided by each of them for the other from such facility, and each Party will bear its own relocation costs and expenses.    Before requiring Supplier to relocate from any Recipient Facilities, the Parties will agree on any adjustments to (i) the Services that may be required as a result of the alteration or relocation, and (ii) Supplier's Charges that may be required to equitably compensate Supplier for any additional costs it may reasonably incur in connection with the alteration or relocation.

        **(c)**    Supplier's Obligations.    Supplier will (i) keep the Recipient Facilities in good order, and (ii) not commit waste or damage to those facilities or use those facilities for

any purpose other than providing the Services (and appropriate incidental use for internal Supplier administrative tasks unrelated to other customer accounts or Supplier marketing efforts).

     **(d)** <u>Access to Recipient Systems</u>.  Supplier will limit its, and will require that all Supplier Personnel who have access to Recipient Systems will limit their, access to those portions of such Recipient Systems for which they are authorized in connection with the Services.  Supplier will limit such access to those Supplier Personnel who are needed in order to provide the Services.  Supplier will cooperate with Recipient in the investigation of any apparent unauthorized access by Supplier Personnel to the Recipient Systems.

     **6.2** <u>Supplier Facilities and Systems</u>.

     **(a)** <u>Supplier Facilities</u>.  Supplier may perform the Services in such facilities maintained by or for Supplier or its Affiliates or Subcontractors (collectively, "**Supplier Facilities**") as Supplier reasonably deems appropriate, so long as appropriate security procedures have been implemented and are being observed at the Supplier Facilities.  While at Supplier Facilities, each Party will, and will cause its and its Affiliates' personnel to, in its capacity as "Recipient", comply with Supplier's reasonable security requirements and other relevant policies of which they have been given notice.

     **(b)** <u>Access to Supplier Systems</u>.  Each Party in its capacity as Recipient will limit its, and will require that all Recipient personnel who have access to Supplier's computer or electronic data storage systems to, limit their, access to those portions of such systems for which they are authorized in connection with their receipt and use of the Services.  Each Party in its capacity as Recipient will (i) limit such access to those Recipient personnel who are authorized to use the Services, (ii) subject to Recipient's record retention policy, make available, upon Supplier's request, to Supplier a written list of the names of each individual who has been granted such access, and (iii) adhere to Supplier's security rules and procedures for use of Supplier's systems.  All user identification numbers and passwords disclosed to the Recipients to permit Recipient personnel to access the Supplier systems will be deemed to be, and will be treated as, Supplier's Confidential Information.  Recipient will cooperate with Supplier in the investigation of any apparent unauthorized access by Recipient personnel to Supplier's systems.

     **6.3** <u>Physical Security for Facilities</u>.  Supplier will be responsible for all security procedures at any Supplier Facilities.  Each Party as Recipient will provide all necessary security personnel and security equipment at the Recipient Facilities.  While at the Recipient Facilities, each Party as Supplier will cause all Supplier Personnel to comply with Recipient's physical security procedures, as made known to Supplier's Relationship Manager.

**7.**                            **INTELLECTUAL PROPERTY AND PROPRIETARY RIGHTS**

     **7.1** <u>Ownership of Pre-Existing Intellectual Property</u>.  Except as expressly provided in **Section 7.2**, and **7.3**, nothing in this Agreement shall grant or transfer any rights, title or interests in any Intellectual Property invented or created before or after the Effective Date by

or on behalf of a Party and/or its Affiliates or otherwise controlled by or licensed to such Party and/or its Affiliates (the "**Pre-Existing Intellectual Property**").  A Party's use of the other Party's Pre-Existing Intellectual Property shall not modify the ownership rights set forth above.

**7.2**  Development of Intellectual Property.  Subject to **Section 8**, as between the Parties (and without affecting Recipient's right, title and interest in and to Recipient Data or any Confidential Information of Recipient), all Intellectual Property developed or acquired by or for Supplier or any of its Affiliates in connection with providing the Services shall be owned by Supplier.  Any services that rely on New Developments are outside the scope of the Services under this Agreement and therefore would have to be separately negotiated and agreed upon by the Parties.

**7.3**  Limited License to Use Supplier Work Processes and Software.  Supplier grants to Recipient a limited, non-exclusive, non-assignable license, with the right for Recipient to grant sublicenses to its Affiliates, to use the work processes and Software owned by Supplier and/or its Affiliates that are provided to Recipient in connection with the Services solely to the extent necessary for Recipient to receive Services, and perform its responsibilities under this Agreement during the Term.  THE SUPPLIER WORK PROCESSES AND SOFTWARE AND ALL DELIVERABLES ARE PROVIDED BY SUPPLIER ON AN AS-IS BASIS.  SUPPLIER EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH WORK PROCESSES AND SOFTWARE AND DELIVERABLES.

**7.4**  No Implied Licenses.  Except as expressly specified in this Agreement, nothing in this Agreement will be deemed to grant to one Party, by implication, estoppel or otherwise, license rights, ownership rights or any other Intellectual Property Rights in any work processes, Software or other materials, data or information owned by the other Party or any Affiliate of the other Party.

**8.**                              **RECIPIENT DATA.**

**8.1**  Definition.  The term "**Recipient Data**" means (i) any data or information of Recipient or its respective vendors, customers or other business partners that is provided to or obtained by Supplier in the performance of its obligations under this Agreement, including data and information regarding Recipient's businesses, customers, operations, facilities, products, consumer markets, assets and finances in whatever form or format including in the form of any analysis or compilation of such data, and (ii) any data or information collected or processed in connection with the Services, even if such data or information is contained in reports, documentation, compilations or analyses provided to Recipient as part of the Services. For the avoidance of doubt, Supplier retains ownership of data pertaining to its performance of Services, including data pertaining to the volume and quality of the Services.

**8.2**  Ownership.  As between Recipient and Supplier, Recipient owns and will continue to own all right, title and interest in and to all Recipient Data. To the extent that

ny-1040886

Recipient Data is embedded or incorporated into reports and other documentation, analyses, compilations and other materials (including code or software) owned or licensed by Supplier ("Supplier Materials") and provided to and for use by Recipient as part of the Services, Supplier will not be deemed to have assigned or transferred any of its right, title or interest in or to any underlying Intellectual Property Rights thereto.  Supplier hereby grants to Recipient a perpetual, irrevocable, royalty free, transferable (to a Buyer of all or substantially all of the core business of Recipient) license to use, reproduce, display and perform (whether publicly or otherwise) and modify (and have others exercise such rights on behalf of Recipient (or Buyer)) such Supplier Materials solely as necessary for Recipient's (or Buyer's) use in the ordinary course of its mortgage related business.  Recipient's (or Buyer's) use (including, without limitation, the use by any third party on behalf of Recipient (or Buyer)) of the Supplier Materials  is subject to the confidentiality obligations set forth below in **Section 9** and any third party restrictions imposed on any Supplier Materials of which Supplier makes Recipient aware.  Additionally, Recipient's ownership of the Recipient Data reflected in Supplier Materials shall not serve to transfer or otherwise affect any of Supplier's right, title and/or interest in and/or to any of underlying Intellectual Property Rights in any Supplier Materials.  Supplier may not use Recipient Data for any purpose except: (x) to provide the Services; (y) as required by AFI as the parent of ResCap to meet its financial and regulatory reporting requirements; or (z) as otherwise permitted under this Agreement, nor may Supplier sell, assign, lease or otherwise dispose of or commercially exploit Recipient Data.  Supplier acknowledges that Recipient is not restricted from using or disseminating Recipient Data in the format in which it is provided by Supplier or any different format.

**8.3**  Data Security.  Supplier will establish and maintain safeguards against the destruction, loss or alteration of Recipient Data in its possession that are no less rigorous than those for Supplier's operations.  If Recipient reasonably requests additional safeguards for Recipient Data, Supplier will provide those additional safeguards as Additional Services under a new Supplement subject to **Sections 3.2** and **3.3**.  Recipient has established backup security for data and keeps backup data files in its possession.  If Recipient chooses to establish additional backup security and backup data files, it may do so, except that if such activities increase Supplier's cost of providing the Services or require Additional Services or Customized Services, such activities will be subject to **Sections 3.2** and **3.3**.  In all instances, Recipient will ensure that Supplier will have access to the backup data files as Supplier reasonably needs to provide the Services.

**9.**                                    **CONFIDENTIALITY.**

**9.1**  Obligations .  Each Party will retain the other Party's non-public, proprietary and confidential information with the same degree of care as it uses to avoid unauthorized use, disclosure, publication or dissemination of its own confidential information of a similar nature ("**Confidential Information**") in confidence and not disclose the same to any third party nor use the same, except as expressly permitted in this **Section 9** .  As used in this Agreement, "**Confidential Information**" shall include all non-public information, in any form, furnished or made available directly or indirectly by one Party to the other that is (a) marked confidential, restricted, proprietary and/or with a similar designation and/or (b) provided under circumstances reasonably indicating that it is confidential, restricted and/or proprietary.  The terms and conditions of this Agreement shall be deemed Confidential Information.  In the case

of either Party, Confidential Information also shall include, whether or not designated "Confidential Information", (i) Software, materials and other Intellectual Property owned by the disclosing Party, and (ii) all non-public information concerning the operations, affairs and businesses of a Party or its Affiliates, the financial affairs of a Party or its Affiliates, and the relations of a Party or its Affiliates with its customers, employees and service providers (including customer lists, customer information, account information and consumer markets).

**9.2** <u>Excluded Information</u>.  Excepted from the obligations of confidence and non-use under this **<u>Section 9</u>** is that information which:

**(a)** the receiving Party is legally required to disclose, which disclosure shall be made in accordance with the below provisions of Section 9.3;

**(b)** is independently developed by the receiving Party without reference to Confidential Information of the disclosing Party;

**(c)** was, at the time of disclosure to it, in the public domain;

**(d)** after disclosure to it, is published or otherwise becomes part of the public domain through no fault of the receiving Party;

**(e)** was in the possession of the receiving Party at the time of disclosure to it;

**(f)** was received after disclosure to it from a third party who had a lawful right to disclose such information to it without any obligation to restrict its further use or disclosure.

**9.3** <u>Compelled Disclosure</u>.  Notwithstanding the provisions of this **<u>Section 9</u>**, if the receiving Party becomes legally compelled to disclose any of the disclosing Party's Confidential Information, the receiving Party will promptly advise the disclosing Party of such legal requirement to disclose Confidential Information in order that the disclosing Party may seek a protective order, may interpose an objection to such disclosure, take action to assure confidential handling of the Confidential Information, or take such other action as it deems appropriate to protect the Confidential Information in the circumstances.  The receiving Party will disclose only that portion of the disclosing Party's Confidential Information that it is legally required to disclose.

**9.4** <u>Return of Information</u>.  Except for Confidential Information for which a continuing license is granted to the receiving Party under this Agreement, upon written request by the disclosing Party or upon Termination or conclusion of the Agreement, all of the disclosing Party's Confidential Information in whatever form will be returned to the disclosing Party or destroyed by the Receiving Party and certified as such to the Disclosing Party, without retaining copies thereof, except that any instances of such Confidential Information in an archived form that are commercially impractical to return may be retained so long as the receiving Party does not access or make use of such Confidential Information after receipt of the written request for return from the disclosing Party.

**9.5** <u>Exception</u>.  Notwithstanding anything else in this **<u>Section 9</u>**, Supplier will have a

right to disclose Recipient's Confidential Information to third parties to the extent reasonably necessary for Supplier to accomplish its responsibilities contemplated hereunder or for Supplier to comply with its obligations under applicable law, including its reporting obligations under applicable law, and, in the case of AFI, to use Confidential Information of ResCap to operate AFI's business, consistent with the manner such Confidential Information was used by AFI prior to the Effective Date; provided, however, that such disclosure to third parties will be made under confidentiality terms and conditions that are no less favorable to Recipient than the provisions of this **Section 9** or, if less favorable, that are consistent with Recipient's customary practice for the nature of the third party receiving Recipient's Confidential Information.

**9.6** Obligations.

(**a**) Each Party's Confidential Information shall remain the property of that Party except as expressly provided otherwise by the other provisions of this Agreement. Except as otherwise provided in this Agreement, each Party shall each use at least the same degree of care, but in any event no less than a reasonable degree of care, to prevent disclosing to third parties the Confidential Information of the other as it employs to avoid unauthorized disclosure, publication or dissemination of its own information of a similar nature.

(**b**) In the event of any disclosure or loss of any Confidential Information of the disclosing Party, the receiving Party shall notify the disclosing Party promptly upon become aware thereof.

**9.7** Loss of Confidential Information. In the event of any disclosure or loss of any Confidential Information of the disclosing Party due to the fault of the receiving Party, the receiving Party shall promptly, at its own expense: (a) notify the disclosing Party in writing; and (b) cooperate in all reasonable respects with the disclosing Party to minimize the violation and any damage resulting therefrom.

**9.8** No Implied Rights. Nothing contained in this **Section 9** shall be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or impliedly, any rights or license to the Confidential Information of the other Party.

## 10. COMPENSATION.

**10.1** General. ResCap will pay to AFI the Charges as set forth in **Schedule C-1a** and elsewhere in **Schedule C**, and AFI will pay to ResCap the Charges as set forth in **Schedule C-2a** and elsewhere in **Schedule C**. Supplier will provide Recipient with estimated invoices (with information linking the Services delivered to the invoice amounts) on a monthly basis on or before the last day of each calendar month for all Services performed by Supplier and all related Charges incurred by Recipient during that month. The last business day of the calendar month is the cut-off for delivered Services and related Charges to be invoiced in the next calendar month. The estimated charges will be adjusted to actual charged by the last day of the following month. Recipient will pay the estimated and adjusted actual invoices within

45 days of the receipt of an invoice from Supplier.  Any payment by Recipient is without prejudice of its right to contest the accuracy of any Charges.

**10.2** Taxes.   In addition to the prices determined pursuant to **Schedule C**, each Party will pay, and hold the other Party harmless against, all goods and services, sales, use, excise and other taxes, and other fees or assessments imposed by law in connection with the provision of the Services by the other Party, other than taxes measured by the other Party's net income.  The Parties will cooperate with each other and use commercially reasonable efforts to assist the other in entering into such arrangements as the other may reasonably request in order to minimize, to the extent lawful and feasible, the payment or assessment of any taxes relating to the transactions contemplated by this Agreement; provided, however, that nothing in this **Section 10.2** will obligate Supplier to cooperate with, or assist, Recipient in any arrangement proposed by Recipient that would, in Supplier's sole discretion, have a detrimental effect on Supplier or any of Supplier's Affiliates.

**10.3** Invoicing and Payment.   Supplier will invoice Recipient in accordance with **Schedule C**.  Payments for amounts past due will bear interest calculated on a per annum basis from the due date to the date of actual payment at a fluctuating interest rate equal at all times to the prime rate of interest announced publicly from time to time by Citibank, N.A. plus two percent (2%), but in no case higher than the maximum rate permitted by Law.  Each Party will make payments under this Agreement by electronic funds transfer in accordance with payment instructions provided by the other Party in its capacity as Supplier from time to time.

## 11.                   REPRESENTATIONS AND WARRANTIES.

**11.1** Services.  Supplier represents and warrants to Recipient that it will use the level of care in providing the Services required by **Section 3.1(c)**, or with respect to Services that are dedicated to Recipient (i.e., where Supplier does not provide similar services to itself or its Affiliates), Supplier will provide such Services using commercially reasonable efforts and in a workmanlike manner, and in accordance with commercially reasonable practices.

**11.2** Maintenance .  Supplier represents and warrants to Recipient that it shall provide for the maintenance of the Supplier Systems, Supplier Equipment and Supplier Software in the same manner that such functions were generally performed by Supplier for Recipient immediately prior to the effective Date and thereafter in a manner consistent with the standard of performance required by **Section 3.1(c)**, for such items to generally operate in accordance with the manner in which they operated in the past or in the manner in which they operate in the future in support of Supplier and its Affiliates.

**11.3** Authorization.  Each Party represents and warrants to the other Party that, subject to approval of this Agreement by the Bankruptcy Court:  (a) it has the requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated by this Agreement; and (b) the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite corporate action on the part of such Party.

**11.4** Viruses.  Each Party represents and warrants to the other Party that it shall use the

17

same efforts that it uses with respect to its own users and Systems, to avoid computer viruses from being introduced into the Systems of the other Party under this Agreement or the Systems that such Party is using to perform Services hereunder.

**11.5** Disclaimer.  EXCEPT AS EXPRESSLY SET FORTH IN THIS **SECTION 11**, NONE OF SUPPLIER, ITS AFFILIATES OR ANY OF THEIR RESPECTIVE REPRESENTATIVES MAKE OR HAVE MADE ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE SERVICES, INCLUDING WITH RESPECT TO (A) MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR USE OR PURPOSE, (B) THE USE OF THE SERVICE BY RECIPIENT AFTER THE RECEIPT THEREOF, OR (C) THE PROBABLE SUCCESS OR PROFITABILITY OF RECIPIENT'S OR ANY OF RECIPIENT'S BUSINESS AFTER THE RECEIPT OF THE SERVICES.

## 12.                      INSURANCE.

**12.1** Insurance.  At all times during the Term and any extension hereof, unless and until the effective date of the Plan, ResCap, its Affiliates, and all of their respective directors, officers and employees will be covered under AFI's existing policies of insurance.  Upon and following the effective date of the Plan, (i) both Parties will procure and maintain in full force and effect their own insurance policies at their own expense and for their own benefit, as determined by each party independently, but consistent with any and all applicable federal, state and local laws or regulations, and (ii) AFI will use commercially reasonable efforts to continue to renew its current blended directors and officers liability and fiduciary liability insurance program (the "Current Program"), for a period of six years following the effective date of the Plan (the "Run Off Period"), on substantially the same terms and conditions as the Current Program and including prior acts coverage with respect to claims arising from acts or omissions that occurred prior to the Effective Date; provided that if AFI is unable to continue the Current Program for the entire Run Off Period despite its commercially reasonable efforts it shall promptly notify the Debtors and use best efforts to obtain run off coverage for the balance of the Run Off Period.

**12.2** Risk of Loss.  Supplier will be responsible for the risk of loss of, or damage to, any property of Recipient at a Supplier facility, unless and to the extent that such loss or damage was caused by the acts or omissions of Recipient and/or Recipient's Affiliates, and/or its and/or their employees, agents and/or Subcontractors.  Recipient will be responsible for the risk of loss of, or damage to, any property of Supplier at a Recipient facility unless and to the extent that such loss or damage was caused by the acts or omissions of Supplier and/or Supplier's Affiliates, and/or its and/or their employees, agents and/or Subcontractors.  The risk of loss of, or damage to, property in transit will remain with the Party arranging the shipment.

## 13.                      INDEMNIFICATION AND LIMITATIONS ON LIABILITY.

**13.1** Indemnification.

**(a)** Recipient Indemnification.  Recipient will indemnify, hold harmless and defend Supplier and its Affiliates and their respective directors, officers and employees

("**Indemnified Parties**"), from and against any and all liabilities, damages, penalties, judgments, assessments, losses, costs and expenses in any case, whether arising under strict liability or otherwise (including reasonable outside attorneys' fees) (collectively, "**Damages**") suffered or otherwise incurred due to a Third Party Claim arising from or out of or relating to this Agreement, including the performance (or failure to perform) by Supplier of its obligations under this Agreement; provided, however, that to the extent and in the proportion Damages also arise out of or relate to the gross negligence or willful misconduct of any Indemnified Party, then the indemnity under this **Section 13.1(a)** will not apply.

**(b)** Indemnification by Supplier. Supplier will indemnify, hold harmless and defend the Recipient Indemnified Parties from and against any and all Damages suffered or otherwise incurred due to a Third Party Claim to the extent arising from or out of or relating to the gross negligence or willful misconduct of any Supplier Parties; provided, however, that to the extent and in the proportion Damages also arise from or out of or relate to the performance (or failure to perform) by Recipient of its obligations under this Agreement, then Supplier's indemnity under this **Section 13.1(b)** will not apply.

**(c)** Infringement.

**(1)** Indemnity. Supplier will indemnify, hold harmless and defend the Recipient Indemnified Parties, and Recipient will indemnify, hold harmless and defend the Supplier Indemnified Parties, from and against any and all Damages due to a Third Party Claim to the extent that the claim alleges that any information or materials provided by the Indemnifying Party to the Indemnified Party under this Agreement infringes or misappropriates any Intellectual Property Right of such third party in any country in which Services are performed or received under this Agreement.

**(2)** Exclusions. Neither Party shall have any obligation or liability to the other Party to the extent any infringement or misappropriation is caused by:

(i)        modifications to any such information or materials made by the other Party, its Affiliates, or its third party contractors;

(ii)        any combination of the allegedly infringing information or materials with items not provided by the Indemnifying Party , unless such combination was approved or directed in writing by the Indemnifying Party;

(iii)        a breach of this Agreement by the other Party;

(iv)        the failure of the other Party to use corrections or modifications provided by the Indemnifying Party offering equivalent features and functionality to the extent the Indemnifying Party notified the other Party that the failure to do so could result in infringement liability;

(v)        the content provided by the other Party and not resulting from the Indemnifying Party's modification of that content without the other Party's approval; or

(vi)          third party Software, except to the extent that such infringement or misappropriation arises from the failure of the Indemnifying Party to obtain the necessary licenses or to abide by the limitations of the applicable third party Software licenses.

(3)    Third    Party    Software    Indemnities.    As    specified    in    **Section 13.1(c)(2)(vi)**, the foregoing infringement indemnification does not apply to third party Software.  With respect to third party Software provided by Supplier or its Subcontractors pursuant to this Agreement, Supplier and its Subcontractors shall use commercially reasonable efforts to obtain intellectual property indemnification for Recipient (or obtain intellectual property indemnification for itself and enforce such indemnification on behalf of Recipient) from the suppliers of such Software comparable to the intellectual property indemnification generally available in the industry for the same Software products.  With respect to third party Software provided by Recipient pursuant to this Agreement, Recipient shall use commercially reasonable efforts to obtain intellectual property indemnification for Supplier and its Affiliates (or obtain intellectual property indemnification for itself and enforce such indemnification on behalf of the Supplier and its Affiliates) from the suppliers of such Software comparable to the intellectual property indemnification generally available in the industry for the same Software products.

(d) Indemnification Procedure.  The Party making a claim for indemnification under this **Section 13.1** is referred to as the "Indemnified Party" and the Party or other Persons against whom such claims are asserted under this **Section 13** are referred to as the "**Indemnifying Party**."  All claims by any Indemnified Party under this **Section 13** will be asserted and resolved as follows:

(1)    In the event that any right, demand, claim, action and cause of action, assertion, notice of claim or assertion, complaint, litigation, suit, proceeding, formal investigation, inquiry, audit or review of any nature, civil, criminal, regulatory, administrative or otherwise, or any grievance or arbitration (each, a "**Claim**") is asserted or instituted in writing by any person or entity other than the Parties or their Affiliates that could give rise to Damages for which an Indemnifying Party could be liable to an Indemnified Party under this Agreement (such Claim, a "**Third Party Claim**"), the Indemnified Party will promptly send to the Indemnifying Party a written notice specifying the nature of such Third Party Claim, together with all information reasonably available to the Indemnified Party with respect to such Third Party Claim (a "**Third Party Claim Notice**"); provided, however, that a delay in notifying the Indemnifying Party will not relieve the Indemnifying Party of its obligations under this Agreement, except to the extent that such failure will have caused actual prejudice to the Indemnifying Party.

(2)    In the event of a Third Party Claim, the Indemnifying Party will have ten (10) business days  after receipt of the Third Party Claim Notice relating to such Third Party Claim to elect to undertake, conduct and control, through counsel of its own choosing (provided that such counsel is reasonably acceptable to the Indemnified Party) and at its own expense, the settlement or defense of such Third Party Claim (in which case the Indemnifying Party will not thereafter be responsible for the fees and expenses of any separate counsel retained by any Indemnified Party except as set forth below).  Notwithstanding an Indemnifying Party's election to appoint counsel to represent an Indemnified Party in connection with a Third Party Claim, an Indemnified Party will have the right to employ separate counsel, and the Indemnifying Party will bear the reasonable fees, costs and expenses of such separate counsel if

ny-1040886

(i) the use of counsel chosen by the Indemnifying Party to represent the Indemnified Party would present such counsel with a conflict of interest, or (ii) the Indemnifying Party will not have employed counsel to represent the Indemnified Party within a reasonable time after notice of the institution of such Third Party Claim.  If the Indemnifying Party elects to undertake such defense, it will promptly assume and hold such Indemnified Party harmless from and against the full amount of any Damages resulting from such Third Party Claim to the extent provided herein.  If the Indemnifying Party elects to undertake such defense, (x) the Indemnified Party agrees to cooperate with the Indemnifying Party and its counsel in contesting such Third Party Claim, and, if appropriate and related to such Third Party Claim, the Indemnifying Party and the Indemnified Party will reasonably cooperate with each other in connection with defending such Third Party Claim, and (y) such Third Party Claim may not be settled or compromised by the Indemnifying Party without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed; provided, however, that in the event any Indemnified Party settles or compromises or consents to the entry of any judgment with respect to any Third Party Claim without the prior written consent of the Indemnifying Party, such Indemnified Party will be deemed to have waived all rights against the Indemnifying Party for indemnification under this **Section 13**.  If the Indemnifying Party does not undertake the defense of such Third Party Claim, the Indemnified Party will have the right to contest, settle, compromise or consent to the entry of any judgment with respect to such Third Party Claim, and, in doing so, will not thereby waive any right to recourse therefor pursuant to this Agreement; provided however, that at any time during the course of the matter the Indemnifying Party may assume the defense of such Third Party Claim by written notice of the same to the Indemnified Party.

(3)    In the event of a Third Party Claim, from and after the delivery of a Claim Notice under this Agreement, at the request of the Indemnifying Party, the Indemnified Party will grant the Indemnifying Party and its representatives all reasonable access to the books, records and properties of such Indemnified Party to the extent reasonably related to the matters to which the Claim Notice relates.  All such access will be granted during normal business hours and will be granted under conditions that will not unreasonably interfere with the businesses and operations of such Indemnified Party.  The Indemnifying Party will not, and will cause its representatives not to, use (except in connection with such Claim Notice or such Third Party Claim) or disclose to any third person or entity other than the Indemnifying Party's representatives (except as may be required by Law) any information obtained pursuant to this **Section 13.1(c)(3)**, which is designated by the Indemnified Party as (or provided under circumstances in reasonably indicating that it is) confidential.

13.2 Limitations on Liability.

(a) Subject to the specific provisions and limitations of this **Section 13.2** it is the intent of the Parties that each Party will be liable to the other Party for all Damages incurred by the non-breaching Party arising out of the breach of or failure to perform any of the breaching Party's agreements, covenants or obligations under this Agreement.  If a Party has a Claim for such Damages, it will promptly send to the breaching Party a written notice specifying the nature of such Claim, together with all information reasonably available to such non-breaching Party with respect to such Claim (a "**Claim Notice**"); provided, however, that a delay in notifying the breaching Party will not relieve the breaching Party of its obligations under this Agreement, except to the extent that such failure will have caused

actual prejudice to the breaching Party. In the event of such a Claim, the breaching Party will notify the non-breaching Party within 45 days of receipt of a Claim Notice whether or not the breaching Party disputes such Claim.

(b)     The total aggregate liability of Supplier under or in connection with this Agreement, regardless of the form of the action or the theory of the recovery, will be limited to:

(1)     With respect to Damages arising out of or relating to the failure by Supplier to meet the standards set forth in **Section 11.1**, subject to **Section 13.2(b)(2)**, at Recipient's option, which option Recipient shall exercise in its reasonable discretion after reasonably consulting with Supplier and after exhausting the escalation process set forth in Schedule B , the replacement of (if applicable) or re-performance of, or repayment of the price paid for, such Service; provided, however, that if Recipient requests the replacement of or re-performance of such Service, Supplier shall, instead have the option of refunding to Recipient the price paid for such Service in those instances where re-performance or replacement of the Services cannot, in Supplier's good faith opinion  be completed in a commercially reasonable manner. In the limited instances where Supplier determines that Supplier cannot replace or re-perform the Services in a commercially reasonable manner, Recipient shall have the option to terminate those specific Services from the Agreement without cost to Supplier other than the refund for the Services not performed in accordance with the Agreement discussed above. In any such limited instance, Recipient may elect to terminate and no longer have any obligation to pay for those specific Services under the Agreement, and Supplier's obligation will be limited to the refund discussed above and any reasonable cooperation requested by Recipient in the transition of the terminated services to Recipient or a third party.

(2)     With respect to indemnity Claims under **Section 13.1** or other Claims arising out of or relating to the gross negligence or willful misconduct of Supplier, the fees actually received by Supplier from Recipient for Services during the twelve (12) months preceding the last act or omission giving rise to such Claims or, in the event such last act or omission occurs during the first twelve (12) months following the date hereof, an amount equal to twelve (12) times the fees paid for Services in the month preceding such last act or omission;

(3)     With respect to all other Damages under or in connection with this Agreement, the fees actually received by Supplier from Recipient for Services during the twelve (12) months preceding the last act or omission giving rise to such Damages or, in the event such last act or omission occurs during the first twelve (12) months following the date hereof, an amount equal to twelve (12) times the fees paid for Services in the month preceding such last act or omission.

(c)     Each Party will use its commercially reasonable efforts to mitigate Damages for which it seeks recourse hereunder, including by promptly pursuing recovery under available insurance policies, provided, however, that the failure of such Party to successfully mitigate such Damages will not affect such Party's right to seek recourse with respect to such Damages so long as such Party will have used its commercially reasonable efforts to mitigate.

(d)     Any amounts payable under **Article 13** will be calculated after giving effect to any proceeds received from insurance policies covering the Damages.

22

(e)  IN NO EVENT SHALL EITHER PARTY, ITS AFFILIATES OR ANY OF ITS OR THEIR DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS BE RESPONSIBLE OR LIABLE TO THE OTHER PARTY OR ITS AFFILIATES FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, OR FOR ANY LOSS OF PROFITS, LOSS OF REVENUE, LOSS RESULTING FROM INTERRUPTION OF BUSINESS OR LOSS OF USE OR DATA, EVEN IF THAT PARTY, ITS AFFILIATES OR ANY OF THEIR DIRECTORS, OFFICERS, EMPLOYEES OR AGENTS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY OF ANY KIND, UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY, ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR ITS IMPLEMENTATION.

**13.3** Indemnification and Limitations on Liability Relating to Negligence and Strict Liability.  ALL INDEMNITIES AND LIMITATIONS ON LIABILITY CONTAINED IN THIS **SECTION 13** WILL APPLY WHETHER OR NOT THE INDEMNITEE OR PARTY CLAIMING DAMAGES WAS OR IS CLAIMED TO BE PASSIVELY, CONCURRENTLY OR ACTIVELY NEGLIGENT, AND REGARDLESS OF WHETHER LIABILITY WITHOUT FAULT IS IMPOSED OR SOUGHT TO BE IMPOSED ON SUCH INDEMNITEE OR PARTY.

**13.4** Exclusive Remedy.  Neither Party will have any remedy arising out of or relating to the breach of this Agreement other than the indemnification remedies set forth in **Section 13.1** and Claims for direct damages referred to in **Section 13.2**, in each case subject to the limitations and exclusions set forth in this **Section 13**.

**13.5** Insurance.  From and after the completion of a Sale, each Party will cause its insurers to waive their rights of subrogation against the other Party with respect to any Claim.

# 14.    TERMINATION.

**14.1** Termination.  Without limiting the rights of the Parties under any other provision of this Agreement, any Service to be provided under this Agreement may be terminated as follows:

(a) by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, after Recipient fails to pay the Charges for such Service when due in accordance with this Agreement, the terminating Party sends to the other Party an initial notice of such failure and the other Party fails to pay such Charges within forty-five (45) days of receipt of such initial notice; or

(b) by either Party acting in its capacity as "Supplier", upon written notice to the other Party if, following a material breach by Recipient of this Agreement other than a payment default, the terminating Party sends to the other Party a notice of such material breach and the other Party fails to cure such material breach within 30 days; provided however, that if cure cannot reasonably be accomplished within such 30-day period, this Agreement may not be terminated by reason of such breach for so long as the other Party

commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within 90 days of such written notice; or

(c) by either Party acting in its capacity as "Recipient", upon written notice to the other Party if, following a material breach by Supplier of this Agreement, the terminating Party sends to the other Party an initial notice of such material breach and the other Party fails to cure such material breach within 30 days of receipt of such initial notice; provided, however, that if cure cannot reasonably be accomplished within such 30-day period, this Agreement may not be terminated by reason of such breach for so long as the other Party commences a cure within such 30-day period and pursues such cure diligently to completion and such completion occurs within 90 days of such written notice;

(d) by either Party acting in its capacity as "Recipient", upon at least ninety (90) days prior written notice to the other Party; or

(e) otherwise upon mutual agreement of the Parties.

14.2 <u>Termination Following Sale</u>.  Upon the final approval by the Bankruptcy Court of a Sale, either Party in its capacity as a Supplier may within 14 days of such final approval elect to terminate the provision of the Services that such Party is required to provide to the other Party under this Agreement, effective upon the closing of such Sale.  In the event of such termination, Recipient will provide Supplier with notice of any Termination Assistance Services required by Recipient within twenty-one (21) days after receipt of such notice.

14.3 <u>Election of Terminating Party</u>.  In connection with any termination pursuant to this **Section 14**, the Party exercising such termination rights may elect to continue to receive the Services (other than Services so terminated) that the other Party provides to it.

14.4 <u>Survival</u>.  Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement will survive any termination or expiration of this Agreement and continue in full force and effect including, but not limited to, the following:    **Sections 8.2** (Ownership), **9** (Confidentiality), **10** (Compensation), **11** (Representations and Warranties), **12** (Insurance), **13** (Indemnification and Limitations on Liability), **14.4** (Survival), **14.5** (Rights Upon Termination or Expiration; Sale), **16.3** (Counterparts), **16.5** (Force Majeure), **16.6** (Further Assurances), **16.7** (Governing Law; Jurisdiction and Forum; Waiver of Jury Trial), **16.8** (Headings), **16.11** (Public Announcements), and **16.13** (Severability).

14.5 <u>Rights Upon Termination or Expiration; Sale</u>.

(a) <u>Termination or Expiration</u>.  Commencing six (6) months prior to expiration of the Term or any extension thereof, or upon either Party receiving any notice of termination from the other Party pursuant to the above provisions of **Section 14**:

(1)    At Recipient's option, Supplier will provide to Recipient the termination assistance reasonably requested by Recipient to allow the Services to continue, and to facilitate the orderly transfer of responsibility for performance of the Services, including any migration of Recipient Data, to Recipient (collectively, "**Termination Assistance Services**"),

for a period of up to six (6) months (or, with respect to information technology Services, eighteen (18) months) after the effective date of such termination of Services or expiration of the Term (the "**Termination Services Periods**"); provided however, that, if mutually agreed upon in writing by the Parties (including with respect to adjustments in Charges), the Termination Service Periods may be extended until the effective date of the Plan.

(2)    The Termination Assistance Services to be provided during the Termination Services Periods may include, as and if reasonably required by Recipient, the following, among other Services: (i) developing, together with Recipient, a plan for the orderly transition of the performance of the Services, including the migration of Recipient Data from Supplier to Recipient or to a third party designated by Recipient; (ii) providing reasonable training for personnel of Recipient in the performance of the Services then being transitioned to Recipient or the third party designated by Recipient, to the extent Services are being assumed by that third party; and (iii) providing cooperation to Recipient to facilitate the transition of the performance of the Services to Recipient or to a third party designated by Recipient, in accordance with a mutually agreed upon transition plan for the applicable Services. If Supplier provides any access to Supplier facilities, Systems or resources in connection with the execution of such plan, Recipient will, and will cause its personnel and any third parties having such access to, comply with Supplier's security and confidentiality requirements. Notwithstanding the foregoing, Supplier shall not be required to grant access to or share any of Supplier's proprietary information, data or technology with any third party.

(b) Charges. ResCap will pay to AFI Charges for the Services described in **Section 14.5(a)** as provided in **Schedule C**, including during the Termination Services Periods. AFI will pay to ResCap Charges for the Services described in **Section 14.5(a)** as provided in **Schedule C**, including during the Termination Services Periods. In the event of any termination of Services by Supplier for cause, if approved by the Bankruptcy Court, Charges for the related Termination Assistance Services will be paid by Recipient monthly in advance.

14.6 Dedicated Assets. Upon the approval by the Bankruptcy Court of any Sale or as otherwise mutually agreed between the Parties to facilitate a Sale, AFI and ResCap each agree to promptly enter into good faith negotiations with the Buyer(s) in such Sale to agree on which, if any, Dedicated Assets are to be transferred to Recipient, an Affiliate of Recipient, or such Buyer(s), in connection with such Sale, and the terms and conditions of such transfer (including pricing and allocation of responsibility with respect to obtaining and paying for the associated Required Consents). Notwithstanding the allocation of responsibility for Required Consents in **Section 3.5**, except as otherwise agreed upon by the Parties, Recipient shall reimburse Supplier for any actual costs, losses, transfer fees or termination penalties incurred by Supplier in connection with the transfer or assignment to Recipient, an Affiliate of Recipient or such Buyer(s) of any Dedicated Assets. Supplier shall use good faith efforts to mitigate such costs including, to the extent feasible, by not entering into (or extending) during the Term such Supplier contracts that contain transfer fees or early termination penalties without the written consent of Recipient. For the avoidance of doubt, while each Party agrees to negotiate in good faith with respect to the transfer of Dedicated Assets, neither Party shall be obligated to transfer any Dedicated Assets, except as otherwise mutually agreed upon in writing by the Parties.

**14.7** Transition Services Agreement.  Upon the approval by the Bankruptcy Court of any Sale or as otherwise mutually agreed between the Parties to facilitate a Sale, AFI and ResCap each agree to promptly enter into good faith negotiations with the Buyer(s) in such Sale for an agreement pursuant to which AFI, ResCap and/or the Buyer(s) would provide or receive, as applicable, reasonable specified transition services in connection with such Sale (the "**Transition Services Agreement**").  The services to be provided to the Buyer and the terms relating to the transition of certain Services are to be addressed in the Transition Services Agreement.  For the avoidance of doubt, while AFI agrees to negotiate in good faith with ResCap and/or a Buyer with respect to entering into a Transition Services Agreement, AFI is not obligated to provide services to a Buyer or after a Sale, other than Termination Assistance Services  as contemplated in **Section 14.5(a)(2)** unless otherwise agreed by  AFI.


**15.**                          **FULLY INTEGRATED AGREEMENT.**  The following provisions of this Section 15 are subject to the other provisions set forth in this Agreement relating to Recipient's right to increase the amount of, decrease the amount of and/or terminate any Service provided to Recipient by and/or on behalf of Supplier.

15.1        Each of the Parties represents, warrants, covenants, and agrees that this Agreement including the exhibits and schedules thereto comprise a single, unitary, indivisible, and non-severable agreement governing the operational arrangements between Supplier and its Affiliates on the one hand and Recipient and its Affiliates on the other hand.  Although various schedules in this Agreement describe different services, all of the Services covered by this Agreement are highly integrated and interdependent, such that removal of any of the services would impair the delivery, value or usability of the remaining services.  Accordingly, the description of those Services and the associated terms in separate documents, including separate Charges for the Services, does not signify that each constitutes a separate agreement; instead, such treatment is intended solely to facilitate articulation of the terms and conditions of the overall single, unitary and indivisible transaction.  The use of expressions "single", "unitary", "indivisible", and "non-severable" to describe this Agreement is not merely for convenient reference.  It is the conscious choice and express intent of the Parties to enter into a single, unitary, indivisible and non-severable transaction. Each of the Parties agrees that from an economic point of view this Agreement including all exhibits and schedules thereto reflect one indivisible and non-severable economic bargain between Supplier and Recipient, all other provisions of this Agreement and the provisions of each exhibit and schedule thereto, including such schedules and exhibits that may be executed following the Effective Date, have been negotiated and agreed to collectively as a single, composite, inseparable transaction, and that any one component of the transaction would not have been entered into other than as a part of the overall transaction.  Except as expressly provided in this Agreement or any exhibit or schedule thereto for specific isolated purposes (and in such cases only to the extent expressly so stated, it otherwise being presumed that this paragraph is applicable), (i) all provisions of this Agreement including all exhibits and schedules thereto, including definitions, commencement and expiration dates, monetary provisions, use provisions, breach, default, setoff, recoupment, enforcement and termination provisions, and assignment, are integral to the entire transaction and are not severable; (ii) the economic terms of the transaction would have been substantially different had separate transactions been acceptable

to the Parties; and (iii) the provisions of this Agreement including all exhibits and schedules thereto will at all times be construed, interpreted and applied such that the intention of all Parties to effect a unitary, indivisible transaction will be preserved and maintained.

15.2      Without limiting the foregoing **Section 15.1**, the Parties further agree that for all purposes, including any transfer, assignment, rescission, assumption, or rejection of this Agreement under Section 365 of the Bankruptcy Code or any amendment or successor section thereof, or otherwise, this Agreement including all exhibits and schedules thereto constitutes one indivisible, integrated and non-severable agreement dealing with and covering one legal and economic unit which must be transferred, assigned, rescinded, assumed, or rejected (as applicable) as a whole with respect to all (and not less than all) of the obligations covered under this Agreement including all exhibits and schedules thereto.

15.3      The terms and provisions of this Agreement govern the provision of all Services under this Agreement.

# 16.      GENERAL.

**16.1** <u>Acknowledgement</u>.  The Parties acknowledge that the terms and conditions of this Agreement have been the subject of active and complete negotiations, and that this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provision of this Agreement.

**16.2** <u>Binding Effect; No Assignment</u>.  This Agreement is binding upon and inures to the benefit of the Parties and their respective successors, permitted assigns and legal representatives.  This Agreement is not assignable by either Party without the prior written consent of the other Party, and any other purported assignment will be null and void.

**16.3** <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which will be considered one and the same agreement, and will become effective when one or more counterparts have been signed by each of the Parties and delivered (including by facsimile) to the other Parties.

**16.4** <u>Entire Agreement</u>.   This Agreement, including the Schedules hereto, which are each hereby incorporated herein and made a part hereof, contains the entire agreement between the Parties with respect to the subject matter hereof.  While purchase orders, invoices or similar routine documents may be used to implement or administer provisions of this Agreement, any provisions of such documents that add to, vary, modify or are at conflict with the provisions of this Agreement will be deemed deleted and will have no force or effect on either Party's rights or obligations under this Agreement.

**16.5** <u>Force Majeure</u>.

**(a)** "**Force Majeure Event**" means any event beyond the reasonable control of the Party affected that significantly interferes with the performance by such Party of its obligations under this Agreement, including acts of God, strikes, lockouts or industrial disputes or disturbances, civil disturbances, arrests or restraint from rulers or people,

interruptions by government or court orders or present and future valid orders of any regulatory body having proper jurisdiction (other than any such interruption arising from the failure by the Party claiming force majeure to comply with any applicable regulation or to obtain and comply with any required permit), acts of the public enemy, wars, riots, blockades, insurrections, inability to secure labor or secure materials upon terms deemed practicable by the Party affected (including by reason of allocations, voluntary or involuntary, promulgated by authorized governmental agencies), epidemics, landslides, lightning, earthquakes, fire, storm, floods, washouts, explosions, breakage or accident to machinery.

**(b)** If a Force Majeure Event is claimed by either Party, the Party making such claim will orally notify the other Party as soon as reasonably possible after the occurrence of such Force Majeure Event and, in addition, will provide the other Party with written notice of such Force Majeure Event within five (5) days after the occurrence of such Force Majeure Event.

**(c)** Except for a Party's obligations to make payments hereunder (including those obligations of **Section 10.3** hereof), neither Party hereto will be liable for any nonperformance or delay in performance of the terms of this Agreement when such failure is due to a Force Majeure Event and the Charges payable by Recipient shall be equitably adjusted such that Recipient is not be obligated to pay any Charges for any Services to the extent not performed due to a Force Majeure Event. If either Party relies on the occurrence of a Force Majeure Event as a basis for being excused from performance of its obligations hereunder, such Party relying on the Force Majeure Event will (i) provide an estimate of the expected duration of the Force Majeure Event and its probable impact on performance of such Party's obligations hereunder and (ii) provide prompt notice to the other Party of the cessation of the Force Majeure Event.

**(d)** Upon the occurrence of a Force Majeure Event, the same will, so far as possible, be remedied as expeditiously as possible using commercially reasonable efforts. It is understood and agreed that nothing in this **Section 16.5(d)** will require the settlement of strikes, lockouts or industrial disputes or disturbances by acceding to the demands of any opposing party therein when such course is inadvisable in the discretion of the Party having the difficulty.

**16.6** Further Assurances. Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party will execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

**16.7** Governing Law; Jurisdiction and Forum; Waiver Of Jury Trial.

**(a)** This Agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the choice of law principles thereof.

**(b)** Each Party irrevocably submits to the jurisdiction of the Bankruptcy Court in any action arising out of or relating to this Agreement, and hereby irrevocably agrees that

ny-1040886

all claims in respect of such action may be heard and determined in the Bankruptcy Court. Each Party hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding.  The Parties further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any proceeding contemplated above will be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which will be conclusive evidence of the fact and amount of such judgment.

       **(c)** Each Party waives, to the fullest extent permitted by Law, any right it may have to a trial by jury in respect of any action, suit or proceeding arising out of or relating to this Agreement.  Each Party certifies that it has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications set forth above in this **Section 16.7**.

       **16.8** Headings.  The Section headings contained in this Agreement are inserted for convenience of reference only and do not affect the meaning or interpretation of this Agreement.  All references to Sections contained herein mean Sections of this Agreement unless otherwise stated and except in the Schedules hereto, wherein references to Sections mean Sections of such Schedule unless otherwise stated.

       **16.9** Independent Contractors.  Supplier is an independent contractor, with all of the attendant rights and liabilities of an independent contractor, and not an agent or employee of Recipient.  Any provision in this Agreement, or any action by Recipient, that may appear to give Recipient the right to direct or control Supplier in performing under this Agreement means that Supplier will follow the desires of Recipient in results only.

       **16.10**    Notices.  All notices and other communications to be given to any Party hereunder are sufficiently given for all purposes hereunder if in writing and delivered by hand, courier or overnight delivery service or three days after being mailed by certified or registered mail, return receipt requested, with appropriate postage prepaid, or when received in the form of a facsimile or e-mail transmission and will be directed to the physical address, facsimile number or e-mail address set forth below (or at such other address or facsimile number as such Party will designate by like notice):

**IF TO AFI:**

       Ally Financial Inc.
       200 Renaissance Center, MC 200-B09-B-11
       Detroit, Michigan 48265
       Attention:  Chief Financial Officer
       E-Mail Address: james.mackey@ally.com

       With a copy to:
       Ally Financial Inc. Legal Staff
       200 Renaissance Center, MC 200-B09-B-11

Detroit, Michigan 48265
Attention:  IT Counsel
E-mail address: Thomas.lynch@ally.com

**IF TO RESCAP:**

Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  James Whitlinger
E-Mail Address.: jim.whitlinger@gmacm.com

With a copy to:
Residential Capital, LLC
1100 Virginia Drive
Fort Washington, PA 19034
Attention:  Tammy Hamzehpour
E-mail Address: tammy.hamzehpour@gmacm.com

      16.11     <u>Public Announcements</u>.  Except as otherwise required by law, each of AFI and ResCap will consult with the other and obtain the prior written consent of the other before issuing, or permitting any agent or Affiliate to issue, any press releases or otherwise making, or permitting any agent or Affiliate to make, any public statements with respect to this Agreement or the transactions contemplated hereby; <u>provided</u>, <u>however</u>, that the prior written consent of the other Party is not required hereunder with respect to any press release, public announcement or communication that is substantially similar to a press release, public announcement or communication previously issued with the prior written consent of the other Party.

      16.12     <u>Amendments and Waivers</u>.  This Agreement may not be modified or amended except by an instrument or instruments in writing signed by both Parties.  The Parties may, only by an instrument in writing, waive compliance by the other Party with any term or provision of this Agreement on the part of such other Party to be performed or complied with.  The waiver by either Party of a breach of any term or provision of this Agreement will not be construed as a waiver of any subsequent breach.  Except as otherwise expressly provided herein, no failure to exercise, delay in exercising or single or partial exercise of any right, power or remedy by either Party, and no course of dealing between the Parties, will constitute a waiver of any such right, power or remedy.

      16.13     <u>Severability</u>.  If any provision of this Agreement is held invalid, illegal or unenforceable, the validity, legality or enforceability of the other provisions of this Agreement will not be affected thereby, and there will be deemed substituted for the provision at issue a valid, legal and enforceable provision as similar as possible to the provision at issue.

      16.14     <u>No Third Party Beneficiaries</u>.  This Agreement is entered into solely between, and, except with respect to the rights of the Supplier Parties and the Recipient Parties under **Section 13**, may be enforced only by, Recipient and Supplier.  This Agreement does not

create any rights or causes of action in or on behalf of any third parties, including employees, suppliers, customers, Affiliates or Subcontractors of a Party, or create any obligations of a Party to any such third parties, except that either Party is entitled to include as part of its Damages under this Agreement the Damages incurred by its Affiliates or Subcontractors in connection with a breach by the other Party of this Agreement.

      **16.15**     <u>Order of Precedence</u>.  In the event of a conflict, this Agreement takes precedence over the Schedules.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their authorized representatives, to be effective as of the Effective Date.

**Ally Financial Inc.**

By: _____

Name:    Michael A. Carpenter

Title:    Chief Executive Officer

**Residential Capital, LLC**

By: _____

Name: _____

Title: _____

S-1

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed
by their authorized representatives, to be effective as of the Effective Date.

**Ally Financial Inc.**                                    **Residential Capital, LLC**

By: _____                By: _____

Name: _____                Name:    Thomas Marano

Title: _____                Title:    Chief Executive Officer

## Schedule A-1

## Parent Services

**The following Statements of Work are governed by the Agreement.**

**AFI to ResCap Statements of Work by Functional Service Area**

|  | Functional Service Area | SOW Name | SOW Number (if applicable) |
|---|---|---|---|
| 1 | Audit | Internal Audit Services | 1G |
| 2 | Capital Markets | Capital Markets Services | 1C |
| 3 | Communications | Communications and Investor Relations Services | - |
| 4 | Communications | eCommerce Services | 1H |
| 5 | Compliance | Global Security Services | 1O |
| 6 | Compliance | Global Privacy Services | 1N |
| 7 | Compliance (includes Consent Order Costs) | Global Compliance Services | 1M |
| 8 | Facilities | Facilities Services | 1Ka |
| 9 | Finance Tax | Finance Shared Services | 1a04 |
| 10 | Finance Tax | Tax Services | 1a08 |
| 11 | Finance Tax | General Accounting Services | 1A5 |
| 12 | Government Relations | Government Relations | 1X |
| 13 | Human Resources | Human Resources Support Services | 1Qa |
| 14 | ITG | Global Information Security | 1R1 |
| 15 | ITG | Application Development and Support – IT Corporate Services | 1R9 |
| 16 | ITG | Cross Functional Services | - |
| 17 | ITG | End User Computing Services | - |
| 18 | ITG | IT Technology Strategy and Architecture Services | - |
| 19 | ITG | Voice Services Mobility SOW (Mid)_AFI to ResCap | - |
| 20 | ITG | Network Services – Local Area Network | - |
| 21 | ITG | Network Services – Network WAN Network Services WAN (Mid)_AFI to ResCap | - |
| 22 | ITG | Hosting Operations – Hosting, Implementation and Data Center Services | - |
| 23 | ITG | Voice Services - Telecommunications and Contact Center Telecom Call Center AFI to ResCap | - |
| 24 | Legal | Legal Services | 1S |
| 25 | Loan Review | Loan Review | 1T |
| 26 | Marketing | Global Brand & Product Marketing | 1I |
| 27 | Risk | Risk Management | 1J |
| 28 | Supply Chain | Supply Chain Management Services | 1P |
| 29 | Treasury | Treasury Services - Global Funding and Liquidity ("GF&L") | 1W1 |
| 30 | Treasury | Treasury Services Structured Funding Deal Compliance and Facility Management | 1W2 |
| 31 | Treasury | Treasury Services, Treasury Operations | 1W7 |

## Schedule A-2

## Reverse Services

**The following Statements of Work are governed by the Agreement.**

**ResCap to AFI Statements of Work by Functional Service Area**

| # | Functional Service Area | SOW Name | SOW Number (if applicable) |
|---|---|---|---|
| 1 | Accounting | Capital Markets Accounting | 14L |
| 2 | Accounting | ResCap Accounting Services | - |
| 3 | Accounting | Accounting | 14F |
| 4 | Business Risk and Controls and Business Excellence Support | Business Risk and Controls and Business Excellence Support | 14J |
| 5 | Capital Markets | Capital Markets | 14B |
| 6 | Capital Markets | Records Services | 14I |
| 7 | Compliance | Line of Business Compliance Services | 14H |
| 8 | Consumer Lending | Consumer Lending Services | 14M |
| 9 | Finance | Mortgage Financial Planning and Analysis | 14G |
| 10 | Human Resources | HR Support Services (AFI) | 1Qb |
| 11 | Human Resources | HR Support Services (Bank) | 14C |
| 12 | ITG | IT Resource Services | - |
| 13 | ITG | Application Support | 14A |
| 14 | Legal | Legal Services (AFI) | 1S |
| 15 | Legal | Legal Services (Bank) | 14E |
| 16 | Masterservicing | Master Servicing for Ally Auto - Bond Administration | - |
| 17 | Masterservicing | Master Servicing for Ally Auto - Bond Modeling | - |
| 18 | Risk | Risk Services Reporting and Special Assets | - |
| 19 | Risk | Risk Management & Data Collection | 14D |
| 20 | Risk | Client Repurchase | 14N |

# Schedule A-3

## Planned IT Projects

| AFI ==> Recap | Selected Driver | 2012 Total 3rd Party Expense | | 2012 People Expense | | 2012 Total Project Expense | | Mortgage Allocation | |
|---|---|---|---|---|---|---|---|---|---|
| | | Monthly $ | Annual $ | Monthly $ | Annual $ | Monthly $ | Annual $ | Monthly $ | Annual $ |
| Global Functions Infrastructure | 33.1% | 128,835 | 1,546,021 | 13,760 | 165,120 | 142,595 | 1,711,141 | 47,199 | 566,388 |
| Corporate Infrastructure | 33.1% | 34,614 | 415,364 | 3,645 | 43,736 | 38,258 | 459,100 | 12,664 | 151,962 |
| Security | 33.1% | 50,000 | 600,000 | 22,054 | 264,646 | 72,054 | 864,646 | 23,850 | 286,198 |
| Finance | 33.1% | 53,333 | 640,000 | 26,100 | 313,203 | 79,434 | 953,203 | 26,293 | 315,510 |
| Treasury | 33.1% | 97,583 | 1,171,000 | 122,259 | 1,467,106 | 219,842 | 2,638,106 | 72,768 | 873,213 |
| Compliance | 33.1% | 35,333 | 424,000 | 7,378 | 88,532 | 42,711 | 512,532 | 14,137 | 169,648 |
| Legal | 33.1% | 60,083 | 721,000 | 50,439 | 605,273 | 110,523 | 1,326,273 | 36,583 | 438,996 |
| HR | 24.9% | 52,083 | 625,000 | 43,152 | 517,822 | 95,235 | 1,142,822 | 23,707 | 284,485 |
| Communications | 24.9% | 12,500 | 150,000 | 24,584 | 295,009 | 37,084 | 445,009 | 9,231 | 110,777 |
| Supply Chain | 33.1% | 39,583 | 475,000 | 75,825 | 909,896 | 115,408 | 1,384,896 | 38,200 | 458,401 |
| Capital Markets | 33.1% | 60,083 | 721,000 | 50,079 | 600,950 | 110,162 | 1,321,950 | 36,464 | 437,565 |
| Technology Operations | 16.1% | 166,327 | 1,995,928 | 192,734 | 2,312,805 | 359,061 | 4,308,733 | 57,809 | 693,706 |
| Total | | 790,359 | 9,484,314 | 632,008 | 7,584,098 | 1,422,368 | 17,068,412 | 398,904 | 4,786,850 |

| Memo: Direct Charged Project Expense | |
|---|---|
| Shared Services - RTCoE Project | 401,380 |
| Technology Ops. Project Expense | 73,185 |
| Finance - Mortgage Ledger Risk Project | 893,630 |
| Direct Charged Infrastructure Shared Services - TI $ | 221,928 |
| Mortgage Infrastructure Project Expense | 1,690,480 |
| Total Projects Direct and Shared Expense (excl ResCap DW) | $ 8,067,453 |
| | |
| Rescap Data Warehouse Apr-Dec (Capital) | 3,823,528 |
| ResCap Data Warehouse Apr-Dec (Expense) | 158,235 |
| Hardware purchased to date | 2,748,351 |

Schedule A-3

## Consolidated 2012 Project List

| Project/ Initiative Name | BU/GF Name | Budget Allocated To | 2012 IT Project Spend Subtotal (calculated IT Project Spend Expense + IT Project Spend Software Capital + IT Project Spend...) | 2012 IT Project Spend Expense | People Expense Factor (varies by Global Function) | People Expense Dollar | Total Project Expense (3rd Party + People Factor) | Difference in Plan b/w Spend and Capital | Official Color |
|---|---|---|---|---|---|---|---|---|---|
| EU EUI Enterprise Windows 7 Test Environment | Global Functions Infrastructure | Infrastructure | $ 59 | $23 | 10.7% | $2 | $25 | $36 | Green |
| EU EUI Wireless LAN | Global Functions Infrastructure | Infrastructure | $ 4 | $2 | 10.7% | $0 | $2 | $2 | Green |
| Global Database Upgrade | Global Functions Infrastructure | Infrastructure | $ 110 | $10 | 10.7% | $12 | $121 | $0 | Green |
| HT EV 2011 Evergreen-Win & UNIX Servers | Global Functions Infrastructure | Infrastructure | $ 2 | $1 | 10.7% | $0 | $1 | $0 | Green |
| HT EV F5 Load Balancing | Global Functions Infrastructure | Infrastructure | $ 11 | $11 | 10.7% | $1 | $12 | $0 | Green |
| HT TI TSS Storage and BUR Capacity Optimization | Global Functions Infrastructure | Infrastructure | $ 7 | $7 | 10.7% | $1 | $8 | $0 | Green |
| NW D2D - Telecom/Network - LAN - Corporate Port Admission (CPA) Transformation | Global Functions Infrastructure | Infrastructure | $ 122 | $122 | 10.7% | $13 | $135 | $0 | Green |
| NW EV Datacenter LAN Expansion and Upgrade  Datacenter WAN Backbone | Global Functions Infrastructure | Infrastructure | $ 90 | $20 | 10.7% | $2 | $23 | $79 | Green |
| Risk (TeamMate, Open Pages) | Global Functions Infrastructure | Infrastructure | $ 1,068 | $868 | 10.7% | $93 | $961 | $200 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (20%) | Global Functions Infrastructure | Infrastructure | $ 7 | $7 | 10.7% | $1 | $8 | $0 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (80%) | Global Functions Infrastructure | Infrastructure | $ 508 | $183 | 10.7% | $20 | $203 | $323 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Global Functions Infrastructure | Infrastructure | $ 127 | $46 | 10.7% | $5 | $51 | $81 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Global Functions Infrastructure | Infrastructure | $ 2 | $2 | 10.7% | $0 | $2 | $0 | Green |
| SM D2D - Service Mgmt Suite for Mortgage / LV | Global Functions Infrastructure | Infrastructure | $ 167 | $83 | 10.7% | $9 | $92 | $83 | Green |
| Transition/Transformation | Global Functions Infrastructure | Infrastructure | $ 52 | $52 | 10.7% | $6 | $57 | $0 | Green |
| Vulnerability Scanning - Expansion for WebInspect / AMP | Global Functions Infrastructure | Infrastructure | $ 54 | $9 | 10.7% | $1 | $10 | $45 | Green |
| Mortgage Data Warehouse Build (Retail and Commercial) | Basel II | Corp - Basel II | $ 4,386 | $0 | 39.7% | $0 | $0 | $4,386 | Green |
| Blackrock Interfaces Release 2012 | Capital Markets | Corp - Capital Markets | $ 278 | $278 | 83.3% | $230 | $508 | $0 | Green |
| Broker Dealer Enhancement Release 2012 | Capital Markets | Corp - Capital Markets | $ 400 | $200 | 83.3% | $167 | $367 | $200 | Green |
| Model Support Initiatives | Capital Markets | Corp - Capital Markets | $ 445 | $245 | 83.3% | $204 | $449 | $200 | Green |
| Ally Pulse release program | Communications | Corp - Communications | $ 150 | $150 | 196.7% | $295 | $445 | $0 | Green |
| Compliance Training | Compliance | Corp - Compliance | $ 100 | $100 | 20.9% | $42 | $242 | $0 | Green |
| Control Room Function for Surveillance to the Insider Trading/Pre-clearance Policies | Compliance | Corp - Compliance | $ 100 | $100 | 20.9% | $21 | $121 | $0 | Green |
| US Bridger Upgrade | Compliance | Corp - Compliance | $ 124 | $124 | 20.9% | $26 | $150 | $0 | Green |
| CMAP / Eagle Release Program | Finance | Corp - Finance | $ 640 | $640 | 48.9% | $313 | $953 | $0 | Green |
| Mortgage Ledger Risk Mitigation | Finance | Corp - Finance | $ 1,350 | $600 | 48.9% | $294 | $894 | $750 | Green |
| 2012 Compensation Cycle Project | HR | Corp - HR | $ 39 | $39 | 82.9% | $32 | $71 | $0 | Green |
| 2012 HR Talent Mgmt & TA Release Pool | HR | Corp - HR | $ 10 | $10 | 82.9% | $8 | $18 | $0 | Green |
| 2012 HR Total Rewards Release Pool | HR | Corp - HR | $ 20 | $20 | 82.9% | $17 | $37 | $0 | Green |
| 2012 Workforce Admin and ER&P Release Pool | HR | Corp - HR | $ 74 | $74 | 82.9% | $61 | $135 | $0 | Green |
| 2013 Compensation Cycle Project | HR | Corp - HR | $ 228 | $228 | 82.9% | $187 | $413 | $0 | Green |
| Annual Enrollment Benefits Program | HR | Corp - HR | $ 156 | $156 | 82.9% | $129 | $285 | $0 | Green |
| Equity Program Implementation | HR | Corp - HR | $ 100 | $100 | 82.9% | $83 | $183 | $0 | Green |
| eDiscovery Release | Legal | Corp - Legal | $ 115 | $115 | 83.9% | $97 | $212 | $0 | Green |
| eDocs DM Upgrade | Legal | Corp - Legal | $ 57 | $57 | 83.9% | $48 | $105 | $0 | Green |
| Team Room Release | Legal | Corp - Legal | $ 42 | $42 | 83.9% | $35 | $77 | $0 | Green |
| TeamConnect Release | Legal | Corp - Legal | $ 142 | $142 | 83.9% | $119 | $261 | $0 | Green |
| TeamConnect Upgrade | Legal | Corp - Legal | $ 365 | $365 | 83.9% | $306 | $671 | $0 | Green |
| Cogent Release Pool | Risk | Corp - Risk | $ 200 | $200 | 39.7% | $79 | $279 | $0 | Green |
| Open Pages - Release Pool | Risk | Corp - Risk | $ 892 | $359 | 39.7% | $143 | $502 | $533 | Green |
| Open Pages - Technology Upgrade | Risk | Corp - Risk | $ 2,335 | $166 | 39.7% | $74 | $260 | $2,249 | Green |
| Polytranche Upgrade (Accutage/Aploytraunche/NEV Tech Upgrade) | Risk | Corp - Risk | $ 54 | $54 | 39.7% | $21 | $75 | $0 | Green |
| Ariba Release Program | Supply Chain | Corp - Supply Chain | $ 248 | $248 | 191.6% | $475 | $723 | $0 | Green |
| Supplier Risk Management Program | Supply Chain | Corp - Supply Chain | $ 227 | $227 | 191.6% | $436 | $663 | $0 | Green |
| Quantum Release Program | Treasury | Corp - Treasury | $ 212 | $150 | 125.3% | $188 | $338 | $62 | Green |
| Quantum Upgrade | Treasury | Corp - Treasury | $ 345 | $195 | 125.3% | $244 | $439 | $150 | Green |
| Security Compliance and Remediation | Treasury | Corp - Treasury | $ 286 | $0 | 125.3% | $0 | $0 | $286 | Green |
| Sierra, Intellimatch, SSB Release Master | Treasury | Corp - Treasury | $ 665 | $515 | 125.5% | $645 | $1,160 | $150 | Green |
| WebSeries Release Program | Treasury | Corp - Treasury | $ 425 | $311 | 125.3% | $390 | $701 | $115 | Green |
| Application Vulnerability Scanning Improvements | Information Security | Information Security | $ 1,200 | $600 | 44.1% | $265 | $865 | $600 | Green |
| Enterprise IAM R2 | Information Security | Information Security | $ 700 | $0 | 44.1% | $0 | $0 | $700 | Green |
| EU EUI Enterprise Windows 7 Test Environment | Corp Infrastructure | Infrastructure | $ 33 | $13 | 10.7% | $1 | $14 | $20 | Green |
| EU EUI Wireless LAN | Corp Infrastructure | Infrastructure | $ 2 | $1 | 10.7% | $0 | $1 | $1 | Green |
| Global Database Upgrade | Corp Infrastructure | Infrastructure | $ 61 | $61 | 10.7% | $7 | $68 | $0 | Green |
| HT EV F5 Load Balancing | Corp Infrastructure | Infrastructure | $ 6 | $6 | 10.7% | $0 | $6 | $0 | Green |
| HT TI TSS Storage and BUR Capacity Optimization | Corp Infrastructure | Infrastructure | $ 4 | $4 | 10.7% | $0 | $4 | $0 | Green |
| NW D2D - Telecom/Network - LAN - Corporate Port Admission (CPA) Transformation | Corp Infrastructure | Infrastructure | $ 69 | $69 | 10.7% | $7 | $76 | $0 | Green |
| NW EV Datacenter LAN Expansion and Upgrade | Corp Infrastructure | Infrastructure | $ 51 | $11 | 10.7% | $1 | $13 | $44 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (20%) | Corp Infrastructure | Infrastructure | $ 4 | $4 | 10.7% | $0 | $4 | $0 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NADD (80%) | Corp Infrastructure | Infrastructure | $ 283 | $102 | 10.7% | $11 | $113 | $181 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Corp Infrastructure | Infrastructure | $ 71 | $26 | 10.7% | $3 | $28 | $46 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy, IPS - NIDD (20%) | Corp Infrastructure | Infrastructure | $ 1 | $1 | 10.7% | $0 | $1 | $0 | Green |
| SM D2D - Service Mgmt Suite for Mortgage / LV | Corp Infrastructure | Infrastructure | $ 167 | $83 | 10.7% | $9 | $92 | $83 | Green |
| TI Technical Support Resources | Corp Infrastructure | Infrastructure | $ 3,500 | $3,500 | 10.7% | $374 | $3,874 | $0 | Green |
| Transition/Transformation | Corp Infrastructure | Infrastructure | $ 29 | $29 | 10.7% | $3 | $32 | $0 | Green |
| Vulnerability Scanning - Expansion for WebInspect / AMP | Corp Infrastructure | Infrastructure | $ 30 | $5 | 10.7% | $1 | $5 | $25 | Green |
| EU EUI Enterprise Windows 7 Test Environment | Mortgage - Infrastructure | Infrastructure | $ 77 | $30 | 10.7% | $3 | $34 | $47 | Green |
| EU EUI Wireless LAN | Mortgage - Infrastructure | Infrastructure | $ 5 | $2 | 10.7% | $0 | $2 | $3 | Green |
| Global Database Upgrade | Mortgage - Infrastructure | Infrastructure | $ 143 | $143 | 10.7% | $15 | $158 | $0 | Green |
| HT EV 2011 Evergreen-Win & UNIX Servers | Mortgage - Infrastructure | Infrastructure | $ 2 | $1 | 10.7% | $0 | $1 | $1 | Green |
| HT EV F5 Load Balancing | Mortgage - Infrastructure | Infrastructure | $ 14 | $14 | 10.7% | $1 | $15 | $0 | Green |
| HT EV Ruby on Rails 2.0.x + Mongrel 1.x Upgrade and Replacement | Mortgage - Infrastructure | Infrastructure | $ 3 | $3 | 10.7% | $0 | $3 | $0 | Green |
| HT EV SunOne | Mortgage - Infrastructure | Infrastructure | $ 3 | $3 | 10.7% | $0 | $3 | $0 | Green |
| HT TI TSS Storage and BUR Capacity Optimization | Mortgage - Infrastructure | Infrastructure | $ 9 | $9 | 10.7% | $1 | $10 | $0 | Green |
| NW EV Datacenter LAN Expansion and Upgrade | Mortgage - Infrastructure | Infrastructure | $ 129 | $27 | 10.7% | $3 | $29 | $103 | Green |
| NW EV Rescap Telephony Evergreen 2015 | Mortgage - Infrastructure | Infrastructure | $ 75 | $75 | 10.7% | $8 | $83 | $0 | Green |

## Consolidated 2012 Project List

| Project/Initiative Name | BU/SF Name | Budget Allocated To | 2012 IT Project Spend Subtotal (calculated IT Project Spend Expense + IT Project Spend Software) | 2012 IT Project Spend Expense | People Expense Factor (Varies by Global Function) | People Expense Dollar | Total Project Expense (Def Party + People Factor) | Difference in Plan Line Spend and Capital | Official Color |
|---|---|---|---|---|---|---|---|---|---|
| Reeces WAN/LAN/Voice Transition | Mortgage - Infrastructure | Infrastructure | 450 | $250 | 10.7% | $27 | $277 | $150 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy; IPS - NADD (20%) | Mortgage - Infrastructure | Infrastructure | 9 | $9 | 10.7% | $1 | $10 | $0 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy; IPS - NADD (60%) | Mortgage - Infrastructure | Infrastructure | 669 | $236 | 10.7% | $28 | $264 | $421 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy; IPS - NEDD (20%) | Mortgage - Infrastructure | Infrastructure | 166 | $60 | 10.7% | $6 | $66 | $105 | Green |
| SEC EV Security Evergreen - Firewalls, Proxy; IPS - NEDD (20%) | Mortgage - Infrastructure | Infrastructure | 2 | $2 | 10.7% | $0 | $3 | $0 | Green |
| SM D2D - Service Mgmt Suite for Mortgage / I.V | Mortgage - Infrastructure | Infrastructure | 1,000 | $500 | 10.7% | $53 | $553 | $500 | Green |
| TLV Infrastructure Evergreen Program | Mortgage - Infrastructure | Infrastructure | 82 | $82 | 10.7% | $9 | $90 | $0 | Green |
| Transition/Transformation | Mortgage - Infrastructure | Infrastructure | 87 | $87 | 10.7% | $9 | $75 | $0 | Green |
| Vulnerability Scanning - Expansion for Webinspect / AMP | Mortgage - Infrastructure | Infrastructure | 70 | $12 | 10.7% | $1 | $13 | $58 | Green |
| FMO Resource Release Pool | Tech Ops - GPMO | TO - GPMO | 1,800 | $1,800 | 29.2% | $534 | $2,334 | $0 | Green |
| RTO&E Managed Resources for BU NADD | Tech Ops - RTO&E | TO - RTO&E | 6,000 | $6,000 | 29.7% | $1,778 | $7,778 | $0 | Green |

Yellow Shading - Projects to be Direct Charged at 100%
Grey Shading - Partially Direct Charged
Orange Shading - 100% Capital Charged at 0%

Schedule A-3

Page 3

6

**Schedule B**

**Governance Model**

**1.    INTRODUCTION**

This <u>**Schedule B**</u> (this "**Schedule B**") is incorporated by reference and attached to the Shared Services Agreement by and between ResCap and AFI dated May__, 2012 (the "**Agreement**").

**2.    AGREEMENT COVERAGE**

This <u>**Schedule B**</u> sets out the service management model for Supplier and Recipient (the "**Service Management Model**"), related to the Services provided under the Agreement.

**3.    OVERVIEW**

Supplier and Recipient will each appoint responsible, knowledgeable persons to serve as their representatives to oversee the performance of the Agreement (such persons and each Party's Relationship Manager shall collectively constitute the "**Service Management Team**").

The Service Management Team members will work informally on a regular basis, but the Relationship Managers, and such additional Service Management Team members as the Relationship Managers may designate from time to time, will meet formally at least monthly.  These monthly meetings will review such topics as significant operational concerns, performance metrics as developed by the Service Management Team, future service needs, transition service progress and pricing.  In addition, the Relationship Managers may from time to time designate Service Management Team members to meet in sub-teams either on a temporary or ongoing basis, to deal with specific issues under the Agreement.  The Relationship Managers will share the responsibility for organizing the meetings and ensuring the effectiveness of the meetings.

Each Party will staff its Service Management Team as necessary to represent the areas of services offered.

**4.    SCOPE**

The Service Management Team will be responsible for overseeing the overall execution of the Agreement to ensure that each Party performs its responsibilities as expected.

The Service Management Team's responsibilities shall include the following:

(a)    ~~Strategy and Direction~~.  The Service Management Team may make recommendations as to strategic direction and provide critical input for business planning decisions between Supplier and Recipient.

(b)    <u>General Service Management</u>.  The Service Management Team may review the status of projects and prioritize work.  The Service Management Team will also be a forum for discussions between Supplier and Recipient regarding service changes and opportunities for Additional Services, and will coordinate with management and service delivery teams to ensure appropriate execution of such service changes or Additional Services.

(c)    <u>Issue Resolution</u>.   The Service Management Team will be responsible for resolving problems, concerns or inefficiencies in their execution as they arise, and will escalate unresolved issues as described below.

5.    **ESCALATION**

Issues that cannot be resolved within a reasonable period of time (which period of time shall not exceed twenty (20) days) by the Parties' respective Service Management Team members responsible for the applicable subject area must be first be escalated to the Relationship Managers.  If the Relationship Managers are unable to resolve an issue within ten (10) days, then either Party's Relationship Manager may, upon prior written notice to the other Relationship Manager, escalate such issue to Recipient's and Supplier's executive management representative for resolution.   Neither Party may initiate any formal legal proceedings for resolution of such issue until ten (10) business days after such issue has been escalated to each Party's executive management representatives.

The provisions and time periods specified in this **Section 5** will not be construed to prevent a Party from instituting, and a Party is authorized to institute, formal proceedings earlier to (A) avoid the expiration of any applicable limitations period, (B) preserve a superior position with respect to other creditors, or (C) address a claim arising out of the breach of a Party's obligations under **Section 9** of the Agreement or a dispute with respect to Intellectual Property Rights.

## Schedule C

## Pricing Methodology

1.    **INTRODUCTION**

This **Schedule C** (this "**Schedule C**") is incorporated by reference and attached to the Shared Services Agreement by and between ResCap and AFI dated May__, 2012 (the "**Agreement**").

1.1    <u>Charges</u>.  This **Schedule C** describes the Charges, and the methodologies for their calculation, with respect to the Services.

1.2    <u>Order of Precedence</u>.  The Parties acknowledge that certain obligations may be set forth in both this Schedule and elsewhere in the Agreement, and in the event of a conflict, such conflict shall be resolved in accordance with **Section 16.15** of the Agreement.

1.3    <u>Section and Article References</u>.  Unless otherwise specified, Section references in this **Schedule C** refer to the Sections of this **Schedule C**.

1.4    <u>Definitions</u>.  Capitalized terms have the meanings assigned below.  Any other capitalized terms used and not otherwise defined in this **Schedule C** have the meanings given them in the Agreement.

(a)    "**Business Change Event**" means any change in the products or services offered by Recipient or the expansion or closure of any Facility of any Recipient, or a decrease or increase in Recipient's level of consumption of the Services from the historical usage levels of its business, in either case that has a material impact on the cost to Supplier of providing any impacted Services.

(b)    "**Charges**" means:

(i)    any Total Shared Services Charge;

(ii)    amounts to be paid by Recipient as Pass-Through Expenses;

(iii)    the charges for Additional Services that may be agreed upon by the Parties pursuant to a signed Supplement from time to time;

(iv)    the charges for the Customized Services that may be agreed upon by the Parties pursuant to a signed Supplement from time to time; and

(v)    the charges for Termination Assistance Services.

(c) **"Monthly Fixed Charges"** means, for a given month and Service, the amount reflected in **Schedule C-1b** or **C-2b** for such Service. This amount does not include amounts to be paid by Recipient as Monthly Variable Charges or Pass-Through Expenses.

(d) **"Monthly Variable Charges"** means, for a given month and Service, the (i) total actual costs incurred by Supplier for the Service, multiplied by (ii) the Recipient cost allocation percentage for such Service that was agreed upon between the Parties, as reflected in **Schedule C-1b** or **C-2b**, as applicable. This amount does not include amounts to be paid by Recipient as Pass-Through Expenses.

(e) **"Pass-Through Expenses"** as referenced in **Schedule C-1b** and **C-2b** means those third-party, out-of-pocket expenses actually incurred by Supplier in connection with a given Service (e.g., external audit fees, training for consent orders, consent order direct vendor costs), which will be either (i) approved by Recipient prior to being incurred by Supplier; provided, that if Recipient does not approve any such expense Supplier will have no obligation to procure or provide the goods or services associated with such expense, (ii) approved by Recipient in advance of being within a category or for a Service already approved by the Parties as for a billed-as-incurred expense, or (iii) for a good or service reasonably necessary to allow Supplier to deliver the Services contemplated under this Agreement.

(f) **"Price Adjustment Event"** means any of the following:

(i) a Business Change Event occurs; or

(ii) a Service has been terminated pursuant to **Section 3** or **Article 14** of the Agreement.

(g) **"Price Adjustment Process"** means the process described in **Section 3.4** of this **Schedule C**.

(h) **"Total Monthly Shared Services Charge"** means, in respect of any individual Service, the monthly Charge for that Service, which shall be applicable from the Effective Date until the termination date for such Service, as such Charges are listed on **Schedule C-1a** or **Schedule C-2a** and may be adjusted in accordance with any Price Adjustment Event and/or Price Adjustment Process. The Total Shared Services Charge represents the aggregate of the Total Base Costs, Third Party Costs and IT Projects as referenced on Schedule C-1a and Schedule C-2a. The Total Base Costs are equal to an amount representing Employee Costs, IT Costs,

Platform Costs and the Indirect Support Costs for that Functional Service Area, as described below:

(i)        Employee Costs means compensation, benefits, travel and other non-compensation related personnel costs;

(ii)        IT Costs means those costs associated with IT services under Schedule A-1 and Schedule A-2;

(iii)        Platform Costs means the Charges to the Recipient for use of the IT services on Supplier's platform related to depreciation and amortization in respect of IT infrastructure; and

(iv)        Indirect Support Costs means, for AFI, an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in Schedule C-1b, and for ResCap means an amount equal to the percentage of the total of Employee Costs, IT Costs and Platform Costs set forth in Schedule C-2b. Such percentages in each case are those referenced in the formulas in the Pricing Methodology Spreadsheets titled "Shared Services Global Functions Exhibit v.11.pdf" (AFI to ResCap) and "ResCap to AFI Shared Services Pricing 05-13-12.pdf " (ResCap to AFI).

These amounts are set forth in **Schedule C-1a** and **Schedule C-2a** on a monthly basis as the Total Monthly Shared Services Charge. The Total Monthly Shared Services Charges do not include any (i) Charges for Additional Services or Customized Services, (ii) Termination Assistance Services or (iii) Pass-Through Expenses.

Pricing for the Services set forth on **Schedule C-1a** and **Schedule C-2a** can change on a monthly basis, depending upon whether the Service is priced on the basis of Monthly Fixed Charges or Monthly Variable Charges, as indicated on **Schedule C-1b** and **Schedule C-2b**. Any such calculations will be made by reference to and in accordance with the formulas in the Pricing Methodology Spreadsheets titled "Shared Services Global Functions Exhibit v.11.pdf" (AFI to ResCap) and "ResCap to AFI Shared Services Pricing 05-13-12.pdf " (ResCap to AFI).

1.5    <u>General</u> .

(a)    Unless specifically stated otherwise, each Party will be financially responsible for all costs and expenses associated with performing its responsibilities under this Agreement.

(b)    Unless the Parties otherwise agree, for the purpose of calculating Charges, any Services that start on a day other than the first day of a month or are

1.6    Attachments.  Attached to this **Schedule C** are the following Attachments:

**Schedule C-1a** – Pricing for Parent Services

**Schedule C-2a** – Pricing for Reverse Services

**Schedule C-1b** –Billing Method by Service – Parent Services

**Schedule C-2b** –Billing Method by Service – Reverse Services

2.    **COMMENCEMENT OF CHARGES.**

The Total Shared Services Charges will begin on the Effective Date and are set forth in **Schedule C-1a** and **Schedule C-2a**.  Charges for Additional Services, Customized Services, and Termination Assistance Services shall begin on the date such services begin to be performed by Supplier.

3.    **PRICING METHODOLOGY.**

3.1    Total Monthly Shared Services Charges.  All Total Monthly Shared Services Charges will only be adjusted in accordance with the Price Adjustment Process.

3.2    Additional Services.  Charges for Additional Services will be set forth in the applicable Supplement for such Services.  To the extent the Additional Services are ongoing, the Charge may also or in the alternative be added as a separate item in **Schedule C-1a** or **Schedule C-2a**, as applicable and, if so included as a separate item, will be subject to the Price Adjustment Process just as any other Total Shared Services Charges would be.

3.3    Customized Services.  Charges for Customized Services will be set forth in the applicable Supplement for such Services.  To the extent the Customized Services are ongoing, the Charge may also or in the alternative be added as a separate item in **Schedule C-1a** or **Schedule C-2a**, as applicable and, if so included as a separate item, will be subject to the Price Adjustment Process just as any other Total Shared Services Charges would be.

3.4    This section is intentionally left blank.

3.5    Price Adjustment Process.  The Price Adjustment Process described in this **Section 3.5** will be followed by the Parties upon either Party's written request in the event of a Price Adjustment Event.  The Price Adjustment Process for Business Change Events is subject to any approval right or termination right that Supplier may have with respect to such change in Services pursuant to **Section 3** or **14** of the Agreement.

(a)    The Price Adjustment Process will be initiated immediately following a Price Adjustment Event and the resulting change to the Charges will take

effect as soon as practical and will be retroactive to the point in time that the Price Adjustment Event occurs (or, in the case of adjustments under **Section 3.5(c)** below, retroactive to the point in time that the New Cost Allocation is determined).

(b)     Unless the Price Adjustment Process is initiated for a Business Change Event, during the Price Adjustment Process the Parties will mutually determine in good faith the cost impact of the Price Adjustment Event through the methodologies set forth in the exhibits to Schedule C including all of the sub-attachments. When a Service is being terminated by a Party, the starting assumption is that Recipient will no longer be charged for that Service; provided, however, that Supplier may be entitled to reimbursement from Recipient of all costs previously paid by Recipient for such Service that Supplier is not able to eliminate, for example, costs for physical assets which cannot be reduced (i.e. leasing expenses or rental expenses which cannot be eliminated), third party costs (i.e. minimum revenue commitments which are required under a third party agreement) or any other non-internal costs ("**Stranded Costs**") which the Parties using appropriate due diligence and commercially reasonable efforts can not eliminate.  If, after using such efforts the Parties are unable to eliminate 100% of any Stranded Costs, the Parties will meet and discuss the remaining Stranded Costs to be reimbursed by Recipient to Supplier.

(c)     The Total Shared Services Charges set forth in **Schedule C-1a** and **Schedule C-2a** were determined by allocating to Recipient a portion of Supplier's underlying costs of performing the applicable Service (such cost allocation, the "**Initial Cost Allocations**").  In the event the Price Adjustment Process is initiated solely due to a Business Change Event and does not involve a termination of the applicable Service, then during the Price Adjustment Process, Supplier will (i) use the cost allocation methodology that was used to determine the Initial Cost Allocation for such Service, to determine a new cost allocation reflecting Recipient's then-current level of consumption of such Service, taking into account material increases or decreases (if any) in Supplier's overall costs that are a direct result of the change in Recipient's level of consumption of such Service (a "**New Cost Allocation**"), and (ii) if the New Cost Allocation differs from the Initial Cost Allocation for such Service, adjust the Total Shared Services Charge for such Service accordingly.   Except as otherwise agreed by the Parties, the cost allocation determination described above shall only be performed for the area impacted by the Business Change Event and such cost allocation determination per Functional Service Area shall not be performed more than once per month.  At Recipient's request, Supplier will provide Recipient with all supporting calculations of the effects of such Business Change Event on Supplier's costs of performing the Services.

3.6     Charges for Extensions of Term.   The pricing in this **Schedule C** as of the

Effective Date includes only the pricing for the Services during the Initial Term. Any extensions of the Term are subject to the Parties reaching agreement of the pricing during such extension period.

3.7   <u>Termination Assistance Services</u>.  If requested by Recipient, Supplier will provide Termination Assistance Services in accordance with **<u>Section 14.5</u>** of the Agreement.  The price of Termination Assistance Services shall be documented in a Supplement to **<u>Schedule A</u>**. In addition to any Charges otherwise provided for in the Agreement or **<u>Schedule C</u>**, Recipient will reimburse Supplier for all incremental additional resource and other costs and expenses required or incurred by Supplier to provide Termination Assistance Services.

**Schedule C-1**
**Pricing for Parent Services** [1]

| Parent Services Pricing | Monthly Total Shared Services Charge (US$) | | | |
|---|---|---|---|---|
| **Functional Service Area** | **Total Base Costs** [2] | **Third Party Costs** | **IT Projects** | **Total Shared Services** |
| Finance / Tax | $ 1,340,595 | $         - | $         26,293 | $      1,366,888 |
| Audit | 12,845 | 67,168 | - | 80,013 |
| Treasury | 820,790 | - | 72,768 | 893,558 |
| Risk | 799,225 | 29,000 | - | 828,225 |
| Insurance Premium | - | 1,267,250 | - | 1,267,250 |
| Compliance | 403,948 | - | 14,137 | 418,086 |
| Consent Order | 189,720 | 150,000 | - | 339,720 |
| Loan Review | 33,577 | - | | 33,577 |
| HR | 367,188 | 468,747 | 23,707 | 859,642 |
| Legal | 127,175 | - | 36,583 | 163,758 |
| Communications / IR | 296,414 | - | 9,231 | 305,645 |
| Capital Markets | 464,577 | - | 36,464 | 501,041 |
| Marketing | 253,271 | - | - | 253,271 |
| Facilities | 115,956 | 119,436 | - | 235,392 |
| Supply Chain | 608,376 | - | 38,200 | 646,576 |
| Gov't Relations | 31,651 | 3,000 | - | 34,651 |
| ITG | 1,879,177 | - | 141,521 | 2,020,698 |
| **Total Monthly Charge** | **$ 7,744,484** | **$ 2,104,601** | **$ 398,904** | **$ 10,247,989** |

[1] Approximate costs of services - refer to 3 supporting Exhibits. C-1a AFI Shared Services Workstream, C-1b Monthly Billing detail and Exhibits in C-1c for Pricing calculations

[2] Includes employee costs, IT services, IT platform costs, and 13.8% of Indirect Support

## Schedule C-1a
## AFI Shared Services Workstream
## ResCap, LLC - Pricing Summary

| AFI Shared Service | BASE COSTS | | | | | BILLED AS INCURRED | | | As of May 10, 2012 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Employee (1) | IT Costs | Platform Costs | Indirect Support Costs | Total Base Costs | Third Party Costs (2) | IT Projects | Total As Incurred | Total Shared Services | Total Shared Services Monthly |
| | [A] | [B] | [C] | [D] = 13.8% of [A]+[B]+[C] | [E] = [A]+[B]+[C]+[D] | [F] | [G] | [H] = [F]+[G] | [I] = [E]+[H] | |
| Finance / Tax | $ 5.9 | $ 5.4 | $ 2.9 | $ 2.0 | $ 16.1 | - | 0.3 | $ 0.3 | $ 16.4 | $ 1.4 |
| Audit | 0.1 | 0.0 | - | 0.0 | 0.2 | 0.8 | - | 0.8 | 1.0 | 0.1 |
| Treasury | 3.9 | 4.3 | 0.5 | 1.2 | 9.8 | - | 0.9 | 0.9 | 10.7 | 0.9 |
| Risk | 2.8 | 4.7 | 0.9 | 1.2 | 9.6 | 0.3 | - | 0.3 | 9.9 | 0.8 |
| Insurance Premium | - | - | - | - | - | 15.2 | - | 15.2 | 15.2 | 1.3 |
| Compliance | 2.3 | 1.5 | 0.5 | 0.6 | 4.8 | - | 0.2 | 0.2 | 5.0 | 0.4 |
| Consent Order | 2.0 | - | - | 0.3 | 2.3 | 1.8 | - | 1.8 | 4.1 | 0.3 |
| Loan Review | 0.4 | - | - | 0.0 | 0.4 | - | - | - | 0.4 | 0.0 |
| HR | 2.9 | 0.9 | 0.0 | 0.5 | 4.4 | 5.6 | 0.3 | 5.9 | 10.3 | 0.9 |
| Legal | 0.3 | 0.9 | 0.1 | 0.2 | 1.5 | - | 0.4 | 0.4 | 2.0 | 0.2 |
| Communications | 1.4 | 1.6 | 0.1 | 0.4 | 3.6 | - | 0.1 | 0.1 | 3.7 | 0.3 |
| Capital Markets | 3.4 | 1.4 | 0.1 | 0.7 | 5.6 | - | 0.4 | 0.4 | 6.0 | 0.5 |
| Marketing | 2.7 | - | - | 0.4 | 3.0 | - | - | - | 3.0 | 0.3 |
| Facilities | 1.0 | 0.2 | 0.0 | 0.2 | 1.4 | 1.4 | - | 1.4 | 2.8 | 0.2 |
| Supply Chain | 5.6 | 0.7 | 0.1 | 0.9 | 7.3 | - | 0.5 | 0.5 | 7.8 | 0.6 |
| Gov't Relations | 0.3 | - | - | 0.0 | 0.4 | 0.0 | - | 0.0 | 0.4 | 0.0 |
| ITG (3) | | 17.5 | 2.4 | 2.7 | 22.6 | - | 1.7 | 1.7 | 24.2 | 2.0 |
| **Total Shared Services** | $ 34.9 | $ 39.1 | $ 7.7 | $ 11.3 | $ 92.9 | $ 25.2 | $ 4.8 | $ 30.0 | $ 123.0 | $ 10.2 |

(1) Base costs include 2012 C&B plus employee cost for T&E, Facilities, Office & Communications, Training, and other employee related expenses

(2) Direct / Third Party costs represent pass through costs based on diligence and negotiations

(3) ITG Breakdown

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tech Infrastructure | | 8.1 | 0.8 | 1.2 | 10.1 | - | 0.7 | 0.7 | 10.8 | |
| Security | | 5.8 | 1.4 | 1.0 | 8.2 | - | 0.3 | 0.3 | 8.4 | |
| Architecture | | 1.7 | 0.1 | 0.2 | 2.0 | - | - | - | 2.0 | |
| Tech & Ops | | 2.0 | - | 0.3 | 2.2 | - | 0.7 | 0.7 | 2.9 | |
| Total ITG | | $ 17.5 | $ 2.4 | $ 2.7 | $ 22.6 | $ - | $ 1.7 | $ 1.7 | $ 24.2 | |

**Schedule C-1b**
**Pricing for Parent Services**

## Parent Services Pricing

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| 1  Finance/Tax | 1a4 | Headcount | Finance Shared Services - Payroll | $33,260 | Monthly Variable |
| | 1a4 | Purchase Orders | Finance Shared Services - P2P | $64,648 | Monthly Variable |
| | 1a4 | Reconciliations | Finance Shared Services - Accounting | $17,379 | Monthly Variable |
| | 1a4 | Expenses Accounts | Finance Shared Services - T&E | $17,895 | Monthly Variable |
| | 1a5 | Time Study | Accounting Policy Team | $48,854 | Monthly Fixed |
| | 1a5 | Time Study | Benefits Accounting | $5,949 | Monthly Fixed |
| | 1a5 | Time Study | Accounting Leadership and Oversight - Accounting and Policy | $17,753 | Monthly Fixed |
| | 1a8 | Time Study | Tax - Direct Team Costs | $212,846 | Monthly Fixed |
| | 1a8 | Time Study | Tax Indirect Services | $56,717 | Monthly Fixed |
| | 1a8 | Time Study | Tax Leadership | $48,543 | Monthly Fixed |
| | NA | pass through | External Audit Fees | $0 | Monthly Variable - Bill as Incurred |
| | 1a5 | Time Study | Financial Controls - Consolidated and Global Functions (Grennan Team) | $0 | Monthly Fixed |
| | 1a4 | Time Study | ITG Finance - FP&A Support for ResCap and Global Functions (Kubitz Team) | $32,448 | Monthly Fixed |
| | 1r9 | OPEX share less SAP exclusions | Finance - Sustain | $507,713 | Monthly Variable |
| | 1r9 | OPEX share less SAP exclusions | Finance - IT Platform | $276,591 | Monthly Variable |
| | 1r9 | OPEX share of selected projects | Finance - IT Projects | $26,293 | Monthly Variable |
| | | | **Finance Total** | **$1,366,888** | |
| 2  Audit | 1g | Time Study | Direct Team Related to ResCap | $0 | Monthly Fixed |
| | 1g | Time Study | Training for the Consent Order - signed with PwC - training for all audit staff - already expensed - design classes; customize the services | $0 | Monthly Variable - Bill as Incurred |
| | 1g | pass through | Co-Sourcing for the Consent Order - Subject Matter experts for demonstrating enhanced coverage - planning activities make sure we cover the right audits | $66,667 | Monthly Variable - Bill as Incurred |
| | 1g | pass through | Indirect costs for additional Audit work from Fisette Team - Help Mgmt reporting, audit deck etc | $9,046 | Monthly Variable |
| | 1g | pass through | TeamMate - Audit software to hold workpapers | $502 | Monthly Variable - Bill as Incurred |
| | 1r9 | OPEX share | Audit - IT Sustain | $3,799 | Monthly Variable |
| | | | **Audit Total** | **$80,013** | |
| 3  Treasury | 1w1 | Time Study | ST Liquidity and Funding Planning | $16,933 | Monthly Fixed |
| | 1w1 | Time Study | LT Liquidity | $11,288 | Monthly Fixed |
| | 1w1 | Time Study | Risk Controls | $3,327 | Monthly Fixed |
| | 1w1 | Time Study | Liquidity Executive | $8,877 | Monthly Fixed |
| | 1w1 | Time Study | OH Allocation - Facilities and Travel | $4,209 | Monthly Fixed |
| | 1w1 | Time Study | Leadership Direct | $7,864 | Monthly Fixed |
| | 1w2 | Time Study | Global Funding Team | $97,558 | Monthly Fixed |
| | 1w2 | Time Study | OH Allocation - Facilities and Travel | $8,862 | Monthly Fixed |
| | 1w2 | Time Study | Leadership Allocation - Direct | $14,202 | Monthly Fixed |
| | 1w7 | Time Study | Direct Costing | $147,214 | Monthly Fixed |
| | 1w7 | Time Study | Facilities and Travel | $16,173 | Monthly Fixed |
| | 1w7 | Time Study | Leadership Allocation | $30,789 | Monthly Fixed |
| | 1r9 | EOP Assets | Treasury - ITG Sustain | $405,076 | Monthly Variable |
| | 1r9 | EOP Assets | Trasury - ITG Platform | $48,418 | Monthly Variable |
| | 1r9 | OPEX share of selected projects | Treasury - IT Projects | $72,768 | Monthly Variable |
| | | | **Treasury Total** | **$893,558** | |
| 4  Risk (Includes Model Governance) | 1j | Time Study | Leadership Administration | $101,341 | Monthly Fixed |
| | 1j | Time Study | Enterprise Risk (includes Analytics from Seth S. Group) | $73,041 | Monthly Fixed |
| | 1j | Time Study | Corporate Insurance/BCP | $9,969 | Monthly Fixed |
| | 1j | Time Study | Market Risk | $77,142 | Monthly Fixed |
| | 1j | Time Study | SAG | $0 | Monthly Fixed |

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| | 1j | Reserved seats at contigency site | Business Continuity Planning - Sungard Expenses 3rd party | $29,000 | Monthly Variable - Bill as Incurred |
| | 1j | Headcount | Corporate Insurance Premiums | $1,267,250 | Monthly Fixed |
| | 1r9 | Risk Time Study | Risk - IT Sustain | $448,279 | Monthly Variable |
| | 1r9 | Risk Time Study | Risk - Platform | $89,453 | Monthly Fixed |
| | | | **Risk Total** | **$2,095,475** | |
| 5   Compliance (Includes Consent Order Costs) | 1o | Time Study | Global Security | $42,747 | Monthly Fixed |
| | 1n | Time Study | Privacy Services | $0 | Monthly Fixed |
| | 1m | Time Study | Leadership Administration | $45,046 | Monthly Fixed |
| | 1m | Time Study | AML | $47,424 | Monthly Fixed |
| | 1m | Time Study | Program Management | $56,744 | Monthly Fixed |
| | 1m | Time Study | Global Functions | $22,916 | Monthly Fixed |
| | 1m | 100% to ResCap | Consent Order Direct Costs - 3rd Party | $150,000 | Monthly Variable - Bill as Incurred |
| | 1m | 100% to ResCap | Consent Order Staffing | $189,720 | |
| | 1r9 | OPEX share | Compliance - IT Sustain | $143,865 | Monthly Variable |
| | 1r9 | OPEX share | Compliance - Platform | $45,206 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Compliance - IT Projects | $14,137 | Monthly Variable |
| | | | **Compliance Total** | **$757,806** | |
| 6   Loan Review | 1t | % of total loans reviewed | **Loan Reviews** | **$33,577** | Monthly Fixed |
| 7   Human Resources | 1q | Time Study | Benefits Administration | $32,410 | Monthly Fixed |
| | 1q | Time study | Compensation | $67,169 | Monthly Fixed |
| | 1q | ResCap specific BPO costs | Employee Relations | $15,005 | Monthly Fixed |
| | 1q | Time Study | HR Business Partner Support | $91,370 | Monthly Fixed |
| | 1q | Time Study | Operations - Base Costs | $39,485 | Monthly Fixed |
| | 1q | Time Study | Operations - Third party | $440,167 | Monthly Fixed |
| | 1q | Time Study | Staffing - Base Costs | $31,247 | Monthly Fixed |
| | 1q | Time Study | Staffing - Third Party | $28,580 | Monthly Fixed |
| | 1q | Higher of 11.75% of ResCap base pay or claim experience | Medical Dental, Life Insurance, Disability Charges | $0 | Monthly Variable |
| | 1q | actual contributions | 401K Employer Contributions | $0 | Monthly Variable |
| | 1r9 | headcount share | HR - IT Sustain | $87,360 | Monthly Variable |
| | 1r9 | headcount share | HR - IT Platform | $3,142 | Monthly Variable |
| | 1r9 | headcount share | HR - IT Projects | $23,707 | Monthly Variable |
| | | | **HR - Total** | **$859,642** | |
| 8   Legal | 1s | Time Study | HR and Employment | $10,022 | Monthly Fixed |
| | 1s | Time Study | Procurement | $2,181 | Monthly Fixed |
| | 1s | Time Study | Law Department Management Support | $5,527 | Monthly Fixed |
| | 1s | Time Study | Proportion of Attorneys & Paralegals | $14,798 | Monthly Fixed |
| | 1r9 | OPEX share | Legal - IT Sustain | $82,841 | Monthly Variable |
| | 1r9 | OPEX share | Legal - IT Platform | $11,805 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Legal - IT Projects | $36,583 | Monthly Variable |
| | | | **Legal Total** | **$163,758** | |
| 9   Communications and Investor Relations | SOW* | Time Study | Employee Communications | $2,016 | Monthly Fixed |
| | SOW* | Time Study | Community Relations | $0 | Monthly as Incurred |
| | SOW* | Time Study | Digital Communications | $10,149 | Monthly Fixed |
| | SOW* | headcount share | Investor Relations | $124,433 | NA |

5/12/2012

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|---|---|---|---|---|---|
| | 1r9 | headcount share | Communications - IT Sustain | $150,324 | Monthly Variable |
| | 1r9 | headcount share | Communications - IT Platform | $9,493 | Monthly Fixed |
| | 1r9 | headcount share | Communications - IT Projects | $9,231 | Monthly Variable |
| | | | **Communications Total** | **$305,645** | |
| 10 Capital Markets and IM | SOW* | Time Study + Blackrock | Investment Management | $305,570 | Monthly Fixed |
| | SOW* | 1 analyst | MSR Analyst | $14,229 | Monthly Fixed |
| | 1r9 | OPEX share | Capital Markets - IT Sustain | $136,423 | Monthly Variable |
| | 1r9 | OPEX share | Capital Markets - IT Platform | $8,355 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Capital Markets - IT Projects | $36,464 | Monthly Variable |
| | | | **Capital Markets - Total** | **$501,041** | |
| 11 Marketing | 1i | Time Study | Strategic Marketing Planning & Strategy Development | $53,206 | Monthly Fixed |
| | 1i | Time Study | Creative Asset Design Production & Mgmt | $46,856 | Monthly Fixed |
| | 1i | Time Study | Marketing performance evaluation & optimization activities | $13,686 | Monthly Fixed |
| | 1i | Time Study | Management of day-to-day marketing operational responsibilities | $12,839 | Monthly Fixed |
| | 1i | Time Study | Facilities, Office Communications | $8,298 | Monthly Fixed |
| | 1i | Time Study | Travel | $3,781 | Monthly Fixed |
| | 1i | Time Study | eCommerce Product Mgmt Services | $50,190 | Monthly Fixed |
| | 1i | Time Study | Customer Experience Design & Development | $49,137 | Monthly Fixed |
| | 1i | Time Study | Website Optimization | $3,676 | Monthly Fixed |
| | 1i | Time Study | Facilities, Office Communications | $7,969 | Monthly Fixed |
| | 1i | Time Study | Travel | $3,632 | Monthly Fixed |
| | | | **Marketing Total** | **$253,271** | |
| 12 Facilities | 1ka | Square Footage | Facility Services | $90,479 | Monthly Fixed |
| | 1ka | Square Footage | 3rd party JLL Services | $119,436 | Monthly Fixed |
| | 1ka | Square Footage | Current rent payment process and allocation to business/function based on occupied space will stay in effect | $0 | Settled Monthly |
| | 1r9 | Square Footage | Facilities - IT Sustain | $22,293 | Monthly Variable |
| | 1r9 | Square Footage | Facilities - IT Platform | $3,184 | Monthly Fixed |
| | | | **Facilities Total** | **$235,392** | |
| 13 Supply Chain | 1kb | Time Study | | | |
| | 1kb | NA | Sourcing, Monitoring and Off-boarding of Vendors | $535,930 | Monthly Fixed |
| | 1kb | NA | Pricing covers the Maintenance of the Risk Partner Relationships and all work associated with meeting the Consent Order requirements and other services | $0 | NA |
| | 1r9 | Vendor Spend | Supply Chain - IT Sustain | $63,513 | Monthly Variable |
| | 1r9 | Vendor Spend | Supply Chain - IT Platform | $8,933 | Monthly Fixed |
| | 1r9 | OPEX share of selected projects | Supply Chain - IT Projects | $38,200 | Monthly Variable |
| | | | **Supply Chain - Total** | **$646,576** | |
| 14 Executive Leadership | | | | $0 | NA |
| 15 Government Relations | 1x | | Government Relations | **$34,651** | Monthly Fixed |
| 16 ITG | | | ITG Sustain | | |
| | All IT SOWs excl 1r1, 1r9, SOW for IT Resources, IT Tech Strat and Architecture | OPEX share less non-Mortgage NIDD exclusions | Corporate TI (includes NIDD) | $844,182 | Monthly Variable |
| | 1r1 | OPEX share less non-Mortgage Privacy and Project Sustain | Security | $679,516 | Monthly Variable |

| Function | SOW Link | Notes | Service | Monthly Total Shared Service Charge (US$) | Monthly Billing Methodology |
|----------|----------|-------|---------|------------------------------------------|------------------------------|
| IT Tech_Strat_Architecture | | OPEX share less non Mortgage application and Project Sustain | Architecture | $169,203 | Monthly Variable |
| Cross Functional | | OPEX Share | Technology Operations Group | $186,276 | Monthly Variable |
| | | | IT Projects for Mortgage | | |
| | 1r9 | OPEX share for selected projects | TI Global Functions NADD | $47,199 | Monthly Variable |
| | 1r9 | OPEX share for selected projects | TI Corporate NADD | $12,664 | Monthly Variable |
| | 1r9 | OPEX share for selected projects | Security | $23,850 | Monthly Variable |
| | 1r9 | Project spend | Technology Operations Group | $57,809 | Monthly Variable |
| | | | Projects for Mortgage | $0 | Monthly Variable |
| | | | **ITG - Total** | **$2,020,698** | |

**Total Monthly Shared Service Charge**       $10,247,989

**Annual Total Shared Service Charge**         $122,975,884

*  SOW is not numbered

5/12/2012

**Schedule C-2**
**Pricing for ResCap Services** [1]

| ResCap to AFI | | Monthly Total Shared Services Charges (US $) | | | |
|---|---|---|---|---|---|
| **Functional Service Area** | **Statement of Work** | **Total Base Costs (2)** | **Third Party Costs** | **IT Projects** | **Total Shared Services** |
| Human Resources | HR Support Services (AFI) | $    74,326 | $         - | TBD | $    74,326 |
| Legal | Legal Services (AFI) | 21,481 | - | TBD | 21,481 |
| ITG | IT Resource Services | 1,015,068 | - | TBD | 1,015,068 |
| Compliance | Line of Business Compliance Services | 79,088 | - | TBD | 79,088 |
| Risk | Risk Services - Reporting and Special Assets | 23,342 | - | TBD | 23,342 |
| Accounting | ResCap Accounting Services | 163,437 | - | TBD | 163,437 |
| Master Servicing | Master Servicing for Ally Auto - Bond Modeling | 15,436 | 15,000 | TBD | 30,436 |
| Master Servicing | Master Servicing for Ally Auto - Bond Administration | 26,274 | - | TBD | 26,274 |
| **Subtotal** | | **$    1,418,453** | **$    15,000** | **$         -** | **$    1,433,453** |

| ResCap to AFI  for Bank | | Monthly Total Shared Services Charges (US $) | | | |
|---|---|---|---|---|---|
| **Functional Service Area** | **Statement of Work** | **Total Base Costs (2)** | **Third Party Costs** | **IT Projects** | **Total Shared Services** |
| ITG | Application Support | $    444,495 | $    222,122 | TBD | $    666,617 |
| Capital Markets | Capital Markets | 428,678 | - | TBD | 428,678 |
| Human Resources | HR Support Services (Bank) | 32,388 | - | TBD | 32,388 |
| Risk | Risk Management and Data Collection | 501,014 | 141,858 | TBD | 642,872 |
| Legal | Legal Services (Bank) | 20,317 | - | TBD | 20,317 |
| Accounting | Accounting | 78,159 | - | TBD | 78,159 |
| Finance | Mortgage Financial Planning and Analysis | 101,984 | - | TBD | 101,984 |
| Capital Markets | Records Services | 49,829 | - | TBD | 49,829 |
| Business Risk and Controls and Business Excellence | Business Risk and Controls and Business Excellence | 105,454 | 8,381 | TBD | 113,835 |
| Accounting | Capital Markets Accounting | 50,377 | - | TBD | 50,377 |
| Consumer Lending | Consumer Lending Services | 817,156 | - | TBD | 817,156 |
| Risk | Client Repurchase Management | 6,638 | - | TBD | 6,638 |
| **Subtotal** | | **$    2,636,488** | **$    372,361** | **$         -** | **$    3,008,850** |
| **Subtotal** | | **$    4,054,941** | **$    387,361** | **$         -** | **$    4,442,302** |

[1] Approximate costs of services  - refer to supporting exhibts C2-a and C2-b
[2] Includes Employee Costs and 2.9% indirect support

**Schedule C-2a**
**Pricing for ResCap Services** [(1)]

| ResCap to AFI - Functional Area | Statement of Work | Employee (1) (A) | IT Costs (B) | Platform Costs (C) | Indirect Support Costs (D) = 2.9% of (A) + (B) + (C) | Total Base Costs (E) = (A) + (B) + (C) + (D) | Third Party Costs (F) | IT Projects (G) | Total As Incurred (H) = (F) + (G) | Total Shared Services (I) = (E) + (H) |
|---|---|---|---|---|---|---|---|---|---|---|
| **ResCap to AFI** | | | | | | | | | | |
| Human Resources | HR Support Services (AFI) | 866,926 | - | - | 24,991 | 891,918 | - | - | - | 891,918 |
| Legal | Legal Services (AFI) | 250,555 | - | - | 7,223 | 257,777 | - | - | - | 257,777 |
| ITG | IT Resource Services | 11,839,510 | - | - | 341,302 | 12,180,812 | - | - | - | 12,180,812 |
| Compliance | Line of Business Compliance Services | 922,464 | - | - | 26,592 | 949,057 | - | - | - | 949,057 |
| Risk | Risk Services - Reporting and Special Assets | 272,258 | - | - | 7,848 | 280,107 | - | - | - | 280,107 |
| Accounting | ResCap Accounting Services | 1,906,290 | - | - | 54,953 | 1,961,243 | - | - | - | 1,961,243 |
| Master Servicing | Master Servicing for Ally Auto - Bond Modeling | 174,996 | - | - | 10,234 | 185,230 | 180,000 | - | 180,000 | 365,230 |
| Master Servicing | Master Servicing for Ally Auto - Bond Administration | 306,456 | - | - | 8,834 | 315,290 | - | - | - | 315,290 |
| **Total AFI** | | **16,539,455** | **-** | **-** | **481,979** | **17,021,434** | **180,000** | **-** | **180,000** | **17,201,434** |
| | | | | | | | | | | |
| **ResCap to AFI for Ally Bank** | | | | | | | | | | |
| ITG | Application Support | 5,109,805 | - | - | 224,141 | 5,333,945 | 2,665,462 | - | 2,665,462 | 7,999,408 |
| Capital Markets | Capital Markets | 5,000,000 | - | - | 144,137 | 5,144,137 | - | - | - | 5,144,137 |
| Human Resources | HR Support Services (Bank) | 377,765 | - | - | 10,890 | 388,655 | - | - | - | 388,655 |
| Risk | Risk Management and Data Collection | 5,796,011 | - | - | 216,157 | 6,012,168 | 1,702,299 | - | 1,702,299 | 7,714,467 |
| Legal | Legal Services (Bank) | 236,973 | - | - | 6,831 | 243,804 | - | - | - | 243,804 |
| Accounting | Accounting | 911,628 | - | - | 26,280 | 937,908 | - | - | - | 937,908 |
| Finance | Mortgage Financial Planning and Analysis | 1,189,513 | - | - | 34,291 | 1,223,804 | - | - | - | 1,223,804 |
| Capital Markets | Records Services | 581,189 | - | - | 16,754 | 597,943 | - | - | - | 597,943 |
| Business Risk and Controls and Business Excellence | Business Risk and Controls and Business Excellence | 1,227,169 | - | - | 38,275 | 1,265,444 | 100,575 | | 100,575 | 1,366,019 |
| Accounting | Capital Markets Accounting | 587,589 | - | - | 16,939 | 604,528 | - | - | - | 604,528 |
| Consumer Lending | Consumer Lending Services | 9,531,114 | - | - | 274,757 | 9,805,872 | - | - | - | 9,805,872 |
| Risk | Client Repurchase Management | 77,419 | - | - | 2,232 | 79,651 | - | - | - | 79,651 |
| **Total AFI for the Bank** | | **30,626,175** | **-** | **-** | **1,011,684** | **31,637,859** | **4,468,336** | **-** | **4,468,336** | **36,106,196** |
| | | | | | | | | | | |
| **Total Bank and AFI** | | **47,165,630** | **-** | **-** | **1,493,663** | **48,659,293** | **4,648,336** | | **4,648,336** | **53,307,629** |

*(Occupancy is currently cash settled)*

[(1)] Employee Costs include Compensation and Benefits plus costs for T&E, Facilities, Office and Communications, Training and other emmployee related expenses
[(2)] Direct third party costs represent  pass-through costs based on diligence and negotiations

**Schedule C-2b**
**Pricing for ResCap Services**

| ResCap to AFI Pricing | | | | |
|---|---|---|---|---|
| **Function** | **Statement of Work** | **Service** | **Monthly Total Shared Service Charge (US$)** | **Monthly Billing Methodology** |
| 1. Human Resources | HR Support Services (AFI) | All Services | $74,326 | Monthly Fixed |
| 2. Legal | Legal Services (AFI) | Internal Counsel | $21,481 | Monthly Fixed |
| | | External Counsel | TBD | Monthly Variable As incurred |
| 3. ITG | IT Resource Services | IT Sustain | $1,015,068 | Monthly Variable As incurred |
| | | IT Projects | TBD | Monthly Variable As incurred |
| 4. Compliance | Line of Business Compliance Services | All Services | $79,088 | Monthly Fixed |
| 5. Risk | Risk Services - Reporting and Special Assets | All Services | $23,342 | Monthly Fixed |
| 6. Accounting | ResCap Accounting Services | All Services | $163,437 | Monthly Fixed |
| 7. Master Servicing | Master Servicing for Ally Auto - Bond Modeling | All Services | $30,436 | Monthly Fixed |
| 8. Master Servicing | Master Servicing for Ally Auto - Bond Administration | All Services | $26,274 | Monthly Variable As incurred |

| ResCap to AFI for the Bank Pricing | | | | |
|---|---|---|---|---|
| **Function** | **Statement of Work** | **Service** | **Monthly Total Shared Service Charge (US$)** | **Monthly Billing Methodology** |
| 14a ITG | Application Support | Sustain | $666,617 | Monthly Variable based on departmental expenses |
| | | Projects | TBD | Monthly Variable As incurred |
| 14b Capital Markets | Capital Markets | All Services | $428,678 | Monthly Fixed |
| | | Document Custody 3rd Party | TBD | Monthly Variable As incurred |
| 14c. Human Resouces | HR Support Services (Bank) | All Services | $32,388 | Monthly Fixed |
| 14d Risk | Risk Management and Data Collection | All Services | $642,872 | Monthly Variable based on departmental expenses |
| 14e Legal | Legal Services (Bank) | Internal Counsel | $20,317 | Monthly Fixed |
| | | External Counsel | TBD | Monthly Variable As incurred |
| 14f. Accounting | Accounting | All Services | $78,159 | Monthly Fixed |
| 14g Finance | Mortgage Financial Planning and Analysis | All Services | $101,984 | Monthly Fixed |
| 14i Capital Markets | Records Services | All Services | $49,829 | Monthly Fixed |
| | | 3rd Party Costs | TBD | Monthly Variable As incurred |
| 14j Business Risk and Controls and Business Excellence | Business Risk and Controls and Business Excellence | All Services | $113,835 | Monthly Fixed |
| 14L Accounting | Capital Markets Accounting | All Services | $50,377 | Monthly Fixed |
| 14M Consumer Lending | Consumer Lending Services | All Services | $817,156 | Monthly Variable Based on Consumer Loans funded |
| 14N Risk | Client Repurchase Management | All Services | $6,638 | Monthly Fixed Needs to be reviewd quarterly to establish a new ratio of recoveries processed |

Total Monthly Shared Service Charge  $        4,442,302
Total Annual Shared Service Charge  $      53,307,630

## Schedule D-1

List of AFI and Supported Facilities

As kept by the Corporate Real Estate Office as of the Effective Date

**<u>Schedule D-2</u>**

List of ResCap and Supported Facilities

As kept by the Corporate Real Estate Office as of the Effective Date

## Schedule E

## Form of Supplement

_____

## Supplement [X]

This Supplement __ (this "**Supplement**") is made and entered into as of the __ day of
____, 2012 (the "**Supplement Effective Date**") by and between Ally Financial Inc., a
Delaware corporation ("**AFI**") and Residential Capital, LLC, a Delaware limited liability
company ("**ResCap**") (together with AFI, the "**Parties**").

### 1.    BACKGROUND

This Supplement is entered into pursuant to the terms of the Shared Services
Agreement between AFI and ResCap dated [●] (the "**Agreement**") and constitutes
a Supplement under the Agreement.  Capitalized terms used but not defined in
this Supplement have the meanings assigned to those terms in the Agreement.

### 2.    SERVICES DESCRIPTION AND CHARGES

Supplier will provide [*Insert brief description of the services here.*]____ services
as [Additional Services]/[Customized Services][, which shall be described in
more detail in _____, for the Charges set forth [therein]/[in **Schedule C** to the
Agreement].

### 3.    CHANGES

[*Refer to the clauses in the Agreement relating to Services and incorporate here
as appropriate and agreed as the clauses in the Agreement do not apply to the
Additional Services or Customized Services being added pursuant to this
Supplement.*]

### 4.    TERM AND TERMINATION

[*Term and notice provisions to be inserted as appropriate.*]

### 5.    [OTHER TERMS

*The Parties further agree:*

[*Insert any other terms and conditions applicable to the Additional Services or
Customized Services to be performed under this Supplement.* ]

### 6.    MISCELLANEOUS

This Supplement is incorporated by reference into the Agreement.  In the event of

any conflict between the terms of this Supplement and the Agreement, the terms of this Supplement shall only prevail to the extent that this Supplement expressly states that it is intended to override a term of the Agreement.

SPACE BELOW INTENTIONALLY BLANK – SIGNATURE PAGE FOLLOWS

**IN WITNESS WHEREOF**, the Parties have caused this Supplement to be executed by their respective duly authorized representatives as of the Supplement Effective Date.

Ally Financial Inc.

By: _____
      Name:
      Title:

Residential Capital, LLC

By: _____
      Name:
      Title: