# Exhibit 60

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

**FINANCIAL GUARANTY INSURANCE COMPANY,**

        **Plaintiff,**

        -against-

**ALLY FINANCIAL, INC. F/K/A GMAC, LLC; RESIDENTIAL CAPITAL, LLC F/K/A RESIDENTIAL CAPITAL CORPORATION; ALLY BANK F/K/A GMAC BANK; GMAC MORTGAGE, LLC F/K/A GMAC MORTGAGE CORPORATION**

        **Defendants.**

---------------------------------------------------- x

**12 CV 1818**

Civil Action No._____

**COMPLAINT**

Plaintiff Financial Guaranty Insurance Company ("FGIC"), by and through its attorneys, Jones Day, for its Complaint against defendants, Ally Financial, Inc., formerly known as GMAC, LLC ("Ally Financial"), Residential Capital, LLC, formerly known as Residential Capital Corporation ("ResCap"), Ally Bank, formerly known as GMAC Bank ("Ally Bank"), and GMAC Mortgage, LLC, formerly known as GMAC Mortgage Corporation ("GMACM"), alleges as follows:

## NATURE OF THE ACTION

1.    This action arises in connection with two financial guaranty insurance policies (each the "Policy" and collectively the "Policies") issued by FGIC in relation to two GMACM-sponsored transactions (each a "Transaction" and collectively the "HE Transactions" or the "Transactions") in which GMACM Home Equity Loan Trust 2006-HE2 (the "2006-HE2 Trust") and GMACM Home Equity Loan Trust 2007-HE2 (the "2007-HE2 Trust" and together with the

2006-HE2 Trust, the "HE Trusts") issued and sold to investors a combined $1.87 billion

aggregate principal amount of insured residential mortgage-backed securities (the "HE Notes").

As the sponsor of the HE Transactions, GMACM procured the Policies from FGIC in order to

enhance the ratings and marketability of the HE Notes. GMACM fraudulently induced FGIC's

agreement to provide insurance for the HE Transactions through willful and material

misrepresentations and omissions concerning, among other things, the nature of its business

practices and the credit quality and characteristics of the thousands of home equity loans

(individually the "Mortgage Loans," and collectively with respect to each of the Transactions the

"Mortgage Loan Pool" or "Loan Pool") that provided the collateral for the HE Notes. In short,

the Mortgage Loans were different—and demonstrably worse—than GMACM had represented

them to be. FGIC's issuance of the Policies enabled the HE Notes to receive a triple-A rating

from the rating agencies, which in turn made the HE Transactions viable, and enabled GMACM

and its affiliates to earn millions of dollars in transaction fees.

      2.      Since the closing of the HE Transactions, GMACM has compounded its

misconduct by repeatedly and materially breaching its contractual obligations to FGIC. From the

very inception of the HE Transactions, GMACM has violated the essential terms of its

agreements with FGIC. GMACM has also breached the essential terms of the other operative

documents incorporated therein.

      3.      The wrongdoing committed by GMACM, as detailed more fully below, was

directed by Ally Financial, acting directly or indirectly through its wholly-owned subsidiary,

ResCap. Ally Financial is the ultimate parent of ResCap, which owns GMACM. Ally Financial,

as the ultimate parent of ResCap and GMACM, has the practical ability, which it has repeatedly

exercised, to direct and control the activities of these (and other) subsidiaries. In many instances,

including in these Transactions, Ally Financial's direction and control was effected by using ResCap as an intermediary instrument to achieve its goals. For example, many of the material contractual breaches committed by GMACM, concerning, primarily, FGIC's right to access information in GMACM's possession and GMACM's failure to repurchase or cure certain of the Mortgage Loans backing the HE Notes that FGIC sought to have repurchased, were carried out by ResCap, at the direction and control of Ally Financial.

4.       GMACM was also substantially assisted in fraudulently inducing FGIC to issue the Policies by another Ally Financial subsidiary, Ally Bank, then doing business as GMAC Bank. Ally Bank and GMACM were the two principal originators of loans that became the collateral for the HE Transactions, and as such had intimate knowledge of the quality of the Mortgage Loans. In total, Ally Bank sold nearly $1.1 billion in loans that it had originated or acquired to GMACM to be securitized in the HE Transactions. Further, Ally Bank agreed to serve as custodian (the "Custodian") of the HE Transactions—one of the critical parties charged with certain oversight and maintenance duties with respect to the HE Trusts—and received certain key operative documents with respect to the Transactions. With knowledge of GMACM's material misrepresentations and omissions regarding the Mortgage Loans that collateralized the HE Transactions, Ally Bank separately made representations and warranties regarding those loans for the purpose of aiding GMACM's inducement of FGIC to issue the Policies. By assisting GMACM in inducing FGIC to issue the Policies, Ally Bank was able to collect substantial fees as Custodian and perpetuate its lucrative loan origination business.

5.       Ally Bank has materially breached its own separate contractual agreements regarding its duties as Custodian, in particular by failing to ensure that essential documents were

included in the loan file and failing to notify FGIC of breaches of representations and warranties by GMACM of which Ally Bank was aware.

6.      The HE Transactions are mortgage loan securitizations:  complex arrangements comprising multiple interdependent agreements among GMACM and several other parties whereby tens of thousands of home equity loans were pooled together and transferred to the HE Trusts, which then issued to investors securities (*i.e.*, the HE Notes) collateralized by those loans.

7.      In June 2006, FGIC and several other parties entered into the 2006-HE2 Transaction.  In June 2007, FGIC and several other parties entered into the 2007-HE2 Transaction.  The HE Transactions were sponsored by GMACM.  To facilitate the Transactions, GMACM pooled together tens of thousands of Mortgage Loans to provide collateral for the HE Notes.  All of the Mortgage Loans were either originated or acquired by GMACM or Ally Bank.

8.      After pooling the Mortgage Loans originated or acquired by GMACM and Ally Bank, GMACM transferred the Mortgage Loans directly or indirectly to another Ally Financial subsidiary, Residential Asset Mortgage Products, Inc. ("RAMP").  RAMP then deposited the Mortgage Loans it received from GMACM into the HE Trusts.  The HE Trusts, in turn, issued the HE Notes to investors.  The HE Trusts were legal entities created by GMACM solely for the purposes of the HE Transactions to hold the Mortgage Loans and to issue the HE Notes to investors in registered public offerings.

9.      The periodic mortgage payments made by the borrowers under the Mortgage Loans held by the HE Trusts are used to pay, among other things, principal and interest due on the HE Notes, and the fees and expenses of GMACM and other participants in the Transactions.

10.     GMACM is also the servicer of the 2006-HE2 Transaction (the "2006-HE2 Servicer") and, until March 2012, was the servicer of the 2007-HE2 Transaction (the "2007-HE2

Servicer"). The servicer of the Transactions supervises the collection of borrower payments and performs other duties related to servicing the Mortgage Loans. Yet another Ally Financial subsidiary, Ally Securities, LLC ("Ally Securities" f/k/a GMAC RFC Securities), was a co-manager of the HE Transactions. In addition, JPMorgan Chase Bank, N.A. ("JPMorgan") agreed to act as Indenture Trustee of the 2006-HE2 Trust, while The Bank of New York Trust Company, N.A. ("BNY") agreed to act as Indenture Trustee of the 2007-HE2 Trust. BNY later succeeded JPMorgan as Indenture Trustee of the 2006-HE2 Trust, as well.

    11.    GMACM, directed and controlled by Ally Financial, is, therefore, the hub of the HE Transactions: it is the sponsor of each securitization, the originator and seller of many of the Mortgage Loans, and the original servicer of all of the loans that collateralize the HE Notes. The primary victim of the HE Transactions—which turned out to be backed by inferior loans that did not meet the underwriting standards or loan characteristics warranted by GMACM—is FGIC, which has already paid out tens of millions of dollars in losses under the Policies, with further material losses still to come.

    12.    FGIC, a monoline financial guaranty insurance company, was in the business of writing financial guaranty insurance policies with respect to asset-backed and debt securities, including residential mortgage-backed notes ("RMBS Notes"). At the time of the HE Transactions, FGIC's financial strength was rated triple-A by Moody's Investors Services, Inc. ("Moody's"), Standard and Poor's Ratings Services (a division of The McGraw-Hill Companies, Inc.) ("S&P"), and Fitch, Inc., which enabled securities that were insured by FGIC to be rated triple-A as well. FGIC's financial guaranty insurance policies for RMBS Notes typically guaranteed the timely payment of the principal and interest due on the insured securities.

including the amount, if any, of principal losses allocated to the RMBS Notes. FGIC's insurance policies thus enhanced the credit quality, and marketability, of the insured securities.

13.    To enhance the ratings and marketability of the HE Notes, and to increase the profit that GMACM would derive from the 2006-HE2 and 2007-HE2 Transactions, GMACM sought to have FGIC issue the Policies to JPMorgan and BNY, respectively, each in its capacity as Indenture Trustee.

14.    To induce FGIC to issue the Policies, GMACM, *inter alia*, offered certain material representations and warranties to FGIC regarding the Transactions. These representations and warranties were false when stated, and FGIC reasonably relied on such warranties, among others, when deciding to enter into the HE Transactions. As a result, FGIC was fraudulently induced to enter the Transactions, and the credit risk assumed by FGIC in connection with the Transactions was far greater than it would have been had GMACM's representations and warranties been true, as demonstrated by the overwhelming number of claims that have been subsequently presented to FGIC.

15.    GMACM received substantial assistance from Ally Bank in fraudulently inducing FGIC to issue the Policies. Ally Bank was aware of the material misrepresentations GMACM had made to FGIC, and further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of certain material aspects of the Mortgage Loan files, as well as inform FGIC of certain failures by GMACM to comply with its obligations under the HE Transaction documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties to FGIC. As such, Ally Bank actively aided and abetted GMACM's fraudulent inducement of FGIC to issue the Policies.

16.    Moreover, both GMACM and Ally Bank received substantial assistance from Ally Financial in fraudulently inducing FGIC to issue the Policies. Ally Financial took actions and made statements to boost investor confidence in, and otherwise finance and support, its mortgage securitization business, which was carried out by its subsidiaries. Ally Financial was aware of the material misrepresentations GMACM and Ally Bank had made to FGIC. As a result of its dominance over ResCap, Ally Bank, and GMACM, Ally Financial knew that the representations and warranties GMACM and Ally Bank made to FGIC, prior to and at the closing, upon which FGIC reasonably relied, were false. As such, Ally Financial actively aided and abetted GMACM's and Ally Bank's fraudulent inducement of FGIC to issue the Policies.

17.    The increased credit risk inherent in the Mortgage Loans has resulted in extremely high levels of delinquencies, defaults, and losses on the Mortgage Loans, and the resultant claims presented to FGIC have been far in excess of what FGIC reasonably expected when it decided to issue the Policies in reliance on the (presumed) accuracy and truthfulness of GMACM's representations and warranties and affirmative covenants. In fact, the levels of defaults and losses, and the resulting amount of claims presented to FGIC, have been overwhelming. Had FGIC been told the truth about the nature of GMACM's underwriting and business practices and/or the true characteristics of the Mortgage Loans, it would never have agreed to issue the Policies, and would thereby have avoided the significant losses and liabilities it has incurred, and will incur, as a result of GMACM's misconduct.

18.    In order to evaluate the extent of GMACM's breaches, FGIC has requested copies of the mortgage loan files and servicing notes for the Mortgage Loans. GMACM is obligated, under its agreements with FGIC, to provide those documents to FGIC. GMACM has refused to provide FGIC with the requested documentation, which, on information and belief, will further

evidence material breaches by GMACM. This refusal to provide information in itself constitutes a material breach of GMACM's insurance agreements with FGIC.

19.    Certain of the material contractual breaches committed by GMACM and Ally Bank—including, but not limited to, its refusal to honor FGIC's right to access information in GMACM's possession—were directed by Ally Financial, acting directly or indirectly through ResCap.

20.    Through this Complaint, FGIC seeks relief against GMACM, Ally Bank, ResCap, and Ally Financial for GMACM's fraudulent inducement of FGIC, and for GMACM's material breaches of its insurance agreements with, and contractual obligations owed to, FGIC in connection with the HE Transactions.

21.    Further, FGIC seeks relief against Ally Financial and Ally Bank for aiding and abetting GMACM's fraudulent inducement, as well as for Ally Bank's material breaches of its contractual obligations to FGIC.

22.    FGIC also seeks a declaration from the Court that Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other.

## THE PARTIES

23.    Plaintiff FGIC is a New York stock insurance corporation with its principal place of business at 125 Park Avenue, New York, New York 10017.

24.    Defendant Ally Financial is a Delaware corporation with its principal place of business in Detroit, Michigan. Ally Financial is the parent company of ResCap, GMACM, and all GMACM-affiliated entities relevant to this action.

25.    Defendant GMACM is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. In the period relevant to this action,

GMACM originated, acquired, and serviced residential mortgage loans, and sponsored securitizations of mortgage loans.

26.    Since 2005, GMACM has been an indirect wholly-owned subsidiary of ResCap; prior to that time, GMACM was an indirect, wholly-owned subsidiary of Ally Financial.

27.    Defendant ResCap is a Delaware limited liability corporation and an indirect wholly-owned subsidiary of Ally Financial. ResCap is the indirect corporate parent of GMACM and its business includes originating, acquiring, selling, and servicing mortgage loans.

28.    In September 2008, ResCap announced that it was closing much of its mortgage loan acquisition business.

29.    Defendant Ally Bank (f/k/a GMAC Bank), an indirect, wholly-owned subsidiary of Ally Financial, was at all times relevant to this Complaint a loan originator. To facilitate the HE Transactions, Ally Bank sold to GMACM nearly $1.1 billion in mortgage loans that it had originated or acquired to be securitized in the Transactions. These loans comprised more than 75% of the initial Mortgage Loans. GMAC Bank was renamed Ally Bank in May 2009. Ally Bank is an online bank chartered under Utah law.

## JURISDICTION AND VENUE

30.    This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

31.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this claim occurred within this judicial district. Moreover, at least one of the defendants in this action, GMACM, has agreed to submit to the jurisdiction of this Court, and has agreed not to challenge venue in this Court.

## RELEVANT NON-PARTIES

32.     RAMP, a special purpose vehicle, is an indirect, wholly-owned subsidiary of Ally Financial and a Delaware corporation with its principal place of business in Minnesota.  To facilitate the HE Transactions, RAMP purchased mortgage loans from GMACM and another affiliate, Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove"), and deposited those loans into the HE Trusts.  The Trusts then issued the HE Notes to the underwriters, including Ally Securities (then doing business as GMAC RFC Securities), to be sold to investors.

33.     Ally Securities, an entity incorporated in Delaware, is an affiliate of GMACM and RAMP and a registered broker-dealer under the Securities Exchange Act of 1934, and is registered to do business in New York.  Prior to 2007, Ally Securities was known as Residential Funding Securities Corporation, and was doing business as GMAC RFC Securities.  Ally Securities served as an underwriter of the HE Notes and, on information and belief, participated in the preparation of certain of the key offering documents for the HE Transactions.

34.     Walnut Grove is a Delaware statutory trust established by an affiliate of GMACM. Beginning in 2003, GMACM sold to Walnut Grove second-lien mortgage loans that it had originated or acquired.  To facilitate the HE Transactions, Walnut Grove sold certain of the Mortgage Loans to RAMP.

## FACTUAL ALLEGATIONS

### A.     Ally Financial and its Subsidiaries

35.     In the period relevant to this action, GMACM originated, acquired, sold, and serviced residential mortgage loans and, from time to time, arranged for the securitization of those mortgage loans and the sale of securities collateralized by those mortgage loans to investors, often in the form of RMBS Notes.

36.    The Mortgage Loans have suffered extremely high rates of delinquencies, defaults and losses, and it is a matter of public knowledge that the business practices of Ally Financial's subsidiaries, including those of GMACM, Ally Bank, and ResCap, led Ally Financial to seek a bailout by the federal government in 2008.

**(1)    GMACM, GMAC-RFC, and RFC**

37.    GMACM is a subsidiary of GMAC-RFC Holding Company, LLC ("GMAC-RFC") which in turn is a subsidiary of ResCap, which in turn is a subsidiary of the ultimate parent, Ally Financial.

38.    Residential Funding Corporation, LLC ("RFC") is also a subsidiary of GMAC-RFC and ResCap.  Like its affiliate GMACM, RFC engaged in the business of originating, acquiring, servicing, and securitizing mortgage loans during the period relevant to this action.

39.    GMAC-RFC companies issued $42.34 billion of non-agency mortgage-backed securities in 2004, $56.93 billion in 2005, $66.19 billion in 2006, and $32.43 billion in 2007, according to Inside Mortgage Finance Publications, Inc.  *See* 2011 Mortgage Market Statistical Annual: Volume II at 38-41.  GMAC-RFC was the fifth largest issuer of non-agency mortgage-backed securities in 2005, the fourth largest in 2006, and the eighth largest in 2007.  *Id.*

40.    GMAC-RFC was the largest issuer of private mortgage-backed securities in 2002, when it issued $11.5 billion of private mortgage-backed securities, according to the Financial Crisis Inquiry Report, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (the "FCIC Report"), published in January 2011.  *See* FCIC Report at 462.  GMAC-RFC was also the fourth largest subprime mortgage lender in 2004, when it loaned $26 billion to subprime borrowers.  *See id.* at 504.

41.    The FCIC Report pointedly notes the widespread failure among the mortgage-backed security industry generally to adhere to basic standards in loan origination, selection, and

evaluation—a truth FGIC would come to learn specifically in its dealings with GMACM.  The
FCIC Report concludes that:

> [F]irms securitizing mortgages failed to perform adequate due
> diligence on the mortgages they purchased and at times knowingly
> waived compliance with underwriting standards.  Potential
> investors were not fully informed or were misled about the poor
> quality of the mortgages contained in some mortgage-related
> securities.  These problems appear to have been significant.

*Id.* at 187.

42.     The FCIC Report further notes that, in light of Ally Financial and its subsidiaries'
systemic failure to ensure the credit quality of the mortgage loans backing its securitizations,
repurchase demands against GMAC/Ally Financial have mounted.  From 2007 to 2010, the
Federal National Mortgage Association ("Fannie Mae") has forced Ally Financial to buy back
approximately $838 million worth of mortgage loans.  *Id.* at 225.  And in 2009 and 2010, the
Federal Home Loan Mortgage Corporation ("Freddie Mac") forced Ally Financial to buy back
approximately $453 million worth of mortgage loans.  *Id.*

**(2)     Ally Financial's Securitization Business**

43.     Ally Financial's business model depended on securitizations, which were
conducted by its business units, including GMACM.  Pooling mortgage loans and selling them
into securitizations enabled GMACM to fund its ongoing mortgage loan originations and
acquisitions, earned it significant fees from the resulting transactions, and reduced  the credit risk
it retained with respect to those loans.

44.     In order to gain additional fees for performing certain administrative duties under
the various transaction agreements, including collecting mortgage payments and determining
whether a mortgage loan is in default based on the transaction documents, GMACM generally
acted as servicer of its own securitizations.  GMACM thereby earned servicing fees that

normally amounted to 0.50% per annum of the aggregate principal balance of the mortgage loans, as well as collected fees in the range of approximately 20%-35% of any subsequent recoveries from charged-off loans.

45.    GMACM also enriched Ally Financial and its other subsidiaries through its sponsorship of securitizations.  Ally Financial entities typically participated in each of the key steps in the securitization process, and recorded gains and earned fees at each of those steps.  For example, in the HE Transactions:

- Ally Bank gained fees for originating more than 75% of the loans initially comprising the HE Trusts, and proceeds from selling those loans to GMACM; Ally Bank also gained fees as Custodian of the HE Trusts for holding certain documents;

- Walnut Grove received the proceeds from selling certain of the Mortgage Loans to RAMP (after purchasing approximately 38% of the 2006-HE2 Mortgage Loans and 44% of 2007-HE2 Mortgage Loans from GMACM);

- RAMP received payments for serving as the depositor of the Mortgage Loans to the HE Trusts; and

- Ally Securities received fees for underwriting the HE Notes.

### (3)    Ally Financial, GMACM, and RFC Face Numerous Investigations and Lawsuits Relating to Their RMBS Securitizations

46.    GMACM is currently being investigated by the U.S. Department of Justice (the "DOJ") for fraud related to the origination and underwriting of mortgage loans.  On June 29, 2011, Ally Financial disclosed that the DOJ had served GMACM with a subpoena in June 2011, which "includes a broad request for documentation and other information in connection with its investigation of potential fraud related to the origination and/or underwriting of mortgage loans." Ally Fin. Inc., Amendment No. 3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

47.     Additionally, on September 2, 2011, the Federal Housing Finance Authority
("FHFA"), as conservator for Freddie Mac, filed suit in the Supreme Court of the State of New
York, New York County against Ally Financial and several of its subsidiaries for claims arising
in connection with its role in the public filing of offering documents containing false and
misleading statements.  These claims arise from Freddie Mac's purchase of over $6 billion in
certificates issued through twenty-one transactions similar to the transactions at issue here.
Among other claims, FHFA brought suit for common law fraud against various Ally Financial
subsidiaries and aiding and abetting fraud against Ally Financial for its intentional and
substantial assistance in rendering material misrepresentations to Freddie Mac in connection with
the sale of the subject certificates.

48.     The FHFA also alleges violations of state and federal securities laws by Ally
Financial and several of its subsidiaries stemming from false and misleading statements
contained in publicly-filed prospectuses, prospectus supplements, registration statements, and
other offering documents.  Additionally, the FHFA alleges aiding and abetting fraud against Ally
Financial and certain of its affiliates for their intentional and substantial assistance in rendering
material misrepresentations to Freddie Mac in connection with the sale of the certificates.  The
FHFA action seeks relief in the form of rescission and recovery of the $6 billion purchase price
of the certificates, including lost principal and interest, as well as punitive damages and
attorneys' fees and costs.  In October 2011, Ally Financial and its co-defendants removed the
FHFA action to the U.S. District Court for the Southern District of New York.

49.     In addition, GMACM is currently facing a lawsuit brought by MBIA Insurance
Corporation ("MBIA") in New York Supreme Court in which MBIA alleges that, in connection
with three transactions similar to the one at issue here. GMACM affirmatively misrepresented

Case 1:12-cv-08838-PAC    Document 31    Filed 03/12/12    Page 35 of 104

the credit quality of tens of thousands of mortgage loans, with a total original principal balance of more than \$4 billion, as a means of unfairly shifting to investors and MBIA risks that GMACM should have borne itself. On December 15, 2010, the New York Supreme Court issued a ruling denying GMACM's motion to dismiss, which allowed both the breach of representations and warranties and fraud claims, among others, to proceed to trial.

50.    GMACM's sister company, RFC, is also currently facing a lawsuit brought by MBIA in New York Supreme Court for, among other things, fraud and breach of representations and warranties in connection with RMBS transactions. In December 2009, the New York Supreme Court rejected RFC's motion to dismiss certain of the claims brought against it, allowing both the breach of contract and fraud claims, among others, to proceed.

51.    Additionally, according to Ally Financial's quarterly report for the third quarter of 2011, as of November 4, 2011, there were twenty-two suits in various jurisdictions pending against Ally Financial's mortgage-related business units and subsidiaries, arising from numerous mortgage-backed securities offerings. The plaintiffs in those suits have alleged, among other things, that Ally Financial's various mortgage subsidiaries made misstatements and omissions in registration statements, prospectuses, prospectus supplements, and other documents related to RMBS offerings. The alleged misstatements typically concern underwriting standards. *See* Ally Fin. Inc., Quarterly Report (Form 10-Q), at 159 (Nov. 4, 2011). Further, in its 2011 annual report, Ally Financial stated that it expects additional similar claims to be brought against Ally Financial and/or its subsidiaries in the future. *See* Ally Fin. Inc., Annual Report (Form 10-K), at 20 (Feb. 28, 2011).

52.    Since the filing of its November 2011 quarterly report, moreover, Ally Financial and its subsidiaries have been sued by additional plaintiffs, including HSH Nordbank AG, which

have alleged, *inter alia*, material misrepresentations and omissions about the loans backing
RMBS securities issued by Ally Financial's affiliates.

53.    Moreover, Ally Financial has disclosed that it expects additional RMBS lawsuits
from monoline insurers like FGIC given that Ally Financial and its subsidiaries sold $42.7
billion of loans into monoline-wrapped securitizations from 2004 to 2007.  During 2011, Ally
Financial and its subsidiaries have received repurchase claims from monoline insurers for $265
million worth of mortgages related to securitizations it consummated between 2004 and 2007.
Ally Financial clearly recognizes its exposure because, according to Ally Financial's CEO,
Michael Carpenter, ResCap has already reserved $829 million for representations and warranties
claims and, according to its own Securities and Exchange Commission ("SEC") filings, Ally
Financial confirms that "litigation with . . . monolines is likely."  Ally Fin. Inc., Annual Report
(Form 10-K), at 98 (Feb. 28, 2012).

54.    Indeed, according to Ally Financial's 2011 annual report, Ally Financial,
GMACM's parent, also believes that "[t]he total exposure . . .  to mortgage representation and
warranty claims is most significant for loans originated and sold between 2004 through 2008,
specifically the 2006 and 2007 vintages that were originated and sold prior to enhanced
underwriting standards and risk-mitigation actions implemented in 2008 and forward."  Ally Fin.
Inc., Annual Report (Form 10-K), at 224 (Feb. 28, 2012).  The 2006-HE2 and 2007-HE2
Transactions are, as their names imply, of the 2006 and 2007 vintages.

55.    Additionally, Ally Financial also disclosed that the SEC served a subpoena on
Ally Financial in June 2011, requesting documentation regarding certain "bulk settlements"
relating to securitized mortgage loans as well as a request for materials provided to investors and
prospective investors in mortgage securitization transactions.  *See* Ally Fin. Inc., Amendment No.

3 to Form S-1 Registration Statement under the Securities Act of 1933 (Form S-1/A), at 23 (June 29, 2011).

**(4)     The Mortgage Loan Servicing Misconduct of Ally Financial and GMACM Has Come Under Scrutiny and Resulted in Severe Sanctions**

56.     On February 9, 2012, the Federal Reserve Board announced that Ally Financial, its subsidiaries, and several other mortgage loan servicers would be required to pay $766.5 million in monetary sanctions for "unsafe and unsound processes and practices in residential mortgage loans servicing and foreclosure processing." Press Release, Fed. Reserve Bd., Federal Reserve Board Announces Agreement in Principle with Five Banking Organizations Regarding the Issuance of Monetary Sanctions (Feb. 9, 2011).   On February 12, 2012, the Federal Reserve Board imposed well over $200 million of this fine against Ally Financial, ResCap, and GMACM pursuant to an assessment order, which requires that the sanctions be paid into various borrower assistance programs and nonprofit programs established to help victims of improper servicing and foreclosure practices. *See In re Ally Fin. Inc.*, FRB Docket Nos. 12-006-CMP-HC & 12-006-CMP-DEO (Feb. 10, 2012) (the "Assessment Order").   According to the Federal Reserve Board, the sanction "takes into account the maximum amount prescribed for unsafe and unsound practices under the applicable statutory limits, the comparative severity of the institutions' misconduct, and the comparative sizes of the institutions' foreclosure activities." *See* Press Release, Fed. Reserve Bd., Federal Reserve Board Announces Agreement in Principle with Five Banking Organizations Regarding the Issuance of Monetary Sanctions (Feb. 9, 2011).

57.     Further, also on February 9, 2012, the U.S. Attorney General announced that Ally Financial will take part in a $25 billion settlement to resolve claims brought by the government in response to the "reckless and abusive mortgage practices" of Ally Financial and four similarly situated bank holding companies. *See* Eric Holder, U.S. Attorney General, Remarks at the

Mortgage Servicers Settlement Press Conference (Feb. 9, 2012). Although the settlement

releases Ally Financial from certain civil claims brought by the DOJ and multiple state attorneys

general, *see id.*; National Mortgage Settlement, Servicing Standard Highlights, *available at*

http://www.nationalmortgagesettlement.com (last visited Mar. 10, 2012), the settlement was not

designed to resolve any other liabilities that Ally Financial has incurred through its improper

origination, securitization, and servicing practices, *see* National Mortgage Settlement, About the

Settlement, http://www.nationalmortgagesettlement.com/about (last visited Mar. 10, 2012).

58.     According to the U.S. Attorney General, the $25 billion settlement and $766.5

million sanction are just "the latest step forward" in holding Ally Financial and others

accountable for "egregious mortgage loan servicing abuses." *See* Eric Holder, U.S. Attorney

General, Remarks at the Mortgage Servicers Settlement Press Conference (Feb. 9, 2012).

59.     Similarly, the New York Attorney General recently announced a $136 million

settlement with the nation's five largest mortgage servicers—including GMAC/Ally Financial.

*See* Press Release, Office of the New York Attorney General, Schneiderman Secures Major

Settlement that Allows Sweeping Mortgage Investigations to Proceed (Feb. 9, 2012). As the

New York Attorney General noted, the settlement principally addressed "foreclosure abuses" by

GMAC/Ally Financial and other banks, and "[i]n addition to penalties for past abuses, the

settlement includes direct relief to victims of wrongful foreclosure conduct" and "imposes strong

national standards for mortgage servicing" that had previously been lacking. *Id.* Additionally,

the New York Attorney General will lead the new Residential Mortgage-Backed Securities

Working Group, a component of the interagency Financial Fraud Enforcement Task Force led by

the DOJ, which "brings together the Department of Justice (DOJ), several state law enforcement

officials, and other federal agencies to investigate those responsible for misconduct contributing to the financial crisis through the pooling and sale of residential mortgage-backed securities." *Id.*

60.     In addition to these recent settlements and Assessment Order, the Federal Reserve Board and the Federal Deposit Insurance Corporation (the "FDIC") previously ordered Ally Financial, GMACM, and several other Ally Financial subsidiaries to adopt new procedures and practices in relation to mortgage loan servicing. *See In re Ally Fin. Inc.*, FRB Docket Nos. 11020-B-HC & 11020-B-DEO, FDIC-11-123b  (April 13, 2011) (the "Consent Order").

61.     The Consent Order notes that Ally Financial's mortgage servicing subsidiaries, including GMACM, have been accused, *inter alia*, of (1) failing to properly increase financial, staffing, and managerial resources in order to meet an increasing number of foreclosures; (2) failing to properly put in place "adequate internal controls, policies and procedures, compliance risk management, internal audit, training, and oversight of the foreclosure process"; (3) filing false affidavits in foreclosure actions; and (4) litigating foreclosure proceedings without "confirming that the promissory note and mortgage document were properly endorsed or assigned." *Id.* at 3-4.

62.     Furthermore, under the Consent Order, Ally Financial must direct GMACM and its other mortgage servicing subsidiaries to take certain remedial action to ensure that they operate in a "safe and sound manner" in the future. *Id.* at 4.  Specifically, among other things, the Consent Order requires Ally Financial to take "steps to improve the information and reports that will be regularly reviewed by [Ally Financial's] board of directors. . . [to assess the performance of] residential mortgage loan servicing, Loss Mitigation, and foreclosure activities and operations." *Id.* at 8.

Case 1:12-cv-08838-PAC   Document 31   Filed 03/12/12   Page 205 of 704

63.     In connection with the enforcement of the Consent Order, as of November 2011,
the Federal Reserve Board is permitting mortgage borrowers who were financially harmed by the
foreclosure processes of GMACM to request an independent review of their files. *See* Press
Release, Fed. Reserve Bd., Federal Reserve Board Announces that Borrowers from Four
Mortgage Servicers Can Request an Independent Review and Potentially Receive Compensation
(Nov. 1, 2011). This independent review will determine whether errors and misrepresentations
in GMACM's foreclosure processes indeed caused financial harm to the borrower. *See id.* If the
foreclosure process is found to have caused financial injury to the borrower, GMACM will then
be required to provide full compensation. *See id.*

64.     As a result of servicing misconduct, Ally Financial and other bank holding
companies will now be required to adhere to new, heightened servicing standards. *See* Press
Release, Fed. Reserve Bd., Federal Reserve Board Announces Agreement in Principle with Five
Banking Organizations Regarding the Issuance of Monetary Sanctions (Feb. 9, 2011). The
Federal Reserve Board has ordered Ally Financial to remedy its servicing practices by, *inter alia,*
"strengthen[ing] the coordination of communications with borrowers by providing borrowers the
name of the person at the service who is their primary point of contact, establish[ing] limits on
foreclosures where loan modifications have been approved, establish[ing] robust third party
vendor controls, strengthen[ing] compliance programs, and provid[ing] appropriate remediation
to borrowers who suffered financial injury as a result of errors by the servicers." *See id.*

65.     Moreover, the servicing and foreclosure improprieties of Ally Financial and its
subsidiaries is a matter of public record. According to the sworn testimony of an Ally
Financial/GMACM employee, Ally Financial's mortgage servicing subsidiaries have routinely
filed false affidavits in thousands of foreclosure actions across the country. *See* Jeffrey Stephan

Dep. *Fed. Nat'l Mortgage Ass'n v. Bradbury*, BRI-RE-09-65 (Me. Dist. Ct., Dist. Nine, Div. N.

Cumberland) (June 7, 2010). Indeed, according to the FCIC Report:

> [L]enders have relied on "robo-signers" who substituted speed for
> accuracy by signing, and sometimes backdating, hundreds of
> affidavits claiming personal knowledge of facts about mortgages
> that they did not actually know to be true. One such "robosigner,"
> Jeffrey Stephan of GMAC, said that he signed 10,000 affidavits in
> a month—roughly 1 per minute, in a 40-hour workweek—making
> it highly unlikely that he verified payment histories in each
> individual case of foreclosure.

FCIC Report at 407.

66.    Stephan also testified that, when executing summary judgment affidavits to be

used in judicial foreclosure actions, he was acting in accordance with policies and procedures,

and never in fact inspected any of the exhibits to the affidavits or even ensured that the exhibits

were attached, despite swearing that he had done so in the affidavits themselves. Stephan Dep.

Tr. at 54:12-25. Such exhibits would generally include (or at least should have included), among

other things, the mortgage note and documents relating to the assignment of the mortgage. *See*

*id.* at 51:15-23. Stephan further testified that when he signed an affidavit affirming that the

foreclosure was proper, all he knew was the borrower's name and whether he had signing

authority for the GMAC entity foreclosing on the property. *Id.* at 62:23-25, 63:2-6. Stephan

testified that the process he followed in signing summary judgment affidavits was in accordance

with the policies and procedures required by GMACM. *Id.* at 64:8-14.

67.    Additionally, in October 2010, the Ohio Attorney General filed suit against

GMACM and Ally Financial, alleging, *inter alia*, that employees of GMACM had executed

thousands of false affidavits in connection with foreclosures on properties in that state. *See Ohio*

*v. GMAC Mortgage, LLC*, CI0201006984, Ct. C.P. Lucas Cnty. Although some of the claims

brought by the Ohio Attorney General's suit have been resolved by the $25 billion multi-party

settlement, many additional claims not encompassed by the settlement, including those relating to the improper assignment of mortgage notes, have survived. As of February 2012, the action remains pending in Ohio.

68.     Similarly, in December 2011, the Massachusetts Attorney General filed suit against GMACM for, among other things, engaging in unfair and deceptive foreclosure practices. *See Massachusetts v. Bank of Am., N.A.,* 11-4363, Suffolk Cnty. Super. Ct. Days after filing suit, the Massachusetts Attorney General sent a letter to the United States Senate Committee on Banking, Housing and Urban Affairs, and the United States House Committee on Financial Services asking that the federal government investigate Ally Financial and GMACM for allegedly carrying out illegal foreclosures and submitting false documents related to property seizures. *See* Boston Globe, *Attorney General Martha Coakley Urges Congress to Investigate Ally Financial's GMAC Over Foreclosure Practices,* Dec. 6, 2011. Specifically, the Massachusetts Attorney General's letter to the Senate and House Committees stated:

> In light of Ally [Financial]'s alleged deceptive and illegal actions
> against homeowners in Massachusetts and across the country, I
> respectfully request that your committees investigate Ally
> [Financial]'s serious misconduct and consider what actions the
> federal government can take to ensure that Ally [Financial] adheres
> to the law.

*Id.*

69.     While the $25 billion settlement ultimately resolved certain claims brought by the Massachusetts Attorney General in this action, several claims relating to improper foreclosure practices and abuse of certain state recordation systems have survived and will continue to be prosecuted. *See* Press Release, Office of the Attorney General of Massachusetts, *Massachusetts Homeowners to Receive $318 Million in Relief as Part of State-Federal Agreement Over Unlawful Foreclosures and Loan Servicing,* Feb. 9, 2012.

     **(5)**    **Significant Possibility of Ally Financial Seeking Bankruptcy Protection for ResCap, GMAC-RFC, and GMACM**

70.    Since at least as far back as November 2011, Ally Financial has been considering filing for bankruptcy protection for ResCap, its wholly-owned subsidiary, which has reportedly lost $555 million since 2009, according to multiple published reports. GMACM is a wholly-owned, indirect subsidiary of ResCap.

71.    Around that time, the financial industry was "betting that Ally [Financial] will place its Residential Capital LLC [ResCap] mortgage unit into bankruptcy instead of supporting the business as the bank prepares for an initial public offering." Bloomberg News, *Ally May Put ResCap in Bankruptcy to Ease IPO: Corporate Finance*," Nov. 14, 2011.

72.    As the article notes, Ally Financial has the power to decide whether its "mortgage unit," ResCap, should file for bankruptcy. *See id*.

73.    Indeed, Ally Financial warned in its 2011 annual report that "[t]here is a significant risk that ResCap will not be able to meet its debt service obligations and other funding obligations in the near term." Ally Fin. Inc., Annual Report (Form 10-K), at 19 (Feb. 28, 2012).

74.    That risk ultimately came to pass as Ally Financial recently disclosed that the penalties assessed by the federal government and numerous state attorneys general regarding the foreclosure practices of Ally Financial and its subsidiaries "resulted in our Mortgage operations recording a $230 million charge in the fourth quarter of 2011." *Id.* at 31. As Ally Financial detailed in its previous public filing, the "[t]he majority of [the charge] was recorded at Residential Capital, LLC ('ResCap') . . . [which] resulted in a covenant breach in certain of ResCap's credit facilities." Ally Fin. Inc., Current Report (Form 8-K) (Jan. 31, 2012). Indeed, as Ally Financial more recently explained, "ResCap is required to maintain consolidated net

- 23 -

worth . . . of $250 million at the end of each month under the terms of certain of its credit facilities. . . [and] as a result of the fourth quarter charge, ResCap's consolidated net worth was $92 million at December 31, 2011." Ally Fin. Inc., Annual Report (Form 10-K), at 31-32 (Feb. 28, 2012). ResCap's substantial shortfall, however, was "immediately remediated by Ally through a capital contribution of $197 million, which was provided through forgiveness of intercompany debt during January 2012." *Id.*

75.    Moreover, in February 2012, it was reported that Ally Financial had contacted buyout firms such as Fortress Investment Group LLC and Cerberus Capital Management LP regarding a potential sale of ResCap through a pre-packaged bankruptcy to be effectuated by the end of March as ResCap faces financing and liquidity deadlines. *See* Bloomberg News, *Ally's ResCap Said to Seek Buyers for Prearranged Bankruptcy*, Feb. 8, 2012.

76.    According to the report, "[p]otential bidders are being told that a pre-packaged bankruptcy filing would allow the buyer to leave behind liabilities such as [RMBS] securitizations that have been the subject of litigation." *Id.* To that end, Ally Financial's CEO, Michael Carpenter, has stated that he will not pursue the aforementioned initial public offering for Ally Financial "until [these] legacy mortgage issues are resolved." *Id.* Nevertheless, a bondholder group representing holders of approximately $800 million in ResCap debt has expressed its desire to "fight [Ally Financial] tooth and nail" to oppose the bankruptcy, based in part on the belief that "Ally [Financial] can't legally separate itself from ResCap because it has stripped assets from the unit." Bloomberg News, *Paulson, Tepper Said Among Investors Urging Ally to Back ResCap*, Jan. 10, 2012.

77.    Indeed, as Ally Financial has pointedly noted in its most recent annual report: "In light of ResCap's liquidity and capital needs combined with volatile conditions in the

marketplace, there is substantial doubt about ResCap's ability to continue as a going concern." Ally Fin. Inc., Annual Report (Form 10-K), at 18 (Feb. 28, 2012).

**B.     GMACM's Securitizations and Financial Guaranty Insurance Generally**

**(1)     Financial Guaranty Insurance Policies**

78.     To improve the marketability and ratings of the RMBS Notes issued as part of its securitizations, GMACM from time to time sought credit enhancement for the RMBS Notes from FGIC, a financial guaranty insurer, in the form of financial guaranty insurance policies. Under the terms of a financial guaranty insurance policy like the ones FGIC issued here, the insurer unconditionally and irrevocably guarantees to the trustee for the benefit of the holders of the insured RMBS Notes that, if there is a shortfall in cash available to make required payments on the insured securities, the financial guaranty insurer will pay the amount of the shortfall to the trustee for the benefit of the holders of the insured securities.

79.     For a trust that issues RMBS Notes, the primary source of funds is the remittance of payments on the underlying residential mortgage loans.  Delinquencies by borrowers in making their mortgage loan payments will, by definition, reduce cash flows to the trust, which will directly impair the ability of the trust to make required payments on the RMBS Notes. Delinquencies, if not cured, will eventually result in losses on the mortgage loans, which reduce the aggregate principal amount of the loan pool held by the trust.  In this manner, high levels of mortgage loan delinquencies and defaults can lead to shortfalls in cash available to pay RMBS investors.  Such shortfalls result in claims on FGIC's policies.

**(2)     Securitization Sponsor's Disclosures and Representations and Warranties**

80.     The risk FGIC assumes when it agrees to issue a policy for RMBS Notes depends upon the credit quality of the underlying mortgage loans, which in turn depends on the

underwriting practices of the loan originators and the characteristics of the loans. If, for instance, GMACM and other loan originators employ substandard underwriting practices, the underlying mortgage loan pool as a whole would be of inferior credit quality. Consequently, the credit risk—the risk of delinquency or default—of the underlying mortgages, and of the mortgage portfolio as a whole, would be materially increased.

81. Accordingly, FGIC generally required securitization sponsors, like GMACM, to provide substantial representations and warranties about the underlying mortgage loans, such as the ratio of the borrower's monthly debt payments to monthly income ("DTI ratio"), the ratio of the mortgage loan principal balance to the value of the mortgaged property at origination—plus, in the case of a junior lien mortgage loan, the principal balance of the senior mortgage loan on the related mortgaged property—("LTV ratio"), and the borrower's credit score ("FICO score"). Even where GMACM did not originate a particular loan, it nonetheless is typically required to make representations about that loan, thereby assuming the risk that those representations might not be accurate. GMACM's representations and warranties, including representations about the standards and procedures used to underwrite the loans, were intended to allow FGIC to assess the credit risk inherent in the mortgage loan pool before deciding to commit to the transaction.

82. GMACM's representations and warranties in its RMBS transactions regarding the characteristics of the loans included in the mortgage loan portfolios, and the underwriting standards used to evaluate those mortgage loans, are particularly vital because each loan pool is comprised of thousands of mortgage loans, each of which was in itself a complex legal transaction. Each loan file typically contains (or at least is supposed to contain) a mortgage application, a credit report, income and employment verifications, an appraisal, the lender's internal documentation and a wide variety of other documentation necessary to support proper

loan underwriting decisions. Moreover, in seeking financial guaranty insurance from FGIC for the HE Transactions, GMACM demanded that FGIC commit to the pricing and other material terms within a very limited time frame. Both GMACM and FGIC understood and intended that FGIC would rely on the information supplied by GMACM as sponsor, as well as GMACM's representations and warranties concerning that information, in assessing the credit risk of the mortgage loan pool.

83.    Further, on information and belief, for each of its securitizations, GMACM as sponsor supplied the same data it provided to FGIC to one or several rating agencies in order for those agencies to create expected loan level default and loss estimates. The loan level default and loss estimates were then used by the rating agencies to create cash flow projections and potential loss estimates for the entire transaction. Finally, the rating agencies delivered to the sponsor and to FGIC a private credit assessment for the transaction (sometimes referred to as a "shadow rating") without considering the effect of FGIC's policy. The shadow rating provided an overall evaluation of the likelihood of default on the securities FGIC would be insuring in the securitization. As sponsor, GMACM arranged for the shadow rating to be provided to FGIC knowing that it was an essential condition to FGIC's willingness to issue a financial guaranty insurance policy.

**C.    The HE Transactions**

**(1)    The GMACM 2006-HE2 Transaction**

84.    On June 29, 2006, GMACM pooled together and deposited many thousands of fixed rate Home Equity Loans ("HELs") into the 2006-HE2 Trust. The 2006-HE2 Trust served as the Issuer of $626,240,000 aggregate principal amount of 2006-HE2 Notes. Home equity loans are essentially second-lien mortgage loans, which are generally funded entirely at the closing of the loan.

85.     The initial conveyance to the 2006-HE2 Trust by RAMP (acting as Depositor) contained over 9,500 HELs with an aggregate principal balance of approximately $480 million. Investors in the GMACM-sponsored 2006-HE2 Transaction were issued four classes of securities (*i.e.*, the 2006-HE2 Notes)—Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, and Class A-4 Notes (formally termed the GMACM Home Equity Loan-Backed Term Notes, Series 2006-HE2)—which were collateralized by the Mortgage Loans transferred to and held by the 2006-HE2 Trust.  In addition, approximately $160 million was deposited into a pre-funding account at closing, which was used to acquire approximately 3,500 additional HELs in the 90 days following the closing.

**(2)     The GMACM 2007-HE2 Transaction**

86.     Similarly, on June 28, 2007, GMACM pooled together and deposited many thousands of fixed rate HELs into the 2007-HE2 Trust.  The 2007-HE2 Trust served as the Issuer of $1,240,884,000 aggregate principal amount of 2007-HE2 Notes.

87.     The initial conveyance to the 2007-HE2 Trust by RAMP (acting as Depositor) contained over 17,800 HELs with an aggregate principal balance of approximately $960 million. Investors in the GMACM-sponsored 2007-HE2 Transaction were issued six classes of securities (*i.e.*, the 2007-HE2 Notes)—Class A-1, Class A-2, Class A-3, Class A-4, Class A-5 and Class A-6 (formally termed the GMACM Home Equity Loan-Backed Term Notes, Series 2007-HE2)— which were collateralized by the Mortgage Loans transferred to and held by the 2007-HE2 Trust. In addition, approximately $320 million was deposited into a pre-funding account at the closing, which was used to acquire approximately 5,800 additional HELs in the 90 days following the closing.

### (3)   The HE Transactions Generally

88.     To enhance the ratings and marketability of the HE Notes, GMACM sought financial guaranty insurance policies from FGIC for the purpose of insuring the Transactions for the benefit of the certificate holders.  For each of the HE Transactions, FGIC and GMACM executed an Insurance and Indemnity Agreement (respectively, the "2006-HE2 I&I Agreement" and the "2007-HE2 I&I Agreement," and collectively the "I&I Agreements"),[1] under which FGIC agreed to and did issue financial guaranty insurance policies—Policy number 06030080 and Policy number 07030046, respectively—to insure the 2006-HE2 and 2007-HE2 Notes.  Each I&I Agreement was signed by FGIC (as the "Insurer" of each Transaction); GMACM (as the "Servicer" and a "Seller" for each Transaction), RAMP (as the "Depositor" for each Transaction); Walnut Grove (a "Seller" for each Transaction); and the respective Indenture Trustee for each Transaction.[2]

89.     In each Transaction, Ally Bank (using its then-current name, GMAC Bank) also entered into a Custodial Agreement whereby it agreed to serve as Custodian of the underlying mortgage loan notes on behalf of the respective Trusts (the "2006-HE2 Custodial Agreement" and "2007-HE2 Custodial Agreement," and, together the "Custodial Agreements").  FGIC is an express third party beneficiary of the Custodial Agreements.  *See* Custodial Agreements § 5.6.

90.     Each I&I Agreement provides that FGIC (the Insurer) is a third-party beneficiary of, and shall have all of the rights provided for in, the "Operative Documents."  I&I Agreements § 2.02(k).  With respect to the 2006-HE2 and 2007-HE2 Transactions, the "Operative

---

[1] JPMorgan initially served as the Indenture Trustee for the 2006-HE2 Transaction, but was succeeded by The Bank of New York Trust Company, N.A.  The Bank of New York Trust Company, N.A., also served as the Indenture Trustee for the 2007-HE2 Transaction.

[2] The 2006-HE2 I&I Agreement was executed on June 29, 2006 and the 2007-HE2 I&I Agreement was executed on June 28, 2007.

Documents" are defined to include, among other documents: (i) the relevant HE Notes; (ii) the

Mortgage Loan Purchase Agreement, among GMACM, RAMP, Walnut Grove, the relevant HE2

Trust, and the relevant Indenture Trustee (respectively, the "2006-HE2 MLPA" and the "2007-

HE2 MLPA," and collectively the "MLPAs"); (iii) the Servicing Agreement among GMACM,

the relevant HE2 Trust, and the relevant Indenture Trustee (respectively, the "2006-HE2

Servicing Agreement" and the "2007-HE2 Servicing Agreement," and collectively the

"Servicing Agreements"); (iv) the Indenture between the relevant Trust and Indenture Trustee;

and (v) the Custodial Agreement among GMACM, the relevant Indenture Trustee, and Ally

Bank (then doing business as GMAC Bank).[3]  *See* I&I Agreements § 1.01.  FGIC is referred to

as the "Enhancer" under certain of the Operative Documents.

91.     Pursuant to the I&I Agreements, FGIC insured $1,867,124,000 aggregate

principal amount of the HE Notes.  The Policies improved the marketability of the HE Notes by

mitigating risk for potential investors and making the HE Notes eligible to receive a credit rating

of triple-A by the rating agencies at closing.

92.     GMACM and the Depositor offered the HE Notes for sale pursuant to a

prospectus (a "Prospectus," and for each Transaction respectively, the "2006-HE2 Prospectus,"

and the "2007-HE2 Prospectus"), and a prospectus supplement (a "Prospectus Supplement," and

for each Transaction respectively, the "2006-HE2 Prospectus Supplement" and the "2007-HE2

Prospectus Supplement"), each touting the respective Policies and the triple-A initial rating of

---

[3] The MLPA, Servicing Agreement, Indenture and Custodial Agreement for the 2006-HE2 Transaction
were each executed on June 29, 2006.  The MLPA, Servicing Agreement, Indenture and Custodial Agreement for
the 2007-HE2 Transaction were each executed on June 28, 2007.

the HE Notes, which was made possible by those Policies.[4]  The Prospectus and Prospectus

Supplement, together with certain preliminary offering documents, each as further supplemented

by any subsequent amendment or supplement thereto, and any other offering document that

make reference to the Policies, are referred to collectively as the "Offering Documents."

93.     Upon the closing of each HE2 Transaction, Ally Securities, an Ally Financial

subsidiary, acted as a co- manager and joint-lead manager, respectively, for a syndicate of

underwriters that purchased from the respective HE Trust and sold to investors the related HE

Notes, and FGIC, for its part, issued the related Policy in accordance with the terms of each I&I

Agreement.

### D.     GMACM Fraudulently Induces FGIC to Insure the HE Notes with Substantial Assistance from Ally Financial and Ally Bank

#### (1)     GMACM's Fraudulent Inducement of FGIC

94.     FGIC's participation in the HE Transactions was an essential component of the

HE Transactions and enhanced GMACM's ability to market the securitizations effectively.  The

Policies allowed GMACM to sell the HE Notes with an initial triple-A credit rating, making

them more attractive to a broader pool of potential investors.

95.     In order to induce FGIC to write financial guaranty insurance for the HE

Transactions, GMACM provided to FGIC, directly or indirectly, a variety of information, and

promised to—and did—provide FGIC with a variety of representations, warranties, and

covenants.

96.     *First*, GMACM provided to FGIC initial and final 2006-HE2 and 2007-HE2

Prospectus Supplements (collectively, the "Prospectus Supplements") which summarized, among

---

[4] The 2006-HE2 Prospectus is dated as of April 7, 2006; the 2007-HE2 Prospectus is dated as of April 17, 2007.  The 2007-HE2 Prospectus Supplement is dated as of June 27, 2006; the 2007-HE2 Prospectus Supplement is dated as of June 28, 2007.

other material information, the credit quality and characteristics of the Mortgage Loans, and GMACM's loan underwriting guidelines and loan origination criteria.

97.     *Second,* FGIC received a document (generally referred to as a "loan tape" or "magnetic tape") detailing material characteristics of individual borrowers and loans expected to be included in the HE Transactions, together with representations regarding material statistics about the initial Loan Pool as a whole.

98.     *Third,* GMACM provided to FGIC credit ratings for the HE Notes determined on the basis of information concerning the characteristics of the Mortgage Loans supplied to the rating agencies by GMACM, but without considering the effect of the Policies.  These ratings, which GMACM procured from the credit rating agencies, are known as "shadow ratings."

99.     *Fourth,* as discussed in detail in Section E below, GMACM provided to FGIC representations, warranties, and affirmative covenants in the Operative Documents and the I&I Agreements regarding the Mortgage Loans specifically and the Loan Pool generally.

100.     ***Prospectus Supplement and Other Offering Documents.*** In determining whether to insure the HE Notes, FGIC relied in part upon representations and warranties regarding GMACM's loan underwriting standards made by GMACM in the Prospectuses and Prospectus Supplements.  The 2006-HE2 Prospectus, as supplemented by the 2006-HE2 Prospectus Supplement, was filed with the SEC and became effective on June 29, 2006.  A Preliminary Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about June 21, 2006, in an email sent by Jeffrey Wittenberg, on behalf of GMACM.  The Final 2006-HE2 Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about June 28, 2006, in an email sent by Jeffrey Wittenberg, on behalf of GMACM.

101.    The 2007-HE2 Prospectus, as supplemented by the 2007-HE2 Prospectus
Supplement, was filed with the SEC and became effective on June 28, 2007.  A Preliminary
Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about
June 25, 2007, in an email sent by Dennis Bent on behalf of GMACM.  The Final 2007-HE2
Prospectus Supplement was transmitted to, among others, Dana Skelton of FGIC, on or about
June 28, 2007, in an email sent by Duane Beasley, on behalf of GMACM.

102.    In the 2006-HE2 and 2007-HE2 Offering Documents, GMACM represented that,
based on the data provided in the borrower's application and certain other applicable
verifications, "a determination will have been generally made by the original lender that the
borrower's monthly income, if required to be stated, would be sufficient to enable the borrower
to meet its monthly obligations on the loan and other expenses related to the property."  2006-
HE2 Prospectus at 23; 2007-HE2 Prospectus at 30.

103.    Further, in the Prospectus Supplements, GMACM also represented to FGIC that
"[a]ll of the mortgage loans were underwritten generally in accordance with [GMACM's]
underwriting standards."  2006-HE2 Prospectus Supplement at S-30; 2007-HE2 Prospectus
Supplement at S-33.

104.    The Prospectus Supplements expressly state that GMACM's "underwriting
standards with respect to the mortgage loans generally will conform to those published in the
[GMACM] underwriting guidelines, including the provisions of the [GMACM] underwriting
guidelines applicable to the GMAC Mortgage Home Equity Program."  2006-HE2 Prospectus
Supplement at S-30; 2007-HE2 Prospectus Supplement at S-33.

105.    GMACM publishes its loan underwriting standards in a document referred to in
the Prospectus Supplements as "the GMAC Mortgage Corporation underwriting guidelines" or

the "GMAC Mortgage, LLC underwriting guidelines" (and referred to herein as the

"Underwriting Guidelines"). 2006-HE2 Prospectus Supplement at S-30; 2007-HE2 Prospectus

Supplement at S-33. In general, the Underwriting Guidelines specify documentation

requirements, and substantive criteria for key credit-related characteristics, that borrowers must

satisfy in order to qualify for a particular mortgage loan. Depending upon the particular type of

loan, these requirements and criteria may include asset verification, income verification,

employment verification, bank statements, payment histories and/or evidence of closing funds,

among other things. The substantive criteria for eligibility address material characteristics of the

proposed loan, such as DTI ratios, Combined Loan-to-Value ("CLTV") ratios (a ratio comparing

the aggregate principal balance of first and second mortgages on a covered property to the value

of the property), and occupancy status.

106.   The Prospectus Supplements set forth, among other information, the following

important characteristics of the initial Loan Pools: the ranges of and weighted average FICO

scores, the ranges of and weighted average CLTV ratios, the ranges of and weighted average

outstanding principal balances of the loans, the DTI ratios of the borrowers, the geographic

distribution of the loans, and the occupancy status of the borrowers (*i.e.*, whether the property

securing a mortgage is: (i) the borrower's primary residence; (ii) a second home; or (iii) an

investment property). *See* 2006-HE2 Prospectus Supplement at A-I-1 to A-I-7; 2007-HE2

Prospectus Supplement at A-I-1 to A-I-7.

107.   In particular, GMACM represented in the 2006-HE2 and 2007-HE2 Prospectus

Supplements that the loans had been originated with a maximum DTI ratio of 80%—with less

than 1% of the Mortgage Loans originated with a DTI ratio over 60%—and a maximum CLTV

ratio of 100%. *See* 2006-HE2 Prospectus Supplement at A-I-3, A-I-6; 2007-HE2 Prospectus

- 34 -

Supplement at A-I-3, A-I-6. GMACM also represented that for each Mortgage Loan it had
generally made a determination based upon all applicable employment, credit and property
information regarding whether the prospective borrower had sufficient monthly income available
to meet the borrower's monthly obligations. *See* 2006-HE2 Prospectus at 23; 2007 HE2
Prospectus at 30.

108.    GMACM also represented in the 2006-HE2 Offering Documents that, with
respect to occupancy status, 98.79% of the Mortgage Loans would be secured by the borrower's
primary residence. 2006-HE2 Prospectus Supplement at A-I-4. GMACM further represented in
the 2007-HE2 Offering Documents that, with respect to occupancy status, 95.41% of the
Mortgage Loans would be secured by the borrower's primary residence. 2007-HE2 Prospectus
Supplement at A-I-4.

109.    *Loan Tapes.* The loan tapes set forth, for each Mortgage Loan in the initial Loan
Pool, key characteristics such as the borrower's FICO score, DTI ratio, and the CLTV ratio for
the loan. GMACM also disclosed in the 2006-HE2 and 2007-HE2 Prospectus Supplements—
with respect to each Loan Pool as a whole—aggregate characteristics also relevant to the
assessment of the credit risk of the pool, including weighted averages of FICO scores, DTI ratios
and CLTV ratios.

110.    *Shadow Rating Letters.* GMACM, on information and belief, provided Moody's
and S&P with, at a minimum, the same mortgage loan tapes that were provided to FGIC. As
requested by GMACM, Moody's and S&P provided the shadow ratings on the respective closing
dates of the HE Transactions. In its letters to FGIC describing the shadow ratings for each of the
HE Transactions, Moody's noted that it reviewed the documentation provided by GMACM and
that the rating was "based primarily on the credit quality of the loans backing the transaction."

Similarly, in its letters to FGIC, S&P noted that it too relied on the information provided to it by GMACM and that each shadow rating "relies on the issuer . . . for the accuracy and completeness of the information submitted in connection with the [shadow rating]."

111.   Based on the information supplied by GMACM, Moody's assessed the credit quality of the initial 2006-HE2 and 2007-HE2 Loan Pools and assigned shadow ratings of Baa1 and Baa2, respectively, to the 2006-HE2 and 2007-HE2 Notes.  S&P assigned the 2006-HE2 and 2007-HE2 Notes shadow ratings of BBB- and BBB, respectively.

112.   These shadow ratings, which were based, in part, on GMACM's representations in respect of the characteristics of the Loan Pools, met FGIC's minimum requirements and were required by FGIC as an essential condition to its willingness to participate in HE Transactions and issue the Policies.

### (2)   GMACM's Fraudulent Inducement of FGIC is Carried Out with Substantial Assistance from Ally Bank

113.   Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently procuring the Policies from FGIC.  As it originated or acquired approximately 75% of the initial Mortgage Loans, Ally Bank was well aware of the true characteristics of the majority of the Loan Pool.  Moreover, as a result of its affiliate status with GMACM, and its role as Custodian for the HE Transactions—for which it received substantial fees—Ally Bank was aware of the representations and warranties GMACM made to FGIC regarding the nature of GMACM's business practices and the characteristics of the Mortgage Loans (including the many thousands of Mortgages Loans that were originated by Ally Bank).

114.   With full knowledge that GMACM had not complied—and would not comply— with the representations and warranties it made to FGIC, and direct knowledge of the many thousands of loans it had originated and sold to GMACM, which formed a substantial part of the

collateral for the HE Transactions. Ally Bank represented to FGIC that, as Custodian, it would

inform FGIC if it discovered any non-compliant Mortgage Loans or non-compliance with

GMACM's obligations under the Operative Documents.  By offering FGIC this false comfort,

despite knowing that GMACM was fraudulently inducing FGIC to provide financial guaranty

insurance for the HE Transactions, Ally Bank provided material assistance to GMACM's fraud.

> **(3)    GMACM's Fraudulent Inducement of FGIC is Carried Out with
> Substantial Assistance from Ally Financial**

115.    Ally Financial provided substantial assistance to its subsidiaries GMACM and

Ally Bank in fraudulently inducing FGIC to participate in the HE Transactions and, ultimately,

issue the Policies.  Ally Financial knew that the Mortgage Loans underlying the HE Transactions

were of a substantially poorer quality than was represented to FGIC and other participants in the

Transaction, including investors.  Ally Financial further knew that the Mortgage Loans were not

underwritten to the standards represented in the Offering Documents and warranted in the

Operative Documents.  Moreover, on information and belief, as a result of its dominance over

ResCap, Ally Bank, and its other subsidiaries, Ally Financial knew that the representations and

warranties GMACM made to FGIC prior to and at the closing, upon which FGIC reasonably

relied, were false.

116.    Ally Financial, at the direction of its board of directors, took a number of actions

in 2005 to engender investor confidence in, and otherwise finance and support, its mortgage

securitization business, which was carried out by its subsidiaries.  Ally Financial substantially

restructured its subsidiaries in 2005.  ResCap, for example, did not conduct any operations

whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of

Ally Financial's wholly-owned subsidiaries—were transferred to it in March 2005.  Those two

subsidiaries represented substantially all of Ally Financial's mortgage securitization business.

117.    Ally Financial, at the direction of its board of directors, also provided ResCap with liquidity and capital.

118.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap would enter into an operating agreement with Ally Financial, under which Ally Financial would agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."

119.    On information and belief, Ally Financial's restructuring and financial support of its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to improve and maintain the investment grade rating and profitability of Ally Financial's mortgage securitization business.  This restructuring then enabled Ally Financial to present itself to its subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries more attractive as counterparties to market participants, such as FGIC.

120.    Ally Financial's corporate restructuring also allowed GMACM to explicitly represent and warrant to FGIC in the I&I Agreements that GMACM "is solvent and will not be rendered insolvent by the Transaction. . . . [GMACM] shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business . . . ."  I&I Agreements § 2.01(m).  This statement—on which FGIC materially relied—could not have been made absent Ally Financial's decision to prop up its subsidiary GMACM.

121.    Additionally, Ally Financial was aware that the true characteristics of the Mortgage Loans in the HE Transactions—and other securitization transactions—were far worse than was represented to FGIC and were not underwritten to the standards that were represented and warranted to FGIC.  This is true in that Ally Financial's subsidiaries were, in many cases, the

- 38 -

acquirers, sellers, and servicers of those very loans.  Indeed, the driving factor in the separation
of Ally Financial from General Motors Corporation ("GM") and the creation, in particular, of
ResCap, was to create an entity, the sole focus of which was the home mortgage business.

122.    Moreover, as a result of its domination and control over ResCap, GMACM, and
Ally Bank, as well as the shared officers and directors among and between Ally Financial and its
subsidiaries, Ally Financial was aware of GMACM's representations and warranties to FGIC—
and that they were untrue when stated—as well as the substantial assistance Ally Bank was
rendering GMACM in aid of its fraudulent inducement of FGIC.  For example, Eric A. Feldstein
was Ally Financial's CEO and Chairman of its board of directors and also served as Chairman of
ResCap's board of directors.  Furthermore, Sanjiv Khattri has served as Executive Vice President
and CFO of Ally Financial, while also serving as a director and CFO of ResCap.  Numerous
other individuals served as Directors and Officers of both Ally Financial and ResCap, with many
serving in roles directly related to the mortgage operations of both companies.  ResCap and its
own subsidiaries, including GMACM, shared numerous directors and senior management as
well.  Similarly, William F. Muir, Ally Financial's President, has served in that capacity since at
least 2004 (first at GMAC and then at Ally Financial) while also serving as President and
Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally Bank—
and as a director of Ally Bank.

123.    David C. Walker is another example of the many employees who had overlapping
responsibilities at Ally Financial and its subsidiaries, including GMACM and RAMP.  Walker
joined Ally Financial in 1985 and has served as Vice President of GMAC Group and CFO of
GMAC Mortgage Group.  Walker has also served as a director at ResCap, GMACM, RFC, and
RAMP, among other ResCap subsidiaries.  In the 2006-HE2 Transaction, acting as a director of

RAMP, Walker was a signatory to RAMP's December 20, 2005 "Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors," which was included among the closing documents of the 2006-HE2 Transaction.

124.    Similarly, as of April 13, 2006, David Applegate served as Director, President and CEO of GMAC Mortgage LLC, while David M. Bricker served as Director, Senior Vice President and CFO of GMAC Mortgage, LLC.  In the 2007-HE2 Transaction, acting as directors of RAMP, both Bricker and Applegate were signatories to RAMP's January 25, 2007, "Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors," which was included among the closing documents of the 2007-HE2 Transaction.

125.    As a result of the overlapping personnel, intertwined business operations, and the free flow of information among Ally Financial, ResCap, Ally Bank, and GMACM, it is more than reasonable to conclude that information regarding the representations and warranties being made to FGIC by GMACM was shared among and between GMACM and its parent ResCap, ResCap and its parent Ally Financial, and Ally Bank and its parent and affiliates.  Indeed, at least one Ally Financial employee who was involved in the 2006-HE2 Transaction appeared on the Transactions' working group list and received all distributions that were sent to the group, including all drafts, final versions, and communications concerning the Operative and Offering Documents.

126.    Ally Financial, by (1) representing that its mortgage loan practices were sound and that its securitization transactions were supported by mortgage loans that met the criteria to which they were purportedly underwritten, (2) providing financial, managerial, and strategic assistance to its subsidiaries, and (3) modifying its corporate structure to control and direct its subsidiaries, provided substantial assistance to GMACM in fraudulently inducing FGIC to

participate in the Transactions and issue the Policies. Further, the issuance of the Policies, which made the HE Transactions possible, inured to the significant financial benefit of Ally Financial and its subsidiaries.

### E.    GMACM's Representations, Warranties and Affirmative Covenants

127.    In connection with the HE Transactions, GMACM, at the direction of Ally Financial, either directly or indirectly through ResCap, gave numerous representations, warranties and affirmative covenants to FGIC. These representations and warranties were material and concerned, among other things, the way GMACM conducted its loan origination, selection and evaluation processes, the characteristics of the Mortgage Loans and of the initial and complete Loan Pools, and the accuracy and completeness of the information supplied to FGIC. These and other characteristics of the Mortgage Loans included in each of the initial Loan Pools were detailed in schedules attached to the applicable Servicing Agreement, and provided to FGIC by GMACM in the form of loan tapes (collectively, for each Transaction, the "Mortgage Loan Schedules.") Moreover, these same representations and warranties were restated by GMACM when it transferred additional Mortgage Loans to the HE Trusts after the closing of each Transaction (as was permitted for a short time following closing).

128.    GMACM further promised to provide FGIC with a variety of information, including access to GMACM's books and records and to GMACM's Chief Financial Officer and its independent accountants.

129.    GMACM's representations and warranties, and particularly GMACM's representation that the information supplied to FGIC was not materially inaccurate or misleading, induced FGIC to enter into the HE Transactions and to issue the Policies on the agreed terms. Further, the I&I Agreements' incorporation and restatement of the representations and warranties in the Operative Documents was intended to allow FGIC to rely upon each and

- 41 -

every one of the representations and warranties that GMACM made in connection with the HE Transactions.

130.    FGIC, for its part, reasonably relied on the information available to it regarding the underlying Mortgage Loans and the representations and warranties provided by GMACM. Since FGIC had neither the right under the applicable Operative Documents, nor the practical ability, to review the tens of thousands of underlying Mortgage Loan files in the days available to it prior to the closing of the HE Transactions, GMACM knew that FGIC had no choice but to rely on GMACM's representations regarding the underlying loans in determining whether to issue the Policies. Further, FGIC had no reason to believe that those representations were not true and accurate.

131.    Indeed, GMACM included more than 27,000 individual Mortgage Loans in the HE Transactions at their closing dates, and additional Mortgage Loans post-closing. Typically, each Mortgage Loan has its own voluminous file containing, among other items, mortgage applications, credit reports, income and employment verifications, the lender's internal documentation and other forms of documentation necessary to support each underwriting decision. Unlike GMACM, FGIC was under no contractual duty whatsoever to review the tens of thousands of initial Mortgage Loans or the Mortgage Loans subsequently transferred after closing. Instead, FGIC, as contemplated by the many representations, warranties, and affirmative covenants by GMACM regarding its loan origination, selection, and evaluation practices, and the credit quality of the Mortgage Loans, reasonably relied on GMACM to conduct its underwriting processes according to the promised standards and FGIC had no basis to conclude that GMACM's representations and warranties were false. Thus, FGIC reasonably believed that truthful and accurate information had been provided and that it would not face

additional, hidden risk by virtue of material omissions or positive misrepresentations having
been made.

132.   Based on the information received by FGIC and the representations and
warranties given by GMACM, FGIC entered into the I&I Agreements and agreed to issue the
Policies to the respective Indenture Trustees for the benefit of the holders of the HE Notes.  In
return for doing so, FGIC received a modest annual premium, based on a small, fixed percentage
of the aggregate principal balance of the HE Notes.  Specifically, FGIC received .13%
and .125% per annum of the aggregate balance of the 2006-HE2 Notes and 2007-HE2 Notes,
respectively, for serving as insurer, figures commensurate with the risk that FGIC believed it was
accepting, based on the representations, warranties and affirmative covenants provided by
GMACM.

133.   As discussed below, GMACM's information, representations and warranties were
materially false when disclosed and/or provided by GMACM.  GMACM knew that this
information, and its representations and warranties, were materially false when made.  GMACM
also knew that this information and the representations and warranties were essential to FGIC's
decision to issue the Policies.  Indeed, GMACM intentionally made these material
misrepresentations to induce FGIC to enter into the I&I Agreements and issue the Policies.  The
issuance by FGIC of the Policies—induced by GMACM's fraudulent misrepresentations and
substantial assistance by Ally Financial—made the HE Notes eligible to receive an initial triple-
A credit rating, thus greatly improving their marketability to potential investors.

**(1)     Representations, Warranties and Affirmative Covenants Relating to
the Operative and Offering Documents**

134.   Under Section 2.01 of the I&I Agreements, GMACM made the following
representations and warranties, among others (emphasis added in each case):

- 43 -

♦   *Accuracy of Information.*  **Neither the Operative Documents to which it is a party nor other information relating to the Mortgage Loans**, the operations of GMACM. . . or the financial condition of GMACM . . . furnished to [FGIC] . . . by GMACM . . . including the Offering Documents . . . **contains any statement of a material fact which was untrue or misleading in any material respect when made** . . . GMACM  . . . has no knowledge of any circumstances that could reasonably be expected to cause a Material Adverse Change with respect to GMACM . . . Since the furnishing of the Documents, there has been no change nor any development or event involving a prospective change known to GMACM . . . that would render any of the Documents untrue or misleading in any material respect.

♦   *Compliance with Securities Laws.*  The offering and sale of the Securities complies in all material respects with all requirements of law, including the registration requirements of the Securities Act and any other applicable securities laws. **The Offering Documents do not contain any untrue statement of a material fact and do not omit to state material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading** . . . .

♦   *Operative Documents.*  **Each of the representations and warranties of GMACM . . . contained in the applicable Operative Documents and the Underwriting Agreement is true and correct in all material respects** [and] GMACM . . . hereby makes each such representation and warranty to, and for the benefit of, [FGIC] as if the same were set forth in full herein . . . .

♦   *Solvency; Fraudulent Conveyance.*  [GMACM] . . . is solvent and will not be rendered insolvent by the Transaction and . . . **GMACM . . . shall not be left with an unreasonably small amount of capital with which to engage in the ordinary course of its business**, and . . . GMACM . . . does not intend to incur, or believe that it has incurred, debts beyond its ability to pay as they mature . . . GMACM . . . is not transferring the Mortgage Loans . . . with any intent to hinder, delay or defraud . . . creditors.

135.   *First*, in the I&I Agreements, GMACM represented and warranted to FGIC that "[n]either the Operative Documents to which it is a party nor other information relating to the Mortgage Loans. . . including the Offering Documents . . . contains any statement of a material fact which was untrue or misleading in any material respect when made." I&I Agreements § 2.01(j). Through these Operative and Offering Documents, GMACM communicated several material facts about the characteristics of the mortgage loans sold to the HE Trusts.

136.    *Second*, in the I&I Agreements, GMACM represented and warranted that "[t]he Offering Documents do not contain any untrue statement of a material fact and do not omit to state material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading . . . ." *Id.* § 2.01(k). As discussed above, in the Prospectus Supplements, GMACM represented that all of the mortgage loans sold to the HE Trusts had been underwritten generally in accordance with GMACM's underwriting standards, including the GMAC Mortgage Home Equity Program. 2006-HE2 Prospectus Supplement at S-30; 2007-HE2 Prospectus Supplement at S-33.

137.    *Third*, the I&I Agreements incorporated by reference, for the benefit of FGIC, the representations and warranties contained in the "Operative Documents," as that term was defined in the I&I Agreements: "[e]ach of the representations and warranties . . . contained in the applicable Operative Documents . . . is true and correct in all material respects[.]" *See* I&I Agreements §§ 1.01, 2.01(l). The incorporation by reference of the Operative Documents into the I&I Agreements was intended to allow FGIC to rely on any representation and warranty that GMACM made to other entities, such as investors or the respective Indenture Trustees, in connection with the HE Transactions. Indeed, the I&I Agreements expressly identify FGIC as a third-party beneficiary with respect to the related Operative Documents. I&I Agreements § 2.02(k).

138.    *Fourth*, GMACM also provided information to FGIC concerning Mortgage Loans in the HE Transactions. *See* I&I Agreements § 2.02(c)(iii). This information included loan tapes that set forth statistics about the respective Loan Pools. The loan tapes purported to describe key characteristics relevant to the assessment of risk, including DTI ratios, CLTV ratios, occupancy status, and FICO scores. *See* MLPAs § 2.1(d),(e). On information and belief, the loan tapes

FGIC received at closing of each of the Transactions contain the same information as is contained in the Mortgage Loan Schedules referred to in the related MLPAs.

139.    In turn, in the MLPAs, GMACM represented that all the information in those Mortgage Loan Schedules "is true and correct in all material respects as of the date or dates respecting which such information is furnished." MLPAs § 3.1(b)(i).

140.    As a result of incorporating into the I&I Agreements the representations and warranties in the related Operative Documents, GMACM incorporated representations and warranties regarding the underwriting of the Mortgage Loans included in the HE Transactions. These representations and warranties set forth the standards governing each Mortgage Loan, including the representation that the Mortgage Loans had been underwritten in compliance with GMACM's underwriting guidelines. *See* MLPAs § 3.1(b)(xxxvi).

141.    In particular, in the MLPAs, GMACM represents and warrants, as to each Mortgage Loan that:

◆    The information set forth in the Mortgage Loan Schedule with respect to each Mortgage Loan or the Mortgage Loans is true and correct in all material respects as of the date or dates respecting which such information is initially furnished;

◆    As of the respective Cut-Off Dates (June 1, 2006, for the 2006-HE2 Transaction, and June 1, 2007, for the 2007-HE2 Transaction) or any Subsequent Cut-Off Date (the date specified in the agreement by which any Subsequent Mortgage Loan was transferred to the respective Trust), no Mortgage Loan was 30 days or more delinquent in payment of principal or interest. Additionally, with respect to the 2007-HE2 Transaction, no more than 1.00% of the Subsequent Mortgage Loans had been 30 or more days delinquent in the twelve months preceding the sale of the Subsequent Mortgage Loans to 2007-HE2 Trust;

◆    With respect to the GMACM Initial Mortgage Loans or, as applicable, any Subsequent Mortgage Loans sold by GMACM, the related Mortgage File contains or will contain, in accordance with the definition of "Mortgage File" in Appendix A to the related Indenture, each of the documents and instruments specified to be included therein;

- 46 -

12-12020-mg   Doc 2813-60   Filed 02/01/13   Entered 02/01/13 16:43:05   Exhibit 60
Case 1:12-cv-08838-PAC   Document 31   Filed 03/12/13   Page 49 of 104
Pg 48 of 105

&#9670;   As of the Cut-Off Date or Subsequent Cut-Off Date, the CLTV for each Mortgage Loan was not in excess of 100.00%;

&#9670;   GMACM used no selection procedures that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by GMACM under the GMACM Home Equity Program.

142.    Additionally, the 2007-HE2 MLPA further represents and warrants that "[n]o fraud or misrepresentation of a material fact with respect to the origination of a Mortgage Loan has taken place on the part of GMACM and to the best of GMACM's knowledge, no fraud or misrepresentation of a material fact with respect to the origination of a Mortgage Loan has taken place on the part of any third party, including without limitation the related mortgagor, connected with the origination of a Mortgage Loan." 2007-HE2 MLPA § 3.1(xxxvii).

143.    Moreover, in the I&I Agreements—which expressly identify FGIC as a third-party beneficiary with respect to the related Operative Documents—GMACM specifically covenants that it will "comply in all material respects with the terms and conditions of and perform its obligations under the Operative Documents to which it is a party . . . ." I&I Agreements § 2.02(a).

### (2)    Representations, Warranties and Affirmative Covenants Regarding Access to Information and Servicing

144.    The I&I Agreements also incorporate the representations and warranties that GMACM made in the Servicing Agreements in its capacity as Servicer. *See* I&I Agreements § 2.02(l).  Under the I&I Agreements, GMACM covenanted that "[a]ll Mortgage Loans will be serviced in all material respects in compliance with the Servicing Agreement." I&I Agreements § 2.02(l).  In the Servicing Agreements GMACM covenanted, represented, and warranted that it would service the Mortgage Loans in the HE Transactions in a manner consistent with its own servicing guidelines. *See* Servicing Agreements § 3.01(a).

145.    Additionally, the Servicing Agreements provide that, "documents contained in the Mortgage File . . . shall be held by the Servicer in trust as agent for the Indenture Trustee on behalf of the Noteholders." Servicing Agreements § 3.01(c). As such, the information and documents regarding the Mortgage Loans are not the property of or otherwise owned by GMACM, but rather such files are to be held by the servicer of the Transactions—whether that party be GMACM or a third party. Moreover, through the Servicing Agreements, GMACM expressly covenanted that, in the event GMACM's servicing duties are terminated and transferred to another party, GMACM "agrees to cooperate with the Issuer, the Enhancer [*i.e.*, FGIC] and Indenture Trustee, as the case may be, in effecting the termination of the responsibilities and rights of the Servicer . . . ." *Id.* at § 7.01(a). FGIC is an express third-party beneficiary of the Servicing Agreements. *See id.* at § 8.05.

146.    The I&I Agreements further afford FGIC the express right "to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans, reappraisals of Mortgaged Properties and reviews of servicing practices." I&I Agreements § 2.02(p). FGIC also has the express right to "inspect the books and records of GMACM . . . [and to] discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM; and . . . with GMACM's consent, which consent shall not be unreasonably withheld or delayed, to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants[.]" I&I Agreements § 2.02(e)(i)-(iii).

147.    The I&I Agreements further provide that GMACM shall furnish to FGIC, promptly upon request, "such data as FGIC may reasonably request." I&I Agreements § 2.02(c)(v).

F.    **GMACM's Breaches of Its Representations, Warranties and Affirmative Covenants**

148.    As discussed above, FGIC relied on material representations and warranties made by GMACM regarding the manner in which the Mortgage Loans were originated, selected, and evaluated, the characteristics of those loans, and the accuracy and completeness of information GMACM supplied to FGIC.  Based on those representations and warranties, FGIC agreed to issue the Policies.  In fact, as demonstrated by the extreme levels of delinquencies and losses detailed below, the risk that FGIC assumed when it issued the Policies was many times greater than the risk disclosed by GMACM's representations and warranties.  GMACM breached its representations and warranties to FGIC, and FGIC has been damaged as a result of those breaches.

149.    The HE Transactions have performed poorly, and delinquencies and defaults for Mortgage Loans in the HE Transactions have been substantial.  For the 2006-HE2 Transaction, as of January 31, 2012, approximately 20% of the balance of the entire Loan Pool had been liquidated, modified, or was severely delinquent.  And for the 2007-HE2 Transaction, as of January 31, 2012, approximately 26% of the balance of the entire Loan Pool had been liquidated, modified or was severely delinquent.  As discussed above, by making these extensive representations and warranties to FGIC, and thereby inducing FGIC to issue the Policies, which cover, *inter alia*, shortfalls in amounts paid to noteholders arising from liquidated mortgage loans, GMACM assumed and allocated to itself all risk associated with the Mortgage Loans failing to comply with GMACM's representations and warranties.

150.    The poor performance of the Mortgage Loans has reduced the cash flow to the HE Trusts, which has caused, and will continue to cause, substantial claims to be presented to FGIC under the Policies to cover these shortfalls.  As of February 2012, more than $47 million and

$121 million in claims had been presented to FGIC in connection with the 2006-HE2 and 2007-HE2 Transactions, respectively.  FGIC expects tens of millions of dollars more in claims to be presented to it under the HE Transactions in the future.

151.    As an increasingly high percentage of the Mortgage Loans enter delinquency and default, FGIC has uncovered a wealth of material breaches of GMACM's representations and warranties regarding the characteristics of the loans and the standards to which they were underwritten.

### (1)    Breaches Identified Through Initial Review

152.    When FGIC became concerned about the high delinquencies and default rates in the HE Transactions, FGIC requested that GMACM provide it with certain Mortgage Loan files underlying the HE Transactions.

153.    FGIC selected for review a number of non-performing (*i.e.*, non-current or charged-off) loans that had resulted in losses to the 2006-HE2 and 2007-HE2 Trusts.  To perform this review, FGIC hired an independent outside consultant with particular skill, experience, and expertise in the review, evaluation, and re-underwriting of mortgage loans.

154.    That review revealed that GMACM had breached one or more material representations and warranties with respect to approximately 72% of the 2006-HE2 Mortgage Loans reviewed, and approximately 82% of the 2007-HE2 Mortgage Loans reviewed.

### (2)    Breaches Identified Through Additional Review

155.    In 2010, as the HE Transactions continued to perform poorly, FGIC again retained a professional mortgage loan review team to identify, review, and evaluate a statistically significant sample of mortgage loans in each of the HE Transactions.

156.    With respect to 2006-HE2, FGIC's independent loan consultant reviewed 100 loan files received by FGIC. That review revealed that GMACM had breached one or more material representations and warranties with respect to 97, or an astounding 97%, of these loans.

157.    A small sample of these material breaches and underwriting violations are listed below:

- Loan Number 8253462462: the Mortgage Loan Schedule reported a DTI ratio of 32.4%. However, the borrowers had several outstanding mortgages that were not accounted for, resulting in an actual DTI ratio of 115%. In addition, the loan file was missing the required verbal verifications of employment, the hazard insurance policy, the preliminary and final title options, and the first lien mortgage note.

- Loan Number 8655918345: the Mortgage Loan Schedule reported a CLTV ratio of 88.4% based on an appraised value of $165,000. However, because the borrowers had owned the subject property for less than twelve months, the purchase price of $124,000 should have been used instead of the appraised value. The use of the correct value results in an actual CLTV ratio of 119.2%, higher than allowed by any program guidelines. In addition, the loan file was missing required verification of mortgage and the preliminary and final title options.

- Loan Number 8656035576: the Mortgage Loan Schedule reported a CLTV ratio of 94.90% based on an appraised value of $200,000. However, because the borrower had owned the subject property for less than twelve months, the purchase price of $174,000 should have been used instead of the appraised value. The use of the correct value results in an actual CLTV ratio of 108.60%, higher than allowed by any program guidelines. In addition, the loan file was missing required preliminary and final title options and the first lien note.

158.    Similarly, with respect to the 2007-HE2 Transaction, FGIC's independent loan consultant reviewed 154 loan files received by FGIC. That review revealed that GMACM had breached one or more material representations with respect to 139, or approximately 90%, of these loans.

159.    A small sample of these material breaches and underwriting violations are listed below:

- Loan Number 7306296823: the Mortgage Loan Schedule represented that the subject loan was for a first mortgage debt consolidation refinance of an owner occupied

property with a CLTV ratio of 9.93%; however, the Hud-1 Settlement Statements contained in the loan file indicated the borrower has a first ($216,000) and second ($27,000.00) mortgage loan on the subject property which appraised for $272,000, raising the actual CLTV ratio to 89.34%, which exceeds the maximum CLTV ratio allowed under the GMAC Underwriting Guidelines applicable to the particular type of loan.  In addition, the Mortgage Loan File did not contain a verification of the mortgage or a credit report supplement indicating the mortgage payment was made on time.

- Loan Number 8255124946: the loan approval stipulated that a verbal verification of employment be obtained; in fact, the borrower was not employed at the time the subject loan was made.  If the required verbal verification of employment had been completed prior to the loan closing, the subject loan would not have been approved.

- Loan Number 8656670831: the Mortgage Loan Schedule indicated the appraised value as $123,000; however, the purchase price of $65,000 should have been used since the borrower had not owned the property for twelve months. Based on the correct loan application information, the actual CLTV ratio should have been 141.0% rather than 74.5% as listed, which exceeds the maximum CLTV ratio allowed under the program guidelines.

160.    These examples of underwriting violations are but a small smattering of the extensive defects among the Mortgage Loans and evidence significant breaches of the MLPAs. *See* MLPAs § 3.1.  And it is reasonable to conclude—based on what is now known by FGIC and as a result of what is being wrongly withheld from FGIC—that a substantial majority of the approximately 36,790 Mortgage Loans (27,400 initial Mortgage Loans and 9,390 Subsequent Mortgage Loans, with a combined principal balance as of their respective Cut-Off Dates of over $1.94 billion) held by the HE Trusts evidence similar breaches of GMACM's representations and warranties.

161.    Moreover, with respect to the 2007-HE2 Transaction, FGIC has discovered that a portion of the underlying Mortgage Loans were procured through borrower fraud at the time of origination.  For example, a review of the Mortgage Loans has revealed that, in certain instances, borrowers claimed to have been employed in different positions and/or earning significantly more income than was in fact the case.  Nevertheless, in spite of numerous such red flags in Loan

Files indicating that certain borrowers' income representations were fraudulent, the loans closed, resulting in, among other things, actual DTI ratios that were higher than reported. Given the frequency with which Mortgage Loans contained red flags and/or were missing critical documentation, GMACM must have been—or at least now is—aware that at least some of the Mortgage Loans were procured through fraud. Accordingly, GMACM has breached the representation and warranty in the 2007-HE2 MLPA that, to the best of GMACM's knowledge, no fraud or misrepresentation of material fact with respect to the origination of a Mortgage Loan had taken place.

162.    Additionally, since, as noted, GMACM continues to wrongfully withhold material Mortgage Loan information from FGIC, FGIC is unable to determine whether more examples of such fraud in the origination have taken place, and thus FGIC reserves its right to bring further claims with respect to this breach.

163.    Following the discovery of these high defect rates and pursuant to the respective I&I Agreements and the MLPAs, FGIC demanded that GMACM repurchase the non-compliant Mortgage Loans discovered during its repurchase review. GMACM has expressly refused to repurchase a substantial number of non-conforming Mortgage Loans. This failure constitutes a material breach of the I&I Agreements and Operative Documents incorporated therein.

164.    Moreover, on information and belief, GMACM is and has been aware that many of the Mortgage Loans, whether acquired at the closing or thereafter, were nonconforming and, thus, in breach of its own representations and warranties. Despite this knowledge, GMACM has failed to repurchase the nonconforming loans with conforming loans, as is required under the Operative Documents.

165.    With respect to the 2006-HE2 Transaction, FGIC ultimately obtained access to 168 mortgage loan files (68 files FGIC obtained in 2009, as well as 100 files received from GMACM in 2011), which FGIC's independent consultant reviewed to evaluate and re-underwrite the mortgage loans.  These reviews revealed that GMACM breached one or more material representations with respect to 146—approximately 87%—of the Mortgage Loans reviewed.

166.    Moreover, despite its express obligations under the 2006-HE2 MLPA and the 2006-HE2 I&I Agreement, GMACM continues to refuse to repurchase or cure certain of the non-compliant and defective loans that FGIC has asked GMACM to repurchase.

167.    With respect to the 2007-HE2 Transaction, FGIC ultimately obtained access to 509 mortgage loan files (357 files FGIC obtained in 2009, as well as 152 files received from GMACM in 2011), which FGIC's independent consultant reviewed to evaluate and re-underwrite the mortgage loans.  These reviews revealed that GMACM breached one or more material representations with respect to 430 of 509—approximately 84%—of the Mortgage Loans reviewed.

168.    Moreover, despite its express obligations under the 2007-HE2 MLPA and the 2007-HE2 I&I Agreement, GMACM continues to refuse to repurchase or cure certain of the non-compliant and defective loans that FGIC has asked GMACM to repurchase.

(3)    **Breaches Uncovered Using Loan Pool Data**

169.    FGIC also commissioned its independent loan consultant to test the accuracy of GMACM's representations and warranties relating to the Mortgage Loans in the 2007-HE2 Transaction regarding occupancy status and CLTV ratios.  The consultant extracted information and data relating to over 11,000 Mortgage Loans.

- 54 -

### a.   Breaches of Owner-Occupancy Representation and Warranty

170.   GMACM represented in the 2007-HE2 Offering Documents that 95.41% of the aggregate principal amount of the Mortgage Loans in the 2007-HE2 Transaction would be secured by the borrower's primary residence. *See* 2007-HE2 Prospectus Supplement at A-I-4.

171.   Based on the information provided, FGIC determined that only 91.7% of the aggregate principal amount of the Mortgage Loans were secured by the owner's primary residence.

172.   The Prospectus Supplement therefore materially overstated the percentage of Mortgage Loans in their respective pools that were owner-occupied as a primary residence. As such, GMACM breached its representation and warranty that the information in the Prospectus Supplement did not contain any untrue statements of material fact.

173.   Moreover, FGIC has determined that, as of February 2012, fully 26.8%, by aggregate principal amount, of the 2007-HE2 Mortgage Loans that were *not* secured by the owner's primary residence, were non-performing (*i.e.*, were delinquent for more than 60 days, in foreclosure, liquidated, or have posted a loss). This non-performance rate was significantly greater than the non-performance rate of Mortgage Loans that were secured by the owner's primary residence.

### b.   Breaches of CLTV Ratio Representation and Warranty

174.   The 2007-HE2 Prospectus Supplement also provided information relating to the CLTV ratios of the underlying Mortgage Loans in the 2007-HE2 Transaction.

175.   The 2007-HE2 Prospectus Supplement provided that the Mortgage Loans had been originated with a maximum CLTV ratio of 100%. *See* 2007-HE2 Prospectus Supplement at A-I-3. CLTV information provided in the Prospectus Supplement included (1) the number and aggregate value of the Mortgage Loans with CLTV ratios in a given percentage band (*e.g.*, the

- 55 -

number of Mortgage Loans with CLTV ratios of between 80% and 85%, between 85% and 90%, and so on), and (2) the average weighted CLTV ratio for the entire Loan Pool. *Id.* The Prospectus Supplement reported that *none* of Mortgage Loans had a CLTV ratio over 100 percent. *Id.*

176.    Using an industry standard automated valuation model to calculate the value of the underlying property at the time the Mortgage Loan was originated, FGIC determined that 12.1% of the aggregate principal amount of the Mortgage Loans—as opposed to *none* of the loans, as reported in the 2007-HE2 Prospectus Supplement—had an original CLTV ratio above 100%, and 29.8% of the aggregate principal amount of the Mortgage Loans—as opposed to fewer than 21.9%, as reported in the 2007-HE2 Prospectus Supplement—had an original CLTV ratio above 95%.

177.    In addition, GMACM represented in the 2007-HE2 Prospectus Supplement that for the entire Loan Pool, the weighted average CLTV ratio of the Mortgage Loans at origination was 80.52%. FGIC determined that the actual weighted average CLTV ratio of the Mortgage Loans at origination was approximately 84.06%. Thus, GMACM breached its representation and warranty that the information in the Prospectus Supplement did not contain any untrue statements of material fact.

178.    Moreover, FGIC has determined that the rate of Mortgage Loan non-performance (*i.e.*, loans that, as of February 2012, were delinquent for more than 60 days, in foreclosure, liquidated, or have posted a loss) in the 2007-HE2 Transaction for loans for which the automated valuation model indicated a CLTV ratio greater than 100% was over 22.3% of the aggregate principal amount of such loans.

Case 1:12-cv-08838-PAC    Document 31    Filed 03/12/12    Page 59 of 104

179.    The pervasive and overwhelming defects in the Mortgage Loan files reviewed to date indicate clear breaches of GMACM's contractual representations, warranties and affirmative covenants relating to, among other things, the characteristics of the Mortgage Loans and the initial and final Loan Pool, including the guidelines to which the Mortgage Loans were underwritten. Specifically, GMACM breached representations and warranties stating, as of the respective closing dates for the HE Transactions, that:

- neither the Operative Documents nor any information related to the Mortgage Loans contain any untrue or misleading statement of material fact;

- the Offering Documents (*i.e.* the Prospectus and Prospectus Supplement) contain no untrue or misleading statement of material fact;

- each representation and warranty of GMACM in the Operative Documents (including each representation and warranty in the MLPAs) is true and correct in all material respects;

- the information set forth in the Mortgage Loan Schedule is true and correct in all material respects;

- no Mortgage Loan was 30 days or more delinquent as of the date the loan was transferred to the HE Trusts;

- each Mortgage File contains all required documents and instruments;

- the CLTV of each Mortgage Loan did not exceed 100%; and

- GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.* the Home Equity Loan Program).

- with respect to the 2007-HE2 Transaction, that no fraud or misrepresentation of a material fact with respect to the origination of a Mortgage Loan had taken place on the part of GMACM, or, to the best of GMACM's knowledge, any third party.

180.    Many of these representations were repeated in connection with the subsequent transfer of additional Mortgage Loans, and were also breached with respect to those additional Mortgage Loans.

181.   Moreover, the true scope of the material underwriting failures is unknown given GMACM's refusal to provide FGIC with pertinent—and contractually required—information. This refusal in itself constitutes a breach of GMACM's affirmative covenant to comply with FGIC's reasonable requests regarding access to information concerning the Mortgage Loans.

### (4)   GMACM's Denial of Loan File Requests

182.   As the HE Transactions continued to perform poorly, on December 9, 2010, FGIC wrote to Jeff Blaschko, a GMACM/ResCap employee, via e-mail demanding that GMACM provide additional Mortgage Loan files to FGIC, including origination files, servicing notes, and custodian files, for a random sample of 143 2006-HE2 and 280 2007-HE2 Mortgage Loans. Having received no response from GMACM to its earlier requests, FGIC sent a follow-up e-mail on February 3, 2011, regarding the status of its December 9, 2010 request for files. FGIC's demands for information were received by ResCap, which informed FGIC that ResCap could not respond to the requests until the matter was discussed internally at ResCap and a response was authorized by those with decision-making authority. On information and belief, the request required authorization from officers at Ally Financial, and GMACM/ResCap's response was directed by officers at Ally Financial.

183.   On February 14, 2011, FGIC sent further follow-up letters requesting loan files.

184.   In finally responding to FGIC's request for information, GMACM refused to provide any loan files or other information relating to current or pre-paid loans ("Performing Loans"). Instead, it only provided FGIC with a small sampling (254 of 423) of the requested loan files, consisting largely of non-performing loans, and chose to conceal the Performing Loan files from FGIC.

185.   Pursuant to the Servicing Agreements and the I&I Agreements, FGIC is entitled to reasonable access to the documentation regarding all of the Mortgage Loans. Section 2.02(p)

of the I&I Agreements provides that FGIC "shall have the right, so long as any of the [HE] Notes remains outstanding, to conduct an ongoing review of GMACM's practices as Servicer through reviews of the Mortgage Loans . . . ." Notably, there is no limitation in the I&I Agreements as to the nature of the Mortgage Loans files that are subject to review. Further, Section 2.02(c)(v)(B) of the I&I Agreements states that "promptly upon request," GMACM must provide to FGIC "such other data as [FGIC] may reasonably request. . . ."

186.   On April 26, 2011, having still received none of the remaining performing Mortgage Loan files it requested, FGIC sent a further letter requesting the remaining loan files. To date, GMACM has not responded.

187.   By producing only non-performing Mortgage Loan files, in contravention of the I&I Agreements, GMACM has arbitrarily and unreasonably imposed limitations on FGIC's contractual rights to reasonable access to Mortgage Loan files in contravention of the Operative Documents.

### (5)   GMACM's Denial of Servicing Notes

188.   On December 9, 2010, FGIC demanded, pursuant to Section 2.02(c)(v) of the I&I Agreements, that GMACM furnish or cause to furnish the servicing notes for the Mortgage Loans.

189.   GMACM, without justification or explanation, and in breach of its obligations in the I&I Agreements, has failed to respond to requests for servicing notes.

### (6)   GMACM's Denial of FGIC's Access To Books and Records, Chief Financial Officer, and GMACM's Independent Accountants

190.   On January 19, 2012 (with respect to the 2007-HE2 Transaction) and January 20, 2012 (with respect to the 2006-HE2 Transaction), in accordance with its express rights under Sections 2.02(e)(i)-(iii) of the I&I Agreements, FGIC requested to (i) inspect the books and

records of GMACM; (ii) discuss the affairs, finances and accounts of GMACM with the Chief

Financial Officer of GMACM; and (iii) discuss the affairs, finances and accounts of GMACM

with GMACM's independent accountants.

191.    To date, GMACM has failed to respond to these requests, in violation of the I&I

Agreements.

### (7)    GMACM's Continued Frustration of FGIC's Right to Access Information Regarding the 2007-HE2 Mortgage Loans

192.    On March 1, 2012, servicing duties for the 2007-HE2 Transaction were

transferred from GMACM to a third-party servicer.  Following the transfer, FGIC again sought

information regarding the Mortgage Loan files, this time from the successor (and current)

servicer of the 2007-HE2 Transaction.

193.    FGIC has been made aware that the current servicer of the Transaction is unable

to provide the information FGIC has sought due to GMACM's refusal to provide its successor

with certain Mortgage Loan files and other crucial information.  GMACM's refusal to turn over

information in its possession to, and otherwise cooperate with, its successor servicer is a clear

violation of the Servicing Agreement that GMACM entered into as the then-Servicer of the

2007-HE2 Transaction and to which FGIC is a third-party beneficiary, as well as a breach by

GMACM of its obligations under the 2007-HE2 I&I Agreement to comply with the terms of the

Operative Documents.  *See* 2007-HE2 Servicing Agreement §§ 3.01(c), 7.01(a), 8.05; 2007-HE2

I&I Agreement § 2.02.

194.    Additionally, GMACM has an independent obligation under the 2007-HE2 I&I

Agreement to provide FGIC such information as FGIC may reasonably request.  *See* 2007-HE2

I&I Agreement § 2.02(c)(v).  As such, through its obstinate refusal to provide either FGIC or the

successor servicer with material information—admittedly within its possession—regarding the
Mortgage Loans, GMACM has further breached its obligations to FGIC.

195.    Moreover, on information and belief, the Mortgage Loan information that
GMACM refuses to provide either to FGIC or the successor servicer will evidence further
material breaches of representations and warranties made by GMACM.  Accordingly, FGIC
reserves its rights to assert additional causes of action regarding GMACM's breaches of its
representations and warranties.

**G.      Ally Bank's Breaches of The Custodial Agreement**

196.    Under the Custodial Agreements, to which FGIC is an express third party
beneficiary, *see* Custodial Agreements § 5.6, and through which Ally Bank received substantial
fees, Ally Bank undertook several obligations to FGIC concerning the manner in which Ally
Bank would ensure that the Mortgage Loans contained complete and accurate information and
that GMACM was in compliance with its representations and warranties regarding the
origination, selection, and characteristics of those loans.

197.    Ally Bank agreed that it would hold the Mortgage Notes relating to the Initial
Mortgage Loans and any Subsequent Mortgage Loans, and that it would review the Mortgage
Notes and deliver to FGIC a certification of "the completeness of the receipt of the Mortgage
Notes." *Id.* §§ 2.1, 2.2.

198.    Ally Bank further agreed to notify FGIC of breaches of the MLPAs by GMACM,
by providing that: "Upon discovery by the Custodian of a breach of any representation or
warranty made by [GMACM] in the Purchase Agreement . . .with respect to a Mortgage Loan . . .
the Custodian shall give prompt written notice to [FGIC]." Custodial Agreements § 2.3.

199.    On information and belief, in some instances the Mortgage Note was not included
in the loan file.  The lack of a Mortgage Note within a particular file constitutes a breach of the

representations and warranties given by GMACM in the MLPAs. Ally Bank should have been aware of the fact that Mortgage Notes were missing from certain Mortgage Loan files, and that this was a breach of the MLPAs' representations and warranties. Consequently, it should have notified FGIC pursuant to its own obligations under the Custodial Agreements. *See id.* §§ 2.1-2.3. Ally Bank has, however, failed to provide FGIC with any notices regarding defects in any Mortgage Loan file, and has further provided inaccurate and/or incomplete certifications regarding the Mortgage Loans, thereby breaching the Custodial Agreements to which FGIC is an express third party beneficiary.

200.    Moreover, Ally Bank had an obligation to notify FGIC of any breach by GMACM of the MLPAs' representations and warranties that it discovered, not just those pertaining to the Mortgage Note. Since Ally Bank originated or acquired approximately 75% of the Mortgage Loans in the HE Transactions—which have suffered astounding defect rates—it must have been keenly aware of the breadth and scope of the underwriting failures with respect to those loans. Ally Bank, thus, must have known that GMACM was in breach of the representations and warranties in the MLPAs, and its failure to so notify FGIC was a further breach of the Custodial Agreements.

**H.    GMACM's Fraud**

201.    The material breaches of GMACM's representations and warranties, including the extensive underwriting failures by GMACM, and the poor credit quality of almost all of the Mortgage Loans, demonstrate the knowing and wanton disregard of the material representations and warranties and affirmative covenants GMACM made to FGIC to induce its participation in the Transactions. The extraordinarily high defect and default rate among the Mortgage Loans demonstrates not merely that GMACM breached its representations and warranties as a contractual matter, but that it did not—and never intended to—comply with them, despite

representing to FGIC that, if FGIC issued the Policies, it (GMACM) would make the

representations and warranties set forth in the Operative Documents, and that those

representations and warranties would be true.  Because GMACM refuses to provide all of the

requested Mortgage Loan files in violation of its contractual obligation to do so, however, the

full extent and scope of the fraud has yet to be revealed.

202.   All of the Mortgage Loans underlying the HE Transactions were originated or

acquired by GMACM and its affiliate Ally Bank.  As such, GMACM had the access and ability

to evaluate the Mortgage Loan files and to determine if the loans were in substantial compliance

with the applicable GMACM underwriting guidelines and if the loans breached other

representations and warranties made by GMACM.

203.   To induce FGIC to enter into the HE Transactions, GMACM provided FGIC with

a loan tape for each of the Transactions, which contained false and misleading information

regarding, among other things, the CLTV and DTI ratios, occupancy status, and FICO scores of

the borrowers.

204.   In addition, GMACM made critical misrepresentations to FGIC with respect to

the credit rating agencies' assessment of the loans that were to comprise the HE Trusts.

GMACM was well aware that FGIC would not agree to insure the HE Notes unless the shadow

ratings assigned satisfied FGIC's minimum requirements.  To this end, upon information and

belief, GMACM provided Moody's and S&P with the same false information regarding the

credit quality of the underlying Mortgage Loans that it also provided to FGIC.  Based on this

faulty information, Moody's and S&P assigned shadow ratings regarding the credit quality of the

2006-HE2 and 2007-HE2 Notes that met FGIC's minimum requirements—Baa1 and BBB-,

respectively, for the 2006-HE2 Notes, and Baa2 and BBB, respectively, for the 2007-HE2 Notes.

In this way, GMACM made both direct and indirect misrepresentations to FGIC—first, by providing faulty information to the rating agencies to provide a risk assessment that GMACM would pass on to FGIC, and second, by causing shadow ratings of the HE Notes to be delivered to FGIC without disclosing to FGIC that those ratings were based on incomplete and inaccurate loan-level data.

205.   GMACM was well aware that FGIC would rely on the shadow ratings—prepared with information supplied by GMACM—as the I&I Agreements specifically contemplated as a condition to issuance of the Policies that FGIC "shall have received confirmation that the Notes insured by the Policy are rated" by S&P and Moody's at a specified minimum level "without regard to the Policy." I&I Agreements § 3.01(k).

206.   As noted, the issuance of the Policies enabled the HE Notes to receive triple-A ratings from the rating agencies. Moreover, the receipt of a triple-A ratings for the HE Notes, which depended on the issuance of the Policies, which in turn depended on the shadow ratings formulated using (inaccurate) information supplied by GMACM, was a critical component of each of the HE Transactions. As GMACM expressly noted in the Prospectus Supplements: "It is a condition to the issuance of the notes that they rated 'Aaa' by Moody's . . . and 'AAA' by Standard & Poor's[.]" 2006-HE2 Prospectus Supplement at S-90; 2007-HE2 Prospectus Supplement at S-104.

207.   Had the information provided to the ratings agencies by GMACM been accurate and truthful, Moody's and S&P would almost certainly have assigned very different (and lower) shadow ratings to the HE Transactions, and FGIC in turn would not have issued the Policies on the agreed terms, or would have refused to issue the Policies altogether.

208.     GMACM also made material misrepresentations to FGIC, on which FGIC relied, about the characteristics of the Mortgage Loans, including the guidelines under and standards to which the Mortgage Loans were underwritten.

209.     For example, in the 2006-HE2 Prospectus Supplement (and in the I&I Agreements by incorporation) GMACM assured FGIC that the Mortgage Loans "were originated generally in accordance with the underwriting standards of GMAC Mortgage Corporation." 2006-HE2 Prospectus Supplement at S-30.   Similarly, in the 2007-HE2 Prospectus Supplement (and in the I&I Agreements by incorporation), GMACM also represented to FGIC that "[t]he mortgage loans were selected for inclusion in the mortgage pool from among mortgage loans originated or purchased in connection with [GMACM's] Underwriting Standards . . . based on [GMACM's] assessment of investor preferences and rating agency criteria."   2007 HE2 Prospectus Supplement at S-30.  GMACM provided FGIC with GMACM's Underwriting Guidelines themselves, which contained extensive underwriting standards and requirements.

210.     In fact, as confirmed by the overwhelming defect rates described above regarding the Loan Pools, all of which are due to Mortgage Loans that are inconsistent with GMACM's own underwriting guidelines, GMACM was well aware at the closing of the HE Transactions that those representations were false.  In other words, at the time of the closing of the HE Transactions, GMACM either (1) knew or should have known that its representations were materially false because GMACM had not, among other things, determined if the Mortgage Loans were originated "generally in accordance" with its own underwriting guidelines, or (2) had reviewed whether the Mortgage Loans were originated "generally in accordance" with the its underwriting guidelines, had determined that they were not, but nonetheless materially

misrepresented to FGIC that the Mortgage Loans were originated "generally in accordance" with those guidelines.

211.    Moreover, GMACM represented to FGIC that, in the case of each loan within the Loan Pools, an underwriter had made an assessment that the borrower had the ability to repay his or her loan, after receiving and reviewing all applicable employment, credit, and property information. In fact, GMACM was not verifying the ability of borrowers to repay their loans in compliance with its own underwriting guidelines accurately or at all. As a result, GMACM misrepresented facts that were uniquely within its knowledge.

212.    Moreover, the MLPAs (and the I&I Agreements by incorporation) contained other false and misleading representations about the Mortgage Loans. In particular, GMACM misrepresented that, as of the closing: (i) the information set forth in the Mortgage Loan Schedule is true and correct in all material respects; (ii) no Mortgage Loan was 30 days or more delinquent as of the applicable Cut-Off Date; (iii) each Mortgage File contains all required documents and instruments; (iv) the CLTV of each Mortgage Loan did not exceed 100%; and (v) GMACM selected the Mortgage Loans in accordance with its underwriting guidelines (*i.e.* the Home Equity Loan Program). The true information regarding these loans—as known by GMACM—simply could not substantiate GMACM's assurances. In short, no amount of GMACM promising that the loans met certain standards, despite knowing otherwise, actually made those promises true.

213.    GMACM knew that its representations were materially false and that these false representations were essential to FGIC's decision to issue the Policies on the terms to which FGIC agreed. GMACM intentionally made these material misrepresentations to induce FGIC to enter into the I&I Agreements and to issue the Policies.

214.   GMACM knew when making the representations and warranties regarding the
Mortgage Loans to FGIC prior to FGIC agreeing to issue the Policies that GMACM never
intended to honor those representations and warranties, as is evidenced, *inter alia*, by the
extraordinary breadth and depth of the problems FGIC has uncovered with respect to the
underwriting and characteristics of those loans, and the poor performance of the HE Trusts.  In
short, in order to induce FGIC to issue the Policies, GMACM represented to FGIC that, if FGIC
issued the Policies, GMACM would comply with its contractual representations and warranties,
despite knowing that it had not complied––and would not comply––with those very same
obligations.

215.   GMACM's repeated fraudulent acts have exposed it to investigations by the DOJ
and the SEC, including the receipt of a subpoena served in connection with GMACM's
suspected fraudulent origination and underwriting practices, as well as to a multitude of suits and
the potential for more litigation to come.

216.   Consistent with this pattern of behavior, GMACM defrauded FGIC into issuing
the Policies, through its knowing misrepresentations.

**I.      Ally Bank Aids and Abets GMACM's Fraud**

217.   Ally Bank provided substantial assistance to GMACM in fraudulently inducing
FGIC to issue the Policies.  In its role as Custodian—for which it received substantial fees—Ally
Bank undertook to provide "prompt written notice" to FGIC of any breaches of the
representations and warranties in the MLPAs that it discovered.  The MLPAs, *see supra* at ¶ 141,
contained several representations and warranties regarding the characteristics of the underlying
Mortgage Loans as well as loans subsequently transferred to the HE Trusts.

218.   Furthermore, as an originator or acquirer of approximately 75% of the Mortgage
Loans, Ally Bank was well aware of the true nature of the Loan Pool.  As a result of being a key

part of the HE Transactions and its affiliate status with GMACM, Ally Bank surely must have

been aware of the representations and warranties GMACM routinely made to financial guaranty

insurers—and did make here to FGIC—regarding the nature of GMACM's business practices

and the quality of the mortgage loans that collateralized its many RMBS transactions, including

the HE Transactions.

219.    Against this backdrop, Ally Bank represented to FGIC that, if the HE

Transactions were consummated, it (Ally Bank) would hold and monitor certain key information

and documentation regarding the Mortgage Loans, and would provide notice to FGIC of any

breaches by GMACM of which it was aware with respect to GMACM's representations and

warranties to FGIC.  As must have been known to Ally Bank, those representations and

warranties made by GMACM directly concerned the Mortgage Loans, including the 75% of

them that Ally Bank itself had originated or acquired.  Ally Bank made these representations to

FGIC with full knowledge that GMACM had not complied—and would not comply—with its

relevant representations and warranties, and, accordingly, that they were false.  By representing

to FGIC that it would (a) hold and certify the accuracy of certain key information and

documentation regarding the Mortgage Loans, the majority of which it had originated or

acquired itself, and (b) inform FGIC of any failure by GMACM to comply with its obligations,

Ally Bank materially aided GMACM's fraudulent inducement of FGIC to issue the Policies.

The issuance of the Policies, which made the HE Transactions possible, inured to the significant

financial benefit of Ally Bank, given that it collected substantial fees as Custodian and also

perpetuated the market for its loan origination and sales business.

**J.    Ally Financial Aids and Abets GMACM's Fraud**

220.    Ally Financial provided substantial assistance to GMACM in fraudulently

inducing FGIC to issue the Policies.  As the ultimate parent of an intertwined corporate

enterprise, the subsidiaries of which were substantially involved in every aspect of Ally
Financial's securitization business. Ally Financial was well aware of the true nature of the
Mortgage Loans. Moreover, as discussed above, Ally Financial was aware of the representations
and warranties GMACM made regarding the nature of GMACM's business practices and the
quality of the Mortgage Loans and that such representations and warranties were false.

### K.    GMACM's Breach of Obligations as Servicer

221.    GMACM, as Servicer, failed in numerous material respects to properly perform
its duties to service and administer the Mortgage Loans in accordance with the provisions of the
relevant Operative Documents for the HE Transactions, including, but not limited to, its
obligations to follow proper servicing procedures.

222.    GMACM had responsibility for the servicing of the Mortgage Loans and thereby
undertook certain related contractual obligations under the I&I Agreements and the Servicing
Agreements with respect to the HE Transactions. Under the I&I Agreements, GMACM
covenanted that "[a]ll Mortgage Loans will be serviced in all material respects in compliance
with the Servicing Agreement." I&I Agreements § 2.02(l). Under the Servicing Agreements,
GMACM is liable to FGIC for the servicing and administering of the Mortgage Loans, and in
doing so is required to "follow such collection procedures as shall be normal and usual in its
general mortgage servicing activities and consistent with the procedures the Servicer employs in
servicing all other Mortgage Loans in the servicing portfolio with characteristics similar to those
of the Mortgage Loans." Servicing Agreements §§ 3.02(a), 6.01.

223.    During 2007, the servicing operations of GMACM were integrated into ResCap.
Following the integration, on information and belief, GMACM breached these obligations by,
among other things, being deficient in its borrower contact, collections, and loss mitigation
standards, and by failing to honor FGIC's contractual rights to information. In particular, an

onsite review of the Ally Financial servicing arm's headquarters, including those of GMACM,
on March 25, 2009 by FGIC and a third party firm, and subsequent analysis, revealed *inter alia*:
(i) inadequate call center staffing—staffing unable to handle increased incoming and outgoing
call volumes; (ii) call center staffing turnovers as high as 40% in a single year; (iii) a calling
campaign that does not attempt to contact borrowers through other means when GMACM does
not have a viable number or the borrower is continuously unresponsive to messages left; (iv) a
lack of effort to hire personnel to visit the mortgaged property to discuss loss mitigation
strategies with borrowers in default; and (v) severely infrequent use of alternative loss mitigation
strategies as compared to the industry.  GMACM, as servicer, also had an obligation to notify
FGIC of any material breaches of representations and warranties, and to cause GMACM, as
seller, to repurchase the affected Mortgage Loans.

224.    On information and belief, GMACM has failed to remedy any of its deficient
servicing practices.

225.    In addition, GMACM disclosed to FGIC for the first time in March 2009 that it
classified loans into one of three categories or "Risk Tiers" under a servicing protocol ("Risk
Protocol").  Such an approach was, upon information and belief, part of the further cost-cutting
measures implemented under the direction of Ally Financial when all of the servicing operations
were integrated.

226.    FGIC was damaged by the use of the Risk Protocol following the Ally-directed
integration.  Under the Risk Protocol, the timing and frequency of calls made with respect to a
loan are determined in accordance with the loan's assigned category or Risk Tier.  GMACM
disclosed to FGIC that all of the mortgage loans in FGIC-insured, GMACM-serviced
transactions (over 90,000 mortgage loans), including all of the Mortgage Loans in the HE

Transactions, were placed in the lowest category of risk. For such mortgage loans, regardless

whether they were (i) first- or second- lien, (ii) underwritten under less stringent guidelines, or

(iii) originated by non-GMAC entities—all of which are factors that require more attentive

servicing—delinquent borrowers were called at a later stage of delinquency and less frequently

than loans in higher risk categories. As the purchaser of the Mortgage Loans, however,

GMACM clearly knew that such Mortgage Loans, by their very nature, required particularized

servicing before the implementation of the Risk Protocol. The Mortgage Loans were therefore

knowingly miscategorized and neglected, and intentionally received much less care than if they

had been properly categorized and appropriately serviced. Consequently, the failure by

GMACM to ensure that the Mortgage Loans were serviced and administered in accordance with

"procedures as shall be normal and usual in its general mortgage servicing activities" constitutes

a breach of the Servicing Agreements and the I&I Agreements. *See* Servicing Agreements §

3.02(a); I&I Agreements § 2.02(l).

227.    On July 8, 2009, FGIC requested: (1) additional information concerning the

various Risk Tiers generally, and (2) documentation in order to assess whether or not FGIC was

being harmed as a result of being placed in the lower risk tier. To date, GMACM has failed to

provide such information in breach of Section 2.02(c)(v) of the I&I Agreement.

**L.      Ally Financial's Domination and Control of its Subsidiaries Results in an
          Integrated, Single Corporate Enterprise**

228.    As discussed in greater detail below, Ally Financial is the ultimate parent of all of

the other Defendants to this action. Ally Financial owns ResCap, which owns GMACM and

RFC. Ally Financial—as the ultimate parent of ResCap, GMACM, Ally Bank, and RFC—has

the practical ability, which it has repeatedly and admittedly exercised, to direct and control the

actions of its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC.

229.     As also discussed below, Ally Financial has exercised such domination and control over its subsidiaries, including ResCap, GMACM, Ally Bank, and RFC. Ally Financial exercised its direction and control in connection with the HE Transactions. At times, Ally Financial performed such direction and control by using ResCap as an instrument to effect its goals.

230.     As mentioned above, Ally Financial has recently admitted to the Federal Reserve Board and FDIC that it "indirectly owns and controls . . . numerous direct and indirect nonbank subsidiaries, including Residential Capital, LLC . . . ('ResCap'), and its direct and indirect subsidiaries." *See In re Ally Fin. Inc.*, FRB Docket Nos. 11020-B-HC & 11020-B-DEO, FDIC-11-123b (April 13, 2011) (emphasis added).

231.     As further discussed below, Ally Financial's public statements and actions at or around the time of the Transactions' close until present, also demonstrate that Ally Financial: (i) owns a majority of its subsidiaries' stock; (ii) shares resources, management and employees with its subsidiaries; (iii) considers its mortgage businesses to be "units" of its business; and (iv) has a business relationship with its subsidiaries designed to benefit itself at the expense of its subsidiaries.

> **(1)     Evidence of Ally Financial's Domination of GMACM Directly and Indirectly Through its Control of ResCap**

232.     From its inception as the ultimate parent company, Ally Financial focused on controlling the management of its subsidiaries to the point that it treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length.

233.     ResCap, for example, did not conduct any operations whatsoever until GMAC Residential Holding Corp. and GMAC-RFC Holding Corp.—two of Ally Financial's wholly-

owned subsidiaries—were transferred to it in March 2005. Those two subsidiaries represented
substantially all of Ally Financial's mortgage securitization business.

234.    Ally Financial, at the direction of its board of directors, also provided ResCap
with liquidity and capital.

235.    Further, in Ally Financial's 8-K, filed on June 9, 2005, it disclosed that ResCap
would enter into an operating agreement with Ally Financial, under which Ally Financial would
agree to "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap]
suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries."
Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (hereinafter "2005
Operating Agreement").

236.    On information and belief, Ally Financial's restructuring and financial support of
its subsidiaries was undertaken at the direction of the Ally Financial board of directors in order to
improve and maintain the investment grade rating and profitability of Ally Financial's mortgage
securitization business. This restructuring then enabled Ally Financial to present itself to its
subsidiaries' securitization transaction partners—including FGIC—as a stable corporate parent
supporting and overseeing the business of its subsidiaries, which in turn made those subsidiaries
more attractive as counterparties to market participants, such as FGIC.

237.    On December 1, 2006, Ally Financial, had its inaugural conference call with
investors, at which time Rick Buxton, the then head of Ally Financial's Investor Relations,
"welcome[d everyone] to the beginning of a new era [of Ally Financial] as an independent global
financial services company." On the same investor call, Eric Feldstein, Ally Financial's then
CEO, demonstrated how Ally Financial was going to take initial steps to actively control its
subsidiaries. For instance, Feldstein declared that one of Ally Financial's first acts as controlling

parent was "to integrate certain of GMAC mortgage operations . . . with RFC operations . . . to drive some cost efficiencies." *Id.*

238.    At all times since Ally Financial caused ResCap to be incorporated, it has owned 100% of ResCap.[5] Since incorporation, the ownership of ResCap has not changed—Ally Financial still "owns 100% of ResCap . . . ." Ally Financial Earnings Call dated Nov. 2011, statement by Michael Carpenter, Ally Financial's CEO.

239.    Ally Financial has continued to exert its domination and control over ResCap via shared resources, management and employees. For example, Ally Financial and ResCap shared at least three common board members, including two individuals who were active participants with respect to the intertwined relationship between Ally Financial and ResCap: (1) ResCap's chairman and Ally Financial's CEO, Eric Feldstein; and (2) Ally Financial's CFO and a director of ResCap, Sanjiv Khattri. In fact, the 2005 Operating Agreement, between ResCap and Ally Financial, which Ally Financial filed with the SEC, and which upon information and belief is still currently in effect, "*require[s]* that [ResCap's] board of directors include at least two independent directors, *to be selected by GMAC*." Proposed Operating Agreement, Ex. 99.1 to Form 8-K, dated June 8, 2005 (emphasis added).

240.    Moreover, on April 26, 2007, "ResCap Investor Relations" announced the release of Ally Financial's 2007 first quarter financial results to investors in an email bearing the

---

[5] GM had created a shell company, GMAC Mortgage Group Inc., which was the direct parent of ResCap. However, there is no indication that this company conducted any business independent from Ally Financial. In fact, Ally Financial's first Annual Report as an independent entity, which was filed with the SEC on March 3, 2007, included a corporate hierarchy chart that evidenced Ally Financial's corporate structure. There was a direct line from Ally Financial to ResCap. *See* Ally Fin. Form 10-K, at 2 (March 3, 2007). In addition, there is no indication that Ally Financial ever discusses ResCap as an "indirect subsidiary." To the contrary, as discussed, below, Ally has publicly stated on numerous occasions that it is the owner of ResCap.

ResCap logo.  That announcement stated that Ally Financial's financial results were found on both Ally Financial's and ResCap's websites.

241.    Moreover, David C. Walker, as discussed above, has served as Vice President of GMAC Group and CFO of GMAC Mortgage Group, and as of September 29, 2005, was a director at ResCap, GMACM, RFC, and RAMP, among other Ally Financial subsidiaries.

242.    Similarly, as noted above, William F. Muir, Ally Financial's President, has also served as President and Chairman of the Board of IB Finance Holding Company, LLC—the direct parent of Ally Bank—and as a director of Ally Bank.

243.    Ally Financial's domination and control of its subsidiaries, and in particular its use of ResCap to effectuate that control, is further evidenced by John Ruckdaschel, who, according to publicly available information, has served as in-house counsel at Ally Financial since October 2006.  According to an e-mail sent from ResCap to FGIC, Ruckdaschel has served as "internal legal counsel for all [] securitizations" since at least May 2008.  Although purportedly an Ally Financial employee, Ruckdaschel also sent and received e-mail using a ResCap e-mail address.  Further, an employee of ResCap specifically instructed FGIC that all "official letters" regarding several Ally Financial subsidiaries—including GMACM, RFC, RAMP and others—should be sent not to the relevant (and supposedly independent) subsidiary, but rather to Ruckdaschel, Ally Financial's internal counsel.  Additionally, Ruckdaschel—using his Ally Financial e-mail address—received correspondence relating to the Operative Documents at issue in the HE Transactions.

244.    As further evidence of Ally Financial's domination over ResCap, the 2005 Operating Agreement also indicates that Ally Financial has expressly "restrict[ed] ResCap's

ability to declare dividends or prepay subordinated indebtedness owed to [Ally Financial] or its other affiliates." *See id.*

245.    Conversely, Ally Financial has also agreed to directly pay the losses or expenses of ResCap. In the same 2005 Operating Agreement, Ally Financial stated that it would stand behind ResCap and "indemnify, defend and hold [ResCap] harmless from and against any losses [ResCap] suffer[s] related to the businesses and liabilities of [Ally Financial] and its subsidiaries." *Id.*

246.    Ally Financial has continued to make additional public statements that further demonstrate its willingness to support and fund ResCap. For instance, in May 2007, during an investor earnings call, Sanjiv Khattri, the Executive Vice President and Chief Financial Officer of Ally Financial, repeatedly made statements that Ally Financial's board of directors "will take whatever reasonable efforts that need to be done to maintain [ResCap's] earnings." Ally Financial's Q1 2007 Earnings Call at 24 (May 2, 2007). Khattri pointed to the fact that "the [Ally Financial] Board . . . and [Ally Financial] did not hesitate to inject a billion dollars of equity when it was appropriate . . . ." Ally Financial's Q2 2007 Earnings Call at 9 (July 30, 2007). Khattri unequivocally stated that "[a]ll I can assure you [is] that if you look at the strategic plan of [Ally Financial], a strong ResCap with an investment grade rating is a key part of our plan and a key part of our value creation." *Id.* (emphasis added). Thus, Ally Financial's senior management assured the market that Ally Financial was supporting ResCap for the purposes of Ally Financial's own "value creation."

247.    The financial support Ally Financial gave to ResCap began as far back as May 2005 and has persisted over many years. Upon information and belief, Ally Financial continued to prop up ResCap, an undercapitalized entity, by channeling capital and liquidity into ResCap

even as its condition continued to deteriorate as the housing market crashed. In addition to the direct financial support Ally Financial contributed to ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries. In 2008, Ally Financial announced to the market that it renewed a funding facility with Citibank, which provided "funding of up to $13.8 billion." Ally Fin. Inc., Form 8-K (Sept. 19, 2008). A portion of such funding was specifically earmarked for "mortgage assets across the [Ally Financial] and [ResCap] businesses." *Id.*

248.    Indeed, Ally Financial's 2011 annual report states that "ResCap remains heavily dependent on [Ally Financial] and its affiliates for funding and capital support." Ally. Fin. Inc., Annual Report (Form 10-K), at 128 (Feb. 28, 2012).

249.    Additionally, Annual Reports prepared by Ally Financial further note its pursuit of strategic alternatives with ResCap, and highlight the extent to which Ally Financial manipulated its control over its subsidiaries to enhance its own financial health. According to Ally Financial: "On December 31, 2009, we announced that due to our ongoing strategic review of how to best deploy GMAC's current and future liquidity, we decided to pursue strategic alternatives with respect to ResCap and committed to a plan . . . related to management's intent to sell certain ResCap related assets and businesses. . . .  In order to maximize value, we will consider a variety of options including one or more sales, spin-offs, or other potential transactions . . . [that we believe] should minimize the impact of any significant future losses related to ResCap's legacy mortgage business . . . ." Ally Fin. Inc., Annual Report (Form 10-K), at 3-4 (Feb. 26, 2010).

250.    There is also substantial evidence that billions of dollars of TARP funds meant to stabilize Ally Financial were given to ResCap by Ally Financial. See TARP Report dated March

10, 2010, at 41, 44 (hereinafter "TARP Report").  Upon information and belief, the TARP funds

were commingled among a variety of entities within Ally Financial's mortgage family, including

ResCap.

251.    Further, Ally Financial has established a "Mortgage Repurchase Reserve" to

account for the potentially significant liabilities stemming from repurchase demands made on its

mortgage-related subsidiary business units.  The balance of the Mortgage Repurchase Reserve

was $825 million as of the fourth quarter of 2011.  *See* Ally Financial's 4Q 2011 Earnings

Presentation at 16.  Although these repurchase demands are generally made on Ally Financial's

subsidiaries—such as GMACM—in discussing the reserve on an earnings call, Ally Financial

CFO Jim Mackey made clear that it was Ally Financial that was recording "repurchase

expense[s]" related to mortgages, as he stated that Ally Financial "had lower mortgage

repurchase expense of $44 million."  Ally Financial's Q4 2011 Earnings Call at 4 (Feb. 2, 2012).

252.    Similarly, in discussing Ally Financial's Mortgage Repurchase Reserve on Ally

Financial's third quarter 2011 earnings call, Mackey further described losses attributable

mortgage loan repurchases as belonging to Ally Financial, when he stated:  "Our mortgage

repurchase reserve is [as it then stood] $829 million . . . .  Our loss experience improved during

the quarter due to the fact that we had fewer mortgage insurance rescission payments that we

experienced last quarter and that did not repeat this quarter."  Ally Financial's Q3 2011 Earnings

Call at 6 (Nov. 2, 2011) (emphases added).  On the same call, Ally Financial CEO Carpenter

explained that "we have routinely repurchased problem loans voluntarily and by contract . . . ."

*Id.* at 8 (emphasis added).

253.    Additionally, as discussed above, Ally Financial recorded a $230 million charge

in the fourth quarter of 2011, $212 million of which was recorded at its controlled subsidiary,

ResCap.  As a result of the penalties assessed against ResCap by government regulators, and the fact that ResCap failed to maintain sufficient tangible net worth to comply with the requirements of the terms of certain credit facilities, Ally Financial propped up its subsidiary ResCap with a $197 million capital contribution in the form of intercompany debt forgiveness.  See Ally Fin. Inc., Form 10-K, at 31-32 (Feb. 28, 2012).

### (2)    Ally Financial Has Disregarded Corporate Formalities and Treated Its Businesses as a Single Enterprise

254.    Ally Financial describes its subsidiaries as its own business units rather than separate and distinct entities.  For example, Ally Financial declares, in a section of its website specifically intended to inform investors, that GMACM is a "business unit" of Ally Financial, rather than an indirect subsidiary owned by ResCap.  See Ally Financial Website, Ally Home > About Ally > Investor Relations, available at http://www.ally.com/about/investor/ (last visited Dec. 9, 2011).

255.    In line with Ally Financial's current classification of its mortgage businesses as "units" of Ally Financial, it has consistently been involved in the day-to-day operations of its subsidiaries.  For example, at least one individual, who was identified at various times as being a GM and/or Ally Financial employee, was on the working group list for transactions involving ResCap subsidiaries that FGIC insured, including these Transactions.  He was included on communications surrounding the deal document drafting processes from commencement to close.  Such communications sent to him concerned both the negotiation of the various Operative and Offering Documents, as well as the final executed versions of the Operative and Offering Documents, including the fraudulent representations, warranties, and affirmative covenants that are at issue in this action.

256.     The origination and securitization of mortgage loans by ResCap and its subsidiaries have long been integral parts of Ally Financial's core business.  In its 2006 Annual Report, Ally Financial (then reporting as GMAC LLC) stated that "[w]e are a leading real estate finance company focused primarily on the residential real estate market.  Our business activities include the origination, purchase, servicing, sale and securitization of residential mortgage loans."  GMAC LLC, Annual Report (Form 10-K), at 3 (Mar. 13, 2007) (emphasis added).  Ally Financial further stated that "we utilize asset and mortgage securitizations and sales as a critical component of our diversified funding strategy."  *Id.* at 5 (emphasis added).

257.     Ally Financial continued to publicly report on its own business and that of its subsidiaries in later filings on an integrated basis:  "We engage in the origination, purchase, servicing, sale, and securitization of consumer (i.e., residential) mortgage loans and mortgage-related products.  Mortgage operations include the Residential Capital, LLC (ResCap) legal entity, [and] the mortgage operations of Ally Bank . . . ."  Ally Fin. Inc., Annual Report (Form 10-K), at 3 (Feb. 26, 2010).  More recently, continuing to discuss its various mortgage operations as a single enterprise, Ally Financial stated that "[o]ur Origination and Servicing operations is one of the leading originators of conforming and government-insured residential mortgage loans in the United States.  We are one of the largest residential mortgage loan servicers in the United States and we provide collateralized lines of credit to other mortgage originators."  Ally Fin. Inc., Annual Report (Form 10-K), at 4 (Feb. 28, 2012).

258.     Moreover, as discussed above, Ally Financial—at least in the view of certain of ResCap's bondholders—is believed to have stripped assets from its subsidiary.

259.     In addition to the dominance and control Ally Financial exerted over its mortgage units, ResCap also viewed GMACM and RFC as part of its own business.  For example, in its

investor presentation from 2007, ResCap declares that GMACM and RFC "are owned and
*operated* by GMAC Residential Capital Company, LLC [ResCap]." It further states that ResCap
"is part of the [Ally Financial] family of companies." As discussed above, Ally Financial
exerted its dominance and control over ResCap. Upon information and belief, when Ally
Financial was not directly controlling GMACM and RFC, it was using ResCap as an instrument
to do so.

260.    Ally Financial is currently using its subsidiaries' resources as its own in order to
earn favorable ratings by credit rating agencies. For instance, a report put out by Moody's in
November 2011 rated Ally Financial as an "above average" originator of mortgage loans. It is
evident from that report that Ally Financial obtained such a rating by providing information
related to its mortgage units, including GMACM and Ally Bank. Ally Financial itself is not
engaged in the origination business. Instead, it is using its mortgage units as instruments to
obtain favorable ratings.

261.    Such disregard for the corporate form has persisted over time. For instance, Fitch
Ratings in 2007 publicly reported that "operations of [Ally Financial]'s residential mortgage
servicing businesses—which include [GMACM, RFC], and HomeComings Financial Network—
have been integrated into" ResCap. Moreover, Moody's reported that in 2007, "ResCap
combined all servicing operations under one servicing entity . . . under common management
[and] common systems . . . ." There is no indication that either RFC or GMACM has ceased
operations or been sold to other entities or investors. Thus, upon information and belief, ResCap
has conflated various businesses that currently have extensive third-party contractual
relationships, such as the one GMACM has with respect to the HE Transactions as Servicer.

262.    Even the employees of Ally Financial's subsidiaries think of themselves as employees of Ally Financial rather than separate entities since there appears to be no difference. For example, Thomas F. Marano, served as an officer of Ally Financial as well as Chairman and CEO of ResCap.  His responsibilities include overseeing the mortgage lending and servicing in ResCap.  In testimony before the House Financial Services Subcommittee on November 18, 2011, Marano stated that "Ally [Financial]'s mortgage business is conducted through GMAC Mortgage."  Upon information and belief, Marano—in his dual role as an officer of Ally Financial as well as Chairman and CEO of ResCap—directed and controlled the actions of GMACM and RFC.

263.    In another example, Larry Hipp, a member of ResCap's Risk Analyst/Investor Repurchase Department, communicated with FGIC regarding rescission requests using an Ally Financial email address, but in those very same emails, lists his ResCap contact information, including a ResCap email address.  In addition, Ally Financial/ResCap used to send FGIC secure communications bearing a "GMAC ResCap" header, but those secure communications now have an Ally Financial header.

264.    A further example is supplied by Jeffrey Stephan, a loan officer of GMACM who was implicated in the robo-signing issues associated with servicing mortgage loans.  He was asked the following questions at his deposition:

> Q:    Could you please state your name for the record.
> A:    My name is Jeffrey Stephan.
> Q:    Okay.  And who do you work for?
> A:    GMAC, LLC [Ally Financial].
> Q:    And is there a difference between GMAC, LLC and GMAC Mortgage, LLC?
> A:    GMAC, LLC – I'm trying to think of the word to use – the most recent name.
> Q:    Okay.
> A:    It's GMCA [sic] Mortgage Corporation.

> Q:      Okay.
> A:      I'm not sure how you would word that.
> Q.      Okay.  So are they -- does GMAC, LLC -- now has that basically taken over these other entities --
> A.      Yes.
> Q.      -- that formerly existed?
> A.      Yes.
> Q.      So these entities no longer currently exist?
> A.      Right.
> Q.      Okay.  And how long then have you been employed by GMAC, LLC?
> A.      Five years.

Jeffrey Stephan Deposition, *GMAC Mortgage, LLC v. Neu*, 4:25-5:22, Dec. 10, 2009, Case No. 50 2008 CA 040805, (15th Cir. Ct., Palm Beach, Fl.).

## M.    FGIC's Contractual Remedies Under The I&I Agreements

265.    The I&I Agreements provide FGIC with broad remedies for GMACM's breaches of its representations and warranties.  The breadth of these remedies provided further material inducement for FGIC to issue the Policies.  Specifically, Section 5.02(b) of the I&I Agreements provides:

> Unless otherwise expressly provided, no remedy herein conferred or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under this Insurance Agreement, the Indenture or existing at law or in equity.

266.    Moreover, the I&I Agreements provide that, upon an "Event of Default"—which is defined to include when "[a]ny representation or warranty" made by GMACM in the I&I Agreements or the Operative Documents is materially untrue or incomplete—FGIC can "take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under this [I&I Agreement] or any other Operative Document or to enforce performance and observance of any obligation, agreement or covenant of GMACM[.]"  I&I Agreements §§ 5.01(a), 5.02(a)(vi).

267.    In addition, GMACM agreed:

> to pay, and to protect, indemnify and save harmless
> [FGIC] . . . from and against, any and all claims, losses, liabilities
> (including penalties), actions, suits, judgments, demands, damages
> costs or expenses (including reasonable fees and expenses of
> attorneys . . . ) of any nature arising out of or relating to the breach
> by GMACM of any of the representations or warranties contained
> in Section 2.01 [of the I&I Agreement] or arising out of or relating
> to the Transaction contemplated by the Operative Documents . . . .

I&I Agreements § 3.04(a).

268.    Moreover, consistent with its obligation to select Mortgage Loans that met its

published criteria, GMACM agreed to repurchase or substitute Mortgage Loans that did not

conform to GMACM's representations and warranties, and to indemnify FGIC for claims and

losses arising from GMACM's breach of any representation or warranty. *See* I&I Agreements §

3.03(b), 3.04(a).

### FIRST CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Material Breach of the 2006-HE2 I&I Agreement – Declaratory Relief Regarding GMACM's Indemnification Obligations)

269.    FGIC re-alleges and incorporates by reference paragraphs 1 through 268 of this

Complaint.

270.    The 2006-HE2 I&I Agreement is a valid and binding agreement between the

parties.

271.    FGIC has performed its obligations under the 2006-HE2 I&I Agreement.

272.    GMACM's representations and warranties were material to FGIC's decision to

insure the 2006-HE2 Notes and to issue the 2006-HE2 Policy.

273.    GMACM's pervasive and material breaches of its representations and warranties,

from the very inception of the Transaction and in the years since, constitute a material breach of

the 2006-HE2 I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

274.    Pursuant to Section 3.04(a) of the 2006-HE2 I&I Agreement, GMACM must indemnify FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any nature arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.01 of the 2006-HE2 I&I Agreement or arising out of or related to the transactions contemplated by the related Operative Documents by reason of, among other things:  (i) the breach by GMACM of any representation, warranty, or covenant under any of the related Operative Documents; or (ii) any untrue statement or alleged untrue statement of a material fact contained in the related Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

275.    As explained above, GMACM has breached numerous representations, warranties, and covenants in the 2006-HE2 Offering and Operative Documents.  These breaches have caused FGIC to pay claims and to incur losses, costs, and expenses; and it will continue to do so.

276.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

277.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2006-HE2 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2006-HE2 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2006-HE2 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the 2006-HE2 I&I Agreement or any of the related Operative Documents; or,

alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

278.    In addition, FGIC seeks a declaration that GMACM must indemnify FGIC for all sums arising out of the 2006-HE2 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2006-HE2 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2006-HE2 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the 2006-HE2 I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

## SECOND CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Material Breach of the 2007-HE2 I&I Agreement – Declaratory Relief Regarding GMACM's Indemnification Obligations)

279.    FGIC re-alleges and incorporates by reference paragraphs 1 through 278 of this Complaint.

280.    The 2007-HE2 I&I Agreement is a valid and binding agreement between the parties.

281.    FGIC has performed its obligations under the 2007-HE2 I&I Agreement.

282.    GMACM's representations and warranties were material to FGIC's decision to insure the 2007-HE2 Notes and to issue the 2007-HE2 Policy.

283.    GMACM's pervasive and material breaches of its representations and warranties, from the very inception of the Transaction and in the years since, constitute a material breach of the 2007-HE2 I&I Agreement that has deprived FGIC of the purpose of the parties' bargain.

Case 1:12-cv-08838-PAC    Document 1    Filed 03/12/12    Page 895 of 104

284.    Pursuant to Section 3.04(a) of the 2007-HE2 I&I Agreement, GMACM must indemnify FGIC for any and all claims, losses, liabilities, demands, damages, costs or expenses of any nature arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.01 of the 2007-HE2 I&I Agreement or arising out of or related to the transactions contemplated by the related Operative Documents by reason of, among other things: (i) the breach by GMACM of any representation, warranty, or covenant under any of the related Operative Documents; or (ii) any untrue statement or alleged untrue statement of a material fact contained in the related Offering Documents or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

285.    As explained above, GMACM has breached numerous representations, warranties, and covenants in the 2007-HE2 Offering and Operative Documents. These breaches have caused FGIC to pay claims and to incur losses, costs, and expenses; and it will continue to do so.

286.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

287.    FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM must jointly and severally indemnify and reimburse FGIC for all sums arising out of the 2007-HE2 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2007-HE2 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2007-HE2 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the 2007-HE2 I&I Agreement or any of the related Operative Documents; or,

alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

288.    In addition, FGIC seeks a declaration that GMACM must indemnify FGIC for all sums arising out of the 2007-HE2 Transaction for which FGIC has or will become liable, and that FGIC is entitled to immediate indemnity: (i) for all sums it has paid to date under the 2007-HE2 Policy and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the 2007-HE2 Policy as and when such sums fall due or claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the 2007-HE2 I&I Agreement or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and an order giving effect to such indemnification.

## THIRD CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Fraudulent Inducement — 2006-HE2 I&I Agreement)

289.    FGIC re-alleges and incorporates by reference paragraphs 1 through 288 of this Complaint.

290.    GMACM induced FGIC to enter into the 2006-HE2 I&I Agreement and to issue the 2006-HE2 Policy by making false representations and warranties about its business practices and the Mortgage Loans, and by agreeing to broad remedies (including indemnification) for any breach of those representations and warranties.

291.    As explained above, GMACM knowingly made materially false statements to FGIC, and/or omitted material facts from its statements to FGIC, with the intent to induce reliance by FGIC.

Case 1:2-cv-08819-PAC   Document 1   Filed 03/12/12   Page 89 of 104

292.    GMACM intended for FGIC to rely on GMACM's material false statements and/or omissions.  FGIC had no reason to believe that GMACM's representations were false, and reasonably and justifiably relied on GMACM's material false statements and/or omissions regarding information uniquely in the possession of GMACM when it decided to enter into the 2006-HE2 I&I Agreement and to issue the Policy for the 2006-HE2 Notes.

293.    As a result of GMACM's material false statements and omissions, FGIC entered into the 2006-HE2 I&I Agreement, issued the 2006-HE2 Policy, and thereby agreed to insure Notes backed by a pool of Mortgage Loans that was, in actuality, materially different from the Loan Pool that GMACM represented would collateralize the 2006-HE2 Transaction.

294.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

295.    As a result of GMACM's material false statements and material omissions from its statements, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

296.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

297.    Alternatively, GMACM is liable for such damages.

### FOURTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, GMACM: Fraudulent Inducement— 2007-HE2 I&I Agreement)

298.    FGIC re-alleges and incorporates by reference paragraphs 1 through 297 of this Complaint.

299.    GMACM induced FGIC to enter into the 2007-HE2 I&I Agreement and to issue the 2007-HE2 Policy by making false representations and warranties about its business practices

and the Mortgage Loans, and by agreeing to broad remedies (including indemnification) for any breach of those representations and warranties.

300.   As explained above, GMACM knowingly made materially false statements to FGIC, and/or omitted material facts from its statements to FGIC, with the intent to induce reliance by FGIC.

301.   GMACM intended for FGIC to rely on GMACM's material false statements and/or omissions. FGIC had no reason to believe that GMACM's representations were false, and reasonably and justifiably relied on GMACM's material false statements and/or omissions regarding information uniquely in the possession of GMACM when it decided to enter into the 2007-HE2 I&I Agreement and to issue the Policy for the 2007-HE2 Notes.

302.   As a result of GMACM's material false statements and omissions, FGIC entered into the 2007-HE2 I&I Agreement, issued the 2007-HE2 Policy, and thereby agreed to insure Notes backed by a pool of Mortgage Loans that was, in actuality, materially different from the Loan Pool that GMACM represented would collateralize the 2007-HE2 Transaction.

303.   Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

304.   As a result of GMACM's material false statements and material omissions from its statements, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

305.   GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

306.   Alternatively, GMACM is liable for such damages.

Case 1:12-cv-08318-PAC   Document 1   Filed 03/12/12   Page 95 of 104

## FIFTH CAUSE OF ACTION

### (As Against Ally Financial and Ally Bank:
### Aiding and Abetting Fraudulent Inducement — 2006-HE2 I&I Agreement)

307.    FGIC re-alleges and incorporates by reference paragraphs 1 through 306 of this Complaint.

308.    As explained above, Ally Financial provided substantial assistance to its subsidiary GMACM in fraudulently inducing FGIC to enter the 2006-HE2 I&I Agreement and issue the 2006-HE2 Policy.

309.    GMACM could not have perpetrated its fraudulent scheme against FGIC without the substantial assistance of Ally Financial.

310.    Ally Financial knew that GMACM fraudulently induced FGIC to issue the Policy for the 2006-HE2 Transaction.

311.    Ally Financial's statements materially aided GMACM's fraudulent inducement.

312.    As a result of Ally Financial's aiding and abetting GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

313.    Moreover, as explained above, Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently inducing FGIC to issue the 2006-HE2 Policy.

314.    Ally Bank originated or acquired nearly 85% of the Mortgage Loans (amounting to over $406 million in loans), which form a substantial part of the collateral for the 2006-HE2 Transaction.  Ally Bank was therefore aware of the characteristics of the Loan Pool.  Ally Bank was also an affiliate of GMACM, received a copy of the 2006-HE2 MLPA, and served as Custodian of the 2006-HE2 Transaction, for which it received substantial fees.  As such, Ally Bank was aware of the material misrepresentations GMACM had made to FGIC to fraudulently induce FGIC to issue the 2006-HE2 Policy.  Ally Bank further represented to FGIC that it would

undertake duties to monitor and certify the accuracy and completeness of the Mortgage Loan files, as well as inform FGIC of failures by GMACM to comply with its obligations under the 2006-HE2 Operative Documents. Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties.

315.    Ally Bank's representations to FGIC materially aided GMACM's fraudulent inducement of FGIC to issue the 2006-HE2 Policy.

316.    As a result of Ally Bank's aiding and abetting of GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (As Against Ally Financial and Ally Bank: Aiding and Abetting Fraudulent Inducement — 2007-HE2 I&I Agreement)

317.    FGIC re-alleges and incorporates by reference paragraphs 1 through 316 of this Complaint.

318.    As explained above, Ally Financial provided substantial assistance to its subsidiary GMACM in fraudulently inducing FGIC to enter the 2007-HE2 I&I Agreement and issue the 2007-HE2 Policy.

319.    GMACM could not have perpetrated its fraudulent scheme against FGIC without the substantial assistance of Ally Financial.

320.    Ally Financial knew that GMACM fraudulently induced FGIC to issue the Policy for the 2007-HE2 Transaction.

321.    Ally Financial's statements materially aided GMACM's fraudulent inducement.

322.    As a result of Ally Financial's aiding and abetting GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

323.    Moreover, as explained above, Ally Bank provided substantial assistance to its affiliate GMACM in fraudulently inducing FGIC to issue the 2007-HE2 Policy.

324.    Ally Bank originated or acquired approximately 71% of the Mortgage Loans (amounting to over $686 million in loans), which form a substantial part of the collateral for the 2007-HE2 Transaction.  Ally Bank was therefore aware of the characteristics of the Loan Pool. Ally Bank was also an affiliate of GMACM, received a copy of the 2007-HE2 MLPA, and served as Custodian of the 2007-HE2 Transaction, for which it received substantial fees.  As such, Ally Bank was aware of the material misrepresentations GMACM had made to FGIC to fraudulently induce FGIC to issue the 2007-HE2 Policy.  Ally Bank further represented to FGIC that it would undertake duties to monitor and certify the accuracy and completeness of the Mortgage Loan files, as well as inform FGIC of failures by GMACM to comply with its obligations under the 2007-HE2 Operative Documents.  Ally Bank made these representations to FGIC despite its knowledge that GMACM had not complied—and would not comply—with its representations and warranties.

325.    Ally Bank's representations to FGIC materially aided GMACM's fraudulent inducement of FGIC to issue the 2007-HE2 Policy.

326.    As a result of Ally Bank's aiding and abetting of GMACM's fraud, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**

**(As Against Ally Financial, ResCap, and GMACM: Breach of Contract 2006-HE2 Transaction—Representations, Warranties, and Affirmative Covenants)**

327.    FGIC re-alleges and incorporates by reference paragraphs 1 through 326 of this Complaint.

328.    The 2006-HE2 I&I Agreement is a valid and binding agreement between the parties.

329.    FGIC has performed its obligations under the 2006-HE2 I&I Agreement.

330.    As explained above, GMACM has materially breached its representations and warranties and affirmative covenants under Sections 2.01 and 2.02 of the 2006-HE2 I&I Agreement.

331.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

332.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

333.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

334.    Alternatively, GMACM is liable for such damages.

## EIGHTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Contract 2007-HE2 Transaction—Representations, Warranties, and Affirmative Covenants)

335.    FGIC re-alleges and incorporates by reference paragraphs 1 through 334 of this Complaint.

336.    The 2007-HE2 I&I Agreement is a valid and binding agreement between the parties.

337.    FGIC has performed its obligations under the 2007-HE2 I&I Agreement.

338.    As explained above, GMACM has materially breached its representations and warranties and affirmative covenants under Sections 2.01 and 2.02 of the 2007-HE2 I&I Agreement.

339.    Ally Financial, acting directly and/or indirectly through ResCap, directed
GMACM's actions as set forth in this cause of action.

340.    As a result of these breaches of contract, FGIC has been damaged and will
continue to be damaged in an amount to be determined at trial.

341.    GMACM, ResCap and Ally Financial are jointly and severally liable for such
damages.

342.    Alternatively, GMACM is liable for such damages.

## NINTH CAUSE OF ACTION

### (As Against Ally Bank:  Breach of the 2006-HE2 Custodial Agreement)

343.    FGIC re-alleges and incorporates by reference paragraphs 1 through 342 of this
Complaint.

344.    The 2006-HE2 Custodial Agreement is a valid and binding agreement between
the parties thereto.

345.    FGIC is an express third party beneficiary of the 2006-HE2 Custodial Agreement.

346.    As explained above, Ally Bank has materially breached its obligations under
Sections 2.1, 2.2, and 2.3 of the 2006-HE2 Custodial Agreement.

347.    Ally Financial, acting directly and/or indirectly through ResCap, directed Ally
Bank's actions as set forth in this cause of action.

348.    As a result of these breaches of contract, FGIC has been damaged and will
continue to be damaged in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (As Against Ally Bank:  Breach of the 2007-HE2 Custodial Agreement)

349.    FGIC re-alleges and incorporates by reference paragraphs 1 through 348 of this
Complaint.

350.    The 2007-HE2 Custodial Agreement is a valid and binding agreement between the parties thereto.

351.    FGIC is an express third party beneficiary of the 2007-HE2 Custodial Agreement.

352.    As explained above, Ally Bank has materially breached its obligations under Sections 2.1, 2.2, and 2.3 of the 2007-HE2 Custodial Agreement.

353.    Ally Financial, acting directly and/or indirectly through ResCap, directed Ally Bank's actions as set forth in this cause of action.

354.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM:  Breach of Repurchase Obligation)

355.    FGIC re-alleges and incorporates by reference paragraphs 1 through 354 of this Complaint.

356.    The I&I Agreements are valid and binding agreements between the parties.

357.    FGIC has performed its obligations under the I&I Agreements.

358.    Pursuant to the terms of the I&I Agreements, and the provisions of the MLPAs incorporated therein, FGIC has demanded that GMACM repurchase non-complying Mortgage Loans.  GMACM has refused to repurchase numerous such Mortgage Loans.

359.    GMACM has breached the I&I Agreements, and the provisions of the MLPAs incorporated therein, by failing to repurchase any and all Mortgage Loans that violated GMACM's representations and warranties that FGIC has noticed to GMACM.

360.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

361.    As a result of these breaches of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

362.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

363.    Alternatively, GMACM is liable for such damages.

## TWELFTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Contract – Declaratory Relief Regarding Access to Information)

364.    FGIC re-alleges and incorporates by reference paragraphs 1 through 363 of this Complaint.

365.    The I&I Agreements are valid and binding agreement between the parties.

366.    FGIC has performed its obligations under the I&I Agreements.

367.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreements, GMACM agreed to furnish or cause to be furnished to FGIC financial statements, accountants' reports, and other information.  Such other information includes, but is not limited to, data relating to the Mortgage Loans, the servicing of the Mortgage Loans, and the HE Transactions.  FGIC further has the right to conduct reviews of GMACM's practices as Servicer through reviews of the Mortgage Loans pursuant to Section 2.02(p) of the I&I Agreements.

368.    As discussed above, pursuant to the I&I Agreements, FGIC made numerous reasonable written requests that GMACM furnish or cause to be furnished data relating to the Mortgage Loans, and the servicing of those loans, in order for FGIC to determine the veracity of representations and warranties made by GMACM, and others, concerning the Mortgage Loans.

369.    GMACM has refused to provide more than a fraction of the data concerning the Mortgage Loans sought by FGIC.

370.    GMACM has failed to comply with its contractual obligations and breached the

I&I Agreements by failing to provide data relating to the Mortgage Loans after receiving

reasonable requests for such data from FGIC.

371.    Pursuant to Sections 2.02(e)(i)-(iii) of the I&I Agreements, GMACM agreed to

permit FGIC, upon its reasonable request, to (i) inspect the books and records of GMACM; (ii)

discuss the affairs, finances and accounts of GMACM with GMACM's Chief Financial Officer;

and (iii) discuss the affairs, finances and accounts of GMACM with GMACM's independent

accountants.

372.    On January 20, 2012, FGIC made a reasonable written request that GMACM

permit FGIC or its authorized agent to conduct an inspection of the books and records of

GMACM, as well as permit FGIC to (i) discuss the affairs, finances and accounts of GMACM

with the Chief Financial Officer of GMACM, and (ii) with GMACM's consent, which consent

shall not be unreasonably withheld or delayed, discuss the affairs, finances, and accounts of

GMACM with GMACM's independent accountants.

373.    GMACM has failed to make available such persons or to produce such

information.

374.    GMACM has failed to comply with its contractual obligations and breached the

I&I Agreements by failing to make available the persons requested or to provide the information

requested pursuant to the I&I Agreements, Sections 2.02(e)(i)-(iii).

375.    Pursuant to Section 2.02(c)(v) of the I&I Agreements, GMACM agreed to furnish

or cause to furnish to FGIC "all reports provided . . . pursuant to the Servicing Agreement[.]"

376.    FGIC made a reasonable request for servicing notes on December 9, 2010.

377.    GMACM has failed to comply with its contractual obligations and breached the I&I Agreements by failing to cause the Servicing Reports to be delivered to FGIC after receiving reasonable requests from FGIC.

378.    Further, pursuant to Section 7.01(a) of the 2007-HE2 Servicing Agreement, to which FGIC is an express third-party beneficiary and the provisions of which are incorporated by reference into the 2007-HE2 I&I Agreement, GMACM agreed to provide information regarding the Mortgage Loans to, and otherwise cooperate with, the successor servicer of the 2007-HE2 Transaction.

379.    GMACM has failed to comply with its contractual obligations and breached the 2007-HE2 I&I Agreement and 2007-HE2 Servicing Agreement by failing to make available to FGIC and/or the successor servicer Mortgage Loan files and other related material information.

380.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

381.    Accordingly, FGIC seeks a declaration that GMACM must comply with Sections 2.02(c)(v), 2.02(e)(i)-(iii), and 2.02(p) of the I&I Agreements, and Section 7.01(a) of the 2007-HE2 Servicing Agreement, and an order requiring GMACM to promptly remedy those breaches and therefore comply with FGIC's and/or the successor servicer's requests and notices to GMACM pursuant to the relevant provisions, as detailed above.

## THIRTEENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Breach of Servicer Obligations)

382.    FGIC re-alleges and incorporates by reference paragraphs 1 through 381 of this Complaint.

383.    The I&I Agreements are valid and binding agreements between the parties.

384.    FGIC has performed its obligations under the I&I Agreements.

385.    Moreover, as explained above, GMACM has breached its affirmative covenant under the I&I Agreements to service all Mortgage Loans in all material respects in compliance with the Servicing Agreements.

386.    GMACM's breaches of the I&I Agreements have caused substantial harm and damages to FGIC, in an amount to be proved at trial, but at a minimum including substantially higher claims on Policies and other losses and expenses.

387.    Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this cause of action.

388.    As a result of this breach of contract, FGIC has been damaged and will continue to be damaged in an amount to be determined at trial.

389.    GMACM, ResCap and Ally Financial are jointly and severally liable for such damages.

390.    Alternatively, GMACM is liable for such damages.

## FOURTEENTH CAUSE OF ACTION

### (As Against Ally Financial, ResCap, and GMACM: Declaratory Relief)

391.    FGIC re-alleges and incorporates by reference paragraphs 1 through 390 of this Complaint.

392.    As discussed above, Ally Financial, acting directly and/or indirectly through ResCap, directed GMACM's actions as set forth in this complaint.

393.    For the reasons set forth in paragraphs 228 through 264, among others, Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other.

394.    FGIC has been damaged as a result of the actions of Ally Financial, ResCap, and GMACM.

395.     FGIC therefore seeks a declaration that Ally Financial, ResCap, and GMACM were and continue to be alter egos of each other, and therefore are jointly and severally liable for each other's liabilities.

## FIFTEENTH CAUSE OF ACTION

### (As Against GMACM: Attorneys' Fees and Costs)

396.     FGIC re-alleges and incorporates by reference paragraphs 1 through 395 of this Complaint.

397.     The I&I Agreements are valid and binding agreement between the parties.

398.     FGIC has performed its obligations under the I&I Agreements.

399.     Pursuant to Section 3.03(c) of the I&I Agreements, GMACM agreed to reimburse FGIC for any and all costs or expenses "including reasonable attorneys' . . . fees and expenses" in connection with the enforcement, defense or preservation of any rights in respect of any of the Operative Documents.  Further, pursuant to Section 3.04(a) of the I&I Agreements, GMACM agreed to pay FGIC any and all costs or expenses "including reasonable fees and expenses of attorneys" arising out of or relating to the breach by GMACM of any of the representations or warranties contained in Section 2.01 of the I&I Agreements or arising out of or relating to the HE Transactions.

400.     FGIC has incurred and will continue to incur substantial costs and expenses, including but not limited to attorneys' fees in filing and prosecuting this lawsuit, arising out of GMACM's failure to provide Mortgage Loan files, Servicing Reports, and financial information and its breach of the representations and warranties contained in Section 2.01 of the I&I Agreements and other representations, warranties, and its covenants within the Operative Documents, such as Section 2.02 of the I&I Agreements.

Case 9:12-cv-4781 -PAC    Document 1    Filed 03/02/12    Page 102 of 104

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Financial Guaranty Insurance Company demands judgment in

its favor and against defendant GMAC Mortgage Company, LLC, with respect to (1), (2), and (4)

through (14) below, and in its favor and against Residential Capital, LLC, with respect to (1), (2),

(4) through (11), (13) and (14), below, and in its favor and against Ally Bank, with respect to (3),

(7), (13), and (14) below, and in its favor and against Ally Financial, Inc., with respect to (1)

through (11), (13) and (14) below and the following relief:

(1)    A declaration that, pursuant to GMACM's obligations under the I&I Agreements, GMACM must solely and/or Ally Financial, ResCap, and GMACM must jointly and severally reimburse and indemnify FGIC for all sums arising out of the HE Transactions for which FGIC has or will become liable, and that FGIC is entitled to immediate reimbursement: (i) for all sums it has paid to date under the Policies and to the payment of all future amounts that may fall due or claims that may be presented for payment by FGIC under the Policies as and when such sums fall due or such claims are presented; or, alternatively, (ii) for all loss resulting from any breaches of the representations, warranties, and covenants of the I&I Agreements or any of the related Operative Documents; or, alternatively, (iii) in an amount to be determined at trial; and (iv) an order giving effect to that declaration;

(2)    Further or alternatively, an award of all legal, rescissory, equitable and punitive damages, to be proven at trial, for GMACM's fraudulent inducement of FGIC to enter into the HE Transactions and to issue the Policies;

(3)    Further or alternatively, an award of all legal, rescissory, equitable, and punitive damages, to be proven at trial, for Ally Financial's and Ally Bank's aiding and abetting of GMACM's fraudulent inducement of FGIC to enter into the HE Transactions and to issue the Policies;

(4)    Further or alternatively, an award of all legal, rescissory, and equitable damages, to be proven at trial, for GMACM's material breaches of the HE Transactions;

(5)    Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for GMACM's pervasive and material breaches of its representations, warranties, and affirmative covenants, which constitute material breaches of the I&I Agreements and frustration of the parties' bargain;

(6) Further or alternatively, a declaration that GMACM must repurchase all Mortgage Loans that are in breach of GMACM's representations and warranties in the HE Transactions, and an order giving effect to that declaration;

(7) Further or alternatively, an award of compensatory, consequential and/or equitable damages, and any other damages to be proven at trial, for Ally Bank's material breaches of its obligations under the Custodial Agreements;

(8) Further or alternatively, a declaration that GMACM must provide full access to all Mortgage Loan files requested or that will be requested by FGIC in the HE Transactions, and that GMACM must comply with its obligations to provide FGIC and/or the successor servicer information pertaining to the Mortgage Loan files in the 2007-HE2 Transaction; and an order giving effect to that declaration;

(9) Further or alternatively, a declaration that GMACM must allow FGIC to inspect the books and records of GMACM, to discuss the affairs, finances and accounts of GMACM with the Chief Financial Officer of GMACM, and to discuss the affairs, finances and accounts of GMACM with GMACM's independent accountants, and an order giving effect to that declaration;

(10) Further or alternatively, a declaration that GMACM must cause to be provided servicing notes for the HE Transaction when requested by FGIC;

(11) Further or alternatively, a declaration that Ally Financial, ResCap, and GMACM are alter egos of each other;

(12) An award of FGIC's attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the I&I Agreements and other Operative Documents, as defined in the I&I Agreements;

(13) An award of prejudgment interest at the statutory rate; and

(14) Any other and further relief that the Court deems just and proper.

Case 9:12-cv-3fbdd86PAC Document 3 Filed 03/12/12 Page 104 of 104

## JURY DEMAND

FGIC demands a trial by jury for all issues so triable as a matter of right.

Dated: March 12, 2012

JONES DAY,

_____
Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Plaintiff*
*Financial Guaranty Insurance Company*