# Exhibit 61

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MBIA INSURANCE CORPORATION,

                    Plaintiff,

          -against-

GMAC MORTGAGE, LLC (F/K/A GMAC
MORTGAGE CORPORATION),

                    Defendant.

Index No. 10600837

Date of Filing: 4/1/10

**SUMMONS**

NEW YORK
COUNTY CLERK'S OFFICE
APR 01 2010
NOT COMPARED
WITH COPY FILE

TO THE ABOVE-NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED and required to serve upon Plaintiff's attorneys an

answer to the complaint in this action within twenty (20) days after the service of this summons,

exclusive of the day of service, or within thirty (30) days after service is complete if this

summons was not personally delivered to you within the State of New York. In case of your

failure to answer, judgment will be taken against you by default for the relief demanded in the

complaint.

The bases for venue are CPLR §§ 501 and 503, because the Defendant agreed that the

Courts within the County and State of New York are an appropriate venue and substantial acts

giving rise to the Plaintiff's claims occurred in New York County.

DATED:  New York, New York
April 1, 2010

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____
Peter E. Calamari
Philippe Z. Selendy
Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849 7000

*Attorneys for MBIA Insurance Corporation*

TO:    GMAC Mortgage, LLC
1100 Virginia Drive
Fort Washington, PA 19034

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK CITY

| | |
|---|---|
| MBIA INSURANCE CORPORATION, | Index No. 1060083 |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| GMAC MORTGAGE, LLC (f/k/a GMAC MORTGAGE CORPORATION), | |
| Defendant. | |

Plaintiff MBIA Insurance Corporation ("MBIA"), by its attorneys, Quinn

Emanuel Urquhart & Sullivan, LLP, for its Complaint herein against GMAC Mortgage, LLC

(formerly known as GMAC Mortgage Corporation) ("GMAC Mortgage" or "Defendant")

alleges as follows:

### NATURE OF THE ACTION

1.      This action arises out of the fraudulent acts and breaches of contract of GMAC

Mortgage in connection with three publicly offered securitizations of residential mortgages. All

of the mortgage loans underlying the securitizations were originated or acquired by GMAC

Mortgage, a subsidiary of lending giant GMAC Inc. This Complaint alleges that, in its dealings

with MBIA, GMAC Mortgage affirmatively misrepresented the quality of tens of thousands of

mortgage loans, with a total original principal balance of more than $4 billion, as a means of

unfairly shifting to investors and MBIA risks that GMAC Mortgage should have borne itself.

2.      In particular, GMAC Mortgage pooled and conveyed mortgage loans into trusts,

which in turn issued residential mortgage-backed securities ("RMBS") to investors in three

offerings, in 2004, 2006, and 2007. The three mortgage loan securitization transactions at issue

are: GMAC Mortgage Corporation Home Equity Loan Trust 2004-HE4 (the "2004

Transaction"), GMAC Mortgage Corporation Home Equity Loan Trust 2006-HE4 (the "2006 Transaction"), and GMAC Mortgage Corporation Home Equity Loan Trust 2007-HE1 (the "2007 Transaction") (collectively, the "Transactions"). In each of the Transactions, the loans at issue were collateralized by second mortgages and were represented to be prime because of the purportedly creditworthy nature of the borrowers and loans.

3.  To make the securities more marketable in each of the three offerings, GMAC Mortgage sought a financial guaranty insurer to guarantee the trusts' payments to investors in the event that cash flows to the trusts were impaired by the failure of mortgage borrowers to make payments of principal and interest. To secure MBIA's agreement to provide this insurance, GMAC Mortgage made a comprehensive set of representations about the securitizations. These representations included loan-level representations about key attributes of individual loans and transaction-level representations about the characteristics of the pools of loans that were securitized.

4.  While GMAC Mortgage was soliciting MBIA to provide financial guaranty insurance, and before each Transaction closed, GMAC Mortgage provided to MBIA: (1) loan "tapes" that included data about each borrower and loan, including measurements of each borrower's creditworthiness; (2) schedules that set forth key statistics about the loan pools, including averages of measures contained in the loan tapes; and (3) initial and final Prospectus Supplements that represented that all of the loans in the pools had been originated in compliance with GMAC Mortgage's Underwriting Guidelines, which supposedly had been developed to ensure that borrowers were creditworthy and that the mortgage loans would be repaid. Using the same loan tapes it provided to MBIA, and summary data conveying key characteristics of the loan pool, GMAC Mortgage also procured from rating agencies "shadow ratings"—credit ratings

2

the Transactions would carry without financial guaranty insurance. GMAC Mortgage knew that

MBIA would rely on these shadow ratings, as well as the loan tapes, schedules, and initial and

final Prospectus Supplements, in determining whether to insure the Transactions.

5.       As part of the Transactions, GMAC Mortgage also made to MBIA, and for

MBIA's benefit, extensive contractual representations and warranties. GMAC Mortgage

represented and warranted, among other things, that: (1) all of the information it provided to

MBIA about the mortgage loans was accurate and not misleading; (2) all of the mortgage loans

in the pools were underwritten in accordance with GMAC Mortgage's underwriting standards;

and (3) in the case of each loan, after receiving all applicable employment, credit, and property

information, a determination had been made that the borrower was able to meet his or her

monthly payments, including loan payments.

6.       In reality, however, GMAC Mortgage originated and sold loans into the trusts that

contradicted the pre-closing representations it made to MBIA and blatantly violated its

contractual representations and warranties. In 2009, faced with mounting claims payments

caused by delinquent and so-called "charged-off" loans—loans deemed uncollectible and thus

written down to zero—MBIA began examining loan files and documentation associated with

thousands of loans. The results of this review made clear that GMAC Mortgage had wholly

abandoned its own underwriting policies and instead routinely approved loans to borrowers who

failed to meet basic risk criteria. At least 89% of the 4,104 delinquent or charged-off loans

reviewed by MBIA were not originated in material compliance with GMAC Mortgage's

3

Underwriting Guidelines or the contractual representations and warranties made by GMAC
Mortgage.[1]

7.      MBIA's review demonstrated that GMAC Mortgage had misrepresented the
quality of the mortgage loans consistently from its first contacts with MBIA. Loan tapes and
schedules—including those attached to GMAC Mortgage's first solicitations of bids from
MBIA—contained false data about borrowers, loans, and the characteristics of the loan pools.
GMAC Mortgage had used the same false loan tapes and other false pool-level information
derived from the false data on the loan tapes to procure from the rating agencies inflated shadow
ratings, which it then furnished to MBIA. GMAC Mortgage was able to carry out its fraudulent
scheme by virtue of its unique and superior knowledge about the mortgage loans, its false
representations about the quality of those loans, and the trust that MBIA placed in GMAC
Mortgage. The relationship of trust and confidence existed between MBIA and GMAC
Mortgage as a result of MBIA having provided insurance in at least eight prior GMAC
Mortgage-sponsored securitizations of RMBS, beginning in 1999.

8.      GMAC Mortgage succeeded in concealing from MBIA the loans' hidden risks,
and as a result MBIA has suffered tremendous harm. In agreeing to provide financial guaranty
insurance, MBIA assumed only the risk that loans conforming to GMAC Mortgage's
Underwriting Guidelines would not perform as expected. It did not, however, assume the risk
that GMAC Mortgage would flagrantly ignore prudent underwriting standards and stock the
securitizations with non-compliant loans. As of December 31, 2009, MBIA had received

---

[1]   As discussed below, although GMAC Mortgage has repeatedly and unreasonably
denied MBIA access to complete versions of the GMAC Mortgage Underwriting Guidelines,
there is little dispute as to the content of the Guidelines relevant to this action. In responses to
correspondence in which MBIA sought to enforce contractual remedies, GMAC Mortgage has
not challenged MBIA's contentions about the standards set forth in the Guidelines.

4

premiums of approximately $12.5 million. These premiums were supposed to be commensurate with risks associated with loan pools that conformed to GMAC Mortgage's representations. As of December 31, 2009, MBIA had paid approximately $132 million in claims and remains exposed to millions in further liabilities.

9.      GMAC Mortgage has compounded MBIA's losses by breaching an express representation and warranty to cure, repurchase, or replace non-compliant mortgage loans with loans conforming to the representations made by GMAC Mortgage. To date, MBIA has requested that GMAC Mortgage cure, repurchase, or replace approximately 3,669 non-compliant loans. In response, GMAC Mortgage agreed to repurchase or replace only 28 of these loans. In an obvious and improper attempt to prevent MBIA from exercising its contractual rights, GMAC Mortgage has also refused to provide complete versions of GMAC Mortgage Underwriting Guidelines and has failed to provide information that would enable MBIA to gain full knowledge of the historical performance of the loans, including loan-level data dating from the closing of each Transaction to early 2008.

10.     GMAC Mortgage's refusal to participate in good faith in the so-called "putback" process leaves MBIA uncompensated for its losses. At a more fundamental level, the repurchase obligation was never intended to provide an adequate remedy where non-compliant loans pervade the pools rather than constitute isolated exceptions. Had GMAC Mortgage told the truth about the risks associated with the mortgage loans, MBIA never would have agreed to insure the securitizations.

11.     GMAC Mortgage's deception enabled it to sell pools of mortgage loans it represented to be worth billions of dollars, while transferring the risks embedded in those loan pools to investors and, ultimately, MBIA. Because GMAC Mortgage's fraud, concealment, and

5

breaches of contract have deprived MBIA of the benefit of its bargain, MBIA is entitled to
recover from GMAC Mortgage, at a very minimum, the value of payments that MBIA has made
and will make in the future.

## PARTIES

12.    Plaintiff MBIA Insurance Corporation is a New York corporation with its
principal place of business at 113 King Street, Armonk, New York.  MBIA is one of the nation's
oldest and largest monoline insurers, and provides financial guaranty insurance and other forms
of credit protection, generally on financial obligations, which are sold in the new issue and
secondary markets.

13.    Defendant GMAC Mortgage, LLC, formerly known as GMAC Mortgage
Corporation, is a Delaware limited liability company with its principal place of business in Fort
Washington, Pennsylvania.  Upon information and belief, the members of GMAC Mortgage,
LLC include at least one New York resident.  In the period relevant to this action, GMAC
Mortgage acquired, originated, and serviced residential mortgage loans.  GMAC Mortgage also
sponsored securitizations of mortgage loans.

14.    GMAC Mortgage is a wholly owned subsidiary of Residential Capital, LLC
("ResCap"), which in turn is a wholly owned subsidiary of GMAC Inc.  In September 2008,
ResCap announced that it was closing much of its business of acquiring mortgage loans.  At or
about this time, GMAC Mortgage closed all of its retail locations, locations at which home
buyers or owners could obtain mortgages.  GMAC Mortgage remains one of the largest
residential mortgage servicers in the nation.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this proceeding pursuant to CPLR §§ 301 and
302. GMAC Mortgage is authorized to do business in New York, has appointed an agent for

6

service of process and has consented to the jurisdiction of the Courts within the State. In addition, GMAC Mortgage expressly consented to the jurisdiction of this Court over all claims arising out of the Transactions. GMAC Mortgage participated in negotiations and other activities within the State which led to the transactions that give rise to the claims in the Complaint, and the transactions themselves occurred within the State. GMAC Mortgage has also regularly transacted business within the State.

16.    Venue is proper in this Court pursuant to CPLR §§ 501 and 503. GMAC Mortgage expressly agreed that the Courts within the County and State of New York are an appropriate venue for all actions arising out of the transactions that give rise to the claims in the Complaint. In addition, negotiations and other substantial activities relating to the transactions that give rise to the claims in this Complaint occurred within New York County.

## RELEVANT NON-PARTIES

17.    GMAC Inc. ("GMAC"), the ultimate parent company of GMAC Mortgage, is a Delaware corporation with its principal place of business in Detroit, Michigan. GMAC specializes in automotive financings, residential mortgage financings and services, and insurance services. GMAC is the indirect parent company of all GMAC and GMAC-affiliated entities relevant to this action.

18.    GMAC Bank, formerly an indirect, wholly owned subsidiary of GMAC, was at all times relevant to this Complaint a loan originator. GMAC Bank sold loans it originated to GMAC Mortgage to be securitized. GMAC Bank was renamed Ally Bank in May 2009. Ally Bank is an online bank chartered under Utah law.

19.    Walnut Grove Mortgage Loan Trust 2003-A ("Walnut Grove") is a Delaware statutory trust established by an affiliate of GMAC Mortgage. Beginning in 2003, GMAC Mortgage sold to Walnut Grove mortgage loans it had originated or purchased from GMAC

7

Bank.  At the time of each of the three securitizations at issue in this case, Walnut Grove sold

mortgage loans to Residential Asset Mortgage Products, Inc. ("RAMP").

20.    RAMP, a special purpose vehicle, is an indirect, wholly owned subsidiary of

GMAC and a Delaware corporation with its principal place of business in Minnesota.  In

connection with each securitization at issue in this case, RAMP purchased mortgage loans from

GMAC Mortgage and Walnut Grove and deposited those loans into a "GMAC Mortgage Home

Equity Loan Trust" arranged by GMAC Mortgage.  Each trust then issued securities to

underwriters to be sold to investors.

21.    GMAC RFC Securities, an entity incorporated in Delaware, is an affiliate of

GMAC Mortgage and RAMP and a registered broker-dealer under the Securities Act of 1934.

GMAC RFC Securities, also known as Residential Funding Securities, LLC, served as an

underwriter of the securities issued in each of the securitizations at issue in this case.

## FACTUAL ALLEGATIONS

**A.    The Securitization of Mortgage Loans**

22.    Asset-backed securitization is the process by which risk is distributed by pooling

cash-producing financial assets, such as mortgage loans, and issuing securities backed by the

pool.

23.    The most common form of securitization of mortgage loans involves a sponsor—

the original owner of the mortgages—and the creation of a trust, to which the sponsor sells a

portfolio of mortgage loans.  In many instances, the transfer of assets to a trust "is a two-step

process: the financial assets are transferred by the sponsor first to an intermediate entity, often a

limited purpose entity created by the sponsor . . . and commonly called a depositor, and then the

depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  SEC

8

Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70

Fed. Reg. 1,506-1,631 (Jan. 7, 2005).

24.    After receiving the portfolio of mortgage loans, the trust will issue debt securities

using the pool of loans as collateral.  Investors acquire rights to the income flowing from the

mortgage pools.  This income is generated by homeowners' payments of principal and interest

on the mortgage loans held by the trust.

25.    A servicer is also necessary to manage the collection of proceeds from the

mortgage loans.  The servicer is responsible for maximizing homeowners' mortgage loan

payments, which the servicer remits to the trust after deducting a monthly servicing fee.  The

servicer is also responsible for minimizing potential losses to the trust when homeowners fail to

make required payments.  The servicer's duties include making collection efforts on delinquent

loans, initiating foreclosure proceedings, and determining when to charge off a loan by writing

down its balance to zero.  The servicer reports key information about the loans to the trustee,

which administers the trust funds and delivers payments due each month on the investors' notes.

26.    To decrease the risk to investors of a shortfall in cash flows to the trust, and to

make the securitization more attractive to investors, many securitizations include additional

credit "enhancement" in the form of a financial guaranty insurance policy.  Under the terms of

such a policy, a financial guaranty insurer, in consideration of a premium and subject to the

terms and conditions of the policy, will guarantee to investors that in the event there is a shortfall

in cash flows to the trust, the insurer will insure certain payments with respect to current interest

and ultimate principal to the trustee for the benefit of the investors.  In this way, the risk to the

investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the

marketability and pricing of the securities.

9

27.    The financial viability of an investment in a securitization, or an insurance policy issued on that investment, is a function of the quality of the underlying mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases. Among the factors that determine the interest rate of a loan are the degree to which the borrower is required to verify his or her income, the borrower's credit score and employment history, and the amount of equity the borrower has in the mortgaged property. For example, a borrower who is not required to verify income and has little or no equity in his or her home typically pays a higher interest rate. Likewise, the value of a pool of mortgage loans depends on the quality of the loans, because a pool in which there is a higher risk of delinquencies and charge-offs is deemed more likely to suffer impaired cash flows. Based on its assessment of the risk of impaired cash flows, an insurer may decide not to provide insurance on a particular transaction, ask that the transaction be structured to provide additional protection against losses, or increase premiums to reflect the risk.

28.    Accordingly, the ability of the market, or of a potential financial guaranty insurer, to accurately assess risk depends on the information it has regarding the quality of the underlying mortgage loans and the standards used to originate those loans. Sponsors of securitizations thus make extensive disclosures to investors in publicly filed offering documents and make separate and additional disclosures, representations, and warranties to the providers of financial guaranty insurance.

29.    The sponsor possesses unique and special knowledge and expertise regarding the characteristics of the loans and the underwriting. At all times relevant to this Complaint, it was standard in the industry for sponsors to require financial guaranty insurers to submit bids within weeks of a sponsor's initial solicitation, for a securitization that would close only weeks later.

10

Because of this compressed time frame, it also became the practice in the industry that insurers did not undertake to re-underwrite the thousands or tens of thousands of loans that might be contributed to the pool. Instead, sponsors provided potential insurers with comprehensive representations and warranties about the quality of the underlying loans and the standards under which they had been originated and encouraged reliance on those representations and warranties. Sponsors also bore the risk that their representations and warranties would be proven untrue; they routinely undertook to cure, repurchase, or replace loans that were found before or after closing to fail to conform to its representations and warranties in a manner that materially and adversely affected the insurer's interests.

30.    Also because sponsors do not expect potential insurers to undertake a loan-by-loan review, they furnish to potential insurers loan tapes and schedules, or spreadsheets and charts, respectively, that contain data regarding key characteristics of the mortgage loans to be included in the securitization, including borrowers' Fair Isaac Corporation, or "FICO," scores; the appraised value of the mortgaged properties; and statistics such as combined loan-to-value ("CLTV"), the ratio of the sum of the first and second mortgage amounts to the appraised value of the property; and debt-to-income ("DTI"), the ratio of the borrower's monthly debt to income. Underwriters—typically investment banks responsible for selling the mortgage-backed securities—also provide potential insurers with due diligence performed by a third-party accounting or underwriting firm on a sample of the loans in the pool. The due diligence is intended to assess whether the characteristics of the sampled loans, and the underwriting used to originate them, conform to the sponsor's disclosures and representations.

31.    Sponsors also provide to rating agencies, as part of the securitization process, loan tapes and pool-level data based on the loan-level information contained in the loan tapes. Rating

11

agencies use that information to create expected loan-level default and loss estimates. These estimates, in turn, are used to generate cash flow projections for the securitization. On the basis of the expected losses for the proposed securitization, the rating agency will provide a so-called "shadow rating" for the securitization, the credit rating the securitization would carry without financial guaranty insurance. Sponsors cause these shadow ratings to be provided to potential insurers, knowing that the insurers will rely on the shadow ratings when determining whether to insure a securitization.

32.    In sum, the ability of the investor or insurer to accurately assess the risks associated with an RMBS securitization depends entirely on the truthfulness of the sponsor's disclosures and representations about the quality of the loan pools and underwriting standards. The investor or insurer takes responsibility for certain risks not within the sponsor's control, such as risks created by changes in interest rates or the economic climate. However, the sponsor alone is responsible for the risks hidden by its own fraudulent misrepresentations.

**B.    GMAC Mortgage and the Securitization of Mortgage Loans**

33.    GMAC Mortgage first began acquiring, originating, and servicing residential mortgage loans in 1985 when it purchased other companies in those lines of business. By the mid-2000s, GMAC Mortgage was originating tens of billions of dollars' worth of mortgage loans per year, or consistently over 500,000 mortgage loans annually. It also sponsored publicly offered securitizations of mortgage loans. For each year from 2002 to 2006, the aggregate principal balance of the mortgage loans backing GMAC Mortgage-sponsored securitizations ranged from $5 billion to $7 billion.

34.    Second-lien mortgage loans represented a rapidly growing portion of GMAC Mortgage's mortgage loan business during this same period. A second-lien mortgage is

12

subordinate to the main or first mortgage; if the homeowner/borrower defaults, the holder of the

first mortgage must be satisfied first from any proceeds from sale of the collateral or the home.

From 2002 to 2006, the value of GMAC Mortgage-sponsored securitizations of second-lien

mortgage loans more than doubled, from $2.4 billion to $5.7 billion.

      35.     Securitization played an important role in GMAC Mortgage's business model.

Pooling mortgage loans and selling them into securitizations enabled GMAC Mortgage to reduce

the credit risk on its balance sheet and acquire funds with which it could originate new loans to

be pooled in future securitizations. GMAC Mortgage also enriched other GMAC affiliates by

sponsoring securitizations. GMAC entities participated in each of the key steps in the

securitization process, and recorded gains and earned fees at each of those steps. In the

Transactions at issue here, for example:

- GMAC Bank gained fees for originating loans and proceeds from selling those loans to GMAC Mortgage;

- GMAC Mortgage, because it originated and aggregated the loans before selling them to RAMP, gained loan origination fees as well as proceeds from selling the loans;

- Walnut Grove purchased a portion of the loans from GMAC Mortgage, and then gained proceeds from selling the loans to RAMP;

- RAMP established the trusts, transferred the loans to the trusts, and charged fees to cover its operating expenses;

- GMAC RFC Securities made fees for underwriting GMAC Mortgage-sponsored securities offerings; and

- GMAC Mortgage gained fees for acting as Servicer for loan pools that were securitized, after it sold the pooled loans to be deposited into the securitizing trust.

      36.     To promote demand for the lucrative securitizations, GMAC Mortgage touted its

experience in acquiring, originating, and servicing the underlying mortgage loans. It represented

that the loans it sold into securitizations "were originated generally in accordance with the

13

underwriting standards of GMAC Mortgage, LLC." GMAC Mortgage assured potential buyers of RMBS that in the case of each loan within the pool, an underwriter had made an assessment, after receiving all applicable employment, credit, and property information, that the borrower had the ability to repay his or her loan.

37.    As described below, GMAC Mortgage failed to fulfill these promises in a series of transactions that involved a significant portion of GMAC Mortgage's securitization of prime, second-lien loans from 2004 to 2007. In truth, GMAC Mortgage routinely extended loans to borrowers whose ability and willingness to repay could not be verified and regularly purchased loans that were not originated in compliance with its own purported origination standards. GMAC Mortgage then schemed to off-load billions of dollars worth of debt by misrepresenting facts uniquely within its knowledge.

38.    The collapse of the housing market has exposed the hidden risks embedded in the loan pools GMAC Mortgage repeatedly pooled and sold. Today, an extremely high percentage of GMAC Mortgage-originated loans have suffered delinquencies or been charged-off. It is widely known that the mortgage lending practices of GMAC's subsidiaries have led GMAC—now majority-owned by the U.S. Government—to the brink of financial ruin. GMAC recently announced that it is seeking a buyer for all or parts of ResCap, the subsidiary of GMAC that houses GMAC's mortgage operations, including GMAC Mortgage.

39.    This suit seeks to prevent GMAC Mortgage, which banked billions of dollars from the sale and servicing of defective loans, and at the time enriched other GMAC entities through its sponsorship of securitizations, from walking away from its responsibility for the harm it has foisted on others.

## C.    The Transactions

40.    The Transactions at issue in this action involve securitizations of pools of second-lien mortgage loans. The 2004 and 2006 Transactions involved pools of mostly home equity lines of credit ("HELOCs"). A HELOC allows a borrower to draw upon a line of credit, collateralized by a mortgage, for a fixed period of time after the origination of the HELOC, in any amount up to limit of the credit line, and at an adjustable interest rate. The 2007 Transaction involved a pool of mostly closed-end mortgages, loans in which the borrower receives the full amount of the loan at origination at a fixed interest rate. Certain of the basic characteristics of each of the Transactions at the time of closing are set forth in the following table:

| Transaction | Date of Closing | Number of Loans at Closing | Aggregate Note Balance Issued at Closing | Type of Loans Securitized |
|---|---|---|---|---|
| 2004 | 10/28/04 | 23,428 | $1,018,000,000 | 91.82% HELOCs |
| 2006 | 09/27/06 | 17,342 | $1,159,060,631 | 94.10% HELOCs |
| 2007 | 03/29/07 | 16,638 | $1,185,871,000 | 94.55% Closed-End Seconds |
| **Totals** | | **57,408** | **$3.363 billion** | |

In each Transaction, the aggregate note balance represented the face value of the notes issued at closing, an amount which should not be exceeded by the aggregate principal balance of the mortgage loans backing those notes.

41.    The Transactions were structured to permit GMAC Mortgage to add mortgage loans to the pool during specified periods after closing. In each Transaction, the mortgage loan pool was not fully populated at closing. Rather, GMAC Mortgage was permitted to sell loans to the pool for a three-month Pre-Funding Period immediately after closing, in exchange for payments made by the trust, until the aggregate principal balance of the loans in the pool

15

approached the aggregate note balance. The 2004 and 2006 Transactions also permitted GMAC

Mortgage to sell loans during specified periods—called Revolving and Managed Amortization

Periods, the latter of which ended five years after closing—on the condition that the aggregate

principal balance of the pool at any given time never exceeded the balance at closing.

42.    The feature of the so-called "Subsequent Mortgage Loans" thus enabled GMAC

Mortgage for a number of years past closing to continue to shift credit risk to investors and to

MBIA, in exchange for immediate gains on the loans it sold. In creating the Revolving and

Managed Amortization periods, in particular, the parties agreed that as the aggregate loan

balance of each pool fell—a characteristic that is usually the result of borrowers paying off their

loans—GMAC Mortgage could sell new loans to the pool and MBIA would continue to insure

payments to holders of the RMBS for which the pool served as collateral. Critical to MBIA's

acceptance of the feature of the "Subsequent Mortgage Loans" were GMAC Mortgage's

representations and warranties that any loan added to a pool after closing would conform to the

same contractual representations and warranties GMAC Mortgage made about the quality and

underwriting of the loans in the pool at closing.

43.    The approximate number and dollar amount of loans in each Transaction over the

entire life of the transactions are set forth in the following table:

| Transaction | Date of Closing | Aggregate Number of Loans in Pool During Life of Transaction | Aggregate Principal Balance of Loans in Pool During Life of Transaction |
|---|---|---|---|
| 2004 | 10/28/04 | 42,753 | $1,662,888,882 |
| 2006 | 09/27/06 | 30,730 | $1,550,141,454 |
| 2007 | 03/29/07 | 22,132 | $1,185,871,165 |
| Totals | | 95,615 | $4.399 billion |

The figure of 30,730 loans in the pool over the life of the 2006 Transaction is, if anything,

understated because GMAC Mortgage has failed to provide loan-level data that spans the life of

16

any of the Transactions, and the number of Subsequent Mortgage Loans for the 2006 Transaction could not be determined using other information.

44.    GMAC Mortgage and other wholly owned subsidiaries of GMAC and affiliates of GMAC Mortgage carried out the steps of each Transaction, as described above. Nearly 90% of the mortgage loans in the pools were originated by GMAC Bank and GMAC Mortgage. GMAC Mortgage then conveyed, directly or indirectly, mortgage loans it had originated or acquired from GMAC Bank to RAMP, the special purpose vehicle that acted as the depositor and transferred the loans to the trust created by GMAC Mortgage for each securitization. In each of the Transactions, GMAC RFC Securities was one of the underwriters that marketed the securities issued by the trusts.

45.    In addition to its role as the sponsor in each Transaction, GMAC Mortgage was also appointed the Servicer for each of the pools. The Servicing Agreements provided that GMAC Mortgage would collect prorated monthly fees equal to 0.50% per year of the outstanding principal balance of each loan it serviced, in exchange for servicing the loan pool in compliance with its "normal and usual" procedures, which included making reasonable efforts to collect all payments due from borrowers.

**D.    GMAC Mortgage's Fraudulent Inducement of the Transactions**

46.    For each Transaction, GMAC Mortgage sought credit enhancement in the form of financial guaranty insurance provided by MBIA. GMAC Mortgage solicited a bid from MBIA a matter of weeks before it planned to close each Transaction. In each case, the insurance GMAC Mortgage obtained from MBIA enabled it to market the RMBS on the basis of an AAA credit rating, rather than the lower credit quality of the collateral and structure of the Transaction alone.

17

47.    In order to induce MBIA to write financial guaranty insurance for the

Transactions, GMAC Mortgage provided to MBIA, directly or indirectly, information including:

(1) loan tapes detailing attributes of individual borrowers and loans; (2) schedules that set forth

statistics about the loan pool; (3) registered initial and final Prospectus Supplements

summarizing GMAC Mortgage's Underwriting Guidelines and loan origination criteria; and (**4**)

shadow ratings that GMAC Mortgage represented characterized the credit quality of each loan

pool.

48.    In connection with each Transaction, GMAC Mortgage sent or caused to be sent

to MBIA, by email, bid requests, loan tapes, and schedules.  Specifically:

- On October 12, 2004, MBIA received a loan tape and schedule for the 2004 Transaction;

- On September 11, 2006, MBIA received a bid request, loan tape, and schedule for the 2006 Transaction;

- On September 13, 2006, MBIA received a revised loan tape for the 2006 Transaction;

- On March 8, 2007, MBIA received a bid request, loan tape, and schedule for the 2007 Transaction; and

- On March 12, 2007, MBIA received a revised loan tape for the 2007 Transaction.

The loan tapes provided by GMAC Mortgage set forth, on a loan-by-loan basis, such statistics as

the borrower's FICO score, DTI, and CLTV.  The schedules purported to describe—at the level

of the pool as a whole—key characteristics also relevant to the assessment of risk, including

weighted averages of FICO scores and DTI and CLTV ratios.

49.    Further, GMAC Mortgage provided MBIA with Prospectus Supplements that also

would be filed with the SEC on or before the day each Transaction closed.  In the Prospectus

Supplements, GMAC Mortgage made specific representations describing GMAC Mortgage's

underwriting standards, including the criteria set forth in GMAC Mortgage's Underwriting

Guidelines applicable to the GMAC Mortgage Home Equity Program.  According to the

Prospectus Supplements, the Underwriting Guidelines set forth the types of documentation

which borrowers must provide and should be included in the mortgage loan file, under each loan

program.  This documentation can include the loan application, verifications of income, assets,

funds available to the borrower at closing, and mortgage payment histories.  The GMAC

Mortgage Underwriting Guidelines also require appraisals of the mortgaged property and an

underwriter's assessment of whether the applicable thresholds for DTI and CLTV are met.

50.    For example, according to the Prospectus Supplements, the Underwriting

Guidelines provide that to qualify for a "Standard" program loan—one requiring full

documentation—a borrower applying for a loan mortgaged by his primary residence must fill out

a detailed application providing pertinent credit information, including tax returns, pay stubs, or

a W-2, and must provide authorization for GMAC Mortgage to obtain a credit report.  The

borrower is also required to provide an appraisal of the subject property, or collateral.

51.    The Prospectus Supplements also state that an important variable in evaluating a

loan under the GMAC Mortgage Underwriting Guidelines is the level of documentation of a

borrower's income and assets.  According to the Prospectus Supplements, a borrower can apply

for a loan through programs that require significantly less documentation from the borrower than

that required under the "Standard" full documentation program.  These reduced documentation

programs—which typically charge higher interest rates—include the "Stated Income," "Stated

Value," and "No Income/No Appraisal" programs, among others.  For these loan programs, and

unlike the "Standard" full documentation program, GMAC Mortgage does not independently

verify a borrower's income (in the case of "Stated Income" loans), the value of the collateral (in

19

the case of "Stated Value" loans), or either income or collateral value (in the case of "No Income/No Appraisal" loans).

52.     Critically, although income is not independently verified in Stated Income loans, such loans remain subject to the requirement that the borrower's income be reasonable in light of three main factors:  employment, credit, and assets.  For every program, GMAC Mortgage's Underwriting Guidelines, and prevailing mortgage origination industry standards, require an underwriter to determine, after receiving all applicable employment, credit, and property information, whether the borrower is able to meet his or her monthly loan payments and other expenses related to the home, such as taxes, insurance, and debt service on senior liens.

53.     Each Prospectus Supplement provided to MBIA expressly states that all mortgage loans contributed to the pools had been underwritten generally in compliance with GMAC Mortgage's underwriting standards.

54.     A final, key representation that GMAC Mortgage sent or caused to be sent to MBIA, and upon which MBIA relied in each Transaction, was the shadow rating GMAC Mortgage procured from rating agencies.  GMAC Mortgage knew that MBIA would not agree to provide the requested financial guaranty insurance unless each Transaction carried a shadow rating of at least BBB- or the equivalent.  GMAC Mortgage approached Moody's Investors Service and Standard & Poor's and provided them with the same loan tapes GMAC Mortgage provided to MBIA, together with pool-level data derived from the loan-level information on the loan tapes.  These rating agencies relied on the information furnished by GMAC Mortgage to issue shadow ratings for each Transaction to MBIA.  MBIA received shadow ratings from the rating agencies on or about the following dates, among others:

- On September 27, 2006, MBIA received a letter from Standard & Poor's assigning a shadow rating of BBB- for the 2006 Transaction;

20

- On September 27, 2006, MBIA received a letter from Moody's Investors Service assigning a shadow rating of Baa3 for the 2006 Transaction;

- On March 28, 2007, MBIA received an email from Standard & Poor's assigning a shadow rating of BBB for the 2007 Transaction; and

- On March 29, 2007, MBIA received a facsimile from Moody's Investors Service assigning a shadow rating of Baa3 for the 2007 Transaction.

55.    GMAC Mortgage was well aware that MBIA would rely on GMAC Mortgage's representations in deciding whether to enter into the Insurance Agreements. MBIA had no contractual right to review loan origination files before the Transactions closed, nor any meaningful opportunity to do so. In addition, and in accordance with the custom and practice of financial guaranty insurers at the time, MBIA relied on representations and warranties made by the loan originator and/or owner to ensure that risks in the loan pools were known and fully disclosed and that it would not face additional risks hidden in the pools. MBIA relied on the unique and special knowledge and expertise of GMAC Mortgage regarding the mortgage loans, and the standards under which they were originated, in deciding to insure the Transactions.

56.    The relationship of trust and confidence GMAC Mortgage and MBIA had forged in the preceding five years also fostered MBIA's reliance on the representations GMAC Mortgage made. The 2004 Transaction was the ninth GMAC Mortgage-sponsored securitization of second-lien mortgage loans for which MBIA had provided insurance since 1999. The eight prior GMAC Mortgage-sponsored securitizations also involved specifically prime HELOC or closed-end second-lien mortgages. MBIA thus had been relying on GMAC Mortgage's unique and special knowledge for many years preceding the first Transaction. Its longstanding relationship with GMAC Mortgage caused MBIA to trust that GMAC Mortgage would conduct itself in good faith.

21

57.    Based on the representations made by GMAC Mortgage to MBIA in the loan tapes, schedules, Prospectus Supplements, and by means of the shadow ratings issued by the rating agencies, and because of the special trust that MBIA placed in GMAC Mortgage, MBIA decided to provide financial guaranty insurance for each Transaction. MBIA insured the trusts' payments to investors, and received in return an annual premium, based on a small, fixed percentage (tenths of one percent) of the aggregate principal balance of each loan pool. The existence of financial guaranty insurance enhanced the ability of GMAC Mortgage and GMAC RFC Securities, among others, to market the securities issued in each Transaction as AAA, the highest possible investment grade.

### E.    The Contractual Terms

#### 1.    The Representations and Warranties

58.    In each Transaction, pursuant to insurance agreements it made with GMAC Mortgage, among other entities, on the closing date (the "Insurance Agreements"), MBIA issued a financial guaranty insurance policy (collectively, the "Policies"). These Insurance Agreements are:

- Insurance Agreement among MBIA, GMAC Mortgage, Walnut Grove, Home Equity Loan Trust 2004-HE4, RAMP, Wilmington Trust and Wells Fargo, dated October 1, 2004;

- Insurance Agreement among MBIA, GMAC Mortgage, Walnut Grove, Home Equity Loan Trust 2006-HE4, RAMP, Wilmington Trust and JP Mortgage Chase, dated September 1, 2006; and

- Insurance Agreement among MBIA, GMAC Mortgage, Walnut Grove, Home Equity Loan Trust 2007-HE1, RAMP, Wilmington Trust and The Bank of New York, dated March 1, 2007.

59.    Through the provisions of the Insurance Agreements, GMAC Mortgage made representations and warranties to MBIA concerning: (1) the key characteristics of the mortgage loans that backed the securities issued in the Transaction; and (2) the underwriting standards

22

used by GMAC Mortgage, GMAC Bank, and any other originator whose loans were acquired by

GMAC Mortgage and sold into the pools of loans to be securitized.

60.    Specifically, the Insurance Agreements incorporated by reference, and for

MBIA's benefit, the representations and warranties contained in the "Transaction Documents,"

as that term was defined in the Insurance Agreements. The incorporation by reference of the

Transaction Documents into the Insurance Agreements granted to MBIA the right to rely upon

representations and warranties that GMAC Mortgage made to other entities who were parties to

the Transactions and also to investors. For each Transaction, "Transaction Documents" was

defined to include, among other documents:

- the Mortgage Loan Purchase Agreements that set forth the terms of the sale of the mortgage loans to the relevant trust (the "Purchase Agreements");

- the Servicing Agreements that set forth the terms for servicing the relevant pool of mortgage loans (the "Servicing Agreements"); and

- the offering materials provided to potential investors and filed with the SEC to market the securities issued by the trusts (the "Offering Documents").

MBIA is an express third-party beneficiary of the Purchase Agreements and the Servicing

Agreements.

61.    GMAC Mortgage made two representations and warranties directly to MBIA in

the Insurance Agreements that are particularly relevant to this action.

62.    First, GMAC Mortgage represented and warranted that all representations and

warranties in each of the Transaction Documents to which it was a party were "true and correct

in all material respects," and that it made all of those representations and warranties "to, and for

the benefit of, the Insurer as if the same were set forth in full herein [*i.e.*, in the Insurance

Agreement itself]." GMAC Mortgage thus re-made for MBIA's benefit the representations and

23

warranties that it had initially made in, *inter alia*, the Purchase Agreements. These

representations and warranties included, but were not limited to, the following:

- **Proper Documentation**: Each mortgage loan file was complete, and all of the required documents and instruments were contained therein.

- **Accurate Loan Information**: Information furnished in Mortgage Loan Schedules provided by GMAC Mortgage was true and correct in all material respects, and as to each loan, as of the date when GMAC Mortgage provided the information.

- **No Offset, Defense or Counterclaim of a Borrower**: To the best of GMAC Mortgage's knowledge, there was no valid offset, defense or counterclaim of any obligor under any loan agreement or mortgage.

- **CLTV Ratio Not in Excess of 100%**: The combined loan-to-value ratio of each mortgage loan—*i.e.*, the ratio of the combined value of the first and second mortgages to the appraised value of the property—was not in excess of 100%, as of the relevant "Cut-Off Date" (defined in the Transaction Documents to be a date a few weeks before the closing of the Transaction or, for a Subsequent Mortgage Loan, the date upon which it may be added to the pool).

- **No Delinquent Loans**: No mortgage loan was 30 days or more delinquent in payment of principal or interest, as of the relevant "Cut-Off Date."

- **No Adverse Selection**: GMAC Mortgage used no selection procedures that identified the mortgage loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by GMAC Mortgage under the GMAC Mortgage Home Equity Program, and the mortgage loans are representative of GMAC Mortgage's portfolio of home equity lines of credit that were originated under the GMAC Mortgage Home Equity Program.

- **Compliance with Applicable Laws**: To the best of GMAC Mortgage's knowledge, the loan agreements and mortgages at the time made complied in all material respects with applicable local, state, and federal laws, including, but not limited to, applicable predatory lending laws.

- **No Material Breach Or Default**: There was no material default, breach, violation or event of acceleration existing under the terms of any Loan Agreement or Mortgage and, to the best of GMAC Mortgage's knowledge, no event which, with notice and expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration under the terms of any Loan Agreement or Mortgage, and no such material default, breach, violation or event of acceleration has been waived by GMAC Mortgage involved in originating or servicing the related Mortgage Loan.

24

63.    Second, GMAC Mortgage represented and warranted that any information it

furnished or supplied for inclusion in the Transaction Documents, and any information relating

to the mortgage loans that it furnished to MBIA, was accurate and not misleading. Specifically,

GMAC Mortgage represented and warranted that:

> Neither the information supplied by [GMAC Mortgage] contained
> in the Transaction Documents to which it is a party nor any other
> material information relating to the Mortgage Loans . . . furnished
> to the Insurer by [GMAC Mortgage] . . . contains any statement of
> material fact made by [GMAC Mortgage] which was untrue or
> misleading in any material respect as of the date reflected therein.

Through this provision, GMAC Mortgage represented and warranted that the specific

information it provided for inclusion in the Prospectus Supplements issued at or around the time

that each Transaction closed was accurate and not untrue or misleading in any material respect.

These representations and warranties included, but were not limited to, the following:

- **Compliance with Underwriting Guidelines**:  All of the mortgage loans were
  underwritten generally in accordance with GMAC Mortgage's underwriting
  standards.

- **DTI Ratio Not in Excess of 45%**:  Loans were generally originated with a
  maximum total monthly DTI ratio of 45%.

- **CLTV Ratio Not in Excess of 100%**:  Loans were generally originated
  subject to a maximum CLTV ratio of 100%.

- **Determination Made as to Borrower's Ability To Repay**:  Once all
  applicable employment, credit, and property information was received, a
  determination was made as to whether the prospective borrower had sufficient
  monthly income available to meet the borrower's monthly obligations on the
  proposed mortgage loan and other expenses and other financial obligations.

64.    Under the Purchase Agreements and the Servicing Agreements, MBIA is entitled

to notify GMAC Mortgage if it learns that any loan fails to conform to the above representations

and warranties in a manner that "materially and adversely affects" MBIA's interests. Within 90

days of such notice, GMAC Mortgage is obligated to cure the breach, repurchase the defective

25

loan, or substitute a conforming loan. Because GMAC Mortgage had complete control over information about the origination of the loans, the Servicing Agreements also obligated GMAC Mortgage to give prompt written notice to MBIA if GMAC Mortgage was aware that any such non-conforming loans were in the pools. In addition, GMAC Mortgage represented and warranted in the Insurance Agreements that it would promptly provide all data reasonably requested by MBIA, and would not "interfere in any material respect with the enforcement of any rights of [MBIA] under or with respect to any of the Transaction Documents."

65.     The Insurance Agreements also incorporated the representations and warranties that GMAC Mortgage made in the Servicing Agreements in its capacity as Servicer. In the Servicing Agreements, GMAC Mortgage covenanted, represented, and warranted that it would service the mortgage loans in each of the Transactions in a manner consistent with its own servicing guidelines. It also covenanted, represented, and warranted that it would use all of its "normal and usual" procedures in servicing the mortgage loans, which included making reasonable efforts to collect all payments due from borrowers.

### 2.    MBIA's Remedies

66.     The Insurance Agreements entitle MBIA to broad remedies for breaches by GMAC Mortgage of its representations and warranties.

67.     As described above at paragraph 64, the Purchase and Servicing Agreements grant MBIA the right to notify GMAC Mortgage of any loan failing to conform to GMAC Mortgage's representations and warranties in a manner that "materially and adversely affects" MBIA's interests, an event that in turn triggers a 90-day period during which GMAC Mortgage is obligated to cure the breach, repurchase the loan, or substitute a conforming loan (the "Putback Procedure").

26

68.    The Insurance Agreements also provide that upon an "Event of Default," MBIA is entitled to "take whatever action at law or in equity as may appear necessary or desirable in its judgment to collect the amounts, if any, then due under the Transaction Documents or to enforce performance and observance of any obligation, agreement or covenant of [GMAC Mortgage]." An "Event of Default" occurs when "any representation or warranty" made by GMAC Mortgage in the Insurance Agreements or the Transaction Documents is materially untrue or incomplete, or when GMAC Mortgage fails to perform any covenant in any material respect.

69.    In addition, the Insurance Agreements require GMAC Mortgage to reimburse MBIA for any payments it makes as a result of GMAC Mortgage's failure to comply with its obligations under the Putback Procedure and "any and all charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including, but not limited to, reasonable attorneys' and accountants' fees and expenses, in connection with . . . the enforcement, defense, or preservation of any rights in respect of any of the Transaction Documents." The Insurance Agreements also require GMAC Mortgage to pay and indemnify MBIA for any losses or liabilities "arising out of or relating to," among other things, any breach of a representation or warranty made to MBIA in the Purchase Agreements or the Insurance Agreements.

**F.    GMAC Mortgage's Misconduct Is Revealed**

**1.    MBIA's Review Demonstrates GMAC Mortgage's Breach of Contract**

70.    Since closing, the Transactions have performed extremely poorly. Delinquencies and charge-offs for mortgage loans in the loan pools have been much higher than would be expected for loan pools allegedly of the "prime" quality that GMAC Mortgage represented and warranted, even taking into account the downturn in the housing market. By the end of 2009, for example, loans representing over 15% of the initial aggregate pool balance in the 2006

27

Transaction had defaulted and been charged off. A total of at least $326 million has been lost from the original aggregate pool balances of the three Transactions due to defaulted and charged-off loans.

71.     In January 2009, concerned about the high delinquencies and charge-off rates, MBIA asked GMAC Mortgage to provide MBIA and its representatives and agents access to documents relating to the mortgage loans underlying the Transactions.

72.     MBIA requested access to documentation that would facilitate a review of the loan files for all mortgage loans that were 60 or more days delinquent and/or charged-off. MBIA requested copies of the relevant loan files and also of the relevant GMAC Mortgage Underwriting Guidelines. It made these requests under the provisions in the Insurance Agreements requiring GMAC Mortgage to comply with MBIA's reasonable requests for data and not to interfere in any material respect with MBIA's attempts to enforce its rights under the Transaction Documents.

73.     GMAC Mortgage's response to these basic requests has been wholly unsatisfactory. GMAC Mortgage has repeatedly and unreasonably denied MBIA access to complete versions of the GMAC Mortgage Underwriting Guidelines. Also, in many instances, the loan files provided by GMAC Mortgage were incomplete and MBIA has been forced to make supplemental requests. As a result, to conduct the evaluation that would enable MBIA to enforce rights explicitly granted to it under the Insurance Agreements, MBIA has been compelled to refer to: (1) portions of certain GMAC Mortgage Underwriting Guidelines that GMAC Mortgage has made available to the public; (2) the underwriting guidelines of GMAC Mortgage affiliate Residential Funding Corporation, which is also a major mortgage loan

originator and acquirer; and (3) reasonable and prudent underwriting standards that are
customary in the industry.

74.     Despite GMAC Mortgage's obstructive conduct, there is little dispute about the
content of the Underwriting Guidelines, insofar as those Guidelines relate to this action. GMAC
Mortgage's responses to MBIA's requests, pursuant to the Putback Procedure, that GMAC
Mortgage cure, repurchase, or substitute loans found not to comply with its representations and
warranties are described below in paragraphs 86 and 87. These responses have not challenged
MBIA's claims about the standards set forth in GMAC Mortgage's Underwriting Guidelines.

75.     To date, MBIA has been able to obtain and review loan files associated with
4,104 delinquent and charged-off loans. The review has uncovered that the overwhelming
majority of the delinquent or charged-off loans—at least 89%—were in breach of one or more of
GMAC Mortgage's representations and warranties. The aggregate original principal balance of
just this modest portion of non-compliant loans is over $246 million.

76.     Most of the loans found by MBIA to be non-compliant with GMAC Mortgage's
representations and warranties contain multiple breaches of those representations and warranties.
As a result of these breaches, the real risk profile of these loans was materially understated. The
most prevalent and troubling of the breaches identified by MBIA in the loan pools of the
Transactions include the following:

- GMAC Mortgage egregiously and routinely breached its representation and
  warranty that the mortgage loans were underwritten generally in compliance
  with GMAC Mortgage's underwriting standards.

- A significant number of mortgage loans were made on the basis of "stated
  incomes" that were grossly unreasonable or were approved despite DTI or
  CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's
  Underwriting Guidelines or the Purchase Agreements or Prospectus
  Supplements.

29

- Moreover, contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves.

- GMAC Mortgage used its proprietary automated electronic loan underwriting program, known as "Assetwise," to approve loans that did not comply with its Underwriting Guidelines. Assetwise assisted in the underwriting of mortgage loans by automating the process of determining whether a loan met pre-specified underwriting criteria set up in the program. GMAC Mortgage used the program itself and also made the program available to its affiliates. Assetwise, however, failed to analyze proposed mortgage loans using the criteria set forth in GMAC Mortgage's Underwriting Guidelines. As a result, GMAC Mortgage routinely contributed loans to the Transactions that failed to comply with its own underwriting standards.

- GMAC Mortgage routinely breached its representation and warranty that the mortgage loan files were complete and contained all required documents and instruments. The vast majority of mortgage loan files are missing necessary mortgage loan documents, such as disclosures relating to loan transfers and notes establishing the first lien. The absence of these and other necessary documents from the loan files impedes the ability of the trustees for the Transactions to enforce their rights and remedies with respect to delinquent mortgages. The failure to maintain the required loan documentation also impairs proper servicing.

- GMAC Mortgage breached its representation and warranty that all mortgage loans would comply with all local, state and federal laws, by furnishing, among other things, mortgage loans to the pools that violated state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices by, for example, prohibiting the approval of a loan to a borrower who lacks the ability to repay.

77.    MBIA's review has demonstrated that notwithstanding its representation and warranty that all loans in the pools had been underwritten generally in compliance with the Underwriting Guidelines, GMAC Mortgage in fact had failed to ensure conformity with those Guidelines. GMAC Mortgage regularly contributed loans to the pools that failed to satisfy representations and warranties setting maximum permissible DTI and CLTV ratios and requiring the maintenance of complete loan files. Most important, GMAC Mortgage routinely breached

30

the representation and warranty that each mortgage loan had been made to a borrower who was

able to repay his or her mortgage loan.

78.    The following examples illustrate the types of breaches that pervade the loan

pools for the Transactions:

- On January 25, 2006, a loan in the amount of $210,000 was made to a borrower in Vacaville, California on a property with an original appraisal value of $460,000 and a senior loan balance of $368,150. The borrower was employed as a correctional officer by the State of California. The loan was approved based on a DTI that was calculated using the borrower's highest reported monthly income, rather than his average income over a 33-month period, as is required by the Underwriting Guidelines. As a result, the true DTI on the loan was 65.56%, which exceeded the maximum ratio of 50% permitted under the applicable loan program. The CLTV ratio of 125.68% also exceeded the maximum CLTV ratio of 100% permitted under the Guidelines. The loan has been charged-off. (Loan # 8601487693 – 2004 Transaction.)

- On April 20, 2007, a loan in the amount of $40,000 was made to co-borrowers in Vernon, New Jersey on a property with an original appraisal value of $305,000 and a senior loan balance of $244,000. The loan file is incomplete and lacks, among other documents, verbal verification of either borrower's employment, evidence of sufficient closing funds and reserves, an appraisal, a copy of the note from the senior lien, and the borrowers' credit reports. Further, the loan was approved even though the income stated by each borrower was unreasonable. One claimed to earn $4,583 per month as a counter manager at a discount tire store though, for example, salary.com, a website which maintains a national salary database based on job title and zip code, reports that the income at the 90th percentile for such a position is only $2,801 per month. The second borrower claimed to earn $59,592 annually as a sales associate at a home improvement store, but an income verification database showed that the borrower earned only $28,092 in 2006 and $32,977 in 2007. The loan has been charged-off. (Loan # 1000117685 – 2006 Transaction.)

- On December 15, 2006, a loan in the amount of $22,000 was made to a borrower in Medford, Oregon on a property with an original appraisal value of $220,000 and a senior loan balance of $176,000. The loan file is missing many documents that bear upon the borrower's ability to repay and are required to be included in the file, including: verification of down payment funds, a CPA letter, an appraisal, a twelve-month housing history, a copy of the first mortgage, a preliminary title commitment, a credit report, and the final loan application. Moreover, although the borrower, an operator at a drywall company, had declared bankruptcy prior to applying for the loan, the

31

loan file lacks documentation that the bankruptcy had been discharged for at least three years, as required by the Guidelines. The loan has been charged-off. (Loan # 8254682837 – 2007 Transaction.)

- On January 23, 2007, a loan with a principal balance of $100,000 was made to a borrower in Yuma, Arizona on a property with an original appraisal value of $298,000 and a senior loan balance of $129,035. The borrowers claimed on their loan application that their combined income was $113,520 per year. However, on May 12, 2009, the borrowers jointly filed for bankruptcy under Chapter 7, and their court filings indicated that they earned only $13,085 in 2007 and $17,650 in 2008. Moreover, no record of the borrower's claimed employer can be located on websites commonly used to verify the existence of a business: manta.com or yellowpages.com. The loan has been charged-off. (Loan # 8254730412 – 2007 Transaction.)

79.    The gross underwriting deficiencies MBIA identified in its review establish that GMAC Mortgage breached not only its representations and warranties setting criteria for the underwriting of the mortgage loans, but also the representations and warranties in the Insurance Agreements that information about the mortgage loans furnished by GMAC Mortgage—either for inclusion in the Transaction Documents or directly to MBIA—was accurate and not untruthful or misleading in any material respect, as of the date of the information.

### 2.    MBIA's Review Demonstrates GMAC Mortgage's Scheme To Defraud

80.    The information that GMAC Mortgage provided to MBIA from its first solicitations of MBIA to provide financial guaranty insurance, was indeed false and misleading, and intentionally so. MBIA's review has made clear that the defects in the loan pools are not isolated or accidental. To the contrary, the incidence of violations of GMAC Mortgage's Underwriting Guidelines is so extraordinarily high—at least 89% of the loan files reviewed by MBIA for delinquent or charged-off loans—that it could not have been result of mere error. GMAC Mortgage induced MBIA to provide insurance for the Transactions based on blatant misrepresentations of the true state of the characteristics of the loans and loan pools.

32

81.     MBIA's review demonstrates that the loan tapes GMAC Mortgage provided to

MBIA, as a means of inducing MBIA's participation in the Transactions, are replete with false

statistics relating to individual loans.  In many instances, DTI and CLTV ratios are falsely

understated in the tapes.  Schedules provided to MBIA, which also were reproduced in the

Offering Documents, contain pool-level statistics about DTI and CLTV ratios that are likewise

materially false.  The DTI ratios are materially false and misleading because the monthly income

has been falsely overstated or monthly debt obligations falsely understated.  The CLTV ratios are

materially false and misleading because, among other things, the value of the underlying

collateral has been falsely overstated.

82.     The Prospectus Supplements provided to MBIA also contain representations that

are materially false and misleading.  They reproduce schedules that purport to describe the loan

pool but contain false data about FICO scores, DTI and CLTV.  They falsely state that the

mortgage loans contributed to the Transactions were underwritten generally in compliance with

GMAC Mortgage's underwriting standards and fail to disclose that GMAC Mortgage regularly

contributed non-compliant loans to the pools.  The Prospectus Supplements represent that loans

were generally originated subject to a maximum total monthly DTI ratio of 45% and a maximum

CLTV ratio of 100%, when in truth GMAC Mortgage frequently added to the pools loans with

DTI and CLTV ratios exceeding these cut-offs.

83.     The Prospectus Supplements also falsely state that once all applicable

employment, credit, and property information had been received, a determination had been made

as to the borrower's ability to meet his or her monthly obligations.  MBIA's review of loan files

establishes that instead, the loan underwriter routinely failed to collect applicable employment,

33

credit, and property information and also regularly failed to make determinations that the borrower had the ability to repay his or her mortgage loan.

84.    The shadow ratings GMAC Mortgage caused to be provided to MBIA, with knowledge MBIA would rely on them, were also intended to deceive.  GMAC Mortgage obtained shadow ratings of the level it knew that MBIA would require—BBB- or the equivalent—by knowingly providing to the rating agencies the same false loan tapes and pool-level data that it provided to MBIA.  GMAC Mortgage knew that the rating agencies would rely on the false information, including false data about key characteristics of the mortgage loans and the loan pools, and as a result issue falsely inflated shadow ratings.  By supplying false information to Moody's Investors Service and Standard & Poor's, GMAC Mortgage ensured that MBIA would be provided with artificial shadow ratings that concealed from MBIA the true risk in the loan pools.

85.    Importantly, GMAC Mortgage knew that MBIA would not only rely on GMAC Mortgage's false representations but would be unable to detect any falsity.  MBIA was prevented from discovering the scheme to defraud before being induced to enter the Insurance Agreements because:  (1) MBIA had no contractual right or meaningful opportunity to review loan origination files before closing; (2) MBIA followed the industry practice of relying on the sponsor's representations and warranties about the matters within the sponsor's special expertise and unique knowledge, namely the mortgage loans and the Underwriting Guidelines under which they were originated; and (3) MBIA placed trust and confidence in GMAC Mortgage, as a result of a business relationship based upon on MBIA having provided insurance in connection with eight prior GMAC Mortgage-sponsored securitizations in the preceding five years.  GMAC Mortgage capitalized on MBIA's inability to discover the falsity of GMAC Mortgage's

34

representations by passing the risks embedded in the loan pools to unwitting investors and, ultimately, to MBIA.

### 3.    MBIA Is Entitled To Recover All Past and Future Claims Payments, at a Minimum

86.    Beginning in May 2009, in an attempt to recoup some of the massive losses that GMAC Mortgage had transferred to it, MBIA initiated the Putback Procedure. MBIA began notifying GMAC Mortgage, in writing and with specificity, of the nature of the contract breaches MBIA had discovered and the factual support for its conclusions. As of today, MBIA has sent 25 letters to GMAC Mortgage, requesting that GMAC Mortgage cure, repurchase, or replace with eligible loans a total of 3,669 mortgage loans that were found not to be in compliance with GMAC Mortgage's representations and warranties. These loans have an aggregate initial principal balance of approximately $244 million.

87.    To date, GMAC Mortgage has agreed to repurchase a token 28 of these 3,669 loans. In its responses to MBIA's letters, GMAC Mortgage takes positions that are contrary to the representations it made in the Transaction Documents. As just one example, and as described above in paragraph 78, GMAC Mortgage now claims that loans originated through use of its automated underwriting program are excused from that representation and warranty, despite having represented and warranted that *all* of the mortgage loans were underwritten in general compliance with GMAC Mortgage's underwriting standards.

88.    GMAC Mortgage's unreasonable and arbitrary refusal to fulfill its obligations of cure, repurchase, or substitution highlights the inadequacy of the Putback Procedure to redress the harm suffered by MBIA. The Putback Procedure assumes isolated and accidental breaches of loan-level representations and warranties. By contrast, GMAC Mortgage's deliberate contribution of non-compliant loans to the Transactions breached representations and warranties

35

so fundamental that the very heart of the bargain struck by the parties has been pierced. GMAC

Mortgage breached transaction-level representations and warranties, contained in the Insurance

Agreements that it would furnish information to MBIA and for inclusion in the Transaction

Documents about the mortgage loans that was accurate and not untruthful or misleading in any

material respect. GMAC Mortgage's breach of its representation and warranty about the quality

of the underwriting used to originate the loans has also been so pervasive and extreme that it has

deprived MBIA of any benefit of having entered into the Insurance Agreements.

89.     Moreover, GMAC Mortgage's conduct in fraudulently inducing MBIA to provide

insurance for the Transactions, based on representations about the loans and loan pools that

GMAC Mortgage knew to be untrue, entitles MBIA to be returned to the position it would have

been in had it not entered into the Insurance Agreements. MBIA has been, and will continue to

be, required to satisfy its obligations under the Insurance Agreements and Policies by making

payments to cover shortfalls in cash flows to the trusts. As of December 31, 2009, MBIA had

paid approximately $132 million in claims in connection with the Transactions, while receiving

approximately $12.5 million in premiums. MBIA is exposed to additional claims because

additional loans continue to go delinquent or be charged off every month. To place MBIA in the

position it would have occupied absent GMAC Mortgage's fraud and breaches of contract,

GMAC Mortgage must pay to MBIA, at a very minimum, all claims payments made to date and

all future claims payments under the Policies.

G.      **GMAC Mortgage's Breaches of Its Servicing Obligations**

90.     Finally, GMAC Mortgage has compounded the harm it has inflicted on MBIA by

breaching its representations and warranties that as Servicer, it would: (1) provide prompt

written notice to MBIA if it was aware of loans in the pools that failed to conform with GMAC

Mortgage's representations and warranties in a manner that materially and adversely affected MBIA's interests; and (2) make reasonable efforts to collect all payments due from borrowers and service loans in a manner consistent with its own servicing guidelines.

91.    GMAC Mortgage has not provided MBIA with notice of the non-conforming loans MBIA uncovered through its review, although as originator, owner, and servicer of the loans, GMAC Mortgage was well aware that such loans pervaded the pools and materially and adversely affected MBIA's interests.

92.    In October 2009, MBIA exercised its right under the Servicing Agreements to terminate GMAC Mortgage as Servicer on all three Transactions. The termination was based on the occurrence of a Servicing Default on the part of GMAC Mortgage, which was triggered when a certain measure of loss of aggregate principal balance exceeded a limit specified in the Servicing Agreements.

93.    Since the termination of GMAC Mortgage as Servicer, MBIA has reviewed records relating to the servicing of the loans contributed to the Transactions. While again MBIA has yet to gain access to all relevant records, this review has brought to light that GMAC Mortgage employed wholly deficient servicing practices and made only perfunctory efforts to service the loans properly. In essence, after deliberately and routinely selling non-compliant loans into the pools and fraudulently procuring insurance to protect investors from shortfalls in payments to the trust, GMAC Mortgage walked away from its contractual obligation to make reasonable efforts to collect payments from borrowers to be used as cash flows for the trusts. It collected fees as Servicer, while providing loan servicing so defective that it *increased* the losses inflicted on the trust, investors, and ultimately MBIA by GMAC Mortgage's fraud and breaches of representations and warranties relating to the quality of the loans and loan pools.

37

94.    MBIA's review revealed, most fundamentally, that GMAC Mortgage allocated

resources and staff that were entirely inadequate to service and administer the loans in the

Transactions effectively. As a result, servicing of the mortgage loans was overly passive.

GMAC Mortgage failed to treat borrowers and loans individually, and failed to maintain records

sufficient to support reasonable servicing efforts. Delinquent loans advanced to the stage of

charge-off without adequate exploration of means of collecting some part of the payments owed.

95.    Among the host of unreasonable and substandard practices that have been

revealed by MBIA's review are GMAC Mortgage's: (1) failure to initiate and document contact

with borrowers, or to follow up after successful initial contact; (2) failure to discuss loss

mitigation with borrowers when delinquency was reasonably foreseeable; (3) failure to monitor

and record information bearing on loss mitigation, such as the reasons for delinquency or default,

the status of the senior lien holder, and the progress of loss mitigation efforts; (4) failure to

conduct property inspections as a means of, among other things, locating the borrower or valuing

the property; (5) over-reliance on mass offerings of settlements, often with the result that a non-

responsive borrower was rewarded with increasingly favorable terms; and (6) failure to monitor

foreclosure sale activities.

96.    GMAC Mortgage neglected its duties as Servicer in order to further its own

interests at the expense of MBIA, among others. GMAC Mortgage's decision to allocate

inadequate resources and staff to service the loan pools allowed it to minimize its own operating

costs without suffering adverse consequences itself, because GMAC Mortgage no longer bore

the risk of losses from delinquencies and charge-offs that it had fraudulently induced MBIA to

accept. In the meantime, GMAC Mortgage collected servicing fees equal to 0.50% per annum of

the outstanding principal balance of the loan pools, or at least $42 million. It collected late

38

payment fees and charges that likely were increased through its own inactivity, including its failure to modify loans so as to maximize collections.

97.     MBIA has suffered significant harm as a result of GMAC Mortgage's breaches of the Servicing Agreements, and it is entitled to be compensated for the damages inflicted by GMAC Mortgage.

## **FIRST CAUSE OF ACTION**

### **(Fraud)**

98.     MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

99.     GMAC Mortgage intentionally misrepresented existing material facts to induce MBIA to enter into the Insurance Agreements, both in documentation provided to MBIA before each Transaction closed and also at the time of execution of each Insurance Agreement.

100.    GMAC Mortgage intentionally misrepresented existing material facts, before closing and while soliciting MBIA's participation in the Transactions, in requests for bids, loan tapes, and loan schedules that GMAC Mortgage either transmitted or caused to be transmitted to MBIA. Among these transmittals of requests for bids, loan tapes, and loan schedules to GMAC Mortgage were:

- a materially false and misleading loan tape for the 2004 Transaction, by email dated October 12, 2004;

- a materially false and misleading schedule for the 2004 Transaction, by email dated October 12, 2004;

- a materially false and misleading bid request, loan tape, and schedule for the 2006 Transaction, by email dated September 11, 2006;

- a materially false and misleading revised loan tape for the 2006 Transaction, by email dated September 13, 2006;

39

- a materially false and misleading bid request, loan tape, and schedule for the 2007 Transaction, by email dated March 8, 2007; and

- a materially false and misleading revised loan tape for the 2007 Transaction, by email dated March 12, 2007.

101.    The materially false and misleading information contained in the loan tapes that GMAC Mortgage provided to MBIA included misrepresentations related to the characteristics of individual mortgage loans and borrowers, including FICO scores, DTI, and CLTV. The loan schedules presented materially false and misleading pool-level data, including weighted averages of FICO scores, DTI, and CLTV. In both loan tapes and schedules, statistics relating to DTI and CLTV were materially understated. In particular, the DTI ratios were materially false and misleading because the monthly income had been falsely overstated or monthly debt obligations falsely understated. The CLTV ratios were materially false and misleading because, among other things, the value of the underlying collateral was falsely overstated.

102.    GMAC Mortgage also intentionally misrepresented existing material facts, before closing and while soliciting MBIA's participation in the Transactions, in Prospectus Supplements that it either transmitted or caused to be transmitted to MBIA. Among these transmittals of Prospectus Supplements were:

- a materially false and misleading initial Prospectus Supplement for the 2006 Transaction, by email dated September 19, 2006;

- a materially false and misleading final Prospectus Supplement for the 2006 Transaction, by email dated September 25, 2006;

- a materially false and misleading initial Prospectus Supplement for the 2007 Transaction, by email dated March 21, 2007; and

- a materially false and misleading final Prospectus Supplement for the 2007 Transaction, by email dated March 28, 2007.

103.    The materially false and misleading information contained in the initial and final Prospectus Supplements that GMAC Mortgage provided to MBIA included reproductions of the

40

same schedules that GMAC Mortgage provided to MBIA, containing false data about FICO scores, DTI, and CLTV. The Prospectus Supplements falsely state that the mortgage loans contributed to the Transactions were underwritten generally in compliance with GMAC Mortgage's standards and fail to disclose that GMAC Mortgage regularly contributed non-compliant loans to the pools. The Prospectus Supplements falsely represent that loans were generally originated subject to a maximum total monthly DTI ratio of 45% and a maximum CLTV ratio of 100%, when in truth GMAC Mortgage frequently contributed loans with DTI and CLTV ratios exceeding these cut-offs to the pools. The Prospectus Supplements falsely state that once all applicable employment, credit, and property information had been received, a determination had been made as to the borrower's ability to meet his or her monthly obligations. In truth, GMAC Mortgage routinely failed to collect applicable employment, credit, and property information and also regularly failed to make determinations that the borrower had the ability to repay his or her mortgage loan.

104.    MBIA reasonably relied to its detriment on GMAC Mortgage's representations in the bid requests, loan tapes, schedules, and initial and final Prospectus Supplements. As GMAC Mortgage knew, MBIA did not have a contractual right to review loan origination files before closing, nor any meaningful opportunity to do so. GMAC Mortgage also knew that the industry practice was for a financial guaranty insurer to rely upon the representations and warranties of the sponsor regarding the quality of the mortgage loans and the standards under which they were originated, rather than to carry out a loan-by-loan review of thousands or tens of thousands of loan origination files.

105.    GMAC Mortgage further intentionally misrepresented existing material facts, while soliciting MBIA's participation in the Transactions, by either transmitting or causing to be

41

transmitted to MBIA false and misleading shadow ratings upon which MBIA reasonably relied.

GMAC Mortgage knew that MBIA would not furnish financial guaranty insurance unless the

rating agencies provided credit ratings of BBB- or the equivalent for each Transaction. GMAC

Mortgage thus deliberately procured falsely inflated shadow ratings by conveying to Moody's

Investors Service and Standard & Poor's the same false and misleading loan tapes that it had

transmitted to MBIA, together with false pool-level data derived from the loan-level information

in the tapes. GMAC Mortgage well knew that the rating agencies would rely on the false

information and data in generating estimates of potential losses and thus issue false and inflated

shadow ratings. The rating agencies thus issued to MBIA shadow ratings based on GMAC

Mortgage's false representations on the following occasions, among others:

- shadow rating of BBB- for the 2006 Transaction, by letter from Standard & Poor's dated September 27, 2006;

- shadow rating of Baa3 for the 2006 Transaction, by letter from Moody's Investors Service dated September 27, 2006;

- shadow rating of BBB for the 2007 Transaction, by email from Standard & Poor's dated March 28, 2007; and

- shadow rating of Baa3 for the 2007 Transaction, by facsimile from Moody's Investors Service dated March 29, 2007.

106.    GMAC Mortgage's false representations in the requests for bids, loan tapes,

schedules, initial and final Prospectus Supplements, and shadow ratings, were material—indeed

essential—to MBIA's decision to enter into the Insurance Agreements. MBIA never would have

agreed to provide any of the Policies had it known that GMAC Mortgage's representations about

characteristics of the mortgage loans and mortgage loan pools were false. It would not have

entered into the Insurance Agreements had it been aware that GMAC Mortgage had omitted to

state that it had routinely contributed loans to the Transactions:  (1) that were not originated

generally in compliance with GMAC Mortgage's Underwriting Guidelines; (2) that failed to

42

meet cut-offs set out in the initial and final Prospectus Supplements and Purchase Agreements

for DTI and CLTV ratios; and as to which (3) there had been no determination, once all

applicable employment, credit, and property information had been received, that the borrower

had the ability to repay the loan. Absent a shadow rating of at least BBB- or the equivalent,

MBIA would not have agreed to provide the Policies.

107.    GMAC Mortgage also intentionally misrepresented existing material facts with

respect to and at the time of execution of each Insurance Agreement. Specifically, GMAC

Mortgage falsely represented:

- All of the mortgage loans were underwritten generally in accordance with GMAC Mortgage's underwriting standards;

- Under GMAC Mortgage's Underwriting Guidelines, the mortgage loans were generally originated with a maximum total monthly DTI ratio of 45%;

- Under GMAC Mortgage's Underwriting Guidelines, the CLTV ratio of each mortgage loan was generally not in excess of 100%; and

- For each of the mortgage loans in the Transactions, and after all applicable employment, credit, and property information was received, a determination had been made that the borrower was able to meet his or her monthly loan payments and other expenses related to the home, such as taxes, insurance, and debt service on senior liens.

108.    These representations—like the misrepresentations GMAC Mortgage made

before closing—were materially false. In truth, GMAC Mortgage consistently originated and

acquired mortgage loans that failed to comply with its Underwriting Guidelines, and routinely

and deliberately contributed such non-compliant loans to the Transactions. These

misrepresentations of existing fact conveyed by means of the Insurance Agreements were

material—indeed essential—to MBIA's decision to enter into the Insurance Agreements. MBIA

never would have agreed to provide any of the Policies had it known that the pools were replete

with loans that were not originated in compliance with GMAC Mortgage's Underwriting

43

Guidelines, that GMAC Mortgage had routinely failed to ensure that loans contributed to the pools satisfied DTI and CLTV cut-offs set forth in the Transaction Documents, or that there had been routine failures to make determinations of a borrower's ability to satisfy his or her monthly obligations, before originating the loans.

109.    As a result of knowing misrepresentations it made before and at closing, GMAC Mortgage intended to, and did, defraud MBIA into issuing the Policies for the Transactions. GMAC Mortgage defrauded MBIA so that it could sell mortgage loans it had acquired or originated and also earn fees for servicing those loans after their securitization, while simultaneously passing the risks embedded in the non-compliant loans to MBIA.

110.    As a direct result of, and in reliance upon, GMAC Mortgage's misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, insurance claims in an amount in excess of $132 million. MBIA is exposed to further liabilities because delinquencies and charge-offs continue to occur in the loan pools.

111.    Due to GMAC Mortgage's fraud, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial. Further, MBIA is entitled to recover punitive damages, because GMAC Mortgage committed its fraudulent acts maliciously, wantonly, and oppressively, and with knowledge that the consequences of its conduct would affect the general public.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation)

112.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

113.    In connection with MBIA's issuance of the Policies, GMAC Mortgage had a duty to communicate accurate and complete information to MBIA. This duty arose out of GMAC

44

Mortgage's special relationship of trust and confidence with MBIA. By late 2004, when MBIA

was deciding whether to provide insurance for the 2004 Transaction, MBIA had provided

insurance for eight GMAC Mortgage-sponsored securitizations of second-lien mortgage loans

since 1999. These prior securitizations also involved specifically prime HELOC or closed-end

second-lien mortgages.

114.    GMAC Mortgage misrepresented existing material facts with respect to the

Transactions. It misrepresented that loans contributed to the pools were generally originated in

compliance with GMAC Mortgage's Underwriting Guidelines and that data regarding the

mortgage loans, including statistics relating to the borrower's FICO score, DTI, and CLTV, were

accurate. It misrepresented that after all applicable employment, credit, and property

information was received, a determination had been made that the borrower was able to meet his

or her monthly loan payments and other expenses related to the home.

115.    GMAC Mortgage possessed clear and reasonable grounds for believing or

determining that its representations were materially false and should have known that its

representations were materially false. GMAC Mortgage was the originator and/or owner of all

loans contributed to the pools and indeed had unique knowledge and expertise about the manner

in which the loans had been originated.

116.    GMAC Mortgage knew or should have known that MBIA would rely on GMAC

Mortgage's materially false representations and that those representations were essential and

material to MBIA's decision to issue the Policies. GMAC Mortgage knew that the information it

provided to MBIA, including the requests for bids, loan tapes, loan schedules, and initial and

final Prospectus Supplements, was critical to MBIA's decision whether to enter into the

Insurance Agreements. GMAC Mortgage knew that MBIA was not aware and could not

45

reasonably have been aware of the falsity of GMAC Mortgage's representations, because GMAC Mortgage's knowledge and expertise were unique and special. GMAC Mortgage had unique and special knowledge and expertise regarding both the underwriting of mortgage loans generally, and the underwriting of the mortgage loans in the loan pools for the Transactions. MBIA is not a mortgage loan originator and did not originate any of the loans contributed to the Transactions. GMAC Mortgage also knew that MBIA followed the industry practice of requiring the sponsor to provide representations and warranties about the mortgage loans and the Underwriting Guidelines under which they were originated.

117.    Accordingly, GMAC Mortgage acted either recklessly or negligently in making the materially false representations to MBIA with respect to the underwriting of the mortgage loans GMAC Mortgage contributed to the mortgage loan pools.

118.    MBIA reasonably relied to its detriment on GMAC Mortgage's misrepresentations. MBIA had no contractual right to review loan origination files before closing, nor any meaningful opportunity to do so. MBIA reasonably followed the industry standard of relying on a sponsor's representations and warranties regarding the quality of the loans and the standards under which loans were originated, rather than attempting to re-underwrite thousands or tens of thousands of loans before closing. Finally, MBIA placed trust and confidence in GMAC Mortgage, as a result of a business relationship based upon at least eight prior GMAC Mortgage-sponsored securitizations for which MBIA had provided insurance since 1999.

119.    Had MBIA known about GMAC Mortgage's significant and substantial misrepresentations, MBIA would not have issued the Policies.

46

120.    As a proximate result of its reasonable reliance on GMAC Mortgage's reckless or negligent misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to remain exposed to future liabilities.

121.    As a result of GMAC Mortgage's negligent misrepresentations, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### (Breach of Contract: Insurance Agreements)

122.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

123.    In the Insurance Agreements GMAC Mortgage made extensive representations and warranties concerning the loans that GMAC Mortgage contributed to the pools, the accuracy of the information that it provided for inclusion in the Transaction Documents or to MBIA, and the remedies to which MBIA would be entitled if GMAC Mortgage breached its representations and warranties.

124.    GMAC Mortgage's representations and warranties were material to MBIA's decision to insure each of the Transactions.  GMAC Mortgage's compliance with its representations and warranties was and is necessary to assure MBIA of the benefit of its bargain.

125.    GMAC Mortgage has materially breached the Insurance Agreements.  In Section 2.01(j) of the Insurance Agreements, GMAC Mortgage represented and warranted that any information relating to the mortgage loans that it furnished for inclusion in the Transaction Documents, or to MBIA, was accurate and not misleading, as of the dates reflected therein. GMAC Mortgage breached these representations and warranties by:  (1) furnishing for inclusion in the Transaction Documents false and misleading statements, including the statement that the mortgage loans contributed to the Transactions were underwritten generally in accordance with

47

GMAC Mortgage's underwriting standards; and (2) giving MBIA false and misleading information, including requests for bids, loan tapes, schedules, and initial and final Prospectus Supplements that provided materially false statistics relating to DTI and CLTV, among other false information, and shadow ratings that were artificially inflated.

126.    GMAC Mortgage breached its representation and warranty, contained in Section 2.01(m) of the Insurance Agreements, that each of the representations and warranties contained in the Transaction Documents to which it is a party is true and correct in all material respects. Specifically, GMAC Mortgage breached numerous representations and warranties it made in the Purchase Agreements, including that each mortgage loan file was complete, that the information in schedules furnished by GMAC Mortgage was true and correct in all material respects, and that the CLTV ratio for each mortgage loan was not in excess of 100%. It breached representations and warranties made in the initial and final Prospectus Supplements that all of the mortgage loans were underwritten generally in accordance with GMAC Mortgage's underwriting standards, that loans were generally originated with a maximum DTI ratio of 45% and CLTV ratio of 100%, and that once all applicable employment, credit, and property information had been received, a determination had been made that the borrower had sufficient monthly income available to meet monthly obligations, including payments on the proposed mortgage loan.

127.    These breaches of GMAC Mortgage's transaction-level representations and warranties strike at the heart of the Insurance Agreements. Had MBIA known that GMAC Mortgage had furnished false and misleading information for inclusion in the Transaction Documents or to MBIA, or had routinely contributed loans to the Transactions that had not been originated generally in compliance with GMAC Mortgage's Underwriting Guidelines, MBIA would not have entered into the Insurance Agreements.

48

128.     GMAC Mortgage has also materially breached the Insurance Agreements by: (1) failing to provide MBIA with access to information reasonably requested by MBIA; and (2) failing to honor its covenant not to interfere with MBIA's enforcement of its rights under the Transaction Documents.  Specifically, GMAC Mortgage has breached the Insurance Agreements by refusing MBIA's requests for copies of complete versions of the GMAC Mortgage Underwriting Guidelines.  It has failed to provide, for each Transaction and despite MBIA's written request, monthly loan-level collateral performance tapes for each month preceding early 2008.

129.     GMAC Mortgage's breaches constitute Events of Default under the Insurance Agreements.

130.     MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements, and the Policies.

131.     MBIA has incurred and will continue to incur damages, including without limitation interest and reasonable attorneys' and accountants' fees and expenses in an amount to be determined at trial.

132.     Pursuant to Section 3.04 of the Insurance Agreements, GMAC Mortgage agreed to indemnify MBIA for these liabilities when they arise out of "the breach by [GMAC Mortgage] . . . of any representation or warranty . . . under any of the Transaction Documents to which it is a party."

133.     Accordingly, MBIA seeks declaratory judgment that GMAC Mortgage is required:  (1) to reimburse MBIA for all claims payments made to date and all future claims payments under the Policies; and (2) to indemnify MBIA for any and all payments made as a

49

result of GMAC Mortgage's breaches of its representations and warranties in the Insurance Agreements.

## FOURTH CAUSE OF ACTION

### (Breach of Contract: Servicing Agreement)

134.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

135.    In October 2009, MBIA exercised its right under the Servicing Agreements to terminate GMAC Mortgage as Servicer, in all three Transactions. Since that time, GMAC Mortgage has not serviced the mortgage loans underlying the Transactions.

136.    In each Transaction, GMAC Mortgage was required to give MBIA prompt, written notice if it became aware that loans failed to conform with its representations and warranties in the Purchase Agreements in a manner that "materially and adversely affects" MBIA's interests.

137.    In each Transaction, GMAC Mortgage was required to make reasonable efforts to collect all payments due from borrowers and service loans in a manner consistent with its own servicing guidelines. As Servicer, GMAC Mortgage was required to employ, in its good faith business judgment, all of its "normal and usual" servicing procedures.

138.    GMAC Mortgage failed to give notice of loans failing to conform with its representations and warranties in the Purchase Agreements, and materially and adversely affecting MBIA's interests, even though it was fully aware, from the inception of the Transactions, that the pools were replete with non-conforming loans that materially and adversely affected MBIA's interests.

139.    GMAC Mortgage also failed to make reasonable efforts to collect all payments due from borrowers. GMAC Mortgage employed wholly deficient servicing practices and made

only perfunctory efforts to collect payments from borrowers. The resources that GMAC Mortgage allocated to servicing the loan pools fell far short of being adequate to fulfill its contractual obligation. As a result of the lack of resources, the servicing of the mortgage loans was overly passive. GMAC Mortgage failed to treat borrowers and loans individually, and failed to maintain records sufficient to support reasonable servicing efforts.

140.    The material deficiencies in GMAC Mortgage's servicing included: (1) failure to initiate and document contact with borrowers, or to follow up after successful initial contact; (2) failure to discuss loss mitigation with borrowers when delinquency was reasonably foreseeable; (3) failure to monitor and record information bearing on loss mitigation, such as the reasons for delinquency or default, the status of the senior lien holder, and the progress of loss mitigation efforts; (4) failure to conduct property inspections as a means of, among other things, locating the borrower or valuing the property; (5) over-reliance on mass offerings of settlements, often with the result that a non-responsive borrower was rewarded with increasingly favorable terms; and (6) failure to monitor foreclosure sale activities.

141.    GMAC Mortgage's improperly inactive approach resulted in delinquent loans advancing to the stage of charge-off without adequate exploration of means of collecting some part of the payments owed. GMAC Mortgage's failure to devote adequate resources to collection efforts also exploited its role as a collector of funds for the trusts, because GMAC Mortgage made gains at the expense of MBIA and investors. GMAC Mortgage wrongly minimized the expense to itself while disregarding its obligation to seek returns for the trusts, for the benefit of investors.

142.    MBIA has fully complied with its obligations under the Transaction Documents and the Insurance Agreements.

51

143.    GMAC Mortgage's breaches of the Servicing Agreements have caused substantial harm and damages to MBIA, in an amount to be proved at trial, but at a minimum including substantially higher claims on Policies and other losses and expenses.

## FIFTH CAUSE OF ACTION

### (Breach of Contract:  Repurchase Obligation)

144.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

145.    Pursuant to the Servicing Agreements, if MBIA determines that, with respect to any loan, GMAC Mortgage breached its representations and warranties in the Purchase Agreements in a manner that "materially and adversely affect[ed] the interests of the Securityholders or the Enhancer [*i.e.*, MBIA]," MBIA may notify GMAC Mortgage of the presence of such breach.  Upon such notice, GMAC Mortgage has 90 days to:  (1) cure the breach; (2) repurchase the mortgage loan; or (3) substitute one or more eligible loans for the mortgage loan.  Under the terms of the Putback Procedure, however, substitution is only permitted within a two-year period following the closing date of the Transaction.  The Putback Procedure is not an exclusive remedy and does not apply to breaches of the Insurance Agreements.

146.    MBIA has provided GMAC with 25 notices of breach by letters dated May 15, 2009; May 19, 2009; May 26, 2009; June 4, 2009; June 10, 2009; June 15, 2009; June 22, 2009; June 30, 2009; July 7, 2009; July 28, 2009; July 29, 2009; August 6, 2009; August 12, 2009; August 18, 2009; August 26, 2009; September 1, 2009; September 9, 2009; September 15, 2009; September 22, 2009; September 30, 2009; October 9, 2009; October 14, 2009; February 16, 2010; February 22, 2010; and March 10, 2010.  MBIA notified GMAC of specific deficiencies in 3,669 individual loans in these putback requests, which are hereby incorporated by reference.

These letters notified GMAC Mortgage of loans that were in breach of one or more of GMAC Mortgage's representations and warranties set forth in the Purchase Agreements and that such breaches materially and adversely affected the interests of MBIA.

147.    MBIA continues to notify GMAC Mortgage of additional loans that are discovered to be in breach of one or more of GMAC Mortgage's representations and warranties. Additional loans continue to become delinquent or are charged-off every month. On information and belief, such delinquencies and charge-offs will continue through the date of trial in this action and beyond.

148.    The mortgage loans identified in MBIA's notices failed to comply with one or more of the representations and warranties made by GMAC Mortgage in the Purchase Agreements. For example, many of the loan files relating to the mortgage loans were incomplete and lacked required documentation and instruments, including mortgage notes, disclosures relating to the sale of the mortgage loans, disclosures relating to the transfer of servicing for the mortgage loans, documents confirming appropriate reserves, and documents relating to the appraisal. Mortgage loans were underwritten in violation of the representation and warranty that the CLTV ratio would not exceed 100%. GMAC Mortgage also approved loans that did not comply with applicable local, state, and federal laws, including applicable predatory lending laws.

149.    MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial. For the vast majority of the mortgage loans identified in MBIA's letters, GMAC Mortgage has neither cured the material breaches nor repurchased or substituted eligible mortgage loans as required by the Putback Procedure. By failing either to cure the defective aspects of the non-compliant mortgage loans identified in MBIA's letters or to repurchase or

substitute those non-compliant mortgage loans, GMAC Mortgage has caused MBIA to incur payments for shortfalls in cash flows to investors when, in fact, such shortfalls should properly be paid by GMAC Mortgage. In addition, MBIA expects that because delinquencies and charge-offs continue to occur, it will continue to make payments under the Insurance Agreements due to the true quality of the mortgage loans, which GMAC Mortgage misrepresented to MBIA in obtaining the Policies.

150.    MBIA also has incurred, and will continue to incur, significant fees for professional services, including attorneys' fees, to engage in, and enforce GMAC Mortgage's obligations under, the Putback Procedure. Pursuant to Section 3.03 of the Insurance Agreements, GMAC Mortgage agreed to indemnify MBIA for these payments, when made as a result of GMAC Mortgage's failure to comply with the Transaction Documents, including, without limitation, GMAC Mortgage's failure to comply with the Putback Procedure.

151.    MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements, and the Policies.

152.    Accordingly, MBIA seeks declaratory judgment that GMAC Mortgage is required:  (1) to repurchase the mortgage loans identified in MBIA's notices; (2) to repurchase any additional mortgage loans that breach the applicable representations and warranties; and (3) to indemnify MBIA for any and all payments made as a result of GMAC Mortgage's breaches of its representations and warranties, including GMAC Mortgage's failure to comply with the Putback Procedure.

54

## SIXTH CAUSE OF ACTION

### (Breach of Contract – Good Faith and Fair Dealing)

153.    MBIA repeats and realleges, as if set forth herein, the allegations of all of the preceding paragraphs.

154.    Under the Insurance Agreements, the Purchase Agreements, and the Servicing Agreements, GMAC Mortgage is required to comply with the covenant or duty of good faith and fair dealing that is implied in all contracts.

155.    The Insurance Agreements and the Transaction Documents incorporated therein are built on the premise that, as GMAC Mortgage affirmatively represented, the mortgage loans had been evaluated consistently with the underwriting standards of GMAC Mortgage. The Insurance and Servicing Agreements are founded on the understanding that GMAC Mortgage, as Servicer, would make reasonable servicing efforts. GMAC Mortgage encouraged trust and reliance on its underwriting and servicing precisely because of its expertise and experience.

156.    The implied duty of good faith and fair dealing required application of underwriting and servicing standards consistent with MBIA's understanding and with GMAC Mortgage's awareness of what MBIA had understood about those standards.

157.    GMAC Mortgage breached its duty of good faith and fair dealing by knowingly, and in bad faith, deliberately and routinely contributing mortgage loans to the pools that had not been originated in accordance with GMAC Mortgage's underwriting standards.

158.    GMAC Mortgage further breached its implied duty of good faith and fair dealing by failing in good faith to employ loan servicing procedures consistent with servicing industry standards, or make efforts to collect all payments due from borrowers.

159.    GMAC Mortgage also breached its implied duty of good faith and fair dealing by failing to provide MBIA with access to information reasonably requested by MBIA, such as the complete versions of the GMAC Mortgage Underwriting Guidelines. The Insurance Agreements are based on the premise that GMAC Mortgage will not affirmatively frustrate MBIA's ability to enforce its contractual rights. GMAC Mortgage's bad faith withholding of information relating to the mortgage loans, and the standards under which those loans were underwritten, has impermissibly interfered with MBIA's enforcement of its rights.

160.    Had MBIA known of the true risk profile of the loan pools in the Transactions, or that GMAC Mortgage would fail to undertake reasonable servicing efforts or refuse access to information necessary for MBIA to enforce its contractual rights, MBIA would not have issued the Policies. GMAC Mortgage's breach of its implied duty of good faith and fair dealing has deprived MBIA of the benefit of having entered into the Insurance Agreements.

161.    MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements, and the Policies.

162.    As a result of GMAC Mortgage's breach of the implied covenant of good faith and fair dealing, MBIA has incurred, and will continue to incur, damages including, without limitation, interest and reasonable attorneys' and accountants' fees and expenses. GMAC Mortgage is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

56

## PRAYER FOR RELIEF

WHEREFORE MBIA prays for relief as follows:

      a.      For an award of damages against GMAC Mortgage, in an amount to be proven at trial, but including at a minimum:

      i.      MBIA's payments on current and future claims under the Policies;

      ii.      MBIA's compensatory and consequential losses, including lost profits and business opportunities;

      iii.      Indemnification for MBIA's attorneys' fees, costs, and expenses associated with enforcing its legal rights under the Transaction Documents;

      iv.      Punitive damages; and

      v.      Pre-judgment interest at the maximum legal rate.

      b.      For a declaratory judgment that GMAC Mortgage is required:  (1) to repurchase the mortgage loans identified in MBIA's notices; (2) to repurchase any additional mortgage loans that breach the applicable representations and warranties; and (3) to indemnify MBIA for any and all payments made as a result of GMAC Mortgage's failure to comply with the Putback Procedure.

      c.      For a declaratory judgment that GMAC Mortgage is required to reimburse MBIA for all claims payments made to date and all future claims payments under the Policies, and to indemnify MBIA for any and all payments made as a result of GMAC Mortgage's breaches of the representations and warranties in the Insurance Agreements.

      d.      Such other and further relief as the Court may deem just and proper.

DATED:  New York, New York
        April 1, 2010

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By: _____

Peter E. Calamari
Philippe Z. Selendy
Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849 7000

*Attorneys for MBIA Insurance Corporation*

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MBIA INSURANCE CORPORATION,

Plaintiff,

-against-

GMAC MORTGAGE, LLC (F/K/A GMAC
MORTGAGE CORPORATION)

Defendant.

## SUMMONS AND COMPLAINT

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

Peter E. Calamari
Philippe Z. Selendy
Christine H. Chung

51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Plaintiff*
*MBIA Insurance Corporation*