# Exhibit 62

FILED: NEW YORK COUNTY CLERK 03/19/2010
NYSCEF DOC. NO. 28

INDEX NO. 603552/2008

12-12020-mg    Doc 2813-62    Filed 02/01/13    Entered 02/01/13 16:43:05    Exhibit 62

RECEIVED NYSCEF: 03/19/2010

Pg 2 of 56

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MBIA INSURANCE CORPORATION,

                            Plaintiff,

                -against-

RESIDENTIAL FUNDING COMPANY, LLC,

                          Defendant.

Index No. 603552/2008 (Fried, J.)

**FIRST AMENDED COMPLAINT**

       Plaintiff MBIA Insurance Corporation ("MBIA") for its First Amended Complaint against defendant Residential Funding Company, LLC ("RFC") alleges, on information and belief as to all facts other than as to itself, as follows:

## NATURE OF THE ACTION

       1.    This action arises from defendant RFC's fraudulent inducement of plaintiff MBIA to provide financial guaranty insurance policies (each a "Policy" and, collectively, the "Policies") for five securitization transactions sponsored by RFC and RFC's pervasive breach of contract representations and warranties made to MBIA in connection with those five securitizations.

       2.    RFC, a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota, is engaged in the business of, among other things, originating and acquiring residential mortgage loans and selling those loans through securitization programs. During 2006 and 2007, RFC sought to sell certain of its residential home equity loans by means of securitization transactions and approached MBIA to provide the Policies for certain of these securitization transactions. These Policies were intended to insure

timely payments of interest and ultimate principal to investors who purchased the securities that were issued through the securitization transactions.

3.     Among other representations and warranties, RFC represented to MBIA that the mortgage loans underlying the securitization transactions were of a certain quality and had been underwritten in accordance with RFC's underwriting guidelines and policies.  RFC made this representation to assure MBIA that for each individual mortgage loan there was a reasonable expectation that the borrower would be able to repay the mortgage debt.

4.     In reality, and contrary to RFC's representations and warranties, the portfolios of mortgage loans that RFC included in the securitization transactions were of a fundamentally different quality and character than RFC represented to MBIA.  A material number of mortgage loans included in the mortgage loan pools underlying the securitizations were made to borrowers who could not reasonably have been expected to be able to repay the mortgage loans, and the risks inherent in the portfolios were significantly higher than as represented to MBIA.  Moreover, there were fundamental, material and consistent violations of RFC's underwriting guidelines and policies in connection with the underwriting of the mortgage loans that RFC included in the securitization transactions.  The undisclosed and misrepresented risks were pervasive throughout the mortgage loan portfolios for the securitization transactions. Had MBIA been aware of the condition of the mortgage loan portfolios and RFC's material disregard of its underwriting guidelines and policies, MBIA would not have issued the Policies for the securitization transactions.

5.     MBIA's agreement to issue the Policies with respect to the securitizations was based on representations and warranties from RFC that constituted an intentional scheme to defraud MBIA into providing financial guaranty insurance in connection with the securitization transactions sponsored by RFC.  MBIA, as the financial guaranty insurer, has now paid hundreds

of millions of dollars in claims, and is now exposed to significant further liability incurred directly as a result of RFC's pervasive misrepresentations with respect to the mortgage loans.

6.      Subsequent to its fraud in inducing MBIA into writing the policies, RFC also has breached its contractual obligations and acted in bad faith by refusing to cure, repurchase or otherwise remedy the material deficiencies in respect of individual mortgage loans. In fact, RFC has stopped responding altogether to MBIA's requests that RFC repurchase such deficient mortgage loans and has repudiated the contractual remedy process, thereby repudiating its obligations under the contracts.

## PARTIES

7.      Plaintiff MBIA Insurance Corporation is a New York stock insurance corporation with its principal place of business in Armonk, New York.

8.      Defendant Residential Funding Company, LLC is a Delaware limited liability company with its principal place of business in Minneapolis, Minnesota.  Residential Funding Company, LLC is successor-in-interest to Residential Funding Corporation, a Delaware corporation with its principal place of business in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this proceeding pursuant to CPLR § 301.

10.     RFC is a registered limited liability company within the State of New York, has appointed an agent for service of process and has consented to the jurisdiction of Courts within the State.  RFC transacts business within the State.  Further, actions that led to the transactions that give rise to the claims in this Complaint occurred within the State.

11.     Venue is proper in this Court pursuant to CPLR § 503.  RFC has designated New York County as its county of residence in the State of New York.  Further, RFC has agreed that courts in the State of New York located in the City and County of New York are

the appropriate venue for all actions arising out of the transactions that give rise to the claims in the Complaint. Moreover, substantial activities relating to the transactions that give rise to the claims in the Complaint occurred within New York County.

## FACTUAL ALLEGATIONS

A.    **RFC**

12.    RFC is engaged in the acquisition of residential mortgage loans under several loan purchase programs from individual mortgage loan originators or sellers nationwide. RFC, through its affiliates, also originates residential mortgage loans. Further, RFC acts as a servicer for mortgage loans.

13.    RFC's practice is to sell, by means of securitization transactions, mortgage loans that it has acquired, as well as mortgage loans it originated through its affiliates. RFC has sponsored securitizations of mortgage loans secured by first liens on one- to four- family residential properties since 1986. In 1995, RFC expanded its business to include second lien mortgage loans. From 2002 through the first quarter of 2007, RFC sponsored securitizations of 1,313,052 first lien mortgage loans with an aggregate principal balance of $243,493,046,962. During the same period, RFC sponsored securitizations of 338,441 second lien mortgage loans with an aggregate principal balance of $14,393,392,561.

14.    As of December 4, 2008, RFC was a wholly-owned subsidiary of Residential Capital LLC ("ResCap"), a Delaware limited liability company, which was itself a wholly-owned subsidiary of GMAC LLC ("GMAC"), a Delaware limited liability company registered as a foreign limited liability company in the State of New York.

B.    **The Securitization Of Residential Mortgage Loans**

15.    Acquirers and originators of mortgage loans may sponsor securitization transactions to sell mortgage loans and to enable the acquisition or origination of additional

mortgage loans.  Securitization is the act of using a financial asset, such as a mortgage loan, as security for another instrument.

16.     Securitizations can take various forms.  The most common form used for mortgage loans involves the creation of a trust, to which the sponsoring entity sells a portfolio of mortgage loans.  The trust will then divide the cash flows from the portfolio of mortgage loans into various pieces or tranches and issue securities, which are sold to investors.  Those pieces or tranches underlying the securities have different economic rights to principal and interest, among other things, and have different attributes of repayment risk.  As the United States Securities and Exchange Commission ("SEC") has observed, in many instances the transfer of assets to the trust "is a two-step process:  the financial assets are transferred by the sponsor first to an intermediate entity, often a limited purpose entity created by the sponsor for a securitization program and commonly called a depositor, and then the depositor will transfer the assets to the [trust] for the particular asset-backed transactions."  SEC Release "Asset-Backed Securities" (Regulation AB), SEC Release Nos. 33-8518; 34-50905, 70 Fed. Reg. 1,506-1,631.

17.     Because the mortgage loans, and their underlying cash flows, are sold to an entity, such as a trust, in connection with the securitization, the appointment of a servicer is also necessary.  The servicer's primary responsibilities are (1) collecting mortgage payments on performing mortgage loans, (2) engaging in loss mitigation efforts to increase collection efforts on delinquent mortgage loans, (3) initiating foreclosure proceedings, (4) charging-off mortgage loans when appropriate, (5) reporting key information about the mortgage loans to the trustee for dissemination to the other transaction participants and (6) transferring collections to the trustee for distribution to the investors.  The trustee is responsible for administering the funds of the trust, determining the adequacy of the trust's funds to satisfy the trust's obligations in connection with the securities issued by the trust and making payments to the investors.

18.     Mortgage loans may consist of, among others, closed-end second lien mortgage loans ("Closed-End Mortgage Loans") and home equity lines of credit ("Home Equity Loans"). For Closed-End Mortgage Loans, a borrower receives the full borrowed amount of the loan at the time of origination. For Home Equity Loans, a borrower receives the right to draw upon a line of credit, which is collateralized by a mortgage lien, for a period of time after origination of the Home Equity Loan up to the full amount of the Home Equity Loan. The amount of a Home Equity Loan that has been drawn upon as of any date of determination is known as the "Utilization."

19.     The financial viability of an investment in a securitization is based on the quality of the underlying mortgage loans. If, for instance, the lender that originated the mortgage loans employed substandard underwriting practices, risk increases. This risk manifests itself through delinquencies on mortgage loan payments eventually leading to defaults on these mortgage loans. After a mortgage loan is in default, if a servicer of a mortgage loan determines that the value of net recoveries to be achieved by foreclosing upon, or comparably converting, the mortgage loan are unlikely to equal or exceed the outstanding principal balance of the delinquent mortgage loan, plus certain costs and expenses related thereto, the servicer will charge-off such delinquent mortgage loan, meaning that the servicer will write down or recognize the outstanding principal balance of such mortgage loan as zero, without a corresponding payment or receipt of principal. These delinquencies, defaults and charge-offs have the potential to result in significant shortfalls of anticipated cash flows to the trust and, consequently, a shortfall in cash flows payable to the investors.

20.     To increase marketability, lower interest costs and mitigate the risk to the investors of a potential shortfall in anticipated cash flows to the trust, many securitizations historically have included the purchase of a financial guaranty insurance policy from a financial

guaranty insurer, such as MBIA. Under the terms of such a policy, a financial guaranty insurer, in consideration of a premium and subject to the terms and conditions of the policy, will unconditionally and irrevocably guarantee to the investors that, in the event there is a shortfall in cash flows to the trust, the financial guaranty insurer will insure certain payments with respect to current interest and ultimate principal to the trustee for the benefit of the investors. In this way, the risk to the investors of a shortfall in the anticipated cash flows to the trust is mitigated, thus increasing the marketability and pricing of the securities.

21.    To satisfy both the investors and the financial guaranty insurer as to the quality of a particular portfolio of mortgage loans, the sponsor of a securitization typically makes disclosures and representations regarding the quality and character of the underlying mortgage loans and the underwriting standards used to underwrite the mortgage loans. While these disclosures and representations do not entirely remove the risk of delinquency and/or charge-off, they are intended to assure the financial guaranty insurer that risks are known to the insurer and that the financial guaranty insurer does not face additional, hidden risks.

22.    A sponsor's disclosures and representations in a residential mortgage-backed securitization are extremely important because of the sponsor's unique and special knowledge and expertise regarding the underwriting of mortgage loans. The sponsor's disclosures and representations regarding the quality and character of the mortgages included in the mortgage loan portfolios and the underwriting standards used to underwrite the mortgage loans are necessary because it is neither practical nor feasible for the financial guaranty insurer to review the many thousands of mortgage loans in the loan portfolios. Individual loan files are typically voluminous, containing mortgage applications, credit reports, income and employment verifications, the lender's internal documentation and many other forms of documentation necessary to support underwriting decisions. In addition, sponsors typically require a bid from a

financial guaranty insurer within a few days of the sponsor's initial solicitation, and the securitization's closing date is often only a few weeks later.

          23.     Because the review of all the loan files underlying a securitization is impractical and infeasible, a sponsor instead will provide to the financial guaranty insurer and the rating agencies, among others, schedules and data tapes that set forth general financial characteristics of the mortgage loans that will be transferred by the sponsor to the securitization trust.  The rating agencies rely upon the data contained in the schedules and data tapes to create expected loan level default and loss assumptions.  The loan level default and loss assumptions are then used to create cash flow projections – that is, estimates of potential losses – for the securitizations.    The rating agencies then provide shadow ratings for the securitization transactions, which shadow ratings are based on the expected losses for the proposed securitization structure.  A financial guaranty insurer must rely on the sponsor's representations and data with respect to the quality of the mortgage loan portfolio underlying the securitizations as well as the integrity of the sponsor's underwriting policies and practices.  Further, the financial guaranty insurer must also rely on the shadow ratings provided by the ratings agencies, which are based on the same representations, warranties and data provided to the financial guaranty insurer.  In addition, it is infeasible and impractical for a financial guaranty insurer to confirm based on schedules or data tapes whether a sponsor has underwritten the mortgage loans in compliance with its underwriting criteria.  The sponsor's unique and special knowledge, and expertise regarding its underwriting practices, cannot be duplicated by the financial guaranty insurer, especially given the short timeframe in which the financial guaranty insurer is required to make an underwriting decision.

### C.    MBIA's Special Relationship Of Trust And Confidence With RFC

24.    MBIA provided financial guaranty insurance policies for certain securitization transactions sponsored by RFC and its affiliates during 2003 and 2004. In late 2005 and early 2006, MBIA and RFC engaged in discussions about furthering their relationship and developing a program pursuant to which MBIA could issue financial guaranty insurance policies for securitization transactions sponsored by RFC. Because a financial guaranty insurer – like MBIA – is reliant on the integrity and veracity of the sponsor of a mortgage-backed securitization – like RFC – MBIA must trust and have confidence in the sponsor as part of its determination whether to issue a financial guaranty insurance policy for an individual securitization transaction. To further this relationship of trust and confidence with RFC, MBIA undertook a due diligence review of RFC, which included a credit and financial analysis of RFC and its affiliates.

25.    In August 2005, MBIA visited RFC's offices in Minnesota to inspect RFC's operations and to discuss the development of a program pursuant to which MBIA could compete to issue financial guaranty insurance policies for securitization transactions sponsored by RFC. In June 2006, RFC sent MBIA financial statements for RFC, its affiliate, GMAC Mortgage, LLC ("GMAC Mortgage"), and its parent company, ResCap.

26.    MBIA used this and other information provided by RFC to analyze the credit profiles and financial stability of RFC, its parent companies, including ResCap, and its affiliates. MBIA also analyzed the historical performance of securitizations sponsored by RFC and GMAC Mortgage, and evaluated RFC's corporate history, market share, management team, underwriting standards and servicing platform. In addition to publicly available information, MBIA relied on information provided by RFC to conduct its due diligence review and to analyze

whether to further a relationship of trust and confidence with RFC in respect of a program to provide financial guaranty insurance for RFC's securitization transactions.

27.    On or about June 30, 2006, MBIA's Executive Credit Committee ("ECC") approved a program pursuant to which MBIA furthered its special relationship of trust and confidence with RFC. In that regard, the ECC authorized MBIA's underwriters to incur up to $8.5 billion of gross exposure to RFC and GMAC Mortgage, with the proviso that each proposed securitization transaction be reviewed and approved in accordance with MBIA's underwriting policies and procedures. The ECC delegated authority to review and approve individual securitization transactions to MBIA's Underwriting Committee. The ECC's approval of this program and its delegation of authority to the Underwriting Committee was based on MBIA's trust and confidence in RFC, which resulted from MBIA's discussions with and analysis of RFC during 2005 and early 2006.

28.    Approximately two weeks after the ECC approved this program, RFC solicited MBIA to bid on the first of the five securitization transactions that are the subject of this action. The program was ultimately extended though June 30, 2007. The last of the securitization transactions at issue here closed on May 30, 2007.

### D.    The RFC Transactions

29.    Starting in approximately July 2006 and pursuant to MBIA's Exposure Plan, RFC solicited MBIA to provide financial guaranty insurance policies for five securitizations sponsored by RFC: Home Equity Loan Trust 2006-HSA4 ("2006-HSA4"), Home Equity Loan Trust 2006-HSA5 ("2006-HSA5"), Home Equity Loan Trust 2007-HSA1 ("2007-HSA1"), Home Equity Loan Trust 2007-HSA2 ("2007-HSA2") and Home Equity Loan Trust 2007-HSA3 ("2007-HSA3" and, collectively with 2006-HSA4, 2006-HSA5, 2007-HSA1 and 2007-HSA2, the "RFC Transactions").

30.      2006-HSA4 is a securitization that was issued on or about July 28, 2006. The 2006-HSA4 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans. Approximately 99.05% of the Home Equity Loans in the 2006-HSA4 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.95% of the Home Equity Loans secured by first liens.  As of July 1, 2006 (the "2006-HSA4 Cut-off Date"), the mortgage loan pool for 2006-HSA4 contained 8,954 Home Equity Loans with an approximate initial principal mortgage loan balance of $402,118,000 as of the 2006-HSA4 Cut-off Date.  The weighted average amount of Utilization of the Home Equity Loans as of the 2006-HSA4 Cut-off Date was 77.89% of the available credit limit.

31.      2006-HSA5 is a securitization that was issued on or about September 28, 2006.  The 2006-HSA5 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans.  Approximately 99.2% of the Home Equity Loans in the 2006-HSA5 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.80% of the Home Equity Loans secured by first liens.  As of September 1, 2006 (the "2006-HSA5 Cut-off Date"), the mortgage loan pool for 2006-HSA5 contained 5,124 Home Equity Loans with an approximate initial principal mortgage loan balance of $295,648,000 as of the 2006-HSA5 Cut-off Date.  The weighted average amount of Utilization of the Home Equity Loans as of the 2006-HSA5 Cut-off Date was 87.98% of the available credit limit.

32.      2007-HSA1 is a securitization that was issued on or about February 27, 2007.  The 2007-HSA1 mortgage loan pool consists of adjustable rate, revolving Home Equity Loans.  Approximately 98.3% of the home equity loans in the 2007-HSA1 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 1.7% of the Home Equity Loans secured by first liens.  As of February 1, 2007 (the "2007-HSA1 Cut-off Date"), the mortgage loan pool for 2007-HSA1 contained 9,484 Home

Equity Loans with an approximate initial mortgage loan principal balance of $546,774,000 as of the 2007-HSA1 Cut-off Date.  The weighted average amount of Utilization of the Home Equity Loans as of the 2007-HSA1 Cut-off Date was 85.84% of the available credit limit.

33.    2007-HSA2 is a securitization that was issued on or about April 27, 2007. The 2007-HSA2 mortgage loan pool consists of fixed rate Closed-End Mortgage Loans. Approximately 99.84% of the Closed-End Mortgage Loans in the 2007-HSA2 mortgage loan pool are secured by second liens on one- to four- family residential properties with the remaining approximately 0.16% of the Closed-End Mortgage Loans secured by first liens.  As of April 1, 2007 (the "2007-HSA2 Cut-off Date"), the mortgage loan pool for 2007-HSA2 contained 24,092 Closed-End Mortgage Loans with an approximate initial mortgage loan principal balance of $1,300,997,943 as of the 2007-HSA2 Cut-off Date.

34.    2007-HSA3 is a securitization that was issued on or about May 30, 2007. The 2007-HSA3 mortgage loan pool contains two mortgage loan groups.  One loan group ("2007-HSA3 Loan Group 1") contains 11,268 fixed rate Closed-End Mortgage Loans with an aggregate initial mortgage loan principal balance of $590,465,000 as of May 1, 2007 (the "2007-HSA3 Cut-off Date").  The other loan group ("2007-HSA3 Loan Group 2") contains 4,146 adjustable rate, revolving Home Equity Loans with an aggregate initial mortgage loan principal balance of $239,848,476 as of the 2007-HSA3 Cut-off Date.  Approximately 99.87% of the 2007-HSA3 Loan Group 1 loans and 99.26% of the 2007-HSA3 Loan Group 2 loans are secured by second liens on one- to four- family residential properties with the remaining approximately 0.13% and 0.74% of the respective group mortgage loans secured by first liens.  As of the 2007-HSA3 Cut-off Date, the weighted average amount of Utilization of the Home Equity Loans in 2007-HSA3 Loan Group 2 was 86.0% of the available credit limit.

35.     RFC is the seller for the RFC Transactions.   RFC was also the master servicer for the RFC Transactions and outsourced certain of its servicing functions to affiliated entities, which acted as subservicers.   On November 2, 2009, RFC voluntarily relinquished its rights and responsibilities as master servicer and allowed MBIA to appoint a new master servicer.   As such, neither RFC nor its subservicer affiliates were involved with the servicing of the mortgage loans after November 2, 2009.

### E.     RFC's Representations And Warranties

36.     In connection with each RFC Transaction, MBIA and RFC entered into an Insurance Agreement pursuant to which MBIA issued a Policy for the RFC Transactions.   The Policies increased the marketability of the securities by mitigating the risk to potential investors of any shortfalls in anticipated cash flows, which allowed for better pricing of the securities for RFC.   These Insurance Agreements are: (1) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2006-HSA4 and Residential Funding Mortgage Securities II, Inc. ("RFMS II"), dated July 28, 2006 (the "2006-HSA4 Insurance Agreement"); (2) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2006-HSA5 and RFMS II, dated September 28, 2006 (the "2006-HSA5 Insurance Agreement"); (3) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2007-HSA1 and RFMS II, dated February 27, 2007 (the "2007-HSA1 Insurance Agreement"); (4) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2007-HSA2 and RFMS II, dated April 27, 2007 (the "2007-HSA2 Insurance Agreement"); and (5) an Insurance Agreement among MBIA, RFC, Home Equity Loan Trust 2007-HSA3 and RFMS II, dated May 30, 2007 (the "2007-HSA3 Insurance Agreement" and, collectively with the foregoing, the "Insurance Agreements").

37.     RFC made numerous representations and warranties to MBIA in connection with each Insurance Agreement.   RFC further made numerous representations and

warranties to the rating agencies that contributed to the issuance of incorrect shadow ratings by the rating agencies. These representations and warranties, as well as the shadow ratings, were a material inducement to MBIA to enter into the Policies.

38.     Specifically, each Insurance Agreement incorporated by reference, for the benefit of MBIA, the representations and warranties contained in the respective "Transaction Documents," as that term was defined in the Insurance Agreements. The incorporation by reference of the Transaction Documents into the Insurance Agreements was intended to allow MBIA to itself rely upon any representation and warranty that RFC made to any other entities, such as investors, in connection with each of the RFC Transactions. For 2006-HSA4, 2006-HSA5, 2007-HSA1 and 2007-HSA3, the "Transaction Documents" included, among others, the purchase agreements that set forth the terms of the sale of the mortgage loans to the relevant trust in connection with the respective transaction (the "Purchase Agreements"); the servicing agreements that set forth the terms for servicing the mortgage loans in connection with the respective transaction (the "Servicing Agreements"); and offering materials provided to potential investors and filed with the SEC in connection with the respective transaction (the "Offering Documents"). For 2007-HSA2, the "Transaction Documents" included the assignment agreement ("2007-HSA2 Assignment Agreement"), which set forth the terms of the assignment of the mortgage loans to the 2007-HSA2 Trust, the pooling and servicing agreement ("2007-HSA2 PSA"), which set forth the terms for servicing the mortgage loans for 2007-HSA2, and the Offering Documents, among others. MBIA is an express third-party beneficiary of the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA.

39.     RFC also separately represented and warranted in the Insurance Agreements that "[t]he Offering Documents did not, as of the Closing Date, contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading." Further, RFC represented that "[n]either the Transaction Documents . . . nor other material information relating to the [mortgage loans] . . . furnished to the Insurer by the Issuer in writing or in electronic form contains any statement of a material fact by the Issuer which was untrue or misleading in any material respect when made."  Moreover, RFC represented and warranted that its financial statements were "complete and correct in all material respects, [] present fairly the financial condition and results of operations of RFC as of the dates and for the periods indicated and [] have been prepared in accordance with generally accepted accounting principles consistently applied . . . ."

40.    By incorporating in the Insurance Agreements the representations and warranties in the Transaction Documents, RFC incorporated the following general representations and warranties regarding the underwriting of the mortgage loans contributed to the RFC Transactions, which were stated in the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA, for the benefit of MBIA:

> **Compliance With Underwriting Guidelines:** All of the mortgage loans were underwritten in substantial compliance with the criteria set forth in the relevant program guide (the "Underwriting Guidelines").
>
> **Accurate Loan Information:** Certain information about the Home Equity Loans or the Closed-End Mortgage Loans was true and correct in all material respects when the information was furnished by RFC to MBIA and others.
>
> **CLTV Ratio:** As of the Cut-off Dates, the combined loan-to-value ratio of each Home Equity Loan or Closed-End Mortgage Loan was not in excess of 100%.

**Proper Documentation:** Except for a few specifically identified instances, each Home Equity Loan file or Closed-End Mortgage Loan file was complete, and all of the required documents and instruments were contained therein.

**Compliance With Applicable Laws:** The loan agreements and mortgage notes underlying the RFC Transactions complied, when made, in all material respects with local, state and federal laws, including anti-predatory lending laws.

**No High Cost Or Covered Loans:** None of the Home Equity Loans or Closed-End Mortgage Loans were loans that, under applicable state or local law in effect at the time of origination of such loans, were referred to as (1) 'high cost' or 'covered' loans or (2) any other similar designation if the law imposes greater restriction or additional legal liability for residential mortgage loans with high interest rates, points and/or fees.

**No Material Breach Or Default:** There was no material default, breach, violation or event of acceleration existing under the terms of any Mortgage Note or Mortgage and no event which, with notice and expiration of any grace or cure period, would constitute a material default, breach, violation or event of acceleration under the terms of any Mortgage Note or Mortgage, and no such material default, breach, violation or event of acceleration has been waived by the Seller or by any other entity involved in originating or servicing a mortgage loan.

These representations and warranties, among others, set forth the standards governing each mortgage loan contributed to the RFC Transactions, including, significantly, the standard that each mortgage loan had been underwritten in substantial compliance with RFC's Underwriting Guidelines.

41.    RFC's Underwriting Guidelines specified criteria that the mortgage loans must meet depending upon the individual loan program and circumstances of each mortgage loan.  In general, the Underwriting Guidelines stipulated what documentation was required to be included in the mortgage loan files for each loan product (which may include, depending upon the loan product, verifications of income, assets, closing funds and payment histories, among others) and criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-

to-value ("CLTV") ratios.   The Underwriting Guidelines provided, for example, that for a borrower under a home equity loan program for a primary residence who applies for a loan based on the borrower's declaration of his or her income (a "stated income" loan) and has a Fair, Isaac & Co. ("FICO") credit score of 630, the maximum acceptable DTI would be 45%, the maximum CLTV would be 80%, the maximum loan amount would be $150,000 and a full appraisal of the property would be required.

42.    An important variable affecting the applicable criteria for evaluating a loan under the Underwriting Guidelines was the level of documentation of a borrower's income. Under RFC's Underwriting Guidelines, a borrower could apply for a loan by providing "full documentation" or could apply through other reduced documentation programs such as "lite doc," "stated income," or "no doc" programs, among others.   The principal difference with respect to these RFC loan programs was that for loan programs other than "full documentation," RFC would not undertake to independently verify a borrower's income, if required to be stated. However, despite differing levels of necessary verification, RFC's Underwriting Guidelines required that for all the loan programs, borrowers must have a history of receiving stable income from employment or other sources and a reasonable expectation that the income will continue for the foreseeable future.   Moreover, if a borrower stated his or her income, even if RFC was not required to verify the income, RFC was required to determine that a borrower's stated income was at least reasonable for the borrower's type of employment, line of work and assets.   In fact, for stated income loan programs, RFC's Underwriting Guidelines clearly state that "[e]mployment stability is a critical component in evaluating the Borrower's continuing ability to meet obligations" and that "[o]ther factors in the [loan] file, including but not limited to Borrowers employment and position disclosed, geographical location, assets, and liabilities must demonstrate the reasonableness of the income stated."

-17-

43.    In addition to giving representations and warranties, RFC also provided information to MBIA with respect to the mortgage loans contributed to the RFC Transactions. This information included data tapes and schedules incorporated in the Offering Documents that contained representations regarding CLTV, DTI and FICO score statistics for mortgage loans for each RFC Transaction.    RFC also conveyed information to MBIA during MBIA's discussions with RFC regarding the issuance of Policies for the RFC Transactions.

44.    Because it was impractical and infeasible for MBIA to review the almost 60,000 mortgage loans contributed to the RFC Transactions, MBIA, like all financial guaranty insurers, required these representations and warranties from RFC to ensure that risks in the RFC Transactions were known and fully disclosed to MBIA and that MBIA would not face additional risks hidden in the mortgage loan pools by RFC.    MBIA relied on RFC's representations and warranties and on RFC's unique and special knowledge and expertise regarding the mortgage loans in making its decisions to issue the Policies for the RFC Transactions.

45.    RFC provided information to the rating agencies with respect to the mortgage loans contributed to the RFC Transactions.    The rating agencies relied on this information to issue shadow ratings for the RFC Transactions.    MBIA also relied on the shadow rating in making its decisions to issue the Policies for the RFC Transactions.

46.    RFC further covenanted, represented and warranted that it would service the mortgage loans in each of the RFC Transactions in a manner consistent with its servicing guidelines and the Servicing Agreements and would employ, in its good faith business judgment, all its "normal and usual" procedures in servicing the mortgage loans.    In return, RFC collected a servicing fee equal to 0.50% per annum of the outstanding principal balance of each serviced loan, payable monthly.    In addition, RFC, as the master servicer for all of the RFC Transactions, took as its master servicing fee either a percentage of the principal balance of the underlying

mortgage loans or the interest from certain accounts created in connection with the transaction, depending on the specific structure of the individual RFC Transaction.  As of November 2, 2009, RFC had collected approximately $32 million in servicing and master servicing fees in connection with the RFC Transactions.

F.    **RFC's Pervasive Breaches Of Its Representations And Warranties**

47.    The RFC Transactions have performed poorly.  Delinquencies and defaults for mortgage loans in the RFC Transactions have been substantial, diminishing cash flow to the trusts, which has required and will continue to require MBIA to satisfy its obligations under the Insurance Agreements and the Policies by making payments to cover these shortfalls. As of December 2009, MBIA has paid approximately $871 million in claims in connection with the RFC Transactions.

48.    In January 2008, MBIA became concerned about the high delinquencies and default rates in the RFC Transactions.  Accordingly, MBIA requested that RFC provide MBIA and its representatives and agents access to certain documents with respect to the mortgage loans underlying the RFC Transactions.  Specifically, MBIA requested access to all relevant documentation concerning the mortgage loans that were delinquent as of December 31, 2007, that is, those mortgage loans that became delinquent less than 18 months after the closing dates of the RFC Transactions.  Pursuant to the Servicing Agreements and the Insurance Agreements, MBIA is entitled to reasonable access to the documentation regarding the mortgage loans.

49.    In May 2008, MBIA requested access to additional mortgage loans for the RFC Transactions pursuant to the Servicing Agreements and the Insurance Agreements.  RFC consistently thwarted MBIA's good faith efforts to obtain information regarding these additional mortgage loans by arbitrarily and unreasonably limiting the number of days that RFC would

permit MBIA to review the additional mortgage loan files in RFC's possession, by arbitrarily and unreasonably limiting the space available to MBIA's personnel for review of the additional mortgage loan files and by arbitrarily and unreasonably limiting the number of MBIA personnel allowed to review the additional mortgage loan files, among other actions.  RFC established these arbitrary and unreasonable limitations in direct breach of its contractual obligations to provide MBIA with reasonable access to mortgage loan files.  Many of the loan files provided by RFC were incomplete, in direct breach of RFC's representation and warranty that the mortgage loan files were complete, thus forcing MBIA to make supplemental requests to RFC regarding the same loan files.  Further, despite MBIA's request, RFC arbitrarily and unnecessarily objected to providing MBIA with documents or information reflecting RFC's decisions or actions with respect to the servicing of delinquent or charged-off mortgage loans.

50.    MBIA ultimately obtained access to 7,913 mortgage loans that became delinquent before November 30, 2008, which MBIA reviewed for compliance with RFC's representations and warranties to MBIA.  Of these 7,913 mortgage loans, at least 7,019 – more than 88% of the mortgage loans that MBIA reviewed – were not originated or acquired in material compliance with RFC's representations and warranties.

51.    As of December 25, 2009, a total of 21,237 mortgage loans, representing a staggering 34% of the mortgage loans underlying the RFC Transactions, had been charged-off or were delinquent.

52.    MBIA's review uncovered that a significant percentage of the delinquent mortgage loans were in breach of one or more of RFC's representations and warranties with respect to the underwriting of the mortgage loans contributed to the RFC Transactions.  The following examples are illustrative of the substantial number of mortgage loans in the RFC

Transactions and their non-compliance with RFC's representations and warranties in connection with the RFC Transactions:

a. On March 8, 2006, a loan with a principal balance of $55,000 was made to a borrower in Perris, California on a property with an original appraisal value of $225,000 and a senior loan balance of $440,000. The borrower stated his income to be $9,800 per month ($117,800 per year) as a dispatcher at a freight company. Further, the borrower could only demonstrate $22,270.80 in liquid assets, the majority of which was in a 401K retirement account. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. In that regard, the borrower's credit profile indicated a prior bankruptcy filing, an existing loan against the borrower's 401K retirement account and an automobile repossession. (Loan # 10570977 – 2006-HSA4)

b. On November 30, 2006, a loan with a principal balance of $140,000 was made to a borrower in Newton, Massachusetts on a property with an original appraisal value of $740,000 and a senior loan balance of $513,567. The property subject to the loan was a non-owner occupied investment property. The borrower stated his income to be $41,666 per month ($500,000 per year) as the owner of a Wine/Spirits store. Further, the borrower did not demonstrate any liquid assets. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2007 in connection with which the borrower claimed to have earned $0.00 for 2006. Further, the appraisal indicated the property failed to conform to legal standards and the loan file lacked any letter from the local authority regarding rebuilding. RFC Underwriting Guidelines require verification of 6 months of reserves for the monthly Principle, Interest, Taxes and Insurance ("PITI") payments for stated income loans on non-owner occupied investment properties yet there is no indication in the loan files that these reserves were identified or verified. Finally, RFC guidelines limit loans under the non-owner occupied loan program to $100,000, $40,000 less than was loaned. (Loan # 11169067 – 2007-HSA2).

c. On June 9, 2006, a loan with a principal balance of $132,000 was made to a borrower in Agoura Hills, California on a property with an original appraisal value of $660,000 and a senior loan balance of $528,000. This loan was originated as a loan for an owner-occupied property. The borrower owned his prior residence for

only three months, for which he provided a two month payment history. RFC's Underwriting Guidelines, however, require documentation of a minimum of one year mortgage or rental history, and no such documentation is included in the loan file. Moreover, the final loan application states monthly income of $21,700, and the initial application states rental income of $6,750. However, the underwriting transmittal states income of $14,500, and the final loan application states rental income of $3,000. Based on these lower values, the DTI for loan is 67.37% and exceeds the maximum DTI of 50% under RFC's Underwriting Guidelines. Notably, the borrower could only demonstrate $34,469.41 in liquid assets. (Loan # 10776379 – 2006-HSA5).

d.      On March 16, 2007, a loan with a principal balance of $40,000 was made to a borrower in Bradenton, Florida on a property with an original appraisal value of $440,000 and a senior loan balance of $328,000. The borrower is retired and receives a fixed income that was stated as $6,450 per month. The borrower's FICO credit score of 688 required the DTI for the loan not to exceed 45%, however, the borrower's DTI was 55.93%. Because the borrower receives a fixed income, the borrower does not meet the residual income requirements for a higher DTI under RFC's Underwriting Guidelines. Further, the loan file lacks any evidence of 2 months of PITI reserves as required by RFC's Underwriting Guidelines. (Loan # 11434381 – 2007-HSA3).

e.      On July 24, 2006, a loan with a principal balance of $29,500 was made to a borrower in Flint, Michigan on a property with an original appraisal value of $57,497 and a senior loan balance of $24,676. The borrower stated income of $3,700 per month and had a FICO score of 650. The CLTV for the mortgage loan was 94.2%. Pursuant to RFC's Underwriting Guidelines, the borrower was required to have monthly income of $4,000 and the CLTV for the loan could not exceed 80%. Further, the loan file lacks evidence of a full appraisal for the property as well as evidence of 2 months of PITI reserves, both of which are required by RFC's Underwriting Guidelines. (Loan # 11147061 – 2007-HSA1).

f.      On November 12, 2006, a loan with a principal balance of $135,000.00 was made to a borrower in Scottsdale, Arizona on a property with an original appraisal value of $540,000.00 and a senior loan balance of $405,000.00. The borrower stated income of $11,000 per month as a sales manager at a concrete company, however, the borrower could only demonstrate assets of $11,491. The stated income was unreasonable based on the borrower's employment and not substantiated by the borrower's credit/asset profile. Notably, the borrower filed for bankruptcy in 2008 in

connection with which the borrower claimed to have actually earned $43,523 for 2006 and $20,401 for 2007. Additionally, the bank account used to verify the borrower's reserves is actually held in the name of the loan officer that issued the loan. (Loan # 11165457 – 2007-HSA3).

53.     The mortgage loans identified above – examples of a much larger universe of non-compliant mortgage loans – all fail to comply with the general representations and warranties regarding the underwriting of the mortgage loans contributed to the RFC Transactions, which were stated in the Purchase Agreements, the Servicing Agreements, the 2007-HSA2 Assignment Agreement and the 2007-HSA2 PSA, for the benefit of MBIA and identified in paragraph 40, *supra*.   These mortgage loans are illustrative of the pervasive breaches of RFC's representations to MBIA throughout the portfolios for the RFC Transactions. In that regard:

a.      RFC breached its representation and warranty that the mortgage loans were underwritten in substantial compliance with RFC's Underwriting Guidelines. A significant number of mortgage loans have DTI ratios far in excess of RFC's Underwriting Guidelines, have CLTV ratios far in excess of RFC's Underwriting Guidelines and were made on the basis of "stated incomes" that were grossly unreasonable. In certain circumstances, CLTV ratios not only exceeded the permissible ratio pursuant to RFC's Underwriting Guidelines, but they even exceeded 100%, in breach of RFC's explicit representation and warranty in the Purchase Agreements and the 2007-HSA2 Assignment Agreement that the CLTV ratio for each of the mortgage loans was not in excess of 100%. Moreover, contrary to RFC's Underwriting Guidelines, RFC failed, with respect to a significant number of mortgage loans, to verify employment for mortgage loan borrowers where required to do so, failed to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with credit scores that are ineligible under the Underwriting Guidelines and closed mortgage loans without verifying that the borrower had sufficient funds or reserves as required by the Underwriting Guidelines.

b.      RFC breached its representations and warranties that the mortgage loan files contained all necessary documents and complied with applicable law. Numerous mortgage loan files are missing

necessary mortgage loan documents and are missing certain disclosures, such as disclosures relating to loan transfers, which are necessary under applicable law. The absence of these documents from the loan files may greatly impede the ability of the trustees for the respective RFC Transactions to enforce their rights and remedies with respect to delinquent mortgages.

c.   RFC breached its representation and warranty that the RFC Transactions would not contain high cost loans. In fact, RFC even contributed mortgage loans to the mortgage loan pools that violated either, or both, the federal Home Ownership and Equity Protection Act ("HOEPA") and state predatory lending laws. These laws are designed to protect borrowers from abusive lending practices. Among other violations of these laws, the mortgage loan pools include mortgage loans for which the finance charges were materially understated, the annual percentage rate ("APR") was materially understated or exceeded the maximum cap and high cost thresholds were exceeded. Notably, it is standard in the mortgage loan industry to test for HOEPA compliance by means of a simple mathematical calculation. RFC's failure to identify HOEPA violations indicates that RFC failed to perform the calculation, incompetently performed the calculation or performed the calculation but purposely ignored the result.

54.   RFC also breached its representation and warranty in the Insurance Agreements that "[t]he Offering Documents did not, as of the Closing Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in the light of the circumstances under which they were made, not misleading." In the Offering Documents, RFC made a number of untrue statements of material fact, including that the mortgage loans contributed to the RFC Transactions were underwritten in compliance with RFC's Underwriting Guidelines, that the mortgage loans complied with local, state and federal laws and that the RFC Transactions did not contain high cost loans. These statements are materially false because a significant number of mortgage loans have DTI or CLTV ratios far in excess of RFC's Underwriting Guidelines, were made on the basis of "stated incomes" that were unreasonable or were originated in violation of federal and state predatory lending laws.

55.     Moreover, the information RFC provided MBIA in the data tapes and the schedules included in the prospectus was materially false and misleading.  RFC provided MBIA data tapes regarding each of the RFC Transactions on numerous occasions.  Specifically:

a.     On July 12, 2006, Lonnie Proechel of RFC sent a data tape to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2006-HSA4 that included materially false and misleading information regarding the mortgage loans contributed to the 2006-HSA4 mortgage loan pool.

b.     On August 1, 2006, Lonnie Proechel of RFC sent a data tape to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2006-HSA5 that included materially false and misleading information regarding the mortgage loans contributed to the 2006-HSA5 mortgage loan pool.

c.     On January 30, 2007, Jesse J. Roth of RFC sent a data tape to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2007-HSA1 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA1 mortgage loan pool.

d.     On March 1, 2007, Joseph Orning of RFC sent a preliminary data tape to MBIA by e-mail with respect to mortgage loans to be included in the mortgage loan pool for 2007-HSA2 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA2 mortgage loan pool. This preliminary data tape was supplemented with additional data tapes sent by Lonnie Prochel of RFC to MBIA by e-mail on April 4, 2007 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA2 mortgage loan pool.

e.     On May 8, 2007, Jeffrey Blaschko of RFC sent data tapes to MBIA by e-mail with respect to mortgage loans included in the mortgage loan pool for 2007-HSA3 that included materially false and misleading information regarding the mortgage loans contributed to the 2007-HSA3 mortgage loan pool.

56.     These data tapes and schedules indicated characteristics of the mortgage loans sold to the RFC Transactions; however, the data on these data tapes was materially false and misleading as a result of RFC's breaches of its representations and warranties.  For example,

mortgage loan statistics such as DTI and CLTV were materially understated as a result of RFC's failure to underwrite the mortgage loans in compliance with its Underwriting Guidelines. Further, there was no way for MBIA to confirm based on schedules or data tapes whether RFC had underwritten the mortgage loans in compliance with its underwriting criteria. MBIA did not have the special and unique knowledge and expertise that RFC had regarding the mortgage loans.

57.    RFC's breaches of its representations and warranties establish that the information conveyed to MBIA, including the schedules in the Offering Documents containing DTI and CLTV statistics for the mortgage loan pools, as well as specific loan information provided to MBIA by RFC, was materially false. Notably, the DTI and CLTV statistics for the mortgage loan pools contained in the Offering Documents are based on "stated incomes" and appraisals that are grossly inflated and unreasonable.    Further, RFC's breaches of its representations and warranties establish that the information conveyed to the rating agencies was materially false, causing the rating agencies to issue incorrect shadow ratings for the RFC Transactions.

58.    RFC has admitted to MBIA that it was aware that mortgage loans contributed to the mortgage loan pools for the RFC Transactions failed to comply with RFC's Underwriting Guidelines and, thus, were in breach of RFC's contractual representations and warranties. In that regard, RFC underwrote or purchased a significant number of non-compliant mortgage loans by purporting to grant "exceptions" to RFC's Underwriting Guidelines. The Underwriting Guidelines, however, only allowed RFC to make such exceptions in specifically defined and limited circumstances. For example, the Underwriting Guidelines state that certain loans with a DTI exceeding the standards for its individual loan program "may be eligible for purchase as an exception under a non-standard Loan Program or will be slotted to a Loan

Program that accepts higher DTIs regardless of credit grade." Further, RFC's Underwriting Guidelines required that a form – Form 1600 – be completed and approved for any exceptions made to the Underwriting Guidelines in connection with the underwriting or purchase of a mortgage loan.

59.     For a significant number of non-compliant mortgage loans, RFC did not identify any specifically defined exception that was permitted under the Underwriting Guidelines. Further, for a significant number of mortgage loans, RFC failed to document the alleged exceptions on a Form 1600, as required by the Underwriting Guidelines. Instead, RFC engaged extensively in three improper underwriting practices that were not permitted under the Underwriting Guidelines. As a result of these practices, RFC deliberately contributed a significant number of non-compliant mortgage loans to the RFC Transactions.

60.     The first improper practice engaged in by RFC was called a "negotiated commitment." In a "negotiated commitment," RFC prospectively entered into an agreement with a loan originator whereby RFC agreed that the loan originator could in the future originate mortgage loans that failed to comply with RFC's Underwriting Guidelines and that RFC would still purchase these mortgage loans, notwithstanding the fact that RFC understood that these mortgage loans would not comply with RFC's Underwriting Guidelines.

61.     Even though RFC knew that mortgage loans acquired from the loan originators through the "negotiated commitments" did not comply with RFC's Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with RFC's Underwriting Guidelines. Further, RFC wrongfully attempted to justify its conduct by claiming that mortgage loans purchased in connection with "negotiated commitments" were excepted from the Underwriting Guidelines.

To the contrary, the Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitting RFC to make exceptions to the Underwriting Guidelines on the basis of "negotiated commitments."

62.    The second improper practice engaged in by RFC was called a "bulk purchase program."  In a "bulk purchase program," RFC entered into a transaction with a loan seller – that is, an entity that owned mortgage loans – whereby RFC agreed to purchase a bulk amount of mortgage loans that had already been originated and were owned by that loan seller. In connection with these "bulk purchases," RFC did not undertake to "re-underwrite" or confirm that the mortgage loans being acquired complied with RFC's Underwriting Guidelines.  Instead, RFC agreed with the loan seller that RFC would acquire mortgage loans from that loan seller regardless of whether the mortgage loans complied with RFC's Underwriting Guidelines.  In many instances, the mortgage loans, in fact, did not comply with RFC's Underwriting Guidelines.

63.    Notwithstanding that RFC knew that mortgage loans acquired through the "bulk purchase programs" did not comply with RFC's Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans, in fact, were underwritten in substantial compliance with RFC's Underwriting Guidelines.  Further, RFC wrongfully attempted to justify its conduct by claiming that mortgage loans purchased in connection with "bulk purchase programs" are excepted from the Underwriting Guidelines.  The Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitting RFC to make exceptions on this basis.

64.    RFC also underwrote or purchased mortgage loans that failed to comply with the Underwriting Guidelines but were approved for purchase by RFC's proprietary automated electronic loan underwriting program known as "Assetwise."  Assetwise was used by loan originators as a tool to assist in the underwriting of mortgage loans that would be acceptable to RFC.  Assetwise is a software program in which a loan originator inputs certain characteristics of a proposed mortgage loan.  The program then permits the user to determine whether the loan meets the pre-specified underwriting criteria that are set up in the program.  MBIA understood, based on the Underwriting Guidelines, that Assetwise was programmed so that the characteristics of proposed mortgage loans would be analyzed to determine whether they complied with the Underwriting Guidelines.

65.    RFC used Assetwise to originate mortgage loans through its affiliates.  RFC also made Assetwise available to unaffiliated loan originators, which would sell the mortgage loans to RFC.

66.    The Assetwise program utilized by RFC, either as an originator or as made available to unaffiliated originators, did not analyze proposed mortgage loans on the basis of the RFC Underwriting Guidelines.  Indeed, a significant number of mortgage loans originated or purchased by RFC on the basis of Assetwise did not comply with RFC's Underwriting Guidelines.

67.    Moreover, RFC's reliance on Assetwise itself was a violation of the Underwriting Guidelines.  RFC's Underwriting Guidelines expressly state that "clients who use the Assetwise electronic services are still bound by the representations and warranties as set forth in the [Underwriting Guidelines].  Additionally, use of Assetwise does not relieve Clients of loan eligibility and underwriting requirements set forth in [the Underwriting Guidelines]."  The Underwriting Guidelines further state that "[t]he loan must conform to the [Underwriting

Guidelines] and Loan eligibility requirements.  Assetwise provides program eligibility grading and slotting.   Clients are responsible to ensure the Loan conforms to [the Underwriting Guidelines]."   RFC never stated in the Underwriting Guidelines or in its representations and warranties to MBIA its intention to allow Assetwise to approve mortgage loans that failed to comply with RFC's Underwriting Guidelines.

68.    Notwithstanding that RFC knew that numerous mortgage loans underwritten by use of the Assetwise program failed to comply with the Underwriting Guidelines, RFC contributed these non-compliant mortgage loans to the mortgage loan pools underlying the RFC Transactions and falsely represented to MBIA that these mortgage loans in fact were underwritten in substantial compliance with RFC's Underwriting Guidelines.  RFC wrongfully attempted to justify its conduct by claiming that loans underwritten by use of the Assetwise program are excepted from the Underwriting Guidelines.   The Underwriting Guidelines, the Purchase Agreements, the 2007-HSA2 Assignment Agreement, the Insurance Agreements or the Offering Documents contain no provision permitted RFC to make exceptions on this basis.

69.    As a result of its "negotiated commitments," "bulk purchases" and use of Assetwise, RFC deliberately contributed a substantial and material number of loans to the RFC Transactions that failed to comply with its Underwriting Guidelines.  RFC's claim that these mortgage loans were issued through "exceptions" to the Underwriting Guidelines or "substantially" complied with the Underwriting Guidelines essentially eliminated any meaningful role that RFC's Underwriting Guidelines would serve in the mortgage loan origination and purchase process for mortgage loans contributed to the RFC Transactions.

70.    Through its egregious and pervasive breaches of its representations and warranties, including, without limitation, RFC's representation and warranty that the mortgage

loans were underwritten "in substantial compliance with [the Underwriting Guidelines]," RFC knowingly misled MBIA into issuing the Policies for the RFC Transactions without disclosing their substantial, hidden risks, thereby passing those risks to MBIA.  By misleading MBIA into issuing the Policies, RFC was able to sell mortgage loans it held at a higher price to investors in the RFC Transactions for an inflated price and to then earn fees for servicing the mortgage loans underlying the RFC Transactions.

71.     Further, through its egregious and pervasive breaches of its representations and warranties, RFC caused the rating agencies to issue incorrect shadow ratings for the RFC Transactions, on which MBIA relied.

72.     RFC's pervasive breaches of its representations and warranties materially undermine and distort the fundamental basis upon which MBIA agreed to issue the Policies.  The substantial and hidden risks present in the RFC Transactions, which were hidden by RFC's misrepresentations, have caused the mortgage loans in the RFC Transactions to become delinquent and subsequently charged-off at a severe and unexpected rate, thus causing significant shortfalls in cash flows to the trusts and, consequently, causing MBIA to incur losses in honoring its obligations under the Policies issued for the RFC Transactions.  Further, RFC's failure to minimize losses on the mortgage loans through its normal and usual mortgage loan servicing procedures has exacerbated shortfalls to the trusts for the RFC Transactions.  Consequently, MBIA has incurred, and will continue to incur, significant losses in connection with its obligations under the Policies to insure certain shortfalls in payments to investors in the RFC Transactions, all as a result of RFC's pervasive misrepresentations and misleading conduct.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (FRAUD)

73.     MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 72.

74.     In connection with MBIA's issuance of the Policies, RFC had a duty to communicate accurate and complete information to MBIA.

75.     RFC intentionally misrepresented existing material facts with respect to the RFC Transactions.

76.     RFC knew that its representations were materially false and that its false representations were essential and material to MBIA's decisions to issue the Policies in connection with the RFC Transactions.  MBIA was not aware and could not reasonably have been aware of the falsity of RFC's representations.  Accordingly, RFC acted intentionally and purposefully in making the materially false representations to MBIA with respect to the RFC Transactions.

77.     Additionally, RFC intentionally and purposely misled MBIA by making representations with respect to the underwriting of the mortgage loans that were contributed to the mortgage loan pools underlying the RFC Transactions that RFC knew were untrue.  RFC materially misrepresented to MBIA that the mortgage loans in the RFC Transactions were underwritten in substantial compliance with its Underwriting Guidelines and failed to disclose RFC's consistent violations and manipulations of its Underwriting Guidelines.  RFC falsely misled MBIA into believing that RFC's Underwriting Guidelines employed appropriate underwriting standards.

78.     To the contrary, RFC underwrote mortgage loans by intentionally and consistently issuing improper "exceptions" to its Underwriting Guidelines, including by issuing purported "exceptions" in connection with RFC's use of "negotiated commitments," "bulk purchase programs" and the use of Assetwise in blatant violation of the Underwriting Guidelines. RFC knew that the purported "exceptions" would cause the mortgage loans to fail to comply with its Underwriting Guidelines, yet knowingly contributed these non-compliant mortgage loans to the mortgage loan pools for the RFC Transactions notwithstanding their failure to comply with the Underwriting Guidelines.  RFC knowingly defrauded MBIA by representing to MBIA that the mortgage loans contributed to the RFC Transactions were underwritten in substantial compliance with the Underwriting Guidelines.

79.     As a result of its knowing misrepresentations, RFC intended to, and, in fact, did defraud MBIA into issuing the Policies for the RFC Transactions.  RFC defrauded MBIA so that it could earn both proceeds on the securitization and sale of the mortgage loans underlying the RFC Transactions and fees for servicing those loans after their securitization while passing the risks inherent in the poorly-underwritten mortgage loans to MBIA.

80.     MBIA reasonably relied to its detriment on RFC's misrepresentations. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

81.     As a direct result of, and in reliance upon, RFC's misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

82.     As a result of RFC's fraud, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

83.     A justiciable controversy exists as to (a) whether RFC fraudulently induced MBIA to issue the Policies in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## SECOND CAUSE OF ACTION

### (MATERIAL BREACH OF THE INSURANCE AGREEMENTS)

84.     MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 83.

85.     The Insurance Agreements are valid and enforceable contracts between MBIA and RFC that give rise to certain obligations on the part of RFC in connection with the mortgage loans and the RFC Transactions.  MBIA has fully complied with its obligations under the Insurance Agreements and the Policies.

86.     In the Insurance Agreements, RFC made numerous representations and warranties to MBIA, including the representation that none of the material information that RFC supplied to MBIA regarding the mortgage loans or the "operations of RFC" contained an untrue or misleading statement of material fact.  Additionally, the Insurance Agreements incorporate by reference, for the benefit of MBIA, each of RFC's representations and warranties in the Transaction Documents, including the representation that the mortgage loans that RFC contributed to the RFC Transactions were underwritten in substantial compliance with RFC's Underwriting Guidelines.

87.     These representations and warranties were material to MBIA's decisions to enter into the Insurance Agreements and to issue the Policies.  RFC's compliance with its representations and warranties was and is necessary to assure MBIA the benefit of its bargain.

88.     RFC, however, has pervasively and extensively breached its representations and warranties to MBIA.  Tens of thousands of the mortgage loans underlying

the RFC Transactions failed to comply with RFC's Underwriting Guidelines.  Moreover, a substantial number of mortgage loans breached one or more of RFC's representations and warranties to MBIA.  The non-compliant mortgage loans in the mortgage loan pools with multiple breaches of representations and warranties are so pervasive that RFC has deprived MBIA of the benefit of its bargain in connection with the Insurance Agreements and the Policies, taken as a whole.

89.      A justiciable controversy exists as to (a) whether RFC has materially breached the Insurance Agreements and (b) MBIA's entitlement to damages as a result thereof.

90.      Accordingly, MBIA seeks an award of damages, in amount to be proved at trial, for RFC's material breaches of the Insurance Agreements.

### THIRD CAUSE OF ACTION

### (BREACH OF CONTRACT: FAILURE TO COMPLY WITH AND REPUDIATION OF THE LOAN BREACH REMEDY PROCEDURE)

91.      MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 90.

92.      Pursuant to the Purchase Agreements and the 2007-HSA2 Assignment Agreement, if MBIA determines that RFC breached its representations and warranties in a manner that "materially and adversely affects the interests of [MBIA]," including, without limitation, by contributing a mortgage loan to the RFC Transactions that did not comply with RFC's representations and warranties or with RFC's Underwriting Guidelines, MBIA can give notice to RFC of the presence of the non-compliant mortgage loan, after which RFC will have 90 days to cure the breach.  Alternatively, RFC can repurchase the mortgage loan or, if substitution can be completed within two years of the closing date of the RFC Transaction in question, RFC can substitute a performing, compliant mortgage loan for the non-compliant mortgage loan (the

"Loan Breach Remedy Procedure"). The Loan Breach Remedy Procedure is not an exclusive remedy and does not apply to breaches of the Insurance Agreements.

93. The parties established the Loan Breach Remedy Procedure because they recognized the possibility that an isolated and limited number of mortgage loans, among the thousands of mortgage loans underlying the RFC Transactions, may not comply with RFC's representations and warranties or with RFC's Underwriting Guidelines. Because of this possibility with respect to an isolated and limited number of mortgage loans, the parties intended, through the Loan Breach Remedy Procedure, to establish an agreed-upon mechanism whereby MBIA could give notice to RFC of an isolated and limited number of non-compliant mortgage loans and RFC could repurchase such non-compliant mortgage loans without implicating an event of default for the RFC Transactions in their entirety.

94. On several occasions during 2008 and 2009, MBIA sent notices to RFC identifying numerous mortgage loans underlying the RFC Transactions that were in breach of one or more of RFC's representations and warranties, pursuant to Section 3.1(b) of the Purchase Agreements and Section 4 of the 2007-HSA2 Assignment Agreement, and notifying RFC that such breaches materially and adversely affected the interests of MBIA (the "Remedy Notices"). Specifically, MBIA sent the following Remedy Notices to RFC:

| Date | Transaction(s) | Number of Loans |
|---|---|---|
| May 22, 2008 | HSA4, HSA5 | 194 |
| May 22, 2008 | HSA2 | 359 |
| May 22, 2008 | HSA1, HSA3 | 139 |
| September 2, 2008 | HSA4, HSA5 | 310 |
| September 5, 2008 | HSA2 | 57 |

| September 17, 2008 | HSA1 | 293 |
| September 25, 2008 | HSA3 | 484 |
| December 30, 2008 | HSA4, HSA5 | 202 |
| December 30, 2008 | HSA1 | 246 |
| December 30, 2008 | HSA3 | 416 |
| January 22, 2009 | HSA2 | 736 |
| | **Total** | 3,436 |

95.    The mortgage loans identified in the Remedy Notices were included in the Remedy Notices because they failed to comply with one or more of RFC's representations and warranties.  For example, many of the mortgage loans were underwritten on the basis of "stated incomes" that were clearly unreasonable for the circumstances of the individual borrower or were based on DTI or CLTV ratios that exceeded the Underwriting Guidelines.  In addition, the files for the mortgage loans lacked necessary documents including mortgage notes, disclosures relating to the sale of the mortgage loan, disclosures relating to the transfer of servicing for the mortgage loan, documents confirming appropriate reserves and documents necessary for compliance with the Patriot Act.

96.    Initially, RFC participated in the Loan Breach Remedy Procedure by responding to the two Remedy Notices that MBIA sent to RFC on May 22, 2008.  While MBIA and RFC were able to reach agreements with respect to approximately 24% of the 692 mortgage loans identified in those Remedy Notices, RFC refused to cure, substitute for or repurchase the remaining non-compliant mortgage loans, as required by the Loan Breach Remedy Procedure.

97.    RFC refused to cure the material breaches for the vast majority of the non-compliant mortgage loans that MBIA identified in the Remedy Notices that MBIA sent to RFC in September 2008, and on information and belief, RFC does not intend cure any of those

breaches nor will it substitute for or repurchase any of the non-compliant mortgage loans.  In addition, RFC has completely ignored and never responded to the Remedy Notices that MBIA sent to RFC in December 2008 and January 2009, which identified more than 1,600 non-complaint mortgage loans with an unpaid principal balance of more than $106 million.  As such, RFC, by its conduct, has abandoned its contractual repurchase obligations, and such abandonment constitutes a wrongful repudiation of RFC's obligations under the Loan Breach Remedy Procedure.

98.     Moreover, the existing Remedy Notices do not identify all of the mortgage loans that fail to comply with RFC's representations and warranties.  For example, RFC obstructed MBIA's right to access certain documents and information concerning the mortgage loans.  Pursuant to the Servicing Agreements and the Insurance Agreements, MBIA is contractually entitled to such information, and RFC's refusal to provide it constitutes an independent breach of contract, which prevented MBIA from pursuing appropriate remediation efforts and damaged MBIA in an amount to be proved at trial.

99.     Moreover, additional mortgage loans continue to become delinquent and are charged-off every month.  For example, in December 2009 alone, 3,762 mortgage loans were delinquent by 60 or more days.  On information and belief, such delinquencies and charge-offs will continue through the date of trial in this action and beyond.  However, because RFC has abandoned and wrongfully repudiated the Loan Breach Remedy Procedure by its conduct, it would be futile for MBIA to generate and send additional Remedy Notices.

100.    As a result of RFC's failure to comply with its obligations under the Loan Remedy Breach Procedure with respect to the mortgage loans identified in the Remedy Notices and RFC's abandonment and wrongful repudiation of the Loan Breach Remedy Procedure in its entirety, MBIA has incurred, and will continue to incur, damages in an amount to be proved at

trial. MBIA has been, and will continue to be, required to make payments to investors as a result of shortfalls in cash flow to the trusts in the RFC Transactions. By failing to cure the defective aspects of the non-compliant mortgage loans identified in the Remedy Notices, to repurchase or substitute for those non-compliant mortgage loans and by abandoning and wrongfully repudiating its obligations under the Loan Breach Remedy Procedure, RFC has caused MBIA to incur payments for certain shortfalls in cash flows to investors when, in fact, such shortfalls should have been properly paid by RFC as a result of RFC's repurchase of or substitution for non-compliant mortgage loans.

101.    In addition, MBIA has incurred, and will continue to incur, significant fees for professional services, including attorneys' fees, to engage in, and enforce RFC's obligations under, the Loan Breach Remedy Procedure with RFC. Pursuant to Section 3.03 of the Insurance Agreements, RFC agreed to indemnify MBIA for (i) damages as a result of RFC's failure to comply with the Transaction Documents, including, without limitation, RFC's failure to comply with its obligations under the Loan Breach Remedy Procedure, with interest, and (ii) reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA reasonably incurs, in connection with the enforcement, defense or preservation of any rights in respect of any of the Transaction Documents.

102.    RFC has failed to indemnify MBIA, pursuant to Section 3.03 of the Insurance Agreements, for the damages it has incurred, and will continue to incur, as a result of RFC's failure to comply with its obligations under the Loan Breach Remedy Procedure, including interest, attorneys' and accountants' fees and costs and any other fees and expenses that MBIA reasonably has incurred and continues to incur.

103.    MBIA has fully complied with its obligations under the Transaction Documents, the Insurance Agreements and the Policies.

-39-

104.    A justiciable controversy exists as to (a) RFC's obligation to comply with the Loan Breach Remedy Procedure; (b) RFC's wrongful repudiation of the Loan Breach Remedy Procedure; and (c) MBIA's entitlement to damages as a result of RFC's breaches of its representations and warranties, RFC's failure to comply with the Loan Breach Remedy Procedure and RFC's wrongful repudiation of its obligations under the Loan Breach Remedy Procedure.  Accordingly, MBIA seeks a declaratory judgment that (a) RFC is required to comply with its obligations under the Loan Breach Remedy Procedure; (b) RFC has wrongfully repudiated its obligations under the Loan Breach Remedy Procedure; and (c) RFC is required to indemnify MBIA for any and all damages it has incurred, and that MBIA incurs, as a result of RFC's breaches of its representations and warranties, including RFC's failure to comply with and wrongful repudiation of its obligations under the Loan Breach Remedy Procedure.

## FOURTH CAUSE OF ACTION

### (BREACH OF CONTRACT – SERVICING)

105.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 104.

106.    RFC was the initial Master Servicer for the RFC Transactions.  On November 2, 2009, RFC voluntarily relinquished its rights and responsibilities under the Servicing Agreements and allowed MBIA to appoint a new Master Servicer.  As such, RFC is not presently involved with the servicing of the mortgage loans underlying the RFC Transactions.

107.    Between the closing date of each of the RFC Transactions and November 2, 2009, RFC was required to service the mortgage loans underlying the RFC Transactions in a manner consistent with RFC's servicing guidelines and the Servicing Agreements.  As Master Servicer, RFC was required to employ, in its good faith business judgment, all of its "normal and

usual" servicing procedures.  Because RFC was required to use its good faith business judgment, RFC's servicing procedures must have been prudent and must have materially complied with industry standards.  RFC also outsourced some of its servicing duties to certain of its affiliates as subservicers – namely, GMAC Mortgage and Homecomings Financial Network, Inc. (later Homecomings Financial, LLC and, collectively, "Homecomings").    As Master Servicer, however, RFC had ultimate responsibility for servicing the mortgage loans underlying the RFC Transactions.

108.    In fact, RFC's manner of servicing suffered from a number of material deficiencies and areas of serious concern that, in many instances, amounted to a breach of the Servicing Agreements and an abdication by RFC of its servicing responsibilities.  These material deficiencies included, among other things, (a) failing to contact borrowers prior to charging-off loans, (b) failing to charge-off loans that were substantially delinquent, (c) failing to initiate proper skip tracing activities, (d) failing to discuss loss mitigation with borrowers and to obtain borrower financial information to conduct a proper workout analysis, (e) failing to offer properly designed modifications to reduce re-defaults, (f) failing to provide authority to early stage collection offices to offer loss mitigation options, (g) failing to initiate and document contact with borrowers, (h) failing to conduct timely property inspections, instead relying excessively on broker price opinions, (i) failing to monitor loss mitigation deal compliance and (j) failing to properly monitor foreclosure sale activities.  In addition, RFC (a) unduly and improperly relied upon automated calling rather than establishing and maintaining human contact with borrowers, (b) serviced the loans in a low cost minimal effort manner with long periods of inaction, (c) serviced the loans in a passive manner that relied upon borrower-initiated contact rather than servicer action, and (d) experienced a significant downturn in servicing capacity and activities, especially during 2008.

109.    These numerous and material breaches of the Servicing Agreements and RFC's own servicing guidelines between RFC's appointment as Master Servicer and November 2, 2009 have both accelerated and increased MBIA's losses.  Had RFC complied with its contractual obligations and employed more rigorous servicing and remediation procedures, the payments that MBIA has been required to make pursuant to its financial guaranty insurance policies for the RFC Transactions would have been significantly smaller.  As such, MBIA has been damaged by RFC's breach of its responsibilities as Master Servicer in an amount to be determined at trial.

110.    MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the RFC Transactions.

## FIFTH CAUSE OF ACTION

### (NEGLIGENT MISREPRESENTATION)

111.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 110.

112.    In connection with MBIA's issuance of the Policies, RFC had a duty to communicate accurate and complete information to MBIA because of MBIA's special relationship of trust and confidence with RFC.

113.    MBIA had issued financial guaranty insurance policies for securitization transactions sponsored by RFC and its affiliates during 2003 and 2004.  In late 2005 and early 2006, MBIA and RFC engaged in discussions to further their relationship and develop a program pursuant to which MBIA would issue financial guaranty insurance policies for securitization transactions sponsored by RFC.  As part of these discussions, MBIA visited RFC's offices and analyzed RFC's credit profile and financial stability based on, among other things, information provided by RFC.  After performing this analysis, MBIA authorized its underwriters to incur up

to $8.5 billion of gross exposure to securitization transactions sponsored by RFC and its affiliate, GMAC Mortgage, subject to each proposed securitization transaction being reviewed and approved in accordance with MBIA's underwriting policies and procedures. MBIA's Executive Credit Committee also delegated authority to approve transactions to MBIA's Underwriting Committee based on MBIA's trust and confidence in RFC. The special relationship between MBIA and RFC predated MBIA's contractual relationship with RFC in connection with the RFC Transactions.

114.    In addition, MBIA's special relationship with RFC is demonstrated by RFC's unique and special knowledge and expertise regarding both the underwriting of mortgage loans, generally, and the underwriting of the mortgage loans in the loan pools for the RFC Transactions. While MBIA may be viewed in certain contexts as a "sophisticated" party, it is not a mortgage loan originator. Moreover, it did not originate any of the mortgage loans underlying the RFC Transactions and could not reasonably have reviewed those loans before issuing the Policies. MBIA's inability to reasonably review and underwrite the mortgage loans is demonstrated by the fact that MBIA was provided only a few days to bid on the RFC Transactions, which often closed less than a month after RFC's initial invitation to submit a bid. As such, MBIA was entirely reliant on RFC's unique and special knowledge and expertise.

115.    RFC misrepresented existing material facts with respect to the RFC Transactions.

116.    RFC possessed clear and reasonable grounds for believing or determining that its representations were materially false and should have known that its representations were materially false. Moreover, RFC knew or should have known that MBIA would rely on RFC's materially false representations. Accordingly, RFC acted negligently in making the materially

false representations to MBIA with respect to the underwriting of the mortgage loans contributed to the mortgage loan pools for the RFC Transactions.

117.    RFC knew or should have known that RFC's false representations were essential and material to MBIA's decision to issue the Policies in connection with the RFC Transactions.  MBIA was not aware and could not reasonably have been aware of the falsity of RFC's representations.

118.    MBIA reasonably relied to its detriment on RFC's misrepresentations. Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

119.    As a proximate result of its reasonable reliance on RFC's negligent misrepresentations, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

120.    As a result of RFC's negligent misrepresentations, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

121.    A justiciable controversy exists as to (a) whether RFC made negligent misrepresentations to MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## SIXTH CAUSE OF ACTION

### (BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING)
### (PRESERVED FOR APPEAL)

122.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 121.

123.     Under the Insurance Agreements, the Purchase Agreements and the 2007-HSA2 Assignment Agreement, RFC is required to comply with the covenant or duty of good faith and fair dealing that is implied in all contracts.

124.     By entering into the Insurance Agreements with MBIA, which incorporated by reference the representations and warranties stated in the Purchase Agreements and the 2007-HSA2 Assignment Agreement, RFC agreed to act in good faith with respect to its contribution of mortgage loans to the mortgage loan pools underlying the RFC Transactions.

125.     RFC breached its implied covenant or duty of good faith and fair dealing. In that regard, RFC represented and warranted to MBIA that the mortgage loans contributed to the mortgage loan pools underlying the RFC Transactions were underwritten in substantial compliance with RFC's Underwriting Guidelines, among other representations and warranties. However, RFC, in bad faith, knowingly and systematically contributed mortgage loans to the mortgage loan pools underlying the RFC Transactions that RFC knew breached one or more of RFC's representations and warranties.  RFC further breached its implied covenant or duty of good faith and fair dealing by failing to employ mortgage loan servicing procedures consistent with mortgage loan servicing industry standards, and otherwise failing to comply with its obligations, pursuant to the Transaction Documents, to service, in good faith, the mortgage loans for the RFC Transactions.

126.     RFC's breach of its implied covenant or duty of good faith and fair dealing deprived MBIA of its right to receive the full benefits of the Insurance Agreements by compelling MBIA to make payments on insurance claims that would not have arisen but for RFC's bad faith conduct.  Further, RFC, in bad faith, has denied MBIA reasonable access to information necessary to evaluate RFC's actions as servicers for the mortgage loans or to enforce MBIA's contractual rights in connection with the RFC Transactions.

127.    Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

128.    As a result of RFC's material breach of the implied covenant of good faith and fair dealing, MBIA has incurred, and will continue to incur, damages, including, without limitation, interest and reasonable attorneys' and accountants' fees and expenses.  Because MBIA would not have issued the Policies if MBIA had known the true risk profile of the loan portfolios in the RFC Transactions, RFC is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

129.    MBIA has fully complied with its obligations under the Transaction Documents and the financial guarantee insurance policies with respect to the RFC Transactions.

130.    A justiciable controversy exists as to (a) whether RFC breached the covenant or duty of good faith and fair dealing implied in the Transaction Documents in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## SEVENTH CAUSE OF ACTION

### (EQUITABLE OR IMPLIED INDEMNIFICATION)
### (PRESERVED FOR APPEAL)

131.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 130.

132.    In connection with the RFC Transactions, RFC made representations and warranties to MBIA and provided information with respect to the mortgage loans contributed to the mortgage loan pools for the RFC Transactions to MBIA.  RFC's representations and warranties were materially false.  In reliance upon RFC's representations and warranties and

other information with respect to the mortgage loans, MBIA issued the Policies in connection with the RFC Transactions.

133.    RFC's breaches of its representations and warranties materially undermined and distorted the fundamental basis upon which MBIA agreed to issue the Policies for the RFC Transactions.    Moreover, the substantial and hidden risks present in the RFC Transactions, which were hidden by RFC's representations and warranties and were pervasive to the mortgage loan pools for the RFC Transactions, have caused the mortgage loans in the RFC Transactions to become delinquent and subsequently charged-off at a severe and unexpected rate, thus causing significant shortfalls in cash flows to investors in the RFC Transactions. Further, RFC's failure to minimize losses on the mortgage loans through normal and usual mortgage loan servicing procedures, and as otherwise required pursuant to the Transaction Documents, has exacerbated shortfalls to investors in the RFC Transactions and, accordingly, losses to MBIA.

134.     Had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

135.     As a result of having issued the Policies, MBIA is contractually liable to the trusts, and, in that regard, the investors in the RFC Transactions, to insure the payment of certain cash flows or losses as a result of charge-offs to the investors in the RFC Transactions in the event of shortfalls in the cash flows to the trust for the RFC Transactions.

136.     MBIA has paid and will continue to pay all insurance claims made in connection with the RFC Transactions pursuant to the terms of the Policies.

137.     MBIA, however, is in whole or in part, discharging a duty which is owed by MBIA to investors in the RFC Transactions pursuant to the Policies but which, as between

MBIA and RFC, should in equity and good conscience be discharged by RFC because the Policies were procured based on RFC's providing MBIA materially false representations and warranties.

138.    MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial as a result of discharging a duty which is owed by MBIA to investors in the RFC Transactions but which, as between MBIA and RFC, should in equity and good conscience have been discharged by RFC.  Because MBIA would not have issued the insurance policies had it known the true risk profile of the loan portfolios in the RFC Transactions, RFC is responsible for all losses incurred by MBIA whether or not such losses relate directly to non-compliant mortgage loans.

139.    A justiciable controversy exists as to (a) whether RFC, in equity and good conscience, is liable for all insurance claims against MBIA and other losses incurred by MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
### (PRESERVED FOR APPEAL)

140.    MBIA repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 139.

141.    MBIA has conferred a benefit on RFC by issuing the Policies with the reasonable expectation of receiving the full rights and value negotiated in connection with that benefit.

142.    RFC was unjustly enriched at MBIA's expense and equity and good conscience require RFC to compensate MBIA for the unjust benefit conferred on RFC.  In that

regard, had MBIA known about RFC's significant and substantial breaches of its representations and warranties, MBIA would not have issued the Policies with respect to the RFC Transactions.

143.    If MBIA had not issued the Policies, RFC would have had to follow either of two courses of action:

a.    RFC may have sold the securities issued in connection with the RFC Transactions without the Policies. In this scenario, RFC would have received a substantially lower amount from the sale of the securities than it did because the investors in the RFC Transactions would demand a discount in the purchase price of the securities or a higher interest rate on the securities to compensate for the additional, uninsured risk of shortfalls in cash flows; or

b.    RFC may not have been able to consummate the RFC Transactions. In this scenario, RFC would not have sold the mortgage loans by means of the RFC Transactions. RFC may have sold the mortgage loans to another purchaser, possibly for a lesser purchase price. If RFC was unable to sell the mortgage loans, all of the losses with respect to the mortgage loans would have been borne by RFC, and only RFC. Further, if the RFC Transactions were not consummated, RFC and its affiliate would not have been entitled to servicing fees for servicing the mortgage loans in connection with the RFC Transactions.

144.    By improperly and unjustly inducing MBIA to issue the Policies as a result of its materially false representations and warranties, RFC was able to obtain payments under the Policies for investors in the RFC Transactions in the event of shortfalls of cash flows or losses to the trusts for the RFC Transactions. Consequently, investors in the RFC Transactions were willing to pay more to RFC for securities issued in connection with the RFC Transactions because of the presence of the MBIA insurance policies. Thus, RFC was able to receive a higher payment for the securities issued in connection with the RFC Transactions by causing the risk of liability for insuring certain cash flows for the RFC Transactions to pass to MBIA. Further, RFC earned servicing fees in connection with the servicing of the mortgage loans for the RFC Transactions while passing the risk of shortfalls in cash flows to investors in

the RFC Transactions to MBIA. RFC earned these servicing fees despite failing to utilize good faith business judgment to employ its normal and usual mortgage loan servicing procedures, and otherwise comply with its obligations pursuant to the Transaction Documents, to service the mortgage loans for the RFC Transactions.

145.    As a result of RFC's improper and unjust actions, MBIA issued the Policies, requiring MBIA to pay, to its substantial detriment, sizable insurance claims and to incur even greater future liabilities.

146.    As a result of RFC's improper and unjust actions, MBIA has incurred, and will continue to incur, damages in an amount to be determined at trial.

147.    A justiciable controversy exists as to (a) whether RFC was unjustly enriched with respect to the Policies issued by MBIA in connection with the RFC Transactions and (b) MBIA's entitlement to damages as a result thereof.

## RELIEF DEMANDED

WHEREFORE, plaintiff MBIA Insurance Corporation demands judgment against defendant Residential Funding Company, LLC, as follows:

1.    With respect to the First Cause of Action, a judgment (a) declaring that RFC fraudulently induced MBIA to issue the Policies in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses and liabilities relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any

other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

2.      With respect to the Second Cause of Action, a judgment (a) declaring that RFC has materially breached the Insurance Agreements and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial, including interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

3.      With respect to the Third Cause of Action, a judgment (a) declaring that RFC is required to comply with its obligations under the Loan Breach Remedy Procedure; (b) declaring that RFC has wrongfully repudiated its obligations under the Loan Breach Remedy Procedure; and (c) declaring that RFC is required to indemnify MBIA for any and all damages it has incurred, and that MBIA incurs, as a result of RFC's breaches of its representations and warranties, including RFC's failure to comply with and its wrongful repudiation of its obligations under the Loan Breach Remedy Procedure; and (d) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to RFC's breaches and ultimate repudiation of the Loan Breach Remedy Procedure, including damages, interest, reasonable attorneys' and accountants' fees and expenses, and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

4.      With respect to the Fourth Cause of Action, a judgment (a) declaring that RFC breached the Servicing Agreements when RFC was acting as Master Servicer by failing to property service the mortgage loans underlying the RFC Transactions and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, as a result of RFC's breaches of the Servicing Agreements, including interest, reasonable attorneys' and

accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, in an amount to be determined at trial; and

       5.       With respect to the Fifth Cause of Action, a judgment (a) declaring that RFC made negligent misrepresentations to MBIA with respect to the Policies issued by MBIA in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses and liabilities relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

       6.       With respect to the Sixth Cause of Action, a judgment (a) declaring that RFC has breached the covenant or duty of good faith and fair dealing implied in the Transaction Documents in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses and liabilities resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and

expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

7.      With respect to the Seventh Cause of Action, a judgment (a) declaring that RFC is liable for all insurance claims against MBIA and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or reasonably incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

8.      With respect to the Eighth Cause of Action, a judgment (a) declaring that RFC has been unjustly enriched with respect to the Policies issued by MBIA in connection with the RFC Transactions and must compensate MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses relate directly to specifically identified non-compliant mortgage loans and (b) awarding damages to MBIA for all losses and liabilities incurred by MBIA, and that MBIA incurs, with respect to the Policies issued in connection with the RFC Transactions, including, without limitation, all losses resulting from RFC's failure to properly service the mortgage loans in the RFC Transactions, as well as, interest, reasonable attorneys' and accountants' fees and expenses and any other fees and expenses that MBIA incurred or incurs, whether or not such losses and

liabilities relate directly to specifically identified non-compliant mortgage loans, in an amount to be determined at trial; and

9.    The full amount of MBIA's attorneys' fees and expenses with respect to this action; and

10.    Punitive and consequential damages; and

11.    For such other and further relief as the Court may deem just and proper.

Dated: March 19, 2010

        CADWALADER, WICKERSHAM & TAFT LLP

      By: /s/ Howard R. Hawkins, Jr.

        Gregory M. Petrick
        Howard R. Hawkins, Jr.
        Jonathan M. Hoff
        One World Financial Center
        New York, New York 10281
        (212) 504-6000

        *Attorneys for Plaintiff*
        *MBIA Insurance Corporation*